THE HONORABLE JAMES L. ROBART

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>                    Plaintiff,<br><br>        vs.<br><br>CITY OF SEATTLE<br><br>                    Defendant. | CASE NO.  C12-1282JLR<br><br>**THE SEATTLE POLICE MONITOR'S FIRST SEMIANNUAL REPORT** |

The Seattle Police Monitor's First Semiannual Report is attached.

THE SEATTLE POLICE MONITOR'S FIRST SEMIANNUAL REPORT
Case No.  C12-1282JLR

**DORSEY & WHITNEY LLP**
COLUMBIA CENTER
701 FIFTH AVENUE, SUITE 6100
SEATTLE, WA 98104-7043
PHONE: (206) 903-8800
FAX: (206) 903-8820

# THE SEATTLE POLICE MONITOR

## FIRST SEMIANNUAL REPORT



April 2013

# Table of Contents

Introduction ................................................................................................................................. 1

    Milestones ............................................................................................................................... 4

    Challenges ............................................................................................................................... 5

    Accountability in the review of use of force ........................................................................ 6

    Crisis Intervention ............................................................................................................... 12

    Accountability at Precinct Level .......................................................................................... 15

    OPA Investigations .............................................................................................................. 16

    Stops and Detention and Biased Based Policing ................................................................ 17

    Future Activities.................................................................................................................17

Conclusion ................................................................................................................................ 19

# THE SEATTLE POLICE MONITOR

## FIRST SEMIANNUAL REPORT

### APRIL 2013

## Introduction

Pursuant to ¶ 196 of the court-ordered Settlement Agreement (SA), the Monitor submits this First Semiannual Report.  The Monitor commends the City of Seattle and the Seattle Police Department (SPD or Department) for the progress that has been made—and there has been considerable progress—but cautions that compliance has only begun and that full and effective compliance remains for the future.  We acknowledge Chief Diaz for his many years of service and devotion to the SPD and welcome interim Chief Jim Pugel.  We look forward to working with him.

Over these last six months, the Monitor and his team (collectively, the Monitor) have come to know Seattle and have established good relationships with City Council, the Mayor's Office, the City Attorney's Office, and the Department of Justice (DOJ).  The Monitor has met with City Council and its members formally and informally and is grateful for their support.  The Monitor has met with Mayor McGinn in person on two occasions and had several additional good telephone conversations to dispel any prior misconceptions on either side and to lay the groundwork for increased communication and collaboration with him and his office.  The Monitor has met with City Attorney Peter Holmes on several occasions and has high respect for his integrity and intelligence and that of his staff.  The same is true of the representatives from the Department of Justice and United States Attorney Jenny Durkan and her staff.

We have met with the Chief of Police, the Deputy and Assistant Chiefs, several captains, and other department heads and officers on several occasions, receiving detailed presentations about the workings of the SPD and its efforts to begin compliance with the Settlement Agreement.  We have had several useful and productive meetings with Chief John Diaz, interim Chief Jim Pugel and Assistant Chief Michael Sanford, former Compliance Coordinator Steve Brown, and his successor, Bob Scales.  Chief Sanford and Bob Scales recently visited Los Angeles and met with the Los Angeles Police Department (LAPD), the Monitor and Pat Gannon, and Connie Rice, co -director of the Advancement Project in Los Angeles.  Our conversations, both formal and informal, were productive and elevated the level of mutual respect.

We have begun to be trained to use SPD computers and databases and have become acquainted with the Department's data systems, with particular attention to Versadex and the AIM system used for use of force tracking, the early identification system, and the Office of Police Accountability (OPA)'s complaint tracking systems.  We have remote computer access to certain non-personnel files and are seeking wider remote access to files and data. We have

1

been given key cards providing access to SPD Headquarters and some of the precincts on a 24/7 basis.

As will be developed more over the next six months, we have the sense that SPD record keeping, data storage, and data retrieval are in need of profound overhaul and rethinking. There is a substantial amount of data that is not captured but needs to be. There is data in separate databases that do not communicate with each other. Information exists in silos and is not available to those with a need to know. There is insufficient data on officer performance to permit robust risk management at the precinct level and department-wide.

Failure to correct these problems will substantially, if not fatally, prevent the SPD from reaching full and effective compliance. We do not take a position at this time on how SPD's data systems should be replaced or prescribe a particular system, but will follow its development with great interest, as described in the Monitoring Plan. We recently had the opportunity to describe to the SPD and the City the Monitor's hopes for the information technology system. It will be in Seattle's interest to fund the project adequately, and the Monitor and others will lend support efforts to secure federal and private funding in addition.

The Monitor has met with more than 100 individuals and community organizations, including the Downtown Seattle Association, The NW Immigrant Rights Project, El Centro de la Raza, the Defender Association, MEDC, the Downtown Emergency Services Center, the ACLU, the NAACP, the Asian Counseling & Referral Service, the Council on American-Islamic Relations, and the Native American Advisory Council. Glenn Harris, Ronald Ward, and Ian Warner have done an excellent job arranging and facilitating many of those meetings. Early on, and again recently, we met with the Seattle Human Rights Commission and continue to receive input and insight from its members. Some of those community meetings have taken place out in the community, particularly in the South and West precincts. The Monitoring Team has also met with members of the newly formed Community Police Commission (CPC) and made a presentation at the Commission's retreat on April 2. Since then, the Monitoring Team has attended the regular meetings of the CPC. The discourse is on a high level and all the members of the CPC are respectful of the views of others and strive to achieve consensus.

The Monitor has received guidance from the Hon. James L. Robart, the federal judge overseeing the implementation of the court-ordered SA. The Judge and the Monitor are in consistent contact. The Court has been active and involved in the judicial role in the ongoing litigation and keeps himself abreast of all developments.

