THE HONORABLE JAMES L. ROBART

1

2

3

4

5

6

7

8

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9  UNITED STATES OF AMERICA

10                    Plaintiff,

11        vs.

12  CITY OF SEATTLE

13                    Defendant.

14

15

CASE NO.  C12-1282JLR

**THE SEATTLE POLICE
MONITOR'S SECOND
SEMIANNUAL REPORT**

16

17        The Seattle Police Monitor's Second Semiannual Report is attached.

18

19

20

21

22

23

24

25

THE SEATTLE POLICE MONITOR'S SECOND SEMIANNUAL
REPORT
Case No.  C12-1282JLR

Merrick J. Bobb, Monitor
Police Assessment Resource Center
PO Box 27445
Los Angeles, CA 90027
(213) 623-5757



# Seattle Police Monitor
## Second Semiannual Report
### December 2013

# Monitoring Team Staff

**Merrick Bobb**
Monitor

**Matthew Barge**          **Peter Ehrlichman**          **Ronald Ward**
Deputy Director             Deputy Monitor               Assistant Monitor

**Pat Gannon**
**Joseph Brann**
Senior Police Experts

**Julio Thompson**
**Marnie Carlin MacDiarmid**
**Ian Warner**
Esq.

**Ellen Scrivner**
Ph. D.

**Christopher Moulton**          **Nicholas Armstrong**
Director of Research             Chief of Staff

**Jeffrey Yamson**
**Melissa Tobin**
Executive Assistants

Seattle Police Monitor | Second Semiannual Report | December 2013

# Table of Contents

Preface .......................................................................................................................................iv

Introduction ................................................................................................................................1
    Overview ................................................................................................................................1
    Summary of Progress During the Last Six Months.................................................................2
    Summary of Remaining Challenges ........................................................................................5

Data & Information Technology ..................................................................................................6
    Use of Force Data ..................................................................................................................8
    Business Intelligence System ...............................................................................................12
    In-Car Video .........................................................................................................................13
        Summary ..........................................................................................................................13
        Implementation of ICV .....................................................................................................14
        Future Expectations Regarding ICV ..................................................................................16

Use of Force Review ..................................................................................................................19
    How the UOFRB Works ........................................................................................................20

Assessment of UOFRB Meetings ..............................................................................................22
    Recommendations ...............................................................................................................25

Review of Officer-Involved Shootings ......................................................................................31
    How the FRB Works ............................................................................................................32
    Assessment of FRB Meetings ..............................................................................................34

OPA Investigations ...................................................................................................................39
    How the OPA Works ............................................................................................................40
    Recommendations ...............................................................................................................42

Community Outreach .................................................................................................................44
    Community Outreach by the Monitoring Team .....................................................................45
        Survey of Community Perceptions and Attitudes ..............................................................47
        Results of the Survey .......................................................................................................49
        Future Research................................................................................................................53
    Community Outreach by the SPD .........................................................................................54
    Community Outreach by the Community Police Commission ................................................54

Crisis Intervention ....................................................................................................................54
    What the CIC Does ..............................................................................................................57
    Assessment of the CIC's Progress .......................................................................................58

Conclusion ................................................................................................................................62

Appendix A..................................................................................................................................

# Preface

Under the terms of the Consent Decree (also referred to as the "Settlement Agreement") between the United States Department of Justice ("DOJ") and the City of Seattle ("the City"), the Monitor must "issue reports . . . every six months detailing the Parties' compliance with and implementation of the Settlement Agreement."[1]  A draft of the report must be submitted to each of the Parties for their review one month prior to submitting the report to the Court.[2]  In accordance with these provisions, the Monitor circulated a draft of its Second Semiannual Report to the Parties on November 15, 2013.

Aside from minor, and primarily non-substantive, edits and formatting changes, the following report largely reflects the November 15 draft.  The Monitoring Team would be remiss, however, if it did not briefly note some developments that have occurred and issues that have surfaced since it provided its draft.

The following report details problems and deficiencies with SPD's information technology capabilities.  Specifically, it discusses ongoing problems with the Department's in-car video ("ICV") technology and notes that issues with ICV arise frequently during the Board's review of use of force packets. In response to the Monitoring Team's request and suggestion, an officer knowledgeable about ICV issues has attended the last few UOFRB meetings. That officer has been able to explain most of the issues that have arisen related to ICV.  Unfortunately, however, the officer does not work in the IT department—the department responsible for the selection, implementation, and maintenance of the new ICV system.  His attendance at the meetings seems, therefore, to be for informational purposes only.  In order to ensure that the concerns and recommendations of the Board be addressed in a timely and effective manner, the Monitoring Team continues to recommend that an SPD employee with both responsibility and knowledge of the ICV system attend the UOFRB meetings regularly.

The Monitor has also recently discovered that many officers are experiencing battery-life issues with the body microphones used with the ICV systems.  This disclosure came up in the context of the Monitoring Team's attendance at the UOFRB meetings, when it inquired as to why an officer's body microphone was left in the patrol car charging, despite it being early in the shift.  The response was that, due to the equipment energy demands of the new microphones and their limited battery life, they do not last the length of a shift, which requires officers to recharge their microphones while on duty.  In order to recharge, officers must remove the microphones

---

[1] Consent Decree ¶ 196.

[2] *Id*.

from their bodies.  Consequently, officers' microphones are not functioning due to an expired battery or are not activated because they are charging and not on an officer's person.  The SPD's proposed solution was to purchase more batteries—a "fix" that ignores the problems associated with removal of the old batteries and, more importantly, the apparent failure of new equipment to meet the obvious requirements of normal use (i.e. to last the length of an 8-hour shift).  This problem begs the question of why the contract with the ICV vendor, COBAN, was accepted so hastily such that the Department must pay the vendor despite the ongoing implementation issues.

The Monitoring Team understands that the results of a study conducted by Price Waterhouse on the long-term Business Intelligence System for tracking internal performance data will be released soon.  The Monitor also looks forward to significant progress in early 2014 on the implementation of IAPro, the short-term solution that the Department has selected for tracking data on use of force given the deficiencies in its data collection and systems that the following report details.

The following report notes that the Department's new Use of Force policies will be finalized soon.  Since distributing a draft of the report to the parties, the Monitor has recommended to the Court that it accept the Use of Force policies and order them effective.  The Court has subsequently indicated that it would conduct a "thorough review" of the policies and will subsequently "enter a final order" regarding those policies.[3]

When the new policies are approved, the Department's immediate concern will become training officers.  A number of training issues have caused the Monitoring Team some initial concern.  First, it has been recently confirmed that approximately one-third of the Department's patrol officers will not receive required their annual 32 hours of "street skills" training for 2013.  Additionally, the SPD candidly admits that given inadequacies in its existing technology, it is not currently able to accurately track whether its officers actually attended required trainings.  This means that the Department can neither readily ascertain nor guarantee that sergeants, detectives, and patrol officers—who closely interact with the community on a daily basis—have actually attended required training sessions.  Fixing the deficiency in tracking capability is now the SPD's top priority, according to senior command staff.  Remedying the substantial backlog in officer training will likely await implementation of the new Use of Force and other policies, but it must nonetheless be given a high priority.  The Department will not be in compliance until it offers adequate training and accurately tracks the training received by every officer.

---

[3] (12/4/13 Order Regarding Memoranda Concerning Use of Force Policies (Dkt. No. 109), at 2.)

This report discusses the Department's Use of Force Review Board ("UOFRB"), offering some commendation on the Board's progress while making additional recommendations for Board meetings.  It is worth noting here that the UOFRB meetings held since the dissemination of the draft of this Semiannual Report have shown additional improvements:

- A far higher number of Board members have come to the meetings fully prepared.  They have had their use of force packets and notes in hand and have contributed to the substantive discussions.
- Many more subject area experts have attended the meetings and have actively participated, including representatives from Training, Non-lethal Force, and Policy.
- The Chair of the meeting has asked more open-ended questions of all the Board members, helping to solicit the open airing of additional comments and opinions.
- At the last Board meeting, three Assistant Chiefs attended and were observed taking notes of the discussion, particularly relating to those aspects that are applicable and useful to the department as a whole.

In short, the Monitoring Team continues to find the progress that the UOFRB has made toward adopting new approaches and embracing innovation to be encouraging.

The relationship between CPC and the parties and the Monitor has recently been the subject of a court order denying CPC's motion to intervene formally.  As noted by Judge Robart, "[t]he 'unique role' of the CPC, as an aid in implementing the Consent Decree, is therefore defined by that document.  The Consent Decree does not provide for the CPC to exercise party status in this litigation.  Its role is indeed distinct from that of the parties, and it is not one."[4]

The Court notes further than CPC's interests are adequately represented by DOJ and the City and that "the existing parties are zealously pursuing the same ultimate objectives as the CPC."[5]  The Court then grants CPC *amicus* status to provide a direct avenue to express CPC's views.

The Court states further:

> Finally, just as the parties and other interested entities have access to the Monitor in this litigation, so too does the CPC.  (Consent Decree ¶ 192 ("The Monitor may periodically meet with the [CPC] and/or other interested community stakeholders to discuss the Monitor's reports, and to receive community feedback about SPD's

---

[4] (11/26/13 Order Regarding Motion to Intervene & Motions for Deadline Extensions (Dkt. No. 106) at 10 (citations omitted).)

[5] (*Id.* at 13.)

> progress and/or compliance with the [Consent Decree]".) Under the Consent Decree, the Monitor serves as an agent of the court for purposes of assessing the City's compliance herein. (See 9/21/13 Order (Dkt. No. 13) at 2 (¶ 172).) The CPC may express any concerns that it has about implementation of the Monitoring Plan or, more broadly, the Consent Decree to the Monitor. Under the circumstances described above, the CPC's interests are adequately represented herein.[6]

The Consent Decree is also specific in terms of how the Monitor and the parties are to draft and review policies and training materials:

> SPD will submit the policies, procedures, training curricula, and training manuals required to be written, revised, or maintained by the Settlement Agreement to the Monitor and DOJ for review and comment prior to publication and implementation. The Parties will meet and confer regarding any comments on the policies, procedures, training curricula, and training manuals within 45 days of submission if necessary. The Monitor will approve the materials unless the Monitor determines that they conflict with the terms of the Settlement Agreement. If the Monitor disapproves, he or she will state the reasons for the decision in writing.[7]

As explained in the Monitoring Plan for the First Year[8], the structure and the deadlines in "Appendix A," which provides the parties with deadlines for various elements within the process, build off ¶ 177 of the Consent Decree to ensure a collaborative process.

Thus far, the parties have achieved consensus on policies. It is not the Monitor's role, and is counter to the Consent Decree, to review and consider alternative policies drafted by others. That said, the Monitor welcomes, receives, and considers comments and recommendations from the parties about the policies, including comments and suggestions made to the parties by the CPC, as well as any other person or entity. The Monitor strongly encourages CPC to make timely suggestions or recommendations to the parties as early as possible in the 45-day window. The Monitor, for his part, promises to continue to consult actively with CPC; other community, business, and civic organizations; and other community representatives.

Finally, the Monitor has been made aware of some recent personnel changes among the upper command level of the SPD.[9] The Monitoring Team will be looking to see whether these changes

---

[6] (Id. at 12.)
[7] (Consent Decree ¶ 177.)
[8] (Monitoring Plan for the First Year at 12.)
[9] See, e.g., Steve Miletich, "SPD Shake-Up: Assistant Chief Agrees to Demotion," Seattle Times (Nov. 25, 2013), http://seattletimes.com/html/localnews/2022333614_spdreassignmentxml.

promote the type of change, internal innovation, and active embrace of the goals of the Consent Decree that will be necessary for the SPD to achieve full and effective compliance.

December 13, 2013

html; "Another Assistant Seattle Police Chief Demoted; Second One This Week," Q13Fox.com (Nov. 27, 2013), http://q13fox.com/2013/11/27/another-assistant-seattle-police-chief-demoted-second-one-this-week/#axzz2nBhL7bF6.

# Introduction

Pursuant to ¶ 196 of the court-ordered Consent Decree (also referred to as the "Settlement Agreement" or "SA") between the United States Department of Justice ("DOJ") and the City of Seattle ("the City"), the Monitor submits this Second Semiannual Report.

## Overview

The past six months has been a period of positive progress.  Since our last report, the improvements among the Use of Force Review Board ("UOFRB") and Crisis Intervention Committee ("CIC") have been especially significant.  The growing capacities of both groups to innovate purposefully and transform critically have been tremendously encouraging.  Although both have much work remaining, these groups have begun to engage in critical self-analysis and to innovate in a thoughtful and dynamic way.  The Monitoring Team applauds the leaders, members, and participants that have enabled the UOFRB and CIC to turn an important corner.

The same period has also witnessed significant disappointment and frustration across several areas.  Because of intransigence and an aversion to innovation in some quarters, the Seattle Police Department ("SPD") has not made nearly as much progress during this period as the Monitoring Team knows to have been possible.  The Department's Information Technology ("IT") leadership has given incorrect or incomplete information to the Monitor and Monitoring Team and has proven itself unable to tackle the management of projects of import or complexity relating to use of force and other areas encompassed by the Settlement Agreement.  SPD's existing capacities to track, analyze, and use data are, at best, weak.  The data produced by the IT Department has been error-ridden and inadequate:  The SPD simply does not have the data required to implement the Consent Decree, to manage the risk of unconstitutional conduct, to respond to the Monitoring Team's requests for data in order to measure progress, to enable the Court to assess the speed and good faith of implementation, or to respond to routine inquiries by City Council for data needed for legislative purposes.

The failure of the SPD to fully and fairly analyze officer-involved shootings is equally disappointing.  Rather than coming to grips with the Monitor's recommendations in its First Semiannual Report, the SPD's Firearms Review Board ("FRB") continues to conduct reviews that fall well short of a full, fair, and impartial analyses of SPD shootings.  Efforts to keep the Monitoring Team at bay or restricted in its ability to inject real accountability at the Firearms Review Board persist.  Patent attempts to narrowly restrict the scope of the inquiry, to improperly coach officer testimony, and to definitively stack the odds against a proceeding that would determine via a neutral and rigorous process whether the shooting was inconsistent with policy

are commonplace.   Recently, FRB members were visibly agitated when a member of the Monitoring Team, who had been invited to ask questions of officers present at the hearing, posed a few direct questions related to after-shooting policy compliance—questions of the type that the Monitoring Team expects that members of the Board itself should ask but failed to consider.  The FRB has barred the Director of the Office of Professional Accountability ("OPA") from its proceedings, betraying a strong reluctance to have shootings independently reviewed.   Much progress remains to be made.  The Monitor expects for the changes to the FRB outlined in this report to be made without delay.

It appears to the Monitoring Team that a struggle wages on at the upper command level for control of policy related to the Consent Decree.  An earnest attempt to limit internecine conflict by flattening the command structure ironically seems to have provoked even more saber-rattling. Successful implementation of the Consent Decree requires all of the command staff to join ranks, end resistance to the Settlement Agreement, and embrace reform.  If the current senior command staff remains in place and their attitudes toward the Settlement Agreement do not change, the SPD is unlikely to be able to achieve full and effective compliance with the Consent Decree.

## Summary of Progress During the Last Six Months

As described in the First Semiannual Report, during the first six months of the Consent Decree, the Monitor encountered disagreements, misunderstandings, and resistance to the Consent Decree within the ranks of the SPD, particularly at the executive, managerial, and union levels. Among police agencies that have successfully implemented consent decrees, initial resistance is not unusual.

The Monitor is pleased that the SPD's resistance to the Consent Decree has started to diminish, at least in some quarters.  The SPD's overall working relationship with the Monitoring Team has indeed been moving in a positive direction.  Although City and SPD staff appeared initially to have some misapprehensions about what the Monitor's role and authority would be, a clearer understanding is evolving.  The routine attendance and active participation of the Monitoring Team at SPD and community meetings has advanced a more effective working relationship between the Monitoring Team, SPD, and the City.  The lawyers in the City Attorney's Office, including the City Attorney himself, have given the City vigorous and effective representation while maintaining cordial relationships with DOJ and the Monitoring Team.

Evidence of the progress in the relationship between the Monitoring Team and SPD can also be found in the increasingly constructive and frequent interactions between the Team and key members of SPD.  Chief Jim Pugel merits recognition for open-mindedness and responsiveness to

our inquiries and requests.  The Monitoring Team has found willingness on the part of some SPD executives and supervisors to entertain feedback and to engage in meaningful and constructive discussions about the development of the policies under review during the last six months, including policies on use of force, the Use of Force Review Board, *Terry* stops, and bias-free policing.  The Compliance Coordinator, his staff, and Assistant Chief Michael Sanford have displayed an admirable willingness to act with a sense of urgency and an ability to adroitly manage bureaucratic issues that could otherwise routinely thwart progress.  Both attributes will become even more important and necessary as the organization transitions from policy development into the training and implementation stages.

In preparation of this report, the Monitor requested that the City report the SPD's most significant accomplishments during the last six months.  The Monitoring Team largely agrees that the following achievements articulated by the SPD are significant accomplishments about which the SPD and City can take pride:

- **Policy Development.**  The City's main focus during the last six months has been on the development of the draft policies required by the Settlement Agreement.  The City, DOJ, and Monitor successfully negotiated a final draft of the Use of Force policies, which, pending receipt and consideration of comments by the Community Police Commission ("CPC"), are due for the Monitor's assessment of compliance in November 2013.  Pursuant to a finding of compliance, officers will be trained in the new policies, and they will begin to become fully effective.  The City has successfully met all of the deadlines outlined in the Monitoring Plan's Schedule of Priorities.

  The Monitoring Team notes that the initial policy development process was time-consuming, especially at the outset.  An ongoing commitment by the Parties to an open, free exchange of ideas and positions will ensure that future policy innovations are thoughtful and timely.

- **Crisis Intervention Committee.**  The Crisis Intervention Committee convened for the first time in June 2013 and developed, approved, and disseminated mission, vision, and goal statements.  These established the priorities and direction for efforts to enhance services provided to individuals in behavioral crisis and increase efficiencies related to how SPD works with behavioral health service providers. The CIC's Policy and Curriculum committee and the CIC's Executive Steering Committee provided in November a draft policy to SPD leaders.  SPD will provide a final draft policy to the Monitor and DOJ in December.  The CIC will then focus on training curriculum evaluation in the first quarter of 2014.  A Data Committee is evaluating how best to collect data, both internal to SPD and external from service providers, to support, evaluate, and enhance the CIT program.

The Systems committee is tasked with evaluating the "flow" of resources available to SPD officers who are dealing with an individual in crisis and any bottlenecks in that web of systems, as well as advising on the best organizational structure internal to SPD. Senior leaders from law enforcement, academia, and the leading social service providers, clinicians, and advocates, voluntarily participate in the various committees and provide guidance, recommendations, and policy proposals to the CIC, which submits final policies to SPD. The relationships that are being created and institutionalized within this inter-agency, regional committee will improve the services to these vulnerable populations and increase officer and public safety in the long term.

- **Use of Force Review Board.**  Although the policies governing the UOFRB have not yet been approved by the Monitor or implemented, the Board continues to review all currently reportable uses of force by Seattle police officers. The Board has broadened the scope of the review to include training, policy, and equipment issues. The Board continues to make recommendations regarding the reasonableness of the reported force.

- **Information Technology**

    o *In-Car Video.*  The City successfully installed the new COBAN in-car video system by the September 30, 2013 deadline that was imposed by the Monitor.

      The Monitoring Team must note, however, that there are continuing equipment and usage problems, which are recounted in detail below. The Monitoring Team expects that these problems will be resolved quickly. To the Monitor's dismay— and contrary to prior representations to the Monitoring Team that the contracting process was still open—SPD prematurely accepted the contract with COBAN, the outside, in-car video vendor such that COBAN is not contractually obligated to assist the Department in troubleshooting. SPD thus gave a final sign-off on the delivery of COBAN's services before the Department performed adequate due diligence to ensure that audio and video were working as planned.

    o *Price Waterhouse.*  In June 2013 the City engaged Price Waterhouse to analyze the current state of SPD's IT systems and conduct a gap analysis and risk assessment for the development of a comprehensive business intelligence solution for performance management. The final report should be completed in the near future.

    o *IAPro.*  The City acquired an "off-the-shelf" computer database system, IAPro, as an interim solution to handle data collection, analysis, and reporting needs. IAPro

will be configured to handle data collection and reporting on use of force, and it has the potential to be set up to handle *Terry* stops (stops of citizen subjects because the officer has a reasonable suspicion that the subject has, is, or will be engaging in criminal misconduct), misconduct complaints, and officer performance.  The process of configuring and implementing IAPro has begun and should be completed in early 2014.

- **Tracking the Costs of Compliance Activities.**  Several prior forecasts of costs associated with compliance with the Settlement Agreement were not well-supported. Similarly, various costs to the City had previously been attributed to the catch-all category of "SA implementation," including costs associated with the Mayor's "20/20" and RSJI initiatives.  Forecasts and estimates of the costs associated with implementing the Settlement Agreement were therefore neither sufficiently precise nor based on realistic data.  In July 2013, the City implemented a new coding system to track Settlement Agreement-related expenditures.  The City is now able to report on the type of expenditures (*e.g.*, regular time, overtime, purchases) by project type (*e.g.*, use of force policy development, bias policing training curriculum development, stops and detentions training) according to 17 codes based specifically upon the Settlement Agreement and Monitoring Plan.  This system will continue to be refined and improved over time.  It should be noted that, as result of previously used methods, forecasts and summaries of costs associated with compliance prior to August 2013 cannot be considered accurate.

## Summary of Remaining Challenges

Despite notable accomplishments, significant challenges remain.  Although it is diminishing, the SPD's resistance to the Settlement Agreement is not abating with adequate speed, which has manifested in several ways over the past six months.  There has been an effort to delay and seek extensions of Court-ordered deadlines for which there had been previous agreement.  Bureaucracy and outmoded internal processes routinely thwart quick gains or swift progress.  SPD's review of officer-involved shootings, via the FRB review process, is inadequate and narrow.  There are ongoing attempts by the SPD to limit the authority and autonomy of the OPA Director. Management has excused officers who fail to activate in-car video long after the new system has been in place and training related to it has been completed, in part because ongoing technical issues with the in-car video systems have been allowed to persist.

