THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>                    Plaintiff,<br><br>        vs.<br><br>CITY OF SEATTLE<br><br>                    Defendant. | CASE NO. C12-1282JLR<br><br>**THE SEATTLE POLICE MONITOR'S THIRD SEMIANNUAL REPORT** |

The Seattle Police Monitor's Third Semiannual Report is attached.

THE SEATTLE POLICE MONITOR'S THIRD
SEMIANNUAL REPORT
Case No.  C12-1282JLR

Merrick J. Bobb, Monitor
Police Assessment Resource Center
PO Box 27445
Los Angeles, CA 90027
(213) 623-5757



# Seattle Police Monitor
## Third Semiannual Report
### June 2014

# Table of Contents

Executive Summary ....................................................................................................... 1

## 1. Summary of Personnel Changes and Primary Policy & Structural Changes in the Last Six Months ........................................................................................................ 8

Personnel Changes .......................................................................................................... 8
Primary Successes ........................................................................................................... 9
    Policies ......................................................................................................................... 9
    Structures of Critical Self-Analysis ........................................................................... 16
    Other Successes ........................................................................................................ 17

## 2. Training ........................................................................................................... 18

Use of Force Training ..................................................................................................... 19
    Phase I: Interim Use of Force Training ..................................................................... 19
    Phase II: Comprehensive Use of Force Training ...................................................... 20
Bias-Free Policing & Stops & Detentions Training ....................................................... 22
    Phase I: Interim Training ............................................................................................ 22
    Phase II: Comprehensive Training ............................................................................ 23
Crisis Intervention Training ............................................................................................ 23
Training for Force Investigators and Reviewers ........................................................... 23
Recommendations .......................................................................................................... 24

## 3. Crisis Intervention ......................................................................................... 27

SPD Crisis Intervention Team ("CI") Program ............................................................. 27
Crisis Intervention Committee ("CIC") ........................................................................ 28
Training ........................................................................................................................... 29
    Basic Training and CI Training Strategy ................................................................... 29
Data on Crisis Interventions .......................................................................................... 32

## 4. Data & Technology ......................................................................................... 35

Why Data Matters & What a BI System Will Do ........................................................... 35
SPD's Current Gaps & Deficiencies in IT ..................................................................... 38
Comprehensive Business Intelligence System ("BI System") ..................................... 39
The Interim Database Solution ("IAPro") ..................................................................... 43
    SPD's Historical Struggles to Implement the Interim Solution ............................... 44
    SPD's Current Configuration Status ......................................................................... 45

## 5. Review & Investigation of the Use of Force ................................................. 48

Use of Force Review Board ............................................................................................ 48

The UOFRB's Updated Processes and Procedures..................................................48
    Recommendations..........................................................................54
Firearms Review Board...................................................................................55
Force Investigation Team ("FIT")....................................................................57
In-Car Video ("ICV")......................................................................................60
    SPD's Resolution of Technical Issues...........................................62
    Ongoing Confusion Regarding ICV Usage...................................63

6.  Supervision ...........................................................................................66

The Supervision-Related Provisions of the Settlement Agreement.................67
SPD's Struggles to Comply with the Supervision-Related Provisions.............68

7.  Office of Professional Accountability ("OPA") ......................................71

OPA Policies and Procedures.........................................................................71
OPA Investigations........................................................................................72
Disciplinary Process.......................................................................................72
The Role of OPA at the UOFRB.....................................................................74
OPA's Role in FIT...........................................................................................75

8.  Performance Mentoring Program ("PMP) Policy and Early Intervention ..............76

What PMP Is...................................................................................................76
How PMP Will Work.......................................................................................77
    The PMP Addresses Several, Specific Requirements of the Settlement Agreement.................78
    The PMP Policy is Non-Punitive...................................................78
    Data on Officer Performance Trends Sets the Occasion for a Careful Assessment of Officer Performance...................79
    A Defined Process Will Be in Place for Reviewing a Flagged Officer's Performance Trends .........81
SPD Has Much Work Ahead to Implement the PMP.....................................86
    Recommendations..........................................................................86

9.  Community Outreach ...........................................................................90

Community Outreach by the Community Police Commission........................90
Community Outreach By the Monitoring Team..............................................91

Conclusion.....................................................................................................95

Appendix A: Current Issues with IAPro Implementation ...........................A-1

# Executive Summary

Pursuant to paragraph 196 of the Court-ordered Consent Decree (also referred to as the "Settlement Agreement") between the United States Department of Justice ("DOJ") and the City of Seattle ("the City"), the Monitor submits this Third Semiannual Report.

In the past six months, the major tasks in furtherance of the Consent Decree have moved from an emphasis on policy drafting, revision, and negotiation to a focus on the implementation of critical changes. Rather than discussing and negotiating words on paper, SPD must now implement a host of major, complex projects. The scope of these changes cannot be overstated. The SPD is wholly remaking how it does business and evaluates its work, with an emphasis on training officers on new policies and implementing critical projects, processes, and, initiatives.

So far, this transition has accomplished a good deal. Nonetheless, critical milestones remain elusive—particularly in the areas of data collection and analysis and the complex analysis necessary to ensure that SPD appropriately fields an acceptable number of supervisors.

In terms of successes, between December 2013 and March 2014, the Court approved several policies and procedural manuals addressing:

- **Use of force**, which included:
  - A nine and a half page policy, which includes two pages of basic definitions, addressing core force principles;
  - A detailed, supporting procedural manual governing how officers should use specific force instruments (such as OC spray or the taser);
  - Procedural manuals covering how force incidents are reported, investigated, and reviewed, which included procedures for the Use of Force Review Board ("UOFRB"); and
  - A supporting procedural manual for a new, dedicated Force Investigation Team ("FIT");
- **Stops and detentions**;
- **Bias-free policing**;
- **Crisis intervention**; and
- **Performance mentoring** (which has previously been referred to as "early intervention").

For each of the above policies or procedural manuals, the Parties, Monitor, and SPD achieved consensus after substantial work. Each is a significant and notable achievement. Each is an important milestone toward compliance. The policies lay down clear "rules of the road" for officers

and the Department and establish standards by which the Monitoring Team, and the DOJ under its independent enforcement authority, can gauge progress toward compliance with the Consent Decree. The Monitor steadfastly believes that, so long as they are faithfully implemented, the policies will form the foundation for a definitively new era in the Department—and a new approach in the way that SPD manages itself, holds officers accountable, and interacts with the community.

> Each of the approved policies is an important milestone toward compliance.

Perhaps the most hopeful turn of events in the last six months has been the active involvement of the Mayor's Office in its oversight of the SPD. Mayor Murray has so far taken on hard issues. He has maintained a sustained and thoughtful involvement with Consent Decree issues. His staff has provided him with steady assistance. The Mayor appears to recognize that the SPD needs a deep and thorough cultural change to earn the respect, trust, and cooperation of all of Seattle's diverse communities, including those represented on the Community Police Commission ("CPC").

With respect to the CPC, the Mayor appointed Fé Lopez as CPC's Executive Director. As this report notes below, the CPC has been participating in a constructive, thoughtful, and timely manner in the formulation of policy and the consideration of a host of critical issues relating to reform. The Monitor applauds the Executive Director and each of the volunteer commissioners for their dedication and productive work. A key upcoming CPC task is to engage with all relevant stakeholders regarding its proposed changes to the OPA structure. The Monitor stands at the ready to provide its technical assistance in discussions about strengthening accountability structures.

The CPC, Mayor's Office, DOJ, and Monitoring Team now appear to share similar goals and expectations for the SPD—namely, that it affirmatively embrace best practices; come into full and effective compliance with the Consent Decree; continue to provide effective and proactive law enforcement services; repair frayed relationships with the Seattle community and win its cooperation, approval, and support; and move forward as a leader in contemporary American law enforcement.

The Education and Training Section deserves especially high praise. During 2014, it has thoughtfully embraced a fundamentally new approach to designing and conducting comprehensive officer training programs. The Monitoring Team's observations to date suggest that this new approach

> The Education and Training Section deserves especially high praise.

holds real promise in increasing the quality and rigor of officer education. The Monitor genuinely appreciates the Section's thoughtful exploration and debate of critical issues with the Monitoring Team, DOJ, CPC, and other community groups.

At the beginning of the year, the Education and Training Section created, implemented, and completed a high-quality, "interim" training program on SPD's new use of force policies that provided officers with an introduction to the expectations under the new policies. This initial training included a video message from the Chief, e-learning, and in-class instruction. The training program addressed the use of force policies and new processes for reporting and investigating force. Nearly 1300 officers completed the course. This herculean effort was ultimately accomplished in an impressively condensed, eight-week time period between March and April 2014. The Monitoring Team and DOJ audited these classes and found them well-taught.

The Section has, at the same time, worked diligently on: (i) a detailed work plan for an additional 24 hours of use of force instruction that the nearly 1300 sworn officers will receive by December 31, 2014; (ii) "interim" training on stops and detentions and bias-free policing, consisting of a video from the Chief, e-learning, and roll call training elements; (iii) comprehensive training on the stops and bias-free policing policies; (iv) specialized training for FIT investigators; and (v) specialized training for members of the UOFRB.

The Monitor is also encouraged by the continued development and evolution of several structures of critical-self analysis. When they are fully operational, these entities, groups, and organizations will help SPD engage in vigorous self-evaluation, assist the Department in developing or refining policies and training, and function as forums for problem-solving long after the Consent Decree dissolves. These structures include the UOFRB, the FIT team, the Crisis Intervention Committee ("CIC"), and the Performance Mentoring Program ("PMP").

The UOFRB continues to transform itself into a central driver of the Department's critical self-analysis. Although much important work remains, the Board's review of force incidents has continued to become more thorough and probing. It is appropriately holding supervisors more accountable for generating timely, high-quality incident reviews. It has, for the first time, found certain uses of force out of policy and referred matters to OPA. On its own initiative, the Force Review Section's ("FRS") new leadership instituted commendable processes and procedures that allow it to gather rigorous data on force and force review—the only reliable data on force that SPD currently has.

> The Monitor is encouraged by the continued development and evolution of several structures of critical self-analysis.

As of January 1, SPD has been sending dedicated force investigators from FIT out to investigate the most serious uses of force. The Monitor has recently been encouraged by the willingness of FIT personnel to thoughtfully consider mechanisms for improving the quality, rigor, and integrity of its investigations.

The Department has agreed to merge the Firearms Review Board with the UOFRB by the end of

the year.  Even as it prepares to finalize this merger, SPD has exhibited a willingness to consider processes and procedures for making the reviews of four recent officer-involved shootings more thorough, rigorous, and fair.  Still, the Monitoring Team notes that there remains much room for improvement in the procedures that FIT and the Board use in investigating firearms discharges and reviewing such incidents.

The CIC has inspired a notable, new approach to SPD's interaction with wider social service providers and networks when responding to individuals experiencing behavioral crisis.  Whereas SPD had previously sought to address such issues with little or no collaboration with external resources, it has partnered closely with the CIC and the Washington State Criminal Justice Training Commission ("CJTC") to construct a crisis intervention response program— a program that is directly relevant to patrol officers and the challenges that they encounter on the street.   SPD has developed, in partnership with the CJTC, a training program for some 1200 officers featuring a basic, eight-hour training course and additional e-learning material.   A three-hour training course for communications dispatchers has been developed.  Advanced training will be provided to officers to become "CIT-certified" experts in crisis intervention situations.  Taken together, these significant training initiatives hold tremendous promise for remaking SPD's, and the Seattle community's, approach to linking individuals in behavioral crisis both safely and effectively with necessary services and resources.

> The CIC has inspired a notable, new approach to linking individuals in behavioral crisis with necessary services and resources.

Although there have been many successes, the SPD's transition to implementing complex initiatives and projects has also had its share of challenges.  Much work remains to ensure that the objectives and goals of the Consent Decree have been understood and internalized by all officers—whether command staff or the rank and file.[1]  Likewise, much additional collaboration will be necessary to ensure that the era of hiding the ball on developing problems, institutional isolation, and routine tolerance of underdeveloped or inadequate solutions for important problems is over.

> Much work remains to ensure that the objectives and goals of the Consent Decree have been understood and internalized by all officers.

While some areas of the Department—like the UOFRB and Training Section—have excelled at embracing fresh modes of thinking and engaging in dynamic collaboration during the past six months, other areas have been slow to adopt new approaches and less open to such collaboration. The Monitor has been concerned with, and quite frustrated by, the Department's struggles to self-

---

[1] *See, e.g.*, Steve Militech, et al., "Seattle cops sue over DOJ reforms," *Seattle Times* (May 28, 2014), http://seattletimes.com/html/localnews/2023717834_spdofficerslawsuitxml.html.   This reference should not be construed as addressing the lawsuit's merits, legal or otherwise.

initiate, self-manage, and solve problems in some areas—particularly those related to technology and supervision.

With respect to technology, SPD needs reliable data systems, that make data easily accessible, so that the Department can complete a host of important objectives, including: implementing the Performance Mentoring Policy; tracking and reviewing uses of force, stops and detentions, crisis intervention, and other incidents; and analyzing information so that it can identify supervisor, precinct, squad, and unit trends. A December 2013 SPD-commissioned report by PricewaterhouseCoopers noted deep and fundamental deficiencies in SPD's current data systems and IT infrastructure.[2] SPD's lack of reliable and accessible data leads to debate about data quality and analytical methods rather than on solving problems and squarely addressing important issues.[3]

SPD has been attempting to implement an off-the-shelf, stopgap database system to track performance data while also beginning to plan for a comprehensive, permanent business intelligence system. Both the implementation and planning have been problematic. With respect to the stopgap system, the Department has made, or attempted to make, configuration decisions contrary to the recommendations of the software vendor. Contrary to the recommendations of the Pricewaterhouse report, the SPD has sought to tether both the stopgap and permanent business intelligence systems to deficient, discredited legacy systems and platforms that provide unreliable, incomplete, and error-ridden data. The Monitor is greatly encouraged by the prospect of the Mayor's office, a new Chief, and experts from within and outside the City taking the lead to ensure that the Department finally benefits from fresh thinking, dynamic collaboration, and new approaches to information technology.

> The implementation and planning for both a stopgap and permanent data system to track officer performance have been problematic.

With respect to supervision, while it appears that the Department may be able to meet two of three pertinent deadlines, the Monitor has been concerned by the length of time taken to finalize a plan for conducting a complicated analysis that could change precinct boundaries, budget demands, and personnel allocation. The Monitoring Team and Parties have not yet been able to agree to a satisfactory plan for ensuring that SPD deploys an adequate number of sergeants to effectuate law enforcement objectives and the objectives of the Consent Decree.

---

[2] PricewaterhouseCoopers, "Seattle Police Department: Information Systems, Processes, Operations, and Technologies—Current State and Maturity Analysis" (Dec. 6, 2013) http://www.seattle.gov/police/compliance/docs/BI_Reports/SPD_Current_State_FINAL.pdf.

[3] See 6/2/14 Press Release, Community Police Commission, "Community Police Commission's Clarification of Data Presentation" (June 2, 2014); Bill Lucia, "Murky meaning and motives shroud SPD report," Crosscut.com (June 2, 2014), http://crosscut.com/2014/06/02/law-justice/120336/seattle-police-data-low-level-enforcement-DOJ/.

In other areas—including FIT, the Performance Mentoring Program ("PMP"), and SPD's disciplinary system—much work remains.  While the Monitor is encouraged by SPD's recent indication that it would seek to implement a compendium of best practices with respect to its Force Investigation Team ("FIT"), additional effort is needed to ensure that FIT investigations are uniformly seen as having integrity, rigor, and fairness.  The Department has only recently gotten to the stage, given the recent approval of the Performance Mentoring Program ("PMP") policy, where it can start to consider the host of important and complex issues that must be addressed long before it can roll out the policy.

Events during the last six months have made clear that SPD's disciplinary system is byzantine and arcane.[4]  Providing SPD officers and the Seattle community with a rational, reasonable disciplinary system will require swift and sustained effort.  It is difficult to envision the SPD reaching full and effective compliance with the Consent Decree without a well-functioning system for imposing discipline on police officers found to have violated SPD policy.  Mayor Murray appointed Dr. Bernard Melekian, former chief of police in Pasadena, California and former head of the COPS Office, to lead the effort to devise a rational and fair disciplinary system.  The CPC and the Office of Professional Accountability ("OPA") Auditor have provided constructive and thoughtful input.  Consistent with provisions of the Consent Decree and related Memorandum of Understanding, the Monitoring Team will remain available in the coming months for technical assistance with respect to the discipline system.  An irrational and convoluted system cannot be allowed to systematically undo the accountability that a host of other policies and practices are intended to foster.[5]

> It is difficult to envision SPD reaching full and effective compliance without a well-functioning system for imposing discipline.

At an April 3, 2014 status conference, the Honorable James Robart made two points especially clear.  The first was that he intended "to hold the parties' 'feet to the fire' to keep going," even as a new Chief comes on board.[6]  The second was that:

> "[U]nity and community is what . . .  we seek to achieve here, where the police are not viewed as 'them,' they are viewed as 'us.'  If we can accomplish that by these changes, then I believe that we will have a police department that Seattle can be justifiably proud of."[7]

---

[4] *See, e.g.,* Steve Miletich, "Reversal of discipline puts interim SPD chief under spotlight," *Seattle Times* (Feb. 20, 2014), http://seattletimes.com/html/localnews/2022957736_spddisciplinexml.html; Amy Radil, "Seattle Officials Probe 'Twilight Zone' of Police Discipline Reversals," KUOW.org (Mar. 7, 2014), http://kuow.org/post/seattle-officials-probe-twilight-zone-police-discipline-reversals.

[5] *See* 4/3/14 Status Conference Transcript at 54.

[6] 4/3/14 Status Conference Transcript at 87; *see* Gene Johnson, "Next Seattle police chief: Kathleen O'Toole," *AP* (May 19, 2014), *available at* http://www.king5.com/news/cities/seattle/Next-Seattle-police-chief-Kathleen-OToole-259819121.html.

[7] 4/3/14 Status Conference Transcript at 88.

In the spirit of the Court's instructions, and as the appointed agent of the Court, the Monitor is ever mindful of ensuring that the Parties and Department never lose sight of the goal: a respected SPD that self-manages the risk of unconstitutional policing and maintains the confidence and trust of all elements of Seattle's richly diverse communities.

Based on the Monitoring Team's attendance at roll calls, ride-alongs with officers, weekly attendance at force review boards, rollouts to the scenes of significant uses of force, near-daily discussions with SPD leadership, and formal and informal interactions with patrol officers, the Monitor has come to recognize that the internalization of the objectives and goals of the Consent Decree by the SPD will require a redoubling of additional, focused efforts.

> Nothing about this Consent Decree contemplates quick fixes, temporary measures, or partially implemented reforms.

The Monitor is aware of the perception, in many quarters of the community, that previous efforts to reform and modernize SPD were failures. Indeed, across the country, "[t]here is a long history of major police reforms (that is, reforms that were considered important in their time) that simply faded away."[8]

Nothing about this Consent Decree contemplates quick fixes, temporary measures, or partially implemented reforms. The Monitoring Team is committed to seeing that comprehensive new programs, initiatives, policy changes, and approaches are not merely adopted halfheartedly but, instead, become part of the fabric of the Department. The goal is to help SPD build structures and a culture within the Department that will remain changed for the better long after the monitoring period ends.

---

[8] Samuel Walker, "Institutionalizing Police Accountability Reforms: The Problem of Making Police Reforms Endure," 32 St. Louis Univ. Pub. L. R. 57, 60 (2013).

# 1.  Summary of Personnel Changes and Primary Policy & Structural Changes in the Last Six Months

**Summary**

In the past six months of monitoring, SPD has experienced substantial changes in leadership.  A new Bureau of Compliance and Professional Standards, currently composed of an Assistant Chief and five Captains, has been created to coordinate compliance-related tasks within SPD.

Nearly all policies required by the Consent Decree have been approved by the Court and have begun to be implemented—including policies relating to use of force, stops and detentions, bias-free policing, crisis intervention, and performance mentoring.  These consensus policies are significant achievements and squarely address several of the Consent Decree's most critical objectives.  The continued development of internal and external structures of critical-analysis is of near or equal importance.

This section provides an overview of the important personnel changes that have occurred, and the primary policy and structural successes that have been achieved, since the Monitor's December 2013 Second Semiannual Report.

## Personnel Changes

In November 2013, Seattle elected a new Mayor, who appointed a new Interim Chief of the SPD.  Both before and after the mayoral election, Ed Murray pledged a rapid pace toward full and effective compliance with the Consent Decree.  At the Mayor's behest, Harry Bailey came out of retirement and returned to public service in the interim period before the appointment of a new Chief.  In rapid succession, three former Assistant Chiefs who had led the Department for the last decade resigned or retired.  The Monitoring Team respects Interim Chief Bailey's contributions to the Seattle community throughout his career.

Importantly, Chief Bailey appointed a new Assistant Chief, Tag Gleason, to head a newly fashioned Bureau of Compliance and Professional Standards.  The Bureau, which includes five Captains and several lieutenants and sergeants, was intended to be the place where the major Consent Decree compliance work will occur within the Department.

Assistant Chief Gleason has appointed Captain Jamie Koutsky to head the Policy, Research, Audit and Compliance section of the Bureau.  Acting Captain Gregg Caylor is in charge of the Force Review Section, which oversees the Use of Force Review Board.  Sean O'Donnell serves as Captain of the Training and Education Section.  Acting Captain Michael Teeter oversees the Force Investigation Team.  Ron Rasmussen was assigned as Acting Captain to work as an IT Liaison.

For the vast majority of the time period described in this report, Assistant Chief Nick Metz was the head of the IT Section.  Assistant Chief Joe Kessler was in charge of the Patrol Operations Bureau.  Assistant Chief Mike Washburn is the Chief of Staff.  Some of these Assistant Chiefs were recently moved to different assignments.[9]

## Primary Successes

### Policies

The Parties, SPD, and Monitor unanimously agree that the development of several new and critical policies represent, cumulatively, the most significant substantive achievement and area of progress over the last six months.  The policies that have been submitted to, and approved by, the Court cover issues at the heart of the Consent Decree, including: (i) use of force; (ii) stops and detentions; (iii) bias-free policing; (iv) crisis intervention; and (v) performance mentoring.  As the Court said in the April 3, 2014 status conference, "[E]very one of them—each and every one of them—is a meaningful improvement and step in the right direction."[10]

> The development of several new and critical policies represent, cumulatively, the most significant substantive achievement over the last six months.

For all newly approved policies, the Consent Decree provides that the Parties and Monitor will review and evaluate the policies six months after SPD begins to implement them.[11]  This policy review will ensure that the Parties and Department can correct for inadequacies, misunderstandings, deficiencies, and oversights.[12]  Consequently, Seattle can remain confident that the Monitor and Parties will continue to review how well the policies are doing in practice and make any necessary adjustments.

### Use of Force

After many months of extended drafts, redrafts, consideration of recommendations from community members and organizations, and significant negotiation, a new use of force policy and related manuals were approved by Judge Robart on December 17, 2013.[13]  As the Monitor observed in a memorandum recommending that the Court approve the policies, the policies reflect best practice, the best guidance of nationally-renowned police experts, and the important input of SPD officers themselves.  The policies embody the desire to ensure constitutional policing and the safety and

---

[9] *See* Steve Miletich, "Latest Seattle police shake-up in top ranks follows report," Seattle Times (May 23, 2014), http://seattletimes.com/html/localnews/2023684534_spdshakupxml.html.
[10] 4/3/14 Status Conference Transcript at 85.
[11] Settlement Agreement ¶ 180; Dkt. No. 127 at 42.
[12] *See* Dkt. No. 107 at 5.
[13] Dkt. No. 115.

well-being of both the public and law enforcement personnel. Perhaps most importantly, the policies represent the consensus of SPD and the Parties.

As approved by the Court, the basic use of force policy runs slightly more than nine and a half pages, which includes approximately two pages of definitions of basic concepts and terms.[14] The remainder of the associated sub-policies and manuals provide specific guidance to SPD officers and supervisors on how to report force, how to investigate and review force incidents, and how to deploy specific less-lethal instruments.

> *The new use of force policy and manuals provide line officers and supervisors with clear guidance on performance expectations.*

Taken together, these policies and manuals replace SPD's previously insufficient and ill-defined policies with detailed, precise guidelines that provide line officers and supervisors alike with clear guidance on performance expectations. The Monitoring Team has been heartened by the numerous line officers and command staff who have—even before completing all of the 32 hours of training that SPD officers will receive on the policies this year—articulated their appreciation of the clear expectations that the policy and manuals codify.

Notable features of the new use of force policy and manuals include:[15]

---

**Enhancing officer safety and protecting rights with clear core principles guiding appropriate use of force**

- Officers must "accomplish the police mission with the cooperation of the public as effectively as possible, and with minimal reliance upon the use of physical force."[16]
- Officers must use "de-escalation tactics and techniques . . . which seek to minimize the likelihood of the need to use force during an incident" when safe to do so and the totality of circumstances permit [17] and must recognize that a subject's lack of compliance is not always a deliberate attempt to resist but may instead be related to an inability to comply due to medical impairment or a language barrier;
- Although force is sometimes unavoidable, officers must "use only the force necessary to perform their duties" and "use only the degree of force that is objectively reasonable, necessary under the circumstances, and proportional to the threat or resistance of a subject";[18] and
- The conduct of officers prior to the need to use force will be a factor that the Department will consider when assessing any use of force incident.

---

[14] *See* Dkt. No. 107-1 at 2–10 (presenting Seattle Police Manual §§ 8.000, 8.050, 8.100), available at http://seattlemonitor.com/uploads/Use_of_Force_Policy.pdf.
[15] Parts of this summary are excerpted and adapted from the Monitor's Introduction to the Second-Year Monitoring Plan. *See* Dkt. No. 127 at 5.
[16] Dkt. No. 107-1 at 1
[17] Dkt. No. 107-1 at 8; *id.* at 1.
[18] Dkt. No. 107-1 at 1, 3.

**Clearly defining force—when it is appropriate and when it is prohibited—and when and how to report force**

- "Force means any physical coercion by an officer";
- "All uses of force other than de minimis are reportable."[19]
- For reporting purposes, force is broken into four types based upon the nature and severity of the incident: de minimis, and Types I, II, and III.
- It is inappropriate for officers to use force to punish or retaliate; against individuals who only verbally confront them; and against handcuffed or restrained individuals, except in exceptional circumstances.

