1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA

                  Plaintiff,

   vs.

CITY OF SEATTLE

                 Defendant.

CASE NO. C12-1282JLR

**THE SEATTLE POLICE
MONITOR'S FOURTH
SEMIANNUAL REPORT**

The Seattle Police Monitor's Fourth Semiannual Report is attached.

THE SEATTLE POLICE MONITOR'S FOURTH
SEMIANNUAL REPORT
Case No.  C12-1282JLR

Merrick J. Bobb, Monitor
Police Assessment Resource Center
PO Box 27445
Los Angeles, CA 90027
(213) 623-5757



SEATTLE
POLICE
MONITOR

Fourth Semiannual Report
December 2014

# Table of Contents

**Executive Summary** ........................................................................................................ **1**

**Overview of the Report** ................................................................................................ **14**

**I.  Use of Force** ............................................................................................................... **15**
   A. Application of Force ............................................................................................... 16
      1. Use of Force Policy ........................................................................................ 16
      2. Use of Force Training .................................................................................... 19
         Comprehensive 2014 Training ................................................................ 19
         Assessment of Training ........................................................................... 22
   B. Use of Force Reporting & Data ........................................................................ 26
      1. Policies on Reporting Force ........................................................................ 26
         Supervisor Screening of the Incident .................................................... 26
         Classification of the Incident and Officer Reporting ........................... 27
      2. Data and Information Reported on Use of Force ...................................... 29
   C. Internal Investigations of Force ....................................................................... 31
      1. Chain of Command Investigations ............................................................ 31
      2. Force Investigation Team ("FIT") ............................................................. 31
   D. Review, Analysis, Assessment, & Supervision of Force ............................... 37
      1. Force Review Board ..................................................................................... 37
         Assessment of the FRB Process During the Past Six Months ........... 39
         Upcoming Assessments of FRB Performance ..................................... 46
      2. Office of Professional Accountability ("OPA") ........................................ 47
         OPA Policies and Procedures ................................................................ 48
         Recent Developments ............................................................................. 52
      3. Supervision .................................................................................................. 55
         Supervision Generally ............................................................................ 56
         Specific Obligations ................................................................................ 57


**II.  Structures of Critical Self-Analysis** ................................................................. **61**
   A. Data Analytics Platform ("DAP") ................................................................... 62
      SPD's Dual-Track Data System Development ............................................. 63
      Current Status of the Comprehensive Data Analytics Platform ("DAP") .. 65
   B. Early Intervention System ("EIS") ................................................................. 69
      Developments During the Past Six Months ............................................... 70
      Current Challenges ........................................................................................ 73
   C. Crisis Intervention & the Crisis Intervention Committee ("CIC") ............ 76
      Crisis Intervention Training .......................................................................... 77
         Basic Training ........................................................................................... 77
         Advanced Training .................................................................................. 78
         40-hour CIT Certification Training ....................................................... 79
         Dispatcher Training ................................................................................ 80
      Crisis Intervention Committee ("CIC") ....................................................... 80
      Data & Systems ............................................................................................. 82

**III. Discriminatory Policing** ................................................................ **85**

    A. Policy ................................................................................................ 85

    B. Training ............................................................................................ 86

        Stops & Detentions Training ...................................................... 87

        Bias-Free Policing Training ......................................................... 88

    C. Data .................................................................................................. 92

    D. Supervision ..................................................................................... 96

**IV.  Additional Progress & Challenges** ............................................... **99**

    A.  Community Outreach ..................................................................... 99

        Community Outreach by the Monitoring Team .......................... 100

          Ongoing Community Engagement Forums ........................... 100

          Ongoing Community Involvement ......................................... 101

          Updated Website ................................................................... 102

          Survey of Community Perceptions and Attitudes ................ 103

        Community Police Commission ("CPC") ................................... 103

    B.  Additional Training Developments & 2015 Officer Training ...... 104

        Continued Commitment to More Rigorous Curriculum Development ....... 104

        2015 Training ............................................................................. 106

**Appendix A: Current Force Review Board Adjudications** ................................ **A-1**

# EXECUTIVE SUMMARY

The Seattle Police Department ("SPD") is approaching midpassage in its voyage to fully and effectively comply with many of the provisions of the Consent Decree. Sharing the accolades for the solid progress to date—and buoying optimism that the SPD will reach the farther shore—are SPD Chief Kathleen O'Toole, Mayor Ed Murray, City Attorney Pete Holmes and his office[1], the Seattle City Council, the Civil Rights Division of the Justice Department in DC, the U.S. Attorney's Office in Seattle[2], and the Community Police Commission ("CPC")[3]

Chief O'Toole, although leading the SPD only since June, has made her highest priority compliance with the Consent Decree and reform of the SPD. The Monitoring Team and Chief O'Toole independently concluded that the relationship between them would be collaborative, open, transparent, and trusting.

Among her first moves as Chief, she promoted and advanced the careers of some of the Department's best and brightest who are fully in support of the Consent Decree and understand the necessity for reform. She redefined the rank of Deputy Chief and promoted a progressive

[1] Two of the lawyers for whom the Monitor has great respect have recently left the City Attorney's office. Sarah Morehead has joined the US Attorney's Office in Seattle. Although she will not be involved with the Consent Decree, she is certain to be a valuable addition to that office. Brian Maxey has recently joined his former client, SPD, as Senior Police Counsel. Both Brian and Sarah bring great skill as advocates, negotiators, and providers of wise counsel. The Monitoring Team retains the highest regard for their credibility and personal integrity.

[2] The Monitoring Team acknowledges its great respect and fondness for Jenny Durkan, who, until recently, served as the U.S. Attorney for the Western District of Washington. She is goodhearted, smart, funny, loyal, a convincing advocate, and solidly devoted to the public good.

[3] As with previous reports, the Monitor provides the assessments contained within this Fourth Semiannual Report pursuant to paragraph 196 of the Court-ordered Consent Decree. As required by that paragraph, and as he has done before each of the prior reports, the Monitoring Team provided the Parties an opportunity for review and comment. However, the views expressed are entirely the view of the Monitor and his Team.

Assistant Chief who is highly regarded inside and outside the SPD.  She recruited an exceptionally talented civilian police expert from Northern Virginia as the SPD's Chief Operations Officer with the power and ability to get things done in what was a sluggish, passive, and often simply dysfunctional bureaucracy.  The Chief likewise brought in a superb manager, on loan from the Mayor's office, and an excellent police IT consultant, on loan from the LAPD.  She also appeared in person before federal District Judge Robart—which her two immediate predecessors had pointedly not done[4]—to assure the Court that, under her direction, things would move quickly toward compliance.

Chief O'Toole has spent many hours with and in the community.  She has appeared to lay important foundations of trust and mutual communication—attending a notably diverse array of forums, meetings, church services, and formal and informal get-togethers to gain a deeper understanding of Seattle. Likewise, she has spent many hours listening to police officers and their representatives about their needs and concerns.  She has gone repeatedly to each of the precincts to demonstrate committed leadership.

> The progress that the Monitoring Team has previously noted has continued and accelerated under Chief O'Toole's leadership.

As a result of those meetings with officers, and on her own initiative, Chief O'Toole recently issued a directive clarifying the SPD's policies about reporting some lower-level uses of force. Her actions commendably demonstrated a clear concern for officers on the street and the obligations they have, both old and new.[5]  As the Chief has noted in conversations with officers, the Consent Decree requires, and the current Monitoring Plan provides for, a review of each approved policy.[6]  The input of officers of all ranks and of community members from across Seattle will continue to inform the refinement of new policies, practices, and procedures.

The progress that the Monitoring Team noted in its previous Semiannual Report has continued and accelerated under Chief O'Toole's leadership.  In the past six months, the Education and Training Section has continued to create and refine important new training on search and seizure and bias-free policing while conducting—on a highly accelerated timetable—intensive use of force and crisis intervention training programs.  Whatever the issues might have been in the past with the quality of SPD

---

[4]   *See*   8/19/14   Status   Conference   Transcript   at   7,   *available   at* http://static.squarespace.com/static/5425b9f0e4b0d66352331e0e/t/542c31d0e4b07743f726470f/1412182480658/ Transcript+08.19.14+USA+v.+City+of+Seattle.pdf.

[5] Specifically, confusion had existed about how complex or in-depth an officer's statement needed to be with respect to comparatively low-level ("Type I") uses of force, which include a subject complaining about the pain of handcuffing or an officer pointing a firearm at a subject. The Chief's directive of September 26, 2014 clarified the less detailed reporting and documentation requirements for Type I force and that holding a firearm in the "sul" or "low ready position" does not constitute reportable force.  *See* Steve Miletich, "Police chief says less paperwork OK for minor use of force," Seattle Times (Sept. 29, 2014), http://seattletimes.com/html/localnews/2024658814_chiefdirectivexml.html.

[6] Consent Decree ¶ 180; Dkt. 127 at 42.

training and the resources devoted to it[7], the Education and Training Section under its new leadership—which has only been on the job for eight months—has become one of the Department's most promising drivers of systemic change.

The Training Section's renaissance occurred during a critical juncture. As major stakeholders correctly identified near the start of the year, 2014 has been "the year of training."[8] By December 31, all officers will have received 32 hours of in-class training on the new force-related policies, at least eight hours of live training on how officers should deal with the mentally ill and others in behavioral crisis ("crisis intervention"), and eight hours of training on stops, detentions, and bias-free policing. Select SPD officers (also known as "CI-Certified" officers) have received at least eight hours of related training on crisis intervention, and SPD dispatchers and communications personnel received three hours on identifying crisis situations when 9-1-1 calls come in.

> The Education and Training Section has become one of the Department's most promising drivers of systemic change.

Thus, it will only be as of January 1, 2015, that all officers will have received the same, comprehensive picture of the new policies on force, bias-free policing, stops, and crisis intervention. It likewise can only be January 1, 2015 going forward that the SPD, and Monitor, may fairly assess systemic changes that may have occurred as a result of those policies.

Overall, the quality of the Department's reporting, documentation, investigation, and review of force has also continued to improve. The Force Investigation Team ("FIT") is partnering better with the Office of Professional Accountability ("OPA"), and FIT investigators are using better and more focused investigative techniques. The Force Review Board ("FRB"), which reviews FIT's investigations to determine whether the force was consistent with SPD policy, continues to improve its ability to critically, fairly, and thoughtfully analyze force incidents—considering not merely the application of force but the events leading up to the force and the training, policies, and procedures implicated by the incident.

Chief O'Toole has been proactive in a number of other important areas. Upon her arrival in Seattle, she expressed frustration about the current absence of relevant data and lack of trustworthiness of current data systems in the SPD—frustrations that the Monitor's previous Semiannual Reports have inventoried.[9] She and the Monitor appear to share the conviction that "[t]he days of police management needing to rely on hunches or gut intuition alone" to deploy resources, address crime, and manage officers "are over."[10]

---

[7] Graham Johnson, "New report: $1 million in excessive overtime at SPD," kirotv.com (Sept. 30, 2014), http://www.kirotv.com/news/news/new-report-1-million-excessive-overtime-spd/nhYcH/#__federated=1; Linda Byron, "Report: Lax controls in SPD Training Unit go back years," King5.com (June 2, 2014), http://www.king5.com/story/news/local/investigations/2014/09/30/spd-training-unit-seattle-police/16501829/.

[8] Liz Jones, "Seattle Police Reforms Shift to Officer Training," KUOW.org (Feb. 5, 2014), http://kuow.org/post/seattle-police-reforms-shift-officer-training.

[9] Third Semiannual Report at 35-47, Second Semiannual Report at 6-19.

[10] Second Semiannual Report at 6.

The Chief took several swift actions to address the Department's deficiencies with gathering and effectively using data about what it and its officers do.  The first was with respect to the interim data system, called IAPro, which the Department had failed to implement for collecting data about force, stops, and other critical incidents for nearly a year before her arrival.[11]  Recognizing that the project was foundering, she put a new team in charge.  The team has been addressing issues, both previously known[12] and more recently discovered, expeditiously.

As a direct result, SPD has reached a notable milestone: for the first time, SPD has collected a set of standardized force data for a continuous 6-month period (from April 1 through September 30).  Whether that data will prove to be accurate and reliable and can be analyzed and worked with flexibly and easily are questions the Monitoring Team intends to explore in the near future.  Assuming that force is being accurately reported, what the data does suggest now, however, is that there are, on average, about 1.5 force events per day City-wide—suggesting that force reporting, investigation, and review requirements are not generally tying up substantial operational resources on any given day.  The Department also will soon begin using IAPro to collect and manage other data necessary to implement the Early Intervention System ("EIS") policy.  Because of the new project team's sustained and impressive efforts, SPD has climbed the first rungs of a ladder leading ultimately to accurate, real-time data that can be aggregated and analyzed.

> SPD has reached a notable milestone:  For the first time, it has collected a set of standardized force data for a continuous 6-month period.

The Chief swiftly implemented an analytical forum called SeaStat to guide SPD's efforts to address crime trends quickly and deploy resources effectively.[13]  Precinct Commanders are being held accountable for ensuring that officers under their command are proactively policing according to what data and community input reveal to be current crime trends.  That said, if recent media reports relating to a purported lack of proactivity and reactivity among the SPD precincts are determined to be consistent with a broader, systemic trend, the Monitoring Team will be concerned.[14]

---

[11] *See* Third Semiannual Report at 43-47.

[12] *Id.* at A-1–A-7.

[13] *See, e.g.,* "SeaStat: What Is It? And How are Police Using It to Disrupt Crime Trends?," SPD.gov (Sep. 17, 2014), http://spdblotter.seattle.gov/2014/09/17/seastat-what-is-it-and-how-are-police-using-it-to-disrupt-crime-trends/;  Elisa Hahn, "SPD 'SeaStat' program uses stats, community input to fight crime," King5.com (Sep. 17, 2014), http://www.king5.com/story/news/crime/2014/09/17/seastat-crime-data-statistics/15805387/.

[14] *See* Danny Westneat, "Police allow car break-ins to become a Seattle growth industry," *Seattle Times* (Oct. 31, 2014), http://seattletimes.com/html/localnews/2024924914_westneat02xml.html; Danny Westneat, "My brazen car prowlers turn out to be state's 'Most Wanted,'" *Seattle Times* (Nov. 7, 2014), http://seattletimes.com/html/localnews/2024924914_westneat02xml.html.  It is troubling that, purportedly, "some police officers wrote" the columnist to say that the Department's non-response was "due to new Department of Justice (DOJ) rules—specifically one that limits their abilities to make stops for criminal misdemeanors even when they have reasonable suspicion," *id.*—an attempt to shift responsibility that appears based on misunderstandings, or mischaracterizations, of current Department policies.  Regardless, the cited provision is no longer the policy of the Department, as DOJ long ago advocated.

Finally, Chief O'Toole clearly recognizes SPD's need for a computerized Business Intelligence system, which has been re-named the Data Analytics Platform ("DAP"). The DAP will enable the Department to capture, aggregate, parse, and visualize data about officer performance. In an August 19, 2014 status conference, Judge Robart emphasized the importance of SPD collecting and using reliable data to manage officer and departmental performance:

> The [DAP] doesn't tell you if there is or is not full and effective compliance, but it does give me the information that allows me to make that judgment. And that's why I have taken such a keen interest in this.[15]

Chief O'Toole echoed the Court's sentiment, noting that "it's absolutely essential to have all of the information that [the Monitor] has indicated is required."[16] Preparation for an RFP for the DAP has become substantially more organized and focused since the Chief charged oversight of the project to her deputy, Virginia Gleason, consultant, Maggie Goodrich. The Department is now set to release an RFP for the project in early 2015—which would be ahead of schedule. Based on the substantial progress the Department has made in this respect over the last six months, the Monitor has increasing confidence that SPD will eventually be in a position to harness the power of so-called "big data" to help it manage officer performance and the risk of unconstitutional policing.[17]

**Issues raised at the Force Review Board are not reliably followed up on elsewhere in the agency, and the Board does not yet hold officers accountable for an unreasonable failure to de-escalate.**

Even with such progress, however, significant work remains. The Monitor continues to see delays in the completion of some force investigations conducted by the chain of command. The partnership between FIT and OPA must continue to be cemented over the next 6 months before, as recently agreed, a final determination will be made as to FIT's long-term location within SPD's Bureau of Professional Standards and Compliance.

The FRB still has some ways to go to truly become the hub of internal accountability and innovation with respect to use of force. Although the FRB attempts to communicate its findings to officers, the chain of command, and the policy and training sections, the issues raised, problems discussed, and lessons learned in the context of good FRB discussion are simply not reliably followed up on elsewhere in the agency. This lack of internal accountability greatly inhibits the Department's ability to adjust its policies, practices, and training in light of critical thinking about real-world incidents. The Board also does not yet hold officers accountable for an unreasonable failure to de-escalate despite the importance and centrality of de-escalation in SPD's use of force policy and training.

---

[15] 8/19/14 Status Conference Transcript at 39.

[16] *Id.* at 13.

[17] *See generally* Third Semiannual Report at 35-36; Second Semiannual Report at 6.

Likewise, the Department must still demonstrate, or risk Court intervention, that it holds all officers strictly accountable for failures to activate their in-car video systems—which routinely provide crucial information in force investigations and reviews.

On the data and technology front, even with properly committed personnel and resources, the most optimistic scenarios suggest that the DAP will not be up and running for some time.  And even though the SPD has been pushing IAPro to its limits, which we applaud, the software alone does not track all the data, have the analytical capabilities, or provide the full scope of functionality that SPD will need to effectuate its policies, for the Court and the Monitor to make informed judgments about full and effective compliance, and that SPD supervisors will need to effectively manage officer performance.[18]

The Department also has substantial work remaining on establishing structures of critical self-analysis and collecting objective information that will allow the Department and its supervisors[19] to better manage the risk of unconstitutional policing. It must begin collecting critical information on encounters with individuals experiencing behavioral crisis and on stops and detentions of civilians.  Such information must be rigorously and routinely analyzed, with SPD placing its supervisors and implementing strategies based on the outcome of such analysis.   The Monitoring Team is optimistic that a process for tracking this information via an upgrade of an existing in-car computing system will soon be possible.

> SPD still must begin collecting critical information on stops and detentions and behavioral crisis incidents.

The Department must still fully implement an Early Intervention System ("EIS") that allows supervisors to identify potentially problematic performance trends and to design non-disciplinary interventions that might stop or change those trends.  The Crisis Intervention Committee ("CIC") is transitioning from an informal body charged with specific Consent Decree tasks to a body that affirmatively and proactively addresses the concerns not only of SPD but also of regional social service providers and other stakeholders with respect to addressing individuals experiencing behavioral crisis.

The Parties needed to invest resources and attention over the course of the past six months to address a lawsuit filed by some SPD officers who had objected to the implemented use of force policies.[20]  With officers having since received substantial training on those policies, the Monitoring Team hopes that, going forward, the 4-page use of force policy that addresses when officers may and may not use force becomes—along with the other policies related to the reporting, investigation, and review of force—a settled part of the SPD's fabric and culture.  As much distance as has been made, there remains a significant span to travel.

---

[18] Likewise, IAPro cannot be customized or expanded to meet or accommodate all of the SPD's discrete needs.

[19] As used in this report, the term "supervisor" refers generally to sergeants or their equivalent and "manager" refers to lieutenants and captains.  "Executives" refers to assistant and deputy chiefs or their equivalent.

[20] See Steve Miletich, "Federal judge rejects SPD officers' suit over use of force," Seattle Times (Oct. 20, 2014), http://seattletimes.com/html/localnews/2024830111_courtrulingxml.html.

* * *

Recent events across the country have focused public attention on issues related to law enforcement and the relationship between police departments and the communities that they serve.  For Seattle, the various substantive "commitments"[21] that the Consent Decree requires—and the tools, processes, and procedures necessary to meet them—serve as the primary means for ensuring that the public can have confidence that the SPD and its officers are delivering constitutional, effective, and safe policing.  Each specific provision of the Consent Decree is a tool or mechanism for seeing that SPD delivers policing that is constitutional, advances the safety of officers and the public, and engenders public confidence and trust.

> Each provision of the Consent Decree is a tool or mechanism for seeing that SPD delivers policing that is constitutional, advances the safety of officers and the public, and engenders public confidence and trust.

For the Consent Decree to end, the Court must certify that SPD has reached "full and effective compliance" with the various commitments, requirements, and terms set forth in the Consent Decree.  SPD must remain in compliance for two years thereafter.  "Full and effective compliance" is a term of art:

> "Full and effective compliance" with a material requirement of the Settlement Agreement requires that the City and SPD have:
> (a) incorporated the requirement into policy;
> (b) trained all relevant personnel as necessary to fulfill their responsibilities pursuant to the requirement; and
> (c) ensured that the requirement is being carried out in practice.[22]

To ensure that SPD is meaningfully carrying out the Consent Decree's requirements in practice, the Monitor cannot rely on a general feel or amorphous sense that the Department has changed or done what it must.  Nor is halfhearted adoption adequate: the aspiration is for the Consent Decree's new culture of accountability to become woven into the fabric of the organization, independent of who is Chief or the passage of time.

The full scope, and precise contours, of "full and effective" compliance may at this juncture look different depending upon one's angle or perspective.  The Parties are engaged in ongoing discussions about the contours of "full and effective" compliance.  Notwithstanding such discussions, and while the Parties' views remain useful, it is clear that it is the Court, with input from the Monitor, that determines what compliance is.[23]  Indeed, the Court addressed the issue at the August 19 status conference, observing:

---

[21] Consent Decree, Dkt. No. 3-1, at 16.
[22] *Id.* ¶ 184.
[23] Consent Decree ¶ 230.

> The term full and effective compliance with the settlement agreement has been bandied around this morning.  That takes into consideration almost everything the Seattle Police does, or do.  And that's what I am going to measure.[24]

Nonetheless, some of the guideposts and tests for compliance in use by the Monitor and known to the Parties can be stated with some confidence and clarity[25]:

1.  **The Consent Decree was necessitated by DOJ's conclusion that SPD engaged in a pattern or practice of excessive or unnecessary force.  The identified pattern or practice must be found to have definitively come to an end.**  That pattern will have ended when each of the following is clearly identified:

    a.  The SPD demonstrates that it has systems and processes in place that allow it to successfully and systemically identify for itself instances of excessive or unnecessary force—across levels, from an officer-involved shooting to an unnecessary takedown to unnecessarily painful handcuffing—and find such use of force out of policy.

    b.  Any officers who use excessive or unnecessary force—or supervisors or managers who know or should know that an officer uses such force and do not put a stop to it—are routinely and consistently subject to appropriate discipline.

    c.  Supervisors, managers, and executives routinely and fully meet their duty to strictly review force used by officers under their command, including faithfully adhering to the duty to use accurate, clear, timely, and easily available data from high-quality data systems (including the anticipated DAP when it comes aboard), to identify officers, shifts, precincts, and specialized units at risk of engaging or actually engaging in excessive force and to take affirmative action to cure the situation expeditiously.

    d.  Sergeants are held accountable by a lieutenant for the performance of officers under his or her charge in the use of force.  Each lieutenant is held accountable for the sergeants' performance; the captain for the lieutenants; the Deputy and Assistant Chiefs for the Captains; and the Chief of Police for all.  Such accountability is based on the timely and routine analysis of objective information and data.

    e.  SPD has in place and actively utilizes real, rigorous, and fair mechanisms of critical self-analysis to hold officers accountable for their performance and to assist the Department in continually

---

[24] 8/19/14 Status Conference at 39.

[25] It is important to note that this is not an exhaustive list or inventory of what is required for SPD to reach "full and effective."  It does not supplant, augment, or take away from the Consent Decree itself or anything contained within it.  Instead, it is a summary that attempts to describe the most important and salient features that SPD will exhibit when such "full and effective" compliance is reached.

learning and affirmatively improving.  This will be the case when, among other things:

1. Uses of force are found to be reported; rigorously documented; thoroughly, completely, and objectively investigated (whether by the Force Investigation Team or the chain of command); and objectively, critically, and timely reviewed.  The Department has mechanisms in place that identify any deficiencies in the rigor, quality, fairness, and timeliness of such reporting, investigation, and review.

2. The Force Review Board is the forum for debate and critical consideration of serious uses of force and officer-involved shootings.  Analyses routinely consider not only the moment when force was applied but consider the incident as a whole, from the moment when officers are dispatched or observe possible criminal activity.  Analyses likewise regularly consider each critical decision thereafter up to and including the conclusion of the event.  There are routine, candid, and robust discussions of whether the matter could or should have been handled differently by a lower level of force or no force, de-escalation, allowing for the passage of time, or waiting for backup or a crisis intervention-trained officer.  The Board serves as the locus of the Department's continual learning and improvement by overseeing the implementation of lessons learned.  Those lessons learned are widely disseminated within the Department, and items or areas identified for improvement are regularly studied and, whenever appropriate, reach the Chief's desk for consideration and implementation.

3. The Department's determinations about whether force is or is not within policy are, on the whole, justifiable based on the facts of the investigation, a fair reading of SPD policy, and accurate knowledge about any relevant training, policy, or practice issues.  If out of policy, there is demonstrable, further action—whether reference to OPA, discipline, retraining, or change of policy—that is proportional to the seriousness of the policy violation.

4. A discipline system in the SPD that is fair, comprehensive, transparent, and capable of being uniformly applied.  In the aggregate, discipline is directly proportional to the nature of the policy violation or misconduct at issue, particularly as it relates to other requirements of the Consent Decree or policies, procedures, and other practices that SPD has enacted to further the objectives of the Decree.  Instances in which discipline is changed, overturned, reversed, mitigated, held in abeyance, or otherwise deviates from this general proportionality principle are rare—and when discipline does so deviate, the deviations are justifiable and transparent.

5. The Crisis Intervention Committee ("CIC") is the primary forum for SPD to

partner actively with regional stakeholders to address the provision of services to individuals experiencing behavioral crisis—individuals who may often be the subject of the application of force.

2. **The investigation that led to the Consent Decree raised significant concerns that some SPD policies and practices, particularly those related to pedestrian encounters, could result in discriminatory policing.** Those concerns will have been addressed when:

   a. Systems, procedures, and processes are in place that ensure that allegations of bias are thoroughly investigated and fairly reviewed.

   b. A record is kept of each instance when an individual is stopped by SPD. Each stop is thoroughly reviewed by the officers supervisor to ensure that the stop was consistent with SPD policy. That record is available to managers and the chain of command, which evaluates both an officer's stop activity and the Department's general activity. The Department has in place and robustly uses a high-quality system and defined process for systematically analyzing data on stop activity, as well as other law enforcement activity, to determine if any groups or classes of individuals are being subject to disparate impact.

   c. The Department's policies and ongoing training reflect a clear commitment to the delivery of equitable and respectful police services.

3. **SPD has mechanisms in place to ensure that it can manage the risk of unconstitutional policing with or without civilian oversight.** This will be the case when:

   a. SPD uses high-quality information, housed sound data systems and informed by clear business practices, to reliably and empirically assess officer and departmental performance. Based on the recommendations of the Department's external consultants, SPD will have in place a high-quality, functioning Data Analysis Platform ("DAP") that allows the Department to manage itself according to reliable and accurate data on officer and departmental performance. Objective data is routinely accessed and regularly used by command staff, managers, and supervisors to supervise and hold officers under their command accountable.

   b. SPD actively uses an early intervention system ("EIS") in which supervisors and managers rigorously use high-quality data to evaluate trends in officer performance and construct high-quality, non-disciplinary intervention plans for officers exhibiting potentially problematic trends.

   c. SPD has in place mechanisms for managing the Department's systemic risk and exposure

to litigation.  Coordinating with the City's Law Department, SPD should track the status and outcome of litigation that involves any of its employees.  A centralized risk management unit should have responsibility for identifying specific risks of constitutional misconduct, including violations of the First, Fourth, Fifth, and Eighth Amendments, and devise ongoing strategies for reducing or eliminating such risks.

4. **SPD's provision of services and internal accountability mechanisms effectively promote public safety and public confidence.**

   a. The diverse communities of Seattle—and the African-American, Native American, East African, and Latino communities in particular—have trust and confidence in the SPD, and the SPD has trust and confidence in the communities. **The bedrock of the Consent Decree is a substantially improved relationship between the communities of Seattle and members of the SPD.  The community, in collaboration with the SPD, will participate in the decision about how it is to be policed and what the priorities are.**  It will become manifest when the SPD has no tolerance for biased policing, as demonstrated through the robust use of systems to detect, track, and thoroughly and objectively analyze any evidence of bias, conscious or implicit, or of disparate impact; and to discipline SPD officers who engage in unconstitutional or otherwise unlawful conduct.

   b. The SPD demonstrates that it listens to and formulates its policing strategy based upon community input, and the community demonstrates greater willingness to cooperate with the police in helping to identify criminals, provide leads, and collaborate with the SPD. This building of trust is generally accelerated when the police force reflects the diversity of the community.

   c. The SPD's core law enforcement and policing activities promote public safety and officer safety.  SPD activity reflects a commitment to proactive, safe policing consistent with constitutional demands—and an aversion to suggestions that unconstitutional policing should be reduced by reducing policing.  In this manner, officer support for the Consent Decree and its new use of force, stops and detentions, crisis intervention, early intervention, and biased policing policies will be manifest.

The Monitoring Team will not be evaluating whether SPD is uniformly perfect at all times; rather, it will be considering whether the Department has the systems, processes, capacity, and will to critically identify instances where, for example, an officer might have performed better, a supervisor might have monitored supervisees more closely, or the Department's internal investigations and processes could have been stronger.   Indeed, the Consent Decree emphasizes that compliance entails more than temporarily and technically meeting objectives or failing to meet objectives in an isolated instance:

> Noncompliance with mere technicalities, or temporary or isolated failure to comply during a period of otherwise sustained compliance, will not constitute failure to maintain full and effective compliance. At the same time, temporary compliance during a period of otherwise sustained noncompliance will not constitute full and effective compliance . . . .[26]

Accordingly, rigorous, systemic compliance reviews and assessments will be increasingly necessary over the coming months. Those assessments may be quantitative, qualitative, or contain elements of both. Anything on which the Monitoring Team relies to recommend that SPD has reached compliance must generally be supported by sound evidence of the quality demanded in any other federal court proceeding.[27] The Monitoring Team and Parties have begun discussions about the scope and nature of assessments that will inform the Monitor's determination of whether SPD has come into compliance with various of the Consent Decree's provisions and, overall, whether and when SPD reaches "full and effective compliance."

