THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>       Plaintiff,<br><br>  vs.<br><br>CITY OF SEATTLE<br><br>       Defendant. | CASE NO.  C12-1282JLR<br><br>**THE SEATTLE POLICE MONITOR'S FIRST SYSTEMIC ASSESSMENT** |

The Seattle Police Monitor's First Systemic Assessment is attached.

THE SEATTLE POLICE MONITOR'S FIRST
SYSTEMIC ASSESSMENT
Case No.  C12-1282JLR

Merrick J. Bobb, Monitor
Police Assessment Resource Center
PO Box 27445
Los Angeles, CA 90027
(213) 623-5757



SEATTLE
POLICE
MONITOR

# First Systemic Assessment: Force Investigation & Reporting

September 2015

# Table of Contents

Executive Summary .................................................................................................................. 1

Introduction to the Monitor's Systemic Assessments ............................................................ 5

Part 1.  Overview of Force Reporting & Investigations and Assessment Methodology........................ 8

   I.  An Overview of Force Reporting & Investigations ............................................................... 8

      A.   How the Consent Decree Addresses Force Investigation & Reporting ........................ 8
      B.   The Categorization of Force by Type ............................................................... 10
      C.   Reporting Force ................................................................................. 12
          1.  Supervisor Notification & Response ...................................................... 13
          2.  Documenting the Force ...................................................................... 13
      D.   Investigating Force ............................................................................ 15
          1.  Type I Force ..................................................................................... 15
          2.  Type II Force .................................................................................... 16
          3.  Type III Force ................................................................................... 17
      E.   Prior Progress & Prior Evaluations of Force Investigations & Reporting ................ 18

   II.  Assessment Methodology...................................................................................... 20

      A.   What Force Reports & Investigations Were Reviewed ........................................ 21
      B.   How the Force Reports & Investigations Were Evaluated..................................... 22

Part 2.  Force Investigation Team ("FIT") Investigations ................................................... 25

   Description of Reviewed Cases ................................................................................. 25
   Immediate Post-Incident Response .......................................................................... 25
   FIT Response ................................................................................................... 26
   FIT Investigative Processes & Fact-Gathering ............................................................. 27
   Overall Sufficiency of the Investigation ..................................................................... 29

Part 3.  Type II Reporting and Chain of Command Investigation & Review.......................... 33

   Description of Reviewed Type II Cases ..................................................................... 33
   Type II Reporting .............................................................................................. 33
      Supervisory Response ....................................................................................... 33
      Officer Documentation ...................................................................................... 34
   Type II Review ................................................................................................. 35
      Sergeant's Investigation..................................................................................... 35
      Sergeant's Report............................................................................................ 41
      Lieutenant's Review ........................................................................................ 43
      Captain's Review ............................................................................................ 45

Part 4.  Type I Reporting & Chain of Command Review ....................................................46

   Description of Reviewed Type I Cases ....................................................................... 46
   Type I Force Reporting ....................................................................................... 46
      Supervisor Notification & Response ..................................................................... 46
      Officer Documentation ...................................................................................... 48
   Type I Review .................................................................................................. 50
      Sergeant's Review............................................................................................ 50
      Lieutenant's Review ........................................................................................ 53
      Captain's Review ............................................................................................ 54

# Executive Summary

This Report assesses how effectively the Seattle Police Department ("SPD") is documenting, investigating, and analyzing use of force by SPD officers across all levels of reportable force: low-level uses of force (Type I), intermediate uses of force (Type II), and high-level uses of force (Type III and officer-involved shootings).[1] Specifically, as described in the Monitor's Third-Year Monitoring Plan filed in March and updated in July 2015, this Report considers those processes within four separate assessments on: (1) Type I reporting, (2) Type II and III reporting, (3) Chain of Command Investigations for Type I and II incidents and (4) Force Investigation Team ("FIT") investigations of Type III incidents.[2]

The good news is that in a short amount of time – just six months from the Court-approved, force-related policies taking effect on January 1, 2014 – rank and file officers have responded to clear rules of the road for systematically documenting force whenever it is used, sergeants have responded to the scene in way that permits a thorough investigation, and FIT investigations are consistently excellent. **As a result, the Monitor finds the SPD in initial compliance with certain provisions or requirements of the Decree and thus in partial compliance with the Decree as a whole.**[3]   That and other advances represent an impressive achievement, rapid progress, and, most importantly, an encouraging suggestion that officers are accepting the new requirements of the Consent Decree as the way that business will be done going forward within the SPD.

All in all, this assessment on force reporting and investigation gives the Monitor, despite much more work that will need to be accomplished by the SPD, still greater confidence that if SPD "continues on the path that it is now . . . [it] is likely to get the job done."[4]  This is an important milestone, reflecting Chief O'Toole and her command staff's leadership.  These advances in police reform owe a good deal to the commitment and leadership of Mayor Ed Murray and his staff; the City Attorney, Pete Holmes, and his staff; City Council, including its President, Tim Burgess, and the Chair of its Public Safety committee, Bruce Harrell, and his committee members; and the Seattle community.

A fundamental deficiency that the Department of Justice ("DOJ") identified in its 2011 investigation was the failure of SPD officers to uniformly and accurately report when they used force and of the Department to rigorously investigate and review such force.[5]  There was, at best, cursory reporting, inadequate on-scene supervisory investigation of force, insufficient analysis of use of force incidents, and too little meaningful oversight and review of force investigations.  The City of Seattle and the DOJ negotiated a Consent Decree in 2012 which aims, in part, at ameliorating those deficiencies under the theory that institutional change is often

---

[1] The Consent Decree, and the subsequently-implemented SPD policies, set forth express requirements for and "different levels of departmental reporting and review that become more rigorous depending on the type of the force used." Dkt. 3-1 ¶ 93. Specifically, force is categorized into three levels for force "types" – low-level Type I force, intermediate-level Type II force, and serious Type III force.  The categories account for the nature of the force used, outcome of the actual force used, and – regardless of the outcome or injury to the subject – the risks that can reasonably be expected to be associated with the application of the force, with a focus on the highest scrutiny on the highest levels of force.

[2] *See* Dkt. 195 & 222.

[3] The Parties, SPD, and Seattle community must be careful to understand what the Monitor means and does not mean by "initial compliance" and "partial compliance."  These phrases are not expressly used in the Consent Decree itself, although the concept is contained in the Decree.  *See* Dkt. 3-1 ¶¶ 185, 230.  It is not the same as "full and effective compliance" with the Consent Decree.  Rather, it connotes that, in the Monitor's opinion, the SPD has initially satisfied the requirements of some provisions of the Consent Decree, but that such initial compliance must be maintained as the SPD moves systematically toward full and effective compliance with the Consent Decree as a whole.

[4] Fourth Semiannual Report at 12.

[5] For a variety of different reasons, force often went unreported – leaving it subject to no departmental scrutiny.  *See* United States Department of Justice, Civil Rights Division and U.S. Atty's Office, W.D. Wash., Investigation of Seattle Police Department (Dec. 16, 2011) [hereinafter "2011 Findings Letter"] at 15, *available at*  http://static.squarespace.com/static/5425b9f0e4b0d66352331e0e/t/5436d96ee4b087e24b9d38a1/1412808 7506/spd_findletter_12-16-11.pdf.  Where force was reported, it was documented "on paper stuffed, unreviewed, in file cabinets . . . ."  Fourth Semiannual Report at 26.  SPD supervisors "fail[ed] to supervise patrol officers' use of force . . . at every level, from the first line supervisor's investigation and review, to the chain of command's secondary review of that investigation, to the final review by command staff."  2011 Findings Letter at 17.

most effective when it comes from within. Consequently, the Consent Decree and the comprehensive revision to SPD's force-related policies approved by the Court in late December 2013 – which incorporated input from all stakeholders, including the Parties, the Community Police Commission ("CPC"), SPD officers, and other community groups – require that, rather than being ignored or addressed superficially, all force be reported, investigated, and reviewed.[6]

As is demonstrated in this Report[7]:

- Across all of Type III, Type II, and Type I force incidents, the Monitor finds that officers are routinely reporting force to supervisors, that supervisors are responding to the scene and adequately carrying out their on-scene responsibilities in a vast majority of cases, and that officers are thoroughly documenting information about the force that they use. Consequently, **the Monitor finds that the reporting of and response to force is in initial compliance with paragraphs 100, 101, 102, and 103 of the Consent Decree.**[8]

- FIT's investigations are covering all relevant investigative lines of inquiry, probing important issues and attempting to resolve inconsistencies among statements and evidence. In multiple instances, Monitoring Team reviewers saw the quality of SPD's force response and investigation improve immediately upon FIT's arriving at the scene or beginning to investigate the incident. The Monitor therefore finds that **the quality and integrity of FIT investigations are consistent with the requirements of paragraphs 112, 113, 114, 117, and 118 of the Consent Decree and demonstrate initial compliance with those provisions**.

  Although FIT can, and should, still improve in a number of areas, FIT's Captain, Mike Teeter, and his team of dedicated investigators should be commended for their commitment to fair and thorough investigations of officer force. Their willingness, too, for accepting suggestions and incorporating guidance from the Office of Professional Accountability ("OPA"), the Force Review Unit ("FRU"), the Force Review Board ("FRB"), the DOJ, and the technical assistance of the Monitoring Team has been laudable. So also is the thoughtful guidance and support of FIT from Assistant Chief Lesley Cordner.

  There does remain some room for continued progress in FIT investigations with respect to the quality of some interviews of involved officers and civilians. Likewise, FIT's impending switch to interviewing all witnesses—whether civilian or officer—rather than having witness officers submit statements will allow FIT investigators to more effectively and efficiently probe all relevant lines of inquiry.

  In summary, FIT is providing SPD chain of command with fair, thorough, complete, and objective factual records about the highest levels of force from which to make determinations about whether

---

[6] Dkt. 3-1 ¶¶ 72, 91; Dkt. 115 at 3. Although SPD's force-related policies have been updated over the last several months, the changes memorialized there were limited, especially in the areas of force reporting and investigation. *See* Dkt. 204 (updated policies); Dkt. 225 (approving updated policies).
[7] The findings presented here result from the Monitoring Team's intensive, structured reviews, agreed to by the Parties, of the reporting and investigation of force incidents that occurred between July 1, 2014 and December 31, 2014 and for which investigations had been completed as of March 17, 2015. Of those cases, the Team reviewed a statistically significant, random sample of Type I force; a statistically significant, random sample of Type II force; and all Type III and officer-involved shootings. Team members independently evaluated reports and investigations using an agreed assessment instrument that contained both audit-like and general qualitative elements. Thus, they logged, for example, whether investigators accomplished require tasks or the force reports contained required information. Their inquiry was geared toward identifying whether the quality of the reporting and investigations were such that SPD's chain of command could make an objective and well-supported determination about whether the force was consistent with SPD policy. This work was done in coordination with the Parties who were simultaneously conducting assessments of the same areas on their own.
[8] The Monitor will still need to examine whether or not there are any issues with officers using force but not reporting it. This will be one of the subjects addressed in the upcoming Officer Use of Force Assessment. *See* Dkt. 221-2 at 8–9; Dkt. 221–3 at 1.

officer performance involving force is consistent with SPD policy.  So long as all of FIT's policies and procedures are codified in the FIT Manual, required by paragraph 115 of the Consent Decree and that is expected to be filed imminently with the Court, and are not diminished by any provisions of a labor contract, the Monitor believes that FIT will be able to maintain compliance with those requirements of paragraph 118 of the Consent Decree.[9]  **Importantly, the quality of FIT's performance makes its continued location within SPD's Bureau of Compliance and Professional Standards consistent with the objectives of the Consent Decree.**

- For intermediate-level, Type II force, the investigation of the force incident is conducted by a sergeant and reviewed by the chain of command.  The sergeant's role is to be an "impartial fact-finder"[10], conduct a thorough investigation, and complete a Use of Force Report that summarizes the incident, documents evidence, and presents witness accounts of the force.[11]  A lieutenant and captain must review the investigation and the sergeant's report both to ensure that the investigation was thorough and to make express findings as to whether the force was consistent or inconsistent with SPD policy.

  **Sergeant investigations of Type II force are not yet where they need to be.**  Indeed, under half (45 percent) of use of force investigative files (commonly referred to as "packets") included all material evidence.  Likewise, in too many instances, sergeants are not yet preparing an investigative report or summary that can provide the chain of command with "a complete understanding of the incident from beginning to end."[12]  Some basic investigative deficiencies leave the investigation less thorough, fair, and objective than they must be.  Sergeants are not uniformly canvassing for all witnesses, impartially and thoroughly interviewing those witnesses, pursuing all relevant lines of investigative inquiry, securing adequate statements from witness officers, and ensuring that they are sufficiently uninvolved in the incident in the first instance to conduct an impartial investigation.

  **Lieutenants and captains are likewise not yet identifying and addressing deficiencies in sergeant investigations of Type II force.**  In some 45 percent of cases, lieutenants failed to address investigatory issues that the sergeant's investigation left outstanding.  Although captain reviews were slightly better than lieutenant reviews, the captain also failed to spot and resolve thoroughness issues more than half (48 percent) of the time.  In far too many instances, supervisors failed to determine whether the force was consistent with SPD policy.  Because "every supervisor in the chain of command is responsible to assure the accuracy and completeness of the Investigation Reports completed by supervisors,"[13] SPD's lieutenants and captains must assist sergeants in generating high-quality Type II investigations and reports.

- For low-level, Type I force, a sergeant reviews the force.  The Monitoring Team found that a majority of those reviews covered the bases – evaluating all relevant evidence and assessing the incident in terms of SPD policy and training.  Importantly, reviewers found that the use of force packet included all relevant evidence in a substantial majority (86 percent) of cases.

---

[9] Issues that need to be explored with the Parties and Department going forward include mechanisms for ensuring that the subject officer in a Type III use of force or officer-involved shooting is shielded from undue influence or contamination prior to providing his or her account of what happened. In other jurisdictions, pre-interview viewing of video of an incident and conversation (apart from bare minimum facts) with anyone other than the officer's lawyer or union representative has been identified as reducing the integrity of the interview and investigatory process. Likewise, the full and complete audio and/or video recording of the subject officer's statements and questioning can help to ensure that interviews are complete, thorough, and fair – without leading questions or suggested answers.
[10] 2014 SPD Manual Section 8.300-POL-3(3), Dkt. 107-3 at 6.
[11] 2014 SPD Manual Section 8.300-TSK-5(19), Dkt. 107-3 at 13.
[12] Dkt. 3-1 ¶ 106(a).
[13] *Id.* ¶ 109.

Lieutenants and captains review the sergeant's evaluation of Type I force. They are doing an adequate job of reviewing such force – but barely. They often, but not always, identify issues or inconsistencies in the officer reporting or sergeant's reviews. Further, some findings as to whether the force was consistent with SPD policy or raised any tactical or training issues were overly perfunctory ("Officer's actions were in compliance with training and policy" or "This is a type 1 use of force investigation" or "This investigation is complete"). Although the Monitoring Team is acutely aware of the workloads and daily demand on SPD lieutenants and captains, they need to "show their work" to at least some extent for the basis of the determinations that force is consistent or inconsistent with SPD policy. Nevertheless, **the Monitor finds that SPD's review of Type I force is in initial compliance with paragraph 102 of the Consent Decree**, although some work remains to ensure that compliance is maintained.

That SPD's performance is in initial compliance with several of the areas addressed in this assessment should be cause for pride in the SPD, from the rank and file officers on the beat protecting the citizens of Seattle, all the way through to the top levels of management.

Still, **much work remains.** With respect to this assessment, the quality and integrity of Type II force investigations must improve substantially. To this end, SPD has already begun discussions with the Parties about mechanisms for quickly strengthening sergeant investigations and chain of command review of Type II force. One proposal that Chief Kathleen O'Toole has advanced is to create Precinct Operations Sergeants to review Type II investigations for completeness, thoroughness, and objectivity and to send the investigation back to sergeants where there are issues. SPD recommends the approach because it would preserve the continuity of front-line supervision and investigation – but also ensure an objective and thorough review. Although the Monitor will render technical assistance, if asked, on that specific proposal, it is, at the least, strong evidence that SPD and the Parties are dedicated to making pragmatic reforms based on strong, systematic, real-world evidence. The recent updates to the force-related policies approved by the Court in July 2015[14] also provide for an additional review by the Force Review Unit, which should also help ensure accuracy, completeness, and consistency of Type II investigations.

The Monitoring Team is or will soon be evaluating where the Department is across a host of other critical areas. The Monitoring Team is currently assessing the performance of the Force Review Board, including the quality of its review of Type III and officer-involved shootings. The Monitor will file the assessment with the Court by November 9, 2015. Assessments on several other important topics, including the quality of OPA investigations, SPD supervision, stops and detentions, crisis intervention, and officer use of force generally will be filed over the next six months. Collectively, these assessments will cover every area of the Consent Decree.

---

[14] *See* Dkt. 225.

# Introduction to the Monitor's Systemic Assessments

This report marks the first report on 4 of what will ultimately be 15 "systemic assessments" of SPD's progress toward complying with the major areas of the Consent Decree.[15]  For "the Parties, Monitor, and Seattle community . . . to have confidence that the requirements of the Consent Decree are being carried out in practice—not merely on paper," the performance of the Department and its officers must be assessed across a material span of time and number of incidents.[16]  The assessments will more formally gauge whether SPD is where it needs to be in complying with the Decree.

The Monitoring Team calls these evaluations "systemic" because their focus is on "whether the Department has the systems, policies, structures, and culture in place" that the Consent Decree contemplates.[17]  Neither these assessments nor the Monitoring Team will demand that "SPD is uniformly perfect at all times . . . ."[18]  It is an unfortunate fact of any professional organization that employees "might from time to time perform poorly" or "make mistakes or bad decisions."[19]  The Consent Decree indicates, however, that "[n]oncompliance with mere technicalities, or temporary or isolated failure to comply during a period of otherwise sustained compliance, will not constitute [a] failure to maintain full and effective compliance."[20]

As ordered by Judge Robart, the Monitor will, at the same time, insist that there is clear evidence that the various requirements of the Consent Decree are in fact "being carried out in practice"[21] and are sufficiently manifest throughout the Department and across Seattle's diverse communities.  "Full and effective compliance" requires clear, sustained evidence that SPD is where it needs to be not just in a few instances or temporarily across some of the Consent Decree's provisions – but that it has reached and maintained the appropriate outcomes and compliance with the whole of the Consent Decree, that the reforms are "baked in," and that SPD has reset its culture and relationship with all the diverse communities it serves, particularly the African-American community.  Our examination of individual cases or data will therefore be done with an eye toward determining what those individual instances say, in the aggregate and overall, about the performance of SPD and its officers.

The assessments that will be reported to the Court in the coming months "may be quantitative, qualitative, or contain elements of both."[22]  To ensure that the assessments are independent, objective, fair, and consistent with best practices, they will always entail work that the Monitor and his Team, consistent with their duty to the Court, conduct themselves.  They will also be informed by the outside endeavors of the Parties, other stakeholders, and outside groups material to the scope of the particular inquiry at hand so long as that work constitutes the kind of "sound evidence of the quality demanded in any other federal court proceeding."[23]

---

[15] *See generally* Dkt. 221; Dkt. 195 at 7–9; Fifth Semiannual Report at 11.
[16] Dkt. 195 at 7.
[17] Fifth Semiannual Report at 9.
[18] Fourth Semiannual Report at 11.
[19] Fifth Semiannual Report at 9.
[20] Dkt. 3-1 ¶ 184.
[21] *Id.*
[22] Fourth Semiannual Report at 12.
[23] *Id.; accord* Dkt. 3-1 ¶ 190 ("In conducting these outcome assessments, the Monitor may use any relevant data collected and maintained by SPD and OPA, provided . . . that this data is reasonably reliable, complete, and relevant . . . .").

