1

THE HONORABLE JAMES L. ROBART

2

3

4

5

6               UNITED STATES DISTRICT COURT
7     FOR THE WESTERN DISTRICT OF WASHINGTON
                    AT SEATTLE
8

9   UNITED STATES OF AMERICA          CASE No. C12-1282JLR

10                  Plaintiff,        **THE SEATTLE POLICE
                                      MONITOR'S SECOND SYSTEMIC
11        vs.                         ASSESSMENT REGARDING THE
                                      FORCE REVIEW BOARD**
12  CITY OF SEATTLE

13                  Defendant.

14

15

16

17        The Seattle Police Monitor's Second Systemic Assessment, regarding the Force Review

18  Board, is attached.

19

20

21

22

23

24

25

THE SEATTLE POLICE MONITOR'S SECOND SYSTEMIC
ASSESSMENT REGARDING THE FORCE REVIEW BOARD
Case No.  C12-1282JLR

Merrick J. Bobb, Monitor
Police Assessment Resource Center
PO Box 27445
Los Angeles, CA 90027
(213) 623-5757



SEATTLE
POLICE
MONITOR

# Second Systemic Assessment: Force Review Board

November 2015

# Table of Contents

Table of Contents ................................................................................................................. i

Executive Summary ........................................................................................................... 1

Part 1. Methodology ......................................................................................................... 7

Part 2. Results of the Assessment .................................................................................. 9

   A.   Nature of Cases Reviewed by the Board ................................................................. 9

   B.   Presentation .................................................................................................................. 9

   C.   Board Composition ..................................................................................................... 11

   D.   Board Review of Underlying Investigation ............................................................ 11

   E.   Board Deliberation and Discussion ........................................................................ 12

       1.  Discussion of Officer Force .................................................................................. 12
       2.  Discussion of Implications for Policy, Training, Equipment, and Tactics .......... 15
       3.  Discussion of Quality of Force Investigation & Review ................................... 15

   F.   Board Recommendations and Follow-Up ............................................................. 16

       1.  Board Recommendations ....................................................................................... 16
       2.  Follow-Up Regarding Policy, Training, Tactics, and Systemic Issues ............... 17
       3.  Memorialization of FRB Findings ......................................................................... 19

Appendix A. About the Force Review Board ............................................................... 20

   A.   What the Force Review Board Does ...................................................................... 20

   B.   SPD's Policies Regarding the FRB and Progress to Date ................................. 21

# Executive Summary

The Monitoring Team recently completed a review of all cases that came before the Seattle Police Department's ("SPD") Force Review Board ("FRB" or the "Board"), which reviews and analyzes serious (Type III) and intermediate (Type II) force, between June 2 and August 25, 2015.

The review finds SPD's FRB functioning well and, in a great majority of instances, as the Department's hub of internal accountability, analysis, and continual improvement with respect to force. The Board appears to be understanding, and embracing, its role as the key forum for "internal innovation and critical analysis" of force.[1] It is regularly exploring important issues that go well beyond whether an involved officer's use of force was consistent or inconsistent with SPD policy and instead consider "what [the] force incidents can teach the Department and its officers about training, tactics, procedure, and policy"[2]:

- Eighty-five percent of the cases were handled adequately or better by the Board in a manner that was consistent with, or above, the expectations of the Consent Decree.

- In nearly every instance (96 percent of cases), the Board appropriately evaluated the legal basis for the searches, detentions, and arrests involved in or implicated by the force incident.

- In 87 percent of Board deliberations, the group's discussion was based solely on facts in evidence, without speculation.

- In 93 percent of cases, the Board sufficiently evaluated the objective reasonableness of the force used, the proportionality of force used, and the necessity of force used.

- In instances where equipment issues were implicated, the Board's discussion adequately addressed those issues in nearly 91 percent of cases.

- Where there were issues involving the adequacy of the Department's training, policy, or adherence to best practices, the Board adequately discussed them in most (92 percent) cases.

The high proportion of cases that were handled adequately or better is a noteworthy, highly positive achievement. In more than half (56 percent) of cases, the Board found that an officer may have violated an SPD policy – either related to force (in nearly 13 percent of cases brought before the Board and nearly 9 percent of officers) or to some other issue (in the remainder of cases). Especially given that, between 2009 and 2011, only 0.04 percent of cases received any significant chain of command scrutiny whatsoever[3], it is a praiseworthy advance in accountability that SPD, through its Force Review Board, has become far more comfortable with critically analyzing and scrutinizing officer use of force and holding officers accountable for their performance during incidents involving force. For that, the Monitoring Team compliments the SPD and sees it as a

---

[1] Fourth Semiannual Report at 37.
[2] *Id.* at 37.
[3] *See* United States Department of Justice, Civil Rights Division and U.S. Atty's Office, W.D. Wash., Investigation of Seattle Police Department (Dec. 16, 2011) [hereinafter "2011 Findings Letter"] at 21, *available at* http://static.squarespace.com/static/5425b9f0e4b0d66352331e0e/t/5436d96ee4b087e24b9d38a1/14128807506/spd_findletter_12-16-11.pdf.

significant stepping stone along the path toward full and effective compliance and a notable improvement from the beginning of the consent decree, when review of force, when it occurred, was superficial at best.

As such, **the Monitor finds that the FRB's performance is in initial compliance with paragraphs 119 to 125 of the Consent Decree**. As the Monitor summarizes elsewhere in this report, FRB's composition, policies, and procedures just got up and running as of June 2015. In fact, the first Board meeting that the Monitoring Team's reviewers considered for this assessment was the first time that the newly-constituted Board met under the revamped policies and procedures. We have witnessed, in real-time, the Department and FRB committing to make important refinements and fine-tuning on its approach and operations – refinements that appear, in the first few months, to be paying off. The fact that the newest iteration of the FRB has managed to start strongly and rapidly improve is a testament to the dedication of the Board and the noteworthy commitment of its current leaders.

Because this latest iteration of the Board is still relatively new, **the Monitoring Team will take particular care to remain involved and invested in ongoing monitoring of the FRB deliberations** to ensure that the progress has been made is not temporary or short-lived but, instead, is truly systemic.

***

The Court has previously articulated the importance of the Force Review Board ("FRB")[4] to reform of the SPD under the Consent Decree:

> The ultimate goal of the [Consent Decree] reform process is to have a police organization that no longer needs the intervention of the Department of Justice or the oversight of the Monitor or the court, but rather is capable of policing this community both effectively and constitutionally through self-regulation. The FRB is a critical element of that reform process and . . . is essential to the [Department's] self-regulation.[5]

The FRB is intended to be the SPD's principal vehicle to analyze use of force. It serves two broad functions. The first is to review force investigations, critically consider them, and reach a determination as to "whether specific conduct" during a force incident amounts to possible "misconduct under SPD policy" such that an internal, administrative investigation by the Office of Professional Accountability ("OPA") should be initiated.[6] Thus, the Board must make an express determination as to whether an officer's or supervisor's performance during an incident was consistent or inconsistent with SPD policy.

In addition to reviewing the force investigation and analyzing involved officer performance, the Board must act as "quality control" for the underlying force investigations that the Force Investigation Team (" FIT") (for Type III force and some designated Type II force) and the chain of command (for most Type II force) conduct. In reviewing the investigative file (or "packet") that FRB considered, the Monitoring Team's reviewers found that the packet included all material information and evidence in 71 percent of cases. Given the Monitor's previous conclusions that Type II investigations "are not yet where they need to be," with sergeant investigations suffering from "[s]ome basic investigative deficiencies" that "[l]ieutenants and captains are . . . not yet identifying,"[7] and that a majority of cases reviewed by the FRB during the study period were Type II force, it

---

[4] A more complete accounting of the FRB and how it works may be found at Appendix A.
[5] Dkt. 225 at 8.
[6] Dkt. 204 at 18.
[7] First Systemic Assessment at 3.

does appear that improvement at the precinct level in Type II investigations should remain an area of strong focus for the Department and the FRB in the short-term.

While the first role in reviewing force can lead to OPA referrals for the review of individual officer performance, the Board's second general function—and just as important as the adjudication of whether officer and supervisor performances was in or out of policy—is to consider what the Department can learn from force incidents. In this way, the Board "do[es] far more than determine whether an officer's discharge was 'in' or 'out' of policy at the moment the trigger was pulled" or force was used."[8] Instead, "[i]t must consider the tactics of all involved officers from the time that they were dispatched or initiated activity through the use of force and securing of the scene, until the time when the involved officers completed their statements," to determine what elements of officer performance were in or out of SPD policy.[9] Within this function, the Board assesses incidents from the standpoint of how the Department itself can improve going forward, and not simply whether specific officer conduct should be subject to a disciplinary investigation. This portion of the review does not result in officer discipline referrals, but rather, referrals to any and every area of the Department in which improvements could be made to training, policy, supervision, and the like. The goal is continual improvement and implementation of best practices across all of SPD's operations.

