THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>        Plaintiff,<br><br>vs.<br><br>CITY OF SEATTLE<br><br>        Defendant. | Case No. C12-1282JLR<br><br>**SEATTLE POLICE MONITOR'S<br>SIXTH SEMIANNUAL REPORT** |

The Monitor's Sixth Semiannual Report is attached.

Merrick J. Bobb, Monitor
Police Assessment Resource Center
PO Box 27445
Los Angeles, CA 90027
(213) 623-5757

THE SEATTLE POLICE MONITOR'S SIXTH
SEMIANNUAL REPORT
Case No.  C12-1282JLR



SEATTLE
POLICE
MONITOR

Sixth Semiannual Report
December 2015

## Introduction

In our last semiannual report in June of this year, the Monitor forecast that if SPD "continue[d] on the path that it is now . . . [it] is likely to get the job done":[1]

> That optimism results from confidence in Chief O'Toole and her command staff and the unflagging commitment to police reform by the Mayor's office, City Attorney, City Council, and Department of Justice. Although significant work on implementing and refining Consent Decree reforms remains, SPD has moved closer in the last six months to where it needs to be. There is still significant work ahead, but the SPD is positioned to be a leader in the national reform effort. While many departments are struggling with where to start, SPD is well underway.[2]

Over the last six months, the SPD has moved forward and continues to be on track. Indeed, during the last six months, the Attorney General of the United States and the head of the Civil Rights Division came to Seattle to see firsthand how well the collaborative effort to implement the Consent Decree is proceeding. As part of a tour of cities "that have turned the corner" toward improved policing, Attorney General Loretta Lynch met with members of the community and SPD officers alike.[3] She praised the collaborative relationship that the City, SPD, Monitoring Team, and Seattle community have forged, noting:

> Sweeping progress will not occur overnight. But as Seattle's recent experience can attest, real progress is possible – when we engage with one another, when we summon our goodwill and good faith and when we work collaboratively as partners with a mutual and shared interest in ensuring the safety and security of the communities we call home . . . .

> I am here in Seattle today because this city's leaders . . . have demonstrated your commitment to make progress – together . . . Thanks to the Consent Decree and the commitment to change it represented, the Seattle Police Department has adopted and institute trainings to address bias, curtail the use of force and implement new mechanisms of accountability. These reforms have not only led to positive results in Seattle, but have become a model for similarly situated departments throughout the country.[4]

As Seattle has come to be seen as a national model on how to address fundamental issues relating to use of force, stops and detentions, and bias-free policing, it is understandable that some within the community indicate to us that they still do not feel the effects of the Consent Decree in their communities or disagree with some of the specific reforms that the process otherwise requires. Principal Deputy Assistant Attorney General Gupta indeed has acknowledged that repairing and resetting relationships is indeed the hardest part of the Consent Decree process:

---

[1] Fifth Semiannual Report at 12.
[2] *Id.*
[3] Amy Radil, "Seattle Police Reforms Bring Praise from U.S. Attorney General," KUOW.org (Sept. 24, 2015), http://kuow.org/post/seattle-police-reforms-bring-praise-us-attorney-general.
[4] Attorney General Loretta E. Lynch, Remarks at Community Policing Forum in Seattle, Washington (Sept. 24, 2015), http://www.justice.gov/opa/speech/attorney-general-loretta-e-lynch-delivers-remarks-community-policing-forum-seattle.

> This work is like being part of a family—it's loud, large, and messy.  And let's be real, no one likes everyone in their family.  So we're not always going to agree.  We're going to get on each other's nerves sometimes.  We're going to offend each other sometimes.  We're going to argue.
>
> If we would take the time to listen—really listen—and understand why most protestors take to the streets, why police officers risk their lives every day, we would find that, while perspectives may differ, people's aspirations—and their values—tend to be very similar.[5]

Along these lines, SPD, the Department of Justice, and the Monitoring Team were encouraged to see that, in many quarters, opinions of police provided in the Monitor's recent survey of community attitudes, a follow-up to a similar survey conducted in 2013, have substantially improved since 2013.  Furthermore, the percentage of people who disapprove of SPD (25 percent) is substantially down from 2013 (when disapproval was at 34 percent).

Some of the notable groups who are more supportive of Seattle police this year include:

|  | 2015 | 2013 |
|---|---|---|
| **Latinos** | 65 % approve / 23 % disapprove | 54 % approve / 39 % disapprove |
| **LGBT** | 72 % approve / 27 % disapprove | 55 % approve / 44 % disapprove |
| **Asian Americans** | 70 % approve / 17 % disapprove | 67 % approve / 27 % disapprove |
| **White** | 66 % approve / 25 % disapprove | 60 % approve / 35 % disapprove |

Likewise, those anonymously surveyed reported fewer troubling interactions between officers and Seattle residents, particularly among African Americans and Latinos, notably in the area of excessive force.  Less than 1 percent of people say they have been victims of excessive force in the past year. That includes 1 percent of African Americans and 1 percent of Latinos, who in 2013 reported much higher rates of experiencing excessive force (5 percent and 9 percent respectively).

The most notable group that has not seen confidence in SPD grow is African-Americans. A small plurality approved of SPD in 2013 (48 percent approve, 40 percent disapprove), and that's still true today (49 percent approve, 42 percent disapprove). African-Americans are also the only group more likely to strongly

---

[5] Principal Deputy Assistant Attorney General Vanita Gupta, Remarks at the 21st Annual Conference of the National Association for Civilian Oversight of Law Enforcement (NACOLE) (Oct. 6, 2015), http://www.justice.gov/opa/speech/principal-deputy-assistant-attorney-general-vanita-gupta-delivers-remarks-21st-annual.

disapprove of Seattle PD (27 percent) than they are to strongly approve (13 percent). Latinos had a similar dynamic in 2013, but now they are more likely to strongly approve of SPD (29 percent) than strongly disapprove (11 percent), even while approval ratings for local and state institutions (the Seattle Fire Department, Seattle Public Schools, and Washington States Patrol) have not changed.

Thus, it is clear to the Monitor that there is more hard work to be done in improving the ongoing relationship between SPD and Seattle's diverse communities, in particular the African-American community. The Monitor takes the long view, however, as it further understands from the survey that perceptions of police are a "trailing indicator," i.e., that it is likely, and wholly understandable, that only many years of good policing and stronger partnerships between the police and Seattle's community can change the perceptions of the Department in some communities.

Likewise, there is more hard work to be done – on the part of the Monitor, the SPD, the City, and the community – toward ensuring that the significant changes that have taken place over the past few years in policy, training, process, and operations have been translated into everyday practice. To that end, the Monitoring Team and the Parties are in the midst of conducting 15 "systemic assessments" of SPD's progress toward complying with each area of the Consent Decree.[6] As the Monitor noted in its report summarizing the results of the first four of those assessments:

> The Monitoring Team calls these evaluations "systemic" because their focus is on whether the Department has the systems, policies, structures, and culture in place that the Consent Decree contemplates. Neither these assessments nor the Monitoring Team will demand that SPD is uniformly perfect at all times . . . . It is an unfortunate fact of any professional organization that employees might from time to time perform poorly or make mistakes or bad decisions. The Consent Decree indicates, however, that [n]oncompliance with mere technicalities, or temporary or isolated failure to comply during a period of otherwise sustained compliance, will not constitute [a] failure to maintain full and effective compliance.

> As ordered by Judge Robart, the Monitor will, at the same time, insist that there is clear evidence that the various requirements of the Consent Decree are in fact "being carried out in practice" and are sufficiently manifest throughout the Department and across Seattle's diverse communities. "Full and effective compliance" requires clear, sustained evidence that SPD is where it needs to be not just in a few instances or temporarily across some of the Consent Decree's provisions – but that it has reached and maintained the appropriate outcomes and compliance with the whole of the Consent Decree, that the reforms are "baked in," and that SPD has reset its culture and relationship with all the diverse communities it serves . . . .[7]

Over the last six months, the Monitoring Team has filed two reports on five, or fully one-third of, in-depth assessments of core areas of reform that relate to the functioning of important new areas of internal accountability. The first report covering the first four assessments looked at how effectively SPD is documenting, investigating, and initially analyzing use of force by officers at all levels of reportable force: low-level uses of force (Type I), intermediate uses of force (Type II), and high-level uses of force (Type III

---

[6] *See generally* Dkt. 221; Dkt. 195 at 7–9; Fifth Semiannual Report at 11.
[7] First Systemic Assessment at 5 (internal citations and quotations omitted).

and officer-involved shootings).[8]  Specifically, the Monitoring Team and DOJ reviewed use of force reports and investigations from incidents occurring from July 1, 2014 through December 31, 2014 to conduct four separate assessments relating to:

1) uniformity, detail and completeness of Type I reporting;
2) uniformity, detail and completeness of Types II and III reporting;
3) quality, rigor, completeness and timeliness of Chain of Command Investigations for Types I and II incidents; and
4) quality, rigor, completeness and timeliness of Force Investigation Team (FIT) Investigations for Type III incidents.

Of the first four assessments, the Monitor and DOJ found that SPD is in initial compliance with Type I reporting, Type II and III reporting, and FIT investigations for Type III uses of force ((1), (2) and (4) above).

Across all levels of force, the Monitor found that officers are routinely reporting force to supervisors, that supervisors are responding to the scene and adequately carrying out their on-scene responsibilities in a vast majority of cases, and that officers are thoroughly documenting information about the force that they use.

FIT's investigations are covering all relevant investigative lines of inquiry, probing important issues and attempting to resolve inconsistencies among statements.  In multiple instances, Monitoring Team reviewers saw the quality of SPD's force response and investigation improve immediately upon FIT's arriving at the scene or beginning to investigate the incident.

Although substantial improvement is needed in the investigation and review by chain of command of intermediate-level, Type II force, it was a signal achievement that SPD had achieved initial compliance of some discrete paragraphs of the Consent Decree.  Moreover, SPD immediately proposed innovative solutions to remedy the deficiency, such as implementing Administrative Lieutenants at each precinct. DOJ, the City, and the Monitor continue to discuss specific issues identified in the assessments and how to reach compliance in the one area that fell short. These first four assessments, previously filed with the Court in September 2015, are included here as Appendix A.

The second report covering the fifth assessment focused on the Force Review Board ("FRB").  Previously filed with the Court in November 2015, it is included here as Appendix B.  The major conclusions of that report are:

- **The Board is embracing, its role as a "hub for internal innovation and critical analysis" of force.**[9]  It is regularly exploring important issues that go well beyond whether an involved officer's use of force was consistent or inconsistent with SPD policy and instead consider "what [the] force incidents can teach the Department and its officers about training, tactics, procedure, and policy."[10]

- **The Board handled the great majority of cases before it adequately or better, which is a noteworthy, highly positive achievement.**  For that, the Monitoring Team complimented

---

[8] *See generally* First Systemic Assessment.
[9] Fourth Semiannual Report at 37.
[10] Fourth Semiannual Report at 37.

the SPD, found the performance in initial compliance, and saw it as a significant stepping stone along the path toward full and effective compliance. However, given the newness of the policies governing the Board and its composition, the Monitor will remain involved and invested in ongoing monitoring of the FRB deliberations to ensure that the progress has been made is not temporary or short-lived but, instead, is truly systemic. In particular, it will be monitoring the Compliance Bureau's tracking and implementation of the FRB's referrals – an critical piece of the achievement of the FRB's mission.

In the next few months, indeed starting in the next several weeks, the Monitor will issue important reports on the results of our assessments on SPD's efforts at community policing and engagement, the Office of Professional Accountability ("OPA"), officer use of force, crisis intervention, and others. Because those reports provide great detail on the consent decree's core subjects, the remainder of the present report serves as an update on some important but more generalized areas of progress, focus, and work.

## I.     Public Confidence Survey

In late Summer 2015, the Monitoring Team commissioned a survey of Seattle residents that paralleled an earlier baseline survey of August 2013 to determine attitudes and perceptions of excessive force and racial profiling.

In 2015, the survey design "oversampled" African-Americans and Latinos (both English- and Spanish-speaking), which allowed the survey to make both statistically-significant conclusions about what the Seattle public generally thinks of SPD and the views of specific communities. In other words, "[t]his [oversampling] allowed and analysis of these communities not just as a monolithic bloc, but to look for differences in perceptions among these groups by key demographics and experiences (age, gender, interactions with police, etc.). We weighted the full survey results to be representative of Seattle's population."[11]

The introduction to this report has already summarized the key finding that "the Seattle Police Department's overall ratings improved" between 2013 and 2015 "with disapproval of the department down sharply."[12] Latinos, LGBT residents, Asian-Americans, and whites are all more supportive of Seattle police than they were in 2013. Black Seattleites remain most skeptical of SPD and are the group more likely to strongly disapprove of SPD (27 percent) than to strongly approve (13 percent).[13] Some other key findings of the survey include:[14]

- **Police Chief Kathleen O'Toole is popular with Seattleites (61 percent approve / 11 percent disapprove).**

- **Fewer people are reporting problems with SPD from their personal interactions.** People who are stopped by SPD are more likely to approve of the way that stop is

---

[11] Brian Stryker, Memorandum re: Seattle Police Community Survey Findings (Sept. 10, 2015) at 1, available at http://static1.squarespace.com/static/5425b9f0e4b0d66352331e0e/t/562ce664e4b022641dac5c59/1445783140680/ALG+SUMMARY+-+SEATTLE+POLICE+SURVEY+2015.pdf.
[12] Id.
[13] Id.
[14] The text that follows this footnote is quoted directly from, or otherwise adapted from, the memorandum prepared by the national polling firm that designed and executed the survey. See id.

handled (70 percent approve) than they were in 2013 (65 percent).  In particular, African Americans and Latinos (55 percent approve 2015 / 44 percent approve 2013) and people who have been stopped for something besides a traffic issue (65 percent approve 2015 / 47 percent approve 2013) have given SPD much better marks.  Those same groups were the most likely to disapprove of SPD's handling of their interaction in 2013.

- **Almost no survey respondent personally being victims of excessive force from SPD in the last year.**  Less than 1 percent of survey respondents say they have been a victim of excessive force in the past year, which is no higher than 1 percent among any racial subgroup. African Americans and Latinos in 2013 reported much higher rates of experiencing excessive force (5 percent and 9 percent respectively).

- **Four percent of Seattleites say they were victims of SPD racial profiling in the past year, identical to 2013.**  This includes 10 percent of Asian Americans, 9 percent of African Americans, and 6 percent of Latinos – all within the margin of error of last year or down.

- **Overall public perception isn't changing as quickly as people's personal interactions.**  Just as many people today say SPD uses excessive force very or somewhat often (46 percent) as said the same in 2013 (45 percent).  The same goes for racial profiling: 55 percent of people say that police engage in it today very or somewhat often, compared with 53 percent who said so in 2013. SPD is "swimming against the tide" of national popular opinion in trying to improve community perceptions.

- **Latinos' and African Americans' experiences still back up the public's perception that SPD treats them worse than others.**  African Americans' and Latinos' experiences have gotten better in the last two years, but they are still not the same as whites or Asian Americans.  They are more likely to disapprove of how police treat them, they are more likely to say police used force in an interaction, and they are less likely to say police engaged in a wide range of positive behaviors such as treated them respectfully and listened to them.  And they are more likely to report being stopped in the first place by SPD.  Most Seattleites also think that SPD treats Latinos and African Americans worse than others in the city.

- **Word of mouth is still a serious factor in negative opinions of SPD.**  Word of mouth is one of the most popular ways for communities to spread news about the police: among African Americans, it is second only to TV, as 49 percent of African Americans say they get much of their information about the police through word of mouth. Consequently, bad police interactions have a multiplier effect that flows through our data and through the community as people tell their family, friends, and neighbors about their experiences.

Bad news still travels faster than the good when it comes to community-police interactions: people are much more likely to disapprove of how the police treated someone they know who interacted with the police (31 percent disapprove) than they are to disapprove of how they were treated (23 percent disapprove). It is also very likely that perceptions of police are a trailing indicator, and it will take years of continued good work to mitigate the negative perceptions in some communities. Given the

positive trends in SPD approval overall and in the public's report of their interactions with SPD during stops, there's reason to believe that this process is beginning to occur.

- **Seattle PD community engagement makes people like the department more.** These personal meetings and interactions such as neighborhood/block watch programs make a significant difference. Thirty-nine percent of people have been to one of these types of meetings, and those persons are more likely to give SPD a positive job rating (68 percent approve / 25 percent disapprove) than Seattleites overall. People who have participated in a neighborhood/block watch program (75 percent approve) or a living room conversation (75 percent approve) are especially supportive of the police.

The improvement in positive attitudes toward the SPD is a welcoming and encouraging sign. The SPD is to be congratulated on these achievements – especially in an era where, in the wake a series of high-profile and galvanizing incidents, police departments across the country have been subject to elevated media coverage, community attention, and public scrutiny.

The SPD continues to have its greatest difficulty in gaining the trust and confidence of the African-American community. The positive attitude of black Seattleites improved modestly from 48 to 49 percent. Disapprovals increased modestly from 40 to 42 percent between 2013 and 2015. More ominously, however, African Americans are also the only group more likely to *strongly* disapprove of the SPD (27 percent) than to strongly approve (13 percent).

To the Monitor, a key outcome measure of the Consent Decree, demonstrating whether the changes that the decree was designed to produce have taken effect, will be improvement of the trust and confidence of African Americans is a necessary component of full and effective compliance. For the reforms of the Consent Decree to have truly worked, it must be demonstrated that a new relationship has been established between SPD and the African-American community – and that the relationship will expand and endure.

Critical to strengthening relationships between SPD and the communities it serves is the implementation of body cameras throughout the Department. Indeed, a separate key finding of the public perception survey is that **Seattleites overwhelmingly want to see body cameras on their officers.** This is almost universally popular (89 percent support / 7 percent oppose), and it is not possible to find a statistically-significant population in the city who supports this by any less than 80 percent.

The Department is appropriately moving forward with implementation of body-worn cameras in conjunction with the Mayor's Office. The City has convened state legislators and other key stakeholders to consider revisions to state law to ensure a proper balance of privacy, transparency, and accountability. Current state disclosure laws offer almost no protection to civilians videotaped on police cameras, which is likely to have a chilling effect on other police department's ability to implement body cameras.

While rigorous discussions should continue during the roll-out to help guide the process and address the serious privacy implications, Seattle should continue to avail itself of the substantial experience and real-

world lessons learned in the area from other jurisdictions across the country, including those with substantially similar public disclosure requirements.[15]

Seattle has moved forward in the implementation of many of the substantive provisions of the Consent Decree.  The City should take great pride in that.  Many parts of the Seattle community proudly regard the city as one of the most – if not the most – forward-looking big cities in the nation.  It must be borne in mind that, if that reputation is to last, the SPD needs to be seen by all its diverse communities, and in particular it's African-American community, as its guardians and protectors, policing effectively and constitutionally.

## II.        Early Intervention System ("EIS")

An early intervention system is "a non-disciplinary, institutionalized process for supervisors to identify officer performance trends that may benefit form intervention or other formal professional development."[16]  Although "SPD technically had an EIS in place at the start of the Consent Decree," the Department of Justice's 2011 investigation of SPD identified "systemic deficiencies" in the system then in place.[17]

As of June 19, 2015, a dramatically-overhauled early intervention system has been up and running across SPD.  Because an EIS is a "best practice in accountability,"[18] the successful implementation of a new, forward-looking system in Seattle represents significant progress and a noteworthy milestone.

It is too early to tell, as of this writing, how the EIS system is doing in practice.  Does EIS, as is hoped, provide a new mechanism for identifying officers in need of coaching, counseling, or mentoring to meet performance expectations?  Are supervisors reliably and appropriately utilizing the EIS to proactively steer the professional development of employees under their command?  Is the Performance Review Committee providing the appropriate oversight to ensure that supervisors are completing assessments and developing mentoring plans, when needed, in a thorough and thoughtful manner?

In the upcoming months, the Monitoring Team will conduct a systemic assessment of whether the EIS has become effective in practice.  Among other things, the Team will be considering whether supervisors are routinely reviewing officer performance data on officers on a weekly basis, as required by the policy,

---

[15] Jay Stanley, American Civil Liberties Union, "Police Body-Mounted Cameras: With Right Policies in Place, A Win for All," (2d Ed. Mar. 2015), https://www.aclu.org/police-body-mounted-cameras-right-policies-place-win-all ("Although we at the ACLU generally take a dim view of the proliferation of surveillance cameras in American life, police on-body cameras are different because of their potential to serve as a check against the abuse of power by police officers."); Campaign Zero/Black Lives Matter, Policy Solutions: Body Cams/Film the Police, http://www.joincampaignzero.org/film-the-police (last visited Dec. 2, 2015); National Assc'n for the Advancement of Colored People, Press Release, "Civil Rights Coalition Urges National Reforms and Recommendations to Address Police Abuse," http://www.naacp.org/news/entry/civil-rights-coalition-urges-national-reforms-and-recommendations-to-addres (describing "coalition of national civil and human rights organizations and leaders . . . continu[ing] to call for the use of police officer body-worn cameras nationally"); Written Testimony and Recommendation of National Urban League and Marc Morial to the President's Task Force on 21st Century Policing, "The 10-Point Justice Plan" (Dec. 2014), http://nul.iamempowered.com/content/10-point-justice-plan-0 (summarizing National Urban League's recommendation for the "widespread use of body cameras and dashboard cameras"); Gray Fields & Colleen McCain Nelson, "Task Force Calls for More Police Body Cameras," Wall Street Journal (Mar. 1, 2015), http://www.wsj.com/articles/task-force-report-calls-for-more-body-cameras-1425257551 ("A presidential task force is calling for increased use of body cameras and other technology . . . ."); Bureau of Justice Assistance, U.S. Dept. of Justice, National Body-Worn Camera Toolkit, https://www.bja.gov/bwc/ (last visited Dec. 2, 2015) (providing "a comprehensive clearinghouse for criminal justice practitioners interested in planning and implementing a body-worn camera program . . . .").

[16] Fifth Semiannual Report at 35; see also Fourth Semiannual Report at 69 (noting that EIS "provides a basis for affirmative, non-disciplinary supervisor intervention to assist officers in performance and career development").

[17] United States Department of Justice, Civil Rights Division and U.S. Atty's Office, W.D. Wash., Investigation of Seattle Police Department (Dec. 16, 2011) [hereinafter "2011 Findings Letter"] at 22, available at http://static.squarespace.com/static/5425b9f0e4b0d66352331e0e/t/5436d96ee4b087e24b9d38a1/1412880750546/spd_findletter_12-16-11.pdf; see generally Fifth Semiannual Report at 35–36 (summarizing former deficiencies).

[18] Samuel Walker, "What a Good Police Department Looks Like: Professional, Accountable, Transparent, Self-Monitoring" at 2 (2014), available at http://samuelwalker.net/wp-content/uploads/2014/10/WHAT-A-GOOD-POLICE-DEPARTMENT-Final.pdf.

whether the early intervention process is a forum for in-depth discussions on how to enhance the professional and skills development of SPD officers, and whether the continued location of the EIS in the SPD Human Resources department rather than "more squarely within the core of the Department's operational structure" is consistent with the EIS policy being truly effective in practice.[19]

## III.      Data Analytics Platform ("DAP")

In the Monitor's previous semiannual reports, the subject of data and information systems has been a recurring one.  The emphasis stems from the fundamental recognition that no department can hold its officers accountable for performance about which it does not know, that it does not track, and that it does not systematically review.  Indeed:

> When the Consent Decree began, the Department faced the task of fundamentally changing the manner in which its officers report and supervisors investigate and review critical incidents like use of force and stops.  This required an end of the days where reporting existed – if it existed at all – on paper stuffed, unreviewed, in file cabinets or entered into an unreliable, inaccurate, and incomplete legacy database.  Likewise, to better manager officer performance and engage in proactive officer development, the SPD would need to be able to access and analyze information about what its officers are doing reliably and efficiently.[20]

A 2013 report commissioned by SPD "revealed a variety of deficiencies within the SPD IT landscape . . . pertain[ing] to the integrity, quality, and basic reliability of SPD's data and systems."[21]  In late 2014 and early 2015, an information technology consulting firm, Gartner, identified "a number of gaps in data quality and integrity that must be remedied . . . ."[22]

Consistent with the objectives of the Consent Decree and to enhance the strength of the Department's use of data for core operational and law enforcement objectives, SPD released an RFP in February 2015 for a Data Analytics Platform ("DAP").  The Monitor's Fifth Semiannual Report in June 2015 observed that "the RFP is an impressive, detailed, and straightforward document that paints a realistic picture of the opportunities and challenges that any vendor will face."[23]

During the Summer of 2015, the SPD's DAP selection team spend multiple days interviewing the finalists and talking with them about their systems, approaches, and teams.  In September, the Department selected and contracted with Accenture, a technology services and consulting firm, to design and implement the DAP.[24]  The Monitor is pleased that SPD is now definitively working with Accenture on "us[ing] an existing, tested third-party platform that fully incorporates the explosion of recent technical advances in data mining and aggregation – which . . . make[s] the ultimate system cheaper, better, and more powerful than many law enforcement agencies' previous attempts at building their own systems from scratch."[25]

---

[19] Fifth Semiannual Report at 37.
[20] *Id.* at 33 (internal quotations and citations omitted).
[21] *Id.* at 34; *see* PricewaterhouseCoopers, "Seattle Police Department: Proposed Development of a Business Intelligence System—Executive Summary" (Dec. 6, 2013), *available at* http://www.seattle.gov/police/compliance/docs/BI_Reports/SPD_BI_ExecSummary_FINAL.pdf.
[22] Fifth Semiannual Report at 34.
[23] *Id.*
[24] Press Release, "Seattle Police Department Selects Accenture to Deliver Data Analytics Platform to Support Police Operations and Investigations" (Oct. 22, 2015), https://newsroom.accenture.com/news/seattle-police-department-selects-accenture-to-deliver-data-analytics-platform-to-support-police-operations-and-investigations.htm.
[25] Fourth Semiannual Report at 68.

Accenture has hit the ground running in Seattle, beginning work in earnest on September 28, 2015.  Five Accenture team members and at least four SPD staff have conducted work on-site in October, with sixteen individuals slated to contribute to project implementation by 2016.  The current completion date for Phase 1 of the project, which relates to areas related directly to the Consent Decree, is projected to be September 2016, although staged rollouts will begin as early as January 2016.

The Monitoring Team looks forward to continue working closely with Accenture and SPD has the DAP continues to be implemented.  When the DAP is in place, it "will enable the Department to capture, aggregate, parse, and visualize data about officer performance"[26] in a manner that both provides the Court with "the information that allows [it] to make [a] judgment"[27] as to whether SPD is fully and effectively complying with the Consent Decree and, even more fundamentally, allows the Department to better manage for itself officer performance, the risk of unconstitutional policing, and its response to crime and community needs.

## IV.        Accountability Structures

United States District Judge Robart, who oversees the Consent Decree, held status conferences, or in-Court hearings with the Parties and Monitoring Team, on June 30, 2015 and August 26, 2015.  Among other things, the Court provided opportunities for the Parties and involved stakeholders to submit views related to the accountability system and its constituent elements – including FRB, FIT, OPA, the OPA Director and Auditor, SPD chain of command, and additional civilian oversight of the police.

All of the City of Seattle, Department of Justice, OPA, and CPC were provided opportunities to provide briefing with the Court.  The Monitor looks forward to discussing the implicated issues on or before January 20, 2016.

## V.        Policy

In the last six months, the Parties completed and the Court approved limited, surgical revisions to four of the five following SPD policies, which form the bedrock of police reform:

1.   Use of Force policy: approved by the Court on July 27, 2015, after a hearing on June 30, 2015.
2.   Bias-Free Policing and Stops Policies: approved by the Court on June 11, 2015.
3.   Crisis Intervention Policy: approved by the Court on June 4, 2015.
4.   Early Intervention Policies: approved by the Court on May 4, 2015.

Revisions to the OPA Manual and two supporting policies were postponed until January 14, 2106 (from October 10, 2015), so that SPD and the Parties could consider the result of the Monitoring Team and DOJ's assessment of the quality of OPA's investigations.

A discussion of the substance of those policy revisions was provided in the filings submitting them to the Court for its consideration and, thus, will not be repeated again here.  It is important to note, however, that

---

[26] *Id.* at 5.
[27] 8/9/14 Status Conference Transcript at 39.

every policy revision was completed, not only with input from nationally recognized experts, but with regular feedback from community groups and SPD officers alike who experience the realities of the policies on the ground.

Over the next several months, we look forward to finalizing revisions to the FIT Manual, the Crowd Management policy, and the Body Worn Cameras policy.

## VI.     Training

SPD officers and command staff continue to receive significant training on topics and issues related to the Consent Decree.  This second year of training is a significant part and evidence of SPD's commitment to the reform process.  It is a testament to the City as a whole that it is willing to expend the hours and cost to ensure that SPD officers are among the best-trained in the nation.

Since the Monitor's Fifth Semiannual Report in June 2015, all sworn supervisors, permanent acting sergeants, and officers contemplated to become acting sergeants received a course entitled Transactional and Transformational Leadership.  This was the first day part of a three-day and – for SPD – a first-of-its-kind leadership development initiative.  Anecdotal indications are that the training has been well-received and valuable.  Between September and November 2015, supervisors attended Day 2, namely, a course on critically analyzing force geared toward strengthening further the investigations and reviews conducted by the chain of command.  The Monitoring Team and the Parties recently received and are reviewing the draft materials for Day 3.  Finally, the Monitoring Team and the Parties look forward to receiving the draft materials for an additional course on institutional or organization bias being developed in conjunction with the CPC and the Seattle Office of Civil Rights (OCR).

Additionally, between May and November 2015, all sworn personnel received or will begin to receive the following training:

1. An additional 8 hours of instruction on tactical de-escalation skills and individual firearms skills. See Dkt. Nos. 198 and 199. The curriculum was geared toward giving officers additional, scenario-based training on de-escalating situations by using defined strategies and tactics not necessarily entailing the use of force or, if force was used, minimizing the severity and extent of the force application.  Several departments around the country attended this course.  It is considered at the leading edge of this type of training.

2. An 8 hour "Integrated Tactics" training built on the tactical de-escalation skills training.  During UOF Day 3 training, officers combined their de-escalation skills, defensive tactics and team tactics to respond appropriately during incidents involving various and changing levels of threat from subjects in concert with their fellow officers to stop threats posed to themselves and/or others.  Moreover, officers were expected to be capable of articulating and justifying their responses according to relevant legal standards and department policy, which is itself a skill that is reinforced in all of SPD's UOF training. Finally, effective training must simulate the reality of these incidents, as well as the environments or contexts in which officers regularly operate, to the greatest degree possible. Integrated Tactics

training exemplifies "integrated reality-based" training, which is at the heart of SPD training and education program.

3. An 8-hour "Active Shoot/Rapid Intervention" training is integrated firearms and team tactics training for officers in both the external and internal movements and tactics necessary to successfully resolve a significant active shooter incident, including acts of terror involving multiple suspects attacking population centers and "soft" targets. The training includes proper threat identification, coordination of multiple officers and the employment of a proportional response to solve the perceived problem.  As single or multiple active shooter incidents, the situation can flow from dynamic to static and officers' reactions should be predicated on the suspect(s)' actions. The added elements of re-directed suspects, multiple suspects, and operations both inside and outside of buildings will create additional challenges in the operational environment for officers and field commanders.  SPD is at the leading edge on this important training.

4. A 16-hour course on the proper application of a TASER X2 less-lethal tool.  This course is intended to prepare both new users and those users transitioning from the X26 for deployment with the X2.  Officers will learn when and how to use the TASER safely as a force option, including compliance with the policy applicable to this device (such as verbal warnings) and post-application procedures such as providing medical aid and screening.

Additionally, all non-"CIT-Certified" sworn personnel, or all of those who do not have a specialist certification on crisis intervention issues, are receiving an eight-hour course in advanced crisis intervention training skills.  This adds to the eight of hours of basic instruction that all SPD officers received in 2014.  Meanwhile, the advanced CIT-Certified officers are receiving advanced instruction of their own on issues related to traumatic brain injury and veteran concerns (such as post-traumatic stress disorder).  Communications personnel received e-learning on how to identify and properly resource calls from persons in crisis.

Finally, all members of the FIT and the FRB received training specific to their disciplines.  Members of FIT attended specialized trainings on body worn cameras, cognitive interviewing, law enforcement photography, digital evidence management and training provided at the Washington Homicide Investigators Association Conference and the Quarterly Washington State Patrol Crime Lab Update. FIT managers also partnered with the Los Angeles Police Department's Force Investigation Division and started to participate in quarterly conference calls to share issues, practices, and lessons learned.

