EXHIBIT A

**Seattle**
Community
**Police Commission**
Our city. Our safety. Our police. Better together.

# An Assessment of the Seattle Police Department's Community Engagement

Through Recruitment, Hiring, and Training

January 2016

## TABLE OF CONTENTS

About the Community Police Commission............................................. 1

Introduction....................................................................... 3

Sources and Methodology............................................................ 4

Summary of Findings................................................................ 5

Section 1: Demographics............................................................ 6

Section 2: Recruitment............................................................ 11

Section 3: Hiring................................................................. 15

Section 4: Field Training......................................................... 26

Conclusion........................................................................ 33

Bibliography...................................................................... 34

Appendix I: Outreach and Feedback................................................. 37

Appendix II: Interviewees......................................................... 41

Appendix III: CPC Listening Sessions.............................................. 42

Appendix IV: Demographic Advisory Councils Attended by CPC........................ 43

Appendix V: SPD Hiring Standards.................................................. 44

## ABOUT THE COMMUNITY POLICE COMMISSION

The 2010 shooting death by a Seattle police officer of First Nations woodcarver John T. Williams, and a series of other serious incidents involving police and people of color, ignited public concern about racial bias and the use of excessive force in the Seattle Police Department (SPD). After a federal investigation, the City of Seattle in July of 2012 signed a settlement agreement with the US Department of Justice (DOJ) to reform SPD practices. Guiding that commitment was a memorandum of understanding (MOU) with DOJ establishing the work to be done over the subsequent years to ensure bias-free policing and to address the issue of use of excessive force. By ordinance, and as mandated under the MOU, the City of Seattle established the Community Police Commission (CPC).

The CPC began its work in March of 2013. Its mission is to give community members a voice and stake in police reform efforts. Specifically, its charge is to represent a broad range of community perspectives and to reach out and engage communities directly, to get critical feedback, and to then recommend changes to SPD policies and practices. The city provided the CPC with resources (e.g. budget to operate an office and hire staff) to support the work outlined in the MOU.

The CPC is depending on community involvement over the long haul. Community perspective is needed for short-term proposed policy changes and also down the road for determining whether the policies and practices that SPD may adopt will have been, in fact, effective. Meanwhile, the CPC fosters ongoing dialogue about police practices with community members in order to build trust and strengthen community-police relations. All CPC recommendations are intended to:

- ensure police services comply with the Washington State and US constitutions, as well as state and federal law;
- increase the effectiveness of the police accountability system; and
- promote public confidence in SPD.

The CPC's 15 commissioners are appointed by the mayor and confirmed by the city council. At times the CPC has commissioner positions that go unfilled due to the amount of time it takes to identify and confirm replacements following commissioner departures. As of January 2016, the CPC has three vacancies.

The CPC represents the diversity of Seattle and includes people from communities of color, ethnic and faith communities, immigrant communities, the urban Indian community, the LGBTQ community, civil rights advocates, and the business community. The group also includes individuals familiar with the challenges faced by homeless people and those with mental illness or substance abuse issues, as well as Seattle's youth. One member represents the Seattle Police Officers' Guild and one represents the Seattle Police Management Association. CPC members live or work in all five Seattle police precincts.

While the CPC is an independent commission, it works closely with many community organizations. Other key partners include the SPD, the Office of Professional Accountability, the mayor's office, the DOJ, the city attorney's office, and the Seattle Police Monitor, who oversees the settlement agreement.

## Community Police Commission Members

- **Lisa Daugaard (co-chair)**, Policy Director at the Public Defender Association
- **Harriett Walden (co-chair)**, Reverend
- **Claudia D'Allegri**, Vice President of Behavior Health at Sea Mar Community Health Centers
- **Melinda Giovengo**, Executive Director of YouthCare
- **Kay Godefroy**, Founder and Executive Director of the Seattle Neighborhood Group
- **Enrique Gonzalez**, Juvenile Justice Policy Advocate
- **Jay Hollingsworth**, Chair of John T. Williams Organizing Committee
- **David Keenan**, Attorney
- **Marcel Purnell**, Program Coordinator for Youth Undoing Institutional Racism
- **Jennifer Shaw**, Deputy Director of the American Civil Liberties Union of Washington
- **Kevin Stuckey**, Seattle Police Officer
- **Aaron Williams**, Reverend

## INTRODUCTION

In the July 27, 2012, MOU between DOJ and the City of Seattle, the CPC was charged with conducting an assessment of the community's "experiences with and perceptions of SPD's community outreach, engagement, and problem-oriented policing."[1]

Community engagement is a complex topic that means different things to different people. After collecting feedback across Seattle to gain direction (see Appendix I, Parts A-C), the CPC distilled the comments into 10 topics for potential analysis within the larger theme of community engagement (see Appendix I, Part D). We then prioritized three of the topics based on our understanding of the interests and concerns of the constituencies we represent. This report documents our findings from one of those topics, namely, whether SPD's policies and practices in recruitment, hiring, and training of officers promote positive engagement with people from racial, ethnic, immigrant, and refugee communities.[2]

The CPC prioritized the study of recruitment, hiring, and training because it emerged as a central community concern across all demographics. In addition, SPD is in the middle of a hiring surge, and we hoped our assessment would ultimately inform the department's practices. Specifically, we are studying SPD's policies and practices as they may affect its relations with racial, ethnic, immigrant, and refugee communities. Certainly, the CPC recognizes the importance of studying other historically underrepresented communities. Provided that we have the resources necessary, we plan to carry out future assessments along these lines.

The other two topics that were prioritized and flagged for immediate study regard communications and the formal channels available to racial, ethnic, immigrant, and refugee communities to provide input to SPD, and the communication structures employed by SPD to provide output to those communities. Findings on those topics will be released in the spring of 2016.

This report, meanwhile, broadly addresses the question of whether SPD's policies and practices for recruitment, hiring, and training are sufficient to assure that its personnel reflect, understand, and engage with the many racial, ethnic, immigrant, and refugee communities it serves. This is a very expansive area to cover, and our report does not have all the answers. Nevertheless, it attempts to shed light on strengths, weaknesses, and opportunities for improvement. This report does not offer any recommendations; rather, those will be formulated in the coming months in collaboration with the community and SPD.

We have pursued information about the racial makeup of SPD and how it compares to the City of Seattle's population, how SPD's congruity in racial composition compares to that of other cities, the department's current goals for increasing diversity in new hires in the midst of a hiring surge, and how SPD handles recruitment and hiring with regard to racial/ethnic candidates. We have also considered whether there are unnecessary barriers for such candidates moving through the multiple hurdles of the application and selection process and whether there is identifiable attrition. In addition, we have recounted many of the expressed concerns within the communities where we conducted interviews and listening sessions. Finally, we have examined SPD's training of new officers to evaluate the level of focus placed on developing community engagement and cultural competency skills.

---

1.  The United States and the City of Seattle, *Memorandum of Understanding between the United States and the City of Seattle* (July 27, 2012), 3–4.

2.  From this point forward, the reference to "racial, ethnic, immigrant, and refugee communities" will be shortened to "racial/ethnic" or "racial/ethnic communities" for simplicity. The intent is for this abbreviated reference to still encompass immigrant and refugee communities and any other non-white individuals. The CPC prefers to avoid the use of other shorter but often disparaging terminology, such as "minority," which can be interpreted as inferior or less than.

## SOURCES AND METHODOLOGY

To compare the racial composition of SPD and other law enforcement agencies with the cities they serve, we analyzed US Census Bureau data, national law enforcement agency staffing surveys, and SPD personnel data, in addition to reviewing relevant news articles.

To understand SPD's philosophy regarding targeted recruitment for increasing the diversity of future hires, we gathered data and interviewed officials from SPD's Human Resources Department, Recruiting Unit, and Background Unit (see Appendix II). We also visited and corresponded at length with SPD recruiters to collect more detailed information on current strategies used to recruit applicants, particularly in racial/ethnic communities. Furthermore, we scoured the SPD jobs webpage, the public recruitment materials, and internal SPD recruiting documents to obtain a full picture.

To learn about the selection process and consider barriers to success, we conducted interviews and analyzed data provided by the Seattle Public Safety Civil Service Commission, given its role as the coordinating agency for the initial application process and the civil service exam. To identify a range of perspectives, we talked to and corresponded with personnel from various units across SPD. We also organized a focus group and arranged individual phone calls with 14 SPD sworn personnel who self-identified as people of color who wanted to participate in our study.

To gather information regarding SPD training of its new officers, we spoke with SPD field training staff and reviewed the SPD field training handbook. We also conducted research on the philosophy and curriculum at Washington's Basic Law Enforcement Academy and communicated with its staff members in order to establish a point of comparison between how the academy and SPD conduct their portions of training. In addition, we talked to staff from both Seattle's Office for Civil Rights and the CPC about trainings on racism and cultural competence. Finally, we researched different models of field training employed nationwide.

Our evaluative criteria for each of these areas of study were informed by literature from the field and research on best practices. Also taken into consideration were policies and practices of other law enforcement agencies across the country. We conducted the bulk of this research between February and November 2015.

Input from the community was gathered on multiple topics to enhance our grasp of community and individual perceptions, and for this report, to present those perceptions with regard to SPD officers, careers in policing, and experiences with the hiring process. Community input was collected during listening sessions held in various racial/ethnic communities (and in various languages) in April and May 2015 (see Appendix III). Furthermore, the CPC attended many SPD Demographic Advisory Council meetings (see Appendix IV).

## SUMMARY OF FINDINGS

### SPD is more diverse than many police departments, but lacks strategies for engaging the varying communities it serves.

SPD is more diverse in its racial and ethnic composition compared to law enforcement agencies in other cities, a potentially significant asset. However, its recruitment, hiring, and field training programs each lack some important strategies for engaging and understanding the diverse communities it serves.

With regard to recruitment, SPD has established an initial application process that is clearly defined and has deployed a recruiting staff that is approachable and responsive to applicant inquiries. However, its plan to add 100 new sworn officers by the end of 2018 has no explicit strategy and goal for ensuring hires from racial/ethnic communities. Meanwhile, community interviews revealed negative views of policing as a career, while recruitment officials expressed concern that national and local news stories have fostered negative perceptions.

With regard to hiring, while SPD's recruitment initially yields a significant number of applicants from racial/ethnic communities, we found that a relatively high proportion drop out early in the application process, and others disproportionately fail the civil service exam. The department has not analyzed this data to consider the reasons for this attrition and whether it could be remedied. Furthermore, for the subsequent stages of the hiring process, the department does not specifically track racial/ethnic candidates, a fact that has precluded the CPC's ability to assess hiring outcomes. Although SPD favors candidates with military experience through a point system, it does not do so for such potential assets as language skills, being a Seattle resident, or having experience working with disproportionately affected communities. Nor does it mentor racial/ethnic individuals through the hiring process, despite research pointing to its effectiveness. Meanwhile, the oral boards and background investigations lack some transparency in terms of whether or how they employ objective, validated criteria. With regard to racial/ ethnic community views on the hiring process, those whom we interviewed through listening sessions cited job qualifications and hiring standards as seemingly unreasonable hurdles.

As for training new hires, SPD has improved its advanced classroom curriculum by adding instruction in bias-free policing and service to individuals in behavioral health crisis. However, SPD's advanced curriculum and field training programs still lack components for developing cultural competency and community engagement skills, both of which are invaluable for policing in communities with different social customs and modes of communication. Finally, as a result of previous understaffing, the SPD Field Training Unit has lacked adequate support and oversight, but is making improvements with internal restructuring and staffing additions in the latter half of 2015.

