THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>                    Plaintiff,<br><br>        vs.<br><br>CITY OF SEATTLE<br><br>                    Defendant. | CASE NO.  C12-1282JLR<br><br>**THE SEATTLE POLICE MONITOR'S FIFTH SYSTEMIC ASSESSMENT REGARDING CRISIS INTERVENTION** |

The Seattle Police Monitor's Fifth Systemic Assessment, regarding the Seattle Police Department's progress toward complying with the provisions of the Consent Decree related to crisis intervention, is attached.

THE SEATTLE POLICE MONITOR'S FIFTH SYSTEMIC
ASSESSMENT REGARDING CRISIS INTERVENTION
Case No.  C12-1282JLR

Merrick J. Bobb, Monitor
Police Assessment Resource Center
PO Box 27445
Los Angeles, CA 90027
(213) 623-5757

**CERTIFICATE OF SERVICE**

I certify that on the 16th day of February, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following attorneys of record:

| | |
|---|---|
| J. Michael Diaz | michael.diaz@usdoj.gov |
| Jonathan Smith | jonathan.smith2@usdoj.gov |
| Kerry Jane Keefe | kerry.keefe@usdoj.gov |
| Michael Johnson Songer | michael.songer@usdoj.gov |
| Rebecca Shapiro Cohen | rebecca.cohen@usdoj.gov |
| Emily A. Gunston | emily.gunston@usdoj.gov |
| Puneet Cheema | puneet.cheema2@usdoj.gov |
| Timothy D. Mygatt | timothy.mygatt@usdoj.gov |
| Christina Fogg | christina.fogg@usdoj.gov |
| Annette L. Hayes | annette.hayes@usdoj.gov |
| Jean M. Boler | jean.boler@seattle.gov |
| Peter Samuel Holmes | peter.holmes@seattle.gov |
| Brian G. Maxey | brian.maxey@seattle.gov |
| Gregory C. Narver | gregory.narver@seattle.gov |
| John B. Schochet | john.schochet@seattle.gov |
| Rebecca Boatright | rebecca.boatright@seattle.gov |

DATED this 16th day of February, 2016.


*/s/ Matthew Barge*
Matthew Barge

THE SEATTLE POLICE MONITOR'S FIFTH SYSTEMIC
ASSESSMENT REGARDING CRISIS INTERVENTION
Case No.  C12-1282JLR

Merrick J. Bobb, Monitor
Police Assessment Resource Center
PO Box 27445
Los Angeles, CA 90027
(213) 623-5757



SEATTLE
POLICE
MONITOR

# Fifth Systemic Assessment: Crisis Intervention

February 2016

# Table of Contents

Executive Summary ..................................................................................................... 1

Background .................................................................................................................. 3

Assessment .................................................................................................................. 5

   A.   Whether CI-Certified Officers Are Being Dispatched to Incidents or Calls Involving Individuals in Crisis .... 5

      1.  Dispatch of CI-Certified Officers to Crisis Intervention Incidents ............................................ 5
      2.  Implications of CI-Certified Officer Response Rate for Crisis Intervention Program Going Forward ....... 7
      3.  Additional Considerations & Recommendations Regarding Crisis Intervention Data ......................... 8
      4.  Conclusions Regarding Ci-Certified Officer Dispatch Rate ................................................ 9

   B.   Whether CI-Certified Officers Are Appropriately Leading or Getting Involved in Interactions with Individuals Experiencing a Crisis ......................................................................... 10

   C.   Whether SPD Officers Are Engaging with Individuals in Crisis Consistent with Their Training & Using Best Practices to Help Minimize the Need to Employ Force ........................................ 11

      1.  Quantitative Analysis of Use of Force in Crisis Incidents ............................................... 11
      2.  Qualitative Review of Use of Force in Crisis Incidents ................................................ 12

   D.   Whether Officers Are Being Adequately Trained ......................................................... 14

   E.   Whether SPD Is Providing Sufficient Trained Personnel in The Field .................................... 15

   F.   Whether the Management & Administrative Structure Governing the CIT Includes Both Strong Efforts to Maintain an Active CIC and Provides Ongoing Efforts to Review Processes Being Used ...................... 17

   G.   Whether Crisis Incidents Are Ending with Proper Dispositions ......................................... 18

   H.   Whether The Current Data & Accountability System Is Adequate ........................................ 21

Conclusion ................................................................................................................. 22

# Executive Summary

As set forth in the Third-Year Monitoring Plan, the Monitoring Team has engaged in an assessment as to whether the Seattle Police Department's ("SPD" or "Department") Crisis Intervention ("CI") Trained Officers are both being dispatched to incidents or calls involving individuals in crisis and are appropriately leading interactions with individuals in crisis and minimizing the need to use force against these individuals (for example through de-escalation techniques).

The Monitoring Team also assessed efforts that underlie the SPD's ability to effectively meet certain requirements of the Consent Decree relating to the Department's response to individuals experiencing a behavioral crisis, including:

- Adequately training officers;
- Providing sufficient staffing in the field;
- Maintaining a Crisis Intervention Committee ("CIC") to help drive a thoughtful and collaborative CI process;
- Ensuring the ability to properly dispose of crisis incidents, including with attempted referrals to the social service system or arrest where appropriate; and
- Maintaining a data tracking system to provide an ongoing feedback loop to system improvement and accountability.[1]

Overall, the Monitoring Team has been impressed with SPD's efforts to implement policies and procedures – and to create a structure that supports an effective strategy to engage individuals in behavioral crisis, which can include mental illness, substance abuse, or other personal or behavioral concerns.[2]  This effort has included training all officers in at least some level of CI training, creating new policies and operational and organizational changes to support a new robust Crisis Intervention Team ("CIT") program with dedicated.  Command-level personnel, establishing new avenues and structures for input from the relevant (mental health and social services) community, and implementing a new data tracking system.

Based upon the information available to the Monitoring Team at this time and based upon the standards above, we find the SPD is in initial compliance with the relevant requirements of the Consent Decree.

In summary:

1) The SPD is dispatching their now large and trained cadre of CI-Certified officers to crisis events in the great majority of instances.

2) Initial data indicates that officers use force against individuals in crisis less than two percent of the time and, when they do use force, 80 percent of the time they use the lowest level of force (and not once used the highest level of force), even in high risk situations.

---

[1] Dkt. 3-1 ¶¶ 130–37.
[2] Fourth Semiannual Report at 76.

3)  Over the past two years, all officers have received some level of crisis intervention training, which has been approved by the Department of Justice, the Monitor, and the Federal Court.

4)  A sufficient number of officers appear to be stationed throughout the City, and on all watches, to provide coverage for crisis incidents.

5)  SPD has institutionalized attention to crisis intervention work by establishing and funding the CIT Program, implementing training and data collection processes, and continuing to take the lead in maintaining the CIC.

6)  SPD is making strong efforts to guide people in crisis into the social service system, as opposed to arresting and jailing them.

Nevertheless, as the program grows and matures, more work will need to be done to gather additional data and information about how crisis incidents are managed on the front line in order to assist the Department and the Crisis Intervention Committee – a community-based "interagency, volunteer, advisory committee composed . . . of regional mental and behavioral health experts, providers, clinicians, community advocates, academics, other law enforcement agencies, command-level members of SPD, and of the judiciary"[3] – in further refining the CI program and ensuring that officers are handling those in crisis with skill and discretion.

Some of the strategies we had hoped to employ in this assessment were not possible given the current flow or state of some types of information.  However, we expect that, as additional strategies are employed in the coming year and we continue to monitor this program, we will continue to see further strides in the areas assessed.

---

[3] Third Semiannual Report at 28.

