THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>CITY OF SEATTLE<br><br>　　　　　Defendant. | CASE NO. C12-1282JLR<br><br>**SEATTLE POLICE MONITOR'S SEVENTH SEMIANNUAL REPORT** |

The Monitor's Seventh Semiannual Report is attached.

DATED this 26h day of September, 2016.

*/s/ M Bobb/*

Merrick J. Bobb, Monitor

THE SEATTLE POLICE MONITOR'S SEVENTH
SEMIANNUAL REPORT
 Case No.  C12-1282JLR

Merrick J. Bobb, Monitor
Police Assessment Resource Center
PO Box 27445
Los Angeles, CA 90027
(213) 623-5757

# CERTIFICATE OF SERVICE

I certify that on the 26th day of September, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following attorneys of record:

| | |
|---|---|
| J. Michael Diaz | michael.diaz@usdoj.gov |
| Jonathan Smith | jonathan.smith2@usdoj.gov |
| Kerry Jane Keefe | kerry.keefe@usdoj.gov |
| Michael Johnson Songer | michael.songer@usdoj.gov |
| Rebecca Shapiro Cohen | rebecca.cohen@usdoj.gov |
| Emily A. Gunston | emily.gunston@usdoj.gov |
| Puneet Cheema | puneet.cheema2@usdoj.gov |
| Timothy D. Mygatt | timothy.mygatt@usdoj.gov |
| Christina Fogg | christina.fogg@usdoj.gov |
| Annette L. Hayes | annette.hayes@usdoj.gov |
| Jean M. Boler | jean.boler@seattle.gov |
| Peter Samuel Holmes | peter.holmes@seattle.gov |
| Brian G. Maxey | brian.maxey@seattle.gov |
| Gregory C. Narver | gregory.narver@seattle.gov |
| John B. Schochet | john.schochet@seattle.gov |
| Rebecca Boatright | rebecca.boatright@seattle.gov |

DATED this 26th day of September, 2016.

*/s/ Jackie Slavik*
Jackie Slavik

THE SEATTLE POLICE MONITOR'S SEVENTH SEMIANNUAL REPORT
Case No. C12-1282JLR

Merrick J. Bobb, Monitor
Police Assessment Resource Center
PO Box 27445
Los Angeles, CA 90027
(213) 623-5757

SEATTLE POLICE MONITOR

# Compliance Status & Seventh Semiannual Report

September 2016

## Introduction

The Seattle Police Department ("SPD") has made significant progress over the last year in achieving compliance with many aspects of the Consent Decree. With diligence and hard work, and in the absence of unforeseen impediments, and if there comes about greater community cooperation and trust, the SPD could well reach full and effective compliance in as little as a year from now (Fall 2017) in many, if not all, areas. It has been a prodigious effort to come this far, and the distance traveled now exceeds the distance that remains.

Mayor Ed Murray promised nearly three years ago that reform of the SPD was the top priority of his first term. He has been good to his word and significant credit is due to the Mayor. He selected a Police Chief who could get the job done. The Monitoring Team acknowledges Chief O'Toole for her sharp focus on compliance with the Consent Decree, building necessary bridges, and collaborating both internally and with the key stakeholders outside the SPD—including the Mayor's Office, the City Attorney's Office, DOJ, the Monitoring Team, and the Seattle community. Similarly, credit is due Ian Warner, the Mayor's point person on Consent Decree issues. The Department of Justice, including the Civil Rights Division in Washington D.C. and the U.S. Attorney's Office for the Western District of Washington, have contributed substantially to the successes to date.[1] Pete Holmes and his staff have also been responsible for significant and sustained progress in many areas.

Finally, but by no means least, the rank-and-file of the SPD—who have had to learn and implement new policies, receive and internalize extensive new training, work under more sustained supervision, document and report more about their daily performance, and respond constructively to greater accountability—also are deserving of recognition. It is becoming more and more evident that many officers have come to understand that the Consent Decree encapsulates best practice and contributes to their effectiveness and safety. It appears that the necessary cultural change has begun to at least some meaningful extent.

