HONORABLE JAMES L. ROBART

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

        Plaintiff,

   vs.

CITY OF SEATTLE,

        Defendant.

Case No. 12-cv-1282-JLR

**MONITOR'S EIGHTH SYSTEMIC ASSESSMENT REGARDING THE EARLY INTERVENTION SYSTEM (EIS)**

    The Monitor's Eighth Systemic Assessment, addressing issues related to the Seattle Police Department's Early Intervention System (EIS), is attached.

    DATED this 23rd day of March, 2017.

Merrick J. Bobb, Monitor

MONITOR'S EIGHTH SYSTEMIC ASSESSMENT
REGARDING THE EARLY INTERVENTION
SYSTEM (EIS) - 1
Case No. 12-cv-1282-JLR



SEATTLE
POLICE
MONITOR

# Eighth Systemic Assessment: Early Intervention System (EIS)

March 2017

# Table of Contents

Table of Contents ........................................................................................................................... i

Executive Summary ....................................................................................................................... 1

EIS-Related Provisions of the Consent Decree & Summary of Prior EIS-Related Progress and Findings ............... 5
    A.   EIS-Related Provisions of the Consent Decree ............................................................... 5
    B.   Summary of Prior EIS-Related Findings ........................................................................ 5

Findings ........................................................................................................................................ 11
    A.   Review of Triggering Incidents .................................................................................... 11
    B.   Potential Conflicts of Interest ...................................................................................... 12
    C.   Discussion of Performance Feedback ........................................................................... 13
    D.   Analysis of Officer Performance ................................................................................... 14
    E.   Insufficient Attention to Officer Welfare ...................................................................... 16
    F.   Documentation of Review Process ............................................................................... 17

# Executive Summary

In 2011, the Department of Justice's investigation of the Seattle Police Department ("SPD") concluded that its previous early intervention system[1] ("EIS") – a process for identifying potentially problematic officer performance trends and changing them before they became more serious or long-term problems – did "not provide the intended backstop for the failures to the direct supervisory review process," and at its core, was "broken."[2]

Specifically, performance thresholds, which set the occasion for supervisors to review officer performance to determine if there was a need for subsequent intervention, were "far too high and intervention on officers' behavior far too late."[3] and when performance assessments occurred, "review by the supervisor [was] superficial at best . . . ."[4]  There were also significant issues with respect to tracking the efficacy of interventions, who was doing the performance assessments, the voluntary nature of the former EIS process, and the fact that "officer performance evaluations frequently fail to reference EIS interventions."[5]

Over the past few years, SPD has made relatively good progress in implementing an improved EIS.  It has developed basic protocols for identifying officers whose conduct may require closer evaluation.  The SPD has trained supervisors how to evaluate employee performance.  It has employed fair, non-punitive interventions where performance required correction or closer supervision.

This Eighth Systemic Assessment marks the first time that the Monitoring Team audited a sample of completed EIS officer assessments carried out by the SPD.  For this assessment, the Monitoring Team reviewed three categories of documents:

(1) the Blue Team "resume" report, a report from the SPD's officer performance database consisting of a summary of incidents leading to the EIS assessment, plus any additional incidents counting as EIS threshold indicators;

(2) the Blue Team routing history, information from the performance database which shows when the EIS assessment was assigned, reviewed by the chain of command, and submitted to the EIS Coordinator and Performance Review Committee; and

(3) the supervisor's EIS assessment, or account of how an officer's performance history was appraised and considered, along with any subsequent mentoring plans, or specific initiatives proposed to remedy any discovered performance challenges or issues, developed for the officer under review.

The Monitoring Team's sample consisted of 43 EIS assessments completed during the first half of 2016.

**The Monitor finds the SPD in initial compliance in large part with paragraphs 157 through 163 of the Consent Decree.**  Although the SPD nevertheless remains at some distance from full and effective compliance

---

[1]  The SPD has had an EIS policy since December 2009, which stated that the system was "developed for the purposes of identifying and supporting employees who demonstrate symptoms of job stress, training deficiencies, and/or personal problems that may affect job performance.  The ultimate goal of the program is to support the employee's career development through counseling, training and correcting behaviors that may cause performance concerns."  SPD Policy 3.070.0 (Dec. 2009).
[2]  2011 Findings Letter at 5, 22.
[3]  *Id.* at 23.
[4]  *Id.* at 23.
[5]  *Id.*

with the Consent Decree, it has achieved a level of progress that is reasonable under the circumstances. Early intervention systems take significant time and many resources to operate. To date, SPD has made competent efforts to ensure not only that supervisors and managers have access to important data but that they are also making reasonable efforts to analyze that data and to identify officers in need of support. Much of this assessment identifies those areas of progress, as well as those areas in which performance is exemplary. In particular, it should be noted that the SPD is among only a few agencies that have provided detailed training for supervisors about how to respond when notified that an officer has been flagged for closer review. SPD is to be applauded for those efforts.

A finding of initial compliance does not mean that SPD need only continue the level of performance identified in this assessment to reach full and effective compliance. Some substantial work remains. Specifically, the Monitoring Team's assessment has identified additional needs for supervisor training and guidance materials. The Monitor looks forward to working with the Parties to ensure such additional supervisor support is provided in a timely fashion. To this end, this report sets forth concrete steps that SPD must take to move from here to full and effective compliance.

In sum, additional examination of the SPD's implementation of the system is needed. Additional early intervention system assessments will need to be audited, including review the underlying incidents or performance that led to the officer's review. In this manner, the Monitor will be able to more carefully assess whether the supervisors are sufficiently analyzing the underlying early intervention threshold incidents, and fairly and accurately reporting them. Only after such an in-depth analysis is conducted will the Monitor be in a position to determine whether the SPD is closer to or has achieved a greater degree of compliance.

The Team also found that supervisors and the chain of command generally satisfied the core requirements of completing and reviewing assessments. Therefore, the process outlined in SPD policy about what should occur upon a given threshold incident setting the occasion for a supervisor response appears to be functioning as it should under the Consent-Decree-required guidelines.

Most of the cases reviewed by the Monitoring Team – about 86 percent – resulted in a recommendation that the officer who was the subject of the assessment inquiry did not require mentoring or any other form of intervention. That is, the review culminated in a determination that the SPD did not need to take any sort of action to address any identified performance trends, concerns, or issues. Based upon our review of the same records provided to the EIS Coordinator and Performance Review Committee, **we agreed with approximately three-fourths of those recommendations that an officer did not require mentoring or intervention.** In these cases, there was sufficient information provided in the relevant files to support a determination that there was no need for further action – generally because there was no apparent pattern and the officer's actions were explained by the assessment.

