UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br>v.<br><br>CITY OF SEATTLE,<br><br>Defendant. | CASE NO. C12-1282JLR<br><br>ORDER APPROVING THE SEATTLE POLICE DEPARTMENT'S DRAFT BODY-WORN VIDEO POLICY |

## I. INTRODUCTION

Before the court is the Monitor's memorandum regarding the Seattle Police Department's ("SPD") proposed body-worn video ("BWV") policy. (Monitor Mem. (Dkt. # 370).) At issue is Paragraph 3 of Section 16.090-POL-2 of the policy, which prohibits SPD officers from reviewing BWV footage prior to making statements in cases involving high-level uses of force (such as force resulting in injuries like a broken bone or any use of deadly force), but permits SPD officers to review such footage prior to making statements in cases involving low-level uses of force (such as force used in

handcuffing or that causes transient pain). (*See id.* Ex. A (attaching proposed SPD policy) at 7-8.) The Monitor is concerned that Paragraph 3 of Section 16.090-POL-2 violates the Consent Decree[1] and recommends that the court adopt a modified version of the provision that prohibits SPD officers from reviewing BWV prior to making statements in any case involving an officer's use of force—including low levels of force.[2] (*See id.* at 10 ("[T]he Monitor takes issue with officers being able to review video of force incidents before they have provided their recollections of what transpired."); *see also id.* Ex. B (attaching the Monitor's proposed revision to the SPD policy) at 7-8).) Both Plaintiff United States of America (or the Department of Justice ("DOJ")) and Defendant City of Seattle ("the City") filed responses to the Monitor's memorandum in support of SPD's proposed BWV policy. (City Resp. (Dkt. # 379); DOJ Resp. (Dkt. # 378).) The Community Police Commission ("CPC"), on the other hand, filed a memorandum in support of the Monitor's position.[3] (CPC Resp. (Dkt. # 377).)

The court has reviewed all of the materials submitted on the issue of SPD's proposed BWV policy and appreciates the thoughtful and thorough analysis contained in all of the memoranda. In addition, the court appreciates the steadfast and comprehensive

---

[1] (Consent Decree (Dkt. # 3-1, *as amended by* Dkt. # 13).)

[2] Pursuant to Paragraph 177 of the Consent Decree, because the Monitor opposes Section 16.090-POL-2, Paragraph 3, of SPD's proposed BWV policy on grounds that it is inconsistent with the Consent Decree, the Monitor must set forth those grounds in writing. (*See* Consent Decree ¶ 177.)

[3] In addition, the CPC sought a revision to the proposed SPD BWV policy prohibiting the use of BWV to record the questioning of victims, suspects, or witnesses. (*See* CPC Mem. at 3-5.) Neither the Monitor nor the parties have advocated for this limitation, and the court does not require that the SPD adopt it.

work of the Monitor and recognizes his substantial contribution to SPD's success in moving toward constitutional and effective policing. Nevertheless, on the issue of SPD's BWV policy, the court declines to accept the Monitor's recommendation. Based on its review of the submitted materials, the terms of the Consent Decree, the relevant portions of the record, and the applicable law, the court concludes that SPD's proposed policy does not violate of the Consent Decree and hereby APPROVES SPD's proposed BWV policy without modification or amendment as discussed below.

## II. BACKGROUND & ANALYSIS

### A. Application of the Consent Decree

In general, the parties agree that the Consent Decree does not expressly address the topic of BWV but that the Monitor may appropriately offer technical assistance to SPD on the topic under Paragraph 173(c).[4] (DOJ Resp. at 3; *see* City Resp. at 6.) When an issue falls within the purview of Paragraph 173(c), SPD has discretion to decide whether to utilize the Monitor's advice or not. (*See* Consent Decree ¶ 173(c).) The parties agree that the Monitor provided technical assistance to SPD on SPD's proposed

//
//

---

[4] Paragraph 173(c) of the Consent Decree states:

> SPD may request technical assistance from the Monitor as needed. The Monitor may provide the requested technical assistance as long as the requested technical assistance will not conflict with the Monitor's duties under the Settlement Agreement and falls within the Monitor's budget. SPD has the discretion whether or not to utilize the Monitor's advice.

(Consent Decree ¶ 173(c).)

BWV policy, and SPD decided to adopt most but not all of the Monitor's advice.[5] (DOJ Resp. at 3; City Resp. at 5-6.)

However, the Monitor and DOJ generally agree that, irrespective of the applicability of the Consent Decree to the remainder of proposed BWV policy, Section 16.090-POL-2, Paragraph 3, of the policy falls squarely within the purview of the Consent Decree and thus is reviewable by DOJ, the Monitor, and the court. (DOJ Resp. at 4; *see* Monitor Mem. at 6-7; *see also id.* at 3 ("The Monitor has examined the SPD policy provisions regarding review of video recorded by body-worn cameras and asserts that it does indeed conflict with the Consent Decree.").) The City also agrees that "where any affirmative SPD action or policy touches on the areas of reporting, investigation and review, that portion of the action or policy is within the purview of the Monitor," but thinks that the court need not address the issue because its proposed policy comports with the Consent Decree anyway. (*See* City Resp. at 5-6.)

