1               UNITED STATES DISTRICT COURT

2          WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3    _____

                                    ) C12-01282-JLR
4    UNITED STATES OF AMERICA,       )
                                     ) SEATTLE, WASHINGTON
5                   Plaintiff,       )
                                     ) July 18, 2017
6    v.                              )
                                     ) Status Hearing
7    CITY OF SEATTLE,                )
                                     )
8                   Defendant.       )
                                     )
9    _____

10   _____

11            VERBATIM REPORT OF PROCEEDINGS
          BEFORE THE HONORABLE JAMES L. ROBART
12             UNITED STATES DISTRICT JUDGE
     _____

13   APPEARANCES:

14   For the Plaintiff:      J. Michael Diaz
                             Christina Fogg
15                           U.S. Attorney's Office
                             700 Stewart Street
16                           Suite 5220
                             Seattle, WA  98101
17
                             Timothy D. Mygatt
18                           U.S. Department of Justice
                             Civil Rights Division
19                           950 Pennsylvania Avenue NW
                             Washington, D.C. 20530
20
     For the Defendant:      Peter S. Holmes
21                           Josh Johnson
                             Seattle City Attorney's Office
22                           701 Fifth Avenue
                             Suite 2050
23                           Seattle, WA 98104

24                           Ian J. Warner
                             600 4th Avenue, Floor 7
25                           Seattle, WA 98104

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

The Monitor:            Merrick Bob

CPC Representative:     Isaac Ruiz

1          THE COURT:  Please be seated.

2      The clerk will call this matter.

3          THE CLERK:  Case No. C12-1282, United States versus

4  City of Seattle.

5      Counsel, please make your appearances for the record.

6          MR. DIAZ:  Good morning, Your Honor.  Mike Diaz for the

7  United States.

8          MR. MYGATT:  Good morning, Your Honor.  Tim Mygatt for

9  the United States.

10          MS. FOGG:  Christina Fogg for the United States.

11          THE COURT:  Thank you.

12          MR. HOLMES:  Peter Holmes, Seattle City Attorney.

13          THE COURT:  Mr. Holmes.

14          MR. JOHNSON:  Good morning, Your Honor.  Josh Johnson

15  appearing for the City of Seattle.

16          THE COURT:  Mr. Johnson.

17          MR. WARNER:  Ian Warner, Mayor's Office, legal counsel.

18          THE COURT:  Thank you.

19          MR. RUIZ:  Isaac Ruiz on behalf of the Community Police

20  Commission.

21          THE COURT:  Thank you, Mr. Ruiz.

22      Counsel, I do not anticipate that today's hearing is going to

23  be a long one.  I will make a few brief introductory remarks to

24  set the stage here, and then I would like to hear from the

25  Department of Justice, from the City, and from the CPC, and then

1   it's my intention to provide you with some guidance about where

2   we go from here.

3         So in terms of setting the stage, I would remind you that, in

4   October of 2016, the City filed proposed legislation with the

5   Court.  We gave ourselves a relatively short period of time in

6   order to comment on that.  And in what is found in the docket at

7   357, January 6th, 2017, there is an order granting preliminary

8   approval and setting out some areas of concern.  The Court then

9   does not have an active role in this while legislative

10  consideration is underway.

11        I would note that in addition to considering the proposed

12  legislation, there were also numerous amendments to some pending

13  terms and to some new areas that have never before been

14  considered by the Court.

15        On May 22nd, 2017, the City Council passes the ordinance, and

16  on June 1, 2017, the Mayor signed it.  I am not involved in what

17  has happened since the Mayor signed it and I know nothing about

18  it other than what I read in the newspapers, but it's clear that

19  there is a collective bargaining process underway, which became

20  somewhat newsworthy yesterday.

21        So I asked that we have this status conference, and I set it

22  for today with the expectation that I would hear from the parties

23  and then give you some suggestions of where we are at the present

24  time.

25        So against that backdrop, I'm not sure who is speaking for

1   the government today.  Mr. Diaz, is that you?

2           MR. DIAZ:  It is me, Your Honor.  But the City is a

3   moving party -- is the moving party, so we would defer to them to

4   go first, if that's okay.

5           THE COURT:  All right.

6           MR. HOLMES:  Good morning, Your Honor.  May it please

7   the Court, I'm Pete Holmes, City Attorney for the defendant, City

8   of Seattle.

9       There are many people from the City here today, Your Honor,

10  but I would like to take just a moment to introduce three of

11  them.  City Council Members Burgess, Gonzalez, behind me to my

12  right, along with Deputy Chief Carmen Best.

13          THE COURT:  Mr. Burgess, would you stand up, please?

14      I think we're losing you some time this fall.  Not in the

15  sense of you're getting lost, but going on to other things.  But

16  I will tell you that I'm going to be lost without you.  I have

17  thought you have been a very responsible voice in this process,

18  and I have appreciated your efforts.  So you'll be missed.

19      Ms. Gonzalez -- wherever you are there -- welcome to the

20  club.  I applaud the work that you have been doing.  I think it's

21  represented the best of what the City Council has to offer, and I

22  look forward to continue to work with you.

23          MS. GONZALEZ:  Thank you, Your Honor.

24          THE COURT:  Assistant Chief Best, who is back there

25  somewhere, you have big shoes to fill today, but I expect you not

 1   to speak with an Irish accent, so ...  Thank you.

 2        Please continue, Mr. Holmes.

 3             MR. HOLMES:  Thank you, Your Honor.

 4        As the Court is aware, our five-year police reform effort,

 5   nearly five years, has produced remarkable results within SPD,

 6   particularly on the use of force, as confirmed by a series of

 7   positive assessments from the Court's Monitoring Team.

 8        Most recently, the City Council has focused on legislation to

 9   institutionalize SPD's permanent accountability structure.

10   Throughout, the Executive has bargained in good faith with the

11   Seattle Police Management Association and Seattle Police

12   Officers' Guild.  My office has simultaneously managed a

13   considerable amount of related litigation, including these

14   federal proceedings as well as state-court and administrative

15   matters.

