HONORABLE JAMES L. ROBART

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                                 Plaintiff,<br><br>              vs.<br><br>CITY OF SEATTLE,<br><br>                                 Defendant. | Case No.  12-cv-1282-JLR<br><br>**MONITOR'S COMPLIANCE STATUS REPORT** |

Pursuant to the terms of the current Monitoring Plan, the Monitoring Team provides the Court with this update on the progress of the Seattle Police Department ("SPD" or the "Department") and the City of Seattle (the "City") in complying with the terms of the Consent Decree between the City and the United States.

In general, the Monitoring Team notes that the SPD continues to progress toward effective implementation of the letter and spirit of the Consent Decree. The progress to date constitutes a significant success that has many parents, including the rank-and-file of the SPD; Kathleen O'Toole, the Chief of Police; Mayor Ed Murray; Pete Holmes, the City Attorney; City Council persons; DOJ at the local and national levels; and community members throughout Seattle who have been involved in the reform process and providing support and good counsel to the Monitoring Team.

**MERRICK J. BOBB, MONITOR**
Police Assessment Resource Center
P.O. Box 27445
Los Angeles, CA 90027
(213) 623-5757

I.  **TERMS RELATING TO COMPLIANCE WITH THE CONSENT DECREE**

A.  **"Full and Effective Compliance"**

Paragraph 182 of the Consent Decree requires that the City "demonstrate 'full and effective compliance' with the terms of this Agreement." Dkt. 3-1 ¶ 182. The Decree defines "full and effective compliance" as follows:

> 'Full and effective compliance' with a material requirement of the Settlement Agreement requires that the City and SPD have: (a) incorporated the requirement into policy; (b) trained all relevant personnel as necessary to fulfill their responsibilities pursuant to the requirement; and (c) ensured that the requirement is being carried out in practice.

*Id.* ¶ 184.

One cannot unscramble an egg or turn a cake back to its original ingredients. Thus, the nub of the question is whether various Consent Decree and Court-ordered reforms have been "baked in" and are resulting consistently and predictably in constitutional policing. It has been the Monitoring Team's view since the beginning that "full and effective compliance" does not mean perfection has been reached or that all of SPD's problems are solved. It is a working milestone— which is precisely why such compliance, once reached, continues to be actively monitored by the Court and Monitor and needs to be maintained for at least two, continuous years thereafter. The Monitor's obligation is to make that monitoring as robust, substantive, and probing as possible. The monitoring will have real teeth. If substantial noncompliance occurs during that period, the Monitor will so inform the Court and, if the Court agrees, the two-year clock will be reset anew from whenever the SPD again reaches full and effective compliance. The term "substantial compliance," although not appearing in the Consent Decree, is the same as "full and effective compliance." Because it is this Court's prerogative to determine full and effective compliance, the Monitoring Team will refrain from using that phrase in this report in order to

**MERRICK J. BOBB, MONITOR**
Police Assessment Resource Center
P.O. Box 27445
Los Angeles, CA 90027
(213) 623-5757

1  respect the clear line of authority between the Court and its agent, the Monitor.

2  **B.      "Initial Compliance"**

3     The term "initial compliance" does not appear in the Consent Decree. The Monitor's

4  First Systemic Assessment defined "initial compliance":

5     [T]he Monitor's determination of 'initial compliance' in a given area or for
6     particular Consent Decree provisions means that SPD's performance overall a
       material time period and across incidents suggests that the Department has reached
       a level of performance in that defined area that is consistent with complying with
7     the terms of the Court-enforced Settlement Agreement.

8  Dkt. 231 at 6.

9  **II.     PROGRESS MADE TO DATE**

10    Since September 2015, the Monitoring Team has submitted ten systemic assessments that

11  sought to evaluate and analyze SPD's progress across the major subject matters and areas of reform

12  that the Consent Decree requires. The ten assessments, all clearly important, nevertheless do not

13  constitute all the requirements of the Consent Decree. The assessments found the SPD in initial

14  compliance with more to be done in various areas. This section briefly summarizes the findings

15  of each of those assessments and outlines, now that all assessments have been completed and a

16  fuller view of where SPD is with respect to the whole of the Decree has emerged, what the Monitor

17  believes should happen next.

