UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                         Plaintiff,<br>     v.<br><br>CITY OF SEATTLE,<br><br>                         Defendant. | CASE NO. C12-1282JLR<br><br>ORDER FINDING INITIAL COMPLIANCE WITH THE CONSENT DECREE |

## I.    INTRODUCTION

Before the court are two motions: (1) an "emergency" motion by the personal representative of the estate of Charleena Lyles ("the Estate") to intervene in this proceeding (MTI (Dkt. # 427)); and (2) a motion by Defendant City of Seattle ("the City") for an order declaring it to be in full and effective compliance with the Consent Decree (FEC Mot. (Dkt. # 419); *see also* Consent Decree (Dkt. # 3-1 (attaching Settlement Agreement); Dkt. # 8 (order provisionally approving the Settlement Agreement); Dkt. # 13 (order modifying and preliminarily approving the Settlement

Agreement))). The court has reviewed the Estate's, the parties', and Amicus Curiae Community Police Commission's ("the CPC") submissions concerning these motions, the relevant portions of the record, and the applicable law. Being fully advised,[1] the court DENIES the Estate's motion to intervene and GRANTS the City's motion.

## II. BACKGROUND

The parties entered the Consent Decree to settle Plaintiff United States of America's ("the Government") claim invoking 42 U.S.C. § 14141, which authorizes a suit to "eliminate" "a pattern or practice of conduct by law enforcement officers . . . that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States."[2] The Consent Decree requires the Seattle Police Department ("SPD") to comply with two phases: (1) SPD must attain "full and effective compliance" with the Consent Decree ("Phase I"), and then (2) sustain that compliance for two years ("Phase II"). (Consent Decree ¶¶ 229-30.) The question the City places before the court is whether the City has accomplished Phase I.

The Consent Decree maps two paths to full and effective compliance. (*Id.* ¶ 182.) The first path is through "compliance reviews and audits." (*Id.*) Utilizing this path, the City must show that it "incorporated the requirement into policy," trained personnel to "fulfill their responsibilities pursuant to the requirement," and "ensured that the

---

[1] The City requests oral argument on its motion. (*See* FEC Mot. at 1.) The parties have fully briefed the issues, and the court does not believe that oral argument would assist its determination of the motion. Accordingly, the court denies the City's request. *See* Local Rules W.D. Wash. LCR 7(b)(4).

[2] Congress recently re-codified 42 U.S.C. § 14141 at 34 U.S.C. § 12601.

requirement is being carried out in practice." (*Id.* ¶ 184.) Alternatively, the City can demonstrate full and effective compliance through "outcome assessments." (*Id.* ¶ 182.) "[I]f the City is able to establish, through outcome measures, that the purposes of the [Consent Decree] have been met, the decree may terminate even if the City is not in full and effective compliance with the specific process terms." (*Id.* ¶ 186.) These outcome assessments may include "[u]se of [f]orce [m]easurements," "[t]raining [m]easurements," "[s]upervision [m]easurements," and "[a]ccountability [m]easurements." (*Id.* ¶ 189.)

Beginning in September 2014, the parties and the Monitor began discussing how to systemically evaluate whether the Consent Decree's required policies and training were being "carried out in practice" and how to "define and measure 'full and effective compliance.'" (*See* U.S. Resp. (Dkt. # 422) at 5) (citing Diaz Decl. (Dkt. # 422-1) ¶ 2, Ex. A).) As a result, "compliance work groups" were set up including members of the Monitoring Team, the Government, and the City's attorneys. (*See id.*) These work groups met six times in 2014 and 2015 with the purpose of identifying: (1) all the material requirements of the Consent Decree; and (2) how to determine compliance with each of them, including (a) what data should be gathered, (b) who should gather and review the data, (c) when individual assessments and audit should occur, and (d) how to work out any disputes. (*Id.* (citing Diaz Decl. ¶ 3, Ex. B).)

