UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. C12-1282JLR |
| Plaintiff, | ORDER TO SHOW CAUSE WHETHER THE COURT SHOULD FIND THAT THE CITY HAS FAILED TO MAINTAIN FULL AND EFFECTIVE COMPLIANCE WITH THE CONSENT DECREE |
| v. | |
| CITY OF SEATTLE, | |
| Defendant. | |

## I.   INTRODUCTION

In light of current circumstances, the court ORDERS the parties to SHOW CAUSE whether the court should find that Defendant City of Seattle ("the City") has failed to maintain full and effective compliance with the Consent Decree[1] as more fully described below.

//

---

[1] (Consent Decree (Dkt. # 3-1) (attaching Settlement Agreement); (Dkt. # 8) (order provisionally approving the Settlement Agreement); (Dkt. # 13) (order modifying and preliminarily approving the Settlement Agreement).)

## II.  BACKGROUND & ANALYSIS

On December 16, 2011, the United States Department of Justice ("DOJ") released a report announcing that it had found reasonable cause, under the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 ("Section 14141"), to believe that the Seattle Police Department ("SPD") had engaged in a pattern and practice of excessive force.  (*See* DOJ Report (Dkt. # 1-1); *see also* Stip. Find. & Concl. (Dkt. # 14) ¶ 6.)  On July 27, 2012, Plaintiff United States of America filed a complaint against the City based on that report.  (*See* Compl. (Dkt. # 1).)  On the same day, the City and the United States filed a joint motion to approve a Settlement Agreement and a Stipulated Order of Resolution with this court.  (Stip. Find. & Concl. ¶ 12; *see also* Joint Mot. (Dkt. # 3) (attaching Settlement Agreement).)  On September 21, 2012, the court preliminarily approved the Settlement Agreement, along with certain agreed modifications.  (*See* 9/21/12 Order (Dkt. # 13).)  The modified agreement and order is now commonly referred to as "the Consent Decree."  (*See id.*); *see also supra* at 1 n.1.

The purpose of the Consent Decree "was to resolve the litigation filed by the United States and to ensure that police services are delivered to the Seattle community in a manner that fully complies with the Constitution and laws of the United States."  (Stip. Find. & Concl. ¶ 16.)  Specifically, the City "entered into [the Consent Decree] with the goal of ensuring that the SPD's policies, procedures, training, and oversight are *sufficient to prevent* practices that the United States allege[d] contributed to a pattern and practice of constitutional violations."  (*Id.* (emphasis added).)  The Consent Decree "is tailored to the alleged deficiencies identified by the United States" and "is consistent with and

1   furthers the objectives of Section 14141 because it embodies the agreement of the City

2   and commitment of [the SPD] to ensure that no pattern or practice of unconstitutional

3   police conduct exists." (*Id.* ¶ 25.)  Both the City and the United States acknowledge that

4   the Consent Decree is "supported by an evidentiary record . . . ." (*Id.* ¶ 31.)

5           On September 29, 2017, after more than five years of working to reform the SPD

6   under the court's administration of the Consent Decree, the City asked the court to

7   declare it to be in full and effective compliance with the Consent Decree.  (FEC Mot.

8   (Dkt. # 419).)  On January 10, 2018, after extensive briefing by the parties and the

9   Community Police Commission ("CPC"), the court entered an order granting the City's

10  motion and declaring it and the SPD to be in full and effective compliance with the

11  Consent Decree.  (FEC Order (Dkt. # 439).)  Under the Consent Decree, the City was

12  required (1) to attain "full and effective compliance with the Consent Decree ("Phase I")

13  and (2) to sustain that compliance for two years ("Phase II").  (Consent Decree ¶¶ 229-

14  30.)  The court's January 10, 2018, ruling commenced Phase II of the Consent Decree.

15  (FEC Order at 13-14.)

16          In its January 10, 2018, order, the court noted that, in many ways, Phase II would

17  be the more difficult portion of the Consent Decree for the City and SPD to fulfill.  (*Id.* at

18  14.)  The court specifically expressed concern about the City's labor negotiations with the

19  Seattle Police Officers Guild ("SPOG") and the effect those negotiations might have on

20  the City's new Accountability Ordinance.  (*Id.* at 14-15); *see also* Seattle City Ordinance

21  No. 125315.  Although the Accountability Ordinance contained many provisions that

22  appeared to safeguard the City's progress under the Consent Decree, the court declined to

ORDER - 3

1    grant final approval to the City's Accountability Ordinance until after the City's

2    collective bargaining with SPOG was complete.  (*See* FEC Order at 15 (citing 9/7/17

3    Order (Dkt. # 413) at 3).)  The court noted that "[i]f collective bargaining results in

4    changes to the [A]ccountability [O]rdinance that the court deems to be inconsistent with

