THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 2:12-cv-01282-JLR |
| | ) | |
| Plaintiff, | ) | **UGCVVNG'RQNKEG'F GRCTVO GP V₀U'** |
| | ) | **ETKUKU'KP VGTXGP VKQP 'CP F 'WUG'QH'** |
| v. | ) | **HQTEG'GXCNWCVKQP '** |
| | ) | |
| CITY OF SEATTLE, | ) | |
| | ) | |
| Defendant. | ) | |

The City respectfully submits the Seattle Police Department's Crisis Intervention and Use of Force Evaluation.

**UGCVVNG'RQNKEG'F GRCTVO GP V₀U'ETKUKU'KP VGTXGP VKQP**
**CP F 'WUG'QH'HQTEG'GXCNWCVKQP** - 1
(12-CV-01282-JLR)

Rgvgt 'UUJ qm es
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

DATED this 17th day of December, 2018.

     For the CITY OF SEATTLE

     PETER S. HOLMES
     Seattle City Attorney

     *s/ Kerala T. Cowart*
     Kerala T. Cowart, WSBA #53649
     Assistant City Attorney
     Seattle City Attorney's Office
     701 Fifth Avenue, Suite 2050
     Phone: (206) 733-9001
     Fax: (206) 684-8284
     Email: kerala.cowart@seattle.gov

## CERTIFICATE OF SERVICE

I hereby certify that on December 17, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sends notification of such filing to the following counsel of record:

| | |
|---|---|
| Annette L Hayes | Annette.Hayes@usdoj.gov |
| Christina Fogg | Christina.Fogg@usdoj.gov |
| Gregory Colin Narver | gregory.narver@seattle.gov |
| Kerry Jane Keefe | kerry.keefe@usdoj.gov |
| Peter Samuel Holmes | peter.holmes@seattle.gov |
| Jeff Murray | jeff.murray@usdoj.gov |
| Rebecca Boatright | rebecca.boatright@seattle.gov |
| Ronald R. Ward | Ron@wardsmithlaw.com |
| Timothy D. Mygatt | timothy.mygatt@usdoj.gov |
| Michael K. Ryan | michael.ryan@seattle.gov |
| Carlton Seu | carlton.seu@seattle.gov |
| Gary T. Smith | gary.smith@seattle.gov |
| Hillary H. McClure | hillarym@vjmlaw.com |
| Kristina M. Detwiler | kdetwiler@unionattorneysnw.com |

DATED this 17th day of December, 2018, at Seattle, King County, Washington.

*s/ Kerala T. Cowart*
Kerala T. Cowart, WSBA #53649
Assistant City Attorney
E-mail: kerala.cowart@seattle.gov

.

SEATTLE POLICE DEPARTMENT USE OF FORCE EVALUATION
AND USE OF FORCE EVALUATION - 3
(12-CV-01282-JLR)

Peter S. Holmes
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200



Calls for service that involve individuals in crisis fall at the intersection of public safety and public health, are often volatile and unpredictable, and represent among the most tactically challenging incidents to which law enforcement responds. During Phase II of the Consent Decree, the Seattle Police Department (SPD) committed to audit SPD's crisis intervention systems to ensure continued compliance with SPD policies and the terms of the Consent Decree, including an assessment of its uses of force against persons in crisis. *See* Sustainment Plan, dkt. 444 at 7; *see also* Sustainment Matrix (Rows 100-105), dkt. 444-1 at 15. In this evaluation SPD conducts a deeper inquiry into the use of force in crisis-involved incidents specifically.   Consistent with the methodology agreed upon by the parties, SPD accordingly provides this report as (1) a confirmation that SPD has continued to follow the terms of the Consent Decree related to crisis intervention; (2) an  analysis of use of force in crisis-involved incidents, and (3) a qualitative review of all Type II and Type III (serious) uses of force occurring during this study period (January 1, 2017, to June 30, 2018).  The latter demonstrates that SPD has continued to put training and policies implemented during the Consent Decree into practice during the Sustainment Period. Specifically, SPD has taken appropriate steps to minimize the need to use force against individuals in crisis..

Some of the data and information relied upon in this audit report come from SPD's October 31, 2018 Crisis Intervention Outcome Report, which detailed SPD's responses to the nearly 16,000 crisis-involved calls for service received over the 18-month period between January 1, 2017 and June 30, 2018.  The Crisis Intervention Outcome Report was filed with the Court on October 31, 2018 (*see* dkt. 495-1), and it is also included as Appendix A to this document. This report included data and analysis addressing Consent Decree requirements related to crisis intervention training (Consent Decree paragraphs 130-135); staffing and deployment of CIT officers (Consent Decree paragraphs 131-132); dispositions and outcomes of crisis calls (Consent Decree paragraph 136); and data-driven

practices (Consent Decree paragraph 137).  In addition, the Crisis Intervention Outcome Report provided an overview of use of force in crisis incidents, while previewing that a deeper analysis into this topic would be provided in this Evaluation.

_**This Evaluation Crisis Intervention and Use of Force demonstrates that the Department has sustained compliance with the requirements in paragraphs 130-137 of the Consent Decree.**_



The data presented in the Crisis Intervention Outcome Report demonstrate compliance with the following Consent Decree requirements:

<u>Training</u>:

The Consent Decree contains several requirements related to training officers in how to safely and effectively engage individuals in crisis. _See_ Consent Decree ¶¶ 130 & 133-35.

Paragraph 130 requires that SPD provide training in verbal tactics with the goal of reducing the use of force against individuals in crisis. In addition, all SPD officers must receive basic training in crisis intervention. ¶ 134. The Monitor previously approved the content of these aspects of SPD's crisis intervention training in 2013 (_see_ dkt. 191 at 15-16) and 2015 (dkt. 254 at 7-8). As detailed in the Crisis Intervention Outcome Report, the Department continues to comply with these requirements. All officers receive at least eight hours of annual crisis intervention training. In addition, since 2015, SPD has continued to improve upon its training, utilizing increasingly sophisticated scenario-based, integrated tactics training that is now replicated, with SPD training assistance, in agencies around the country. _See_ Appendix A, pp. 4-6; _see also_ Dkt. 254 at 8 (Monitor's report describing SPD partnership program to provide crisis intervention training to police departments and sheriff's offices across the region).

The Consent Decree also necessitates that the Department provide advanced crisis training to a subset of officers. ¶ 133. Although the Consent Decree refers to these officers as "CI trained," SPD refers to such officer in practice (and in this report) as "CI certified."  The distinction is used because all SPD officer receive at least 8 hours of crisis intervention training each year.  To be "CI certified," an officer must complete a 40-hour comprehensive training program and then receive 8 hours of annual in-service to remain certified. ¶ 133.. SPD continues to make available to officers the advanced 40-hour CI training course that is run through the Washington State Criminal Justice

Training Commission, and, as noted above, all of SPD's sworn officers receive 8 hours of annual training. *See* Appendix A, pp. 4-6.

Pursuant to the Consent Decree, the Crisis Intervention Committee must be consulted regarding changes to the crisis intervention training curriculum. ¶ 133. The Crisis Response Unit has continued to coordinate and attend quarterly meetings with Seattle's Crisis Intervention Committee. *See infra*, Section IV, pp. 52 & 62. The Crisis Intervention Committee includes regular participants from local hospitals, mental health service providers, and social service providers, and continues to review updates to SPD's data collection, training, and policy with related to crisis incidents. *Id.* at p. 62.

The Consent Decree also requires that SPD appropriately train dispatchers to identify calls for service involving individuals in crisis. ¶ 135. During the study period, SPD provided to its dispatchers a training course that addressed call processing and dispatching for individuals in behavioral crisis. Appendix A, pg. 6.

Staffing and Deployment:

SPD must ensure that CI certified officers are available on all shifts to respond to crisis incidents and will maintain its program of dispatching CI certified officers to incidents involving community members in crisis. ¶¶ 130-31. When appropriate, CI certified officers will take the lead in interacting with individuals in crisis. ¶ 132.  During the study period, SPD greatly increased its number of CI certified officers. An additional 118 officers became CI certified in 2017 and more than 80 became certified in 2018 by attending the 40-hour training through the Washington State Criminal Justice Training Commission.  *See* Appendix A, pp. 4-6.  Staffing of CI certified personnel in the Operations Bureau increased by 8.2% over the study period.  Appendix A, pp. 15-19.

Its training program has allowed the Department to continuing dispatching CI certified officers to calls involving individuals in crisis as appropriate. On average, 60% of personnel assigned to and responsible for 911 response were CIT certified. In nearly 80% of crisis calls, a CIT-certified officer was on-scene.  *See* Appendix A, pp. 15-19. Although crisis contacts have risen by 26 percent in the first half of 2018, compared to 2017, the increased number of CI certified officers allows the Department to maintain consistent outcomes. Accordingly, the staffing and deployment requirements of paragraphs 130 and 132 are met.

Gathering and Tracking Data:

The Consent Decree requires SPD to gather and track extensive data regarding officers' interactions with individuals in crisis, including, *inter alia*: information about the person in crisis, whether a supervisor responded to the scene, if the person was armed, the actions and techniques used by the officer, whether injuries occurred, the name and badge number of the officer, and a description of the event and its outcome.  ¶ 136.

The Crisis Intervention Outcome Report demonstrates that SPD continues to comply with paragraph 136. *See* Appendix A. The data are gathered in the form of "crisis templates" which officers are required to complete after making contact with a subject experiencing any type of behavioral crisis. Appendix A, pp. 25-26. A Crisis Response Unit sergeant reviews all Significant Incident Reports and ensures that, for those that contain crisis indicators, a crisis template has been completed for that subject.  *Infra* at p. 52.

In addition to simply gathering and tracking data on interactions with individuals in crisis, SPD synthesizes it into annual reports that are published on its website each year. These reports provide the public with a window into the Department's crisis intervention program as well as emerging trends. Some of the important conclusions from the current Outcome Report are provided here.

> *Increased Call Volume*:  Between January 1, 2017 and June 30, 2018, Seattle Police Officers made 15,995 contacts with persons believed to be experiencing a behavioral crisis, of which 92% were responses to calls from the public reporting an incident.  Over the first six month of 2018, dispatched crisis contacts increased by 26%, and on-viewed crisis contacts increased by 30%, relative to the first six months of 2017.  *See* Appendix A, pp. 6-14.

> *Consistent Dispositions of Crisis Incidents*:  Resolutions that result in connections to social and mental health services remain high.  *See* Appendix A, pp. 25-29. Peaceful, constructive dispositions of crisis incidents, such as referrals for services, reflect the benefits of SPD's robust crisis intervention training program.

> *Despite the Surge in Crisis Calls, Use of Force Remains Low*:  Of the 15,995 crisis contacts reported during the study period, reportable force occurred in just 277 (1.7%) of all crisis contacts, comprising 557 total uses of force.  The rate of force over the 18-month period remained relatively stable between 1.3% and 1.8%.  Of these 557 total uses of force, 75% comprised no greater than low-level, Type I force (transient pain such as associated with a soft take-down, handcuffs, or the pointing

4

of a firearm).  Five uses of force (.9%) were classified at the highest level, Type III. *See* Appendix A, pp. 29-32.

Data-Informed Policies:

The Consent Decree further requires that SPD review the crisis intervention data and use it to inform programs and generate recommendations. ¶ 137.

The work required by paragraph 137 is carried out by SPD's Crisis Response Unit (CRU). This specialized unit consists of a sergeant, five officers and a mental health professional.  CRU's responsibilities include supporting patrol officers with direct field-response and coordinating with service providers and partner agencies. *See infra* pp. 51-52.

In addition, CRU reviews and analyzes crisis data collected by the Department and uses it to inform program decisions. CRU monitors a series of dashboards that present city-wide crisis data in an easily digestible format and allow CRU to run queries to answer questions. *Infra* p. 53. One dashboard focuses on members of the community who frequently use crisis intervention services ("high utilizers"). *Id.* at 55. CRU uses this information to develop individualized profiles of subjects of crisis incidents and provides the profiles to patrol officers in RideAlong.  *Id.* at 55-56. (RideAlong is a mobile internet-based application that officers access from a precinct laptop or a patrol car's dash computer.) CRU also develops response plans for high utilizers, when appropriate, including information such as case manager contact information, service provider, or identified approaches that are likely to be successful. *Infra* at 56-58. Profiles and response plans contained in RideAlong inform responses in the field in several ways.  *Id.* at 59-61. The dashboards also allow CRU to view information by precinct, by watch, by various subject characteristics, and to drill down on uses of force in crisis incidents. *Id.* at 53-54.

As a final word before turning to the substance of the report, the careful reader may note small differences between the numbers reported here and those previously reported on October 31st.  Because the Data Analytics Platform, from which data for each of these reports are drawn, is a dynamic system, updated every 24 hours as reviews are completed and new data entered, numbers reported will expectedly differ very slightly from query to query.  In this case, as the DAP queries for this report were run approximately two months after queries for the prior report, the numbers reported here include two additional cases that had not been completed as of the time data for the prior report was queried.

In addition to SPD's Crisis Intervention Policy (16.110), SPD's use of force policies are relevant to this evaluation's qualitative analysis of the propriety of SPD officers' encounters with people in crisis.

The Seattle Police Department's Use of Force polices are published, collectively, as Title 8 of the SPD Manual.  Policy sections 8.000 through 8.200 set forth the conditions under which force is authorized, when force is prohibited, and affirmative obligations to de-escalate prior to using force, when reasonably safe and feasible to do so, and to assess and modulate force as resistance changes.  While recognizing that officers are on occasion forced to act very rapidly, this policy permits officers to use only the force that is objectively reasonable, necessary, and proportionate to effectively bring an incident or a person under control.  Section 8.300 addresses the use and deployment of force tools that are authorized by the Department, such as less-lethal munitions, canine deployment, firearms, OC spray, and vehicle-related force tactics.  Section 8.400 prescribes protocols for the reporting and investigation of force; section 8.500 sets forth the process for review of force.

Consistent with Paragraphs 91-125 of the Consent Decree, force is classified, documented, investigated and reviewed according to level of severity, described as below:

) Physical interaction meant to separate, guide, and/or control without the use of control techniques that are intended to or are reasonably likely to cause any pain or injury. Examples including using hands or equipment to stop, push back, separate or escort, the use of compliance holds without sufficient force to cause pain, and unresisted handcuffing.  Officers are not required to report or investigate this level of force.

— Actions which "causes transitory pain, the complaint of transitory pain, disorientation, or intentionally pointing a firearm or bean bag shotgun."  This is the most frequently reported level of force. Examples of Type I force, generally used to control a person who is resisting an officer's lawful commands, include "soft takedowns" (controlled placement), strike with sufficient force to cause pain or complaint of pain, or

an open hand technique with sufficient force to cause complaint of pain.  Type I uses of force are screened by a sergeant and reviewed by the Force Review Unit.

u      Force that causes or is reasonably expected to cause physical injury greater than transitory pain but less than great or substantial bodily harm.  Examples include a hard take-down or and/or the use of any of the following weapons or instruments: CEW, OC spray, impact weapon, beanbag shotgun, deployment of K-9 with injury or complaint of injury causing less than Type III injury, vehicle, and hobble restraint.  An on-scene (where feasible) sergeant collects available video evidence and witness statements; the evidence packet and analysis of the force is reviewed by the Chain of Command and the Force Review Unit (FRU).  Cases flagged by the Force Review Unit for further inquiry, in accordance with policy criteria, plus an additional random 10% of Type II cases are also analyzed by the Force Review Board (FRB).

u      Force that causes or is reasonably expected to cause great bodily harm, substantial bodily harm, loss of consciousness, or death, and/or the use of neck and carotid holds, stop sticks for motorcycles, and impact weapon strikes to the head.  Type III force is screened on-scene by a sergeant, investigated by the Force Investigation Team (FIT), and analyzed by the FRB.

" k    7

Under Title 8 of SPD's policy manual, all reportable uses of force (Type I, II and III) are thoroughly and critically reviewed, and it is the substantive review of each force case by the chain of command, the Force Review Unit, and the Force Review Board that makes the initial determination as to whether a use of force is in or out of SPD policy. If any reviewer in the chain of command or the FRU, or if the FRB by consensus, finds an indication of a policy violation, whether related to the force or otherwise, that case is required to be referred to the Office of Professional Accountability for further review and a determination about whether there is any policy violation, and if so, the level of recommended discipline.  In addition, the OPA Director or his designee sits in on all FRB discussions, and has the prerogative to take for further review any case regardless of whether the FRB separately refers.

As noted above, Type I uses of force are screened by sergeant, reviewed/approved (or, not approved) by the Chain of Command, and reviewed by the Force Review Unit for completeness.  While the Chain of Command is responsible for determining whether the force was within policy, these cases do not go through a fuller FRU/FRB review *except*

when the use of force is used in an incident in which a higher level of force was also used. In such instances, the Type I force is then reviewed under the higher standards against which Type II or III force is examined.

By policy, the FRB reviews all Type III cases. The FRU, comprising a captain, a lieutenant, a sergeant, and two detectives, reviews all Type II use of force reports. FRU staff and FRB members undertake the same inquiry, and apply the same standard of review, as the FRB when reviewing cases. FRU staff and FRB members attend the same annual training involving the objective analysis of force, which ensures that the FRU is conducting a thorough review of their cases consistent with the reviews conducted by the Board.

Type II cases are sent to the FRB by the FRU when any of the following factors are involved:

- Possibility of misconduct;
- Significant policy, training, equipment, or tactical issues;
- When FIT was contacted for consultation and declined to respond or investigate;
- When less-lethal tools were used on the subject;
- When a canine makes physical contact with the subject;
- When the subject is transported to an emergency room.

All cases not selected for FRB review are reviewed by the FRU detectives and their chain of command. The FRU captain makes the final determination based on the FRU's reviews and recommendations. Bifurcating Type II use of force cases allows the FRB to focus its efforts on the more significant cases, such as Officer Involved Shootings, Type III investigations, and serious Type II cases. Additionally, a random 10% of cases reviewed each month by FRU are presented to the FRB for a second independent review – a mechanism to ensure quality control.

Both FRU answer the core inquiries of (1) whether the force was consistent with policy – including an affirmative obligation to de-escalate when safe and feasible to do so, and if there were issues with the force, whether supervisors appropriately identified those issues. The FRU considers – and the FRB discusses – all pertinent factors surrounding the force, including the tactics used and supervision at the scene. FRB determinations are documented and any issues identified are referred to the appropriate commander for follow-up. If policy violations are suspected, the incident is immediately referred to OPA,

or to the chain of command if appropriate under Manual Section 5.002, by the FRB Chair or designee, if not already referred by the reviewing chain of command.[1]

The aggregated data presented in this report is sourced through the Data Analytics Platform, including fielded data around crisis and use of force incidents and newly including a protocol for capturing and integrating data relating to FRU/FRB reviews.

SPD Manual Section 16.110 requires that officers document all contacts with subjects who are in any type of behavior crisis.  Currently, the Versaterm Records Management System (RMS) is configured with a template designed to capture certain data in structured fields.  These templates are submitted as "children" of a "parent" report and consumed by the DAP Extract, Transfer, Load (ETL) process.  This process updates the DAP's data warehouse with new or changed records daily and renders them for analysis in the Tableau server as a discrete data source and associated attribute of the Use of Force data source.  Additionally, these data can be joined with other data sources in ad hoc querying, as needed.

This report presents a deeper review of Type I, II, and III uses of force associated with a crisis event, including an aggregate review of (1) the nature of the force used (including implement, if any) and (2) subject behaviors/resistance across the Type I and Type II classifications of force.   The report also compares crisis events to non-crisis events relative to overall use of force across the study period.  This report further presents the FRU/FRB qualitative analysis as to those cases reviewed by FRU/FRB during the study period, where both a crisis template and Use of Force report were joined under the same

---

[1] It is important to understand what an FRB finding means relative to the question as to whether the force was constitutional.  By law, whether any use of force is lawful under the Constitution is a case-specific determination, based on the perception of a reasonable officer under the totality of the circumstances present at the time the force is applied, and often a point on which reasonable minds can differ.  While the courtroom is generally the forum for determining the *legality* of a use of force, the Force Review Board is a mechanism by which members analyze the broader question of whether the force meets the requirements of policy and training that hold officers to a higher standard of conduct – and care should be taken not to conflate the two.  Importantly, SPD policy incorporates both federal and state constitutional thresholds, but holds officers to a substantially higher level of performance and scrutiny consistent with community expectations. Simply put, a finding that force is out of policy does *not* equate to a finding that the force violated the Constitution, but a finding that the force was in policy *does* mean that, in the view of the reviewers, it was also likely lawful.

case file.[2]  The reader should note that, because this review encompasses only those Type I uses of force that were included in force cases classified at a higher level (Type II or III), the numbers reported in this section of the report do not include the majority of the Type I incidents reported in the Department's Crisis Intervention Outcome Report, published October 31, 2018, and in Section I of this accordingly, will differ in raw number from those reported in other contexts.

For each case in which either the Chain of Command, FRU or FRB, or a third-party sought OPA review of a crisis-related use of force incident, this report provides both (1) a description of the case; (2) the FRB's discussion; and (3) the OPA disposition.  In three instances that involved a FIT investigation, the entirety of the FIT Force Investigation Report is included for full context and transparency.

Finally, this report examines a smaller cohort of subjects who, over 2017-2018, presented in three or more crisis incidents, for purposes of examining whether there are any remarkable distinctions in use of force involving these "high utilizers" as compared to the overall population of subjects in crisis/use of force cases.

## † ∖ y 7 # k #

The Consent Decree required SPD to continue and expand its tracking of information related to SPD's interactions with individuals in crisis.  These metrics include information about each crisis interaction such as date, time, location, name, age, gender, address, weapon, veteran status, involved officers, supervisory response, techniques or equipment used, injuries, disposition, and a brief narrative.  *See* Consent Decree at paragraph 136.  SPD met this requirement during Phase I of this matter, and has continued to comply with these requirements during Phase II.  Aggregations and SPD's analysis of this data is provided herein.Between January 1, 2017, and June 30, 2018, a total of          SPD officers responded to a total of          unique calls for service. During this same time period, a total of          cases were generated involving a reportable use of force by one or more officers. In total, across these          cases,          separate

---

[2] Due to the limitations of siloed records system capturing use of force and crisis events separately, relationships between crisis and use of force can only be inferred presently through a common report number. A match, involving the exact subject of the crisis /use of force is not possible, at this time. Comparisons made to the Crisis Event and Use of Force data sources suggest just 1 crisis event believed to be associated with a UoF and 3 uses of force believe to include a crisis event, were not included. The observed disparity is due to date filtering, where a Crisis Contact or a UoF were reported, associated with a common report, outside the study period. NRMS (MK43) has a UoF reporting capability and is being configured by the NRMS core team, in a feasibility study. De-siloing UoF reporting will improve counts and relationships by joining reports, natively.

uses of force were reported, representing              .   .        .   .        .        .           of the              officer dispatches during this study period  .  . . This reflects a rate that is consistent with prior years' reports.  (A more comprehensive discussion of overall use of force will be presented in the Department's upcoming 2018 Use of Force Annual Report, to be published on January 31, 2019.)

