# EXHIBIT D

City Council Resolution Number 31855

# CITY OF SEATTLE

## RESOLUTION 31855

A RESOLUTION recognizing the service and dedication of the Seattle Police Department's police officers, detectives, and sergeants; and requesting the United States District Court for the Western District of Washington conduct a judicial review of the Collective Bargaining Agreement reached between The City of Seattle and the Seattle Police Officers' Guild.

WHEREAS, the City Council, in voting to approve Council Bill 119368, authorizes the execution of a new collective bargaining agreement (CBA) between The City of Seattle (City) and the Seattle Police Officers' Guild (SPOG) to be effective January 1, 2015, to December 31, 2020; and

WHEREAS, the previous CBA between the City and SPOG expired on December 31, 2014, and representatives of the City and SPOG engaged in good-faith negotiations to reach a Tentative Agreement which was ratified by SPOG in September 2018; and

WHEREAS, Seattle's police officers, detectives and sergeants, roughly 1,300 members in all, have continued to provide critical public safety services to the residents and visitors of Seattle without a labor contract since January 1, 2015; and

WHEREAS, the City Council recognizes the sacrifice and contributions of SPOG members, who strive to ensure the City achieves its public safety goals while being strong partners in ongoing efforts to implement lasting policing reforms and accountability structures, critical to ensuring the security of our communities but especially those that are disproportionately impacted by unconstitutional policing; and

WHEREAS, the City Council also recognizes the right of SPOG and all public employee unions to collectively bargain for wages, hours, and working conditions in the best interest of their members; and

1    WHEREAS, in July 2012 the City entered into a settlement agreement ("Consent Decree") with

2        the United States Department of Justice (DOJ), enforceable by the U.S. District Court for

3        the Western District of Washington ("Court"), in *United States of America v. City of*

4        *Seattle*, 12 Civ. 1282 (JLR); and

5    WHEREAS, the City Council votes to approve Council Bill 119368 and, with it, the SPOG

6        CBA, while acknowledging that the Community Police Commission (Attachment 1), the

7        Office of Police Accountability (Attachment 2), and the Office of Inspector General for

8        Public Safety (Attachment 3), submitted to the City Council their analysis and concerns

9        about its compliance with Ordinance 125315 (hereinafter "Accountability Ordinance");

10        and

11   WHEREAS, the City Council unanimously passed Ordinance 125315 in May 2017, and key to

12        the Accountability Ordinance were several Findings of Fact and Declarations, including

13        but not limited to, a clear statement of the City Council's goals in adopting the

14        Accountability Ordinance: "The goals of this ordinance are to institute a comprehensive

15        and lasting police oversight system that ensures that police services are delivered to the

16        people of Seattle in a manner that fully complies with the Constitution and laws of the

17        United States and State of Washington, effectively ensures public and officer safety, and

18        promotes public confidence in SPD and the services that it delivers. To accomplish these

19        goals, The City of Seattle has committed to strengthen elements of Seattle's existing

20        system including building a strong community-based entity with authority to review and

21        weigh in on police policies and assess the responsiveness of SPD, The City of Seattle,

22        and accountability system professionals to community concerns, which has been missing

23        in previous reform efforts"; and

1   WHEREAS, on September 17, 2017, the Court issued its Order Regarding Accountability

2       Ordinance, in which the Court declined "to rule on the entirety of the Ordinance as it

3       relates to the SPD accountability system at this time. (*See* Tr. at 8-9, 21-22.) Until the

4       collective bargaining process is complete, the court cannot be assured that the Ordinance,

5       as it stands today, is a final product. The court declines to rule on a variant of the

6       Ordinance, but will await the final version that is ultimately implemented following

7       collective bargaining"; and

8   WHEREAS, the Court went on in its September 7, 2017, Order Regarding Accountability

9       Ordinance, by explaining its rationale for declining to approve the Accountability

10      Ordinance: "In withholding its approval, the court is not suggesting that the City should

11      not implement those portions of the Ordinance that the City understood would take effect

12      30 days after the Mayor signed the Ordinance (*see* Supp. Br. At 3), or that the City should

13      refrain from entering into collective bargaining concerning those aspects of the

14      Ordinance that require it (*see id.* at 9 (suggesting that court approval is necessary for the

15      City to engage in collective bargaining over the Ordinance)). The court simply declines

16      to place its final imprimatur on what is essentially a work-in-progress. The court

17      cautions the parties who either are or will be engaged in collective bargaining over

18      provisions of the Ordinance that the United States Constitution and the right of the City's

19      citizens to have constitutional policing ultimately trumps all other concerns at issue

20      here"; and

21   WHEREAS, the City Council approves the SPOG CBA in order to make possible judicial

22      review; and

1   WHEREAS, the City Council seeks the guidance and direction of the Court with regard to the

2       CBA's compliance with the terms and purposes of the Consent Decree and its

3       consistency with the stated goals of the Accountability Ordinance and the principles of

4       constitutional policing; NOW, THEREFORE,

5   **BE IT RESOLVED BY THE CITY COUNCIL OF THE CITY OF SEATTLE THAT:**

6       Section 1. The City Council requests that the City Attorney's Office jointly file this

7   resolution, including Attachments 1-3, and the Seattle Police Officers' Guild (SPOG) collective

8   bargaining agreement (CBA) with the Court to request a judicial review of the labor contract.

9       Section 2. In furtherance of continued compliance with the Consent Decree, the City

10  Council requests that the City Attorney's Office petition the Court to review those contract terms

11  that fall within the scope of the Court's judicial oversight role pursuant to the Consent Decree,

12  specifically including, but without limitation, the following terms of the CBA:

13      A.      **Article 3.1** (page 6) – The standard of review and burden of proof in labor

14              arbitration (Seattle Municipal Code (SMC) 3.29.135.F);

15      B.      **Article 3.6.B-D** (pages 9-12) – The calculation, extension and/or re-calculation

16              of the 180-day timeline for the Office of Police Accountability to investigate

17              complaints of misconduct by the Seattle Police Department (SMC 3.29.130); and

18      C.      **Appendix E.12** (page 84) – Narrowing of legislated subpoena powers of the

19              Office of Police Accountability (SMC 3.29.125.E) and the Office of Inspector

20              General (SMC 3.29.240.K).

21

1    Adopted by the City Council the 13th day of November _____, 2018,

2   and signed by me in open session in authentication of its adoption this 13th day of

3   November _____, 2018.

4

5                                          President _____ of the City Council

6    Filed by me this 13th day of NOVEMBER _____, 2018.

7

8                                  Monica Martinez Simmons, City Clerk

9   (Seal)
10
11  Attachments:
12  Attachment 1 – Overview of Several Issues with SPOG Tentative Agreement Related to
13  Implementation of Accountability System Reforms
14  Attachment 2 – Office of Police Accountability Letter to Councilmember M. Lorena González
15  Attachment 3 – Office of Inspector General Memorandum to Councilmember M. Lorena
16  González

**State of Washington,**
**County of King**

I, _Janet Polata_ certify that this is a true and correct

copy of _Resolution 31855, without attachments_, on file in the records

of the City of Seattle Office of the City Clerk

Signed by:
Signature _____
Title: _Information Services Supervisor_
Date: _November 15, 2018_

5

# ATTACHMENT 1
# to EXHIBIT D

**November 9, 2018**

**Overview of Several Issues with SPOG Tentative Agreement**
**Related to Implementation of Accountability System Reforms**

*prepared by Judge Anne Levinson (ret.) at the request of the Community Police Commission*

Introductory notes:

- While new structures and many operational mandates concerning the OPA, OIG, and CPC in the Accountability Ordinance [Ordinance 125315] remain mostly intact (many were not subject to bargaining), the SPOG tentative agreement (TA) eliminates or modifies a large number of other reforms design to strengthen the accountability system, that were to be implemented after bargaining. The City expressly committed to the Ordinance to "… negotiate[e] collective bargaining agreements that conform to and are fully consistent with the provisions and obligations of [Ordinance 125315]." (Section 3.29.510.) As the Ordinance stated, this was an unusual approach made necessary by the unique nature of policing and the pending Consent Decree. The Ordinance terms were the results of more than two years of civilian oversight experts' and community advocates' discussions and negotiations with City officials to make long-needed system improvements in ways that best served the public, could be supported by the Police Department, were fair to employees, and would be consistent with the goals of the Consent Decree, in particular enhancing community trust. Many provisions were more moderate than experts and advocates preferred, because of those many months of discussions to find approaches on which all sides could agree. The Ordinance language was then carefully crafted to ensure fidelity to those outcomes. The expectation was that the SPMA and SPOG TAs would help ensure that the intended reforms were comprehensively implemented. The civilian experts and community did not argue for stronger terms in the Ordinance, so that they could then be 'pared back' in the TAs. The Ordinance was understood to be the baseline, not the ceiling.

- The TA states that the language in the TA, not City ordinance, will prevail whenever there is a conflict. (Article 18.2 of TA.) That means, in addition to terms where the parties apparently intended the language to differ from the Ordinance, every place where there are unclear or out-of-date provisions, or terms that are different in any other way from any City ordinance (and therefore 'conflict'), whether intentional or not, it is the exact language of those TA provisions that must prevail. There are a number of apparent drafting errors or issues throughout the TA, including several where only some aspects of the relevant Ordinance language were included. Because of the "express language of the TA shall prevail" terms in the TA, each of these allows for challenges to disciplinary actions based on the plain language of the TA. Those challenges then result in settlements or appeals due to that lack of clarity, add delay and cost for the public and complainants, and potentially result in less accountability. All of which are contrary to the purpose of the accountability system reforms.

- The SPMA collective bargaining agreement also did not accept some reforms set forth in the Ordinance. At the time, the City took the position that these differences were acceptable because SPMA agreed to accept all other aspects of the Ordinance. However, the value of SPMA's acceptance of most Ordinance provisions is now undercut because the SPOG TA conflicts with so many of them, and as noted above, the SPOG TA language will prevail. Because of different contract terms (including different 180-day deadlines, different burdens of proof, different notice requirements, etc.), OPA will have to either establish two systems for handling complaints and investigations of different ranks (which directly conflicts with the Ordinance requirement that all ranks be treated equivalently regarding accountability so that the public and SPD employees can rely on complaint, investigation, discipline, disciplinary appeals, and related processes to not treat higher ranking personnel differently than officers and sergeants), or OPA and the City will be forced to apply weakened accountability standards from the SPOG TA to SPMA members as well. For example, if members from both unions are involved in an OPA investigation of a single incident, OPA's management of that investigation will be complicated because different rules apply to SPMA and SPOG employees. If those differences result in different outcomes, accountability and community trust will be impacted. Further, if the OIG conducts the investigation, the complications may be even more difficult. There is no language in either the SPOG TA or the SPMA contract that accountability policies and practices be applied uniformly regardless of rank or position, as required by the Ordinance.

- The TA states that "[t]he parties have agreed to re-open the Agreement on some topics …" (Article 21.7) While the TA stipulates a number of specific areas of the Ordinance, including, notably, allowing secondary employment reforms for future re-opening (which is problematic), no specifics are included as to what the intent is, and not all topics subject to re-openers are listed. Additional information and parameters are needed to help ensure that re-openers do not result in further weakening or delay of reforms. As well, technical advisors should be utilized when the parties negotiate these.

1

The following table details areas where key accountability system reforms appear to have been weakened or eliminated by the proposed SPOG TA. The Comments column explains what would have been needed in the TA to preserve the essence of the accountability reform noted. "Should" in this column means "In order to preserve the reform", understanding that the collective bargaining process is one in which the community must look to City leaders to advance their priorities.

## Areas of Conflict Between Accountability System Reforms and the SPOG TA

| Ordinance 315215 Language (Followed by Additional System Issues) | Related SPOG TA Language | Comments |
|---|---|---|
| **3.29.010 Purpose**<br>**A.** The police are granted extraordinary power to maintain the public peace, including the power of arrest and statutory authority under RCW 9A.16.040 to use deadly force in the performance of their duties under specific circumstances. Public trust in the appropriate use of those powers is bolstered by having a police oversight system that reflects community input and values. It is The City of Seattle's intent to ensure by law a comprehensive and sustainable approach to independent oversight of the Seattle Police Department (SPD) that enhances the trust and confidence of the community, and that builds an effective police department that respects the civil and constitutional rights of the people of Seattle. The purpose of this Chapter 3.29 is to provide the authority necessary for that oversight to be as effective as possible. | **Preamble** The City and the Guild agree that the purpose of this Agreement is to provide for fair and reasonable compensation and working conditions for employees of the City as enumerated in this Agreement, and to provide for the efficient and uninterrupted performance of municipal functions.<br><br>**Appendix E** ... Recognizing the importance of proceeding with implementation of the Ordinance, and the need to protect the interests of both the Guild and the City, the parties hereby agree as follows ... | In the preamble, the TA should have acknowledged that in negotiating the terms, it was important to address the interests of the public. Those interests include not only competitive wages, fair working conditions, effective public safety, but also a fair and strong system that holds police accountable when necessary, to ensure Constitutional policing, best practices, fairness, and community trust. Either the Ordinance language at left should have been included, or at minimum, among the stated purposes should be "to ensure the police accountability system is as effective as possible." Also, in Appendix E, there should be a reference to protecting the interests of the public. |
| **3.29.100 OPA established– Functions and authority**<br>**F.** OPA shall have the authority to address complaints of police misconduct through investigation, Supervisor Action referral, mediation, Rapid Adjudication, or other alternative resolution processes, as well as through Management Action findings and Training Referrals. Management Action findings may be made for either Sustained or Not Sustained complaints of misconduct. | **Article 3.10.A.** The parties recognize and embrace the value of having a process whereby officers and community members can openly discuss situations in which a member of the public felt dissatisfied with an interaction with an officer. Through communication and dialogue, officers will have the opportunity to hear the perspective and concerns of the public, and complainants will have an opportunity to get a better understanding of the role and responsibility of a police officer. The parties commit to monitoring and improving, as needed, the alternative resolution process detailed in this section of the Agreement. While this section references mediation, the parties may choose to utilize other means | Article 3.10 does not align with recommendations that address obstacles to mediation, such as a requirement that the officer agree to participate and the complainant give up the option of possible discipline, even if the officer doesn't participate in a meaningful way; other obstacles include extended periods before mediation occurs and the formal nature of the process, often in a downtown law firm, rather than in a community agency or other more informal setting. (See also 3.29.120.D below - that CPC and OIG were to provide guidance in refining mediation processes.)<br><br>Appendix E.8 TA language is only true if the OPA Director fully institutes the Rapid |

2

# Areas of Conflict Between Accountability System Reforms and the SPOG TA

| Ordinance 315215 Language (Followed by Additional System Issues) | Related SPOG TA Language | Comments |
|---|---|---|
| | of alternative dispute resolution by mutual agreement. **Article 3.10.B.** For cases involving dissatisfaction with an interaction with an officer, the initial notification under 3.6A will ask the officer whether he/she is willing to mediate the complaint. Assuming the employee is interested in mediation, the OPA will have the discretion to determine whether or not mediation of a complaint is appropriate. The classification report will normally be used to inform the named employee that the OPA has determined that a complaint is eligible for mediation. ~~Complaints~~ may also be deferred to mediation after an investigation has been commenced. A deferral will not be made until such time as the complainant has agreed to participate in the mediation process. Nothing herein shall affect the obligation of the employer that any discipline be imposed in accordance with just cause.<br><br>1. Voluntary process – Mediation will occur only if both the complainant and employee agree.<br><br>2. Non-disciplinary process – If the employee agrees and participates in mediation, or the complainant refuses to participate after the employee has agreed to participate, the complaint will not result in discipline or a record on the employee's complaint history.<br><br>3. The Mediator will attempt to schedule the mediation as soon as reasonably possible, recognizing the importance of holding the mediation at a time that is convenient for the complainant. | Adjudication program and makes needed improvements to the Mediation program. The TA language does not fully align with program recommendations to-date, is not fully detailed, and Rapid Adjudication is defined only as a pilot.<br><br>Note that drafting errors in Article 3.10 of the TA may also need to be corrected (the inadvertent removal of "complaints" from a sentence and the substitution of "deferred" for "referred" in several instances.) |

| Areas of Conflict Between Accountability System Reforms and the SPOG TA | | |
|---|---|---|
| Ordinance 315215 Language (Followed by Additional System Issues) | Related SPOG TA Language | Comments |
| | 4. If the Mediator informs the Department that the employee participated in the process in good faith, the complaint will be dismissed and will not be recorded on the officer's complaint history. Good faith means: | |
| | a. The officer actively listens to the perspective of the other party; and | |
| | b. The officer fully communicates his/her own position and engages in the discussion. | |
| | Good faith does not require the officer to agree to any particular resolution of a complaint. | |
| | 5. If the Mediator informs the Department that the employee did not participate in the mediation in good faith, a finding of which shall not be subject to challenge, the complaint will be returned to OPA. If returned to OPA, the 180-day time period shall be tolled during the time from when the complaint was deferred to mediation until the matter is returned to OPA. | |
| | 6. Confidential process— The parties to mediation will sign a confidentiality agreement. The mediator will only inform the OPA whether or not the parties met and participated in good faith. Any resolution will be confidential. | |
| | 7. Time spent at the mediation shall be considered on-duty time. | |
| | 8. The panel of mediators will be jointly selected by the OPA and the Guild. All costs of mediation shall be borne by the City. | |
| | **Appendix E.8.** (See also 3.29.120.D of the Ordinance.) The parties have included both Rapid Adjudication and Mediation in the | |

