# EXHIBIT F

*Seattle Police Officers Guild (on behalf of Shepherd) v. City of Seattle, SPD*

Disciplinary Review Board's Opinion and Award, SPD's Post-Hearing Brief, and SPOG's Post-Hearing Brief

**BEFORE CITY OF SEATTLE DISCIPLINARY REVIEW BOARD**

| | |
|---|---|
| In the Matter of the Dispute Between<br><br>City of Seattle<br><br>and<br><br>The Seattle Police Guild | **DISCIPLINARY REVIEW BOARD'S OPINION AND AWARD**<br><br>Appeal of Adley Shepherd |

**MEMBERS OF THE DISCIPLINARY REVIEW BOARD**

**NEUTRAL/INDEPENDENT PANEL MEMBER**
**Jane Wilkinson**
**Labor Arbitrator**
PMB 211. 3 Monroe Pkwy, Ste. P
Lake Oswego, OR 97035

**PANEL MEMBER FOR THE GUILD**
Suzanne Parton, Officer, SPD

**PANEL MEMBER FOR THE CITY**
Lesley Cordner, Ass't Chief, SPD

**PARTIES' REPRESENTATIVES:**

**Attorneys For the City:**
Coby Cohen
David Bruce
Savitt Bruce and Willey, LP
1425 Fourth Avenue, Suite 800
Seattle, WA 98101-2272

**Attorneys for the Guild:**
Hillary McClure
Alyssa Melter
Vick, Julius, McClure, P.S.
5506 Sixth Avenue S., Suite 201A
Seattle, WA 98108

Date of Award: November 19, 2018

## WITNESS LIST

**For the City:**
Pierce Murphy, former Director of SPD's Office of Professional Accountability
Mike Teeter, Captain, SPD
Bryan Grenon, Captain, SPD
Kathleen O'Toole, former SPD Chief of Police
Stephen Wilske, SPD Assistant Chief, Patrol
Gregg Caylor, SPD Captain
Steven Hirjak, SPD Captain
Carmen Best, SPD Chief of Police

**For the Guild**
Eric Zerr, SPD Sergeant
Steven Strand, SPD Lieutenant
April Howard, SPD Officer
Roger A. Rusness, SPD Sergeant
James Kim, SPD Sergeant
Richard Peterson, SPD Lead Defensive Tactics Instructor
Richard F. O'Neill, SPD Sergeant, Guild past President, now Guild Vice-President
Adley Shepherd, Appellant

## EXHIBIT LIST

**City Exhibits**
1. Agreement, City Seattle & Police Guild, eff. Through Dec. 31, 2014
2. Request from Police Guild for DRB for Officer Shepherd to appeal decision, November 18, 2016
3. Letter to Mayor McGinn from Dept of Justice re investigation, December 16, 2011
4. Settlement Agreement and Stipulated [Proposed] Order of Resolution (Consent Decree) filed July 27, 2012
5. SPD Manual, 8.000, Use-of-Force Core Principles, Eff. January 1, 2014
6. SPD Manual, 8.100, Using Force, Eff. January 1, 2014
7. SPD Memo from Director Pierce Murphy, Office of Professional Accountability to FIT Capt. Mike Teeter, June 23, 2016 – request for criminal investigation and review
8. SPD Memo to Director Pierce Murphy, Office of Professional Accountability from FIT Capt. Mike Teeter, re SPD incident, June 24, 2014
9. Command staff email string on referral for criminal investigation, June 25 and 26, 2014
10. Email memo to/from Chief Kathleen O'Toole, re SPD officer under investigation, June 26, 2014
11. WSP Report, December 4, 2014
12. SPD email from Kevin Grossman to Barbara Wilson and Tyrone Davis, suspending OPA investigation pending criminal investigation, December 10, 2014.
13. Letter from Dept. of Justice to Sr. Police Counsel, April 21, 2015
14. DOJ letter to Chief Kathleen O'Toole declining to prosecute Adley Shepherd for civil rights, undated
15. SPD Statement from Cyber crimes support unit re search for videos or witness statements, December 10, 2014
16. Photo of Officer Shepherd, circa June 24, 2014
17. Photo of Officer Shepherd, circa June 24, 2014
18. Photo of Officer Shepherd, circa June 24, 2014
19. Photo of Officer Shepherd, circa June 24, 2014
20. Photo of Officer Shepherd, circa June 24, 2014
21. Photo of Officer Shepherd, circa June 24, 2014
22. Photos of a Seattle Police car, various angles, undated
23. In-car video, dated stamped June 22, 2014
24. In-car video, dated stamped June 21, 2014
25. In-car video, dated stamped June 21, 2014
26. Memo to Capt. Teeter from Lt. Magee, Education & Training, November 19, 2015
27. Fax from Harborview Medical Center, Emergency Dept. Records, June 25, 2014
28. Photo of altercation, June 21, 2014
29. Not admitted
30. SPD Investigation Report, November 19, 2015
31. SPD Force Investigations Lieutenant Review, November 19, 2015
32. SPD Force Investigations Captain Review, June 22, 2014
33. SPD Forensics Video Analysis, December 7, 2015
34. OPA Fact Summary, December 16, 2015

35. SPD Memo to Director Pierce Murphy, Office of Professional Accountability from OPA Auditor Anne Levinson, re OPA investigation review, December 23, 2015
36. Memo Office of Professional Accountability, to Capt. Mike Washburn from Capt. Dick Reed, re Director's Certification Memo, December 24, 2015
37. Memo to File from OPA Director Pierce Murphy, re Amended Certification and Recommended Filings, January 5, 2016
38. Email from OPA Director Pierce Murphy to Kathleen O'Toole re Additional Investigation, January 26, 2016
39. Memo from Chief Kathleen O'Toole to Adley Shepherd, re Reply to Your Concerns, February 2, 2016
40. Memo from Chief Kathleen O'Toole to Amy Lowen, Rebecca Boatright, re Additional Investigation, February 1, 2016
41. Disciplinary Action Report, March 29, 2012
42. DRB Award, Discipline of Adley Shepherd, March 17, 2012
43. SPD Memo to Chain of Command from HR Director, January 7, 2016
44. Memo from Ron Smith to Amy Lowen, re Loudermill materials, March 18, 2016
45. Letter to Chief Kathleen O'Toole from Pierce Murphy, OPA Director, re OPA recommendations, June 9, 2016
46. File memorandum from Pierce Murphy, Re: Consultation with Use of Force Expert, June 27, 2017 (erroneously dated, should be 2016)
47. DAR for Adley Shepherd, November 19, 2016
48. SPD Directive re New Use of Force Policy, December 31, 2013
49. SPD Quiz re use of force, undated
50. SPD Quiz, Adley Shepherd results, undated
51. Same as Exh. C-50
52. Chief Harry Bailey video on new use of force policy
53. E-learning slides on authorized use of force, undated
54. City of Seattle External Training Details, June 16, 2018
55. Use of Force: Core Principles, PowerPoint, undated
56. SPD Training Attendance handwritten roster, re use of force principles, May 6, 2014
57. SPD Training Attendance typewritten roster, re use of force principles, May 6, 2014
58. SPD Use of Force Decision Making PowerPoint, undated
59. Transcript of Adley Shepherd's external training, January 8, 2016
60. FIT interview transcript, Adley Shepherd, November 15, 2015
61 FIT interview transcript, Adley Shepherd, November 17, 2015
62. OPA interview transcript, Adley Shepherd, November 24, 2015
63. WSP Witness Statement of Evelyn Shelby, July 4, 2014
64. WSP Witness Statement of firefighter Roderick Porter, July 18, 2014
65. Memo from Lt.. Steven Strand to Michael Marken, WSP re clarification of interview, July 26, 2014
66. WSP Witness Statement of Steven Strand, July 8, 2014
67. WSP Witness Statement of Michael Griffin, July 14, 2014
68. SPD, Use of Force Witness Officer Statement of Michael Griffin, June 23, 2014
69. WSP Witness Statement of Rory Smith, July 10, 2014
70. SPD, Use of Force Witness Officer Statement of Rory Smith, June 22, 2014
71. SPD Statement Form of Robert Shelby, June 22, 2014
72. Dept. of Licensing photo of Shepherd, June 30, 2014
73. SPD Statement Form of Miyekko Durden-Bosley, June 22, 2014
74. WSP tape-recorded Witness Statement of Miyekko Durden-Bosley, June 27, 2014
75 Deposition of Officer Shepherd, Durden-Bosley vs. Shepherd and City of Seattle, February 29, 2016
76. (Digital) Compilation of Office of Professional Accountability investigative documents, 32 file folders, numerous sub-files, various dates
77. Memo from Brian Maxey, Sr. Policy Counsel to Pierce Murphy & Michael Teeter, April 22, 2015
78. Memorandum from Michael Teeter to Adley Shepherd, Re: Missing Statement, February 17, 2016
79. Use of Force Decision Making 2012 (undated)
80. 2014 Use of Force Concepts, Core Principles (part of training lesson plan)
81. In-car video, dated stamped, June 22, 2014
82. SPD Ed. & Training, Street Skills 2012, PowerPoint, undated
83. Street Skills 2012 (handcuff training)
84. SPD Street Skills 2011 Lesson Plan PowerPoint, undated
85. Street Skills 2010 Training Outline, undated
86. SPD Special Orders, Training Section, Mandatory e-learning sessions, April 8, 2014
87. Mandatory Less Lethal, Use of Force Core Principals and First Aid Training, Nay 14, 2014
88. SPD Use of Force Witness Officer Statement of Roger Rusness, June 22, 2014
89. City of Seattle, Workers' Compensation Unit, Insurer Activity Prescription Form for Shepherd, June 22, 2014
90. Harborview Medical Center, preliminary neuroradiology report on Adley Shepherd, June 22, 2014

91. Harborview Medical Center, letter to Washington State Patrol, August 25, 2014
92. In-car video, dated stamped, April 27, 2016
93. In-car video, undated
94. DRB award, discipline of Michael Faust, October, 15, 2014

**Guild Exhibits**

1. Memo from Bryan Grenon to SPD Staff, September 18, 20142. SPD Blotter on termination, November 9, 2016
3. Seattle PI article re gang problem, October 11, 2011
4. Memo from Sarah Scott to Hilary McClure re receipt of complaint, April 19, 2017
5. SPD Use of Force Policy, March 26, 2010
6. SPD DAR re 10-day suspension of David Bauer, July 28, 2016
7. withdrawn
8. SPD DAR re one-day suspension of Clark Dickson
9. SPD Memo from Renni Bispham, Legal Advisor to Chain of Command, re Proposed Discipline, April 3, 2013
10. No exhibit
11. SPD DAR re 10-day suspension of Matthew Good, April 3, 2018
12. SPD DAR re five-day suspension without pay of Christopher Hairston, April 2, 2014
13. Memo Office of Professional Accountability re OPA case completion, February 23, 2017
14. Office of Professional Accountability Closed Case Summary, March 27, 2017

## I. INTRODUCTION

This dispute, between City of Seattle (the City), specifically its police department (SPD) and the Seattle Police Officers' Guild (the Guild) concerns the dismissal appeal of Adley Shepherd that the Guild timely submitted to the City pursuant to the parties' then-effective Collective Bargaining Agreement, which had an expiration date of December 31, 2014. The appeal alleges that the City's discharge of Adley Shepherd violated the just cause clause of that Agreement. The parties were unable to resolve the dispute pursuant to the dispute resolution provisions of their Labor Agreement. Accordingly, they submitted the dispute to a jointly constituted Disciplinary Review Board (DRB or Board) that is part of their collective bargaining agreement. At hearings held on June 25 through 29, 2018, in Seattle, Washington, the parties had the opportunity to make opening statements, submit documentary evidence, examine and cross-examine sworn witnesses and argue the issues in dispute. The parties stipulated that the dispute was properly before the undersigned Board Members who have the authority to issue a final and binding decision as to the issues submitted herein. The parties also stipulated that the Board would retain jurisdiction, for 90 days, over the remedial aspect of the dispute should a remedy be awarded in favor of the Guild. The proceedings were transcribed by court reporter Barbara Castrow. Upon the receipt of both parties' closing briefs to the Board Members on August 31, 2018, the hearing closed and the case stood fully submitted for decision.[1]

## II. SUMMARY OF THE EVIDENCE

Officer Adley Shepherd was discharged for using excessive force on a woman resisting arrest at about 2:30 a.m. on June 22, 2014. This occurred after he responded, along with two other officers (Officers Mike Griffin and Rory Smith) to a report of possible domestic violence. The underlying facts are essentially undisputed. These are shown on three patrol car in-car

[1] The parties waived the 30-day decision deadline specified in their labor agreement to give the neutral Board member time to prepare a draft decision and confer with her fellow DRB members on the outcome. The three DRB members met and conferred on this case on October 11, 2018, and several times thereafter by e-mail.

video systems with both forward and rear facing cameras, but the inferences to be drawn from those facts are in dispute. The following sets forth the undisputed sequence of events.

On the afore-mentioned date, Evelyn Shelby called 911 and reported a potential domestic violence incident at her home. The call concerned alleged threats made by Miyekko "Coco" Durden-Bosley against her son Robert Shelby. The two were parents to a small daughter but it is not clear whether they were still romantically involved. In any event, they did not live together. Ms. Durden-Bosley apparently lived with her daughter in her mother's home, within walking distance of the Shelby home.

At 2:15 a.m., Officer Shepherd was the first officer to arrive at the Shelby residence. He was followed by Officers Griffin and Smith. As stated, almost everything that subsequently transpired that night was captured by in-car video or on-person audio recording.[2]

When Officer Shepherd arrived, he encountered Robert Shelby on the sidewalk outside the residence and he tried to interview him. Mr. Shelby was angry about his mother calling the police. Officer Shepherd asked Mr. Shelby whether threats had been made, and the latter responded, "I hope not. I don't know what she'd do. I don't know what the fuck she's going to do," but that he thought his mother was safe. Exh. C-33, page 18. The interview was interrupted by two cell phone calls that Ms. Durden-Bosley made to Mr. Shelby. At hearing, Officer Shepherd said that Mr. Shelby "did seem alarmed." Tr. 935. Officer Shepherd explained that at this point, he was simply trying to gather as much information as he could.

Officer Shepherd next went inside to speak with Evelyn Shelby, who reported that her son had told her that Ms. Durden-Bosley had threatened to come over and fight her son. She

---

2 The fact summary above is taken primarily from Exh. C-33, which the City's forensic expert put together after reviewing in-car videos and audio recordings. This document contains a second-by-second narrative and transcript of what transpired. It arranges this evidence into a coherent whole. To assist the reviewer, the primary PDF-formatted document contains a number of digitally embedded documents and video clips. This technique of embedding digitally makes precise page citations to quotations taken from those embedded documents difficult. Therefore, material in quote marks taken from the main document itself is cited as Exh. C-33, page ___. Embedded material in quotation marks is cited to the page where the link is found: Exh. C-33, embedded at page ___.

The above fact summary secondarily draws from the transcript of hearing where the attribution can be made to a page number.

indicated that there had been a prior history of domestic violence between the two and that she was frightened. Officers Griffin and Smith remained outside.

While Officer Shepherd was speaking to Evelyn Shelby, an intoxicated Ms. Durden-Bosley arrived on foot. She walked along the sidewalk past Mr. Shelby and then turned around. Mr. Shelby tried to avoid her. Officer Griffin asked her questions but she refused to answer. Officer Shepherd went outside to talk to her. He asked her questions to get more information and while doing so, he remarked on her obvious inebriation. She then became agitated and verbally confrontational. Officer Shepherd touched her right elbow to steer her towards his patrol vehicle and away from Mr. Shelby. She pulled away, objecting to being touched and denied threatening anyone. Her agitation grew and Mr. Shelby told her to answer the questions. After Officer Shepherd told Ms. Durden-Bosley that she had frightened Evelyn Shelby, Mr. Shelby interjected, "Nobody fucking threatened me, bro." Exh. C-33, embedded page 21. Shortly after that, Ms. Durden-Bosley shouted at Evelyn Shelby, "Ms. Shelby, why are you scared?" *Id*. This drew Robert Shelby's ire and he said to Ms. Durden-Bosley, "Don't fucking ___ at my mom like that, bro. You already called her a fucking bitch, dawg." Exh. C-33, page 21. He then told her to "just handle shit cordially for once, man." Exh. C-33, embedded page 21. At the same time, Mr. Shelby became antagonistic towards his mother for calling the police. During these interchanges Officer Shepherd told the hyper-agitated Ms. Durden-Bosley at least three times she was "out of control." *Id.* He also tried to persuade Robert Shelby to stop yelling; while doing so, Ms. Durden-Bosley interjected with personally insulting remarks to or about Shepherd.

Finally, Officer Shepherd exclaimed, "My patience is done. It's done. It's, it's over. So, somebody's going to go to jail. Who's it going to be?" Exh. C-33, page 22. Ms. Durden-Bosley responded by exclaiming that no one touched anyone, but Officer Shepherd told her she had threatened someone. After more interchange, Officer Shepherd told Ms. Durden-Bosley that she was under arrest. At hearing, he said he was trying to get information but temperaments were escalating. With the assistance of Officer Griffin, Officer Shepherd put Ms. Durden-Bosley into

handcuffs and they escorted her towards the patrol car. Mr. Shelby again interjected himself, objecting strongly to Ms. Durden-Bosley's arrest, though he remained at an appropriate distance. For the next minute or probably less, Ms. Durden-Bosley vehemently, vociferously and repeatedly denied making a threat. She was generally uncooperative. Officer Griffin continued to be present and made some remarks.

Officer Shepherd testified that he was having issues controlling Ms. Durden-Bosley; he explained that she was "wiry and strong," and very "flexible." Tr. 954. She resisted getting into the patrol car. Officer Shepherd testified that she had moved her cuffed hands and wrists to her left hip area (which should have caused her pain, Officer Shepherd said, but nevertheless she managed to do this). He realized he was "over extended," meaning slightly off-balance; he paused and stepped back momentarily. Tr. 956. He noted that Officer Griffin had opened the front passenger door, possibly to put Ms. Durden-Bosley's bag in. He said he tried to guide her into the car through the left rear door. He explained that he likes to have the prisoner's back facing him to maintain control and allow him to control the wrists (which are in handcuffs). At this point he thought Officer Griffin was moving to the rear door on the other side of the car to assist, but he stopped at the rear of the car. Officer Shepherd said he used body pressure to get her into the car, but suddenly she spun around, fell or sat backwards onto her back on to the seat, brought up her right leg and kicked at Officer Shepherd while yelling, "Fucking bitch!" Exh. C-33, page 24. It was uncontroverted that Ms. Durden-Bosley's kick landed in Officer Shepherd's face and she was wearing Doc Marten brand boots.[3] He said he felt a shooting pain in his jaw and a piercing noise in his ears; it lasted six or seven seconds. I was injured and thought "I can't take another one of these." Tr. 961. In the video, Officer Shepherd twice said "she kicked me," Exh. C-33, embedded page 23, appeared to step back, perhaps to regain balance, and Ms. Durden-Bosley appeared to be sitting back up or trying to sit back up. According to the forensics

---

[3] She also kicked him in the thigh.

analysis, she moved toward the open door. "From a second camera view, her right foot is seen moving toward the ground outside of the car as she moves to the open door." Exh. C-33, page 6. Her hands remained cuffed behind her. In a rapid sequence, Officer Shepherd moved toward her from his position just outside the patrol car's open door and struck her in her right eye with his right fist. The viewer can see his head and right arm and fist entering the vehicle on the dash-cam video. He followed this punch by "applying downward force with his right hand and arm against her right cheek and shoulder area," *Id*., thus pinning her down in the back of the car in order to subdue her.

Officer Shepherd explained at hearing that with the acceleration from his punch, he was able to fall on top of her and subdue her. Ms. Durden-Bosley started to calm down at this point. He testified that it all happened very fast and he thought he needed to use force (a punch) to subdue her. He explained that he was taught to "hit what you get," Tr. 961, meaning he didn't necessary aim toward her eye, but that's what he happened to connect with. He strongly denied punching her because he was angry. After subduing Ms. Durden-Bosley, Officer Shepherd said he asked Officer Griffin to take control of Ms. Durden-Bosley because he was still in pain.

Meanwhile, according to another in-car video, Robert Shelby was pacing in the street near another patrol car and displayed a great deal of agitation. Officer Smith engaged in a conversation to calm him down. He appeared to have been successful.

From the in-car videos and forensic analysis, it appears that approximately two seconds elapsed between the time Ms. Durden-Bosley kicked Officer Shepherd in his face and the time he punched her in the eye.[4]

[4] According to Exh. C-33, the forensics analysis, Ms. Durden-Bosley kicked Officer Shepherd at 2:28:20 a.m.. *Id*., page 23. Ms. Durden-Bosley appeared to sit up or move forward at 2:28:21 a.m. *Id.* That exhibit shows a video frame of Officer Shepherd punching Ms. Durden-Bosley at 2:28:22 a.m., which is two seconds later. *Id*. This analysis does not appear to measure fractions of a second.

Both Officer Shepherd and Ms. Durden-Bosley were transported to Harborview hospital where they were treated. Ms. Durden-Bosley was released to police custody but was never charged for her felonious assault on an officer.

Ms. Durden-Bosley suffered a serious, but not permanent injury to her right eye, described in the medical report as:

> very small, minimally displaced orbital floor fracture (right) along the infraorbital canal and similarly minimally displaced medial wall fracture right eye.

Exh. C-30. See also Exh. C-11. In a photo taken soon after the incident, Ms. Durden-Bosley's eye appeared bloody, bruised and swollen.

Ms. Durden-Bosley's kick to Officer Shepherd's face caused him shooting pain and numbness. Officer April Howard, who visited Officer Shepherd in the hospital, testified that he was unusually quiet, that he appeared very tired and "somewhat out of it." Tr. 673. At the hospital, he was diagnosed with moderate, acute Temporomandibular Disorder (TMD) due to trauma. He called in sick the next day, but returned to work the day after that.

Following this incident, the SPD determined that Officer Shepherd had used "Type III" force that should be investigated under its relatively recently revised use of force policy. The SPD's use of force policies, procedures and training changed after a U.S. Department of Justice (DOJ) investigation and a consequent Consent Decree (July 12, 2012) between the DOJ and the City of Seattle. The implementation of the Consent Decree was and is being monitored under the supervision of a U.S. District Court judge. The City's revised use of force policies, approved by the court monitor, were rolled out at the beginning of 2014, fewer than six months prior to the incident in question. Classroom, e-training and scenario-based training ensued. Officer Shepherd completed a number of training courses prior to June 22, 2014, but had not completed all of the required training courses under the new policies. The parties submitted a written stipulation on August 31, 2018, setting forth agreed-upon facts regarding the training Officer Shepherd had received.

The ensuing investigation of Officer Shepherd's conduct included a Force Investigative Team (FIT) investigation and report, an Office of Professional Accountability (OPA) investigation and report, a Washington State Patrol[5] and FBI investigation regarding criminal misconduct (no criminal charges were filed), an EEO investigation of possible SPD racial bias (none was found), and two Loudermill hearings. The outside criminal investigations delayed the conclusion of the SPD investigations, meaning that the Loudermill hearings were not conducted until 2016. After the second Loudermill hearing, then-Chief of Police Kathleen O'Toole made the decision to terminate Officer Shepherd.[6] She testified that those who assisted her in making this decision were unanimous in their opinion that termination was warranted. She explained that she carefully considered all the evidence and went so far as to ask the OPA to reopen its investigation in response to matters brought up by Officer Shepherd and the Guild at the first Loudermill hearing. The OPA did so, but after receiving its updated report, Chief O'Toole again determined that termination should be the probable outcome, and held a second Loudermill hearing. She testified that terminating a police officer is one of the most difficult decisions she has to make and she fully understands the difficulty of the job and the risks that officers assume. She does not let the "court of public opinion" sway her, but instead goes where the truth takes her. Tr. 356. She opined that punching a rear-handcuffed prisoner in the eye when that person is in the back seat of a patrol car cannot be justified and is a violation of SPD rules and policies.[7] It is an unacceptable use of force. Although Ms. Durden-Bosley kicked Officer Shepherd in the

---

[5] The Washington State Patrol conducted a criminal investigation at the request of Chief O'Toole, who wanted an outside agency to handle the matter.

[6] Chief Kathleen O'Toole was hired to oversee the changes required of the SPD to comply with this Consent Decree. She was sworn in as Chief of Police on June 23, 2014, the day after the incident described above. She resigned from the SPD at the end of 2017.

[7] Chief O'Toole may have believed. Ms. Durden-Bosley was supine, face up, in the back of the patrol car when she was punched. Tr. 299, 308, 309. The in-car video shows that Ms. Durden-Bosley had been supine, face up, but had raised herself up to more or less a seated position, with at least her right leg out the door and near the ground, when Officer Shepherd punched her. When Guild counsel asked Chief O'Toole whether Ms. Durden-Bosley's position was a primary consideration, the Chief responded that the primary consideration was the fact Ms. Durden-Bosley was handcuffed. Tr. 310.

face, he had several responsive options available to him that he did not utilize. Punching Ms. Durden-Bosley was not one of them. She was also very concerned that Officer Shepherd never admitted that what he did was wrong, which would make it difficult for him to learn from his mistake. She noted a prior 10-day suspension (in 2009) that he received that similarly, in her opinion, showed a lapse of judgment. She testified that she considered the fact that Officer Shepherd had been employed by the SPD since 2005.

## III. ISSUE

The parties stipulated to the following statement of the issue:

> Whether the Chief's disciplinary decision was for just cause and in compliance with this Agreement and, if not, what the remedy should be?

## IV. RELEVANT CONTRACT LANGUAGE

ARTICLE 3 - DISCIPLINARY, COMPLAINT HEARING, AND INTERNAL INVESTIGATION PROCEDURES

3.1 The parties agree that discipline is a command function, and that the Department may institute a disciplinary procedure. …. Disciplinary action shall be for just cause.

****

3.5 Hearing Procedures

****

H. Disciplinary Review Board.

1. If a suspension, demotion, termination, or a transfer identified by the City as disciplinary in nature is challenged, the discipline may be challenged through the Public Safety Civil Service Commission or through the Disciplinary Review Board (DRB), but not through both. …The DRB shall determine whether the Chief's disciplinary decision was for just cause and in compliance with this Agreement and, if not, what the remedy should be. …

****

3. The DRB shall be comprised of three (3) voting members. One member of the DRB shall be appointed by the City, and one member of the DRB shall be appointed by the Guild. The Guild appointee must be a member of the Guild's bargaining unit. The City's appointee shall hold at least the rank of Lieutenant.

4. The Chairperson of the DRB shall be selected … by the parties …. l. The expenses of the Chairperson of the DRB shall be borne evenly by the parties.

****

9. The hearing before the DRB shall be recorded. …

10. DRBs are not judicial tribunals, and any evidence pertinent to the issue may be presented. The Chairperson shall decide any question of procedure or acceptability of evidence, accepting any evidence which is reasonably relevant to the present charges. The Legal Advisor may be present. The DRB will consider the investigation reports, statements and other documents, testimony of witnesses, and such other evidence as it deems appropriate. The Chairperson, at his/her discretion, may order the employee or any other member of the Department to appear, and shall issue subpoenas as necessary. The DRB may only consider evidence which was introduced during the hearing

11. The decision of the DRB shall be rendered in writing no later than thirty (30) days following the conclusion of the hearing. The DRB's decision shall be final and binding, and additional appeals through the grievance process or the Public Safety Civil Service Commission shall be foreclosed.

ARTICLE 15 - MANAGEMENT RIGHTS

****

15.4 Subject to the provisions of this Agreement, the Employer reserves the right:

****

B. To suspend, demote, discharge, or take other disciplinary action against members, other than probationary employees, for just cause, and to suspend, discharge or take other disciplinary action against probationary employees consistent with the rules of the Public Safety Civil Service Commission;

****

****

## V. POSITIONS OF THE PARTIES

**A. Position of the City** - The grievance should be denied because there was just cause to terminate Officer Shepherd.

1. The correct burden of proof is by a preponderance of the evidence; this is favored by the weight of precedent.
2. Officer Shepherd violated multiple Department policies when he punched Ms. Durden-Bosley.
    a. The Department's use-of-force policy (8.100(2)) specifically precludes force against handcuffed people except in exceptional circumstances.
        i. There was no threat that needed to be immediately stopped as Officer Shepherd was not engaged in an ongoing fight with Ms. Durden-Bosley and he was out of range of harm from her when he made the decision to re-enter the patrol vehicle and punch her.
        ii. The punch appears to have been retaliatory or punitive and therefore unreasonable and unnecessary.
        iii. There were reasonably effective alternatives available to Officer Shepherd.
            1) He could have used the door as a shield to prevent her from kicking him.

2). He could have used the car door to prevent her escape from the vehicle.

3) He could have told her to stand down and put her feet in the vehicle so he could close the door.

4) He could have gotten help from the other officers to pull her into the vehicle.

5) He could have stepped back a couple of more feet to reassess his options.

b. Officer Shepherd violated the Department policy regarding the reasonable, necessary, and proportional use of force (Policy 8.100(1)).

i. Officer Shepherd's use of force was unreasonable given the totality of circumstances facing him; he made a tactical decision to re-engage Ms. Durden-Bosley.

1) At the time of the punch, officers were out of range of Ms. Durden-Bosley's feet, so she was not an immediate threat.

2) There was a break in the action between her kick and his punch, giving him time to choose his action.

3) The risk of escape was low because Ms. Durden-Bosley was in the patrol car, inebriated, handcuffed, and there were three officers present.

4) Officer Shepherd had the door available for shielding and other officers available to assist.

ii. Officer Shepherd had received extensive training on the reasonableness of the use of force, including recent training on the new policies.

iii. Even if some force had been necessary, he could have used other types of force, such as a bear hug, using the door to restrict her movement, using a leg restraint, and pushing her head back with the palm of his hand.

c. Officer Shepherd violated the de-escalation policy (8.100(3)) by not choosing one of the many nonviolent options described above; he'd received training on de-escalation techniques.

d. It is common sense that use of force is prohibited on a handcuffed, seated subject who is partially contained.

3. No case comparable to Officer Shepherd's exists; none of the cases presented by the guild involved similar facts and only two involve handcuffed suspects.

4. Officer Shepherd's termination was an appropriate response to Officer Shepherd's actions.

a. If just cause supports discipline for the underlying charge, arbitrator precedent holds that the reviewing entity should defer to the employer's discretion as to the appropriate penalty.

b. Because Officer Shepherd's use of force was the second incident in which he used poor judgment, Chief O'Toole said she no longer trusted him to follow procedure and use restraint.

c. The City concluded that Officer Shepherd's conduct "could defeat the City's efforts to strengthen its image"

d. Officer Shepherd gave no indication that he would change his behavior.

e. If Officer Shepherd is reinstated, the City urges the Board to fashion a remedy that does not return Officer Shepherd to a patrol position.

**B. Position of the Guild** - The City did not have just cause to terminate Officer Shepherd and he should be made whole for all losses.

1. The City failed to prove, by clear and convincing evidence, that Officer Shepherd's single strike violated department policy.

a. Court precedent and department policy dictate that the evaluation must be done not with the benefit of hindsight but from the perspective of a reasonable officer who must make split-second decisions in tense and rapidly-evolving situations.

b. Officer Shepherd repeatedly informed Ms. Durden-Bosley that she had made a threat and placed her under arrest but she vigorously resisted, refusing his commands to get in the police vehicle.

c. Ms. Durden-Bosley kicked Officer Shepherd hard in the face, cursing him.

d. Being struck in the face or head can daze an officer and leave him stunned.

e. After her kick, Ms. Durden-Bosley began moving upright and forward towards Officer Shepherd and the vehicle door; she placed her foot outside the door, moved it towards the ground and then back towards Officer Shepherd: This movement could be reasonably perceived as a continued threat of assault and/or escape.

f. Officer Shepherd needed to act immediately to protect himself and others on the scene; after delivering the single strike, Officer Shepherd did not strike her again or use any force beyond holding her down to restrain her.

g. The department teaches officers, in the case that they are assaulted, to stop the threat as fast as they can, look for a breakdown in structure, and then move in for control; in fact, verbal training drills teach officers to hit back ‘as hard as [they] can" if they are hit.

h. Supervisors, trainers, and fellow officers testified that Officer Shepherd's actions were reasonable and within policy; experts with the Washington State Patrol and the Pierce County Police Department also concluded that Officer Shepherd's actions were reasonable.

i. Both King County and the U.S. Attorney's office declined to press charges.

j. Exceptional circumstances, within SPD policy, were present in Officer Shepherd's situation.

k. There were no reasonable alternatives.

i. Ms. Durden-Bosley could have reached Officer Shepherd in a very short time.

ii. Backing away was not reasonable; Ms. Durden-Bosley could have left the vehicle and continued her assault or escaped.

iii. Requesting help from other officers on the scene was not reasonable because only one officer at a time could fit in the car doorway.

iv. Closing the car door was not possible, as Ms. Durden-Bosley's legs were partially out the door.

v. Using the car door to pin her legs was problematic, as it would have constituted a use of force against her and could have seriously injured her.

