THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>CITY OF SEATTLE,<br>Defendant. | Case No. 2:12-cv-01282-JLR<br>**CITY OF SEATTLE'S JANUARY 2019 QUARTERLY REPORT** |

Once the Court declared the City had achieved full and effective compliance with the Consent Decree, a new phase began in which the City must demonstrate its ability to sustain its progress. The Court-approved "Sustainment Plan," Dkt. 444, includes a commitment to provide seven quarterly reports updating the Court on the City's progress. The Sustainment Plan provides that each quarterly report will include recent data on use-of-force and crisis intervention practices, an update on the Seattle Police Department's Force Review Board and Unit, and a discussion of relevant activities of the Office of Police Accountability. This is the third quarterly report.

## I. BACKGROUND

During Phase II, the City must maintain compliance with the Consent Decree for two years. The City must also demonstrate the ability to identify and address any obstacles to further reform. To



**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

these ends, the Sustainment Plan provides that the City will conduct three sets of self-assessments to verify whether it is continuing to comply with the Consent Decree: Audits,[1] Policy Reviews, and Outcome Reports. The Plan sets out more than two hundred deadlines detailing when the City must complete each step of each assessment through January 2020. Since the Court approved the Sustainment Plan on March 13, 2018, the Seattle Police Department ("SPD") has timely met all of the milestones set forth in the plan.

Audits: Since March, the parties and the Monitor have collaborated on developing methodologies for the Department's audits. Starting after the Mayor's appointment of the City's first Inspector General for Public Safety, her office began to contribute as well. In keeping with its deadlines, the City filed SPD's first two completed audits on October 31, 2018, addressing the Consent Decree's supervision requirements and its reporting, review and investigation requirements. These documents, and the independent verification of DOJ and the Monitoring Team, demonstrated sustainment compliance with these requirements.

During the past quarter, SPD completed one additional audit which the City filed with the Court on December 17, 2018.

Crisis Intervention and Use of Force Evaluation. This audit demonstrates sustained compliance with the Consent Decree requirements for how to safely and effectively respond to members of the community who are in behavioral crisis.

---

[1] The audits required by the Sustainment Plan are not audits in a formal sense, because they do not follow auditing guidelines nor are they conducted by an outside body. Rather, in keeping with the two phases set out in the Consent Decree, the parties and the Monitor agreed that these reports would be comprised of assessments conducted by SPD in order demonstrate SPD's ability to engage in critical self-analysis and to identify and address any obstacles to further progress that may arise.



**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

Paragraphs 130-35 imposed minimum crisis intervention training requirements for all officers and provide that officers with advanced certifications ("CI certified officers") must be available to respond and lead in crisis incidents. Between January 1, 2017, and June 30, 2018, the Department greatly increased its number of CI certified officers. An additional 118 officers became CI certified in 2017 and more than 80 became certified in 2018 by attending a 40-hour training through the Washington State Criminal Justice Training Commission. Overall, staffing of CI certified personnel in the Operations Bureau increased by 8.2% during this period. SPD's robust training program has allowed it to continue dispatching CI certified officers to calls involving individuals in crisis as appropriate. On average, 60% of personnel assigned to and responsible for 911 response were CI certified. In nearly 80% of crisis calls, a CI-certified officer was on-scene. Although crisis contacts rose by 26 percent in the first half of 2018, compared to 2017, the increased number of CI certified officers allows the Department to maintain consistent outcomes.

The Consent Decree also requires SPD to gather and track extensive data regarding officers' interactions with individuals in crisis at Paragraph 136. The data are gathered in the form of "crisis templates" which officers are required to complete after making contact with a subject experiencing any type of behavioral crisis. In addition to simply gathering and tracking data on interactions with individuals in crisis, SPD synthesizes it into annual reports that are published on its website each year. These reports provide the public with a window into the Department's crisis intervention program as well as emerging trends.

