1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT G

Disciplinary Review Board's Decision and Award for
Officer Hunt (2016)

EXHIBIT G TO THE DECLARATION OF CHRISTINA FOGG IN SUPPORT OF
UNITED STATES' RESPONSE TO COURT'S ORDER TO SHOW CAUSE
Case No. 2:12-cv-01282-JLR - 1

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

BEFORE THE DISCIPLINARY REVIEW BOARD
COMPOSED OF

MICHAEL E. CAVANAUGH, J.D., Neutral Chair,
DEPUTY CHIEF CARMEN BEST, SPD Member,
and OFFICER KEVIN STUCKEY, SPOG Member

| | |
|---|---|
| CITY OF SEATTLE, SEATTLE POLICE DEPARTMENT, | ) ) |
| | ) |
| Employer, | ) |
| | ) DECISION AND AWARD |
| | ) OF THE BOARD |
| and | ) |
| | ) |
| SEATTLE POLICE OFFICERS' GUILD, | ) ) |
| | ) |
| Union. | ) |
| | ) |
| (Grievance of Officer Jennifer Hunt) | ) |

**For the Employer:**

Tami Becker Gomez
Seattle City Attorney's Office
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769

**For the Guild:**

Shawna Skjonsberg-Fotopolous
In-House Counsel
Seattle Police Officers' Guild
2949 Fourth Avenue South
Seattle, WA 98134

I.       INTRODUCTION

Grievant, a sworn officer, received a suspension based on her conduct while pursuing a

fleeing African-American domestic violence suspect in downtown Seattle. An investigation by

the Office of Professional Accountability ("OPA") resulted in three substantiated violations.

First, OPA found that Officer Hunt, while chasing the suspect, had driven her vehicle without

due regard for his safety and the safety of the public, a violation of the SPD Emergency Vehicle

Operations Policy. Second, Officer Hunt had addressed the suspect with a term widely perceived

to be racially derogatory ("boy"), and had also coupled that term with an implied threat to use

deadly force.[1] OPA found that her conduct in that regard violated the Department's policy

against the use of Derogatory Language. In addition, Officer Hunt had used the word "fuck" in

ordering the suspect to back away from her vehicle once she had caught up with him in an alley.

That language, OPA found, violated the Department's policy on the use of profanity. Those

sustained findings, after being reviewed with the chain of command, resulted in a

recommendation to Interim Chief of Police Harry Bailey that Officer Hunt be suspended for

fifteen days. Chief Bailey ultimately accepted that recommendation.

     The Guild contends that the facts[2] do not amount to just cause for discipline, at least not

at the level imposed by the Department, because Officer Hunt did not intend her comments to be

racially derogatory and the suspect did not, in fact, complain about her language (thus he must

not have been offended). The Guild also argues that Officer Hunt's driving was within policy

((as established, says the Guild, by the testimony of a lead emergency vehicle operations

("EVOC") trainer)). Finally, the Guild argues that Officer Hunt's use of the F-word for emphasis

on a single occasion while apprehending the suspect was within policy because he had failed to

comply with repeated orders to back away from her vehicle (which presented an imminent

---

[1] The precise phrase Officer Hunt used was "You're gonna get your ass shot, boy."

[2] As an aside, Officer Hunt's conduct during the apprehension of the suspect was captured on in-car video ("ICV") from her squad car as well as most of the other police vehicles involved in the chase. Consequently, there is little, if any, dispute about the facts here. Instead, the parties differ over precisely how the Department's policies apply to those facts and what level of discipline for her conduct, if any, is consistent with the principles of just cause.

potential danger to her).[3] Chief Bailey, after a Loudermill Hearing, did not agree with the Guild's arguments. He actually considered increasing the length of the suspension,[4] but ultimately imposed the fifteen days recommended by OPA and the command staff. The Guild filed a timely grievance and requested a hearing before a Disciplinary Review Board ("DRB") as provided in the CBA.  These proceedings followed.

A hearing was held at the Seattle City Attorney's office on November 18-19 and December 16, 2015. The proceedings were transcribed by a certified court reporter, and the parties made a copy of the transcript available to the Board for its use in evaluating the evidence. Counsel filed simultaneous post-hearing briefs on February 8, 2016, and with the Board's receipt of the briefs, the record closed. The Board met for initial deliberations on February 17, 2016, and following that conference, the Neutral Chair prepared a draft decision and circulated it to the other Board members for comments and suggestions. Having completed that process, the Neutral Chair is now prepared to render the following Decision and Award on behalf of a unanimous Disciplinary Review Board.

## II.      STATEMENT OF THE ISSUE

The parties stipulated to a standard just cause formulation of the issue to be decided:

Did the Department have just cause to suspend Officer Hunt for fifteen days? If not, what is an appropriate remedy?

