THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:12-cv-01282-JLR |
| Plaintiff, | **COMMUNITY POLICE COMMISSION'S RESPONSE TO COURT'S ORDER TO SHOW CAUSE** |
| v. | |
| CITY OF SEATTLE, | |
| Defendant. | |

CPC'S RESPONSE TO COURT'S ORDER
TO SHOW CAUSE
(No. 2:12-cv-01282-JLR)

143373394.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ................................................................................................ 1

II.    ISSUES PRESENTED.......................................................................................... 3

III.   ANALYSIS.......................................................................................................... 5

     A.     The Court's understanding of the Shepherd incident is accurate,
          and the events preceding the use of force provide additional cause
          for concern. ............................................................................................... 5

          1.     How Officer Shepherd's case was reviewed on appeal ............................ 8

          2.     The appeals process under the Accountability Ordinance
               would have differed in important ways and under the CBAs
               will be even less consistent with the Consent Decree's goal
               of public trust and confidence ................................................... 9

     B.     The SPOG and SPMA CBAs are barriers to sustained reform........................... 14

          1.     The SPOG CBA purports to supersede or nullify any other
               City law or policy that, implicitly or explicitly, conflicts
               with its terms ........................................................................... 16

          2.     Contrary to the suggestion of the City and DOJ, the CBAs
               are not consistent with the purpose of the Consent Decree .................... 19

          3.     The CBAs undermine the gains achieved under the Consent
               Decree ..................................................................................... 22

          4.     The SPOG CBA rejects reforms that addressed known
               issues with secondary employment......................................... 24

     C.     The Court should make clear that fixing what has gone off track
          with the CBAs, and undoing the impediments they embed to the
          intended reform of Seattle's police accountability system, is a
          necessary precondition to a successful resolution of the Consent
          Decree process .................................................................................. 26

IV.    CONCLUSION................................................................................................. 28

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Diaz v. Int'l Longshore & Warehouse Union, Local 13*,
    474 F.3d 1202 (9th Cir. 2007) ...........................................................................18

*Keith v. Volpe*,
    784 F.2d 1457 (9th Cir. 1986) ...........................................................................26

*United States v. Oregon*,
    769 F.2d 1410 (9th Cir. 1985) ...........................................................................26

**STATUTES**

RCW 41.56 .............................................................................................................16

Accountability Ordinance ................................................................................. Passim

**OTHER AUTHORITIES**

David Kroman, *When Cops Play Security Guard, Whom Do They Serve?*,
    Crosscut (Oct. 19, 2016), https://crosscut.com/2016/10/when-cops-play-
    security-guard-who-do-they-serve .......................................................................23

Heidi Groover, *Mayor Burgess Signs Executive Order To Stop Private
    Management of Cops' Off-Duty Work*, The Stranger (Sept. 27, 2017),
    https://tinyurl.com/y2vefzyg .................................................................................24

*June 22nd In-Car video*, YouTube (Dec. 5, 2014),
    https://www.youtube.com/watch?v=gdrvV5ZzIxg ..................................................6

Kimbriell Kelly, Wesley Lowery & Steven Rich, *Fired/Rehired: Police Chiefs
    Are Often Forced to Put Officers Fired for Misconduct Back on the Streets*,
    Wash. Post (Aug. 3, 2017), https://www.washingtonpost.com
    /graphics/2017/investigations/police-fired-rehired/?utm_term=.363c83a47f5b ....................12

Levi Pulkkinen, *As FBI Investigates Seattle Cops' Off-Duty Work, City Steps In*,
    Seattle PI (Sept. 27, 2017), https://www.seattlepi.com/local/article/As-FBI-
    investigates-Seattle-cops-off-duty-12234590.php ................................................24

Lewis Kamb & Steve Miletich, *Seattle, Police Union Delayed Release of Ruling
    to Reinstate Fired Officer Until After Labor Contract Was Approved*, Seattle
    Times (Jan. 14, 2019)............................................................................................10

CPC'S RESPONSE TO COURT'S ORDER
TO SHOW CAUSE
(No. 2:12-cv-01282-JLR) – ii

143373394.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1

**TABLE OF AUTHORITIES**
(continued)

2

Page(s)

3

MYNorthwest, *Seattle Police Officer Fired for Punching Woman Tells His Side of
4        the Story* (Nov. 22, 2016), http://mynorthwest.com/470124/seattle-police-
         officer-fired-for-punching-woman-tells-his-side-of-the-story/ .................................................. 7

5

Office of the Mayor, Executive Order 2017-09: Reforming Secondary
6        Employment at the Seattle Police Department (Sept. 27, 2017),
         http://www.seattle.gov/Documents/Departments/Mayor/Executive-Order-
7        2017-09-Secondary-Employment.pdf ...................................................................................... 24

8

Office of Professional Accountability, Closed Case Summary Complaint Number
9        OPA #2014-0216 (Dec. 13, 2016),
         http://www.seattle.gov/Documents/Departments/OPA/ClosedCaseSummaries/
10       OPA2014-0216ccs12-13-16.pdf .............................................................................................. 6

11

Reforming Secondary Employment at the Seattle Police Department (Sep. 27,
12       2017), http://www.seattle.gov/Documents/Departments/Mayor/ Executive-
         Order-2017-09-Secondary-Employment.pd ........................................................................... 17

13

Sara Jean Green,
14       *Seattle Officers Appeal Discipline for Fatal Release Decision*, Seattle Times
         (May 11, 2010), https://www.seattletimes.com/seattle-news/seattle-officers-
15       appeal-discipline-for-fatal-release-decision/ ........................................................................... 8

16

Seattle City Council, Resolution 31855 (Nov. 13, 2018) ................................................................ 14

17

Steve Miletich & Mike Carter, *Mayor Orders Seattle Police To Take Control of
18       Officers' Lucrative Off-Duty Work Amid
         FBI Investigation*, Seattle Times (Sept. 28, 2017),
19       https://www.seattletimes.com/seattle-news/mayor-orders-seattle-police-to-
         take-control-of-officers-off-duty-work-amid-fbi-investigation/ .............................................. 24

20

Steve Miletich & Lewis Kamb, *Off-duty Work By SPD Officers Has Been An
21       Issue For Years*, Seattle Times (Sept. 24, 2017)................................................................... 23

22

23

24

25

26

CPC'S RESPONSE TO COURT'S ORDER
TO SHOW CAUSE
(No. 2:12-cv-01282-JLR) – iii

143373394.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

# I. INTRODUCTION

When the Court found the City of Seattle ("City") in initial compliance with the Consent Decree, it cautioned that sustained compliance "require[s] dedication, hard work, creativity, flexibility, vigilance, endurance, and continued development and refinement of policies and procedures in accordance with constitutional principles."[1]  In other words, initial compliance would not be durable without protecting the reforms that gave rise to that compliance.

Well before issuing its initial compliance order, the Court warned that collective bargaining on the Accountability Ordinance[2] and the Seattle Police Department ("SPD") accountability system could endanger the City's progress.[3]  That warning was prescient.  In negotiating collective bargaining agreements ("CBAs") with the Seattle Police Officers Guild ("SPOG") and the Seattle Police Management Association ("SPMA"), the City bargained away critical reforms from the Accountability Ordinance and other accountability system improvements.  These reforms had been crafted carefully and deliberately, drawing on hard lessons over many years with the existing system.

In its response to the Court's Order to Show Cause, the City minimizes the impact of the SPOG CBA on accountability, particularly for serious misconduct, and how this may then affect the sustainability of other Consent Decree reforms.  Notably, the City does not address the SPMA CBA (and the differences between the two CBAs), the impact of both CBAs on SPD

---

[1] Order Finding Initial Compliance (Dkt. 439) at 14.
[2] *See* Accountability Ordinance (Dkt. 396-1).
[3] *See* Order Regarding Accountability Ordinance (Dkt. 413) at 2 (refusing to approve Accountability Ordinance prior to collective bargaining because "no provision of the Ordinance is categorically exempt from bargaining . . . [and because] the relevant unions may disagree with the City's assessment concerning which provisions of the Ordinance are subject to collective bargaining").

CPC'S RESPONSE TO COURT'S ORDER
TO SHOW CAUSE
(No. 2:12-cv-01282-JLR) – 1
143373394.2

policies, the Office of Police Accountability ("OPA") Manual, or the Executive Order on secondary employment. The Department of Justice ("DOJ") does not assess those impacts either.

Both parties ask the Court to measure the CBAs against standards such as whether the City is within its rights to agree to those changes, whether these contracts are better than the prior contracts in some ways, or whether other cities have CBAs with similar provisions.  Instead, the Court should ask whether the CBAs will result in a less robust police accountability system *for this community* than that recommended and enacted in the Accountability Ordinance and other laws and policies that, taken together, form the accountability system.

The Community Police Commission ("CPC") as *amicus curiae* provides the following analysis to ensure that the Court has a different perspective than what the parties are providing. The CPC agrees with the Court that it is critically important to evaluate the effects of these contracts against the backdrop of the purpose and spirit of the Consent Decree.  That was the reason the Consent Decree Memorandum of Understanding ("MOU") between the City and the DOJ required the CPC to lead an evaluation of the accountability system and make recommendations for improvements—because a stronger accountability system will instill public confidence.  As then-U.S. Attorney Jenny Durkan wrote in 2014:

> Of the many important roles the CPC plays in the reform process, the holistic review of the accountability process required by the consent decree and MOU is pivotal. That work and the changes [to the accountability system that the CPC] will help craft with City leadership will be critical to successful reform of SPD.[4]

---

[4] *See* Declaration of Fé Lopez in Support of Community Police Commission's Response to Court's Order to Show Cause ("Lopez Decl.") ¶ 2, Ex. A.

CPC'S RESPONSE TO COURT'S ORDER
TO SHOW CAUSE
(No. 2:12-cv-01282-JLR) – 2

143373394.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

Accountability system improvements are not tangential to or separate from other Consent Decree reforms. A strong accountability system will help ensure that necessary reforms are sustained over time.

The years-long effort leading up to the Court's finding of initial compliance shows that lasting reform is hard to get. But the City's negotiations with SPOG and SPMA demonstrate that lasting reform is just as hard to keep. Accordingly, the CPC respectfully requests that Court conclude that revising the CBAs is a necessary precondition to sustained compliance under the Consent Decree.

## II. ISSUES PRESENTED

The CPC responds to the questions and instructions of the Court as follows:

1. Is the Court's understanding of the foregoing events [regarding Officer Shepherd] accurate? If not, how is the Court's understanding of the foregoing events not accurate?

