THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) Case No. 2:12-cv-01282-JLR |
| | ) |
| v. | ) **CITY OF SEATTLE'S APRIL 2019** |
| | ) **QUARTERLY REPORT** |
| CITY OF SEATTLE, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**CITY'S APRIL 2019 QUARTERLY REPORT**- 1
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 3

II.   BACKGROUND ................................................................................................. 5

III.  THE CITY HAS REACHED COLLECTIVE BARGAINING AGREEMENTS with BOTH SPD UNIONS THAT ADVANCE KEY ACCOUNTABILITY REFORMS AND BUILD UPON THE PROGRESS THAT THE CITY HAS ACHIEVED UNDER THE CONSENT DECREE... 5

IV.   The CITY IS WORKING TO REVITALIZE THE COMMUNITY POLICE COMMISSION BY NOMINATING NEW COMMISSIONERS WHO WILL BRING A RENEWED COMMITMENT TO BUILDING STRONG RELATIONSHIPS BETWEEN SPD AND THE COMMUNITIES IT SERVES .............................................................. 8

V.    ENGAGING WITH THE CITY'S DIVERSE COMMUNITIES CONTINUES TO BE OF THE UTMOST PRIORITY FOR SPD ................................................................... 9

VI.   SPD WORKED WITH DOJ AND THE MONITOR TO DEVELOP PROPOSED POLICY REVISIONS THAT REPRESENT IMPORTANT, CONTINUED PROGRESS ........................ 14

VII.  SPD CONTINUES TO BE A LEADER AMONG POLICE DEPARTMENTS NATIONWIDE WITH REGARD TO DATA ANALYTICS ...................................................... 18

VIII. THE OFFICE OF POLICE ACCOUNTABILITY AND THE FORCE REVIEW BOARD AND UNIT CONTINUE TO ENSURE THAT POLICY VIOLATIONS ARE IDENTIFIED AND ADDRESSED .................................................................. 20

IX.   FIRST QUARTER DATA ON USE OF FORCE AND CRISIS INTERVENTION IS CONSISTENT WITH PREVIOUS QUARTERS, EXCEPT FOR A DECREASE IN TYPE I FORCE .................................................................................................... 23

X.    SPD HAS TIMELY AND SUCCESSFULLY COMPLETED ALL FIVE SCHEDULED AUDITS ................................................................................................... 28

XI.   CONCLUSION ................................................................................................. 31

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

1

## I.      INTRODUCTION

2      The Consent Decree between the City and the U.S. Department of Justice imposes

3  extensive policy, operational, and training requirements on the Seattle Police Department (SPD).

4  Since 2012, SPD has implemented comprehensive reforms affecting nearly every aspect of its

5  operations. Through the reform process, SPD's culture, policies, data-driven decision-making, and

6  accountability framework have been transformed.

7      SPD's recent accomplishments demonstrate that these important reforms have taken root and

8  will endure. Most fundamentally, the recent collective bargaining agreement (CBA) reached

9  between the City and the Seattle Police Officers Guild (SPOG) will effectuate key accountability

10  reforms that the community and City Council sought to achieve through the Accountability

11  Ordinance. As highlighted in the City's previous filings, the Office of the Inspector General for

12  Public Safety (OIG) can now exercise its authorities under the Accountability Ordinance.  In

13  addition, key provisions of the Ordinance that are intended to make the Office of Police

14  Accountability (OPA) function more efficiently and effectively now can be implemented as well,

15  such as civilianizing investigators and lengthening and clarifying the limitations period for

16  discipline. Critically, the negotiations also secured the withdrawal of SPOG's legal challenge to

17  body-worn video policy—as a result, if an officer is in uniform, then the officer must wear video.

18  As this Court has emphasized, "any number of legislative options might fit within the parameters of

19  the Consent Decree." Court's Jan. 6, 2017 Order at 4 (Dkt 357). The City has adopted a robust

20  accountability framework through the Ordinance and the CBA, which was negotiated and signed

21  by the Mayor and approved by the Council.

22      Other updates contained in this report further demonstrate that SPD is not only meeting, but

23  exceeding, its legal requirements and has earned a stellar reputation as a leader among police

**CITY'S APRIL 2019 QUARTERLY REPORT**- 3
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

departments nationwide. Due to new techniques in hiring and recruitment, SPD's officers now reflect the communities it serves. Collectively, the officers hired in 2018 are more racially diverse than the population of Seattle, reflecting both a cultural and demographic shift in the Department. SPD also continues to advance progress through its policies; SPD regularly updates its policies to ensure that they continue to incorporate national best practices and constitutional principles. Proposed revisions to its Bias-Free Policing, Employee Conduct, and Crisis Intervention policies are presented to the Court concurrently with this filing. Finally, two recent audits that are filed with this report demonstrate continued compliance with the Consent Decree requirements as to Stops and Detentions and SPD's Early Intervention System and, moreover, provide evidence that SPD continues to deliver constitutional policing. One of the ways SPD does this is by providing officers with a robust program of counseling and mentoring through its Early Intervention System.

**CITY'S APRIL 2019 QUARTERLY REPORT** - 4
(12-CV-01282-JLR)

## II.     BACKGROUND

During Phase II, the City must maintain compliance with the Consent Decree for two years. The City must also demonstrate the ability to identify and address any obstacles to further reform. To these ends, the Court-approved Sustainment Plan (Dkt. 444-1) provides that the City will conduct self-assessments, or audits,[1] to verify whether it is continuing to comply with the Consent Decree. The Sustainment Plan sets out more than two hundred deadlines detailing when the City must complete each step of each assessment through January 2020, as well as setting out requirements for SPD's policy revisions and "outcome" reports on data related to core Consent Decree areas. Since the Court approved the Sustainment Plan on March 13, 2018, SPD has timely met all of the milestones set forth in the plan.

The Sustainment Plan also includes a commitment to file quarterly reports updating the Court on the City's progress. The Sustainment Plan requires the City to include updates on labor relations in each quarterly report.  This is the fourth quarterly report.

