UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF SEATTLE,<br><br>Defendant. | CASE NO. C12-1282JLR<br><br>ORDER FINDING CITY OF SEATTLE PARTIALLY OUT OF COMPLIANCE WITH THE CONSENT DECREE |

**I. INTRODUCTION**

On November 5, 2018, the court held a status conference in response to Defendant City of Seattle's ("the City") notification that it had concluded labor negotiations with the Seattle Police Officer's Guild ("SPOG") and entered into a tentative agreement. (*See* 11/5/18 Hearing Tr. (Dkt. # 499); Min. Entry (Dkt. # 498); 10/23/18 Order (Dkt. # 485); 10/26/18 Order (Dkt. # 487); City Notice (Dkt. # 484).) On December 3, 2018, the court ordered the parties to show cause "whether . . . [the City] has failed to maintain full and

//

ORDER - 1

effective compliance with the Consent Decree."[1] (OSC (Dkt. # 504) at 1.) The City, Plaintiff United States of America ("the United States"), and Amicus Curiae Community Police Commission ("CPC") filed responses to the court's order. (*See* City Resp. (Dkt. # 512); U.S. Resp. (Dkt. # 528); CPC Resp. (Dkt. # 531); *see also* City Reply (Dkt. # 543).) In addition, on May 15, 2019, the court held a hearing on its order to show cause in which the parties and the CPC participated.

For the reasons stated below, the court finds that the City has fallen partially out of full and effective compliance with the Consent Decree. The court does not find that the City has fallen out of compliance in any of the areas listed in the Phase II Sustainment Plan that are covered by the Audits (*see* Phase II Sustainment Plan (Dkt. # 444) at 4-10), but notes that a number of key assessments need to be completed. The court nevertheless remains hopeful that the City can complete these assessments and discharge these areas of the Consent Decree within the two-year sustainment period. The court, however, does find that the City is out of compliance with the Consent Decree in one of its additional areas of responsibility—accountability. (*See id.* at 12-13.) With respect to this area, the City will need to come back into full and effective with the Consent Decree, and then maintain that compliance for two years.

//

//

---

[1] The Consent Decree consists of the Settlement Agreement (Dkt. # 3-1) and the order modifying and preliminarily approving it (Dkt. # 13). On the same day that the parties executed the Settlement Agreement, they also executed a Memorandum of Understanding ("MOU"), which established the CPC the and Crisis Intervention Committee.

## II. BACKGROUND & ANALYSIS

On December 16, 2011, the United States Department of Justice ("DOJ") released a report announcing that it had found reasonable cause, under the Violent Crime Control and Law Enforcement Act of 1994, 34 U.S.C. § 12601 (formerly codified at 42 U.S.C. § 14141), to believe that the Seattle Police Department ("SPD") had engaged in a pattern and practice of excessive force. (*See* DOJ Report (Dkt. # 1-1); *see also* Stip. Find. & Concl. (Dkt. # 14) ¶ 6.) On July 27, 2012, the United States filed a complaint against the City based on that report. (*See* Compl. (Dkt. # 1).) On the same day, the City and the United States filed a joint motion asking the court to approve a Settlement Agreement and a Stipulated Order of Resolution. (Stip. Find. & Concl. ¶ 12; *see also* Joint Mot. (Dkt. # 3) (attaching the Settlement Agreement).) On September 21, 2012, the court preliminarily approved the Settlement Agreement, along with certain agreed modifications. (*See* 9/21/12 Order (Dkt. # 13).) The modified agreement and order is now commonly referred to as "the Consent Decree." *See supra* n.1. The Consent Decree requires SPD to comply with two phases: (1) SPD must attain "full and effective compliance" with the Consent Decree ("Phase I"), and then (2) SPD must sustain that compliance for two years ("Phase II"). (Consent Decree ¶¶ 229-30.)

On January 10, 2018, the City and SPD reached an important milestone. The court entered an order declaring that they were in "full and effective compliance with the Consent Decree," fulfilling Phase I. (FEC Order (Dkt. # 439) at 16.) Nevertheless, on December 3, 2018, the court issued an order to show cause "whether the court should find . . . the City . . . has failed to maintain full and effective compliance." (OSC at 1.)

