

**Stops and Detentions**
**Annual Report**
**2019**

## STOPS AND DETENTIONS ANNUAL REPORT

# INTRODUCTION

This report focuses on data surrounding police-civilian contacts that involved the stop and limited detention of an individual.  This type of stop and limited detention is known as a *Terry* stop[1]  and is authorized under law and policy for purposes of investigating, based on an officer's reasonable suspicion, whether the individual is engaging, has engaged, or is about to engage in criminal activity.   During a *Terry* stop, an officer may develop probable cause to arrest an individual, but an officer does not need probable cause to make the initial stop, nor does a stop based upon probable cause qualify as *Terry* stop.  This report also considers changes in data from 2017 to 2018.[2]

Two introductory notes are important.  First, the Seattle Police Department does not use "stop and frisk" as an enforcement tactic.   While some may look at officer stops as a proxy for proactivity, the Department does not view the number of stops as a measure of proactive policing. Without question, investigative stops supported by reasonable suspicion are a useful tool to address potential criminal activity, but increasing or even maintaining the level of stops year to year is not a goal for the Department.  Other tactics, such as premises checks, persistent offender arrests, and simply maintaining a uniformed police presence in crime and disorder hot spots are considered as effective in intervening in criminal activity, while stop and frisk models that have been used elsewhere are not.

Second, while racial/ethnic/gender data are reported, this report is not intended to determine whether there is racial disparity in who is subject to a Terry stop, nor is it intended to understand – if racial disparity were to be detected – the root causes of investigative stops' disparate impact upon individuals of one or more races, or other protected classes.[3]  As those who study criminal justice will caution, attempting to identify disparity itself, let alone root cause, from raw numbers alone, is to perilously ignore the myriad social and economic stressors that feed disparities at stages far before individual victims, witnesses, or suspects reach the attention of the police.  Nor is this report intended to provide a qualitative analysis as to the underlying basis of support for each stop.  The Department has recently released two separate reports, as required under the Sustainment Plan that governs the Department's remaining obligations under the federal Consent Decree between the City of Seattle and the United States Department of Justice, that

---

[1] In *Terry v. Ohio*, 392 U.S. 1 (1968), the United States Supreme Court held that such brief detentions are authorized under the Fourth Amendment when, under the totality of circumstances, an officer has reasonable suspicion to believe that criminal activity is afoot.

[2] This report is strictly descriptive in nature.  It is not intended to elicit or suggest root causes for any disparities that may be observed.

[3] Disparate impact exists when a law or government action impacts individuals of one race (or other protected class) more than another.

**STOPS AND DETENTIONS ANNUAL REPORT**

provide additional insight into the nature and quality of investigative stops and thus complement the descriptive statistics provided here.  On the question of disparity, the Department filed on April 30, 2019, Part I of a two-part analysis (*Using Propensity Score Matching to Analyze Racial Disparity in Police Data*) that seeks to better isolate areas of disproportionality in data relating to investigative stops and use of force.  A separate audit report examining the articulation of reasonable suspicion for stops over a coincident study period was filed with the federal court on March 7, 2019 (*Stops and Detentions Audit*).

In conjunction with last year's Stops and Detentions Annual Report, the Department also began releasing the raw data underlying this report to the City of Seattle's open data portal and added to the Department's website a public facing dashboard through which users may navigate, parse, and analyze these data.   Last year's report was heavily oriented towards familiarizing readers with this dashboard.  In this report, the Department focuses on observed changes from 2017 to 2018. Again, to the extent that the reader may be interested in analyses that are not presented here, the Department encourages active exploration of its data through its website.   All data utilized in this Section were sourced from the Department's Data Analytics Platform (DAP), can be accessed in raw form through the City's open data portal, and again, may be explored in interactive format through the Department's dashboard. [4]

## A. Policies and Overview

The Seattle Police Department's policies regarding arrests, searches, and seizures are published, collectively, as Title 6 of the SPD Manual.  Policy requirements for conducting and documenting Terry stops specifically are prescribed in Section 6.220.

Section 6.220 of the SPD Manual distinguishes between police-civilian contacts depending on the nature of the encounter and whether the stop constitutes a seizure under law as articulated in Section 6.220. Per Section 6.220 of the SPD Manual:

> A ***seizure*** occurs any time an officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen.  A seizure may also occur if an officer

---

[4] Note, data in the online dashboard is updated quarterly and will not match the data presented in this report. Data on data.seattle.gov ("DSG") is updated daily with new and evolved records. Neither the dashboard nor the data on DSG will match, exactly the data underlying this report.

uses words, actions, or demeanor that would make a reasonable person believe that he or she is not free to go.

