UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF SEATTLE,<br><br>Defendant. | CASE NO. C12-1282JLR<br><br>ORDER REGARDING THE CITY'S MOTION TO APPROVE IT'S ACCOUNTABILITY METHODOLOGY |

## I. INTRODUCTION

On May 21, 2019, the court found that Defendant City of Seattle ("the City") is partially out of compliance with the Consent Decree[1] regarding accountability. (5/21/19 Order (Dkt. # 562) at 2.) As a result, the court ordered the parties "to formulate a

//

---

[1] The Consent Decree consists of the parties' Settlement Agreement (Dkt. # 3-1), the parties' stipulation modifying their initial Settlement Agreement (Dkt. # 11), and the court's order approving and entering the modified Settlement Agreement (Dkt. # 13). The parties have colloquially referred to these documents, together, as the "Consent Decree." Thus, the court will cite to these documents as the "Consent Decree" as well.

methodology (1) for assessing the present accountability regime, and (2) for how the City proposes to achieve compliance." (*Id.* at 13-14.) On August 15, 2019, Defendant City of Seattle filed a stipulated motion seeking the court's approval of its accountability methodology. (Mot. (Dkt. # 576).) Plaintiff United States of America ("the Government") does not object to the City's proposed methodology. (*See* US Resp. (Dkt. # 574) at 3.) However, Amicus Curiae Community Police Commission ("the CPC")[2] does object and requests that the court deny the City's motion. (*See* CPC Resp. (Dkt # 581)).

Although the court ordered the parties to formulate and submit a methodology as described above, the court did not ask the City to seek the court's "approval" of that methodology. (*See generally* 5/21/19 Order.) The import of the court's order was not to "approve" a specific methodology but to set a deadline for the parties to formulate a plan to resolve the City's non-compliance with the Consent Decree. Obtaining the court's approval regarding accountability and returning to full and effective compliance with the Consent Decree is the ultimate issue on which the parties should focus. With this caveat in mind, and as more fully described below, although the court declines to "approve" the City's methodology, it nevertheless authorizes the City to proceed subject to the court's continuing supervision.

//

//

---

[2] On the same day that the parties executed the initial version of the Settlement Agreement, they also executed a Memorandum of Understanding, which created the CPC.

## II. ANALYSIS

Preliminarily, the court would like to address the Government largely unhelpful response to the court's order. (*See* US Resp. (Dkt. # 574).) Instead of providing a substantive response on accountability and the City's proposed methodology, the Government reiterated its position that considerations of police accountability "are outside the scope of the Consent Decree." (*Id.* at 2.) Accordingly, the Government simply "defer[red] to the City to implement [the City's] preferred approach." (*Id.* at 3.) The court understands that this was the position of the Government prior to the court's May 21, 2019, order. (*See* US Resp. to OSC (Dkt. # 528) at 3.) But the court ruled on that issue and concluded that the Government's position was not well-taken (*see* 5/21/19 Order at 5-10 (detailing the pertinent language within the Consent Decree and the myriad ways in which the parties have acquiesced to the court's jurisdiction concerning the Seattle Police Department's ("SPD") accountability regime throughout these proceedings)),[3] and the Government's penchant for relitigating the issue is unhelpful to the court and the process of reform.

The court now turns to the City's proposed methodology. (*See* Mot.; *see also* Katz Decl. (Dkt. # 577) ¶ 7, Ex. A (attaching final, proposed methodology).) First, the City forthrightly admits that its proposal addresses only the first portion of the court's May 21, 2019, order—a methodology for assessing the present accountability regime—

---

[3] Moreover, in the Consent Decree, the parties expressly agreed that the court "has the power, *sua sponte*, to issue orders . . . including, but not limited to, the construction . . . of [the Consent Decree's] terms and provisions . . . ." (Consent Decree ¶ 224 (as revised by the parties and entered by the court at Dkt. ## 11, 13).)

