SEATTLE
POLICE
MONITOR

# Follow-up Review of the Office of Police Accountability

**January 10, 2020**

I.      Introduction

In accordance with the Consent Decree's Phase II Sustainment Period Plan,[1] this report summarizes the Monitoring Team's review of the Seattle Office of Police Accountability's ("OPA") investigations, closed between June 1, 2018, through May 31, 2019.  In conducting this review, the Monitoring Team focused on the "timeliness of OPA investigations, including the frequency of cases that have missed the 180-day disciplinary window" and the "quality and integrity of OPA's investigations."[2]   The Monitoring Team also examined the "quality, consistency, and timeliness of OPA interviews and the thoroughness of OPA investigations raising potential criminal or terminable offenses."[3]   The review's purpose "is not to assess compliance with specific requirements under the Consent Decree."[4]   Rather, this review was designed to follow-up on issues the Monitoring Team identified in its *Fourth Systemic Assessment: Office of Professional Accountability,* filed with the court on January 22, 2016,[5] and provide information to the OPA and other stakeholders about how the OPA, a key component of Seattle's police accountability system, can continue to improve its performance.

Consistent with previous reviews of the OPA's operations and investigations, conducted by both the United States Department of Justice ("DOJ") and the Monitor,[6] the Monitoring Team found that the quality of the great majority of OPA's investigations is generally "adequate" or "thorough, well documented, and complete."[7]  The Monitoring Team also determined that OPA closed 95% of investigations within the 180-day deadline, a significant improvement since the Monitoring Team's 2016 assessment, which found that OPA closed 75% of cases within the 180-day deadline.[8]   The Monitoring Team's examination of cases raising potential criminal or terminable offenses identified issues in some of these cases, but not systemic problems unique to these types of investigations.   By contrast, the Monitoring Team's 2016 assessment did identify systemic problems in these types of cases.[9]

---

[1] Dkt. 444.

[2] Dkt. 444-1, at 29.  (References to specific page numbers refer to the docketed page number, not the document's original pagination.)

[3] Dkt. 444, at 7.

[4] *Id.*

[5] Dkt. 259-1.  The Monitoring Team's 2016 review of the OPA evaluated 36 sample investigations that the OPA completed between August 1, 2014, and April 30, 2015.  *Id.* at 9.

[6] *See* e.g., United States Department of Justice, Civil Rights Division and U.S. Attorney's Office, W.D. Wash., Investigation of Seattle Police Department (Dec. 16, 2011), at 5 and App. D at 3, https://www.justice.gov/sites/default/files/crt/legacy/2011/12/16/spd_findletter_12-16-11.pdf ("[S]tructure of OPA is sound, and the investigations OPA itself conducts generally are thorough."); Dkt. 3-1, ¶ 164, at 50 ("DOJ found … the OPA system" to be "sound and that investigations of police misconduct complaints are generally thorough, well-organized, well-documented, and thoughtful."); Dkt. 259-1, at 5 ("[Monitor] found that … quality of the great majority of OPA's investigations [is] generally satisfactory or better.")

[7] *See infra* discussion, pp. 16-17.

[8] Dkt. 259-1, at 6-7, 28-30.

[9] Dkt. 259-1, at 6-7.

In an effort to provide substantive technical advice, the Monitoring Team discussed with the OPA issues it identified during this review, and found the OPA receptive to making recommended changes to address them.  These recommendations include: 1) updating the OPA Internal Operations and Training Manual; 2) increasing staffing to reduce investigative and case-closure completion delays; 3) improving the quality of OPA interviews; 4) seeking exceptions to the SPD's rule prohibiting the OPA from accessing any Homicide Unit documents while the homicide investigation is pending; 5) taking additional steps for some biased-based policing complaints to examine officers' thought processes; 6) documenting all case and investigative actions in a single report; 7) creating a stand-alone Investigation Plan form; and 8) making the OPA Case Summary report, which summarizes relevant and material evidence gathered, more useful and concise.

This report will first describe the OPA and its investigative process and detail the assessment's methodology.  It will then discuss the review's findings, conclusions, and recommendations.

**The Seattle Office of Police Accountability**

*Responsibilities*

The OPA is part of Seattle's three-pronged police accountability system, which also includes the Office of Inspector General for Public Safety ("OIG") and the Community Police Commission.[10] Though the OPA is part of the SPD administratively, which enables it to immediately access SPD-controlled data and records, it operates independently from the department both "physically and operationally," and is led by a civilian director.[11]  The OPA is responsible for processing allegations of misconduct—violations of SPD policy—involving SPD sworn and civilian employees.[12]  The OPA possesses limited subpoena authority to assist in carrying out these investigations.[13]  It does not conduct criminal investigations.[14]

---

[10] *See* City of Seattle Police Accountability Ordinance 125315 (June 1, 2017), https://www.seattle.gov/Documents/Departments/OPA/Legislation/2017AccountabilityOrdinance_052217.pdf. The Office of the Inspector General for Public Safety replaced the Independent Auditor for the City of Seattle Office of Professional Accountability ("OPA Auditor").  The Community Police Commission replaced the Office of Professional Accountability Review Board.

[11] Seattle Office of Police Accountability 2018 Annual Report (April 2019), at 6. https://www.seattle.gov/Documents/Departments/OPA/Reports/2018-Annual-Report.pdf.

[12] *Id.*

[13] The OPA did not possess subpoena authority under the Seattle Police Officers' Guild's ("SPOG") collective bargaining agreement applicable to most of the investigations the Monitoring Team reviewed for this report.  *See* Agreement By and Between the City of Seattle and the Seattle Police Officers' Guild, Effective through December 31, 2014.  In the absence of a new contract, this collective bargaining agreement was in effect until November 13, 2018.  Seattle's Police Accountability Ordinance, approved in June 2017, provided the OPA with authority to issue subpoenas.  *See* City of Seattle Police Accountability Ordinance 125315 (June 1, 2017), at 23.  However, since it was subject to collective bargaining, this provision did not go into immediate effect.  *Id.* at 85.  The SPOG's current collective bargaining agreement, which went into effect on November 14, 2018, acknowledges the OPA's authority to issue subpoenas under the Accountability Ordinance, but limits the OPA's subpoena authority with regard to issuing subpoenas to bargaining unit employees and their family members, and third-party subpoenas seeking personal records of such employees and their family members.  *See* Agreement By and Between the City of Seattle

3

In addition to handling individual allegations of SPD employee misconduct, the OPA is responsible for "promoting public awareness of, full access to, and trust in the complaint investigation process" and "identifying SPD system improvement needs and recommending effective solutions."[15]

*OPA Policy and Case-processing Changes Since Monitor's Fourth Systemic Assessment*

Since the Monitoring Team issued its *Fourth Systemic Assessment: Office of Professional Accountability*, in January 2016,[16] the city and OPA instituted a series of changes relevant to this current review.   First, in 2017, the OPA's name changed from the Office of Professional Accountability to the Office of Police Accountability.[17]  Second, the OPA revised and obtained court approval, on March 16, 2016, to issue an updated Internal Operations and Training Manual ("OPA 2016 Manual"),[18] which the OPA put into effect on April 1, 2016.[19]  Third, in March 2017, the OPA began instituting a vertical system of investigation.[20]  Under a vertical investigative system, the same investigator is assigned to the case from inception to disposition.  Within the OPA's investigative system, this means that the OPA now assigns the same investigator, in the absence of staff turnover or extended leaves, to conduct both the preliminary investigation and the subsequent "comprehensive," or "full" investigation.[21]  The Monitoring Team supports the OPA's decision to use a vertical system of investigation, which enhances internal accountability for investigative actions and decision-making and provides for continuity of contact with witnesses.  Fourth, in the latter half of 2016, the OPA began classifying cases it investigates in two ways, one as an "investigation," (hereinafter "full investigation") and the second as an "expedited investigation."  The OPA director must issue a Director's Certification Memorandum ("DCM") for both types of investigations.  Of the sample set of closed investigations the Monitoring Team examined for this assessment, expedited investigations constituted approximately 48.6%.

---

and the Seattle Police Officers' Guild, Effective through December 31, 2020, Appendix E, at 84, https://www.seattle.gov/Documents/Departments/OPA/Legislation/SPOG_CBA_expires_12-31-20_111418.pdf
[14] Seattle Office of Police Accountability 2018 Annual Report (April 2019), at 6.  When OPA receives a complaint involving possible criminal conduct, "it refers the case for criminal investigation within the appropriate jurisdiction and monitors its progress.  In such cases, OPA may simultaneously conduct an administrative investigation, if appropriate."
[15] *Id.*
[16] *See* Dkt. 259-1.
[17] The City of Seattle Police Accountability Ordinance 125315 (June 1, 2017) required that OPA's name be changed from the Office of Professional Accountability to the Office of Police Accountability.  *See also* Seattle Office of Police Accountability 2017 Annual Report (April 2018), at 4,
  https://www.seattle.gov/Documents/Departments/OPA/annualreports/Annual%20Report%202017FINAL.pdf.
[18] Dkt. 278.
[19] Office of Professional Accountability Internal Operations and Training Manual (April 1, 2016),
  https://www.seattle.gov/Documents/Departments/OPA/manuals/2016_04_01_OPA_Manual_Court_Approved.pdf,   (hereinafter OPA 2016 Manual).
[20] Interim OPA Auditor Final Report (May 31, 2019), at 4,
  https://www.seattle.gov/Documents/Departments/OIG/OPA/OPAAuditorReport053119.pdf.
[21] *Id.*

The OPA utilizes the category "expedited investigation" when the evidence gathered during its preliminary investigation disproves the allegation(s) by the totality of the evidence, usually video evidence.  In these cases, the OPA will issue an investigative finding based solely on the intake, or preliminary investigation, without interviewing the named employee(s).[22]  The OPA's intake investigation typically includes gathering and analyzing documentary evidence, such as police reports and video, and interviewing the complainant (when one exists), if possible. When the OPA classifies a case for a "full investigation," it conducts a "comprehensive investigation, which generally includes reviewing evidence and conducting interviews with involved parties and/or witnesses.  A [full] investigation is followed by a recommended finding and can result in formal discipline."[23]  Particularly with the SPD's deployment of body-worn cameras, which occurred in 2017, in appropriate cases the Monitor considers the use of expedited investigations to be a useful tool.  Expediting investigations allows the OPA to focus limited resources on cases where there are factual disputes.

