

# Use of Force
## Annual Report
## January 10, 2020

# OVERVIEW

## What is in this report?

This report provides a quantitative and qualitative discussion of use of force incidents involving Seattle Police Officers occurring between January 1 and December 31, 2019.

Utilizing the advanced analytical capability available through the Data Analytics Platform (DAP), Section I of this report presents aggregate statistics regarding use of force events and applications, filtered across assignment, subject demographics, call types, and other discrete measures.  Key among the findings, consistent with prior years' reports, was that the use of force overall remains extraordinarily infrequent: ***in 2019 officers reported using force, of any level, at a rate of less than one-fifth of one percent (0.15%) of all officer dispatches, and fewer than one-fifth of one percent (0.17%) of unique events – and of these uses of force, as in prior years, the majority (77%) involved no greater than the lowest level of reportable force (such as minor complaints of transient pain with no objective signs of injury, or the pointing of a firearm).***

***Further, the use of serious levels of force – force that causes or may be reasonably expected to cause substantial bodily injury – remained extraordinarily low, occurring only 20 times out of over 850,000 officer dispatches (0.0023% - or less than one quarter of one hundredth of a percent).***

In short, while each application of force is separately investigated and reviewed, overall the use of force by Seattle police officers continues to be an empirically rare occurrence.  This finding shows that that officers continue to implement, in practice, the de-escalation training and tactics that have brought Seattle into full and effective compliance with the Consent Decree between the City of Seattle and the United States Department of Justice (DOJ), while maintaining a high level of engaged, proactive law enforcement activity.

Section II provides an overview of the Force Investigation Team (FIT) – a specialized unit comprised of experienced detectives, sergeants, and commanders that responds to and investigates all serious force incidents – and briefly describes each of the 23 separate events to which FIT responded during 2019.  The Seattle Police Department (SPD, or the Department) also reports in this Section on case assessments by the Force Review Unit (FRU) and the Force Review Board (FRB) during 2019, which provide an additional layer of review with respect to officer use of force and chain of command review of force, ensuring that force applied by Seattle police officers is consistent with the mandates of Department policy.  Additionally, as a forum for reviewing policies, training, tactics and equipment, the FRB provides the opportunity for experience and review to continually drive improvements to Department operations and practices.  These processes help to ensure that the department is policing the community it serves effectively and constitutionally through self-regulation.

## What if this report doesn't answer my questions?

The Department continues to release its use of force data described in Section I of this report to the City's open data portal and maintains updated interactive dashboards through which the public can explore for itself officers' use of force, parsed across demographic and geographic fields.[1]  The Department cautions of the inherent hazard that data can be subject to differing interpretations and lead to differing conclusions depending on the sophistication of the analysis and the potential for confirmation bias; SPD provides this data with the hope that, as new technology has created opportunity for increasingly sophisticated inquiries internally, providing greater transparency of its data externally creates greater opportunity for SPD and the community to work collaboratively to drive the policies and priorities of this department.

# SECTION I:  USE OF FORCE

## A.  Policies and Overview of Force

The Seattle Police Department's use of force policies are published, collectively, as Title 8 of the SPD Manual.  Policy sections 8.000 through 8.200 set forth the conditions under which force is authorized, when force is prohibited, and affirmative obligations to de-escalate prior to using force, when reasonably safe and feasible to do so, and to assess and modulate force as resistance changes.  While recognizing that officers are often forced to make split second decisions, in circumstances that are tense, uncertain, and rapidly evolving, this policy allows officers to use only the force that is objectively reasonable, necessary, and proportionate to effectively bring an incident or a person under control.  Section 8.300 addresses the use and deployment of force tools that are authorized by the Department, such as less-lethal munitions, canine deployment, firearms, oleoresin capsicum (OC) spray, and vehicle-related force tactics.  Section 8.400 prescribes protocols for the reporting and investigation of force; section 8.500 sets forth the process for review of force.

Force is classified and reviewed by type:

**De Minimis Force -** Physical interaction meant to separate, guide, and/or control without the use of control techniques that are intended to or are reasonably likely to cause any pain or injury. Examples including using hands or equipment to stop, push back, separate or escort, the use of compliance holds without sufficient force to cause pain, and unresisted handcuffing.  Officers are not required to report or investigate this level of force.

---

[1] This data may be found at http://www.seattle.gov/police/information-and-data/use-of-force-data

**Type I** – Actions which "causes transitory pain, the complaint of transitory pain, disorientation, or intentionally pointing a firearm."  This is the most frequently reported level of force. Examples of Type I force, generally used to control a person who is resisting an officer's lawful commands, controlled placements, strike with sufficient force to cause pain or complaint of pain, or an open hand technique with sufficient force to cause complaint of pain.  Type I uses of force are screened by a sergeant and reviewed by the Chain of Command; the Force Review Unit (FRU) provides quality assurance.

**Type II** – Force that causes or is reasonably expected to cause physical injury greater than transitory pain but less than great or substantial bodily harm.  Examples include take-downs with injury and/or the use of any of the following weapons or instruments: conducted electrical weapons (Tasers), OC spray, impact weapon, deployment of K-9 with injury or complaint of injury causing less than Type III injury, and vehicles.  An on-scene (where feasible) sergeant collects available video evidence and witness statements; the evidence packet and analysis of the force is reviewed by the Chain of Command and the FRU.  Cases flagged by the FRU for further inquiry, in accordance with policy criteria, plus an additional random 10% of Type II cases are also analyzed by the Force Review Board (FRB).

**Type III** – Force that causes or is reasonably expected to cause great bodily harm, substantial bodily harm, loss of consciousness, or death, and/or the use of neck and carotid holds, stop sticks for motorcycles, and impact weapon strikes to the head.  Type III force is screened on-scene by a sergeant, investigated by the Force Investigation Team (FIT), and analyzed by the FRB.

### B.  Quantitative Overview of Use Force

The Seattle Police Department documents three types of force.[2]  Most broadly, use of force at the incident level (generally but not always associated with a specific computer-aided dispatch (CAD) event) may involve multiple officers and/or multiple subjects, each of whom may be documented as either involved in or witness to the use of force.  At the individual officer level, force is documented and recorded as the combination of a force incident, a unique officer, and a unique subject; accordingly, depending on how many officers used force during an incident, a single use of force incident may be associated with multiple uses of force reports. The most granular level of documentation occurs at the use of force application level, at which the involved officer documents *each* reportable application of force; a single use of force may thus include multiple applications of force.  For example, if in the course of one incident, Officer A pointed a firearm, Officers B and C used a hard-takedown maneuver to bring a subject under control, following which Officer A handcuffed the subject, who then complained of pain to his shoulder,

---

[2] Throughout this section, the figures and tables refer to "levels" of force. Levels of force are the equivalent of type of use of force.  For instance, Level I is a Type I use of force; Level II is a Type II Use of Force.

the incident would be documented as one incident, involving three uses of force, comprising four applications of force, two of which (the pointing of a firearm and subsequent shoulder pain by Officer A) would be classified as Type I, and two of which (the hard take-down by Officers B and C) would be classified as Type II.  Because force is reviewed at the type commensurate with the highest type of force used, the incident would be reviewed as a Type II incident.  For purposes of this report, force is discussed at the officer report level – i.e., the combination of a unique officer, unique subject, and unique incident, and reported at the highest level of force used by a given officer.

Between January 1 and December 31, 2019, officers were dispatched (either responsive to a 911 call for service or an on-viewed incident) **850,910** times in response to **396,755** unique CAD events.[3]  While the count of unique events received by the 911 Communication Center increased by **2.4%** in 2019 compared to 2018, officer dispatches increased by **7.0%.**  (Dispatch counts reflect the number of officers responding to a unique event, as captured in the Department's Computer Aided Dispatch (CAD) data.)

Over this same time period, officers reported using force (Type I, II, or III) **1,264** times over **675** unique incidents.

***Viewed in the context of overall activity, less than one-fifth of one percent (0.15%) of all officer dispatches, and fewer than one-fifth of one percent (0.17%) of unique events, resulted in any reportable use of force.***

---

[3] CAD (Computer Aided Dispatch) is the Department's database for recording communications, including the date, time, and location of a police incident, how the case was received (911 or "on-view"—an officer viewing activity and initiating a contact with an individual), the case type, and the disposition.

### 1. Use of Force by Level of Force

**Figure 1: Force Counts 2019**



Figure 1 shows the breakdown of use of force, by type, over the calendar year reported. Of the 1,264 uses of force reported during 2019, 973 (77.0%) involved no greater than low-level, Type I force. As shown in Table 1, overall use of force across all force types has declined by nearly half (down 44.0% as compared with 2018). The number of reported Type I uses of force decreased 47.8%.[4] Type II and Type III uses of force also declined as compared with 2018. Officer involved shootings increased in 2019 as compared with 2018; however, as reflected in Table 1, the number of officer involved shootings in 2018 was exceptionally low when compared with other years.

***The decrease in reported Type I force is due in large part to the court-approved changes to SPD's use of force polices. Officers no longer report handcuff discomfort as Type I force.*** These policies went into effect in January 2019. While handcuffing discomfort is no longer a Type I use of force, SPD officers must still report it, and it is tracked separately.[5] Type II force also declined by just over thirty percent (30.4%) in 2019, comprising 21.5% of force reported in 2019 (relative to 16% of all force reported in 2018).