The Monitor drafted a Monitoring Plan, negotiated over it at great length with the parties, and submitted it to the Court. Both parties approved the Plan, which the Court approved on March 12, 2013.

The Monitoring Team met twice with the union representing Seattle police officers and the union representing lieutenants and captains. Thus far, the unions have failed to play a

2

constructive role in word and deed.  As the court emphasized on March 12, the road ahead is toward full and effective compliance with the Settlement Agreement.  It is hoped that the unions will join in that effort.

The Deputy Monitor, Peter Ehrlichman, the Assistant Monitor, Ronald Ward, and the rest of the Monitoring Team have been instrumental in the successes to date.  The Monitor and the team members from Los Angeles have been in Seattle for three or four days almost every other week.  The Seattle team members, of course, provide constant coverage.

The Monitor has been careful and prudent in expenditures and at each turn has endeavored to keep costs down.[1]  The Monitor is well within the budget for the first year that was approved by both parties and the Court.

Each member of the Monitoring Team has contributed substantial time pro bono to the project above and beyond what has actually been billed. Dorsey & Whitney, LLP, Peter Ehrlichman's law firm, bills out only some of Peter's hours of service as Deputy Monitor and those hours are billed at less than one half of Peter's usual hourly rate.  Dorsey & Whitney has contributed hundreds of pro bono hours on this project, in addition to donating meeting space for numerous meetings with City and DOJ officials, and with the community leaders mentioned above.

This Report will first describe some important milestones from the last six months as well as challenges confronting the parties and the Monitor.  Next, this Report will cover four important areas where the Monitor and the Monitoring Team have devoted substantial effort: Accountability in the review of use of force; OPA investigations; accountability at the precinct level, and the SPD's Crisis Intervention Team (CIT) program.  This Report will also describe progress to date for two draft SPD policies— Biased Policing Policy and Stops and Detentions Policy.  The Monitoring Plan adopts the language of Paragraph 196 of the Settlement Agreement, which indicates several additional topics that will be addressed in the Monitoring Reports, including outcome assessments and a listing of which Settlement Agreement requirements have been fully implemented.  At this stage, it is too premature to address these topics, but they will be addressed in future Monitoring Reports.

---

[1] The Los Angeles contingent takes an approximately eighteen percent smaller per diem than the federal rate for people traveling to the metropolitan area of Seattle.  Instead of taking several hotel rooms for each stay, four of the Los Angeles team members, including the Monitor, have rented an apartment, the monthly cost of which is decidedly lower than what hotel charges would be.  Each person on the Monitoring Team bills at rates significantly lower than the prevailing rate for equivalent persons in the community.

**Milestones**

The Monitor requested the City to outline what it considered the important milestones and other results achieved since the appointment of the Monitor.  Set forth below is a summary of the City's response. The following are the important milestones since the appointment of the Monitor.

**A.  Settlement Agreement Milestones**
1.   Appointment of the Monitor.
2.   Engaging Former Compliance Coordinator, ret. Captain Steve Brown, and current Compliance Coordinator, Bob Scales.
3.   Providing the SPD Statement of Priorities and Matrix (Dec. 31, 2012).
4.   Status Conference before the Hon. James Robart and approval of the Monitoring Plan (March 12, 2013).
5.   Appointment and Confirmation of the CPC by City Council, including funding for three staffers.  (March 18, 2013).

**B.  Policies, Training and Reporting**
1.   As of March 30, 2013, the City has provided three draft policies and one manual according to schedule. Early drafts of policies were provided ahead of the delivery dates in some cases.
2.   Initial CIT coverage analysis was completed.  CIT Training is in progress.

**C.  Access for Monitoring Team**
1.   Building access, parking, and office space have been provided to the Monitoring Team.
2.   Access to SPD personnel, data, and documents has been provided in many instances.
3.   Four remote access laptops were set up.
4.   Access provided to many SPD data systems.
5.   Limited participation provided to Use of Force Review Boards, Firearms Review Boards, and Chief's Briefings.
6.   Documents responsive to DOJ's Forth Request for Documents, issued October 30, 2012, and also requested by the monitor, have been mostly produced. Some of those document requests are ongoing. The parties are working to make this process more collaborative.

**D.  Staffing**
1.   The Office of the Compliance Coordinator has hired an administrative assistant

and a strategic advisor and is hiring a senior management systems analyst.

2. The SPD Professional Standards Bureau was formed.

3. City Council approved funding and positions for seven additional SPD positions dedicated to the Settlement Agreement and MOU. Three CPC positions were funded.

The Monitor acknowledges and appreciates these milestones. Nonetheless, these first six months of monitoring have also presented challenges.

**Challenges**

The initial months since appointment of the Monitor have seen the parties explore, debate, and test:

- The limits, scope, and sweep of the Settlement Agreement;
- The degree to which negotiation and collaboration between the parties themselves and with the Monitor is possible;
- The intentions of Judge Robart regarding enforcement of the SA;
- Who in the City of Seattle is empowered to act in the City's name.

These debates should now be settled.  As Judge Robart made clear, the Court will give a plain meaning interpretation to the Settlement Agreement and the Monitoring Plan. The SA will not be splintered into myriad tiny tasks while losing sight of the ultimate goal: top to bottom reform of the Seattle Police Department into an organization that effectively fights crime and enforces the laws by listening to and working in constant consultation with Seattle's diverse communities; actively and persistently dealing with the risk of unconstitutional conduct by sworn personnel, including excessive use of force and discriminatory policing; and demonstrating at all times its abhorrence of excessive force and race-based policing and its unwillingness to tolerate those who engage in it.  It is also necessary that the community rise to its responsibilities to cooperate with the SPD in solving crimes and maintaining order.

The SPD has taken its first steps down the road to compliance.  Yet, it still does not speak with one voice.  In-fighting up and down the command staff level has been a concern.  The SPD does not appear settled on a unified vision of what it is to become.  We are hopeful that interim Chief Pugel will articulate that vision by embracing the Settlement Agreement.