A year has passed since the Monitor's appointment, and a year and a half has passed since Judge Robart signed the Consent Decree.  It is unfortunate that there is still resistance to the notion that

police officers and their supervisors must be accountable for misuse of force and discrimination and must challenge themselves to embrace new approaches.  The period of resistance, whether active or passive, must quickly come to an end.  Progress and pragmatic innovation must not be merely tolerated but energetically pursued.

The Monitoring Team will continue to collaborate with all stakeholders to ensure that policing in Seattle is constitutional and effective.  All members of the SPD, City, and the community must, in turn, embrace the Court-mandated reforms in good faith and commit to their rapid implementation.

## Data & Information Technology

Technological advances have radically changed American policing.  The active use of data and statistical analysis has improved the way that police conduct law enforcement and measure performance trends.  Indeed, the days of police management needing to rely on hunches or gut intuition alone to deploy officers and suppress crime are over.  Numerous jurisdictions have adopted technological systems modeled after COMPSTAT, the pioneering and influential data system originating in New York in the early 1990s, and credit the use of the technology with reductions in crime.[10]  Data about crime, complaints, and incidents can be rigorously analyzed nearly in real time.  Law enforcement agencies nationwide likewise use "early intervention" or "early warning" systems to identify performance trends among officers.[11]

In addition to the ability of sophisticated databases to gather, present, and analyze data, the proliferation of cell phone cameras, sophisticated security cameras, body cameras on police officers, video recorders, and cameras in police cars means that police officers no longer confront or arrest individuals out of sight and anonymously.  Policing is increasingly out in the open and transparent.  The consequences have been transformative.  Fewer situations are difficult to resolve—video and audio evidence reduces the likelihood of an unresolvable "he said/she said" scenario.  Video and audio recordings affirm good policing.  They help identify instances in which

---

[10] *See, e.g.*, Weisburd, et al., "Reforming to Preserve: Compstat and Strategic Problem Solving in American Policing," 2 *Criminology & Pub. Pol'y* 421, 422-23 (2003); Willis, et al., "Making Sense of COMPSTAT: A Theory-Based Analysis of Organizational Change in Three Police Departments," 41 *Law & Society Review* 147, 148-49 (2007).

[11] Walker, et al., "Early Warning Systems: Responding to the Problem Police Officer," National Institute of Justice, United States Department of Justice at 1-2 (July 2001), http://zimmer.csufresno.edu/~haralds/Linkpages/reports/earlywarn.pdf; Samuel Walker, "Early Intervention Systems for Law Enforcement Agencies: A Planning & Management Guide," Office of Community Oriented Policing Services, United States Department of Justice (2003).

a complainant has made a false claim against an officer.  Likewise, such recordings help spot and even deter instances of misconduct and unconstitutional policing.

Modern policing is, in short, a scientific and data-driven enterprise.  Unlike earlier computer database systems, which were built primarily to provide early identification of officers who generate more personnel complaints than their peers, today's business intelligence systems permit tremendous amounts of data to be retained, sorted, and mined for research, insight, and a more comprehensive picture of officer performance, department-wide practices, and both systemic and officer-specific trends.

The Settlement Agreement repeatedly stresses the need for the SPD to gather accurate data by which to manage the risk of unconstitutional policing and measure compliance.  The SPD has nonetheless found it difficult to embrace these new technologies.  Current data and analytical capabilities are nowhere near adequate.  The SPD generates frequently erroneous and incomplete factual information about itself and officer performance. The SPD and the Monitoring Team cannot access the data needed to assess the Department's performance or to implement the Settlement Agreement.  The lack of timely, trustworthy data is a substantial impediment to progress, efficient management, and effective policing.

A business intelligence system, properly conceived and developed, is pivotal to SPD's ability to hold itself accountable for constitutional policing and to test whether performance outcomes are consistent with the Settlement Agreement's goals and ends.  The Monitor cannot certify full and effective compliance until the Business Intelligence System is producing the data needed and the SPD is using that data in a manner consistent with the Settlement Agreement.  The Monitor has repeatedly described some of the elements that should be a part of the Business Intelligence System.  For example, one element that the business intelligence system must include is a mechanism for collecting, storing, retrieving, and organizing use of force and stop data, all in a manner that allows the Department to identify officers whose patterns of use of force and other performance trends may be problematic.

During the last year, the SPD has spent substantial time and money—possibly hundreds of thousands of dollars—on the business intelligence project because some within the Department firmly insisted that they could develop a system on their own, without input from outside experts or from those who will be the users of the system.  A proposed "vendor" solution that would link the Department's existing, jerry-built silos of erroneous and incomplete data to each other, with a weak interconnection, fell well short of what is needed: a modern, sophisticated, and dynamic tool that SPD can use to pragmatically and rigorously assess its performance.

Despite the Monitoring Team repeatedly advising SPD to turn to outside experts and consider alternative solutions for collecting more reliable data, this advice was slow to gain internal support. SPD's IT leadership consistently told the Monitoring Team that some interim solutions were not technologically feasible—even though they were later shown to be easy to accomplish.  In a slightly different context, the Monitoring Team was told that it was impossible to devise a system that required an officer to log on to a patrol vehicle's in-car video system before the car left the station. At the Monitor's suggestion, COBAN, an outside vendor, was contacted.  It showed that it was indeed feasible and solved the problem rapidly.  Against this backdrop of resistance and incorrect information, Chief Pugel made the difficult but appropriate decision to use outside vendors, rather than rely on internal personnel, to develop the Business Intelligence System.  The IT Department's leadership nonetheless still resists.

Notwithstanding the SPD's resistance to change and suspicion of innovation in some quarters, the Monitor emphasizes that there are many talented individuals within the SPD dealing with data and information technology who are working in good faith and taking justifiable pride in their accomplishments.  The problem appears not to be the lack of a talented and dedicated staff but, instead, a failure by some members of senior IT leadership to fully accept the requirements of the Settlement Agreement, the overall role and importance of the Business Intelligence System, and the possibility that new approaches to information technology will benefit line officers, managers, and the community alike.

The following sections explore the substantial deficiencies in the SPD's ability to capture, analyze, and employ basic use of force data; the challenges that have faced the SPD and Monitoring Team in the past six months when contemplating new in-car video technology; and the opportunities that the SPD has, in the coming months, for wholesale innovations in its approach to capturing, storing, and using information.

## Use of Force Data

Tracking the force used by Seattle Police Department personnel is paramount to the Settlement Agreement.[12]  The Monitor must address fundamental questions about excessive and unnecessary force including:

- Is force used disproportionately against certain minority populations?
- Are some officers disproportionately using force without justification?
- Are some officers routinely failing to timely report use of force until hours or days later, or only after asked by the command staff?

---

[12] See, e.g., Settlement Agreement at ¶¶ 99, 188-90.

- Do uses of some types of force lead disproportionately to injury, litigation, or citizen complaints?
- Are supervisors holding police officers responsible and accountable for each use of force?  Are supervisors themselves being held accountable?
- Is force being reviewed and adjudicated timely, fairly, and responsibly within the SPD?
- Has the message been clearly communicated that excessive force will not be tolerated and that there will be meaningful discipline, demotion, or termination for those who engage in it?

Only when force is accurately and uniformly recorded with sufficient detail and meaningfully reviewed can the SPD and the Monitoring Team even begin to contemplate these important questions.

Since the First Semiannual Monitor report, the Monitoring Team has endeavored to collect and analyze SPD's use of force data.  The Monitoring Team's discoveries have been alarming.  Although the SPD keeps data on uses of force, it is incomplete, lacks necessary detail, and is frequently incorrect.  The current data management system, the Administrative Investigations Management system ("AIM"), is unacceptably antiquated, impractical, and onerous to use.  It lags far behind other law enforcement agencies and best practices.  At the time of this report, SPD simply lacks any reliable means of knowing or analyzing when and how its officers are using force.

The Business Intelligence System proposed by the SPD Compliance Office and anticipated by the Monitoring Team will entirely replace AIM.  The implementation of this new system cannot happen quickly enough.  The AIM system is neither modern nor straightforward.  After data is entered into the AIM system, it can be accessed only through a cumbersome, ad hoc query in the AIM Report program, a subsection of the AIM computer program.  Although the AIM Report will generate results that can be exported into a Microsoft Excel file or as a JPEG image document, the system itself is not designed to do any analysis of the data.  And, of course, if the data entered into the system is itself inaccurate, no meaningful review or analysis can occur.

For example, if a supervisor wanted to know the total number of use of force incidents that occurred in the West Precinct over the past three years, AIM requires that she: (1) run a query of the AIM system; (2) download the query to an Excel file; (3) clean the data; and (4) substantially manipulate the data to isolate the necessary variables.  If the supervisor successfully completes this inquiry but wants additional or more precise information, such as a breakdown of demographic information of individuals on whom officers applied force, she would have to run an entirely new query and proceed through all the involved steps anew.

The Monitoring Team gathered use of force information in the manner described above for the period from January 2008 and July 2013, a total of 66 months.  The Team spent weeks of its time

learning the unintuitive query process of using the AIM program, cleaning data line by line in Excel, and manually sorting data so that meaningful analysis could be conducted.

Despite a significant investment of staff, the Monitoring Team could analyze only a limited number of variables: discrete incidents (which may have involved multiple uses of force), the type of force used, dates, the race of the subject to whom force was applied, the subject's name, the precinct involved, and the involved officer's number.  It should be noted that, in numerous police departments throughout the country, supervisors easily access this information in a matter of seconds, not weeks.   Indeed, the Monitor had wanted to collect much more information, including: injury to the subject, injury to officer, a narrative why the specific force was used, how the force was applied, whether there were reasonable less harmful alternatives, the level of resistance by the subject, whether any complaints resulted from the use of force, whether there were any criminal or administrative consequences, and whether litigation was connected to the use of force.  The Monitoring Team will be able to collect this information about use of force and closely scrutinize it in the future only when a new database solution is implemented.

The Monitoring Team's inquiry, while necessarily limited by inaccurate or inadequate data, led to three troubling discoveries.  First, use of force data is frequently incomplete in the AIM program because the underlying force reports themselves are incomplete.  That is, officers frequently omit critical descriptive data on the form on which basic information about the use of force is recorded.  Much data is missing, likely because it was never reflected on use of force forms in the first instance.

Second, for a significant period of the last six months, the AIM program was also missing <u>all</u> use of force data from April 2013.  The Department has indicated that the absence of data was related to staff changes and the time required to cull information from hard-copy use of force reports and enter it into the AIM system.  Because some information is recorded on the use of force form via check boxes, and other information reflected in the involved officer's written account of the incident, SPD staff—who, rather than officers, input information into the database system—must read hundreds of pages of use of force descriptions, extract relevant information, and enter it into the database system.  No less troubling than the absence of the data was the fact that SPD had overlooked or simply ignored the missing force data.

Although SPD formerly employed a dedicated staff member to complete this tedious task, that individual was transitioned to another part of the Department without a replacement.  For several months, the duty was left unassigned, which created a large backlog of reports that had yet to be entered into AIM.  The Department sought to remedy the lack of current data only after the Monitoring Team called for it.  The Monitoring Team understands that the 2013 use of force data for 2013 is now fully up-to-date as a result of SPD temporarily asking a number of staff members to

clear out the backlog of unrecorded uses of force on nights and weekends.[13]  Their effort deserves praise.  Another staff member, with principal responsibilities elsewhere in the Department, has been tasked with ensuring that 2013 is, and remains, up to date in the AIM system.

As an _interim_ measure, and as noted previously, the SPD will use an "off-the-shelf" database product, called IAPro, to track use of force data while the Business Intelligence System is under construction.  The IAPro program has substantial limitations and is difficult to customize.  It does not substitute for full, dynamic business intelligence.  Nonetheless, IAPro is substantially more useful than the current AIM system in documenting and storing use of force data.  The Monitoring Team is encouraged by SPD's indications that IAPro's use of force tracking module will be technically and practically operational in early 2014.

When IAPro's use of force module is functioning, new use of force data will be inputted into that system exclusively.  The Monitoring Team expects that the SPD will need to alter some of its existing processes and innovate internally to ensure that the data that is required to assess progress and performance is reliably captured and analyzed.  SPD managers must understand that, going forward, the imperative of collecting accurate data and robustly analyzing it will require changes in business practices and systems.  Consequently, senior leadership will need to be directly and proactively involved in the process of configuring and implementing IAPro.

The Monitoring Team's third troubling discovery was that, for two consecutive years, the demographic figures for Asian and Caucasian subjects in use of force incidents were notably inconsistent with subsequent years.  After confirming the accuracy of its analysis, the Monitoring Team brought this inconsistency to the attention of the Compliance Coordinator's office.  After an inquiry, the SPD explained that, for two years, "Asian" was incorrectly recorded in AIM as "Caucasian," and vice-versa.  Thus, although the Monitoring Team collected use of force data across only seven basic categories, it discovered a critical systematic error.  The Monitoring Team understands that no effort is currently being made to audit or otherwise correct these errors.  It underscores DOJ's view that the SPD lacked—and the Monitoring Team thinks the SPD still lacks—the basic tools necessary to manage the risk of unconstitutional policing.

As a consequence of these and other issues, the Monitoring Team has little confidence in the reliability of use of force data previously recorded and entered into the SPD's AIM database.  Accordingly, the Monitor cannot assess or analyze the Department's use of force data unless and until: (1) the SPD's interim information database system, IAPro, is both technically and practically operational; and (2) an audit of use of force forms completed by officers indicates far fewer

---

[13] The use of force data in the AIM system became fully up-to-date as of October 31, 2013.  The backlog was first discovered in August 2013.

reporting gaps and incomplete elements.  As a result, this report can only focus on the deficiencies in the data collected and await the swift implementation of the interim IAPro database to record use of force data.

The Monitoring Team can report that, according to our initial inquiries, the most common types of force that AIM indicates were used by SPD officers are "Hands/Elbows/Arms" and "Feet/Knee/Legs"—two very vague descriptors that encompass an overly broad potential universe of force.  Other categories, such as "body force," are similarly broad.  The Monitor will continue to work closely with the SPD to provide guidance and ensure that the categories of data collected on the use of force reporting form and within IAPro and the eventual Business Intelligence System are both sufficiently broad and defined to capture real trends and sub-categories are sufficiently specific and narrowly tailored so as to be meaningful for critical analysis.

## Business Intelligence System

The Monitoring Team has clearly and consistently noted that the Business Intelligence System which will pass muster will be a close first cousin to the LAPD's Teams II and the LASD's PPI in terms of functionality, depth, speed, breadth, flexibility, and ease of use for both ad hoc and pre-programmed inquiries.  Computer technology has, of course, advanced since the PPI and Teams II systems were constructed.  Accordingly, the Monitoring Team is seeking the functionality of those systems rather than their specific hardware or software architecture.

The Monitoring Team is aware that, for some business intelligence system options that SPD may consider, the interim IAPro system could be a longer-term solution for housing use of force data because the Business Intelligence System would pull or derive data from both IAPro and other databases used to track other information.  The Monitor will be closely scrutinizing whether IAPro, in conjunction with a complete business intelligence system that pulls data from it, could functionally and practically accomplish the goals of the Settlement Agreement, allow the Monitoring Team to assess compliance, and allow SPD officers to actively and rigorously use data in a manner consistent with best practices.

During the past six months, there has been some suggestion that, if IAPro performed well over the first six months to a year after implementation, there might be no need for a Business Intelligence System whatsoever.  The Monitoring Team disagrees with any such notion.  Nothing less than the full Business Intelligence System, with all necessary functionality, will suffice.  IAPro is a short-term measure that the Monitoring Team supports solely in light of AIM's abundant deficiencies. In more recent discussions, the SPD has indicated that IAPro will indeed stand as an interim system.  The Monitoring does, however, continue to encourage SPD to continue thinking about

how it may reduce the cost of the permanent Business Intelligence System without sacrificing its breadth, flexibility, and rigor.

It is the Monitor's understanding that Chief Pugel assigned responsibility for the development of the Business Intelligence System to the Assistant Chief in charge of Compliance, leaving IT to fulfill a service role.  The idea is to give a stronger voice to end users who will be responsible for operating the system.  SPD officials have traveled to other departments to observe firsthand how other time-tested systems, such as Teams II and the PPI, look and feel.  Over the next six months, the Monitor expects the planning process on the Business Intelligence System to be completed, a vendor selected, and work be underway to meet targets agreed upon by the SPD and the Monitor.

Lest there be any remaining doubt, the Monitoring Team will <u>not</u> recommend to the Court that the SPD is in compliance with the Consent Decree until, informed by impartial and independent studies, an outside vendor expeditiously, accurately, and at reasonable cost constructs a reliable Business Intelligence System and SPD demonstrates that it is using that system in a manner consistent with the goals and requirements of the Settlement Agreement.

## In-Car Video

### Summary

The process of rigging up SPD vehicles to record video and audio of incidents has been needlessly complex and time-consuming.  Fortunately, nearly all SPD vehicles now have in-car video ("ICV") installed.  Unfortunately, much work remains to ensure that technical problems—whether applying to the technology and implementation generally or affecting specific pieces of equipment in cars or used by officers—are experienced infrequently and are promptly addressed if they occur.

As this report details elsewhere, video and audio are missing far too frequently for incidents reviewed by the Use of Force Review Board ("UOFRB") and Firearms Review Board ("FRB").  These omissions compromise the integrity and quality of investigations.  When ICV is missing, the Department regularly and without additional inquiry accepts the explanation that the officer's equipment was not properly functioning or that the officer did not know how to operate it.  The days of technical issues being an immediately accepted excuse for the absence of video must come to an end so that officers can be fairly held accountable if they inappropriately fail to activate ICV or cause their on-body microphone to be muted during an incident.

## *Implementation of ICV*

In-car video promotes good policing and accountability.  Video and audio evidence affirms good officer decision-making.  It provides an important piece of evidence for investigators attempting to determine precisely what happened during a given incident.  Far fewer incidents devolve into "he said/she said" situations where the only observers, subjects and officers, provide divergent or contradictory accounts of what happened.  Watching and hearing what occurred during an incident allows SPD management to more closely and accurately consider the incident's training, policy, and practice implications.  Although video and audio may not capture everything, and may not always show the whole truth, it can provide invaluable evidence as to what actually occurred at a given incident.

The Monitor's goal, from the earliest discussion regarding in-car video systems, was to see the SPD install equipment and embrace technology that makes video recording a regular, everyday part of officers performing their duties.  To this end, the Monitoring Team sought a process for the camera to be activated before the patrol car left the station.  It was important to remove any discretion or incentive for an officer not to start the camera system.

The SPD's IT unit, however, repeatedly claimed that it was impossible to establish a process for ICV to be activated when an officer leaves the station.  The Monitoring Team asked for a meeting with COBAN, the company developing the software used with the cameras.  At that meeting, COBAN directly contradicted IT's claims.  Shortly thereafter, COBAN provided a solution that permitted a single sign-in for ICV and the vehicle's other mobile computing devices.  Glitches and bugs were identified and resolved.

The single sign-in is now reality.  Absent external pressure, the job would not have gotten started. IT's incorrect information and lack of interest in finding creative solutions caused substantial delays in getting this relatively basic technological equipment deployed.

As of October 29, 2013, 97 percent of vehicles in SPD's fleet have been equipped with in-car video ("ICV").  The Monitor appreciates the efforts of all of those who worked to ensure nearly fleet-wide installation of ICV systems.  It commends the Department for ensuring technical installation.

Technical installation of ICV equipment is not the same, however, as full, complete, and practical implementation.  Equipment and software bugs must be identified, addressed, and eliminated. Cameras have to be turned on at the time of an incident to capture it.  Microphone equipment must be optimized to ensure clear audio of incidents.

SPD has a long way to go to make certain that, because the technology works and the involved officers properly use the system, video and audio of incidents are reliably captured.  During the last year, the Monitoring Team learned of an incident in which a substantial number of patrol vehicles responded to the scene of an officer-involved shooting.  Incredibly, none of the officers activated their in-car video or audio systems during the key moments of the incident.  Purported excuses were made, including shift changes, the emergent nature of the situation, and the time necessary to log on.  The presence of a command officer, and plenty of planning time, should have allowed for compliance with the SPD's ICV policy—which requires the use of recording equipment when responding to an emergency.  Whatever the reasons might have been, no video was recorded.  During the course of several other hearings by SPD's review boards, it became clear that the failure to log on to and activate the ICV is not an uncommon occurrence and is never an occasion for discipline.

The incident described above is exactly the kind of incident that should have been immediately referred to OPA for administrative review because there might have been misconduct on the part of officers who failed to follow existing policy on activating cameras.  We are closely following whether the SPD demonstrates through discipline, if necessary, its insistence that the tools to assist in constitutional policing are being used.  Failures to refer possible misconduct bearing upon constitutional policing to OPA will preclude the Monitoring Team from finding full and effective compliance.

Over the past several months, an unacceptably high rate of Use of Force Review Board "packets" and Force Review Board investigations have lacked video of the incident.  Specifically, between April and November 2013, the UOFRB reviewed at least 50 use of force packets where recording equipment (either the ICV video or audio) malfunctioned or an officer failed to properly activate recording equipment.  In many other instances where video was captured, poor audio quality renders the media entirely unhelpful.   The oft-cited officer explanations—that equipment malfunctioned, that the incident was too fast-moving to allow ICV activation, that log-in is cumbersome, that the "out-of-range" warning for the body mic is troublesome—are routinely accepted by command staff and management without further inquiry.  No effort is made, or at least documented, to determine whether the alleged failure of equipment has been properly and timely reported and that the equipment was, in fact, malfunctioning as reported.