**Defining and enhancing responsibilities for supervisors and creating the new Force Investigation Team ("FIT"):**

- Supervisors will be responsible for their officers, review all uses of force, and conduct a detailed investigation of all uses of force categorized as Type I and II.
- Supervisors screen all Type I force incidents in person with the officer and respond to the scene for Type II incidents.
- A new, independent, and inter-disciplinary FIT team investigates the highest level uses of force (Type III and above) and for officer-involved shootings, in-custody deaths, and serious assaults on officers.[20]
- New procedures protect against tainting possible future criminal investigation of the involved officers.

**Institutionalizing the Use of Force Review Board:**

- The UOF Review Board reviews all Type II and Type III uses of force to:
  - Confirm that use of force reporting, investigation, and review are thorough and complete;
  - Determine whether the findings from the chain of command regarding whether the force used is consistent with law and policy are supported by a preponderance of the evidence;
  - Ensure that all uses of force contrary to law or policy are appropriate addressed; and
  - Identify trends or patterns of deficiencies regarding policy, training, equipment, or tactics.

---

[19] Dkt. No. 107-3 at 2.
[20] Dkt. No. 107-3 at 7.

> **Creating procedural manuals to provide specific, tailored guidance on using less-lethal instruments:**
> - An instrument-by-instrument manual provides guidance to officers on when and how instruments like tasers and OC spray (pepper spray) can be used; and
> - Officers must carry at least one less-lethal force tool, such as a conducted energy weapon ("CEW" or "taser"), OC spray (pepper spray), or baton; and officers must use them in compliance with particular policies addressing specific issues for each instrumentality.[21]

The Monitoring Team, DOJ, the City, and SPD all recognized the critical importance of officers receiving in-depth training on the policies and procedural manuals.  As will be discussed in more detail later in this report, nearly all 1300 sworn SPD officers have completed a high-quality, basic training course on the new use of force policies, which included a video message from the Chief, e-learning modules, and an eight-hour in-class training session.  The Monitoring Team and DOJ audited these classes and found them well-taught.  The enormous effort was accomplished in a period of eight weeks.

As part of the comprehensive training plan submitted to the Court on May 30, and as required by the Consent Decree and Second-Year Monitoring Plan, officers in the coming months will receive another 24 hours of interactive, in-classroom training—which will address less-lethal tools, core use of force concepts, and force tactics.  Thus, by the end of 2014, all SPD officers will have completed some 32 hours of in-class, scenario-based, and electronic learning on use of force.

> By the end of 2014, all SPD officers will have completed some 32 hours of in-class, scenario-based, and electronic learning on use of force.

The Monitor cannot overstate the size and complexity of the use of force training initiative.  The Parties and Monitor are working together collaboratively to ensure that this rigorous and comprehensive use of force training initiative provides officers with the knowledge and skills necessary to police actively, safely, and constitutionally.  The Monitor is encouraged that such training can be the foundation for the change in culture within the SPD that the community has sought for decades.

### Stops and Detentions and Bias-Free Policing

After many months of negotiations between the City and DOJ, and with input from CPC, the Court approved policies on stops and detentions and bias-free policing on January 17, 2014.  Together, those policies are intended to clarify how officers are to handle street encounters and will

---

[21] Dkt. No. 107-1 at 11.

help ensure that officers do not engage in discriminatory policing.  For the first time, the policies require that SPD collect data to help evaluate trends and address any ongoing concerns.

The DOJ investigation that preceded the Consent Decree found that SPD officers often exhibited confusion about the distinctions between a casual, social contact—where a person is free to leave— and an investigative detention short of an arrest, commonly referred to as a *Terry* stop—where a person is not free to leave.  Some data and community input suggested that this confusion, as well as other problems with training and oversight, led to inappropriate pedestrian encounters that may have resulted in a disproportionate number of individuals from minority populations, and particularly youths, being stopped when no underlying offense occurred.  Incidents of officers using racially-charged language and the fact that force disproportionately occurred against minorities also gave the Department concern.  SPD's failure to collect and analyze data on civilian contacts compounded the problem.  Accordingly, these issues were addressed by the Consent Decree.

The new Stops and Detentions policy lays the foundation to resolve those concerns by:

> - Clarifying the distinction between social contacts and *Terry* stops;
> - Making clear that a *Terry* stop must be based on reasonable suspicion, must be reasonable in scope and duration and has certain limits imposed by law, and  must be documented with clearly articulated and objective facts;
> - Ensuring professionalism in such stops; and
> - Improving oversight by requiring supervisors to review *Terry* stop documentation before the end of their shift and requiring SPD to collect, for the first time, electronic data about such stops that will permit analysis and identification of trends, patterns, and concerns with practices at a systemic level.

The Parties, SPD, and CPC have reached consensus on what data the SPD will collect from officers with respect to stops, which the Court approved on June 5.[22]  This data will be assessed by the Monitor, Department, DOJ, and CPC in the months and years to come.

The new Bias-Free Policing policy also gives officers clear direction by:

> - Clearly and accurately defining what bias-based policing is.
> - Expanding what "personal characteristics" are covered by the policy, including: age; disability, economic, or familial status; gender; gender identity; homelessness; mental illness; national origin; political ideology; race, ethnicity, or color; religion; sexual orientation; and status as a veteran.[23]
> - Identifying expressly prohibited acts and reporting obligations when an officer observes a prohibited act.

---

[22] Dkt. No. 150.
[23] *See* Dkt. No. 116 at 6 (summarizing SPD Policy 5.140).

- Improving oversight by requiring any officer hearing a complaint of discriminatory policing to "call a supervisor to review the circumstances and determine the appropriate course of action." [24]
- Requiring SPD to collect, for the first time, data about policies and practices that may have, not an overtly discriminatory intent, but an unwarranted "disparate impact on particular protected classes relative to the general population." [25]  If they do, SPD will "explore," with a variety of community stakeholders, whether "equally effective alternative practices" are available "that would result in less disproportionate impact." [26]

Although the Parties, Department, Monitoring Team, CPC, and other community groups must continue to consider precisely how data on stops and detentions should be considered and precisely how a disparate impact is identified, discussed, or rectified, these policies form a critical foundation toward ensuring that SPD policies civilians in a fair, equitable fashion.

The status of training on these two new policies is discussed in detail elsewhere in this report.

Crisis Intervention

The Court approved the policy guiding SPD's handling of persons experiencing a behavioral health crisis on February 10, 2014.[27]  The policy was developed through the collective and collaborative efforts of experts in mental health and substance abuse from Seattle, King County, and across the United States with the aim of improving community safety and providing officers training and resources for engaging with individuals who are experiencing a behavioral crisis event.

> The aim of the new crisis intervention policy is to improve community safety and provide officers training and resources for engaging with individuals experiencing a behavioral crisis.

A primary goal of the policy is to treat those experiencing a behavioral crisis with dignity and respect, and to resolve crisis incidents by connecting those individuals with community services that can provide long-term stabilizing support.  One key component of the policy calls for officers to de-escalate the situation when feasible and reasonable.

This new policy also created critical new organizational and operational changes for SPD that will guide and help officers when dealing with individuals in crisis. The new "Crisis Intervention Program" consists of three distinct levels of expertise: all patrol officers, who will receive basic training on crisis intervention; the "certified" Crisis Intervention officers; and the follow-up Crisis Response Team.  To become a CIT-"certified" officer, an officer

---

[24] Dkt. No. 116 at 7 (summarizing SPD Policy 5.140-5).
[25] SPD Policy 5.140-9.
[26] *Id.*
[27] *See* Dkt. No. 121.

must take a 40-hour crisis intervention course with a certification exam and complete additional annual training.   A CIT-certified officer will be dispatched to every scene where the police communications center suspects a behavioral crisis and, for the first time, will take primary responsibility at the scene of crisis events.  The Crisis Response Team is tasked with following up on officer encounters with those enduring a crisis to assess that appropriate services are in place.

The policy also introduced a Crisis Intervention Team ("CIT") coordinator, who is appointed by the Chief of Police and provides command-level oversight of the Crisis Intervention Program.  The coordinator is the SPD's primary point of contact for the mental health provider/clinician/advocacy community.

In the next several months, officers will, for the first time, be required to collect data on every encounter they have with individuals in behavioral crisis.  This data will allow SPD to systematically track and assess the deployment and effectiveness of crisis intervention resources.

The Monitoring Team praises the diligent and difficult work of the Crisis Intervention Committee ("CIC")—the regional interagency coalition of social service providers, mental health experts, academics, law enforcement and judicial representatives, DOJ and its two regionally and nationally-renowned consultants, and other stakeholders who united behind this important, new crisis intervention response framework and policy.  Additional achievements of SPD with respect to crisis intervention issues, particularly in the areas of training and other systemic matters, are discussed elsewhere in this report.

> The Monitoring Team praises the diligent and difficult work of the Crisis Intervention Committee.

Performance Mentoring Program

The Court approved the consensus Performance Mentoring Program policy on March 20, 2014.[28] The policy calls for the Department to collect and assess data to identify officers that may be engaged in at-risk behavior and provide timely behavioral or performance intervention where appropriate.  It establishes a defined, non-disciplinary process by which the Department will use performance-related data to identify officers with performance issues or presenting signs of stress, to assess officer performance trends, and to conduct behavioral intervention.

The PMP provides a process for the evaluation data about an officer's performance and provides for mandatory and discretionary review by supervisors.  The new system requires patrol sergeants and commanders to review monthly the performance data of the employees they supervise to determine whether the threshold for triggering events has been met or exceeded.  Those triggering thresholds

---

[28] *See* Dkt. No. 128.

include uses of force, complaints received and vehicle pursuits, and other criteria.

> The new Performance Mentoring Policy requires patrol sergeants to regularly and systematically review officer performance.

In the context of the mandatory PMP review, a supervisor is required to initiate a performance mentoring assessment of an employee who meets or exceeds a given threshold.  In addition to the mandatory review, the PMP allows supervisors to conduct a discretionary review whenever there is a concern about an employee's behavior.  The supervisor's assessment is reviewed by the new Department-wide Performance Review Committee to ensure Department-wide consistency and uniformity in the implementation of the PMP.  The Committee is also tasked with determining the adequacy of the assessment and proposed plan to address the concerns identified and to provide the tools and support necessary for the officer to meet Department standards.  The supervisor's recommended intervention will be reviewed up the chain of command for final approval and a Performance Mentoring Coordinator will oversee all aspects of the plan until it is fully implemented and closed.

The 2011 DOJ investigation found SPD's prior early intervention system to be deficient.  The number of triggering event thresholds were set too high, the intervention occurred too long after the triggering event and did not effectively remedy an officer's behavior, and the supervisory review was often superficial.  The new policy, when implemented, promises to remedy these shortcomings.

This Third Semiannual Report discusses the PMP policy, and considerations and challenges for its rollout, in some detail elsewhere.

### Structures of Critical Self-Analysis

In addition to the development of the policies in terms of substantive achievements, SPD has continued to develop and strengthen crucial "structures of critical self-analysis"—those entities, groups, and organizations that will help SPD to evaluate itself critically, to develop and refine policies and training, and to solve problems long after the Consent Decree dissolves.  These structures include the CPC, CIC, UOFRB, the FIT team, and the PMP.

All of these structures will be discussed in further detail elsewhere in this report.  Nonetheless, two examples should be highlighted.  First, the CPC has become an important and constructive player in the formulation of policy and the advancement of a host of critical issues relating to reform—not least of which is the fundamental structure of the accountability system and the disciplinary system.

Likewise, the CIC—an SPD-led volunteer, interagency coalition of social service providers, clinician, mental health experts, academics, law enforcement and judicial representatives—has been

extremely productive: (1) finalizing policy, (2) reviewing and advising on every aspect of CIT training materials, and (3) laying the groundwork for further expansion of the newly revitalized CIT Program by generating important work product, including:

- An explanation of the involuntary commitment process for officer training,
- A schemata/framework that describes the entirety of social services available to those experiencing behavioral health crisis, in terms useful to the line officers,
- Scientific surveys of officer attitudes towards these programs, and
- Forms and data collection plans that will revolutionize the way the department manages its officers who contact these populations going forward.

The active participation and contributions of these groups is important.  In these areas, SPD has begun collaborating with the range of experts and other committed law enforcement officials.  It represents an important break from the isolation and "go-it-alone" attitude that many have described as having tended to characterize SPD's practices for the last two decades.

A recent meeting arising from the CIC is emblematic.  Several of the leading hospitals in the area were concerned about a form for emergent detentions that SPD was using.  The CIC served its function as a "problem-solving" forum by giving a space for a collaborative and constructive dialogue between the Seattle community's mental health providers and its police department.  The Monitoring Team hopes and expects that these types of conversations will become even more frequent and valued by SPD in the months to come.

### Other Successes

In subsequent sections, this report details positive developments in the areas of training, the review of the use of force, and crisis intervention over the last six months.  Progress in these areas has been notable and encouraging.

# 2. Training

**Summary**

Since February 2014, the Education and Training Section's progress has been laudable.  The Section has appropriately challenged old assumptions and embraced new approaches to creating comprehensive training plans.  It has partnered closely with outside experts, DOJ, and the Monitoring Team to create high-quality training curricula addressing use of force and crisis intervention.

Meanwhile, the Section has met the Second-Year Monitoring Plan's aggressive deadlines for the creation and completion of the first phase of officer training on SPD's new use of force policies.  By the end of 2014, officers will have received 32 hours of use of force training, at least 8 hours of crisis intervention training, and at least initial instruction on the new stops and detentions and bias-free policing policies.  The scope and scale of these initiatives efforts cannot be overstated.

The Section's workload will remain substantial over the next six months.  As it progresses, the Section should institutionalize recent changes, work toward a non-manual system for tracking officer training, explore outside training programs and approaches more regularly, and ensure that "lessons learned" from elsewhere in the Department are appropriately communicated to officers.

On February 4, 2014, stakeholders from the DOJ Civil Rights Division, Seattle U.S. Attorney's Office, Mayor's Office, City Attorney's Office, SPD, and Monitoring Team met to discuss the status of SPD's efforts to comply with the Consent Decree.  At a press conference following this meeting, Mayor Murray called 2014 "the year of training." [29]  That characterization accurately encapsulates the primary importance of ensuring that officers receive instruction on the myriad new policies, procedures, and technologies that have, or will soon, emerge.

> This year's training programs will provide knowledge, scenarios, and tactics to allow officers to police effectively, safely, respectfully, and constitutionally.

Only high-quality, rigorous training that incorporates best practices in adult education can ensure that paper becomes practice—and can effectuate the significant, systemic changes that the Consent Decree requires.  The training programs that officers will complete this year will provide specific knowledge, real-world training scenarios, and solid tactics that will allow officers to police effectively, safely, respectfully, and constitutionally.

---

[29] Liz Jones, "Seattle Police Reforms Shift to Officer Training," KUOW.org (Feb. 5, 2014), http://kuow.org/post/seattle-police-reforms-shift-officer-training.

This section describes the noteworthy progress, to date, that SPD has made in training officers on new policies addressing use of force, stops and detentions, bias-free policing, and critical incidents—and the substantial challenges that remain.  It also describes systemic issues that the Education and Training Section must address in the coming months to position itself, by the time of the next semiannual report, to have timely finalized a comprehensive training plan for 2015.

## Use of Force Training

By the end of 2014, all SPD officers are slated to have received some 32 hours of training on use of force.  This training consists of two phases.  Nearly 1300 SPD officers have already completed Phase I, an "interim" training program intended to provide officers with clear, immediate guidance on the new use of force policies.  Phase II, intended as a "comprehensive" training, will feature 24 hours of in-class and scenario-based training on use of force.

### Phase I: Interim Use of Force Training

Recognizing that line officers needed clear guidance on expectations under the use of force policies approved by the Court on December 17, 2013, the Department, with significant input from the Monitor and DOJ, created an "interim" or "Phase I" use of force training program.  That program consisted of: (i) a message by Interim Chief Bailey introducing the updated use of force policies; (ii) five e-learning modules addressing the basic use of force policy, the differences between the various classifications (or "Types") of force that the new policies created, policies regarding the review of force, the new Force Investigations Team, and an overview on less-lethal tools and policies for their use; and (iii) a one-day, live classroom training covering the new policies and reporting requirements.

> The development and delivery of the Phase I "interim" use of force training has been a significant achievement.

The interim training commenced in March 2014.  As of April 30, nearly all patrol and other relevant officers have completed this interim training.  Officer participation in the program was tracked manually by the Education and Training Section.  DOJ and Monitoring Team representatives have attended the live, in-classroom training sessions to assess quality.  All representatives were pleased with the in-class trainings that they observed.  The Monitoring Team has been encouraged by anecdotal feedback from participating officers that suggest that the interim training did much, at least for some, to clarify expectations and alleviate some anxieties about how the Department expects them to perform under the new policies.

The development and delivery of the Phase I "interim" use of force training has been a significant achievement.  The Monitor commends the Training section for their ability to construct, plan for,

and complete an important training for SPD officers—and to do so in the relatively tight timeframe of three months from initial conception of the training program to the completion of training. The Monitor also recognizes and applauds the dutiful efforts of the officers who have attended in-class instruction and completed the electronic learning elements of the program.

## Phase II: Comprehensive Use of Force Training

Over the last three months, the Education and Training Section has adopted a fundamentally different approach to creating comprehensive training initiatives that meet expressly defined objectives, provide for real-time measurement of the effectiveness of the plan's various components, and accommodate logistical and personnel challenges. This new approach has been used for decades in other industries and in the last few decades by leading police departments. The Section's ability to embrace change is commendable and has been instrumental in driving progress forward at a rapid rate.

Under previous leadership, on December 31, 2013, SPD provided the Monitor and Parties with an undeveloped set of training materials requiring substantial revision and a timeline that contemplated use of force training lasting well into 2015. In a March 3, 2014 meeting with the Education and Training Section and its new leadership, the Monitoring Team expressed significant concern about the lack of specificity and precision in the proposed 2014 training schedule, the substantial time horizon contemplated for completing necessary training in some of the newly approved policies, and the absence of a clear internal process for crafting a logistical plan to get officers trained.

Subsequently, however, the Department partnered closely with a DOJ consultant, former San Jose Chief of Police Rob Davis, and adopted a new approach modeled after the Instructional Systems Design Model ("ISDM")—an instruction methodology with roots in military training that has gained steady acceptance in law enforcement.[30] The ISDM model provides detailed steps for rigorous analysis of deficiencies or needs, design and development of highly-detailed written training materials to address the organization's needs, detailed plans for presenting the training, and detailed strategies for consistently and effectively evaluating the training provided.

Representatives of DOJ, the City Attorney's Office, and the Monitoring Team carefully reviewed several drafts of the ISDM and reviewed the associated materials to be used in the training. They

---

[30] See David Mehlhoff, "Critical Thinking as an Instructional Model: Instructional Systems Design," California Commission on Police Officer Standards & Training, http://lib.post.ca.gov/lib-documents/idi/MICC3/MICC3%20Mehlhoff%20ISD%20Critical%20Thinking.pdf; see generally Robert A. Reiser, "A History of Instructional Design and Technology: Part II: A History of Instructional Design," 49 Educational Technology, Research & Development 57, 57–58 (2001), http://www.capella.edu/IDOL/HistoryofIDTPartII.pdf, (detailing the instructional systems design model and recounting history of the instructional systems design approach as originating with the development of military training in World War II).

met with SPD over a period of four months—and over a dozen times—and provided hundreds of comments and suggestions for improvement or additional clarification. The quality of the discussions with the Training Section was superior.

The resulting ISDM for comprehensive use of force training—which provides for 24 hours of instruction on core use of force principles, less lethal instrumentalities, team tactics, the use of firearms, and a variety of critical use of force skills including de-escalation—suggests a sea change in the depth, rigor, and sophistication of SPD's approach to training officers. The Monitoring Team has already seen some early fruits of this new ISDM approach with respect to bias-free policing and stops and detentions, which the Monitor and Parties are currently reviewing.

In a series of conversations with SPD, both DOJ and the Monitor repeatedly stressed the urgent importance of training officers on less-lethal instruments (*e.g.*, OC spray or Tasers) and core use of force principles associated with using such instruments, including de-escalation. With the use of less-lethal instruments having been associated in numerous studies with decreases in injuries to both subjects and officers alike,[31] equipping officers with less-lethal instruments, and training them on how to use such instruments, as quickly as feasible is imperative.

> By July 15, all SPD patrol officers will have been certified, and required, to carry at least one less-lethal instrument.

The comprehensive training includes three basic blocks of training. First, the ISDM expedites the completion of an 8-hour, classroom and scenario-based training course that addresses less-lethal instruments and foundational use of force principles. DOJ and the Monitoring Team reviewed the materials and provided comments, suggestions, and edits on a similarly expedited timeframe. This training program commenced on May 5. All officers are currently slated to have completed the training by July 15, 2014. Assuming that SPD can adhere to this ambitious but achievable timeline, all SPD patrol officers will, by July 15, have been certified to use a less-lethal instrument and will be required to carry at least one such instrument. The Monitoring Team looks forward to seeing the Department reach this important

---

[31] *See, e.g.*, Bruce Taylor, et al., Police Executive Research Forum, "Comparing Safety Outcomes in Police Use-of-Force Cases for Law Enforcement Agencies that Have Deployed Conducted Energy Devices and a Matched Comparison Group that Have Not: A Quasi-Experimental Evaluation," at 1 (2009), http://www.policeforum.org/library/use-of-force/CED_outcomes.pdf (concluding that, after controlling for "incident" and "agency-level factors," rates of both suspect and officer injuries were lower among agencies using tasers); Michael R. Smith et al., "Impact of CEW and Other Types of Force and Resistance on Officer and Suspect Injuries," *in TASER Conducted Electrical Weapons: Physiology, Pathology, and the Law* 257, 263 (Mark W. Kroll and Jeffrey D. Ho eds., 2009) (summarizing several studies and concluding that tasers "may lower levels of nonlethal injuries relative to hands-on tactics and impact weapons"); MacDonald, et al., "The Effect of Less-Lethal Weapons on Injuries in Police Use-of-Force Events," 99 American Journal of Public Health 2268 (2009) ("Using administrative data from 12 local police departments including more than 24,000 use-of-force cases, . . . the use of less-lethal weapons (OC spray or CEDs [tasers]) decreased the odds of injury to suspects," with OC spray slightly elevating the likelihood for injury risk for officers.).

milestone.

The Department's ISDM for use of force contains two other 8-hour instructional blocks. One addresses a host of use of force skills. The other addresses firearms qualifications and team tactics. DOJ and the Monitoring Team worked closely with the Training section to improve still further the quality of the curricula, approaches, and materials that these training blocks used.

On June 13, the Court approved the ISDM.[32] The Monitoring Team's May 30 memorandum recommending such approval provides additional details on the development of the ISDM and the specifics of its training elements.[33]

## Bias-Free Policing & Stops & Detentions Training

### Phase I: Interim Training

The Parties, SPD, and Monitor agreed that the Department should provide officers with immediate, "interim" training on the bias-free policing and stops and detentions policies that the Court approved on December 17, 2013. Similar to the updated use of force policies, officers and command staff alike require a clear understanding of what the new policies on stops, detentions, and bias-free policing require—and how their performance will be assessed by the Department going forward.

The interim training will consist of: (i) a proposed message by the Chief of Police introducing the new policies; (ii) e-learning modules; and (iii) a plan for ongoing roll call trainings highlighting specific, important topics within and related to the policies.

The Education and Training Section prepared an initial set of e-learning materials. In early April, it explained that it wanted to throw out the initial set of materials because, by simply reproducing and summarizing the approved policies, they were conforming too closely to ineffective past practices that produced inferior materials and results. The Monitoring Team readily agreed and applauds the Training section for critically appraising its previous approaches—and proposing a reasonable process for producing superior materials. The stakeholders will be meeting to refine and edit these new materials in the coming weeks.

> The Monitoring Team applauds the Training Section's critical appraisal of its previous approaches.

The interim training will commence on June 30, 2014 and be completed by August 1, 2014.

---

[32] Dkt. No. 153.
[33] Dkt. No. 144.

*Phase II: Comprehensive Training*

The Department is developing a comprehensive, classroom training program on bias–free policing and stops and detentions.   It will be provided to patrol officers, command staff, and supervisors. SPD will be collaborating closely throughout the development of this comprehensive training with the Parties, Monitoring Team, CPC, and other community groups to develop a training program that provides officers with practical knowledge on effectuating fair and impartial policing.   Because of the diversity of stakeholders who will be involved in creating it, the deadline for final approval of the finalized training program is August 31.   As noted above, the Monitor and Parties have received an initial ISDM with respect to bias–free policing and stops and detentions.   All are encouraged by its rigor.

Upon approval of those materials, including the ISDM, the Court will approve a firm date by which the comprehensive training will be provided.   Nonetheless, and pending that approval, the Education and Training Section is proactively planning to begin training officers in September.

## Crisis Intervention Training

SPD's efforts to provide appropriate crisis intervention training for officers are occurring within the context of the Crisis Intervention Committee ("CIC").   A detailed discussion of the crisis intervention training initiatives can be found elsewhere in this report.

## Training for Force Investigators and Reviewers

The Consent Decree expressly requires the Department to create several specialized training programs.   The first is a training program for Force Investigation Team ("FIT") investigators that will provide practical, detailed knowledge on best practices for investigations generally and administrative inquiries specifically.   As this report notes elsewhere, a two–day training session held in April 2014 on the mechanics of an administrative investigation was an important, initial step in providing such training.   Additional training will continue through November 2014.

A second, specialized training program is for UOFRB members.   The Settlement Agreement requires that "[e]ach member [of the UOFRB] receive a minimum of eight hours of training, including legal updates regarding the use of force and curriculum utilized by the Education and Training Section regarding use of force."[34]   The Second–Year Monitoring Plan calls for this training to be completed by September 30.   The Monitoring Team looks forward to working with representatives of the Force Review and Training sections in developing an instructional program that will further strengthen the quality of the analysis and review that is occurring at the UOFRB.

---

[34] Settlement Agreement ¶ 121.

## Recommendations

The completion of an interim use of force training, acceptance of the rigorous ISDM method of instruction, and the development of a detailed plan for the comprehensive use of force training represent impressive and important progress.  The section's ability to embrace new approaches and critically assess its prior practices stands as a model to other areas of the Department.  Nonetheless, some significant challenges remain.