This report describes the Department's progress in becoming the department described above and required by the Consent Decree, and it describes in general terms some of the types of metrics and assessments that the Court, Monitor, and Parties will need to consider to determine SPD's progress toward that end.

* * *

Mayor Murray, City Council, City Attorney Holmes, and other political leaders have repeatedly committed to the goal of reaching "full and effective compliance" with the Consent Decree thoroughly and expeditiously. That commitment is notable and critical. Ultimately, however, arriving at "full and effective compliance" depends upon factors beyond the control of political actors, this Monitor, or the Court. It requires that the SPD—command staff and rank and file alike—re-commit continuously to embracing the new policies, processes, technologies, and culture that are necessary.

> The Monitoring Team can make no representations about how long it will take to reach "full and effective compliance." Work on critical issues remains unfinished, and some essential projects are still in their infancy.

Thus, as much as the Monitoring Team would like to do so, it cannot make any promises or representations about how long it will take to reach "full and effective compliance." What the Monitor can say, however, is that, thanks to its current leadership, SPD is making sustained, positive progress. If it continues on the path that it is now, the Monitor can say—for the first time—that SPD is likely to get the job done. With the ongoing support of the Mayor, City Council, SPOG, and the Chief of Police, compliance can move forward at a good clip.

---

[26] Consent Decree ¶ 184.
[27] *See generally Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993); *Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999).

For the SPD to reach full and effective compliance, significant work remains to be done.  Work on critical issues remains unfinished, and some essential projects are still in their infancy.  Likewise, as the Monitoring Team has learned from its series of community forums, SPD has a significant distance to go to re-establish a relationship with the Seattle community grounded in mutual trust and respect.

> If SPD continues on the path that it is now, the Monitor can say—for the first time—that SPD is likely to get the job done.

Despite this remaining work, SPD has indeed made notable progress in many areas in the past six months.   This report details that progress.  It also outlines the significant objectives, goals, and areas of reform that remain.

# Overview of the Report

The Consent Decree with which SPD is currently working to comply resulted from a 2011 investigation of the Department by the United States Department of Justice.[28]  That investigation found: (1) "a pattern or practice of constitutional violations regarding the use of force"; and (2) "serious concerns about biased policing."[29]

This Fourth Semiannual Report takes in turn each of these major substantive areas—use of force and discriminatory policing—describing in detail the Department's progress in making the policy, training, procedural, structural, and cultural changes that it must to address the core concerns of the Consent Decree.  It seeks to demonstrate how the various strands of reform and initiatives, which can sometimes seem "very amorphous"[30] or disjointed, are connected to address comprehensively the major underlying issues with respect to force and discriminatory policing.

In prior reports, the Monitoring Team has set forth the SPD's successes and important achievements with respect to the Consent Decree both in a standalone section and as part of the discussion of major substantive areas of focus.[31]  The absence of a discrete section in this report should not be interpreted as suggesting, in any way, that the SPD's successes and achievements during the past six months have been lesser or insignificant.  Instead, the report evaluates both SPD's progress and remaining work in the context of the core objectives to which those achievements and challenges relate and that they promote.

---

[28] Consent Decree ¶ 13.

[29] United States Department of Justice, Civil Rights Division and U.S. Atty's Office, W.D. Wash., Investigation of Seattle Police Department (Dec. 16, 2011) [*hereinafter* "2011 Findings Letter"] at 2, *available at* http://static.squarespace.com/static/5425b9f0e4b0d66352331e0e/t/5436d96ee4b087e24b9d38a1/1412880750546/spd_findletter_12-16-11.pdf.

[30] Third Semiannual Report at 95.

[31] *See id.* at 8–17; Second Semiannual Report at 2–5.

# I.  USE OF FORCE

The 2011 DOJ investigation that resulted in the Consent Decree found that SPD engaged in a "pattern or practice of using unnecessary of excessive force."[32]  The investigation identified "[d]eficiencies" in SPD's training, policies, oversight, and supervision.[33]

The Consent Decree requires that SPD officers use force in a manner consistent with the Constitution and laws of the United States.[34]  It requires the adoption of substantially clearer and more detailed policies relating to force.  It requires that every officer is properly trained; that force is properly reported, investigated, and assessed; and that findings regarding the propriety of force are supported by a preponderance of the evidence.   It requires that the Department analyze force data to determine trends, identify and correct deficiencies, and issue annual force reports.[35]  It also commits the Department to engage and educate the public about use of force issues.

To date, the Department has made significant strides toward partial achievement of the Consent Decree's requirements in the area of force.  The following sections describe how the things that SPD has been implementing pursuant to the Consent Decree relate directly to addressing the core concerns and alleviating the Department's primary deficiencies related to use of force.

---

[32] 2011 Findings Letter at 3; *see also* Order Approving Consensus Use of Force Policies, Dkt. No. 115 at 2 ("The issue of the SPD's use of force is a major aspect of the Consent Decree . . . . ").

[33] *Id.*

[34] *See generally* Dkt. No. 3-1.

[35] To the Monitoring Team's knowledge, no such reports have previously been issued.  The Monitor looks forward to reviewing a report in the near future.

# A.  Application of Force

**Summary**

SPD's use of force policy, approved by the Court in December 2013, is the embodiment of the Consent Decree.   It provides officers with clear guidance and expectations consistent with constitutional imperatives.

The end of the year will mark a significant milestone:  By December 31, 2014, all 1,300 SPD officers will have, over a period of just 10 months, completed 32 hours of in-service use of force training.  The training has included significant instruction on de-escalation, less-lethal instruments, and team tactics.   The dedication to the Education and Training Section is to be commended.

The Monitoring Team has found the comprehensive use of force training conducted in 2014 to be rigorous, engaging, and geared toward practical skills and real-world scenarios.  Because even a training program that looks good on paper or while it is being conducted may not have a measurable and observable impact on officer performance, the Monitor will be evaluating the effectiveness of the training in the upcoming months.

## 1.    Use of Force Policy

"A common theme of the Government's investigation that culminated in the Consent Decree . . . was that ambiguity in SPD policies in effect" previously "left field personnel (and their supervisors) uncertain as to the acceptable use or level of force that should be employed in varying situations."[36]  The pattern and practice of unconstitutional force "is the result," among other things, "of inadequate policies . . . ."[37]  Accordingly, the Consent Decree called for SPD to revise its use of force policies, procedures, and training to be consistent with constitutional imperatives and to reflect several important principles.[38]

The first major focus under the Consent Decree was revising and updating SPD's various policies relating to officer use of force and the reporting, investigation, and review of that force.  The policies, all approved by the Court in December 2013,[39] resulted from a protracted policy drafting and revision process that involved the Department of Justice, City of Seattle, SPD command staff and patrol officers, the two police unions, the Community Police Commission, and the public themselves during a period of public comment.[40]  The Monitor, in evaluating those policies, "consulted police trainers . . . , law enforcement leaders, SPOG [the Seattle Police Officers' Guild] in Seattle, and law enforcement rank-and-file . . . to make sure that the policies recommended by the [P]arties did not compromise the safety of Seattle police

---

[36] Dkt. No. 115 at 2.
[37] 2011 Findings Letter at 8.
[38] Consent Decree ¶¶ 70, 71.
[39] Dkt. No. 115.
[40] *See* Dkt. No. 107 at 1–2 (detailing the process for finalizing the consensus use of force policies).

officers and the public they serve."[41]

The basic policy that governs what officers should and should not do in the field with respect to force—entitled "8.100: Use of Force—Using Force"—runs roughly 4 pages in length as approved by the Court.[42]   The remainder of what some incorrectly refer to as the "80-page use of force policies"[43] are separate policies that deal with many important but distinct areas. That material provides important, general statements of principle about how the Department's values are reflected in the force policy and the reporting and review procedures[44]; explains force is reported, reviewed, and investigated[45]; clarifies specific considerations and expectations for the deployment of certain less-lethal tools[46]; or standardizes definitions[47].

> The basic policy that governs what officers should and should not do in the field with respect to force runs roughly 4 pages in length as approved by the Court.

This use of force policy is the embodiment of the Consent Decree. It provides officers with clear guidance and expectations consistent with constitutional imperatives.  Under the use of force policy that specifically governs an officer's actions in the field responding to a subject or emerging incident, "[o]fficers shall only use objectively reasonable force, proportional to the threat or urgency of the situation, when necessary, to achieve a law-enforcement objective."[48]   Thus, four major concerns guide the use of force policy:

> **Reasonableness.**   Consistent with constitutional imperatives and Supreme Court guidance,[49] the reasonableness of force depends on "the totality of circumstances known

---

[41] *Id.* at 5.

[42]   Seattle   Police   Manual   8.100,   Dkt.   No.   107-1   at   5–9,   *available   at* http://static.squarespace.com/static/5425b9f0e4b0d66352331e0e/t/542ea0cce4b05059a4ab0b85/1412096204453/Use_of_Force_Policy.pdf.

[43] *See, e.g.,* Renee Lewis, "Seattle police aren't using enough force, internal memo says," Aljazeera America (Sept. 26, 2014),   http://america.aljazeera.com/articles/2014/9/26/seattle-police-force.html;   Brandi Kruse, "Words before Weapons," Mynorthwest.com (Nov. 5, 2014), http://mynorthwest.com/980/2637205/Words-Before-Weapons; Joel Moreno, "Federal monitor rolls out new guidelines for SPD use of force," KOMOnews.com (Sept. 18, 2013), http://www.komonews.com/news/local/Federal-monitor-rolls-out-new-guidelines-for-SPD-use-of-force-224323311.html.

[44] Seattle Police Manual 8.000, Dkt. No. 107-1 at 1–3.  For instance, a central "core principle" advanced is that "[i]t is the policy of the Seattle Police Department to accomplish the police mission with the cooperation of the public and as effectively as possible, and with minimal reliance upon the use of physical force."  Id.  This commitment is reflected in numerous of the other policy provisions. *See, e.g.,* Seattle Police Manual 8.300-POL-1–4; 8.300-TSK-1–12.

[45] Seattle Police Manual 8.300-POL-1–4, 8.300-TSK-1–12.

[46] Seattle Police Manual 8.200; Seattle Police Manual 8.200-POL-1–13.

[47] Seattle Police Manual 8.050, Dkt. No. 107-1 at 4–6.

[48] Seattle Police Manual 8.100(1), Dkt. No. 107-1 at 6; *see also id.* at 8.000(1.1) (requiring officers to seek to perform their tasks with the cooperation of the public); *id.* at 8.000(1.2) (requiring officers to use only the force necessary to effectuate their lawful purpose).

[49] *See, e.g., Graham v. Connor,* 490 U.S. 386 (1989); *Scott v. Harris,* 550 U.S. 372 (2007); *see also Tennessee v. Garner,* 471 U.S. 1 (1985).

by the officer at the time of the use of force"—not "the 20/20 vision of hindsight."[50]

**Necessity.**   Force is to be used only in the absence of "reasonably effective alternative[s]."[51]

**Proportionality.**   "To be proportional, the level of force applied must reflect the totality of circumstances surrounding the immediate situation, including the presence of an imminent danger to officers or others."[52]   Indeed, officers "should assess and modulate the use-of-force as resistance decreases."[53]   The policy expressly provides that "[o]fficers must rely on training, experience, and assessment of the situation to decide an appropriate level of force to be applied."[54]

**De-escalation.**   The policy mandates consideration of de-escalation tactics.   Specifically, "when safe and feasible under the totality of circumstances, officers shall attempt to slow down or stabilize"—that is, de-escalate—"the situation so that more time, options and resources are available for incident resolution."[55]   The policy lists several examples of strategies and tactics that officers can use to de-escalate situations, including "decreasing the exposure to [a] potential threat by using distance, cover, [or] concealment" and "using verbal techniques" to gain compliance.[56]   This represents a significant evolution—and one that was asked for by members of the Seattle community for years.

In some instances, force is expressly prohibited—such as a means of retaliation, against individuals who only verbally confront officers, and against handcuffed or restrained subjects.[57]   Some specific policy provisions address the use of deadly force (to be used "where threat of death or serious physical injury to the officer or others is imminent"), use of force to prevent escape of a fleeing suspect (which reinforces the necessity requirement outlined above), and provision of medical aid when necessary.[58]

> Four major concerns guide the use of force policy: reasonableness, necessity, proportionality, and de-escalation.

---

[50] Seattle Police Manual 8.100(1), Dkt. No. 107-1 at 7.   This policy provision is consistent with the Department's core principles.   *Id.* 8.000(4) at 3 ("The reasonableness of a particular use of force is based on the totality of the circumstances known by the officer at the time of the use of force and weighs the actions of the officer against the rights of the subject, in light of the circumstances surrounding the event.").

[51] Seattle Police Manual 8.100(1), Dkt. No. 107-1 at 7.   This policy provision is also consistent with the Department's core principles.   *Id.* at 8.000(4.1) (requiring officers to use only that force necessary to effectuate the lawful purpose of their actions).

[52] *Id.* at 7.

[53] Seattle Police Manual 8.100(4), Dkt. No. 107-1 at 8.

[54] Seattle Police Manual 8.100(1), Dkt. No. 107-1 at 7.

[55] Seattle Police Manual 8.100(3), Dkt. No. 107-1 at 7.

[56] *Id.*

[57] Seattle Police Manual 8.100(2), Dkt. No. 107-1 at 7.

[58] Seattle Police Manual 8.100(5)–(8), Dkt. No. 107-1 at 8–9.

A policy review is underway with respect to the policies related to use of force that the Court approved in December 2013. As one of many components of that review, the Community Police Commission ("CPC") expended substantial effort to solicit feedback from SPD officers, which they received from a limited number.[59] Only one minor clarification, involving a prohibition against using force to prevent subjects from swallowing a substance, related to the core use of force policy—Seattle Police Manual section 8.100—that addresses what officers generally must and must not do in the field.[60] Although the Monitor and Parties will continue to assess how the policies are functioning in practice and seek independent input from community members and SPD personnel of all levels, the focus of discussion and scope of proposed changes appears to affect the administrative details relating to the reporting, investigation, and review of force and not the basic policy governing when force should and should not be applied.

## 2.    Use of Force Training

For the policy changes addressing the use of force to become ingrained like muscle memory, they must be fully implemented in practice by officers—in the field and on a day-to-day basis. Only high-quality, interactive training can translate the clear expectations of the use of force policy into everyday officer performance.

### Comprehensive 2014 Training

Historically, SPD's training with respect to use of force been problematic. The 2011 Department of Justice investigation concluded that "[d]eficiencies in SPD's training . . . contribute to constitutional violations,"[61] with "inadequate training encourag[ing] pervasive underreporting [of force] and render[ing] the Department's statistics on its use of force incomplete."[62] It cited specific inadequacies with "training relating to verbal de-escalation techniques" that provide "strategies for using verbal commands" which might reduce the need for force in some instances.[63] The report likewise highlighted deficient training on how to use specific force tools, such as batons and Tasers.[64]

The Consent Decree required the development and delivery of use of force training that addresses several topics:

- SPD's use of force policy, use of force reporting requirements, and the mechanics of efficiently writing an informative use of force report;
- proper use of force decision-making;

---

[59] Lisa Daugaard & Diane Narasaki, Letter re: SPD Use of Force Policy (Nov. 25, 2014).
[60] *Id.* at 3.
[61] 2011 Findings Letter at 3.
[62] *Id.* at 5.
[63] *Id.* at 24–25.
[64] *Id.* at 16–17.

- the Fourth Amendment and related law;
- participatory scenarios and interactive exercises that illustrate proper use of force decision-making; and
- the appropriate use of de-escalation techniques.[65]

Accordingly, with the use of force policies approved in December 2013, and as Mayor Murray noted in February, much of 2014 has been "about getting training right"—"[d]eveloping training manuals and programs to translate the policies that we're deciding on . . . ."[66]

> The end of the year will mark a significant milestone: All 1,300 SPD officers will have completed 32 hours of in-service training on use of force.

The end of the year will mark a significant milestone: By December 31, all 1,300 SPD officers will have, over a period of just 10 months, completed 32 hours of in-service training on use of force. Officers will also have completed additional, mandatory electronic self-instruction or roll call group training modules on use of force and force reporting. The training program has represented a significant, sustained commitment and required a noteworthy investment of resources. The Education and Training Section must be commended for their dedication to implementing a comprehensive and rigorous training program under significant time and logistical constraints.

The training in which officers have participated in 2014 has addressed numerous critical areas in several discrete modules:[67]

**Use of Force Policy and Reporting Overview.** An eight-hour classroom training conducted in March and April 2014 introduced officers to the updated use of force policy and provided details about the new force reporting requirements.[68] The training was geared toward "provid[ing] officers with clear, immediate guidance on the new use of force policies" pending even more comprehensive in-class and scenario-based training later in the year.[69]

**Use of Force Core Principles.** A two-hour module covered the SPD's revised policies, with particular emphasis on de-escalation and other approaches to force reduction that do not compromise officer or public safety. The instruction included interactive assessment of video footage of real police-citizen encounters that involve conflict and/or the use of force. Officers needed to identify failures and successes and articulate alternative

---

[65] Consent Decree ¶ 128; Dkt. 144 at 3.

[66] Liz Jones, "Seattle Police Reforms Shift to Officer Training," KUOW.org (Feb. 5, 2014), http://kuow.org/post/seattle-police-reforms-shift-officer-training.

[67] This discussion is an adaption of the summary that the Monitor provided to the Court when it recommended approval of the use of force training program in May 2014. *See* Dkt. No. 144 at 5–7.

[68] *See* Third Semiannual Report at 19.

[69] *Id.* at 19.

approaches to encounters that would reduce the likelihood of a use of force incident.

**Less-Lethal Tools.**  A four-hour course combined legal and policy principles with hands-on skills training to allow officers to comply with the force policy's requirement that all officers carry at least one less-lethal tool.  A classroom presentation was followed by drill and role-playing scenarios for the SPD's most common less-lethal weapons: baton, OC Spray, and Taser.  Officers needed to demonstrate when less lethal tools are appropriate to deploy and demonstrate an ability to de-escalate as a suspect either stops resisting or complies with officer commands.  As of July 15, when all officers had successfully completed the course, all SPD patrol officers are certified, and required, to carry at least one less-lethal instrument.[70]

**De-Escalation and Contact/Cover Techniques.**  This four-hour in-class component emphasized how the use of de-escalation to defuse volatile situations or prevent situations from getting to the point where force would need to be contemplated is a key tactical tool.  It also addressed the use of sound team tactics to preserve officer safety, allow officers to conduct critical law enforcement activities, and limit the number of situations in which circumstances evolve such that force would need to be used.  This includes the strategy of, during interactions, assigning one officer to communicate with a civilian (the contact officer) while the other serves in a supporting, protective role (the cover officer(s)).  Instruction has included review and discussion of video footage of officers' successful and unsuccessful uses of these techniques.  It has also included role-playing exercises that have required students to demonstrate de-escalation as well as safe restraint and handcuffing techniques.

**Threat Assessment and Subject Control.**  A four-hour course has addressed how officers may safely and effectively respond to potential risks posed by suspects who are prone on the ground with one or both hands concealed from view.  This position, sometimes known as the "turtle position," can present a particularly high risk both to the officer, who does not know if the suspect has access to a deadly weapon, and to the suspect, who may sustain an injury while officers seek to move his or her hands into a handcuffing position.  Role-playing exercises have required students to demonstrate proficiency both in safely handcuffing an unarmed suspect and in responding to a suspect who either attempts to fight the officer or reach for a concealed firearm.

**Firearms Skills.**  A four-hour manual skills course has reinforced  basic firearms skills, including one- and two-handed shooting techniques, flashlight/firearm techniques, and positioning a firearm safely out of the holster.  Although the course did not address deadly force decision making (*e.g.,* "shoot/don't shoot" scenarios), SPD will develop additional

---

[70] *See id.* at 21.

training to cover that subject to be conducted in 2015.

**First Aid.**  A two-hour skills course that provides officers instruction in CPR and basic trauma response, such as use of a field tourniquet.

**Team Tactics.**  A four-hour module has addressed rapid intervention techniques (*e.g.*, active shooter in school or shopping center), team searches for suspects in buildings, and team response to an "officer down" call.  Instruction has been primarily skills-based, with an emphasis on reducing firearms risk to officers and to members of the public through coordinated tactics.  Students needed to demonstrate proficiency in role-playing exercises that include "shoot/don't shoot" scenarios.

### *Assessment of Training*

The Monitor's Second-Year Monitoring Plan, which covers March 2014 through March 2015, provided some qualitative metrics for assessing the use of force Instructional System Design Model ("ISDM").[71] First, it noted that the Monitor and DOJ would "assess the draft training curricula, materials, and plan to determine whether they, among other things" were consistent with the use of force policies, "provide officers clear expectations and guidance," "incorporate best practices in adult education," and address the Consent Decree's use of force training requirements.[72]  The Monitor worked closely with SPD, the City, the Department of Justice, and others, providing numerous comments—both major substantive concerns and smaller edits to language used on slides to be used in classroom presentations.[73]

> The Monitoring Team's assessments of the use of force training were positive.

As the Monitoring Team previously noted, "[t]he quality of the discussions with the Training Section was superior."[74]  The Monitoring Team and Department of Justice's experts rigorously assessed the training and made ongoing, real-time suggestions for improvements.  Ultimately, the Monitor and DOJ separately determined that the use of force training program was adequate.  The Court approved the program on June 13, 2014.

The Monitoring Plan also indicated that "[t]he Monitor and Parties will attend training sessions . . . [o]n an unannounced basis . . . to assure quality and consistency with approved training materials, curricula, and objectives."[75]  Accordingly, experts from both the Monitoring Team and Department of Justice have attended each of the individual courses or modules that have made up the 32-hour 2014 use of force training program.

---

[71] *See* Dkt. No. 127 at 21–23.
[72] *Id.* at 22.
[73] *See* Third Semiannual Report at 20-21.
[74] *Id.* at 21.
[75] Dkt. No. 127 at 22.

By and large, these experts' assessments about the use of force training were positive. The training closely followed the Court-approved training materials. The courses were taught by skilled instructors who used proven pedagogical techniques to engage the students—including open-ended questions, humor, setting high expectations, and emphasizing key points and takeaways. They did a good job of conducting debriefs with officers after each practical scenario to confirm a common understanding of what officers were doing, why they were doing it, and what reporting actions they needed to take in the field following the force application. Several videos set the occasion for strong, interactive discussions about de-escalation techniques such as contact and cover, distance, and shielding. Overall, the instructors appeared to believe in and have clearly internalized the important new messages contained in the lessons. They were positive when articulating the reasons why the training was important to the officers, the Department, and the community.

Taser and OC spray training in the Less-Lethal class was not as effective as the Monitoring Team and DOJ would have liked—likely because not many officers carried or plan to carry the instruments.[76] The Monitoring Team and DOJ experts communicated in real time those concerns and saw those addressed in subsequent classes. Although the instructors did a good job, it was clear that some of the new principles taught (including verbal warnings and proportionality) were not uniformly welcome by some students. One instructor commented that this area of training was the most difficult year to teach than any other in a long teaching career. If anything, this emphasizes the need to continue less-lethal training going forward.

> It is hoped that 2015 training will provide further instruction on actual techniques that can be used to de-escalate situations.

Some classroom-style de-escalation training seemed hurried, with an emphasis on getting students to the more practical, scenario-based training or time on the firing range. The Monitoring Team and DOJ would have preferred to have seen more time dedicated to discussion of actual techniques that can be used in de-escalation situations, rather than merely describing shooting techniques or the goals of de-escalation generally. It is hoped that 2015 training will provide even further specifics in this area. Initial proposals for 2015 de-escalation training to be provided in the first quarter of 2015 appear to address this pressing need.[77]

During the training sessions observed by the Monitoring Team, the class was a mix of line officers and supervisors. The Monitoring Team and DOJ witnessed several instances in which those supervisors provided strong insight and interaction. We have heard, however, that not all supervisors have been as willing to engage and participate in this training. If true, this will need to change in the future.

In short, both the Monitoring Team and DOJ believed that, overall, the training was compliant with the

---

[76] The Monitoring Team has become aware of SPD's need to replace and add to its existing stock of Tasers with updated models—and supports the acquisition of such less-lethal instruments as expeditiously as feasible.
[77] See infra Part IV(B), "2015 Training," at 106.

Court-approved lessons plans and exhibited a high quality, with instructors and attendees alike participating actively.  However, there was some room for improvement that the Education and Training Section has indicated that it will address as it refines plans for training in 2015.

As with most professional training programs, the proof will be in the proverbial pudding.  Even a training program that looks good on paper and is presented well may, nonetheless, not be successful in practice.  Especially as the conclusion of 2014's comprehensive use of force training draws near, the Monitor, Parties, and SPD will need to evaluate the effectiveness of the training.[78]

For the Monitor's part, SPD's training will need to be evaluated along at least four discrete dimensions:[79]

> **Reaction criteria.**  These "represent trainees' affective and attitudinal responses to the training program" and are gauged "by using self-report measures."  Such evaluation is limited, however, because "there is very little reason to believe that how trainees feel about or whether they like a training program tells researchers much, if anything" about what trainees learned, how it affected job performance, or the value of the program to the organization.
>
> **Learning criteria.**  These "are measures of the learning outcomes of training" and "typically operationalized by using paper-and-pencil performance tests."  This form of evaluation also may be limited, however, because "trainee learning appears to be a necessary but not sufficient prerequisite for behavior change."
>
> **Behavioral criteria.**  These "are measures of actual on-the-job performance and can be used to identify the effects of training on actual work performance."  They are "typically operationalized by using supervisor ratings or objective indicators of performance."  However, "behavioral criteria are susceptible to environmental variables that can influence the transfer or use of trained skills or capabilities on the job"—that is, even an effective training will not manifest in changed behavior if the environment does not provide trainees with an opportunity to deploy what they learned.
>
> **Results criteria.**  These evaluate the overall utility to the organization of the training.  It seeks to assess the "value gained by engaging" in training.  These criteria are important but tend to be the most challenging to measure or identify.

Given the limitations of each individual type of evaluation criteria, it is likely that all four will need to be

---

[78] SPD has not yet identified the consequences for officers that do not complete the required 2014 training by year's end.  Relegation of an officer to a desk assignment pending completion of course work is an option that will be discussed with SPD leadership in the near future.  Responsibility for failure to complete training also rests on the chain of command, and consequences for the failure of officers to complete training—especially training so fundamental to the Consent Decree and basic law enforcement objectives—should also be borne by the officer's supervisors.

[79] Winfred Arthur, et al, "Effectiveness of Training in Organizations: A Meta-Analysis of Design and Evaluation Features," 88 *Journal of Applied Psychology* 234, 235 (2003).

considered to assess the ultimate effectiveness of the use of force program, as well as programs in other areas.   The Monitoring Team is not clear whether the Department has systematically assessed the effectiveness and value of its training programs in the past.   The Monitor has confidence that, given Chief O'Toole's "promise[] to run the department like a business," the Department will embrace what may be unfamiliar evaluation metrics with respect to training.[80]

Finally, it should be noted that the Consent Decree requires that SPD continue to train on use of force each year going forward.[81]   This report elsewhere details the Department's plans for reinforcing and expanding this year's training during its upcoming training programs throughout 2015.[82]

---

[80]   Linda   Byron,   "Up   close   with   Seattle's   top   cop,"   King5.com   (Sept.   30,   2014), http://www.king5.com/story/news/local/seattle/2014/09/30/kathleen-otoole-seattle-police-chief/16448393/; *see also* Brandi   Kruse,   "Words   before   Weapons,"   Mynorthwest.com   (Nov.   5,   2014), http://mynorthwest.com/980/2637205/Words-Before-Weapons.
[81] Consent Decree ¶ 127.
[82] *See infra* Part IV(B), "2015 Training," at 106.

# B. Use of Force Reporting & Data

**Summary**

It is encouraging that the end may be in sight to SPD's ineffective force reporting existing—if it existed at all—on paper stuffed, unreviewed, in file cabinets or entered into an unreliable, inaccurate, and incomplete legacy database.  Since July, and with data entered back to April, officers are now providing critical information about use of force via Blue Team, a simplified, web-based portal that feeds information into the IAPro system.

Under new project management put in place by Chief O'Toole, SPD has finally made significant progress in getting its interim data system, IAPro, up and running.  The Department has technically and, to a large extent, operationally implemented IAPro during the time period covered by this report.  As a result of this significant implementation effort, SPD has, for the first time, a set of force data that has been collected in the same manner and that hopefully is complete and comprehensive for a continuous, six-month period (comprising April 2014 through September 2014).  Progress on collecting other, non-force data also has also continued at a swift pace.  As a result of the new team's sustained and impressive efforts, the SPD has climbed the first rungs of a ladder leading to accurate, real-time data that can be aggregated and analyzed.

The 2011 Department of Justice investigation that resulted in the Consent Decree identified deficiencies in the reporting, investigation, and review of use of force incidents.  Among other things, it found that many uses of force were either unreported or inadequately reported, with "SPD officers hav[ing] an inconsistent understanding of when force should be reported . . . ."[83]  As a result, SPD had no reliable way until last April to know what force its officers were using.

In order to identify systemic patterns or trends with respect to force, two elements have been necessary.  First, rigorous and detailed policies and procedures for reporting of force have needed to be implemented.  That is, SPD has needed to ensure that it knows the full scope of force that its officers deploy.  Second, the Department has needed to get an interim, stopgap database system—to replace wholly inadequate legacy systems that had previously tracked force with minimal precision—up and running to track data and information about force incidents and to manage the investigations of force incidents.  That is, SPD has needed a mechanism for easily obtaining detailed information about force that can be aggregated and analyzed across time.  This section considers both important areas in turn.

## 1.    Policies on Reporting Force

### *Supervisor Screening of the Incident*

As this report describes in further detail below,[84] SPD's new policies with respect to use of force reporting,

---

[83] 2011 Findings Letter at 16; *see id.* at 15-16
[84] *See infra* Part I(D), "Supervision," at 55.

review, and investigation emphasize the involvement of front-line supervisors—sergeants.  DOJ's 2011 investigation found that supervisors irregularly "respond[ed] to the scene of use of force incidents," "frequently neglect[ed] their duty to investigate the use of force," and failed to conduct rigorous investigations of force incidents.[85]  In short, the Department could not be assured that it, or its supervisors, really knew when or how officers were using force.