Where the results of one of the Monitor's independent assessments indicate that SPD has not yet reached "initial compliance" with a particular area of the Consent Decree, the reports on those assessments will typically make specific recommendations on what the Department can do to get to where it needs to be. Even where the Monitor believes that SPD is performing well, the reports may still outline recommendations for improvements that can further strengthen the Consent Decree's systems and objectives.

These assessments will often, although not always, situate the Monitor's findings in terms of numbers or descriptive statistics. As this report elsewhere notes, the use of quantitative-qualitative, hybrid methodological designs are an important part of social science research and systems analysis.

However, all readers must be cautioned to note that the general numbers themselves may not tell the entire story. There is no single threshold number that SPD must reach across each and every area that represents initial compliance. For example, an assessment might judge 70 percent of a given type of investigative report as sufficiently thorough and accurate as consistent with compliance – because the quality of the remaining 30 percent of cases leaving room for improvement but being relatively close to where it should be. On the other hand, even if 90 percent of reports were judged to be sufficiently thorough and accurate, there still might not be initial compliance with the relevant provision of the Consent Decree because the remaining 10 percent of investigative reports were wholly inadequate, disturbingly biased, or insufficiently documented. Thus, initial compliance with provisions of the Consent Decree depends not just on the number of percent of instances where SPD is adhering to requirements but also on the quality or nature of those instances where SPD is falling short.

Police departments change because fundamental, day-to-day processes of the institution are transformed into mechanisms that allow those departments to ensure effective and constitutional policing. Indeed, it was the lack of sound internal systems for reporting and reviewing force, tracking information about officer performance, and promoting high-quality supervision that were the basic drivers of the 2011 Justice Department findings.

As the Monitor has previously noted:

> The true test has been and will remain whether SPD has the systems, policies, structures, and culture in place to manage for itself the risk of unconstitutional policing – and whether, through those systems, SPD holds officers and supervisors rigorously accountable through fair and transparent processes, critically analyzes officer and departmental performance based on unbiased evidence and objective data, and proactively identifies and seriously addresses performance issues and trends.[24]

These systemic assessments focus on progress across both a substantial period and a significant number and scope of discrete cases, incidents, or instances. Determinations that the Department has gotten to where it needs to be on a given front or with a particular part of a Consent-Decree-required process is not a certification that everything is entirely perfect along that dimension, that SPD can ease its efforts in the area, or that the Monitor did not find anything during the evaluation that suggested a need for continued improvement.

Instead, the Monitor's determination of "initial compliance" in a given area or for particular Consent Decree provisions means that SPD's performance over a material time period and across incidents suggests that the Department has reached a level of performance in that defined area that is consistent with complying with the

---

24 Fifth Semiannual Report at 9.

terms of the Court-enforced Settlement Agreement.  Likewise, it means that, so long as that performance improves yet further or remains at the level it has been, SPD is in a position, at least for those elements of the Consent Decree referenced, that is consistent with where it needs to be.

# Part 1.
# Overview of Force Reporting & Investigations and Assessment Methodology

## I.   An Overview of Force Reporting & Investigations

A foundational objective of the Consent Decree is that the use of force by SPD officers be uniformly reported by the officers who use it and thoroughly reviewed by supervisors.  For any police department to be able to minimize the risk of unconstitutional force and for the community to be able to have confidence that the department is affirmatively taking officer encounters involving force seriously, it must know when officers use force.  It must also reliably develop an objective and complete account of what happened – from the moment that an officer was dispatched or initiated the encounter until after force was applied and the incident concluded.

In his Fourth Semiannual Report in December 2014, the Monitor distilled – from the many specific and technical Consent Decree provisions – what SPD will look like and how it will function when SPD has reached "full and effective compliance."[25]  That description noted that, to be in compliance, SPD must "ha[ve] in place and actively utilize[] real, rigorous, and fair mechanisms of critical self-analysis to hold officers accountable for their performance and to assist the Department in continually learning and affirmatively improving."[26]  It indicated that the Department will have gotten to that state when, first and foremost:

> Uses of force are found to be reported; rigorously documented; thoroughly, completely, and objectively investigated (whether by the Force Investigation Team or the chain of command); and objectively, critically, and timely reviewed.   The Department has mechanisms in place that identify any deficiencies in the rigor, quality, fairness, and timeliness of such reporting, investigation, and review.[27]

Many of the other accountability systems that the Department must actively utilize – including the Force Review Board, a fair and comprehensive officer discipline system, the Early Intervention System, and others – rely, at least in part, on the accurate reporting and comprehensive review of force.

This chapter provides an overview of the force reporting and investigation requirements of the Consent Decree and of the SPD policies that have been implemented to comply with the Decree and further its objectives.

## A.  How the Consent Decree Addresses Force Investigation & Reporting

The Department of Justice's 2011 investigation of the SPD identified a number of "deficiencies contributing to [a] pattern or practice of excessive force."[28]  One foundational deficiency was the failure of SPD officers to uniformly and accurately report when they used force.  In numerous instances, force was simply not reported

---

[25] Fourth Semiannual Report at 7–12.
[26] *Id.* at 8–9.
[27] *Id.* at 9.
[28] 2011 Findings Letter at 15 (cited in sentence case).

whatsoever – leaving it subject to no departmental scrutiny.  In many, officers were even "identified as using force in other officers' use of force statements, but were omitted from the summary portion of the use of force packet" – leading SPD to "not track these officers' uses of force."[29]  Further, half of OPA investigations relating to complaints of force "did not have an accompanying use of force report, despite the clear application of some level of force."[30]  Even where force had been reported, officer statements were often deficient and regularly used inappropriately boilerplate language.[31]  Finally, the standard for reportable force was too high, allowing officers not to report pushing, non-injurious punches, shoving, and pointing of firearms.

The DOJ investigation concluded that SPD's then-vague policy requirements, training deficiencies, and supervisory failures were leaving numerous instances in which officers used sometimes serious force unreviewed, unscrutinized, and untracked.

Even when officers reported force, that "reporting exist[ed] . . . on paper stuffed, unreviewed, in file cabinets . . . ."[32]  SPD supervisors "fail[ed] to supervise patrol officers' use of force . . . at every level, from the first line supervisor's investigation and review, to the chain of command's secondary review of that investigation, to the final review by command staff."[33]  There was inadequate on-scene supervisory investigation of force, insufficient analysis of use of force incidents, and inadequate oversight and review of force investigations.

These investigatory inadequacies resulted in a system where, of 1,230 use of force reports that were actually made during a two-and-a-quarter-year period, "only *five* use of force packets were referred *at any level* for further review," or just 0.4% of all force reports.[34]

The Consent Decree requires that – rather than being ignored or addressed superficially – all uses of force be reported, investigated, and reviewed.[35]  It sets forth express requirements for and "different levels of departmental reporting and review that become more rigorous depending on the type of the force used."[36]

Accordingly, "[t]he first order of business" once the Consent Decree was entered between the City and the U.S. Department of Justice "was the formulation of new Use of Force policies" that addressed the requirements of the Consent Decree and conformed with federal law.[37]

After "marathon negotiating sessions . . . between the parties" and "substantial input from SPD officers and the community," including the CPC, the Monitor considered whether the proposed force-related policies were consistent with the requirements and terms of the Consent Decree and federal law.[38]  The Monitor determined that they were and recommended approval.[39]  The Court approved the policies in late December 2013.[40]

The policies "became effective on January 1, [2014], with officers receiving in-class training soon thereafter" on the policies, including on the policies' rigorous new reporting requirements and investigative processes.[41]

---

[29] *Id.*
[30] *Id.*
[31] *Id.*
[32] Fourth Semiannual Report at 26.
[33] 2011 Findings Letter at 17.
[34] *Id.* at 21 (emphasis added).
[35] Dkt. 3-1 ¶¶ 72, 91.
[36] *Id.* ¶ 93; *see id.* ¶¶ 100–02 (Type I force requirements), ¶¶ 103–11 (Type II requirements), ¶¶ 112–18 (Type III requirements).
[37] Dkt. 107 at 2–3.
[38] Dkt. 204 at 5 (quoting Dkt. 107 at 1).
[39] Dkt. 107.
[40] Dkt. 115 at 3.
[41] Dkt. 204 at 5–6.

As discussed later in this report, the force reports and investigations that the Monitoring Team reviewed for this assessment covered the period of July 1, 2014 through December 31, 2014.  Consequently, the assessments covered here evaluate SPD's force reporting and investigations in light of the originally-approved, 2014 force-related policies – and not the 2015 updates recently approved by the Court.[42]

However, the changes memorialized in the updated policies were "limited," especially in the areas of force reporting and investigation.[43]  Accordingly, when this and other sections address whether the requirements of 2014 SPD Police Manual Section 8.300 and related sections are effective in practice, it is unlikely that those assessments would be materially different if analyzed through the re-named but substantially similar Section 8.400 in the recently approved updates.  Likewise, when this report addresses the requirements of 2014 SPD Manual Section 8.400 – addressing the supervisory review of force reports and investigations – the requirements addressed track closely the requirements of 2015 SPD Manual Section 8.500 with respect to supervisory review prior to the Force Review Board ("FRB").  The Monitoring Team will formally evaluate the FRB in a separate, forthcoming assessment.[44]

Likewise, SPD reports that, since December, when the Department began maintaining general offense data in aggregate form, 53,714 total general offense reports have been issued.[45]  Of those 53,714 reports, 665, or approximately 1 percent, involved reportable force.  The Monitoring Team will formally assess the Department's use of force – both quantitatively and qualitatively – in separate, upcoming assessments.

## B.  The Categorization of Force by Type

Under SPD's new force-related policies, and consistent with the Consent Decree, force is "any physical coercion by an officer in performance of official duties."[46]  The policies, again consistent with the Decree, set forth "different levels of departmental reporting and review that become more rigorous depending on the type of the force used."[47]

The force categories account for the nature of the force used, the outcome of the actual force used, and – regardless of the actual outcome – the risks that can reasonably be expected to be associated with the application of the force.[48]  More specifically, the Consent Decree's categorization of force is based on several factors:

- Degree of injury caused;
- Potential of the technique or weapon to cause injury;
- Degree of pain experienced [by the subject];
- Degree of disability experienced by the subject;
- Complaint by subject;
- Degree of restraint of the subject;
- Impairment of the functioning of any organ;
- Duration of the force; and
- Physical vulnerability of the subject.[49]

---

[42] See id. (updated policies); Dkt. 225 (approving updated policies).
[43] Dkt. 204 at 14.
[44] See Dkt. 221-3 at 7.
[45] This number does not include police contacts where no general offense report is necessary.
[46] Dkt. 107-1 at 5; Dkt. 3-1 ¶ 16.
[47] Dkt. 3-1 ¶ 93; see id. ¶¶ 100–02 (Type I force requirements), ¶¶ 103–11 (Type II requirements), ¶¶ 112–18 (Type III requirements).
[48] See id. ¶ 92 (levels of force "correspond to the amount of force used and/or the outcome of the force").
[49] See id.

**Figure 1: Use of Force Categories**
*2014 SPD Manual, 8.300-POL-1*

| Force | Threshold | Examples | Components of Investigation |
|---|---|---|---|
| *De Minimus* | Physical interaction meant to separate, guide, and/or control that does not cause pain or injury | – Using hands or equipment to stop, push back, separate or escort, the use of compliance holds without the use of sufficient force to cause pain, and unresisted handcuffing without transient pain | No investigation or reporting required |
| **Type I** | – Transient Pain<br>– Disorientation<br>– Aiming of Firearm or Beanbag Shotgun at a Subject | – "Soft" takedowns (controlled placement)<br>– Open or empty hand strike or other disorientation techniques<br>– Wrist lock with sufficient force to cause pain or complaint of pain | • Sergeant Screening In-person (Unless Impractical)<br>• Use-of-Force Report |
| **Type II** | – Physical Injury (Greater than temporary pain/redness)<br>– Reasonably expected to cause physical injury<br>– Complaint of injury<br>– Use of CEW (TASER)<br>– Use of OC Spray<br>– Use of Impact Weapon causing less than a Type III injury<br>– Use of Beanbag Shotgun causing less than a Type III injury<br>– K9 Deployment with Injury or Complaint of Injury causing less than a Type III injury<br>– Vehicle<br>– PIT<br>– Hobble Restraint | – Abrasion<br>– Bruising<br>– "Hard strike"<br>– Hard takedown<br>– Kick | • Sergeant Screening at the Scene<br>• Use-of-Force Statement<br>• Witness Statements<br>• Collection of Evidence<br>• Review of Video<br>• UOFRB Review |
| **Type III** | – Great Bodily Harm<br>– Substantial Bodily Harm<br>– Deadly Force<br>– Loss of Consciousness<br>– Neck and Carotid holds<br>– Criminal Conduct by Officer(s)<br>– Serious Misconduct by Officer(s)<br>– Use of Stop Sticks Against<br>– a Motorcycle<br>– Impact Weapon Strike to the Head | – Broken arm<br>– Closed head injury | • Sergeant Screening at the Scene<br>• FIT response & Investigation<br>• UOFRB Review |

Force that must now be reported is categorized into three Types. Type I force is "low-level physical force."[50] Such force "causes transitory pain, the complaint of transitory pain, disorientation, or" involves an officer "intentionally pointing a firearm or bean bag shotgun" at a subject.[51]

Type II force is "[f]orce that causes or is reasonably expected to cause physical injury greater than transitory pain but less than great or substantial bodily harm."[52] The use of a number of less-lethal force tools – including

---

[50] *Id.* ¶ 64
[51] Dkt. 107-1 at 5.
[52] *Id.*

a "CEW [Taser], OC spray [pepper spray], impact weapon [such as a baton], bean bag shotgun, deployment of K-9 with injury or complaint of injury causing less than Type III injury, vehicle, [or] hobble restraint" – is also Type II force.[53]

Type III force encompasses the most serious and severe force.[54]  It is "[f]orce that causes or is reasonably expected to cause[] great bodily harm, substantial bodily harm, loss of consciousness or death, and/or the use of neck and carotid holds, stop sticks for motorcycles, [and] impact weapon strikes to the head."[55]

**Figure 1** provides a chart contained within the SPD Manual that outlines the definitional thresholds, and selected examples, for each force type.[56]

## C.  Reporting Force

The Monitor has previously emphasized the importance of the SPD's new force reporting provisions:

> The reporting requirements . . . are not merely bureaucratic.  The Department simply cannot adequately address the risk of unconstitutionally excessive force if it does not know about every instance in which an officer employed force.[57]

Under both the Consent Decree and the SPD's use of force policies, all uses of force above *de minimis* force are reportable.  Thus, whenever an officer uses any Type of force, that officer (commonly referred to as the "involved officer") has a duty to report it, and the Department and its supervisors have an obligation to rigorously review it.

An exception to the general requirement that force be reported is when force is "*de minimis*."  *De minimis* force is a "[p]hysical interaction meant to separate[,] guide, and/or control without the use of control techniques that are intended to or are reasonably likely to cause pain or injury."[58]  *De minimis* force includes, for instance:

> •  An officer using his or her hands or equipment to "stop, push back, separate, or escort a person without causing any pain" to that person and in a manner that would not have reasonably caused any pain generally.[59]
>
> •  The use of control hold techniques in a manner that is not reasonably likely to cause any pain and in fact does not cause the subject pain.[60]

The concept of *de minimis* force reflects the recognition by many courts that some types of physical contact "are just too minor to constitute a 'seizure' for Fourth Amendment purposes without doing violence to that word."[61]  In short, the Consent Decree and SPD policies recognize that officers may in some instances need to

---

[53] *Id.*
[54] Dkt. 3-1 at ¶ 66 ("'Type III use of force' means all uses of force by a SPD officer that have the likelihood of significant injuries to a subject including (1) any use of 'Lethal Force;' and (2) any use of force that results in or could reasonably be expected to result in 'Great Bodily Harm' or 'Substantial Bodily Harm.'").
[55] Dkt. 107-1 at 5.
[56] 2014 SPD Manual Section 8.300-POL-1(2), Dkt. 107-3 at 3.
[57] Fourth Semiannual Report at 28.
[58] Dkt. 107-1 at 5.
[59] *Id.*
[60] *Id.*
[61] *Acevedo v. Canterbury*, 457 F.3d 721, 725 (7th Cir. 2006); *accord Graham v. Connor*, 490 U.S. 386, 396 (1989) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment."); *Bingham v. City of Manhattan*, 341 F.3d 939, 947 (9th Cir. 2003) (indicating that some Fourth Amendment violations can be, by their nature, *de minimis*); *Watts v. County of Sacramento* 1111, 1119–20 (E.D. Cal. 1999), *rev'd on other grounds*, 256 F.3d 886 (9th Cir. 2001) (lifting suspects by handcuffs was not *de minimis* force as a matter

use physical coercion that would not be reasonably like to cause pain and, in fact, did not cause the subject any pain or order to effectuate lawful objectives.

Thus, whenever an officer's use of force causes pain or injury, causes a subject to complain of pain or injury, would reasonably be likely to result in pain or injury (regardless of whether it in fact does in a given situation), or otherwise involves more substantial coercion (such as pointing a firearm at a subject). the force must be reported under SPD policy.

Under SPD policy, reporting entails notifying a supervisor of a use of force and documenting the force used.

### 1.  *Supervisor Notification & Response*

When an officer has used reportable force or has witnessed other officers using force, officers must immediately notify a supervisor verbally.[62]  In the typical instance, when an officer uses reportable force while on-duty, the officer must "call for an on-duty sergeant via radio."[63]  Sergeants "must screen uses of reportable force in-person with the involved officer and the subject . . . prior to the subject being booked or released."[64]

It is the sergeant who, upon arriving at the scene, classifies the force as a Type I, II, or III use of force.[65]  The sergeant may always "request a higher level of investigation for a given force incident" if the nature of the force or of the incident suggests that a more detailed or substantial investigation would be useful.[66]

### 2.  *Documenting the Force*

After the force has been classified, the officers who used the force must document that force.  Officers have a general duty to "thoroughly document all reportable uses of force to the best of their ability, including a description of each force application" for all force types, whether more or less serious.[67]

The Consent Decree sets forth more minimal reporting requirements for Type I force.  For this low-level force, it requires that officers document, "in a searchable and retrievable format": (1) the officer's account of his or her actions in using force; (2) the suspect's actions that led to the application of force; (3) the officer's identity; (4) the identities of civilian and/or officer witnesses; and (5) the name of the supervisor who screened the incident.[68]  These requirements are fully reflected in the approved 2014 policies relating to Type I force.[69]

The reporting requirements are more significant for more serious or severe force.  For Type II and Type III force, the Consent Decree requires that an officer use "descriptive language" to complete an officer statement that includes: (1) "the reason for the initial police presence"; (2) "a detailed description of the incident . . . "; (3)

---

of law).  It must be noted that, unlike some courts that suggest that no constitutional violation can be sustained unless a subject suffers an injury greater than a *de minimis* injury, SPD policy presupposes that force may not be appropriate even when the subject suffered no injury simply because the type of force would have been reasonably likely to result in pain or injury or involves a particularly severe physical coercion or clear seizure.  *See, e.g.*, Ian A. Mance, "Power Down: Tasers, the Fourth Amendment, and Police Accountability in the Fourth Circuit" 91 N.C.L. Rev. 606 (2013) (discussing potential problems with *de minimis* injury standard of some courts in the Fourth Amendment area).