Thus, FRB "is where SPD must dynamically analyze tactics, training, policies, processes, and procedures so that the organizations learns as much as possible from every significant use of force incident, regardless of whether the application of force in any given incident was legally justified."[10]

In his Fourth Semiannual Report in December 2014, the Monitor described how the FRB should look and function when the Department has reached full and effective compliance with the Consent Decree:

> The Force Review Board is the forum for debate and critical consideration of serious uses of force and officer-involved shootings. Analyses routinely consider not only the moment when force was applied but consider the incident as a whole, from the moment when officers are dispatched or observe possible criminal activity. Analyses likewise regularly consider each critical decision thereafter up to and including the conclusion of the event. There are routine, candid, and robust discussions of whether the matter could or should have been handled differently by a lower level of force or no force, de-escalation, allowing for the passage of time, or waiting for backup or a crisis intervention-trained officer. The Board serves as the locus of the Department's continual learning and improvement by overseeing the implementation of lessons learned. Those lessons learned are widely disseminated within the Department, and items or areas identified for improvement are regularly studied and, whenever appropriate, reach the Chief's desk for consideration and implementation.[11]

SPD made "changes to the FRB, codified in a revised policy submitted to the Court on May 11, 2015"[12] intended to address the reduced rate of progress at the FRB and the backlog of cases that had not been reviewed. Those changes, developed as part of a comprehensive evaluation and fine-tuning of all of SPD's force-related policies and pursuant to "constructive discussions with SPD officers of all ranks, [the Parties], the police officers' unions, the Community Police Commission, and a number of other community groups,"[13] were approved by the Court

---

[8] Second Semiannual Report at 34.
[9] Dkt. 204 at 34.
[10] Third Semiannual Report at 48.
[11] Fourth Semiannual Report at 9.
[12] Fifth Semiannual Report at 28.
[13] Dkt. 204 at 1; *see also* Dkt. 225 at 2–3 (describing SPD and CPC outreach efforts).

on July 27, 2015.[14]  Thus, during the period that this assessment evaluates, the Board was running according to the most recently updated policies and procedures.[15]  It is important to note that several of the intended procedural effects of the FRB appear to have been realized, with the previous backlog of unreviewed cases effectively eliminated.

✻✻✻

The Force Review Board has evolved significantly.  Officer use of force is subject to far more objective, fair, and thorough analysis and discussion than it was just a few years ago.  The Board has become steadily more comfortable focusing on officer performance or tactics in the run-up to force.  In so doing, the Board has engaged in critical analysis and established a foundation for possible OPA-eligible misconduct investigations.  This constitutes significant progress.

Because the FRB is at the core of the Department's reforms, and in order to ensure that FRB's progress is maintained at the necessary level, the Monitoring Team will continue to observe FRB deliberations of all OIS and all Type III force cases going forward.  Members will cover a representative sample of Type II deliberations.  Monitoring Team members will be provided with all force review investigations before they are on the Board's agenda for deliberation, and members will attend the reviews of those Type II cases that appear to raise significant issues, problems, or concerns.  In consultation with the Monitor, those members will either simply observe FRB deliberations or, as appropriate, provide comments on issues in need of FRB deliberation and consideration.

Although FRB is in initial compliance, significant work remains to be done.  One area that the Monitoring Team will be a focus of the Monitor's ongoing attention is whether FRB recommendations and referrals of issues to other parts of the Department are treated with urgency and follow-up.  Individual FRB members do not have the charge to ensure that SPD's Policy, Training, and other departments follow up on issued identified during Board deliberations and referred to them as a result, but this sort of dynamic, internal follow-up to issues raised and lessons learned during Board deliberations is central to the FRB's mission.  If the Board's recommendations are not doggedly tracked to completion, all of the good work of the Board in reviewing and identifying issues will be for naught.

To this end, since the updated FRB policies and procedures have been implemented, the Compliance Bureau, in coordination with the other Bureaus, has redoubled commitments to ensuring appropriate follow-up and documentation of such follow-up.  For instance, the Compliance Bureau Chief will refer policy issues to the Audit, Policy, and Research Section ("APRS") for integration into potential policy revisions; if finalized, those revisions are distributed via Department-wide directive.  Additionally, the FRB Captain sends out monthly reports to each precinct that provide statistics regarding force cases reviewed each month or each precinct and recommendations for roll call training.

The hard work of the Compliance Bureau cannot alone, however, ensure that Board recommendations and insights set the occasion for changes in policy, training, and procedure elsewhere within the Department.  The Department as a whole needs to commit to treating the Board's recommendations with seriousness and utmost urgency.

---

[14] *See* Dkt. 225.
[15] In mid-May, SPD determined that instituting the contemplated changes to the FRB even before Court approval would more swiftly and affirmatively drive progress.  DOJ and the Monitor agreed so long as any potential adjustments or disapproval by the Court would be immediately incorporated by SPD when any such instruction from the Court arrived.  SPD subsequently suspended regular convening of the FRB for multiple weeks in order to train and coordinate new FRB members appointed under the new FRB policies by Assistant Chief Lesley Cordner.  The revamped FRB initially convened on June 2, 2015.

With this in mind, the Monitor will continue to observe the manner by which the Department ensures implementation of the Board's referrals and recommendations.  Although the FRB has embraced its role as a driving force for innovation and best practices, the Seattle Police Department cannot achieve overall full and effective compliance until it fully integrates the spirit of the consent decree, and in particular, the guidance of the FRB, Department-wide.  In particular, we will be looking to see additional progress in the following areas:

- The Department needs to address and resolve the low quality of underlying investigations by supervisors and for the chains' erroneous findings as to policy.  In 29 percent of cases, the packet from the precinct omitted important evidence or information material to reviewing and analyzing the force.  The Board sometimes, but not always, identifies deficiencies in the underlying supervisory investigation and review, but the Board is not designed to be the only backstop of accountability in these areas in the Department.[16]

    This finding regarding Type II investigations is consistent with the Monitor's First Systemic Assessment.  The Department has proposed a plan to place Administrative Lieutenants in the precincts to ensure quality, consistency, and completeness of force investigations before they are even submitted to FRB.  The Monitor will continue to track this effort to see if it alleviates the fundamental issues identified in the assessments.

- The chain of command had determined that the use of force was inconsistent with Department policy in only 2 percent of cases.  However, as is discussed below, the Board made a finding that officers engaged in possible misconduct in 56 percent of instances – which related to use of force itself in approximately 40 percent of the cases.  This resulted in OPA referrals for 22 of the 140 (16 percent of) officers involved in the 55 incidents reviewed.

    Although final determination of a policy violation rests with OPA, the fact that the Board identified possible violations of the use of force policy in significantly more cases than the chain of command is concerning to the Monitor.  To reach full and effective compliance, the Department will need to hold the chain of accountable for reconciling this disparity.  The Board cannot be, and is not designed to be, the sole entity within the organization to identify potential misconduct.

    Indeed, supervisors themselves have an affirmative duty to identify for themselves potential misconduct and refer it to the Office of Professional Accountability ("OPA") rather than passing the responsibility on to FRB.[17]  The Monitoring Team will consider these issues in greater detail in its upcoming assessment of OPA.

- As noted above, the extent to which the Department follows up on FRB referrals of issues to the Policy, Training, or other sections is irregular and imprecise, at best.  For FRB to continue to drive change

---

[16] Some persons argue that holding the chain of command accountable is the responsibility of the Assistant Chief of Compliance rather than the FRB or chain of command.  We respectfully disagree.  The Assistant Chief or her Captain convenes the FRB, leads the discussion, and carries out its recommendations.  As such, the Assistant Chief is acting for and on behalf of FRB, which has as one of its major charges to ensure the quality and integrity of all investigations of possible misconduct or violation of policy.  Likewise, the FRB serves as a final layer of accountability – not the sole engine of quality control.

[17] 2015 Seattle Police Manual Section 5.002, *available at* http://www.seattle.gov/police-manual/title-5---employee-conduct/5002---responsibilities-of-employees-concerning-complaints-of-possible-misconduct#5.002-TSK-1.

within SPD, the Department must take its recommendations seriously – and address them quickly and urgently.[18]

Given the substantial progress that the Board has made to date, and the swift progress that has been made under the revised Board composition, leadership, policies, and procedures, the Monitor has a good deal of confidence that this Board, under the leadership of Assistant Chief Lesley Cordner and Captain Gregg Caylor, operating under the current policies, can soon and definitively be where it needs to be.

---

[18] The Monitoring Team understands that, after the assessment period, Assistant Chief Cordner reassigned the management of the Board recommendations to her level.  She and the other Bureau Chiefs are now working together to rack and ensure follow-up of all recommendations. The Monitor is concerned that the Professional Standards and Compliance Bureau does not have high level staff other than the Assistant Chief directly working on compliance issues and recommends that an Administrative Lieutenant, or civilian equivalent, be assigned to assist the Bureau in tracking, follow-up, and dissemination of the Board's findings and recommendations.