A number of FIT representatives also attended LAPD's Officer Involved Shootings and Categorical Force Investigation program this Fall.  The FRB received the same eight-hour course that all Supervisors received within SPD related to critical analysis of force.

The Monitoring Team shortly will file on the public record an "anthology" of the training for 2015, which will discuss in greater detail the training above and provide copies of the training materials.

## VII.    Crisis Intervention

In the Fifth Semiannual Report in June 2015, the Monitoring Team described the encouraging results of the first week's collection of CIT's data.  In September, SPD reported their preliminary data analysis of crisis contacts from the first three months of data collection (May 15, 2015 to August 15, 2015).  According to SPD, that data shows that SPD officers are using force minimally, namely: less than one half of one percent of crisis contacts (10) resulted in Type II, or intermediate use of force; less than 2 percent of crisis contacts resulted in any use of force at all, with the most common use of force being a control hold.

SPD also reports that, during this three month period, officers responded to 2,464 crisis calls – a rate trending towards approximately 10,000 crisis calls annually.  CIT Certified Officers (again, who undergo 40 hours of crisis intervention training) responded to 82 percent of these crisis calls.  An additional 14 percent of crisis contacts were handled by officers (again, all of whom receive a day of basic crisis intervention training annually) in the field before more specialized certified officers.  SPD reports that, in only 4 percent of cases (100 contacts), certified officers were requested and/or dispatched but did not arrive on scene.

SPD is taking a deeper look into these 4 percent of cases to determine whether adjustments in communications/dispatch or staffing need to be made to reduce this number even further, or whether there are alternative explanations as to why certified officers may not have been present – including the very real possibility that the incident was resolved peaceably, before a certified officer could arrive, by the responding officer utilizing de-escalation tactics or the crisis intervention skills that all officers are expected to employ, regardless of whether they are CIT-certified.

SPD also reports that officers as a whole also made the 550 referrals or attempted referrals to other community services and attempted to engage emergency mental health services (commitments) over 1,000 times (or in about 40 percent of cases).

Additionally, SPD reports that arrests of persons in crisis were relatively low, namely, only 8 percent (187) of persons in crisis were arrested.  Sixty-four percent of those arrested were either armed or threatening violence against a third-party or an officer.  Furthermore, officers seemed to have exercised high discretion when determining whether to make an arrest: officers report that they had probable cause to make arrests of another 5 percent of the crisis contacts, but chose another resolution to the incident.

As the SPD policy describes, the ideal resolution for a crisis incident is that the subject is connected with resources that can provide long-term stabilizing support.  While there are many factors well outside of SPD's control that contribute to such long-term stability, the number and breadth of these referrals is a promising indicator that SPD, as a first-responder, is making tremendous strides to meet the ideals of its policy.

Otherwise, the policy changes enacted recently to solidify the structure of crisis intervention efforts and the training described above seem to be continuing to sink in as part of a culture change on how to approach these fraught and often highly unpredictable situations.

All of this said, as stated previously, in upcoming months, the Monitor will report on a full range of CIT issues to see whether SPD is in initial compliance with those provisions of the Consent Decree.

## VIII.          Personnel Changes

Over the last six months, there has been a significant change of personnel who have been involved in Consent Decree compliance among each of the SPD, City, and Monitoring Team. Brian Maxey, formerly of the City Attorney's Office, joined the SPD and was recently promoted to the civilian head of operations. Joining Brian as SPD's senior counsel is Rebecca Boatright, also formerly of the City Attorney's Office, who had been the day-to-day lead for that office on compliance. Both Rebecca and Brian are exceptionally well-qualified for their new positions and have made significant contributions to the implementation of the Consent Decree.

Brian replaces Mike Wagers, who is returning to his wife and children in northern Virginia. He has been Chief O'Toole's right-hand man since she came on board last year and has done an extraordinary job driving reform forward. His contributions to the implementation process have been legion, and he will be greatly missed.

Greg Russell, former Chief Information Officer at SPD, has gone back to private practice. He, too, made substantial contributions. He has been replaced by an interim appointee. It is critically important that progress on the new data system—DAP—not be delayed or reversed by Mr. Russell's departure.

Ian Warner, a highly talented lawyer, has left the law firm of Dorsey & Whitney and the Monitoring Team to work directly with Mayor Ed Murray as counsel. Undoubtedly, he will prove himself to be as valuable to the Mayor as he was to the entire Monitoring Team.

The Monitor, with the agreement of the Parties, has added Rob Saltzman to the Monitoring Team going forward. Rob is a lawyer who, until June 2015, was Associate Dean of the University of the Southern California Gould School of Law. He has served for more than seven years on the Los Angeles Police Department's Board of Police Commissioners (the "Commission") – the era in which LAPD made steady and sustained progress in complying with a Department of Justice Consent Decree addressing use of force, stops and detentions, training, internal investigations, the tracking of officer performance, and the introduction of integrity units aimed at identifying systemic corruption.

Rob was the only Police Commissioner appointed and confirmed by both of Los Angeles' two most recent mayors. The Commission serves as the head of the Los Angeles Police Department, setting policies for the department and overseeing its operations. It shares power with the mayor to hire and fire the Chief of Police, adjudicates all serious uses of force to determine if force was within LAPD policy, and oversees an Inspector General who investigates and evaluates LAPD operations, including biased policing, excessive force, and corruption. Rob's long tenure on the Board is a testament to his integrity, judgment, skill, and even manner.

With direct respect to this project, Rob has significant and specific expertise in use of force, internal investigations, administrative reviews, stops and detentions, and biased policing issues. He has participated in the adjudication of nearly 750 force cases and regularly reviews discipline applied when an officer's actions have been held out of policy. Rob was involved in the revision of policy changes relating to the investigation and review of use of force incidents. He was significantly involved in a major revision of training regarding use of force, less-lethal instruments, drawing and exhibiting weapons, and force tactics. He is a frequent speaker at the LAPD Academy on constitutional policing issues.

Rob will serve as a reviewer for the officer use of force, stops, crisis intervention, and EIS assessments.  He will assist in the drafting and editing of reports, as well as in the analysis of statistical findings.  He will travel to Seattle periodically for on-the-ground visits.

## Conclusion

Over the next few months, the Monitor will continue to update the Court and the Seattle community on the Department's progress, across time and in each area of the Consent Decree, in the context of the ongoing systemic assessments.  Areas relating to SPD's community engagement efforts, OPA, crisis intervention, and officer use of force will be the subjects of the most immediate focus, with future assessments in Spring 2016 dealing with early intervention, stops and detentions, and supervision.

The results of these assessments, and our ongoing involvement with and oversight of the Department, will inform a monitoring plan for the next span of monitoring, which will be filed with the Court by mid-March 2016.  As always, we look forward to updating the Court and the community as to SPD's continuing progress to reach full and effective compliance with the Consent Decree and to ensure that policing in Seattle is safe, is effective, and promotes public confidence and trust.[28]

---

[28] Dkt. 3-1 at 5.

**Appendix A**



SEATTLE
POLICE
MONITOR

# First Systemic Assessment: Force Investigation & Reporting

September 2015

# Table of Contents

Executive Summary ...................................................................................................................... 1

Introduction to the Monitor's Systemic Assessments ................................................................ 5

Part 1.  Overview of Force Reporting & Investigations and Assessment Methodology ........................ 8

   I.  An Overview of Force Reporting & Investigations ................................................................ 8

      A.   How the Consent Decree Addresses Force Investigation & Reporting ............................. 8
      B.   The Categorization of Force by Type ............................................................................ 10
      C.   Reporting Force .......................................................................................................... 12
          1.  Supervisor Notification & Response ...................................................................... 13
          2.  Documenting the Force ....................................................................................... 13
      D.   Investigating Force ...................................................................................................... 15
          1.  Type I Force ....................................................................................................... 15
          2.  Type II Force ...................................................................................................... 16
          3.  Type III Force ..................................................................................................... 17
      E.   Prior Progress & Prior Evaluations of Force Investigations & Reporting ........................ 18

   II.  Assessment Methodology ................................................................................................... 20

      A.   What Force Reports & Investigations Were Reviewed .................................................... 21
      B.   How the Force Reports & Investigations Were Evaluated ............................................... 22

Part 2.  Force Investigation Team ("FIT") Investigations ................................................................ 25

   Description of Reviewed Cases ............................................................................................... 25
   Immediate Post-Incident Response ........................................................................................ 25
   FIT Response ......................................................................................................................... 26
   FIT Investigative Processes & Fact-Gathering ........................................................................ 27
   Overall Sufficiency of the Investigation .................................................................................. 29

Part 3.  Type II Reporting and Chain of Command Investigation & Review ..................................... 33

   Description of Reviewed Type II Cases ................................................................................... 33
   Type II Reporting .................................................................................................................. 33
      Supervisory Response ........................................................................................................ 33
      Officer Documentation ...................................................................................................... 34
   Type II Review ...................................................................................................................... 35
      Sergeant's Investigation ..................................................................................................... 35
      Sergeant's Report .............................................................................................................. 41
      Lieutenant's Review .......................................................................................................... 43
      Captain's Review .............................................................................................................. 45

Part 4.  Type I Reporting & Chain of Command Review ................................................................ 46

   Description of Reviewed Type I Cases .................................................................................... 46
   Type I Force Reporting .......................................................................................................... 46
      Supervisor Notification & Response .................................................................................... 46
      Officer Documentation ...................................................................................................... 48
   Type I Review ....................................................................................................................... 50
      Sergeant's Review ............................................................................................................. 50
      Lieutenant's Review .......................................................................................................... 53
      Captain's Review .............................................................................................................. 54

# Executive Summary

This Report assesses how effectively the Seattle Police Department ("SPD") is documenting, investigating, and analyzing use of force by SPD officers across all levels of reportable force: low-level uses of force (Type I), intermediate uses of force (Type II), and high-level uses of force (Type III and officer-involved shootings).[1] Specifically, as described in the Monitor's Third-Year Monitoring Plan filed in March and updated in July 2015, this Report considers those processes within four separate assessments on: (1) Type I reporting, (2) Type II and III reporting, (3) Chain of Command Investigations for Type I and II incidents and (4) Force Investigation Team ("FIT") investigations of Type III incidents.[2]

The good news is that in a short amount of time – just six months from the Court-approved, force-related policies taking effect on January 1, 2014 – rank and file officers have responded to clear rules of the road for systematically documenting force whenever it is used, sergeants have responded to the scene in way that permits a thorough investigation, and FIT investigations are consistently excellent. **As a result, the Monitor finds the SPD in initial compliance with certain provisions or requirements of the Decree and thus in partial compliance with the Decree as a whole.**[3] That and other advances represent an impressive achievement, rapid progress, and, most importantly, an encouraging suggestion that officers are accepting the new requirements of the Consent Decree as the way that business will be done going forward within the SPD.

All in all, this assessment on force reporting and investigation gives the Monitor, despite much more work that will need to be accomplished by the SPD, still greater confidence that if SPD "continues on the path that it is now . . . [it] is likely to get the job done."[4] This is an important milestone, reflecting Chief O'Toole and her command staff's leadership. These advances in police reform owe a good deal to the commitment and leadership of Mayor Ed Murray and his staff; the City Attorney, Pete Holmes, and his staff; City Council, including its President, Tim Burgess, and the Chair of its Public Safety committee, Bruce Harrell, and his committee members; and the Seattle community.

A fundamental deficiency that the Department of Justice ("DOJ") identified in its 2011 investigation was the failure of SPD officers to uniformly and accurately report when they used force and of the Department to rigorously investigate and review such force.[5] There was, at best, cursory reporting, inadequate on-scene supervisory investigation of force, insufficient analysis of use of force incidents, and too little meaningful oversight and review of force investigations. The City of Seattle and the DOJ negotiated a Consent Decree in 2012 which aims, in part, at ameliorating those deficiencies under the theory that institutional change is often

---

[1] The Consent Decree, and the subsequently-implemented SPD policies, set forth express requirements for and "different levels of departmental reporting and review that become more rigorous depending on the type of the force used." Dkt. 3-1 ¶ 93. Specifically, force is categorized into three levels for force "types" – low-level Type I force, intermediate-level Type II force, and serious Type III force. The categories account for the nature of the force used, outcome of the actual force used, and – regardless of the outcome or injury to the subject – the risks that can reasonably be expected to be associated with the application of the force, with a focus on the highest scrutiny on the highest levels of force.

[2] See Dkt. 195 & 222.

[3] The Parties, SPD, and Seattle community must be careful to understand what the Monitor means and does not mean by "initial compliance" and "partial compliance." These phrases are not expressly used in the Consent Decree itself, although the concept is contained in the Decree. See Dkt. 3-1 ¶¶ 185, 230. It is not the same as "full and effective compliance" with the Consent Decree. Rather, it connotes that, in the Monitor's opinion, the SPD has initially satisfied the requirements of some provisions of the Consent Decree, but that such initial compliance must be maintained as the SPD moves systematically toward full and effective compliance with the Consent Decree as a whole.

[4] Fourth Semiannual Report at 12.

[5] For a variety of different reasons, force often went unreported – leaving it subject to no departmental scrutiny. See United States Department of Justice, Civil Rights Division and U.S. Atty's Office, W.D. Wash., Investigation of Seattle Police Department (Dec. 16, 2011) [hereinafter "2011 Findings Letter"] at 15, available at http://static.squarespace.com/static/5425b9f0e4b0d66352331e0e/t/5436d96ee4b087e24b9d38a1/1412 8807506/spd_findletter_12-16-11.pdf. Where force was reported, it was documented "on paper stuffed, unreviewed, in file cabinets . . . ." Fourth Semiannual Report at 26. SPD supervisors "fail[ed] to supervise patrol officers' use of force . . . at every level, from the first line supervisor's investigation and review, to the chain of command's secondary review of that investigation, to the final review by command staff." 2011 Findings Letter at 17.

most effective when it comes from within.  Consequently, the Consent Decree and the comprehensive revision to SPD's force-related policies approved by the Court in late December 2013 – which incorporated input from all stakeholders, including the Parties, the Community Police Commission ("CPC"), SPD officers, and other community groups – require that, rather than being ignored or addressed superficially, all force be reported, investigated, and reviewed.[6]

As is demonstrated in this Report[7]:

- Across all of Type III, Type II, and Type I force incidents, the Monitor finds that officers are routinely reporting force to supervisors, that supervisors are responding to the scene and adequately carrying out their on-scene responsibilities in a vast majority of cases, and that officers are thoroughly documenting information about the force that they use.  Consequently, **the Monitor finds that the reporting of and response to force is in initial compliance with paragraphs 100, 101, 102, and 103 of the Consent Decree.**[8]

- FIT's investigations are covering all relevant investigative lines of inquiry, probing important issues and attempting to resolve inconsistencies among statements and evidence.  In multiple instances, Monitoring Team reviewers saw the quality of SPD's force response and investigation improve immediately upon FIT's arriving at the scene or beginning to investigate the incident.  The Monitor therefore finds that **the quality and integrity of FIT investigations are consistent with the requirements of paragraphs 112, 113, 114, 117, and 118 of the Consent Decree and demonstrate initial compliance with those provisions**.

   Although FIT can, and should, still improve in a number of areas, FIT's Captain, Mike Teeter, and his team of dedicated investigators should be commended for their commitment to fair and thorough investigations of officer force.  Their willingness, too, for accepting suggestions and incorporating guidance from the Office of Professional Accountability ("OPA"), the Force Review Unit ("FRU"), the Force Review Board ("FRB"), the DOJ, and the technical assistance of the Monitoring Team has been laudable.  So also is the thoughtful guidance and support of FIT from Assistant Chief Lesley Cordner.

   There does remain some room for continued progress in FIT investigations with respect to the quality of some interviews of involved officers and civilians.  Likewise, FIT's impending switch to interviewing all witnesses—whether civilian or officer—rather than having witness officers submit statements will allow FIT investigators to more effectively and efficiently probe all relevant lines of inquiry.

   In summary, FIT is providing SPD chain of command with fair, thorough, complete, and objective factual records about the highest levels of force from which to make determinations about whether

---

[6] Dkt. 3-1 ¶¶ 72, 91; Dkt. 115 at 3.  Although SPD's force-related policies have been updated over the last several months, the changes memorialized there were limited, especially in the areas of force reporting and investigation.  *See* Dkt. 204 (updated policies); Dkt. 225 (approving updated policies).
[7] The findings presented here result from the Monitoring Team's intensive, structured reviews, agreed to by the Parties, of the reporting and investigation of force incidents that occurred between July 1, 2014 and December 31, 2014 and for which investigations had been completed as of March 17, 2015.  Of those cases, the Team reviewed a statistically significant, random sample of Type I force; a statistically significant, random sample of Type II force; and all Type III and officer-involved shootings.  Team members independently evaluated reports and investigations using an agreed assessment instrument that contained both audit-like and general qualitative elements.  Thus, they logged, for example, whether investigators accomplished require tasks or the force reports contained required information.  Their inquiry was geared toward identifying whether the quality of the reporting and investigations were such that SPD's chain of command could make an objective and well-supported determination about whether the force was consistent with SPD policy.  This work was done in coordination with the Parties who were simultaneously conducting assessments of the same areas on their own.
[8] The Monitor will still need to examine whether or not there are any issues with officers using force but not reporting it.  This will be one of the subjects addressed in the upcoming Officer Use of Force Assessment.  *See* Dkt. 221-2 at 8–9; Dkt. 221–3 at 1.

officer performance involving force is consistent with SPD policy.  So long as all of FIT's policies and procedures are codified in the FIT Manual, required by paragraph 115 of the Consent Decree and that is expected to be filed imminently with the Court, and are not diminished by any provisions of a labor contract, the Monitor believes that FIT will be able to maintain compliance with those requirements of paragraph 118 of the Consent Decree.[9]  **Importantly, the quality of FIT's performance makes its continued location within SPD's Bureau of Compliance and Professional Standards consistent with the objectives of the Consent Decree.**

- For intermediate-level, Type II force, the investigation of the force incident is conducted by a sergeant and reviewed by the chain of command.  The sergeant's role is to be an "impartial fact-finder"[10], conduct a thorough investigation, and complete a Use of Force Report that summarizes the incident, documents evidence, and presents witness accounts of the force.[11]  A lieutenant and captain must review the investigation and the sergeant's report both to ensure that the investigation was thorough and to make express findings as to whether the force was consistent or inconsistent with SPD policy.

  **Sergeant investigations of Type II force are not yet where they need to be.**  Indeed, under half (45 percent) of use of force investigative files (commonly referred to as "packets") included all material evidence.  Likewise, in too many instances, sergeants are not yet preparing an investigative report or summary that can provide the chain of command with "a complete understanding of the incident from beginning to end."[12]  Some basic investigative deficiencies leave the investigation less thorough, fair, and objective than they must be.  Sergeants are not uniformly canvassing for all witnesses, impartially and thoroughly interviewing those witnesses, pursuing all relevant lines of investigative inquiry, securing adequate statements from witness officers, and ensuring that they are sufficiently uninvolved in the incident in the first instance to conduct an impartial investigation.

  **Lieutenants and captains are likewise not yet identifying and addressing deficiencies in sergeant investigations of Type II force.**  In some 45 percent of cases, lieutenants failed to address investigatory issues that the sergeant's investigation left outstanding.  Although captain reviews were slightly better than lieutenant reviews, the captain also failed to spot and resolve thoroughness issues more than half (48 percent) of the time.  In far too many instances, supervisors failed to determine whether the force was consistent with SPD policy.  Because "every supervisor in the chain of command is responsible to assure the accuracy and completeness of the Investigation Reports completed by supervisors,"[13] SPD's lieutenants and captains must assist sergeants in generating high-quality Type II investigations and reports.

- For low-level, Type I force, a sergeant reviews the force.  The Monitoring Team found that a majority of those reviews covered the bases – evaluating all relevant evidence and assessing the incident in terms of SPD policy and training.  Importantly, reviewers found that the use of force packet included all relevant evidence in a substantial majority (86 percent) of cases.

---

[9] Issues that need to be explored with the Parties and Department going forward include mechanisms for ensuring that the subject officer in a Type III use of force or officer-involved shooting is shielded from undue influence or contamination prior to providing his or her account of what happened. In other jurisdictions, pre-interview viewing of video of an incident and conversation (apart from bare minimum facts) with anyone other than the officer's lawyer or union representative has been identified as reducing the integrity of the interview and investigatory process.  Likewise, the full and complete audio and/or video recording of the subject officer's statements and questioning can help to ensure that interviews are complete, thorough, and fair – without leading questions or suggested answers.
[10] 2014 SPD Manual Section 8.300-POL-3(3), Dkt. 107-3 at 6.
[11] 2014 SPD Manual Section 8.300-TSK-5(19), Dkt. 107-3 at 13.
[12] Dkt. 3-1 ¶ 106(a).
[13] *Id.* ¶ 109.

Lieutenants and captains review the sergeant's evaluation of Type I force. They are doing an adequate job of reviewing such force – but barely. They often, but not always, identify issues or inconsistencies in the officer reporting or sergeant's reviews. Further, some findings as to whether the force was consistent with SPD policy or raised any tactical or training issues were overly perfunctory ("Officer's actions were in compliance with training and policy" or "This is a type 1 use of force investigation" or "This investigation is complete"). Although the Monitoring Team is acutely aware of the workloads and daily demand on SPD lieutenants and captains, they need to "show their work" to at least some extent for the basis of the determinations that force is consistent or inconsistent with SPD policy. Nevertheless, **the Monitor finds that SPD's review of Type I force is in initial compliance with paragraph 102 of the Consent Decree**, although some work remains to ensure that compliance is maintained.

That SPD's performance is in initial compliance with several of the areas addressed in this assessment should be cause for pride in the SPD, from the rank and file officers on the beat protecting the citizens of Seattle, all the way through to the top levels of management.

Still, **much work remains.** With respect to this assessment, the quality and integrity of Type II force investigations must improve substantially. To this end, SPD has already begun discussions with the Parties about mechanisms for quickly strengthening sergeant investigations and chain of command review of Type II force. One proposal that Chief Kathleen O'Toole has advanced is to create Precinct Operations Sergeants to review Type II investigations for completeness, thoroughness, and objectivity and to send the investigation back to sergeants where there are issues. SPD recommends the approach because it would preserve the continuity of front-line supervision and investigation – but also ensure an objective and thorough review. Although the Monitor will render technical assistance, if asked, on that specific proposal, it is, at the least, strong evidence that SPD and the Parties are dedicated to making pragmatic reforms based on strong, systematic, real-world evidence. The recent updates to the force-related policies approved by the Court in July 2015[14] also provide for an additional review by the Force Review Unit, which should also help ensure accuracy, completeness, and consistency of Type II investigations.

The Monitoring Team is or will soon be evaluating where the Department is across a host of other critical areas. The Monitoring Team is currently assessing the performance of the Force Review Board, including the quality of its review of Type III and officer-involved shootings. The Monitor will file the assessment with the Court by November 9, 2015. Assessments on several other important topics, including the quality of OPA investigations, SPD supervision, stops and detentions, crisis intervention, and officer use of force generally will be filed over the next six months. Collectively, these assessments will cover every area of the Consent Decree.

---

[14] *See* Dkt. 225.

# Introduction to the Monitor's Systemic Assessments

This report marks the first report on 4 of what will ultimately be 15 "systemic assessments" of SPD's progress toward complying with the major areas of the Consent Decree.[15]   For "the Parties, Monitor, and Seattle community . . . to have confidence that the requirements of the Consent Decree are being carried out in practice—not merely on paper," the performance of the Department and its officers must be assessed across a material span of time and number of incidents.[16]   The assessments will more formally gauge whether SPD is where it needs to be in complying with the Decree.

The Monitoring Team calls these evaluations "systemic" because their focus is on "whether the Department has the systems, policies, structures, and culture in place" that the Consent Decree contemplates.[17]   Neither these assessments nor the Monitoring Team will demand that "SPD is uniformly perfect at all times . . . ."[18]   It is an unfortunate fact of any professional organization that employees "might from time to time perform poorly" or "make mistakes or bad decisions."[19]   The Consent Decree indicates, however, that "[n]oncompliance with mere technicalities, or temporary or isolated failure to comply during a period of otherwise sustained compliance, will not constitute [a] failure to maintain full and effective compliance."[20]

As ordered by Judge Robart, the Monitor will, at the same time, insist that there is clear evidence that the various requirements of the Consent Decree are in fact "being carried out in practice"[21] and are sufficiently manifest throughout the Department and across Seattle's diverse communities.   "Full and effective compliance" requires clear, sustained evidence that SPD is where it needs to be not just in a few instances or temporarily across some of the Consent Decree's provisions – but that it has reached and maintained the appropriate outcomes and compliance with the whole of the Consent Decree, that the reforms are "baked in," and that SPD has reset its culture and relationship with all the diverse communities it serves, particularly the African-American community.   Our examination of individual cases or data will therefore be done with an eye toward determining what those individual instances say, in the aggregate and overall, about the performance of SPD and its officers.

The assessments that will be reported to the Court in the coming months "may be quantitative, qualitative, or contain elements of both."[22]   To ensure that the assessments are independent, objective, fair, and consistent with best practices, they will always entail work that the Monitor and his Team, consistent with their duty to the Court, conduct themselves.   They will also be informed by the outside endeavors of the Parties, other stakeholders, and outside groups material to the scope of the particular inquiry at hand so long as that work constitutes the kind of "sound evidence of the quality demanded in any other federal court proceeding."[23]

---

[15] *See generally* Dkt. 221; Dkt. 195 at 7–9; Fifth Semiannual Report at 11.
[16] Dkt. 195 at 7.
[17] Fifth Semiannual Report at 9.
[18] Fourth Semiannual Report at 11.
[19] Fifth Semiannual Report at 9.
[20] Dkt. 3-1 ¶ 184.
[21] *Id.*
[22] Fourth Semiannual Report at 12.
[23] *Id.; accord* Dkt. 3-1 ¶ 190 ("In conducting these outcome assessments, the Monitor may use any relevant data collected and maintained by SPD and OPA, provided . . . that this data is reasonably reliable, complete, and relevant . . . .").

Where the results of one of the Monitor's independent assessments indicate that SPD has not yet reached "initial compliance" with a particular area of the Consent Decree, the reports on those assessments will typically make specific recommendations on what the Department can do to get to where it needs to be. Even where the Monitor believes that SPD is performing well, the reports may still outline recommendations for improvements that can further strengthen the Consent Decree's systems and objectives.

These assessments will often, although not always, situate the Monitor's findings in terms of numbers or descriptive statistics. As this report elsewhere notes, the use of quantitative-qualitative, hybrid methodological designs are an important part of social science research and systems analysis.

However, all readers must be cautioned to note that the general numbers themselves may not tell the entire story. There is no single threshold number that SPD must reach across each and every area that represents initial compliance. For example, an assessment might judge 70 percent of a given type of investigative report as sufficiently thorough and accurate as consistent with compliance – because the quality of the remaining 30 percent of cases leaving room for improvement but being relatively close to where it should be. On the other hand, even if 90 percent of reports were judged to be sufficiently thorough and accurate, there still might not be initial compliance with the relevant provision of the Consent Decree because the remaining 10 percent of investigative reports were wholly inadequate, disturbingly biased, or insufficiently documented. Thus, initial compliance with provisions of the Consent Decree depends not just on the number of percent of instances where SPD is adhering to requirements but also on the quality or nature of those instances where SPD is falling short.

Police departments change because fundamental, day-to-day processes of the institution are transformed into mechanisms that allow those departments to ensure effective and constitutional policing. Indeed, it was the lack of sound internal systems for reporting and reviewing force, tracking information about officer performance, and promoting high-quality supervision that were the basic drivers of the 2011 Justice Department findings.

As the Monitor has previously noted:

> The true test has been and will remain whether SPD has the systems, policies, structures, and culture in place to manage for itself the risk of unconstitutional policing – and whether, through those systems, SPD holds officers and supervisors rigorously accountable through fair and transparent processes, critically analyzes officer and departmental performance based on unbiased evidence and objective data, and proactively identifies and seriously addresses performance issues and trends.[24]

These systemic assessments focus on progress across both a substantial period and a significant number and scope of discrete cases, incidents, or instances. Determinations that the Department has gotten to where it needs to be on a given front or with a particular part of a Consent-Decree-required process is not a certification that everything is entirely perfect along that dimension, that SPD can ease its efforts in the area, or that the Monitor did not find anything during the evaluation that suggested a need for continued improvement.

Instead, the Monitor's determination of "initial compliance" in a given area or for particular Consent Decree provisions means that SPD's performance over a material time period and across incidents suggests that the Department has reached a level of performance in that defined area that is consistent with complying with the

---

[24] Fifth Semiannual Report at 9.

terms of the Court-enforced Settlement Agreement. Likewise, it means that, so long as that performance improves yet further or remains at the level it has been, SPD is in a position, at least for those elements of the Consent Decree referenced, that is consistent with where it needs to be.

# Part 1.
# Overview of Force Reporting & Investigations and Assessment Methodology

## I.   An Overview of Force Reporting & Investigations

A foundational objective of the Consent Decree is that the use of force by SPD officers be uniformly reported by the officers who use it and thoroughly reviewed by supervisors.  For any police department to be able to minimize the risk of unconstitutional force and for the community to be able to have confidence that the department is affirmatively taking officer encounters involving force seriously, it must know when officers use force.  It must also reliably develop an objective and complete account of what happened – from the moment that an officer was dispatched or initiated the encounter until after force was applied and the incident concluded.

In his Fourth Semiannual Report in December 2014, the Monitor distilled – from the many specific and technical Consent Decree provisions – what SPD will look like and how it will function when SPD has reached "full and effective compliance."[25]  That description noted that, to be in compliance, SPD must "ha[ve] in place and actively utilize[] real, rigorous, and fair mechanisms of critical self-analysis to hold officers accountable for their performance and to assist the Department in continually learning and affirmatively improving."[26]  It indicated that the Department will have gotten to that state when, first and foremost:

> Uses of force are found to be reported; rigorously documented; thoroughly, completely, and objectively investigated (whether by the Force Investigation Team or the chain of command); and objectively, critically, and timely reviewed.  The Department has mechanisms in place that identify any deficiencies in the rigor, quality, fairness, and timeliness of such reporting, investigation, and review.[27]

Many of the other accountability systems that the Department must actively utilize – including the Force Review Board, a fair and comprehensive officer discipline system, the Early Intervention System, and others – rely, at least in part, on the accurate reporting and comprehensive review of force.

This chapter provides an overview of the force reporting and investigation requirements of the Consent Decree and of the SPD policies that have been implemented to comply with the Decree and further its objectives.

## A.  How the Consent Decree Addresses Force Investigation & Reporting

The Department of Justice's 2011 investigation of the SPD identified a number of "deficiencies contributing to [a] pattern or practice of excessive force."[28]  One foundational deficiency was the failure of SPD officers to uniformly and accurately report when they used force.  In numerous instances, force was simply not reported

---

[25] Fourth Semiannual Report at 7–12.
[26] *Id.* at 8–9.
[27] *Id.* at 9.
[28] 2011 Findings Letter at 15 (cited in sentence case).

whatsoever – leaving it subject to no departmental scrutiny.  In many, officers were even "identified as using force in other officers' use of force statements, but were omitted from the summary portion of the use of force packet" – leading SPD to "not track these officers' uses of force."[29]  Further, half of OPA investigations relating to complaints of force "did not have an accompanying use of force report, despite the clear application of some level of force."[30]  Even where force had been reported, officer statements were often deficient and regularly used inappropriately boilerplate language.[31]  Finally, the standard for reportable force was too high, allowing officers not to report pushing, non-injurious punches, shoving, and pointing of firearms.

The DOJ investigation concluded that SPD's then-vague policy requirements, training deficiencies, and supervisory failures were leaving numerous instances in which officers used sometimes serious force unreviewed, unscrutinized, and untracked.

Even when officers reported force, that "reporting exist[ed] . . . on paper stuffed, unreviewed, in file cabinets . . . . ."[32]  SPD supervisors "fail[ed] to supervise patrol officers' use of force . . . at every level, from the first line supervisor's investigation and review, to the chain of command's secondary review of that investigation, to the final review by command staff."[33]  There was inadequate on-scene supervisory investigation of force, insufficient analysis of use of force incidents, and inadequate oversight and review of force investigations.