## SECTION 1: DEMOGRAPHICS

### Compared to other police departments, SPD better reflects the racial makeup of the communities it serves.

SPD more closely mirrors the racial makeup of Seattle residents than law enforcement agencies in other cities, both nationally and in the Pacific Northwest. A September 7, 2014, *Associated Press* analysis that used DOJ staffing surveys documenting more than 1,400 police departments and Census Bureau data of the racial makeup of the communities they served found SPD to be among the most balanced in its representation, as were police departments in Miami Beach, Florida; Oak Park Village, Illinois; Pasadena City, California; Bexar County, Texas; Cambridge, Massachusetts; New Orleans, Louisiana; and Washington, D.C.[3]

*The New York Times* on September 4, 2015, published an analysis similar to that of the *Associated Press*, using the same DOJ and US Census data. The *Times* article found that in hundreds of police departments across the country the proportion of white officers on the force was at least 30 percentage points higher than in the communities they served, while SPD showed closer to a 9 percentage point difference.[4]

Using the *Times* analysis as a starting point, we conducted our own review of data from DOJ and US Census data for medium-to-large cities across the US. Our analysis found that SPD more closely mirrors the racial makeup of Seattle than the police departments in 16 of 20 other cities (see Figure 1).[5]

Again using the *Times* data, we compared SPD sworn personnel to sworn personnel in police departments in five other major Pacific Northwest cities, including Spokane, Everett, Tacoma, Portland, and Bellevue, and we found that the police in Seattle and Spokane most closely reflect the racial demographics of the cities they serve (see Figure 2).[6] Both SPD and the Spokane Police Department's sworn personnel were 9 percentage points more white than the city's general population. The other police departments analyzed were between 16 and 26 percentage points more white than their respective city populations.

3.   Eileen Sullivan, "Report: Seattle Among 'Balanced' Police Departments in US," *Associated Press*, September 7, 2014, accessed June 25, 2015, http://www.komonews.com/news/local/Report-Seattle-among-balanced-police-departments-in-diverse-US-cities-274265101.html.

4.   Jeremy Ashkenas and Haeyoun Park, "The Race Gap in America's Police Departments," *New York Times*, September 2, 2014, accessed June 25, 2015, http://www.nytimes.com/interactive/2014/09/03/us/the-race-gap-in-americas-police-departments.html?_r=3.

5.   Ibid; United States Census Bureau, "2010 US Census," (2010); Bureau of Justice Statistics, "Data Collection: Law Enforcement Management and Administrative Statistics," (2007).

6.   Ashkenas and Park, "The Race Gap in America's Police Departments"; US Census Bureau, "2010 US Census"; Bureau of Justice Statistics, "Data Collection: Law Enforcement Management and Administrative Statistics" (2007).

FIGURE 1: RACIAL DISPROPORTIONALITY BETWEEN POLICE FORCES AND MEDIUM/LARGE
CITY POPULATIONS (2010)



National Cities

Sources: Ashkenas, Jeremy and Haeyoun Park, "The Race Gap in America's Police Departments," *New York Times*, September 2, 2014; United States Census Bureau, "2010 US Census," 2010; Bureau of Justice Statistics, "Data Collection: Law Enforcement Management and Administrative Statistics," 2007.

**RESEARCH SAYS:** Experts report that when a police department's officers reflect the racial demographics of the communities they serve the department fulfills several important purposes. First, if a police department reasonably reflects the community's racial and ethnic makeup, it helps convey a sense of equity to the public. If it does not, it can invite suspicion as to why members of various racial and ethnic groups are not represented. Second, it increases the probability that the department will be able to understand the perspectives of racial and ethnic communities and be able to communicate more effectively with them. Employing police officers who understand and empathize with various cultures may contribute to more effective policing. Third, it increases the likelihood that officers will come to better understand and respect various racial and ethnic perspectives through their daily interactions. Lack of exposure to other cultures can increase the likelihood that citizens' motives will be misunderstood.[7]

---

7.   Lorie Fridell et al., *Racially Biased Policing: A Principled Response*, (Police Executive Research Forum, Washington DC, 2001), 68-70.

It is important to note that there are significant inherent weaknesses in the available data that make it difficult to precisely determine the racial makeup of cities, and therefore the extent to which police departments mirror the populations of the cities they serve.[8]

FIGURE 2: RACIAL DISPROPORTIONALITY BETWEEN POLICE FORCES AND PACIFIC NORTHWEST CITY POPULATIONS (2010)



Pacific Northwest Cities

Sources: Community Police Commission analysis of: United States Census Bureau, "2010 US Census," 2010; Bureau of Justice Statistics, "Data Collection: Law Enforcement Management and Administrative Statistics," 2007.

Nevertheless, even with data limitations, our own evaluation of Seattle's 2013 population statistics (the most recent data available) and May 2015 SPD sworn personnel data provides a general picture of the current composition of SPD in comparison to Seattle's population (see Figure 3).[9] The proportion of SPD sworn officers who are white is 7.3 percentage points greater than the city's overall white population. There is a slightly larger proportion of black or African American SPD officers (about 1 percentage point)

8. Not everyone identifies with one or more of the racial categories defined in the US Census (for example, East Africans do not necessarily identify as black or African American, and therefore may choose the category of "other" or possibly not respond to the survey); DOJ data is from 2007 but is the most recent data available; population surveys may undercount certain populations (particularly undocumented individuals and American Indians and Alaska Natives who are members of tribes not recognized by the US government); and the data only reflects the residential population rather than the more transient population.

9. United States Census Bureau, "2013 American Community Survey Data (Seattle)" (2013); Seattle Police Department, "Sworn Personnel Data, As of May 2015" (unpublished data).

Section 1: Demographics

than their representation in the population, as is the case for officers who are American Indian or Alaska Native (1.5 percentage points) or Native Hawaiian or other Pacific Islander (0.5 percentage points). Among those who identify as "Two or More Races," the proportion of SPD officers is lower (by about 2 percentage points) than their representation in the population, and the proportion of Hispanic/Latino officers is 1.7 percentage points lower than the city's Hispanic/Latino population. Asians are the least represented group in SPD; the proportion of Asian officers is approximately 7 percentage points lower than the proportion of Asians in the city's overall population.

A COMMUNITY VIEWPOINT: *There aren't enough people 'like us' on SPD—we want to see officers in our community who share our physical traits and cultural values.*

FIGURE 3: COMPARISON OF SEATTLE'S RACIAL MAKEUP (2013) AND THAT OF SPD'S SWORN PERSONNEL (2015)

Percentage Point
80
70
60
50
40
30
20
10
0
Seattle Population
SPD Sworn Personnel
0.4
0.9
0.5
2
4.5
2
6.4
4.7
7.2
8
14
6.9
66.7
74
Native Hawaiian and Other Pacific Islander
American Indian and Alaska Native
Two or More Races
Hispanic or Latino
Black or African American
Asian
White
Race

Sources: Community Police Commission analysis of: United States Census Bureau, "2013 American Community Survey Data (Seattle)," 2013; Seattle Police Department, "Sworn Personnel Data, As of May 2015," received May 2015.

FIGURE 4: NUMERIC COMPARISON OF SEATTLE'S RACIAL MAKEUP (2013) AND THAT OF
SPD'S SWORN PERSONNEL (2015)

| Race | SPD Sworn Personnel (#) | SPD Sworn Personnel (%) | Seattle Population (#) | Seattle Population (%) |
|---|---|---|---|---|
| White | 994 | 74% | 416,569 | 66.7% |
| Black or African American | 109 | 8% | 45,193 | 7.2% |
| Asian | 93 | 6.9% | 87,555 | 14% |
| Hispanic or Latino | 63 | 4.7% | 40,110 | 6.4% |
| Two or More Races | 32 | 2.3% | 28,402 | 4.5% |
| American Indian and Alaska Native | 27 | 2.0% | 3,360 | 0.5% |
| Native Hawaiian and Other Pacific Islander | 13 | 0.9% | 2,567 | 0.4% |
| Not specified/ some other race | 13 | 0.9% | 925 | 0.1% |
| **Total** | **1,344** | | **624,681** | |

Sources: United States Census Bureau, "2013 American Community Survey Data (Seattle)," 2013; Seattle Police Department, "Sworn Personnel Data, As of May 2015," received May 2015.

Section 1: Demographics

## SECTION 2: RECRUITMENT

SPD conducts significant outreach to racial/ethnic communities, but recruitment lacks an explicit strategy for increasing diversity.

In 2015, SPD's goal was to hire 90 officers (10 more than the number of hires in 2014). This target took into account unfilled vacancies, estimated attrition, and some recruit failures during basic and field training,[10] and is consistent with Mayor Ed Murray's plan to increase SPD's sworn staff by 100 by the end of his term (2018).[11]

As a result of the City's commitment to increase the number of sworn officers, SPD has had an opportunity to further diversify the department. However, while the department's recruiters attempt to reach out to many different communities, specific strategies and resources for doing so are limited. Personnel we interviewed from SPD's hiring team expressed the view that the department treats all candidates and communities "equally," irrespective of race[12]—a position that may explain the lack of an organizational plan with specific goals for diversity.

Further, the SPD Recruiting Unit's strategic plan has remained largely unchanged over the past few years. A section titled "Targeted Recruitment" is very general and lacks a racial/ethnic recruitment plan with directed activities, clear benchmarks, and specific timetables.[13]

**Recruitment Unit Staffing.** The SPD Recruiting Unit is staffed by two officers, who were, until recently, both male—one white and one black. In August 2015, a white female recruiter took the place of the black officer. These officers are tasked with a range of responsibilities, one of which is to attend community events to recruit interested individuals. They attend academic and military career fairs, job expositions, festivals, and special events across the state, including some Seattle events that target racial and ethnic communities.[14] In the first half of 2015, the two officers attended an average of eight recruiting events every month, many requiring travel across the state.[15]

A COMMUNITY VIEWPOINT: *SPD doesn't turn to willing minority community members for recruitment ideas and assistance. The department's recruitment efforts in communities of color, as well as immigrant and refugee communities, are insufficient and poorly executed. They need to try harder.*

The recruiters are limited in the number of outreach events they can attend because they also have responsibilities for a number of other candidate selection procedures. For example, they lead many exam preparation workshops and help to staff the entry-level and lateral exams, physical agility tests, and oral boards.

10. Mike Fields (Director, Human Resources Department, SPD), "Seattle Police Department Presentation to Seattle City Council Committee on Public Safety, Civil Rights and Technology" (presentation, Seattle City Hall, April 1, 2015).

11. Anna Minard, "How Many Police Officers Is 'Enough'?" *The Stranger* (Seattle, WA), October 1, 2014, accessed June 25, 2015, http://www.thestranger.com/seattle/how-many-police-officers-is-enough/Content?oid=20712411.

12. Mike Fields (Director, Human Resources Department, SPD), Andre Sinn (Detective, Recruitment Unit, SPD), Thomas Janes (Officer, Recruiting Unit (formerly), SPD), and Deborah Nicholson (Sergeant, Background Investigations Unit, SPD), interview with Community Police Commission staff, March 17, 2015.

13. Seattle Police Department, "2015 Recruitment Plan Overview," received March 2015.

14. Examples include the Arab Festival, Pista sa Nayon, the Chinatown International District Dragon Festival, and the Asia Pacific Islander Fair.

15. Seattle Police Department, "2015 Recruiting Events," received June 2015.

**RESEARCH SAYS:** Research studies have shown that all racial and ethnic groups are receptive to recruitment events and to approximately the same degree.[16]

In the course of our interviews with both SPD personnel and community leaders, many expressed the view that one of the greatest strengths of the department's Recruiting Unit is its energy, accessibility, and the level of personal engagement exhibited with potential applicants. Interviewees particularly noted that these officers are very responsive in answering calls and emails from anyone interested in applying. One community leader expressed appreciation that the [white] recruiter, "acted as an advocate for the community and multicultural population." In our own interviews with the recruiters, we found both officers to be extremely approachable, open, and candid.

Certainly, recruitment responsibilities should not rest solely on the shoulders of SPD's professional recruiters. In a focus group of SPD officers of color, one participant maintained that "the best recruiters are the 1,300 SPD officers."[17] To encourage tenured employees to take recruiting seriously, particularly with potential candidates in racial/ethnic communities that may be harder to reach, some police departments offer financial bonuses or paid time off for successful referrals.[18] SPD offers employees a day off for each referred applicant who is ultimately hired. Interviews with various SPD personnel strongly indicated that paid time off is not adequate incentive to actively recruit new hires; rather, the officers would be more motivated by cash. Nevertheless, in 2016 the department will further encourage all officers to think in terms of recruitment by providing them with "recruiting cards" that they can distribute to community members encountered during their shift who may be good candidates for hire.[19]

**Marketing and Advertising.** In 2015, SPD allocated $48,000 for recruitment advertising on radio, in print, and on the Internet.[20] Most of these efforts, such as C89.5 radio and the *Alaska Airlines Magazine*, were not customized to appeal to racial/ethnic populations. However, racial/ethnic community members were the target audience for a variety of ads, including those placed on *Saludos.com* and in *NW Asian Weekly* and *The Cause* (online and print magazine). It should be noted that none of the ads are tracked or measured for success. While $48,000 is not a large figure, there was no funding for advertising and marketing in 2013 and 2014.