# Background

Before reporting on the current status of SPD's crisis intervention efforts, we briefly reflect on where the SPD started at the beginning of the process. [4]

When the Consent Decree was first implemented, there were a significant number of officers who had received some level of training on crisis intervention and many officers doing that work well already.  However, such training was sporadic and not part of an overall strategy.  Indeed, some of the training was itself crisis-driven – with training starting only after high-profile incidents occurred.

Further, while the Department maintained a Crisis Response Unit ("CRU," which was previously the Crisis Response Team or "CRT"), there was no formal crisis intervention program in place or a consistent, unified approach to crisis events.  Specifically, there was no overarching policy governing response to and performance in crisis events; no crisis intervention committee that brought together key community stakeholders to collaboratively and collectively address community and interagency issues; no ongoing, structured  crisis intervention training program; no experienced, trained, and dedicated certified CIT-officers; and no centralized organizational structure to implement a strategic and coordinated approach to policing those in crisis.

Perhaps most importantly, there was no commitment or vision from the top of the Department on how it intended to respond to individuals experiencing or exhibiting signs of a behavioral crisis.  This, unfortunately, was not atypical of many similarly situated departments around the country.

However, at the time that the Consent Decree was approved, SPD was, as it is today, likely facing thousands of crisis incidents each year.  The general impression was that the resources in place were not sufficient to deal with the problem.  In 2014, the SPD reported that the CRU – designed to help ensure that people in crisis engaged by the SPD receive effective services – received over 4,800 case referrals, which constituted an increase of over 30 percent as compared to 2013.

"At the time of the Department of Justice's 2011 investigation that led to the Consent Decree, SPD itself estimated that 70 percent" of its use of force encounters involved people who would, under SPD's current policies, be labeled as in "behavioral crisis."[5]  In 2015, SPD reported that slightly more than 50 percent of the Department's applications of force involved subjects impaired by either mental illness, or drugs or alcohol, or other indicators which would meet the current "behavioral crisis" definition over the past year.[6]

These numbers in part engendered the general concern that when SPD officers arrived at the scene of a behavioral crisis event, they did not always have the skill or training to address them in a manner that adequately promoted officer safety, subject safety, and any implicated law enforcement objectives.

---

[4] For a more detailed history of the evolution of crisis intervention issues, and the evolution of progress in the area over the past three years, please see the Monitor's semi-annual reports, at www.seattlemonitor.com.
[5] Fourth Semiannual Report at 76 (quoting United States Department of Justice, Civil Rights Division and U.S. Att'ys Office, W.D. Wash., Investigation of Seattle Police Department (Dec. 16, 2011) at 4, *available at* http://static.squarespace.com/static/5425b9f0e4b0d66352331e0e/).
[6] An "application of force" refers to a singular act of physical coercion by an officer and does not equate to an incidence of force.  For example, if more than one officer applies force in a single incident, or one officer applies two levels of force, once force incident could count for multiple applications of force.  Over a one-year period between April 2014 and March 2015, the Department's 2,051 applications of forced were distributed across 1,028 force incidents.

Additionally, there was a concern that unnecessary force was used in some instances. This concern aligned with issues facing police departments nationally. Studies estimate that, nationwide, people with severe mental illness, while making up approximately 4 percent of the population, account for around 25 percent fatal police encounters and 10 percent of police calls for service.[7] It should be noted here that, to our knowledge, Seattle is the only agency of its size in the United States that is now tracking the level of detail necessary to transform rough estimates to far more precise figures of the nature and outcomes of police interactions with individuals experiencing a behavioral crisis.

As noted below, and as described in great detail in each of the Monitor's six semi-annual reports to date, SPD has, in a relatively brief amount of time, created a full-fledged crisis intervention program that is successfully being woven into the SPD organization. This has included investing resources into training of personnel related to interacting with those in crisis. The Department's Education and Training Section developed new training so that, beginning in 2014, all officers now receive 8 hours of basic training related to crisis intervention. A 40-hour class was re-established to offer to officers, who volunteer, to become so-called "CIT-Certified" officers – forming a dedicated cadre of SPD officers who, by virtue of their training and ongoing experience in addressing crisis incidents, are crisis specialists. Dispatchers are also now trained on how to handle crisis calls and how to identify crisis incidents that might benefit from the presence of CIT-Certified officers.

The program is also now staffed by a full time sergeant to act as the crisis intervention coordinator ("CIT Coordinator") and a patrol lieutenant to oversee the coordinator and all crisis intervention issues as the "Commander" of the Crisis Intervention Unit. The CIT Commander reports directly to both the Assistant Chief of Patrol Operations and Assistant Chief of Compliance and Professional Standards Bureau, who are both command level staff in SPD.

SPD's efforts also included creating new policies and procedures, and organizing and leading the Crisis Intervention Committee ("CIC"), an interagency advisory committee composed of regional mental and behavioral health experts, social service providers, clinicians, community advocates, academics, other law enforcement agencies, the judiciary, and members of the SPD.[8] In partnership with the CIC, the Department created a new data collection tool, as discussed below.

In short, since the Monitor's First Semiannual Report in April 2013 – less than 3 years ago – SPD has recognized the importance of crisis work and dedicated significant resources to create a full-fledged crisis intervention program. The drive and commitment of those personnel directly responsible for the program's implementation and success, particularly Sgt. Dan Nelson and Assistant Chief Lesley Cordner, are to be commended. With the foundation for SPD's crisis intervention program in place, the Monitoring Team can turn to assessing the effects of that program in the real world and on the streets of Seattle.

---

[7] Fuller et al, Treatment Advocacy Center, *Overlooked in the Undercounted: The Role of Mental Illness In Fatal Law Enforcement Encounters* (December 2015).
[8] Third Semiannual Report at 28.

# Assessment

## A. Whether CI-Certified Officers Are Being Dispatched to Incidents or Calls Involving Individuals in Crisis

### 1. Dispatch of CI-Certified Officers to Crisis Intervention Incidents

We first consider whether CI-Certified officers – those who receive 40 hours of specialized training and volunteer to be certified – are being sufficiently and appropriately dispatched to incidents or calls involving individuals in crisis. One consistent concern has been that, given the large amount of crisis calls received, the SPD may not have the resources and organization to dispatch trained officers to those calls where that training can be used. For a crisis intervention program to be effective in practice, CI-Certified Officers must be available, able to respond, and, indeed, actually respond to incidents where their specialized skills and in-depth training might be effective in addressing the situation.

To determine whether CI-Certified officers are being dispatched to incidents or calls involving individuals in crisis, we analyzed SPD data detailing the number of incidents defined as "crisis" and evaluating the number and rate of incidents in which a CI-Certified officer arrived at the scene.

The data that we reviewed was generated through a crisis template implemented by the Department in 2015. Specifically, in May 2015, the Department rolled out the use of a data collection tool called the Crisis Template ("Template" or "Form"). It is a form that was designed by the SPD with the help of researchers, the community members involved in the CIC, as well as feedback from front line officers. The Template is designed to capture significant amounts of data for every contact made with someone in crisis, even if no force is used. The Template includes a space for narratives to allow reviewers to gain insight into more details about the encounters. Crucially, officers can enter the data quickly and efficiently into the Department's in-car computing system.[9]

We analyzed data from Templates entered into the SPD system between June 1 and August 31, 2015. During those 3 months, officers filled out 2,516 forms, an average of 839 per month and just over 27 per day. This puts the Department on track for around 10,000 crisis contacts per year. That number demonstrates the enormous workload that crisis calls create for the SPD.