Perhaps the clearest example of progress under the Consent Decree has to do with persons in crisis due to mental illness or drugs. The Department recently reported on its most recent data relating to crisis intervention. It showed that, of approximately 9,300 crisis contacts by officers of individuals experiencing a behavioral crisis over a one-year period, fewer than two percent involved any reportable use of force, with less than half of one percent involving force greater than low-level, Type I force. More recent data over the reporting period of May 15, 2016 through August 14, 2016 shows these numbers continuing to decline, with only 32 of 2,041 crisis contacts reported involving any reportable use of force.[2]

---

[1] The Monitor would be remiss if he did not thank the whole of the Monitoring Team that has contributed, to date, for its extraordinary, hard work provided to a significant degree on a pro bono and reduced fee basis. Over the years and currently, the Monitoring Team will have produced and is producing a slate of high-quality, methodologically-rigorous evaluations of SPD performance along a host of dimensions. The Team will have done so while continuing to provide real-time feedback on policies, procedures, and progress to SPD. This model of collaborative monitoring—in which a Monitoring Team works closely with the Parties and the wider community to address issues in real-time and critically analyzes departmental performance and compliance across time and incidents—necessarily requires substantially more time and resources than a passive model in which the Monitor might set artificial benchmarks for the Department to reach and merely assesses, across short periods of time, whether the Department has technically "checked the box." Because such collaborative monitoring is capable of producing more rapid, comprehensive, and lasting progress, the Monitor thanks the Monitoring Team for its dedication to balancing the demands of both real-time monitoring and technical assistance with concurrent work on several assessments and other projects.

[2] The statistical data was supplied by the SPD. Although we have no reason to doubt its accuracy, we have not yet had the opportunity to double check the numbers.

As the Monitoring Team will discuss in greater detail in its upcoming Systemic Assessment on Officer Use of Force, it also appears that there has been a decrease of 340 incidents—a 55 percent reduction—in the number of moderate to higher-level force (Type II and Type III force and officer-involved shootings) in the 2014-2015 period analyzed.[3] To the extent that this statistic may signal that officers on the whole are de-escalating more incidents and reserving force for only those instances where it is necessary, proportional, and reasonable under the circumstances, this is encouraging.

Nevertheless, and as the balance of this report details, there remain several areas that still need to be evaluated and addressed before SPD is in full and effective compliance with the Consent Decree as a whole. They are some of the most important aspects of SPD's performance and of the Decree, including better and sustained trust of the SPD in all the various and diverse communities it serves.[4] Likewise, there remains some distance to travel to ensure that the requirements of the Consent Decree and the associated cultural change are not fleeting or temporary but are, instead, "baked in" to the fabric of the Department.

It must also be borne in mind that the precise *time* that the City and SPD will reach full and effective compliance is not in the hands of Judge Robart, the Monitoring Team, or DOJ—and thus is not the purpose of this report. Instead, it falls squarely to SPD rank-and-file officers and their leaders to collaborate to bring about the needed change in practice and in culture. If they focus on the requirements as set forth in the Consent Decree and the policies and programs developed pursuant to the Monitoring Plans, they can drive the process forward to full and effective compliance as quickly as possible. If they do not, the Consent Decree will be in place longer and the monitoring will necessarily continue until success is achieved.

The purpose of this report is to describe where the Monitor and the Parties are in the compliance assessment process and, under the framework of the Consent Decree, how the SPD achieves full and effective compliance with the Decree, in whole and in part. Pursuant to the Consent Decree, the Fourth-Year Monitoring Plan requires that the Monitor submit a Compliance Status Report and Plan for Evaluating Compliance.[5] It calls for that report to: (1) "set☐ forth each of the requirements of the Consent Decree and the status of their assessment/compliance"; (2) "specifically identify any requirements of the Consent Decree, if any, not already captured by the assessments already conducted" and outline "a plan and timeframe" for outstanding assessments; and (3) "address the significance of the prior and future findings of 'initial compliance.'"[6] This report is provided in satisfaction of these obligations. Given the comprehensive reports that will be filed with the Court and public in the next few months, the report constitutes and overall summary of the status of compliance and the assessment of Consent Decree progress.