**In nearly all other instances where the Monitoring Team could not expressly agree with SPD's ultimate determination regarding whether an officer should receive intervention, the issue was insufficient or incomplete documentation.** Specifically, in 20 percent of instances (nine EIA reports) that recommended that no further action was necessary, the underlying reports and documentation lacked sufficient information to support a conclusion one way or another.

Consequently, the EIS assessments we reviewed do contain some areas for improvement and, in some instances, contained some deficiencies that SPD will need to address going forward. However, **these shortcomings do**

**not appear to reflect either an inability or unwillingness to implement a meaningful early intervention review.  Instead, they appear to be errors typical of new EIS programs** and the process of growth and refinement necessary for successful, comprehensive implementation of fundamental new approaches that become part of an organization's day-to-day operational culture.

In other words, although supervisors did satisfy the core requirements of the EIS policy and the Monitoring Team agreed with the SPD's ultimate determinations about whether particular officers needed mentoring or not, there are a host of improvements that SPD should make to strengthen the quality of the EIS system.  Specifically, the Monitor observes that supervisors and the chain of command will need to develop a better understanding going forward of how to use an EIS system to gain a deeper understanding of officers' needs, and how to assess, support, and guide them.

The EIS process, which required a roll-out that entailed a multitude of substantial changes and process modifications, remains relatively new for the SPD.  Critiques offered in this assessment thus should be viewed as technical assistance offered to assist the SPD in improving to ultimately meet the Consent Decree's EIS expectations.

As a first example, SPD policy requires supervisors to review at least the last two performance evaluations and any other information relevant to identified performance issues. However, the Monitoring Team found inadequate discussion of performance feedback.  It was often difficult to determine whether supervisors did review past evaluations and, if they did, what information they gleaned.

Second, the Monitoring Team found insufficient analysis of the officers' overall performance by supervisors in some instances.  Instead, supervisors often only noted whether the officer was found to be within policy in the triggering incidents and whether, in their view, the officer was hard-working or proactive.  On about 47 percent of assessments, the supervisors did not report seeking input from others or provide a reason why they did not. These constitute missed opportunities for completing thorough, comprehensive assessments and meeting the stated goals and objectives of the EIS system, such as providing consistent oversight and supervision, other pathways to improve performance, and enhanced training and education.  Similarly, on a number of occasions, the assessments showed that supervisors missed opportunities to support officers by ensuring that they were not being particularly adversely or unduly impacted by stress after high-risk incidents, such as officer-involved shootings.

Third, supervisors have not yet become as proficient as they should be at completing the officer assessments in a manner that creates a clear "paper trail" to show that all steps were taken to ensure a thorough analysis.  By way of example, supervisors often failed to make clear what information or documents they reviewed to fully understand the threshold incidents. In many instances, supervisors merely wrote that they "reviewed the incident" without describing what materials they actually considered.  As a consequence, neither the chain of command, the EIS, Coordinator, nor Performance Review Committee were in a position to evaluate whether the supervisor's review was adequate.  As noted below, this weakness may be remedied easily by additional guidance and revisions to the EIS assessment form.

Generally, supervisors need to provide more clarity and candor in their EIS assessments.  Similarly, it was often unclear if supervisors spent any time observing an officer that was the subject of an EIS inquiry in the field – a very simple and effective way to provide rich information about an officer.  Additionally, it was unclear from the documents provided the extent to which the full chain of review, including the Performance Review Committee

("PRC"), reviewed the assessments. Although there were some instances in which a particular review and finding could be inferred from the BlueTeam database log, no other documentation of the PRC or Bureau Chief evaluation was provided.

The Monitoring Team found a few instances in which the supervisor assigned to conduct the EIS assessment was personally involved in the incidents leading to the EIS review. In some circumstances, this may make the supervisor less well-equipped to review the incident with the required degree of professional detachment or even subject the supervisor to claims he or she has a conflict of interest.

SPD is to be commended on two fronts, both for its commitment to learning from and working with academia regarding the theory of early intervention, and in its pursuit to utilize technology in the daily monitoring of officer performance by all levels of the chain of command. First, SPD is, and has been an active participant in the academic discourse around early intervention. SPD has provided access into its data to researchers across the country, and has partnered with researchers at Washington State University to examine, specifically, the predictive value of its current system with any eye towards adjusting thresholds or EIS criteria to provide greater statistical strength if appropriate. In addition, SPD is a member of a national advisory committee supporting the University of Chicago Crime Lab to develop an EIS model with data scientists that can provide "backend" machine learning support to agencies. In this regard, SPD has demonstrated a commitment to being on the leading edge of improving the science surrounding Early Intervention Systems.

Second, SPD is to be commended for its decision to shift focus on the Data Analytics Platform to replace what had initially contemplated as a templated series of static dashboard reports with a new dynamic analytics layers that, for the first time, allows supervisors to engage interactively with officer and squad performance data. By providing real-time situational awareness to sergeants of their officers' activities – and to lieutenants of their sergeants, to captains of their precincts', and ultimately to command staff across all precincts – this platform offers remarkable opportunity to capture and analyze officer performance at a level of nuance previously impossible.

# EIS-Related Provisions of the Consent Decree & Summary of Prior EIS-Related Progress and Findings

## A.  EIS-Related Provisions of the Consent Decree

The Consent Decree required revisions to SPD's EIS policy.  Paragraphs 157 through 163 of the Consent Decree provide:

- The EIS system will continue to be used for risk management, and not disciplinary, purposes;
- SPD will monitor the EIS to ensure it meets its objective of providing notice before officer behaviors become problematic;
- SPD will review and adjust, where appropriate, the threshold levels for each of the current EIS indicator criteria, and the EIS indicators, which revisions will be reviewed and approved by the Monitor;
- SPD will revise its EIS policy to include a mechanism for review of an officer whose activity has already triggered a threshold for one of the EIS indicator criteria, so that the threshold level is lower if EIS is triggered again, where appropriate;
- SPD will collect and maintain information related to supervisor, precinct, squad, and unit trends;
- SPD will collect, maintain, and retrieve information related to the following precinct-level activity: uses of force, OPA complaints and their dispositions, number of individual officers who have triggered EIS reviews, and supervisor EIS reviews with officers;
- Supervisors should periodically review EIS activity of officers in their chain of command; and
- SPD will revise its EIS policy and procedure, as necessary, to ensure: (1) the intervention strategy is implemented in a timely manner, (2) data regarding the implementation of the intervention is tracked in EIS, and (3) if necessary, the employee's supervisor reviews the progress of the intervention strategy.