Large portions of the Consent Decree are devoted to setting forth requirements for the review and reporting of uses of force by SPD officers. (*See* Consent Decree ¶¶ 100-26.) These provisions require SPD officers to promptly and accurately report force used in incidents. (*See, e.g., id.* ¶¶ 97, 100.) Thus, if a new, proposed SPD policy

---

[5] As a general matter, with the exception of Paragraph 3 of Section 16.090-POL-2, the Monitor views SPD's proposed BWV policy as consistent with the Consent Decree. (*See* Monitor Mem. at 1-2.) Nevertheless, the Monitor asserts that some areas of SPD's draft BWV policy, in which SPD rejected the Monitor's technical assistance, may conflict with the Consent Decree in the future. (Monitor Mem. at 15-18.) The Monitor, therefore, "reserves [his] objections" to these provisions depending on the outcome of future assessments. (*Id.* at 17-18.) The court need not make any determinations regarding these provisions at this time and therefore declines to address them further in this order.

or program conflicts with the ability of officers to provide prompt and accurate reports of their use of force, the policy or program conflicts with the Consent Decree and should not be enacted or approved. For this reason, the court agrees with the Monitor and DOJ that both the Monitor and the court have the authority to examine whether Section 16.090-POL-2, Paragraph 3—which relates to officer reporting—conflicts with the reporting requirements set forth in the Consent Decree or any other Consent Decree provisions. Accordingly, the court now conducts its review based on the filings of the Monitor, the parties, and the CPC.

**B. Section 16.090-POL-2, Paragraph 3, of the SPD's Proposed BWV Policy**

The Monitor is concerned that Paragraph 3 of Section 16.090-POL-2 violates Paragraphs 70(h), 119, and 164 of the Consent Decree. (*See* Monitor Mem. at 2-3.) These paragraphs provide as follows: (1) SPD must "ensure that [any use of force] incident is accurately and properly reported, documented, and investigated" (Consent Decree ¶ 70(h)); (2) the Force Review Board ("FRB") must "conduct timely, comprehensive, and reliable reviews of all Type II and Type III uses of force"[6] (*id.* ¶ 119); and (3) the Office of Professional Accountability ("OPA") must "ensure that all complaints regarding officer conduct are fully and fairly dealt with" and "all investigative findings are supported by evidence." (*id.* ¶ 164). In general, the Monitor objects to

---

[6] A Type II use of force "means a use of force which causes an injury, could reasonably be expected to cause an injury, or results in a complaint of an injury, but does not rise to the level of a Type III use of force." (Consent Decree ¶ 65.) A Type III use of force "means all uses of force by a SPD officer that have the likelihood of significant injuries to a subject including: (1) any use of 'Lethal Force;' and (2) any use of force that results in or could reasonably be expected to result in 'Great Bodily Injury' or 'Substantial Bodily Harm.'" (*Id.* ¶ 66.)

SPD's proposed policy because it allows officers to review video of low-level force incidents before the officers provide their recollections of what transpired. (Monitor Mem. at 10.) The Monitor believes that such review exposes officers to aspects of the incident that they might not have seen or could not recall, which will affect the investigators' ability to assess the officer's contemporaneous appraisal of circumstances that led the officer to use force. (*Id.*)

As an alternative to Paragraph 3 of Section 16.090-POL-2, the Monitor proposes a policy that would prohibit SPD officers from reviewing video prior to making a report in any use of force situation. (Monitor Mem. at 12-13.) The Monitor further proposes that the policy governing BWV be silent on officer review of video prior to reporting and instead simply refer to the FIT Manual and Use of Force policies, which he suggests the parties could revise to refer to BWV. (*Id.* at 13-15.)

Although the court is sensitive to the Monitor's concerns, the court disagrees that Section 16.090-POL-2, Paragraph 3, violates either the terms or the purposes of the Consent Decree. Paragraph 3 of Section 16.090-POL-2 prohibits SPD officers from reviewing BWV footage prior to making a statement regarding their use of force in instances involving serious uses of force, but permits officers to review such footage prior to making a statement in incidents involving low-level uses of force. The Consent Decree does not expressly address BWV, but it does require that officer use of force be "accurately" documented. (*See* Consent Decree ¶ 70(h).) The Consent Decree, however, also emphasizes that its goal is to "focus police resources on the most serious cases, while also requiring that all reportable uses of force cases are reported and not

under-classified." (*Id.* ¶ 91.) Thus, the Consent Decree seeks to strike a balance by requiring that all use of force cases are properly reported while at the same time focusing SPD resources on the highest level use of force cases.