16        As directed by the Court, I intend to provide a broad

17   overview of the present status of Seattle's police reform effort,

18   key to these legislative, collective bargaining, and litigation

19   activities, and with reference to our last two status conferences

20   on August 15, 2016, and January 4 of this year.

21        Regarding the accountability legislation in front of the

22   Court, following that last status conference on January 4, the

23   Court issued an order approving, with certain caveats, the

24   proposed accountability legislation that had been submitted last

25   October.

1            THE COURT:  Approved it for what?  Because it seems to

2    me we part company on that particular question.  I approved it to

3    go to the City Council.  Certain parties in this proceeding have

4    viewed that as an opportunity to say, "The Court blessed it;

5    we're never going to look back at it."  That's not the situation.

6            MR. HOLMES:  Yes, Your Honor.

7        We are back here today specifically to talk about what was

8    different between October and the legislation that was

9    submitted -- excuse me, the legislation that was originally

10   proposed in October and that which is accompanying the motion

11   today.

12       The City's June 21 brief, in fact, Your Honor, attaches the

13   entire accountability legislation package, but the brief itself

14   focuses solely on those differences between the original

15   submitted legislation and that which is attached to the 21 brief,

16   June 21.  It outlines every provision, Your Honor, that the City

17   Council passed in late May and was signed by the Mayor on June 1,

18   but every provision that contains a substantive change from the

19   provisions that the Court conditionally "approved," if that's an

20   acceptable term, in January.  The brief explains further which

21   additions and changes are consistent with the Consent Decree.

22   And I will not repeat here what has been set forth in the City's

23   June 21 brief except to answer any questions the Court may have.

24           THE COURT:  Well, the fundamental question that I

25   have --

1          MR. HOLMES:  Yes, Your Honor.

2          THE COURT:  -- is you're giving me a work-in-progress

3    and asking me to approve it, and that seems to me to be somewhat

4    of a rush to termination and premature.

5        You have, it seems to me, a very significant issue going on

6    right now that broke out into the public on Monday when the

7    Mayor, apparently independent of labor negotiations, implemented

8    the body-camera procedures.

9        How is it that you want me to say what's there now is okay,

10   when it potentially is impacted by developments that I can't

11   predict and am not involved in?

12         MR. HOLMES:  It is our hope, Your Honor, that with

13   approval and guidance from the Court, that the ongoing collective

14   bargaining negotiations can be pushed further.  We recognize, as

15   I stated to the Court at the January 4 status conference, that we

16   had a problem.  We have to continue bargaining in good faith

17   while we try to make progress on the accountability legislation.

18   It's the situation, Your Honor, it's the process that the City

19   collectively -- the Council and the Mayor, the Executive -- have

20   elected to move forward.

21       If we stop and wait to bargain every element with unions, we

22   may not be back before the Court for some time.  But this was a

23   way -- a decision that was made by the City as a way of

24   continuing to advance the police reforms with ongoing guidance

25   from the Court while we meet our collective bargaining

1   obligations.  It is a difficult situation.

2        THE COURT:  Well, it's difficult.  And, you know, let me

3   hypothetically suggest the following situation:  There is a

4   provision in the accountability package that sets out a certain

5   procedure to be followed.  In the course of negotiations with the

6   various labor unions, there is a result which undermines some

7   portion of that process or undermines some portion of the

8   accountability effort, and I'm then going to have to go back and

9   undo the provision in the ordinance, which no longer accurately

10  ensures or procedurally ensures constitutionality in police

11  practices.  That's what my dilemma is.  And it seems to me that

12  there's little consideration on the part of, well, we're going to

13  work this all out, let's get this stuff in place on some kind of

14  provisional approval, and then, depending on what happens in

15  contract negotiations that I'm not a party to and I don't

16  influence, at least other than from the bully pulpit up here,

17  having to undo things that have been created and are in effect.

18       MR. HOLMES:  Indeed, Your Honor.  You have previously

19  admonished the parties that you did not want to be -- the Court

20  did not want to be in the position of vetoing legislation that

21  has been enacted by the City Council.  We appreciate that as

22  well.

23       Unfortunately, Your Honor, that's a fairly accurate

24  description of what is a complex situation of simultaneously

25  dealing -- negotiating with two unions, moving forward with

 1   legislative authority to institutionalize the police

 2   accountability structure, while observing the requirements of the

 3   Consent Decree.  It is a difficult situation, Your Honor.

 4       Our proposal, however, is that we keep -- this is, in effect,

 5   a second trip here to the Court to inform the Court of our

 6   progress on the accountability legislation while bargaining.

 7   That bargaining is difficult.  The last time I was here I

 8   suggested that one of the possibilities might be that if every

 9   party was here in the room before the Court, that might get

10   through some of these issues that we have.  Short of that, Your

11   Honor, this seems to be the process that circumstances have

12   dictated.

13           THE COURT:  Well, we informally know that as the "Holmes

14   party interpleader proposal," and it got the attention that it

15   deserved.  You know, I can't very well order people who aren't in

16   front of me to just show up and participate --

17           MR. HOLMES:  No, you can't.

18           THE COURT:  -- as much as I would like to.

19           MR. HOLMES:  If you could, Your Honor.

20           THE COURT:  All right.  Please, continue.

21           MR. HOLMES:  Correct, Your Honor.  And, no, I was never

22   suggesting that the Court order parties to appear.

23       But the joinder issue is something that perhaps we will

24   revisit.  For now, the course is to attempt to do simultaneous

25   collective bargaining and work on the legislation.

1           THE COURT:  Well, there is only one amicus that I am

2     aware of that has said, "Judge, whatever you do, you have to

3     allow contract negotiations to go forward," and that was the CPC,

4     which was surprising since it seems to me that ultimately that's

5     contrary to the public's best interest.  But if that's the case,

6     then it seems to me one option is simply to say, "Judge, we have

7     reached an impasse in the contract negotiations.  We wish to go

8     forward.  Please give us judicial authorization to do this."