18    **A.   Force Reporting, Investigation & Review (First & Seventh Systemic Assessments)**

19    The First Systemic Assessment focused on SPD's reporting, investigation, and review of

20  officer force. It found that, across all types of force incidents, officers are now routinely reporting

21  force to supervisors, supervisors are responding to the scene and adequately executing their on-

22  scene responsibilities in most cases, and officers are documenting information about the force they

23  use. In the Monitor's view, **the reporting and response to force are in initial compliance with**

MONITOR'S COMPLIANCE STATUS REPORT  - 3
Case No. 12-cv-1282-JLR

paragraphs 100, 101, 102, and 103 of the Consent Decree and are now at the point that the Court could consider as adequate the progress with respect to those paragraphs after completion of the outstanding elements described below.

The Assessment explored the performance of SPD's Force Investigation Team ("FIT"), which primarily investigates more-significant Type III force. The Monitor concluded that FIT's investigations cover all relevant investigative lines of inquiry, probing important issues, and attempting to resolve inconsistencies among statements and evidence. In multiple instances, Monitoring Team reviewers saw the quality of SPD's force response and investigation improve immediately upon FIT's arrival at the scene or starting investigation. In the Monitor's view, **the quality and integrity of FIT investigations were consistent with the requirements of paragraphs 112, 113, 114, 117, and 118 of the Consent Decree and demonstrated initial compliance with those provisions. The Court could consider as adequate the progress with respect to those paragraphs after completion of the outstanding elements described below.**

For intermediate-level, Type II force, the investigation of the force incident is conducted by a sergeant and reviewed by the chain of command. The First Systemic Assessment (September 2015) found that sergeant investigations of Type II force were not yet where they needed to be, with too many investigations failing to be as comprehensive, complete, fair, thorough, and objective as they must be. At the same time, it appeared that lieutenants and captains were not yet identifying and addressing those deficiencies in sergeant investigations.

In the Seventh Systemic Assessment (January 2017), the Monitor presented a follow-up assessment on Type II force investigations, which evaluated more recent Type II force investigations and review. The Monitor found that sergeants were appropriately responding to the scene of Type II incidents. They were similarly complying with additional responsibilities,

MERRICK J. BOBB, MONITOR
Police Assessment Resource Center
P.O. Box 27445
Los Angeles, CA 90027
(213) 623-5757

including examining the subject for injury and summoning medical aid where necessary, when they responded. And with respect to sergeants' subsequent investigation of Type II force and related reports, the Monitor found noticeable improvement since the initial assessment.

Given the short timeframe (of three months and 27 cases) evaluated for the follow-up assessment, the Monitor strongly commend SPD's proactive steps to bring in administrative lieutenants to improve and hopefully cure deficiencies in the precinct-level investigations. In recognition of SPD's "proactivity" in this regard, and with confidence in SPD's reporting, investigation, and review of lower-level Type I force, **the Monitor found SPD in initial compliance with Paragraphs 103–111 of the Consent Decree with respect to Type II force investigation and review, and the Court could consider as adequate the progress under those paragraphs subject to the Monitor finding that the administrative lieutenants are in fact curing deficiencies in precinct-level investigations.**

### B.   Force Review Board (Second Systemic Assessment)

In the Second Systemic Assessment (November 2015), the Monitor reviewed all cases that came before the Force Review Board between June 2 and August 25, 2015. The review found the FRB functioning well and, in a great majority of instances, as the Department's hub of internal accountability, analysis, and continual improvement with respect to force. It found the Board understanding and embracing its role as the key forum for "internal innovation and critical analysis" of force. The FRB was also regularly exploring important issues going well beyond whether an involved officer's use of force was consistent or inconsistent with SPD policy, and instead considering what the force incidents can teach the Department and its officers about training, tactics, procedure, and policy.