The March 17, 2015, Third Year Monitoring Plan (Dkt. # 195) grew out of these collaborative workgroup meetings and thus enumerated the areas the audits would cover and the process that would be used for what became the "ten assessments." (*Id.*) The resulting ten assessments were systemic reviews and represented a collaborative effort of

the City, the Government, and the Monitor across both a substantial period of time and significant number and scope of discrete cases, incidents, or instances.[3] (*See id.* at 6 (citing First Systemic Assessment (Dkt. # 231) at 8-9).) The ten assessments were conducted and completed between March 2015 and June 2017. (*Id.*) Over time, the Monitor concluded that SPD had achieved "initial compliance" in each of the ten areas.[4] (*See* FEC Mot. at 7-8, App. A.) The Monitor defines "initial compliance" as meaning that "SPD's performance over a material time period and across incidents suggests that [SPD] has reached a level of performance in that defined area that is consistent with complying with the terms of the Court-enforced [Consent Decree]." (*See* Compliance

//

---

[3] The ten assessments include: (1) force investigation and reporting, (2) the Force Review Board ("FRB"), (3) community confidence, (4) the Office of Professional Accountability ("OPA"), (5) crisis intervention, (6) supervision, (7) Type II force investigation, (8) the Early Intervention System ("EIS"), (9) use-of-force, and (10) stops, search, and seizure. (*See* FEC Mot. at 8, App. A.)

[4] The City asserts that the Monitor's finding with respect to the use-of-force assessment alone demonstrates full and effective compliance with the Consent Decree as a whole. (FEC Mot. at 8-10.) The City asserts that this assessment demonstrates that it has complied with the alternative path to demonstrating full and effective compliance through the "outcome assessments" described in paragraphs 186-90 of the Consent Decree, rather than the "compliance reviews" of paragraphs 183-85. (*See id.*) However, after engaging collaboratively since 2014 in the process described above to create the ten assessments and then implement them, the court declines the City's invitation to alter the multi-year process established by the parties and the Monitor for assessing compliance with the Consent Decree. Through its participation in the process described above, the City has acquiesced to the ten assessments. The City never petitioned this court for relief from the assessments or for the court to determine full and effective compliance through a path other than the one collaboratively chosen by the parties and the Monitor. (*See generally* Dkt.) The court cannot conclude that compliance with only one of the ten assessments somehow now translates—after the assessments have occurred—to compliance with the entire Consent Decree. Indeed, the Consent Decree itself indicates that use-of-force measurements is only one of the "outcome assessments" that the parties may employ with respect to the alternative path of demonstrating full and effective compliance. (*See* Consent Decree ¶ 189.)

Status Report ("CSR") (Dkt. # 416) at 3 (quoting 1st Systemic Assessment ("SA") (Dkt. # 231) at 6-7).)

On September 8, 2017, the Monitor filed his Compliance Status Report, which outlined the Monitor's views on SPD's progress in complying with the Consent Decree. (*See generally id.*) In his report, the Monitor distinguishes between a determination that SPD has achieved "initial compliance" in the assessment areas and a determination that SPD has attained "full and effective compliance" with the Consent Decree such that the two-year maintenance period can begin. (*See id.* at 2-3.) The Monitor notes that SPD's "progress to date constitutes significant success," but declines to opine on whether SPD has met "full and effective compliance" with the Consent Decree because such a determination is the court's "prerogative." (*Id.* at 2.)