5    the Consent Decree, then the City's progress in Phase II will be imperiled."  (*Id.* at 15;

6    *see also* 7/18/17 Hearing Tr. (Dkt. # 407) at 21-22 (expressing concern that the collective

7    bargaining process was essentially a "black hole" whose impact on the Accountability

8    Ordinance and the SPD accountability system could not be predicted).)

9          The court notes that the Consent Decree does not mandate that the City make

10   specific changes to its discipline and accountability structures.  Nevertheless, the court is

11   responsible not only for ensuring that the City complies with all the specific terms and

12   conditions of the Consent Decree, but also that it does not do anything that—although not

13   specifically mandated by the Consent Decree—would undermine compliance with the

14   document.  The United States has acknowledged that such review of the SPD's

15   accountability systems is appropriate.  (*See* 7/10/17 US Br.  (Dkt. # 401) at 2.)  Further

16   all the parties and stakeholders agree that, even though many of the elements of the

17   SPD's accountability system are not specifically referenced in the Consent Decree, any

18   legislation concerning that system must not conflict with either the terms or the purposes

19   of the Consent Decree.  (*See* 7/11/16 Stip. (Dkt. # 297) ¶ 7.)  Consistent with this

20   agreement, the court previously identified the following test for reviewing legislation

21   related to SPD's accountability systems:  Does the legislation conflict with the terms or

22   the purposes of the Consent Decree, which include delivering to the people of Seattle (1)

1  constitutional policing, (2) effective policing, and (3) policing in which the community

2  can have confidence?  (1/6/17 Order (Dkt. # 357) at 4.)  Indeed, in the court's view,

3  ensuring that appropriate oversight and accountability mechanisms are in place is one of

4  the cornerstones to securing constitutional and effective policing in this City beyond the

5  life of the Consent Decree.  In short, getting this aspect of reform right may well be a

6  linchpin to the long-term success of this entire process.

7       With this background in mind, the court has examined the City's compliance with

8  the Consent Decree.  Much of that examination raises no concerns.  However, two

9  considerations underlie the court's issuance of the present order.  The first significant

10  consideration is the City's completion of its collective bargaining with SPOG and the

11  impact of that bargaining on the Accountability Ordinance.  The second consideration is

12  the recent decision by the Disciplinary Review Board ("DRB") to overturn former Chief

13  of Police Kathleen O'Toole's decision to terminate SPD Officer Adley Sheperd.  The

14  court briefly sets forth its understanding of these events below.

15       On October 22, 2018, the City notified the court that it had completed labor

16  negotiations and had entered into a tentative agreement with SPOG.  (Letter (Dkt.

17  # 484).)  In filings with the court, the CPC was highly critical of the tentative agreement

18  and its effect on the Accountability Ordinance.  (*See generally* CPC Resp. (Dkt. # 493-

19  1).)  The CPC stated that the tentative agreement "and its failure to prioritize and

20  safeguard much of the progress made in the Accountability Ordinance compromise[s] the

21  core values and objectives of the Consent Decree, namely, transparency and promoting

22  public confidence in the oversight mechanisms governing policing in Seattle."  (*Id.* at 5;

1    *see also id.* at 4 (stating that the tentative agreement with SPOG "heavily compromise[s]"

2    "*the accountability system as a whole*, including transparency to the public and the ability

3    of the Chief of Police to effectively uphold reform values as she leads [the SPD]") (italics

4    in original).)   The court understands that, despite the CPC's opposition to the tentative

5    agreement (*see* Hearing Tr. (Dkt. # 499) at 47 ("We . . . recommend that the Council not

6    adopt this contract.")), the Seattle City Council approved the tentative agreement on

7    Tuesday, November 13, 2018.  The tentative agreement, thus, will become the City's new

8    collective bargaining agreement ("CBA") with SPOG.[2]  The court also understands that

9    the new CBA substantially changes or eliminates many of the provisions of the

10   Accountability Legislation.  (*See* CPC Resp., Attachment A.)

11          On Tuesday, November 20, 2018, one week after the City Council approved the

12   CBA, the DRB overturned former Chief of Police Kathleen O'Toole's discharge of SPD

13   Officer Adley Sheperd.  Chief O'Toole had terminated Officer Sheperd on November 9,

14   2016, for violating three separate use-of-force provisions of SPD's Policy & Procedure

15   Manual.  *See* SPD Disciplinary Action Report, File No. OPA 14-0216.  These violations

16   occurred when Officer Sheperd punched a hand-cuffed subject in the face while she was

17   sitting in the back of a police car on June 22, 2014.  *See id.*  It is the court's

18   understanding that the DRB overturned Chief O'Toole's decision, imposed a 15-day

19

20

21          [2] The court does not know if Mayor Jenny Durkan has signed the legislation approving
     the tentative agreement yet.  However, based on her remarks to the court at the November 13,
22   2018, status conference, the court has no reason to believe that she will not.  (*See* Hearing Tr. at
     7-16.)