Of these        calls for service,             .        involved one or more subjects reported to be in behavioral crisis, as documented via crisis templates configured in the RMS.  In total,        crises templates were completed across these 14,181 cases (indicating some cases that involved more than one subject in crisis).  (As noted in the Department's Annual Crisis Intervention Outcome Report, published on October 31, 2018, and attached hereto as Appendix A for ready reference, these numbers represent a nearly 30% surge in crisis-related calls for service over the past two years.)

Of these        crisis contacts reported,             .(across        unique case numbers) involved one or more reportable uses of force.[3]  In total, across these        cases, separate uses of force were reported.  These        separate uses of force represent        of overall force (across crisis and non-crisis incidents) during the same study period ($n$=2,724).

Figure 1 shows the distribution of force, by Type (I, II or III), across the 560 uses of force in crisis-related incidents.

---

[3] These numbers differ very slightly from those reported on October 31, 2018.  The reason for this is that as the DAP, a dynamic system, is updated daily, numbers may change insignificantly from day to day as data is updated.  Further, when selecting data from a date range, numbers may change depending on which data source is queried (*e.g.*, use of force cases with associated crisis templates, or crisis templates with an associated use of force report) and the timing of entry of different records into the system.  SPD's reporting of Type I and Type II force, accordingly, significantly exceeds that standard.  See https://ucr.fbi.gov/use-of-force



Consistent with rates of force observed across the general population of data, low-level, Type I force continues to represent the largest proportion of overall force – comprising over half (62.86%) of all force used in crisis-related incidents.

Type III (serious use of force) continues to be an empirically rare occurrence, with a total of five uses of Type III force, across three separate incidents, comprising less than one percent (0.89%) of the 560 overall uses of force.[4]   Each of these cases is discussed later in this report.

One notable distinction between crisis and non-crisis related use of force incidents is observed with respect to Type II (intermediate) use of force. Whereas, over the past three years, Type II use of force, overall, has remained fairly consistent at around 20% of all use of force, in crisis incidents, Type II force comprises a higher percentage of all use of force – approximately 36%.  This is a real and true difference; whether this observed difference is statistically meaningful is yet to be determined.  It is likely that the addition of a subject experiencing apparently behavioral crisis defines a distinct class of force but a statistical approach is required to validate the finding.  This will be discussed further later in this report.

Tables 1 and 2 shows a breakdown of 2,610 reports, citywide, that contain at least one application of Type I and/or Type II force, by non-crisis/crisis-involved events.

Overall, across these 2,610 reports, "Handcuffing" continues to comprise the largest proportion of force applied (39.2% of force overall), followed by "Control Hold – Restraint" (24.67% of total use of force) and "Firearm (Pistol) Point" (18.05% of total uses of force).  Of the 32 separate force applications represented in these reports, these three application types were the only to be observed in greater than 10% of force cases, with a sharp (>10%) divide between the third ("Firearm (Pistol) Point") and fourth ("Verbal

---

[4] Of note, the Department is participating in the FBI's new Use of Force collection program (SPD, in fact, was one of the Departments that participated in the pilot to develop the platform); Type III force is the only level of force that is required to be reported in that platform and is the nationwide standard for "force."

Commands") most frequent force.  Only six application types were observed in greater than 5% of reported force, and just 14 application types were observed in at least 1% of reported force.

Some notable distinctions are observed, however, between non-crisis and crisis-involved events.  In non-crisis events, "Handcuffing" is the most frequent use of force reported, comprising nearly half (47.06%) of all reported Type I force where no crisis is reported. "Firearm (Pistol) Point" is the second most frequently reported force application within this population of cases (24.54%), followed by "Control Hold – Restraint" (15.59%).  In contrast, within the population of crisis-involved events, the "Control Hold – Restraint" is by far the most frequently reported force type (50.15%), followed by "Handcuffing" (37.64%); fewer than 10% (8.26%) involved a "Firearm (Pistol) Point" use of force.

# Table 1: Distribution of Type I/II Use of Force, Non-Crisis/Crisis-Involved Events

| | Level 1 - Use of Force | | | | Level 2 - Use of Force | | | | Grand Total | |
| | No Crisis | | Crisis | | No Crisis | | Crisis | | | |
| | % of Total | UoF Count | % of Total | UoF Count | % of Total | UoF Count | % of Total | UoF Count | % of Total | UoF Count |
|---|---|---|---|---|---|---|---|---|---|---|
| Handcuffing | 47.06% | 815 | 37.46% | 127 | 13.49% | 46 | 17.68% | 35 | 39.20% | 1,023 |
| Control Hold – Restraint | 15.59% | 270 | 50.15% | 170 | 33.43% | 114 | 45.45% | 90 | 24.67% | 644 |
| Firearm – Pistol – Point | 24.54% | 425 | 8.26% | 28 | 4.40% | 15 | 1.52% | 3 | 18.05% | 471 |
| Verbal Commands | 5.83% | 101 | 6.19% | 21 | 14.08% | 48 | 9.60% | 19 | 7.24% | 189 |
| Control Hold – Takedown | 2.37% | 41 | 5.01% | 17 | 23.46% | 80 | 21.72% | 43 | 6.93% | 181 |
| Control Hold – Team Takedown | 2.77% | 48 | 10.91% | 37 | 14.08% | 48 | 21.21% | 42 | 6.70% | 175 |
| Firearm – Rifle – Point | 7.39% | 128 | 3.24% | 11 | 0.88% | 3 | | | 5.44% | 142 |
| NFDD | 2.71% | 47 | 1.47% | 5 | 1.47% | 5 | | | 2.18% | 57 |
| Personal Weapons – Push | 1.39% | 24 | 1.18% | 4 | 5.28% | 18 | 5.56% | 11 | 2.18% | 57 |
| Electronic Control (ECD / Taser) | 0.06% | 1 | | | 6.74% | 23 | 11.62% | 23 | 1.80% | 47 |
| Personal Weapons – Punch/Elbow | 0.17% | 3 | 0.29% | 1 | 8.21% | 28 | 7.58% | 15 | 1.80% | 47 |
| Personal Weapons – Feet/Leg Kick/Knee | 0.17% | 3 | 0.29% | 1 | 7.04% | 24 | 5.05% | 10 | 1.46% | 38 |
| Vehicle – Other | 0.12% | 2 | 0.59% | 2 | 7.04% | 24 | 5.05% | 10 | 1.46% | 38 |
| Chemical Agent – OC Spray | | | | | 10.26% | 35 | 0.51% | 1 | 1.38% | 36 |
| Personal Weapons – Pressure Point | 0.29% | 5 | 1.77% | 6 | 1.47% | 5 | 2.53% | 5 | 0.80% | 21 |
| Other Weapon – Other | 0.23% | 4 | 0.29% | 1 | 2.64% | 9 | | | 0.54% | 14 |
| Canine | | | | | 3.81% | 13 | | | 0.50% | 13 |
| Firearm – Shotgun – Point | 0.52% | 9 | 0.29% | 1 | | | | | 0.38% | 10 |
| Hobble Restraint | | | 0.29% | 1 | 1.17% | 4 | 2.02% | 4 | 0.34% | 9 |
| Personal Weapons – Open Hand Strike | 0.12% | 2 | 0.29% | 1 | 1.17% | 4 | 1.01% | 2 | 0.34% | 9 |
| Personal Weapons – Feet/Leg Sweep | | | 0.29% | 1 | 0.88% | 3 | 0.51% | 1 | 0.19% | 5 |
| Firearm – Pistol – Other | 0.23% | 4 | | | | | | | 0.15% | 4 |
| Balls – Blast | | | | | 0.88% | 3 | | | 0.11% | 3 |
| Chemical Agent – Other | | | | | 0.88% | 3 | | | 0.11% | 3 |
| Vehicle – PIT | | | | | 0.59% | 2 | | | 0.08% | 2 |
| Baton – Expandable –Control/Pressure Point | 0.06% | 1 | | | | | | | 0.04% | 1 |
| Baton – Straight –Control/Pressure Point | | | | | 0.29% | 1 | | | 0.04% | 1 |
| Bicycle – Push | | | | | 0.29% | 1 | | | 0.04% | 1 |
| Blue Nose Device | | | | | 0.29% | 1 | | | 0.04% | 1 |
| Carotid/Neck Restraint | 0.06% | 1 | | | | | | | 0.04% | 1 |
| Other Weapon – Blunt Object | | | | | | | 0.51% | 1 | 0.04% | 1 |
| Shield | | | | | | | 0.51% | 1 | 0.04% | 1 |
| Grand Total | 100.00% | 1,732 | 100.00% | 339 | 100.00% | 341 | 100.00% | 198 | 100.00% | 2,610 |

With respect to Type II force cases, "Control Hold – Restraint" is the most frequently reported use of force, comprising 33.43% of all Type II force in non-crisis cases, and 45.45% in crisis-involved cases.  "Control Hold – Takedown" and "Control Hold – Team Takedown" are the second and third most frequently reported use of force across both populations, comprising 23.4% and 14.08%, respectively, of Type II force in non-crisis events, and nearly equal proportions (21.72% and 21.21% respectively) of Type II force in crisis-involved events.

Notable differences were observed between the two populations with respect to certain less lethal tools.  Specifically, while the number of Taser deployments was equal (n=23) in both non-crisis and crisis-involved events, the proportion of Taser applications was higher in crisis-involved events (11.62%) relative to non-crisis events (5.28%).  Only one (0.51% of the total) application of OC spray was deployed in a crisis-involved event, compared to 35 (10.26% of the total) applications of OC spray in non-crisis events.  Across both Type I and Type II cases, only two applications of force in non-crisis events involved the use of a baton; there were no reported uses of an impact weapon "strike" in any crisis-involved event during the study period.

Of 2,083 Type I/II use of force reports (overall during the study period) in which at least one type of subject resistance was noted, some similarly notable differences were observed.  A breakdown of subject resistance in Type I/II reports, in both non-crisis and crisis-involved events, is presented in Table 2.

As was observed with respect to application of force, a review of subject resistance suggests some differences between non-crisis and crisis-involved interactions.  In all categories of resistance in which at least one type of resistance was specified (*i.e.*, excluding "other"), the proportions of such resistance was markedly higher in crisis-involved events relative to both non-crisis events and overall use of force.  See, in particular, proportions involving "Resist Handcuffing" (45.44% in crisis-involved, compared to 25.9% in non-crisis, events); "Resist Restraint/Control Hold" (39.88% in crisis-involved, compared to 18.75% in non-crisis, events); and "Personal Weapons – Feet/Leg/Kick" (17.26% in crisis-involved, compared to 4.88% in non-crisis, events).  These numbers suggest that greater force may be necessary to bring subjects in crisis under control.

**Table 2: Distribution of Subject Resistance in Non-Crisis/Crisis-Involved Use of Force Events**

| | No Crisis | | Crisis | | Total | |
|---|---|---|---|---|---|---|
| | % of Total | UoF Count | % of Total | UoF Count | % of Total | UoF Count |
| Other (Specify in Narrative) | 47.69% | 753 | 25.00% | 126 | 42.20% | 879 |
| Resist Handcuffing | 25.90% | 409 | 45.44% | 229 | 30.63% | 638 |
| Passive Noncompliance (including Verbal) | 28.50% | 450 | 29.17% | 147 | 28.66% | 597 |
| Resist Restraint/Control Hold See above. | 18.75% | 296 | 39.88% | 201 | 23.86% | 497 |
| Break Free of Control Hold | 8.49% | 134 | 14.88% | 75 | 10.03% | 209 |
| Personal Weapons – Feet/Leg Kick/Knee | 4.88% | 77 | 17.26% | 87 | 7.87% | 164 |
| Personal Weapons – Bodyweight | 5.89% | 93 | 13.69% | 69 | 7.78% | 162 |
| Personal Weapons – Push | 3.61% | 57 | 5.75% | 29 | 4.13% | 86 |
| Personal Weapons – Punch/Elbow | 2.60% | 41 | 8.33% | 42 | 3.98% | 83 |
| Control Hold – Restraint | 1.90% | 30 | 5.95% | 30 | 2.88% | 60 |
| Edged Weapon - Present/Brandish | 1.96% | 31 | 4.56% | 23 | 2.59% | 54 |
| Control Hold – Takedown | 0.82% | 13 | 3.57% | 18 | 1.49% | 31 |
| Firearm – Point | 1.27% | 20 | 0.60% | 3 | 1.10% | 23 |
| Blunt Object – Use | 0.89% | 14 | 1.39% | 7 | 1.01% | 21 |
| Blunt Object – Brandish | 0.44% | 7 | 1.98% | 10 | 0.82% | 17 |
| Personal Weapons – Open Hand Strike | 0.51% | 8 | 1.79% | 9 | 0.82% | 17 |
| Firearm – Fire | 0.76% | 12 | | | 0.58% | 12 |
| Edged Weapon – Use | 0.19% | 3 | 0.79% | 4 | 0.34% | 7 |
| Personal Weapons – Feet/Leg Sweep | 0.19% | 3 | 0.40% | 2 | 0.24% | 5 |
| Personal Weapons – Pressure Point | 0.06% | 1 | 0.20% | 1 | 0.10% | 2 |
| Canine | 0.06% | 1 | | | 0.05% | 1 |
| Carotid/Neck Restraint | | | 0.20% | 1 | 0.05% | 1 |
| Chemical Agent | 0.06% | 1 | | | 0.05% | 1 |
| Electrical Weapon (Taser, Stun Gun) | 0.06% | 1 | | | 0.05% | 1 |
| Explosive | 0.06% | 1 | | | 0.05% | 1 |
| Firearm – Impact Weapon | 0.06% | 1 | | | 0.05% | 1 |
| Grand Total | 100.00% | 1,579 | 100.00% | 504 | 100.00% | 2,083 |

Although a pattern of increased resistance (passive and active) is observed across force types, caution should be used when drawing conclusions from strict observation of these data, particularly when comparing unequal samples. Observed differences in force and resistance suggest crisis involved force is a distinct class of response data, but this has yet to be established empirically. Future analyses will attempt to validate this observation using appropriate methods that control for the disparate sample size; nonetheless, initial observations suggest it is the demeanor of the subject that is likely responsible for the increased occurrence of Type II force, within crisis involved interactions.

This observation is supported as well by a review of behaviors exhibited by individuals in crisis. Table 3 compares a breakdown of exhibited behaviors in crisis-involved events that involved force with those in which no force was reported.

| Exhibiting Behavior | Involved Force | | |
| --- | --- | --- | --- |
| | No | Yes | Total |
| Biologically Induced | 57.67% | 48.75% | 57.51% |
| Unknown Crisis Nature | 43.67% | 50.54% | 43.79% |
| Disorderly Disruptive | 31.86% | 74.91% | 32.61% |
| Suicide Threat Attempt | 25.77% | 22.94% | 25.72% |
| Belligerent Uncooperative | 22.24% | 73.12% | 23.13% |
| Chemically Induced | 22.47% | 37.63% | 22.73% |
| Neglect Self Care | 14.83% | 9.68% | 14.74% |
| Unusual Fright Scared | 14.31% | 17.92% | 14.37% |
| Behavior Other | 8.64% | 9.32% | 8.65% |
| Medically Induced | 3.93% | 2.15% | 3.90% |
| Excited Delirium | 0.52% | 0.72% | 0.52% |

As might be expected, a majority of force applications were used to bring under control subjects exhibiting "disorderly disruptive" (74.91% of force applications) and/or "belligerent uncooperative" (73.12%) behaviors, or who were engaged in a suicide attempt or threat (22.94%) – behavior that often requires immediate action to protect one's self or others.

A breakdown of injuries associated with Type I and Type II uses of force, in non-crisis and crisis-involved events, is shown in Table 4. While few notable differences are observed, a review of injuries suggests that Type II force reports involving subjects in crisis are driven predominantly by reports of abrasions and lacerations, with some observation of differences in the occurrence of soft tissue damage, bruises and the occurrence of hospital treatment. Again, however, caution should be used in drawing any conclusion

from these visually apparent differences.  As noted earlier, future analyses will attempt to verify Type II crisis involved force as a distinct class through appropriate statistical means[5] to handle unbalanced population size and the problem of multiple comparisons.

While (as reported in the Department's Crisis Intervention Outcome Report (see Appendix A)) the overwhelming majority of crisis interactions (~ 92%) are in response to dispatched events, force occurs with greater frequency (2.78%) in on-viewed events relative to dispatched events (1.81%).  While again a statistical comparison of these two populations is difficult given both the extraordinarily infrequent occurrence of force, overall, and the substantial difference in population size between dispatched and on-viewed events, some differences can be observed when comparing use of force to subject behavior in dispatched and on-viewed events.

---

[5] A Principal Components Analysis (PCA) approach to Confirmatory Factor Analysis (CFA) and Bayesian classification are both valid approaches.

## Table 4: Reported Injuries in Non-Crisis/Crisis-Involved Use of Force Events

| | Level 1 – Use of Force | | | | Level 2 – Use of Force | | | | Total | |
| | No Crisis | | Crisis | | No Crisis | | Crisis | | | |
| | % of Total | UoF Count | % of Total | UoF Count | % of Total | UoF Count | % of Total | UoF Count | % of Total | UoF Count |
|---|---|---|---|---|---|---|---|---|---|---|
| Complaint of Pain Only | 53.18% | 853 | 61.04% | 199 | 25.46% | 83 | 30.00% | 57 | 48.73% | 1,192 |
| No injuries noted or visible | 45.95% | 737 | 35.89% | 117 | 24.54% | 80 | 17.37% | 33 | 39.53% | 967 |
| Abrasion | 1.62% | 26 | 2.45% | 8 | 42.94% | 140 | 56.32% | 107 | 11.49% | 281 |
| Laceration | 0.56% | 9 | 1.53% | 5 | 9.20% | 30 | 10.53% | 20 | 2.62% | 64 |
| Soft Tissue Damage | 0.19% | 3 | 0.31% | 1 | 4.60% | 15 | 3.16% | 6 | 1.02% | 25 |
| Bruise | 0.37% | 6 | | | 1.84% | 6 | 2.63% | 5 | 0.70% | 17 |
| Hospital Treated/Released | 0.19% | 3 | 0.31% | 1 | 0.61% | 2 | 3.16% | 6 | 0.49% | 12 |
| EMS/At Scene | | | 1.53% | 5 | 0.92% | 3 | 1.05% | 2 | 0.41% | 10 |
| Dog Bite – Puncture | 0.12% | 2 | | | 2.45% | 8 | | | 0.41% | 10 |
| Treatment Refused | | | 0.31% | 1 | 1.84% | 6 | 1.05% | 2 | 0.37% | 9 |
| Death | 0.19% | 3 | 0.92% | 3 | | | | | 0.25% | 6 |
| Dog Bite – Abrasion | | | | | 1.84% | 6 | | | 0.25% | 6 |
| Self-Treatment | | | | | 1.84% | 6 | | | 0.25% | 6 |
| Hospital Admitted | 0.06% | 1 | 0.31% | 1 | | | 0.53% | 1 | 0.12% | 3 |
| EMS/At Precinct | 0.12% | 2 | | | | | 0.53% | 1 | 0.12% | 3 |
| Sprain / Strain / Twist | | | 0.31% | 1 | 0.31% | 1 | | | 0.08% | 2 |
| Dislocation | | | | | 0.61% | 2 | | | 0.08% | 2 |
| Gunshot | 0.06% | 1 | | | 0.31% | 1 | | | 0.08% | 2 |
| Burn | 0.06% | 1 | | | 0.31% | 1 | | | 0.08% | 2 |
| Concussion | | | 0.31% | 1 | | | | | 0.04% | 1 |
| Human Bite | | | 0.31% | 1 | | | | | 0.04% | 1 |
| Dog Bite – Rake Wound | | | | | 0.31% | 1 | | | 0.04% | 1 |
| Fracture | | | | | 0.31% | 1 | | | 0.04% | 1 |
| Grand Total | 100.00% | 1,604 | 100.00% | 326 | 100.00% | 326 | 100.00% | 190 | 100.00% | 2,446 |

19

As shown in Table 5, on-viewed crisis-involved events involving a use of force were highly likely to involve observed subject behaviors classified as "Disorderly Disruptive," "Unknown Crisis Nature," and "Belligerent Uncooperative," and "Chemical Induced." The higher frequency of these reported behaviors in on-viewed cases, while prevalent in dispatched cases as well, suggests that officers are observing that intervening in events that, as a result of more agitated subject behavior, are more likely to result in a use of force.

|  | DISPATCH | | ONVIEW | | |
| Exhibiting Behavior | Force | No Force | Force | No Force | Total |
|---|---|---|---|---|---|
| Biologically Induced | 50.63% | 59.18% | 37.50% | 50.13% | 58.28% |
| Disorderly Disruptive | 74.06% | 32.19% | 81.25% | 36.50% | 33.34% |
| Unknown Crisis Nature | 48.54% | 42.47% | 62.50% | 51.21% | 43.29% |
| Belligerent Uncooperative | 72.38% | 22.84% | 81.25% | 25.29% | 23.99% |
| Chemically Induced | 36.40% | 22.09% | 50.00% | 30.04% | 23.02% |
| Suicide Threat Attempt | 23.85% | 29.35% | 12.50% | 12.02% | 27.87% |
| Unusual Fright Scared | 18.41% | 14.08% | 12.50% | 15.07% | 14.22% |
| Neglect Self Care | 8.37% | 15.26% | 18.75% | 17.67% | 15.34% |
| Behavior Other | 10.04% | 8.49% | 6.25% | 10.76% | 8.69% |
| Medically Induced | 2.51% | 3.98% |  | 4.48% | 3.99% |
| Excited Delirium | 0.84% | 0.54% |  | 0.90% | 0.57% |

In sum, the data support the intuitive conclusion that force is unfortunately necessary more frequently in crisis-involved incidents because of the behaviors of subjects in crisis who, as compared to the general population, more frequently exhibit dangerous or threatening behaviors, often driven by substance use that precludes effective de-escalation. In other words, the data strongly suggest that crisis related use of force is a distinct type of event. While some notable differences can be observed in force classification, the observed difference is likely the result of officer response to specific subject behaviors, resulting in injuries and force applications which are definitive of the class.  This is particularly true with respect to Type II uses of force, which occur with greater frequency in crisis-involved incidents than in use of force cases, overall.  As noted, future analyses will explore these apparent patterns more closely and attempt to better understand the nature of these events.  Anecdotally, as discussed in Appendix A, there is discussion nationally about the rise in methamphetamine use – a category of narcotic known to cause violent and erratic behavior (see, e.g., SPD Type III case 2017-319167,

20

discussed later in this report); these reports are consistent with data from both the Seattle Fire Department and the King County Medical Examiner that indeed show a rising trend in the number of incidents involving the use of methamphetamine.  As both SPD, public health agencies, and mental health providers are able to better understand the mechanisms that drive such behavior, it is possible that additional intervention strategies may be developed that may reduce the energy of such events.