4

## Areas of Conflict Between Accountability System Reforms and the SPOG TA

| Ordinance 315215 Language (Followed by Additional System Issues) | Related SPOG TA Language | Comments |
|---|---|---|
| **3.29.100 OPA established – Functions and authority**<br><br>G. OPA's jurisdiction shall include all types of possible misconduct. In complaints alleging criminal misconduct, OPA shall have the responsibility to coordinate investigations with criminal investigators external to OPA and prosecutors on a case-by-case basis to ensure that the most effective, thorough, and rigorous criminal and administrative investigations are conducted. | **Appendix E.12**" The City agrees that the intent of the Ordinance is that OPA will not itself conduct criminal investigations, but rather that the OPA will have responsibility to coordinate its investigations with criminal investigators and/or prosecutors from the City or other jurisdictions.<br><br>**Article 3.7** Criminal Investigations. ...." The Chief, after consultation with OPA, will determine the appropriate investigative unit with expertise in the type of criminal conduct alleged to conduct the criminal investigation. ...... [I]nvestigations may be sent [at the Chief's discretion] to other agencies. In the event the Chief decides to have the Department conduct a criminal investigation internally despite the objection of OPA, the Chief will provide a written statement of the material reasons for the decision to the Mayor and the City Council President. OPA will not conduct criminal investigations. OPA and specialty unit investigators conducting the investigation may communicate about the status and progress of the criminal investigation, but OPA will not direct or otherwise influence the conduct of the criminal investigation ... In the discretion of the Department, simultaneous OPA and criminal investigations may be conducted... | There was no intention that OPA conduct criminal investigations, but because Appendix E.12 does not incorporate a key clause in the Ordinance (" ... to ensure that the most effective, thorough, and rigorous criminal and administrative investigations are conducted "), the intended scope of OPA's role appears to be scaled back from the reform intended to be in the Ordinance.<br><br>This TA language appears to limit OPA's role to coordinating only scheduling. This undercuts a major reform. The lack of civilian oversight of criminal investigations, which often involve the most serious allegations, has always been a significant weakness in Seattle's system. When an allegation involves possible criminal acts, OPA has been limited to referring the complaint to SPD (which infrequently refers such cases to another law enforcement agency for investigation). OPA then waits for that investigation to be completed and referred back to OPA. OPA cannot help ensure that important questions or evidence related to the OPA investigation are addressed as part of that initial investigation, or address the quality, nature, or length of time of the criminal investigation. If the criminal investigation is not thorough or timely, the OPA investigation is often compromised (e.g., evidence is no longer available, witnesses' memories fade over time, there is limited time left in OPA's 180-day investigation window, or the quality of the investigation impacts the OPA investigation because it is incorporated in the case file). |

| Ordinance 315215 Language (Followed by Additional System Issues) | Related SPOG TA Language | Comments |
|---|---|---|
| 3.29.105 OPA – Independence | There are inaccurate references throughout the TA to "SPD" or "Department" or "City," when the reference should be to "OPA," | The intended reform was to provide the OPA Director the authority to consult with the criminal investigator and prosecuting attorney at the beginning of the case, to determine the most effective approach for achieving thorough and rigorous criminal *and OPA investigations*. Also, the OPA Director, not the Department, should determine whether there are simultaneous OPA and criminal investigations and any decision on who investigates a criminal case, whether it's an internal or external body, should depend on the OPA Director's independence. (See also 3.29.130.G which requires concurrence of the OPA Director.)<br><br>These inaccuracies matter because OPA is to be entirely independent of SPD in its operations. The TA needs to be clear as to when authority rests with OPA and when it rests elsewhere.<br><br>(Additional drafting and technical corrections are needed throughout the TA; see separate TA mark-up for those.) |
| 3.29.105 OPA – Independence<br>A. OPA shall be physically housed outside any SPD facility and be operationally independent of SPD in all respects. OPA's location and communications shall reflect its independence and impartiality. . . | Article 3.12 C.3 Any interview (which shall not violate the employee's constitutional rights) shall take place at a Seattle Police facility, except when impractical. | For public trust and independence, interviews are intentionally not conducted in an SPD facility, but are conducted in OPA's office or elsewhere. (OPA was in the Seattle Municipal Tower, but is now in an office building on 3rd Avenue.) This sentence is not needed in the TA, but if it is included, it should simply say that when OPA interviews employees, those interviews "shall take place at OPA," not interviews "shall take place at a Seattle Police facility." |
| 3.29.120 OPA Director – Authority and responsibility<br>B. Hire, supervise, and discharge OPA civilian staff, and supervise and transfer out of OPA any sworn staff assigned to OPA. OPA staff shall | Appendix E.12 See comments. | This section is cited in Appendix E.12 but there is no italicized summary of the parties' agreement. See endnote. |

| Ordinance 315215 Language (Followed by Additional System Issues) | Related SPOG TA Language | Comments |
|---|---|---|
| collectively have the requisite credentials, skills, and abilities to fulfill the duties and obligations of OPA set forth in this Chapter 3.29.<br><br>**3.29.120 OPA Director – Authority and responsibility**<br><br>**D.** Oversee and strengthen the effectiveness of OPA investigations, Supervisor Action referrals, mediation, Rapid Adjudication, and other alternative resolution processes, as well as Management Actions and Training Referrals. The OPA Director shall, in consultation with CPC and OIG, make and maintain a fair and effective mediation program and a fair and effective Rapid Adjudication process. | **Article 3.11 A-D**<br><br>A. The parties agree to pilot a process of Rapid Adjudication during the term of this Agreement. There are situations when an employee recognizes that their conduct was inconsistent with required standards and is willing to accept discipline for the policy violation rather than requiring an extensive investigation by OPA.<br><br>B.1 Employee Initiated. Included in the initial notice will be information about the Rapid Adjudication process. Within five (5) days of receiving the initial notice under 3.6.A, the employee may request starting Rapid Adjudication. The OPA (in consultation with the Chief or designee) will have ten (10) days to determine whether the case is appropriate for Rapid Adjudication and if so, to provide a recommendation for discipline or a range of discipline to the Chief (or designee). If the Chief (or designee) accepts the recommendation for Rapid Adjudication and the discipline or range of discipline recommended, then OPA will inform the employee (the "Acceptance Notice") and the 30-day period for submittal of the classification report and the 180-day period for investigation will be tolled upon notice to the employee. If the discipline involves suspension, the range of proposed discipline shall be a variance of no more than three (3) days. The employee shall have five (5) days to accept the discipline or range of discipline. If the offer is not accepted by the employee, the matter will be returned to OPA for investigation, with the 30 and 180-day timelines re-started at | The Ordinance provides for Rapid Adjudication (RA), which was a recommended reform to quickly resolve certain types of cases of misconduct, which often is better for all involved; tie accountability to the behavior sooner, which is an important principle of effectiveness; and save time and resources for other investigations. In RA, the named employee immediately acknowledges a policy violation and appropriate discipline is imposed without an investigation. For example, if an employee failed to get a required approval, meet annual training requirements, complete a supervisory use of force review within the mandated timeline, or use in-car video, there would be an expedited process for acknowledging the violation, with appropriate discipline imposed using a discipline matrix, and with no appeals allowed. It would also help strengthen SPD's culture of accountability, making it clear that acknowledging mistakes is encouraged. For this reason, the employee's file would reflect resolution through the RA alternative.<br><br>Also, the Ordinance provides that the RA program (and presumably its governing policies) be refined in consultation with CPC and OIG (See also 3.29.100.F). The TA also has some key elements missing or in error. For example, it does not provide for documenting RA resolutions in employee files and refers to a disciplinary appeal of an RA case.<br><br>RA was to be piloted when first recommended in January 2014 so that it |

| Areas of Conflict Between Accountability System Reforms and the SPOG TA | | |
|---|---|---|
| Ordinance 315215 Language (Followed by Additional System Issues) | Related SPOG TA Language | Comments |
| | that time. If accepted, the employee's acceptance shall close the case. In cases where a range of discipline has been offered, the employee may request to meet with the Chief to provide the Chief with information that the employee would like the Chief to consider in making a final determination on the amount of discipline within the range. The employee may have a Guild Rep at any such meeting. | could be fully implemented in the union contacts. Implementation may now again be delayed, and limited to just a pilot project governed by practices outlined in the TA that are not entirely consistent with those intended. |
| | 2. OPA Initiated. Prior to a classification report being issued, OPA may review the case and make a determination as to whether OPA believes the case is appropriate for Rapid Adjudication. If so, OPA will set forth the discipline, or range of discipline, it recommends and forward it to the Chief (or designee). The Chief (or designee) will approve or disapprove the recommendation for Rapid Adjudication, and the recommended discipline (or range of discipline) to be offered to the employee. | |
| | For those cases approved by the Chief (or designee), at or prior to the time that the classification report is issued, the OPA will provide notice to the employee explaining Rapid Adjudication and include the employee's option to elect Rapid Adjudication. The notice will include the proposed discipline (or a range of proposed discipline) that would be imposed if the employee elects to have the matter rapidly adjudicated. If the discipline involves suspension, the range of proposed discipline shall be a variance of no more than three (3) days. | |
| | Within five (5) days after receipt of the offer for Rapid Adjudication, an employee may inform OPA in writing, that the employee will | |

| Areas of Conflict Between Accountability System Reforms and the SPOG TA | | |
|---|---|---|
| Ordinance 315215 Language (Followed by Additional System Issues) | Related SPOG TA Language | Comments |
| | utilize the Rapid Adjudication process and accepts the proposed discipline. Upon notification by the employee to the City of acceptance, the case will be closed. In cases where a range of discipline has been offered, the employee may request to meet with the Chief to provide the Chief with information that the employee would like the Chief to consider in making a final determination on the amount of discipline within the range. The employee may have a Guild Rep at any such meeting. | |
| | C. In all cases using Rapid Adjudication, the discipline imposed by the Chief will be final and binding and not subject to challenge or appeal through either the grievance procedure or the Public Safety Civil Service Commission. The discipline shall be non-precedent setting, although it may be used in any subsequent proceeding involving that employee. | |
| | D. Neither the Department's proposed discipline, the willingness of the Department, OPA, and the employee to consider utilizing Rapid Adjudication, or rejection of Rapid Adjudication by the employee, may be offered as evidence in any subsequent proceeding. Additionally, if the employee rejects Rapid Adjudication, the fact that Rapid Adjudication was rejected will not be considered in any future deliberations on the case or in deciding any potential discipline. The rejection will not be part of the case file, but may be tracked by OPA/OIG for purposes of systemic review. | |
| 3.29.120 OPA Director – Authority and responsibility
E. Ensure OPA policies and practices are detailed in, and in compliance with, the OPA Manual, which shall be updated at least annually. Such | Appendix E.12 See comments | This section is cited in Appendix E.12 but there is no italicized summary of the parties' agreement. See endnote. |

| Ordinance 315215 Language (Followed by Additional System Issues) | Related SPOG TA Language | Comments |
|---|---|---|
| updates shall be done in accordance with a process established by the OPA Director that provides for consultation and input by OIG and CPC prior to final adoption of any updates. | | |
| **3.29.125 OPA – Classifications and investigations** <br> **A.** When necessary, the OPA Director may issue a subpoena at any stage in an investigation if evidence or testimony material to the investigation is not provided to OPA voluntarily, in order to compel witnesses to produce such evidence or testimony. If the subpoenaed individual or entity does not respond to the request in a timely manner, the OPA Director may ask for the assistance of the City Attorney to pursue enforcement of the subpoena through a court of competent jurisdiction. <br><br> **3.29.240 OIG – IG – Authority and responsibility** <br> **K.** Issue a subpoena if evidence or testimony necessary to perform the duties of OIG set forth in this Chapter 3.29 is not provided voluntarily, in order to compel witnesses to produce such evidence or testimony. If the subpoenaed individual or entity does not respond to the request in a timely manner, the Inspector General may ask for the assistance of the City Attorney to pursue enforcement of the subpoena through a court of competent jurisdiction. | **Appendix E.12** The City agrees that these sections of the Ordinance will not be implemented at this time with regard to bargaining unit employees and their family members, and third party subpoenas seeking personal records of such employees and their family members. After the City further reviews questions raised concerning the authority and potential need for OPA and the OIG to issue such subpoenas, the City may re-open the Agreement for the purpose of bargaining over these sections of the Ordinance and the parties will complete bargaining prior to the OIG or OPA issuing subpoenas to bargaining unit employees and their family members, or a third party subpoena seeking the personal records of such employees and their family members. | The agreement in the TA also states that "the City [will] further [review] … the potential need for OPA and the OIG to issue such subpoenas" prior to a possible re-opening to address the issue of OPA or OIG access to "personal records." If the TA's intent is to assume bank records, medical records, and the like are "personal records," this exclusion covers a significant amount of potentially important evidentiary information . <br><br> As noted each time the recommendation for subpoena power has been made over the years, other City agencies that conduct investigations (e.g., SEEC and OCR) have this authority. |
| **3.29.125 OPA – Classifications and investigations** <br> **B.** ...Unless the OPA Director determines exigent circumstances require otherwise, all SPD employee interviews shall be conducted in-person. All interviews shall be audio-recorded and transcribed, except any interviews conducted before a Rapid Adjudication disposition. If an interview is transcribed both the recording and the transcription shall be retained in the OPA case file. | **Article 3.6.F.6** All interviews shall be digitally audio-recorded and transcribed unless the employee objects. Interviews that are not digitally [sic] audio-recording for transcription by OPA shall be recorded by a court reporter or stenographer. The employee and/or entity requesting a court reporter or stenographer shall pay all appearance fees and transcription costs assessed by the court reporter or stenographer and shall make available to the other party an opportunity to obtain a copy of any transcription. | The Ordinance requires all named employee and witness interviews to be recorded and transcribed, and all recordings and transcriptions retained in the investigative files. |
| **3.29.125 OPA – Classifications and investigations** <br> **F.** Every OPA investigation shall have an investigation plan approved by the OPA Director or the OPA Director's designee prior to the initiation of an investigation.... | **Appendix E.12** The investigation plan shall be produced to the Guild after completion of the investigation and prior to the due process hearing. | Providing the investigation plan to SPOG will not further trust in the system's fairness. |
| **3.29.125 OPA – Classifications and investigations** | **Appendix E.12** In the event the Chief meets | The purpose of this recommended reform |

| Areas of Conflict Between Accountability System Reforms and the SPOG TA | | |
|---|---|---|
| Ordinance 315215 Language (followed by Additional System Issues) | Related SPOG TA Language | Comments |
| G. In cases where a Sustained finding has been recommended by the OPA Director and hearing from the complainant would help the Chief better understand the significance of the concern or weigh issues of credibility, the OPA Director may recommend that the Chief meet with the complainant prior to the Chief making final findings and disciplinary decisions. | with a complainant as provided in this section, notes will be taken at the meeting, and a copy of those notes will be made available to the Guild. | was to provide a fairer system by allowing the complainant to be heard in-person, at least in some cases, by the Chief, as employees are afforded the opportunity to do. The Chief is not required to take notes and share them with the public when the Chief meets with the employee. The TA term requiring the Chief to share notes when the Chief meets with a complainant will not further trust in the system's fairness. While it may be helpful on appeal for there to be notes in some instances, that is not something that should be directed by SPOG. Nor should the Chief be required to share these notes with SPOG. |
| **3.29.130 OPA – Classification and investigation timelines**<br>A. OPA shall notify named employees, the Captain or equivalent of the named employees, and the bargaining unit of the named employees within 30 days of receiving directly or by referral a complaint of possible misconduct or policy violation. The notice shall by default not include the name and address of the complainant, unless the complainant gives OPA written consent for disclosure after OPA communicates to the complainant a full explanation of the potential consequences of disclosure. The notice shall confirm the complaint and enumerate allegations that allow the named employees to begin to prepare for the OPA investigation; however, if OPA subsequently identifies additional allegations not listed in the 30-day notice, these may also be addressed in the investigation. | **Article 3.1.A** Except in criminal investigations or where notification would jeopardize the investigation (the most common example being ongoing acts of misconduct), OPA shall notify the named employee of the receipt of a complaint, including the basic details of the complaint, within five (5) business days after receipt of the complaint by OPA. The OPA shall furnish the employee and the Guild with a classification report no later than thirty (30) days after receipt of the complaint by the OPA. The classification report shall include, at a minimum, i) a copy of the complaint, ii) the results of the OPA's preliminary review of the complaint, iii) the title and section (e.g. – 8.04 is Title 8, Section 4) of the policy or policies that the employee potentially violated, iv) a meaningful, detailed description of the employee's alleged actions that potentially violate the Department's policies, and, v) if the OPA intends to investigate the complaint, the procedures it intends to use in investigating the complaint (e.g., OPA investigation or | The Ordinance eliminates the five-day notice and provides for notice (and Ordinance language that allows OPA to investigate additional allegations not listed in the 30-day notice. By not explicitly incorporating this provision, the TA appears to have eliminated this reform.<br><br>In Article 3.1.A, the TA does not incorporate classification) within 30 days. Extending this initial period allows OPA to conduct more thorough intake before determining the possible violations and notifying the employee. The TA reinstates the five-day notice.<br><br>Identifying the complainant to the named employee has a potential chilling effect. The TA obliquely cites that some complaints may be anonymous, while noting that "the issue of how OPA should deal with them when providing information" is a re-opener (Appendix H). The TA does not appear to align with the intention to guarantee complainant anonymity per the Ordinance, the |