3. Even if the Board were to find that Officer Shepherd violated the department's policies, the City failed to prove that termination is reasonable and appropriate.

a. The SPD taught its officers that a single strike is appropriate in situations such as that faced by Officer Shepherd; a training officer and four others, including two superiors, attested to this training.

b. Training was inadequate: Its April and May 2014 training did not elaborate on the verbiage of the policy and did not convey clear expectations to officers.

c. The City tacitly admitted that its training was inadequate when it beefed up its training program following Officer Shepherd's being placed on administrative leave.

d. Officer Shepherd's termination is punitive rather than progressive.

i. Officer Shepherd had no prior discipline for improper use of force.

ii. The only discipline on his record was for failing to book a suspect who was scheduled for surgery the next day; contrary to the Chief's statements, he accepted responsibility for this mistake in a written statement.

iii. Officer Shepherd's conduct was not egregious enough to bypass progressive discipline; in fact, several members of the police force did not consider it a policy violation.

iv. The Chief ignored mitigating circumstances including that Officer Shepherd was a conscientious officer with only one discipline unrelated to the use of force on his record.

e. The Chief terminated Officer Shepherd for political purposes.

i. Chief O'Toole made only a cursory review of the investigations and drew conclusions that contradicted evidence.

ii. The City decided not to hold a Force Review Board.
iii. Chief O'Toole was hired to make reforms and this case was her highly publicized first big test under SPD settlement with the U.S. DOJ.
iv. She chose not to investigate Ms. Durden-Bosley's felonious assault of Officer Shepherd; nor were charges pressed.

## VI. DISCUSSION AND ANALYSIS

### A. Preliminary Issues

#### 1. Burden of Proof

Both parties agree that the City has the burden of proving that Officer Shepherd violated City policies and rules when he struck Ms. Durden-Bosley and that it had just cause to discharge him. *See*, 1 *Labor and Employment Arbitration*, §19.03[2], T. Bornstein and A. Gosline, eds., (Matt. Bender 1991).

The Guild contends that the City must prove its case by clear and convincing evidence. The City asserts that the quantum of proof is a preponderance of the evidence.

The DRB majority agrees with the City. In most cases, where the quantum of proof is not specified, the preponderance of the evidence standard is used. *Elkouri and Elkouri, How Arbitration Works*, 950 (6th ed., BNA 2007). Some, but not all, arbitrators have made exceptions for cases involving charges of possible criminal conduct or moral turpitude. Here, the relevant authorities effectively absolved Officer Shepherd of criminal wrongdoing when they declined to press charges. The appropriate quantum of proof is the preponderance of the evidence. This means that the City must provide sufficient evidence showing that it is more likely than not that Officer Shepherd violated its rules *and* that it had just cause to discharge him.

#### 2. Just Cause Requirements

There is no dispute here that the principle of just cause requires the City to prove that Officer Shepherd violated its use of force rules, that the City respected labor principles of due process, which include a full and fair investigation, and that discharge was the appropriate penalty for the offense(s) proven. No material issue exists here regarding the thoroughness and

fairness of the City's pre-discharge investigation.[8] The two questions before the DRB are whether Officer Shepherd violated the City's use of force rules and if so, whether discharge was the appropriate remedy.

**B. The City's Use of Force Rules**

The City's use of force policy, revised in part not long prior to the incident at issue here, requires interpretation. That interpretation does not need to take place in a vacuum. Rather, prior federal court decisions as well as the previously discussed Consent Decree provide contextual foundations that illuminate and give meaning to the SPD's rules.

**1. Graham v. Connor Context**

The revised SPD policies continued to reflect the constitutional use of force standard set out by the U.S. Supreme Court in *Graham v. Connor*, 490 U.S. 386 (1989), and its progeny. That decision set forth the basic framework for determining whether the use of force by law enforcement is excessive and a violation of a person's Fourth Amendment rights. The Court held that a police officer's use of force is permissible if it is objectively reasonable. Reasonableness is determined after giving careful consideration to the facts and circumstances of the situation, including the severity of the crime at issue, whether the suspect is actively resisting arrest or attempting to evade arrest, and whether the suspect poses an immediate threat to the safety of the officers or others. The reasonableness of the use of force must be judged from the perspective of a reasonable officer on the scene. The application of 20/20 hindsight is not acceptable. Allowance must be made for the fact that police officers are often

[8] The Guild contends that the City's failure to convene a Force Review Board is an investigative failure and is evidence of the political nature of the decision to terminate Officer Shepherd. It argues that the Force Review Board's review would have provided input from more street officers and trainers about Officer Shepherd's use of force and whether it complied with policy and training. It faults Chief O'Toole for relying principally on the opinion of command staff when reaching the decision to terminate Officer Shepherd. A witness for the City, however, testified that conducting a Force Review Board inquiry into Officer Shepherd's conduct would have been redundant, given that there was an OPA investigation (among others). The Board majority does not find the Guild's argument persuasive. Chief O'Toole had various opinions available to her, including opinions favoring Officer Shepherd, that were presented at the *Loudermill* hearings. It is doubtful that there was anything missing that could have changed her mind.

"forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving . . . ." *Id*., at 397. The high Court has recognized the "practical difficulties of attempting to assess the suspect's dangerousness." *Tennessee v. Garner*, 471 U.S. 1, 20 (1985). The Court emphasized that its decision does not require "police to make impossible, split-second evaluations of unknowable facts." *Id*.

In the view of the neutral Board member, the language of these federal decisions results in a bar that is a bit low because the word "reasonable" is flexible and includes a fairly broad range of considerations. There is no bright line for reasonableness and reasonable jurists can and do have differing opinions as to whether given conduct falls within the "range of reason." Complicating the matter is the fact that most reported cases concern the criminality of the officer's conduct. Proof of that criminality must be beyond a reasonable doubt, a far more restrictive quantum of proof than the preponderance of the evidence standard being used here.

A law enforcement organization agency is free to adopt policies that do no more than mirror the line of decisions referenced above. In such a case, this neutral Board member would use these decisions for interpretive guidance. However, a law enforcement agency may (in a manner consistent with collective bargaining laws), impose a higher, clearer, or more nuanced standard on its officers. The City revised its use of force policy. It is arguable that the underlying revised policy is not more restrictive, but there was a change of emphasis and process. The context and language of this revised policy are discussed next.

**2. The Consent Decree**

Like many cities in the U.S., the City of Seattle's Police Department has been accused of operating in an environment that condoned or tolerated what was perceived as the excessive use of force, often lethal force. Use of force incidents involving the Seattle Police Department caused a deterioration of community trust and confidence in that agency.

In December, 2011, the U.S. Department of Justice delivered a report to the City regarding its investigation of the SPD's use of force past practices. That report found, *inter alia*,:

> Our investigation finds a pattern or practice of constitutional violations regarding the use of force that result from structural problems, as well as serious concerns about biased policing. Resolution of our findings will require a written, court-enforceable agreement that sets forth remedial measures to be taken within a fixed period of time. A disciplined remedial structure will provide all interested parties with the greatest assurance that violations of constitutional rights are corrected and will not reoccur. Efforts by SPD to address the findings in this letter will not only ensure that SPD meets its obligations under the United States Constitution, but will also improve public confidence in the Department and enhance its ability to provide for the public safety of all Seattle residents.

Exh. C-3, at 3.

In 2012, the parties entered into a Consent Decree filed with the Federal District Court for the Western District of Washington. The implementation of the decree is subject to continued court monitoring. The City's revised policy arose from that Consent Decree. It was approved by the court monitor and took effect at the start of 2014. Its governing principle requires Seattle Police Officers to use no more force than is reasonable, proportional and necessary. The revised policy was intended to instill practices that would eschew the use of force whenever reasonably possible. The revised policy includes an emphasis on de-escalation, the application of force-avoidance options, and rules or standards for specific situations.

**3. The Revised SPD Use of Force Policy**

The key provisions of the City's current use of force policy are discussed next. See, Exh. C-5 and Exh. C-6. These provisions are part of the Seattle Police Manual.

Provision 8.000 sets forth "Use-of-Force Core Principles." Subsection 4 states as a headline: "An officer shall use only the degree of force that is *objectively reasonable, necessary under the circumstances, and proportional to the threat or resistance of a subject.*" (Exh. C-5, Emphasis added). Subsection 2 states in part: "when time, circumstances, and safety permit," officers will take steps to gain compliance and de-escalate conflict without using physical force. Subsection 4 goes on to define or describe what is objectively reasonable, necessary and proportional, as follows:

> <u>Objectively reasonable</u>: The reasonableness of a particular use of force is based on the totality of circumstances known by the officer at the time of the use of force and weighs the

actions of the officer against the rights of the subject, in light of the circumstances surrounding the event. It must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.

The assessment of reasonableness must embody allowance for the fact that police officers are often forced to make split-second decisions—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

The reasonableness inquiry in an excessive-force case is an objective one: the question is whether the officers actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.

Necessary: Officers will use physical force only when no reasonably effective alternative appears to exist, and only then to the degree which is reasonable to effect a lawful purpose.

Proportional: The level of force applied must reflect the totality of circumstances surrounding the situation, including the presence of imminent danger to officers or others. Proportional force does not require officers to use the same type or amount of force as the subject. The more immediate the threat and the more likely that the threat will result in death or serious physical injury, the greater the level of force that may be objectively reasonable and necessary to counter it.

Exh. C-5.

Provision 8.100 is more specific. Subsection 2 is particularly relevant. It states, in part:

2. Use-of-Force: When Prohibited

An Officer may **not** use physical force:

- To punish or retaliate

****

- On handcuffed or otherwise restrained subjects except in exceptional circumstances when the subject's actions must be immediately stopped to prevent injury, escape, or destruction of property. Use-of-force on restrained subjects shall be closely and critically reviewed. Officers must articulate both:

  o The exceptional circumstances, and

  o Why no reasonably effective alternative to the use-of-force appeared to exist.

****

Exh. C-6. In other words, this rule restricts the use of force on handcuffed subjects to "exceptional circumstances." Those circumstances are the prevention of escape and/or the

prevention of injury or property destruction. In both cases, force may be used if the suspect's conduct must be "immediately stopped." Importantly, the officer using force on a handcuffed person must affirmatively articulate the exceptional circumstances and explain why no reasonable alternative existed.

Although not explicitly stated in the handcuff rule, the requirement for an explanation implicitly means that no reasonable alternative to the use of force on the handcuffed suspect was available. This is consistent with Policy 8.000, subsection 4, stating that "Officers will use physical force only when no reasonably effective alternative appears to exist, and only then to the degree which is reasonable to effect a lawful purpose."

**4. Training Officer Shepherd Received**

The Consent Decree called for the training of police officers on the revised policy. Specifically, it stated:

> SPD's use of force training for all patrol and other relevant officers will address the following use of force topics:
>
> a) SPD's use of force policy, use of force reporting requirements, and the mechanics of efficiently writing an informative use of force report;
>
> b) proper use of force decision-making;
>
> c) the Fourth Amendment and related law;
>
> d) role-playing scenarios and interactive exercises that illustrate proper use of force decision-making; and
>
> e) the appropriate use of de-escalation techniques.

The parties entered into a post-hearing agreement on exactly what training Officer Shepherd received. The Guild contends that the training was insufficient to prepare Officer Shepherd for what the City expected of him less than six months after the new rules were implemented. The City, of course, disagrees. The neutral Board member finds the training received by Officer Shepherd to be less than robust, but not fatal to the City's case. The Board majority notes that the prior use of force policy, like the revised policy required officers to use

only what force is reasonable, necessary and proportional. Officer Shepherd had been adequately trained on the basics of the prior policy, which was carried forward into the current policy. The neutral Board member is concerned about some unclear or conflicting signals the City gave its officers. In particular, the Guild presented undisputed testimony from both Officer Shepherd and SPD training officer Richard Peterson, that an officer who is physically assaulted is trained to respond with sufficient force to subdue the subject, which is exactly what Officer Shepherd did here.[9] Nevertheless, the neutral Board member finds that the message was clear from the City that alternatives to the use of physical force on a handcuffed person should be utilized when circumstances permit. The written rule on use of force on handcuffed prisoners is clear. This specific language creates a targeted message regarding what force is permitted. The neutral Board member recognizes the impossibility of training for all potential fact scenarios and that comprehensive and meaningful training involving "role-playing scenarios and interactive exercises that illustrate proper use of force decision-making" cannot be accomplished within six months of a new rule. But, the clarity and specificity of the policy regarding handcuffed subjects overrides any deficiencies in training. In sum, the neutral Board member is unable to find that Officer Shepherd's conduct should be excused because his training was inadequate or conflicting.[10]

**C. Did Officer Shepherd Use Excessive Force?**

This is one of the two critical issues before the Discipline Review Board. The parties' respective positions are set forth above and will not be repeated in detail.

First, I will consider certain facts that comprise the context of the incident at issue. These facts are:

---

[9] Officer Peterson testified that after an assault, an officer is trained to respond immediately with a strike that will produce a breakdown in structure (i.e., subdue the suspect). The strike should not exceed that which is necessary for control. Tr. 792-3. Officer Peterson testified that Officer Shepherd was following SPD's training when he used a single-strike to stop the assault and control Ms. Durden-Bosley. Tr. 797.

[10] The Board will revisit this matter when it addresses penalty mitigating considerations.

- Ms. Durden-Bosley was handcuffed.
- Ms. Durden-Bosley was angry, resistant, intoxicated and exhibited no self-restraint.
- She was wearing sturdy Doc Marten boots
- Ms. Durden-Bosley was not a large person although Officer Shepherd described her as amazingly strong
- Officer Shepherd appears to be relatively large and physically strong, a physique that would befit the former football player and combat veteran that he was.
- There were two additional officers, including a K-9 officer at the scene[11]
- She was the only person arrested; Robert Shelby was agitated and didn't want her arrested, but Officer Griffith appeared to be successfully calming him down. There were no other bystanders in the immediate vicinity.

Officer Shepherd had his hand on the top of Ms. Durden-Bosley's head and pushed her head down to get her into the patrol car. He said he tried to hold her wrists to seat her properly but she twisted in such a way that she ended up lying backwards on the seat, face up, with one or both legs free to kick at anyone in the car door area. She in fact kicked Officer Shepherd in the face with her boot, yelling "Fuckin Bitch." She kicked hard enough for him to feel pain, and exclaim, "she kicked me." From the in-car videos, one can see that after she kicked him and Officer Shepherd exclaimed "she kicked me," she moved into a sitting position. Another video shows that she successfully placed her right foot on or near the ground outside of the police vehicle. It is unclear where her left leg and foot were at this point. It is possible that she could have exited the vehicle had she not been restrained in some way. It is impossible to know her intent at this point; she might have been thinking of fleeing or falling back to kick Officer Shepherd again. After being kicked, Officer Shepherd felt a little off-balance and stepped back a bit. It is at this point, the video shows Officer Shepherd's right arm and then his head entering the vehicle with his arm delivering a blow to Ms. Durden-Bosley, which we know landed on her eye. According to the neutral Board member's review of Exh. C-33, approximately two seconds elapsed between the time Ms. Durden-Bosley kicked Officer Shepherd and his resulting blow

---

11 It was clear to the Board where the police dog was, since it did not appear in any videos. The Board presumes it was in its handler's patrol car.

landed on Ms. Durden-Bosley's eye socket. This is technically not a "split second." Two seconds gave Officer Shepherd a little time to reflect, though not a lot of time.

Officer Shepherd contends that because she posed either a flight risk or the risk of a second assault, the only option available to him was to strike her physically. He exercised this option, and it instantly subdued her into compliance. He did not strike her again because he didn't need to. Nevertheless, the single strike left her injured as described previously.

The City contends that there were other options available to Officer Shepherd:

- He could have simply backed up a step or two to be out of range of her feet kicking. He still could remain close enough to prevent her fleeing.
- He could have retreated to behind the car door to protect himself and in the process closed it enough to prevent her exit.
- He could have subdued her physically with a bear hug kind of maneuver, which would not have caused injury.
- He could have yelled to another officer to go to the other side of the car, open that door, and pull her in from that side. (That may have been something one of the officers on the scene should have done right away, but didn't).

The City minimizes the risk of her escape. It points out that she was handcuffed and intoxicated, that there were three police officers, including a K-9 officer, at the scene, so if she had tried to run she wouldn't have gotten very far.

During the DRB's post-hearing conference, the Guild's appointed Board member argued forcefully that two seconds is not enough time to consider the various options, especially when the officer is feeling the pain and shock of a booted kick to the face. To accept the City's position is to use 20-20 hindsight, which the courts have rejected.

The neutral Board member finds the Guild's point of view to be not without reason and has carefully considered the arguments favoring Officer Shepherd. Nevertheless, after considering and weighing the evidence and arguments, the neutral Board member finds the City has the better case. The neutral Board member in particular believes that Officer Shepherd could have stepped back sufficiently to be able to maneuver the car door to partially shut on Ms. Durden-Bosley. He wouldn't have had to shut it all the way (since her legs were in the way) or use enough force to cause her injury. But he could have used it as a shield to protect himself and

keep her from getting out. At this point, if she were still noncompliant, he could have asked another officer to pull her in from the other side or otherwise assist him. The Board majority finds that Officer Shepherd had sufficient time to consider and execute this maneuver. The Board majority also believes that retreating out of kicking distance from Ms. Durden-Bosley was another option. The majority agrees with the City that she wasn't much of a flight risk since she was handcuffed, intoxicated, and there were three officers and apparently a police dog at the scene. If Officer Shepherd had put a barrier or distance between himself and Ms. Durden-Bosley, she could not have assaulted him again. He could have engaged the other officers at the scene to work on subduing her without using undue force.

Accordingly, the Board majority concludes that Officer Shepherd violated the City's use of force policy, particularly 8.100 subsection 2 (which allows force on a handcuffed suspect only to prevent escape, injury or destruction of property) when he struck Ms. Durden-Bosley in the eye, causing injury.

## VII. THE APPROPRIATE PENALTY

The second critical issue in this case is whether discharge was the appropriate penalty for Officer Shepherd's misconduct.

As noted in the City's brief, there is a long line of arbitration rulings stating that arbitrator's power "is only to modify penalties which are beyond the range of reasonableness, and are unduly severe. If the penalty is within range, it may not be modified." *Ford Motor Co.,* Opinion A-2 (Shulman, 1943), quoted in *St. Clair County*, 80 LA 516, 519 (Roumell, 1983). This range of reasonable penalties is sometimes referred to as the "manager's margin." 0. Fairweather, *Practice and Procedure in Labor Arbitration*, 232-33 (2d ed. 1983). Lead cases include *Enterprise Wire Co,* 46 LA 356, Appendix A (Daugherty, 1966) and *Stockham Pipe Fittings Co.*, 1 LA 160, 162 (McCoy, 1945).

The neutral Board member is cognizant of, and usually adheres to the principle of deferring to management's judgment of the appropriate penalty once misconduct has been proven and no "due process" violations have been shown.

Nonetheless, under CBAs, a neutral decision-maker may overturn an ultimate penalty that is unduly severe. In *Paperworkers v. Misco, Inc*., 484 U.S. 29, 41 (1987) the Court stated:.

> Normally, an arbitrator is authorized to disagree with the sanction imposed for employee misconduct. In *Enterprise Wheel*, for example, the arbitrator reduced the discipline from discharge to a 10-day suspension. The Court of Appeals refused to enforce the award, but we reversed, explaining that though the arbitrator's decision must draw its essence from the agreement, he “is to bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies.

See also, *Clow Water Systems Co*., 102 LA 377 (J. Dworkin, 1994) ("Inherent in the right to discipline for just cause is the requirement that the form and degree of discipline be reasonable both as regards the basis for discipline and the penalty assessed. . . ."); Leewall Sportswear Co., Inc., 53 LA1165, 1170 (H.J. Dworkin 1969) ("[A] penalty that is markedly too harsh for the offense is unreasonable and an abuse of managerial discretion. A penalty that flows from incomplete analysis of both the misconduct and the individual employee is arbitrary. . . ."); *Kelly-Springfield Tire Co*., 37 LA 704 at p.706 (W.P. McCoy 1961) (discharge for assault and battery on a fellow employee reduced to a suspension.)

The punishment must be proportional to the offense, must not be wholly out of line with the penalty meted in similar circumstances, must consider the offender's employment record, and must to the extent appropriate, reflect principles of progressive discipline. See, *Houston Grinding and Manufacturing Co.*, 106 LA 875, 878 (Shieber, 1996); *Harshaw Chemical Co.*, 46 LA 248 (M.M. Volz 1966).

The penalty of discharge, in the view of the neutral Board member and the Guild's designated Board member, was not proportional to the offense when one considers its context (including new rules, training, closeness of the question), did not employ progressive discipline and did not properly reflect Officer Shepherd's employment record. The Board will also address

the weight Chief O'Toole gave to the fact that Officer Shepherd was adamant that he did nothing wrong as well as to the Guild's argument that the decision to discharge was politically motivated.

**A. Proportionality**

While the Board majority has found that Officer Shepherd had time to assess the situation and consider his options, that amount of time was measurable in seconds, which isn't much. He had been kicked in the face by a booted woman and felt stinging pain. Another officer probably should have been helping haul Ms. Durden-Bosley into the back seat from the other side of the car, but was not. Officer Shepherd, perhaps reflexively, used force. He landed one blow to Ms. Durden-Bosley's face and then stopped, since she quit resisting at that point. He had previously used de-escalation tactics with Ms. Durden-Bosley, but these were not effective. His patience was being tried. These circumstances tend to mitigate somewhat the seriousness of Officer Shepherd's offense.

A related consideration is that while the neutral Board member has concluded that a preponderance of the evidence has shown a policy violation, this violation was certainly not proven beyond a reasonable doubt, or even, perhaps, by clear and convincing evidence. The assessment of culpability appears to be one over which reasonable minds could differ. Testimony was received at hearing from SPD personnel (two of whom were in Officer Shepherd's chain of command) who opined that Officer Shepherd's use of force was reasonable, necessary and appropriate and not a violation of policy. The record contains a similar opinion from Officer Smith (who was at the scene), see Exh. C-76, OPA-W, 8025-6. Ultimately, the neutral Board member found the weight of the evidence supported a finding that the SPD's policy on handcuffed suspects was violated. However, the question was a close one. This is a consideration weighing against the appropriate penalty being discharge.

**B. Training Considerations as Mitigation**

The Board majority concluded above that the specific rule concerning using force on handcuffed prisoners, as well as the more general policy requiring officers to utilize reasonable options that involve lesser force or no force at all, trumps any contrary training Officer Shepherd may have received. Nevertheless, the neutral Board member finds it disturbing that the training officer and Officer Shepherd testified credibly that Officer Shepherd was trained to respond with measured force when a subject has used force against him. As discussed above, Officer Peterson testified that he trained Officer Shepherd to respond to an assault like Ms. Durden-Bosley's with the kind of force Officer Shepherd utilized. The response should be a strike that should not exceed what is necessary to subdue the subject. Officer Peterson said this response is drilled into the classes he conducts:

> I say the same thing to every class: "If someone hits you, what are you supposed to do to protect yourself? If they hit you, what do you do?" The whole class will say, "You hit them back." Then I say to the class, "How hard do we hit them?" The whole class will say, "As hard as you can." After I say that, I say, "What do we do next? What do we do after we stop the threat?" I'm prompting them. They'll say, "We modulate our force. We modulate our force to control it."

Tr. 792. When asked whether he was ever told to stop this kind of training, he responded, "Never." Tr. 793.

Officer Peterson opined that Officer Shepherd's use of force was consistent with SPD policy and with his training.

The City's post-hearing brief characterizes Officer Peterson's testimony as showing that "Officer Shepherd used good fighting tactics and fought well. This misses the point" since the issue here is not Officer Shepherd's use of force skills, but the fact he used force in the first place. City's post-hearing brief, at 27. The City, however, did not present evidence that cast doubt on the veracity of Officer Peterson's testimony that Officer Shepherd was trained to respond to an assault with the immediate use of measured force. Officer Shepherd believed his use of force against Ms. Durden-Bosley was consistent with his training. The neutral Board

member is inclined to believe that Officer Shepherd was sincere in that belief, although she notes the City DRB member's observation that Officer Peterson's testimony should apply only to situations where the officer does not have two seconds to pursue other options. Although the neutral Board member would not excuse Officer Shepherd's blow to Ms. Durden-Bosley on the basis of training concerns, she finds it to be a mitigating consideration.[12]

**C. Penalty Meted Other Officers**

Not surprisingly, there are no prior or subsequent disciplinary situations exactly comparable to Officer Shepherd's. The panel simply notes that the record contains several instances where officers received discipline, but were not discharged, for using unreasonable non-lethal force on a suspect. There are no instances of record where the officer was discharged.

**D. Progressive Discipline, Not Accepting Responsibility, and Employment Record**

These three things are related to one another and will be discussed in the aggregate here.

**1. Officer Shepherd's Prior Discipline**

Chief O'Toole gave great weight to the fact that Officer Shepherd received a 10-day suspension as the result of a policy violation in 2009. In that case, Officer Shepherd had responded to a domestic violence call from a man who was experiencing conflict with his male housemate. However, Officer Shepherd was not sure which of the two men was primarily responsible for the altercation between them, since they'd both participated in a physical altercation and appeared injured, although the caller appeared slightly more injured. SPD rules requires officers on domestic violence assault calls to arrest the person primarily responsible. Officer Shepherd arrested the housemate and took him to the precinct station. Nevertheless, he was concerned that he might have picked the wrong person. The housemate who called 911 did not want his

12 The neutral Board member commented previously that the training Officer Shepherd received during the five-plus months following the rollout of the new policy was less than robust. The Guild's post-hearing brief addressed other arguable deficiencies. It also notes that a particularly pertinent skills training took place after Officer Shepherd was placed on administrative leave. The Board majority does not fault the City for any training deficiencies during the months following the rollout of the revised policies. The SPD is a large police department and the Board recognizes that meaningful, comprehensive training takes time. Also, it is impossible to train for every potential scenario.

roommate arrested and refused to give a statement or cooperate. Further, the arrestee was scheduled for surgery at 6:00 a.m. the next morning on an injured hand. After conferring with his sergeant and getting the sergeant's sign-off, Officer Shepherd released the arrestee. Tragically, that person went home and murdered his housemate, the one who had made the 911 call. As a result, Officer Shepherd was suspended for 10 days and re-assigned and his sergeant received a 15-day suspension. Officer Shepherd readily admitted he had acted wrongly and was remorseful.[13]

Chief O'Toole concluded that both the 2009 incident and the incident at issue here showed "poor judgment" on the part of Officer Shepherd and that he could not be relied upon to show good judgment in the future. Therefore, she considered the offenses similar, and believed a discharge was the next step in progressive discipline. In the Board majority's opinion, the connection between the two offenses is tenuous. They really were quite different matters. This is not to say that the principle of progressive discipline prohibits discharge for a qualitative different offense. However, it does not necessarily require discharge either.

Officer Shepherd has never been disciplined for anything except the 2009 domestic violence matter.

**2. Officer Shepherd's Unwillingness to Acknowledge a Violation of City Policy**

Chief O'Toole was very disturbed by Officer Shepherd's unwillingness to acknowledge that he made a mistake when he struck Ms. Durden-Bosley. She did not see how he could be "reformed" or change his behavior if he didn't see anything wrong with it. This view is troubling. Although it has its logic, there is another side to it. Officer Shepherd was quite adamant he had done nothing wrong; in fact he was passionate about it.[14] In addition, he had several co-workers

---

[13] This factual summary is drawn from the DRB award on the matter in 2012, authored by Arbitrator Michael Beck. See Exh. C-42.

[14] The Beck DRB award did not address Officer Shepherd's culpability in the 2009 matter. It is significant that Officer Shepherd accepted complete responsibility. He stated:

> … I took an oath to serve and protect citizens of Seattle. On May 28th 2009, I failed to uphold that oath and

who agreed with him. An employee arguably should not be unduly penalized for an honest, sincere and even reasonable, but mistaken belief that he or she had done nothing wrong. Therefore the neutral Board member believes both sides of this coin should be examined and weighed. More importantly, an honest, but mistaken belief that he was following SPD policy does not mean that Officer Shepherd is incapable of changing his behavior. There is no reason to believe that Officer Shepherd does not respect SPD policy, and it is quite possible, if not probable, that a lengthy suspension will tell him that he always has to think about and utilize options that involve the least amount of appropriate force under the circumstances. He also should be motivated by the fact that a subsequent offense involving the improper use of force could result in discharge.

**3. Officer Shepherd's Record of Employment**

Finally, the length of Officer Shepherd's employment with the City (since 2005) and his record of performance as a good cop are mitigating considerations. His sergeant described his value to the City:

> [A]t work, he was an incredibly conscientious officer. I think he was a courageous officer, and I think he was courageous because he was a guy that really knew the law. He had a firm grip what about department policies are and the things he could and couldn't do, and he was competent in how he did his work.
>
> And I think he really cared. The South Precinct where we worked together on third watch, that's a really violent place that has a lot of gangs and a lot of families that are feeling marginalized because of all the violence around them in those neighborhoods. And I think that he really saw that, and that touched him. . . .
>
> [H]e was a good writer, and . . . he was a very good interviewer . . . a person that really set up the rapport with people and tried to meet [them] where they were at and speak with them in a way that meant something to them, . . .

Tr. 544-5.

---

> Arturo Ramirez lost his life as a result. I've taken sole responsibility for the tragic events that unfolded on May 28th 2009. I sincerely apologize to the Ramirez family for not protecting their son, the City of Seattle for failing to uphold my oath and Officers of the City of Seattle for the embarrassment this incident has caused.

Exh. C-42, at 16. This statement shows that Officer Shepherd does not automatically shirk responsibility for his conduct and supports the neutral Board member's belief that his belief that he was following policy in the matter at hand was honest and sincere, albeit mistaken.

This work record should be considered as mitigating.

**4. Was Officer Shepherd's Discharge Politically Motivated?**

The Guild posits that Officer Shepherd's discharge was politically motivated, which is an improper motivation. The Guild contends that Chief O'Toole did not thoroughly review the investigations, made erroneous factual assumptions, and improperly decided not to convene a Force Review Board. It further notes that Ms. Durden-Bosley went scot-free after the incident. No charges were filed against her, even though she engaged in the very serious offense of assaulting a police officer.

The neutral Board member notes that perhaps discharging Officer Shepherd was intended to send a message to the public, court monitor and DOJ and SPD officers that it was taking its use of force policies seriously. Perhaps this is "political," but the Board understands that the SPD cannot be seen as doing business as usual. The Board understands that the SPD needs to optimize the public's trust in its policing. After considering the Guild's other arguments, the Board majority does not find that the evidence shows that the SPD's actions were improperly "political."