Finally, Paragraph 137 of the Consent Decree requires SPD to analyze the crisis intervention data that it collects and use it to identify and respond to systemic issues. The work required by Paragraph 137 is carried out by SPD's Crisis Response Unit (CRU). This specialized



**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

unit consists of a sergeant, five officers and a mental health professional. CRU reviews and analyzes crisis data collected by the Department and uses it to inform program decisions. For example, CRU has been able to identify members of the community who frequently use crisis intervention services and develop profiles and response plans for them, which are shared with officers in the field. The response plans include, for example, information such as a case manager contact number or specific techniques that have worked well in the past. Taken together, these tools and policies minimize the need for SPD officers to use force against individuals in crisis.

The Department of Justice and the Monitor independently validated the Crisis Intervention and Use of Force Evaluation. Based on their review of a sample of the Department's use of force reports and case files involving people in crisis, DOJ and the Monitor concluded that the Department has demonstrated sustained compliance with the crisis response requirements of the Consent Decree. A summary of their findings can be found in the Validation section at the end of the report.

Policy Reviews: The SPD Audit Policy and Research Section ("APRS") is reviewing all Department policies on a three-year cycle. The Consent Decree-mandated policies are being reviewed annually. During the last quarter, there were no policy reviews scheduled. However, in order to accomplish critical priorities, the Department completed "off-cycle" revisions to two Consent-Decree-mandated policies. The Monitor, DOJ, and the Court approved the revised policies.

SPD added a section to its use of force policies to govern use of the 40mm launcher—a less lethal tool that the Department recently acquired. Equipping officers with the 40mm launcher is expected to provide important safety benefits. The 40mm launcher replaced a different less-lethal option, the beanbag shotgun. The 40 mm launcher is a significant improvement over the beanbag



**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

shotgun because it offers better safety protections and greater accuracy. Any long-range less lethal tool needs to be as accurate as possible to protect bystanders. In addition, the 40mm launcher poses an overall lessened risk of injury than the beanbag shotgun (because, in part, the 40mm round does not change shape after discharge and the impact of the round is distributed over a larger surface area, i.e., has reduced energy density).

Additionally, SPD revised its Early Intervention System ("EIS") policies based on SPD's self-assessment of its EIS program, as well as research conducted with Washington State University. These findings indicated that the EIS triggers did not adequately account for the individual officers' exposure rates to high-risk encounters and situations and, as a result, the current triggers focus too much attention on officers who are more proactive and who are assigned to work in areas with a higher volume of calls for service.

With the participation of the Monitor, DOJ, and approval by the Court, SPD made two main revisions to its EIS program. First, it refined the description of the program's purpose, triggers, and risks to better align the policy with the philosophy of the program, which is not intended to be punitive or disciplinary. For example, instead of describing the EIS program solely as a "strategy to address at-risk behavior," the revised policy identifies a more holistic set of goals, including to support employee wellness and professional growth and to address underlying factors that can lead to negative performance issues (including incident-based stress or training needs). The revised policy also clarifies that the purpose of a mentoring plan under EIS is to support the employee in achieving professional goals.

Second, SPD adjusted some of the trigger levels. The triggers for use of force no longer are based solely on percentages, but are modified to encompass only officers who exceed a set number of uses of force within the six-month time period. For Type I force, the trigger is still the top 1% of



**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

officers, but now only officers who exceed five incidents within the period will be reviewed. Similarly, for Type II and Type III the percentage stays at 5%, but the trigger is restricted to officers who have used Type II force more than three times or Type III force more than once during the period. The threshold for triggering review is raised from 3 OPA complaints to 4 OPA complaints. In addition, three of the trigger categories are eliminated, because they are duplicative of other policy provisions or review processes.

Outcome Reports: In addition to the audits and policy reviews, SPD has continued the practice it began in 2016 of publishing periodic reports summarizing policing data for the public. These "outcome reports" demonstrate the concrete effects of SPD's work under the Consent Decree, such as reductions in serious uses of force. During this quarter, SPD was responsible for reporting on its use of force.

The 2018 Use of Force Annual Report, which is also being filed today, contains SPD's annual review and analysis of all uses of force. The report demonstrates that, overall, the rate at which officers use force remains extremely low. Officers reported using force of any level at a rate of less than one quarter of one percent of all dispatches. The overwhelming majority (83%) of incidents in which officers used force involved no greater than the lowest level of reportable force (such as minor complaints of transient pain with no objective signs of injury, or the pointing of a firearm).