---

[3] In addition, the Guild contends that an MOU between the parties governing the use of ICV evidence in matters of officer discipline precludes the use of such evidence to support discipline for the use of profanity. For reasons that follow in this Decision and Award, the Board does not find it necessary to consider that issue.

[4] Chief Bailey had the perception at the Loudermill that Officer Hunt was offering excuses for her conduct instead of accepting responsibility, i.e. that she had failed to comprehend the seriousness of her use of a term that would be considered derogatory by virtually all African-Americans.

### III.    FACTS

The events at issue occurred October 7, 2013 at approximately 8:15 PM.[5] An off-duty police officer working as a security guard at a downtown Seattle store radioed a report of a domestic dispute on 3rd Avenue just north of Union Street (the officer had observed part of a "verbal" altercation between and male and female before returning inside the store, and shortly afterwards customers told him that the situation warranted monitoring).[6] Stepping back outside, the officer saw the suspect push the victim against a wall, and thus he reported to dispatch that the dispute seemed on the verge of becoming "physical." Officer Hunt, among others, was dispatched to the scene. She drove north on 3rd Avenue for several blocks and then pulled to the curb at the southeast corner of 3rd and Pike. Realizing that she had overshot the scene, she made a U-turn and arrived at the site of the altercation (between Union and Pike on 3rd Avenue) just after another officer who had traveled to the scene from the north along 3rd Avenue.

The first officer immediately exited his vehicle to engage the suspect, who quickly began running south along 3rd Avenue, chased by the officer on foot.[7] Although the video from Officer Hunt's vehicle does not show the suspect or the other officer, from the route she traveled it is clear that the suspect had turned east on Union heading toward 4th Avenue, then had turned right (south) on 4th Avenue toward University. As Officer Hunt followed, she turned left onto Union (traveling the wrong way on a one-way street), and as she did so, she lost rear wheel traction and

---

[5] The narrative that follows is based on the ICV footage in evidence, primarily the video from Officer Hunt's vehicle.

[6] As context, it is important to note that domestic violence events are mandatory arrests within four hours under state law.

[7] Officer Hunt can be heard exclaiming "He's running!" on the radio to advise dispatch and the other officers.

fishtailed.[8] Recovering quickly, she proceeded east to 4th and Union. She paused briefly at the southwest corner of the intersection and radioed that the suspect was running south on 4th Avenue on the west side of the street. While Officer Hunt paused, another squad car went around her and turned right on 4th (also against one-way traffic), and Officer Hunt followed. As she drove toward University, the suspect can be seen running along the east sidewalk. The first squad car turned left (east) toward the curb at the northeast corner of the intersection of 4th and University to cut him off. Officer Hunt then also turned left toward the curb some distance short of the intersection, and as she did so, the suspect apparently reversed course and ran past her back north on 4th Avenue. As she turned her vehicle around to follow him, Officer Hunt can be heard shouting out her window "Go ahead, fool. Keep running!"

Officer Hunt completed a U-turn and returned north on 4th Avenue following the suspect who had crossed back to the west side of the street. She arrived at the intersection of 4th and Union before he did, however, and drove up on the sidewalk on the southwest corner, using a wide wheelchair cutout. That maneuver placed the left front of her vehicle close to the corner of the building (which she hoped block the suspect's escape). He squeezed between the front of her car and the building, however, and then ran west on the sidewalk along Union toward 3rd Avenue. Officer Hunt drove down the sidewalk close behind him until he suddenly darted to the right between two parked cars and out into the street.[9] Another police vehicle was waiting in the street, pointed east on Union about halfway between 3rd and 4th Avenues.[10] As the suspect ran

---

[8] Several of the ICV's the Board has reviewed show raindrops on the windshields of the squad cars. Wet streets, of course, can be slippery, particularly if it has not rained for a while. *See*, Knight Testimony, Tr. at 345.

[9] It is difficult to judge from the ICV the precise distance between Officer Hunt's vehicle and the suspect as he darted to the right, but it appears that her forward velocity brought her quite close to him as he stopped moving away from her vehicle and quickly began running laterally instead.

[10] Apparently, there is no ICV available from this vehicle.

across the street, he lost his balance and fell to the pavement.[11] After he fell, Officer Hunt can be heard laughing. She then rounded the two parked cars in her vehicle and turned right, heading directly toward the suspect who had regained his feet and was continuing across the street (apparently heading toward the alley on the north side of Union, halfway between 3rd and 4th Avenues). Just as the suspect reached the curb, he jumped to his right onto the sidewalk. It appears on the ICV from one of the other vehicles[12] that had the suspect not jumped away, he easily could have been struck by Officer Hunt's squad car. At the very least, his left foot came within a foot or so of being touched by the right front of Officer Hunt's vehicle as she braked to a stop and he leaped out of the way. After jumping to the sidewalk, the suspect ran past Officer Hunt's vehicle toward the alley, and as he did so, Officer Hunt shouted out the window "You're gonna get your ass shot, boy!"