The Court's understanding of the Shepherd incident is correct. The events preceding the actual use of force are further cause for concern. *See* Section III.A.

2. Whether the events surrounding the DRB's decision to reinstate an SPD officer who punched a hand-cuffed subject who was sitting in a patrol car, and the new CBA's rejection of aspects of the Accountability Ordinance—including those aspects that would have replaced the DRB with the PSCSC and provided for a different standard of review—should lead the Court to conclude that the City and the SPD have failed to maintain full and effective compliance with the Consent Decree during Phase II?

The departures from the Accountability Ordinance (including intended reform of the disciplinary appeals process) and other accountability system reforms will make it harder to uphold findings of misconduct and appropriate discipline—undermining the authority of OPA and the Chief. This result threatens the Consent Decree's purpose of ensuring constitutional and effective policing in which the community of Seattle can have confidence. *See* Section III.B-C.

CPC'S RESPONSE TO COURT'S ORDER
TO SHOW CAUSE
(No. 2:12-cv-01282-JLR) – 3
143373394.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

3. Provide the Court with a detailed list of all the changes to the Accountability Ordinance or any other SPD policy or procedure that the new CBA with SPOG precipitated, how those changes either do or do not conflict with the Consent Decree under the standard articulated above, and whether those changes undermine or threaten to undermine the City's status as being in full and effective compliance with the Consent Decree.

The Declaration and Exhibits of Judge Anne Levinson (Ret.) ("Judge Levinson Decl.") provide a detailed analysis of these changes, and inventory the ways in which the SPOG and SPMA CBAs affect, conflict with, or compromise the Accountability Ordinance, the OPA Manual, and SPD policies. Judge Levinson was appointed by the Mayor and confirmed by the City Council to serve for two terms (six years) as the City's independent, external OPA Auditor (from 2010-2016), to review complaints and investigations of misconduct and make recommendations for oversight system improvements, and is an authority on police oversight. Because of Judge Levinson's expertise as an objective reviewer of Seattle's existing accountability system, familiarity with the national landscape regarding police accountability systems, contributions to the Accountability Ordinance and Executive Order, and recommendations issued in past years to enhance police accountability,[5] her conclusions on the likely implications of the current CBAs should be given great weight. *See also* Section III.B-C.

4. Provide the Court with a recommendation on how it should proceed under the Consent Decree in light of present circumstances, including but not limited to the changes to the Accountability Ordinance as a result of the CBA with SPOG.

The CPC disagrees with the position taken by the parties that no further action is needed to ensure continued compliance with the Consent Decree, and instead asks the Court to make clear that removing the barriers the CBAs present to the intended reform of Seattle's police

---

[5] *See* Judge Levinson Decl. at 2-5.

CPC'S RESPONSE TO COURT'S ORDER
TO SHOW CAUSE
(No. 2:12-cv-01282-JLR) – 4

143373394.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1   accountability system is a condition to a successful conclusion of the Consent Decree process.

2   *See* Section III.C.

3   ### III.  ANALYSIS

4   The central issue this brief addresses is whether the SPOG and SPMA CBAs are barriers

5   to sustained compliance under the Consent Decree.  But first the CPC addresses the Court's

6   questions relating to the Officer Adley Shepherd case.

7   **A.   The Court's understanding of the Shepherd incident is accurate, and the events**
    **preceding the use of force provide additional cause for concern.[6]**

8

9   What follows is a summary of the incident that led Chief Kathleen O'Toole to dismiss

10  Officer Shepherd, focusing on elements which seem particularly germane to community

11  confidence and preservation of Consent Decree achievements on use of force and de-escalation.

12  Around 2 a.m. on June 22, 2014, Evelyn Shelby called 911 to report that her son, Robert

13  Shelby, had received a threatening phone call from his girlfriend, Miyekko Durden-Bosley.[7]

14  Officer Adley Shepherd arrived on the scene to interview Robert, and Miyekko arrived shortly

15  thereafter.  Miyekko offered to answer Officer Shepherd's questions, and repeatedly denied

16  making any threats.[8]  Robert corroborated Miyekko's denial, insisting that "[n]obody [expletive]

17  threatened me, bro."[9]

18

19  When Robert began to yell loudly at his mother (because he was upset that she had called

20  the police),[10] Officer Shepherd interjected, telling Robert that he was acting like a child and

21

22  ─────────────────

23  [6] The CPC does not "have access to any non-public information regarding [Officer Shepherd] or allegation[s] of misconduct or disciplinary action [against him]." Consent Decree (Dkt. 3-1) ¶ 12.

24  [7] *See* City of Seattle's Response to Court's Order to Show Cause ("City Br.") (Dkt. 512), Ex. F at 2.

25  [8] *See June 22nd In-Car video*, YouTube (Dec. 5, 2014) ("Dashcam Video"), https://www.youtube.com/watch?v=gdrvV5ZzIxg.

26  [9] City Br., Ex. F at 3.
    [10] *Id.*

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1    expressing anger at the way Robert was yelling at his mother.[11]  He then announced "my

2    patience is done, it's done, it's over, so somebody's gonna go to jail,"[12] and intimated that this

3    "somebody" would be chosen based on a game of "eeny meeny miny moe."[13]

4          Miyekko repeated that she had not threatened anyone, which apparently prompted Officer

5    Shepherd to choose her as the arrestee.[14]  After Officer Shepherd grabbed her, Miyekko said,

6    "Please don't touch me."[15]  She repeatedly asked him, "Why am I under arrest? Can you tell me

7    why I'm under arrest?"[16]  Robert—the person against whom the alleged threat was made—also

8    objected strongly to the arrest.[17]

9          At the car door, Miyekko pleaded with Officer Shepherd to "please talk to me,"[18] but

10   Officer Shepherd instead pushed her into his patrol car.  She fell onto her back, swore, and

11   attempted to kick Officer Shepherd (it is not clear whether she made contact).[19]  Officer

12   Shepherd then took a step backwards away from the car, yelled, "she kicked me," and retaliated

13   by "lung[ing] back inside the vehicle and deliver[ing] a closed fist strike to [Miyekko]'s face

---

[11] Dashcam Video at 0:40.
[12] *Id.* at 0:50.
[13] *Id.* at 0:55; *see also* Office of Professional Accountability, Closed Case Summary Complaint Number OPA #2014-0216 (Dec. 13, 2016) ("OPA Report") at 3, http://www.seattle.gov/Documents/Departments/OPA/ClosedCaseSummaries/OPA2014-0216ccs 12-13-16.pdf (confirming that Office Shepherd "said a phrase commonly used to indicate the use of chance to make a selection").
[14] Dashcam Video at 1:05.
[15] *Id.* at 1:10.
[16] *Id.* at 1:18-23.
[17] City Br., Ex. F at 4.
[18] Dashcam Video at 2:28.
[19] *Compare*, City Br., Ex. F at 4 (declaring it "uncontroverted that [Miyekko's] kick landed in Officer Shepherd's face), *with* OPA Report at 6 (finding only that it was "more likely than not that [her] right foot made some physical contact"), *and* Dashcam Video at 2:45 (neither contact nor lack of contact can be established).

CPC'S RESPONSE TO COURT'S ORDER
TO SHOW CAUSE
(No. 2:12-cv-01282-JLR) – 6

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

with such force that it fractured her eye socket and inflicted substantial soft tissue damage to her face."[20]

OPA investigated and ultimately found that "[h]itting the subject in the face with the amount of force employed by [Officer Shepherd] was unreasonable and excessive, given the totality of the circumstances."[21]  OPA concluded that Officer Shepherd violated three separate policy provisions related to the use of force, and that termination of employment was the appropriate remedy.[22]  Chief O'Toole agreed and expressed concern that Officer Shepherd's punch may have been an act of retaliation:

> I am unconvinced that your reaction was either a trained instinct or an unintentional response.  Your instinctive movement away from the subject, and ability to process and formulate a verbal response prior to your physical response only reinforces this notion . . . .  Moreover, the level of force you used was not insignificant—quite the opposite, in fact.  Your force seriously injured the subject and could have been lethal.[23]

Chief O'Toole also observed that this was not the first time that Officer Shepherd had disregarded department policy with serious consequences.[24]  In 2009, Officer Shepherd responded to a call reporting that a man, Valente Alvarez-Guerrero, had assaulted his roommate. Officer Shepherd arrested Mr. Alvarez-Guerrero, but apparently believed that the King County Jail would refuse to book him because he was scheduled to have surgery on his hand the following day.  Officer Shepherd nevertheless called his supervisor and obtained authorization to

---

[20] OPA Report at 5; *see also* Dashcam Video at 2:45-3:00; *id* at 3:18 ("[Y]ou punched me for no reason.").
[21] OPA Report at 4-5.
[22] *Id*. at 8.
[23] MYNorthwest, *Seattle Police Officer Fired for Punching Woman Tells His Side of the Story* (Nov. 22, 2016), http://mynorthwest.com/470124/seattle-police-officer-fired-for-punching-woman-tells-his-side-of-the-story/.
[24] City Br., Ex. F at 25.

CPC'S RESPONSE TO COURT'S ORDER
TO SHOW CAUSE
(No. 2:12-cv-01282-JLR) – 7

143373394.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

release the suspect.  This violated department policy because supervisors are required to conduct

screenings in-person prior to authorizing release.  It also violated state law, which defines all

fights between roommates (even those who are not romantically involved) as domestic violence

and mandates that an arrestee be booked in such instances.  But Officer Shepherd never told his

supervisor that the victim was a roommate.  And because the supervisor was not privy to this

information, he erroneously authorized Mr. Alvarez-Guerrero's release.  That same night, Mr.

Alvarez-Guerrero fatally stabbed his roommate.[25]

### 1.  How Officer Shepherd's case was reviewed on appeal.

Under the prior SPOG CBA, Officer Shepherd had the right to appeal his termination to

the Disciplinary Review Board ("DRB"), a body comprised of three members: one appointed by

the City, one by SPOG, and one "neutral" member, here, an arbitrator.  Notably, the DRB *agreed*

that Officer Shepherd had violated at least one department policy regarding the use of force

against handcuffed individuals.[26]  But instead of deferring to the Chief's termination decision,

the DRB concluded that termination was not a proportionate penalty and ordered reinstatement

with full back pay "less pay reflecting a 15-day unpaid suspension."  The deciding vote was cast

by the arbitrator member of the DRB.  The union representative voted to reinstate Officer

Shepherd, and the management representative voted to sustain the termination.[27]

The arbitrator who cast the deciding vote dismissed the Chief's conclusion that Officer

Shepherd would not change his behavior and therefore was not safe to continue to employ as a

---

[25] Sara Jean Green, *Seattle Officers Appeal Discipline for Fatal Release Decision*, Seattle
Times (May 11, 2010), https://www.seattletimes.com/seattle-news/seattle-officers-appeal-
discipline-for-fatal-release-decision/.
    [26] *See* City Br., Ex. F at 21.
    [27] *Id*. at 30.