## III.    THE CITY HAS REACHED COLLECTIVE BARGAINING AGREEMENTS WITH BOTH SPD UNIONS THAT ADVANCE KEY ACCOUNTABILITY REFORMS AND BUILD UPON THE PROGRESS THAT THE CITY HAS ACHIEVED UNDER THE CONSENT DECREE

After negotiating for several years, the City has reached collective bargaining agreements (CBAs) with the Seattle Police Management Association, in November 2017, and the Seattle Police Officers Guild, in November 2018. Dkts. 425 & 512. The Court ordered briefing on these

---

[1] The audits required by the Sustainment Plan are not audits in a formal sense, because they do not follow auditing guidelines nor are they conducted by an outside body. Rather, in keeping with the two phases set out in the Consent Decree, the parties and the Monitor agreed that these reports would be comprised of assessments conducted by SPD in order to demonstrate SPD's ability to engage in critical self-analysis and to identify and address any obstacles to further progress that may arise. One exception is that the parties and the Monitor agreed that the Office of the Inspector General will conduct the audit of SPD's Force Review Board.

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

agreements and the potential implications, if any, for the City's compliance with the Consent

Decree, and that briefing was completed on March 6, 2019. Dkts. 504, 507, 543. The Court has set

a status conference for May 15, 2019, to discuss these issues.

The CBA Achieved Key Accountability Reforms

Officer discipline is improved, through the clarification and, in some circumstances, the

extension of the 180-day clock for OPA to investigate allegations of police misconduct, including

bias complaints and serious use-of-force investigations. The CBA also provides that two sworn

investigators in OPA and a sworn sergeant in SPD human resources can be replaced by civilians;

The CBA also implements the accountability framework envisioned by the City's

democratic leaders, by guaranteeing OIG full and unfettered access to all SPD operations. It

implements SPD's body-worn video policy BWV and the great majority of the Accountability

Ordinance provisions (and the Guild must withdraw its unfair labor practices complaints as to

each).

The SPOG CBA also eliminates the DRB and replaces it with an updated method for

selecting an arbitrator, which the City anticipates will lead to faster processing of appeals.

The CBA Retained Both Arbitration and the Public Safety Civil Service Commission
(PSCSC) for Disciplinary Appeals

Although the CBA eliminates the DRB, it does retain arbitration as an alternative to the

PSCSC for disciplinary appeals. Binding arbitration has significant advantages. As an initial

matter, it is a relatively fast, inexpensive method of resolving labor disputes. Arbitration is an

integral part of labor law. *See*, *e.g. United Steelworkers of Am. v. Enter. Wheel & Car*, 363 U.S.

593, 596 (1960). ("[T]he arbitrators under these collective agreements are indispensable agencies

in a continuous collective bargaining process."). Because public safety employees are prohibited

**CITY'S APRIL 2019 QUARTERLY REPORT**- 6
(12-CV-01282-JLR)

1    from striking, arbitration is considered especially critical in this setting. *See* Elkouri & Elkouri,

2    *How Arbitration Works*, Ch. 22.4 (8th ed) (Dkt. 512-8, Exhibit H).

3          Moreover, arbitration of discipline and other disputes is a widespread method for resolving

4    disagreements for public employees. In Seattle, for example, under all twenty-eight of the CBAs

5    to which the City is a party, employees have the ability to challenge discipline through arbitration.

6    This includes firefighters, utility workers, carpenters, court marshals, IT professionals, parking

7    enforcement, and every other City employee under a CBA. The City is not aware of any CBA for

8    public safety employees in Washington state that does not allow for arbitration of major

9    disciplinary decisions.

10          There is no basis in fact or law to conclude that restricting disciplinary appeals to the Public
      Safety Civil Service Commission (PSCSC) would improve accountability.

11

12          While some have argued to this Court that the Public Safety Civil Service Commission is

13    preferable to arbitration for purposes of accountability, there is no basis in fact or law for that

14    argument. First, in any system that affords due process there will be instances when disciplinary

15    decisions are overturned. Second, history refutes the assertion that a civil service commission will

16    overturn fewer cases than arbitrators is unsupported.

17          The PSCSC does not have a better track record than arbitration of upholding the Chief of

18    Police's disciplinary decisions. In fact, the PSCSC has reversed SPD's disciplinary terminations

19    three times and sustained four times.[2] Those numbers are comparable to arbitration; if anything,

20    over the long run, SPD has fared slightly better in arbitrations.

21

22          [2] These results are publicly available at https://www.seattle.gov/public-safety-civil-service-
      commission/findings.

23

**CITY'S APRIL 2019 QUARTERLY REPORT**- 7
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

1    The Accountability Ordinance did not mandate that the PSCSC provide any greater

2  deference to the Chief's disciplinary decisions than that shown by arbitrators.[3] The Ordinance

3  provides that the decision of the Chief will be affirmed "unless the Commission specifically finds

4  that the disciplinary decision was not in good faith for cause," which is identical to the existing

5  PSCSC standard. *Compare* AO § 4.08.105(A)(3), *with* SMC § 4.08.100(A). The PSCSC's "good

6  faith for cause" standard is comparable to the "just cause" standard used by arbitrators. *See City of*

7  *Seattle v. City of Seattle*, 230 P.3d 640, 645-46 (Ct. App. Wash. 2010).

8  **IV.    THE COMMUNITY POLICE COMMISSION'S ROLE IS MORE CRITICAL**
        **THAN EVER TO ACCOUNTABILITY AND ITS MISSION REMAINS ONE OF**
9        **THE FUNDAMENTAL PILLARS OF REFORM**

10    As set forth in the Memorandum of Understanding, the Community Police Commission

11  (CPC) is integral to community oversight, accountability, and promoting greater transparency and

12  public understanding of the Seattle Police Department. One of its central missions is community

13  outreach and engagement in order to educate and build public trust between SPD and the

14  communities it serves. As an ambassador to, and voice of, Seattle's communities, the Commission

15  must be a reflection of Seattle in terms of key demographics, geography, and other key

16  characteristics of the communities served.

17    On May 1, eight new members will join the Commission and more appointments are

18  expected. The new Commissioners represent a diverse cross-section of Seattle and bring new

19  energy to the Commission at this critical time in the Sustainment Period. Given that one-third of

20  the Commission will be new members, it also provides a fresh opportunity for the City to re-

21  evaluate and re-focus the Commission on its mission of engaging with communities and

22

23    [3] In fact, this interpretation of the Ordinance would bring it into conflict with the state law
    that gives the PSCSC authority to modify disciplinary decisions. *See* RCW 41.12.090.