The court stated that two considerations prompted its order: (1) the City's completion of collective bargaining with SPOG, and (2) the decision by the Disciplinary Review Board ("DRB") to overturn former Chief of Police Kathleen O'Toole's decision to terminate SPD Officer Adley Shepherd. (*Id.* at 5.) The court stated that the "decision to reinstate an officer who had violated three provisions of . . . SPD's use-of-force policies when he punched a handcuffed subject in the face while she was sitting in a patrol car, and the new [Collective Bargaining Agreement's ("CBA")] rejection of reforms in the Accountability Ordinance that would have substantially changed the process and standard of review by which the decision was made" caused the court "to question whether the City and . . . SPD can remain in full and effective compliance with the Consent Decree." (*Id.* at 8.)

The court's January 10, 2018, "full and effective compliance" ruling was based, in part, on the Monitor's conclusion in his 2017 Compliance Status Report that the City had achieved "initial compliance" with assessments that the Monitor and the parties formulated for this purpose. (*See* FEC Order at 3-5 (citing 3d Year Monitoring Plan (Dkt. #195) and Compliance Status Report ("CSR") (Dkt. # 416)).) The assessments include: (1) force reporting and investigation, (2) the Force Review Board ("FRB"), (3) community confidence, (4) the Office of Professional Accountability ("OPA"), (5) crisis intervention and the intersection with the use of force, (6) supervision, (7) Type II force investigation, (8) the Early Intervention System ("EIS"), (9) use-of-force, and (10) stops, searches, and seizures. (*See* FEC Order at 4 n.3; *see also* CSR at 3-17.)

//

Although the ten assessments are "clearly important," they "do not constitute all the requirements of the Consent Decree." (CSR at 3.) Indeed, in his Report, the Monitor expressly identified accountability and the conclusion of labor negotiations as additional areas of focus or concern for assessing SPD's compliance. (CSR at 17-18.) At the time that the court declared the City to be in "full and effective compliance" with the Consent Decree, the City had presented its original Accountability Ordinance for court approval. (*See* 7/11/16 Stip. Mot. (Dkt. # 297); 6/21/17 City Br. (Dkt. # 396).) Because the Ordinance at that time was still subject to alteration during the City's collective bargaining process with SPD's labor unions, the court declined to rule on a version of the Ordinance that was not the "final product." (9/7/17 Order (Dkt. # 413) at 3; *see also* FEC Order at 15.) Indeed, the court's approval is still pending. Nevertheless, in adopting the Accountability Ordinance, the City indicated its intent to discard the old accountability regime. Thus, the original, unmodified Accountability Ordinance was the only accountability benchmark by which the court could assess the City's Phase I compliance in that area at that time.

In its order finding the City in full and effective compliance with the Consent Decree, the court specifically warned:

> [T]he court takes seriously, and so should the parties, the many ongoing concerns raised by the Monitor in his Compliance [Status] Report. If the City and SPD fail to satisfactorily address these concern, they may well fail to sustain the progress they have made. The court will not hesitate to restart the two-year sustainment period if SPD falls below the full and effective compliance standard set forth in the Consent Decree.
>
> The court notes that the City still has not . . . concluded labor negotiations with all of SPD's unions. . . . The court previously indicated that it will not

> grant final approval to the City's new police [A]ccountability [O]rdinance until after collective bargaining is complete. . . . If collective bargaining results in changes to the [A]ccountability [O]rdinance that the court deems to be inconsistent with the Consent Decree, then the City's progress in Phase II will be imperiled.

(FEC Order at 14-15 (citations and footnote omitted).)

In its order to show cause and in this order, the court is particularly concerned about provisions related to officer discipline and accompanying appeals that are found in the original Accountability Ordinance that SPOG's CBA altered. In its response to the court's order to show cause, the United States notes that the terms of SPOG's CBA related to the use of arbitration in an appeal and the burden of proof applied therein "are materially unchanged from the time period in which DOJ investigated SPD and the Consent Decree was entered." (U.S. Resp. at 3.) The United States argues that because the Consent Decree did not expressly mandate changes to either of those specific items, the court should not find that the CBA's reversion to the old arbitration scheme and abandonment of critical aspects of the Accountability Ordinance conflicts with or undermines the Consent Decree. (*See id.*) In making this argument, the United States misapprehends both the import of the arbitration process and its intersection with the Consent Decree, as well as the court's starting point for assessing accountability that formed the basis for its finding that the City was in full and effective compliance with the Consent Decree.