***Voluntary Contacts*** falls within two categories:

>(1) A ***social contact*** is a voluntary, consensual encounter between the police and a subject with the intent of engaging in casual and/or non-investigative conversation.  The subject is free to leave and/or decline any of the officer's requests at any point.  A ***non-custodial interview*** is a voluntary and consensual investigatory interview that an officer conducts with a subject during which the subject is free to leave and/or decline any of the officer's requests.  Neither a social contact nor a non-custodial interview is a seizure, and during contacts of these types, officers may not use words, action, demeanor, or other show of authority that would indicate that a person is not free to leave.

>(2) A ***Terry stop*** is a seizure under both state and federal law.  A *Terry* stop is defined in policy as a brief, minimally intrusive seizure of a subject based upon articulable reasonable suspicion in order to investigate possible criminal activity.  The stop can apply to people as well as to vehicles.  The subject of a *Terry* stop is not free to leave.

Section 6.220 of the SPD Manual defines ***Reasonable Suspicion*** as:

>Specific, objective, articulable facts which, taken together with rational inferences, would create a well-founded suspicion that there is a substantial possibility that a subject has engaged, is engaging or is about to engage in criminal conduct.

The reasonableness of the *Terry* stop is considered in view of the totality of the circumstances, the officer's training and experience, and what the officer knew before the stop.  Information learned during a stop can lead to additional reasonable suspicion or probable cause that a crime has occurred but cannot provide the justification for the original stop.

An officer may frisk, or pat-down, the subject of a *Terry* stop when, under "the totality of the circumstances and reasonable conclusions drawn from the officer's training and experience[,]" the officer has reasonable suspicion that "the subject may be armed and presently dangerous." A frisk is strictly limited to a search (generally a pat-down of outer clothing) necessary to the discovery of weapons that may be used to harm the officer or others nearby.

Section 6.220 also requires supervisors to review, by end of shift, their officers' documentation of *Terry* stops to determine whether the stops were supported by reasonable suspicion and consistent with SPD policy, federal and state law.  If a supervisor concludes that a *Terry* stop

3

## STOPS AND DETENTIONS ANNUAL REPORT

appears to be inconsistent with SPD policy, the supervisor must address the concern with the officer involved and take action as appropriate, which may include a referral to the Office of Police Accountability.

4

## STOPS AND DETENTIONS ANNUAL REPORT

## B. General Statistics – Overview

The Seattle Police Department noticed several changes in reported *Terry* stops between 2017 and 2018.  SPD continues to evaluate these changes in the context of other data analysis and reports discussed herein; however, as an initial matter, SPD believes the variations from 2017 to 2018 are well within the expected variances of police practices for Seattle, in particular given the fluctuations in crime rate.  For example, while this report notes a significant increase in stops in East Precinct, East Precinct also experienced an increase in shots fired in 2018, which resulted in an increased police presence in that area generally.

While the data are broken down in greater detail throughout this report, the Department focused on a collection of key trends:

- SPD conducted 18.5% more *Terry* stops in 2018 than in 2017.  However, statistical trend analysis shows that this increase appears to be an anomaly.  Our analysis next year will indicate whether a pattern is developing or whether 2018's data are a one-time increase.
- Among the five precincts, the North Precinct accounted for 27.76% percent of *Terry* stops city-wide, the East Precinct for 19.15%, the West Precinct for 26.87%, the South Precinct for 16.48%, and the Southwest Precinct for 9.75% of all *Terry* stops.
- The East, West, and South precincts each saw increases in their percentages of *Terry* stops.  The East Precinct's *Terry* stops increased by 59.1%, or approximately 1.7 additional *Terry* stops across the precinct per day. The East Precinct also saw a 126.4% increase in arrests following a *Terry* stop. This report looks in-depth at the East Precinct data because it saw the highest percentage of increases across the city.
- Over 70% of all *Terry* stops city-wide were responsive to a request for service from the public (i.e., a call to 911) to which an officer was dispatched.
- As in 2017, most of the subjects stopped were perceived as male – 77.4% in 2018 as compared with 77.2% in 2017.
- In 2018, 27.5% of all stops resulted in an arrest, an increase of 41.1% from 2017.