and leaves the issue of how the City proposes to achieve compliance until after the city completes that portion of the court's order. (*See* Mot. at 3 ("With regard to part (2) of the Court's Order, 'how the City proposes to achieve compliance,' the City will review the completed assessment, and with the input of the Monitor, [the] CPC, [the Office of the Inspector General ('OIG'), the Office of Professional Responsibility ('OPA'),] and other key stakeholders submit a plan to the Court based on that assessment.").) To accomplish the first part of the court's order, the City hired a group of subject matter experts with expertise in labor law, police discipline, and civilian accountability to develop a proposed methodology for assessing the City's current accountability system. (*See id.* at 1.) The City represents that the experts will focus their assessment on: (1) calculation of the 180-day timeline for disciplinary investigations; (2) lack of subpoena authority for the [OPA] and the [OIG]; and (3) the standard of review and quantum of proof in disciplinary appeals. (*See id.* at 2, 21.)

In addition, the experts will also conduct a survey of accountability systems and gather data on disciplinary appeals in other "comparable police departments nationwide." (*Id.* at 2, 21-22.) As discussed below, if the City intends to use the nationwide survey to justify its current accountability system (*see* Mot. at 17 (indicating that one purpose of the assessment is to "increase public confidence")), then the exercise will be a failure, reform will be delayed, and full and effective compliance with the Consent Decree will recede further into the future.

Finally, the City commits that its "top priorities" in the next round of collective bargaining with the police unions will include: (1) calculation of the 180-day timeline for

disciplinary investigations; (2) lack of subpoena authority for OPA and OIG; (3) the standard of review and quantum of proof in disciplinary appeals; and (4) features of grievance arbitration that affect public confidence, such as degree of transparency and the selection process for arbitrators. (*Id.* at 3, 24-26.) The City states that it can complete the survey and accountability assessment by November 29, 2019. (*Id.* at 23.)

Although the Government offers no objection to the City's proposal, the CPC urges the court to reject it. (*See generally* CPC Resp.) Many of the CPC's objections center on the idea that the City's proposed assessment is redundant of work the CPC has already done. (*See* CPC Resp. at 5-9.) The court acknowledges the CPC's significant contributions over the life of the Consent Decree and the substantial reforms contained in the Police Accountability Ordinance,[4] which the City Council unanimously approved and the Mayor signed in 2017. For these reasons, the court understands that the CPC is highly invested in the Police Accountability Ordinance, which represents the culmination of the CPC's work under the parties' Memorandum of Understanding.[5] (*See id.* at 9 (arguing that the Police Accountability Ordinance should be "the starting point" of any assessment).) However, the reality is that many of the reforms in the Accountability Ordinance did not survive the City's collective bargaining with its police unions. Although some or all of the reforms contained in the Police Accountability Ordinance

//

//

---

[4] Seattle, Wash., Ordinance 125315 (June 1, 2017).

[5] *See supra* footnote 2.

may be reinstated following additional collective bargaining in 2020 (*see* Mot. at 23-26), the court clarified in its May 21, 2019, order that it was "not ruling that—to be in full and effective compliance—the City must necessarily return to the provisions of the Accountability Ordinance . . . as those provisions existed prior to collective bargaining" (5/21/19 Order at 13). Indeed, the court acknowledged that there may be "other methods" for bringing the City into compliance on the issue of accountability. (*Id.*) In other words, new thinking on the issue may find pathways not yet considered that will not only satisfy the requirements of the Consent Decree but also survive collective bargaining. Full and effective compliance on accountability is not wedded to the Police Accountability Ordinance, and the court concludes that a methodical search for new ideas—as the City proposes—may further the work of reform.

Further, as the City noted "[a]ll of the Consent Decree assessments conducted by the Monitor during Phase I were designed and conducted by national subject matter experts." (Mot. at 17.) Thus, the City argues that a similar assessment of the current accountability system will enable the parties to "develop a methodology for measuring compliance with accountability" and setting corresponding standards. (*Id.*) The court agrees, and for this reason does not consider the assessment that the City proposes to be redundant of the CPC's prior work. Indeed, in its May 21, 2019, order, the court specifically directed the parties to "formulate a methodology . . . for assessing the present accountability regime." (5/21/19 Order at 13-14.) For these reasons, the court does not find the CPC's objections based on redundancy to be well-taken.