*OPA Staffing*

The OPA's staff includes sworn officers, who are sergeants and largely responsible for conducting the OPA's investigations, and civilians dedicated to investigations management, public outreach, administrative processing, and policy and data analysis.   The sergeants "generally serve at OPA for a few years before rotating to a different SPD assignment."[24]

As a result of the city's 2017 Police Accountability Ordinance[25] and negotiation with the police unions, on May 31, 2019, the OPA civilianized investigative supervisory positions previously filled by one captain and two lieutenants.[26]   Based on Seattle's 2020 budget, since the end of

---

[22] *See* Seattle Office of Police Accountability, Complaints, Complaint Process, https://www.seattle.gov/opa/complaints/complaint-process (last accessed December 18, 2019).  According to the OPA website, the OPA often uses expedited investigations to "resolve allegations OPA is required by law and policy to investigate, such as excessive force, biased policing, and violations of law." *Id.*  The creation and use of expedited investigations, according to the OPA, has increased the proportion of complaints that OPA investigates and reduced the number of complaints it records as "contact logs."  (When the OPA classifies a complaint as a "contact log," it takes no action other than to record the information and send a closing letter to the complainant, if there is one.)  *Id.*  From 2017 to 2018, the proportion of complaints the OPA classified as investigations (both expedited and full) increased from 34% to 44%, and the proportion of complaints the OPA classified as contact logs decreased from 43% and 38%.  *See* Seattle Office of Police Accountability 2018 Annual Report, at 17; Seattle Office of Police Accountability 2017 Annual Report (April 2018), at 7.

[23] *See* Seattle Office of Police Accountability, Complaints, Complaint Process, https://www.seattle.gov/opa/complaints/complaint-process.

[24] Seattle Office of Police Accountability, About Us, Meet Our Staff, https://www.seattle.gov/opa/about-us/meet-our-staff (last accessed December 18, 2019).

[25] *See* City of Seattle Police Accountability Ordinance 125315 (June 1, 2017), at 28-29.

[26] *See* Seattle Office of Police Accountability 2017 Annual Report, at 4; Email from OPA Director to Monitoring Team, December 23, 2019.

2017, the number of budgeted OPA staff positions has increased from 19 to 26.[27]   The additional positions include one policy analyst, three community engagement specialists, one administrative specialist, and two civilian investigators. The Monitoring Team has long recommended that half of the OPA investigators be civilians.  Though the current dearth of such investigators is a matter of serious concern, the Monitoring Team is encouraged that the OPA now has two civilian investigator lines (a product of negotiation with the Seattle Police Officers Guild), which the OPA plans to fill by the end of March 2020.

As depicted in Figure 1, the OPA's total headcount is comprised of 26 full-time positions: nine sworn officers and 17 civilian staff members.

**Figure 1. OPA Organizational Chart**[28]



*Overview of Complaint Process*

As outlined in the OPA's 2016 Internal Operations and Training Manual, its 2018 Annual Report, and its website, the complaint process begins when a member of the public or an employee of the SPD reports a possible violation of SPD policy.  Generally, within five days of the OPA's receipt of the complaint, the OPA notifies the named employee(s) of the complaint, and the

---

[27] *See* Email from OPA Director to Monitoring Team, October 23, 2018 (providing historical staffing information); Seattle Office of Police Accountability, About Us, Organizational Chart, https://www.seattle.gov/opa/about-us/organizational-chart (last accessed December 18, 2019).
[28] Seattle Office of Police Accountability, About Us, Organizational Chart, https://www.seattle.gov/opa/about-us/organizational-chart.

employee's union.[29]  The OPA will also notify the complainant that the OPA has received the complaint.[30]   The OPA then assigns the complaint to an investigator for an intake, or preliminary investigation, which usually involves gathering SPD records, reviewing video, and interviewing the complainant (when one exists), if possible.[31]  The investigator memorializes the results of the preliminary investigation in an Intake Follow-up Report.

Within 30 days of receiving the complaint, the OPA's director, or the director's designee, determines, by classifying a complaint, how the OPA will proceed.[32]  For the June 1, 2018 to May 31, 2019 time period at issue in this assessment, the OPA used the following classification categories: "contact log;"[33] "supervisor action;"[34] "expedited investigation;" and "investigation" (full investigation).[35]

Upon classifying a complaint as an expedited investigation or full investigation, the OPA must issue a classification report to the named employee(s) detailing information concerning the complaint, including a complaint summary, the allegations, and the SPD Manual sections implicated.  The OPA will also notify the complainant of the classification.[36]

Expedited investigations differ from full investigations in one primary respect—there is no interview of the named employee(s).  A case is eligible for classification as an expedited investigation when the OPA determines that the evidence gathered during the intake investigation disproves the allegation(s) by the totality of the evidence.[37]  Once a case is classified as an expedited investigation, it is ready for closure, subject to review by the OIG, (formerly the OPA Auditor), a review process designed to ensure that the investigation is

---

[29] *See infra* discussion, p. 14.

[30] OPA 2016 Manual, at 6, 15, and 21-22.  If the OPA classifies the complaint as a contact log, the OPA will not notify the named employee or the union.  To protect the integrity of the criminal investigative process, for some complaints the OPA receives involving potential criminal conduct, the OPA will not notify the employee or the union.  If the employee is not identified, the OPA will notify the union, and notify the named employee once identified.  OPA 2016 Manual, at 21-22.

[31] Seattle Office of Police Accountability, Complaints, Complaint Process, https://www.seattle.gov/opa/complaints/complaint-process.

[32] Seattle Office of Police Accountability 2018 Annual Report, at 16.

[33] *See* Seattle Office of Police Accountability, Complaints, Complaint Process, https://www.seattle.gov/opa/complaints/complaint-process.  The OPA will record the complaint as a contact log if the allegation "does not involve a policy violation by an SPD employee or there is insufficient information to proceed with further inquiry[,]" e.g., complaints of slow police response times and parking ticket disputes.

[34] *Id.*  The OPA may decide the allegation is "best addressed through training, communication, or coaching by the employee's supervisor[,]" e.g., minor policy violations or performance issues.  The OPA will send a memorandum to the "employee's supervisor requesting that specific actions be taken.  The supervisor has 15 days to complete and return the case to OPA for review."

[35] *Id.*  In appropriate cases, the OPA will pursue alternative dispute resolutions such as mediation or rapid adjudication (employee recognizes his/her conduct was inconsistent with required standards and is willing to accept discipline in place of undergoing a full OPA investigation).  However, even when the OPA intends to pursue an alternative dispute resolution, the OPA may classify the case for investigation so that it can still meet its classification notification obligations, as detailed in collective bargaining agreements.

[36] OPA 2016 Manual, at 6, 15, and 22-23.

[37] *See supra* discussion, p. 5.

thorough, timely, and objective.[38]   For cases classified for full investigation, the OPA will conduct additional investigative steps, as necessary, and interview the named employee(s).[39]

Once a full investigation is complete, it is also subject to OIG review.  After the OIG has reviewed both expedited investigations and investigations, the OPA may conduct additional investigative steps as requested by the OIG.  To close the case, the OPA director issues a Director's Certification Memo ("DCM"), summarizing the evidence collected during the investigation and reaching recommended findings using a preponderance of the evidence standard, except when "the allegation is one of dishonesty, in which case the collective bargaining requires the application of a clear and convincing standard of proof."[40]   The DCM, a redacted version of which (called a "closed case summary") is available on the OPA website for every investigation the OPA has closed, summarizes the complaint and the evidence, and analyzes each allegation by applying relevant SPD Manual provisions to the established facts.  It explains how the OPA director reached his findings.[41]   For each allegation, the OPA reaches either a "sustained" finding, indicating the OPA determined that the employee violated a SPD policy or one of five "not sustained" findings: not sustained (unfounded); not sustained (lawful and proper); not sustained (inconclusive); not sustained (training referral); and not sustained (management action).[42]   For cases involving a sustained finding, only the SPD chief of police possesses the authority to impose discipline.[43]

A key deadline in the investigative process is the 180 days by which the OPA must close investigations in order for discipline to be imposed.[44] To ensure a timely investigation, OPA generally calculates the 180-day deadline from the date of incident, even if the OPA receives the complaint at a later date.[45]   For not sustained cases, the end date is the day that the OPA issues the DCM. For sustained cases, the OPA holds a disciplinary meeting with the named

---

[38] *See* City of Seattle Police Accountability Ordinance 125315 (June 1, 2017), at 44-46.

[39] *See* Seattle Office of Police Accountability, Complaints, Complaint Process, https://www.seattle.gov/opa/complaints/complaint-process.

[40] *Id.* at 37.  *See also* Agreement By and Between the City of Seattle and the Seattle Police Officers' Guild, Effective through December 31, 2014 (in effect until November 13, 2018), § 3.1, at 5.  This agreement deemed that a presumption of termination applies to sustained findings of dishonesty.  The new collective bargaining agreement reiterates that the presumption of termination applies to sustained findings of dishonesty, and that for "termination cases where the alleged offense is stigmatizing to a law enforcement officer, making it difficult for the employee to get other law enforcement employment," the "standard of review and burden of proof in labor arbitration requires an elevated standard of review (i.e. - more than preponderance of the evidence)...." Agreement By and Between the City of Seattle and the Seattle Police Officers' Guild, Effective through December 31, 2020 (in effect beginning November 14, 2018), § 3.1, at 6.

[41] *See* Seattle Office of Police Accountability, Complaints, Complaint Process, https://www.seattle.gov/opa/complaints/complaint-process.

[42] *See* Seattle Office of Police Accountability, Complaints, Complaint Process, https://www.seattle.gov/opa/complaints/complaint-process.

[43] *Id.*  The chief may delegate discipline involving oral or written reprimands to assistant chiefs.  For more information regarding the disciplinary process after the OPA reaches a sustained finding, *see* OPA 2016 Manual, at 39-42.

[44] *See infra* discussion, pp. 11-12.

[45] *See* Seattle Office of Police Accountability 2018 Annual Report, at 21.

officer's chain-of-command and other SPD command staff.  Following the disciplinary meeting, if the disciplinary determination is to issue a written or oral reprimand, the end date is the date of the final outcome—the date of the reprimand or closure letter.[46]   If the discipline recommended involves suspension, demotion, or termination, the date the SPD issues to the officer the "proposed discipline action report" is the end date.[47]

The OIG, one of the three prongs of Seattle's police accountability system, serves to provide an additional layer of review, as indicated in this section, at different stages of the investigative process.  First, the OIG reviews the propriety of all classification decisions.  Second, the OIG reviews all cases the OPA designates for expedited investigations (after completion of the intake investigation).  If the OIG does not find that the expedited investigation is thorough— without interviews of the named employees—and therefore not appropriate for an expedited investigation classification, the OPA will conduct a full investigation.  Third, the OIG reviews all completed investigations, can request that the OPA conduct investigative steps, and ultimately certifies in a memorandum, whether it believes that the OPA investigation was objective, thorough, and/or timely.[48]

*Complaints*

The OPA received 1,313 complaints in 2017, and 1,172, in 2018.[49]   During 2018, it classified a total of 1,172 complaints as follows: 518 investigations (including expedited investigations); 449 contact logs; 197 supervisor actions; and seven mediations.[50]   By contrast, in 2017 the OPA classified 1,313 complaints: 453 investigations (including expedited investigations); 570 contact logs; 283 supervisor actions; seven mediations; and 14 frontline investigations.[51]   Consequently,

---

[46] *See* Email from Seattle assistant city attorney to Monitoring Team, December 19, 2019

[47] OPA 2016 Manual, at 35-36.