In total, 20 Type III uses of force, across 12 separate incidents, were reported in 2019. The small number and extreme infrequency of these incidents does not lend this category to statistical trend analysis. Type III incidents in 2019 comprised two fewer uses of Type III force across two fewer incidents than in 2018. Twelve of these Type III uses of force involved the discharge of a firearm, across six separate Officer Involved Shooting (OIS) incidents. Each Type III incident, including the six OIS incidents, is described in greater detail in Section II of this report.

---

[4] As seen in past years, these numbers are likely to change as force investigations are completed and captured by DAP. The City will report any significant changes to the Court in its next filing.

[5] SPD officers reported 827 incidents of handcuffing discomfort in 2019.

For purposes of showing trends over time, Table 1 shows all use of force reported between January 1, 2015 and December 31, 2019; Figure 2 shows a linear regression time series analysis of use of force trends, citywide, over a five-year time period dating back to 2015.

**Table 1: Use of Force Counts by Year**

| Incident Type | 2015 | 2016 | 2017 | 2018 | 2019 | Grand Total |
|---|---|---|---|---|---|---|
| Level 1 - Use of Force | 1,573 | 1,203 | 1,292 | 1,864 | 973 | 6,905 |
| Level 2 - Use of Force | 477 | 381 | 364 | 368 | 271 | 1,861 |
| Level 3 - Use of Force | 20 | 20 | 12 | 22 | 8 | 82 |
| Level 3 - OIS | 15 | 5 | 21 | 3 | 12 | 56 |
| **Grand Total** | **2,085** | **1,609** | **1,689** | **2,257** | **1,264** | **8,904** |

Figure 2 shows a curvilinear regression trend analysis of Type I and Type II force, citywide, over this four-year period. Across prior years, an overall decline is observed in both Type I and Type II force. The presence of a well fit curvilinear form suggests an oscillating wave, rather than a continuous decline. The presence of "shock" in the reporting system (the change to clarify the reporting of Type I handcuffing discomfort), likely explains the emergence of a wave in Type I force but does not explain the decline in Type II force. The department will continue to monitor these effects.[6]

---

[6] As noted earlier, Type III force continues to occur so infrequently in Seattle as to be considered a statistically random event and is therefore does not support conventional applications of statistical trend analysis, although each case is discussed later in this report.

**Figure 2: Use of Force Trends Citywide (2019)[7] [8]**



## 2.  Use of Force by Administrative Assignment

Table 2 shows the distribution of force by type and bureau of involved officers' administrative assignment.  In total, as would be expected, 91.6% of all reported force was related to patrol operations.  The majority (86.7%) of uses of force were reported within the Patrol Operations Bureau, which is primarily responsible for beat patrols and 911 responses, while the Professional Standards Bureau, which includes the Field Training Unit (to which student officers on patrol are administratively assigned), accounted for 4.9% of all uses of force. All other bureaus (Homeland Security and Special Operations, Investigations, and Collaborative Policing) accounted for the remaining 8.4% of force reported.  These figures are consistent with 2018 distribution by assignment figures despite the removal of handcuffing pain from this reporting.

**Table 2: Distribution of Use of Force by Type and Bureau**

---

[7] Type I UoF: $r^2 = 0.4962$ p = <0.000, indicating the presence of a highly significant two-period polynomial trend (an oscillating wave), with effect, bordering on "large" in measurement.

[8] Type II UoF: $r^2 = 0.2140$ p = <0.0035, indicating the emergence of a significant medium effect trend, similar to Type I force.

| | OPERATIONS BUREAU | HOMELAND SECURITY AND SPECIAL OPERATIONS BUREAU | PROFESSIONAL STANDARDS BUREAU | INVESTIGATIONS BUREAU | COLLABORATIVE POLICING BUREAU | Grand Total |
|---|---|---|---|---|---|---|
| Level 1 - Use of Force | 87.2% | 6.0% | 5.8% | 0.9% | 0.2% | **100.0%** |
| Level 2 - Use of Force | 90.6% | 6.1% | 2.5% | 0.8% | | **100.0%** |
| Level 3 - Use of Force | 80.0% | 16.7% | 3.3% | | | **100.0%** |
| Level 3 - OIS | 100.0% | | | | | **100.0%** |
| Grand Total | **87.8%** | **6.1%** | **5.1%** | **0.9%** | **0.1%** | **100.0%** |

Compared to 2018 data, these numbers reflect a 48.8% decrease in the Operations Bureau and a 54.5% decrease in Professional Standards Bureau in Type I force, due in large part to the removal of handcuff discomfort from these figures. There was a nearly 60% decrease in the Homeland Security and 75% decrease Investigations Bureaus in Type II force. See Table 3.[9]

---

[9] The Department presents these numbers for context only; meaningful inference should not be derived from measures of change over a short time period, particularly with the low counts observed here.

**Table 3: Percent Change of Distribution of Use of Force by Type and Bureau**

| Table 3.  Types of Uses of Force by Bureau | | Operations Bureau | | Homeland Security and Special Operations Bureau | | Professional Standards Bureau | | Investigations Bureau | |
|---|---|---|---|---|---|---|---|---|---|
| | | 2018 | 2019 | 2018 | 2019 | 2018 | 2019 | 2018 | 2019 |
| Level 1 Use of Force | Percent of total uses of force within each bureau | 82.5% | 75.9% | 76.9% | 83.1% | 92.6% | 86.4% | 77.8% | 91.7% |
| | Counts | 1,635 | 837 | 100 | 69 | 112 | 51 | 14 | 11 |
| | Percent change in use of force from 2017 to 2018 | -48.8% | | -31.0% | | -54.5% | | -21.4% | |
| Level 2 Use of Force | Percent of total uses of force within each bureau | 16.6% | 22.7% | 20.8% | 14.5% | 6.6% | 13.6% | 22.2% | 8.3% |
| | Counts | 329 | 250 | 27 | 12 | 8 | 8 | 4 | 1 |
| | Percent change in use of force from 2017 to 2018 | -24.0% | | -55.6% | | 0.0% | | -75.0% | |

## 3.  Use of Force by Subject Demographics

In discussing disparity in the demographic distribution of subjects involved in any study of law enforcement activity, one important note bears emphasizing.  As is reflected in statistics nationwide, racial disparity is of significant ongoing concern, and is an important issue that requires continued discussion and analysis within the limited role of law enforcement but also beyond.  In the present state of sociological and criminal justice research, there is no proven, reliable methodology for accounting for all the multitude of recognized factors that may combine to result in a disparity within the metric measured – including those critical factors upstream (education, socioeconomic status, family structure, etc.) of police involvement that may contribute to the likelihood a person will come into contact with police.  *In other words, while numbers can identify a disparity, they cannot explain the disparity.*  The Department is proud of its work in identifying and addressing disparity.[10]  In addition to its many research agreements with academic institutions around the country (including the University of Virginia and Harvard, Princeton, Northwestern and George Mason Universities), and the world (including University of

---

[10] See SPD's Disparity Review – Part II Developing a Deeper Understanding of Disparities

Tel Aviv in Israel), the Department continues to maintain close research partnerships with Seattle University and the University of Washington – the latter two partnerships explore measures of racial disparity in police data. The Department also continues to partner closely with the Institute on Race and Justice at Northeastern University in Boston, MA. ***All these strategic partnerships are focused on better understanding the causes and remedies for observed disparity across law enforcement metrics.***

With respect to the Department's 2019 data, 75.2% of subjects were male; 23.4% were female (1.3% of subjects are of unspecified gender). 38.5% % of male subjects were white; nearly half (45.6%) of female subjects were white. Figure 3 shows the distribution of force subjects by race and gender; table 4 shows the distribution in subject race by level of force. No significant differences were observed when broken down by level (type).

**Figure 3: Use of Force by Subject Gender and Race**



**Table 4:  Subject Race by Force Type**

| | White | Black or African American | Not Specified | Asian | Hispanic or Latino | American Indian/Alaska Native | Nat Hawaiian/Oth Pac Islander | Grand Total |
|---|---|---|---|---|---|---|---|---|
| Level 1 - Use of Force | 39.88% (n=388) | 28.88% (n=281) | 23.43% (n=228) | 3.39% (n=33) | 3.29% (n=32) | 0.72% (n=7) | 0.41% (n=4) | 100.00% (n=973) |
| Level 2 - Use of Force | 41.70% (n=113) | 29.52% (n=80) | 20.66% (n=56) | 1.85% (n=5) | 2.21% (n=6) | 1.48% (n=4) | 2.58% (n=7) | 100.00% (n=271) |
| Level 3 - Use of Force | 37.50% (n=3) | 25.00% (n=2) | 37.50% (n=3) | | | | | 100.00% (n=8) |
| Level 3 - OIS | | 8.33% (n=1) | 41.67% (n=5) | 50.00% (n=6) | | | | 100.00% (n=12) |
| **Grand Total** | **39.87%** (n=504) | **28.80%** (n=364) | **23.10%** (n=292) | **3.48%** (n=44) | **3.01%** (n=38) | **0.87%** (n=11) | **0.87%** (n=11) | **100.00%** (n=1,264) |

As noted above, the data in tables 3 and 4 numbers reflect distinct uses of force, and one incident may include multiple uses reportable of force.  Of 6 distinct subjects involved in OIS incidents, one was a White male; one was a Black female; one was an Asian male; one was an Asian female; and two were males of a not specified race.  Of the 5 distinct subjects involved in Type III (non-OIS) incidents, two were White males; one was a Black male; one was a Black female; and one was male of a not specified race.  Each of the Type III uses of force is discussed in greater detail in Section II of this report.