A part of the SPD, mostly but not exclusively within the union- organized ranks, remains "dug in" and continues to resist the force and implications of the Settlement Agreement.  Part of the cause of this resistance may be because the Settlement Agreement has not been adequately explained to captains, lieutenants, sergeants, and rank-and-file officers.  The Monitor and the Monitoring Team have been misidentified as being part of the Department of Justice to officers at several roll calls.

5

Stories and myths have been fed to rank-and-file officers without their having received counterbalancing messages from the command staff to understand reform as being in the long-term best interests of all officers and the Department.  The time has come for the all persons in the SPD, and particularly those with influence and authority, to move past their disagreements with DOJ and to get on with reform.  Over the next six months, the Monitor will be looking for signs of improvement in these areas, including efforts by command staff to make clear that the Settlement Agreement is here to stay and is not going to be fed to the shredder; by captains to make clear that their units or precincts will fully implement the provisions calling for greater responsibility and accountability for managing the risk of police misconduct; by sergeants in their obligation to make certain their squads are policing in a constitutional manner, and by the rank-and-file, understanding that a new protocol is being developed and that certain of the former procedures are unacceptable.

Similarly, the disagreements at the highest level of City government also will not distract the Monitoring Team from doing its job and holding the SPD to account to the Court.  As we noted recently in a hearing before the City Council, the City of Seattle is not just the Mayor or the City Council or the City Attorney or the SPD. It consists of the varied and diverse Seattle communities—racially, ethnically, geographically, economically, healthy or physically or mentally unwell.  And it is to all these communities to which the ears of the Monitor and the Monitoring Team are particularly attuned.  The Monitor and the Monitoring Team look forward to working closely with the newly formed Community Police Commission—a primary conduit of the community's perception of the changes taking place.

The Monitor is vitally concerned that the SPD also be heard. The SPD has not previously faced a sea change such as this one which creates new roles and responsibilities and accountability. Other law enforcement agencies subject to similar consent decrees have floundered or wasted time fighting the inevitable.  We strongly do not wish this to happen here. To that end, the Monitoring Team includes two experienced police professionals to assist the Team to build a strong relationship with the SPD: Chief Pat Gannon and former Chief Joe Brann. Chief Gannon was a key to the successful implementation of the consent decree in the LAPD, and Chief Brann has served successfully as a monitor under a consent decree in Riverside, California.  They understand what it is like to implement a court-ordered decree with the DOJ like the SA.

**Accountability in the review of use of force**

The following section corresponds to paragraphs 119-125 of the Settlement Agreement and discusses SPD's progress in coming into compliance with this portion of the Settlement Agreement.

As set forth below, the Use of Force Review Board (UOFRB or Board) is doing a good job in ascertaining whether the review of use of force by the chain of command comports with the

6

SA and is complete and thorough.  In order to move closer to full compliance, however, it will be necessary for the Board to have a more expansive discussion of the force itself and alternatives.  The Board is currently operating under an interim policy from 2012 and the Board's processes will be modified and improved once the new Use of Force policies are adopted, according to the SPD.  Part of the process improvements will include enhanced data collection and analysis using a new e-use of force reporting system, according to the SPD.  The SPD's goal will be to use this new data system to issue detailed reports on use of force incidents on an ongoing basis.

The SPD generally holds weekly UOFRB meetings.  These meetings have been chaired over the past several months by interim Chief Pugel and have been led by Training Section Captain Mike Edwards, both of whom have done admirable jobs in these settings.  Consistently in attendance are one or more sergeant or lieutenant level representatives from each of the five precincts, a representative from Training, and most recently, one or more representatives from CIT.  In addition, representatives from Policy, the Range, and various other departments sometimes attend and participate.  Although we acknowledge that interim Chief Pugel now has substantial additional duties, the Monitor recommends and encourages the Chief to remain in charge of the Board so that it may continue to make the good progress it has to date.

At each of these meetings, all recently completed use of force packets are reviewed. Interim Chief Pugel prescreens each use of force packet, and he may send one back for more information or refer the case to OPA before the Board reviews it. Each attendee has the responsibility to review each packet to be discussed in advance of the meeting.  At the meeting, the representative from the precinct where the use of force at issue took place summarizes the use of force for the group (which occurs with varying degrees of efficiency). Captain Edwards, or, in his absence, his designee, leads the group in a general discussion about the merits or issues raised by the use of force.  At the end of the discussion, Captain Edwards asks the questions set forth in Paragraph 123 of the Settlement Agreement:

1.  Whether the force used is consistent with law and policy.
2.  Whether the investigation is thorough and complete.
3.  Whether there are considerations of tactical, equipment, or policy that need to be addressed.

If anyone raises any issues in response to these questions, the Board will decide if the packet needs to be sent back for further information or clarification.  If not, Captain Edwards asks whether the Board recommends approval.  After an informal vote, interim Chief Pugel will either approve the packet or return it to the Section or Precinct for further information or to correct technical deficiencies.

Members of the Monitoring Team (and, on occasion, DOJ) consistently have been attending the UOFRB meetings for the past several months.  At the Monitoring Team's request after

attending three meetings, SPD has been providing the Monitoring Team with access to all of use of force packets before the meetings, allowing review by the Team in advance. Initially, Captain Edwards and interim Chief Pugel requested the Monitoring Team to attend the meeting as silent observers but did stay after the meetings to answer any questions the Monitoring Team might have.  At the Monitor's request, SPD has modified its position and now allows the Monitoring Team to ask questions and participate in the meetings when necessary. Interim Chief Pugel and Captain Edwards continue to remain after each meeting for further discussion with the Monitoring Team.