Furthermore, new problems have surfaced with the audio recording of incidents.  Whether intentional or accidental, the audio is failing to record.  Clearly, the Department must have both video and audio operational.  The SPD's IT unit recently explained that some audio issues were related to officers attempting to use old, incompatible on-body microphone equipment with the new system.  It also explained that a request that it had made of COBAN, the technology vendor, relating to the microphone on the vehicle's rear camera had resulted in that microphone being

essentially non-functional.   It further suggested that the lack of reliable audio could be related to ongoing calibration of the location and placement of the antennas that pick up the wireless signals.

Many explanations for ongoing difficulties have been identified, but insufficient interest has been exhibited toward following up and eliminating these ongoing difficulties, including the hastened acceptance of the COBAN contract (i.e. a final sign-off on the final delivery of the services that COBAN agreed to provide) despite repeated and well-known equipment issues.   In fact, several months ago, the Captain of the UOFRB acknowledged awareness of the problems with the ICV microphones; nonetheless, the Assistant Chief responsible for the ICV has indicated that he learned of these problems only weeks ago.   No effort is underway—at least one disclosed to the Monitoring Team—to establish a process to eliminate all viable excuses so that officers whose audio or video systems are not operational during a use of force incident can be held accountable for violations of the ICV policy where appropriate.

The Monitoring Team fully appreciates the difficulties associated with implementing new technologies.   Unexpected problems almost inevitably arise.   Nonetheless, it has been repeatedly frustrated with the capacity of those charged with getting ICV implemented to anticipate problems, proactively identify issues, and address difficulties in an organized, thoughtful fashion which is then communicated to all concerned.

### Future Expectations Regarding ICV

The Monitor expects the SPD and its IT Department to remedy all existing technical problems with ICV without any additional delay.   Officers must expect that their equipment is functional— and that IT will quickly respond to their concerns about such equipment.   Supervisors must ensure that their reports know that the lack of video or audio of an incident will not be automatically excused on the grounds that the equipment was not working, too cumbersome to employ, or the like.   The active and passive resistance to the implementation of ICV technology must end.

Specifically, the Monitor expects the following:

1. **IT Will Ensure that On-Body Microphone Equipment No Longer Makes It Easier for Officers to Mute the Audio System Rather than to Turn it On.**

As noted above, line officers have repeatedly told the Monitoring Team and other members of the Department for months that, problematically and counter intuitively, it is actually easier to <u>mute</u> their on-body microphone equipment than to <u>turn it on</u>—because the mute button is bigger and more easily located than the comparatively small activation button that turns the unit on.  Despite the IT's knowledge of the problem for some time, and the Monitor's repeated follow-up on the

issue, nothing has happened.  Line officers deserve an easier, more straightforward way to comply with ICV policy and turn on their audio equipment.  The Monitoring Team insists that IT leadership provide this modification immediately.

**2.    An IT Representative Should Begin Attending All UFORB and FRB Meetings and, When Audio or Video is Unavailable, Should Be Responsible For Determining Whether the Involved Equipment Is Functioning Appropriately.**

The Monitoring Team has strongly suggested that an IT representative attend UOFRB meetings.  In the last meetings, an IT representative has failed to attend.  The routine attendance of IT at UOFRB meetings has taken too long to occur.  Once it is in place, several important functions should be implemented.  IT should review the Use of Force Review Board packets ahead of the regularly scheduled UOFRB meetings.  If any ICV issues are noted by reviewers in advance of the meeting, the IT representative will locate the equipment involved and will be prepared to report to the Review Board whether the ICV issue may have been related to a technical deficiency.

SPD has represented to the Monitoring Team that its officers currently are required to report problems with their technology equipment via the City's centralized "HEAT" technology request tracking system.  When officers report a problem, a "HEAT ticket number" is generated to which IT staff respond.  In this manner, the HEAT log is an important indication of precisely what equipment may or may not have been properly functioning.  IT should review the log of HEAT tickets prior to the UOFRB and FRB hearings and will come prepared to report on whether the officer(s) timely reported the lack of ICV or audio and whether that lack of video or audio is due to equipment failure.

**3.    All Audio Issues in SPD Vehicles Must be Resolved.**

Generally, on-body audio must be functional at all times during patrol, with the possible exception of during private conversations unrelated to work.  Accordingly:

a.    The ongoing, rear vehicle microphone issues should be configured to work seamlessly with all other audio equipment so as to maximize sound quality.

b.    The SPD will follow up with the vendor on a number of apparently available options to temper the undesirable effects of the current way that the ICV system alerts officers when their on-body microphone is out of range of the vehicle's equipment.  During incident responses, the current out-of-range notification appears to compromise officer safety by prematurely disclosing officer positions.  After the

vendor reports on the other out-of-range notification options, SPD must pick a solution that appropriately balances the practical needs of line officers and the importance of giving officers information about when the ICV's audio systems may no longer be capturing audio.

c.      A solution to eliminate sound interference from vehicle AM/FM radios must be rapidly determined and implemented—including whether to retrofit the patrol cars to include a switch to turn off radio when ICV is activated, a policy articulating guidelines and expectations for AM/FM use and volume, the elimination of AM/FM radios altogether (as is standard in many other law enforcement departments), or some other solution.  Serious consideration should be given to eliminating the AM/FM radios altogether from the new service vehicles set to be acquired in the next round of purchases.

d.      SPD must design, implement, and enforce a policy on when officers should or are permitted to mute their on-body microphones.

### 4.    The IT Department Must Propose and Implement an Ongoing, Forward-Looking Quality Assurance Program to Ensure that All ICV Equipment Remains Fully Operational and Functional.

The IT Department must ensure that all on-body microphones, vehicle cameras, antennas necessary for reception of audio from the on-body microphones, and all other technological and equipment components are fully functional—and remain so.  The Monitoring Team expects that a program of routinely auditing cars, cameras, microphones, and other related equipment will be straightforward to devise, entail a minimum of administrative or bureaucratic discussion, and be highly effective in ensuring that all officers have the benefit of reliable and functioning ICV equipment.

### 5.    The IT Department Must Provide Impartial, Objective, and Detailed Estimates for Other Possible ICV System "Triggers."

Currently, the in-car video system may be manually activated by officers or, alternatively, by certain "triggers" that automatically activate ICV.   It is the Monitoring Team's current understanding that triggers that have been implemented include activation of crash sensors, use of emergency lights, and the activation of an officer's microphone.  In discussions with community organizations and members, other triggers have been discussed, including the triggering of ICV upon: (1) the opening of the vehicle's back door, (2) activation of sirens, (3) activation of the dome light, (4) release of rifle lock, and (5) GPS-based triggers.  So far, SPD has provided either no

estimate of the costs of employing these triggers or, in a few instances, only an imprecise estimate (*e.g.* 30 minutes of labor per car).

The Monitor has on several occasions heard from community representatives who have expressed concerns about ICV.  The Seattle Human Rights Commission ("HRC") and members of the CPC were among them.  At the insistence of the Monitor, a meeting was set up at which SPD met with the HRC, DOJ, and members of the CPC to discuss policy and standards for use of in-car video.  Out of that meeting, a working group was designated by the Monitor to collaborate with SPD to devise proposed standards for the use of ICV.  This is an important example of how the community can work with the Monitor, DOJ, and the SPD to consider acceptable solutions without delaying implementation of the Settlement Agreement.  The Monitor has consistently sought community input, as described in other sections of this Report, and looks forward to continuing to recommend proactive, effective, and timely reforms congruent with the Consent Decree and the community and public interest.

The Monitoring Team, along with CPC and the Seattle Human Rights Commission ("HRC"), can only meaningfully discuss the importance of additional triggers for activation of ICV when the costs and benefits are specifically and clearly understood.  The Monitor expects that IT will provide an accurate, precise, and thoughtful analysis of the costs of additional triggers as soon as possible.  This is required for the CPC, HRC, DOJ, SPD, and other community stakeholders to be able to formalize a formal policy governing the use of in-car video.

## Use of Force Review[14]

The Monitor's tremendous respect for the hardworking men and women of the Seattle Police Department has grown even deeper since the First Semiannual Report in April 2013.  The Monitoring Team has—in ride-alongs, meetings, informal discussions, SPD functions, and public events—been impressed by their dedication and commitment to professionalism.

Any professional is accountable for the manner in which he or she deploys the skills acquired.  The skill to use force reasonably and constitutionally is a *sine qua non* of professional policing.   A probing inquiry by the Use of Force Review Board ("UOFRB" or "Board") into how officers deployed force and what other options may have been available, even if the conduct was consistent with policy, is an inquiry that honors the skills, training, challenges, and risks that officers deploy and encounter on a daily basis.

---

[14] The following section discusses SPD's progress in coming into compliance with ¶¶ 119-25 of the Settlement Agreement.

The UOFRB reviews reportable uses of force, other than those involving a firearm (which are reviewed separately by the Firearm Review Board), by officers that "cause[] an injury, could reasonably be expected to cause [pain or] an injury, or results in a complaint of an injury" up to and including lethal force or other force that "could reasonably be expected to result in '[g]reat . . . ' or '[s]ubstantial" bodily harm."[15]  It reviews incidents in which officers used force not only to determine whether an officer's particular force was consistent with SPD policy but to consider what implications the incident might have for training, policy, practice, procedure, supervision, and the like.

The Monitoring Team is greatly pleased with the UOFRB's progress in 2013.  The Board continues to do a commendable job in ascertaining whether a precinct chain of command completed a thorough use of force review.  Furthermore, since our First Semiannual Report, an increasing number of Board members have begun to understand that the UOFRB must be the SPD's hub for internal innovation and critical analysis—that the Board's review is about much more that reaching a verdict or disposition as to whether an officer's use of force was consistent with SPD policies.  Consequently, Board members are far more frequently engaging in the type of spirited discussions about use of force incidents that support good policing, foster innovation, and detect problematic trends in their infancy.  A presenter describing a use of force who takes a defensive or hostile tone in the discussion now stands out and, fortunately, is becoming a rarity in these proceedings.

Despite substantial progress in broadening the scope of the review, the UOFRB must challenge itself further still to ensure that <u>all</u> members of the Board participate in a genuinely freewheeling and critical discussion of the incident.  It must ensure that investigative information contained in use of force "packets" that Board members review is complete, thorough, and timely submitted— and that the Board imposes clear, swift consequences for investigators who delay the process or submit less than rigorous materials.  The Board must also develop a system for confirming that the Board's recommendations about training, policies, practices, procedures, and other departmental actions are completed so that the fruits of its increasingly dynamic and valuable discussions can be enjoyed throughout the Department.

## How the UOFRB Works

The SPD holds weekly UOFRB meetings, which generally last approximately three hours each, to review and analyze reported uses of force and their assessment by those in the involved officers' chain of command.  Over the last six months, the leadership of these meetings has changed.  An Assistant Chief took over as Chair of the Board from Chief Pugel.  Beginning in September,

---

[15] Settlement Agreement ¶¶ 65-66.

Captain Wilske, the newly promoted and appointed Captain of Force Investigations, took over the job of directing the meetings from Captain Edwards.

The UOFRB's membership consists of one or more sergeant or lieutenant-level representatives from each of the five precincts, Training, Policy, Crisis Intervention Team, and (for the previous few months) the Office of Professional Accountability ("OPA").  Representatives from the Range, Less Lethal Weapons, and Narcotics units also sometimes attend.  Members on the UOFRB engage in some of the most important work of the SPD.  It requires diligence, attention to detail, knowledge of street skills, and hours of preparation.

At each UOFRB meeting, all recently completed use of force investigations, commonly referred to as "packets," are reviewed.  These packets consist of a standardized form that provides basic information about the use of force incident, a summary of the incident prepared by the supervisor of the involved officer, written statements by the involved officer, witness statements by other officers, summaries of third party witness statements, photos, miscellaneous reports, and other pertinent information.  The chain of command from the precinct where the use of force occurred also briefly comment upon the incident, focusing primarily on whether the incident raised any concerns, what steps were taken to deal with those concerns, and whether the use of force was consistent with policy.

Before the Board's review, the presiding Captain (the "Captain") prescreens each use of force packet.  The Captain may send a packet back to the precinct for more information or refer a case involving the possibility of misconduct to OPA.  Each attendee has the responsibility to review each packet to be discussed before each meeting.

At the UOFRB meeting, a summary of each use of force is presented to the Board by a representative from the precinct where the use of force occurred.  The Captain then leads the Board in a discussion about the merits of the use of force or issues raised by the incident.  When this discussion concludes, the Captain asks the questions set forth in Paragraph 123 of the Settlement Agreement:

1.  Whether the force used is consistent with law and policy;
2.  Whether the investigation is thorough and complete; and
3.  Whether there are considerations of tactical, equipment, or policy that need to be addressed.

If a Board member raises any issue in response to the initial presentation or these questions, the Board discusses the issue and decides whether the packet should be sent back to the Chain of Command for further information or clarification.  If not, the Captain asks whether the Board

recommends approval.  After a voice vote by the Board members, the Assistant Chief decides whether to approve the use of force packet or return it to the Precinct for further information or to correct technical deficiencies.  At the conclusion of the Board's discussion of an incident, the Captain polls the Board on the course of action to recommend.

## Assessment of UOFRB Meetings

Members of the Monitoring Team consistently attend the UOFRB meetings.  SPD continues to provide the Monitoring Team with access to all of use of force packets before the meetings.  The Monitoring Team may, and frequently does, participate in the discussion of the incidents described in the packets by asking questions to clarify issues or generate discussion among the Board members.

Data provided by the SPD reflecting the actions taken to date by the Board with respect to individual officers is set forth in Table 1 below.  Notably, in the UOFRB meetings attended by the Monitoring Team, not a single instance where force was used has been found to be out of SPD's current (*i.e.*, pre-Settlement Agreement) use of force policy.

| Table 1:  Actions Taken by UOFRB, January 2013 – October 2013 | | | | |
|---|---|---|---|---|
| | Total | Approved | Held for More Information | Referred to OPA |
| January 2013 – March 2013 | 112 | 78 | 34 | 0 |
| April 2013 – October 2013 | 245 | 178 | 55 | 12 |
| Total (through October 2013) | 357 | 256 | 89 | 12 |

Although force has only infrequently been found outside policy, the UOFRB's progress in 2013 has been notable and worthy of praise.  With increasing frequency Board members engage in the sort of lively and wide-ranging discussion about use of force incidents.  Given the constituency of the Board, the Board is precisely the correct forum to consider tactics, policy, force, and other Department- or precinct-wide issues.  Indeed, on many occasions, members have shared their analyses and opinions about a use of force, with other members challenging assumptions and conclusions or responding with different points of view.

The UOFRB must continue to ensure that, whenever appropriate, this freewheeling discussion and lively debate is not only permitted but encouraged.  Even if Board members are unable to reach a

consensus as to whether other force options were available, whether an officer should have used different tactics earlier in an event to reduce the likelihood that force would need to be used, or whether the incident suggests changes in training or internal procedures, engaging in the debate is important.  Such debates and exchanges of views within the UOFRB should help chart a new course in which critical analysis of the Department's performance is not seen as disloyalty to fellow officers but is, rather, viewed as necessary to constantly improve officer and public safety and ensure constant adherence to professional standards.  The UOFRB provides the opportunity for members to think critically, challenge traditional assumptions where appropriate, and consider not just how things have always been done but challenge the Department to think of new and better ways to conduct law enforcement.  This mode of operation requires that the Board ensure that all members are prepared and active participants.  It is likewise important that consistent methods for capturing the good work product of the Board and transmitting it throughout the Department are developed.

The practice by Board members of taking "lessons learned" back to the Precincts has been reported with increasing frequency.  There is, however, currently no report provided to the Board (or the Monitoring Team) on how thoroughly across the Department these "lessons learned" are transmitted.  For instance, after being told that such a report had been transmitted concerning the misuse of tasers in an environment loaded with petroleum fumes, the Monitoring Team requested a copy of the policy reminder.  Two months have gone by without being provided the report, calling into question the representation made about its distribution.  The failure to establish a regular and uniform process for passing along "lessons learned" during the UOFRB's must be remedied by the next reporting period.

The Monitor continues to find that video of incidents is an essential tool to the UOFRB process.  Such video, whether from responding officers' in-car video or from private security and private sources, provides important details about the use of force itself and context about the circumstances surrounding the use of force.  An important part of that context is timing: the video makes much clearer than any written report how quickly, or how slowly, the incident under review actually unfolded.  The Monitor is pleased that the SPD now attempts, or offers, to show relevant video evidence at each meeting.  When video is available, the review of the use of force incident is more thorough, and the discussion is more probing.  As noted elsewhere, the SPD must continue to assure that in-car video and audio technology is fully and consistently functional.

Despite substantial progress in broadening the scope of its review, some Board members continue to resist the notion of asking whether an officer whose use of force was consistent with policy nonetheless had other reasonable force options available.  This reluctance to ask whether the Department can do better must be overcome if the SPD is to keep pace with the evolving demands placed on its officers.  Good teams routinely ask whether they could have done better—even in

games they win.

In addition to reviewing regular uses of force during the past six months, the UOFRB was called upon to review the SPD's uses of force that arose out of the May Day 2013 protests.  The Monitoring Team observed the SPD's preparations for the May Day protests.  Capable and agile SPD oversight addressed the permitted and peaceful May Day 2013 protest rally and march, as well as the unpermitted and less peaceful May Day protest outgrowths.  Members of the Monitoring Team attended the roll calls before the main permitted rally and march.  The SPD Command staff made clear to officers attending the roll calls that the SPD's mission was to allow citizens to engage in their constitutional rights but to enforce the law and make arrests if and when warranted.  The permitted rally and march remained peaceful and organized, but, as anticipated, some protest participants became more destructive and violent as the day and night proceeded, resulting in multiple arrests and multiple reported SPD use of force incidents.

Each distinct use of force related to the May Day protests was individually and carefully reported in use of force packets.  The UOFRB reviewed each use of force report systematically, individually, and fully.  In some instances the Board reviewed video that had been posted online by civilians.  Overall, the use of force reviews involving the May Day protests proceeded smoothly and efficiently.

As noted elsewhere in this report, SPD will—subject to final approval of the policies by the federal court—be operating under a new, substantially revised general use of force policy, policies governing the use of less-lethal force options, and policies addressing the review of use of force as of November 30, 2011.  The Monitor commends SPD for its good faith effort in developing these new policies.  Officers must now be swiftly afforded the opportunity to review and be trained in the new policies.  Once they have, the Monitor expects the UFORB to be clear about its expectations of officers through its meetings, analysis, and conclusions and to fully enforce and adhere to both the letter and spirit of the new use of force policies.

The Monitoring Team is aware of some contentions by SPD officers that force is being underutilized, at the risk of officer safety, because of the Settlement Agreement and DOJ.  That is, the Monitor has heard accusations that contemplated changes in use of force policy and the Monitor's ongoing role have motivated SPD officers to "de-police"—to abandon proactive policing so that their performance will not be scrutinized.  If true, these suggestions of de-policing would be extremely troubling.

The Monitor will continue to look closely for any signs of de-policing.  The Monitoring Team has yet, however, to observe an incident in which it appeared to the Team, or to UFORB members, that the outcome or series of events was unduly influenced by officers taking an unnecessarily passive

approach. The Team's interactions with line officers consistently indicate that they take their job seriously. Nonetheless, there have been consistent claims that de-policing is indeed occurring, particularly in the West Precinct.[16] There have been efforts to shift the blame to the City Attorney on the unsubstantiated grounds that his office would not prosecute even if SPD did make arrests. There is much to be desired in how the SPD and the City deals with the homeless, the drug addicted, and the mentally ill in downtown Seattle. The solutions, however, are not solely more arrests and prosecutions but the ongoing development and support of more thorough and well-staffed programs for diversion and alternatives to incarceration. To this end, the Monitoring Team looks forward to the development and implementation of policies by the Crisis Intervention Committee ("CIC"), whose work is discussed in detail elsewhere in this report.

Senior SPD leadership has much work to do to assure line officers that the use of force policy changes are innovative, forward-looking changes designed to assist officers in better maintaining their safety, accomplishing their law enforcement objectives, and protecting the public. In the next sixth months, the Monitoring Team will be looking for SPD command staff to personally and proactively demonstrate to the SPD rank-and-file that the new policies are sound, settled, implemented, and nothing to fear. It is in the best interest of the community, Parties, and the Monitor for SPD to actively combat misinformation, or a lack of information, among the rank-and-file about use of force polices, as well as the Monitor and the Settlement Agreement generally.

## Recommendations

Although the Monitoring Team applauds the UOFRB's progress, it recommends continued improvements to the review process and Board meetings to increase further the extent to which the UOFRB is the center of the Department's critical thinking about force, training, tactics, policy, and procedure. The following recommendations are aimed toward ensuring that the UOFRB addresses not merely whether a specific officer acted within or outside policy but what lessons the Department can learn from the incident generally.

It should be noted that both the Board's presiding Captain and the responsible Assistant Chief have demonstrated a commendable willingness to improve in each of the areas listed below and have met with members of the Monitoring Team on more than one occasion to discuss the Monitor's recommendations.

---

[16] *See*, *e.g.*, Steve Miletich, "SPD Refused to Act on Public Pot Smoking, Man Claims," *Seattle Times* (Nov. 5, 2013), http://seattletimes.com/html/localnews/2022197653_potenforcement xml. html?prmid=4748.

### 1.    SPD Must Ensure that Video, with Audio, Is Available for All Incidents and for All UOFRB Members to Easily Review Prior to UOFRB Meetings.

The Monitoring Team is encouraged that fewer officers are claiming that they had not been trained in how to use the ICV system.  Nonetheless, the number of incidents of for which video or audible audio is available remains unacceptably low.  As noted above, between April and November 2013, the UOFRB reviewed at least 50 use of force packets where recording equipment (either video or audio) malfunctioned or an officer failed to properly activate recording equipment.

Although the Captain has been doing a good job of attempting to show relevant video at each meeting, locating and watching the relevant videos prior to UOFRB meetings continues to be cumbersome for both members of the Board and the Monitoring Team.  Although individual force packets will generally note whether video is available, actually locating and watching the relevant portion of in-car video on the COBAN system in advance of UOFRB meetings currently requires each interested reviewer to separately locate relevant video.