**1.   The Education and Training Section Should Expand and Institutionalize the Use of the Instructional System Design Model (ISDM) Beyond the Comprehensive Use of Force Training Plan.**

The ISDM approach appears to have provided SPD with a standardized framework for engaging in the critical thinking and project management necessary to identify specific training objectives, create curricula and programs to meet such objectives, and assess the effectiveness of the training program both during its implementation and after the program has completed.

Over the long term, the Department's development of a robust business intelligence system should greatly enhance the use of the ISDM approach to training.  Instructors' access to a wealth of data regarding officer performance should greatly enhance their ability to follow the ISDM approach of rigorously analyzing current performance to identify training needs, design effective solutions, and evaluate the effectiveness of training provided.  The Monitor therefore anticipates that the Education and Training Section will regularly review such performance data as part of a continuing effort to develop and refine training that benefits officers and the community.

Although the Monitoring Team is sensitive to the resources required to follow the ISDM approach and develop the necessary, detailed instructional materials, it is confident that—like many other law enforcement agencies that use the same, or a similar, framework—SPD will reap substantial, practical benefits from making the ISDM its standard framework for creating and implementing training programs.

**2.   SPD Needs a Better, Non-Manual System for Tracking Officer Training.**

In late 2013, the Monitor learned that SPD had no reliable information on officer training.  The Department could not report, with any meaningful level of confidence, on precisely which officers have attended what training.   Rather than being stored in an easily accessible and searchable database, officer training data has existed in disparate locations and been captured by decidedly manual, paper-based processes.  For instance, information about what officers are trained to use the taser currently resides only in a collection of 3 x 5 index cards.  Accordingly, if a supervisor wanted to determine whether, or when, an officer under his or her command had been trained to use the

taser, the supervisor would need to ask a member of the Education and Training Section staff to manually sift through a stack of paper cards.

The inability to generate a specific officer's training history posed significant challenges when command staff or administrative review bodies, like the UOFRB, wanted to know whether a particular officer had received training on policies, procedures, or tactics relevant to a particular incident.  It also creates a substantial impediment to full implementation of the ISDM training method, which is built upon a rigorous assessment of current training and officer performance.

> *SPD needs a permanent, non-manual system for tracking which officers have received what training.*

Recently, the Education and Training Section established a process, involving manual entry of information into a Microsoft Excel spreadsheet, for tracking whether officers had successfully completed the interim use of force training and officer participation in training programs through the remainder of 2014.  The Monitoring Team appreciates the Section's willingness to devise a temporary measure to ensure that accurate information about officer training from February going forward is available. This stopgap, manual-based data system is, however, too time-consuming and separated from other data on officer performance to be a useful or dynamic long-term solution to tracking training information.

SPD should establish a computerized system for tracking training and ensure that this system is part of, or can eventually be integrated into, the comprehensive business intelligence system.[35]

### 3. SPD Must Explore External Training Programs, Consultants, and Approaches with Greater Regularity.

Historically, SPD has favored handling training itself—creating officer training programs almost exclusively in-house and having SPD personnel conduct the training.  This approach has the advantage of permitting maximum customization and oversight.  However, it has also contributed to some degree of insularity within the Department and the Education and Training Section.  Some have expressed concern that SPD—before the leadership and personnel overhaul that occurred in January 2014—has tended to invest too many resources in training as a result of overtime, overhead, and the like.

SPD has recently begun to benefit from external resources.  SPD should more regularly look to training programs offered by outside groups, such as the Washington State Criminal Justice Training

---

[35] The Monitoring Team is aware of a possibility of SPD using a city-wide training and professional development database system.  So long as such a system's functionalities align with SPD's needs, becoming a key stakeholder in the city-wide system would appear to be a promising approach.

Commission, and to training programs and materials created outside the Department by agencies like the Community Oriented Police Services ("COPS") office of DOJ, National Institute of Justice ("NIJ"), the California Commission on Police Officer Standards and Training ("POST"), and others.  Even if SPD cannot import the whole of a given training program, becoming familiar with other organizations' approaches to ensure that SPD is not needlessly reinventing the wheel.  SPD has started to do this with its Crisis Intervention and Bias–Free Policing training initiatives, and it is an encouraging sign.

### 4. SPD Needs to Develop a Mechanism for Ensuring that "Lessons Learned" from the UOFRB Are Contemporaneously Sent to All Precincts for the Benefit of Patrol Operations and Later Incorporated into Formal Training Programs.

At UOFRB meetings, and in discussions with representatives of the Education and Training Section, the Monitoring Team has consistently heard that the Training section is transmitting "lessons learned" during reviews of incidents at the UOFRB to line officers.[36]  Specifically, the Monitoring Team has been told, on several occasions, that particular lessons from reviewed incidents would be covered in use of force training modules.

> SPD needs to develop a clear process for relaying "lessons learned" in the UOFRB to the rank and file.

Although the Monitor was encouraged to see some of these "lessons learned" incorporated into content and scenarios outlined in the comprehensive use of force ISDM, instructor materials, the Education and Training Section must partner even more closely with representatives of the Force Review Section to ensure that these lessons are transmitted to the force both in real-time and into formal trainings.  The ISDM approach cannot succeed without regular, rigorous analysis of in-the-field performance in order to identify training successes, failures, and unexpected changes in the patrol environment that require revised or supplemental training.

---

[36] *See* Second Semiannual Report at 30–31.

# 3. Crisis Intervention

**Summary**

Since the Monitor's previous report, SPD has made significant progress in implementing important organizational and operational changes to how the Department manages incidents that involve people experiencing a behavioral crisis event—including those diagnosed with mental illness, suffering from substance abuse disorders, or experiencing other personal crises. The development and recent Court approval of the crisis intervention policy marks a significant achievement and substantial milestone about which SPD, and the host of community stakeholders that participated in the policy development process, can be justifiably proud.

The ongoing efforts to provide officers with phased, specialized training in interacting with individuals in behavioral crisis, and with resources that enable officers to connect individuals in crisis with social services when necessary, continue to represent a noteworthy achievement for these community stakeholders.

This section documents SPD's progress in working to achieve compliance with paragraphs 130–137 of the Consent Decree, which address crisis intervention.

## SPD Crisis Intervention Team ("CI") Program

Previously, SPD assigned one sergeant and three officers trained in crisis intervention to a unit (now the "CRT Unit") that was organizationally located within Special Operations/SWAT Teams. SPD has, instead, recently placed the Crisis Intervention Team ("CIT") Program under the command of the Patrol Operations Bureau, where it will be managed by a newly-appointed command-level CIT Coordinator. All work to ensure that the three distinct levels of CIT specialization—officers who have undergone basic CIT training, officers who have undergone advanced CIT training and are referred to as "CIT-certified officers", and a squad of officers designated as the CRT/Crisis Response Unit—are available as resources to the entire department and not just to Special Operations.

> Several organizational and operational changes are geared toward making the CIT program useful to patrol officers.

The primary purpose of these organizational changes is to make the CIT Program highly relevant and useful to the patrol officers who encounter individuals experiencing crisis events on a regular basis. These organizational changes, the operational changes described below, and the regional collaboration also described below reflect best practices in urban policing (often referred to as the "Memphis Model").

## Crisis Intervention Committee ("CIC")

The Crisis Intervention Committee ("CIC") is an interagency, volunteer, advisory committee composed of the best and brightest of regional mental and behavioral health experts, providers, clinicians, community advocates, academics, other law enforcement agencies, command-level members of SPD, and of the judiciary.[37]  The CIC now plays a major role in developing the critical components of SPD's crisis intervention strategy.  The SPD CIT Coordinator works with the CIC committee and has begun to oversee the day-to-day operations of all critical components of the CI Program.

The CIC held its first meeting in June 2013 and immediately began work on developing a Crisis Intervention policy and the revitalization of the "design and structure of its crisis intervention program," as required by the MOU.[38]  The Monitor submitted this policy to the Court in January 2014, and the Court approved it on February 10, 2014.  As outlined above, the approval of the policy was the culmination of unprecedented collaboration among community stakeholders.  The Monitoring Team appreciates the hard work, dedication, and thoughtful discussion of the complex web of issues related to city-wide crisis intervention.[39]

> The approval of the Crisis Intervention policy was the culmination of unprecedented collaboration among community stakeholders.

The CIC is organized into four sub-committees:  Executive Steering, Policy-Curriculum, Systems, and Data Output.  The Executive Steering sub-committee is comprised of representatives from the other sub-committees and serves as the chief decision-making authority of the CIC.  Each of the other sub-committees serve as advisory and problem-solving fora designed to address specific aspects of the complex web of issues related to city-wide crisis intervention.  For instance, as part of the development of Basic Training described below, the CIC's systems subcommittee developed the following resources for officers, which line officers and SPD believed would be helpful to officers:

---

[37] The Monitor's Second Semiannual report contains a more detailed introduction of the origins and structure of the CIC and the CI Program.  (*See* Second Semiannual Report at 57-58.)

[38] Memorandum of Understanding at ¶ 25(e).

[39] To aid the efforts of the CIC, DOJ arranged for two experts to be available to consult: Randy Dupont, Ph.D., from the University of Memphis and an expert who played a crucial role in creating the CI Team from the Memphis (Tennessee) PD and dozens of other departments; and Sgt. Elisabeth Eddy (retired), who played a similarly significant role in formulating a prior iteration of CIT at SPD and was a CI instructor at the Washington State Criminal Justice Training Center.  The Monitoring Team's Ellen Scrivner, Ph.D., former Deputy Director of the National Institute of Justice and former chair of the Chicago Police Department's citywide Task Force to Respond to the Needs of the Mentally Disabled, also consulted closely with the CIC.

- A summary of the involuntary treatment procedure in King County Mental Health Court;
- Schematics of the resources available system-wide in King County;
- A decision-making chart for officers confronted with a crisis event; and
- A pocket guide, for officers to print and carry, on key concepts and resources in the County.

Following the approval of the crisis intervention policy, the various sub-committees worked to ensure that all elements of the policy are being carried out in training. The CIC-approved training was submitted to the Court on May 30, 2014, which is an achievement equally significant to that of the policy development. Nonetheless, some notable challenges remain and require resolution.

## Training

The Policy/Curriculum sub-committee is tasked with assisting SPD in providing training at three different levels of expertise: (i) basic training, to be provided to all (non-specialized) sworn personnel (i.e., 1300 officers); (ii) advanced training, an extended and in-depth training course for specialized CI-certified officers, who will have received 40 hours of more in-depth training from the state academy, will be dispatched to every scene where the police communications center suspects a behavioral crisis, and who—for the first time—will take primary responsibility at the scene of crisis events; and (iii) training for 120 dispatchers has been added, given the centrality of their role in responding to the initial crisis call. The basic and dispatcher training was submitted to the Court on May 30, 2014.[40]

### Basic Training and CI Training Strategy

Members of the sub-committee engaged in an initial, robust, and difficult debate on how to develop the required basic crisis intervention training for all SPD officers in a cost-effective manner that leverages resources and makes the most of existing training programs. More specifically, the group encountered some challenges in agreeing on appropriate training curricula that will permit SPD to meet the requirement to train all officers in basic crisis intervention skills by the December 31, 2014 that the Second-Year Monitoring Plan requires. Although such robust debate often appeared non-linear, the Monitor is mindful that such a process is frequently part and parcel of inter-agency and inter-governmental collaboration.

To resolve these difficulties, CIC has formed a collaborative Working Group that involves both SPD representatives and those from King County, including representatives from the Criminal Justice Training Commission ("CJTC") and King County Mental Health's Chemical Abuse and Dependency Services Division, which administers King County's Mental Illness and Drug Diversion ("MIDD") funds.

---

[40] Dkt. No. 145.

A central insight developed over the course of several months of discussion with the CIC was that CI training had to be woven into the culture of the department—not through one-time-only training but, instead, as a regular part of its training program going forward. The Training Strategy, filed with the Court on May 30 and approved by the Court on June 13, conceptualizes and represents the inculcation of these principles in a wave of "phases" of training.[41]

In Phase I, with a few exceptions for even more highly trained officers, all sworn SPD personnel will attend the basic (eight-hour) Crisis Intervention Training Class currently offered by the CJTC. This is training, then, for all 1300 officers done in collaboration and partnership with and at the CJTC. Furthermore, this is training that is largely funded by the King County MIDD fund and, thus, a cost-effective way for the City to proceed. Officers will subsequently complete four e-modules, focused on "Seattle-specific" parts of the new CI policy and described in greater detail in the Monitor's filing of May 30, 2014.

In Phase II, SPD will reinforce this training in several sessions of every officer's contractually-required 32-hour "Street Skills" training. In Phase III, those select officers (again the "CI-Certified" officers) who have shown an interest and aptitude for working with people in crisis will receive "advanced" training, on top of their required 40 hour training. The content of that training

> The crisis intervention training program begins to break down the "silo" that SPD created in which it separated itself from the best regional training.

is being developed will be provided to the Court later this year, consistent with the Second-Year Monitoring Plan. In Phases IV and V, this cycle is repeated for continued development and emphasis of these skills.

This training program begins to break down the "silo" SPD had created over time in which it separated itself from the best regional training initiatives. SPD is now pooling resources and collaborating with CJTC and the CIC on every step of this important initiative. Indeed, the CJTC has been open and cooperative to changes in its own lesson plans, both vis-à-vis the SPD and the CIC, even though it is not subject to the Consent Decree. For example, a CIC member raised concerns about how certain diagnoses were described and categorized in their lesson plan. The CJTC made changes to its program after vetting it with its own subject matter experts.

The CI Program that has been developed (based on the "Memphis Model") represents the best practices in urban policing and, more importantly, is directly relevant to patrol officers and the challenges they face on the street.

---

[41] Dkt. No. 145-1; Dkt. No. 152.

Dispatcher Training

The dispatcher training materials were originally authored by members of the SPD and submitted to the CIC. As with the other types of training, the CIC, Parties, and Monitor have engaged in a process of revision and refinement of the dispatcher training materials that has been substantial, productive, and collaborative. That process has included an SPD-initiated pilot training of dispatchers that has allowed for the integration dispatcher feedback into the training materials.

The three-hour, in-person training course for dispatchers filed by the Monitor on May 30, 2014 addresses four central elements: (i) communicating with an individual experiencing a crisis event; (ii) determining if mental illness is a factor in the incident; (iii) locating CI-certified officers; and (iv) identifying possible community mental health resources that can assist the subject in crisis. With respect to these elements, the training provides dispatchers with important instruction on critical skills. For instance, although communication dispatchers necessarily do not diagnose mental illnesses, the training provides dispatchers with techniques for facially recognizing the potential signs of schizophrenia, bi-polar disorder, depression, and other mental disorders that SPD officers often encounter. The training includes instruction on active interviewing skills to enable dispatchers to de-escalate crisis situations and to cull pertinent information from the individual so that officers can respond to the scene. The submitted training also includes instruction on how dispatchers can use SPD technology quickly and effectively to identify on-duty officers who are CI-trained and can be dispatched as necessary.

Communications dispatchers will also learn about important community resources that can assist SPD with crisis intervention events. These resources include services from the King County Mobile Crisis Team, the Crisis Clinic, and the Seattle Municipal Mental Health Court. The CIC's social service and clinical representatives have contributed significantly in ensuring that dispatchers receive necessary information about the full array of services and resources that are available to subjects in crisis.

CIT Coverage Strategy

Paragraph 130 of the Consent Decree (the "coverage provision") requires SPD to "ensure that CI[-certified] officers are available on all shifts to respond to incidents or calls involving individuals known or suspected to" be in behavioral crisis. While it defines what training is required for an officer to become "certified," the Consent Decree does not define when "certified" officers must have completed their training, or conversely, how long ago is too long ago to be considered current on CI training.

Determining which officers should be presently considered to be "certified," and then determining the effect that standard has for the coverage provision, is complicated. It is not as simple as

establishing a bright-line cutoff date.  Rather, the determination must account for the fact that some officers who were trained years ago may still be current in their skills due to continued use and the nature of their assignments.  The Monitoring Team appreciate the hard work of the CIC's various subcommittees, the SPD, the DOJ, and the Monitoring Team's consultants in coming to a workable and fair solution to this important question.

The CIT Coverage Strategy sets forth a reasonable and "holistic" process to identify those officers the Department wishes to hold out as "certified."  It has some redundancy built in to capture those officers who should stay in the program, weed out those who do not wish to, and, if there are not sufficient volunteers at this time, to build a program to meet the requirements of the Consent Decree.

Pursuant to the Second-Year Monitoring Plan, by June 15, 2014, the Department will assess the effect of the process on the coverage provision.  SPD, in short, will then be in a position to determine how to populate its revitalized, highly trained and dedicated CIT-certified officers.  These continue to be issues of concern to the Monitor.  The Department will need to determine how CI-certified officers are distributed across department precincts.  Unlike officers who receive the basic training, officers receiving advanced training need to be available on a 24-hour basis to respond to incidents or calls involving individuals in behavioral crises or those known or suspected to have a mental illness. Furthermore, they need to be available to consult to officers and supervisors who encounter behavioral crises calls.  The Monitor will observe with great interest over the next six months as the CIC and SPD confront these significant logistical and operational challenges.

## Data on Crisis Interventions

The CIC's Data sub-committee has developed a "Mental Health Contact" from and has been working to implement a process for systematically tracking data on crisis incidents.  SPD has never tracked this information previously.  The purpose of doing so to provide rigorous, fact-based evidence for how the overall crisis intervention program and mental health system may be doing.
Specifically, the sub-committee is work on developing systems to track crisis incidents, the outcomes of interventions, and the success of crisis intervention training.

> SPD will soon implement a process for systematically tracking data on crisis incidents.

Data on critical incidents are currently captured at best sporadically and by several different systems that do not "talk to" each other.  Within existing systems, data and reporting are frequently inconsistent or unreliable. The Data sub-committee hoped that the introduction of the Department's interim database solution, IAPro, would accommodate the data analysis needs with respect to crisis intervention. However, the sub-committee has more recently learned that IAPro does not currently have an existing, "off-the-shelf" module for tracking crisis intervention data.  Full, comprehensive tracking

of data on crisis intervention will likely await the possible implementation of a module within the interim database solution and, in any event, the ultimate implementation of the comprehensive business intelligence system solution.

Pending integration into the comprehensive business intelligence system, the CIC subcommittee has been working to develop a stopgap solution that will allow it to begin gathering data as soon as possible.   A Mental Health Contact Report has been created using variables and other data-collection elements approved by the Data Outcome subcommittee and Monitor.   This Report is based on similar forms used by other police departments.

*The IT Department's inability to act with necessary expediency appears to be frustrating SPD's ability to make greater progress in the crisis intervention area.*

Data will be collected using one of SPD's in-the-field computer system (RMS), an off-the-self program called Versaterm.   This requires a programmatic update in order to incorporate data collected on the form.   The CIC requested this update several months ago.   Nonetheless, SPD's IT department has not yet responded as to whether or when it will go forward with the modification required to implement the Mental Health Contact Report.   Thus, the IT Department's inability to act with necessary expediency and willingness to adopt new approaches appears to be frustrating SPD's ability to make greater progress in an area of the Consent Decree for which much community support and infrastructure now exists. Since CI training is starting soon, the Monitor urges the IT Department to advance this process with all due haste.

Without an immediate ability to capture necessary information, the sub-committee has needed to explore how to collect at least some relevant data.   Following substantial discussion, two surveys are being developed by experts.   One will assess the efficacy of the training provided both at CJTC and SPD.   A second purports to measure cultural change reference acceptance and use of CIT across the department.   Development is nearing completion and, once the surveys are completed, the data collected will provide information both on the effectiveness of the training and changes in SPD culture relating to the acceptance and use of CIT.

Data on CIT training from these surveys is particularly important.   The Monitor supports the use of the surveys to collect data in order to provide the most comprehensive analysis of training needs at this time.   The Monitor also notes that although progress has been made in the area of data related to crisis intervention, SPD has not expressly tasked anyone within the Department with the responsibility for overseeing, gathering, analyzing, and ensuring the quality of data collected by the Department.   This too must occur soon.

In summary, the Monitor acknowledges that translating the Court-approved Crisis Intervention

policy into practice department-wide can be difficult and that the reorganization of the CI Program is an important step in the right direction. The Monitor further recognizes that the training developed by SPD in collaboration is a significant accomplishment. A great deal of work still remains—including conducting and assessing the training, as well as gathering the data necessary to continuously improve the CI Program.  Only SPD can assure that this happens.

# 4.  Data & Technology

**Summary**

SPD needs reliable data systems that make data easily accessible so that it can accomplish a host of important objectives—including implementing the Performance Mentoring Policy, tracking officer performance, analyzing trends among units and supervisors, and ensuring adequate supervision.

To remedy the deep flaws in existing data systems that an SPD-commissioned study by PricewaterhouseCoopers identified, the Department needs to implement a comprehensive, permanent business intelligence system.  On April 30, SPD proposed a "phased approach" that unacceptably calls for the Department to throw up an umbrella over deficient, existing data systems and worry about the poor quality of underlying data at a future juncture.  The Monitor is encouraged by recent indications that the Department will be working closely with the Mayor's office, outside experts, and the new Chief to engage in the fresh thinking and dynamic collaboration necessary to guide and implement the technological overhaul that SPD requires.

Meanwhile, the Department has struggled to implement a stopgap, interim database system to track basic information about use of force, stops and detentions, and the like.  The Monitor has been concerned that SPD has attempted to configure or implement the interim system in a manner contrary to what the vendor recommended.  Even if such configuration decisions do not affect the long-term integrity of the system, SPD has not appeared to clearly prioritize the optimization of the system over the maintenance of discredited legacy systems.

SPD has been engaged in ongoing efforts to implement systems—both an interim, stopgap database system, called IAPro, and a permanent, comprehensive business intelligence system—that can capture, review, and officer and departmental performance data.

This section explains the Monitoring Team's disappointment with the progress so far.  It explains why a substantial overhaul of SPD's approach to data systems, information technology, and IT management is critical.  It describes SPD's most recent, and unacceptable, proposal for a "phased" approach to create a business intelligence system.  It then details the Monitor's concerns with the implementation of a stopgap system to collect important data in the interim period while the comprehensive business intelligence system is being developed.

## Why Data Matters & What a BI System Will Do

As memorialized in the book and movie *Moneyball*, the 2002 Oakland Athletics and then–general manager Billy Beane famously used sophisticated data analytics and an evidence-based management approach to improve performance on the baseball field.  Public and private organizations have long

recognized that they can be much more effective by using sophisticated data analytics and evidence-based management to identify community or client needs and improve the delivery of services. [42] The Monitor's Second Semiannual Report described the extent to which law enforcement in particular has, for many years, been a "data-driven enterprise."[43]

> SPD's data is often either inaccurate or incomplete—and impossible or time-consuming to retrieve.

SPD is a long way from playing Moneyball. As the Monitor noted to stakeholders in a March 31, 2014 memorandum, SPD currently lacks data to assess officer performance; manage constitutional violations; identify misconduct; manage the risk of litigation and liability; hold supervisors and managers accountable; and identify and reward officers who excel at community-based policing, strategic communication, and constitutional and effective law enforcement. [44] The data that the SPD does have—at least with respect to use of force, stops and detentions, and litigation involving its officers—is often neither accurate nor complete. SPD's prior database systems make retrieving this often inaccurate data either impossible or time-consuming.

SPD needs dramatically updated data and technology systems to help it effectuate a host of major initiatives and policies. Specifically, it needs ironclad data systems so that it can implement the Performance Mentoring Policy with the confidence that officer performance is being assessed based on accurate data. It must track uses of force, stops and detentions, and crisis intervention incidents so that the effectiveness of those policies can be assessed. The Department must be able to analyze reliable performance data so that it can identify supervisor, precinct, squad, and unit trends. It must be able to ensure that supervisors are conducting timely and rigorous reviews of use of force and other incidents. It must, in many areas, transition from paper-driven to electronic processes.

The Monitor's March 31 memorandum indicated that SPD is some 20 years behind major law

---

[42] *See, e.g.*, Anthony G. Vito & Gennaro F. Vito, "Lessons for policing from Moneyball: the views of police managers – a research note," 38 American Journal of Criminal Justice 236 (2013); Anne Milgram, "Moneyballing Criminal Justice," *Atlantic* (June 20, 2012), http://www.theatlantic.com/national/archive/2012/06/moneyballing-criminal-justice/258703/; Steve Towns, "Colorado Government Takes a Play from 'Moneyball,'" *Governing* (Apr. 2012), http://www.governing.com/columns/tech-talk/col-colorado-government-takes-play-from-moneyball.html; David Bornstein, "Can Government Play Moneyball?," *N.Y. Times* (Apr. 16, 2001), http://opinionator.blogs.nytimes.com/2014/04/16/can-government-play-moneyball/?_php=true&_type=blogs&_r=0; Kevin Desouza, "Big Data is a Big Deal for Local Government," ICMA.org (Feb. 18, 2014), http://icma.org/en/icma/knowledge_network/blogs/blogpost/2162/Big_Data_Is_a_Big_Deal_for_Local_Government.
[43] Second Semiannual Report at 6 ("[T]he days of police management needing to rely on hunches or gut intuition alone . . . are over.").
[44] Merrick Bobb & Matthew Barge, "Memorandum re: Business Intelligence System: Overview of Expected Functionalities & Capabilities," March 31, 2014, *available at* http://timothyburgess.typepad.com/files/memorandum-re--business-intelligence-system-overview.pdf.

enforcement agencies—including the Los Angeles Police Department, Los Angeles Sheriff's Department, Phoenix Police Department, Miami Police Department, and Washington DC's Metropolitan Police Department—that have computerized, relational databases for tracking, managing, and analyzing officer performance.  Compared to many other law enforcement agencies, the SPD is flying blind.

A comprehensive business intelligence system "combine[s] data gathering, data storage, and knowledge management with analytical tools to present complex internal . . . information to planners and decision makers." [45]  Specifically, as the Monitor observed in the March 31 memorandum to stakeholders, SPD will rely on the business intelligence system—and the interim solution in the meantime—for several critical functions:

- **Incident Reporting and Performance Data Tracking.**  Officers will use the system to report the occurrence of various incidents, such as uses of force, stops and detentions, and vehicle collisions.  Therefore, officers will satisfy the important reporting requirements of new policies by entering data, and (in almost all instances) a free-text narrative, about the incident.