The Court approved new policies and procedures relating to the reporting, review, and investigation of force in December 2013.[86]  Those policies, consistent with the Consent Decree requirements, now require that a sergeant screen all use of force incidents.[87]  At all screenings, sergeants must determine the appropriate level of investigation and reporting.

In general, sergeants are responsible for conducting the use of force investigation as a fact finder for Type I and Type II uses of force.  Sergeants' investigatory tasks include: examining the subject of the force for injury, interviewing the subject for complaints of injury, confirming that appropriate medical attention is rendered; locating witness and arranging witness interviews; and conducting separate interviews of all involved officers.

At any time during the sergeant's initial screening or fact-finding, if a supervising sergeant believes that criminal or other officer misconduct occurred, the sergeant is responsible for consulting with an on-duty captain or lieutenant and confirming that either OPA or the specialized Force Investigations Team ("FIT") is notified.  That specialized team is described in greater detail below.[88]

### Classification of the Incident and Officer Reporting

> Since July, officers have been using a computer-based force reporting system.

Since July, officers have been providing critical information about use of force via Blue Team, a simplified, web-based portal that feeds information into the larger, more complicated IAPro database system.[89]  The new reporting, review, and investigation policies classify use-of-force incidents "into three types, based on the nature of the incident."[90]  Type I uses of force are comparatively low-level

---

[85] 2011 Findings Letter at 17–18.
[86] Dkt. No. 115; *see* Seattle Police Manual 8.300-POL-1–4, 8.300-TSK-1–12, *available at* http://static.squarespace.com/static/5425b9f0e4b0d66352331e0e/t/542ae118e4b0c93d84bdc253/1412096280992/Policies_re-Review_of_the_Use_of_Force.pdf.
[87] Consent Decree ¶ 94.
[88] *See infra* Part I(C), "Force Investigation Team ('FIT')," at 31.
[89] Data points that are collected on the electronic form include, for instance: the reason that the officer initially contacted the subject; the specific force used; whether the incident was ICV recorded; whether the subject required medical aid; all force used by the officer; salient features of the force application; and general features of the environment and circumstances surrounding the incident.  Officers make selections from pre-populated "drop-down" menus, click boxes, and complete diagrams indicating where a force was applied to the subject's body.
[90] Seattle Police Manual 8.300-POL-1.

(including actions that cause disorientation or transient pain).  Type II uses of force encompass more serious uses of force and force causing less than great or substantial injury (including the use of OC spray, force that causes physical injury or would reasonably be expected to cause injury, and the like).  Type III uses of force include deadly force and force causing great or substantial injury.  The responding sergeant reviews the incident and classifies the level of force used.[91]

The Monitor has increasing confidence that officers are becoming comfortable with the new reporting requirements.[92]  Using the BlueTeam interface required a minimal, one- to two-hour training, with many officers remarking that navigating the system is no more complicated than purchasing a book on Amazon.com or buying a movie ticket online.[93]

The reporting requirements of SPD policy and the Consent Decree are not merely bureaucratic.  The Department simply cannot adequately address the risk of unconstitutionally excessive force if it does not know about every instance in which an officer employed force.

> The force reporting requirements are not merely bureaucratic.  SPD cannot address the risk of excessive force if it does not know about every instance in which an officer employed force.

The reporting process, and the reporting "form," has not changed materially since April 1.  Therefore, it is only recently that the Department has had in place the kind of sufficient and stable force reporting that can be systemically evaluated.  Consequently, the Monitor will soon be in a position to consider a comprehensive assessment of whether the reporting requirements can be considered fully effective.  This analysis will have at least three components.  First, the Monitor will need to consider whether reported force incidents are appropriately classified and categorized, with sergeants and/or FIT responding as appropriate based on that classification.  Second, the Monitor will need to evaluate the rigor and completeness of an officer's use of force reports—including the quality of an officer's narrative of the incident and the thoroughness and timeliness of the officer's completion of the mandatory data fields on the use of force report.  Finally, the Monitor will need to consider whether any under-reporting is occurring—by sampling things like OPA complaints to determine if there are any patterns of citizens credibly alleging that force was used that does not link up to a reported use of force.

---

[91] This classification guides the manner of investigation and, to at least some extent, the depth and detail of reporting requirements, with more serious force incidents requiring more comprehensive accounts than comparatively low-level force.  *See generally* Seattle Police Manual, 8.300-POL-2–4, 8.300-TSK-1–12.

[92] Part of this comfort may be related to the resolution of some confusion that had previously existed about whether the Blue Team and IAPro environments wholly ended the need for paper-based forms.  Some officers, for reasons that remain unclear to the Monitoring Team, filled out both handwritten, paper-based forms *and* completed the identical, computer-based version of the same documentation, including the manually completed forms as attachments in the computerized environment.  The current IAPro implementation group and Force Review Board have both worked hard to clarify expectations and avoid needless redundancies.

[93] Indeed, the Monitoring Team notes that the data collected via BlueTeam and IAPro on use of force incidents are nearly identical to the information collected by most of the more than 500 law enforcement agencies that use the software solution.

## 2.    Data and Information Reported on Use of Force

At the start of the Monitor's work overseeing implementation of the Consent Decree, the Monitor concluded that SPD's use of force data—formerly captured in a problematic and inadequate home-grown legacy system—was "incomplete, lack[ed] necessary detail, and [was] frequently incorrect."[94]  IAPro is a temporary, partial solution to these problems.  It is an interim or stopgap data, case management, and early intervention solution that the Department originally decided to use to fulfill these and other functions in August 2013.  Progress was slow.[95]

> Under new project management, SPD has made significant progress in implementing an interim database system to track use of force and other needed officer performance data.

Under new project management[96], and with Chief O'Toole's full and express support, the Monitoring Team is pleased to report that SPD appears to have made significant progress.  That project team has committed to ensuring not merely that the system gets technically up and running but that "the system functions well for all users from the start."[97]  It has created an impressively detailed and sophisticated project management plan that recognizes that the technology must be fully integrated into Department policy and existing business practices—and that plan is guiding rapid, high-quality progress.  The new team is on track to have all of the modules and functionality available within IAPro that are necessary to effectuate the EIS by December 31, which is a noteworthy achievement.

Importantly, the new team has actively addressed, or is well down the path to solving, all of the problems and issues that the Monitoring Team raised in its Appendix to the Third Semiannual Report.[98]  Luckily, prior management's errors and inaccuracies have not affected the new team's ability to make incredibly swift, positive progress.  However, the failings of prior management highlight the Monitoring Team's existing concerns about SPD's culture.  IT and other project staff are not doing their jobs if they fail to ask managers tough questions.  Command staff must press project managers for detailed, evidence-based justifications for actions.  Neither of these happened here until only very recently.  Both need to happen

---

[94] Second Semiannual Report at 9.
[95] Third Semiannual Report at 43–47; Second Semiannual Report at 1–7.
[96] The Monitor would be remiss not to observe that, in multiple instances, prior project management greatly exaggerated the obstacles facing IAPro, inflated the team's success, or mischaracterized issues.  Specifically, prior leadership insisted, from March through July, that the Department had concluded that a "security risk" associated with a default storage configuration was so significant that an alternative was necessary.  However, the Monitor later learned of an authoritative internal risk assessment—dated either April 4 or April 15, 2014—that characterized the likelihood of the risk as "low" and the "impact" of the risk being realized to be "minimal."  Likewise, prior leadership represented that SPD had created an updated human resources technology platform (the Employee Management Tracking system or "EMT") to ensure accurate personnel data.  Later, the Monitor learned that EMT was not a new computer system but merely a mildly revamped business process for entering information about personnel changes into precisely the same database system.
[97] Third Semiannual Report at 47.
[98] *Id.* at A-1–7.

in the future, across SPD leadership, to ensure "[v]igilant decision making . . . designed to encourage deliberation, use of statistical and technical processes, and extensive processing of information in group decision making."[99]

The Monitoring Team appreciates that the new project management team has been willing to revisit or revise many of the frequently problematic configuration decisions that had been made under prior leadership.  As a result of the new team's sustained and impressive efforts, the SPD has climbed the first rungs of a ladder leading ultimately to accurate, real-time data they can be aggregated and analyzed.

The Monitor cautions that, in the upcoming months, evaluation will be necessary to assess the systemic quality of the reporting.  The Monitoring Team will need to ensure that the data that officers are entering are sufficiently thorough, systematically reflect the reporting officer's and witness officers' reports, and the like.

> SPD finally turned around a failing project that will help it ensure that the days of SPD's force reports existing—when they existed at all—only on paper stuffed in filed cabinets are in the past.

These caveats, though important, should not detract from SPD finally having turned around a failing project and reaching the significant milestone of getting a database system partially up and running and displaying a firm commitment to ensuring that it collects force, and other, data in a uniform and systematic matter.  It is extremely encouraging that the days of SPD's force reports existing—when they existed at all—only on paper stuffed in file cabinets may well be in the past.[100]

The Monitoring Team will be closely analyzing the data and information that the Department has captured on force over the past several months.  General force trends—such as the overall numbers of Type I, II, and III uses of force and the breakdown of such force according to precinct, watch, and the like—will be considered.  However, IAPro will also permit the Monitor, and the Department, to consider more detailed questions—such as what force types are being used more often than others, which force instruments are resolving incidents more swiftly and with fewer injuries than others, and what officers may be using force substantially more or less frequently than similarly-situated peers.  The Monitoring Team looks forward to presenting the Court and the public with the results of this and other assessments in the coming months.

---

[99] Randall S. Peterson et al, "Group Dynamics in Top Management Teams: Groupthink, Vigilance, and Alternative Models of Organizational Failure and Success," 73 Organizational Behavior & Human Decision Processes 272, 273–74 (1998).  Vigilant decision making stands in contrast with so-called "groupthink" in which individuals "censor any misgivings they may have, ignore outside information," and engage in a "pattern of concurrence-seeking."  *See id.* at 273 (discussion I.L. Janis, *Victims of Groupthink* (1972).

[100] *See* Second Semiannual Report at 10-11 (describing incomplete and inaccurate data entry of force reports into the SPD's legacy system).

# C.  Internal Investigations of Force

**Summary**

The quality and rigor of investigations by the Force Investigation Team ("FIT"), which investigates serious uses of force by SPD officers, have generally continued to improve over the last six months.  Those investigations, along with chain of command investigations of lower-level force, appear far more objective, thorough, and rigorous than investigations even six or twelve months ago.

The relationship between FIT and the Office of Professional Accountability ("OPA") has likewise improved as a result of the Department following a detailed protocol that defines the extent to which OPA must be permitted to play an active oversight role at the scene of serious uses of force and officer-involved shootings.  To ensure both that the protocol is memorialized in Department policy and that its procedures and understandings become the habit and reflexive practice of both FIT and OPA, the Monitoring Team, DOJ, and the Department have agreed that FIT should remain within SPD's Bureau of Professional Standards and Compliance for another six months.  At that point, a final determination as to its location will be made.

FIT's capability should be expanded to that SPD's internal mechanisms of critical self-analysis are at least capable of functioning well in straightforward and difficult, high-profile cases alike so that SPD need not "farm out" its most serious or potentially egregious criminal investigations of officer misconduct to other agencies.

## 1.  Chain of Command Investigations

For lower-level force, including Type I and many Type II uses of force, an involved officer's chain of command conducts the investigation and review.  For Type II uses of force, the chain of command reviews both the officer's Blue Team report as well as associated in-car video footage.  The officer's sergeant, in addition to screening a force incident and classifying the incident, serves as the primary investigator.  SPD's new policies require this chain of command review to be rigorous.  When lower-level supervisor review is not rigorous, there is to be strict accountability.

As part of its consideration of where the SPD is with respect to partially complying with the Consent Decree's use of force provisions, the Monitoring Team will rigorously evaluate a statistically valid sample of all Type I and Type II uses of force since the new reporting requirements came online.  It will consider whether they are as thorough, objective, and complete as SPD's policies require them to be.

## 2.  Force Investigation Team ("FIT")

The Force Investigation Team ("FIT") is an integral part of the package of Consent Decree requirements that establish clear structures and processes for expanding the objectivity, thoroughness, and fairness of investigations of serious uses of force, including shootings.

The Consent Decree requires that FIT investigate serious uses of force by SPD officers.[101]  Generally, those incidents include Type III uses of force, and some other uses of force.  Thus, "[a]s the primary investigative unit for serious use of force incidents, FIT plays a crucial, initial role in ensuring the Department's reviews of force incidents are thorough, objective, and complete."[102]  The creation of a FIT team in the SPD is consistent with Consent Decree provisions relating to other law enforcement agencies, as well as best practice provisions elsewhere—including, among others, the Los Angeles Police Department ("LAPD") and the Washington, DC Metropolitan Police Department ("MPD").  Since FIT's creation, its jurisdiction includes officer-involved shootings.[103] Among other relevant processes and procedures in place to ensure that investigations are unbiased and thorough, the current policies and protocol relating to FIT provide:

- After the shooting or other lethal incident occurs, the involved and witness officers are separated and ordered not to speak to each other about the incident until the investigation is complete.

- As soon as practicable thereafter, the involved officer and witness officers remain separated and transferred to an appropriate location for an interview.

- Unless the officer requires immediate medical attention or admission to a hospital for treatment, the involved officer gives a video- and audio-recorded interview after being afforded a reasonable opportunity to consult with a union representative and/or a lawyer.

- The FIT investigators afford the involved officer upon request his or her *Garrity* rights prior to a compelled interview.  There is no pre-interview discussion of the substance of the investigation or other similar dialogue with the involved prior to the video recording device having been turned on.  The FIT investigators may explain the process of the interview to the interviewee but shall not discuss the substance of the investigation or interview prior to the video recording device having been turned on.

- The interview of the involved officer and any other witnesses must not contain leading questions or any other coaching of the witness to give particular answers.

- Following an officer-involved shooting, the involved officer will be relieved of duty when the interview is concluded.[104]

---

[101] Consent Decree ¶ 112 et seq.

[102] Third Semiannual Report at 58.

[103] This was done for at least two significant reasons.  First, Homicide's investigation of officer-involved shootings were determined to suffer from serious flaws that compromised the integrity, rigor, and fairness of the investigations.  Second, the Firearms Review Board procedure was determined to lack essential elements of objectivity, critical analysis, and fairness, which led the Department to review officer-involved shootings in the preferable manner that they review other types of force.

[104] Merrick Bobb, Protocol of Best Practices for Use of Force Investigations (May 21, 2014).

The FIT team is part of the internal affairs function of the law enforcement agency.  It investigates instances where SPD officers have applied force to determine whether officer complied appropriately with Department policy and the law.  In Seattle, the Office of Professional Accountability ("OPA") is an important mechanism for internal or administrative investigations.  Its investigators report to a civilian head.

The FIT team has received significant training tailored to their charge of investigating force.  The Monitor's Third Semiannual Report noted that, in April 2014, all FIT investigators attended an intensive, two-day training "emphasiz[ing] approaches, procedures, and strategies for ensuring impartial, comprehensive fact-gathering across all major stages of the investigative process."[105]  It emphasized inquiry "not merely relating to the moment that force was applied but [also] to . . . tactics, training, and procedure" leading up to the application of force.[106]

Additionally, on June 13, the Court approved a more extensive and ongoing training program for FIT investigators.[107]  As of November 1, all FIT investigators have completed that program.  This marks a significant milestone on the road to ensuring that SPD always benefits from investigators with well-honed skills necessary to conduct rigorous, impartial investigations of force.

> The rigor and depth of an average FIT investigation represents a sea change from the SPD's formerly perfunctory force investigations.

That training appears, so far, to have been paying off.  The quality and rigor of FIT's investigations have generally continued to improve over the last six months.  The investigations are more objective, thorough, and rigorous than investigations conducted even six or twelve months ago.  The investigations generally address not only the moments immediately surrounding the application of force but the whole of the incident, which provides members of the FRB and other reviewers with the necessary full scope of information to be able to conduct comprehensive, critical reviews.  Thus, the rigor and depth of an average FIT investigation represents a sea change from the perfunctory investigations that the DOJ found to be the norm in its analysis in 2011.

Approximately one year ago, there was disagreement inside the SPD, and between the Parties, regarding where FIT should be situated within the Department.  Some argued it should be placed in OPA because FIT was performing a critical internal affairs-like function.  Others thought that it should be part of SPD's Professional Standards Bureau or elsewhere in the Department.

In December 2013, a compromise was reached wherein FIT would be located Professional Standards for a year.[108]  This compromise was formally incorporated into the Second-Year Monitoring Plan in March

---

[105] Third Semiannual Report at 58.
[106] Id. at 58.
[107] Dkt. No. 151.
[108] Dkt. No. 127 at 51–52.

2014.[109]  Thus, the Monitor and Parties have invested significant time interacting with and monitoring FIT, both to be able to provide technical assistance as necessary and to be in a position to make a determination as to whether FIT should not transition out of the Department and to OPA now.

Early in 2014, concerns were raised about FIT allowing OPA to have sufficient access to the crime scene and keeping OPA generally informed about its initial investigations.  The Monitor was concerned that, if OPA and its Director were relegated to the role of "potted plant," OPA and FIT both might not be sufficiently robust and central mechanisms of internal accountability as cogent as they should be.

The Monitoring Team therefore attempted to facilitate a resolution of the controversy between the SPD, FIT, and OPA.  Especially between April and June 2013, the Monitor and Parties engaged in several constructive discussions.[110]  From these discussions emerged a working protocol on FIT's relationship with OPA that permits OPA to play an active oversight role at the scene of an officer-involved shooting or serious use of force (the "Protocol").  Among other provisions, the Protocol calls for the following:

- OPA will observe actions of FIT investigators and CSI personnel and the taking of the public safety statement if OPA arrives in sufficient time.

- OPA will presumptively be permitted in the crime scene ("red tape") area for a walk-through.  If the involved officer has been given a walk-through, then the same detective who accompanied the involved officer on the walk-through will give OPA its walk-through and inform OPA, to the best of the detective's recollection, of what the officer did and said in the prior walk-through.  If the FIT Commander determines that OPA must remain out of crime scene (red tape) because the presence of an OPA representative is tactically, strategically, or otherwise prejudicial to a specific part of an investigation, the Commander will personally confer with the OPA Director.  If the OPA Director desires to contest the FIT Commander's conclusion, the Assistant Chief of the Compliance and Professional Standards Bureau shall meet contemporaneously with the OPA Director and the FIT Commander to rule on the issue.  The Assistant Chief must thereafter state in writing the specific reasons for exclusion of OPA.

- At the conclusion of a compelled interview but before the involved officer is told the interview has ended, the FIT Commander will confer with the OPA representative to discuss the scope of the interview and questions or areas of inquiry that OPA wishes to see covered to determine if OPA should open a misconduct or criminal investigation.[111]

- FIT investigations may be required in the context of a fluid and dangerous crime scene.  The Monitor, Parties, and FIT understand that the first obligations of officers

---

[109] *Id.* at 41.
[110] *See* Third Semiannual Report at 59 ("The Monitor applauds the productive and thoughtful discussions among the Parties, SPD, and the Monitoring Team that nears consensus regarding future expectations.").
[111] *Id.*

responding to a scene is to take the necessary steps to secure a scene, determine the scope of events, ensure public safety, and provide necessary medical assistance.

Another area of some attention has been the manner in which the SPD has addressed the criminal investigations of some potentially high-profile incidents.  In June 2014, an officer's application of force became the subject of a FIT investigation.[112]  An initial review of the involved officer's in-car video suggested the possibility that the officer's conduct may have been criminal.  Subsequently, the Department asked the Washington State Patrol to conduct the criminal investigation of the incident, which was completed on October 14.[113]

The Consent Decree provides mechanisms for SPD to address difficult or troubling circumstances in which criminal liability may be at issue.  Specifically, in instances where "information is obtained that suggests that an officer may have committed a crime during [a] use of force incident," the Consent Decree calls for SPD to establish separate investigative "teams": an "exposed team," which conducts an administrative investigation and can compel the involved officer to make a statement, and a "clean team," which conducts the criminal investigation and, among other legal restrictions, cannot compel the involved officer to make a statement if the officer invokes his or her constitutional protections against self-incrimination.[114]  Evidence developed by the "exposed team" can pass to the "clean team" once a Case Master has reviewed the material to ensure that no improper materials are transmitted, while anything developed by the "clean team" can be considered in the "exposed team"'s administrative investigation.[115]

> The Monitor believes SPD should strengthen the quality and capacity of FIT so that it no longer must "farm out" to other agencies the most serious criminal investigations of officer misconduct.

In other agencies that maintain highly trained investigative teams expressly to investigate force incidents—such as the Las Vegas Metropolitan Police Department and Washington D.C.'s Metropolitan Police Department—the force investigation team conducts both the criminal and administrative investigations.[116]  The Monitor believes that SPD should make sustained efforts to strengthen the quality

---

[112] "Report: Seattle cop 'caused unnecessary' injury to handcuffed woman he punched in face," Q13fox.com (Oct. 14, 2004), http://q13fox.com/2014/10/14/seattle-cop-put-on-leave-after-use-of-force-incident-with-handcuffed-female-prisoner/.  The Monitoring Team notes that it discusses this incident as part of addressing the systemic issues surrounding SPD's investigations of force incidents.  The Monitor and Team expressly do not address anything here pertaining to any potential underlying criminality or propriety of any officer performance in the incident.

[113] Press Release, Washington State Patrol, "WSP Completes Investigation into Seattle PD Use of Force Allegation" (Oct. 14, 2014), http://www.wsp.wa.gov/information/releases/2014_archive/mr101414.htm.

[114] Consent Decree ¶ 118(k)(1).

[115] Id.; see Community Oriented Policing Services, U.S. Department of Justice, Standards and Guidelines for Internal Affairs: Recommendations from a Community of Practice at 25, available at http://ric-zai-inc.com/Publications/cops-p164-pub.pdf ("Unless otherwise prohibited by law, the facts gathered in the criminal investigation can be shared with those conducting the administrative investigation; the reverse is not necessarily true.").

[116] See Las Vegas Metropolitan Police Department, "Key Conclusions, Recommendations and Outcomes of a Categorical Use of Force: Officer-Involved Shooting – 1741 E Charleston Boulevard on May 16, 2013" at 2, http://www.lvmpd.com/Portals/0/OIO/OIOReview_130516-0243_1741_E_Charleston.pdf; Michael R. Bromwich, et al,

and capacity of FIT so that it no longer must "farm out" its most serious or potentially egregious criminal investigations of officer misconduct.  Internal mechanisms of critical self-analysis must function well even when the case is difficult, hard, high-profile, or subject to harsh public or media scrutiny.  Indeed, it is the performance in those situations that may most quickly engender greater public trust that SPD can fairly, rigorously, and impartially investigate and review its own.  At the least, SPD should ensure that it has codified, established processes and procedures for making the determination about when and under what circumstances to send a criminal investigation to another agency.

FIT's partnership with the Parties and the Monitor to continue to refine its processes and procedures to ensure "best of practice" force investigations has continued to be encouraging.  To ensure both that the Protocol is memorialized in Department policy and that its procedures and understandings become the habit and reflexive practice of both FIT and OPA, the Monitoring Team, DOJ, and the Department have agreed that FIT should remain within the Department's Bureau of Professional Standards and Compliance for another six months.  At that point, a final determination as to its ultimate location will be made.

# D.  Review, Analysis, Assessment, & Supervision of Force

**Summary**

The quality of the Force Review Board's reviews and critical analysis of force incidents continues to improve overall.  The Board, which includes a broad group of representatives from all precincts and subject matter experts from across the Department, more regularly and critically explores what officers involved in incidents resulting in force might have done differently from a strategic and tactical perspective.  Board members regularly identify issues and develop "lessons learned" about what force incidents can teach the Department and its officers about training, tactics, procedure, and policy. Importantly, the Board now considers officer-involved shootings, which represents significant progress.

Nonetheless, several systemic issues are preventing its progress in becoming the SPD's hub for internal innovation and critical analysis.  Although the FRB does tend to consider whether other tactical or strategic options were available to officers at various junctures during the incident, the Board does not seriously deliberate as to whether a failure to de-escalate constitutes a policy violation for which an officer should be held accountable.  Likewise, the CRT unit is not an active participant in the FRB, and the Board does not normally question whether the officer at the scene had CIT training or whether the crisis intervention policies were followed.  Additionally, the Department as a whole is not benefiting from FRB conversations because no clear procedures or internal accountability have been established to ensure that problems discussed and issues raised are in fact followed up on elsewhere in the Department.  Identified issues or "lessons learned" must both be communicated consistently to officers and be a driver for serious consideration of changes in policy, practice, procedure, and operations at the command and administrative level.

The Monitoring Team has been encouraged by OPA's recent updates and revisions to its Manual.  That Manual codifies a set of investigatory processes and procedures to ensure that OPA investigations are rigorous and fair.  It likewise makes OPA's scheme for adjudicating incidents more comprehensible and fair.

SPD still has a distance to travel to ensure that it deploys a sufficient number of sergeants to provide the level of first-line supervision that the Consent Decree requires, but clear progress has been made. SPD has for the most part eliminated the practice of having officers untrained as supervisors nonetheless serve as long-term "acting" sergeants.  SPD purports to have complied with provisions to ensure that each officer is assigned to a single and consistent sergeant, though historic problems with SPD's human resources have complicated verification.  The Chief and her Chief Operating Officer have put considerable thought and effort into addressing span of control issues, which had languished unacceptably under prior leadership. The Monitor looks forward to the opportunity to review their draft proposals and to work together, along

## 1.    Force Review Board

The Force Review Board ("FRB") reviews Type II and Type III force incidents to determine whether an officer's use of force was consistent with SPD policy and the implications of such force incidents for

training, policy, practice, procedure, supervision, and the like.[117]   The Board "is where SPD must dynamically analyze tactics, training, policies, processes, and procedures so that the organization learns as much as possible from every significant use of force incident—regardless of whether the application of force in any given incident was legally justified."[118]

The FRB's membership consists of one or more sergeant or lieutenant-level representatives from each of the five precincts, Training, Policy, Crisis Intervention Team (which is generally not active at FRB), and the Office of Professional Accountability ("OPA").   Representatives from the Range, Less-Lethal Weapons, SWAT, and Narcotics units also periodically attend.   By policy, the FRB is supposed to be led by an Assistant Chief.   In practice, a presiding Captain leads the Board.   The Captain is also responsible for pre-screening the use of force packets that the Board receives from precincts.[119]

The FRB receives the finished "packet," or investigation of the incident—whether conducted by the involved officer's chain of command (for Type I and some Type II uses of force) or conducted by FIT (for shootings, Type III, and some Type II uses of force).   Their analysis and recommendations rely on the investigation and review below to be thorough and fair—which emphasizes further the importance of the policies and procedures used to conduct investigations of force described above.

As prompted by the following questions from the presiding Captain, the Board analyzes and discusses the incident.   Those discussions are usually structured according to a defined list of questions and prompts, including:

- Does the Board concur with the legal basis for the lawful basis for the contact, and for any seizure as documented in the investigation?
- Does the Board concur that the use of force was necessary, objectively reasonable and proportional based on the documentation provided?
- Does the Board concur with the chain of command's identification of any tactical/decision making issues?
- Does the Board concur with how those issues were dealt with and documented?
- Does the Board identify any tactical/decision making issues that were not identified by the chain of command?
- Does the Board concur with the chain of command's identification of any policy violations?
- Does the Board concur with how those policy violations were addressed and documented?
- Does the Board identify any policy violations that were not identified by the chain of command?

---

[117] Consent Decree ¶ 123.   Specifically, the Consent Decree requires that the Board review all force packets to determine "whether the force used is consistent with law and policy," "whether the investigation is thorough and complete, an whether there are tactical, equipment, or policy considerations that need to be addressed." *Id.*
[118] Third Semiannual Report at 48.
[119] In practice, the Captain may delegate some of that prescreening work to members of the Force Review Unit.

- Does the Board concur with the chain of command that the investigation was thorough and complete?
- Are there any other items that the board should consider in their review of the case?

After each of these prompts had been thoroughly discussed by the Board, the presiding Captain asks the Board to reach formal findings: (1) administrative approval or disapproval of the force applied; (2) administrative approval or disapproval of the officer's tactics and decision-making; (3) administrative approval or disapproval of the supervision, investigation, or reporting of the incident; and (4) other findings, including a finding of a policy violation not related to use of force and a policy, training, or planning failure.[120]

The presiding Captain is responsible for referring any noted deficiencies regarding policy, training, or equipment to the appropriate commanders in the involved officers' chain of command.  Although the Board has the ability to refer any policy violations to OPA, the Board does not make any recommendations regarding discipline.[121]  Currently, the involved officer's Bureau Commander has the final responsibility regarding retraining or recommending discipline to the Chief.

### Assessment of the FRB Process During the Past Six Months

#### Areas of Positive Progress

The Monitoring Team continues to be impressed by the hard work and dedication of FRB members.  Nearly all prepare diligently for FRB's meetings by carefully reviewing the force investigation files, or "packets," which are frequently long and involve complicated fact patterns.  All devote substantial time in discussing the incidents at the Board's weekly meetings.  The Monitor remains appreciative of their continuing involvement in this critical area.

> The quality of the FRB's reviews and critical analysis of force incidents continues to improve overall.

Over the past six months, representatives of the Monitoring Team have continued to attend FRB meetings on a weekly basis.  As a result of this sustained attendance, the Monitoring Team is able to identify that the quality of the Force Review Board's reviews and critical analysis of force incidents continues to improve overall.  The Board more regularly and critically explores what officers involved in incidents resulting in force might have done differently from a strategic and tactical perspective.  Board members regularly identify issues and develop "lessons learned" about what force incidents can teach the Department and its officers about training, tactics, procedure, and policy.

---

[120] See Appendix A for further detail.

[121] The Monitoring Team notes that, in practice over the last six months, it has appeared that Board recommendations are subject to review by the Assistant Chief.  If the Assistant Chief disagrees with the Board's conclusion or referrals, no such referral occurs.  The Monitoring Team strongly disagrees with the practice.

Likewise, Board members appear, at least in a healthy portion of cases, much more comfortable with considering the whole of an incident and an officer's actions leading to the application of a use of force rather than, as not too long ago, solely the moment at which an officer deployed force.  In short, the "quality, rigor, and integrity of the review process" that was improving as of the Third Semiannual Report has continued to improve in the intervening six months.[122]

Some of the Monitor's strongest and most sustained concerns had previously focused on the prior Firearms Review Board.[123]  Previously, a Firearms Review Board considered all officer-involved shootings, while a Use of Force Review Board considered applications of all other types of force.  With the quality of the rigor and integrity of the Firearms Review Board's inquiries lagging well behind, the Monitor urged the Department to consider merging the bodies into a single board that would consider all types of force.