[62] 2014 SPD Manual Section 8.300-POL-1(2), Dkt. 107-3 at 3.
[63] 2014 SPD Manual Section 8.300-POL-1(2)(a), Dkt. 107-3 at 3.
[64] 2014 SPD Manual Section 8.300-POL-2(1), *id.* at 5.  However, "[i]f the subject is free to leave, the detention will not be extended to facilitate the screening process . . . ." *Id.*; 2014 SPD Manual Section 8.300-POL-2(6), *id.* at 5.
[65] 2014 SPD Manual Section 8.300-POL-1(2), Dkt. 107-3 at 3–4.
[66] 2014 SPD Manual Section 8.300-POL-1(3), Dkt. 107-3 at 4.
[67] 2014 SPD Manual Section 8.300-POL-1(1), Dkt. 107-3 at 2.
[68] Dkt. 3-1 ¶ 100.
[69] 2014 SPD Manual Section 8.300-TSK-1(4), Dkt. 107-3 at 9 (listing involved officers' reporting responsibilities and requirements for Type I force).

"a detailed description of the force used by the officer giving the statement"; (4) "detailed" witness officer statements; (5) "a detailed description of any apparent injury to the suspect, any complaint of injury, or the lack of injury, including information regarding medical aid or medical evaluation provided."[70] These requirements are fully reflected in the approved 2014 policies relating to Type II force.[71] For Type III force, SPD policy requires that the officer "[p]articipate[] in an audio-taped Type III Use-of-Force interview" with FIT, with the interview needing to include, among other things, the Consent-Decree-required elements.[72]

The officer who applied the force fulfills the requirements by completing a Use of Force Report. Since the Spring of 2014, SPD officers complete the Report in BlueTeam. BlueTeam is a web-based interface that feeds information into the more comprehensive IAPro computer application, which is "the Department's interim officer performance database system."[73] In look, feel, and user interface, "many officers [have] remark[ed] that navigating the system is no more complicated than purchasing a book on Amazon.com or buying a movie ticket online."[74]

The Use of Force Report contains two components: (1) standardized collection of basic information, and (2) a narrative statement by the involved officer. For uniform data collection purposes, officers provide basic information – often by selecting a value from a drop-down menu or click boxes to select applicable variables – about the incident, the involved officer, the involved subject, civilian and officer witnesses, the force application, and subject and officer injuries. By selecting common variables from a standardized list, this data can be aggregated, analyzed, and searched to identify trends in officer and departmental performance later. Because IAPro, like any "off-the-shelf" database solution, is minimally customizable, one of its "built-in limits and constraints" is that SPD cannot easily change what information the Report collects.[75]

Although the Parties and Monitor worked closely with the Department to ensure that the Report collects as much of the material information about force incidents as possible, no policy sets forth what data or information the Report must capture. Instead, SPD policy imposes some minimal requirements with respect to the officer's free-form narrative statement. This contrasts with more particular requirements associated with *Terry* stop reporting, for instance.[76] The Monitoring Team will revisit the issue after analyzing the data as part of our systemic assessment on Office Use of Force, which will be filed with the Court in January 2016.

Additionally, and equally importantly, an officer who has used force completes a narrative statement – describing the incident, subject, and force in the level of detail required by the Consent Decree and the various SPD policies that reflect the requirements for an officer's statement.[77]

The Use of Force Report is the same for all force Types because IAPro and BlueTeam do not currently allow for different forms to be used for different types of force. Thus, officers who use lower-level, Type I force must provide the same data as officers involved in higher-level, Type III force. Nonetheless, the Consent Decree and SPD contemplates that officers' Type I statements can be more succinct than Type III statements. Accordingly, in September 2014 – about two months into the six-month period on which this assessment focuses – SPD Chief

---

[70] Dkt. 3-1 ¶ 103.
[71] 2014 SPD Manual Section 8.300-TSK-3(5), Dkt. 107-3 at 10 (listing involved officers' reporting responsibilities and requirements for Type II force).
[72] 2014 SPD Manual Section 8.300-TSK-6(4), *id.* at 14 (listing involved officers' reporting responsibilities and requirements for Type II force).
[73] Fifth Semiannual Report at 40.
[74] Fourth Semiannual Report at 28.
[75] *Id.* at 63.
[76] *See* 2014 Seattle Police Manual Section 6.220(10), Dkt. 116 at 18.
[77] Dkt. 3-1 ¶¶ 100, 103; 2014 SPD Manual Section 8.300-TSK-1(4), Dkt. 107-3 at 9; 2014 SPD Manual Section 8.300-TSK-3(5), Dkt. 107-3 at 10; 2014 SPD Manual Section 8.300-TSK-6(4), Dkt. 107-3 at 14 (listing involved officers' reporting responsibilities and requirements for Type II force).

Kathleen O'Toole issued a directive that clarified and re-emphasized that the documentation and reporting for Type I uses of force indeed requires less detail than higher-level force.[78]

For Type I and Type II force, officers generally complete this Report at the station immediately or soon after the force incident.  For Type III force, FIT must "conduct☐ in-person interviews of the involved officers."[79] Although the involved officer narrative in a Type III use of force is therefore the in-person FIT interview, FIT has nonetheless been charged with requiring, as a standing practice, the involved officer to complete the Use of Force Report at the conclusion of the in-person interview.

During the time period addressed here, witness officers also complete brief documentation, and provide written statements, using BlueTeam.

## D.  Investigating Force

Just as reporting requirements differ according to the severity or seriousness of the force applied, the manner that SPD must investigate force is based on the force Type at issue.

### 1.  Type I Force

For lower-level, Type I force, the officer's immediate supervisor – typically, a sergeant – must review the involved officer's force "documentation as soon as practicable."[80]   The sergeant must ensure that the documentation is sufficiently complete and "direct the officer to provide more information, if needed."[81]

Once documentation is sufficient, the sergeant must "[e]valuate☐ the incident for any concerns (tactical, threat assessment, etc.)."[82]  If the sergeant identifies that "serious misconduct may have been involved," the sergeant must contact OPA and consult with FIT about whether the force may need to be reclassified as a more serious Type II or Type III use of force.[83]  Even if the Type I force involved no serious misconduct, the sergeant must "address☐ any concerns" about tactics, training, or performance "with the involved officer and initiate☐ corrective action, as necessary."[84]

Type I force receives several levels of review.  Any reviewer must "address concerns that arise during use-of-force investigations or review" and "refer misconduct, other than minor misconduct" to OPA.[85]  Likewise, any supervisor "may re-classify a use-of-force investigation to a higher level" if warranted.[86]

After reviewing the incident and documentation, and taking any necessary action with the involved officer(s), the sergeant "[f]orwards the report to the lieutenant."[87]  Subsequently, the force "packet" – or the host of reports, investigatory materials, and evidence relating to the use of force incident – is reviewed by the lieutenant, who must send the incident back to the sergeant upon identifying any deficiencies in the

---

[78] Fourth Semiannual Report at 2 n. 5.
[79] Dkt. 3-1 ¶ 118(g); see 2014 SPD Manual Section 8.300-TSK-6(4), Dkt. 107-3 at 14.
[80] 2014 SPD Manual Section 8.300-POL-2(3), Dkt. 107-3 at 6.
[81] Id.
[82] 2014 SPD Manual Section 8.300-TSK-2(3), Dkt. 107-3 at 9.
[83] Id.
[84] 2014 SPD Manual Section 8.300-TSK-2(4), Dkt. 107-3 at 9.
[85] 2014 SPD Manual Section 8.400-POL-1(8)-(9), Dkt. 107-4 at 3.
[86] Id.
[87] 2014 SPD Manual Section 8.300-TSK-2(8), Dkt. 107-3 at 10.

documentation or the sergeant's review.[88] The lieutenant must "make determinations" about the thoroughness of the Use of Force Report, whether the force was consistent with SPD policy, whether previously-identified concerns were appropriately addressed, and identify any additional concerns.[89] The lieutenant must forward his or her review on to the involved officer's captain within 72 business hours.[90]

The captain must also consider whether the investigation and documentation was thorough and complete, the lieutenant's findings "are supported by a preponderance of evidence," identified concerns were addressed by the sergeant and lieutenant, and any otherwise outstanding concerns are likewise addressed.[91] The captain may send the incident back to the chain of command below for the correction of deficiencies or to address issues not appropriately identified.[92] If, and only if, the Captain signs off on the Type I force is the record of the force, along with supporting documentation and the chain of command reviews, archived permanently in the IAPro performance database system.[93]

### 2.   *Type II Force*

For force that the on-scene, responding sergeant has classified as Type II force, the sergeant conducts the primary investigation of the force.[94] The sergeant must be an "impartial fact-finder and shall not draw conclusions about whether the force was within policy or law."[95] During the investigation, the sergeant must, among other duties: obtain basic information, secure evidence, canvass for and interview civilian witnesses, conduct separate interviews with all officers applying force, review witness officer statements, secure privately-captured video, take photographs of the scene, and review ICV or other SPD-captured video.[96] The supervisor completes a Supervisor's Use of Force Report that summarizes the incident, documents evidence, and presents witness accounts of the force.[97] The investigation must be completed, and the sergeant's report forwarded to the involved officer's lieutenant, within three days.[98]

The lieutenant subsequently reviews the sergeant's report, evaluating the investigation with respect to whether the investigation is thorough and complete; discrepancies, confusion, or lack of relevant information has been addressed; and possible misconduct has been forwarded to OPA.[99] As with Type I force investigations, the lieutenant must "make determinations" about the thoroughness of the Use of Force Report, whether the force was consistent with SPD policy, whether previously-identified concerns were appropriately addressed, and identify any additional concerns.[100] The lieutenant forwards the review to the involved officer's captain within 72 business hours.[101]

Similarly, the captain reviews the investigation and the officer's, sergeant's, and lieutenant's documentation. The captain determines whether it is thorough and complete, the lieutenant's findings "are supported by a preponderance of evidence," identified concerns were addressed by the sergeant and lieutenant, and any

---

[88] 2014 SPD Manual Section 8.400-POL-1(1), Dkt. 107-4 at 2; *id.* POL-1(4), Dkt. 107-4 at 3.
[89] 2014 SPD Manual Section 8.400-POL-1(10), Dkt. 107-4 at 5.
[90] 2014 SPD Manual Section 8.400-POL-1(11), Dkt. 107-4 at 5.
[91] 2014 SPD Manual Section 8.400-POL-1(12), Dkt. 107-4 at 5.
[92] 2014 SPD Manual Section 8.400-POL-1(1), Dkt. 107-4 at 2.
[93] 2014 SPD Manual Section 8.400-POL-1, Dkt. 107-4 at 2.
[94] 2014 SPD Manual Section 8.300-POL-3(2), Dkt. 107-3 at 6.
[95] 2014 SPD Manual Section 8.300-POL-3(3), Dkt. 107-3 at 6.
[96] 2014 SPD Manual Section 8.300-TSK-5, Dkt. 107-3 at 11.
[97] 2014 SPD Manual Section 8.300-TSK-5(19), Dkt. 107-3 at 13.
[98] 2014 SPD Manual Section 8.300-POL-3(4), Dkt. 107-3 at 6.  The lieutenant may approve an extension to this timeline.  *Id.*
[99] 2014 SPD Manual Section 8.300-POL-1, Dkt. 107-3 at 2–7.
[100] 2014 SPD Manual Section 8.400-POL-1(10), Dkt. 107-4 at 5.
[101] 2014 SPD Manual Section 8.400-POL-1(11), Dkt. 107-4 at 5.

otherwise outstanding concerns.[102]  The captain may send the incident back to chain of command below for the correction of deficiencies or to address issues not appropriately identified below.[103]

After the captain makes his or her findings, the force packet is forwarded to the Force Review Unit ("FRU"), which coordinates consideration of force incidents by the Force Review Board ("FRB") – the group that serves as "SPD's hub for internal innovation and critical analysis" of force.[104]  The Monitor is conducting a separate assessment of "the quality, rigor, completeness, and timeliness of Force Review Board reviews and deliberations on force incidents" that it will provide to the Court by November 9, 2015.[105]

For any Type II force, a sergeant may always request that FIT handle the investigation.[106]  If Type II force is referred to FIT, the review process described for Type III force, below, applies.

### 3.  Type III Force

Type III force investigations are conducted by SPD's Force Investigation's Team.[107]  "As the primary investigative unit for serious use of force incidents, FIT plays a crucial, initial role in ensuring that the Department's reviews of force incidents are thorough, objective, and complete."[108]  FIT investigators "receive special training on gathering evidence, interviewing witnesses, and exploring avenues of inquiry not merely relating to the moment that the force was applied"[109] but also on the "events, decisions and tactics that led up to the use of force incident."[110]

FIT rolls to the scene of all officer-involved shootings, Type III force, and Type II force for which the responding sergeant has requested FIT's assistance.  "Once FIT has assumed control of the scene, the patrol sergeant" works at the direction of the FIT Captain.[111]

FIT detective and sergeants conduct the investigation, with the FIT Captain actively monitoring and directing the investigation as necessary.[112]  Relevant evidence is gathered, witnesses are interviewed, and an objective factual record is developed.  During the time period addressed in this assessment, all officers who applied force during a Type III incident were required to participate in an audio-taped interview with FIT.[113]

FIT must present the completed investigation to the Assistant Chief of the Compliance & Professional Standards Bureau within 30 days.[114]  The Assistant Chief's review addresses the completeness and thoroughness of the investigation.[115]  If certified as sufficiently complete and thorough, the investigation is forwarded to the involved officer's chain of command for review.[116]

---

102 2014 SPD Manual Section 8.400-POL-1(12), Dkt. 107-4 at 5.
103 2014 SPD Manual Section 8.400-POL-1(1), Dkt. 107-4 at 2.
104 Second Semiannual Report at 20.
105 Dkt. 221-3 at 7.
106 2014 SPD Manual Section 8.300-POL-1(3), Dkt. 107-3 at 4.
107 2014 SPD Manual Section 8.300-POL-4(1), Dkt. 107-3 at 7.
108 Third Semiannual Report at 57.
109 Id.
110 Dkt. 127 at 52; accord 2014 SPD Manual Section 8.300-POL-4(4), Dkt. 107-3 at 7 (noting that "FIT should be staffed with individuals with appropriate expertise and investigative skills to ensure that" FIT investigations allow the FRB "to identify trends or patterns of policy, training, equipment, or tactical deficiencies, or positive lessons related to the use-of-force").
111 2014 SPD Manual Section 8.300-POL-4(7)(a), Dkt. 107-3 at 7.
112 2014 SPD Manual Section 8.300-TSK-9–10, Dkt. 107-3 at 16–17.
113 2014 SPD Manual Section 8.300-POL-4(8), Dkt. 107-3 at 8.
114 2014 SPD Manual Section 8.300-POL-4(9), Dkt. 107-3 at 8.
115 2014 SPD Manual Section 8.300-POL-4(9), Dkt. 107-3 at 8.
116 Id.; 2014 SPD Manual Section 8.400-POL-1, Dkt. 107-3 at 2.

The chain of command – the involved officer's sergeant, lieutenant, and captain – reviews the investigation in the same manner as Type II force. After the captain has reviewed the force packet, it is sent to the FRU for consideration by the FRB.

## E.  Prior Progress & Prior Evaluations of Force Investigations & Reporting

This report is the first systemic evaluation of force reporting and investigation. That is, it is the first time that the Monitoring Team has systematically evaluated force reports and investigations from across a significant time period – the 6 months from July 1, 2014 through December 31, 2014 – to determine whether the requirements of the Consent Decree have become effective in practice.

This type of assessment could not have been done previously. One reason is that SPD did not get IAPro up and running across the Department in a manner that could "rigorously track use of force and other incidents" and eliminate non-standardized paper reporting and review processes until July 1, 2014.[117] Prior to that time, between the Department's revised force-related policies becoming effective on January 1, 2014 and mid-June 2014, SPD used several different paper-based forms and templates for officers to use to report force and provide statements and for the chain of command to use to complete their investigations and reviews.

Further, FIT's investigative and case management functions only became fully integrated into the computer-based IAPro environment in Spring 2014. Before that time, FIT was actively getting its processes and procedures up and running. Likewise, a "protocol governing the respective rights and obligations of FIT and OPA" at the scene and during the investigations of force incidents was only finalized as of June 2014.[118]

Similarly, although the underlying incidents addressed in the reports and investigations that are assessed here occurred between some 9 and 15 months ago, some time is necessary for the investigation, FIT, or chain of command investigation and review to occur, and for the packet to be completed. Thus, for those incidents that occurred near the end of the studied period – in November and December 2014 – the investigations and chain of command review often lasted into the first quarter of 2015. Accordingly, the Monitoring Team identified force cases for review on March 17, 2015. Production of the voluminous investigative materials in a manner accessible to the Parties and Monitor was completed on May 11, 2015.[119] Accordingly, the July 2014 through December 2014 time period addressed in this report is the earliest feasible time period that the Monitoring Team could address how SPD is doing over a material period of time with respect to the Consent Decree's reporting and investigation requirements.

The Monitoring Team is, however, continually aware of ongoing force investigations. The Team is notified of every FIT roll-out to the scene of Type III force, including officer-involved shootings. Some members of the Team who monitor the Force Review Board on a weekly basis review both FIT and chain of command investigations in order to be able to assess the quality of the Board's deliberations. Those Monitoring Team members who previously reviewed the completed force investigations that the present study evaluated in order to monitor the FRB did not participate in this assessment.

---

[117] Fourth Semiannual Report at 27 ("Since July, officers have been providing critical information about use of force via Blue Team, a simplified, web-based portal that feeds information into the larger, more complicated IAPro database system."); *see* Third Semiannual Report at 35–47, A-1–7 (describing challenges in implementation of IAPro); Second Semiannual Report at 11–12 (noting that Monitoring Team could not analyze the Department's use of force data and other related practices "until: (1) the SPD's interim information database system, IAPro, is both technically and practically operational; and (2) an audit of use of force forms completed by officers indicates far fewer reporting gaps . . . .").
[118] Third Semiannual Report at 75.
[119] Dkt. 221 ("In some instances, the processes necessary for the Parties and Monitor to work together to identify a sample of investigations for review and to produce and transmit associated paper, image, video, and audio files of those investigations has been time-and labor-intensive.").