# Part 1.
# Methodology[19]

The Court-approved Third-Year Monitoring Plan required that "[t]he Monitoring Team . . . assess the quality, rigor, completeness, and timeliness of Force Review Board reviews and deliberations on force incidents."[20]  The purpose of the assessment is to gauge—across force incidents, conversations, and FRB meetings—what aggregate trends may say about the progress that FRB has made toward compliance.

To conduct this assessment, the Monitoring Team created a review protocol (or "assessment instrument") that team members attending the FRB used to assess the nature, quality, and scope of the FRB deliberation of each force incident.  This assessment instrument contained both audit-like and evaluative elements.  For example, for each FRB review of a force case, Team reviewers needed to indicate whether the FRB was constituted in compliance with SPD policy, an important, but more narrow and mechanical determination.  Across this and other similar dimensions, Monitoring Team reviewers logged whether officers or supervisors complied with various express requirements of SPD policy, marking "yes," "no," or "unable to determine."[21]

Additionally, they were also asked whether the Board sufficiently, given the facts and circumstances of the incident, evaluated the reasonableness, necessity, and proportionality of force used in the incident. This necessarily required a more qualitative assessment in which the experienced and seasoned reviewers needed to determine whether or not the Board's discussion, given the nature of the force investigation and discussion during the Board meeting, sufficiently covered the necessary bases.  Furthermore, the instruments contained "notes" sections below most areas of inquiry that permitted reviewers to identify and discuss in greater detail the pertinent portions of the investigative file pertaining to the force or important issues identified in the packet or in the Board's discussions.

The Monitoring Team also evaluated the quality of the referrals made by the FRB.  That is not to say that significant referrals, such as those to OPA, were necessarily deemed synonymous with appropriate FRB performance.  Rather, the Monitoring Team looked at the referrals made by the FRB to determine if they appropriately addressed each of the issues raised in their deliberations, properly identified the appropriate group to refer to (e.g. Training, Policy, Chain), and reflected an appropriate way to address the issue identified (for instance, were serious issues referred to OPA with a dual referral back to the Chain of Command for immediate action).

Ultimately, "[u]sing methods that gather and represent human phenomena with numbers (such as standardized questionnaires and structured observation protocols), along with methods that gather and represent human phenomena with words (such as . . . unstructured observations) are classic instances of mixing data gathering

---

[19] Because the methodology used to review FRB deliberations was similar to that used to assess force investigations and reporting in the Monitor's First Systemic Report of September 2015, this section incorporates several elements and passages of that methodological discussion without citation.  Given that the Monitoring Team did not take a sample of FRB deliberations to evaluate but, rather, evaluated all deliberations within a set period (FRB discussions between June 2, 2015 and August 25, 2015), issues related to sampling and statistical significance are greatly eliminated or reduced.
[20] Dkt. 195 at 37; Dkt. 221-3 at 7.
[21] See Floyd J. Fowler, Survey Research Methods 121 (2009, 4th Ed.) (noting that, for self-administered questionnaires, "[c]hecking a box, clicking a response, or circling a number should be" emphasized because self-generated responses "are usually incomplete, vague, and difficult to code" or aggregate).

and analysis techniques" that are widely used by contemporary social science researchers.[22]  The use of this hybrid quantitative-qualitative approach allows this report to do more that provide vague or general conclusions.  That is, rather than only being able to say that certain features or trends apply "[i]n many cases" or "in some cases"[23], the methodology allows this report to quantify with some level of precision the size or scope of the identified trends.[24]

The Monitoring Team began using the assessment instrument to analyze all FRB deliberations from June 2, 2015 to August 25, 2015.  The data on the forms they filled out were sorted and analyzed by the Monitoring Team's data expert.

---

[22]  Jennifer C. Grenne, et al, "Combining Qualitative and Quantitative Methods in Social Inquiry," *in Research Methods in the Social Sciences*, Bridget Somekh & Cathy Lewins (eds.) 274, 274 (2005).
[23]  *See, e.g.*, Police Executive Research Forum, "U.S. Customs & Border Protection Use of Force Review: Cases and Policies" at 5, 6 (Feb. 2013).
[24]  *See* Phil K. Eure, Office of the Inspector General for the NYPD, "Observations on Accountability & Transparency in Ten NYPD Chokehold Cases" (Jan. 2015), *available at* http://www.nyc.gov/html/oignypd/assets/downloads/pdf/chokehold_report_1-2015.pdf.

# Part 2.
# Results of the Assessment

## A.  Nature of Cases Reviewed by the Board

Under the most recent iteration of the FRB's policies, the Force Review Unit ("FRU") screens Type II (intermediate level) uses of force to weed out cases that can be resolved by the FRU without further review by the FRB.[25]  Nonetheless, during the FRB assessment review period, most of the cases (82 percent) that FRB reviewed during the studied period were intermediate-level, Type II force.  This is encouraging evidence that the FRU's screening of Type II force cases in advance of FRB consideration is not leading to any systematic lack of consideration of Type II force by the FRB.[26]

The Board rarely reviewed force cases that the chain of command had already referred to OPA – but the Board is far more regularly referring cases as a result of their deliberations to OPA.[27]  One the one hand, the Board's higher frequency of detecting possible policy violations than the chain of command underscores the importance of the Review Board as a dedicated and specialized internal accountability structure.  Without the FRB's analysis, instances of potential policy violations during force incidents may well go undetected or unaddressed.

On the other hand, however, this finding suggests that the chain of command—the sergeants, lieutenants, captains, and Bureau chiefs—is in some instances not yet fully and critically reviewing all aspects of officer use of force against the backdrop of policy and, in others, inclined to pass responsibility for such review by sending a case to OPA or the Force Review Board rather than affirmatively investigating it at the precinct level.  Although it is encouraging to see FRB's ever-increasing willingness to identify potential policy violations occurring in force incidents and sending the case to OPA, the Board must be a complement to, and not a substitute for, accountability at the precinct level and above.

## B.  Presentation

Before the Board proceeds to discuss a case, members receive an oral summary of the facts of the force investigation from a member of FIT or a representative of the chain of command.  This summary is often referred to as the "presentation."  Although Board members receive the full, written investigative file in advance of each Board meeting, the Monitoring Team has observed that the initial outline of the case at the Board meeting can shape the contours of the discussion of the case subsequently.

Overall, Monitoring Team reviewers found that the FRB presentations met the expectations of the FRB's policies and the consent decree's provisions in about 86 percent of instances.  Specifically, the Monitoring found that 55 percent were thorough, accurate, unbiased and complete—including all relevant information and properly addressing all material inconsistencies or questions resulting from the investigation.  The presentation was judged "adequate" by reviewers in another nearly one-third (31 percent) of cases, reflecting the assessment

---

[25] A 10 percent random sampling of those cases is referred to FRB for quality control.
[26] Dkt. 204 at 15 (internal quotations omitted).
[27] These referrals were due both to issues with the force itself and with other policy issues that were identified during review of the incident.

that, although some aspects of the presentation could be improved, the identified flaws or concerns did not appear to materially impact the overall accuracy and completeness of the investigation.  For instance:

- While presenting a Type II case involving strikes used to a suspect attempting to escape arrest, the presenting FRB member clearly articulated the actions taken by each suspect and officer involved, citing the source of each piece of information (*e.g.* "the video shows…" "the officer states that he…").  She also identified the legal authority and lawful purpose for the stop, showed the relevant ICV video, discussed the chain of command's findings and timeframe for review and identified possible areas for additional discussion regarding the tactics used.  Her clear articulation of each of these issues in an unbiased and complete manner enabled the board to conduct a thorough and unbiased review.

- In another Type II case, the FRB member played the relevant ICV video multiple times over to walk the Board through the most critical moments of the incident and highlight each relevant piece of information.  The FRB member did so in an unbiased manner with a focus on what the facts of the video demonstrated.

- A sergeant presenting a Type II incident in which a fleeing subject ran into bike officers, injuring both himself and the bike officers.  The Sergeant provided a good, thorough, and objective presentation of the facts.

In about one in ten cases (11 percent), there was room for improvement because the factual presentation of the case to the FRB contained material deficiencies or omissions, inaccuracies, evidence of bias[28], or other significant issues that did materially impact the overall accuracy and completeness of the presentation.  For instance:

- When presenting a Type II case, an FRB member simply read the statements of an involved officer out loud instead of synthesizing the evidence from various sources (other statements, ICV video, and the like) and citing those sources for each factual assertion.

- In another Type II case, an FRB board member included in his factual presentation a statement that an alleged chokehold probably did not occur based upon speculation about the suspect's motivations for saying that it did.