These investigatory inadequacies resulted in a system where, of 1,230 use of force reports that were actually made during a two-and-a-quarter-year period, "only *five* use of force packets were referred *at any level* for further review," or just 0.4% of all force reports.[34]

The Consent Decree requires that – rather than being ignored or addressed superficially – all uses of force be reported, investigated, and reviewed.[35]  It sets forth express requirements for and "different levels of departmental reporting and review that become more rigorous depending on the type of the force used."[36]

Accordingly, "[t]he first order of business" once the Consent Decree was entered between the City and the U.S. Department of Justice "was the formulation of new Use of Force policies" that addressed the requirements of the Consent Decree and conformed with federal law.[37]

After "marathon negotiating sessions . . . between the parties" and "substantial input from SPD officers and the community," including the CPC, the Monitor considered whether the proposed force-related policies were consistent with the requirements and terms of the Consent Decree and federal law.[38]  The Monitor determined that they were and recommended approval.[39]  The Court approved the policies in late December 2013.[40]

The policies "became effective on January 1, [2014], with officers receiving in-class training soon thereafter" on the policies, including on the policies' rigorous new reporting requirements and investigative processes.[41]

---

[29] *Id.*
[30] *Id.*
[31] *Id.*
[32] Fourth Semiannual Report at 26.
[33] 2011 Findings Letter at 17.
[34] *Id.* at 21 (emphasis added).
[35] Dkt. 3-1 ¶¶ 72, 91.
[36] *Id.* ¶ 93; *see id.* ¶¶ 100–02 (Type I force requirements), ¶¶ 103–11 (Type II requirements), ¶¶ 112–18 (Type III requirements).
[37] Dkt. 107 at 2–3.
[38] Dkt. 204 at 5 (quoting Dkt. 107 at 1).
[39] Dkt. 107.
[40] Dkt. 115 at 3.
[41] Dkt. 204 at 5–6.

As discussed later in this report, the force reports and investigations that the Monitoring Team reviewed for this assessment covered the period of July 1, 2014 through December 31, 2014. Consequently, the assessments covered here evaluate SPD's force reporting and investigations in light of the originally-approved, 2014 force-related policies – and not the 2015 updates recently approved by the Court.[42]

However, the changes memorialized in the updated policies were "limited," especially in the areas of force reporting and investigation.[43] Accordingly, when this and other sections address whether the requirements of 2014 SPD Police Manual Section 8.300 and related sections are effective in practice, it is unlikely that those assessments would be materially different if analyzed through the re-named but substantially similar Section 8.400 in the recently approved updates. Likewise, when this report addresses the requirements of 2014 SPD Manual Section 8.400 – addressing the supervisory review of force reports and investigations – the requirements addressed track closely the requirements of 2015 SPD Manual Section 8.500 with respect to supervisory review prior to the Force Review Board ("FRB"). The Monitoring Team will formally evaluate the FRB in a separate, forthcoming assessment.[44]

Likewise, SPD reports that, since December, when the Department began maintaining general offense data in aggregate form, 53,714 total general offense reports have been issued.[45] Of those 53,714 reports, 665, or approximately 1 percent, involved reportable force. The Monitoring Team will formally assess the Department's use of force – both quantitatively and qualitatively – in separate, upcoming assessments.

## B.  The Categorization of Force by Type

Under SPD's new force-related policies, and consistent with the Consent Decree, force is "any physical coercion by an officer in performance of official duties."[46] The policies, again consistent with the Decree, set forth "different levels of departmental reporting and review that become more rigorous depending on the type of the force used."[47]

The force categories account for the nature of the force used, the outcome of the actual force used, and – regardless of the actual outcome – the risks that can reasonably be expected to be associated with the application of the force.[48] More specifically, the Consent Decree's categorization of force is based on several factors:

- Degree of injury caused;
- Potential of the technique or weapon to cause injury;
- Degree of pain experienced [by the subject];
- Degree of disability experienced by the subject;
- Complaint by subject;
- Degree of restraint of the subject;
- Impairment of the functioning of any organ;
- Duration of the force; and
- Physical vulnerability of the subject.[49]

---

[42] See id. (updated policies); Dkt. 225 (approving updated policies).
[43] Dkt. 204 at 14.
[44] See Dkt. 221-3 at 7.
[45] This number does not include police contacts where no general offense report is necessary.
[46] Dkt. 107-1 at 5; Dkt. 3-1 ¶ 16.
[47] Dkt. 3-1 ¶ 93; see id. ¶¶ 100–02 (Type I force requirements), ¶¶ 103–11 (Type II requirements), ¶¶ 112–18 (Type III requirements).
[48] See id. ¶ 92 (levels of force "correspond to the amount of force used and/or the outcome of the force").
[49] See id.

## Figure 1: Use of Force Categories
*2014 SPD Manual, 8.300-POL-1*

| Force | Threshold | Examples | Components of Investigation |
|---|---|---|---|
| *De Minimus* | Physical interaction meant to separate, guide, and/or control that does not cause pain or injury | – Using hands or equipment to stop, push back, separate or escort, the use of compliance holds without the use of sufficient force to cause pain, and unresisted handcuffing without transient pain | No investigation or reporting required |
| **Type I** | – Transient Pain<br>– Disorientation<br>– Aiming of Firearm or Beanbag Shotgun at a Subject | – "Soft" takedowns (controlled placement)<br>– Open or empty hand strike or other disorientation techniques<br>– Wrist lock with sufficient force to cause pain or complaint of pain | • Sergeant Screening In-person (Unless Impractical)<br>• Use-of-Force Report |
| **Type II** | – Physical Injury (Greater than temporary pain/redness)<br>– Reasonably expected to cause physical injury<br>– Complaint of injury<br>– Use of CEW (TASER)<br>– Use of OC Spray<br>– Use of Impact Weapon causing less than a Type III injury<br>– Use of Beanbag Shotgun causing less than a Type III injury<br>– K9 Deployment with Injury or Complaint of Injury causing less than a Type III injury<br>– Vehicle<br>– PIT<br>– Hobble Restraint | – Abrasion<br>– Bruising<br>– "Hard strike"<br>– Hard takedown<br>– Kick | • Sergeant Screening at the Scene<br>• Use-of-Force Statement<br>• Witness Statements<br>• Collection of Evidence<br>• Review of Video<br>• UOFRB Review |
| **Type III** | – Great Bodily Harm<br>– Substantial Bodily Harm<br>– Deadly Force<br>– Loss of Consciousness<br>– Neck and Carotid holds<br>– Criminal Conduct by Officer(s)<br>– Serious Misconduct by Officer(s)<br>– Use of Stop Sticks Against<br>– a Motorcycle<br>– Impact Weapon Strike to the Head | – Broken arm<br>– Closed head injury | • Sergeant Screening at the Scene<br>• FIT response & Investigation<br>• UOFRB Review |

Force that must now be reported is categorized into three Types.  Type I force is "low-level physical force."[50] Such force "causes transitory pain, the complaint of transitory pain, disorientation, or" involves an officer "intentionally pointing a firearm or bean bag shotgun" at a subject.[51]

Type II force is "[f]orce that causes or is reasonably expected to cause physical injury greater than transitory pain but less than great or substantial bodily harm."[52]  The use of a number of less-lethal force tools – including

---

[50] *Id.* ¶ 64
[51] Dkt. 107-1 at 5.
[52] *Id.*

a "CEW [Taser], OC spray [pepper spray], impact weapon [such as a baton], bean bag shotgun, deployment of K-9 with injury or complaint of injury causing less than Type III injury, vehicle, [or] hobble restraint" – is also Type II force.[53]

Type III force encompasses the most serious and severe force.[54]  It is "[f]orce that causes or is reasonably expected to cause[] great bodily harm, substantial bodily harm, loss of consciousness or death, and/or the use of neck and carotid holds, stop sticks for motorcycles, [and] impact weapon strikes to the head."[55]

**Figure 1** provides a chart contained within the SPD Manual that outlines the definitional thresholds, and selected examples, for each force type.[56]

## C.  Reporting Force

The Monitor has previously emphasized the importance of the SPD's new force reporting provisions:

> The reporting requirements . . . are not merely bureaucratic.  The Department simply cannot adequately address the risk of unconstitutionally excessive force if it does not know about every instance in which an officer employed force.[57]

Under both the Consent Decree and the SPD's use of force policies, all uses of force above *de minimis* force are reportable.  Thus, whenever an officer uses any Type of force, that officer (commonly referred to as the "involved officer") has a duty to report it, and the Department and its supervisors have an obligation to rigorously review it.

An exception to the general requirement that force be reported is when force is "*de minimis*."  *De minimis* force is a "[p]hysical interaction meant to separate[,] guide, and/or control without the use of control techniques that are intended to or are reasonably likely to cause pain or injury."[58]  *De minimis* force includes, for instance:

- An officer using his or her hands or equipment to "stop, push back, separate, or escort a person without causing any pain" to that person and in a manner that would not have reasonably caused any pain generally.[59]

- The use of control hold techniques in a manner that is not reasonably likely to cause any pain and in fact does not cause the subject pain.[60]

The concept of *de minimis* force reflects the recognition by many courts that some types of physical contact "are just too minor to constitute a 'seizure' for Fourth Amendment purposes without doing violence to that word.'"[61]  In short, the Consent Decree and SPD policies recognize that officers may in some instances need to

---

[53] *Id.*
[54] Dkt. 3-1 at ¶ 66 ("'Type III use of force' means all uses of force by a SPD officer that have the likelihood of significant injuries to a subject including (1) any use of 'Lethal Force;' and (2) any use of force that results in or could reasonably be expected to result in 'Great Bodily Harm' or 'Substantial Bodily Harm.'").
[55] Dkt. 107-1 at 5.
[56] 2014 SPD Manual Section 8.300-POL-1(2), Dkt. 107-3 at 3.
[57] Fourth Semiannual Report at 28.
[58] Dkt. 107-1 at 5.
[59] *Id.*
[60] *Id.*
[61] *Acevedo v. Canterbury*, 457 F.3d 721, 725 (7th Cir. 2006); *accord Graham v. Connor*, 490 U.S. 386, 396 (1989) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment."); *Bingham v. City of Manhattan*, 341 F.3d 939, 947 (9th Cir. 2003) (indicating that some Fourth Amendment violations can be, by their nature, *de minimis*); *Watts v. County of Sacramento* 1111, 1119–20 (E.D. Cal. 1999), *rev'd on other grounds*, 256 F.3d 886 (9th Cir. 2001) (lifting suspects by handcuffs was not *de minimis* force as a matter

use physical coercion that would not be reasonably like to cause pain and, in fact, did not cause the subject any pain or order to effectuate lawful objectives.

Thus, whenever an officer's use of force causes pain or injury, causes a subject to complain of pain or injury, would reasonably be likely to result in pain or injury (regardless of whether it in fact does in a given situation), or otherwise involves more substantial coercion (such as pointing a firearm at a subject). the force must be reported under SPD policy.

Under SPD policy, reporting entails notifying a supervisor of a use of force and documenting the force used.

### 1.  *Supervisor Notification & Response*

When an officer has used reportable force or has witnessed other officers using force, officers must immediately notify a supervisor verbally.[62]  In the typical instance, when an officer uses reportable force while on-duty, the officer must "call for an on-duty sergeant via radio."[63]  Sergeants "must screen uses of reportable force in-person with the involved officer and the subject . . . prior to the subject being booked or released."[64]

It is the sergeant who, upon arriving at the scene, classifies the force as a Type I, II, or III use of force.[65]  The sergeant may always "request a higher level of investigation for a given force incident" if the nature of the force or of the incident suggests that a more detailed or substantial investigation would be useful.[66]

### 2.  *Documenting the Force*

After the force has been classified, the officers who used the force must document that force.  Officers have a general duty to "thoroughly document all reportable uses of force to the best of their ability, including a description of each force application" for all force types, whether more or less serious.[67]

The Consent Decree sets forth more minimal reporting requirements for Type I force.  For this low-level force, it requires that officers document, "in a searchable and retrievable format": (1) the officer's account of his or her actions in using force; (2) the suspect's actions that led to the application of force; (3) the officer's identity; (4) the identities of civilian and/or officer witnesses; and (5) the name of the supervisor who screened the incident.[68]  These requirements are fully reflected in the approved 2014 policies relating to Type I force.[69]

The reporting requirements are more significant for more serious or severe force.  For Type II and Type III force, the Consent Decree requires that an officer use "descriptive language" to complete an officer statement that includes: (1) "the reason for the initial police presence"; (2) "a detailed description of the incident . . . "; (3)

---

of law).  It must be noted that, unlike some courts that suggest that no constitutional violation can be sustained unless a subject suffers an injury greater than a *de minimis* injury, SPD policy presupposes that force may not be appropriate even when the subject suffered no injury simply because the type of force would have been reasonably likely to result in pain or injury or involves a particularly severe physical coercion or clear seizure.  *See, e.g.*, Ian A. Mance, "Power Down: Tasers, the Fourth Amendment, and Police Accountability in the Fourth Circuit" 91 N.C.L. Rev. 606 (2013) (discussing potential problems with *de minimis* injury standard of some courts in the Fourth Amendment area).

[62] 2014 SPD Manual Section 8.300-POL-1(2), Dkt. 107-3 at 3.
[63] 2014 SPD Manual Section 8.300-POL-1(2)(a), Dkt. 107-3 at 3.
[64] 2014 SPD Manual Section 8.300-POL-2(1), *id.* at 5.  However, "[i]f the subject is free to leave, the detention will not be extended to facilitate the screening process . . . . " *Id.*; 2014 SPD Manual Section 8.300-POL-2(6), *id.* at 5.
[65] 2014 SPD Manual Section 8.300-POL-1(2), Dkt. 107-3 at 3–4.
[66] 2014 SPD Manual Section 8.300-POL-1(3), Dkt. 107-3 at 4.
[67] 2014 SPD Manual Section 8.300-POL-1(1), Dkt. 107-3 at 2.
[68] Dkt. 3-1 ¶ 100.
[69] 2014 SPD Manual Section 8.300-TSK-1(4), Dkt. 107-3 at 9 (listing involved officers' reporting responsibilities and requirements for Type I force).

"a detailed description of the force used by the officer giving the statement"; (4) "detailed" witness officer statements; (5) "a detailed description of any apparent injury to the suspect, any complaint of injury, or the lack of injury, including information regarding medical aid or medical evaluation provided."[70] These requirements are fully reflected in the approved 2014 policies relating to Type II force.[71]  For Type III force, SPD policy requires that the officer "[p]articipate[] in an audio-taped Type III Use-of-Force interview" with FIT, with the interview needing to include, among other things, the Consent-Decree-required elements.[72]

The officer who applied the force fulfills the requirements by completing a Use of Force Report.  Since the Spring of 2014, SPD officers complete the Report in BlueTeam.  BlueTeam is a web-based interface that feeds information into the more comprehensive IAPro computer application, which is "the Department's interim officer performance database system."[73]  In look, feel, and user interface, "many officers [have] remark[ed] that navigating the system is no more complicated than purchasing a book on Amazon.com or buying a movie ticket online."[74]

The Use of Force Report contains two components: (1) standardized collection of basic information, and (2) a narrative statement by the involved officer.  For uniform data collection purposes, officers provide basic information – often by selecting a value from a drop-down menu or click boxes to select applicable variables – about the incident, the involved officer, the involved subject, civilian and officer witnesses, the force application, and subject and officer injuries.  By selecting common variables from a standardized list, this data can be aggregated, analyzed, and searched to identify trends in officer and departmental performance later.  Because IAPro, like any "off-the-shelf" database solution, is minimally customizable, one of its "built-in limits and constraints" is that SPD cannot easily change what information the Report collects.[75]

Although the Parties and Monitor worked closely with the Department to ensure that the Report collects as much of the material information about force incidents as possible, no policy sets forth what data or information the Report must capture.  Instead, SPD policy imposes some minimal requirements with respect to the officer's free-form narrative statement.  This contrasts with more particular requirements associated with *Terry* stop reporting, for instance.[76]  The Monitoring Team will revisit the issue after analyzing the data as part of our systemic assessment on Office Use of Force, which will be filed with the Court in January 2016.

Additionally, and equally importantly, an officer who has used force completes a narrative statement – describing the incident, subject, and force in the level of detail required by the Consent Decree and the various SPD policies that reflect the requirements for an officer's statement.[77]

The Use of Force Report is the same for all force Types because IAPro and BlueTeam do not currently allow for different forms to be used for different types of force.  Thus, officers who use lower-level, Type I force must provide the same data as officers involved in higher-level, Type III force.  Nonetheless, the Consent Decree and SPD contemplates that officers' Type I statements can be more succinct than Type III statements.  Accordingly, in September 2014 – about two months into the six-month period on which this assessment focuses – SPD Chief

---

[70] Dkt. 3-1 ¶ 103.
[71] 2014 SPD Manual Section 8.300-TSK-3(5), Dkt. 107-3 at 10 (listing involved officers' reporting responsibilities and requirements for Type II force).
[72] 2014 SPD Manual Section 8.300-TSK-6(4), *id.* at 14 (listing involved officers' reporting responsibilities and requirements for Type II force).
[73] Fifth Semiannual Report at 40.
[74] Fourth Semiannual Report at 28.
[75] *Id.* at 63.
[76] *See* 2014 Seattle Police Manual Section 6.220(10), Dkt. 116 at 18.
[77] Dkt. 3-1 ¶¶ 100, 103; 2014 SPD Manual Section 8.300-TSK-1(4), Dkt. 107-3 at 9; 2014 SPD Manual Section 8.300-TSK-3(5), Dkt. 107-3 at 10; 2014 SPD Manual Section 8.300-TSK-6(4), Dkt. 107-3 at 14 (listing involved officers' reporting responsibilities and requirements for Type II force).

Kathleen O'Toole issued a directive that clarified and re-emphasized that the documentation and reporting for Type I uses of force indeed requires less detail than higher-level force.[78]

For Type I and Type II force, officers generally complete this Report at the station immediately or soon after the force incident.  For Type III force, FIT must "conduct☐ in-person interviews of the involved officers."[79]  Although the involved officer narrative in a Type III use of force is therefore the in-person FIT interview, FIT has nonetheless been charged with requiring, as a standing practice, the involved officer to complete the Use of Force Report at the conclusion of the in-person interview.

During the time period addressed here, witness officers also complete brief documentation, and provide written statements, using BlueTeam.

## D.  Investigating Force

Just as reporting requirements differ according to the severity or seriousness of the force applied, the manner that SPD must investigate force is based on the force Type at issue.

### 1.  Type I Force

For lower-level, Type I force, the officer's immediate supervisor – typically, a sergeant – must review the involved officer's force "documentation as soon as practicable."[80]   The sergeant must ensure that the documentation is sufficiently complete and "direct the officer to provide more information, if needed."[81]

Once documentation is sufficient, the sergeant must "[e]valuate☐ the incident for any concerns (tactical, threat assessment, etc.)."[82]  If the sergeant identifies that "serious misconduct may have been involved," the sergeant must contact OPA and consult with FIT about whether the force may need to be reclassified as a more serious Type II or Type III use of force.[83]  Even if the Type I force involved no serious misconduct, the sergeant must "address☐ any concerns" about tactics, training, or performance "with the involved officer and initiate☐ corrective action, as necessary."[84]

Type I force receives several levels of review.  Any reviewer must "address concerns that arise during use-of-force investigations or review" and "refer misconduct, other than minor misconduct" to OPA.[85]  Likewise, any supervisor "may re-classify a use-of-force investigation to a higher level" if warranted.[86]

After reviewing the incident and documentation, and taking any necessary action with the involved officer(s), the sergeant "[f]orwards the report to the lieutenant."[87]  Subsequently, the force "packet" – or the host of reports, investigatory materials, and evidence relating to the use of force incident – is reviewed by the lieutenant, who must send the incident back to the sergeant upon identifying any deficiencies in the

[78] Fourth Semiannual Report at 2 n. 5.
[79] Dkt. 3-1 ¶ 118(g); see 2014 SPD Manual Section 8.300-TSK-6(4), Dkt. 107-3 at 14.
[80] 2014 SPD Manual Section 8.300-POL-2(3), Dkt. 107-3 at 6.
[81] Id.
[82] 2014 SPD Manual Section 8.300-TSK-2(3), Dkt. 107-3 at 9.
[83] Id.
[84] 2014 SPD Manual Section 8.300-TSK-2(4), Dkt. 107-3 at 9.
[85] 2014 SPD Manual Section 8.400-POL-1(8)-(9), Dkt. 107-4 at 3.
[86] Id.
[87] 2014 SPD Manual Section 8.300-TSK-2(8), Dkt. 107-3 at 10.

documentation or the sergeant's review.[88] The lieutenant must "make determinations" about the thoroughness of the Use of Force Report, whether the force was consistent with SPD policy, whether previously-identified concerns were appropriately addressed, and identify any additional concerns.[89] The lieutenant must forward his or her review on to the involved officer's captain within 72 business hours.[90]

The captain must also consider whether the investigation and documentation was thorough and complete, the lieutenant's findings "are supported by a preponderance of evidence," identified concerns were addressed by the sergeant and lieutenant, and any otherwise outstanding concerns are likewise addressed.[91] The captain may send the incident back to the chain of command below for the correction of deficiencies or to address issues not appropriately identified.[92] If, and only if, the Captain signs off on the Type I force is the record of the force, along with supporting documentation and the chain of command reviews, archived permanently in the IAPro performance database system.[93]

### 2.  *Type II Force*

For force that the on-scene, responding sergeant has classified as Type II force, the sergeant conducts the primary investigation of the force.[94] The sergeant must be an "impartial fact-finder and shall not draw conclusions about whether the force was within policy or law."[95] During the investigation, the sergeant must, among other duties: obtain basic information, secure evidence, canvass for and interview civilian witnesses, conduct separate interviews with all officers applying force, review witness officer statements, secure privately-captured video, take photographs of the scene, and review ICV or other SPD-captured video.[96] The supervisor completes a Supervisor's Use of Force Report that summarizes the incident, documents evidence, and presents witness accounts of the force.[97] The investigation must be completed, and the sergeant's report forwarded to the involved officer's lieutenant, within three days.[98]

The lieutenant subsequently reviews the sergeant's report, evaluating the investigation with respect to whether the investigation is thorough and complete; discrepancies, confusion, or lack of relevant information has been addressed; and possible misconduct has been forwarded to OPA.[99] As with Type I force investigations, the lieutenant must "make determinations" about the thoroughness of the Use of Force Report, whether the force was consistent with SPD policy, whether previously-identified concerns were appropriately addressed, and identify any additional concerns.[100] The lieutenant forwards the review to the involved officer's captain within 72 business hours.[101]

Similarly, the captain reviews the investigation and the officer's, sergeant's, and lieutenant's documentation. The captain determines whether it is thorough and complete, the lieutenant's findings "are supported by a preponderance of evidence," identified concerns were addressed by the sergeant and lieutenant, and any

---

[88] 2014 SPD Manual Section 8.400-POL-1(1), Dkt. 107-4 at 2; *id.* POL-1(4), Dkt. 107-4 at 3.
[89] 2014 SPD Manual Section 8.400-POL-1(10), Dkt. 107-4 at 5.
[90] 2014 SPD Manual Section 8.400-POL-1(11), Dkt. 107-4 at 5.
[91] 2014 SPD Manual Section 8.400-POL-1(12), Dkt. 107-4 at 5.
[92] 2014 SPD Manual Section 8.400-POL-1(1), Dkt. 107-4 at 2.
[93] 2014 SPD Manual Section 8.400-POL-1, Dkt. 107-4 at 2.
[94] 2014 SPD Manual Section 8.300-POL-3(2), Dkt. 107-3 at 6.
[95] 2014 SPD Manual Section 8.300-POL-3(3), Dkt. 107-3 at 6.
[96] 2014 SPD Manual Section 8.300-TSK-5, Dkt. 107-3 at 11.
[97] 2014 SPD Manual Section 8.300-TSK-5(19), Dkt. 107-3 at 13.
[98] 2014 SPD Manual Section 8.300-POL-3(4), Dkt. 107-3 at 6.  The lieutenant may approve an extension to this timeline.  *Id.*
[99] 2014 SPD Manual Section 8.300-POL-1, Dkt. 107-3 at 2–7.
[100] 2014 SPD Manual Section 8.400-POL-1(10), Dkt. 107-4 at 5.
[101] 2014 SPD Manual Section 8.400-POL-1(11), Dkt. 107-4 at 5.

otherwise outstanding concerns.[102]  The captain may send the incident back to chain of command below for the correction of deficiencies or to address issues not appropriately identified below.[103]

After the captain makes his or her findings, the force packet is forwarded to the Force Review Unit ("FRU"), which coordinates consideration of force incidents by the Force Review Board ("FRB") – the group that serves as "SPD's hub for internal innovation and critical analysis" of force.[104]  The Monitor is conducting a separate assessment of "the quality, rigor, completeness, and timeliness of Force Review Board reviews and deliberations on force incidents" that it will provide to the Court by November 9, 2015.[105]

For any Type II force, a sergeant may always request that FIT handle the investigation.[106]  If Type II force is referred to FIT, the review process described for Type III force, below, applies.

### 3.  Type III Force

Type III force investigations are conducted by SPD's Force Investigation's Team.[107]  "As the primary investigative unit for serious use of force incidents, FIT plays a crucial, initial role in ensuring that the Department's reviews of force incidents are thorough, objective, and complete."[108]  FIT investigators "receive special training on gathering evidence, interviewing witnesses, and exploring avenues of inquiry not merely relating to the moment that the force was applied"[109] but also on the "events, decisions and tactics that led up to the use of force incident."[110]

FIT rolls to the scene of all officer-involved shootings, Type III force, and Type II force for which the responding sergeant has requested FIT's assistance.  "Once FIT has assumed control of the scene, the patrol sergeant" works at the direction of the FIT Captain.[111]

FIT detective and sergeants conduct the investigation, with the FIT Captain actively monitoring and directing the investigation as necessary.[112]  Relevant evidence is gathered, witnesses are interviewed, and an objective factual record is developed.  During the time period addressed in this assessment, all officers who applied force during a Type III incident were required to participate in an audio-taped interview with FIT.[113]

FIT must present the completed investigation to the Assistant Chief of the Compliance & Professional Standards Bureau within 30 days.[114]  The Assistant Chief's review addresses the completeness and thoroughness of the investigation.[115]  If certified as sufficiently complete and thorough, the investigation is forwarded to the involved officer's chain of command for review.[116]

---

[102] 2014 SPD Manual Section 8.400-POL-1(12), Dkt. 107-4 at 5.
[103] 2014 SPD Manual Section 8.400-POL-1(1), Dkt. 107-4 at 2.
[104] Second Semiannual Report at 20.
[105] Dkt. 221-3 at 7.
[106] 2014 SPD Manual Section 8.300-POL-1(3), Dkt. 107-3 at 4.
[107] 2014 SPD Manual Section 8.300-POL-4(1), Dkt. 107-3 at 7.
[108] Third Semiannual Report at 57.
[109] *Id.*
[110] Dkt. 127 at 52; *accord* 2014 SPD Manual Section 8.300-POL-4(4), Dkt. 107-3 at 7 (noting that "FIT should be staffed with individuals with appropriate expertise and investigative skills to ensure that" FIT investigations allow the FRB "to identify trends or patterns of policy, training, equipment, or tactical deficiencies, or positive lessons related to the use-of-force").
[111] 2014 SPD Manual Section 8.300-POL-4(7)(a), Dkt. 107-3 at 7.
[112] 2014 SPD Manual Section 8.300-TSK-9–10, Dkt. 107-3 at 16–17.
[113] 2014 SPD Manual Section 8.300-POL-4(8), Dkt. 107-3 at 8.
[114] 2014 SPD Manual Section 8.300-POL-4(9), Dkt. 107-3 at 8.
[115] 2014 SPD Manual Section 8.300-POL-4(9), Dkt. 107-3 at 8.
[116] *Id.*; 2014 SPD Manual Section 8.400-POL-1, Dkt. 107-3 at 2.

The chain of command – the involved officer's sergeant, lieutenant, and captain – reviews the investigation in the same manner as Type II force. After the captain has reviewed the force packet, it is sent to the FRU for consideration by the FRB.

## E.  Prior Progress & Prior Evaluations of Force Investigations & Reporting

This report is the first systemic evaluation of force reporting and investigation. That is, it is the first time that the Monitoring Team has systematically evaluated force reports and investigations from across a significant time period – the 6 months from July 1, 2014 through December 31, 2014 – to determine whether the requirements of the Consent Decree have become effective in practice.

This type of assessment could not have been done previously. One reason is that SPD did not get IAPro up and running across the Department in a manner that could "rigorously track use of force and other incidents" and eliminate non-standardized paper reporting and review processes until July 1, 2014.[117] Prior to that time, between the Department's revised force-related policies becoming effective on January 1, 2014 and mid-June 2014, SPD used several different paper-based forms and templates for officers to use to report force and provide statements and for the chain of command to use to complete their investigations and reviews.

Further, FIT's investigative and case management functions only became fully integrated into the computer-based IAPro environment in Spring 2014. Before that time, FIT was actively getting its processes and procedures up and running. Likewise, a "protocol governing the respective rights and obligations of FIT and OPA" at the scene and during the investigations of force incidents was only finalized as of June 2014.[118]

Similarly, although the underlying incidents addressed in the reports and investigations that are assessed here occurred between some 9 and 15 months ago, some time is necessary for the investigation, FIT, or chain of command investigation and review to occur, and for the packet to be completed. Thus, for those incidents that occurred near the end of the studied period – in November and December 2014 – the investigations and chain of command review often lasted into the first quarter of 2015. Accordingly, the Monitoring Team identified force cases for review on March 17, 2015. Production of the voluminous investigative materials in a manner accessible to the Parties and Monitor was completed on May 11, 2015.[119] Accordingly, the July 2014 through December 2014 time period addressed in this report is the earliest feasible time period that the Monitoring Team could address how SPD is doing over a material period of time with respect to the Consent Decree's reporting and investigation requirements.

The Monitoring Team is, however, continually aware of ongoing force investigations. The Team is notified of every FIT roll-out to the scene of Type III force, including officer-involved shootings. Some members of the Team who monitor the Force Review Board on a weekly basis review both FIT and chain of command investigations in order to be able to assess the quality of the Board's deliberations. Those Monitoring Team members who previously reviewed the completed force investigations that the present study evaluated in order to monitor the FRB did not participate in this assessment.

---

[117] Fourth Semiannual Report at 27 ("Since July, officers have been providing critical information about use of force via Blue Team, a simplified, web-based portal that feeds information into the larger, more complicated IAPro database system."); *see* Third Semiannual Report at 35–47, A-1–7 (describing challenges in implementation of IAPro); Second Semiannual Report at 11–12 (noting that Monitoring Team could not analyze the Department's use of force data and other related practices "until: (1) the SPD's interim information database system, IAPro, is both technically and practically operational; and (2) an audit of use of force forms completed by officers indicates far fewer reporting gaps . . . .").

[118] Third Semiannual Report at 75.

[119] Dkt. 221 ("In some instances, the processes necessary for the Parties and Monitor to work together to identify a sample of investigations for review and to produce and transmit associated paper, image, video, and audio files of those investigations has been time-and labor-intensive.").

Nonetheless, this ongoing familiarity with FIT's investigations has led the Monitoring Team to evaluate FIT's progress in prior semiannual reports. In December 2013, the Parties and Monitor were still "discussing the use of a dedicated Force Investigation Team" and how it would function.[120]

The Third Semiannual in June 2014 report described "[t]he creation and rollout of FIT [a]s a significant milestone and a major shift in the Department's approach to conducting internal, administrative investigations."[121] It noted some problems with some basic investigative techniques, including the use of leading questions and the failure to ask obvious follow-ups or to "pursue[] lines of inquiry that answers have clearly suggested" in interviews.[122] It noted that FIT needed to "use necessary safeguards to ensure the basic integrity of the investigatory process" including securing a recorded interview from involved officers as soon as possible, keeping involved and witness officers separated until being interviewed, and interviewing officers prior to the officer viewing any captured video of the incident.[123]

The report also emphasized that FIT needed to permit OPA with access to the scene of a force incident, the ability to observe officer interviews and pass along questions to be asked to FIT investigators, and the ability to "be present at all witness interviews."[124] It reported that SPD, the Parties, and the Monitor were close to agreeing on a protocol that would guide the relationship between FIT and OPA (the "FIT-OPA Protocol") so that both entities could concurrently execute their important functions. Finally, it noted that FIT would be housed within the Bureau of Compliance and Professional Standards until December 2014, when the Parties and Monitor would evaluate how well it was doing there.