16. Carl F. Matthies, "Evidence-Based Approaches to Law Enforcement Recruitment and Hiring" (doctoral thesis, Pardee RAND Graduate School, RAND Corporation, 2011).

17. Seattle Police Department Personnel, Focus Group and Interviews with Dr. Bruce Brown (PRR, Seattle WA), April 2015.

18. Bruce Taylor, et al., "Cop Crunch: Identifying Strategies for Dealing with the Recruiting and Hiring Crisis in Law Enforcement," Police Executive Research Forum, December 30, 2005.

19. Andre Sinn (Detective, Recruitment Unit, SPD), interview with Community Police Commission staff, November 11, 2015.

20. Les Liggins (Captain, Human Resources, SPD), e-mail correspondence with Community Police Commission staff, June 2015.

**RESEARCH SAYS:** According to a 2009 study, law enforcement agencies with more recruiting resources produce a larger pool of qualified minority applicants and a higher proportion of successful minority hires. The study specifically found that an increase in the recruiting budget of $16,900 resulted in 48% more minority hires.[21]

Data collected by the Public Safety Civil Service Commission from almost 5,000 SPD entry-level exam-takers between July 2014 and May 2015 indicates that people learned of SPD job opportunities in various ways, the top three of which were: SPD's website (61%), a Seattle police officer (20%), and employment/career fairs (4%).[22] The extent to which SPD has used this information to guide its decisions related to advertising and marketing is unclear.

The SPD police jobs website employs many known best practices for recruitment. It is visually appealing and showcases photos of racially diverse officers conducting positive, varied police work. It also prominently posts information on how to apply to the department, including hiring process details and testing dates, and it clearly lists benefits, salary, and shift schedules.

However, there is no specific mention that the department is seeking racially and ethnically diverse candidates, nor is there a clearly visible reference that SPD is an equal opportunity employer. As an example, here is how the Wichita, Kansas police department highlights diversity in its online recruitment materials: "We appreciate our differences and recognize that unique skills, knowledge, and backgrounds bring strength to the community. We aspire to create a police department that reflects our community. We embrace and include our community by seeking their input and responding to their concerns."

**RESEARCH SAYS:** One study found that law enforcement agencies that used special recruiting strategies to target minorities (as opposed to relying on general recruiting strategies) increased the number of minority hires by 3.2 times, all without increasing the number of unqualified applicants.[23]

---

21. William Jordan, et al, "Attracting Females and Racial/Ethnic Minorities to Law Enforcement," *Journal of Criminal Justice* 37 (2009): 333-341.

22. Public Safety Civil Service Commission, "How Did You Hear About This Opportunity?" (unpublished data collected from SPD entry-level exam takers in July 2014, October 2014, February 2015, and May 2015).

23. William T. Jordan, et al, "Attracting Females and Racial/Ethnic Minorities to Law Enforcement," *Journal of Criminal Justice* 37 no. 4 (July/August 2009): 333-341.

## Community interviews revealed negative views of policing as a career.

Meanwhile, the department's recruitment efforts also face the challenge of negative views about policing and police careers within many racial/ethnic communities. One strategy SPD is using that might mitigate the effects of such negative perceptions is the Explorers Program. The program's mission is to bridge the gap between youth and police by educating and involving them in police operations and potentially interesting them in pursuing law enforcement careers in the future. Still, our interviews and listening sessions within some of these communities[24] revealed perceptions that:

- associated police with bias and unequal treatment,
- assumed policing to be a white-dominated and racist profession,
- expected that peers would see them as a "sell out" if they were to work in law enforcement,
- viewed policing as a blue-collar occupation rather than a profession,
- expected the SPD to be like police in their countries of origin—corrupt or commonly using excessive force,
- felt limited by their lack of spoken and written proficiency in the English language, and
- believed that cultural differences would preclude them from fitting into SPD.

Within the department, we found concern that national and local news stories have engendered negative perceptions. Both the current and former SPD human resource directors separately cited the "media's portrayal of the department" as the single greatest challenge to recruiting for diversity.[25]

---

24. The CPC conducted 13 outreach events in various racial, ethnic, immigrant, and refugee communities during April and May of 2015. Interpreters were present at many events, and a variety of meeting handouts were translated into attendees' native languages.

25. Mike Fields (Director, Human Resources Department, SPD), interview with Community Police Commission staff, March 17, 2015; Mike Teeter (Captain, Force Investigations Team, SPD), interview with Community Police Commission staff, March 18, 2015.

## SECTION 3: HIRING

A high proportion of individuals from racial/ethnic communities submit initial applications, but many drop out or fail the civil service exam.

SPD's recruitment yielded a high percentage of racial/ethnic applicants who submitted an online application in 2014 and the first half of 2015 (see Figure 5). However, a considerable number dropped out after passing an initial screening and others failed the civil service exam. The department has not analyzed these numbers to identify the causes and determine whether they can be addressed.

FIGURE 5: SPD ENTRY-LEVEL POLICE OFFICER APPLICANTS BY RACE (2014/2015)

| Race | Number | Percent |
|------|--------|---------|
| White | 3,565 | 56% |
| Black | 918 | 14% |
| Hispanic | 845 | 13% |
| Asian | 639 | 10% |
| Native American | 97 | 2% |
| Prefer Not to Respond | 281 | 4% |

Source: Community Police Commission analysis of: Public Safety Civil Service Commission, applications and self-reported information for 2014 (February, July, and October) and 2015 (February and May) entry-level exams.

Like most police departments in the US, SPD uses a multi-hurdle approach for candidate selection, which means that applicants must pass through many stages—13 steps across five phases of activity (see Figure 6). The rationale is that applicants who are able to surmount all of these challenges will have the greatest potential for success.

A COMMUNITY VIEWPOINT: *The selection and hiring process is lengthy and a 'pain' from start to finish. Getting hired feels like an impossible task, even if it's your life's dream.*

FIGURE 6: SPD SELECTION AND HIRING PROCESS FLOW CHART



Source: Developed by the Community Police Commission.

**Initial Auto Screening.** The first step in SPD's selection process is an initial, automatic screen of applications. Using the data set of 6,345 individuals who submitted applications between approximately February 2014 and May 2015, we determined that about 95% of racial/ethnic candidates (2,375 of 2,499) who submitted applications passed this check, compared to 97% of white candidates (3,461 of 3,565).[26] The screening asks questions associated with minimum qualifications (e.g. Have you ever been convicted of domestic violence?). The intent of these questions is to let candidates know, prior to taking the exam, that these preliminary answers may later affect the success of their application. However, if candidates still want to take the test after being informed their application may not be competitive, they are allowed to do so.[27]

---

26. Community Police Commission analysis of 2014 and 2015 entry-level exam data (up through the May 2015 exam) compiled and provided by the Public Safety Civil Service Commission. This data set excludes all individuals who checked the box for "prefer to not respond."

27. Rachael Schade (Exams Analyst, Seattle Public Safety and Civil Service Commission), e-mail correspondence with Community Police Commission staff, June 2015.

Section 3: Hiring

**Civil Service Exam.** The Civil Service exam is administered by the City of Seattle Public Safety Civil Service Commission. SPD generally schedules this entry-level police officer civil service exam three or four times a year on the University of Washington campus in Seattle. There is speculation that the infrequency of Seattle's exam, and the fact that testing opportunities are not offered in a variety of locations across the state of Washington, may lead applicants, including individuals from racial/ethnic communities, to apply to law enforcement agencies elsewhere out of convenience.

> **NOTE:** Some police departments outsource the officer exam (and background investigation) processes to private vendors. The benefits of this are more frequent exams, geographic diversity of exam location, information sharing among agencies, and ability to test for multiple agencies at the same time. A common downside is that the costs shift to the applicant in order to reduce department costs of conducting more exams.[28]

This six-hour video and written exam is designed to identify candidates' abilities to comprehend and interpret myriad scenarios they may face as an officer.[29] The video portion, which is pass/fail, requires a minimum score of 65% to pass. It is not used to rank the candidate against other test-takers. The written exam requires a score of 80% or higher to pass. This score is used to rank candidates against one another. The higher the ranking of the candidates, the faster they will move through the hiring process because the detectives who conduct the background investigations want to pursue those who they think are the more competitive candidates first. This may greatly affect candidates from racial/ethnic communities (particularly African Americans, Latinos, and Native Americans) because there has historically been a wide achievement gap between racial/ethnic community members and whites on standardized tests.[30]

One scoring policy currently in place at SPD may be helpful to some who have military service experience; if candidates pass both portions of the exam and submit paperwork verifying an honorable military discharge, they receive veteran's preference points amounting to 10% of their written exam score (so a score of 82% would become 92%).[31] However, there is a distinct absence of additional scoring policies for candidates who might increase the racial and ethnic diversity of the department, such as individuals who are bilingual, are residents of Seattle, or have prior experience working in different racial/ethnic communities.

---

28. Joseph Kessler (Captain, Special Operations Bureau, SPD), "Police Officer Hiring, Training & Retention 2014," (unpublished internal report, November 2014).

29. The City of Seattle Public Safety Civil Service Commission was created by city ordinance in 1978 to establish a process for selecting Seattle Police and Fire Department employees based on merit rather than relationships. The Commission governs appointments, promotions, promotional testing, layoffs, recruitment, retention, classifications, removals, and discipline, pursuant to Charter Article XVI, and in substantial compliance with RCW Chapters 41.08, 41.12, and 41.56.

30. Christopher Jencks and Meredith Phillips, "The Black-White Test Score Gap: Why It Persists and What Can Be Done," *Brookings Institution Press*, (Spring 1998).

31. Candidates who currently serve as Parking Enforcement Officers or 911 Dispatchers are eligible to receive preference points amounting to 5% of their exam score.

There is no charge to take the exam.[32] However, a substantial number of applicants did not take it, even though they had registered for it. Nearly 60% of white applicants (2,138 of 3,434) and 67% of racial/ethnic applicants (1,573 of 2,354) did not show up. No data are available and no assessment has been done that could help explain these substantial attrition rates.

Anecdotally, we heard that unemployed individuals, in an attempt to satisfy the requirements for unemployment benefits, submit applications with no intention of following through and taking the exam. On the other hand, we also heard that some applicants find they are not physically ready to take the next step in the process, a fitness test, so they drop out and reapply later when they are in better condition.

> **NOTE:** Lack of attendance by those who registered for entry-level police officer exams is not uncommon throughout the US, and observers have suggested that it may signal an absence of understanding of the role, responsibilities, and expectations of a police officer in today's society. While the media often portray officers as tough crime fighters, that depiction fails to showcase the full range of duties an officer performs. Those who apply for the positon with only a fraction of the knowledge of what policing entails are more likely to become disenchanted and may subsequently drop out of the process.[33]

A disparity among those who took and failed the civil service exam was more notable: while 31% of white candidates (407 of 1,296) who took the civil service exam failed to receive a passing score, 46% of racial/ethnic candidates (357 out of 781) failed. Although the exam has been validated to assure that it is job-related and legally defensible,[34] it may be more challenging to some applicants due to various social, economic, and educational barriers, as well as those for whom English is a second language. However, as noted above, SPD does not analyze this data to determine whether language or other factors may be relevant—despite the fact that more bilingual officers, for example, could be important assets to the department.

On the other hand, SPD offers considerable preparation assistance for the exam, which is one way to help "mitigate adverse impact in testing to the extent possible."[35] Multiple workshops are held leading up to an exam with no limit on the number of times an individual may attend. The goal of the workshops is to familiarize candidates with the exam format and content as well as to explain what to expect during the later phases of the hiring process.