Preliminary data from the Templates shows that, out of 2,516 crisis incidents that generated a Template, a CI-Certified officer arrived on scene – because they were requested by dispatch, requested by another officer over their radio, or they arrived on the scene on their own – in some 1,783 instances, or approximately 71 percent of the time. A CI-Certified officer was not present in 733 instances, or approximately 29 percent of the time. The arrival rate was similar regardless of whether a certified officer was requested by dispatch or by other officers. A CI-Certified officer was dispatched on 1,016 instances, and such an officer in fact arrived during 754 instances (or about 74 percent of the time). Another officer requested a Certified officer on 291 instances, with such a Certified officer arriving on 225 occasions (or about 77 percent of the time).

---

[9] This technological platform is also how SPD is collecting information on stops and detentions, which the Monitoring Team will evaluate in a future Assessment. *See* Fifth Semiannual Report at 40.

It is important to note, however, that the data from the Template may not, in isolation, tell the whole story. Accordingly, to assess these numbers, we first looked to SPD's Policy Manual, which states in pertinent part:

**16.110-POL-5 Responding to Subjects in Behavioral Crisis**

1. Upon Encountering a Subject in Any Type of Behavioral Crisis During Any Type of Incident (On-View or Dispatched), Officers Shall Make Every Reasonable Effort to Request the Assistance of CIT-Certified Officers

2. Communications Shall Dispatch at Least One CIT-Certified Officer to Each Call That Appears to Involve a Subject in Behavioral Crisis.

The policy does not expressly *require* a Certified officer to be on scene for all crises but, instead, requires that officers and dispatchers make good-faith attempts to ensure that the resource (CI-Certified officers) are available.

It is further important to note that several of the 733 incidents in which a CI-Certified officer was not present during a crisis incident also involved situations where no crisis element was identified by communications personnel or first-arriving officers. Thus, in some of the incidents where the data indicates that a Certified Officer was not present, the incident was in fact only determined to be a crisis incident *after* officers were dispatched or after they arrived.

Additionally, it is not uncommon that a crisis incident may be fully addressed before the "crisis element" is identified or the primary or initially-responding officers complete their interactions with the person in crisis. For example, if a non-certified patrol officer walks up to a woman who seems to be in crisis and is talking to herself but declines help, and no crime is committed and no one is in danger, the officer would fill out a Template – but, appropriately, take no action. Further, there would be no basis for detaining the individual to wait for a CI-Certified Officer. Indeed, officers noted that in 64 incidents (2.5 percent of total incidents), they were notified of a crisis but unable to even contact the person in crisis. On 512 occasions (20 percent of incidents), officers noted on the Template "no action possible/necessary" – further suggesting that, for some portion of the crisis incidents to which a Certified officer did not respond, it was not possible or not feasible under the circumstances of the interaction for the Certified officer to have responded. During interviews with SPD officers, a number of officers reported that, at times, the incident resolved before a certified officer could be called, or after he or she was called but before the officer arrived.

While any crisis incident has the potential to quickly turn into a use of force, high-intensity incidents in particular appear more risky and clearly warrant the presence of a more highly-trained officer, and should have an even higher rate of CI-Certified officers present. Accordingly, we cross-referenced data to determine if CI-Certified officers arrived on scene when incidents were more serious – because the Template indicated belligerence, threats of suicide, threats of violence, or the subject was arrested. We found that CI-Certified officers arrived on 908 of 1,259 calls (72 percent). For example, of the occasions when officers checked a box that indicated the subject used or brandished a weapon (218 times), a CI-Certified officer arrived on scene 157 times (72 percent). Out of the 189 people in crisis arrested, a CI-Certified officer was on scene 131 times (69 percent).[10]

---

[10] Also of interest -- of the approximately 50 times that force was used by an SPD officer on someone in crisis, a CI-Certified officer arrived 40 times, around 78.5 percent of the time. SPD data indicates that on 3 other occasions, a CIT officer did arrive but that fact was not captured by the Template. It is unclear whether these called "more serious." Six of the remaining seven incidents related to handcuff pain or complaint of pain.

At first blush, these numbers caused some concern. However, this raw data may not be fully reflective of what is actually happening on the ground. The basis for this assertion is the work of SPD's Crisis Response Unit ("CRU") audits all CIT calls. If a box is checked that a CI-Certified officer did not arrive on scene, a member of the unit makes calls and reviews documentation to determine why. At times, a CI-Certified officer may have been on the scene as back-up but the appropriate box on the Template was not checked because the officer filling out the form did not think to ask. Likewise, a scene may have resolved quickly, or turned out to not be a crisis intervention situation after all, and the CI-Certified officer was "called off" – but no one cleaned up the data on the Template. Complicating the issue, there currently is no data field to reflect such an occurrence.

Going forward, the CIT Commander (a Lieutenant) who oversees the CRU has committed to provide a feedback email, informing officers about situations in which crisis intervention data was incorrectly or inconsistently provided and to train them how to collect data in a more accurate manner. Additionally, as part of the eight-hour, mandatory, and yearly crisis intervention training for all sworn officers, the Department will emphasize training on CI reporting and on streamlining a "team" approach to CI events involving several officers.

Regardless of the potential reasons why the raw Template data might suggest a lower CI-Certified officer response rate than is the reality, CRU estimates that, based on their auditing, CI-Certified officers are on scene over 90 percent of the time, and essentially every time a serious incident occurs.

Whether it is 74 percent or over 90 percent, the Monitoring Team finds this response rate is impressive, and the Department should be applauded for these efforts to ensure that specialized, highly trained officers respond to crisis intervention incidents. It is particularly impressive given that SPD officers generally, and patrol officers specifically, are proportionally few for a city with a population (both residents and daytime visitors) and geographical reach of Seattle.

There is no bright-line percentage for establishing adequate CI-Certified officer response, and it would be difficult to create one given the difficulty in defining and identifying crisis calls and the fluid nature of crisis incidents (i.e. the difficulty of being able to know or predict when a crisis incident may be relatively minor or more serious). The response rates above are supportive of initial compliance. The Monitoring Team will continue to look for continued high percentages over the next year as we assessed sustained compliance.

## 2. Implications of CI-Certified Officer Response Rate for Crisis Intervention Program Going Forward

In early 2015, some within SPD expressed a concern about whether CI-Certified officers responding to this high percentage of calls was actually a problem. The thought was, based on anecdotes from the field, that CI-Certified officers may be getting "run ragged" and limiting their availability to respond to other calls by having to run among low-level calls across precincts, even when the average patrol officer could adequately handle the call.

During the course of our assessment, this same concern was expressed again from some SPD supervisors, CI-Certified officers, and from some members of the community. Some questioned if the current crisis intervention program is putting CI-Certified officers too much in demand, particularly as the number of incidents classified as crises by SPD policy appears to be increasing. These individuals thought that the current policy was initially a good stopgap or preliminary measure but were concerned that the "CI-Certified" designation may be taking on a negative connotation. Since nearly all patrol officers have now received the department-required basic crisis intervention training as well as an advanced, follow-up eight-hour training that included scenarios, some

wondered whether regular patrol officers are now equally capable of responding to lower level crisis incidents as a CI-Certified officer to arrive – obviating the need for such patrol officers to wait for a CI-Certified officer to respond to such low-level incidents.  Some community participants expressed an additional concern related to longer wait times while a CI-Certified officer is being dispatched and traveling from another area.  They had concerns that those long wait times, particularly in places like shelters, might put health or social service providers at risk when they are involved in crisis situations that can escalate into violence or harm in the absence of a needed and timely police response.

The potential implications of the "training gap" between CI-Certified and patrol officers being shrunk, distinguishing the difference between acute and "regular" crisis events that patrol officers might address as capably as CI-Certified officers, and the implications of dispatching CI-Certified officers to crisis calls on response times have been discussed at CIC meetings, but no conclusions have been reached as to a resolution.