## I. Status of Compliance & Assessment of Consent Decree Progress

Since September 2015, the Monitor and his Team have engaged in a systematic program of comprehensive assessments that is part and parcel of the implementation and monitoring of Consent Decrees pursuant to

---

[3] Again, however, there are limits to what this can indicate about SPD's compliance with the Consent Decree. Specifically, because SPD's force reporting policies and systems were markedly different and substantially less rigorous in during the 2009 to 2011, the true number of pre-Consent Decree force incidents is likely higher, which would reduce the comparative drop. Still, even if the magnitude of the decrease was smaller, a likely drop is still important to point out.

[4] Community surveys and community meetings are the most objective way to judge whether greater trust and cooperation are occurring. No single individual or group represents the entire community. There are many voices and many groups in Seattle.

[5] Dkt. 294-1 at 22.

[6] *Id.*; Dkt. Nos. 302 & 313 (extending deadlines for the filing of this report).

42 U.S.C. Section 14141. This program of assessments has been aimed at identifying the state of SPD's current progress in complying with major areas of the Consent Decree.[7] The First Systemic Assessment outlined the purpose of the Monitor's series of formalized assessments:

> For the Parties, Monitor, and Seattle community to have confidence that the requirements of the Consent Decree are being carried out in practice – not merely on paper, the performance of the Department and its officers must be assessed across a material span of time and a number of incidents. The assessments will more formally gauge whether SPD is where it needs to be in complying with the Decree.[8]

The formalized assessments are "systemic" because they focus on "whether the Department has the systems, policies, structures, and culture in place" that the Consent Decree requires both across time and incidents.[9] In the past thirteen months, the Monitoring Team has submitted to the Court formalized and systemic assessments in nine (9) of the now-thirteen (13) contemplated assessment areas. Work is well underway on all of the remaining four assessments.

This section reviews the nature and findings of the assessments presented to the Court to date and describes the nature of ongoing assessments that will be filed with the Court in the coming months.

### A.   Review of Completed Assessments & Findings

The Monitor's First Systemic Assessment considered several related areas concurrently, which included the state of SPD's compliance with the Decree's provisions on force reporting and investigations. The "population of cases reviewed included all reportable use of force incidents . . . that occurred between July 1, 2014 and December 31, 2014 and for which any required force investigation had been completed as of March 17, 2015."[10] The Monitoring Team found that SPD had reached initial compliance with respect to: the reporting of Type I, II, and III force, and paragraphs 100 through 103 of the Consent Decree; Force Investigation Team ("FIT") investigations, and paragraphs 112, 113, 114-117, and 118 of the Consent Decree; and chain of command investigations of Type I force, and paragraph 102 of the Consent Decree.[11] By implication, the Monitor found initial compliance with related paragraphs 94 and 96 (setting forth additional Type I and Type II force reporting requirements) and paragraph 126 (involving the provision of *Garrity* in SPD internal investigations). The Monitor found that SPD was not yet in compliance with respect to the chain of command investigation of intermediate, Type II force.[12] A follow-up assessment on Type II force investigations and review is underway.

The Second Systemic Assessment considered the Department's review and analysis of officer force by its Force Review Board ("FRB"). That assessment entailed "a review of all cases that came before" the FRB

---

[7] The Consent Decree is a series of reforms. Some of the Parties argue that that full implementation of those reforms will necessarily generate change in the police department to permanently eliminate a pattern or practice of excessive force or biased policing. The Monitoring Team certain hopes this is so but is less certain. Thus, the Monitoring Team envisions that the Court must look beyond simple fulfillment of the reforms to see whether the culture and ethos of the department has actually changed, thereby actually reducing the risk of a recurrence of unconstitutional conduct.
[8] First Systemic Assessment, Dkt. 231 at 5.
[9] *Id.* at 9.
[10] Dkt. 231 at 23.
[11] Dkt. 231 at 5.
[12] *Id.*

"between June 2 and August 25, 2015."[13] The Monitor found that FRB's performance was in initial compliance with and paragraphs 119 to 125 of the Decree. Captain Gregg Caylor deserves recognition for his efforts to focus and professionalize the deliberations of the FRB.[14]