## B.  Summary of Prior EIS-Related Findings

The Monitor has discussed EIS-related issues in nearly all of the prior Semiannual Reports.  This section summarizes SPD's progress through December 2015 with respect to EIS.

On March 21, 2014, the Court approved SPD's substantially revised policy concerning the EIS, which was temporarily known as  the Performance Mentoring Program ("PMP")[6]  Under this policy, EIS is, first and foremost, *non-punitive*, or non-disciplinary, in nature.[7]  This approach is necessary and appropriate because: (1) an officer's conduct or performance under examination may not, strictly speaking, violate any laws or agency policies, and therefore discipline is not possible; (2) officers may be less likely to share with supervisors any

---

[6]  Third Semiannual Report at 77.  The PMP was subsequently renamed the Early Intervention System, or EIS in May 2015.
[7]  *Id.*

personal or professional difficulties if that information will result in punishment; and (3) officers may be more receptive to change by means of positive support and reinforcement, than by punishment and deterrence.[8]

In June 2014, the Monitor observed that the primary goals of any early intervention system are "to identify and respond proactively and positively to behaviors or performance trends that – while not rising to the level of legal or policy violations – may nonetheless indicate that an officer is at risk," and "to improve the performance of supervisors by providing them with reliable performance data and requiring them to proactively develop their officers."[9]  The Monitor also identified a number of key performance indicators under the EIS, each of which sets numerical thresholds.[10]

| Performance Indicator Criteria | Threshold |
| --- | --- |
| Chain of Command Recommendations | Each reviewed on a case-by-case basis |
| Use-of-force (Type I) | Reaching the top 1% of officers who have used force investigated at Type I within 6 months |
| Use-of-force (Type II and Type III) | Reaching the top 5% of officers who have used force investigated at Type II or Type III within 6 months |
| Vehicle collisions | 2 Department vehicle collisions within 12 months |
| Receipt of OPA complaints | 3 complaints within 12 months |
| Receipt of Equal Employment Opportunity (EEO) complaints | 2 complaints within 12 month |
| Named in police actions claims or lawsuits against the City | 2 within 24 months |
| Vehicle pursuits | 2 within 6 months |
| Unexcused failure to appear in mandatory training* | 1 within 12 months |
| K9 apprehension-bite ratio | More than 15% K-9 apprehension bite ratio in a 12-month period |
| Officer-involved shooting | Single incident threshold |
| Combination of Indicators (A-J) | 5 within 6 months |

In SPD's EIS system, reaching a threshold level of activity for a given indicator triggers careful review of an officer's performance as follows.  The threshold time periods are on a rolling basis – such that, for example, if an officer has two vehicle pursuits within any six-month period, he or she has met the threshold level.[11]  Furthermore, the Monitor set forth various stages of a EIS process to review a flagged officer's performance trends.[12]

After an officer has reached a threshold, the first stage of the EIS process is to evaluate the officer's overall performance to determine whether there are patterns of conduct or behaviors that may suggest potential deficiencies or the effects of stress.[13]  The review must be qualitative and quantitative, and consider the entire officer – *e.g.*, his or her performance and training history, and whether there is any common thread between any

---

[8]   T. Bertoia, "Developing an Early Intervention System for Police Misconduct in a Law Enforcement Agency," NSW Police Integrity Commission, at 4-5 (Aug. 2008).
[9]  *Id.* at 76.
[10]  *Id.* at 79.
[11]  *Id.* at 79-80.
[12]  *Id.* at 81.
[13]  *Id.*

of the performance indicators.[14]  A Sergeant conducts this assessment as follows: (1) notifying the involved officer and allowing the officer to identify any possible errors in the data flagging him or her for review; and (2) reviewing at least two of the officer's personnel evaluations, the data and documentation relating to the underlying incidents, and any additional information that would be relevant to any identified performance issues."[15]  The Sergeant then provides a recommendation within 14 days.[16]

Prior to launching the EIS, the SPD created a "toolkit" and FAQ sheet to provide additional guidance to supervisors in conducting this review.  In relevant portion, this guidance states:

> By policy, a supervisor must review no fewer than the employee's last two Performance Appraisals.  A supervisor should have sufficient information about underlying incidents to understand the initiation, progression, and conclusion of each incident and the employee's conduct throughout, but it is not expected that a supervisor review, as part of an EIS Assessment, information to the same extent as is required of a chain of command review of an incident.  If incidents that reach the EIS threshold for an employee have already gone through an administrative review, the supervisor should be aware of the outcome of such review and whether the employee has followed through with any training recommendations or requirements.  A supervisor should consider other factors that may be impacting an employee's performance, such as their work history, time and attendance records, or secondary employment activity.  A supervisor may find it beneficial to talk with other supervisors about their experiences with or knowledge of the employee's performance.

At the second stage, the Sergeant must then take the following steps[17]:

1.  Meet with the concerned employee to discuss any performance issues identified, or any stressors the officer may be facing.  This meeting is not an investigative interview and the sergeant may not ask the employee about matters that are under investigation.

2.  Where appropriate, refer the employee to training, the Employee Assistance Plan ("EAP"), or Critical Incident Stress Management ("CISM").  These referrals may be part of an overall mentoring plan, but do not replace the need for such a plan.

3.  Prepare a written Performance Mentoring Assessment ("PMA") that describes the review undertaken and recommends whether additional action is appropriate.  If the review and discussion with the officer revealed no potential areas of concern, the Sergeant makes a "no further action" recommendation supported by a detailed explanation set forth in the PMA report.  (As noted below, this recommendation is subject to several layers of review.)

---

[14] *Id.*
[15] *Id.* at 82.
[16] *Id.*
[17] *Id.* at 83.

4.   If warranted, prepare a detailed intervention plan that may include a broad range of non-punitive interventions designed to correct the performance concerns and address any officer support needs.   These interventions, include, without limitation:

    a.   Conducting regular and consistent discussions about the performance issues and potential causes;

    b.   Going on ride-alongs with the officer;

    c.   Accompanying the officer on at least 4 calls or citizen contacts per week;

    d.   After action debriefs of significant events (except certain matters currently under investigation[18]) arrests, or other incidents tracked as a performance threshold indicator; and

    e.   Identifying and supporting positive behaviors exhibited by the officer.