The court finds that Paragraph 3 of Section 16.090-POL-2 strikes that same balance with respect to officer review of BWV. SPD believes permitting officer review of BWV in low-level uses of force will increase the accuracy of use of force reporting and ease the administrative burden of notetaking and drafting reports. (*See* City Resp. at 7-11.) As the City points out, with respect to the accuracy of force reporting, there will inevitably be inconsistencies between reports written before and after review of BWV due to the inherent limits of human perception and memory. (*Id.* at 11 & n.57.) Allowing officers to view BWV prior to writing a report reduces officers' potential exposure to allegations of inaccuracy and dishonesty in those instances involving the use of lower levels of force. (*See id.*) The Monitor is correct that this procedure increases the risk of clouding the officer's contemporaneous appraisal of circumstances that led the officer to use the force employed. (*See* Monitor Mem. at 10.) However, it is important to note that "DOJ has seen no evidence (either during the course of the investigation or the enforcement of the Consent Decree) that indicates that permitting officers to view video footage before making a statement about low level uses of force undermines the accuracy of the reporting, documentation, or investigation of that use of force." (DOJ Resp. at 7.) If such evidence emerges in the future, when the policy is reviewed in practice, then the parties, the Monitor, and the court can consider appropriate modifications. However, in the absence of any such evidence to date, the court is inclined to credit SPD's

representations about the benefits of allowing officers to review BWV prior to making reports in low-level uses of force and approve the SPD's proposed policy.

Further, the administrative burdens that the Monitor's proposal would entail are not *de minimus*. "In 2016, SPD officers were involved in 830 Type I[7] and 294 Type II uses of force, and at least one report was generated for each event." (City Resp. at 10 (footnote added).) The City argues that under the Monitor's proposal, "potentially hundreds, if not thousands, of supplemental reports would be required to provide for additional details observed after review of BWV." (*Id.*) The time officers take on these additional reports is time that they are not available for patrol. Indeed, this additional reporting would undercut one of the benefits of BWV, which at least one study found to include a decrease in officers' reporting time (by 22.4%) and an increase in officers' time spent on patrol (by 9.2%). (*Id.* at 11 & n.56 (citing Michael D. White, *Police Officer Body-Worn Cameras: Assessing the Evidence*, at 24, *available at* https://www.ojp diagnosticcenter.org/sites/default/files/spotlight/download/Police%20Officer%20Body-Worn%20Cameras.pdf).) For the foregoing reasons, the court concludes that, like the Consent Decree, SPD's proposed policy properly allocates SPD resources on the highest level use of force cases while allowing for proper reporting of all use of force incidents. (*See* Consent Decree ¶¶ 70(h), 91.)

//

---

[7] Type I use of force "means the use of low-level physical force that is greater than De Minimus Force, is not reasonably expected to cause injury and does not result in an actual injury or complaint of injury, but causes transient pain and/or disorientation during its application as means of gaining compliance." (Consent Decree ¶ 64.)

SPD's proposed BWV policy is also consistent with existing SPD policy on video review, which the parties and the Monitor previously agreed upon in their review of the Force Investigation Team ("FIT") Manual and which the court approved in December 2016. (*See* 12/13/16 Order (Dkt. # 341) (approving FIT Manual).) FIT investigates all Type III uses of force, and the parties and the Monitor agreed that officers would not be permitted to review any video footage, including BWV or in-car camera video, prior to making a statement in Type III force cases. (*See* FIT Manual (Dkt # 340-1) at 31 ("Once FIT has taken investigatory responsibility for a case, FIT shall instruct officers that they will not be permitted to review video or audio of the incident from any source . . . prior to their initial FIT interview . . . .").) Paragraph 3 of Section 16.090-POL-2 is consistent with this prior agreement. (*See* Monitor Mem. Ex. A (attaching SPD proposed policy) at 8 ("Employees may review their own recorded video except in instances of FIT investigations. The FIT manual outlines when employees may review video in those cases.").)

The different approaches to reviewing video in high and lower level use of force cases also make sense given the other procedural safeguards that are in place during a FIT investigation but that are not otherwise utilized. For example, unlike cases involving lower level uses of force, FIT investigations require a thorough interview of the officer by trained FIT investigators—not just a written statement. (Maxey Decl. (Dkt # 381) ¶ 25.) Thus, FIT investigators can draw out information and test the officer's memory to ensure as complete and accurate an initial statement as possible, thereby reducing the risk of unwarranted or unintended inconsistencies with the video recording. (*Id*.) In addition,

reporting is bifurcated in a FIT investigation. The general offense report is completed by another officer, while the officer's supervisor and FIT review the video. (*Id.* ¶ 31.) The bifurcated reporting allows SPD to focus on the higher-level force investigation, while also resolving any issues with a person in custody. (*Id.*) These procedures are not in place for lower level Type I and Type II force cases because SPD simply does not have the resources to do so. (*See* City Resp. at 9.) Again, the court concludes that Paragraph 3 of Section 16.090-POL-2 of SPD's proposed BWV policy strikes the same balance as the Consent Decree does by focusing SPD resources on the highest level use of force cases.