9     Somewhat similar to what the Mayor apparently did on Monday when

10    he got -- I'm going to use my phrase -- got tired of trying to

11    deal with some party that wouldn't agree to a reasonable

12    compromise or wouldn't agree without some compensation to flow

13    from it, and then suddenly just said, "All right.  Then we're

14    going to implement it."

15        Doesn't that undercut your position that I'm hog-tying you?

16           MR. HOLMES:  I would not take the position that the

17    Court is hog-tying us.  And certainly yesterday's action by

18    Judge -- by Mayor Murray, Your Honor --

19           THE COURT:  An interesting slip there.

20           MR. HOLMES:  A Freudian slip, Your Honor.

21        But the action by Mayor Murray, I think, demonstrates the

22    practical problems that the City faces.  We have ongoing

23    encounters with community members and the police department even

24    while we're trying to reform it, even while we are trying to

25    comply with the terms of the five-year-old Consent Decree, even

1    while we're trying to negotiate the impacts with our two police

2    unions.  It is a practical, complicated situation, Your Honor,

3    and this is the one that we have in front of the Court today.

4          THE COURT:  Well, you know, take away as your bottom

5    line that the constitution trumps everything else.  And, you

6    know, against constitutional principle, labor contracts will

7    fall, and that message should come across loud and clear.

8        You know, as I have said before, I have no idea what goes on

9    in those negotiations.  At least one newspaper has reported that

10   the various provisions, in terms of accountability and police

11   practices, are being held captive to a pay increase.  I have

12   already spoken to that, and I'm not going to back down from it.

13   The citizens of Seattle are not going to pay blackmail for

14   constitutional policing.  That's simply the bottom line.

15         MR. HOLMES:  Your Honor used the term "impasse" a few

16   moments ago, and that is a labor term that could indeed occur, if

17   we are not able to make significant progress.  That formal

18   declaration has not occurred.  And until that does, we need to

19   continue bargaining.  If there is impasse, then there will be

20   arbitration proceedings that will ensue at that point, Your

21   Honor.

22         THE COURT:  All right.  I keep interrupting you.

23         MR. HOLMES:  No.  That's --

24         THE COURT:  Please continue.

25         MR. HOLMES:  -- quite fine, Your Honor.

1        With due respect, we request that the Court approve this

2   legislation, if the Court is willing to indulge this process that

3   we have at present, to approve the accountability legislation

4   that we've submitted.  And we will continue to bargain, as I have

5   said, in good faith.  And to the extent, though, that the

6   bargaining itself leads to changes in the legislation now in

7   front of the Court, it is the City's intent to bring those

8   changes back to Your Honor for the Court's review and approval

9   before they would be implemented.

10        THE COURT:  But does the City understand that that may

11   impact not only changes that are made in the negotiations, but

12   changes to the existing ordinance to reflect those changes?

13        MR. HOLMES:  Yes, Your Honor.  And the ordinance itself

14   reflects that bargaining is required, Court approval is required,

15   and consequently, even the legislative process contemplates that

16   further amendments, subsequent amendments, may be required.

17        THE COURT:  All right.  I believe it's in your briefing,

18   396, page 25 of 26, Footnote 78, you make the offer that:  To the

19   extent the Court requests, the City can provide a full list of

20   provisions which are subject to collective bargaining.

21        I do not intend to approve the ordinance today because I need

22   to see that.  But I'm taking you up on your offer.  That will

23   assist me in determining if there are portions of the ordinance

24   that I feel can go forward.  But right now I don't know what is

25   subject to collective bargaining, and you can understand that

 1    ambiguity is very concerning to me.

 2            MR. HOLMES:  Correct, Your Honor.

 3        We do have one situation where, at least for body cams, I

 4    think the City -- the City has taken the position -- the

 5    Executive has taken the position that in light of the impacts of

 6    community-police interactions that are ongoing, without the aid

 7    of body cams, that that was something that needed to be

 8    unilaterally implemented, and that is the reasoning behind Mayor

 9    Murray's decision yesterday to issue the executive order.  So

10    that is one example.  There is a longer list.

11            THE COURT:  Well, Mr. Holmes, you and I have been at

12    this a long time.  You know that I was a champion of dashboard

13    cams at the point that there was active resistance on the part of

14    line personnel.  We got over that.  The results of that, as far

15    as I can see, have been civility on the part of the public

16    towards the police, civility on the part of the police towards

17    the public, and a record of what happens in these encounters.  I

18    have championed body cams.  I understand all of the privacy

19    issues to go with it.

20        I am frankly astounded that when the polling that has been

21    conducted by the CPC and the Monitor reflect overwhelming -- 80,

22    90 percent -- approval, one of the groups, that Mr. Ruiz can

23    speak to, that has opposed this at every step of the way is the

24    CPC.

25        I understand the privacy concerns, but, you know, what I hear

1   now is, we finally have come to the realization that the public

2   demands that this happen so that we don't have situations, as

3   we've had within the last two weeks, where we don't know what

4   happened in an encounter.  And it seems to me that it betrays

5   the public's trust in the police department.  I think, you know,

6   those officers, you know, that honestly report what happened --

7   if they didn't, then there needs to be consequences -- if they

8   did, then the public would better understand how those kinds of

9   tragic situations arise.

10      My frustration on this issue is apparent because I find we

11  are working at cross purposes seemingly on this kind of

12  mother-knows-best mentality that I don't think is appropriate in

13  police practices.

14      MR. HOLMES:  Your Honor, I share the Court's

15  frustrations personally.  I am here, however, not as Pete Holmes

16  the police reformer, as you noted, being at this for some time,

17  but rather as the City's attorney.  And this is that collective

18  entity's process.  This is the position that the City finds

19  itself in your Court today.  And every observation you have just

20  made, there is no dispute from counsel standing before you.

21      THE COURT:  All right.

22      Why don't you go ahead and wrap up, sir?

23      MR. HOLMES:  Sure.

24      I really want to, without belaboring bargaining too much

25  further, I did want to give the Court a 30,000-foot view of the

1    status of those, collective bargaining and related litigation.