The Monitor lauded the many cases that were handled adequately or better. In more than

**MERRICK J. BOBB, MONITOR**
Police Assessment Resource Center
P.O. Box 27445
Los Angeles, CA 90027
(213) 623-5757

half (56 percent) of cases, the FRB found that an officer may have violated an SPD policy—either related to force (in nearly 13 percent of cases brought before the Board and nearly nine percent of officers) or to some other issue (in the remainder of cases).  Especially given that between 2009 and 2011, only 0.4 percent of cases received any significant chain of command scrutiny whatsoever,[1] it was a praiseworthy advance in accountability that SPD, through its FRB, has become far more comfortable with critically analyzing and scrutinizing officer use of force and holding officers accountable for their performance during incidents involving force.  As such, **the Monitor found the FRB's performance in initial compliance with paragraphs 119 to 125 of the Consent Decree.  The Court could consider as adequate the progress with respect to those paragraphs after completion of the outstanding elements described below.**

Specifically, the Second Systemic Assessment specifically outlined some areas in which the Monitor would be looking to see additional progress.  First, it observed that SPD's the chain of command had determined that use of force was inconsistent with Department policy in only two percent of cases.  However, the Board found that officers engaged in possible misconduct in 56 percent of instances, which related to use of force itself in approximately 40 percent of the cases.  This resulted in OPA referrals for 22 of the 140 (16 percent of) officers involved in the 55 incidents reviewed.  Although final determination of a policy violation rests with OPA, the fact that the Board identified possible violations of the use of force policy in significantly more cases than the chain of command is and remains concerning to the Monitor.  The Monitor noted that the Department will need to hold the chain of accountable for reconciling this disparity, as the Board cannot be, and is not designed to be, the sole entity within the organization to identify potential misconduct.  Accountability and discipline constitute unfinished business and need to be

---

[1] *See* Findings Letter at 21.

MONITOR'S COMPLIANCE STATUS REPORT  - 6
Case No.  12-cv-1282-JLR

MERRICK J. BOBB, MONITOR
Police Assessment Resource Center
P.O. Box 27445
Los Angeles, CA 90027
(213) 623-5757

addressed, in the Monitoring Team's view, prior to this Court's ruling overall that the SPD is in full and effective compliance.[2]

Second, the Monitor observed that the extent to which the Department follows up on FRB referrals of issues to the Policy, Training, or other sections is irregular and imprecise, at best. For FRB to continue to drive change within SPD, the Department must take its recommendations seriously, and address them quickly and urgently.

With respect to both areas, the Monitor recommends that the Court seek the Monitor's investigation and assurance that the chain of command has, since November 2015, identified more policy violations where they exist and that the Department is addressing and incorporating lessons learned from FRB review of force cases in a more systematic and systemic manner.

## C. Community Confidence (Third Systemic Assessment)

One primary benefit from reform of the SPD is a stronger, more trusting relationship with the Seattle community. Indeed, ensuring that policing "complies with the Constitution . . . , effectively ensures public and officer safety, and promotes public confidence in the [SPD] and its officers" is the tri-partite goal of the Consent Decree. Dkt. 3-1 at 5; Dkt. 113.

The Monitor has assessed public trust in the SPD through quantitative surveys of public confidence in the SPD (in September 2013, September 2015, and October 2016, respectively), and (2) a qualitative assessment of SPD's efforts to build public confidence with the community—the result of interviewing SPD personnel; reviewing numerous documents and reports created by the SPD, CPC, and other governmental and community organizations; and interviewing Seattle's community members—the Third Systemic Assessment (January 2016). In that Assessment, the Monitor did not determine compliance with specific requirements under the Consent Decree.

---

[2] The Monitoring Team understands that some of the Parties believe that full and substantial compliance has already been reached. The Court will decide the issue.

MERRICK J. BOBB, MONITOR
Police Assessment Resource Center
P.O. Box 27445
Los Angeles, CA 90027
(213) 623-5757

Instead, the Monitor surveyed the many areas, initiatives, programs, and general characteristics commonly associated with community policing and public confidence in law enforcement—and evaluated SPD's progress with respect to each of them.