In his report, the Monitor also highlights a number of concerns in nearly every assessment area, including:

- lieutenants and captains, who are not yet sufficiently identifying and addressing certain deficiencies in Type II, precinct-level, force investigations (*id.* at 4-5);
- the disparity between the FRB's identification of possible use-of-force policy violations and the number of violations identified by the chain of command (*id.* at 6);
- the consistency with which SPD follows up on FRB recommendations (*id.* at 7);

- SPD's relationship with certain "isolated communities" and the level of trust these communities place in SPD (*id.* at 9-11);
- the quality, consistency, and timeliness of OPA interviews (*id.* at 12-13);
- the thoroughness of OPA investigations raising potential criminal or terminable offenses (such as false statements) (*id.* at 13-14);
- the intersection between crisis intervention and use-of-force and whether particular high-profile incidents, like the death of Ms. Lyles, are indicative of any systemic issues (*id.* at 14-15);
- the disproportionate number of Blacks and Latinos that are stopped and frisked (*id.* at 17); and
- the resolution of current changes that are pending in SPD's system of accountability and the conclusion of labor negotiations (*id.* at 17-18).

On September 29, 2017, the City filed its instant motion seeking an order declaring the City and SPD to be in full and effective compliance with the Consent Decree, which would end Phase I of the Consent Decree and initiate Phase II—the sustainment period. (*See* FEC Mot.) Both the Government and the CPC filed responses in support of the City's motion. (*See* U.S. Resp.; CPC Resp. (Dkt. # 421).) The parties and the CPC argue that the Monitor's ongoing concerns do not undermine his prior determinations that SPD achieved "initial compliance" in all ten assessment areas related to the Consent Decree. (FEC Mot. at 13-14; U.S. Resp. at 8-10; *see* CPC Resp. at 1.)

On November 20, 2017, the court ordered the parties to file additional briefing concerning the impact, if any, that two events should have on the court's consideration of the City's motion. (11/20/17 Order (Dkt. # 424).) Those events were: (1) the City Council's approval of a new contract between SPD and the Seattle Police Management Association ("SPMA") that included an arbitration provision that impacts the police accountability ordinance, and (2) the unanimous vote of SPD's FRB finding that the fatal shooting of Ms. Lyles was reasonable, proportional, and within SPD policy. (*Id.* at 1-2.) The parties and the CPC filed responses to the court's order. (City Supp. Br. (Dkt. # 430); U.S. Supp. Br. (Dkt. # 429); CPC Supp. Br. (Dkt. # 435).)

On December 5, 2017, the Estate filed its motion to intervene in these proceedings. (*See* MTI.) The City responded asking the court to deny the motion. (City Resp. (Dkt. # 433).) The Estate did not file a reply. (*See generally* Dkt.)

The court now considers both motions.

### III. ANALYSIS

**A. The Estate's Motion to Intervene**

The Estate cannot satisfy the requirements for intervention of right. When analyzing a motion to intervene as of right under Federal Rule of Civil Procedure 24(a), courts apply a four-part test: (1) the motion must be timely; (2) the applicant must claim a "significantly protectable" interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may as a practical matter impair or impede its ability to protect that interest; and (4) the applicant's interest must be inadequately represented by the parties to the action.

| 1 | *Wilderness Soc. v. U.S. Forest Serv.*, 630 F.3d 1173, 1177 (9th Cir. 2011); Fed. R. Civ. P.
| 2 | 24(a). The burden is on the proposed intervenor to demonstrate that the conditions for
| 3 | intervention are satisfied. *United States v. Alisal Water Corp.*, 370 F.3d 915, 919 (9th
| 4 | Cir. 2004).
| 5 |       The Estate cannot satisfy elements two or three of the four-part test. First, the
| 6 | Estate does not identify its "significantly protectable interest" in this litigation. The court
| 7 | is presiding over a case focused on an alleged pattern or practice of the use of excessive
| 8 | force and a Consent Decree intended to end any pattern or practice in that regard. It is
| 9 | not presiding over any individual incident in which a party alleges excessive force.
| 10 | Whatever the Estate's "significantly protectable interests" might be, they are not at issue
| 11 | in this litigation. If the court were to allow the Estate to intervene, then any party to a
| 12 | suit claiming that an SPD officer used excessive force would have a right to intervene in
| 13 | this proceeding. This court is not adjudicating the events that led to Ms. Lyle's death; nor
| 14 | is any party asking it to do so. The court merely ordered the parties to advise it what, if
| 15 | any, impact the FRB's decision concerning Ms. Lyles' death should have on the court's
| 16 | consideration of the City's motion to declare it in full and effective compliance with the
| 17 | Consent Decree. (*See* 11/20/17 Order at 2.) To the extent that the FRB's decision
| 18 | touches upon the City's instant motion, any determination by the court here would not
| 19 | "impair or impede" the Estate's ability to protect its own interests in separate litigation
| 20 | with the City. Accordingly, the court DENIES the Estate's motion to intervene in this
| 21 | action as a matter of right.