ORDER - 6

1   suspension on Officer Sheperd instead, and ordered the SPD to re-instate Officer Sheperd

2   to a new assignment with back pay, less 15 unpaid days for his suspension.

3        Under the Accountability Ordinance, the process for review of Chief O'Toole's

4   decision to discipline Officer Sheperd would have been substantially different.  The

5   three-member DRB would have been replaced by the Public Safety Civil Service

6   Commission ("PSCSC"), consisting of three Commissioners, none of whom were current

7   employees of the City or SPD.  *See* Accountability Ordinance No. 125315 §§ 3.29.420,

8   4.08.105.  Under the Accountability Ordinance, the PSCSC would have had the authority

9   to appoint a Hearing Officer to conduct a hearing on the officer's appeal of the Chief's

10  disciplinary decision.  *See id.* §§ 4.08.070(J), 4.08.105(A).  The Hearing Officer's

11  decision, in turn, would have been subject to review by the 3-member panel of the

12  PSCSC.  *See id.* § 4.08.105(A)(2).  The Hearing Officer's review of the Chief's decision

13  would have been "confined to the determination of whether the employee's removal . . .

14  was made in good faith for cause."  *See id.*  Likewise, the PSCSC's review of the Hearing

15  Officer's recommended decision would "affirm the disciplinary decision unless the

16  [PSCSC] specifically finds that the disciplinary decision was not in good faith for cause."

17  *See id.* § 4.08.105(A)(3).

18       However, it is the court's understanding that the new CBA with SPOG does not

19  retain the PSCSC or the PSCSC's standard of review as set forth in the Accountability

20  Ordinance.  Rather, the new CBA reverts to the old appeal process used by the DRB—the

21  same process that was utilized to overturn former Chief O'Toole's discipline of Officer

22  Sheperd and return him to duty.  (*See* CPC Resp., Attachment A at 5.)

1    The Consent Decree was imposed due to the DOJ's finding that the SPD was

2    engaged in a pattern and practice of the use of excessive force.  (*See* DOJ Report; *see*

3    *also* Stip. Find. & Concl. ¶ 6.)  The DRB's decision to reinstate an officer who had

4    violated three provisions of the SPD's use-of-force policies when he punched a hand-

5    cuffed subject in the face while she was sitting in a patrol car, and the new CBA's

6    rejection of reforms in the Accountability Ordinance that would have substantially

7    changed the process and standard of review by which this decision was made, lead the

8    court to question whether the City and the SPD can remain in full and effective

9    compliance with the Consent Decree.  Although this single incident may be insufficient

10   for the court to rescind the City's Phase II status under the Consent Decree, it raises the

11   specter that the new CBA's rejection of reforms in the Accountability Ordinance will

12   undermine the progress that the City has made to date and stymie its efforts to complete

13   Phase II in little more than a year.

14   ## III.    CONCLUSION

15   Based on the court's understanding of the foregoing events, the court orders the

16   parties to provide briefing on the following issues:

17   (1)  Is the court's understanding of the foregoing events accurate?  If not, how is

18   the court's understanding of the foregoing events not accurate?

19   (2) Whether the events surrounding the DRB's decision to reinstate an SPD officer

20   who punched a hand-cuffed subject who was sitting in a patrol car, and the

21   new CBA's rejection of aspects of the Accountability Ordinance—including

22   those aspects that would have replaced the DRB with the PSCSC and provided

1    for a different standard of review—should lead the court to conclude that the

2    City and the SPD have failed to maintain full and effective compliance with

3    the Consent Decree during Phase II?

4    (3) Provide the court with a detailed list of all the changes to the Accountability

5    Ordinance or any other SPD policy or procedure that the new CBA with SPOG

6    precipitated, how those changes either do or do not conflict with the Consent

7    Decree under the standard articulated above, and whether those changes

8    undermine or threaten to undermine the City's status as being in full and

9    effective compliance with the Consent Decree.

10   (4) Provide the court with a recommendation on how it should proceed under the

11   Consent Decree in light of present circumstances, including but not limited to

12   the changes to the Accountability Ordinance as a result of the CBA with

13   SPOG.

14         The parties shall file their responses no later than 14 days from the date this order

15   is filed and shall limit their responses to no more than 30 pages each.  The CPC may also

16   file a response to the court's order under the same time and page limitations.  After the

17   //

18   //

19   //

20   //

21   //

22   //

ORDER - 9

court receives the parties' and the CPC's initial submissions, it will determine whether

additional responsive briefing is warranted and set a hearing date.

Dated this 3rd day of December, 2018.

JAMES L. ROBART
United States District Judge