The Force Review Unit and Force Review Board serve as SPD's internal review mechanisms for all serious uses of force.  This includes uses of force that involve people in crisis.  For purposes of this report, SPD extracted the data and findings of the FRU and FRB's findings with respect to all Type II uses of force during the audit period (January 1, 2017 to June 30, 2018).[6]

Between January 1, 2017, and June 30, 2018, FRU/FRB reviewed a total of      crisis-involved cases including one or more uses of force, comprising      separate uses of force in total.  A breakdown of use of force reviewed, by type, is shown in Figure 3.[7]   All Type II uses of force within this population of cases were reviewed by the full FRB.

---

[6] In May 2018 the FRU (a unit staffed with subject matter experts with respect to force review) began entering data from force review findings documents into a custom software application SPD developed to capture unstructured data relating to force reporting, investigation, and review.  Findings for each of the Type II cases associated with a crisis template that had undergone FRU/FRB review were backfilled into this system.  This application allows SPD to populate, in DAP, findings of the FRU/FRB with respect to whether officers acted consistently with Department policy and training.  Data reported in this section comprise both aggregated findings from this application and manual review of FIT and FRU records.

[7] Because of the inherent time lag between the date of occurrence and the date that final review is completed, the number of cases occurring during the study period that had completed final review during that same period will be lower.



The findings of the FRB (and the findings of the Office of Police Accountability "OPA", where additional investigation was performed) demonstrate that SPD has sustained compliance with the terms of the Consent Decree related to minimizing the use force against people in crisis.  In addition to the quantitative finding that these numbers are exceptionally low, the qualitative analysis conducted by the FRB found that each serious use of force was necessary, reasonable, and proportionate and otherwise complied with SPD's policies and training relating to force and de-escalation.

In all but the small number of cases discussed herein, FRB found that the Type II uses of force involving people in crisis in the study period were within policy and consistent with training.

Whether the FRU appropriately decided in all cases is beyond the scope of this review.

FRB referred  three cases (4.2%) involving a Type II use of forceto OPA for  issues relating to either the reporting, investigation, and/or use of force.  Of the allegations referred, none were sustained by OPA.  The circumstances, and OPA's findings, as to each are presented in Tables 6-10, which are attached hereto as Appendix B.

In one case, the FRB found the officers' actions to be consistent with use of force policy and training, but referred to OPA allegations concerning separate possible policy violations.  OPA returned this case for supervisor action.  This case is described in Table 7.

In nine cases (12.5%), OPA complaints, generated either by the Chain of Command (two cases) or a third party (either individually or as forwarded by the Chain of Command) were pending at the time of the FRB review. Accordingly, FRB discussed tactics and decision-making around the use of force, but deferred findings to OPA. Of these eight cases, each containing multiple allegations, OPA sustained allegations relating to the force itself in only one. These cases are described in Table 8.

In one case, OPA received a complaint from the subject via the Chain of Command prior to FRB review; the matter was reviewed by the FRB because OPA classified the case as an Expedited Investigation with the agreement of the OPA Auditor and, thus, determined that the case would not be sustained. See Table 9. Ultimately, the FRB found that the officers took reasonable steps to de-escalate and that the force was reasonable, necessary and proportional. The FRB noted as training issues that the officers should have been more aware of officer safety issues, as they separated without having frisked the subject or securing him in handcuffs. The FRB recommended that this case be referred to Training for incorporation into future training sessions on tactics.

Finally, in two cases, the FRB noted concerns about tactics and decision-making and on-scene supervision, but noted that all concerns had been addressed prior to its review by the Chain of Command. *See* Table 10.

## † @ ˙ j      k   ˙ u   @y  ˙ 7

The Force Review Board serves as SPD's internal review mechanisms for all Type III uses of force, including uses of force that involve people in crisis. For purposes of this report, SPD extracted the data and findings of FRB in the same manner described in Section VI. with respect to all Type III uses of force during the audit period (January 1, 2017 to June 30, 2018).

As with Type II force, the findings of the FRB and OPA demonstrate that SPD has sustained compliance with the terms of the Consent Decree related to minimizing the use force against people in crisis during cases involving Type III force. As with Type II force, in addition to the quantitative finding that these numbers are exceptionally low, the qualitative analysis conducted by the FRB shows that each serious use of force was necessary, reasonable, and proportionate and otherwise complied with SPD's policies and training relating to force and de-escalation.

23

There were only two Type III uses of force against people in crisis during the audit period. Descriptions of each, as well as relevant FRB and OPA findings are provided as Appendix C to this Evaluation.

In the first, FRB concluded that officers used sound tactics and de-escalation efforts in this incident.  Officers communicated clearly with the subject to get on the ground and comply with their commands.  A warning was provided to the subject, prior to the Taser deployment, but was ignored.  No additional de-escalation tactics were identified by the Board that the involved officers could have used.  The use of force was also referred to OPA by a civilian.  Following OPA review, the OPA Director issued a "Not Sustained" finding with respect to all six allegations, certifying four as a "Lawful and Proper" use of force, and certifying two allegations as "Unfounded."

With respect to the second case involving Type III force, at the time of the FRB review, OPA had taken review of multiple issues related to force, de-escalation, stops and detentions, and professionalism, which had been referred to OPA by the chain of command.  The FRB accordingly discussed elements around tactics and decision-making, but, per policy, did not issue findings on either tactics/decision-making or the use of force.  The FRB did conclude, however, that no Type III force was used, finding (a) that no choke/neck hold was applied and there was no indication that officers obstructed the subject's airway while applying force to the subject. Following OPA's review of the subject's allegation that he was choked, the OPA recommended a finding of "Not Sustained – Inconclusive."  OPA rejected allegations of excessive use of force as to two other officers at the scene as "Not Sustained – Unfounded." As to referrals relating to the lawfulness of the stop, OPA found all related allegations, against all named employees, to be "Not Sustained – Lawful and Proper." As to referrals relating to professionalism and discretion, OPA found all related allegations, against all named employees, to be "Not Sustained – Lawful and Proper" except in the instance of named employee #1 where, because evidence of the alleged choke/neck hold was inconclusive, OPA found the allegations to be "Not Sustained – Inconclusive."

In addition to full FRB review, two Type III cases were referred and reviewed directly by OPA - one by way of a third-party complaint (2017-319167), and one by way of an FRB referral.  In both, OPA issued "not sustained" findings as to each allegation.

Finally, while not directly required by the terms of the Consent Decree, SPD's Crisis Response Unit has engaged in significant additional work in the field of crisis intervention

with the goal of improving SPD's understanding of the interactions it has with people in crisis and how to improve the Department's capacity to engage and support people in crisis. A summary and some key conclusions from the past year of CRU's work are described herein.

The Crisis Response Unit consists of 1 sergeant, 5 officers and 1 mental health professional (MHP).  Throughout the study period and ongoing, CRU has maintained its standing mission of supporting Patrol with direct field-response, assessing Crisis related reports for appropriate follow up to include potential Response Plans, and coordinating with service providers and partner agencies.  By way of example, in 2018 alone, CRU personnel responded to over                    , coordinated                    with service partners (including regular meetings with the Crisis Intervention Committee), and conducted follow-up on over 700 incidents.

In addition to their field and follow-up work, CRU maintains situational awareness of crisis-involved activity throughout the city in two significant ways, at both an incident level and through aggregate review.

At the incident level, a CRU sergeant is responsible for reviewing all Significant Incident Reports (SIRs)[8] and ensuring, for those that contain crisis indicators, that a crisis template has been completed for that subject.  In addition, where exceptional work is noted, the Sergeant may retain those SIRs for purposes of informing future training and/or commendations.  Thus, for purposes of answering questions that have come up as to how SPD measures de-escalation in instances in which no force is used, incident-specific review in crisis cases, which are inherently more likely to involve force at some level, provides one such measure of oversight.  Examples of some such SIRs generated within the study period are included below for illustrative purposes.

---

[8] Significant incidents include any incident involving an assault with serious injury, bias crime, circumstances likely to generate media attention and/or community concern, homicide, hostage/barricade, in-custody death, assault on officer, robbery, shots fired, significant crisis incidents, including those resolved without force, Type II and Type III use of force, and any other event a sergeant believes to be significant.  The purpose of the SIR is to provide command staff with rapid notification of significant incident, to inform sergeants, lieutenants, and captains of potential cross-precinct issues to enhance officer safety and incident investigation, and to make specific information about significant events directly and quickly available to officers and detectives to improve officer communication and safety.  See SPD Manual Section 15.350.

| 2017-151250 | Crisis |
|---|---|
| Precinct: NORTH | U1 Third Watch |
| Date: 05/01/2017 | Time: 0250 |
| Created by: | Stone, Steven |

Patrol officers responded to a report of a man with a gun threatening to kill himself and his roommates. The caller was one of the roommates who was able to get out of the house. A crisis team and containment was established. The caller further reported she saw the suspect hold a gun to his chest while naming off the roommates he was going to kill in order. SWAT/HNT responded to the scene. A Mandarin interpreter was contacted via communications and the complainant was interviewed again in her native language. After approximately twenty minutes of interviewing the complainant in her native language it was determined the complainant was in crisis. Patrol officers conducted a welfare check of the roommates and learned they were fine. The caller went to the hospital for a voluntary mental health evaluation. 221 and 271 responded to the scene. Car 88 was notified.

| 2017-237314 | Crisis with Knife |
|---|---|
| Precinct: SOUTH | O3 First Watch |
| Date: 07/01/2017 | Time: 0854 |
| Created by: | Burrows, David |

At approximately 0850 HRS, the subject parked his truck at the Boeing parking lot which is located at the 7500 BLK of E Marginal Wy S. Boeing staff called SPD about the incident. The subject cut himself and he had a knife to his neck. Boeing staff and officers barricaded the subject's vehicle in. The subject kept threatening a suicide by cop and that he wanted to be shot by police. Multiple CIT Certified Officers were on scene and tried to de-escalate the situation. HNT was requested and en route to the location. I arrived on scene and I saw that the male inside the truck had a knife to his neck and he was trying to bait police to engage him. The subject wanted to be shot by police. I confirmed that the subject was inside the vehicle by himself, and that he didn't commit any crimes. Once I confirmed the status of the incident, I had officers safely move vehicles to allow an exit for the subject. The subject drove away, and left on E. Marginal Wy S. A Hazard Report was completed and dispatch broadcasted the subject's information over radio.

| 2017-149251 | Arrest-Threats to Kill Officer |
|---|---|
| Precinct: WEST | Q3 First Watch |
| Date: 04/29/2017 | Time: 0947 |
| Created by: | , Hilton, Shaun |

A 911 caller reported a man yelling to himself and waving a 5-inch knife around near the Seattle Center grounds near wear groups of children were gathering. Officers responded to the area and were continually updated with the suspect's location by multiple callers. Officers eventually caught up to him at a nearby parking garage. There, the suspect turned on a uniformed police officer, made stabbing motions with a fixed blade knife and verbally threatened to kill him with the knife. The suspect fled and sought refuge on top of a roof of the parking garage. HNT was called and the area locked down. CIT certified patrol officers formed a team and were able to successfully negotiate multiple knives and other weapons away from the suspect, talk him down from the roof and take him into custody without any further incident.

| 2017-108552 | Crisis |
|---|---|
| Precinct: WEST | M3 Second Watch |
| Date: 03/28/2017 | Time: 1402 |
| Created by: | Schenck, Scott I. |

On 3-28-17 around 1400 hours officers responded to a man with a knife in the 1200 block of 3 AV. The streets and sidewalks were very crowded. The officers arrived to find the subject standing in the middle of the street with a knife in his hand. He repeatedly demanded that officers shoot him as he moved closer to them. Streets were shut down and the sidewalks were cleared. Officers on scene did an excellent job of containing and communicating with the subject. They kept him away from the passersby. Attempts to get the subject to drop the knife were ignored and the subject moved closer to officers yelling ?pull it? and ?come on, do it.? CIT, HNT and SWAT were called to the scene. After more than two hours of negotiation, the subject surrendered and was taken into custody. He was later sent to HMC for a Mental Health Evaluation.

| 2017-44742 | Crisis |
|---|---|
| Precinct: WEST | D2 First Watch |
| Date: 02/06/2017 | Time: 0820 |
| Created by: | Bennett, Anthony |

On February 6, 2017 at 0820 hours, Officers were dispatched to 2025 Terry AV, in regards to male threatening to jump off the roof, which is on the twentieth floor of the building. Upon arrival, Officers went up to the roof and they observed the male standing on the edge of the roof. The male told Officers he was hearing voices and he wanted to jump. Officers were able to start a dialogue with the male, as the waited for additional resources and SFD personnel. While speaking with Officers, the male removed his prosthetic leg and appeared to be preparing to jump. Officers were able to calm the male down. After a few minutes, Officers were able to convince the male to back away from the edge of the roof. The male told Officers he no longer wanted to jump and he needed help. Officers, along with SFD personnel, assisted the male off of the roof and walked him back into the building where they were met by AMR medics. Officers transferred custody of the male to AMR medics without incident. AMR transported the male to HMC for a (ITA) psychiatric evaluation.

At the aggregate level, city-wide, the CRU monitors a series of dashboards that allow for ready queries into SPD's crisis data.  The dashboard shown in Figure 3 displays all crisis responses city-wide, query-able by precinct and watch.  Data can further be parsed by subject characteristics, whether the officer is CIT-certified, nature of crisis, disposition, and whether force was involved.



A second dashboard Figure 4 presents data for those crisis incidents associated with a use of force, searchable by nature of injury, type of force, nature of force, subject resistance, and subject and officer characteristics.  (Note: a CRU sergeant represents the unit on the FRB and serves as a subject matter expert in force cases involving a subject in crisis.)



A third dashboard (Figure 5) provides information concerning high-frequency utilizers (names redacted) of crisis intervention services.  The CRU is responsible for creating and maintaining individualized profiles of subjects of crisis incidents, for purposes of potentially informing future responses.  As Crisis Templates are completed by officers, the data points are captured and then populated into a custom application platform (currently, RideAlong).  A "profile" is created in RideAlong for each individual when a template is completed; additional interactions with such individuals further populate the data contained within each profile.



While profiles are created for all subjects of crisis templates, the designation of a 'high-utilizer' takes multiple factors into consideration, including the number of crisis contacts within a rolling 365-day period, whether an individual was involved in a high-risk crisis call requiring a large number of resources or presenting an on-going safety concern and the volume of calls to the 911 center.

Response Plans are developed for those individuals deemed as high-utilizers and where a consistent structured approach by patrol officers would be beneficial. While some individuals do not necessitate a full Response Plan, relevant information exists that could assist patrol with future encounters – such as case manager contact information, service providers, specific 'hooks' that could prove successful during de-escalation efforts, etc. In those instances, the CRU adds information into RideAlong – creating an 'extended' profile and making it visible to Patrol. The CRU also

disseminates Officer Safety Bulletins as appropriate.  In 2018, the CRU has published 26 specific Response Plans and an additional 43 Bulletins.

An example (redacted) of such a profile is shown in Figure 6, as screenshots of the information officers have available to review in the field, which they may rely on in informing their approach to the individual or the disposition of the event.





Incident No. 18-020083, a Type II use of force event discussed above in Table 10, provides a good illustration of how response plans contained in the RideAlong application inform responses in the field.  In this case, which involved a subject who had disrobed, was running around in the street, barricading himself in a trashcan, and was otherwise aggressive towards officers, the subject's profile noted a violent history associated with drug use.  Because the root cause of the subject's behavior was known to be drug related, rather than due to an underlying mental health condition, the response plan called for an arrest of the subject where probable cause to do so exists, rather than seeking an Involuntary Treatment Act detainer, which had been ineffective in the past.  Officers on-scene further sought to offer a blanket, cigarettes, and music to the subject in an effort to achieve cooperation and compliance, based on suggestions in the response plan. Though ultimately unsuccessful in resolving the incident without the need for force, officers were able to call upon information in this application to potentially diffuse what may have resulted in a higher level of force otherwise.

The high-utilizers dashboard assists in the Department in being able to answer *ad hoc* queries as well.  In a recent discussion with a DOJ subject matter expert, for example, a question was raised as to whether there were any unusual patterns or frequencies of use of force involving subjects who were deemed high utilizers of crisis intervention services. For purposes of examining this question, SPD examined all crisis and use of force incidents across the study period (January 1, 2017 – June 30, 2018) that were associated with a known subject.  Just five individuals were involved in a crisis contact associated with a reportable use of force more than once: Four of these five subjects were involved in two separate crisis-involved use of force events each; one was involved in three.

Expanding the study period to the universe of crisis events associated with a use of force, as of the time of this drafting (May 15, 2015 to November 25, 2018, *n = 627*), one subject was involved in five separate crisis-involved use of force events; two individuals were involved in four separate events.  Five individuals were involved in three separate events, and 31 individuals were involved in two each.  In other words, of the 627 unique events with both a crisis template and use of force associated, approximately 14% (*n*=90) involved one of 39 repeat subjects, none of which were involved in any greater than five incidents.  Considering the substantial number of individuals listed as high-utilizers with crisis contacts far exceeding these numbers (see Figure 5), it is fair to say that the low number and sporadic nature of these "high utilizer involved" force incidents across both the study period and the total universe of crisis involved use of force data do not support

any meaningful inquiry in terms of pattern or trend analysis.  Notwithstanding, CRU performed a cross-check to determine the number of these individuals with established response plans in RideAlong.  Of the nine individuals identified as subjects in three or more separate crisis-involved use of force events, all have CRU profiles; three of which, however, are inactive due to inactivity.  Four subjects have full response plans on file, all with officer safety flag cautions.

Additionally, the ability to pair a subject not only with the number of crisis-related force incidents but the number of uses of force in each incident allows the CRU to examine any trends or outliers that might indicate escalating behavior.  One such example can be seen with respect to one individual who was involved in three separate crisis-involved use of force incidents over the course of one year, involving a total of 19 separate uses of force – 6 associated with the first, 2 associated with the second, and 11 associated with the third.  Reviewing each of these incidents shows not only escalating behavior, but highlights the opportunities to engage more systemically in intervention options.

- In the first contact with this individual, SPD responded to a suspicious person call where the subject appeared to be in a crisis state, with behavior that was bordering on excited delirium (keening, growling, barking).  During the investigation, officers identified and verified a warrant.  During the arrest process, the subject lost all behavioral control which resulted in a "help the officer" call out.  SFD ultimately administered Ketamine to the subject.  At the time of this incident, the individual was not tiered with any mental health agency, per the crisis clinic.

- In the second incident, officers on-viewed a disturbance at the Union Gospel Mission where several clients were chasing the subject down the sidewalk.  After containing the subject and listening to the pursuers, it was learned that the subject had stolen a puppy from another client.  At one point in the contact the officer patted the subject in a reassuring way, which resulted in the subject dropping to the ground and crying out in pain.  Following arrest, the subject made numerous injury claims (including a broken leg, which resulted in a Type II use of force investigation).

- In the third incident, radio had broadcast a city-wide Amber Alert that a male subject (identified as the subject in the above-two incidents) had taken his five-year-old child at knife point from the grandparents and might be heading to Seattle from Lake Forest Park.  A description of the vehicle being driven by the subject was given during the Amber Alert, and multiple citizens called 911, gave the location of the vehicle, and

33

reported that the child was in the front seat.  Officers responded to the area, located the subject vehicle, and attempted to stop it.  The subject refused to stop and attempted to elude them.  As the subject fled, he rammed two officers' vehicles with his own, and then drove onto the sidewalk.  Several officers rammed/pinned the subject's vehicle in with their patrol vehicles to disable it.  Once the subject's vehicle was unable to move further, officers approached the vehicle.  The subject attempted to take hold of the child and use him as a shield, but officers were able to use verbal persuasion to rescue the child and take the subject into custody.

In the second incident, the subject was found to be in possession of methamphetamine – likely a significant factor in his erratic behavior.  During the 2016 legislative session, a bill ("Ricky's Law") was presented which would add "Substance Use Disorder" to the criterial for an emergent detention under the Involuntary Treatment Act (ITA) outline in RCW 71.05.153.  Based on data from SPD' crisis templates, which showed substance use disorder listed as a possibly underlying cause in nearly a quarter of all crisis incidents, SPD's crisis coordinator (Sgt. Dan Nelson) was asked by the co-author of the bill to provide testimony to the state legislature, which he did – arguing that individuals who were struggling with the disease, were suicidal, and were needing involuntary treatment were left out of the system of care, forcing them to continue a pattern of substance use, self-harm, and potential harm to others.  Due to the large fiscal impact of the legislation, the bill did not pass in 2016, but was introduced and was passed in 2017 with broad bipartisan support.

Many of the CRU's "high utilizers" come to police attention because of crisis behavior attributed to substance use disorder.  Prior to Ricky's Law, officers would often bring subjects in crisis to the Emergency Room pursuant to the ITA, only to have it medically determined that their behavior (often lack of control or suicidality) was the result of substance use disorder, and they would be released.  This resulted in an alarming rate of recidivism amongst this population, which no option for involuntary services.

Pursuant to this legislation, the secured detox facility in King County is scheduled to open in 2019.  Once that facility is open, the King County Designated Crisis Responders will be able to detain individuals to one of the secured 16 detox beds, to hopefully provide the

individual with meaningful and appropriate treatment.  Had this option been available in 2017, when officers responded to the second incident and found methamphetamine on the individual, such intervention may have disrupted behavior that may have eventually led to the third incident.

Separate and apart from its heavy workload around its core mission of providing analytical and field support around crisis incidents and responses, the CRU has additionally, beginning in mid-2017, absorbed two new bodies of work associated with other legislative changes, both of which likewise serve to either provide new connections to services or reduce the likelihood of harm.  Sheena's Law (RCW 71.05.458) enables law enforcement officers to refer directly to mental health professionals individuals who fall short of the legal threshold for involuntary detainment but still may pose a threat of harm to themselves or others).  The Extreme Risk Protection Order (ERPO) Act (RCW 7.94) enables family members or law enforcement agencies to petition a court to temporarily prevent individuals who are at high risk of harming themselves or others from accessing firearms.

Since these laws went into effect, the CRU has made nearly      direct referrals under Sheena's Law to King County Designated Crisis Responders, and has assessed individuals for criteria meeting an ERPO.  In      of those instances, CRU personnel sought, and secured, court orders, pursuant to which the CRU has since secured      firearms from 33 individuals, arguably saving lives and proactively mitigating the need to use force in eventual responses.[9]

Finally, at a regional level, the CRU has been integral in leading the charge to expand the cross-disciplinary approach, which in nascent form was limited to Seattle's Crisis Intervention Committee, to addressing behaviors that fall in the widening intersection between public safety and public health.  While Seattle's Crisis Intervention Committee continues to meet quarterly, includes regular participants from local hospitals, mental health service providers, and social service providers (as well as invitees from both the DOJ and Monitoring Team), and continues to review updates to data collection, training, and policy, Sgt. Nelson also serves as the Vice-Chair of the King County Behavioral Health Advisory Board.  In this role, he helps to plan both regional and international CIT conferences and participates in monthly Regional CIT Coordinators meetings, hosted by the Washington State Criminal Justice Commission.  The primary purpose of these meetings is to synthesize the Crisis Intervention Committee process around program development, legal updates, data collection, advocacy, and co-responder programming

---

[9] The workload associated with these new bodies of work is not insubstantial, averaging nearly 50 hours of work per pay period.

for agencies who are in the process of standing up their own Crisis Response Units or Crisis Intervention Committees.  Other participating agencies include the King County Sheriff's Office; Kirkland, Redmond, Tukwila, Issaquah, Port of Seattle, Auburn, Lake Forest Park, and Bellevue Police Departments; the Washington State Patrol; SCORE (South Correctional Entity) Jail; King County Behavioral Health and Recovery Division, and the King County Mental Illness and Drug Dependency Program.