11

# Areas of Conflict Between Accountability System Reforms and the SPOG TA

| Ordinance 315215 Language (Followed by Additional System Issues) | Related SPOG TA Language | Comments |
|---|---|---|
| **3.29.130 OPA – Classification and investigation timelines** *(with respect only to cases involving possible criminal actions)* <br><br> **G.** In cases involving possible criminal actions, if an OPA administrative investigation is not commenced or is paused due to a criminal investigation, that time shall not be counted as part of the 180-day investigation period, and shall be documented in an administrative investigation follow-up log in the investigation file. The OPA intake or investigation follow-up log in the investigation file. The OPA administrative investigation shall be paused as long as is necessary so | line investigation). In order to ensure mutual understanding of this provision, the parties have included examples in Appendix H. In the case of allegations involving discrimination, harassment, retaliation or other Equal Employment Opportunity (EEO) laws, the classification report will indicate whether the investigation will be managed through the Seattle Department of Human Resources (SDHR). No employee may be interviewed until the employee has been provided the classification report. <br><br> **Article 3.12. C.1.** The employee shall be informed in writing if the employee so desires of the nature of the investigation and whether the employee is a witness or a named employee before any interview commences, including the name, address of the alleged misconduct and other information necessary to reasonably apprise him of the allegations of such Complaint. ... <br><br> **Article 3.6.F.** At least five (5) calendar days and no more than thirty (30) days prior to the interview, the OPA shall provide notice to the Guild and the employee being interviewed. The Chief of Police, or Acting Chief of Police in the event the Chief is unavailable, may determine that notice of not less than one (1) calendar day is appropriate for interviews in a specific case due to exigent circumstances. ... <br><br> **Article 3.7** ... In the event the Department is conducting an OPA investigation while the matter is being considered by a prosecuting authority, the 180-day timeline provision continues to run. The criminal investigation shall become part of the administrative investigation. The Chief of Police may, at his/her discretion, request | complainant may not be identified unless agreed to by the complainant; and while Article 3.12.C.1 may intend to refer to the address of the incident, including "name" suggests it refers to the name of the complainant. <br><br> Article 3.6.F should say: "unless waived by the employee." Sometimes employees are fine with quicker interviews. It has been unclear in the past whether an employee's stated preference to proceed and OPA's documentation of that preference is an acceptable waiver to normal TA terms. <br><br> The TA does not adopt a key reform that pauses the 180-day clock any time a criminal investigation is outside OPA's control. The TA also treats criminal cases investigated by SPD differently than those investigated by other law enforcement agencies by pausing the clock when the case is being investigated by outside |

| Ordinance 315215 Language (Followed by Additional System Issues) | Related SPOG TA Language | Comments |
|---|---|---|
| that neither the OPA administrative nor the criminal investigation of the same incident is compromised. The 180-day clock shall resume whenever any administrative investigation steps are taken by OPA. | that an outside law enforcement agency conduct a criminal investigation. | agencies, but not when the investigation is conducted by SPD (which is most common). There is an incorrect reference in the TA to the Department conducting an OPA investigation. SPD does not conduct OPA investigations, but may assist OPA in its investigation. |
| **3.29.130 OPA – Classification and investigation timelines**<br><br>**B.** The time period in which investigations must be completed by OPA is 180 days. The time period begins on the date OPA initiates or receives a complaint. The time period ends on the date the OPA Director issues proposed findings.<br><br>**E.** If an OPA interview of a named or witness employee must be postponed due to the unavailability of the interviewee or the interviewee's labor representative, the additional number of days needed to accommodate the schedule of the employee or the employee's bargaining representative shall not be counted as part of the 180-day investigation period.<br><br>**F.** If the OPA Director position becomes vacant due to unforeseen exigent circumstances, the 180-day period shall be extended by 60 days to permit the designation of an interim OPA Director and the initiation of the appointment process for a permanent OPA Director. | **Article 3.6.B.** Except in cases where the employee is physically or medically unavailable to participate in the internal investigation, no discipline may result from the investigation if the investigation of the complaint is not completed within one-hundred eighty (180) days after the 180-day start date (the 180 Start Date) or (if submitted to the prosecutor within one hundred eighty (180) days) thirty (30) days after receipt of a decline notice from a prosecuting authority or a verdict in criminal trial, whichever is later. The 180 Start Date begins on the earliest of the following:<br><br>i. Receipt/initiation of a complaint by the OPA;<br><br>ii. Receipt/initiation of a formal complaint by a sworn supervisor alleging facts that, if true, could without more constitute a serious act of misconduct violation, as long as the supervisor forwards the matter to OPA within forty-eight (48) hours of receipt. For cases of less than serious acts of misconduct, the 180 Start Date will begin with the receipt of information where the supervisor takes documented action to handle the complaint (for example a supervisor takes documented action to handle the complaint (for example a documentation in the performance appraisal system);<br><br>iii. For incidents submitted to the Chain of Command in Blue Team (or its successor), | The Ordinance intentionally did not tie the imposition of discipline to the 180-day timeline, and instead tied the timeline to performance reviews by OPA. Additionally, in the event discipline remained tied to the timeline, because the imposition of discipline has so often been challenged due to lack of clarity about the 180-day timeline, the Ordinance was very specific and concrete in defining it, in setting forth the circumstances under which the deadline could be extended, the length of time allowed for those extensions, and when the 180-day period was to be paused. There should be no ambiguity about any of these terms. Articles 3.6.B, C, and D should have been entirely eliminated to align with these critical reforms and the extensions provided for should have been included.<br><br>In two places, Article 3.6.B refers to "verdicts" or "guilty pleas" but does not account for other types of dispositions.<br><br>TA sections 3.6.B.(i)-(v) muddy a clear definition of the start-date, which should simply be when OPA receives or initiates a complaint, regardless of whether it is formal, without distinctions based on the seriousness of the allegations, or associated with when the complaint in entered in Blue Team, or whether OPA or OIG personnel are at an incident. |

| Ordinance 315215 Language (Followed by Additional System Issues) | Related SPOG TA Language | Comments |
|---|---|---|
| | fourteen (14) days after the date on which the initial supervisor submits the incident for review to the Chain of Command;<br><br>iv. OPA personnel present at the scene of an incident; or<br><br>v. If the Office of the Inspector General (OIG) is present at the scene of an incident at which OPA is not present, and if OIG subsequently files a complaint growing out of the incident, the date of the incident. Provided, however, in the case of a criminal conviction, nothing shall prevent the Department from taking appropriate disciplinary action within forty-five (45) days, and on the basis of, the judicial acceptance of a guilty plea (or judicial equivalent such as nolo contendere) or sentencing for a criminal conviction.<br><br>For purposes of (iii) above, if following a Blue Team entry, the Chain of Command concludes that no misconduct occurred, and then material new evidence (including video) is provided at a later date that suggests serious misconduct did occur, then a new 180 Start Date is triggered on the date that the new material evidence of serious misconduct is provided.<br><br>1. If the OPA cannot immediately identify the employee who is the subject of the complaint, the OPA will provide the required notifications to the Guild. Once the OPA-identifies the employee who is the subject of the complaint, the notification process with respect to that employee shall begin. In such cases, the 180-day time limit provided in this section shall be temporarily held in abeyance if sixty (60) days have elapsed without identification of the employee. The 180- | Articles 3.6.B.1 and 3.6.B.2 retain old contract language that incorrectly states that "the City" provides information and requests extensions from SPOG. Currently, OPA provides this information and requests extensions.<br><br>Article 3.6.C requiring SPOG approval of extensions undercuts OPA's authority, and SPOG's duty of fair representation may sharply narrow when they would agree to such extensions. In Article 3.6.D, the first sentence should be removed, as well as the phrase "and a community member later complains." There should not be different approaches based on who the complainant is. Also, this should not be limited to Type II use of force. Similarly, Article 3.6.D.1 includes a clause that effectively limits the start-date recalculation to community member complaints and, as noted elsewhere, SPOG approval of should not be required when exceptions are made to the 180-day period. With respect to appealing such exceptions, note that the Ordinance expressly eliminates arbitration as an option, requiring these appeals go to the PSCSC.<br><br>In Article 3.6.B.2, the TA identifies when a pause in the 180-day period may occur related to criminal prosecutions. The reform was to make sure that this pause is tied to any time the OPA investigation is on hold while a criminal investigation is ongoing, not just to the time when the prosecutor reviews the case for a filing decision after the criminal investigation is completed. This is another important reform that the TA eliminates.<br><br>As noted above, The TA again allows for the |

| Areas of Conflict Between Accountability System Reforms and the SPOG TA | | |
|---|---|---|
| Ordinance 315215 Language (Followed by Additional System Issues) | Related SPOG TA Language | Comments |
| | day time limit will continue from the point where it was held in abeyance (i.e., at day 61) when the OPA identifies and notifies the employee of the complaint in accordance with subsection 3.6A above. The Guild will be contemporaneously notified whenever the notification process has stopped due to the Department's inability to identify the employee who is the subject of the complaint and will be notified contemporaneously whenever the Department subsequently is able to identify the employee.<br><br>2. In addition to those circumstances defined in subsection B.1, above, the 180-day time period will be suspended when a complaint involving alleged criminal conduct is being reviewed by a prosecuting authority or is being prosecuted at the city, state, county, or federal level or if the alleged conduct occurred in another jurisdiction and is being criminally investigated or prosecuted in that jurisdiction.<br><br>**Article 3.6.C** 180-Day Extension Requests<br>1. The OPA may request and the Guild will not unreasonably deny an extension of: (1) the thirty (30) day period for furnishing the employee a classification report, if the complaint was not referred by the sworn supervisor to his/her Chain of Command or the OPA in a timely manner; (2) the one-hundred eighty (180) day time restriction if the OPA has made the request before the one-hundred eighty (180) day time period has expired; has exercised due diligence in conducting the investigation of the complaint; and is unable to complete the investigation due to one of the following | 180-day clock to start due to actions outside the control and knowledge of OPA. The OIG has also noted that in the event the OIG undertakes an OPA conflict investigation, the same potential issue with the time calculation would apply to OIG. In addition, OIG has authority to request or direct further investigation (3.29.260.D). The OIG has also noted that in those cases, OPA must resubmit the case to OIG for certification before the OPA Director may issue proposed findings. Any impacts of the issue noted above will also affect the TA on the 180-day investigation time limit will affect OIG's ability to respond to OPA, as well as the amount of time left for OPA to issue findings. |

| Areas of Conflict Between Accountability System Reforms and the SPOG TA | | |
|---|---|---|
| Ordinance 315215 Language (Followed by Additional System Issues) | Related SPOG TA Language | Comments |
| | reasons: i) the unavailability of witnesses/named employee; ii) the unavailability of a Guild representative; iii) the OPA Director position becomes vacant due to unforeseen exigent circumstances; iv) when a complex criminal investigation conducted by the City takes an unusually long period of time to complete, and the City has exercised due diligence during the investigation; or v) other reasons beyond the control of the Department. A request for an extension due to the unavailability of witnesses must be supported by a showing by the Department that the witnesses are expected to become available within a reasonable period of time. The City's request for an extension will be in writing. The Guild will respond to the request in writing, providing the basis for denial, and recognizing that the determination will be based on the information provided to it. | |
| | **2.** The OPA may request an extension for reasons other than the reasons listed above; however, any denial shall not be subject to subsection C.1 above. Any approval or denial of a request for an extension other than the reasons listed in C.1 shall be non- precedential. | |
| | **3.** Nothing in this section prohibits the OPA from requesting more than one extension during the course of an investigation. | |
| | **4.** In determining whether an extension request under C1 was appropriately denied, the factors to be considered are the good faith of the parties, the facts and circumstances surrounding the request, and the information provided to the Guild by the City. | |

## Areas of Conflict Between Accountability System Reforms and the SPOG TA

| Ordinance 315215 Language (Followed by Additional System Issues) | Related SPOG TA Language | Comments |
|---|---|---|
| | **Article 3.6.D. 180 Start Date Re-calculation**<br><br>When a community member complains about an incident, the OPA will generally investigate even in situations where the 180-day period for investigation may have expired. In the event an incident that was or should have been determined to be a Type II Use of Force, Bias, or Pursuit is entered into Blue Team, reviewed by the Chain of Command, the Chain of Command does not forward the incident to OPA, and a community member later complains, the OPA may initiate the following process to determine whether a re-calculation of the 180 Start Date is appropriate.<br><br>1. If OPA's investigation results in an OPA recommended finding that: (i) serious misconduct occurred, and that (ii) the serious misconduct was or should have been determined by the Chain of Command to be a violation of the Type II Use of Force, Bias, or Pursuit policy (or policies), OPA may request in writing that the 180 Start Date be recalculated to commence effective on the day of the community member's complaint. Such requests may not be unreasonably denied by the Guild. In the event the Guild denies the re-calculation, the Guild shall explain in writing the reason for the denial, and the matter will be resolved by the Chief, as provided below. If OPA recommends a finding that the serious misconduct described above occurred, it will forward its recommendations to the Chief. After reviewing OPA's recommendations, and offering a due process hearing where required, the Chief will determine in writing whether the matter was appropriate for re-calculation, and if so, | |

| Ordinance 315215 Language (Followed by Additional System Issues) | Related SPOG TA Language | Comments |
|---|---|---|
| **3.29.130 OPA – Classification and investigation timelines**<br><br>I. To ensure the integrity and thoroughness of investigations, and the appropriateness of disciplinary decisions, if at any point during an OPA investigation the named employee or the named employee's bargaining representative becomes aware of any witness or evidence that the named employee or the employee's bargaining representative believes to be material, they shall disclose it as soon as is practicable to OPA, or shall otherwise be foreclosed from raising it later in a due process hearing, grievance, or appeal. Information not disclosed prior to a due process hearing, grievance, or appeal shall not be allowed into the record after the OPA investigation has concluded if it was known to the named employee or the named employee's bargaining representative during the OPA investigation, and if OPA offered the employee an opportunity to discuss any additional information and suggest any additional witnesses during the course of the employee's OPA interview.<br><br>J. If further investigation is initiated because new information is brought forward during an OPA interview or a due process hearing, or because of any additional investigation directed by OIG, the 180-day investigation time period shall be extended by 60 days. | whether the findings of OPA should be sustained and discipline imposed. The Chief's decision on re-calculation as well as any discipline issued are subject to arbitration.<br><br>2. In the event a Bias or Pursuit incident entered into Blue Team is recalculated pursuant to D.1. above, and there was a Type I Use of Force in the same incident that was serious misconduct, which was not previously reported to OPA, then the recalculated 180 Start Date from the Bias/Pursuit incident will be applied to the Type I Use of Force.<br><br>**Appendix E.12** The City agrees that [section 3.29.130.I] will not be implemented during the term of this Agreement (including any holdover period). Instead, the parties will implement the following provisions. This agreement does not in any way change or impact the application of any evidentiary standards applicable in grievance arbitration. In the interest of the Chief receiving relevant information prior to making a disciplinary decision, the parties have agreed that in the event new material evidence is presented to the Chief at a due process hearing, the Chief may return the matter to OPA, and the 180-day period will be extended to allow the OPA to investigate the new evidence and provide it to the Chief (see Article 3.5F) of the Agreement). Additionally, in order to minimize the likelihood that either party is unduly surprised at an appeal hearing, the parties agree that fifteen days prior to a discipline appeal hearing, each party will disclose any experts not previously used in the due process hearing or the grievance procedure. | In agreeing to not implement section 3.29.130.I, the TA fails to achieve the reform that new information may not be raised in the due process hearing (or on appeal) if known by the employee or SPOG and not disclosed during the OPA investigation. Under Article 3.5.F, the TA also unduly limits time extensions for investigating new material evidence, countering the Ordinance provision that allows 60 additional days, to ensure sufficient time for OPA to follow-up on any new evidence presented at the due process hearing and for OPA's additional investigation to be certified by the OIG.<br><br>Article 3.5.F also conflicts with the Ordinance definition of the 180-day investigation period (beginning on the date OPA initiates or receives a complaint and ending on the date the OPA Director issues proposed findings). Both the TA start date (see Article 3.5.B) and the TA end date (when the Disciplinary Action Report is issued) are inconsistent with the Ordinance, which purposefully established well-defined |

## Areas of Conflict Between Accountability System Reforms and the SPOG TA

| Ordinance 315215 Language (Followed by Additional System Issues) | Related SPOG TA Language | Comments |
|---|---|---|
| | **Article 3.5.F** Unless further investigation is deemed necessary, the Chief shall make a good faith effort to make the final decision within ten (10) days as to whether charges should be sustained, and if so, what discipline, if any, should be imposed, after considering the information presented in any due process hearing. If new material facts are revealed by the named employee during the due process hearing and such new material facts may cause the Chief to act contrary to the OPA Director's recommendation, the case will be sent back to the OPA for further investigation. The 180-day period for investigation will be extended by an additional sixty (60) days, less any time remaining on the 180-day clock (i.e. – if at one hundred twenty (120) days on the clock, then no extension; if at one hundred fifty (150) days, then an additional thirty (30) days; if at one hundred eighty (180) days, then an additional sixty (60) days). | time parameters that are entirely within OPA's control (See 3.29.130.B). The TA language in Appendix E.12 also conflicts with the intended reform to not allow the grievance process to be used for disciplinary appeals, as well as with the reform of the evidentiary standard for disciplinary appeals. |
| | The 180-day period runs from the 180 Start Date (see 3.6B) until the proposed Disciplinary Action Report is issued. If further investigation is warranted the 180-day period begins to run again the day after the due process hearing and will not include the time between issuance of the proposed Disciplinary Action Report and the due process hearing…. | |
| **3.29.135 OPA—Explanations of certain complaint dispositions F.** Termination is the presumed discipline for a finding of material dishonesty based on the same evidentiary standard used for any other allegation of misconduct. | **Article 3.1** … The standard of review and burden of proof in labor arbitration will be consistent with established principles of labor arbitration. For example, and without limitation on other examples or applications, the parties agree that these principles include an elevated standard of review (i.e. – more than preponderance of | An MOA supplementing the existing CBA had a higher burden of proof for an initial allegation of dishonesty that could result in termination, "clear and convincing," rather than "preponderance." The reform was to set the standard at preponderance (the long-standing standard for all findings and discipline except in a first instance of |