**5. All Things Considered**

Determining the appropriate penalty here is not an easy determination. The Board has the highest respect for the decision-making of Chief O'Toole and her command staff. Chief O'Toole was in a difficult position in June 2014. She was new to her position and an outsider, charged with making changes to the culture of the police department, no easy task. She needed to send a message to the public, the Justice Department, and the court monitor that the police agency was serious about the consent decree and its revised policy on the use of force. Nevertheless, the City cannot eschew the just cause considerations that are written into its CBA. The City, of course, is free to vigorously police its officers on the use of force and enforce it's revised policies. However, it adopted no rule or policy, nor did it provide notice, that lesser, but

improper, uses of force would likely result in discharge, regardless of the context, circumstances and mitigating considerations.[15]

In the opinion of the neutral Board member, the penalty of discharge for Officer Shepherd's offense, after taking into account the various mitigating considerations, was excessive. It should be reduced to a significant suspension. Determining the appropriate suspension length was challenging. The City's appointed Board member (who strongly believed discharge was appropriate), sought to ensure that, should the termination be overturned, a lesser penalty would emphasize the seriousness of Officer Shepherd's offense. It should send a message to the SPD's officers and to the public that the City takes its policies on the use of force and its implementation of modern policing practices very seriously.

The neutral Board member underscores that the decision herein is intended to send that message. Alternatives to the use of injury-producing force must be employed when such measures can be used to accomplish the officer's legitimate objectives. When a subject is handcuffed, those alternatives must be used unless greater force is needed to prevent injury, escape or property destruction.

The neutral Board member believes that a 15-day, *i.e.*, three working-week suspension (coupled with Officer Shepherd's removal from patrol and training duties, discussed below), is sufficient to send that message.[16] A number of use-of-force cases were placed into evidence, but there were no cases parallel to this one. Each one was different and distinguishable in some material respect; therefore the neutral Board member could not draw on SPD practice or

[15] The neutral Board member does not intend to say that if the City, in the past, has let officers "off easy" for excessive force, it cannot step up the penalty. However, the decision to step up the penalty should still reflect the proper considerations regarding the appropriate penalty. It also may be subject to bargaining. (The Guild made this argument in a DRB appeal brought by Officer Jennifer Hunt. SPD/SPOG (Hunt, M. Cavenaugh chair), at 13, note 21.)

[16] The Guild's Board member opined that a 15-day penalty is quite severe, particularly when coupled with the determination that Officer Shepherd may be removed from patrol and his prior duties as a defensive tactics instructor. She further observed, speaking from her position as a patrol officer, that the City's message on the use of force is loud and clear. On the other hand, the City's Board member (whose believes first of all that termination is appropriate) opined that if Officer Shepherd is to be reinstated, then a 30-day suspension, the maximum permitted by the parties' Collective Bargaining Agreement, should be imposed. The neutral Board member respects both positions as thoughtful and worthy of serious consideration.

precedent. She reiterates, however, that the reduction of the penalty here should not be read as permitting the use of injury-producing force on a handcuffed prisoner when other options exist that do not compromise security. Depending on the circumstances, an officer who violates the City's use of force policies can expect significant discipline or even termination.

**E. The Reinstatement and Back Pay**

The appropriate remedy is reinstatement with full back pay, less pay reflecting a 15-day unpaid suspension, and less interim earnings. The exact amount of this remedy is left to the negotiation of the parties.

The City believes that Officer Shepherd should not be returned to patrol. The neutral Board member does not know what options are available nor would she know how to evaluate them. She notes that the Arbitrator Beck DRB ruling, Exh. C-42, allowed the City to reassign Officer Shepherd, and finds that ruling influential. Therefore, this award will not order Officer Shepherd's return to his former or equivalent position. The neutral Board member orders the parties to meet, confer, and attempt to agree on a suitable assignment for Officer Shepherd. If the parties cannot agree on an appropriate reassignment for Officer Shepherd, the City may act unilaterally, so long as it does not abuse its discretion. It would not be an abuse of discretion to remove Officer Shepherd from conducting training on the use of force or defensive tactics.

If the parties fail to resolve remedial issues within 90 days of this award, one or both parties may invoke the Board's jurisdiction and submit their dispute to the Board, but on remedial topics only. The 90 days, of course, may be extended by mutual agreement of the parties.

The parties are hereby directed to jointly and equally share the fees and expenses of the neutral Board member.[17]

---

17 The grievance and arbitration language in the parties' CBA contains a "losers pay" provision. However, a termination appeal to the DRB is not part of the grievance process, according to the CBA. Even if the "losers pay" provision were applicable, the parties should be deemed to have equally won (or lost) so the neutral Board member's fees/expenses would be allocated equally. In any event, the neutral Board member's fee schedule, requires equal sharing by the parties of her fees and expenses, absent an agreement between the parties to the contrary.

## VIII. AWARD

Pursuant to the foregoing discussion and analysis, the grievance herein is sustained in part and denied in part. The Board majority finds that the City has shown by a preponderance of the evidence that it had just cause to discipline Officer Shepherd for violation of SPD policies when he struck Ms. Durden-Bosley in 2014. Although his was a serious offense, the Board majority finds that discharge was too severe a penalty, considering the circumstances of his use of force and other mitigating considerations.

The Board majority hereby orders instead that Officer Shepherd be disciplined for violating City's policy on the use of force with a 15-day unpaid suspension. It is also ordered that he be reinstated as a police officer and that he received full back pay (not including overtime compensation, since that is speculative), less 15 days pay for the suspension, and less all interim earnings and compensation. This includes unemployment compensation, unless he will be legally obliged to return that money to the State's unemployment fund.

The Board shall retain jurisdiction in this matter for 90 days from the date of this award in order to resolve any issues pertaining to the remedy herein ordered.

Dated: November 19th, 2018

Jane R. Wilkinson
Jane R. Wilkinson
Labor Arbitrator
Neutral Board Member

L. Cordner
Lesley Cordner
SPD Assistant Chief
City-appointed Board member
Concurring in part and dissenting in part

Suzanne Parton
SPD Patrol Officer
Guild-appointed Board member
Concurring in part and dissenting in part

IN THE MATTER OF THE DISCIPLINARY REVIEW BOARD

| | |
|---|---|
| SEATTLE POLICE OFFICERS GUILD (on behalf of Adley Shepherd),<br><br>Grievant,<br><br>v.<br><br>THE CITY OF SEATTLE, SEATTLE POLICE DEPARTMENT,<br><br>Respondent. | **SEATTLE POLICE DEPARTMENT'S POST-HEARING BRIEF** |



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

## TABLE OF CONTENTS


I. INTRODUCTION .... 1

II. FACTS .... 1

A. Officer Shepherd's Investigation of Harassment and Punch of Ms. Durden-Bosley. .... 1

B. Criminal Investigations. .... 8

C. Investigation by Force Investigation Team and Referral to OPA. .... 9

D. OPA's Investigation Finds That Officer Shepherd Violated SPD Policies. .... 10

E. Termination Is Recommended for Officer Shepherd's Misconduct. .... 13

F. Officer Shepherd's *Loudermill* Hearing. .... 14

G. OPA's Further Investigation Did Not Result in Modified Findings. .... 16

H. Officer Shepherd's Second *Loudermill* Hearing. .... 16

I. Chief O'Toole Terminates Officer Shepherd's Employment. .... 17

J. The State of SPD's Relationship with The Community. .... 17

III. ISSUE .... 19

IV. ANALYSIS .... 20

A. Burden of Proof. .... 20

B. SPD Had Just Cause to Discharge Officer Shepherd. .... 21

1. The Evidence Establishes That Officer Shepherd Violated Multiple SPD Policies When He Punched the Handcuffed and Seated Ms. Durden-Bosley. .... 22

a. The Department's use-of-force policy (8.100(2)) specifically precludes force against restrained people except in exceptional circumstances not present here. .... 22

1) There was no threat that needed to be immediately stopped. .... 22

2) The punch appears to have been retaliatory or punitive. .... 24

3) Reasonably effective alternatives existed and were apparent. .... 24

b. Officer Shepherd violated the SPD policy regarding the reasonable, necessary and proportional use of force (Policy 8.100(1)). .... 25

1) The use of force was not reasonable based on the totality of the circumstances facing Officer Shepherd at the time. .... 25




SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

2) The use of force was not necessary because there were many reasonably effective alternatives to the use of force against Ms. Durden-Bosley. ..................... 28

c. Officer Shepherd violated the de-escalation policy (8.100(3)). .................................................................. 30

2. Officer Shepherd Had Notice that his Conduct Violated Policies and Could Result in Discipline. ......................................................... 31

a. The Directive Highlighting the Modified Use-of-Force Policies Provided Actual Notice to Officer Shepherd of SPD's Expectations ............................................................. 31

b. Officer Shepherd had notice through the receipt of substantial training on the new policies.................................. 32

c. Officer Shepherd also had notice through receipt of prior training consistent with the new policies................................ 34

d. Common sense established that the use of force against a handcuffed and partially contained prisoner was prohibited in these circumstances. ......................................................... 35

3. The Seattle Police Department's Expectations Regarding the Use of Force and De-Escalation Are Reasonably Related to its Mission.... 36

4. The Seattle Police Department Conducted a Full and Fair Investigation of Officer Shepherd's Conduct. .................................... 37

5. No Comparable Discipline Exists. .................................................... 37

6. Termination Was Appropriate Discipline for Officer Shepherd's Conduct. ......................................................................................... 41

a. Termination was reasonable given the context and gravity of Officer Shepherd's conduct. .............................................. 42

b. Officer Shepherd gave no indication that he would change his behavior. ............................................................................. 43

C. Remedy. ......................................................................................................... 44

V. CONCLUSION ........................................................................................................ 45




SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

# I. INTRODUCTION

This Disciplinary Review Board should issue an award finding that there was just cause for Officer Shepherd's discharge because Officer Shepherd used significant, unreasonable, and unnecessary force on a handcuffed suspect in the back of a patrol car, in clear violation of Seattle Police Department ("SPD") policy. Officer Shepherd had several other options available, and he elected not to use any of them. Instead, in violation of SPD policy and common sense, he significantly escalated the situation, contrary to the very essence of modern policing that the Department committed to as part of its Consent Decree with the federal government.

The gist of Officer Shepherd's response is that he was in an ongoing fight, and that he had to punch the handcuffed suspect in the face in order to defend himself. This fails. This was not a street fight. It was not a fight at all; it was an ordinary arrest of a woman who was belligerent and intoxicated; officers are regularly tasked with dealing with citizens in similar circumstances and must do so without significant violence and physical harm.

Officer Shepherd's reaction to Ms. Durden-Bosley violated SPD policies. He has a prior, and significant, disciplinary history. And throughout these proceedings, he has demonstrated a remarkable lack of insight into SPD's policies and expectations. This Disciplinary Review Board is charged to determine whether management's disciplinary decision had "reasonable grounds" and was "within the bounds of reasonableness." *Enterprise Wire Co.*, 46 LA 359, 363-364 (1996). We respectfully submit that this Board's award should affirm management's decision. Public safety, and the public trust, require no less.

# II. FACTS

## A. Officer Shepherd's Investigation of Harassment and Punch of Ms. Durden-Bosley.

Early in the morning on June 22, 2014, Officer Shepherd responded to a misdemeanor domestic disturbance call at 8119 47th Avenue South.[1] The caller, Ms. Evelyn Shelby, had

[1] The designation "TR" is used throughout this brief to refer to the transcribed testimony taken during the arbitration hearing. Each such designation is followed by a page:line indication and the last name of the witness who provided the testimony. TR at 929:7-10 (Shepherd); Ex. 60 at p. 4 (DRB-SHEP000352).



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

reported that her son, Robert Shelby, received a call from a female who said she was going to come to the house and fight him.[2]

Officer Shepherd arrived on scene first, was the primary officer, and had the obligation to control the scene.[3] He began speaking with Robert Shelby, who was standing on the sidewalk in front of the house when Officer Shepherd arrived.[4] Officers Michael Griffin and Rory Smith arrived shortly thereafter as back-up.[5] Officer Shepherd asked Mr. Shelby about any threats he had received. Mr. Shelby neither confirmed nor denied threats, saying only that his child's mother, Ms. Miyekko Durden-Bosley, had been speaking with him when the situation "escalated."[6] Mr. Shelby indicated he did not want the police involved.[7]

After speaking with Mr. Shelby, Officer Shepherd went into Evelyn Shelby's home to interview her.[8] Ms. Shelby was not on the phone with Ms. Durden-Bosley, but she claimed Ms. Durden-Bosley had said that she was going to come over and "beat [Mr. Shelby's] ass."[9]

Shortly thereafter, Ms. Durden-Bosley arrived on foot.[10] Officer Shepherd exited Ms. Shelby's house moments after Ms. Durden-Bosley's arrival on scene.[11] Officer Shepherd called Ms. Durden-Bosley over and spoke with her.[12] Ms. Durden-Bosley repeatedly denied making any threats.[13] She was "extremely inebriated," "appeared lethargic" and put a lot of effort into even simple tasks, including walking.[14] Her eyes were bloodshot red and she exuded

---

[2] TR at 1009:2-8 (Shepherd); Ex. 60 at pp. 4-5 (DRB-SHEP000352-53).
[3] TR at 938:15-16 (Shepherd); 1009:10-18 (Shepherd).
[4] TR at 931:5-16 (Shepherd); 1009:24-1010:10 (Shepherd).
[5] Ex. 60 at p. 4 (DRB-SHEP000352); TR at 939:20-940:4 (Shepherd).
[6] Ex. 60 at p. 4 (DRB-SHEP000352).
[7] *Id.*
[8] TR at 932:16-23 (Shepherd).
[9] Ex. 60 at pp. 5-6 (DRB-SHEP000353-54).
[10] TR at 933:7-19 (Shepherd).
[11] *Id.*
[12] TR at 934:24-935:5 (Shepherd).
[13] Ex. 81 at 13:07-13:45
[14] *Id.* at p. 6; Ex. 62 at pp. 31-32 ("She was noticeably intoxicated. She had a strong odor of alcohol coming from her person…slurred speech, watery eyes and incoherent, unable to reason and actually have a conversation or answer my questions….[S]he was very lethargic just walking in those boots, just as an intoxicated person would do….[S]he was drunk."); TR at 1056:22-1057:18 (Shepherd).



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

a strong odor of alcohol.[15] Officer Shepherd thought she was so inebriated that, in his experienced opinion, she was unquestionably too drunk to drive.[16]

A few minutes after he began speaking with Ms. Durden-Bosley, and despite the inconclusive information about whether Ms. Durden-Bosley had made any threats, Officer Shepherd decided that someone needed to be arrested because there appeared to be tension between Mr. Shelby and Ms. Durden-Bosley.[17]

Officer Shepherd said "my patience is done" and that "somebody is going to jail."[18] He said "we can do eenie meenie miney."[19] Even if he did not intend to pick an arrestee at random, his threat to do so itself suggested indifference to right and wrong – as if it did not matter who was victim and who was perpetrator.

Officer Shepherd decided to arrest Ms. Durden-Bosley on suspicion of harassment.[20] She protested, saying over and over that she had not made any threats.[21] Officer Shepherd nonetheless said he was going to put her in handcuffs.[22] Officer Griffin came over to assist, and eventually the officers successfully handcuffed her.[23] Officer Shepherd then guided Ms. Durden-Bosley to the vehicle.[24]

Officer Shepherd brought Ms. Durden-Bosley to the rear passenger door of the vehicle and asked her to get in.[25] Ms. Durden-Bosley began to resist being put in the vehicle; she repeated over and over that she hadn't done anything wrong, and didn't understand why she was being arrested.[26] Officer Griffin came and spoke with her to express that she'd just be

---

[15] *Id.*

[16] *Id.*

[17] TR at 946:4-947:2 (Shepherd) (indicating that he was trying to see who would de-escalate when he threatened arrest).

[18] TR at 946:4-7 (Shepherd); Ex. 81 at 12:35-12:40.

[19] Ex. 81 at 12:39-12:43.

[20] *Id.* at 12:44-12:51.

[21] *Id.* at 13:07-13:45.

[22] *Id.*

[23] *Id.*

[24] *Id.* at 13:17 – 13:22

[25] *Id.* at 13:44-14:00.

[26] *Id.* at 14:01-14:11.



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

taken to the precinct, and Ms. Durden-Bosley seemed to calm somewhat, but continued to protest being arrested, repeating again that she had not made any threats.[27]

Officer Griffin then went to the back of the vehicle, possibly to stow Ms. Durden-Bosley's purse.[28] Officer Shepherd understood that Officer Griffin had communicated that he'd go to the other side of the vehicle to help pull Ms. Durden-Bosley into the vehicle.[29] Ms. Durden-Bosley expressed further frustration, and noted that Officer Shepherd was escalating the situation.[30] As Officer Griffin approached the rear of the vehicle, Officer Shepherd tried to put Ms. Durden-Bosley in the vehicle.[31] She twisted away, lost her balance, and fell backward into the vehicle, with her legs still outside the vehicle and swinging upward.[32] Officer Shepherd's momentum brought his torso down toward the opening to the rear compartment.[33]

Immediately thereafter, the in-car video ("ICV") shows Ms. Durden-Bosley's leg bend and kick outward.[34] Her foot struck Officer Shepherd in his vest and the left side of his jaw, and she yelled, "Fucking bitch!"[35] Officer Shepherd testified that his vest and jaw were hit hard by the kick, and he immediately hopped or stutter-stepped back a few feet, as shown on the ICV.[36] He acknowledged, however, that he was not disoriented by the strike and was not dizzy; the kick to the vest and jaw, while painful, did not affect his ability to comprehend the situation.[37] Importantly, despite offering testimony from several witnesses about the potential effects of a blow to the head during the DRB, Officer Shepherd *expressly* acknowledged that he

---

[27] *Id.* at 14:12-14:25.

[28] Ex. 23 at 13:18-13:21.

[29] Ex. 60 at p. 8 ("Officer Griffin was going to the other side of the vehicle to open the passenger door and then assist in pulling Miyekko body completely inside the vehicle.").

[30] Ex. 25 at 14:20-14:30.

[31] *Id.*

[32] Ex. 25 at 14:29-14:33.

[33] Ex. 25 at 14:30.

[34] Ex. 25 at 14:30-14:31.

[35] Ex. 60 at p. 8 (noting that the "kick [ ] contacted my vest as well as the left side of my jaw."); Ex. 25 at 14:30-14:33.

[36] Ex. 25 at 14:30-14:33.

[37] TR at 1054:2-15 (Shepherd).



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

did not consider it a kick to the head, and that he was *not* dazed and did *not* at any point have a concussion.[38]

Ms. Durden-Bosley remained in handcuffs in the back of the patrol vehicle.[39] She did not make any verbal threats.[40] She was sitting up from where she had fallen, but her buttocks remained on the seat.[41] Officer Shepherd had moved several feet away from Ms. Durden-Bosley after he hopped or stutter-stepped backward following her kick.[42] That distance, estimated to be possibly three feet by Sergeant Kim, was confirmed by the ICV that shows Officer Shepherd nearly out of the picture following his motion after the kick.[43] Officer Shepherd and Ms. Durden-Bosley were not engaged with one another—they were not actively fighting—following Ms. Durden-Bosley's single kick to Officer Shepherd's vest and jaw.[44] They were not grappling; they were not locked up; and Ms. Durden-Bosley was in handcuffs and in the police car.[45]

The ICV shows there was no way for Ms. Durden-Bosley to kick Officer Shepherd again without getting out of the car, which would have taken significant effort.[46] No witness

---

[38] *Id.*; *but see* offered testimony on blows to the head and being dazed or possibly concussed by Sgt. Zerr (TR at 523:13-15; 530:23-531:13; 560:11-25; 567:21-568:4) (discussing how serious a blow to the head could be, even deadly and a Level III use of force, and concussion concerns he had about Ofc. Shepherd)); Lt. Strand (TR at 652:7-12 (noting that Ofc. Shepherd had been kicked in the face and might have been dazed)); Sgt. Rusness (TR at 678:16-19 (opining that Ofc. Shepherd was dazed when he talked to him moments before Ofc. Shepherd said he wasn't to the EMT; this is prior to his statement that he'd have choked Ms. Durden-Bosley)); Ofc. Howard (TR at 673:13-15 (noting that Ofc. Shepherd incorrectly stated to her that he'd been kicked in the face)); Ofc. Peterson (TR at 797:12-798:15 (discussing how he "saw" Ofc. Shepherd kicked in the face and how dangerous a kick to the face could be). Officer Shepherd also claimed that Ms. Durden-Bosley's kick was the most painful thing he had ever experienced, TR at 962:15-22 (Shepherd), notwithstanding his extensive history of participation in fights, including having been shot "on multiple occasions." He appears to have modified his position on cross-examination, when confronted with his history and his statements to aid personnel the night of the injury (which minimized his pain, *see*, TR at 1050:4-1054:25 (Shepherd).)

[39] Ex. 25 at 14:29-14:33; Ex. 33.

[40] *Id.*

[41] *Id.*

[42] TR at 558:13-22 (Zerr) (agreeing that Ofc. Shepherd moved back outside range of Ms. Durden-Bosley); 629:6-9 (Strand) ("he was outside that [leg kicking range] when he gained his balance"); 729:12-25 (Kim) (agreeing that Ofc. Shepherd was outside range of her feet and that his report notated that fact); 746:13-747:1 (Kim) (discussing that he was outside range of her feet).

[43] TR at 706:12-22; Ex. 25 at 14:30-14:33; Ex. 33.

[44] Ex. 25 at 14:27-14:33.

[45] *Id.*; Ex. 33.

[46] *Id.*



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

testified that Officer Shepherd was within range of her feet at that time—to the contrary, even Officer Shepherd's witnesses testified that he was out of range of Ms. Durden-Bosley's feet after moving backward following the kick.[47]

Ms. Durden-Bosley was not only handcuffed and seated in the vehicle; she was also, according to Officer Shepherd, severely intoxicated and unable even to walk appropriately.[48] For her to pose a threat at all, she would have needed to shimmy out of the bucket seat, navigate the partially open door, and regain her balance on her feet, all with her hands cuffed behind her back.[49] The ICV shows that the door being closed even a little would have fully blocked her exit.[50]

Officer Griffin was only a few feet away from Officer Shepherd at the back of the vehicle.[51] Officer Smith was nearby at the front of the vehicle and on the same side as Officer Shepherd.[52] But Officer Shepherd did nothing to express to his fellow officers that he needed any assistance at any point before punching Ms. Durden-Bosley.

After the kick, and while out of range of Ms. Durden-Bosley's feet, Officer Shepherd made a tactical decision to re-engage and to re-enter the vehicle.[53] He lunged back into the vehicle to punch the handcuffed and seated Durden-Bosley, saying as he initiated his motion, "She kicked me!"[54] Another full second after initiating his motion forward, Officer Shepherd punched Ms. Durden-Bosley squarely in the face while she was handcuffed and seated in the

---

[47] TR at 558:13-22 (Zerr) (agreeing that Ofc. Shepherd moved back outside range of Ms. Durden-Bosley); 629:6-9 (Strand) ("he was outside that [leg kicking range] when he gained his balance"); 729:12-25 (Kim) (agreeing that Ofc. Shepherd was outside range of her feet and that his report notated that fact); 746:13-747:1 (Kim) (discussing that he was outside range of her feet).

[48] *Id.* at p. 6; Ex. 62 at pp. 31-32 ("She was noticeably intoxicated. She had a strong odor of alcohol coming from her person…slurred speech, watery eyes and incoherent, unable to reason and actually have a conversation or answer my questions….[S]he was very lethargic just walking in those boots, just as an intoxicated person would do….[S]he was drunk."); TR at 1056:22-1057:18 (Shepherd).

[49] TR at 307:5-15 (O'Toole) (describing the relative immobility of a handcuffed person); 65:10-13 (Murphy) (same).

[50] Ex. 25 at 14:27-14:33.

[51] *Id.*

[52] *Id.*; *see also* Ex. 23 at 13:20-13:28.

[53] TR at 1078:25-1079:4 (Shepherd) ("Yes, a decision was made, and it was the best decision that I had").

[54] Ex. 25 at 14:27-14:33; *see also* Ex. 33.



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

back of his police vehicle, a punch that fractured her orbital socket in two places.[55] He claims he did so to protect himself, but in fact, before he re-engaged, he was out of the handcuffed Durden-Bosley's kicking range.[56]

De-escalation tactics specifically listed in the applicable de-escalation policy in the Seattle Police Manual to address situations like this included:

- Placing barriers between an uncooperative subject and an officer
- Containing a threat
- Moving from a position that exposes officers to potential threats to a safer position
- Decreasing the exposure to potential threat by using
    - Distance
    - Cover
    - Concealment
- Communication form a safe position intended to gain the subject's compliance, using:
    - Verbal persuasion
    - Advisements
    - Warnings
- Avoidance of physical confrontation, unless immediately necessary (for example, to protect someone, or stop dangerous behavior)
- Using verbal techniques, such as Listen and Explain with Equity and Dignity (LEED) Training, to calm an agitated subject and promote rational decision making
- Calling extra resources to assist or officers to assist:
    - More officers
    - CIT-trained officers
    - Officers equipped with less-lethal tools
- Any other tactics and approaches that attempt to achieve law enforcement objectives by gaining the compliance of the subject[57]

Officer Shepherd utilized *none* of those.

Officer Shepherd did not ask either of the other officers present to help him; he did not try to use the vehicle door to protect himself; and he did not take any other measures to increase the time, space or options available to him, to reduce his exposure to any threat posed by

[55] *Id.*; Ex. 27 (medical records of Ms. Durden-Bosley).

[56] TR at 729:12-730:5 (Kim).

[57] Ex. 6.



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

Ms. Durden-Bosley, or to contain her. Instead, he decided to use a high level of force against a handcuffed, extremely inebriated woman in the back of his patrol vehicle.[58]

Aid was called to address Ms. Durden-Bosley's injury and to assess Officer Shepherd, and both ultimately were transported to Harborview. Officer Shepherd confirmed to the aid personnel that he was not dazed and only felt a little sharp pain from the kick,[59] and he was released later that morning following a thorough review that indicated he had suffered no acute injury.[60] Officer Shepherd's only injury was self-reported jaw soreness.[61] Ms. Durden-Bosley, on the other hand, was vomiting as a result of concussive symptoms the next day, and required weeks to recover from the two fractures to her orbital socket.[62]

**B. Criminal Investigations.**

Officer Shepherd's direct supervisor notified Captain Teeter, of the Force Investigation Team (the "FIT"), that night.[63] Captain Teeter promptly determined that the incident warranted an FIT response, and later that day determined that he also would refer the matter to the OPA for investigation of possible violations of SPD policy.[64] In addition, recognizing the possibility that Officer Shepherd's actions may have even been criminal, the OPA Director referred the incident to the Washington State Patrol ("WSP") for investigation.[65] The FIT investigation was put on hold to allow the WSP to investigate the matter without interference,[66] and Officer

---

[58] Ex. 25 at 14:30-14:33; TR at 1078:25-1079:4 (Shepherd) (acknowledging he made a decision to use force).

[59] TR at 1052:18-1053:21 (Shepherd); Ex. 81 at 33:07-33:18.

[60] Ex. 91 at pp. 2-11 (DRB-SHEP 005785-94) (indicating that there were "No Injuries" to Officer Shepherd's sinuses, skull base, temporal bones (bones on either side of the skull that enclose the middle and inner ear), mandible (jawbone), temporomandibular joints (hinge joints connecting jaw to skull, with the records noting that they "appear normally aligned"), or tooth alignment (noting "[n]o malocclusion", which is misalignment of the jaw or teeth) (pp. DRB-SHEP 005787, 005793); imaging was "negative for any acute injuries" (p. DRB-SHEP 005787); "[n]o tenderness to palpation" (p. DRB-SHEP 005787); "[n]o lacerations or abrasions noted to face" (p. DRB-SHEP 005787); and Officer Shepherd denied having any "blurry vision, diplopia, changes in gait, headaches, nausea, or vomiting" (p. DRB-SHEP 005785); and that Officer Shepherd was discharged to leave on his own at about 6:20 a.m. (p. DRB-SHEP 005792)).

[61] Exs. 89-91 (Shepherd's medical records).

[62] Ex. 27 at pp. 4-6 (DRB-SHEP 002749-51) (noting that she "vomited 5-6 times since admission" and "5-6x since jail admission" and complained of headache, deemed consistent with ("c/w") "post-concussive syndrome").

[63] TR at 168:6-170:4 (Teeter).

[64] TR at 171:23-173:14 (Teeter).

[65] Exs. 7-10.

[66] TR at 173:18-174:22 (Teeter).



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

Shepherd was placed on paid administrative leave while the criminal investigation was pending.[67] The WSP investigation was extensive, and included interviews of witnesses at the scene, at the hospital, and even an expert review of the incident.[68]

After the completion of the WSP investigation, the King County Prosecutor's Office considered the investigative materials and on December 4, 2014 declined to file criminal charges against Officer Shepherd. [69] The Prosecutor's Office noted that it was "unlikely" that there was sufficient evidence to prove beyond a reasonable doubt that Officer Shepherd's actions were in violation of the law.[70] At the same time, The Office noted "that Shepherd's actions may be inconsistent with SPD's training and policies on the use of force," and indicated that The Office expected OPA to review the matter.[71]

Next the U.S. Attorney's Office for the Western District of Washington and the FBI initiated their own inquiry into whether federal criminal laws had been broken. The FBI did not rely solely on the investigation that WSP had conducted. The Bureau initiated its own extensive investigation, again speaking with all the key witnesses on the issues.[72] The federal investigation took a substantial amount of time, and it was not until November 3, 2015 that the federal authorities provided a letter to SPD indicating that the U.S. Attorney did not intend to file charges against Officer Shepherd.[73]

**C. Investigation by Force Investigation Team and Referral to OPA.**

Upon the declination by the U.S. Attorney's Office, the Force Investigation Team ("FIT") proceeded with its investigation.[74] FIT, created as part of the Consent Decree, is the

---

[67] Ex. 76 at OPA-J, DRB-SHEP004415 – 4417.
[68] Ex. 76 at OPA-J.
[69] Ex. 11.
[70] *Id.*
[71] *Id.*
[72] Ex. 76 at OPA-W.
[73] Ex. 76 at OPA-Q, DRB-SHEP006525.
[74] TR at 173:16-174:14 (Teeter).



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

SPD unit devoted to investigating the significant use of force by SPD officers, to ensure thorough and objective investigations.[75]

Sergeant Davisson immediately began an investigation of the incident on behalf of FIT. He reviewed the WSP case file and interviews and compiled information about the incident.[76] He also conducted two interviews of Officer Shepherd himself, on November 10 and 17, 2015.[77] By that time, Officer Shepherd had prepared a written statement concerning the events at issue.[78]

Captain Steven Hirjak (at the time a Lieutenant) reviewed the investigation and considered whether Officer Shepherd's actions had violated SPD policies.[79] He found that they had in several respects, issued a report describing his findings, and submitted it to Captain Michael Teeter for review.[80] Captain Teeter came to the same conclusion.[81] As a result of his conclusion, the matter was officially transferred to OPA for its review and determination as to whether policies had been violated by Officer Shepherd and its recommendation to the Chief that discipline be imposed if so.[82]

**D. OPA's Investigation Finds That Officer Shepherd Violated SPD Policies.**

Though the transfer to the OPA was not official until the issuance of the FIT Captain's report issued on or about November 19, 2015, the OPA had simultaneously begun its investigation into Officer Shepherd's conduct upon the federal declination, with an attendee at the FIT interviews of Officer Shepherd and a review by Sergeant Kim of other relevant evidence in the case.[83] The OPA investigation was extensive, and included not only a review of the prior investigations of the WSP and FIT, but also additional interviews, including a

---

[75] TR at 162:9-164:19 (Teeter).
[76] *See* Ex. 30 (detailing FIT investigation and investigatory steps undertaken).
[77] *See* Exs. 60 and 61.
[78] *See* Ex. 60 at p. 4 (DRB-SHEP000352).
[79] Ex. 31.
[80] *Id.*
[81] Ex. 32.
[82] *Id.* at p. 6 (DRB-SHEP000234).
[83] *See* Exs. 60-61.