The most serious uses of force (Type II and Type III) decreased (although Type III force is so rare that yearly fluctuations may be statistical anomalies) when compared to 2017. By contrast, reported uses of Type I force increased by 43%, from 1,272 in 2017 to 1,818 in 2018. Despite the increase in reported Type I force, there has been no increase in out-of-policy findings by FRB/U and no meaningful increase in OPA's recommendations for sustained use-of-force



**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

findings. In 2018 OPA recommended sustained use-of-force findings in four cases, compared to three cases each in 2017 and 2016.

The Department is continuing to investigate the potential causes for this increase and has not found a definitive answer, but it expects to learn more over the next few months. Based on anecdotal observations made by FRU, SPD currently believes that the primary cause is officers' overreporting of discomfort caused by handcuffing.[2] Under Court-approved policy revisions that went into effect earlier this month, handcuffing discomfort is no longer reportable as force and, going forward, will be tracked separately. If the increase in Type I force is, in fact, due to overreporting of handcuffing discomfort, then there should be a substantial reduction in the amount of Type I force reported in 2019. Finally, the Department recently tested and deployed new handcuffs which are beveled and made of lighter-weight aluminum, and which it anticipates will be equally effective and more comfortable.

The Annual Report also includes an in-depth analysis of the use of Tasers. The Department tracks all Taser deployments (whether in probe mode or contact mode) as a Type II use of force. Tasers continue to be used rarely; in 2018 tasers were used in only 25 incidents. Officers are also required to report whether the Taser deployment was effective in taking a subject into custody, providing critical information to the Department as to factors which improve or limit Taser effectiveness.

After the Consent Decree is complete and federal oversight has ended, the City will continue to conduct the audits, policy reviews, and outcome reports on regular cycles to ensure that progress

[2] Handcuffing discomfort occurs when the handcuffs are applied properly and no injury is reported, but a subject nonetheless complains of discomfort or minor pain. Seattle Police Department Manual § 8.050.



**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

continues and that the Department remains accountable to the public.

## II. Use-of-Force and Crisis Intervention Data

This section provides data on SPD's use-of-force and crisis intervention practices for the fourth calendar-year quarter of 2018, which runs from October 1, 2018, to December 31, 2018. The report does not undertake to analyze or contextualize the data for two reasons. First, it would be speculative to infer trends or draw comparisons based on one quarter of cross-sectional data. Second, the Sustainment Plan, approved by the parties and the Court, sets forth a series of annual audits and outcome reports which contain the Department's analyses and conclusions. As contemplated in the Sustainment Plan, the Department's 2018 Use of Force Annual Report is being filed concurrently with this report.

In addition to the numbers below, comprehensive data on these topics are available to the public through the Department's "dashboards" on its webpage at *https://www.seattle.gov/police/information-and-data/public-data-sets*. The public dashboards can be used to analyze and display data from numerous, disparate sources within SPD through a data analytics platform ("DAP").

### *A. Use of Force*

Five hundred and fifteen uses of force were reported in Q4 2018. Because of the way "use of force" is defined, a single incident often results in multiple reported uses of force.

In the fourth quarter of 2018, four hundred forty-eight (87%) of the reported applications of force involved no greater than low-level, Type I force.[3] Sixty-three (12%) involved Type II

[3] The types of force are defined in Title 8 of the SPD manual. In brief: Type I is low-level force that may involve transitory pain. Type II force causes or is reasonably expected to cause physical injury greater than transitory pain but less than great or substantial bodily harm. Type III force causes or is reasonably expected to cause great or substantial bodily harm.



**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

force and 3 (less than 1%) involved Type III force. There was one officer-involved shooting. *See* Figure 2.