Officer Hunt then backed away from the curb and followed the suspect into the alley at a relatively high rate of speed. The suspect ran north in the alley for what appears to be 100 feet or so, where Officer Hunt caught up with him.[13] She immediately said, in a command voice, "Stop now!" then "Get on the ground!" Officer Hunt testified that despite these commands the suspect approached her door, which she believed placed her in danger.[14] She told him "Back up!" three more times with increasing urgency, and then finally said "Back the fuck away from my door!

---

[11] It is unclear from the video exactly what happened. The suspect may have run into the push bar of the other squad car (which appeared to be backing up slowly as the suspect approached), or he may have tripped on a seam in the pavement—perhaps a patch from a repair or from utilities work of some kind.

[12] The ICV is labeled "7570." That car had traveled westbound on Union, arriving on scene just as Officer Hunt attempted to block the suspect with her vehicle at the southwest corner of 4th and Union. The video clearly shows the following events also, i.e. it captured Officer Hunt's driving on the sidewalk in pursuit of the suspect, the suspect's fall in the middle of the street, and the close encounter between the suspect and Officer Hunt's vehicle near the curb on the north side of the street just before he ran into the alley.

[13] It is unclear from the ICV whether the suspect stopped running because Officer Hunt caught up to him or vice versa. In any event, the suspect ended up close to the driver side door of Officer Hunt's vehicle.

[14] In fact, Officer Hunt testified that she got out her Taser and prepared to use it, aiming at his chest.

Do it now!" She then followed with "Get down!" at least twice, and at that point the audio from

Officer Hunt's ICV appears to capture sounds of a struggle between the suspect and other

officers who had arrived on scene to take him into custody (which the suspect resisted).[15]

## IV.    DECISION

### A.  Burden and Quantum of Proof

The Department bears the burden of proof on the factual matters relied upon to support

the discipline imposed here. Because a substantial suspension was imposed on Officer Hunt, and

also because at least one of the charges against her involves conduct that could be "stigmatizing"

to her reputation in the community, particularly as a police officer, the Department should be

held to a standard that requires something more than the barest preponderance of the evidence.

That is, widely accepted principles of just cause require that a good officer with no prior

disciplinary issues, such as Officer Hunt, should not be subjected to a significant disciplinary

penalty unless serious misconduct has been established by convincing evidence, i.e. evidence

from which the Board can conclude that it is substantially more likely than not that she is guilty

of the policy violations alleged.

As already noted, however, most of the violations at issue in this case concern conduct

that was caught on Department video and audio. Thus, there is little in the way of disputed facts

here. Rather, the crux of the case is whether that conduct amounts to a serious violation of one or

more SPD policies as the Department has alleged, and if so, whether the disciplinary penalty

---

[15] The suspect repeatedly told the officers that he was "done" and that they should "calm down"—as he attempted to explain that he just did not want to "get down" in a puddle in the alley. In fact, during booking, the suspect complained bitterly about how he had been treated by the "dudes," but expressed no complaint about anything Officer Hunt had said or done.

imposed is consistent with the contractual standard, i.e. whether principles of just cause support the level of discipline Chief Bailey chose.[16]

    B.  Profanity

    OPA and Chief Bailey found that Officer Hunt violated the policy on profanity when she used the "F word" in ordering the suspect away from her vehicle in the alley. In analyzing that finding, the Board begins with the language of the policy itself, i.e. SPD Policy 5.001(A)(6)(b):

> Prohibition concerning derogatory language: profanity is discouraged, but it is understood that it will occur occasionally in a law enforcement environment. The use of profanity will be judged based on the totality of the circumstances in which it is used.

In the Board's view, the "totality of the circumstances" in the alley justified Officer Hunt's use of profanity as an attempt to convey to the suspect the importance of complying with her repeated commands to back away from her door. Officer Hunt testified that she felt in danger trapped inside her vehicle with the suspect so close—in fact, she had readied her Taser for use if necessary. And the Board notes that Officer Hunt did not elevate the level of discourse to profanity until after she had given multiple commands the suspect had ignored—"Stop Now!", "Get on the ground!", "Back up!", "Back up!", and "Back up!" Only on the *sixth* command did she add the "F word." Nor did Officer Hunt continue to utilize profanity afterwards, although she gave orders to the suspect such as "Get down!" on at least two occasions. The "totality" of these circumstances convinces the Board that no profanity policy violation occurred in the alley. Rather, this incident is one of those "occasional" instances in the law enforcement environment