CPC'S RESPONSE TO COURT'S ORDER
TO SHOW CAUSE
(No. 2:12-cv-01282-JLR) – 8
143373394.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1   sworn officer.[28]  She also (1) brushed aside the Valente Alvarez-Guerrero incident as "quite [a]

2   different matter[]," despite the Chief's conclusion that both incidents showed poor judgment, (2)

3   determined that Officer Shepherd's lack of insight and adamant stance that he did nothing wrong

4   weighed *in his favor* because, according to the arbitrator, his unremorseful posture showed that

5   he had "an honest, but mistaken belief that he was following SPD policy," and (3) gave great

6   weight to Officer Shepherd's employment record while discounting SPD leadership's assessment

7   of that record.[29]  The decision showed no deference to the Chief's judgment.[30]

### 2. The appeals process under the Accountability Ordinance would have differed in important ways and under the CBAs will be even less consistent with the Consent Decree's goal of public trust and confidence.

Officer Shepherd's disciplinary appeals process would have been much different under

the Accountability Ordinance, which creates a transparent appeals process designed to instill

public trust and confidence, critical ingredients to constitutional policing.

The DOJ takes the position that "there is nothing to suggest that the option chosen by the

City of Seattle will make disciplining officers for offenses related to the Consent Decree (Use of

Force or biased policing) more difficult than in the past."[31]  This fails to address two important

points.  First, the CBAs abandon provisions that represented needed improvements over past

practices that arose as part of the accountability system review called for under this Consent

Decree and the associated MOU.  Second, with the newly-negotiated requirement of a

heightened standard in almost all officer termination cases, it has become more difficult to

sustain discipline even compared to the prior situation under the former CBAs.

---

[28] *Id*. at 26-27.
[29] *Id*.
[30] *Id*. at 21 (declining to follow "long line of arbitration rulings" stating that arbitrators should "only . . . modify penalties which are beyond the range of reasonableness").
[31] United States' Response to Court's Order to Show Cause (Dkt. 528) ("DOJ Br.") at 12.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

First, under the Accountability Ordinance, Officer Shepherd and SPOG would not have been allowed to choose their preferred appellate forum.  They could not have chosen a path where the appellate decision-maker was an arbitrator whose selection they could have vetoed.  Moreover, the proceedings would have been open to the public, making it more difficult for City officials and SPOG to delay issuance of the reinstatement decision until after the parties had updated the Court and the SPOG CBA had been approved by the City Council—a controversy that has come to light since the City submitted its brief.[32]

Under the Accountability Ordinance, the reviewing body would have been required to defer to the Chief unless it made an affirmative finding that the termination was not in good faith for cause, and then it would have been required to limit its order to that necessary to rectify the identified issue.[33]  But under the CBAs, such deference is no longer required.  As shown in the Shepherd case, when a decisionmaker does not afford *any* deference to the Chief's determination, reversal is much more likely.

Under the Accountability Ordinance, Officer Shepherd's disciplinary appeal would have taken place before a neutral three-member Public Safety Civil Service Commission ("PSCSC") appeals panel or a hearing officer with subject matter expertise designated by the PSCSC.  The members of the panel or the hearing officer would have been appointed through a merit-based process, would not be allowed to be a current City employee or have been employed by SPD within the past 10 years, and could not have been de-selected for this case or the next case if they

---

[32] *See* Lewis Kamb & Steve Miletich, *Seattle, Police Union Delayed Release of Ruling to Reinstate Fired Officer Until After Labor Contract Was Approved*, Seattle Times (Jan. 14, 2019), https://www.seattletimes.com/seattle-news/city-police-union-delayed-release-of-ruling-to-reinstate-fired-officer-until-after-approval-of-contentious-new-police-contract/.
[33] *See* Judge Levinson Decl., Ex. A § 5.

CPC'S RESPONSE TO COURT'S ORDER
TO SHOW CAUSE
(No. 2:12-cv-01282-JLR) – 10
143373394.2

1  decided a case adversely to the union.  Moreover, the PSCSC would have been bound to set

2  timelines to help ensure less delay in accountability, and the public and media would not have

3  been barred from the proceedings.[34]

4

5          Second, under the Accountability Ordinance, the required standard of review was a

6  preponderance, which is what the DRB used in the Shepherd case (contrary to the DOJ's

7  suggestion about prior practice).[35]  But the CBAs will now require an arbitrator to use an

8  undefined "elevated standard" to make and uphold a sustained disciplinary finding in all

9  termination cases where the alleged offense is stigmatizing to the law enforcement officer—

10  which would apply to all for-cause terminations, which are by their nature stigmatizing.  In

11  effect, this will require OPA and the Chief to apply an elevated standard in any case that may

12  ultimately lead to termination, so as not to invite reversal.  In this respect, the new CBAs do not

13  just impede needed improvements, but they actually take a step back from the pre-existing

14  system, making it harder to address all serious misconduct.

15

16          The net result (akin to what we saw in the Shepherd case other than the standard of

17  review) is that under the appeals system mandated by the CBAs, employees and the unions will

18  likely choose arbitration rather than the PSCSC.[36]  Under the CBAs' arbitration path, the union

19  can strike the selection of an arbitrator; the general rules of arbitration apply, which are not

20  grounded on values of public trust and confidence particularly relevant to police misconduct

21  matters; deference to the Chief's decision is not required, which means that the arbitrator can

22

23

24  _____

25      [34] *See id.*, Ex. A § 6.
        [35] *See* DOJ Br. at 16-17.
26      [36] Also, if the PSCSC were ever selected, it will still have an SPD employee as one of its
    three members because the SPOG CBA requires bargaining of any changes to the PSCSC's
    composition.  *See* Judge Levinson Decl. at 30 n. 42.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

issue a sweeping order well beyond correcting any procedural error; the arbitrator must use an undefined heightened standard of review for any type of serious misconduct that might result in termination; and complainants, the public, and the media are prohibited from attending the hearing—eliminating the transparency that was so critical to the Accountability Ordinance.[37]

As Judge Levinson's Declaration describes, and as both the City and the DOJ filings confirm, these are the rules that have been set in place in police contracts across the country for decades. The City and the DOJ view this universality as a strength. But as Judge Levinson points out, the widespread proliferation of these provisions in CBAs explains why officers who appeal their terminations are often reinstated, regardless of proven misconduct, its seriousness, or its impact on community trust.[38] These sorts of contractual provisions are a big reason why meaningful police accountability has proven so elusive to so many communities, including our own. Simply put, the Shepherd case is not an anomaly, but rather a feature of a system designed to limit accountability. It is no surprise that SPOG wanted to hold onto that attribute; but from the perspective of the community, doing so reinstated a longstanding barrier to accountability.

The City and DOJ insist that the Shepherd reinstatement was erroneous but that the City should not be faulted for actions out of its control, especially because the City is appealing the decision.[39] But the issue is not just that an arbitrator ordered Shepherd reinstated, but that the

---

[37] *See* Judge Levinson Decl., Exs. A & E.

[38] *See* Judge Levinson Decl. ¶¶ 23-30; *see also* Kimbriell Kelly, Wesley Lowery & Steven Rich, *Fired/Rehired: Police Chiefs Are Often Forced to Put Officers Fired for Misconduct Back on the Streets*, Wash. Post (Aug. 3, 2017), https://www.washingtonpost.com /graphics/2017/investigations/police-fired-rehired/?utm_term=.363c83a47f5b (describing study where the Washington Post "filed open records requests with the nation's 55 largest municipal and county police forces" and found "[m]ost of the officers regained their jobs when police chiefs were overruled by arbitrators" based on cited proportionality concerns).

[39] City Br. at 10-11; *see also* DOJ Br. at 7 ("The fact that an arbitration panel, which is not controlled by the City, overturned the City's efforts to enforce its policies is not a fair indication of a failure by the City and SPD to hold officers accountable.").

CPC'S RESPONSE TO COURT'S ORDER
TO SHOW CAUSE
(No. 2:12-cv-01282-JLR) – 12

143373394.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1  SPOG and SPMA CBAs retain (and by changing the burden of proof, actually worsen) attributes

2  of an appeals system that are likely to result in more cases in which discipline is overturned on

3  appeal.  In fact, the CBAs may even cause a Chief not to order suspension or termination, even

4  in the face of misconduct, due to the heightened standard and other barriers embedded in these

5  contracts.

6

7          The DOJ refers to six instances of officer termination that have been reviewed at

8  arbitration over the last 15 years, and points out that termination was upheld in four of these

9  six.[40]  But the two that were not upheld were terminations associated with the very issues

10  implicated by the Consent Decree.  And notably, the two that were not upheld were terminations

11  associated with excessive force, used against individuals of color, who were hand-cuffed in the

12  back of the officer's patrol car.  These were also the only two cases that involved individuals

13  subjected to police action and excessive force, not matters initiated administratively by SPD

14  itself.[41]  Given the limits on certiorari, the City cannot obtain an extraordinary writ every time

15  this happens.  Systemic reforms—like those in the Accountability Ordinance—are the only

16  answer.

17

18  **B.      The SPOG and SPMA CBAs are barriers to sustained reform.**

19          The Court has stated that effective accountability processes are essential to maintaining

20

21

22  _____

23  [40] Judge Levinson's Declaration raised the issue that the City provided the Court with no
record of disciplinary appeals to validate its judgment that the Shepherd case was an anomaly.
24  That Declaration was signed in January 2019, prior to the DOJ's February 2019 filing that
identifies six termination cases over 15 years.  However, the DOJ also did not provide
25  documentation validating this assertion.  There is also no record from either party about the
appeal status of all non-termination disciplinary cases and any pending cases still in the queue
26  for an appellate decision, nor identification of cases where the Chief decided to not terminate or
suspend due to burden of proof considerations.
[41] *See* Declaration of Christina Fogg in Support of the DOJ Br. (Dkt. 529).