**CITY'S APRIL 2019 QUARTERLY REPORT**- 8
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

facilitating community oversight of SPD. The City hopes the composition of the new Commissioners will bring a spirit of cooperation and collaboration with SPD and the other "Accountability Partners"—the Office of Police Accountability and Office of the Inspector General. In so doing, the City plans to convene the Accountability partners around a visioning and strategy retreat that strategically maps out the work for present and beyond the sustainment period. The City believes the CPC's role is critical now and that it will be even more so after the Sustainment Period ends. The City will redouble its efforts to support and partner with CPC and the other Accountability partners to make the Commission even more relevant and impactful to building public trust and confidence.

## V.   ENGAGING WITH THE CITY'S DIVERSE COMMUNITIES CONTINUES TO BE OF THE UTMOST PRIORITY FOR SPD

<u>Diversity Hiring Numbers for 2018</u>

When considering disparities in terms of how police contacts affect the City's diverse communities, the role of recruiting and retaining a diverse police force that reflects the composition of the community must be emphasized. Significant changes in recruitment and hiring implemented by the Department have produced results. *Thus, SPD's 2017 and 2018 hiring were more diverse than Seattle as a whole.* The percentage of new hires who are people of color in recent years is as follows:

| | |
|---|---|
| **2014:** | **22%** |
| **2015:** | **30%** |
| **2016:** | **30%** |
| **2017:** | **35%** |
| **2018:** | **36%** |

Throughout 2018 and into the present, the Department has remained focused on sustainment of earlier improvements and implemented additional outreach strategies. For example,

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

among other changes, SPD developed a "recruiting cadre" of department officers who are trained and serve as recruiting liaisons in their precincts and in the community, allowing for wider reach and more direct connections, and it increased the quality and quantity of outreach engagement at local events.

<u>Training to Address Implicit Bias and the History of Racism</u>

SPD is a leader in innovative, socially conscious training, and SPD's training section continues to evolve its curriculum with the goal of building trust between its officers and the community.

In 2019, for the first time, all sworn officers will be required to complete courses in African American history and the history of Seattle's Central District. SPD has worked with the Northwest African American Museum to develop this training, which will include, among other topics, a guided tour of the museum's galleries and a facilitated discussion regarding cultural diversity and the importance of culturally relevant policing.

In addition, SPD is working in partnership with the Washington State Criminal Justice Training Commission to provide officers with high quality training on implicit racial bias. For the first time in 2019 the Department has mandated that all sworn officers complete an eight-hour[4] class on implicit racial bias that is offered by the Washington State Criminal Justice Training Commission. The training is given by Dr. Bryant Marks, a Professor of Psychology at Morehouse College and a nationally recognized training expert on diversity and implicit bias.

---

[4] This training replaces the four-hour course on implicit racial bias that officers were previously required to take. *See generally* Monitor's Mem. Re Bias-Free Policing Training (Dkt. 176).

**CITY'S APRIL 2019 QUARTERLY REPORT**- 10
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

These new training requirements are in addition to the trainings that SPD continues to provide in conjunction with the Seattle Holocaust Center. This course focuses on interactions between law enforcement and minority communities and cultural sensitivity.

<u>Creation of a New Collaborative Policing Bureau</u>

SPD recently created a new Collaborative Policing Bureau. As law enforcement, nationwide, has increasingly been called upon to assume a leadership role at the intersection of public health and public safety, SPD recognized the opportunity to provide more coordinated services by centralizing the Department's many community-based initiatives within one bureau. The Collaborative Policing Bureau is overseen by an Assistant Chief, highlighting the importance of its mission. The Bureau brings together the Navigation Team/Homeless Outreach, the Crisis Response Section, and the Community Outreach Section, and serves a vital role in enhancing collaboration between SPD and the many social service agencies that provide both on-the-ground assistance and on-going care for many of Seattle's most vulnerable citizens.

Officers throughout the Department continue to embrace their important role in the community, as reflected in the continuing high rate of advance crisis intervention training among patrol and in SPD's micro-community policing plan priorities. The Collaborative Policing Bureau builds on these accomplishments and reflects the Department's commitment to focused attention on sustaining community relationships, open communication, and building trust as the City works, collectively to address the crises around homelessness, substance use disorder, and mental health concerns. SPD's commitment in this area demonstrates yet further action to ensure the Department keeps pace with society's rapidly evolving expectations for police officers.

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

SPD's Disparity Review

Concurrently with this quarterly report, the City submits SPD's Disparity Review. This Disparity Review is undertaken to carry out the Seattle Police Department's commitment to eliminate unwarranted racial disparities in police contacts. This report identified disparities in the use of force, investigative stops, and frisks. These activities are particularly important areas in which to study and address unwarranted racial disparity. If an officer uses unreasonable or unnecessary force against a member of the community, it violates the person's civil rights and dignity. Investigative stops and frisks are critical in light of concerns previously raised in the U.S. Department of Justice's 2011 investigation and more recent findings by the Monitor.

SPD recognizes that it alone cannot explain or address the many factors that underlie the tremendous disparities that pervade not only the criminal justice system but distributions in income, education, health, and housing throughout this country. SPD's goal for this study is to identify if there are unwarranted racial disparities that result from the Department's own practices which can be addressed by policy changes. This report contains initial results, with a follow-on study due to the Court on December 31, 2019. As detailed in policy, SPD's efforts to identify and eliminate unwarranted racial disparities will continue beyond the Consent Decree.

SPD's Bias-Free Policing Policy Affirms These Commitments

As part of its reform efforts under the Consent Decree, SPD worked with the court-appointed monitor, the U.S. Department of Justice, and the Community Police Commission to adopt a strong policy on bias-free policing[5] that goes beyond the requirements of the Consent

---

[5] Available at https://www.seattle.gov/police-manual/title-5---employee-conduct/5140---bias-free-policing. Importantly, under the Bias-Free Policing Policy any officer who hears a complaint related to biased policing is required to call a supervisor to respond to the scene in person.