First, although the Consent Decree contains no explicit mandate concerning the arbitration process or the burden of proof therein, the Consent Decree expressly requires the City, when "establish[ing] or reorganiz[ing] a government agency or entity whose

function includes overseeing . . . investigating, or otherwise reviewing the operations of SPD," to "ensure these functions and entities are consistent with the terms of the [Consent Decree]." (Consent Decree ¶ 219.) Further, the United States and the City have acknowledged that any accountability system proposed or instituted by the City may not conflict with either the terms or the purposes of the Consent Decree. (7/11/16 Stip. Mot. (Dkt. # 297) at 2, 4.) The Consent Decree expressly defines its purposes or goals as ensuring that police services are delivered to the people of Seattle in a manner that (1) fully complies with the Constitution and laws of the United States, (2) ensures public and officer safety, and (3) promotes public confidence in the SPD and its officers. (*See* Consent Decree at 1.) The court concludes that any provision that implicates officer discipline related to use-of-force inherently implicates all three of the Consent Decree's purposes, and thus, must be consistent with them.

Second, irrespective of what the Consent Decree may or may not expressly provide about SPD's accountability systems, the statements and conduct of the parties throughout these proceedings reveal the inadequacy of the past accountability regime, the critical need for reform to that regime, and the parties' acquiescence to the court's jurisdiction in this area. Thus, contrary to the United States' current position, the old accountability regime is not the appropriate baseline for finding the City in full and effective compliance with the Consent Decree.

For purposes of clarifying the parties' acknowledgement of the old accountability system's inadequacy and their acquiescence to the court's jurisdiction over reform in this area, the court recounts pertinent portions of the proceedings herein. As far back as 2015,

the City assured the court that it intended to bring all recommendations for reform of SPD's accountability systems before the court.[2] Specifically, at the August 26, 2015, status conference, in discussing a schematic of SPD's accountability systems, the City's representative stated:

> And the development of those [accountability] recommendations, they started back in 2014, when the CPC and the OPA auditor, consistent with their obligations under the MOU, started to have conversations with the rest of the city, to take a look at the accountability system, see what was working, and what was not working. . . . [B]ut I do wish to assure the Court that it was always the city's intent to provide whatever these recommendations were to the monitor and ultimately to the Court. Certainly the city is very cognizant of the Court's role in this and that nothing may occur without the Court's approval, ultimately.
>
> **********
>
> So much of what is proposed by those recommendations is bringing the current status quo and codifying it in a way that reflects reality. But there are also several really important expansions that are proposed in those recommendations that we look forward to discussing. And I think probably the most significant, from the department's perspective, is that we created all of these new review systems, all of these new accountability systems, and they're new, they're all a part of the [C]onsent [D]ecree, and right now the monitor is looking at it, the Court is looking at it, certainly DOJ, with its independent obligations, is looking at it.

(8/26/15 Hr. Transcript (Dkt. #229) at 27-29.)

//

---

[2] Even earlier, on April 4, 2014, Mayor Jenny Durkan, then the United States Attorney for the Western District of Washington, assured the co-chairs of the CPC as follows:

> As we told the court yesterday: the accountability system is in need of wholesale review and significant reform. Too many layers have been grafted on over the years by law and practice. It is almost unthinkable that so many experienced people can have so much confusion over how things work. It is also unacceptable. Both the officers and the public must have a system that is transparent, certain and just.

(Lopez Decl. (Dkt. # 532) ¶ 2, Ex. A.)