Between January 1, 2018 and December 31, 2018, **688** SPD officers reported a total of **8,871** *Terry* stops, involving **6,858** unique subjects.  While the count of stops increased 18.5% from the same period in 2017, a trend analysis found no statistically significant model to fit the data suggesting the observed increase does not represent a meaningful trend or "signal" and is instead "noise," and as such should be considered aberrant in nature. The Department will continue to monitor for the emergence of a trends. See Figure 1.

5

**Figure 1: Stops, Frisks from Stops, and Arrests from Stops 2016-2018**



When reviewing these **8,871** stops[5], each precinct saw an increase in the number of *Terry* stops except for the North Precinct, where the number of *Terry* stops remained virtually unchanged. The East Precinct accounted for the most significant change over time, reporting a nearly 60% increase in stops from 2017.  See Figures 2 and 3.

---

[5] Descriptive analysis presented here is based on population data. Any observed difference is a real and true difference. No statistical significance testing is appropriate or necessary.

# STOPS AND DETENTIONS ANNUAL REPORT

**Figure 2:** Percent of Stops Distribution by Precinct, 2017-2018.



**Figure 3:** Percent Change in Stops Distribution by Precinct, 2017-2018

|  | Stop Count | | Difference | % Change |
| --- | --- | --- | --- | --- |
| **Precinct** | **2017** | **2018** | | **2017-2018** |
| **North** | 2,401 | 2,381 | -20 | -0.8% |
| **West** | 1,834 | 2,304 | 470 | 25.6% |
| **East** | 1,032 | 1,642 | 610 | 59.1% |
| **South** | 1,109 | 1,413 | 304 | 27.4% |
| **Southwest** | 811 | 836 | 25 | 3.1% |
| **Other** | 300 | 295 | -5 | -1.7% |

**Figure 4:** Distribution of Stops by Watch, 2017-2018

7

SEATTLE POLICE DEPARTMENT

## STOPS AND DETENTIONS ANNUAL REPORT



The proportion of all 2018 stops that took place during 2nd Watch (1100-1900 hours) (37.0%) and 3rd Watch (1900-0300 hours) (36.3%) was essentially the same, with little change in the percentage among watches from 2017 to 2018.  See Figure 4.

Most of the subjects were perceived to be between 18-45 years of age (76.6%), with subjects perceived to be between 26-35 years of age representing the highest percentage (35.8%).  See Figure 5.

**Figure 5:** Distribution by Subject Perceived Age



As in 2017, most of subjects stopped by officers in 2018 were perceived as male (77.4%).   White males accounted for 39.6% of total stops; White females accounted for 11.6%. Black males accounted for 24.6% of total stops; Black females accounted for 5.5%. Latino/Hispanic males and females accounted for 4.4% and 0.8%, respectively, of all stops.  Relative to 2017, an increase in the number of stops was observed across all perceived subject race categories except Other and Unknown (females) and American Indian/Alaskan Native (male).  See Figures 6 and 7.

8

**Figure 6:** Subject Race by Gender 2018



**Figure 7:** Subject Race by Gender, Percent and Count of Change 2017-2018



9

## STOPS AND DETENTIONS ANNUAL REPORT

## C. Stops by Precinct

### A. North Precinct

As in 2017, the largest percentage of total stops (27.76%) occurred in the North Precinct, Seattle's largest precinct by resident population, land area, and number of officers. In this precinct in 2018, **370** individual officers contacted **1,971** unique individuals across a total of **2,381** *Terry* stops. Though the number of stops was up 18.5% citywide, the total number of stops in the North Precinct (2,381) remained virtually constant, down only slightly (-0.8%, n= -20) from 2017.  See Figure 8.

**Figure 8:** Percent Change in Stops 2017-2018          **Figure 9**: Distribution by Watch





10

# STOPS AND DETENTIONS ANNUAL REPORT

**Figure 10**: Subject Race, Percent Change 2017-2018 (North Precinct)



The distribution of perceived race of subjects of North Precinct stops was comparable to 2017. Across the 1,971 individual subjects, White subjects accounted for 29.4% of all stops; Black subjects accounted for 12% of all stops; and Hispanic subjects accounted for just 2.5%. Percent change and count of stops is shown in this distribution from 2017 to 2018 in Figure 10.

Consistent with citywide aggregate data, in 2018, in the North Precinct, officers most frequently stopped individuals perceived to be between the ages of 26-35 years of age (18.3%). The number of stops of perceived juveniles (17 and under), in the North Precinct, decreased 23.9%, from 134 stops in 2017 to 102 stops in 2018. The number of stops of subjects perceived to be 26-35 was up 7.5% from 816 stops in 2017 to 877 stops in 2018. See Figure 11.