//

The CPC raises one concern, however, that mirrors a concern of the court. The CPC argues that a nationwide survey is not useful because "[e]quivalency to other cities is not a metric to determine compliance with the Consent Decree." (CPC Resp. at 7 (bolding omitted); *see also id.* at 8 (arguing that "Seattle should not aspire to the lowest common denominator").) The court agrees. The court has already determined that the City is out of compliance with the Consent Decree on accountability. (*See generally* 5/21/19 Order.) The City may not utilize its proposed nationwide survey as a stealth method of bringing an out-of-time motion for reconsideration of that ruling. If, however, the City intends to utilize the survey to formulate an appropriate compliance-related assessment process, develop new ideas or models related to accountability, and collect data that may be of assistance to the parties in collective bargaining, then the court believes that the exercise could be productive and further the cause of reform. The court is confident that the City will heed this warning, and thus, authorizes the City to implement its proposed methodology for assessing its present accountability regime.

One issue remains: the role of the Monitor, as the court's agent, in assessing the City's compliance on accountability. The court remains hopeful that—except for accountability—the court will be able to discharge the remaining portions of the Consent Decree at the end of the two-year sustainment period—ending both the court's and the Monitor's role in assessing areas other than accountability. The court understands that the Monitor submitted a proposal to the parties concerning his role in assessing the City's progress on accountability, which both the City and the Government rejected on grounds that accountability falls outside the duties assigned to the Monitor under the Consent

Decree. As discussed above, the court takes a contrary view.[6] Accordingly, the court ORDERS the parties, in consultation with the Monitor, to submit a joint proposal from the parties (or, if necessary, separate proposals) concerning the Monitor's role in assessing compliance with the Consent Decree on accountability. The court notes that once the two-year sustainment period is complete for all areas governed by the Consent Decree except for accountability, the OPA and OIG will presumably be fully operational and have primary responsibility for SPD oversight. Thus, the work of the Monitor in assessing accountability may at that time intersect with or overlap the work of the OPA and the newly created OIG. *See, e.g.*, Accountability Ordinance § 3.29.240. The court, therefore, ORDERS the parties to consider how best to utilize these resources (the Monitor, the OPA, and the OIG) to assist the City in achieving compliance on accountability and the court in administering the Consent Decree in this final area and to include this analysis in their proposal(s).

### III. CONCLUSION

Based on the foregoing analysis, the court authorizes the City to proceed with its proposed methodology for assessing the present accountability regime (Dkt. # 576). The court ORDERS the City to file its completed accountability assessment no later than November 29, 2019. (*See* Mot. at 23.) At that time, the City also must comply with the second portion of the court's May 21, 2019, order and submit a "methodology . . . for

---

[6] The court notes that, in addition to his other duties, the Consent Decree states that "[t]he Monitor will be an agent of the Court for purposes of assessing the City's compliance with the [Consent Decree].". (*See* Consent Decree ¶ 172 (as modified by the parties' stipulation and entered by the court in Dkt. ## 11, 13).)

how the City proposes to achieve compliance" on the issue of accountability. (5/21/19 Order at 14.) The Government and the CPC may file their responses to the City's accountability assessment and proposed methodology to achieve compliance no later than December 13, 2019.

In addition, as described above, the court ORDERS the parties to submit a joint proposal (or, if necessary, separate proposals) concerning the Monitor's role in assessing accountability compliance. The parties must submit their proposal(s) no later than November 29, 2019. The CPC may, but is not required to, comment on the parties' proposal(s) concerning the Monitor's role no later December 13, 2019.

Dated this 15th day of October, 2019.

JAMES L. ROBART
United States District Judge