[48] *See* Seattle Office of the Inspector General, About, Oversight of Police Misconduct Cases, https://www.seattle.gov/oig/opa_oversight (last accessed December 18, 2019).  *See also* Email from OPA Director to Monitoring Team, December 23, 2019.  In the event that a complaint presents a conflict of interest for the OPA (e.g., a member of the OPA is involved in the complaint), the OIG will also handle the classification, and investigate the complaint if necessary.  In addition, the OIG conducts reviews of the OPA, as warranted, involving any systemic concerns, as it does of the SPD generally.  [E]ach OIG annual report will include the OIG's analysis of how well [the] OPA is meeting its responsibilities."  Seattle Office of the Inspector General, About, Oversight of Police Misconduct Cases, https://www.seattle.gov/oig/opa_oversight.

[49] Seattle Office of Police Accountability 2018 Annual Report, at 9.

[50] *See* Email from Seattle city assistant attorney to Monitoring Team, December 17, 2019.  Based on an update of OPA's data, the number of cases classified as investigations varied from the 519 reported in the Seattle Office of Police Accountability 2018 Annual Report, at 17.

[51] *See* Email from Seattle city assistant attorney to Monitoring Team, December 17, 2019.  Based on an update of OPA's data, the number of complaints and cases classified as investigations, contact logs, and supervisor actions varied slightly from the numbers reported in the Seattle Office of Police Accountability 2017 Annual Report, at 7. The OPA also used to classify some complaints as "frontline investigation," which meant that it referred the complaint to the named employee's chain of command to investigate and address minor administrative procedural, or technical violations of SPD policy as the employee's supervisors deemed appropriate.  Seattle Office of Police Accountability 2017 Annual Report, at 6.

the number of complaints the OPA classified for investigation (thereby affecting its workload), from 2017 to 2018, increased by 65, or 14.3%.

## II.    Methodology

For this assessment, the Monitoring Team reviewed OPA investigations closed between June 1, 2018, and May 31, 2019, involving sworn officers.[52]   During this date range, the SPD and the OPA did not make any significant policy changes related to the OPA investigative process.  The Monitoring Team reviewed both expedited investigations and full investigations, cases closed with both sustained and not sustained findings, and those that involved alleged use of force allegations and those that did not.

Between June 1, 2018, and May 31, 2019, the OPA completed 494 investigations involving sworn officers; it completed 530 investigations involving all employees.[53]

Each "investigation" or "case" refers to an individually numbered OPA complaint.  A case can include one or more allegations, with one or more named (subject) employees, including both a sworn officer and a civilian employee, e.g., a parking enforcement officer.  A "completed" investigation is one for which the OPA director has issued a DCM.

From the pool of 494 closed investigations involving sworn officers, the Monitoring Team selected a random sample of 38 cases to assess. The Monitoring Team calculated the sample size using an 80% confidence level and a 10% margin of error.  The Monitoring Team then used a random number generator to randomly select the cases.  During the review, the Monitoring Team and the city realized that one of the electronic case files the OPA provided to the Monitoring Team corresponded to a different case, which fell outside the review's parameters. The Monitoring Team dropped this case from the review, which left a sample of 37 cases.  Using a sample size of 37 did not impact the confidence level or margin of error, which remains at 80% and 10%, respectively.

In total, the Monitoring Team used seven expert reviewers for this assessment.  Two experts reviewed each closed investigation, which the OPA provided to reviewers on hard drives.  The OPA electronic case files (the OPA no longer uses paper case files) included the original complaint, in-car video, body-worn camera video, and other SPD records, audio recordings of interviews, transcripts of officer interviews, Intake Follow-up Reports, Investigation Plan & Case Summary Reports, notifications to and correspondence with complainants and named officers, OPA Auditor or OIG Investigation Review memoranda, and Director Certification Memos.  For each case, reviewers applied a standardized assessment instrument, which, but for minor changes, mirrored the assessment instrument Monitoring Team reviewers used for the *Fourth*

---

[52] These cases sometimes involve retired sworn officers in possession of a "special commission" from the SPD that allows them to be hired, as private citizens, to perform certain law enforcement-type functions.  The SPD chief has the authority to revoke special commissions.

[53] Email from OPA Management Systems Analyst to the Monitoring Team, September 4, 2019.

*Systemic Assessment*.  Each reviewer also possessed the OPA's 2016 Manual, referenced in the assessment instrument, to measure the OPA's compliance with its own policies and procedures. Through October 23, 2019, the reviewers entered their assessments into SurveyMonkey, a central database.   For seven weeks, beginning September 10, 2019 and ending October 21, 2019, the reviewers discussed, in a conference call, their findings, comments, and questions about cases on each week's agenda, with the OPA director, a Seattle assistant city attorney, members of the SPD command staff, at least one representative from the DOJ, and a representative from the OIG.  Prior to each call, the Monitoring Team provided the reviewers' case notes to the city and the DOJ.  These conference calls permitted the Monitoring Team members to identify issues they spotted in cases, hear the city's response, and in some instances discuss mutually agreeable solutions to issues.

The Monitoring Team provided a draft of this report to the city of Seattle and the DOJ on November 12, 2019.  On December 10, 2019, the city of Seattle and the DOJ both provided feedback regarding the draft to the Monitoring Team, which in turn submitted a revised draft to the DOJ and the city on December 23, 2019.   The city of Seattle provided its final written feedback to the Monitoring Team on January 4, 2020, and January 7, 2020.

## III.    Findings

This section will first address the overall timeliness of OPA's investigations, specifically its compliance with the 180-day deadline for case closures, and its compliance with other internal deadlines, which stem from the collective bargaining agreements that govern the SPD's disciplinary and internal investigation procedures.  Second, the section will then focus on the Monitoring Team's assessment of the quality and consistency of the OPA's investigations, including the overall evaluation of the quality of its investigations, and the investigation's components, including the thoroughness of its evidence gathering, the quality of its interviews, Case Summary, recommendations, and Director's Certification Memo.  Finally, the section will analyze the concerns that the Monitor's Fourth Systemic Assessment described, including issues involving the thoroughness of OPA investigations raising potential criminal or terminable offenses.

**Timeliness of OPA Investigations**

*Case Closures*

Seattle's collective bargaining agreements with the Seattle Police Officers' Guild ("SPOG") and the Seattle Police Management Association ("SPMA"), specify, with few exceptions, that "no discipline may result from [an OPA] investigation if the investigation of the complaint is not completed within … 180 days after receipt of the complaint by the OPA or by a Department

sworn supervisor…."[54]  The OPA has memorialized this 180-day deadline in its Internal Operations and Training Manual,[55] and to ensure a timely investigation, generally begins calculating the 180-day start date from the date of incident.[56]   In assessing the OPA's compliance with the deadline, the Monitoring Team took into account cases in which the OPA ran the 180-day start date from the date it received the complaint rather than the date of incident, extensions to the 180-day deadline the OPA obtained from the union, and the differing end dates for sustained and not sustained cases.

The Monitoring Team found that the OPA closed 35 of 37 cases, or 95%, within the 180-day time frame.[57]  This is a substantial improvement since the Monitoring Team's prior assessment of the OPA—involving the period of August 1, 2014 through April 30, 2015—when it concluded that in "a full one-fourth of OPA cases, the [OPA] did not meet the well-known 180-day deadline."[58]   The OPA's accomplishment is particularly impressive in light of the fact that the number of complaints it is classifying for investigation (expedited and full) has increased and its investigative staffing has remained relatively static.  Of the 37 cases the Monitoring Team examined, the OPA sustained one or more allegations in three cases and closed 34 with no sustained findings.  Of the two not sustained cases where the OPA did not meet the 180-day deadline, the OPA found both to be not sustained based on the merits of the complaint.  In one case, the OPA placed its administrative investigation on hold while the SPD conducted a criminal investigation that took eight months.   In the second case, the OPA erroneously calculated the date it received the complaint as later than when it actually did.

*Case-completion Times*

In evaluating the OPA's 95% compliance with the 180-day investigation period, the Monitoring Team observed that investigative delays in numerous cases prevented the OPA from closing cases more expeditiously.  Measuring case-completion times from the date the OPA received the complaint until the DCM date, as depicted in Table 1 (page 13), the Monitoring Team found that OPA took 121 to 150 days to close 19% of cases and 151 to 180 days to close 70% of cases. The OPA closed four cases, or 11%, on or after the 181st day.  As described above, two of these four cases were not closed within the case closure deadline.  In the two others, the OPA

---

[54] Agreement By and Between the City of Seattle and the Seattle Police Officers' Guild, Effective through December 31, 2020 (in effect beginning November 14, 2018), §§ 3.6(B)-(D), at 9-12;
Agreement By and Between the City of Seattle and the Seattle Police Officers' Guild, Effective through December 31, 2014, § 3.6(B), at 10 (in effect through November 13, 2018); Agreement By and Between the City of Seattle and the Seattle Police Management Association, Effective January 1, 2014 through December 31, 2019, § 16.4(C), at 34, https://www.seattle.gov/Documents/Departments/OPA/Legislation/SPMA_CBA_expires_12-31-19_111717.pdf.
Although the predecessor SPOG agreement was in effect and applicable to most of the investigations the Monitoring Team reviewed, this report will cite to the current SPOG agreement unless the cited provisions substantively vary from the predecessor agreement.

[55] OPA 2016 Manual, at 35-37 and 43-44.

[56] Seattle Office of Police Accountability 2018 Annual Report, at 21.