## 4.  Use of Force by Dispatch Type and Priority[11]

Officers are logged to calls either by a dispatcher (e.g., in response to a 911 call) or by on-viewing an incident (observing an incident while on patrol) and responding.  Of the 1,251 use of force reports that could be associated to a CAD[12] event in 2019, most (71.2%) were calls in which the officer was dispatched in response to a call for service from the public.  A breakdown of use of force, by type, distinguished between dispatches and on-views, is presented in Table 5.

---

[11] These numbers exclude a small fraction of force reports that could not be cross-referenced with a specific CAD event.

**Table 5: Use of Force by Dispatch Type**

| | DISPATCH | | | 2019 ONVIEW | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|
| | UoF Count | % of UoF | %Δ 2018-2019 | UoF Count | % of UoF | %Δ 2018-2019 | UoF Count | % of UoF | %Δ 2018-2019 |
| Level 1 - Use of Force | 700 | 73.0% | -49.39% | 259 | 27.0% | -43.20% | 959 | 100.0% | -47.85% |
| Level 2 - Use of Force | 172 | 63.5% | -30.36% | 99 | 36.5% | -18.18% | 271 | 100.0% | -26.36% |
| Level 3 - Use of Force | 7 | 87.5% | -30.00% | 1 | 12.5% | -91.67% | 8 | 100.0% | -63.64% |
| Level 3 - OIS | 11 | 91.7% | 450.00% | 1 | 8.3% | 0.00% | 12 | 100.0% | 300.00% |
| **Grand Total** | **890** | **71.2%** | **-45.80%** | **360** | **28.8%** | **-38.98%** | **1,250** | **100.0%** | **-44.00%** |

The reasonableness of force, both in law (*see*, e.g., *Graham v. Connor*, 490 U.S. 386 (1989)) and in policy (*see* SPD Manual Section 8.000(4)) is based in part on the totality of the circumstances known to the officer at the time the force used, and considered from the perspective of the reasonable officer on the scene, rather than with 20/20 hindsight and the benefit of additional information. In that regard, call type and priority can be considered to some degree as *a priori* (theoretical, or deductive) knowledge of the circumstances to which an officer is responding.

Calls for service, whether dispatched or officer-initiated, are assigned a priority, based on the immediacy of the need. Priority 1 calls are incidents that require an immediate response, including incidents that involve obvious immediate danger to the life of a citizen or an officer. Priority 2 calls are noted as urgent, or incidents which if not policed quickly could develop into a more serious issue (such as a threat of violence, injury, or damage). Priority 3 calls are investigations or minor incidents where response time is not critical to public safety. Priority 4 calls involve nuisance complaints, such as fireworks or loud music. Priority 7 calls are officer-initiated events, such as traffic stops; Priority 9 is used to indicate administrative tasks or downtime. As would be expected, across force levels, the highest frequency of force occurred in connection with Priority 1 calls. A breakdown of force, by level, call priority, and percent change relative to 2018 is presented in Table 6[13]. As shown, 42.5% of all use of force was associated with a Priority 1 call; another 34.1% of force was associated with a Priority 2 call. The trend of overall decline in use of force is seen again across call priority.

---

[13] These numbers exclude a small fraction of force reports that could not be cross-referenced with a specific CAD event.

**Table 6: Levels of Use of Force by Call Priority (2019)**

|  |  | Level 1 - Use of Force | Level 2 - Use of Force | Level 3 - Use of Force | Level 3 - OIS | Total |
|---|---|---|---|---|---|---|
| 1 | UoF Count | 423 | 92 | 4 | 12 | 531 |
|  | % of UoF | 44.1% | 33.9% | 50.0% | 100.0% | 42.5% |
|  | %Δ 2018-2019 | -43.3% | -37.0% | -20.0% | 500.0% | -40.9% |
| 2 | UoF Count | 315 | 107 | 4 |  | 426 |
|  | % of UoF | 32.8% | 39.5% | 50.0% |  | 34.1% |
|  | %Δ 2018-2019 | -53.5% | -13.7% | -33.3% |  | -47.2% |
| 3 | UoF Count | 143 | 52 |  |  | 195 |
|  | % of UoF | 14.9% | 19.2% |  |  | 15.6% |
|  | %Δ 2018-2019 | -47.0% | 2.0% |  |  | -40.5% |
| 7 | UoF Count | 66 | 17 |  |  | 83 |
|  | % of UoF | 6.9% | 6.3% |  |  | 6.6% |
|  | %Δ 2018-2019 | -38.3% | -58.5% |  |  | -45.8% |
| 9 | UoF Count | 12 | 3 |  |  | 15 |
|  | % of UoF | 1.3% | 1.1% |  |  | 1.2% |
|  | %Δ 2018-2019 | -60.0% | -50.0% |  |  | -58.3% |
| Grand Total | UoF Count | 959 | 271 | 8 | 12 | 1,250 |
|  | % of UoF | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
|  | %Δ 2018-2019 | -47.6% | -26.4% | -63.6% | 300.0% | -43.8% |

When an incident is created by Communications, whether initiated in response to a 911 call for service or called in by an officer on-scene, the incident is assigned an initial call type based on information that is reported at the outset. Table 7 sets forth the top ten initial call types that were associated with the majority of uses of Type I and Type II force. Because Type III uses of force are statistically random events, they are excluded from this analysis.

**Table 7: Top Ten Initial Call Type by Resulting Level of Use of Force**

|  | Level 1 - Use of Force | Level 2 - Use of Force | Grand Total |
|---|---|---|---|
| DISTURBANCE, MISCELLANEOUS/OTHER | 15.0% | 1.4% | **16.4%** |
| ASLT - IP/JO - WITH OR W/O WPNS (NO SHOOTINGS) | 12.9% | 2.1% | **15.0%** |
| TRESPASS | 9.9% | 3.2% | **13.1%** |
| SUICIDE - IP/JO SUICIDAL PERSON AND ATTEMPTS | 8.8% | 2.1% | **10.8%** |
| ASLT - IP/JO - DV | 7.6% | 0.7% | **8.3%** |
| SUSPICIOUS STOP - OFFICER INITIATED ONVIEW | 5.3% | 3.0% | **8.3%** |
| WEAPN-IP/JO-GUN,DEADLY WPN (NO THRT/ASLT/DIST) | 7.4% | 0.9% | **8.3%** |
| AUTO RECOVERY | 6.5% | 0.5% | **6.9%** |
| SUSPICIOUS PERSON, VEHICLE OR INCIDENT | 4.4% | 2.5% | **6.9%** |
| DIST - IP/JO - DV DIST - NO ASLT | 4.8% | 1.2% | **6.0%** |
| Grand Total | **82.5%** | **17.5%** | **100.0%** |

Calls are assigned a final call type that is based on information gathered during the call and response and standards for federal crime reporting.  As seen in Table 8, Types I and II force were most frequently associated with incidents that resolved as Assault, Other (27.7%), followed by Crisis Complaint – General (13.6%), Domestic Violence with Mandatory Arrest (11.4%), Warrant Services – Felony (10.5%), and Prowler – Trespass (10.1%).

**Table 8: Top Ten Final Call Types by Resulting Level of Use of Force**

|  | Level 1 - Use of Force | Level 2 - Use of Force | Grand Total |
|---|---|---|---|
| --ASSAULTS, OTHER | 18.9% | 8.8% | **27.7%** |
| --CRISIS COMPLAINT - GENERAL | 11.2% | 2.4% | **13.6%** |
| --DV - DOMESTIC VIOL/ASLT (ARREST MAND.. | 9.5% | 1.8% | **11.4%** |
| --WARRANT SERVICES - FELONY | 7.5% | 3.0% | **10.5%** |
| --PROWLER - TRESPASS | 8.8% | 1.3% | **10.1%** |
| --ASSAULTS - HARASSMENT, THREATS | 7.5% | 2.1% | **9.7%** |
| --TRAFFIC - D.U.I. | 4.5% | 0.7% | **5.3%** |
| --NARCOTICS - OTHER | 3.8% | 1.0% | **4.8%** |
| --WARRANT SERVICES - MISDEMEANOR | 3.4% | 1.1% | **4.5%** |
| --AUTOMOBILES - RECOVERY (THEFT) | 2.4% |  | **2.4%** |
| Grand Total | **77.7%** | **22.3%** | **100.0%** |

## 5. Use of Force by Day and Time

**Figure 4: Average Use of Force by Day of Week**



The distribution of force across day of the week is shown in Figure 4. Use of Type I force occurred most frequently on Wednesday (16.2%) and Friday (16.1%). Use of Type II force was reported most frequently on Saturday (19.6%) and Friday (15.5%). In 2018, Wednesday and Thursday had the highest rates of Type I force while in 2019, Type I force shifted to Wednesday and Friday. Generally, Type II force was found to be volatile across the week but highest on the weekend. Friday (15.5%) and Saturday (19.6% had the highest rates of Type II force in 2019.

Distribution of force across the watches deviated somewhat from 2018. Type I force was reported as occurring slightly more frequently during 2nd watch than during 3rd watch as in 2018. Type II force was most frequently reported on 3rd watch in 2019, though only slightly higher than 2nd watch. The majority of Type III - OIS force occurred during 3rd watch, though other Type III force tended to happen during 1st and 2nd watch. See Table 9.