The Monitoring Team finds that the UOFRB meetings are valuable and is generally pleased by the manner in which they are conducted. In attending these meetings, the Monitoring Team recognizes its role in large part is as an observer. The pertinent questions asked are to better understand the logic in the decisions made by the Board and to help the Monitor evaluate the process.  In attending these meetings, the Monitor, of course, does not "bless" or "condemn" any particular use of force as appropriate or excessive.

The UOFRB's discussion of the procedure involved in completing the use of force packet is quite thorough.  The UOFRB generally confirms that each packet complies with the Settlement Agreement, i.e. that, among other things, a supervisor who is not involved in the use of force screens the incident, summarizes the type and circumstances surrounding the force used, includes the involved officers' statements and available video and photos, that a lieutenant and a captain have also reviewed and signed off on the packet and use of force, and that all the pertinent boxes are checked and relevant sections are completed on the use of force form.  The UOFRB does not hesitate to send back the packets to the precincts to ensure that all the information is accurate and complete.

Increasingly, the UOFRB meetings generate discussion among its members as to the substantive merits or problems associated with a particular use of force or with officers' decision-making that led up to a use of force.  One officer might question whether the force used was actually necessary or was the best option to be employed in a particular incident. Another officer might then disagree, causing a debate to ensue.  But members do not frequently engage in these types of discussions.  Indeed, the Monitoring Team encourages the UOFRB to engage in thoughtful discussion of each use of force discussed at the meetings.

For each use of force reviewed, members should ask whether, in practical terms, the incident could have been handled better and, if so, whether the Department can do anything to better equip or prepare their officers for future encounters.  Furthermore, this inquiry should not be limited to the use of force itself, but to officers' actions that led up to the use of force.  The UOFRB does address such issues, but not always consistently or at the appropriate level of rigor.  Both the SPD and the public have a shared interest in reducing the number of police encounters where officers *unnecessarily* place themselves in situations that require officers to use force.

8

One manner to accomplish this is through watching relevant video. While the descriptions of the force in question in the use of force packets are usually quite detailed, in-car and other video that show the actual force are sometimes available.  UOFRB members can—and are supposed to—watch the available video prior to the meetings. At one meeting, for example, SPD did show video of a takedown of a fleeing suspect and his arrest.  But this was video taken by and obtained from an outside source.  At the Monitoring Team's request, SPD has begun to exhibit in-car videos at the meetings in an effort to promote additional substantive discussion and training opportunities.  This has the added benefit of ensuring the presenter has adequately reviewed the videos and can efficiently present them to his colleagues on the Board.

Representatives of the Training section could also be more engaged in the discussion of each use of force incident under discussion.  For example, the Training Representative could be asked to state in each instance whether the officer's conduct—both the use of force and conduct leading up to it—appears consistent with best practice and training and if not, outline potential alternative ways, if any, to handle each incident.  In addition, the representative could be asked to briefly describe any existing or planned scenario-based training that addresses incidents similar to the one under review. Other Board members would benefit from this information and analysis, and Training would benefit from the ensuing discussion among Board members who are aware of the practical limitations imposed by real-life policing.

The recent addition of a CIT representative to the force reviews is a welcome improvement.  It is not uncommon for a use of force incident to arise in circumstances where officers learned at an early point, such as through the initial radio broadcast, that they are going to encounter someone who may be emotionally disturbed. (The benefits of expanding the CIT program department-wide are discussed more fully below.)

For each such incident, similar questions should be asked: Were any CIT-trained officers deployed to the incident?  If not, was there at least the effort to do so?  What efforts, if any, did officers take to de-escalate the situation?  What options appeared available?  Was the approach exemplary, warranting not only praise for those involved, but also incorporation into scenario-based training?  Have the involved officers had the benefit of CIT or verbal skills training that would better equip them in the future?  Is refresher training warranted?  It is our hope and expectation that by including CIT in the review process, this sort of evaluation will become the rule, and not the exception.[2]

---

[2] In increasing its emphasis on de-escalation when dealing with individuals in crisis, the SPD also should be mindful of how officers refer to such individuals. Disrespectful language may reflect or foster an underlying lack of respect for persons in crisis. It remains troubling, therefore, to see force packets in which officer reports or dispatcher calls refer to individuals as "mentals." The reference to "mentals" need not be malicious to be inappropriate. The term has become so routine that it is embedded in the Department's reporting protocols.

Interim Chief Pugel has demonstrated a commendable willingness to move quickly and flexibly, when necessary, to improve procedures.  At one recent Board meeting, a packet came up for review where an officer encountered a suspect who was assertedly resisting being handcuffed.  In an effort to control the suspect, the officer took the suspect to the ground, apparently causing the suspect to lose consciousness.  The Seattle Fire Department was called to the scene and cleared the suspect.  But when the Monitoring Team member in attendance questioned the use of force, interim Chief Pugel noted that Paragraph 112 of the Settlement Agreement requires a Force Investigation Team (FIT) roll out in all instances in which force results in a loss of consciousness.  Assistant Chief Sanford then sent a Provisional Directive to all precincts requiring a FIT roll out pursuant to Settlement Agreement requirements, even though the new FIT roll out policies have not yet been finalized and approved.  For this, we commend Jim Pugel and Mike Sanford.