The Monitoring Team recommends that, at least one week before the incident comes before the UOF Review Board, one SPD employee—with the full, timely assistance of IT—conduct the video research for each packet, locate relevant video, and link it to the packet in the SPD UOF shared drive.  In addition, although some supervisors in the a chain of command do a great job of identifying all video and recording on the report the relevant video time stamp, most supervisors do not.  Unless and until SPD can provide a link of all video clips pertaining to a given packet, the involved officers or supervisors should note a time stamp for each video or audio clip in their reports.

### 2.    SPD Should Develop and Implement Procedures for Holding Involved Officers Accountable for Incomplete or Delayed Force Packets.

Supervisors within the Chain of Command have the responsibility to ensure UOF packets are both complete and timely.  The Monitoring Team acknowledges and appreciates the hardworking members of the Department who timely and thoroughly complete the important, arduous, and time-consuming task of preparing or reviewing use of force incidents.  Nonetheless, the Monitoring Team finds that, far too often, SPD leadership fails to hold the responsible officer, or the officer's Chain of Command, accountable for deficiencies in the packets or the untimely review of such packets.

The Board will sometimes find that a force packet is incomplete.  When it does, the Board generally sends these packets back to the relevant Chain of Command (usually the sergeant).  The UOFRB has deemed force packets to be incomplete when they failed to find relevant video,

inadequately described a use of force (*e.g.*, including in a narrative that the officer "took the suspect to the ground" rather than providing a more detailed description of *how* the officer took the suspect to the ground), and failed to identify and interview witnesses seen in a video. The Captain may also return incomplete packets to the Precinct before the Board receives them. Problematically, however, beyond sending an incomplete packet back for further information, the Monitoring Team knows of no consequences to the Chain of Command for incomplete packets. Recently, the Captains and Watch Commanders of all Precincts have been reminded of deficiencies being seen regularly in their reviews of UOF packets. It will be expected that these deficiencies will be promptly reduced.

Likewise, on far too many occasions, packets are not completed in a timely fashion. Pursuant to current SPD policy, UOF reports are supposed to be completed within 72 hours of a use of force incident, and reviewed by the Chain of Command in a similar time frame.[17] When reports are not completed within this timeframe, the delay is typically excused because it purportedly related to "requests for additional information and review of the available ICVs" or other similar justifications. These excuses do not explain delays in submission that have lasted in excess of 30 days. The unexcused delays and lack of specificity in explaining the delay are entirely unacceptable.

It appears that there have been few or no consequences to the Chain of Command for such delays. In one particularly troubling instance, a single commander was responsible for reviewing 25 packets for incidents occurring between February and September 2013. In all but one instance, the officer exceeded the 72-hour requirement set forth in current SPD Policy – many times by more than a month. In some of those instances, the delay was not explained. In others, only vague, unhelpful explanations were provided. The officer's Precinct Chain of Command tacitly accepted the continued violation of SPD policy. The Board's repeated reference to the untimeliness of these reports went unheeded by the presiding Captain and Assistant Chief. Only after the Monitoring Team pressed the issue with the presiding Captain and Assistant Chief did the Department take action and then, only to give the offender an oral warning. Recently, it has been reported that the incident was being investigated by OPA. Although this recent development may send a message, it is important for the Command staff to communicate clearly that the tolerance for protracted delay for reporting and reviewing force must end immediately, and "stock" excuses should be neither entertained nor accepted. If overwork is the cause of the delay, the Department must immediately remedy that problem.

The Monitoring Team will audit whether the SPD is holding involved officers and Chain of Command accountable for incomplete or delayed force packets. The message should be clearly

---

[17] *See* SPD Manual 6.247(6).

conveyed that the review of force is vital to compliance with the Settlement Agreement and that delay or a casual attitude about deadlines will not be countenanced.

### 3.   All UOFRB Members Must Participate Fully in Board Discussions.

The Monitoring Team and the Board leadership have noted that not all members of the Board regularly participate in a meaningful way at each Board meeting.  Whether related to a lack of preparation or an unwillingness to criticize the actions of fellow sworn SPD employees, this lack of participation by some members both detracts from the meeting and hampers the growth of the UOFRB as a forum for internal innovation.  In an effort to extract substantive contributions from more reticent members, the presiding Captain has begun to "call on" Board members to opine on a particular use of force.  This effort is laudable, but it has been met with only limited success.  Perhaps if the presiding Captain did not use leading questions or express his opinion about a certain reported use of force being consistent with policy before the members of the Board expressed their opinions, the reticence of certain members or invited experts to speak would dissipate.  It is also unfortunate that not all members of the Board bring to each meeting a complete set of the packets to be reviewed and show that they have read the material (not merely the packet directly relating to their particular precinct or division).  Having the material at the meetings allows members to follow the discussions and refer to particular statements in question.

Service on the Review Board should be viewed as an honor.  Reward for active, diligent participation should be considered for its members.  Removal from the Board for persistent failures to meet appropriately high standards should be followed.

Pursuant to the Monitoring Team's request, the presiding Captain has been asking Training and Policy representatives in attendance to weigh in on use of force incidents.  Because a primary purpose of the UOFRB is to identify best practices and explore changes in training or procedure form which an involve officer, precinct, or the Department generally could benefit, the Monitoring Team applauds the expanded participation of Training and Policy representatives.  Recently, they have been included "at the table" with the other Board members.  This type of critical analysis and broader discussion is occurring more often at the UOFRB sessions than it did—but still not as regularly as it could and should.

### 4.   A Tracking System, Supported by a UOFRB-Dedicated Staff Member, Should be Established to Ensure that UOFRB Recommendations Are Implemented.

After reviewing a particular UOF incident, the Board either recommends approval or that a particular remedial course of action to be taken.  The Board might, for example, recommend that

an officer receive some sort of counseling from his or her supervisor.  They may recommend that an officer receive more formal training from the Training section.  They could recommend that a roll call training be given at each precinct.

Until only recently, there has, however, been little or no tracking to confirm that these recommended actions actually occur.  In most cases the supervisors presumably comply with the Board's recommendations and required actions.  Nonetheless, the Department did not set up a formal system to confirm that they have.  Although the UOFRB assistant issues a follow-up report after UOFRB meetings that details what actions need to be taken, no system was in place to insure that a given action was, in fact, taken.

To his credit, and in an effort to correct this deficiency, the presiding Captain recently announced his intentions to establish a tracking spreadsheet and tasked the staff member supporting the Board to follow up recommended actions related to every packet.  UOFRB leaders believe that the new Business Intelligence System will allow them to track more easily whether required actions have indeed occurred.  However, the act of tracking cannot wait until this new system is designed and in place.

The Monitor makes two more specific recommendations.  First, the SPD should, as soon as it is feasible, appoint a full-time staff support person to the UOFRB.  This staff person's duties could include locating and identifying the relevant portions of videos relating to incidents to be reviewed, following up with Chain of Command to assist in the complete and timely preparation of UOF packets, and tracking implementation of Board recommendations.  In the view of the Monitor, this position does not need to be filled by a sworn officer.

Second, a reporting system should be implemented immediately that allows the Department to ensure (and the Board to confirm) that all adopted UOFRB recommendations that are adopted by the Chair or the Chief are implemented.  For example, at the beginning of each weekly UOFRB meeting, the Chair could report back on steps taken to implement the recommendations of the Board for recently reviewed incidents.  A tracking sheet could be provided weekly to the Board (and the Monitoring Team), and reviewed at the beginning of each Board meeting, showing each reviewed incident for which follow-up action was recommended and its status (e.g., training of involved officer on street skills completed, date of completion, Training Division sign off, Department-wide bulletin issued; and so on.)

### 5.    The Use of Force Report Form Must Be Revised to Include Additional, Key Information.

The current use of force report form fails to require the involved officers and their supervisors to

document certain vital information.  The Monitoring Team understands that SPD is in the process of revising its form.  In the coming months, the Monitor will be working with SPD to refine the use of force form so that it can both relate efficiently and effectively with the interim IAPro database system and anticipate the additional data elements that will figure into the permanent Business Intelligence System.

### 6. The UOFRB Should Continue to Review Use of Force Packets Even After Referral to OPA.

Currently, if the Captain or Assistant Chief reviews a packet prior to a UOFRB meeting that he deems could possibly involve officer misconduct, that packet is pulled from the UOFRB and referred to OPA.  The UOFRB is then prohibited from reviewing and discussing the packet.

Although OPA is the appropriate body to investigate and recommend to the Chief whether a particular incident constitutes misconduct warranting discipline, the Monitoring Team believes that the UOFRB should continue to review the packet for other issues despite any OPA referral. Indeed, the UOFRB's continued review of these other issues is important and benefits the Department.  In these instances, the UOFRB must continue to, among other things: (1) deliberate over whether the tactics used were best practices and identify areas for training that could benefit the entire department; (2) determine whether there were deficiencies in the equipment used; and (3) identify any deficiencies in the review by the Chain of Command.  The only exception would be if the OPA Director specifically requested that the packet not be considered.

The continued review of use of force packets and incidents even after referral to OPA is another change that the UOFRB must make to ensure that it considers the implications of uses of force not just in terms of possible discipline for an involved officer but for Department practice, policy, procedure, and training.  Freezing broader considerations of what the SPD can learn from a given use of force incident just because OPA will be proceeding with a review is inconsistent with the UOFRB becoming a primary and vital center for critical analysis and innovation.

### 7. The UOFRB Must Ensure that "Lessons Leaned" from UOFRB Meetings Are Passed Along to All Officers and the Department

Training officers have consistently indicated that they transmit "lessons learned" from UOFRB meetings to rank-and-file officers, usually in the context of the street skills training modules.  The Monitoring Team is unaware, however, of a rigorous, standardized process for ensuring that the results of the UOFRB's productive discussions result in information transmitted throughout the Department.  Because not all officers have been scheduled to receive street skills training in 2013, many of the "lessons learned" have not been imparted to those officers.  The Training division

should be held accountable for ensuring that all officers receive the wisdom, lessons, and information that result from UOFRB deliberations on a timely basis—and not dependent upon the street skills training mode of communication, given the infrequency and uneven schedule with which officers participate in that training. The SPD cannot benefit from the Board's critical analysis and internal innovations until its pragmatic conclusions and solutions are routinely communicated throughout the Department.

## Review of Officer-Involved Shootings

Firearms Review Board ("FRB") proceedings are SPD's administrative review of any firearm discharge by a SPD officer. The FRB, like the UOFRB, must use the review of incidents as a tool for departmental learning and a catalyst for internal assessment, improvement, and innovation.

The Monitor's First Semiannual Report noted that the FRB "fail[s] to reach the higher standards of the Use of Force Review Board."[18] It expressed deep concern that "the scope of discussion . . . is too narrow and considers only whether a given shooting was consistent with policy at the moment the trigger was pulled."[19] It observed that the FRB must instead "consider the tactics, strategy, and performance of the involved officers from the time" of dispatch and through the use of force.[20] The Report also listed several best practices that the Monitor strongly suggested should be seriously considered.

The FRB has failed to address any of the issues that the Monitor previously outlined. It has failed to address any of the specific changes that the Monitor urged. Both the scope and quality of its reviews are deficient. The FRB lags unacceptably behind good, let alone best, practices— and far behind any state or performance approaching compliance with the terms of the Settlement Agreement.

First and foremost, the quality of the FRB proceedings themselves remains very low. The FRB's members continue to operate under the mistaken belief that their only charge is to determine whether, at the moment that an officer pulled the trigger, the officer was acting within or out of policy. The FRB actively refuses to entertain its broader charge of critically evaluating the tactics, strategy, and performance of involved officers—from the time of dispatch or initiation of activity through the use of force and to the juncture at which involved officers have made statements about the incident. Far from being a nexus of internal debate, discussion, and learning, the FRB is the area within the Department in most urgent need of sweeping reform.

---

[18] First Semiannual Report at 11.
[19] *Id.* at 12.
[20] *Id.*

Even under its self-adopted and unacceptably limited charge of considering only whether the pulling of the trigger was consistent or inconsistent with policy, the FRB fails. Its processes do not guarantee anything close to a thorough, fair, and impartial investigation. Instead, they continue to permit the possibility of collusive, biased, or inaccurate testimony.

The Monitoring Team will continue to have minimal confidence in the FRB's proceedings, investigations, and findings unless and until it improves the quality of its deliberations and investigations, as well as considers implementation of the recommendations outlined below.

## How the FRB Works

Since its April 2013 report, the Monitoring Team has attended many FRB proceedings. FRB proceedings have not significantly changed during the Monitoring Period. The Board consists of four voting members and four observing members. The four voting members include an Assistant Chief who presides over the proceedings. The other three voting members are a Captain from Training, a Captain selected by the presiding Assistant Chief, and a Lieutenant selected by the presiding Assistant Chief. The four observing (non-voting) members are a Citizen Observer, a Seattle Police Officers' Guild representative, a representative from communications (911), and a legal advisor from the City.

Approximately two weeks before a FRB, the SPD compiles all investigative materials for the Board's review. Board members are required to review those materials prior to the FRB. The investigative materials include: an incident summary; incident and arrest reports; CAD history and crime scene logs; Crime Scene Investigation reports, diagrams, and charts; officer statements; suspect/victim information; autopsy photos, when available; witness information; evidence and property reports; gun information; communications logs; related police reports; and, when available, audio and/or video recordings of the incident. Each of the involved officers (those whose weapon was discharged) provides a written statement.

The form and process of FRB review has generally been consistent. First, the Board visits the site where the officer involved shooting ("OIS") occurred. At the site, the investigating homicide detectives walk the Board through the scene and summarize the series of events that led to the OIS. Board members ask questions about the physical locations and positions of the involved officers, persons, and citizens during the incident.

The Board then reconvenes at the Department. There, Homicide and CSI—the divisions currently charged with investigating officer-involved shootings—report on their investigation. This report includes a description of the involved officers, 911 audio recordings, other video and audio

recordings, ballistic analysis, and an account of any history of SPD involvement with the suspect/victim.   The Board asks questions of the Homicide and CSI detectives about their investigation and report.

After the Homicide and CSI report, the involved officers testify orally before the Board.   The officers' testimony recounts the series of events leading to the shooting, the actual use of force itself, and the events preceding the giving of a compelled, written statement.   After each officer testifies, the Board members, including the non-voting Seattle Police Officers' Guild representative and the Citizen Observer, are permitted to ask the officer questions to clarify their testimony.   The Monitoring Team also asks questions from time to time.   Yet, without adequate reason, the Director of OPA has been barred from attending the FRB, much less asking questions.   The City and SPD need to take steps to see this absence is remedied.

When more than one officer has discharged his weapon, the other involved officers are not permitted in the hearing room while testimony is being taken.   A break between the testimony of each officer regularly occurs.   The Guild representative observer to the FRB generally takes that time to meet privately with the next officer ahead of his appearance before the Board.   Once all involved officers have testified, the Board permits questions or comments by non-voting Board participants (union representative, citizen observer, and – recently – the Monitoring Team) before convening for deliberations.   The presiding Assistant Chief apparently has discretion over when deliberations conclude, as the Monitoring Team has observed the delay of FRB deliberations pending the possible scheduling and outcome of an Inquest.[21]   When the Board convenes for deliberations, the presiding Assistant Chief leads a general discussion of the evidence and testimony.   The format of this general discussion varies and depends on how active of a role the presiding Assistant Chief assumes.

Once the general discussion is completed, the Assistant Chief asks the following questions of the voting members of the Board:

1. The discharge occurred while the officer was?
   [ ] On Duty [ ] Off Duty

---

[21] An Inquest is a fact-finding hearing conducted before a jury. The King County Executive regularly calls for an inquest to determine the causes and circumstances of any death involving a member of any law enforcement agency within King County while in the performance of his or her duties.

2. Considering the circumstances known to the officer at the time, would it have been a reasonable alternative to allow the suspect to escape without resorting to the use of firearm(s)?[22]
   [ ] Yes [ ] No
3. Did the actions of the officer contribute to the need to fire?
   [ ] Yes [ ] No

Each voting board member then votes whether the firearm discharge was:

- Justified,
- Not Justified,
- Unintentional,
- Accidental (Weapon Malfunction), or
- Finding delayed until inquest or court action in this case is concluded.

The presiding Assistant Chief, typically following the voting, asks the Board whether it has any recommendations related to its conclusion about the nature of the firearm discharge. Those recommendations could include referring the case to OPA, mandating retraining for the involved officer, imposing discipline, or taking no further action.

## Assessment of FRB Meetings

The FRB has been heard to discuss whether its charge is limited to determining whether an individual officer's firearm discharge was "in policy" at the moment that the officer pulled the trigger. The Monitoring Team is puzzled by this discussion. The issue is settled. The Board must do far more than determine whether an officer's discharge was "in" or "out" of policy at the moment the trigger was pulled. It must consider the tactics, strategy, and performance of all involved officers from the time that they were dispatched or initiated activity through the use of force and securing of the scene, until the time when the involved officers completed their statements.

Regardless of whether an individual's firearm use was within policy, the FRB must consider what the Department can learn from the incident as a whole and suggest all necessary modifications in practice, procedure, process, training, supervision, or technology. This wide-ranging, critical

---

[22] This question is problematic in a number of important respects, foremost of which is that it presumes in each case that the only alternative to deadly force is escape. It unduly restricts the scope of inquiry and the nature of the FRB's discussions. The Monitoring team urges the City and SPD to revise the question.

inquiry promotes internal innovation and departmental learning that will enhance officer safety, improve law enforcement outcomes, and reduce the number of officer-involved shootings.

The Monitoring Team has recently observed that the FRB believes that an "accidental" shooting is a category of shooting that is independent of an "in policy"/"justified" or "out of policy"/"not justified" shooting.  It has observed that the Board seemed to shut down its analysis altogether when an officer said that a shooting as "accidental."  That is, an officer's indication that a shooting may have been "accidental" leads the Board to not carefully or candidly scrutinize the incident and, instead, merely to find that the shooting is consistent with SPD policy and "justified."  Such an abrogation of the Board's charge and duties simply because an officer claimed that a shooting was unintentional is inappropriate, inconsistent with best practice, and inspires little confidence in the community that the SPD evaluates all officer-involved shootings fairly and equally.

The Monitoring Team notes that the FRB's ongoing focus on the terms "justified" and "unjustified" in FRB determinations captures the self-imposed limitations of the Board's review. The concept of "justification" alludes imprecisely to criminal law, while the FRB's charge is largely to consider whether an officer's firearm use was consistent or inconsistent with SPD policy.  This is a change that other major departments have made long ago:  For example, the San Francisco Police Department's Firearms Discharge Board identifies shootings as "In Policy" or "Not in Policy."[23]  The Metropolitan Police Department in Washington, D.C. uses categories that include "Justified – In Policy," "Justified – Policy Violation" and "Justified – Tactical Improvement Opportunity," among others.[24]  Framing the discussion in terms of determining whether an officer's force was "justified" or "unjustified" is preventing the Board from a more comprehensive inquiry.

The FRB's current deficiencies go beyond an inability to embrace a broad inquiry that is critical and rigorous.  Too often, the examination of the involved officer involves suggestive or leading questions.   Breaks between multiple officers' testimony have permitted Board members or observers to potentially communicate the substance of questions being posed to, or testimony being provided by, preceding officers to witnesses that have yet to testify.  Likewise, the manner and means by which the officer's written statements are obtained does not lead to an appearance of independent, uncoached, unrehearsed testimony, as officers are not consistently sequestered prior to providing statements.  Such inconsistencies permit the possibility or, at a minimum, the appearance of collusive, biased, or inaccurate testimony.

---

[23] San Francisco Police Department (SFPD) General Order 3-10 (Sept. 2005), available at http://sf-police.org/Modules/ShowDocument.aspx?documentid=14802.
[24] Metropolitan Police Department (MPD) General Order 901.09 (2003 & May 2009 Rev.), available at https://go.mpdconline.com/GO/GO_901_09.pdf.

The Monitoring Team would be remiss not to note that the SPD has made some limited improvements.  During the past several FRB meetings, the presiding Assistant Chiefs have begun to refrain from prematurely announcing their own views of the merits until the FRB's voting membership has spoken.  The Monitor applauds these Assistant Chiefs for doing so, as this is one type of change that moves the FRB toward becoming a more rigorous, thorough, impartial, and dynamic deliberative body.  The SPD should create systematic safeguards to ensure that the mode of conduct that these Assistant Chiefs have appropriately adopted remains the norm.

The SPD has also shown a willingness to discuss structural changes to improve the FRB and satisfy the requirements of the Consent Decree.  Consistent with Paragraph 113 of the Consent Decree, the parties are currently discussing the use of a dedicated Force Investigation Team ("FIT") in all officer-involved shootings and parallel criminal and administrative use of force investigations.  The parties have also discussed collecting involved officer oral testimony shortly after an OIS occurs, rather than months later during FRB proceedings.  The Monitor looks forward to resolution and implementation of these structural changes.

To promote the sort of comprehensive inquiry that the FRB must commit to conducting, the Monitoring Team recommends that the FRB immediately make several significant structural and procedural changes:

> **1.** **SPD Must Strongly and Consistently Enforce a Prohibition on Involved Officers From Watching Any Video of the Incident and From Discussing the Incident with Other Officers Prior to Providing a Statement.**

SPD claims that it isolates each shooting officer from other involved officers and from outside sources of information immediately after an OIS.  In reality, it does not.  It is, at best, unclear whether the SPD provides involved officers with specific direction as to what kind of conversations are barred and what limitations on exposure to news media are imposed prior to the Department obtaining the officer statements.  Officer testimony during recent FRB proceedings has unequivocally demonstrated that the SPD is either failing to provide involved officers with clear sequestration instructions or the command staff is not enforcing any such restrictions.

For example, in one recent OIS, two of the shooting officers conversed privately at the scene about substantive events that immediately preceded the shooting.  One of those same officers watched a televised news report of the shooting before he wrote his official statement.  This television report supplied substantive information about the incident that the officer did not otherwise know.