- **Incident Review.**  Whether policy prescribes that the involved officer's chain of command (e.g., sergeant lieutenant, captain) or a specialized board (such as the UOFRB or traffic collision review board) investigates and reviews an incident, the system will be the platform by which use of force, *Terry* stop, and other incidents are investigated and analyzed.

- **Administrative Investigations.**  Both OPA and FIT will use the system as a case management platform to coordinate their investigations of either alleged officer misconduct or of "serious" uses of force.

- **Performance Mentoring.**  As noted elsewhere in this report, SPD's Performance Mentoring policy requires supervisors to conduct a comprehensive review of officer performance once an officer meets a specific activity threshold in a given activity type. (For instance, with respect to vehicle pursuits, an officer having engaged in two vehicle pursuits within a rolling, 24-month period will—once the policy is up and running—"trigger" a performance mentoring assessment.)  The business intelligence system, then, will be both the basis for indications to supervisors that they should take a closer look at a particular officer's performance and serve as the fundamental data that supervisors will scrutinize when they take their closer look.

---

[45] Solomon Negash, "Business Intelligence," 13 Communications of the Association for Information Systems 177, 178 (2004).

- **Data-Driven Management and Data Analytics.**  Command staff, as well as a dedicated data analytics group within SPD, will conduct real-time, in-depth, and proactive analyses of officer and departmental trends.[46]

City government stakeholders have also indicated that they will expect crime and other operational data to be yet another critical part of the BI system.  Thus, the BI system will enable SPD—in a single, reliable, and modern computer platform—to assess officer and departmental performance in a rigorous, quantitative manner.

## SPD's Current Gaps & Deficiencies in IT

In July 2013, SPD hired PricewaterhouseCoopers ("Pricewaterhouse") to conduct a "gap analysis" that would assess the difference, or "gap," between where SPD's data systems and practices currently stand and where they need to be in order to implement a comprehensive business intelligence system.  The resulting report, issued in December 2013, reported that the gap was extraordinarily wide—in large part due to longstanding and substantial weaknesses in SPD's existing IT systems, structures, practices, and processes.  It found, among numerous other issues:

- "[A]reas where SPD data is either inconsistent, inaccurate, out of date, or out of sync";
- "[A] lack of data management and data governance practices within the department that results in inconsistencies across systems resulting in lack of data, inconsistent data, and inaccurate data";
- "Key business processes [that] are manual, [and] paper-based," which makes various "reporting" tasks "manual, difficult, and time consuming with limited value";
- Deficiencies among basic IT governance practices, including "project management, project portfolio management, change management, [and] incident and problem management"; and
- Deficiencies in resources for "support[ing]" additional projects."[47]

The Pricewaterhouse report reinforced the urgent need for SPD to develop both (i) an immediate, stopgap solution for gathering basic use of force, stop and detention, and other officer performance data on a computerized platform that permits data to be easily accessed; and (ii) a permanent, comprehensive business intelligence system that replaces inadequate legacy systems wherever

---

[46] This discussion is adapted from the Monitor's March 31 memorandum to stakeholders regarding the development of the comprehensive business intelligence system.  *See* Merrick Bobb and Matthew Barge, "Memorandum re: Business Intelligence System: Overview of Expected Functionalities & Capabilities" (Mar. 31, 2014), *available at* http://timothyburgess.typepad.com/files/memorandum-re--business-intelligence-system-overview.pdf.

[47] PricewaterhouseCoopers, "Seattle Police Department: Information Systems, Processes, Operations, and Technologies—Current State and Maturity Analysis" (Dec. 6, 2013) at 14, http://www.seattle.gov/police/compliance/docs/BI_Reports/SPD_Current_State_FINAL.pdf.

necessary and allows the Department to harness the power of good and reliable information to become a modern, data-driven organization.  Significantly, Pricewaterhouse indicated that, in order to implement a new system, SPD must first clean up its existing systems and upgrade its existing practices.

The Pricewaterhouse report further noted that, although SPD's deficiencies are attributable to some extent to insufficient staffing[48], existing resources have not been effectively deployed:

- "Overall, SPD IT is spending over a third of its time on projects and associated overhead more than operational support, which is one of its primary duties";
- IT resources have been tied up with time-consuming but rudimentary functions;
- "Only 1% [of resources are] spent on IT Governance activities."[49]

This "gap analysis" was not imposed upon the Department by DOJ or the Monitor.  Instead, the SPD ordered the analysis and during the contract bidding process, identified Pricewaterhouse as its "preferred vendor" to conduct the study.[50]  Over the past five months, the SPD has not refuted or challenged Pricewaterhouse's findings or dispute its analysis.  Moreover, as described more fully below, the Department has done relatively little to address the points raised in the Pricewaterhouse report.

With performance database and business intelligence systems, details matter.  Overlooking even the most basic details in how data is to be collected, stored, and accessed can make the overall system unreliable and useless.

## Comprehensive Business Intelligence System ("BI System")

The Second-Year Monitoring Plan required that the City and SPD develop a Business Intelligence System Work Group by April 1, 2014 and submit a work plan by April 30, 2014.  A meeting of stakeholders—including the Mayor and several members of his staff, several members of City Council, the City Attorney and representatives of his office, the United States Attorney's Office, the Civil Rights Division of the Department of Justice, the Interim Chief of Police and several senior members of his command staff, and the Monitoring Team—convened on April 2 to discuss the vital importance of dramatically upgrading SPD's data systems and updating how the Department uses data and analytics.

---

[48] *Id.* at 26-27 (""SPD is significantly understaffed, with resources stretched across multiple assignments and projects . . . ."").

[49] *Id.* at 26.

[50] SPD Settlement Agreement Compliance Progress Report (June 13, 2013), at 2, *available at* http://www.seattle.gov/police/compliance/docs/June_2013_Progress_Report.pdf ("The City has selected its preferred vendor, Price Waterhouse, and is currently negotiating the contract.").

On April 30, the Monitoring Team received a minimalist, 4-page work plan.  That plan provided a rudimentary timeline and list of various committee assignments for members of the Work Group.  It also outlined a "phased approach" to the project:

> In the first phase we will . . .  acquir[e] the Business Intelligence system and . . . we will implement this system over our existing transactional databases.  This will provide us an opportunity to fully evaluate our transactional systems' fitness to meet the requirements of the settlement agreement as well as allow us to begin the learning process necessary to build a culture of data driven management . . . .

> In the second phase, . . . we will further evaluate the recently implemented or upgraded foundation transactional [systems] to see which need to be further upgraded or completely replaced in order to meet the requirements necessary to achieve compliance with the Settlement Agreement.[51]

This "phased approach" is unacceptable.  It proposes nothing more than the type of "solution that would link the Department's existing, jerry-built silos of erroneous and incomplete data to each other, with a weak interconnection" that the Monitor has made clear—in the Second Semiannual Report, countless conversations with SPD, and in the April 2 stakeholder meeting discussed above—is not adequate.[52]

The quality of any business intelligence, data mining, or data analytics system depends substantially on the quality of the underlying data.[53]  SPD's April 30 proposal would have the Department acquire a software interface that would sit on top of SPD's existing, legacy systems.  The "business intelligence" interface would pull data from those existing systems.  However, the independent evaluation by Pricewaterhouse, outlined above, found that these legacy systems are operating in the absence of any "data management and data governance practices" which results in a "lack of data" or

---

[51] Memorandum from Tag Gleason to Merrick Bobb et al., "Document for Submission to the Monitor and DOJ," (Apr. 30, 2014).

[52] Second Semiannual Report at 7.

[53] *See, e.g.*, Carlo Batini, et al, "Methodologies for Data Quality Assessment and Improvement," 41 ACM Computing Surveys 16:1, 16:2 (2009) ("Because electronic data are so pervasive, the quality of data plays a critical role in all business and governmental applications . . . [T]he overall quality of the data that flows across information systems can rapidly degrade over time if the quality of both processes and information inputs is not controlled."); Hian Chye Koh & Gerald Tan, "Data Mining Applications in Healthcare," 19 Journal of Healthcare Information Management, 64, 70 (2011) ("The quality of data mining results and applications depends on the quality of data."); Kesheng Wang, "Applying data mining to manufacturing: the nature and implications," 18 Journal of Intelligent Manufacturing 487, 494 (2007) ("The availability and quality of data are the important factors for a successful DM [data mining] project.").

"inconsistent[] and inaccurate data."[54]  Consequently, all of the systemic issues with SPD's data and underlying information technology would simply feed directly into the "business intelligence" interface and render its functionalities and capabilities minimally useful.

> SPD's approach to a business intelligence system has been to fire first and aim later, if at all.

In short, SPD's approach as of late April calls for the Department to fire first and aim later, if at all.  It would throw up an umbrella over existing systems immediately and worry about the underlying quality of those systems and their data at an undefined point down the road.  The result would be a "business intelligence" system that lacked any intelligence.  It appears exceedingly unlikely to the Monitoring Team that the "learning process necessary to build a culture of data driven management"[55] could be fostered under the SPD's April 30 proposal.  Using bad data to make ill-informed decisions is not in the interest of the Department or the community.

SPD's proposal runs counter not only to previous discussions with the Monitor but also to the recommendations of the City's handpicked outside experts.  PricewaterhouseCoopers recommended a two-stage process for building a comprehensive BI system in its December 2013 report:

> **Stage One:**  Engage an external vendor to focus on developing and implementing foundational Processes around data management and governance as well as help SPD in validating and remediating existing data in systems that will be leveraged for the BI solution.
>
> **Stage Two:**  Once such foundational processes and governance controls have been put in place, work with an external vendor to design, development and implement, a BI solution can commence.
>
> . . . [I]n order for SPD to have a higher probability of success with the implementation of a BI solution, **these foundational gaps** around how data is managed as well as governance processes **must be addressed before the start of the implementation**.  Processes around proper end-to-end management of data as well as governance of the processes need to be developed and implemented immediately.  **If these are not done prior to the implementation of the BI solution, the risk of failure would be significantly higher.**"[56]

---

[54] PricewaterhouseCoopers, "Seattle Police Department: Information Systems, Processes, Operations, and Technologies—Current State and Maturity Analysis" (Dec. 13, 2013), http://www.seattle.gov/police/compliance/docs/BI_Reports/SPD_Current_State_FINAL.pdf, at 14.

[55] Memorandum from Tag Gleason to Merrick Bobb et al., "Document for Submission to the Monitor and DOJ" (Apr. 30, 2014).

[56] PricewaterhouseCoopers, "Proposed Development of a Business Intelligence System - Executive Summary 5 (Dec. 13, 2013) (emphasis added), http://www.seattle.gov/police/compliance/docs/BI_Reports/SPD_BI_ExecSummary_FINAL.pdf.

The first stage would "put in place foundational processes to address some of the high priority gaps" in SPD's existing systems and platforms:[57]

> **Data from source systems will be a significant part of the BI solution, thus accurate data is needed for a successful BI solution.[58]**

Pricewaterhouse emphasized the importance of outside vendors for both stages of the project:

> . . . **SPD IT does not have the capacity to support the implementation of the proposed BI solution**, from not only a capacity standpoint, but the organization is also missing essential roles needed during the lifecycle.[59]

Additionally, Pricewaterhouse found that SPD lacked the resources to conduct this initial cleanup work on its own:

> The assessment also uncovered some deficiencies in IT governance processes.  Some examples are processes through which project and portfolio management is carried out.  The foundational processes will recommend strengthening IT governance processes based on industry-wide IT best practice . . . [which] will influence the SPD's ability to implement a successful BI solution as well as sustain it over time.  **The capacity to build these processes does not currently exist in SPD as they require specialized skillsets that are not currently within the organization.[60]**

A BI system can be adequate only if the integrity, reliability, and adequacy of any underlying database system that provides data to the BI system has been verified and validated.  A BI system that uses data that has been audited and certified as reliable, accurate, and complete is what is required.

As planning for the system goes forward, the Monitor's assumption will be that *any* existing or legacy information and data systems is inadequate, and cannot be used as an input or component of the BI system, unless or until the Monitoring Team and/or an independent, outside expert certifies that the system is sound, reliable, and governed by sound data management and governance practices—and that the data that the existing or legacy system produces is sufficiently accurate, adequate, and reliable.  Indeed, the Pricewaterhouse report shared this assumption, as it appeared to contemplate two, distinct RFPs related to a BI system—one to engage a vendor to assess and upgrade or replace underlying systems and another to select a vendor to design the BI system itself.

---

[57] *Id.*
[58] *Id.* (emphasis added).
[59] *Id.* at 6 (emphasis added).
[60] *Id.* at 5 (emphasis added).

Similar to its observations regarding IAPro, below, the Monitoring Team is deeply disappointed that SPD has taken affirmative steps with its BI planning in a direction contrary to the Monitor's clearly expressed expectations—expectations rooted in best practice, the experiences of other law enforcement and local government agencies, academic and personnel management literature, and other real-world sources.   No less troubling is that the SPD is proceeding along a path directly contrary to that charted in the Pricewaterhouse analysis it commissioned.

Adopting new technologies and approaches to solving problems is always challenging.   Uprooting previously established systems and processes is, by its nature, disruptive.   It is clear, however, that SPD can no longer hold on to its old approaches to information, data, solving technological problems.   The Department's ability to self-manage the risk of unconstitutional policing, hold officers accountable based on accurate and reliable information, and police the Seattle community using modern approaches hangs in the balance.

> SPD can no longer hold on to its old approaches to information, data, and solving technological problems.

On May 8, Mayor Murray announced the creation of a new interdepartmental team to focus "specifically [on] the complex technological opportunities that exist in order to successfully implement innovative policing practices."[61]   That team will include representatives from the Mayor's Office, City Council, Department of Information Technology, Department of Finance and Administrative Services, Department of Personnel, and SPD.

Likewise, on June 3, representatives of the Parties, Monitoring Team, and Mayor's Office agreed in principle that, after SPD obtains advice from outside consultants who have worked extensively with BI systems and received input from the new Chief, a revised plan and timeline for the development of the system will likely be warranted.   SPD has indicated a willingness to collaborate with outsiders in re-thinking its approach to planning for the BI system.

The Monitoring Team is encouraged that these recent developments, and the active leadership of a new Chief, will spawn the fresh thinking and dynamic collaboration that is necessary to guide and implement the technological overhaul that SPD requires.

## The Interim Database Solution ("IAPro")

Even while a comprehensive and permanent business intelligence solution is, as described above, being developed, SPD has a need for reliable, readily accessible data on officer performance—including use of force, *Terry* stops, officer-involved vehicle collisions, litigation, missed training or court appearances, and other areas.   An "off-the-shelf" computer database program, called IAPro,

---

[61] 5/8/14 Press Release.

has been selected to serve as an interim business intelligence system platform.  That is, as a stopgap measure, SPD will use IAPro and its companion, web-based data entry platform called BlueTeam, to accomplish the basic BI functions set forth above.  In addition to the Department's practical need to collect data, IAPro also provides an opportunity for the Department to begin its cultural shift to becoming a modern, data-driven law enforcement agency.

> SPD has experienced difficulty in getting an interim database solution up and running in a manner that ensures trustworthy data and reliable business processes.

Over the past six months, SPD has experienced difficulty in getting an interim database solution it selected—called IAPro—up and running and implemented in a manner that ensures trustworthy data and reliable business processes.  This section describes the Monitor's significant concern that SPD has made configuration and implementation decisions that threaten to take it far afield of vendor recommendations, the Monitoring Team's expectations, and best practice.

### SPD's Historical Struggles to Implement the Interim Solution

IAPro is an "off-the-shelf" performance management software program.  The Monitor has repeatedly stressed that IAPro is an interim or stopgap solution that SPD will use while a comprehensive business intelligence system is being developed, so that the Department can—for the first time—have reliable data on officer performance that can be easily accessed and analyzed by supervisors and command staff.[62]

More than 500 other law enforcement agencies have successfully implemented at least some elements of IAPro, including several agencies of similar or greater size.[63]  The Monitoring Team understands both from IAPro and from other agencies that have successfully begun to use IAPro that the standard initial implementation period for the software is between 3 to 4 months.

SPD decided to use IAPro in August 2013—nearly ten months ago.  SPD initially indicated to the Monitor that, at minimum, IAPro's use of force capabilities would be up and running by January 1, 2014.  However, in November 2013, SPD acknowledged that it would not meet the agreed-upon January 1 deadline.  In part, the Department's inability to meet the January 1 deadline was self-inflicted: the implementation plan created by the SPD IT Department contemplated a process opposite to the software vendor's standard implementation plan and recommendations.[64]  The SPD

---

[62] *See* Second Semiannual Report at 12–13.

[63] *See* "IAPro—Client List," http://www.iapro.com/clients/ (last visited: Feb. 28, 2014).

[64] In November 2013, SPD's implementation plan focused on training line officers and sergeants to use BlueTeam, a web-based and user-friendly data entry interface for officers to enter information that is eventually fed into IAPro, before training command staff to use IAPro.  This is inverted from IAPro's

and Monitor subsequently agreed that the IAPro implementation deadline would be extended to April 15, 2014.

Based on personnel changes within its Compliance Bureau, and the Monitoring Team's recommendation that senior command staff outside the IT Department lead the project, SPD restructured its IAPro project team.  During the first week of March 2014, SPD's new project team informed the Monitor and Parties of its inability to meet the revised April 15 deadline.  Instead the new project team would require until September 30, 2014 to implement IAPro.

After working extensively with both the Monitoring Team and IAPro representatives, SPD agreed to a structured project plan that includes several milestones that provide specific, important prerequisites for IAPro's full implementation.   These milestones, with accompanying deadlines, were based on the Monitoring Team and SPD's discussions with IAPro and were determined by the Parties, Monitor, SPD, and IAPro to be reasonable and achievable.   The milestones, and the associated deadlines for achieving each of them, were incorporated into the Second-Year Monitoring Plan approved by the Court on March 24, 2014.[65]

### SPD's Current Configuration Status

The Monitoring Team is concerned with SPD's current configuration status.   It is especially troubled by SPD's recent, affirmative pursuit of configuration options that run counter to the vendor's recommendations and the practices that other agencies have used to successfully implement the program.

**Appendix A** inventories the Monitor's current concerns with respect to IAPro.  It is possible that no single issue outlined there will ultimately frustrate implementation.  Likewise, it is possible that no specific issue, or combination of issues, will render the implementation a failure.  Indeed, the Monitor hopes that they do not.

The protracted history of IAPro's installation, however, has made the Monitoring Team come to expect that configuration and implementation decisions that are inconsistent with the vendor's recommendations and that do not take into account the assessments of the Pricewaterhouse study will not result in an optimized and stable system that houses reliable data.  Poor project management or shortsighted decision-making should not result in officers being frustrated by new electronic processes for critical reporting and review of force.

---

standard and recommended protocol to first train end users (supervisors in the chain of command) to use IAPro so that they can review, from the first day that the integrated system "goes live," incidents that officers have entered using the BlueTeam interface.
[65] *See* Dkt. No. 127 at 31–33.

Because of these concerns, the Monitoring Team and Parties requested, on May 7, to have weekly status calls about IAPro. These calls have yet to occur. Despite the notable lack of substantive communication about the status of IAPro implementation between the Department and the Parties and Monitor, some issues have managed to be identified early and resolved. Still, the Monitoring Team remains concerned that internal politicking and turf battles, rather than simple data issues, have led SPD to poor choices that may undermine the optimal use of a road-tested program that hundreds of other agencies have implemented.

> The Monitoring Team is concerned that internal politicking and turf battles, rather than simple data or configuration issues, may be undermining its ability to optimize the potential of a road-tested program that hundreds of other agencies have implemented.

The Monitor has been able to work with SPD to solve issues about which it has been made aware. However, there appear to be other configuration decisions that have been made without consulting with the vendor, the Monitoring Team, or an adequate cross-section of ends users within the Department—which may compromise the optimal implementation of the system. Accordingly, despite the Department's representation that it is fulfilling deadlines outlined in the Second-Year Monitoring Plan, the Monitor remains concerned that the Department may not be implementing IAPro in a manner that prepares it, and the Department, for success.

The first milestone, SPD's technical implementation of IAPro, was April 15, 2014. It required SPD to "complete all necessary installation and technical tasks necessary to have IAPro 'go live.'"[66] As of April 15, the Department had successfully completed some basic configuration of background data servers, conducted initial testing of IAPro on an SPD test server, worked closely with IAPro to create IAPro training modules, created an ambitious training schedule, made some important business practice decisions to accommodate the use of the system, and successfully trained IAPro end users in the Office of Professional Accountability ("OPA"). Still, SPD did not, by April 15, complete basic installation of the program on the computers of all end users.

It took the Department more than three weeks, despite the Monitoring Team's repeated requests, to update the Monitoring Team as to how many machines still required that IAPro be installed, how many had been completed, and the timeline for completion of basic installation. Although the Monitoring Team currently understands that installation has been successful, the quality of communications between SPD and the Monitoring Team and Parties has clearly been far less successful.

---

[66] Dkt. No. 127 at 32. Specifically, SPD needed to complete all technical tasks necessary "to have designated supervisors and command staff use the IAPro program, to have their work captured in the IAPro database, and to allow IAPro to capture all information, data, and attachments required . . . ." *Id.*

SPD appears to have met its April 30 deadline to have IAPro "go live" at OPA such that all new OPA investigations will use IAPro as their primary case management platform.  As of May 30, the Department reports that command staff, FIT, and FRS personnel have been trained in IAPro.

Likewise, SPD has rolled out IAPro and BlueTeam (the software program's web-based data entry portal) in the East Precinct as a "pilot" precinct.  Although the "pilot" approach is promising, SPD leadership has adopted a decentralized management approach that has pushed critical business practice decisions on to line officers and command staff who have both less ability and authority to make such important decisions as they begin to learn to use the systems.  In the context of this "pilot," project, then, the Department—as Appendix A details—has not addressed several known issues, has not anticipated or thought through the implications of some issues and decisions, and has appeared to prioritize simply getting the system running Department-wide over ensuring that the system functions well for all users from the start.[67]

> The true test in the coming months will be whether the stopgap system is rigorously tracking use of force and other incidents once paper reporting is eliminated.

Although the Department is starting to move in the right direction by getting FIT and OPA to use IAPro and to have officers begin to use IAPro and BlueTeam to document use of force in the East precinct, the true test will be in the system's ability to rigorously track use of force and other incidents once paper reporting and review is eliminated and IAPro and BlueTeam are up and running Department-wide.  In the coming months, the Monitoring Team looks forward to taking a detailed look at whether the Department's configuration and technological decisions have managed to set the system up for success.

---

[67] *See generally* Nadim F. Matta & Ronald N. Ashkenas, "Why Good Projects Fail Anyway," 81 Harvard Business Review 109, 109 (2003), *in Harvard Business Review on Managing Projects* (2005) ("Complicated long-term projects are customarily developed by a series of teams working along parallel tracks.  If managers fail to anticipate everything that might fall through the cracks, those tracks will not converge successfully at the end to reach the goal."); Megan McArdle, "Why Pilot Projects Fail," *Atlantic* (Dec. 21, 2011), http://www.theatlantic.com/business/archive/2011/12/why-pilot-projects-fail/250364/ ("Rolling something out across an existing system is substantially different from even a well run test, and often, it simply doesn't translate."); Gillian A. Lancaster, et al., 10 Journal of Evaluation in Clinical Practice 307, 311 (2004) ("Pilot studies should have a well-defined set of aims and objectives to ensure methodological rigor . . . . ")

# 5.  Review & Investigation of the Use of Force

**Summary**

The quality of the reviews, discussion, and analysis of force incidents by the Use of Force Review Board has continued to improve.  The new Force Review Section ("FRS"), which is responsible for coordinating the Board, has proactively initiated several important mechanisms and processes for ensuring that lower-level review of force is more timely, rigorous, and complete.  Notably, the Board recently found a use of force to be out of policy, which appears to signify an increased willingness to review incidents thoroughly and to analyze officer performance critically.

The Department worked with the Parties and Monitor to establish a process and structure for the consideration of officer-involved shootings in the same dynamic, critical, and thorough manner that the UOFRB has been making great strides to conduct.  Shooting reviews held on May 14 and June 2 have been encouraging.

The Monitoring Team is continuing to work with the new Force Investigations Team to ensure that its practices, investigative techniques, and procedures have rigor and integrity.

## Use of Force Review Board

As discussed in prior reports, the Use of Force Review Board must become the Department's hub for internal innovation and critical analysis.[68]  It is where SPD must dynamically analyze tactics, training, policies, processes, and procedures so that the organization learns as much as possible from every use of force incident—regardless of whether the application of force in any given incident was legally justified.

Since the Monitor's Second Semiannual Report, the Department has critically analyzed the Board's processes and procedures.  On May 12, it submitted to the Monitor and DOJ proposed changes to some processes and procedures relating to the Board that reflected this analysis.  Although room for improvement still remains, the Department's continuing efforts represent a significant area of progress.

### *The UOFRB's Updated Processes and Procedures*

Since the Monitor's last report, the Monitoring Team has continued to prepare for and attend each

---

[68] Second Semiannual Report at 20.  For a general discussion on what incidents the UOFRB currently reviews and the basic process by which force incidents are reviewed prior to coming before the Board, see the Monitor's Second Semiannual Report at 19–22.

of the Board's weekly meetings that review and analyze reported uses of force. During that time, the leadership of the Board has changed significantly. Although the Board was once chaired by either an Assistant Chief of the Investigations Bureau or the Chief of Police, it is now chaired by the Assistant Chief of the Compliance Bureau, who delegates that duty to Captain Gregg Caylor for Type I and Type II uses of force, consistent with proposed changes to the policies. Captain Caylor leads the new Force Review Section, a unit housed within the Compliance and Professional Standards Bureau that is tasked with operating the Board.

Prior to creation of the FRS, the UOFRB used an *ad hoc* process that predated the new use of force policy. The Board focused nearly exclusively on the review of individual cases and on determining whether the use of force was justified at the moment that the force was used. It did not frequently focus on broader questions, including whether the deployment of different tactics prior to the use of force, or consideration of other force options, might have resulted in a superior tactical outcome— even if the actual force used was justified under the circumstances at the moment that an officer used it.