> All reviews of officer-involved shootings over the last six months were conducted before the Force Review Board rather than the former Firearms Review Board, which is encouraging progress.

The Monitoring Team worked closely with the Parties, SPD, and the officer and management unions to develop a process that would be more fair, thorough, critical, and objective.[124]  This collaboration produced important progress: All reviews of officer-involved shootings that have occurred in the last six months were conducted in front of the Force Review Board using the process described in the Third Semiannual Report.[125]

Thus, when this and future reports discuss progress with respect to the newly-christened "Force Review Board," the discussion applies to just one body's consideration of all force, including shootings.  Although SPD's use of a single board to fairly, thoroughly, objectively, and critically analyze all instances in which its officers use force needs to be finally confirmed as the agreed-upon process going forward and codified in policy, the interim folding of the Firearms Review Board into the Force Review Board represents encouraging progress.

Finally, since the last Semiannual Report, FRB members have engaged in a focused training effort consisting of a two-day in-class training (with pre-class assignments) and e-learning.  Assignments in advance of class included the review and analysis of major legal precedent relating to force.  The in-class material focused on Department and Board policy and the analysis of force scenarios.  On the whole, the Monitoring Team was impressed with the training materials and hopes that the training will contribute to the ongoing strengthening of the quality of Board discussion and review.

---

[122] Third Semiannual Report at 49.
[123] *See* Second Semiannual Report at 31 (observing that the Firearms Review Board "lag[ged] unacceptably behind good, let alone best, practices—and far behind any state or performance approaching compliance with the terms of the Settlement Agreement").
[124] Third Semiannual Report at 56.
[125] *Id.* at 56–57.

Areas for Continued Focus

Although FRB continues to make progress, the Monitoring Team does have several areas on which the Board must focus:

### 1. FRB Does Not Yet Systematically Address Whether the Failure to De-Escalate Is a Violation of SPD Policy.

The Board far more regularly discusses whether officers could have availed themselves of different tactics or strategies during the course of incidents that ultimately led to force. As a whole, the Board more critically examines de-escalation options from the first moment of contact to the end of contact. There continue, however, to be some cases that do not benefit from this comprehensive consideration of de-escalation and other strategic alternatives.

Furthermore, regardless of whether the Board has engaged in discussion of de-escalation or strategic alternatives, it is not yet addressing whether the failure to de-escalate—or an officer's affirmative decision to use tactics that appear to Board members to have escalated the situation—constitute a violation of SPD policy. For instance:

> **Example 1:** An officer went "hands on" with a significantly larger subject well before backup arrived. The officer was dragged about 10 feet by the subject. In their review of the incident, the Training Section concluded that, given both the physical stature and demeanor of the subject upon initial contact, no further contact should have been considered until a sufficient number of officers were on the scene. Furthermore, the officer detailed no actions by the suspect that would have made waiting until additional officers arrived unsafe for the officer or the public. Although the FRB sent the incident back to the Chain of Command for follow-up based on some discussion of de-escalation issues, there was not a finding that the officer had acted contrary to policy.
>
> **Example 2:** Officers confronted two men appearing to drink from open beer cans. Video documents that, within moments of approaching the men, one of the officers unsuccessfully attempted to grab one of the men's beer can. The officers subsequently detained and moved the two men over to their squad car. The incident resulted in a serious use of force against two bystander friends who demanded that officers explain their actions. The Board's review of the incident did not address why the contact, initiated on suspicion that suspects were consuming alcohol from an open container, escalated into a significant force incident. The Board did not consider whether the officers' actions constituted a failure to de-escalate that constituted a policy violation.
>
> **Example 3:** An officer, failing to explain the reason for the stop to the subject, initiated an arrest of a longtime alcoholic without having waited for backup. The FRB did not

address if the failure to strategically de-escalate by waiting for backup constituted violation of policy.

It is essential that the FRB regularly consider, with respect to adjudication of incidents, whether the following are grounds for finding a use of force to be out of policy:

**Failures to de-escalate:** "When safe under the totality of the circumstances and time and circumstances permit, officers shall use de-escalation tactics in order to reduce the need for force."[126]

**Failures to use force only when necessary:** "Officers will use physical force only when no reasonably effective alternative appears to exist, and only then to the degree which is reasonable to effect a lawful purpose."[127]

**Any otherwise related failures to act consistently with an SPD "core principle" relating to force:** "Officers should take reasonable care that their actions do not precipitate an unnecessary, unreasonable, or disproportionate use of force, by placing themselves or others in jeopardy, or by not following policy or training."[128]

For SPD's use of force policy to be meaningful and effective in practice, the Board must demonstrate the ability to meaningfully, critically, and thoroughly discuss whether an identified failure to de-escalate constitutes a violation of policy.  In some instances, the Monitoring Team suspects that the Department will identify the provision of additional training or a supervisory counseling session as an appropriate response to less serious violations.  In other, more serious instances where de-escalation clearly should have been used but was not or where an officer's actions affirmatively escalated the situation, the Department may determine that referral to OPA is appropriate.  Regardless, SPD has a distance to travel to ensure that officers are held accountable for the failure to use reasonable and strategic de-escalation tactics or skills when it was safe and feasible to do so.

> The Department has a distance to travel to hold officers accountable for the failure to use reasonable and strategic de-escalation tactics.

The Monitoring Team has very recently learned that the Board will be routinely asked to consider de-escalation in the context of policy, with the "template" that guides and structures discussion being updated to direct the Board to address in all cases whether or not reasonable de-escalation efforts were made in a manner consistent with policy.  If true, this would constitute a significant step toward ensuring

---

[126] Seattle Police Manual 8.100
[127] *Id.* 8.100(1); *see also id.* 8.000(3) ("Officers should take reasonable care that their actions do not precipitate an unnecessary, unreasonable, or disproportionate use of force, by placing themselves or others in jeopardy, or by not following policy or training.").
[128] *Id.* 8.000(3).

that the Department is seriously considering all aspects of its use of force policy.

Additionally, while a very large percentage of force cases involve crisis events, the FRB rarely asks whether officers certified in crisis intervention (so-called "CI-Certified officers") were called and used at the scene in the manner that new policy requires.  The FRB must improve this if the Crisis Intervention is to be effectively implemented.

## 2.  Meaningful and Coordinated Follow-Up to FRB Discussions Is Not Adequate.

The Department as a whole is not benefiting from the increasingly critical and probing analyses of force incidents by the FRB.  FRB sends out information about specific tactical or training-oriented "lessons learned" to officers, but the Department currently lacks a mechanism for following up on the broader policy, training, procedure, business process, and other systemic issues that the FRB flags and discusses in FRB meetings.  Consequently, some FRB members have expressed exasperation that they are starting to discuss the same issues over and over again—with little being done to address them elsewhere in the Department.

> FRB members are expressing exasperation that the same issues are being discussed again and again—with little being done to address them elsewhere in the Department.

For instance, at a recent FRB addressing an officer-involved shooting, FRB members engaged in significant discussions about interagency coordination issues, team tactics training, and canine deployment policy.  Despite the time, energy, and thoughtful analysis involved in these discussions, it was not readily apparent to the Monitor or Board members precisely how or when these important issues would be addressed.  The Monitor will look carefully to see if appropriate follow-up occurs to ensure that policy would explore the canine issues, that training would report back on whether the team issues implicated by the incident would be addressed by upcoming training, or that the Department would initiate conversations with neighboring law enforcement agencies about coordination issues.  Furthermore, it should be noted that merely alerting an area of the Department that an issue needs to be addressed or explored is insufficient—follow-up and accountability for demonstrably addressing the issue must occur.

The concern about a lack of follow-up and internal accountability is not new.[129]  For the FRB to function as SPD's "hub for internal innovation and critical analysis,"[130] SPD has to consider whether the issues raised or problems identified at the Board should set the occasion for changes, reforms, updates, or other action.  FRB deliberation must be the impetus for broader conversations, policy changes, or adjustments to operational practices.

---

[129] Third Semiannual Report at 54.
[130] Id. at 48.

Given the substantial resources that SPD invests in force investigation and review, the Board's discussions should not be the *end* of the story but, rather, the *start* of an operationalized process to identify how SPD can address the problems or issues raised. From the Monitoring Team's perspective, a central responsibility of the Compliance Bureau is to coordinate actively SPD's compliance-related efforts. Accordingly, it must be the entity that demands that other parts of SPD are tasked with follow-up based on FRB discussion—and that such follow-up does not unacceptably languish.

> The Force Review Board's discussions should not be the end of the story but, rather, the start of an operationalized process to identify how SPD can address the problems and issues raised.

The Captain in charge of FRB has, in recent discussions with the Monitoring Team and Parties, pledged to strengthen and formalize the process for following up on issues raised or lessons learned that are forwarded to other parts of the Department for review, decision, or additional information. Thus, the Monitor is optimistic that SPD will soon create, and put in policy, a process that allows FRB's valuable discussions to have long-term value to the organization generally.

### 3. FRB's Discussions At Times Remain Too Narrow.

As noted above, the quality of the Board's reviews, discussion, and analysis of force incidents continues to improve.[131] Still, there remain reviews during which the Board's focus still on the reasonableness of the force still falls too much on the instant when force is applied, with the Board forgetting that its mandate is to consider the incident from the time the involved officer(s) begins to engage in police activity relating to the incident (whether responding to a 9-1-1 call or on-viewing suspicious activity) until the completion of the enforcement activity. At a few junctures over the last six months, some members of the Board appear satisfied to "check the box" on whether the force was objectively reasonable and proportional based upon the circumstances—skipping over the requirement to find that it was also "necessary."[132] Again, the Monitoring Team has identified relatively few instances in which the Board considers whether involved officers had received crisis intervention training, requested that advanced CIT-certified specialists respond to the scene, and whether officers might have more fully availed themselves of the crisis intervention resources that the Department has been emphasizing.

In recent discussions, the head of FRB has pledged to employ a more focused and chronological consideration of a force incident. The Monitoring Team is encouraged that this approach will provide a structure within which Board members will necessarily address all critical issues.

### 4. The Timeliness of Force Reviews Must Still Improve.

In prior reports, we have emphasized that force investigations need to be completed in a timely manner,

---

[131] *Id.*

[132] *See infra* Part I(A)(1), "Use of Force Policy," at 16 (discussing requirement of "necessity").

with any delays documented and justified.[133]  Some developments have been aimed at addressing these issues.

FRB has begun to refuse to accept packets that are deemed inexcusably late—including recently disapproving a packet because the Captain failed to adequately provide an explanation for why his review of the incident packet took weeks to complete.  In another incident, the Captain of a precinct that "lost" a force packet for two months was required to provide a written explanation of how additional procedures were instituted to ensure packets would be timely completed by the chain of command even if a superior officer was out on an extended approved leave.  In aid of precinct commanders and their ability to track the status of use of force reports, the Force Review unit has recently instituted a process of providing regular notice to commanders of packets that are bordering on being untimely.

> Several recent developments promise to alleviate delays in the completion of force reviews.

With the successful implementation of IAPro, all force investigations and reviews are now being managed and completed electronically.  The length of delays and the identification of the cause of delays can be established clearly and quickly. Statistics regarding the timeliness of force reviews derived from IAPro have, as of early November, been part of SPD's SeatStat meetings, which the Monitor likewise hopes will call ongoing attention to ensuring timely force reviews.

All of these developments are welcome and commendable.  It is hoped that they will help the Department to prevent occasions—that have historically, in the Monitoring Team's view, occurred too often—where force packets are completed months after the incidents occurred.

### 5.  Force Reporting Involving Major Demonstrations Will Need Continued Attention.

FRB is sometimes called upon to review incidents where force is applied in the context of crowd containment during protest demonstrations (May Day and recent protests related to the grand-jury decision in Ferguson, Missouri[134]) or exuberant celebrations (spontaneous public gatherings following the Super Bowl victory).  The standard reporting procedures which work reasonably well for "normal" uses of force may not work as effectively when multiple officers and supervisors are thrown into situations where multiple incidents of force occur during chaotic, dynamic, and extended periods of time.  As one Board member observed, "Seattle is the protest capital"—and in response, the Department will need to continue to anticipate similar incidents in development of modifications to the force reporting process.

---

[133] Third Semiannual Report at 50.

[134] Erik Lacitis, et al, "Protestors overtake festivities in Seattle; mall closes early," *Seattle Times* (Nov. 28, 2014), http://seattletimes.com/html/localnews/2025125583_blackfridayprotests1xml.html; Teresa Yuan, "Seattle police prepare for Ferguson grand jury decision," KING5.com (Nov. 19, 2014), http://www.king5.com/story/news/local/seattle/2014/11/19/seattle-police-prepare-for-possible-demonstrations-over-ferguson-grand-jury-decision/19265897/.

Attempting to use the standard system for large-scale crowd incidents had the unfortunate effect of substantially delaying the receipt of May Day force packets before the FRB. Likewise, the FRB has not been asked to provide input into any "After Action Reports" for the last two major events (May Day 2014 and the Super Bowl parade and celebration). Policy questions arose at the FRB level when reviewing the 2014 May Day protests, including whether use of a long baton or a "bike push" into swarming protesters which do not result in injury or a subject falling down, are "reportable uses of force."

> The Monitoring Team and SPD collaborated effectively to establish an interim protocol that balances the need for SPD to preserve order and safety while still tracking and investigating all uses of force during larger-scale demonstrations.

Because effective demonstration management includes consideration for how force can be effectively reported and evaluated, the Monitoring Team and SPD collaborated closely, in advance of the anticipated verdict from the grand jury in Ferguson, Missouri in mid-November, to establish an interim protocol that balances the need for the SPD to preserve order and public safety in fast-moving and emerging situations involving a critical mass of civilians while also rigorously tracking and investigating all uses of force that occur within such mass demonstration environments. In the coming weeks, lessons learned and input from the Parties will be incorporated into a permanent protocol relating to the reporting of force used in the context of major demonstrations.

### Upcoming Assessments of FRB Performance

The Monitoring Team's primary role with respect to the FRB so far has been to promote the kind of rigorous, expansive, and systematic review and assessment of force incidents that the Board must conduct. Earlier in the process—circa a year or so ago—Monitoring Team representatives frequently had to be very engaged in the discussions. They needed to raise an array of issues for consideration and press FRB members to reconsider instinctive responses with respect to certain classes of officer performance and decision-making. In essence, the Monitoring Team provided real-time technical assistance by modeling the type of questioning and discussion in which the Board needed to engage.

> The Monitoring Team's role so far has been to promote in real-time the rigorous review that the FRB must conduct. It will soon conduct broader, systemic analyses of force incidents and force reviews.

The Monitoring Team's participation at the FRB has also allowed the Monitor to identify, from time to time, issues with policy, process, procedure, and training that have warranted follow-up or closer scrutiny. FRB is often the first opportunity that the Department and the Monitor have to see how SPD's new policies and procedures with respect to force—still in their relative infancy—are being implemented. As the Monitor and Parties review the policies governing the application, reporting,

investigation, and review of force, as the Consent Decree requires on a regular basis,[135] a notable part of the discussion will be how to incorporate lessons learned from reviews of force incidents in FRB to further strengthen the quality of Department policy, practice, and procedure.

More recently, the Monitoring Team has been pleased, as noted above, by the Board's ability to proactively and affirmatively raise important issues, topics, and questions. Accordingly, Monitoring Team representatives will wait to participate until the Board's self-generated review of an incident has naturally wound down. This ensures that any issues that were missed or not adequately addressed previously might be more fully considered by the FRB before they vote on the final disposition of a case.

Although the Monitoring Team asks questions and participates in FRB discussions, neither the Monitor nor any of his representatives is a voting member of the Board. Indeed, the Monitoring Team refrains from expressing any view as to whether the underlying force was or was not consistent with SPD policy.

To further test the quality of force review, the Monitor and his team will soon be conducting a systemic, qualitative-quantitative analysis of force incidents that will assess the FRB's review of force investigations. Experts on the Monitoring Team with substantial law enforcement and oversight experience will use rigorous protocols for determining whether the FRB's consideration of force—independent of what the FRB and SPD's internal review processes determined—was thorough, fair, and objective. Although audits or assessments by SPD and others may prove very useful, the Monitoring Team itself will need to conduct the type of qualitative analysis required here for itself.

It may or may not be useful for the Monitor to consider force incidents that occurred in 2014 as part of this systemic analysis. As noted above, not all officers will have received the full complement of the 32 hours of force training required in 2014 until the very end of the year. The Monitoring Team is concerned about the fairness and methodological implications of assessing performance during a time period in which officers were still receiving basic, critical instruction on the new policies. Although, analyzing force incidents, at some juncture, for some part of 2014 may provide a useful, intermediate "snapshot" of where the Department was as the use of force policies were being more fully implemented, it is likely that only an assessment of post-training trends can fully and fairly reflect SPD's progress.

## 2.    Office of Professional Accountability ("OPA")

As the Monitor's Second Semiannual Report described, the Office of Professional Accountability ("OPA") conducts the Department's complaint-driven administrative investigations.[136] "With respect to any OPA investigation or other OPA matter, OPA employees take direction from and answer to only the OPA Director and OPA supervisors, not any other command staff or SPD employees."[137]

---

[135] Consent Decree ¶ 180.
[136] *See* Second Semiannual Report at 39–42.
[137] Dkt. No. 156 at 18.

OPA investigations result from complaints, which can be filed by anyone—a member of the public, SPD personnel, or the OPA Director himself.[138]  The public can file complaints at OPA's new offices, which now reside outside of the Department at 720 Third Avenue; by phone; or via the OPA's website.

SPD personnel have the duty under newly-revised Department policy to report to OPA anything that raises the possibility of officer misconduct.[139]  In this manner, the OPA conducts investigations into incidents referred to it by SPD employees and entities, including but not limited to the Force Review Board, the Force Investigation Team, the Traffic Collision Investigation Squad, and members of the SPD's chain of command.[140]  In July 2014, the Court approved a revised policy that strongly condemns retaliation against anyone who files an OPA complaint.[141]

Thus, OPA has an ongoing, critical role with respect to use of force, as well.  Where it appears that there is a possibility of officer misconduct, an incident will be referred to OPA.  During the past six months, the Monitoring Team has continued to monitor OPA—to identify whether OPA conducts rigorous and objective investigations that inform a transparent and fair review of officer performance.  This process has been ongoing and geared toward providing real-time advice, counsel, and technical assistance where appropriate.

> The quality of OPA investigations is high, with new policies and procedures in place that have appeared to make such investigations even stronger.

As detailed below, the quality of OPA investigations is high, and new policies and procedures are in place that have appeared to make such investigations even stronger.  Accordingly, there will soon be an appropriate juncture for the Monitor to assess systematically the quality and rigor of OPA investigations—and whether they are conforming to the Consent Decree-required OPA Manual update.[142]

## OPA Policies and Procedures

### Revision of the OPA Manual

The Consent Decree required an "update" to its Training and Operations Manual.[143]  However, because

---

[138] *See* Office of Professional Accountability: Internal Operations and Training Manual, Dkt. No. 156 [hereinafter "OPA Manual"] at 15, http://www.seattle.gov/Documents/Departments/OPA/manuals/OPAInternalTrainingandOperationsManualAugust-1-2014.pdf.

[139] *See id.* at 16, 82 ("Employees must report both any conduct that a reasonable officer would believe is misconduct and any allegations of misconduct brought to their attention that fall outside those areas listed in above to a supervisor or directly to OPA.").

[140] *See id.* at 16.

[141] *See id.* at 74–75.

[142] *See* Consent Decree ¶¶ 164, 167.

[143] *Id.* ¶ 167.

no manual in fact had ever been finalized, the OPA Director needed to create one.  Director Murphy drafted and submitted the OPA Policies and Procedures Manual (the "OPA Manual") to the Parties and the Monitor.  The Parties engaged in several productive and collaborative discussions with members of the Community Police Commission ("CPC"), OPA Auditor Judge Anne Levinson (ret.), and the Department.  Director Murphy incorporated comments and feedback into subsequent drafts.

The OPA Manual was then submitted to the Court, with the Monitor recommending approval.  The Court approved it on July 10, 2014, with the manual becoming effective on August 1, 2014.[144]  The OPA Manual is available to the public on the OPA website.

> *Without doubt, the substantially revised OPA Manual makes the process for investigating officer misconduct more transparent than ever before.*

Without doubt, the OPA Manual makes the OPA policies and processes for investigating officer misconduct more transparent than they ever were before.  Director Murphy's tireless work in crafting it is commendable.  We applaud Pierce Murphy and OPA.  The Manual sets forth in detail the previously obscure and complicated policies, procedures, and roles of OPA within the City and the SPD.

It clearly states, for public and internal use, the guiding principles and philosophy of the OPA.  It lays out, in detail, the road that each complaint travels within OPA from beginning to end.  It describes the different mechanisms for making a complaint, the procedures used to investigate it, and the process used to decide whether the actions in question amount to actual misconduct.  It defines and describes the findings and formal outcomes of investigations and explains disciplinary considerations opportunities for appealing findings.  It describes the structure and composition of OPA and outlines the roles of the Auditor and OPA Review Board ("OPARB"), which both provide ongoing oversight of OPA.

The Manual incorporates some important changes to OPA's structure and investigatory procedures.  First, it creates the new position of Civilian Deputy Director of the OPA.   This person provides operational assistance to the Director and OPA in general.  She is responsible for "the development, implementation, administration and evaluation of comprehensive programs related to police accountability for OPA."[145]   The new Civilian Deputy Director has been hired and, based on the Monitor's observations to date, has already helped to strengthen further OPA's operations.

Second, the OPA Manual makes an important revision to the Findings scheme, which is roughly analogous to the final administrative "verdict" or disposition for a given incident.  Previously, OPA could recommend to the Chief findings of "Lawful and Proper," "Unfounded," "Inconclusive," "Sustained," or "Training Referral."  The first three findings—"Lawful and Proper," "Unfounded," and

---

[144] Dkt. No. 161.
[145] OPA Manual, Dkt. No. 156 at 58.

"Inconclusive"—ultimately meant that the underlying complaint was not sustained and no discipline was warranted or given.  A "Sustained" finding meant that the investigation revealed that a preponderance of the evidence showed that the allegations in the complaint existed and that discipline was warranted.  A "Training Referral" finding meant that the complaint was not sustained, but that the officer in question possibly did not follow best practices or Department-trained tactics and would benefit from additional training or re-training.

The "Training Referral" finding could not and did not result in discipline.  It could not be used in making any personnel related decisions.  Many believed, including the DOJ and Monitoring Team, that this finding (previously called "Supervisory Intervention") was utilized too liberally, or as a "catchall" disposition, in order to avoid imposing discipline even though it might have been warranted.

Changes to the OPA's findings scheme helped to streamline what was often a confusing process that could encourage undue "hair splitting."

The Manual eliminates the "Training Referral" finding.  In fact, the Manual provides for only two findings—"Sustained" and "Not Sustained."  There could be a number of reasons for a "Not Sustained" finding, including but not limited to a decision that the allegations are unfounded; that the actions in question were lawful and proper; that the investigation was thorough but nonetheless did not conclusively show that the conduct in question constituted misconduct; or that the conduct did not rise to the level of misconduct but that the involved officer would nonetheless benefit from some sort of training or counseling.[146]

In some instances, the investigation of an incident that is ultimately "Not Sustained" will reveal a deficiency with the Department's training, supervision, or policies.  In such instances:

> OPA will clearly communicate this to the complainant and the public. Such communication should include a clear explanation of the recommended process to be followed to remediate and correct policy, training, supervision, etc.[147]

If the finding is used properly, it should provide the OPA and SPD another means for ensuring continual self-critique and improvement.  The Monitoring Team is encouraged by efforts to streamline what was often a confusing process that could encourage undue "hair splitting" with respect to applying the various findings categories.  The Team will monitor the use of the new findings scheme closely to assess whether it leads to a clearer, more comprehensible system.

Third, the Manual codifies a set of investigatory processes and procedures to ensure that OPA investigations are rigorous and fair.  It provides OPA investigators with specific guidance on gathering evidence, interviewing witnesses, managing investigations, reviewing and evaluating evidence, and

---

[146] *See id.* at 40–44.
[147] *See id.* at 42.

constructing a case summary for review by the OPA chain of command.[148]  It responds to several of the Monitor's recommendations from previous reports.[149]  Although the Consent Decree noted that the Department of Justice's investigation of the SPD in 2011 "found that . . . investigations of police misconduct complaints are generally thorough, well-organized, well-documented, and thoughtful," this appeared to be the result of dedicated investigators choosing to exercise good judgment rather than a systematic adherence to codified rules and procedures.[150]  The Monitor is confident that the Manual can serve as the clear foundation for strong internal investigations, regardless of who is working within OPA or serving in its leadership in the future.

### Disciplinary Process

In a status conference on August 19, Judge Robart re-emphasized the importance of addressing the SPD's discipline process to compliance with the Consent Decree:

> You're not going to get by this court without some review of the disciplinary process.[151]

The Court had previously described issues surrounding the discipline system as a "level-one problem" in which "we need to make some changes" and in which the Court "do[es] intend to be involved . . . going forward."[152]

> The discipline system must be reviewed and strengthened as necessary to ensure that in-depth and meaningful review of misconduct cannot be jettisoned or un-done with minimal or no transparency.

Accordingly, the discipline system must be reviewed and strengthened as necessary to ensure that the institutional resources being invested to ensure uniform reporting of incidents like OPA complaints and uses of force, rigorous and exhaustive investigations of such incidents, and in-depth and meaningful review of those incidents cannot be jettisoned or un-done late in the process and with minimal or no transparency.[153]

That is, the results of internal investigations and reviews should not be able to be unilaterally ignored, contradicted, or discarded by a system that is "byzantine and arcane."[154]  The Seattle community needs to have confidence that the SPD's increasingly high-quality internal investigations and administrative reviews will set the occasion for real consequences when they reveal officer misconduct or performance contrary to policy or training.  It

---

[148] *Id.* at 28–39.
[149] *See* Second Semiannual Report at 42 (recommending expanded use of in-person interviews and decreased use of leading questions in such interviews).
[150] Consent Decree ¶ 164.
[151] 8/19/14 Status Conference Transcript, at 31.
[152] 4/3/14 Status Conference Transcript, at 53, 54.
[153] *See* Steve Miletich, "Reversal of discipline puts interim SPD chief under spotlight," *Seattle Times* (Feb. 20, 2014), http://seattletimes.com/html/localnews/2022957736_spddisciplinexml.html?syndication=rss.
[154] Third Semiannual Report at 6.

simply cannot be the case all of the work to comply with the Consent Decree can be undone because of a broken discipline system.

The Monitoring Team, Court, and Seattle community await a serious and comprehensive grappling with how to align the discipline system with the goals of transparency, fairness, accountability, and integrity—goals that are being sought in, and promoted by, numerous of the Consent Decree's mechanisms, tools, and provisions.  The time for beginning that process is now.

> The time for grappling with how to align the discipline system with the goals of transparency, fairness, accountability, and integrity is now.

### Potential Changes in the Accountability Structure

Over the past six months, the OPA Director and Auditor worked actively with the CPC as it considered the OPA and its functions in terms of the wider system of accountability.  The CPC issued recommendations about the OPA structure generally on April 30.[155]  As the Third Semiannual Report noted, the Monitoring Team observed a number of the CPC Accountability Group meetings and was quite pleased to see the proactive collaboration between the Auditor, the OPA Director, and the CPC members.

As a result of this collaboration, the OPA has—either through the OPA Manual or through less formal business practices—implemented many of the CPC's recommendations that did not require action by the City Council.  For instance, both the new findings scheme and creation of the Civilian Deputy Director position discussed above were discussed by the CPC prior to inclusion in the OPA Manual.

Other of the CPC's recommendations require legislative action.  On November 12, 2014, Mayor Murray announced a package of accountability system reforms consistent with many of those recommendations.[156]  The Monitoring Team agrees with the Mayor that Seattle's police accountability system had "over the years become complicated and confusing to the public,"[157] and it looks forward to legislative developments in this area in the near future.

### Recent Developments

### In-Car Video ("ICV") Policy & OPA

In recent months, increased national and local attention has been paid to the use of in-car and body-worn

---

[155] *Id.* at 73.
[156] Press Release, "Murray and Community Leaders Announce Police Accountability Reforms," (Nov. 12, 2014), http://murray.seattle.gov/murray-and-community-leaders-announce-police-accountability-reforms/#sthash.e2WF4PUt.dpbs.
[157] *Id.*

video by police officers.[158]  The Monitoring Team has consistently stressed the importance of the recordings to generate and sustain community trust and confidence.  Especially since the Rodney King incident was captured on video, the use of in-car video and body cameras by police has widely proliferated.  In many instances, it has been used to resolve conflicts in testimony and create a credible record of what transpired in confrontations with the police.  It has led to deep drops in use of force and personnel complaints.[159]

> Too often, crucial events are not captured by in-car video—sometimes by multiple police cars at the same scene.

Despite the stressed importance of ICV and the increased attention that the topic has received nationally, the FRB and other force reviewers too often lack a video record of an incident to consider when reviewing a force incident.  Too often, crucial events are not captured—sometimes by multiple police cars at the same scene.

SPD, and the Monitor, previously had to invest substantial attention, time, and resources to address technical issues with the ICV equipment.[160]  The Monitor's last report noted that, "[b]ecause it ha[d] now certified that it has remedied the technical issues with ICV," SPD could "start holding officers accountable, where appropriate, for failures to comply with ICV policies."[161]  ICV and body cameras chill unnecessary or excessive force and give management valuable evidence of what occurred in a given confrontation.  Consequently, the failure to record ICV and body cameras for other than technical reasons frustrates those ends.  For video systems to enhance accountability, it must obviously capture video.  There must be consequences to officers and supervisors when a non-technical failure occurs.