Nonetheless, this ongoing familiarity with FIT's investigations has led the Monitoring Team to evaluate FIT's progress in prior semiannual reports.  In December 2013, the Parties and Monitor were still "discussing the use of a dedicated Force Investigation Team" and how it would function.[120]

The Third Semiannual in June 2014 report described "[t]he creation and rollout of FIT [a]s a significant milestone and a major shift in the Department's approach to conducting internal, administrative investigations."[121]  It noted some problems with some basic investigative techniques, including the use of leading questions and the failure to ask obvious follow-ups or to "pursue[] lines of inquiry that answers have clearly suggested" in interviews.[122]  It noted that FIT needed to "use necessary safeguards to ensure the basic integrity of the investigatory process" including securing a recorded interview from involved officers as soon as possible, keeping involved and witness officers separated until being interviewed, and interviewing officers prior to the officer viewing any captured video of the incident.[123]

The report also emphasized that FIT needed to permit OPA with access to the scene of a force incident, the ability to observe officer interviews and pass along questions to be asked to FIT investigators, and the ability to "be present at all witness interviews."[124]  It reported that SPD, the Parties, and the Monitor were close to agreeing on a protocol that would guide the relationship between FIT and OPA (the "FIT-OPA Protocol") so that both entities could concurrently execute their important functions.  Finally, it noted that FIT would be housed within the Bureau of Compliance and Professional Standards until December 2014, when the Parties and Monitor would evaluate how well it was doing there.

In the Fall of 2014, the Department circulated two directives to clarify expectations relating to the reporting and review of Type I force.  A September directive clarified that only "drawing a firearm, or holding a firearm in the 'sul' or 'low ready position' is not reportable force"; and that the "complaint of pain" from handcuffing with "no apparent injury" requires only a "brief narrative entry" on the force form rather than an extended discussion; that "only brief narrative statements are required" of officers on Type I force reports; that "witness officer statements are not required" for Type I force; and that the chain of command need not watch ICV video of Type I force.[125]  Another directive emphasized that sergeant review of Type I force should be a "brief summary" and provide approval or disapproval of the officer's performance.[126]  Likewise, that directive reiterated that "[l]ieutenants and captains should assess the quality of the sergeant's review and briefly indicate why the approval of the force is warranted."[127]

In the Fourth Semiannual Report in December 2014, the Monitoring Team reported that "[t]he quality and rigor of FIT's investigations have generally continued to improve."[128]  Their investigations were "more objective, thorough, and rigorous than investigations conducted even six or twelve months ago."[129]  Consequently, "the rigor and depth of an average FIT investigation represents a sea change from the perfunctory investigations that the DOJ found to be the norm in its analysis in 2011."[130]  It outlined the important provisions of the FIT-OPA Protocol.[131]  Finally, the Report noted that the Parties and Monitor

---

120 Second Semiannual Report at 36.
121 Third Semiannual Report at 58.
122 *Id.* at 59.
123 *Id.* at 59–60.
124 *Id.* at 60.
125 SPD Directive No. 14-00038 (Sep. 26, 2014).
126 SPD Directive No. 14-00045 (Oct. 24, 2014).
127 *Id.*
128 Fourth Semiannual Report at 33.
129 *Id.*
130 *Id.*
131 *Id.* at 34–35.

"agreed that FIT should remain within the Department□ . . . . for another six months" until "a final determination as to its ultimate location" could be made.[132]

Most recently, in June 2015's Fifth Semiannual Report, the Monitor again found that FIT "investigators are generally doing a better job of covering all the bases in a typical force investigation . . . ."[133]  However, the report found ongoing concerns with the use of "inappropriately leading and suggestive questions."[134]  It also outlined "concern[s] about the potential lack of objectivity during some FIT presentations to the FRB."[135]

So that final determination as to whether FIT should permanently remain within SPD's Bureau of Compliance and Professional Standards could be informed by a systematic and systemic assessment of FIT's performance over time, the Court-approved Updated Third-Year Monitoring Plan provided until September 24, 2015 for this determination.[136]

Accordingly, one of the tasks of this report is to outline the Monitor's views with respect to whether FIT has "performed satisfactorily in Professional Standards" or whether FIT should "be transferred to OPA" or some other location.[137]

The Monitor has not substantially addressed the quality of non-FIT, chain of command investigations in prior reports.[138]

## II.  Assessment Methodology

The methodology used by the Monitoring Team, and summarized here, is consistent with accepted best practices for evaluating use of force reports and investigations employed to evaluate use of force reports and investigations in other jurisdictions.[139]  Dr. Joseph Doherty, the Monitoring Team's lead social science and statistics expert, worked closely and transparently with the City, SPD, and DOJ on the study's design.[140]  Several members of the Monitoring Team collaborated on the creation of an evaluative instrument to assess force case files.  The methodology was reviewed and agreed to by both the Department of Justice and the City of Seattle.

---

[132] *Id.* at 36.
[133] Fifth Semiannual Report at 21.
[134] *Id.* at 22.
[135] *Id.* at 23.
[136] Dkt. 221-2 at 4.
[137] *Id.*
[138] *See* Fourth Semiannual Report at 31 (previewing the present assessment of Type I and Type II chain of command investigations for consideration of whether "they are as thorough, objective, and complete as SPD's policies require them to be").
[139] *See, e.g.*, Denise Rodriguez King, et al, Community Oriented Policing Services (COPS) Office, U.S. Department of Justice, *Collaborative Reform Model: A Review of Use of Force Policies, Processes, and Practices in the Spokane Police Department* (2014) at 9, 12 (describing random sampling of use of force reports for analysis "using a 95 percent confidence level and a confidence interval of 5 percent"); George Fachner & Steven Carter, *Collaborative Reform Initiative: An Assessment of Deadly Force in the Philadelphia Police Department*, Community Oriented Policing Services (COPS) Office, U.S. Department of Justice (2015) at 16 (describing "investigative quality evaluation" of officer-involved shootings of "randomly selected . . . case files" using a survey instrument "of 'yes/no' and Likert scale (1–5 items)" evaluated by "expert, experienced investigators"); U.S. Department of Justice, Letter to Mayor Richard J. Berry re: Albuquerque Police Department (Apr. 10, 2014) at 3 ("review[ing] a random sample of the department's use of force reports completed by officers and supervisors").
[140] Dr. Doherty is the Director of the Empirical Research Group at the University of California, Los Angeles School of Law, which is a "methodology-oriented research center that specializes in the design and execution of quantitative research in law and public policy." Empirical Research Group, About the Empirical Research Group, http://law.ucla.edu/centers/interdisciplinary-studies/empirical-research-group/about/ (last visited Sep. 21, 2015). He is also Co-Director of the UCLA-RAND Center for Law & Public Policy, a group dedicated to "legal scholarship grounded in multidisciplinary empirical analysis to guide legal and public policymakers in the 21st century."  About the UCLA-RAND Center for Law and Public Policy, http://law.ucla.edu/centers/interdisciplinary-studies/ucla-rand-center-for-law-and-public-policy/about/ (last visited Sep. 21, 2015).  He has substantial experience – across several fields, including policing – with designing research and empirical methods to answer complicated legal questions and address public policy issues.

## A.  What Force Reports & Investigations Were Reviewed

The population of cases reviewed included all reportable use of force incidents, also referred to within the Department as "cases," that occurred between July 1, 2014 and December 31, 2014 (the "study period") and for which any required force investigation had been completed as of March 17, 2015.

For purposes of this report, "cases" and "incidents" refer to investigations of applied force in a given encounter or instance.  It does not refer to individual applications of force within those instances.  Accordingly, one force "case" or "incident" may involve multiple types or applications of force.  For example, a single traffic stop that involved 3 discrete applications of force by Officer A and 2 separate applications of force by Officer B would be, for purposes of this review, a single "case" or "incident."

Per SPD policy – and, therefore, for this inquiry – if a case involved more than one level of use of force, it is "assigned" the highest level of force used by any officer for purpose of the investigation.  For example, a case involving a control hold (Type I) and a baton strike (Type II) is classified as a Type II case for investigation.

As described above, the study period of July 1, 2014 through December 31, 2014 is the earliest possible relevant and substantial period during which the necessary force reporting and investigation processes, systems, technology, and support mechanisms were in place.  Because force investigation and review necessarily can require time and resources, the Monitoring Team waited until March 17, 2015 to finalize the population so that force incidents that occurred later in 2014 could be included.

"Completed" means that the chain of command has certified the investigation as complete, and the case has been accepted for review by the Force Review Unit ("FRU").  It does not mean that the Force Review Board has completed its review of the incident – only that FIT or the chain of command has forwarded it to the Board or otherwise signaled that all intended investigatory activities have been completed.

At the beginning of the study period, SPD and the Monitoring Team identified that there were 369 Type I force cases reflected in the IAPro database for the study period.  There appeared to be 58 Type II cases investigated by the chain of command rather than FIT.

Reviewers evaluated a significant, random sample of reports.  That is, we reviewed a randomly selected subset of Type II and Type I cases[141] that included a number of cases large enough to ensure, within generally accepted levels of confidence within social science, that the subset was unbiased and representative of the whole set of cases.  This "random-sampling approach is the best way to ensure that the selected sample represents the population" of all use of force reports and investigations that occurred during the studied period "and that the findings in the sample" of reviewed cases "can be generalized to the population" of all of the force cases "from which the sample was obtained."[142]  To determine how many cases needed to be examined to ensure that inferences about all SPD force cases could be made, multiple factors were examined and statistically evaluated.[143]

---

[141] See Michael S. Lewis-Beck, et al, 3 SAGE Encyclopedia of Social Science Research Methods 985 (2004); see also id. at 986 ("Simple random sampling is often practical for a population of business records . . . .").

[142] Lemuel A. Moye, Statistical Reasoning in Medicine: The Intuitive P-Value Primer 30 (2006); Timothy C. Urdan, Statistics in Plain English 48 (2001) ("[W]hen we do inferential statistics, we want to know something that we observe in a sample represents an actual phenomenon in the population.").

[143] The first factor was a benchmark, or "null hypothesis," against which the outcome of the assessments could be compared.  See Michael K. Le Roy, Research Methods in Political Science 91 (2008) ("A null hypothesis states that there is no relationship between the variables in a hypothesis . . . [Researchers] actually test the null hypothesis rather than . . . [T]he basic strategy of scientific research focuses on disproof rather than on proof."); Neil J. Salkland, 1 Encyclopedia of Research Design 1301 (2010) ("The most common approach when planning an appropriate sample size is the power analytic approach, which has as its goal rejecting a false null hypothesis with some specified probability.").  For this inquiry,

During the course of the study period, the Monitoring Team identified some difficulties with the classification of some cases in the IAPro database – specifically, the misclassification of 7 Type I cases. Six Type I cases should have been classified as Type II. One was actually a Type III officer-involved shooting. Additionally, one Type II case should have been classified as a Type III use of force. Accordingly, the population was ultimately 362 Type I cases and 63 Type II cases. The data entry issue did not affect the assessments or sampling methodology – and, likewise, did not affect how the Department or its officers reported or investigated the cases.[144]

The Team reviewed 53 Type I force cases.[145] It reviewed 31 Type II cases.[146] One of the sampled cases was the Type III case identified incorrectly in the IAPro database as a Type II. Accordingly, the Team ultimately examined a total of 30 Type II cases. There were 13 Type III uses of force, including 4 officer-involved shootings, during the study period.[147] The Monitoring Team was able to review all Type III cases, including officer-involved shootings.

It should be noted that the size of the populations of both Type II and Type III cases did not allow for the Monitoring Team to make comparisons of performance between SPD's precincts.[148] The Monitor's upcoming assessment of supervision will evaluate this and other cross-precinct performance trends.

## B.  How the Force Reports & Investigations Were Evaluated

Four members of the Monitoring Team reviewed Type II and Type III force cases. The cases were assigned to one team member for a primary review. A sub-sample was assigned to a second team member for a second-level review. This two-tiered reporting structure sought to ensure that any unduly outlying determinations would be identified or "checked" by another equally comprehensive review.[149]

Three separate Team members reviewed Type I force cases. Each case was assigned to one of these Team members. In addition, each reviewer was assigned cases that were also assigned to each of the other reviewers, so that 17 of the cases were reviewed twice. The reason for this redundancy was to estimate inter-rater

---

the benchmark contemplated was "90/10" – reflecting the desire to have a sample with sufficient power to detect a deviation from a hypothetical 90% "acceptability" rate. That is, the sample needed to be sufficiently large to enable the Team to identify a deviation in quality or other attributes evaluated from a hypothetical level at which 90% of cases were of acceptable quality or sufficiently possessed the attribute. However, to expand the power of the sample even further, we calibrated the benchmark at "80/20," which required a larger sample size, to ensure confidence that the Team was reviewing a sufficient number of cases for detecting significant downward deviations in quality. *See* Andrew Gelman & Jennifer Hill, *Data Analysis Using Regression and Multilevel/Hierarchical Models* 440 (2007).
  The second factor to establish was the desired confidence interval. The Team wanted enough power to reject the benchmark or null hypothesis with 95% confidence (z=1.96). Third, it was necessary to include a "finite population correction" in the assessment in the sample size computation because the total number of observations in the population is small (n=58). Standard sample size calculations typically assume that the population form which the sample is drawn is infinite. Thus, to obtain a 10% confidence interval from an infinite population (say, of people), one would need to sample 97 people. However, there are not an infinite number of force cases to review. Of Type II II cases, for example, the total number of cases during the study period was only 58.
  Thus, in sum, to determine the size of the sample, the benchmark was set to 80/20. The confidence interval was set at 10% with a 95% confidence. The finite population correction is .688.
[144] For one thing, the number of cases sampled was calculated using a "finite population correction," which compensates for the number of cases in the population. The Team recalculated the sample sizes using the new population sizes, and concluded that no adjustment is necessary to achieve a 10% confidence interval at a p < .05 level of statistical significance. Second, only one of the misclassifications (the Type II that was actually a Type III) actually ended up in the sample that was distributed to the Monitoring Team. Third, there is no apparent systematic bias in the types of cases that were misclassified. That is, there were no trends or qualitative linkages that we could identify between the cases. Accordingly, the error appears to have been as random as a data entry error can be.
[145] A random sample of this size produces a standard error of .055 and a finite population correction of .926, with a resulting 95% confidence interval (margin of error) of .099.
[146] A random sample of this size produces a standard error of .071, and a finite population correction of .688, with a resulting 95% confidence interval (margin of error) of .097.
[147] This includes the officer-involved shooting that was discovered to have been incorrectly classified in the IAPro database as a Type II case.
[148] *See* Dkt. 3-1 ¶¶ 156, 161.
[149] For Type III cases, reviewers agreed with each other across some 84% of data elements (kappa .37, p<.001). For Type II cases, reviewers agreed with each other across 86% of data elements (kappa .62, p<.001).

reliability, which is the degree to which reviewers using the same instrument, and with the same instructions, arrive at the same conclusions about the same case.[150]

Reviewers considered the whole of the force investigation materials, commonly referred to as the "packet," supplied to the Monitoring Team by the SPD. This included written material, such as officer reports, investigator logs, and supervisor evaluations; video material, including in-car video and private video footage; other images, including incident photographs or pictures of subject or officer injuries; and audio material, such as audiotapes of recorded officer interviews.

The assessment instruments for both reporting and investigations of Type I, II, and III force contained both audit-like and evaluative elements. For example, reviewers of Type III force were asked whether officer interviews were video or audio-recorded in accordance with SPD policy – an important but more narrow and mechanical determination. Across many dimensions, reviewers logged whether officers or supervisors complied with various express requirements of SPD policy – marking "yes," "no," or "unable to determine."[151]

On the other hand, they were also asked whether they identified "[l]eading questions or potential contamination of officer accounts." This required a more qualitative assessment in which the experienced and seasoned reviewers needed to determine whether or not questions to the officer's account were compromised because of the role, questioning, or procedures of FIT investigators. Furthermore, the instruments contained "notes" sections below most areas of inquiry that permitted reviewers to identify and discuss in greater detail the pertinent portions of the files or important issues identified.

In making many of the more qualitative and evaluative determinations required, Monitoring Team reviewers considered whether, under the totality of the circumstances, the investigation, report, or evaluation provided sufficiently objective, fair, thorough, and complete information about the force incident to allow a subsequent SPD reviewer to fairly and systematically apply SPD policy with respect to the officer's performance. Thus, we operationalized the concept of "quality" – or "convert[ed] . . . the abstract idea or notion into a measurable item" – in terms of whether it would ultimately permit a neutral factfinder to fairly and fully apply SPD's officer use of force policy.[152]

Ultimately, "[u]sing methods that gather and represent human phenomena with numbers (such as standardized questionnaires and structured observation protocols), along with methods that gather and represent human phenomena with words (such as . . . unstructured observations) are classic instances of mixing data gathering and analysis techniques" that are widely used by contemporary social science researchers.[153] The use of this hybrid quantitative-qualitative approach allows this report to do more than provide vague or general

---

[150] The assessors had an overall agreement rate of 73% (kappa .32, p<.001). This provides the Monitoring Team adequate confidence that there would be no substantial or material deviation in results even if all Type I cases were reviewed by two reviewers because, across most points of evaluation, they agreed substantially more often than they disagreed. *See* Anders Jonsson & Gunilla Svingby, "The Use of Scoring Rubrics: Reliability, Validity and Educational Consequences," 2 *Educational Research* Review 130, 134 (2007) ("In consistency estimates, values about .70 are deemed acceptable."); *accord* David Wittenburg, et al, United States Social Security Administration, 1 *Inter-Rater Reliability Analysis of Data to Document the Consultative Examination Process* 3 and n.7 (2012) (70% as minimum inter-rater reliability standard); David Royse, et al, *Program Evaluation: An Introduction* 281–2 (2010) (same).

[151] *See* Floyd J. Fowler, *Survey Research Methods* 121 (2009, 4th Ed.) (noting that, for self-administered questionnaires, "[c]hecking a box, clicking a response, or circling a number (such as . . .)" emphasized because self-generated responses "are usually incomplete, vague, and difficult to code" or aggregate).

[152] Mark L. Dantzker & Ronald Hunter, *Research Methods for Criminology & Criminal Justice* 47 (2012).

[153] Jennifer C. Grenne, et al, "Combining Qualitative and Quantitative Methods in Social Inquiry," *in* Research Methods in the Social Sciences, Bridget Somekh & Cathy Lewins (eds.) 274, 274 (2005).

conclusions.  That is, rather than only being able to say that certain features or trends apply "[i]n many cases" or "in some cases"[154], the methodology allows this report to identify the size or scope of the identified trends.[155]

---

[154] Police Executive Research Forum, "U.S. Customs & Border Protection Use of Force Review: Cases and Policies" at 5, 6 (Feb. 2013).
[155] *See* Phil K. Eure, Office of the Inspector General for the NYPD, "Observations on Accountability & Transparency in Ten NYPD Chokehold Cases" (Jan. 2015), *available at* http://www.nyc.gov/html/oignypd/assets/downloads/pdf/chokehold_report_1-2015.pdf.

# Part 2.
# Force Investigation Team ("FIT")
# Investigations

**Summary**

*The Monitor finds that the quality and integrity of FIT investigations demonstrate initial compliance with paragraphs 112, 113, 114, 117, and 118 of the Consent Decree.  FIT's investigations are covering all relevant investigative lines of inquiry, probing important issues and attempting to resolve inconsistencies among statements and evidence.  In multiple instances, Monitoring Team reviewers saw the quality of SPD's force response and investigation improve immediately upon FIT's arriving at the scene or beginning to investigate the incident.  FIT is providing SPD chain of command with fair, thorough, complete, and objective factual records from which to make determinations about whether officer performance involving force is consistent with SPD policy.*

*So long as all of FIT's policies and procedures are codified in the FIT Manual required by paragraph 115 of the decree and expected to be filed imminently with the Court – and are not diminished by any provisions of a labor contract – the Monitor believes that FIT will be able to maintain compliance with the requirements of paragraph 118 of the Consent Decree and that FIT remaining within SPD's Bureau of Compliance and Professional Standards will allow SPD to sustain compliance.*

## Description of Reviewed Cases

About one-third of the cases were officer-involved shootings.  The remainder were classified as Type III force because the force used either caused or was expected to cause substantial bodily harm or, otherwise, involved an impact weapon strike to the subject's head.