Further, while Force Investigation Team presentations are not conducted by FRB members, the Board still has an obligation to ensure that such presentations are thorough, complete, and unbiased.  Presentations that fail to meet this standard should be the subject of a Board referral.  That has not always been the case:

- In an officer-involved shooting case, three officers mistakenly shot at the occupants of a car which came up to the officers at the time shots were fired.  The officers failed to assess their targets before opening fire.  The occupants of the near car were, as it later turned out, attempting to escape from shooters in another vehicle down the street.  Following the incident the involved officers were instructed not to speak to anyone about the incident prior to being interviewed.  One of the officers had recently failed the "shoot/don't shoot" portion of training, and despite doing so against the recommendation of the

---

[28] As used in this report, "bias" is not limited to discrimination against protected groups and individuals but rather refers to bias in favor of the officer's or some other particular version of events.

Training Section, that officer was authorized to commence patrol work.  Although such information was contained within the FIT investigative materials, the presenters omitted this relevant information.

The presentation appropriately included information material for evaluating the circumstances where force was used in 89 percent of cases.  It likewise included information sufficient for the Board to evaluate de-escalation efforts in 84 percent of cases and to evaluate tactical decision-making in most (91 percent) of cases.  The presentation also included information material for evaluating the legal basis for searches, detentions, arrests, or other similar actions that occurred in the context of the incident in some 95 percent of cases.  The initial factual presentation included a showing of relevant video to the Board in most cases.[29]

The initial presentation identified and properly identified and addressed inconsistencies in 61 percent of instances where the underlying force investigation had contained such inconsistencies.  Going forward, the Monitoring Team recommends that the presentations highlight any areas of factual inconsistency in the underlying force packet.  This will better set the occasion for the Board to resolve investigative problems while also holding investigators and reviewers in FIT and the chain of command accountable for any issues with the force investigation itself.

## C.  Board Composition

One sign that a new structure or process has become an accepted part of an organization's standard operations is that it functions consistent with codified regulations when it comes to who contributes to the structure or process.

As a formalized structure of critical self-analysis, the Board is running according to a defined structure.  The Monitoring Team did not identify any serious or systemic concerns relating to the composition or constitution of the Board on a week-to-week basis.  In every instance, the FRB was constituted in a manner that complied with SPD policy.

Similarly, in all instances, standing members in attendance had attended the required FRB training.  All participants are among those who have received dedicated training on force reporting, investigation and review. Observers and representatives from OPA, the Department of Justice, and the Monitoring Team were always permitted to attend, as required by SPD policy.  Additionally, the Monitoring Team is encouraged that the Department has constituted a diverse Board in terms of race, age, and experience.

## D.  Board Review of Underlying Investigation

In a number of instances, material omissions or investigatory issues were not addressed by the Board and the reason for those deficiencies was not an area for follow-up.  Although the Monitoring Team has seen great improvement in this area since the Board was initially established, there remain instances where the Board does not adequately address material investigatory issues or omissions.  Because part of the Board's charge is to ensure that force investigations are thorough, adequate, and complete, the rate at which it clearly addresses investigative deficiencies must continue to improve.

---

[29] The FRB has the discretion to ask to review any video at any time.  Reviewers presumptively should have watched the video prior to the Board.

## E.  Board Deliberation and Discussion

Overall, the Monitoring Team is encouraged by the quality of the Board's discussion and analysis of force cases. In 85 percent of the cases reviewed, the Boards deliberations conformed to SPD policy and the requirements of the Consent Decree.  Specifically, in 47 percent of cases, the Monitoring Team concluded that the FRB's discussion and analysis of force incidents was thorough, accurate, unbiased, and complete in about half (47 percent) of cases, with the discussion including a full and competent analysis to resolve any identified material inconsistencies and critically address all outstanding policy and training concerns.  In another more than one-third (38 percent) of cases, the FRB's discussion was adequate: meaning that, although the analysis and discussion could be improved, it was sufficiently adequately overall to have left no material questions or concerns unaddressed. For example:

- An officer deployed a Taser for a ten-second cycle with a subject who was positioned on stairs.  The Board engaged in a good debate and analysis of whether the officer's performance was consistent or inconsistent with the portion of the SPD's taser policy which permits a five-second cycle before reassessing the need to continue taser application.  But Monitoring Team reviewers believed that the Board either did not adequately discuss the portion of the policy which prohibits a taser application when a subject is in an elevated or other physical position where the risk of injury from falling is especially significant.  The officers involved in the taser application were appropriately referred to OPA, with the OPA referral including notice that the officers may have violated the Taser policy because the subject was in an elevated position.[30]

- Two officers responded to a call for a subject trespassing and harassing people in and around a downtown car dealership.  Officers contacted the subject, who refused to comply with verbal commands and resisted physical escort.  One of the officers, with the assistance of the other, lifted the subject up by his torso and took him to the ground.  The subject landed on his back.  A witness stated that one of the officers applied his forearm to the subject's neck and the subject complained that he could not breathe.  The Board found that the chain of command had failed to identify an officer's failure to act upon the subject's complaint, which is contrary to SPD policy, and for which FIT should have been summoned.  The FRB properly referred involved officers to OPA.

### 1.  Discussion of Officer Force

The Monitoring Team's conclusion that a good majority of Board discussions were superior or adequate is rooted in a number of sub-assessments on specific elements or features of the Board's deliberations in each case.

For example, Monitoring Team reviewers found most, but not all, Board deliberations were appropriately and exclusively situated in terms of the factual record rather than conjecture.  In another 13 percent, however, the discussion involved inappropriately speculative elements.

- It was unclear in one instance if the involved subject suffered an abrasion on his forehead prior to, or as a result of, the force incident.  Rather than refer the case back to the chain of command for follow-up

---

[30] After the Board meeting, the Captain and Assistant Chief overrode the Board's direction that the Sergeant be referred to OPA because they independently determined that she did not order the Taser application.  To the best of our knowledge, the new information was not communicated to the Board for further discussion whether it would change the reference to OPA.  Moreover, the Captain and Assistant Chief should be required to put in writing why and when they overrule the Board's OPA referral.  This was not done and only included as a comment in the later FRB findings report.

to determine whether a more precise determination could be made, the Board engaged in speculation in an unsatisfactory discussion.[31]

In a substantial number of cases, the Board's deliberations—given the facts and circumstances of the incident—covered the bases in a thorough, probing, critical, and thoughtful manner.

- In one case, SPD officers responded to back up officers who witnessed a burglary or attempted burglary at a homeless encampment.  One involved subject had a warrant for his arrest and another was inside the back of a van.

The Board concluded that officers did not have authority to search and seize the subject from inside the van where he was apparently living.  It referred officer performance to OPA on this and other grounds.

- In another case, downtown mall security officers flagged down SPD bike officers, telling the SPD officers that a male subject was threatening and harassing them and refusing to leave the property.  The security officers then asked the SPD to arrest the subject.  In its review of this incident, the Board discussed that the security officers cannot on their own provide probable cause for arrest.  Instead, the Board noted that the SPD officers must come to their own independent conclusion based on the information they have at the time and that in this case SPD officers properly concluded they had reasonable suspicion at the time to contact and detain the subject in question.  The case, however, was not without problems: the Board did not question why FIT was not called out or consulted, given the allegation of that the subject reported that he could not breathe as a result of officer contact and use of force.

- A drug use suspect was peacefully handcuffed and arrested in an alley, and while being led to the street, unexpectedly resisted, to which the officer responded by forcefully shoving the handcuffed suspect up against the wall until control was regained.  The Board addressed the question of whether force was properly applied to a handcuffed subject, or whether the officer was "jacking" the suspect in violation of policy, and concluded that force was reasonable, proportional and necessary.

- In a recent use of force, the armed suspect reportedly was brandishing a knife, and was approached by two officers at a gas station.  The Board determined that they applied appropriate contact and cover techniques.  When the opportunity presented itself, the officer approached and applied an academy-trained "knee collapse" technique, while the other officer applied an arm hold.  Both actions were determined to be reasonable, proportional and necessary given the potentially dangerous situation.  A knife was located on the suspect.

- In a case where the Board disagreed with the determination of the Chain of Command's finding that the vehicle pursuit in question did not qualify as a "pursuit" under the language of the applicable SPD policy, the Board referred the vehicle pursuit policy to APRS for clarification.

- In a case involving multiple baton strikes to a subject, which conduct the Board found out of policy and unreasonable, the Board referred the matter to APRS (the SPD's policy section) to explore whether an

---

[31] Even though the injury appeared to be a minor abrasion, it appeared clear, at least to the Monitoring Team, from both the officer statement and the ICV that the take down caused the abrasion.  It would have been preferable to have the chain review the officer statement and ICV to, at the least, better determine how the abrasion occurred.

expandable baton should be an officer's sole less lethal option.  The Board also referred the incident to OPA.  In another instance, the Board recommended that officers who carry batons should also be required to carry another less lethal weapon.  These instances demonstrated the Board's increased willingness and ability to identify systemic issues within SPD and recommend measures to ensure best practices, consistent with the Board's mandate.