In the Fall of 2014, the Department circulated two directives to clarify expectations relating to the reporting and review of Type I force. A September directive clarified that only "drawing a firearm, or holding a firearm in the 'sul' or 'low ready position' is not reportable force"; and that the "complaint of pain" from handcuffing with "no apparent injury" requires only a "brief narrative entry" on the force form rather than an extended discussion; that "only brief narrative statements are required" of officers on Type I force reports; that "witness officer statements are not required" for Type I force; and that the chain of command need not watch ICV video of Type I force.[125] Another directive emphasized that sergeant review of Type I force should be a "brief summary" and provide approval or disapproval of the officer's performance.[126] Likewise, that directive reiterated that "[l]ieutenants and captains should assess the quality of the sergeant's review and briefly indicate why the approval of the force is warranted."[127]

In the Fourth Semiannual Report in December 2014, the Monitoring Team reported that "[t]he quality and rigor of FIT's investigations have generally continued to improve."[128] Their investigations were "more objective, thorough, and rigorous than investigations conducted even six or twelve months ago."[129] Consequently, "the rigor and depth of an average FIT investigation represents a sea change from the perfunctory investigations that the DOJ found to be the norm in its analysis in 2011."[130] It outlined the important provisions of the FIT-OPA Protocol.[131] Finally, the Report noted that the Parties and Monitor

---

[120] Second Semiannual Report at 36.
[121] Third Semiannual Report at 58.
[122] *Id.* at 59.
[123] *Id.* at 59–60.
[124] *Id.* at 60.
[125] SPD Directive No. 14-00038 (Sep. 26, 2014).
[126] SPD Directive No. 14-00045 (Oct. 24, 2014).
[127] *Id.*
[128] Fourth Semiannual Report at 33.
[129] *Id.*
[130] *Id.*
[131] *Id.* at 34–35.

"agreed that FIT should remain within the Department□ . . . . for another six months" until "a final determination as to its ultimate location" could be made.[132]

Most recently, in June 2015's Fifth Semiannual Report, the Monitor again found that FIT "investigators are generally doing a better job of covering all the bases in a typical force investigation . . . ."[133]  However, the report found ongoing concerns with the use of "inappropriately leading and suggestive questions."[134]  It also outlined "concern[s] about the potential lack of objectivity during some FIT presentations to the FRB."[135]

So that final determination as to whether FIT should permanently remain within SPD's Bureau of Compliance and Professional Standards could be informed by a systematic and systemic assessment of FIT's performance over time, the Court-approved Updated Third-Year Monitoring Plan provided until September 24, 2015 for this determination.[136]

Accordingly, one of the tasks of this report is to outline the Monitor's views with respect to whether FIT has "performed satisfactorily in Professional Standards" or whether FIT should "be transferred to OPA" or some other location.[137]

The Monitor has not substantially addressed the quality of non-FIT, chain of command investigations in prior reports.[138]

## II.  Assessment Methodology

The methodology used by the Monitoring Team, and summarized here, is consistent with accepted best practices for evaluating use of force reports and investigations employed to evaluate use of force reports and investigations in other jurisdictions.[139]  Dr. Joseph Doherty, the Monitoring Team's lead social science and statistics expert, worked closely and transparently with the City, SPD, and DOJ on the study's design.[140]  Several members of the Monitoring Team collaborated on the creation of an evaluative instrument to assess force case files.  The methodology was reviewed and agreed to by both the Department of Justice and the City of Seattle.

---

[132] *Id.* at 36.
[133] Fifth Semiannual Report at 21.
[134] *Id.* at 22.
[135] *Id.* at 23.
[136] Dkt. 221-2 at 4.
[137] *Id.*
[138] *See* Fourth Semiannual Report at 31 (previewing the present assessment of Type I and Type II chain of command investigations for consideration of whether "they are as thorough, objective, and complete as SPD's policies require them to be").
[139] *See, e.g.*, Denise Rodriguez King, et al, Community Oriented Policing Services (COPS) Office, U.S. Department of Justice, *Collaborative Reform Model: A Review of Use of Force Policies, Processes, and Practices in the Spokane Police Department* (2014) at 9, 12 (describing random sampling of use of force reports for analysis "using a 95 percent confidence level and a confidence interval of 5 percent"); George Fachner & Steven Carter, *Collaborative Reform Initiative: An Assessment of Deadly Force in the Philadelphia Police Department*, Community Oriented Policing Services (COPS) Office, U.S. Department of Justice (2015) at 16 (describing "investigative quality evaluation" of officer-involved shootings of "randomly selected . . . case files" using a survey instrument "of 'yes/no' and Likert scale (1–5 items)" evaluated by "expert, experienced investigators"); U.S. Department of Justice, Letter to Mayor Richard J. Berry re: Albuquerque Police Department (Apr. 10, 2014) at 3 ("review[ing] a random sample of the department's use of force reports completed by officers and supervisors").
[140] Dr. Doherty is the Director of the Empirical Research Group at the University of California, Los Angeles School of Law, which is a "methodology-oriented research center that specializes in the design and execution of quantitative research in law and public policy." Empirical Research Group, About the Empirical Research Group, http://law.ucla.edu/centers/interdisciplinary-studies/empirical-research-group/about/ (last visited Sep. 21, 2015). He is also Co-Director of the UCLA-RAND Center for Law & Public Policy, a group dedicated to "legal scholarship grounded in multidisciplinary empirical analysis to guide legal and public policymakers in the 21st century."  About the UCLA-RAND Center for Law and Public Policy, http://law.ucla.edu/centers/interdisciplinary-studies/ucla-rand-center-for-law-and-public-policy/about/ (last visited Sep. 21, 2015).  He has substantial experience – across several fields, including policing – with designing research and empirical methods to answer complicated legal questions and address public policy issues.

## A.  What Force Reports & Investigations Were Reviewed

The population of cases reviewed included all reportable use of force incidents, also referred to within the Department as "cases," that occurred between July 1, 2014 and December 31, 2014 (the "study period") and for which any required force investigation had been completed as of March 17, 2015.

For purposes of this report, "cases" and "incidents" refer to investigations of applied force in a given encounter or instance.  It does not refer to individual applications of force within those instances.  Accordingly, one force "case" or "incident" may involve multiple types or applications of force.  For example, a single traffic stop that involved 3 discrete applications of force by Officer A and 2 separate applications of force by Officer B would be, for purposes of this review, a single "case" or "incident."

Per SPD policy – and, therefore, for this inquiry – if a case involved more than one level of use of force, it is "assigned" the highest level of force used by any officer for purpose of the investigation.  For example, a case involving a control hold (Type I) and a baton strike (Type II) is classified as a Type II case for investigation.

As described above, the study period of July 1, 2014 through December 31, 2014 is the earliest possible relevant and substantial period during which the necessary force reporting and investigation processes, systems, technology, and support mechanisms were in place.  Because force investigation and review necessarily can require time and resources, the Monitoring Team waited until March 17, 2015 to finalize the population so that force incidents that occurred later in 2014 could be included.

"Completed" means that the chain of command has certified the investigation as complete, and the case has been accepted for review by the Force Review Unit ("FRU").  It does not mean that the Force Review Board has completed its review of the incident – only that FIT or the chain of command has forwarded it to the Board or otherwise signaled that all intended investigatory activities have been completed.

At the beginning of the study period, SPD and the Monitoring Team identified that there were 369 Type I force cases reflected in the IAPro database for the study period.  There appeared to be 58 Type II cases investigated by the chain of command rather than FIT.

Reviewers evaluated a significant, random sample of reports.  That is, we reviewed a randomly selected subset of Type II and Type I cases[141] that included a number of cases large enough to ensure, within generally accepted levels of confidence within social science, that the subset was unbiased and representative of the whole set of cases.  This "random-sampling approach is the best way to ensure that the selected sample represents the population" of all use of force reports and investigations that occurred during the studied period "and that the findings in the sample" of reviewed cases "can be generalized to the population" of all of the force cases "from which the sample was obtained."[142]  To determine how many cases needed to be examined to ensure that inferences about all SPD force cases could be made, multiple factors were examined and statistically evaluated.[143]

---

[141] *See* Michael S. Lewis-Beck, et al, 3 *SAGE Encyclopedia of Social Science Research Methods* 985 (2004); *see also id.* at 986 ("Simple random sampling is often practical for a population of business records . . . .").

[142] Lemuel A. Moye, *Statistical Reasoning in Medicine: The Intuitive P-Value Primer* 30 (2006); Timothy C. Urdan, *Statistics in Plain English* 48 (2001) ("[W]hen we do inferential statistics, we want to know something that we observe in a sample represents an actual phenomenon in the population.").

[143] The first factor was a benchmark, or "null hypothesis," against which the outcome of the assessments could be compared.  *See* Michael K. Le Roy, *Research Methods in Political Science* 91 (2008) ("A null hypothesis states that there is *no relationship* between the variables in a hypothesis . . . [Researchers] actually test the null hypothesis rather than the hypothesis . . . [T]he basic strategy of scientific research focuses on *disproof* rather than on *proof*."); Neil J. Salkland, 1 *Encyclopedia of Research Design* 1301 (2010) ("The most common approach when planning an appropriate sample size is the *power analytic approach*, which has as its goal rejecting a false null hypothesis with some specified probability.").  For this inquiry,

During the course of the study period, the Monitoring Team identified some difficulties with the classification of some cases in the IAPro database – specifically, the misclassification of 7 Type I cases. Six Type I cases should have been classified as Type II. One was actually a Type III officer-involved shooting. Additionally, one Type II case should have been classified as a Type III use of force. Accordingly, the population was ultimately 362 Type I cases and 63 Type II cases. The data entry issue did not affect the assessments or sampling methodology – and, likewise, did not affect how the Department or its officers reported or investigated the cases.[144]

The Team reviewed 53 Type I force cases.[145] It reviewed 31 Type II cases.[146] One of the sampled cases was the Type III case identified incorrectly in the IAPro database as a Type II. Accordingly, the Team ultimately examined a total of 30 Type II cases. There were 13 Type III uses of force, including 4 officer-involved shootings, during the study period.[147] The Monitoring Team was able to review all Type III cases, including officer-involved shootings.

It should be noted that the size of the populations of both Type II and Type III cases did not allow for the Monitoring Team to make comparisons of performance between SPD's precincts.[148] The Monitor's upcoming assessment of supervision will evaluate this and other cross-precinct performance trends.

## B.  How the Force Reports & Investigations Were Evaluated

Four members of the Monitoring Team reviewed Type II and Type III force cases. The cases were assigned to one team member for a primary review. A sub-sample was assigned to a second team member for a second-level review. This two-tiered reporting structure sought to ensure that any unduly outlying determinations would be identified or "checked" by another equally comprehensive review.[149]

Three separate Team members reviewed Type I force cases. Each case was assigned to one of these Team members. In addition, each reviewer was assigned cases that were also assigned to each of the other reviewers, so that 17 of the cases were reviewed twice. The reason for this redundancy was to estimate inter-rater

---

the benchmark contemplated was "90/10" – reflecting the desire to have a sample with sufficient power to detect a deviation from a hypothetical 90% "acceptability" rate. That is, the sample needed to be sufficiently large to enable the Team to identify a deviation in quality or other attributes evaluated from a hypothetical level at which 90% of cases were of acceptable quality or sufficiently possessed the attribute. However, to expand the power of the sample even further, we calibrated the benchmark at "80/20," which required a larger sample size, to ensure confidence that the Team was reviewing a sufficient number of cases for detecting significant downward deviations in quality. *See* Andrew Gelman & Jennifer Hill, *Data Analysis Using Regression and Multilevel/Hierarchical Models* 440 (2007).

    The second factor to establish was the desired confidence interval. The Team wanted enough power to reject the benchmark or null hypothesis with 95% confidence (z=1.96). Third, it was necessary to include a "finite population correction" in the assessment in the sample size computation because the total number of observations in the population is small (n=58). Standard sample size calculations typically assume that the population form which the sample is drawn is infinite. Thus, to obtain a 10% confidence interval from an infinite population (say, of people), one would need to sample 97 people. However, there are not an infinite number of force cases to review. Of Type II cases, for example, the total number of cases during the study period was only 58.

    Thus, in sum, to determine the size of the sample, the benchmark was set to 80/20. The confidence interval was set at 10% with a 95% confidence. The finite population correction is .688.

[144] For one thing, the number of cases sampled was calculated using a "finite population correction," which compensates for the number of cases in the population. The Team recalculated the sample sizes using the new population sizes, and concluded that no adjustment is necessary to achieve a 10% confidence interval at a p < .05 level of statistical significance. Second, only one of the misclassifications (the Type II that was actually a Type III) actually ended up in the sample that was distributed to the Monitoring Team. Third, there is no apparent systematic bias in the types of cases that were misclassified. That is, there were no trends or qualitative linkages that we could identify between the cases. Accordingly, the error appears to have been as random as a data entry error can be.

[145] A random sample of this size produces a standard error of .055 and a finite population correction of .926, with a resulting 95% confidence interval (margin of error) of .099.

[146] A random sample of this size produces a standard error of .071, and a finite population correction of .688, with a resulting 95% confidence interval (margin of error) of .097.

[147] This includes the officer-involved shooting that was discovered to have been incorrectly classified in the IAPro database as a Type II case.

[148] *See* Dkt. 3-1 ¶¶ 156, 161.

[149] For Type III cases, reviewers agreed with each other across some 84% of data elements (kappa .37, p<.001). For Type II cases, reviewers agreed with each other across 86% of data elements (kappa .62, p<.001).

reliability, which is the degree to which reviewers using the same instrument, and with the same instructions, arrive at the same conclusions about the same case.[150]

Reviewers considered the whole of the force investigation materials, commonly referred to as the "packet," supplied to the Monitoring Team by the SPD.  This included written material, such as officer reports, investigator logs, and supervisor evaluations; video material, including in-car video and private video footage; other images, including incident photographs or pictures of subject or officer injuries; and audio material, such as audiotapes of recorded officer interviews.

The assessment instruments for both reporting and investigations of Type I, II, and III force contained both audit-like and evaluative elements.  For example, reviewers of Type III force were asked whether officer interviews were video or audio-recorded in accordance with SPD policy – an important but more narrow and mechanical determination.  Across many dimensions, reviewers logged whether officers or supervisors complied with various express requirements of SPD policy – marking "yes," "no," or "unable to determine."[151]

On the other hand, they were also asked whether they identified "[l]eading questions or potential contamination of officer accounts."  This required a more qualitative assessment in which the experienced and seasoned reviewers needed to determine whether or not questions to the officer's account were compromised because of the role, questioning, or procedures of FIT investigators.  Furthermore, the instruments contained "notes" sections below most areas of inquiry that permitted reviewers to identify and discuss in greater detail the pertinent portions of the files or important issues identified.

In making many of the more qualitative and evaluative determinations required, Monitoring Team reviewers considered whether, under the totality of the circumstances, the investigation, report, or evaluation provided sufficiently objective, fair, thorough, and complete information about the force incident to allow a subsequent SPD reviewer to fairly and systematically apply SPD policy with respect to the officer's performance.  Thus, we operationalized the concept of "quality" – or "convert[ed] . . . the abstract idea or notion into a measurable item" – in terms of whether it would ultimately permit a neutral factfinder to fairly and fully apply SPD's officer use of force policy.[152]

Ultimately, "[u]sing methods that gather and represent human phenomena with numbers (such as standardized questionnaires and structured observation protocols), along with methods that gather and represent human phenomena with words (such as . . . unstructured observations) are classic instances of mixing data gathering and analysis techniques" that are widely used by contemporary social science researchers.[153]  The use of this hybrid quantitative-qualitative approach allows this report to do more than provide vague or general

---

[150] The assessors had an overall agreement rate of 73% (kappa .32, p<.001). This provides the Monitoring Team adequate confidence that there would be no substantial or material deviation in results even if all Type I cases were reviewed by two reviewers because, across most points of evaluation, they agreed substantially more often than they disagreed. *See* Anders Jonsson & Gunilla Svingby, "The Use of Scoring Rubrics: Reliability, Validity and Educational Consequences," 2 *Educational Research* Review 130, 134 (2007) ("In consistency estimates, values about .70 are deemed acceptable."); *accord* David Wittenburg, et al, United States Social Security Administration, 1 *Inter-Rater Reliability Analysis of Data to Document the Consultative Examination Process* 3 and n.7 (2012) (70% as minimum inter-rater reliability standard); David Royse, et al, *Program Evaluation: An Introduction* 281–2 (2010) (same).

[151] *See* Floyd J. Fowler, *Survey Research Methods* 121 (2009, 4th Ed.) (noting that, for self-administered questionnaires, "[c]hecking a box, clicking a response, or circling a number (such as . . ." emphasized because self-generated responses "are usually incomplete, vague, and difficult to code" or aggregate).

[152] Mark L. Dantzker & Ronald Hunter, *Research Methods for Criminology & Criminal Justice* 47 (2012).

[153] Jennifer C. Grenne, et al, "Combining Qualitative and Quantitative Methods in Social Inquiry," *in* Research Methods in the Social Sciences, Bridget Somekh & Cathy Lewins (eds.) 274, 274 (2005).

conclusions.  That is, rather than only being able to say that certain features or trends apply "[i]n many cases" or "in some cases"[154], the methodology allows this report to identify the size or scope of the identified trends.[155]

[154] Police Executive Research Forum, "U.S. Customs & Border Protection Use of Force Review: Cases and Policies" at 5, 6 (Feb. 2013).
[155] *See* Phil K. Eure, Office of the Inspector General for the NYPD, "Observations on Accountability & Transparency in Ten NYPD Chokehold Cases" (Jan. 2015), *available at* http://www.nyc.gov/html/oignypd/assets/downloads/pdf/chokehold_report_1-2015.pdf.

# Part 2.
# Force Investigation Team ("FIT")
# Investigations

**Summary**

*The Monitor finds that the quality and integrity of FIT investigations demonstrate initial compliance with paragraphs 112, 113, 114, 117, and 118 of the Consent Decree. FIT's investigations are covering all relevant investigative lines of inquiry, probing important issues and attempting to resolve inconsistencies among statements and evidence. In multiple instances, Monitoring Team reviewers saw the quality of SPD's force response and investigation improve immediately upon FIT's arriving at the scene or beginning to investigate the incident. FIT is providing SPD chain of command with fair, thorough, complete, and objective factual records from which to make determinations about whether officer performance involving force is consistent with SPD policy.*

*So long as all of FIT's policies and procedures are codified in the FIT Manual required by paragraph 115 of the decree and expected to be filed imminently with the Court – and are not diminished by any provisions of a labor contract – the Monitor believes that FIT will be able to maintain compliance with the requirements of paragraph 118 of the Consent Decree and that FIT remaining within SPD's Bureau of Compliance and Professional Standards will allow SPD to sustain compliance.*

## Description of Reviewed Cases

About one-third of the cases were officer-involved shootings. The remainder were classified as Type III force because the force used either caused or was expected to cause substantial bodily harm or, otherwise, involved an impact weapon strike to the subject's head.

The average number of officers who used some type of force during incidents classified as Type III force was about three (2.83). The average number of witness officers – or those who were on hand during an incident, observed other officers applying force, but did not themselves apply force – was 5.23. The average number of total witnesses during FIT investigations was about seven (6.92).

## Immediate Post-Incident Response

*The Monitor concludes that SPD's immediate post-incident response to Type III force incidents demonstrate initial compliance with paragraph 117 of the Consent Decree, including its sub-paragraphs. Supervisors are responding to the scene of Type III force and summoning medical aid for the subject when necessary. In all cases reviewed, supervisors appropriately classified the force as Type III force, notified FIT, and secured the scene and identified witnesses while waiting for FIT to respond.*

As with other types of force, "[a] sworn supervisor [must] respond to the scene" of Type III force and must "obtain sufficient basic information to determine whether a FIT response is appropriate" in the first instance.[156] Officers promptly notified a supervisor in all Type III force cases reviewed. When supervisors responded to the scene, officers summoned medical aid in a timely manner in all cases where it was necessary.[157]

---

[156] Dkt. 3-1 ¶¶ 117(a), (b).
[157] *Id.* ¶ 117(a).

In turn, those supervisors properly appropriately classified all Type III force accordingly.[158] Crucially, FIT was promptly notified in every case that we reviewed.[159]   In most cases, supervisors appropriately secured and preserved the scene pending FIT's arrival, including making reasonable attempts to locate civilian witnesses and request that they standby pending the arrival of FIT personnel.[160]

## FIT Response

> *FIT's response to the scene of Type III force, including officer-involved shootings, demonstrates initial compliance with paragraphs 112, 113, 114, and 118(a) through (e) of the Consent Decree.  FIT personnel are assuming control of the scene and capably identify and collecting basic information – including video of the incident and photographs of the scene.  Furthermore, they are permitting OPA with simultaneous access to the scene and to their investigations in a manner that appears consistent with the FIT-OPA Protocol.*

FIT appropriately assumed control of the scene from the responding sergeant upon arrival in every case where applicable.[161]

- In one officer-involved shooting, FIT appropriately waited to assume control until the incident was stabilized and outstanding public safety concerns had been resolved.

FIT generally did a good job of identifying and collecting basic information about the incident soon after arriving at the scene.  In nearly all (90 percent) of instances, FIT conducted a thorough canvass for witnesses. Officer ICV footage was secured in all cases.  Where FIT's documentation of its efforts to canvass for privately-owned video was clear[162], the Monitoring Team found the canvass to be sufficient.  It should be noted, however, that the documentation included in the force investigation file did not allow reviewers to make a clear determination, one way or another, as to whether the video canvass was sufficient in more than one-third (34 percent) of cases.   Going forward, canvass documentation should be more clearly organized across all investigations.  This is especially true given how important video evidence was to several FIT investigations:

- FIT investigators created a superior compilation of video evidence to show a continuous view of the complete incident from various sources of video footage.  In part, the superiority of the video evidence created a detailed reconstruction of the encounter and overcame shortcomings in SPD's questioning of both officer and civilian witnesses.

- An officer responds to a scene to find an agitated woman, in behavioral crisis and waving her arms wildly.  Although the quality of witness interviews could have been stronger, the incident was captured in detail on ICV.  The video in concert with the involved officer's interview provided a sound basis for adequately and thoroughly evaluating the incident.

  FIT responded to the subject's location – whether at the scene or another location when seeking medical treatment – in all cases.[163]  FIT likewise appropriately requested a medical release in close to all instances.[164]

---

[158] *Id.* ¶ 117(b).
[159] *Id.*
[160] *Id.* ¶¶ 117(d), (e).
[161] *Id.* ¶ 118(a).
[162] *Id.* ¶ 118(c).
[163] *Id.*
[164] *Id.* ¶ 118(e).

1 of 107

OPA was granted required access to the investigation in almost every instance reviewed.[165] This is a significant finding. After an initial period of hesitancy in 2013 and early 2014, FIT has fully embraced a clear, transparent, professional, and constructive relationship with OPA both at the scene and during investigations of serious force incidents and officer-involved shootings. It is tremendously encouraging to see that both SPD and OPA are following the substantially negotiated FIT-OPA Protocol. So long as the terms of this Protocol are definitively reduced to policy in the upcoming revision of the FIT Manual, it appears that the internal oversight and expertise that FIT provides can function side-by-side with the external oversight and experience that OPA provides.

A reasonable suspicion of criminal conduct was not found in any reviewed Type III incident for any involved officer. A reasonable suspicion of possible misconduct with respect to SPD policy was found in approximately one-third (38 percent) of reviewed cases. In four of the thirteen reviewed cases, potential misconduct was in fact referred to OPA for investigation during the FIT investigation period.

- A FIT investigation was initiated due to an allegation that SPD officers injured a subject's finger. The initial investigation failed to substantiate the claim. FIT did, however, appropriately identify non-force-related misconduct. It properly referred the case to OPA.

In one instance, the Monitoring Team's reviewers identified potential misconduct that did not appear to generate an OPA investigation during the FIT investigation period.[166]

## FIT Investigative Processes & Fact-Gathering

> *The Monitor finds that the FIT's investigative processes and evidence-gathering for Type III force and officer-involved shootings demonstrate initial compliance with sub-paragraphs 118(f) through (k). FIT investigations thoroughly cover all relevant investigative bases.*
>
> *Interviews of subjects and officers must continue to be mindful that investigators avoid leading and suggestive questions. Likewise, the quality of the investigation will improve even further when witness officers are interviewed by FIT about the force in the same way that civilian witnesses and the involved officers are rather than only submitting a written statement. Nonetheless, FIT's processes and evidence-gathering appear sound.*

FIT appears to be appropriately and sufficiently collecting and analyzing physical evidence at the scene of serious force incidents. In nearly all cases where applicable, FIT collected all relevant physical evidence – and sufficiently documented that evidence in nearly every instance.[167] FIT sufficiently analyzed that physical evidence for the purposes of the investigation in nearly all instances.[168] Nonetheless, there were isolated instances reflecting lapses in evidence collection and preservation.

- In the aftermath of a non-fatal officer involved shooting, the involved officer left the scene with his wife unaccompanied by any SPD personnel and traveled to a nearby emergency room for examination.

---

[165] Only in one case was one reviewer unable to determine based on available documentation. In another case, OPA was not involved in an interview of a subject at a hospital but was otherwise granted the appropriate and required access to the investigation.
[166] Although FIT should be able to affirmatively identify instances of potential misconduct and refer them to OPA for a misconduct investigation, referral to OPA can, and often does, occur when the case is screened by the Force Review Unit and considered in detail by the Force Review Board. Thus, this potential, single failure of FIT to identify the potential misconduct that our review identified cannot serve as evidence that either FIT or the Department generally is not appropriately forwarding misconduct to OPA. In the implicated case, the case was indeed referred to OPA following the FRB.
[167] One reviewer concluded that whether all physical evidence was appropriately document was unable to be determined. In another 12 percent of instances, the collection and documentation of physical evidence were not implicated by the factual circumstances.
[168] In only one case did one reviewer determine the analysis of the collected physical evidence to be insufficient.

The officer unwittingly carried with him an expended shell casing and blood / DNA evidence which, fortunately, FIT was able to recover later. The Force Review Board was critical of the FIT sergeant and lieutenant for the lapse and scene control.

- In another incident, FIT's ability to process evidence was compromised in part by first responders' failure to secure pertinent scenes. For example, two civilians had walked into the scene of a Taser deployment and one of them picked up an expended Taser cartridge. In addition, a non-FIT commander entered the crime scene to mark perceived evidence, and an unidentified officer placed evidence in an SPD officer's car without notifying him. The responsible FIT lieutenant identified this lapses and drew them to the attention of the Force Review Board.

Likewise, all injuries were well-documented – with subject injuries and officer injuries always documented when applicable. If a case involved a fatality, the subject autopsy report was always included in the investigatory file.

One of the areas on which FIT should still focus is with respect to officer interviews. Officer interviews were audio-recorded in 64 percent of cases. The questioning of officers was generally adequate. Although there was room for improvement overall, reviewers noted that the quality of the officer interviews by FIT investigators was stronger in cases that occurred toward the end of the study period (e.g., the end of 2014) rather than the start of the period (mid-2014). Questioning was complete in nearly 70 percent of cases. At times, some of the questioning was not sufficiently tied to the incident at hand. For example, FIT detectives might routinely ask officers about their general training history – but might neglect to follow up and ask the officers whether or how they were trained to respond to incidents or situations like the one under investigation.

Although reviewers identified some leading or suggestive questioning in about one-third (29 percent) of reviews, as well as indicia of pre-interview questioning or discussion in two instances, reviewers did not believe that the issues with questioning tended to materially alter the overall quality or objectivity of the investigations.

- In one case that involved multiple officers applying multiple types of force, only the officer that used Type III force submitted to a recorded interview. All other officers, including those who had used lower-level force, provided only written statements. The written statements did not necessarily provide all of the detail that could have been helpful. For instance, one officer's statement was fairly inaccurate, which was correctly and impressively flagged as such by FIT. Nonetheless, FIT never asked the officer to correct the record or pursued a follow-up investigation.

- In an officer-involved shooting, only the two shooting officers submitted to recorded interviews with FIT. Other officers submitted witness statements. Those statements did not necessarily answer all of the questions or provide all the detail that the interview might have – for example, the exact position of the subject and one of the officers, what the suspect was saying, and what elements of his behavior constituted combative behavior.

  Although the uncovered details in the witness officer statements did not impact the overall integrity of the investigation in this case, the opportunity for FIT to ask follow-ups or cover common ground would further enhance the rigor of FIT's processes. This opportunity to engage in follow-up interviews to ask for more information, press witnesses on certain points, or integrate subsequently-gathered evidence into the interviews was regularly used with civilians.

- In an officer-involved shooting at which members of the Washington State Patrol were present, witness officers only provided statements – reports that the FRB would later note left some material questions less addressed than they should have been.

- Only an officer that used a taser was interviewed on tape.  Officers who pointed their guns at the suspect (thereby using Type I force) and handcuffing the subject submitted only written statements.

- One FIT investigation would have been superior if FIT investigators had an opportunity to ask follow-up questions of witness officers, who supplied only written statements, about tactical decision-making related to closing the distance on a man wanted for a crime involving a knife.

The Parties, FIT, and the Monitoring Team have begun discussions about ensuring that, going forward, officers who actually witnessed the force or had a decision-making role in the force as it unfolded are interviewed by FIT investigators rather than providing written statements, which however is not required by current policy.

All civilian witnesses were interviewed in about three-quarters (73 percent) of FIT investigations.  There was only one investigation in which not every interview with witnesses was video- or audio-recorded.[169]  As with officer interviews, Monitoring Team reviewers identified some room for improvement with respect to civilian witness interviewing techniques.  In a bit more than half (55 percent) of force cases, there was at least some incomplete questioning of civilian witnesses noted.  Similarly, in 44 percent of instances, some leading questions were identified.  Crucially, however, the Monitoring Team reviewers here, too, believed that the technical deficiencies with respect to the interviews did not materially alter the overall quality or objectivity of the investigation.  For example:

- An interviewer asked one interviewer, "Would it be fair to say that you guys had been drinking a good portion of the day?" to establish the condition the subject at the time of the force incident.

  Interviews with the subject of the force were conducted in every instance where the subject was available to submit to such an interview and did not otherwise decline to be interviewed.  Those interviews were video- or audio-recorded in all instances where such recording was feasible.  The Monitoring Team's review of those interviews observed some instances of incomplete or leading questioning.

- One subject interview was less complete than it could have been because it focused disproportionately on the subject describing the force used against him – and not the subject's own actions leading up to and during the force.

## Overall Sufficiency of the Investigation

*The Monitor concludes that the quality and integrity of FIT investigations demonstrate initial compliance with paragraph 118 of the Consent Decree.  FIT is identifying and resolving inconsistencies among statements and evidence.  It is generating usually high-quality investigative summaries, though the quality of some summaries could have been improved in some instances.  Although FIT investigations are not perfect, they are providing SPD chain of command with a fair, thorough, complete, and objective factual record from which to make determinations about whether officer performance that involves the use of force is consistent with SPD policy.*

---

[169] The documentation in the investigative file prevented a reviewer of anther case from making a determination one way or another.

Generally, the quality of FIT investigations is good. In 96 percent of Monitoring Team reviews, the investigation was judged sufficient to evaluate the objective reasonableness of the force used. Likewise, in 96 percent of instances, the investigation was sufficient to evaluate the compliance with the duty to de-escalate by the involved officer(s). In 88 percent of cases, the investigation was sufficient both to evaluate the proportionality of the force used and to evaluate the necessity of force used. Similarly, in some 88 percent of instances, the investigation overall formed a sufficient basis for evaluating tactical decision-making.

- FIT's review identified potential issues in an officer's tactical decision-making when he encounters an agitated woman, in behavioral crisis and waving her arms wildly. The officer positioned himself immediately in front of the woman. Soon thereafter, he grabs her arm, which leads to a takedown or fall to the ground. FIT's investigation explored whether the officer might have failed to apply the appropriate contact/cover role with his partner, providing more time for de-escalation while minimizing the risk of assault from the subject.

Subsequent assessments will provide the Monitoring Team with occasion to evaluate both the appropriateness of FRB determining that the officer had engaged in a "technical" violation of the force policy that should be dealt with by chain of command counseling and OPA's election to decline the opening of an investigation. Nonetheless, FIT investigators exhaustively and soundly provided ample, balanced factual details about the officer tactics in the moments leading to the application of case – not just focusing on the use of force alone.