---

32. In 2013, the Seattle City Council voted unanimously to eliminate a $25 fee in order to "attract and hire local police officers who reflect Seattle's values and increasing diversity and represent all of its communities." According to the Council (Council Bill 117742, April 5, 2013), the $25 fee "reduced the number of possible viable applicants who sit for the exam."

33. Michelle Comeau and John Klofas, "The Police Recruitment Process: Rochester," (working paper # 2010-06, April 2010).

34. The exam is developed, reviewed, and revised by a committee that includes a professional exam consultant, subject matter experts, and a senior personnel analyst from the Department of Human Resources; Seattle Department of Human Resources, "Seattle Fire and Police Department Testing," received April 2015.

35. Ibid.

Section 3: Hiring

In 2013, SPD attempted to increase racial/ethnic participation in the test prep workshops by holding them at 18 sites sponsored by community-based organizations (CBOs). However, attendance was minimal, according to both SPD and CBO spokesmen.[36] One of the CBO liaisons attributed the lack of applicant interest to hiring qualifications that were too high and recruitment materials that did not adequately explain the application process and expectations.[37] Those involved from SPD said that, while it was a great way to make connections in the community, finding interested and qualified candidates is simply a challenge: "[Qualified candidates] aren't always in the places where the community thinks they are."[38]

## SPD does not specifically track or mentor racial/ethnic individuals in the hiring process.

All hiring steps following the civil service exam are administered by SPD. However, SPD does not track candidates by race such that progress among racial/ethnic recruits could or would be measured or monitored. Moreover, SPD has no mentoring program to identify and shepherd promising candidates, racial/ethnic or otherwise, through the remainder of the lengthy hiring process, though innovations in police recruitment and hiring suggest its potential.

A COMMUNITY VIEWPOINT: *We hear stories about people from our communities who have applied to be officers at SPD...but they never hear back from anyone or know where they stand in the hiring process.*

**RESEARCH SAYS:** Best practices suggest using veteran officers to mentor candidates through the hiring process. Mentors can provide information, guidance, and perspectives that support candidates and keep them engaged. The goal of a mentor is to minimize candidate frustration and ensure that they remain in the process rather than seeking employment elsewhere.[39]

For subsequent stages of the hiring process, we were unable to identify attrition or failure rates by race, because the Public Safety Civil Service Commission data and the SPD data systems are not linked. However, we did study a much smaller data set maintained by SPD to examine outcomes for a single (February 2015) cohort of candidates, though it does not include a breakout of candidates by race.[40] Nevertheless, a description of the process overall offers potential insights as to how it may affect candidates from racial/ethnic communities.

36. Adrian Diaz (Sergeant, Community Outreach Section, SPD), e-mail correspondence with Community Police Commission staff, May 2015; James Manning (Officer, SPD), phone interview with Community Police Commission staff, May 26, 2015; Edith Elion (Executive Director, Atlantic Street Center), phone interview with Community Police Commission staff, May 26, 2015.

37. Edith Elion (Executive Director, Atlantic Street Center), phone interview with Community Police Commission staff, May 26, 2015.

38. Adrian Diaz (Sergeant, Community Outreach Section, SPD), e-mail correspondence with Community Police Commission staff, May 2015; James Manning (Officer, SPD), phone interview with Community Police Commission staff, May 26, 2015.

39. International Association of Chiefs of Police, "Law Enforcement Recruitment Toolkit," (Department of Justice publication from the Office of Community Oriented Policing Services, 2009); Ellen Scrivner, "Innovations in Police Recruitment and Hiring: Hiring in the Spirit of Service," Office of Community Oriented Policing Services, 2001.

40. Seattle Police Department, February 28, 2015 entry-level exam cohort data.

**Physical Agility Test.** Once candidates successfully pass the written and video exams, they take the Physical Agility Test (PAT), which consists of pushups, sit-ups, and running. This score is then considered alongside the written test score. Together, these two scores are what make a candidate competitive in terms of the rank-order.

Of the 329 people who were eligible to take the PAT following SPD's February 28, 2015, civil service exam, 88% (288 of 329) showed up to test.[41] For each exam cohort, the PAT occurs on a single day. This limitation could be part of the reason why approximately 12% of the eligible candidates (41 out of 329) did not appear for the PAT. Although some attendance exceptions are made by SPD (for example, to accommodate candidates who live out of state, have military obligations, or work weekends),[42] scheduling of PAT testing is generally inflexible. Of the 288 who took the PAT, 75% (217) passed.[43] Since SPD does not track statistics on the applicants, we could not determine if candidate performance varied by race.

**Personal History Information Packet.** After passing the PAT, candidates are required to immediately submit a completed and notarized Personal History Information (PHI) packet. The PHI is the basic applicant screening document used to initiate the background investigation process, assist in determining a candidate's overall competitiveness, and identify immediate disqualifiers. Of the 217 individuals who passed the February 28, 2015, PAT, 17% (36) were disqualified based on information included in their PHI packet.[44] Since SPD did not provide the data, we could not determine if PHI disqualifications varied by race.

## Oral boards and background investigations lack some transparency and clear criteria.

We found that both the oral board and the background investigation phases of the hiring process lack some transparency and clear criteria. While some of the administrators we interviewed maintained that each process was well structured and validated, we found the department unwilling or unable to share essential information with us to verify those assertions.

**Oral Boards.** If the candidates pass the PAT and submit a qualifying PHI packet, they complete a brief writing assignment and subsequently appear before a board of examiners who pose a series of scenario-based questions. As with the PAT, the schedule for oral boards is generally inflexible since they are also offered on just one pre-arranged day. However, there is an exception for out-of-state applicants, who are granted a different oral board date.

Seventy-nine percent (95 of 120) of the in-state candidates who took the oral boards at the end of May 2015 passed.[45] Again, since SPD did not provide us with the data, we could not determine if failures varied by race. The pass/fail rate for the 61 out of state test takers was not tracked by SPD.

---

41. Community Police Commission analysis of the February 28, 2015 SPD entry-level exam cohort data, provided by the SPD Recruiting Unit.
42. Deborah Nicholson (Sergeant, Background Investigations Unit, SPD), interview with Community Police Commission staff, May 14, 2015.
43. Community Police Commission analysis of the February 2015 SPD entry-level exam cohort data, provided by the SPD Recruiting Unit.
44. Ibid.
45. Ibid. Of the 217 who passed the PAT, this data set only tracks the 120 who underwent the regularly scheduled oral boards (95 of them passed). Of the other 97 who passed the PAT and would seemingly be included in the data, 36 were disqualified because of their PHI and 61 were from out of state and therefore had a different oral board date.

FIGURE 7: SPD ENTRY-LEVEL POLICE OFFICER APPLICANT ATTRITION FROM PAT THROUGH ORAL BOARD (2015).



329 registered for PAT

288 took PAT

217 passed PAT

181 passed PHI check*

120 took oral board**

95 passed oral board

\*   36 candidates were disqualified for infomation in their PHI.
\*\*  61 candidates were given a different oral board date.

Source: Community Police Commission analysis of February 28, 2015 SPD entry-level exam cohort data provided by SPD Recruiting Unit.

The oral board is comprised of a panel of three people: a background detective, another sworn member of the department, and an SPD civilian staff member. Prior to sitting on the board, panelists participate in a mere one-hour training session. However, the department declined to share with us its oral board training materials.

Additionally, the department did not share the structure and content of the interviews with us. One SPD sergeant involved in the administration of the oral boards reported that SPD has made the oral board process more structured, improving its reliability, validity, and overall effectiveness. According to this individual, SPD currently uses interview questions from a bank of validated questions gathered by the California Commission on Peace Officer and Training Standards (California POST)[46] that are written in a manner that helps the interviewers evaluate the specific core competencies being sought.[47] Additionally, according to this source, SPD scores the interviews based on validated California POST interview rating criteria, which the research says is essential for transforming candidate responses into fair and consistent evaluative data.[48] Still, some individuals we interviewed, including high-ranking SPD personnel and others intimately involved in the hiring process, were not aware that SPD was using evidence-based practices, and others said the oral board process still needs to be improved.

---

46. California POST has developed a bank of interview questions relating to six core competencies that its interviews seek to evaluate: experience, problem solving ability, communication skills, interest/ motivation, interpersonal skills, and community involvement/awareness.

47. The CPC was unable to determine or locate any clear documentation on specific competencies sought by SPD for its entry-level officers.

48. California Commission on Peace Officer Standards and Training, "Hiring Interview Guidelines," (2003, revised 2009).

**RESEARCH SAYS:** Structured interviews use multiple mechanisms, such as questions based on job analysis, detailed rating scales, and trained interviewers to make the interview job-related and systematic. These efforts have been shown to result in more valid, defensible, unbiased hiring decisions. At best, a lack of structure reduces the value of the interview as an assessment tool. At worst, a lack of structure can lead to perceptions—and quite possibly the reality—of disparate and unfair treatment.[49]

Overall, the oral board process lacks some transparency, such that we could not assess its quality.[50] While some aspects of the oral board process may need to remain "close to the vest," of necessity, SPD either does not have or would not share its guidelines, panelist training materials, the core competencies the process seeks to identify, interview questions, or the scoring guide/evaluative criteria. As a result, we do not know whether the oral board process is objective or whether there are biases or other factors that disadvantage candidates from racial/ethnic communities.

**Background Investigation.** Once candidates pass the oral board, they sit for an interview with the background detective who has been assigned to review their file. This signals the start of their background investigation, which could, according to SPD, take between one and five months. Shortly after the interview, they undergo a polygraph test. Prior to early 2015, the polygraph took place after the entire background investigation was completed. This was changed in order to eliminate dishonest candidates sooner in the process, thus potentially saving many hours of the background detective's time.

After the polygraph, investigations are conducted by SPD detectives who use information provided in PHI packets as the basis for their reconnaissance.[51] The background investigation seeks to make two determinations: whether applicants have a suitable behavioral history to be a police officer and whether they have been forthright and honest about their educational level, residency, employment record, drug use, credit history, and other facts about themselves.

According to the SPD website, conducting a background investigation can take up to 10 months to complete after an applicant has passed the civil service exam. Because we do not have the data, it remains to be seen whether such duration would have increased any attrition among candidates from non-white, ethnic, immigrant, or refugee communities, although a number of individuals we spoke to suggested that it is the case. Although unsubstantiated by data, inadequate staffing may be contributing to the long wait candidates must endure before they are informed of the department's hiring decision. As of May 2015, the Background Unit had four permanent employees, plus five who were on loan from elsewhere in the department. An additional two retired detectives were providing temporary staffing assistance.[52]

---

49. Ibid.

50. The CPC recognizes the need for SPD to keep some items confidential and secure. We were not expecting transparency with regard to details but rather with regard to process.

51. Deborah Nicholson (Sergeant, Background Investigations Unit, SPD), interview with Community Police Commission staff, May 14, 2015.

52. Ibid.

Section 3: Hiring

**NOTE:** Processing time is an important factor in a person's decision to drop out of the hiring process. Thousands of 2013 applicants to the New York Police Department were surveyed to try to determine the factors that caused them to discontinue the process. One of the barriers they cited was the length of the process.[53]

Meanwhile, the background investigation process appears to lack guidance with specific criteria, so as to avoid inconsistency in the way investigators assess candidates. While one SPD supervisor told us that certain information in the PHI packet is used to gauge core competencies for police work, we found background investigators had no guide that would help them relate candidate histories and experiences to job competencies. "We just know what combination of factors is going to present a solid candidate," this supervisor told us.[54] In addition, we could not ascertain whether a set of core competencies that background investigators may focus on are the same as those emphasized in other steps of the hiring process, such as the civil service exam or the oral board.

**NOTE:** California POST created a document called "Behavioral Traits Evaluated in the Selection Process" that reflects the five major behavior categories assessed in the background investigation, along with their related character dimensions. The behavior categories include moral character, handling stress and adversity, work habits, interactions with others, and intellectually-based abilities. Documents such as this benefit both the background investigator and the applicant as to the clarity of evaluative criteria.[55]

The department maintains that it is most interested in an applicant's complete life history rather than a piecemeal picture, and that detectives are interested in learning about how candidates may have dealt with life challenges. Mike Fields, SPD's Human Resources Director, told us, "We don't want perfect people; we want people who have learned from their mistakes; that said, there are some automatic disqualifiers." These disqualifiers mainly involve criminal history, driving history, and drug use. Past drug use is evaluated on a case-by-case basis; however, if drugs were used within a certain number of years prior to taking the exam, the applicant will likely be disqualified (e.g. opiates within 10 years, club drugs within five years, marijuana within 12 months).[56] These expectations are posted clearly on SPD's Website.