Others disagreed with the view that CI-Certified officers are being overextended – suggesting that it may have been more of an issue at the outset of the CIT program when there were fewer CI-Certified officers available, as well as challenges related to dispatch and patrol communicating whether an incident should be considered a "crisis" and when to dispatch certified officers.  Currently, there is no data available to suggest that officers are ready to "drop out" of the program or are feeling burned out.  In fact, since the beginning of the program, only one CI-Certified officer has left the program.  Further, in a recent email blast to CI-Certified officers, something akin to an informal survey, officers did not report significant difficulties.

Given these different views, and in the absence of solid empirical evidence, we believe that the concerns about the requirement for dispatching and using CI-Certified officers for specialized duties should continue to be monitored over the next year.  The crisis intervention program is still in its early stages.  Growing pains are to be expected.  It appears that, to date, SPD has decided to take a "wait and see" approach."  We think that it is appropriately cautious to not undo all of the positive changes made in this area based solely on anecdotes or general perceptions created during what may well be the initial growing pains of getting the CIT program up and running.

Going forward, there should be much more clarity about whether this issue was an early "kink" to be worked out or, instead, a more serious, long-term issue that might warrant collaborative, data-driven changes to policy, process, or procedure.  In particular, over the next year, SPD needs to pay close attention to the perceptions of CI-Certified officers, the data indicating the ability of Certified officers to arrive at incidents that require their expertise, a review of response times, and a thoughtful attempt to balance having CI-Certified officers on scene as much as possible for crisis events with the need to use the time of officers wisely.

### 3. Additional Considerations & Recommendations Regarding Crisis Intervention Data

As discussed in part above, the issue of the accuracy and detail of crisis intervention data must be flagged for additional work and assessment.  While the implementation of the Template is a great advance for the SPD, it is only useful if it provides accurate data.  SPD should explore adding to the Template a box for when CI officers are "called off" or not needed, perhaps cross-validating that data with communications data.  In-car video ("ICV") is also available of many incidents and can be a resource for the CIT Program.  SPD should explore whether regular, systematic review of ICV by the CIT Commander is feasible (and consistent with the collective bargaining agreement's use of ICV) to give officers an honest critique how they handle crisis matters.

We note here that, in the context of our review of data, we also considered the information in the "narrative" portion of the Templates, which are designed to provide greater insight into what is happening with crisis calls. In our assessment process, we randomly selected 30 Templates to review in more detail. However, we found that the narratives were not particularly helpful to determine specifically whether Certified officers were arriving on scene as expected.

The SPD recognizes that many officers are not filling out the Template or GO narratives with sufficient details, and they intend to provide more training in this regard in 2016. SPD's CIT Unit indicates that officers are generally trained to write in more direct ways to document criminal activities, in contrast to documenting processes, and that in crisis situations officers may be more focused on how the situation is progressing rather than labeling what they are doing to make it happen. The Monitoring Team's independent interviews further confirmed this to be a problem – and also raised some concerns about the potential loss of information, due to reporting procedures, of important for appropriate resolution for a range of crises situations. For example, in 42 percent of the cases, officers listed the nature of the crisis as "unknown." Although officers are not expected to be clinical diagnosticians, there is an opportunity for more education and improved documentation.

SPD's CIT unit, which reviews all the Crisis Templates, endorses future training to address the issues involved in writing CIT reports. The training will be specifically focused on how to write the narratives for the report so that they can track what type of verbalization and de-escalation skills are most effective in different types of crises and they are recommending that this type of training be included as the next critical topic in CIT training.

Similarly, as for response times, given the significant number amount of changes and reforms in SPD data collection generally in the past 18 to 24 months, including computer systems used, it was not feasible to harvest and analyze response times for crisis incidents. SPD should explore how to collect this important piece of data – even if the data environment is fluid while the Data Analytics Platform ("DAP") is being developed.

Thus, we suggest that the SPD continue efforts to ensure that data is accurate and easier to retrieve for management purposes – which includes statistics from the Template, narratives, and response times. It is our impression that at this time, while a lot of new data is being collected, the information is not set up to be analyzed easily and often – so that Department managers might view key statistics to track the effectiveness of the CIT program and make evidence-based changes based on that data.

## 4.  Conclusions Regarding Ci-Certified Officer Dispatch Rate

In sum, when we set out to conduct this assessment, we were looking to see: (1) whether the percentage of times a CI-Certified officer arrives on scene is reasonable given the intent of the Consent Decree; (2) whether the data appears accurate and complete; (3) response times; and (4) whether any recommendations can be made to improve the system or the tracking of this item. Although the collection of data regarding crisis intervention incidents has only been in place for less than nine months, we believe the percentage of calls to which CI-Certified officers have been able to respond appears to be reasonable based on the overall number of crisis incidents. Again, although there is no bright line percentage that would constitute compliance with the consent decree, the data indicate that the SPD appears to be meeting expectations. Accordingly, we find that the Department is in initial compliance in these respects.

## B.   Whether CI-Certified Officers Are Appropriately Leading or Getting Involved in Interactions with Individuals Experiencing a Crisis

We next attempted to determine whether CI-Certified officers, once on the scene, were engaging appropriately with those in crisis.  Paragraph 132 of the Consent Decree requires that:

> CI trained officers will take the lead, when appropriate, in interacting with individuals in crisis. If a supervisor has assumed responsibility for the scene, the supervisor will seek the input of CI trained officers on strategies for resolving the crisis event where it is reasonable and practical to do so.[11]

Accordingly, we attempted to determine whether CI-Certified officers, once on the scene, were engaging appropriately with those in crisis.  We looked first to see if we could determine the level of involvement of Certified officers.  Specifically, we were curious if we could determine whether a CI-Certified officer took the lead in handling the interaction with the person in crisis or whether the CI-Certified officer was simply present but did not significantly engage the subject or otherwise assume a primary role in the incident.

Out of the 2,516 crisis incidents, a CI-Certified officer, though they themselves were not necessarily required to, filled out the Template, indicating some form of lead role, 1,537 times (61 percent of the time).  However, this figure does not indicate in any conclusive way how officers may actually have divided roles in interacting with the subject in crisis as the situation unfolded.

We also examined a statistically-relevant sample of Template narratives to determine if we could get a sense of the same information.  It was difficult to determine, in a systematic way, whether CI-Certified officers were taking an appropriate, lead role at the scene.[12]

In our interviews, SPD officers believed that CI-Certified officers are playing appropriate roles at crisis incidents. We did not hear any concerns from SPD on this issue.  When circumstances preclude the CI-Certified officer from becoming the lead officer, according to those we interviewed from the SPD, they still provide valuable contributions by providing guidance to those at the scene to help contain the crisis and facilitate the appropriate disposition of the incident.  If a non-Certified officer already has taken the lead, the CI-Certified officer will not interfere unless the situation would start to get out of hand.  According to the interviews, this nuanced approach appears to be appropriately developing as a common practice across precincts.

Other anecdotal evidence that supports the notion that officers are handling crises in an effective manner comes in the form of the in the SPD's Significant Incident Reports ("SIRs").  SPD regularly circulates these reports to the Monitor and we frequently see stories such as the following.  While they do not make clear if the success is a result of CI-Certified officers being engaged as opposed to non-certified, we have continually heard such accounts:

> • "Over the course of the 4 day [King County Medical and Dental] clinic [10/22 - 10/25/15], we were able to partner and collaborate to de-escalate almost a dozen situations that

---

[11] Dkt. 3-1 ¶ 132.
[12] It should be noted that, although in-car video footage was available in 92 percent of the incidents, and is downloaded and flagged such that it could be accessed to provide reviewers a first-hand look at how officers are performing in the field, a review of videos was not part of this initial assessment. As part of our continuing monitoring obligation over the next year, the Monitoring Team will undertake a review of video and audio from a statistically significant sample of incidents in order to gain a better understanding of the dynamics at the incident scenes, and of the quality of interaction between the officers and person in crisis.

could have led to more significant issues, had it not been for our collaboration.  I was impressed with their professionalism, dedication, and efforts to work with mental health issues while still maintaining safety and order for those at the clinic. Working with these officers demonstrates that the CIT training and efforts of SPD are being implemented well, to the betterment of civilians and professionals. Sgt. XX and Officers AA, BB, CC and DD should be commended for their work in support of the Medical and Dental Clinic and acting as excellent ambassadors for the Seattle Police Department as well as the crisis intervention program."