The Third Systemic Assessment addressed public confidence in SPD and the Department's efforts to engage with the community. The time period addressed was August 2015 through November 2015. Rather than gauging specific compliance with material reform elements, this assessment—featuring both a qualitative analysis and a scientific survey of community perceptions of SPD—was geared toward determining whether the set of ongoing reforms mandated by the Decree was producing enhanced trust and confidence among all of Seattle's diverse communities in the Department. The Monitoring Team noted that SPD had "fully embraced a community-oriented policing approach" and was showing "a willingness to engage and join with the community in an effort that is impressive in focus and shows early signs of success."[15] At the same time, the Monitor "caution[ed] that SPD efforts to date are just a beginning to the steps necessary to cementing an organizational culture capable of building and sustaining trust with the community."[16]

The Fourth Systemic Assessment concerned the performance of the Office of Professional Accountability ("OPA"). That assessment, which related to Consent Decree paragraphs 164 through 168, expressly noted that "the purpose of th[at] assessment is not to assess compliance with specific requirements under the Consent Decree" but, "rather, is to provide the Parties, the Court, and the Monitoring Team itself vital information" necessary to revise OPA's Manual and advise the Court on how to "create a better framework of independent review of the various policies, organizations and systems that will monitor the performance of" SPD going forward and after the Consent Decree has concluded. The assessment considered "all OPA investigations . . . that were completed between August 1, 2014 and April 30, 2015."[17] The Monitor praised Director Murphy and the investigations conducted under his watch. Fourth Systemic Assessment, Dkt. 259-1 at 3.

The Fifth Systemic Assessment concerned SPD's efforts to comply with the Decree's requirements concerning crisis intervention. The time period studied ran roughly from June 1, 2015 through August 31, 2015. The assessment found that SPD was in initial compliance with the Consent Decree with respect to crisis intervention and paragraphs 130 through 137. [18]

### B.     Description of Outstanding Assessments & Timetable

Four major assessments remain. The first relates to use of force and the status of the Department's compliance with paragraphs 71 through 91, 93, 95, 97, 98, and 99. It has entailed a quantitative analysis and review of force cases. It also involved a qualitative, in-depth review of a statistically significant sample of force incidents. The Monitoring Team has considered both quantitative and qualitative determinations in light of overall officer activity and productivity in order to provide the general policing context in which the

---

[13] Dkt. 247 at 5.
[14] So does Peter Ehrlichman, Deputy Monitor, whose technical assistance taught the FRB and FIT better to think critically, question closely, and be guarded against officer bias. With the full support of the Monitor, Peter will continue to do so, as necessary, but at this point is not obliged to render technical assistance nearly as often.
[15] Third Systemic Assessment, Dkt. 263 at 2.
[16] *Id*. at 3.16
[17] Fourth Systemic Assessment at 18.
[18] Dkt. 272 n.1.

5

force trends summarized were occurring. Although the quantitative and qualitative elements were originally contemplated as separate assessments, the Parties, SPD, and Monitor have agreed that a report on force generally that covers both aggregate trends and specific cases will be more comprehensive, accurate, and useful. Consequently, and if approved by the Court, the Monitor intends to file a comprehensive assessment on officer use of force by October 15, 2016.

The second outstanding assessment relates to SPD's compliance with Consent Decree provisions regarding the Early Intervention System ("EIS") and paragraphs 157 through 163 of the Decree. The Parties, SPD, and Monitoring Team have received all relevant information, paperwork, and files to conduct the investigation. The current deadline for filing this report with the Court is September 12, 2016, but, if approved by the Court, the Monitoring Team expects to file a report on its findings with the Court by October 30, 2016.

The third outstanding assessment involves SPD's compliance with the various provisions of the Decree that relate to officer supervision, which include paragraphs 104, 105-6, 107 through 111, 113, 117, 144, and 151 through 156. The Monitoring Team's work on this assessment is well underway, and the Monitor will file a report on its findings with the Court by October 30, 2016. The Monitoring Team has exhaustively interviewed supervisors and rank-and-file, appearing at roll calls in each precinct, including the ones at 3 AM, preparing a survey instrument, and considering focus groups.[19]