The Monitor emphasized the importance of preparing supervisors to conduct interventions, and accordingly, the need for SPD to develop a detailed curriculum – including problem-solving and role-playing scenarios – that will inform supervisors how to conduct a thorough and fair review of officer performance; how to document that review; and how to interact with the concerned officer to affect a prompt and positive outcome.[19]

At the <u>third stage</u>, the Lieutenant and Captain in the chain of command reviews and approves, modifies, or rejects the Sergeant's early intervention assessment ("EIA") and recommendation.[20]   Importantly, the decision is not final: the Captain's recommendation is forwarded to the newly-created office of Early Intervention Coordinator, who reviews all EIAs for thoroughness and consistency.[21]   The Coordinator identifies any deficiencies in the EIA analysis or weaknesses in the proposed intervention plan for the Performance Review Committee, which consists of: (1) the Chief's designee, (2) HR Director or designee, (3) OPA Director, (4) representative from the Audit, Policy, and Research section, (5) representative from the Education and Training Section, (6) Early Intervention Coordinator, and (7) upon committee request, a representative of the City Attorney's Office.[22]

On a monthly basis, the Committee is to discuss EIAs and proposed intervention plans; assess whether Lieutenants and Captains are adequately holding their Sergeants accountable for supervision of officers under their command; and whether executives are holding Captains accountable for managing the risk of police misconduct in their units.[23]

At the <u>fourth stage</u>, the Committee makes its recommended findings and/or changes, and forwards the EIA and any proposed intervention plans to the concerned officer's Bureau Chief for review, comment, and approval.[24] The Chief then has five days of receiving the materials to make her determination.[25]

At the <u>fifth stage</u>, upon approval from the Bureau Chief, the assigned supervisor must immediately implement the intervention plan and document both his or her actions and the officer's progress.[26]   The EIS progress reports are

---

[18] The policy specifically states: "Designated Type III use-of-force incidents, firearms discharges, and any open OPA complaint cannot be discussed in detail, per labor agreements and Department policy.  Sergeants may discuss general issues and best practices with the involved officer after that officer has given a statement and has been interviewed by OPA."

[19] *Id.* at 83-84.

[20] *Id.* at 84.

[21] *Id.* at 84-85.

[22] *Id.* at 85.

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.*

provided to the chain of command.[27]  The EIS Coordinator and Committee may recommend modifications to the intervention plan, or seek additional documentation or clarification from the supervisor.[28]  They may also review the progress reports to ensure Department-wide consistency.[29]

The Monitor noted that SPD formed a EIS Work Group in early April 2014.[30]  As of June 2014, however, the Monitor believed the Work Group had much work ahead and made several recommendations.[31]  First, he encouraged SPD, in connection with the Parties and the Monitoring Team, to carefully and rigorously scrutinize any data system that might be used to provide data for performance mentoring – as until that point, SPD had made slow progress in developing data and information systems that made performance-related data available to supervisors and managers.[32]  Second, the Monitor cautioned SPD to carefully manage a rollout of the EIS system, which required all components to be concurrently ready – *e.g.*, the trainings for supervisors and managers to be complete, data to be certified as reliable, and command staff to clearly understand what performance assessments and performance mentoring plans entail.[33]  Third, the EIS Work Group should be chaired by an Assistant Chief, include more senior command staff, and be assisted where possible by outside experts.[34]  Fourth, as SPD began to accumulate reliable performance-related data, it should begin evaluating how to refine its performance thresholds and ensure that its planned business intelligence system can provide support.[35]

In December 2014, the Monitor observed that while SPD had taken several solid steps toward implementing EIS, including the preparation of officer and training materials, supporting documentation, and determination of how an EIS Committee would function.[36]  Nonetheless, the Monitor believed SPD still needed to develop substantially more sophisticated supervisor training so that early interventions would be fair, rigorous, and effective.[37]  The Monitor also noted that IAPro could not automatically effectuate the Court-approved EIS policy; instead, manual processes and defined business workflows would need to be in place in order for sergeants to efficiently conduct reviews of officer performance, command staff to review intervention plans, and the like.[38]

In June 2015, the Monitor identified the need for cultural progress to be made with respect to EIS.[39]  He observed that while such programs had been implemented by numerous law enforcement agencies, nonetheless EIS was the source of substantial anxiety at SPD.[40]  For instance, officers worried that EIS would somehow lead to them unfairly getting "dinged" or singled out," and supervisors seemed to view EIS as an obligatory or onerous bureaucratic process, rather than as a fundamental new approach to managing officer performance on a daily basis.[41]  The Monitor observed that it had taken some 14 months to get a high-quality EIS up and running, and only until recently had any SPD senior command staff asserted clear ownership, or investment, in making EIS a success.[42]  The Monitor lauded the support of Chief O'Toole, Deputy Chief Carmen Best, and Assistant Chiefs Cordner and Wilske for their strong support of getting EIS "off the ground," and emphasized the importance of

---

[27] *Id.*
[28] *Id.* at 85-86.
[29] *Id.* at 86.
[30] *Id.*
[31] *Id.*
[32] *Id.*
[33] *Id.* at 87-88.
[34] *Id.* at 88-89.
[35] *Id.* at 89.
[36] Fourth Semiannual Report at 70-72.
[37] *Id.* at 73.
[38] *Id.* at 74.
[39] Fifth Semiannual Report at 7.
[40] *Id.*
[41] *Id.* at 8.
[42] *Id.*

conveying the proactive intent and non-disciplinary nature of EIS to captains, lieutenants, sergeants, and officers.[43]  EIS was scheduled to be up and running throughout SPD by June 19, 2015.[44]

Additionally, the Monitor noted that at the time, EIS was considered an SPD Human Resources responsibility.[45] While he had faith in the abilities and dedication of the Human Resources Sergeant then-assigned to coordinate EIS, the Monitor believed the location of EIS in Human Resources sent the wrong message about the importance of the system in managing and supervising officers.[46]  The Monitor observed that in other agencies, where command staff and the chief met to review the behavior of officers above threshold levels, EIS then quickly becomes viewed as a core means of doing business and ensuring the professional development of officers.[47]

Further, the Monitor noted concerns about whether mechanisms were in place to ensure supervisors are carrying out the basic requirements of the EIS policy.[48]  For instance, one requirement for sergeants was to survey officer performance information once per weekly; and lieutenants were supervisors in charge of ensuring sergeants' compliance with this responsibility.  At least as of late April 2015, however, no mechanism or system was in place by which a lieutenant could confirm independently, or at least review a sergeant's representation, the required reviews occurred.[49]