The court also agrees with the City that SPD's proposed policy is not in conflict with case authority. In *Graham v. Conner*, 490 U.S. 386, 396 (1989), the Supreme Court held that "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Although this standard remains fixed in the law, in *Scott v. Harris*, the Supreme Court treated the question of whether the force used was reasonable as an undisputed fact where there was video footage of the incident. 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. . . . The Court of Appeals . . . should have viewed the facts in the light depicted by the videotape."); *Plumhoff v. Rickard*, --- U.S. ---, 134 S. Ct. 2012, 2021 (2014) (stating that the Court found in *Scott* "that events recorded on the [video]tape justified the officer's conduct"). Since *Scott*, courts, including this one, have often incorporated review of

videotape into their reasonableness analysis.  *See, e.g.*, *Davis v. City of Seattle*, No. C13-0895JLR, 2014 WL 3810574, at *6-9 (W.D. Wash. Aug. 1, 2014) (relying extensively on in-car video in concluding on summary judgment that officer did not use excessive force); *Emmons v. City of Escondido*, 168 F. Supp. 3d 126, 1275 (S.D. Cal. 2016) ("The Court notes that if a picture is worth a thousand words, a video from the body-worn camera of a law enforcement officer during a 'contact' giving rise to litigation may be worth a thousand pictures.").  These developments in the law largely reflect modern realities and the ubiquitous presence of videotaped recordings of the interactions between police officers and the public, whether through BWV, cell phones, private surveillance cameras, or other devices.  The court does not find SPD's policy at odds with applicable case authority, particularly with respect to low level uses of force, which are not accompanied by procedural and investigatory safeguards designed to facilitate accuracy and minimize the potential effects of unintended or unwarranted inconsistencies.  (*See* City Resp. at 13-14.)

In addition, the court notes that SPD's proposed BWV policy appears to be more restrictive when compared to the policies of other law enforcement agencies.  According to SPD's research, the vast majority of law enforcement agencies either place no restrictions on when officers can review video or only prohibit officers from viewing video in incidents involving police shootings or the highest level of force.  (City Resp. at 4, 19-21.)  Indeed, if enacted, SPD's proposed policy would be the fourth most restrictive in the country.  (*Id.* at 4.)

Finally, the City, SPD, and DOJ are committed to continuing to review, analyze, and if appropriate, modify the BWV policy in the future. (*See id.* at 24; DOJ Resp. at 7 ("If such evidence [that SPD's proposed policy undermines the accuracy of reporting, documenting, or investigating the use of force] later came to light, the Parties and the Monitor could reconsider whether SPD's current body-worn camera policy is appropriate.").) Indeed, the court notes that it considered placing the same restrictions upon officer viewing of BWV footage in cases involving Type II and Type III uses of force. However, grouping Type II with Type III uses of force would increase the number of incidents that officers are prohibited from viewing BWV footage prior to reporting by more than fifteen-fold. (*See* Use of Force Annual Report (Dkt. # 362) at 7 (indicating that in 2016 there were 294 Level II uses of force and a total of 17 Level III uses of force and officer-involved shootings).) The court concludes that in the absence of any evidence that permitting officers to view BWV footage before making a statement about lower level uses of force undermines the accuracy of such reporting (*see* DOJ Resp. at 7), the administrative and operational burdens associated with this change would be too great (*see* City Resp. at 9-12). The court, however, urges the parties, the Monitor, and the CPC to focus their operational review of SPD's BWV policy on the reporting of Type II uses of force. If issues arise concerning the accuracy, documentation, or investigation of Type II uses of force, the court urges the parties, the Monitor, and the CPC to bring those issues back to the court for further review and possible modification of SPD's BWV policy.

The court acknowledges that reasonable minds can and do differ on what the precise contours of SPD's BWV policy should be. At this time, however, the court does not believe that the record indicates that Paragraph 3 of Section 16.090-POL-2 of SPD's proposed BWV policy is inconsistent with the Consent Decree. In light of that conclusion, the court defers to the balance that SPD has struck between the manner in which BWV is handled in low-level and high-level uses of force and approves SPD's draft BWV policy.

### III. CONCLUSION

For the foregoing reasons, the court hereby APPROVES SPD's draft BWV policy, including Paragraph 3 of Section 16.090-POL-2.

Dated this 3rd day of May, 2017.

JAMES L. ROBART
United States District Judge