2    So SPOG has been here, the Seattle Police Officers' Guild, before

3    Your Honor.  The Seattle Police Management Agency has not.  But

4    it is important to note that both unions jointly signed a letter

5    to Your Honor on August 1, before our August 4 status conference,

6    and stated that they were not opposed to police reform, but,

7    quote, "What both SPOG and SPMA oppose is any non-negotiated

8    breach in its collective bargaining agreement or rights."  That's

9    at the docket of 306.

10       So as the Court has reviewed already, we filed our proposed

11   legislation in October, and then the SPMA filed its unfair labor

12   practice complaint, which is still pending in front of the Public

13   Employees Relations Commission, or PERC.

14       On January 5, Your Honor, one day after our last status

15   conference, PERC issued a preliminary ruling requiring the City

16   to defend six counts, six claims, of a failure to bargain in good

17   faith.  That is the gravamen of the ULP, the unfair labor

18   practice.  The very next day this Court approved, conditionally,

19   that legislation that had been submitted in October.  The City

20   submitted the accountability legislation on June 21, and the very

21   next day -- again, these are kind of remarkable when you consider

22   the milestones of the status conferences and then rulings on the

23   ULP -- the very next day, after we had submitted that proposed

24   legislation, PERC rejected a proposal by the City to bifurcate

25   the litigation and focus first on those matters directly related

1    to police accountability.  So with regard to SPOG, that pretty

2    much encapsulates where we are with the ULP and SPMA.  But with

3    regard to SPOG, you will recall that there was a tentative

4    agreement that had been voted down by the membership before our

5    August 4th status conference.  Union leadership was replaced at

6    the same time, and bargaining has since been unproductive,

7    admittedly.  The City's labor negotiation team has made it clear

8    that the City is prepared to expedite bargaining on the

9    accountability provisions in the legislation before the Court,

10   and my hope is that the Court's approval of that legislation will

11   help allow those negotiations to pick up steam.  That hope,

12   however, has to be tempered with a comment, again, about the

13   executive order issued yesterday.

14       The City and this Court agree, Your Honor, that black lives

15   matter.  The City and this Court also agree that body cameras are

16   a fundamental tool for building and maintaining community trust

17   in law enforcement and for ensuring police accountability.  This

18   was all too clear in the aftermath of the tragic shooting of

19   Charleena Lyles, where body cameras might have provided greater

20   insights into the events which led to Ms. Lyles -- the loss of

21   Ms. Lyles' life.

22       The Executive began discussions in earnest early this year

23   with SPOG to elevate body cams as a bargaining issue, and

24   immediately following Charleena Lyles' death, we began to

25   earnestly discuss the executive order itself, and it was signed

1   yesterday by Mayor Murray.  Absent any demonstrable progress in

2   collective bargaining, Mayor Murray's order demonstrates that the

3   City recognizes its obligation to provide a foundation for

4   constitutional policing and that it will in some instances

5   require that the City act without further delay while continuing

6   to bargain those effects with the unions.

7        So, finally, Your Honor, you have asked for an update on full

8   and effective compliance with the Consent Decree.

9           THE COURT:  I have.  And let me just set the stage for

10  that.  I have been hearing rumblings for some period of time that

11  "Why don't we just declare victory and, you know, all celebrate?"

12  It's not going to happen.  I know we have had a change in

13  administration in Washington.  I understand that we're going to

14  have a change in the administration in Seattle because Mayor

15  Murray is not running for re-election.  The Court is one of the

16  few constants in this process.  I would like not to be, but I am

17  and the court is.  And, consequently, we are not going to rush to

18  just declare victory and walk away.  We have sacrificed too many

19  lives, we have sacrificed too much effort to bring us to where we

20  are now, to prematurely just say, oh, well, we have got it done,

21  let's move on.

22       The consent decree is an order of the Court.  Regardless of

23  the point of view of various parties, you know, it's under the

24  Court's control, and it's just not going to get terminated

25  because it's expedient.

1      MR. HOLMES:  Your Honor, your comments are quite helpful

2  to the parties.

3      I would remind the Court that, in August, I observed that

4  Your Honor and I were the last two signatories to the Consent

5  Decree that are still in office, and indeed, rather

6  prophetically, that has also become an issue in my own campaign.

7  So I would submit that perhaps I wasn't speaking out of school

8  there.

9      Your Honor, I don't want to belabor the points here.  I know

10 that the Court -- I share a lot of the frustrations.  I really do

11 appreciate, and I know that the City appreciates, the guidance

12 that we have received today.  That's why this status conference,

13 I think, has been singularly important.  That's why I do hope

14 that, as a result of this, we can together reassess.  We will

15 have the parties, our unions together, and assess the direction

16 that this Consent Decree is going.  I, again, share Your Honor's

17 comments, and I have the same goal, to see a reform of the very

18 culture of policing in the City of Seattle.  I have said before

19 that I personally believe this is Seattle's first, best, and

20 perhaps last opportunity to demonstrate that constitutional

21 policing can be had, and I do not want to see this opportunity

22 wasted.

23     Thank you, Your Honor.

24      THE COURT:  Thank you.

25 Mr. Diaz, I'm going to hear from Mr. Ruiz first.

1          MR. DIAZ:  Sure.

2          MR. RUIZ:  Thank you, Your Honor.

3          THE COURT:  I have been picking on him.  So I will give

4     him a chance to comment.

5          Welcome back, sir.

6          MR. RUIZ:  Thank you, Your Honor.  Good morning.  My

7     name is Isaac Ruiz.  I am one of the co-chairs of the CPC.  We

8     have several commissioners in attendance today, and that includes

9     Co-chairs Reverend Harriett Walden and Enrique Gonzalez.

10         We believe the legislation as its stands today meets the test

11    that the Court has articulated in the past.  It moves Seattle

12    toward policing, one, that complies with the constitution; two,

13    that allows police to be effective; and three, that the people of

14    the community can have confidence in.

15         THE COURT:  So let me interrupt you the same way I

16    interrupted Mr. Holmes.  How do I know that it's going to be

17    constitutional when I don't know what's going to happen with the

18    accountability phase?