Specifically, the Monitor found that, since the start of the Consent Decree, the SPD had engaged in important and appropriate efforts to recalibrate and reset its relationship with Seattle's diverse communities. Many best practices in community policing were being addressed and implemented by the SPD and its command staff. Chief O'Toole and her command staff have been shifting the focus of the Department to a more community-oriented policing approach. These efforts are deservedly receiving national attention and praise.

The Assessment noted that Chief O'Toole's prioritization of community policing has been apparent in tangible and operational ways. All precincts have been required to develop and are implementing micro-community or neighborhood policing plans; training around bias-free policing and de-escalation tactics is provided to lay the ground work for more respectful front-line encounters; and new or strengthened structures and systems are in place to improve partnerships with the community and other governmental organizations to promote an organizational commitment to a culture of collaboration and problem-solving.

SPD has also advanced another basic strategy for fostering trust and improving collaboration: directly engaging officers with community members to address ongoing neighborhood concerns. Specifically, SPD made precinct commanders and their staff responsible for engaging the community on an ongoing basis around identifying and addressing the problems prioritized by the community, and assigned specific officers to engage with targeted parts of the community (*e.g.*, LGBTQ, youth) to address specific issues. Thus, it appears that overall structural reforms and efforts of the Department with respect to improving community perception of the

MONITOR'S COMPLIANCE STATUS REPORT  - 8
Case No.  12-cv-1282-JLR

1   SPD are on the right track.

2        The Monitor indicated that SPD's efforts to date are the start to establishing an

3   organizational culture capable of building and sustaining trust with the community.  Perhaps most

4   critically, it appears that SPD has not yet benefitted from an overall strategy to engage certain

5   individuals within some historically under-represented portions of the Seattle community—

6   including those who are isolated from governmental organizations and systems; who do not attend

7   meetings; or who are often involved in police contacts on the street and feel disrespected or

8   victimized by the police.  We refer to these under-represented groups as "isolated communities."

9   According to at least some individuals and community representatives, this may include

10  individuals within some portions of the African, African-American, Hispanic and Latino, Native

11  American, Asian-American, refugee, and immigrant communities—as well as some who are

12  young, experiencing mental illness or substance abuse challenges, veterans, navigating re-entry

13  from prison or the correctional system, and others.

14       During the Monitor's qualitative evaluation process, some community members reported

15  that little had changed over the past few years regarding officers gaining the trust of portions of

16  these isolated communities.  In particular, some noted that harassment and disrespect are still

17  common; that officers show a lack of cultural understanding; and, perhaps most importantly, that

18  there is no mechanism in place for these isolated communities to voice their concerns or see the

19  SPD attempt to address them.  The Monitor heard the concerns of individuals with movements

20  such as Black Lives Matter who believe that SPD, like police agencies across the country, continue

21  a history of violence, disrespect, or apathy against individuals in some communities.  Indeed, the

22  Monitor's quantitative surveys have found that, while there has been some improvement in

23  perceptions of the SPD in the African-American community, there is more hard work to be done

MERRICK J. BOBB, MONITOR
Police Assessment Resource Center
P.O. Box 27445
Los Angeles, CA 90027
(213) 623-5757

in improving and strengthening the relationship.

In interviews with SPD members, officers felt community relations were generally solid and positive.  The Monitoring Team did not see or hear sustained awareness on the part of many in the SPD that certain portions of the community have in fact felt that little has changed.  At higher levels, the SPD has attempted to articulate a more comprehensive strategy, coordinate its myriad community outreach efforts, and include efforts to reach all parts of the community.  It indicates that it has been, and will continue, to reach out to communities and community organizations that feel excluded, victimized, injured, or aggrieved by SPD—even when those groups may, at times and in a number of instances understandably, be skeptical, uncomfortable, or resistant to doing so.