The Estate fares no better under the relaxed requirements for permissive intervention. *See* Fed. R. Civ. P. 24(b)(1). Permissive intervention under Rule 24(b)(1) "'requires (1) an independent ground for jurisdiction; (2) a timely motion; and (3) a common question of law and fact between the movant's claim or defense and the main action.'" *Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836, 843 (9th Cir. 2011) (quoting *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 473 (9th Cir. 1992)); Fed. R. Civ. P. 24(b)(1). "Even if an applicant satisfies those threshold requirements, the district court has discretion to deny permissive intervention." *Donnelly v. Glickman*, 159 F.3d 405, 412 (9th Cir. 1998). In exercising its discretion, the court considers factors like the "nature and extent of the intervenor's interest," and "whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." *Perry v. Prop. 8 Official Proponents*, 587 F.3d 947, 955-56 (9th Cir. 2009).

First, the Estate fails to demonstrate any independent ground for jurisdiction. *See id.* at 955. Indeed, the Estate does not suggest a basis for federal jurisdiction. (*See* MTI at 6.) Second, the Estate fails to identify a common question of law or fact. (*See id.*) Even if the Estate could somehow satisfy the elements for permissive intervention, the court would still exercise its discretion to deny it. This case has been ongoing since 2012 and focuses on a broad Consent Decree to ensure overall constitutional and effective policing in Seattle. The focus of this litigation is not any single tragic incident. As noted above, allowing a single claimant to intervene would open the door for all individual claimants to intervene. Such a result might impede this litigation and diminish the focus of the court and parties on the systemic reform that is the core of these proceedings.

Thus, even if the Estate could meet the elements necessary for permissive intervention, the court would exercise its discretion and deny the Estate's motion.

Based on the foregoing authorities and analysis, the court DENIES the Estate's motion to intervene in these proceedings.

**B.     The City's Motion for a Declaration of Full and Effective Compliance with the Consent Decree**

In evaluating the City's motion to declare SPD in full and effective compliance with the Consent Decree, the court first recognizes the significant progress that the City and SPD have made since the Government filed this suit in 2012. Although the Monitor's use-of-force assessment is not determinative of the City's compliance with the Consent Decree as a whole, *see supra* note 4, it is emblematic of the impressive advancements SPD has made during the course of the Consent Decree. The Monitor's findings concerning use of force, which are based on a two-year study and underpin his use-of-force assessment, are worthy of highlighting here:

- In the 760,000 incidents to which SPD officers were dispatched during the two-year study period, they used force in just under 2,400 incidents or less than 0.5% of all incidents.

- SPD officers' use of force decreased 11% from the first half of the two-year study period to the second half.

- About 80% of those uses of force were at the lowest level or Type I force that causes transient pain but no injury, or firearm pointing but no discharge.

- Only 39 incidents over the two-year study period involved serious uses of force or Type III force that is likely to result in serious injury.
- More serious uses of force (Type II and Type III) declined by 60% compared with the Government's findings covering January 2009 to April 2011.
- More serious uses of force declined across the study period, suggesting that officers were not only using less force overall, but using lower levels of force, too.
- The number of incidents in which officers used force in each of SPD's five precincts was roughly proportional to the number of arrests in each precinct.
- Although a group of 109 SPD officers accounted for almost 40% of the force used during the study period, those officers did not use serious force more frequently than other SPD officers who used force.
- Crime rates remained flat while use of force rates fell.