Collectively, through its participation on the FRB, its engagement with the CIC locally and regionally, its analytical work, and its incident-based review of each crisis-involved incident, the CRU continues to hold a vital position in ensuring not only that each crisis event and each crisis-involved force event is critically reviewed, but in harnessing its experience, and its data, to advance policies, training, practices, and key legislative changes that all serve to mitigate, to the extent possible, negative interactions – including foremost the already empirically rare occurrence of force –  between police and persons in crisis.

## The Structure of Phase II Work Under the Consent Decree

In Phase I of the work of under the Consent Decree, DOJ and the Monitoring Team reviewed SPD's compliance with the requirements of the Consent Decree through 10 assessments, covering the roughly six topic areas of the Consent Decree: force investigation and reporting, crisis intervention, supervision, Early Intervention System ("EIS"), use of force, and stops and biased policing. By the end of 2017, the Monitoring Team and DOJ found the City of Seattle to be in compliance with each area. On that basis, the Court issued a finding of "full and effective compliance" with the requirements of the Consent Decree. By the terms of the Consent Decree, the City of Seattle is now required to demonstrate that it can sustain compliance with those requirements for a period of two years.

During Phase II of the Consent Decree work, the City of Seattle has taken over the lead role in conducting assessments of the six core topic areas of the Consent Decree. By taking this lead role, SPD must demonstrate not only sustained compliance, but also a willingness and ability to critically self-assess their own progress in these areas, which are central to effective and constitutional policing.

This does not mean, however, that the work of DOJ and the Monitoring Team is done. In Phase II, DOJ and the Monitoring Team are reviewing the City's proposed methodologies for each audit and are conducting their own independent analysis or "look behind" the City's review.

For this audit, DOJ and the Monitoring Team consulted with SPD and ultimately approved the methodology used by SPD in conducting its own self-assessment. DOJ and the Monitoring Team also consulted with leaders in SPD's Crisis Response Unit regarding their work. Further, DOJ and the Monitoring Team requested and received a randomly generated sample of force case files involving people in crisis for the time period January 1, 2017 to June 30, 2018.  The sample set was comprised of 6 Type I case files (the equivalent of 10% of cases from a three month time period)[10]; 5 Type II case files (the equivalent of 20% of cases from a three month time period); and 3 Type III cases (representing all of the Type III uses of force against people in crisis during audit time period).  DOJ and the Monitoring Team, together with their subject matter experts, reviewed these case files for compliance with the terms of the Consent Decree relating to crisis intervention and its intersection with use of force, and SPD's policies regarding the same. DOJ and the Monitoring Team subsequently conferred about their findings and, based on their Phase II reviews, concluded as follows:

- The City of Seattle has demonstrated that it has sustained compliance with the crisis intervention requirements of the Consent Decree, including continuing crisis training, engagement with the Crisis Intervention Committee, and by engaging with individuals in crisis in a manner generally consistent with crisis intervention and force policies.

- DOJ and Monitoring Team were particularly encouraged at the markedly high rates of CIT certification among patrol officers (73%), rendering the vast majority of patrol officers well-equipped for encounters with people in crisis. This widespread training may account for the encouraging statistics captured in the Crisis Outcome Report (Dkt. 495-1) and its finding that SPD officers have kept up with demand despite a 12% increase in dispatched crisis contacts.  Approximately 80% of crisis contacts involved a CIT certified officer. The high number of CIT-certified officers responding to crisis incidents may also, in turn, account for some of the outcomes Seattle has experienced with respect to people in crisis.  Referrals to designated crisis responders increased

---

[10] During Phase I, the Monitoring Team and DOJ examined a three month time period.  For purposes of this self-assessment, SPD opted to use a broader time period in order to get a more robust sample for data analysis. However, for purposes of using a comparable sample from Phase I, the Monitoring Team and DOJ used the equivalent of a three month time period to provide the base number from which to sample cases across the 18 months audit time period.

by 103% during 2017 and officers used reportable force only 1.7% of the time across more than 15,000 contacts with people in crisis.

- In reviewing the sampling of cases involving force used against people in crisis, DOJ and the Monitoring Team found that where issues related to the use of force against a person in crisis did exist, the chain of command made appropriate referrals.  For instance, in the Type III matter involving an officer's failure to de-escalate and potential use of excessive force, the chain referred to the matter to the Office of Police Accountability, ultimately resulting in a referral for criminal prosecution (the officer was charged with assault).  Likewise, where a supervisor identified that an officer's statements could have contributed to the eventual need to use force in a Type III incident, the supervisor referred the officer for additional training. DOJ and the Monitoring Team are encouraged that such instances of self-referral indicate a willingness and ability to manage risk in the Department and, where appropriate, hold fellow officers accountable for violating policy.

- DOJ and the Monitoring Team also note with encouragement that SPD has plans to enable officers' computer aided dispatch systems in early 2019 to access high utilizer profiles for people who frequently encounter the police while in crisis. The system will enable officers to immediately review information collected by the Crisis Response Unit about a subject's potential triggers, behaviors likely to de-escalate the encounter, and case management contacts, among other things.

In the interest of continuous improvement, however, DOJ and the Monitoring Team offer the following technical assistance to SPD based upon issues spotted during their respective reviews. Although none of these issues rose to the level of systemic non-compliance with the terms of the Consent Decree, DOJ and the Monitoring Team strongly encourage SPD, and the Inspector General who will take over the audit function for this topic area in the future, to give attention to these matters going forward:

- There were a number of cases in our sampled review set in which it was unclear which officer was taking the lead in a given encounter.  While we appreciate that many police encounters involve dynamic situations that change quickly, we believe that it is critical to have an officer in charge whenever multiple officers are involved, if possible.  Even a hasty plan for

38

tactical approach and designating which officers will handle contact, cover, and less lethal, provides officers with better options for engagement and a higher chance of a resolution without the need to use force. This is particularly true in cases involving persons in crisis because of the importance of de-escalation techniques in such encounters. We have observed that where there is a lack of clear leadership, the officer with the lowest threshold for use of force becomes the *de facto* decision-maker for the group. For these reasons, we strongly encourage SPD to focus its training in crisis, de-escalation, and team tactics on the designation of a tactical leader and the formation of a contact team. Further, this training should specify that when an incident involves a person in crisis and one or more CIT-certified officers on scene, a CIT-certified officer should be designated as the tactical leader.

- It was often difficult to tell in the case files we reviewed whether a Crisis Template had been filled out for certain Type I uses of force. To the extent SPD is not already including these templates in its force review files, they should be included so that they can be part of the review for both the chain of command and any future auditor. Further, it was often difficult to tell from the case file if the involved officers were CIT certified. We were able to ascertain their status by cross-referencing a list of CIT certified officers. However, for ease of reference to the chain of command and future auditors, we would suggest that SPD include CIT certification status in either the Crisis Template and/or the use of force report as a matter of course.

- Several cases in our review raised a potential concern with tactical positioning. In one, officers were approaching a subject who was advancing toward them on foot. Officers rode their bicycles towards the subject and then stopped immediately in front of him, after which they quickly engaged in physical contact with him. Had officers stopped their bicycles farther back from the subject it would have given the subject the opportunity to hear and respond to verbal commands and, therefore, to potentially voluntarily comply. Similarly, other cases included incidents where additional space on approach may have provided better opportunity for voluntary compliance. Accordingly, we would encourage SPD to further emphasize tactical positioning as part of its de-escalation training.

- Finally, a mixed note.  As a practice, DOJ and the Monitoring Team review the significant incident reports ("SIRs") published by SPD on a near-daily basis.  Although they are not part of our formal, statistical analysis of crisis cases, they do provide an additional window into SPD's interactions with people in crisis.  We note with encouragement that the vast majority of incidents appearing in these SIRs appear to resolve issues with people in crisis without the use of force.  In fact, we have been struck by the impressive feats that SPD officers have accomplished in particular in preventing suicides and in achieving compliance through scene management and verbal de-escalation approaches.  We note that many of these outcomes have been achieved by the Hostage Negotiation Team ("HNT").  From the anecdotal outcomes we have observed in the SIRs it appears that HNT is versed in the same general techniques as CIT-certified officers, however, it would be useful to ensure that everyone at SPD who encounters people in crisis operates from a uniform set of training and principles.  Accordingly, we would recommend that HNT officers receive the same or substantially similar training as CIT-certified officers, in addition to their specialized negotiation training, which includes techniques for working with people in crisis, but typically does not delve as deep as the 40-hour CIT certification course.

40



Seattle Police Department's

Crisis Intervention Outcome Report

October 2018



## Part of Section

Since 2014, in collaboration with the Department of Justice and community partners, the Seattle Police Department has become widely recognized as a model for delivering meaningful and compassionate police services to individuals in behavioral health crises, helping to drive best practices around the nation.[1]

In keeping with its commitment to transparency, accountability, and data-driven practice, over the past three years SPD has published annual reports detailing its work around crisis intervention, both in response to increasing numbers of crisis calls for service and proactively by SPD's Crisis Response Unit, which seeks to keep individuals in frequent or chronic crisis connected with appropriate service providers.  This reports builds on prior years' reports and presents updated data around crisis incidents, deployment and distribution of officers with advanced Crisis Intervention Training, Use of Force in crisis incidents, and disposition of crisis incidents.

In addition, this report fulfills a key requirement under the court-ordered plan (Sustainment Plan) that sets forth the schedule by which SPD, now in full and effective compliance with all of its commitments under the Consent Decree, is to demonstrate during this next phase that it is sustaining performance across all topical areas of the Consent Decree.  With respect to Crisis Intervention, the Sustainment Plan requires three separate reports over 2018-2019: an annual Outcome Report of crisis contacts, to be filed in October of both 2018 and 2019, and a comprehensive evaluation of use of force in crisis incidents, to be filed in December 2018.  Pursuant to the methodology attached as Exhibit A, this report meets the 2018 deadline of the former.

With respect to data concerning crisis calls, officer deployment, and disposition, the time period studied for this report extends from January 1, 2017 to June 30, 2018.  For discussions concerning training, this report covers a study period of January 1, 2017 to December 31, 2017, to account for the annual training cycle.

Data used in this report is sourced to the extent possible from the Data Analytics Platform, a comprehensive enterprise-wide platform that consolidates data from multiple unique source systems and allows for ad hoc reporting and analysis.  In support of the ongoing mission of the Crisis Response Unit to manage its nearly 10,000 annual contacts with

---

[1] See, e.g., Critical Issues in Policing: Guiding Principles on Use of Force (Police Executive Research Forum, 2016) (highlighting the Seattle Police Department's crisis intervention training).

persons in crisis, the Department has customized in DAP a suite of specialized reports specific to this Unit:

- The Crisis Events data set allows the user to view information regarding crisis events by officer, squad, unit, precinct/section, and bureau of the officer, as well as the location of the event. Information as to whether or not the responding officer is CIT certified is also available.

- The CAD (Computer Aided Dispatch) Events to Crisis Events data set combines the functionality of both the CAD Events data set and the Crisis Events data set to allow the user to view all CAD Events with an associated Crisis Template (a screenshot of this dashboard, provided for illustrative purposes, is presented below in Figure 1).

- The Crisis Events to Use of Force data set combines the functionality of both the Crisis Events data set and the Use of Force data set to allow the user to view all Crisis Events with an associated Use of Force incident.

- The Crisis Response Team data set combines selected functionality of Crisis Event and CAD information along with General Offense and Street Check information to allow the user to review information regarding events that are routed, notified, or assigned to the Crisis Response Team for follow up investigation.

Additionally, in last year's report, the Department previewed the release of a public-facing dashboard that will allow the public to explore for itself this subset of SPD responses.  This dashboard is now online, providing aggregated information of the nearly 35,000 crisis calls to which SPD officers responded over the last three years.

The Consent Decree contains eight paragraphs setting forth SPD's obligations with respect to Crisis Intervention; all are addressed in this report.

## I0.    Vt clcplpi

*SPD will continue its work in providing training in verbal tactics with the goal of reducing the use of force against individuals in behavioral or mental health crisis, or who are under the influence of drugs or alcohol, and to direct or refer such individuals to the appropriate services where possible.  … SPD will continue to provide Crisis Intervention training as needed to ensure that CI trained officers are available on all shifts to respond to incidents or calls involving individuals known or suspected to have a mental illness, substance abuse, or a behavioral crisis ("individuals in crisis").*

#      )      · ·  ·

*SPD officers who do not receive the [40 hour CIT Certification Training) will receive basic training on crisis intervention.  This training should include a subset of topics and training methods included in the CI training, and will also explain the circumstances in which a CI trained officer should be dispatched or consulted, and how situations involving impaired subjects should be addressed when a CI trained officer cannot respond.*

#      )      · ·  ·

In 2017, the Education and Training Section (ETS) and the Crisis Response Unit (CRU) began delivering 'e-module' CIT training to be able to deliver classroom-based training more efficiently, in both time and cost. E-module' training can be viewed from any networked SPD computer and allows officers to revisit the curriculum as they wish to access resources provided. In addition, consistent with the ICAT (Integrating Communications, Assessment, and Tactics) model for learning, SPD is increasingly delivering CIT/de-escalation training in different formats and decentralized under different "core" blocks of training, reinforcing skills learned across different situations.

Table 1 shows a breakdown of training blocks during 2017 that included a CIT component, the number of eligible[2]  employees who completed the training, and number of employees referred to the Office of Police Accountability for failure to complete training.

---

[2]  "Eligible" employees exclude employees who are on extended leave or otherwise unavailable for training, per Human Resources determination.  Where no HR reason is apparent, the issue is referred to OPA, which conducts the investigation into whether there is a breach of policy.

| # | k | # | # | k | \ h |
|---|---|---|---|---|---|
| k | ° o | | | . | . |
| **Alzheimer's and Dementia** | ° o | | | . | . |
| 7 @ k ° o | ° o | | | . | . |
| o u u | o " k O | | | . | |
| # y 7 | \ \ o | | | . | |

> *To be considered "CI trained," SPD officers will be required to undergo a 40-hour initial comprehensive CI training, and eight hours of in-service CI training annually thereafter.  SPD's CI training will continue to address field evaluation, suicide intervention, community mental health resources, crisis de-escalation, and scenario exercises.  The training may include on-site visitation to mental health facilities and interaction with individuals with a mental illness.  Additionally, the CI training will provide clear guidance as to when an officer may detain an individual solely because of his/her crisis.*

#        )

SPD continues to send officers to the 40-hour CIT Certification course, administered by the Washington State Criminal Justice Training Commission (WSCJTC).  Although seats are limited (in order to accommodate all agencies in King County), in 2017, 118 SPD officers attended this program.

Officers who attend the 40-hour class are still required to complete the current SPD training cycle CIT training.

> *SPD will ensure that all dispatchers are appropriately trained to identify calls for service involving individuals in crisis and dispatch CI trained officers to the crisis event.*

#        )

The Communications Section delivers a three-hour Crisis Intervention Identification Course to all new personnel hired into the Section, and roll-call training throughout the year.  In 2017, topics of roll-call training included:

- Community Resources – Crisis Clinic (now Crisis Connections)
- American Medical Response (AMR) for Crisis calls
- Individuals in Behavioral Crisis – A review for call processing and dispatching.

### IK0    Qxgtxkgy 'cpf 'Fktdwvkqp 'qh'Etkuku'Kpekfgpvu 'Ekv{/Y kfg'

Between January 1, 2017 and June 30, 2018, officers reported              contacts with people believed to be in behavioral crisis.  Year over year, these numbers reflect a 9% (n=842) increase from 2016 to 2017 and a 20% (n=949) during the first six months of 2018 relative to the same six-month period in 2017.  See Table 2.

| 2017 | 2018 | Grand Total |
|---|---|---|
| 10,234 | 5,759 | 15,993 |

Across the study period, 91.98% (13,185) of all reported crisis contacts originated from a call for service to which an officer was dispatched; officers self-initiated ("on-viewed") the contact in 8.02% (1,150)[3] of crisis reports.[4]

---

[3] Call time is used, derived from the "Original Time Queued" (OTQ) of the underlying call, in place of Reported Date / Time. Reported Date / Time is often reflective of when the officer wrote the crisis template and is believed to be temporally distinct from the time when the contact occurred. OTQ is logged by the 911 Communications Center, at the time the call is queued in the CAD system and is believed to be a reliable date / time stamp, suitable for temporal analysis.

[4] Approximately 10% (1658) of crisis templates could not be associated to an underlying CAD event. In order to associate a crisis template to a CAD call, the officer must first locate and relate the underlying call. It is common for officers to wait until the end of their shift, after they have returned to the precinct, to "write up" low-level contacts, making it difficult to search for a specific event. MK43 will make relating a crisis contact to a CAD event more intuitive and confident by aggregating the calls an officer has logged to, in the User Interface (UI), allowing the officer to locate and associate an event.



Overall, dispatched crisis contacts in 2017 were up over the preceding year.

On-viewed crisis contacts were up 5.4% in 2017 compared to 2016 and were up by nearly 30% over the first six months of 2018 relative to the same time period in 2017. *See Figure 1.*

While the continuing increase in the number of crisis incidents is concerning, and certainly reflects the urgency of expanding supportive services for this vulnerable population, there is no indication that the increase in crisis contacts is straining SPD's resources or leading to worsened outcomes (due, in part, to greater number of officers with CIT training).

Regression of the time series indicates a strong[5] and highly significant ($r^2$=.61, p<.0001) curvilinear (exponential) effect or trend in reports over time, suggesting a continuous effect (rather than an unexpected, one-time event) is responsible for the observed increase in reports. *See* Figure 2.

---

[5] Cohen, J. (1992). A power primer. Psychological bulletin, 112(1), 155.



Crisis contacts result from a request from the community (dispatched) or officer-initiated behavior (on-view). The green line, above, represents the cumulative increase observed in reports of contact with people in behavioral crisis; the blue and orange lines represent crisis contacts dispatched, and on-viewed, respectively.  Month-by-month, the increase in reports is attributable to dispatched calls for service; note that the orange line remains relatively flat across the time series, while the blue line is trending up.  This apparent visual trend is confirmed empirically by the fit of a strong, highly significant trend model.[6]

Crisis contact reports remain fairly evenly distributed across the days of the week, between 13% and 15%.  *See* Figure 3.



---

[6] Regression of the time series indicates a strong and highly significant ($r^2$=.75, p<.0001) curvilinear (exponential) effect or trend in reports over time.

No meaningful patterns were observed over the days of the week or year over year. Trend analysis (linear and curvilinear regression) failed to identify any specific form over the week and descriptive statistics suggest, dispatched crisis contacts by day of week have not changed in any consistent way, year over year.

As shown in Figure 4, over the 18-month study period the average number of dispatched crisis contacts per hour rose from a substantially negatively skewed (-1.4) .8 to a comparatively symmetrical (normally distributed) 1[7].



Observations ranged between .9 and 1.1 crisis contacts per hour over 95% of the distribution.  Between 2017 and the first half of 2018, the average was observed to increase, consistent with other observations of trend, from .9 to 1.1, with both years,

---

[7] SD = .4, skewness = .6, kurtosis = .02

taken independently, beginning to demonstrate some skewness (-.86 and -.83 respectively). Across all three years, the form of the line remained consistent, with a highly significant, two period polynomial pattern (curvilinear regression) and strong effect (.68 to .88) suggesting a predictable low between 2 AM and 6 AM, a spike toward the noon hour and a period maximum around 8 PM or 9 PM.





Ninety-nine percent of all crisis contacts could be mapped to a location in the City of Seattle. As shown in Figure 5, the largest concentration of contacts occurred in the North Precinct (30%); fewer than 9% of all crisis contacts were reported in the Southwest Precinct.

These proportions remain fairly stable when considering only dispatched crisis events.





Comparing complete years, 2016 over 2017 (the only full year of the study period), dispatched crisis events were seen to increase in every precinct except East, which showed a decrease of 1.74%.

10

With that exception, the distribution of crisis remained relatively stable, suggesting that crisis events have increased in every area of the city.  The North Precinct reported a nearly 20% increase in requests for response, resulting in the documentation of a person believed to be experiencing behavioral crisis.  West Precinct reported the second highest increase (16.6%), followed by Southwest (15.17%) and South (8.9%).[8]



---

[8] When reporting on population data (not a sample), any observed difference is believed to be a real and true difference. Statistical significance testing is not required or appropriate. The meaning of the difference may be interpreted within the context of a properly formulated research question, however. *See* Carver, R. (1978). The case against statistical significance testing. *Harvard Educational Review*, *48*(3), 378-399; Johnson, D. H. (1999). The insignificance of statistical significance testing. *The journal of wildlife management*, 763-772.

To the extent that any trend over time can be derived from the relatively short time period of this, and the prior year's, study, some interesting observations emerge.  While a comparison of the full years' data period of 2016 to 2017 shows increases in all precincts except East, with a relatively stable distribution year over year (*see* Figure 7), a comparison of the first six months of each of 2016, 2017, and 2018 show a very different pattern.

Figure 8 presents a comparison of percentage change in dispatched crisis calls between January-June 2017 relative to the same time period of 2016 (left) and the percentage change between January-June 2018 relative to the same time period of 2017 (right).



While the relative distribution, again, remained fairly unchanged, both West and East Precincts reported a substantial increase in dispatched calls to crisis events over the first six months of 2018 (31.27% and 30.7% respectively), as compared to a relatively small (4.37%) increase in West and a *decline* (6.21%) over the first six months of 2017.   The most notable effect was observed in the South Precinct, which reported a 55% increase in dispatched crisis contacts in the first half of 2018 relative to a 5.94% increase over the first six months of 2017.

At the Sector level, while three Sectors in each of East and West Precincts reported declines in dispatched crisis calls during the first half of 2017, all saw increases over the same period in 2018.  Most notably, Edward Sector (East Precinct) and David Sector (West Precinct) reported 50% and 60% increases, respectively.  *See* Figure 9.



In the South Precinct, which observed a 55% increase in dispatched crisis contacts in the first half of 2018, Sam Sector in particular saw a more than two-thirds increase (70.5%), over the same period in 2018.  *See* Figure 10.



This increase in Sam Sector likely reflects an increase in services associated with a supportive housing facility that opened in February 2018.  It should be noted that a full 80% percent of patrol officers in Sam Sector are CI certified, and presently there is no indication that any staffing adjustment is needed to absorb the rise in crisis contacts.