| Ordinance 315215 Language (Followed by Additional System Issues) | Related SPOG TA Language | Comments |
|---|---|---|
| | the evidence) for termination cases where the alleged offense is stigmatizing to a law enforcement officer, making it difficult for the employee to get other law enforcement employment. In the case of an officer receiving a sustained complaint involving dishonesty in the course of the officer's official duties or relating to the administration of justice, a presumption of termination shall apply. Dishonesty is defined as intentionally providing false information, which the officer knows to be false, or intentionally providing incomplete responses to specific questions, regarding facts that are material to the investigation. Specific questions do not include general or "catch-all" questions. For purposes of this Section dishonesty means more than mere inaccuracy or faulty memory. | dishonesty resulting in termination) for all misconduct findings and discipline, including dishonesty. The Federal Court agreed with this reform, but the TA instead creates an ambiguous "elevated standard of review" for a broad set of misconduct cases. (Any misconduct for which an employee is fired, including dishonesty, is "stigmatizing" and makes it "difficult for the employee to get other law enforcement employment.") Thus, the TA not only changes the "preponderance" standard for dishonesty, it also subjects many other misconduct allegations to the as-yet undefined "elevated standard of review." De facto, the City is taking the position that, because an arbitrator may not uphold termination based on a preponderance standard, regardless of contractual requirements, instead of appealing when that occurs, the City is agreeing to preemptively impose a higher standard. Both OPA and the Chief will then also have to use this higher standard for this wide span of misconduct cases leading to termination, as both will need to use a standard that will be sustained on review. Note also, that this is tied to the TA not implementing the appeals process reform that required use of the PSCSC and hearing examiner, thus eliminating the use of arbitrators, and attendant risk of them not following contract provisions, that seemingly is the rationale for this change. The TA defines dishonesty as intentionally providing false information. A key reform was to remove intentionality from the definition of dishonesty because it is nearly impossible to prove. |

| Ordinance 315215 Language (Followed by Additional System Issues) | Related SPOG TA Language | Comments |
|---|---|---|
| | | Another problem with the TA is that this section continues to state that the obligation to be truthful and complete in all communications is only tied to OPA investigations. This conflicts with SPD policy 5.001 that employees must be truthful and complete in all communications, (e.g. employees must be truthful when testifying in court, completing incident reports, conducting Use of Force reviews, and in all other aspects of their work.) |
| **3.29.135 OPA—Explanations of certain complaint dispositions**<br><br>**A.** If there is disagreement between the Chief and the OPA Director as to the OPA Director's recommendations on findings, the Chief and the OPA Director shall engage in a supplemental meeting to discuss the disagreement, which shall occur after an employee due process meeting has been taken place.<br><br>**B.** If the Chief decides not to follow one or more of the OPA Director's written recommendations on findings following an OPA investigation, the Chief shall provide a written statement of the material reasons for the decision within 30 days of the Chief's decision on the disposition of the complaint. If the basis for the action is personal, involving family or health-related circumstances about the named employee, the statement shall refer to "personal circumstances" as the basis. The written statement shall be provided to the Mayor, the Council President and the Chair of the public safety committee, the City Attorney, the OPA Director, the Inspector General, and the CPC Executive Director, and be included in the OPA case file and in a communication with the complainant and the public. If any findings or discipline resulting from an investigation are changed pursuant to an appeal or grievance, this responsibility shall rest with the City Attorney. | **Article 3.5.G** When the Police Chief changes a recommended finding from the OPA, the Chief will be required to state his/her reasons in writing and provide these to the OPA Director. A summary of the Chief's decisions will be provided to the Mayor and City Council. In stating his/her reasons in writing for changing an OPA recommendation from a sustained finding, the Chief shall use a format that discloses the material reasons for his/her decision. The explanation shall make no reference to the officer's name or any personally identifying information in providing the explanation. In the event the change of recommendation is the result of personal, family, or medical information the Chief's explanation shall reference "personal information" as the basis of his decision. | This TA language is inconsistent in several ways with the intended reform to ensure sufficient transparency both when the Chief finds differently than the OPA Director and when a finding or disciplinary decision is overturned on appeal. The TA does not include the Ordinance requirements for notifying the City Attorney, the OPA Director, the OIG, and the CPC, and the public and complainant, of these changes. It also does not include the requirement that this information be retained in the OPA case file or the requirement that the City Attorney send the written statement if the change occurs pursuant to a grievance or appeal.<br><br>These reforms were adopted to address serious problems identified in a 2014 disciplinary system review. |
| **3.29.140 OPA – Staffing**<br><br>**A.** The OPA Director and the Deputy Director shall be civilians and, within 18 months of the effective date of the ordinance introduced as Council Bill 118969, all investigative supervisors shall be civilian.<br><br>**B.** All OPA staff working directly with SPD supervisors to support the handling of minor violations and public access to the accountability system shall be civilians.<br><br>**C.** Within 12 months of the effective date of the ordinance introduced as Council Bill 118969, intake and investigator personnel shall be | **Article 7.10** It is agreed that non-sworn personnel shall neither be dispatched to, nor assigned as a primary unit to, investigate any criminal activity.<br><br>**Appendix D.** The parties agree as follows:<br>1. Unless otherwise agreed, at any time after the date of signing, the City may replace up to two (2) sworn investigator | It should be noted that pursuant to the Consent Decree, OPA civilian staff are routinely involved at Force Investigation Team call-outs and with Type III Use of Force incidents. Some of these may involve allegations of criminal activity.<br><br>The TA's limit of two civilian investigators could last far beyond the current expiration |

| Areas of Conflict Between Accountability System Issues) | | |
|---|---|---|
| **Ordinance 315215 Language (Followed by Additional System Issues)** | **Related SPOG TA Language** | **Comments** |
| entirely civilian or a mix of civilian and sworn, in whatever staffing configuration best provides for continuity, flexibility, leadership opportunity, and specialized expertise, and supports public trust in the complaint-handling process. | positions (Sergeant positions currently filled by Sergeants or Acting Sergeants) continues after expiration until a new agreement is in place. The limit is with up to two (2) civilian investigators. | date of this contract, since the contract continues after expiration until a new agreement is in place. The limit is inconsistent with the intended reform, which provided the OPA Director authority to have a mix of civilian and sworn staff to handle all intake, complaint-handling, and investigations. Having civilians take complaints at intake offers complainants an alternative to sworn staff. Civilian investigators and investigation supervisors enhance trust; provide continuity and staffing flexibility; and add specialized expertise non-law enforcement perspectives. The expertise and perspective of sworn staff is also important, and an OPA assignment is valuable for moving up the chain of command. In the Ordinance, while the OPA Director collaborates with the Chief in determining rotations of OPA's sworn staff, the OPA Director maintains managerial authority for both civilian and sworn OPA staff. |
| **D.** All staff shall have the requisite skills and abilities necessary for OPA to fulfill its duties and obligations as set forth in this Chapter 3.29 and for OPA's operational effectiveness. No civilian staff shall be required to have sworn experience and no civilian staff shall have been formerly employed by SPD as a sworn officer. | 2. Any case that reasonably could lead to termination will have a sworn investigator assigned to the case. 3. Once the civilian investigators of OPA have been trained, the intake work for civilian initiated complaints will primarily be performed by civilian investigators. Sergeants may be assigned to fill-in or back-up a civilian investigator engaged in intake duties for civilian initiated complaints. All other intake and all | The OPA Director was to have discretion in establishing an appropriate staffing mix to balance competing needs, handle investigations efficiently, and maintain an effective complement of differing expertise and perspectives (See: 3.29.120.B). |
| **E.** The OPA Director and the Chief shall collaborate with the goal that the rotations of sworn staff into and out of OPA are done in such a way as to maintain continuity and expertise, professionalism, orderly case management, and the operational effectiveness of both OPA and SPD, pursuant to subsection 3.29.430.G. | investigations will be performed by both Sergeants and the civilian investigators (collectively the "investigators"). It is agreed that while OPA civilian administrative personnel will not conduct investigations or intake duties, they will have responsibility for providing routine administrative support to the | In addition, the TA language "Any case that reasonably could lead to termination will have a sworn investigator assigned to the case" either means OPA may not use a civilian investigator or OPA must pair the |
| **F.** The appropriate level of civilianization of OPA intake and investigator personnel shall be evaluated by OIG pursuant to Section 3.29.240. | Investigators. Examples of duties that are considered administrative support are creating the IA-Pro file, adding documents to the file as directed by Investigators, and preparing routine response communications for Investigators such as a file closing letter. Examples of duties that are considered intake, and not administrative support, are conducting interviews, analyzing video, determining relevancy, determining policy violations, and drafting any non-routine communications. | civilian investigator or OPA must pair the civilian with a sworn investigator. The intent of the parties is unclear. Either way, it undercuts the intended reform of use of |
| **G.** OPA investigators and investigative supervisors shall receive training by professional instructors outside SPD in best practices in investigations and police practices investigations. OPA investigators and investigative supervisors shall also receive in-house training on current SPD and OPA policies and procedures. | 4. The civilianization of OPA shall not result in the reduction of Sergeant FTE's in the Department. The FTE for any Sergeant position removed from OPA shall be transferred to another position in the | civilian investigators in the manner that best serves the public. It means that for the |

| Areas of Conflict Between Accountability System Reforms and the SPOG TA | | |
|---|---|---|
| Ordinance 315215 Language (Followed by Additional System Issues) | Related SPOG TA Language | Comments |
| | Department. | most serious allegations, OPA will not be more accessible for complainants who were not trusting of having sworn investigators, which was one of the goals of civilianization; nor does it help with the challenges inherent in a sworn investigator having to recommend a colleague or superior be fired for misconduct that civilianization would help address. |
| | 5. In determining the order of transfer out of OPA, the initial transfer will consist of any Acting Sergeant(s) filling a position in OPA. Thereafter, the order will initially be determined by volunteers. In the event there are more volunteers than needed, the most senior (most time in OPA) volunteer(s) will be transferred. Thereafter, transfers will be in the order of inverse seniority, and the provisions of the Agreement to any involuntary transfer shall apply. | As the OIG has noted, this would also potentially directly conflict with the obligation of OIG to investigate serious misconduct allegations in those situations where OPA is conflicted out, since the OIG staff are civilians. |
| **3.29.330 CPC – Independence** Without the necessity of making a public disclosure request, CPC may request and shall timely receive from other City departments and offices, including SPD, information relevant to its duties under this Chapter 3.29 that would be disclosed if requested under the Public Records Act. | 6. Acting Sergeants currently on the Sergeant promotional roster may serve in OPA to fill a temporary vacancy limited to three (3) months. While at OPA, Acting Sergeants shall only perform intake duties and may be paired with a Sergeant to assist in investigations. | Section 3.29.140.E is cited in Appendix E.12 of the TA which identifies sections of the Ordinance about which the parties have "understandings," but no italicized summary of the parties' understandings are documented there. See endnote. |
| | **Article 3.6.H** …. The Community Police Commission (CPC) will only have access to closed OPA files. The Chief of Police or his or her designee may authorize access to those others are involved in (1) the disciplinary process; (2) the defense of civil claims; (3) the processing of a public disclosure request; or (4) the conduct of an administrative review. | The TA limits CPC access, which conflicts with the Ordinance provisions that give CPC access to any information relevant to its duties. |
| **3.29.380 CPC – Access to and confidentiality of files and records** A. CPC and the Office of the CPC shall have access to unredacted files of all closed OPA complaint forms and unredacted files of all closed OPA investigations. | **Article 3.6.H** …. The Community Police Commission (CPC) will only have access to closed OPA files. The Chief of Police or his or her designee may authorize access to the officer's Captain, and to others only if the officer's Captain, and to others only if | By not including language about CPC access to unredacted OPA complaint forms and unredacted closed OPA investigation files, the TA may be inconsistent with the Ordinance. |

## Areas of Conflict Between Accountability System Reforms and the SPOG TA

| Ordinance 315215 Language (Followed by Additional System Issues) | Related SPOG TA Language | Comments |
|---|---|---|
| | those others are involved in (1) the disciplinary process; (2) the defense of civil claims; (3) the processing of a public disclosure request; or (4) the conduct of an administrative review. | Elsewhere in this section of the TA there is a reference to the OPA Auditor's access to material. This error should be corrected. |
| **3.29.420 Disciplinary, grievance, and appeals policies and processes**<br>**A.4** The Chief shall have the authority to place an SPD employee on leave without pay prior to the initiation or completion of an OPA administrative investigation where the employee has been charged with a felony or gross misdemeanor; where the allegations in an OPA complaint could, if true, lead to termination; or where the Chief otherwise determines that leave without pay is necessary for employee or public safety, or security or confidentiality of law enforcement information. In any case of such leave without pay, the employee shall be entitled to back pay if reinstated, less any amounts representing a sustained penalty of suspension. | **Article 3.3 Indefinite Suspensions** – On indefinite suspensions used for investigative purposes which do not result in termination of employment or reduction in rank, the resultant punishment shall not exceed thirty (30) days including the investigative time incorporated within the indefinite suspension. However, if an employee has been charged with the commission of a felony or a gross misdemeanor involving either moral turpitude, or a sex or bias crime, where the allegation if true could lead to termination, the Employer may indefinitely suspend that employee beyond thirty (30) days as long as the length of such suspension is in accord with all applicable Public Safety Civil Service Rules. In the event the gross misdemeanor charges are filed by the City, and are subsequently dropped or the employee is acquitted, the backpay withheld from the employee shall be repaid, with statutory interest. The Guild will be notified when the Department intends to indefinitely suspend an employee. The Guild has the right to request a meeting with the Chief to discuss the suspension. The meeting will occur within fifteen (15) days of the request. If the charges are dropped or lessened to a charge that does not meet the qualifications above, there is a plea or verdict to a lesser charge that does not meet the qualifications above, or in the case of a hung jury where charges are not refiled, the employee shall be immediately | The Ordinance language was debated, discussed, and precisely drafted. The TA's introduction of "moral turpitude, or a sex or bias crime" greatly narrows the types of misconduct for which the Chief may place an employee on leave without pay for longer than 30 days, undercutting the intended reform, no longer providing the Chief appropriate managerial latitude in determining the need for such leave. Most serious cases will not be charged within 30 days, placing the Chief in a difficult position in cases of apparent misconduct that may in fact ultimately result in criminal charges, but haven't reached a filing decision within 30 days of coming to light. |

| Areas of Conflict Between Accountability System Reforms and the SPOG TA | | |
|---|---|---|
| Ordinance 315215 Language (Followed by Additional System Issues) | Related SPOG TA Language | Comments |
| | returned to paid status. An employee covered by this Agreement shall not suffer any loss of wages or benefits while on indefinite suspension if a determination of other than sustained-is made by the Chief of Police. In those cases where an employee covered by this Agreement appeals the disciplinary action of the Chief of Police, the Chief of Police shall abide by the decision resulting from an appeal as provided by law with regard to back pay or lost benefits. | |
| **3.29.420 Disciplinary, grievance, and appeals policies and processes**<br>**A.5** No disciplinary action will result from a complaint of misconduct where the misconduct comes to the attention of OPA more than five years after the date of the alleged misconduct, except where the alleged misconduct involves criminal law violations, dishonesty, or Type III Force, as defined in the SPD policy manual or by applicable laws, or where the alleged act of misconduct was concealed. | **Appendix E.12** The parties have amended Article 3.6.G of the Agreement, which will be applicable. The parties further agree that the existing phrase in Article 3.6.G "where the named employee conceals acts of misconduct" includes but is not limited to misconduct where an employee fraudulently completes a timesheet because such act conceals the actual amount of time that was worked.<br>**Article 3.6.G** Timing of Investigations - No disciplinary action will result from a complaint of misconduct where the complaint is made to the OPA more than four (4) years after the date of the incident which gave rise to the complaint, except:<br>1) In cases of criminal allegations, or<br>2) Where the named employee conceals acts of misconduct, or<br>3) For a period of thirty (30) days following a final adverse disposition in civil litigation alleging intentional misconduct by an officer. | The TA does not adopt the intended reforms to the statute of limitations. The statute of limitations was to be extended to five years for most misconduct cases, and eliminated altogether for certain more serious types of misconduct. This reform was in response to past instances when action could not be taken in cases of significant misconduct. As a result, named employees could not be held accountable and public trust was damaged. |
| **3.29.420 Disciplinary, grievance, and appeals policies and processes**<br>**A.8** SPD employees shall not use any type of accrued time balances to be compensated while satisfying a disciplinary penalty that includes an unpaid suspension. | **Appendix E.12** The parties agree that application of Section 3.4 of the Agreement meets the interests of the City, and thus will continue to be applicable.<br>**Article 3.4** An employee will be precluded | The TA language eliminates the intended reform by retaining contract language that permits accrued time balances to be used for discipline of less than 8 days. The reform eliminated the 8-day minimum so |

| Ordinance 315215 Language (Followed by Additional System Issues) | Related SPOG TA Language | Comments |
|---|---|---|
| | **Areas of Conflict Between Accountability System Reforms and the SPOG TA** | |
| **3.29.420 Disciplinary, grievance, and appeals policies and processes**<br><br>A.9 The City Attorney's Office shall determine legal representation for SPD in disciplinary challenges. The City, including SPD, shall not settle or resolve grievances or disciplinary appeals without the approval of the City Attorney's Office. | **Appendix E.12** The parties confirm that this section of the Ordinance is not intended to expressly mandate the role of the City Attorney's Office in representing the City in disciplinary challenges and settlements. In contrast, the TA retains vague representation language. | The intent of the reform was to clearly and expressly mandate the role of the City Attorney's Office in representing the City in disciplinary challenges and settlements. In contrast, the TA retains vague representation language. |
| **3.29.420 Disciplinary, grievance, and appeals policies and processes**<br><br>A.2.b SPD shall provide a copy of any proposed Disciplinary Action Report or successor disciplinary action document to the affected employee via electronic communication. If the employee seeks a due-process meeting with the Chief or the Chief's designee, the employee must communicate that request to the Chief's office electronically within 10 days of the date of receipt of the disciplinary action document. | Grievance process. Each party is expected to designate the representative(s) authorized to enter into a binding settlement agreement. While each party may have internal processes in place in terms of attaining authority for reaching an agreement, it is the responsibility of the representative to ensure internal processes have been complied with.<br><br>**Article 3.1.B** When the City provides the employee with the notice described in the previous paragraph, the Guild shall additionally be provided with the City's disciplinary investigation, including access to any physical evidence for examination and testing … | The Ordinance stipulates, here and elsewhere, per the recommended reforms, specific deadlines to address patterns of delay, which have often prevented timely resolution of complaints. The TA does not explicitly adopt the Ordinance requirement that the employee notify the Chief's office within 10 days if requesting a due process hearing. |
| **3.29.420 Disciplinary, grievance, and appeals policies and processes**<br><br>A.2.c The Chief or the Chief's designee shall hold the due process meeting within 30 days of the employee's request.<br><br>A.2.d The Chief or the employee may request one reasonable postponement of the due-process meeting, not to exceed two weeks from the date of the originally scheduled meeting. | **Article 3.5.A** …The employee, the City, and the Guild shall cooperate in the setting of a hearing date, which shall be held thirty (30) days after the investigation file is provided to the Guild (unless mutually agreed to hold it earlier). The parties may agree to an extension based on extenuating circumstances. | The TA is consistent with the Ordinance in agreeing to the 30-day window, but undercuts the intended reform by allowing the parties to extend that timeline. This could result in open-ended delays. |
| from using accrued time balances to satisfy a disciplinary penalty that mandates suspension without pay when the suspension is for eight or more days. However, if precluding such use of accrued time negatively affects the employee's pension/medical benefit, the unpaid suspension may be served non-consecutively. | | that regardless of the length of discipline imposed, the employee could not use accrued time to satisfy a penalty that is supposed to be days without pay. |