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

further interview of Officer Shepherd, and a forensic video analysis of the ICVs covering the scene.[84] The investigation was completed as of December 16, 2015, less than a month following the completion of the FIT investigation.[85]

The OPA considered potential violations of four different SPD policies by Officer Shepherd: (1) Voluntary Contacts and *Terry* Stops – SPD Policy 6.220, (2) Using Force: Use-of-Force: When Authorized – SPD Policy 8.100.1, (3) Using Force: Use-of-Force: When Prohibited – SPD Policy 8.100.2, and (4) Using Force: Use-of-Force: De-Escalation – SPD Policy 8.100.3.[86] The OPA investigation included a review of Officer Shepherd's recorded and transcribed statements, the applicable policies, the trainings attended by Officer Shepherd pertaining to the incident, statements of the other officers on scene, the statements of civilian witnesses including Ms. Durden-Bosley, and ICV video evidence, and associated forensic analysis.[87]

An OPA Lieutenant, OPA Captain Reed, OPA Director Pierce Murphy, and the OPA Auditor, Judge Anne Levinson (ret.) all reviewed and assessed the thoroughness and adequacy of the OPA investigation.[88] After a thorough review of the evidence, the OPA sustained the allegations concerning the prohibited use of force and the failure to de-escalate. The OPA Director issued his Certification Memorandum on December 24, 2015.[89]

Following a disciplinary committee conference, discussed further below, the OPA Director revised his conclusions, finding an additional policy violation, and formalized his conclusions in a Director's Amended Certification Memorandum ("DCM") on January 5, 2016. The Amended DCM found that Officer Shepherd violated SPD Policy 8.100.1:

---

[84] Ex. 34; *see also* Ex. 33.

[85] *Id.*

[86] Ex. 6.

[87] Exs. 33-34.

[88] TR at 53:13-54:2 (Murphy); Ex. 35.

[89] Ex. 36.



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

> Hitting the SUBJ in the face with the amount of force employed by the NE[90] was unreasonable and excessive (not proportional), given the totality of the circumstances. . . . the NE had a number of other options available to him in order to control the SUBJ and prevent her from further injuring him or anyone else and to prevent her from escaping. Given that the SUBJ was still handcuffed and seated in the back of the police vehicle and that the NE had stepped back from the open back door of the police vehicle and was not in immediate danger from attack by the SUBJ, it was unreasonable for him to lunge back inside the vehicle and deliver a closed fist strike to the SUBJ's face with such force that it fractured her eye socket and inflicted substantial soft tissue damage to her face. For this reason I recommend a Sustained finding for this allegation.[91]

OPA also found Officer Shepherd's use of force against a handcuffed suspect violated SPD Policy 8.100.2 because:

> The NE chose to respond to the apparent kick to his face by moving back towards the open back door of the police car, leaning in with his head and upper body and punching the SUBJ one time in the face. The NE had a number of other alternatives available to him, including, but not limited to:
>
> - putting greater distance between himself and the SUBJ
> - enlisting the assistance of the other officer, who was a few feet away at the rear of the same police car, to either help him control the SUBJ if she emerged from the car or to go around to the other side of the car and control her movements by reaching in and pinning her upper body on the seat
> - going around the open back door of the car and using it as a shield and partial leverage to keep the SUBJ in the car until other resources could be employed to control her movement
> - using his radio to call for additional officers to assist
>
> I find that the NE failed to articulate why no reasonably effective alternative to the punch was available. Other alternatives were available, but the NE neither considered nor attempted any alternatives to the punch as a means of reducing the threat posed by the handcuffed SUBJ. For this reason, I find that the NE violated SPD Policy Section 8.100(2) and have recommended a Sustained finding.[92]

Finally, OPA concluded that Officer Shepherd's punch of Ms. Durden-Bosley violated SPD Policy 8.100.3 concerning de-escalation because:

> [O]nce the NE was kicked and after he was out of range of the SUBJ's feet and able to move further from the open car door, the NE failed to use or attempt to use any de-escalation tactics. He gave no warnings or commands, attempted no other verbal tactics

[90] "Named Employee."

[91] Ex. 37.

[92] *Id.*



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

> or persuasion, did not move from his position of vulnerability to a safer one (in fact, he moved back into a position of increased vulnerability), did not use distance or cover to limit his exposure to danger from the SUBJ, failed to summon help from the other officer who was just a few feet away at the rear of the police car, or any other recognizable de-escalation tactic. He simply moved back into the open doorway of the police car and delivered a single punch to the SUBJ's face. . . . [The NE] had the opportunity to attempt to de-escalate the situation in order to reduce the need for him to use force. For these reasons, I have recommended a finding of Sustained for the allegation of violating SPD Policy Section 8.100(3).[93]

**E. Termination Is Recommended for Officer Shepherd's Misconduct.**

The SPD convened a discipline meeting on January 4, 2016 to discuss OPA's findings, to ensure there was agreement as to the findings that policies had been violated, and to determine what discipline to recommend to Chief O'Toole.[94] OPA presented its investigation to determine (1) if the allegations should be sustained and (2) if sustained what was the appropriate level of discipline to recommend to Chief O'Toole.[95] The attendees unanimously agreed that all three of the allegations detailed above should be sustained.[96] All agreed that while the *de minimis* force prior to the punch had not been improper, the force in punching Ms. Durden-Bosley was unreasonable, unnecessary and disproportionate and otherwise not in accord with the applicable policies. This discussion led Director Murphy to prepare the Amended DCM finding a violation of SPD Policy 8.100(1), since he had not addressed whether the punch was reasonable, necessary or proportionate in his first analysis.[97]

The attendees also were advised of Officer Shepherd's disciplinary history, a significant 10-day suspension for a previous policy violation.[98] They reviewed prior disciplinary cases to determine whether any were comparable, and determined none were.[99] Given SPD's ongoing efforts to bring its practices into line with the highest standards in policing, they viewed Officer

[93] *Id.*

[94] Ex. 37; TR at 452:10-453:3 (Wilske); 457:6-458:5 (Wilske).

[95] *Id.*, TR at 74:24-77:2 (Murphy).

[96] TR at 77:3-14 (Murphy); 457:6-464:11 (Wilske).

[97] TR at 76:13-77:7 (Murphy).

[98] TR at 462:13-463:10 (Wilske); Ex. 41 (prior DAR suspending Officer Shepherd for 10 days for policy and law violations).

[99] TR at 464:12-22 (Wilske).



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

Shepherd's policy violations as particularly egregious, and simply not in accord with appropriate police practices.[100]

The attendees reached consensus that a recommendation of termination was the only appropriate recommendation, taking into account both the gravity of Officer Shepherd's conduct and multiple policy violations, his refusal to acknowledge that he had made any error in how he reacted as set forth in his multiple statements regarding the incident, as well as his prior discipline and employment history.[101] In coming to this recommendation, the attendees focused on the seriousness of the use of force, especially in light of SPD's renewed focus on and communication about community trust, de-escalation and efforts to ensure the proper use of force.[102] Following the meeting, a proposed Disciplinary Action Report ("DAR") was prepared recommending termination. Officer Shepherd was advised of the proposed termination, and of his rights to a *Loudermill* hearing with the Chief.[103]

**F. Officer Shepherd's *Loudermill* Hearing.**

On February 26, 2016, Officer Shepherd attended a *Loudermill* hearing with Chief O'Toole, OPA Director Murphy, SPOG President Ron Smith, Assistant Chief Wilske, Assistant Chief Best, Human Resources Director Fields, and counsel for the Department.[104] In preparation for the *Loudermill* hearing, Chief O'Toole reviewed the OPA file, including the ICV, Shepherd's ICV, the recommended discipline, and considered, among other things, Officer Shepherd's prior 10-day suspension.[105] Chief O'Toole was particularly struck by

---

[100] TR at 465:16-466:5 (Wilske) (discussing why termination was appropriate and concerns about Ofc. Shepherd being back out on the street); 461:21-24 (Wilske) ("And quite honestly, I didn't find that the force used was reasonable, necessary and proportionate. Quite honestly, I didn't find it to be a particularly close call that it was a policy violation"); 469:14-470:1 (Wilske) (discussing that the force was likely improper under prior policies); 474:6-11 (Wilske) (discussing that it wasn't the right thing to do based on his 32 years of experience); 477:22 (Wilske) (describing the violations as "very egregious"); 282:10-20 (O'Toole) ("for the last nearly 40 years, I always knew that – I mean it was always understood that, you know, you don't use force on a handcuffed prisoner unless there's no other option whatsoever"); 305:8-22 (O'Toole); 255:20-257:24 (Grenon) (discussing pre-2014 training consistency with post-2014 training); 259:2-16 (Grenon) ("I would say code red")..

[101] TR at 465:5-466: 11 (Wilske).

[102] TR at 465:5-12 (Wilske).

[103] TR at 466:12-25 (Wilske); Ex. 43.

[104] TR at 467:5-20 (Wilske); Ex. 45.

[105] TR at 288:6-290:1 (O'Toole); 295:20-296:9 (O'Toole).



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

Officer Shepherd's lack of concern or understanding that his unnecessary use of force had put a public stain on the Department.[106] Chief O'Toole felt that an officer who had fully absorbed the training on de-escalation and the other use-of-force policies that Officer Shepherd had reviewed would have known that his actions were entirely unacceptable.[107] In fact, it struck Chief O'Toole that even common sense would establish that Officer Shepherd's actions were out of line.[108]

Chief O'Toole listened to SPOG's presentation of Officer Shepherd's case and was disappointed by what she heard; she was again struck by the nonchalance and lack of remorse of Officer Shepherd.[109] Indeed, in Chief O'Toole's estimation, Officer Shepherd not only failed to recognize the gravity of his crushing punch on Ms. Durden-Bosley, but also did not feel he had made any mistakes with regard to any aspect of the incident.[110] Given her experience in prior *Loudermill* hearings, Chief O'Toole noted that most officers realize that, if nothing else, they "did something wrong, made mistakes. And in this instance, there was no acknowledgement whatsoever that there was any violation."[111] The other *Loudermill* attendees had the same impression.[112]

SPOG requested that OPA review additional materials, including the FBI investigation materials, the analysis and report of Sergeant Carpenter, a revised report issued by Trooper Bragg of the WSP, the training received by Officer Shepherd prior to the incident, and a prior contact in 2013 between Ms. Durden-Bosley and Officer Shepherd.[113] At Chief O'Toole's request and in order to leave no stone unturned, OPA reviewed every item requested by SPOG.[114] SPOG agreed to provide additional time to OPA to complete that further

---

[106] TR 294:3-9 (O'Toole); *cf.* TR at 465:8-20 (Wilske).
[107] Ex. 47 at p. 3 (DRB-SHEP010336).
[108] *Id.*
[109] TR at 294:3-9 (O'Toole); 301:9-23 (O'Toole).
[110] *Id.*
[111] TR at 301:12-17 (O'Toole).
[112] *See, e.g.*, TR at 470:9-23 (Wilske).
[113] TR at 81:10-20 (Murphy); TR at 471:9-472:2 (O'Toole).
[114] TR at 333:9-15 (O'Toole); Ex. 45.



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

investigation.[115] In addition, because Officer Shepherd raised questions of bias, Chief O'Toole requested an EEO investigation into his concerns, which found no violation of SPD EEO policies.[116]

**G. OPA's Further Investigation Did Not Result in Modified Findings.**

On June 9, 2016, OPA completed its further investigation.[117] It had reviewed the FBI interviews conducted on the matter, the expert opinions concerning the use of force presented by Officer Shepherd, the training undertaken by Officer Shepherd, statements of Officer Peterson concerning Officer Shepherd's punch being consistent with his training, and the previous contact between Officer Shepherd and Ms. Durden-Bosley.[118] It also conducted an interview of Officer Peterson.[119] Director Murphy reported that the further review did not alter OPA's findings with regard to any of the sustained violations of SPD policies.[120]

**H. Officer Shepherd's Second *Loudermill* Hearing.**

On July 25, 2016, SPOG and Officer Shepherd again appeared before Chief O'Toole to argue against the termination of Officer Shepherd's employment. Officer Shepherd's arguments at the second *Loudermill* hearing were substantially similar to those that had already been presented to Chief O'Toole and that had been further investigated by OPA.[121] They were no more persuasive the second time around. [122]

Chief O'Toole remained struck by Officer Shepherd's continued outright denial that he had done anything wrong,[123] and she expressed significant concern with his lack of

---

[115] Ex. 44.

[116] TR at 359:5-360:4 (O'Toole).

[117] Ex. 45.

[118] *Id.*

[119] *Id.*; TR at 82:23-25 (Murphy).

[120] Ex. 45.

[121] TR at 468:5-469:13 (Wilske).

[122] TR at 295:11-19 (O'Toole).

[123] TR at 301:12-17 (O'Toole); Ex. 47 at pp. 2-3 (DRB-SHEP010335-36).



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

understanding as to how his conduct so starkly contrasted with the clear expectations set and established by SPD policies and training.[124]

**I. Chief O'Toole Terminates Officer Shepherd's Employment.**

Following Officer Shepherd's presentation at the second *Loudermill* hearing, and after considering all of the information at her disposal, Chief O'Toole determined that the policy violations concerning Officer Shepherd's use of force should be sustained and terminated Officer Shepherd's employment.[125] Chief O'Toole determined that termination was the only appropriate option as a result of the egregious facts of the incident, the multiple policy violations, the lack of trust she had in his self-control, and his prior significant discipline for another policy violation.[126]

The Chief issued a final Disciplinary Action Report detailing her decision.[127] In it, she noted that even the violation of Seattle Police Manual 8.100(2) alone (Use of Force Against Handcuffed Suspect) would have warranted termination.[128]

**J. The State of SPD's Relationship with The Community.**

Building and maintaining the public's trust are integral to the SPD's mission.[129] The Department's patrol officers are the public face of SPD and often the first and only point of contact a citizen has with SPD. SPD always has trained its officers that the use of unnecessary or unreasonable force is prohibited.[130] And in the years immediately prior to Officer Shepherd's conduct and discipline, the improper and unconstitutional use of force by SPD

---

[124] Ex. 47 at p. 2 (DRB-SHEP010335).

[125] *Id.* at pp. 2-3 (DRB-SHEP010335-36).

[126] *Id.* at p. 3 (DRB-SHEP010336); TR at 305:8-22 (O'Toole) (testifying regarding her final termination decision that her initial impression was that it was a "clear violation of policy" and that after consultation with the others involved in the Loudermill, "it wasn't a difficult decision").

[127] *See* Ex. 47.

[128] *Id.* at p. 3 (DRB-SHEP010336).

[129] TR at 304:9-24 (O'Toole); 472:19-473:25 (Wilske); Ex. 47 at p. 3 (DRB-SHEP010336) ("Public safety and public trust remain at the forefront of my decisions as chief, and this decision is no exception").

[130] TR at 229:20-230:6 (Grenon); 437:14-438:3 (Grenon) (discussing that the "well-trained officer" is expected to utilize their training "to react . . . [in an] objectively reasonable and necessary and proportional [way] as opposed to just reacting").



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

officers was investigated by the United States Department of Justice.[131] Ultimately the SPD agreed to a Consent Decree with the Department of Justice that emphasized use-of-force issues and required certain operational changes.

Those operational and policy changes included revision of its use-of-force policies, adoption and implementation of a significant amount of training for its officers to ensure an adequate understanding of the policies, and supervisory and structural changes to ensure adequate supervision and review of use-of-force incidents.[132]

These changes were highlighted by implementation of a new de-escalation policy, which was central to the recommendations of the Department of Justice, which among other things noted that the focus needed to be on how to avoid conflict, as opposed to how to win it.[133] Importantly, while the policy was entirely new, the concepts were consistent with those taught to SPD officers for years, including through the Tactical Concepts Model ("TCM") created by Sergeant James Kim that had long been included in trainings.[134]

All officers in SPD, including Officer Shepherd, received training when these new policies were rolled out at the beginning of 2014.[135] That training, which Officer Shepherd

---

[131] One incident particularly called out by the Department of Justice was when "a handcuffed man was being seated in a patrol car when he started to kick his feet at two officers. One of the officers then punched the subject five times in the stomach and chest with a closed fist, rather than finding alternate ways to gain full compliance from this already restrained subject." Ex. 3, *DOJ Report*, at p. 14 (DRB-SHEP010156).

[132] TR at 226:6-227:10 (Grenon).

[133] Ex. 3, *DOJ Report*, at pp. 23-24 (DRB-SHEP010165-66); TR at 226:10-13 (Grenon).

[134] TR 250:7-252:9 (Grenon) (discussing the TCM and its inclusion in training for years, as well as the consistency of concepts over the years).

[135] *See* Stipulation Regarding Training Received by Adley Shepherd ("Training Stipulation") submitted herewith; *see also* Ex. 76, OPA-G, 14-199378 FIT Investigation Files, FIT Related Police Reports at DRB-SHEP002261-62 (describing Phase 1 and Phase 2 of training associated with the rollout of the new policies); TR at 904:11-905:3 and 905:19-906:1 (O'Neill) (acknowledging that Shepherd had attended all the e-Learnings on the new use of force policies, along with the classroom training on Core Principles and other classroom trainings on the new policies); Ex. 59 (which identifies all trainings received by Officer Shepherd); TR at 238:2-9 (Grenon) ("This is a comprehensive listing of the training that Officer Adley Shepherd had taken in the Seattle Police Department. It looks like it covers a multi-year period and shows all the different types of training that he's had."); Exs. 48-58, 79-80, 82-85 (selected training materials and records of Officer Shepherd's attendance at same); TR at 238:10-16 (Grenon) (regarding Officer Shepherd's review of the Chief Bailey video on the new use-of-force policies); 243:8-244:15 (Grenon) (regarding Officer Shepherd's attendance at the Core Principles classroom training); 247:7-248:15 (Grenon) (regarding the e-Learning on Authorized Use of Force); 248:21-249:12 (Grenon) (regarding Officer Shepherd's attendance at the Use of Force Decision-Making course in 2012); *and* 259:17-22 (Grenon) (Ex. 58, notated on Ex. 59 at p. 2 as "Use of Force Decision Making 2012"). Officer Shepherd's training record also includes Street Skills 2012 Tactics (Ex. 82, notated on Ex. 59 at p. 2 (DRB-SHEP010404) as "Street Skills 2012 -



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

received, included training on the policy language itself through a Directive and quiz on the material, a video from the Chief of Police describing the policies and their importance, e-Learnings on the new policies, and classroom training on the policies that included scenario-based learning.[136] Of particular import to the facts of this case, Officer Shepherd received the following trainings: Directive 13-00054; e-Learning on Authorized Use of Force; classroom training with scenarios on Use of Force Core Principles.[137] Prior trainings received by Officer Shepherd incorporating the TCM, including Use of Force Decision Making and several Street Skills courses, also are pertinent to the issues in this matter.[138] Although Officer Shepherd's representatives devoted considerable attention in these proceedings to arguments about Officer Shepherd's training, in fact the content of Officer Shepherd's training is essentially undisputed – as is the fact that he was on notice of the new policies and trained on their content.[139]

## III. ISSUE

This grievance was brought by SPOG under its Collective Bargaining Agreement with the City of Seattle,[140] and SPOG requested a Disciplinary Review Board hearing to review the termination of its member Officer Shepherd.[141] The CBA provides that the issue is as follows: Did the Seattle Police Department have just cause to terminate Officer Shepherd for his actions during the June 22, 2014 arrest of Miyekko Durden-Bosley? If not, what is the appropriate remedy?[142]

Tactics"), Street Skills 2011 Tactics (Ex. 84, notated on Ex. 59 at p. 3 (DRB-SHEP010405) as "SS11 ICC/Tactics I and II"), and Street Skills 2010 Tactics (Ex. 85, notated on Ex. 59 at p. 3 (DRB-SHEP010405) as "SS010 ICC/Tactics I and II").

[136] *Id.*

[137] *Id.*

[138] *Id.* (specifically noting those courses toward the end of n.135); TR 250:7-252:9 (Grenon); 735:2-739:13 (Kim).

[139] *Supra* n.135; Training Stipulation.

[140] Ex. 1.

[141] Ex. 2.

[142] Ex. 1 at § 3.5(H)(1).



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

## IV. ANALYSIS

### A. Burden of Proof.

It is SPD's burden to prove it had just cause to discharge Officer Shepherd. Arbitrators generally agree that "preponderance of the evidence" is the standard to apply in the ordinary discharge or discipline case, only using a higher burden in cases of criminal behavior or moral turpitude.[143] Arguably, the standard is even lower, with this Board sitting in a capacity analogous to an "appellate tribunal whose function is to discover whether the decision of the trial tribunal (the employer) was within the bounds of reasonableness" and looking only for whether there was "substantial evidence" that the employee did the acts charged by management, and assessing whether management had "reasonable grounds for believing the evidence presented to [management] by [management's] own people."[144]

SPOG may argue (as it has in other proceedings) that a higher burden of proof applies here given the "serious nature" of the discipline. That argument is belied not only by the weight of precedent, but also by the language of the CBA, which specifies a higher "clear and convincing evidence" standard *only* where a "presumption of termination" applies, namely for dishonesty violations relating to the administration of justice.[145] "A CBA is a contract, whose construction is governed by ordinary principles of contract law."[146] Where a contract provides for a higher burden of proof for a single issue, that higher burden does not extend to other issues. "[T]he court must enforce the contract as written[.]"[147] The CBA expressly provides for that higher burden of proof *only* for dishonesty findings, and because the parties specified

---

[143] *See* Elkouri & Elkouri, *How Arbitration Works*, at 15-26 n.123 (8th ed., BNA 2016); *Rittman Nursing Center*, 113 LA 284 (Kelman, 1999) ("[a]s for the required level of proof in discipline and discharge cases, the prevailing standard is preponderance of the evidence" except for criminal allegations); *BASF Wyandotte Corp.*, 63 LA 121 (Bettner, 1974) (absent criminal allegations, the "appropriate standard . . . is proof by a preponderance of the evidence, which is the standard used in civil litigation as in the ordinary fact discharge used in arbitration.").

[144] *See generally Enterprise Wire Co.*, 46 LA 359, 364 (Appendix) (Daugherty, 1966); Elkouri & Elkouri at 15-30.

[145] Ex. 1 at § 3.1.

[146] *Spokane Sch. Dist. No. 81 v. Spokane Educ. Ass'n*, 182 Wn. App. 291, 305, 331 P.3d 60 (2014).

[147] *Lehrer v. State, Dept. of Social and Health Svcs.*, 101 Wn. App. 509, 515, 5 P.3d 722 (2000), *citing McDonald v. State Farm Fire & Cas. Co.*, 119 Wn.2d 724, 733, 837 P.2d 1000 (1992); *see also Hearst Comm's, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 503-04, 115 P.3d 262 (2005) ("We do not interpret what was intended to be written but what was written.").



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

when to use that higher burden, it must be assumed that the parties intentionally elected *not* to apply that higher burden to other issues. The "preponderance of the evidence" standard is the only one applicable here.

Regardless of the standard of proof applied, the competent and credible evidence establishes that the SPD has met its burden that it had just cause for Shepherd's discharge.

**B. SPD Had Just Cause to Discharge Officer Shepherd.**

The evidence introduced in this DRB establishes just cause for the discharge of Officer Shepherd from SPD. Just cause is a flexible standard involving a balancing of interests and concerns for fundamental fairness. In general, the just cause standard is one of reasonableness, namely "whether a reasonable [person] taking into account all relevant circumstances[] would find sufficient justification in the conduct of the employee to warrant [discharge]."[148]

Public safety employees are held to a higher degree of accountability than most other professional employees. Their performance has a direct effect upon the people they are entrusted to serve.[149] "Discharge cases cannot be taken lightly. But police misconduct must be dealt with seriously."[150]

The remainder of this argument tracks the widely-accepted *Enterprise Wire* just cause test,[151] and demonstrates that: (1) Officer Shepherd's actions violated several SPD policies regarding officers' use of force; (2) he had notice that his conduct violated those policies (which had been emphasized in the months prior to the incident) and that violation of those policies could result in discipline; (3) SPD's policies regarding the use of force on handcuffed prisoners were reasonably related to its mission; (4) OPA conducted a fair, thorough, and

---

[148] *RCA Communications, Inc.*, 29 LA 567, 571 (Harris, 1957).

[149] *See, e.g., City of Coweta*, 119 LA 42 (Moore, 2003); *City of Oakland Park*, 133 LA 929 (Wood, 2014) (finding that public safety employees are typically held to a higher standard of conduct because they hold positions of public trust); *Perkins Township Trustees*, 1999 LA Supp. 107930 (Ruben, 1999) (conduct of those who hold public safety positions is subject to a broader scope of scrutiny because of the special trust and confidence the public reposes in them).

[150] *Labor Arbitration Decision*, 2010 LA Supp. 161547 (Dorby, 2010).

[151] Arbitrator Daugherty articulated a widely-accepted test for just cause in *Enterprise Wire Co.*, 46 LA at 363-364, and the listed topics track these elements.



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

appropriate investigation; (5) Officer Shepherd's actions were unique such that a valid comparator could not be identified, and therefore the discipline was not inconsistent with other discipline; and (6) discharge was the only appropriate remedy for Officer Shepherd's conduct.

**1. The Evidence Establishes That Officer Shepherd Violated Multiple SPD Policies When He Punched the Handcuffed and Seated Ms. Durden-Bosley.**

As Chief O'Toole testified, "SPD policies and procedures hold officers to a higher standard[,]" which was "developed . . . under the watchful eye of the federal government because they wanted us to have . . . more stringent policies around use of force given the department's history."[152] Officer Shepherd failed to abide by those policies.

Officer Shepherd's failure to act in accordance with SPD policies is objectively demonstrated in the ICV recording. It is undisputed that Officer Shepherd punched Ms. Durden-Bosley, and the circumstances are extensively portrayed in the video. "What happened" is not subject to meaningful dispute. And, for the many reasons discussed below, Officer Shepherd's actions violated several SPD policies regarding the proper use-of-force.[153]

**a. The Department's use-of-force policy (8.100(2)) specifically precludes force against restrained people except in exceptional circumstances not present here.**

Officer Shepherd violated the policy prohibiting the use of force in certain circumstances because: (1) there was no threat that needed to be immediately stopped, a prerequisite to any use of force against a handcuffed suspect; (2) Officer Shepherd's punch appears to have been punitive or retaliatory, which is never allowed; and (3) there were reasonably effective alternatives to Officer Shepherd's use of force against Ms. Durden-Bosley.

**1) There was no threat that needed to be immediately stopped.**

Pursuant to the policy, force may **not** be used on a handcuffed suspect except in "exceptional circumstances" "when the subject's actions must be immediately stopped to

---

[152] TR at 292:15-18 (O'Toole); 346:13-20 (O'Toole).

[153] This is *not* an inquiry into the constitutionality of Officer Shepherd's actions, as some of Officer Shepherd's witnesses seemed to suggest, but rather into whether his actions comported with the specific and more restrictive language of SPD's policies.



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

prevent injury, escape, or destruction of property."[154] No exceptional circumstances existed here, as there was no need to "immediately stop" any action of Ms. Durden-Bosley. She posed no immediate threat at that time to Officer Shepherd or to any other person or property.

Officer Shepherd and his witnesses tried to address this by arguing that he was somehow 'engaged' in a continuing or ongoing fight that required a forceful and prompt response. However, critically, *no witness* testified that Officer Shepherd remained *within range* of Ms. Durden-Bosley's feet when he stepped back following her kick. To the contrary, even witnesses that Officer Shepherd selected to present in an attempt to bolster his case, including Sergeant Zerr, Lieutenant Strand, and Sergeant Kim, testified that he was *out of range* of Ms. Durden-Bosley *prior* to initiating his tactical decision to re-enter the patrol vehicle and use force against her.[155]

Additionally, as Sergeant Zerr conceded, Officer Shepherd's verbalization, "She kicked me" shows there was a break in the action following Ms. Durden-Bosley's kick, a break during which Officer Shepherd was able to consider what actions to take: "Verbalizations are something you can't do until there's that pause. . . . Because your mind is now saying, I've got that pause, I can use verbalizations now."[156] That break, in addition to his being out of range, establishes that the engagement was not ongoing. Officer Shepherd had options, considered them, and selected an option that violated SPD policies. The immediacy of threat required to use *any* force against a handcuffed suspect was not present in this circumstance, and Officer Shepherd's use of force was violative of the policy.

---

[154] Ex. 6 (emphasis in original).

[155] *See, e.g.*, TR 558:13-22 (Zerr) (including the testimony that it was "true" that Officer Shepherd was not within range of her feet after he had stepped back following the kick); 559:17-21 (Zerr) (that Officer Shepherd chose a tactical response to re-enter the vehicle and use force against Ms. Durden-Bosley); 629:6-9 (Strand) ("he was outside that [leg kicking range] when he gained his balance"); 729:12-25 and 746:13-747:24 (Kim) (testifying that he was outside the range of Ms. Durden-Bosley's feet when he stepped back and she was still seated in the patrol vehicle);

[156] TR at 542:7-17 (Zerr); 557:8-558:2 (Zerr) (same).



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

**2) The punch appears to have been retaliatory or punitive.**

Policy 8.100(2) specifically proscribes any use of force that is retaliatory or punitive in nature. It appeared to Captain Grenon that Officer Shepherd's use of force may have been punitive or retaliatory.[157] His prior loss of patience also is relevant here, as his patience was "done" before he even decided to make an arrest.[158] It was just, as Officer Shepherd put it, "not the day" for Ms. Durden-Bosley to do that.[159] SPD acknowledges that this was not an independent reason for termination set forth in the DAR,[160] but the possibility that his use of force was retaliatory or punitive highlights that Officer Shepherd's use of force was neither reasonable nor necessary, and therefore violated the SPD policies that did form the basis for his termination.

**3) Reasonably effective alternatives existed and were apparent.**

SPD policy also forbids the use of force against a handcuffed suspect unless no reasonably effective alternatives that appear to exist at the time.[161]

The numerous reasonably effective alternatives, including the ability to call on the assistance of other officers or using the door as a shield, establish that Officer Shepherd's use of force violated SPD Policy 8.100(2). Among the reasonably effective alternatives that were available to Officer Shepherd immediately following her kick were the following:

- Officer Shepherd could have used the door as a shield to ensure Ms. Durden-Bosley couldn't kick him (or anyone else);
- Similarly, the car door could have been utilized to impede any possibility of her exit from the vehicle;
- He could have communicated to her to stand down and put her feet into the vehicle so he could close the door;

---

[157] TR at 259:4-12 (Grenon).
[158] Ex. 81 at 12:36-12:38.
[159] *Id*. at 9:47-9:50.
[160] Ex. 47.
[161] Ex. 6 at SPD Policy 8.100(2).



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

- He could have obtained assistance from his fellow officers to pull her into the vehicle from the other door; or
- He could have simply stepped back a couple more feet to reassess his options with his fellow officers, placing him further from any prospective danger.

**b. Officer Shepherd violated the SPD policy regarding the reasonable, necessary and proportional use of force (Policy 8.100(1)).**

The situation faced by Officer Shepherd did not allow for his use of force against Ms. Durden-Bosley—it was unreasonable, unnecessary, and disproportionate. As a result, his use of force violated SPD Policy 8.100(1).

**1) The use of force was not reasonable based on the totality of the circumstances facing Officer Shepherd at the time.**

As the policy indicates, the "totality of circumstances" are taken into account when determining the reasonableness of an officer's use of force.[162] The policy notes that the review is not intended to be 20/20 hindsight.[163] This follows *Graham v. Conner*.[164] The inquiry looks at what a reasonable officer would have done when facing the same circumstances, and whether Officer Shepherd's actions were reasonable in light of that inquiry.[165]

This doesn't mean that Officer Shepherd's actions are presumed reasonable, or that his thoughts or perceptions necessarily were those of a reasonable officer – this approach would presume reasonableness for every action by officers. "Not all errors in perception or judgment . . . are reasonable."[166] This Panel must look at the totality of the situation from the perspective of a reasonable officer perceiving the same facts, and "ask whether a reasonable officer would

[162] Ex. 6.

[163] *Id.*

[164] *Graham v. Conner*, 490 U.S. 386, 396 (1989) ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight")

[165] *See* TR 257:13-258:20 (Grenon) (discussing how officers' actions are judged); TR 820:22-821:13 (Peterson) (noting that officers must take into account the totality of the circumstances); *see also Scott v. Harris*, 550 U.S. 372, 383 (2007) (noting that the inquiry is fact-intensive, and that a decision-maker must "slosh [her] way through the factbound morass of 'reasonableness'" to arrive at an answer to whether a use of force was objectively reasonable).