**Figure 1. Use of Force By Quarter**

| | 2017 Q4 | 2018 Q1 | 2018 Q2 | 2018 Q3 | 2018 Q4 | **Total** |
|---|---|---|---|---|---|---|
| Type I Force | 337 | 389 | 463 | 523 | 448 | 2,160 |
| Type II Force | 54 | 117 | 75 | 98 | 63 | 407 |
| Type III Force | 2 | 6 | 10 | 2 | 3 | 23 |
| Type III - OIS | 13 | 2 | | | 1 | 16 |
| **Total** | 406 | 514 | 548 | 623 | 515 | 2,606 |

**Figure 2. Q4 2018 Types of Force Used:**




In the context of overall encounters with the community, force is used rarely. During the fourth quarter of 2018, the computer-aided dispatch ("CAD") database recorded 99,458 unique events to which officers were either called by a dispatcher or which officers observed or were



**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

alerted to while on patrol. Four hundred and sixty-four of these events involved one or more reportable applications of force. That means less than one half of one percent of all events involved any use of force. Sixty-four (approximately six one-hundredths of one percent) of the 99,458 unique CAD events ultimately involved a use of force greater than Type I (i.e., Type II or Type III).

The demographic characteristics of subjects of force for the quarter are presented below in Figure 3.

**Figure 3. Q4 2018 Race of Subjects of Force**

| Subject Race | % of Total | UoF Count |
|---:|---:|---:|
| White | 39.39% | 206 |
| Black or African American | 28.68% | 150 |
| Not Specified | 20.08% | 105 |
| Asian | 6.69% | 35 |
| Hispanic or Latino | 4.02% | 21 |
| Nat Hawaiian/Oth Pac Islander | 0.76% | 4 |
| American Indian/Alaska Native | 0.38% | 2 |
| **Total** | 100.00% | 523 |

*B. Crisis Intervention and Use of Force*

During the fourth quarter of 2018, officers reported 2,798 incidents involving a person in crisis. Officers used force in seventy-one of those incidents (less than 3%). The breakdown of types of force used in crisis responses is similar to the breakdown for all uses of force, although Type II force is slightly more frequent.



**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

**Figure 4. Q4 2018 Use of Force in Crisis Events:**




Out of the seventy-one crisis incidents in the quarter, approximately 15% were resolved by voluntary commitment or by referral to or notification of a community or social service support agency or shelter. The most common disposition was a decision to detain the person for their own safety under the Involuntary Treatment Act (32%). The second most common resolution was "No Action Possible or Necessary," which means the person in crisis had left the scene or did not pose an imminent threat of self-harm or harm to others (21%). *See* Figure 5 below.



**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

**Figure 5. Q4 2018 Disposition of Crisis Contacts:**

| Disposition | % of Total |
|---|---|
| Emergent Detention/ITA | 32.31% |
| No Action Possible or Necessary | 20.99% |
| Resources Declined | 15.84% |
| Subject Arrested | 9.89% |
| Voluntary Committal | 8.62% |
| Chronic Complaint | 7.63% |
| Mobile Crisis Team | 6.93% |
| Unable to Contact | 3.93% |
| Mental Health Agency or Case Manager Notified | 2.34% |
| DMHP Referral | 2.19% |
| Crisis Clinic | 1.04% |
| Drug/Alcohol Treatment Referral | 1.01% |
| Shelter Transport | 0.39% |
| Geriatric Regional Assessment Team | 0.08% |

*Note: Percentages total more than 100% because a crisis contact often leads to more than one disposition.*

## III. SPD Force Review Board and Unit

The SPD Force Review Board ("FRB") and Force Review Unit ("FRU") review all uses of force to determine if they were compliant with SPD's Use of Force Policy. A brief summary of internal review is provided here, while the complete procedures are specified in Title 8 of the SPD Manual. After using Type I force, an officer must screen the incident with a sergeant and complete a use of force report. The sergeant begins the investigation of the incident and, if necessary, elevates the review up the chain of command. Type II uses of force are reviewed in depth first by an administrative lieutenant, through the chain of command to the section captain, and then by the Force Review Unit (described below). Type III uses of force are investigated by a specially trained unit called the Force



**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

Investigation Team. The Force Review Board (described below) provides an additional layer of review for all Type III uses of force, to include officer-involved shootings, and the most serious Type II uses of force.