---

[16] With respect to the level of discipline issue, the Board notes that Chief Bailey imposed a fifteen day suspension for the *totality* of the policy violations he found, i.e. he imposed a collective penalty based on Officer Hunt's conduct as a whole rather than imposing a separate penalty for each individual violation and then adding them up to get to fifteen days. Consequently, the Board must examine first whether each individual finding of a violation is supported by just cause, and if *all* of the allegations have been established, turn to whether the fifteen day suspension is an appropriate penalty. If the Board finds that only *some* of the violations found are supported by just cause, on the other hand, the Board will then have to determine what level of discipline is appropriate for that more limited *set* of violations. In doing so, the Board will have to use its own judgment because Chief Bailey did not indicate what penalty he might have thought was appropriate for each individual violation.

when the use of profanity is "understood" to be appropriate because it has been employed for a necessary and legitimate purpose—emphasizing to the suspect the importance of compliance with her commands. SPD Policy 5.001(A)(6)(b).

The Board cannot agree with the suggestion that Officer Hunt's use of profanity should be found to be a policy violation because of the *preceding* events, i.e. her driving and her use of derogatory language addressed to the suspect—as well as, perhaps, her "taunting" of the suspect ("Keep running, fool") and her laughter when he fell in the street. That is, even if her conduct in that regard constituted one or more policy violations, matters we will turn to next, the potential danger she found herself in once the suspect had stopped running in the alley amply justified her use of profanity for emphasis. To hold otherwise could run the risk of endangering officer safety in a perilous encounter simply because the officer had *previously* committed some unrelated policy violation in the same chain of events. Put another way, if Officer Hunt's use of profanity for emphasis helped prevent a physical altercation between her and the suspect while she was in a disadvantageous position (which could easily have escalated to use of the Taser and perhaps beyond), it was justified even if she might have made earlier errors in judgment that contributed to putting her in that dangerous situation.

The Board finds that the Department did not have just cause to discipline Officer Hunt for using profanity under these circumstances.

C.  Emergency Driving

After carefully reviewing the ICV in the record, the Board finds that the Department had just cause to discipline Officer Hunt for driving without due regard for the safety of others. In outlining the Board's reasoning, we begin once again with the language of the cited policy:

SPD Policy 13.030 – Emergency Vehicle Operations:

1) Defining emergency response – Emergency Response: When an officer operates an authorized police vehicle in a manner that is substantially outside of a normal traffic pattern.
2) Officer may drive in an emergency response only when the need outweighs the risk – Preservation of life is the highest priority. Criminal apprehension and the preservation of property are secondary. Misdemeanor or property crimes generally do not justify an emergency response.

\* \* \* \*

4) Officers are responsible for the safe operation of their police vehicle – Officers are not relieved of the obligation to drive with due regard for the safety of all persons. Officers shall drive no faster than reasonably necessary to safely arrive at the scene.

The Guild presented the testimony of an experienced lead EVOC Instructor for the Department, Officer Knight, who testified that he had reviewed the video and found no policy violations. The Board, however, did not find Officer Knight's testimony convincing as to all aspects of Officer Hunt's emergency vehicle operations—particularly her close pursuit of the suspect on the sidewalk and her aiming of her vehicle *at* the suspect after he fell in the street (and coming very close to hitting him). In these two ways, at least, Officer Hunt's driving presented a serious risk of harm to the suspect and/or the public that was not justified by the need to effect the arrest.

More specifically, as Officer Hunt drove down the sidewalk in close pursuit, the suspect could easily have fallen—just as he fell moments later while crossing Union Street. Had he fallen, of course, there is a serious potential that he could have been run over and gravely injured or killed. In fact, even though the suspect did not fall, the ICV from Officer Hunt's vehicle shows that she came uncomfortably close to hitting him when he darted to the right into the street between the two parked cars. The Board accepts Officer Knight's testimony that driving on the sidewalk in an emergency is all right so long as "no pedestrians are there," but in this case, at

least one pedestrian—the suspect—*was* there, and others could have appeared suddenly, e.g. members of the public could have opened the curbside door of one of the parked cars and stepped onto the sidewalk, or a pedestrian (or a vehicle) could have exited the parking garage entrance just beyond the two parked cars. Luckily, the suspect did not fall on the sidewalk, and no one exited the parked cars or the parking garage. In the Board's view, however, Officer Hunt failed to operate her vehicle on the sidewalk, when pursuing the suspect, with due regard to the safety of the suspect and of the public.[17]

Similarly, after the suspect had darted between the parked cars, and then fell while crossing the street, Officer Hunt aimed her vehicle directly at him after she rounded the two parked cars (and the squad car in the street) and continued the chase as he got to his feet. Although Officer Hunt was able to stop her vehicle before the curb, the suspect had to jump sideways to the sidewalk to avoid being hit (shown clearly in the ICV labeled "7570"). In this way, too, then, Officer Hunt failed to exhibit "due regard for the safety of all persons" and failed to recognize the importance of the Department's policy that "preservation of life is the highest priority. Criminal apprehension and the preservation of property are secondary."