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

police reform,[42] and also has expressed concern about the potential negative impact of collective bargaining on the accountability system.[43]  When the Court first issued its finding of full and effective compliance, it stated that "[i]f collective bargaining results in changes to the accountability ordinance that the court deems to be inconsistent with the Consent Decree, then the City's progress in Phase II will be imperiled."[44]  The Court's concern was well founded.  The SPOG CBA undercuts long-sought and publicly promised reforms to the accountability system in significant ways leaving myriad weaknesses and gaps.[45]

The City paints a different picture, describing the impact as limited.[46]  In particular, the City overstates the degree to which the CBAs enhance chain of command authority,[47] and understates how the Chief's ability to suspend an employee without pay pending investigation in cases where active duty would compromise community safety or trust was sharply pared back from the Accountability Ordinance.[48]  The City also fails to acknowledge how the CBAs

---

[42] *See* Order to Show Cause (Dkt. 504) at 5 ("[E]nsuring that appropriate oversight and accountability mechanisms are in place is one of the cornerstones to securing constitutional and effective policing in this City beyond the life of the Consent Decree.").

[43] 7/18/17 Hearing Tr. (Dkt. 407) at 21-22.

[44] Order Finding Initial Compliance (Dkt. 439) at 15.

[45] The City's brief expressly contradicts the City Council's Resolution calling on the Court to examine specific concerns about the effect of certain contractual provisions, including Article 3.1 governing "[t]he standard of review and burden of proof in labor arbitration," Article 3.6.B-D governing "[t]he calculation, extension and/or re-calculation of the 180-day timeline for the [OPA] to investigate complaints of misconduct," and Appendix E.12 "[n]arrowing [the] legislated subpoena powers of the [OPA." *See* Seattle City Council, Resolution 31855 (Nov. 13, 2018), http://clerk.seattle.gov/~archives/Resolutions/Resn_31855.pdf. It is unlikely that, when the City Council expressed a desire for this Court to pass on the impact of those provisions, it expected the Seattle City Attorney to affirmatively argue that these same provisions are harmless.

[46] *See* City Br. at 5-9; *id.* Ex. E (itemizing limited areas in which the City agrees the SPOG contract supersedes the Accountability Ordinance and contending that CPC analyses previously circulated are incorrect and the Ordinance is unaffected on specific points).

[47] City Br. at 20.

[48] *Compare id.* at 19 (touting purported improvements), *with* Judge Levinson Decl. ¶ 40(K), *and* Judge Levinson Decl. at 27 n. 38 ("A key issue is that, in serious cases with ongoing investigations, it is likely that charging decisions may take more than 30 days, requiring the Chief to restore to active duty an officer who ultimately will be charged with serious law

---

CPC'S RESPONSE TO COURT'S ORDER
TO SHOW CAUSE
(No. 2:12-cv-01282-JLR) – 14
143373394.2

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

undermine the Chief's authority to impose and maintain discipline by (i) restoring arbitration on appeal from the Chief's decision, and (ii) introducing a new heightened standard to sustain termination if the alleged offense could be stigmatizing to the officer and make it more difficult to find other law enforcement employment.[49]  The City defends these concessions—which contradict the Ordinance it passed—because other public employees can appeal to arbitrators. But police officers are not in the same position as other public employees.  They have the power to use deadly force and deprive individuals of their liberty, and their employer is currently subject to a Consent Decree due to the need to ensure that police powers are exercised in a constitutional manner.

For its part, the DOJ minimizes the impacts of the City's decision to bargain away the Accountability Ordinance's reforms.  According to the DOJ, the "only circumstance" where it would be concerned with a local law or CBA would be if it conflicted with the Consent Decree. But the DOJ agrees that if the CBAs have "the effect of making it more difficult for the City to hold officers accountable for misconduct related to the Consent Decree (e.g., excessive uses of force, biased policing), then there would be a potential conflict with the Consent Decree."[50]  As detailed below, the CBAs do precisely that: they make it harder to hold officers accountable, including for misconduct related to the Consent Decree.  Notably, while DOJ presently does not predict that accountability system weaknesses will compromise progress on the underlying issues in this case, former U.S. Attorney Jenny Durkan early on was very clear that improving the accountability system was a requirement to ensure lasting reform:

---

violations.  The Chief is in the best position to know when restoring an officer to active duty is inconsistent with public trust in light of all the circumstances.").

[49] *Compare* City Br. at 23-27, *with* Judge Levinson Decl. ¶¶ 42-43.

[50] DOJ Br. at 10-11.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1
2
3
4
5

> As we told the Court yesterday: the accountability system is in need of wholesale review and significant reform.  Too many layers have been grafted on over the years by law and practice.  It is almost unthinkable that so many experienced people can have so much confusion over how things work.  It is also unacceptable.  Both the officers and the public must have a system that is transparent, certain and just. The question is not simply how does the City improve what exists, but how does it create and insist on what is needed [with respect to accountability improvements].[51]

6
7
8
9
10

Contrary to the DOJ's narrow analysis, the CBAs affect numerous provisions of the Accountability Ordinance and the accountability system, not just maintaining arbitration as an option for review and imposing a heightened burden of proof—the only two changes the DOJ calls out.[52]

11

       **1.**       **The SPOG CBA purports to supersede or nullify any other City law or policy that, implicitly or explicitly, conflicts with its terms.**

12
13
14
15
16
17
18
19
20

The SPOG CBA provides that it preempts the Accountability Ordinance (and any other City law) that it "conflicts with."[53]  The City itself states that the "conflict with" language should be understood to mean *any inconsistency*.[54]  Thus, the preemption may encompass not just explicit, intentional conflicts, but also the use of slightly different terms, ambiguous phrasing, the omission of clauses, and terms ordered or organized differently that an arbitrator might later find to have created a "conflict."  Given the open-ended scope of this preemption clause, it is not possible to ascertain the full extent to which the SPOG CBA nullifies City laws and policies.  In

21
22
23
24
25
26

---

[51] Lopez Decl., Ex. A.

[52] As previously noted, all of the areas in which both the SPOG and SPMA CBAs depart from or compromise the Accountability Ordinance, and implicate the Executive Order on secondary employment, the OPA Manual, and SPD policies, are comprehensively detailed in the Exhibits to Judge Levinson's Declaration.

[53] *See* City Br., Ex. B at 71, Art. 18.2 ("[T]he parties [to the SPOG CBA] and the employees of the City are governed by applicable City Ordinances, and said Ordinances are paramount except where they conflict with the express provisions of this [SPOG] Agreement.").

[54] City Br. at 3-4 ("If a local law or regulation is inconsistent with a . . . CBA[], then the CBA supersedes."); *see also id.* ("[A] liberal construction should be given to all of RCW 41.56 [governing public employees' collective bargaining] and conflicts resolved in favor of the dominance of that chapter" (quoting *Rose v. Erickson*, 721 P.2d 969, 971 (Wash. 1986))).

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1   other words, the full impact of the CBAs on the accountability system, as well as on public

2   perceptions of that impact, is unknown.

3        Adding to the ambiguity, SPOG has not committed in any forum—let alone through

4   binding submissions—to refrain from interpretations that nullify aspects of the Accountability

5   Ordinance or other law.  The City does not speak for SPOG and SPMA; these other parties can

6   and likely will take a more expansive view of the concessions they and their members gained

7   through these agreements.  Notably, the parties to the CBAs have not provided the Court with an

8   inventory of which aspects of the Accountability Ordinance they consider preempted or in

9   conflict with CBAs.  While the City lists a few areas, SPOG has remained silent as to its

10  interpretation, reserving the ability to contend later that much larger swathes of the

11  Accountability Ordinance are abrogated.  Additionally, the parties have not provided information

12  about the various existing Memoranda of Agreement which the CBAs cite as still in effect.[55]

13       Indeed, the City contends that deviations from the Ordinance will play out in a benign

14  fashion, and that many aspects of the Ordinance the CPC has flagged will "stand as enacted due

15  to a lack of actual conflict with a CBA."[56]  For instance, the City claims that "longstanding past

16  practice regarding location of OPA interviews" resolves the apparent conflict between the

17  Accountability Ordinance's instruction that "OPA shall be physically housed outside any SPD

18  facility and be operationally independent of SPD in all respects," and the contract's instruction

19  that "[a]ny [OPA] interview . . . shall take place at a Seattle Police facility."[57]  In other words,

---

[55] *See* City Br., Ex. A at App. E (SPMA CBA); *id*., Ex. E at App. F (SPOG CBA).
[56] *See* City Br., Ex. E (green highlighted provisions).
[57] *See* Judge Levinson Decl., Ex. A § 35.

CPC'S RESPONSE TO COURT'S ORDER
TO SHOW CAUSE
(No. 2:12-cv-01282-JLR) – 17

143373394.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

the City asks the Court to believe that the text of the CBA does not mean what it says—an interpretation by which SPOG or an arbitrator is unlikely to feel constrained.

History suggests that SPOG will zealously discharge its duty to its members by leveraging every ambiguity, omission, different word choice, or inconsistency as presenting a conflict with CBA terms; seeking to abrogate Accountability Ordinance provisions, other municipal law or subordinate policy bearing on accountability that do not expressly align with SPOG CBA terms.[58] Thus, the full scope of the contracts' impact is a matter of the unions' view, which is not before this Court.[59] The unions are in no way estopped from taking a much more expansive position about how much the Accountability Ordinance was eroded, and may have a duty to their members to do so when such an interpretation would advance a member's interest.[60] Judge Levinson's Declaration, informed by her closer acquaintance with the materials and with the approach taken by the unions in the past,[61] is a reliable guide to the likely range of these arguments.

---

[58] This includes Mayor Burgess's 2017 Executive Order on secondary employment. *See* Office of the Mayor, Executive Order 2017-09: Reforming Secondary Employment at the Seattle Police Department (Sep. 27, 2017), http://www.seattle.gov/Documents/Departments/Mayor/ Executive-Order-2017-09-Secondary-Employment.pdf. It also includes various EEO provisions, as well as a range of SPD policies now embedded in the OPA Manual and elsewhere. *See* Judge Levinson Decl. ¶¶ 65-66.

[59] The Court may wish to devise a mechanism to take sworn testimony from union representatives that either confirms their agreement with the City's analysis in their Exhibit E or confirms the CPC's point that the unions retain the prerogative to argue that the contracts supersede a much wider swath of Accountability Ordinance provisions.

[60] *See Diaz v. Int'l Longshore & Warehouse Union, Local 13*, 474 F.3d 1202, 1205 (9th Cir. 2007) (describing duty of fair representation requiring unions to "serve the interests of all members . . . with complete good faith and honesty") (citation omitted).