**CITY'S APRIL 2019 QUARTERLY REPORT**- 12
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

Decree. On June 11, 2015, the Court approved this policy (Dkt. 205), which defines "bias-based policing" as "the different treatment of any person by officers motivated by any characteristic of protected classes under state, federal, and local laws as well as other discernible personal characteristics of an individual." The policy reinforces the Department's values of providing services and enforcing the laws in a professional, nondiscriminatory, fair, and equitable manner and expresses the Department's commitment to study and eliminated unwarranted racial disparities:

> The Seattle Police Department is committed to eliminating policies and practices that have an unwarranted disparate impact on certain protected classes. It is possible that the long-term impacts of historical inequality and institutional bias could result in disproportionate enforcement, even in the absence of intentional bias. The Department's policy is to identify ways to protect public safety and public order without engaging in unwarranted or unnecessary disproportionate enforcement.

> In consultation with the Community Police Commission, and the Office of the Inspector General for Public Safety, the Department shall periodically analyze data which will assist in identification of SPD practices – including stops, citations and arrests – that may have a disparate impact on particular protected classes relative to the general population.

SPD's Bias-Free Policing policy further provides that, "[w]hen unwarranted disparate impacts are identified and verified, the Department will consult with neighborhoods, businesses, community groups, and/or the Community Police Commission, and the Office of the Inspector General for Public Safety, to explore equally effective alternative practices that would result in less disproportionate impact."

---

All such complaints must be documented and investigated. In appropriate cases, bias allegations are forwarded to OPA for review or investigation.

**CITY'S APRIL 2019 QUARTERLY REPORT**- 13
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

As part of its commitment to bias-free policing, SPD is proposing improvements to the process for handling allegations of bias. SPD made revisions intended to ensure the adequacy of bias investigations under circumstances in which the person making the allegation left the scene prior to a supervisor's arrival or declined to speak with the supervisor. The proposed revisions require that an officer who receives a bias complaint must ask the person to (voluntarily) provide contact information before he or she leaves the scene. If the person leaves the scene without talking to a supervisor, then the supervisor must make meaningful attempts to contact them afterward. If the complainant is still unavailable or unresponsive, then the supervisor must review any body-worn video and in-car video of the incident.

## VI. SPD WORKED WITH DOJ AND THE MONITOR TO DEVELOP PROPOSED POLICY REVISIONS THAT REPRESENT IMPORTANT, CONTINUED PROGRESS

The SPD Audit Policy and Research Section (APRS) reviews all Department policies on a three-year cycle. The Consent Decree-mandated policies, which are especially critical, are being reviewed annually. During the last quarter, two of these policy reviews were scheduled and are discussed below. In addition, the Department completed revisions to its Employee Conduct Policy and issued an interim policy directive regarding the use of data analytics by supervisors. The Monitor and DOJ approved all of these changes and were particularly instrumental in the second two.

Interim Directive Regarding Data Analytics Platform

Based on feedback from the Monitor, SPD recently issued a policy directive that establishes new requirements for Captains, Lieutenants, and Sergeants to regularly review the squad and officer performance data available within SPD's data analytics platform (DAP). Through the DAP and other records management systems, SPD is able to accurately collect and

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

track the data required by the Consent Decree. The wealth of data in the DAP on use of force, crisis response, and stops and detentions, is also relevant to risk management and performance management. This sophisticated data management tool allows supervisors to track and analyze data and identify trends for purposes of employee supervision and management. This new directive will encourage direct engagement between supervisors and their direct reports throughout the chain of command. It will also enable lieutenants and captains to view information at the individual officer level more frequently and in more detail.

Proposed Changes to Crisis Intervention Policy

In addition to DOJ the Monitor, and CPC, the Crisis Intervention Committee[6] also reviewed the proposed changes to the Crisis Intervention policy. Only minor revisions to this policy are proposed. A number of very small edits were to make language more clear or precise. A note of clarification is added to 16.110-POL-5, which addresses taking a person into custody based on an order from the person's designated crisis responder (typically a mental health professional). The added language clearly sets out the boundaries of an officer's legal authority in that situation; for example, such an order does not give an officer authority to enter a person's house without consent.

Proposed Changes to Employee Conduct Policy

The proposed revisions to the Employee Conduct Policy, title sections 5.001-003, accomplish two important goals. First, they delineate clear lines of responsibility with respect to serious policy violations, which must be referred to OPA for investigation. Second, they empower

---

[6] As required by the Consent Decree, SPD established the Crisis Intervention Committee, a regional interagency coalition of social service providers, mental health experts, law enforcement and judicial representatives.

**CITY'S APRIL 2019 QUARTERLY REPORT** - 15
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

supervisors to address performance deficiencies through mentoring, counseling, and setting clear expectations.

These changes continue SPD's work to address feedback from the Monitoring Team and other stakeholders that supervisors should have greater responsibility to address minor policy violations. *See e.g.*, *Monitor's Fourth Systemic Assessment* at 5-6. Effective supervisory engagement requires the ability to handle relatively small performance issues quickly and informally, through feedback, instruction, or training. It has the potential to impede on-the-job learning and the supervisor-employee relationship if all performance matters must be submitted through the formal OPA process.

Section 5.002 governs the responsibilities of employees concerning alleged policy violations. Substantial revisions are proposed to this section. To provide greater guidance to supervisors regarding the matters that must be referred to OPA, it defines a new term, "Serious Policy Violation," clarifies the categories of misconduct that qualify as Serious Policy Violations, and mandates that all conduct within these categories must be referred to OPA.  Under the proposed revisions, Serious Policy Violations include: use of force that is not reasonable, necessary, and proportional; violations of constitutional protections; criminal violations; dishonesty; bias-based policing; and failure to cooperate in an internal investigation. The revised version of 5.002 also defines another new term, "Performance Deficiencies," as failures to meet the Department's performance expectations, including any policy violations that are not categorized as Serious Policy Violations. Performance Deficiencies are handled internally by the Chain of Command, rather than being referred to OPA.[7]

---

[7] Repeated policy violations are still referred to OPA, even if the violation is not a Serious Policy Violation. *See* revised 5.002-POL-4.