In its initial September 30, 2015, memorandum to the court concerning a "proposed framework for ensuring systems of review and accountability," the City acknowledged that "there are capacity issues and inefficiencies in the independent accountability system as it now functions that must be expediently addressed" and "the [accountability] systems [the City] proposes must work symbiotically with all of the internal accountability systems, and certainly may not conflict with the provisions of the [Consent Decree]." (9/30/15 Br. (Dkt. # 233) at 8.) Toward that end, the City recognized the need to submit those recommendations to the Monitor and the United States for review, and ultimately to the court. (*Id.*)

In their July 11, 2016, stipulated motion regarding SPD accountability systems legislation, the parties "agreed that while many of the accountability system elements discussed were not specifically referenced in the Consent Decree, any legislative proposal must not conflict with either the terms or purpose of the Consent Decree" and that "any elements of the legislative proposal that did, in fact, implicate provisions of the Consent Decree would require [c]ourt approval." (7/11/16 Stip. Mot. at 2-3; *see also* 5/10/16 City Br. (Dkt. # 289) at 28-29 ("Once the City's legislative process has been completed, the City will submit any resulting legislation to the Court for review. This will allow the Court to ensure that the legislation is consistent with the letter and spirit of the Consent Decree.").)

In its motion seeking the court's declaration that it was in full and effective compliance with the Consent Decree, the City reiterated "its commitment to allowing the [c]ourt to complete [its] review [of the Accountability Ordinance] before termination of

the [Consent] Decree." (9/29/17 FEC Mot. (Dkt. # 419) at 18.) More specifically, in its Phase II Sustainment Plan, which delineated a series of Audits for evaluating the City's ongoing compliance with the Consent Decree (*see* Phase II Sustainment Plan at 4-10), the City expressly acknowledged additional obligations—beyond maintaining compliance with the ten assessments—including "achieving labor accords consistent with the reforms of the police [A]ccountability [O]rdinance it passed in 2017" (*id.* at 12). Further, the City restated "its commitment to present a fully-negotiated [A]ccountability [O]rdinance to the [c]ourt." (*Id.* at 13.)

Finally, as recently as November 30, 2018, in announcing the completion of collective bargaining, the City again recognized its obligation to "present changes to the City's police accountability and review system to the [c]ourt for review." (11/30/18 City Not. (Dkt. # 503) at 1.) The City also confirmed that court's review of the Accountability Ordinance is now "timely." (*Id.* at 2.)

The City and the United States may not repudiate these repeated past representations to the court—concerning the old accountability system's inadequacy, the need for reform, and the court's jurisdiction in this area—for the sake of political expediency today. Both expressly by their words and implicitly by their actions and lack of objection, the parties have acquiesced in the court's review of the Accountability Ordinance and, more generally, SPD's accountability systems as a part of assessing whether the City has sustained full and effective compliance with the Consent Decree in Phase II. The court initiates that review now, and as described below, finds the City to be out of compliance with respect to its accountability systems.

Again, in its order to show cause, the court was particularly concerned by the reversal of former Chief of Police O'Toole's discharge of Officer Shepherd. (OSC at 6-7.) The court noted the substantial differences between the process for review of that decision under the old arbitration regime and the new Accountability Ordinance prior to the Ordinance's alteration by SPOG's CBA. (*Id.* at 7.) No party argues in favor of the reversal of Chief O'Toole's decision or commends the outcome of that arbitration process to the court. (*See generally* City Resp.; U.S. Resp.; CPC Resp.; City Reply.) Nevertheless, the City and the United States insist that the Officer Shepherd case is an aberration and the City should not be faulted for actions out of its control, especially because the City is appealing the decision. (City Resp. at 10-11; U.S. Resp. at 7 ("The fact that an arbitration panel, which is not controlled by the City, overturned the City's efforts to enforce its policies is not a fair indication of a failure by the City and SPD to hold officers accountable.").) But as the CPC points out, the issue is not just that an arbitrator reinstated this officer, but that the CBA (1) retains significant attributes of the old appeals system that the parties admit needs reform, and (2) abrogates critical reforms in the Accountability Ordinance that the parties put in place. (*See* CPC Resp. at 12-13.)