**Figure 11**: Distribution by Subject Perceived Age (North Precinct)



11

## STOPS AND DETENTIONS ANNUAL REPORT

### B.  West Precinct

In this precinct in 2018, **379** individual officers contacted **1,978** unique subjects across a total of **2,305** stops. Though the number of stops was up 18.5% citywide, West Precinct officers conducted 25.7% (n=470) more *Terry* stops (2,304) in 2018 than in 2017 (**1,834**). See Figure 12.

**Figure 12**: Percent Change in Stops 2017-2018     **Figure 13**: Distribution by Watch





SEATTLE POLICE DEPARTMENT

## STOPS AND DETENTIONS ANNUAL REPORT

**Figure 14**: Subject Race, Percent Change 2017-2018



The demographic distribution of the 1,978 individual subjects in the 2,305 West Precinct stops, including perceived race, perceived gender, and perceived age resembled the demographic distribution of the citywide stops in 2018. Though there were 46 (74.2% increase) more stops involving Hispanic subjects in 2018 than in 2017, they account for just 2.5% of all West Precinct stops in 2018. White subjects make up 29.1% of stops, while Black subjects account for 16.6%.   See Figures 14 and 15.

Consistent with citywide aggregate data, in 2018, in the West Precinct, officers most frequently stopped individuals perceived to be between the ages of 26-35 years of age (20.5%).  The number of stops of perceived juveniles (17 and under), in the West Precinct increased from 48 stops in 2017 to 57 stops in 2018.  The number of stops of subjects perceived to be 26-35 increased from 644 stops in 2017 to 850 stops in 2018.  See Figure 15.

**Figure 15**: Distribution by Subject Perceived Age (West Precinct)



13

## STOPS AND DETENTIONS ANNUAL REPORT

### C. East Precinct

The East Precinct reported the largest increase in the number and percentage of overall stops, from **1,032** stops by **267** individual officers in 2017 to **1,641** stops by **297** individual officers in 2018 – an increase of 59% (n=609). While all beats in the East Precinct reported increases of at least 31%, Beats Charlie 1 (+142.3%, 189 stops), George 3 (+94.4%, 175 stops), and George 2 (+70.5%, 150 stops) reported the highest increases.  See Figure 16.  Across Watches, the number of stops during 1st Watch increased 83.8%, by 223 individual stops, from 2017 to 2018.  See Figure 17.  It is important to note that the areas of the East Precinct that saw the larger increases in stops in 2018 experienced an increase in reports of shots fired. In response, the SPD deployed additional resources throughout the area to ensure public safety. Some of this increase in stops likely is attributable to the increase in police presence.

**Figure 16**: Percent Change in Stops 2017-2018 (by Beat)          **Figure 17**: Distribution by Watch





SEATTLE POLICE DEPARTMENT

## STOPS AND DETENTIONS ANNUAL REPORT

**Figure 18**: Subject Race, Percent Change 2017-2018 (East Precinct)



As shown in Figure 18, the number of stops increased across all racial demographic categories in 2018; the distribution of subject age (see Figure 19) remained fairly constant between 2017 and 2018.

**Figure 19**: Distribution by Subject Perceived Age (East Precinct)



15

## STOPS AND DETENTIONS ANNUAL REPORT

### D.  South Precinct

Consistent with the citywide numbers, the South Precinct reported an increase in the number of stops between 2017 (**1,109** stops of 1,016 individuals by **299** officers) and 2018 (**1,413** stops of **1,287** individuals by **324** officers) – an increase of 27.4% (n=304).  See Figure 20.  See Figure 21.

**Figure 20**: Percent Change in Stops 2017-2018

**Figure 21**: Distribution by Watch





As with other precincts, the South Precinct reported increases in the number of stops across all demographic categories except "Multi-Racial," although the numbers reported remain too low to draw any significance from the observations.  See Figure 22.

16

# STOPS AND DETENTIONS ANNUAL REPORT

**Figure 22**: Subject Race, Percent Change 2017-2018



Also consistent with citywide data, stops of individuals perceived to be between 26 and 35 years of age comprised the largest percentage of stops. The South Precinct reported fewer stops of perceived juveniles and young adults (25 and under) relative to 2017.  See Figure 23.