[57] The Monitoring Team's findings with respect to the OPA's compliance with the 180-day deadline are consistent with those of the OPA.  According to its annual report, in 2018 the OPA completed 94% of all investigations within the 180-day deadline, and none of the untimely investigations contained sustained findings.  *Id.*

[58] Dkt. 259-1, at 6.

requested and obtained extensions from the SPOG, extending the 180-day deadline by 14 and 15 days, respectively, and the OPA closed each of these cases within the extended deadline date. The Monitoring Team is concerned that when the director completes the DCM on or near the 180-day, it will be too late for the OPA to conduct any additional investigative steps, including re-interviewing witnesses, should the OPA director believe further investigation is warranted. In conversations with the OPA, it acknowledged the delays and attributed them to caseloads, complaint and investigation rates, and staffing issues. From 2017 to 2018, for example, the number of complaints the OPA classified for investigation (expedited or full) rose from 453 to 518, a 14.3% increase.[59] Given the number of authorized line investigator positions (nine at the end of 2017 and ten during most of 2019), even slight increases in the number of investigations can disproportionately affect caseloads. Investigator turnover and unexpected leaves, both of which occurred during the review period, can also lead to undesirable case reassignments and caseload increases.[60]

**Table 1. Days to Complete Investigations, Measured from Date OPA Received Complaint to Date of Director's Certification Memorandum**

|  | Full Investigations | | Expedited Investigations | | Total | |
|---|---|---|---|---|---|---|
| 0 to 90 Days | 0 | 0% | 0 | 0% | 0 | 0% |
| 91 to 120 Days | 0 | 0% | 0 | 0% | 0 | 0% |
| 121 to 150 Days | 3 | 16% | 4 | 22% | 7 | 19% |
| 151 to 180 Days | 13 | 68% | 13 | 72% | 26 | 70% |
| 181 or more Days | 3 | 16% | 1 | 6% | 4 | 11% |
| Total | 19 | 100% | 18 | 100% | 37 | 100% |

Four cases illustrate two types of delays the Monitoring Team found in investigations. The first type involves delays in conducting interviews of sworn officers and other investigative tasks. For example, in a case that resulted in sustained findings against two officers, involving the use of improper neck restraints, the OPA classified the complaint on May 11, 2018, but did not begin to conduct interviews of officers until August 15, 2018, a delay of more than three months. The OPA Auditor did not certify this OPA investigation as timely and the OPA closed the case on the 180-day date. In a second case involving allegations that a lieutenant retaliated against a sergeant for filing an OPA complaint against officers under her command,[61] the OPA classified the complaint on June 1, 2018, but did not conduct subsequent investigative work until August 29, 2018, when it interviewed the named officer. The assigned investigator, a lieutenant with supervisory responsibilities, indicated in the Investigation Plan & Case Summary, that "[d]ue to case load and other responsibilities, I did not work on this case for

---

[59] *See supra* discussion, pp. 9-10.

[60] *See* Email from OPA Director to Monitoring Team, October 23, 2018 (providing historical staffing information).

[61] *See infra* discussion, p. 18, where the report describes this investigation.

extended periods of time.[62]   The OPA Auditor did not certify this OPA investigation as timely and the OPA closed the case on the 180-day date.   The second type of delay involves time lags between the completion of the investigation and the issuance of the DCM, which is driven by the number of DCMs for which the OPA director is responsible—530 during the 12-month assessment period.   For example, in a case the OPA determined to close as an expedited investigation on May 18, 2018, (signifying that the case was ready to be closed after the intake investigation), the OPA did not complete the DCM until October 11, 2018, nearly five months later and one day before the 180-day deadline.   For a second case the OPA closed as an expedited investigation, there was a more than four-month time lag between the classification, on April 6, 2018, and the DCM, which the OPA completed on the 180-day date, August 28, 2018.

**Timeliness of Investigative Actions**

*Notification to Sworn Officers of Complaint*

The OPA complied with requirements to notify sworn officers of complaints, within specified time guidelines, in 33 of 34 applicable cases.   The Seattle Police Officers' Guild collective bargaining agreement states that "except in criminal investigations or where notification would jeopardize the investigation … the [OPA] shall notify the named employee of the receipt of a complaint, including the basic details of the complaint, within five … days after [OPA's] receipt of the complaint…."[63] The agreement further specifies that if the OPA cannot immediately identify the named employee, the OPA shall notify the union of the complaint and notify the named employee within five days once identified.[64]   The OPA has incorporated this deadline in the OPA 2016 Manual, which also states that the OPA "usually defaults to SPOG requirements regarding notice and timelines, as they are the most stringent."[65]   Of the 37 cases the Monitoring Team examined, it found that the OPA notified the named sworn officer(s) of the complaint within five days of receipt in 32 cases and in three of the four cases where it did not, the OPA referred the cases for criminal investigation, an explicit exception to the five-day notice requirement.   In just one case when required to do so, the OPA did not provide notice of

---

[62] The OPA assigned this case to lieutenant because the named officer was a lieutenant and the collective bargaining agreement with the SPMA requires that "the lead investigative function … be performed by an officer of equal or greater rank….   If officers holding the rank of [l]ieutenant or [c]aptain have been replaced through civilianization, the lead investigative function may be performed by a civilian permanently assigned to the OPA. Agreement By and Between the City of Seattle and the Seattle Police Management Association, Effective January 1, 2014 through December 31, 2019, § 16.4(A), at 33.   At the time this case was investigated, the OPA had not yet hired civilian investigative supervisors (replacing a captain and two lieutenants).   The OPA plans to hire its first civilian investigators in the first quarter of 2020.  *See supra* discussion, pp. 5-6.

[63] Agreement By and Between the City of Seattle and the Seattle Police Officers' Guild, Effective through December 31, 2020, § 3.6(A), at 9 (in effect beginning November 14, 2018).  *See also* Agreement By and Between the City of Seattle and the Seattle Police Management Association, Effective January 1, 2014 through December 31, 2019, § 16.4(B), at 33.  The SPMA agreement requires notice of the complaint to the named officer within ten days.

[64] Agreement By and Between the City of Seattle and the Seattle Police Officers' Guild, Effective through December 31, 2020, § 3.6(B), at 10 (in effect beginning November 14, 2018).

[65] OPA 2016 Manual, at 21.

14

the complaint within five days.  The OPA, therefore, complied with the requirement (accounting for the three cases excepted from the requirement), in approximately 97% of the sample cases.

*Intake Investigation*

The police unions' collective bargaining agreements require that the OPA classify complaints within 30 days "after receipt of the complaint by the OPA or by a [d]epartment sworn supervisor."[66]  Consequently, OPA's internal "goal," as articulated in the OPA 2016 Manual, "is to have the intake, or preliminary investigation completed within two weeks."[67]  However, … the intake investigation must be completed soon enough to allow the OPA [d]irector to make a classification decision within 30 days from the date on which the complaint was received by OPA."[68]   The Monitoring Team assessed the timeliness of the OPA's intake investigation and found that, (excluding one case in which the OPA did not document conducting an intake investigation), the OPA completed intake investigations in less than 30 days approximately 94% of the time, or in 34 of 36 cases.  The OPA completed its intake investigation within two weeks in nine cases, or 25% of the time.  In 25 other cases, 69% of the sample, the OPA completed the intake investigation in less than 30 days.  In approximately six percent, or two cases, the OPA placed the administrative investigation on hold during the pendency of a criminal investigation and took more than 30 days to complete the intake investigation.  For these criminal cases, the collective bargaining agreements' 30-day classification notice requirement did not apply.

*Classification of Complaints*

The Monitoring Team evaluated the OPA's compliance with deadlines, established by the unions' collective bargaining agreements, for the classification of complaints.    These agreements require that the OPA furnish, with limited exceptions, the named employee(s) and the relevant union(s) "with a classification report no later than … 30 days after the [OPA's] receipt of the complaint."[69]  The classification report must detail how the OPA classified the complaint, a list of allegations and SPD Manual provisions allegedly violated, and other information pertinent to the complaint.[70]   The OPA 2016 Manual makes these classification requirements clear for OPA staff.[71]

---

[66] Agreement By and Between the City of Seattle and the Seattle Police Officers' Guild, Effective through December 31, 2020, § 3.6(A), at 9 (in effect beginning November 14, 2018); Agreement By and Between the City of Seattle and the Seattle Police Management Association, Effective January 1, 2014 through December 31, 2019, § 16.4(B), at 33.

[67] OPA 2016 Manual, at 19.

[68] *Id*.

[69] Agreement By and Between the City of Seattle and the Seattle Police Officers' Guild, Effective through December 31, 2020, § 3.6(A), at 9 (in effect beginning November 14, 2018).   *See also* Agreement By and Between the City of Seattle and the Seattle Police Management Association, Effective January 1, 2014 through December 31, 2019, § 16.4(B), at 33.

[70] *See* Agreement By and Between the City of Seattle and the Seattle Police Officers' Guild, Effective through December 31, 2020, § 3.6(A), at 9 (in effect beginning November 14, 2018); Agreement By and Between the City of Seattle and the Seattle Police Management Association, Effective January 1, 2014 through December 31, 2019, § 16.4(B), at 33.

[71] OPA 2016 Manual, at 22-24.

The OPA classified complaints consistent with applicable guidelines in 97% of the cases reviewed, or in 36 of 37 cases.  It classified 34 of the 35 cases in which the deadline applied within 30 days of receiving the complaint.  In two cases involving criminal referrals, an exception to the 30-day notice requirement, the OPA was not required to meet the 30-day deadline.   In one case, the OPA classified the complaint and notified the named officers one day late, due to an administrative error.

*Notification to Complainant of Classification and Nature of Classification*

The OPA 2016 Manual articulates standards for when staff must notify complainants of investigative actions and decisions.   For example, the OPA staff is required to notify complainants when the OPA has received the complaint, classified the complaint, completed the investigation, and when the OPA director has recommended findings to the chief of police.[72]  The Monitoring Team assessed compliance with one of these standards: whether the OPA provided a timely notification to the complainant of the OPA's classification decision.  The review revealed that of the 26 cases in which the OPA should have sent a notification of its classification decision, the OPA notified the complainant in 17 cases, or 65% of the time, and failed to notify the complainant in 35%, or nine cases.  In 11 of the 37 cases reviewed, there was no complainant, an anonymous complainant, or the OPA had already attempted to contact the complainant and learned it did not have a valid address.

*Notification to Officers of Interviews*

Officers' collective bargaining agreements require that officers receive advance notice before the OPA can interview them.  The OPA 2016 Manual articulates that employees covered under the SPOG contract must receive notice at least five calendar days prior to the interview;[73] it advises staff to check other collective bargaining agreements for notification requirements. The SPMA contract requires three business days' notice.[74]

The Monitoring Team found that the OPA made appropriate notifications in 84% of the cases, or 16 of 19 full investigations; it could not make a determination in the remaining 16%, or three cases, due to notifications missing from the file.

**Quality and Consistency of Investigations**

*Overall Quality of the Investigations*

In evaluating the overall quality of the OPA's investigations, the Monitoring Team rated approximately 81% of the sampled investigations as "adequate" or "thorough, well

---

[72] *Id*. at 15-16.

[73] OPA 2016 Manual, at 28.  *See also* Agreement By and Between the City of Seattle and the Seattle Police Officers' Guild, Effective through December 31, 2020, § 3.6(F)(2), at 13 (in effect beginning November 14, 2018).