**Table 9: Distribution of Use of Force by Type and Watch[14]**

| | | Level 1 - Use of Force | Level 2 - Use of Force | Level 3 - Use of Force | Level 3 - OIS |
|---|---|---|---|---|---|
| 2018 | 1st Watch | 15.6% (*n*=290) | 19.8% (*n*=73) | 36.4% (*n*=8) | 66.7% (*n*=2) |
| | 2nd Watch | 41.4% (*n*=772) | 43.8% (*n*=161) | 45.5% (*n*=10) | 33.3% (*n*=1) |
| | 3rd Watch | 43.0% (*n*=802) | 36.4% (*n*=134) | 18.2% (*n*=4) | |
| 2019 | 1st Watch | 18.1% (*n*=176) | 17.7% (*n*=48) | 12.5% (*n*=1) | |
| | 2nd Watch | 42.2% (*n*=411) | 41.0% (*n*=111) | 75.0% (*n*=6) | 16.7% (*n*=2) |
| | 3rd Watch | 39.7% (*n*=386) | 41.3% (*n*=112) | 12.5% (*n*=1) | 83.3% (*n*=10) |

Distribution of force across the 24-hour day maintained a curvilinear pattern virtually indistinguishable in 2019 relative to 2018, though there was a slight shift of force occurrence earlier in the evening.  This visual pattern is confirmed by the presence of two well-fit models (see footnotes 12 and 13). See Figure 5.

---

[14] Officers are assigned to one three watches.  First watch is from 0300-1200 hours, or 0330-1230.  Second Watch is from 1100-2000, or 1130-2030.  Third Watch is from 1900-0400 or 1920-0430.

**Figure 5: Use of Force Rates by Time of Day[1516]**



## 6. Location

Analysis of use of force location data is based on the geolocation of the address associated with the force incident. Though all use of force incidents record a location address, in 2019, just under 15% of these addresses did not resolve into geolocated information[17]. Complete success in the geolocation process is not possible with current technology, however the Department is working to improve the geolocation process to increase the percentage of incidents included in future location analyses. The following analyses are conducted on the approximately 85% of use of force incidents recorded in 2019 which resolved correctly.

In 2019, West precinct had the largest percentage of all use of force (31.6%) while the Southwest precinct accounted for just 4.0%. 14.5% of all use of force was not able to be geolocated.

**Table 10: Distribution of Use of Force by Precinct**

---

[15] 2018 $r^2$ = .60, p = .0003, indicating a large effect trend or well fit model.

[16] 2019 $r^2$ = .76, p <.0001, indicating a very large effect trend or very well fit model.

[17] Geolocation is the identification of the real-world longitude and latitude coordinates of UoF incidents. These coordinates are used by SPD to accurately analyze the incidents geographically. Ambiguous or non-specific addresses associated with UoF incidents are currently not able to be resolved into geolocated coordinates. These address locations are spread across Seattle.

| West | 31.6% |
|------|-------|
| North | 21.7% |
| East | 14.3% |
| South | 13.8% |
| Southwest | 4.0% |
| No Precinct | 14.5% |

Figure 6 [18] shows the distribution of all geolocated uses of force in 2019. The percent change from 2018 to 2019 is consistent across all precincts and aligned with the overall decline in use of force attributed in great part to the change in the reporting of handcuffing pain. The West precinct saw the smallest decline in overall use of force (-31.5%) while all other precincts saw a decline between 50% and 55%.

**Figure 6: All Use of Force 2019 with Percent Change 2018-2019**



---

[18] The percentages shown in the figure do not match Table 10 above because Figure 6 does not include the null geolocated values.

The distribution of use of force was less evenly distributed in 2019 than it was in 2018. Type I force distribution is similar to all use of force because it makes up the bulk of all force use (see Figure 7). Type II force was also significantly less evenly distributed in 2019 than in 2018 (see Figure 8). In 2019, the West precinct accounted for 40.9% of Type II force while accounting for 29.2% in 2018. The Southwest precinct accounted for 5.3% of Type II force in 2019 but just 2.3% in 2018 while the North precinct declined to 17.8% from 30.6%.

*Figure 7: Type I Force 2018 and 2019 by Precinct*

**Figure 8: Type II Force 2018 and 2019 by Precinct**



Most use of force in the West precinct occurred in the King and David sectors (see Figure 9). The distribution of force in the North Precinct was more evenly spread among the Nora, Lincoln, and Union sectors (see Figure 10).

**Figure 9: West Precinct All Use of Force Distribution 2019**



**Figure 10: North Precinct All Use of Force Distribution 2019**



## 7.  Arrests to Use of Force

In previous reports, SPD was unable to report arrest counts which prevented the department from calculating an arrest rate in use of force incidents.  The department committed to filling this gap and in May of 2019 went live with a New Records Management System (NRMS).  This new system captures the full spectrum of constitutional seizures, including arrests.  With this new data, SPD calculated the arrest rate in use of force incidents for the second half of 2019.  The rate of force used during the arrest of a subject in the last half of 2019 was just 7.8%. 5.9% of all arrests involved a Type I Use of Force while fewer than 2% of all arrests resulted in Type II or Type III force.[19]  See Table 11.

**Table 11: Arrest Rates (July 1, 2019-December 30, 2019)**

|  | July | August | September | October | November | December | Grand Total |
|---|---|---|---|---|---|---|---|
| Level 1 - Use of Force | 5.8% | 6.8% | 5.3% | 5.3% | 5.9% | 6.5% | **5.9%** |
| Level 2 - Use of Force | 1.8% | 2.5% | 2.6% | 1.7% | 1.4% | 0.2% | **1.7%** |
| Level 3 - Use of Force |  | 0.2% |  |  | 0.2% |  | **0.1%** |
| Level 3 - OIS | 0.1% |  |  | 0.2% |  |  | **0.1%** |
| Grand Total | **7.7%** | **9.5%** | **7.9%** | **7.2%** | **7.5%** | **6.7%** | **7.8%** |

## 8.  Use of Force – Less Lethal Devices

As defined in SPD Manual Section 8.050, less lethal devices are "devices designed and intended to apply force not intended nor likely to cause the death of a subject or great bodily harm." Approved Department-issued devices include conducted electrical weapons (Taser), impact weapons (baton), and Oleoresin Capsicum (OC) spray. In addition, vehicle related tactics, 40MM/ Blue Nose, and canine deployments are tracked as less lethal tactics; hobble restraints, which can be used to restrain a subject's limbs, and Noise Flash Diversionary Devices (NFDDs), a device typically used by SWAT which cause a large flash and a noise and are intended to disorient, but not make contact with, a subject are also tracked in this category. A breakdown of incidents involving one or more less lethal tools is provided in Table 12.

**Table 12: Less-Lethal Deployments (January 1 – December 31, 2019)**

| Tool | Number of Incidents | Number of Involved Officers |
|---|---|---|
| Taser | 24 | 26 |
| Baton (Pressure Point) | 1 | 1 |

---

[19] There is some disagreement about what constitutes an appropriate denominator for force rates. The department will consider both arrest and dispatch rates in future analysis.

| Baton (Strike) | 1 | 1 |
| Hobble Restraint | 2 | 2 |
| NFDD | 29 | 39 |
| Canine | 4 | 4 |
| Vehicle Tactics (PIT) | 1 | 1 |
| Vehicle Tactics – Other (Ramming) | 1 | 2 |
| OC – Pepper Spray | 4 | 4 |
| Chemical Other | 7 | 2 |
| Blast Balls | 0 | 0 |
| Blue Nose / 40MM | 6 | 7 |
| Stop Stick Deployment | 4 | 4 |

## 9.  Less-Lethal Devices – Taser[20]

The use of a Taser is governed by SPD Manual Section 8.300, Use of Force Tools.  As with any less lethal tool, it may be used "to interrupt a subject's threatening behavior so that officers may take physical control of the subject with less risk of injury to the subject or officer than posed by greater force applications.  Less-lethal devices alone cannot be expected to render a suspect harmless."

Tasers operate in two primary modes: "probe" (or "dart") mode and "contact" (or "drive stun") mode.   In dart mode, Tasers use compressed nitrogen to fire two barbed probes (darts). Electricity travels along thin wires attached to the probes and can bring about uncontrolled muscle contractions which override an individual's voluntary motor function (neuromuscular incapacitation, or NMI).   In drive stun mode, the device is placed in direct contact with the subject's body; in this manner of deployment, the Taser is intended to cause significant pain, but it does not override motor function.

By policy, Seattle Police Officers are required to carry at least one less-lethal tool (Taser, baton, or Oleoresin Capsicum (OC) spray).  Officers who choose to carry Tasers are required to attend a two-day training course before being issued their device.

The Department tracks all Taser deployments (whether in dart mode or drive stun mode) as a Type II use of force, regardless of whether the Taser application was effective or not in bringing the subject under control.  Each Taser application is reported as a separate force count; an officer who deploys their Taser twice in the course of an incident is required to report that as two separate applications.  Arc warnings (a spark triggered as a visual indicator of the Taser's capacity to enhance a verbal warning) and the pointing of the device's laser alone, are not reportable events.