Set forth below are data provided by the SPD reflecting the actions taken to date by the Board. Notably, in the UOFRB meetings attended by the Monitor Team, not a single instance where force was used has been found to be out of SPD's current (i.e., pre-Settlement Agreement) policy.

| Date | UOF Packets reviewed | Force found in policy | Force found out of policy by the UOF Review Board | Packets held for further information to be provided |
|---|---|---|---|---|
| 1/8/2013 | 10 | 3 | 0 | 7 |
| 1/15/2013 | 8 | 3 | 0 | 5 |
| 1/22/2013 | 15 | 11 | 0 | 4 |
| 1/29/2013 | 13 | 8 | 0 | 5 |
| 2/5/2013 | 18 | 11 | 0 | 7 |
| 2/12/2013 | 14 | 8 | 0 | 6 |
| 2/19/2013 | 7 | 2 | 0 | 5 |
| 2/26/2013 | 7 | 6 | 0 | 1 |
| 3/5/2013 | 5 | 5 | 0 | N/A |
| 3/12/2013 | 14 | 13 | 0 | 1 |
| 3/19/2013 | 7 | 5 | 0 | 2 |
| 3/26/2013 | 3 | 3 | 0 | 0 |
| Grand Total | 121 | 78 | 0 | 43 |

Again, the Monitor does not make findings here whether a given use of force is or is not in policy. Accordingly, the Monitor expresses no opinion whether any of the force that has come before the Board should have been held to be out of policy.  It may be that the uses of force policies in effect at the time of the incidents were such that a finding of "in policy" was compelled. It may yet be awhile before new use of force policies are adequate to meet constitutional standards and best practice.  If that is the case, it would be very useful if the Board was to have a fuller discussion of the use of force and its implications.

We suggest that the Board formally discuss and memorialize answers to the following questions:

1. If the Board was compelled to find a given use of force in policy because the existing policies were inadequate, what should the revised policy be?
2. Were there less injurious alternatives to the given use of force that would have permitted the SPD officers to gain control of the suspect without compromise of reasonable officer safety?
3. Prior to the use of force, would different tactics, strategy, training, or policies have increased the likelihood that less injurious force could have been employed?  Were there less than lethal tools available to the officers in fact that could have been used?
4. Is there anything about the given officer's use of force history or habitual type of force used that suggests a pattern or practice of unnecessary or disproportionate force or a lack of physical or verbal skills?  If so, what should be done about it?
5. As the particular use of force incident went up the chain of command for review, did each rank hold the rank below it accountable?  In particular, do sergeants thoroughly review the packet and acquit themselves of the responsibility to strictly manage the risk of excessive, unnecessary, and disproportionate force by officers under their control?  If not, is remedial action warranted?  Do certain captains or lieutenants invariably find that the force used was in policy?  Should they be counseled or subject to remedial action?  Does a failure by the chain of command to identify glaring deficiencies or inconsistencies in the force packets portend broader problems?  Are the standards applied uniformly throughout all precincts?

Finally, and perhaps most importantly, the Monitor will be looking to see if there is a process in place to ensure that the changes suggested (either to policy, training, tactics, equipment, etc.) by the Board are being implemented down the road in practice.  This "loop back" is essential to institutionalize the Board's self-correcting function, which should be at the heart of the Board's mission.

The Monitoring Team will continue to attend and participate in Use of Force Review Board meetings.  The Team will continue to follow carefully the Board's decisions on use of force.

The Monitoring Team has also attended and participated in the proceedings of the Firearms Review Board (FRB).  They fail to reach the higher standards of the Use of Force Review Board. On two occasions, the presiding SPD executive chilled open and free discussion of the merits by prematurely announcing their own views on them.  There have been serious issues surrounding the Monitoring Team's ability to participate.  There has been some activity that, at minimum, raises the potential or appearance of skewing testimony by those seeking to protect an officer.  Those issues are and will continue to be the subject of current discussion. The investigation and adjudication of officer-involved shootings must be fair and transparent, and reform of the current process should be high on the agenda, including consultation with the CPC.  As an initial matter, we are concerned that the scope of discussion at the

11

FRB is too narrow and considers only whether a given shooting was in policy at the moment the trigger was pulled. It is necessary to look beyond that to consider the tactics, strategy, and performance of the involved officers from the time they were dispatched or initiated activity and the time the shooting took place.  The SA makes provision for parallel criminal and administrative investigations of force.  It may be wise to begin doing so for shootings and other serious uses of force.  There are other best practices that need to be considered:

- following a brief public safety statement, immediately sequester the shooter and the witness officers;
- separately transport the officers back to the precinct without permitting a discussion of the incident by the shooter and the other officers;
- prohibit officers sent to provide moral support to the shooter from discussing the shooting itself or how it came about;
- speedily provide a union representative or a lawyer for SPD officers so requesting;
- fully record on videotape or its equivalent the compelled interview of the involved officers by FIT or Internal Affairs, including the shooter, prior to the officers being relieved of duty; and
- make sure that compelled statements and their fruit do not cross an airtight barrier between the administrative and criminal investigations.

## Crisis Intervention

The following section corresponds to paragraphs 130-137 of the Settlement Agreement and discusses SPD's progress in coming into compliance with this portion of the Settlement Agreement.

Many law enforcement agencies in the United States need to change their approach to incidents involving persons who are mentally impaired or emotionally disturbed, under the influence of drugs or excessive amounts of alcohol, or in behavioral or emotional crisis.  Law enforcement must avoid tactics that exacerbate the volatility of persons in an overly excited state, driving them to even higher levels of agitation.

The SPD has recognized that its officers require more training in tactics and strategy to resolve these encounters without unnecessary force or without compromising the safety of officers, bystanders, or suspects.  Use of force policies must be calibrated to eliminate or minimize the risk of unnecessary or disproportional force.

The SPD has also taken the laudatory step of creating a four-person Crisis Intervention Team (CIT) and is in the process of giving some SPD patrol officers 40 hours of basic instruction on recognizing individuals who are in emotional or behavioral crises and learning how best to respond to them.  As of the end of February 2013, the Monitor is informed that 41 percent of patrol officers (272 of 671 patrol officers) had received the 40 hours of instruction at some

12

point in their career.  Of the entire SPD, 32 percent (404 of 1261 current sworn personnel) have received that training at some point in their career.