The SPD's standard practice also allows officers involved in shootings to watch videos—both SPD-generated and those obtained from citizens—of the incident <u>before</u> completing their statements.

The videos are selected and edited by the SPD in advance by the detectives in charge of the post-shooting investigation, with unclear objectives for what is and is not included in the excerpts. There is no written policy or procedure restricting the detectives from commenting upon the incident during the course of their contact with the involved officers. There is no enforcement of any restriction against the involved officers meeting or speaking with each other, with ample opportunity to discuss the incident, before writing and signing their final statements.

In order for an involved officer's statement to be a true and independent recollection of the officer's actions and state of mind during the incident, officers should not be permitted to discuss the incident with other officers or view any videotape of the incident before giving a officer statement. To the extent that it is SPD's policy to restrict access to involved officers until the statements are obtained, it does not appear that that policy is being communicated to the officers, emphasized to the command staff, or enforced. As a result, the integrity of all of its OIS investigations can be called into question. The Monitoring Team finds this entirely unacceptable. There must be serious consequences for involved officers who receive additional or outside information from any source before giving a compelled statement for purposes of the administrative review. Of course, after giving a statement, an officer may properly be able to review such video.

### 2.      Involved Officers Should Not Testify at FRB Meetings.

After FRB proceedings have begun, it is common for FRB representatives—people who were present and heard prior testimony—to meet with involved officers before they testify. Regardless of whether those individuals discuss evidence that has been previously presented to the FRB, such meetings or conversations permit the appearance that involved officer testimony has been "coached" or may otherwise be skewed by disclosure of previously presented evidence. Restructuring the FRB, especially by dispensing entirely with involved officer testimony before the Board, would eliminate this risk. The Monitoring Team's recent discussions with SPD suggest that such testimony could be eliminated from FRB proceedings with minimal effort.

Especially once a FIT team is fully operational and conducting all criminal and administrative investigations, the Monitoring Team will expect that the FRB discontinue the practice of hearing live testimony from officers at the FRB, and instead rely upon officers' oral recorded or videotaped statements at or soon after the shooting, as described below.

### 3.      In-Car Video and Audio Must Be Available Of All Incidents.

As it is for the Use of Force Review Board, the availability of video in FRB proceedings is an ongoing issue. When video or audio is unavailable for an officer-involved shooting, the FRB

meetings to date have failed to adequately explore the issue.  Although the Monitoring Team recognizes that officer safety or other practical considerations makes capturing every officer-involved shooting unrealistic, accepting without serious question or inquiry the involved officers' explanations for multiple failures to activate recording equipment is unacceptable.

The Monitor expects that when video or audio of an OIS is unavailable, the Board will engage in a probing, meaningful examination of any failure to activate in-car video or audio recording equipment.  When an involved officer has failed to activate video and/or audio prior to or during an officer-involved shooting, the Monitor expects that the matter be automatically referred to OPA for a thorough administrative review.  When an involved officer's failure to activate in-car video or audio is found to violate policy, the Chain of Command should ensure that appropriate disciplinary consequences result.

### 4.   SPD and FIT Should Incorporate Several Best Practices to Aid FRB in Broadening the Scope of Its Inquiry.

The SPD should incorporate the following best practices to ensure higher-quality investigations and proceedings:

- Following delivery of a brief public safety statement, both shooter officer(s) and witness officers should be immediately sequestered.
- All officers should be separately transported back to Headquarters or the station.  All other necessary measures should likewise be implemented to preclude the shooter and other involved officers from discussing the incident by the shooter and other involved officers.
- Representatives sent to the scene to provide moral support to the involved officer(s) should not be permitted to discuss the details of the shooting itself, the events leading up to the shooting, or anything else related to how the shooting occurred.
- A union representative or lawyer should be provided as quickly as reasonable to SPD officers who request such assistance or representation.  Those representatives should be informed of and agree to be compliant with the SPD's policy against sharing incident information with the involved officer prior to obtaining of the involved officer's oral statement from the involved officer.
- The voluntary or compelled interview of the involved officers, including the shooter, should be fully recorded on videotape or its equivalent prior to the involved officer being relieved of duty.
- The SPD should at all times ensure that all involved officers observe an impermeable barrier between the parallel administrative and criminal investigations such that compelled officer statements and the fruit of those statements cannot cross over to the criminal investigation in

a manner inconsistent with involved officers' Fifth Amendment rights in the criminal investigation.

### 5. FRB Must Expressly Consider What the Department Can Learn From the Incident Generally.

As noted above, the FRB actively avoids considering anything other than whether an involved officer's pulling the trigger was or was not "justified."  FRB members seem to find consideration of whether other force should have been considered or other tactics deployed to constitute an impermissible "second-guessing" of officers.  However, many major departments have learned to overcome this institutional bias and have reaped the benefits of analyzing critical incidents with an eye toward learning lessons that can be passed on to fellow officers.  For example, the San Francisco Police Department has long observed that a central purpose of its firearms review process "is to ensure that the department is continually reviewing its training, policy and procedures in light of the circumstances that lead to firearm discharges by members."[25]  In a similar vein, for the past decade the Metropolitan Police Department in Washington, D.C. has required Board review of all serious force incidents address not only about policy and training compliance, but also: (i) "Whether proper tactics were used by the involved member(s)"; (ii) Risk management issue(s)"; and (iii) "Adequacy of related MPD training."[26]

Going forward, the Monitoring Team expects that FRB will engage in the more comprehensive and dynamic type of discussion similar to that which has begun to take place at the UOFRB.  At the same time, the City and SPD must take steps to improve the process, overcoming objections from any quarter and obtaining governmental approvals, as necessary, for such change.  Far from being a nexus of internal debate, discussion, and learning, the FRB is the area within the Department of the need of the most sweeping reform.

## OPA Investigations[27]

Since our First Semiannual Report, the Monitoring Team has continued to find OPA investigations to be careful, thorough, and impartial.  During that time, newly appointed OPA Director Pierce Murphy has made and announced a number of positive changes to the OPA investigation and certification procedure.  Although the CPC will ultimately need to determine

---

[25] SFPD General Order 3-10, *supra* note 14.
[26] MPD General Order 901.09, *supra* note 15.
[27] The following section corresponds to ¶¶ 164-67 of the Settlement Agreement and discusses SPD's progress in coming into compliance with this portion of the Settlement Agreement.

whether structural and other changes might be necessary for OPA going forward, the Monitoring Team recommends several changes to further improve the review process and quality of the already rigorous and fair investigations.

## How the OPA Works

The Office of Professional Accountability currently consists of six Internal Affairs investigating sergeants, one intake sergeant, one lieutenant, and one captain under the direction of a civilian Director. Pierce Murphy, after undergoing a selection process, was appointed by the Mayor and chosen by the City Council to succeed outgoing Director Kathryn Olson.  Director Murphy officially began his tenure as OPA Director on July 1, 2013.  The City Council has recently confirmed the reappointment of the OPA Auditor, Judge Anne Levinson (Ret.), for another three-year term.  The Monitoring Team has been pleased with the work of the Director and Auditor and applauds their appointments.

As stated in the First Semiannual Report, the CPC will ultimately need to grapple with the question of whether OPA is in need of structural or other change.  Pursuant to the Settlement Agreement and the Memorandum of Understanding, the Monitor can render technical assistance and recommendations to the CPC if requested to do so.  It is premature to anticipate what that advice might be.  In order to determine those eventual recommendations, and to gauge progress under the Settlement Agreement, we will evaluate the thoroughness, completeness, objectivity, and fairness of internal SPD investigations.  These investigations include Homicide investigations of shootings, chain of command investigations of use of force, and OPA investigations of complaints.  We also review OPA investigations in conjunction with ¶ 167 of the Settlement Agreement relating to the preparation of an OPA manual, ¶ 164 providing that the parties will continue to see that OPA conducts fair investigations, and  ¶ 201 providing the Monitoring Team with access to OPA files.

OPA has been quite hospitable to the Monitoring Team, allowing Team members to review its closed files and use its office space to do so.  In addition, OPA has agreed to scan all complaint files closed since the end of the DOJ investigation to the present time in order to enable the Monitoring Team to review them remotely.  The Monitoring Team believes that the scanning process is nearly complete.  To date, the Monitoring Team has reviewed almost 100 closed complaint files.

The Monitoring Team has also observed "classification" meetings between the Director and the Auditor.   At these weekly meetings, the Director and Auditor discuss classification of new complaints as either Supervisor Action ("SA") or full OPA Investigation Section ("IS") complaints.  The Director and Auditor add any allegations to a complaint if missing and appropriate,

recommend complaints for mediation where appropriate, refer cases for criminal investigation where appropriate, and discuss the recommended findings of IS complaints after OPA has conducted its investigation but before it has made an official finding.

Finally, members of the Monitoring Team have also attended Discipline Meetings where the chain of command meets to discuss and recommend discipline to the SPD Chief on those IS complaints where the OPA Director has issued a finding of "Sustained."

With a few exceptions, the investigations reviewed to date are professional, complete, and thorough. The investigative conclusions are, for the most part, reasonably supported by the evidence, even in those instances where the Monitoring Team might have seen things differently.

Director Murphy has recently instituted some changes in the OPA investigation and certification procedure. These changes were made, in part, in response to the DOJ's Findings set forth in its letter to the Mayor dated December 16, 2011. Director Murphy's changes include:

- **Staffing a Full-Time Intake Sergeant.**  In the past, investigating sergeants rotated as "intake" sergeants, taking the original complaints and conducting the preliminary investigation prior to classification of a complaint as SA or IS. OPA is now staffing a full-time Intake Sergeant or Acting Sergeant on a six-month basis, to handle all complaint intakes.

- **Recording OPA Director's Recommended Finding Before the Chief Makes a Finding.**  In the past, after an OPA investigation, the OPA Captain would issue a Proposed Disposition Memo ("PDM") to the relevant precinct or section captain of a particular employee named in an IS complaint informing him of the OPA proposed finding. After the precinct or other captain signed off on the PDM, the Chief would agree or disagree with the finding. The Chief, after generally consulting with the Director, would propose discipline. After that point, the Director would issue the Certification setting forth the official finding on an IS complaint.

  Under the new system, the process begins with the OPA Director informing the OPA Captain of his recommended finding. The OPA Captain then articulates that recommended finding in the Director's Certification Memo ("DCM"). Next, the DCM circulates to the relevant precinct or section captain for their review before being received by the Chief. This process ensures that the OPA Director's recommended finding is recorded before the Chief makes his finding.

- **Discontinuing Discipline Meeting Attendance.**  In the past, the OPA Director

attended Discipline Meetings attended by an Assistant Chief, the Captain in an employee's chain of command, and the SPD counsel. At these meetings both the merits of the Sustained finding and the recommended discipline would be discussed. Now, because the OPA Director has already issued his recommended finding, he attends the Discipline Meetings, but because he has already certified his Sustained finding, he will discuss the reasons for his decision but will instead focus the meeting on the recommended discipline. If the employee's chain of command disagrees with the Sustained finding, or if the parties in attendance at the Discipline cannot agree on a particular course of discipline to recommend to the Chief, then the parties can meet with the Chief to present the reasons for their disagreement before he makes a final decision.

- **Moving Director's Office to OPA Offices in a Centralized Location.** The Director's office has previously been located in SPD Headquarters. OPA offices have worked from another building. To enhance his independence from the SPD command staff and to work more closely and efficiently with OPA staff, the Director is actively looking to move his office to the OPA offices.

The Monitoring Team finds these changes to be positive. In particular, the Monitoring Team finds the new procedure for the Director to make recommendations on findings for Sustained IS complaints to be an important step in establishing the Director's independence from the Command Staff. The Monitoring Team will continue to review and assess these changes.

## Recommendations

The Monitoring Team looks forward to the CPC's review and assessment of the OPA process, as well as additional changes that continue to resolve issues implicated by the Department of Justice's Findings. In the meantime, the Team recommends the following changes to continue to improve the review process and further strengthen the quality of investigations:

1.   **OPA Should Make Attempts and Devote More Resources to Conducting In-Person Interviews of Complainants and Witnesses.**

Many complainants and most non-SPD employee witnesses are interviewed telephonically. In-person interviews are, however, much more valuable, because they provide the investigator with a better opportunity to judge a person's credibility, establish rapport with the witness, and (where applicable) permit the witness to sketch a scene or annotate a scene diagram.

### 2. Command Staff Employees Should Be Interviewed In-Person, Like All Other Employees, Rather Than in Writing.

When higher-level SPD employees are involved as witnesses to a particular complaint, they are afforded the opportunity to respond to an investigator's questions in writing.  This unusual procedure does not seem warranted and may create the appearance of preferential treatment.  Command staff employees should be interviewed in person like all other employees.

### 3. Investigators Should Receive Additional Training to Reduce the Frequency of Leading Questions.

Investigators tend to ask many leading questions.  Although leading questions may be appropriate to speed through topics that are not dispute (*e.g.*, "You were working patrol that night, correct?"), they are often counterproductive when addressing matters that are in dispute.  Open-ended questioning, on the other hand, permits the witness to provide a narrative in his or her terms and often yields relevant information previously unknown to the investigator.  Investigators would benefit from some additional training in interview techniques.  In addition, OPA supervisors reviewing interview transcripts should provide investigators with prompt, detailed feedback regarding interview technique.

### 4. The Auditor Should Provide Notes or a Memo in IS Files to Confirm Review.

The Auditor reviews every IS complaint and provides valuable insight to the Director.  But this insight is not memorialized or kept in the IS complaint file unless she makes an order or recommendation pertaining to the investigation.  The Auditor should begin providing notes or a memo in each file confirming that she has reviewed it and providing summary comments.

### 5. OPA Should Continue to Attend All UOFRB Meetings.

In part due to the Monitoring Team's recommendation, OPA has been attending the weekly UOFRB meetings for the past two months.  OPA members in attendance at these meetings have included Director Murphy, an OPA Lieutenant, and investigating sergeants.  The Monitoring Team requested OPA's attendance at the UOFRB meetings for several reasons.  First, OPA will be able to identify any force incidents that merit further internal investigation by OPA.  Second, if OPA does assert jurisdiction over a particular force incident, it will have the benefit of the initial review and discussion of the Board members to consider along with its in own analysis and investigation. Third, the participation by and input from OPA employees, who have significant investigation experience, enhances the UOFRB discussion and review process.  Finally, OPA

representatives benefit from hearing UOFRB representatives articulate current training, practice, and expectations. The learning process works both ways.

It should be noted that OPA's attendance at these meetings has not been met with universal acceptance by the Board members, some of whom question whether the OPA will be able to conduct an IS investigation into potential misconduct with impartiality if it attends a UOFRB review of that same incident. However, this concern mistakenly conflates OPA's attendance at UOFRB meeting with its rendering final judgment over particular cases. OPA fully understands that the force packets provided to UOFRB members do not constitute a full, complete investigation of an underlying incident. Instead, it is a collection of reports written by involved officers, witness officers, and the chain of command. It also understands the difference between first and final impressions: additional facts may come to light later as a result of a detailed investigation.

Thus, the Monitoring Team and others within SPD and OPA strongly believe that OPA staff members are professionals who will be able to conduct an objective investigation. In fact, the Monitoring Team has reviewed more than one IS complaint file where UOFRB had already reviewed and made a finding on a particular use of force before the OPA made its finding. In those cases, OPA noted and possibly gave appropriate weight to the UOFRB finding, but it nonetheless conducted its own, independent investigation and made its own finding based on additional facts it obtained during its investigation. Based on its review to date, the Monitoring Team will continue to recommend OPA's attendance at the UOFRB meetings. The Command staff of SPD must promptly act to describe the appropriateness of OPA's attendance in the UOFRB meetings to the Board members, so that resistance is eliminated. Any Board member who continues to resist or hold reservations about OPA's involvement should not participate in Board reviews.

## Community Outreach

In the First Semiannual Report, the Monitor set forth three goals for the Monitoring Team's own community outreach:

1. To be in close contact with communities of color and other minority communities, civil rights and human rights constituencies, and advocacy organizations in order to assess the progress of the SPD in complying with both the letter and spirit of the Settlement Agreement.

2. To work with the CPC, pursuant to the Memorandum of Understanding and Settlement Agreement, so that the CPC may function as a powerful,

independent policymaking body that proceeds carefully based upon evidence and whose conclusions and recommendations have great integrity and persuasive power.

3. To work with the CPC, OPA, OPARB, the OPA Auditor, and the SPD so that, also pursuant to the Memorandum of Understanding and the Settlement Agreement, standards are established to ensure that SPD investigations and reviews are above reproach, including augmenting the powers and responsibilities of those entities providing oversight to OPA and recommending other meaningful reform of OPA.

During the past six months, the Monitoring Team has made substantial progress toward all three goals. It has directly engaged with community organizations and citizens, seeking opinions, views, and counsel. It commissioned a community-wide survey on the views of Seattle residents toward the SPD—a survey that revealed general approval for the SPD to the extent that it is seen as keeping people safe, serving neighborhoods effectively, and quickly solving crimes or arresting suspects. However, the survey also revealed a widespread view that the SPD treats members of different races differently and uses force excessively. The Monitoring Team has developed good, collaborative relationships with the parties, community organizations, and key officials.

The Monitoring Team commends SPD's direct community outreach efforts and urges the Department to prepare even more sustained and coordinated education and outreach to coincide with the implementation of new use of force, stops and detentions, and bias-free policing policies. It likewise commends the efforts of the CPC and its focused leadership, dedicated membership, and hardworking staff. The Monitor eagerly awaits the ability to consider the results of the CPC's ongoing community outreach efforts as part of the ongoing quantitative and qualitative assessment of the SPD's relationship with the Seattle community generally and minority communities specifically.

## Community Outreach by the Monitoring Team

The Monitor and his team have continued to meet, consult, and interact with a multitude of institutional and community stakeholders, including the Community Police Commission, the parties to the Settlement Agreement, community groups and organizations, and other interested community members. A representative sample of individuals, organizations, and activities with which the Monitoring Team has been engaged over the past six months includes, but is not limited to:

- Attendance at the YWCA Seattle Stand Against Racism Program, with youth from Franklin and Garfield High Schools, members of the sponsoring committee board, and panel of public officials and members of the King County bench;
- Participation at an outreach event for at-risk youth and prisoners sponsored by True Vine Holiness Missionary Baptist Church and Pastor Lawrence Willis of United Black Clergy;

- Attendance at MLK First AME Church 23rd Annual Youth & Law Forum, with SPD Chief Pugel and other SPD members; community youth; community parents; various Judges; and other interested community people;

- Presentation on the progress of the police reform effort before NAACP Executive Board with Chief Pugel at Shiloh Baptist Church;

- Attendance at SPD Chief's City-Wide Advisory Council Meeting with Chief Pugel and OPA Director Pierce Murphy at SPD Academy;

- Presentation by the Monitoring Team to the Downtown Business Association;

- Presentation by the Monitoring Team to the Loren Miller Bar Association;

- Attendance at the 2013 SPD Promotional Ceremony;

- Attendance at the 2013 Seattle Police Foundation Annual Awards Banquet;

- Attendance at nearly every CPC Board meeting and at several of the CPCs work groups;

- Presentation of the Monitoring Team Community Survey to representatives of the Mayor's Office, CPC, SPD, the DOJ, the Seattle City Council, and the public;

- Attendance at meetings of the African-American Advisory Council;

- Meeting with Carla Lee, Deputy King County Prosecutor, Director of Community Outreach, King County Prosecutor's Office; and

- Attendance at a South Precinct and Rainier Beach community-wide meeting celebrating the promotion to Captain of Lt. Carmen Best, former head of Community Outreach for SPD, at the Rainier Beach Community Center, attended by (among others) Virginia Peterson (head of the South Africa Social Security system), members of the CPC, and members of the SPD.

The Monitor has continued to seek ideas, views, and feedback from members of the Seattle Police Officers Guild, the Downtown Business Association, the American Civil Liberties Union, the Seattle City Council, the Seattle Human Rights Commission, and the Seattle Office of Civil Rights. The Monitoring Team has also enjoyed, as noted elsewhere in this report, good relationships with Pierce Murphy, OPA Director; members of OPARB; and Anne Levinson, OPA Auditor.

## Survey of Community Perceptions and Attitudes

As an important, early step in what will be ongoing and multi-faceted efforts to assess community perceptions of the SPD, the Monitor charged nationally renowned polling research firm Anzalone Liszt Grove with the task of conducting a community survey.  The survey provides a snapshot of Seattleites' perceptions of the SPD with respect both to the Department and issues central to the Settlement Agreement, such as use of force and racial profiling.[28]  The results of the survey are not a baseline.  Instead, they represent an initial element of the Monitoring Team's continuing and comprehensive initiative to fully and rigorously asses the Seattle community's perceptions of the SPD.  The Monitoring Team eagerly awaits additional insights and information from the community focus groups and other assessments that the CPC is conducting.

### Survey Methodology

The Monitoring Team developed the survey instrument and questions, and determined the appropriate number of individuals to sample, after consulting with the Community Police Commission ("CPC") and Professor Jack McDevitt of Northeastern University, an expert on issues of race and justice.[29]

For the survey, 900 people were interviewed in English by telephone, 55 percent on landlines and 45 percent on cell phones.  Respondents were Seattle residents who are at least 18 years of age.  As summarized in Table 2, the sample was apportioned to match the city's demographics in terms of race, age, gender, educational attainment, sexual orientation, and geography (in terms of police precinct).

The survey sought to measure both race and nationality or ethnic descent, as the Monitoring Team recognizes the diversity of these populations and of the potential experiences and attitudes toward the SPD among these groups.  Accordingly, the survey asked Asian-Americans and Pacific Islanders

---

[28] Appendix A to this report provides Anzalone Liszt Grove's summary of its survey results, which were released to the parties, stakeholders, and public in September 2013.

[29] The Monitoring Team also conferred with Professor McDevitt on the analysis and interpretation of the survey's results.

for their ancestry.[30]  Likewise, the survey asked whether those identifying as black considered themselves Eritrean, Ethiopian, or Somali.