It should also be noted that the incidents that the Board has reviewed over the last six months have been largely based on the old (pre-2014) use of force policies and without the benefit of the new training programs outlined elsewhere in this report. After all officers have received the full complement of training on use of force, the Monitor and DOJ will be able to systematically and independently examine the use of force incidents that come before the Board. That time has not yet arrived. In the meantime, however, the goal of the Monitoring Team has been to encourage improvement in the quality, rigor, and integrity of the review process has been improving—so that

*SPD's Force Review Section has helped the Use of Force Review Board respond favorably to the Monitor's previous recommendations.*

issues, concerns, and lessons from incidents that might enhance officer performance going forward can be addressed and shared throughout the Department.

In the Second Semiannual Report, the Monitor made seven UOFRB recommendations.[69] To varying degrees, the FRS has helped the UOFRB to respond positively to each of these seven recommendations.

First, the completeness of prepared incident "packets" (the common term for completed incident investigation files) for the Board's review, including relevant video and audio of incidents, has greatly improved. Previously, the Board's analytical work was frequently undercut by incomplete investigations. Although incomplete packets still come before the Board from time to time, the Board has clearly communicated to the precincts that incomplete investigations are unacceptable and will be promptly returned for thorough follow-up. Much of the improvement is due to the new

---

[69] Second Semiannual Report at 26–31.

team of sworn and civilian employees who scrutinize the incoming packets and send back those that lack required information or detail to the chain of command with instructions to complete and return promptly.

Second, the Board has shown an ability to address delayed packets though clear, Department-wide procedures to address such delays.  On a precinct-by-precinct basis, the chain of command is now documenting the review timeline and providing explanations for delays.  Although the process is manual, the Force Review Section has been keeping rigorous track of how long reviews have been taking before coming to the Board.   This allows SPD, for the first time, to hold supervisors accountable for timely reviews.  Table 1 summarizes the length of time necessary for reviews of force incidents.



Table 1: Number of Use of Force Cases and Time for Precinct Review January 1 through April 30, 2014
Source: SPD Force Review Section

The recognition that delays in presenting a packet will not be accepted without inquiry is an encouraging sign of progress.  Nevertheless, the Monitoring Team encourages the Board to scrutinize closely the documented explanations for delay rather than simply accepting any documentation of delay as legitimate.

Third, the level of participation and quality of conversation and discussion at the Board continues to improve.  The Board appears to be gaining confidence in its ability to have constructive disagreements concerning officer tactics and supervisor review responsibility.  The acceptance of constructive disagreement has not permeated through the ranks, however, as evidenced by the

resistance of certain presenters to the types of questioning that the Board typically engages in and the nature of comments from some Board members from time to time.  All presenters to the Board should be briefed in advance on the charge of the Board so that they can accept its review, suggestions, and criticisms without defensiveness or hostility.

The Board must remain mindful that an officer's actions or performance in a use of force incident may be justified from the perspective of underlying constitutional and state law but nonetheless be inconsistent with the requirements set forth in SPD policy.  In other words, the Board must reinforce that concluding that a use of force was justifiable or lawful at the moment that force was applied does not necessarily mean that the force was consistent with SPD policies.

> The level of participation and quality of conversation and discussion at the UOFRB continues to improve.

Notably, the Board recently found a use of force to be out of policy—an action signifying an increased willingness to review incidents thoroughly and to analyze officer performance critically. Overall, four incidents brought before the UOFRB have been seen as potentially out of policy during the past six months and sent to OPA.  Although the Board can remain reluctant, at times, to find incidents to be out of policy—often debating a single Type II use of force incident for the better part of its three hour weekly meeting—it therefore no longer fails to do so.  The Monitoring Team finds this development to be very encouraging.

Nonetheless, the Board tends to refer a matter to OPA only as a matter of "last resort"—which is inconsistent with the fact that a referral to OPA does not automatically mean that an officer's conduct was out of policy or will result in discipline.  The Board and the Department prefer to see issues raised in the context of reviewing use of force to be handled by an officer's Chain of Command.  The Monitor agrees that the responsibility for officer compliance with policy rests squarely upon the Chain, and especially the officer's immediate supervisor.  However, where a violation of policy is suspected, neither the Chain nor the UOFRB should resist enlisting the assistance of OPA to conduct a thorough investigation of the matter.  After all, OPA is staffed with trained investigators, whose sole function is to ferret out all the facts surrounding the matter.  The resistance to involving OPA may be the last vestige of the "close the ranks" culture prevalent within the Department.

The Board's progress must be continued in earnest.  To ensure it does not lose momentum, the Board's composition should continue to include the current leadership but be revised so that an Assistant Chief is always available to guide the discussion when necessary.  Under the current structure, if a precinct Captain voices an opinion that is inconsistent with another Board member, no Board member possesses the appropriate rank to address a potential impasse.  Furthermore, the presence of an Assistant Chief will reinforce that the UOFRB is a central component of the

Department's to manage risk and foster self-improvement and self-correction.

Fourth, the Board has made significant improvements to its internal tracking systems, which are essential to expanding the scope of the Board's review from simply considering individual cases to a more systematic approach that identifies and addresses departmental trends. Prior to the FRS' creation, the Board's tracking of lessons learned, case status and location, and officer performance data was, at best, disjointed, confusing, and inaccurate. Records existed in several disparate systems, unit spread sheets and, at times, in paper form on supervisors' desks. It was unclear what information the Department possessed, what information was accurate, and how that information could be accessed.

Although some related issues remain, the FRS has undertaken to remedy these issues in advance of IAPro's implementation. The Section developed tracking tools to identify where a particular use of force packet resides in the review process, any related ICV issues, and the disposition of each use of force reviewed. Those tracking functions resulted in the Department recognizing systematic technical problems with microphone batteries and dropped frames of video captured by the ICV system. All packets to be reviewed, including relevant video and images, are now retained in one central depository. While limited by the Department's current technological shortcomings, these changes are an important, initial improvement consistent with the Department becoming a rigorously data-driven culture in which analyses of force incidents can, in the aggregate, lead to subsequent, systemic improvements in the field.



Table 2: Uses of Force by Type, By Precinct
January - April 2014
Source: SPD Force Review Section

These internal tracking systems have become sufficiently automated and managed to allow the Force Review Section to be the only part of the Department that is maintaining reliable force data. Because of its initiative and hard work, the FRS can provide the first glimpse at the trends across precincts in use of force since the new use of force policies began to be implemented on January 1. Table 2 depicts uses of force, by Type, for each of the precincts, as well as SWAT. Neither the Parties nor Monitoring Team have compared these numbers to any pre-Consent Decree baselines, as this type of analysis is in its infancy.

> The Force Review Section is the only part of the Department that is reliably tracking force data.

Fifth, the FRS effectively worked with the Parties and the Monitoring Team to revise the Department's use of force forms to include additional, key information. The new forms—designed to work as seamlessly as possible with the interim IAPro database system when it is implemented—have now been deployed in the field and are designed to improve the Department's ability to track data that is necessary for effective officer performance review, analysis of departmental trends, and risk management. The Board and the Department need to ensure that the use of force forms and related business practices are continually updated to optimize departmental technology and to reflect ongoing lessons learned.

Sixth, it appears that the Board is now reviewing packets that potentially involve officer misconduct or an OPA referral. Previously, if prior to a Board meeting, the presiding Captain or Assistant Chief reviewed a packet and believed that it might involve officer misconduct, then that packet was removed from Board review and referred to OPA. Removing such packets from Board review denied the Board opportunities to recognize performance trends and glean policy or training lessons from those incidents. This practice has apparently, and commendably, stopped.

During a recent meeting, the Board discussed whether a particular packet should be reviewed by the Board or whether it should be sent to OPA prior to the Board's review. The packet was ultimately reviewed by the Board, which led to a valuable and substantive conversation that focused on the administrative relationship between a particular unit at issue, a companion law enforcement agency, and the Department as a whole. The systemic issues identified during the Board's conversation are precisely the type of lessons learned that demonstrate the utility of the Board reviewing incidents that may be referred to OPA. The Monitoring Team urges that the Board continue its practice of reviewing such incidents in the future.

Seventh, as noted above, the Board is beginning to accurately capture and track "lessons learned" through its review process. Nevertheless, significant room for improvement remains in relation to how those "lessons learned" are communicated to the precincts. Currently, the Board transmits its lessons learned to the Education and Training Section, which is tasked with implementing those lessons into future training curriculum. This process creates an overly attenuated feedback loop

through which the Board receives no verification of whether lessons learned were actually incorporated into training or distributed Department-wide.

The Department should formalize a process by which lessons learned are contemporaneously sent to the precincts and specialty units for the benefit of their operations and later incorporated into training. The Board should also receive confirmation that such lessons learned were actually sent out to the precincts and incorporated into training. As noted in the Second Semiannual Report, the Department as a whole cannot benefit from the Board's critical analysis and internal innovations until its pragmatic conclusions and solutions are routinely communicated throughout the Department. As noted earlier, the SPD's recent adoption of ISDM for training requires training officers to mine real-life incidents for lessons that can be directly incorporated into the training material.

Finally, it should be noted that the reviews outlined above largely involved incidents that occurred under the previous (pre-2014) use of force policies and before officers have received training on the new policies. After training is complete, the Monitor and DOJ will be able to evaluate systematically the uses of force presented to the Board.

### Recommendations

In addition to continuing to incorporate the Monitor's prior recommendations, in light of the above discussion, the Monitoring Team urges the Board to implement the following the recommendations:

1. **The Board's composition should be revised so that an Assistant Chief is always available to guide the discussion when necessary.**

2. **Rather than bypassing the Board, the Board should continue to review packets that potentially involve officer misconduct or an OPA referral.**

3. **SPD Needs to Develop a Mechanism for Ensuring that "Lessons Learned" from the UOFRB Are Contemporaneously Sent to Precincts for the Benefit of Patrol Operations and Later Incorporated into Formal Training Programs.**

On May 12, the FRS provided an initial revision of the "forms" that guide the chain of command's initial investigation of the involved-officer's force (when the FIT is not involved) and to analyze the incident before the case goes before the UOFRB. These revisions are aimed to focus first-line supervisors and the involved officer's chain of command to think critically about force incidents, considering not merely the application of the force but also an officer's performance and tactics both leading up to and following the use of force.

The Monitoring Team looks forward to working with the Department to finalize these forms, which will serve as an important step toward having all officers, and not merely representatives of the UOFRB, engage in the type of comprehensive, critical assessment of force incidents that the Department must undertake.  It also looks forward to collaborating further on refining processes that maximize the integrity and rigor of the force review at all levels.

## Firearms Review Board

The Monitor's Second Semiannual Report noted that the Department's Firearms Review Board, which reviews firearms discharges by an SPD officer, "lags unacceptably behind good, let alone best, practices—and far behind any state or performance approaching compliance with the terms of the Settlement Agreement."[70]  It made a number of specific recommendations for reforming the Board.[71]

To its credit, in the months following the implementation of the new use of force policy, the Department met with the Parties and the Monitor to discuss reforming the Firearms Review Board. A key component of those discussions was a merger of the UOFRB with the Firearms Review Board to create a centralized, unified force review body.  In light of the significant improvements in the quality of the analysis and review that has occurred at the UOFRB, the Monitor strongly supports the proposed merging of the review boards and suggested a deadline of December 31, 2014 for the completion of the merger, which was has agreed to by the Parties.

As the Department considered such important structural changes, four officer-involved shootings occurred.[72]  Neither the UOFRB, nor an improved version of the Firearms Review Board, convened for some time.  Holding high-quality reviews in a timely manner was, of course, a primary concern of SPD, the Parties, and Monitor.  Delays in review do little to engender public trust in the fairness and rigor of internal incident reviews.   They likewise prevent SPD from identifying important lessons with respect to training, tactics, or policy that should be communicated across the Department.  Furthermore, delays in the convening of reviews of the incidents could mean that the careers of involved officers who are potentially on paid leave pending administrative review are unacceptably put on indefinite hold.   Such delays also may exert a negative impact upon a community that has long mistrusted the Department's ability to investigate itself.

Nonetheless, the Monitoring Team firmly believed that the Seattle community, SPD, and involved officers deserved far more than an Firearms Review Board process riddled with gross inadequacies

---

[70] Second Semiannual Report at 31.  For a discussion of how, by policy, the FRB currently works and a full account of the inadequacies of the current process identified by the Monitor, see the Monitor's Second Semiannual Report at 31–39.

[71] Second Semiannual Report at 36–39.

[72] The shootings in question occurred on November 29, 2013; January 19, 2013; January 20, 2013; and April 3, 2014.

and known flaws.   An immediate review of the shootings that lacked integrity would not be consistent with the goals embodied in the Consent Decree and would not engender greater confidence in the quality, fairness, and objectivity of the Department's internal reviews.

The Monitor, Parties, and SPD engaged in numerous and sustained discussions about a process for reviewing the four officer-involved shootings outlined above.   The Monitoring Team was consistently encouraged by the Department's recognition that the previous Firearms Review Board structure would not suffice for review going forward.   SPD has appeared to act responsibly and in good faith regarding these hearings.   The Department and Parties should be commended on their active collaboration in working toward an interim solution for conducting reviews both in a timely manner and using processes and procedures that seek to remedy the previously identified and serious flaws with the prior system.

> The Monitoring Team has been encouraged over the past several months by the Department's recognition that the previous Firearms Review Board structure would not suffice.

The process and protocol for reviews of officer-involved shootings is now largely consistent with the objectives of, and comprehensive inquiry conducted on a weekly basis by, the UOFRB.   As of this writing, reviews of two of the shootings have taken place, on May 14 and June 4, 2014, respectively.   The two other pending reviews have been scheduled for June 18 and July 2.

> The review of officer-involved shootings remains a work in progress, but the Monitor is encouraged by the increasing rigor, thoroughness, and integrity of recent reviews.

Although the FRB review remains a work in progress—with procedures being actively, and collaboratively, adjusted—the Monitoring Team is greatly encouraged by the far superior quality of the inquiry in which FRB members have been engaging, particularly for the three officer-involved shootings that were investigated by FIT.   For the first time, the reviews of shootings are considering critical questions related to tactics, training, and procedure—and not merely whether, at the moment that the officer pulled the trigger, the force was legally justified.   Accordingly, SPD is beginning to engage in critical self-analysis not merely of lower-level uses of force but of officer-involved shootings, as well.   The rigor, thoroughness, and integrity of the reviews appear to be increasing.

While the shooting review process being utilized for the four recent shootings has, therefore, incorporated some of the Monitor's previous recommendations, it has not entirely addressed the underlying reasons for the recommendation that involved officers should not testify at the reviews of officer-involved shooting incidents.   Specifically, although live officer testimony is no longer heard during force review boards, an officer's union representative and lawyer are routinely invited to ask

questions during the FIT interview of involved officers.  Questioning from union representatives has routinely been observed, as recently as in a May 29 follow-up interview related to the June 4 shooting review, to be inappropriately leading, inconsistent with the objectives and goals of FIT and the FRB process, and capable of distorting critical facts.  The effect has been simply to change where and how leading, inappropriate, and ill-informed questioning of the involved officer occurs from in person before the review board to in a recorded interview—not to eliminate the practice altogether.[73]

The Monitoring Team will continue to work with the Parties to refine a process that can form the basis of a permanent and updated structure for rigorous officer-involved shooting reviews going forward.

## Force Investigation Team ("FIT")

As part of the new use of force policies, a dedicated Force Investigation Team and a manual detailing the responsibilities and obligations of FIT was created.[74]  As the primary investigative unit for serious use of force incidents, FIT plays a crucial, initial role in ensuring that the Department's reviews of force incidents are thorough, objective, and complete.

A force incident, such as an officer-involved shooting, presents serious legal questions that call for different perspectives and methods of investigation.   First, prosecutors are interested solely in questions of criminal law—whether the suspect, the officer, or both committed a crime.   Second, FIT investigators are focused more broadly on whether all officers involved complied with the criminal statutes, constitutional law, SPD policy, tactics, and training.   Third, the Office of Professional Accountability, headed by a civilian Director, provides transparency and acts to ensure that internal SPD investigations are full, fair, complete, and unbiased.  OPA may also have a role in investigations that start out with FIT.

FIT investigators are officers who receive special training on gathering evidence, interviewing witnesses, and exploring avenues of inquiry not merely relating to the moment that the force was applied but to avenues relating to tactics, training, and procedure.  That is, FIT investigators conduct use of force investigations in a manner not only to determine what happened with respect to an officer's application of force but to all events and circumstances leading to the incident or otherwise related to it.

---

[73] Furthermore, SPD's willingness to let some individuals outside FIT ask leading or charged questions while not permitting OPA representatives to ask follow-up investigatory questions during officer-involved interviews is at best inconsistent and at worst could be seen as an attempt to weigh the scales to favor the officer.

[74] See generally Dkt. No. 107-5.

To this end, on April 24 and 25, the Monitor and FIT Captain Mike Teeter convened training on use of force investigations.  Instructors included Captain Kris Picher, 24-year veteran of the Los Angeles Police Department who had commanded the Los Angeles Police Department's Force Investigation Division for several years while it was making efforts to comply to a federal consent decree, and Django Sibley, Assistant Inspector General for the Los Angeles Police Commission and head of the Inspector General's Use of Force Section.  The content emphasized approaches, procedures, and strategies for ensuring impartial, comprehensive fact-gathering across all major stages of an investigative process.  The Parties and the Monitor found the training to be an immensely useful introduction into the types of investigative processes and procedures that will allow the Department to review all issues raised by a use of force incident with the appropriate rigor, impartiality, and thoroughness.  This training is one part of the training that will be provided to members of FIT.

> As of January 1, 2014, dedicated force investigators must respond to the scene of all officer-involved shootings, in-custody deaths, and serious uses of force.

As of January 1, 2014, a team of FIT investigators must respond to the scene of all officer-involved shootings, in-custody deaths, Type III uses of force (which is deadly force, force causing substantial or great bodily harm, and other serious types of force)[75], Type II uses of force (which encompasses some more serious uses of force and force causing less than great or substantial injury) when requested by a responding supervisor, and serious assaults against officers.  In all instances, FIT investigations focus not only upon the officer's immediate use of force but also the "events, decisions and tactics that led up to the use of force incident."[76]

The creation and rollout of FIT is a significant milestone and a major shift in the Department's approach to conducting internal, administrative investigations.  During the past six months, the SPD, Parties, and Monitor have discussed the investigation procedures that FIT should use in connection with officer-involved shootings and serious use of force incidents.

Over the past few months, at the request of the Assistant Chief of Bureau of Compliance and Professional Standards, the Monitor, in close partnership with DOJ, worked with the Department to develop a compendium of best practices with respect to FIT and its relationship to OPA.  The Monitoring Team is encouraged by the Department's willingness to address these best practices directly and recent indication that they will convert them into policy for the Parties and Monitor to review.  The Monitor applauds the productive and thoughtful discussions among the Parties, SPD, and the Monitoring Team that nears consensus regarding future expectations.

---

[75] *See* Dkt. No. 107-3 at 3.
[76] Dkt. No. 127 at 52.

Accordingly, FIT is working to increase the quality and improve the structure of involved officer interviews by FIT investigators.  In the past, SPD investigators have used leading questions that appeared aimed at soliciting particular response rather than gathering facts in an unbiased and objective manner.  Similarly, in many instances, investigators have not asked obvious follow-up questions, pursued lines of inquiry that answers have clearly suggested, and have not structured interviews in a rigorous, probing fashion consistent with good investigatory techniques and best practices for internal affairs investigations.  The Monitoring Team expects that the extensive training being provided to FIT investigators will allow the Department to eliminate these issues.

*FIT is collaborating with the Monitor and Parties to increase the quality and integrity of its investigations.*

FIT is also working to ensure that investigations use necessary safeguards to ensure the basic integrity of the investigatory process.  One primary safeguard is ensuring that involved officers provide a compelled interview as soon as possible.  While some minor delays may arise (*e.g.,* checking on the officer's physical condition and affording him the chance to consult with a lawyer or union representative), in most instances, the officer should be interviewed within a matter of hours, not days of an incident.  FIT representatives heard during the April 24-25 force investigation training that without contemporaneous, recorded interviews, Seattle's community will not trust the Department.  The instructors of that training urged SPD to learn from the mistakes LAPD had made in the early stages of its own consent decree.  Delay introduces the opportunity for collusion, contamination by exposure to media accounts, and fosters community distrust.[77]

Other necessary safeguards relate to ensuring that involved and witness officers remain separated in order to eliminate any possibility that the officers, even without any bad faith or ill intention, could engage in discussions that will shape or influence subsequent statements.  Likewise, no officer should be permitted to review any videotape of the incident by ICV or otherwise prior to giving the compelled statement.  If the officer later reviews such video and believes it is necessary to correct the record, the compelled interview can be re-opened for that purpose.  These points constitute best practice and were emphasized by the instructors who presented the April FIT training.

---

[77] Such distrust may not only arise out of recognition of the increased opportunities for officer collusion but out of recognition that, by delaying involved officer interviews, agencies are, in effect, treating officer witnesses better than they treat many civilian crime victims:  individuals who may be interviewed minutes or hours after being robbed or assaulted.  Moreover, questions about the reliability of contemporaneous officer interviews may ring hollow when the public considers how many civilians have been arrested and convicted on the basis of contemporaneous civilian interviews.  The Parties and the Monitoring Team are aware of studies suggesting that an officer's memory is improved if there is a two- or three-day break before the compelled interview.  Those studies lack scientific validity and the requisite viability as evidence to be considered here.  *See generally Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) (noting that the reliability of scientific evidence is based on the purported evidence's testability, peer review or publication, error rate, adherence to scientific standards, and the evidence's general acceptance in the scientific community).

Third, SPD has needed to consider closely the appropriate scope of access afforded to OPA investigators at the scene of officer-involved shootings. In a recent officer-involved shooting, during the initial stages of the investigation, OPA personnel were limited to an area out of view of the incident scene and excluded from the involved officer's walk-through of the scene with his lawyer and union representative. The Monitor is confident that trained OPA investigators can enjoy an expanded role at the scene without compromising the integrity of the FIT investigation. At the same time, the Monitor is cognizant that a crime scene can be a fluid and dangerous place and that officers must secure a scene, provide public safety, and sometimes provide medical assistance.

Currently, OPA may have a role at many discrete junctures of an administrative inquiry. Consequently, to fulfill its oversight function, OPA personnel must be permitted to fully observe the actions of FIT investigators and CSI personnel at the scene. OPA must be permitted access to the crime scene area for any walk-through after the involved officer has completed his or her walk-through. The same person who conducted the walk-through with the officer should give the walk-through to OPA and tell the OPA representative everything that was said or pointed out during the officer walk-through.

Before a FIT investigator initiates a compelled interview with the involved officer, the FIT Commander must confer with the OPA investigator to discuss the scope of the interview and questions or areas of inquiry that OPA wishes to see covered. OPA representatives must be able either to observe any compelled interview so that it has the full benefit of examining an officer's demeanor, body language, and non-verbal communications or, if OPA is excluded from an interview, the SPD must either provide a contemporaneous video feed to OPA or a videotape of the interview. OPA representatives should be present at all witness interviews, to the extent that doing so does not compromise securing the scene or ensuring public safety, and FIT investigators must discuss those interview plans prior to the interview.

In the coming two and a half months before the start of a "rigorous review to determine how well FIT has functioned" in the Bureau of Compliance and Professional Standards, the Monitoring Team and the Parties will closely examine whether FIT can demonstrate the significant strides that it must to conform to the Consent Decree; promote best practice; and engender substantially greater confidence in the community in the quality, objectivity, and rigor of SPD's investigations into the performance and tactics of its officers.[78]

## In-Car Video ("ICV")

An issue related to the review and investigation of force that has required the expenditure of substantial effort is the use (or failure to use) in-car video and portable microphones (collectively,

---

[78] Dkt No. 127 at 52.

"ICV") in connection with enforcement activity by the Department.[79]   The Monitoring Team detailed the importance of in-car video to both officers and the community of the technology in its Second Semiannual Report in December 2013.[80]  It noted then that the SPD "ha[d] a long way to go to make certain . . . the technology works and the involved officers properly use the system."[81] Since the Second Semiannual Report, incidents reviewed by the UOFRB continued to involve all-too-frequent failures to capture the subject enforcement activity on video or audio.

As a result of sustained encouragement, SPD has worked extensively determine precisely why either the technology failed or why the involved officers failed to properly use the system.   Some enterprising SPD personnel, with prodding from the Court and Monitoring Team, became able to proactively and affirmatively detect and solve various ICV problems.   The Monitor is pleased to report that significant progress, both with respect to solving technological problems and ensuring that officers comply with ICV policy, has finally been realized in the past few months.

> After SPD struggled tremendously to solve technological problems and ensure that officers comply with ICV policy, significant progress has finally been realized in the past few months.

The Department's recent certification that it "has investigated and resolved the technical issues it had experienced with its ICV system and its microphone batteries" is summarized below.[82]  With technical glitches or issues far less likely to be a plausible justification for an officer's failure to appropriate capture enforcement activity using the ICV system, the focus has now turned to ensuring that officers fully comply with SPD's ICV policy.

The Monitoring Team would be remiss, however, if it did not note the challenges encountered in resolving the ICV issue.   The Department struggled tremendously to identify problems with ICV, determine the source of those problems, and create a plan to solve the problems.   A systematic, rigorous approach to identifying and eliminating technical issues was never clearly developed.   Thus, although the Department managed, after many months, to address the necessary issues, the problem-solving approach that SPD IT and Patrol Operations used is far from a model for the Department. The Monitor hopes that the Department's ongoing efforts to "implement an ongoing, forward-looking quality assurance program to ensure that all ICV equipment remains fully operational and functional" will involve a different project management approach.[83]

---

[79] *See* Second Semiannual Report at 13–19; 4/3/14 Status Conference Transcript at 11–26.
[80] *See* Second semiannual Report at 14.
[81] *Id.* at 15.
[82] Dkt. No. 138 at 4.
[83] Second Semiannual Report at 18 (capitalization changed to sentence case).

## *SPD's Resolution of Technical Issues*

The Second Semiannual Report observed that "[t]he process of rigging up SPD vehicles to record audio and video of incidents has been needlessly complex and time-consuming."[84]  Since at least September 2013, SPD and the Monitoring Team received reports of technical issues with the ICV system.  Through the Fall of 2013 and early 2014, a host of additional technical problems became apparent.