---

[158] *See, e.g.*, Kendall Breitman, "White House Backs Body Cameras for Cops," Politico.com (Sept. 16, 2014), http://www.politico.com/story/2014/09/police-body-cameras-white-house-support-110996.html (summarizing White House statement that it "support[s] the use of video technology . . . , both body-worn and vehicular, and recognize[s] the numerous benefits to making cameras available to law enforcement officers"); Christopher Mims, "What Happens When Police Officers Wear Body Cameras" *Wall Street Journal* (Aug. 18, 2014), http://online.wsj.com/articles/what-happens-when-police-officers-wear-body-cameras-1408320244 (noting a 60% decrease in use of force and 88% drop in citizen complaints against police in Rialto, California during the first year after cameras were introduced); Margaret Harding, "Pittsburgh Police Officers Start Wearing Video Cameras," *Pittsburgh Tribune* (Oct. 20, 2014), http://triblive.com/news/allegheny/6969202-74/cameras-officers-police#axzz3GslZltjM (noting that Pittsburgh "join[ed] a growing number of departments nationwide that require officers to wear cameras" as of September 2014); Leigh Martinez, "Modesto Police Say Body Cameras Protect Officers, Ensure Accountability," CBS13.com, http://sacramento.cbslocal.com/2014/08/15/modesto-police-say-body-cameras-protect-officers-ensure-accountability/ (reporting that video from body-worn cameras often ensures against civilian cell phone videos of incidents being "taken out of context"); Community Oriented Policing Services, U.S. Dept. of Justice, "Implementing a Body-Worn Camera Program: Recommendations and Lessons Learned" vii (2014) ("Body-worn cameras, which an increasing number of law enforcement agencies are adopting, represent one new form of technology that is significantly affecting the field of policing . . . .").

[159] In Rialto, California, during a 12-month test period, there was a 50 percent reduction in use of force by officers using body cameras as contrasted to officers not using the cameras.  The numbers of complaints lodged against officers using the cameras similarly dropped to only one instance in the test year.  See Tony Farrar, "Self-Awareness to Being Watched and Socially-Desirable Behavior: A Field Experiment on the Effect of Body-Worn Cameras on Police Use-Of-Force," Police Foundation (Mar. 2013), http://www.policefoundation.org/content/body-worn-camera.

[160] *See* Third Semiannual Report at 60–65; Second Semiannual Report at 13–19.

[161] Third Semiannual Report at 63.

The Monitoring Team is of the view that ICV and body camera audio and video are necessary and vital evidentiary records that must be available to resolve controversies and increase community trust.  The Consent Decree, which was necessitated by the identification of a pattern or practice of excessive force, cannot be fully and effectively implemented if officers and supervisors are not held strictly accountable for each instance of noncompliance.  Accordingly, the Monitoring Team recommends formal progressive discipline, commencing with a written reprimand, for non-technical failure to record audio and video evidence.

> ICV and body camera audio and video are necessary and vital evidentiary records that must be available to resolve controversies and increase community trust.

The Monitor and the Director of OPA share an understanding that, for violations of ICV policy not related to any technological or technical malfunctioning of ICV technology, there should be a presumption of formal discipline without binding the Director from recommending less than disciplinary consequences in given cases with strong justification.  The Director will keep the Monitoring Team informed of actions taken for failure to comply with the ICV policy.  Additionally, there will be audits to assess whether everything that should be recorded is, in fact, being recorded.

These issues related to ICV are especially important as the SPD begins the use of body cameras.  SPD appears poised to finally implement its long-delayed pilot body camera pilot project, using 12 body cameras across a 4-month period.[162]  The Monitoring Team has been reviewing the policy governing the pilot project but notes concerns with the relatively small number of cameras to be piloted.[163]

In sum, there needs to be more progress within the SPD itself toward ensuring that SPD and its officers uniformly take advantage of ICV and body cameras—forms of technology that help "to improve evidence collection, to strengthen officer performance and accountability, to enhance agency transparency, to document encounters . . . , and to investigate and resolve complaints."[164]

### Measures to Strengthen the Independence of OPA

OPA's offices have moved to a new location.  Although the former OPA office was in a building separate

---

[162] *See* Eric M. Johnson, "Seattle police body cameras plan revived by deal with anonymous programmer," Reuters (Nov. 21, 2014), http://www.reuters.com/article/2014/11/22/us-usa-washington-police-idUSKCN0J601Q20141122; *see also* Jennifer Sullivan, "State AG says police don't need consent to record with body cams," *Seattle Times* (Nov. 24, 2014), http://blogs.seattletimes.com/today/2014/11/ag-says-police-dont-need-consent-to-record-with-body-cams/.

[163] *See* Brendan Smialowski, AP (Oct. 1, 2014), available at http://washington.cbslocal.com/2014/10/01/d-c-police-begin-wearing-body-cameras/.  The D.C. Metropolitan Police's body camera pilot program will have 160 officers, or approximately 4.2 percent of force, outfitted with cameras.  The SPD's pilot program will have just 12 officers, or approximately .009% of the force, outfitted with cameras at any one time.  The Monitoring Team has commented on deficiencies elsewhere in the methodological rigor of SPD's pilot projects.  *See* Third Semiannual Report at 47 & n.67.

[164] Community Oriented Policing Services, U.S. Dept. of Justice, "Implementing a Body-Worn Camera Program: Recommendations and Lessons Learned" vii (2014).

from the SPD headquarters, the OPA Director, the Civilian Deputy Director and OPA's Administrative Assistant had offices in the SPD headquarters—in part because the OPA office was too small to house all its employees.  As of October 13, 2014, all OPA employees, including the Director, Civilian Deputy Director, and the Administrative Assistant, are in the same office.  The new office, located in the Pacific Building, 720 Third Avenue, is a further distance away from SPD Headquarters.

Additionally, OPA has adopted a new logo that bears no resemblance to or affiliation with the SPD. OPA's website likewise is no longer part of SPD's website; instead, OPA has its own City-based website. Moving to definitively independent offices and taking care to ensure differentiation from SPD is important to OPA being consistently perceived as independent.  The Monitor continues to appreciate Director Murphy's efforts to emphasize, to SPD personnel and community members alike, OPA's commitment to:

> [A]lways acting in a fair and impartial manner, no matter how difficult the issue; conducting investigations, audits, evaluations and reviews with thoroughness, an open and questioning mind, integrity, objectivity and fairness, and in a timely manner; rigorously testing the accuracy and reliability of information from all sources[,] and presenting the facts and findings without regard to personal beliefs or concern for personal, professional or political consequences.[165]

## 3.    Supervision

In 2011, DOJ found that "SPD has tacitly allowed a pattern or practice of excessive use of force by failing to provide adequate supervision of force."[166]  In 2011, DOJ recommended that:

> SPD should ensure that supervisors perform the following actions in response to any use of force incident: . . . (b) conduct a thorough analysis of the incident based on all obtainable physical evidence, adequately descriptive use of force reports, witness statements, and independent investigation; (c) resolve any discrepancies in use of force reports or witness accounts and explain and document all injuries; and (d) complete a summary analysis regarding the reasonableness, proportionality, and legality of the force used . . . . Every level of supervision thereafter should be held accountable for the quality of the first-line supervisor's force investigation.[167]

In the process outlined above, an involved officer's chain of command—his or her sergeant, lieutenant, and captain—plays a critical role in the screening, investigation, and review of force incidents.  From the perspectives of the Monitoring Team and DOJ, full implementation of the Consent Decree's supervision provisions requires that SPD commit adequate personnel to meet this updated conception of internal accountability and to properly implement the various requirements of the Consent Decree.

---

[165] OPA Manual, Dkt. No. 156 at 9.
[166] 2011 Findings Letter at 17.
[167] *Id.* at 37.

## Supervision Generally

Various of the Consent Decree's provisions provide that SPD ensure that its system of supervision allow for strong and consistent oversight of employee performance and of important incidents or events such as use of force incidents and *Terry* stops.[168]  In the past, patrol sergeants were not necessarily working the same shift as the officers they were supposed to supervise.  Likewise, in the past, including the recent past, precinct captains and lieutenants did not analyze force or force patterns—on the grounds that the job was the responsibility of people at headquarters.  They were unable to say which of their officers use more force than others.  The Consent Decree is supposed to change that.

> The principal burden of assuring that force is not excessive must now lie with sergeants.

The principal burden of assuring that force is not excessive will now lie with the patrol or specialized–unit sergeant.  "It is an established principle in policing that first-line supervisors—sergeants—play a critical role in directing and controlling the behavior of officers in police-citizen interactions."[169]  Accordingly, the Sergeant will be held accountable for every use of force employed by the officers he or she supervises.  That sergeant will be held accountable for ensuring that all force is properly reported in a timely fashion and analyzed thoroughly and properly within strict time guidelines.  Sergeants will be responsible for ensuring that officers activate their ICVs in accordance with SPD policy.  Sergeants will be providing guidance in the field and otherwise to officers on when and how to use force.  Sergeants will assess whether similarly situated officers under their command are using more force than their peers and, if so, what steps have been taken to deal with the issue.  Sergeants will give objective and complete performance evaluations based upon facts and data.

The sergeant will ascertain whether each officer is doing his or her fair share of proactive policing and investigations, responding to calls, handling calls efficiently, and making a reasonable number of prosecutable arrests. Sergeants will keep themselves apprised of any arrest that cannot be prosecuted because of officer misconduct, suppression of evidence, or lack of truthfulness.  Likewise, the sergeants will keep themselves informed and aware of all litigation arising from the activities of officers under their

---

[168] *See, e.g.,* Consent Decree ¶ 17 ("[T]he City commits to ensuring that its police department's policies, procedures, training, and supervision are based on recognized standards of the policing profession"); ¶ 97 ("Each supervisors reviewing [a use of force] incident is responsible for ensuring a full and accurate account of the incident . . . ."); ¶ 129 (setting forth training requirements for supervisors of all levels); ¶¶ 100–118 (detailing responsibilities of supervisors in force investigations and reviews); ¶ 144 (requiring ongoing supervisory review of Terry stops); ¶ 150 ("SPD leadership and supervising officers will continue to reinforce to subordinates that discriminatory policing is an unacceptable tactic, and officers who engage in discriminatory policing will be subject to discipline."); ¶ 156 ("Precinct commanders and watch lieutenants will continue to closely and effectively supervise the first-line supervisors and officers under their command, particularly whether commanders and supervisors identify and effectively respond to uses of force."); ¶ 160 ("SPD will collect and maintain information related to supervisor, precinct, squad, and unit trends . . . ."); ¶ 162 ("Supervisors should periodically review EIS activity of officers in their chain of command.").

[169] Samuel Walker, "Police Accountability: Current Issues and Research Needs," National Institute of Justice (2007), available at http://www.ncjrs.gov/pdffiles1/nij/grants/218583.pdf, at 12; *see also* Third Semiannual Report at 66 n. 89 (surveying additional authority with respect to the primary importance of high-quality first-line supervision).

command and take appropriate steps.

Sergeants will, by the end of officers' shifts, become aware of, and review data on, traffic and pedestrian stops and will be accountable for detecting any bias or disparate impact or allegation of the same. Sergeants will investigate and resolve any claims of bias or disparate impact in a fair, objective, and thorough manner.

Lieutenants will be held responsible for the performance of sergeants under their command. Lieutenants will actively manage and have adequate data to assess whether sergeants are carrying out their responsibilities. Lieutenants will actively supervise sergeants and assess their skill in managing force, instructing their officers, giving fair and accurate performance reviews of their officers, meeting deadlines, producing quality reviews of force, and reviewing ICVs and ascertaining why footage that should be recorded was not.

Lieutenants will actively review and critique the sergeant's findings and analysis of each use of force. Likewise, lieutenants will actively review and critique how sergeants investigate and resolve any claims of bias or disparate impact.

In their performance reviews of sergeants under their span of control, lieutenants should specifically state, in narrative form, whether the sergeant is appropriately managing the risk of police misconduct, with particular emphasis on excessive force and biased policing.

Captains, in turn, will evaluate whether the lieutenants are properly carrying out their responsibilities with respect to management of sergeants and the prevention of unconstitutional policing and other police misconduct. Moreover, the captain is responsible for any failures of management or leadership among those in his or her command. The captain has the responsibility to know the precinct and the data bearing upon officer performance; the effectiveness of supervision; the use of force statistics; the names of officers using more force than others; the number of civilian complaints filed and their allegations and how they were resolved; and the effectiveness of the precinct's strategies to eliminate excessive force and biased policing. Captains should be regularly quizzed on the foregoing at SeaStat—the Department's bi-weekly, data-driven crime and accountability meetings—and praised for good performance or held strictly to account for failures. In this fashion, the Consent Decree and its various provisions set forth how and by whom police officers will be supervised.

> All supervisors must be held responsible for any failures of management or leadership among those in his or her command.

### Specific Obligations

In addition to requiring that supervision with respect to force incidents, *Terry* stops, and officer

performance generally be consistent and strong, the Consent Decree specifically requires that the Department have a sufficient number of first-line supervisors who can provide consistent and ongoing supervision in the manner described above. One provision relates to ensuring so-called "unity of command" in which officers in the field are "assigned to a single, consistent, clearly identified first-line supervisor," with those supervisors "assigned to work the same days and hours as the officers they are assigned to supervise."[170]

The City and SPD represented to the Court on June 30, 2014 that "the Department is in compliance" with this provision because "every patrol officer is currently assigned to a single, consistent, clearly-identified sergeant."[171] The Monitor hopes that this is true. However, Chief O'Toole and her command staff have expressed ongoing frustration, well after June 30, with the inability to get a full and accurate accounting of precisely who was working for whom throughout the Department. They are not alone. The Monitoring Team has previously raised the issue of the basic underlying accuracy of SPD's human resources information.[172] Likewise, in their December 2013 report about SPD's technology infrastructure, Pricewaterhouse Coopers concluded that SPD's personnel data "is not kept in sync nor is it checked for accuracy," making human resources data "inaccurate and not kept up to date."[173]

> *For too long, it was unclear whether SPD knew precisely who is working for whom within the Department.*

The Chief has pledged that getting a clear picture of where everyone in the organization is actually working is a priority. SPD has conducted informal internal audits to get an accounting of precisely who was working for whom throughout the Department. For a more formal staffing assessment, SPD will soon be issuing an RFP for a comprehensive staffing analysis. Accordingly, the Monitoring Team is providing her team a full opportunity to address the issue before independently assessing whether the City is in compliance in the manner reported on June 30.

Another provision relates to ensuring that any personnel who will be assigned as a long-term "acting sergeant" receive specific training within 60 days on the responsibilities and requirements of such a supervisor position.[174] On this front, significant and commendable progress has been made. Chief O'Toole, going beyond the bare requirements of the Consent Decree, determined that the Department would effectively eliminate the use of untrained "acting" sergeants by providing the first 25 officers awaiting promotion on the sergeant's list with sergeant's training. When a short-term or fill-in sergeant is required, only individuals who have received sergeant's training may now work as an "acting" sergeant.

---

[170] Consent Decree ¶ 154.
[171] Dkt. No. 157 at 4.
[172] Third Semiannual Report at A-2.
[173] PricewaterhouseCoopers, "Seattle Police Department: Information Systems, Processes, Operations and Technologies—Current State & Maturity Analysis" (Dec. 2013), *available at* http://www.seattle.gov/spd/compliance/docs/BI_Reports/SPD_BI_Gap_Analysis_FINAL.pdf, at 34; *see* Third Semiannual Report at A-2–3.
[174] Consent Decree ¶ 155.

The Monitor applauds the Chief and SPD for proactively eliminating what had previously been an obstacle to consistent and effective supervision.

As the Third Semiannual Report described[175], the requirements addressing unity of command and acting sergeants "were set forth in the context of . . . [the] more general requirement that SPD employ a sufficient number of high-quality, trained first-line supervisors."[176]  Specifically, the Consent Decree requires the City to provide, and SPD to employ, "an adequate number of field/first-line supervisors (typically sergeants" to ensure that the provisions of the Consent Decree are implemented.[177]  That is, there must be a sufficient number of supervisors to, among other core responsibilities:

- "[R]espond to the scene of uses of force . . . ";
- "[I]nvestigate each use of force (except those investigated by FIT) in the manner required by [the Consent Decree]";
- "[E]nsure documentation of uses of force . . . "; and
- "[P]rovide supervision and direction as needed to officers employing force."[178]

In our last Semiannual Report, we concluded that:

[SPD] has still failed to produce a satisfactory and defensible work plan for the complex work of coming into compliance with the Consent Decree's provision with respect to 'span of control' ensuring that SPD deploy an adequate number of first line supervisors to effectuate supervisory duties in a manner consistent with best practice and the provisions of the Consent Decree.  The necessary work in this area includes such foundational concerns as where precinct boundaries should be drawn and whether funding is available for any necessary new sergeants.[179]

During the last six months, the Chief of Police and her Chief Operating Officer have put considerable thought and effort into addressing span of control issues.  SPD has pledged that it is working diligently toward reaching the anticipated January 15, 2015 milestone for compliance with the span of control provision of the Consent Decree.[180]  In addition to its internal process, a DOJ expert in the area will be assisting SPD in how to assess the necessary number of sergeants now and how to estimate how needs may change as additional responsibilities, including those related to reviewing *Terry* stops and routinely reviewing officer performance data, are introduced.  The Monitor is confident that issues that the span of control issue is—finally—in the appropriate hands and that substantial progress will be able to be featured in the next semiannual report.

---

[175] Third Semiannual Report at 66–68.
[176] *Id.* at 67.
[177] Consent Decree ¶ 153.
[178] *Id.*
[179] Third Semiannual Report at 66.
[180] Dkt. No. 157 at 4.

The Consent Decree further requires that "[p]recinct commanders and watch lieutenants . . . closely and effectively supervise the first-line supervisors and officers under their command, particularly" with respect to the identification and response to uses of force. [181]   In the coming months, the Monitoring Team will be interested in systemic assessments of lieutenants and commanders with respect to their supervision of first-line supervisors.   The Monitor expects that SPD will hold supervisors accountable for the performance of their officers and for the timely completion of objective and thorough investigations and reviews of force incidents.

> The Monitor expects that SPD will hold supervisors accountable for the performance of their officers and the timely completion of force investigations and reviews.

The supervision provisions and issues outlined above have implications beyond merely the use of force area, which this report addresses elsewhere.[182]  Indeed, the Consent Decree contains specific provisions relating to supervision in the context of discriminatory policing[183] concerns and the successful use of the Early Intervention System.[184]

---

[181] Consent Decree ¶ 156.
[182] *See infra* Part III(D), "Discriminatory Policing—Supervision," at 96.
[183] Consent Decree ¶¶ 150–152.
[184] Consent Decree ¶¶ 157–163.

## II.  STRUCTURES OF CRITICAL SELF-ANALYSIS

The 2011 DOJ investigation concluded that the SPD lacked "backstop[s] for the failures of the direct supervisory review process" and mechanisms for affirmatively and proactively addressing trends with respect to force and officer performance.[185]

Thus, in addition to eliminating past deficiencies with respect to policies and procedures, the Consent Decree requires that SPD develop and continually strengthen what we call "structures of critical self-analysis": "those entities, groups, and organizations that will help SPD to evaluate itself critically, to develop and refine policies and training, and to solve problems long after the Consent Decree dissolves."[186]  They are the critical processes, procedures, systems, and platforms that will "make sure the changes we make are enduring changes and hardbaked."[187]

FRB, the FIT team, and OPA—all entities beyond the chain of command expressly charged with analyzing force incidents critically and continually evaluating what the Department can learn from critical incidents—serve the need function with respect to force.  However, several additional systems and structures of self-analysis allow SPD not merely to learn after an incident has occurred or to innovate because of problems or issues that have already surfaced—but, instead, to proactively and affirmatively identify performance trends, how officers are interacting with subjects in the field, and how resources and training can be best delivered to respond to the Department's actual needs.  These structures will assist the Department to self-manage the risk of unconstitutional policing *both* with respect to the underlying issues of force and discriminatory policing.

The mechanisms covered here—the Data Analytics Platform, the Early Intervention System, and the Crisis Intervention Committee—are the structures that will ensure that the Department "remain[s] changed for the better long after the monitoring period ends."[188]

---

[185] 2011 Findings Letter at 5.
[186] Third Semiannual Report at 16.
[187] 4/3/14 Status Conference Transcript at 34 (quoting former U.S. Attorney Jenny Durkan); *accord id.* at 25 (comments of Assistant U.S. Attorney noting that the point of "these mechanisms of self-correction . . . is to ensure that we are satisfying the requirements of constitutional policing as laid out in the Consent Decree.").
[188] Third Semiannual Report at 7.

# A.  Data Analytics Platform ("DAP")

**Summary**

In recent months SPD has come to an even greater realization of how IAPro's built-in constraints will limit its ability to use aggregated data about officer performance in the way that it must.  This has underscored the need in Seattle for a more robust and comprehensive solution known as a Data Analytics Platform ("DAP"). The Monitoring Team is pleased that Chief O'Toole and the Parties have committed to the swift implementation of the DAP, on which SPD will rely to become the Department it wants to become and to fully effectuate the objectives and aims of the Consent Decree and the specific policies and procedures that it is implementing in fulfillment of the Decree.

After a long period of what can be charitably described as muddled management of the DAP project, the Department has recently made significant strides toward releasing a Request For Proposal ("RFP") to potential vendors and developers of a DAP.  SPD has engaged external consultants to review closely the SPD's source systems and data, identifying gaps that need to be addressed to ensure that any and all inputs to the DAP will provide sound and reliable data.  Consequently, the DAP ship has now definitively set sail, with the soon-to-be-issued, high-quality RFP representing significant progress.

The 2011 Department of Justice investigation that resulted in the Consent Decree identified deficiencies in the reporting, investigation, and review of use of force incidents.  Among other things, it found:

- Many uses of force were either unreported or inadequately reported.[189]
- Inadequate supervisory investigation of force, with supervisor summaries often incomplete and guidance to supervisors on how to investigate force incidents lacking.[190]
- A pattern of "inadequate secondary review of use of force incidents," indicating that "[t]he supervisory technique of collecting data and examining the activity of particularly active officers" should be used in the area of stops and "in other aspects of policing, including, but not limited to pedestrian stops."[191]

The 2011 investigation also found fundamental problems with SPD's prior Early Intervention System—the Department's means of affirmatively and proactively identifying employees with problematic performance trends in order to effectuate an intervention that might lead to positive changes.  At least two issues relate to deficiencies in the Department's mechanisms for tracking and analyzing information about officer performance:

---

[189] 2011 Findings Letter at 16; *see id.* at 15-16.

[190] *Id.* at 17-18.

[191] *Id.* at 19.

> First, the EIS thresholds are far too high . . . . Second, the interventions that follow an EIS trigger happen far too long after the triggering incident, which diminishes the effectiveness of the intervention and the ability to remedy an officer's behavior.[192]

Part I of this Report described the SPD's notable progress in getting IAPro, the interim database system, up and running to ameliorate issues with data on force and other areas. This section describes how the SPD in recent months has come to a greater realization of the limits of IAPro and the Department's need to implement a more robust and comprehensive solution known as a Data Analytics Platform ("DAP"). It summarizes the encouraging progress that the Department has made toward securing an external vendor to develop a DAP as SPD's long-term officer performance management system.

## SPD's Dual-Track Data System Development

When it comes to implementing new computer systems and platforms that will allow SPD to conduct data-driven officer performance and risk management, SPD has been proceeding along two parallel tracks since at least September 2013.

The first track remains the implementation of IAPro, an "off-the-shelf" software solution used by many, and often smaller, law enforcement agencies. As good as IAPro may be, it is nonetheless limited, especially for a department of SPD's size and historic problems with capturing and using data. A disadvantage of any "off-the-shelf" program like IAPro is that the user cannot customize the platform. Just as users of Microsoft's Office or Apple's iOS know, the typical user cannot easily change components of the software or add functionality.

> As good as IAPro may be, its built-in limits and constraints mean that, in Seattle, the platform cannot provide all of the information on officer performance that SPD and its supervisors need.

In the case of IAPro, its built-in limits and constraints mean that, in Seattle, the platform cannot provide all of the information on officer performance and risk management that the Department and supervisors will need to be able to efficiently and effectively assess aggregated officer data. First, IAPro alone will not, in its current form, allow SPD to fully implement its EIS policy. IAPro's early intervention module permits agencies to set particular thresholds of officer behavior to alert a supervisor to evaluate the officer's recent performance trends. SPD's early intervention policy sets thresholds for use of force according to defined categories of force seriousness or severity (Type I, Type II, Type III, including officer-involved shootings). However, IAPro can currently only automate thresholds for use of force according to the force instrument used (baton, open hand strike, Taser, or the like). Accordingly, SPD cannot fully implement its early intervention policy using IAPro alone. Instead, SPD will have to supplement parallel, integrated business practices and policies to manually "trigger" officers.

---

[192] *Id.* at 22–23.

The inability to easily customize IAPro has so far prevented SPD from collecting information about contacts with individuals in behavioral crisis or during *Terry* stops.  Although this information may be able to be collected by other systems,[193] the data collected cannot be fully integrated into IAPro.  Similarly, the review and assessment process required by the Early Intervention System will need to be effectuated via a paper-based, manual process rather than in an electronic environment.  Thus, although investigation and review of some critical incidents can occur in IAPro, a comprehensive assessment of officer performance will still require review of a number of different data systems—systems in which, according to the Department's own consultants, critical data is often incomplete or unavailable, and not subject to sound data governance and management practices.[194]

Rather than looking to simplify and centralize systems that collect important information on what officers do in the field, SPD has a history of developing new IT solutions, of variable quality, to address narrow objectives or sub-issues.  One such system that the Monitor has recently evaluated is the Performance Appraisal System ("PAS").  Currently, PAS is an extremely rudimentary database portal that logs lower-level or informal performance assessments and interventions.  For instance, if the Force Review Board concludes that an officer may have not appropriately followed a procedure for calling a supervisor to the scene of a given incident but the officer arrived at the scene in any event, the Board might recommend that the officer's chain of command counsel the officer about the appropriate policy.  The fact of this counseling would be logged in the PAS.

The value of SPD's DAP will be in its ability to streamline the process for supervisors and command staff of knowing what and how their officers are doing.

Until recently, PAS did not preserve information for the long-term in an easily searchable manner.  At the Monitor's urging, the Department made some modifications and upgrades to PAS that allow data to be far more easily searched, aggregated, and retained.  Although these changes appear to be worthwhile and commendable, supervisors will still need to separately query the PAS system along with IAPro and other systems (such as whatever mechanism might initially capture information on stops and detentions) to get a fair and comprehensive view of officer performance.  The value of SPD's DAP will be in its ability to streamline the process for supervisors and command staff of knowing what and how their officers are doing.

Even more problematically, IAPro's internal data querying and reporting features do not allow for detailed and customized data analysis.  The software's built-in reporting capabilities are limited and at times counterintuitive.  Indeed, the company that develops and markets IAPro acknowledges that it is making

---

[193] *See infra* Part III(C), "Discriminatory Policing—Data," at 92.

[194] PricewaterhouseCoopers, "Seattle Police Department: Proposed Development of a Business Intelligence System—Executive Summary" (Dec. 6, 2013), *available at* http://www.seattle.gov/police/compliance/docs/BI_Reports/SPD_BI_ExecSummary_FINAL.pdf.

ongoing improvements to a built-in "customized" reporting feature that can—through no fault of the user and without any underlying problems in system configuration or data entry—spit out information that is garbled, clearly erroneous, or nonsensical.  Thus, to address core Consent Decree concerns before the DAP is up and running, SPD will be accessing data from the "back end" of IAPro.  This will require the use of a separate software platform to extract, manipulate, and report data—a complicated, expensive, and time-intensive process that is ill-suited for managers who are not data analysts but want a clear view of officer performance.

The long-term limitations and constraints of IAPro were familiar to SPD, the Parties, and the Monitoring Team when the software was proposed as the interim or stopgap data solution in mid-2013.   As noted elsewhere in this report, the implementation of IAPro as a stopgap system represents a significant milestone.

> When in place, DAP promises to capture, aggregate, and analyze data from high-quality, underlying database sources maintained according to sound management practices.

Nonetheless, the Department has proceeded simultaneously along a second path: the development of DAP.  When in place, it promises to serve as the hub of the Department's data-driven self-management.  It will capture, aggregate, and analyze data from high-quality, underlying database sources that are maintained according to sound data management and governance practices. The Monitor's Third Semiannual Report noted the "critical functions" for SPD's DAP, including incident reporting and performance data tracking, incident review, management of administrative investigations, the capacity to fully implement a robust early intervention policy, and the capacity of both supervisors and the Department generally to "conduct real-time, in-depth, and proactive analyses of officer and departmental trends."

Encouragingly, Chief O'Toole and the Department have signaled that, in addition to assisting it in meeting the terms of the Consent Decree, the Department sees the development of a DAP "as an opportunity to acquire a system which will also be extended to as many data systems as possible within the department in an effort to improve its ability to manage all its activities and staff."[195]  Thus, the Department intends, on its own initiative, to integrate many other functions, capabilities, and types of data not immediately connected to the Consent Decree once the basic system is up and running—turning the DAP into the central clearinghouse of data for how the Department and its personnel are performing.

## Current Status of the Comprehensive Data Analytics Platform ("DAP")

After a long period of what can be charitably described as muddled management of the DAP project, the Department has, under Chief O'Toole's clear leadership, made significant strides toward releasing a

---

[195] Mike Wagers et al, SPD Data Analytics Platform Project Charter [*hereinafter* "DAP Project Charter"], at 4 (Oct. 20, 2014).

Request For Proposal ("RFP") to potential vendors and developers of a DAP.   Under the daily management of Virginia Gleason and consultant Marty Chakoian, and informed significantly by LAPD Chief Technology Officer Maggie Goodrich, progress has been quick, sustained, and organized.   The Department is currently on track to release such an RFP—a major milestone—in early 2015.

The new project leadership quickly reversed the misguided approach that SPD had previously been embracing to implement the project—namely, the "fire first, aim later" approach that would have hastily implemented a data platform without worrying about the quality and integrity of underlying data, which the Monitor strongly criticized in the Third Semiannual report.[196]  Instead, SPD has finally appeared to fully embrace the two-stage process for building the system that its outside experts, PricewaterhouseCoopers, had recommended in December 2013.