The average number of officers who used some type of force during incidents classified as Type III force was about three (2.83).  The average number of witness officers – or those who were on hand during an incident, observed other officers applying force, but did not themselves apply force – was 5.23.  The average number of total witnesses during FIT investigations was about seven (6.92).

## Immediate Post-Incident Response

The Monitor concludes that SPD's immediate post-incident response to Type III force incidents demonstrate initial compliance with paragraph 117 of the Consent Decree, including its sub-paragraphs. Supervisors are responding to the scene of Type III force and summoning medical aid for the subject when necessary.  In all cases reviewed, supervisors appropriately classified the force as Type III force, notified FIT, and secured the scene and identified witnesses while waiting for FIT to respond.

As with other types of force, "[a] sworn supervisor [must] respond to the scene" of Type III force and must "obtain sufficient basic information to determine whether a FIT response is appropriate" in the first instance.[156] Officers promptly notified a supervisor in all Type III force cases reviewed.  When supervisors responded to the scene, officers summoned medical aid in a timely manner in all cases where it was necessary.[157]

---

[156] Dkt. 3-1 ¶¶ 117(a), (b).
[157] *Id.* ¶ 117(a).

In turn, those supervisors properly appropriately classified all Type III force accordingly.[158] Crucially, FIT was promptly notified in every case that we reviewed.[159] In most cases, supervisors appropriately secured and preserved the scene pending FIT's arrival, including making reasonable attempts to locate civilian witnesses and request that they standby pending the arrival of FIT personnel.[160]

## FIT Response

> *FIT's response to the scene of Type III force, including officer-involved shootings, demonstrates initial compliance with paragraphs 112, 113, 114, and 118(a) through (e) of the Consent Decree. FIT personnel are assuming control of the scene and capably identify and collecting basic information – including video of the incident and photographs of the scene. Furthermore, they are permitting OPA with simultaneous access to the scene and to their investigations in a manner that appears consistent with the FIT-OPA Protocol.*

FIT appropriately assumed control of the scene from the responding sergeant upon arrival in every case where applicable.[161]

- In one officer-involved shooting, FIT appropriately waited to assume control until the incident was stabilized and outstanding public safety concerns had been resolved.

FIT generally did a good job of identifying and collecting basic information about the incident soon after arriving at the scene. In nearly all (90 percent) of instances, FIT conducted a thorough canvass for witnesses. Officer ICV footage was secured in all cases. Where FIT's documentation of its efforts to canvass for privately-owned video was clear[162], the Monitoring Team found the canvass to be sufficient. It should be noted, however, that the documentation included in the force investigation file did not allow reviewers to make a clear determination, one way or another, as to whether the video canvass was sufficient in more than one-third (34 percent) of cases. Going forward, canvass documentation should be more clearly organized across all investigations. This is especially true given how important video evidence was to several FIT investigations:

- FIT investigators created a superior compilation of video evidence to show a continuous view of the complete incident from various sources of video footage. In part, the superiority of the video evidence created a detailed reconstruction of the encounter and overcame shortcomings in SPD's questioning of both officer and civilian witnesses.

- An officer responds to a scene to find an agitated woman, in behavioral crisis and waving her arms wildly. Although the quality of witness interviews could have been stronger, the incident was captured in detail on ICV. The video in concert with the involved officer's interview provided a sound basis for adequately and thoroughly evaluating the incident.

  FIT responded to the subject's location – whether at the scene or another location when seeking medical treatment – in all cases.[163] FIT likewise appropriately requested a medical release in close to all instances.[164]

---

[158] *Id.* ¶ 117(b).
[159] *Id.*
[160] *Id.* ¶¶ 117(d), (e).
[161] *Id.* ¶ 118(a).
[162] *Id.* ¶ 118(c).
[163] *Id.*
[164] *Id.* ¶ 118(e).

OPA was granted required access to the investigation in almost every instance reviewed.[165] This is a significant finding. After an initial period of hesitancy in 2013 and early 2014, FIT has fully embraced a clear, transparent, professional, and constructive relationship with OPA both at the scene and during investigations of serious force incidents and officer-involved shootings. It is tremendously encouraging to see that both SPD and OPA are following the substantially negotiated FIT-OPA Protocol. So long as the terms of this Protocol are definitively reduced to policy in the upcoming revision of the FIT Manual, it appears that the internal oversight and expertise that FIT provides can function side-by-side with the external oversight and experience that OPA provides.

A reasonable suspicion of criminal conduct was not found in any reviewed Type III incident for any involved officer. A reasonable suspicion of possible misconduct with respect to SPD policy was found in approximately one-third (38 percent) of reviewed cases. In four of the thirteen reviewed cases, potential misconduct was in fact referred to OPA for investigation during the FIT investigation period.

- A FIT investigation was initiated due to an allegation that SPD officers injured a subject's finger. The initial investigation failed to substantiate the claim. FIT did, however, appropriately identify non-force-related misconduct. It properly referred the case to OPA.

In one instance, the Monitoring Team's reviewers identified potential misconduct that did not appear to generate an OPA investigation during the FIT investigation period.[166]

## FIT Investigative Processes & Fact-Gathering

*The Monitor finds that the FIT's investigative processes and evidence-gathering for Type III force and officer-involved shootings demonstrate initial compliance with sub-paragraphs 118(f) through (k). FIT investigations thoroughly cover all relevant investigative bases.*

*Interviews of subjects and officers must continue to be mindful that investigators avoid leading and suggestive questions. Likewise, the quality of the investigation will improve even further when witness officers are interviewed by FIT about the force in the same way that civilian witnesses and the involved officers are rather than only submitting a written statement. Nonetheless, FIT's processes and evidence-gathering appear sound.*

FIT appears to be appropriately and sufficiently collecting and analyzing physical evidence at the scene of serious force incidents. In nearly all cases where applicable, FIT collected all relevant physical evidence – and sufficiently documented that evidence in nearly every instance.[167] FIT sufficiently analyzed that physical evidence for the purposes of the investigation in nearly all instances.[168] Nonetheless, there were isolated instances reflecting lapses in evidence collection and preservation.

- In the aftermath of a non-fatal officer involved shooting, the involved officer left the scene with his wife unaccompanied by any SPD personnel and traveled to a nearby emergency room for examination.

---

[165] Only in one case was one reviewer unable to determine based on available documentation. In another case, OPA was not involved in an interview of a subject at a hospital but was otherwise granted the appropriate and required access to the investigation.
[166] Although FIT should be able to affirmatively identify instances of potential misconduct and refer them to OPA for a misconduct investigation, referral to OPA can, and often does, occur when the case is screened by the Force Review Unit and considered in detail by the Force Review Board. Thus, this potential, single failure of FIT to identify the potential misconduct that our review identified cannot serve as evidence that either FIT or the Department generally is not appropriately forwarding misconduct to OPA. In the implicated case, the case was indeed referred to OPA following the FRB.
[167] One reviewer concluded that whether all physical evidence was appropriately document was unable to be determined. In another 12 percent of instances, the collection and documentation of physical evidence were not implicated by the factual circumstances.
[168] In only one case did one reviewer determine the analysis of the collected physical evidence to be insufficient.

The officer unwittingly carried with him an expended shell casing and blood / DNA evidence which, fortunately, FIT was able to recover later.  The Force Review Board was critical of the FIT sergeant and lieutenant for the lapse and scene control.

- In another incident, FIT's ability to process evidence was compromised in part by first responders' failure to secure pertinent scenes.  For example, two civilians had walked into the scene of a Taser deployment and one of them picked up an expended Taser cartridge.  In addition, a non-FIT commander entered the crime scene to mark perceived evidence, and an unidentified officer placed evidence in an SPD officer's car without notifying him.  The responsible FIT lieutenant identified this lapses and drew them to the attention of the Force Review Board.

Likewise, all injuries were well-documented – with subject injuries and officer injuries always documented when applicable.  If a case involved a fatality, the subject autopsy report was always included in the investigatory file.

One of the areas on which FIT should still focus is with respect to officer interviews.  Officer interviews were audio-recorded in 64 percent of cases.  The questioning of officers was generally adequate.  Although there was room for improvement overall, reviewers noted that the quality of the officer interviews by FIT investigators was stronger in cases that occurred toward the end of the study period (e.g., the end of 2014) rather than the start of the period (mid-2014).  Questioning was complete in nearly 70 percent of cases.  At times, some of the questioning was not sufficiently tied to the incident at hand.  For example, FIT detectives might routinely ask officers about their general training history – but might neglect to follow up and ask the officers whether or how they were trained to respond to incidents or situations like the one under investigation.

Although reviewers identified some leading or suggestive questioning in about one-third (29 percent) of reviews, as well as indicia of pre-interview questioning or discussion in two instances, reviewers did not believe that the issues with questioning tended to materially alter the overall quality or objectivity of the investigations.

- In one case that involved multiple officers applying multiple types of force, only the officer that used Type III force submitted to a recorded interview.  All other officers, including those who had used lower-level force, provided only written statements.  The written statements did not necessarily provide all of the detail that could have been helpful.  For instance, one officer's statement was fairly inaccurate, which was correctly and impressively flagged as such by FIT.  Nonetheless, FIT never asked the officer to correct the record or pursued a follow-up investigation.

- In an officer-involved shooting, only the two shooting officers submitted to recorded interviews with FIT.  Other officers submitted witness statements.  Those statements did not necessarily answer all of the questions or provide all the detail that the interview might have – for example, the exact position of the subject and one of the officers, what the suspect was saying, and what elements of his behavior constituted combative behavior.

Although the uncovered details in the witness officer statements did not impact the overall integrity of the investigation in this case, the opportunity for FIT to ask follow-ups or cover common ground would further enhance the rigor of FIT's processes.  This opportunity to engage in follow-up interviews to ask for more information, press witnesses on certain points, or integrate subsequently-gathered evidence into the interviews was regularly used with civilians.

- In an officer-involved shooting at which members of the Washington State Patrol were present, witness officers only provided statements – reports that the FRB would later note left some material questions less addressed than they should have been.

- Only an officer that used a taser was interviewed on tape. Officers who pointed their guns at the suspect (thereby using Type I force) and handcuffing the subject submitted only written statements.

- One FIT investigation would have been superior if FIT investigators had an opportunity to ask follow-up questions of witness officers, who supplied only written statements, about tactical decision-making related to closing the distance on a man wanted for a crime involving a knife.

The Parties, FIT, and the Monitoring Team have begun discussions about ensuring that, going forward, officers who actually witnessed the force or had a decision-making role in the force as it unfolded are interviewed by FIT investigators rather than providing written statements, which however is not required by current policy.

All civilian witnesses were interviewed in about three-quarters (73 percent) of FIT investigations. There was only one investigation in which not every interview with witnesses was video- or audio-recorded.[169] As with officer interviews, Monitoring Team reviewers identified some room for improvement with respect to civilian witness interviewing techniques. In a bit more than half (55 percent) of force cases, there was at least some incomplete questioning of civilian witnesses noted. Similarly, in 44 percent of instances, some leading questions were identified. Crucially, however, the Monitoring Team reviewers here, too, believed that the technical deficiencies with respect to the interviews did not materially alter the overall quality or objectivity of the investigation. For example:

- An interviewer asked one interviewer, "Would it be fair to say that you guys had been drinking a good portion of the day?" to establish the condition the subject at the time of the force incident.

  Interviews with the subject of the force were conducted in every instance where the subject was available to submit to such an interview and did not otherwise decline to be interviewed. Those interviews were video- or audio-recorded in all instances where such recording was feasible. The Monitoring Team's review of those interviews observed some instances of incomplete or leading questioning.

- One subject interview was less complete than it could have been because it focused disproportionately on the subject describing the force used against him – and not the subject's own actions leading up to and during the force.

## Overall Sufficiency of the Investigation

> *The Monitor concludes that the quality and integrity of FIT investigations demonstrate initial compliance with paragraph 118 of the Consent Decree. FIT is identifying and resolving inconsistencies among statements and evidence. It is generating usually high-quality investigative summaries, though the quality of some summaries could have been improved in some instances. Although FIT investigations are not perfect, they are providing SPD chain of command with a fair, thorough, complete, and objective factual record from which to make determinations about whether officer performance that involves the use of force is consistent with SPD policy.*

---

[169] The documentation in the investigative file prevented a reviewer of anther case from making a determination one way or another.

Generally, the quality of FIT investigations is good.  In 96 percent of Monitoring Team reviews, the investigation was judged sufficient to evaluate the objective reasonableness of the force used.  Likewise, in 96 percent of instances, the investigation was sufficient to evaluate the compliance with the duty to de-escalate by the involved officer(s).  In 88 percent of cases, the investigation was sufficient both to evaluate the proportionality of the force used and to evaluate the necessity of force used.  Similarly, in some 88 percent of instances, the investigation overall formed a sufficient basis for evaluating tactical decision-making.

- FIT's review identified potential issues in an officer's tactical decision-making when he encounters an agitated woman, in behavioral crisis and waving her arms wildly.  The officer positioned himself immediately in front of the woman.  Soon thereafter, he grabs her arm, which leads to a takedown or fall to the ground.  FIT's investigation explored whether the officer might have failed to apply the appropriate contact/cover role with his partner, providing more time for de-escalation while minimizing the risk of assault from the subject.

Subsequent assessments will provide the Monitoring Team with occasion to evaluate both the appropriateness of FRB determining that the officer had engaged in a "technical" violation of the force policy that should be dealt with by chain of command counseling and OPA's election to decline the opening of an investigation.  Nonetheless, FIT investigators exhaustively and soundly provided ample, balanced factual details about the officer tactics in the moments leading to the application of case – not just focusing on the use of force alone.

- Even without FIT being able to clarify or ask follow-up questions about some issues of witness officers, because they submitted statements rather than sat for interviews, an investigation of officer-involved shooting was thorough, comprehensive, objective, and pursued all relevant investigatory avenues – with rigorous interviews of the involved officer and civilian witnesses.

- Prior to FIT's arrival at the scene of an officer-involved shooting, a responding captain marked various evidence at the scene with rocks.  Meanwhile, an unknown person put some of the subject's clothing into a sergeant's car while civilians were walking in and out of the scene.  All of these issues were flagged by FIT as part of an otherwise thorough investigation.

In a majority (63 percent) of cases where the Monitoring Team identified inconsistencies in or among various evidence, FIT appropriately identified and addressed the inconsistencies during the course of their initial investigation or in the FIT chain of command's review of the investigation.[170]  For instance:

- One FIT investigation started out as a Type II investigation because the subject was not admitted to the hospital for several hours.  The Type II portion of the investigation could have been substantially improved.  However, the FIT investigation was superior – and importantly addressed the issues and deficiencies that had occurred in the sergeant's investigation earlier.

- FIT rejected a sergeant's statement about an officer-involved shooting as inadequate – sending a follow-up request to provide comprehensive answers to a host of important questions.

---

[170] It must be noted that review of FIT investigations to not end with the FIT chain of command.  The investigations are actively reviewed and discussed by the Force Review Board.  The Monitor's upcoming assessment of the FRB will consider whether they identify investigatory deficiencies that FIT does not.  *See* Dkt. 221-3 at 7–8.

- The quality of another force investigation that began as a Type II investigation before a subject's injury became apparent increased dramatically after FIT took over. Before FIT arrived, witness interviews were of inferior quality, and the investigating sergeant had delegated the task of witness interviews to officers in some instances. FIT called back several previously interviewed witnesses to interview them on tape to improve the quality of witness interviews.

FIT's investigative summaries were also generally adequate. Nonetheless, the Monitor recommends that FIT continue to work toward comprehensive reports that summarize key evidence, inconsistencies, or issues without reaching conclusions about credibility or accuracy.

- One report did not identify or clearly discuss the conflicts expressed in statements from three witnesses – all of whom did not directly corroborate an officer's statement about whether a subject was stepping toward the officer when she fired. Although the detail became less material than it often is given that the shot did not hit the subject and the incident continued thereafter, the detail was nonetheless crucial to adequately set up and flag for subsequent reviewers attempting to analyze the whole of the incident in light of SPD policy.

- One investigative summary was overly brief, describing only the Type III force and failing to describe other, lesser types of force used in the same incident. Likewise, it did not fully describe the information gathered from witnesses, including the fact that one witness said that it appeared that the subject was subdued at the time that officers delivered knee strikes. Although the investigation itself contains these facts and details, FIT should ensure that this pertinent information is synthesized in the FIT report.

Ultimately, only one force investigation was deemed inadequate overall. The remainder were judged either superior or adequate. A "superior" FIT investigation was one that was thorough, accurate, unbiased, and complete – in compliance with all SPD protocols, containing all relevant evidence and information, and properly addressing any and all material inconsistencies or questions resulting from the investigation. An "adequate" FIT investigation was one where some aspects of the investigation could be strengthened but the identified flaws did not materially impact the overall accuracy, completeness, and integrity of the investigation.

In other words, this assessment finds that FIT investigations still have room for some important improvement but that, crucially, the deficiencies are not materially affecting the ability of subsequent adjudicators to make a fair, unbiased, and comprehensive determination about the performance of involved officers. For example:

- The minor nature of the injury – a pinky fracture – to an intoxicated subject seemed to dictate the direction of the FIT response and report. The FIT account of evidence in the investigatory report can be overly conclusory. However, the overall presentation and quality of evidence – including ICV audio and civilian witness accounts – was sufficiently detailed to make determinations about whether the force used was consistent with SPD policy and to assess officers' tactics while handling the call.

- A type III force involved an attempted taser deployment and non-hit officer-involved shooting against an intoxicated subject who later told SPD that he was attempting "suicide by cop" by brandishing large butcher knives. After force was deployed, the subject fled. Officers followed. An officer deployed four foam nonlethal projectiles, striking the subject. The subject requested to speak to a Hostage Negotiation Team officer, who ultimately convinced him to surrender.

Although some witness interviews were unnecessarily delayed, some FIT detective interactions with the involved officer were not recorded, and some inconsistencies among witness accounts of what the subject did after the failed taser deployment went unaddressed, the force investigation otherwise collected a great amount of pertinent detail, generated a well-organized and thorough force packet, and adopted a neutral tone and approach to its fact-finding.

Thus, the Department has much reason to applaud FIT's performance – but also reason to ensure that it continually recommits to making its investigations as solid as it possibly can. FIT's investigations involve the most serious uses of force by officers which carry the greatest risk of endangering the community's trust in its Department. Ensuring that FIT's investigations remain thorough, independent, and have integrity will help to enhance public trust in the Department.

These results give the Monitor confidence that FIT permanently remaining within SPD's Bureau of Compliance and Professional Standards is consistent with the Consent Decree and will continue to promote fair and complete investigations of officer force.[171]

---

[171] *See* Dkt. 221-2 at 4.