- After the Board found an officer's use of the new X2 taser to be out of policy for firing his Taser three times where there was apparently no active resistance by the subject, the Board "[r]ecommended department wide training for all taser X2 users before use is allowed."

However, the Board's review of de-escalation techniques, including what additional tactics might have reduced or obviated the need to use force, was not sufficiently robust in 11 percent of cases.  Because this is a core area of SPD's updated force policy and a central focus of officer training throughout 2014 and 2015, the Monitor will give particular attention to the strength of these discussions going forward.[32]

- One Type II case involved the confrontation of an intoxicated suspect who was damaging business signs.  The confrontation quickly led to an attempt to arrest the man, his attempted to escape, and, ultimately, multiple Taser deployment.  During FRB deliberations, Board members stated that de-escalation was not "feasible" – apparently only examining it with respect to the decision to use a Taser on the suspect – but failed to discuss why de-escalation tactics were not feasible during the initial approach.

In cases where the adequacy of supervision during the force incident was at issue, the Board's deliberations adequately evaluated those concerns 88 percent of the time.

- In a case involving a fight disturbance and an arrest at bar closing in Bell Town amidst a crowd of people "[t]he Board also did a good job of identifying the now retired sergeant's failure to control the scene."

- In a Type III involving a force incident at Pike Place Market, the Board engaged in robust debate regarding the supervisor's decision to "go hands on," _i.e._ involve himself in the force incident as well as the supervisor's decision to have his officers clear out of the scene immediately after the force instead of remaining to debrief with officers and witnesses. Both decisions were ultimately deemed appropriate based upon sound reasoning regarding public and officer safety.

Monitoring Team reviewers found that the Board's discussions were, in most instances, uniform in nature, quality, and focus—and consistent with the FRB taking their charge seriously as the core venue for SPD to closely consider issues related to force.  In 84 percent of cases, the Monitoring Team's reviewers found that Board's deliberations were sufficiently critical, objective, and probing to ensure that uses of force contrary to law or policy were appropriately addressed.  Similarly, the nature of the Board's discussions was sufficient to confirm that uniform standards are being applied in use of force practices across 93 percent of cases.  Likewise,

---

[32] Some individuals take, in good faith, a different view.  According to their argument, a case in which it is clearly not feasible to use de-escalation or one in which extended de-escalation efforts have been used to no avail does not warrant an extended discussion, particularly a discussion of all hypothetical variations that could have occurred.  This would be true as well, they say, with respect to tactics and decision making; when officers use good tactics consistent with training the Board will likely not engage in an in-depth analysis of why the officers were adhering to best practices. The Monitoring team disagrees with this view.  The FRB in each instance should be considering whether any given case could have been handled better in terms of de-escalation, strategy, tactics, and decision-making, regardless of whether a tactic may or may not be found "reasonable" with respect to the adjudication of a particular officer's tactics.  Put simply, the Board's inquiry must focus on what officers and the Department can do better.  We strongly dispute the notion that simply because the alternative chosen could be characterized as "reasonable," there is no room for discussion of "different and better" tactics or decision making.

Team reviewers thought that the Board's deliberations were consistent with the Board sufficiently monitoring all aspects of the Department's use of force practices with the goal of continual improvement.

## 2.  Discussion of Implications for Policy, Training, Equipment, and Tactics

The Board appears to be understanding, and embracing, its role as a "hub for internal innovation and critical analysis" of force.[33]  It is regularly exploring important issues that go well beyond whether an involved officer's use of force was consistent or inconsistent with SPD policy and instead consider "what [the] force incidents can teach the Department and its officers about training, tactics, procedure, and policy."[34]

Specifically, in instances where equipment issues were implicated, the Board's discussion adequately addressed those issues in nearly 91 percent of cases.  Where there were issues involving the adequacy of the Department's training, policy, or adherence to best practices, the Board adequately discussed them in most (92 percent) cases.

## 3.  Discussion of Quality of Force Investigation & Review

The Board is exploring the quality of the underlying force reporting and investigation in most, but not all, instances.  The Monitoring Team's reviewers found that the Board's deliberations were sufficient to confirm whether the underlying use of force reporting by officers, investigation by sergeants or FIT investigators, and chain of command review was thorough and complete in 87 percent of instances.  Likewise, in 85 percent of cases, the Board's deliberations appeared sufficient for the Board to fairly and objectively determine whether findings from the chain of command about the force incident were sufficiently well-supported by the evidence.

Yet, in some instances, the Board did not focus on the Chain of Command's review and investigation of force in the manner that the facts required:

- An officer warned the subject not to trespass in a public park and the subject responded by slapping the officer's hand.  The officers then attempted to place the subject in handcuffs and he resisted.  In response the officers attempted to take him to the ground, and, fearing that the subject was going to strike him, the officer struck the subject in the face.  After the subject refused to put his arms behind his back for handcuffing, one officer was able to force one of subject's arms behind his back but the other used her baton to pry the other arm free.

The Board in its deliberation failed to identify the inconsistency regarding which officer the suspect struck, failed to discuss the officer's use of the baton, and failed to address the failure to seatbelt the subject or identify reasons for not doing so.

- The Board voted to disapprove the use of a Taser to the back of a suspect who had turned and was escaping from a single officer investigating low level suspicious behavior, but found that the Chain's performance assessment and counseling of the officer was sufficient.  This vote was taken despite the acknowledged lack of de-escalation and lack of proper cover/contact by the officer.  The Board chair reversed this decision after the Board meeting and referred it to OPA for a thorough investigation.

---

[33] Fourth Semiannual Report at 37.
[34] *Id.*.

## F.  Board Recommendations and Follow-Up

Overall, the Monitoring Team's reviewers found that the FRB's adjudication of the incident was objective, fair, and reasonable in a manner consistent with the Consent Decree in 84 percent of cases.  Specifically, the FRB's formal determinations followed from the Board's discussion or were sufficiently supported by the facts and circumstances of the incident in 42 percent of instances.  In another 42 percent of cases, the FRB's adjudication was adequate because, although its determinations did not necessarily follow precisely or entirely from the Board's discussions or were less well-supported by the facts and circumstances of the incident, the Board's determinations were reasonable in light of the whole of the FRB's evaluation and the force investigation packet. In approximately 15 percent of cases, the FRB's adjudication appeared problematic because the Board's formal determinations did not reasonably follow from the Board's discussion or were not reasonably supported by the facts and circumstances of the incident, or both.

It must be noted the Monitoring Team's reviewers, in assessing the Board's adjudication of cases, were not reaching their own, independent conclusions about whether the force used in the incident was consistent or inconsistent with SPD policy.  The Monitor will have occasion in the coming months to make independent assessments as to how SPD officers are doing in the field with respect to performing in a manner consistent with SPD's use of force policy.[35]  For the purposes of this review, the standard was whether the Board's determinations about an incident were supported by the force packet, reasonable in light of the facts presented, and appropriately followed from the nature of the discussion in which Board members engaged about the incident during the FRB meetings.

### 1.  Board Recommendations

In more than half (56 percent) of cases, the Board found that an officer may have violated SPD policy – either the officer use of force policy itself, other force-related policies, or other Department policy.  Of all cases, the Board only referred approximately 30 percent of cases to OPA because of concerns about the officers' conduct in relation to the use of force policy.  The other referrals resulted as a result of identify potential policy violations arising from conduct during the incident generally, or in the investigation and review, of such an incident rather than the application of the force itself.

Especially given that, between 2009 and 2011, only 0.04 percent of cases received any significant chain of command scrutiny whatsoever[36], it is a noteworthy advance in accountability that SPD, through its Force Review Board, has become far more comfortable with identifying potential policy violations relating to force. This marks a substantial improvement from the Monitor's prior observations.[37]

Some cases were especially noteworthy:

• A subject, suspected of being involved in a burglary, spat on the ground in front of an officer.  The involved officer ordered the subject to stop.  The subject said that he could spit on the officer if he wanted to do so, proceeding to spit on the officer's lower face and upper chest.  The officer punched the subject in the face.  With the help from another officer, that officer took the subject to the ground

---

[35] Dkt. 221-2 at 8–9; Dkt. 221-3 at 1.
[36] 2011 Findings Letter at 21.
[37] See Fifth Semiannual Report at 24–28; Fourth Semiannual Report at 37–47.

and handcuffed one wrist.  The subject "turtled" up, making application of the cuffs to the other hand impossible.  The same involved officer punched the subject twice in the side.

The Board disapproved of the punch as inconsistent with training and policy, finding that the officers did not use proper de-escalation tactics and used force that was not necessary, reasonable, or proportionate and, as such, not within policy.  It referred the involved officers to OPA.

- The Board found an officer's six-second taser application to be reasonable under the circumstances but inconsistent with policy.  It referred the matter to OPA.