- Even without FIT being able to clarify or ask follow-up questions about some issues of witness officers, because they submitted statements rather than sat for interviews, an investigation of officer-involved shooting was thorough, comprehensive, objective, and pursued all relevant investigatory avenues – with rigorous interviews of the involved officer and civilian witnesses.

- Prior to FIT's arrival at the scene of an officer-involved shooting, a responding captain marked various evidence at the scene with rocks. Meanwhile, an unknown person put some of the subject's clothing into a sergeant's car while civilians were walking in and out of the scene. All of these issues were flagged by FIT as part of an otherwise thorough investigation.

In a majority (63 percent) of cases where the Monitoring Team identified inconsistencies in or among various evidence, FIT appropriately identified and addressed the inconsistencies during the course of their initial investigation or in the FIT chain of command's review of the investigation.[170] For instance:

- One FIT investigation started out as a Type II investigation because the subject was not admitted to the hospital for several hours. The Type II portion of the investigation could have been substantially improved. However, the FIT investigation was superior – and importantly addressed the issues and deficiencies that had occurred in the sergeant's investigation earlier.

- FIT rejected a sergeant's statement about an officer-involved shooting as inadequate – sending a follow-up request to provide comprehensive answers to a host of important questions.

---

[170] It must be noted that review of FIT investigations to not end with the FIT chain of command. The investigations are actively reviewed and discussed by the Force Review Board. The Monitor's upcoming assessment of the FRB will consider whether they identify investigatory deficiencies that FIT does not. *See* Dkt. 221-3 at 7–8.

- The quality of another force investigation that began as a Type II investigation before a subject's injury became apparent increased dramatically after FIT took over.  Before FIT arrived, witness interviews were of inferior quality, and the investigating sergeant had delegated the task of witness interviews to officers in some instances.  FIT called back several previously interviewed witnesses to interview them on tape to improve the quality of witness interviews.

FIT's investigative summaries were also generally adequate.  Nonetheless, the Monitor recommends that FIT continue to work toward comprehensive reports that summarize key evidence, inconsistencies, or issues without reaching conclusions about credibility or accuracy.

- One report did not identify or clearly discuss the conflicts expressed in statements from three witnesses – all of whom did not directly corroborate an officer's statement about whether a subject was stepping toward the officer when she fired.  Although the detail became less material than it often is given that the shot did not hit the subject and the incident continued thereafter, the detail was nonetheless crucial to adequately set up and flag for subsequent reviewers attempting to analyze the whole of the incident in light of SPD policy.

- One investigative summary was overly brief, describing only the Type III force and failing to describe other, lesser types of force used in the same incident.  Likewise, it did not fully describe the information gathered from witnesses, including the fact that one witness said that it appeared that the subject was subdued at the time that officers delivered knee strikes.  Although the investigation itself contains these facts and details, FIT should ensure that this pertinent information is synthesized in the FIT report.

Ultimately, only one force investigation was deemed inadequate overall.  The remainder were judged either superior or adequate.  A "superior" FIT investigation was one that was thorough, accurate, unbiased, and complete – in compliance with all SPD protocols, containing all relevant evidence and information, and properly addressing any and all material inconsistencies or questions resulting from the investigation.  An "adequate" FIT investigation was one where some aspects of the investigation could be strengthened but the identified flaws did not materially impact the overall accuracy, completeness, and integrity of the investigation.

In other words, this assessment finds that FIT investigations still have room for some important improvement but that, crucially, the deficiencies are not materially affecting the ability of subsequent adjudicators to make a fair, unbiased, and comprehensive determination about the performance of involved officers.  For example:

- The minor nature of the injury – a pinky fracture – to an intoxicated subject seemed to dictate the direction of the FIT response and report.  The FIT account of evidence in the investigatory report can be overly conclusory.  However, the overall presentation and quality of evidence – including ICV audio and civilian witness accounts – was sufficiently detailed to make determinations about whether the force used was consistent with SPD policy and to assess officers' tactics while handling the call.

- A type III force involved an attempted taser deployment and non-hit officer-involved shooting against an intoxicated subject who later told SPD that he was attempting "suicide by cop" by brandishing large butcher knives.  After force was deployed, the subject fled.  Officers followed.  An officer deployed four foam nonlethal projectiles, striking the subject.  The subject requested to speak to a Hostage Negotiation Team officer, who ultimately convinced him to surrender.

Although some witness interviews were unnecessarily delayed, some FIT detective interactions with the involved officer were not recorded, and some inconsistencies among witness accounts of what the subject did after the failed taser deployment went unaddressed, the force investigation otherwise collected a great amount of pertinent detail, generated a well-organized and thorough force packet, and adopted a neutral tone and approach to its fact-finding.

Thus, the Department has much reason to applaud FIT's performance – but also reason to ensure that it continually recommits to making its investigations as solid as it possibly can. FIT's investigations involve the most serious uses of force by officers which carry the greatest risk of endangering the community's trust in its Department. Ensuring that FIT's investigations remain thorough, independent, and have integrity will help to enhance public trust in the Department.

These results give the Monitor confidence that FIT permanently remaining within SPD's Bureau of Compliance and Professional Standards is consistent with the Consent Decree and will continue to promote fair and complete investigations of officer force.[171]

---

[171] *See* Dkt. 221-2 at 4.

# Part 3.
# Type II Reporting and
# Chain of Command Investigation & Review

**Summary**

*The Monitoring Team's review concludes that officer reporting of Type II force demonstrate initial compliance with paragraph 103. The reports and documentation of Type II force by officers is sufficiently detailed and comprehensive.*

*Some Type II investigations and review are where they need to be and conform to the requirements of the Consent Decree and SPD policy. Nevertheless, SPD still has some ways to go toward ensuring that Type II investigations conducted by sergeants and reviewed by the chain of command are complete, thorough, fair, and objective.*

## Description of Reviewed Type II Cases

Monitoring Team reviewers ultimately evaluated 30 randomly-selected Type II cases that occurred between July 1, 2014 and December 31, 2014 and for which the force investigations had closed and been forwarded to the Force Review Unit as of March 17, 2015.

## Type II Reporting

*The Monitor concludes that officer reporting is in initial compliance with paragraph 103. Although officers must take care to ensure sufficient documentation of subject medical screening and ICV, officer reports on Type II force are generally thorough and complete – containing descriptions of the reason for police presence, detailed descriptions of the incident and force used or witnessed, and a description of subject injury.*

*SPD is complying with the requirement in paragraph 104 that requires supervisors to respond to the scene of Type II force.[172]*

## Supervisory Response

*In most instances, officers are reporting Type II force to sergeants immediately. Those supervisors are responding to the scene. Likewise, the force classified as Type II was properly classified by responding supervisors in most instances. Sergeants are similarly complying with additional responsibilities, including examining the subject for injury and summoning medical aid where necessary, when they respond to the scene.*

Officers immediately reported force to a supervisor immediately in some 83 percent of instances. In 10 percent of cases, force did not appear to be immediately reported to a supervisor and no justification was provided. In one case, the notification was not immediate, but there was justification for the delay. In another, reviewers were unable to determine precisely when the force was reported.

---

[172] Because paragraph 104 contains numerous provisions that pertain to the sergeant's investigation and review – and on which the Monitor finds that SPD must still make progress – this is in no way an indication that SPD has reached initial compliance with paragraph 104 of the consent decree.

Supervisors responded promptly to the scene in nearly 83 percent of cases. In close to 87 percent of cases where a subject was identified, they screened the subject for injury, although in one of those cases, the screening by the sergeant – and the subsequent request for medical assistance – did not occur until the subject had been transported to the precinct.

By and large, supervisors (usually sergeants) are making the appropriate determination when they classify force at the Type II level. Some 87 percent of Type II force was properly classified at the time of the incident.[173] About 80 percent of Type II force was classified as such because it was reasonably likely to cause injury. Within those cases, approximately two-thirds actually involved an injury or complaint of injury or pain. In the remaining 20 percent of cases, the force was Type II simply because the outcome of the force applied was an injury or complaint of an injury.

Per SPD policy, and to effectuate Consent Decree requirements, the responding supervisor in Type II force cases must review officer statements for accuracy and completeness.[174] It was often difficult for Monitoring Team reviewers to verify that this occurred, as the supervisor's review of these statements was generally not specifically documented.

## Officer Documentation

> *A vast majority of Type II use of force reports and statements include a reason for the initial police presence; a detailed description of the incident; a detailed description of the force used; force used by other officers; and a detailed description of the subject's injury, complaint of injury, or lack of injury.*
>
> *To maintain its progress going forward, SPD must ensure that officers more rigorously describe "any medical aid or medical evaluation provided."[175] Likewise, documentation about ICV footage must be more thorough.*

On many fronts, officer documentation of use of force was good. A full 98 percent of officer use of force reports provided a thorough, detailed reason for the initial police presence. Four out of five (80 percent) of cases provided a complete and thorough description of officer actions and the force used by officers. Three-quarters (77) percent of cases similarly provided a thorough and detailed description of the incident and the subject's words and actions. The supervisor's response and screening to the incident was adequately covered in 78 percent of cases. Officer description of force that was applied by other officers and that they witnessed was thorough and complete in some 79 percent of instances where applicable.

On some other fronts, officer reporting can improve further, particularly with regard to documentation relating to subject injury. Although officers provided a description of the subject's injury, complaint of injury, or lack of injury in almost all (95 percent) of cases, nearly 29 percent of those descriptions were insufficiently thorough or complete. In another 5 percent of cases overall, an injury description was not included whatsoever. Similarly, officers did not sufficiently describe any medical aid or evaluation in approximately one-quarter of cases the where medical aid or evaluation was necessary. This appeared especially material given the potential implications for medical aid not being rendered when necessary and in a timely manner:

---

[173] In three cases, the incident was initially misclassified by the responding supervisor but subsequently upgraded to reflect the proper classification. In another case, there was no use of force referenced in the limited documentation in the file, making it unclear as to why the incident was classified as a Type II.
[174] Dkt. 3-1 ¶ 104(6); 2014 SPD Manual Section 8.300-TSK-5(13).
[175] Dkt. 3-1 ¶ 103.

- In one case, although the subject was moaning at the scene and repeatedly referenced his injured shoulder, no medical treatment was requested until after he arrived to the precinct – and some 40 minutes after the use of force.

Despite the overall strength of the reporting, Monitoring Team reviewers found that officer reports omitted at least some relevant information in about one-third (32 percent) of cases. Apparent material inconsistencies among information provided by the officer were noted in 10 percent of cases. Boilerplate or conclusory language was also noted in about 10 percent of cases.

In most cases, the nature of the missing information, boilerplate language, or other problems was not so substantially material that the officer reports were rendered wholly inadequate because of the omission. However, in some instances, the issues led Monitoring Team reviewers to question the underlying objectivity and accuracy of the officer reports:

- An officer reported that he used pepper (OC) spray "at least three" times." He did not fully explain why he used force each time, as required by policy.

  The same officer said that the subject was "swinging his arms wildly" and tried to go around the officer after he gave the subject a warning. That account was not consistent with video from another officer's ICV, where a warning cannot be heard. It was also not mentioned by other officers. The video did not depict the suspect as threatening the officer nor appear aggressive.

  These issues were not flagged or addressed by the chain of command. They were eventually flagged by the Force Review Board and referred to OPA.

- In a case where officers used a hard "distraction" strike, officers described the subject's actions and behavior as more agitated and difficult to control than he appeared to be on video of the incident. Likewise, the officer statements did not mention that the subject was in clear pain as they handcuffed him and repeatedly asserted that he was in pain and had a dislocated shoulder.

- An involved officer's report of a rapid subject escape attempt followed by a takedown and scuffle almost identically tracks the audio conversation on the captured ICV – which might suggest that the officer reviewing the video before writing report influenced the officer's recollection.

## Type II Review

*Some Type II investigations and review are where they need to be and conform to the requirements of the Consent Decree and SPD policy. Nevertheless, SPD still has some ways to go toward ensuring that Type II investigations conducted by sergeants and reviewed by the chain of command are complete, thorough, fair, and objective.*

## Sergeant's Investigation

*Basic investigative deficiencies leave sergeant investigations of Type II force less thorough, fair, and objective than they need to be under the Consent Decree. During the time period reviewed, SPD was still determining efficient mechanisms for investigating force transpiring in demonstration or "crowd management" scenarios – which left several Type II incidents less rigorously reviewed than they should have been. Beyond the demonstration context, sergeant investigations do not cover all the bases as*

> *regularly as they must – failing to canvass for all witnesses, impartially and thoroughly interviewing such witnesses when they are identified, pursuing all relevant lines of inquiry, securing adequate statements from witness officers, and ensuring that an uninvolved sergeant indeed conducts an impartial investigation.*

The Monitoring Team found that about 10 percent of Type II investigations by sergeants were thorough, well-documented, and complete – characterized by investigators complying with all SPD protocols and making reasonable attempts to follow all leads and answer all material questions.  Another 38 percent were adequate such that, although some aspects of the investigations could be improved, identified flaws did not appear to materially impact the quality of the overall investigation and resulting force packet provided sufficient information to evaluate the incident.

However, more than half (52 percent) of investigations were found by reviewers to be inadequate, however, because the investigation did not establish sufficient information to support an evidence-based evaluation of the incident, whether due to investigative deficiencies, material omissions, potential investigator bias, or other issues.[176]

Monitoring Team reviewers encountered several investigations, and subsequent reviews, that were inadequate because no investigation or review appeared to have been conducted by a sergeant, lieutenant, or captain.  With the exception of one case, the seven (of 31 total) cases for which there was seemingly minimal or no investigation all occurred in the context of large demonstration or crowd management situations.

At the time that these demonstration-related Type II force incidents occurred, the Department was operating under an interim policy on force reporting and investigation in demonstration management situations.  For Type II investigations, the policy called for a Force Collection Team – an *ad hoc* group of detectives assembled by the incident commander – to conduct Type II investigations.[177]  Where an incident commander authorized use of chemical agents or less-lethal munitions, that commander would report the force and complete documentation rather than the officer who complied with the order to deploy such force.[178]  The review of those force reports, for Type II force, was to be conducted by a captain assigned to the same bureau as the incident commander.[179]  The bureau commander was to also review the force before forwarding the case on to the Force Review Board.[180]

- A force packet for a takedown, involving a grabbing and holding of a subject, contained only statements from witness officers, not the involved officer.  No sergeant's investigation, sergeant's review, lieutenant's review, or captain's review appears to have occurred – nor any review by a bureau captain or commander.

- Type II force reporting on deployment of OC spray, a hair pull, the use of blast balls, and a takedown of one named subject and other unknown subjects occurred after officers were relieved from their demonstration duties.  The only statements in the force packet were statements from a SWAT lieutenant about authorization of blast balls and the statement of an acting lieutenant, who describes his own hair pull takedown of a suspect.  The acting lieutenant also indicates that unidentified officers

---

[176] SPD indicates that the Force Review Board, once it receives and reviews force investigations, has been referring approximately 32% of Type II cases to OPA for further investigation and another 12% back to the chain of command for additional review.  These numbers suggest that the Department may well be catching these deficiencies – which would be consistent behind the goal of such systems of critical self-analysis.  The Monitor's upcoming review of the Force Review Board will have occasion to address this issue.  *See* Dkt. 221-3 at 7–8.
[177] SPD Manual Interim Policy Section 8.310, Nov. 21, 2014 Draft.
[178] *Id.*
[179] *Id.*
[180] *Id.*

used OC spray without his prior authorization or announcement. Unidentified officers deployed blast balls – but with prior authorization. The one identified subject was never actually interviewed.

Although it is evidence that SPD must have at least some additional information about this incident not included in the force packet itself, it does not appear that this force, occurring during a demonstration, received the same kind of systematic review as incidents that occurred outside the context of large-scale crowd management situations.

- Other force occurring during a crowd management situation did not appear to be adequately reviewed. Scattered officer reports described application of OC spray, deployment of flashbangs and/or blast balls, and of a bike push. It identifies one officer as involved, but the file does not reflect any activity of that officer. The account of the blast ball deployment was relatively threadbare – providing insufficient facts to form a judgment, one way or another, on the force used.

  Interim Policy 8.310 does not require statements by officers who use force in large-scale crowd management situations at the direction of the chain of command. Nonetheless, there appeared to be no use of force report or investigative account that set forth in sufficient detail precisely what force was used by whom, when, and for what reasons.

- A subject purportedly pushed an officer's bike into her, causing the subject transient pain to the knee and shin. The subject was arrested. The subject sustained a bump on his head – but there is no description in the file indicating whether the subject alleged that the head injury was caused by an SPD officer or what force may have caused it. In fact, the only description of the incident was on a handwritten booking data card filled out by the officer that is provided and quoted by a non-witness detective in the related general offense report. The incident received no review or analysis by a sergeant, lieutenant, or captain – or by a bureau captain or commander.

- A sergeant reported the use of a takedown maneuver with respect to a participant in a demonstration. It provides a detailed account of demonstration events but does not describe the force in much detail other than to say that the sergeant used his body strength to "gain advantage and eventually get on top of the subject" and gain control of the suspect's arm with both hands.

  The force packet provided insufficient information to fully address the tactical issues implicated. The sergeant purported to have been "ambushed" by a protestor, but the packet gave no details. No chain of command review of any sort was evident.

- A woman was alleged to have spit in an officer's face during a demonstration. The officer purportedly punched her. The force investigation itself provided no details about the subject, whether she was actually punched, and whether anyone else saw either the subject spit on the officer or the punch. A subsequent OPA investigation of the incident included a six-minute long interview of the investigating sergeant that refers to a written report about the force incident. However, this is not included in the force investigation packet.

  The OPA investigation was opened following a complaint by a civilian other than the subject, who was arrested for spitting at the officer. There was no chain of command evaluation of the force outside the OPA context. The Force Review Board found that the officer's punch was disproportionate and

recommending re-training.   The outcome of the OPA investigation was outside the scope of the present review.

- A takedown of a subject during a crowd management situation resulted in the subject's scraped knee. Private video of the incident showed demonstrators who appear to be attempting to assist a suspect in escaping.

   No investigative report or chain of command evaluations were completed.  FRB approved the force based largely on video of the incident.

Confusingly, at least some force used during mass demonstration or crowd management scenarios did receive more in-depth chain of command review:

- An officer reported that he was directed to arrest a subject for pedestrian interference and obstruction. No documentation indicates who directed the arrest.  When the officer attempted to make the arrest, the subject tried to flee.  A third party made a complaint about the use of force and submitted to a brief interview that was not recorded.  There, she said only that she was "unhappy" with the arrest.  In a written statement, she says she was "terrified" by the arrest.  There was no further information about any particular concerns she had about the force itself.

   A sergeant completed a minimally adequate investigative report.  A lieutenant and captain subsequently reviewed the force – reaching express findings as to whether the force was reasonable, necessary, and consistent with SPD policy.

Nevertheless, in the many other cases evaluated for this assessment and where at least some investigation and review did in fact occur, the Monitoring Team still identified a range of problems.  For example:

- One investigation did not secure reports from two officers who participated in a canine deployment. The lack of basic information from involved officers left chain of command reviewers with insufficient information to form basic conclusions about the force based on a thorough, objective factual record.

- The subject of one use of force was interviewed only about injuries – not the use of force.  The interview was not recorded.

- An interview with a subject in another case inquired minimally about the use of force, with the interviewer – who was, inappropriately, the involved officer – instead telling the subject, "You know why you're here . . . . running from a traffic stop."  Accordingly, the "interview" entailed merely a basic screening of complained-of injuries, not a meaningful examination of the force and what happened leading to it.

Reasonable attempts to identify and interview witnesses, commonly referred to as "canvassing" for witnesses, were documented in half (50 percent) of all Type II cases.[181]  The failure to make efforts to systematically

---

[181] Dkt. 3-1 ¶ 104(e)(3) (requiring sergeants to "[m]ake reasonable attempts to locate relevant civilian witnesses, including the subject and third parties, and arrange for witnesses to be interviewed"); ¶ 106(b) (requiring use of force report to include "names, phone numbers, addresses, and summaries of statements by all civilian witnesses to the incident" or, if "there are no known witnesses, the report will specifically state this fact").

identify potential witnesses – or at least to document these efforts – posed problems for the quality of the investigation in a number of instances.[182]  For instance:

- One use of force case involved two canine deployments.  Both occurred in residential areas with houses located close together.

  Nevertheless, the sergeant reported that officers told the sergeant that no one could have witnessed the force, and the sergeant "confirmed their accounts."  Nothing in the report indicates which houses were adjacent to the scene and what attempts were made to contact the residents.  Witnesses in nearby houses may well have seen the incident, heard the commands, or observed the arrest.  Indeed, an officer's use of force report referred to a homeowner standing outside smoking a cigarette during the canine tracking.  The file contains no indication that the homeowner was identified or contacted for an interview.

In general, the reviewers noted that, while there is a checkbox on the sergeant's report indicating that canvassing was completed, there did not appear to be a practice of providing much additional detail as to how the canvass was conducted – which made it difficult to determine whether such actions were sufficient.

When witnesses were identified and interviewed, recorded interviews were conducted with all relevant witnesses in about two-thirds (61 percent) of cases. It appeared to the Monitoring Team that it would have been "practicable and warranted in the circumstances" to have made reasonable efforts to conduct recorded such interviews in the remaining cases where witnesses were present but record interviews not secured.[183]

When interviews were recorded, Monitoring Team reviewers found that about 29 percent were thorough and unbiased.  Leading questions were identified in about 43 percent of recorded interviews.[184]  For example:

- A sergeant's recorded interviews of several civilians included leading questions about whether they had seen the subject get up from a gurney and approach officers.  None of the civilians corroborated the assertion.   Nonetheless,  the sergeant's subsequent review described the subject approaching officers and suggested that this behavior provided reasonable justification for officers applying force.  The investigating sergeant was also directly involved in the events that he was investigating.

- For reasons not adequately explained, a fairly new officer, with only about 6 months on the job, conducted the interviews of two witnesses who saw a takedown maneuver.  Those interviews were incomplete and involved few follow-up questions.  A more experienced officer did a better job of another civilian witness, while the investigating sergeant's interview was excellent.  The varying levels of quality suggest that the quality of the investigation would have improved if the sergeant had conducted all interviews – although it was not yet required by SPD policy.

Inadequate questioning – including failing to explore relevant lines of questioning, using other inappropriate interviewing techniques, or not covering all material bases – was noted in about two-thirds (64 percent) of recorded interviews.  Specifically, relevant questions were left unanswered in 21 percent of interviews.

---

[182] *See id.*
[183] *Id.* ¶ 104(e)(4).
[184] *Id.* ¶ 104(e)(3) ("Supervisors should use interview techniques taught in use of force investigation courses, including avoiding leading questions.").

- A subject alleged to the investigating sergeant that he was kneed a few times while he was on the ground following a scuffle.

  The sergeant did not ask about any details – e.g., how many times he was kneed, where he was kneed, who kneed him, and the like. None of the officer's reports mentions kneeing the subject. ICV does not show what happened after the suspect went to the ground.

- A sergeant interview of a witness, pursuant to a taser deployment, was open and balanced for a little less than half of its duration. Thereafter, the interview more resembled a direct examination of a sympathetic witness designed to elicit agreement with officer actions. The witness indicated that he objected to an officer placing a knee to the back of the subject's head. The sergeant did not ask the witness to describe that force further. Through a series of questions, the sergeant did get the witness into agreeing that officers "did what they had to do."

- Witnesses to a Type II officer takedown of a subject were engaged in limited questioning. Although it appeared that the witnesses may not have been overly cooperative, there were no meaningful questions about what the subject may have been doing to actively resist the involved officer who ultimately applied force.

In about half (52 percent) of cases, reviewers were able to verify that all officers who were present at the scene were interviewed, though it is not strictly required by policy, and directed to complete a written statement. It was not always clear from the record when or how these interviews at the scene took place and whether they were conducted separately from other officers where possible. In other cases, witness officer statements were missing from the record entirely. Witness officers must always be directed to provide a statement, and the supervisor must ensure that those witness statements comply with SPD guidelines.[185]

Relevant officer ICV footage was appropriately identified and reviewed in all (97 percent) instances where it was available. However, in only about half (52 percent) of force packets was a canvass of the area for any available private video (security camera footage, cell phone footage) fully documented. This must be done going forward to ensure a full and thorough investigatory record.

The force investigations generally included photographs of the subjects (89 percent of cases where a subject was identified and/or apprehended) and of relevant physical evidence, where applicable. The location of the use of force was photographed a bit more than half (53 percent) of the time. In all but one cases, reported injuries to officers were photographed.

During its evaluation of Type II investigations, the Monitoring Team developed concerns about the extent to which supervisors who were involved at the scene ultimately conducted the investigation.

- In one force case involving a taser application, the investigating supervisor was at the scene in a supervisory capacity, provided direction to officers, and witnessed the use of force. He indicated that he believed himself sufficiently uninvolved because he elected not to go "hands-on" with the subject himself. However, the better course to ensure a fair and impartial investigation would have been to have secured another supervisor to conduct the investigation.

---

[185] *See* 8.300-TSK-5(10); Dkt. 3-1 ¶ 104(e)(6).

## Sergeant's Report

> *Sergeant force investigation reports are not yet where they need to be.  They do not yet provide the chain of command with "a complete understanding of the incident from beginning to end."[186]  Progress must be made toward ensuring that the summary rigorously and objectively reflects all material evidence, identifies and attempts to resolve material inconsistencies in that evidence, and adequately analyzes incidents in light of policy and tactical concerns raised by officer actions throughout the incident.  The summaries must also be forwarded to the chain of command in a substantially more timely manner.*

The sergeant's investigative summary or report is a primary document that usually forms the foundation of subsequent review by the chain of command.  Overall, the investigative file compiled by the sergeant was found to be either thorough or adequate in less than half (47 percent) of cases.

- A sergeant's investigative report on a taser application was notably thorough – identifying tactical issues related to verbal communication techniques and the failure of involved officers to preserve appropriate distance between themselves and a subject.  Indeed, this thorough analysis set the occasion for the Lieutenant's review to describe the officer's performance as "troubling" and the FRB referring the case back to the chain of command for counseling of the involved officers.

Nonetheless, the reports were inadequate – because of material deficiencies or omissions, inaccuracies, evidence of bias, or other significant issues – in some 50 percent of cases.  The quality and rigor of sergeant's reports will need to improve going forward.

A number of features contributed to the reports being not as strong as they must be under the Consent Decree and SPD policy.  The Monitoring Team found a little over half (57 percent) of the completed summaries of the supervisory investigation to be thoroughly and accurately written, with an additional 13 percent of cases having no supervisory report to speak of.  The reports included sufficient summaries of any force or resistance offered by the subject during the incident (68 percent), officer statements (65 percent), and the incident itself (62 percent).  A bit over half half (58 percent) of cases summarized officer attempts at de-escalation and any effects with respect to the subject.  Sergeants adequately and thoroughly summarized civilian witness statements about 69 percent of the time that they were available.

When the packet contained factual inconsistencies material to a full and complete understanding of what happened, sergeants failed to identify or resolve such inconsistencies about half of the time.[187]  The most common inconsistencies that Monitoring Team reviewers noted were inconsistencies among statements (23 percent of cases) and video that was inconsistent with statements (10 percent of cases).  Reviewers were unable to determine whether there was a material inconsistency in about 18 percent of the cases due to insufficient information in the file.

- Injuries to a subject were purportedly sustained as a result of civilian efforts to subdue the subject and officers arriving and eventually using force.  The sergeant does not ask, in audio-recorded interviews, two of three civilian witnesses if they knew how or when the suspect sustained injuries.  Nonetheless, the sergeant's investigative summary asserts that all civilians agreed that the suspect sustained his injuries prior to SPD involvement.

---

[186] Dkt. 3-1 ¶ 106(a).
[187] *See id.* ¶ 106(d) (requiring sergeant's summary to include "[t]he supervisor's evaluation of the evidence, including any material inconsistencies in the evidence or statements").

Under half (43 percent) of use of force packets included all material evidence.[188]  This often stemmed directly from material insufficiencies with the sergeant's investigation generally:

- A subject had been talking with an assigned crisis intervention sergeant for some 45 minutes.  At some point, the sergeant stopped engaging the subject and left the vicinity.  Officers applied the taser only moments after the sergeant left.

   The sergeant who investigated the Type II force was, in fact, the on-scene sergeant who had walked away prior to force being used.  The sergeant conducted several recorded interviews of civilian witnesses, which was inappropriate.  Likewise, those interviews contained leading questions and comments on the event that had transpired – and that had directly involved the sergeant.  Furthermore, only a subsequent OPA investigation – which arose as a result of a civilian complaint, not an internal SPD referral – explored precisely why the sergeant had left and why the subject – who was engaging with the sergeant and not presenting an assault risk when the sergeant walked away – presented such an immediate risk to officers after the sergeant left.

- A force packet lacked officer reports, photos of the scene and subject, a recorded interview by the subject, and a full account of whether and how officers canvassed for nearby witnesses.

- The basis for a use of pepper (OC) spray was inadequately documented in a sergeant's review, as eventually and appropriately noted by the FRB.  The investigating sergeant was on the scene and had given officers directions during the restraint of the subject and, accordingly, did not meet the definition of an uninvolved supervisor.

- Much of one written report appeared biased toward a finding that an involved subject was "in crisis" and that the force was appropriate.  There was no discussion of the subject's stated disabilities or his obvious exclamations of pain (captured on ICV).  Likewise, the report does not consider the nature of one involved officer's approach of the subject (barking at him to "sit down" while pulling on gloves) and whether it constituted sufficient de-escalation.

Sergeants conducted at least some investigation to assist subsequent Department reviewers of the force incident in conducting the necessary analysis of the incident for policy and legal concerns (in 76 percent of cases) and of any training, tactical, or equipment concerns (also in 76 percent of cases).[189]  However, this investigation was too often insufficiently comprehensive and probing – leaving important issues unaddressed.  For instance:

- The sergeant reports that officers used force because he was making verbal threats against nearby civilians and exhibited "a high level of passive resistance" – but no overt or physical aggression.  The sergeant's report did not sufficiently explore facts that would allow subsequent adjudicators to fully consider precisely why force was necessary at the specific point that officers used it and whether officers might have spent more time or used additional communication tactics to de-escalate the situation.

---

[188] *See id.* ¶ 104(e)(11).
[189] *See id.* ¶ 106(d).

- For most of an incident, one officer attempted to interact with a subject who appeared to be in behavioral crisis while another officer drove in a patrol car behind him. Among other issues missed, the sergeant did not address whether such partner splitting, with one officer in a car and another on foot, was tactically sound and adequately protective of officer safety. The sergeant did not consider why the involved officers did not request for a crisis intervention-trained officer, as required for someone experiencing behavioral crisis. Likewise, the sergeant did not consider why a hobbled suspect appeared to be placed face-down, contrary to policy, for as many as 24 minutes.

- ICV and photos of an involved officer's car show that his car may have struck a stolen car – which placed the officer extremely close to a felony suspect, who clambered over the officer's bumper to escape. The car had two other occupants, neither of whom was identified in the sergeant's review. The sergeant's review did not consider whether the officer's approach of the car constituted inappropriate tactics that may have substantially compromised his own safety.

- Multiple sergeant reviews did not address the SPD requirement that officers provide a warning before firing a taser, either reconciling whether a warning was given or whether it was not feasible under the circumstances.

- An otherwise detailed sergeant's investigation report omitted mention of officers who are shown on ICV video engaging in a gratuitous and potentially provocative exchange that raised issues related to professionalism and de-escalation.[190]

- An officer's in-car video was operative during the transport of a subject, after the application of force to the station. An officer engaged in a problematic exchange with the subject that might have escalated the situation. The officer's interactions with the subject during transport were not identified nor mentioned by subsequent reviewers.[191]

It should be noted that the sergeant's obligations are not to express judgments or make findings as to the reasonableness of force or whether it was in or out of SPD policy. The Consent Decree itself indicates that "[i]f a FIT response is not appropriate, the supervisor will conduct the investigation, as an impartial fact-finder and will not be responsible for determining the ultimate disposition of the incident."[192] In most instances, sergeants were appropriately analyzing the facts but appropriately not making findings.

Although SPD policy requires completion of a Type II investigation within 72 hours (three days), very few Type II use of force packets (20 percent) were completed within three days. The Consent Decree requires that the report be completed within 72 hours.[193] The Department will need to redouble its efforts to ensure consistently timely investigative reviews.