A COMMUNITY VIEWPOINT: *Despite going clean, any past drug use leads us to believe that we'd never be hired by SPD. The drug disqualifiers are too harsh—we all have a past.*

---

53. New York City Police Department, "Statement by Police Commissioner William Bratton on Minority Recruitment," *NYPD News*, June 10, 2015, accessed September 4, 2015. NYPD conducted a survey of 11,000 applicants in the 2013 hiring process to try to determine the factors that caused them to discontinue the process. They cited barriers such as the length of the process, the lack of support for applicants, and the lack of transparency in how the process works.

54. Deborah Nicholson (Sergeant, Background Investigations Unit, SPD), interview with Community Police Commission staff, May 14, 2015.

55. California Commission on Peace Officer Standards and Training, "Behavioral Traits Evaluated in the Selection Process: Reference Guide January 2014," (2014).

56. Seattle Police Department, "Seattle Police Department Jobs: Qualification," accessed June 26, 2015, http://www.seattle.gov/policejobs/hiring-process/qualification.

**RESEARCH SAYS:** Most drug offenses are classified as felonies. Research shows that nationally and in Seattle/King County, while illegal drug activity is pervasive and roughly equally distributed among racial groups, the risk of arrest and conviction is dramatically different across racial groups. Thus, employment exclusions based on felony convictions, as opposed to drug activity itself, may disproportionately exclude members of some racial groups from entering the pool of candidates.[57]

**NOTE:** "When it comes to hiring new police officers, tolerance for a history of minor infractions, such as experimental use of illegal drugs, varies from department to department. Some have strict disqualifiers based on the number of times a drug has been used (e.g. use of cocaine more than five times throughout an applicant's lifetime), while others focus on how recently the drugs were used (e.g. any use of mushrooms within the past ten years). Either way, publication of specific drug use limitations increases the possibility that applicants will understand the hiring standards and be honest about their past."[58]

SPD personnel said they do not actively track the reasons for candidate elimination during the backgrounding process. However, this information does exist on paper, as a memo must be written for each candidate eliminated from the process. Although we requested that SPD pull a large random sample of these memos, redacting any personal identifying information, to allow us to analyze reasons for disqualification to see if there were any trends by race, they did not acquiesce. Therefore, we cannot report on whether elimination of candidates during the background investigation varies by race and, if so, what the reasons are for disqualification.

A COMMUNITY VIEWPOINT: *There is no real explanation given by SPD for why someone has been eliminated from the process during the background investigation. Sometimes they send a generic letter, but it is worded harshly and makes people feel defeated and angry.*

**RESEARCH SAYS:** "A study of all entry-level applicants (15,553 individuals) for the Rochester Police Department between 2000 and 2008 revealed a disparity in background investigation failure rates between white and minority candidates. While 71% of minority candidates failed the background process, only 53% of white candidates failed."[59]

---

57. Michelle Alexander, *The New Jim Crow: Mass Incarceration in the Age of Colorblindness* (New York, NY: The New Press, 2010); Katherine Beckett, "Race, Drugs, and Law Enforcement: Toward Equitable Policing," Criminology and Public Policy 11, no. 4 (November 2012)

58. Bruce Taylor, et al., "Cop Crunch: Identifying Strategies for Dealing with the Recruiting and Hiring Crisis in Law Enforcement," (US DOJ Report, Police Executive Research forum, December 30, 2005): https://www.ncjrs.gov/pdffiles1/nij/grants/213800.pdf.

59. Michelle Comeau and John Klofas, "The Police Recruitment Process: Rochester," (report).

Section 3: Hiring

If candidates are still deemed competitive after the background investigation is complete, they are scheduled for psychological testing. The results are then presented, along with the rest of the candidate's file, as part of an internal hiring meeting. If candidates are approved for hire, they are scheduled for a medical examination. The last step in the process is for the candidate to successfully pass the PAT again. After that, a final offer of employment is made.

## SECTION 4: FIELD TRAINING

SPD has improved training for new recruits, but its curriculum still lacks community engagement and cultural competency components.

Once hired, SPD candidates become police recruits and start basic training at the state-run academy.[60] After their initial training, SPD takes over the preparation of its recruits with two phases of its own training—advanced classroom instruction followed by field training in the form of supervised patrol work. We found that the department has added four hours of classroom training designed specifically to cultivate bias-free policing, as well as an additional eight hours for skills in crisis intervention. In addition, according to leadership from within SPD's Education and Training Section, the department has recently woven some "integrated scenario" training into its curriculum, designed to operationalize new reforms adopted by the academy. However, SPD's advanced classroom and field training programs still lack components for developing cultural competency and community engagement skills, both of which are invaluable for policing in communities with different social customs and modes of communication. Finally, as a result of previously being understaffed, the Field Training Unit has lacked adequate support and oversight. However, with staff additions in the latter half of 2015, the unit reports that it is improving operations.

**State Academy Reforms.** The Basic Law Enforcement Academy (BLEA) provides initial training for all police officers in Washington State.[61] With the appointment in 2012 of a new Executive Director, Sue Rahr,[62] the academy's curriculum has been reshaped to focus more on connecting to communities and improving public trust. A member of the 2015 President's Task Force on 21st Century Policing, Rahr spearheaded the academy's implementation of what she calls a "guardian" approach to policing—and altered the "warrior" emphasis on power and discipline that she said has "little to do with the daily realities of policing."[63] In an April 2015 paper published in collaboration with the National Institute of Justice and the Harvard Kennedy School, Rahr described the "guardian" versus "warrior" mindset:

> The guardian operates as part of the community, demonstrating empathy and employing procedural justice principles during interactions. The behavior of the warrior cop, on the other hand, leads to the perception of an occupying force, detached and separated from the community, missing opportunities to build trust and confidence based on positive interactions.[64]

Endorsed in the final report of the May 2015 President's Task Force on 21st Century Policing, this philosophy is reportedly taking hold in many police departments across the United States.[65]

---

60. SPD and the academy strive to be partners in facilitating a new employee's professional development. To that end, SPD assigns staff to play various roles both from within the academy and from the SPD side as liaisons and instructors.

61. BLEA is a component of the Washington State Criminal Justice Training Commission (WSCJTC), which sets training standards, issues police officer certifications, and conducts basic and advanced training for police, local corrections and a wide variety of other criminal justice system professionals.

62. The WSCJTC, a 14-member group made up of criminal-justice leaders and public officials, hired Rahr as executive director in March 2012. Rahr had previously served in law enforcement for 33 years and as King County Sheriff since 2005.

63. Sue Rahr and Stephen K. Rice, "From Warriors to Guardians: Recommitting American Police Culture to Democratic Ideals," New Perspectives in Policing Bulletin, (Washington, DC: U.S. Department of Justice, National Institute of Justice, 2015).

64. Ibid.

65. President's Task Force on 21st Century Policing, "Final Report of the President's Task Force on 21st Century Policing," (Washington, DC: Office of Community Oriented Policing Services, 2015).

Seeking a more effective policing philosophy, Rahr has also incorporated behavioral principles into academy training that are referred to as "LEED" for the injunction to: "Listen and Explain with Equity and Dignity."[66] She additionally expanded training hours for handling crisis situations, identifying mental illnesses, using intervention strategies, and de-escalating situations. A series of classes on emotional intelligence called Blue Courage has also been launched, and coursework on implicit bias and cultural awareness have been integrated into the curriculum.[67] The hours spent on communication, crisis, and behavioral management are now at 55 out of the total 720 hours of academy training—approximately 45% more than in the past.[68] According to BLEA's curriculum developer, time spent on these concepts actually goes above and beyond the reported 55 hours, since LEED and the guardianship philosophies are also woven into fundamental knowledge coursework, like patrol procedures, as well as physical skill classes on firearms and defensive tactics.[69]

According to Rahr, recruits are taught that officers cannot do their jobs effectively unless community members view their authority in police-citizen encounters as legitimate (a concept referred to as "procedural justice"). The training underscores how this legitimacy can easily be undermined by the words and tone used, as well as by the actions taken by officers—even when these may otherwise seem inconsequential.[70]

> **NOTE:** "Procedural justice focuses on perceived impartiality during interactions between police and the communities they serve, participation ('voice') from the public during these interactions, fairness, and consistency of treatment. Fairness relates to the protection of human rights and goals to include equal treatment, nondiscrimination, and nonpartisanship."[71]

The first class to receive the new curriculum graduated May 30, 2013, and *The Seattle Times*, which followed the cohort of trainees around the academy, offered this account of the changes:[72]

> They still learned the basics of police work, such as handcuffing, writing reports, and handling firearms. But the instruction also included an increased emphasis on expressing empathy, following constitutional requirements, and treating citizens with respect and dignity.[73]

---

66. While serving as King County Sheriff in 2011, Rahr introduced the LEED model, which was ultimately adopted by the Sheriff's Office and SPD.

67. Washington State Criminal Justice Training Commission, "WSCJTC Curriculum Block Definitions: Basic Law Enforcement Academy July 2015–Current" (internal document received September 10, 2015).

68. Ibid; Donna Rorvik (Curriculum Developer, Basic Law Enforcement Academy), e-mail correspondence with Community Police Commission staff, September 10. 2015.

69. Rahr and Rice, "From Warriors to Guardians."

70. Ibid. Procedural justice training at the academy does not necessarily include analysis of when, why, and how an officer would or should stop, interrogate, or make initial contact with someone in the first place.

71. Ibid.

72. *The Seattle Times* was given unprecedented access to the academy and allowed to follow a class as it underwent 19 weeks of training between January and May 2013.

73. Steve Miletich, "Police Academy 2.0: Less Military Training, More Empathy," *Seattle Times*, July 14, 2013, accessed September 3, 2015, http://www.seattletimes.com/seattle-news/police-academy-20-less-military-training-more-empathy/.

Rahr's changes were not uniformly applauded at the time of their adoption. In fact, she estimated that a third of the academy staff quit when she came on board, reportedly skeptical of the new approach and loyal to the old model.[74] Nonetheless, the new curriculum has received favorable press coverage for reforming police culture to one "that is less physical and more verbal, less reactive and more critical, less military and more human."[75]

We asked Sergeant Shanon Anderson, an SPD employee assigned to work at the academy, if she has actually seen a change in the recruits with the new model. She responded in the affirmative but with a note of caution: "Of course—it's a huge curriculum shift. The question is, will it last once they get to their department and spend some time on patrol."[76]

To answer that question, Rahr has commissioned a five-year longitudinal study that will follow new academy graduates to determine if the "guardian" philosophy and new training programs are positively affecting officers in the field.[77]

**Advanced Classroom Instruction.** After graduating from the state academy, SPD student officers spend about seven weeks in the classroom being trained under the department's own tutelage to learn about City of Seattle laws, SPD department policy and procedures, and services available in Seattle.

In addition to typical law enforcement skill development courses, student officers receive some instruction to help them understand how to better relate to Seattle's diverse communities. One such course, introduced in 2011 as a replacement to a "less effective" course previously taught on the same topic,[78] provides a full day of training on ending institutional racism called *Race: the Power of an Illusion*. SPD worked with Seattle's Office for Civil Rights, the group that originally developed the training, to make this city-wide training specifically applicable to police officers.[79] In addition, post-academy classroom instruction includes a new four-hour block of instruction on bias-free policing; an eight-hour visit from a major Seattle service provider; and a full day focused on advanced crisis intervention training.[80]

According to Assistant Chief Lesley Cordner of SPD's Compliance and Professional Standards Bureau, the department has also begun to build upon and "operationalize" the reforms instituted at the state academy by inserting scenario-based training sessions into SPD's advanced training curriculum. Referred to as "integrated scenario training," these sessions mimic crisis situations and evaluate student officers on their responses. Debriefings that follow each scenario discuss de-escalation, crisis intervention techniques, communication techniques, LEED principles, and the tenants of procedural justice, according to Cordner.[81]

---

74. David Kroman, "Can Sue Rahr Reinvent Policing?" Crosscut, April 28, 2015, accessed September 2, 2015, http://crosscut.com/2015/04/can-sue-rahr-reinvent-policing/.