- The Benjamin Franklin Elementary School special needs instructor called to praise the "phenomenal handling by the officers with their incredibly calm tone of voice and de-escalation techniques" while interacting with an out of control 9-year-old.  The school staff was at a loss after trying to calm the 9-year-old down, who was actively destroying school furniture, during an incident which lasted 3 hours.  Officer AA and Officer BB acted as "excellent ambassadors for the Seattle Police Department, and should be commended for their exceptional crisis intervention skills."

- Officers AA and BB were dispatched to the scene of an intoxicated individual in crisis, holding two large butcher knives in each hand. The officers withdrew from the entrance of the apartment, creating distance, and developed a rapport with the individual. The subject later complied with the officer's instructions and was taken into custody without further resistance. Officer AA and BB did an excellent job working together to not only protect each other but the safety of the suspect as well.

In short, while it appears based on reviews of these SIRs that the SPD is complying expectations of the Consent Decree that in terms of CI-Certified officers take appropriate roles at crisis incidents, we will need to continue to monitor these interactions through the review of in-car video, Template narratives, and associated reports to determine whether CI-Certified officers are having an impact at the scene of crisis events.

## C.  Whether SPD Officers Are Engaging with Individuals in Crisis Consistent with Their Training & Using Best Practices to Help Minimize the Need to Employ Force

### 1.  Quantitative Analysis of Use of Force in Crisis Incidents

Perhaps the most important question is whether officers are engaging with individuals in crisis using best practices to effectively resolve the situation, keep themselves and the public safe, and to minimize the use of force.

To assess the SPD's efforts in this regard, we first looked at data from the Templates.  Over the three months that we examined, out of the 2,516 contacts SPD had with individuals in crisis, officers reported using force in 51 instances – or in two percent of all contacts.  Nearly four out of five of these uses of force (42 use of force incidents) were classified as Type I, or the lowest level of force.  Another eight were Type II force.  No force was Type III force, the highest level of force.[13]

---

[13] One Template in which reportable use of force was noted could not be matched to IAPro, the SPD database that logs information on officer use of force.  For additional information about the classification of force of force under SPD's force policies, see the Monitor's First Systemic Report at 10-12.

Although not in itself dispositive, this relative frequency of force in crisis intervention incidents is solid. This is especially true in light of the significant challenges that many subjects posed to officers. For example, 823 subjects were listed as "disorderly disruptive;" 590 as "belligerent uncooperative;" 611 made a suicide threat or attempt; 96 had a knife; 16 had a gun; and 109 had other weapons. These numbers suggest that the SPD is using significant and appropriate restraint in difficult situations, making decisions that preserve safety and reduce use of force. This is a significant finding, indicative of the culture shift that has taken place – and supportive of initial compliance.

It is important to note here that there is no baseline number against which to compare SPD's current performance with respect to force used in crisis intervention incidents. Likewise, there is not established number or clear national standard to use as a guidepost to determine if the number or rate of force incidents in crisis intervention incidents is reasonable. Indeed, to our knowledge, SPD is the only agency in the nation that is currently tracking this statistic with any level of detail.

Because data has only been collected in a structured manner for less than a year, the Monitoring Team will be looking for trends in the data over time to determine with a greater level of precision whether the level and rate of force during these incidents appears to be reasonable.

The Monitoring Team also made an effort in the present assessment to cross-reference the Templates to other use of force data collected by the SPD, to test if we could determine whether the data appears consistent and accurate. That is, rather than relying on the accounts of whether and what force was used on the crisis intervention Templates themselves, we attempted to sync information about incidents on the Templates to data in SPD's use of force database.

However, we found that it was difficult to match up use of force incidents from the SPD's general use of force database, called IAPro, with data from the Templates. For instance, we could not find a match for one of the 51 CIT Templates in IAPro, and seven use of force incidents noted in IAPro did not indicate that reportable force was used on the Template. Although small in number (eight), these inconsistencies could cause a substantial swing in the data explaining how often force is used on those in crisis. Similarly, during the time period, there were 297 uses of force, which means the 51 uses of force documented with the Template as crises constituted 17 percent of all use of force. This figure is positive, but it differs both from the information from the crisis Templates themselves and from prior estimates.

We recommend that the SPD investigate how the data from IAPro and the Template can more easily be matched up, and ensure that they are consistent.[14] Again, with the development of the DAP, the data environment is fluid. Because data collection in this area is so new, these kinds of growing pains related to data are not, in themselves, surprising.

## 2.  Qualitative Review of Use of Force in Crisis Incidents

In addition to reviewing statistics or data from the Template, we reviewed 30 Templates to conduct a qualitative review of how officers employed trained tactics at the scene of crisis incidents. We were interested in what techniques were used (i.e. physical distancing, verbal tactics); whether officers (whether CI-Certified or not) complied with the training and best practices in handling the incident (with an explanation of why or why not);

---

[14] It should be noted that the CIT Coordinator sits on the Force Review Board, and should be able to rectify as part of the review process those instances in which a template should have been completed, but was not.

and what supervisory review by SPD was completed to assess the quality of the interaction and create a culture of accountability.

We found that officers recorded that they used verbalization in 92 percent of instances.  In those narratives, we found consistent stories where the incidents did not escalate into confrontation or use of force.  Similarly, in tracking significant incident reports, we saw a number of instances where officers were in difficult situations and resolved the incident without the use of force.  In other words, the narratives and significant incident reports provided anecdotal support for the notion that SPD is almost always handling crises with a high level of skill and avoiding the unnecessary use of force in difficult situations.

We note, however, that simply reviewing the narratives did not give us a first-hand look at how officers were behaving on the streets.  Likewise, the review did not involve the review of video of the incidents.  At the outset of conducting this Assessment, our intent was to grade efforts by officers as "excellent, adequate, below expected standards, or unable to determine" based on aggregate determinations of the presence or absence of various crisis intervention skills, techniques, and strategies.  Still, as noted above, without a view of what was actually taking place on the front line, we are reluctant to hand out such grades or go beyond inference from the data and interviews.

The Monitoring Team interviewed some supervisors, as well as the staff of the CIT unit and CRU, to determine if additional information is available, based upon the supervisors' efforts, to assess the quality of the officers' work during incidents.  We note that the Template data indicates that SPD supervisors, although they are *not* currently required by policy to be there, are on scene at crisis incidents approximately 24 percent of the time.  SPD also states that supervisors may be in contact and/or checking in by phone when not on scene of crisis incidents.

From their experiences at the scene of crisis incidents, and from their discussions with those in the field, supervisors felt confident that officers were handling crises with skill, consistent with their training, in a sizeable majority of incidents.  In addition, the CIT Unit reviews all reports and contacts supervisors if concerns about officer's performance emerge, use of force being one.  Consequently, the chain of command would appear to have some level of awareness as to how officers under their supervision are following training and minimizing use of force.