The fourth outstanding assessment will evaluate whether "police-community contacts" are being "conducted in accordance with the rights, privileges, or immunities secured or protected by the Constitution or laws of the United States."[20] It will specifically consider whether SPD is in compliance with paragraphs 138 through 152 of the Decree. It involves a quantitative element, focused on analyzing aggregate data and information on SPD's stops of Seattle residents, and a qualitative element, focused on both reviewing a statistically significant sample of SPD stop documentation to determine if officers are sufficiently articulating a legal justification for stops and to determine if supervisors and SPD chain of command are meaningfully reviewing officer stop activity. Initial analysis of SPD data has begun. The Parties and Monitoring Team continue to discuss a methodology for completing the various elements described here. Given the complexity of the data analysis and the number of stops that will need to be qualitatively reviewed by Monitoring Team experts, it is highly likely that the Parties, SPD, and Monitor will ask the Court to extend the timetable for completing a final report from November 30, 2016 to a somewhat later date, but before the December 21. The Monitor will keep the Parties and the Court apprised as to the status of this assessment and the timeline for any adjustment in timetables.[21]

Finally, the Monitoring Team will be re-assessing the quality of SPD's chain of command investigations and reviews of Type II force incidents. As noted above, the First Systemic Assessment found that SPD still needed to make progress in the area. That assessment, using a substantially similar methodology to the initial evaluation, will consider whether SPD's performance has improved and has come into compliance in the area since December 31, 2014. The Monitoring Team's work on this assessment is well underway, and, if approved by the Court, the Monitor will file a report on its findings with the Court by October 30, 2016.

---

[19] The Monitoring Team who have taken on this vital assessment are Hassan Aden, Karlene Goller, Peter Ehrlichman, Joe Doherty, and Andrea Yang.
[20] Dkt. 3-1 ¶ 138.
[21] Matthew Barge has the lead on this project. The overall success of the Monitoring Team efforts is due in no small measure to Matthew's intellect and diligence. Joe Doherty will assist Matthew in this assessment.

It should be noted here that there are a few areas of the Consent Decree that impose requirements on the City that cut across several areas and are accordingly subsumed within the completed or outstanding assessments rather than independently assessed. These include, for instance, paragraphs 19 through 68, and 92 of the Decree, involving various definitions paragraphs 127-129, 176-179, 180 and 181, outlining a process for policy and training review; and paragraphs 6 through 12, relating to the creation and end of the temporary Community Police Commission ("CPC").

Similarly, there are a number of paragraphs that do not appear appropriate for consideration in a systemic assessment because they principally frame or introduce elements of the agreement but do not independently create specific obligations or requirements. These paragraphs include paragraphs 1 and 2, which give background on the structure of the Decree; paragraphs 3 through 5 and 7(c) through 7(d), which provide background on the CPC; paragraphs 13 through 18, 69-70, which give background and foundation on the Decree; paragraphs 169, 171, 198, 201 through 204, 209, and 210, which address the selection of, resourcing, access, and compensation of the Monitor; paragraphs 170, 172 through 175, 182 through 192, 196, 197, 199, 200, 205 through 208, and 211 through 213, which outline principles of the Monitor's role, what "full and effective compliance" is, and various issues related to the Monitor's communications, reports, confidentiality, and compensation; paragraphs 193 through 195, which describe SPD's obligation to have a compliance coordinator, retain documents, and issue certain reports; and paragraphs 214 through 230 which provide further, generalized terms and outline processes for termination of the Decree.

## II. Path to Full and Effective Compliance

The preceding sections have summarized the assessments conducted to date. In several specific instances, Monitor has concluded that SPD and the City were in "initial compliance." The Monitor has previously outlined to the Court and Seattle community what "initial compliance" means:

> [T]he Monitor's determination of 'initial compliance' in a given area or for particular Consent Decree provisions means that SPD's performance over a material time period and across incidents suggests that the Department has reached a level of performance in that defined area that is consistent with complying with the terms of the Court-enforced Settlement Agreement. Likewise, it means that, so long as that performance improves yet further or remains at the level it has been, SPD is in a position, at least for those elements of the Consent Decree referenced, that is consistent with where it needs to be.[22]

Paragraph 185 of the Consent Decree provides: "[w]here the Monitor recommends and the Parties agree, the Monitor may refrain from conducting a compliance audit or review of a requirement previously found to be in compliance by the Monitor pursuant to audit or review."