In December 2015, the Monitor reiterated that EIS is "a non-disciplinary, institutionalized process for supervisors to identify officer performance trends that may benefit from intervention or other formal professional development."[50]  He noted that while "SPD technically had an EIS in place at the start of the Consent Decree," the Department of Justice's 2011 investigation of SPD identified "systematic deficiencies" in the system then in place.[51]  But as of June 2015, a "dramatically-overhauled" EIS has been running across SPD, which represented "significant progress and a noteworthy milestone."[52]

At that time, however, it was too early to evaluate the extent to which the SPD was meeting the expectations of the Consent Decree with regard to EIS.[53]  Was it, for example, providing a new mechanism for identifying officers in need of coaching, counseling, or mentoring to meet performance expectations?  Were supervisors reliably and appropriately using the EIS to proactively steer the professional development of employees under their command?  Was the Performance Review Committee providing the appropriate oversight to ensure supervisors are completing assessments and developing mentoring plans, when needed, thoroughly and thoughtfully?  These questions provide the backdrop to this Eighth Systemic Assessment.

---

[43] *Id.*
[44] *Id.* at 36.
[45] *Id.* at 37.
[46] *Id.*
[47] *Id.*
[48] *Id.* at 37-38.
[49] *Id.*
[50] Sixth Semiannual Report at 8.
[51] *Id.*
[52] *Id.*
[53] *Id.*

# Findings

For this assessment, the Monitoring Team drew a sample of 43 Early Intervention Assessments for officers identified for review between October 2015 and June 2016. To do so, we reviewed three categories of documents, where provided.[54] First, we reviewed the Blue Team "resume" report, consisting of a summary of the incidents that led to the EIS Assessment, plus any additional incidents that count as EIS threshold indicators – even if those incidents did not provide the basis for review. Second, we reviewed the Blue Team routing history, which showed when the EIS Assessment was assigned, reviewed by the chain of command, and submitted to the EIS Coordinator and Committee. Finally, and most importantly, we reviewed the supervisor's EIS Assessment, along with any mentoring plans developed for the officer under review.

## A. Review of Triggering Incidents

SPD policy recognizes that in order for supervisors to conduct a fair and meaningful EIS Assessment of their officers, they must thoroughly understand the threshold incidents that led to the review assignment. SPD Policy 3.070-TSK-2 requires the assigned supervisor to review:

> . . . documentation relating to the triggering incident. The scope of the review must be thorough enough to identify factual circumstances surrounding the initiation, progression, and conclusion of the triggering incident(s) and to enable the supervisor to identify potential issues.

If a triggering incident has already gone through a separate administrative review (e.g., force review, OPA, collision review), the supervisor should be aware of the outcome of such review and should verify that the employee has followed through with any training recommendations or requirements or is scheduled to do so.

In reviewing EIA reports completed by supervisors, the Monitoring Team found that in roughly four-fifths of the reports, supervisors clearly described the officer actions in each of the triggering incidents and articulated performance or officer welfare issues presented by the incidents. In about three-fourths of the cases, the supervisor also noted the outcome of any completed reviews or investigations of the triggering incidents (*e.g.* Force Review Board or Vehicle Collision Board findings).

As noted above, our assessment of these EIA reports did not include our reviewing the underlying incident files. Instead, we reviewed the materials in the same manner as the chain of command, EIS Coordinator, and Performance Review Committee. They likewise do not conduct an independent review of the underlying documentation — a shortcoming we address below.

Far less clear from the EIA report forms was whether the supervisors had complied with the EIS policy's requirements to conduct a sufficiently thorough review of the case file. For example, Section 2 of the EIA Report form instructs supervisors, "Describe and document *specifically what you reviewed* as part of the assessment process." (emphasis added). In about 58 percent of cases (25 out of 43), supervisors completing this portion of the form did not follow this instruction and did not identify any specific documents or records that they actually reviewed. This relatively high rate was troubling given that the EIA reports we reviewed had been approved by

---

[54] A few files provided did not include all of these components.

each step in the chain of command, the EIS Coordinator, and the Performance Review Committee, as required by the EIS policy. A significant opportunity exists for the SPD to provide future training in this area.

In the majority of cases, supervisors either failed to mention what they had reviewed or merely reported that they had "reviewed the incident" without indicating what that meant. For example, one supervisor stated, "I reviewed the 5 incidents that triggered this EIS for Officer _____." The summaries of the incidents do not identify any particular reports, mention whether the incidents were captured on in-car video (ICV), or indicate any review of reports or findings by the chain of command, Force Review Unit, or Force Review Board.

In other instances, supervisors did appropriately describe what they had – or had not – reviewed. For example, one supervisor offered this summary:

> This incident was a type III UOF and a FIT call out. There was limited information in the officer statements and G.O. [*i.e.*, crime report] regarding what precipitated to the use of force and if it was reasonable, necessary and proportionate. There is also no information to what Officers ___ roll [sic] was in the use of force. This information is held by the FIT team and part of their investigation and is not accessible by me. I cannot fairly make an assessment on this incident.

Going forward, SPD's EIS Assessments should uniformly provide this level of clarity and candor. In the case cited here, the specific use of force investigation was still pending, yet the involved supervisor affirmatively and appropriately took the effort to review the available information and articulate where it left the assessment process.

In another EIA report, a supervisor appropriately noted which use of force incidents were recorded on the officer's ICV. As SPD moves to equipping officers with body-worn video cameras, it can expect that more use of EIS-triggering incidents will be captured on video. Supervisors conducting EIS assessments will need to review the video and document that review in their EIA reports. During this review, however, the EIA reports left few clues as to which incidents had been captured on video and which had not.

## B. Potential Conflicts of Interest

The Monitoring Team found four instances in which the supervisor assigned to conduct the EIS was personally involved in the incidents that led to EIS review. In such circumstances, the supervisor may be ill-suited to provide an objective, "fresh look" at the incidents or identify performance deficiencies that he or she had missed before. For example, in some instances, an EIS-triggering incident may involve officer conduct that was approved, or even ordered by the supervisor assigned to conduct the EIS assessment. In other cases, an involved supervisor's analysis of an EIS-triggering incident may be disproportionately influenced by his or her own recollection, with insufficient weight given to other evidence, such as video, statements from other witnesses, or physical evidence. While an involved supervisor's input may be useful during the course of an EIS assessment, he or she may not be the best person to conduct the assessment itself.

- One officer was flagged for EIS review because he had used deadly force. The EIS assessment was assigned to a supervisor who had used a lower degree of force in the same incident. The supervisor stated in the EIS report that he had been present during the shooting, but did not mention his own use of force.