19         MR. RUIZ:  You don't know right now.  And the way the

20    Court knows is as long as this Consent Decree case stays open,

21    Your Honor has jurisdiction to review the final product.

22         THE COURT:  But that puts me in the position of undoing

23    something that would be better off left to be done once and done

24    properly as opposed to being done and then putting the Court in

25    the position of saying, no, you didn't get it right, try again.

1  That's fundamentally where we are.

2      MR. RUIZ:  I think the principle is the same one that

3  Your Honor applied before, which is to give guidance, before the

4  legislation was submitted to the City Council, about whether the

5  proposal by the Mayor at the time, overall, looking at all the

6  provisions together, was consistent with the letter and the

7  spirit of the Consent Decree.  And I think Your Honor has done

8  that before, and I don't think there is a problem with doing it

9  again, when we're reminded of the fact that this Court will

10  retain jurisdiction.  So whatever the final product is, Your

11  Honor can do that same level of review, looking at the changes

12  that got made, but also looking at those changes and how they fit

13  with the global package to see whether the total accountability

14  system package accomplishes those three aims that Your Honor

15  articulated back in 2015.

16      THE COURT:  Well, there are portions of the Consent

17  Decree that I'm perfectly content with.  I mean, it's clearly a

18  work in progress.  But, I mean, we have made -- you know, the

19  use-of-force investigation, clearly something that the Court

20  considered extremely important.  A procedure is in place.  Now

21  we're monitoring the compliance with that procedure.  There was a

22  suggestion in a news story recently that somehow we were

23  participating in that, and that's not accurate, as I think

24  everyone knows.  But we do continue to review compliance with

25  those procedures.  You know, stops and detention I see

1    significant progress on.  I noticed that the Council recently,

2    you know, codified some of the bias-free policing practices.  All

3    of those are going forward because I think we know that we have

4    come up with a final product, the Court has reviewed it, now

5    they're being implemented.

6        The accountability package is different to me in that, one, I

7    think it is fundamentally important.  It's been a flashpoint for

8    a long time.  There have been improvements in it there.  I think

9    there's tremendous improvement with the inspector general notion.

10   But I don't know what's happening in this black hole over here,

11   which Mr. Holmes shined the flashlight on and said, "You don't

12   want to look."  You know, that's a problem for me.

13            MR. RUIZ:  I think we would all like to take a peek,

14   Your Honor, but we don't know what's going on there.

15            THE COURT:  And you are not supposed to, so ...

16            MR. RUIZ:  Right.

17       And I will also say that -- I want to remember that back in

18   August of 2015 Your Honor was concerned that, even though the

19   accountability legislation or accountability reforms were not

20   part of the Consent Decree in the same way that the other

21   subjects that Your Honor has just identified are, that there was

22   the potential that the accountability legislation could do things

23   that affect the Consent Decree process, and Your Honor was

24   careful to note that it wanted to look to see if anything in the

25   accountability recommendations would conflict with the Consent

 1  Decree.  And I guess what I'm saying is that that ability remains

 2  now, and it will remain at the end of collective bargaining.

 3          THE COURT:  I don't -- it is not a major point, but I

 4  think the Consent Decree speaks very clearly to supervision,

 5  which is --

 6          MR. RUIZ:  That's true, Your Honor.

 7          THE COURT:  -- another effect of accountability.

 8          MR. RUIZ:  Yeah.  And it's also true that the

 9  legislation is a key deliverable under the Consent Decree in the

10  sense that the settlement agreement assigned to the CPC

11  evaluating and making recommendations about the accountability

12  system, and the CPC did deliver that.  The City Council, through

13  the leadership of Council Member Lorena Gonzalez, delivered this

14  legislation.  They passed it unanimously.  The Mayor signed it.

15  And that's why we're here today.  We're following the process

16  that Your Honor set out for us last year.

17          And so we do ask that the Court enter an order.  What the

18  precise terms of the order are, I do not know.  But what we

19  want -- but here is what we want in non-legal terms, just opening

20  the door to move forward toward implementation.  We recognize

21  that there's a lot of work that still needs to be -- that still

22  needs to be done.  The process for appointing key accountability

23  system leaders is just now going to begin.  Budget questions

24  remain unanswered.  The old accountability system, it hasn't been

25  dismantled, but it's under a lot of stress, as Your Honor knows.

1   We have both an interim OPA director and an interim OPA auditor,

2   and meanwhile, as the Court has observed, the uncertainty of the

3   collective bargaining process is hanging over this legislation.

4   And so everyone in this courtroom knows, as Your Honor has said,

5   that it's not time to declare victory.  We cannot say, "Mission

6   accomplished."  What we want to see, and what I think the parties

7   in the case want to see, is a complete accountability system up

8   and running as soon as possible.

9       We're thinking of John T. Williams and others who should

10   still be here with us.  We are thinking of people like Reverend

11   Harriett Walden who have devoted their lives to the cause of

12   changing police culture in our city.  We are thinking of

13   Charleena Lyles and her family.

14       And our bottom line, Your Honor, is, Seattle has been

15   debating those reforms for years, and have the reforms benefited

16   from the investment and time that has been made?  Absolutely.

17   The time spent crafting, refining, and reviewing this legislation

18   is literally impossible to count.  There are a lot of people in

19   this courtroom today, who haven't been introduced to the Court,

20   who have spent thousands of hours on this legislation, and here

21   we are.  The CPC made its recommendation, the City Council

22   refined it and voted for it unanimously, the Mayor signed it, the

23   public supports it, and we hope the Court will say it can go

24   forward.  And after that, whatever needs to be done to fully

25   implement this legislation, we hope it can be done without delay.

1    Whatever obstacles stand in the way -- and there are obstacles,

2    Your Honor -- we think it's essential that those obstacles be

3    addressed through proper channels, whatever those may be, and

4    resolved as soon as possible.  And, of course, this Court

5    maintains its jurisdiction.

6        This legislation has momentum.  We can't let this moment

7    pass.  Let's get this implemented.  And we want the Court's

8    permission to move forward.