The Monitor found that SPD and the City of Seattle must commit to seeking out, listening to, and engaging with those who may not attend community meetings, may not be part of formal community or advocacy organizations, and may know little about the day-to-day activities of the Department or the police reform process. The Department and other stakeholders must ensure that it has mechanisms in place to incorporate the values, experiences, interests, and histories not just of those who have the ability, resources, or inclination to be formally involved in police reform and accountability issues, but also of those who are directly impacted by policing in Seattle.

Finally, the Monitor recommended that SPD expand its community engagement strategies to ensure inclusion, across Seattle's diverse communities, of those more isolated populations; provide a feedback loop for their input; and demonstrate that the diverse voices of the community are being heard.

As detailed further below, the Monitor will continue to assess the effects, if any, to the relationship between the community, particularly the African-American, and the SPD of the Charleena Lyles shooting.  We single out for praise Chief O'Toole's transparency and her

MONITOR'S COMPLIANCE STATUS REPORT  - 10
Case No.  12-cv-1282-JLR

commitment to improve SPD's relationship with Seattle's isolated communities, including the East African and Muslim communities.

### D.  Office of Professional Accountability (Fourth Systemic Assessment)

The civilian-led OPA conducts the Department's complaint-driven administrative investigations of officer misconduct.  In the Fourth Systemic Assessment (January 2016), the Monitor evaluated whether OPA investigations were conducted consistent with the requirements of the operative 2014 OPA Manual and SPD's policies on reporting officer misconduct to OPA. There were three key areas of focus: (1) the strength of the design of the process and protocols; (2) the strength of the adjudication/review phase; and (3) the strength of the investigations themselves.

First, the Monitor found the design of SPD's complaint investigation process exceptionally strong and well structured.  The process requires extensive documentation and redundancy from intake to follow-up to case summary to case completion, some of which have clear, required timelines.  The investigative components were seemingly designed as an integrated system to produce a product that is thorough, accurate and conclusive, all by following a series of standard and reasonable steps. Internal and external transparency is now built into the structure by requiring a series of email notifications at various intervals, and opening and closing correspondences to complainants, officers, chain of command and the police union, thereby keeping everyone apprised. It is possible, however, for contacts to be documented better and for communications to be even clearer.

Another important advance from DOJ's investigation in 2011, which found OPA's then classification and findings systems so complex that they damaged OPA's credibility and undermined public confidence in OPA, is the now streamlined findings and classifications system.

MERRICK J. BOBB, MONITOR
Police Assessment Resource Center
P.O. Box 27445
Los Angeles, CA 90027
(213) 623-5757

As to the strength of the adjudication/review component, the Monitor found the "back-end" review phase extremely strong. The Director's Certification Memo ("DCM") routinely closely examined all evidence and testimony for every single allegation in the complaint investigation, listing SPD policies and procedures as review standards directly in the adjudication document.[3] The focal point of the DCM is to rationally weigh the strength of the evidence, veracity of testimony and reasonableness of decisions made and actions taken. This, too, was an important advance from DOJ's investigation in 2011, which found that OPA's overuse and misuse of the now-defunct finding "Supervisory Intervention," improperly disposed of allegations as serious as excessive use of force and discriminatory policing simply to avoid the "stigma" of a formal finding.

As to the strength of the investigations, the Monitor found that, although the quality of the great majority of OPA's investigations was generally satisfactory or better, OPA should make certain targeted changes to its operations, and formalize the same in a revised OPA Manual, before it could be considered in practice as the "backstop" to the failures of any other part of the accountability system, including the direct supervisory review process.[4]

The Monitor also identified some areas for additional improvement, which fell into three major areas: (1) the quality and consistency of interviews; (2) the timeliness of the interviews; and (3) investigations raising potential criminal or terminable offenses (such as false statements). First, the biggest "wild card" with respect to the quality of OPA investigations was the appropriateness, strength, and thoroughness of the interviews. OPA investigators derived their questions from a structured format, which guided the questioning of the interviewees and which

---

[3] *See* Judge Anne Levinson, "Semi-Annual Report of the Independent Auditor for the City of Seattle Office of Professional Accountability: December, 2010 – May, 2011" (June 21, 2011) at 16, http://www.seattle.gov/Documents/Departments/OPA/Auditor/AuditorReportDec10May11.pdf.