(FEC Mot. at 9-10 (citing 9th SA (Dkt. # 383) at 30-34, 39, 62-63).) The credit for these dramatic improvements goes in large part to the diligent and on-going work of the SPD—both its rank and file officers and its command staff. The court also wishes to highlight the exceptional work of Chief Kathleen O'Toole during her tenure with SPD in sustaining the significant progress noted above. In particular, the court commends Chief O'Toole on her leadership in developing a more community-based policing approach for

SPD. These efforts are receiving national attention and are making a difference in the level of trust the community places in SPD.

The court now turns to the specifics of the City's motion. The Consent Decree mandates changes to SPD policies, practices, and training with the goal of ensuring constitutional policing that protects officers, provides for public safety, and has the community's confidence. To evaluate SPD's implementation of these changes, the Consent Decree sets forth a two-phase process. In Phase I, the court evaluates whether SPD has incorporated the Consent Decree's requirements into policy and training and has carried them out in practice—at which point the court declares SPD to be in "full and effective compliance" with the Consent Decree. (*See* Consent Decree ¶¶ 184, 186.) In Phase II, the court evaluates whether SPD has maintained those reforms for at least two years—at which point the court terminates the Consent Decree. (*See id.* ¶ 229 ("The Parties may agree to jointly ask the Court to terminate the Agreement . . . , provided the City and SPD have been in full and effective compliance with the Agreement for two years."); *see also* FEC Mot. at 1 (recognizing that during Phase II "the City must prove that it has sustained compliance for two years").) The only issue presently before the court is whether the City and SPD have satisfied Phase I. (*See generally* FEC Mot.) The court agrees with the Government that the answer to that question is driven by the ten assessments conducted by the Monitor. (*See* U.S. Resp. at 3.)

In his Compliance Status Report, the Monitor takes no position on whether SPD has reached "full and effective compliance" under the Consent Decree. (*See* CSR at 2.) Rather, he appropriately leaves this determination to the court. (*See id.* at 2-3.) The

parties and the CPC argue that the Monitor's definition of "initial compliance" is the substantive equivalent of "full and effective compliance" under the Consent Decree. (FEC Mot. at 11-12; U.S. Resp. at 7-8; *see* CPC Resp. at 1.) Because the Monitor has found SPD to be in "initial compliance" with all ten assessments, the parties and the CPC urge the court to declare SPD to be in "full and effective compliance" with the Consent Decree's requirements and commence the Phase II sustainment period. (*See* FEC Mot. at 10; U.S. Resp. at 7-8; CPC Resp. at 1).

As noted above, the Monitor raises a number of serious concerns in his Compliance Status Report. (*See generally* CSR.) The court is cognizant of these concerns and understands that the City must address them going forward. Indeed, the City acknowledges that "[r]eform will continue in the sustainment period."[5] (FEC Mot. at 1.) Nevertheless, the court believes that these concerns do not undermine the Monitor's previous conclusions that SPD had reached "initial compliance" with the Consent Decree in all ten (10) assessment areas. Further, the court agrees with the parties and the CPC that the Monitor's definition of initial compliance is the substantive equivalent of full and effective compliance under the Consent Decree. Accordingly, the

---

[5] For example, the City commits to on-going review of its bias-free policing policy to assess any disparate impact in officers' traffic and *Terry* stops. (*See* FEC Mot. at 15-16.) The City also commits to demonstrating during the sustainment period the steps it has taken to verify that SPD documents and addresses FRB recommendations. (*See id.* at 16.) In addition, the City indicates an intent to improve EIS during the sustainment period. (*See id.* at 19.) Further, the City states that it will utilize the sustainment period to "prove its continued compliance" with Type II reporting obligations. (*See id.* at 20.) Finally, the City acknowledges that the circumstances surrounding Ms. Lyles's death "raised questions about the consistent implementation of SPD's crisis intervention practices" and that "scrutiny" into the incident "will be a crucial part of the sustainment period." (*Id.* at 17.)

court finds that SPD has achieved full and effective compliance with the Consent Decree such that Phase I of the Consent Decree is now complete and the Phase II sustainment period should commence. The court directs the parties and Monitor to meet, confer, and prepare a plan for discharging their obligations during the Phase II sustainment period.