### III. Staffing and Deployment of CIT Officers

Staffing of CIT certified[9] personnel in the Operations Bureau[10] increased by 8.2% between January 2017 and June 2018. This significant, medium effect trend[11] is shown in Figure 11. On average, 60% of personnel assigned to and responsible for 911 response were CIT certified, during the study period.[12]



Figure 12 shows the average daily deployment of CIT certified officers. On average, 58.96% of deployed resources were CIT certified.[13] First Watch 911 response units reported the highest average daily deployment of CIT certified officers, a normal[14]

---

[9] CIT Certification is a voluntary certification maintained under the "Memphis Model." Officers must receive a 40-hour training and elect to be part of the certification group.

[10] Because the Operations Bureau (which includes Patrol (911 response units), the Anti-Crime Team, and the Crisis Response Unit) is the response bureau to dispatched crisis calls, this analysis focuses exclusively on this Bureau.

[11] $r^2$ = .35, p<.0007

[12] SD = 2.6%, Skewness = -.9, Kurtosis = .01

[13] SD = 6.53%, Skewness = .1, Kurtosis = -.7

[14] SD = 4.26, Skewness = -.2, Kurtosis = -.3

65.37%. Third Watch 911 response units were observed to deploy the smallest proportion of CIT certified personnel, with a daily average rate of 55.29% of the watch.[15]

These numbers exceed those saturation levels for CI certified staffing generally accepted in law enforcement practice and in the academic literature (which vary between 10% of a department overall[16] to 25% of patrol.[17])



Cumulatively, across all personnel, the South Precinct reported the highest number of deployed CI certified personnel (70.17%), followed by the Southwest Precinct (62.88%). The East Precinct deployed the fewest CIT certified personnel, 55.56%.  Across rank in the Operations Bureau, cumulatively, Acting Police Sergeants were found with the highest rate of certification (78.4%), followed by Police Officers (67.9%), Acting Detectives (62.5%)

---

[15] SD = 4.69, Skewness = -.02, Kurtosis = -.46

[16] Morabito, M.S., M. Watson, J. Draine.  (2013).  "Police Officer Acceptance of New Innovation: The Case of Crisis Intervention Teams",   *Policing: An International Journal of Police Strategies and Management,* 36:2; 421-436.

[17] Watson, A.C., M.S. Morabito, J. Draine, and V. Ottati.  (2008).  "Improving Police Response to Persons with Mental Illness: A Multi-Level Conceptualization of CIT."  *International Journal of Law and Psychiatry.* 31(4): 359-368.

and Police Sergeants (61.26%). Detectives and Lieutenants (acting and permanent), ranged between 40% and 45%. 36% of Operations Bureau Captains were CIT certified. These data are presented in Tables 3 and 4, respectively.

|  | CIT Certified |
|---|---|
| SOUTH PCT | 70.17% |
| SOUTHWEST PCT | 62.88% |
| WEST PCT | 62.55% |
| NORTH PCT | 57.42% |
| EAST PCT | 55.56% |
| Grand Total | 61.70% |

|  | CIT Certified |
|---|---|
| POLICE OFFICER PROBATION | 5.38% |
| POLICE OFFICER | 67.91% |
| ACTING POLICE OFFICER DETECTIVE | 62.50% |
| POLICE OFFICER DETECTIVE | 40.00% |
| ACTING POLICE SERGEANT | 78.43% |
| POLICE SERGEANT DETECTIVE | 50.00% |
| POLICE SERGEANT | 61.26% |
| ACTING POLICE LIEUTENANT | 40.00% |
| POLICE LIEUTENANT | 45.45% |
| POLICE CAPTAIN | 36.36% |
| Grand Total | 61.70% |

*SPD will maintain its program of dispatching CI trained officers to incidents or calls involving individuals in crisis.*

#      )

*CI trained officers will take the lead, when appropriate, in interacting with individuals in crisis.  If a supervisor has assumed responsibility for the scene, the supervisor will seek the input of CI trained officers on strategies for resolving the crisis event where it is reasonable and practical to do so.*

#      )

Between January 2017 and June 30, 2018, the Department dispatched            officers to           total Calls for Service (CFS). Across these 638,984 CFS, at least one CIT certified officer was on scene a little more than half the time (51.26%).  *See* Figure 13.



Of the 638,984 total calls for service during this study period,          (2.2%) resulted in the documentation of at least one crisis contact.[18]  A CIT-certified officer was on-scene in nearly          (79.3%) of these events; approximately          of these events were reported by a CIT certified officer, indicating they were primary on the contact.

A breakdown of responses by certification status, across watch, is shown in Figure 14. Following the pattern observed in earlier sections, 40.65% of all calls involving a crisis contact occur during the Second Watch operational period;[19] a CIT-certified officers was

---

[18] With record growth, CFS have been trending up for several years. Observations of the crisis rate, controlling for inflation in call volume, suggest the observed effect in crisis contacts is not related to an overall increase in call volume.

[19] The SPD operates a 24-hour schedule, with 6 overlapping (early and late) 9.5 hour shifts, organized into 3 "Watches." This is done to accommodate shift change and briefings. At any given time, at least one full watch (half of the previous and half of the next) are "in service" and available for calls.

on-scene in 82.9%.  Just under 25% of all crisis calls occurred on First Watch; of those, a CIT-certified officer was on-scene in 79%.



Across Third Watch calls, approximately 25% were reported as showing no CIT-certified officer on-scene, despite a CI-certified officer being logged to calls nearly 50% of the time.

Although there is, facially,[20] no indication that the presence or absence of a CI certified officer has a meaningful difference in the ultimate disposition of crisis incidents (as discussed later in this report and likely reflective of the robust continuing training in crisis

---

[20] The Department is presently partnered with the John Jay College of Criminal Justice to explore the effects, with respect to outcomes, of the 40-hour CI training relative to the 8-hour trainings.

intervention that all officers receive, annually) a closer review of Third Watch calls, by initial call type, may offer some insight into this gap. *See* Figure 15.   A breakdown of crisis call by initial dispatch indicates that the majority of events to which a CI certified officer was dispatched, but did not arrive, were associated with Priority 1 calls that were classified initially by the Communication Center as "SUICIDE..." In Progress (IP) or Just Occurred (JO).  In such cases, is it likely that the immediacy of the need to transport for medical care negated the necessity of a CI certified officer response.



A distribution of all initial call types across all dispatched crisis events is shown in Figure 16.  Cumulatively, 40% of all CFS are identified by Communication Center personnel, at the time the calls are queued for dispatch, as one of two call types likely involving someone in crisis. The largest single proportion (21.59%) of crisis related CFS are classified, initially, by the Communication Center as "SUICIDE – IP/JO…" In Progress (IP) or Just Occurred (JO). 17.86% of incoming CFS are classified as "PERSON IN BEHAVIORAL / EMOTIONAL CRISIS."



A distribution of final call types across all dispatched crisis events is shown in Figure 17. Three-quarters (75.22%) of all calls for service involving a crisis contact are classified by the primary officer as a crisis event, specifically ("CRISIS COMPLAINT – GENERAL") at the time the call is closed. The remaining quarter of calls are classified at the next highest or urgent classification type; of these, the next largest single clearance type represented during the study period accounts for just 2.87% of all CFS, "ASSAULTS OTHER."



Conservatively,[21] approximately 50% (49.4%) of all calls eventually closed as "CRISIS COMPLAINT…" are identified as crisis events and handled by the Communication Center as potentially crisis-involved. Another 8.64% are classified as "DISTURBANCE…OTHER" and no other proportion of initial call types is represented above 3.38% ("SERVICE – WELFARE CHECK").  Approximately 94% of all calls originally classified as either suicide or crisis, were closed as crisis complaints (e.g. domestic violence related criminal offenses, including assault).  *See* Figure 18.



---

[21] This is a conservative estimate because "crisis" is likely an attribute of a proportion of calls closed by a higher call type, often one involving a criminal offense, where the crisis contact is a secondary attribute of the event.

23

On average, response time[22] to calls resulting in the documentation of a person believed to be in behavioral crisis was 20.5 min[23] over the study period, a 14% increase over the previous year (2016), 17.91 min.[24]   *See* Figure 19.[25]



This increase was observed to be a continuous, exponential[26] trend with highly significant, large effect on the model.[27] There is not enough data to conduct a meaningful analysis across precinct

---

[22] Response time, in this case, is calculated as the difference between the time the call was dispatched and when the first officer arrived. It does not include "dispatch lag" or the time between when the call is queued and when it is dispatched to the officers. Given the myriad factors that contribute to dispatch lag, the response time calculation was constrained to reflect officer behavior. Future evaluations should focus on dispatch lag and its impact on the overall time to respond.

[23] The distribution was relatively normal. SD = 2.1, Skewness = .4, Kurtosis = -.01 suggesting symmetry.

[24] SD = 1.94, Skewness = .4, Kurtosis = -.2 suggesting symmetry.

[25] Different models were used to estimate would could happen if the trend continues. An optimized forecasting model utilizing the Akaike Information Criteria (AIC) statistic identified the presence of an additive trend and rendered a slightly more sophisticated projection a 3.13 min increase in the response time, July 2019, slightly higher than the curvilinear projection (2.87 min).

[26] Both linear and curvilinear models were fit, with the best fit found in an exponential form, suggesting a steepening trend or additive effect over time. This form is confirmed by the forecast model.

[27] $r^2$=.6, p<.0001

and watch.[28]  If this trend continues, SPD will consider whether adjustments to its staffing model are warranted.

### KX0   Fkruqukkkqpul Qwweqo gu'ql'Etkku'Gxgpvu

*SPD will continue and expand its tracking of information regarding SPD's interactions with individuals in crisis and provide this data to SPD's current CI Team.  SPD will consult with the CIC to determine what interactions result in data collection, and the types of information to be collected based on the level of interaction.  Subject to the CIC's review and recommendations, and applicable law, SPD should gather and track the following data:*

a)  *Date, time and location of the incident;*
b)  *Subject's name, age, gender and address;*
c)  *Whether the subject was armed, and the type of weapon;*
d)  *Whether the subject is a U.S. military veteran[29];*
e)  *Complainant's name and address;*
f)  *Name and badge number of the officer on scene;*
g)  *Whether a supervisor responded to the scene;*
h)  *Techniques or equipment used;*
i)  *Any injuries to officers, subject, or others;*
j)  *Disposition; and*
k)  *Brief narrative of the event (if not included in any other document).*

#       )       ˙ ˙

The data collected for this report show that SPD continues to comply with Paragraph 137. First, SPD Manual Section 16.110 requires that officers document all contacts with

---

[28] When across precinct and watch, in monthly and weekly averages, the distribution becomes distinctly asymmetrical, counter indicative of the use of an average and suggestive of a high degree of situational variability in the data. When disarticulated, and viewed at the watch level alone, medium effect but still highly significant trends ($r^2$=.39 & .43 (respectively), p<.0001) were observed in both 1st and 2nd Watches, with the steepest tend in 2nd Watch response times, 58% (2016 over June 2018). A 4.07 min increase (17%) during the study period, 23.55 to 27.62.

[29] The term "veteran" has since been changed in SPD's reporting format to "served in the military" at the request of the CIC, as some veterans do not identify as such.  The "served in the military" data does not distinguish between the United States military or the military or that of another country.

subjects who are in any type of behavior crisis with the above data, where available.[30] After an interaction with a community member who is in crisis, an officer must fill out a "crisis template," answering questions about the subject's behavior, the outcome or "disposition" of the interaction, perceived demographic characteristics (where appropriate/possible), and other information. Presently, this documentation is completed through the Versaterm Records Management System (RMS), which is configured with a template designed to capture certain data in structured fields, including disposition of events, as shown in Figure 20.

```
DISPOSITION  (Check all that apply)
   □ Unable to Contact
   □ Chronic Complaint
   □ Social Service / Alcohol and Drug / Treatment Referral
   □ Resources Offered / Declined
   □ MCT (Mobile Crisis Team)
   □ GRAT (Geriatric Regional Assessement Team)
   □ Shelter
   □ No Action Possible / Necessary
   □ Case Manager / MH Agency Notified
   □ DMHP / Referral
   □ Crisis Clinic
   □ CSC / CDF (Crisis Solution Center / Crisis Diversion Facility)
   □ CCORS (Childrens Crisis Outreach Response System)
   □ Courtesy Transport
   □ Detox
   □ Spruce Street
```

Compliance with this requirement is audited, daily, by the Crisis Response Unit Supervisor, who reviews each template submitted for completeness and thoroughness; in addition, the Crisis Intervention Coordinator and Commander review significant incident reports (see SPD Manual Section 15.350) as they are issued to ensure that where there are indications of crisis incidents, a template has been submitted.

Across the 18-month study period, the most frequent disposition noted was "Emergent Detention / ITA" (34.8%) followed by "No Action Possible or Necessary" (18.9%), cumulatively accounting for more than half of all templates. In just 9.7% of cases the officer indicated the subject was arrested.

---

[30] By law, complainants are not required to give their names, for example, nor are subjects unless arrested. Often, particularly in the case of emergent detentions, officers are not able to obtain subjects' names, age, gender, or address.

Comparisons of dispositions in 2017 relative to 2016, and over the first six months of 2018 relative to the same time period in 2017, are shown in Figure 21 and 22, respectively.







Although the Department has not been tracking this data long enough to draw any strong conclusions, overall the changes in disposition from 2016 to 2017 appear to be expected, random fluctuations. Between 2016 and 2017, dispositions of "Emergent Detentions…" and "No Action…" increased by 5.3% and 18.3% increase, respectively. The disposition "Resources Declined" increased 18% over that same time period, but flattened slightly (13.1%) over the first six months of 2018 relative to the same period in 2018. "Emergent Detention" dispositions steepened (32.9%) in 2018,[31] but remained relatively stable as a proportion of the whole, at 35.48%.  The disposition "Subject Arrested" increased 24.1% between 2016 and 2017, steepened slightly to 30.1% over the first six months of 2018

---

[31] Anecdotally, officers are reporting an increase in the level of 'acute' behavior exhibited by individuals in behavioral crisis, necessitating an ITA (Involuntary Treatment Act / Community care taking) response.

relative to 2017 over the same period in 2018, but overall remained proportionately stable at approximately 9.7%.

Of note, referrals to designated crisis responders (DCR)[32] increased by over 103% over the first six months of 2018 relative to the same time period in 2017.  This is likely reflective of additional training with respect to how officers can make DCR community referrals in instances where the individual does not meet the statutory requirements to articulate an Involuntary Treatment Act referral to an Emergency Department.

Some dispositions were seen to decline (cumulatively, 14.5%) over the study period (shown in blue, above), including Mobile Crisis Team responses, notifications to Mental Health Agency or Case Manager, Crisis Clinic, Shelter Transport, Drug / Alcohol Treatment Referral, and Geriatric Regional Assessment Team. Attempts to model trends across dispositions observed with the most movement (up and down), however, failed to find sufficient fit. In other words, no meaningful conclusions could be drawn from this data, because the number of dispositions was too small and the time period too short. SPD will continue to track these dispositions to watch for any trend that may require adjustments in approach.

### X0   Wg'qhHqt eg

Of the 15,995 crisis contacts reported during the study period, reportable force occurred in just 277 (1.7%) of all crisis contacts, comprising 557 total uses of force.  The rate of force over the 18-month period remained relatively stable between 1.3% and 1.8% and did not support trend analysis.[33]

A breakdown of the 557 reported uses of force across these 277 incidents is shown in Figure 23.

---

[32] A designated crisis responder, or DCR (formerly titled a Designated Mental Health Professional, or DHMP), is a mental health professional appointed by the county, an entity appointed by the county, or the behavioral health organization to perform duties relating to the detention or treatment of mental health patients.  See generally RCW Chapter 71.05.

[33] While reportable force occurred in just 1.7% of crisis contacts, crisis was reported in approximately 25% of all use of force.



Similar to City-wide use of force distributions by type, 75% of force reported associated with a crisis contact was classified at the lowest level, Type I. Just five uses of force (.9%) were classified at the highest level, Type III.

The only significant departure from citywide use of force patterns was in reported Type II force, which was observed to be approximately 15% above the distribution of all force (20.27%) for the same period, 34.6%. *See* Figure 24.





Because the Department began tracking this data only recently, and due to the relatively small number of uses of force associated with a person in behavioral crisis, it is not clear if Figure 24 represents a normal fluctuation or a genuine trend.  While hypotheses can be drawn, and explored in upcoming work,[34] it is also likely that use of force in incidents with a behavioral crisis component represents a distinct class of data in which an observed difference in the distribution of force type would be expected. SPD will continue to monitor Type II force in crisis incidents and, if warranted, explore it further in its next report.[35]

As shown in Table 5, little difference was observed between crisis-involved and non-crisis involved use of force and officer certification. In both cases, the observed certification rate for involved officers was approximately 20%.

|  | Crisis Involved | No Crisis | Grand Total |
| --- | --- | --- | --- |
| Not Certified | 20.42% (260) | 79.58% (1,013) | 100.00% (1,273) |
| Certified | 20.37% (295) | 79.63% (1,153) | 100.00% (1,448) |
| Grand Total | 20.40% (555) | 79.60% (2,166) | 100.00% (2,721) |

Figure 25 shows a comparison of the demographics of subjects of use of force subjects[36] in crisis-involved and non-crisis incidents over the 18-month study period.

---

[34] Data from both the Seattle Fire Department and the King County Medical Examiner, for example, show a rising trend in the number of incidents involving the use of methamphetamine – a category of narcotic known to cause violent and erratic behavior.  Other departments around the country are likewise reporting, anecdotally, an increase in the intensity of crisis incidents that they suspect to be linked to the rise in methamphetamine.  Over the next year, SPD intends to partner with SFD to explore commonalities or trends with respect to observed behaviors and incident outcome.

[36] Community members are not often required to be identified in a crisis contact. Given the large amount of unrecorded data, demographic details are not presented within the context of all crisis contacts but as a representation of subjects of UoF, instead.



In both comparison groups (crisis-involved and non-crisis incidents), subjects identified as "White" make up the largest portion of both distributions (46.67% and 38.13% respectively) but are slightly overrepresented in crisis-involved incidents. Conversely, subjects identifying as "Black or African American" were slightly underrepresented (23.24% and 32.18%). In both groups, between 23.4% and 20.4% were listed as race, "Not Specified." These over- and underrepresentations, although slight, may be a fruitful topic for future study.

The distribution of gender, shown in Figure 26, was relatively equal. In approximately three-quarters of all UoF, regardless of whether the incident involved a crisis complaint, the subject identified as male. Between 21.05% and 23.96% of subjects identified as female.



## XI.  Conclusion and Next Steps

*SPD will review the outcome data generated through the process described [in paragraph 136], and may use the data for developing case studies for roll call and CI training, recognizing and highlighting successful individual officer performance, developing new response strategies for repeat calls for service, identifying training needs for the annual in-service CI training, making CI training curriculum changes, or identifying systemic issues that impeded SPD's ability to provide an appropriate response to a behavioral crisis event.*

The data analytics platform (DAP) is utilized by the Crisis Intervention Team Coordinator (CIT coordinator) to implement and sustain the SPD Crisis Intervention Program on a weekly basis.  The CIT coordinator utilizes the information to identify trends, volume, emerging high utilizers of police services (often undiagnosed / underserved mental health resource consumers), etc.  The CIT Coordinator utilizes this information to inform the community service providers / Behavioral Health Organization (BHO) who are responsible for providing care and funding for this vulnerable population.  Through the DAP, the CIT

coordinator can articulate gaps in the emergency mental health care system from anecdotal stories to data-based accounting of what SPD is encountering in the field.  This ability has proven invaluable in allowing SPD to drive meaningful discussions with the Crisis Intervention Committee around SPD policies, practices, and strengthening relationships with community care partners.

The DAP also informs the work of the CRU while performing their function of creating response plans for those disproportionate utilizers of SPD services.  The DAP allows for almost 'real time' analysis on the effectiveness of the plan which was created and disseminated.  Additionally, the high-utilizer dashboard displays information which assists the CRU in identifying cyclical crisis patterns.

This capacity demonstrates that not only is the Department in continuing compliance with paragraph 137 of the Consent Decree, but it is analyzing, and leveraging, its data in increasingly sophisticated and innovative ways.

In addition to exploratory research with the Seattle Fire Department and the King County Medical Examiner regarding trends in behaviors associated with changing patterns of substance use and its partnership around CI training with John Jay College of Criminal Justice (see footnotes 20 and 34), the Department is separately evaluating the feasibility of undertaking studies relating specifically to the nature of crisis incidents that result in a custodial arrest, for purposes of examining the current landscapes of both pre-booking and post-booking diversion opportunities.  While present data would allow for a reporting of what an individual was arrested for, a more detailed, qualitative analysis may provide insight into why an individual was arrested, particularly in instances in which the underlying criminal behavior may be that of a low-level, otherwise divertible misdemeanor.  A working hypothesis would be that in such instances, an individual's lack of behavioral control and the possible impact on public safety, if left in the community, requires the custodial arrest; such data may, ideally, provide actionable knowledge to drive alternative support options in lieu of arrest.

Finally, in March 2019, the Department will transition from its current records management system to a new model for capturing more complete and consistent data around its community contacts.  This system, which will include more granulated fielded data points than the current system, will feed into the DAP, allowing for greater cross-linkage of data across incidents.   A preliminary discussion of the impact of this system in analyzing crisis incidents, and SPD's responses, will be presented in next year's report.