| Ordinance 315215 Language (Followed by Additional System Issues) | Related SPOG TA Language | Comments |
|---|---|---|
| **3.29.420 - Disciplinary, grievance, and appeals policies and processes**<br><br>**A.7.a** All appeals related to SPD employee discipline shall be open to the public and shall be heard by PSCSC. | **Appendix E.12** The parties have agreed that appeals related to employee discipline can go through arbitration pursuant to the collective bargaining agreement or to the PSCSC. The City may re-open the Agreement for the purpose of bargaining over members of the public attending arbitrations, and the parties will not change their current practice until after a change is achieved through the negotiation process. | The TA removes the reform of eliminating multiple avenues of appeal. Further, having hearings open to the public was a bare bones improvement, and even that minor improvement has been left for future negotiations. |
| **3.29.420 Disciplinary, grievance, and appeals policies and processes**<br><br>**A.7.b** The PSCSC shall be composed of three Commissioners, none of whom shall be current City employees or individuals employed by SPD within the past ten years, who are selected and qualified in accordance with subsection 4.08.040.A. | **Appendix E.12** The parties have agreed that changes to the structure of the PSCSC contained in the Ordinance should be resolved through joint bargaining with the other interest arbitration eligible public safety unions. The Guild agrees to participate in such bargaining. During joint bargaining, the Guild will retain the ability to disagree with the position(s) advocated by the other unions, and may vote independently. If the event of such a disagreement, the City and Guild shall proceed to mediation and arbitration to resolve the matter. In the event other public safety unions refuse to engage in joint bargaining, the City may re-open the Agreement for the limited purpose of negotiating the changes in the Ordinance related to the structure of the PSCSC. The City agrees to defer implementation of this section until bargaining is completed on all issues for which bargaining is required. | The TA removes the reform of ending with certainty the practice of sworn employees presiding over appeals of discipline to better ensure impartial review and support public perceptions of fairness. Further, the PSCSC is a creature of State law and City Ordinance and the City is under no obligation to bargain its composition. |
| **3.29.420 - Disciplinary, grievance, and appeals processes**<br><br>**A.6** All appeals related to employee discipline shall be governed by this Chapter 3.29 and Chapter 4.08. Only appeals for which the hearing has already been scheduled prior to the effective date of the ordinance introduced as Council Bill 118969—including Disciplinary Review Board proceedings for officers and sergeants, and arbitration proceedings for lieutenants and captains—shall continue in accordance with the relevant contractual or legislated procedures. As of the effective date of | **Article 14.1** Any dispute between the Employer and the Guild concerning the interpretation or claim of breach or violation of the express terms of this Agreement shall be deemed a grievance. Such a dispute shall be processed in accordance with this Article. For purposes of processing, grievances will be | The retention of arbitration as an avenue for disciplinary appeals in the TA is counter to the intended reforms that eliminated multiple appeal routes, provided for open hearings, and established a standard of review for appeals. The TA also continues to allow the grievance process to be used for disciplinary appeals and for written |

| Areas of Conflict Between Accountability System Reforms and the SPOG TA | | |
|---|---|---|
| **Ordinance 315215 Language (Followed by Additional System Issues)** | **Related SPOG TA Language** | **Comments** |
| the ordinance introduced as Council Bill 118969, all other disciplinary appeals may proceed only under this Chapter 3.29 and Chapter 4.08.<br><br>**3.29.420 - Disciplinary, grievance, and appeals policies and processes**<br>**A.7.c** Oral reprimands, written reprimands, "sustained" findings that are not accompanied by formal disciplinary measures, and alleged procedural violations may be processed through grievance processes established by the City Personnel Rules or by Collective Bargaining Agreements, but no grievance procedure may result in any alteration of the discipline imposed by the Chief. Such grievances are not subject to arbitration and may not be appealed to the PSCSC or any other forum.<br><br>**4.08.105 – Tenure of employment for police officers**<br>**A.3** ... The Commission will review the recommended decision and, within 30 days of the oral argument, issue a final determination whether the disciplinary decision was in good faith for cause, giving deference to the factual findings of the Hearing Officer. Both the recommended decision and the final decision should affirm the disciplinary decision unless the Commission specifically finds that the disciplinary decision was not in good faith for cause, in which case the Commission may reverse or modify the discipline to the minimum extent necessary to achieve this standard. | categorized in two ways: "Discipline Grievances" and "Contract Grievances".<br><br>**Discipline Grievances** cover the challenge to a suspension, demotion, termination or transfer identified by the Employer as disciplinary in nature. Any grievance challenging such discipline shall be considered a Discipline Grievance, even though the grievance may involve other contractual issues as well. A Discipline Grievance will be initiated at Step 3 and may include additional related grievance(s) regarding an interpretation or claim of breach or violation of the terms of the Agreement, which may be added per Section 14.2 Step 4.<br><br>**Contract Grievances** cover all other grievances that do not fit in the definition of "Discipline grievance" including other types of discipline. A Contract Grievance will be initiated at Step 1 or as provided for in Section 14.3 ... An employee covered by this Agreement must, upon initiating objections relating to actions subject to appeal through either the grievance procedure or pertinent Public Safety Civil Service appeal procedures, use either the grievance procedure contained herein or pertinent procedures regarding such appeals to the Public Safety Civil Service Commission. Under no circumstances may an employee use both the grievance procedure and Public Safety Civil Service Commission procedures relative to the same action. If there are dual filings with the grievance procedure and the Public Safety Civil Service Commission, the City will send a notice of such dual filings by certified mail to the employee(s) and the | reprimands, contrary to the reforms adopted in the Ordinance to eliminate forum shopping and ensure public access and transparency. |

| Areas of Conflict Between Accountability System Reforms and the SPOG TA | | |
|---|---|---|
| Ordinance 315215 Language (Followed by Additional System Issues) | Related SPOG TA Language | Comments |
| **4.08.040 Powers and duties of Commission**<br><br>J. Hear and determine appeals or complaints respecting the administration of this Chapter 4.08, including, but not limited to, all appeals affecting discipline of SPD employees defined in subsection 4.08.060.A. In hearing police discipline cases, the Commission may delegate its authority to conduct hearing appeals to a hearing officer that it retains, or to a hearing officer in the City of Seattle Office of the Hearing Examiner, subject to Commission review. Any hearing officer shall have appropriate expertise and objectivity regarding police disciplinary decisions.<br><br>**4.08.105 - Tenure of employment for police officers**<br><br>A.1 Any employee removed, suspended, demoted, or discharged may | [See also steps outlined in the contract for processing both types of grievances, including the option of using arbitration.]<br><br>**Appendix E.12** The City agrees that [section 3.29.40.A.7.c] of the Ordinance shall not change the scope of matters that are subject to the grievance procedure and arbitration under the Agreement and to challenge/hearings under the PSCSC. In addition, the City confirms that operation of the grievance procedure and PSCSC can result in the alteration of discipline imposed by the Chief. Both parties recognize the right of the other party to utilize internal review processes prior to entering into a settlement of a grievance or a PSCSC appeal.<br><br>Article 3.2 Written reprimands shall be subject to the grievance procedure of the Agreement.<br><br>**Article 14.4** The time limits for processing a grievance stipulated in 14.2 of this Article may be extended for stated periods of time by mutual written agreement between the Employer and the Guild, and the parties to this Agreement may likewise, by mutual written agreement, waive any step or steps of Section 14.2.<br><br>An arbitration hearing shall generally be conducted within ninety (90) calendar days from the date the arbitrator provides potential dates to the parties, recognizing | The ordinance adopted the recommended reform of detailing requirements for scheduling and completing PSCSC appeal hearings to address long-standing problems with delays. The CBA appears to have not adopted these provisions:<br><br>• Have the PSCSC use a hearing examiner who is a tenured professional not subject to selection by the parties and whose availability is certain; OR have the PSCSC contract with an arbitrator, but only if the selection process for the arbitrator is via a pre-determined pool |

**Areas of Conflict Between Accountability System Reforms and the SPOG TA**

| Ordinance 315215 Language (Followed by Additional System Issues) | Related SPOG TA Language | Comments |
|---|---|---|
| within ten days from the date of electronic service of the final disciplinary decision by the Chief of Police, file with the Commission a written notice of appeal. The notice of appeal may be filed electronically, and the employee shall submit copies of this notice to the City Attorney and the Chief of Police. | that the parties may extend the timeline to account for availability. Requests for an extension will not unreasonably be denied. | to be used for several years, not a process where either side can refuse to accept the arbitrator. |
| **A.2** The Commission shall ensure that a hearing is conducted as soon as practicable, but in no event later than three months after submission of the notice of appeal. The hearing shall be confined to the determination of whether the employee's removal, suspension, demotion, or discharge was made in good faith for cause. | | • Require the union to file notices of appeal with the City Attorney at the same time they are filed with SPD. |
| **A.3** ... The Commission will review the recommended decision and, within 30 days of the oral argument, issue a final determination whether the disciplinary decision was in good faith for cause, giving deference to the factual findings of the Hearing Officer. Both the recommended decision and the final decision should affirm the disciplinary decision unless the Commission specifically finds that the disciplinary decision was not in good faith for cause, in which case the Commission may reverse or modify the discipline to the minimum extent necessary to achieve this standard. | | • Require hearings be conducted no later than three months after the appeal is filed and to issue a final determination within 30 days of oral argument. |
| **B.** ... All hearings pursuant to this Section 4.08.105 shall be open to the public. Hearings shall be held after due notice of the time and place of hearing to the affected employee. The employee has the right to union and legal representation of the employee's choosing and at the employee's own expense. Hearings and related deadlines shall not be delayed more than two weeks due to the unavailability of the City's or the employee's union representative or legal counsel. | | • Require each side to have two attorneys who can handle appeals to eliminate delays caused due to assigned attorney being unavailable for weeks or months. The Ordinance doesn't stipulate back-up representation, but it does state that deadlines shall not be delayed more than two weeks due to the unavailability of attorneys. |
| **3.29.430 Recruitment, hiring, assignments, promotions, and training**<br><br>**E.** SPD shall adopt consistent standards that underscore the organizational expectations for performance and accountability as part of the application process for all specialty units, in addition to any unique expertise required by these units, such as field training, special weapons and tactics, crime scene investigation, and the sexual assault unit. In order to be considered for these assignments, the employee's performance appraisal record and OPA history must meet certain standards and SPD policy must allow for removal from that assignment if certain triggering events or ongoing concerns mean the employee is no longer meeting performance or accountability standards." | **Article 7.4.G.** Prior to an involuntary transfer for inadequate performance, an employee will be given notice of the performance deficiencies and a reasonable opportunity to correct the deficiencies.<br><br>**7.4.4 Performance Based Transfers – A** transfer based upon inadequate performance shall only occur if the Department has documented a repetitive performance deficiency and informed the employee, and the employee has had a reasonable opportunity to address the | In Article 7.4.G and 7.4.4, the TA conflicts with an important reform that was intended to give management appropriate authority to set and use performance standards that take into account OPA history in making specialty assignments and to transfer employees out of specialty units whose misconduct warrants transfer.<br><br>Also, mandatory transfers were not addressed in the TA. Management has the authority to move captains and lieutenants at-will so they gain experience in different |

| Ordinance 315215 Language (Followed by Additional System Issues) | Related SPOG TA Language | Comments |
|---|---|---|
| | performance deficiency, normally no less than thirty (30) and no more than ninety (90) days. The performance deficiency to be corrected must be based on objective criteria that are evenly applied across similar units of assignment (for purposes of this provision similar units of assignment in patrol will be citywide across the watch). The performance deficiency identified as needing correction cannot be simply general statements. The employee shall be given a written explanation of 1) the concerns, which shall include sufficient facts or examples of the employee's failures to meet the objective criteria in order to assist the employee to understand the issue(s); and 2) specific actions the employee can take to satisfactorily address the employer's concerns. Prior to the written explanation document being given to the employee, it shall be reviewed and approved by the employee's Bureau Commander and the Department's Human Resource Director (or designee). When making the transfer, the Department will give good faith consideration to the employee's preference for a new assignment. | units, different parts of the city, etc. and assign these staff in ways that match their skills and abilities to SPD's need to provide effective policing services. The TA is silent on management authority to do the same for sergeants and officers. |
| **3.29.430 Recruitment, hiring, assignments, promotions, and training D.** After consulting with and receiving input from OIG, OPA, and CPC, SPD shall establish an internal office, directed and staffed by civilians, to manage the secondary employment of its employees. The policies, rules, and procedures for secondary employment shall be consistent with SPD and City ethical standards, and all other SPD policies shall apply when employees perform secondary employment work. | **Article 7.9** Employees covered by this Agreement shall be allowed to engage in off-duty employment subject to the same terms and conditions in effect on January 1, 1992. This provision is subject to the Secondary Employment reopener set forth in Article 21. <br><br> **Article 21.5** For the duration of this Agreement, the City may reopen this Agreement on the issue of Secondary Employment. In the event the City does re-open, the Guild may re-open the | The TA provides for a re-opener to bargain secondary employment. This concession is a setback to critical reform. Secondary employment is not an employment right and should not have been subject to bargaining. In response to egregious situations and apparent corruption coming to light recently, and a history of problems addressed in repeated recommendations over the years, secondary employment reforms were to be implemented last year pursuant to an Executive Order by then- |

## Areas of Conflict Between Accountability System Reforms and the SPOG TA

| Ordinance 315215 Language (Followed by Additional System Issues) | Related SPOG TA Language | Comments |
|---|---|---|
| | Agreement on any economic issue that is directly related to and impacted by the change in Secondary Employment. | Mayor Burgess and recommendations from the Ethics & Elections Commission, the City Auditor, the OPA Auditor and the CPC. These reforms were to address real and perceived conflicts of interest, internal problems among employees competing for business, the need for appropriate supervisory review and management, and to adopt technological opportunities. The recommendations included eliminating the practice of having secondary employment work managed outside SPD, often by current employees acting through their private businesses created for this purpose or through contracts between the employee and a private business; making clear that video recording, use of force, professionalism, and all other policies apply when employees perform secondary employment work; creating an internal civilian-led and civilian-staffed office; and establishing clear and unambiguous policies, rules, and procedures consistent with strong ethics and a sound organizational culture. |
| **3.29.430 Recruitment, hiring, assignments, promotions, and training**<br><br>**G.** The Chief shall collaborate with the OPA Director with the goal that sworn staff assigned to OPA have requisite skills and abilities and with the goal that the rotations of sworn staff into and out of OPA are done in such a way as to maintain OPA's operational effectiveness. To fill such a sworn staff vacancy, the Chief and the OPA Director should solicit volunteers to be assigned to OPA for two-year periods. If there are no volunteers or the OPA Director does not select from those who volunteer, the Chief shall provide the OPA Director with a list of ten acting sergeants or sergeants from which the OPA Director may select OPA personnel to fill intake and investigator positions. Should the OPA Director initially decline to select personnel from this list, the Chief shall provide the OPA Director with a second list of ten additional acting sergeants or sergeants for consideration. If a second list is provided, the OPA Director may select personnel from either list, or from among | **Appendix E.12** The City confirms that all transfers in or out of OPA of bargaining unit members will be done in compliance with the CBA. | The TA appears to suggest that the parties intend repeal of this section of the Ordinance, replacing it with transfer language in the TA's Appendix D. If so, this provision is inconsistent with the Ordinance because the TA unduly limits the responsibility of the OPA Director to establish an effective mix of staff. |

| Areas of Conflict Between Accountability System Reforms and the SPOG TA | | |
|---|---|---|
| Ordinance 315215 Language (Followed by Additional System Issues) | Related SPOG TA Language | Comments |
| **3.29.440 Public disclosure, data tracking, and record retention**<br>E. All SPD personnel and OPA case files shall be retained as long as the employee is employed by the City, plus either six years or as long as any action related to that employee is ongoing, whichever is longer. SPD personnel files shall contain all associated records, including Equal Employment Opportunity complaints, and disciplinary records, litigation records, and decertification records; and OPA complaint files shall contain all associated records, including investigation records, Supervisor Action referrals and outcomes, Rapid Adjudication records, and referrals and outcomes of mediations. Records of written reprimands or other disciplinary actions shall not be removed from employee personnel files. | **Article 3.6.L.** OPA files shall be retained based on their outcome. Investigations resulting in findings of "Sustained" shall be retained for the duration of City employment plus six (6) years, or longer if any action related to that employee is ongoing. Investigations resulting in a finding of not sustained shall be retained for three (3) years plus the remainder of the current year. OPA files resulting in a not sustained finding may be retained by OIG for purposes of systemic review for a longer period of time, so long as the files do not use the name of the employee that was investigated. | The TA counters records-retention reforms, which included setting the same longer retention period for all files, whether complaint findings were sustained or not, and describing specifically which files must be retained. In the past, because records were retained for shorter periods of time, and all files were not retained, the City's accountability to the public was more limited, and SPD management's ability to establish progressive discipline and comparable treatment of like cases compromised. (Note also that retention is easier now that all records are electronic.) |
| **3.29.440 Public disclosure, data tracking, and record retention**<br>F. For sworn employees who are terminated or resign in lieu of termination, such that the employee was or would have been separated from SPD for cause and at the time of separation was not "in good standing," SPD shall include documentation in SPD personnel and OPA case files verifying … (d) that the Chief did not or will not grant any request under the Law Enforcement Officers Safety Act to carry a concealed firearm. The latter two actions shall also be taken and documentation included in the SPD personnel and OPA case files whenever a sworn employee resigns or retires with a pending complaint and does not fulfill an obligation to fully participate in an OPA investigation. | **Appendix C.1.B** Upon service retirement from the Seattle Police Department, an employee may purchase from the Department, at market value, the service weapon he or she had been issued.<br><br>**Appendix C.1.C** An employee whose request to purchase service weapon is denied shall have the right to appeal the denial to the Chief of Police or designee, whose decision shall be final and binding. | Appendix C.1.B should apply only to employees who retire in good standing. Concealed carry privileges should be granted under rules of the Law Enforcement Officers Safety Act, including having retired in good standing. These caveats should be made explicit in the TA to ensure consistency with reforms in the Ordinance. Similarly, the option for secondary employment or retiree employment should only apply to employees who retire in good standing. |
| **3.29.460 Collective bargaining and labor agreements**<br>B. The terms of all collective bargaining agreements for SPD employees, along with any separate agreements entered into by SPD or the City in response to an unfair labor practice complaint, settlement of grievance or appeal, or for other reasons, including those previously reached, shall be clearly and transparently provided to the public, by posting on the SPD website.<br><br>**C.** Whenever collective bargaining occurs, any separate agreements in place affecting ongoing practices or processes which were entered into by SPD or the City in response to an unfair labor practice complaint, settlement of grievance or appeal, or for any other reasons, shall be | **Appendix E.12** Pursuant to SMC 3.29.460, the parties have reviewed all of their outstanding separate agreements. After determining which of those involve "ongoing practices or processes" under the Ordinance, the parties have agreed to incorporate the agreements listed below into this MOA. It is understood that while the failure to incorporate an agreement involving an ongoing practice or process means that the agreement can no | Listing the titles of separate agreements in the contract does not conform to the spirit of the Ordinance. The intent of the Ordinance was that the terms of any ongoing agreements be added to the contract or be abrogated. This was to ensure that any existing MOA terms are fully reviewed during negotiations and are not in conflict with any other contract terms. Policymakers, the public, appellate officers, and others need to see the terms of those additional agreements. If the |