[166] *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir., 2011).



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

have or *should* have accurately perceived."[167] The Panel then must examine what a reasonable officer should have done when facing those circumstances, and assess Officer Shepherd's actions through that lens.[168]

The factors outlined for reasonableness in the policy[169] all establish that the use of force in this instance was unreasonable. The policy specifically points to the risk of the subject's escape, the time available to an officer to make a decision, the availability of other resources, and the potential for injury to citizens or others.[170] Some of these are addressed below, and several were referenced in Officer Shepherd's DAR.[171] Factors indicating that Officer Shepherd's use of force was unreasonable include:

- At the time Officer Shepherd punched her, neither he nor other officers were in range of her feet; as such, Ms. Durden-Bosley was not an *immediate* threat to officers or others;
- The risk of escape, while not non-existent, was low, as Ms. Durden-Bosley would have had to escape the back of the patrol vehicle while handcuffed and heavily inebriated, and to escape from three officers on the scene, one of whom was a K-9 officer;
- Ms. Durden-Bosley was not a credible challenge to anyone when Officer Shepherd punched her;
- Officer Shepherd had time available to choose other actions and to avoid the use of force altogether, and could have given himself even more time through one of many other actions, including simply stopping to assess the situation;

[167] *Id.*
[168] *Id.*
[169] *See* Ex. 6.
[170] *Id.*
[171] *See* Ex. 47 at p. 1.



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

- Officer Shepherd had the car door available for shielding and two other officers to assist in addressing the situation without the immediate need for any use of force and had available all the alternatives listed at pp. 26–27, among others;
- Officer Shepherd had received extensive training about the reasonableness of any use of force, including recent and extensive training on the new policies;

In arguing that his strike was reasonable, Officer Shepherd brought his friend, Officer Rich Peterson, to testify on his behalf.[172] They were both in the military, and both describe themselves as experts at fighting techniques.[173] In fact, Officer Peterson exclusively taught "combatives," the military version of fighting tactics, for about the last four years he was in the military, and referred to his specialty in training officers as "fighting."[174] Officer Peterson expressed apparent pride in how Officer Shepherd had handled himself in the incident.[175] He indicated that the "fight is on" when an officer is "about to be attacked" or is "being attacked in that space and time," and that an officer should react with force.[176] Officer Shepherd analogized the situation to a war zone, noting "that's the reality of war, and that's the reality of getting assaulted, and that's the reality of being in the fight at the time."[177] Both he and Officer Peterson also acknowledged, however, that well-trained professional fighters such as them could "turn it off just as fast" and could make "split-second decisions."[178]

The import of Officer Peterson's testimony is that Officer Shepherd used good fighting tactics and fought well. This misses the point. This was not a war zone—the rules of engagement are different in civilian policing than in Afghanistan or Iraq—and the situation was not even properly characterized as a fight. The issue here is not whether force was used

---

[172] Neither wanted to admit that they were friends, with Officer Peterson saying he is friends with all officers, and with Officer Shepherd only admitting he was an instructor for several questions before finally acknowledging that they have been friends since the Academy. TR at 802:23-803:1 (Peterson); 989:13-990:22 (Shepherd).

[173] TR 1044:19-24 (Shepherd); TR 782:23-784:1 (Peterson) (discussing his extensive martial arts and military fighting training).

[174] TR 783:19-784:1 (Peterson); 852:21-23 (Peterson).

[175] TR 799:23-24 (Peterson).

[176] TR 823:4-6 (Peterson); 791:1-2 (Peterson) 828:21-829:3 (Peterson).

[177] TR 966:17-19 (Shepherd).

[178] TR 966:20-22 (Shepherd); 822:19-23 (Peterson).



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

skillfully, but *whether it should have been used at all.* At the time that Officer Shepherd punched Ms. Durden-Bosley, he was not "being attacked in that space and time." The single kick to his vest and jaw had already occurred, and Officer Shepherd was able to move back away from Ms. Durden-Bosley after her kick, able to disengage from her, able to get out of range of her feet, able to assess the situation and communicate with other officers that he'd been kicked, and able to (though he *did not*) take additional time or use other options besides the use of force. In Officer Shepherd's own words, he could have "turned it off" in a split second and ensured that no force needed to be utilized against Ms. Durden-Bosley. However, despite the distance, time, officers, potential shielding, and other options available to him, Officer Shepherd improperly chose to treat the situation as combat, and elected to proceed with force unsuited to civilian police work and not appropriate given the totality of the circumstances facing Officer Shepherd at the time.

The evidence establishes that Officer Shepherd violated the policy and unreasonably used force against Ms. Durden-Bosley. As Captain Grenon testified, Officer Shepherd improperly and unnecessarily went "Code Red."[179] His actions were obviously not in accord with the SPD policies or training.[180] The totality of the circumstances do not evidence a "war zone" or even a fight; they evidence a clear opportunity for Officer Shepherd to have avoided the use of force against Ms. Durden-Bosley, and SPD policies required him to take advantage of that opportunity to avoid the unreasonable use of force.

**2) The use of force was not necessary because there were many reasonably effective alternatives to the use of force against Ms. Durden-Bosley.**

Likewise, the use of force was not necessary. SPD policy only allows physical force when it is "necessary," that is, "when *no reasonable effective alternative* appears to exist."[181] As outlined in part in the DAR,[182] many reasonably effective alternatives existed at the time

---

[179] TR at 259:13-14 (Grenon).

[180] TR at 259:2-16 (Grenon).

[181] Ex. 6 at SPD Policy 8.100(1) (emphasis added).

[182] *See* Ex. 47 at pp. 1-2 (DRB-SHEP 010334-35).



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

Officer Shepherd made the tactical decision to re-enter the vehicle and to punch Ms. Durden-Bosley; Officer Shepherd simply chose not to take advantage of them. *See* alternatives listed at pp. 26–27.

The policy also notes that when force is necessary (though it was not here), it can only be utilized to the degree necessary to effect a lawful purpose. Even if some force were arguably acceptable, there were several minimal force options that could have accomplished the same thing as his punch, but with much less danger to him or to Ms. Durden-Bosley, including:

- Pressing the door against Ms. Durden-Bosley's legs to restrict her movement;
- Utilizing a leg restraint.
- Putting Ms. Durden-Bosley into a bear hug; or
- Pushing Ms. Durden-Bos ley's head back with the palm of his hand (since she was handcuffed and couldn't punch back).

Additionally, despite various testimony elicited by Officer Shepherd about what might happen if an officer were concussed, Officer Shepherd did not suffer a head injury, was not feeling woozy, dizzy, or confused following Ms. Durden-Bosley's kick to his vest and jaw.[183] On cross-examination, he explicitly disclaimed the argument that he had suffered a head injury.[184] As his own witness, Sergeant Zerr, noted:

> If you are actually in your right mind in the sense that you have all your full faculties, you can reason out a lot of things. You can play out a million scenarios of this stuff. . . . We could talk about de-escalation and all of the things that could have been played out when you . . . have all of your faculties.[185]

Officer Shepherd had an obligation to reason out the options and to take advantage of available options other than his punch of Ms. Durden-Bosley. The above are by no means an exhaustive list of the options Officer Shepherd had to address the situation with Ms. Durden-Bosley. But *any* of the options discussed above, in the DAR, and at pp. 26–27, would have

---

[183] *See supra* at p. 7 and n.38 for a detailed discussion of this point.

[184] TR at 1054:2-15 (Shepherd).

[185] TR 572:11-18 (Zerr).



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

been reasonably effective alternatives to the tactic chosen and employed by Officer Shepherd to forcefully punch Ms. Durden-Bosley in the face and break her eye socket in two places. For that reason, the force was not necessary, and Officer Shepherd's use of force violated SPD policy.

**c. Officer Shepherd violated the de-escalation policy (8.100(3)).**

Under the circumstances of this arrest, SPD policy required Officer Shepherd to de-escalate the situation, not to utilize force.[186] The policy itself outlines many ways in which Officer Shepherd could have addressed the situation without the use of force:

- Officer Shepherd could have used the door as a shield from any further kick;
- He could have used the door to impede her potential exit from within the vehicle with limited or no force;
- He could have remained out of range of any further kicks, instead of diving back into such range;
- Officer Shepherd could have increased the distance between him and Ms. Durden-Bosley and sought cover;
- He could have communicated with Ms. Durden-Bosley to obtain her cooperation after she had kicked at him, seeking to get her compliance to finish getting within the patrol vehicle without escalation;
- Since there was no immediacy of potential harm to him or anyone else, he could have avoided physical confrontation by staying away from the open door;
- He could have called on the other officers on scene, both of whom were within feet of the open door, to assist; and
- He could have simply stayed where he was and used more time to assess more options.

[186] Ex. 6 at SPD Policy 8.100(3).



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

Officer Shepherd ignored all of these options, despite receiving training on all of them and despite understanding that de-escalation was a new and central policy of the SPD in the wake of the Consent Decree. His failure to de-escalate was a violation of the policy.

**2. Officer Shepherd Had Notice that his Conduct Violated Policies and Could Result in Discipline.**

Officer Shepherd was on notice of "the possible or probably disciplinary consequences of his conduct."[187] The test for whether notice has been given is objective – in other words, has the employer taken reasonable steps to provide the employee with notice. An employer is not required to use any particular form of communication to inform employees of the rules. "So long as the rules exist, and are known to the employees, the sufficiency of the rule is established."[188] SPD took reasonable and thorough steps to ensure that every SPD officer had sufficient notice of the use-of-force policies that precluded the very action Officer Shepherd took, through explicit written policies, a Directive to all officers identifying and clearly outlining the policies and their importance, and training and various other forms of communication. These measures gave Officer Shepherd actual and ample notice of the policies and practices he violated, and knowledge that his actions in violation of those policies and practices could result in discipline.

**a. The Directive Highlighting the Modified Use-of-Force Policies Provided Actual Notice to Officer Shepherd of SPD's Expectations**

All SPD sworn personnel were alerted to the changes in SPD's use-of-force policies via a Directive sent on or about December 31, 2013, including a description of the changes, the applicable new policies, and other forms and materials.[189] All SPD personnel were required to review and understand that material. It noted, in bold, "**Officers are required to read Title 8 by January 1st or their first day back to work thereafter.**"[190] Section commanders were

[187] *Enterprise Wire*, 46 LA at 463.

[188] *Eastern Air Lines, Inc.*, 44 LA 459, 461 (Murphy, 1965).

[189] Ex. 48 (SPD Directive 13-00054).

[190] *Id.* at p. 1 (DRB-SHEP 007831).



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

required to verify that all sworn officers had done so.[191] The Directive went on to note that "**Officers are expected to comply with the new policy effective January 1st.**"[192]

The Directive went on to set forth each of the newly-applicable policies, including all of those at issue in this matter. The policies can be found in the Directive and in the separate pertinent policy exhibit.[193]

Officer Shepherd acknowledged receipt of the Directive and his review of the modified policies.[194] By taking a quiz and certifying he had read and understood the Directive, Officer Shepherd indicated that he understood that he would be held to account for abiding by those policies, and that his actions would be judged under those policies following their adoption on January 1, 2014.[195] Officer Shepherd also received the "significant training" from SPD on the new policies as discussed in the Training Stipulation, testimony concerning his training, and evidence presented at the hearing.[196]

**b. Officer Shepherd had notice through the receipt of substantial training on the new policies**

SPD required all of its officers to attend a series of trainings designed to "address the essential requirements of uniform policy understanding and policy compliance."[197] The trainings consisted of the following elements:

Phase 1:

- Chief's introduction of Use of Force policy message

---

[191] *Id.*

[192] *Id.* at p. 4 (DRB-SHEP 007834).

[193] *Id.* at pp. 6-17 (DRB-SHEP 007836-47); Ex. 6.

[194] Exs. 49-51; TR at 231:16-232:23 (Grenon).

[195] *Id.*; Officer Shepherd pointed to a subsequent Directive, SPD Directive 14-00019, that provided that "[u]ntil such time as an officer receives training in the new use of force policy, an officer's use of force that does not violate the Department's use of force policy in effect prior to January 1, 2014, but which is inconsistent with the new policy published on that date through Directive 13-0054, will result in instruction and training based on the new policy rather than discipline." Ex. 76, OPA-VV2 at DRB-SHEP007955. It went on to state, however, that "[o]nce an officer receives the updated use of force training, the above exemption will no longer apply." *Id.* at DRB-SHEP007956. As established at the hearing, Officer Shepherd received extensive training on the new use of force policies, so that Directive does not exempt him from discipline. *See infra* pp. 35-37; *supra* pp. 20-21 and n.135.

[196] *See supra* n.135; Training Stipulation.

[197] Ex. 76, OPA-G, 14-199378 FIT Investigation Files, FIT Related Police Reports at DRB-SHEP002263.



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

- e-Learning Modules[198]
  - Authorized Use of Force
  - Type I, II, III Use of Force identification
  - Less-Lethal Tools
  - Reviewing Use of Force
  - Force Investigation Team (FIT) callout criteria and procedures
- Use of Force Reporting for all officers

Phase 2, Block One:

- Use of Force Comprehensive Course: One day, 8 hours
  - Core Use of Force Concepts
    - In person interactive classroom presentation with policy identification scenarios
  - First Aid skills re-certification
  - Less-lethal Re-Certification
    - Present policy, drill deployment, conduct threat assessment scenario
    - Included six scenarios, three of which involved de-escalation[199]

SPD indicated that successful completion of that slate of training "ensures uniformity of understanding, encourages compliance, operationalizes core concepts and establishes the appropriate models for officer conduct."[200] Officer Shepherd acknowledged that he received all of that training prior to the incident central to this matter on June 22, 2014,[201] and his receipt of

---

[198] The e-Learnings were designed to "**assist officers in mastering the new policy.**" Ex. 48 at p. 3 (DRB-SHEP 007833) (emphasis in original).

[199] Ex. 76, OPA-G, 14-199378 FIT Investigation Files, FIT Related Police Reports at DRB-SHEP002261-62.

[200] *Id.*

[201] TR at 1007:25-1008:25 (Shepherd) (acknowledging that all training he received from SPD was received prior to June 22, 2014).



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

all of that training has been stipulated to and is memorialized in his training record.[202] The training that Officer Shepherd received put him on further notice that the use of force that was inconsistent with the policies adopted January 1, 2014 would not be tolerated by SPD.

**c. Officer Shepherd also had notice through receipt of prior training consistent with the new policies**

Officer Shepherd also attended various other trainings in the years leading up to the June 22, 2014 incident that trained him on concepts entirely consistent with the new policies.[203] These included several trainings covering the TCM, which taught officers to conduct threat assessments, utilize time, distance, and shielding, utilize angles, engage in command, communication and coordination, and to practice containment.[204] TCM posters were posted throughout SPD buildings.[205]

Sergeant Kim testified that the TCM emphasizes the same tactics as those in the de-escalation policy (8.100(3)), and Captain Grenon echoed that in his testimony.[206] And all officers were heavily exposed to it.[207] The concepts in TCM were essentially the same concepts built into the de-escalation policy, and those concepts were already familiar to officers prior to adoption of the de-escalation policy in January 2014.[208] In addition, prior training incorporated the concepts of the reasonable, necessary and proportional use of force by

---

[202] Training Stipulation; Ex. 59; TR at 238:2-9 (Grenon) ("This is a comprehensive listing of the training that Officer Adley Shepherd had taken in the Seattle Police Department. It looks like it covers a multi-year period and shows all the different types of training that he's had.").

[203] *See supra* n.135; Ex. 59.

[204] *See* Ex. 59 (establishing Officer Shepherd's attendance at trainings); Training Stipulation; *see also* Ex. 58 at DRB-SHEP010359; Exs. 82-85 (Street Skills courses attended by Officer Shepherd that incorporated the TCM); TR at 734:2-16 (Kim) (noting that the TCM is "typically shown as a reference for most of our curriculum up 'til today.").

[205] TR at 738:15-18 (Kim).

[206] TR at 735:20-736:1 (Kim); 251:9-254:16 (Grenon).

[207] TR at 738:13-739:9 (Kim).

[208] TR at 739:14-740:6 (Kim); 118:9-119:17 (Murphy) ("officers and the police department had continually and prior to [January 1, 2014] received training about how to de-escalate, tactics to be used for de-escalation . . . and officers were being trained in the very principles that were embodied and articulated in the January 1st, 2014 use-of-force policy").



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

officers, the accurate perception of threats, and taking into account the totality of the circumstances, including applicable law and policies.[209]

Again, Officer Shepherd understood from these trainings that he needed to utilize opportunities to de-escalate through utilization of time, distance, shielding, coordination, teamwork, containment, and communication, all of which were part of the TCM; that he was permitted to use only objectively reasonable, necessary and proportional force; and that he needed to take into account the totality of the circumstances, including applicable law and policies. His prior training underlines and emphasizes that he was on notice that his actions in punching Ms. Durden-Bosley on June 22, 2014 were not in accord with SPD policies and would result in discipline or discharge.

**d. Common sense established that the use of force against a handcuffed and partially contained prisoner was prohibited in these circumstances.**

Some workplace misconduct is so unquestionably wrong or inappropriate that it does not require the publication or specific notice of a rule encompassing it, and discipline for such conduct rests on the common sense interpretation of existing rules and the expectation of good judgment. Using force on a handcuffed, seated suspect who is not posing an imminent threat is so obviously wrong that notice should be presumed.[210] SPD policy and common sense put Officer Shepherd on notice that his use of force against a handcuffed, seated, and substantially contained prisoner would result in discipline or discharge.

---

[209] TR at 233:25-235:4 (Grenon) (finishing by noting that the policy "just highlights . . . the requirements to using reasonable and necessary and proportional force as opposed to in the past when we didn't have as great of clarity on these concepts"); 256:20-258:12 (Grenon) (noting the similarities with pre-2014 training including reasonable, necessary, proportional uses of force, prohibition on punitive use of force, and training officers to take into account the totality of the circumstances, including applicable law and policies); Ex. 58.

[210] *See, e.g., Enterprise Wire Co.*, 46 LA 359 (noting that forewarning is not always necessary "because certain offenses such as insubordination, coming to work intoxicated, drinking intoxicating beverages on the job, or theft of the property of the company or of fellow employee are so serious that any employee in the industrial society may properly be expected to know already that such conduct is offensive and heavily punishable"); *Patterson Steel Co.*, 37 LA 862 (1961) ("discipline may be meted out . . . even[] if all that is shown is conduct so out of harmony with the obligations of the employment that common sense should teach that it is forbidden"); *In re Detroit Inc. and International Union of Operating Engineers*, 118 LA 1777, 1781 (Allen, 2003) ("It is just plain common sense to know offensive racially derogatory comments should not be used by employees…there need not be a specific workplace rule prohibiting stealing, fighting, or using racial epithets and offensive racist language while at work. This is the type of misconduct that anyone, applying any common sense, should know is just plain wrong.").



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

### 3. The Seattle Police Department's Expectations Regarding the Use of Force and De-Escalation Are Reasonably Related to its Mission.

SPD has created appropriate policies reasonably related to ensuring the proper use of force and building confidence with the community that SPD serves. To establish just cause, SPD need only show that the policies at issue are "reasonably related to (a) the orderly, efficient, and safe operation of the [police force] and (b) the performance that [SPD] might properly expect of the [officer.]"[211] The policies at issue were drafted in conjunction with the Consent Decree to ensure constitutional policing, professionalism, the minimal use of force, and to rebuild public trust in the policing of SPD and its officers.[212] Concerns that had been raised historically about the improper use of force were addressed through policies, increased hours of training and increased supervision of the use of force; and the policies were designed to ensure the safety of the officers and the public at large.[213]

Although early in the proceedings SPOG feinted at an argument that SPD failed to comply with its own policies,[214] SPOG did not offer any evidence or argument that the SPD policies at issue here were unreasonable, nor could it do so; the policies are reasonably drafted to provide clear expectations to the officers and to set appropriately high standards for policing and use of force.

---

[211] *Enterprise Wire*, 46 LA at 363.

[212] Exs. 3 and 4 (DOJ Investigation Report and Consent Decree); TR at 225:19-226:13 (Grenon); TR at 227:17-228:20 (Grenon).

[213] *See, e.g.*, Ex. 5 (SPD Policy 8.000) ("It is the policy of the Seattle Police Department to accomplish the police mission with the cooperation of the public and as effectively as possible, and with minimal reliance upon the use of physical force" and "[a]n officer's commitment to public safety includes the welfare of members of the public, the officer, and fellow officers, with an emphasis on respect, professionalism, and protection of human life, even when force is necessary").

[214] SPOG raised a "red herring" issue concerning what it decried as SPD not abiding by its own policies in failing to conduct a Force Review Board review of administrative issues pertaining to the incident involving Officer Shepherd. However, Captain Greg Caylor explained that the failure to conduct a Force Review Board was due to a backlog of cases and mootness of some of that backlog, including Officer Shepherd's case, before they could be considered. TR at 501:1-503:1 (Caylor). Additionally, the handling of that issue was expressly approved by the monitor charged with ensuring compliance with the Consent Decree, through which the Force Review Board policy and practices had been created. *Id.* That decision certainly cannot undermine the reasonableness of the use-of-force policies that are at issue in this case.



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

### 4. The Seattle Police Department Conducted a Full and Fair Investigation of Officer Shepherd's Conduct.

The investigation here went well beyond the "fair and objective" standard imposed by the cases.[215] The OPA investigation reviewed the evidence it gathered and analyzed, as well as that gathered and analyzed by the WSP and FIT. Following an initial *Loudermill*, the Chief also directed OPA to re-open its investigation and conduct a further inquiry on issues raised by SPOG and Officer Shepherd, and OPA conducted that further investigation, including a review of the FBI evidence, and reported back on its results.[216] Chief O'Toole requested this to ensure that no stones were left unturned before she made a decision about a possible discharge.[217] Every indication is that the investigation was both fair and objective, and there was no testimony at the hearing questioning either the fairness or objectivity of the investigation.[218]

### 5. No Comparable Discipline Exists.

SPD also appropriately considered whether there was comparable discipline to guide its discipline of Officer Shepherd, but ultimately determined there were no comparable cases.[219] SPOG has not challenged that with evidence presented at the hearing. It bears noting that, as an affirmative defense, SPOG had the burden of proving that SPD improperly discriminated against Officer Shepherd in its imposition of discipline.[220] "In order to prove disparate treatment, a union must confirm the existence of both parts of the equation. It is not enough that an employee was treated differently than others; it must also be established that the circumstances surrounding his/her offense were substantively like those of individuals who received more moderate penalties."[221] Importantly, "[t]here is no discrimination, or no

---

[215] TR at 728:12-729:4 (Kim) (indicating that the investigation was thorough, "robust," "detailed," and complete, and very few, if any compared to it in depth and detail); Ex. 76 (the entirety of the OPA file on this matter, which is extraordinarily voluminous); *compare Enterprise Wire Co.*, 46 LA at 364; *and see* pp. 10 - 15, *supra*.

[216] Ex. 45.

[217] TR at 294:10-295:2 (O'Toole).

[218] In addition, a separate EEO review concluded there had been no violation of Department EEO policies with respect to the investigation and discipline. TR at 359:5-360:4 (O'Toole); Ex. 47 at p. 2 (DRB-SHEP 010335).

[219] TR at 464:12-22 (Wilske); 295:20-296:9 (O'Toole).

[220] *See* Elkouri & Elkouri at 15-83 to 15-85 ("the union generally has the burden of proving that the employer improperly discriminated against the employee").

[221] *Id.* at 15-84, *citing Genie Co.*, 97 LA 542, 549 (Dworkin, 1991).



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

departure from the consistent or uniform treatment of employees, merely because of variations in circumstances."[222] SPOG failed to meet that burden.

To the contrary, the evidence established that SPD carefully considered whether there were others who had engaged in similar behavior to Officer Shepherd before determining the appropriate level of discipline—prior examples of discipline related to the use of force and de-escalation were gathered and presented to the members of the discipline meeting and Chief O'Toole, but no previous discipline was considered reasonably comparable to Officer Shepherd's conduct.[223]

Despite its burden, SPOG put forth very limited evidence and made no argument about comparables at the hearing, and elected not to ask *any* questions about comparators of witnesses who participated in the Disciplinary Committee meeting or of Chief O'Toole, who made the decision to discharge Officer Shepherd. Instead, SPOG merely put the following DARs into the record during Sergeant O'Neill's testimony without elaboration. All of them are distinguishable or inapplicable.

- Officer David Bauer was acknowledged by SPOG as a unique case that occurred under the prior use-of-force policy. As a unique case it would not have been useful in addressing the appropriate discipline in this case. The facts of the case are disturbing, including over a dozen unnecessary and objectively unreasonable strikes to a suspect while he was pinned down and not assaultive. As Sergeant O'Neill testified, the incident, occurring under the prior use of force policies, was not addressed by OPA until it was later identified in a public disclosure request. Chief O'Toole strongly considered termination on the facts of that case, but given that it occurred under the prior use of force policies, she ultimately elected not to terminate Officer Bauer. She did note, however, that had it occurred under the policies applicable to Officer Shepherd's actions, it would have resulted in termination because of the requirement to de-escalate in SPD Policy 8.100(3). She also noted her "recognition that the Department's approach to use of force ha[s] changed considerably since the time of [the] incident." Officer Bauer had also not had any complaints about his use of force between that incident and the drafting of the Disciplinary Action Report, a period of over 5 ½ years.

- Officer Christopher Hairston was a 2012 discipline, thus falling under the prior policies (not containing a specific policy on prohibition of use of force against a handcuffed

---

[222] *Alan Wood Steel Co.*, 21 LA 843, 849 (Short, 1954).

[223] TR at 464:12-22 (Wilske); 295:20-296:9 (O'Toole).



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

suspect). It involved a minor (Type I) use of force on a handcuffed suspect, unnecessarily putting his hand on a suspects face, and did not involve any injury to the suspect. Officer Hairston received a 5-day suspension for his actions.

- Officer Eric Faust was addressed by a stipulation at the hearing noting that the discipline was overturned by a DRB finding (in October 2014) prior to any discipline ever being imposed in Officer Shepherd's case. Thus Officer Faust's discipline could not have been considered by Chief O'Toole when she made a discipline decision in Officer Shepherd's case (and there is no evidence that it was considered).[224] Further, and in any event, Faust's discipline was initially imposed (and later reversed) applying different use of force policies, and involved only the unnecessary escalation of a situation *prior to implementation of the de-escalation policy* in 2014. It also did not concern a handcuffed subject, as the incident at issue here did, meaning the policy forbidding use of force against a subject was also not at issue. The landscape changed fundamentally subsequent to the Faust incident, and discipline imposed prior to the consent decree and its reforms is irrelevant to the issues here.[225]

- Officer Clark Dickson's incident was completely different than this case. Officer Dickson was spit upon by a suspect who was *not* handcuffed or in a patrol vehicle, and he responded with a single punch to the head that was deemed unnecessary and unreasonable under SPD Policy 8.100(1) because it was not designed to address the ongoing threat of further spitting. The DAR noted that, under the circumstances, an open-handed strike to move the subject's head away from a position threatening further spitting would have been permitted, but a punch went beyond what was necessary. Officer Dickson took responsibility for his actions, noting to the commanders that it did not reflect well on him or on the SPD, and independently sought out additional training so that he could be sure to comply with the policies in the future. He also had only an unrelated verbal reprimand in his work history prior to the discipline he faced for that action. He was disciplined with a one-day suspension.

- Officer Matthew Good, whose discipline post-dates the discipline imposed on Officer Shepherd and was imposed by another Chief of Police (discipline imposed in March 2018 by Chief Best), struck a handcuffed woman with his forearm after she'd spit on him. The DAR noted that Officer Good would have been justified in using some level of force to ensure that the woman did not again spit on him, but that his forearm strike

---

[224] TR at 1094:3-16.

[225] Despite not discussing the case at the hearing and acknowledging it wouldn't have played any role in the Chief's decision, SPD expects that Officer Shepherd will cite to and cherry-pick language from the DRB decision that a strike in that case was within policy because Officer Faust was still actively engaged with the suspect. This ignores the entirely different situation facing Officer Faust (the suspect was not handcuffed, had just spit on officers, was situated immediately next to Officer Faust with no potential shield between them, was kicking Officer Faust, and was moving to continue the fight). It also ignores that, in the *Faust* case, critically, SPD did not identify "any lower level of force that could reasonably have been expected to prevent [the suspect] from further spitting on the officers (and repeatedly kicking Officer Faust). . . . Thus, the City's evidence does not allow us to conclude that an effective alternative existed to Officer Faust's use of force." DRB decision at p. 17. Here, of course, there were many effective alternatives that existed to Officer Shepherd's use of force, as described in detail *supra*.



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

was excessive and inconsistent with policy. Officer Good's forearm strike was less severe than the force used by Officer Shepherd, and, unlike that used by Officer Shepherd, did not cause any injury. Officer Good was also a relatively new officer (just two years on the force), acknowledged his mistake and indicated that he had already acted differently when spat upon following that incident. He also had no prior discipline in his record, unlike Officer Shepherd. Even with significant mitigating facts and a lower level of force, Officer Good received significant discipline, a 10-day suspension, for his actions.[226]

Even setting aside that the *Good* case post-dates the discipline here and that the *Faust* case was not considered because it was overturned (and concerned application of different policies), SPOG's attempt to analogize Officer Shepherd's conduct with the conduct of the officers noted above fails. These disciplinary actions are simply not comparable to Officer Shepherd's. Some were under different policies and practices, others had grossly different operative facts, including the lack of injury to the suspects, and none had a handcuffed suspect seated in a police car punched in the face by an officer after a pause and consideration of his tactical options. Additionally, as noted above, SPOG was charged with presenting substantively similar circumstances for those who received more moderate penalties.[227] SPOG put into evidence nothing to establish how the cases are in any way comparable to Officer Shepherd's case. The DARs submitted to the Panel do not establish that Officer Shepherd was treated differently than other officers who committed comparable offenses, or even that any other officers committed comparable offenses.

It is axiomatic that inconsistent treatment will not be found where the cases being compared are dissimilar.[228] No departure from the consistent or uniform treatment of employees occurs merely because of variations in discipline reasonably appropriate to the variations in circumstances.[229] As discussed by Assistant Chief Wilske and Chief O'Toole,

---

[226] Discipline imposed after Officer Shepherd's discipline is irrelevant and should not be considered by the Panel. The later disciplinary decision was not before the attendees of the discipline meeting when a disciplinary recommendation was made, nor before Chief O'Toole at the time she made her decision regarding Officer Shepherd.

[227] *See supra*, nn.220-22.

[228] American Bar Association, *Discipline & Discharge in Arbitration*, p. 81 (Norman Brand ed., 1998).

[229] *Id.* at p. 83; *see also* Elkouri & Elkouri at 15-84 to 15-86.



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

there were no useful or comparable prior cases for consideration in this case, and thus SPOG has established no inconsistency in the treatment of its sworn employees.[230]

Additionally, variations in discipline can be acceptable based on the particular circumstances of the case. "One basis for differentiations is the degree or flagrant nature of the misconduct."[231] In general, "arbitrators will uphold variations in punishments among employees if a reasonable basis exists that justifies such differences."[232] Here, the egregiousness of Officer Shepherd's actions, particularly in light of SPD's efforts in the shadow of the consent decree to reduce the use of force through its policies and practices, justified his discharge even had there been similar comparable cases (though there were not).

**6. Termination Was Appropriate Discipline for Officer Shepherd's Conduct.**

The discipline imposed on Officer Shepherd was appropriate and is consistent with just cause.[233] Arbitrators have recognized that the employer has discretion in deciding the appropriate level of discipline and have consistently held that an "arbitrator should not substitute [her] judgment for that of management unless [s]he finds that the penalty is excessive, unreasonable, or that management has abused its discretion."[234] A widely-accepted recitation of the power of the Panel in this regard is "only to modify penalties which are beyond the range of reasonableness, and are unduly severe. If the penalty is within range, it may not be modified."[235]

---

230 TR at 464:12-22 (Wilske); 295:20-296:9 (O'Toole).

231 Elkouri & Elkouri at 15-83.

232 *Id.* at 15-84.