The FRB is a select group of SPD personnel who are specially trained to investigate officer uses of force which meets regularly to make determinations as to (1) whether a use-of-force investigation is thorough and complete; (2) whether the force was compliant with SPD policy, and consistent with training, and core principles; and (3) whether any broader, systemic issues need to be addressed with respect to policy, tactics, equipment, or otherwise.

By policy, the FRB reviews all cases in which Type III force is used, including all officer involved shootings. The FRU, comprised of a captain, a lieutenant, a sergeant, and two detectives, reviews all Type II uses of force. When certain factors are present in a Type II case—such as the use of less-lethal tools or use of a canine—the FRU places it on the calendar to be reviewed by the FRB. In the fourth quarter of 2018, the FRB and FRU reviewed 79 cases.

**Number of Cases Reviewed By Quarter:**

| Quarter | FRB | FRU |
|---|---|---|
| Q1 (1/1/18-3/31-18) | 41 | 9 |
| Q2 (4/1/18 – 6/30/18) | 41 | 10 |
| Q3 (7/1/28-9/30/18 | 45 | 5 |
| Q4 (10/01/18-12/31/18) | 59 | 20 |

A total of 212 officers were involved in the 79 cases reviewed by FRU and FRB this quarter. The numbers below represent the number of officers involved across the cases, aggregated, and the determination by FRB and FRU as to whether each officer's actions were approved as consistent with policy and training.



**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

**Q4 2018 Most Serious Type of Force Used in Each Case**

| | |
|---|---|
| Type I | 0 |
| Type II | 78 |
| Type III | 1 |
| Officer Involved Shooting | 0 |
| In-Custody Death | 0 |
| Total | 79 |

**Q4 2018 Force Review Findings by Officer:**

| | |
|---|---|
| Approved | 146 |
| Not Approved | 1 |
| Referred to OPA | 41 |
| N/A[4] | 24 |
| Total | 212 |

For 146 of the officers reviewed by the FRB and FRU in the fourth quarter of 2018, the force used was found to be reasonable, necessary, proportional, and in conformance with the Department's Use of Force Policy. In 41 instances, a matter was referred to OPA, and the FRB/U made no determination, per policy. Of the 41 referrals to OPA, the chain of command generated all of them, and OPA added additional allegations of excessive force to two of the cases.

Since late 2015, the FRB/U has generated recommendations for all systemic issues identified during its discussions of force incidents. Once the FRB or FRU identifies an issue and determines that policy, procedure, training, or other action is appropriate, the recommendation is entered into SPD's workflow management system (IAPro) and the Assistant Chief of the Professional Standards Bureau then assigns it to the appropriate bureau chief for consideration. Recommendations that have significant budget implications, arise from high-profile cases, and

[4] In the cases reviewed by FRB/U, 24 officers were involved in tactics and decision making who did not use force. In reviewing the actions of these officers, FRB/U made no findings on the use of force.



**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

those that stem from officer-involved shootings go through an additional step: they are reviewed directly by the Deputy Chief of Operations or Command Staff as appropriate, and then distributed to the appropriate bureau chief. The Professional Standards Bureau ensures that all recommendations receive a response; if a unit commander does not implement the recommendation then the commander provides a response to the Professional Standards Bureau Assistant Chief in closing out the assignment.

Examples of FRB recommendations implemented or adopted this quarter include:

- There was an incident in which confusing and conflicting information was broadcast over radio to patrol officers. On FRB's recommendation, the incident was used as an opportunity to train on the real world impact of misinformation at all Communications Section roll calls.
- SWAT adopted protocol to photograph deployed ARWEN rounds (i.e., the rounds fired by recently deployed less-lethal tool, the 40mm launcher) as part of each use-of-force investigation.
- The Education and Training Section was assigned to research and develop training on best practices for taking down a subject who is fleeing on a moving bicycle.