Thus, even if the rest of Officer Hunt's driving was consistent with policy, and even if she was chasing a DV suspect for which the law mandates an arrest, and even if the suspect might have been guilty of a felony if he was in violation of a preexisting protection order,[18] Officer Hunt's driving nonetheless violated policy in at least two ways. Thus, the Board finds

---

[17] Officer Knight conceded that Officer Hunt would have violated the emergency driving policy if she *had* hit the suspect or another pedestrian, but seemed to suggest that because she did not, no violation should be found. With all due respect, the policy requires that officers operate vehicles exercising due care taking into account the *possibility* of hitting someone, and the Board finds that Officer Hunt failed to meet that standard while pursuing the suspect.

[18] The Guild argued this possibility as perhaps justifying a degree of emergency response vehicle operation that might not be appropriate for a simple misdemeanor, i.e. as a circumstance affecting the weighing of the "risk" against the "need."

that the Department had just cause to impose discipline for violations of the Emergency Vehicle Operations Policy.

### D.  Derogatory Language

We come now to the most important aspect of the case, i.e. Officer Hunt's use of a racially derogatory term, coupled with an implied threat of deadly force: "You're gonna get your ass shot, boy." The Board unanimously finds that this comment is inherently racially charged. As such, it is simply unacceptable, especially coming from a police professional serving in a major metropolitan city with a substantial minority population. In reaching that conclusion, the Board is well aware of our current historical context. That is, relations between police and communities of color is a pressing issue nationally, and that is particularly true of police interactions with African-American males because several of those interactions across the country in recent years have resulted in police use of deadly force in situations that much of the public finds questionable—if  not actually criminal. Police Departments cannot serve the public effectively without trust of those they seek to protect, and trust between minority communities and the police is endangered in many American cities, a fact that appears in the news almost daily.

Unfortunately, Seattle is not immune to these issues, having suffered through several high-profile incidents that have called the professionalism of SPD into question,[19] as well as patterns of excessive use of force, as found in an investigation by the Department of Justice, which resulted in a federal consent decree under which the Department now operates. The City and the Department have taken steps to attempt to rebuild trust where it has deteriorated, and it appears the City has made progress. But the City's efforts at improved community relations

---

[19] As the Neutral Chair was drafting this Decision and Award, another Seattle incident hit the news in which officers shot and killed an African-American male who they said had reached for a gun as they were attempting to arrest him. One or more comprehensive investigations will no doubt result in conclusions about whether the officers' use of force was justified, but the suspect's family and some African-American community leaders have already protested the actions of the police as biased and unwarranted.

cannot ultimately succeed if officers on the street are perceived as displaying discriminatory attitudes. A police officer's use of the term "boy" when addressing an African-American male, especially in conjunction with a statement that might reasonably be understood as a threat of deadly force, is precisely the sort of conduct that will significantly delay, if not defeat, the City's efforts to strengthen its image in the African-American community. In his testimony at the hearing, for example, Chief Bailey, who is African-American himself, eloquently explained the corrosive effect of that sort of language on minority citizens in Seattle.[20] For all of the foregoing reasons, the Board agrees with Chief Bailey that a police officer's use of racially derogatory language provides just cause for a significant disciplinary penalty.[21]

The Guild does not really contend otherwise,[22] but does offer some arguably mitigating circumstances that might affect the precise level of discipline that would be appropriate in Officer Hunt's case. First, says the Guild, the suspect does not appear to have been offended by the language Officer Hunt used. As noted, he complained about his treatment by the male officers who arrested him, but not about Officer Hunt's remarks. The fact that the target of the offensive language was not *actually offended*, says the Guild, undermines Chief Bailey's sense of the seriousness of Officer Hunt's policy violation.

---

[20] While Chief Bailey had the impression during the Loudermill Hearing that Officer Hunt had failed to display an appreciation of the seriousness of her use of the term "boy," she appeared to the Board to be genuinely contrite after listening to Chief Bailey's testimony at the hearing.