[61] Judge Levinson Decl. ¶¶ 5,12.

CPC'S RESPONSE TO COURT'S ORDER
TO SHOW CAUSE
(No. 2:12-cv-01282-JLR) – 18

143373394.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1

2        **2.      Contrary to the suggestion of the City and DOJ, the CBAs are not consistent
                    with the purpose of the Consent Decree.**

3        The DOJ focuses on arbitration (discussed above) and the burden of proof and standard

4    of review to be applied by arbitrators.  The DOJ is correct that many police contracts across the

5    country do not expressly set forth the required burden, and that absent explicit guidance

6    arbitrators use traditional principles of labor arbitration to guide their approach in each case.

7    And, as the DOJ's brief and the DRB cases included in their exhibits highlight, those traditional

8    labor arbitration principles leave a wide berth for case-by-case discretion.

9        But the conclusion the City and DOJ draw from this context is that it is not inconsistent

10   with the purposes of the Consent Decree for the City to embed an "elevated standard of review"

11   for termination cases where the alleged offense is stigmatizing to a law enforcement officer, and

12   otherwise rely on labor arbitration principles.  In so doing, the parties argue that the way for the

13   Court to assess this issue is to consider it a success that this approach is consistent with what

14   police unions everywhere else have also been able to embed in their contracts, "in essence

15   returning SPD to the ranks of the large number of other police departments."[62]

16

17       As Judge Levinson points out, that is the wrong conclusion to draw if one is prioritizing

18   the public's interest.[63]  First, arbitration conventions are not transparent or known to the public

19   and are far from predictable.  Experience in Seattle and other jurisdictions show that approaches

20   differ from arbitrator to arbitrator (a fact the DOJ highlights in its brief and exhibits).  Second,

21   the City's rationale for adopting an "elevated" standard of review (apparently because arbitrators

22   often use this elevated standard) ignores that the Accountability Ordinance eliminated arbitration

23

24

25

26       ----------
         [62] DOJ Br. at 16.
         [63] *See* Judge Levinson Decl. ¶¶ 42-43.

CPC'S RESPONSE TO COURT'S ORDER
TO SHOW CAUSE
(No. 2:12-cv-01282-JLR) – 19

143373394.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1
2
3
4
5
6

for this and other reasons.  Third, the course most consistent with public trust and confidence would have been for the City to remedy the vagueness and inconsistency in the standard of review used by arbitrators by *clearly requiring a preponderance standard and a deferential review standard in the CBAs* (which would have been consistent with the prior direction from the Court).  That approach would have aligned with the Consent Decree.[64]

7
8
9
10

The City and the DOJ miss another important point.  These CBAs don't just require a higher standard for dishonesty, or even for a narrow range of serious misconduct.  The CBAs have in effect eliminated the preponderance standard for *all* serious misconduct.  As Judge Levinson's Declaration makes clear, this will have untold ramifications for the public:

> The SPOG CBA mandates that an ambiguous "elevated" standard be used for cases that result in termination where the misconduct is "stigmatizing" and makes it "difficult for the employee to get other law enforcement employment."  But nearly any misconduct for which an employee is fired could be viewed as meeting these conditions (and certainly the union and employee will assert that is the case whenever termination is imposed).  The weakening in accountability then has a domino effect.  De facto, the higher standard of review will also impose a higher burden of proof for OPA investigations and for Chief's initial decision for a wide span of misconduct cases.  The preponderance of evidence will no longer be the burden of proof for any case of alleged misconduct that may lead to termination, because both the findings and disciplines now will only be sustained on review if they meet this undefined "elevated" standard of review.  OPA will have to use this higher burden of proof for *any serious misconduct*—it won't be able to divine at the initiation of an investigation whether ultimately discipline will be warranted, whether that discipline might be termination, and whether that termination might be found to be "stigmatizing".  The impact of this change to the accountability

---

[64] Under the CBAs' sliding-scale standard, it is impossible for the public to know what standard will apply until the arbitrators deliver their decision.  The City's analysis neglects the values of clarity and consistency in results, both of which were served by firmly requiring adjudicators to use a preponderance standard consistent with prior direction from the Court. And, were an adjudicator to depart from the preponderance standard, the City would have been able to appeal under an abuse-of-discretion standard.

CPC'S RESPONSE TO COURT'S ORDER
TO SHOW CAUSE
(No. 2:12-cv-01282-JLR) – 20

143373394.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

system is, of course, to the detriment of the public and complainants. Serious misconduct that heretofore needed to be proven by a preponderance of the evidence now must be proven by a higher standard, a standard that has yet to even be defined."[65]

With regard to using the heightened standard for dishonesty resulting in a presumption of termination, the DOJ says that it erred previously when it took issue with that heightened standard.  Again, the CPC takes a different view, treating public trust and confidence as the touchstones.  As Judge Levinson summarizes in her Declaration, "[t]he City describes this CBA approach as 'the City and SPOG agreed to treat dishonesty in the same manner as other cases of misconduct.' . . .  This may be technically in compliance with the Court's earlier direction endorsing the recommendation to not have termination for dishonesty be subject to a different burden of proof than other misconduct, but it appears to be a significant departure from the Court's intention to strengthen the accountability system, not weaken it.'"[66]

Additionally, with regard to dishonesty, the parties do not address that the City agreed to retain the requirement that intentionality must be proven in order to sustain an allegation of dishonesty.[67]  As the DRB itself said in the *Hunt* case the DOJ cites:

> For one thing, if intent were the proper standard, the Department and OPA (as well as DRBs like the present one) would forever be attempting to divine what is in an officer's heart, and there is no reliable way to make that kind of determination with any degree of accuracy.[68]

Accordingly, the CPC does not concur that the public and the Court can rely on the City's and the DOJ's analysis as to how much of the Accountability Ordinance and related systemic reforms survive the SPOG CBA.

---

[65] Judge Levinson Decl. ¶ 41.
[66] *Id.* ¶ 43.
[67] *See* Judge Levinson Decl., Ex. A § 9.
[68] DOJ Br., Ex. G at 15.

CPC'S RESPONSE TO COURT'S ORDER
TO SHOW CAUSE
(No. 2:12-cv-01282-JLR) – 21

143373394.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

Moreover, Judge Levinson explains why it is important to understand how the SPMA CBA departs from the Accountability Ordinance in certain respects.[69]  In particular, the SPMA CBA retains multiple disciplinary appeal avenues, including arbitration, and uses the same standard of review as applies under "established principles of labor arbitration."[70]  And while the SPMA CBA nominally agrees that the Accountability Ordinance may be implemented except where not expressly abrogated, the impact of the SPOG CBA renders that agreement hollow because the Accountability Ordinance is now full of holes inflicted by the SPOG CBA.

### 3. The CBAs undermine the gains achieved under the Consent Decree.

Community confidence will suffer because the recommended oversight to address corruption in the secondary employment market for policing services will not be implemented. OPA's limited ability to ensure that both criminal and administrative investigations into serious misconduct—particularly when it has occurred in Seattle—can be conducted without compromising one another will not be improved;[71] if a complaint is not filed within four years, discipline will be barred even where dishonesty and certain types of excessive force or concealment have been proven;[72] employees of different ranks will still be treated differently;[73] and the Chief will continue to be forced to restore to active duty personnel who may have engaged in grave misconduct pending prosecutors' decisions about filing charges.[74]  There are many other explicit concessions that do not align with strengthening public trust and confidence, and implicit concessions that will later be captured by the CBA's preemption clause (as any

---

[69] *See* Judge Levinson Decl. ¶¶ 31-37, 40, 42.
[70] *See* City Br., Ex. A at 32, Art. 16.1.
[71] *See* Judge Levinson Decl., Ex. A § 11.
[72] *Id.*, Ex. A § 13.
[73] *Id.*, Ex. A § 3.
[74] *Id.*, Ex. A § 12.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

inconsistency can be deemed a conflict and used to overturn a decision of the Chief, regardless of the minor nature of the contractual inconsistency and the significant nature of the misconduct).  All of this means that accountability will be neither certain nor predictable.

The Settlement Agreement describes two different "paths" to full and effective compliance,[75] but the parties here "collaboratively chose[]" the policy-based path as opposed to the outcome-based path.[76]  Consequently, any change to existing policy designed to implement reform, and any failure to implement anticipated system improvements, may imperil the City's continued compliance.  The Settlement Agreement also made clear that "[a]t all times, the City and SPD will bear the burden of demonstrating substantial compliance with the Settlement Agreement."[77]

As Judge Levinson states in her Declaration describing some of the most impactful areas in which the Accountability Ordinance was compromised:

> Seattle is now considered at the national forefront for many of its policies, systems, and training reforms because of the Consent Decree.  The City's approach to bringing the accountability system up to par with the other Consent Decree reforms was to pass the accountability ordinance and then to prioritize aligning the CBAs to it through bargaining.  Unfortunately, with respect to the accountability system, in contrast with the other reforms implemented under the Consent Decree, the provisions in the current CBAs do not come close to best practices.  Accountability system reforms as now changed by the CBAs pale in comparison to other reforms achieved under the Consent Decree…. To help ensure constitutional policing, appropriate oversight in which the community can place its trust is necessary.  The accountability system must be effective.  Seattle's system has many positive elements that others do not.  But the CBAs before the Court impede Seattle from having a system the public can trust to work when the added safeguard of judicial oversight is gone, and regardless of who the Chief, Council, and Mayor may be.[78]

---

[75] Order Finding Initial Compliance (Dkt. 439) at 2.
[76] *Id*. at 4 n.4.
[77] Settlement Agreement and Stipulated [Proposed] Order of Resolution (Dkt. 13) ¶ 223.
[78] Judge Levinson Decl. ¶¶ 76, 81-82.

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1

2   If the Court concludes, as the CPC believes, that these CBAs have frayed the

3   accountability framework of which Seattle was justifiably proud just 18 months ago, the

4   ramifications for other accomplishments during the Consent Decree period are substantial.

5   Accountability processes are essential to safeguard other reforms and to reinforce the shift in

6   culture that the Consent Decree has achieved.[79]

7   **4.      The SPOG CBA rejects reforms that addressed known issues with secondary employment.**

8

9   In 2017, actual and potential corruption in the Seattle secondary market for off-duty

10  policing services came to light when a contractor vying to break into the secondary employment

11  market by happenstance received damning information from an SPD officer who described the

12  existing system as akin to the Mafia, and observed that it was virtually immune to the efforts of

13  SPD commanders to control or reform it.[80]  Despite immediate statements of resolve by City

14  leaders to get a hold of this situation and clean it up, the SPOG contract actually leaves it in place

15  exactly as it has been since 1992, and insulates it from any change.