**CITY'S APRIL 2019 QUARTERLY REPORT**- 16
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

The proposed revisions to 5.002 also create a new screening procedure for "Unsubstantiated Allegation of Serious Misconduct." This process is employed when a supervisor investigates an alleged Serious Violation Policy and determines that the evidence refutes the allegations. For example, there is an allegation of excessive force, and the officer's body-worn video definitely establishes that the officer made no physical contact whatsoever with the complainant. Under current policy, such an allegation would still be referred to OPA for investigation. Under the revised policy, the supervisor will review the incident with a lieutenant or captain, document the incident, and then send it to OPA for screening. OPA will confirm that the complaint is unsubstantiated and then return it to the chain of command, instead of conducting a full investigation. This revision will allow OPA's investigative resources to be better focused. OIG began tracking the new screening procedure in 5.002 for Unsubstantiated Allegations of Serious Misconduct when this procedure was being tested as a pilot program, and OIG will continue to exercise oversight going forward.

The revisions to 5.003 are also significant. The existing version of 5.003, titled "Frontline Investigations," established a process for SPD supervisors to handle minor policy violations (which are redefined as Performance Deficiencies in the proposed version of 5.002) internally, rather than referring all violations to OPA. The new proposed changes maintain this purpose, but clarify the supervisor's role embraces coaching, mentoring, and training—in addition to making appropriate referrals to OPA.

The proposed version of 5.003 is titled Performance Counseling Review. The new policy clarifies the role of supervisors in addressing Performance Deficiencies. It directs supervisors to counsel and mentor employees to address Performance Deficiencies, and identifies specific, non-disciplinary remedial actions that supervisors can take, such as training, direct coaching, and

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

mentoring. In the revised policy, Performance Deficiencies are documented and logged in SPD's management system, BlueTeam, instead of in the Performance Appraisal System (where they are currently recorded). The BlueTeam records will ensure transparency and enable auditing of this new system to ensure that it is used appropriately. For the first six months under the new policy, OPA will monitor all of the Performance Deficiencies being documented. The new process in 5.003 for handling Performance Deficiencies within the chain of command will be routinely audited by OIG to ensure that they are being consistently and appropriately handled.

## VII.  SPD CONTINUES TO BE A LEADER AMONG POLICE DEPARTMENTS NATIONWIDE WITH REGARD TO DATA ANALYTICS

*A. SPD's Data Analytics Platform (DAP)*

As noted in previous reports, SPD procured and implemented a customized data analytics platform (DAP), which extracts data from the Department's records management systems and Computer Aided Dispatch. The DAP integrates data and allows it to be systemically analyzed, contextualized, and displayed. The DAP allows SPD, not only to search data relating to use of force, crisis responses, and Terry stops, but also to analyze the relationships between this information and information that is stored in other databases—such as information on arrests, charges, and 911 calls. The Department's researchers work closely with the operational commanders to address questions relevant to policy and strategy; for example, they use "dashboards" powered by the DAP to monitor real-time trends. SPD also uses DAP for its annual reports to the public to analyze data and present it visually. Significantly, the DAP also enables most of the data and analysis for all of SPD's Consent Decree-related audits and assessments.

Significant enhancements and additions to the DAP, referred to internally as "DAP 1.1," are scheduled to be implemented in June 2019. DAP 1.1 will ensure more detailed documentation of *all* detentions—going far beyond the requirements of the Consent Decree—by incorporating

**CITY'S APRIL 2019 QUARTERLY REPORT**- 18
(12-CV-01282-JLR)

new requirements for officers to record information about community caretaking and booking activities. Another example of an enhancement is that DAP 1.1 will link officers' reports on Terry stops and interactions with people in crisis to a Master Name Index in order to more frequently and accurately identify repeated contacts. Collectively, these upgrades will complement the new capabilities of Mark43 and improve and expand SPD's already advanced data analytics.

   *B. SPD is scheduled to go live with a next-generation records management system on May 7, 2019.*

   It was neither advisable nor feasible for SPD to replace all of its records management systems (RMS) at the same time that it rolled out a program as complex as the DAP, which was first implemented in mid-2017 and to which SPD has continued to add new capabilities throughout 2018. Accordingly, SPD planned for its new, highly customized RMS, called Mark43, to be implemented in 2019. With Mark43, the DAP will be able to draw a wider range of data more quickly and with a greatly reduced requirements for time-consuming quality control efforts (i.e., "data governance"). Currently, the DAP pulls data from SPD's various legacy RMS. In addition, many of the reports that officers make about their policing activities must be filled out in a separate template and then attached or uploaded, rather than input directly into the legacy RMS. Mark 43 will replace these legacy systems with a single, user-friendly system into which officers can type their reports directly. In addition, Mark43 is more user friendly and it contains significant quality control improvements, such as error alerts and protocols that do not allow incomplete reports to be submitted. Examples of the benefits that Mark43 will deliver include:

- Reportable incidents—such as a use of force, Terry stop, or crisis contact—can no longer be submitted by an officer without completing the disposition field, eliminating the small number of incidents for which disposition (i.e., the ultimate outcome, such as an arrest) cannot be immediately retrieved.

- Officer's documentation of Terry stops and crisis contacts will be seamlessly linked to the records of the corresponding Computer Aided Dispatch event and General Offense Report.

**CITY'S APRIL 2019 QUARTERLY REPORT**- 19
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

In the future, once Mark43 has been running smoothly for several months, officers' use of force reports will also be input directly into Mark43 and linked to other materials in the same manner.

As with any other major software change or upgrade it is expected that some bugs will need to be worked out in the initial weeks. However, in short order, Mark43 is expected to improve the speed, accuracy, and thoroughness with which data about SPD's policing activities can be searched and retrieved.

## VIII.   THE OFFICE OF POLICE ACCOUNTABILITY AND THE FORCE REVIEW BOARD AND UNIT CONTINUE TO ENSURE THAT POLICY VIOLATIONS ARE IDENTIFIED AND ADDRESSED

SPD Force Review Board (FRB) and Force Review Unit (FRU)

The FRB and FRU review all uses of force to determine if they were compliant with SPD's Use of Force Policy. A brief summary of internal review is provided here, while the complete procedures are specified in Title 8 of the SPD Manual. After using Type I force, an officer must screen the incident with a sergeant and complete a use of force report. The sergeant investigates the incident and then elevates the review up the chain of command. Type II uses of force are reviewed in depth first by an administrative lieutenant, through the chain of command to the section captain, and then by the Force Review Unit (described below). Type III uses of force are investigated by a specially trained unit called the Force Investigation Team. The Force Review Board (described below) provides an additional layer of review for all Type III uses of force, to include officer-involved shootings, and the most serious Type II uses of force.