The United States, nevertheless, cites six instances of officer termination that occurred under the old regime over the past 15 years (*see* Fogg Decl. (Dkt. # 529) ¶¶ 3-8, Exs. B-G) and points out that termination was upheld in four of those cases under the old accountability regime (U.S. Resp. at 17). Significantly, however, the two that were not upheld were terminations associated with the use of excessive force or a threat to use excessive force against individuals of color, and one of those two incidents also involved

an individual who was handcuffed in the back of the officer's patrol car at the time of the event. (Fogg Decl. ¶¶ 6, 8, Exs. E, G.) Further, the two terminations that were not upheld were the only cases that involved individuals subject to police action—not matters initiated administratively by the SPD. (*See id.*) Thus, of three relevant incidents before the court—the two cited above and the Officer Shepherd appeal—all were overturned in the appeals process. The court does not find this statistic reassuring.

The court has no interest in portions of the Accountability Ordinance that do not relate to the Consent Decree, but plainly the portions implicated by Officer Shepherd's arbitration do so relate. Specifically, these portions relate to the use-of-force, the supervision of officers, and community confidence, which also correspond to three of the ten assessments the parties have used to evaluate compliance.[3] The court does not find that the City is out of compliance with any of the areas listed in the Phase II Sustainment Plan that are covered by the Audits (*see* Phase II Sustainment Plan at 4-10), although the court is concerned about possible negative impacts by the developments in accountability detailed herein. Nevertheless, the parties may continue on the same timeline presently outlined in their Sustainment Plan with respect to the Phase II Audits, and the court

---

[3]In addition, underpinning nearly all the assessments is adequate and constitutional police training. Much of the parties' work in attaining compliance with the Consent Decree has been focused on reforming SPD training in a variety of areas, including use-of-force, crisis intervention, and de-escalation. The court notes that the United States identified certain aspects of SPD's use-of-force training—specifically, Defensive Tactics—that may have fallen out of compliance with both the Consent Decree and the Constitution. (U.S. Resp. at 7-9.) The United States suggests that representatives of DOJ reattend this training to ensure compliance with the Consent Decree. (*Id.*) The City agrees with this proposal (*see id.*), and the court does too. However, the parties should ensure that the Monitor is also involved in this reexamination. Finally, the court directs the parties to file a report with the court on this issue once their reassessment is complete.

remains hopeful that it will be able to discharge those areas of the Consent Decree within the anticipated two-year timeframe. (*See id*; *see also* Order Approving Phase II Sustainment Plan (Dkt. # 448).)

The court further clarifies that it makes no ruling concerning the CBA, specific provisions of the CBA, or how the City should conduct collective bargaining with any of its unions. The CBA is relevant here only insofar as it affects accountability. By their conduct and statements in these proceedings, the parties have acknowledged that the old accountability system is inadequate for purposes of compliance with the Consent Decree. Because the CBA eliminates reforms instituted by the Accountability Ordinance and leaves the old arbitration regime "materially unchanged" (*see* U.S. Resp. at 3), the court finds that the City and SPD have fallen out of full and effective compliance with the Consent Decree concerning SPD discipline and accountability. Before the court will terminate the Consent Decree as it pertains to accountability, the City must bring itself into compliance in this area and then sustain that compliance for two years. (*See* Consent Decree ¶¶ 229-30.)

Finally, the court also is not ruling today that—to be in full and effective compliance—the City must necessarily return to the provisions of the Accountability Ordinance referenced herein as those provisions existed prior to collective bargaining. With the assistance of the Monitor, the United States and the City are free to find other methods that will bring the City into compliance with the Consent Decree on accountability. To this end, the court ORDERS the City and the United States, with the assistance of the Monitor and the CPC, to formulate a methodology (1) for assessing the

present accountability regime, and (2) for how the City proposes to achieve compliance. The court further ORDERS the parties to jointly file their methodology no later than July 15, 2019.

### III. CONCLUSION

As stated above, the court FINDS that the City has fallen partially out of full and effective compliance with the Consent Decree. The court so rules due to the changes in the Accountability Ordinance that occurred following implementation of SPOG's CBA and the City's reversion to an arbitration system that is materially unchanged from the old, inadequate accountability regime. Accordingly, the court ORDERS the City and the United States, with the assistance of the Monitor and the CPC, to formulate a methodology (1) for assessing the present accountability regime, and (2) for how the City proposes to achieve compliance. The court further ORDERS the parties to jointly file their methodology no later than July 15, 2019.

Dated this 21st day of May, 2019.

JAMES L. ROBART
United States District Judge