**Figure 23**: Distribution by Subject Perceived Age (South Precinct)



17

### E. Southwest Precinct

The Southwest Precinct reported the fewest number of stops in 2018 (**836** stops of **725** individuals by **226** officers), relative to other precincts, accounting for 9.75% of the citywide total. This number was consistent with the number of stops the precinct reported in 2017 (**811** stops of **717** individuals by **235** officers), an increase of only 3.1% (n=25).   See Figure 24.  In contrast to citywide numbers, a higher percentage of stops in the Southwest Precinct were reported during Second Watch hours (1100-1900 hours) than in other precincts, in both 2017 and 2018. See Figure 25.

**Figure 24:** Percent Change in Stops 2017-2018



**Figure 25**: Distribution by Watch



Because so few *Terry* stops are reported in the Southwest precinct, larger percentage differences are seen across the reported race of the subject even though the actual number of stops is relatively small.   However, the rate of stops of American Indian/Alaskan Natives showed a decrease of nearly 50% (n=-16).  See Figure 26.

**Figure 26**: Subject Race, Percent Change 2017-2018 (Southwest Precinct)

# STOPS AND DETENTIONS ANNUAL REPORT



As in 2017, the distribution of perceived subject age continued to skew younger in 2018, although officers reported a 33% decrease in the number of stops of juveniles (17 and under), down from 97 stops in 2017 to 65 stops in 2018.  See Figure 27.

**Figure 27**: Distribution by Subject Perceived Age (Southwest Precinct)



19

**STOPS AND DETENTIONS ANNUAL REPORT**

## D. Stops by Functional Assignment

Table 1 shows a breakdown of *Terry* stops, frisk rates, and arrest rates by functional assignment, categorized for purposes of this analysis as either 911 Response, Beats, ACT-SWAT, or "Other." Table 2 reflects the changes between 2017 and 2018.  911 Response officers are those assigned to regular patrol vehicles and geographical sectors.  They are primarily responsible for responding to calls for service, patrolling their assigned sectors for criminal activity or traffic violations, and participating in dedicated anti-crime and community engagement duties. Beat officers are those assigned to bicycle and foot patrols. SWAT and Anti-Crime Team (ACT) officers are assigned to target specific criminal activity, as directed by precinct commanders depending on the needs of that precinct (e.g., narcotics enforcement, warrant service, etc.), with the secondary responsibility to respond to high priority calls for service, such as in-progress and violent crimes.  "Other" may include officers assigned to any number of other units, such as Traffic, Narcotics, or Harbor.

**Table 1**: Distribution by Functional Assignment for 2018

|  | Stop | % Stop | Frisk | % Frisk | Arrest | % Arrest |
|---|---|---|---|---|---|---|
| 911 Response | 7,078 | 79.8% | 1,583 | 83.4% | 2,028 | 83.3% |
| Other | 965 | 10.9% | 178 | 9.4% | 220 | 9.0% |
| Beats | 635 | 7.2% | 61 | 3.2% | 131 | 5.4% |
| ACT-SWAT | 193 | 2.2% | 77 | 4.1% | 57 | 2.3% |
| **Total** | 8,871 | 100.0% | 1,899 | 100.0% | 2,436 | 100.0% |

**Table 2: Percent Change by Functional Assignment (2017-2018)**

|  | % Change Stop | % Change Frisk | % Change Arrest |
|---|---|---|---|
| 911 Response | 26.7% | 24.6% | 54.9% |
| Other | -13.1% | -24.6% | -8.3% |
| Beats | 15.5% | -4.7% | -7.1% |
| ACT-SWAT | -18.9% | 24.2% | 54.1% |

911 responders conducted 79.8% of all stops in 2018, as compared with 81.8% of all stops in 2017. The remaining 20.2% of stops were distributed among officers conducting bicycle and foot patrol operations (7.2%), Anti-Crime Team (ACT), Special Weapons and Tactics (SWAT) Unit, and Proactive Squad units (2.2%) and all other units, including investigative units (10.9% cumulative). 911 responders reported 26.7% more stops in 2018 than 2017 and Beats (bicycle and foot patrols) conducted 15.5% more stops. ACT/SWAT/ Proactive Squad units (-18.9%) and all other units (-13.1%) reported fewer stops in 2018 than 2017.