[74] Agreement By and Between the City of Seattle and the Seattle Police Management Association, Effective January 1, 2014 through December 31, 2019, § 16.4(H)(2), at 36.

documented, and complete" and 19% as "inadequate,"[75] which is consistent with the Monitoring Team's 2016 assessment of OPA investigations.[76]

This section details some of the qualitative investigative issues the Monitoring Team identified in the investigations it reviewed. These issues, which the Monitoring Team discussed with the OPA during weekly conference calls, generated recommendations that the Monitoring Team describes in the final section of this report. The Monitoring Team and the OPA agree that implementation of these recommendations will enhance the quality of the OPA's investigations.

Interviewing Techniques[77]

The Monitoring Team determined that in some investigations, the OPA's interview techniques likely deprived it of necessary, material, and relevant evidence. For example, in one case, the OPA investigator who interviewed an officer accused of improperly using a Taser on a fleeing, non-violent suspect allowed responses to stand without the necessary follow-up or probing, including of potential inconsistencies. The officer had asserted that he saw the suspect reach towards his pocket and that the officer detected an object in the suspect's hand. The officer's body-worn camera video does not appear to corroborate some of the officer's assertions, and the investigator did not confront the officer with the video, or ask the officer about holstering his firearm if the officer believed the suspect possessed a weapon. The investigator did not question the officer's contention that he had no time to issue the requisite warning before using the Taser but did have time to order the suspect to stop. In his explanation as to what threat existed when the officer fired the Taser, the officer referenced a person running behind him (not the suspect), yet the investigator did not explore this aspect of the officer's account, and why the officer believed the use of the Taser to be appropriate in this circumstance. The

---

[75] Monitoring Team reviewers were asked to categorize their overall assessment of the quality of investigations in one of three ways:
- The investigation is thorough, well documented, and complete. The investigator(s) complied with all OPA protocols and made reasonable attempts to follow all leads and answer all material questions.
- The investigation is adequate. Although some aspects could be improved, any identified flaws did not appear to materially impact the quality of the overall investigation, and the resulting file provided sufficient information to evaluate the incident.
- The investigation is inadequate. The investigation does not establish sufficient information to support an evidence-based evaluation of the incident due to investigative deficiencies, material omissions, or other issues.

This report considered the overall quality of investigations and other qualitative findings (overall quality of the Case Summary, the Director's Certification Memo, and recommended findings) to be inadequate only when both reviewers rated the quality of the work product at issue as inadequate. With respect to the overall quality of investigations rating, this report excluded one case from the inadequate category since the issue the Monitoring Team identified was outside of the OPA's control and not the fault of OPA investigators.

[76] Dkt. 259-1, at 5-6, and 23. The percentage of cases the Monitoring Team found to be adequate in this report is not statistically different from the 86% percent found to be adequate in the Fourth Systemic Assessment. Therefore, the Monitor considers the proportion of cases determined to be adequate to be consistent with the Monitoring Team's 2016 findings.

[77] The Monitoring Team's 2016 report also identified "deficiencies related to interviews of involved officers, witness officers, and civilian witnesses" as an issue the OPA should address. *Id.* at 6.

OPA Auditor did not certify this OPA investigation as thorough, and detailed in his memorandum the interview's deficiencies.

In a second investigation, a sergeant complained, in writing, that a lieutenant retaliated against her because the sergeant filed a complaint with the OPA against officers under her command, who refused to communicate with her before entering a home without a warrant. Subsequently, according to the sergeant who filed the complaint, the lieutenant met with her and counseled her regarding the incident (memorializing the meeting in the Performance Appraisal System), lowered her evaluation scores, transferred her to different squad, and ceased to assign her to acting lieutenant duties.  The sergeant also alleged that the lieutenant had singled her out, possibly due to her gender.  The reviewers discovered numerous problems in this investigation, including the OPA's failure to interview the complaining sergeant and the precinct captain, who was present during the initial counseling session.  They also determined that the OPA interview with the named lieutenant was biased and incomplete.  The OPA DCM recognized that the assigned investigator "did not ask [the named employee] any specific questions concerning the basis for the [c]omplainant's transfer or concerning her and [the named employee's] relationship.  As such, OPA's investigation was incomplete in this regard."  When the Monitoring Team discussed this case in a conference call, the OPA indicated that it should have, upon receipt of the complaint, referred the entire case for an Equal Employment Opportunity ("EEO") investigation, and awaited the EEO Office's determination of what, if any allegation fell outside the EEO Office's jurisdiction.  (During the investigation, the OPA did refer the case to the EEO Office, but continued with its own investigation.)  The OPA 2016 Manual does not contain any information pertaining to ostensible EEO complaints the OPA receives.

In a third investigation, a woman complained that police entered her home improperly, without her consent, and that one of the officers laughed at her during the ensuing conversation.  In the investigator's telephone interview with the complainant, the investigator repeatedly used the term "the officers" or "they" to refer to both named officers; he failed to have the complainant differentiate between the two officers, did not ascertain whether one or both officers crossed the threshold of her home, or which one laughed at her.  In subsequent interviews with the officers, the lead officer volunteered that he was the officer in front and entered the home, but the investigator never determined whether the second officer entered the home as well.  When the investigator interviewed the lead officer, the investigator did not ask the officer to provide an open-ended narrative, never established the officer's partner's name, and never asked where the partner stood, in relation to the lead officer.  The investigator provided information to the officer the officer did not possess and led the officer through the incident asking leading questions, as illustrated by this series of questions and answers:

> Q: … when you first arrived at the residence, did you look inside the residence from the outside?
> A: I don't recall but more than likely.
> ...
> Q: OK, did you knock and announce your presence at the door?
> A: Yes.

Q: Did you attempt to open the … front door?
A: When I knocked, I don't recall, like specifically, but when I knocked, I believe the door opened from knocking or just from me pressing on the frame.
Q: OK.  Did you enter the residence?"

The Monitoring Team reviewers were not confident, based on the absence of evidence the interviews should have elicited, that the allegations of improper entry and unprofessionalism should have been pleaded against both officers.

### Investigative Steps Not Taken to Obtain Necessary Testimonial and Documentary Evidence

The OPA failed to interview or identify relevant witnesses and did not obtain the documentary evidence it should have in an investigation both reviewers deemed inadequate.  A doctor at a hospital overheard a detective aggressively question a shooting victim to obtain information about the shooting.  In the doctor's view, the detective utilized overly coercive threats and tactics, including obscenities, during questioning.  The OPA did not interview the shooting victim.  The OPA did not attempt to interview the shooting victim while he was still hospitalized or attempt reach this individual for nearly five months, when it sent a letter to the individual's last known address (and received no response).  In addition, the OPA made no effort to identify the patient the doctor indicated was in the "next bed," or that patient's family.  Finally, when the OPA interviewed the doctor by telephone, she indicated that she had made contemporaneous notes of the detective's conversation with the shooting victim, but did not have them with her at the time of the interview.  The OPA made no effort to obtain them, or to re-interview the doctor once she retrieved them.  The DCM stated that "the differences between the parties' version of events makes it difficult to reach a conclusive determination as to the [detective's] professionalism or lack thereof."  In the reviewers' opinion, that the OPA did not have more evidence to reach a conclusion by a preponderance of the evidence was a product of its own lack of investigative initiative.

### Inability to Obtain Homicide Unit Documentary Evidence

The OPA's investigation of a biased-based policing case was compromised by the OPA's inability to access SPD Homicide Unit files.  The father of a murder victim complained that the assigned detective did not provide him with the same information about the homicide case as his son's fiancée, because the father is African American and the fiancée is white.   The OPA did not obtain any records from the Homicide Unit or an affiliated victim advocate office that would presumably have documented the detective's and advocate's communications with both the father and the fiancée.  In the conference call during which this case was discussed, the city advised the Monitoring Team that the SPD does not permit the OPA or any other unit to access Homicide Unit files while the homicide investigation is still pending, and will not even provide redacted files to the OPA.  The inability to access these files detrimentally impacted the quality and depth of the interviews the OPA could conduct with both the complainant and the

detective.   (The OPA did not interview the fiancée.)   The OPA conceded that its ability to conduct investigations of allegations involving open Homicide Unit cases is limited.

<u>Biased-based Policing Allegations and Officers' Thought Processes</u>

The Monitoring Team reviewed a total of 14 full and expedited investigations involving allegations of biased-based policing, the great majority of which it rated as adequate or better. One case, though, illustrates the Monitoring Team's concern with the OPA's decision to classify a specific type of biased-based policing complaint as an expedited investigation—one where the officer's legal justification is based on his/her own observations, and the law enforcement decision or action at issue expressly results from the officer's discretion.  As captured on video, in this case, an officer in a marked patrol car observed an African American man riding a bicycle on a sidewalk.  The man was not wearing a helmet, in violation of the local health code, and the officer stopped him.  The bicyclist accused the officer of stopping him because he was black.   It is undisputed that the officer had probable cause to stop the bicyclist and issue him a citation for not wearing a helmet.  Under SPD policy, however, establishment of probable cause does not mean that biased-based policing did not occur.[78]   The OPA did not review the officer's citation history or interview the officer about what, if any, role race played in the officer's decision to stop the bicyclist for not wearing a helmet.   Notwithstanding that proof of bias, prejudice, or discriminatory intent is difficult to ascertain, the Monitoring Team believes that in these types of cases the OPA should conduct a full investigation, including interviewing the named officer and reviewing the officer's relevant citation history, in order to make a proper, evidence-based assessment of whether bias influenced the decision or action.

*Intake Investigation: Efforts to Interview Complainants*

Of the 28 cases reviewed in which there was a complainant, the OPA interviewed the complainant or made reasonable efforts to do so in all but two instances.  In 12 cases, the OPA conducted interviews with the complainant, during the intake investigation, and did not interview the complainant in 16.   In nine of the 37 cases, there was no complainant (an individual who made a complaint to on-scene SPD personnel, at a precinct, directly with the OPA, or to some other SPD employee or entity).   The OPA therefore interviewed the complainant in 43% of the cases in which a complainant existed.  The OPA interviewed two complainants in-person, both of whom came to the OPA office to file complaints and conducted the remaining ten complainant interviews by telephone.   Of the 12 cases in which the OPA interviewed the complainant, it recorded 11.  In the 16 cases where the OPA did not interview the complainant, the Monitoring Team found that the OPA made reasonable efforts to do so in 12 cases, did not make reasonable efforts in two, and in two other cases found the question not

---

[78] Seattle Police Department Manual, § 5.140, Bias-Free Policing, effective August 1, 2019, https://www.seattle.gov/police-manual/title-5---employee-conduct/5140---bias-free-policing (last accessed December 21, 2019).  The predecessor policy in effect during the assessment period also contained this language. *See also infra* discussion, p. 32.

applicable.  (With respect to the not applicable determinations, in one case the complainant informed the on-scene sergeant he did not want to pursue the complaint.  For the second case, the OPA only sent one letter to the incarcerated complainant's attorney, but the body-worn camera video disproved the complainant's allegations.)