---

[20] This report follows on the Department's 2016 Taser Report, a stand-alone report that describes in greater detail how Taser deployments are tracked and reported.  A copy of that report can be accessed at http://spdblotter.seattle.gov/wp-content/uploads/2017/12/Taser-Report-2016.pdf.

In reviewing data around Taser deployments, it is important to note that the low frequency with which Seattle officers deploy Tasers precludes drawing statistically meaningful inferences from these numbers.

### a. Taser Deployments

***In total, in 2019, 26 Seattle Police officers reported deploying/activating their Taser 42 times across 24 separate use of force incidents.*** (In other words, an involved officer could deploy their Taser more than once in the same incident.) Most of these incidents (88.5%) involved one or two Taser activations. As shown in Figure 11, the numbers reported for 2019 are consistent with those reported the prior two years with respect to the number of officers involved, the number of incidents in which a Taser was used, and the total number of Taser applications.

**Figure 11: Trends over Time in Taser Deployments**



### b. Taser Effectiveness

Officers are required to report on the effectiveness of all force used, from verbal commands to discharging a firearm, as "effective" or "not effective" under the guideline that "if the force used allowed you to take the subject into custody," then it was effective. If it did not, then it was not effective. Officers make this determination for each type of force they apply in a given incident.



The Taser reporting module (shown to the left) allows officers to report force as "Effective," "Limited," or "Not Effective." Effectiveness is determined by the involved officer at the time of Taser activation and is based on their training and experience. If an officer believes the Taser was effective in taking the subject into custody, that officer should report the Taser application as "Effective." If the application had some useful effect in taking the person into custody, it should be reported as "Limited." If the Taser failed, misfired, missed, did not result in NMI, or otherwise was not useful in taking the person into custody, the deployment should be reported as having "No Effect."

One limit to this reporting interface is that officers evaluate the effectiveness of Taser application with regard to his or her deployments in the aggregate, rather than assessing each deployment individually. In other words, if an officer deploys three Taser applications, the third of which is effective but the first two are not, the reporting interface would reflect that officer's Taser use, overall, as effective. For purposes of this report, for incidents that involved multiple applications, narratives were examined to determine the effectiveness of each application separately. In the hypothetical example above, accordingly, three applications would be reported, one of which was effective, and two of which were not.

**Figure 12: Overall Taser Effectiveness by Activation**



A breakdown of Taser effectiveness, by activation count, is shown in Figure 12. In 23, approximately 54.8% of the 42 total activations across 24 incidents, the Taser was reported to be effective in taking the person into custody; it was reported not to be effective in 14, or approximately 33.3%, of the 42 applications. The Taser was reported to be of limited effect in the remaining 11.9% of applications. Seattle's Taser effectiveness rate is consistent with those reported by other agencies; *see*, e.g., Los Angeles Police Department's 2016 Use of Force Year-End Review, reporting a 58% Taser effectiveness rate (http://assets.lapdonline.org/assets/pdf/2016-use-of-force-year-end-review-small.pdf).

### c. Taser Effectiveness by Application Type

In addition to dart-mode (or probe deployment) and drive stun, officers may classify certain applications as either "probe/contact" or "re-energize." A probe/contact application indicates a situation in which the Taser is fired in dart mode, at least one probe makes good contact, but NMI is not achieved. In this circumstance, the Taser is then deployed in drive stun elsewhere on the body to complete the circuit in an effort to achieve NMI. The "re-energize" classification indicates a situation in which an officer is required to apply a second or third trigger pull in order to recycle the electric current; as each application is separately described in the officer's Blue Team statement, a "re-energize" application would necessarily appear in conjunction with another mode of deployment. Again, multiple applications may be reported in a single incident; returning to the hypothetical example of the three applications, only the last of which was effective, one might envision that situation to entail a probe deployment, a re-energizing application, followed by a probe/contact.



**Figure 13: Taser Deployments by Activation Type**



A breakdown of Taser deployments by activation type (or mode) is presented in Figure 13; Figures 14(a) and (b) show a breakdown of Taser effectiveness by activation type. As shown between these two figures, the majority (69%; n=29) of all Taser deployments in 2019 were in "probe" mode. Of these, 17, or approximately 59%, were reported to be effective; 10 were reported to be not effective, and the remaining 2 were reported to be of limited effect. No Taser deployments were made in probe/contact mode during 2019. 4 of the 8 drive stun deployments, or approximately 50%, were reported to be effective with 1 reported to be not effective and 3 reported to be of limited effect.

**Figure 14(a): Taser Effectiveness (Count) by Activation Type**



**Figure 14(b): Taser Effectiveness (Percent) by Activation Type**



## a. Taser Effectiveness by Subject Distance

To work in probe, or dart, mode, there must be adequate spread between the probes to generate a sufficient current to cause NMI. Due to the trajectories and lag of the probe wires, the greater the distance the officer is from the subject, the greater the spread will be; as shown in the graphic to the right, Taser estimates an approximate one foot spread per seven feet of travel. Optimum distance for a Taser deployment is 7-12 feet, with a target of center mass. In probe mode, the spread between probes must be generally be a minimum of four inches to be effective.



The reporting module for Taser deployments requires officers to report their estimated distance from the subject by way of four drop-down range selections of 0 feet (as would be the case in probe/contact or drive stun mode), 1-5 feet, 6-10 feet, and 11-20 feet. A breakdown of Taser deployments by distance from subject is presented in Figure 15; Figures 16(a) and (b) show a breakdown of Taser effectiveness by distance.

**Figure 15: Taser Deployments by Distance from Subject**



Of the 11 deployments that were reported at a distance of 1-5 feet, six were reported to be effective, four were reported to be not effective, and one was reported to be of limited effect. At a distance of 6-10 feet, nine of ten deployments were reported to be effective and one was reported to have a limited effect; zero activations were reported to have no effect. Of the 12 deployments that were reported at a distance of 11-20 feet, the majority (9) were reported to have no effect and 3 were reported to be effective.

**Figure 16(a): Taser Effectiveness (Count) by Distance from Subject**



**Figure 16(b): Taser Effectiveness (Percent) by Distance from Subject**



### b. Factors Limiting Taser Effectiveness

Several factors may impact the effectiveness of a Taser, including a missed probe, low spread between probes, heavy or baggy clothing, low or high body mass. The physiological state of a subject may also impact Taser effectiveness. Where a Taser application is not effective, officers are required to identify in their statements the reason so, based on their training and perspective at the time of the deployment. The Taser reporting module provides the following options for recording Taser ineffectiveness:

- Spread (i.e., insufficient to cause NMI);
- Miss (i.e., probes did not strike the subject);
- Clothing (e.g., thick, puffy, and baggy clothing may cause a gap between the subject and the probe, resulting in a disconnect and ultimately failure of the application);
- Cartridge Failed: Didn't activate.

A breakdown of those factors identified as limiting Taser effectiveness is shown in Figures 17(a) and (b).

**Figure 17(a): Factors Limiting Taser Effectiveness (Count)**



**Figure 17(b): Factors Limiting Taser Effectiveness (Percent)**



Of the 19 Taser deployments that were reported to be not effective or of limited effect, clothing was identified as the limiting factor in the majority of instances (n=11). In four instances, one or more Taser probes missed the subject; in two instances, the officers reported insufficient spread between the probes. Distance was provided in one instance and dislodged probes was reported in another.

# SECTION II:  FORCE INVESTIGATION AND REVIEW

All uses of force are thoroughly and critically reviewed. While the section above provides data and statistics about the frequency and distribution, it is the substantive review of each force case by the chain of command, the Force Review Unit, and the Force Review Board that determines whether force is in or out of SPD policy. If any reviewer in the chain of command or the FRU, or if the FRB by consensus, finds an indication of a policy violation, whether related to the force or otherwise, that case is required to be referred to the Office of Police Accountability for further review and a determination about whether there is any policy violation, and if so, the level of recommended discipline.  In addition, the OPA Director or his designee sits in on all FRB discussions, and has the prerogative to further review any case regardless of whether the FRB separately refers.

This Section describes the investigation and review processes for Types II and III uses of force, provides a summary of each Type III force investigation initiated by the Force Investigation Team (FIT) between January 1 – December 31 20199, and discusses assessments by the Force Review Board (FRB) of both Type II and Type III cases reviewed during 20199.

## A. INVESTIGATION OF FORCE

### 1. Investigation of Type II Use of Force

Investigation and Review of Type II uses of force are governed by SPD Manual Sections 8.400 and 8.500.

Officers who are involved in using Type II force are required to notify an on-duty sergeant of the incident, upload and flag in-car video with the incident number, complete necessary documentation relating to the incident (General Offense report) and submit a detailed use of force statement before leaving their shift.  Officers who witness a Type II use of force are likewise required to submit a witness officer use of force statement prior to ending their shift.

The responding Sergeant is responsible for conducting the investigation into the use of force. The Sergeant interviews the subject, the involved officer(s), any witness officers, and any civilian witnesses.  The Sergeant reviews the officer's statement to ensure it is thorough and complete, secures relevant in-car video, and provides a summary narrative of the incident and description of the evidence gathered and the investigative process.  This summary, and all supporting documents, are then forwarded up the chain of command.

### 2. Investigation of Type III Use of Force

Investigation of Type III uses of force, including Officer Involved Shootings, are governed by Manual Sections 8.400 and by the FIT Manual, a comprehensive guide for conducting thorough, complete investigations, interviews, and analysis.