According to SPD, there are currently adequate numbers of CIT trained officers so that at least one such officer is on duty in each precinct on every shift.  The following table, based upon data provided by the SPD, sets forth, by precinct and by watches, the numbers and percentages of officers who have received CIT training:

| Precinct | Total Officers | Total CIT-trained | Percentage |
| --- | --- | --- | --- |
| West | 171 | 82 | 48 percent |
| North | 185 | 66 | 36 percent |
| South | 115 | 42 | 37 percent |
| East | 113 | 50 | 44 percent |
| Southwest | 87 | 32 | 37 percent |
| All | 671 | 272 | 41 percent |

| Watch | Total Officers | Total CIT-trained | Percentage |
| --- | --- | --- | --- |
| 1st | 151 | 60 | 40 percent |
| 2nd | 284 | 120 | 42 percent |
| 3rd | 236 | 92 | 39 percent |
| All | 671 | 272 | 41 percent |

The lowest number of CIT trained officers on any shift is 39 percent and in any precinct, 36 percent.  The high percentage at West is appropriate given the number of social-service and mental-health care facilities located within its boundaries.  Taking the SPD at its word, we acknowledge and commend the progress toward full compliance in CIT coverage as required by a portion of ¶ 130 of the SA ("SPD will continue to provide Crisis Intervention training as needed to ensure that CI trained officers are available on all shifts to respond to incidents or calls involving individuals known or suspected to have a mental illness, substance abuse, or a behavioral crisis.…").  We suggest that SPD conduct additional analysis to combine the watch and precinct data to calculate how many officers are CIT-trained for each watch at each precinct.

We note, however, that the training includes any sworn officer who has received training at any point in their career. As the training began in 1998, some officers clearly will need in-service training courses to be "CI Trained" under the Settlement Agreement and a companion Memorandum of Understanding (MOU).  Moreover, those documents also require all officers to receive basic training in CIT issues.  SPD states that it is developing curriculum for 18 hour Crisis Intervention Awareness and De-escalation training that will be given to all SPD officers.  The curriculum is due to the Monitor in June 2013.  Finally, much of the training (and policies and data collection) will be developed in conjunction with the Crisis Intervention Committee (CIC), an inter-agency group that the City is required to create.  Movement toward creation of the CIC has begun.

13

In January and February, eight officers received the 40 hours of CIT training.  This is a relatively small number of officers, and, at that pace, it will take a long while to train all patrol officers. In 2013, SPD intends to train 50 officers with the 40-hour CIT course.  SPD's current standard is to have one in three patrol officers fully CIT-trained in every precinct on every shift, 24/7, which provides adequate coverage.  There is every advantage in having a highly trained *volunteer* group of dedicated CIT officers.  It may be that one in three patrol officers is adequate with the balance receive significant exposure to CIT in the 18 hour course without a full 40 hours of training.  The Monitor will continue to follow closely how the SPD fares with CIT.

In addition to trained patrol officers, the SPD also has a four-person mobile response team of four sergeants and a dedicated mental health professional.  The team will respond to the scene if it is out in the city or is requested by an officer on the scene.  The great majority of the time, however, the mobile team will not be able to respond quickly enough to help resolve the incident.  It will then attempt to find out at a later time what happened to the suspect and if he or she requires assistance.  If so, the mobile team will add the suspect to the caseload of persons it manages.

The Monitor would recommend that SPD, in conjunction with the CIC, examine the costs and benefits of giving the mobile team the ability to respond 24/7 in each precinct and during every shift.  This may require the addition of a substantial number of officers.  The mobile team members have extensive daily experience dealing with persons who are mentally ill or are otherwise in a heightened emotional or behavioral state.  They can bring to bear greater expertise than a CIT-trained patrol officer who does not have on a daily basis the same opportunity to sharpen his or her skills.  The presence of a mental health professional while the incident is unfolding further reduces the risk that the incident will go awry.

With regard to a protocol for CIT, among the many other policies required by the Agreements and to be created in conjunction with the CIC, we recommend that the SPD consider a protocol resembling the one used by the Denver Police Department and set forth below (with our editing and additions):

Requesting a CIT officer: Whenever an officer learns, through his or her observations or otherwise, that a person with whom the officer is dealing may be a mentally ill, developmentally disabled, or emotionally disturbed individual, or under the influence of drugs, the officer will, if time and circumstances reasonably permit and dictate, contact dispatch and request that a CIT officer respond to the scene.  If time and circumstances reasonably permit, officers will use distance, time, verbal tactics, or other tactics, to de-escalate the situation when dealing with such persons.  When a CIT officer arrives on the scene, he or she should be the primary officer responsible for coordinating negotiations with such individuals unless determined otherwise by the CIT officer or a superior officer.  Based

14

upon Denver Police Department Operations Manual (2011) §105.01.

In summary, we largely concur with SPD when they state that:

"Seattle Police should maintain a minimum CIT deployment rate of **33%** on all watches and in all precincts. It should retain an analyst to review deployment quarterly.  Patrol attrition through transfers, retirements and other personnel actions should inform officer selection for attendance at the 40-hour CIT course." (Emphasis in original)

For the time being, the Monitoring Team is reserving judgment on whether 33 percent is the optimal minimum.  Over the next six months, the Monitoring Team will be reviewing the CIT training curricula.

## Accountability at the Precinct Level

The following section corresponds to paragraphs 153-163 of the Settlement Agreement and discusses SPD's progress in coming into compliance with this portion of the Settlement Agreement.

The Monitoring Team has visited the five precincts of the SPD and has done so more than once at the South, West, and East precincts.  We have attended roll calls at North, South, West, and East and have done ride-alongs at all of the stations.  We have met the five current precinct captains and with Operations Lieutenants at each station. We have reviewed documentation regarding complaints and activities at the precincts in the area of use of force and discriminatory police practices.