Survey interviews were conducted in English.  The Monitoring Team is mindful that members of some minority communities may not speak, understand, or feel comfortable communicating in English.  Indeed, language obstacles may have caused potential respondents for whom English is not their first language to elect not to respond to the survey or, in other cases, to take the survey without being precisely certain about what was being asked.  The Monitor closely considered the prospect of adding the capability of conducting interviews in additional languages.  The main barrier to doing so, however, was the substantial increase in cost.

Just as the overall survey sample matched Seattle's overall racial composition, the ages of those sampled were roughly representative of Seattle's overall age diversity.  The survey offered several sub-samples of age groups to thoroughly explore potential differences in attitudes and experiences among different age groups.  For example, as a means of better understanding the younger Seattle population, the survey examined respondents age 18-34, 18-24, and then more specifically, 20-24.

The sample was evenly split between men and women.  The survey asked respondents whether they identify as Lesbian, Gay, Bisexual, and/or Transgender (LGBT).

Seattle is, of course, a city of distinct neighborhoods.  The survey's sample reflects this geographic diversity and is proportionately representative of where Seattleites live.  A plurality of Seattle residents live north of the Lake Washington Ship Canal within the boundaries of SPD's North Precinct.  Accordingly, 42 percent of the survey's respondents live in that area of the city.  Thirty (30) percent of the survey's respondents were from the southern portion of the city, including SPD's South and Southwest Precincts.  An additional 28 percent of respondents were from the central portion of the city, encompassing SPD's West and East Precincts.  The map below identifies each respective SPD precinct:

---

[30] The nationality choices with their respective percentage of the Asian American or Pacific Islander populations were: Cambodian (1%), Chinese (25%), Filipino (16%), Indian (10%), Japanese (11%), Korean (10%), Laotian (0%), Vietnamese (17%), Other (5%), and Don't know/Refused (6%).



Results of the Survey

A majority of Seattle residents approve of the job that the SPD is doing generally, to keep people safe, to serve their neighborhoods, and to quickly solve crimes and arrest suspects. This overall approval rate does, however, mask some underlying problems. In particular, just 35 percent of

Seattle residents believe that the SPD treats members of all races equally, while 45 percent of respondents say that the SPD uses excessive force very or somewhat often.

Seattle residents' overall approval of the SPD was indeed high, with 60 percent of Seattleites approving and 34 percent disapproving.  Overall approval was lower for African-American (49 percent) and Hispanic/Latino (54 percent) respondents.  Table 3 details SPD's overall job approval among various demographic groups.[31]

## Table 3: Seattle Police Department Job Approval

| Demographic | Total Approve | Total Disapprove | Net Approval |
|---|---|---|---|
| *Race* | | | |
| White | 60% | 35% | +25% |
| African American | 49% | 42% | +7% |
| Hispanic/Latino | 54% | 39% | +15% |
| Asian American | 67% | 27% | +40% |
| *Gender* | | | |
| Male | 60% | 34% | +26% |
| Female | 60% | 33% | +27% |
| *Educational Attainment* | | | |
| High School or Less | 70% | 24% | +46% |
| Some College | 66% | 28% | +38% |
| College Graduate | 53% | 39% | +14% |
| Postgraduate | 57% | 37% | +20% |
| Geography | | | |
| North Precinct | 62% | 30% | +32% |
| West Precinct | 61% | 36% | +25% |
| East Precinct | 49% | 45% | +4% |
| South Precinct | 59% | 31% | +28% |
| Southwest Precinct | 63% | 35% | +28% |
| Sexual Orientation | | | |
| Gay/Lesbian/Bisexual/Transgender | 55% | 27% | +28% |
| Not Gay/Lesbian/Bisexual/Transgender | 61% | 32% | +29% |
| *Age* | | | |
| 18—34 | 61% | 34% | +27% |

---

[31] The response percentages for "Don't Know" were omitted from Table 3.

| 35—49 | 56% | 36% | +20% |
| 50—64 | 60% | 34% | +26% |
| 65+ | 64% | 30% | +34% |

One useful method for identifying groups with the highest and lowest approval of the SPD is to identify a given group's "net approval," which is derived by taking the percentage of group members who approve of the SPD and subtracting from that number the percentage of group members who disapprove of the SPD.  For example, Table 3 shows that although 60% of white respondents approve of the SPD, 35% of white respondents do not — leaving a net approval rating of 25%.

- African Americans
- Hispanics or Latinos
- College Graduates (highest level of completion)
- People living within the boundaries of East Precinct

The following groups were at least seven percentage points higher in net approval than 26 percent:

- Asian Americans
- People who have completed high school or less
- People who have completed some college
- People older than 65 years of age

Based on feedback from community members and the CPC, we plan to further explore Asian American, as well as African-American and Hispanic/Latino, support and perception of the police because the survey may not have sufficiently gauged the opinions of those who do not consider English their first language.  Additionally, in subsequent surveys, efforts will be intensified to obtain a broader sample of Native American opinion.

The survey revealed weak approval numbers from college graduates.  One reason may be that this group tends to get their information from different sources than others.  Generally, respondents hearing about SPD from "other newspapers, online or in print," "other websites," or through "word of mouth" disapproved of SPD by a larger margin than respondents who get their information from "local TV news," "radio," or "the *Seattle Times*, online or in print."  Another reason may be that African-American and Hispanic/Latino college graduates strongly disapprove of the job that the SPD is doing – some 56 percent disapprove.  Conversely, a similar percentage of white college graduates (55 percent) approve of the SPD.

The survey also revealed that people of all races believe that the SPD does not treat people of all races and ethnicities equally.  Indeed, just one-third of Seattle residents (35 percent) say that the Department treats all races equally.  Similarly, a majority of those surveyed (53 percent) believe that SPD often engages in racial profiling.  African-American and Hispanic/Latino respondents are even more likely to say that the SPD does not treat people of all races equally, engages in racial profiling, and uses excessive force.  Table 4 reflects these troubling statistics.

### Table 4: The Seattle Police Department "Treat[s] people of all races and ethnicities equally."

| Demographic | Total Agree | Total Disagree | Net Agree |
|---|---|---|---|
| *Race/Ethnicity* | | | |
| White | 31% | 50% | —19% |
| African American | 35% | 64% | —29% |
| Hispanic/Latino | 29% | 57% | —28% |
| Asian American | 42% | 36% | +6% |

### The Seattle Police Department "Engage[s] in racial profiling."

| Demographic | Total Agree | Total Disagree | Net Agree |
|---|---|---|---|
| *Race/Ethnicity* | | | |
| White | 54% | 31% | +23% |
| African American | 68% | 26% | +42% |
| Hispanic/Latino | 61% | 29% | +32% |
| Asian American | 32% | 49% | —17% |

### The Seattle Police Department "Use[s] excessive physical force."

| Demographic | Total Often | Total Not Often | Net Often |
|---|---|---|---|
| *Race/Ethnicity* | | | |
| White | 43% | 44% | —1% |
| African American | 70% | 26% | +44% |
| Hispanic/Latino | 62% | 30% | +32% |
| Asian American | 31% | 48% | —17% |

Furthermore, only about one quarter (25 percent) of respondents said that the SPD treated homeless people the same as everyone else.  Just one-third (33 percent) of respondents said that the SPD did not treat African-Americans, Hispanic/Latinos, or Native Americans the same as everyone else.  Clearly, the perception that SPD treats some populations differently is not simply an opinion held by certain minority populations or demographic groups.

In a multivariate regression analysis (a statistical test that can control for or isolate some variables to identify what factors are most highly correlated with a given outcome— for example, whether,

or to what extent changes in income, education, or population density might be associated with changes in crime rates) conducted by Anzalone Liszt Grove, the most predictive statement of respondents' opinions of SPD was whether or not respondents agreed that "the Seattle Police treats all races equally."  That is, those who saw the SPD as treating people equally tended to approve of the SPD overall, while those who saw the SPD as not treating people equally had a negative view of the SPD generally.  Thus, the perception that SPD does not treat people of different races the same is an area in which the SPD must work to change perceptions, policies, and practices.  Overall support for the SPD and its reform efforts depends on it.  Higher approval ratings for the SPD in general and less differentiation between the various demographic groups need to come about.  To demonstrate full and effective compliance with the Consent Decree, it must be demonstrated that Seattle residents do not diverge significantly in the perception that the SPD treats all races, ages, ethnicities, and members of the LGBT community equally and that significant majorities of all groups believe the SPD treats all groups equally and fairly.  Likewise, the SPD must reverse the common perception by 45% of the Seattle population that the SPD routinely uses excessive force.  The Seattle Police Department has a long way to go in this area before full and effective compliance is reached.

## Future Research

The Monitoring Team plans to conduct future surveys to discern whether, and how, Seattle residents' perceptions of the Department change over time.  Indeed, one benefit of this initial, broad survey of community-wide attitudes is the ability to ask the same questions to future statistically significant samples of Seattle residents such that comparisons over time can be valid and rigorous.  The Monitoring Team plans to explore various additions to the survey and methodology that might enable us to further understand the relationship between the community and SPD, including conducting the survey in more than one language, oversampling populations of interest, and asking respondents about their income levels.

The Monitor also intends to conduct additional qualitative inquiries to gauge attitudes, perceptions, and experiences among some minority populations that, although their representation in the survey sample matched their representation in the overall Seattle population, did not provide sufficient responses to be able to characterize their views with the necessary statistical certainty.  Specifically, the Monitoring Team looks forward to exploring further the attitudes of the Native American and African born population.

Additionally, we encourage SPD to conduct an internal survey of officers and supervisors to determine the Department's perceptions about the community and their interaction with it, as well as the Department, including:

- Do police officers feel supported by the community?
- Is the Department heading in the right direction?
- What are the problems that officers face when interacting with the community?

The quality of the relationship between the community and SPD is shaped not only by how the community perceives SPD but how the rank-and-file view the Department and community.  All stakeholders would benefit from a systematic, comprehensive view of officer attitudes about SPD and the community.

## Community Outreach by the SPD

Community outreach by the Seattle Police Department and its reception by the community will be important to the long-term success of the Consent Decree and comprehensive reform effort.

Since the First Semiannual Report, the SPD has been active in outreach via presentations to community groups on the police reform effort.  Such outreach has been primarily accomplished through the SPD Community Outreach division's ties to existent groups (including the African-American Advisory Council, Mothers For Police Accountability, the Chief's City-Wide Advisory Council) as well as in collaboration with the Monitoring Team.  Members of the CPC and Compliance Office joined members of the Monitoring Team at the annual conference of the National Association for Civilian Oversight of Police (NACOLE) in Salt Lake City, which addressed police oversight, use of force, investigations, accountability, and managing settlement agreements.

The Monitoring Team commends the SPD for its community outreach efforts.  As new policies are approved and implemented, however, the SPD will need to engage in a larger, more comprehensive, and city-wide effort to educate the public with regard to the Department's reforms.  We urge the Department to begin actively planning a broader, more sustained community outreach initiative that will educate and inform citizens about the how the SPD is changing—and continue to solicit community feedback about how the SPD is doing.

## Community Outreach by the Community Police Commission

The Settlement Agreement, recognizing that the Seattle Police Department serves a diverse population with sometimes divergent interests and law enforcement goals.  It is one of several important avenues for communicating and incorporating the "community's perspective" to internal City discussions on vital issues in police reform.

The CPC specifically is one instrument to facilitate reciprocal communication and consultation

with Seattle's diverse communities with the purpose of accomplishing the SPD and community's goals of achieving police reform, as well forging a new relationship and fulfillment of community responsibilities to cooperate with the SPD in solving crimes and maintaining order.

The Community Police Commission's establishment was initially slowed by delays in the confirmation, funding, and staffing process.  The formulation of final policies by the parties and the Monitor was further delayed by CPC's several requests for extensions to provide input.

The CPC has established at least six workgroups to assess, make suggestions, and provide feedback to the parties regarding stops and detentions, bias-free policing, in-car video, community engagement, crisis intervention, and use of force.

For policies related to bias-free policing and stops and detentions, the workgroups reviewed policy drafts developed by SPD, and made suggested revisions to those drafts.  The Monitor's work with the CPC in-car video work group, under the stewardship of chair Tina Podlodowski, working together with the Seattle Human Rights Commission ("HRC"), has been aided by suggestions from HRC and CPC. Those two groups still must resolve differences between them on recommendations on triggers for the ICV system.

The CPC has promulgated a questionnaire on Use of Force and police reform issues.  The results of that questionnaire, combined with the Monitor's earlier survey and SPD's own survey, provide a rounded base of community attitudes.

The CPC's Community Engagement effort has initially consisted of a set of community engagement sessions conducted by the CPC and various community partners.  It seeks to provide insight into community attitudes on use of force and other police reform issues.  A full report of the CPC's community engagement outreach process is expected to be issued in January 2014.

The Monitor recognizes the hard work of the CPC, its partners, and all the other community and law enforcement voices sharing their experiences, perspectives, and recommendations.

# Crisis Intervention[32]

The Monitor has been encouraged and impressed by the creation and development of the Crisis Intervention Committee (CIC).  Yet much work remains, including a final decision about the chain of command under which the dedicated Crisis Intervention Team ("CIT") follow up unit and the CI-Trained Patrol Officers' Coordinator should be housed, the continued development of policies and procedures for such a unit, and an expanded, dynamic critical incident database.

---

[32] This section corresponds to ¶¶ 130-37 of the Settlement Agreement.

The SPD's "CIT Program" was created so that SPD patrol officers might use their CIT training, expertise, and experience to join first responders to handle individuals manifesting mental or psychological impairment or behavioral crisis.  There are three components of the Program: the line patrol officers, all of whom will receive at least 18 hours of CI training; the 4-person CIT follow-up Unit; and the dedicated CI Trained Officer, who voluntarily has or will take the 40-hour training at the CJTC and annual 8-hour refresher.  Currently, the CIT Unit now primarily performs only follow-up to incidents that involved individuals with mental illness or psychological difficulties, suffering from drug addiction, who are suicidal, or who have exhibit signs of substantial emotional distress.  While doing excellent work in that capacity, the follow up Unit is largely divorced from the work and day-to-day operations of the line patrol officers and even the CI-Trained officers.  The Unit also does not have an established relationship with the CJTC and does not have an active training/consultation function.  CI-Trained officers do, on rare occasions, become involved at a scene while an incident is still active, either because responding SPD units request their assistance or because the Unit discerns from radio traffic that their expertise could be useful.

The CIC is considering whether, and how, a dedicated CI-Trained officer could return to being a part of the first response.  The CIC has recommended that the CIT follow-up Unit be moved from within the SWAT chain of command to the Patrol division.  Similarly, the CIC has determined that the CI-Trained patrol officers need a point of contact, a coordinator within the Patrol Division (and liaisons within each precinct), to coordinate training and be a source of expertise for consultation. The Monitor hopes that this reallocation unit and the establishment of a coordinator and liaisons will create a better integration with patrol operations and promote the role of the CI-Trained patrol officers in first response situations.  The CIC should provide the Monitor with an outline of the specific steps that are needed to quickly and effectively make this happen.  CIC also needs to provide the Monitor with recommendations on how to effectively roll out the CIT program both within the Department and the community.

The Monitor will eagerly await any recommendations from the CIC as to how to change a culture in the SPD that, for too long, has believed that other organizations and groups, like medical professionals or social service providers, are better equipped than police officers to interact with individuals in a crisis situation, and the countervailing view that the CI training does not have much to offer the line patrol officer.  That is, line officers and SPD leadership alike have tended to believe that the role of officers is to safely detain an individual involved in a crisis situation and that CIT expertise is unnecessary to effectuate detention.  This must change.  Although the outside resources continue to play a vital support function, the SPD needs to elevate the profile of CIT-trained and –dedicated officers and to clarify their role throughout the Department.

All officers must come to understand that CIT is an important, fully legitimate, and effective part of the Department's strategy for managing crises situations.  The Monitor is confident that the CIC will devise effective strategies to reverse this conception of CIT at SPD.  The planned move of a dedicated CIT Unit to the Patrol division is an encouraging start.  Continued communication to all parts of the Department on CIC's newly-approved mission and vision statement, which proposes that CIC's task is to build "[a]n effective regional crisis incident response built upon best practices, innovation, and experience" that will "set[] the conditions for strong community and regional partnership in establishing best practices."

## What the CIC Does

There are currently 42 members of the CIC, each belonging to one or two subcommittees.  Other than members of SPD, the CIC's members are voluntarily providing their time and expertise.  The Monitor is grateful to them.  Membership on the CIC was determined, consistent with the Settlement Agreement, as a result of collaboration between the city of Seattle, including the SPD, the DOJ, and the Executive Steering Committee.  The goal was to bring together the best and brightest of regional mental health providers, clinicians, advocates, academics, outside law enforcement representatives, and the judiciary.  To aid the efforts of the CIC, the DOJ provided Randy Dupont from the University of Memphis, an expert who played a crucial role in creating the Crisis Intervention Team for the Memphis (Tennessee) PD, and Lisabeth Eddy, who played a similarly major role in formulating a CIT program in the Seattle PD in the late 1990s and early 200s, which largely went moribund following her departure.  Ellen Scrivner of the Monitoring Team provided her knowledge of relevant issues gained as a result of her role in the creation of CIT operations at the Chicago Police Department.  Since June 2013, Captain Chris Fowler of the Seattle Police Department is responsible for the execution of the CIC meetings and development.

The CIC's mission is to:

- Collaboratively revise SPD's policies and procedures on dealing with individuals in crisis;
- Identify and resolve systemic barriers to doing so;
- Establish permanent problem-solving forums with those providers; and
- Collect data so that the network of services among SPD and providers is self-correcting.

The CIC is composed of an Executive Steering Committee and three sub-committees, which have all met on three to four occasions:

- Policy and Curriculum, which is responsible for reviewing the CIT policy and training curriculum;

- Data Outcomes, which is investigating existing data that can guide the creation of the CIT program and planning for the collection of data in the future, both internal and external to the Department; and
- Systems, which is researching the current system for crisis response and delivery and the connections between agencies and operating procedures currently in effect.

This model (the "Memphis Model") has been subject to peer review study and it has been shown that, where it has been adopted and sustained, it has decreased the incident of force on those in behavioral health crisis.  Because historically 70% of SPD's use of force is on this population, this interagency, regional collaboration can make a significant impact, particularly in shaping an officer's interaction with those populations.

## Assessment of the CIC's Progress

The Monitor is encouraged by the progress that the CIC has already made.  The CIC's ongoing and active use of experts from medicine, law, law enforcement, social welfare, and academia reflects a willingness to explore new approaches to critical incident intervention that can link social service providers with either specially trained SPD CIT officers or non-CIT officers.  The Monitoring Team commends the CIC for considering an array of informed opinions and expertise.

The CIC's structure and process must also be praised.  Meetings now are scheduled well in advance, relevant materials are usually sent to all members prior to meetings, detailed notes are taken and distributed, and discussions are conducted in a manner that takes in many often conflicting opinions while not becoming bogged down in minutia.  We commend Chris Fowler for his work in providing this structure to the CIC. Stephanie Provido has also made significant contributions to the CIC as an Administrative Specialist, and the Monitoring Team wishes her well in her next position at SPD.

The Policy and Curriculum Subcommittee's diligent work has already produced promising results. An initial draft policy outlining the role and responsibilities of the dedicated CIT Unit has been created.  The Policy Subcommittee reviewed this and crisis intervention policies from other law enforcement agencies from around the country including the Memphis Police Department (Tennessee), the Hillsborough County Sheriff's Office (Florida), and the Seminole County Sheriff's Department (Florida).

As of the time of this report, the Policy and Curriculum Subcommittee continues to refine the current draft of the policies.  The Executive Committee will review and present their proposed policies to the SPD by November 22.  The SPD will present those policies to the Monitor by

December 17, 2013.  Nonetheless, the Monitor is heartened by the latest draft policies.  They incorporate several improvements to previous Crisis Intervention policies.  The policies include clear protocols that address referring individuals suffering from crisis to health organizations for assistance and treatment.  The role of a Designated Mental Health Professional is explicit, and his or her ability to have a subject detained is clear.

Additional issues should be addressed in the policies before they are delivered to the Monitor.  Frist, the policies should expressly clarify the role and responsibilities of CIT-trained officers in the critical moments of first response.  Once a subject is identified as suffering from a "Crisis Incident" the policies should, as specifically as possible, lay out how a CIT officer's expertise will be utilized in the context of other responding officers during an ongoing incident.  All officers on the scene should understand the role of the CIT trained officers.  Nothing should obstruct the CIT officer from engaging with the individual.  Of course, the CIT officer should not trump the chain of command.  Nonetheless, the policies should allow a CIT-trained officer to implement their training and special expertise, without superseding rank.  The Monitor looks forward to the recommendations of the Systems Subcommittee, which is evaluating this aspect of first response.

Second, generalized CIT training must be supplemented by specialized instruction that focuses on the CIT needs specific to the Seattle population.  For example, CIT-trained officers should be well educated in the public and mental health resources of Seattle and familiar with the operations of the Mental Health Courts.  The 40-hour CIT training, conducted by the Washington State Criminal Justice Training Commission, given to officers who will use these skills on patrol has previously been examined.  The Policy and Curriculum subcommittee will examine the 18-hour training that all officers will receive, dispatcher training, and the 8-hour refresher courses that CI-Trained officers complete annually after the initial training.  It is considering mechanisms for providing officers supplementary, Seattle-tailored instruction, whether by supplying leaders within the CIT Unit to provide supplemental trainings at state trainings or requiring Seattle-specific training at SPD in addition to the general CIT course.  The Monitoring Team looks forward both to a decision on how to provide instruction focusing on local CIT issues, as well as de-escalation training and training to dispatch so that they can direct CIT-trained officers to situations where their expertise is needed, and the development of a Seattle-specific CIT training curriculum.