One problem was that the video was "dropping frames"—or failing to capture very small portions of video.  Another issue involved audio not synchronizing with the video images.  Additionally, SPD and the Monitoring Team learned that the batteries used in officers' portable microphones were not holding an electrical charge throughout a typical 9-hour shift.

Accordingly, the Monitor's Second–Year Monitoring Plan required SPD to take steps to investigate and resolve technical issues regarding the ICV system.  Specifically, the Plan required a formal certification to the Monitor and Court that SPD had resolved ICV issues:

> SPD will formally certify, in writing, to the Parties, Monitor, and the Court that it has taken all reasonable steps to investigate all known and reasonably foreseeable technical issues and other technical implementation issues with ICV, on-body microphones, and the COBAN technology. It will further certify that, because the Department has taken all such reasonable steps to investigate and eliminate the possibility of systemic technological problems, individual SPD officers may be appropriately held accountable for any failure of ICV equipment to capture a use of force incidents. Finally, it will certify that it has developed an ongoing auditing program for ensuring the ongoing discovery of any technical issues with ICV, on-body microphones, and COBAN technology and their swift elimination.[85]

On April 30, 2014, the City of Seattle filed its Certification regarding in-car video issues with the U.S. District Court.[86]  In it, the SPD provided background on the ICV technical issues that it discovered during the last 6 months.

The Certification recounts the corrective measures taken to remedy those deficiencies, including instituting "appropriate safeguards to detect and address any recurrence of these technical issues," which "include the installation of software to detect dropped frames from video, and the new policies regarding the testing, charging, distribution and replacement of microphone batteries."[87]

---

[84] Second Semiannual Report at 13.
[85] Dkt. No. 127 at 35.
[86] Dkt. No. 128.
[87] Dkt. No. 138 at 4.

SPD issued a directive—a statement of policy issued to all sworn officers—detailing how portable microphones are the responsibility of sergeants and including a protocol for the issuance and recharging of microphones for each shift.  The Monitoring Team conducted an audit of each precinct in late April.  Although it noted a few discrepancies with this stated protocol for ensuring that on-body microphones are fully charged at the start of each shift, each precinct was giving the microphone issue the attention that previously had been lacking.

Because it has now certified that it has remedied the technical issues with ICV, SPD has reemphasized recently that that any officer who fails to comply with the requirements of the ICV policies and procedures may be held appropriately accountable.  That is, fixing the technical issues has, at long last, allowed SPD to start holding officers accountable, where appropriate, for failures to comply with ICV policies.

The progress recounted above has been encouraging.  Significant resources and efforts were expended by a host of SPD personnel.  The Monitoring Team acknowledges their earnest efforts, especially in the past few months.  Nonetheless, ICV technical issues have been purportedly fixed for such a short duration that the Monitor cannot confirm at this time whether SPD has definitively solved the technological problems.  More time will need to elapse before the Monitoring Team can be certain.

Moreover, incidents of noncompliance with Department policies regarding ICV continue to be observed in the context of force incidents analyzed by the UOFRB.  Such instances of noncompliance are being detected by the Force Review Section and command staff, with increasing frequency, before the incident comes to the attention of the UOFRB or the Monitoring Team. Reportedly, such incidents of non-compliance are being documented in the Performance Assessment System ("PAS").  The Monitor has not been provided written evidence of this occurring, however, which has made independent confirmation impossible.  Whether the command staff at each precinct is self-auditing compliance with ICV policies remains unknown—and would be a welcome discovery.

The Monitor expects to receive periodic reports from the Compliance Bureau, as well as the IT Division, on incidents of technological failures and the discovery of any ICV technology issues in order to assess whether ICV has been fixed in the manner that the Department has recently certified.

### *Ongoing Confusion Regarding ICV Usage*

Despite the progress made on rectifying technological deficiencies in the ICV system, the Monitoring Team has concerns over recent uncertainty among line officers about fundamental issues concerning ICV usage—when to use it, when to turn it off, and when audio must be activated or can be muted.

As a part of the Monitoring Team's periodic participation in precinct roll calls, regular attendance at Use of Force Review Boards, and frequent interaction with sworn officers, it has received direct and repeated inquires about ICV, including when it needs to be activated, when it can be shut off or the microphone muted, and many other similar questions.  This uncertainty has led to failures to have the ICV activated in too many instances—such as when two officers are riding together in a patrol car, transporting suspects to the precinct for processing, responding to a call which later turns into a use of force, and prematurely stopping a recording before the enforcement activity is complete, for example.

> Some uncertainty remains among line officers with respect to ICV—when to use it, turn it off, and when audio must be activated or muted.

The repeated failures to properly activate ICV for the entirety of the enforcement activity have led the Education and Training Division to build ICV training into its interim and comprehensive use of force curricula.  Despite that effort, however, there remains demonstrable uncertainty over whether a portable microphone is required to be worn at all times when engaged in enforcement activity—even though policy plainly requires it.

Confusion among the ranks has led to the creation of a "Frequently Asked Questions" document that is to be distributed throughout the SPD in the very near future.  SPD has also identified a need to correct arguably ambiguous wording in the heading of one subsection of the Department's ICV policy to eliminate any doubt that *the ICV system is to be activated at the commencement of all enforcement related activity and to remain activated throughout its duration, with only the narrowest of exceptions*.  Examples of enforcement-related activity include, but are not limited to, traffic stops, *Terry* stops, vehicle searches, emergency responses, vehicle eluding/pursuits, on-view criminal activity, arrests, prisoner transports and where there is a reasonable suspicion to believe that criminal activity has occurred or will occur.

Recently, there has been some suggestion that a solution to the failures to turn on the ICV at required times could be obviated if officers merely turn on the system at the beginning of the shift and keep it on throughout the entire shift.  Although this may solve the "problem" of not having it running when important enforcement-related activity is taking place, it raises other questions that should be promptly addressed—such as expectations of privacy by the public and capacity of the SPD data systems, to name a few of the obvious.  The Monitoring Team recommends that senior command staff and the City Attorney's office give prompt attention to the acceptability of this option, since this "option" is currently being utilized with some frequency in the field.

Adopting the recent statements of a UOFRB member recently, the Monitoring Team looks forward to when ICV usage or failures no longer are the subjects of attention, and distraction, within the Department.  The Monitor likewise looks forward to seeing increased recognition among SPD and

the community that ICV both protects the rights of civilian subjects and vindicates superior officer performance.[88]  With continued effort, and some luck, the Monitor's next report will not need to contain a section devoted to ICV.

---

[88] *See Plumhoff v. Rickard*, 572 U.S.___, 10–11 (2014) (basing conclusion that "police acted reasonably in using deadly force to end th[e] risk" posed by a fleeing motorist on a record that included in-car video of the incident); *Scott v. Harris*, 127 S. Ct. 1769, 1775–76 (2007) (concluding that an officer's pursuit of a fleeing subject "did not violate the Fourth Amendment" because the in-car "video [of the incident] more closely resembles a Hollywood-style car chase of the most frightening sort, placing police officers and innocent bystanders alike at great risk of serious injury").

# 6. Supervision

**Summary**

Three provisions of the Consent Decree address officer supervision.  SPD has only recently provided to the Monitor with a satisfactory work plan for coming into at least temporary compliance with two provisions on the more straightforward issues relating to ensuring that all officers have a consistent, identified supervisors and eliminating the use of temporary, or "acting," sergeants.

The Department has still failed to produce a satisfactory and defensible work plan for the complex work of coming into compliance with the Consent Decree's provision with respect to "span of control"— ensuring that SPD deploy an adequate number of first-line supervisors to effectuate supervisory duties in a manner consistent with best practice and the provisions of the Consent Decree.  The necessary work in this area includes such foundational concerns as where precinct boundaries should be drawn and whether funding is available for any necessary new sergeants.

It appears increasingly likely that deadlines in the Court-approved Second Year Monitoring Plan with respect to "span of control" will not be met and that the City will need to petition the Court to change those deadlines.

Countless law enforcement agencies, management audits, and academic studies have identified the primary importance of first-line supervisors in ensuring accountability, promoting an agency's values, and driving change.[89]  Indeed, three key provisions of the Consent Decree address the crucial relationship between first-line supervisors (sergeants) and line officers.

This section details the Department's struggle meet deadlines codified nearly 15 months ago with respect to the important supervision-related provisions in the Consent Decree.  SPD's challenges in this area, much like those in implementing IAPro and solving problems associated with ICV technology, endured multiple leadership structures—which has suggested to the Monitoring Team that SPD has room to grow in its drive to become the type of nimble, proactive organization that can

---

[89] *See, e.g.,* Harry W. More & Larry S. Miller, *Effective Police Supervision* (6ᵗʰ ed. 2011) at 7 ("If the police organization is to become more effective, the first-line supervisor must play a major role in responding to change that affects the organization"); Samuel Walker, "Police Accountability: Current Issues and Research Needs," National Institute of Justice (2007), http://www.ncjrs.gov/pdffiles1/nij/grants/218583.pdf, at 12 ("It is an established principle in policing that first-line supervisors—sergeants—play a critical role in directing and controlling the behavior of officers in police-citizen interactions" and in a myriad of "other accountability mechanisms"); David Weisburd & Rosann Greenspan, "Police Attitudes Toward Abuse of Authority: Findings from a National Study," National Institute of Justice: Research in Brief (May 2000), at 6, http://www.ethicsinstitute.com/pdf/NIJ%20-%20Police%20Attitudes%20about%20authority.pdf (noting that almost 90 percent of officers in a comprehensive survey "believed that good first-line supervisors were effective in preventing police officers from abusing their authority"—perhaps by "serving as role models").

self-identify problems, critically grapple with determining approaches to achieve important objectives, execute tasks in a timely manner that serve those objectives and help to solve those problems, and hold personnel accountable when they fail to accomplish adequately those tasks.

## The Supervision-Related Provisions of the Settlement Agreement

The Consent Decree contains multiple provisions that seek to ensure that SPD adequately deploys a sufficient number of high-quality, well-trained sergeants who can provide the supervision, guidance, and oversight necessary to provide real-time accountability to line officers.

Specifically, paragraph 154 relates to ensuring unity of command:

> As a general rule, all operational field officers (including patrol officers) should be assigned to a single, consistent, clearly identified first-line supervisor. First-line supervisors should normally be assigned to work the same days and hours as the officers they are assigned to supervise.

Paragraph 155 requires that long-term acting (*i.e.*, non-permanent) sergeants be appropriately trained:

> Sergeant training is central to effective first-line supervision. The City and SPD will ensure that personnel assigned to a planned assignment of acting sergeant for longer than 60 days will be provided adequate training to fulfill the supervisor obligations under this Agreement, either prior to serving as acting sergeant, or as soon as practicable (and in no event longer than 90 days from the beginning of the planned assignment).

These requirements were set forth in the context of paragraph 153's more general requirement that SPD employ a sufficient number of high-quality, trained first-line supervisors:

> The City will provide and SPD will deploy an adequate number of qualified field/first-line supervisors (typically sergeants) to assure that the provisions of this Agreement are implemented. SPD will employ sufficient first-line supervisors to assure that first-line supervisors are able to: 1) respond to the scene of uses of force as required by this Agreement; 2) investigate each use of force (except those investigated by FIT) in the manner required by this Agreement; 3) ensure documentation of uses of force as required by this Agreement; and 4) provide supervision and direction as needed to officers employing force.

Accordingly, paragraph 153 requires not merely that SPD field an adequate number of sergeants but that, crucially, they are deployed in the field in a distribution that is consistent with the needs of the Department and that allows supervisors to conduct the work required by the Consent Decree. Complying with the paragraph requires that the Department must, among many other tasks:

- Prospectively determine the likely workload of sergeants once all incident response, review, and reporting requirements have been wholly implemented;
- Demonstrate, given the workload demands on each supervisor and understanding that a single supervisor can only feasibly and effectively supervise a limited number of officers, that the Department have a sufficient number of sergeants;
- Re-assess deployment schedules and personnel distribution in light of infrastructure and budgetary factors; and
- Re-draw precinct boundaries to accommodate real-world workload demands and according to the determined sergeant to officer ratio.

Thus, the tasks associated with complying with paragraph 153 are complex. They implicate such foundational concerns as where precinct boundaries should be drawn and whether funding is available for the number of new sergeants that might be necessary.

## SPD's Struggles to Comply with the Supervision-Related Provisions

SPD has provided an adequate workplan for coming into compliance, at least for now, with two of the three supervision-related provisions.

The Department has not yet been able to engage the Parties or Monitoring Team in a thorough conversation about the substance or merits of its proposed approach to complying with paragraph 153 of the Consent Decree provisions related to span of control. Instead, for at least six months, discussions have focused on trying to get SPD to generate a work plan that reveals enough detail about its process or approach for the Monitoring Team or Parties to meaningfully comment. Put simply, time has been wasted discussing the form and quality of work plans rather than whether the substance of the plans will actually allow SPD to reach compliance.

> Time has been wasted addressing the form and quality of work plans regarding first-line supervision rather than discussing whether the substance of the plans will allow SPD to reach compliance.

The First-Year Monitoring Plan provided that SPD would present a detailed report setting forth a plan for achieving compliance with the supervision-related provisions of the Consent Decree by December 31, 2013 and would come into compliance with the terms of those

provisions by June 30, 2014.  Thus, SPD needed to field an adequate number of permanent, non-active sergeants to ensure accountability and fidelity to the Consent Decree by June 30, 2014.

The December 31 submission provided no real guidance or specificity with respect to how the Department would come into compliance.  It advanced a timetable by which the Department would only reach compliance at an undefined date sometime in 2015.  It relied, without justification, on reproducing the approach of a "Neighborhood Policing Plan" that the Department had conducted more than 5 years ago.

Since December 31, the Department has generated several revised work plans.  The most recent that the Monitor has reviewed in detail was submitted on April 16, 2014.  The Monitor is reviewing a subsequent, May 23 revised submission.  The Monitoring Team appreciates the hard work of the Department to create and refine a reasonable plan for coming into partial compliance with paragraphs 154 and 155 by June 30, 2014.

Nonetheless, the April work plan does not adequately detail exactly how the Department will come into compliance with paragraph 153, which, again, mandates that enough sergeants be engaged to guarantee adequate supervision of SPD officers and which involves the most complex, complicated, and important set of considerations and tasks.   In a meeting with the Parties and SPD, the Monitoring Team communicated the following:

- The plan lacks specificity regarding the Department personnel that will be responsible and accountable for carrying out each step of the plan.
- The plan summarizes various Span of Control objectives but fails to specifically address how each of those objectives will be met.
- The plan fails to adequately describe how the SPD will determine workload and the ratios of sergeants to police officers necessary to guarantee the level of supervision demanded by the Consent Decree.
- The plan does not describe how the workload analysis will inform the reallocation or redeployment of personnel.
- The Span of Control plan does not provide any alternative deadline for coming into compliance with paragraph 155, or a new proposed compliance deadline to replace the original (and existing) June 30, 2014 deadline.

More than a year has now elapsed without a reasonable plan having been in place to achieve compliance with paragraph 153.  Even with a suitably detailed plan in place that sets forth aggressive deadlines by which to meet the necessary milestones, it is likely that the City and the Department will need to request that the Court extend deadline for partial compliance well beyond the existing June 30, 2014 date.

Furthermore, it should be noted that the analysis required to come into compliance with paragraph 153 will have to ensure that the decreased use of acting sergeants and improved unity of command continue.  Although the Department has therefore outlined a mechanism for reaching compliance with paragraphs 154 and 155, the process of coming into compliance with paragraph 153 will require SPD to continue to address these important areas.

SPD provided a revised plan on May 23.  The Monitor and Parties are reviewing it closely.  If, and only if, the plan provides a clear and detailed plan for the Department to come into compliance with paragraph 153 in a timely manner, the Monitor will inform the Court and request that the deadlines contained within the plan are incorporated into the Second-Year Monitoring Plan.  It should be noted, however, that the Monitoring Team has clearly expressed to SPD and the Parties that it will not tolerate a change in the compliance deadline to anything beyond, at latest, December 31, 2014.

The Monitoring Team hopes that, in the next six months, less time will be spent on discussing the adequacy or inadequacy of plans and more time spent on a collaborative approach in addressing the important work and critical decisions that lie ahead.

# 7. Office of Professional Accountability ("OPA")

**Summary**

The development of an OPA Manual codifies important processes that work to ensure integrity.  Even in advance of the completion of that Manual, OPA's investigations continue to appear to be thorough, complete, and professional.  A new procedure, where the Director certifies a "sustained" finding on a complaint before the Chief conducts his review and determines discipline, likewise has enhanced the integrity and independence of OPA.

The last six months have made clear that, while the OPA investigations continue to be solid, SPD's disciplinary system is byzantine and arcane.  Providing SPD officers and the Seattle community with a rational, reasonable disciplinary system will require significant and sustained effort.  SPD must ensure that it has a well-functioning system for imposing discipline on police officers found to have violated SPD policy.

The Monitor's Second Semiannual Report described what OPA is and how it works.[90]  It also detailed the scope of the Monitoring Team's review of OPA—to ensure that the OPA conducts rigorous and objective investigations that inform a transparent and fair review of officer performance.  Soon, officers will have received training on the new Court-approved policies, and the Monitoring Team and DOJ will begin to review misconduct investigations that involve the new policies.

## OPA Policies and Procedures

Pursuant to paragraph 167 of the Consent Decree, OPA Director Pierce Murphy drafted and submitted to the Monitor and the DOJ on December 31, 2013 the OPA Policies and Procedures Manual (the "OPA Manual").  Although the Consent Decree requires an OPA Manual "update," the Monitor confirmed that no such formal manual had previously existed.  The ensuing work of the OPA Director and his staff in drafting a Manual, especially after having been in their positions for only a few months, is laudable.  The purpose of the OPA Manual is to institutionalize the good aspects of the complaint investigations and resolve other important aspects of the investigative process.

The OPA Manual, as drafted by the Director, actually includes two manuals: (i) a shorter, more general description of OPA's purpose and process intended for the public's use, and (ii) a much longer, detailed description of the procedures and requirements, for OPA's internal, that guide and govern receiving complaints and conducting investigations.

---

[90] Second Semiannual Report at 39–42.

The DOJ and the Monitor have reviewed the Manual. The CPC has actively and constructively provided important recommendations on the Manual. The Monitoring Team is working with the Director to finalize the OPA Manual prior to a June 30, 2014 deadline for final approval set forth in the Second-Year Monitoring Plan.

## OPA Investigations

The Consent decree requires that "SPD should continue to strive to ensure that all complaints regarding officer conduct are fully and fairly dealt with, that all investigative findings are supported by the evidence and documented in writing; and that officers and complainants receive a thorough, fair, and expeditious resolution of complaints."[91] To ensure that that SPD's Office of Professional Accountability meets this standard, the Monitoring Team reviews closed OPA investigation files.

Even before the Parties and Monitor finalize the OPA Manual, the Monitoring Team continues to find that OPA's investigations appear to be thorough, complete, and professional. After a complaint is made and classified by the OPA Director for full OPA investigation, OPA investigators, who are usually sergeant-level sworn SPD employees, do a good job of searching for all available relevant physical evidence (including ICV and other video), searching for and interviewing available witnesses, and interviewing the involved officer or officers. Review of OPA records indicates that the next-level reviewer, usually a lieutenant, does an equally good job analyzing all the gathered evidence, occasionally recommending additional areas of investigation and/or further interviews and suggesting findings to the captain and Director.

> The Monitoring Team continues to find that OPA's investigations appear to be thorough, complete, and professional.

The Director continues to utilize the newly adopted procedure of certifying a "sustained" finding on a particular complaint *before* the Chief conducts his review on the merits of the allegations and determining appropriate disciplinary measures. This new procedure helps enhance the integrity and independence of the OPA. Whereas OPA was considered by some for the last few years to be a cat's paw of SPD executives, this perception has seemed to change markedly under the leadership of OPA's current Director, Pierce Murphy.

## Disciplinary Process

The process by which SPD officers are disciplined for poor performance or misconduct has recently

---

[91] Consent Decree ¶ 164.

received significant attention.[92]  In the April 3, 2014 status conference with the Parties and Monitor, the Court described the discipline system as a "level-one area of concern" in which "we need to make some changes."[93]

Currently, if the OPA Director issues a "sustained" finding on an OPA Investigation file, the Chief then reviews the file.  If the Chief agrees that the finding should be "Sustained," he must determine the appropriate discipline.  Although the Chief makes the final decision on discipline, the OPA Director provides the Chief with his expert and informed advice on this issue in each case.  The Chief makes the decision as to appropriate discipline and notifies the officer.  The officer and his union representative subsequently participate in a *Loudermill* hearing—an informal, but important due process meeting in which the officer who has received written notice of the administrative allegations against him or her is afforded an opportunity to present his or her side of the story, identify factual errors, and emphasize factors that relevant to any discipline under consideration. SPD counsel and the OPA Director also attend this hearing.  After the *Loudermill* hearing, the Chief makes his final discipline decision.

After the Chief issues a final discipline decision, the employee has two avenues to appeal this decision: (i) going to the Public Safety Civil Service Commission, or (ii) appealing to a three-member Discipline Review Board.  Importantly, there is currently *no deadline for such an appeal to be heard or resolved*.  Consequently, many appeals languish for long periods of time without being heard or resolved.  During this lengthy waiting period, as has been reported in the media, it has—at least in some instances—been the Chief's practice to settle these cases scheduled for appeal before they are heard by the relevant panel without consulting with the OPA Director or Auditor.

Although the whole of the discipline system will likely need to be overhauled, the specific practice of the Chief being able to unilaterally reduce discipline or settle cases must change.  If all of the investigation and analysis conducted by the OPA can be negated with the stroke of the Chief's pen, and without regard to the opinion of the OPA, the fairness, thoroughness, and rigor of investigations below are rendered meaningless.

The OPA Auditor, the CPC, and the Mayor have all undertaken to review and make recommendations for the reform of the discipline system.  The OPA Auditor, Anne Levinson, issued a number of recommendations on April 3.  The Monitoring Team has reviewed those recommendations and found them extremely helpful.  The Mayor and his advisors are undertaking

---

[92] Steve Miletich, "Reversal of discipline puts interim SPD chief under spotlight," *Seattle Times* (Feb. 20, 2014), http://seattletimes.com/html/localnews/2022957736_spddisciplinexml.html?syndication=rss; "Editorial: Make Seattle Police discipline coherent, transparent, timely," *Seattle Times* (Mar. 1, 2014) http://seattletimes.com/html/editorials/2023019048_policereviewedit02xml.html; "Editorial: Make Seattle police discipline procedures timely, public," *Seattle Times* (Apr. 13, 2014), http://seattletimes.com/html/editorials/2023357658_spddisciplineedit14xml.html.
[93] 4/3/14 Status Conference Transcript at 54.

their own review, which the Monitor likewise looks forward to reviewing.

The CPC has also formally issued recommendations on the OPA and accountability structure generally—including the discipline system—on April 30.  Pursuant to the Consent Decree and the Memorandum of Understanding, the CPC is tasked with reviewing and making recommendations for changes to the OPA process and structure.  In order to accomplish this, the CPC established an Accountability Workgroup consisting of a subgroup of the CPC members. This Workgroup has been meeting regularly since December 2013.  Members of the Monitoring Team and DOJ have consistently attended these meetings.  Both the OPA Director Murphy and OPA Auditor Levinson attend and advise and guide the CPC.

> The Monitor stands at the ready to provide advice, counsel, and technical assistance to all interested parties as reforms on the accountability structure are considered in the coming months.

The Monitoring Team has reviewed the CPC's recommendations.  Many constitute extremely promising steps toward creating a more transparent, reliable, and fair accountability system.  The Monitoring Team hopes that all interested stakeholders give their recommendations serious and thoughtful consideration as the discipline system is finally reformed to ensure fairness and accountability.  The Monitor continues to stand at the ready to provide advice, counsel, and technical assistance to all interested parties as these critical reforms are considered in the coming months.

## The Role of OPA at the UOFRB

The Consent Decree has inspired important changes in the manner that SPD reviews and investigates the use of force, as this report discusses elsewhere.  The UOFRB is charged with serving as the Department's engine for internal improvement and critical thinking on force, tactics, policy, and procedure.  The Department's FIT team is charged with conducting impartial and thorough investigations of use of force incidents that will assist command staff and the UOFRB in critically evaluating officer performance.

OPA also has a role to play in the review of use of force incidents.  An OPA investigation may be initiated at several different junctures during a use of force investigation or review.  Thus, if the UOFRB determines that an officer's use of force or other tactics or performance in an incident violated departmental policy, an OPA investigation may be initiated.

Accordingly, the OPA Director and/or his representatives continue to review the use of force packets and attend the UOFRB meetings on a weekly basis.  Although they are not voting members, they participate in the discussion of the propriety of each use of force.  If they determine

that any use of force packet involves or potentially involves officer misconduct, the OPA representative, similar to any other participant, can refer a packet to OPA for further investigation, either by an OPA investigator or for a Supervisory Action.

> OPA's participation at UOFRB provides unique insight.

The Monitoring Team has directly observed that a small minority of UOFRB members continue, for whatever reason, to make known that they do not approve of OPA's presence at the UOFRB meetings.   OPA nonetheless continues to attend.   Any attempt to bar OPA from participation would not be looked upon favorably by the Monitoring Team.   OPA's participation provides unique insight to the discussion and an opportunity for OPA to dynamically review SPD use of force practices.

## OPA's Role in FIT

As outlined elsewhere in this report, OPA also has an express role in force investigations.   OPA is called out to the scene of every Type III use of force, including officer-involved shootings, and "will attempt to identify any potential misconduct issues."  If OPA determines that an officer "may have committed misconduct during a use of force incident," the misconduct investigation will be conducted by the OPA.   Further, "OPA personnel will participate at the scene to the extent necessary to identify any potential misconduct or criminal issues and whether OPA will initiate its own investigation."[94]

OPA has been called and has responded to every Type III incident and officer-involved shooting since the effective date of the new force policy, January 1, 2014.   However, as discussed above, SPD must continue to make strides to ensure that OPA representatives are permitted to be present for crucial parts of the investigation.

The Monitoring Team is nearing agreement with the Parties on a protocol governing the respective rights and obligations of FIT and OPA.   The Monitor will expect that the protocol is followed.   The Monitoring Team will continue to insist that OPA—will ensure that OPA receives the kind of access to the scene of use of force investigations that can inspire greater community confidence in the transparency and rigor of force investigations.