**SPD has engaged a respected technology consulting firm to review existing data systems and identify foundational gaps that must be addressed prior to, or as part of, implementing the DAP.**

Specifically, SPD has engaged a highly respected technological research and consultancy firm to conduct the first step in building the DAP—to "[r]eview source systems and data, identify[] any gaps that need to be addressed" and "[r]eview the technology infrastructure to support a more robust data management environment and program."[197]  Thus, these consultants are working to identify the sorts of "foundational gaps" that Pricewaterhouse and the Monitoring Team had previously agreed needed to "be addressed before the start of the implementation" of any data platform that would aggregate or draw data from existing source systems.[198]

The Monitoring Team has worked closely with the Department to refine comprehensive requirements for the system so that the consultants can clearly identify the full extent of the gaps between the capabilities and quality of SPD's current data systems and the ultimate requirements of the DAP.[199]  The Monitor is cautiously optimistic that this process will go a significant distance toward ensuring that any and all "input[s] or component[s] of the  [DAP] system" will be "sound, reliable, and governed by sound data management and governance practices" such that any data that the DAP uses is "accurate, adequate, and reliable."[200]

The Monitoring Team has been encouraged by the SPD's willingness, especially in the last several months, to engage in the type of "fresh thinking and dynamic collaboration" that the Monitor had

---

[196] *See* Third Semiannual Report at 39-43.
[197] DAP Project Charter at 5.
[198] Third Semiannual Report at 41 (quoting PricewaterhouseCoopers, Proposed Development of a Business Intelligence System - Executive Summary 5 (Dec. 13, 2013), *available at* http://www.seattle.gov/police/compliance/docs/BI_Reports/SPD_BI_ExecSummary_FINAL.pdf).
[199] DAP Project Charter, at 5 (Oct. 20, 2014).
[200] Third Semiannual Report at 42.

previously identified as "necessary to guide and implement the technological overhaul that SPD requires."[201]  The Monitor has appreciated the organized and structured management that the new leadership has brought to the project.

The Monitoring Team has reviewed an initial draft of the RFP for the DAP.  While it must still be informed by the insights of the external consulting firm with respect to the viability of underlying source systems to feed into the DAP, the current draft of the RFP is impressive and extremely high-quality work product.  The Monitoring Team has commended the group for producing such a sophisticated, detailed, and clear document.

> The current draft of the RFP, which will be issued in early 2015, is impressive and extremely high-quality work product.

Much work remains.  The RFP must be finalized.  Responses must be evaluated and finalists selected.  These finalists must provide a demonstration of their various platforms' capacities and capabilities.  A vendor must ultimately be selected and begin work in earnest on implementation.  SPD personnel must be trained in, and transitioned to using, the new system.

Despite the structured and swift progress that SPD has finally made with respect to a DAP in recent months, there still may be some who argue that the adoption of a comprehensive DAP by SPD is unnecessary.  However, the built-in constraints with respect to IAPro's data collection and its limits with respect to data analysis outlined above have reaffirmed the importance to SPD, given the scope of provisions requiring sound data and the Department's historic struggles to capture and use data to drive management, of constructing a reliable DAP and "demonstrat[ing] that it is using that system in a manner consistent with the goals and requirements of the Settlement Agreement."[202]

In an August 19, 2014 status conference, the Court explained the importance of the DAP to the Consent Decree process:

> The Business Intelligence System doesn't tell you if there is or is not full and effective compliance, but it does give me the information that allows me to make that judgment. And that's why I have taken such a keen interest in this.[203]

Multiple stakeholders have signaled their agreement with the importance of a comprehensive data technology platform.  At the same August 19 hearing, Chief O'Toole once again committed to the swift implementation of the DAP, observing that "it's absolutely essential to have all of the information that [the Monitor] has indicated is required."[204]  The City similarly "underscore[d] how important the process

---

[201] *Id.* at 43.

[202] Second Semiannual Report at 13.

[203] 08/19/14 Transcript at 39; *see also id.* at 13 (Court agreeing that a comprehensive database system is "within the four corners of the document" and has "been there for awhile").

[204] *Id.* at 13.

is":[205]

> The Department very much needs accurate data and a manageable way to store it.  And so we want to make sure we get the process right.  We want to issue an RFP [for a DAP] that's meaningful and will get us the system that we need.[206]

Despite the agreement that a DAP is of critical importance, a few still worry that it will take many years to construct a functioning DAP, citing the experience of the FBI and LAPD, among others.[207]  These experiences, several years ago, of other agencies can be easily distinguished.  The SPD is not building its own system "from the ground up."  It will use an existing, tested third-party platform that fully incorporates the explosion of recent technical advances in data mining and aggregation—which promises to make the ultimate system cheaper, better, and more powerful than many law enforcement agencies' previous attempts at building their own systems from scratch.[208]

**SPD will be able to use an existing third-party platform for the DAP— which promises to make the ultimate system cheaper, better, and more powerful.**

Thus, going forward, the Monitoring Team has increasing confidence that conversation can definitively turn away from whether the DAP is unnecessary, too complicated, or somehow can be obviated by the long-term use of the stopgap IAPro system.  Especially given the swift and significant progress that the Department has made in preparing an RFP for external vendors, the DAP ship has set sail.  Although the DAP project may well encounter some periods of rough sea, the Department's ongoing commitment to a structured, sound development of a DAP constitutes real progress toward achieving the objectives and requirements of the Consent Decree.

---

[205] *Id.* at 23.

[206] *Id.*

[207] *See* Todd R. Weiss, "Update: New FBI management system could cost $500M," Computerworld (Mar. 14, 2006), *available at* http://www.computerworld.com/article/2562857/business-intelligence/update--new-fbi-management-system-could-cost--500m.html; Samuel E. Walker & Carole A. Achbold, *The New World of Police Accountability* 170 (2012) ("The saga of the TEAMS (Training Evaluation and Management System) is a disturbing story of a long delay in implementing an EIS.").

[208] *See, e.g.,* Julie Bort, "Big Data is the Hottest Thing to Hit the Web in Years," *Business Insider* (Feb. 21, 2012) ("Cheap technology makes big data possible now," with users able to "access . . . a massive amount of computational power" in the so-called "cloud" rather than, as previously, users needing to "buy a mainframe and a data center"); "Data, data everywhere," *Economist* (Feb. 25, 2010) (noting the exponential growth in the overall volume of digital data created since just 2005 has led to a "business of information management" that "is growing by leaps and bounds").

# B.  Early Intervention System ("EIS")

**Summary**

SPD has yet to implement fully the Early Intervention System—which is a system and process for proactively identifying and assessing officer performance trends—required by the Consent Decree and Court-approved policy.  It has taken several solid steps toward implementation, including the preparation of officer and training materials, supporting documentation, and determining how an EIS Committee, which oversees the process, will function.  In the coming months, SPD will need to develop substantially more sophisticated supervisor training so that early interventions are fair, rigorous, and effective.  Likewise, because IAPro cannot currently provide all of the underlying functionality necessary to inform supervisors about when officers have reached policy-defined thresholds of performance activity, SPD will need to supplement IAPro with manual processes and business practices.

Another mechanism in the Consent Decree geared toward the Department proactively identifying and assessing performance trends is the implementation of an effective Early Intervention System ("EIS" or "EI system").  An EIS tracks a broad range of officer performance data and provides a basis for affirmative, non-disciplinary supervisor intervention to assist officers in performance and career development.[209] Most simply:

> An EI system is early in the sense that it helps to identify officer performance problems that do not warrant formal disciplinary action but suggest that an officer is having problems dealing with citizens.  The major contribution of an EI system is its capacity to spot patterns of performance and to intervene before problems lead to a serious incident such as a lawsuit, a citizen complaint over excessive force, or some other public crisis involving the department.[210]

"[A] closely–related goal" of an EIS "is to improve the performance of supervisors by providing them with reliable performance data and requiring them to proactively develop their officers."[211]  An inquiry into an officer's performance trends may well just as likely identify a high-performing officer as an officer who is in need of intervention.  In short, an EIS serves as a primary mechanism for providing officers with the tools and resources they need to be safe and to grow both as officers and individuals.

The Department of Justice's 2011 investigation of the SPD concluded that its previous EIS did "not

---

[209] *See* Consent Decree ¶¶ 157–63.

[210] Samuel Walker et al, Office of Community Oriented Policing Services, U.S. Dept. of Justice, "Early Intervention Systems for Law Enforcement Agencies: A Planning and Management Guide" (2003) at 3, *available at* http://www.cops.usdoj.gov/files/RIC/Publications/e07032003.pdf.

[211] Third Semiannual Report at 67.

provide the intended backstop for the failures to the direct supervisory review process."[212]  At heart, it was "broken."[213]  Its performance thresholds were "far too high and interventions on officers' behavior far too late."[214]  Furthermore, performance interventions "happen[ed] far too long after the triggering incident, which diminishes the effectiveness of the intervention . . . ."[215]  When performance assessments occurred, "review by the supervisor [was] superficial at best . . . ."[216]  Finally, there were significant issues with respect to tracking the efficacy of interventions, who was doing the performance assessments, the voluntary nature of the former EIS process, and the fact that "officer performance valuations frequently fail to reference EIS interventions."[217]

Accordingly, the Consent Decree required revisions to the Department's EIS policy.  SPD, the City, DOJ, and the Monitor worked collaboratively toward a consensus EIS policy to address the requirements of the Consent Decree.  The revised policy includes, among other things, significantly revised triggers and a requirement for supervisors to review their officers' EIS data at least monthly.  The Court approved a substantially overhauled EIS policy on March 10, 2014 pursuant to the Monitor's recommendation.[218]  The Monitor described that policy in some detail in the Third Semiannual Report.[219]

## Developments During the Past Six Months

*The Department is making slow but steady progress toward ensuring that once the "switch is flipped" on EIS, the system will proactively identify officers who could benefit from intervention.*

Assuring that officers of all ranks and assignments thoroughly understand, apply, and embrace the policies, procedures, and values underlying the EIS model is critical to the Consent Decree.  The Department is making slow but steady progress toward ensuring that, once the "switch is flipped" and the system is up and running, the system will proactively identify officers who could benefit from intervention.

The Department has ambitiously targeted January 1 as a "go live" date for the EIS system.  Given the hard work of the IAPro project management team, the IAPro platform appears able to support many of the triggers and thresholds mandated by policy.  However, as described below, it may be that a modified date will be necessary to ensure that all components of the EIS process and system have been fully and rigorously addressed.

---

[212] 2011 Findings Letter at 5.
[213] *Id.* at 22.
[214] *Id.*
[215] *Id.* at 23.
[216] *Id.*
[217] *Id.*
[218] *See* Dkt. No. 125.
[219] *See* Third Semiannual Report at 76–89.

During this review period, the Department has taken several steps toward implementation of the EIS system:

- Following discussions with focus groups of officers and sergeants, the group tasked with implementation of the system found that officers viewed the prior name of the new system, the "Performance Mentoring" program, as a misnomer. Officers knew it was an early intervention system and preferred to call it that. Thus, SPD determined that the system should retain its original name.

- In September 2014, Chief O'Toole named Deputy Chief Carmen Best as her designee on the EIS Committee. That committee, which includes representatives from OPA, Human Resources, and the policy and training units, meets monthly to ensure that the early intervention performance thresholds are working as intended; performance assessments are adequately identifying potential at-risk behavior; and mentoring plans are fair, practical, and implemented in a timely fashion.

- Also in September 2014, the SPD was introduced to Commander Linda Rosato-Barone, of the Pittsburgh Police Bureau, whom DOJ retained to work with SPD on EIS implementation issues. Commander Rosato-Barone has over thirty years of policing experience and was a key participant in Pittsburgh's development of its early intervention system, known as PARS (Performance Assessment and Review System), in connection with a 1996 DOJ consent decree. The system has been well-regarded for bringing accountability to a once-troubled agency.[220]

  SPD's collaboration with Commander Rosato-Barone's to date has focused principally upon how business practices should work, how supervisors should be educated as to how to conduct performance assessments and construct performance intervention plans where appropriate, how officers should be introduced to the core components of the new system, and the like. Following her initial visit to the Department in the first week of October 2014, she has been consulting with the Department and DOJ on issues relating to leadership, supervision, and training.

  The Monitoring Team is heartened to see how well the Department has been working with Commander Rosato-Barone, whose years of practical experience of implementing an early intervention system in a police department roughly the same size as the SPD should prove quite valuable. The Department of Justice is to be

---

[220] R. Davis, N. Henderson, C. Ortiz, Vera Institute of Justice, "Can Federal Intervention Bring Lasting Intervention in Local Policing? The Pittsburgh Consent Decree" (2005) ("In the last year of the decree we found the PARS early warning system to be a functional system that helped to create broad accountability within the Bureau."), *available at* http://www.vera.org/sites/default/files/resources/downloads/277_530.pdf.

credited for making such resources available to SPD.

- Also in September 2014, the Department's Sergeant's School included a segment on the enhanced EIS program to begin to prepare new sergeants for the system.

- On October 16, the EIS Committee, which is responsible for maintaining performance thresholds and reviewing mentoring plans, met for the first time. Because the EIS is not up and running, this first meeting was devoted to orientation of Deputy Chief Best and training on IAPro, which will provide much of the data for the interim EIS program. Since then, the Committee has continued to meet on a monthly basis to prepare for the implementation of the system.

- On November 5, the EIS Working Group submitted a draft redline of the EIS policy that largely includes updates to take into account changes in workflow necessitated by the IAPro software. These proposed revisions remain under discussion.

- Also on November 5, SPD's EIS Working Group submitted e-learning modules that would introduce the new EIS system to officers and to supervisors. These training materials will be part of a roll call training that will include an oral presentation by the EIS Coordinator, who will be on hand to answer questions from officers and supervisors. Although not finalized, the e-learning modules promise to provide useful background information and to reinforce all parties' commitment that the system aim to maintain high standards of policing while providing officers the tools and resources they need to be safe and to grow as officers and individuals.

- Finally, on November 5, the EIS Working Group submitted a first draft of a Supervisor's Toolkit and a Frequently Asked Questions (FAQ) guide for employees about the EIS. Both drafts are in rough draft form.

The idea behind the FAQ is to provide officers with answers to the most basic questions about the early intervention system. The first draft provided is very brief (only five pages) and inadequate to address the many questions officers and the public would have about the system. This will need to be improved in subsequent iterations, particularly given the model that the Monitoring Team had provided the Department to consult. The Third Semiannual Report pointed the SPD to the Charlotte-Mecklenburg Police Department's excellent EIS guide, which spans 19 pages, and includes graphics and a helpful flow chart in the appendix.[221] The hope and expectation is that the SPD's version of the FAQ will become much more developed

---

[221] *See* Third Semiannual Report at 88 & n. 107.

in the coming weeks.

The Supervisors' Toolkit, though more fleshed out than the FAQ, likewise needs much more thought and work.  In some instances, it simply suggests that supervisors may choose one option or another when deciding whether an officer should receive intervention or when constructing an intervention plan—without stating the pros or cons of each option or stating the Department's overall preference.

## Current Challenges

Despite the encouraging progress in getting the EIS system up and running, some significant challenges remain, including:

- **Developing More Sophisticated Supervisor Training.** To date, it appears the EIS Work Group has done little advance thinking about the more difficult supervision challenges that lie ahead.  If SPD is like any of the many other departments that have implemented EIS programs before it, then it is almost certain that supervisors will end up facing officers who are (i) subjects of ongoing personnel investigations; (ii) simply resistant to the entire EIS program; or (iii) are dealing with significant personal or family issues that are affecting their job performance.  Supervisors need to be well-trained to handle those situations.  They will need additional resources at the ready if one or more mentoring meetings with the officer become difficult.  To date, the SPD does not appear to have done any advance work in this area, even though the Training Section is already blocking out time for supervisor training in 2015.

- **Identifying and Working With Effective Supervisors.**  The EIS Working Group deserves much credit for asking officers and supervisors for their input on procedure and business practices related to the EIS and to the IAPro software system.  Seeking input from end users and stakeholders almost invariably yields a stronger product that reflects the practical, day-to-day needs of any work process.

  The Working Group should extend that same logic to its development of supervisor training.  The group should identify and work with a representative corps of supervisors already known for their effectiveness, communication skills, and commitment to the Department's core values.  The Working Group and that supervisor corps can work hand-in-hand to identify, in great detail, how individual supervisors can best identify symptoms of at-risk behavior, encourage officers to acknowledge any problems they may be encountering, and motivate them to make positive changes that will help them achieve their goals.  Working with a group of successful supervisors offers several benefits at once:  (i) it provides the EIS working

group with practical, time-proven strategies for spotting performance issues and communicating with and motivating officers; (ii) it provides the supervisors with the opportunities to identify and correct any overlooked inefficiencies or errors in EIS procedures or workflows; and (iii) it makes those supervisors well-versed in the EIS program so that when they return to their assignments, they may serve as ambassadors of the system.

- **Supervisor Accountability and Manager Training.**   The EIS Working Group also must begin working on (i) how the Department plans to use EIS to hold individual supervisors accountable for the officers they supervise and (ii) how it will to train Lieutenants and other managers become better leaders within their own commands.

  Sergeants whose officers repeatedly engage in at-risk behavior may themselves warrant intervention and training—a point that should not be lost upon the Department as it moves toward implementing its early intervention system.   The interim software program currently in place, IAPro, has the ability to identify supervisors whose officers repeatedly meet performance thresholds.   The EIS Working Group may consider utilizing this feature.   The EIS will be of no assistance to the Department or to the community if the leadership at a particular precinct, assignment, or shift does not have the respect or authority of the men or women under their command.

- **Data and Systems Deficiencies.**   The Consent Decree also requires that SPD "collect and maintain information related to supervisor, precinct, squad, and unit trends . . . ."[222]   Moreover, SPD must "collect, maintain, and retrieve information related to" things like uses of force, OPA complaints and their dispositions, the number of individuals officers who have reached defined thresholds of activity that "trigger" EIS reviews, and supervisor EIS reviews with officers.[223]

To assess systemic trends in performance across supervisors, precincts, squads, and units, the Department must rigorously capture accurate data about officer performance with respect to use of force, OPA complaints, and the other categories that serve as performance "triggers" in the SPD's overhauled EIS policy.

> SPD's stopgap database system, IAPro, is not currently equipped to effectuate fully the Court-approved EIS policy.

The Department's stopgap data system, IAPro, is not currently equipped to effectuate fully the Court-approved EIS policy.[224]   Furthermore, even if upcoming software updates render those limitations short-lived, the workflow and "paperwork" associated with assessing an

---

[222] Consent Decree ¶ 160.

[223] *Id.* ¶ 161.

[224] *See infra* Part II(A), "Data Analytics Platform ('DAP')," at 62; *see generally* Third Semiannual Report at 79-80.

officer's performance, determining whether the officer would benefit from an intervention, constructing an intervention, reviewing an intervention, implementing the intervention, and assessing whether the intervention ultimately was effective all cannot currently occur within IAPro.

For police agencies of other sizes, in other places, and with different historical trends, it could be the case that IAPro or defined manual processes might result in an effective system.   However, given the significant problems that the 2011 DOJ investigation found with respect to SPD's formerly "superficial" supervisor review of officer performance and significant time delays in the early intervention process, it has appeared to the Monitor for some time that the Department can benefit significantly from a robust, computerized platform for effectuating early intervention and other performance assessments.   Looking ahead, it is hoped that the Data Analytics Platform that the Department is developing will provide supervisors with a practical, efficient means of justifying their assessment of an officer's performance.

# C. Crisis Intervention & the Crisis Intervention Committee ("CIC")

**Summary**

SPD continues to make significant progress in implementing and maintaining important organizational and operational changes addressing how SPD manages incidents that involve individuals experiencing behavioral crises. Training is currently being provided to all SPD personnel on crisis intervention. The Monitor and SPD still need accurate data about such interactions in order to assess the Department's overall crisis response efforts. Because SPD invests significant resources in the crisis area, it, and the Court, need to know what is and is not working. SPD must institutionalize the work of the Crisis Intervention Committee. It must continue to transition from a "task-based entity" working on issues required by the Consent Decree to a self-sustaining, problem-solving forum and advisory body. SPD must accordingly ensure stable, consistent leadership of crisis intervention functions.

Research "suggest[s] that as many as 7–10% of US police contacts involve persons with mental illnesses."[225] Indeed, at the time of the Department of Justice's 2011 investigation that led to the Consent Decree, SPD itself "estimate[d] that 70% of use of force encounters involve . . . populations" of "persons with mental illnesses or those under the influence of alcohol or drugs."[226]

Law enforcement agencies across the country are increasingly recognizing the need to provide in-depth training to officers on strategies, tactics, and techniques for interacting with individuals in behavioral crisis.[227] (Behavioral crises include mental illness, substance abuse disorders, or other personal and behavioral issues or concerns.) Such training has been associated with increased officer safety and improved subject outcomes, as well as overall decreased use of force on this population, which is an express goal of the Consent Decree.[228]

Likewise, the deployment of crisis intervention-trained officers and a dedicated Crisis Response Team

---

[225] Stephanie Franz & Randy Borum, "Crisis Intervention Teams may prevent arrests of people with mental illnesses," 2010 *Police Practice and Research* 1, 1 (2010) (collecting research).

[226] 2011 Findings Letter at 4.

[227] *See* Fernanda Santos & Erica Goode, "Police Confront Rising Number of Mentally Ill Subjects," *N.Y. Times* (Apr. 1, 2014), http://www.nytimes.com/2014/04/02/us/police-shootings-of-mentally-ill-suspects-are-on-the-upswing.html?_r=1.

[228] *See, e.g.,* Amy C. Watson & Anjali J. Fulambarker, "The Crisis Intervention Team Model of Police Response to Mental Health Crises: A Primer for Mental Health Practitioners," 8 Best Pract. Ment. Health 71 (2012) (summarizing study of Chicago crisis intervention program in which crisis intervention-trained "officers used less force as subject resistance increased than officers that were not CIT trained"); Randy Dupont & Sam Cochran, "Police response to mental health emergencies: barriers to change," 28 J. Am. Academy of Psychiatry & L. 338 (2000) (noting decreased number of injuries to officers after adoption of crisis intervention program); Jennifer Skeem & Lynne Bibeau, "How Does Violence Potential Relate to Crisis Intervention Team Responses to Emergencies?," 59 Psychiatric Services 2 (2008) (noting that crisis intervention-trained officers used force in only a small percentage of incidents that posed a "serious to extreme potential for violence").

("CRT") have been associated with freeing up patrol officer time, capacity, and resources.[229]  When highly-skilled specialists can arrive to assist with the resolution of a behavioral crisis incident, it frequently allows initially-responding officers to recommence patrol or other law enforcement activities.

SPD continues to make significant progress in implementing and maintaining important organizational and operational changes that address how the Department manages incidents that involve individuals experiencing behavioral crises.[230]  Most notable is the Department's sustained, ongoing progress toward completing Court-approved training on crisis intervention skills and strategies.

> SPD has made sustained, ongoing progress toward completing Court-approved training curricula on crisis intervention skills and strategies.

## Crisis Intervention Training

The training that the Third Semiannual Report previewed will be complete by the end of the year.  Three types of training have occurred: (i) basic training, provided to all (non-specialized) sworn personnel (i.e., 1300 officers); (ii) advanced training, an extended and in-depth training course for officers who had already been "CI-certified" as a result of receiving more than 40 hours of crisis intervention training at the state academy; and (iii) training for SPD communications personnel (9-1-1), who frequently have the first contact with individuals in crisis.

### *Basic Training*

The Court approved a basic, 8-hour training course, with additional e-learning components, on crisis intervention on June 13, 2014.  The goal of the training is to "ensure . . . a common, fundamental understanding of Crisis Intervention techniques, SPD[-]specific policies and forms, and [the] operational structure of the King County Mental Health system . . . ."[231]  The e-learning elements of the training emphasized de-escalation and active listening skills.[232]

By December 31, all key SPD personnel, including all sworn personnel, will have completed the basic training, which is being provided by the Washington State Criminal Justice Training Commission ("CJTC").[233]

The close collaboration between SPD's Education & Training Division and CJTC has continued to be commendable, with CJTC providing additional classes to accommodate SPD's personnel and the imperative to have the training completed by the end of the year.  Additionally, CJTC is providing an 8-

---

[229] Franz & Borum, *supra* note 226.
[230] This Section corresponds to paragraphs 130–37 of the Consent Decree.
[231] Dkt. No. 177 at 70.
[232] *Id.* at 70.
[233] *Id.* at 73.  Data, accurate as of July 2014, indicated that 774 individuals are scheduled to receive the Basic training by the end of the year.

hour "super-session" to provide the basic curriculum training to as many as 202 non-operational personnel—which includes special units and administrative units—per session.

The Monitor is pleased that CIC, DOJ and the SPD were able to resolve commendably some early issues about the type and content of Basic training.  SPD and CJTC ultimately concurred that that CJTC's standard, 8-hour Basic could be supplemented with SPD-specific policies and practices highlighted in SPD-developed e-learning modules.   The ongoing partnership between SPD and CJTC has continued to "break down the 'silo' SPD created over time in which it separated itself from the best regional training initiatives."[234]

> By December 31, all sworn SPD personnel will have completed basic training on crisis intervention.

The Monitoring Team, and DOJ and its consultants, audited multiple sessions of the Basic course.  All found the course compliant with the Court-approved lesson plans.  In particular, it found that the instructors, a mix of SPD and King County officers and experienced clinicians, were of high quality—engaging and substantively sound.  The instructors did a very good job providing general and specific tactics that officers should use in situations involving subjects experiencing behavioral crisis, organized by "conditions" subjects may be presenting to officers on the street.

The Monitor notes that SPD must continue to ensure consistency across its various training initiatives.  For instance, core skills and concepts, such as de-escalation and strategic communication techniques, are presented and reiterated across Use of Force trainings as well as crisis intervention trainings.  Regardless of when the training occurs and who provides it, the frameworks that officers use to consider these issues must be consistent.

## Advanced Training

The Advanced Training is a 9-hour course initially offered to officers who had previously been "CIT-Certified" within the past five years.  To have become "CIT-Certified," officers volunteer to receive 40 hours of in-depth training on a host of topics, skills, strategies, and tactics related to interacting with individuals who are experiencing behavioral crisis.   They serve as specialists in the field and are often dispatched to, or requested to respond to, the scene of incidents at which an individual in behavioral crisis may be involved.

Some 432 officers have received CIT certification training in the past.  Of that number, 195 officers received that training within the past 5 years.  For these officers, the Advanced Training program serves as a kind of "refresher" course that underscores and reinforces the in-depth training that they had previously received.  That left 237 officers who had received that training at least 5 years ago or longer.  Over the course of several weeks in the summer, the SPD CIT Coordinator asked those officers to indicate whether they would want to continue to remain in the CIT Program as a "CI-certified" officer.  A large

---

[234] Third Semiannual Report at 30.

percentage of such officers responded immediately to this call for service, despite of (or perhaps because of) the additional, uncompensated training and responsibilities it will require. Specifically, 160 officers volunteered to re-certify, by going through the adapted certification training, when given the opportunity. Another 76 officers will allow their certification to expire.

As to the content of the Advanced Training for 2014, the in-class instruction is a mix of lecture, tactical communication skills training, performance drills, and scenarios. The training emphasizes active listening techniques and de-escalation tactics, with a significant emphasis on suicide intervention. Unlike the Basic Training, the Advanced Training is largely a skills-based, hands-on, scenario-heavy curriculum. The performance of participants is evaluated during the scenario training.

The Monitoring Team has attended this Advanced Training. By and large, it appears well-taught, substantive, and consistent with the Court-approved curriculum. Even though this year's participants have already received significant crisis training previously, most appear engaged and eager to participate.

SPD is requiring that all CIT-Certified officers attend the course no later than June 30, 2015.[235] Additionally, the CIC and SPD currently contemplate that all key sworn personnel will attend the Advanced Training, at some time after completing the Basic training course, by the end of 2015.[236]

> In 2015, the CIC and Department will consider providing more advanced crisis training to all key sworn personnel.

The Monitoring Team has previously suggested that, although suicide prevention is an undoubtedly important topic and concern, the Advanced Training in 2015 should drill down into a wider range of behavioral crises. Especially as the CIC and Department consider providing a version of this Advanced Training to all key sworn personnel in 2015 as part of ongoing crisis intervention training, the Monitor recommends that SPD identify the most common or recurrent behavioral crises and that those be addressed with similar specificity. This will be a matter of further discussion and development over the coming months.

Furthermore, based on the auditing conducted by the Monitoring Team and DOJ in November 2014 classes, it is recommended that the 2015 Advanced Training include small group sessions with CIC members and challenges that have arisen during the initial implementation of the new CIT policy, such as reported reluctance to call CIT officers and leadership issues.

### 40-hour CIT Certification Training

SPD officers can become CIT-Certified officers by electing to attend a 40-hour course, currently offered by the CJTC. SPD and CJTC have again collaborated closely to ensure that the CJTC's 40-hour course

---

[235] Dkt. No. 177 at 6.
[236] Id. at 71.

could be adapted to meet SPD's needs, at least for the time being.  Going forward, the CIC and CJTC will need to consider whether, and how, these SPD-specific adaptations will become a permanent part of the certification training.

### Dispatcher Training

All dispatchers have completed a three-hour training.  The training for Dispatchers addressed preparing Dispatchers to recognize individuals experiencing a crisis event or who are in need of a CIT trained officer; communicating with the individual in crisis; locating CIT officers; and identifying community mental health resources that can be of assistance.  Dispatcher feedback from the training was positive.

The CIC will now need to determine what type of ongoing refresher training will be needed for Dispatchers going forward.  Further, based upon ride-alongs and reviews of force incidents at FRB, there is some anecdotal evidence that SPD communications is not regularly dispatching CIT-Certified officers to the scene or identifying it as a crisis call in SPD's computer-aided dispatch system.  This is something that SPD and the Parties must examine closely in coming months.

## Crisis Intervention Committee ("CIC")

The CIC remains an interagency advisory committee composed of regional mental and behavioral health experts, social service providers, clinicians, community advocates, academics, other law enforcement agencies, the judiciary, and members of SPD.[237]  Much of its work continues to take place in its sub-committees, which now number three: an Executive Steering, Policy/Curriculum, and Systems & Data Output (which combined during the time period of this report).  During the last six months, the Crisis Intervention Committee played a key role in reviewing and advising on the Advanced Training curriculum described below and in truly initiating the required review of the Crisis Intervention Team ("CIT") policy that began August 2014 and remains ongoing.

Although the CIC has successfully met many of the specific tasks required by the Consent Decree and MOU, SPD must now take the lead in institutionalizing the work of the CIC.  It must develop processes for the continual refinement of policies, operations, and training previously implemented, and it must consider how to maximize the CIC's ability to be a centralized forum where the regional response to individuals experiencing behavioral crisis is addressed purposefully and candidly.  In short, the CIC must transition from a "task-based" entity to a self-sustaining, problem-solving forum and advisory body, with a mission and goals that are embraced by that community and the Police Department.