# Part 3.
# Type II Reporting and
# Chain of Command Investigation & Review

**Summary**

*The Monitoring Team's review concludes that officer reporting of Type II force demonstrate initial compliance with paragraph 103. The reports and documentation of Type II force by officers is sufficiently detailed and comprehensive.*

*Some Type II investigations and review are where they need to be and conform to the requirements of the Consent Decree and SPD policy. Nevertheless, SPD still has some ways to go toward ensuring that Type II investigations conducted by sergeants and reviewed by the chain of command are complete, thorough, fair, and objective.*

## Description of Reviewed Type II Cases

Monitoring Team reviewers ultimately evaluated 30 randomly-selected Type II cases that occurred between July 1, 2014 and December 31, 2014 and for which the force investigations had closed and been forwarded to the Force Review Unit as of March 17, 2015.

## Type II Reporting

*The Monitor concludes that officer reporting is in initial compliance with paragraph 103. Although officers must take care to ensure sufficient documentation of subject medical screening and ICV, officer reports on Type II force are generally thorough and complete – containing descriptions of the reason for police presence, detailed descriptions of the incident and force used or witnessed, and a description of subject injury.*

*SPD is complying with the requirement in paragraph 104 that requires supervisors to respond to the scene of Type II force.[172]*

## Supervisory Response

*In most instances, officers are reporting Type II force to sergeants immediately. Those supervisors are responding to the scene. Likewise, the force classified as Type II was properly classified by responding supervisors in most instances. Sergeants are similarly complying with additional responsibilities, including examining the subject for injury and summoning medical aid where necessary, when they respond to the scene.*

Officers immediately reported force to a supervisor immediately in some 83 percent of instances. In 10 percent of cases, force did not appear to be immediately reported to a supervisor and no justification was provided. In one case, the notification was not immediate, but there was justification for the delay. In another, reviewers were unable to determine precisely when the force was reported.

---

[172] Because paragraph 104 contains numerous provisions that pertain to the sergeant's investigation and review – and on which the Monitor finds that SPD must still make progress – this is in no way an indication that SPD has reached initial compliance with paragraph 104 of the consent decree.

Supervisors responded promptly to the scene in nearly 83 percent of cases. In close to 87 percent of cases where a subject was identified, they screened the subject for injury, although in one of those cases, the screening by the sergeant – and the subsequent request for medical assistance – did not occur until the subject had been transported to the precinct.

By and large, supervisors (usually sergeants) are making the appropriate determination when they classify force at the Type II level. Some 87 percent of Type II force was properly classified at the time of the incident.[173] About 80 percent of Type II force was classified as such because it was reasonably likely to cause injury. Within those cases, approximately two-thirds actually involved an injury or complaint of injury or pain. In the remaining 20 percent of cases, the force was Type II simply because the outcome of the force applied was an injury or complaint of an injury.

Per SPD policy, and to effectuate Consent Decree requirements, the responding supervisor in Type II force cases must review officer statements for accuracy and completeness.[174] It was often difficult for Monitoring Team reviewers to verify that this occurred, as the supervisor's review of these statements was generally not specifically documented.

## Officer Documentation

*A vast majority of Type II use of force reports and statements include a reason for the initial police presence; a detailed description of the incident; a detailed description of the force used; force used by other officers; and a detailed description of the subject's injury, complaint of injury, or lack of injury.*

*To maintain its progress going forward, SPD must ensure that officers more rigorously describe "any medical aid or medical evaluation provided."[175] Likewise, documentation about ICV footage must be more thorough.*

On many fronts, officer documentation of use of force was good. A full 98 percent of officer use of force reports provided a thorough, detailed reason for the initial police presence. Four out of five (80 percent) of cases provided a complete and thorough description of officer actions and the force used by officers. Three-quarters (77) percent of cases similarly provided a thorough and detailed description of the incident and the subject's words and actions. The supervisor's response and screening to the incident was adequately covered in 78 percent of cases. Officer description of force that was applied by other officers and that they witnessed was thorough and complete in some 79 percent of instances where applicable.

On some other fronts, officer reporting can improve further, particularly with regard to documentation relating to subject injury. Although officers provided a description of the subject's injury, complaint of injury, or lack of injury in almost all (95 percent) of cases, nearly 29 percent of those descriptions were insufficiently thorough or complete. In another 5 percent of cases overall, an injury description was not included whatsoever. Similarly, officers did not sufficiently describe any medical aid or evaluation in approximately one-quarter of cases the where medical aid or evaluation was necessary. This appeared especially material given the potential implications for medical aid not being rendered when necessary and in a timely manner:

---

[173] In three cases, the incident was initially misclassified by the responding supervisor but subsequently upgraded to reflect the proper classification. In another case, there was no use of force referenced in the limited documentation in the file, making it unclear as to why the incident was classified as a Type II.
[174] Dkt. 3-1 ¶ 104(6); 2014 SPD Manual Section 8.300-TSK-5(13).
[175] Dkt. 3-1 ¶ 103.

- In one case, although the subject was moaning at the scene and repeatedly referenced his injured shoulder, no medical treatment was requested until after he arrived to the precinct – and some 40 minutes after the use of force.

Despite the overall strength of the reporting, Monitoring Team reviewers found that officer reports omitted at least some relevant information in about one-third (32 percent) of cases. Apparent material inconsistencies among information provided by the officer were noted in 10 percent of cases. Boilerplate or conclusory language was also noted in about 10 percent of cases.

In most cases, the nature of the missing information, boilerplate language, or other problems was not so substantially material that the officer reports were rendered wholly inadequate because of the omission. However, in some instances, the issues led Monitoring Team reviewers to question the underlying objectivity and accuracy of the officer reports:

- An officer reported that he used pepper (OC) spray "at least three" times." He did not fully explain why he used force each time, as required by policy.

  The same officer said that the subject was "swinging his arms wildly" and tried to go around the officer after he gave the subject a warning. That account was not consistent with video from another officer's ICV, where a warning cannot be heard. It was also not mentioned by other officers. The video did not depict the suspect as threatening the officer nor appear aggressive.

  These issues were not flagged or addressed by the chain of command. They were eventually flagged by the Force Review Board and referred to OPA.

- In a case where officers used a hard "distraction" strike, officers described the subject's actions and behavior as more agitated and difficult to control than he appeared to be on video of the incident. Likewise, the officer statements did not mention that the subject was in clear pain as they handcuffed him and repeatedly asserted that he was in pain and had a dislocated shoulder.

- An involved officer's report of a rapid subject escape attempt followed by a takedown and scuffle almost identically tracks the audio conversation on the captured ICV – which might suggest that the officer reviewing the video before writing report influenced the officer's recollection.

## Type II Review

*Some Type II investigations and review are where they need to be and conform to the requirements of the Consent Decree and SPD policy. Nevertheless, SPD still has some ways to go toward ensuring that Type II investigations conducted by sergeants and reviewed by the chain of command are complete, thorough, fair, and objective.*

## Sergeant's Investigation

*Basic investigative deficiencies leave sergeant investigations of Type II force less thorough, fair, and objective than they need to be under the Consent Decree. During the time period reviewed, SPD was still determining efficient mechanisms for investigating force transpiring in demonstration or "crowd management" scenarios – which left several Type II incidents less rigorously reviewed than they should have been. Beyond the demonstration context, sergeant investigations do not cover all the bases as*

> *regularly as they must – failing to canvass for all witnesses, impartially and thoroughly interviewing such witnesses when they are identified, pursuing all relevant lines of inquiry, securing adequate statements from witness officers, and ensuring that an uninvolved sergeant indeed conducts an impartial investigation.*

The Monitoring Team found that about 10 percent of Type II investigations by sergeants were thorough, well-documented, and complete – characterized by investigators complying with all SPD protocols and making reasonable attempts to follow all leads and answer all material questions.  Another 38 percent were adequate such that, although some aspects of the investigations could be improved, identified flaws did not appear to materially impact the quality of the overall investigation and resulting force packet provided sufficient information to evaluate the incident.

However, more than half (52 percent) of investigations were found by reviewers to be inadequate, however, because the investigation did not establish sufficient information to support an evidence-based evaluation of the incident, whether due to investigative deficiencies, material omissions, potential investigator bias, or other issues.[176]

Monitoring Team reviewers encountered several investigations, and subsequent reviews, that were inadequate because no investigation or review appeared to have been conducted by a sergeant, lieutenant, or captain.  With the exception of one case, the seven (of 31 total) cases for which there was seemingly minimal or no investigation all occurred in the context of large demonstration or crowd management situations.

At the time that these demonstration-related Type II force incidents occurred, the Department was operating under an interim policy on force reporting and investigation in demonstration management situations.  For Type II investigations, the policy called for a Force Collection Team – an *ad hoc* group of detectives assembled by the incident commander – to conduct Type II investigations.[177]  Where an incident commander authorized use of chemical agents or less-lethal munitions, that commander would report the force and complete documentation rather than the officer who complied with the order to deploy such force.[178]  The review of those force reports, for Type II force, was to be conducted by a captain assigned to the same bureau as the incident commander.[179]  The bureau commander was to also review the force before forwarding the case on to the Force Review Board.[180]

- A force packet for a takedown, involving a grabbing and holding of a subject, contained only statements from witness officers, not the involved officer.  No sergeant's investigation, sergeant's review, lieutenant's review, or captain's review appears to have occurred – nor any review by a bureau captain or commander.

- Type II force reporting on deployment of OC spray, a hair pull, the use of blast balls, and a takedown of one named subject and other unknown subjects occurred after officers were relieved from their demonstration duties.  The only statements in the force packet were statements from a SWAT lieutenant about authorization of blast balls and the statement of an acting lieutenant, who describes his own hair pull takedown of a suspect.  The acting lieutenant also indicates that unidentified officers

---

[176] SPD indicates that the Force Review Board, once it receives and reviews force investigations, has been referring approximately 32% of Type II cases to OPA for further investigation and another 12% back to the chain of command for additional review.  These numbers suggest that the Department may well be catching these deficiencies – which would be consistent behind the goal of such systems of critical self-analysis.  The Monitor's upcoming review of the Force Review Board will have occasion to address this issue.  *See* Dkt. 221-3 at 7–8.
[177] SPD Manual Interim Policy Section 8.310, Nov. 21, 2014 Draft.
[178] *Id.*
[179] *Id.*
[180] *Id.*

used OC spray without his prior authorization or announcement. Unidentified officers deployed blast balls – but with prior authorization. The one identified subject was never actually interviewed.

Although it is evidence that SPD must have at least some additional information about this incident not included in the force packet itself, it does not appear that this force, occurring during a demonstration, received the same kind of systematic review as incidents that occurred outside the context of large-scale crowd management situations.

- Other force occurring during a crowd management situation did not appear to be adequately reviewed. Scattered officer reports described application of OC spray, deployment of flashbangs and/or blast balls, and of a bike push. It identifies one officer as involved, but the file does not reflect any activity of that officer. The account of the blast ball deployment was relatively threadbare – providing insufficient facts to form a judgment, one way or another, on the force used.

Interim Policy 8.310 does not require statements by officers who use force in large-scale crowd management situations at the direction of the chain of command. Nonetheless, there appeared to be no use of force report or investigative account that set forth in sufficient detail precisely what force was used by whom, when, and for what reasons.

- A subject purportedly pushed an officer's bike into her, causing the subject transient pain to the knee and shin. The subject was arrested. The subject sustained a bump on his head – but there is no description in the file indicating whether the subject alleged that the head injury was caused by an SPD officer or what force may have caused it. In fact, the only description of the incident was on a handwritten booking data card filled out by the officer that is provided and quoted by a non-witness detective in the related general offense report. The incident received no review or analysis by a sergeant, lieutenant, or captain – or by a bureau captain or commander.

- A sergeant reported the use of a takedown maneuver with respect to a participant in a demonstration. It provides a detailed account of demonstration events but does not describe the force in much detail other than to say that the sergeant used his body strength to "gain advantage and eventually get on top of the subject" and gain control of the suspect's arm with both hands.

The force packet provided insufficient information to fully address the tactical issues implicated. The sergeant purported to have been "ambushed" by a protestor, but the packet gave no details. No chain of command review of any sort was evident.

- A woman was alleged to have spit in an officer's face during a demonstration. The officer purportedly punched her. The force investigation itself provided no details about the subject, whether she was actually punched, and whether anyone else saw either the subject spit on the officer or the punch. A subsequent OPA investigation of the incident included a six-minute long interview of the investigating sergeant that refers to a written report about the force incident. However, this is not included in the force investigation packet.

The OPA investigation was opened following a complaint by a civilian other than the subject, who was arrested for spitting at the officer. There was no chain of command evaluation of the force outside the OPA context. The Force Review Board found that the officer's punch was disproportionate and

recommending re-training.  The outcome of the OPA investigation was outside the scope of the present review.

- A takedown of a subject during a crowd management situation resulted in the subject's scraped knee. Private video of the incident showed demonstrators who appear to be attempting to assist a suspect in escaping.

  No investigative report or chain of command evaluations were completed.  FRB approved the force based largely on video of the incident.

Confusingly, at least some force used during mass demonstration or crowd management scenarios did receive more in-depth chain of command review:

- An officer reported that he was directed to arrest a subject for pedestrian interference and obstruction. No documentation indicates who directed the arrest.  When the officer attempted to make the arrest, the subject tried to flee.  A third party made a complaint about the use of force and submitted to a brief interview that was not recorded.  There, she said only that she was "unhappy" with the arrest.  In a written statement, she says she was "terrified" by the arrest.  There was no further information about any particular concerns she had about the force itself.

  A sergeant completed a minimally adequate investigative report.  A lieutenant and captain subsequently reviewed the force – reaching express findings as to whether the force was reasonable, necessary, and consistent with SPD policy.

Nevertheless, in the many other cases evaluated for this assessment and where at least some investigation and review did in fact occur, the Monitoring Team still identified a range of problems.  For example:

- One investigation did not secure reports from two officers who participated in a canine deployment. The lack of basic information from involved officers left chain of command reviewers with insufficient information to form basic conclusions about the force based on a thorough, objective factual record.

- The subject of one use of force was interviewed only about injuries – not the use of force.  The interview was not recorded.

- An interview with a subject in another case inquired minimally about the use of force, with the interviewer – who was, inappropriately, the involved officer – instead telling the subject, "You know why you're here . . . . running from a traffic stop."  Accordingly, the "interview" entailed merely a basic screening of complained-of injuries, not a meaningful examination of the force and what happened leading to it.

Reasonable attempts to identify and interview witnesses, commonly referred to as "canvassing" for witnesses, were documented in half (50 percent) of all Type II cases.[181]  The failure to make efforts to systematically

---

[181] Dkt. 3-1 ¶ 104(e)(3) (requiring sergeants to "[m]ake reasonable attempts to locate relevant civilian witnesses, including the subject and third parties, and arrange for witnesses to be interviewed"); ¶ 106(b) (requiring use of force report to include "names, phone numbers, addresses, and summaries of statements by all civilian witnesses to the incident" or, if "there are no known witnesses, the report will specifically state this fact").

identify potential witnesses – or at least to document these efforts – posed problems for the quality of the investigation in a number of instances.[182]  For instance:

- One use of force case involved two canine deployments.  Both occurred in residential areas with houses located close together.

  Nevertheless, the sergeant reported that officers told the sergeant that no one could have witnessed the force, and the sergeant "confirmed their accounts."  Nothing in the report indicates which houses were adjacent to the scene and what attempts were made to contact the residents.  Witnesses in nearby houses may well have seen the incident, heard the commands, or observed the arrest.  Indeed, an officer's use of force report referred to a homeowner standing outside smoking a cigarette during the canine tracking.  The file contains no indication that the homeowner was identified or contacted for an interview.

In general, the reviewers noted that, while there is a checkbox on the sergeant's report indicating that canvassing was completed, there did not appear to be a practice of providing much additional detail as to how the canvass was conducted – which made it difficult to determine whether such actions were sufficient.

When witnesses were identified and interviewed, recorded interviews were conducted with all relevant witnesses in about two-thirds (61 percent) of cases. It appeared to the Monitoring Team that it would have been "practicable and warranted in the circumstances" to have made reasonable efforts to conduct recorded such interviews in the remaining cases where witnesses were present but record interviews not secured.[183]

When interviews were recorded, Monitoring Team reviewers found that about 29 percent were thorough and unbiased.  Leading questions were identified in about 43 percent of recorded interviews.[184]  For example:

- A sergeant's recorded interviews of several civilians included leading questions about whether they had seen the subject get up from a gurney and approach officers.  None of the civilians corroborated the assertion.  Nonetheless, the sergeant's subsequent review described the subject approaching officers and suggested that this behavior provided reasonable justification for officers applying force.  The investigating sergeant was also directly involved in the events that he was investigating.

- For reasons not adequately explained, a fairly new officer, with only about 6 months on the job, conducted the interviews of two witnesses who saw a takedown maneuver.  Those interviews were incomplete and involved few follow-up questions.  A more experienced officer did a better job of another civilian witness, while the investigating sergeant's interview was excellent.  The varying levels of quality suggest that the quality of the investigation would have improved if the sergeant had conducted all interviews – although it was not yet required by SPD policy.

Inadequate questioning – including failing to explore relevant lines of questioning, using other inappropriate interviewing techniques, or not covering all material bases – was noted in about two-thirds (64 percent) of recorded interviews.  Specifically, relevant questions were left unanswered in 21 percent of interviews.

---

[182] *See id.*
[183] *Id.* ¶ 104(e)(4).
[184] *Id.* ¶ 104(e)(3) ("Supervisors should use interview techniques taught in use of force investigation courses, including avoiding leading questions.").

- A subject alleged to the investigating sergeant that he was kneed a few times while he was on the ground following a scuffle.

  The sergeant did not ask about any details – e.g., how many times he was kneed, where he was kneed, who kneed him, and the like.  None of the officer's reports mentions kneeing the subject.  ICV does not show what happened after the suspect went to the ground.

- A sergeant interview of a witness, pursuant to a taser deployment, was open and balanced for a little less than half of its duration.  Thereafter, the interview more resembled a direct examination of a sympathetic witness designed to elicit agreement with officer actions.  The witness indicated that he objected to an officer placing a knee to the back of the subject's head.  The sergeant did not ask the witness to describe that force further.  Through a series of questions, the sergeant did get the witness into agreeing that officers "did what they had to do."

- Witnesses to a Type II officer takedown of a subject were engaged in limited questioning.  Although it appeared that the witnesses may not have been overly cooperative, there were no meaningful questions about what the subject may have been doing to actively resist the involved officer who ultimately applied force.

In about half (52 percent) of cases, reviewers were able to verify that all officers who were present at the scene were interviewed, though it is not strictly required by policy, and directed to complete a written statement.  It was not always clear from the record when or how these interviews at the scene took place and whether they were conducted separately from other officers where possible.  In other cases, witness officer statements were missing from the record entirely.  Witness officers must always be directed to provide a statement, and the supervisor must ensure that those witness statements comply with SPD guidelines.[185]

Relevant officer ICV footage was appropriately identified and reviewed in all (97 percent) instances where it was available.  However, in only about half (52 percent) of force packets was a canvass of the area for any available private video (security camera footage, cell phone footage) fully documented.  This must be done going forward to ensure a full and thorough investigatory record.

The force investigations generally included photographs of the subjects (89 percent of cases where a subject was identified and/or apprehended) and of relevant physical evidence, where applicable.  The location of the use of force was photographed a bit more than half (53 percent) of the time.  In all but one cases, reported injuries to officers were photographed.