Where the officer's potential misconduct or policy violation was serious, as defined by SPD policy, it was appropriately referred to OPA in about four out of five (80 percent) of instances.  For instance:

- An officer's leave caused a three-month delay in the completion of the investigation of Type II force. The Force Review Board referred the timeliness issue to OPA for an investigation.[38]

- In one instance, the Board found that the officer failed to use proper de-escalation techniques by failing to use feasible contact and cover tactics that could have slowed down the situation and decrease the likelihood that force would be necessary.  It disapproved of the tactics and officer decision-making as inconsistent with training and contrary to the SPD's de-escalation requirement.  The case was referred to OPA.

Where the officer's potential misconduct or policy was not serious—again, as defined by SPD policy—it was properly referred to a supervisor, addressed, and documented in most instances.  However, this was not done in every instance:

- An officer's muting of the on-body microphone, part of the in-car video system, was deemed by chain of command and the Board to be "inadvertent."  The violation of the ICV policy was not referred to OPA or to the chain of command for further action.[39]

Still, in some cases, important violations of SPD policies were not addressed as clearly as they may have been:

- The Board indicated that an incident would be referred to OPA for the failure of the involved officer to adhere timely to reporting requirements.  However, the Board's "findings report" indicated that the issue was referred to the involved Bureau Chief, not OPA.  As with other such reports on FRB findings, it was not clear if the there were any consequences for findings of unexcused or excessive delay in completing force reporting, investigation, and review.  At least under the current system, Monitoring Team reviewers had some discomfort with the FRB sending matters to the Bureau Chief without simultaneously sending them to OPA.

## 2.  Follow-Up Regarding Policy, Training, Tactics, and Systemic Issues

---

[38] We note, however, some inconsistencies with respect to whether untimely packet preparation and review were sent to OPA.  They should be, and the FRB should be informed of the outcome.  The Department should continue to develop management systems to ensure timely investigation and reporting; egregious cases should continue to be referred to OPA.

[39] SPD made the affirmative decision to disable the ability of officers to mute their on-body microphones.

The Monitor has previously identified some problems with the Department "lack[ing] a mechanism for following up on the broader policy, training, procedure, business process, and other systemic issues that the FRB flags . . ."[40]. Although the Department is doing a better job in this regard, it is unclear why some problems with policy and equipment significant enough to be raised and actively discussed in the Board are still not being addressed by the Department.

The Board identified a need to clarify or change SPD policy in close to one-third (29 percent) of force reviews. For instance:

- In one case, the Board found that there was excessive delay in decontaminating subjects who were sprayed with OC spray (pepper spray), in part because traffic conditions prevented Seattle Fire from arriving at the scene. The Board recommended a change in policy whereby officers who carry OC spray also carry a decontamination tool. Reviewers believed this to be a good example of the Department seeking to update and revise policies to make them practical for officers and ensure better outcomes for involved subjects based on real-world evidence. [41]

- Another incident set the occasion for a Training section review into tactics associated with suicide by cop calls. SPD responded to a call involving a suicidal subject holding a knife in the middle of a street. The suspect was out of taser range. The suspect was ultimately shot by an officer from another department with a beanbag shotgun and thereafter safely detained. Even though the use of the beanbag shotgun did not involve an SPD officer, the Board gave due consideration to it and emphasized the need for SPD to find suitable and effective long-range, less-lethal options based on the facts of the case.

However, these policy issues have – at least to date – not been followed up, with the elements of the Department charged with evaluating implicated issues or concerns failing to report back to the FRB on action taken or problems addressed. In more than half (52 percent) of those cases with policy issues, the referral and reporting back to the Board on how the issues was addressed clearly did not take place.[42]

The Board should not be a "black box." Other areas of the SPD need to take seriously the FRB's referral – treating the response to referrals of issues from the FRB with the utmost of importance and urgency. It is not clear that this has yet permeated across the Department's culture. SPD must benefit Department-wide from the FRB's critical analysis and robust discussion of force. So long as the Department only meaningfully addresses potentially policy issues in barely more than one in ten instances, the Board's hard work will not "set the occasion for changes, reforms, updates, or other action" that addresses the content of the Board's deliberations.[43]

To this end, the Monitor is encouraged by procedures that have been set in place by the Compliance Bureau to ensure recommendations from the Board are acted upon and relayed to all members of the Department,

---

[40] Fourth Semiannual Report at 43.
[41] Currently all vehicle patrol officer who carry OC spray have water in their cars for decontamination. But this officer was on foot patrol directing pedestrian and vehicle traffic following a Mariners game and did not have any water to decontaminate the individuals he sprayed with OC.
[42] In another one-third of cases (35 percent) of cases, the Board's documentation procedures and other issues did not allow the Monitoring Team to clearly determine whether the policy concerns were actually addressed elsewhere in the Department. The Monitoring Team has, since the study period, come to understand that some of this documentation existed elsewhere within the Department and was, in good faith, not produced to the Team during the period. The Parties and Team currently have a clearer understanding going forward as to how follow-up on Board referrals are documented.
[43] Fourth Semiannual Report at 43.

including those who sit on the FRB.[44]  Some recommendations of FRB are being implemented in significant ways, with, for example, the Department having purchased new-model Tasers to replace all current Tasers across the Department, which FRB had originally recommended.

### 3.  Memorialization of FRB Findings

The FRB findings report (which is where the Board's ultimate determinations and items for follow-up are memorialized and logged) accurately and fully described all findings in many (80 percent) but not all cases. Many of the findings reports were delayed in circulation during the second half of the review period.  The FRB's findings are where the hard work of the Board is memorialized or logged for future review or reference.  Going forward, the Board needs to ensure that it has the systems or processes in place to ensure that the logging of its findings and deliberations is not hit or miss but, rather, uniform and automatic.

---

[44] The Department notes that these mechanisms include a "findings" document from each FRB is sent out to each involved precinct or section, to the Captain, Operations Lieutenant, and Lieutenant.  The Findings documents are also sent out to each FRB member, and, redacted for the involved persons' names, to all lieutenants and captains across the Department.  It is also sent to the Monitoring Team and the DOJ. Referrals to OPA from the FRB are sent out by the Force Review Unit within 24 hours of the Board.  All recommendations by the FRB from the Findings document are entered into a tracking spreadsheet; during the assessment period of June 2 through August 25, the FRB met 13 times, out of which the FRB made 84 recommendations. From this spreadsheet, an "action memo" is created and sent to the appropriate Bureau Chief with the particular action items required to fulfill the recommendation.  The Bureau Chief then responds back in kind on the action memo, and the tracking spreadsheet is updated accordingly.  In addition, the FRU authors a precinct-specific monthly report from the Board findings and data in IAPro, which includes statistics for that precinct (number and type of force incidents, sector, and hour of occurrence), as well as a summary of Lessons Learned and Roll Call Reminders. The FRU also authors a semi-annual report which includes accomplishments and information about the FRB reviews (including trends seen, timelines, technology, Board recommendations, those incorporated into policy, those incorporated into training, etc.).

# Appendix A.
# About the Force Review Board

## A.  What the Force Review Board Does

The Department of Justice's 2011 investigation of the SPD found that the Department's "chain of command does not properly investigate, analyze, or demand accountability from its subordinate officers for their uses of force."[45]  Specifically, SPD's "secondary review process" for force was "little more than a formality that provides no substantive oversight or accountability"[46]—typically serving as nothing more than "a rubber stamp of the first-line supervisor's conclusion" that officer force was consistent with policy.[47]  During the multi-year time period that the DOJ reviewed, only 5 of 1,230 use of force files reviewed "were referred at any level for further review" up the chain of command.[48]

The DOJ's report on the findings of its investigations noted that, in response to the Department's own recognition of "the inadequacy of its current first-line investigatory and secondary review process," it had created "a Force Review Committee to . . . review☐ use of force reports☐ and . . . identify☐ problematic use of force patterns and training deficiencies."[49]

The Consent Decree established specific requirements for what it refers to as a Use of Force Committee but expressly allows SPD to rename it.[50]  That Committee is currently called the Force Review Board, or FRB.

The Decree requires that the FRB "conduct timely, comprehensive, and reliable reviews" of Type II and Type III force incidents.[51]  It specifies that the Board consist of an Assistant Chief or designee to chair the Board; representatives of the Training Section; a representative of each involved precinct, selected by a precinct captain; and a representative from the Department's Professional Standards Section that is responsible for drafting SPD policy.[52]  Board members "receive a minimum of eight hours of training on an annual basis" on use of force.[53]  The Board could consult with other "subject matter experts"[54] or "other advisors"[55] when useful.