## Lieutenant's Review

> *Lieutenants are not yet identifying and resolving deficiencies in Type II investigations and reports as SPD policy requires. Accordingly, they are not adequately "review[ing] the report packet to ensure it is complete*

---

[190] *See* 2014 SPD Manual Section 5.001(9).
[191] Although the interaction does not directly address the use of force, it does relate to transport of the prisoner by two involved officers.
[192] Dkt. 3-1 ¶ 104.
[193] *Id.* ¶ 106.

*and the investigation was thorough.*"[194] *Likewise, they must more regularly engage in a probing analysis of the incident and clearly "reach findings as to whether the use of force was lawful and consistent with policy."*[195]

Lieutenants clearly reviewed, to at least some extent, the sergeant's investigation to ensure that the investigations were thorough and complete in 72 percent of cases.  However, in 55 percent of cases, lieutenants failed to address investigatory issues that the sergeant's investigation left outstanding – thereby not complying with the requirements of paragraph 109 of the Consent Decree, which requires supervisors to "initiate corrective action" where "deficiencies exist" or where "additional relevant and material evidence . . . may assist in resolving inconsistencies or improve the reliability or credibility of the findings."[196]  For instance:

- An officer applied a taser to a subject.  A Seattle Fire Department witness' account differed from officer statements about the nature of the subject's purportedly assaultive actions immediately prior to deployment of the taser.  Neither the sergeant nor lieutenant meaningfully explored the core inconsistency.

- A lieutenant's review was entirely missing from one packet.  The captain's review suggests that he reviewed the sergeant's report – but does not mention a lieutenant's review.

Lieutenants reached express findings as to whether force was reasonable and necessary in 68 percent of cases.  However, some one-third (38 percent) of analyses were unduly limited or otherwise inadequate, while no analysis was provided whatsoever in another 38 percent of cases.  Monitoring Team reviewers judged the lieutenant analysis sufficiently thorough and complete in fewer than one in five in cases (28 percent).

- In a fairly simple and straightforward incident, one lieutenant's review only provided conclusions regarding the use of force ("The use of force was minor and well within SPD policy").  It did not, however, detail underlying rationales presented.

- A use of force that was originally misclassified as Type I force received a cursory and insufficiently detailed investigation by a sergeant.  The reviewing lieutenant stated a conclusion that force was appropriate as it was minimal (an officer grabbing a subject's arm).  However, the lieutenant provided no further explanation or rationale for why the force was authorized under SPD policy, proportional and reasonable under the circumstances, and consistent with the de-escalation policy.

Lieutenants reached express findings about whether the force was consistent with SPD policy in 68 percent of cases.  No analysis was provided at all in more than one-third (35 percent) of cases, and the analysis that was provided was inadequate or incomplete in about one in five cases (17 percent).  Thus, SPD still has progress to be made to ensure that "[t]he reviewing lieutenant will . . . reach findings as to whether the use of force was lawful and consistent with policy."[197]

- Three officers used a large quantity of Type II force, including a power slide takedown, multiple groin strikes, and strikes to the subject using handcuffs as an improvised impact weapon.

---

[194] *Id.* ¶ 108.
[195] *Id.*
[196] *Id.* ¶ 109.
[197] *Id.* ¶ 108.

The chain of command review identified no policy or tactical issues except the officer's failure to draw pistols when initially contacting the subject, who reportedly had a handgun. The lieutenant in particular did not have issues or concerns with material inconsistencies in the officer's statement regarding the use of force and officer tactics. Upon subsequent review, the Force Review Board referred the matter to OPA for an officer misconduct investigation.

## Captain's Review

*Captains are likewise not yet adequately "ensur[ing] that [the force packet] is complete, the investigation was thorough, and that the findings are supported by a preponderance of the evidence."[198]*

The reviews of force packets by captains were generally more adequate than the lieutenant's reviews. Nearly three-quarters (74 percent) of the written reviews themselves were generally thorough, with most (72 percent) reaching clear findings as to whether the use of force was reasonable and necessary and whether force was consistent with policy (73 percent).

Nonetheless, captains still need to do a better job of identifying and addressing issues with the underlying investigation, or inadequacies left unaddressed by sergeants and lieutenants. Where there were issues involving the thoroughness or completeness of the investigation, the captain resolved them in about 32 percent of cases. Likewise, where there were outstanding investigatory issues bearing on the determination of whether force was consistent with SPD policy, captains resolved them in only about 35 percent of cases.

"Every supervisor in the chain of command is responsible to assure the accuracy and completeness of the Investigation Reports completed by supervisors."[199] Consequently, captains must more regularly identify investigatory deficiencies and hold sergeants accountable for those deficiencies – and lieutenants who did not identify such deficiencies accountable for not addressing the issues.

---

[198] *Id.*
[199] Dkt. 3-1 ¶ 109.

# Part 4.
# Type I Reporting & Chain of Command Review

**Summary**

*The findings of the Monitoring Team's review show that SPD is in initial compliance with paragraphs 100 and 101 of the Consent Decree. Sergeants are conducting in-person screening of Type I force and classifying such force appropriately. Officers are generally documenting Type I force with sufficient detail and accuracy.*

*Although the SPD has made sufficient progress, it has not yet reached compliance with respect to supervisor obligations during the review of Type I force. The chain of command too often leaves inconsistencies or missing information unaddressed; do not reach express findings as to whether the force was in or out of policy; and fail to address important tactical, training, or related policy issues.*

## Description of Reviewed Type I Cases

Monitoring Team reviewers evaluated 55 randomly-selected Type I cases that occurred between July 1, 2014 and December 31, 2014 and for which the force investigations had close and been forwarded to the Force Review Unit as of March 17, 2015. Of those cases, 15 were selected for secondary review to ensure quality control and inter-reviewer reliability. Reviewer assessments across those 15 cases did not materially differ on the aggregate measures.

A significant majority – two-thirds (66 percent) – of Type I cases in our sample related to handcuffing. Approximately one-quarter (24 percent) of Type I force involved officers pointing a firearm at a subject. Thirteen percent involved "soft" takedowns. Various other force techniques accounted for the remainder.

Two-thirds (66 percent) of Type I force cases involved transient pain or disorientation. This suggests to the Monitoring Team that the Department is not spending a disproportionate amount of time focusing on reporting and investigating merely "technical" force where a subject does not purport to or actually experience some measure of physical pain.

By the Monitoring Team's assessment, at least 39 percent of Type I cases involved subjects who were experiencing signs of behavioral crisis (including mental impairment or intoxication).

## Type I Force Reporting

### Supervisor Notification & Response

*The Monitor finds that SPD is in initial compliance with paragraph 101 of the Consent Decree. Supervisors are responding to the scene of in nearly every instance when it is feasible to do so – and in only 5 out of 55 cases did supervisors not conduct an in-person screening with officer(s) and the subject where it appeared practical and feasible to do so. No instances were identified in which that screening improperly extended the length of the detention.*

Officers appear to be reporting Type I force to a supervisor in the manner that SPD policy requires. In 90 percent of Type I force, the force was immediately reported to a supervisor. In another 4 percent of instances,

force was not immediately reported but appropriate justification was provided. The officer documentation generally contained an adequate accounting of supervisor screening (79 percent of cases).

Supervisors appear to be appropriately responding to the scene of Type I incidents. Sergeants, or another appropriate supervisor in rare instances, conducted in-person screening with the involved officer(s) and the subject in a significant majority (80 percent) of cases. In just 7 percent of cases was in-person screening feasible and practical but not conducted. In a few instances, sergeants went to some length to conduct in-person screening of subjects.

- The screening of a juvenile subject who had complained that handcuffs were applied too tight was screened in-person by a sergeant at a children's hospital some time later.

A sergeant must respond to the scene of any use of force unless impractical or not feasible to do so. Part of the reason is so that the sergeant can classify the force as a Type I, Type II, or Type III incident for the purposes of subsequent review. At least with respect to Type I force, supervisors appear to be properly classifying force as Type I force in some 96 percent of cases.

Quite encouragingly, sergeants do not appear to be classifying more-serious Type II or Type III force – whether intentionally, to ensure less rigorous review, or unintentionally, because of misunderstandings of the classification requirements – as Type I force. Of the 55 cases reviewed, only four were potentially misclassified. Two cases involved *de minimis* force being classified as Type I reportable force. A third, more complicated case involved the sergeant classifying the force as Type II force but the FRB voting to reclassify the force as a Type I after the fact.[200] The fourth misclassified case was the only of the 55 cases reviewed in which reviewers believed that higher-level force was inappropriately classified as Type I force.

- An officer stopped a subject that he knew to have an outstanding arrest warrant on his own. The subject resisted, and the officer used a "cross face technique" to take the subject to the ground. The officer's self-described application of the technique involved him placing his forearm over the subject's nose and mouth and twisting his head down, causing the subject to fall to the ground. The subject subsequently claimed that the officer had punched the subject in the face.

  The incident occurred in September 2014. SPD trained on the cross face technique during the first half of 2014. The training did not include the intentional placement of an officer's forearm over the mouth and nose. In fact, SPD trained its officers to not intentionally block a subject's airways at any time.

  The force likely should have been classified as at least a Type II because (a) the technique could be reasonably expected to cause physical injury, and, in any event (b) the subject claimed that the officer injured her by punching her. Likewise, there is a plausible argument that the intentional blocking of the mouth and nose amounted to an untrained hold functionally equivalent to Type III force.[201] Regardless, the force was unlikely Type I force.

  The classification issue was not addressed by any of the reviewing sergeant, lieutenant, or captain.

---

[200] The Monitoring Team was somewhat confused – given that the subject was treated for injuries at the scene subsequent to a handcuffing and takedown, regardless of what injuries may have been caused by officers and what had been pre-existing or unrelated to the force – by the Board's decision to downgrade the use of force given that the subject was treated for injuries at the scene. Because the FRB is beyond the scope of this report, however, the Monitor will address FRB decisions in a subsequent assessment.

[201] *See* 2014 SPD Manual 8.300-POL-10 (prohibiting use of neck and carotid restraints except when deadly force is justified and classifying such restraints as Type III force).

## Officer Documentation

*The Monitor finds the SPD in initial compliance with in paragraph 100 of the Consent Decree. Officers are documenting Type I use of force in a searchable and retrievable format, in BlueTeam (the web-based interface of IAPro). The use of force report forms and attached officer statements are providing sufficiently detailed accounts of their actions; the suspect's actions; and the names of involved officers, witnesses, and supervisors.*

*The most notable outstanding issue with respect to officer reporting is the failure to sufficiently document in-car video (ICV) footage or explain the lack of such footage. Although three-quarters (73 percent) of Type I reports adequately document ICV footage or explain the lack of such footage, the description provided in the remainder of reports was inadequate, incomplete, or not provided. The Monitor will still want to see sustained improvement in that area going forward.*

In their Type I Force Reports, officers appear to be doing a good job of providing sufficient detail about the circumstances leading to the force and the application of the force itself. In a full 97 percent of instances, officers adequately detailed for the reason for the initial police presence. In 93 percent of instances, officers provided an appropriately detailed description of the incident and of the subject's words and actions. In 96 percent of instances, officers provided a sufficiently detailed description of their own actions and of the force applied. For example:

- A subject exhibiting signs of mental illness and possible intoxication, and known to be aggressive was running away from police after being identified as a suspect in an assault. While the subject was distracted by other officers, at whom he was waving or swinging his cane, an officer gave the subject a bear hug (a control hold) and took him to the ground without injury to the suspect or officer. One of the distracting officers had, around the same time, pointed a firearm at the subject as he advanced toward them.

The reports were thorough, providing good imagery and an appropriate amount of detail – neither too much nor little – about the scene and sequence of events.

- Officer reports of a complaint of pain due to handcuffing by a subject who had been observed walking in and out of moving traffic, and detained for community caretaking purposes, were especially thorough and complete – documenting the state of ICV footage, identifying the reason for initial police presence, and describing in sufficient detail the subject's words and actions and the officer's actions and use of force.

- A juvenile experiencing a behavioral crisis was blocking another girl against a wall while threatening to hit the other girl and fight with officers. Officers used C-clamp grips to get her under control and successfully handcuff her. She complained of pain from the handcuffs.

  The officer's report was thorough and detailed without introducing immaterial or extraneous details – noting that the cuffs were gauged and double locked and describing the scene adequately.

Officer documentation of whether the subject was injured, complained of injury, or received medical aid or evaluation was likewise generally good. In 83 percent of instances, documentation of the injury, complaint of injury, or lack of injury was thorough and complete. In most instances, the officer's relatively short and straightforward summaries were adequate under the circumstances described. For instance, in one case, the

officer said only that the subject had said "ouch" twice when he applied the handcuffs; reviewers found this to be a sufficient complaint of injury.

Actual medical aid or evaluation was not necessary in 41 percent of cases reviewed. Where it was necessary, a good majority (75 percent) of descriptions of that aid or evaluation were judged thorough and complete.

The Monitoring Team did not detect significant problems with officers relying on patterned, canned, or vague language. In just 6 percent of instances did reviewers identify with boilerplate or conclusory language, and in only 1 percent of cases did reviewers uncover language that seemed copied from other reports or sources. Still, the Monitor did identify some instances where the quality of reports could be improved:

- An officer reported only that handcuffs were applied "as trained" and that the officer subsequently adjusted them when the subject complained of pain. The report did not explain why the cuffs were double locked after pain but not before; did not list the length of time between the complaint of pain and the adjustment; and did not explain anything about the subject's behavior or condition at the time of cuffing. Although the force described appeared to be relatively minor and involved temporary handcuff pain that the officer alleviated, the report was overly generic.

- A dementia patient discharged from the hospital was observed walking on a busy street. Two CIT-trained officers responded to the call. The subject raised his walker to push past the officers. Officers seized the walker and handcuffed the subject, who complained of pain during the application of handcuffs.

  One officer's report indicated that the subject's "actions dictated we physically control him; as he was now acting out against us and we could no longer safely evaluate him [sic] was trying to use the walker as a weapon . . . ." The other officer's report indicated that the subject's "actions dictated we physically control him; as he was physically acting out against us and I could no longer safely evaluate him as he was using the walker as a weapon against us." The similarity of language, grammatical construction, and the seeming omission of words in the first officer's report all strongly suggest to the Monitoring Team that at least one officer had access to the other's report or that the officers otherwise collaborated on their reports – neither of which would be appropriate.

- An officer responded to a child welfare call, with information that the child's mother was intoxicated. The mother also had an outstanding arrest warrant. The mother was brought into custody. She complained of pain from handcuffs during her arrest.

  The officer's report failed to describe specifically when and under what circumstances the complaint of pain occurred or how the officer had applied the handcuffs. These omissions were not addressed by any of the reviewing sergeant, lieutenant, or captain.

The most significant issue with Type I reporting involved missing or insufficient documentation regarding in-car video ("ICV") footage or the omission of an explanation for the lack of such footage. Nearly one-third (31 percent) of the time, the documentation about in-car video footage was either insufficiently thorough and complete or simply not provided. Although the Monitor understand that information about ICV footage is purportedly logged in other SPD systems, the Monitor recommends that officers at least document the

existence of ICV footage for incidents – and, if it is unavailable for whatever reason, to document why the footage was not captured.

Most (89 percent) of Type I reports were completed in a timely manner as defined by SPD policy.

## Type I Review

*The Monitor finds that SPD's review of Type I force is in initial compliance with paragraph 102 of the Consent Decree. Force packets are generally sufficiently thorough and complete and contain all relevant evidence.*

*Going forward, sergeants must take care – even in the realm of relatively low-level and often more straightforward Type I force – that they resolve material inconsistencies and thoroughly cover all investigative avenues. Likewise, although the Monitor understands the significant workloads that the chain of command must manage, lieutenants and captains must remain mindful that they must reach express findings as to whether the force was consistent with SPD policy, and not merely that the investigation was closed or no issues identified.*

### Sergeant's Review

*The Monitoring Team found that a majority of sergeant reviews of Type I force generally covered the bases – including all relevant evidence and summarizing information to permit the analysis of the incident in terms of SPD policy and training. Going forward, sergeants must make continued progress toward ensuring that they uniformly explain the incident in a non-conclusory manner that permits lieutenants and captains to fully and objectively review the sergeant review.*

In a substantial majority of cases (86 percent), the use of force packet was found to include all relevant evidence. Sergeants completed their review according to SPD timeline requirements in most instances (84 percent).

In some instances, the various pieces of evidence of a force packet contained elements that were not entirely consistent with other elements. In approximately one-third (32 percent) of Type I cases, the force packet contained at least some inconsistencies. Of these, sergeants failed to identify and resolve the issues in nearly two-thirds (63 percent) of instances. However, the general completeness of the force packets themselves allowed the Monitoring Team's reviewers – just like subsequent SPD chain of command reviewers – to identify inconsistencies in evidence or statements and address it for themselves.

Sergeants reached a conclusion as to whether the Type I force was objectively reasonable in a vast majority (84 percent) of cases.[202] In many instances (64 percent of cases), the sergeant's analysis relating to whether force was objectively reasonable was viewed by the Monitoring Team's reviewers to be as thorough and complete as it could have been.

---

[202] At the start of the study period, SPD policy provided that "all reviewers shall evaluate use-of-force with regard to department policy and existing statutes and laws." 2014 SPD Manual 8.400-POL-1(3). The policy identified the sergeant as the first level of the Type I review process. *Id.* POL-1(1). On October 24, 2014, SPD issued a directive that sought to clarify the sergeant's role in reviewing Type I incidents: "Sergeants should give a brief summary of their review of the incident and give the approval [or disapproval]. Lieutenants and captains should assess the quality of the sergeant's review and briefly indicate why the approval of the force is warranted." SPD Directive No. 14-00045.

However, under current SPD policy, sergeants are not called to make an express finding as to whether the force was in policy, reasonable, or the like. *See* Dkt. 204. They are still, however, called to raise policy, tactical, training, or procedure issues. This change was intended to emphasize the idea that the sergeant should operate as a neutral and objective fact-gatherer.

The review here considers whether supervisors were adhering to then-operative SPD policy. However, the success or failure of sergeants to adhere to a policy requirement that has since been updated has been given appropriate context as the Monitor and his Team have considered what the results of the systemic assessment may say about the Department's overall progress in complying with the terms of the Consent Decree.

Thus, sergeants are using a generally complete factual record to make supportable conclusions about Type I force in most instances – but not always "showing their work" or summarizing the incident in an understandable manner. Although the Monitor understands the significant workloads that sergeants must manage, the sergeant's documentation about the force must be present and at least summarily address the issues implicated by the incident. For instance:

- Officers were called to Harborview to assist in taking two children in to Child Protective Services custody. The children's mother attempted to obstruct that process. Officers restrained her (a "soft" takedown) and applied handcuffs. She later complained of pain.

  The sergeant's report provided no analysis as to whether the force implicated any training or tactical concerns and whether there were any other SPD policy or training issues.

- An officer responded to a residential burglary call. Upon entering the dwelling, the officer encountered the subject. The officer ordered the subject to show his hands, pointing a firearm at the subject following what the officer perceived to be an unreasonable delay. Ultimately, the subject was determined to live at the residence, and no arrests were made.

  The officer's report was adequate, and the reviewing sergeant appropriately determined that the use of force packet contained all relevant evidence. However, the sergeant failed to reach findings about whether the force was reasonable, consistent with SPD policy, or raised any training, tactical, or equipment concerns. Neither the subsequent lieutenant's nor captain's review would address these deficiencies – either by making their own determinations about the force or by identifying that the sergeant's review was deficient.

Sergeants reached conclusions as to policy or legal concerns – including the legality of the enforcement action, appropriate request for medical assistance, ICV use, or the positioning of a prone subject – in 70 percent of cases. The Monitoring Team found many of them well-supported:

- An officer pointed a firearm at a subject while arresting him on a felony warrant. The officer did not tell a sergeant about the force until a phone call well after the force was used. Likewise, the officer failed to upload in-car video footage of the incident.

  The sergeant identified both issues, counseled the officer, and made an entry of the officer counseling into the PAS system.

- Following a DUI stop, a combative subject was restrained in a holding cell. Several officers assisted in applying full restraints to the subject.

  The sergeant appropriately noted that officers should not have left an un-handcuffed suspect in the cell and provides counseling to the officer who had initially placed the subject in the cell.

Sergeants similarly evaluated the Type I incident for related training, tactical, or equipment concerns in some 70 percent of cases.

- After reviewing an ICV of an incident, the sergeant appropriately counseled the involved officer for failing to identify himself when he approached the subject and notifying the subject that he was being recorded, per SPD's ICV policy.

- Officers responded to a call of a subject threatening to kill someone with possible guns at the location. A sergeant counseled an officer for parking his patrol car directly in front of the residence to which they were dispatched, given the advance indication that firearms may have been present. Similarly, the officer was counseled for searching the subject that he ultimately encountered when only a frisk for weapons was warranted.

In some instances, the Monitoring Team reviewers identified policy, tactical, and training issues that sergeants did not address. The nature of the implicated tactical concerns tended to related to de-escalation issues:

- A subject, who was reported to have been involved in a prior incident involving the theft of a gun, was stopped by officers for theft of a water bottle. The subject was placed on the push bars of a patrol car. After a few questions, the subject tried to flee, but the involved officer was able to talk him back to returning to the patrol car. Observing that the subject was sweating profusely and acting erratically, SFD was called on suspicion that the subject was intoxicated. After SFD arrived, the subject tried to flee again. A subsequently-responding officer – who was alone with the subject while the initially responding officer went to talk to witnesses – grabbed one arm before feeling the subject grab his gun. Officers and SFD took the subject to the ground. The officer's gun, which had come out of its holster, was then secured.

  The reviewing sergeant made a finding that force was reasonable, but analysis of officer tactics was limited – including why the primary and subsequently-responding officers had split, whether the subject could or should have been handcuffed earlier in the exchange, and how the subject was able to access the officer's firearm in the first instance. Although such determinations are unlikely to have altered the finding that force was reasonable and consistent with SPD policy, the quality and nature of the decision-making that led to force being used should have been analyzed. Indeed, the captains' report indicated that the gun "falling out" of the officer's holster was being addressed by the lieutenant – although the lieutenant's report does not mention if or how the issue was being addressed – but such issues were not addressed by the sergeant. This failure of the sergeant was not appropriately noted or addressed by the lieutenant or captain.

- An officer responded to a mentally ill juvenile with a history of self-harm who had locked herself into a bathroom. When she exited the bathroom, the officer grabbed her arm and applied hold to allow him to search her for weapons.

  The sergeant's review included no assessment as to the officer's tactical planning, including whether the officer had deployed any verbal strategies prior to using force that would have permitted only *de minimis* force during the search, the fact that the force occurred in an area of low lighting, and the nature of the officer's communication with on-scene mental health facility staff.

- A juvenile purportedly under the influence of LSD went to a neighborhood, jumped off a private residence dock, broke into a residence, and poured beers. A single officer arrived, approached the suspect, and took the subject into custody by employing a "soft" takedown.

Although the officer's report was thorough and complete, the sergeant's review did not provide any analysis as to the officer's one-officer approach to a subject that was suspected of being intoxicated, potentially dangerous, and likely crisis-eligible.  Subsequent reviews by the lieutenant and captain neither flagged the sergeant's omission nor addressed the issue independently.

The Monitoring Team will have more to say on the issue of whether officers are complying with the SPD officer use of force policy in the future Officer Use of Force Assessment.

## Lieutenant's Review

> *Lieutenants appear to be doing an adequate job in reviewing the Type I force, including its related packet and the sergeant review of force.  Where the sergeant has failed to adequately address outstanding issues relevant to making core determinations about whether force was consistent with SPD policy, lieutenants must take care going forward that they systematically address such deficiencies with sergeants.*

Lieutenants appropriately reached findings as to whether the incident was properly classified as a Type I (in 81 percent of cases).  Likewise, lieutenants appropriately evaluated the sergeant's reports to ensure that they were thorough and complete (in 81 percent of cases).  In cases where the sergeant's review had outstanding issues, lieutenants address those issues a majority (60 percent) of the time.

Lieutenants usually (in 77 percent of cases) conducted a good review of the sergeant's underlying evidence-gathering.  Still, in approximately one in five (20 percent) of Type I force, the lieutenant's review of the investigation was not adequate.  Consequently, of the one-quarter (25 percent) of total cases where there were outstanding issues that needed to be addressed, the lieutenant managed to address them slightly less than half (44 percent) of the time.

In most instances (79 percent of cases), lieutenants reached findings as to whether the Type I force was consistent with SPD policy.  Lieutenants had slightly more room for improvement with respect to analyzing Type I force in terms of the core determinations about whether the force was reasonable, necessary, and proportional under the circumstances – reaching express findings on these fronts slightly less than two-thirds (63 percent) of the time.  Lieutenants did not completely resolve outstanding investigatory in approximately 20 percent of cases.  In at least some instances, the lieutenant proactively identified previously unaddressed issues below:

- An officer saw a subject, who the officer knew to have an outstanding arrest warrant, walking alone in the early morning.  The officer called for backup before initiating contact with the subject on his own and ordered him to comply with the arrest.  The officer used force when the subject resisted.

  The lieutenant identified an improper contact and cover issue – which the sergeant had not previously discussed – and directed the sergeant to counsel the officer on tactics.

- The lieutenant in a review of a complaint of pain from handcuffing identified missing details from the officer's descriptions of the reason for the arrest of the subject and the actions that occurred before and during that arrest.  The lieutenant had the officer amend his report to include the information.

- A lieutenant sent one force packet back to the sergeant because the sergeant had failed to complete required criteria of the sergeant's review template.

- An officer pointed a gun at a subject as cover while the subject was commanded out of the car during an arrest from a stolen vehicle. The lieutenant's review thoroughly detailed why pointing a gun at a suspect in this situation was acceptable and consistent with SPD training.

In others, however, the lieutenant failed to address issues in the sergeant's review:

- The sergeant's report in one case, involving a complaint of pain from handcuffing, was inadequate in many respects – including the failure to describe the basis for the arrest of a subject, the failure to make clear findings as to whether the force was consistent with SPD policy, and the failure to consider any tactical considerations.

  The reviewing lieutenant failed to note or address this deficiency. In fact, the lieutenant, like the captain who would subsequently review the packet, failed to make an independent determination as to whether force was or was not consistent with SPD policy.

- Officers were part of a coordinated felony stop of a suspected drug transaction. When the stop was initiated, the driver of the suspect vehicle would not raise his hands. Two officers pointed their firearms at the driver. The driver was taken into custody without further force or incident.

  The officer reports, beyond inadequate ICV documentation, were sufficient. However, the sergeant's review failed to expressly evaluate the incident in terms of consistency with SPD policy, training, and tactics. The lieutenant's subsequent review not only failed to identify the deficiencies in the sergeant's report but independently failed to reach findings as to whether the force was consistent with SPD policy. Although the force involved was not typical, as it was a coordinated effort involving SPD supervisors, the force must still – per SPD policy – go through the usual review procedures.

  In a similar case, an ACT team was executing a search warrant. Several officers pointed their firearms at subjects during the search. All suspects complied with commands and were taken into custody without further force or incident. Again, the chain of command – from sergeant through captain – did not make findings as to whether the force was consistent with SPD policy.

Lieutenants completed their reviews in accordance with SPD policy timelines in 73 percent of cases. Frequently-cited reasons for delays were "workload" and, in at least one instance, the "cumbersome" BlueTeam system.

## Captain's Review

> *Captains generally made required findings as to whether force reports and reviews were thorough and whether the underlying force was consistent with SPD policy. Like lieutenants, captains could more clearly explain and justify their findings, as well as ensure that deficiencies or problems with the review by sergeants are addressed.*

Captains made a finding as to whether the incident was appropriately classified as Type I force in most (79 percent) of cases. Likewise, captains usually conducted the appropriate reviews as to whether the officer, sergeant's, and lieutenant's reports were thorough and complete (in 74 percent of cases) and to ensure that the investigation was sufficiently thorough and complete (in 69 percent of cases).

In some instances, the reviews were overly perfunctory and did not adequately explain the justifications for the findings.  For example:

- "This is a type 1 use of force investigation.  It is complete and should be closed."

- "Officer's actions were in compliance with training and policy."

- "This is a type 1 use of force investigation.  This investigation is complete."

- "I found no issues with the force used."

Captains reached findings as to whether the force was otherwise consistent with SPD policy in 83 percent of cases.



# Monitoring Team Staff

**Merrick Bobb**
Monitor

**Matthew Barge**
Deputy Director

**Peter Ehrlichman**
Deputy Monitor

**Ronald Ward**
Assistant Monitor

**Chief Joseph Brann (ret.)**
Senior Police Expert

**Julio Thompson**
**Marnie Carlin MacDiarmid**
Esq.

**Joseph Doherty**
**Ellen Scrivner**
Ph.D.

**Brian Center**
Senior Consultant

**Jeffrey Yamson**
**Luis Perez**
Executive Assistants

**Appendix B**



SEATTLE
POLICE
MONITOR

# Second Systemic Assessment: Force Review Board

November 2015

# Table of Contents

Table of Contents.................................................................................................................. i

Executive Summary ............................................................................................................. 1

Part 1. Methodology............................................................................................................. 7

Part 2. Results of the Assessment ...................................................................................... 9

  A.  Nature of Cases Reviewed by the Board................................................................. 9

  B.  Presentation ............................................................................................................ 9

  C.  Board Composition ................................................................................................ 11

  D.  Board Review of Underlying Investigation ............................................................. 11

  E.  Board Deliberation and Discussion ...................................................................... 12

     1.  Discussion of Officer Force ............................................................................. 12
     2.  Discussion of Implications for Policy, Training, Equipment, and Tactics .......... 15
     3.  Discussion of Quality of Force Investigation & Review .................................... 15

  F.  Board Recommendations and Follow-Up ............................................................. 16

     1.  Board Recommendations ................................................................................. 16
     2.  Follow-Up Regarding Policy, Training, Tactics, and Systemic Issues ............... 17
     3.  Memorialization of FRB Findings ..................................................................... 19

Appendix A. About the Force Review Board ...................................................................... 20

  A.  What the Force Review Board Does....................................................................... 20

  B.  SPD's Policies Regarding the FRB and Progress to Date..................................... 21

# Executive Summary

The Monitoring Team recently completed a review of all cases that came before the Seattle Police Department's ("SPD") Force Review Board ("FRB" or the "Board"), which reviews and analyzes serious (Type III) and intermediate (Type II) force, between June 2 and August 25, 2015.

The review finds SPD's FRB functioning well and, in a great majority of instances, as the Department's hub of internal accountability, analysis, and continual improvement with respect to force. The Board appears to be understanding, and embracing, its role as the key forum for "internal innovation and critical analysis" of force.[1] It is regularly exploring important issues that go well beyond whether an involved officer's use of force was consistent or inconsistent with SPD policy and instead consider "what [the] force incidents can teach the Department and its officers about training, tactics, procedure, and policy"[2]:

- Eighty-five percent of the cases were handled adequately or better by the Board in a manner that was consistent with, or above, the expectations of the Consent Decree.

- In nearly every instance (96 percent of cases), the Board appropriately evaluated the legal basis for the searches, detentions, and arrests involved in or implicated by the force incident.

- In 87 percent of Board deliberations, the group's discussion was based solely on facts in evidence, without speculation.

- In 93 percent of cases, the Board sufficiently evaluated the objective reasonableness of the force used, the proportionality of force used, and the necessity of force used.

- In instances where equipment issues were implicated, the Board's discussion adequately addressed those issues in nearly 91 percent of cases.

- Where there were issues involving the adequacy of the Department's training, policy, or adherence to best practices, the Board adequately discussed them in most (92 percent) cases.

The high proportion of cases that were handled adequately or better is a noteworthy, highly positive achievement. In more than half (56 percent) of cases, the Board found that an officer may have violated an SPD policy – either related to force (in nearly 13 percent of cases brought before the Board and nearly 9 percent of officers) or to some other issue (in the remainder of cases). Especially given that, between 2009 and 2011, only 0.04 percent of cases received any significant chain of command scrutiny whatsoever[3], it is a praiseworthy advance in accountability that SPD, through its Force Review Board, has become far more comfortable with critically analyzing and scrutinizing officer use of force and holding officers accountable for their performance during incidents involving force. For that, the Monitoring Team compliments the SPD and sees it as a

---

[1] Fourth Semiannual Report at 37.
[2] *Id.* at 37.
[3] *See* United States Department of Justice, Civil Rights Division and U.S. Atty's Office, W.D. Wash., Investigation of Seattle Police Department (Dec. 16, 2011) [hereinafter "2011 Findings Letter"] at 21, *available at* http://static.squarespace.com/static/5425b9f0e4b0d66352331e0e/t/5436d96ee4b087e24b9d38a1/14128807506/spd_findletter_12-16-11.pdf.

significant stepping stone along the path toward full and effective compliance and a notable improvement from the beginning of the consent decree, when review of force, when it occurred, was superficial at best.