75. Ibid.

76. Shanon Anderson (Sergeant, Basic Law Enforcement Academy, SPD), interview with Community Police Commission staff, March 31, 2015.

77. Seattle University launched the study in the fall of 2014. Preliminary results are not yet available to the public.

78. Martin Welte (Race and Social Justice Coordinator, Education and Training Section, SPD), phone interview with Community Police Commission staff, September 3, 2015. Prior to this course, SPD taught a less-robust curriculum called Perspectives on Profiling.

79. Ibid. Elliot Bornstein (Public Information Officer, Seattle Office of Civil Rights), e-mail correspondence with Community Police Commission staff, September 3, 2015.

80. Seattle Police Department, "Post BLEA Master Schedule — Class 7111, 712, Laterals," (received in June 2015).

81. Lesley Cordner (Assistant Chief, Compliance and Professional Standards Bureau, SPD), written correspondence with Community Police Commission staff, December 4, 2015.

Section 4: Field Training

On the other hand, SPD's post-academy coursework does not address the task of increasing student officers' cultural competence (nor does the academy), an important skill for engaging different community cultures. Such instruction is designed to enable more effective work in cross-cultural situations, such as the everyday interactions involved with providing service to, and making connections with, the diverse population of Seattle.

> **NOTE:** "Cultural competence requires having the capacity to (1) value diversity, (2) conduct self-assessment, (3) manage the dynamics of difference, (4) acquire and institutionalize cultural knowledge, and (5) adapt to diversity and the cultural contexts of the communities being served."[82] "Cultural competence is a developmental process that evolves over an extended period. Both individuals and organizations are at various levels of awareness, knowledge, and skills along the cultural competence continuum."[83]

**Field Training.** When student officers' advanced classroom training ends, they begin the last phase of preparation to be an officer, which is field training. Over the next 12 weeks, they complete rotations on patrol with three different SPD Field Training Officers (FTOs) who evaluate their performance.

Up until 2009, Seattle's field training program mostly followed the basic San Jose model, which measures the trainee's skills against a set of standardized guidelines (see box on following page). After that, however, the department decided to create and implement its own "hybrid" approach that integrated aspects from other models.[84] SPD Field Training Supervisor Yvonne Underwood, however, characterized SPD's approach as "functional rather than conceptual," a reference to its technical emphasis, without the philosophical approach taught at the state academy.[85] She acknowledged that SPD's field training program lacks a formal community engagement component. Although, she noted that student officers are encouraged to be proactive in making contacts with community members, an activity she monitors informally.[86]

> **NOTE:** The Field Training Officer (FTO) Program, also called the San Jose model, remains in widespread use today as a way to provide law enforcement agencies with the structure to document a new officer's performance in the field. The model relies on daily observation reports to measure behaviors against a checklist of standardized guidelines.

---

82. T. Cross et al., "Towards A Culturally Competent System of Care," Volume 1 (Washington, DC: Georgetown University Child Development Center, CASSP Technical Assistance Center, 1989).

83. "Definitions of Cultural Competence," National Center for Cultural Competence, accessed October 12, 2015, http://nccccurricula.info/culturalcompetence.html.

84. Joseph Kessler (Captain, Special Operations Bureau, SPD), "Police Officer Hiring, Training & Retention 2014."

85. Yvonne Underwood (Sergeant, Field Training Unit, SPD), phone interview with Community Police Commission Staff, June 10, 2015.

86. Yvonne Underwood (Sergeant, Field Training Unit, SPD), phone interview with Community Police Commission Staff, September 16, 2015.

The SPD Field Training Handbook details nine specific skills a student is expected to progressively master over the 12-week training period (see Figure 8). While the students receive numeric ratings on their progress from their FTOs following each shift, they also submit a journal entry once a week, as part of a requirement to reflect on and explain particular incidents that occur in the field. While this component may encourage some social and situational awareness, critics of this field training model are generally concerned that it does not teach students how to more broadly involve the community as a collaborative partner in determining solutions to local issues.[87] A high-ranking SPD supervisor who requested to remain anonymous highlighted this gap: "The situational training our student officers receive needs to be better designed if we want to reach our internal objectives for community engagement."

FIGURE 8: SPD FIELD TRAINING SKILL AREAS

| 1. Report writing | 6. Computer use |
|---|---|
| 2. Willing to prioritize calls | 7. Vehicle operations |
| 3. Radio | 8. Officer safety |
| 4. Suspect contact (traffic) | 9. Basic investigations |
| 5. Suspect contact (non-traffic) | |

Source: Seattle Police Department, "SPD Field Training Handbook (Student Copy)," internal document received September 16, 2015.

A newer model of field training, called the Police Training Officer (PTO) program emphasizes engagement with community partners (see box on following page). Asked whether SPD has considered employing this program, Assistant Chief Cordner reaffirmed the department's commitment to excellence and on-going improvement in field training, but cautioned that a wholesale transition to the PTO program would be far beyond the department's current budget and staffing capacity.[88] Nevertheless, she said the Field Training Unit is currently assessing whether there are components of the PTO program, such as those that focus on emotional intelligence, that could be integrated into SPD's program in the near future as a stopgap until more comprehensive reform can be undertaken.

87. Patricia Rushing, "A New Strategy for Training Police Officers-the PTO Program," *CALEA Update Magazine* 102, February 2010.
88. Lesley Cordner (Assistant Chief, Compliance and Professional Standards Bureau, SPD), interview with Community Police Commission staff, October 21, 2015.

Section 4: Field Training

**NOTE:** The Police Training Officer (PTO) program, also called the Reno model, is an alternative to field training that was first piloted in Reno, Nevada in 2000. It emphasizes the engagement of community members as partners in policing. As such, it represents a shift away from traditional field training. Today it is used by some law enforcement agencies, including the King County Sheriff's Office, although it is not in wide use throughout the United States. A research study conducted by the University of Illinois Center for Public Safety and Justice found that recruits' knowledge, independent thinking, and problem solving skills had dramatically increased since implementing the PTO program.[89]

Samantha Daly of the Washington State Criminal Justice Training Commission praised the current field training program, saying the SPD trainers have gone "above and beyond" to help students become quality officers. On the other hand, she also noted that with "the evolution of societal conditions… the culture of policing has changed and calls for more attention to be placed on making community connections…[as] spelled out in the PTO program." Yet she was cautious about the prospect of its adoption at SPD: "A transition to PTO is long and labor intensive. For a big agency like Seattle to get something like this implemented would be huge. It can be done, but it will take extreme dedication and commitment."[90]

**Program Staffing and Oversight.** Meanwhile, up until recently, the Field Training Unit has been lacking in sufficient staff, resulting in weak program oversight. Existing personnel had reported that they were struggling to adequately support the Field Training Officers (FTOs) with necessary supervision and coaching. In fact, until October 2015, monthly meetings between the FTOs and their supervisors to discuss concerns had been suspended for two years. Although these meetings have now resumed, there are no formal, supervisor-led performance evaluations for FTOs. The only written evaluations carried out for FTOs are those of the student officers after their rotation is complete.[91]

Captain Dave Proudfoot, the leader of SPD's Education and Training Section, recently reported that over the course of 2015 there has been a substantial increase in the support dedicated to the FTO program. He noted that this has included filling various open officer positions and civilian administrative roles, which he said has greatly assisted with the FTO Unit's workload issues including paperwork flow, report tracking, and rewriting of the FTO manual.[92]

89. Steven Pitts and Ronald W. Glensor, "The Police Training Officer (PTO) Program: A Contemporary Approach to Postacademy Recruit Training," *The Police Chief* 74, no. 8 (August 2007).

90. Samantha Daly (Director, Advanced Training Division, Criminal Justice Training Commission), phone interview with Community Police Commission staff, May 21, 2015.

91. Yvonne Underwood (Sergeant, Field Training Unit, SPD), phone interview with Community Police Commission staff, September 16, 2015.

92. David Proudfoot (Captain, Education and Training Section, SPD), e-mail with Community Police Commission Staff, December 8, 2015.

Nevertheless, SPD officials have reported a shortage of FTOs, commenting that interest in becoming an FTO has been low and speculating that it may be due to the responsibility and effort required for training a student in the field. Currently there are 80 student officers under the direct oversight of 59 FTOs.[93] Also, several SPD personnel noted that FTOs are not fully compensated for their time. The number of hours they spend working with students is said to far exceed the allowable overtime earned.[94]

In addition, the selection process for FTOs has some weaknesses. Although it includes a review of a candidate's personnel/disciplinary file, as well as recommendations from superiors and samples of their police reports, the process does not incorporate personal interviews. According to Sergeant Underwood, a lack of sufficient time and staff precludes conducting personal interviews with FTO candidates to assure a proper fit for the job. Moreover, once instated as an FTO, there is no requirement that the FTO maintain a respectable personnel/disciplinary record. In fact, Sergeant Underwood said that once officers have been accepted and trained as FTOs, they are rarely formally removed from the position.[95]

Such weaknesses in selection and oversight might be evidenced in the recent dismissal of a 13-year FTO veteran for failing to adhere to SPD policies that specifically call for unbiased policing, use of appropriate discretion, and communication to deescalate a situation. A reported history of complaints against this FTO does not appear to have affected the officer's ability to have remained a trainer over time and, in effect, a role model.

---

93. As of September 29, 2015, there were 59 FTOs. Of the 80 student officers (as of October 27, 2015), 44 were in phase II of field training (patrol rotations with an FTO) and 36 were in phase III (probationary period, although still occasionally shadowed by an FTO).

94. FTOs receive one hour of overtime pay for each shift they spend with a student officer. Three times during the month they receive three hours of overtime for writing summary performance reports. On average, this equals about 27-29 hours of overtime (per month) for each rotation an FTO is actively training.

95. Yvonne Underwood (Sergeant, Field Training Unit, SPD), phone interview with Community Police Commission staff, September 16, 2015.

Section 4: Field Training

## CONCLUSION

Over the past three years, SPD has extended itself substantially to meet many of the requirements of the federal consent decree, initiated after local community organizations requested a federal investigation into the department's policies and practices. In terms of rebuilding public trust in police, SPD is in some respects better positioned for reform than other agencies because its racial and ethnic composition are, to a degree, a reflection of Seattle's population. However, given that we uncovered deep-seated, negative perceptions of SPD within Seattle's racial, ethnic, immigrant, and refugee communities, we have come to understand that racial congruity, alone, is not enough to build rapport with communities, many of which have long felt oppressed.

In addition, our review of SPD's recruitment and hiring process suggests that SPD's 'colorblind' approach that does not proactively seek out or mentor strong candidates from racial/ethnic communities, while not intentionally harmful, may result in fewer officers who can identify with and relate well to Seattle's diverse communities. The absence of an explicit strategy for doing so, therefore, leaves the department greatly handicapped in the face of the negative views of policing within the communities from which it would ideally be hiring.

While the civil service exam has been designed to increase fairness in hiring, it may, nevertheless, have unintended consequences, given that the exam failure rate among racial/ethnic individuals is significantly higher than among whites. Compounding this attrition is SPD's practice of fast-tracking those candidates who score higher on the exam, despite research showing that, while racial/ethnic individuals historically underperform whites on standardized tests, it is not empirically relevant to subsequent career success. This certainly begs the question of whether using the civil service exam score as a primary indicator of an individual's future success as a police officer is ideal. Also detrimental to further reform may be SPD's veteran preference point policy. In the absence of similar points to favor those candidates with highly needed skills such as being multilingual, a resident of Seattle, or having experience working with diverse communities, the department may only stand to reinforce the notion of police officers as "warriors" rather than "guardians."