Some community members interviewed expressed a concern regarding the lack of access to a systematized source of information demonstrating the relationship between the CIT program and use of force.  The provision of data in an ongoing way about use of force in crisis intervention incidents could be another way to drive transparency and cooperation in a way that might transform the long history of distrust of data and numbers that come directly from the police.

In sum, both initial quantitative and qualitative analysis indicates that officers are skillfully dealing with those in crisis.  We accordingly find that the Department is in initial compliance in this respect.  We will continue to assess, for purposes of determining sustained compliance, how SPD assures accurate data and whether a system for supervisors to review video and audio of officer performance in crisis events is established that would enable the CIT program to ensure that it learns from real-world incidents and continually strives toward the effective implementation of best practices.

## D.  Whether Officers Are Being Adequately Trained

As of December 31, 2015, some 550 officers have gone through a 40-hour advanced crisis intervention training and eight additional hours of annual "advanced" training.  As such, they are considered CI-Certified.  This constitutes 40 percent of the entire force of around 1,356 sworn officers and 58.47% of patrol operations.  A total of 901 officers (66 percent) have actually gone through the advanced training, but many have not volunteered to be certified or are considered to be on the certified list.  It has been verified that functionally all sworn officers have received at least eight hours of CIT training both in 2014 and then again in 2015.

We believe this level of training meets the intent of, and is supportive of initial compliance with, the Consent Decree with respect to having a force adequately trained to take on the challenge of dealing with individuals in crisis.

Seattle University, through researcher Jacqueline Helfgott, conducted a "crisis intervention culture survey" of officers, and published a report on that survey in May 2015.  The survey focused on the acceptance of the CIT efforts in the SPD, including whether CIT training impacted perceptions of CIT work.  While it did not establish any empirical conclusions related to the quality of training or its impact in the quality of interactions in the field, it did give some insight as to the impact of training.

Specifically, the survey showed that those who went through CIT training had a greater appreciation for the importance of crisis intervention training, which may be a driving factor in the uptick in officers volunteering for the program.  In other words, since every officer is now receiving some level of crisis intervention training, the generally positive view of the program and objectives is driving recruitment.  The training also resulted in greater confidence by the officers in their ability to handle persons in crisis.[15]

We suggest that the Seattle University survey be re-run in 2016, with additional questions that may be appropriate given the development of the program – such as whether CI-Certified officers are able to maintain their enthusiasm for the program given the high demand for their services.

With respect to the adequacy of the crisis intervention training and its corresponding impact in the field, it must initially be noted that in 2014, when CIT training was being created, it was reviewed by DOJ and Monitoring Team experts and found to be compliant with the Consent Decree, and ultimately approved by the Court.  The same occurred in 2015.

For this assessment, we interviewed a number of SPD officers.  Most of those interviewed feel that the "Basic" CIT training from 2014 and "Advanced" Training from 2015 went very well.  They see the essence of the overall training program as focused on learning how to talk to people and how to listen.  Some officers in the field think that the CIT training is particularly important for younger officers who may particularly benefit from communications-related skills training early in their careers.  Many confirm a possible overall growth in interview skills by SPD officer, as well as an increased capacity for remaining patient in demanding crisis situations.

---

[15] Jacqueline Helfgott, et al, Seattle University Department of Criminal Justice, *Seattle Police Department Crisis Intervention Team Culture Survey – Final Report*, (May 21, 2015); *see also* Jacqueline Helfgott, et al, Seattle University Department of Criminal Justice, *Evaluation of the Washington State Criminal Justice Training Commission's "Warriors To Guardians" Cultural Shift and Crisis Intervention Team (CIT) Training – Final Report* (June 30, 2015) (finding significant training effects on CIT scenarios with respect to identification of the individual's condition, interactions with the individual in crisis, and case disposition).

In our interviews of community members, there was further endorsement of the value of CIT-Certified officers, as expressed by those in contact with families who are frequent users of the CIT.  While somewhat limited in number, community members indicated that these families say that they can detect qualitative differences between the levels of skill used by officers trained as CI-Certified, in comparison to officers who have not had comparable training.  In other words, frequent customers of the system report that Certified officers are more skilled at engaging with their family members than non-Certified officers.

With few exceptions, the overall impressions of CIT training are generally positive.  One concern that did emerge regarding training is related to more recent CIT Certified training.  According to some officers, the training may be more academic and focused on science – in contrast to meeting officer expectations for learning "hands on" what to do and how to help resolve a variety of crises.  These concerns were particularly focused on more recent training on specific topics, such as Traumatic Brain Injury.  In contrast, officers appear very supportive of the scenario-based training conducted by SPD.

## E.  Whether SPD Is Providing Sufficient Trained Personnel in The Field

We reviewed SPD data to determine the number of trained personnel in the field available to respond to crisis calls; where those officers are stationed; the ability to maintain accurate data, given the tendency of officers to move around to different jobs; and whether this staffing pattern makes sense in terms of the goals of the Consent Decree.

As noted above, SPD data indicates that 550 officers (nearly 60 percent of patrol) have been designated CI-Certified, and virtually all officers have received at least eight hours of crisis intervention training.  Because of the regular movement of officers, any chart listing precisely where those officers are stationed could quickly become out-of-date.  However, based on the snapshots SPD provided, it appears that sufficient officers are stationed throughout the City, and throughout all shifts, to provide coverage for crisis incidents; and this factor is thus supportive of initial compliance.  Specifically, as of the time of this drafting, out of the 550 certified officers, 341 (68 percent) are assigned directly to the five precincts.   The distribution of these officers is reflected in Table 1, below.

### Table 1: Number & Distribution of Crisis Intervention-Certified Officers

| Precinct | Total CIT-Certified |
|----------|---------------------|
| West | 112 |
| North | 81 |
| South | 69 |
| East | 45 |
| Southwest | 34 |
| SWAT | 24 |

The Consent Decree requires the SPD to "provide Crisis Intervention training as needed to ensure that CI trained officers are available on all shifts to respond to incidents or calls involving individuals" in crisis.[16]  In our First Semiannual Report in April 2013, we noted that the SPD set a goal of having a CIT deployment rate of 33

---

[16] Dkt. 3-1 ¶ 130.

percent on all watches and in all precincts.  Based on several snapshots, across several different days and time periods, of data from precincts, SPD data indicates a deployment rate that generally exceeds that standard.  For example, Table 2 presents, in a snapshot from a typical day, the percentage of CI-Certified officers on patrol in each precinct.

**Table 2: Distribution of Crisis Intervention-Certified Officers by Precinct & Watch**

| Watch | Percentage CI-Certified |
|---|---|
| **West Precinct** | |
| 1st Watch | 59 % |
| 2nd Watch | 56 % |
| 3rd Watch | 74 % |
| **North Precinct** | |
| 1st Watch | 52 % |
| 2nd Watch | 37 % |
| 3rd Watch | 43 % |
| **South Precinct** | |
| 1st Watch | 97 % |
| 2nd Watch | 43 % |
| 3rd Watch | 42 % |
| **East  Precinct** | |
| 1st Watch | 58 % |
| 2nd Watch | 34 % |
| 3rd Watch | 26 % |
| **Southwest Precinct** | |
| 1st Watch | 27 % |
| 2nd Watch | 53 % |
| 3rd Watch | 19 % |

We note that data from the template indicates that crisis incidents seem to be spread fairly evenly across the East, North, and West Precincts, with smaller, but still significant amounts, in the South and Southwest.  The East Precinct handled 21.2 percent of the crisis incidents; North handled 29 percent; South 12.9 percent; Southwest 7.2 percent; and West 29.7 percent.  Two of the three watches that fell below 33 percent were in the Southwest, where significantly fewer incidents are happening.  The other was the Third Watch of East, which came in at 26 percent.