In laymen's terms, a finding of "initial compliance" in a given area signals to the Court, the Parties, SPD, and the Seattle community that Monitoring Team resources and effort should mainly go to other areas. Although SPD's obligations to comply with the terms of the Decree as a whole continue during that period, the focus of the monitoring effort will predominantly be on other areas, subject to the Monitor concluding that the Monitoring Team should reopen an area to determine whether sustained compliance has been maintained. At or near the conclusion of overall sustained compliance, we propose that the Parties, on one

---

[22] First Systemic Assessment, Dkt. 231 at 6-7.

hand, and the Monitoring Team, on the other hand, conduct tests focused on whether or not full and effective compliance has been achieved in practice and in changed SPD culture.

Once these assessments have been performed and if the Monitor is prepared to recommend to the court that the SPD has achieved full and effective compliance with the Consent Decree as a whole, the Monitor shall file within 45 days a "Final Compliance Report" summarizing the achievements of the City of Seattle. If the Court concurs, and certifies that SPD and the City are in "full and effective compliance" with the Consent Decree, the two-year period in which the SPD and the City must maintain such "full and effective compliance" will begin to run.[23]

Thus, upon determining that all or nearly all of the areas addressed by the Consent Decree have reached sustained compliance the Monitor will make a recommendation to the Court as to whether SPD and the City has reached "full and effective compliance" with the Consent Decree. If during the following two-year period the Monitor finds or is presented with evidence of trivial and transitory minor noncompliance, the two-year period will continue to run. But if the noncompliance is major, serious, or apparently permanent, the Monitor will recommend to the Court that it consider the Department and City "out of compliance" in whole or in part, depending on the circumstances. If the Court concurs, the two-year time period will dissolve in whole and the City must come once more into "full and effective compliance." A new two-year time period will commence at that time, in whole or in part, depending on the circumstances.

In the last few weeks, there has been some handwringing by the Parties about how the Monitoring Team will go about its work during that two-year period. Some suggest that the Monitoring Team will become the passive recipient of assessments by the SPD of their Department's own performance. The Monitoring Team unequivocally rejects this approach. The Monitoring Team will continue to have unfettered access and will maintain the power to initiate any assessments or tests it deems necessary.

Nonetheless, it will be important to carefully consider assessments conducted by the SPD itself —indeed, those assessments will be the best proof that the SPD can perform constitutionally, partner with the community to establish enforcement priorities, gain confidence and trust in communities throughout Seattle, and adopt best practice in managing and retraining or disciplining police officers who engage in misconduct. If and when SPD and the City come back into "full and effective compliance" with the relevant Consent Decree requirements, the Monitor will recommend to the Court that it re-certify SPD. If there is an Inspector General in place, the Monitoring Team will be assisting that individual to perform the kind of close scrutiny the Monitoring Team has employed.

Finally, if and when SPD and the City stay in "full and effective compliance" for a continuous and uninterrupted two-year period, the Monitor will recommend to the Court that it dissolve the Consent Decree. Upon dissolution of the Consent Decree, monitoring and federal oversight of SPD will conclude.

### III. Conclusion

Over the last year, the Monitor has indicated that SPD has continued to "move[] forward and continues to be on the right track" toward compliance with all of the requirements of the Consent Decree.[24] Indeed, the Monitor maintains ever-increasing confidence that, although "[t]here is still significant work ahead, . . . SPD

---

[23] Dkt. 3-1 ¶ 229.
[24] Sixth Semiannual Report, Dkt. 251 at 1.

is positioned to be a leader in the national reform effort" with respect to contemporary policing and enhancing public trust and confidence in the police.[25] As always, through the assessment program outlined here and its other ongoing responsibilities to provide real-time monitoring and assistance, the Monitor will continue to keep the Court and public informed on the status of SPD and the City's progress.

---

[25] Fifth Semiannual Report, Dkt. 212 at 10.



## Monitoring Team Staff

**Merrick Bobb**
Monitor

**Matthew Barge**
Deputy Director

**Peter Ehrlichman**
Deputy Monitor

**Ronald Ward**
Assistant Monitor

**Chief Hassan Aden (ret.)**
Senior Police Expert

**Brian Center**
Senior Consultant

**Julio Thompson**
**Marnie Carlin MacDiarmid**
**Karlene Goller**
**Andrea Yang**
Esq.

**Joseph Doherty**
**Ellen Scrivner**
Ph.D.

**Jeffrey Yamson**
**Luis Perez**
Executive Assistants