- A second officer was flagged for EIS review because he had used deadly force in the above-referenced incident. The EIS assessment was assigned to a supervisor who also had used a lower degree of force during the incident. However, this supervisor's EIA report not only failed to mention the supervisor's use of force, but also failed to disclose that the supervisor was in any way involved in the incident. The supervisor noted that numerous officers had responded to the incident but did not mention that he was one of them.

- In another case, the supervisor assigned an EIS review was a witness to one of the uses of force under examination. The supervisor began the incident summary thus: "Ofc. ___was involved in a Level 1 UOF. I was the screening supervisor for this force investigation and present when the force was used."

The SPD should revise its EIS assessment procedures to address the issue of conflicts in each case. One simple remedy would be to require the EIS Coordinator to conduct a conflict check when deciding who will conduct the EIS assessment. Another would be to amend the EIA report form to require supervisors to check a box indicating whether they were involved in or witnessed any of the events under question. This would alert others to potential conflicts that the EIS Coordinator may have missed.

## C.  Discussion of Performance Feedback

Pursuant to the EIS Policy, 3.070-POL-1, supervisors "must also review at least the last two performance evaluations in the PAS [Performance Appraisal System], documentation relating to the underlying incident(s) reflected in the EIS indicator, and any additional information that would be relevant to the identified performance issues." The policy later adds that this review must include "any documentation relating to performance that has occurred between the last evaluation and the date of the [EIS] assessment."[55]

In approximately 65 percent of cases, the EIA assessment report either indicated the supervisor had reviewed the two most recent performance o or provided a satisfactory reason why this had not occurred, often related to the short tenure of the officer. However, in most cases (57 percent), the supervisor merely stated he or she had reviewed prior performance feedback, without any discussion of what the feedback was. For example:

- "In addition to reviewing the trigger incidents above, I read through Ofc. ___'s last two performance appraisals."

- "I reviewed Officer ____'s PAS [i.e., Performance Appraisal System] entries. Nothing of concern found in the entries."

In such cases, those involved in the EIS process would not be able to learn from this document what the feedback actually concerned or whether it was relevant to the EIS.

Supervisors in some other instances offered at least some idea about prior evaluations and feedback. For example, one assessment reads: "Officer ___ most recent Performance Evaluation by Sgt ____ rated Officer ___ as Fully Competent or Exceeds Job Expectations in all fields."

---

[55] 3.070-TSK-2(2).

Giving short shrift to past performance, in addition to not complying with the policy, may cause the chain of command to miss potential issues with the officer, thus undermining the effect of the EIS system.  On a broader scale, it also misses an opportunity to align the SPD's performance and EIS systems, as well as other efforts to shape performance, such as the promotion of community-based policing, to ensure that officers are being given clear indicators of what it means to be successful at their job, and clear feedback about whether they are meeting expectations.   Over time, we would hope to see a consistency in all systems.  For example, we would hope that supervisors, in the field, during performance reviews, and during EIS assessments, will start to steer away from vague compliments, such as that the officer is "hard-working" or "doing a good job," and start to communicate more detailed critiques of tactics, demeanor, risk, attitude, thoughtfulness and effectiveness.

## D. Analysis of Officer Performance

Similar to the above-referenced concerns, the Monitoring Team also found a tendency for supervisors to only look at surface level indicators of success, for example whether an officer's use of force was within policy or lawful, or whether the officer is "proactive" or "hard working."  The supervisors generally did not dig deeper to look at the officer's tactics, demeanor, professionalism, attitude, or thoughtfulness in performing their duties, to analyze how best to develop the officer and, at the same time, keep an eye out for at-risk behavior (even if within policy). Similarly, supervisors often came to conclusions that were unsupported, for example, by stating that an officer's frequent use of force was appropriate given that they are proactive, without any data or analysis to back up the conclusion.

Overall, we noted 11 cases that characterized officers – or their assignment -- in this manner as a justification for the number of triggering incidents, without providing supporting data.  As one example, an EIS Assessment was triggered when an officer was involved in five uses of force in six months, including a shooting. In the recommendation, the supervisor stated that the officer was "one of the most active and hard-working officers" the supervisor had ever known.  While the supervisor's conclusion may have been accurate, the assessment was far too conclusory to communicate effectively to the chain of command, a reviewer, or the officer.  There were no details about, for example, the supervisor observing the officer in the field and how he or she behaved in terms of demeanor, risk taking, attitude, respect or tactics. Without additional information, it is difficult to know whether the label, "active and hard-working" is being applied to officers inclined to take an overly aggressive policing style and subject themselves and others to unnecessary risks.

Nor was there any data or relevant comparisons to similarly-situated officers.  It would be helpful to know, for example, whether the supervisor had other, equally proactive officers in his command with fewer uses of force and if so, whether they conducted themselves in a manner that might explain the difference.  For example, it may be that those officers apply a team policing approach more consistently than the officer flagged for EIS review.

Supervisors and commanders must take care not to allow vague words like "hard-working" or "proactive" come to define the success of officers, to the point where potential inappropriate conduct or force are glossed over. SPD supervisors must be trained to engage in more nuanced discussions about their officers to communicate that successful performance is more than being hard-charging.  As the SPD rolls out, in earnest, its Data Analytics Platform ("DAP") and develops a more fully-integrated EIS process that utilizes the DAP's ability to index officer performance in light of the activity and performance of other similarly-situated peer officers, supervisors' analysis should include an assessment not only of the quantity of officer activity, but the *quality* of that activity — such as whether the officer is devoting his time to enforcement activities that are a priority for the policing sector.

Currently, however, much of the analysis is relatively rudimentary.  For example, we reviewed a case where an officer had accumulated 17 EIS threshold incidents – including eight instances involving pain from handcuffing -- and was in the top one percent of officers with Type I use of force incidents.  In his EIA report, the supervisor noted: "Handcuffs will always be uncomfortable. Officer ___ and I discussed that he makes a large number of arrests – specifically a large number of Domestic Violence and people in crisis arrests. We further discussed that the only way to prevent Type 1 handcuffing pain UOF is to not make arrests." This analysis is hardly satisfactory. First, the EIA report does not include any data that would indicate that this incidence of handcuffing pain is commensurate with the number of arrests. The assessment also did not include a meaningful summary or analysis of the relevant handcuffing incidents, generally noting only that the officer followed SPD training.