9            THE COURT:  Well, what you are going to get is, we're

10   going to start the process of identifying for the Court what are

11   the areas that are still open.  The amended legislation contains

12   provisions that I have not seen before and are going to get close

13   scrutiny.

14       I would remind you, because it sticks with me, that the

15   reason we don't have body cameras, in part, has been the

16   consistent opposition of the CPC to body cameras based on privacy

17   concerns, and now we have the Lyles shooting, and people are out

18   saying, "Well, where are the body cameras?  The police must be

19   responsible that we don't have body cameras."  I have real

20   trouble with that.

21           MR. RUIZ:  The position that the CPC took in its filing

22   regarding body cameras, Your Honor, was a revision in policy.  We

23   did not propose that the body cams not be implemented.  We

24   proposed a revision in the policy which Your Honor did not

25   accept, and that's fine.  But the CPC is not standing in the way

1    of body-camera implementation.  This is -- this is a

2    collective-bargaining issue.

3            THE COURT:  Sir, you're a recent member of the CPC.

4    There are a lot of people sitting out there in the audience who

5    have been here for a long time.  We can go back and look at the

6    record where you have been on the record as saying "Do not

7    implement body cameras because of privacy concerns."  And please

8    don't come in and say, "It's not us standing the way."  You were.

9    And now it's troublesome to me that all of a sudden we're hearing

10   it's all somebody else's fault.  This is a frustration for me.

11   And, you know, I'm not blaming you for it, but I think you need

12   to recognize you have a role in this.  You had an advisory role,

13   and your advice was "Don't do it until we can resolve these

14   issues."  You can call it a pause.  That was a convenient term to

15   use.  But that was the position you were taking in "Don't

16   implement this."

17       And I don't know if it would have made a difference.  But at

18   least I would know what happened in these instances but for a

19   number of parties who have taken the position that, you know, we

20   have too much of a privacy interest in it.  So that's my

21   rejoinder to your statement.

22           MR. RUIZ:  All right, Your Honor.  I'm not sure if

23   there's anything for me to say in response to that.

24           THE COURT:  Probably there isn't.

25           MR. RUIZ:  I mean, I have gone back and I have looked at

1  the record from before my involvement, and I do think that there

2  are important privacy concerns.

3          THE COURT:  Well, remember that lives matter also.

4          MR. RUIZ:  We know that just as well as anyone else,

5  Your Honor, and I think Your Honor knows that we know that.  We

6  take the issue very seriously.  We take the issue of marginalized

7  communities who are disproportionally affected by certain police

8  practices very seriously, and that includes body cameras.  And

9  those are some of the interests that we raised during the

10  process.

11     At this time the body-camera issue is not really the reason

12  we're here today.  What we want today is permission, Your Honor,

13  after the Court reviews the changes in the legislation, which

14  Your Honor should do, but also look at those changes and how they

15  affect the entire package, and we ask for a ruling that Your

16  Honor believes that the accountability legislation, taken as a

17  whole, is consistent with the aims of the Consent Decree.

18          THE COURT:  All right.  Thank you, sir.

19     Mr. Diaz, now you get your chance.

20          MR. DIAZ:  Thank you, Your Honor.

21     May it please the Court.  You have given us some hint at what

22  is concerning to you right now about the motion before you, and I

23  want to address that head on, but if you would indulge me for

24  20 seconds, I just want to say that on behalf of the Department

25  of Justice and the U.S. Attorney's Office here in Seattle, I want

1    to begin by recognizing the impact that the officer-involved

2    shooting death of Charleena Lyles has had on so many.  Words are

3    not up to the task at these kinds of moments, but they are what

4    we have.  I want to convey our collective, most sincere

5    condolences to Ms. Lyles' family and friends and everyone who is

6    impacted by the shooting in countless ways.

7         With that, Your Honor, your question ultimately goes to:  Why

8    am I shooting at a moving target here?

9              THE COURT:  Well, let me ask you a more fundamental

10   question.

11             MR. DIAZ:  Sure.

12             THE COURT:  And if you might want to defer this to

13   Mr. Mygatt.  Is the position of the Department of Justice that

14   the City of Seattle is in full compliance at this time?

15             MR. DIAZ:  This question -- there's a distinction that

16   has to be made before I can answer that question.  Full and

17   effective compliance is different from termination.

18             THE COURT:  I understand that.  But I want to know the

19   answer.

20             MR. DIAZ:  Yep.

21             THE COURT:  Full compliance.  I didn't ask you about

22   termination.

23             MR. DIAZ:  Yep.

24        Full and effective compliance, as we define it, is a process,

25   and that process was started in September of 2015 with a

1    three-year monitoring plan laying out a series of systemic

2    assessments that the monitoring team and the DOJ together and

3    collaboratively engaged in over a year and a half.  That process

4    was to cover every aspect of the Consent Decree.  And that's what

5    was stated in the monitoring reports, and that's the position we

6    took.  We are now done, at the end of that.  We are -- the SPD is

7    ten for ten at this point.  They didn't pass a couple of them.

8    They've remediated, and they're now back.

9        But right now the question is, what's next?  Are we in a

10   position to declare full and effective compliance?  Not

11   termination, but full and effective compliance with the terms of

12   the Consent Decree.  And that's a conversation I prefer -- and

13   Mr. Mygatt would say the same thing -- that's a conversation that

14   we're going to have with the monitoring team, with the City, as

15   early as tomorrow, and the monitoring team is going to file

16   something on August 10th which gives its views, and it will give

17   us the opportunity to brief-up our position on whether or not

18   they are presently in full and effective compliance.

19           THE COURT:  I think you need to be careful.  You

20   inadvertently suggested that you were going to have -- your

21   interpretation of the Consent Decree was the terms of the Consent

22   Decree, and those are two quite different subjects.

23       I'm going to re-ask my question --

24           MR. DIAZ:  Sure.

25           THE COURT:  -- which is, because I think the public is

1   entitled to know, we have heard, based on sort of national-policy

2   statements from the Attorney General and others, that, you know,

3   consent decrees bind the police in an unnecessary way.  There's a

4   Consent Decree that's in place here.  Is it the position of the

5   Department of Justice that this Consent Decree should be

6   terminated?