[4] Findings Letter at 24.

**MERRICK J. BOBB, MONITOR**
Police Assessment Resource Center
P.O. Box 27445
Los Angeles, CA 90027
(213) 623-5757

could easily (and should) be audited for accuracy simply by reviewing the transcripts.  There were also case follow-up forms and case summaries to ensure consistency, both within the case itself and from case to case.  Nonetheless, the Monitoring Team identified deficiencies related to interviews of involved officers, witness officers, and civilian witnesses.  In officer interviews, Monitoring Team reviewers sometimes observed leading, biased, or otherwise inappropriate questioning.  The Monitor was troubled by the obligation of OPA, when requested, to allow more senior supervisors and members of the command staff to send answers to written questionnaires rather than sitting for in-person interviews.

The second area of concern related to OPA timeliness.  After 180 days from the initiation of a complaint investigation, any findings cannot form the basis of discipline.  In a full one-fourth of OPA cases, the unit did not meet the well-known, 180-day deadline.  Accordingly, in these cases, officers would not serve discipline even if the Chief determined that they should. The Monitor recognized that, in some cases, OPA's failure to meet the 180-day deadline can be attributed to limitations on resources, thus resulting in a determination made by the agency to de-prioritize cases in which a sustained finding is unlikely based on the complaint and initial investigation.

Third, some investigations involved or raised potential criminal allegations of sworn and civilian personnel.  In those instances, OPA addressed less than it could and should have on issues that came to light during the context of the criminal investigation.  For instance, it did very little with an officer who admittedly provided false and misleading statements—a terminable offense. The issue was either never addressed or framed with insufficient flexibility to sweep it into the investigation.  OPA should be more comfortable to reach its own, independent conclusions about officer performance, regardless of whether a criminal investigation related to the same underlying

MERRICK J. BOBB, MONITOR
Police Assessment Resource Center
P.O. Box 27445
Los Angeles, CA 90027
(213) 623-5757

facts is also conducted.

The Fourth Systemic Assessment emphasized the important roles of the OPA Director. The crucial preliminary review and classification process appears to be strong, working well, and producing fair results.  In the vast majority of cases, all appropriate allegations were identified. In an even greater percent of cases, the classification appeared appropriate given the facts raised in the complainant's preliminary interview.  The preliminary contacts with complainants appeared, on the whole, to be generally thorough and unbiased.  Also in the great majority of cases, reasonable steps were taken to gather evidence and documents.  However, it is important to continue to work to ensure that the feedback loop is closed and recommendations made to the system are, in fact, acted upon.  This will ensure that OPA investigations continue improving and OPA ever more independent.  When that is done, **the court could consider as adequate the progress with respect to OPA, assuming that a new OPA Director and Inspector General are selected who meet this Court's standards of independence from the police, community and community groups, and Seattle's executive and legislative branches.**

**E.  Crisis Intervention (Fifth Systemic Assessment) & the Intersection with Use of Force (Ninth Systemic Assessment)**

The Fifth Systemic Assessment found SPD in initial compliance with paragraphs 130 through 137 addressing crisis intervention after considering more than 2,500 crisis incidents that occurred in 2015. The Ninth Systemic Assessment found it in initial compliance with paragraphs 69-90 addressing officer use of force after evaluating a sizable, statistically-significant sample of all force used by all SPD officers over the 28-month period of July 2014 through October 2016.

However, although each assessment did consider a number of incidents involving subjects experiencing a crisis, neither assessment systematically looked — by evaluating a statistically-significant sub-sample — at SPD's use of force on individuals experiencing a mental or behavioral

**MERRICK J. BOBB, MONITOR**
Police Assessment Resource Center
P.O. Box 27445
Los Angeles, CA 90027
(213) 623-5757

crisis.  In light of the centrality of the intersection between crisis intervention and use of force issues to the DOJ's 2011 investigation,  the Consent Decree, and the recent attention to the shooting of Charleena Lyles, the Monitoring Team and Parties will focus on officer response to individuals in crisis with special emphasis on the use of force.  This will allow the Court and Monitor to understand if, regardless of what transpired in the Lyles incident, any issues present in that incident are indicative of systemic issues.  **It is now at or near the point that the Court could consider as adequate the progress with paragraphs 130 through 137, subject to the completion of a further inquiry into SPD's performance across incidents with respect to the use of force in incidents involving subjects experiencing a behavioral crisis.**