Fulfilling Phase I is an enormous milestone and one in which the City and SPD should take pride. Nevertheless, the court cautions the City and SPD that this does not mean their work is done. In many ways, Phase II is the most difficult portion of the Consent Decree to fulfill. The ability to sustain the good work that has begun is not a foregone conclusion. It will require dedication, hard work, creativity, flexibility, vigilance, endurance, and continued development and refinement of policies and procedures in accordance with constitutional principles. Further, the court takes seriously, and so should the parties, the many ongoing concerns raised by the Monitor in his Compliance Report. If the City and SPD fail to satisfactorily address these concerns, they may well fail to sustain the progress they have made. The court will not hesitate to restart the two-year sustainment period if SPD falls below the full and effective compliance standard set forth in the Consent Decree.[6]

The court further notes that the City still has not named an Inspector General or concluded labor negotiations with all of SPD's labor unions. Although the City has

---

[6] The court notes that there appears to be a dispute regarding whether SPD must maintain full and effective compliance in all ten assessment areas concurrently or if the two-year sustainment period may run independently in the ten areas. The court need not decide this issue in the course of the City's present motion and so declines to do so.

executed a new collective bargaining agreement with SPMA, it has not yet reached agreement with the Seattle Police Officers Guild ("SPOG"). The court has previously indicated that it will not grant final approval to the City's new police accountability ordinance until after collective bargaining is complete. (9/7/17 Order (Dkt. # 413) at 3.) If collective bargaining results in changes to the accountability ordinance that the court deems to be inconsistent with the Consent Decree, then the City's progress in Phase II will be imperiled.[7]

Finally, the court comments on the role of the Monitor during the Phase II period of sustainment. During Phase I of the Consent Decree, the Monitor was actively engaged with the City and SPD identifying and crafting new policies and training that would mold SPD into a force providing both constitutional and effective policing to the citizens of Seattle. During Phase II, the Monitor will concentrate his efforts in assisting the City and SPD in evaluating the changes they have implemented, considering whether those new policies need any tweaks or modifications to be most effective, and in monitoring continued and consistent compliance with the Consent Decree.[8] The Monitor will only be engaged in proposing new policies or training to the extent necessary to assist the City and SPD in sustaining the progress attained during Phase I and in a manner consistent

---

[7] The court asked the parties and the CPC for additional briefing concerning the events surrounding Ms. Lyles's death and the City's collective bargaining agreement with SPMA. (*See* 11/20/17 Order.) The court considered the parties' responses (City Supp. Br.; U.S. Supp. Br.; CPC Supp. Br.) and determined that it could move forward on the City's motion.

[8] In performing these duties, the Monitor may request information from the City or SPD in order assess SPD's compliance with the Consent Decree and may make periodic assessments of SPD's continued compliance consistent with the Consent Decree.

with the Consent Decree. The role of the Monitor remains robust but has a different focus now in recognition of the City's and SPD's progress and the different needs of those institutions and the court as the Consent Decree moves into Phase II.

## IV. CONCLUSION

Based on the foregoing analysis, the court DENIES the Estate's motion to intervene (Dkt. # 427) and GRANTS the City's motion to declare SPD in full and effective compliance with the Consent Decree (Dkt. # 419). The Phase II sustainment period of the Consent Decree shall commence on the date this order is filed. The court further ORDERS the Monitor and the parties to submit no later than March 2, 2018, a joint plan for discharging their obligations under the Consent Decree during the Phase II sustainment period.

Dated this 10th day of January, 2018.

JAMES L. ROBART
United States District Judge