# APPENDIX B

Type II Use of Force Qualitative Review

## Table 6: Force Review Board Referrals to OPA – Use of Force

| GO Number | FRB Review | OPA Determination |
|---|---|---|
| 17-470105 | West Precinct officers were dispatched to a male in crisis who was talking to himself and waiving a steak knife in the air. When officers arrived, the subject had fled on foot and was not located. A short time later, East Precinct officers were dispatched regarding the same subject, who was again talking to himself, while waiving a knife in the air. The East Precinct officers located the male and approached him in their patrol vehicle. The subject put his hands in his pockets, walked towards the patrol car, then suddenly ran past the officers and down the street. Officers exited their patrol vehicle and followed the subject on foot. Officer A caught up to the subject and pushed him from behind, knocking him to the ground. When the subject fell, a knife was dislodged from the subject and fell to the ground. Officer A fell on top of the subject and attempted to gain control of his arms. Officer A and Officer B both gave the subject verbal commands, while attempting to physically restrain him. The subject continued to resist arrest and kept moving his hands towards his waist, where officers believed he had access to weapons. Each officer, believing the subject posed a threat to their safety, deployed their Tasers separately at the subject. The first Taser deployment was unsuccessful (both probes did not make contact). After the first deployment, the second officer deployed his Taser with a drive stun application. The second Taser application was successful, allowing the two officers to gain control of the subject's arms and apply handcuffs.<br><br>The FRB identified as a training issue that the officers did not fully describe their actions and decision-making with respect to training concerning using time, distance, and shielding absent the need to take immediate action. Based on this deficiency in documentation, the FRB could not determine whether the officers took reasonable steps to de-escalate prior to using force, and referred the matter to OPA. | OPA reviewed six allegations in total (three relating to each Named Employee (NE) relating to de-escalation, the use of the Taser specifically, and the authorization for use of force.<br><br>As to all allegations, OPA issued findings of **"Not Sustained – Lawful and Proper."** |
| 18-098491 | Anti-Crime Team officers located a felony warrant subject walking into a local strip mall store and requested patrol officers to assist with his apprehension. The subject was known to run from officers upon contact and was considered dangerous due to previous firearms convictions. The backing officers arrived in the area and were directed by ACT officers to the subject. They made verbal contact with the subject who responded by fleeing on foot. As the officers followed on foot, the subject | OPA reviewed a total of 17 allegations against four officers relating to de-escalation, use of force authorization, use of force prohibitions, and professionalism. As to all allegations relating to de-escalation, OPA issued findings of **"Not Sustained – Lawful and Proper."** As to all allegations |

| | | |
|---|---|---|
| | realized he was trapped and gave himself up by lowering himself to a seated position between two parked vehicles. Officers approached the subject and immediately applied control holds, transitioning him to a prone handcuffing position on the ground.  When the officers began to position the subject's arms behind his back, the subject pulled his left arm away from them.  The subject then attempted to push himself up off the ground with his left arm.  The officers retained control of the left arm and placed both the subject's wrists into handcuffs.  When officers began to escort the subject to a patrol vehicle, he actively resisted, and yelled/cursed at one officer.  The subject dropped his body weight and laid on the ground. The officers determined they would carry the subject to the patrol vehicle, so four officers lifted him off the ground. While carrying the subject to the patrol vehicle, he made a complaint of pain that the officers broke his wrist.<br><br>The FRB reviewed three separate uses of force - Type II force on the initial contact, and Type I contact post-contact. The FRB found that officers acted consistent with de-escalation tactics and training with regard to the initial contact (finding specifically that de-escalation was not safe or feasible), but found that officers did not appropriately seek to de-escalate post-contact, noting that, when the subject dropped his body weight, there was no exigency, and that officers could have taken a moment to reassess the situation and modulate their force, rather than using an untrained technique (picking up the subject).<br><br>The FRB referred this issue to OPA.<br><br>At the time of the FRB review, OPA was reviewing allegations concerning the Type II force that had been forwarded by FRU.  The FRB accordingly deferred its findings to OPA. | relating to use of force authorization, OPA issued findings of **"Not Sustained – Lawful and Proper."**  As to all allegations relating to use of force prohibition, OPA issued findings of **"Not Sustained – Unfounded."** As to all allegations relating to professionalism, OPA issued findings of **"Not Sustained – Unfounded."** |
| 18-101563 | Officers were dispatched to assist AMR personnel at the Crisis Solutions Center, where a patient threatened to kill responders and damaged a wall. The officers arrived on-scene and located the subject still arguing with staff members and AMR personnel. The officers announced their presence and identified themselves to the subject. They attempted to achieve cooperation from the subject by explaining the situation and options for a resolution. When the subject refused to cooperate, the officers determined the subject was in crisis and would be involuntarily committed. AMR personnel attempted to place the subject into soft restraints but he began to resist them. The officers stepped in to assist by holding the subject's arms, legs, and wrists so that he could be placed into soft restraints. While officers were restraining the | OPA noted that the incident had been screened with FIT, which had declined to respond after it was determined that the subject had no injuries and this was only a complaint of pain.  OPA concluded that the contact in question was captured by video and that the involved employee's action to not appear to support the claim of assault or excessive force.   OPA determined, however, that in light of the subject's comment "You just broke my wrist.  It snapped.  This is |

| | | |
|---|---|---|
| | subject's right arm, he yelled out that an officer broke his wrist. The officer repositioned his hold on the subject's arm and continued to hold him until the soft restraints were applied. The officers notified their sergeant of the situation and requested he come to the scene. AMR personnel evaluated the subject for injuries and noted he complained about his left wrist being injured not his right wrist, as he had initially claimed. During the interview with the investigating sergeant, the subject recanted his story and claimed he was not injured. The subject was transported to HMC via AMR for a mental evaluation. (Note: this case was screened by FIT, which concurred in the Type II investigation.) The FRB found the officers' efforts to de-escalate, and the force used, to be consistent with policy. However, in light of the subject's complaints, in an abundance of caution and after consultation with the OPA Director, the complaint of force was submitted to OPA for review. | an assault[,]" the chain should have referred the allegation to OPA.<br><br>OPA issued a **supervisor action notice** requesting roll call training to remind officers and supervisors to report alleged force, rather than just consulting FIT. |

In **one** case, the FRB found the officers' actions to be consistent with use of force policy and training, but referred to OPA allegations concerning separate possible policy violations. **OPA returned this case for supervisor action.** This case is described in Table 7.

### Table 7: Force Review Board Referrals to OPA - Other

| GO Number | FRB Review | OPA Determination |
|---|---|---|
| 17-069129 | Officers A and B were patrolling on bikes when they on-viewed a subject camping on city property. Officers contacted the subject and requested identification. The subject refused to provide identification to officers. The officers believed he was trying to conceal his identity in order to hide a possible warrant. The officers called for a Mobile Fingerprint ID Device to be brought to the scene. While waiting for the Mobile ID to be delivered, the subject stood up to stretch, then fled on foot from officers. Officer A chased after the subject. He was able to catch up to the subject and grab him from behind. The momentum of grabbing the subject while running knocked both the subject and Officer A to the ground. Officer C arrived and assisted Officer A. Both Officer A and Officer C tried to control the subject's upper body. Officer B arrived and held down the subject's legs. The subject was able to retract his leg and kick Officer B in the knee. In response to the subject's assaultive behavior, after hearing that Officer B had been assaulted, Officer C | OPA referred the case back to the chain for a **supervisor action**, requesting that the chain review with the named employee (1) Manual Section 15.360 concerning the Mobile Fingerprint Device and circumstances in which it can be used; and (2) the need to document that if property belonging to an arrested person is left in place, to make note of that in the GO report to avoid concerns regarding property disposition. |



In **nine** cases (12.5%), OPA complaints, generated either by the Chain of Command (two cases) or a third-party (either individually or as forwarded by the Chain of Command) were pending at the time of the FRB review.  Accordingly, FRB discussed tactics and decision-making around the use of force, but deferred findings to OPA.  **Of these eight cases, each containing multiple allegations, OPA sustained allegations relating to the force itself in only one.**  These cases are described in Table 8.

## Table 8: FRB Cases with OPA Review Pending

| GO Number | FRB Review | OPA Determination |
|---|---|---|
| 17-078011 | A resident called 911 to report a burglary in progress in the shed that was attached to the back of her house.  The caller advised the suspect was still inside.  Multiple officers were dispatched and immediately began setting up containment.  One officer updated radio that he could see the suspect standing in the victim's backyard.  The suspect suddenly ran down the driveway towards Officer A, where he had set up his containment position.  Officer A drew his duty weapon, pointed it at the suspect, and ordered him to get on the ground.   The suspect refused Officer A's commands and continued to flee.  Officer B and C observed the fleeing suspect and gave chase.  They caught up to the suspect and were able to grab hold of him.  The suspect began flailing his arms in an attempt to escape their grasp.  Officers B and C used a team takedown to get the suspect on the ground to control his movements.  Whlie on the ground, officers observed the butt of a firearm in the suspect's waistband.  Officers B and C used control holds to keep the suspect pinned to the ground until Officer A arrived to assist with handcuffing.  Officers recovered two | As to NE #1, OPA determined the allegation to be **"Not Sustained – Lawful and Proper."**  As to NE #2, OPA issued a finding of **"Not Sustained – Inconclusive"** based on what OPA determined to be inconsistencies in NE #2's statements as to whether the takedown and control hold involved the head, the face, and/or the neck. |

| GO Number | FRB Review | OPA Determination |
|---|---|---|
| | suspected firearms from the suspect's waistband after he was in custody.<br><br>The FRB found the officers' actions consistent with de-escalation policy and found Officer A's pointing of a firearm to be reasonable, necessary, and proportional. At the time of the FRB review, OPA was investigating a complaint by the subject that Officers B and C had used excessive force; FRB, accordingly, deferred to OPA's findings. | |
| 17-185652 | Officers were dispatched to an assault call where an unknown female punched the victim in the face. Officers located the suspect based on a description provided by the victim. Following a positive identification, the suspect was taken into custody for assault. While being placed under arrest, the subject yelled and screamed at officers. The subject escalated by spitting on Officer A's face. Officer A forced the suspect's head down onto the hood of the patrol car to prevent her from spitting on officers. A spit sock was placed on the subject's head for transport and to prevent further spitting. Due to the subject's behavior, she was transported to the precinct for processing the use of force and arrest was subsequently screened at the precinct.<br><br>At the time of the FRB review, allegations concerning de-escalation and the use of force were under OPA review. Additional issues identified by the FRB included deficiencies in documentation (subsumed in the initial referral), to include lack of specific information concerning that the force (placing her head on the car to prevent spitting) involved a handcuffed subject, photographs of the subject, and information as to whether the subject was closely monitored while wearing the spit sock. The FRB also noted that officers could have called ARM for a transport, rather than using the patrol vehicle (Note: this option is no longer available.) | As to three allegations concerning force reporting and investigation by NE #1, OPA issued, **"Not Sustained – Inconclusive," "Sustained", and "Not Sustained – Training Referrals".** As to the same three allegations concerning NE #2, OPA issued **"Not Sustained – Training Referrals**" on each. As to two allegations concerning standards and duties involving NE #3, OPA issued a **"Not Sustained – Inconclusive**" on one and **Sustained** the second. As to two separate force reporting allegations involving NE #3, OPA **sustained** one allegation and issued a **"Not Sustained – Training Referral**" as to the second. OPA **sustained** three allegations relating to the force itself. OPA dismissed a complaint concerning the application of the spit sock as **"Not Sustained – Lawful and Proper."** As to NE #4, OPA **sustained** an allegation concerning duties and responsibilities and issued **"Not Sustained – Training Referral"** and **"Not Sustained – Lawful and Proper"** findings as to two allegations concerning force reporting and investigation. |
| 17-269114 | Officer A was working to address exclusionary zone violations that were occurring on an Aurora Avenue off-ramp at Denny way after he noticed clothing and luggage next to the roadway. He removed the items and was preparing to leave when he was approached by the subject, who said that the was the owner of the items. Officer A attempted to explain why he removed the items, and the subject became upset. Officer A requested an additional | In total, OPA reviewed seven complaints concerning the use of force, de-escalation, bias-free policing, standards and duties (professionalism) and standards and duties – use of discretion. The OPA Director issued **"Not Sustained"** findings as to all; |

| GO Number | FRB Review | OPA Determination |
|---|---|---|
| | officer to respond.  Once the additional officer arrived, the subject refused to leave the roadway, causing a hazard for traffic and established probable cause for pedestrian interference.  The subject was advised that he was under arrest after he refused to move out of the street.  When officers went to take the subject into custody, he resisted their efforts.  The officers took the subject to the ground, causing a scrape to his elbow.  The subject then broke free and attempted to jump over a barrier onto a lower part of the roadway.  The officers were able to stop the subject, overcome his resistance, and place him into a patrol vehicle.  Later, after being placed in a holding cell, the subject was viewed on video banging his head into the walls, causing a laceration.  He was treated by SFD and transported to HMC via AMR. <br><br>At the time of the FRB review, OPA was reviewing several complaints by community members who had witnessed the interaction, as well as complaints by the subject who complained that he was subjected to excessive force, unlawfully arrested, harassed, and treated unfairly due to his housing and economic status. | allegations concerning the use of force, de-escalation, and the arrest were found to be **"Lawful and Proper;"** allegations concerning bias were found to be **"Unfounded;"** and one allegation concerning the use of discretion was not sustained as **"Inconclusive."** |
| 17-360655 | **As every aspect of this case was taken under investigation by OPA based on a referral from the Downtown Emergency Services Center (DESC), the FRB deferred to OPA in full.** <br><br>The following summary is taken from the OPA Director's Certification Memo: <br><br>It was alleged that Named Employee #1 engaged in a number of policy violations during a physical altercation with the subject in a DESC building, including the use of excessive force and the failure to de-escalate. Named Employee #2, Named Employee #3, and Named Employee #4 were alleged to have potentially failed to report an allegation of serious misconduct and to have generated incorrect and incomplete paperwork. It was alleged that Named Employee #5 engaged in policy violations during his review of the force used and that Named Employee #6 violated policy during his classification and investigation of the force and by purportedly failing to investigate or refer an allegation of serious misconduct. Lastly, Named Employee #7 was also alleged to have failed to have reported an allegation of serious misconduct. <br><br>On the date in question, Named Employee #1 (NE#1), Named Employee #2 (NE#2), Named Employee #3 (NE#3), and Named Employee #4 (NE#4) responded to a call for service at a DESC building. The call was regarding the subject, who was alleged to have attempted to assault a DESC employee and was refusing to leave the building. I note that the entirety of the officers' response to this call was captured by Body Worn Video (BWV) and video cameras located at DESC. The responding Named Employees observed an individual lying on the floor of the DESC lobby, who was identified as the subject. The officers made contact with DESC employees, who told them that the subject threw a punch in the direction of a staff member but that it did not make contact. The DESC employees said that the subject then got onto the ground and would not leave when asked to do so. They told the officers that if the subject did not leave the vicinity, they wanted him to be trespassed. After speaking with the DESC employees, the officers moved into the lobby and made |

| GO Number | FRB Review | OPA Determination |
|---|---|---|
| | contact with the subject. They called the subject's name and identified themselves as police officers. The officers told the subject that he needed to leave the building. NE#3 shined a flashlight on the top of the subject's body and then she and NE#4 began to tap his feet to get him to wake up. NE#1 shook the subject's shoulder. The subject told the officers to "get the fuck off of me" repeatedly. NE#1 told him that he should not talk to her like that. The officers, who were surrounding the subject, took a few steps back as the subject began to move around and continued to tell him to get up and leave the building.  The subject stood up and again told the officers to "get the fuck off of me." The subject took a step towards NE#1, pointed his finger in her face, and said "don't you fucking come near me." NE#1 pushed him back towards the wall with a straight hand and told him "do you want to do that?" The other officers converged on the subject. At that point, NE#1 claimed that the subject struck at her with his left hand and, when he did so, she "ducked" her head back and down. She stated, however, that the subject still hit her cheek with his hand. NE#1 reported that she did not know whether he struck her with an open hand or a closed fist. She further stated that he kicked his leg out at her. While explaining why she used force to OPA, NE#1 again stated that she was "assaulted" by the subject.  In his use of force report, NE#2 stated that, after the subject stood up and began to interact with NE#1, he saw NE#1 "abruptly move her head," suggesting that she was either struck or that she had dodged an attempted assault. NE#2 did not report observing the subject make contact with NE#1. He remained consistent with this account at this OPA interview. NE#2 told OPA that he observed NE#1's head move back as if she had been struck or was avoiding being struck but that he could not see exactly what happened given his positioning. He recalled that, after the incident occurred, NE#1 pointed to her mouth and asked whether she had any marks on her face.  In her use of force report, NE#3 reported seeing the subject "strike [NE#1] on the face and continue to move towards her." She reaffirmed at her OPA interview that she saw the subject strike NE#1.<br><br>NE#4 reported that he observed that the subject "reached up and pushed" NE#1. He did not note seeing a strike to NE#1's face in his use of force report. However, at his OPA interview, NE#4 said the following: "And then he just immediately, very quickly, just punches her or goes to punch her and fortunately she was able to defend herself." As discussed below, appears to be inconsistent with his use of force statement.<br><br>While NE#1's BWV captured her initiation of the interaction with the subject and her first push to his body, it does not clearly show whether or not the subject struck her as she and NE#3 claimed. NE#2 was not equipped with BWV on that day. NE#3's BWV did not, from my review, clearly show what occurred. NE#4's BWV provided a fairly clear view of much of the lead up to the force. There was a moment where the right side of the subject's body was not captured by the video and a noise was made that could suggest contact. (*See* NE#4's BWV, at 6:45-6:46.) However, NE#4's BWV does not conclusively show the subject ever striking or making physical contact with NE#1's face.<br><br>The altercation was also captured by DESC video. On this video, NE#1 and the subject can only partially be seen. Notably, the subject's right side and NE#1's left side are outside of the view of the camera. The video did show, however, apparent movement by the subject from his right side, which could be consistent with his striking at NE#1. It also showed NE#1 moving backwards immediately after the subject's apparent movement. When she moved backwards, the entirety of her body was within the view of the camera. It is possible that in the second between the apparent movement by the subject and NE#1 moving into full view of the camera, her face was struck. (*See* DESC Video #1, at 1:55-1:56.) That being said, it is unclear from a review of the video whether that | |

| GO Number | FRB Review | OPA Determination |
|---|---|---|
| | did, in fact, occur.  NE#1 then engaged in a physical altercation with the subject. From my review of the BWV, she punched him approximately six times and kneed him at least twice. This is consistent with the force that NE#1, herself, reported. NE#2, NE#3, and NE#4 grabbed onto the subject's arms and body and assisted NE#1 in taking him to the ground. As discussed more fully below, NE#1's force was clearly Type II. I agree that the other Named Employees likely only used de minimis force during the takedown.<br><br>From my review of BWV and DESC video, no further force was used against the subject when he was on the ground. He was handcuffed and the Seattle Fire Department (SFD) came to treat his injuries. He was bleeding from his mouth and nose areas, but apparently suffered no other significant physical harm. The subject continued to be uncooperative and would not let SFD personnel medically treat him.<br><br>After the force occurred and while the subject was secured on the ground, Named Employee #6 (NE#6) – the officers' sergeant, Named Employee #7 (NE#7), and another officer and acting sergeant arrived on the scene. NE#6 directed a Type II use of force investigation and the steps he took in that regard were detailed on BWV. The investigation and related documentation were reviewed by the officers' chain of command, including Named Employee #5 (NE#5). Approximately six days after the incident, DESC staff members initiated an OPA complaint regarding this matter. The DESC staff were particularly concerned with the actions of NE#1, which they believed constituted excessive force and the failure to de-escalate. During his review, NE#5 also referred to OPA the potential failure of several of the Named Employees to report an allegation of misconduct made by a witness.<br><br>As to two allegations against NE #1 concerning use of force, OPA issued findings of **"Not Sustained – Inconclusive"** as to one, and **"Not Sustained – Unfounded"** as to the other.  As to allegations concerning de-escalation against NE #1, OPA issued a finding of **"Not Sustained – Lawful and Proper."**  As to two additional allegations concerning standards and duties (professionalism and discretion), OPA issued findings of **"Not Sustained – Inconclusive."**<br><br>As to one allegation against NE #2 concerning reporting of alleged policy violations, OPA issued a finding of **"Not Sustained – Unfounded."**  As to three additional allegations concerning use of force investigation and reporting, OPA issued findings of **"Not Sustained – Lawful and Proper."**<br><br>OPA **sustained** one allegation against NE #2 concerning the reporting of certain policy violations. As to two additional allegations concerning use of force investigation and reporting, OPA issued findings of **"Not Sustained – Lawful and Proper."**<br><br>As to one allegation against NE #4 concerning the reporting of policy violations, OPA issued a finding of **"Not Sustained – Unfounded."**  As to three additional allegations concerning use of force investigation and reporting, OPA issued findings of **"Not Sustained – Lawful and Proper."**<br><br>As to two allegations against NE #5 concerning use of force investigation and reporting, OPA issued findings of **"Not Sustained – Lawful and Proper."**<br><br>As to one allegation against NE #6 concerning the reporting of policy violations, OPA issued a finding of **"Not Sustained – Unfounded."**  As to an additional allegation concerning use of force investigation and reporting, OPA issued a finding of **"Not Sustained – Lawful and Proper."** |

| GO Number | FRB Review | OPA Determination |
|---|---|---|
| | OPA **sustained** one allegation against NE #7 concerning the reporting of policy violations. | |
| 17-417824 | While SPD officers were at the scene of a traffic accident involving a vehicle and a pedestrian that resulted in a fatality, an individual (the subject, and the complainant in the OPA matter) called 911 to say that officers had shot someone.  Based on the call, a subsequent call, and the subject's rambling and incoherent speech during those calls, the 911 operator identified that the subject/complainant was possibly in crisis.  Shortly thereafter, A/Sgt. A, who was at the scene of the collision, was flagged down by a citizen regarding a person on the ground who appeared to be having a medical emergency (acute alcohol poisoning or substance overdose).  As the sergeant went to the scene, he noticed a man down, with the subject/complainant kneeling next to him.  While the sergeant assessed the situation, the subject began to interfere.  The sergeant asked the subject to back away from the person on the ground several times.  When the subject refused, the sergeant requested another unit to his location.  As backing Officer A arrived, the subject became increasingly hostile and continued to interfere with officers' efforts to assist the person on the ground.  The subject was informed that he was under arrest, and Sgt. A took hold of his elbow to take him into custody.  As the sergeant attempted to bend the subject's arm into a position to be handcuffed, the subject suddenly struck the sergeant in the chest with his elbow.  Officer A ran over and was able to assist as they struggled with the subject on the ground until additional officers arrived.  The additional officers were able to control the subject until he was placed into handcuffs.<br><br>At the time of the FRB review, OPA was reviewing a complaint of excessive force that the chain of command referred after receiving the subject's complaint.<br><br>The FRB noted that the chain of command separately and appropriately identified, and addressed, issues concerning the sergeant's de-brief (together, rather than individually) with the involved officers, and noted that although it was documented that a spit sock was applied, the reason for the application was not articulated in the officers' reports. | OPA reviewed a total of seven allegations against three named employees, one concerning the failure to activate in-car video, and the remaining relating to de-escalation, use of force, and reporting and investigation of force.  OPA **sustained** the allegation relating to ICV.  As to the remaining six, OPA issued findings of either **"Not Sustained – Unfounded"** or **"Not Sustained – Lawful and Proper."** |
| 17-424093 | Officers were dispatched to a residence after the tenant called to report his friend, a guest at the residence, was threatening to kill himself.  Officers spoke with the caller | This case involved an OPA-initiated complaint containing allegations concerning the use of ICV, use of |