33

| Ordinance 315215 Language (Followed by Additional System Issues) | Related SPOG TA Language | Comments |
|---|---|---|
| incorporated into the new or updated collective bargaining agreement or shall be eliminated. | longer be enforced through the CBA, any such former agreement may still be relied upon for historical purposes or as evidence of past practice. While enforcement through the CBA has been "eliminated", the former agreement may be used for historical or past practice purposes. In addition, as compliance with 3.29.460B, each of the incorporated agreements will be posted on the Department website. In addition, the parties agree that 3.29.460B is satisfied in full by posting CBA, the incorporated agreements, and any future agreements that change ongoing practices or policies on the Department website.<br><br>**[Appendix F** lists the MOUs and MOAs incorporated into the contract.] | terms of separate agreements in any way provide for additional, different, or conflicting obligations, those need to be readily apparent. If they are in conflict with the TA, those conflicts need to be addressed prior to adoption of the TA.<br><br>Some examples of issues with these separate agreements that needed to be addressed in the TA include:<br><br>a. Limitations on the use and review of in-car video for improving performance, for auditing, or other purposes.<br><br>b. References to Firearms Review, Firearms Review Board, and Officer-Involved Shootings review processes; ensuring appropriate OPA and OIG attendance and involvement<br><br>c. Limitations on promotions from any of the top five scorers, regardless of order<br><br>d. The decision-making process for, and length of, assignments of sworn personnel to OPA<br><br>e. Limitations on uses of holding cell video<br><br>f. Limitations on due process hearing attendance<br><br>(Note: The TA refers to side agreements listed in Appendix G, but they are listed in Appendix F.) |
| **3.29.500 Construction**<br>A. In the event of a conflict between the provisions of this Chapter 3.29 and any other City ordinance, the provisions of this Chapter 3.29 shall govern. | **Article 18** Subordination of Agreement. It is also understood that the parties hereto and the employees of the City are governed by applicable City Ordinances, and said Ordinances are paramount except where they conflict with the express provisions of this Agreement. | The parties expressly agree that the TA terms, including the appendices, shall prevail, even though they are inconsistent or in conflict with the any City ordinance. (See for example, TA Article 4.4 which does not conform to City law.) "Conflict with" can include the omission or partial omission of ordinance terms and provisions when the TA covers the same subject matter. Or it |

| Areas of Conflict Between Accountability System Reforms and the SPOG TA | | |
|---|---|---|
| Ordinance 315215 Language (Followed by Additional System Issues) | Related SPOG TA Language | Comments |
| **3.29.510 Implementation**<br>A. Provisions of the ordinance introduced as Council Bill 118965 subject to the Public Employees' Collective Bargaining Act, chapter 41.56 RCW, shall not be effective until the City completes its collective bargaining obligations. As noted in Section 3.29.010, the police are granted extraordinary power to maintain the public peace, including the power of arrest and statutory authority under RCW 9A.16.040 to use deadly force in the performance of their duties under specific circumstances. Timely and comprehensive implementation of this ordinance constitutes significant and essential governmental interests of the City, including but not limited to (a) instituting a comprehensive and lasting civilian and community oversight system that ensures that police services are delivered to the people of Seattle in a manner that fully complies with the United States Constitution, the Washington State Constitution and laws of the United States, State of Washington and City of Seattle; (b) implementing directives from the federal court, the U.S. Department of Justice, and the federal monitor; (c) ensuring effective and efficient delivery of law enforcement services; and (d) enhancing public trust and confidence in SPD and its employees. For these reasons, the City shall take whatever steps are necessary to fulfill all legal prerequisites within 30 days of Mayoral signature of this ordinance, or as soon as practicable thereafter, including negotiating | **Appendix E.3** In the event there is a conflict between the language of the Ordinance and the language of the CBA or the explanations and modifications in this Appendix, the language of the CBA or this Appendix shall prevail. | can include conflicts in wording even when that may not have been the intent of the parties. The extent to which the TA eviscerates the Ordinance won't be fully seen until SPOG or employees make this argument in specific cases to bar a sustained finding or discipline. SPD commanders, the oversight bodies, and the public are left to guess what terms are certain and what language will later be challenged. A key purpose of adopting reforms by Ordinance was to provide clarity and certainty, and make the system less reliant on who is serving in OPA, SPD, SPMA, SPOG, or City leadership, their 'understanding', their level of advocacy, etc.<br><br>The parties expressly agree that the TA terms, including the appendices, shall prevail, even though they are inconsistent or in conflict with the Ordinance. While the public may believe that what is in City law can be relied on, in fact even if those impacted laws are never amended through a public process, this provision means that they have nonetheless been amended. While it is traditional for contracts to have this kind of language, in this instance it seems particularly out of alignment with the goals of the accountability system and the Consent Decree regarding public trust, transparency and legitimacy. |

| Areas of Conflict Between Accountability System Reforms and the SPOG TA | | |
|---|---|---|
| | Related SPOG TA Language | Comments |
| **Ordinance 31521S Language (Followed by Additional System Issues)**<br>with its police unions to update all affected collective bargaining agreements so that the agreements each conform to and are fully consistent with the provisions and obligations of this ordinance, in a manner that allows for the earliest possible implementation to fulfill the purposes of this Chapter 3.29. | | |
| **Other Topics Requiring Attention**<br>Firearms Review Board | **Appendix G** In addition to the other agreements reached by the parties related to the OIG, the OIG may attend Firearms Review Boards and will in all respects be afforded the same access, participation, and treatment as be as the Monitor (see the January 18, 2013 MOU of the parties). | Language in the TA should be updated to make sure it correctly references the names of all currently constituted boards and processes to which the OIG must have full and unfettered access. |
| **Other Topics Requiring Attention**<br>**3.29.460 Collective bargaining and labor agreements**<br>**A.** Those who provide civilian oversight of the police accountability system shall be consulted in the formation of the City's collective bargaining agenda for the purpose of ensuring their recommendations with collective bargaining implications are thoughtfully considered and the ramifications of alternative proposals are understood. These individuals shall be subject to the same confidentiality provisions as any member of the Labor Relations Policy Committee. | | Bargaining should begin again relatively soon since this TA, if ratified, ends in December, 2020. It will be important to follow through on the commitment to have technical advisors with accountability system expertise advise the City, as was provided for in the Ordinance. (This should be the practice, as well, for all contract re-openers and for the list of other exceptions to the Ordinance laid out in Appendix E.) See CM Herbold's proposed legislation which provides for more ongoing advice throughout the bargaining process, and Section 3.29.460 of the Ordinance, which provides for this advisory role as the City prioritizes its bargaining agenda. |
| **Other Topics Requiring Attention**<br>Payment of SPOG President Salary | **Article 1.4** ... Having reviewed the data, it is agreed that effective July 1, 2018, the City will pay seventy-eight percent (78%) of the Guild President's salary for 1736 hours a year, with the remaining twenty-two percent (22%) paid by the Guild for 1736 hours a year, up to 2088 per year. In addition, the City shall pay the entire cost of any hours over 1736 in a year, without contribution from the Guild. Thereafter, the parties will review the data in the spring of each year (recognizing the Guild's July | The public continues to pay 78% of the SPOG President's salary, including all time spent in labor-management meetings, addressing grievances, and "other such duties." And, the greater amount of time spent by SPOG on these functions, the more it costs the public, which seems contrary to the public's interest. |

| Areas of Conflict Between Accountability System Reforms and the SPOG TA | | |
|---|---|---|
| **Ordinance 315215 Language (Followed by Additional System Issues)** | **Related SPOG TA Language** | **Comments** |
| **Other Topics Requiring Attention**<br>Dispute Process Regarding Payment of SPOG President Salary | through June budget year) to determine whether an adjustment of the 78/22 percentage (up or down) should be made.<br><br>**Article 1.4** ... Recognizing that there may at times be a difference of opinion on this issue, and that there may be confidential time records of the Guild President, the parties agree that any dispute will be submitted to a neutral third party for final and binding resolution. | The TA does not state whether the cost of dispute resolution is also paid by the public. |
| **Other Topics Requiring Attention**<br>Managing Time of SPOG Representatives | **Article 1.5.A** The Employer shall afford Guild representatives a reasonable amount of on-duty time to consult with appropriate management officials and/or aggrieved employees, to post Guild notices and distribute Guild literature not of a political nature and to meet with the recruit class during a time arranged by the Employer; provided that the Guild representative and/or aggrieved employees contact their immediate supervisors, indicate the general nature of the business to be conducted, and request necessary time without undue interference with assignment duties. Time spent on such activities shall be recorded by the Union representative on a time sheet provided by the supervisor. Guild representatives shall guard against use of excessive time in handling such responsibilities.<br><br>**Article 1.5.B** The Employer reserves the right to determine the total amount of specific hours of official time which will be approved for Guild officials to conduct Guild business on duty time. | The TA does not give supervisors authority to approve or manage SPOG representative time requests to help ensure the SPOG-related tasks don't negatively impact assigned duties and don't consume an excessive amount of time, even though SPOG work is paid for by the public. It suggests the supervisor's role is simply to provide the time sheet and grant the time requested. It is unclear if this language aligns with the employer's authority in Article 1.5.B of the TA. |
| **Other Topics Requiring Attention**<br>Non-Discrimination | **Article 4.4** Non-discrimination - It is agreed by the Employer and the Guild that the City and the Guild are obligated, legally and morally, to provide equality of opportunity, | As noted above, this language conflicts with City law (and per the TA terms, will prevail.) "The City of Seattle (City) assures that no person shall be discriminated against in City |

| Areas of Conflict Between Accountability System Reforms and the SPOG TA | | |
|---|---|---|
| **Ordinance 315215 Language (Followed by Additional System Issues)** | **Related SPOG TA Language** | **Comments** |
| | consideration and treatment to all members employed by the Seattle Police Department in all phases of the employment process and will not unlawfully discriminate against any employee by reason of race, disability, age, creed, color, sex, national origin, religious belief, marital status or sexual orientation. | programs and activities based on their race, color, national origin, religion, sex, age, or disability as provided by Title VI of the Civil Rights Act of 1964, the Civil Rights Restoration Act of 1987 (P.L. 100.259), the Age Discrimination Act of 1975, as amended, and Title II of the American with Disabilities Act. The City further complies with additional state and municipal civil rights laws and assures that no person shall be discriminated against in its programs and activities based on their sexual orientation, gender identity, marital status, parental status, political ideology, creed, ancestry, participation in the Section 8 housing program, military status or veteran status, or due to breastfeeding in a public place, as provided by Seattle Municipal Code 14.04, 14.06 and 14.10." –OCR |
| **Other Topics Requiring Attention** EEO Complaints | **Article 3.13.E** The provisions of Section 3.6 shall apply to EEO investigations. | As noted above, Article 3.6 of the TA significantly conflicts with Ordinance reforms. Article 3.13.E broadens this problem by applying those same provisions regarding OPA investigations to EEO investigations as well. As noted by the OIG, this also presents obstacles to the ability of the OIG to investigate retaliation complaints, as mandated by Ordinance. |
| **Other Topics Requiring Attention** Garrity | **Appendix E.10** Garrity. Without limiting other potential situations where Garrity could/would apply, the City agrees that in implementing the Ordinance it will comply with Garrity whenever it seeks to compel testimony during an OPA interview. | As has been noted over the years, Garrity should only be used when appropriate, in cases involving potential criminal liability. |
| **Other Topics Requiring Attention** Re-Openers | **Article 21** cites specific re-opener areas including patrol shift schedules (21.4), secondary employment (21.5), and mandatory subjects related to the Gender/Race Workforce Equity efforts | All accountability system re-opener topics should be disclosed for public transparency, and additional parameters provided, and should be considered and addressed using the expertise of accountability system technical |

| Areas of Conflict Between Accountability System Reforms and the SPOG TA | | |
|---|---|---|
| **Ordinance 315215 Language (Followed by Additional System Issues)** | **Related SPOG TA Language** | **Comments** |
| | (21.6). It also states that "the parties have agreed to re-open the Agreement on some topics" [cited elsewhere in the contract].<br><br>**Appendix E.12** states that subpoena authority for OPA and OIG could be re-opened "after the City further reviews questions raised concerning the authority and potential need for OPA and the OIG [to do so]". It also cites re-opener areas related to public attendance at arbitration and changes to the composition of the PSCSC.<br><br>**Appendix H** cites re-opener related to how anonymous complaints are to be handled when providing complaint classification information. | advisors. Without further clarity or additional details, each re-opener can result in further weakening, elimination or delay of reforms in the Ordinance. For example, re-openers are included on:<br>- Whether disciplinary hearings will be open to the public;<br>- Subpoena authority;<br>- Secondary employment;<br>- The composition of the PSCSC; and<br>- Protecting the confidentiality of complainants.<br><br>Also, the Ordinance refers to steps to be taken to develop a community complaint process, but the TA does not provide for a re-opener related to establishing this. |

---

* At the start of Appendix E.12, the TA states "The parties have also reached the following understandings on specific sections of the Ordinance. For ease of reference, the relevant language from the section is included . . . followed by the agreement of the parties in italics." It states that the parties have reached "understandings" on specific sections of the Ordinance and then the parties go on to "interpret" the Accountability Ordinance. Aside from the problems inherent in those "interpretations", in a few instances those "understandings" are not, in fact, detailed. These understandings may undermine or conflict with reforms, or make uncertain that reforms will be implemented, but without the language, the intent cannot be ascertained. (TA, Appendix E.12)



**EXAMPLES OF WAYS THE PROPOSED SEATTLE POLICE OFFICERS' GUILD (SPOG) CONTRACT AFFECTS POLICE ACCOUNTABILITY REFORMS**

Prepared by the Community Police Commission

Examples of ways the proposed police officers' contract affects the police accountability system

*The reforms incorporated into the Accountability Legislation adopted in 2017 to strengthen the accountability system were based on review of cases by independent experts, and the experiences of the public, where weaknesses in the system had been identified that undermined accountability. The Community Police Commission's concern is that the community advocated for those reforms in the Legislation, and understood that City leaders would prioritize this package in collective bargaining. If the terms of the collective bargaining agreement with the Guild mean those reforms will not be implemented or a weaker alternative will be substituted, it is important that there be a full and accurate explanation of what changes are being proposed and why, and what the impact will be. If it is not possible to have clarity about what rules are in effect, that is a problem per se for transparency and can compromise efforts to impose discipline in appropriate cases.*