233 "Was the degree of discipline administered by the [employer] in a particular case related to (a) the seriousness of the employee's proven offense and (b) the record of the employee in his service with the company?" *Enterprise Wire*, 46 LA at 364.

234 *Franz Food Prods., Inc.*, 28 LA 543, 548 (Bothwell, 1957); *Stockham Pipe Fittings Co.*, 1 LA 160, 162 (McCoy, 1945). Substantial deference regarding the penalty imposed is owed to the decision-maker and management's decision should not lightly be upset if within broad parameters of reasonableness. *Orange County, FL*, 132 LA 606 (Sergent, 2013); *Caro Center*, 104 LA 1092, 1095 (Kanner, 1995).

235 *Ford Motor Co.*, Opinion A-2 (Shulman, 1943), *quoted in St. Clair County*, 80 LA 516, 519 (Roumell, 1983).



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

Misconduct that is directed toward the very people the employee is tasked to serve warrants a high level of discipline.[236] Termination was reasonable in light of Officer Shepherd's conduct and failure to show remorse or recognize the gravity of his actions.

**a. Termination was reasonable given the context and gravity of Officer Shepherd's conduct.**

Here, both the attendees of the discipline meeting who recommended the termination and the final decision maker, Chief O'Toole, gave thoughtful consideration to the misconduct at issue and determined that termination was the only way to maintain public trust, to protect the public, and to send a clear message that misconduct of this type would not be tolerated.[237] Chief O'Toole's DAR summarizes why termination was not only reasonable, but necessary:

> This instance marks the second time you have displayed your inability to consistently exhibit these attributes, and the second time you have failed to take personal responsibility for the same. You previously received a ten day suspension in 2009 for violating a different SPD policy where your failure resulted in the death of a victim; as such, you should be acutely aware of the potentially dire consequences of disregarding policies created to protect the public. I cannot take the risk of affording you further opportunity to serve as a police officer for this City given your demonstrated lapses in judgment and restraint. Public safety and public trust remain at the forefront of my decisions as Chief, and this decision is not an exception. Your behavior toward and the decisions you made about the subject are deeply damaging to the Department's confidence in your ability to effectively function as a member of this police service. I do not have sufficient trust in your self-control or prudence to send you back into the field as a police officer.[238]

SPD properly considered the impact of Officer Shepherd's conduct on SPD's ability to maintain the public's trust.[239] In *Hunt*, a 2016 Disciplinary Review Board that considered, among other things, Officer Hunt's use of racially derogatory language in the post-consent decree environment, the Board noted that it was "well aware of our current historical context"

---

[236] Employers have disciplined employees whose misconduct is directed toward students, patients, and inmates. Misconduct in these areas can be especially troubling because of the nature of the relationships. *Discipline and Discharge in Arbitration*, p. 296.

[237] TR at 465:5-466:8 (Wilske); 472:19-475:18 (Wilske); Ex. 47 at p. 3 (DRB-SHEP 010336); TR at 301:24-302:6 (O'Toole); 304:1-24 (O'Toole); 305:4-22 (O'Toole).

[238] Ex. 47 at p. 3 (DRB-SHEP 010336).

[239] *See, e.g., Hunt v. Seattle Police Department* (Cavanaugh, 2016) (a copy of which is submitted herewith).



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

and went on to point out that "Police Departments cannot serve the public effectively without the trust of those they seek to protect[.]"[240] The Board also noted the importance of the Consent Decree: "Unfortunately, Seattle is not immune to these issues, having suffered through several high-profile incidents that have called the professionalism of the SPD into question, as well as patterns of excessive use of force, as found in an investigation by the Department of Justice, which resulted in a federal consent decree under which the Department now operates. The City and the Department have taken steps to attempt to rebuild trust where it has deteriorated, and it appears the City has made progress."[241] The Board noted that the incident at issue in *Hunt* – use of a racially derogatory term – "is precisely the sort of conduct that will significantly delay, if not defeat, the City's efforts to strengthen its image" and concluded that for all these reasons, the Board agreed with the Chief that the incident in question provided "just cause for a significant disciplinary penalty."[242]

The same logic applies here. Officer Shepherd's improper use of force provides additional support for finding just cause, as it is unquestionably conduct that could "defeat[] the City's efforts to strengthen its image."

**b. Officer Shepherd gave no indication that he would change his behavior.**

Arbitrators assessing the reasonableness of discipline often consider the attitude of the employee. An admission of wrongdoing, an expression of remorse, or an offer of apology, may lead to a finding that leniency was appropriate. And a failure to accept responsibility can serve as an aggravating factor for imposition of more severe discipline.[243] As one arbitrator put it, "[o]nly under most extraordinary circumstances would an arbitrator hazard putting an employee back to work who refused to accept responsibility for violation of company rules and who would admit that

---

[240] *Id.* at p. 12.

[241] *Id.*

[242] *Id.* at p. 13.

[243] *Vancouver Police Officers Guild & City of Vancouver, WA*, 2005 BNA LA Supp. 111179 (holding that an Officer's failure to accept responsibility for his actions in tripping a suspect and causing him to fall provided "ample justification to support Chief M's conclusion that termination was the only appropriate remedy.").



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

in a public forum."[244] The failure to take responsibility also bolsters the remedy selected by management in labor arbitrations, making it less likely to be overturned.[245]

Throughout these proceedings, and when testifying at this DRB, Officer Shepherd has insisted that punching Ms. Durden-Bosley in the face was the best and only decision he had.[246] Given Officer Shepherd's training and the SPD's policies, SPD finds Officer Shepherd's "failure to acknowledge that [his] actions here were not consistent with Department policies … especially concerning."[247] Termination was appropriate here.

**C. Remedy.**

We respectfully submit that this DRB should find that the SPD had just cause to terminate Officer Shepherd and dismiss the grievance. The evidence, the law, and the public trust require this result.

If this DRB determines that the discipline at issue was not "within the bounds of reasonableness,"[248] then we urge the Panel to consider SPD's grave and serious public safety concerns,[249] and fashion a remedy that ensures Officer Shepherd does not return to patrol. This Panel has authority to deem reinstatement inappropriate even in the event it issues a finding that the discharge lacked just cause,[250] and the stipulated issue for decision as set forth in the CBA encompasses a determination of the appropriate remedy (if, and only if, the Panel finds just cause lacking).[251] If the Panel does not find just cause, the nature of the remedy is not limited by the CBA, and refusals to reinstate have been upheld where just cause was found lacking.[252] Such a remedy has been deemed appropriate, for instance, "where a personality conflict is too great to

---

244 *Buffalo & Pittsburgh Railroad*, 123 LA 70 (Suntrup, 2006).

245 *Discipline and Discharge in Arbitration*, p. 87.

246 TR at 1079:3-6 (Shepherd).

247 Ex. 47 at p. 3 (DRB-SHEP 010336).

248 *Enterprise Wire Co.*, 46 LA 359, 363-364.

249 *See, e.g.*, Ex. 47 at p. 3 (DRB-SHEP 010336).

250 *Int'l Union of Operating Eng'rs, Local 19*, 2000 WL 36175961 (Szuter, 2000).

251 Ex. 1 at § 3.5(H)(1).

252 *See, e.g., Westbrook Police Union Local 1257 v. Town of Westbrook*, 125 Conn. App. 225, 229, 6 A.3d 1164 (App. Ct. 2010); *Int'l Union of Operating Eng'rs*.



SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

have a useful working relationship restored."[253] In such cases, an award of front pay for an interim period to permit the grievant to find comparable employment may be appropriate.[254]

Here, the egregiousness of Officer Shepherd's actions, and his refusal to acknowledge their impropriety, establish that he is unsafe to serve SPD on patrol. If the Panel finds an absence of just cause, it should craft a remedy that ensures Officer Shepherd does not return to patrol, either by not reinstating Officer Shepherd to SPD, or by expressly providing that any reinstatement does not require that he be returned to a patrol role in SPD.

## V. CONCLUSION

For the reasons set forth above, SPD has shown that it had just cause to discharge Officer Shepherd, and respectfully requests that the grievance be denied.

DATED this 31st day of August, 2018.

SAVITT BRUCE & WILLEY LLP

By: *__/s/David N. Bruce__*
David N. Bruce, WSBA #15237
Coby Cohen, WSBA #30034
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
Telephone: 206.749.0500
Facsimile: 206.749.0600
Email: dbruce@sbwLLP.com
Email: ccohen@sbwLLP.com

Attorneys for Respondent
Seattle Police Department

[253] *Int'l Union of Operating Eng'rs.*
[254] *Id.*

**BEFORE THE DISCIPLINARY REVIEW BOARD**

| | | |
|---|---|---|
| Seattle Police Officers' Guild, | ) | |
| | ) | |
| | ) | |
| and | ) | |
| | ) | OFFICER ADLEY SHEPHERD |
| | ) | |
| City of Seattle. | ) | |
| | ) | |
| | ) | |

# SPOG'S POST HEARING BRIEF

Hillary McClure
Alyssa Melter
Attorneys for SPOG
Vick, Julius, McClure, P.S.
5506 6th Ave S., Suite 201A
Seattle, WA 98108

## I. INTRODUCTION

The City of Seattle (City) attempted to convince the Disciplinary Review Board (Board) that this is a black and white, open and shut case, with former-Chief of Police Kathleen O'Toole describing her decision as easy and not a close call. However, a thorough review of the facts of this case reveals that Chief O'Toole ignored all facts that were contrary to the decision she believed would garner the most political support. Notably, she ignored that Ms. Miyekko Durden-Bosley delivered a significant kick to Officer Shepherd's face when she was handcuffed. Immediately, after kicking him, Ms. Durden-Bosley advanced towards him and the open vehicle door he was standing in. Her actions left Officer Shepherd in substantial pain and believing that she was in the process of continuing her assault and might try to escape. He needed to act immediately, so he delivered a single-strike. Chief O'Toole further ignored that a single-strike, under these conditions, was consistent with Officer Shepherd's Seattle Police Department (SPD or Department) training and his supervisors' expectations. Without being guided by the facts of the case, Chief O'Toole terminated Officer Shepherd's employment for the single-strike. Her decision to terminate Officer Shepherd's employment was not supported by just cause. Therefore, the Board must reverse the termination and make Officer Shepherd whole for all losses he sustained.

## II. STATEMENT OF FACTS

The Seattle Police Officers' Guild (SPOG) is the exclusive bargaining representative for all commissioned employees of the SPD through the rank of sergeant. [City 1]. The City and the SPOG are signatory to a collective bargaining agreement setting forth the wages, hours, and other terms and conditions of employment for members of the bargaining unit represented by the SPOG. [City 1]. The collective bargaining agreement prohibits the City from disciplining bargaining unit employees unless it has just cause for such discipline. [City 1, p. 24]. This case arises out of Chief O'Toole's decision to terminate Officer Shepherd's employment.



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

Officer Shepherd joined the SPD as an officer in 2005, following a career in the military that included deployments to Iraq and Afghanistan. [*See* TR 923, L 12-13; TR 926, L 19-23]. Over his career with the SPD, he worked primarily out of the South and Southwest Precincts and held several assignments, including in patrol, the TRU training unit, and community outreach. [*See* TR 927, L 2-TR 928, L 17]. In June 2014, he was working patrol out of the South Precinct. [TR 928, L 18-20].

In the early morning hours of June 22, 2014, Ms. Evelyn Shelby called 911, reporting that a 22-year-old female "was going to come to her house and fight her son." [City 30, p. 5]. During this call, the dispatcher could hear yelling in the background and the phone was disconnected. [City 30, p. 5]. Upon calling Ms. Evelyn Shelby back, she reported that her son unplugged the phone. [City 30, p. 5]. Dispatch sent a broadcast regarding the disturbance and officers responded. [City 30, p. 5].

Officer Shepherd was the first to arrive. [City 33, p. 18; City 60, p. 4]. When he arrived, he saw a male outside the house pacing around. [TR 929, L 13-15]. The male was annoyed and upset when he realized that police had arrived. [TR 929, L 16-19]. He smacked his head and ran his hand over the top of his head. [TR 929, L 16-19; City 60, p. 4].

Officer Shepherd contacted the male, who was Mr. Robert Shelby, Ms. Evelyn Shelby's son. [*See* TR 929, L20-21]. As Officer Shepherd approached Mr. Robert Shelby, he introduced himself and advised Mr. Robert Shelby that he was being audio and video recorded. [City 60, p. 4]. Mr. Robert Shelby was agitated as he smoked a cigarette and explained that he was trying to have a normal conversation with his "baby mama" when things escalated. [City 60, p. 4]. To avoid further escalation, Mr. Robert Shelby left the location they had been at and went home to his mother's house. [City 60, p. 4]. However, Ms. Miyekko Durden-Bosley (the mother of Mr. Robert Shelby's child) would not leave him alone and began calling him. [City 60, p. 4].



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

During Officer Shepherd and Mr. Robert Shelby's conversation, Mr. Robert Shelby received a couple of phone calls. [City 60, p. 4-5]. On one of the calls, Mr. Robert Shelby told the person on the line that he was at home and that his mother had called the police. [City 60, p. 5]. On the next call, he told the person that he was still at home and to go ahead and laugh. [City 60, p. 5]. He was noticeably annoyed at the caller. [City 60, p. 5]. Officer Shepherd suspected that it was Ms. Durden-Bosley contacting him, so he asked Mr. Robert Shelby if she was still calling. [City 60, p. 5]. Mr. Robert Shelby confirmed that Ms. Durden-Bosley was calling him and said that she thought this "shit is so funny." [City 60, p. 5].

Having confirmed that it was Ms. Durden-Bosley still contacting Mr. Robert Shelby, Officer Shepherd inquired into what she was saying on the phone. [City 60, p. 5]. Mr. Robert Shelby told Officer Shepherd that she was calling him a "bitch ass nigger and all types of shit." [City 33, p. 18 (transcript of first contact with Robert Shelby)]. Officer Shepherd viewed these as fighting words. [City 60, p. 5]. He asked if there were any threats, to which Mr. Robert Shelby responded, "I hope not. I don't know what she'd do. I don't know what the fuck she's going to do. I don't know what the fuck's going to happen." [City 33, p. 18 (transcript of first contact with Robert Shelby)]. Officer Shepherd followed up by asking whether his mother was safe. *Id.* Mr. Robert Shelby responded, "Hopefully . . . Actually, I'm pretty sure she is. Nobody's gonna ____." *Id.* Officer Shepherd then asked whether there was a restraining or protection order in place or any history of domestic violence. *Id.* Mr. Robert Shelby stated, "Not, I'm sure, on the record nothing." *Id.*

Next, Officer Shepherd left Mr. Robert Shelby with other officers who had arrived on scene to speak with his mother in the house. [TR 932, L 16-TR 933, L 2]. Ms. Evelyn Shelby reported that she heard the two of them yelling and screaming on the phone, and Ms. Durden-Bosley "sayin' that she's gonna come down here [the Shelby residence], and she's gonna beat his ass, and this



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

and that." [City 33, p. 18-19 (transcript of conversation between Ms. Evelyn Shelby and Officer Shepherd)]. Officer Shepherd asked whether the two have a history of domestic violence, and she confirmed, "[Y]es. They've been at it before, arguing and fighting like this." [City 33, p. 18-19 (transcript of conversation between Ms. Evelyn Shelby and Officer Shepherd)].

At this point, Ms. Durden-Bosley was not present at the residence, so Officer Shepherd confirmed that all Ms. Evelyn Shelby heard was a verbal argument over the phone. [City 33, p. 18-19 (transcript of conversation between Ms. Evelyn Shelby and Officer Shepherd)]. Ms. Evelyn Shelby assented and said that she asked Mr. Robert Shelby what was going on and he told her, "She's going to come down here, and she's going to fight me because she did me dirty. Fine. I'm waiting." [City 33, p. 18-19 (transcript of conversation between Ms. Evelyn Shelby and Officer Shepherd)].

Piecing this all together, Officer Shepherd told Ms. Evelyn Shelby that he would update the call. [City 33, p. 18-19 (transcript of conversation between Ms. Evelyn Shelby and Officer Shepherd)]. He explained that if both Ms. Durden-Bosley and Mr. Robert Shelby were at the residence he could write up a police report, but Ms. Durden-Bosley was not present. [City 33, p. 18-19 (transcript of conversation between Ms. Evelyn Shelby and Officer Shepherd)]. Ms. Evelyn Shelby indicated that she understood and said again that her concern was Ms. Durden-Bosley threatening to come over to the house. [City 33, p. 18-19 (transcript of conversation between Ms. Evelyn Shelby and Officer Shepherd)].

As Officer Shepherd exited the house, he learned that Ms. Durden-Bosley had arrived at the Shelby residence. [City 60, p. 6]. He could see Mr. Robert Shelby walking on the sidewalk headed away from the house, being followed closely by a woman. [City 60, p. 6]. It looked as though the woman was trying to get Mr. Robert Shelby's attention; however, he was changing directions trying to get away from her. [City 60, p. 6].



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

Ms. Durden-Bosley's presence concerned Officer Shepherd. [TR 936, L 3-4]. The initial call had been for a domestic disturbance of threats of domestic violence. [TR 636, L 6-9]. Now, the individual who had made the alleged threat had taken the substantial step of showing up at the residence. [TR 936, L 6-9]. Officer Shepherd believed he may now be dealing with a crime. [TR 936, L 6-9].

Officer Shepherd called out to Ms. Durden-Bosley, asking her to come speak with him. [City 33, p. 20 (transcript of first contact with Durden)]. He introduced himself to her and asked her what was going on. [City 33, p. 20 (transcript of first contact with Durden)]. Ms. Durden-Bosley stated, "Nothing. We have no beef. This is no beef prior, so ____." [City 33, p. 20 (transcript of first contact with Durden)]. At this point, Officer Shepherd could smell alcohol and suspected she was intoxicated, so he asked her whether she drove to the location. [City 60, p. 6]. Ms. Durden-Bosley responded that she had walked to the location and then asked a number of questions about whether she was legally allowed to walk. [City 33, p. 21 (transcript of contact with Durden)].

Trying to focus Ms. Durden-Bosley, he asked her again why she was at the residence. [City 33, p. 21 (transcript of contact with Durden)]. To separate Ms. Durden-Bosley and Mr. Robert Shelby and gain better control of the scene, he requested that Ms. Durden-Bosley speak with him near his patrol Explorer. [*See* City 33, p. 21 (transcript of contact with Durden); TR 941, L 25-TR 942, L 2]. Ms. Durden-Bosley tried to keep walking past the vehicle and would not stop when asked, so he reached for her arm and guided her back so he could further investigate. [*See* City 33, p. 21 (transcript of contact with Durden); City 76, OPA-H, 3274 (video)]. He then explained that it had been reported that she threatened Mr. Robert Shelby, including a threat to come to his house. [City 33, p. 21 (transcript of contact with Durden)]. Ms. Durden-Bosley stated that she did



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

not threaten him, asked what evidence Officer Shepherd had that she threatened to come to the house, and became upset. [City 33, p. 21 (transcript of contact with Durden)].

Officer Shepherd attempted to de-escalate and calm her down. [*See* TR 942, L 18-TR 943, L 6]. He asked her to take a minute and "take some hee-hee-hoos" to breathe and calm down. [City 33, p. 21 (transcript of contact with Durden)]. He told her to relax and go to her happy place. [City 33, p. 21 (transcript of contact with Durden)].

Next, he inquired about the reported threat and told her that she had scared Ms. Evelyn Shelby. [City 33, p. 21 (transcript of contact with Durden)]. This agitated Ms. Durden-Bosley. She began yelling towards the house to Ms. Evelyn Shelby. [City 33, p. 21 (transcript of contact with Durden)]. This caused Mr. Robert Shelby to begin shouting at Ms. Durden-Bosley, "Don't fucking [yell] at my mom like that, bro. You already called her a fucking bitch, dawg. . . . Just fucking, just handle shit cordially for once, man." [City 33, p. 21 (transcript of contact with Durden)]. The scene and situation had become more out of control and were starting to spiral. [TR 944, L 1-3].

Officer Shepherd continued questioning Ms. Durden-Bosley until Mr. Robert Shelby began shouting at his mother. [City 33, p. 21 (transcript of contact with Durden)]. Officer Shepherd told Ms. Durden Bosley to stay where she was and walked over to Mr. Robert Shelby. [TR 945, L 4; City 33, p. 22 (transcript between Shepherd, Shelby, and Durden)]. He told Mr. Robert Shelby not to yell at his mother, meanwhile Ms. Durden-Bosley was making comments about Officer Shepherd's and Mr. Robert Shelby's contact. [*See* City 33, p. 22 (transcript between Shepherd, Shelby, and Durden)].

Finally, Officer Shepherd told Mr. Robert Shelby and Ms. Durden-Bosley, "My patience is done. It's done. It's . . . over. So somebody's going to go to jail. Who's it going to be?" [City 33, p. 22 (transcript between Shepherd, Shelby, and Durden)]. "We can do eeny-meeny-mi . . . ."



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

[City 33, p. 22 (transcript between Shepherd, Shelby, and Durden)]. This was an attempt to de-escalate and change their behavior. [TR 945, L 13]. He was putting them on notice that he was serious and the situation was serious. [TR 945, L13-14; TR 947, L 8]. He needed them to calm down, listen to his instructions, and start answering his questions so that he could continue his investigation into whether threats had been made and whether there had been an assault during the initial fight that evening. [TR 945, L 13-22]. It was Officer Shepherd's opinion that he could not leave the scene without making sure there was some resolution. [TR 946, L 13-15]. Both subjects were angry, had been yelling, and were mad at Ms. Evelyn Shelby; and there was a reported threat of violence.

Ms. Durden-Bosley started arguing again, this time that "nobody touched anybody" so he could not take them to jail. [City 33, p. 22 (transcript between Shepherd, Shelby, and Durden)]. Officer Shepherd explained that, at this point, it did not matter. [City 33, p. 22 (transcript between Shepherd, Shelby, and Durden)]. She had threatened to come over to the Shelby residence to commit violence and then came to the house. [City 33, p. 22 (transcript between Shepherd, Shelby, and Durden)].

He decided to place her under arrest. [City 60, p. 8]. He moved towards Ms. Durden-Bosley and took control of her right hand for handcuffing. *Id.* She became rigid and resisted by pulling away and leaning back against the hood of the patrol Explorer. *Id.* At the same time, she kept telling him not to touch her and repeatedly asked him why she was under arrest. [City 33, p. 22 (transcript between Shepherd, Shelby, and Durden)]. Another officer on-scene, Officer Griffin, who was helping Officer Shepherd conduct the arrest, explained once again that it was reported that she had made a threat. [City 33, p. 22 (transcript between Shepherd, Shelby, and Durden)]. Ms. Durden-Bosley again started yelling at Ms. Evelyn Shelby. [City 33, p. 22 (transcript between Shepherd, Shelby, and Durden); City 60, p. 8].



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

With Ms. Durden-Bosley in handcuffs, the officers tried placing her in the back of the patrol Explorer. [City 33, p. 22 (transcript between Shepherd, Shelby, and Durden)]. Officer Shepherd repeatedly directed her verbally to get in the vehicle. [City 33, p. 22 (transcript between Shepherd, Shelby, and Durden)]. She did not comply; instead, she twisted her body, resisting getting into the vehicle. [City 60, p.8]. At that point, Officer Griffin tried to calm her down again. [City 33, p. 22 (transcript between Shepherd, Shelby, and Durden)]. He explained that they were going to take her down to the precinct to document the charges. [City 33, p. 22 (transcript between Shepherd, Shelby, and Durden)].

The officers could not get her to calm down or enter the vehicle. [City 60, p. 8]. She continued twisting her body. [City 60, p. 8]. Eventually, Officer Shepherd placed her in the vehicle. [City 60, p. 8]. He put his hand on the top of her head, tried to control her wrists, and pushed down. [City 60, p. 8]. He lost control of the handcuffs and she spun, positioning herself so that she was facing him. [City 60, p. 8].

She raised her right leg, brought her heel up so that it was facing Officer Shepherd, and kicked him in the jaw, while yelling, "Fucking Bitch." [City 60, p. 8; TR 961, L 7-9]. Everything happened very quickly. [TR 961, L 20]. Immediately, he felt a tremendous amount of sharp, shooting pain in his jaw, felt and heard his jaw bone pop, felt numbing, and heard a high pitch ringing in his ears. [City 60, p. 8; TR 961, L 10-19]. The kick knocked him off balance and pushed him backwards about a foot. [City 60, p. 8-9].

Immediately after kicking him, Ms. Durden moved towards him again. [TR 961, L 20; City 33, p. 24-25]. The video analysis reveals, after kicking Officer Shepherd, she moved towards the vehicle door, where Officer Shepherd was located, started putting her foot down towards the ground, and then brought it up again towards Officer Shepherd. [City 33, p. 24-25]. He needed to act to protect himself, stop the assault, and prevent her from getting out of the vehicle. [*See* TR



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

961, L 20-21]. Officer Shepherd delivered one punch to stop her and used the momentum from the punch to hold her down and gain control of her handcuffs. [TR 961, L 24-TR 962, L 6; City 60, p. 9]. Ms. Durden-Bosley kept kicking and eventually came under control. [*See* City 60, p. 9].

Officer Shepherd asked Officer Griffin to take over because he was still working through the effects of the kick and requested that a sergeant come to the scene because he had used force. [*See* TR 963, L 13-16]. Eventually, both Officer Shepherd and Ms. Durden-Bosley were transported to the hospital for examinations. [City 60, p. 9].

People who saw Officer Shepherd that night after the kick described him as being dazed, in a lot of pain, unable to focus, and saw swelling on his jaw. [TR 672, L 17-21; TR 673, L 5; TR 678, L 16-19]. Clearly, the kick to his face had been significant. *Id.*

A couple of days later, Officer Shepherd was placed on administrative leave pending an investigation into his use of force. [*See* TR 598, L 4-6]. This occurred on the day that Chief O'Toole was sworn in as the Chief of Police. [TR 599, L 5-7]. Chief O'Toole asked the head of the Washington State Patrol to conduct a criminal investigation into Officer Shepherd's use of force. [TR 284, L 14-16]. This criminal investigation led to a prosecutor's decline, stating some level of force was necessary, as Ms. Durden-Bosley had resisted arrest and assaulted him. [*See* City 11]. Next, the case went to the Department of Justice to determine whether he willfully violated Ms. Durden-Bosley's civil rights, by using excessive force. [*See* City 14]. The FBI investigated what happened, and the Department of Justice determined that there was no violation of the federal civil rights laws. [*See* City 14].

At this point, the SPD began its administrative investigation into Officer Shepherd's use of force. [*See* TR 285, L 1]. It was determined that all of his actions were within policy, with the exception of the single-strike he used to stop Ms. Durden-Bosley's assault and potential escape.



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

[*See* City 37; City 47]. For the single-strike, Chief O'Toole terminated Officer Shepherd's employment. [City 47]. Pursuant to the collective bargaining agreement, the SPOG appealed the termination for lack of just cause. [*See* City 2]. The Disciplinary Review Board heard evidence on June 25, 26, 27, 28, and 29, 2018 in Seattle, Washington.

## III. STIPULATED ISSUE FOR DECISION

Whether the Chief's disciplinary decision was for just cause and in compliance with the collective bargaining agreement and, if not, what the remedy should be. [City 1, p. 7].

## IV. THE CITY DID NOT HAVE JUST CAUSE TO TERMINATE OFFICER SHEPHERD'S EMPLOYMENT

### A. INTRODUCTION

As in many collective bargaining agreements, the labor contract in this case does not define "just cause." The parties have instead decided to rely upon a robust body of arbitral cases for the definition. Arbitrators frequently describe just cause as "a broad and elastic concept, involving a balance of interests and notions of fundamental fairness." *Clearwater Paper Corp.*, 132 LA 465, 472 (Gaba, 2013); *Drummond Co.*, 122 LA 1753, 1760 (Almenoff, 2006); *Rabanco Recycling*, 118 LA 1411, 1415 (Gaba, 2003). While arbitrators have employed many different tests and standards to determine when just cause exists, it is axiomatic that just cause requires the employer to prove (1) the grievant engaged in the alleged misconduct, (2) the penalty was reasonable and appropriate under the circumstances, and (3) the employer "complied with all applicable procedural requirements including the norms of industrial due process commonly followed by labor arbitrators." *Boeing Company*, 132 LA 252, 256 (Landau, 2013); *see North Santiam School District, No. 29J*, 133 LA 217, 227-228 (Reeves, 2014); *Industrial Dielectrics*, 123 LA 822, 828 (Dean, 2006); *Cheveron Phillips Chemical Co.*, 121 LA 1386, 1394 (Eisenmenger, 2005); *Lynx*, 119 LA 257, 259 (Sweeney, 2003).



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

The City bears the burden of proving that Chief O'Toole possessed "just cause" when she terminated Officer Shepherd's employment. *See Hawaiian Telephone*, 59 LA 930, 934 (Gilson, 1972). The City must satisfy this burden with evidence that is both clear and convincing. *Golden State Foods Trans.*, 2000 LA Supp. 107923 (Williams, 2000), *HyVee Food Stores*, 102 LA 555, 559-60 (Berquist, 1994). The clear and convincing evidence standard places a high burden on the City. It must establish each element of just cause with evidence "indicating that the thing to be proved is highly probable or reasonably certain." BLACK'S LAW DICTIONARY, clear and convincing evidence (10th ed. 2014); *HyVee Food Stores*, 102 LA 555, 560 (Berquist, 1994); *see City of Mission*, 126 LA 1372, 1385 (Jennings, 2009); *Ohio Dept. of Public Safety*, 119 LA 1050, 1053 (Brookins, 2003). Arbitrators have also directed that, under the clear and convincing standard, "[r]easonable doubts raised by the proofs should be resolved in favor of [the] accused." *Zircoa, Inc.*, 130 LA 1393, 1394 (Felice, 2012); F. Elkouri and E. Elkouri, *How Arbitration Works*, 951 (6th ed., 2003) (citing *Kroger Co.*, 25 LA 906, 908 (Smith, 1955)); *see Rohr Industries, Inc.*, 78 LA 978, 982 (Sabo, 1982). The City has failed to prove the elements of just cause, so the termination must be reversed and Officer Shepherd made whole.

B. THE CITY FAILED TO PROVE THAT OFFICER SHEPHERD'S SINGLE STRIKE VIOLATED SPD POLICY

The City failed to establish that Officer Shepherd's use of force violated SPD policy 8.100. It is a reality in police work that officers must use force at times. This unfortunate reality is recognized by the SPD, which has informed its officers that they "fail in their duty to act as public guardians" when they do not use timely and adequate force. [City 5, 8.000(1) Use-of-Force Core Principles ("[O]fficers who fail to use timely and adequate force when it is necessary fail in their duty to act as public guardians and may endanger themselves, the community and fellow officers.")].



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

Whether a particular use of force is proper is governed by law and department policy. The seminal court case setting forth the standard for evaluating a use of force is *Graham v. Connor*, 109 S.Ct. 1865 (1989), which provides the Fourth Amendment's test for the use of force by law enforcement officers. Departments across the country, including the SPD, have turned to this case for guidance when developing use-of-force policies.

In *Graham*, the Supreme Court clarified that uses of force must be judged by their objective "reasonableness." "Reasonableness," as stated by the Court, is incapable of precise definition. *Id.* at 1871. Rather, the facts and circumstances of each case must be examined, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether he [or she] is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 1872. According to the Court, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on . . . scene, rather than with the 20/20 vision of hindsight." *Id.* at 1872. The Court appreciated, "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers' [citation omitted] violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 1872.

With this background on the use of force, we turn to three sections of the SPD's use-of-force policy.

*1. Use of Force When Authorized – 8.100(1)*

Borrowing from *Graham*, the SPD's use-of-force policy 8.100(1) restricts the use of force to when it is "reasonable, necessary, and proportionate to effectively bring an incident or person



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

under control, while protecting the lives of the officer or others . . . ." [City 6 (8.100(1))]. The policy provides guidance for determining when a use of force meets this standard.