## IV. Office of Police Accountability

The Office of Police Accountability ("OPA") has authority over allegations of misconduct against SPD employees relating to SPD policy and federal, state, and local law. It investigates and makes recommended findings to the Chief of Police. The organization is led by a civilian director and deputy staff, while its investigations are currently carried out by SPD sergeants. OPA is continuing to civilianize its investigators.

During the fourth calendar-year quarter of 2018, OPA received 249 contacts. Contacts include "external" complaints from members of the community and "internal" referrals from SPD employees (primarily the chain of command). Seventy-one percent of the contacts in the fourth quarter were external and 29% were initiated internally by SPD. Biased policing was the



**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

most frequent misconduct allegation made to OPA, and it comprised 17% of all allegations received. Eighty-seven of 260 contacts classified by OPA in Q4 of 2018, or 33%, were classified for investigation. In eighteen percent of the cases in which findings were issued in the fourth quarter, OPA recommended that at least one allegation be sustained. The Chief of Police overturned one OPA recommended finding.

In addition to investigating allegations of misconduct, OPA recommends policy changes to SPD when its investigations indicate that issues with Department policy, rather than actions of individual officers, gave rise to a complaint. Those investigations result in a finding of "Not Sustained – Management Action" and form the basis of OPA's management action recommendations. In the fourth quarter of 2018, OPA issued six new management action recommendations.

## V. Labor Negotiations

After negotiating for several years, the City has reached final collective bargaining agreements with the Seattle Police Management Association, in November 2017, and the Seattle Police Officers Guild, in November 2018. Dkts. 425 & 512. The Court ordered briefing on these agreements and the potential implications, if any, for the City's compliance with the Consent Decree. Dkts. 504 & 507. After the City filed its opening brief on December 17, 2018, the lapse in appropriations for DOJ required a temporary suspension of the rest of the briefing schedule. Dkts. 512 & 517.

## VI. Conclusion

The Department's recent audit on crisis intervention and use of force demonstrates continued compliance with the relevant portions of the Consent Decree. The Department's 2018 Use of Force Annual Report demonstrates SPD's commitment to transparency and evidence-based decision-



**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

making. The report makes extensive use-of-force data and analysis readily available to the community. In addition, SPD's extensive data collection practices and sophisticated analysis of aggregate trends, as well as more granular data on specific tools, such as Tasers, demonstrate that it continues to comply with the Consent Decree requirements regarding the collection, tracking, and use of data. Most importantly, the Use of Force Report shows that the Department continues to use force rarely and consistently with policy and Constitutional requirements.

DATED this 31st day of January, 2019.

For the CITY OF SEATTLE

PETER S. HOLMES
Seattle City Attorney

*s/ Kerala T. Cowart*
Kerala T. Cowart, WSBA #53649
Assistant City Attorney
Seattle City Attorney's Office
701 Fifth Avenue, Suite 2050
Phone: (206) 733-9001
Fax: (206) 684-8284
Email: kerala.cowart@seattle.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on January 31, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

| | |
|---|---|
| Annette L Hayes | Annette.Hayes@usdoj.gov |
| Christina Fogg | Christina.Fogg@usdoj.gov |
| Gregory Colin Narver | gregory.narver@seattle.gov |
| Kerry Jane Keefe | kerry.keefe@usdoj.gov |
| Peter Samuel Holmes | peter.holmes@seattle.gov |
| Jeff Murray | jeff.murray@usdoj.gov |
| Rebecca Boatright | rebecca.boatright@seattle.gov |
| Ronald R. Ward | Ron@wardsmithlaw.com |
| Timothy D. Mygatt | timothy.mygatt@usdoj.gov |
| Michael K. Ryan | michael.ryan@seattle.gov |
| Carlton Wm Seu | carlton.seu@seattle.gov |
| Gary T. Smith | gary.smith@seattle.gov |
| Hillary H. McClure | hillarym@vjmlaw.com |
| Kristina M. Detwiler | kdetwiler@unionattorneysnw.com |

DATED this 31st day of January, 2019, at Seattle, King County, Washington.

*/s/ Kerala Cowart*
Kerala Cowart, WSBA #53649
Assistant City Attorney
E-mail: kerala.cowart@seattle.gov



**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200