[21] As an aside, former Chief Diaz, announcing a settlement of a disciplinary matter arising out of an officer's use of racially derogatory language during an arrest, asserted that henceforth there would be a presumption of termination for any officer guilty of that kind of misconduct. The Guild objects that any such presumption would necessarily be subject to agreement in collective bargaining between the Department and the Guild. Because Officer Hunt was not terminated, however, the Board need not consider that dispute in order to decide this case. At the very least, however, the announcement by Chief Diaz did provide notice to officers that the Department would view racial slurs in the course of police work to be a serious offense.

[22] In fact, Guild President Ron Smith, to his credit, forthrightly testified that he believed Officer Hunt should receive a five-day suspension for her use of derogatory language.

The Board does not agree. The Department's policy does not and should not depend on whether the specific target of derogatory language has taken offense. In these days of ICV and strong oversight of the Department—by the press, the DOJ, and the community—there is no longer any such thing as a racially insensitive comment that can be confined to an officer and the target of the officer's comment. The broader community is highly likely to hear about such offensive comments, too (for example, from news reports or complaints made by community organizations). *And if others become aware of the derogatory language, the harm to the Department's reputation is highly likely to be virtually identical whether the specific target was offended or not*. Given that likelihood, the Department has concluded that language which is highly likely to offend simply must not be used. In the judgment of the Board, that policy is eminently reasonable.

Next, the Guild has argued that Officer Hunt did not *intend* to offend on the basis of the suspect's race.[23] Just as with the issue of whether the target was offended, however, The Board believes that subjective intent is entirely beside the point when racially inflammatory language has been used. For one thing, if intent were the proper standard, the Department and OPA (as well as Disciplinary Review Boards like the present one) would forever be attempting to divine what is in an officer's heart, and there is no reliable way to make that kind of determination with any degree of accuracy. But more importantly, the Board once again notes that the effect on the target and the community is little altered by the "intent" of an officer who has uttered derogatory language. That is, offensive language simply offends, and that is so whether the language has been consciously chosen to offend or whether it has been used because an officer is oblivious to the concerns of society in general and people of color specifically. Thus, in the Board's view,

---

[23] The Board notes that Officer Hunt's chain of command, who knew her well, believed she intended no racial offense.

what is important here is not what Officer Hunt *intended*, but rather whether she knew or should have known that her comment was *likely* to be perceived as racially offensive.

In the judgment of the Board, Officer Hunt well knew or should have known that the use of a term like "boy," directed at an African-American male in an apprehension situation, especially when combined with an implied threat that an officer might shoot him, would be highly offensive—if not to the suspect himself, then surely to the wider community.[24] As a police officer in Seattle in the 21st Century, with interactions between police and African-American males across the country the subject of substantial news coverage over the past several years, and with developments right here in Seattle, including incidents of inappropriate racial language and perceptions of biased policing that contributed to a consent decree with DOJ, Officer Hunt cannot have been unaware that she is required to avoid language that is derogatory and offensive to people of color. In sum, there is no doubt that "boy" is an offensive term and there is no excuse for Officer Hunt not to have known it. As such, it was proper for the Department to discipline her for use of inappropriate language irrespective of her subjective intent.

E.  Double Jeopardy

The Guild nevertheless has made a procedural argument on Officer Hunt's behalf, i.e. that she has been improperly subjected to "double jeopardy." It has long been the rule in labor arbitration that once an Employer has fixed a final penalty for a disciplinary offense, an Employer's subsequent imposition of an *additional* penalty violates just cause. *See*, e.g. Brand & Biren, eds., *Discipline and Discharge in Arbitration* at 500 (2nd Ed, BNA, 2008). The Guild argues that because Officer Hunt had been counseled about her driving and her use of language

---

[24] There was some suggestion at the hearing that the Department had not provided adequate notice to officers of what was expected of them because SPD had not supplied a list of prohibited terms, but the Board finds that any such list would necessarily include the term "boy" when used in reference to an African-American male.

by her chain of command *prior* to the OPA investigation that resulted in a disciplinary recommendation to Chief Bailey (and ultimately to his decision, on the basis of that recommendation, to impose a fifteen-day suspension), the Chief's disciplinary action constituted a second penalty for the same offense.

In reviewing the memo from Sgt. Davisson dated October 10, 2013, however, the Board finds that it would be most accurate to characterize the memo as nondisciplinary "coaching and counseling" rather than "discipline." *See*, Exh. J-2(I); *see*, e.g. *Discipline and Discharge in Arbitration* at 67. Although counseling sessions documented in writing may be considered "disciplinary" under some circumstances, *see id.*, that would not be an appropriate conclusion under these circumstances in which the Department and the Guild operate under the City's OPA system for investigating serious allegations of misconduct and for providing adequate civilian oversight of police conduct.[25] For those reasons, we find that Officer Hunt has not been subjected to double jeopardy.