16  The potential for corruption, and the threat to public confidence and transparency posed

17  by secondary employment practices, and the need for reforms, had been called out repeatedly by

18  Judge Levinson when she was the OPA Auditor.  That this issue remained unaddressed despite

19  extensive media coverage of highly problematic practices,[81] and while the City was subject to the

20  _____

    [79] *See* Order to Show Cause (Dkt. 504) at 5 ("[E]nsuring that appropriate oversight and
21  accountability mechanisms are in place is one of the cornerstones to securing constitutional and
    effective policing in this City beyond the life of the Consent Decree."); *see also* Judge Levinson
22  Decl. ¶¶ 71-80.
    [80] The CPC has attached an appendix which includes particularly illuminating "detailed
23  notes of a street-corner conversation with uniformed off-duty . . . detective . . . who described the
    off-duty system in organized crime-terms—using the word 'mafia'—and said nobody would be
24  allowed to interfere with it," following the article that includes the link to these notes.  Mike
    Carter & Steve Miletich, *Seattle City Light Has Paid 7.8M To Off-Duty Cops In 'Unusual
25  Relationship'*, Seattle Times (Oct. 8, 2017), https://www.seattletimes.com/seattle-news/seattle-
    city-light-has-paid-7-8m-to-off-duty-cops-in-unusual-relationship/.
26  [81] *See* Steve Miletich & Lewis Kamb, *Off-duty Work By SPD Officers Has Been An Issue
    For Years*, Seattle Times (Sept. 24, 2017), https://www.seattletimes.com/seattle-news/crime/off-
    duty-work-by-spd-officers-has-been-an-issue-for-years/; David Kroman, *When Cops Play*

1    Court's supervision of police matters, was of great concern to the CPC, Judge Levinson, and

2    some City leaders.  In response, then-Mayor Burgess issued an Executive Order mandating a

3    review process by the Seattle Department of Human Resources, the Seattle Information

4    Technology Department, the City Budget Office, the Office of the Mayor's Legal Counsel, and

5    the Department of Finance and Administrative Services, with implementation of their

6    recommendations to follow.[82]  Although such reforms were also called for in the Accountability

7    Ordinance,[83] Mayor Burgess's Executive Order was intended to expedite these overdue

8    corrections.

9         It was dismaying, and damaging to transparency and community confidence, to learn that

10   the SPOG contract explicitly maintains a past provision that the secondary employment system

11   will be as it was *in 1992*, and that the City is required *to bargain* for the very changes that the

12   Accountability Ordinance and the Mayor's Executive Order otherwise *require*.  It is evident from

13   Labor Relations Policy Committee ("LRPC") documents provided to the CPC by the Mayor's

14   Office that this derogation from the provisions of the Accountability Ordinance and the

15   requirements of the Executive Order were not clearly called out for members of the LRPC or

16   Councilmembers, who were instead led to believe that changes to the secondary employment

17   program would be undertaken and there would be a re-opening to bargain only economic

18   effects.[84]  While the LRPC and Council may have been misled, there is now no question that the

19

20   *Security Guard, Whom Do They Serve?*, Crosscut (Oct. 19, 2016),
     https://crosscut.com/2016/10/when-cops-play-security-guard-who-do-they-serve; Steve Miletich
21   & Mike Carter, *Mayor Orders Seattle Police To Take Control of Officers' Lucrative Off-Duty
     Work Amid FBI Investigation*, Seattle Times (Sept. 28, 2017),
22   https://www.seattletimes.com/seattle-news/mayor-orders-seattle-police-to-take-control-of-
     officers-off-duty-work-amid-fbi-investigation/; Heidi Groover, *Mayor Burgess Signs Executive
23   Order To Stop Private Management of Cops' Off-Duty Work*, The Stranger (Sept. 27, 2017),
     https://tinyurl.com/y2vefzyg; Levi Pulkkinen, *As FBI Investigates Seattle Cops' Off-Duty Work,
24   City Steps In*, Seattle PI (Sept. 27, 2017), https://www.seattlepi.com/local/article/As-FBI-
     investigates-Seattle-cops-off-duty-12234590.php.
25       [82] Office of the Mayor, Executive Order 2017-09: Reforming Secondary Employment at
     the Seattle Police Department (Sept. 27, 2017), http://www.seattle.gov/Documents/
26   Departments/Mayor/Executive-Order-2017-09-Secondary-Employment.pdf.
         [83] *See* City Br., Ex. E at § 3.29.430 (D)-(F).
         [84] *See* Lopez Decl. ¶ 3, Ex. B (attaching relevant communications).

CPC'S RESPONSE TO COURT'S ORDER
TO SHOW CAUSE
(No. 2:12-cv-01282-JLR) – 25
143373394.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

secondary employment reforms in the Accountability Ordinance, and the Executive Order were nullified by the SPOG CBA, and the community is back to square one.

**C.    The Court should make clear that fixing what has gone off track with the CBAs, and undoing the impediments they embed to the intended reform of Seattle's police accountability system, is a necessary precondition to a successful resolution of the Consent Decree process.**

The Court asked the parties and *amicus* to propose a way forward.  The CPC submits that the changes discussed above and detailed in Judge Levinson's Declaration pose a threat to other progress achieved during the Consent Decree.  As noted in the CPC's 2018 memorandum supporting a finding of full and effective compliance, we value that progress and commend those who collaborated to achieve it.  We supported the Court's initial finding, do not lightly suggest suspending it, and sincerely hope the City can rectify the damage done to accountability reform in time to avert a reversal of that achievement.  Despite our regret that we have come to this point, the CPC asks the Court to make explicit that the City must demonstrate that the damage done to accountability reform by the CBAs has been fully rectified before it can discharge its obligations in this case and bring the Court's supervision to a successful conclusion.

The City argues that it remains in full and effective compliance and that there is, therefore, nothing for the Court to do besides *approve* the weakened Accountability Ordinance.[85] According to both the City and DOJ there is no need for concern unless and until issues show up in compliance reports.[86]  And even if that happens, the most the City will concede is that "if any of [its] compromises unexpectedly turn out to hinder accountability, they will be high priority goals in the next round of negotiations."[87]  Put differently, the City's plan is "see how it goes and try again next time."

---

[85] City Br. at 30; *see also* DOJ Br. at 18 (requesting same).
[86] City Br. at 10, 15.
[87] *Id*. at 27.

CPC'S RESPONSE TO COURT'S ORDER
TO SHOW CAUSE
(No. 2:12-cv-01282-JLR) – 26

143373394.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

But there's no reason to believe the City will drive a harder bargain next time once the Consent Decree has been lifted.  Now is the best opportunity to make key improvements.  The community has been promised "next time" for far too many years.

U.S. Attorney Durkan was correct in 2014.  This was and remains critical and cannot be kicked down the road until after the Consent Decree is lifted.  The situation is an important one for community confidence.  After the celebration and "mission accomplished" quality of City officials' participation in the Accountability Ordinance and the Executive Order on secondary employment—complete with a press conference on the steps of City Hall—it is jarring to find that City negotiators did not prioritize key reforms in that ordinance when negotiating with SPOG and that the advertised commitment to rectifying the secondary employment scandal was abandoned. Community members can be forgiven for sinking into cynicism should the situation remain unchanged.

Never before and likely never again have so many resources, community attention, and expertise been devoted to identifying the weaknesses in Seattle's existing accountability system and proposing improvements.  If that much concentrated learning and effort, under the watchful eye of this Court, was insufficient to get changes in the high-profile areas of disciplinary appeals and secondary employment, the CPC is highly skeptical that "next time"—in 2021 and without judicial oversight—will go better.

This is a unique situation requiring the Court to craft a way forward that is reasonably likely to resolve these intractable dynamics.  Courts enforcing consent decrees have wide latitude to take steps to effectuate the purpose of the decrees.[88]  The Court should make clear that

---

[88] *See Keith v. Volpe*, 784 F.2d 1457, 1460 (9th Cir. 1986) (acknowledging that "flexibility" to modify consent decrees "when experience with a consent decree reveals problems with its administration . . . is essential to the administration of comprehensive decrees arising out of complex litigation [and that] Courts have allowed modifications that retain the essential features and further the primary goals of such decrees while taking into account what is realistically achievable by the parties."); *United States v. Oregon*, 769 F.2d 1410, 1416 (9th Cir. 1985) ("[The] power to modify in light of changed circumstances extends to the modification of consent decrees.").

CPC'S RESPONSE TO COURT'S ORDER
TO SHOW CAUSE
(No. 2:12-cv-01282-JLR) – 27
143373394.2

1   rectifying the damage done by the CBAs is a precondition to successful resolution of the Consent

2   Decree process.[89]  The CPC does not make its recommendation lightly.  It recognizes that SPD

3   has accomplished a great deal through dedicated effort in the months and years leading up to this

4   Court's initial finding of full and effective compliance.  But the community should not be asked

5   to rely on an unenforceable promise to "do better" next time around.

6                                 **IV. CONCLUSION**

7           Real reform must be enduring and resilient.  But in many ways both apparent (because

8   they are enumerated) or forthcoming (under the preemption clause), reforms embedded in the

9   Accountability Ordinance and other laws and policies have been materially weakened. Because

10  accountability structures reinforce and sustain other reforms, in order to safeguard the many

11  important accomplishments of the Consent Decree period, the CPC respectfully asks the Court to

12  convey that the Consent Decree will not be resolved until the City establishes that the

13  accountability system reforms have in fact been secured.

14          Officer Shepherd played "eeny meeny miny moe" with the law, fractured a woman's eye

15  socket, and still kept his job.  That incident illustrates how these rollbacks could limit the Chief's

16  ability to ensure accountability moving forward.  The Officer Shepherd order is not an outlier,

17  but rather a feature of the old system that the City has agreed to bring back with these CBAs: a

18  weakened accountability system that reliably will lead to outcomes that undermine the purposes

19  of the Consent decree, including public confidence and transparency. That the City must resort to

20  an extraordinary writ to the superior court to contest the Shepherd order demonstrates just how

21  significant and damaging these rollbacks to accountability will be.