FRB is "the Department's hub of internal accountability, analysis, and continual improvement with respect to force." *Monitor's Second Systemic Assessment*, Dkt. 247 at 4.The FRB is a select group of SPD personnel who are specially trained to investigate officer uses of force which meets regularly to make determinations as to (1) whether a use-of-force investigation is thorough and complete; (2)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

whether the force was compliant with SPD policy, and consistent with training, and core principles; and (3) whether any broader, systemic issues need to be addressed with respect to policy, tactics, equipment, or otherwise. FRB reviews not just the force itself, but examines all tactics and decision-making starting from the beginning of the incident, including all events that led up to the use of force, and all those that followed the use of force.

By policy, the FRB reviews all cases in which Type III force is used, including all officer involved shootings. The FRU, comprised of a captain, a lieutenant, a sergeant, and two detectives, reviews all Type II uses of force. When certain factors are present in a Type II case—such as the use of less-lethal tools or use of a canine—the FRU places it on the calendar to be reviewed by the FRB. In the first quarter of 2019, the FRB and FRU reviewed 39 cases.

**Number of Cases Reviewed By Quarter:**

| Quarter | FRB | FRU |
|---------|-----|-----|
| Q1 (1/1/18-3/31-18) | 41 | 9 |
| Q2 (4/1/18 – 6/30/18) | 41 | 10 |
| Q3 (7/1/28-9/30/18 | 45 | 5 |
| Q4 (10/01/18-12/31/18) | 59 | 20 |
| Q1 (1/1/19-3/31/19) | 28 | 11 |

A total of 105 officers were involved in the 39 cases reviewed by FRU and FRB this quarter. The numbers below represent the number of officers involved across the cases, aggregated, and the determination by FRB and FRU as to whether each officer's actions were approved as consistent with policy and training.

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

**Q1 2019 Most Serious Type of Force Used in Each Case**

| Type I | 0 |
|---|---|
| Type II | 36 |
| Type III | 3 |
| Officer Involved Shooting | 0 |
| In-Custody Death | 0 |
| Total | 39 |

**Q1 2019 Force Review Findings by Officer:**

| Approved | 84 |
|---|---|
| Not Approved | 1 |
| Referred to OPA | 9 |
| N/A[8] | 11 |
| Total | 105 |

For 84 of the officers reviewed by the FRB and FRU in the fourth quarter of 2018, the force used was found to be reasonable, necessary, proportional, and in conformance with the Department's Use of Force Policy.  In 9 instances, a matter was referred to OPA, and the FRB/U made no determination, per policy. Of the 9 referrals to OPA, the chain of command generated 6 of them, and 3 referrals were generated directly by the subject of force.

Office of Police Accountability

The Office of Police Accountability (OPA) has authority over allegations of misconduct against SPD employees relating to SPD policy and federal, state, and local law. It investigates and makes recommended findings to the Chief of Police. The organization is led by a civilian director and deputy staff, while its investigations are currently carried out by SPD sergeants. OPA is continuing to civilianize its investigators.

---

[8] In the cases reviewed by FRB/U, 11 officers were involved in tactics and decision making who did not use force. In reviewing the actions of these officers, FRB/U made no findings on the use of force.

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

During the first quarter of 2019, OPA received 203 contacts. Contacts include "external" complaints from members of the community and "internal" referrals from SPD employees (primarily the chain of command). Sixty percent of the contacts in the first quarter were external and 40% were initiated internally or forwarded by SPD. A lack of professionalism was the most frequent misconduct allegation made to OPA, and it comprised 15% of all allegations received. Seventy-four of 203 contacts classified by OPA in Q1 of 2019, or 36%, were classified for investigation. In 11% of the cases in which findings were issued in the first quarter, OPA recommended that at least one allegation be sustained. The Chief of Police did not overturn any OPA recommended findings.

In addition to investigating allegations of misconduct, OPA recommends policy changes to SPD when its investigations indicate that issues with Department policy, rather than actions of individual officers, gave rise to a complaint. Those investigations result in a finding of "Not Sustained – Management Action" and form the basis of OPA's management action recommendations. In the first quarter of 2019, OPA issued nine new management action recommendations.

## IX. FIRST QUARTER DATA ON USE OF FORCE AND CRISIS INTERVENTION IS CONSISTENT WITH PREVIOUS QUARTERS, EXCEPT FOR A DECREASE IN TYPE I FORCE

This section provides data on SPD's use-of-force and crisis intervention practices for the first calendar-year quarter of 2019, which runs from January 1, 2019, to March 31, 2019. The report does not undertake to analyze or contextualize the data for two reasons. First, it would be speculative to infer trends or draw comparisons based on one quarter of cross-sectional data. Second, the Sustainment Plan, approved by the parties and the Court, sets forth a series of annual audits and outcome reports which contain the Department's analyses and conclusions.

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

In addition to the numbers below, comprehensive data on these topics are available to the public through the Department's "dashboards" on its webpage at *https://www.seattle.gov/police/information-and-data/public-data-sets*. The public dashboards can be used to analyze and display data from numerous, disparate sources within SPD through the DAP.

A. *Use of Force*

Three hundred twenty-four uses of force were reported in Q1 2019. Because of the way "use of force" is defined (one officer using force against one subject), a single incident often results in multiple reported uses of force.

In the first quarter of 2019, two hundred forty-four (75%) of the reported applications of force involved no greater than low-level, Type I force.[9] Sixty-seven (21%) involved Type II force and 7 (2%) involved Type III force. There were two officer-involved shootings counted as 6 unique uses of force because six officers discharged their firearm; one incident was fatal. *See* Figure 2.

One notable change is a decrease in Type I force, from 457 in the fourth quarter of 2018 to 244 in the first quarter of 2019. As shown in Figure 1, the number of this quarter is lower than for any quarter of 2018. It is too early to conclude the reason for this decrease. However, as noted previously in SPD's 2018 Use of Force Outcome Report, reported uses of Type I force increased by 43% between 2017 and 2018. Dkt. 524-1 at 6. After a preliminary investigation, SPD concluded that the primary cause of that increase was likely officers' overreporting of discomfort caused by handcuffing. *Id.* Under Court-approved policy revisions that took effect on January 1, 2019, handcuffing discomfort is no longer reportable as force and is tracked separately. Dkt. 471-1 at 43,

---

[9] The types of force are defined in Title 8 of the SPD manual. In brief: Type I is low-level force that may involve transitory pain. Type II force causes or is reasonably expected to cause physical injury greater than transitory pain but less than great or substantial bodily harm. Type III force causes or is reasonably expected to cause great or substantial bodily harm.