## E. Stops by Dispatch and Call Type

20

SEATTLE POLICE DEPARTMENT

## STOPS AND DETENTIONS ANNUAL REPORT

Officers are logged to calls either by a dispatcher, (*e.g.* in response to a 911 call or complaint from a community member), or by on-viewing an incident (*e.g.* observing or being alerted to behaviors that may indicate criminal activity while on patrol). The **8,871** stops reported in 2018 were associated with **6,694** distinct CAD events[6], an increase of 21.3% over the 5,520 CAD events with 7,487 associated stops in 2017.  More than two-thirds (70%) were responsive to a request for service from the public (*i.e.*, a call to 9-1-1) to which an officer was dispatched.  In 27.1% of all stops (2,406), the officer witnessed ("on-viewed") activity or behavior that led to the officer's decision to stop an individual.  See Table 3.

**Table 3**: Stops by Dispatch Type and Change Relative to 2017[7]

|  | 2017 | | 2018 | | |
|---|---|---|---|---|---|
|  | **Stop Count** | **% of Stops** | **Stop Count** | **% of Stops** | **% Change** |
| **DISPATCH** | 5,072 | 67.7% | 6,208 | 70.0% | 22.4% |
| **ONVIEW** | 2,143 | 28.6% | 2,406 | 27.1% | 12.3% |
| **MISSING** | 272 | 3.6% | 257 | 2.9% | -5.5% |
| **Total** | 7,487 | | 8,871 | | 18.5% |

Stops resulting from a dispatched call received the largest share of the observed increase in 2018 (70.0%), up 22.4%. Stops related to an officer's on-view were observed to increase 12.3% and stops that could not be associated with an underlying CAD event (2.9%),[8] declined by 5.5%.

## Stops by Initial and Final Call Type

Events that require a police response are initially categorized by response priority and type based on the initial information provided to a dispatcher by a 911 caller or, in the case of on-viewed incidents, the officer.  This categorization is the "initial call type." Based upon updated or more complete information obtained during the call, the event may be reclassified upon closing, which would be the "final call type."[9] In 2018, officers conducted *Terry* stops when

---

[6] A "CAD event" is a unique incident, given a unique identifying number, logged in response to a call from the public ("Call for Service") or a report from an officer in the field, "on-view," of an incident or event requiring their response. CAD Events are classified as "DISPATCH" when in response to a Call for Service and "ONVIEW" when reported by an officer in the field.

[7] Certain low level contacts could not be associated with a CAD event and so the data is notated as "MISSING" rather than unknown. The NRMS, Mk43 makes it easier to identify and associate a CAD event with a report of an investigative stop (a Field Contact). Additionally, under DAP 1.1, the Data Governance program has implemented new errors to identify events where the officer has not logged to or has entered the CAD event number in error .

[9] Often, the call received by the 9-1-1 Center (the "initial call") is different from the final call description after an officer conducts an initial investigation.  For example, a community member may call 9-1-1 after hearing loud

responding to 197 initial call types.   The top five initial call types in which officers conducted a *Terry* stop are listed in Table 4, while the largest percentage increase in "initial call type" was for DV Disturbances, which increased by 109.7% (see Table 5).

**Table 4**: Top Five Initial Call Types Associated with Terry Stops in 2018

|  | % of Stops |
|---|---|
| Suspicious person, vehicle, or incident | 6.8% |
| Suspicious stop – Officer initiated onview | 6.2% |
| Disturbance, miscellaneous/other | 6.0% |
| Trespass | 4.6% |
| Aslt – IP/JO – With or without WPNS (no shootings) | 4.5% |

All initial call types except "Suspicious person, vehicle or incident" experienced increases of 13%-23% between 2017 and 2018.

**Table 5**: Initial Call Types Associated with Terry Stops with Greatest Increase 2017-2018

|  | Stop Count | % Change |
|---|---|---|
| Dist – DV – No ASLT | 130 | 109.7% |
| Burg, comm burglary (includes schools) | 91 | 93.6% |
| Threats (incls in-person/by phone/in writing) | 151 | 73.6% |
| Aslt – With or w/o weapons (no shootings) | 147 | 73.0% |
| Nuisance – mischief | 152 | 68.9% |

*Terry* stops were conducted during 210 different types of final call types in 2018.[10] The most notable change occurred among final call type "Assaults, other" which accounted for 6.2% (549) of all stops, a 48.4% increase between 2017 and 2018. The largest decline between 2017 and 2018 occurred among final call type "Premise checks – crime prevention" (-25.1%, 182 stops). See Table 6.

---

noises and fearing shots are being fired in their neighborhood but upon investigation by the responding officer, some residents were lighting fireworks.  The initial 9-1-1 call would be categorized as "shots fired," but closed by the officer as "disturbance."