While video is often not always dispositive, the Monitoring Team did find that of the 16 cases where the OPA did not interview the complainant, in 15, or 94%, body-worn camera video captured the incident.   Additionally, SPD protocol usually dictates that responding SPD sergeants interview complainants and available witnesses; these interviews are also recorded with body-worn cameras.   The OPA's files indicate that it routinely gathers this relevant evidence.

*Intake Investigation: Quality of Complainant Interviews*

Monitoring Team reviewers were able to assess the quality of the OPA's interviews of complainants in the 11 cases where the interview was recorded.  In all 11 cases the Monitoring Team found that OPA investigators accurately summarized the recorded interview in the investigative file.   The Monitoring Team found the OPA investigators' interview with the complainant was "thorough and unbiased" in seven cases, not thorough and/or biased in two, and the reviewers' opinions diverged in two.   This report previously described both cases in which the reviewers found the complainant interviews not thorough and/or biased—one involving a woman who complained of police unlawfully entering her home and the second involving the father of a homicide victim.

*Intake Investigation: Obtaining Perishable Evidence*

The OPA 2016 Manual dictates that during the intake investigation staff should focus first on preserving perishable evidence, for example, private video or audio recordings, and that post-classification, staff should ensure that any perishable evidence not already collected, is obtained.[79]    Of the 37 cases, in 26 the Monitoring Team did not detect that perishable evidence existed and in another it could not make a definitive determination.  In six cases, the OPA appropriately focused on retrieving perishable evidence, in three it did not, and in one case the two reviewers disagreed: one thought there was no perishable evidence and the other thought that the OPA did not make appropriate efforts to obtain it.

*Intake Investigation: Reasonable Steps to Quickly Gather Documentary (Non-testimonial) Evidence*

The OPA 2016 Manual exhorts OPA staff to quickly gather relevant documentary evidence such as SPD records and video, during both the intake investigation and post-classification full investigation.[80]   The Monitoring Team found that in applicable cases, the OPA took reasonable

---

[79] OPA 2016 Manual at 19, 24
[80] *Id.* at 19, 25-26.

steps to quickly gather documentary evidence, during the intake phase of the investigation, 94% of the time.

*Adequacy of Intake Investigation to Classify the Complaint*

Following the OPA's intake investigation, the assigned investigator prepares an Intake Follow-up Report, which memorializes the investigative actions taken and summarizes the evidence gathered during the intake investigation.  Though the OPA 2016 Manual does not describe this report or how it should be prepared, the OPA director or his designee utilizes the Intake Follow-up Report to classify the complaint.  In only one case out of 37 investigations reviewed did the OPA not document its intake investigation or prepare an Intake Follow-up Report prior to classification.[81]   In the 36 cases where the OPA prepared an Intake Follow-up Report, the Monitoring Team found that in 35, or 97%, the initial case file provided sufficient information to classify the complaint.  In two cases, the reviewers' opinions diverged.

*Post-complaint Classification Investigative Steps: Investigation Plans*

Consistent with best practices, the OPA 2016 Manual requires investigators to "create an Investigation Plan to help focus and guide the investigation and review it with an OPA [l]ieutenant.  The plan provides an investigative strategy, identifies potential sources of information, sets out anticipated timelines for conducting the investigation, and helps the investigator anticipate problems before they arise."[82]   However, the Monitoring Team found that too frequently the Investigation Plans that OPA investigators prepared and supervisors approved were not adequate.

The Monitoring Team discovered that the Investigation Plan is not a separate document within the OPA case file.  Rather, it is embedded within a single form entitled "Investigation Plan & Case Summary."  The OPA does not prepare an Investigation Plan for expedited investigations, since expedited investigations are considered complete and are closed after the intake investigation and classification.  The Investigation Plan is comprised of six parts:

- "Situation Synopsis," typically a short summary of the incident
- "Investigation Priority," described in one word, e.g., high, medium, or low
- "Is there perishable evidence?"

---

[81] In this police shooting case, described in more detail *infra*, pp. 27-28, the OPA director responded to the shooting scene and determined to refer the case for criminal investigation.  After approximately ten days, the district attorney declined to prosecute, and the SPD's Force Investigation Team ("FIT") commenced a comprehensive investigation of the shooting.  OPA investigators observed some FIT interviews and the OPA kept abreast of evidence the FIT gathered.  However, the OPA did not prepare an Intake Follow-up Report or otherwise document its investigative actions prior to classifying the case for full investigation.  While the Monitoring Team agrees that it was not necessary for the OPA to conduct a classic intake investigation prior to classifying this case for full investigation, as indicated elsewhere in this report, (*see infra* discussion, pp. 29 and 32), the Monitoring Team believes that OPA can improve upon its documentation of administrative, investigative, and supervisory investigative actions.

[82] *Id.* at 24.

- "Is there other evidence? If yes, explain"
- "180 Due Date (including any extension requests)"
- "Investigation Approach"

Generally, the section "Investigation Approach" is the only one that calls for prospective investigative steps and strategy.   The Investigation Plan also requires, within the form, an indication that a supervisor reviewed and approved the plan, the date of approval, and the name of the supervisor who approved the plan.

Of the 19 full investigations that the Monitoring Team scrutinized, it found that in two cases the OPA did not prepare a written Investigation Plan.[83]  In the remaining 17 cases, the Monitoring Team concluded that ten Investigation Plans were inadequate.  Thus, in 12 cases, or 63% of the 19 full investigations, the OPA either prepared no Investigation Plan or did not prepare an adequate one.  By way of example, in several cases the section "Investigation Approach" was either left blank or deleted.  In other cases, the prospective actions listed were far too general to be useful.  In one case, the investigator wrote, "Interview named employees to gather information relevant to the allegations."  In another, the section stated, "Read all associated material, interview [c]omplainant, and interview [n]amed [e]mployee to gather information for the allegation."

*Post-complaint Classification Investigation: Obtaining Documentary Evidence*

Both Monitoring Team reviewers determined that OPA investigators documented all the non-testimonial evidence (physical/real and documentary) they obtained throughout the course of the investigation in 75% of the applicable cases.   Where physical/real or documentary evidence was relevant to the investigation, the OPA collected such evidence in 71% of the cases.

*Post-complaint Classification Investigation: Interviews with Alleged Victims of Misconduct and Complainants*

The Monitoring Team sought to quantify and assess the quality of interviews, conducted post-complaint classification, with the complainant and/or alleged victims of the misconduct (who did not make a complaint).  However, there was insufficient data upon which to comment.

---

[83] The evaluation indicators asked reviewers to note whether the OPA "prepared" an investigative case plan and if so, whether it was adequate or inadequate.  It also referred reviewers to relevant pages of the OPA 2016 Manual. In one of the two cases with no written case plan, there was evidence in the file that OPA investigative staff discussed a plan of action and interviewing strategy it did not document in an Investigation Plan.  In the second case without a case plan, it is possible that the OPA investigator discussed the investigative plan with a supervisor who did not document his/her review and approval.  It is also possible that OPA investigators discussed additional plans or strategy with supervisors without documenting these discussions.

*Post-complaint Classification Investigation: Civilian Witness Interviews*

The Monitoring Team tried to quantify and assess the quality of interviews that the OPA conducted with civilian witnesses in full investigation cases.  The Monitoring Team did not possess sufficient data upon which to comment, except that in approximately three of the 19 cases, the Monitoring Team identified civilian witnesses that the OPA did not interview.  In two cases, the OPA relied upon the interviews that the SPD's Force Investigation Team conducted of civilian witnesses.  In the third case, for which the Monitoring Team reviewers rated the overall quality of the investigation as inadequate, the OPA did not attempt to identify the civilian witnesses, and therefore did not interview them.

*Post-complaint Classification Investigation: Quality of Officer Interviews*

When the OPA classifies a complaint for full investigation, interviewing the named officers is mandatory.  Therefore, the OPA interviewed all the named officers in the 19 investigation cases it classified for full investigation.  The Monitoring Team also found that the OPA interviewed all witness officers in 75% (six of eight) of the cases where witness officers were identified.  In the majority of officer interviews, or 57% (11 cases), Monitoring Team reviewers found that the OPA's interviews were "thorough and unbiased." The Monitoring Team reviewers considered interviews in 32% (six cases), as not thorough and/or biased, and in 11% (two cases) the reviewers disagreed.  In terms of the flaws detected, as depicted in Table 2, both reviewers found incomplete questioning in 37%; leading questions[84] or potential contamination of witness accounts in 32%; bias in 11%; inconsistencies not addressed in 11%; and relevant questions not answered in 11%.

**Table 2.  Issues Identified in Officer Interviews**

|  | Yes | | No | | Yes and No Reviewer Disagreement | |
|---|---|---|---|---|---|---|
| Incomplete questioning noted | 7 | 37% | 11 | 58% | 1 | 5% |
| Leading questions or potential contamination of witness accounts | 6 | 32% | 12 | 63% | 1 | 5% |
| Possible bias noted | 2 | 11% | 17 | 89% | 0 | 0% |
| Inconsistencies not addressed | 2 | 11% | 16 | 84% | 1 | 5% |
| Relevant questions left unanswered | 7 | 37% | 11 | 58% | 1 | 5% |

---

[84] Once an interviewer has obtained, through the use of non-leading questions, a narrative from a witness, and posed detailed follow-up (non-leading or open-ended) questions of the witness, it may sometimes be appropriate to use leading questions to confront the witness regarding contradictions with other evidence, inconsistencies among the witness' own statements, and other issues with the witness' account.

24

*Post-complaint Classification Investigation: Case Summary*

The OPA 2016 Manual stipulates that "once all steps in the investigation have been completed, relevant and material evidence is summarized in the Case Summary."[85]  However, the manual goes on to say that there are different ways to organize the Case Summary and discusses one approach, which is to start with the "allegations and elements within each and list the testimonial, documentary, or physical evidence that speaks to that issue."[86]  The Monitoring Team found that in 17 of 19 full investigation cases, or 89%, the Case Summary included all relevant evidence. As previously discussed, the Case Summary is not a stand-alone document. It is embedded in a form entitled "Investigation Plan & Case Summary.  In addition to the Investigation Plan section of the form, OPA investigators also document their post-classification investigative actions in the Case Summary.