The Force Investigation Team is responsible for investigating all Type III uses of force by Seattle officers.  FIT also investigates serious assaults against officers, any discharge of a firearm by an officer, in-custody deaths (both within SPD custody or, by agreement with the King County Jail, any deaths occurring in the jail or within 72 hours of release of the jail), and any use of force incident in which the supervisor believes there was misconduct in the application of the force.

FIT consists of a Captain, a Lieutenant, a Sergeant, and six Detectives.  The team is deliberately decentralized from SPD headquarters, and is instead located in the same building as the Crime Scene Investigation Unit and the State Crime Lab at Airport Way Center.  This location facilitates ease of access to the Evidence Section, the Crime Lab, the Photo Lab, and allows for privacy of officers from their coworkers at each precinct when needed as witnesses in a FIT case.

Table 13 shows a breakdown of total FIT responses from 2014 to 2019.  Response total reflects all responses by the FIT team, including non-force-related incidents (e.g., assisting an outside agency, jail death, or assault on officer investigation).  The number of officers reflects the total number of officers who used force at any level (Type I, II, or III) across all incidents investigated by FIT; because each force case is investigated according to the highest level used in that incident, one FIT case can include multiple uses of force at lower levels as well.

**Table 13:  Total FIT Responses (2014-2019)**

| Year | Responses | Number Of Officers | OIS (Fatal) | Returned to Patrol | In-Custody Death | Unintentional Discharge | Potential Misconduct |
|------|-----------|--------------------|-------------|--------------------|-----------------|-----------------------|---------------------|
| 2014 | 46 | 70 | 9 (5) | 8 | 2 | 3 | 2 |
| 2015 | 26 | 50 | 5 (2) | 3 | 2 | 3 | 2 |
| 2016 | 32 | 49 | 4 (2) | 4 | 1 | 2 | 2 |
| 2017 | 26 | 49 | 6 (3) | 3 | 5 | 1 | 1 |
| 2018 | 28 | 61 | 2 (2) | 0 | 5 | 4 | 4 |
| **2019** | **23** | **33** | **8 (3)[21]** | **0** | **2[22]** | **2** | **2** |

Of the 23 incidents that FIT investigated in 201919,

---

[21] Followings the passage of I-940, SPD now investigates OIS for the King County Sheriff's Office.  These numbers are inclusive of 2 OIS investigations related to KCSO deputies, one which was fatal.

[22] As discussed below, these investigations included the deaths of two subjects in the custody of the King County Jail.

- Fifteen involved Type III use of force by one or more Seattle Police Officers, six of which were Officer Involved Shootings (OIS), two of which were fatal.
- Two were Officer Involved Shootings (OIS) by King County Deputies, one of which was fatal.
- One involved force that after investigation will be reclassified.
- Two were unintentional firearm discharges that did not result in any injuries.
- Two were in-custody deaths which involved subjects in the King County Jail.
- One involved a mercy shooting of an animal.

### a. FIT Response Process[23]

A typical FIT response is initiated when FIT receives a screening call from an on-scene sergeant or other supervisor. FIT directs the supervisor to sequester the involved officers and have them escorted individually, by an uninvolved officer to the FIT office. The OPA Director, the Crime Scene Investigation Unit (CSI), Training Unit, and executive members of Command Staff are also notified to respond to the scene as appropriate.

FIT detectives are responsible for gathering physical evidence, eyewitness and involved subject statements, and any video evidence, both at the scene and through later canvassing of the neighborhood, news media and internet. At the scene, the lead FIT investigator consults with CSI, Training, and OPA regarding the evidence gathered; if there is any indication of criminal conduct by the officer, the investigation is bifurcated such that the administrative review of the incident is screened from the criminal investigation. No case investigated during either 2015 or 2016 involved a criminal allegation.

Involved and eyewitness officers are interviewed, separately, at the FIT offices, for purposes of capturing as close to the event as possible their perceptions and recollections of the incident. Recognizing that video is only one piece of evidence, can be misleading, and is often incomplete, FIT has moved towards not permitting officers to watch video prior to giving their statements, so as to capture as cleanly as possible what the officer perceived leading up to and the moment the force was used.

---

[23] FIT policy and procedure is set forth in greater detail in SPD Manual Section 8.400.

When complete, the FIT investigation, and CSI investigation if any, is formally presented to the Force Review Board.  A completed FIT investigation is required to cover, where applicable:

- A summary of the incident;
- Scene description, diagram, and/or photographs;
- Witness and video canvass;
- Subject information;
- Witness information;
- Injuries, either to officer or subject;
- All physical evidence;
- Clothing analysis;
- Weapons and weapon testing/analysis;
- Personnel involved;
- Any communications concerning the incident or the investigation;
- FIT callout notifications; and
- Detective's log of investigation steps.

### b.  2019 FIT Responses

The descriptions presented in Table 14 are intended to provide neutral but informative statements of each of the 23 incidents to which FIT responded during 2019.  They are not intended to provide a detailed analysis, nor are they intended to convey a qualitative determination as to the use of force, which by policy is the purview of the FRB in each of these cases.  Further, while an overview of the FRB's case dispositions in 2019 in the aggregate is presented later in this section, not all cases described here have yet undergone FRB review.

**Table 14:  FIT Investigations 2019[24]**

| Incident No. | Precinct | Event Summary |
|---|---|---|
| **2019-25276**<br><br>**Type III**<br><br>**1 Involved Officer**<br><br>*Subject Black Female, age 59* | West | Officers were dispatched to a call of a suicidal woman displaying a knife.  The subject was known from past contacts to be combative and assaultive towards first responders.  Verbal commands to drop the knife were ineffective.  As the subject moved towards a civilian witness (her case worker), an officer fired a less-lethal 40 mm round, striking the subject in the leg. |

[24] As of December 31, 2019, cases 2019-278870, 2019-397283, 2019-478870 were still pending before the FRB.

| Incident No. | Precinct | Event Summary |
|---|---|---|
| **2019-44056**<br><br>**In-Custody Death** | KCJ | The subject died in KCJ custody following an arrest by SPD officers.  No force was used in the incident.  An autopsy of the subject determined that the subject had ingested a large amount of cocaine. |
| **2019-48393**<br><br>**Type III/OIS (Fatal)**<br><br>**2 Involved Officers**<br><br>*Subject Hispanic Male, age 34* | North | Officers were dispatched to a series of 911 calls reporting occupants of an apartment building hearing a woman screaming for help in Spanish.  A separate 911 call was received from a woman reporting that a co-occupant of her apartment was threatening to kill another woman in the apartment; subsequently, the caller reported that the woman was dead.  Upon breaching the apartment door, officers discovered the victim's decapitated body and the subject, who was holding a large kitchen knife and a meat cleaver.  The subject initially responded to commands to drop the knives and go to the ground, but then picked the knives up and started moving towards the officers while waving the knives.  Both officers discharged their firearms towards the subject, who died from his injuries.  An autopsy showed the presence of amphetamine and methamphetamine in his system. |
| **2019-55824**<br><br>**In-Custody Death**<br><br>*Subject White Male, age 36* | East | Officers responded to a "help the firefighter" call.  When they arrived, they observed a struggle between the subject and four firefighters who were attempting to restrain him.  The subject continued to struggle as officers stepped in to assist.  Believing that the subject was experiencing excited delirium, SFD paramedics administered ketamine intramuscularly into the back of the subject's right thigh.  Officers maintained their positions holding the subject down until he stopped struggling, at which point he was transported via gurney to a waiting paramedic unit.   Once in the gurney, the subject was determined to be unconscious and without an effective heart rate.  While SFD performed life-saving efforts, the subject was transported to Harborview Medical Center, where he was pronounced deceased.  An autopsy determined that the cause of death was acute amphetamine intoxication with features of excited delirium.  Other than body weight and control holds to restrain the subject while he was struggling, no use of force was used by any SPD officers on-scene. |

| Incident No. | Precinct | Event Summary |
|---|---|---|
| **2019-98802**<br><br>**Type III/OIS (Non-Fatal) Four Involved Officers**<br><br>**Type II 1 Involved Officer**<br><br>**Type I 1 Involved Officer**<br><br>*Subject Asian Male, age 37* | East Precinct | Officers responded to a 911 call from a woman reporting that her husband had loaded a handgun and left the apartment, stating that he was going to kill himself. The caller reported that she believed he would attempt to commit suicide by police. Officers located the subject, formed a contact team, and attempted to establish communication with the subject. The subject acknowledged the officers but declined to put down the gun, stating "You're going to have to shoot me." Additional efforts to de-escalate the situation were unsuccessful. The subject pointed the firearm at officers, who fired upon the subject. Medical aid was rendered, and the subject was transported to Harborview Medical Center. |
| **2019-111079**<br><br>**Type III**<br><br>**1 Involved Officer**<br><br>*Subject Black Male, age 33* | South & K9 | Officers responded to a 911 call regarding the violation of a domestic violence protection order. Officers were familiar with the subject and knew him to be assaultive towards officers. A K9 was called in to locate the subject, who had fled; the subject was subsequently observed running from the scene. After the subject did not comply with orders to stop, the K9 was released to apprehend the subject. During the apprehension, the subject received bite wounds to the hands and thigh. |
| **2019-160099**<br><br>**Type III/OIS (non-injury)**<br><br>**1 Involved Officer**<br><br>**Type I 4 Involved Officers**<br><br>*Subject Black Male, age 25* | West | Officers were staged in Pioneer Square to monitor bar closing; additional officers were nearby on the scene of a traffic collision. All officers heard two gunshots coming from the Sinking Ship parking garage; as they were running towards the garage, they heard multiple additional shots. One officer observed a subject holding what appeared to be a Glock firearm firing eastbound from the top of the garage. Believing that the subject may be firing towards the officers, that officer fired two shots at the subject. The subject was subsequently apprehended, along with two others, while attempting to leave the garage in a vehicle, and was found to be in possession of a Glock firearm. One passenger had a gunshot wound to his leg; the subject stated that his passenger had been shot by an occupant of another vehicle during an altercation that occurred following a minor collision. Video evidence appeared to show the subject firing his weapon downward, toward his passenger. The subject was not |