At the current time, there appears to be little to no active management of the risk of unconstitutional police misconduct at the precinct level.  The sergeants, acting sergeants, lieutenants, and captains do not have regular and timely data about officer performance in this risk area.  In the normal course, the results of citizen and other complaints or litigation are not known or tracked at the precinct level.  The responsibility and accountability for such oversight are shifted to headquarters, and the precinct personnel are cut out of the picture almost entirely until the recent creation of the Use of Force Review Board.  We do not mean to imply that managers and supervisors at the precinct level have not been doing what has been asked of them.  Rather, we are suggesting that the SA will require more active management.  It is for this reason that the free flow of data on officer performance be available to those who need it at the precinct level and up the chain of command.

The Monitor recommends that protocol be developed holding sergeants accountable for the constitutional conduct of the rank-and-file officers they supervise.  There should also be protocols requiring lieutenants be accountable for the performance of sergeants in

15

effectively mentoring and monitoring of rank-and-file officers in constitutional policing. There need to be policies holding the captain accountable for how the whole precinct in each shift and squad in his or her precinct avoids unconstitutional policing.

We look forward to the development of policy and protocols mandating thoughtful and objective analysis at the precinct level of effective risk management.  The most important relationship in the chain of command is between an officer and his or her sergeant. The sergeant is the mentor, the teacher, the grader, the model, and the elder who is quick to praise good work and criticize shoddy performance. Young sergeants may find it difficult to supervise the rank-and-file officers who were their peers yesterday and are their subordinates today.  Yet they must make that transition if they are to become real supervisors.

Along the same lines, the use of and of long-term acting sergeants must come to an end as promptly as possible.  Acting sergeants are police officers who function like a sergeant but without the pay, the stripes on the sleeve, the training, and the accountability.  While several officers are understandably put in that acting function for a day or two or even a week or two, others apparently serve in that capacity for months on end, even supervising their former peer police officers on the same squad.  We agree with the Police Guild and many others that this practice should quickly come to an end and that enough "hard stripe" sergeants need to be assigned so that the span of control of each sergeant is small enough to provide constant mentoring and supervision to the rank-and-file.

The SPD informs the Monitor that it is formulating a draft plan to achieve these ends in a relatively short time frame.  The Monitor has been briefed as to the draft's essential points and possible timetable and believes that if enacted as proposed, the acting sergeant issue can be resolved.

## OPA Investigations

The following section corresponds to paragraphs 164-167 of the Settlement Agreement and discusses SPD's progress in coming into compliance with this portion of the Settlement Agreement.

The Office of Professional Accountability (OPA) consists of Internal Affairs sergeants and a Captain under the direction of a civilian Director.  Kathryn Olson, who currently is the OPA Director, has announced that she will not seek a third term, and soon a replacement for her will be named.  The CPC will ultimately need to grapple with the question whether OPA is in need of structural or other change.  Pursuant to the SA and the MOU, the Monitor can render technical assistance and recommendations to the CPC if requested to do so.  It is premature to anticipate what that advice might be.

In order to determine those eventual recommendations, and to gauge progress under the SA, we test the fullness, completeness, objectivity, and fairness of internal SPD investigations, whether it is of Homicide investigations of shootings, chain of command investigations of use of force, or OPA investigations of complaints. We also review OPA investigations in conjunction with ¶ 167 of the Consent Decree relating to the preparation of an OPA manual. To that end, the Monitoring Team has reviewed approximately 50 completed and closed OPA investigations. We have also observed meetings to classify complaints attended by the Director and the OPA Auditor.

With a few exceptions, the investigations reviewed to date are professional, complete, and thorough. The investigative conclusions are, for the most part, reasonably supported by the evidence, regardless whether we might have seen things differently. The CPC, when the time is ripe, will need to decide how best and who best to investigate police misconduct.

**Stops and detentions and racially biased policing**

We have had two rounds of interesting and productive discussions of proposed policies in this area with the SPD. DOJ has made a number of recommendations for improvement, which the SPD has responded to thoughtfully. The discussions with representatives of the SPD have included the City, DOJ, and Monitoring Team. The City, DOJ, and SPD representatives have put forth excellent suggested wording of policies such that the Monitor has concluded that the City, the SPD, and DOJ are all working together in good faith toward a common goal in these crucially important areas. This is an area in which the CPC will be heavily involved. It is particularly important that there be CPC guidance with respect to necessary data collection in order to test the constitutionality of stops and detentions and patterns of possible disparate impact of policing strategies. These issues are far from easy. Effective policing strategies must ultimately have the consent and support of all persons impacted. As the Monitor stated recently in reference to the NYPD, "wholesale and largely unproductive dragnets may erode community trust and goodwill at a much more rapid rate than they get criminals off street."

**Future activities**

The Monitor's priority for the balance of 2013 will be to review SPD's policy and training materials to assess compliance with the Agreements. Moreover, the Monitor will also be measuring SPD's compliance with other provisions of the Agreements.

Information Technology. The ability to manage the risk of police misconduct from the first line supervisor to the Chief of Police depends as a practical matter on the breadth, depth, and flexibility of integrated relational databases which permit detailed inquiries and analysis of such risks.

The development of such a system, including its early warning components, is essential to full and effective compliance with the SA. Progress toward the planning and construction of the relational databases and their integration will be an ongoing topic of investigation and

17

discussion by the Monitoring Team throughout its first year of operation.  It is the Monitor's goal that conceptualizing and planning the system and selection of vendors be concluded with reasonable speed and care with a proposed deadline of July 1, 2013.  Construction of the databases and their integration should begin shortly thereafter. It behooves the City and the SPD to complete the automated system and have it up and running by midyear 2014.