The CIC Systems Subcommittee is also considering clarifying the appropriate workflow for the SPD, County, and City's critical incident functions.  Ultimately, a flowchart needs to be presented to the Monitor that shows how the CIT will function internally and for various organizations and departments across the City.  Because Seattle is experiencing many challenges in meeting the needs of community involved in mental health issues with appropriate resources, it is the SPD that often must make decisions on whether to detain individuals suffering from mental health challenges.  The CIC Subsystems committee is looking into the current process for authorizing

involuntary detentions where appropriate.  The SPD's Crisis Intervention strategies must account for the available mental and public health capacity when allocating individuals afflicted with severe psychological ailments.  The Monitor appreciates the CIC's thoughtful exploration of these issues.

The Data Outcomes Subcommittee continues to consider what data is currently being collected by the CIT program and how collection and retention of the data, both internal and external, could be improved.  The Monitor will ensure that those who are working on the Business Intelligence System and the Data Outcome subcommittee are informed of issues that affect both parties.

Two important aspects to CIT's data collection must be addressed before the completion of this Consent Decree. The first is the ability is to track individuals who have required, or could require in the future, the assistance of SPD's CIT.  If an individual is a frequent caller of 911, is known by SPD officers as having a substance abuse or mental health problem, or has a history of violence when experiencing moments of crisis, this information should be available to officers during response, to the dedicated CIT Unit, and to supervisors so that they can gain a deeper understanding of their precinct.  This tracking ability is currently available but limited.  The dedicated mental health professional ("MHP") in the dedicated CIT Unit maintains a stand-alone record of individuals that have been identified as experiencing a crisis incident.  This data collection system should be substantially more dynamic and integrated and should allow officers to query the system in real time.

The Monitoring Team is concerned with some additional aspects of the CIC and has some recommendations for improving the group and its work going forward:

1.  **SPD Should Consider the Views of Patrol Officers By Including Patrol-Level Representatives on the CIC and By Conducting a Survey of SPD on CIT Operations.**

There is currently little participation in the CIC process from officers who are on patrol.  A Captain and Sergeant have participated in CIC subcommittee meetings – but this is insufficient input from officers who can provide immediate feedback about the practicality of the changes being considered for CIT.  The perspective of an officer currently serving patrol can shed light on aspects that would not otherwise be considered by the CIC members.  Given the CIC's commitment to a membership that represents the various communities that encounter and serve individuals in crisis, the inclusion of more patrol-level representatives will ultimately affirm that all relevant perspectives have been considered.  Additionally, the CIC is considering a survey of SPD officers on CIT operations.  The Monitor would support such an effort and would be particularly interested in the results.

### 2. The SPD Should Ensure a Stronger Relationship Between the Hostage Negotiation Team and CIT.

Another concern relates to the relationship between the CIT follow up Unit and SPD's Hostage Negotiation Team ("HNT"). It stems from a recent incident involving a barricaded juvenile who was successfully brought into custody by the HNT without harm – but also without the dedicated CIT unit playing any role and no indication that a CIT-trained officers was involved. The Monitoring Team hopes that, going forward, a stronger connection can be forged between HNT and the CIT Program. The functions of CIT and HNT do differ. CITs often handle situations in which no criminal activity has yet occurred. They seek to deescalate conflict with the SPD or the community and refer individuals in crisis to needed treatment or assistance. In contrast, when HNT becomes involved, criminal activity is already in progress. HNT attempts to bring a subject into custody. Despite these differences, both units attempt to defuse conflict and avoid a violent confrontation. Accordingly, a CIT Unit, or CIT-trained officer, can help a HNT member by providing information during a live incident.

### 3. The SPD Must Consider Whether "Excited Delirium" Will Be a Phenomenon that the SPD Recognizes in Policy and Practice and, if so, Establish Protocols and Reporting Requirements for Interacting with Subjects on the Basis of "Excited Delirium."

The Monitor has followed, and will continue to follow, closely the SPD's belief that "excited delirium" is a "medical/physiological emergency that, if left untreated, will result in death."[33] Neither the American Medical Association nor the American Psychological Association recognizes excited delirium as a medical condition or diagnosis. At a minimum, the purported phenomenon of "excited delirium" is not well understood.[34]

Accordingly, the Department should carefully explore the issue, establish a protocol by which individual officers can assess whether an individual may be experiencing such a phenomenon, implement policies that instruct how (if at all) officers should engage subjects experiencing "excited delirium" differently, and require officers who believe they have encountered an individual exhibiting signs of "excited delirium" to explain how they reached the conclusion and to detail how the determination changed their tactics and treatment of the subject. In evaluating

---

[33] Seattle Police Department, *Use of Force by Seattle Department Officers in 2010* http://www.seattle.gov/police/publications/policy/UseofForceReport2010.pdf.

[34] *See, e.g.*, Laura Sullivan, "Death by Excited Delirium: Diagnosis or Coverup?," "All Things Considered," National Public Radio, February 26, 2007; Donald Reay, "Suspect Restraint and Sudden Death," Law Enforcement Bulletin, Federal Bureau of Investigation, May 1996.

compliance, the Monitor will insist that "excited delirium" not serve as an imprecise "catch-all" for subjects exhibiting mental states and behaviors that are particularly challenging to officers.

### 4.      Progress on the CIC Should Be a Priority for the SPD.

The Monitoring Team has some concern that the CIC could have convened more rapidly and started doing its important work earlier than June.  Although the CIC's June 2013 and follow-up meetings have been very productive, sub-committees and follow-up activities have been slow to materialize.  Given the encouraging progress that the Monitoring Team has seen, it calls on the SPD to prioritize the CIC's work so that it may move more rapidly toward tangible achievements that promote its important mission.  SPD leadership must be mindful to the vital role that CIC and CI-Trained officers will play in the life of the Department.  The Monitoring Team will continue to track the process of the CIC and will report on its progress in its next Semiannual report.

## Conclusion

The conclusion of the Monitor's First Semiannual Report noted that, going forward, "there will be a window of opportunity for the entire Department to make peace with the Settlement Agreement and move toward full and effective compliance."[35]  The Monitoring Team is pleased that, in some quarters and in some areas, there has been noteworthy progress during the last six months.  As this Second Semiannual Report makes clear, however, much work remains.  The Monitor will expect to see less resistance and a greater commitment to change and innovation in the coming months.  The Monitoring Team remains dedicated to monitoring and informing Judge Robart and the City as to the SPD's progress.

---

[35] First Semiannual Report at 19.

# Appendix A

September 16, 2013

To: Interested Parties
Fr:  John Anzalone / Brian Stryker
Re: Seattle Police Community Survey Findings

## Purpose Statement + Key Findings

This research was commissioned by the federal monitoring team to assess community perceptions of the Seattle police, gauge the prevalence of community interactions with the police, and understand the nature of those interactions. Of particular note, the monitoring team set out to measure how often Seattle residents say they are the victims of racial profiling, excessive force, and verbally abusive language including racial slurs. The research was also intended to measure Seattleites' perceptions of how often these type of events happen—whether people were personally victims of them or not—and how Seattleites perceive the police treat people in various racial, socioeconomic, and demographic groups.

Some of the key findings of the survey include:

- **Overall, a majority of Seattleites approve of the job the police are doing.** Sixty percent of residents believe the police are doing an excellent or good job, while 34% think they are doing a not so good or poor job. The majority of residents also believes the police do a good job of keeping people safe (74% agree / 20% disagree).

- **However, most residents don't believe the police treats people of all races and groups equally.** Only 35% of people agree that SPD treats people of all races equally. Specifically, few people think the department treats African-Americans (32%), Latinos (33%), and Native Americans (33%) the same as everybody else. This belief extends to other groups as well, as less than a majority of people believe the police treat young people (45%) or homeless people (25%) the same as everybody else.

- **Latinos' and African-Americans' experiences back up the public's perception that SPD them worse than others.** These two groups are more likely than whites or Asian-Americans to report negative interactions with the police including excessive force, racial discrimination, and verbal abuse. They are also less likely to report being treated respectfully by police and have their questions answered. And they are more likely to report being stopped in the first place by SPD.

- **Stops and mistreatment among African-Americans and Latinos directly leads to their poor perceptions of SPD.** Word of mouth is one of the most popular ways for communities to spread news about the police: among African-Americans, it is second only to TV, as 54% of African Americans say they get much of their information about the police through word of mouth. So, bad police interactions have a multiplier effect that flows through our data and through the community as people tell their family, friends, and neighbors about their experiences.

Anzalone Liszt Grove Research conducted n=900 live cellphone and landline telephone interviews with adults 18 and older in Seattle. Respondents were selected at random, with interviews apportioned geographically, by police precinct, based on Census information. Care was taken to get a representative number of interviews via cellphone to insure a survey that was representative of the city's population by race, age, and income. The survey was then weighted to accurately reflect the distribution of the population by various demographic characteristics. The expected margin of sampling error is + 3.3% at the 95% confidence level for all adults and higher for subgroups. The monitor engaged the Department of Justice, the City of Seattle, and the Community Policing Commission during the survey drafting process, who all provided valuable guidance on questionnaire design and methodology.



Washington, D.C.  •  Montgomery, AL  •  Lāna'i, HI  •  New York City, NY

This is why, for example, more than three times as many African-Americans say they know someone who has been a victim of excessive force (17%) than say they have been a victim themselves (5%). Multivariate regression analysis shows that peoples' perceptions of police racial bias have a strong impact on their overall ratings of the police department, which helps explain why the SPD's job rating is lower among African-Americans (49% approve / 42% approve) and Latinos (54% positive / 39% negative) than whites (60% approve / 35% disapprove) and Asian-Americans (67% approve / 27% disapprove), who report much fewer and much more positive interactions with police.

- **It will be hard for SPD to improve community relations with Latinos and African-Americans if these levels of negative officer-citizen interactions persist.** Prescriptions for SPD community-relations improvement were not the intent of our research. However, the high incidence of negative police interactions among Latinos and African Americans—combined with the way information spreads from family to friend to neighbor— means that the SPD must improve its officer-to-person interactions before it improves relations with these two communities. This racial dynamic must be addressed at the patrol officer level, not the public information officer level, given the way information disseminates among communities and the prevalence of problematic interactions among Latinos and African-Americans.

- **Future research is needed to reassess the problem and delve deeper into it.** One research priority is to conduct a follow-up survey in the coming years. We suggest doing so annually or biannually, to assess how these findings are changing over time. We also believe this further research should focus more heavily on the Latino and African-American communities who experience a disproportionate number of negative interactions with police. This should be accomplished via oversampling those groups. This survey also should delve deeper into the difference between positive and negative interactions, to better get a sense of what makes an interaction go in a good or bad direction.

  In addition, we believe qualitative research can play an important role in assessing community-police interactions. We believe that individual interviews and/or focus groups among people who have had interactions with the police would be helpful in understanding why people feel the way they do about SPD. We would suggest focusing these on groups who report high levels of negative interactions with the police or are perceived to have such a problem. These would include African-Americans, Latinos, and homeless people. We would strongly recommend that these not just be conducted among people who have had negative experiences with the police. We think hearing about how officers properly handled these difficult situations is an important aspect of future research.

## Overall Attitudes towards Seattle Police

A majority of Seattleites have positive opinions towards the way the police is doing its job (60% approve / 34% disapprove). These include 60% approval ratings among men and women and they include majority positive ratings among residents of all ages, from under 35 (61%) to 65 and older (64%). This includes 20% of people who strongly approve of the job SPD is doing and 14% who strongly disapprove.

With that said, the SPD compares unfavorably to the Washington State Patrol. Almost three quarters of people think the WSP is doing a good job (74% approve / 9% disapprove). The fact that almost four times as many people disapprove of the Seattle PD's job performance as the Washington State Patrol's is a significant difference.

2

Views of the SPD vary significantly by race. While the SPD gets high marks among Asian-Americans (67% approve / 27% disapprove) and whites (60% approve / 35% disapprove), it receives lower marks among Latinos (54% approve / 39% disapprove) and lower still ratings among African-Americans (49% approve / 42% approve). This is not the case for the Washington State Patrol, who has a job rating between 72% and 75% among all four of these groups.

Racial patterns are even deeper among people who have intense feelings about the SPD. Three times more Asian-Americans strongly approve of the SPD than strongly disapprove (32% strong approve / 10% strong disapprove) and whites on balance strongly approve as well (17% strong approve / 12% strong disapprove). This is flipped, however, among Latinos (17% strong approve / 29% disapprove) and African-Americans (17% strong approve / 27% strong disapprove). This is a consistent theme throughout the poll: on almost every measure, Latinos and African-Americans have much more negative opinions and experiences concerning SPD than do Asian-Americans and whites.

Regionally, the East Precinct is where the SPD gets the lowest ratings. In all of the other four precincts, the department's approval is between 59% and 63%. In the East, it's 49%.


**Public Safety Ratings**

The police get high marks on keeping people safe: 74% of people agree the SPD keeps people safe. People also broadly agree they do a good job of "serving my neighborhood" (72% agree they do so) and "treating people respectfully" (72% of people say they do this very or somewhat often). Almost two thirds of people (63%) say they quickly solve crimes and arrest criminals very or somewhat often. On all of these dimensions, they have majority-positive numbers across police precincts, racial lines, age, and gender.


**Discrimination Ratings**

A majority (52%) of residents believes the SPD "treats people differently because of their race," and 53% of people believe SPD engages in racial profiling very or somewhat often. African-Americans (74%) and Latinos (62%) are more likely to say police do one of these two very or somewhat often, and 48% of African-Americans think the police engage in one of these activities very often.

The SPD also gets low marks for "treating all races equally": only 35% of people agree that the department does so, while 48% disagree. There's majority disagreement among whites (31% agree / 50% disagree), Latinos (29% agree / 57% disagree), and African-Americans (35% agree / 64% agree), and a narrow plurality of Asian-Americans agree that SPD treats all races equally (42% agree / 36% disagree). Again, Latinos and African-Americans' opinions are the most intensely negative. Almost half (45%) of African-Americans strongly disagree that SPD treats all races equally, and 34% of Latinos say the same. The department also receives low ratings on whether it serves all areas of Seattle equally (30% agree / 50% disagree).

It is also noteworthy how much of an effect these racial-treatment perceptions have on people's overall feelings about the SPD. In a multivariate regression analysis, where we analyze how people's opinions about various aspects of the SPD affect their overall opinion on it, we found that whether they agree "the Seattle Police treats all races equally" was the most predictive statement on their opinion of the department. Put simply, the average Seattleite believes it is

more important whether the police is treating people of all races equally than whether they are keeping people safe. (A full table of regressions can be found in Appendix B).

Who do Seattleites believe bear the brunt of police mistreatment? Below we have ranked groups from highest to lowest, by the percent that thinks the group gets treated "not as well" as other members of the community:

- Homeless people (25% the same / 59% not as well)
- African-Americans (32% the same / 54% not as well)
- Latinos (33% the same / 49% not as well)
- Native Americans (33% the same / 48% not as well)
- Young people (45% the same / 39% not as well
- Asian-Americans (56% the same / 24% not as well)

We were not able to gauge homeless peoples' perceptions directly in this survey. However, of the other groups listed, African-Americans also have the biggest disparity between how they believe they are treated and how the rest of Seattle thinks they are treated. While 54% of Seattleites overall believe African-Americans are treated not as well as the rest of residents, more than three-quarters of African-Americans (76%) believe they aren't treated as well as others. There is also a similar disparity among Latinos. While 49% of the city's overall population thinks Latinos are not treated as well by police as others, 59% of Latinos believe the same thing.

### Perceived Harassment/Excessive Force Frequency

Outside of treating people differently because of their race/racially profiling, the use of excessive force was the next most common type of mistreatment people believed the SPD was committing. Forty-five percent of Seattleites believe the police conduct the type of harassment or excessive force often that we asked about. We can't make direct comparisons to past Seattle surveys because of methodology changes, but this broadly comports with the findings of those polls. These beliefs are much more prevalent among African-Americans and Latinos than among whites and Asian-Americans. African-Americans and Latinos are more likely to believe the police use excessive force, stop people without a good reason, and use verbally abusive language including racial slurs:

% saying the Seattle Police does each item often (very often / very + somewhat often)

|  | All Adults | African-Americans | Latinos | Whites | Asian-Americans |
|---|---|---|---|---|---|
| **Uses excessive physical force** | 13 / 45 | 41 / 70 | 30 / 62 | 8 / 43 | 8 / 31 |
| **Stop people on the street without a good reason** | 8 / 24 | 33 / 56 | 25 / 46 | 3 / 28 | 4 / 32 |
| **Stop people in cars without a good reason** | 9 / 32 | 34 / 63 | 18 / 49 | 4 / 27 | 7 / 32 |
| **Use verbally abusive language** | 9 / 33 | 25 / 50 | 25 / 48 | 6 / 32 | 2 / 22 |
| **Use racial slurs towards minorities** | 7 / 26 | 27 / 49 | 14 / 45 | 4 / 23 | 4 / 22 |

### Community Engagement Ratings

The SPD receives middling ratings on whether it takes the time to meet members of your community (40% agree / 42% disagree). SPD receives stronger ratings on meeting members of

4

the community in the South Precinct (50%) and among Asian-Americans (52%), and it gets weaker ratings among Latinos (32%), African-Americans (35%), whites (35%), and West Precinct residents (30%).


## Who is Getting Stopped by Police?

Much of the city interacts with the police in an involuntary manner every year[1]. Almost a quarter of people have done so in the past year (23%), and an additional 25% know a friend, family member, or neighbor who has. Combined, 39% of people have either had such an interaction themselves or know one of these people who have (some people fall in both categories).

The majority of these stops are traffic-related—77% of people who have been in such a police interaction have had a traffic-related interaction, while only 29% have had a non-traffic related interaction (again, some people fall in both categories). Put another way, 18% of Seattle residents have been in a traffic-related interaction with police, while only 9% have been in a non-traffic interaction. These non-traffic stops are almost evenly split between being stopped by police while standing or walking *inside* one's neighborhood (5%), being stopped by police while standing or walking *outside* one's neighborhood (5%), and being questioned by the police at home when someone did not request them to do so (4%).

Traffic interactions vary heavily by race[2]. More than a third of African-Americans have had this type of interaction personally in the last year (38%) compared to 23% of Latinos, 20% of Asian-Americans, and 13% of whites. They also vary slightly by age, as 18-24 year olds have these most frequently (24%) while people 65 and older have these least (9%). Note that we did not control for whether a person owns an automobile or how often they drive: only 63% of workers commute to work in Seattle via car and we know nationally that driving rates are much lower among people 65+, African-Americans, and Latinos. We expect that if we controlled for minutes spent weekly in a car by each Seattleite, this would tend to even out disparities by age and widen disparities by race.

Non-traffic interactions vary even more heavily by race[3]. Twenty percent of Latinos and 19% of African-Americans have had a non-traffic interaction with police in the past year, compared to 4% of Asian-Americans and 7% of whites. This rate also varies by gender due to differences among men and women of color. While white women and men have had the same rate of non-traffic police interactions in the last year (7%), African-American and Latino men (25%) interact with the police in this way at a higher rate than their female counterparts (14%). This is not true of traffic stops, where there are no significant gender disparities by race.

Age is also a slight factor, as 18-34 year olds interact with police outside their cars slightly more (12%) than adults 35 and older (7%). This dynamic crosses racial lines. By precinct, stops are happening less to people who live in the more-populous North (5% not traffic / 16% traffic) than people in the rest of the city (10% not traffic / 23% traffic). Stops overall are most likely to happen in the South precinct (11% not traffic / 27% traffic) and Southwest precinct (13% not traffic / 19% traffic)

---

[1] Defined as being stopped by SPD while in your car, being stopped by SPD while walking or standing in a public place or street, being involved in a traffic accident that was reported to police, or being questioned by SPD at home when you did not request them to come to your home.

[2] Defined as being stopped by SPD while in your car or being involved in a traffic accident that was reported to Police.

[3] Defined as being stopped by SPD while walking or standing in a public place or street, or being questioned by SPD at home when you did not request them to come to your home.

5

**Experiences of Those Who Were Stopped**

Most people who interacted with police in an involuntary manner approved of how the police handled their situation (65% approve / 34% disapprove). They also gave the police positive marks on many underlying aspects of their stops. For example, 72% of people said the police were respectful, 71% were said the police explained why they were stopped or questioned, 67% said the amount of time they were stopped was reasonable, and a comparatively small percentage said the police used physical force against them (11%), threatened to do so (12%), or used verbally abusive language (18%).

With that said, this positive topline read conceals underlying negative opinions among key subsets of this population. There are major disparities in these opinions along two major lines:

1. **People in non-traffic stops have had more negative experiences than those in traffic stops.** People who were involved in a traffic-based interaction with police had widely positive ratings of how SPD handled their interaction (67% approve / 32% disapprove), while people in non-traffic interactions were on balance negative (47% approve / 53% disapprove).

   People in a non-traffic situation are more likely to say the police:
   • Were verbally abusive (37% non-traffic / 15% traffic)
   • Used physical force other than handcuffing (19% non-traffic / 9% traffic)
   • Threatened to use physical force other than handcuffing (26% non-traffic / 10% traffic)

   They also are less likely to say the police:
   • Answered all their questions (48% non-traffic / 73% traffic)
   • Stopped them for a reasonable amount of time (50% non-traffic / 68% traffic)
   • Clearly explained the reason they were stopped (47% non-traffic / 75% traffic)
   • Treated them respectfully (54% non-traffic / 76% traffic)

As mentioned before, traffic stops are more frequent than non-traffic stops, so the type of interaction that is most common is also more positive.

2. **Latinos and African-Americans have had more negative experiences than whites when being stopped by police, whether during a traffic stop or not**[4]**.** This disparity is greater than the traffic vs. non-traffic disparity. Overall, Latinos and African-Americans are almost evenly split on their overall opinions of how the officer handled the situation (44% approve / 42% disapprove), compared to whites who widely approve of their situation's handling (77% approve / 22% disapprove).