---

[94] Dkt No. 127 at 52.

# 8. Performance Mentoring Program ("PMP) Policy and Early Intervention

**Summary**

Although the approval of the consensus Performance Mentoring Program ("PMP") policy is an important first step, SPD has a long way to go to successfully implement it. The PMP provides a framework for the use of officer performance data to identify officers who might benefit from non-punitive performance interventions, such as training, counseling, and mentoring.

The Department must to provide line officers with basic information about what PMP is (and is not), train command staff on how to conduct performance interventions and craft mentoring plans, and ensure that performance data used within the PMP process is accurate and reliable.

One key component of the Settlement Agreement involves the development of an effective early intervention system ("EIS" or "EI system") that uses a broad range of performance-related data to identify officers presenting signs of stress or performance issues. The identification of such officers serves as the basis for conducting non-punitive interventions—including training, counseling, or mentoring—to address the underlying concerns.

The central goal of any EIS is to identify and respond proactively and positively to behaviors or performance trends that—while not rising to the level of legal or policy violations—may nonetheless indicate that an officer is at risk. A closely-related goal is to improve the performance of supervisors by providing them with reliable performance data and requiring them to proactively develop their officers.

This section addresses SPD's new Performance Mentoring Program ("PMP") policy upon which the Parties, SPD, and the Monitor reached consensus and the Court approved on March 21, 2014. It explains what the PMP is (and is not), how the policy will work, and the challenges and opportunities that the Department will face as it prepares to roll out the policy later this year.

## What PMP Is

The concept of an early intervention system is not new. A 1981 report by the United States Civil Rights Commission recommended that departments develop a means of identifying officers who may be more prone to violence or vulnerable to claims of misconduct.[95]

Over time, law enforcement agencies and policing experts came to recognize that EI systems can

---

[95] U.S. Civil Rights Commission, *Who is Guarding the Guardians?* 80 (1989).

have broader functions and benefits than merely identifying "heavies" within departments.  In 1989, the International Association of Chiefs of Police (IACP) endorsed broader application of early intervention systems, characterizing them as "a proactive management tool useful for identifying a wide range of problems, not just a system to focus on problem officers."[96] In 2001, the Commission on Accreditation for Law Enforcement Agencies (CALEA), adopted an accreditation standard noting that implementation of a "comprehensive [EIS] is an essential component of good discipline in a well-managed law enforcement agency.  The early identification of potential problem employees and development of a menu of remedial actions can increase agency accountability and offer employees a better opportunity to meet the agency's values and mission statement."[97]

> The concept of an early intervention system is not new in law enforcement. The SPD has, in fact, had an early intervention system policy on the books since December 2009.

Although the SPD was a relative latecomer, it recognized the importance of early intervention systems prior to its Settlement Agreement.  The SPD has, in fact, had an early intervention system policy on the books since December 2009.  The policy echoed many of the concepts described above: tracking key performance data, reviewing the data when certain numerical thresholds were crossed, and taking non-punitive measures to correct performance or respond to officer stress.  The 2009 policy stated that the EI system was "developed for the purposes of identifying and supporting Department employees who demonstrate symptoms of job stress, training deficiencies and/or personal problems that may affect job performance . . . . The ultimate goal of the program is to support the employee's career development through counseling, training and correcting behaviors that may cause performance concerns."[98]

However, during its investigation of the SPD, DOJ found that the Department did not live up to the commitments outlined in its early intervention policy.  In the Consent Decree that followed, the City and DOJ agreed that the Department would develop an early intervention system that lived up to the SPD's previously-stated goals and is consistent with longstanding best practice in the area.

The Court approved the Department's substantially revised early intervention policy on March 21, 2014.

## How PMP Will Work

Because the Monitor has not discussed early intervention or the PMP in its prior reports—and

---

[96] International Association of Chiefs of Police, *Building Integrity and Reducing Drug Corruption in Police Departments* 80 (1989).
[97] CALEA Standard 35.1.15 cmt. (4th ed. 2001).
[98] SPD Policy 3.070.0 (Dec. 2009).

because the Department will need to invest substantial resources throughout the remainder of 2014 in constructing a framework for rolling out the policy—the following section discusses how the Department's new performance mentoring policy will work once it is up and running.

### The PMP Addresses Several, Specific Requirements of the Settlement Agreement

The PMP policy addresses several requirements of the Consent Decree that relate to:

> - Ensuring the early intervention system "will continue to be used for risk management purposes and not for disciplinary purposes" (¶ 157);
> - Reviewing and adjusting the thresholds for various categories of officer performance, such as uses of force and OPA investigations, subject to Monitor approval (¶ 159);
> - Requiring supervisors to routinely review their officers' EIS data (¶ 161); and
> - Revising policy and procedure to ensure (1) the intervention strategy is implemented in a timely manner; (2) data regarding the implementation of the intervention is tracked in [the] EIS; and (3) if necessary, the employee's supervisor reviews the progress of the intervention strategy." (¶ 163).

### The PMP Policy is Non-Punitive

The PMP Policy follows the Consent Decree's requirement that early intervention remain non-punitive in nature.  Indeed, the new policy's introductory paragraph observes that the program "shall employ risk management strategies that are not punitive or disciplinary in nature."

The non-punitive approach is both necessary and appropriate, for several important reasons:

> - The officer's conduct or performance under examination may not, strictly speaking, violate any laws or agency policies, and thus discipline is not possible;
> - Officers may be less likely to share with supervisors any personal or professional difficulties if that information will result in punishment; and
> - Officers may be more receptive to change by means of positive support and reinforcement, than by punishment and deterrence.[99]

The PMP policy appropriately notes that the new program "is separate from, and does not replace, the existing system of discipline for violations of policy."  In other words, if SPD officers violate policy, they can expect to be held accountable.   Likewise, the PMP policy does not call for a lowering of disciplinary standards in any way.  Instead, performance mentoring is designed to identify and modify behaviors "***before*** they result in actions that are contrary to the mission and

---

[99] T. Bertoia, "Developing an Early Intervention System for Police Misconduct in a Law Enforcement Agency," NSW Police Integrity Commission, at 4–5 (Aug. 2008).

fundamental values of the Seattle Police Department, including its commitment to constitutional policing and upholding lawful, professional and ethical standards."[100]

### *Data on Officer Performance Trends Sets the Occasion for a Careful Assessment of Officer Performance*

The foundation of any early intervention system is a database that tracks various aspects of an officer's performance and provides a mechanism for notifying supervisors that an officer's performance may require greater scrutiny—and, if necessary, correction and support.

For an example of why this is important, consider an officer who uses force much more often than his peers.  The officer may be following the letter of the law and Department policy but may nonetheless be placing himself in unnecessary risk by failing to adhere to basic tactics or by unnecessarily escalating confrontations.  Alternatively, closer scrutiny may show that the officer has been making tactical, sound decisions—but could nonetheless benefit from some additional support from fellow officers and his or her supervisor.  Likewise, the scrutiny may merely identify an officer who is exceptionally productive and proactive.  In any of these cases, the officer and Department alike benefit from the EIS system because officer performance has required the supervisor to take a close look.

The PMP identifies a number of key performance indicators.  For each indicator, it sets numerical thresholds.  Reaching a threshold level of activity for a given indicator triggers careful review of an officer's performance.  The agreed–upon indicators and thresholds are as follows:

| Performance Indicator Criteria | Threshold |
|---|---|
| Chain of Command Recommendations | Each reviewed on a case-by-case basis |
| Use-of-force (Type I) | Reaching the top 1% of officers who have used force investigated at Type I within 6 months |
| Use-of-force (Type II and Type III) | Reaching the top 5% of officers who have used force investigated at Type II or Type III within 6 months |
| Vehicle collisions | 2 Department vehicle collisions within 12 months |
| Receipt of OPA complaints | 3 complaints within 12 months |
| Receipt of Equal Employment Opportunity (EEO) complaints | 2 complaints within 12 month |

---

[100]   SPD   Manual   Policy   3.070   (emphasis   added),   *available*   *at* http://www.seattle.gov/spd/compliance/draft_policy/PMP_Manual_Draft.pdf.

| Named in police actions claims or lawsuits against the City | 2 within 24 months |
|---|---|
| Vehicle pursuits | 2 within 6 months |
| Unexcused failure to appear in mandatory training | 1 within 12 months |
| K9 apprehension-bite ratio | More than 15% K-9 apprehension bite ratio in a 12 month period |
| Officer-involved shooting | Single incident threshold |
| Combination of Indicators (A-J) | 5 within 6 months |

The threshold time periods exist on a rolling basis. For example, if an officer has two vehicle pursuits within any six-month period, he or she has met the threshold level.

In discussions that led to the PMP policy, both SPD and DOJ acknowledged the difficulty in identifying the ideal threshold for a given performance indicator. Over the years, the emerging consensus has been that EIS systems should rely upon peer-to-peer, or assignment-to-assignment, thresholds and should take into account the officer's overall policing activity. Departments in Los Angeles, Pittsburgh, Washington, D.C., and Cincinnati follow some sort of peer-to-peer assessment. In those departments, an officer is flagged for review if his performance indicators stand out among officers with similar duties that serve similar policing districts. Others, such as the Phoenix Police Department, also view an officer's use of force or citizen complaints in relation to his or her arrests, traffic stops, or other policing activity. Under this approach, supervisors might pay closer attention not only to officers with an unusually higher force-per-arrest ratio but also to officers who have substantially fewer arrests or public contacts than others working the same assignment.

> SPD will need to use better and more reliable data on officer performance to refine the thresholds currently set forth in the PMP policy.

Both SPD and DOJ appeared to agree that SPD will eventually move to a more refined model for determining what level of officer activity should trigger closer scrutiny. However, without the necessary body of comparative data, it is not possible to adopt more refined threshold standards until IAPro is up and running.

Pending the implementation of IAPro or the comprehensive BI system, the parties agreed to set forth the above thresholds on an interim basis, and then refine them as the Department generates a more reliable pool of data. Paragraph 158 of Settlement Agreement expressly contemplates such refinements, subject to the Monitor's approval. Although the current thresholds are acceptable to

the Monitor during this interim period, SPD will not achieve compliance with the Settlement Agreement until it has a more refined system akin those used successfully in other major departments.

In keeping with best practice, the PMP policy also vests supervisors with the authority to initiate a review on a discretionary basis—such as when a supervisor notices signs of stress or detects a potential trend in performance issues. [101]

### *A Defined Process Will Be in Place for Reviewing a Flagged Officer's Performance Trends*

#### The First Stage

As noted above, an officer reaching a threshold and "triggering" a closer assessment is only the beginning of the PMP process. The next step is the evaluation of the officer's overall performance to determine whether there any patterns of conduct or behaviors that may suggest potential deficiencies or the effects of stress.

To be effective, this review must be qualitative as well as quantitative. It is not enough to know that an officer has used force often. Management must review the underlying use of force reports or other documentation to gain a better understanding of the officer's behavior.

Additionally, the review has to consider the entire officer—assessing his or her performance and training history, and whether there is any common thread between any of the performance indicators. Closer review may reveal, for example, that a recent uptick in the officer's use of force is also accompanied by citizen complaints of rudeness. The review may identify other, broader issues warranting attention, such as inadequate backup or shortcomings in equipment, communications systems, tactics, or training. Resolving these broader problems can have an immediate multiplier effect, in which numerous officers and members of the public benefit from improved equipment, communications, and training.

---

[101] Specifically, the PMP policy provides, "A supervisor, commander or civilian manager may, at his or her discretion, contact the Performance Mentoring Coordinator to initiate the PMP and assign a PMA [performance mentoring assessment] to that chain of command." This discretionary review and intervention authority is similar to that provided in other departments' early intervention systems. *See, e.g.*, Metropolitan Police Department [Early Intervention] Standard Operating Procedures (2007) ("If a member's behavior and involvement in incidents indicates he/she may be at risk a supervisor/manager need not wait until a member reaches the threshold in order to conduct an [early intervention] Assessment"), *available at* https://go.mpdconline.com/GO/SOP_PPMS_and_SSP.pdf; Cincinnati Police Department Order 16.111 (Rev. 2013) ("At the discretion of district/section/unit commanders, employees can be placed under any level of supervisory overview, including Supervisory Intervention, even if they are not above any established thresholds as determined by the [early intervention system]."), *available at* http://www.cincinnati-oh.gov/police/assets/File/Procedures/16111.pdf.

The PMP refers to this initial supervisor review as a Performance Mentoring Assessment ("PMA").  Once an officer is flagged for review, the officer's captain will assign a sergeant to conduct the assessment and provide his or her recommendation within 14 days.  In the first stage of the process, the sergeant:

1. Notifies the involved officer and allows him to identify any possible errors in that data that flagged him or her for review.
2. Reviews at least two of the officer's personnel evaluations, reviews the data and documentation relating to the underlying incidents, and reviews "any additional information that would be relevant to any identified performance issues."

The requirement to review unspecified "additional information" requirement is vague.  Although this language might function adequately on an interim basis, the Monitor expects that SPD and DOJ will work together to identify with greater specificity what additional data and documentation will be part of the review once the Department has launched IAPro and built additional components of its anticipated business intelligence system.

### The Second Stage

Once the sergeant has reviewed the relevant materials, the process proceeds to the second stage, which requires the sergeant to take the following steps:

1. Meet with the concerned employee to discuss any performance issues identified, or any stressors the officer may be facing.  This meeting is not an investigative interview and the sergeant may not ask the employee about matters that are under investigation.
2. Where appropriate, refer the employee to training, the Employee Assistance Plan ("EAP"), or Critical Incident Stress Management ("CISM").  These referrals may be part of an overall mentoring plan, but do not replace the need for such a plan.
3. Prepare a written Performance Mentoring Assessment ("PMA") that describes the review undertaken and recommends whether additional action is appropriate.  If the review and discussion with the officer revealed no potential areas of concern, the Sergeant makes a "no further action" recommendation supported by a detailed explanation set forth in the PMA report.  (As noted below, this recommendation is subject to several layers of review.)
4. If warranted, prepare a detailed intervention plan that may include a broad range of non-punitive interventions designed to correct the performance concerns and address any officer support needs.  These interventions, include, without limitation:

    a. Conducting regular and consistent discussions about the performance issues and potential causes;

    b. Going on ride-alongs with the officer;

    c. Accompanying the officer on at least 4 calls or citizen contacts per week;

    d. After action debriefs of significant events (except certain matters currently under investigation[102]) arrests, or other incidents tracked as a performance threshold indicator; and

    e. Identifying and supporting positive behaviors exhibited by the officer.

This stage of the performance mentoring process is critical. It comprises both the first discussion with the officer about the performance criteria and the initial stage for planning any necessary interventions. If the early intervention is to have any chance of success, involved supervisors must convey the right message and present it effectively. Otherwise, the process may backfire, leading officers to reject the process overall. It would be unfair to all involved to develop a detailed process for intervention and then leave it to Sergeants to improvise once they are in the room with the concerned officer. It also likely would lead to inconsistency and, ultimately, cynicism and rejection by the rank and file.

This concern is hardly theoretical. Prior research into the effectiveness of early intervention systems has shown that timely, regular training of supervisors on conducting assessments and interventions is critical. For example, one report from the Police Executive Research Forum (PERF) observed, "Perhaps one of the most difficult adjustments supervisors will face when an early intervention system is introduced is learning how to engage officers about their performance problems, given that an EIS intervention is different from the traditional discipline-oriented supervision they know."[103]

A second study, based upon a survey of departments that had implemented early intervention systems, noted:

> **The most important issue identified at the Early Intervention State of the Art Conference involved preparing supervisors to conduct interventions. Lack of adequate orientation and training was also one of the most serious problems reported in the police managers' survey.** One [agency executive] explained that as a result of inadequate training, the system is misunderstood by the first line supervisors, and therefore retraining is needed at the application level. EI [early intervention] systems represent

---

[102] The new policy specifically states: "Designated Type III use-of-force incidents, firearms discharges, and any open OPA complaint cannot be discussed in detail, per labor agreements and Department policy. Sergeants may discuss general issues and best practices with the involved officer after that officer has given a statement and has been interviewed by OPA."

[103] S. Walker, S. Osnick Milligan & A. Berke, Police Executive Research Forum, *Strategies for Intervening with Officers through Early Intervention Systems: A Guide for Front-Line Supervisors* (2006).

a new role for supervisors, especially sergeants, in which they are expected to coach and help officers under their command.

The traditional role of sergeants has involved formal disciplinary actions, and training has emphasized the procedural aspects of the process.  In an EI system it is essential that first-line supervisors actually conduct intervention sessions, and do so in a manner consistent with the system's goals.  It is possible for a particular sergeant to simply tell an officer not to worry about it.  This would undermine the EI system and breed cynicism among officers.

A related problem is the potential for favoritism, in which one supervisor excuses the performance of one officer under his or her command while taking a tough stand on another officer with similar performance problems.

A final problem is the possibility of inconsistent interventions across a group of supervisors.  Since interventions are designed to be confidential, it is not possible to require documentation of the actual substance of intervention sessions.

**It is essential that departments provide proper training for supervisors regarding their role in interventions and that this be done well before an EI system become operational.**[104]

Prompt and thorough PMP training for supervisors and managers prior to the full implementation of the PMP policy is therefore crucial.  The Department needs to develop a detailed curriculum, including problem-solving and role-playing scenarios that will inform supervisors how to conduct a thorough and fair review of officer performance, how to document that review, and most importantly, how to interact with the concerned officer, so that the outcome is prompt and positive.   In addition, the Department needs to provide ongoing, interactive training for supervisors to ensure they develop their mentoring skills.  It needs to routinely collect feedback from officers about their experience with the program.

### The Third Stage

The next step in the process is for the Lieutenant and Captain in the chain of command to review the PMA and approve, modify, or reject the Sergeant's recommendation.  Importantly, their decision is not final.  The Captain's recommendation is then forwarded to the newly-created office of Performance Mentoring Coordinator.  The Coordinator will receive all PMAs and review them

---

[104] Samuel Walker, DOJ/COPS, *Early Intervention Systems for Law Enforcement Agencies: A Planning and Management Guide* 37 (2003) (emphasis added) (footnote and cross-reference omitted); accord Victoria Office of Police Integrity, Early Intervention Systems for Police Agencies 9 (Victoria, Australia 2010) ("The lack of adequate orientation and training of first line supervisors poses a serious problem to the effectiveness of EI systems.").

for thoroughness and consistency.

The Coordinator will identify potential deficiencies in the PMA analysis or weaknesses in the proposed intervention plan for the benefit of a newly-created, Performance Mentoring Committee.  Under the policy, the Committee consists of seven members: (1) the Chief's designee; (2) HR Director (or designee); (3) OPA Director; (4) representative from the Audit, Policy, & Research section; (5) representative from the Education & Training section; (6) Performance Mentoring Coordinator; and (7) upon committee request, a representative of the City Attorney's office.

The Committee will meet monthly not only to discuss PMAs and proposed intervention plans, but also to assess  (1) "Whether the Lieutenant and Captains are adequately holding their Sergeants accountable for their supervision of officers under their command"; and (2) "Whether executives are holding Captains accountable for managing the risk of police misconduct in their units."

### The Fourth Stage

Once the Committee has made its recommended findings or changes, the PMA and any proposed intervention plans are forwarded to the concerned officer's Bureau Chief for review, comment, and approval.  The Chief must make the determination within five days of receiving the Committee's recommendation and accompanying PMA and intervention plan.

### The Fifth Stage

Upon approval from the Bureau Chief, the assigned supervisor must immediately implement the intervention plan and document both his or her actions and the officer's progress.  The new PMP policy provides that the supervisor:

1. Completes checklist provided on PMPR to document actions/training taken.
2. Modifies, in conjunction with the chain of command, the Mentoring Plan as needed.
3. Submits a Performance Mentoring Progress Report on a twice monthly basis to their supervisory chain for review and concurrence.
4. Documents in the Performance Appraisal System ("PAS") that this PMPR was done, along with any actions or additional training given to affected employee.
5. Upon completion of designated review period, documents and recommends on PMPR form whether or not affected employee has participated in and made progress in the designated training/coaching.

The PMP progress reports are provided to the chain of command as well as to the PMP Coordinator

and Committee who may recommend modifications to the intervention plan or seek additional documentation or clarification from the supervisor. The PMP Coordinator and Committee also review the progress reports both to ensure Department-wide consistency and to evaluate the quality of supervision provided by the concerned officer's chain of command.

## SPD Has Much Work Ahead to Implement the PMP

Pursuant to a requirement in the Second-Year Monitoring Plan, SPD formed a PMP Work Group in early April 2014. As the recommendations below indicate, the PMP Work Group has much work ahead of it. Only when a host of decisions are definitively made—about what data will be part of EIS pending the successful of implementation of IAPro, what training will be provided to supervisors and command staff on conducting performance assessments and creating mentoring plans, how the PMP Committee will operate, and what information will be communicated to line officers about the goals and details of the new policy—will the Department be able to roll out the policy and consider it fully effective.

*Recommendations*

1. **Pending the Adoption of the Interim Database Solution and Comprehensive Business Intelligence Solution, SPD Must Consider the Accuracy of Underlying Data Used to Trigger PMP Reviews or That Will Factor Into a PMP Assessment.**

As noted elsewhere in this report, the SPD has made very slow progress in developing data and information systems that make performance-related data available to supervisors and managers. If the Department had managed to get the interim IAPro database up and running either by the original January 1, 2014 deadline or the first modified deadline of April 15, 2014, then it could have confidence that it had in place the necessary data systems to feed into IAPro's built-in early intervention functionality—allowing for supervisors to be automatically alerted if and when one of their officers has reached one of the performance thresholds.

Line officers and supervisors must be able to have confidence that the data that triggers a performance assessment and that command staff review during such an assessment is accurate and reliable. Using inferior, inaccurate, and unreliable data will make performance mentoring far less effective than it should be and provide neither the Department nor the wider community with the necessary confidence that mentoring is being provided to the officers who might need or benefit from it. In addition, bad data may generate "false positives," leading supervisors and managers to waste already-scarce resources by conducting performance reviews that turn out to be unnecessary.

> Line officers and supervisors must be able to have confidence in the accuracy and reliability of data that triggers a performance review.

Accordingly, the Department must, in close consultation with the Parties and Monitoring Team, carefully and rigorously scrutinize any data system that might be used to provide data for performance mentoring purposes.

## 2.    The Department Must Carefully Manage a Rollout of the PMP System.

Implementing the PMP requires that several components be concurrently ready.  It cannot be implemented piecemeal or gradually.  For instance, the Performance Mentoring Committee must be established and trained.  Supervisors and managers who will conduct performance assessments and crafting mentoring plans must receive training well in advance of being asked to implement the program.[105]  The data that will be used, in the short-term, for performance mentoring and the technological systems that will provide such data must be identified.

Before the PMP becomes fully effective—with officer performance triggering performance assessments and, where appropriate, the creation of performance mentoring plans—the Department must ensure that trainings are complete, data is certified as reliable, and command staff (including Performance Mentoring Committee) have a clear understanding of what performance assessments and performance mentoring plans entail.  This will be vital for ensuring that *ad hoc* decision-making does not lead to a lack of rigor and inconsistency and therefore undermine confidence in the new program from the outset.  These tasks and considerations need to be completed *before* officers are assessed under the new PMP.  One positive step in this direction would be the development of checklists that both guide supervisors in conducting their review and counseling, and provide another basis for documenting the work they performed in their analysis.

Prematurely starting the performance assessment and mentoring process risks permanently depriving the program of the institutional buy-in that is central to any robust formal mentoring program.

No less important to the debut of the new system will be a focused, sustained effort to educate officers at all levels about PMP.  Over the years, departments that implement early intervention systems consistently find that the failure to educate officers on the new system creates unnecessary problems during the rollout phase.  One widely-cited survey of agencies reported:

> Virtually all of these problems were related to implementation issues, in particular a lack of communication about the nature of the EI system and a lack of follow-through on the part of responsible officials.

---

[105] *Accord* Samuel Walker, Early Intervention Systems for Law Enforcement Agencies: A Planning and Management Guide 37 (DOJ/COPS 2003) ("It is essential that departments provide proper training for supervisors regarding their role in interventions and that this be done well before an EI system become operational.") (emphasis added).

The greatest number of problems involved a failure to communicate the nature and purpose of the EI system to officers in the department.  Commanders identified this problem in response to several different questions on the survey.  Some commanders explained, for example:

- [Top management] did not explain the purpose of the program well [to mid-level supervisors].
- [Departments needed to deliver better] training and introduction   to the first line supervisors.
- [The agency] could have done a better job of pre-selling and training on the benefits of an EWS.
- While the system was crafted appropriately, it was not explained to the officers or the first line supervisors to the extent necessary to make it an understandable and viable system.
- The system is misunderstood by the first line supervisors, and therefore retraining is needed at the application level.[106]

Such education and communication must come at all levels:  training, briefings, bulletins and written guidance materials.  In 2005, for example, the Charlotte-Mecklenberg Police Department made available to officers and the public a 19-page handbook that stated the goals of its early intervention system and provided, in a question-and-answer format, detailed guidance on how the system would operate.  The handbook was developed by a working group that included numerous rank-and-file employees.[107]  SPD may wish to develop a similar resource.

### 3. The PMP Work Group Should Be Chaired by an Assistant Chief, Include More Senior Command Staff, and Be Assisted Where Possible by Outside Experts.

Given the importance of the PMP in identifying instances in which mentoring and training might proactively improve officer performance, the PMP Work Group should be chaired by a senior member of the command staff, at least for the foreseeable future.  Likewise, given that SPD is by no means the first law enforcement agency to adopt an early intervention or performance mentoring system, the Department should consult officers and experts from outside the Department who have successfully implemented such systems elsewhere.  The Department of Justice and Monitoring Team are committed to assist SPD in any capacity to ensure that the Department can structure the rollout of PMP in a thoughtful manner informed by both the successes and challenges of earlier,

---

[106] Samuel Walker, DOJ/COPS, *Early Intervention Systems for Law Enforcement Agencies: A Planning and Management Guide* 82 (2003).
[107] Charlotte-Mecklenberg Police Department, Early Intervention System: A Tool to Encourage & Support High Quality Performance—A Guidebook for the Public and Our Employees on What We Do and Why We Do It (2005), *available at* http://www.cops.usdoj.gov/files/RIC/Publications/e090676.pdf.

similar efforts elsewhere.