> The CIC must now transition from a "task-based" entity to a self-sustaining, problem-solving forum and advisory body.

---

[237] *See* Third Semiannual Report at 28; Second Semiannual Report at 57-58.

Since early 2014, the CIC has been led by an SPD CIT Coordinator.[238]  That position was filled by a lieutenant who had substantial other responsibilities within the Department.  No senior leader in the chain of command enjoyed direct authority or responsibility for the project, which limited the extent to which the CIT Coordinator could engage in the type of follow-up and institutional problem-solving that many of the issues raised at the CIC demanded.

Chief O'Toole recently named Lt. Leslie Cordner as the new CIC Coordinator.  Lt. Cordner was most recently a North Precinct Operations Commander and, by all accounts, a competent and skilled CIT practitioner.  Because Lt. Cordner is also an aide to the Chief of Police, her assignment stood to strengthen dramatically the chain of command overseeing Crisis Intervention.  The change reflected Chief O'Toole's commitment to regional collaboration and focus on issues related to mental health, drug addiction, and emotional disturbance.  Unfortunately, it was recently announced that Lt. Cordner's position would be temporary, as the job is too time-consuming for a Chief's aide.  Thus, the search is on for the third CIT coordinator in a year.  SPD must quickly end the quick turnover of the position.[239]  The Monitor is hopeful that the Chief's commitment to dedicating resources necessary to that position will yield results.[240]

> Chief O'Toole has demonstrated a commitment to regional collaboration and focus on issues related to mental health, drug addiction, and emotional disturbance.

The CIC held its third Plenary Session (i.e., a meeting with all members of the CIT) on November 14, 2014, which was attended by the Chief of Police and approximately two dozen CIC members.  Her staff and members of the CIC updated the Chief on the progress of CIC activities and explored how the CIC can continue to function in a more permanent advisory capacity and play a significant role beyond the life of the Consent Decree.

Among the recommendations the CIC made at the Plenary were the following:

- Several key CIC members had, over the summer and fall months, gone on to other positions or stopped attending meetings.  The Department committed to following up

---

[238] Third Semiannual Report at 28.

[239] *See* Larry Thompson and Randy Borum, "Crisis Intervention Teams (CIT): considerations for knowledge transfer," 63 Law Enforcement Executive Forum (2006).  "The CIT program leader (often called a coordinator) is an essential part of sustaining a successful program.  The coordinator, regardless of rank, must be respected by sworn personnel at all levels.  She or he must keep CIT on the command staff "radar screen," liaise effectively with community partners, sustain the morale of existing team members, maintain quality control, stimulate and preserve interest in the program and its reputation, identify and remediate any CIT-related problems, and seek lessons and information from programs in other jurisdictions.  Without energetic, committed program leadership, CIT is at risk to 'die on the vine.'" *Id.*

[240] Indeed, the Monitor understands that SPD requested funding, in the 2015 budget, for a full-time Lieutenant to coordinate CIT.  Such dedication of resources in this area would go a long way to providing the stability and focus in this area that the Department has needed for some time.

with those organizations and seek their renewed commitment to this important project.

- A Seattle University Professor, in conjunction with the CIC and nationally-renowned DOJ consultants, developed a survey of officer views of the CIC, discussed further below.  While there are several logistical challenges to conducting this internal survey, the Department committed to finalizing and conducting the survey in short order.

- Likewise, the DOJ and CIC had approved a "mental health contact" form several months ago.  As described in the last semi-annual report, technological challenges have hindered the deployment of this form.

- Consistent with the recommendations above, the CIC has asked for written guidance on its own governance, mission, and vision; in short, a new "charter" for its activity.  The Chief has committed to working with the CIC in developing the Charter and institutionalizing this important partnership.

## Data & Systems

Issues relating to data and systems provide a good example of how the CIC is starting to serve as a forum for collaborative problem-solving.  One important set of changes that the crisis intervention policies that the CIC created and the Court approved relate to the various documentation and forms that SPD uses or provides to hospital and mental health personnel.  Hospital and mental health personnel have been able, from very early in the process, to voice concerns and provide input.

"[T]o provide rigorous, fact-based evidence for how the overall crisis intervention program and mental health system may be doing," the CIC has considered a Mental Health Contact Report form based on similar forms used by other police departments.[241]  In our Third Semiannual Report, we observed that the failure of progress within SPD's IT Department was slowing down the ability of the CIC to collect, analyze, and learn from information about whom officers are interacting with in the field.[242]  After much starting and stopping, SPD approved the form in October.   The Monitoring Team does not entirely understand the sustained delay.   Nonetheless, it is encouraged that the same technological approach that the Department is developing to capture information about *Terry* stops can also be used to capture the necessary information about crisis incidents.[243]

> The lack of accurate tracking of officer training and data about events requiring crisis intervention prevent SPD from making the strategic personnel allocations that it must.

Another data concern relates to assessing the numbers of CIT-Certified officers.  Definitively determining

---

[241] Third Semiannual Report at 33.

[242] *Id.* ("The IT Department's inability to act with necessary expediency appears to be frustrating SPD's ability to make greater progress in the crisis intervention area.").

[243] *See infra* Part III(C), "Discriminatory Policing—Data," at 92.

how many officers have received what training has been challenging.  The current system for tracking officer training is merely a Microsoft Excel spreadsheet.  This method of information storage likely does not provide SPD or the CIC with the level of precision that is critical for tracking training progress, ensuring officer staffing in a manner that distributes CIT-Certified officers throughout the Department and the community, and for ensuring compliance with the Consent Decree's provisions relating to CIT coverage.[244]  The combined lack of accurate data to track officer training and to capture information about events that require crisis intervention prevent SPD from making the strategic personnel allocations that it must.

In short, SPD and the Monitor need accurate data about crisis intervention interactions and CIT/CRT response to incidents in order to assess the Department's overall crisis response efforts.  The Department invests significant resources in the crisis area.  It, and the Court for purposes of the Consent Decree, need to know what is and is not working.

> Both SPD and the Monitor need accurate data about CIT/CRT response to incidents in order to assess the Department's overall crisis response efforts.

The CIC has also begun to collect data to assess and evaluate cultural changes within the Department with respect to the value of crisis intervention training, acceptance of CIT by officers, and supervisor endorsement of CIT.  An external expert associated with Seattle University has been tasked with conducting an internal survey of SPD officers.  The results of the survey will help the CIC, SPD, Parties, and Monitor to assess whether the culture of the SPD is showing a significant change in patterns and practices of how the Department responds to people in behavioral crises.  The Chief herself has committed to moving this survey forward.

The CIC and SPD continue to make progress in translating crisis intervention policy into Department-wide practice and have managed to overcome some earlier difficulties.  The Monitor will continue to follow CIT issues closely and anticipates sustained progress in the coming months.

---

[244] *See* Consent Decree ¶ 130 (SPD must "ensure that CI[-certified] officers are available on all shifts to respond to incidents or calls involving individuals known or suspected to" be in behavioral crisis.); Third Semiannual Report at 31–32.

# III. Discriminatory Policing

The Department of Justice in 2011 identified practices that could disproportionately affect minority communities in contravention of the Constitution and federal law.  This section discusses SPD's efforts to comply with the provisions of the Consent Decree that address the core issues of discriminatory or bias-based policing practices.

By December 31, all SPD officers will have completed an initial training on the critical, Court-approved policies on stops and detentions and bias-free policing.  The Monitoring Team has found the training curriculum and observed training sessions to be rigorous, useful, and engaging.  Ultimately, however, effective and meaningful training on bias-free policing—especially training that is geared toward addressing and changing long-standing patterns of unintentional bias, discriminatory practices, or disparate impact—will be a long-term, iterative process that SPD must continue in 2015.

The Monitoring Team has pressed SPD and the Parties for some time to begin collecting critical data and information about civilian encounters as soon as possible.  Continued delays in starting data collection in this area will only delay the juncture at which the Department and Monitor can assess how SPD and its officers are doing with respect to the Consent Decree's core concerns related to discriminatory policing.

## A. Policy

The 2011 DOJ investigation identified several policy deficiencies that contributed to potentially discriminatory policing practices.  First, SPD's prior "policy and practices blur[red] the line between a social contact or casual encounter, and a temporary investigatory detention" called a "*Terry* stop" (after the Supreme Court case, *Terry v. Ohio*, that provided the legal basis for such a stop).[245]  The distinction is an important one.  A social contact is a voluntary, consensual encounter in which an individual can refuse to answer questions and may leave at any juncture.[246]  A *Terry* stop, however, constitutes an involuntary "seizure" under the Fourth Amendment.  It must be based on a reasonable suspicion that a subject has been, is, or is about to be engaged in the commission of a crime.[247]

DOJ indicated that such confusion over the basis of fact that an officer must have to detain an individual contributed to "inappropriate practices [that] may particularly affect racial and ethnic minorities."[248]  Their investigation noted numerous "reported instances" from the community in which "officers stopped individuals without reasonable suspicion or cause, detained them, and indicated to them that they were not free to leave"—instances that, even if they could only represent "one side of the story," appeared "numerous enough that they clearly contribute to the negative perception of SPD within segments of the community."[249]

> The new stops and detentions policy provides officers with specific guidance about the grounds necessary for different types of contacts and detentions.

Second, DOJ found that the SPD's prior policy on unbiased policing offered insufficient and imprecise "guidance to SPD officers about how to avoid biased policing practices."[250]  It recommended revisions.

Third, noting that "[s]upervisors are essential to ensure their officers do not engage in discriminatory policing," the investigation cited a need for "clearly delineated procedures for a supervisor to follow when investigating a potential biased policing incident, including on-scene investigation and analysis."[251]

SPD's new policies on voluntary contacts and *Terry* stops and on bias-free policing aim to address these deficiencies.  The new stops and detentions policy, approved by the Court in January 2014, provides officers with specific guidance about the distinction between a voluntary contact and an investigatory detention.  It offers specific guidance with respect to limiting any *Terry* stop to a reasonable scope and reasonable duration, to when an officer may conduct a frisk or pat-down pursuant to a stop, and to the

---

[245] *Id.* at 26; *see Terry v. Ohio*, 392 U.S. 1, 30 (1968).
[246] *See* 2011 Findings Letter at 26–27 (summarizing federal and state law).
[247] *See Terry*, 392 U.S. 1; Seattle Police Manual 6.220-POL(1)–(2).
[248] 2011 Findings Letter at 27.
[249] *Id.*
[250] *Id.* at 29.
[251] *Id.* at 29, 33–34.

prohibition on using a traffic violation as a pretext for investigating unrelated crimes for which the officer may lack reasonable suspicion.[252]

The new policy on bias-free policing provides a clear definition of what "biased-based policing" is:

> Bias-based policing is the different treatment of any person by officers motivated by any characteristics of protected classes under state, federal, and local laws as well as other discernible personal characteristics of an individual . . . [which] include, but are not limited to, the following:
>
> - Age
> - Disability
> - Economic status
> - Familial status
> - Gender
> - Gender Identity
> - Homelessness
> - Mental illness
> - National origin
> - Political ideology
> - Race, ethnicity, or color
> - Religion
> - Sexual orientation
> - Use of a motorcycle or motorcycle-related paraphernalia – RCW 43.101.419
> - Veteran status[253]

Importantly, the new policy requires that whenever "a person complains of bias-based policing, the employee shall call a supervisor to the scene to review the circumstances . . . ."[254]  Complaints of bias must be documented and investigated.

## B. Training

By December 31, all SPD officers will have completed an introductory training program on stops and detentions and bias-free policing.  For both areas, officers were required to complete e-learning that addressed the basics of the revised policies and view an introductory video message from Chief O'Toole in which she underscored the importance of the upcoming training.  Subsequently, officers have been required to attend a more comprehensive classroom training.  These training initiatives mark an

---

[252] Seattle Police Manual 6.220-POL (4) – (9).

[253]          Seattle          Police          Manual          5.140,          *available*          *at*
http://static.squarespace.com/static/5425b9f0e4b0d66352331e0e/t/542ae27ae4b080bf617b81ec/1412096634350/
Bias-Free_Policing_Policy.pdf.

[254] Seattle Police Manual 5.140(5).

important first step in what will be a multi-year training initiative, consisting of both additional in-service trainings and ongoing roll call training at each precinct, addressing these critical areas.

## Stops & Detentions Training

The training on contacts with civilians represents is an initial, intensive effort to provide officers with greater clarity on what had been "blur[red] . . . lines between a social contact and a *Terry* stop."[255]   Prior SPD policy "encourage[d] officers to conduct stops that do not comport with federal and Washington law or nationally accepted police practices."[256]

> By the end of 2014, all SPD officers will have received an initial, intensive training on stops and detentions.

The initial four-hour training conducted at the end of 2014 focuses on the "distinction between various police contacts according to the scope and level of police intrusion," focusing on "the facts, circumstances, and best practices that should be considered in initiating, conducting, terminating, and expanding an investigatory stop or detention . . . ."[257]   Officers are reminded that their "conduct, communications, and even non-verbal communication can transform a voluntary contact," in which a civilian is free to leave or refuse an officer's requests, into a *Terry* stop for which officers would require "reasonable suspicion that a crime has occurred, is occurring, or is about to occur."[258]

As the Monitoring Team noted to the Court in September 2014, "the training emphasizes that *Terry* stops are seizures that are brief and minimally intrusive."[259]   Likewise, the training reminds officers that a so-called "frisk" of a subject pursuant to a *Terry* stop is permissible only if the officer has a reasonable suspicion that the subject is armed and presently dangerous.[260]

The Monitor approved of the 2014 training on the grounds that more training in the area would occur in 2015 on multiple fronts.[261]   For one thing, the Consent Decree requires additional training.   It calls for SPD to provide officers with in-service training in the area of *Terry* stops each year.[262]   SPD must also provide "regular roll call trainings," or short training presentations held at roll calls at the beginning of each watch or shit, about stops and detentions.[263]   More importantly, however, legal guidance in the area

---

[255] 2011 Findings Letter at 29
[256] *Id.* at 9; *see id.* at 34–35.
[257] Consent Decree ¶ 142.
[258] Dkt. No. 176 at 4.
[259] *Id.* (internal quotations and brackets omitted).
[260] *Id.*
[261] *Id.* at 2.
[262] Consent Decree ¶ 142.
[263] *Id.* ¶ 143.

of *Terry* stops can be murky, with the legality of a stop often turning on the specific facts or unique circumstances of a given encounter.[264]

The Monitoring Team is generally pleased with the quality of the training curriculum and its implementation in the area of stops and detentions so far.  Anecdotal evidence suggests that SPD officers are finding the instruction to be valuable and clarifying.  Nonetheless, much additional training will be required to provide officers with the full complement of knowledge and experience necessary to make sound and justifiable decisions in this complex area.

## Bias-Free Policing Training

The 2011 DOJ investigation of SPD concluded that SPD's former "training fails to adequately address some of the underlying causes of racially biased policing, namely, that biased policing is not primarily about the ill-intentioned officer but rather the officer who engages in discriminatory practices subconsciously."[265]  Consequently, the Consent Decree requires in-depth training on bias-free policing.[266]

Recognizing that SPD and law enforcement generally are not alone in needing to provide ongoing training relating to the equitable provision of services, SPD's 2014 training on bias-free policing has "incorporate[d] critical features and key insights from numerous fields, well-established research, and existing law enforcement and professional training programs."[267]  Indeed, among many other resources, the bias-free policing training, which the Court approved in September, incorporates specific material and general approaches from:[268]

- "Fair and Impartial Policing," a training program developed by law enforcement leaders and social scientists in partnership with the Department of Justice's Community Oriented Policing Services ("COPS") Office;
- Training materials by the American Bar Association's Section of Litigation;
- "Help Courts Address Implicit Bias," a training program by the National Center for State Courts ("NCSC") for state-court judges and personnel;
- Training materials by the Association of American Medical Colleges;
- Washington State Criminal Justice Training Commission's L.E.E.D. Justice Based Policing Essentials training initiative;
- Training materials from the Seattle Office of Civil Rights ("SOCR"); and
- Applied social science and legal research.

---

[264] *See* Dkt. No. 176 at 5 (citing Katherine M. Swift, "Drawing a Line between Terry and Miranda: The Degree and Duration of Restraint," 73 U. Chi. L. Rev. 1075, 1075 (2006) ("Courts have not settled on a workable rule for determining custody in Terry stop cases.").

[265] 2011 Findings Letter at 34.

[266] Consent Decree ¶¶ 147–49.

[267] Dkt. No. 176 at 6.

[268] *Id.* at 6.

The training also incorporates comments, perspectives, and advice from the Community Police Commission ("CPC").[269]

The starting point of the bias-free policing training is a presumption that SPD officers "maintain an express commitment against discrimination and differential treatment."[270]  That is, it assumes that SPD officers do not harbor express bias and do not actively want to treat people unfairly or treat some people with different characteristics differently.

Bias-free policing training incorporates material and insights from across professions, disciplines, and social science research.

Therefore, the bias-free policing begins with a section that focuses on the Seattle community's perception of law enforcement—and the relationship of those views with concepts of procedural justice and police legitimacy.  Officers discuss why it matters how the community views SPD even if officers do not agree with the entire substance or scope of those views.  The training "emphasizes that an individual's assessment of how she was treated during an interaction with police is substantially more important to her voluntary acceptance of police decisions than the outcome of the interaction (e.g., whether she was cited, received a warning, was arrested, or the like)."[271]  That is, officers learn that the sense that an officer treated a subject fairly and with dignity can often be disproportionately more important than the ultimate result or formal outcome of the interaction.

The training is providing a unique opportunity for community members to speak directly and candidly to SPD officers about their communities' views of SPD.  At least one CPC commissioner is attending each of the more than 40 individual training sessions held between late October and late December.  Those commissioners are providing a live, 20-minute presentation focusing on how issues relating to procedural justice, fairness, and bias-free policing have impacted the communities that they represent and come from, as well as how the CPC is serving as a forum for engaging some of these important issues.

A rich line of social science research has concluded that an individual's "implicit racial attitudes . . . frequently diverge from explicit racial attitudes."[272]  That is, even individuals with an express commitment to equality display implicit bias, or "the attitudes or stereotypes that affect our understanding, actions, and decisions. . . . involuntarily and without an individual's awareness or

---

[269] *Id.* at 7 ("The dynamic collaboration between [SPD] and CPC across multiple iterations of the ISDM has helped to ensure that the [bias-free policing] training addresses some of the central concerns of Seattle's diverse communities with respect to differential treatment and issues relating to procedural justice.")

[270] *Id.* at 7.

[271] *Id.* at 7–8.

[272] Justin D. Levinson, "Forgotten Racial Equality: Implicit Bias, Decisionmaking, and Misremembering, 57 Duke L.J. 345, 360 (2007)).

intentional control."[273]   As we described to the Court upon recommending the approval of the bias-free policing training, social science has established that all human beings harbor implicit biases:[274]

> [The human] brain . . . learns over time how to distinguish different objects (e.g., an apple and an orange) based on features of the objects that coalesce into patterns.  These patterns or schemas help the brain process information efficiently—rather than figuring out what an apple is every time it encounters one, the brain automatically recognizes it and understands that it is red, edible, sweet, and juicy . . . .
>
> These patterns also operate on the social level.  Over time, the brain learns to sort people into certain groups (e.g., male or female, young or old) based on combinations of characteristics as well.  **The problem is when the brain automatically associates certain characteristics with specific groups that are not accurate for all individuals in the group** . . . . [275]

> SPD training is familiarizing officers with the concept of implicit bias and how—even if they are committed to equality and fairness—bias can unconsciously affect decisions in fast-moving situations.

Because implicit biases are intimately related to our inherent, subconscious mental processes[276], implicit biases have been noted across populations of several professions, including death penalty lawyers, physicians, teachers, and others.[277]

Accordingly, the bias-free policing training introduces officers to the concept of implicit bias and why, even if they are expressly committed to equality and fairness, they may still need to be aware of the unconscious effects of bias—especially in fast-moving situations or when quick decisions are necessary.  The training focuses on a "well-established implicit" bias—the association of blacks or African-Americans, as well as other racial or ethnic groups, with crime or criminality.[278]  Officers explore that association both from a general cultural perspective and from the perspective of how it may influence their performance and decision-making on the job.  They

---

[273] Kirwan Institute for the Study of Race and Ethnicity, "State of the Science: Implicit Bias Review 2014 at 16, *available at* http://kirwaninstitute.osu.edu/wp-content/uploads/2014/03/2014-implicit-bias.pdf.

[274] Dkt. No. 176 at 9.

[275] National Center for State Courts, "Helping Courts Address Implicit Bias: Resources for Education" (2012) at 3, http://www.ncsc.org/~/media/Files/PDF/Topics/Gender%20and%20Racial%20Fairness/IB_report_033012.ashx (emphasis added).

[276] *See, e.g.,* Thomas Gilovich, et al, Heuristics and Biases: The Psychology of Intuitive Judgment (2002); Daniel Kahneman, Thinking, Fast and Slow (2013).

[277] *See* Dkt. No. 176 at 9 (collecting sources)

[278] *See* Dkt. No. 179 at 10–11.

are introduced to multiple, peer-reviewed studies from leading academic journals focusing on the potential impact of the race-crime implicit bias on officers in "shoot/don't shoot" scenarios.[279]

Discussions of procedural justice, institutional racism, bias, and the disproportionate effects of law enforcement on minority communities are important and often constructive.  However, they understandably risk failing to transition those conversations about historical issues and histories of broken relationships to proactive collaboration as to what individual officers can do to affect a new path going forward.  Importantly, the training provides officers with clear strategies and tactics for attempting to minimize the effects of implicit bias, including, among others:

> - Ensuring, where feasible, more time and space to identify facts and reduce errors, as more time permits controlled responses and reduces the ambiguity of situations;
> - Thinking about being able to articulate one's reasoning process;
> - Being mindful that education and training builds awareness of implicit bias; and
> - When interacting with the community, using "LEED," or the "Listen and Explain with Equity and Dignity" interaction and community framework formulated by the Washington State Criminal Justice Training Commission.[280]

Representatives of the Monitoring Team, DOJ, City Attorney's Office, Community Police Commission, Seattle Office of Human Rights, and others have attended the initial bias-free policing training sessions.  All have provided input and real-time comments.  The Education and Training Section has been commendably amenable to ongoing refinement of the training, which has resulted in further improvements to the training.   The Monitoring Team has been particularly impressed with the commitment and professionalism of SPD's trainers, who have been guiding potentially difficult and complex conversations in a productive, focused manner.

> The bias-free policing provides officers with clear strategies and tactics for attempting to minimize the effects of implicit bias.

The Monitor's initial impressions of the training, which officers began in earnest in late October, are positive.  Officers are, with some exceptions, engaged and open-minded.  The curriculum's use of videos—especially real video of SPD interactions with the public—inspires important class discussions.  Most importantly, the class has appeared to the Monitoring Team to be appropriately forward-looking.  Rather than focus disproportionately on prior events or long-term institutional history,

---

[279] *See, e.g.,* Melody Salder et al, "The World is Not Black and White: Racial Bias in the Decision to Shoot in a Multi-Ethnic Context," 68 J. Soc. Issues 286 (2012); Joshua Correll, "Across the Thin Blue Line: Officers and Racial Bias in the Decision to Shoot," 92 J. Personality & Soc. Psychol. 1006 (2007); *see generally* Nicholas Kristof, "Is Everyone a Little Bit Racist?," *N.Y. Times* (Aug. 27, 2014), *available at* http://www.nytimes.com/2014/08/28/opinion/nicholas-kristof-is-everyone-a-little-bit-racist.html?_r=0 (summarizing at a high level of generality research on real-world effects of implicit bias).

[280] This summary is adapted from a substantially similar discussion at Dkt. No. 176 at 12 (internal quotations and citations omitted).

it emphasizes what officers can do now and going forward to ensure that they deliver law enforcement services with fairness, equity, and dignity.

Upon completion of the search and seizure and bias-free policing training, the Monitor will conduct a multi-level assessment of the trainings in the same manner as will be conducted for the use of force training.[281]  "Behavioral criteria," or whether the training drives changes in officer performance, will be of particular importance and interest.  "Results criteria," which, in this instance, would relate closely to how, over time, the views of Seattle's diverse communities may change with respect to SPD treating individuals fairly and equally, will likewise be critical.  Again, training programs are valuable only when officers learn information, adopt values, or internalize lessons *and* when such information, values, or lessons consistently affects the performances of officers in the field.  A training program that has no effect in the real world represents largely wasted resources.

From the Monitoring Team's perspective, effective and meaningful training on bias-free policing—especially training that is geared toward addressing and changing long-standing patterns of unintentional bias, discriminatory practices, or disparate impact—will be a long-term, iterative process.  A single four-hour training to patrol officers is far from sufficient in itself.  As we commented to the Court, the initial training "represents an important introduction to the 'complicated and critical' 'issues of bias present in our society.'"[282]

> Effective and meaningful training on bias-free policing will be a long-term, iterative process.

Accordingly, the Monitor's approval of the 2014 bias-free policing training was "contingent on the provision of additional training on bias-free policing . . . to all patrol officers, supervisors, and command staff in 2015."[283]  The Monitoring Team is looking forward to continued collaboration across stakeholders to develop additional training for officers in 2015 that draws from national innovations, solid academic literature, and best adult education practices.  In particular, the Monitor urges all stakeholders to consider the Consent Decree's requirement that the bias-free training initiatives address "precinct-level cultural competency training regarding the histories and cultures of local immigrant and ethnic communities."[284]

## C. Data

This report has detailed the Department's efforts to implement both a stopgap database system and a more comprehensive, permanent Data Analytics Platform.  The importance of both systems with respect to the reporting, investigation, review, and analysis of force incidents—and to the effective implementation of the Early Intervention System, crisis intervention, and supervision provisions of the Consent Decree.

---

[281] *See infra* Part I(A)(2), "Use of Force Training," at 19.
[282] Dkt. No. 176 at 13 (quoting Consent Decree ¶ 147).
[283] *Id.*
[284] Consent Decree ¶ 148(b).

Those data and performance management systems are also vital with respect to the core issue of discriminatory policing.  In 2011, the Department of Justice surveyed SPD's existing data on stops and detentions of civilian subjects.  It concluded that much of the data was "limited in nature, not complete, and not sufficient to support" with any level of confidence whether SPD's patterns of stops represented an impermissibly disparate impact or not.[285]  A particularly noteworthy deficiency is that "the data d[id] not show the reasons or context of such stops,"[286] which several courts have indicated is constitutionally required.[287]  Some classes of data on officer activity, such as information captured by the Computer-Aided Dispatch system (which tracks officer activity resulting from being dispatched by emergency communications personnel), was better, but the Department did not do a good job "of using these data a supervisory tool for analyzing officer activity."[288]  The Department also noted that SPD "fail[s] to conduct data analysis regarding its officers' activity" in a manner that can "identif[y] outlier precincts, officers, and activity."[289]

> SPD still must put in place a system for reporting and documenting the occurrence and grounds for all *Terry* stops.

Thus, the Consent Decree calls for supervisors and command staff to "identify discriminatory practices when reviewing investigatory stop data, arrest data, and use of force data . . . ."[290]  It requires that the Department ensure that officers "specifically and clearly articulate reasonable suspicion when they conduct investigatory stops or detentions, or conduct field interviews for *Terry* stops,"[291] with supervisors expressly charged with reviewing documentation on stops.[292]  Accordingly, SPD's stops and detentions policy requires that officers document all *Terry* stops, with the documentation to include a number of critical elements and descriptions of the interaction, the person stopped, and the basis for the stop.[293]

Additionally, the bias-free policing policy requires SPD to conduct "periodic analysis of data which will assist in identification of SPD practices . . . that may have a disparate impact on particular protected classes relative to the general population."[294]  To conduct such a complex analysis, SPD requires rigorous and comprehensive data about officer performance across a number of areas and functions.

Thus, to address the core concerns and requirements of the Consent Decree with respect to discriminatory policing and to allow SPD and its officers to comply with the new stops and detentions and bias-free policing policies, the Department needs to be able to track data on stops and detentions, use

---

[285] 2011 Findings Letter at 32.
[286] *Id.*
[287] *See Floyd v. City of New York*, 1:08-cv-01034 at 21 (S.D.N.Y. Aug. 12, 2013).
[288] 2011 Findings Letter at 33.
[289] *Id.* at 31–32.
[290] Consent Decree ¶ 149(b).
[291] *Id.* ¶ 141.
[292] *Id.* ¶ 144.
[293] *See* Dkt. No. 143 at 6.
[294] Seattle Police Manual 5.140(9).

of force, and a variety of other police activity—as well as to analyze and aggregate it to identify systemic issues and trends.

IAPro, the stopgap database system, does not currently offer a built-in module for the input of information about stops and detentions.  The product's manufacturer continues to work with SPD to construct such a module that might be rolled out to its users across the country.  However, in the meantime, SPD is developing a method for capturing the data using its existing in-car computer system, called Versaterm.  If implicated technological upgrades are successful and the contemplated process produces reliable, high-quality, easily accessible information that can be analyzed by the Department, Monitor, Parties, and SPD supervisors alike, it would constitute an extremely promising option for gathering required information on a system that SPD officers already use to accomplish other basic law enforcement functions.  However, if the Versaterm-based solution does not work and an IAPro module becomes available, the Monitor will urge SPD to use the IAPro option to ensure that SPD begins to collect the critical information on stops, by one mechanism or another, in the very near future.

> The Department is developing a method for collecting stop data using its existing in-car computer system.  By one mechanism or another, SPD must begin collecting the information in the very near future.

A major functionality of the ultimate Data Analytics Platform will be the tracking and analysis of civilian stops.  The goal of the DAP is to make data entry efficient and data analysis necessary in this area, including peer-to-peer and precinct-to-precinct comparisons, as straightforward as feasible.  It is currently hoped that high-quality data from Versaterm will inform the DAP.[295]

However the data is captured, SPD, the Parties, and the Monitor will need to answer the following types of questions with respects to stops and detentions—all of which will be necessary for the Monitor to be able to assess whether the Consent Decree's requirements on stops and detentions and bias-free policing are "being carried out in practice":[296]

> **How many Terry stops does SPD conduct?**
> - How many *Terry* stops have SPD officers conducted in a given time period?
> - Where and when do *Terry* stops occur?
>
> **Are particular groups or individuals with certain discernible personal characteristics searched at a disproportionately higher rate?**

---

[295] The Monitoring Team notes that it will only be possible for Versaterm to feed into the DAP if a host of previously identified underlying deficiencies—including basic data management and governance issues—are addressed.  *See* PricewaterhouseCoopers, "Seattle Police Department: Information Systems, Processes, Operations and Technologies—Current State & Maturity Analysis" (Dec. 2013), *available at* http://www.seattle.gov/spd/compliance/docs/BI_Reports/SPD_BI_Gap_Analysis_FINAL.pdf.