During its evaluation of Type II investigations, the Monitoring Team developed concerns about the extent to which supervisors who were involved at the scene ultimately conducted the investigation.

- In one force case involving a taser application, the investigating supervisor was at the scene in a supervisory capacity, provided direction to officers, and witnessed the use of force.  He indicated that he believed himself sufficiently uninvolved because he elected not to go "hands-on" with the subject himself.  However, the better course to ensure a fair and impartial investigation would have been to have secured another supervisor to conduct the investigation.

---

[185] *See* 8.300-TSK-5(10); Dkt. 3-1 ¶ 104(e)(6).

## Sergeant's Report

*Sergeant force investigation reports are not yet where they need to be. They do not yet provide the chain of command with "a complete understanding of the incident from beginning to end."[186] Progress must be made toward ensuring that the summary rigorously and objectively reflects all material evidence, identifies and attempts to resolve material inconsistencies in that evidence, and adequately analyzes incidents in light of policy and tactical concerns raised by officer actions throughout the incident. The summaries must also be forwarded to the chain of command in a substantially more timely manner.*

The sergeant's investigative summary or report is a primary document that usually forms the foundation of subsequent review by the chain of command. Overall, the investigative file compiled by the sergeant was found to be either thorough or adequate in less than half (47 percent) of cases.

- A sergeant's investigative report on a taser application was notably thorough – identifying tactical issues related to verbal communication techniques and the failure of involved officers to preserve appropriate distance between themselves and a subject. Indeed, this thorough analysis set the occasion for the Lieutenant's review to describe the officer's performance as "troubling" and the FRB referring the case back to the chain of command for counseling of the involved officers.

Nonetheless, the reports were inadequate – because of material deficiencies or omissions, inaccuracies, evidence of bias, or other significant issues – in some 50 percent of cases. The quality and rigor of sergeant's reports will need to improve going forward.

A number of features contributed to the reports being not as strong as they must be under the Consent Decree and SPD policy. The Monitoring Team found a little over half (57 percent) of the completed summaries of the supervisory investigation to be thoroughly and accurately written, with an additional 13 percent of cases having no supervisory report to speak of. The reports included sufficient summaries of any force or resistance offered by the subject during the incident (68 percent), officer statements (65 percent), and the incident itself (62 percent). A bit over half half (58 percent) of cases summarized officer attempts at de-escalation and any effects with respect to the subject. Sergeants adequately and thoroughly summarized civilian witness statements about 69 percent of the time that they were available.

When the packet contained factual inconsistencies material to a full and complete understanding of what happened, sergeants failed to identify or resolve such inconsistencies about half of the time.[187] The most common inconsistencies that Monitoring Team reviewers noted were inconsistencies among statements (23 percent of cases) and video that was inconsistent with statements (10 percent of cases). Reviewers were unable to determine whether there was a material inconsistency in about 18 percent of the cases due to insufficient information in the file.

- Injuries to a subject were purportedly sustained as a result of civilian efforts to subdue the subject and officers arriving and eventually using force. The sergeant does not ask, in audio-recorded interviews, two of three civilian witnesses if they knew how or when the suspect sustained injuries. Nonetheless, the sergeant's investigative summary asserts that all civilians agreed that the suspect sustained his injuries prior to SPD involvement.

---

[186] Dkt. 3-1 ¶ 106(a).

[187] *See id.* ¶ 106(d) (requiring sergeant's summary to include "[t]he supervisor's evaluation of the evidence, including any material inconsistencies in the evidence or statements").

Under half (43 percent) of use of force packets included all material evidence.[188]  This often stemmed directly from material insufficiencies with the sergeant's investigation generally:

- A subject had been talking with an assigned crisis intervention sergeant for some 45 minutes.  At some point, the sergeant stopped engaging the subject and left the vicinity.  Officers applied the taser only moments after the sergeant left.

  The sergeant who investigated the Type II force was, in fact, the on-scene sergeant who had walked away prior to force being used.  The sergeant conducted several recorded interviews of civilian witnesses, which was inappropriate.  Likewise, those interviews contained leading questions and comments on the event that had transpired – and that had directly involved the sergeant.  Furthermore, only a subsequent OPA investigation – which arose as a result of a civilian complaint, not an internal SPD referral – explored precisely why the sergeant had left and why the subject – who was engaging with the sergeant and not presenting an assault risk when the sergeant walked away – presented such an immediate risk to officers after the sergeant left.

- A force packet lacked officer reports, photos of the scene and subject, a recorded interview by the subject, and a full account of whether and how officers canvassed for nearby witnesses.

- The basis for a use of pepper (OC) spray was inadequately documented in a sergeant's review, as eventually and appropriately noted by the FRB.  The investigating sergeant was on the scene and had given officers directions during the restraint of the subject and, accordingly, did not meet the definition of an uninvolved supervisor.

- Much of one written report appeared biased toward a finding that an involved subject was "in crisis" and that the force was appropriate.  There was no discussion of the subject's stated disabilities or his obvious exclamations of pain (captured on ICV).  Likewise, the report does not consider the nature of one involved officer's approach of the subject (barking at him to "sit down" while pulling on gloves) and whether it constituted sufficient de-escalation.

Sergeants conducted at least some investigation to assist subsequent Department reviewers of the force incident in conducting the necessary analysis of the incident for policy and legal concerns (in 76 percent of cases) and of any training, tactical, or equipment concerns (also in 76 percent of cases).[189]  However, this investigation was too often insufficiently comprehensive and probing – leaving important issues unaddressed.  For instance:

- The sergeant reports that officers used force because he was making verbal threats against nearby civilians and exhibited "a high level of passive resistance" – but no overt or physical aggression.  The sergeant's report did not sufficiently explore facts that would allow subsequent adjudicators to fully consider precisely why force was necessary at the specific point that officers used it and whether officers might have spent more time or used additional communication tactics to de-escalate the situation.

---

[188] *See id.* ¶ 104(e)(11).
[189] *See id.* ¶ 106(d).

- For most of an incident, one officer attempted to interact with a subject who appeared to be in behavioral crisis while another officer drove in a patrol car behind him.  Among other issues missed, the sergeant did not address whether such partner splitting, with one officer in a car and another on foot, was tactically sound and adequately protective of officer safety.  The sergeant did not consider why the involved officers did not request for a crisis intervention-trained officer, as required for someone experiencing behavioral crisis.  Likewise, the sergeant did not consider why a hobbled suspect appeared to be placed face-down, contrary to policy, for as many as 24 minutes.

- ICV and photos of an involved officer's car show that his car may have struck a stolen car – which placed the officer extremely close to a felony suspect, who clambered over the officer's bumper to escape.  The car had two other occupants, neither of whom was identified in the sergeant's review.  The sergeant's review did not consider whether the officer's approach of the car constituted inappropriate tactics that may have substantially compromised his own safety.

- Multiple sergeant reviews did not address the SPD requirement that officers provide a warning before firing a taser, either reconciling whether a warning was given or whether it was not feasible under the circumstances.

- An otherwise detailed sergeant's investigation report omitted mention of officers who are shown on ICV video engaging in a gratuitous and potentially provocative exchange that raised issues related to professionalism and de-escalation.[190]

- An officer's in-car video was operative during the transport of a subject, after the application of force to the station.  An officer engaged in a problematic exchange with the subject that might have escalated the situation.  The officer's interactions with the subject during transport were not identified nor mentioned by subsequent reviewers.[191]

It should be noted that the sergeant's obligations are not to express judgments or make findings as to the reasonableness of force or whether it was in or out of SPD policy.  The Consent Decree itself indicates that "[i]f a FIT response is not appropriate, the supervisor will conduct the investigation, as an impartial fact-finder and will not be responsible for determining the ultimate disposition of the incident."[192]  In most instances, sergeants were appropriately analyzing the facts but appropriately not making findings.

Although SPD policy requires completion of a Type II investigation within 72 hours (three days), very few Type II use of force packets (20 percent) were completed within three days.  The Consent Decree requires that the report be completed within 72 hours.[193]  The Department will need to redouble its efforts to ensure consistently timely investigative reviews.

## Lieutenant's Review

> *Lieutenants are not yet identifying and resolving deficiencies in Type II investigations and reports as SPD policy requires.  Accordingly, they are not adequately "review[ing] the report packet to ensure it is complete*

---

[190] *See* 2014 SPD Manual Section 5.001(9).
[191] Although the interaction does not directly address the use of force, it does relate to transport of the prisoner by two involved officers.
[192] Dkt. 3-1 ¶ 104.
[193] *Id.* ¶ 106.

> *and the investigation was thorough."*[194] *Likewise, they must more regularly engage in a probing analysis of the incident and clearly "reach findings as to whether the use of force was lawful and consistent with policy."*[195]

Lieutenants clearly reviewed, to at least some extent, the sergeant's investigation to ensure that the investigations were thorough and complete in 72 percent of cases.  However, in 55 percent of cases, lieutenants failed to address investigatory issues that the sergeant's investigation left outstanding – thereby not complying with the requirements of paragraph 109 of the Consent Decree, which requires supervisors to "initiate corrective action" where "deficiencies exist" or where "additional relevant and material evidence . . . may assist in resolving inconsistencies or improve the reliability or credibility of the findings."[196]  For instance:

- An officer applied a taser to a subject.  A Seattle Fire Department witness' account differed from officer statements about the nature of the subject's purportedly assaultive actions immediately prior to deployment of the taser.  Neither the sergeant nor lieutenant meaningfully explored the core inconsistency.

- A lieutenant's review was entirely missing from one packet.  The captain's review suggests that he reviewed the sergeant's report – but does not mention a lieutenant's review.

Lieutenants reached express findings as to whether force was reasonable and necessary in 68 percent of cases.  However, some one-third (38 percent) of analyses were unduly limited or otherwise inadequate, while no analysis was provided whatsoever in another 38 percent of cases.  Monitoring Team reviewers judged the lieutenant analysis sufficiently thorough and complete in fewer than one in five in cases (28 percent).

- In a fairly simple and straightforward incident, one lieutenant's review only provided conclusions regarding the use of force ("The use of force was minor and well within SPD policy").  It did not, however, detail underlying rationales presented.

- A use of force that was originally misclassified as Type I force received a cursory and insufficiently detailed investigation by a sergeant.  The reviewing lieutenant stated a conclusion that force was appropriate as it was minimal (an officer grabbing a subject's arm).  However, the lieutenant provided no further explanation or rationale for why the force was authorized under SPD policy, proportional and reasonable under the circumstances, and consistent with the de-escalation policy.

Lieutenants reached express findings about whether the force was consistent with SPD policy in 68 percent of cases.  No analysis was provided at all in more than one-third (35 percent) of cases, and the analysis that was provided was inadequate or incomplete in about one in five cases (17 percent).  Thus, SPD still has progress to be made to ensure that "[t]he reviewing lieutenant will . . . reach findings as to whether the use of force was lawful and consistent with policy."[197]

- Three officers used a large quantity of Type II force, including a power slide takedown, multiple groin strikes, and strikes to the subject using handcuffs as an improvised impact weapon.

---

[194] *Id.* ¶ 108.
[195] *Id.*
[196] *Id.* ¶ 109.
[197] *Id.* ¶ 108.

The chain of command review identified no policy or tactical issues except the officer's failure to draw pistols when initially contacting the subject, who reportedly had a handgun. The lieutenant in particular did not have issues or concerns with material inconsistencies in the officer's statement regarding the use of force and officer tactics. Upon subsequent review, the Force Review Board referred the matter to OPA for an officer misconduct investigation.

## Captain's Review

*Captains are likewise not yet adequately "ensur[ing] that [the force packet] is complete, the investigation was thorough, and that the findings are supported by a preponderance of the evidence."[198]*

The reviews of force packets by captains were generally more adequate than the lieutenant's reviews. Nearly three-quarters (74 percent) of the written reviews themselves were generally thorough, with most (72 percent) reaching clear findings as to whether the use of force was reasonable and necessary and whether force was consistent with policy (73 percent).

Nonetheless, captains still need to do a better job of identifying and addressing issues with the underlying investigation, or inadequacies left unaddressed by sergeants and lieutenants. Where there were issues involving the thoroughness or completeness of the investigation, the captain resolved them in about 32 percent of cases. Likewise, where there were outstanding investigatory issues bearing on the determination of whether force was consistent with SPD policy, captains resolved them in only about 35 percent of cases.

"Every supervisor in the chain of command is responsible to assure the accuracy and completeness of the Investigation Reports completed by supervisors."[199] Consequently, captains must more regularly identify investigatory deficiencies and hold sergeants accountable for those deficiencies – and lieutenants who did not identify such deficiencies accountable for not addressing the issues.

---

[198] *Id.*
[199] Dkt. 3-1 ¶ 109.

# Part 4.
# Type I Reporting & Chain of Command Review

**Summary**

*The findings of the Monitoring Team's review show that SPD is in initial compliance with paragraphs 100 and 101 of the Consent Decree. Sergeants are conducting in-person screening of Type I force and classifying such force appropriately. Officers are generally documenting Type I force with sufficient detail and accuracy.*

*Although the SPD has made sufficient progress, it has not yet reached compliance with respect to supervisor obligations during the review of Type I force. The chain of command too often leaves inconsistencies or missing information unaddressed; do not reach express findings as to whether the force was in or out of policy; and fail to address important tactical, training, or related policy issues.*

## Description of Reviewed Type I Cases

Monitoring Team reviewers evaluated 55 randomly-selected Type I cases that occurred between July 1, 2014 and December 31, 2014 and for which the force investigations had close and been forwarded to the Force Review Unit as of March 17, 2015. Of those cases, 15 were selected for secondary review to ensure quality control and inter-reviewer reliability. Reviewer assessments across those 15 cases did not materially differ on the aggregate measures.

A significant majority – two-thirds (66 percent) – of Type I cases in our sample related to handcuffing. Approximately one-quarter (24 percent) of Type I force involved officers pointing a firearm at a subject. Thirteen percent involved "soft" takedowns. Various other force techniques accounted for the remainder.

Two-thirds (66 percent) of Type I force cases involved transient pain or disorientation. This suggests to the Monitoring Team that the Department is not spending a disproportionate amount of time focusing on reporting and investigating merely "technical" force where a subject does not purport to or actually experience some measure of physical pain.

By the Monitoring Team's assessment, at least 39 percent of Type I cases involved subjects who were experiencing signs of behavioral crisis (including mental impairment or intoxication).

## Type I Force Reporting

### Supervisor Notification & Response

*The Monitor finds that SPD is in initial compliance with paragraph 101 of the Consent Decree. Supervisors are responding to the scene of in nearly every instance when it is feasible to do so – and in only 5 out of 55 cases did supervisors not conduct an in-person screening with officer(s) and the subject where it appeared practical and feasible to do so. No instances were identified in which that screening improperly extended the length of the detention.*

Officers appear to be reporting Type I force to a supervisor in the manner that SPD policy requires. In 90 percent of Type I force, the force was immediately reported to a supervisor. In another 4 percent of instances,

force was not immediately reported but appropriate justification was provided. The officer documentation generally contained an adequate accounting of supervisor screening (79 percent of cases).

Supervisors appear to be appropriately responding to the scene of Type I incidents. Sergeants, or another appropriate supervisor in rare instances, conducted in-person screening with the involved officer(s) and the subject in a significant majority (80 percent) of cases. In just 7 percent of cases was in-person screening feasible and practical but not conducted. In a few instances, sergeants went to some length to conduct in-person screening of subjects.

- The screening of a juvenile subject who had complained that handcuffs were applied too tight was screened in-person by a sergeant at a children's hospital some time later.

A sergeant must respond to the scene of any use of force unless impractical or not feasible to do so. Part of the reason is so that the sergeant can classify the force as a Type I, Type II, or Type III incident for the purposes of subsequent review. At least with respect to Type I force, supervisors appear to be properly classifying force as Type I force in some 96 percent of cases.

Quite encouragingly, sergeants do not appear to be classifying more-serious Type II or Type III force – whether intentionally, to ensure less rigorous review, or unintentionally, because of misunderstandings of the classification requirements – as Type I force. Of the 55 cases reviewed, only four were potentially misclassified. Two cases involved *de minimis* force being classified as Type I reportable force. A third, more complicated case involved the sergeant classifying the force as Type II force but the FRB voting to reclassify the force as a Type I after the fact.[200]  The fourth misclassified case was the only of the 55 cases reviewed in which reviewers believed that higher-level force was inappropriately classified as Type I force.

- An officer stopped a subject that he knew to have an outstanding arrest warrant on his own. The subject resisted, and the officer used a "cross face technique" to take the subject to the ground. The officer's self-described application of the technique involved him placing his forearm over the subject's nose and mouth and twisting his head down, causing the subject to fall to the ground. The subject subsequently claimed that the officer had punched the subject in the face.

  The incident occurred in September 2014. SPD trained on the cross face technique during the first half of 2014. The training did not include the intentional placement of an officer's forearm over the mouth and nose. In fact, SPD trained its officers to not intentionally block a subject's airways at any time.

  The force likely should have been classified as at least a Type II because (a) the technique could be reasonably expected to cause physical injury, and, in any event (b) the subject claimed that the officer injured her by punching her. Likewise, there is a plausible argument that the intentional blocking of the mouth and nose amounted to an untrained hold functionally equivalent to Type III force.[201] Regardless, the force was unlikely Type I force.

  The classification issue was not addressed by any of the reviewing sergeant, lieutenant, or captain.

---

[200] The Monitoring Team was somewhat confused – given that the subject was treated for injuries at the scene subsequent to a handcuffing and takedown, regardless of what injuries may have been caused by officers and what had been pre-existing or unrelated to the force – by the Board's decision to downgrade the use of force given that the subject was treated for injuries at the scene. Because the FRB is beyond the scope of this report, however, the Monitor will address FRB decisions in a subsequent assessment.
[201] *See* 2014 SPD Manual 8.300-POL-10 (prohibiting use of neck and carotid restraints except when deadly force is justified and classifying such restraints as Type III force).

## Officer Documentation

> *The Monitor finds the SPD in initial compliance with in paragraph 100 of the Consent Decree.  Officers are documenting Type I use of force in a searchable and retrievable format, in BlueTeam (the web-based interface of IAPro).  The use of force report forms and attached officer statements are providing sufficiently detailed accounts of their actions; the suspect's actions; and the names of involved officers, witnesses, and supervisors.*
>
> *The most notable outstanding issue with respect to officer reporting is the failure to sufficiently document in-car video (ICV) footage or explain the lack of such footage.  Although three-quarters (73 percent) of Type I reports adequately document ICV footage or explain the lack of such footage, the description provided in the remainder of reports was inadequate, incomplete, or not provided.  The Monitor will still want to see sustained improvement in that area going forward.*

In their Type I Force Reports, officers appear to be doing a good job of providing sufficient detail about the circumstances leading to the force and the application of the force itself.  In a full 97 percent of instances, officers adequately detailed for the reason for the initial police presence.  In 93 percent of instances, officers provided an appropriately detailed description of the incident and of the subject's words and actions.  In 96 percent of instances, officers provided a sufficiently detailed description of their own actions and of the force applied.  For example:

- A subject exhibiting signs of mental illness and possible intoxication, and known to be aggressive was running away from police after being identified as a suspect in an assault.  While the subject was distracted by other officers, at whom he was waving or swinging his cane, an officer gave the subject a bear hug (a control hold) and took him to the ground without injury to the suspect or officer.  One of the distracting officers had, around the same time, pointed a firearm at the subject as he advanced toward them.