The Consent Decree sets forth the Board's mission and required scope of review of force incidents and investigations:

> The [Board] will review each use of force packet to determine whether the findings from the chain of command regarding whether the force used is consistent with law and policy and supported by a preponderance of the evidence, whether the investigation is

---

[45] 2011 Findings Letter at 4.
[46] *Id.*
[47] *Id.* at 19.
[48] *Id.* at 21.
[49] *Id.* at 22.
[50] Dkt. 3-1 ¶¶  68, 119.
[51] First Systemic Assessment at 10–12.
[52] Dkt. 3-1 ¶ 120.
[53] *Id.* ¶ 121.
[54] *Id.* ¶ 120.
[55] *Id.* ¶ 122.

20

> thorough and complete, and whether there are tactical, equipment, or policy
> considerations that need to be addressed.[56]

The Board reviews FIT investigations in the same manner.[57]  The reviews "should be conducted within seven days of the FIT presentation to the [Board],"[58] with FIT "responsible for presenting the investigation to the Use of Force Committee."[59]

The Consent Decree prohibits the Board from making specific recommendations concerning discipline.[60] Instead, the Chair of the Board "is obligated to ensure a referral to OPA is made if potential misconduct is discovered in the review process."[61] OPA subsequently conducts an investigation according to its processes and procedures.[62]

Similarly, if "policy, equipment, or training deficiencies [are] noted in the review process, the [Board] Chair will ensure that they are brought to the attention of the relevant commanding officer for appropriate action" – with ultimate responsibility for addressing such policy, equipment, or training issues resting with the involved officer's Bureau Commander.[63]

After the Board has completed its review, it must rigorously and regularly "document its findings and recommendations."[64]

## B.  SPD's Policies Regarding the FRB and Progress to Date

As the Monitor has previously described, "[t]he first order of business" once the Consent Decree was entered between the City and the U.S. Department of Justice "was the formulation of new Use of Force policies" that addressed the requirements of the Consent Decree[65] – including those related to the review and analysis of force incidents.  After "marathon negotiating sessions . . . between the parties" and "substantial input from SPD officers and the community," including the Community Police Commission (CPC), the Monitor considered whether the proposed force-related policies were consistent with the requirements and terms of the Consent Decree and federal law.[66]  The Monitor determined that the policies were consistent with the Consent Decree and recommended approval of the policies.[67]  The Court approved the policies in late December 2013.[68]  The policies "became effective on January 1, [2014]."[69]

Even as those clear and specific rules of the road for how the Board should function were being clarified, the Department's then-Use of Force Review Board ("UOFRB") was continuing to meet weekly to review Type II and III force.[70]  The Board was to review incidents "not only to determine whether an officer's particular force

---

[56] *Id.* ¶ 123.
[57] *Id.* ¶ 124.  The Decree calls for the reviews of FIT investigations to be "chaired by a Deputy Chief."  Id.
[58] *Id.* ¶ 125.
[59] *Id.* ¶ 118(j).
[60] *Id.* ¶ 125.
[61] *Id.*
[62] This assessment only addresses the quality and integrity of FRB consideration of force incidents.  The Monitor will separately evaluate OPA investigations.  *See* Dkt. 221-3 at 8–9.
[63] Dkt. 3-1 ¶ 125.
[64] *Id.* ¶ 124.
[65] Dkt. 107 at 2–3.
[66] Dkt. 204 at 5 (quoting Dkt. 107 at 1).
[67] Dkt. 107.
[68] Dkt. 115 at 3.
[69] Dkt. 204 at 5–6.
[70] Second Semiannual Report at 20.

was consistent with SPD policy but to consider what implications the incident might have for training, policy, practice, procedure, supervision, and the like."[71]

Accordingly, even as policies for the review of force by the Board were being finalized, SPD was committing to establishing a Board that could provide the comprehensive and probing analysis required by the Consent Decree.  Representatives of the Department of Justice, City Attorney's Office, and—after a short period of disagreement—the Monitoring Team all began attending the meetings each week.[72]

Pursuant to such ongoing attendance, the Monitoring Team has provided generalized assessments of the Board in each of the Monitor's semiannual reports to the Court and Seattle community beginning with the Second Semiannual Report in December 2013.  There, the Monitoring Team noted that it was "greatly pleased with the [Board's] progress," with "an increasing number of Board members hav[ing] begun to understand that the [Board] must be the SPD's hub for internal innovation and critical analysis . . . ."[73]  Nonetheless, the Monitor observed that the Board still had some significant progress to made "to ensure that all members of the Board participate in a genuinely freewheeling and critical discussion of the incident" and that the Board "impose[] clear, swift consequences for investigators who delay the process or submit less than rigorous materials."[74]  Likewise, it noted that SPD needed to establish better processes for "lessons learned" from the Board to feed either down to officers in precincts or to other areas of the Department that might need to consider changes in policy, training, or other Department practice.[75]

As of December 2013, SPD used a separate and distinct structure, called the Firearms Review Board, to review "any firearm discharge by a SPD officer."[76]  The Monitor found the performance of the Firearms Board to be especially problematic, noting that it "fail[s] to reach the higher standards of the Use of Force Review Board" that considers other officer force not involving firearms.[77]  In its Second Semiannual Report, the Monitoring Team concluded that the Firearms Board "ha[d] failed to address any of the issues that the Monitor previously outlined" and that "[b]oth the scope and quality of its reviews" remained "deficient" – "lag[ging] unacceptably behind good, let alone best, practices."[78]  It outlined several, specific areas for swift reform and improvement.[79]

Understanding that "the FRB [wa]s the area within the Department [in] the need of the most sweeping reform,"[80] SPD "[t]o its credit . . . met with the Parties and the Monitor to discuss reforming the Firearms Review Board."[81]  The "key component of those discussions was a merger of the UOFRB with the Firearms Review Board to create a centralized, unified force review body."[82]  As the Department considered such a merger, four officer-involved shootings occurred.[83]  Understanding that "the Seattle community, SPD, and involved officers deserved far more than a[] Firearms Review Board process riddled with gross inadequacies and known flaws," the Parties and Monitor "engaged in numerous and sustained discussions about a process for reviewing" those shootings using a reformed and updated process.[84]  The adoption of procedures that made the

---

[71] *Id.*
[72] *Id.* at 22.
[73] *Id.* at 20.
[74] *Id.; see id.* at 27.
[75] *Id.* at 28–31.
[76] *Id.* at 31.
[77] First Semiannual Report at 11.
[78] Second Semiannual Report at 31.
[79] *Id.* at 36–39.
[80] *Id.* at 39.
[81] Third Semiannual Report at 55.
[82] *Id.*
[83] *Id.*
[84] *Id.* at 56–57.

firearms inquiry resemble the inquiry for all other force led the Monitoring Team to be "greatly encouraged by the far superior quality of the inquiry" surrounding officer-involved shootings when considered by, essentially, the same UOFRB that considers other force.[85]

With respect to non-firearm reviews, the Monitoring Team found in the Third Semiannual Report that "[t]he quality of the reviews, discussion, and analyses of force incidents by the Use of Force Review Board has continued to improve."[86]  It reported on the creation of a new Force Review Section "responsible for coordinating the Board" and which "proactively initiated several important mechanisms and processes for ensuring that lower-level review of force is more timely, rigorous, and complete."[87]  It likewise noted that the Board had "recently found a use of force to be out of policy, which appear[ed] to signify an increased willingness to review incidents thoroughly and to analyze officer performance critically."[88]  Still, the Monitor observed that the Board still had a distance to travel, including continuing to review force incidents, even when specific officer misconduct may be referred to OPA, for policy and training issues; seeing that "lessons learned" were circulated adequately throughout the Department; and that analysis of force was sufficiently critical and comprehensive.