As such, **the Monitor finds that the FRB's performance is in initial compliance with paragraphs 119 to 125 of the Consent Decree**. As the Monitor summarizes elsewhere in this report, FRB's composition, policies, and procedures just got up and running as of June 2015. In fact, the first Board meeting that the Monitoring Team's reviewers considered for this assessment was the first time that the newly-constituted Board met under the revamped policies and procedures. We have witnessed, in real-time, the Department and FRB committing to make important refinements and fine-tuning on its approach and operations – refinements that appear, in the first few months, to be paying off. The fact that the newest iteration of the FRB has managed to start strongly and rapidly improve is a testament to the dedication of the Board and the noteworthy commitment of its current leaders.

Because this latest iteration of the Board is still relatively new, **the Monitoring Team will take particular care to remain involved and invested in ongoing monitoring of the FRB deliberations** to ensure that the progress has been made is not temporary or short-lived but, instead, is truly systemic.

***

The Court has previously articulated the importance of the Force Review Board ("FRB")[4] to reform of the SPD under the Consent Decree:

> The ultimate goal of the [Consent Decree] reform process is to have a police organization that no longer needs the intervention of the Department of Justice or the oversight of the Monitor or the court, but rather is capable of policing this community both effectively and constitutionally through self-regulation. The FRB is a critical element of that reform process and . . . is essential to the [Department's] self-regulation.[5]

The FRB is intended to be the SPD's principal vehicle to analyze use of force. It serves two broad functions. The first is to review force investigations, critically consider them, and reach a determination as to "whether specific conduct" during a force incident amounts to possible "misconduct under SPD policy" such that an internal, administrative investigation by the Office of Professional Accountability ("OPA") should be initiated.[6] Thus, the Board must make an express determination as to whether an officer's or supervisor's performance during an incident was consistent or inconsistent with SPD policy.

In addition to reviewing the force investigation and analyzing involved officer performance, the Board must act as "quality control" for the underlying force investigations that the Force Investigation Team (" FIT") (for Type III force and some designated Type II force) and the chain of command (for most Type II force) conduct. In reviewing the investigative file (or "packet") that FRB considered, the Monitoring Team's reviewers found that the packet included all material information and evidence in 71 percent of cases. Given the Monitor's previous conclusions that Type II investigations "are not yet where they need to be," with sergeant investigations suffering from "[s]ome basic investigative deficiencies" that "[l]ieutenants and captains are . . . not yet identifying,"[7] and that a majority of cases reviewed by the FRB during the study period were Type II force, it

---

[4] A more complete accounting of the FRB and how it works may be found at Appendix A.
[5] Dkt. 225 at 8.
[6] Dkt. 204 at 18.
[7] First Systemic Assessment at 3.

does appear that improvement at the precinct level in Type II investigations should remain an area of strong focus for the Department and the FRB in the short-term.

While the first role in reviewing force can lead to OPA referrals for the review of individual officer performance, the Board's second general function—and just as important as the adjudication of whether officer and supervisor performances was in or out of policy—is to consider what the Department can learn from force incidents. In this way, the Board "do[es] far more than determine whether an officer's discharge was 'in' or 'out' of policy at the moment the trigger was pulled" or force was used."[8] Instead, "[i]t must consider the tactics of all involved officers from the time that they were dispatched or initiated activity through the use of force and securing of the scene, until the time when the involved officers completed their statements," to determine what elements of officer performance were in or out of SPD policy.[9] Within this function, the Board assesses incidents from the standpoint of how the Department itself can improve going forward, and not simply whether specific officer conduct should be subject to a disciplinary investigation. This portion of the review does not result in officer discipline referrals, but rather, referrals to any and every area of the Department in which improvements could be made to training, policy, supervision, and the like. The goal is continual improvement and implementation of best practices across all of SPD's operations.

Thus, FRB "is where SPD must dynamically analyze tactics, training, policies, processes, and procedures so that the organizations learns as much as possible from every significant use of force incident, regardless of whether the application of force in any given incident was legally justified."[10]

In his Fourth Semiannual Report in December 2014, the Monitor described how the FRB should look and function when the Department has reached full and effective compliance with the Consent Decree:

> The Force Review Board is the forum for debate and critical consideration of serious uses of force and officer-involved shootings. Analyses routinely consider not only the moment when force was applied but consider the incident as a whole, from the moment when officers are dispatched or observe possible criminal activity. Analyses likewise regularly consider each critical decision thereafter up to and including the conclusion of the event. There are routine, candid, and robust discussions of whether the matter could or should have been handled differently by a lower level of force or no force, de-escalation, allowing for the passage of time, or waiting for backup or a crisis intervention-trained officer. The Board serves as the locus of the Department's continual learning and improvement by overseeing the implementation of lessons learned. Those lessons learned are widely disseminated within the Department, and items or areas identified for improvement are regularly studied and, whenever appropriate, reach the Chief's desk for consideration and implementation.[11]

SPD made "changes to the FRB, codified in a revised policy submitted to the Court on May 11, 2015"[12] intended to address the reduced rate of progress at the FRB and the backlog of cases that had not been reviewed. Those changes, developed as part of a comprehensive evaluation and fine-tuning of all of SPD's force-related policies and pursuant to "constructive discussions with SPD officers of all ranks, [the Parties], the police officers' unions, the Community Police Commission, and a number of other community groups,"[13] were approved by the Court

---

[8] Second Semiannual Report at 34.
[9] Dkt. 204 at 34.
[10] Third Semiannual Report at 48.
[11] Fourth Semiannual Report at 9.
[12] Fifth Semiannual Report at 28.
[13] Dkt. 204 at 1; *see also* Dkt. 225 at 2–3 (describing SPD and CPC outreach efforts).

on July 27, 2015.[14]  Thus, during the period that this assessment evaluates, the Board was running according to the most recently updated policies and procedures.[15]  It is important to note that several of the intended procedural effects of the FRB appear to have been realized, with the previous backlog of unreviewed cases effectively eliminated.

***

The Force Review Board has evolved significantly.  Officer use of force is subject to far more objective, fair, and thorough analysis and discussion than it was just a few years ago.  The Board has become steadily more comfortable focusing on officer performance or tactics in the run-up to force.  In so doing, the Board has engaged in critical analysis and established a foundation for possible OPA-eligible misconduct investigations.  This constitutes significant progress.

Because the FRB is at the core of the Department's reforms, and in order to ensure that FRB's progress is maintained at the necessary level, the Monitoring Team will continue to observe FRB deliberations of all OIS and all Type III force cases going forward.  Members will cover a representative sample of Type II deliberations.  Monitoring Team members will be provided with all force review investigations before they are on the Board's agenda for deliberation, and members will attend the reviews of those Type II cases that appear to raise significant issues, problems, or concerns.  In consultation with the Monitor, those members will either simply observe FRB deliberations or, as appropriate, provide comments on issues in need of FRB deliberation and consideration.

Although FRB is in initial compliance, significant work remains to be done.  One area that the Monitoring Team will be a focus of the Monitor's ongoing attention is whether FRB recommendations and referrals of issues to other parts of the Department are treated with urgency and follow-up.  Individual FRB members do not have the charge to ensure that SPD's Policy, Training, and other departments follow up on issued identified during Board deliberations and referred to them as a result, but this sort of dynamic, internal follow-up to issues raised and lessons learned during Board deliberations is central to the FRB's mission.  If the Board's recommendations are not doggedly tracked to completion, all of the good work of the Board in reviewing and identifying issues will be for naught.

To this end, since the updated FRB policies and procedures have been implemented, the Compliance Bureau, in coordination with the other Bureaus, has redoubled commitments to ensuring appropriate follow-up and documentation of such follow-up.  For instance, the Compliance Bureau Chief will refer policy issues to the Audit, Policy, and Research Section ("APRS") for integration into potential policy revisions; if finalized, those revisions are distributed via Department-wide directive.  Additionally, the FRB Captain sends out monthly reports to each precinct that provide statistics regarding force cases reviewed each month or each precinct and recommendations for roll call training.

The hard work of the Compliance Bureau cannot alone, however, ensure that Board recommendations and insights set the occasion for changes in policy, training, and procedure elsewhere within the Department.  The Department as a whole needs to commit to treating the Board's recommendations with seriousness and utmost urgency.

---

[14] *See* Dkt. 225.
[15] In mid-May, SPD determined that instituting the contemplated changes to the FRB even before Court approval would more swiftly and affirmatively drive progress.  DOJ and the Monitor agreed so long as any potential adjustments or disapproval by the Court would be immediately incorporated by SPD when any such instruction from the Court arrived.  SPD subsequently suspended regular convening of the FRB for multiple weeks in order to train and coordinate new FRB members appointed under the new FRB policies by Assistant Chief Lesley Cordner.  The revamped FRB initially convened on June 2, 2015.

With this in mind, the Monitor will continue to observe the manner by which the Department ensures implementation of the Board's referrals and recommendations.  Although the FRB has embraced its role as a driving force for innovation and best practices, the Seattle Police Department cannot achieve overall full and effective compliance until it fully integrates the spirit of the consent decree, and in particular, the guidance of the FRB, Department-wide.  In particular, we will be looking to see additional progress in the following areas:

- The Department needs to address and resolve the low quality of underlying investigations by supervisors and for the chains' erroneous findings as to policy.  In 29 percent of cases, the packet from the precinct omitted important evidence or information material to reviewing and analyzing the force.  The Board sometimes, but not always, identifies deficiencies in the underlying supervisory investigation and review, but the Board is not designed to be the only backstop of accountability in these areas in the Department.[16]

  This finding regarding Type II investigations is consistent with the Monitor's First Systemic Assessment.  The Department has proposed a plan to place Administrative Lieutenants in the precincts to ensure quality, consistency, and completeness of force investigations before they are even submitted to FRB.  The Monitor will continue to track this effort to see if it alleviates the fundamental issues identified in the assessments.

- The chain of command had determined that the use of force was inconsistent with Department policy in only 2 percent of cases.  However, as is discussed below, the Board made a finding that officers engaged in possible misconduct in 56 percent of instances – which related to use of force itself in approximately 40 percent of the cases.  This resulted in OPA referrals for 22 of the 140 (16 percent of) officers involved in the 55 incidents reviewed.

  Although final determination of a policy violation rests with OPA, the fact that the Board identified possible violations of the use of force policy in significantly more cases than the chain of command is concerning to the Monitor.  To reach full and effective compliance, the Department will need to hold the chain of accountable for reconciling this disparity.  The Board cannot be, and is not designed to be, the sole entity within the organization to identify potential misconduct.

  Indeed, supervisors themselves have an affirmative duty to identify for themselves potential misconduct and refer it to the Office of Professional Accountability ("OPA") rather than passing the responsibility on to FRB.[17]  The Monitoring Team will consider these issues in greater detail in its upcoming assessment of OPA.

- As noted above, the extent to which the Department follows up on FRB referrals of issues to the Policy, Training, or other sections is irregular and imprecise, at best.  For FRB to continue to drive change

---

[16] Some persons argue that holding the chain of command accountable is the responsibility of the Assistant Chief of Compliance rather than the FRB or chain of command.  We respectfully disagree.  The Assistant Chief or her Captain convenes the FRB, leads the discussion, and carries out its recommendations.  As such, the Assistant Chief is acting for and on behalf of FRB, which has as one of its major charges to ensure the quality and integrity of all investigations of possible misconduct or violation of policy.  Likewise, the FRB serves as a final layer of accountability – not the sole engine of quality control.

[17] 2015 Seattle Police Manual Section 5.002, *available at* http://www.seattle.gov/police-manual/title-5---employee-conduct/5002---responsibilities-of-employees-concerning-complaints-of-possible-misconduct#5.002-TSK-1.

within SPD, the Department must take its recommendations seriously – and address them quickly and urgently.[18]

Given the substantial progress that the Board has made to date, and the swift progress that has been made under the revised Board composition, leadership, policies, and procedures, the Monitor has a good deal of confidence that this Board, under the leadership of Assistant Chief Lesley Cordner and Captain Gregg Caylor, operating under the current policies, can soon and definitively be where it needs to be.

---

[18] The Monitoring Team understands that, after the assessment period, Assistant Chief Cordner reassigned the management of the Board recommendations to her level.  She and the other Bureau Chiefs are now working together to rack and ensure follow-up of all recommendations. The Monitor is concerned that the Professional Standards and Compliance Bureau does not have high level staff other than the Assistant Chief directly working on compliance issues and recommends that an Administrative Lieutenant, or civilian equivalent, be assigned to assist the Bureau in tracking, follow-up, and dissemination of the Board's findings and recommendations.

# Part 1.
# Methodology[19]

The Court-approved Third-Year Monitoring Plan required that "[t]he Monitoring Team . . . assess the quality, rigor, completeness, and timeliness of Force Review Board reviews and deliberations on force incidents."[20]  The purpose of the assessment is to gauge—across force incidents, conversations, and FRB meetings—what aggregate trends may say about the progress that FRB has made toward compliance.

To conduct this assessment, the Monitoring Team created a review protocol (or "assessment instrument") that team members attending the FRB used to assess the nature, quality, and scope of the FRB deliberation of each force incident.  This assessment instrument contained both audit-like and evaluative elements.  For example, for each FRB review of a force case, Team reviewers needed to indicate whether the FRB was constituted in compliance with SPD policy, an important, but more narrow and mechanical determination.  Across this and other similar dimensions, Monitoring Team reviewers logged whether officers or supervisors complied with various express requirements of SPD policy, marking "yes," "no," or "unable to determine."[21]

Additionally, they were also asked whether the Board sufficiently, given the facts and circumstances of the incident, evaluated the reasonableness, necessity, and proportionality of force used in the incident. This necessarily required a more qualitative assessment in which the experienced and seasoned reviewers needed to determine whether or not the Board's discussion, given the nature of the force investigation and discussion during the Board meeting, sufficiently covered the necessary bases.  Furthermore, the instruments contained "notes" sections below most areas of inquiry that permitted reviewers to identify and discuss in greater detail the pertinent portions of the investigative file pertaining to the force or important issues identified in the packet or in the Board's discussions.

The Monitoring Team also evaluated the quality of the referrals made by the FRB.  That is not to say that significant referrals, such as those to OPA, were necessarily deemed synonymous with appropriate FRB performance.  Rather, the Monitoring Team looked at the referrals made by the FRB to determine if they appropriately addressed each of the issues raised in their deliberations, properly identified the appropriate group to refer to (*e.g.* Training, Policy, Chain), and reflected an appropriate way to address the issue identified (for instance, were serious issues referred to OPA with a dual referral back to the Chain of Command for immediate action).

Ultimately, "[u]sing methods that gather and represent human phenomena with numbers (such as standardized questionnaires and structured observation protocols), along with methods that gather and represent human phenomena with words (such as . . . unstructured observations) are classic instances of mixing data gathering

---

[19] Because the methodology used to review FRB deliberations was similar to that used to assess force investigations and reporting in the Monitor's First Systemic Report of September 2015, this section incorporates several elements and passages of that methodological discussion without citation.  Given that the Monitoring Team did not take a sample of FRB deliberations to evaluate but, rather, evaluated all deliberations within a set period (FRB discussions between June 2, 2015 and August 25, 2015), issues related to sampling and statistical significance are greatly eliminated or reduced.

[20] Dkt. 195 at 37; Dkt. 221-3 at 7.

[21] *See* Floyd J. Fowler, Survey Research Methods 121 (2009, 4th Ed.) (noting that, for self-administered questionnaires, "[c]hecking a box, clicking a response, or circling a number should be" emphasized because self-generated responses "are usually incomplete, vague, and difficult to code" or aggregate).

and analysis techniques" that are widely used by contemporary social science researchers.[22]  The use of this hybrid quantitative-qualitative approach allows this report to do more that provide vague or general conclusions.  That is, rather than only being able to say that certain features or trends apply "[i]n many cases" or "in some cases"[23], the methodology allows this report to quantify with some level of precision the size or scope of the identified trends.[24]

The Monitoring Team began using the assessment instrument to analyze all FRB deliberations from June 2, 2015 to August 25, 2015.  The data on the forms they filled out were sorted and analyzed by the Monitoring Team's data expert.

---

[22]  Jennifer C. Grenne, et al, "Combining Qualitative and Quantitative Methods in Social Inquiry," *in Research Methods in the Social Sciences*, Bridget Somekh & Cathy Lewins (eds.) 274, 274 (2005).
[23] *See, e.g.*, Police Executive Research Forum, "U.S. Customs & Border Protection Use of Force Review: Cases and Policies" at 5, 6 (Feb. 2013).
[24] *See* Phil K. Eure, Office of the Inspector General for the NYPD, "Observations on Accountability & Transparency in Ten NYPD Chokehold Cases" (Jan. 2015), *available at* http://www.nyc.gov/html/oignypd/assets/downloads/pdf/chokehold_report_1-2015.pdf.

# Part 2.
# Results of the Assessment

## A. Nature of Cases Reviewed by the Board

Under the most recent iteration of the FRB's policies, the Force Review Unit ("FRU") screens Type II (intermediate level) uses of force to weed out cases that can be resolved by the FRU without further review by the FRB.[25]  Nonetheless, during the FRB assessment review period, most of the cases (82 percent) that FRB reviewed during the studied period were intermediate-level, Type II force.  This is encouraging evidence that the FRU's screening of Type II force cases in advance of FRB consideration is not leading to any systematic lack of consideration of Type II force by the FRB.[26]

The Board rarely reviewed force cases that the chain of command had already referred to OPA – but the Board is far more regularly referring cases as a result of their deliberations to OPA.[27]  One the one hand, the Board's higher frequency of detecting possible policy violations than the chain of command underscores the importance of the Review Board as a dedicated and specialized internal accountability structure.  Without the FRB's analysis, instances of potential policy violations during force incidents may well go undetected or unaddressed.

On the other hand, however, this finding suggests that the chain of command—the sergeants, lieutenants, captains, and Bureau chiefs—is in some instances not yet fully and critically reviewing all aspects of officer use of force against the backdrop of policy and, in others, inclined to pass responsibility for such review by sending a case to OPA or the Force Review Board rather than affirmatively investigating it at the precinct level.  Although it is encouraging to see FRB's ever-increasing willingness to identify potential policy violations occurring in force incidents and sending the case to OPA, the Board must be a complement to, and not a substitute for, accountability at the precinct level and above.

## B. Presentation

Before the Board proceeds to discuss a case, members receive an oral summary of the facts of the force investigation from a member of FIT or a representative of the chain of command.  This summary is often referred to as the "presentation."  Although Board members receive the full, written investigative file in advance of each Board meeting, the Monitoring Team has observed that the initial outline of the case at the Board meeting can shape the contours of the discussion of the case subsequently.

Overall, Monitoring Team reviewers found that the FRB presentations met the expectations of the FRB's policies and the consent decree's provisions in about 86 percent of instances.  Specifically, the Monitoring found that 55 percent were thorough, accurate, unbiased and complete—including all relevant information and properly addressing all material inconsistencies or questions resulting from the investigation.  The presentation was judged "adequate" by reviewers in another nearly one-third (31 percent) of cases, reflecting the assessment

---

[25] A 10 percent random sampling of those cases is referred to FRB for quality control.
[26] Dkt. 204 at 15 (internal quotations omitted).
[27] These referrals were due both to issues with the force itself and with other policy issues that were identified during review of the incident.

that, although some aspects of the presentation could be improved, the identified flaws or concerns did not appear to materially impact the overall accuracy and completeness of the investigation. For instance:

- While presenting a Type II case involving strikes used to a suspect attempting to escape arrest, the presenting FRB member clearly articulated the actions taken by each suspect and officer involved, citing the source of each piece of information (*e.g.* "the video shows..." "the officer states that he..."). She also identified the legal authority and lawful purpose for the stop, showed the relevant ICV video, discussed the chain of command's findings and timeframe for review and identified possible areas for additional discussion regarding the tactics used. Her clear articulation of each of these issues in an unbiased and complete manner enabled the board to conduct a thorough and unbiased review.

- In another Type II case, the FRB member played the relevant ICV video multiple times over to walk the Board through the most critical moments of the incident and highlight each relevant piece of information. The FRB member did so in an unbiased manner with a focus on what the facts of the video demonstrated.

- A sergeant presenting a Type II incident in which a fleeing subject ran into bike officers, injuring both himself and the bike officers. The Sergeant provided a good, thorough, and objective presentation of the facts.

In about one in ten cases (11 percent), there was room for improvement because the factual presentation of the case to the FRB contained material deficiencies or omissions, inaccuracies, evidence of bias[28], or other significant issues that did materially impact the overall accuracy and completeness of the presentation. For instance:

- When presenting a Type II case, an FRB member simply read the statements of an involved officer out loud instead of synthesizing the evidence from various sources (other statements, ICV video, and the like) and citing those sources for each factual assertion.

- In another Type II case, an FRB board member included in his factual presentation a statement that an alleged chokehold probably did not occur based upon speculation about the suspect's motivations for saying that it did.

Further, while Force Investigation Team presentations are not conducted by FRB members, the Board still has an obligation to ensure that such presentations are thorough, complete, and unbiased. Presentations that fail to meet this standard should be the subject of a Board referral. That has not always been the case:

- In an officer-involved shooting case, three officers mistakenly shot at the occupants of a car which came up to the officers at the time shots were fired. The officers failed to assess their targets before opening fire. The occupants of the near car were, as it later turned out, attempting to escape from shooters in another vehicle down the street. Following the incident the involved officers were instructed not to speak to anyone about the incident prior to being interviewed. One of the officers had recently failed the "shoot/don't shoot" portion of training, and despite doing so against the recommendation of the

---

[28] As used in this report, "bias" is not limited to discrimination against protected groups and individuals but rather refers to bias in favor of the officer's or some other particular version of events.

Training Section, that officer was authorized to commence patrol work.  Although such information was contained within the FIT investigative materials, the presenters omitted this relevant information.

The presentation appropriately included information material for evaluating the circumstances where force was used in 89 percent of cases.  It likewise included information sufficient for the Board to evaluate de-escalation efforts in 84 percent of cases and to evaluate tactical decision-making in most (91 percent) of cases.  The presentation also included information material for evaluating the legal basis for searches, detentions, arrests, or other similar actions that occurred in the context of the incident in some 95 percent of cases.  The initial factual presentation included a showing of relevant video to the Board in most cases.[29]

The initial presentation identified and properly identified and addressed inconsistencies in 61 percent of instances where the underlying force investigation had contained such inconsistencies.  Going forward, the Monitoring Team recommends that the presentations highlight any areas of factual inconsistency in the underlying force packet.  This will better set the occasion for the Board to resolve investigative problems while also holding investigators and reviewers in FIT and the chain of command accountable for any issues with the force investigation itself.

## C.  Board Composition

One sign that a new structure or process has become an accepted part of an organization's standard operations is that it functions consistent with codified regulations when it comes to who contributes to the structure or process.

As a formalized structure of critical self-analysis, the Board is running according to a defined structure.  The Monitoring Team did not identify any serious or systemic concerns relating to the composition or constitution of the Board on a week-to-week basis.  In every instance, the FRB was constituted in a manner that complied with SPD policy.

Similarly, in all instances, standing members in attendance had attended the required FRB training.  All participants are among those who have received dedicated training on force reporting, investigation and review.  Observers and representatives from OPA, the Department of Justice, and the Monitoring Team were always permitted to attend, as required by SPD policy.  Additionally, the Monitoring Team is encouraged that the Department has constituted a diverse Board in terms of race, age, and experience.

## D.  Board Review of Underlying Investigation

In a number of instances, material omissions or investigatory issues were not addressed by the Board and the reason for those deficiencies was not an area for follow-up.  Although the Monitoring Team has seen great improvement in this area since the Board was initially established, there remain instances where the Board does not adequately address material investigatory issues or omissions.  Because part of the Board's charge is to ensure that force investigations are thorough, adequate, and complete, the rate at which it clearly addresses investigative deficiencies must continue to improve.

---

[29] The FRB has the discretion to ask to review any video at any time.  Reviewers presumptively should have watched the video prior to the Board.

## E.  Board Deliberation and Discussion

Overall, the Monitoring Team is encouraged by the quality of the Board's discussion and analysis of force cases. In 85 percent of the cases reviewed, the Boards deliberations conformed to SPD policy and the requirements of the Consent Decree.  Specifically, in 47 percent of cases, the Monitoring Team concluded that the FRB's discussion and analysis of force incidents was thorough, accurate, unbiased, and complete in about half (47 percent) of cases, with the discussion including a full and competent analysis to resolve any identified material inconsistencies and critically address all outstanding policy and training concerns.  In another more than one-third (38 percent) of cases, the FRB's discussion was adequate: meaning that, although the analysis and discussion could be improved, it was sufficiently adequately overall to have left no material questions or concerns unaddressed. For example:

- An officer deployed a Taser for a ten-second cycle with a subject who was positioned on stairs.  The Board engaged in a good debate and analysis of whether the officer's performance was consistent or inconsistent with the portion of the SPD's taser policy which permits a five-second cycle before reassessing the need to continue taser application.  But Monitoring Team reviewers believed that the Board either did not adequately discuss the portion of the policy which prohibits a taser application when a subject is in an elevated or other physical position where the risk of injury from falling is especially significant.  The officers involved in the taser application were appropriately referred to OPA, with the OPA referral including notice that the officers may have violated the Taser policy because the subject was in an elevated position.[30]

- Two officers responded to a call for a subject trespassing and harassing people in and around a downtown car dealership.  Officers contacted the subject, who refused to comply with verbal commands and resisted physical escort.  One of the officers, with the assistance of the other, lifted the subject up by his torso and took him to the ground.  The subject landed on his back.  A witness stated that one of the officers applied his forearm to the subject's neck and the subject complained that he could not breathe.  The Board found that the chain of command had failed to identify an officer's failure to act upon the subject's complaint, which is contrary to SPD policy, and for which FIT should have been summoned.  The FRB properly referred involved officers to OPA.

### 1.  Discussion of Officer Force

The Monitoring Team's conclusion that a good majority of Board discussions were superior or adequate is rooted in a number of sub-assessments on specific elements or features of the Board's deliberations in each case.

For example, Monitoring Team reviewers found most, but not all, Board deliberations were appropriately and exclusively situated in terms of the factual record rather than conjecture.  In another 13 percent, however, the discussion involved inappropriately speculative elements.

- It was unclear in one instance if the involved subject suffered an abrasion on his forehead prior to, or as a result of, the force incident.  Rather than refer the case back to the chain of command for follow-up

---

[30] After the Board meeting, the Captain and Assistant Chief overrode the Board's direction that the Sergeant be referred to OPA because they independently determined that she did not order the Taser application.  To the best of our knowledge, the new information was not communicated to the Board for further discussion whether it would change the reference to OPA.  Moreover, the Captain and Assistant Chief should be required to put in writing why and when they overrule the Board's OPA referral.  This was not done and only included as a comment in the later FRB findings report.

to determine whether a more precise determination could be made, the Board engaged in speculation in an unsatisfactory discussion.[31]

In a substantial number of cases, the Board's deliberations—given the facts and circumstances of the incident—covered the bases in a thorough, probing, critical, and thoughtful manner.

- In one case, SPD officers responded to back up officers who witnessed a burglary or attempted burglary at a homeless encampment. One involved subject had a warrant for his arrest and another was inside the back of a van.

The Board concluded that officers did not have authority to search and seize the subject from inside the van where he was apparently living. It referred officer performance to OPA on this and other grounds.

- In another case, downtown mall security officers flagged down SPD bike officers, telling the SPD officers that a male subject was threatening and harassing them and refusing to leave the property. The security officers then asked the SPD to arrest the subject. In its review of this incident, the Board discussed that the security officers cannot on their own provide probable cause for arrest. Instead, the Board noted that the SPD officers must come to their own independent conclusion based on the information they have at the time and that in this case SPD officers properly concluded they had reasonable suspicion at the time to contact and detain the subject in question. The case, however, was not without problems: the Board did not question why FIT was not called out or consulted, given the allegation of that the subject reported that he could not breathe as a result of officer contact and use of force.

- A drug use suspect was peacefully handcuffed and arrested in an alley, and while being led to the street, unexpectedly resisted, to which the officer responded by forcefully shoving the handcuffed suspect up against the wall until control was regained. The Board addressed the question of whether force was properly applied to a handcuffed subject, or whether the officer was "jacking" the suspect in violation of policy, and concluded that force was reasonable, proportional and necessary.

- In a recent use of force, the armed suspect reportedly was brandishing a knife, and was approached by two officers at a gas station. The Board determined that they applied appropriate contact and cover techniques. When the opportunity presented itself, the officer approached and applied an academy-trained "knee collapse" technique, while the other officer applied an arm hold. Both actions were determined to be reasonable, proportional and necessary given the potentially dangerous situation. A knife was located on the suspect.

- In a case where the Board disagreed with the determination of the Chain of Command's finding that the vehicle pursuit in question did not qualify as a "pursuit" under the language of the applicable SPD policy, the Board referred the vehicle pursuit policy to APRS for clarification.

- In a case involving multiple baton strikes to a subject, which conduct the Board found out of policy and unreasonable, the Board referred the matter to APRS (the SPD's policy section) to explore whether an

---

[31] Even though the injury appeared to be a minor abrasion, it appeared clear, at least to the Monitoring Team, from both the officer statement and the ICV that the take down caused the abrasion. It would have been preferable to have the chain review the officer statement and ICV to, at the least, better determine how the abrasion occurred.

expandable baton should be an officer's sole less lethal option.  The Board also referred the incident to OPA.  In another instance, the Board recommended that officers who carry batons should also be required to carry another less lethal weapon.  These instances demonstrated the Board's increased willingness and ability to identify systemic issues within SPD and recommend measures to ensure best practices, consistent with the Board's mandate.

- After the Board found an officer's use of the new X2 taser to be out of policy for firing his Taser three times where there was apparently no active resistance by the subject, the Board "[r]ecommended department wide training for all taser X2 users before use is allowed."

However, the Board's review of de-escalation techniques, including what additional tactics might have reduced or obviated the need to use force, was not sufficiently robust in 11 percent of cases.  Because this is a core area of SPD's updated force policy and a central focus of officer training throughout 2014 and 2015, the Monitor will give particular attention to the strength of these discussions going forward.[32]

- One Type II case involved the confrontation of an intoxicated suspect who was damaging business signs.  The confrontation quickly led to an attempt to arrest the man, his attempted to escape, and, ultimately, multiple Taser deployment.  During FRB deliberations, Board members stated that de-escalation was not "feasible" – apparently only examining it with respect to the decision to use a Taser on the suspect – but failed to discuss why de-escalation tactics were not feasible during the initial approach.

In cases where the adequacy of supervision during the force incident was at issue, the Board's deliberations adequately evaluated those concerns 88 percent of the time.

- In a case involving a fight disturbance and an arrest at bar closing in Bell Town amidst a crowd of people "[t]he Board also did a good job of identifying the now retired sergeant's failure to control the scene."

- In a Type III involving a force incident at Pike Place Market, the Board engaged in robust debate regarding the supervisor's decision to "go hands on," *i.e.* involve himself in the force incident as well as the supervisor's decision to have his officers clear out of the scene immediately after the force instead of remaining to debrief with officers and witnesses. Both decisions were ultimately deemed appropriate based upon sound reasoning regarding public and officer safety.

Monitoring Team reviewers found that the Board's discussions were, in most instances, uniform in nature, quality, and focus—and consistent with the FRB taking their charge seriously as the core venue for SPD to closely consider issues related to force.  In 84 percent of cases, the Monitoring Team's reviewers found that Board's deliberations were sufficiently critical, objective, and probing to ensure that uses of force contrary to law or policy were appropriately addressed.  Similarly, the nature of the Board's discussions was sufficient to confirm that uniform standards are being applied in use of force practices across 93 percent of cases.  Likewise,

---

[32] Some individuals take, in good faith, a different view.  According to their argument, a case in which it is clearly not feasible to use de-escalation or one in which extended de-escalation efforts have been used to no avail does not warrant an extended discussion, particularly a discussion of all hypothetical variations that could have occurred.  This would be true as well, they say, with respect to tactics and decision making; when officers use good tactics consistent with training the Board will likely not engage in an in-depth analysis of why the officers were adhering to best practices. The Monitoring team disagrees with this view.  The FRB in each instance should be considering whether any given case could have been handled better in terms of de-escalation, strategy, tactics, and decision-making, regardless of whether a tactic may or may not be found "reasonable" with respect to the adjudication of a particular officer's tactics.  Put simply, the Board's inquiry must focus on what officers and the Department can do better.  We strongly dispute the notion that simply because the alternative chosen could be characterized as "reasonable," there is no room for discussion of "different and better" tactics or decision making.