It is unclear whether SPD is losing qualified racial/ethnic or other candidates somewhere in the hiring process. That fact alone is reason enough to begin explicitly collecting and analyzing data to see if positive changes could be made. While SPD's initial recruitment numbers of individuals from racial/ethnic communities are high, there is also disproportionately high early attrition. It remains to be seen whether more recruitment resources and a larger budget would garner more qualified candidates, as research suggests it could. Nevertheless, without the data, it is impossible to know whether SPD's selection processes are racially equitable and culturally inclusive and optimal. This lack of data is particularly significant with regard to the oral boards and background investigations.

Our review of SPD's advanced and field training curriculum, in terms of how well they might prepare officers to engage with diverse communities, suggests that SPD is working to adopt and operationalize some of the philosophical reforms undertaken recently by the state-run academy. However, SPD may be missing a critical component of reform until it can also incorporate cultural competency training and community engagement skill development into its curriculum. The absence of more field training officers, in additional to limited managerial oversight and support, may risk inconsistent training of the student officers and limit the capacity for institutional troubleshooting. The recent augmentation of Field Training Unit staff is positive, but it remains to be seen whether this will result in increased efficacy for this important phase of training.

## BIBLIOGRAPHY

Alexander, Michelle. *The New Jim Crow: Mass Incarceration in the Age of Colorblindness.* New York, NY: The New Press, 2010.

Ashkenas, Jeremy and Haeyoun Park. "The Race Gap in America's Police Departments." New York Times, September 2, 2014, accessed June 25, 2015, http://www.nytimes.com/interactive/2014/09/03/us/the-race-gap-in-americas-police-departments.html?_r=3.

Beckett, Katherine. "Race, Drugs, and Law Enforcement: Toward Equitable Policing." *Criminology and Public Policy* 11, no. 4 (2012): 641-653.

Bureau of Justice Statistics. "Data Collection: Law Enforcement Management and Administrative Statistics," 2007.

California Commission on Peace Officer Standards and Training. "Behavioral Traits Evaluated in the Selection Process: Reference Guide January 2014," 2014.

California Commission on Peace Officer Standards and Training. "Hiring Interview Guidelines," 2003, revised 2009.

City of Seattle Public Safety Civil Service Commission. "How Did You Hear About This Opportunity?" Unpublished data, received May 2015.

Comeau, Michelle and John Klofas. "The Police Recruitment Process: Rochester." Working Paper # 2010-06, April 2010.

Cross, Terry, L., Barbara J. Bazmn, Karl W. Dennis, and Mareasa R. Isaacs. "Towards A Culturally Competent System of Care." *National Institute for Mental Health and Child and Adolescent Service System Program*, March, 1989: http://www.mhsoac.ca.gov/meetings/docs/Meetings/2010/June/CLCC_Tab_4_Towards_Culturally_Competent_System.pdf.

"Definitions of Cultural Competence." National Center for Cultural Competence, accessed October 12, 2015, http://nccccurricula.info/culturalcompetence.html.

Fields, Mike. Seattle Police Department Presentation to Seattle City Council Committee on Public Safety, Civil Rights and Technology, Seattle City Hall, April 1, 2015.

Fridell, Lorie, Robert Lunney, Drew Diamond and Bruce Kubu. "Racially Biased Policing: A Principled Response." *Police Executive Research Forum*, 2001: http://www.policeforum.org/assets/docs/Free_Online_Documents/Racially-Biased_Policing/racially%20biased%20policing%20-%20a%20principled%20response%202001.pdf.

International Association of Chiefs of Police. "Law Enforcement Recruitment Toolkit." 2009: http://ric-zai-inc.com/Publications/cops-p171-pub.pdf.

Jencks, Christopher and Meredith Phillips. "The Black-White Test Score Gap: Why It Persists and What Can Be Done." *Brookings Institution Press* (Spring 1998).

Jordan, William, Lorie Fridell, Donald Faggiani, and Bruce Kubu. "Attracting Females and Racial/Ethnic Minorities to Law Enforcement." *Journal of Criminal Justice* 37 no. 4 (July/August 2009): 333-341.

Kessler, Joseph. "Police Officer Hiring, Training & Retention 2014," Unpublished internal report, November 2014.

Kroman, David "Can Sue Rahr Reinvent Policing?" *Crosscut*, April 28, 2015, accessed September 2, 2015, http://crosscut.com/2015/04/can-sue-rahr-reinvent-policing/.

Matthies, Carl F. "Evidence-Based Approaches to Law Enforcement Recruitment and Hiring." Doctoral thesis, Pardee RAND Graduate School, RAND Corporation, 2011.

Miletich, Steve. "Police Academy 2.0: Less Military Training, More Empathy." *Seattle Times*, July 14, 2013, accessed September 3, 2015, http://www.seattletimes.com/seattle-news/police-academy-20-less-military-training-more-empathy/.

Minard, Anna. "How Many Police Officers Is 'Enough'?" *The Stranger* (Seattle, WA), October 1, 2014, accessed June 25, 2015, http://www.thestranger.com/seattle/how-many-police-officers-is-enough/Content?oid=20712411.

New York City Police Department, "Statement by Police Commissioner William Bratton on Minority Recruitment." *NYPD News*, June 10, 2015, accessed September 4, 2015.

Pitts, Steven and Ronald W. Glensor. "The Police Training Officer (PTO) Program: A Contemporary Approach to Postacademy Recruit Training." *The Police Chief*, 74, no. 8, (August 2007).

President's Task Force on 21st Century Policing. "Final Report of the President's Task Force on 21st Century Policing." Washington, DC: Office of Community Oriented Policing Services, 2015.

Rahr, Sue and Stephen K. Rice. "From Warriors to Guardians: Recommitting American Police Culture to Democratic Ideals." *New Perspectives in Policing Bulletin*, Washington, DC: U.S. Department of Justice, National Institute of Justice, 2015.

Rushing, Patricia. "A New Strategy for Training Police Officers-the PTO Program." *CALEA Update Magazine* 102, February 2010.

Scrivner, Ellen. "Innovations in Police Recruitment and Hiring: Hiring in the Spirit of Service," 2006.

Seattle Department of Human Resources. "Seattle Fire and Police Department Testing" received April 2015.

Seattle Police Department. "Sworn Personnel Data, As of May 2015," received May 2015.

Seattle Police Department. "Personal History Information Packet: Police Officer." Last updated March, 19, 2014.

Seattle Police Department. "2015 Recruiting Events," received June 2015.

Seattle Police Department. "2015 Recruitment Plan Overview," received March 2015.

Seattle Police Department. "Field Training Handbook (Student Copy)," received September 2015.

Seattle Police Department. "Post BLEA Master Schedule – Class 7111, 712, Laterals." received in June 2015.

Seattle Police Department. "Seattle Police Department Jobs: Qualification," accessed June 26, 2015, http://www.seattle.gov/policejobs/hiring-process/qualification.

Sullivan, Eileen Sullivan. "Report: Seattle Among 'Balanced' Police Departments in US." Associated Press, September 7, 2014, Accessed June 25, 2015, http://www.komonews.com/news/local/Report-Seattle-among-balanced-police-departments-in-diverse-US-cities-274265101.html.

Taylor, Bruce, Bruce Kubu, Lorie Fridell, Carter Rees, Tom Jordan and Jason Cheney. "Cop Crunch: Identifying Strategies for Dealing with the Recruiting and Hiring Crisis in Law Enforcement." Department of Justice Report, Police Executive Research Forum, December 30, 2005: https://www.ncjrs.gov/pdffiles1/nij/grants/213800.pdf.

Tokuda, Kip: "A Case for Targeted Recruitment of Police Officers." Report, September 21, 2012.

United States Census Bureau. "2010 US Census," 2010.

United States Census Bureau. "2013 American Community Survey Data (Seattle)," 2013.

United States and the City of Seattle. *Memorandum of Understanding between the United States and the City of Seattle.* July 27, 2012.

Warners, Ronald. "Field Training Experience: Perspectives of Field Training Officers and Trainees." The *Police Chief* (November 2010).

Washington State Criminal Justice Training Commission. "WSCJTC Curriculum Block Definitions: Basic Law Enforcement Academy July 2015-Current." Internal document, received September 10, 2015.

## APPENDIX I: OUTREACH AND FEEDBACK

## Part A: Feedback from CPC's 2013 outreach and SPD's Safe Communities Initiative

**Community Police Commission Outreach.** The CPC—with the help of many community partners—conducted extensive outreach in October 2013 to obtain feedback related to bias-free policing, stops and detentions, use of force, and in-car video recordings. The CPC also sought community perspectives about the SPD reform process in general, experiences with the police, and guidance for future community engagement activities. The CPC made special efforts to learn the views of those in Seattle who have had historically troubled relationships with SPD, or who have been traditionally underrepresented in the policymaking process. More than 150 outreach events were held and over 3,000 survey questionnaires completed, 464 of which were in languages other than English. All in all, the CPC reached 3,400 community members. The key themes identified are listed below.

- ⬥ Some police officers in Seattle do not treat people of different races and ethnicities equally.
- ⬥ Some of the formal communication channels that currently exist between the police and the community are ineffective.
- ⬥ Many community members do not know their rights regarding interactions with the police.
- ⬥ Not all areas of Seattle are served equally by SPD.
- ⬥ Some community members do not feel safe when stopped by the police; bullying tactics and verbal abuse are too often used.
- ⬥ SPD sometimes uses force when it is unnecessary.
- ⬥ Some police officers stop people unfairly because of lack of understanding and tolerance of other cultures and customs.
- ⬥ SPD does not employ enough officers from diverse backgrounds.

**Safe Communities Outreach.** The mayor's office and SPD worked together in 2012 and 2013 on an outreach initiative called Safe Communities, which sought to bring residents and officers together across Seattle to develop a list of priorities related to public safety. Information was gathered during meetings held between September and November 2012 within the five SPD precincts. One meeting was held in each precinct. Each meeting was attended by between 80-200 citizens and officers. The key themes identified are listed below.

- ⬥ A desire for increased positive interactions between SPD and the community (particularly with youth and immigrant/refugee communities).
- ⬥ The need to recruit more bilingual officers.
- ⬥ A plea for increased police presence and patrols in neighborhoods with high crime rates.
- ⬥ A request for additional follow up after a crime is committed (especially with victims).
- ⬥ A request to train officers in cultural competency.
- ⬥ The necessity of educating the community on how to use 9-1-1.

## Part B: Feedback from other groups

After analyzing the feedback previously gathered in the community on SPD reform (see Appendix I, Part A), the CPC sought the perspectives of three groups in the community that had not been previously contacted: geographically-based community leaders, city agency partners, and SPD patrol officers.

**Neighborhood District Coordinators.** Neighborhood District Coordinators work to bring city government closer to communities across Seattle. They help to empower all community members to make contributions in their communities, serve as a resource/liaison, and ensure that city programs and services are responsive to and reflect the needs and values of its 13 neighborhood districts.[96] CPC staff met with the eight Neighborhood District Coordinators on May 29, 2014 and identified the following observations and concerns:

- Precinct leadership turnover is challenging for the community.
- Increased foot and bike patrols are well received.
- Officer presence and engagement at community meetings is positive.
- Immigrant and refugee populations need training in 9-1-1 use.
- Community members are eager to engage with officers if the opportunities exist.
- Joint training by officers and community members on "Race: The Power of Illusion" was well received and considered a big success.

**Race and Social Justice Initiative Subcabinet.** The Race and Social Justice Initiative (RSJI) seeks to end institutional racism in Seattle City government, promote inclusion and full participation of all residents in civic life, and partner with the community to achieve racial equity. An RSJI Subcabinet, consisting of department leaders and mayor's office staff, develops proposals to address systemic issues and serves as a forum for sharing RSJI best practices. CPC staff met with the RSJI Subcabinet on June 2, 2014 and identified the following observations and concerns:

- There are many great partnerships/collaborations between SPD and other city agencies.
- In partnerships, successful outcomes for both parties require strong, reliable relationships and a lot of communication.
- SPD should utilize other agencies more as resources/partners to accomplish public safety goals.
- A few good programs have been cut due to lack of funding; there is a need to find ways to keep good programs running.
- Frequent SPD turnover presents challenges to ongoing partnerships.
- Knowledge about SPD programs is not sufficiently shared among city agencies.