We recommend that the SPD continue to track these numbers on a regular basis to ensure that staffing is distributed in a manner that meets their needs.  The snapshots provided indicate that these numbers change regularly, so there is a danger that, without regular tracking, staffing could shift over time to undermine the ability of a Unit to provide Certified officers to a critical incident.  We note that the CIT Commander does track CIT staffing and regularly reports to Command Staff on these levels.

Overall, based on the CIT unit's tracking of when certified officers appear on scene, and the data from the Template, it appears that this distribution has been sufficient to create a structure for full coverage by CI-Certified officers.  However, as noted above, data collection must be strengthened and continually tracked and analyzed to ensure its accuracy.

## F.  Whether the Management & Administrative Structure Governing the CIT Includes Both Strong Efforts to Maintain an Active CIC and Provides Ongoing Efforts to Review Processes Being Used

The Monitoring team performed a qualitative review aimed at determining whether the management and administrative structure governing crisis intervention includes both strong efforts to maintain an active Crisis Intervention Committee consistent with the intent of the Consent Decree and whether adequate processes have been established to ensure that the CIT program continues to be internally monitored and adjusted in dynamic partnership with community stakeholders.  Factors examined included:

1) the number of people involved;
2) the diversity of organizations represented;
3) the level of leadership engaged;
4) the level of activity (i.e. number of meetings, structures for communication and feedback;
5) the form of the structure of the CIC; and
6) the level of engagement.

We found that the management and administrative structure of the CIT Program continues to evolve.  Currently, there is a CIT Coordinator (a Sergeant) and a Crisis Response Unit (CRU/CFU), which includes a separate SRU Sergeant, that answer to a CIT Lieutenant (Commander), representing the three critical functions of CIT Program management.

The CIT Coordinator and the CRU provide different types of services.  The CIT Coordinator manages the overall, day-to-day CIT Program and interacts with the interagency Crisis Intervention Committee and also serves on their Board.  The CIC had a major role in developing critical components of the SPD crisis intervention strategy, and SPD continues to run all policy changes, training proposals, data requests, and high utilizer group inputs through the CIC.  SPD holds a quarterly CIC Plenary meeting, and workgroups are called on an ad-hoc basis.  The CIC and the Department should continue to discuss how they would like to structure their meetings.

In contrast to the CIT Coordinator, the CRU is composed of four CIT trained officers and one Mobile Crisis Professional (Mental Health Professional).  This team is available city wide for on-site consultation as well as for follow up on previous crisis cases, especially those who are "red flagged" as continuing to engage in behaviors that create additional crises.  The CRU engages in ongoing contacts with mental health specialists from groups represented on the CIC, and also provides a specialist resource to patrol when requested. Their ongoing contact with mental health service providers enables them to work to coordinate efforts as to disposition and also to determine if criminal charges are appropriate.  This aspect of CIT is at the operational field level of assistance, in contrast to oversight, and some would like to see it available on a 24-hour basis.  The Monitoring Team acknowledges, however, that this is both a staffing and budgetary issue.  SPD can provide officers, but it will need additional resources to partner with Mental Health Professionals.

Beyond their specific duties, both CIT and CRU report to the CIT Lieutenant through an organizational structure set up to provide for progressive levels of review as to how the program is working, including how the Crisis Templates are being completed since implementation eleven months ago (March 2015).  The Crisis Intervention Lieutenant refers to this multi-level review system as a quality assurance process that enables a continual feedback loop to provide information first to officers and then to their supervisors when problems encountered continue to be reflected in their Crisis Templates.

A number of individuals interviewed believed that the CRU Team should be expanded so that there is one in each precinct in contrast to just one in the CIT Program. Some SPD field personnel and some community members shared in this recommendation. At the same time, those in CRU seek more Mental Health Professionals to work with their current Team. As such, it appears that all are valuing the police-mental health professional partnership and some are recommending that it be expanded. Based upon our research and experience, we would tread carefully in greatly expanding upon or relying on an expanded CRU – but would encourage continued dialogue on this issue in the next few CIC meetings.

Our interview responses suggest that the current CIT procedures seem to have evolved as CIT has played a more prominent role in SPD. Community participants were supportive of the procedures. Over the next year, the Monitoring Team will be looking for continued improvement in information sharing and communication between the CI Unit and the rest of SPD. CIT continues to work with the Department's analysts but they do not have a designated analyst in the unit – again, a budgetary issue.

In terms of information sharing with the community, SPD is enhancing communication through: (1) an email address that is proving to be an effective way to respond to CIC stakeholder questions; (2) the CIT Coordinator has spoken at 45 different community/agency trainings in 2015, at community police academies, regional mental health meetings, precinct roll calls, the Downtown Seattle Association (restaurant employees and owners), Seattle University, academic conferences and others; and (3) while it is currently under development, a website will assist those seeking information about the CIT Program.

We are encouraged to see that the SPD has taken steps to institutionalize attention to crisis intervention work by establishing and funding the CIT Program, implementing training and data collection processes, and continuing to take the lead in maintaining the CIC. For purposes of the Consent Decree, this effort currently meets our expectations and the Department is in initial compliance with these requirements. The Monitoring Team looks forward to seeing how the resources of the CIC continue to drive forward over the coming year. We recommend that, given the enormity of the challenge, the SPD not rest on their laurels, but continue to work on improving these structures.

## G. Whether Crisis Incidents Are Ending with Proper Dispositions

Before the Consent Decree, SPD did not collect data on the results or outcomes of interactions with individuals experiencing a behavioral crisis. Anecdotally, officers and community members would routinely comment on the number of crisis events SPD handled, but it was never quantified. We are now approaching that ability to quantify what is happening in the field.

We reviewed data provided by the SPD, generated from the Templates, breaking down the dispositions for crisis incidents. On the Template, officers are given a choice of 14 dispositions, such as: social service/alcohol and drug/treatment referral; resources offered/declined; Mobile Crisis Team; crisis clinic; emergency detention; voluntary committal; or arrested.

Out of the 2,516 incidents, only 189, or 7.5 percent, ended in arrest. Although we recognize that overriding public safety concerns may make it necessary to take an individual into custody, these numbers are promising – especially given that arresting people in crisis can, many times, be counterproductive to the long-term goal,

embodied in SPD's crisis intervention policies, of connecting those persons to community and social service providers.

Nearly one-quarter (22 percent) of cases (or 561 total) ended with a referral to a community resource. In about forty (39 percent) of cases, resources were either declined or officers noted "no action possible/necessary." Interestingly, 1,069 times, almost 42.5 percent, the people in crisis were held for an emergency detention (787) or voluntary commitment (282), which we believe anecdotally to be consistent with other cities. The hospitals that received the most involuntary transports of people in crisis were Harborview (roughly 388 or 49 percent), Northwest Hospital (roughly 95 or 12 percent), the various campuses of Swedish Hospital (roughly 156 or 20 percent) and Virginia Mason (roughly 49 or six percent). This demonstrates a need for a strong partnership with this handful of hospitals, to track what is happening with those in severe crisis, and whether the SPD and social service system are working together as effectively as possible to address the needs of those patients. SPD, in partnership with Code for America, is moving forward toward developing a first-of-its-kind mobile device app that would allow for in-the-field coordination and data sharing between SPD and hospitals, which would constitute a very promising innovation.

Another noteworthy statistic is that, on 118 occasions, officers believed that the person in crisis committed a chargeable offense but decided not to effect an arrest. While there is no previous data against which to compare this finding, the data would appear to be indicative of at least some SPD officers taking a nuanced approach to dealing with those in crisis.