In addition, the supervisor's noted discussion with the officer — that handcuffing pain can never be completed eliminated — is beside the point.  Why are other high-arrest officers in the same boat?  Is it mere chance or are they doing something that should be emulated?  These issues appeared to elude the supervisor as well as his Lieutenant and Captain, who approved his EIA report.  Fortunately, the PRC appropriately identified the case as one requiring closer scrutiny, and determined that a mentoring plan should be developed to address the handcuffing issue. The records provided for our review did not indicate whether the PRC used the review as an opportunity to educate the supervisor and chain of command on how to conduct a more meaningful EIS assessment.

The Monitoring Team did note cases where the supervisor articulated performance beyond whether force was lawful or in policy.  For example, this supervisor appropriately described performance issues associated with an otherwise justified use of force:

> "Officer ___ and ___ failed to enter the correct incident number on the ICV [in car video].  When contacting the suspect, the officers failed to identify themselves and advise that they were recording the incident by the ICV system.  When frisking the suspect, officers may have been at a better advantage if they took physical control of the suspect as taught by Training before advising him that they intended to frisk him while he was still seated.  These issues were dealt with during the Use of Force review."

Pursuant to Policy 3.070-TSK-2, the front line supervisor is, prior to completing an assessment, to accompany or observe the employee in "work-related activity, whenever possible."  Indeed, the policy highlights the words, "accompanies/observes" in boldface.  Such an activity would be an easy and important way for a supervisor tasked with conducting an EIS assessment to gather detailed information for a complete analysis.

As another example of assessments lacking in-depth analysis, in only four cases did supervisors indicate that they went on ride-alongs or observed the officer up close to get a sense of their performance, in light of the EIS triggers. An additional seven supervisors indicated that they had observed the office's performance in the field prior to learning that the officer had been selected for EIS assessment.  Due to the close working relationship between officers and sergeants, the Monitoring Team suspects that it would have been possible for supervisors to articulate the observation of "work-related activity" during the EIS assessment process in far more than four out of 43 – or just over 9 percent of – instances.

Similarly, it was difficult to determine from the EIA reports the nature of the supervisor's discussions were with the officer.  Under SPD's EIS model, these are one-on-one discussions, and thus the EIA report is the only source

of information regarding supervisor-officer interactions.  The Performance Review Committee does not, for example, invite the assigned supervisors to its discussion of their EIA reports and thus is not in a position to question them about their interactions with, and impressions of the officer.  Thus, providing more detail about supervisor-officer discussions is critical.

These deficiencies made it appear, in some cases, that supervisors misunderstood the full purpose of EIS assessments.  One EIA report for example, offered this observation about the author's seeking performance feedback from another supervisor who had worked with the officer under review:

> I did consult with ... Supervisor ____ who does share some supervisory tasks in regards to [the reviewed officer].  He did not indicate that he felt [the officer] was a danger to himself or others.

Although such information is no doubt useful, the supervisor appears to have set a very low bar for officer performance — whether the officer is a walking public safety threat.  Obviously, EIS program demands much more.  Did that supervisor identify any performance deficiencies or areas requiring improvement? Could the officer benefit from any means of supervisory support? Does he embrace his work with enthusiasm or has he "maxed out" in his current position and thus may be at risk of burning out later on?  The answer to such questions would provide the chain of command and Performance Review Committee with a much more useful picture of the officer's needs.   The SPD needs to emphasize to supervisors that it is not enough to report that the officer is not at imminent risk of harming himself or others.

In sum, SPD has more work to do before it consistently produces EIS assessments reflecting a broad, thorough analysis of the officer's overall performance and welfare.  Quite encouragingly, some supervisors appear to understand the critical need for detailed, nuanced EIS assessment.  For example, one EIA report that we reviewed contained this promising piece of analysis:

> [The officer and I] discussed the force used in each incident and determined that reasonable, necessary and proportional force was used in all of these incidents. De-escalation was attempted in each incident when feasible. I have observed Officer ____ arrest numerous subjects during his short tenure in my squad and have found that he has responded to the suspect's actions and compliance appropriately. I have witnessed his professional demeanor when interacting with citizens, victims and suspects. Officer __'s demeanor when contacting a suspect to arrest him is the key to the success with most of his arrests. . . .

Although there is some marginal room for improvement with respect to this EIA report, it reflects a supervisor who appears to have fully embraced the review process and understood that identifying and supporting positive behaviors is an important part of any early intervention system – and of any good organization with respect to supervision, employee development, and personnel management.

## E.  Insufficient Attention to Officer Welfare

As the Consent Decree articulates, the EIS policy codifies, and the Monitoring Team has repeatedly emphasized, the non-punitive, non-disciplinary nature of EIS allows for supervisors to use the performance assessment process as a mechanism for guiding officers to resources and support that they may need from a welfare and

wellness perspective.  Indeed, one of the important opportunities that the EIS system creates is for supervisors conducting the assessment to take extra care and effort to ensure that officers who are under particular stress receive the assistance they need.  While supervisors should always be on the look-out for opportunities to support the mental health of their officers, certain early intervention triggers provide an additional cue to pay attention to this topic.  For example, officers who have been involved in shootings, or a significant number of high-risk incidents that trigger the early intervention system, should be engaged related to stress.

In our review of EIA reports, we found few that included any discussion of the officer's overall well-being.  This shortcoming may be, to at least some relevant extent, attributable to the current version of the EIA report form, which does not expressly ask the supervisor to discuss the officer's general welfare.  Revising the form to include that inquiry may ensure more consistency and attention to these issues.

It was nevertheless disappointing to see EIA reports omitting discussion of officer welfare routinely approved by the chain of command and Performance Review Committee – especially given that the issues of officer health and well-being were emphasized as part of the Consent-Decree-required training on the early intervention system. Specifically, the Monitoring Team previously reviewed SPD training materials regarding the EIS system that reminded supervisors that they were not only to address at-risk behavior, but also "demonstrated indicators of stress."[56] Another e-learning module emphasized that the EIS program required supervisors "[t]o be aware of, and act on, possible behavioral changes in employees, e.g., sudden personality changes, chronic tardiness, and stressed relationships with peers."[57]

The issue of officer welfare was overlooked in EIA reports even in some cases where an officer may have been involved in situations that could be particularly stressful.  For instance, an officer was accused of serious misconduct in two OPA complaints, and had recently gone through a personal tragedy.  The assessment did not provide any analysis related to determining whether the officer was experiencing a high level of stress (which would seem highly likely for any person) and how that might impact his performance at work.  Instead, the assessment simply stated that the officer was "fully competent," and a Lieutenant stated that he or she suspected that the OPA investigations would come back unfounded.