7           MR. DIAZ:  No.

8           THE COURT:  All right.

9           MR. DIAZ:  That's not our position.  Definitively, it's

10  not our position.

11          THE COURT:  I mean, I don't see how you can reach any

12  other conclusion given the -- I mean, I have the view that there

13  is no perfect police force.  That when we have citizens who we

14  ask to protect us and we give them weapons and they go out into

15  dangerous situations, that there's a possibility -- I stress the

16  "possibility" -- that tragedies can occur.  We train to avoid

17  that situation.  That doesn't extinguish the possibility.

18      But on the other hand, I want to ensure that, you know, the

19  Seattle Police Department is a model of doing it right.  And

20  events of the last couple of months suggest we have still got a

21  ways to go.  And this discussion of, "well, you know, we're ten

22  out of ten," or "we're almost there," it belies the fact that we

23  continue to have these incidents, and we need to learn from them.

24  You know, are we conducting the use-of-force investigation in

25  regards to the Lyles shooting in a proper manner?  That's the

 1    role of the Monitor, that's the role of the Court.  We don't do

 2    the investigation.  We make sure that it's done in accordance

 3    with the policies that are in place.

 4         And, you know, I'm troubled with this notion that all of a

 5    sudden the whole discussion is full and effective compliance and

 6    a two-year waiting period and then termination.  That sounds to

 7    me like a rush, and I'm not going to permit a rush to

 8    termination.

 9         And you've answered this question.  That is my rejoinder to

10    it.

11         MR. DIAZ:  Okay.  Thank you, Your Honor.

12         I mean, we agree with -- as we have discussed this internally

13    a lot -- we agree with what you're saying.  We are not -- no one

14    is walking away, no one is rushing.  There's just a

15    procedural-and-a-Consent-Decree-based conversation that we have

16    to have with the City and with the monitoring team to see where

17    we are now given the ten systemic assessments that have been

18    completed to date and where we go based upon the Consent Decree.

19         I did want to turn --

20         THE COURT:  Let me ask you one other question.

21         MR. DIAZ:  Sure.

22         THE COURT:  How do you propose we conduct a full

23    compliance review of accountability when we don't know what

24    accountability is yet?

25         MR. DIAZ:  Right.  And that's the question I wanted to

1    turn to, Your Honor.

2         I think our answer is that -- the short answer is any changes

3    to the legislation or any changes to the legislation that affect

4    potentially the Consent Decree are going to be brought before the

5    Court.  We're grounded in the Consent Decree.  And we look at

6    paragraphs 226 and 227 to guide this.  There's a process in

7    there.  In 227, there is a notice requirement.  When the City

8    determines that something has become, quote/unquote "subject to

9    collective bargaining," they are required to notify the

10   Department of Justice.  In turn, the Department of Justice is

11   obligated by the Consent Decree Your Honor signed to then seek,

12   quote/unquote, "alternate means ... if necessary."  Right?  And

13   so there's going to be a notice when Mr. Holmes and the City,

14   whatever point in the process they reach that they've determined,

15   or the PERC has determined, the Public Employment Relations

16   Commission determines, that the issues in the accountability

17   legislation are subject to collective bargaining, there's going

18   to be a requirement to provide us notice, and then there's a

19   requirement on us to work through that.  And so anything --

20   again, to repeat the short answer, anything that changes the

21   legislation is going to come back through this Court after notice

22   and a meet-and-confer between the parties.

23        So, yes, there might be a third bite at the apple,

24   unfortunately, Your Honor, but there might not be.  We just don't

25   know that right now.

1     But what I can say -- and I think this is really important --
2  because it's our understanding that, at present, based upon the
3  SPMA's, the management association's ULP, their unfair labor
4  practice, that none of the reforms implemented pursuant to the
5  specific terms of the Consent Decree are being prevented from
6  being implemented because the City -- we're just going off
7  information that we have gotten from the City, and it's publicly
8  available -- is that the PERC has determined that any challenge
9  to any action that the City took before April 2016 is time
10  barred.  They didn't bring a ULP timely.  They can only go back
11  six months.
12     What that means for us, I think, Your Honor, and it should
13  give you some comfort, is that all the policies, all the
14  training, all the structure that we have set up and the Court has
15  approved, including the FIT, the Force Investigation Team; the
16  FRB, the Force Review Board; the CIT program in whole; the
17  Community Police Commission; the CIC, they are continuing to be
18  implemented and are protected from this unfair labor practice
19  complaint because all of that stuff occurred before April 2016.
20     So I think we're going to have a chance at the appropriate
21  time, after notice and after a meet-and-confer, to see if there's
22  anything else post-April 16th that might be subject to collective
23  bargaining, and then we will come back to the Court.  I don't
24  know if that's helpful, Your Honor.
25          THE COURT:  It's helpful.  It restates what I probably

1    inarticulately stated, which is, it seems to me we have made new

2    progress in a lot of areas and we have implemented.  And as far

3    as I know -- I'm not privy to the challenges, but I have not seen

4    any challenges other than these, what's called in this Consent

5    Decree, "supervision" and which we have taken to calling

6    "accountability."  And in that, there's lots of questions.

7              MR. DIAZ:  Uh-huh.

8              THE COURT:  Unfortunately, that accountability aspect

9    sweeps broadly, and it picks up something as, you know,

10   non-accountability-related as body cameras.

11             MR. DIAZ:  Uh-huh.

12             THE COURT:  And that's exactly the kind of situation

13   that I'm worried about is, what else is out there.  I mean, are

14   we going to have an objection to the inspector-general process?

15   Which the Court fully supports, and as far as I know the parties

16   fully support.

17             MR. DIAZ:  Uh-huh.

18             THE COURT:  So that's -- you know, that's what my

19   concern is.  I agree with you that we're dealing with a distinct

20   in-play portion.  There are other aspects of this where we are

21   simply monitoring to make sure that we're in compliance.