### F.  Supervision (Sixth Systemic Assessment)

In the Sixth Systemic Assessment (December 2016), the Monitor assessed how effectively SPD has implemented the supervision-related provisions of the Consent Decree between June 2014 and September 2016.  Using a variety of methodologies, the Monitor found the Department in initial compliance with paragraphs 153 through 156 of the Consent Decree, subject to two important conditions.  The first was improvement in the supervisory review of Type II force cases, which the Seventh Systemic Assessment certified.  The second was the finding that supervisors were sufficiently flagging incomplete stop documentation or inappropriate stop activity, which the Tenth Systemic Assessment certified.  **It is now at the point that the Court could consider as adequate the progress with paragraphs 153 through 156 of the Consent Decree.**

### F.  Early Intervention System (Eighth Systemic Assessment)

The Monitoring Team's Eighth Systemic Assessment (March 2017) addressed SPD's early intervention system.  It noted that, prior to the Department constructing its Data Analytics Platform ("DAP"), "much of the analysis is relatively rudimentary" when it comes to considering officer

**MERRICK J. BOBB, MONITOR**
Police Assessment Resource Center
P.O. Box 27445
Los Angeles, CA 90027
(213) 623-5757

performance history in the Department's IAPro system and whether that history might suggest problematic performance trends worthy of formal intervention.

The Parties and the Monitoring Team agreed that the data analysis platform ("DAP") was the best vehicle to provide the SPD and those engaged in its oversight with adequate data. The Parties and Monitoring Team have previously agreed that a DAP goes a substantial distance toward ensuring that SPD maintains its progress with respect to EIS, supervision, and the use of data-driven management.

The Monitoring Team will need to examine the DAP to consider whether it sufficiently contains the foundation for conducting more sophisticated, effective, and efficient inquiries of officer performance history. From what we have been told, **we expect that DAP will perform well and that this Court could thereafter consider as adequate the progress to date.**

### G. Ninth Systemic ("Use of Force")

The Ninth Systemic Assessment found it in initial compliance with paragraphs 69-90 addressing officer use of force after evaluating a sizable, statistically-significant sample of all force used by all SPD officers over the 28-month period of July 2014 through October 2016. It found that overall use of force rates are substantially down since the DOJ investigation and over the 28 months of data evaluated, with the typical SPD officer using force very infrequently. This more than 60 percent reduction in force occurred during a period where officer injuries were flat to slightly down and crime did not increase. The Monitor also concluded that officer force was consistent both with law and SPD policy in more than 99 percent of instances, including nearly 96 percent of intermediate-level Type II and serious Type III force cases. Many of the specific issues identified in the DOJ investigation and the Consent Decree had been sufficiently addressed.

As noted above, the Ninth Systemic Assessment considered some cases in which the

**MERRICK J. BOBB, MONITOR**
Police Assessment Resource Center
P.O. Box 27445
Los Angeles, CA 90027
(213) 623-5757

involved subject was experiencing a behavioral crisis, but it did not evaluate a statistically-significant sample of cases involving crisis-eligible individuals. In light of the centrality of the intersection between crisis intervention and use of force issues to the DOJ's 2011 investigation, the Consent Decree, and the recent attention to the shooting of Charleena Lyles, the Monitoring Team and Parties should focus on officer response to individuals in crisis with special emphasis on the use of force. **This will allow this Court and Monitor to understand if, regardless of what transpired in the Lyles incident, any issues present in that incident are indicative of systemic issues. Otherwise, the court could thereafter consider as adequate progress under paragraphs 69-90.**