| GO Number | FRB Review | OPA Determination |
|---|---|---|
| | who informed them that the subject had cut his wrist with a razor blade and went into the bathroom.  The tenant let the officers into the apartment and directed them to the bathroom, where the subject was hiding.    Officers attempted to make verbal contact with the subject through the closed door, but received no response.    Officers decided to enter the bathroom to get a better assessment of the situation.   They developed a tactical plan and designated roles that included a Taser officer, lethal cover, and an arrest team.  Officers opened the bathroom door and observed the subject cutting himself with the razor blade.  Th subject looked at the officers and retreated into the shower tall.  Officers ordered the subject to drop the razor and he complied.   After dropping the razor, the subject continued to try and injure himself by clawing at the self-inflicted lacerations on his wrist and forearm.  Officers attempted to verbally de-escalate the subject, who had clenched his fists.  When this failed, the Taser officer gave an arc warning on his Taser as a de-escalation technique to discourage the subject from attacking them.  The subject responded to the arc warning by closing the shower curtain.  When officers pulled open the shower curtain, the subject appeared ready to fight.  The subject's fists were clenched, muscles tensed, and he appeared as if he was going to charge at the officers.  The Taser officers believed the subject was going to attack, and in response to the threat, he deployed his Taser.  The Taser deployment was effective, causing neuromuscular incapacitation.  Officers entered the small bathroom and prevented further injury to the subject by using a team takedown to restrain the subject on the bathroom floor where he was placed into custody.  The subject was transported to HMC for his self-inflicted injuries and for an involuntary mental health evaluation.<br><br>The FRB noted that the chain appropriately handled training issues around (1) although the officers called a sergeant to the scene as soon as feasible, a sergeant had not initially been dispatched to the call; (2) that the officers did not treat the subject, initially, as a barricaded subject; and (3) that the FTO at the scene did not recognize that his student officer was too close to the subject in the bathroom, thus placing himself at risk. | force, and de-escalation.    Noting that the NE did activate body-worn video, OPA issued a **"Not Sustained – Training Referral"** finding, and submitted to the Department a Management Action requesting that the Department clarify the language of Manual Section 16-090-POL-5 "to make clear that where officers are equipped with both ICV and BWV, it is the intent of the policy that they will record on both systems.  The Department should further clarify that simply recording on one and failing to record on the other is improper when the secondary system is required to be activated under this policy."<br><br>As to allegations concerning de-escalation, the authorization to use of force, and the use of force against NE #1 (the Taser officer), OPA issued a finding of **"Not Sustained – Lawful and Proper"** as to the first, **"Not Sustained – Training Referral"** as to the second, and a finding of **"Not Sustained – Management Action"** as to the third, requesting that the Department "amplify its Taser training to provide clearer guidance as to what constitutes an imminent risk of harm justifying the use of a Taser; and more explicit explanations of what constitutes the 'public safety interests' that are referenced in the policy and what conduct is sufficient to meet the requisite 'level of resistance' from the subject." |
| 18-004914 | An officer initiated a traffic stop on a vehicle in a parking lot where several pedestrians (not associated with the traffic stop) were located.  As the officer began to exit his vehicle, one of the pedestrians charged towards the officer yelling, "Get out of here, go back where you came from."  The | OPA reviewed two complaints against one named employee relating to de-escalation and the use of force.  As to both, OPA issued |

| GO Number | FRB Review | OPA Determination |
|---|---|---|
| | subject had clenched fists and began striking them on the officer's patrol car.  The officer remained inside his car, closed the door, locked it, and watched as the subject verbally threatened him from outside the car.  When the subject stepped away, the officer made an attempt to get out of the car again.  The subject again approached him in a threatening manner, at which time the officer retreated into his vehicle again and requested backup.  After backing officers arrived, the involved officer used a control-hold takedown of the subject and placed him under arrest.  After being transported to the precinct the subject complained of broken ribs.  SFD responded and cleared the subject of injury; he was then transported to King County Jail for booking.<br><br>The FRB identified as training issues retreating to his vehicle and remaining at the scene – training standards would have been to take immediate action and contact the subject or create space by moving the vehicle, which would have been safer.  The FRB also noted that the officer did not either terminate the traffic stop or advise the vehicle driver that he was free to leave, thus leaving him at potential risk of harm by the subject.  The FRB noted that the chain of command appropriately addressed this issue.<br><br>At the time of the FRB review, OPA was reviewing the use of force following a chain of command submission of a third-party (a witness who observed part of the incident) complaint to OPA. | findings of **"Not Sustained – Lawful and Proper."** |
| 18-017258 | Officers were dispatched to investigate a trespass call at a residence, where two Airbnb guests were in a dispute.  Officers arrived and located the female subject who was causing a disturbance.  Officers attempted to speak with the subject, but she refused to cooperate.  As the subject attempted to leave, the officers advised her that she would be placed in handcuffs if she attempted to leave before the investigation was complete. The subject began to argue with the officers, stating that she had done nothing wrong.  Officers believed they had probable cause to arrest the female subject for trespassing and attempted to place her in handcuffs.  The subject resisted arrest by pulling her arms back and refusing to cooperate with their commands.  During the struggle, the subject pushed one of the officers, causing him to fall to the ground.  While falling to the ground, the officer pulled the subject to the ground with him. Both officers struggled with the subject on the ground until they were able to place her into handcuffs.  The subject was transported to the precinct where she | OPA reviewed 5 allegations against NE #1 and NE#2, each, three relating to stops and detentions (limit in scope, subject identification, and based on reasonable suspicion); one relating to arrest (probable cause); and one relating to the use of force.   For both employees, as to the allegations concerning the stop, OPA issued findings of **"Not Sustained – Training Referral", "Sustained,"** and **"Not Sustained – Lawful and Proper,"** respectively.  As to the allegation concerning the arrest, OPA issued a finding of **"Sustained."**   As to the allegation concerning the use of force, OPA |

| GO Number | FRB Review | OPA Determination |
|---|---|---|
| | complained of pain to her face.  SFD responded to treat the subject for possible injuries.  The subject was cleared of any injuries and transported to KCJ.<br><br>Prior to the FRB review, the Chain of Command had initiated an OPA referral after identifying concerns with the decision to arrest, to initiate the stop, de-escalation and the use of force; the FRB concurred with these referrals. | issued a finding of **"Not Sustained – Training Referral."**<br><br>OPA separately reviewed an allegation concerning the sergeant's screening and approval of the arrest, issuing a finding of **"Not Sustained – Training Referral."** |
| 18-130285 | Multiple officers responded to a hit and run accident where witnesses reported the driver was intoxicated and had fled the scene on foot.  While officers were responding to the scene, witnesses updated radio as to where the subject was hiding.  When officers arrived on-scene, they located the subject in a fenced courtyard of a residence.  The owner of the residence unlocked the gate and let the officers onto their property so they could remove the subject.  The officers contacted the subject who refused to comply with their orders.  The officers formulated a plan, approached the subject as a team, and lowered her to the ground when she started to resist.  Once the subject was handcuffed, she refused to stand up and walk on her own.  Two officers carried the subject up a small stairwell leading to the sidewalk, where the patrol vehicles were parked.  At the top of the stairs the subject agreed to stand up and walk on her own, so the officers placed her legs back on the ground.  When the officers escorted the subject to the front of a patrol vehicle, she violently kicked the front bumper.  In response, the two escorting officers leaned the subject over the hood of the car to prevent her from further damaging or injuring herself by kicking the patrol vehicle.  The subject then struck her head on the hood of the patrol vehicle.   To prevent her from further injuring herself, officers moved the subject to an adjacent grass planting strip and lowered her to the ground.  The officers retrained the subject on the ground as she attempted to kick them and thrashed about.  While on the ground, the subject made several complaints of pain and accused the officers of hurting her.  Officers called AMR to transport her to the hospital for a blood draw related to the collision.  While being interviewed by the investigating sergeant, the subject attributed bruising on her right bicep to A/Lt. A, who was not present when she was taken into custody.  While the subject was at the hospital, the officer assigned to hospital guard noticed that she had a necklace with a key similar to a handcuff key around her neck.  The officer called hospital security to assist him in removing the necklace/key due to the subject's violent behavior.  The | OPA reviewed allegations against three named employees (two officers and one sergeant) and an unidentified/unknown officer.  The complainant's allegations, and OPA determinations, are as follows: (1) That NE #1 subjected her to excessive force while she was restrained on a hospital gurney by bruising her wrist when he attempted to remove an object from her hand.   Noting that the subject had made statements of self harm, was holding a metal object in her hand that could be used for self-harm, and refused to release it, OPA issued a finding of **"Not Sustained – Lawful and Proper."** (2) That the on-scene sergeant was "a dick" and engaged in excessive force when a different officer injured her elbow.  OPA issued **"Not Sustained – Unfounded"** findings as to these allegations based on the fact that the video, which shows the incident in its entirety, establishes no contact.   (3) OPA also reviewed allegations that the sergeant failed to assist the complainant in filing a report by not asking her whether she wanted to file a report, and failed to report her complaints of pain.  OPA issued **"Not Sustained – Lawful and Proper"** as to the former, and **"Not Sustained – Training Referral"** as to the latter. (4) OPA reviewed allegations that that an unknown employee used excessive force against her.  Again, |

| GO Number | FRB Review | OPA Determination |
|---|---|---|
| | subject later claimed the officer hurt her when he removed the necklace.  The subject was released from the hospital after the blood draw and then booked into KCJ.<br><br>The FRB found the officers' efforts at de-escalation to be consistent with policy and training, and approved five of the six officers' use as reasonable, necessary, and proportional.<br><br>Prior to FRB review, the Chain of Command had forwarded, on behalf of the complaining subject, the subject's complaints about the force used by the officer on hospital guard and the allegations about professionalism and use of force by a. on-scene sergeant.  FRB accordingly deferred its findings to OPA's review. | based on video review, OPA issued a finding of **"Not Sustained – Unfounded"** as to this allegation. |

In **one** case, OPA received a complaint from the subject via the Chain of Command prior to FRB review; because OPA classified the case for Expedited Investigation, the matter was reviewed by the FRB.  See Table 9.

### Table 9: FRB Review Following OPA Return

| GO Number | FRB Review | OPA Determination |
|---|---|---|
| 18-126821 | ARM employees flagged down Officer A to report they observed a male subject assaulting a female at a bus stop. Officer A detained the male subject, who was nearby.  The subject admitted to Officer A that he had his hands on the woman and that he didn't know her.  The subject also expressed his intentions were sexually motivated and he didn't care if the woman consented to his advances or not, because he wanted to have sex with her.  A female backing officer, Officer B, arrived on-scene and Officer A explained the situation.  Officer A requested that Officer B watch the subject while he spoke to the female subject to get her account.  After Officer A walked off, the subject stood up, ignoring orders to stay seated, and grabbed ahold of Officer B's hand and then attempted to grab her genitalia.  Officer B radioed that she needed Officer A to return to assist with the subject.  He returned and the two officers attempted to handcuff the subject, who became physically resistant. The subject continued to resist arrest and pulled way from the officers.  The officers placed the subject on the ground in a prone position and then into handcuffs. Post-arrest, | The subject made a complaint of excessive force that was forwarded by the Chain of Command to OPA. After conducting its intake investigation, OPA classified this case for Expedited Investigation. As such, the involved employees were not interviewed and the allegations were not sustained. |

| | | |
|---|---|---|
| | the subject complained of pain to his head and knee.  SFD responded, evaluated, and cleared him medically.   The subject was transported to KCJ where a small abrasion was located on his left forearm.<br><br>The FRB found that the officers took reasonable steps to de-escalate and that the force was reasonable, necessary and proportional.  The FRB noted as training issues that the officers should have been more aware of officer safety issues, as they separated without having frisked the subject or securing him in handcuffs.  The FRB recommended that this case be referred to Training for incorporation into future training sessions on tactics.<br><br>Prior to FRB review, the Chain of Command had forwarded to OPA the subject's complaint that the officers had used excessive force.  For the reasons stated in the adjacent column, the FRB did not defer its findings on the force. | |

Finally, in **two** cases, the FRB noted concerns about tactics and decision-making and on-scene supervision, but noted that all concerns had been addressed prior to its review by the Chain of Command.  See Table 10.

## Table 10: Issues Addressed by Chain of Command Prior to FRB Review

| GO Number | FRB Review |
|---|---|
| 18-020083 | Officers responded to a call of a male throwing items at passing vehicles.  When officers arrived in the area, they located the subject who had disrobed and was running around in the street.  When officers contacted the subject, he ran from them.  Officers followed the subject on foot until he jumped into a trashcan and refused to come out.  A supervisor, CRT units, and additional resources were called to the scene.  Officers negotiated with the subject for the next 40 minutes.  When the subject began lunging from the trash can and striking a parking sign, the Taser officer deployed his Taser at the subject.  The Taser deployment was ineffective.  The Taser officer then accidentally deployed a second set of probes into the ground.  The Taser officer attempted to re-energize the probes on the subject twice, which was also ineffective.  Officers continued to negotiate with the subject for the next 20 minutes.  When the subject began to spit on officers, they moved in, restrained the subject, and removed him from the trash can.  When officers attempted to place the subject on a gurney for transport to the hospital, he began to resist them again.  The supervisor used a compliance technique to gain control of the subject. The subject was then transported to HMC for evaluation and then booked into KCJ.<br><br>The FRB found that the officers took reasonable efforts to de-escalate prior to using force, and found that the force used was reasonable, necessary, and proportional.  The FRB expressed concerns, however, with the tactics and decision-making employed by the on-scene supervisor, concluding that the supervisor did not formulate or articulate a clear plan to officers on-scene.  The FRB further noted that these issues had been identified, and addressed, by the Chain of Command prior to FRB review. |

| 18-027032 | Officers were dispatched to a local gas station where a male was reported walking through a parking lot with a hammer in his back pocket and looking into parked cars. The caller also reported that the subject was associated with a dark SUV.  When the officers arrived, they located a dark Ford Explorer SUV with the subject sitting in it.  The officers recognized the subject from pervious contacts, but since no crime had been committed, the officers cleared the scene.  At a nearby location, an officer performed a records check on the subject and located a felony DOC warrant.  When the officers re-contacted the subject, they placed a patrol car in front of the subject's SUV, blocking his escape route.  The officers gave the subject orders to exit his vehicle and informed him that he had a felony DOC escape warrant for his arrest.  The officers attempted to establish a dialogue with the subject, using a clam tone and using his name to personalize the contact.  The subject locked the vehicle's doors and refused to come out.  The subject appeared to be under the influence, was possibly armed with a hammer, and was talking incoherently.  An officer safety caution was associated with the subject.  One officer found the rear hatch of the vehicle unlocked and unlocked all the vehicle's doors using the rear vehicle power lock switch.  The officers opened the driver's side door and pulled the subject from the vehicle with minimal effort.  The officers used a team takedown to place the subject on the ground while giving commands for him to get down and to stop resisting.  After taking the subject to the ground, the officers placed him into handcuffs without further incident.  The subject was treated at the scene by SFD for minor abrasions and was booked into KCJ.<br><br>The FRB found the officers used de-escalation tactics and force consistent with policy.  The FRB cited three issues with the on-scene supervision, however, in that (1) the sergeant deferred the photographs of the subject to an officer, rather than taking them himself; (2) the FRB discussed as an "excited utterance" the subject's comment that the officers were "racist ass bitches" and noted that no bias review was initiated, but ultimately agreed that no bias review was possible because the subject was unable to focus or answer questions; and (3) noted an FRU complaint to OPA (subsequently initiated as a Frontline Investigation) regarding the sergeant's failure to Mirandize the subject as he was arrested for a warrant.  The FRB noted, however, that all issues had been identified and addressed by the Chain or FRU. |
|---|---|

# APPENDIX C

Type III Use of Force Qualitative Review

The following summary of **2017-319167** is taken from the Force Investigation Report completed by FIT.  Note: the names of the subject, and the involved officers, have been redacted.

*On August 28, 2017 at approximately 1720 hours, the first of three phone calls came into the Seattle Police 911 Communications Center of a subject walking in traffic. The information on the call indicated, "male walking in the middle of traffic, screaming, pushing bicyclists". Two additional 911 calls provided similar descriptions of the subject's actions. The subject was reported to be walking the wrong way in traffic on 4th Ave. This occurred during the middle of rush hour traffic. The subject was described as a Samoan male, 30's or 40's, 6'4", 250 lbs., heavyset, wearing a grey shirt and black shorts. This subject was later identified as [Subject A].*

*Seattle Police Officer [A] heard the radio broadcast and responded to the area. Seattle Police Officer [B] volunteered to back Officer A. SPD Bike Officers [C] and [D] were located at Westlake Park and announced on the radio they would respond to the call. What follows summarized the events of the Involved Officers and Witness Officer B's encounter with Subject A based on their statements (written and audio) and the video evidence located from this incident:*

*Officers C and D rode northbound on 4th Ave from Westlake Park. They observed Subject A walk southbound in the street on 4th Ave towards oncoming vehicular traffic. Both officers directed Subject A to get out of the roadway. The officers stopped their bikes approximately 10-15 feet away from Subject A. Subject A yelled "Who want it? Who want it?" as he walked directly at the bike officers. Officer D placed his bike as a barrier between himself and Subject A. Subject A walked into Officer D and struck him in the shoulder at least one time with his hands. Officers ordered Subject A to get on the ground and he did not comply.*

*Officer C was positioned to the left side of Officer D. He warned Subject A to get onto the sidewalk or to get onto the ground or he would be tased. Officer C stated Subject A appeared to "square off" on Officer D. Officer C aimed for Subject A's lower chest and upper thigh area on the first Taser cartridge deployment. When Officer C deployed his Taser in probe launch mode, it struck Subject A on the right hand and right abdomen area. The Taser application was initially effective causing Neuromuscular Incapacitation*

1

*(NMI) and Subject A went to the ground on his stomach then he rolled to his back. Officer C got on the air to say they were taking the subject into custody. Officer C and Officer D attempted to place Subject A into custody after the five second Taser cycle. However, Subject A recovered and tried to get up. Officer C stated Subject A swung and kicked at Officer D.*

*Officer C called for a fast back up as they tried to take Subject A into custody. He described that Subject A attempted to punch him and Officer D. In his statement, Officer C said he delivered at least two knees to Subject A's face as he ordered Subject A to get back onto the ground. Subject A continued attempts to get to his feet. Officer C attempted to cycle his Taser 5 to 6 times during the struggle to deliver an additional 5 second cycle but the Taser did not appear to work. Officer C attempted to deploy the second cartridge but the Taser did not deploy the second cartridge. Officer C turned the Taser off then back on and was then able to deploy the second Taser cartridge. Per his statement, Officer C targeted Subject A's abdomen and upper thigh area with the second Taser cartridge. Officer C reported the probes from cartridge 2 landed in the general area he targeted. He stated the second deployment was successful momentarily but Subject A continued to fight them. into custody. He described that Subject A attempted to punch him and Officer D. In his statement, Officer C said he delivered at least two knees to Subject A's face as he ordered Jones to get back onto the ground. Subject A continued attempts to get to his feet. Officer C attempted to cycle his Taser 5 to 6 times during the struggle to deliver an additional 5 second cycle but the Taser did not appear to work. Officer C attempted to deploy the second cartridge but the Taser did not deploy the second cartridge. Officer C turned the Taser off then back on and was then able to deploy the second Taser cartridge. Per his statement, Officer C targeted Subject A's abdomen and upper thigh area with the second Taser cartridge. Officer C reported the probes from cartridge 2 landed in the general area he targeted. He stated the second deployment was successful momentarily but Subject A continued to fight them.*

(Note:  a subsequent inspection of the Taser determined a hardware issue with the Taser, resulting in performance failure.)

*Officer C recalled Subject A kicked him in the legs at least twice and possibly kicked him in the chest. Officer C reported he was almost kicked in the head*

when Subject A kicked his feet in the air. Officer C stated he also delivered two kicks to Subject A's side to keep him on the ground.

As a Witness Officer, Officer C observed Officer D utilize his baton and strike Subject A in the upper left arm and back area. Per his statement, he did not witness any other officer use force during the incident. Officer D reported that he had no prior knowledge or contact with Subject A before the incident.

Officer D utilized his less lethal baton to prevent Subject A from further assaults to them and to keep Subject A on the ground. Officer D delivered 3 initial baton strikes to the left side of Subject A's body. He and Officer C continued to struggle with Subject A. Officer D delivered an additional 6 strikes to the left side of Subject A's body. During his audio interview, Officer D recalled approximately 10 baton strikes to the subject during the struggle. He believed he struck the subject in the left arm and shoulder area. Officer D poked Subject A with the tip of his baton in the chest area during the struggle approximately 2 times. Officer D stated this tactic did not appear effective. Officer D also attempted to control the subject's head when he used his baton across the left side of the subject's face. This too, per Officer D was ineffective.

As a Witness Officer, Officer D observed Officer C deploy his Taser. Officer D also witnessed Officer C use knee strikes on Subject A which effectively kept him on the ground as they struggled with him. Per his statement, he did not witness any other officer use force during the incident. Officer D reported that he had no prior knowledge or contact with Subject A before the incident.

Officer A was staged nearby at 4th Ave and Olive Way. He heard the officers struggle on the radio and the request for a fast backup. Officer A stated he observed Subject A violently struggle with officers as he pulled up to the scene. He observed Officer C at the lower half of Subject A's body and Subject A kicking repeatedly. He observed Officer D at the upper half of the subject's body attempting to control the subject. Officer A described in his statement that he heard a Taser cycle but it did not appear to effect Subject A. He stated he did not know which officer deployed the Taser. Officer A did witnessed Officer D strike Subject A with a baton approximately 2 to 3 times

3

to the left shoulder area of Subject A. Officer A reported a constant struggle with Subject A until multiple officers arrived to control the subject's movements. Per his statement, he did not witness any other officer use force during the incident.

After the force, additional officers arrived and assisted with the control of Subject A by holding his body to the ground with their hands to prevent any further struggle with Jones. Officer E arrived and held down Subject A's legs. Officer B arrived and held down Subject A's right arm. Officer F arrived and held down Subject A's left arm. A/Sgt. G arrived on the scene to screen UOF and supervise the scene. A/Sgt. H also arrived on the scene of the incident to assist with scene control. Medical attention was summoned for Subject A for treatment of his crisis issue and to remove the Taser probes from his right hand and torso area. SFD were called at approximately 1726 hours and arrived at approximately 1733 hours. SFD treated Subject A on the scene and attempted to remove all Taser probes from Subject A but were unable to remove the probe from his right hand. Subject A was transported to Virginia Mason Hospital under hospital guard to have the probe removed.

Backing officers located civilians who witnessed the incident. Approximately ten of the civilian witnesses indicated they observed an aspect of the use of force. These witnesses described seeing or hearing the Taser application, witnessed the baton strikes or witnessed Subject A assault officers. Witness A stated Subject A was in possession of a knife prior to the use of force, but the investigation did not confirm her account. Officers checked the path of the subject and did not locate a knife. All witness information was collected and documented in the GO report and this FIR report.