*There are dozens of ways the proposed contract would in some way weaken the accountability system, many of which are difficult to explain succinctly and in non-technical terms. The following are just a few of the many examples we've identified. In addition, there are terms in the appendices to the agreement where the parties "reinterpret" the Accountability Legislation or agree it will not be implemented as written; terms where certain elements of the legislation are included but others not, so one can't tell whether that is an intentional alteration; terms where the drafting makes the impact unclear; and terms the parties agree to re-interpret, but then that language is not included. There is also no reference to accountability or to protecting the public interest anywhere in the stated purpose, so one can't use that as a foundation from which to understand intent.*

| What the Accountability Legislation Promised | Some of What the Proposed SPOG Contract Does |
|---|---|
| The legislation explicitly stated that the City's goal was to make sure the collective bargaining agreements with SPOG and with SPMA (the union for Lieutenants & Captains) allowed the new  accountability law to be fully implemented: "For these reasons, the City shall take whatever steps are necessary to fulfill all legal prerequisites within 30 days of Mayoral signature of this ordinance, or as soon as practicable thereafter, including negotiating with its police unions to update all affected collective bargaining agreements so that the agreements each conform to and are fully consistent with the provisions and obligations of this ordinance, in a manner that allows for the earliest possible implementation to fulfill the purposes of this Chapter 3.29." **(Accountability Legislation - 3.29.510)** | Rather than ensuring that the contracts were brought into conformance with the new law, the proposed language in the contract weakens, takes away, or makes a reform less clear than what is in the law, or omits language in the ordinance in an area covered by the contract, and then states that if there is any conflict between the law and the contract (and even the appendices to the contract), the contract will prevail. This means that even if City does not formally amend the law, and the public expectation is that the law must be complied with, it will be the contract that must be complied with. **(Proposed SPOG Contract - Article 18.2 and Appendix E.3)** <br><br> Note, by contrast, the SMPA contract says: "The results of the bargaining on the Accountability Ordinance are incorporated into Article 16 of the CBA between the parties. In accordance with this, the City may implement the Accountability Ordinance." |
| The standard for all misconduct findings, including those involving dishonesty, is "a preponderance," meaning an allegation can be sustained if the evidence shows it's more likely than not the alleged offense happened. Termination for an initial instance of dishonesty used to require a higher standard of "clear and convincing," but that was reformed in the | While the contract does set a preponderance as the standard for all misconduct findings, that step is undermined by the introduction of new language that there will be an "elevated standard of review" for any termination to be sustained on appeal if the offense could be stigmatizing to an officer seeking other employment.  This could be virtually any offense, and |

| | |
|---|---|
| legislation, by order of the Court, so that the standard for all discipline is the same. **(Accountability Legislation – 3.29.135 & the Federal court affirmed and so ordered in response to a City filing as part of the consent decree.)**<br><br>Another reform goal was to not have to prove an officer was being \*intentionally\* dishonest (which is nearly impossible).<br><br>Also, according to SPD policy, officers are required to be truthful and provide complete information in all communications. **(SPD Policy 5.001)** | effectively nullifies the preponderance standard for discipline by the Chief. The legislation had also removed arbitration as the way appeals are handled and provided for a clear standard of review by the independent body hearing appeals, so the introduction of a arbitrator's standard of review is connected to the re-introduction of arbitration as a dual appellate path, contrary to the legislation.<br><br>The proposed contract also leaves in the old contract language requiring proof of intentionality for dishonesty, and the old contract language that limits when the officer must provide complete and honest information to times when officers are answering questions in administrative investigations. This contradicts the departmental policy with which all employees must comply, that officers are always required to be truthful and provide complete information - whether in reports, in testimony, when making a stop, etc. This has very wide implications given the tens of thousands of people detained and arrested with supporting police reports each year.<br>**(Proposed SPOG Contract - 3.1)** |
| In the past, if a complaint was not filed within three years of the incident occurring, when video evidence later turned up, or a complainant who was frightened later came forward, or for any other reason the alleged misconduct came to light, no discipline could be imposed, regardless of how serious the misconduct was, unless it was criminal, could be proven the officer concealed it, or was due to litigation. The legislation reformed this by also removing any time limitation for dishonesty and Type III excessive force, and extending the time allowed for discipline to be imposed (the "statute of limitations") for all other types of misconduct to five years after the incident.<br>**(Accountability Legislation – 3.29.420)** | Dishonesty and Type III Use of Force are no longer included as exceptions for which discipline can be imposed whenever the misconduct comes to light (no statute of limitations). The only exceptions remain what was in the contract before - criminal allegations, where the misconduct was concealed, or 30 days following an adverse disposition in civil litigation alleging intentional misconduct by an officer.<br>**(Proposed SPOG -Contract 3.6.G)**<br><br>(*And note that the contract does not say adverse to whom.*) |
| An important provision in the legislation stated that: "*OPA shall be physically housed outside any SPD facility* and be operationally independent of SPD in all respects. OPA's location and communications shall reflect its independence and impartiality, except that OPA shall be organizationally in SPD in order to ensure complete and immediate access to all SPD-controlled data, evidence, and personnel necessary for thorough and timely investigations and complaint handling."<br>**(Accountability Legislation – 3.29.105.A) (emphasis added)** | The proposed contract requires that OPA interviews of SPOG members "shall take place at a Seattle Police facility, except when impractical."<br>**(Proposed SPOG Contract 3.12.C.3)**<br><br>The result is that, if the plain language of the contract is applied, OPA must interview officers away from their offices, which is ineffective and compromises the independence of the office. We've been told that SPOG has privately agreed that officers interviews will continue to be at OPA, but this, if true, both compromises transparency (actual practice contravenes the formally agreed rules of the road), and is a potential |

| | |
|---|---|
| | "ace in the hole" on appeal, if an arbitrator finds that an officer's rights under the contract were violated when he or she was interviewed at OPA despite negotiated language to the contrary. |
| Under the old contract, if an OPA investigation was not completed within 180 days, discipline could not be imposed. In the legislation, the improvement made was that the 180-day limit is kept as a performance measure that OPA must report on each year to show that it is meeting that deadline, but discipline is no longer foreclosed if it takes OPA longer than 180 days to complete the investigation. This helps keep investigations timely without resulting in the public losing the ability to hold officers accountable for misconduct.  Also, how the 180 days is counted, when it starts and stops, and when it must be extended, were clearly laid out in the legislation, to eliminate the frequent challenges and disputes about whether the 180-day timeline was met, as well as the need for OPA to ask the Guild's permission when an extension is warranted. **(Accountability Legislation – 3.29.130)** | Once again, no discipline can be imposed if the investigation takes more than 180 days. In addition, the way in which the 180 days is calculated is less clear; the 180-day clock again includes steps outside of OPA's control (the notice that must be sent to the employee within the 180 days is sent by the department), and OPA again has to ask the Guild for permission for extensions, which the Guild may refuse in light of their duty to represent their members (such refusal would probably be "reasonable" under the contract because it is to the benefit of the SPOG member being represented by the Guild). **(Proposed SPOG Contract - 3.6.B)** |
| The legislation also addressed the problem of the 180 days continuing to run even when the OPA administrative investigation has to be put on hold because of a related criminal investigation. If the criminal investigation takes months, that does not leave OPA much time to do its investigation. Under the legislation, if the 180-day requirement were retained, the 180-day time would be paused while the criminal investigation is ongoing. This was to help ensure both investigations have sufficient time to be done thoroughly. Cases involving possible criminal misconduct are often the most serious, so cutting short the investigative time OPA has does not serve the public well. **(Accountability Legislation – 3.29.130)** | There is no tolling (pausing) of the 180 day clock for OPA while a criminal investigation is underway.  If the OPA administrative investigation has to be put on hold so as not to compromise a  criminal investigation, OPA's 180-day clock continues to run; it is only paused during the time the case is being reviewed by the prosecutor. The result is that OPA may have insufficient time to investigate, whether or not charges are ever filed, in some of the most serious cases of potential misconduct. **(Proposed SPOG Contract - 3.7)**<br><br>Compounding this concern is that the Proposed SPOG Contract does not go as far as the legislation in authorizing the OPA director to coordinate OPA investigations with criminal investigations external criminal investigators and prosecutors on a case-by-case basis. **(Accountability Legislation – 3.29.100.G; Proposed SPOG Contract – Article 3.7, App'x E.12)** This is identified as a reservation by OPA Director Andrew Myerberg in his letter to the City Council. Without limitation, the Proposed SPOG Contract gives SPD discretion to decide when an OPA investigation can proceed in parallel with a criminal investigation, which among other things may decrease the amount of time for an OPA investigation and decrease the ability of the OPA director to independently determine the course of the OPA investigation. Moreover, attempts by the OPA director to actively coordinate or investigate in parallel |

| | |
|---|---|
| | may be considered improper "influence" under the Proposed SPOG Contract. |
| The officer or the Guild must fully disclose any relevant information of which they are aware during the OPA investigation. If they don't, they can't raise it later at the discipline Due Process Hearing or on appeal. This reform was to make sure OPA can conduct as thorough an investigation as possible, without information being withheld and then later raised at the hearing, grievance, or appeal as a rationale for arguing the Chief did not have "just cause" for her decision. **(Accountability Legislation - 3.29.130)** | There is no express provision prohibiting information from being disclosed for the first time at the discipline hearing or on appeal. **(Proposed SPOG Contract -Appendix E.12)** |
| OPA has always had a civilian director, but all the investigators, intake staff and supervisors were sworn. The legislation adopted the reform that the supervisors would be civilian, and investigators and intake staff would be a mix of civilian and sworn, as determined by the director, based on the best mix of skills and background needed to serve the public well. **(Accountability Legislation – 3.29.140)** | The proposed contract limits OPA's civilian investigators to two, limits how they get assigned, prohibits them from investigating allegations that might result in termination (or requires them to be paired with a sworn investigator to do – the language used in the contract is unclear.) So for the most serious allegations, this doesn't make OPA any more accessible for complainants who were not trusting of having sworn investigators, which was one of the goals of civilianization nor does it help with the challenges inherent in a sworn investigator having to recommend a colleague or superior be fired for misconduct. The contract also prohibits civilians from being dispatched to, or assigned as a primary unit to, investigate any criminal activity. This language may interfere with civilian personnel in OPA being involved at FIT call-outs and with Type III Use of Force. **(Proposed SPOG Contract - Appendix D & 7.10)** |
| Because there are some allegations where it does not serve the public well to have the employee continue on active duty and/or continue to get paid while the criminal and/or administrative investigations proceed, the reform adopted in the legislation provided the Chief greater authority to put an officer on leave without pay, if the officer has been charged with a felony or gross misdemeanor; if the allegations could lead to the officer being fired if they're found to be true; or if the Chief finds it necessary for the officer's or public safety, or security or confidentiality of law enforcement information. The officer will get back pay if reinstated, less any amounts representing a sustained penalty of suspension. **(Accountability Legislation - 3.29.420)** | The contract maintains limits on the Chief's authority. An officer can't be suspended longer than 30 days pending investigation unless they've been charged with a felony or gross misdemeanor, and that only if that gross misdemeanor involved moral turpitude or a sex or bias crime; or if the allegation could lead to termination if proven true. The Chief does not have the authority the legislation provided to suspend beyond 30 days if the Chief finds it necessary for the officer's or public safety, or security or confidentiality of law enforcement information. Given the length of time prior to filing of charges, this could well mean needing to return an officer to active duty who will later be charged with a serious crime, which damages public trust, especially in highly visible cases. **(Proposed SPOG - Contract 3.3)** |
| The old contract allowed officers to use vacation time or any other accrued time to be compensated when they had been disciplined with an unpaid suspension, for any suspension of less than 8 days. The legislation reformed this to prohibit the use of accrued paid leave | The proposed contract allows officers to use vacation time or any other accrued time balance to get paid during an unpaid suspension, as long as the suspension is less than eight days (which suspensions frequently are). **(Proposed SPOG - Contract 3.4)** |

| | |
|---|---|
| regardless of the length of the suspension. This addressed the widespread public perception of officers being paid to sit at home as their 'accountability' for misconduct.<br>**(Accountability Legislation – 3.29.420 A.8)** | |
| The legislation addressed the problem of destruction of personnel and OPA records by requiring that all of an officer's personnel and OPA files must be kept on record as long as the officer is still employed with the City, plus six years or as long as an action related to that employee is ongoing.<br><br>The Ordinance also clearly defined what personnel records are, and for the sake of transparency, proving progressive discipline, and public records obligations, ensured the parties couldn't negotiate later removal of records of discipline imposed: "SPD personnel files shall contain all associated records, including Equal Employment Opportunity complaints, and disciplinary records, litigation records, and decertification records; and OPA complaint files shall contain all associated records, including investigation records, Supervisor Action referrals and outcomes, Rapid Adjudication records, and referrals and outcomes of mediations. Records of written reprimands or other disciplinary actions shall not be removed from employee personnel files."<br>**(Accountability Legislation – 3.29.440)** | OPA files on an officer will only be retained based on their outcome. If an investigation finding is "sustained," the record will be kept as long as the Accountability Ordinance says it should. But, if the finding is "not sustained," it will only be kept for three years.<br><br>The proposed contract also removes the specific requirements in the Ordinance for what must be retained and the prohibition on negotiating the later removal of records of sustained findings and discipline, which can impede the department's ability to prove appropriate progressive discipline and fair/uniform application, as well as frustrate public disclosure obligations.<br>**(Proposed SPOG contract - 3.6.L)** |
| The legislation reformed the disciplinary appeals process in several ways, to make the system fair, timely, transparent, efficient and uniform. For example, eliminating other employees being involved in deciding appeals of discipline, and arbitrators who both the City and Guild must agree on, and instead having only the Public Safety Civil Service Commission (PSCSC) working with a professional, neutral Hearing Examiner decide appeals; having a standard of review that gives deference to the factual findings of the Hearing Officer, and requires the recommended decision and the final decision affirm the disciplinary decision unless the PSCSC specifically finds that the disciplinary decision was not in good faith for cause, in which case they may reverse or modify the discipline only to the minimum extent necessary to achieve this standard; having strict timelines for each phase from how much time the officer has to request a hearing to how quickly the ruling must be issued, so that appeals don't drag on for months or years; not allowing grievance procedures to result in any alteration of the discipline imposed by the Chief; and requiring all disciplinary hearings to be open | Other than maintaining some of the timelines, none of the other reforms to the disciplinary appeals process are retained in the contract. These reforms were all recommended based on extensive reviews of problems that had come to light with the City's disciplinary appeals processes in the highly publicized wave of disciplinary reversals in cases on appeal in spring 2014. |

| | |
|---|---|
| to the public.<br>**(Accountability Legislation - 3.29.420 and 4.08.105)** | |
| The legislation stated that the accountability system should work the same way for employees of all ranks. This was to ensure that the public and employees can rely on complaint, investigation, discipline, disciplinary appeals and related processes that do not treat higher ranking personnel differently than officers and sergeants.<br>**(Accountability Legislation - 3.29.100 D.)** | There is no language in the contract that states that accountability policies and practices shall be applied uniformly regardless of rank or position, and the two contracts (SMPA for Captains & Lieutenants and SPOG for sergeants and officers) now have very different terms.<br><br>This means different standards for different ranks. OPA will either have to establish two different systems for complaints and investigations involving employees from SPOG and employees from SPMA (different 180-day deadlines, different burdens of proof, different statutes of limitations, different approaches to investigations of possible criminal misconduct, different notice requirements, etc.) even if the employees are all involved in the same incident; or OPA will instead apply the more onerous approach in the SPOG contract to all employees, giving those concessions to management employees who have not bargained for them. |
| The legislation stated that the police department will establish a civilian office to manage secondary employment (off-duty work) of employees, providing appropriate oversight as well as independence from those who benefit from receiving off-duty work assignments.<br>**(Accountability Legislation -3.29.430 (D) )**<br><br>The Interim Mayor then issued an Executive Order in the fall of 2017 and the department was to move forward by the beginning of 2018 with new secondary employment management and policies.<br>The existing system has for years suffered from real and perceived conflicts of interest, has internal problems among employees competing for business, is technologically out of date, and lacks appropriate supervisory review and management. Among many reforms, the department was to create an internal civilian-led and civilian-staffed office to handle assignments for off-duty work; eliminate the practice of having the work managed outside of the department, often by current employees acting through their private businesses created for this purpose or through contracts between the employee and a private business; make clear that all policies still apply when employees are performing secondary employment work; and establish clear and unambiguous policies, | The contract states: "Employees covered by this Agreement shall be allowed to engage in off-duty employment subject to the same terms and conditions in effect on January 1, 1992" and "the City may reopen this Agreement on the issue of Secondary Employment. In the event the City does re-open, the Guild may re-open the Agreement on any economic issue that is directly related to and impacted by the change in Secondary Employment."<br><br>This appears to step back from commitments made by the City regarding a new system providing for greater accountability in secondary employment as recommended by the OPA Auditor, City Auditor, Executive Director of the Seattle Ethics & Elections Commission, and the CPC.<br>**(Proposed SPOG Contract - 7.9 & 21.5)** |

| | |
|---|---|
| rules and procedures consistent with strong ethics and a sound organizational culture. | |
| Another improvement adopted in the legislation was to address the problem lack of transparency for the complainant, public and others if a sustained finding or discipline is changed at some point in the process after the employee's Due Process Hearing.  The ordinance already required the Chief to send a written summary to the Mayor and Council if the Chief decides not to follow one or more of the OPA Director's written recommendations on findings following an OPA investigation. The legislation strengthened this in several ways: it must be done within 30 days of the Chief's decision on the disposition of the complaint (this was to address long delays that had occurred in the past). In addition to the Mayor, the statement must be specifically sent to the Council President and the Chair of the public safety committee, the City Attorney, the OPA Director, the Inspector General, and the CPC Executive Director. It must be included in the OPA case file and communicated to the complainant. It must also be included in OPA's public summaries. Lastly, to address the problems of findings or discipline resulting from an investigation being changed later in the process as the result of an appeal or grievance, whenever that happens, the City Attorney must send the statement to those recipients, with the same information provided to the complainant and the public.<br><br>**(Accountability Legislation - 3.29.135)** | The proposed contract eliminates these transparency and timeliness improvements, most of which stemmed from the wave of controversial disciplinary reversals in spring 2014. "When the Police Chief changes a recommended finding from the OPA, the Chief will be required to state his/her reasons in writing and provide these to the OPA Director. A summary of the Chief's decisions will be provided to the Mayor and City Council."<br><br>**(Proposed SPOG -Contract 3.5.G)** |
| The legislation set forth that if officers are to be in specialty units and be entitled to the higher pay that comes with that, their performance record and OPA history must meet certain standards. It also made clear that they could be transferred out if performance standards, including OPA history, were not maintained. "SPD shall adopt consistent standards that underscore the organizational expectations for performance and accountability as part of the application process for all specialty units, in addition to any unique expertise required by these units, such as field training, special weapons and tactics, crime scene investigation, and the sexual assault unit. In order to be considered for these assignments, the employee's performance appraisal record and OPA history must meet certain standards and SPD policy must allow for removal from that assignment if certain triggering events or ongoing concerns mean the employee is no longer meeting | The proposed contract requires that a transfer based on inadequate performance may only occur if the department has documented a repetitive performance deficiency and informed the employee, and the employee has had a reasonable opportunity to address the performance deficiency, normally no less than thirty (30) and no more than ninety (90) days. This doesn't align with the goal of allowing for removal from a specialty assignment if certain triggering events, including misconduct or other conduct that warrants transfer. It also does not address the required standards for the initial appointment to a specialty unit. **(Proposed SPOG Contract - 7.4.G & 7.4.4)** |

| | |
|---|---|
| performance or accountability standards." **(Accountability Legislation - 3.29.430)** | |
| The legislation requires all other agreements between the City and the Guild must be made publicly available and incorporated in the contract, or they must be considered no longer in effect. The purpose of this improvement was to address a past problem that there have been other terms and conditions imposed by those separate agreements (often made to resolve a grievance or unfair labor practice) that also impact the public, but they are not publicly known. **(Accountability Legislation - 3.29.460)** | The contract appendices list many agreements that haven't been made publicly available and won't be, presumably, until after the contract is approved. Only their titles are listed, not their terms, so it is impossible for the public to know in what ways they additionally affect how the accountability system works. **(Proposed SPOG Contract - Appendices E.12 & F)** |

# ATTACHMENT 2
# to EXHIBIT D



VIA ELECTRONIC MAIL ONLY

October 26, 2018

M. Lorena González
600 Fourth Avenue, Floor 2
PO Box 34025
Seattle, Washington 98124-4025

RE: Proposed Tentative Collective Bargaining Agreement with Seattle Police Officers' Guild

Dear Councilmember González,

I am writing in response to your request for OPA's written analysis of the implications of the tentative collective bargaining agreement (TA) between the City and the Seattle Police Officers' Guild (SPOG).