The guidance on "reasonableness" states:

> The reasonableness of a particular use-of-force is based on the totality of the circumstances known by the officer at the time of the use-of-force and weighs the actions of the officer against the rights of the subject, in light of the circumstances surrounding the event. It must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. Factors to be considered in determining the objective reasonableness of the force include but are not limited to:
>
> - The seriousness of the crime or suspected offense;
> - The level of threat or resistance presented by the subject; . . .
> - The potential for injury to citizens, officers or subjects;
> - The risk or apparent attempt by the subject to escape; . . .
> - The time available to an officer to make a decision; . . .
> - The training and experience of the officer . . .
>
> The assessment of reasonableness must embody allowance for the fact that police officers are often forced to make split-second decisions—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.
>
> The reasonableness inquiry in an excessive-force case is an objective one: the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.

[City 6, policy 8.100(1) (emphasis added)].

On the requirement of "necessary," the Department provides the following guidance: "Officers will use physical force only when no reasonably effective alternative appears to exist, and only then to the degree which is reasonable to effect a lawful purpose." [City 6 (8.100(1))]. Finally, on proportionality, the policy guides:

> To be proportional, the level of force applied must reflect the totality of circumstances surrounding the immediate situation, including the presence of an imminent danger to officers or others. Officers must rely on training, experience,



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

> and assessment of the situation to decide an appropriate level of force to be applied. Reasonable and sound judgment will dictate the force option to be employed. Proportional force does not require officers to use the same type or amount of force as the subject. The more immediate the threat and the more likely that the threat will result in death or serious physical injury, the greater the level of force that may be proportional, objectively reasonable, and necessary to counter it.

[City 6, policy 8.100(1)].

When putting this guidance together, it becomes clear that reasonableness, necessity, and proportionality are all interrelated. Force would be *unreasonable* if it was not *necessary* to use the force under the circumstances. Likewise, a use of force would not be reasonable if it was excessive or unreasonably disproportionate to the threat. Rather than being separate and distinct requirements, they provide various angles by which a use of force should be examined to determine whether its use was truly reasonable.

Assistant Chief Wilkse provided, in layman's terms, how he examines force:

> [F]or the force to be reasonable to me, if I took another officer with the same or roughly the same training, experience and put them in a similar circumstance, that the force being used in the incident we're looking at would be roughly consistent. It's a range of behavior . . . it has to fit within that range of what a reasonable, trained, competent police officer faced with this circumstance would do. And, again, it's a range.

[TR 458, L 11-TR 459, L 3].

Assistant Chief Wilkse's method for evaluating force is consistent with policy and how the Board should evaluate Officer Shepherd's single-strike. It must place a reasonable officer with similar experience and SPD training into Officer Shepherd's shoes at the time, knowing only what he knew then, and determine whether the strike fits into the range of force that the reasonable officer would have used. When engaging in this analysis, the Board must provide an allowance for the fact that officers, such as Officer Shepherd, are required to make split-second decisions in



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

tense and rapidly evolving circumstances about the level of force that is necessary. [City 6, 8.100(1)].

Applying SPD policy 8.100(1) to the facts of this case, it becomes clear that the single-strike delivered by Officer Shepherd was reasonable, necessary, and proportionate. The SPOG asks the Board to thoughtfully and thoroughly consider the following evidence when conducting its analysis.

First, the SPOG asks the Board to consider the facts known by Officer Shepherd before Ms. Durden-Bosley kicked him in the face. He responded to a domestic disturbance of threats of domestic violence call, with Ms. Durden-Bosley being the reported perpetrator. [TR 935, L 6-8]. Mr. Robert Shelby explained to him that "shit . . . got escalated" and Ms. Durden-Bosley was still contacting him via cell phone and "calling [him] bitch ass nigger and all types of shit." [City 33, p. 18 (transcript of first contact with Robert Shelby); City 30, p. 10-11; *see* TR 931, L 8-16]. Officer Shepherd also spoke with Ms. Evelyn Shelby, who was Mr. Robert Shelby's mother and the reporting party. [*See* TR 932, L 20]. Ms. Evelyn Shelby told Officer Shepherd that she heard the two yelling and screaming on the phone and then her son told her, "[Ms. Durden-Bosley's] sayin' that . . . she's gonna come down here, and she's gonna beat [my] ass . . . ." [Exhibit 33 (transcript from conversation between Ms. Evelyn Shepherd and Officer Shepherd)]. Ms. Evelyn Shelby also told Officer Shepherd that the two had a history of domestic violence and had argued and fought like this in the past. *Id.* Thus, he knew that some kind of domestic dispute was occurring (or had occurred) and that Ms. Durden-Bosley reportedly threatened violence against Mr. Robert Shelby.

Soon after Officer Shepherd's conversation with Ms. Evelyn Shelby, he learned that Ms. Durden-Bosley actually came to the Shelby residence. [*See* TR 933, L 9-14]. She was following Mr. Robert Shelby as he tried to avoid her. [TR 933, L 9-20; *see* City 33, p. 20 (From Grant



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

Fredrick's video analysis: "Durden approaches Shelby. Shelby attempts to avoid Durden who is attempting to confront him")]. Thus, Officer Shepherd believed Ms. Durden-Bosley took a substantial step towards carrying out the threat and might have committed a crime. [TR 936, L 6-9].

Officer Shepherd investigated this crime and, during his contact with Ms. Durden-Bosley, he discovered that she was angry, would not accept his explanations, and would not comply with commands. In this regard, he repeatedly told her that she was accused of threatening Mr. Robert Shelby. [City 33, transcript of conversation between Ms. Durden-Bosley and Officer Shepherd]. He explained: "You threatened to come over here. You came over here . . . You made a threat." *Id.* Despite being told the allegations repeatedly, she refused to acknowledge that they were the reason she was under arrest. *See id.* She also refused to comply with his commands. *See id.* Officer Shepherd instructed: "Look Watch your head . . . Get in the car . . .Get in the car . . . Don't make me put you in there . . . Get in the car. . . . Get in the car . . . I need you in the car . . . Do it now . . . Get in the car . . . Can you please get in the car." *Id.* Instead of complying with these commands, she twisted and physically pulled away from Officer Shepherd and declared, "I'm not going to get in the car because I did not make a threat." *Id.* Later, Ms. Durden explained her version of this interaction to a detective in a recorded statement on the morning of June 22, 2014. [*See* City 73]. She stated:

> So the next thing I know he's telling me that I'm being put under arrest for not resisting but I threatened someone of the household. So like I said the same question I was asking the whole time when he first presented that. "Is the person who supposedly called the police or requested this arrest, are they placing me under arrest? And then he said, "No." So he started pushing me into the car. Me, because I didn't understand why I was being put under arrest, *I resisted and I guess you can say I firmly fought back* . . . .



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

[City 73, p. 6 (emphasis added)]. Ms. Durden-Bosley's description of her behavior is accurate in so far as she was resisting arrest and firmly fighting. Therefore, before being kicked in the face, he knew there was a report that Ms. Durden-Bosley threatened Mr. Robert Shelby, she later showed up at his house, she resisted arrest, and she refused to comply with commands from officers.

Second, the SPOG asks the Board to consider Ms. Durden-Bosley's action of kicking Officer Shepherd in the face and her intent when she did so. Reasonable officers would view the kick as an intentional, aggressive assault. She yelled, "Fucking Bitch," as she kicked him in the face. [TR 961, L 8-9; City 33 (link to transcript of interaction between Ms. Durden-Bosley and Officer Shepherd); *see* City 73, p. 6]. Her assault was not insignificant, and she was wearing boots at the time. Even OPA Director Pierce Murphy agreed that the kick was an aggressive act. [TR 62, L 12]. Therefore, she went from being resistive and non-compliant to exhibiting a willingness, desire, and ability to inflict injury on an officer.

Third, the SPOG asks the Board to consider the physical effects of getting kicked in the face. The kick was powerful and Ms. Durden-Bosley was wearing Doc Marten boots at the time. [City 60, p. 8 (Officer Shepherd transcript interview); City 76, OPA-G, 14-199378 FIT Investigation Files, FIT Misc Digital Files, p. 1908]. Her kick connected with the left side of Officer Shepherd's jaw. [City 60, p. 8]. He felt immediately a tremendous amount of sharp pain shooting in his left jaw and felt his right jaw bone pop as a result of the force being applied to his left jaw. [City 60, p. 8]. Pain started running down the right side of his jaw, beginning at his ear. [City 60, p. 8]. He also felt numbing and had a high pitch ringing in his ear. [City 60, p. 8]. This powerful and unexpected kick knocked him off balance and pushed him backwards. [City 60, p. 9]. According to witness officers who saw Officer Shepherd after the incident, they could see swelling and redness as a result of the kick to his face. [TR 522, L 25; TR 672, L 17-21 (Officer April Howard who sat with him in the hospital)]. They also described him as being blurry-eyed



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

and in a daze. [TR 678, L 16-19 (Sergeant Russness who responded to the scene); TR 681, L 12-19; *see* TR 673, L 4-5 (Officer Howard)].

The Board should not minimize the effects of being kicked in the face when examining whether the use of force was reasonable, necessary, and proportionate. An officer who has been struck in the face or head is in a vulnerable position due to the effects of that impact. Sergeant Eric Zerr, an SPD sergeant and defensive tactics instructor, testified about the effects of a kick to the face/head in a non-controlled environment (as opposed to the impact occurring during training). He conveyed the uncertainty and vulnerability of an officer following the impact because the officer does not know what is going to happen next. [*See* TR 533, L 16-18]. Physically, the officer could become foggy, pass out, or neither, and often he or she is unsure which is going to occur. [*See* TR 533, L 16-TR 534, L 3]. Just as worrisome, an officer does not know what the suspect is going to do next. The officer is facing someone who has shown that they can and will assault, while dealing with the physical effects of an impact to the face or head. Sergeant Zerr summarized this succinctly: "[I]f you get hit in the head, . . . that is a serious deal for us, and we try to combat through that to make sure we stop the threat because you don't know what is happening next." [TR 534, L 15-19]. Officer Shepherd was vulnerable after being kicked in the face and needed to act.

Fourth, SPOG asks the Board to consider Ms. Durden-Bosley's actions immediately after kicking Officer Shepherd in the face, which further created the need for him to act *immediately*. Directly after yelling, "Fucking Bitch," and kicking Officer Shepherd, Ms. Durden-Bosley began moving forward towards Officer Shepherd and the vehicle door. [*See* City 33, p. 24]. She placed her foot outside the door, moved it towards the ground, and then raised it up again towards Officer Shepherd. [City 33, p. 25]. OPA Director Pierce Murphy provided sound insight into Ms. Durden-Bosley's actions when he stated:



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

> At this point [after Ms. Durden-Bosley kicked Officer Shepherd], the NE [named employee] reasonably believed that the SUBJ [Ms. Durden-Bosley] had just kicked him and may pose a continuing threat. This possible threat increased when the SUBJ began sitting up and moving her foot towards the ground outside the police car. This movement by the SUBJ could also be reasonably be viewed as an indication that the SUBJ may attempt to escape by getting out of the police car.

[City 37, p. 5].

These observations were echoed by commissioned SPD employees who noted that Ms. Durden-Bosley showed no "breakdown in structure" after kicking Officer Shepherd. [*See* TR 553, L 4-9]. A breakdown in structure is a physical change in an assaultive subject's posture or body position, indicating he or she is giving up or no longer fighting (i.e., the subject no longer holds a defensive or aggressive posture). [*See* TR 539, L 14-24]. Officers cannot assume that there will be a breakdown in structure; they must actually see or feel a change in behavior because relying on guesses after facing an assault can be incredibly dangerous. [*See* TR 582, L 4-TR 583, L 9]. A reasonable officer in Officer Shepherd's position would have believed that Ms. Durden-Bosley continued to pose a threat after she kicked him in the face. She showed no breakdown in structure and was moving towards him and the door. Further, she was only a couple of feet from Officer Shepherd and could have closed the distance quickly, as he was suffering from the effects of the kick to his face. Ms. Durden-Bosley's actions created the need for Officer Shepherd to act immediately to protect himself and others and control her.

Fifth, the SPOG asks the Board to consider the training received by Officer Shepherd. He was trained through the SPD that, if someone assaults him, he must stop the threat as fast as he can and then modulate his force. [TR 792, L 13-24]. Officer Richard Peterson, who is the SPD's lead defensive tactics instructor, explained that the SPD teaches officers to react immediately to an assault (e.g., strike the suspect), look for a breakdown in structure, and then move in for control.



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

[TR 792, L 18-TR 793, L 9]. A breakdown in structure can come, as it did in this case, as the result of using force. [*See* TR 792, L 23-TR 793, L 9].

This teaching is so engrained in defensive tactics classes at the SPD that Officer Peterson testified that he begins each class with several verbal drills:

Question: If someone hits you, what are you supposed to do to protect yourself? If they hit you, what do you do?

Answer: You hit back.

Question: How hard do we hit them?

Answer: As hard as you can.

Questions: What do we do next? What do we do after we stop the threat?

Answer: We modulate our force.

[TR 792, L 1-12]. SPD teaches counterstrikes as a method for stopping a threat after a suspect hits an officer. [TR 819, L 6-17].

Officer Peterson opined that Officer Shepherd was following SPD's training when he used a single-strike to stop the assault and control Ms. Durden-Bosley. [*See* TR 797, L 13-21]. He testified: "As he was putting the suspect into the car, somehow they broke apart. She leaned back, and she kicked him with a great amount of force in the face. I saw Officer Shepherd react immediately and respond with an appropriate use of force, a hit to stop the suspect. After he stopped the suspect, I thought he did an exceptional job of modulating his force . . . ." [TR 797, L 13-21]. Officer Shepherd followed his SPD training.

Sixth, SPOG asks the Board to consider the level and amount of force Officer Shepherd used. He delivered a single-strike to stop the threat. [TR 961, L 23-TR 962, L 3]. After delivering the strike, he was able control her arms and legs until there was a breakdown in structure and she was no longer assaultive. [*See* TR 962, L 3-6]. In short, the single strike was effective in helping



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

him gain control of the suspect and avoid either further assault or her escaping. He needed to use this force because he had just been kicked in the face, was feet from the assailant, and she was moving towards him and giving no indication that her assault was over.[1] After delivering the single strike, he did not strike her again or use any force beyond holding her down on the seat.

Seventh, SPOG asks the Board to consider the opinions of reasonable SPD commissioned employees who offered insight and who have been through all SPD-required use of force trainings. These opinions establish that similarly-trained, reasonable officers believed that Officer Shepherd's use of force was appropriate under these circumstances and within policy.

This belief was expressed by supervisors and trainers within the SPD. Sergeant Eric Zerr is Officer Shepherd's direct supervisor and has been in the training cadre for a number of years. [TR 520, L 22-TR 521, L 1; TR 526, L 19; TR 528, L 25-TR 529, L 2]. As a member of the training cadre, he is on the team that trains all SPD-commissioned employees on defensive tactics, integrated combat control, and street skills. [TR 527, L 3-7]. He has attended all trainings on the use of force that the SPD requires of officers and sergeants, including the CORE principles classes and all e-learnings. [TR 525, L 13-TR 526, L 1]. The Board should assume that Sergeant Zerr is a reasonable officer because the SPD entrusts him with supervising and training its employees. Sergeant Zerr testified that when he saw the video, he observed Officer Shepherd getting kicked, being stunned, and then doing what he was trained to do, which was "trying to stop th[e] threat, kick her legs to the side, str[ike] her once, and then tr[y] to gather himself ," while "assessing" the situation. [TR 526, L 9-15; TR 537, L 4-11]. Sergeant Zerr had no concerns or issues with Officer

---

[1] The timing of his force is also relevant. He did not linger and then decide to use force. He was kicked in the face, he was feet apart from Ms. Durden-Bosley, and Ms. Durden-Bosley was coming towards him. [City 34, p. 43, 49]. Within 1.056 seconds of being kicked in the face (and with Ms. Durden-Bosley moving towards him), he initiated the strike. [City 34, p. 43, 49]. He acted immediately to prevent further injury and her escape.



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

Shepherd's single-strike and believed that Officer Shepherd demonstrated restraint in his response to her kick. [TR 536, L 24-TR 537, L 2; City 76, OPA-W, p. 8032]. Therefore, Officer Shepherd's supervisor, who was also a trainer within the SPD, believed his use of force was reasonable, necessary, and proportionate.

Lieutenant Steve Strand is a lieutenant and a watch commander in the SPD. [TR 595, L 11-19]. In June of 2014, Lieutenant Strand was serving as the acting-captain of the South Precinct, where Officer Shepherd was assigned. [TR 596, L 7-19]. He also sat on the Force Review Board for nearly four years reviewing use of force incidents—the Force Review Board is the entity required to review all Type II and III uses of force. [TR 595, L 5-11; TR 641, L 15-16; TR 642, L 5-8]. Needless to say, he is intimately familiar with the use-of-force policy and how SPD applies it. He additionally attended all required SPD trainings on the use of force and defensive tactics. [TR 601, L 16-21]. He testified that Officer Shepherd's use of force was reasonable, necessary, and within SPD policy. [TR 602, L 11-12; TR 635, L 12-13]. He testified that Officer Shepherd was kicked in the face, struck the suspect and laid on top of her torso, keeping her in the backseat of the patrol car. [TR 602, L 7-10]. Under the circumstances, these actions were within the SPD's use-of-force policy. [TR 602, L 11-12]. It was Lieutenant Strand's opinion that "Officer Shepherd is being unfairly targeted by the SPD administration and command staff." [City 76, OPA-W, p. 8031]. Thus, another member of Officer Shepherd's command staff and a long-time member of the Force Review Board believed his actions were reasonable, necessary, and proportionate.

Sergeant Roger Russness was the patrol sergeant on duty when the incident occurred. [TR 678, L 1-5]. He too has attended all required use of force and defensive tactics trainings. [TR 682, L 18-20]. According to his testimony, if he had been in Officer Shepherd's position, he probably would have used equal or even greater force than the single-strike used by Officer Shepherd,



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

reasoning it was necessary to stop the threat to avoid further injury. [TR 682, L 2-17]. Thus, another SPD supervisor believes his actions were appropriate.

Additionally, Officer Richard Peterson, the Department's lead defensive tactics instructor, testified that the single-strike was both reasonable and necessary to stop the threat under the circumstances. [TR 797, L 7-9]. He explained that, when he saw the video, he saw a noncompliant suspect kick Officer Shepherd "with a great amount of force in the face [and] saw Officer Shepherd react immediately and respond with an appropriate use of force, a hit to stop the suspect." [TR 797, L 12-19]. He further explained that Officer Shepherd did an "exceptional job modulating his force" after stopping the suspect. [TR 797, L 19-21]. Therefore, both trainers and supervisors agree that Officer Shepherd's force was reasonable, necessary, and proportional.

In addition to the above supervisors and trainers, the investigation contains the perspective of an officer who was at the scene with Officer Shepherd and later watched the video. Officer Rory Smith was standing with Mr. Robert Shelby when Ms. Durden-Bosley kicked Officer Shepherd and Officer Shepherd responded with the single strike. [*See* City 76, OPA-W FBI Materials, p. 8026]. Officer Smith was interviewed by the FBI. [*See* City 76, OPA-W FBI Materials, p. 8026]. According to FBI interview notes, Officer Smith believed that the strike was "an appropriate use of force." [City 76, OPA-W FBI Materials, p. 8026]. He reasoned that just because an individual is handcuffed does not mean he or she is compliant or under control and that "[s]trikes are an appropriate use of force if an officer has been assaulted." [City 76, OPA-W FBI Materials, p. 8026]. Clearly, reasonable and similarly trained officers believed that Officer Shepherd's single-strike was reasonable, necessary, and proportionate, as required by SPD policy.

Eight, the SPOG asks the Board to consider the outside opinions on use of force that were presented at the *Loudermill* hearing and included in Exhibit 76. The first opinion was prepared by Mr. Robert Bragg, who was initially hired by the WSP to provide an opinion on whether the use



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

of force was reasonable and necessary. [City 76, OPA-J – External Investigation Docs, p. 3342 ("The Washington State Patrol is requesting that you evaluate Officer Shepherd's actions, as to whether or not his use of force was reasonable and necessary, *according to Seattle Police Department Policy*.") (emphasis added)]. He is the Program Manager of Physical Fitness and Defensive Tactics at the Washington State Criminal Justice Training Center (CJTC), has trained thousands of line-officers, and has served as a state expert witness on police use of defensive tactics. [City 76, OPA-G – Use of Force Documents, 14-199378 FIT Investigation Files, WSP Case File Items, p. 2976]. The WSP provided him with the SPD's use-of-force policy and trainings, video of the incident, and various statements. [City 76, OPA-J – External Investigation Docs, p. 3342]. Upon receiving and reviewing Officer Shepherd's statement and OPA Sergeant Kim's report, which contained some video analysis, he concluded that Officer Shepherd's single-strike "would be reasonable to effect the lawful intent of self-defense and violator control." [City 76, OPA-U Loudermill Materials, p. 6527].

At the *Loudermill* hearing, the SPOG additionally offered the opinion of Pierce County Sergeant Glen Carpenter. Sergeant Carpenter has extensive experience in the use of force and defensive tactics, which, inter alia, includes being a certified-CJTC defensive tactics master instructor, the only outside-agency certified SPD integrated combat and control tactics master instructor, and a state-recognized use of force expert. [City 76, OPA-U Loudermill Materials, p. 6530-31]. He reviewed much of the investigation in this case[2] and the SPD's use of force policy. [City 76, OPA-U Loudermill Materials, p. 6531-32]. After reviewing the investigation, he concluded that Officer Shepherd's use of force was within federal and state law and within SPD policy. [City 76, OPA-U Loudermill Materials, p. 6547]. He reasoned that Officer Shepherd used

---

[2] An itemize list of materials viewed can be found in City 76, OPA-U Loudermill Materials, p. 6531-32.



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

the amount of force that "any trained" law enforcement officer would use to stop an imminent threat. [City 76, OPA-U Loudermill Materials, p. 6547]. Ms. Durden-Bosley's ability to attack had not changed between the time she kicked him and he struck her; in fact, "the offender was still moving forward leading [O]fficer Shepherd to believe another attack was imminent or [that she] was trying to escape . . . ." [City 76, OPA-U Loudermill Materials, p. 6547]. He opined the force was "objectively reasonable" and "proportional." [City 76, OPA-U Loudermill Materials, p. 6547]. Therefore, outside use-of-force experts judged Officer Shepherd's use of force to be reasonable, necessary, and proportionate.

Ninth, the SPOG asks the Board to consider the evaluations of the King County Prosecuting Attorney's Office and United States Attorney's Office. Both prosecuting attorneys' offices reviewed the case and neither found reason to pursue charges. [*See* City 11; City 14]. The King County Prosecuting Attorney's Office noted that "from his arrival at the scene and until he was kicked, [Officer] Shepherd acted in a calm and professional manner." [City 11, p. 4801]. It also opined that "some force was necessary to control and arrest Durden-Bosley [as she had] actively resisted her arrest and had assaulted the officer." [City 11, p. 4801]. It concluded that it would be unable to meet its burden of proving, in a criminal case, that "Shepherd's single punch was unreasonable." [City 11, p. 4802]. In a much shorter correspondence than the one offered by the King County Prosecuting Attorney's Office, the United States Department of Justice concluded that there was no prosecutable violation of the federal criminal civil rights statutes, after the FBI had conducted its investigation into the use of force. [*See* City 14; 18 USC § 242 (making it a crime to willfully deprive someone of rights, privileges or immunities secured or protected by the Constitution); www.fbi.gov/civil-rights (violations of federal law occur when it can be shown that a use of force was willfully "unreasonable" or "excessive.")].



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

Considering all of the above evidence, it becomes clear that Officer Shepherd's actions were reasonable, necessary, and proportionate. Reasonable and similarly trained officers would have used the same or comparable force to stop the immediate threat and control Ms. Durden-Bosley. Her actions of kicking him in the face, moving towards him, and showing no breakdown in structure created the need for him to use immediate force. The City has not met its burden of proving with clear and convincing evidence that Officer Shepherd's single-strike violated SPD policy 8.100(1). This conclusion is strengthened by SPD's direction that there be an "allowance for the fact that police officers are forced to make split-second decisions—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." [City 6, p. 6271]. This language would mean nothing if it did not apply following a substantial kick to the face, which was followed by the suspect moving towards the officer. Further, the standard of proof requires that reasonable doubts be resolved in favor of the grievant. The City has failed to meet its burden of proof.

*2. Use of Force When Prohibited – 8.100(2)*

In January 2014, the Department adopted a policy that specifically addressed the use of force on handcuffed individuals. [City 48]. The policy states that officers may not use physical force on handcuffed or restrained individuals "**except** in exceptional circumstances when the subject's actions must be immediately stopped to prevent injury, escape, or destruction of property." [City 6 (8.100(2)) (emphasis added)]. Thus, the SPD policy recognizes that it is permissible to use force on handcuffed individuals in some situations, such as when necessary to prevent injury or escape. *Id.* However, when officers use force on handcuffed individuals, their actions will be closely and critically-reviewed and they must articulate both the "exceptional circumstances" and "[w]hy no reasonably effective alternative to the use-of-force appeared to exist" (i.e., SPD's definition of "necessary"). [City 6 (8.100(2)); *see* City 6 (8.100(1))]. To



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

summarize, SPD policy does not prohibit the use of force on handcuffed individuals. Rather, the policy emphasizes for employees that they should only use force on handcuffed individuals in exceptional circumstances, imposes a documentation requirement on officers, and stresses that these incidents will be closely reviewed.

The documentation element does not create a new standard for the use of force. Rather, it requires officers to document why a use of force was reasonable and necessary. In this regard, officers must first document the "exceptional circumstances," i.e., were they preventing injury, escape, or destruction of evidence. They must then document "[w]hy no reasonably effective alternative to the use-of-force appeared to exist." [City 6 (8.100(2))]. As the Board remembers, this is an essential element for all uses of force, under SPD policy 8.100(1). SPD policy 8.100(1) provides the following guidance on "necessary": "Officers will use physical force *only when no reasonably effective alternative appears to exist*, and only then to the degree which is reasonable to effect a lawful purpose." [City 6 (8.100(1))]. Thus, it is not unique to the use of force on a handcuffed individual that no reasonably effective alternative to the use of force appeared to exist. [*See* City 6 (8.100(1))]. In fact, the same language is used in the definition of "necessary" in the RCWs governing when any use of force is lawful by officers: "'Necessary' means that no reasonably effective alternative to the use of force appeared to exist and that the amount of force used was reasonable to effect the lawful purpose intended." RCW 9A.16.010 (definitions); RCW 9A.16.020(1) ("The use, attempt, or offer to use force upon or toward the person of another is not unlawful . . . [w]henever necessarily used by a public officer in the performance of a legal duty.")]. Thus, a different and/or new standard does not exist for the use of force on handcuffed individuals, as it relates to the "necessary" language.

Lieutenant Strand, who sat on the Force Review Board for nearly 4 years, confirmed the above application of policy 8.100(2). [*See* TR 635, L 22-TR 636, L 2; TR 644, L 12-23; TR 645,



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

L 24-TR 646, L 2]. He testified that policy 8.100(2) does not create additional requirements or standards for the use of force on handcuffed individuals. [TR 635, L 22-TR 636, L 2; TR 644, L 12-23]. Uses of force on handcuffed individuals must be reasonable and necessary, as is required for *any* use of force. [TR 635, L 22-TR 536, L 2; TR 644, L 12-23]. Therefore, the policy is not more stringent in terms of a standard; rather, the department felt it was important to highlight for its employees that it will closely review uses of force on handcuffed individuals. [TR 644, L 20-23].

The SPD's policy makes sense because, as officer-after-officer testified, real world experience teaches that handcuffed individuals sometimes assault officers and try to escape. [*See* TR 318, L 16-TR 319, L 2 (Chief O'Toole testifying that handcuffed suspects can assault officers, that officers are trained that they can be assaulted by handcuffed suspects, that handcuffing does not prevent kicking, spitting, or headbutting officers); TR 604, L 11-23; TR 657, L 13-14; TR 722, L 19-TR 723, L 5]. Therefore, it is sometimes necessary to use force against them. However, the SPD closely reviews these uses of force to make sure officers are not abusing a prisoner's vulnerable position.

Unfortunately, Chief O'Toole appears to have ignored the clear language of SPD policy 8.100(2) and applied a heightened standard. When asked by Board member Parton whether she believed a strike would ever be allow on a handcuffed suspect, Chief O'Toole responded: "[I]f there was imminent threat of death or serious bodily harm, yes, of course." [TR 373, L 6-7; *see* TR 373, L 8-15 (Chief O'Toole testifying that it would be "highly unusual" and that she could not think of an instance where it would be allowable to strike a prisoner who is handcuffed from behind.)[3]]. This is not the standard set forth in policy. Rather, Chief O'Toole's standard is far

3 Despite testifying that she could not think of situations in which it would be allowable for an officer to strike an individual who was handcuffed from behind, the SPD determined that it was



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

closer to what is spelled out in the RCWs for when a homicide is justifiable. *See* RCW 9A.16.050 (In defense of self or others, homicide is justifiable if it is reasonable to believe the slain person intends to "do some great personal injury . . . and there is an imminent danger of such design being accomplished . . . ."). The standard used by Chief O'Toole should not be the standard used by the Board. Employees must be notified of policies before being held to their standards; therefore, the Board must apply the policy as written.

Here, "exceptional circumstances" existed because Officer Shepherd needed to act immediately to prevent further injury and escape. Ms. Durden-Bosley had just kicked Officer Shepherd in the face and was moving towards him and the door. As OPA Director Murphy agreed, it was reasonable for Officer Shepherd to believe that Ms. Durden-Bosley may pose a continuing threat after she kicked him in the face and this threat increased as she began sitting up and moving her foot towards the ground outside; further, her actions could reasonably be viewed as an indication that she may attempt to escape by getting out of the patrol Explorer. [TR 93, L 10-23]. Additionally, OPA Director Murphy agreed that it would be appropriate for Officer Shepherd to control Ms. Durden-Bosley to prevent her from further injuring him or anyone else. [TR 93, L 24-TR 94, L 2]. Clearly, the escape and injury "exceptional circumstances" were present; and, Officer Shepherd documented these exceptional circumstances in his FIT interview. [*See* TR 602, L 23-25 (Lieutenant Strand's testimony); City 60, p. 357].

Further, Officer Shepherd's actions were necessary, as the SPOG extensively discussed in the previous section. This necessary element (i.e., whether there "appeared" to be any other "reasonably effective alternatives") is the City's focus in this case. While presenting its case, the City attempted to expand the policy language and argued that SPD policy 8.100(2) required that

---

allowable for an officer to strike a handcuffed individual in 2016 after he had been bitten an officer. [Guild 13; Guild 14].



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

there be "no alternative" course of action (even with 20/20 hindsight) for an officer to use force on a handcuffed individual.[4] However, the policy states clearly that officers only need to use "reasonably effective alternatives" that "appeared to exist." [City 6, 8.100(2)]. They are not required to engage in alternatives that are unsafe or ineffective. Additionally, officers should only be required to use alternatives that reasonable, similarly trained individuals would use in the same situation.

The City has argued that Officer Shepherd had alternatives. In Chief O'Toole's Disciplinary Action Report, she said he could have stepped away from the subject's leg reach, used the other officers on scene, "attempted to secure the subject in the patrol car by simply closing the car door," or "stepp[ed] back to reassess the situation, as there was no immediate threat." [City 47, p. 10334]. Some of Chief O'Toole's options are duplicative. Eliminating the superfluous language, she was proposing that he move away from the car, close the car door, or (SPOG's best guess) either stay where he was or move away and request assistance from another officer on scene.

Requiring Officer Shepherd to move away from the car door was not a reasonably effective alternative. Ms. Durden-Bosley had just kicked Officer Shepherd in the face and was moving toward him and the open car door. [City 33, p. 25]. As recognized by OPA Director Murphy, Ms. Durden-Bosley's actions could "reasonably [be] viewed as an indication [she] may attempt to escape by getting out of the police car," and they caused Officer Shepherd to "reasonably believe[]" she posed a "continuing threat." [City 37, p. 5]. He further testified that it would have

---

4 Any argument that the language requires no alternatives before using force would apply equally to SPD policy 8.100(1), which contains the same language. The SPD does not apply or interpret the policy as such.