F.   Whether a Fifteen Day Suspension Was Consistent With Just Cause

With all of the foregoing discussion as background, we come to the ultimate question: what discipline should Officer Hunt receive for her policy violations? As noted, the Board's task in reviewing the Chief's decision is made somewhat difficult because Chief Bailey did not allocate a number of days of suspension to the three *individual* violations he found in order to reach a *total* of fifteen days. Rather, he imposed the suspension based on the three violations *considered as a whole*. Consequently, now that there are only two offenses left, the Board will

---

[25] It would have been preferable for Sgt. Davisson or Lt. Rogers to refer the matter immediately to OPA rather than counseling Officer Hunt, and perhaps they were actually required to do so (the Board's understanding is that they would clearly be required to make an immediate referral now). In any event, however, we find that the Sgt. Davisson's memo constituted a supervisor's nondisciplinary "coaching" of a subordinate, not "discipline."

have to engage in similar reasoning and make its own judgment as to the level of penalty that fits that combination of policy violations.

At the outset, we note that it would usually be the case that if the Department has imposed a fifteen day disciplinary suspension based on *three* separate policy violations, whereas the evidence at the hearing supported only *two* of those violations, logic would require the Board to find that the penalty originally imposed must be reduced. On the other hand, the Board understood Chief Bailey to say that he would have chosen a suspension of at least fifteen days for the derogatory language violation alone. In the end, however, the Board cannot find that a fifteen-day suspension of Officer Hunt would be justified here, and that conclusion is largely based on considerations of comparative discipline. Specifically, the record established that Sgt. Davisson, subsequent to Officer Hunt's discipline, had received a written reprimand for conduct during a training session that appears to have been remarkably similar to the policy violation committed by Officer Hunt, i.e. Sgt. Davisson directed the term "boy" at an African-American co-worker during a role-play.

The City objects to the consideration of Sgt. Davisson's discipline as a comparator because that disciplinary event occurred subsequent to Chief Bailey's decision as to the appropriate level of discipline here,[26] and also because it was imposed by a different decision-maker, i.e. current Chief O'Toole. The Board is not convinced by these arguments. Whether an instance of comparative discipline is germane to the analysis does not depend on the decision-maker's awareness of it at the time the decision was made. Rather, any final discipline that was imposed on an officer prior to the conclusion of Officer Hunt's case before this Disciplinary Review Board is relevant because discipline that has been challenged under the contractual

---

[26] Because the Davisson situation had not yet occurred, argues the City, Chief Bailey could not have taken it into account in determining the appropriate level of discipline for Officer Hunt.

procedures *is not final until the Board has issued its decision*. Thus, in determining whether the Department has acted consistently in disciplining officers for policy violations such as the use of derogatory language, it is both fair and logical to consider as a comparator any final discipline that has been imposed in a similar case while an officer's challenge is pending.

Nor is it particularly relevant, in the Board's view, that different Chiefs of Police were the decision–makers in the Hunt and Davisson cases. The Department is still the SPD, after all, and in a number of cases in which I have served as Neutral Chair of DRB's, I recall that the Department *itself* has introduced and relied upon disciplinary comparators that dated from a time when a different Chief had served the City. Thus, the City has not necessarily lived by the same rule that it contends should be applied here. For both reasons, the Board will consider the Davisson discipline in analyzing the level of discipline appropriate for Officer Hunt's violations.

There are, to be sure, significant differences between the situations of Sgt. Davisson and Officer Hunt.[27] For example, Sgt. Davisson made his derogatory comment during a training session, *not* while involved in actual policing in a public place (and where publicly available ICV might have recorded it). In addition, Sgt. Davisson's comment did not include an implied threat to use deadly force on a fleeing suspect, as did Officer Hunt's. Despite these dissimilarities, however, the disparity between a written reprimand in the case of Sgt. Davisson and the fifteen day suspension meted out to Officer Hunt, is simply too great to be acceptable when analyzed under longstanding principles of just cause.

---

[27] One distinction offered by the City, however, we cannot accept, i.e. that the Davisson matter was processed as an internal EEO investigation rather than as a violation of the general policy against using derogatory language. We find that to be a distinction without a meaningful difference. That is so because the City *could have* processed the Davisson issue under the same policy applied to Officer Hunt, i.e. SPD Policy 5.001(VII)(A)(6)(a) which provides that derogatory language "shall not be used at any time by employees of the Department *in the course of their duties or at any other time so as to bring the Department or themselves into disrepute*." (emphasis supplied). This policy clearly would have applied to Sgt. Davisson's conduct during a Department training session had the City elected to apply it.