22          Accordingly, to safeguard the many important accomplishments of police reform, the

23  CPC respectfully asks the Court to convey that the Consent Decree will not be resolved until the

24  City establishes that the accountability system reforms have in fact been secured.

25  _____

26  [89] *See* Order Finding Initial Compliance (Dkt. 439) at 14 ("The court will not hesitate to
    restart the two-year sustainment period if SPD falls below the full and effective compliance
    standard set forth in the Consent Decree.").

CPC'S RESPONSE TO COURT'S ORDER
TO SHOW CAUSE
(No. 2:12-cv-01282-JLR) – 28

143373394.2

1

2      DATED: February 20, 2019                    /s/ David A. Perez

3                                                  DPerez@perkinscoie.com
                                                   David A. Perez, WSBA No. 43959
4                                                  Anna Mouw Thompson, WSBA No. 52418
                                                   AnnaThompson@perkinscoie.com
5                                                  **Perkins Coie LLP**
                                                   1201 Third Avenue, Suite 4900
6                                                  Seattle, WA 98101-3099
                                                   Telephone: 206.359.8000
7                                                  Facsimile: 206.359.9000

8                                                  Attorneys for *Amicus Curiae* Community
                                                   Police Commission
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

CPC'S RESPONSE TO COURT'S ORDER
TO SHOW CAUSE
(No. 2:12-cv-01282-JLR) – 29

143373394.2

1

**CERTIFICATE OF SERVICE**

2

    I certify under penalty of perjury that on February 20, 2019, I caused the foregoing

3

document to be electronically filed with the Clerk of the Court using the CM/ECF system, which

4

will send notification of such filing to all attorneys of record.

5

    DATED this 20th day of February, 2019.

6

7

                 *s/ David A. Perez*
                 DPerez@perkinscoie.com

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

CERTIFICATE OF SERVICE
(No. 2:12-cv-01282-JLR) – 1

143373394.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

# APPENDIX

Available at:
https://www.seattletimes.com/seattle-news/seattle-city-light-has-paid-7-8m-to-off-duty-cops-in-unusual-relationship/?utm_source=email&utm_medium=email&utm_campaign=article_left_1.1

# Seattle City Light has paid $7.8M to off-duty cops in 'unusual relationship'

**seattletimes.com**/seattle-news/seattle-city-light-has-paid-7-8m-to-off-duty-cops-in-unusual-relationship/

A retired Seattle police officer's private company has exclusively billed Seattle City Light more than $7.8 million over the past five years to provide off-duty police officers for traffic control or security work, according to billing data obtained by The Seattle Times.

The company, Seattle's Finest Security & Traffic Control, has been chosen by utility crew chiefs for every job, even though another company, Seattle Security, also provides off-duty officers, the records show.

Details of the lucrative relationship between Seattle's Finest and City Light come at a time the FBI is investigating allegations of price-fixing and intimidation in the hiring of off-duty officers directing traffic at parking garages and construction sites.

## Related stories



- Mayor orders Seattle police to take control of officers' off-duty work amid FBI investigation
- Off-duty work by SPD officers has been an issue for years

1/6

- Seattle police officials concerned about officers' off-duty work before FBI probe
- FBI investigating off-duty work by Seattle police at construction sites, parking garages
- 2005: How Seattle cops failed to police their own

The allegations, made by a new startup company, Blucadia, and echoed by some downtown business owners, have renewed longstanding concerns about a murky off-duty employment arrangement controlled by few companies with little oversight.

Alarmed by the developments, temporary Seattle Mayor Tim Burgess moved on Sept. 27 to wrest control of off-duty police work from the private sector and place it under the control of the Police Department. He appointed a task force to provide him specific recommendations by Nov. 14.

For years, much of the off-duty work has gone to Seattle's Finest, owned and operated by Raleigh Evans, a former 20-year Seattle police officer who formed the company in 2002 while still working for the department.

Seattle's Finest has provided officers for some of the city's biggest construction projects, including the Seattle seawall and First Hill streetcar, as well as for Seahawks and Sounders games, according to the company's website.

The other longtime company, Seattle Security, which is affiliated with the Seattle Police Officers' Guild (SPOG), has garnered additional jobs. Guild members also work for Seattle's Finest.

Evans did not respond to numerous requests for an interview. Earlier, he described Seattle's Finest and Seattle Security as "friendly competitors."

Records show Seattle's Finest has been the sole provider of off-duty officers to Seattle City Light and the city's Transportation Department since at least October 2012. No jobs were assigned to Seattle Security, the SPOG spinoff.

City Light spokesman Scott Thomsen said crew chiefs are given a choice to use either company when they need an off-duty officer for traffic control. City policy requires sworn officers to direct traffic around utility work sites, which are often located in the roadway.

Because of the often urgent nature of the need — downed power lines, for example — Seattle City Light is exempt from having to bid for the jobs, according to the city finance department.

Thomsen said the utility does not have a contract with either Seattle's Finest or Seattle Security, and that neither is a "preferred vendor," which requires a screening process.

"There are these two companies, and it's up to each crew chief to decide which company to pick," he said.

He could not explain why crew chiefs called Seattle's Finest for every job requiring an off-duty officer during that time period. City Light finance records show that between October 2012 and Sept. 28 of this year, Seattle's Finest submitted 2,674 invoices to City Light for payments totaling more than $7.8 million.

"There's been a long relationship," Thomsen said. "It looks like they (Seattle's Finest) tend to be the folks called first."

He said Seattle Security has never complained.

Seattle's Finest also provided off-duty officers to Seattle Department of Transportation crews, submitting invoices totaling an additional $445,753 since September 2015, and the city Parks Department, which paid $2,234.

By comparison, the finance department was able to identify a single payment of $236 to Seattle Security in the past two years by an unidentified city department, the records show.

Seattle's Finest and Seattle Security have a long and friendly relationship that has allowed both to operate in the local off-duty market, Guild President Kevin Stuckey, who represents more than 1,300 officers and sergeants, told The Times in an interview last month. Seattle's Finest is listed as a sponsor on the guild's website.

Stuckey couldn't be reached to discuss the City Light work.

In an earlier interview, Evans — the owner/operator of Seattle's Finest — said the companies were "friendly competitors."

When Blucadia emerged as a competitor to Seattle's Finest and Seattle Security last year — ultimately earning the endorsement of the Seattle Police Department — Evans asked a state licensing agency to investigate its credentials.

Earlier this year, Rob McDermott, Blucadia's chief executive officer, complained to Seattle police officials that his startup company was being blackballed by SPOG. He reported receiving a profane and intimidating call from Stuckey when he sought to discuss Blucadia's efforts to use Seattle officers.

Stuckey has acknowledged he lost his temper, saying McDermott relentlessly pursued him for a meeting and had been "condescending and rude." But SPOG has done nothing improper, he said.

In April, Seattle Police Chief Kathleen O'Toole referred Blucadia's allegations to the FBI. Word of the investigation didn't publicly surface until last month.

At that point, McDermott publicly disclosed detailed notes of a street-corner conversation with uniformed off-duty Officer MacGregor "Mac" Gordon, a detective and 32-year department veteran, who described the lucrative off-duty system in organized-crime terms — using the word "mafia" — and said nobody would be allowed to interfere with it. The conversation was witnessed by Drew Finley, a Blucadia co-founder and former Pierce County sheriff's deputy.

Gordon has acknowledged the conversation but said he was joking and that his comments were taken out of context.

McDermott's notes state that Gordon told him that officers would defend "the 'really cake jobs' such as Seattle City Light off-duty work."

"Yeah, we would really break some bones if those were messed with,'" Gordon reportedly said.

"Those jobs are a minimum of four hours, and most are done within an hour and a half," he said.

Evans has previously acknowledged in an interview that Seattle's Finest bills a minimum of four hours regardless of the duration of the work, because it's too difficult to get officers who live outside the city to come into Seattle for less. He declined to provide a minimum amount Seattle's Finest would charge for an officer, saying he didn't want to "tip off the competition."

According to Stuckey, the guild president, the union's contract requires officers be compensated $45 an hour for off-duty traffic-control work.

The Times reviewed a list of the nearly 3,000 City Light invoices, finding just five were for less than $200, and nearly a quarter under $1,000. The average invoice submitted to City Light by Seattle's Finest between 2012 and last month was $2,934.

"We need cops for traffic control," said Thomsen, the City Light spokesman, when asked about the four-hour minimum. "If they've outlined that as a minimum charge, then that's what we have to accept" without a contract in place.

"It is an unusual relationship, and you can certainly ask questions," he said.

Thomsen said he wasn't aware of Blucadia, which originally called itself CopsForHire.

The Olympia company, which describes itself as new model rooted in the gig economy, matches police officers with customers through a software program, much like Uber connects drivers to riders.

Last year, as Blucadia began discussions with the Seattle Police Department about a business relationship, Evans of Seattle's Finest filed his complaint in October 2016 with the state Department of Licensing.

"There is a company in Washington State using the name of 'Cops for Hire,' and selling themselves as a company employing off-duty officers for work within the State," the complaint said.

It alleged that CopsForHire is "not licensed as a private security company, as we are required to be."

The complaint also said CopsForHire shouldn't be allowed to use the word "Cops" in their name, noting Seattle's Finest had previously been barred from using the word "Police" because it might be viewed as a law-enforcement agency.

In a written response to the complaint, CopsForHire said it is not a law-enforcement organization.

"CopsForHire does not, nor will we ever hire or employ law enforcement officers," the company wrote to the Licensing Department, explaining it only serves as a connection for officers and customers.

The "Cops" issue was ultimately resolved when the company changed its name to Blucadia. The company says it did so for business reasons not related to the complaint.

The license issue remains under review, according to a Licensing Department spokeswoman, including a subpoena issued to Blucadia in March.

McDermott, the Blucadia CEO, declined to characterize Evans' actions. "I viewed his complaint as something he felt he needed to do, but I have really no way of interpreting or knowing what Raleigh's intentions were in doing so," McDermott said in an email.

Seattle police chose Blucadia as its preferred provider for off-duty work, giving the company a portal on the department's web page earlier this year.

Brian Maxey, the department's chief operating officer, endorsed Blucadia's system as simpler and more transparent.

The portal has been removed while the task force created by Burgess considers recommendations, although Blucadia may still sign up officers on its own.

# LINKED
# "DETAILED NOTES"

Also available directly at:
https://www.documentcloud.org/documents/4057339-SPD-Off-Duty-Notes.html



RE:            **Notes from SPD Officer Mac Gordon**

Prepared by:   **Drew Finley and Rob McDermott (both present in conversation)**

Date:          **Conversation Date – April 4, 2017**

**CONFIDENTIAL**

---

- After a meeting with Seattle PD leadership we noticed an SPD officer directing traffic from the Columbia Tower underground parking garage and approached him to introduce ourselves at approximately 4:00 PM on April 4th 2017.