**CITY'S APRIL 2019 QUARTERLY REPORT**- 24
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

48; 477. In addition, SPD deployed new handcuffs with beveled edges that are made of lighter-weight aluminum; these handcuffs are equally effective and more comfortable. Dkt. 524-1 at 6. These actions may explain the decrease in reported Type I force.

**Figure 1. Use of Force By Quarter**

|  | 2018 Q1 | 2018 Q2 | 2018 Q3 | 2018 Q4 | 2019 Q1 | **Total** |
|---|---|---|---|---|---|---|
| Type I Force | 395 | 472 | 528 | 457 | 244 | 2,096 |
| Type II Force | 118 | 75 | 98 | 67 | 67 | 425 |
| Type III Force | 6 | 10 | 2 | 4 | 7 | 29 |
| Type III - OIS | 2 |  |  | 1 | 6 | 9 |
| **Total** | 521 | 557 | 628 | 529 | 324 | 2,559 |

**Figure 2. Q1 2019 Types of Force Used:**



CITY'S APRIL 2019 QUARTERLY REPORT- 25
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

In the context of overall encounters with the community, force is used rarely. During the first quarter of 2019, the computer-aided dispatch (CAD) database recorded 96,536 unique events to which officers were either called by a dispatcher or which officers observed or were alerted to while on patrol. Three hundred and one of these events involved one or more reportable applications of force. That means less than one-third of one percent of all events involved any use of force. Seventy-nine (approximately eight one-hundredths of one percent) of the 96,536 unique CAD events ultimately involved a use of force greater than Type I (i.e., Type II or Type III).

The demographic characteristics of subjects of force for the quarter are presented below in Figure 3.

## Figure 3. Q1 2019 Race of Subjects of Force

| Subject Race | % of Total | UoF Count |
|---|---|---|
| White | 45.68% | 148 |
| Not Specified | 24.07% | 78 |
| Black or African American | 21.91% | 71 |
| Asian | 4.01% | 13 |
| Hispanic or Latino | 3.09% | 10 |
| American Indian/Alaska Native | 0.62% | 2 |
| Nat Hawaiian/Oth Pac Islander | 0.62% | 2 |
| **Grand Total** | 100.00% | 324 |

*B. Crisis Intervention and Use of Force*

During the first quarter of 2019, officers reported 2,701 incidents involving a person in crisis. Officers used force in forty-five of those incidents (less than 2%). The breakdown of types of force used in crisis responses is similar to the breakdown for all uses of force, although Type II force is slightly more frequent.

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

1

**Figure 4. Q1 2019 Use of Force in Crisis Events:**



Of all the crisis incidents in the quarter, approximately 16% were resolved by voluntary commitment or by referral to or notification of a community or social service support agency or shelter. The most common disposition was a decision to detain the person for their own safety under the Involuntary Treatment Act (34%). The second most common resolution was "No Action Possible or Necessary," which means the person in crisis had left the scene or did not pose an imminent threat of self-harm or harm to others (19%). *See* Figure 5 below.

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

**Figure 5. Q1 2019 Disposition of Crisis Contacts:**

| Disposition | % of Total |
|---|---|
| Emergent Detention/ITA | 34.17% |
| No Action Possible or Necessary | 19.47% |
| Resources Declined | 14.48% |
| Subject Arrested | 9.51% |
| Chronic Complaint | 8.37% |
| Voluntary Committal | 8.18% |
| Mobile Crisis Team | 6.89% |
| Unable to Contact | 4.11% |
| Mental Health Agency or Case Manager Notified | 2.59% |
| DMHP Referral | 2.15% |
| Drug/Alcohol Treatment Referral | 0.89% |
| Crisis Clinic | 0.85% |
| Shelter Transport | 0.70% |
| Geriatric Regional Assessment Team | 0.15% |

*Note: Percentages total more than 100% because a crisis contact often leads to more than one disposition.*

## X.   SPD HAS TIMELY AND SUCCESSFULLY COMPLETED ALL FIVE SCHEDULED AUDITS

Since March, the parties and the Monitor have collaborated on developing methodologies for the Sustainment Period audits. Starting after the Mayor's appointment of the City's first Inspector General for Public Safety, her office began to contribute to the methodologies as well. In keeping with its deadlines, in previous quarters, the City has filed successfully completed audits with the Court, addressing the Consent Decree's requirements in the areas of supervision; the reporting, review and investigation of force; and crisis intervention and the use of force against people in crisis. Dkts. 497-1 & 497-1, 511. These audits, and the independent verification of DOJ and the Monitoring Team, demonstrate sustainment compliance with the relevant Consent Decree requirements.

During the past quarter, SPD completed two additional audits:

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

<u>Stops and Detentions Audit</u>

This audit evaluated the data on temporary, investigative detentions known as *Terry* stops.[10] Its findings demonstrate that the vast majority of stops and frisks conducted by SPD officers meet constitutional requirements. Detectives from SPD's Audit, Policy, and Research Section (APRS) conducted a review of a random sample of one-third of all contacts reported as *Terry* stops during the period. They determined that, in 93.5% of the stops, the officer's report (called a "Terry template") contained a narrative that documented adequate reasonable suspicion for the stop. Further review was conducted of a small sample of the remaining 6.5% of stops for which the template lacked documentation of adequate reasonable suspicion; in more than half of these stops, adequate reasonable suspicion was documented in the accompanying general offense report. The Monitor and the U.S. Department of Justice each performed an independent validation of these findings and concluded that SPD continues to maintain compliance with the relevant Consent Decree requirements. This audit was submitted to the Court on March 8, 2019. Dkt. 547

<u>Early Intervention System Audit</u>

SPD has also demonstrated sustained compliance with the Consent Decree requirements related to its Early Intervention system (EIS). Paragraph 157 requires SPD to use an EIS for risk management purposes. In keeping with this requirement, SPD adopted and maintains an EIS that is threshold based. The threshold is the number of events and the time period that result in an EIS

---

[10] An investigative stop, or "Terry stop," is a temporary, investigative detention. It occurs when an officer briefly detains a person for the purpose of investigating a crime. A Terry stop falls short of an arrest and does not require probable cause, but it does require that the officer be able to identify specific, objective facts which support a reasonable suspicion that the person committed, is committing, or is about to commit a crime. An officer may conduct a frisk, or pat-down, as part of a stop only if the officer has reasonable suspicion that the subject is armed and dangerous. The legal authority for investigative stops and frisks was explained by the U.S. Supreme Court in *Terry v. Ohio*, 392 U.S. 1 (1968).