[10] When the call is closed, the primary officer reclassifies the event with a "Final Call Type." The final call type may differ from the initial call type.

# STOPS AND DETENTIONS ANNUAL REPORT

**Table 6**: Top Five Final Call Types Associated with Terry Stops in 2018

|  | % of Stops | % Change |
|---|---|---|
| Suspicious circum. – suspicions person | 7.9% | 9.9% |
| Prowler – Trespass | 7.1% | 22.0% |
| Disturbance – other | 6.6% | 3.5% |
| Assaults, other | 6.2% | 48.4% |
| Warrant services – felony | 4.2% | 32.9% |

## F.  Frisks and Arrests

An officer may frisk, or pat-down, the subject of a *Terry* stop when, under the totality of the circumstances and reasonable conclusions drawn from the officer's training and experience, the officer has reasonable suspicion that the subject may be armed and presently dangerous. Citywide, in 2018, officers frisked subjects in 21.4% of all *Terry* stops. Figure 28 shows the distribution of these frisks across precincts; Figure 29 shows the change in frisk rate across precincts between 2017 and 2018.  Table 7 presents, by functional assignment, the number of frisks conducted and the percentage change between 2017 and 2018.  Of the **1,899** frisks reported in 2018, officers found a weapon stemming from **370** of these frisks, or 19.5% of the time ("hit rate"), an **11.8%** increase over 2017.  See Table 7.

Officers assigned to the West Precinct most frequently discovered weapons when conducting a frisk, reporting a hit rate of 28.1%. Officers assigned to the Southwest Precinct had the lowest frisk hit rate, at 7.6%. Officers assigned to Other Sections saw a 20.5% decline in the frisk hit rate, while officers assigned to the East Precinct more than doubled their frisk hit rate (118.8%) in 2018.

23

## STOPS AND DETENTIONS ANNUAL REPORT

**Figure 28:** Frisks by Precinct (2018)     **Figure 29:** Frisk Rate Percent Change (2017-2018)





**Table 7**: Frisk Hit Rates and Change Relative to 2017

|  | Weapon Found 2018 | | | |
|---|---|---|---|---|
|  | Frisk Count | Frisk with Weapon Found Count | Frisk Hit Rate | % Change Frisk Hit Rate |
| WEST PCT | 366 | 104 | 28.11% | 35.06% |
| NORTH PCT | 407 | 80 | 21.62% | -17.53% |
| EAST PCT | 357 | 70 | 18.92% | 118.75% |
| SOUTH PCT | 461 | 57 | 15.41% | -8.06% |
| SOUTHWEST PCT | 126 | 28 | 7.57% | 16.67% |
| OTHER SECTIONS | 182 | 31 | 8.38% | -20.51% |
| **Total** | 1,899 | 370 | 100.00% | 11.78% |

24

## STOPS AND DETENTIONS ANNUAL REPORT

Table 8, below, shows the percentage changes in stops, frisks, and arrests between 2017 and 2018 across the city.  As seen in Table 8, the rate of stops, frisks, and resulting arrest rates increased more in the East Precinct than the other four precincts.

**Table 8**: Stops, Frisks, Arrests, and Percent Change Over Time by Precinct

| | 2018 | | | | | | |
| | Stop Count | % of Total Stops | % Change Stops | % of Total Frisk | % Change Frisk | % of Arrests | % Change Arrests |
|---|---|---|---|---|---|---|---|
| NORTH | 2,381 | 26.8% | -0.8% | 23.0% | -7.4% | 22.5% | -9.4% |
| WEST | 2,304 | 26.0% | 25.6% | 23.8% | 31.1% | 30.2% | 58.3% |
| EAST | 1,642 | 18.5% | 59.1% | 19.3% | 75.6% | 24.6% | 126.4% |
| SOUTH | 1,413 | 15.9% | 27.4% | 23.2% | 14.0% | 14.3% | 42.0% |
| SOUTHWEST | 836 | 9.4% | 3.1% | 8.4% | -10.1% | 7.6% | 31.4% |
| Other | 295 | 3.3% | -1.7% | 2.2% | 0.0% | 0.9% | 162.5% |
| **Grand Total** | 8,871 | 100.0% | 18.5% | 100.0% | 16.3% | 100.0% | 41.1% |

The data in Table 9 identifies *where* in the city stops, frisks, and arrests are occurring and notes the increase or decrease as compared with 2017.  The North Precinct had 9.4% fewer arrests resulting from a *Terry* stop, while the East Precinct showed an increase of 126.4% of arrests resulting from a *Terry* stop.  This data differs slightly from the data in Table 3, which shows *who* conducted the stops, frisks, arrests, and percentage changes based upon the officer's operational assignment. Officers may conduct a *Terry* stop throughout the city.  For instance, an officer assigned to the Traffic unit may conduct a *Terry* stop while directing traffic at a sporting event in the West Precinct.  Because the stop occurred in the West Precinct, the stop would be reflected in the West Precinct's data, above.  However, because the officer is assigned to the Traffic Unit for their day-to-day assignment, the *Terry* stop is also reflected below as having been conducted by an officer in "Other Sections."