In evaluating the overall quality of the Case Summary,[87] the Monitoring Team reviewers rated 84% of the Case Summaries as adequate or thorough, accurate, unbiased, and complete, and only three Case Summaries, or 16% of the 19 full investigations, as inadequate.  At the same time, the Monitoring Team did not find all the Case Summaries to be very useful.  Particularly in more complicated cases, the investigators prepared Case Summaries that were up to 184 and 111 pages long, consisting mostly of verbatim interview transcripts cut and pasted into the document.

*Overall Quality of the Director's Certification Memo and Recommended Findings*

The adjudication-review component of the OPA complaint investigation process—the DCM—remains, as the Monitoring Team put it in its 2016 report, "among the strongest we have seen."[88]  To close all investigation cases—expedited investigations and full investigations—the OPA director issues a DCM, which summarizes the complaint and the evidence, and analyzes each allegation by applying relevant SPD Manual provisions to the facts, to the extent they can be established.  It details the OPA director's recommended findings and explains how the director reached his findings.  During the assessment period alone, the OPA director completed DCMs for 530 investigations involving both sworn and non-sworn SPD employees.  Funneling all OPA investigations through the OPA director ensures an impressive level of consistency, rigorous analysis, and sound judgment, but it also represents an onerous workload.

---

[85] OPA 2016 Manual, at 35.

[86] *Id.*

[87] Monitoring Team reviewers were asked to categorize their overall assessment of the quality of the Case Summary in one of three ways:

- The case summary is thorough, accurate, unbiased, and complete.  The report is in compliance with all SPD protocols, contains all relevant evidence and information, and properly addresses all material inconsistencies identified in the evidence, addressing all outstanding questions or concerns.
- The case summary is adequate.  Although some aspects could be improved, any identified flaws did not appear to materially impact the overall accuracy and completeness of the report.
- The case summary is inadequate.  The report contains material deficiencies or omissions, inaccuracies, evidence of bias, or other significant issues.

[88] Dkt 259-1, at 5.

Asked to evaluate the overall quality of the written evaluation (DCM),[89] the Monitoring Team reviewers agreed that the DCM was adequate or better 89% of the time.  Both Monitoring Team reviewers found just four, or 11%, inadequate.  (In these four cases, both reviewers also rated the overall quality of the investigation as inadequate.)  Reviewers unanimously rated the DCM as thorough, accurate, unbiased, and complete in 15 cases and adequate in seven.  In six cases reviewers disagreed as to whether the DCM was thorough, accurate, unbiased, and complete or adequate.

Similarly, the Monitoring Team found that evidence and analysis supported the OPA director's recommended findings in 92% of the investigations.  In just eight percent, or three cases, both reviewers did not believe that the recommended findings were supported by evidence and analysis.

**Follow-up to Monitor's Fourth Systemic Assessment Concerns**

*Thoroughness of OPA Investigations Raising Potential Criminal or Terminable Offenses*

As the Sustainment Plan directs,[90] the Monitoring Team examined the thoroughness of OPA investigations raising potential criminal or terminable offenses.  The Monitor's January 2016 report on the OPA found fault with some investigations that raised potential criminal allegations of sworn and civilian personnel.  In its 2016 report, which assessed cases the OPA closed from August 1, 2014, and April 30, 2015, the Monitor critiqued three such investigations, and found that the "OPA addressed less than it could and should have on issues that came to light during the context of the criminal investigation."[91]  First, in a case involving an officer who admittedly provided a false and misleading statement—a terminable offense—the Monitoring Team found that OPA either never addressed the issue or framed the issue with insufficient flexibility to sweep it into the investigation.[92]  Second, the OPA failed to address an employee's involvement in a domestic violence incident because the prosecutor chose not to file charges.[93]  In a third case the Monitor identified in the 2016 report, the OPA did not properly resolve

---

[89] Monitoring Team reviewers were asked to categorize their overall assessment of the quality of the DCM in one of three ways:
- The DCM is thorough, accurate, unbiased, and complete.  The evaluation contains a full and competent analysis of the incident, resolves any material inconsistencies identified in the evidence, and addresses all outstanding questions or concerns.
- The DCM is adequate.  Although the analysis could be improved, the overall evaluation is adequate, leaving no material questions or concerns unaddressed.
- The DCM is inadequate.  The evaluation contains material deficiencies or omissions, inaccuracies, evidence of bias, or other significant issues.

[90] Dkt. 444, at 7.
[91] Dkt. 259-1, at 7.
[92] *Id.*
[93] *Id.*

allegations after a prosecutor agreed to defer criminal charges against the employee, once the employee satisfied other requirements.[94]

In this assessment, the Monitoring Team reviewed five cases raising potential criminal or terminable offenses.  The Monitoring Team did not find systemic issues unique to these types of cases, but did observe that the OPA closed one case after the 180-day deadline (due to the criminal investigation's duration), did not take sufficient investigative initiative and lacked authority to obtain secondary employment and tax records in another, and did not obtain allegedly false testimony memorialized in a recording, until the OPA Auditor recommended it do so.  In two other cases, the OPA substantially relied upon the SPD's Force Investigation Team's investigations while independently reviewing video and interviewing officers.  Of the five investigations, the Monitoring Team rated the overall quality of four as adequate or better, and in one case the reviewers disagreed as to whether the investigation was adequate or inadequate.  In arguably the most serious of the 37 cases the Monitoring Team reviewed—an officer-involved shooting—the Monitoring Team considered the overall quality of the investigation to be thorough, well documented, and complete.  The investigation also showcased skillful interview techniques.

As in cases the Monitor mentioned in the 2016 report, in one case, which the OPA referred for criminal investigation, the OPA relied completely on the SPD criminal investigation in reaching its findings, without conducting independent investigative steps.  It was also unable to complete the case within the 180-day deadline (and did not seek an extension from the union), due to the eight months the criminal investigation consumed.  The case, which resulted in a not sustained finding, involved an allegation that an officer abused his position by having sex with a woman he met through his official duties and fathered her child.

In a second case, the OPA did not take the steps it could have to conduct a more thorough investigation, and, under the collective bargaining agreement in effect at the time, lacked the authority to compel production of the records it would have needed to do so.[95]  Two SPD employees, while off-duty, operated businesses that provided security, traffic flagging, and similar services using other off-duty or retired officers.  An individual alleged that these business owners unlawfully issued false IRS 1099 forms, overinflating the money they paid to their workers, thereby depressing their income and tax liability.  After making a criminal referral within the SPD, the case was returned within two weeks to the OPA for investigation.  The OPA did not possess subpoena authority to compel businesses or individuals to turn over tax records or rosters of current or former contractors.  While a named employee is subject to discipline for failure to cooperate with an OPA investigation,[96] the OPA did not ask either named employee to provide such information and therefore did not attempt to interview either business'

---

[94] *Id.*

[95] *See supra* note 13.

[96] Seattle Police Department Manual, § 5.002(11), Responsibilities of Employees Concerning Policy Violations, effective July 15, 2018, https://www.seattle.gov/police-manual/title-5---employee-conduct/5002---responsibilities-of-employees-concerning-alleged-policy-violations (last accessed December 21, 2019).

employees.  In reaching its findings on these allegations, the OPA relied mainly upon the named employees' denials of committing such conduct.

In a third case, a man accused an officer, who had arrested the man a year earlier and testified at the man's assault trial, of lying, under oath, at the man's trial.  The man did not articulate about what fact(s) the officer allegedly lied.  At the trial, the man was found guilty of assault.  The OPA did not reach the complainant to interview him, though the man was on probation.  The OPA obtained the officer's testimony only after the OPA Auditor recommended that it do so, and the OPA did not obtain other witnesses' testimony.  It concluded that the officer's trial testimony was consistent with his reports and what the in-car video showed.  Though the complainant did not appear to be a reliable witness, it would have been best to obtain the testimony of other witnesses to ensure that there was no evidence of false testimony regarding any material facts.

The OPA investigated two other cases raising criminal or terminable offenses, which relied, in part, upon detailed investigations that the SPD's Force Investigation Team ("FIT") conducted.  The OPA independently reviewed video and interviewed officers.  One case involved a police shooting, which the OPA director referred for criminal investigation.  Ten days later, the prosecutor declined to pursue a criminal case.  The OPA investigative actions, which built upon the SPD's FIT investigation, consisted primarily of review of the file and video, and extensive interviews with the two named and two witness officers.  The case resulted in the two officers' termination.  The second stemmed from a use of force where an officer used three neck restraints against an individual, in violation of departmental policy.  The OPA also investigated whether that officer and a sergeant were dishonest in their reports.   The SPD ultimately suspended the officer for four days and issued a written reprimand to the sergeant.

*Interviews with Sworn Senior Supervisors and Command Staff*

The Monitor's 2016 OPA assessment criticized the practice of "allowing more senior supervisors and members of the command staff to send answers to written questionnaires rather than sitting for in-person interviews."[97]   Pursuant to the Seattle Police Management Association contract, the report indicated that the OPA was obligated, when captains and lieutenants made such a request, to submit to this protocol.[98]   During this assessment, the Monitoring Team never observed, in any case, that a captain or lieutenant submitted written answers in lieu of an in-person interview and could not locate any related provision in the current SPMA contract.  The Monitoring Team learned that since 2006, the SPMA contract has not included this provision.  However, until 2017, the OPA had frequently continued the practice of obtaining information from SPMA members through written questions and answers instead of conducting in-person interviews.  According to the city, the OPA has ceased this practice, with rare

---

[97] Dkt. 259-1, at 6.
[98] *Id.*

exception.[99]   The Monitor applauds the OPA for insisting on in-person interviews with all SPD personnel.

*Documentation of Investigative Actions*

The Monitor's 2016 assessment of OPA noted that the OPA's documentation of contacts and its communications could be even clearer.[100]   While this assessment did not set out to measure the OPA's documentation of its contacts or investigative actions, the Monitoring Team did find that the OPA too often did not document all its investigative actions, including contacts with witnesses and various officer notifications, in the two reports in which investigators memorialize them: the Intake Follow-up Report and the Investigation Plan & Case Summary. The Monitoring Team discovered cases in which the OPA failed to document its participation in FIT interviews of named and witness officers; efforts to have a case mediated; referral of a case to the EEO Office; and its obtaining records relating to a domestic violence protective order and other SPD records.

## IV.   Conclusions and Recommendations

This assessment found that the OPA completed 95% of investigations within the 180-day deadline and rated 81% of the OPA's investigations as adequate or better.   Like the Monitoring Team's assessment of four years ago, however, the Monitoring Team identified several issues the OPA should address and remedy, which the Monitoring Team believes will improve the OPA's investigations.   It is within this context that the Monitoring Team makes the following recommendations.