| Incident No. | Precinct | Event Summary |
|---|---|---|
| | | injured, and an investigation determined that the round that struck the passenger was not from an SPD firearm. |
| **2019-165328** <br><br> **Type III/OIS (Fatal)** <br><br> **2 Involved Officers** <br><br> **Type I 1 Involved Officer** <br><br> *Subject Black/Hispanic Male, age 31* | West | Officers responded to a 911 call from a woman crying and stating that her boyfriend had a knife and was telling her he was going to kill her and himself. She advised that there was blood everywhere. She advised that she was in the bathroom, but he was attempting to get in, and she could not leave because he would kill her. Upon arriving at the apartment, officers announced their presence and ordered the subject to open the door; when they received no response, officers breached the door. Officers observed the subject standing inside the threshold of the apartment, holding a knife in his right hand. Officers ordered him to drop the knife; instead, the subject lifted his right hand and moved towards the officers. Two officers discharged their firearms at the subject. |
| **2019-237453** <br><br> **Type III** <br><br> **1 Involved Officer** <br><br> *Subject Black Male, age 54* | West | While officers were arresting a subject, the subject attempted to swallow narcotics. An officer appeared to use a neck restraint to prevent the subject from swallowing. The subject alleged that the officer "stomped" on his neck. Based on the nature of the force used and the allegations, FIT responded and initiated an investigation. The subject was evaluated at Harborview, found to have normal vital signs and no signs of trauma. |
| **2019-243418** <br><br> **Type III OIS (Non-Fatal)** <br><br> **2 Involved Officers** <br><br> *Subject Asian Female, age 38* | West | Officers responding to a report of shots fired in a parking lot observed a subject matching the description provided by 911 callers of an individual seen walking away from the location with a firearm. As officers approached and called out to the subject to stop, sit on the ground, and show her hands, the subject turned and began moving towards the officers, holding a black object in her hand. Both officers discharged their firearms, striking the subject. A black handgun, later determined to have been stolen during a car prowl, was recovered. The subject sustained a fracture of her humerus as a result of the force. |
| **2019-253560** <br><br> **Unintentional Discharge – No Injury** | North | An officer searching a vacant home for a burglary suspect unintentionally discharged his firearm while transitioning the firearm from his right to left hand. |

| Incident No. | Precinct | Event Summary |
|---|---|---|
| **1 Involved Officer** | | |
| **2019-309093**<br><br>**Unintentional Discharge – No Injury**<br><br>**1 Involved Officer** | | An officer, while at home and off-duty and while preparing his firearm for training later that day, unintentionally discharged a round from the firearm. |
| **2019-322701**<br><br>**Type III**<br><br>**3 Involved Officers**<br><br>***Subject Black Male, age 42*** | West | Officers responded to a report of two males harassing people and physically assaulting an elderly male. The caller subsequently reported the two males were aggressively grabbing people as they walked by; then advised that the two males had separated. A second caller reported a male swinging a chain and striking a street pole while another male watched. Officers observed the subject at that location holding a chain. From inside his vehicle, using the PA system, an officer ordered him to put the chain on the ground. The subject did not drop the chain and approached the passenger side of the vehicle. The officer exited the vehicle and again order the subject to drop the chain. The officer could see another chain in the subject's shorts. The subject dropped one chain. The officer ordered the subject to put the other chain on the ground as well. The subject stepped back, pulled out the chain, and began swinging it. Officers were able to get the subject on the ground, but he continued to struggle, was able to get back on his feet, and began waving the chain at the officers again. As officers continued to order him to drop the chain, the subject squatted down, set the chain on the ground, but kept his hand near the chain. One officer deployed his OC spray at the subject, but the spray did not appear to have any effect on the subject, and the subject again grabbed hold of the chain. A Taser-equipped backup officer arrived. One officer continued to order the subject to drop the chain and get on the ground and warned the subject he would be Tased. The subject, holding the chain, did not comply. A Taser was deployed in the area of the subject's back. The subject appeared to pull the Taser probe out and began running, still holding onto the chain. The officer deployed |

| Incident No. | Precinct | Event Summary |
|---|---|---|
| | | a second round of Taser probes, after which the subject fell, sustaining a left temporal bone fracture. |
| **2019-397283**<br><br>**Type III OIS (Non-Injury)**<br><br>**1 Involved Officer**<br><br>*Subject White Male, age 35* | West | A plain-clothed officer observed a victim being assaulted outside a bar.  Another subject ran up with a gun and pointed it at the victim, who was on the ground.  The officer fired at the subject, but missed. |
| **2019-478870**<br><br>**Type III** | West/K9 | This incident involved a K9 deployment with injury to the subject warranting a Type III response.  The investigation of this incident remains open. |

### 3.  FORCE REVIEW UNIT/FORCE REVIEW BOARD

The Force Review Board is a select group of Seattle Police Department personnel which meets regularly to make determinations as to (1) whether a use of force investigation is thorough and complete; (2) whether the force was consistent with SPD policy, training, and core principles; and (3) with the goal of continual improvement and ensuring  the Department remains abreast of evolving best practices, whether any recommendations are made or other issues need to be addressed with respect to policies, tactics, training, equipment, or otherwise.

The FRB is composed of standing members selected by the Assistant Chief of the Professional Standards Bureau. Only standing members of the FRB may participate in the deliberations and vote during board sessions.  These standing members include one representative from the Training Section, three representatives from the Patrol Operations Bureau, one representative from the Audit, Policy & Research Section, and one representative from the Investigations Bureau.  The Captain of the Force Review Unit (or Assistant Chief of Professional Standards in the case of an officer involved shooting review) is the standing Chair and casts the final vote if the

Board's vote is evenly split.  A quorum of four voting members must be present for the Board to review completed cases.[7]

The FRB includes a non-voting participant from the Crisis Intervention Team to answer issues related to a subject's mental health status, services they might be receiving, as well as assisting the FRB in determining if an officer used "best practices" in de-escalation.  Where appropriate, subject matter experts from specialty units (e.g. Canine, SWAT, Communications, or the Range) are asked to attend an FRB to answer any unit-specific questions that may arise.

Case selection for the FRB is determined by policy and handled by the Force Review Unit.  All completed Use of Force investigations are forwarded to the FRU using IAPro and Blue Team, a paperless computer system.  These cases include Type I, Type II, Type III uses of force, and Firearm Discharges (both intentional and unintentional discharges).

By policy, the FRB reviews all Type III cases.  The FRU, comprising a captain, a lieutenant, a sergeant, and two detectives, reviews all Type II use of force reports. FRU staff and FRB members undertake the same inquiry and apply the same standard of review when reviewing cases. FRU staff and FRB members attend the same annual training involving the objective analysis of force, which ensures that the FRU is conducting a thorough review of their cases consistent with the reviews conducted by the Board.

Type II cases are sent to the FRB by the FRU when any of the following factors are involved:

- Possibility of misconduct;
- Significant policy, training, equipment, or tactical issues;
- When FIT was contacted for consultation and declined to respond or investigate;
- When less-lethal tools were used on the subject;
- When a canine makes physical contact with the subject;
- When the subject is transported to an emergency room.

All cases not selected for FRB review are reviewed by the FRU detectives and their chain of command.  The FRU captain makes the final determination based on the FRU's reviews and recommendations.  Bifurcating Type II use of force cases allows the FRB to focus its efforts on the more significant cases, such as Officer Involved Shootings, Type III investigations, and serious Type II cases.  Additionally, a random 10% of cases reviewed each month by FRU are presented to the FRB for a second independent review – a mechanism to ensure quality control.

---

[7] Other observers to the Force Review Board may include Captains and higher, the Department's Executive Director of Legal Affairs, representatives from the City Attorney's Office, the DOJ, the Monitoring Team, the Office of the Inspector General, and a representative from OPA. In cases involving an officer involved shooting, a citizen observer appointed by the Mayor's Office also attend.  These observers may attend FRB meetings, but they are not permitted to vote.

Figure 18 describes the review process for both FRU and FRB. Both look to ensure that the investigation was thorough, timely, and complete, providing all material evidence. Both answer the core inquiries of (1) whether the force was consistent with policy – including an affirmative obligation to de-escalate when safe and feasible to do so, and if there were issues
with the force, whether supervisors appropriately identified those issues. The FRU considers – and the FRB discusses – all pertinent factors surrounding the force, including the tactics used and supervision at the scene. FRB determinations are documented and any issues identified are referred to the appropriate commander for follow-up. If policy violations are suspected, the incident is immediately referred to OPA, or to the chain of command if appropriate under Manual Section 5.002, by the FRB Chair or designee, if not already referred by the reviewing chain of command.