OPA / Use of Force Investigations. On a consistent basis throughout the balance of 2013, the Monitor will evaluate the completeness, thoroughness, objectivity, and fairness of complaint and use of force investigations.  It is the Monitor's goal and intention to review most or all of investigations of alleged misconduct with particular emphasis on officer-involved shootings and other serious use of force, race-based policing, encounters with persons of color and other minority communities, and encounters with persons in a heightened emotional state due to mental illness, drugs, or alcohol.  The Monitor plans also to look at a statistically relevant sample of other inquiries and investigations arising from complaints and use of force reports.

Stops and Detentions. The Monitor will audit and review stop and frisk activity, Terry stops, other vehicle and pedestrian stops, and searches and arrests derived therefrom.  The Monitor will consider quantitative data, including population disparities and stop, search, and arrest statistics. The Monitor will attempt to learn whether the policing priorities of the community, with special emphasis on communities of persons of color and other minorities, are governing the deployment of police resources, with special attention to the deployment of suppression and containment tactics and strategies.  The Monitor intends to learn about the expansion of community policing.

Community Outreach / Community Police Commission. During the next six months, the Monitor will be in close contact with the communities of color and other minority communities, the civil rights and human rights constituencies, and advocacy organizations for assessments of the progress of the SPD and complying with the letter and spirit of the Settlement Agreement.

The monitor plans to work with the CPC, OPA, OPARB, the OPA Auditor, and the SPD pursuant to the Memorandum of Understanding and the Settlement Agreement. It is important that the CPC established standards to ensure that SPD investigations and reviews are above reproach. The CPC may augment the powers and responsibilities of those entities providing oversight to OPA, as well as recommending meaningful reform of OPA.

The Monitor's plan is to work closely with the CPC as directed by the MOU and Settlement Agreement so that the CPC may function as a powerful, independent policymaking body that proceeds carefully based upon evidence and whose conclusions and recommendations have great integrity and persuasive power.

Supervision. DOJ found that the paucity of permanent sergeants with clear reporting requirements constituted a serious impediment to the management of excessive force. The Settlement Agreement provides that SPD must deploy an adequate number of qualified supervisors to implement the Agreement. Given the heightened importance of effective supervision and the promotion of constitutional policing by sergeants and mentors, the Monitoring Team will continue to consider whether there are adequate numbers of full-time sergeants to provide field supervision of police officers as well as to review use of force, investigate complaints and inquiries, and perform other investigative functions.

CIT. Throughout 2013, the Monitoring Team will strongly encourage the development and expansion of diversion programs and specialized drug, mental illness, and homeless courts. The Monitor will also strongly support efforts by the SPD, the CPC, the business community, and social service and advocacy organizations to deal with problems of homelessness, addiction, and mental illness in Downtown Seattle and elsewhere within the city.

Throughout the next six months, the Monitoring Team will evaluate actions by members of the SPD in patrol and specialized units and its crisis intervention teams to avoid unnecessary confrontation and escalation and to rapidly de-escalate as circumstances permit.

## Conclusion

As the interim Chief settles into the new job, there will be a window of opportunity for the entire Department to make peace with the Settlement Agreement and move toward full and effective compliance. Residual bitterness about DOJ and its findings must end as the focus shifts to the future and the implementation of the Settlement Agreement, as the court has ordered. The interim Chief has our full and enthusiastic support, as well as that of elected and appointed officials. But that is not enough. The Seattle Police Department serves a diverse population with divergent interests and law enforcement goals. The hardest task facing the new Chief will be to overcome and surmount the cynicism and skepticism of those who in good faith but with a heavy heart cannot yet believe that change is possible. We think it is possible. We will continue to monitor and inform Judge Robart of the City's progress.

**The Monitoring Team Staff:**

Merrick Bobb - *Monitor*

Peter Ehrlichman - *Deputy Monitor*

Ronald Ward - *Assistant Monitor*

Pat Gannon - *Senior Police Expert*

Joseph Brann - *Senior Police Expert*

Nicholas Armstrong - *Chief of Staff*

Christopher Moulton - *Director of Research*

Julio Thompson - *Esq.*

Marnie Carlin MacDiarmid - *Esq.*

Ian Warner - *Esq.*

Ellen Scrivner – *Ph. D.*

Melissa Tobin - *Executive Assistant*

Jeffrey Yamson - *Executive Assistant*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF SERVICE

I certify that on the 26th day of April, 2013, I electronically filed this document with the

Clerk of the Court using the CM/ECF system, which will send notification of such filing to the

following attorneys of record:

| | |
|---|---|
| J. Michael Diaz | michael.diaz@usdoj.gov |
| Jenny A. Durkan | jenny.a.durkan@usdoj.gov |
| Jonathan Smith | jonathan.smith2@usdoj.gov |
| Kerry Jane Keefe | kerry.keefe@usdoj.gov |
| Michael Johnson Songer | michael.songer@usdoj.gov |
| Michelle Leung | michelle.leung@usdoj.gov |
| Rebecca Shapiro Cohen | rebecca.cohen@usdoj.gov |
| Thomas E. Perez | tom.perez@usdoj.gov |
| Timothy D. Mygatt | timothy.mygatt@usdoj.gov |
| Jean M. Boler | jean.boler@seattle.gov |
| Peter Samuel Holmes | peter.holmes@seattle.gov |
| Brian G. Maxey | brian.maxey@seattle.gov |
| Sarah K. Morehead | sarah.morehead@seattle.gov |
| Gregory C. Narver | gregory.narver@seattle.gov |

DATED this 26th day of April, 2013.


*/s/ Carole Corona*
Carole Corona

THE SEATTLE POLICE MONITOR'S FIRST SEMIANNUAL REPORT
Case No.  C12-1282JLR

DORSEY & WHITNEY LLP
COLUMBIA CENTER
701 FIFTH AVENUE, SUITE 6100
SEATTLE, WA 98104-7043
PHONE: (206) 903-8800
FAX: (206) 903-8820