   African-Americans and Latinos are more likely than whites to say that the police:
   • Were verbally abusive (31% AA + Latino / 3% white)
   • Used physical force other than handcuffing (26% AA + Latino / 5% white)
   • Threatened to use physical force other than handcuffing (30% AA + Latino / 3% white)

   They also are less likely to say the police:
   • Answered all their questions (56% AA + Latino / 77% white)

---

[4] We were not able to draw conclusions about stops among Asian-Americans due to these being a small percentage of overall stops. Also, because of the size of their populations, we were not able to analyze stops among African- Americans and Latinos separately.

- Stopped them for a reasonable amount of time (48% AA + Latino / 76% white)
- Explained the reason they were stopped (49% AA + Latino / 81% white)
- Treated them respectfully (54% AA + Latino / 81% white)

## Formal Complaint Filings Low, Compared to Negative Interactions

Very few people filed a formal complaint, compared to those who experienced a negative interaction. Of the 34% people who disapprove of the way the police handled their situation, only 28% percent made a complaint to the department. Of the 21% who strongly disapprove, only 37% made a complaint to the department. So, measuring the rate of complaints is not an accurate measure of the rate of people having negative interactions with the police.

## Effects of Racial Disparities in Treatment

Racial disparities do not just affect one person's opinion. This is especially true among African-Americans: a 54% majority of them say they hear a large amount of information about the police via word of mouth, higher than any other racial group's word-of-mouth information transmission and higher than any source of police news for African- Americans besides TV.

While whites mostly approved of the way SPD treated someone they know who interacted with police (65% approve / 30% disapprove), Latinos and African-Americans broadly disapprove of how the police treated their friend/neighbor/family member (30% approve / 65% disapprove). African-Americans and Latinos are more likely than others to have heard that their friend/family member/neighbor experienced physical force, unreasonable length of detainment, and disrespectful treatment during incidents. This lines up with self-reporting of these experiences.

When people believe SPD has treated them poorly, people's friends, family, and neighbors have heard about it. A clear illustration of this: 4% of Seattleites report being treated differently because of their race, while 21% report personally knowing someone else who was treated differently because of their race. Only 1% of residents report being victims of excessive force, while 8% of residents say they know someone who was a victim of excessive force.

|  | All Adults | African-Americans | Latinos | Whites | Asian-Americans |
|---|---|---|---|---|---|
| **Experienced racially different treatment (self)** | 4% | 16% | 17% | 1% | 5% |
| **Experienced racially different treatment (someone you know)** | 21% | 36% | 41% | 17% | 16% |
| **Experienced excessive force (self)** | 1% | 5% | 9% | 0% | 0% |
| **Experienced excessive force (someone you know)** | 8% | 17% | 28% | 5% | 5% |

Again, prescriptions for SPD community-relations improvement were not the intent of our research. However, this chart illustrates how deeply one bad incident can affect a community's opinions of police. For the average person who believes they experienced racial profiling or excessive force, 5-8 people heard about it at the minimum. It's not hard to see how this could be having a negative effect on community-police relations, as 28% of all adults and a majority of African-Americans and Latinos say they have either experienced one of these two types of

treatment or know someone who says they have. We are not suggesting the police stop holding community forums and other types of outreach, of course. However, it is hard to see those improving opinions of the police themselves: the amount of people who have had these type of experiences or know someone who has will have to go down before views of the police improve. This is true among Latinos and African-Americans, and it is true for Seattleites overall.

**APPENDIX A – SURVEY TOPLINES**

Q1-3. Cell Usage

Cell Phone Only ..................................................................................................... 39%
Mostly Cell ............................................................................................................. 22%
Both Equally .......................................................................................................... 20%
Mostly Landline ..................................................................................................... 11%
Landline Only ......................................................................................................... 7%
[VOL] Don't Know .................................................................................................. 1%

Q5. Generally speaking, do you think things in Seattle are going in the right direction or the wrong direction?

Right direction ....................................................................................................... 65%
Wrong direction ..................................................................................................... 18%
[VOL] Mixed ............................................................................................................ 8%
[VOL] Don't Know .................................................................................................... 9%

Q6. Now, I'm going to ask you about a few public agencies. For each one, please tell me if you approve or disapprove of the job they are doing.

| | Strongly approve | Somewhat approve | Total approve | Somewhat disapprove | Strongly disapprove | Total disapprove | [VOL] Don't Know |
|---|---|---|---|---|---|---|---|
| A. The Seattle Police Department | 20% | 40% | **60%** | 20% | 14% | **34%** | 7% |
| B. The Washington State Patrol | 30% | 44% | **74%** | 4% | 5% | **9%** | 18% |
| C. The Seattle Fire Department | 70% | 23% | **92%** | 1% | 0% | **1%** | 7% |
| D. Seattle Public Schools | 14% | 38% | **52%** | 16% | 14% | **30%** | 18% |

9

Q7. Next, please tell me whether you agree or disagree with the following statements about the Seattle Police Department. Please note, I am only asking about the Seattle Police Department, not other police in the area. If you aren't sure, just say so and we will move on to another.

| | Strongly Agree | Somewhat Agree | Total Agree | Somewhat Disagree | Strongly Disagree | Total Disagree | [VOL] Don't Know |
|---|---|---|---|---|---|---|---|
| A. The Seattle Police treat people of all races and ethnicities equally | 14% | 21% | **35%** | 22% | 26% | **48%** | 17% |
| B. The Seattle Police do a good job keeping people safe | 28% | 46% | **74%** | 13% | 7% | **20%** | 5% |
| C. The Seattle Police take the time to meet members of your community and neighborhood | 16% | 24% | **40%** | 23% | 19% | **42%** | 18% |
| D. The Seattle Police patrol your neighborhood regularly on foot | 12% | 13% | **25%** | 18% | 48% | **65%** | 9% |
| E. The Seattle Police patrol your neighborhood regularly in a car | 33% | 31% | **64%** | 15% | 13% | **28%** | 8% |
| F. The Seattle Police serve all areas of Seattle equally | 12% | 18% | **30%** | 23% | 26% | **50%** | 21% |
| G. The Seattle Police do a good job serving your neighborhood | 32% | 40% | **72%** | 12% | 9% | **22%** | 6% |

Q8. Now, let me ask you about some things that police officers may or may not do. For each item, please tell me how often you think Seattle Police Department officers do these things--very often, somewhat often, not that often, or almost never?

| | Very Often | Somewhat Often | Total Often | Not That Often | Almost Never | Total not Often | [VOL] Don't Know |
|---|---|---|---|---|---|---|---|
| A. Engage in racial profiling [SPLIT A] | 17% | 36% | **53%** | 16% | 15% | **31%** | 15% |
| B. Treat people differently because of their race [SPLIT B] | 15% | 36% | **52%** | 15% | 19% | **34%** | 14% |
| C. Stop people in cars without good reason | 9% | 23% | **32%** | 27% | 22% | **50%** | 18% |
| D. Stop people on the street or in public places without good reason | 8% | 24% | **32%** | 28% | 24% | **53%** | 15% |
| E. Use excessive physical force | 13% | 32% | **45%** | 23% | 19% | **42%** | 13% |
| F. Use verbally abusive language | 9% | 24% | **33%** | 22% | 27% | **49%** | 18% |
| G. Use racial slurs towards minorities | 7% | 19% | **26%** | 21% | 29% | **50%** | 24% |

10

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| H. Harass people for no good reason | 8% | 20% | **28%** | 28% | 30% | **58%** | 14% |
| I. Treat people respectfully | 29% | 49% | **77%** | 11% | 4% | **15%** | 8% |
| J. Quickly solve crimes and arrest criminals | 16% | 47% | **63%** | 14% | 7% | **20%** | 16% |

Q9. Next, I am going to ask you about some groups of people in Seattle. For each one, please tell me if you think the Seattle Police treats them the same as other members of the community or not as well as other members of the community.

| | Same | Not as well | [VOL] Don't Know |
|---|---|---|---|
| A. Young people | 45% | 39% | 15% |
| B. African-Americans | 32% | 54% | 15% |
| C. Latinos | 33% | 49% | 17% |
| D. Native Americans | 33% | 48% | 19% |
| E. Homeless people | 25% | 59% | 16% |
| F. Asian and Pacific Islanders | 56% | 24% | 20% |

Q10. Now, I am going to read you a list of ways in which some people have interacted with the Seattle Police Department. Please tell me if, in the last year, you have interacted with the Seattle Police Department in this way, or if you know a close family member, friend, or neighbor who has. Again, please note we are not talking about other area officers like the King County Sheriff or the Washington State Patrol.

| | Yes, self | Yes, family friend neighbor | Total yes | No | [VOL] Don't Know |
|---|---|---|---|---|---|
| A. Been stopped by the Seattle Police while you were in a car | 12% | 11% | **22%** | 77% | 1% |
| B. Been stopped by the Seattle Police in your neighborhood while walking or standing in a public place or street | 5% | 7% | **10%** | 89% | 1% |
| C. Been stopped by the Seattle Police outside your neighborhood while walking or standing in a public place or street | 5% | 7% | **11%** | 89% | 1% |
| D. Been involved in a traffic accident that was reported to police, or received a moving violation like a speeding ticket | 12% | 15% | **25%** | 74% | 1% |
| E. Been questioned by the Seattle Police at home, when you did not request them to come to your home | 4% | 4% | **8%** | 92% | 0% |
| F. Been arrested | 1% | 5% | **6%** | 94% | 0% |

11

| | | | | | |
|---|---|---|---|---|---|
| G. Called 9-1-1 or the Seattle police to report a crime | 24% | 13% | **34%** | 65% | 1% |
| H. Attended a community meeting or other presentation by the Seattle police | 11% | 9% | **18%** | 81% | 1% |

Q11. When thinking of the most serious interaction you had with the Seattle Police that we just discussed, please tell me if you agree or disagree with the following statement. If you don't know, it's ok to say so. **[IF YES, SELF IN ANY Q10A-F, N=197]**

| | Agree | Disagree | **[VOL] Don't Know** |
|---|---|---|---|
| A. The police treated you respectfully | 72% | 26% | 2% |
| B. The police explained the reason you were stopped or questioned in a clear way | 71% | 25% | 4% |
| C. You believe the police had a valid reason for stopping you | 60% | 34% | 6% |
| D. The amount of time you were stopped or questioned during this encounter was reasonable | 67% | 28% | 5% |
| E. The officer answered all of your questions | 69% | 28% | 3% |
| F. The police used physical force against you, other than handcuffing | 11% | 84% | 5% |
| G. The police threatened to use physical force against you, other than handcuffing | 12% | 83% | 4% |
| H. The police used verbally abusive language | 18% | 80% | 2% |

Q12. Do you believe the level of force the Seattle Police used in this situation was appropriate or inappropriate? **[IF YES IN Q11F, N=19]**

Appropriate ....................................................................................................... 20%
Somewhat inappropriate ................................................................................... 20%
Very inappropriate ............................................................................................ 60%
[VOL] Don't Know ............................................................................................. 0%

Q13. Overall, do you approve or disapprove of how the Seattle Police handled your situation? **[IF YES, SELF IN ANY Q10A-F, N=197]**

Strongly approve ................................................................................................ 40%
Somewhat approve ............................................................................................. 25%
**Total approve** ................................................................................................**65%**
Somewhat disapprove ........................................................................................ 13%
Strongly disapprove ........................................................................................... 21%
**Total disapprove** ..........................................................................................**34%**
[VOL] Don't Know ............................................................................................. 1%

Q14. What specifically did the police do in your situation that made you approve of how they handled it? **[IF APPROVE IN Q13, N = 132]**

[OPEN-ENDED QUESTION]

Q15. What specifically did the police do in your situation that made you disapprove of how they handled it? **[IF DISAPPROVE IN Q13, N = 63]**

[OPEN-ENDED QUESTION]

---

Q16. Did you make a complaint to the police department as a result of any of these incidents? **[IF YES IN ANY Q10A-F, N=197]**

Yes ......................................................................................................... 11%
No ......................................................................................................... 88%
[VOL] Don't Know .................................................................................. 1%

Q17. Overall, are you satisfied or dissatisfied with how the department handled your complaint? **[IF YES IN Q16, N=21]**

Very satisfied ........................................................................................ 8%
Somewhat satisfied .............................................................................. 11%
**Total satisfied** ....................................................................................**20%**
Somewhat dissatisfied ......................................................................... 16%
Very dissatisfied .................................................................................. 64%
**Total dissatisfied** ...............................................................................**80%**
[VOL] Don't Know .................................................................................. 0%

Q18. When thinking of the most serious interaction your family, friend, or neighbor had with the Seattle Police that we just discussed, was that interaction with the police and a family member, friend, or neighbor? **[IF YES FAMILY/FRIEND/NEIGHBOR IN ANY OF Q10A-F, N=211]**

Family .................................................................................................. 39%
Friend ................................................................................................... 36%
Neighbor .............................................................................................. 15%
[VOL] Don't Know ................................................................................ 10%

13

Q19. When thinking of the most serious interaction your family, friend, or neighbor had with the Seattle Police that we just discussed, please tell me if you agree or disagree with the following statement. If you don't know, it's ok to say so. **[IF YES FAMILY/FRIEND/NEIGHBOR IN ANY OF Q10A-F, N=211]**

|  | <u>Agree</u> | <u>Disagree</u> | <u>[VOL]<br>Don't<br>Know</u> |
|---|---|---|---|
| A. The police treated them respectfully | 55% | 33% | 12% |
| B. The police explained the reason they were stopped or questioned in a clear way | 62% | 24% | 14% |
| C. You believe the police had a valid reason for stopping them | 56% | 35% | 9% |
| D. The amount of time they were stopped or questioned during this encounter was reasonable | 58% | 24% | 18% |
| E. The officer answered all of their questions | 52% | 29% | 19% |
| F. The police used physical force against them, other than handcuffing | 19% | 74% | 7% |
| G. The police threatened to use physical force against them, other than handcuffing | 16% | 72% | 12% |
| H. The police used verbally abusive language | 18% | 67% | 15% |

Q20. Do you believe the level of force the Seattle Police used in this situation was appropriate or inappropriate? **[IF YES IN Q19F, N=37]**

| | |
|---|---|
| Appropriate | 29% |
| Somewhat inappropriate | 19% |
| Very inappropriate | 51% |
| [VOL] Don't Know | 2% |

Q21. Overall, do you approve or disapprove of how the Seattle Police handled this situation? **[IF YES FAMILY/FRIEND/NEIGHBOR IN Q19F, N=211]**

| | |
|---|---|
| Strongly approve | 30% |
| Somewhat approve | 27% |
| **Total approve** | **57%** |
| Somewhat disapprove | 15% |
| Strongly disapprove | 23% |
| **Total disapprove** | **38%** |
| [VOL] Don't Know | 5% |

14

Q22. And to the best of your knowledge, have you or anyone you personally know believe they have been treated differently by the Seattle Police because of their race or ethnicity in the past year?

Yes, self ................................................................................................................... 0%
Yes, someone you know ............................................................................................ 17%
Yes, both ................................................................................................................. 4%
**Total yes** ...........................................................................................................**21%**
No ......................................................................................................................... 76%
[VOL] Don't Know ................................................................................................... 3%

Q23. And to the best of your knowledge, has anyone you personally know been the victim of excessive force from the Seattle Police in the past year?

Yes, self ................................................................................................................... 0%
Yes, someone you know ............................................................................................ 7%
Yes, both ................................................................................................................. 1%
**Total yes** .............................................................................................................**9%**
No ......................................................................................................................... 90%
[VOL] Don't Know ................................................................................................... 1%

Q24. Gender

Male ...................................................................................................................... 50%
Female ................................................................................................................... 50%

Q25. Age

18-34 ..................................................................................................................... 37%
35-49 ..................................................................................................................... 27%
50-64 ..................................................................................................................... 20%
65+ ........................................................................................................................ 13%
[VOL] Refused ........................................................................................................ 3%

Q26. What is the last year of schooling that you have completed?

1st - 11th grade ...................................................................................................... 3%
High-school graduate .............................................................................................. 13%
Some college .......................................................................................................... 24%
Four-year college graduate ...................................................................................... 36%
Post-graduate school .............................................................................................. 23%
[VOL] Don't know/Refused ...................................................................................... 1%

Q29. From which of the following places do you hear the most information about Seattle Police? [MULTIPLE RESPONSES ACCEPTED]

Local TV news ....................................................................................................51%
Radio ...................................................................................................................30%
The Seattle Times, online or in print ................................................................40%
Other newspapers, online or in print ................................................................35%
Other websites ...................................................................................................30%
Word of mouth ..................................................................................................38%
[VOL] Don't know/Refused.................................................................................4%

Q32/33. Race

White ..................................................................................................................62%
African American ................................................................................................8%
Hispanic or Latino ..............................................................................................7%
Asian-American ................................................................................................13%
Native American .................................................................................................1%
Other ...................................................................................................................3%
[VOL] Don't Know/Refused ...............................................................................6%

Q34. What nationality would you say most of your ancestors are? [IF ASIAN OR PACIFIC ISLANDER IN Q32/33, N=77]

Cambodian ...........................................................................................................1%
Chinese ..............................................................................................................25%
Filipino ..............................................................................................................16%
Indian ................................................................................................................10%
Japanese .............................................................................................................11%
Korean ...............................................................................................................10%
Laotian .................................................................................................................0%
Vietnamese .........................................................................................................17%
[VOL] Other ........................................................................................................5%
[VOL] Don't know/refused ..................................................................................6%

Q35. Do you consider yourself of Somali, Ethiopian, or Eritrean descent? [IF AFRICAN-AMERICAN IN Q32/33, N=73]

Yes, Somali ........................................................................................................12%
Yes, Ethiopian ...................................................................................................13%
Yes, Eritrean ........................................................................................................2%
No ......................................................................................................................73%
[VOL] Don't know/refused ..................................................................................0%

16

Q36. Do you consider yourself gay, lesbian, bisexual or transgendered?

Yes, gay/lesbian ................................................................................ 5%
Yes, bisexual ..................................................................................... 2%
Yes, transgendered ........................................................................... 1%
No ...................................................................................................... 86%
[VOL] Don't know/Refused ............................................................. 6%

Q37. Earlier you mentioned that you had a negative interaction with the Seattle police. Would you be willing to be contacted by people working to improve relations between the community and the Seattle police about your experiences?

No ...................................................................................................... 78%
Name ................................................................................................. 22%
Email ................................................................................................. 13%
Phone................................................................................................. 22%

Q38. Police precinct

North .................................................................................................. 42%
West ................................................................................................... 16%
East .................................................................................................... 12%
South .................................................................................................. 16%
Southwest .......................................................................................... 14%

## APPENDIX B – MULTIVARIATE REGRESSIONS

Regression #1
Dependent Variable: Seattle Police department job rating

Independent Variables: agree or disagree with the following statements:

   A.  The Seattle Police treat people of all races and ethnicities equally
   B.  The Seattle Police do a good job keeping people safe
   C.  The Seattle Police take the time to meet members of your community and neighborhood
   D.  The Seattle Police patrol your neighborhood regularly on foot
   E.  The Seattle Police patrol your neighborhood regularly in a car
   F.  The Seattle Police serve all areas of Seattle equally
   G.  The Seattle Police do a good job serving your neighborhood

R-squared=.500

**Coefficients[a]**

| Model | Standardized Coefficients | Sig. |
|---|---|---|
| | Beta | |
| The Seattle Police treat people of all races and ethnicities equally | .369 | .000 |
| The Seattle Police do a good job keeping people safe | .298 | .000 |
| The Seattle Police do a good job serving your neighborhood | .102 | .001 |
| The Seattle Police serve all areas of Seattle equally | .098 | .001 |

Note: Statements C, D, and E were not statistically significant in this model.

18

Regression #2

Dependent Variable: Seattle Police department job rating

Independent Variables: how often do the Seattle Police:

A. Engage in racial profiling [SPLIT A] / Treat people differently because of their race [SPLIT B] *(these two statements were split-sampled in the survey and combined in the regression analysis)*
B. Stop people in cars without good reason
C. Stop people on the street or in public places without good reason
D. Use excessive physical force
E. Use verbally abusive language
F. Use racial slurs towards minorities
G. Harass people for no good reason
H. Treat people respectfully
I. Quickly solve crimes and arrest criminals

R-squared=.380

| Model | Standardized Coefficients | Sig. |
|---|---|---|
| | Beta | |
| Engage in racial profiling / Treat people differently because of their race | .264 | .000 |
| Harass people for no good reason | -.232 | .000 |
| Use verbally abusive language | -.118 | .012 |
| Treat people respectfully | .103 | .024 |
| Quickly solve crimes and arrest criminals | .084 | .024 |

Note: Statements B, C, D, and F were not statistically significant in this model.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**CERTIFICATE OF SERVICE**

I certify that on the 13th day of December, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following attorneys of record:

| | |
|---|---|
| J. Michael Diaz | michael.diaz@usdoj.gov |
| Jenny A. Durkan | jenny.a.durkan@usdoj.gov |
| Jonathan Smith | jonathan.smith2@usdoj.gov |
| Kerry Jane Keefe | kerry.keefe@usdoj.gov |
| Michael Johnson Songer | michael.songer@usdoj.gov |
| Rebecca Shapiro Cohen | rebecca.cohen@usdoj.gov |
| Emily A. Gunston | emily.gunston@usdoj.gov |
| Timothy D. Mygatt | timothy.mygatt@usdoj.gov |
| Jean M. Boler | jean.boler@seattle.gov |
| Peter Samuel Holmes | peter.holmes@seattle.gov |
| Brian G. Maxey | brian.maxey@seattle.gov |
| Sarah K. Morehead | sarah.morehead@seattle.gov |
| Gregory C. Narver | gregory.narver@seattle.gov |
| John B. Schochet | john.schochet@seattle.gov |

DATED this 13th day of December, 2013.

*/s/ Carole Corona*
Carole Corona

THE SEATTLE POLICE MONITOR'S SECOND SEMIANNUAL
REPORT
Case No.  C12-1282JLR

Merrick J. Bobb, Monitor
Police Assessment Resource Center
PO Box 27445
Los Angeles, CA 90027
(213) 623-5757