**4.   As the Department Begins to Accumulate a Body of Reliable Performance-Related Data, It Should Begin Evaluating How to Refine Its Performance Thresholds and Ensure that the Planned Business Intelligence System Can Support Them.**

As noted earlier, both SPD and DOJ agree that, ultimately, the early intervention system will need to develop more sophisticated performance thresholds that more fully account for officer for performance, such as those that enable managers to make peer-to-peer comparisons, or to view uses of force or complaints in relation to arrests or other relevant police activity.  The Parties also agree that it is too soon to do any of this because the Department currently lacks a body of reliable data.

Nonetheless, if the Department is to achieve timely compliance under the Settlement Agreement, it needs to devote the time and effort to researching the sorts of performance measures successfully used by other police agencies—and to ensure that its planned business intelligence system will be capable of tracking and easily reporting that information.  The Department's planning with respect to a comprehensive business intelligence system must include consideration of the technical requirements for generating more sophisticated performance analyses and intervention triggers.

During this research and planning phase, the Department should regularly communicate its progress to DOJ and the Monitoring Team so as to obtain timely input and reduce the risk of pursuing methodologies that may not receive ultimate approval.

In addition, to achieve full compliance with the Settlement Agreement, the Department will need to develop satisfactory performance thresholds to be utilized when an officer has previously crossed one or more performance thresholds.[108]  Without currently available data, it is impracticable right now for the Department to develop a secondary review standard.  Nonetheless, the Department cannot afford to lose track of this specific requirement as it continues to refine its early intervention system.

---

[108] Settlement Agreement ¶ 159.

# 9. Community Outreach

**Summary**

The efforts and contributions of the Community Police Commission ("CPC")—especially since January—have been substantial, constructive, and noteworthy.  The CPC and its staff have been focused, hardworking, and diligent in making important recommendations regarding policy, the structure of OPA, and the SPD's community outreach efforts.

To facilitate continuous dialogue in 2014, the Monitoring Team will host a series of town hall-style community forums open to all.  The Monitor looks forward to hearing from, and speaking with, members of the community and updating them on SPD's progress.

## Community Outreach by the Community Police Commission

As noted in the Monitor's previous reports, the Seattle Community Police Commission ("CPC") was originally composed of 15 commissioners confirmed by the City Council in March 2013.[109] The CPC consists of volunteers including civil rights and civil liberties advocates, business and faith leaders, mental health and housing providers, and representatives from the two SPD unions.

The CPC has not possessed its full complement of commissioners throughout its tenure. The Mayor has moved with alacrity to address this situation over the past several months.  Appointments have been made to four vacant positions, which have been confirmed by the City Council.  A permanent Executive Director, Fé Lopez, has been hired and confirmed, bringing significant day-to-day leadership and direction to the CPC's efforts.

Since March 2013, the CPC has met as a full commission bi-weekly.  Its workgroups on various aspects of police reform have met with greater frequency.  The efforts and contributions of the Community Police Commission—especially since January—have been substantial and constructive.  The CPC and its staff have been focused, hardworking, and diligent.  The CPC has embraced the role that Judge Robart outlined to the Parties, Monitor, and CPC in November 2013.[110]

In November 2013, the CPC issued policy recommendations related to bias-free policing, stops and detentions, use of force, and in-car video recordings. The recommendations were developed by CPC workgroups in close collaboration with multiple stakeholders—including SPD, DOJ, the

---

[109] *See* Second Semiannual Report at 54–55.
[110] *See id.* at vi-vii; 11/26 Order Regarding Motion to Intervene & Motions for Deadline Extensions (Dkt No. 106) at 10.

Monitor, the City Attorney's Office, the OPA Auditor, and staff of other City agencies. Many of the CPC's suggestions were incorporated into SPD policies that have been subsequently approved by the court.

Since January, the CPC has met all court-identified deadlines and has conferred with the Parties about a range of issues. During the early months of 2014, the CPC focused on developing additional policy and practice recommendations regarding accountability, training and SPD community outreach, and a plan for data collection and analysis to address practices with a disparate impact. The Monitoring Team looks forward to additional conversations with CPC and the Parties in the next six months.

> The CPC has met all court-identified deadlines since January and has conferred with the Parties about a range of issues.

In March 2014, the CPC issued an initial assessment of SPD's community outreach programs and will provide a more detailed roadmap for a more comprehensive assessment in late July. It also issued recommendations related to officer training on newly approved policies. Further, beginning in March, a sub-group of commissioners has served as members of Monitoring Team work groups with respect to stops and detentions data collection, the OPA Manual, and revisions of the Department's policies on anti-retaliation for making complaints about officers and on reporting officer misconduct.

The CPC was charged with reviewing SPD's accountability system and, as noted elsewhere in this report, issued recommendations for policy, process, and structural improvements. In particular, in reviewing the oversight structure, the CPC has benefited from its collaboration with the OPA Auditor and Director, the OPA Review Board, and with national police experts.

The Monitor looks forward to continuing to work closely with the CPC—considering its formal recommendations, working with its workgroups and subcommittees, and collaborating as part of the Monitoring Team and Parties' own workgroups for accomplishing objectives in the Second-Year Monitoring Plan.

## Community Outreach By the Monitoring Team

In its prior reports, the Monitoring Team has summarized its Community Goals and efforts.[111] Those continuing goals include:

| 1. | To be in close contact with communities of color and other minority communities, civil rights and human rights constituencies, and advocacy organizations in order to |
|---|---|

---

[111] *See, e.g.*, Second Semiannual Report at 44-45.

assess the progress of the SPD in complying with both the letter and spirit of the Settlement Agreement.

2.   To work with the CPC, pursuant to the Memorandum of Understanding and Settlement Agreement, so that the CPC may function as a powerful, independent policymaking body that proceeds carefully based upon evidence and whose conclusions and recommendations have great integrity and persuasive power.

3.   To work with the CPC, OPA, the OPA Review Board, the OPA Auditor, and the SPD so that, also pursuant to the Memorandum of Understanding and the Settlement Agreement, standards are established to ensure that SPD investigations and reviews are above reproach, including augmenting the powers and responsibilities of those entities providing oversight to OPA and recommending other meaningful reform of OPA.

Through cooperation with its partners and the community, the Monitoring Team has made progress toward those goals. A representative list of individuals, organizations, and activities with which the Monitoring Team has been engaged over the past six months includes, but is not limited to:

- Attendance at MLK First AME Church 24th Annual Youth & Law Forum, with SPD Command and other SPD members, community youth and parents; various members of the Judiciary, and other interested community people and groups;
- Contact by members of the Monitoring Team with the Loren Miller Bar Association;
- Attendance at the SPD Promotional Ceremony;
- Ongoing Attendance at CPC Board meetings and at several of the CPCs works groups;
- Attendance at CPC meeting regarding accountability recommendations with Urban League of Metropolitan Seattle;
- Attendance of SPD Citywide Advisory Council (CWAC) Meeting;
- Attendance at meetings of the African-American Advisory Council;
- Meetings with precinct Patrol officers and command supervisors at SPD Precincts city-wide;
- Attendance at the Seattle City Council Public Safety Committee meeting/public ceremony at the Langston Hughes Center, presenting Mayoral appointees Patricia Lally as Director of the Seattle Office of Civil Rights, and Fé Lopez as Executive Director of the Community Police Commission.

The Monitoring Team strongly believes that continuous dialogue with the community will be required to engender public trust in the reform process and to gauge whether the community is beginning to see the results of reforms implemented as a result of the consent decree.

To facilitate continuous dialogue in 2014, the Monitoring Team will host a series of town hall-style community forums. The community forums will be open to all and held in key community centers. The following non-exclusive list sets forth those community groups that the Monitoring Team will

specifically invite to its 2014 town halls:

- The African-American Community Advisory Council
- The ACLU of Washington
- The American Friends Service Committee
- The Asian Bar Association of Washington
- The Asian Counseling and Referral Service
- Centerstone (formerly CAMP—Central Area Motivation Program)
- Cardozo Society
- Casa Latina
- Chief Seattle Club
- Chinese Information and Service Center
- City of Seattle Native American Employees
- Columbia Legal Services
- The Community Christian Leaders Coalition
- The Council on American-Islamic Relations of Washington State
- Downtown Business Association
- El Centro de la Raza
- El Comité Pro-Reforma Migratoria y Justicia Social
- Feanette Black Bear (Native American Homelessness Advocates)
- Filipino Lawyers of Washington
- The Fred T. Korematsu Center for Law and Equality
- The International District Housing Alliance
- The John T. Williams Organizing Committee
- Kent Black Action Commission
- The King County Coalition Against Domestic Violence
- Korean Bar Association
- Latina/o Bar Association
- Latino Equity Initiative
- Loren Miller Bar Association
- Lutheran Community Services Northwest
- Middle Eastern Legal Association of Washington
- Minority Executive Directors Coalition of King County
- Minority and Justice Commission
- Mothers for Police Accountability
- NAACP of Seattle King County
- National Asian Pacific American Women's Forum Seattle
- NDNS for Justice
- Northwest Defenders Association
- Northwest Immigrant Rights Project
- Northwest Indian Bar Association
- Northwest Justice Project
- One America
- NAACP
- People of Color Against Aids Network
- Qlaw
- Real Change news
- Red Eagle Soaring
- Seattle Human Rights Commission
- Seattle Human Services Coalition
- Seattle King County Coalition on Homelessness
- Seattle Neighborhood Group
- South Asian Bar Association of Washington
- The Defender Association
- Federal Public Defender's Office
- Tingit & Haida Indians of Alaska, Seattle Community Council
- Trusted Advocates Association
- United Black Christian Clergy of Washington
- United Indians of all Tribes
- Urban American Indian/Alaska Native Education Alliance
- Urban League of Metropolitan Seattle

| | |
|---|---|
| • Vietnam Bar<br>• Washington Association of Lawyers with Disabilities | • Washington Indian Civil Rights Commission<br>• Washington Women Lawyers<br>• WSBA Indian Law Section |

The Monitoring Team has been, or will soon be, in contact with each of the community groups identified above. The Monitoring Team expects that this list is not exhaustive and that its initial conversations will lead to suggestions of other groups that should be invited to the community forums.

> During upcoming community forums, the Monitoring Team will report on current progress and seek feedback on the relationship between SPD and the community.

Again, the Monitor plans to hold the community forums in the community itself and at locations and hours that the community suggests. The Monitoring Team anticipates that it will begin to hold these meetings soon after the filing this Third Semiannual Report with the Court.

During the community forums, the Monitoring Team will provide a report on current tasks and progress. The Monitoring Team will also seek feedback on the current relationship between the community and the Department, any noted changes in that relationship, and suggestions for areas of focus in 2014.

The Monitor wholeheartedly believes that far-reaching and ongoing community engagement is vital to achieving the objectives and goals embodied in the Consent Decree. The Monitoring Team's aggressive 2014 community engagement plan reflects that belief. The Monitor thanks the community in advance for its continued contributions to this process.

# Conclusion

The Monitoring Team is mindful, as it noted to the Court at the April 3 status conference, that "from the community's standpoint, a lot of this . . . is very amorphous."[112] Indeed, the inner-workings of the CIC, the approach that the Education and Training Section uses to construct officer training programs, the Department's choices with respect to data system configurations, the process necessary to implement the Performance Mentoring Policy, and other similar topics covered in this Third Semiannual Report can, understandably, appear removed from the central concerns of the Seattle community and the aims of the Consent Decree.

*Getting basic details right is what will ensure that SPD's changes are enduring and substantial for all of Seattle's diverse communities.*

However, if this Semiannual Report dwells at times in what appears to be minutiae, it is because getting basic details right—and remaining vigilant as additional details are added and time elapses—is what will ensure that the changes that SPD must make under the Consent Decree are enduring and substantial for all of Seattle's diverse communities.

The Monitoring Team, as always, is dedicated to monitoring and informing Judge Robart, the Parties, and the Seattle community as to the SPD's progress.

---

[112] 4/3/14 Status Conference Transcript at 64.

# Appendix A: Current Issues with IAPro Implementation

This Appendix inventories and describes, in some detail, current issues with respect to IAPro about which the Monitoring Team is currently aware and concerned:

- **<u>Use of Main SPD Server Rather than a Stand-Alone Server.</u>**

  In many other Departments that have successfully and quickly implemented IAPro, a separate and dedicated server has been established to house IAPro. A discrete server would eliminate concerns about IAPro interacting unfavorably with other programs or elements of the Department's network, would enable the storage of high-resolution and high-capacity files (like audio and video), and would reduce security risks. Furthermore, server capacity issues can be substantially easier to address.

  Despite guidance to secure a standalone server for IAPro, the Department installed IAPro on its main network—a network which also supports several other essential Department programs that have data storage requirements of their own  On the one hand, the Department has assured the Monitoring Team that its main network has sufficient storage capacity to maintain IAPro for the foreseeable future, while on the other hand refusing to store key evidentiary information (in car video, incident photos, etc.) within the IAPro database due to data storage capacity concerns. This contradictory logic has real consequences. Rather than allowing a supervisor to review all information pertinent to a use of force within IAPro, the Department's refusal to store video and other imaged information within IAPro means that supervisors must access that information in systems outside IAPro, thereby complicating and slowing the essential force review process. This decision is but one example of several that contradicts the Monitoring Team's recommendations and continues to cause concern.

  The problems listed below, related to the need to use untested storage models because of alleged security risks, the inability to store large files in the IAPro database itself, and the need for a custom installer all may have been mitigated had the Department embraced a new data storage approach. Going forward, it has been suggested that storage capacity issues will become critical as quickly as 18 months from now, which results from the basic decision with respect to servers.

• **Automatic Integration of Human Resources Data.**

SPD has decided to integrate SPD's existing human resources databases and processes, directly into IAPro. Both IAPro and the Monitoring Team have told SPD not to set up any automated integration of personnel data from external systems into IAPro—because IAPro will not work properly unless human resources personnel data is accurate.[113] Specifically, the system requires accurate, updated information about an officer's current assignment or position—that is, who works for whom—for the statistical reporting, incident review, and "early intervention" capabilities of the program to function properly.

The above-described December 2013 report by Pricewaterhouse concluded that SPD's human resources legacy systems—like many of the Department's in-house legacy data systems—store and generate data that is inaccurate and unreliable. It found that SPD's personnel data "is not kept in sync nor is it checked for accuracy," which makes the human resources data "inaccurate and not kept up to date."[114]

SPD has suggested that it has solved all its human resources data problems. It says that it created a new system, the Employee Management Tracking ("EMT") system, to ensure that IAPro incorporates clean, accurate personnel data. The Monitoring Team certainly hopes that the EMT system is the improvement that SPD says it is.

To date, however, there has been no independent verification that the EMT system actually and accurately reflects current assignments and information about precisely who is working for whom.[115] Additionally, the Department has not provided any

---

[113] The Monitoring Team understands that the software vendor expressly recommended to SPD in October 2013, December 2013, February 2014, and April 2014 that officer information be maintained manually, and within IAPro, unless and until reliable, complete, and accurate data might be automatically integrated from an external system. The Monitoring Team itself told SPD that human resources data should not be automatically integrated from an external system in early November 2013 and again, at a meeting with current SPD leadership, in February 2014. Indeed, the Second-Year Monitoring Plan expressly indicated that technical installation of IAPro should exclude automatic integration of human resources data. (*See* Dkt. No. 127 at 32.)

[114] *See* PricewaterhouseCoopers, "Seattle Police Department: Information Systems, Processes, Operations and Technologies—Current State & Maturity Analysis, *available at* http://www.seattle.gov/spd/compliance/docs/BI_Reports/SPD_BI_Gap_Analysis_FINAL.pdf, at 34.

[115] IAPro has represented to SPD that the automated integration of data from EMT into IAPro appears to be working well from a technological and data migration standpoint. For example, the "officer name" field in EMT is feeding into correct, corresponding fields within IAPro. However, it is beyond the scope of the vendor's work to conduct an independent audit of whether the data in EMT is accurate—that is, if EMT accurately reflects where officers are working across the organization.

specific description of a reliable internal audit of the EMT system.  Unless and until the Monitor or another outside agent can independently audit that the new human resources data system provides IAPro with entirely accurate and reliable data, the Monitor cannot and does not support the automatic integration of personnel data into IAPro.  At a May 7 meeting, SPD pledged to conduct such an audit, which the Monitor eagerly awaits.

Regardless of whether EMT adequately corrects historical data, SPD has not provided any clear documentation regarding its business practices for approving personnel transfers.  In a recent meeting, a Department representative verbally explained that before any change to the EMT occurs, all transfers must be approved by the transferred employee's chain of command and the chief of police.  In the past, the Department's practices consistently lead to large lag times in updating the HR database and personnel working in a new unit long before the HR Department had the opportunity to update its database.  It has yet to be seen whether the Department's recently described transfer practice has in fact been implemented Department wide, and whether the purported change will remedy this issue.  In the meantime, the Monitor remains concerned about the real-time accuracy of the Department's personnel data.  Further, employees are moved during off-pay cycle periods, which makes changes difficult to track.

Thus, the EMT will remain an incomplete solution to human resources data unless there is a freeze on off-pay cycle personnel changes and a widely distributed, clearly written policy regarding precisely who formally approves personnel transfers.  The Monitoring Team recommends that SPD make these changes, or disseminate these decisions throughout the Department, even as a formal audit of the EMT system proceeds.

- **Insistence on Non-Standard Data Storage Architecture.**

SPD told IAPro, soon before the April 15 deadline in the Second-Year Monitoring Plan for technical implementation to be complete, that it wanted to use an underlying file storage architecture that no IAPro customer currently uses (called "Filestream").  SPD indicated that it could use neither the model used by a vast majority of the 500 law enforcement agencies running IAPro (the "file linking" model) nor a tested, production-ready alternative model (the so-called "BLOB storage" model) because both models entailed purportedly significant security risks.

Only after several discussions with IAPro and various stakeholders did SPD agree to adopt the production-ready alternative (the so-called "BLOB" storage model).  SPD

is, accordingly, aligning itself with a tested and proven architecture that the software vendor supports and that other agencies already use.

Although the Monitoring Team is encouraged that any delays resulting from the discussions of data storage architecture appear as though they will ultimately be negligible, it remains unclear whether, in fact, the "security risk" associated with the default storage model that most law enforcement agencies use genuinely justified that delay; whether the Department's insistence that IAPro accommodate the un-tested data storage architecture was reasonable and consistent with the goals of the Monitoring Plan; and whether SPD's, and the vendor's, resources would have been better invested in other areas.

The BLOB storage model that SPD adopted increases the server capacity that will be necessary for IAPro. With BLOB storage, every time that a user goes into an "incident" (akin to a file) and makes a change, it is saved as a "BLOB." Due to the iterative nature of investigative police work, for any given incident, there may be many, slightly different copies of the same incident or file. Accordingly, this dramatically increases the amount of server space required to store all of these BLOB versions or copies—which may make the decision not to install IAPro on a standalone server more problematic in the near future.

- **Failure to Solve Foundational Data Government and Management Issues.**

The December 2013 Pricewaterhouse Coopers report on the comprehensive BI system revealed substantial "deficiencies in IT governance processes" and recommended that basic "IT governance processes" needed to be strengthened "based on industry-wide IT best practices."[116] Historically, the Monitoring Team understands that data backup procedures and processes have been especially problematic for SPD.

Because SPD has decided that certain incident information—including video, audio, and large image files—will be housed outside IAPro on the SPD network, IAPro will depend on legacy systems and processes subject to the deficiencies that Pricewaterhouse outlined. However, SPD has not moved to address any of these deficiencies. For example, the Department has yet to produce a comprehensive Department-wide data retention policy, thereby creating a risk that a given review unit or vendor could delete essential data that another unit in the Department

---

[116] PricewaterhouseCoopers, "Proposed Development of a Business Intelligence System - Executive Summary 5 (Dec. 13, 2013) (emphasis added), http://www.seattle.gov/police/compliance/docs/BI_Reports/SPD_BI_ExecSummary_FINAL.pdf.

expected to be retained.  Accordingly, only time will tell whether critical elements of IAPro will be bogged down by the historical and long-festering inadequacies of basic, foundational IT processes.

- **Insistence on Using a Custom Installer to Push Application to All Machines.**

  SPD has suggested to the Monitor that part of its inability to meet the April 15 deadline was because the vendor only provided it with an alternative, custom installer that would not cause problems with other applications on SPD machines as of April 23.

  It should be noted that the standard installer has worked for nearly all of the more than 500 other agencies that have used it to install IAPro.  Likewise, it has been represented to the Monitoring Team that the alternative installer was made available to the Department prior to April 23.

  Regardless, well prior to April 23, a separate "hand installation" method was available that SPD says requires 15–20 minutes of labor per machine.  Indeed, the Monitor understands that this manual "hand installation" method was used to install the software on OPA's computers.  It also understands that, in other departments, the "hand installation" requires only 2–5 minutes of labor per machine.

  The Monitor is, accordingly, highly skeptical of SPD's explanation that the vendor prevented it from meeting the IAPro installation deadline.  Although the Monitoring Team understands that using an installer to "push" the software onto multiple department machines simultaneously (rather than individually on each machine) may have been the favored or typical approach of the Department in the past, it also notes that the Department is using a new system designed to solve new problems—which requires a new approach.  At a May 7 meeting, SPD suggested that the installer is nonetheless necessary given the "sophistication" of SPD's underlying network architecture.

  On May 13, SPD indicated that the "push" had taken place without any reported issues.  The Monitoring Team was relieved that one month of delay attributable to SPD insisting on using their old approach to installation appears as though it will be sufficient.

- **Failure to Ensure Training Consistency.**

  SPD leadership has been far less than precise about who has or has not received

precisely what training on IAPro training.  At a June 3 meeting, it was represented to the Monitor and Monitoring Team that all FIT detectives, with the exception of a few, had attended IAPro training.  However, the Monitoring Team understands that only one FIT detective and two supervisors attended such training.  To train others within FIT, SPD will depend on a game of "telephone" in which the trained officers will provide instruction on IAPro as events and incidents warrant.  Relatedly, the Monitoring Team is not clear about what senior command staff—who will use IAPro's most sophisticated analytical features most frequently—have been trained to use the system.

Given the important business practices associated with the system, the Monitor is disappointed that SPD insisted on holding IAPro training for FIT on the same day as another long-scheduled, mandatory training (about crisis intervention).  The possibility of inconsistent training and varying levels of knowledge about how to use the system may lead to different officers using the technology in different ways.

- **Inconsistency Among Investigative Groups Regarding Core Business Practices.**

As outlined elsewhere in this report, three major investigative or review bodies will be using IAPro with great frequency—FIT, OPA, and UOFRB.  The Monitoring Team is aware that, ins several instances, each of these entities have made their own conclusions about how to use IAPro.  For example, FIT has indicated that it may be storing video files obtained from private sources within the IAPro database.  The Force Review Section also indicated that it will store such video elsewhere on the system.  Although neither FIT nor FRS' approach is necessarily troubling, the lack of uniformity and centralized guidance from project leadership is concerning key business practices is cause for some concern.

A key business practice decision that the Department has yet to incorporate into any formal protocol or training is where and how reviewing Sergeant's must note in IAPro/BlueTeam the specific location of investigative information that is stored outside of IAPro.  If such notations are made inconsistently, or with varying language, this will cause significant delay in the review process.  Absent a clearly defined business practice, each reviewer would have to sort through the several SPD systems currently storing relevant data to locate the information they need for a particular incident.  The only way to avoid this delay is to implement a strict business practice regarding where and how the location of such information must be noted.  The Department has yet to provide a written business practice that can be consistently applied.  The Monitor urges that it do so prior to rolling out IAPro to the precincts.

Again, while the location of such private video may not, in itself, matter to the long-term health of the system, leaving configuration decisions ill-defined or unaddressed is inconsistent with optimizing the system.

Another business practice decision that the Department has made, but failed to yet adequately document, is its recent choice to limit BlueTeam incident entries to officers that used force.  This means that witness officers will not be entering their statements in BlueTeam and thereby requires that Sergeant's attach the separately completed witness officer statements to the incidents created by officers that used force.  To date, this changed business practice is not reflected in the training materials and has not been otherwise disseminated throughout the Department.  The Monitoring Team again urges that the Department finalize and disseminate such key business practice decisions before utilizing the IAPro program on a Department-wide basis.



# Monitoring Team Staff

**Merrick Bobb**
Monitor

**Matthew Barge**        **Peter Ehrlichman**        **Ronald Ward**
Deputy Director          Deputy Monitor             Assistant Monitor

**Pat Gannon**
**Joseph Brann**
Senior Police Experts

**Julio Thompson**
**Marnie Carlin MacDiarmid**
**Ian Warner**
**Brian Center**
Esq.

**Ellen Scrivner**
Ph. D.

**Chris Moulton**
Director of Research

**Carole Corona**
**Jeffrey Yamson**
Executive Assistants

**CERTIFICATE OF SERVICE**

I certify that on the 16th day of June, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following attorneys of record:

| | |
|---|---|
| J. Michael Diaz | michael.diaz@usdoj.gov |
| Jenny A. Durkan | jenny.a.durkan@usdoj.gov |
| Jonathan Smith | jonathan.smith2@usdoj.gov |
| Kerry Jane Keefe | kerry.keefe@usdoj.gov |
| Michael Johnson Songer | michael.songer@usdoj.gov |
| Rebecca Shapiro Cohen | rebecca.cohen@usdoj.gov |
| Emily A. Gunston | emily.gunston@usdoj.gov |
| Timothy D. Mygatt | timothy.mygatt@usdoj.gov |
| Jean M. Boler | jean.boler@seattle.gov |
| Peter Samuel Holmes | peter.holmes@seattle.gov |
| Brian G. Maxey | brian.maxey@seattle.gov |
| Sarah K. Morehead | sarah.morehead@seattle.gov |
| Gregory C. Narver | gregory.narver@seattle.gov |
| John B. Schochet | john.schochet@seattle.gov |

DATED this 16th day of June, 2014.

*/s/ Carole Corona*
Carole Corona

THE SEATTLE POLICE MONITOR'S THIRD
SEMIANNUAL REPORT
Case No.  C12-1282JLR

Merrick J. Bobb, Monitor
Police Assessment Resource Center
PO Box 27445
Los Angeles, CA 90027
(213) 623-5757