[296] Consent Decree ¶ 184.

- In what number, and in what percentage, of *Terry* stops was the subject a member of a protected class or otherwise exhibited discernible personal characteristics outlined in SPD Manual 5.140 ("Bias-Free Policing")?

- How does the number of protected class members, or those who exhibit certain discernible personal characteristics, compare to certain relevant demographic benchmarks?

- Does the Department conduct *Terry* stops on a disproportionate percentage of protected class members, or those who share particular discernible personal characteristics?

- Does SPD conduct more stops in certain areas where populations of certain protected class members reside or populations of those with certain discernible personal characteristics reside?

- Does SPD carry out more stops in areas with individuals of certain protected classes or with certain discernible personal characteristics after controlling for relevant variables?

**Are the Terry stops that SPD officers perform constitutional and justifiable?**

- In what percentage of *Terry* stops did officers seize weapons or contraband?
  - When officers seized weapons or contraband, was the basis for the stop a reasonable suspicion that the subject possessed weapons or contraband or was the basis unrelated to the seized weapons or contraband?

- What percentage of *Terry* stops resulted in further law enforcement action, such as an arrest, citation, or summons?
  - Was the further law enforcement action related to the basis for the stop or was the basis unrelated to the subsequent arrest, citation, or summons?

- In what percentage of *Terry* stops did SPD officers use force?
  - Are individuals of certain protected classes or with certain discernible personal characteristics more likely to be subjected to the use of force in the context of a *Terry* stop?

- Do officers adequately describe the basis for their suspicion when they conduct a stop?
  - For what proportion of *Terry* stops do officers (i) fail to state a specific suspected crime that forms the basis of reasonable suspicion; (ii) fail to provide or provide insufficient information to articulate a reasonable suspicion necessary to justify a stop; or (iii) provide information that does not suggest reasonable suspicion sufficient to justify a stop?
  - Are stops based on the required, individualized reasonable suspicion?  That is, do the articulated facts suggest justifiably reasonable suspicion of the stopped individual rather than merely anyone who shared certain characteristics with the individual?

- How adequately do officers describe the basis for conducting a frisk after making a stop?[297]

---

[297] *See, e.g., Floyd*, Dkt. No. 372 at 15-16 (noting that the New York Police Department's documentation for Terry stops "should . . . be revised to require a separate explanation of why a pat-down, frisk, or search was performed" because

> **Do some officers, precincts, squads, units, or other sub-divisions of SPD conduct stops in a manner that deviate materially from others?[298]**

The Monitoring Team has pressed SPD and the Parties for some time now to reach agreement on a mechanism for officers to begin collecting critical data and information about civilian encounters as soon as possible.  Continued delays with respect to starting data collection in this area will only delay the juncture at which the Department and Monitor can assess how the Department and its officers are doing with respect to the Consent Decree's core concern of discriminatory policing.  The Monitor Team assumes that if the Department can embrace new technological approaches to enable officers to easily and efficiently provide necessary information in some areas—for instance, ticket writing—then it will be able to similarly adapt to new or modified mechanisms for capturing data on stops and in other areas.[299]

Whatever the mechanism for officers to provide critical information about and explanations of *Terry* stops, supervisors, command staff, and the Department will also need to be able to easily access such information and conduct the types of inquiries and analysis outlined above.

## D. Supervision

The Consent Decree charges supervisors with "obtain[ing] and review[ing]" any reports "that document the basis for investigatory stops and detentions to determine if they were supported by reasonable suspicion and consistent with SPD policy, federal, or state law."[300] In that context, the supervisors will consider if the officer's performance suggests that a "review of agency policy, strategy, tactics, or training" is necessary to improve or enhance the officer's performance going forward.[301]

*First-line supervisors will need to be held accountable for scrutinizing officer stop activity.*

SPD will need to hold first-line supervisors accountable for scrutinizing officer stop activity.  In part, it will do this by holding commanders and lieutenants responsible for effectively supervising their sergeants.[302]  Part of the Monitor's consideration of underlying stop activity will be whether, in problematic instances or for an officer with suboptimal patterns, the officer's first-line supervisor identified such potential problems and appropriately addressed them.

---

subjects are "routinely subjected to these intrusions when no objective facts supported reasonable suspicion that they were armed and dangerous").

[298] This discussion is adapted from Matthew Barge & Ian Warner, Memorandum re: Data Analysis Plan (Revised) (Apr. 8, 2014).

[299] "Seattle Police Switch to Digital Tickets," AP (Nov. 11, 2014), http://seattle.cbslocal.com/2014/11/11/seattle-police-switch-to-digital-tickets/.

[300] Consent Decree ¶ 144.

[301] *Id.* ¶ 144.

[302] *See infra* Part I(D)(3), "Supervision," at 55.

The Consent Decree emphasizes the importance of first-line supervision with respect to complaints of bias and discriminatory policing.[303]   As noted above, SPD policy now requires that a sergeant respond to the scene whenever an individual makes a complaint about bias.   The Monitor will, in the upcoming months, conduct systemic assessments to ensure that supervisors are responding appropriately and affording bias allegations the necessary level of attention and diligence.

---

[303] Consent Decree ¶¶ 150–52.

# IV. Additional Progress & Challenges

Each specific provision of the Consent Decree is a tool or mechanism for seeing that SPD delivers policing that is constitutional, advances the safety of officers and the public, and engenders public confidence and trust. The public must have confidence that SPD and its officers are delivering constitutional, effective, and safe policing.

To facilitate continuous dialogue with the community in 2014, the Monitor has been holding an ongoing series of town hall-style community forums. The Monitoring Team has remained heavily involved with participating in additional community events, as well. The Community Police Commission has continued to work diligently on making important recommendations about SPD's accountability structure and the Department's community outreach efforts.

The Education and Training Section has made commendable progress with respect to institutionalizing a new training framework. The new approach has resulted in more rigorous, focused, and robust training programs. That approach is guiding SPD's plans to reinforce and expand training for 2015 in core areas related to force, crisis intervention, stops and detentions, team tactics, and bias-free policing.

## A.  Community Outreach

The goal of the Consent Decree, as set forth in its first paragraph, is "ensuring that police services are delivered" in a manner that is compatible with the Constitution and U.S. law, ensures the safety of officers and the public, and, crucially, "promotes public confidence in the Seattle Police Department . . . and its officers."[304]

These goals stem closely from the conclusions of the Department of Justice's 2011 investigation.  The DOJ concluded that it "is certainly the perception of a significant segment of communities of color" in Seattle that "inappropriate practices may particularly affect racial and ethnic minorities."[305]  Noting that "[c]ommunity trust is critical to effective policing,"[306] it cited as problematic that "[p]erceptions persist that SPD exhibits bias both in street encounters, and in its use of force."[307]  It reported significant concerns with the reports "[d]uring . . . community interviews" of SPD "officers stop[ping] individuals without reasonable suspicion or cause, detained them, and indicated to them that they were not free to leave."[308]

> The various Consent Decree provisions serve as the primary means for ensuring that the public can have confidence that SPD is delivering constitutional, effective, and safe policing.

The various substantive "commitments"[309] that the Consent Decree requires—which include the significant reforms discussed previously in this report with respect to use of force, crisis intervention, stops and detentions, bias-free policing, supervision, and the Office of Professional Accountability ("OPA")— serve as the primary means for ensuring that the public can have confidence that the SPD and its officers are delivering constitutional, effective, and safe policing.  **Each specific provision of the Consent Decree is a tool or mechanism for seeing that SPD delivers policing that is constitutional, advances the safety of officers and the public, and engenders public confidence and trust.**

In a status conference on August 19, 2014, Judge Robart underscored the centrality of public trust and confidence to the Consent Decree process:

> If you're going to have the full faith and support of the public in Seattle, they're going to have to be proud of their police.  And that's going to be the biggest weapon the police have.  We don't need armored personnel carriers, we need the public to support us.[310]

---

[304] Consent Decree ¶ 1.

[305] 2011 Findings Letter at 27.

[306] *Id.* at 35.

[307] *Id.* at 28.

[308] *Id.* at 27.

[309] Dkt. No. 3-1 at 16.

[310] 8/19/14 Status Conference Transcript at 31.

The Court did the same at an April 3, 2014 status conference, as the Monitor noted in the Third Semiannual Report:

> [U]nity and community is what . . . we seek to achieve here, where the police are not viewed as 'them,' they are viewed as 'us.'  If we can accomplish that by these changes, then I believe that we will have a police department that Seattle can be justifiably proud of."[311]

## Community Outreach by the Monitoring Team

### *Ongoing Community Engagement Forums*

In its prior reports, the Monitoring Team has summarized its community goals and efforts.[312]  Likewise, the Monitoring Team has repeatedly articulated its strong belief that continuous dialogue with the community will be required to engender public trust in the reform process and to gauge whether the community is beginning to see the results of reforms implemented as a result of the Consent Decree.

To facilitate continuous dialogue with the community in 2014, the Monitoring Team is holding an ongoing series of town hall-style community forums, which are open to all and held in community centers and other venues.  During the community forums, the Monitoring Team provides a report on current progress.  More importantly, it seeks feedback and discussion on the current relationship between the community and the Department, any noted changes in that relationship, and suggestions for areas of focus in 2014 and 2015.

In the past three months, the Monitor and members of the Monitoring Team have made formal presentations or participated on panels involving:

> - Filipino Community of Seattle, held at the Filipino Community Center of Seattle in South Seattle
> - Representatives of the Native American Community (coordinated by Jay Hollingsworth of the John T. Williams Organizing Committee), held in North Seattle;
> - The Loren Miller Bar Association (the state-wide African American lawyers group), held at the law firm of Perkins Coie in downtown Seattle;
> - Columbia Legal Services in Seattle and via a state-wide video connection to its offices;
> - SPD North Seattle District Advisory Council-held at North Seattle Community College; and
> - Urban League of Metropolitan Seattle-Career Bridge Program.

The Monitor has appreciated the candor and earnest participation of community members during these

---

[311] 4/3/14 Status Conference Transcript at 88; *see* Third Semiannual Report at 6-7.
[312] Third Semiannual Report at 91-92; Second Semiannual Report at 44-45.

forums.  These community engagement presentations by the Monitor will be ongoing and remain in harmony with continuing goals of assessing, through the eyes and perspectives of Seattle's richly diverse communities, the progress of the SPD in complying with the letter and spirit of the Consent Decree.

## Ongoing Community Involvement

In addition to the above community engagement presentations, the Monitoring Team has continued its involvement with a broad cross-section and spectrum of the Seattle community.   The Monitor wholeheartedly believes that far-reaching and ongoing community engagement is vital to achieving the objectives and goals embodied in the Consent Decree.   Members of the Monitoring Team routinely attend events organized or sponsored by the city, SPD, or community groups that relate to law enforcement issues.   A representative list of individuals, organizations, and activities with which the Monitoring Team has been engaged over the past six months includes, but is not limited to:

- Attendance at Swearing-In Ceremony and Reception for SPD Chief Kathleen O'Toole
- Attendance at "Ask The Mayor" televised (Channel 21) New Holly community gathering with residents and East African community, Mayor Ed Murray, and SPD Chief Kathleen O'Toole
- Attendance at and participation in Community Roundtable focused on public safety issues convened by Councilman Bruce Harrell (SeaMar Community Health Cannon House)
- Attendance and participation in "Find It and Fix It" Walk (Central District) near 23rd Avenue South, focused on public safety and infrastructure issues,  with Mayor Murray, Chief O'Toole, Councilman Bruce Harrell and community residents and organizations
- Attendance of Community Panel and "Find It and Fix It" Walk, focused on public safety and infrastructure issues,     with Mayor, SPD Chief Kathleen O'Toole and Councilmember Bruce Harrell (S. Orcas St. and Martin Luther King Jr. Way S., Seattle)
- Attendance at and Southeast Asian Advisory Council Meeting with community residents and SPD reps (Providence, Peter Claver House (38th Ave South, Seattle))
- Attendance at, and participation in, Native American Advisory Council meeting with community residents, and SPD representatives (Pearl Warren Building, 606 12th Ave. S, Seattle)
- Attendance at Find It and Fix It" Walk focused on public safety and infrastructure issues, (Rainier Avenue and Genesee Neighborhood) with Mayor Murray, Councilman Harrell, Chief O'Toole and community residents and organizations
- Attendance at and participation in "Community Walk" with Mayor Murray, Chief O'Toole, City Attorney Pete Holmes, Councilman Bruce Harrell, et al and members of the Rainier Beach community
- Attendance at First AME Church 123rd Session of the Pacific Northwest Annual Conference with members of the Clergy and Chief Kathleen O'Toole
- Attendance and participation in meeting at Mount Zion Church with SPD Chief Kathleen O'Toole, members of SPD Command staff, Pastors of various Seattle region

churches, and community representatives and members, for a dialogue on how best to preclude conditions that would act as a catalyst to an environment and events analogous to the recent issues in Ferguson, Missouri

- Attendance of SPD Foundation Chief's Breakfast
- Attendance of Mayor Ed Murray's press conference on his 2015-2016 budget as it pertains to Public Safety
- Attendance of Chief Kathleen O'Toole's meeting with the SPD Demographic Advisory Council Chairs/Leads/Precinct Advisory Council Leads/Community Members
- Attendance at SPD East Precinct District Advisory Council meeting with Chief Kathleen O'Toole and community residents at Seattle University
- Attendance at SPD African American Advisory Council meetings at Seattle Vocational Institute
- Ongoing Attendance at nearly every CPC Board meeting and at several of the CPCs works groups
- Attendance at meetings of the African-American District Advisory Council
- Meetings with precinct Patrol officers and command supervisors at SPD Precincts city-wide
- Attendance at the Seattle City Council Public Safety Committee meetings
- Attendance at Mayor's press conference concerning proposed accountability system reforms
- Continuing participation in ride-alongs with SPD officers
- Participation in roll calls in advance of some large demonstrations and major events (including May Day, the Super Bowl parade, and attendance with officers at the scene of Freak Night).

*Updated Website*

Aware that taking time to attend a forum is not feasible for many, the Monitoring Team has substantially expanded is web presence.  On October 13, 2014, a substantially upgraded version of the Team's official website, **seattlemonitor.com**, went live.  The website provides updates on the latest news and progress related to the Consent Decree.  It houses archives of the Monitor's reports, recommendations to the Court, key SPD policies, and the like.

Importantly, it also provides mechanisms for members of the Seattle community to become involved.  A feedback form provides an opportunity for members of the public to communicate directly with the Monitor.  A schedule of the Monitor's participation in upcoming events is featured, as well as the ability to sign up to receive news and updates from the Monitor by email.

Although the Monitoring Team is aware that Internet access might not be readily available to all, it is hoped that an expanded web presence will provide an important mechanism for continuing the public dialogue about the Consent Decree process.

### Survey of Community Perceptions and Attitudes

The Monitor's Second Semiannual Report presented the results of an "important, early step in what will be ongoing and multi-faceted efforts to assess community perceptions of" and confidence in the SPD: a survey conducted by a nationally renowned research firm.[313]  The survey results "provide[d] a snapshot of Seattleites' perceptions of the SPD with respect both to the Department and issues central to the Settlement Agreement, such as use of force and racial profiling."[314]  The report noted that the "Monitoring Team plans to conduct future surveys to discern whether, and how, Seattle residents' perceptions of the Department change over time."[315]

Accordingly, the Monitoring Team intends to supplement its ongoing, qualitative assessments of community sentiment with a follow-up survey to assess overall public confidence in SPD in the third quarter of 2015.

## Community Police Commission ("CPC")

The fifteen commissioners of the Seattle Community Police Commission are volunteers, appointed by the Mayor, who include civil rights and civil liberties advocates, business and faith leaders, and representatives from the two SPD unions.  The CPC has continued to meet as a full commission bi-weekly.  Its workgroups on various aspects of police reform have met frequently.

> The Community Police Commission has been diligent, constructive, and hardworking.

The CPC's work during the first half of 2014 focused on review of the overall accountability system with respect to SPD, with particular emphasis on the accountability structure and the policies and practices of the Office of Professional Accountability ("OPA").  The CPC's recommendations on accountability were informed by the views of the community and developed in collaboration with key stakeholders, including the OPA Director and OPA Auditor.

Consistent with its charge under the Memorandum of Understanding that accompanied the Consent Decree, the CPC has undertaken an assessment of SPD's community engagement activities, programs, and efforts.[316]  The CPC has also collaborated with SPD to review training curricula related to the Department's updated policies on bias-free policing and stops and detentions, discussed in detail above.  In addition to providing input on the training curricula, a CPC Commissioner will attend each of the bias-free trainings and provide a 20-minute presentation on how SPD's relationship with the communities

---

[313] Second Semiannual Report at 47.
[314] *Id.*
[315] *Id.* at 53.
[316] Memorandum of Understanding ¶¶ 13-14.  The Monitoring Team has elsewhere commented on CPC's community outreach efforts.  *See* Second Semiannual Report at 54.

that they represent has impacted their communities, as well as about the CPC generally.

The Commission has been diligent, constructive, and hardworking.  The relationship between the Monitoring Team and CPC is collaborative and constructive.

## B. Additional Training Developments & 2015 Officer Training

This report has elsewhere described the SPD's Education & Training Section implementation of significant training programs for critical officer training in the areas of use of force, bias-free policing, and stops and detentions.[317]

This section describes the Education and Training Section's commendable progress with respect to institutionalizing important changes that have resulted in its training programs being more rigorous, focused, and robust than they were previously.  It also describes how the Section is planning to reinforce and expand on training in core areas related to force, crisis intervention, stops and detentions, team tactics, and bias-free policing during 2015.

### Continued Commitment to More Rigorous Curriculum Development

The Monitoring Team, in a memorandum to the Court recommending that it approve SPD's 2014 use of force training plans, observed that, "[h]istorically, many law enforcement agencies have struggled to provide employees with ongoing, post-academy training that successfully integrates instruction in technical skills, policies . . . [,] procedures, and core values."[318]  We noted that training has too often been "ad hoc" and "scattered" with "[r]e-examination of training curricula . . . driven by" a high-profile incident or a "highly-motivated  lieutenant o[r] captain or commander who may shake things up until he or she is promoted or moves onto the next assignment."[319]

The Monitor has been sensitive to longstanding concerns about the performance of SPD's Education and Training Division under prior leadership—including issues related to overtime spending[320] and to the sense, in some quarters, that SPD had slowly created a "silo . . . in which it separated itself from the best

---

[317] *See infra* Part I(A)(2), "Use of Force Training," at 19; *infra* Part II(C), "Crisis Intervention Training," at 77; *infra* Part III(B), "Discriminatory Policing—Training," at 86.

[318] Dkt. No. 144 at 3.

[319] *Id.* at 4.

[320] Graham Johnson, "New report: $1 million in excessive overtime at SPD," KiroTV.com (Sept. 30, 2014), http://www.kirotv.com/news/news/new-report-1-million-excessive-overtime-spd/nhYcH/#__federated=1; Linda Byron, "Report: Lax controls in SPD Training Unit go back years," King5.com (June 2, 2014), http://www.king5.com/story/news/local/investigations/2014/09/30/spd-training-unit-seattle-police/16501829/.

regional training initiatives," other outside collaboration, and external scrutiny.[321]

In response to these deficiencies and concerns, SPD adopted a methodology called the Instructional System Design Model ("ISDM").  As we have noted elsewhere, "ISDM is an instructional best practice embraced by the armed forces" and major law enforcement agencies such as the Commission on Accreditation of Law Enforcement Agencies ("CALEA") and California's Commission on Peace Officer Standards Training ('POST').[322]  That model provides a framework by which designers of adult education programs conduct an analysis of the Department's existing deficiencies and needs, design and develop training to address the identified gaps, implement the training, and conduct ongoing evaluation of the training as it is rolled out.[323]

> The Education & Training Section's ongoing embrace of a new framework for developing training plans is continuing to improve the quality and focus of SPD training.

As we first reported in June 2014, SPD initially embraced the ISDM approach to develop a 24-hour, comprehensive use of force training.[324]  The Monitor observed that the use of force ISDM "suggested a sea change in the depth, rigor, and sophistication of SPD's approach to training officers."[325] The Monitor recommended approval of the force ISDM[326], with the Court subsequently approving it.[327] This report elsewhere discusses the Monitor's preliminary qualitative assessments of the training that officers have been receiving on force according to this ISDM.[328]

The Monitor commends the Education and Training Section for its ongoing use of the ISDM approach for constructing critical officer training on searches and seizures and on bias-free policing.[329]  The Monitoring Team continues to find the ISDM structure to provide a systematic and robust framework for the Department to specifically address core training objectives and evaluate the potential effectiveness of its training.  In the context of both search and seizure and bias-free policing, the framework appeared to provide to focus and structure what could otherwise have been amorphous, disjointed, or confusing instruction.  It has also provided the Education and Training Section with the flexibility to easily make small adjustments, consistent with the overall goals and objectives of the training, to enhance officer receptivity, learning, and retention.

The Section has pledged to continue using the ISDM approach for its 2015 training initiatives.  The

---

[321] Third Semiannual Report at 30.
[322] Dkt. No. 144 at 4–5.
[323] *Id.* at 4.
[324] Third Semiannual Report at 22.
[325] *Id.* at 21.
[326] *See* Dkt. No. 144.
[327] Dkt. No. 153.
[328] *See infra* Part I(A)(2), "Use of Force Training—Assessment of Training," at 22.
[329] Dkt. No. 176.

Monitoring Team applauds the Department's swift embrace of its recommendation in the Third Semiannual Report that SPD "mak[e] the ISDM its standard framework for creating and implementing training programs."[330]  The Section's ability to embrace a new approach and institutionalize it with such speed and quality has been impressive.

## 2015 Training

In 2014, SPD's Education and Training Section managed to accomplish what the Monitor's previous report called "herculean effort[s]" in constructing high-quality training programs, addressing the most critical areas of the Consent Decree, in substantially compressed time periods.[331]  In part, those efforts were so substantial because it appeared that prior leadership had fallen asleep at the switch as to the need to craft a clear, detailed, and justifiable yearly training plan for officers.[332]  Thus, the Section's current leadership needed to begin crafting a plan for the training that SPD would provide officers in 2014 well into March and April of the year.

For 2015, SPD has embraced a more methodical, forward-looking approach to determining its training needs and crafting a training plan for providing such instruction.  Although some details of officer training in 2015 may still be finalized, the Education and Training Section has worked closely with the Parties and Monitor to create a series of training initiatives that complement, reinforce, and expand upon the critical training that officers received in 2014.

> For 2015, SPD has embraced a methodical, forward-looking approach to assessing its training needs and crafting a plan to address them.

Training will continue to address the core areas of the Consent Decree.  With respect to use of force, the Department will robustly reengage in providing officers the sort of in-depth, scenario-based individual tactical training that prior SPD leadership suspended in 2013.  Crucially, however, this training will seamlessly integrate the important new concepts embodied in the use of force policy, including de-escalation and proportionality with respect to force deployed.  The training will provide scenarios that will require officers to assess, modulate, and de-escalate their force or response accordingly.

Officers will also attend a more specific course in February 2015 on de-escalation training.  The training will provide practical techniques, tactics, and strategies for verbally de-escalating or otherwise defusing potentially problematic encounters.  It will also address how various communication styles or approaches may set the occasion for misunderstandings or misinterpretations that can unwittingly escalate otherwise benign situations.

---

[330] Third Semiannual Report at 24.
[331] *Id.* at 3.
[332] *See id.* at 20.

The individual tactical skills training and tactical de-escalation training will be the Department's first major training initiatives of 2015. All officers are to have completed the training by early June. Furthermore, officers will participate in an additional training on individual de-escalation skills near the end of the year.

Separately, SPD hours will receive 8 hours of advanced crisis intervention training. That class will be the same advanced class that SPD officers already "CIT-certified" by virtue of intensive training in the area in the past 5 years received as an advanced curriculum in 2014. Thus, by the end of 2015, all officers will have received advanced training in dealing with individuals experiencing behavioral crisis.

SPD will officers will also receive an 8-hour block of integrated firearms training and team tactics. The firearms training will, where appropriate, address de-escalation skills and tactics that may obviate or delay the need for officers to use force—such as verbal commands, attempting to secure backup or the presence of additional officers at a scene where appropriate, and moving to cover.

Supervisors will receive several targeted trainings addressing a number of critical supervisory and leadership issues. First, by the end of February, SPD supervisors will complete in-class, collaborative training on coaching and mentoring. It seeks to provide supervisors with expanded information about, and familiarity with, the array of options available to supervisors to guide, counsel, and coach the officers that they supervise in order to enhance performance and identify problematic performance trends.

> In 2015, officers will receive the next sage of training in de-escalation, crisis intervention, team tactics, stops and detentions, bias-free policing, and other areas.

Subsequently, by the end of April, supervisors are to have attended an 8-hour training on tactical leadership and incident command. The training will emphasize de-escalation tactics, leadership in fast-evolving incidents, and scene management processes. A final training block will ensure that officers are kept up-to-date with respect to emerging legal issues, the use of SPD's data technology systems and processes, Consent Decree-related policies, lessons learned from the Force Review Board, and the like. This final training will occur in September and October.

As noted elsewhere in this report, SPD will follow up its 8-hour training on *Terry* stops and bias-free policing with an additional training on these concepts. Indeed, the Monitor recommended approval of the 2014 training subject to the understanding that the Department would provide separate, additional, and in-depth classroom training on these areas. The Monitor urges the SPD to continue its productive partnership with the Parties, Monitor, CPC, and other community stakeholders in developing rigorous training that draws on insights and approaches from similar trainings in other jurisdictions, social science research, and the latest legal developments.

# Appendix A: Current Force Review Board Adjudications

**1. Review of the force applied:**

*Administrative Approval:* The force used was objectively reasonable, necessary, and proportional based on the totality of the circumstances documented in the investigation.

*Administrative Disapproval:* The force used under the circumstances was not objectively reasonable, necessary, or proportional based on the totality of the circumstances documented in the investigation. This finding will result in a referral to OPA for review.

**2. Review of tactics/decision making:**

*Administrative Approval:* The tactics and decision-making employed were consistent with policy, training and reflects a reasonable professional judgment.

*Administrative Disapproval:* The tactics and or decision-making employed were inconsistent with training, policy, or reasonable professional judgment based on the documentation provided. If the tactics/decision-making represent a substantial departure from training, policy or reasonable professional conduct and the chain of command did not address the issue, then this finding will result in a referral to OPA for review and classification to determine whether formal supervisory action and training or a misconduct investigation is warranted.

**3. Review of incident supervision, investigation, and reporting:**

*Administrative Approval:* The review board finds that the investigation is thorough and complete. The review board finds that preponderance evidence support the reviewer's determinations.

*Administrative Disapproval:*
1. The review board does not believe that the investigation is thorough and complete. Disapproval may result in a referral to OPA for review and classification to determine whether formal supervisory action and training or a misconduct investigation is warranted; *or*
2. The review board does not believe that the preponderance of evidence supports the reviewer's determinations. Disapproval will result in a referral to OPA to determine if the chain of command's review warrants formal supervisory action and training or whether a misconduct investigation is warranted.

**4.  Other Findings**

*Policy violation not directly related to the UOF:* This finding covers a range of policy violations that could be minor or significant and which are not addressed above.  This finding will result in a referral to OPA for review and classification to determine whether formal supervisory action and training or a misconduct investigation is warranted if the chain of command did not address the policy violation.

*Policy/Planning/Training Failure*: An undesirable outcome that did not stem from a clear policy, procedure, incident response planning or training violation.  This finding may include global policy, procedure or training deficiencies or developmental needs. This finding requires a referral of the incident by the chief of the compliance bureau to such section of the Department which may be best position to address the issues raised.  The status of this referral must be monitored on a regular basis by the Chief of Compliance to ensure that adequate progress is being made.



# Monitoring Team Staff

**Merrick Bobb**
Monitor

**Matthew Barge**   **Peter Ehrlichman**   **Ronald Ward**
Deputy Director   Deputy Monitor   Assistant Monitor

**Joseph Brann**
**Pat Gannon**
Senior Police Experts

**Julio Thompson**
**Marnie Carlin MacDiarmid**
**Ian Warner**
Esq.

**Joseph Doherty**
**Ellen Scrivner**
Ph. D.

**Brian Center**
Senior Consultant

**Carole Corona**
**Jeffrey Yamson**
Executive Assistants

**CERTIFICATE OF SERVICE**

I certify that on the 15th day of December, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following attorneys of record:

| | |
|---|---|
| J. Michael Diaz | michael.diaz@usdoj.gov |
| Jonathan Smith | jonathan.smith2@usdoj.gov |
| Kerry Jane Keefe | kerry.keefe@usdoj.gov |
| Michael Johnson Songer | michael.songer@usdoj.gov |
| Rebecca Shapiro Cohen | rebecca.cohen@usdoj.gov |
| Emily A. Gunston | emily.gunston@usdoj.gov |
| Puneet Cheema | puneet.cheema2@usdoj.gov |
| Timothy D. Mygatt | timothy.mygatt@usdoj.gov |
| Christina Fogg | christina.fogg@usdoj.gov |
| Jean M. Boler | jean.boler@seattle.gov |
| Peter Samuel Holmes | peter.holmes@seattle.gov |
| Brian G. Maxey | brian.maxey@seattle.gov |
| Gregory C. Narver | gregory.narver@seattle.gov |
| John B. Schochet | john.schochet@seattle.gov |
| Rebecca Boatright | rebecca.boatright@seattle.gov |

DATED this 15th day of December, 2014.

*/s/ Carole Corona*
Carole Corona

THE SEATTLE POLICE MONITOR'S FOURTH
SEMIANNUAL REPORT
Case No.  C12-1282JLR

Merrick J. Bobb, Monitor
Police Assessment Resource Center
PO Box 27445
Los Angeles, CA 90027
(213) 623-5757