The reports were thorough, providing good imagery and an appropriate amount of detail – neither too much nor little – about the scene and sequence of events.

- Officer reports of a complaint of pain due to handcuffing by a subject who had been observed walking in and out of moving traffic, and detained for community caretaking purposes, were especially thorough and complete – documenting the state of ICV footage, identifying the reason for initial police presence, and describing in sufficient detail the subject's words and actions and the officer's actions and use of force.

- A juvenile experiencing a behavioral crisis was blocking another girl against a wall while threatening to hit the other girl and fight with officers.  Officers used C-clamp grips to get her under control and successfully handcuff her.  She complained of pain from the handcuffs.

    The officer's report was thorough and detailed without introducing immaterial or extraneous details – noting that the cuffs were gauged and double locked and describing the scene adequately.

Officer documentation of whether the subject was injured, complained of injury, or received medical aid or evaluation was likewise generally good.  In 83 percent of instances, documentation of the injury, complaint of injury, or lack of injury was thorough and complete.  In most instances, the officer's relatively short and straightforward summaries were adequate under the circumstances described.  For instance, in one case, the

officer said only that the subject had said "ouch" twice when he applied the handcuffs; reviewers found this to be a sufficient complaint of injury.

Actual medical aid or evaluation was not necessary in 41 percent of cases reviewed.  Where it was necessary, a good majority (75 percent) of descriptions of that aid or evaluation were judged thorough and complete.

The Monitoring Team did not detect significant problems with officers relying on patterned, canned, or vague language.  In just 6 percent of instances did reviewers identify with boilerplate or conclusory language, and in only 1 percent of cases did reviewers uncover language that seemed copied from other reports or sources.  Still, the Monitor did identify some instances where the quality of reports could be improved:

- An officer reported only that handcuffs were applied "as trained" and that the officer subsequently adjusted them when the subject complained of pain.  The report did not explain why the cuffs were double locked after pain but not before; did not list the length of time between the complaint of pain and the adjustment; and did not explain anything about the subject's behavior or condition at the time of cuffing.  Although the force described appeared to be relatively minor and involved temporary handcuff pain that the officer alleviated, the report was overly generic.

- A dementia patient discharged from the hospital was observed walking on a busy street.  Two CIT-trained officers responded to the call.  The subject raised his walker to push past the officers.  Officers seized the walker and handcuffed the subject, who complained of pain during the application of handcuffs.

  One officer's report indicated that the subject's "actions dictated we physically control him; as he was now acting out against us and we could no longer safely evaluate him [sic] was trying to use the walker as a weapon . . . ."  The other officer's report indicated that the subject's "actions dictated we physically control him; as he was physically acting out against us and I could no longer safely evaluate him as he was using the walker as a weapon against us."  The similarity of language, grammatical construction, and the seeming omission of words in the first officer's report all strongly suggest to the Monitoring Team that at least one officer had access to the other's report or that the officers otherwise collaborated on their reports – neither of which would be appropriate.

- An officer responded to a child welfare call, with information that the child's mother was intoxicated.  The mother also had an outstanding arrest warrant.  The mother was brought into custody.  She complained of pain from handcuffs during her arrest.

  The officer's report failed to describe specifically when and under what circumstances the complaint of pain occurred or how the officer had applied the handcuffs.  These omissions were not addressed by any of the reviewing sergeant, lieutenant, or captain.

The most significant issue with Type I reporting involved missing or insufficient documentation regarding in-car video ("ICV") footage or the omission of an explanation for the lack of such footage.  Nearly one-third (31 percent) of the time, the documentation about in-car video footage was either insufficiently thorough and complete or simply not provided.  Although the Monitor understand that information about ICV footage is purportedly logged in other SPD systems, the Monitor recommends that officers at least document the

existence of ICV footage for incidents – and, if it is unavailable for whatever reason, to document why the footage was not captured.

Most (89 percent) of Type I reports were completed in a timely manner as defined by SPD policy.

## Type I Review

*The Monitor finds that SPD's review of Type I force is in initial compliance with paragraph 102 of the Consent Decree. Force packets are generally sufficiently thorough and complete and contain all relevant evidence.*

*Going forward, sergeants must take care – even in the realm of relatively low-level and often more straightforward Type I force – that they resolve material inconsistencies and thoroughly cover all investigative avenues. Likewise, although the Monitor understands the significant workloads that the chain of command must manage, lieutenants and captains must remain mindful that they must reach express findings as to whether the force was consistent with SPD policy, and not merely that the investigation was closed or no issues identified.*

### Sergeant's Review

*The Monitoring Team found that a majority of sergeant reviews of Type I force generally covered the bases – including all relevant evidence and summarizing information to permit the analysis of the incident in terms of SPD policy and training. Going forward, sergeants must make continued progress toward ensuring that they uniformly explain the incident in a non-conclusory manner that permits lieutenants and captains to fully and objectively review the sergeant review.*

In a substantial majority of cases (86 percent), the use of force packet was found to include all relevant evidence. Sergeants completed their review according to SPD timeline requirements in most instances (84 percent).

In some instances, the various pieces of evidence of a force packet contained elements that were not entirely consistent with other elements. In approximately one-third (32 percent) of Type I cases, the force packet contained at least some inconsistencies. Of these, sergeants failed to identify and resolve the issues in nearly two-thirds (63 percent) of instances. However, the general completeness of the force packets themselves allowed the Monitoring Team's reviewers – just like subsequent SPD chain of command reviewers – to identify inconsistencies in evidence or statements and address it for themselves.

Sergeants reached a conclusion as to whether the Type I force was objectively reasonable in a vast majority (84 percent) of cases.[202]  In many instances (64 percent of cases), the sergeant's analysis relating to whether force was objectively reasonable was viewed by the Monitoring Team's reviewers to be as thorough and complete as it could have been.

---

[202] At the start of the study period, SPD policy provided that "all reviewers shall evaluate use-of-force with regard to department policy and existing statutes and laws."  2014 SPD Manual 8.400-POL-1(3).  The policy identified the sergeant as the first level of the Type I review process.  *Id.* POL-1(1). On October 24, 2014, SPD issued a directive that sought to clarify the sergeant's role in reviewing Type I incidents: "Sergeants should give a brief summary of their review of the incident and give the approval [or disapproval].  Lieutenants and captains should assess the quality of the sergeant's review and briefly indicate why the approval of the force is warranted."  SPD Directive No. 14-00045.

However, under current SPD policy, sergeants are not called to make an express finding as to whether the force was in policy, reasonable, or the like.  *See* Dkt. 204.  They are still, however, called to raise policy, tactical, training, or procedure issues.  This change was intended to emphasize the idea that the sergeant should operate as a neutral and objective fact-gatherer.

The review here considers whether supervisors were adhering to then-operative SPD policy.  However, the success or failure of sergeants to adhere to a policy requirement that has since been updated has been given appropriate context as the Monitor and his Team have considered what the results of the systemic assessment may say about the Department's overall progress in complying with the terms of the Consent Decree.

Thus, sergeants are using a generally complete factual record to make supportable conclusions about Type I force in most instances – but not always "showing their work" or summarizing the incident in an understandable manner.  Although the Monitor understands the significant workloads that sergeants must manage, the sergeant's documentation about the force must be present and at least summarily address the issues implicated by the incident.  For instance:

- Officers were called to Harborview to assist in taking two children in to Child Protective Services custody.  The children's mother attempted to obstruct that process.  Officers restrained her (a "soft" takedown) and applied handcuffs.  She later complained of pain.

  The sergeant's report provided no analysis as to whether the force implicated any training or tactical concerns and whether there were any other SPD policy or training issues.

- An officer responded to a residential burglary call.  Upon entering the dwelling, the officer encountered the subject.  The officer ordered the subject to show his hands, pointing a firearm at the subject following what the officer perceived to be an unreasonable delay.  Ultimately, the subject was determined to live at the residence, and no arrests were made.

  The officer's report was adequate, and the reviewing sergeant appropriately determined that the use of force packet contained all relevant evidence.  However, the sergeant failed to reach findings about whether the force was reasonable, consistent with SPD policy, or raised any training, tactical, or equipment concerns.  Neither the subsequent lieutenant's nor captain's review would address these deficiencies – either by making their own determinations about the force or by identifying that the sergeant's review was deficient.

Sergeants reached conclusions as to policy or legal concerns – including the legality of the enforcement action, appropriate request for medical assistance, ICV use, or the positioning of a prone subject – in 70 percent of cases.  The Monitoring Team found many of them well-supported:

- An officer pointed a firearm at a subject while arresting him on a felony warrant.  The officer did not tell a sergeant about the force until a phone call well after the force was used.  Likewise, the officer failed to upload in-car video footage of the incident.

  The sergeant identified both issues, counseled the officer, and made an entry of the officer counseling into the PAS system.

- Following a DUI stop, a combative subject was restrained in a holding cell.  Several officers assisted in applying full restraints to the subject.

  The sergeant appropriately noted that officers should not have left an un-handcuffed suspect in the cell and provides counseling to the officer who had initially placed the subject in the cell.

Sergeants similarly evaluated the Type I incident for related training, tactical, or equipment concerns in some 70 percent of cases.

- After reviewing an ICV of an incident, the sergeant appropriately counseled the involved officer for failing to identify himself when he approached the subject and notifying the subject that he was being recorded, per SPD's ICV policy.

- Officers responded to a call of a subject threatening to kill someone with possible guns at the location. A sergeant counseled an officer for parking his patrol car directly in front of the residence to which they were dispatched, given the advance indication that firearms may have been present. Similarly, the officer was counseled for searching the subject that he ultimately encountered when only a frisk for weapons was warranted.

In some instances, the Monitoring Team reviewers identified policy, tactical, and training issues that sergeants did not address. The nature of the implicated tactical concerns tended to related to de-escalation issues:

- A subject, who was reported to have been involved in a prior incident involving the theft of a gun, was stopped by officers for theft of a water bottle. The subject was placed on the push bars of a patrol car. After a few questions, the subject tried to flee, but the involved officer was able to talk him back to returning to the patrol car. Observing that the subject was sweating profusely and acting erratically, SFD was called on suspicion that the subject was intoxicated. After SFD arrived, the subject tried to flee again. A subsequently-responding officer – who was alone with the subject while the initially responding officer went to talk to witnesses – grabbed one arm before feeling the subject grab his gun. Officers and SFD took the subject to the ground. The officer's gun, which had come out of its holster, was then secured.

  The reviewing sergeant made a finding that force was reasonable, but analysis of officer tactics was limited – including why the primary and subsequently-responding officers had split, whether the subject could or should have been handcuffed earlier in the exchange, and how the subject was able to access the officer's firearm in the first instance. Although such determinations are unlikely to have altered the finding that force was reasonable and consistent with SPD policy, the quality and nature of the decision-making that led to force being used should have been analyzed. Indeed, the captains' report indicated that the gun "falling out" of the officer's holster was being addressed by the lieutenant – although the lieutenant's report does not mention if or how the issue was being addressed – but such issues were not addressed by the sergeant. This failure of the sergeant was not appropriately noted or addressed by the lieutenant or captain.

- An officer responded to a mentally ill juvenile with a history of self-harm who had locked herself into a bathroom. When she exited the bathroom, the officer grabbed her arm and applied hold to allow him to search her for weapons.

  The sergeant's review included no assessment as to the officer's tactical planning, including whether the officer had deployed any verbal strategies prior to using force that would have permitted only *de minimis* force during the search, the fact that the force occurred in an area of low lighting, and the nature of the officer's communication with on-scene mental health facility staff.

- A juvenile purportedly under the influence of LSD went to a neighborhood, jumped off a private residence dock, broke into a residence, and poured beers. A single officer arrived, approached the suspect, and took the subject into custody by employing a "soft" takedown.

Although the officer's report was thorough and complete, the sergeant's review did not provide any analysis as to the officer's one-officer approach to a subject that was suspected of being intoxicated, potentially dangerous, and likely crisis-eligible. Subsequent reviews by the lieutenant and captain neither flagged the sergeant's omission nor addressed the issue independently.

The Monitoring Team will have more to say on the issue of whether officers are complying with the SPD officer use of force policy in the future Officer Use of Force Assessment.

## Lieutenant's Review

*Lieutenants appear to be doing an adequate job in reviewing the Type I force, including its related packet and the sergeant review of force. Where the sergeant has failed to adequately address outstanding issues relevant to making core determinations about whether force was consistent with SPD policy, lieutenants must take care going forward that they systematically address such deficiencies with sergeants.*

Lieutenants appropriately reached findings as to whether the incident was properly classified as a Type I (in 81 percent of cases). Likewise, lieutenants appropriately evaluated the sergeant's reports to ensure that they were thorough and complete (in 81 percent of cases). In cases where the sergeant's review had outstanding issues, lieutenants address those issues a majority (60 percent) of the time.

Lieutenants usually (in 77 percent of cases) conducted a good review of the sergeant's underlying evidence-gathering. Still, in approximately one in five (20 percent) of Type I force, the lieutenant's review of the investigation was not adequate. Consequently, of the one-quarter (25 percent) of total cases where there were outstanding issues that needed to be addressed, the lieutenant managed to address them slightly less than half (44 percent) of the time.

In most instances (79 percent of cases), lieutenants reached findings as to whether the Type I force was consistent with SPD policy. Lieutenants had slightly more room for improvement with respect to analyzing Type I force in terms of the core determinations about whether the force was reasonable, necessary, and proportional under the circumstances – reaching express findings on these fronts slightly less than two-thirds (63 percent) of the time. Lieutenants did not completely resolve outstanding investigatory in approximately 20 percent of cases. In at least some instances, the lieutenant proactively identified previously unaddressed issues below:

- An officer saw a subject, who the officer knew to have an outstanding arrest warrant, walking alone in the early morning. The officer called for backup before initiating contact with the subject on his own and ordered him to comply with the arrest. The officer used force when the subject resisted.

  The lieutenant identified an improper contact and cover issue – which the sergeant had not previously discussed – and directed the sergeant to counsel the officer on tactics.

- The lieutenant in a review of a complaint of pain from handcuffing identified missing details from the officer's descriptions of the reason for the arrest of the subject and the actions that occurred before and during that arrest. The lieutenant had the officer amend his report to include the information.

- A lieutenant sent one force packet back to the sergeant because the sergeant had failed to complete required criteria of the sergeant's review template.

- An officer pointed a gun at a subject as cover while the subject was commanded out of the car during an arrest from a stolen vehicle. The lieutenant's review thoroughly detailed why pointing a gun at a suspect in this situation was acceptable and consistent with SPD training.

In others, however, the lieutenant failed to address issues in the sergeant's review:

- The sergeant's report in one case, involving a complaint of pain from handcuffing, was inadequate in many respects – including the failure to describe the basis for the arrest of a subject, the failure to make clear findings as to whether the force was consistent with SPD policy, and the failure to consider any tactical considerations.

  The reviewing lieutenant failed to note or address this deficiency. In fact, the lieutenant, like the captain who would subsequently review the packet, failed to make an independent determination as to whether force was or was not consistent with SPD policy.

- Officers were part of a coordinated felony stop of a suspected drug transaction. When the stop was initiated, the driver of the suspect vehicle would not raise his hands. Two officers pointed their firearms at the driver. The driver was taken into custody without further force or incident.

  The officer reports, beyond inadequate ICV documentation, were sufficient. However, the sergeant's review failed to expressly evaluate the incident in terms of consistency with SPD policy, training, and tactics. The lieutenant's subsequent review not only failed to identify the deficiencies in the sergeant's report but independently failed to reach findings as to whether the force was consistent with SPD policy. Although the force involved was not typical, as it was a coordinated effort involving SPD supervisors, the force must still – per SPD policy – go through the usual review procedures.

  In a similar case, an ACT team was executing a search warrant. Several officers pointed their firearms at subjects during the search. All suspects complied with commands and were taken into custody without further force or incident. Again, the chain of command – from sergeant through captain – did not make findings as to whether the force was consistent with SPD policy.

Lieutenants completed their reviews in accordance with SPD policy timelines in 73 percent of cases. Frequently-cited reasons for delays were "workload" and, in at least one instance, the "cumbersome" BlueTeam system.

## Captain's Review

> *Captains generally made required findings as to whether force reports and reviews were thorough and whether the underlying force was consistent with SPD policy. Like lieutenants, captains could more clearly explain and justify their findings, as well as ensure that deficiencies or problems with the review by sergeants are addressed.*

Captains made a finding as to whether the incident was appropriately classified as Type I force in most (79 percent) of cases. Likewise, captains usually conducted the appropriate reviews as to whether the officer, sergeant's, and lieutenant's reports were thorough and complete (in 74 percent of cases) and to ensure that the investigation was sufficiently thorough and complete (in 69 percent of cases).

In some instances, the reviews were overly perfunctory and did not adequately explain the justifications for the findings.  For example:

- "This is a type 1 use of force investigation.  It is complete and should be closed."

- "Officer's actions were in compliance with training and policy."

- "This is a type 1 use of force investigation.  This investigation is complete."

- "I found no issues with the force used."

Captains reached findings as to whether the force was otherwise consistent with SPD policy in 83 percent of cases.

# Monitoring Team Staff

**Merrick Bobb**
Monitor

**Matthew Barge**
Deputy Director

**Peter Ehrlichman**
Deputy Monitor

**Ronald Ward**
Assistant Monitor

**Chief Joseph Brann (ret.)**
Senior Police Expert

**Julio Thompson**
**Marnie Carlin MacDiarmid**
Esq.

**Joseph Doherty**
**Ellen Scrivner**
Ph.D.

**Brian Center**
Senior Consultant

**Jeffrey Yamson**
**Luis Perez**
Executive Assistants

**CERTIFICATE OF SERVICE**

I certify that on the 24th day of September, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following attorneys of record:

| | |
|---|---|
| J. Michael Diaz | michael.diaz@usdoj.gov |
| Jonathan Smith | jonathan.smith2@usdoj.gov |
| Kerry Jane Keefe | kerry.keefe@usdoj.gov |
| Michael Johnson Songer | michael.songer@usdoj.gov |
| Rebecca Shapiro Cohen | rebecca.cohen@usdoj.gov |
| Emily A. Gunston | emily.gunston@usdoj.gov |
| Puneet Cheema | puneet.cheema2@usdoj.gov |
| Timothy D. Mygatt | timothy.mygatt@usdoj.gov |
| Christina Fogg | christina.fogg@usdoj.gov |
| Annette L. Hayes | annette.hayes@usdoj.gov |
| Jean M. Boler | jean.boler@seattle.gov |
| Peter Samuel Holmes | peter.holmes@seattle.gov |
| Brian G. Maxey | brian.maxey@seattle.gov |
| Gregory C. Narver | gregory.narver@seattle.gov |
| John B. Schochet | john.schochet@seattle.gov |
| Rebecca Boatright | rebecca.boatright@seattle.gov |

DATED this 24th day of September, 2015.

*/s/ Erica Knerr*
Erica Knerr

THE SEATTLE POLICE MONITOR'S
FIRST SYSTEMIC ASSESSMENT
Case No.  C12-1282JLR

Merrick J. Bobb, Monitor
Police Assessment Resource Center
PO Box 27445
Los Angeles, CA 90027
(213) 623-5757