By the time of the Monitor's Fourth Semiannual Report, the former Use of Force Review Board had been renamed the Force Review Board ("FRB") to reflect that it would be a sole, centralized body that would engage in "consideration of all force, including shootings."[89]  Likewise, "FRB members ha[d] engaged in a focused training effort consisting of a two-day in-class training (with pre-class assignments) and e-learning" focusing on force analysis issues.[90]  In its week-to-week deliberation on force cases, the Team reported that it "continue[d] to be impressed by the hard work of FRB members" and observed that "[t]he Board more regularly and critically explores what officers involved in incidents resulting in force might have done differently from a strategic and tactical perspective."[91]

Nevertheless, the Monitor identified some areas for improvement.  First, it noted that, although the Board "far more regularly discusses whether officers could have availed themselves of different tactics or strategies," it too often avoided "addressing whether the failure to de-escalate . . . constitute a violation of SPD policy."[92]  It also noted that the Department "lack[ed] a mechanism for following up on the broader policy, training, procedure, business process, and other systemic issues that the FRB flags and discusses" during analyses of force incidents.[93]  Some of the Board's discussions were still too narrow, and the timeliness of some force reviews still needed improvement.[94]

Most recently, in June 2015, the Monitor observed that "although some good work has certainly continued and the Chief's new command staff has just started to implement some extremely promising changes, FRB's progress seemed to plateau in the last six months."[95]  Even where the Board engaged in robust analysis of force cases, "[t]he FRB continue[d] to appear uncomfortable concluding that force was 'out of policy' . . . "[96] – too often "revert[ing] to their own intuitive sense of what could have been reasonable under the circumstances" rather than "apply[ing] and hold[ing] officers accountable under the specific provisions of SPD's use of force

---

[85] *Id.* at 56.
[86] *Id.* at 48.
[87] *Id.*
[88] *Id.*
[89] Fourth Semiannual Report at 40.
[90] *Id.*
[91] *Id.* at 39.
[92] *Id.* at 41.
[93] *Id.* at 43.
[94] *Id.* at 43–44.
[95] Fifth Semiannual Report at 6.
[96] *Id.*

policy."[97]  Similarly, "[i]n some instances, Board members engage[d] in convoluted interpretations of policy, extended philosophical conversations . . . , or unrealistic and implausible interpretations of facts."[98]  "One effect of the FRB sometimes going to great lengths to find officer performance 'in policy'" was that, as of June 2015, the FRB was "get[ting] through fewer cases than it should in order to keep up with the general use of force activity within the SPD . . . ."[99]

The Monitor noted support for and optimism about "recent changes to the FRB, codified in a revised policy submitted to the Court on May 11, 2015"[100] intended to address the reduced rate of progress at the FRB and the backlog of unreviewed cases that had developed.  Those changes – developed as part of a comprehensive evaluation and fine-tuning of all of SPD's force-related policies and pursuant to "constructive discussions with SPD officers of all ranks, [the Parties], the police officers' unions, the Community Police Commission, and a number of other community groups"[101] – were approved by the Court on July 27, 2015.[102]

The updated FRB policies went "a significant way toward resolving some issues that appear to have been constraining the FRB from making more significant progress."[103]  First and foremost, the composition of the FRB was streamlined and clarified.  Board members are now "selected by the Assistant Chief of Compliance and Professional Standards" and "will continue to receive specialized training" on force and force investigations.[104]  They include a supervisor from the Training Section, three representatives from Patrol Operations, a representative from the Audit, Policy & Research section, and a representative from the Investigations Bureau.[105]

To address the "backlog of cases waiting review," SPD is now using "a pre-screening process within the Department's Force Review Unit" for lower-level, Type II cases.[106]  That Unit reviews all Type II force, with the FRU Lieutenant, Captain, and Bureau Chief all "determin[ing] whether cases should be referred to the full FRB for consideration."[107]  Type II cases must be forwarded whenever there is a "possibility of misconduct; potential training, equipment, or tactical issues; where FIT was contacted for consultation and declined to respond or investigate; when less-lethal instruments were used; when a canine makes physical contact with the subject; and when the subject is transported to an emergency room."[108]  Cases not meeting these requirements do not go to the FRB automatically, but, "[n]onetheless, an additional ten percent of the cases reviewed each month" are "forwarded for review to the full FRB and selected through random, blind sampling."[109]  FRB still "review[s] all Type III force incidents and officer-involved shootings."[110]

The updated FRB policies also clarify how the Board should operate from a week-to-week basis.  The Force Review Unit's Captain is expressly designated as the Standing Chair of the FRB.  A Deputy Chief or Assistant

---

[97] *Id.* at 27
[98] *Id.* at 25.
[99] *Id.* at 27.
[100] *Id.* at 28.
[101] Dkt. 204 at 1; *see also* Dkt. 225 at 2–3 (describing SPD and CPC outreach efforts).
[102] See Dkt. 225.
[103] Dkt. 204 at 15.
[104] *Id.* at 16.  Each standing FRB member must attend at least 8 hours of FRB training per year.  Id., Ex. H at 5.
[105] Dkt. 204, Ex. H at 5.
[106] Dkt. 204 at 15.
[107] *Id.*
[108] *Id.*
[109] *Id.* (internal quotations omitted).
[110] *Id.* at 16.

Chief "may chair the FRB as required by Departmental needs."[111]  The Board's "determinations will be made by majority vote."[112]  The Chair must record and document all FRB findings.

The Board, via the FRB Chair, must "refer all misconduct, other than minor misconduct to OPA" for an administrative investigation.[113]  Consistent with the "experiences of other departments, such as Philadelphia, Washington, D.C., and Las Vegas,"[114] "[t]he determination of whether the act at issue warrants such referral [to OPA] shall be determined by majority vote of the FRB or at the discretion of the Chair."[115]  Individual members may still make a "personal referral to OPA," regardless of the Board's determination.[116]

Because the charge and scope of FRB is much broader than only determining whether officer force was in or out of policy, the new policy clarifies that FRB "will continue review and recommendations relating to matters referred to OPA."[117]  In other words, voting to send a case to OPA does not suspend inquiry on force, tactics, training, and policy issues that the incident may have raised.  Whenever the Board identifies such policy, equipment, or training issues, the FRB chair must ensure referral to appropriate commanders and track the status to ensure follow-up.[118]

The updated FRB policies also clarify that the FRB must review all large-scale crowd management events and other major incidents.[119]  In these instances, the Board includes two additional members, both of the rank of lieutenant or captain, with experience in crowd management.[120]  The Board still reviews all Type II, Type III, and officer-involved shootings that occur during crowd management events but also engages in a "review of crowd management [that] will focus on command of the incident," including "whether decisions made concerning crowd management" were consistent with policy, "whether the incident commander or scene commanders adequately documented their reasons for directing the use of force," tactical or training issues, and "whether any use of less lethal force . . . was properly authorized and executed."[121]

In mid-May, SPD determined that instituting the contemplated changes to the FRB even before Court approval would more swiftly and affirmatively drive progress.  DOJ and the Monitor agreed so long as any potential adjustments or disapproval by the Court would be immediately incorporated by SPD when any such instruction from the Court arrived.  SPD subsequently suspended regular convening of the FRB for multiple weeks in order to train and coordinate new FRB members appointed under the new FRB policies by Assistant Chief Lesley Cordner.

The revamped FRB initially convened on June 2, 2015.  The Board meets every Tuesday for 3 hours in the afternoon to consider force cases that Board members have recently reviewed on their own in preparation for Board discussion and deliberation.

---

[111] Dkt. 204, Ex. H at 6.
[112] *Id.* (capitalization changed to sentence case).
[113] Dkt. 204, Ex. H at 7.
[114] Dkt. 225 at 7; *accord* Dkt. 204 at 17.
[115] Dkt. 204, Ex. H at 8.
[116] *Id.*
[117] *Id.*
[118] *Id.*
[119] Dkt. 204, Ex. H at 9.
[120] *Id.*
[121] *Id.*

## Monitoring Team Staff

**Merrick Bobb**
Monitor

**Matthew Barge**
Deputy Director

**Peter Ehrlichman**
Deputy Monitor

**Ronald Ward**
Assistant Monitor

**Chief Joseph Brann (ret.)**
Senior Police Expert

**Robert Saltzman**
**Julio Thompson**
**Marnie Carlin MacDiarmid**
Esq.

**Joseph Doherty**
**Ellen Scrivner**
Ph.D.

**Brian Center**
Senior Consultant

**Jeffrey Yamson**
**Luis Perez**
Executive Assistants

**CERTIFICATE OF SERVICE**

I certify that on the 24th day of November, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following attorneys of record:

| | |
|---|---|
| J. Michael Diaz | michael.diaz@usdoj.gov |
| Jonathan Smith | jonathan.smith2@usdoj.gov |
| Kerry Jane Keefe | kerry.keefe@usdoj.gov |
| Michael Johnson Songer | michael.songer@usdoj.gov |
| Rebecca Shapiro Cohen | rebecca.cohen@usdoj.gov |
| Emily A. Gunston | emily.gunston@usdoj.gov |
| Puneet Cheema | puneet.cheema2@usdoj.gov |
| Timothy D. Mygatt | timothy.mygatt@usdoj.gov |
| Christina Fogg | christina.fogg@usdoj.gov |
| Annette L. Hayes | annette.hayes@usdoj.gov |
| Jean M. Boler | jean.boler@seattle.gov |
| Peter Samuel Holmes | peter.holmes@seattle.gov |
| Brian G. Maxey | brian.maxey@seattle.gov |
| Gregory C. Narver | gregory.narver@seattle.gov |
| John B. Schochet | john.schochet@seattle.gov |
| Rebecca Boatright | rebecca.boatright@seattle.gov |

DATED this 24th day of November, 2015.

*/s/ Jackie Slavik*
Jackie Slavik

THE SEATTLE POLICE MONITOR'S SECOND SYSTEMIC
ASSESSMENT REGARDING THE FORCE REVIEW BOARD Case No.
C12-1282JLR

Merrick J. Bobb, Monitor
Police Assessment Resource Center
PO Box 27445
Los Angeles, CA 90027
(213) 623-5757