Team reviewers thought that the Board's deliberations were consistent with the Board sufficiently monitoring all aspects of the Department's use of force practices with the goal of continual improvement.

## 2. Discussion of Implications for Policy, Training, Equipment, and Tactics

The Board appears to be understanding, and embracing, its role as a "hub for internal innovation and critical analysis" of force.[33]  It is regularly exploring important issues that go well beyond whether an involved officer's use of force was consistent or inconsistent with SPD policy and instead consider "what [the] force incidents can teach the Department and its officers about training, tactics, procedure, and policy."[34]

Specifically, in instances where equipment issues were implicated, the Board's discussion adequately addressed those issues in nearly 91 percent of cases.  Where there were issues involving the adequacy of the Department's training, policy, or adherence to best practices, the Board adequately discussed them in most (92 percent) cases.

## 3. Discussion of Quality of Force Investigation & Review

The Board is exploring the quality of the underlying force reporting and investigation in most, but not all, instances.  The Monitoring Team's reviewers found that the Board's deliberations were sufficient to confirm whether the underlying use of force reporting by officers, investigation by sergeants or FIT investigators, and chain of command review was thorough and complete in 87 percent of instances.  Likewise, in 85 percent of cases, the Board's deliberations appeared sufficient for the Board to fairly and objectively determine whether findings from the chain of command about the force incident were sufficiently well-supported by the evidence.

Yet, in some instances, the Board did not focus on the Chain of Command's review and investigation of force in the manner that the facts required:

- An officer warned the subject not to trespass in a public park and the subject responded by slapping the officer's hand.  The officers then attempted to place the subject in handcuffs and he resisted.  In response the officers attempted to take him to the ground, and, fearing that the subject was going to strike him, the officer struck the subject in the face.  After the subject refused to put his arms behind his back for handcuffing, one officer was able to force one of subject's arms behind his back but the other used her baton to pry the other arm free.

The Board in its deliberation failed to identify the inconsistency regarding which officer the suspect struck, failed to discuss the officer's use of the baton, and failed to address the failure to seatbelt the subject or identify reasons for not doing so.

- The Board voted to disapprove the use of a Taser to the back of a suspect who had turned and was escaping from a single officer investigating low level suspicious behavior, but found that the Chain's performance assessment and counseling of the officer was sufficient.  This vote was taken despite the acknowledged lack of de-escalation and lack of proper cover/contact by the officer.  The Board chair reversed this decision after the Board meeting and referred it to OPA for a thorough investigation.

---

[33] Fourth Semiannual Report at 37.
[34] *Id.*.

## F.  Board Recommendations and Follow-Up

Overall, the Monitoring Team's reviewers found that the FRB's adjudication of the incident was objective, fair, and reasonable in a manner consistent with the Consent Decree in 84 percent of cases.  Specifically, the FRB's formal determinations followed from the Board's discussion or were sufficiently supported by the facts and circumstances of the incident in 42 percent of instances.  In another 42 percent of cases, the FRB's adjudication was adequate because, although its determinations did not necessarily follow precisely or entirely from the Board's discussions or were less well-supported by the facts and circumstances of the incident, the Board's determinations were reasonable in light of the whole of the FRB's evaluation and the force investigation packet.  In approximately 15 percent of cases, the FRB's adjudication appeared problematic because the Board's formal determinations did not reasonably follow from the Board's discussion or were not reasonably supported by the facts and circumstances of the incident, or both.

It must be noted the Monitoring Team's reviewers, in assessing the Board's adjudication of cases, were not reaching their own, independent conclusions about whether the force used in the incident was consistent or inconsistent with SPD policy.  The Monitor will have occasion in the coming months to make independent assessments as to how SPD officers are doing in the field with respect to performing in a manner consistent with SPD's use of force policy.[35]  For the purposes of this review, the standard was whether the Board's determinations about an incident were supported by the force packet, reasonable in light of the facts presented, and appropriately followed from the nature of the discussion in which Board members engaged about the incident during the FRB meetings.

### 1.  Board Recommendations

In more than half (56 percent) of cases, the Board found that an officer may have violated SPD policy – either the officer use of force policy itself, other force-related policies, or other Department policy.  Of all cases, the Board only referred approximately 30 percent of cases to OPA because of concerns about the officers' conduct in relation to the use of force policy.  The other referrals resulted as a result of identify potential policy violations arising from conduct during the incident generally, or in the investigation and review, of such an incident rather than the application of the force itself.

Especially given that, between 2009 and 2011, only 0.04 percent of cases received any significant chain of command scrutiny whatsoever[36], it is a noteworthy advance in accountability that SPD, through its Force Review Board, has become far more comfortable with identifying potential policy violations relating to force.  This marks a substantial improvement from the Monitor's prior observations.[37]

Some cases were especially noteworthy:

- A subject, suspected of being involved in a burglary, spat on the ground in front of an officer.  The involved officer ordered the subject to stop.  The subject said that he could spit on the officer if he wanted to do so, proceeding to spit on the officer's lower face and upper chest.  The officer punched the subject in the face.  With the help from another officer, that officer took the subject to the ground

[35] Dkt. 221-2 at 8–9; Dkt. 221-3 at 1.
[36] 2011 Findings Letter at 21.
[37] *See* Fifth Semiannual Report at 24–28; Fourth Semiannual Report at 37–47.

and handcuffed one wrist.  The subject "turtled" up, making application of the cuffs to the other hand impossible.  The same involved officer punched the subject twice in the side.

The Board disapproved of the punch as inconsistent with training and policy, finding that the officers did not use proper de-escalation tactics and used force that was not necessary, reasonable, or proportionate and, as such, not within policy.  It referred the involved officers to OPA.

- The Board found an officer's six-second taser application to be reasonable under the circumstances but inconsistent with policy.  It referred the matter to OPA.

Where the officer's potential misconduct or policy violation was serious, as defined by SPD policy, it was appropriately referred to OPA in about four out of five (80 percent) of instances.  For instance:

- An officer's leave caused a three-month delay in the completion of the investigation of Type II force. The Force Review Board referred the timeliness issue to OPA for an investigation.[38]

- In one instance, the Board found that the officer failed to use proper de-escalation techniques by failing to use feasible contact and cover tactics that could have slowed down the situation and decrease the likelihood that force would be necessary.  It disapproved of the tactics and officer decision-making as inconsistent with training and contrary to the SPD's de-escalation requirement.  The case was referred to OPA.

Where the officer's potential misconduct or policy was not serious—again, as defined by SPD policy—it was properly referred to a supervisor, addressed, and documented in most instances.  However, this was not done in every instance:

- An officer's muting of the on-body microphone, part of the in-car video system, was deemed by chain of command and the Board to be "inadvertent."  The violation of the ICV policy was not referred to OPA or to the chain of command for further action.[39]

Still, in some cases, important violations of SPD policies were not addressed as clearly as they may have been:

- The Board indicated that an incident would be referred to OPA for the failure of the involved officer to adhere timely to reporting requirements.  However, the Board's "findings report" indicated that the issue was referred to the involved Bureau Chief, not OPA.  As with other such reports on FRB findings, it was not clear if the there were any consequences for findings of unexcused or excessive delay in completing force reporting, investigation, and review.  At least under the current system, Monitoring Team reviewers had some discomfort with the FRB sending matters to the Bureau Chief without simultaneously sending them to OPA.

## 2.  Follow-Up Regarding Policy, Training, Tactics, and Systemic Issues

---

[38] We note, however, some inconsistencies with respect to whether untimely packet preparation and review were sent to OPA.  They should be, and the FRB should be informed of the outcome.  The Department should continue to develop management systems to ensure timely investigation and reporting; egregious cases should continue to be referred to OPA.

[39] SPD made the affirmative decision to disable the ability of officers to mute their on-body microphones.

The Monitor has previously identified some problems with the Department "lack[ing] a mechanism for following up on the broader policy, training, procedure, business process, and other systemic issues that the FRB flags . . ."[40]. Although the Department is doing a better job in this regard, it is unclear why some problems with policy and equipment significant enough to be raised and actively discussed in the Board are still not being addressed by the Department.

The Board identified a need to clarify or change SPD policy in close to one-third (29 percent) of force reviews. For instance:

- In one case, the Board found that there was excessive delay in decontaminating subjects who were sprayed with OC spray (pepper spray), in part because traffic conditions prevented Seattle Fire from arriving at the scene. The Board recommended a change in policy whereby officers who carry OC spray also carry a decontamination tool. Reviewers believed this to be a good example of the Department seeking to update and revise policies to make them practical for officers and ensure better outcomes for involved subjects based on real-world evidence. [41]

- Another incident set the occasion for a Training section review into tactics associated with suicide by cop calls. SPD responded to a call involving a suicidal subject holding a knife in the middle of a street. The suspect was out of taser range. The suspect was ultimately shot by an officer from another department with a beanbag shotgun and thereafter safely detained. Even though the use of the beanbag shotgun did not involve an SPD officer, the Board gave due consideration to it and emphasized the need for SPD to find suitable and effective long-range, less-lethal options based on the facts of the case.

However, these policy issues have – at least to date – not been followed up, with the elements of the Department charged with evaluating implicated issues or concerns failing to report back to the FRB on action taken or problems addressed. In more than half (52 percent) of those cases with policy issues, the referral and reporting back to the Board on how the issues was addressed clearly did not take place.[42]

The Board should not be a "black box." Other areas of the SPD need to take seriously the FRB's referral – treating the response to referrals of issues from the FRB with the utmost of importance and urgency. It is not clear that this has yet permeated across the Department's culture. SPD must benefit Department-wide from the FRB's critical analysis and robust discussion of force. So long as the Department only meaningfully addresses potentially policy issues in barely more than one in ten instances, the Board's hard work will not "set the occasion for changes, reforms, updates, or other action" that addresses the content of the Board's deliberations.[43]

To this end, the Monitor is encouraged by procedures that have been set in place by the Compliance Bureau to ensure recommendations from the Board are acted upon and relayed to all members of the Department,

---

[40] Fourth Semiannual Report at 43.
[41] Currently all vehicle patrol officer who carry OC spray have water in their cars for decontamination. But this officer was on foot patrol directing pedestrian and vehicle traffic following a Mariners game and did not have any water to decontaminate the individuals he sprayed with OC.
[42] In another one-third of cases (35 percent) of cases, the Board's documentation procedures and other issues did not allow the Monitoring Team to clearly determine whether the policy concerns were actually addressed elsewhere in the Department. The Monitoring Team has, since the study period, come to understand that some of this documentation existed elsewhere within the Department and was, in good faith, not produced to the Team during the period. The Parties and Team currently have a clearer understanding going forward as to how follow-up on Board referrals are documented.
[43] Fourth Semiannual Report at 43.

including those who sit on the FRB.[44]  Some recommendations of FRB are being implemented in significant ways, with, for example, the Department having purchased new-model Tasers to replace all current Tasers across the Department, which FRB had originally recommended.

### 3.  Memorialization of FRB Findings

The FRB findings report (which is where the Board's ultimate determinations and items for follow-up are memorialized and logged) accurately and fully described all findings in many (80 percent) but not all cases. Many of the findings reports were delayed in circulation during the second half of the review period.  The FRB's findings are where the hard work of the Board is memorialized or logged for future review or reference.  Going forward, the Board needs to ensure that it has the systems or processes in place to ensure that the logging of its findings and deliberations is not hit or miss but, rather, uniform and automatic.

---

[44] The Department notes that these mechanisms include a "findings" document from each FRB is sent out to each involved precinct or section, to the Captain, Operations Lieutenant, and Lieutenant.  The Findings documents are also sent out to each FRB member, and, redacted for the involved persons' names, to all lieutenants and captains across the Department.  It is also sent to the Monitoring Team and the DOJ. Referrals to OPA from the FRB are sent out by the Force Review Unit within 24 hours of the Board.  All recommendations by the FRB from the Findings document are entered into a tracking spreadsheet; during the assessment period of June 2 through August 25, the FRB met 13 times, out of which the FRB made 84 recommendations.  From this spreadsheet, an "action memo" is created and sent to the appropriate Bureau Chief with the particular action items required to fulfill the recommendation.  The Bureau Chief then responds back in kind on the action memo, and the tracking spreadsheet is updated accordingly.  In addition, the FRU authors a precinct-specific monthly report from the Board findings and data in IAPro, which includes statistics for that precinct (number and type of force incidents, sector, and hour of occurrence), as well as a summary of Lessons Learned and Roll Call Reminders.  The FRU also authors a semi-annual report which includes accomplishments and information about the FRB reviews (including trends seen, timelines, technology, Board recommendations, those incorporated into policy, those incorporated into training, etc.).

# Appendix A.
# About the Force Review Board

## A.  What the Force Review Board Does

The Department of Justice's 2011 investigation of the SPD found that the Department's "chain of command does not properly investigate, analyze, or demand accountability from its subordinate officers for their uses of force."[45]  Specifically, SPD's "secondary review process" for force was "little more than a formality that provides no substantive oversight or accountability"[46]—typically serving as nothing more than "a rubber stamp of the first-line supervisor's conclusion" that officer force was consistent with policy.[47]  During the multi-year time period that the DOJ reviewed, only 5 of 1,230 use of force files reviewed "were referred at any level for further review" up the chain of command.[48]

The DOJ's report on the findings of its investigations noted that, in response to the Department's own recognition of "the inadequacy of its current first-line investigatory and secondary review process," it had created "a Force Review Committee to . . . review⬚ use of force reports⬚ and . . . identify⬚ problematic use of force patterns and training deficiencies."[49]

The Consent Decree established specific requirements for what it refers to as a Use of Force Committee but expressly allows SPD to rename it.[50]  That Committee is currently called the Force Review Board, or FRB.

The Decree requires that the FRB "conduct timely, comprehensive, and reliable reviews" of Type II and Type III force incidents.[51]  It specifies that the Board consist of an Assistant Chief or designee to chair the Board; representatives of the Training Section; a representative of each involved precinct, selected by a precinct captain; and a representative from the Department's Professional Standards Section that is responsible for drafting SPD policy.[52]  Board members "receive a minimum of eight hours of training on an annual basis" on use of force.[53]  The Board could consult with other "subject matter experts"[54] or "other advisors"[55] when useful.

The Consent Decree sets forth the Board's mission and required scope of review of force incidents and investigations:

> The [Board] will review each use of force packet to determine whether the findings from the chain of command regarding whether the force used is consistent with law and policy and supported by a preponderance of the evidence, whether the investigation is

---

[45] 2011 Findings Letter at 4.
[46] *Id.*
[47] *Id.* at 19.
[48] *Id.* at 21.
[49] *Id.* at 22.
[50] Dkt. 3-1 ¶¶  68, 119.
[51] First Systemic Assessment at 10–12.
[52] Dkt. 3-1 ¶ 120.
[53] *Id.* ¶ 121.
[54] *Id.* ¶ 120.
[55] *Id.* ¶ 122.

> thorough and complete, and whether there are tactical, equipment, or policy
> considerations that need to be addressed.[56]

The Board reviews FIT investigations in the same manner.[57]  The reviews "should be conducted within seven days of the FIT presentation to the [Board],"[58] with FIT "responsible for presenting the investigation to the Use of Force Committee."[59]

The Consent Decree prohibits the Board from making specific recommendations concerning discipline.[60] Instead, the Chair of the Board "is obligated to ensure a referral to OPA is made if potential misconduct is discovered in the review process."[61] OPA subsequently conducts an investigation according to its processes and procedures.[62]

Similarly, if "policy, equipment, or training deficiencies [are] noted in the review process, the [Board] Chair will ensure that they are brought to the attention of the relevant commanding officer for appropriate action" – with ultimate responsibility for addressing such policy, equipment, or training issues resting with the involved officer's Bureau Commander.[63]

After the Board has completed its review, it must rigorously and regularly "document its findings and recommendations."[64]

## B.  SPD's Policies Regarding the FRB and Progress to Date

As the Monitor has previously described, "[t]he first order of business" once the Consent Decree was entered between the City and the U.S. Department of Justice "was the formulation of new Use of Force policies" that addressed the requirements of the Consent Decree[65] – including those related to the review and analysis of force incidents.  After "marathon negotiating sessions . . . between the parties" and "substantial input from SPD officers and the community," including the Community Police Commission (CPC), the Monitor considered whether the proposed force-related policies were consistent with the requirements and terms of the Consent Decree and federal law.[66]  The Monitor determined that the policies were consistent with the Consent Decree and recommended approval of the policies.[67]  The Court approved the policies in late December 2013.[68]  The policies "became effective on January 1, [2014]."[69]

Even as those clear and specific rules of the road for how the Board should function were being clarified, the Department's then-Use of Force Review Board ("UOFRB") was continuing to meet weekly to review Type II and III force.[70]  The Board was to review incidents "not only to determine whether an officer's particular force

---

[56] *Id.* ¶ 123.
[57] *Id.* ¶ 124.  The Decree calls for the reviews of FIT investigations to be "chaired by a Deputy Chief."  Id.
[58] *Id.* ¶ 125.
[59] *Id.* ¶ 118(j).
[60] *Id.* ¶ 125.
[61] *Id.*
[62] This assessment only addresses the quality and integrity of FRB consideration of force incidents.  The Monitor will separately evaluate OPA investigations.  *See* Dkt. 221-3 at 8–9.
[63] Dkt. 3-1 ¶ 125.
[64] *Id.* ¶ 124.
[65] Dkt. 107 at 2–3.
[66] Dkt. 204 at 5 (quoting Dkt. 107 at 1).
[67] Dkt. 107.
[68] Dkt. 115 at 3.
[69] Dkt. 204 at 5–6.
[70] Second Semiannual Report at 20.

was consistent with SPD policy but to consider what implications the incident might have for training, policy, practice, procedure, supervision, and the like."[71]

Accordingly, even as policies for the review of force by the Board were being finalized, SPD was committing to establishing a Board that could provide the comprehensive and probing analysis required by the Consent Decree. Representatives of the Department of Justice, City Attorney's Office, and—after a short period of disagreement—the Monitoring Team all began attending the meetings each week.[72]

Pursuant to such ongoing attendance, the Monitoring Team has provided generalized assessments of the Board in each of the Monitor's semiannual reports to the Court and Seattle community beginning with the Second Semiannual Report in December 2013. There, the Monitoring Team noted that it was "greatly pleased with the [Board's] progress," with "an increasing number of Board members hav[ing] begun to understand that the [Board] must be the SPD's hub for internal innovation and critical analysis . . . ."[73] Nonetheless, the Monitor observed that the Board still had some significant progress to made "to ensure that _all_ members of the Board participate in a genuinely freewheeling and critical discussion of the incident" and that the Board "impose[] clear, swift consequences for investigators who delay the process or submit less than rigorous materials."[74] Likewise, it noted that SPD needed to establish better processes for "lessons learned" from the Board to feed either down to officers in precincts or to other areas of the Department that might need to consider changes in policy, training, or other Department practice.[75]

As of December 2013, SPD used a separate and distinct structure, called the Firearms Review Board, to review "any firearm discharge by a SPD officer."[76] The Monitor found the performance of the Firearms Board to be especially problematic, noting that it "fail[s] to reach the higher standards of the Use of Force Review Board" that considers other officer force not involving firearms.[77] In its Second Semiannual Report, the Monitoring Team concluded that the Firearms Board "ha[d] failed to address any of the issues that the Monitor previously outlined" and that "[b]oth the scope and quality of its reviews" remained "deficient" – "lag[ging] unacceptably behind good, let alone best, practices."[78] It outlined several, specific areas for swift reform and improvement.[79]

Understanding that "the FRB [wa]s the area within the Department [in] the need of the most sweeping reform,"[80] SPD "[t]o its credit . . . met with the Parties and the Monitor to discuss reforming the Firearms Review Board."[81] The "key component of those discussions was a merger of the UOFRB with the Firearms Review Board to create a centralized, unified force review body."[82] As the Department considered such a merger, four officer-involved shootings occurred.[83] Understanding that "the Seattle community, SPD, and involved officers deserved far more than a[] Firearms Review Board process riddled with gross inadequacies and known flaws," the Parties and Monitor "engaged in numerous and sustained discussions about a process for reviewing" those shootings using a reformed and updated process.[84] The adoption of procedures that made the

---

[71] _Id._
[72] _Id._ at 22.
[73] _Id._ at 20.
[74] _Id.; see id._ at 27.
[75] _Id._ at 28–31.
[76] _Id._ at 31.
[77] First Semiannual Report at 11.
[78] Second Semiannual Report at 31.
[79] _Id._ at 36–39.
[80] _Id._ at 39.
[81] Third Semiannual Report at 55.
[82] _Id._
[83] _Id._
[84] _Id._ at 56–57.

firearms inquiry resemble the inquiry for all other force led the Monitoring Team to be "greatly encouraged by the far superior quality of the inquiry" surrounding officer-involved shootings when considered by, essentially, the same UOFRB that considers other force.[85]

With respect to non-firearm reviews, the Monitoring Team found in the Third Semiannual Report that "[t]he quality of the reviews, discussion, and analyses of force incidents by the Use of Force Review Board has continued to improve."[86]   It reported on the creation of a new Force Review Section "responsible for coordinating the Board" and which "proactively initiated several important mechanisms and processes for ensuring that lower-level review of force is more timely, rigorous, and complete."[87] It likewise noted that the Board had "recently found a use of force to be out of policy, which appear[ed] to signify an increased willingness to review incidents thoroughly and to analyze officer performance critically."[88] Still, the Monitor observed that the Board still had a distance to travel, including continuing to review force incidents, even when specific officer misconduct may be referred to OPA, for policy and training issues; seeing that "lessons learned" were circulated adequately throughout the Department; and that analysis of force was sufficiently critical and comprehensive.

By the time of the Monitor's Fourth Semiannual Report, the former Use of Force Review Board had been renamed the Force Review Board ("FRB") to reflect that it would be a sole, centralized body that would engage in "consideration of all force, including shootings."[89]   Likewise, "FRB members ha[d] engaged in a focused training effort consisting of a two-day in-class training (with pre-class assignments) and e-learning" focusing on force analysis issues.[90] In its week-to-week deliberation on force cases, the Team reported that it "continue[d] to be impressed by the hard work of FRB members" and observed that "[t]he Board more regularly and critically explores what officers involved in incidents resulting in force might have done differently from a strategic and tactical perspective."[91]

Nevertheless, the Monitor identified some areas for improvement.  First, it noted that, although the Board "far more regularly discusses whether officers could have availed themselves of different tactics or strategies," it too often avoided "addressing whether the failure to de-escalate . . . constitute a violation of SPD policy."[92] It also noted that the Department "lack[ed] a mechanism for following up on the broader policy, training, procedure, business process, and other systemic issues that the FRB flags and discusses" during analyses of force incidents.[93] Some of the Board's discussions were still too narrow, and the timeliness of some force reviews still needed improvement.[94]

Most recently, in June 2015, the Monitor observed that "although some good work has certainly continued and the Chief's new command staff has just started to implement some extremely promising changes, FRB's progress seemed to plateau in the last six months."[95]   Even where the Board engaged in robust analysis of force cases, "[t]he FRB continue[d] to appear uncomfortable concluding that force was 'out of policy' . . . "[96] – too often "revert[ing] to their own intuitive sense of what could have been reasonable under the circumstances" rather than "apply[ing] and hold[ing] officers accountable under the specific provisions of SPD's use of force

---

[85] *Id.* at 56.
[86] *Id.* at 48.
[87] *Id.*
[88] *Id.*
[89] Fourth Semiannual Report at 40.
[90] *Id.*
[91] *Id.* at 39.
[92] *Id.* at 41.
[93] *Id.* at 43.
[94] *Id.* at 43–44.
[95] Fifth Semiannual Report at 6.
[96] *Id.*

policy."[97]  Similarly, "[i]n some instances, Board members engage[d] in convoluted interpretations of policy, extended philosophical conversations . . . , or unrealistic and implausible interpretations of facts."[98]  "One effect of the FRB sometimes going to great lengths to find officer performance 'in policy'" was that, as of June 2015, the FRB was "get[ting] through fewer cases than it should in order to keep up with the general use of force activity within the SPD . . . ."[99]

The Monitor noted support for and optimism about "recent changes to the FRB, codified in a revised policy submitted to the Court on May 11, 2015"[100] intended to address the reduced rate of progress at the FRB and the backlog of unreviewed cases that had developed.  Those changes – developed as part of a comprehensive evaluation and fine-tuning of all of SPD's force-related policies and pursuant to "constructive discussions with SPD officers of all ranks, [the Parties], the police officers' unions, the Community Police Commission, and a number of other community groups"[101] – were approved by the Court on July 27, 2015.[102]

The updated FRB policies went "a significant way toward resolving some issues that appear to have been constraining the FRB from making more significant progress."[103]  First and foremost, the composition of the FRB was streamlined and clarified.  Board members are now "selected by the Assistant Chief of Compliance and Professional Standards" and "will continue to receive specialized training" on force and force investigations.[104]  They include a supervisor from the Training Section, three representatives from Patrol Operations, a representative from the Audit, Policy & Research section, and a representative from the Investigations Bureau.[105]

To address the "backlog of cases waiting review," SPD is now using "a pre-screening process within the Department's Force Review Unit" for lower-level, Type II cases.[106]  That Unit reviews all Type II force, with the FRU Lieutenant, Captain, and Bureau Chief all "determin[ing] whether cases should be referred to the full FRB for consideration."[107]  Type II cases must be forwarded whenever there is a "possibility of misconduct; potential training, equipment, or tactical issues; where FIT was contacted for consultation and declined to respond or investigate; when less-lethal instruments were used; when a canine makes physical contact with the subject; and when the subject is transported to an emergency room."[108]  Cases not meeting these requirements do not go to the FRB automatically, but, "[n]onetheless, an additional ten percent of the cases reviewed each month" are "forwarded for review to the full FRB and selected through random, blind sampling."[109]  FRB still "review[s] all Type III force incidents and officer-involved shootings."[110]

The updated FRB policies also clarify how the Board should operate from a week-to-week basis.  The Force Review Unit's Captain is expressly designated as the Standing Chair of the FRB.  A Deputy Chief or Assistant

---

[97] *Id.* at 27
[98] *Id.* at 25.
[99] *Id.* at 27.
[100] *Id.* at 28.
[101] Dkt. 204 at 1; *see also* Dkt. 225 at 2–3 (describing SPD and CPC outreach efforts).
[102] See Dkt. 225.
[103] Dkt. 204 at 15.
[104] *Id.* at 16.  Each standing FRB member must attend at least 8 hours of FRB training per year.  Id., Ex. H at 5.
[105] Dkt. 204, Ex. H at 5.
[106] Dkt. 204 at 15.
[107] *Id.*
[108] *Id.*
[109] *Id.* (internal quotations omitted).
[110] *Id.* at 16.

Chief "may chair the FRB as required by Departmental needs."[111]  The Board's "determinations will be made by majority vote."[112]  The Chair must record and document all FRB findings.

The Board, via the FRB Chair, must "refer all misconduct, other than minor misconduct to OPA" for an administrative investigation.[113]  Consistent with the "experiences of other departments, such as Philadelphia, Washington, D.C., and Las Vegas,"[114] "[t]he determination of whether the act at issue warrants such referral [to OPA] shall be determined by majority vote of the FRB or at the discretion of the Chair."[115]  Individual members may still make a "personal referral to OPA," regardless of the Board's determination.[116]

Because the charge and scope of FRB is much broader than only determining whether officer force was in or out of policy, the new policy clarifies that FRB "will continue review and recommendations relating to matters referred to OPA."[117]  In other words, voting to send a case to OPA does not suspend inquiry on force, tactics, training, and policy issues that the incident may have raised.  Whenever the Board identifies such policy, equipment, or training issues, the FRB chair must ensure referral to appropriate commanders and track the status to ensure follow-up.[118]

The updated FRB policies also clarify that the FRB must review all large-scale crowd management events and other major incidents.[119]  In these instances, the Board includes two additional members, both of the rank of lieutenant or captain, with experience in crowd management.[120]  The Board still reviews all Type II, Type III, and officer-involved shootings that occur during crowd management events but also engages in a "review of crowd management [that] will focus on command of the incident," including "whether decisions made concerning crowd management" were consistent with policy, "whether the incident commander or scene commanders adequately documented their reasons for directing the use of force," tactical or training issues, and "whether any use of less lethal force . . . was properly authorized and executed."[121]

In mid-May, SPD determined that instituting the contemplated changes to the FRB even before Court approval would more swiftly and affirmatively drive progress.  DOJ and the Monitor agreed so long as any potential adjustments or disapproval by the Court would be immediately incorporated by SPD when any such instruction from the Court arrived.  SPD subsequently suspended regular convening of the FRB for multiple weeks in order to train and coordinate new FRB members appointed under the new FRB policies by Assistant Chief Lesley Cordner.

The revamped FRB initially convened on June 2, 2015.  The Board meets every Tuesday for 3 hours in the afternoon to consider force cases that Board members have recently reviewed on their own in preparation for Board discussion and deliberation.

---

[111] Dkt. 204, Ex. H at 6.
[112] *Id.* (capitalization changed to sentence case).
[113] Dkt. 204, Ex. H at 7.
[114] Dkt. 225 at 7; *accord* Dkt. 204 at 17.
[115] Dkt. 204, Ex. H at 8.
[116] *Id.*
[117] *Id.*
[118] *Id.*
[119] Dkt. 204, Ex. H at 9.
[120] *Id.*
[121] *Id.*

## Monitoring Team Staff

**Merrick Bobb**
Monitor

**Matthew Barge**
Deputy Director

**Peter Ehrlichman**
Deputy Monitor

**Ronald Ward**
Assistant Monitor

**Chief Joseph Brann (ret.)**
Senior Police Expert

**Robert Saltzman**
**Julio Thompson**
**Marnie Carlin MacDiarmid**
Esq.

**Joseph Doherty**
**Ellen Scrivner**
Ph.D.

**Brian Center**
Senior Consultant

**Jeffrey Yamson**
**Luis Perez**
Executive Assistants



# Monitoring Team Staff

**Merrick Bobb**
Monitor

**Matthew Barge**
Deputy Director

**Peter Ehrlichman**
Deputy Monitor

**Ronald Ward**
Assistant Monitor

**Chief Joseph Brann (ret.)**
Senior Police Expert

**Robert Saltzman**
**Julio Thompson**
**Marnie Carlin MacDiarmid**
Esq.

**Joseph Doherty**
**Ellen Scrivner**
Ph.D.

**Brian Center**
Senior Consultant

**Jeffrey Yamson**
**Luis Perez**
Executive Assistants

**CERTIFICATE OF SERVICE**

I certify that on the 15th day of December, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following attorneys of record:

| | |
|---|---|
| J. Michael Diaz | michael.diaz@usdoj.gov |
| Jonathan Smith | jonathan.smith2@usdoj.gov |
| Kerry Jane Keefe | kerry.keefe@usdoj.gov |
| Michael Johnson Songer | michael.songer@usdoj.gov |
| Rebecca Shapiro Cohen | rebecca.cohen@usdoj.gov |
| Emily A. Gunston | emily.gunston@usdoj.gov |
| Puneet Cheema | puneet.cheema2@usdoj.gov |
| Timothy D. Mygatt | timothy.mygatt@usdoj.gov |
| Christina Fogg | christina.fogg@usdoj.gov |
| Annette L. Hayes | annette.hayes@usdoj.gov |
| Jean M. Boler | jean.boler@seattle.gov |
| Peter Samuel Holmes | peter.holmes@seattle.gov |
| Brian G. Maxey | brian.maxey@seattle.gov |
| Gregory C. Narver | gregory.narver@seattle.gov |
| John B. Schochet | john.schochet@seattle.gov |
| Rebecca Boatright | rebecca.boatright@seattle.gov |

DATED this 15th day of December, 2015.

*/s/ Matthew Barge*
Matthew Barge

THE SEATTLE POLICE MONITOR'S SIXTH
SEMIANNUAL REPORT
Case No.  C12-1282JLR

Merrick J. Bobb, Monitor
Police Assessment Resource Center
PO Box 27445
Los Angeles, CA 90027
(213) 623-5757