---

96. Neighborhood Districts were established in Seattle City Council Resolution 27709 (October, 1987): http://www.seattle.gov/neighborhoodcouncil/27709.pdf.

**SPD Patrol Officer Forum.** SPD patrol officers are the linchpin of community engagement and their feedback is crucial to obtaining a full picture of police-community engagement. Therefore, CPC staff and several CPC commissioners, together with former Assistant Chief Nick Metz and Sergeant Adrian Diaz, conducted a four-hour patrol officer forum on June 10, 2014. The 18 police officer attendees represented all five precincts and each of the three watches. Attendees were assigned to one of three groups to allow for a robust discussion. CPC staff identified the following observations and concerns from the information provided by forum participants:

- Officers like to engage with the community using casual/informal means.
- Competing demands on officers' time make it challenging to proactively engage the community.
- Paperwork reduces the amount of time officers have to engage with the community.
- The police-community relationship in Seattle could be improved by educating the community about the role of officers.
- Language is often a barrier to communication, but officers use a variety of resources to do their best.
- The Community Police Commission should be utilized as a conduit to the community.
- Communication within the department and between precincts and units is poor.
- SPD's external communications, including relationships with the media, need improvement.
- Officers think *Night Out*, *Living Room Conversations*, the *Community Police Academy*, and *Jr. Police Badge Stickers* are the best community engagement programs.
- Patrol officers would like the opportunity (time) to attend advisory council meetings.
- SPD should continue with its social media campaign.
- Officers do not feel that the department supports a culture of community engagement.
- Officers do not think it is SPD's job to equip them to interact with different communities in Seattle; they feel like they treat everyone with fairness and respect.
- Patrol, as a function, needs to be prioritized; there are not enough officers on the streets.

## Part C: Addtional meetings

CPC staff met with SPD precinct leaders and also attended a number of other police-community outreach and engagement functions to learn about and observe the interactions that regularly occur between SPD and Seattle communities. These meetings and functions included:

- SPD Citywide Advisory Council Meeting (May 14, 2014)
- Meeting with Captain Fowler, West Precinct (May 22, 2014)
- Meeting with Captain Emerick, North Precinct (May 22, 2014)
- Meeting with Captain Davis, East Precinct (May 22, 2014)
- Ride-along in West Precinct (May 23, 2014)
- Meeting with Captain Wilske, Southwest Precinct (May 28, 2014)
- Ride-along in East Precinct (May 31, 2014)
- South Seattle Crime Prevention Council Meeting (June 4, 2014)
- North Precinct Community Police Team Meeting (June 5, 2014)
- Muslim, Sikh and Arab and East African Joint Advisory Council Meeting (June 11, 2014)
- Meeting with Acting Captain Strand and Captain Proudfoot, South Precinct (June 27, 2014)
- African American Community Advisory Council Meeting (July 17, 2014)
- East Precinct Advisory Council Meeting (July 24, 2014)

## Part D: Topics for potential analysis

Community engagement is a complex topic that means different things to different people. After collecting and reviewing information gathered from communities in Seattle to gain direction, the CPC distilled feedback into 10 potential areas of focus within the larger theme of community engagement. Those themes are listed below.

1. Outreach to immigrant and refugee communities (e.g. education on how to use 9-1-1)
2. Staffing, deployment, and resource allocation (e.g. sector boundaries, special units, and patrol)
3. Relationships with communities who have historically had troubled relationships with SPD (e.g. open and honest dialogue)
4. Multicultural awareness, understanding, and engagement
5. Recruitment of officers from underrepresented populations
6. Officer participation in community meetings (substance and frequency)
7. Strength/success of partnerships with other City agencies
8. External communications (e.g. media, community, individual-level, education, crisis/non-crisis, and transparency)
9. Internal communications (e.g. consistency of messaging, training, crisis/non-crisis, and transparency)
10. Program effectiveness

## APPENDIX II: INTERVIEWEES

The CPC staff spoke to many people throughout the development of this report. The majority of the individual interviews were with SPD personnel, since feedback from the community was generally collected via community meetings (see other appendices). The name, title, and organization of each person interviewed outside of a community meeting is listed below.

1.   Shanon Anderson, Sergeant, Basic Law Enforcement Academy, SPD
2.   Eliot Bornstein, Public Information Officer, Seattle Office for Civil Rights
3.   Lesley Cordner, Assistant Chief, Compliance and Professional Standards Bureau, SPD
4.   Samantha Daly, Director, Advanced Training Division, Criminal Justice Training Commission
5.   Adrian Diaz, Sergeant, Community Outreach Section, SPD
6.   Edith Elion, Executive Director, Atlantic Street Center
7.   Mike Fields, Director, Human Resources Department, SPD
8.   Tag Gleason, Captain, Human Resources, SPD
9.   Virginia Gleason, Chief Strategic Advisor, SPD
10.  John Hayes, Captain, Community Outreach, SPD
11.  Thomas Janes, Officer, Recruiting Unit (formerly), SPD
12.  Joe Kessler, Captain, Special Operations Bureau, SPD
13.  Les Liggins, Captain, Human Resources, SPD
14.  James Manning, Officer, Special Assignment, SPD
15.  Deborah Nicholson, Sergeant, Background Investigations Unit, SPD
16.  David Proudfoot, Captain, Education and Training Section, SPD
17.  Rachel Schade, Exams Analyst, Seattle Public Safety and Civil Service Commission
18.  Andre Sinn, Detective, Recruitment Unit, SPD
19.  Mike Teeter, Captain, Force Investigations Team, SPD
20.  Yvonne Underwood, Sergeant, Field Training Unit, SPD
21.  Martin Welte, Race and Social Justice Coordinator, Training Section, SPD

## APPENDIX III: CPC LISTENING SESSIONS

In order to reach a variety of communities, the CPC contracted with several community based organizations (CBOs) to conduct listening sessions with the communities they represent. The CPC and CBOs conducted eight of these listening sessions in various racial, ethnic, immigrant, and refugee communities in April and May 2015 (see Figure 9).

CBO listening session facilitators were asked to attend a two-hour training conducted by the CPC prior to hosting their event. This training ensured that the meeting format remained consistent across the board. A report template was provided, and CBOs were required to fill it out after the meeting. At each listening session, meeting facilitators asked the same series of questions designed to assess the SPD and its community engagement practices.

FIGURE 9: LISTENING SESSIONS HELD BY CPC

| Community | Additional Languages Offered | Date/Time | Location | Number of Attendees |
|---|---|---|---|---|
| Somali | Somali | April 9, 6-8 PM | New Holly Gathering Hall | 50 |
| Native American | N/A | April 14, 6-8 PM | Daybreak Star | 15 |
| Ethiopian, Eritrean, Somali | Amharic, Somali, Oromo, Tigrinya | April 23, 6-8 PM | New Holly Gathering Hall | 46 |
| Other Racial/ Ethnic Individuals | Ilocano, Lao, Hmong, Thai, Khmer, Bhutanese | April 30, 6-8 PM | Filipino Community Center | 37 |
| African American | N/A | April 29, 6-8 PM | Rainier Beach Community Center | 30 |
| Latino | Spanish | May 12, 6:30-8:30 PM | El Centro de la Raza | 15 |
| Chinese | Mandarin, Cantonese | May 14, 6-8 PM | Seattle Chinatown Int'l District PDA | 25 |
| African American | N/A | May 21, 6-8 PM | Atlantic Street Family Center | 13 |

## APPENDIX IV: DEMOGRAPHIC ADVISORY COUNCILS ATTENDED BY CPC

SPD formed Demographic Advisory Councils (DACs) over a decade ago as a way to build trust between racial/ethnic communities and the police department, discuss law enforcement in the community, and increase understanding about both cultural norms and the role of police.

We attended six DAC meetings in April and May 2015 (see Figure 10) to inform our evaluation of SPD's community engagement practices. The primary goal of attending these meetings was to further our understanding of SPD's relationship with racial, ethnic, immigrant, and refugee communities.

FIGURE 10: DEMOGRAPHIC ADVISORY COUNCIL MEETINGS ATTENDED

| Advisory Council | Date/Time | Location | Number of Attendees |
|---|---|---|---|
| East African | April 2, 6-8 PM | Police Support Facility | 18 |
| African American | April 16, 6-8 PM | Seattle Vocational Institute | 50 |
| Filipino | April 22, 5:30-7 PM | Filipino Community Center | 28 |
| Muslim, Sikh, and Arab | May 6, 6-8 PM | Yesler Community Center | 12 |
| Native American | May 20, 6:30-8 PM | Pearl Warren Building | 10 |

## APPENDIX V: SPD HIRING STANDARDS

Below are SPD's hiring standards, as excerpted from its website.

**Criminal Record:** An applicant's criminal record, including all arrests, prosecutions, deferred prosecutions, 'Alford' pleas, and non-conviction information will be thoroughly assessed and may be grounds for disqualification. The following examples will be disqualifying:

- Any adult felony conviction.
- Any misdemeanor or felony conviction while employed in a criminal justice and/or law enforcement capacity.
- Any domestic violence conviction.

**Traffic Record:** An applicant's driving record will be considered on a case by case basis with the past five (5) years being the most critical. The following will be disqualifying until the time parameters have been met.

- Driving under the influence (DUI), Negligent and Reckless Driving, or Hit and Run Driving within the past five years of taking the exam.
- Suspension of driver's license as a result of a DUI within the past five years of taking the exam.

**Employment History:** An applicant's employment history, including any terminations or leaving an employer in lieu of termination, will be thoroughly assessed and may be grounds for disqualification.

**Financial:** An applicant's credit history will be thoroughly assessed and related decision-making issues may be grounds for disqualification. The following are areas of concern:

- Failure to pay income tax.
- Failure to pay child support.

**Professional Appearance:** All applicants are expected to maintain a professional appearance at all times. SPD has the sole discretion in determining what is considered professional, as it relates to the position the applicant is applying for. Any and all tattoos, branding (intentional burning of skin to create a design), voluntary disfigurement (marring or spoiling of the appearance or shape of a body part), or scarification (intentional cutting of the skin to create a design) shall be carefully reviewed by SPD on a case-by-case basis.

**Drug Use:** An applicant's drug use will be looked at on a case by case basis. In order to be considered the most competitive candidate and to increase the likelihood of continuing on in the process, the closer the applicant is to the cessation timeline listed for the drug(s) in question the better.

- MARIJUANA: An applicant has not used Marijuana within twelve (12) months prior to the date of the related Police Officer Civil Service Exam.
- COCAINE/CRACK: An applicant has not used cocaine or crack within the ten (10) years prior to the date of the related Police Officer Civil Service Exam.
- CLUB DRUGS: An applicant has not used club drugs, such as, but not limited to: Ketamine, GHB, Rohypnol, or MDMA (ecstasy) within the five (5) years prior to the date of the related Police Officer Civil Service Exam.

- HALLUCINOGENS: An applicant has not used any hallucinogens: PCP, Angel Dust, Wet, Phencyclidine, LSD, Mushrooms, or Psylocybin, within the ten (10) years prior to the date of the related Police Officer Civil Service Exam.

- OPIATES: An applicant has not used Opium, Morphine, or Heroin within the ten (10) years prior to the date of the related Police Officer Civil Service Exam.

- STIMULANTS: An applicant has not used Methamphetamine, Crank, Crystal, Ice, Speed, Glass, or Amphetamine within the ten (10) years prior to the date of the related Police Officer Civil Service Exam.

- AEROSOLS: An applicant has not inhaled aerosols, sometimes referred to as Huffing (paint) or Whippits (Nitrous Oxide) or used Khat within the five (5) years prior to the date of the related Police Officer Civil Service Exam.

- An applicant has not used four (4) or more controlled substances within the ten (10) years prior to the date of the related Police Officer Civil Service Exam.

- An applicant has not used any illegal drug(s) while employed in a criminal justice and/or law enforcement capacity.

- An applicant has not manufactured or cultivated illegal drug(s) for the purpose of the sales/ marketing of the drug(s).

- An applicant has not sold or facilitated the sale of illegal drugs.

To learn more about the CPC, please visit
http://www.seattle.gov/community-police-commission

Project Contact
Anne Bettesworth
CPC Policy Analyst
anne.bettesworth@seattle.gov