Although the Consent Decree does not require any particular "threshold" number with in terms of dispositions, the numerical data on the outcomes of crisis intervention incidents suggest, then, a significant effort by SPD to guide individuals in crisis into the social service system as opposed to jail. As such, this represents a noteworthy development and cultural change.

We also reviewed Template narratives to determine if officers are articulating the reason for their dispositions. We found that officers are describing the situation in the narratives or the accompanying GO reports that support their disposition; however, again, the narratives are relatively brief (as permitted by policy) and do not in many instances readily allow for additional analysis of the appropriateness of the disposition in a given case.

In our discussions with social service providers engaged in the CIC, we asked their view of the effectiveness of SPD officers in crisis incidents. Most of those interviewed have seen gradual improvements in getting people in behavioral crisis to services that can provide help, in contrast to arresting those who are in non-violent, and non-criminal situations. Social service providers reported to us that CIT officers are helping with resolving incidents and in providing resources to maintain the safety of the unfolding situations. In fact, there were some reports that the greatest number of requests for King County's mobile crisis team assistance (52 percent) now originate in the City of Seattle (whether from SPD, SFD, or local hospitals).

The service providers interviewed are generally appreciative of the assistance provided by the CIT program. However, some did question if officers were coordinating with mental health providers to achieve the best outcome or if they were passing cases on to mental health as soon as they were contained in order to conclude their responsibility or for involvement in the situation. In this regard, there were a few concerns raised about CIT officers not using the range of diversion services available, such as the Crisis Solution Center or volunteer crisis clinics as opposed to hospital admissions. Thus, there were some questions about whether officers were seeing volunteer referrals as a short-term fix. Generally, service providers would like to see officers using

diversion options more frequently. We take no position on the veracity of this complaint or cause, but it is, regardless, something for the CIT Program team to consider.

Other concerns demonstrated how both the CIT and service provider groups share common resource problems in that there are not enough staff available to ensure timely law enforcement responses, and it is not unusual for crisis services to be of no avail when a particular facility has met its capacity and has a shortage of beds. These situations create a great deal of frustration both for CIT and Social Services personnel.

From the law enforcement perspective, the front end of the process is working well – but officers are not as confident as to what transpires after an individual is delivered to volunteer treatment centers. Within that same context, interviews with service providers reflect not only the concerns that police are not using the range of diversions at the outset but that they may be misinterpreting clinical decisions to release those in crisis fully realizing that they will return and that those ongoing contacts, which service providers see as part of the healing process, may be misinterpreted by law enforcement as failure. This situation is further complicated by differences in the law as to what kind of information police and social service professionals respectively can openly share and it, too, interferes with coordination of care. Consequently, our interview responses demonstrate that there seems to be a lack of understanding as well as misinterpretations on the part of the community as well as the SPD.

We would hope that the CIC would be utilized to bridge these gaps in understanding and information between the SPD and social service system. Some interviewed suggested collaborative training sessions where Crisis Intervention officers and their Social Service provider partners learn to communicate versus becoming frustrated and argumentative at the scene of incidents. Other suggestions included: developing a problem solving forum to discuss issues such as use of the Crisis Solution Center; designating a point person to troubleshoot these issues in each precinct; or outreach to roll calls to establish a dialogue. All could also be considered as a way to clarify partnership roles, improve communication, and educate as to the operations of voluntary crisis resources, many of which officers may not fully understand.

It is important to note, however, that for purposes of the Consent Decree, we were not looking to determine if the social service network in Seattle is adequately serving individuals experiencing behavioral crises. That analysis is beyond our scope and beyond the sole responsibility of the SPD or law enforcement in general. As with any encounter, the role of SPD is to make the scene and the person in crisis safe, with the appropriate referral as may be called for under the circumstances. SPD is certainly far from the only actor that impacts the success of helping individuals break the cycle of crisis. Long-term treatment and solutions for individuals experiencing mental health, substance abuse, and other behavioral issues require resources and coordination from mental health agencies, non-profit organizations, hospitals, and other community stakeholders – with SPD collaborating with such stakeholders to drive better and more efficient delivery of services to the people who need them most.

For purposes of this assessment, we were looking to see if the SPD has institutionalized an approach that requires best efforts to choose dispositions that foster better public safety, the best interests of those in crisis, and are consistent with the effort to minimize force.

In sum, we find that SPD is developing and institutionalizing a thoughtful approach geared toward guiding those in crisis to appropriate services rather than jail. We accordingly find that SPD is in initial compliance with the related requirements of the Consent Decree.

In the coming year, we will be looking to see that SPD is continuing efforts with the CIC to coordinate efforts and resources with the social service system to maximize efficiency of response and to further clarify, as between SPD and social service providers, the role of each, in order maintain strong and trusting working relationships and feedback loops for the highly challenging issue of mental health response.

## H.  Whether The Current Data & Accountability System Is Adequate

Having now completed an initial assessment of the crisis intervention program, the Monitoring Team is now well aware about what questions can be answered by analyzing existing SPD information and data.  The Monitor recommends that additional systems should be put in place to assess CIT efforts in a more complete way.

In particular, we recommend that the SPD take efforts to ① ensure accurate, consistent and readily obtainable data; ② train officers to complete more detailed narratives that reveal the tactics taken at crisis incidents; ③ create a mechanism to use video and audio records as a management tool, and to gain more insight into the quality of tactics used at crisis scenes; ④ to track response times; and ⑤ to provide clarity about the challenges and solutions to proper dispositions for those in crisis.

Without these improvements, reviews of the CIT program will remain labor-intensive and subject to error. While the CIT management structure attempts to review reports to determine if officers are filling them out correctly, this is done on something of an ad hoc basis despite all good intentions.  As the crisis intervention program continues to grow, the review process needs to be strengthened and re-structured.  This is particularly important from the community perspective, since those interviewed report that people in the community will be expecting information from a system that is objective and which does not raise questions about the data being inaccurate or skewed in favor of the police.

# Conclusion

The Monitoring Team concludes that SPD has made great strides toward implementing a very successful CIT program and is in initial compliance with the Consent Decree. The Department's crisis intervention program is comprehensive and has all of the critical components called for in the Consent Decree, including: Department-wide and ongoing training, the staffing of a CIT unit with dedicated and talented individuals, a thoughtful data collection tool, and a CIC to allow for collaboration, and information-sharing and problem-solving across agencies.

Whether through initial data or qualitative analysis, it appears that reforms implemented pursuant to the Consent Decree and built upon by SPD, the CIT Unit, and the Crisis Intervention Committee, has had a significant impact on how the SPD engages with those in crisis. SPD officers and community members are increasingly giving the SPD positive marks for dealing with those in crisis and not escalating incidents into uses of force. The data suggests adequate coverage by CI-Certified officers – and a relatively low level of use of force during crisis incidents, especially in light of the the number of complicated and challenging incidents faced by officers.

While our assessment naturally identified areas where continued improvement can be made, the tremendous work of the Department in this area is to be commended. The mental health crisis is by no means unique to Seattle. However, through the Department's good work and collaboration with community providers, there has been a real, tangible, and objective change in the way Seattle police are interacting – compassionately and with an eye towards treatment – with those in crisis. We look forward to continued advances in the crisis intervention program over the coming year.

# Monitoring Team Staff

**Merrick Bobb**
Monitor

**Matthew Barge**
Deputy Director

**Peter Ehrlichman**
Deputy Monitor

**Ronald Ward**
Assistant Monitor

**Chief Joseph Brann (ret.)**
Senior Police Expert

**Robert Saltzman**
**Julio Thompson**
**Marnie Carlin MacDiarmid**
Esq.

**Joseph Doherty**
**Ellen Scrivner**
Ph.D.

**Brian Center**
Senior Consultant

**Jeffrey Yamson**
**Luis Perez**
Executive Assistants