A second EIA report concerned an officer flagged for EIS review because he was an outlier among officers using force, was the subject of three OPA investigations for alleged misconduct (one of the investigations had been pending for nine months), and involved in a shooting.  Again, there was no indication that the supervisors or chain of command engaged in any analysis to determine if the officer was experiencing a high level of stress and whether he or she could be better supported.  It is possible they did consider officer welfare, but the EIS Coordinator and Performance Review Committee saw no evidence of it on the EIA report they reviewed and approved.

Officer welfare is a critical element of any EIS program and needs to be squarely and consistently addressed in EIA reports.  We anticipate working with the SPD to ensure progress in this area.

## F.  Documentation of Review Process

Finally, we note that an obvious part of the growing pains in rolling out this EIS system was learning how to provide consistent information in the assessment write-ups and "paper trail."  In the case of this review, that information was provided in the form of a BlueTeam log that included chain of command approvals and

---

[56] SPD E-Learning Module, *Early Intervention System* 11 (November 2014).
[57] SPD E-Learning Module, *Early Intervention System for Supervisors* 9 (January 2015).

comments, including some requests that the supervisor start over from scratch. While the BlueTeam logs provided useful context for the earlier stages of the EIS review process, they generally did not include documentation of any review that occurred once the EIA report was submitted to the Performance Review Committee ("PRC"). This left the reviewers unable to fully analyze the assessments and how the system is working.

For example, the documentation provided offered little information about the PRC's independent review of EIA reports or proposed mentoring plans or the subsequent review by the concerned Bureau Chief. Indeed, none of the 43 EIS assessments and associated BlueTeam logs even mentioned Bureau Chief review. The documentation mentioned PRC's review only mentioned in the five instances where it overruled the chain of command's recommendation that the reviewed officer did not warrant any form of mentoring or intervention. SPD can and should do a much better job documenting the critical work performed during the course of EIS review.

Most of the cases reviewed by the Monitoring Team – about 86 percent – resulted in a recommendation that the officer did not require mentoring or any other form of intervention. Based upon our review of the same records provided to the EIS Coordinator and Performance Review Committee, we agreed with roughly three-fourths of those recommendations. We were in a position to do so because the EIA report provided sufficient information about the officer's performance to support a finding that no further action was required.

In these cases, the incidents, as presented in the documents provided, did not clearly indicate a need for further action, generally because there was no apparent pattern and the officer's actions were explained by the assessment. For example, a supervisor provided a detailed analysis of two minor traffic collisions, one of which was recommended to be non-preventable, and determined that there was no pattern of driving error that needed to be addressed. Based on the information provide, this determination appeared appropriate.

We did note nine EIA reports, all recommending no further action was necessary, that were markedly superficial and reached unsupported conclusions. For example, one EIA report concerned an officer flagged for EIS review because he had four Type I incidents, one Type II incident, an out-of-policy pursuit, and two pending OPA complaints. The EIA report did not mention the OPA complaints at all and offered only a cursory discussion of the officer's role in the other flagged incidents. The EIA report and the associated BlueTeam log entries note several times that the officer is proactive, but do not explain what that means or explain how that description accounts for the incidents that flagged the officer for review.

Five cases resulted in some kind of Mentoring Plan.[58] In each of these cases, the Monitoring Team judged that this was the appropriate result, based on patterns or concerns that were apparent from the description of the triggering incident. This included, for example, the previously-mentioned officer with a large number of Type I incidents involving handcuffing pain, as well as a second officer who was involved in multiple traffic collisions involving stationary objects.

In reviewing these cases, however, we noted that the assigned supervisors in all but one of the cases appear to have initially recommended no action, despite the presence of these issues. In those four cases, the Mentoring Plan was ultimately assigned at the direction of the PRC. While we commend the SPD on coming to the

---

[58] The Monitoring Team noted a sixth case for which it was unable to determine whether a mentoring plan was assigned, as the supervisor marked both "No Action" and "Early Intervention Mentoring Plan" and indicated he would coach the officer. The review was cursory and provided limited analysis of the two traffic collisions, both of which were recommended for a "non-preventable" finding.

appropriate result in these cases, this may be an indication that supervisors have a way to go in their understanding of the EIS process, suggesting a need for future training in this area of the EIS.

## Monitoring Team Staff

**Merrick Bobb**
Monitor

**Matthew Barge**
Deputy Monitor

**Peter Ehrlichman**
Deputy Monitor

**Ronald Ward**
Assistant Monitor

**Chief Hassan Aden (ret.)**
Senior Police Expert

**Brian Center**
Senior Consultant

**Julio Thompson**
**Marnie Carlin MacDiarmid**
**Karlene Goller**
**Andrea Yang**
Esq.

**Joseph Doherty**
**Ellen Scrivner**
Ph.D.

**Jeffrey Yamson**
**Luis Perez**
Executive Assistants

**CERTIFICATE OF SERVICE**

I hereby certify that on this date I caused to be served the foregoing on the following counsel of record by the method indicated:

| | | |
|---|---|---|
| J. Michael Diaz | michael.diaz@usdoj.gov | ☐ Via Messenger |
| Kerry Jane Keefe | kerry.keefe@usdoj.gov | ☐ Via Facsimile |
| Rebecca Shapiro Cohen | rebecca.cohen@usdoj.gov | ☐ Via U.S. Mail |
| Puneet Cheema | puneet.cheema2@usdoj.gov | ☒ Via Electronic Mail |
| Timothy D. Mygatt | timothy.mygatt@usdoj.gov | ☐ Via ECF Notification |
| Christina Fogg | christina.fogg@usdoj.gov | |
| Annette L. Hayes | annette.hayes@usdoj.gov | |
| Peter Samuel Holmes | peter.holmes@seattle.gov | |
| Michael K. Ryan | michael.ryan@seattle.gov | |
| Andrew Thomas Myerberg | andrew.myerberg@seattle.gov | |
| Brian G. Maxey | brian.maxey@seattle.gov | |
| Gregory C. Narver | gregory.narver@seattle.gov | |
| John B. Schochet | john.schochet@seattle.gov | |
| Rebecca Boatright | rebecca.boatright@seattle.gov | |

Dated this 23rd day of March, 2017.


/s/ Matthew Barge
Matthew Barge

MONITOR'S EIGHTH SYSTEMIC ASSESSMENT
REGARDING THE EARLY INTERVENTION
SYSTEM (EIS) - 2
Case No. 12-cv-1282-JLR