22             MR. DIAZ:  Uh-huh.

23             THE COURT:  And once we have determined that there is

24   compliance, then, you know, I'm happy to say, you know, we are

25   now seven-tenths of the way there.  But I want to make sure that

1  when we get there we have the entire interrelated processes all

2  working together.  And that's where I am today.  And I lack that

3  sense of certainty that we're doing that because of activities

4  that are outside the purview of the Court.

5          MR. DIAZ:  Yep.

6      And just a few more specific points, Your Honor.  We don't

7  object to what your next immediate step is, which is, you know,

8  taking a look at -- you have asked Mr. Holmes for the list

9  referenced in Footnote 78, which I appreciate that you have read

10  up to Footnote 78.  But in going through that process,

11  identifying what's in and what's out and what still could be

12  changed, but at the end of the day, I think a couple of points:

13  Again, we're going to have another bite at this apple, if there

14  are changes, if there is anything.  And, second, you know, the

15  accountability stuff, to the extent we can start dividing it up,

16  there is some stuff in the accountability of the legislation

17  which is just codifying the policies and training that we have

18  here developed together.  That stuff should be unobjectionable.

19  There's other stuff that is new, and we will have to see how that

20  affects the overall structure.

21      But at the end of the day, Your Honor, part of this is --

22  this isn't the first time we have taken together this sort of

23  leap of faith.  When you approved the Force Review Board, for

24  example, we didn't know how exactly that was going to work.  We

25  had -- there are a million minor questions that don't go to the

1   core of it, but that have to be answered through practice, and

2   we, with the monitoring team, with Mr. Ehrlichman, at the Force

3   Review Board, we worked through all of those processes together

4   in realtime.  When an issue came up, we would then -- and it

5   required a policy change, we would come before you and say,

6   "Look, here is a material change to the Force Review Board that

7   you approved.  We need to change this.  Does this look okay?"

8   and we would argue about it.  Sometimes we would debate with the

9   CPC about it.  Sometimes we would debate with the City about it.

10  But at the end of the day, we would come to you again.  And

11  learning through practice, I think is -- as I think -- it

12  wouldn't be the first time we did that in this case.

13       With that, Your Honor, I think I've addressed the topics that

14  you wished to address.  If you have no further questions, that's

15  all.

16            THE COURT:  What is the impact if the Court withholds

17  approval until after the collective bargaining agreement is

18  finalized or negotiates -- collective bargaining negotiations?

19            MR. DIAZ:  It depends.  I think -- these are my -- I'm

20  not an expert in this area.  I mean, again, our focus has only

21  been:  Is this in conflict with the terms and purposes of the

22  Consent Decree?  That was the assignment given to us, "Give us

23  DOJ's opinion on this."  So I'm not an expert.

24       My understanding is, that depends -- the impact would depend

25  on how broad that order is.  Are we stopping everything related

1    to the accountability legislation, or are we stopping only those

2    things that could impact the Consent Decree?  I mean, like I

3    said, codifying certain things, things that are clearly not

4    related to the Consent Decree, it would put a pause and we would

5    lose momentum, I think, a little bit, in having at least some

6    processes go forward.

7             THE COURT:  You are beginning to sound like an NFL

8    announcer on this "momentum" question.

9       I mean, this is of such significance that I'm not concerned

10   we're going to lose momentum.

11            MR. DIAZ:  Yeah.

12            THE COURT:  And we need only look at the issues that

13   have arisen in the last bit to understand that the public is not

14   going to lose interest in this.  I mean, they ultimately are the,

15   you know, the reason that we're here.

16            MR. DIAZ:  Uh-huh.

17            THE COURT:  So I'm less troubled by the losing of

18   momentum than I am doing something in some rush to achieve

19   momentum that we ultimately have to go back and undo.

20            MR. DIAZ:  Uh-huh.

21       I mean, at the end of the day, Your Honor -- and this will be

22   my final comment on your question -- at the end of the day, it

23   kind of goes back to, "What is our role here?" both DOJ's and I

24   think the Court's.  And I think it's to implement your Court

25   order here.  And the question is, does the accountability

 1   legislation impact the Court order significantly enough to delay

 2   it or to take our time, wait for collective bargaining?  Which,

 3   again, it's a black box; we're not part of that.  And for us,

 4   again, we're taking a narrow focus -- whether it was the last

 5   administration or this administration, it's a narrow focus on

 6   this Consent Decree -- is this going to violate the terms and

 7   purposes of the Consent Decree?  We don't see the legislation, as

 8   written, doing that, and that's why we're supportive of it.

 9            THE COURT:  All right.  Thank you.

10            MR. DIAZ:  Thank you, Your Honor.

11            THE COURT:  Counsel, I think over the course of a period

12   of time with the parties, I've explained everything that I'm

13   interested in.

14       Mr. Holmes, I will look forward to receiving your list.  And

15   to the extent that we look at it and conduct some negotiations,

16   which we do at least consultations with the parties, we may be

17   able to come up with a list of provisions in the ordinance that

18   can go forward.  I'm happy to do that.  And that seems to me that

19   we'll -- that's about as far as we can go at this time.

20            MR. HOLMES:  Thank you, Your Honor.

21            THE COURT:  Mr. Ruiz, anything further?

22            MR. RUIZ:  No.  Thank you, Your Honor.

23            THE COURT:  All right.

24       Mr. Holmes.

25            MR. HOLMES:  No, Your Honor.  Thank you.

1      We are meeting hopefully tomorrow with the United States, and

2    we will prioritize this list that the Court has requested.

3           THE COURT:  Mr. Diaz?

4           MR. DIAZ:  Nothing further, Your Honor.

5           THE COURT:  All right.  Then we will be in recess.

6    Thank you, counsel.

7                    (Proceedings adjourned.)

8

9                  C E R T I F I C A T E

10

11      I, Nickoline M. Drury, RMR, CRR, Court Reporter for the

12   United States District Court in the Western District of

13   Washington at Seattle, do certify that the foregoing pages are a

14   true and accurate transcription of the proceedings to the best of

15   my ability.

16

17

18                   /s/ Nickoline Drury

19                    Nickoline Drury

20

21

22

23

24

25