### H. Search and Seizure (Tenth Systemic Assessment)

The Monitor's Tenth Systemic Assessment concluded, based on quantitative and qualitative analysis of a large swath of stops across more than 18 months that officers were following SPD's search and seizure policies but that, nonetheless, blacks and Latinos are stopped disproportionately and frisked disproportionately. SPD's bias-free policy requires that, among other things, "when unwarranted disparate impacts are identified and verified," the Department must consult widely "to explore equally effective alternative practices that would result in less disproportionate impact." SPD Manual Section 5.140-POL(9). The Monitor has identified a disparate impact. Accordingly, SPD and the City must now consider what may be driving that disparity, whether such disparity is unwarranted, and, if that disparity is unwarranted, what steps may be taken to ensure greater equity. The Monitoring Team and this Court await that analysis.

### I. Additional Areas of Focus (Accountability, Contract Negotiations)

The Court has previously clarified the importance of the resolution of current changes pending in Seattle's institutional system of accountability and the conclusion of the current labor

MERRICK J. BOBB, MONITOR
Police Assessment Resource Center
P.O. Box 27445
Los Angeles, CA 90027
(213) 623-5757

1   negotiations between the City and the police officer unions.  The Monitor notes here only that the

2   Consent Decree as a whole expects that there be consistent, effective, intelligent, and independent

3   ongoing oversight of the SPD in the minimum of two-year compliance after full and effective

4   progress has been made and maintained.  The City is determined to do so by creating an Inspector

5   General, perhaps the single most important guarantee that the SPD will continue to practice

6   constitutional policing beyond the life of the Consent Decree.  Because of the importance of that

7   office, it must be filled soon by an individual acceptable to the Parties and the Court.

8   **IV.     CONCLUSION**

9         This report finds that there has been a great deal of progress.  The Monitoring Team stands

10  at the ready to continue to assist the Parties, SPD, and the Court with ensuring that the City reaches

11  and obtains that level of compliance.

12        DATED this 8th day of September, 2017.

13  _MBobb_

14  Merrick J. Bobb, Monitor

MONITOR'S COMPLIANCE STATUS REPORT  - 18
Case No.  12-cv-1282-JLR

**MERRICK J. BOBB, MONITOR**
Police Assessment Resource Center
P.O. Box 27445
Los Angeles, CA 90027
(213) 623-5757

1

CERTIFICATE OF SERVICE

2

    I hereby certify that on this date I electronically filed the foregoing document with the

3

Clerk of the Court using the CM/ECF system, which will send notification of such filing to the

4

following CM/ECF participants:

5

| | | |
|---|---|---|
| J. Michael Diaz | michael.diaz@usdoj.gov | ☐ Via Messenger |
| Kerry Jane Keefe | kerry.keefe@usdoj.gov | ☐ Via Facsimile |
| Rebecca Shapiro Cohen | rebecca.cohen@usdoj.gov | ☐ Via U.S. Mail |
| Puneet Cheema | puneet.cheema2@usdoj.gov | ☐ Via Electronic Mail |
| Timothy D. Mygatt | timothy.mygatt@usdoj.gov | ☒ Via ECF Notification |
| Christina Fogg | christina.fogg@usdoj.gov | |
| Annette L. Hayes | annette.hayes@usdoj.gov | |
| Peter Samuel Holmes | peter.holmes@seattle.gov | |
| Michael K. Ryan | michael.ryan@seattle.gov | |
| Andrew Thomas Myerberg | andrew.myerberg@seattle.gov | |
| Brian G. Maxey | brian.maxey@seattle.gov | |
| Gregory C. Narver | gregory.narver@seattle.gov | |
| John B. Schochet | john.schochet@seattle.gov | |
| Rebecca Boatright | rebecca.boatright@seattle.gov | |

6

7

8

9

10

11

12

13

14

15

    Dated this 8th day of September 2017.

16

17

/s/ Jackie Slavik
Jackie Slavik, Legal Assistant

18

19

20

21

22

23

MERRICK J. BOBB, MONITOR
Police Assessment Resource Center
P.O. Box 27445
Los Angeles, CA 90027
(213) 623-5757