A/Sgt. G screened the assault on officers with A/Lt. A of the East Precinct. He then screened the incident with A/Capt. Hirjak of FIT. A/Sgt. G changed location to the hospital where he conducted an interview with Subject A and obtained information regarding the subject's injuries. Subject A had a chipped right front tooth that did not require immediate treatment. Subject A's left shoulder checked negative for fractures after the x-ray. The abrasions on XXXX's knees were cleaned and treated by hospital staff. Subject A had bruises on his left arm, left chest and left back. There was no indication of any head injuries. (**Note**: The Taser probe lodged in the bone of

*Subject A's hand was ultimately removed and A/Sgt. G delivered it to the FIT office where he turned it over to the primary detective.)*

*Detective Steve Corbin and Detective Joe Stankovich responded to Virginia Mason to interview the subject. OPA Sgt. Linda Cook was present during the interview. Detective Corbin led an interview with Subject A. Subject A was read Miranda and agreed to an audio statement. Subject A also signed a medical information release waiver.*

*Subject A described how he smoked PCP with a friend before the incident. He stated he was irritated with his friend, the weather and at the reaction to medication he was prescribed for a medical condition. Subject A stated he did not recall any of the use of force incident. He recalled that he was surrounded by police and SFD when he came to from his black out. Subject A's audio recorded statement and transcript are the best record of the contact. Photos of the subject and his injuries were taken in the emergency room of Virginia Mason Hospital.*

**FRB Review:** The FRB concluded that officers used sound tactics and de-escalation efforts in this incident.  Officers communicated clearly with the subject to get on the ground and comply with their commands.  A warning was provided to the subject, prior to the Taser deployment, but was ignored.  No additional de-escalation tactics were identified by the Board that the involved officers could have used.

At the time of the FRB deliberation, OPA was reviewing a total of six allegations of excessive force, submitted by an employee at a nearby restaurant, who had observed part of the incident.  The FRB accordingly discussed elements around tactics and decision-making, but, per policy, did not rule on the use of force itself.

**OPA Review:** Following OPA review, the OPA Director issued a **"Not Sustained"** finding with respect to all six allegations, certifying four as a **"Lawful and Proper"** use of force, and certifying two allegations as **"Unfounded."**

The following summary of **2017-303566** is taken from the Force Investigation Report completed by FIT:

*On August 16, 2017 Officer A and his first rotation Student Officer B were riding together as 3 David 11. Officer B was driving and Officer A was the passenger. At approximately 2056 hours they were dispatched to 225 Cedar St for a disturbance call (2017-303518). The call stated "In parking lot north*

*of, male hitting a tree with a metal pole." Subsequent updates also added that there were approximately twenty subjects standing around. 3 David 3, Officers C and D were dispatched as the backing unit. Less than a minute later, approximately 2057 hours, 3 David 1, Officer E and Student Officer F answered up that they would also be enroute. Officer E was the passenger, and in plain clothes as Officer F was on his fourth rotation, or his "check out" phase.*

*Officer G, upon hearing the nature of the call and the potential number of subjects felt that he was close enough and asked dispatch over air to log him to the call (2104 hours).*

*Officers A and B arrived first, immediately followed by Officers C and D. They both parked in the alley to the north, in the 200 block of Cedar St, facing north. They were just south of the alley entrance/exit to New Horizons Youth Service Shelter (2709 3rd Ave). Officers A, B, D and C exited their vehicles to begin their investigation.   Officers F and E arrived at the scene about 30 seconds later and approximately 30 seconds after that Officer G arrived. Both vehicles parked on Cedar St for lack of space in the alley.*

*DICV captured the following: Approximately two minutes after arriving on scene, Officer B can be heard on DICV making contact with [Subject A] who admitted that he was hitting a tree with a metal pole. Officer B and Officer F continued their investigation while the other Officers on scene took cover positions, keeping their attention on the large amount of youth subjects in the alley and Grange Insurance parking lot.*

*Less than three minutes into the investigation of Subject A's actions, he can be heard on DICV asking officers if they can make "him" leave. It was determined, based upon the involved officer's audio statements that Subject A was referring to [Subject B], who was interjecting himself into the conversation between Subject A and the investigating officers. Approximately one-minute later Officer C could be heard speaking to all the youth subjects who were sitting on the short retaining wall in the Grange Insurance parking lot (west side of the alley), pointing out the "Conditions of Entry" signs.*

*Officers C's and D's DICV showed officers contacting Subject A. Officer C is heard having a conversation with Subject B (not visible in the frame) who*

*argued about whether or not he needed to leave the property. Subject B then came into view walking eastbound off the property into the alley. Subject B made it about halfway across the alley when he turned around and proceeded to walk back toward the area where Officer C had asked him to leave. According to Officer C, Subject B told him that he needed to grab his property. Officer C watched Subject B walk to the retaining wall and planter that had no property on or near it.*

*Officer C opted to identify Subject B at this time for trespassing and asked him for his identification. Officer C said that Subject B ignored his request and attempted to push by him without providing his identification. Officer C said he put his right hand on Subject B's right shoulder and grabbed Subject B's left wrist with his left hand. Officer C told Subject B to sit down (on the retaining wall). Officer C stated that he immediately was met with verbal resistance from Subject B who told Officer C that he was not going to sit. Officer C said he then used "de minimis" force, putting pressure downward on Subject B's shoulder and pushed him a few steps backward in order to make him sit. Officer C said Subject B resisted him as he did this. As soon as Subject B sat down on the wall Officer C said that Subject B jumped back up and pushed him (Officer C) backwards. Officer C said he believed that Subject B was trying to leave the scene.*

*The altercation can be heard and the officers can be seen going to assist Officer C. Subject B was yelling and can be heard saying, "... get off my neck!" Subject B also was heard making allegations that the officers choked him. At the time of the physical altercation Officer C's mic picked up the noise of the youth subjects around, and their comments regarding the Officers' actions with Subject B.*

*According to Officers F, C and D they performed a trained take down of Subject B. Officer C stated that from his initial contact with Subject B, he still maintained control of his right arm and was on his right side. Officer F described that he was on Subject B's left side. He said that he attempted to control Subject B's left arm to bring it behind his back to handcuff him, but Subject B yanked it away. Realizing that Subject B was being resistive Officer F did a body wrap, "bear hugging" Subject B and pinned his left arm to his side. Officer F reported in his statement that he alerted other officers verbally of what he wanted to do saying, "Down to the front!"*

7

*Simultaneously Officer D approached Subject B from in front of him and took control of Subject B's head.*

*In his FIT statement Officer D said he placed his left forearm on the right side of Subject B's neck and cupped the back of Subject B's head with his left hand. Officer D did this so he could control Subject B's head. Officer D stated he could not immediately recall what his right arm was doing, but he believed it was controlling Subject B's right shoulder. Officer D said that he verbally gave the command, "To the front," to Officer C.*

*The officers all stated that when Subject B went to the ground he was still actively resisting. Officer G recalled in his FIT statement that even though he was mainly acting as a cover officer, when he looked down to check the status of Officers D, F and C he saw they had taken Subject B to the ground and were attempting to handcuff him. Officer G said he saw Subject B had his left arm tucked underneath him and was not willingly putting it behind his back so that he could be handcuffed. Officer G said he tapped Subject B's left wrist and tugged on Subject B's sleeve to let him know which arm he was talking about, at the same time verbally telling Subject B, "Put your arm behind your back." Officer G said he then saw that the officers were able to get leverage and get control of Subject B's left arm.*

*Officer F was able to put the handcuffs on Subject B. The Officers said they then opted to search Subject B as much as possible while he was still on the ground. After approximately a minute of searching Subject B, they stood him up and walked him in front of the patrol car to finish their search.*

*Sgt H arrived on the scene at 2119 hours and Officer C screened the arrest with him. Officer C informed Sgt H at this time that Subject B made allegations that they choked him. Sgt H had Officer C place Subject B in the back of the patrol car and transport him back to the precinct. Subject B declined medical treatment.*

*Once at the precinct Sgt CaHrullo interviewed Subject B. Subject B made allegations of being choked. Sgt H screened the incident with FIT. Detective Simmons and I interviewed and photographed Subject B at the precinct.*

*In his statement Subject B said that "the police officer with the redhead" put his hands on Subject B's throat and that the Officer was holding onto his throat trying to control him. Subject B said he yelled for the Officer to get off*

8

*of his throat. Subject B stated that he "freaked out" when the Officer grabbed him because he didn't know it was an officer touching him. Subject B admitted that he realized it was officers when he was on the ground but that he continued to struggle because of his throat being grabbed. Subject B said that multiple officers took him down to the ground and put a foot on the left side of his head to control him. Subject B said he did not lose consciousness but said he couldn't breathe and he was a little dizzy. Subject B said that he had dust in his eyes, his head hurt and he complained of pain due to the handcuffs. Subject B suffered minor abrasions on his wrists from the handcuffs. The injury was photographed. Subject B did not have any other complaints of injury and there were no further visible injuries. Subject B again, declined medical treatment.  Officer F (FIT statement page 36). Officer D stated that he did this not only because this is how he was trained, but also because it is necessary to protect someone's head if they are being taken to the ground (FIT statement page 14). The three officers then proceeded to bring Subject B to a prone position on the ground in what Officer D described as a controlled takedown.*

*Once Subject B was on the ground Officer D said he placed his knee on the lower, back part of Subject B's neck. Officer D stated that he heard Subject B say that "they" (officers) were choking him, so Officer D quickly repositioned his knee further down toward Subject B's back. (FIT statement page 11). Officer D said he realized that even though he moved his knee and saw that no one was near Subject B's neck, Subject B was still yelling that he was being choked.*

*Subject B was subsequently booked into King County Jail at 0128 hours on August 17th for SMC 12A.08.040, criminal trespass and SMC 12A.16.010, obstructing an officer. He was released at 1654 hours on August 17th, pending charges.*

*Officers D and C provided involved officer statements for Type III use of force.*

*Officers G, F, B and A provided witness officer statements for Type III use of force.*

*Officer F completed a Type II Blue Team entry for the injury to Subject B's wrist.*

9

*Officer F suffered abrasions on both knees, and sustained a tear to his uniform pants on the knee. Officer D had a small abrasion on his hand. All injuries were reported to and documented by Sgt H shortly after the incident. All officers returned to work for their following shift.*

**FRB Review:** At the time of the FRB review, OPA had taken review of multiple issues related to force, de-escalation, stops and detentions, and professionalism that had been referred to OPA by the chain of command. The FRB accordingly discussed elements around tactics and decision-making, but, per policy, did not issue findings on either tactics/decision-making or the use of force. The FRB did conclude, however, that no Type III force was used, finding (a) that no choke/neck hold was applied and there was no indication that officers obstructed the subject's airway while applying force to the subject.

**OPA Review:** As to the subject's allegation that he was choked, OPA recommended a finding of **"Not Sustained – Inconclusive."** The OPA Director's analysis is as follows:

*The subject alleged that N[amed] E[mployee] #1 used excessive force against him. The gravamen of the subject's allegation against NE #1 was that NE #1 grabbed his throat. NE #1 reported using force to stop the subject from walking away and then force to take the subject to the ground and to handcuff him. NE #1 denied grabbing the subject's throat. None of the other Named Employees reported witnessing NE #1 grab the subject's throat. Moreover, while one civilian witness recalled that the subject complained that his throat was grabbed, from OPA's review, no civilian witness recounted observing NE #1 grab the subject's throat.*

*With regard to the force that NE #1 reported using, I find that it was reasonable, necessary, and proportional. At the time the force was used, NE #1 had probable cause to arrest the subject for trespass. Moreover, when he tried to do so, the subject resisted those attempts and made physical contact with NE #1. As such, at that time, it was reasonable to use force to stop the subject from making any further contact with NE #1 and to place the subject into custody. The takedown was further necessary to achieve the lawful goal of effectuating the arrest. Based on the circumstances of this case, I do not believe that NE #1 thought that there was any other reasonable alternative to that force. Lastly, I find that the force reported by NE #1 was proportional to the subject's resistance and the fact that the subject had just made physical contact with NE #1.*

10

*Were the force reported by NE #1 the only force alleged, I would have recommended that this allegation be Not Sustained – Lawful and Proper. However, as discussed above, the subject also complained that NE #1 grabbed his throat and choked him.  Had NE #1 done so, that force would have been out of policy under these circumstances.  I note that not only did NE #1 deny doing so, but that no other witness reported viewing such actions.  That being said, at the time that force was used by NE #1, the subject complained of his throat being grabbed by NE #1 and he consistently reiterated this allegation, identifying NE #1 as the perpetrator. Unfortunately, the video of the force and particularly the instant of when NE #1 was alleged to have choked the subject is of low evidentiary value and does not clearly show what exactly happened.*

*As such, and considering that I cannot conclusively determine that NE #1 did not grab the subject's throat, I recommend that this allegation be Not Sustained – Inconclusive.*

Allegations of excessive use of force as to two other officers at the scene were rejected as **"Not Sustained – Unfounded."**

As to referrals relating to the lawfulness of the stop, OPA found all related allegations, against all named employees, to be **"Not Sustained – Lawful and Proper."**

As to referrals relating to professionalism and discretion, OPA found all related allegations, against all named employees, to be "Not Sustained – Lawful and Proper" except in the instance of NE #1 where, for the reasons articulated above, OPA found the allegations to be **"Not Sustained – Inconclusive."**

In Table 4, one crisis-involved use of force case is identified as resulting in death.  Although the force used in this incident was only low-level, Type I, because this interaction involved an in-custody death it was investigated by FIT and reviewed by the FRB.  The following is from the Force Investigation Report.  In addition, body-worn video of this incident can be viewed at   http://spdblotter.seattle.gov/2017/11/18/death-investigation-in-north-seattle-2/).

*On 11/17/2017, at approximately 23:03:46 hours, Witness A called 911 to report a male in the intersection of Aurora Ave North and North 105th Street. She described the male as an older Native American, "looking panicked and freaking out and showing his phone like he's scared." She stated two other males were walking around him and filming with a phone.*

11

*She was concerned that the males were going to fight the male in the middle of the road.*

*At approximately 23:06 hours, Witness B called 911 to report a male in the intersection of Aurora Ave North and North 105th Street, yelling "Help, help, help!" He described him as a Native American Male, holding a phone, saying he needed help. The male was currently alone in the intersection, and Witness B believed the male was in danger of being struck by a vehicle.*

*At approximately 23:06 hours, Subject A called 911. He reported that a "bunch of people" were chasing him and trying to "kill" him. He stated "I'm at Northgate. I'm everywhere." As the conversation continued, Subject Fredericks stated he was in the intersection of "105th and Northgate and Aurora." When the dispatcher attempted to gather further information, the line disconnected.*

*At approximately 23:08 hours, Dispatch called Subject A back. At first, Subject A stated there was an emergency in the middle of the intersection, and he needed help. When the dispatcher asked, "What's going on?" Subject A stated, "I don't know. Nothing. I just need help." He would not answer any other questions. He could be heard yelling in the background, repeating that he hadn't done anything. Car horns could also be heard in the background until the line disconnected.*

*911 received three more calls regarding Subject A. The callers provided similar information regarding a male in the intersection. Information regarding the calls was broadcasted over North Radio. Officer A and Officer B were working a two-officer car, designated 3N31. They heard the radio traffic and volunteered to take the call. They arrived at approximately 23:12 hours.*

*As Officer A and Officer B arrived with their emergency lights activated, Subject A was in the intersection; he matched the description provided by the 911 callers. From their vehicle, both officers told Subject A to get out of the street and go to the sidewalk. After several commands, Subject A complied and walked to the sidewalk on the SE corner, on the north side of Seattle's Family Dentistry. Officer A parked the patrol car at the SE corner of the intersection and both officers approached Subject Fredericks on foot.*

12

*Subject A told the officers that someone was chasing him. When asked by who, Subject A stated he knew who they were, but refused to provide further details. Subject A talked about unknown subjects disabling video and being "…here still" as he pointed to various locations around the intersection. Officer B told Subject A that it was his choice to identify the subjects, but he needed to stay out of the street. Subject A stated, "I am not going back on the street." Subject A then stated that he needed an escort.*

*Officer A asked Subject A where he lived and Subject A told the officers that he lived at 120th and Aurora. Officer A asked Subject A if he was going home. Subject A responded by saying, "I'm trying to get there." Officer A offered to give him a ride home and told him that, "Nobody's going to chase us." Subject A stated he didn't know because he didn't trust them yet. Both officers continued attempts to convince Subject A to allow them to drive him home.*

*When Officer B asked why he didn't want a ride, Subject A responded by saying "Cause a dispatcher when I call, it didn't even sound like a dispatcher." Officer B asked if he was worried that they weren't the police and Subject A said he was concerned about them not being police officers. When Officer B asked why he felt that way, Subject A said he didn't know. When Officer B told him that he called 911, Subject A told them it wasn't the right number.*

*A warrant was located from Westport PD. The officers made several more attempts to convince Subject A to allow them to drive him home. He continued to refuse and stated he would go back into the roadway. They told him, if he returned to the intersection they would send him to the hospital. They told him he had two options, hospital or home. After approximately ten minutes of contact, Officer B and Officer A broke contact with Subject A. In their statements, both officers stated, since their de-escalation attempts during the initial contact failed, they would break contact and observe.*

*Officer A and Officer B immediately drove to the parking between Seattle Family Dentistry and Sherwin-Williams. They began monitoring Subject A and observed him return to the intersection where he was at risk of being struck by a vehicle. Officer A began checking the MDT for available units and*

13

*made a request via radio for "one more unit to our location." Officer C (3J1) was dispatched to assist.*

*Officer B observed a Metro Bus almost strike Subject A. They decided to reinitiate contact before the second unit arrived. In his statement later provided to FIT, Officer B described a brief feeling of panic because he lost sight of Subject A and believed a bus had struck him. When he was able to see Subject A again, he believed it was clear that they needed to remove Subject A from the intersection.*

*At approximately 23:23 hours, Witness B called back to 911 and reported that the male had returned to the intersection. As he spoke to the call-taker, he observed the patrol car return to the intersection and the officers reinitiate contact. He continued to observe the incident and later provided a statement to investigators.*

*As the officers arrived at the intersection with their emergency lights activated, they contacted Subject A a second time. Officer B rolled down his window and told Subject A to go to the sidewalk. He also informed Subject A that another police car was on the way. Subject A did not comply. Officer A parked the patrol car at the Southeast corner of the intersection. Officer A and Officer B approached on foot.*

*As they approached Subject A, Officer B repeated that another car was coming and he told Subject A to come with them. Subject A yelled "No" several times and turned away from the officers. He began walking south in the northbound turn lane. Officer B reached toward Subject A, lowered his voice and said, "Come on buddy." When Officer B made contact with Subject A, Subject A began screaming "No. Where are you taking me?"*

*Officer B took hold of Subject A's left arm and placed it in what Officer B later described as an escort position, "...left hand on his wrist. Right hand on his elbow." Officer A took hold of the right arm. Both officers described Subject A's reaction as "tensing" his muscles. As they escorted him out of the street, they repeatedly explained that they needed to get out of the road. Subject A told the officers that he would stay right there.*

*As they approached the sidewalk, Subject A appeared to continue to struggle. He pushed and pulled as the officers maintained hold of his arms.*

*Officer A repeatedly told Subject A that he needed to get out of the street. Officer B said, "We just want to help you, buddy." Subject A began to push and pull as Officer B told him to stop fighting. He broke away from Officer A and began to move toward the intersection. Subject A continued to yell for help as he struggled.*

*To prevent Subject A from breaking free and returning to the intersection, the officers decided to take Subject A to the ground. Officer A described the takedown. Officer B placed his right leg behind Subject A's left leg, while Officer A placed his right leg behind Subject A's right leg. Both officers pushed him in a backwards direction to the ground.*

*The completion of the takedown resulted in Subject A on his back with Officer A holding his left arm and Officer B holding the right arm. Officer A patted Subject A's chest while saying, "There you go. There you go. It's ok. It's ok. [Subject name], it's ok, it's ok, breathe. Breathe. Breathe." Subject A yelled that he was not getting in their vehicle and that he needed an ambulance. Officer A told Subject A that he was not getting in their car and Officer B told him they would get an ambulance. Officer B requested an ambulance via radio.*

*Subject A appeared to continue to struggle and begin to sit up. He stated, "I never done drugs" and continued to yell for an ambulance. Subject A was able to get to his knees and struggled to stand as Officer A and Officer B maintained control of his arms. Officer A and Officer B pushed him back to the ground until he was on his right side. Both officers continued to give commands.*

*Subject A continued to struggle in an apparent attempt to stand up. Officer A and Officer B were able to get him on his back. An unknown female approached the struggle and stated, "Stop fighting them, dude. Stop fighting them. Stop fighting them. No, you need to stop fighting them. Relax. Relax…" As the sirens from the backing units approached, Subject A stated, "Here come the real cops." He continued to struggle and yell while he was still on his back. They maintained that position until backup units arrived.*

*Officer D, Officer E, and Officer F assisted with getting control of Subject A. They rolled Subject A onto his stomach. Officer G stood by and provided light to the officers. Officer F and Officer B took control of his arms as Officer E*

*and Officer D took control of his legs. Officer A had his left hand on Subject A back as he used his right hand to assist Officer B with gaining control of Subject A's left arm. Officer B and Officer F held Subject A's arms behind his back as Officer Rogers applied the handcuffs. Subject A said "ow" several times as the handcuffs were applied.*

*According to body camera footage, Subject A was on his stomach for approximately one minute and thirty seconds during the handcuffing process. After the handcuffs were applied, Subject A was no longer struggling. Officers rolled Subject A onto his side into the recovery position. At that time, the American Medical Response ambulance arrived on scene. Officer E asked if Subject A was snoring and subsequently asked if he was breathing. Officer F stated he could hear Subject A breathing. Body camera video captured what sounded like snoring emanating from Subject A.*

*The AMR crew consisting of Emergency Medical Technician A and Emergency Medical Technician B approached the officers with their gurney. Officers assisted by lifting Subject A onto the gurney and removing the handcuffs. EMT A and EMT B placed Subject A in soft restraints and placed him into the back of their ambulance. The EMTs began evaluating Subject A EMT A checked for a carotid pulse and later stated that he detected a "thready" pulse of approximately 40 beats per minute. Officer B asked EMT B if he needed Fire to respond and he replied, "I don't think so, I think it's purposeful." Officer B stayed near the back of the ambulance as Officer A screened the incident with Sgt. A.*

*Officer B requested the ambulance to move out of the roadway, to the parking lot between Sherwin-Williams and the Seattle Family Dentistry. Officer A began the paperwork necessary for the Involuntary Treatment Act. EMT A drove the ambulance to the parking lot as EMT B stayed in the back with Subject A. After moving the ambulance, EMT A returned to the back of the ambulance. Officer B returned to standing by the rear door of the ambulance and observed the EMTs providing treatment to Subject A. EMT A checked for the carotid pulse a second time but was unable to locate it.  EMT A advised that he could not find a pulse and stated he wasn't breathing. Officer B called for Fire to respond. The EMTs began performing CPR on Subject A. Officer B updated via radio that CPR was in progress. Seattle Fire responded and continued CPR for approximately twenty-four minutes before declaring Subject A deceased.*

16

A subsequent autopsy determined the primary cause of death to be acute combined methamphetamine and alcohol intoxication; the manner of death was ruled accidental.

As it involved an in-custody death, the FRB reviewed the Type I use of force in this case. The FRB found that officers performed commendably; that they employed all feasible de-escalation efforts; and that the force used was reasonable, necessary, and proportional to the subject's resistance.  The OPA Director was present at this FRB and declined to initiate any review.