I do not believe that implementation of this TA would prevent OPA from fulfilling its legislated purpose as set forth in the Accountability Ordinance.[1] I further do not believe that it would prevent OPA from carrying out its specific duties and responsibilities, such as holding officers accountable when appropriate; conducting objective, fair, thorough, and timely investigations; and recommending needed improvements to Department policies, tactics, and training. Indeed, when evaluated from an OPA-specific perspective, the TA provides multiple improvements from the existing contract, including:

- Civilianizing two OPA investigator positions;
- Removing the "knew or should have known" language regarding the 180-day timeline;
- Simplifying classification notifications;
- Eliminating the Discipline Review Board;
- Adding flexibility around OPA transcription due dates;
- Relaxing the initial complaint notification timing requirement; and
- Implementing a Rapid Adjudication pilot and Frontline Investigations.

Despite these positive changes, I do have reservations about some aspects of the TA that deviate from the Accountability Ordinance, including those that:

- Limit OPA's authority to coordinate criminal investigations;
- Add elements of complexity to the 180-day timeline and make it more restrictive than the language set forth in the Seattle Police Management Association contract;
- Remove the automatic tolling of the 180-day timeline when a case is criminally investigated within SPD;
- Allow for new evidence to be raised at due process hearings without a mandatory extension to the 180-day timeline; and
- Constrain OPA's ability to allocate staffing and resources as it sees fit.

---

[1] SMC 3.29.010(B) states OPA's purpose as to "…help ensure the actions of SPD employees are constitutional and in compliance with federal, state, local laws, and with City and SPD policies, and to promote respectful and effective policing, by initiating, receiving, classifying, investigating, and making findings related to complaints of misconduct."



Moreover, while it may affect OPA only tangentially, I feel that not addressing mandatory transfers to facilitate the consistent rotation of officers to new assignments was a missed opportunity to strengthen SPD's culture and effectiveness.

In my evaluation of the TA and its impact on OPA, I closely reviewed the documents generated by the Community Police Commission (CPC) and greatly appreciated the depth and perspective of their analysis. All the accountability entities have a responsibility to ensure fidelity to a system that is sound and well-functioning. In this regard, the CPC carried out its purpose thoughtfully. The CPC highlighted the TA's exclusion of some of the systemic reforms legislated by the Accountability Ordinance and noted the incongruous language around the disciplinary appeal process. While these provisions may not implicate OPA directly, I agree that they have potential downstream consequences and could, if not monitored closely, impact the system on a larger scale.

While I agree with much of the CPC's analysis, my interpretation of the potential implications of some of the provisions differs slightly. An example of this includes the language surrounding the roles and responsibilities of the civilian investigators. Furthermore, I do not agree with certain baseline provisions of the Accountability Ordinance that the CPC identified as being rolled back by the TA and, as such, I am less troubled by some of the discrepancies between the two documents. For example, the Accountability Ordinance untethered the 180-day timeline from the imposition of discipline. In my opinion, that is not procedurally just or fair to officers and could, in fact, undermine trust in the disciplinary system.

I recognize, however, that the conceptual arguments surrounding the TA cannot be divorced from the reality that officers, detectives, and sergeants have been working without a contract for the last four years. They have done so while implementing the reforms under the Consent Decree and acting as the engine to move the Department to full and effective compliance. I firmly believe they deserve a contract. I share the concerns raised by many others that Department morale is low, and if the TA is rejected, it could undermine the oversight system and further erode the trust and buy-in that OPA has been working hard to build. These concerns must be balanced against the City's prerogative to negotiate lasting reforms that will ensure accountability and equitable policing moving forward.

Labor contracts consist of a bargained-for exchange. Whether the trade-offs included in the TA – and the non-inclusion of several provisions contained in the Accountability Ordinance – are acceptable is not a question for OPA to answer; that is for City Council to decide. Similarly, I cannot speak to whether the TA is consistent with the Consent Decree, as this is a question for the parties to the Decree and, ultimately, District Judge Robart. Regardless of the Council's decision, OPA will continue to carry out its mission and effectuate its purpose under both the Accountability Ordinance and the Consent Decree.

Lastly, it is OPA's hope that the City and SPOG keep an open dialogue, not just in preparation for negotiations on the next contract, but soon after action on the TA. There are reopeners that will need to be discussed and, ideally, conversations concerning refining the language of the TA, what is and is not working, and how to advance the accountability system by adopting best practices. This will demonstrate that the City and SPOG are committed to a fair, transparent, and constantly improving system. OPA looks forward to participating in these ongoing discussions and assisting in setting the bargaining agenda for 2020.



I appreciate being afforded the opportunity to address the issues set forth in this letter. Please do not hesitate to contact me with any questions concerning the above.

Sincerely,

*Andrew Myerberg*

Andrew Myerberg
Director, Office of Police Accountability

cc:     Mayor Jenny A. Durkan
        Anthony Auriemma, Mayor's Office
        Ian Warner, Mayor's Office
        Chief Carmen Best, Seattle Police Department
        Deputy Chief Marc Garth Green, Seattle Police Department
        Fé Lopez, Director, Community Police Commission
        Lisa Judge, Inspector General for Public Safety
        Pete Holmes, City Attorney
        Council President Bruce Harrell (District 2)
        Councilmember Teresa Mosqueda (Position 8, Citywide)
        Councilmember Sally Bagshaw (District 7)
        Councilmember Mike O'Brien (District 6)
        Councilmember Kshama Sawant (District 3)
        Councilmember Lisa Herbold (District 1)
        Councilmember Rob Johnson (District 4)
        Councilmember Debora Juarez (District 5)

# ATTACHMENT 3
## to EXHIBIT D


**Seattle** Office of
Inspector General

Date:   Oct. 26, 2018

To:     Councilmember M. Lorena González, Chair, Gender Equity, Safe Communities, New
        Americans, and Education Committee
From:   Lisa Judge, Inspector General for Public Safety
Re:     Response to memo dated October 22, 2018

I appreciate the opportunity to discuss potential impacts of the tentative agreement (TA)
between the Seattle Police Officers Guild (SPOG) and the City on the operations of the Office of
Inspector General for Public Safety (OIG).  At the outset, it is of paramount importance that I
stress the objective, independent mission of OIG and the corresponding need, to the extent
possible, to maintain a neutral posture with all partners in the accountability structure.  That
said, I respect the need of the City to take into account community interests in continued
reform, respective negotiation efforts, and need for the City and Guild to reach an agreement.

I recognize that the right and obligation to engage in labor negotiation for the City is the
purview of the Executive, subject to ratification by the Legislative body.  The role of OIG
extends only to engaging in consultation as a subject matter expert at the request of, and with
consent of, the parties.  OIG was consulted regarding this TA in a limited capacity concerning
several specific provisions related to OIG authority and operation.  OIG was not involved in any
direct negotiations between the parties. To the extent OIG might have an ability to remedy any
of the areas of concern with the TA, if adopted, it is within OIG authority to audit the systems
established by the terms of the TA, and to push course correction through audit, analysis, and
recommendations.

As your memo states, OIG was created **"to help ensure the fairness and integrity of the police
system as a whole in its delivery of law enforcement services by providing civilian auditing of
the management, practices, and policies of SPD and OPA and oversee ongoing fidelity to
organizational reforms implemented pursuant to the goals of the 2012 federal Consent
Decree."** This language makes clear not only what the mandate is for OIG, but also the manner
in which OIG has authority to operate.  Accordingly, this memo details the impact of the
proposed TA on the ability of OIG to effectively audit and review SPD and OPA, and to oversee
ongoing fidelity to the reforms implemented by the consent decree.

The following is neither an endorsement nor criticism of the results of the bargaining efforts
that have thus far resulted in a contract approved by SPOG, pending consideration by the
Seattle City Council. It is, rather, an analysis of the impact of the proposed contract on OIG


**Seattle** Office of
Inspector General

operations, as well as the OIG mission to further the stated purposes and goals of the accountability ordinance. The TA legitimizes OIG authority within the labor structure, and solidifies the ability to function effectively, since the terms of the TA acknowledge OIG authority and unfettered access to SPD and OPA operations, as contemplated by the accountability ordinance.

## Main areas of TA impact on OIG operation

### 1. Access to information from SPD

OIG is the singular civilian oversight entity charged with auditing the management, practices, and policies of the Seattle Police Department (SPD) and Office of Police Accountability (OPA). Implicit in the duty to oversee ongoing fidelity to the consent decree is the vital need for full and complete information access. OIG access to SPD and OPA information is critical for effective monitoring and meaningful contribution to ongoing reform efforts.

OIG responsibilities involve auditing SPD and OPA systems and reviewing SPD incident response, including authority for on-scene access by OIG. As part of these duties, OIG also reviews OPA classifications and certifies OPA investigations as thorough, timely, and objective (3.29.260).

The TA formally acknowledges and guarantees "full and unfettered access to the operations of the department." Insofar as "operations" is construed broadly, this particular provision fully realizes and acknowledges the authority of the Inspector General (IG) to daylight the operations of SPD, with an eye toward ensuring that the department remains on the path of innovative reform. Conversely, a narrower definition of "operations" has the potential to constrain access to information needed for meaningful audit or review.

There are two additional areas for discussion regarding information access. One notable concern is the TA's potential restriction on IG participation in Force Review Board (Firearms Review Board) meetings to that of an observer (App. G). A purely observational role that does not allow robust participation of the IG significantly limits the ability of OIG to effectively review serious incidents.

The other area of potential impact is the TA restriction on subpoena power (App. E.12). While generally, the restriction on subpoena power is more likely to affect OPA and OIG in the context of obtaining information related to a misconduct investigation (such as employee bank records), subpoena power as envisioned in the ordinance was intentionally broad. So long as SPD remains a willing partner, the absence of subpoena power may not be felt as an actual negative impact, but planning for the future and the possibility of a less willing law enforcement


partner is prudent. In the event SPD ceases to be collaborative and declines to provide information upon request by the IG, a subpoena might be the only alternative recourse to obtain critical information, or to achieve code or contractual compliance.

### 2. Ability to perform misconduct investigations involving OPA personnel

**a. The 180-day calculation** – The TA allows for the time limitation "clock" to start due to actions outside the control and knowledge of OPA. It is a question for OPA as to whether there are adequate mechanisms in place to allow OPA to receive timely notice when such outside actions trigger the clock. In the event OIG undertakes an OPA conflict investigation, the same potential issue with the time calculation would apply to OIG. In addition, OIG has authority to request or direct further investigation (3.29.260.D). In those cases, OPA must resubmit the case to OIG for certification before the OPA Director may issue proposed findings. Any impacts of the TA on the 180-day investigation time limit will affect OIG ability to respond to OPA, as well as the amount of time left for OPA to issue findings.

**b. Civilian vs. sworn investigators** – The TA allows for two civilian investigators in OPA (App. D & 7.10), but App. D states that any case that reasonably could lead to termination "will have a sworn investigator assigned to the case." This appears to relegate civilian investigators to only investigations of less serious allegations. This would potentially directly conflict with the obligation of OIG to investigate serious misconduct allegations in those situations where OPA is conflicted out.

### 3. Burden of Proof

The accountability ordinance provides that the same evidentiary standard be applied uniformly to all cases. It states, "Termination is the presumed discipline for a finding of material dishonesty based on the same evidentiary standard used for any other allegation of misconduct" (3.29.135.F).

The TA on its face reduces the burden of proof for a departmental finding of dishonesty, as it strikes the existing CBA requirement that the department prove dishonesty by clear and convincing evidence (3.1). It also calls for a standard of review and burden of proof that is consistent with established principles of labor arbitration, including "an elevated standard of review (i.e. - more than preponderance of the evidence) for termination cases where the alleged offense is stigmatizing to a law enforcement officer, making it difficult for the employee to get other law enforcement employment." For purposes of this analysis, stigmatizing cases are presumed to include, but not be limited to, cases involving dishonesty.


**Seattle** Office of
Inspector General

The practical consequence of the TA language is that OIG, in conducting a misconduct investigation, would likely seek to apply a standard that is greater than a preponderance of the evidence in order to be consistent with the standard that would be applied upon review. It is unclear whether termination might be de facto stigmatizing and therefore require all cases to be held to a greater standard of review.

Whether the TA language will result in fewer sustained findings compared to current OPA practice is unknown, given the subjective nature of what constitutes a preponderance of the evidence versus "more than a preponderance." Further, when applying a "more than preponderance" standard, it is unclear how OPA, OIG, and arbitrators would each define this standard and how consistency across entities and between individual arbitrators could be achieved.

**Other TA Impacts on OIG**

1. **Retaliation claims** – The accountability ordinance authorizes OIG to open an investigation into matters involving retaliation against employees of OPA, OIG, CPC, or others who provide information to these entities, and to refer a complaint to the appropriate authority (3.29.480). The TA, however, places the obligation and authority on SPD to receive and handle Equal Employment Opportunity investigations (3.13). Of note, a February 2005 MOU requires that complaints be investigated by a sworn member of SPD.

2. **Changes in findings or discipline** – The accountability ordinance requires that the OIG be copied on changes in findings or discipline (3.29.125). The failure to include this provision will require OIG to proactively seek such information and will impede the timely receipt of information by OIG.

3. **MOUs incorporated by reference** – The TA Appendix F incorporates various other agreements by reference that have potential impacts on OIG operations. Should any of the MOUs become an impediment to "full and unfettered access to the operations of the department," OIG will keep track of such occurrences for purposes of


**Seattle** Office of
Inspector General

providing 2020 collective bargaining agenda input.[1]

4. **Unfair Labor Practice complaints** – The TA provides for dismissal of current unfair labor practice complaints (ULP) lodged against the City (App. G). Two areas that have the potential to be contentious are OIG presence at Force Review Board and at Force Investigation Team activities. Both activities have OIG duties established by the accountability ordinance (3.29.240.G), but as OIG authority has yet to be recognized in the labor scheme, each instance of such oversight activity creates the potential for a ULP complaint.

5. **Unsustained findings records retention** – The ability of OIG to retain unsustained records for analysis is helpful, but if the requirement that names not be kept is interpreted as prohibiting the retention of identifying information, then that limitation would hamper OIG ability to look at trends involving individual officer behavior over time.

**Conclusion**

On balance, the Inspector General is empowered to perform accountability duties under the terms of the TA, with potential limitations as highlighted above. OIG will have a role moving forward as the objective check on the system, to review, audit, and evaluate the systems as they play out under the TA and accountability ordinance. OIG can use that information to help the City's oversight partners advance recommendations that improve the system and serve as guidance for what is needed to sustain public confidence.

---

[1] Examples of MOU areas that could benefit from clarification with respect to OIG include the following:
- August 2008 holding cell video MOU – does not contemplate uses besides performance review or investigations, which could affect OIG access
- August 2008 Automated Vehicle Locator system MOU – directs that data will be maintained and audited by the Communications and/or IT Section, which does not recognize the auditing function of OIG
- Oct. 2012 In Car Video settlement agreement – enumerates the only reasons for which department review of ICV will be conducted, which does not include audit or review purposes by OIG
- Jan. 2013 Monitor FRB attendance MOU – identifies conditions for Monitoring team FRB attendance, including a restriction on asking questions and who can attend. The TA includes OIG attendance.
- Feb. 2013 due process hearing MOU – restricts who can attend due process hearing

**Seattle** Office of
Inspector General

cc: Council President Bruce Harrell (District 2)
Councilmember Lisa Herbold (District 1)
Councilmember Kshama Sawant (District 3)
Councilmember Rob Johnson (District 4)
Councilmember Debora Juarez (District 5)
Councilmember Mike O'Brien (District 6)
Councilmember Sally Bagshaw (District 7)
Councilmember Teresa Mosqueda (Position 8, Citywide)
Mayor Jenny A. Durkan
Ian Warner, Legal Counsel to the Mayor
Anthony Auriemma, Mayor's Office
Chief Carmen Best, Seattle Police Department
Deputy Chief Marc Garth-Green, Seattle Police Department
Interim Chief Operating Officer Mark Baird, Seattle Police Department
Assistant Chief Lesley Cordner, Seattle Police Department
Fé Lopez, Director, Community Police Commission
Andrew Myerberg, Director, Office of Police Accountability
City Attorney Pete Holmes, City Attorney's Office