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

taken "a very short time" for her to get to Officer Shepherd's location after kicking him. [TR 100, L 6-7].

The conclusion that she could reach him quickly was echoed by OPA Sergeant Kim, who concluded that, in the same amount of time it took Officer Shepherd to close the distance and strike her (i.e., one second), she "could have exited the car and attempted to kick [Officer Shepherd] leaving him little time to react to the situation." [City 34, p. 41]. Sergeant Kim explained the Tueller Drill, which examined the distance a person can travel in the amount of time it takes an average officer to unholster his or her weapon and fire. [*See* TR 712, L 21-TR 713, L 17]. In the two seconds it takes an average officer to unholster and fire a weapon, a typical person can cover 21 feet of distance. [TR 713, L 8-17]. Ms. Durden-Bosley and Officer Shepherd were just feet apart. It was reasonable to believe that Ms. Durden-Bosley would have continued her movement towards Officer Shepherd, reached him, and continued her assault or escaped, especially considering the fact that Officer Shepherd was dealing with the physical effects of being kicked in the face one second before. It would be unreasonable to require Officer Shepherd to not stop the threat or control Ms. Durden-Bosley.

Other SPD-trained officers agreed. They testified that backing away was not a reasonable alternative because she would have gotten out of the vehicle and could have further attacked Officer Shepherd (or others) or escaped. [*See* TR 568, L 8-9; TR 605, L 21-24; TR 637, L 1-7]. As stated by Lieutenant Strand, "[H]e ha[d] a duty at this point to secure and to control her, and he [could not] simply continue to back away and allow her to escape, run away." [TR 632, L 5-9].

Chief O'Toole's suggestion that Officer Shepherd back away is additionally problematic because Officer Smith was standing a few feet away with his back to the patrol Explorer, creating an additional officer safety problem if Ms. Durden-Bosley were to get free. [City 76, OPA-W, p.



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

8026]. He could have been assaulted with no warning or Ms. Durden-Bosley could have reached Mr. Robert Shelby, to whom he was speaking. Further, Officer Shepherd could not have turned his back to Ms. Durden-Bosley to move or run away from her; it would have been unsafe to do so.

There are also tactical reasons for not backing away and letting Ms. Durden-Bosley get out of the vehicle. With Ms. Durden-Bosley still in the back of the police Explorer, she was relatively contained, and Officer Shepherd had a position of advantage. [TR 584, L 1-16]. If he let her get out, suddenly the assaultive subject would have more options available to her. She could run, headbutt Officer Shepherd, kick Officer Shepherd, and/or attack Mr. Robert Shelby or the other officers on scene. Allowing her out of the vehicle would have increased the threat and not stopped it. Therefore, backing away did not appear to be a reasonably effective alternative given Ms. Durden-Bosley's behavior.

For similar reasons, staying in the same location and requesting help or moving back and requesting help were not reasonably effective alternatives. Officer Shepherd was just feet from Ms. Durden-Bosley and she could have closed the gap incredibly quickly and continued her assault. In fact, it is reasonable to believe that she would have as she had just kicked him in the face and was moving towards him again. Additionally, only one officer could fit in the door way at the time, so having multiple officers present would not help if she had stayed in the vehicle or its doorway. [TR 634, L 2-8].

The only other alternative suggested in Chief O'Toole's Disciplinary Action Report (i.e., disciplinary decision) is attempting "to secure the subject in the patrol car by simply closing the car door." [City 47]. As easy as this option sounds, there is one glaring problem: Ms. Durden-Bosley's legs were in the doorway. He could not "close" the car door and secure her within the vehicle.



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

It was not expressly mentioned in the Chief's disciplinary decision (DAR); however, the City has suggested that Officer Shepherd should have closed the door on Ms. Durden-Bosley's legs, pinning her in place and using the door to shield from further assaults. The City's suggestion is interesting because it would constitute physical force against a handcuffed individual, triggering SPD policy 8.100(2) and the requirement of "exceptional circumstances," such as "injury, escape, or destruction of property." [*See* City 6, 8.100(2); TR 438, L 25]. This contravenes Chief O'Toole's finding that "there were no such exceptional circumstances here." [City 47, p. 10335]. Pursuant to policy, where there are no "exceptional circumstances," the SPD would expect an officer not to use any physical force against a handcuffed individual. Therefore, it appears the current SPD administration and the OPA disagrees with her finding that there were no "exceptional circumstances."

In this regard, OPA Director Murphy testified that it would have been "possible and within policy" for Officer Shepherd to use some level of force against Ms. Durden-Bosley to prevent her from escaping or assaulting him or anyone else. [TR 114, L 18-TR 115, L 9]. Similarly, Captain Grenon, who is the former commander of the training and education section, testified that it would have been within policy to shut her legs in the door, which he characterized as a Type II and reportable use of force due to the likelihood of causing injury. [TR 438, L 25; *see* TR 435, L 21]. Therefore, it appears they agree with Officer Shepherd's justification for using force: "[s]he [had] kicked me in the jaw and injured me, she was still coming after me, and [so] I used immediate force to prevent her further attacks to gain control." [City 62, p. 22].

Not only did numerous officers, as previously discussed, opine that the single-strike was necessary (i.e., no reasonably effective alternative appeared to exist) and within policy, but OPA Sergeant Kim found pinning Ms. Durden-Bosley into the door to be a "less feasible" option. [*See* City 34, p. 45]. He reported, "Attempting to close the door would have involved Shepherd getting



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

closer to Durden and also presented a likelihood of injury to her given that her legs were across the door jam." [City 34, p. 45]. Lieutenant Strand agreed that this alternative was problematic. [TR 605, L 9-14]. Further, it was not trained, so it was not immediately apparent. Even Chief Wilkse paused when asked about this as an option. [TR 462, L 1-6].

In sum, Officer Shepherd's actions complied with SPD policy 8.100(2). Reasonable officers in the same position would believe that exceptional circumstances existed and that a strike or similar level of force was necessary to stop the threat and regain control of the prisoner. The City has failed to carry its burden of proving with clear and convincing evidence that Officer Shepherd's single-strike violated policy 8.100(2).

*3. When Safe under the Totality of the Circumstances and Time and Circumstances Permit, Officers Shall Use De-Escalation Tactics in Order to Reduce the Need for Force – Policy 8.100(3)*

According to SPD policy 8.100(3), "When safe under the totality of the circumstances and time and circumstances permit, officers shall use de-escalation tactics in order to reduce the need for force." [City 6 (8.100(3)]. The expectation that officers use de-escalation tactics is dependent on whether such tactics are safe and reasonably feasible and whether time and circumstances permit. [City 6 (8.100(3)]. De-escalation tactics are aimed at creating time, space, and distance, and include things like placing barriers between officers and subjects and using verbal persuasion, advisements, and warnings. [City 6 (8.100(3)]. De-escalation does not work in all situations and the Department does not require officers to use it in all circumstances for obvious safety reasons.

Officer Shepherd complied with the de-escalation policy. "Prior to being kicked, [Officer Shepherd] employed a number of de-escalation tactics to prevent violence between [Ms. Durden Bosley] and [Mr. Robert Shelbey] and to minimize the necessity and nature of force he had to use to detain [Ms. Durden-Bosley] and continue his investigation. He tried verbal persuasion, humor, and *de minimis* escort holds to some success." [City 37, p. 6 (OPA Director Murphy)]. He was



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

also "calm[,] respectful and . . . appeared to follow the LEED [listen and explain with equity and dignity] model set forth in SPD dictum." [City 11, p. 4800 (King County Prosecutor's Decline quoting Mr. Bragg)].

For example, Officer Shepherd encouraged Ms. Durden Bosley to sit and "[t]ake some hee-hee-hoo's." [City 33, transcript at 2:24]. The transcript of their conversation includes:

*Shepherd:* *Okay. Do you need to take a second and just—*

Durden-Bosley: I'll take a sit.

*Shepherd:* *Okay.*

Durden-Bosley: I'll take a sit.

*Shepherd:* *___ way to de-escalate, okay?*

[Unrelated comment by Mr. Robert Shelby].

*Shepherd:* *Take some hee-hee-hoo's, okay?*

[Unrelated comment by Mr. Robert Shelby].

*Shepherd:* *I just—Hee-hee-hoo's, yes.*

Durden-Bosley: Hee-hee-hoo.

Durden-Bosley: Hee-hee-hoo.

*Shepherd:* *Relax. ___. Go to your happy place.*

[City 33, transcript at 2:24-25].

Officer Shepherd used these tools and tactics to de-escalate and defuse the situation. However, when Ms. Durden-Bosley kicked Officer Shepherd in the face, moved forward towards him and the open door, and did not show a breakdown in structure, it was no longer safe and feasible to use de-escalation tactics. It was her actions that precluded further use of de-escalation tactics. He needed to use force to stop the assault and gain control of her and the situation. Even the City recommended that he use a Type II use of force on Ms. Durden-Bosley, which undercuts



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

its conclusion that the situation was safe. The City has failed to provide clear and convincing evidence that Officer Shepherd violated policy 8.100(3).

For all of the above reasons, the City has failed to prove with clear and convincing evidence that Officer Shepherd violated the SPD's use of force policy. Therefore, it did not have just cause for the termination, and Board must reverse the discipline and make Officer Shepherd whole for all losses he suffered.

C. EVEN IF THE BOARD FOUND A POLICY VIOLATION, THE CITY FAILED TO PROVE THAT TERMINATION IS REASONABLE AND APPROPRIATE UNDER THE CIRCUMSTANCES

Though Officer Shepherd's actions did not violate SPD policy, the SPOG continues with the next step in the just cause analysis and explains why the discipline meted out is excessive under the circumstances. It is the City's burden to prove with clear and convincing evidence that the punishment is reasonable and appropriate under the circumstances and not excessive. Arbitrators generally find a penalty excessive "if it is disproportionate to the degree of the offense, if it is out of step with the principles of progressive discipline, if it is punitive rather than corrective, or if mitigating circumstances were ignored." *City of Green*, 127 LA 1034, 1046 (Szuter, 2010) (quoting Elkouri and E. Elkouri, How Arbitration Works, p. 964 (Ruben, 6th ed. 2003)). More generally stated, the employer must prove that its chosen level of discipline was fair. When an arbitrator finds that discipline is too severe, the arbitrator should lower or remove the discipline, so that it complies with the requirements of just cause. *See Federal Bureau of Prisons*, 91 LA 276, 280 (Statham, 1988). The following sections explain why termination is an inappropriate and unreasonable level of discipline, even if the Board were to find a policy violation.



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

*1. The City bears fault.*

The penalty in this case is too severe because management bears fault. The "management at fault" arbitral concept provides:

> Where an employee is guilty of wrongdoing, but management . . . is also at fault in some respect in connection with the employee's conduct, the arbitrator may be persuaded to reduce or set aside the penalty assessed by management.

Elkouri and E. Elkouri, How Arbitration Works, 15-80 (Kenneth May ed., 7th ed. 2012). Applying this concept, arbitrators have reduced severe penalties where managers also made mistakes and where these mistakes could have prevented the employee's misconduct or otherwise caused the employee's misconduct. *See* Elkouri and E. Elkouri, How Arbitration Works, 15-81 (Kenneth May ed., 7th ed. 2012); *Cemex Construction*, 130 LA 868, 874 (Hoffman, 2012); *HDS Services*, 107 LA 27, 30 (Hodgson, 1996). The "management at fault" concept appears to be grounded in fairness; it is unfair for an employee to bear the burden of serious discipline when management is also at fault.

In this case, management is at fault because its training failed to convey its expectations, as expressed during the hearing. Its employees did not understand that a single-strike would violate the SPD's expectations under the circumstances. Before discussing this argument, the SPOG acknowledges the uncomfortable position it creates for the Board and itself. The City-appointed Board Member is the Assistant Chief of Training. [TR 277, L 16-17; TR 482, L 16]. The SPOG intends no disrespect to this Board member when raising the argument and trusts that all Board members will view the facts impartially when considering the arguments.

The SPD's training conveyed to employees that a single-strike was an appropriate response under the circumstances. The SPD taught its officers to strike when they were hit for the purpose of stopping a threat and controlling an assaultive suspect; they were then taught to modulate their



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

force. [TR 792, L 18-TR 793, L 9]. This sequence was drilled into officers. [*See* TR 792, L 1-12].

Employees were not taught that the Department expected them to use different force when assaulted by a handcuffed individual. In fact, despite instructing employees that force could be used on handcuffed individuals to prevent injury, escape, or destruction of evidence, the Department never provided training specifically on how it expected employees to apply this force. [TR 423, L 10-13]. Without providing this training, employees defaulted to the training they had received. Even the SPD's former training captain agreed that, without training specifically dealing with handcuffed individuals, it would be reasonable for officers to use the tactics they had been trained in when it became necessary to use force on a handcuffed individual. [TR 424, L 3-13]. Officer Shepherd acted in conformance with SPD training.

Because the Chief indicated that she might terminate Office Shepherd for actions that were consistent with his training, SPD's lead defensive tactics instructor, Officer Peterson, attended Officer Shepherd's *Loudermill* hearing. [TR 798, L 16-17]. He told Chief O'Toole that she needed to fire him if she fired Officer Shepherd because Officer Shepherd did what Officer Peterson trained him to do. [TR 798, L 21-TR 799, L 4]. It is fundamentally unfair to provide training to an employee and then terminate him or her for adhering to that training. This violates the principles of just cause.

The City tried to place blame on Officer Shepherd, instead of recognizing and appreciating that it trained its employees to believe a single-strike complied with policy under the circumstances. The following Department members believed Officer Shepherd's actions were appropriate: Lieutenant Strand (who sat on the Force Review Board and was the lieutenant and acting-captain in Officer Shepherd's chain of command), Sergeant Zerr (who was Officer Shepherd's direct supervisor), Sergeant Russness (who was the sergeant working when the



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

incident occurred and responded to the scene), Officer Peterson (lead defensive tactics instructor), and Officer Smith (who was on scene when the force was used). Each employee attends mandatory trainings. Nonetheless, they believed Officer Shepherd's actions did not violate policy. Clearly, the fault does not lie with Officer Shepherd. The Department led employees to believe his actions complied with policy.

The SPOG notes that three of the individuals listed above are Officer Shepherd's supervisors. It is incredible that the SPD would hold Officer Shepherd to a standard that his supervisors did not understand or know existed. Clearly, the SPD did not adequately convey its expectations to its employees.

During the hearing the City tried to accentuate the training it provided to Officer Shepherd on the use of force. However, if the Board reviews this training, the SPOG is confident the Board will appreciate the deficiency and lack of guidance it provided to its employees on SPD policy 8.100(2). To begin, the SPD issued a directive on December 31, 2013, notifying employees that on January 1, 2014, a new use of force policy would come into effect. [City 48]. The directive was 122 pages in length, which included the new policy (including 8.100(2)) and attachments. [*See* City 48]. The City required employees to certify that they had read the new policy and answer a 10-question quiz on those 122 pages. [*See* City 49-50].

In February, then-Chief of Police Bailey recorded a 4.5 minute message to SPD employees on the new use of force policy. [City 52]. Chief Bailey explained that the new policy built on the current practice with "a few" significant changes that he would highlight. [City 52]. He did not mention SPD policy 8.100(2) and/or using force on handcuffed individuals. [City 52]. The biggest change in the use-of-force policy, according to him, concerned how uses of force would be reported. [City 52].



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

Around the time Chief Bailey issued his video message, the SPD rolled out a directive, stating that it recognized the new use of force policy contained in the December 31st directive was on a "subject that requires training beyond the written word." [City 76, OPA-VV2 Directives RE – 2014 UOF Policy, p. 7955]. Therefore, it would not discipline an officer under the new use-of-force policy until he or she received more training. *Id.*

In April 2014, the SPD came out with a 15-minute e-learning presentation that offered no insight or guidance on SPD policy 8.100(2) beyond what was written in the actual use-of-force policy disseminated on December 31st. [*See* City 53, p. 6935, 6949; City 15]. In fact, the information in the e-learning on SPD policy 8.100(2) was actually sparser than the regular policy. The e-learning included only the following slide on SPD policy 8.100(2):

*1.10 Untitled Slide*




[City 53, p. 6935]. It did not address the documentation requirements.



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

The SPD later offered an in-person class. On May 6, 2014, Officer Shepherd attended the two-hour CORE principles class on the use of force. [City 57]. The employees were again provided with a slide sparsely outlining the policy:

PROHIBITED FORCE

OPERATIONAL CONCEPTS

**What policy says:**

- We ***can't*** use force:
  - To punish or retaliate
  - On people who only verbally confront
  - On handcuffed or otherwise restrained subjects unless exceptional circumstances apply such as preventing injury, escape or destruction of property
  - To prevent someone from swallowing a substance
  - To extract evidence from the body of a person unless we have a warrant

[City 55, p. 7088]. Employee's were then given the following unhelpful guidance on how to follow the policy:



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

PROHIBITED FORCE

OPERATIONAL CONCEPTS

**How to do it:**

- Don't do it
- Stay up to date with policy and procedures



[City 55, p. 7089]. That guidance was not helpful because it did not address those circumstances in which force could be used on a handcuffed individual. To the Department's credit, it did provide one conceptual application exercise, which gave employees a fact pattern involving a use of force on a handcuffed individual. [City 55, p. 7090-91]. The facts were that a handcuffed suspect spun away from an officer and "tried to" kick the officer.[5] [City 55, p. 7091]. The officer responded by pushing the suspect against a wall and taking the suspect to the ground. [City 55, p. 7091]. Employees were asked to analyze the force and determine whether it was within policy. [City 55, p. 7092]. Unfortunately, the SPD did not give employees any clear guidance on the outcome it expected in that situation. The SPD's lesson plan stated, "This situation has . . . too many unknowns to definitively determine if the force is prohibited or authorized." [City 80, p. 16]. The SPD further told instructors, "Be sure that officers understand that this situation will be very fact-dependent; in some cases the force will be authorized and others it will not be. It all depends on

---

5 The facts faced by Officer Shepherd were much worse than the fact pattern. Ms. Durden-Bosley successfully kicked Officer Shepherd in the face, causing him substantial physical pain, and continued moving towards him and the vehicle door.



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

the articulation of the facts by the officer using force." [City 80, p. 17]. Therefore, employees were left to guess at whether force was authorized under the circumstances and, if so, how much force was appropriate. The SPD did not provide clear expectations to its officers.

The SPOG should note that the SPD provided employees with more training on the use of force *after* Officer Shepherd was placed on administrative leave. This included eight hours of classroom and scenario training, including four hours of training on de-escalation and contact and cover and four hours of training on threat assessment and prisoner control. [Stipulation regarding training, para. 5]. Clearly, the SPD realized that its employees needed more training on the use of force, de-escalation, and prisoner control (including placing combative prisoners into vehicles). Officer Shepherd did not receive this additional training, as it was implemented after June 22, 2014. *Id.*

The SPD is similarly at fault because its policy is confusing. While the City argues there is a heightened standard for the use of force on handcuffed individuals, the policy uses identical language to the policy governing all uses of force (i.e., no reasonably effective alternative appeared to exist). [City 6, 8.100(1) and 8.100(2))]. This language is not new. It was housed in the use-of-force policy in effect prior to 2014. [Guild 5]. If the SPD intended for the policy to require "no alternative" or change the standard in some other way, it needed to do so expressly and then provide training to its employees on those changes.[6]

For all of these reasons, management is also at fault. Therefore, the City does not have just cause for Officer Shepherd's termination.

---

6 Under the old policy, an officer punched a handcuffed man in the face 14 times in less than one minute. [Guild 6]. At the time, the man was no longer assaultive. *Id.* The officer received only a suspension. *Id.*



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

*2. The discipline is not progressive in nature—it is punitive.*

Terminating Officer Shepherd's employment is further excessive because it is inconsistent with the principles of progressive discipline. Discipline may be excessive if it is out of step with the principles of progressive discipline. *See* Elkouri & Elkouri, How Arbitration Works, 15-43 (Kenneth May ed., 7th ed. 2012). The principles of progressive discipline "give employees chances to correct their behavior by gradually increasing the penalty." *Pittsburg & Midway*, 111 LA 828, 832 (Stoia, 1998). For discipline to be progressive, "there must be a core relationship between the particular infraction and prior disciplinary action." *Troy Dept. of Public Works*, 77 LA 153, 159 (Lewis, 1981). The level of discipline then escalates with the hope that the discipline will change the employee's behavior. *See Troy Dept. of Public Works*, 77 LA 153, 159 (Lewis, 1981). For example, if an employee had previously received a short suspension for similar behavior, an appropriate escalation of discipline might include imposing somewhat longer suspensions in the hope the employee will change his or her behavior. *Troy Dept. of Public Works*, 77 LA 153, 159 (Lewis, 1981). Clearly, termination is at the upper-end of any progressive discipline scale because it affords employees no opportunity to correct their behavior.

The discipline in this case is not progressive because Officer Shepherd had never been disciplined for an improper use of force. [*See* TR 477, L 16-19]. Therefore, he had no opportunity to receive correction and modify his behavior to comply with the employer's expectations. The only prior discipline in Officer Shepherd's record was a suspension for an incident that was unrelated to the use of force. [See City 42]. In that case, he did not book a suspect in a mandatory arrest situation (domestic violence) because the suspect was scheduled for surgery the next morning. [City 42]. As the Board knows, the result of that case was tragic. Nonetheless, it was unrelated to the use of force and should not form the basis for progressive discipline.



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

Despite the dissimilarities, the Chief attempted to rely on the prior discipline. However, it is unclear whether she even reviewed or read the prior case personally. She wrote in her disciplinary decision and testified that Officer Shepherd did not take responsibility for his actions in that case. Her statements are incorrect. Officer Shepherd took responsibility for his actions in the prior case:

> Before receiving notice on November 19th 2009, that a second proposed finding (administrative violation of law) had been added to my OPA complaint, I had not intentions of appealing any proposed discipline that would come about at the conclusion of this internal investigation or even attending the meeting. My decision was based on the simple fact
>
> that on May 19th 2005, I took an oath to serve and protect citizens of Seattle. On May 28th 2009, I failed to uphold that oath and Arturo Ramirez lost his life as a result. I've taken sole responsibility for the tragic events that unfolded on May 28th 2009. I sincerely apologize to the Ramirez family for not protecting their son, the City of Seattle for failing to uphold my oath and Officers of the City of Seattle for the embarrassment this incident has caused. (Guild Exhibit No. 8, pg. 1.)

[City 42, p. 15-16].

Further, the Board is not faced with conduct egregious enough to set aside the requirement that discipline be progressive. Department-member after Department-member opined that his use of force was appropriate. Clearly, if there was a violation, it was not egregious because others in the Department did not realize it was a policy violation. Therefore, the discipline is excessive because it is not progressive in nature.

*3. The discipline is disproportionate.*

The penalty of termination is additionally excessive because it is unduly harsh when compared with the alleged offense. Termination of employment is the labor law equivalent of capital punishment. *United Automobile Workers*, 77 LA 370, 371 (Ellmann, 1981) (quoting Arbitrator Kesselman). "Termination . . . not only results in the loss of a job with all its attendant seniority rights and benefits, but many also stigmatize the employee and render it difficult to locate



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

equally desirably new employment." *Id.* It should be reserved for the most egregious misconduct and when employees have demonstrated that they are no longer capable of correction.

Officer Shepherd's conduct was not egregious, and he has not demonstrated himself to be an employee beyond correction. Officer Shepherd received a kick to his face from a combative subject who was wearing Doc Marten boots. The kick knocked him back slightly and caused immediate pain and ringing in his ears. Ms. Durden-Bosley moved forward towards Officer Shepherd and the vehicle door immediately after kicking him. Under these circumstances, Officer Shepherd acted in accordance with his SPD training by delivering a single-strike to stop the threat and gain control of the arrestee. He then modulated his force. There was no bad intent on Officer Shepherd's part. He was not a rogue cop, and nothing in his actions was egregious or otherwise warrant termination of employment. The punishment is disproportionally harsh.

*4. The Chief ignored mitigating circumstances.*

The Chief ignored mitigating circumstances when she terminated Officer Shepherd's employment. Officer Shepherd was a good employee, with only one prior disciplinary incident in his history. His sergeant testified about the kind of employee that he was:

> [H]e was an incredibly conscientious officer. I think he was a courageous officer . . . he was a guy that really knew the law. He had a firm grip about what department policies are and the things he could and couldn't do, and he was competent in how he did his work.
>
> And I think he really cared. The South Precinct where we worked together on third watch, that's a really violent place that has a lot of gangs and a lot of families that are feeling marginalized because of all the violence around them in those neighborhoods. And I think that he really saw that, and that touched him. And so when people came to him and wanted . . . him to investigate crimes that they were involved in, that meant something to him because he knows that that community felt that way, and they were really struggling . . .
>
> [H]e was a good writer, and . . . he was a very good interviewer . . . a person that really set up the rapport with people and tried to meet [them] where they were at



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

> and speak with them in a way that meant something to them, where I . . . might not have the experiences that he would have that would lead to that.
>
> So I just found a lot of times when we went out to scenes is that he was able to kind of swap gears with different people to be able to get some rapport set up with them to help those investigations along.

[TR 544, L 13-TR 545, L 14].

By all accounts, Officer Shepherd was a good officer. The facts of this case do not warrant ending his career. Instead, he should be given the opportunity to return to work and continue to prove to the City that he is a good, policy-abiding employee who is passionate about keeping the community safe and affecting lives for the better.

5. *The Chief terminated Officer Shepherd's employment for political purposes and not because she had just cause.*

The decision to terminate Officer Shepherd's employment was made for political reasons, *not* because there was just cause. This is clear based on a variety of evidence.

First, Chief O'Toole afforded Officer Shepherd only a cursory review of the investigations before her. The cursory review is seen in her disciplinary decision where she gets the facts wrong and makes every possible assumption against Officer Shepherd. For example, she idealized Ms. Durden-Bosley as a small, helpless, and harmless prisoner, and concluded that she was "supine" in the police Explorer when Officer Shepherd used force. [*See* City 47, p. 103376]. She also concluded that "there was no immediate threat" or exceptional circumstances, requiring her to be stopped to prevent injury, escape, or destruction of property. [City 47].

These conclusions contradict the evidence collected by her investigators and the observations of her chain of command and the Office of Police Accountability. Expert video analysis concluded that Ms. Durden-Bosley "was moving toward the open door of the police vehicle" after kicking Officer Shepherd, [City 33, p. 27]; and, OPA concluded Officer Shepherd "reasonably believed" that Ms. Durden-Bosley "may pose a continuing threat," that this threat



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

increased as she "began sitting up," and that her movement could "reasonably be viewed as an indication" that she may escape, [City 37, p. 5].

Chief O'Toole either ignored this evidence that conflicted with the conclusion she wanted to reach or she failed to read it. Over and over during the hearing, she stated she had been "briefed" on various documents, indicating that she may not have actually read them. [TR 328, L 25 (prior discipline); TR 353, L 15 (FBI investigation); TR 359, L 24 (EEO investigation); TR 368, L 7-8 (WSP investigation)]. This raises the question of how much of the investigation Chief O'Toole actually read. When making a decision of this magnitude that will have lasting effects on an employee, she should have reviewed the entire investigation before her.

It is especially noteworthy that Chief O'Toole might not have reviewed the WSP and FBI investigations, which contained interviews with Officer Shepherd's chain of command and the other officers on scene. [*See e.g.*, City 76, OPA-W, p. 8024, 8026, 8031, 8032]. These documents revealed that her employees believed that Officer Shepherd's actions were within policy, which should have created questions in her mind about the SPD's training and/or whether she was properly applying the policy. Officer Shepherd specifically asked Chief O'Toole to consider the interviews contained in the FBI file during his *Loudermill* hearing. [*See* City 44, p. 2; City 45]. Her failure to do so highlights the political nature of her decision.

Second, further evidence that this decision was made for political reasons rather than for just cause is the City's decision not to hold a Force Review Board. The Force Review Board is composed of various members including employees from different precincts, officers (who bring the perspective of someone who works on the street), representatives from the training division, and others. [TR 503, L 16-TR 504, L 25; City 48, p. 7905-06, 8.400]. The Force Review Board, per policy, is tasked with reviewing each Type II and Type III use of force to "[c]onfirm that uniform standards are applied in Use-of-Force Practices," "[r]eview each use-of-force packet to



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

determine whether the findings from the chain of command regarding whether the force used is consistent with law and policy are supported by a preponderance of the evidence; and, inter alia, "[i]dentify trends or patterns of deficiencies regarding policy, training, equipment, or tactics . . . ." [City 48, p. 7905].

Interestingly, Officer Shepherd's use of force was the only Type III use of force the Force Review Board did not review, which went against SPD practice and policy. [TR 510, L 3-14; *see* City 48, p. 7905, 8.400; TR 509, L 25-TR 510, L 2 (Since created, policy has always required that Type III uses of force be reviewed by the Force Review Board.)]. This is significant because the Force Review Board's review would have provided input from more street officers and trainers about Officer Shepherd's use of force and whether it complied with policy and training. As noted by Captain Gregg Caylor, who was the captain over the Force Review Board, it is important to have a patrol officer's perspective on a use of force because "the more removed from [patrol administrative members] are, [they] can become a little more . . . theoretical [and] can look at things differently than when you are involved in a situation." [TR 504, L 20-25]. Instead of getting a diverse array of input on this case, as the SPD has done in *all other* Type III cases, the command staff decided that it alone should evaluate the case. Ultimately, it arrived at the decision that caused the least amount of headache to them politically, rather than seeking input from those who work on the street and might have been in similar situations and those who provided training. The Chief's decision was political.

Third, temporal factors also lead to the conclusion that Chief O'Toole's decision was for political reasons rather than for just cause. Officer Shepherd's use of force occurred the day before Chief O'Toole was sworn in as the Chief of Police. [TR 280, L 19-24]. The use of force was highly publicized because of the SPD's settlement agreement with the Department of Justice and, according to Chief O'Toole, because she "was the new chief in town" and "it was [her] first big



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

test . . . ." [TR 281, L 3-8]. She was hired to make reforms in the SPD, particularly in the area of use of force. [TR 274, L 25-TR 275, L 5]. It is safe to assume that Officer Shepherd's use of force posed a problem for her, particularly in how the public viewed her progress towards making the reforms.

Fourth, the Chief's decision not to investigate or charge Ms. Durden-Bosley for kicking Officer Shepherd evidences that her decision was political. Usually when an officer is punched, kicked, or otherwise assaulted by an arrestee, those actions are investigated and criminal charges result. [*See* TR 370, L 1-3; TR 479, L 17-TR 480, L 2]. Here, the SPD and WSP did not investigate the assault Ms. Durden-Bosley inflicted on Officer Shepherd. [*See* City 76, OPA-G, 14-199378, WSP Case File Items, p. 3208 (Report of investigator that WSP was asked by SPD to evaluate Officer Shepherd's actions and determine whether they were reasonable and necessary); TR 986, L 20-TR 987, L 7; Guild 4]. One can assume that this case was treated differently for political reasons. She wanted to send a message to the community that change had come. Filing charges against Ms. Durden-Bosley (the Chief's "victim") would have distracted from her message.

Therefore, termination of employment is excessive. Here, management bore fault by failing to convey to employees its expectations. Additionally, the discipline was not progressive in nature, was disproportionate to the alleged offense, and was made for political purposes.

## V. CONCLUSION

For all of the above reasons, the City did not have just cause to terminate Officer Shepherd's employment. The discipline must be reversed and Officer Shepherd made whole for all losses sustained by him.



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418

Dated this 31st of August 2018.

Vick, Julius, McClure, P.S.

Hillary McClure

Alyssa Melter
Attorneys for SPOG



**Vick, Julius, McClure, P.S.**
5506 6th Avenue South, Suite 201A
Seattle, WA 98108
(206) 957-0926 Fax: (206) 762-2418