There is an additional difference between the two cases that must also be taken into account, of course, i.e. Officer Hunt's driving in which she failed to exercise due care for the safety of a suspect and the public. The Board agrees, for reasons already outlined, that Officer Hunt's driving needlessly placed lives in danger when the need to apprehend the suspect did not outweigh considerations of safety. That means that the Board is dealing with two policy violations in Officer Hunt's case, rather than the single violation committed by Sgt. Davisson. Fixing an appropriate penalty for a mix of offenses, i.e. derogatory language *and* unsafe driving, is a matter of art, not of science. No doubt reasonable minds can and will differ. But in the Board's judgment, a fair penalty for that combination of offenses, and one that gives due regard to the written reprimand received by Sgt. Davisson as a comparator on the derogatory language piece, is a disciplinary suspension of ten days.

The discipline of Officer Hunt shall be reduced from fifteen days to ten days. The grievance must be granted to that extent.

## AWARD

Having carefully considered the evidence and argument in its entirety, the Disciplinary Review Board renders the following AWARD:

1. The Seattle Police Department did not have just cause to discipline Officer Jennifer Hunt for use of profanity, but did have just cause to discipline her for violations of the policies on emergency vehicle operations and the use of derogatory language; therefore,

2. The grievance must be sustained in part and denied in part; and

3. The sustained findings and the discipline imposed by Chief Bailey based on the use of profanity shall be rescinded and shall be removed from Officer Hunt's record; but,

4. The sustained findings on emergency vehicle operations and use of derogatory language are hereby affirmed by the Board.

5. In light of the reduced number of sustained findings against Officer Hunt, and considering comparative discipline meted out to others, the Board finds that the disciplinary suspension without pay of Officer Hunt must be reduced to ten days; therefore,

6. Officer Hunt shall promptly be made whole for lost wages and benefits, if any, beyond the ten-day period of suspension.

7. The Board will retain jurisdiction for the sole purpose of resolving any disputes over remedy that the parties are unable to resolve on their own; either party may invoke this reserved remedial jurisdiction by email sent, or letter postmarked (original to each member of the Board with a copy to the other party) within 60 (sixty) days of the date of this AWARD, or within such reasonable extensions as the parties may mutually agree (with prompt notice to the Board), or that the Board may order for good cause shown.

8. Consistent with the terms of their Agreement, the parties shall bear the fees and expenses of the Neutral Chair in equal proportion.

Dated this 18th day of March, 2015

_____

Michael E. Cavanaugh, J.D.
Neutral Chair

_____             _____
Deputy Chief Carmen Best             Officer Kevin Stuckey
SPD Member of the Board              SPOG Member of the Board

Date: _____               Date: _____

5. In light of the reduced number of sustained findings against Officer Hunt, and considering comparative discipline meted out to others, the Board finds that the disciplinary suspension without pay of Officer Hunt must be reduced to ten days; therefore,

6. Officer Hunt shall promptly be made whole for lost wages and benefits, if any, beyond the ten-day period of suspension.

7. The Board will retain jurisdiction for the sole purpose of resolving any disputes over remedy that the parties are unable to resolve on their own; either party may invoke this reserved remedial jurisdiction by email sent, or letter postmarked (original to each member of the Board with a copy to the other party) within 60 (sixty) days of the date of this AWARD, or within such reasonable extensions as the parties may mutually agree (with prompt notice to the Board), or that the Board may order for good cause shown.

8. Consistent with the terms of their Agreement, the parties shall bear the fees and expenses of the Neutral Chair in equal proportion.

Dated this 18th day of March, 2015

Michael E. Cavanaugh, J.D.
Neutral Chair

Deputy Chief Carmen Best
SPD Member of the Board

Officer Kevin Stuckey
SPOG Member of the Board

Date: 3/18/16

Date:_____

5. In light of the reduced number of sustained findings against Officer Hunt, and considering comparative discipline meted out to others, the Board finds that the disciplinary suspension without pay of Officer Hunt must be reduced to ten days; therefore,

6. Officer Hunt shall promptly be made whole for lost wages and benefits, if any, beyond the ten-day period of suspension.

7. The Board will retain jurisdiction for the sole purpose of resolving any disputes over remedy that the parties are unable to resolve on their own; either party may invoke this reserved remedial jurisdiction by email sent, or letter postmarked (original to each member of the Board with a copy to the other party) within 60 (sixty) days of the date of this AWARD, or within such reasonable extensions as the parties may mutually agree (with prompt notice to the Board), or that the Board may order for good cause shown.

8. Consistent with the terms of their Agreement, the parties shall bear the fees and expenses of the Neutral Chair in equal proportion.

Dated this 18th day of March, 2015

Michael E. Cavanaugh, J.D.
Neutral Chair

_____
Deputy Chief Carmen Best
SPD Member of the Board

Date:_____

Officer Kevin Stuckey
SPOG Member of the Board

Date: 3/18/2016