- We decided to speak with the officer in the hopes of gaining additional market insight about off-duty opportunities and how SPD manages them. We approached him and introduced ourselves, immediately disclosing that we were from CopsForHire, that Drew was the founder and Rob the CEO.

- He introduced himself as Officer Mac Gordon. He indicated he has been on the force for 32 years and working off-duty 31 years of that time.

- He was very polite and respectful. He said he had heard of our company, CopsForHire as recently as the previous Guild meeting.

- Without prompting, he continued to talk about our business model of managing off-duty services through the "Eighth Floor" (while pointing at the HQ building just up the block) and instantly stated "that was your first mistake". We asked why he said that – Officer Gordon's reply was that he doesn't "give a F\*\*K" what they think about how off-duty is managed in this city. He's been here for thirty plus years and the 8th Floor has no idea how things are done.

- He then said, with an attempt at humor and arrogance; "F\*\*k the 8th Floor, F\*\*k anyone they talk to, and F\*\*k anything they tell us to do!"  He went on to say, "Starting with them is where you all screwed up from the beginning, but really you didn't understand the first thing about off-duty in Seattle", he went on to tell us that our approach made us laughable within SPOG.

- Around this point, Drew mentioned that he was a retired Pierce County deputy and had also worked about three years with King County Sheriff's Department.  Drew talked about the many hours he had worked off-duty in Pierce County, and why we built our online solution the way we did.

- He then offered, "Yeah, we spoke about your company at a recent Guild meeting and the word was, working as a 1099-MISC was a really bad choice, and possibly illegal. Plus, we had no protection for insurance - it was not available and the officers were not protected if injured."  In short, it was a strong "don't get caught up with these guys" message from the Guild.

- We then attempted to explain this was misinformation, and that we've worked hard to develop solutions that protect Cops, including a $500,000.00 liability policy that included litigation coverage as well as our supplemental accident insurance, both at no cost to Cops or Departments.

*All Information Confidential and Proprietary to CopsForHire, Inc.*

CopsForHire
113 Thurston Ave NE Olympia, WA 98501
www.copsforhire.com



- Officer Gordon appeared to appreciate this information, allowing us to further explain other areas where he and others were apparently misinformed.  We discussed how our Marketplace was fully automated. We were also very clear with him that we were not a staffing company, rather a technology company; hence the W-2 issues did not apply to us. Finally, we shared with him that we only work with commissioned officers and that no retired Cops are a part of the CopsForHire marketplace.

- Rob then asked if Andrew could provide Officer Gordon with further details about CopsForHire, specifically addressing misinformation that we know have been stated about us and shared with SPOG members directly. Rob asked if he would read that information and provide his feedback and comments. Officer Gordon agreed and it was at this point that he offered his business card and suggested that we could e-mail him directly with anything we wish for him to review and comment on. *(email correspondence for reference attached)*

- At this point, Officer Gordon relaxed quite a bit, and surprised us with about 30 additional minutes of non-stop, highly detailed discussion of how off-duty "really works in Seattle".  He was adamant that off-duty was not a topic that was going to be controlled or changed by anyone. He referenced a lawsuit involving Seattle's Finest that "took care of that" a few years back. He went on to name the owner of Seattle's Finest by saying it was initiated by Raleigh Evans to defend their ability work off-duty on their own terms.

- He went further to explain that most large underground parking garages in the city have officers working them.  He said that most cops are paid around $300 a month to "manage the garages before they even work one hour of off-duty". His quoted $300/month fee is a fee for simply managing the location.  He described that the Manager usually has about 5 or 6 cops working under them, and that the Manager's responsibility is to make sure that every shift is covered. According to Officer Gordon, as Managers, some Cops earn $1,200-$1,500 per month without working a single shift. He indicated that he only runs two locations himself, so he is only making $600 a month in fees.

- He then embarked on a lengthy description of the underlying infrastructure of off-duty in Seattle. He said that he, and the guys that "manage the work" for off-duty are like "the Mafia," a term he used at least 5 times during the subsequent conversation. He said that those customers that need their work know this is the way it's done and everyone knows to not mess with them, or else "all hell breaks loose." He said to us, "it's been this way for 50 years, and it's not going to be changed by CopsForHire or the 8th floor that's for sure!"

- He stated that the Guild's primary interest was in the protection of the above-mentioned "management fees".  At this point, he laughed and commented "the 8th floor has no idea how all this really works".  He went further to clarify that Raleigh at Seattle's Finest understands these relationships, and works with the existing structure to make sure that "managers" get their fees, and helps them run the hours if they want his insurance coverage and to be W-2 employees. The job Officer Gordon was working at the time of our discussion was an example of this arrangement - he said he makes $300 a month for managing the job (one of 2 he manages), but at this point he revealed that the work still goes through Seattle's Finest.  He said he has 5 guys he schedules.  Most "managers" work with 5 to 6 guys in their group.

*All Information Confidential and Proprietary to CopsForHire, Inc.*

CopsForHire
113 Thurston Ave NE Olympia, WA 98501
www.copsforhire.com



- Officer Gordon went further to explain that he earns $100/hr. for the Columbia Tower garage job every day he works the actual shifts at this location. Rob pushed back on the rate of $100 per hour, expressing to him that it seemed high for Seattle off-duty, he explained that it is actually $60/hr. for 4 hours, but he works only 2 of them, gets paid for 4 hours, and he takes $50 dollars x 4 hours billed for his 2 hours actually worked. Raleigh takes the remaining $10 dollars x 4 hours billed for running the work through his business.  So in conclusion, he works 2 hours and takes pay for 4, and has 5 other guys that he splits the hours with weekly.  In addition to this overcharged "hourly" rate, Officer Gordon also receives the management fee for this and one other location.

- We then asked about the customer's thoughts on paying for 4 hours and only having him there for 2 hours, he again laughed and said, "too bad for them, they know how it works, they don't need someone for 4 hours, I'm not standing around that long, and they pay the 4-hour minimum, that's how it works in this town"

- In reaction to Rob's comment that we were confident that the staffing companies were not going to be fans of CopsForHire. Officer Gordon explained that it was this group of "Managers" that "have a lot to lose" if CopsForHire becomes the primary method of running off-duty in Seattle. He went on to tell us that we've likely had no clue that they have really been the ones blocking us from making any progress within SPOG, not Raleigh at Seattle's Finest or anyone else.

- He continued using terms such as "mini mafia", "breaking legs", and repeatedly saying "F the 8th Floor" while describing what would happen if anyone would dare try to mess with their off-duty jobs.  Officer Gordon went on to describe "really cake jobs" such as Seattle City Light off-duty work. He restated twice how these jobs were viewed. "Yeah, we would really break some bones if those were messed with, those jobs are a minimum of four hours, and most are done within an hour and a half. When the hole is filled back in we take off but get paid for the full 4 hours."  He shared the rates on these City jobs are $90 an hour and $180 after hours and weekends and then re-emphasized that "No one is going to F**k with these jobs if they know what's good for them!"

- Referring to City Light and other City jobs he stressed again that it was the staffing companies like Seattle's Finest and SSI that did a great job of "training [those customers] that we are going to get paid a minimum, we are going to get paid more after hours and on weekends and holidays, so no one is going to mess with those jobs, or they are going to end up with broken knee caps."

- In response to a repeated concern over the hourly rates he was quoting, Officer Gordon then offered that he was "squeezing" the building owners for more money. He explained that whenever they wanted a pay raise, he would bypass the parking garage companies and go straight to the building managers. If they refused to pay more, he would threaten to leave and ensure no other cops would work the job. Officer Gordon said that within a day or two with no cop, the building manager would be calling back asking him to please return, quickly agreeing to any new rate.  He indicated that getting to $90 per hour, before the current rate of $100, that this is exactly how it was done in a very matter of fact and arrogant tone.

---

*All Information Confidential and Proprietary to CopsForHire, Inc.*

CopsForHire
113 Thurston Ave NE Olympia, WA 98501
www.copsforhire.com



- Officer Gordon went on to explain that this "squeezing" was so effective because it only takes one or two calls from building tenets waiting an hour or longer to exit a building to make a building manager cave to his demands. He went further to stress that although payment often comes from the parking companies that manage the garages, they never deal with those companies – leveraging with the building manager is so much more effective, since they need things to run smooth.

**Conclusion:**

The above notes capture a conversation that occurred when we happened upon a 32-year veteran of Seattle Police Department. He bragged about how neither we, nor anyone else were going to "f**k with fifty plus years of culture" in Seattle. He talked openly and freely – for about 45 minutes - with absolutely no fear and no belief that the current lack of oversight and transparency in off-duty would ever change.

Andrew Finley, as an 18-year law enforcement veteran, is experienced in and recognizes "cop talk" when he hears it. He can fully appreciate how some stories can be told in a colorful way to emphasize a point.

Officer Gordon's statements, however, both support and add important context to customer comments we've received regarding exploitative behaviors by both off-duty staffing agencies and Seattle Police. They reflect extortionist behavior and violate SPD policies on several levels. The behavior Officer Gordon described is considered "profiting from your position". Andrew, during his career, would expect to have been fired and/or prosecuted for such behavior. Andrew was never permitted to accept as much as a cup of coffee without the threat of being fired for abusing his position.

As disturbing as the implications of this conversation were, it did provide us with some much-needed insight. We now more fully understand the source of the resistance and pushback to Seattle Leadership's efforts to bring oversight, fairness and transparency to off-duty – even in the form of misinformation - from SPOG. Seattle's off-duty is not merely suffering from lack of oversight, transparency and policy enforcement, it is a disturbing source of corruption.

Seattle Police Department may not realize the extent of corruption within Seattle's rank and file with regards to off-duty work.  Ultimately, this story will become exposed, become public and fuel even more community distrust and disrespect for law enforcement. Meanwhile, customers do not deserve this treatment at the hands of those sworn to serve and protect.

The whole of law enforcement suffers from the behavior of a few. Communities, customers, departments and cops themselves all lose. Seattle Police Department must demand immediate transparency and move to fully enforce policies that are in both their own best interests as well as the interests of communities they serve.

**- Rob McDermott and Andrew Finley**

*All Information Confidential and Proprietary to CopsForHire, Inc.*

CopsForHire
113 Thurston Ave NE Olympia, WA 98501
www.copsforhire.com