**CITY'S APRIL 2019 QUARTERLY REPORT** - 29
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

"alert" for an officer. For example, the threshold for preventable vehicle collisions is 2 collisions within 6 months. When an officer receives an alert, the EIS Coordinator reviews it and then, depending on the circumstances, the officer's supervisor may complete an assessment or develop a mentoring plan for the officer.

The Consent Decree requires SPD to regularly monitor, review, and adjust, where appropriate, the EIS events and thresholds to ensure that it is meeting its objectives. ¶¶ 157-58, 163. As described in the Audit, SPD has continued to fulfill these requirements.

The EIS has been successful at developing supervisory skills and providing effective coaching and mentoring to officers. Each assessment that is completed for an officer who receives an alert requires the officer and his or her supervisor to meet in person to discuss the incidents that caused the alert. These assessments lead to a large volume of active, engaged supervision that otherwise would not have occurred. Approximately 10% of assessments result in an employee being placed on a mentoring plan; these plans require supervisors to problem solve and engage with their employees on an ongoing basis, often over a period of several months. The EIS Coordinator serves as an important resource to new supervisors who seek to develop their skills in performance management and mentoring.

In addition to identifying successes of the EIS, SPD also identified areas for improvement and implemented solutions to address them. In order to evaluate the effectiveness of EIS in achieving its risk management objectives, SPD partnered with a team of researchers at Washington State University to compare overall officer performance across a series of behaviors, between a group of officers who received an EIS alert and a group of officers who did not. SPD also conducted internal focus groups with officers. Ultimately, the Department concluded that its

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

current EIS thresholds caused too many alerts for officers who are more proactive and who are assigned to work in areas with a higher volume of calls for service.

To address this issue, SPD undertook a major effort to reform the EIS program and related policies. This work was undertaken in consultation with the Monitor and DOJ. The policy revisions were approved by the Court and took effect on January 1, 2019. Dkts. 502 & 510.  Notably, the triggers for use of force are adjusted so that they are still based on percentages, but now are also subject to a baseline number of uses of force at or beneath which there will be no alert. For Type I force, the trigger is still the top 1% of officers, with a new baseline of five incidents. Similarly, for Type II the percentage stays at 5%, with a new baseline of three incidents. The adjustments are intended to exclude from review the officers who fall within the top percentages for use of force, but still have used force very rarely (to account for the fact that Department-wide the rate of force used is extremely low).

The Monitor and the U.S. Department of Justice reviewed a sample of SPD's EIS assessments and mentoring plans, interviewed the EIS coordinator, and concluded that SPD continues to maintain compliance in this area. This audit was submitted to the Court on April 15, 2019. Dkt. 550.

## XI.   CONCLUSION

As measured by the parties' agreed-upon benchmarks for evaluating compliance—the audits— SPD's performance is unquestionably strong. The Department has demonstrated continued compliance in all of the areas evaluated thus far. But mere compliance with the Consent Decree is not the benchmark that the City or the Department have set for themselves. Rather, the City is firmly committed to progress and continuous improvement. Since the Court's determination that the City was in full and effective compliance, the City and SPD have continued to make improvements in key areas.

Peter S. Holmes
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

The SPOG CBA achieves key advances in accountability and discipline. SPD continues to make strides in engaging with the diverse communities it serves, with its recent diversity hiring success as one notable example. The parties and the Monitor continue to work collaboratively on revising and improving SPD's policies to ensure that the Consent Decree reforms are both effective and durable. The extensive record before the Court documenting SPD's accomplishments throughout the Sustainment Period demonstrates that the City continues to meet and exceed the requirements of the Consent Decree.

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

DATED this 30th day of April, 2019.


        For the CITY OF SEATTLE


        PETER S. HOLMES
        Seattle City Attorney


        *s/ Kerala T. Cowart*
        Kerala T. Cowart, WSBA #53649
        Assistant City Attorney
        Seattle City Attorney's Office
        701 Fifth Avenue, Suite 2050
        Phone: (206) 733-9001
        Fax: (206) 684-8284
        Email: kerala.cowart@seattle.gov

**CITY'S APRIL 2019 QUARTERLY REPORT**- 33
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

**CERTIFICATE OF SERVICE**

I hereby certify that on April 30, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

| | |
|---|---|
| Annette L. Hayes | Annette.Hayes@usdoj.gov |
| Brian T. Moran | bmoran@usdoj.gov |
| Christina Fogg | Christina.Fogg@usdoj.gov |
| Gregory Colin Narver | gregory.narver@seattle.gov |
| Kerry Jane Keefe | kerry.keefe@usdoj.gov |
| Peter Samuel Holmes | peter.holmes@seattle.gov |
| Jeff Murray | jeff.murray@usdoj.gov |
| Rebecca Boatright | rebecca.boatright@seattle.gov |
| Ronald R. Ward | Ron@wardsmithlaw.com |
| Timothy D. Mygatt | timothy.mygatt@usdoj.gov |
| Gary T. Smith | gary.smith@seattle.gov |
| Hillary H. McClure | hillarym@vjmlaw.com |
| David A. Perez | dperez@perkinscoie.com |
| Anna Thompson | annathompson@perkinscoie.com |
| Kristina M. Detwiler | kdetwiler@unionattorneysnw.com |
| Merrick Bobb | mbobb@pacbell.net |
| Bruce E.H. Johnson | brucejohnson@dwt.com |
| Eric M. Stahl | ericstahl@dwt.com |

DATED this 30th day of April, 2019, at Seattle, King County, Washington.


                              /s/ Kerala Cowart
                              Kerala Cowart, WSBA #53649
                              Assistant City Attorney
                              E-mail: kerala.cowart@seattle.gov

**CITY'S APRIL 2019 QUARTERLY REPORT** - 34
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200