**Table 9**: Stops, Frisks, Arrests, and Percent Change by Operational Assignment

| | 2018 | | | | | | |
| | Stop Count | % of Total Stops | % Change Stops | % of Total Frisk | % Change Frisk | % of Arrests | % Change Arrests |
|---|---|---|---|---|---|---|---|
| NORTH PCT | 2,069 | 23.3% | -5.8% | 19.3% | -10.7% | 19.2% | -8.8% |
| WEST PCT | 2,115 | 23.8% | 43.0% | 21.5% | 55.7% | 27.4% | 73.2% |
| EAST PCT | 1,619 | 18.3% | 67.6% | 18.8% | 73.3% | 23.8% | 119.7% |
| SOUTH PCT | 1,243 | 14.0% | 27.6% | 24.3% | 21.6% | 13.4% | 60.3% |
| SOUTHWEST PCT | 914 | 10.3% | 12.0% | 6.6% | -14.3% | 7.4% | 39.5% |
| OTHER SECTIONS | 911 | 10.3% | -13.6% | 9.5% | -20.6% | 8.8% | -7.7% |
| **Total** | 8,871 | 100.0% | 18.5% | 100.0% | 16.4% | 100.0% | 41.1% |

SEATTLE POLICE DEPARTMENT

Consistent with its decrease in the number of stops in 2018, North Precinct officers reported 8.8% fewer *Terry* stops in 2018 than in 2017. All other precincts' officers reported an increase in stops between 2017 and 2018, aligning with the rates of increase noted in the earlier analyses. East Precinct officers not only reported a 67.6% increase in the number of stops they conducted, but they also reported more than double (119.7% increase) the number of stops that resulted in the arrest of the subject relative to 2017.

## G. Stop Resolution

A *Terry* stop may resolve in a variety of ways: from a release of the subject after a reasonable period of time to an arrest and booking for a criminal charge. By policy, SPD officers must document all detentions.  The "street check" represents that lowest level of documentation, where an officer did not find a violation of law.  If an officer determines that the subject violated the law, an officer will file a General Offense (GO) report. If the officer develops probable cause, the officer may document the offense committed by the subject of the stop and "refer" the case to a prosecuting authority.  An officer may also physically arrest and book the subject. Only 1% of all stops resulted in no documented resolution.[11]

In 2018, 27.5% of all stops resulted in an arrest (n=2,436*)*, while officers wrote a GO in an additional 38.3% of stops. See Figure 30.

---

[11] Under SPD's new Record Management System Mk43, a "street check" will be identified as an "incident report," and a GO will be identified as an "offense report."

## STOPS AND DETENTIONS ANNUAL REPORT

**Figure 30: Stop Disposition 2018[12]**



In 2018, the stops resulting in an arrest increased by 41.1% as compared with 2017. See Figure 31.  Notably, East Precinct officers alone accounted for 335 (47.2%) of these additional arrests. North Precinct officers reported 9.4% (-57 stops) fewer stops resulting in arrest, while all other precincts saw increases in the number and percentage of stops resulting in the arrest of the subject.

SEATTLE POLICE DEPARTMENT

## STOPS AND DETENTIONS ANNUAL REPORT

**Figure 31: Disposition of Stops 2018 and Change Relative to 2017**



28

## CONCLUSION

The Department provides this report as part of its ongoing commitment to transparency and critical review of its operations and activity and to complement the two earlier reports the Department filed with the Federal Court consistent with its obligations under the Consent Decree.  As noted throughout,  a descriptive summary of data can be accessed and explored in greater detail through its public-facing dashboards.

Additionally, in May 2019, the Department implemented a new records management system, Mark 43, that provides the Department with greater capacity to examine its stops and detention data in fuller context of the surrounding circumstances.  The Department looks forward to working with its City and community partners as the Department continues its commitment to undertake more sophisticated and rigorous reviews of its activity.