**Update OPA Internal Operations and Training Manual**

Although the Seattle Police Accountability Ordinance requires the OPA Manual to be updated "at least annually,"[101] the current OPA Internal Operations and Training Manual went into effect on April 1, 2016.   On November 21, 2018, the OPA circulated a revised manual, which incorporated provisions of the new SPOG collective bargaining agreement (in effect as of November 14, 2018), to the Monitoring Team, the DOJ, and other stakeholders.   On December 3, 2018, the court issued an order to the parties to show cause whether, in part due to the new SPOG collective bargaining agreement, the city failed to maintain full and effective compliance with the Consent Decree.[102]   Until May 21, 2019,[103] litigation regarding the order to show cause was pending, and the OPA suspended its efforts to revise the manual.

A number of substantive topics will benefit from updating.   For starters, the OPA 2016 Manual does not reflect the OPA's new system of vertical investigation, its practice of classifying

---

[99] Email from Seattle assistant city attorney to Monitoring Team, October 18, 2019.
[100] Dkt. 259-1, at 5.
[101] The City of Seattle Police Accountability Ordinance 125315, at 21.
[102] Dkt. 504.
[103] Dkt. 562.

complaints as expedited investigations, new applicable collective bargaining provisions, expectations for the Intake Follow-up Report, city and SPD procedures on handling EEO complaints, and corresponding protocols for how OPA should handle possible EEO complaints. The Monitor recommends that the OPA update its manual as soon as possible and, when the OPA implements new policies and procedures, it should contemporaneously update its manual, or issue and publish written revisions.

**Expand Investigative Staff to Reduce Investigative and Case-closure Delays**

While the OPA succeeded in closing 95% of the investigations reviewed within the 180-day disciplinary window, too frequently the OPA delayed in conducting officer interviews and other investigative tasks (assigning cases to investigators and reaching out to witnesses), and issuing the DCMs once it deemed cases ready to be closed. Closing cases too close to the 180-day end date may prevent the OPA director from being able to return cases to investigators for additional investigation, should the director believe it warranted, even in cases the OIG certifies as thorough. As the Monitoring Team discussed in its 2016 report on the OPA, it concluded that additional staffing could generally ameliorate investigative delays.[104] The Monitoring Team still believes this to be true.

From 2017 to 2018, the number of complaints the OPA classified for investigation (expedited or full) increased 14.3%, while the OPA's investigator staffing remained relatively static. Investigator turnover and unexpected leaves, both of which occurred during the review period, also resulted in undesirable case reassignments and caseload increases. Increasing the OPA investigator staff will lower caseloads and assist the OPA in producing faster, more detailed, and more thorough investigations. In addition, the sheer number of DCMs for which the OPA director is responsible—530 in the 12-month assessment period—is astounding. That the DCMs the OPA director issues are of such high quality is laudable, but the fact remains that the number of cases requiring DCMs inevitably results in delays. The Monitor and the OPA director strongly believe that the OPA director should remain personally responsible for each DCM and not delegate the DCM function. However, as the Monitoring Team and the OPA have discussed, additional staff members capable of assisting the OPA director draft DCMs will help expedite them.

**Improve the Quality of OPA Interviews**

Though the Monitoring Team concluded that the OPA conducted the majority of complainant and officer interviews thoroughly and without bias, it is clear that OPA investigators could, overall, significantly improve their interviewing skills. Inadequate interview techniques in some cases deprived the OPA of relevant and necessary evidence. Both Monitoring Team reviewers found incomplete questioning in 37% of officer interviews, leading questions in 32%, bias in 11%, inconsistencies not addressed in 11%, and relevant questions not answered in 11%. The

---

[104] Dkt. 259-1, at 7.

OPA 2016 Manual is not the problem; the OPA 2016 Manual's guidelines and tips for conducting effective interviews are consistent with best practices.[105]

In addition to ensuring that the investigators the OPA selects and hires possess the capability to conduct effective interviews, the OPA must ensure that they are properly trained and critiqued on an ongoing basis.  The OPA's 2018 Annual Report indicates that on two occasions in 2018, the OPA brought in a practitioner "to provide training on administrative misconduct investigations, interview preparation and techniques, and case planning."[106]   It also sent investigative staff to certain external trainings.[107]   In conversations with the Monitoring Team, representatives of the OPA indicated that they are developing an in-house interview training program, an idea that the Monitoring Team endorses.  While any in-house interview training program should cover the basics of proper interview preparation and techniques, it should also be interactive.   The training program should incorporate actual (completed) cases, have investigators conduct "mock" interviews with the same information an investigator would have at the time of the interview, record the interviews, and have the group critique them, led by supervisors or instructors who are interview specialists.   The training program should also record and show "model" interviews to investigators, depicting best practices.  Such a training program should be regularly held (and/or recorded), so that newly hired investigators are trained as well.  Finally, supervisors, particularly those who are interview specialists, should regularly observe interviews and critique them afterwards and, when reading interview summaries and transcripts as part of their case reviews, discuss the interviews with their subordinates. If necessary, they should require the investigators to immediately re-interview witnesses.

**Reconsider the Rule Prohibiting Access to All Documentary Evidence in Open Homicide Unit Investigative Files**

Although the Monitoring Team acknowledges the importance of maintaining the integrity of homicide investigations (i.e., not leaking information), the Monitoring Team believes that the SPD should reconsider its rule that prevents the OPA from accessing any Homicide Unit document, even redacted documents, under any circumstances, while the homicide investigation is pending. The OPA's ability to investigate allegations lodged against Homicide Unit detectives without access to relevant documentary evidence, is, as the OPA acknowledged, "limited."  Particularly for certain complaints, such a rigid rule may prevent officers from being held accountable for serious misconduct.

---

[105] OPA 2016 Manual, at 27-34.

[106] Seattle Office of Police Accountability 2018 Annual Report, at 7.

[107] *Id.*

**Take Additional Steps in Some Biased-based Policing Investigations to Examine Officers' Thought Processes**

The Monitoring Team does not necessarily believe every case involving allegations of biased-based policing merits full investigation, but when the law enforcement decision or action at issue is particularly influenced by the officer's observations and/or discretion, the Monitoring Team recommends that the OPA conduct a full investigation, including interviewing the named officer and reviewing the officer's relevant citation history, in order to make a proper, evidence-based assessment of whether bias influenced the decision or action.

Pursuant to SPD policy, bias, prejudice, or discriminatory intent that <u>influences</u> an officer's decision-making or actions, even ones that are legally justified, constitutes a policy violation. SPD policy clearly prohibits biased-based policing and states, in part:

> Employees shall not make decisions or take actions that are <u>influenced</u> by bias, prejudice, or discriminatory intent.  Law enforcement and investigative decisions must be based upon observable behavior or specific intelligence.  Officers may not use discernible personal characteristics in determining reasonable suspicion or probable cause, except as part of a suspect description.  (Emphasis added).[108]

Under the SPD's policy, establishment of reasonable suspicion for a stop, probable cause for an arrest or citation, or legal justification for other law enforcement actions does not mean that an officer's decision or action was not <u>influenced</u> by bias, prejudice, or discriminatory intent.  It is therefore necessary, in some cases, to take additional investigative steps in an effort to ascertain the officers' thought processes.

**Create a Single Report to Document All OPA Staff's Case and Investigative Actions**

The Monitoring Team recommends that the OPA create one report to capture its administrative, investigative, and supervisory staff's investigative actions, from inception to disposition.  Currently, administrative staff's preliminary actions, including the gathering of SPD records and dissemination of notices and correspondence to civilians and officers, are not captured at all, except to the extent that the documents are placed in the electronic case folder.  The Monitoring Team further recommends that the report mimic the level of detail of day-to-day investigative actions that the FIT investigation report captures.  As a result of utilizing a single report, the OPA's Intake Follow-up Report and the Case Summary could focus solely on the recitation and analysis of the evidence gathered each of these investigative stages.

---

[108] Seattle Police Department Manual, § 5.140, Bias-Free Policing, effective August 1, 2019, https://www.seattle.gov/police-manual/title-5---employee-conduct/5140---bias-free-policing.  The predecessor policy in effect during the assessment period also contained this language.

**Create an Independent Investigation Plan Form**

Despite the OPA 2016 Manual provisions that provide detailed guidance as to what information should be in the Investigation Plan,[109] the Monitoring Team found that in 63% of the cases in which the Investigation Plan was required, it was either not completed or did not comply with the 2016 OPA Manual.   The Monitoring Team recommends that the OPA divorce the Investigation Case Plan from the Case Summary and create an independent Investigation Plan form, ensure that staff cannot delete the section, "Investigation Approach," and retrain staff on the importance of completing a detailed plan of action, within the Investigation Approach section, with time guidelines for investigative steps to be taken. Separating out the Investigation Plan from the Case Summary would again allow the Case Summary to focus solely on the recitation and analysis of the evidence gathered during the course of the investigation.

**Structure the Case Summary Report and Create Model Reports to Make the Case Summary More Useful**

The Monitoring Team recommends that the OPA impose a specific structure to its Case Summary, organize the evidence it summarizes more thematically, rather than by evidence category, and have investigators resist the temptation to simply cut and paste interview summaries and transcripts into the report without critically analyzing what testimony is relevant and material to the inquiry.  Though the Monitoring Team found the Case Summary included all relevant evidence in 89% of cases, and rated only 16% inadequate, it has concluded that the Case Summary could be more useful than it is.

Currently, the OPA 2016 Manual does not provide much guidance on how investigators should prepare the Case Summary.  The Monitoring Team recommends that the OPA recreate the Case Summary, with suggested headings, and prepare model Case Summaries for dissemination to all staff.  In addition, instead of summarizing evidence gathered by evidence category, e.g., chain-of-command investigative documents, FIT interviews, and OPA interviews, witness statements should be organized, serially, in the order in which they were made, by witness.  For example, in a case where an officer is accused of using excessive force, under headings like Results of Investigation, Officer Statements, and the Officer's Name (multiple headings with the name of each officer who made relevant statements regarding the incident), the investigator should summarize the officers' statements in the order in which the officer made them: what the officer stated to a responding sergeant as captured on video; what the officer stated in a use of force report; and what the officer subsequently asserted in investigative interviews. Organizing evidence in this manner has the added benefit of forcing investigators to analyze statements a witness made serially, making it easier to identify material inconsistencies among the statements, upon which the investigation should focus.

---

[109] OPA 2016 Manual, at 24.

## Monitoring Team Staff

**Merrick Bobb**
Monitor

**Ronald Ward**
Assistant Monitor

**Brian Center**
**Elana Dean**
**Florence L. Finkle**
**Tammy Hooper**
**Marnie MacDiarmid**
**Camelia Naguib**
**Django Sibley**
Monitoring Team Members

**Jeffrey Yamson**
Executive Assistant