**Figure 18: Force Review Protocol**



*It is important to understand what an FRB finding means relative to the question as to whether the force was constitutional.* As the United States Supreme Court has long held, whether any use of force is lawful under the Constitution is a case-specific determination, based on the perception of a reasonable officer under the totality of the circumstances present at the time the force is applied, and often a point on which reasonable minds can differ. While the courtroom is generally the forum for determining the *legality* of a use of force, the Force Review Board is a mechanism by which members analyze the broader question of whether the force meets the requirements of policy and training that hold officers to a higher standard of conduct – and care should be taken not to conflate the two. Importantly, SPD policy incorporates both federal and state constitutional thresholds, but holds officers to a substantially higher level of performance and scrutiny consistent with community expectations. Simply put, a finding that force is out of policy does *not* equate to a finding that the force violated the Constitution, but a finding that the force was in policy *does* mean that, in the view of the reviewers, it was also likely lawful.

## 4.   OVERVIEW

In 2019, the Force Review Unit reviewed a total of 48 cases; the Force Review Board reviewed a total of 100 cases.  (Note: "Cases" are based on a single General Offense number, or CAD event; cases may thus involve more than one officer, or more than one use of force, each of which is separately considered.)  As ten percent of cases reviewed by the FRU are randomly selected for further review by the FRB, those cases are essentially double-counted in the numbers here.  In total, of the 100 cases reviewed by the FRB, nine cases had also been reviewed by the FRU.

Table 15 shows the 100 cases reviewed by the FRB broken down by the highest force level in each case. [25]

### Table 15: Breakdown of Cases Reviewed by FRB by Type

| | |
|---|---|
| Type II | 87 |
| Type III | 7 |
| OIS | 6 |
| Total | 100 |

## 5.   FORCE REVIEW UNIT/FORCE REVIEW BOARD DETERMINATIONS

In 2019, a total of 502 officers were involved in the 148 cases reviewed by FRU and/or FRB.  The aggregate number of officers includes officers who were reviewed in connection with their tactics and decision-making, even if those officers did not individually apply force.  The numbers below represent the number of officers involved across the cases, aggregated, and the determination as by FRB and FRU as to whether each officer's actions were either approved as consistent with policy or deferred while under review by another unit.

Note: Under policy, the FRU/FRB do not decide any matter that is under investigation by the Office of Police Accountability.  It is thus important to emphasize that the approval/disapproval rate indicated below does not indicate an ultimate determination as to whether the issue under consideration is in or out of policy – a determination that is recommended by OPA following its independent review but ultimately rests with the Chief, informed by OPA review.

---

[25] Again, completed cases are investigated and reviewed at the highest level of force used.  A Type III case, accordingly, may also involve Type II or Type I force; a Type II case may also include Type I force.

### a.  Use of Force

A breakdown of FRU/FRB determinations with respect to officers' use of force is presented in Table 16.

**Table 16: Force Review Findings by Officer**

|  | FRB | FRU | Total |
|---|---|---|---|
| Approved | 259 | 106 | 365 |
| Disapproved | 3 | 0 | 3 |
| Deferred | 30 | 0 | 30 |
| Total | 292 | 106 | 398 |

Across 100 cases reviewed by the FRB, the involved officers' use of force was found to be reasonable, necessary, proportional, and otherwise in conformance with Department's Use of Force Policy in 259, (98.9%) of the 262 instances a determination was reached.  In three instances, the FRB disapproved of the use of force; in 30 instances, where a matter had been referred to OPA prior to FRB review, the FRB determination was deferred, per policy, to OPA.  Across the 48 cases reviewed by the FRU, the involved officers' use of force was approved in all 105 instances.

### b.  Tactics and Decision Making

Officers' tactics and decision making through an incident are reviewed for determination as to whether they are consistent with policy (including in-car video and body-worn camera requirements) and training.  Included in this review as a separate analysis is a determination as to whether officers complied with the Department's de-escalation policies that require reasonable efforts to de-escalate a situation, where safe and feasible to do so, prior to using force.  A breakdown of FRU/FRB determinations with respect to officers' tactics and decision making is presented in Table 17.

**Table 17: Tactics and Decision by Officer or Supervisor**

|  | FRB | FRU | Total |
|---|---|---|---|
| Approved | 362 | 126 | 488 |
| Disapproved | 7 | 0 | 7 |
| Deferred | 6 | 0 | 6 |
| Total | 375 | 126 | 501 |

Across 100 cases reviewed by the FRB, the involved officers'/supervisors' tactics and decision making were found to be consistent with policy, training, and de-escalation requirements in 362 (98.1%) of the 369 instances a determination was reached; in seven instances, the FRB disapproved the tactics and decision making.  In six instances, the determination was deferred pending review by OPA.  Of the 48 cases reviewed by the FRU, the involved officers' tactics and decision making were approved in all of the 126 instances considered.  In considering FRU

findings, however, it should be remembered that FRU has an obligation to refer to the FRB any Type II case that may involve misconduct or significant policy or tactical issue; as it is the FRB findings that are recorded as the determination of the case, these numbers should not be surprising.

### c.  OPA Referrals

The FRU and FRB have an obligation to refer to OPA any serious policy violation, including any violation around use of force, unless already referred by the chain of command.  In addition, the OPA Director sits on the FRB, and can independently take any case for further investigation. While OPA will separately report out on its intakes, investigations, and determinations for 2019, a breakdown of FRU/FRB OPA referrals is presented in Table 18.  It should be noted that the numbers reported below refer only to referrals made by the FRB or FRU – they do not include OPA referrals from the reviewing chain of command, subjects, or by third-party complainants.

**Table 18: OPA Referrals**

|  | FRB | FRU | Total |
|---|---|---|---|
| ICV | 0 | 0 | 0 |
| Use of Force | 5 | 2 | 7 |
| Other | 13 | 6 | 19 |
| Total | 18 | 8 | 26 |

As shown, a total of 26 OPA referrals were made, seven of which were related to potential violations of the use of force policy (which includes de-escalation).  None related to a violation of the ICV policy; an additional 19 related to other, non-force-related policies.

### d.  On-Scene Supervision

FRU and FRB consider as part of their reviews whether an SPD supervisor (Sergeant or above) was on-scene prior to the use of force, and if so, whether the supervisor provided appropriate tactical guidance and support during the incident.  If a supervisor was not on-scene during the incident but responded thereafter, the FRU and FRB consider whether there were any issues with the on-scene portion of the use of force investigation.  A breakdown of FRU/FRB findings relating to on-scene supervision is presented in Table 19.

**Table 19: On-Scene Supervision**

|  | FRB | FRU | Total |
|---|---|---|---|
| Approved | 187 | 52 | 239 |
| Not Approved | 6 | 2 | 8 |
| Deferred | 3 | 0 | 3 |
| Total | 196 | 54 | 250 |

Of the 193 instances in which a case reviewed by the FRB involved an on-scene supervisor present and able to offer tactical guidance and support, the FRB approved the supervision in 187 instances (96.9%); in three instances, the determination was deferred pending review by another unit or OPA.  The FRU approved the on-scene supervision in 52 of the 54 applicable cases it reviewed.

### e.  Use of Force Investigations and Chain of Command Reviews

In addition to considering matters relating to the use of force incident itself, the FRB and FRU consider the timeliness and thoroughness of FIT and chain of command investigations and reviews, including whether FIT or the chain of command appropriately identified and addressed any deficiencies in training, performance, equipment, or policy issues.  A breakdown of FRU/FRB findings relating to FIT and chain of command investigations and reviews is presented in Table 20.

**Table 20: FIT/Chain of Command Reviews**

|              | FRB | FRU | Total |
|--------------|-----|-----|-------|
| Approved     | 382 | 190 | 572   |
| Not Approved | 3   | 1   | 4     |
| Deferred     | 4   | 0   | 4     |
| Total        | 389 | 191 | 580   |

In the 100 cases considered by the FRB, the FRB approved the FIT/Chain of Command investigation and review in 382 of 385 instances, and disapproved the investigation or review in 3 instances.  Four reviews were deferred pending review by another unit or OPA.  Of the 48 cases reviewed by the FRU, the FRU approved the chain of command investigation and review in 190 of the 191 instances considered.

### f.  Type 1 Case Reviews

The FRU is also responsible for conducting quality assurance of each Type I use of force report to determine completeness, timeliness, and accuracy of data entered in the field.  The FRU also reviews the chain of command's review of the incident; if any deficiencies are noted, the reviews are returned to the chain of command for additional work.

In 2019 the FRU processed 454 Type I cases involving a total of 722 officers, broken down as follows:

- 16% involved the reporting of Handcuffing Pain Only (117)
- 30% involved the reporting of Officers pointing their firearm at a Person (217)
- 42% involved the reporting Complaint of Pain Only (306)
- 6% involved the reporting of Using Multiple Types of Type I force (45)

- 5% involved the reporting of Deploying an NFDD (not at a person) by SWAT (34)
- 0.3% involved the reporting of Hobble Only (2)
- 0.1% involved the reporting of Stop Sticks (1)

# ADDITIONAL LINKS

The Department remains committed to providing the public with as much transparency and accessibility into its data as it can within the bounds of the privacy interests of the community we serve.  Additional information queries can be explored relating to stops and detentions, use of force, crisis responses, and crime statistics at  http://www.seattle.gov/police/information-and-data.

****