THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

Plaintiff,

v.

CITY OF SEATTLE,

Defendant.

No. 2:12-cv-01282-JLR

**UNITED STATES' MEMORANDUM IN SUPPORT OF JOINT MOTION FOR TERMINATION OF PARAGRAPHS 69-168 OF THE CONSENT DECREE**

Plaintiff United States of America ("United States" or "DOJ") hereby files this memorandum in support of the Parties' Joint Motion for Termination of Paragraphs 69-168 of the Consent Decree. These paragraphs constitute the provisions of the Consent Decree covered by the Sustainment Plan, (Dkt. 444), as approved by the Court on March 13, 2018. *See* (Dkt. 448). As set forth below, the City of Seattle ("City") has sustained compliance with all the provisions of the Consent Decree covered by the Sustainment Plan, and this sustainment has been validated by the United States and the Monitor. Termination of these provisions is therefore appropriate.

UNITED STATES' MEMO IN SUPPORT OF JOINT MOTION FOR
TERMINATION OF ¶¶ 69-168 OF THE CONSENT DECREE
Case No. 2:12-cv-01282-JLR - 1

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

The City and the Seattle Police Department ("SPD") have undergone a remarkable transformation during course of the Consent Decree.  In July 2012, the United States alleged that SPD engaged in "patterns or practices of using unlawful force that systematically deny the people of Seattle their constitutional rights," (Dkt. 1) at 2.  By April 2017, the Monitor found that SPD officers were "using only force that was necessary under the circumstances more than 99 percent of the time," that "[f]orce was likewise proportional and reasonable in the same more than 99 percent of force incidents," and that officers "complied with the duty to de-escalate in 99 percent of cases where that duty was applicable." (Dkt. 383) at 12.  The City has since held these high levels of achievement.  *See* (Dkt. 588-1) at 15 (October 2019 Comprehensive Use of Force Report); *Id.* at 27 (validation by DOJ and Monitor); (Dkt. 605-1) at 45 (City's 2019 Annual Use of Force Report).  Meanwhile, overall use of force by SPD officers has declined, including a 60 percent decline in serious use of force from the time period before the Consent Decree was entered to the Monitor's assessments; a decline that has also been maintained during the sustainment period.  (Dkt. 588-1) at 3.

Over this same period, crime in Seattle, including violent crime, has remained constant or slightly declined.  *Compare* (Dkt. 383) at 10-11 to the City of Seattle's 2018 Crime Report[1] and on the publicly available data on the SPD's Crime Dashboard.[2]  Officer injuries have similarly remained flat to slightly down during the implementation of the Consent Decree.  *See*, *e.g*., (Dkt. 383) at 10.  And the Monitor's surveys have demonstrated that public confidence in the Seattle

---

[1] The 2018 Crime report is available http://www.seattle.gov/police/information-and-data/2018-crime-report.

[2] The Crime Dashboard can be found at http://www.seattle.gov/police/information-and-data/crime-dashboard.  A customized chart showing the annual totals for violent and property crimes can be found at: https://public.tableau.com/shared/P2R4BRD4T?:display_count=y&:origin=viz_share_link&:embed=y.

UNITED STATES' MEMO IN SUPPORT OF JOINT MOTION FOR TERMINATION OF ¶¶ 69-168 OF THE CONSENT DECREE
Case No. 2:12-cv-01282-JLR - 2

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Police Department has increased substantially over the course of the Consent Decree, from 60 percent approval of SPD in 2013 to 74 percent in 2019.  (Dkt. 546) at 3.  Significantly, these gains have also included substantial increases in SPD's approval ratings among minority groups; SPD's approval rating among African Americans has risen from 44 percent in 2013 to 72 percent in 2019.  *Id.*

These outcomes are a testament to the hard work the City and the SPD put into doing the work mandated by the Consent Decree.  Through the Phase I assessments and Phase II audits, the City and SPD demonstrated that they not only achieved full and effective compliance with the commitments it made in Paragraphs 69-168 of the Consent Decree – including changes to policy, training, supervision, and internal and external systems of self-correction and oversight – but sustained them for the requisite period of two years.  As set forth below, these achievements and the Monitor and DOJ's validation of each, warrant termination of Paragraphs 69-168 of the Consent Decree at this time.

## I.      FACTS

## A.      THE CONSENT DECREE HISTORY AND REQUIREMENTS

1.      <u>Investigation</u>

In 2010, DOJ became aware of a number of recent incidents in which SPD officers were perceived to have used either excessive force or bias policing practices, suggesting that SPD officers may be engaging in a pattern or practice of police misconduct.  Many of these incidents – including the shooting of John T. Williams and the South Lake Union robbery detention – were highlighted in a letter sent by 35 community groups to the Department of Justice Civil Rights Division and the U.S. Attorney's Office for the Western District of Washington, asking that DOJ

UNITED STATES' MEMO IN SUPPORT OF JOINT MOTION FOR
TERMINATION OF ¶¶ 69-168 OF THE CONSENT DECREE
Case No. 2:12-cv-01282-JLR - 3

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

open an investigation into SPD under the authority granted by 42 U.S.C. § 14141.[3] *See* Declaration of Christina Fogg at Exhibit A ("Community Letter Requesting Investigation," December 3, 2010).  After an extensive investigation by DOJ and its experts, DOJ issued a findings letter to the City of Seattle in December 2011, in which it concluded there was reasonable cause to believe that SPD "engaged in a pattern or practice of using unnecessary or excessive force" in particular with impact weapons (such as batons) and against people in crisis. (Dkt. 1-1) at 5.  With respect to discriminatory policing, DOJ stated "[w]e do not make a finding that SPD engages in a pattern or practice of discriminatory policing, but our investigation raises serious concerns on this issue."  *Id.*

2.    Resolution – the Consent Decree

In July 2012, the Parties agreed to resolve DOJ's allegations that SPD engaged in a pattern or practice of unconstitutional policing through a Consent Decree.  *See* (Dkts. 3-1 and 13).  The Consent Decree mandates changes to SPD policies, training, supervision practices, and internal oversight mechanisms with the stated goal of "ensuring that police services are delivered to the people of Seattle in a manner that fully complies with the Constitution and laws of the United States, effectively ensuring public and officer safety, and promotes public confidence in the Seattle Police Department."  (Dkt. 3-1) at 5.  The Consent Decree therefore prescribed a set of organizational changes within SPD that were designed to ensure that SPD had mechanisms in place to engage in critical analysis of its policing practices in the areas in which DOJ made findings.  These mechanisms, combined with the changes to policy and training, were intended

---

[3] Since recodified at 34 U.S.C. § 12601.

UNITED STATES' MEMO IN SUPPORT OF JOINT MOTION FOR TERMINATION OF ¶¶ 69-168 OF THE CONSENT DECREE
Case No. 2:12-cv-01282-JLR - 4

not only to catch potential violations of law or policy, but to evaluate the causes of such violations in order to prevent constitutional violations in the first place.

The Consent Decree also specifies that the Agreement is intended to "provide clear, measurable obligations, while at the same time leaving Seattle with appropriate flexibility to find solutions suitable for this community." *Id.* at ¶ 1.  To that end, the Consent Decree then sets forth six identified subject matter areas for reform, titled "Commitments."  *Id.*  They are: (1) Use of Force; (2) Crisis Intervention; (3) Stops and Detentions; (4) Bias-Free Policing; (5) Supervision; and (6) the Office of Professional Accountability (now renamed the Office of Police Accountability ("OPA").  *Id.* at ¶¶ 69-168.  In August 2012, the Court approved the Consent Decree and shortly thereafter a Court-appointment Monitor was selected and work on implementing the Consent Decree's requirements began.  *See* (Dkts. 13 and 35).

**B.    THE CONSENT DECREE IMPLEMENTATION AND INITIAL COMPLIANCE**

Under the terms of the Consent Decree, the City has the option to demonstrate "full and effective compliance" through either "Compliance Reviews and Audits" or through "Outcome Assessments," each of which is expressly defined by the agreement.  *See* (Dkt. 3-1) at ¶ 182. The City opted to be evaluated under Compliance Reviews and Audits. (Dkt. 439) at 2-3.[4] Under that option, in order to demonstrate full and effective compliance, the City is required to

---

[4] However, the Monitor and the City also tracked a considerable number of outcome data metrics, which were provided to the Court as an alternative means of demonstrating initial compliance.  (Dkt. 419) at 8. The Court ultimately relied only on the findings of the Compliance Reviews and Audits.  *Id.*  Nonetheless, the City continued to track and provide outcome metrics during the later sustainment period, defined below. (Dkt. 452-1) (Community Engagement Program Report May 2018); (Dkt. 458-1) (Stops and Detentions Annual Report 2018); (Dkt. 495-1) (Crisis Intervention Program Report October 2018); (Dkt. 524-1) (Use of Force Annual Report January 31, 2019); (Dkt. 564-1) (Stops and Detentions Annual Report 2019); (Dkt. 588-1) (Comprehensive Use of Force Report); (Dkt. 588-3) (Crisis Intervention Program Report October 2019); (Dkt. 605-1) (Use of Force Annual Report January 10, 2020).  The data from these outcome assessments are discussed further below.

UNITED STATES' MEMO IN SUPPORT OF JOINT MOTION FOR TERMINATION OF ¶¶ 69-168 OF THE CONSENT DECREE Case No. 2:12-cv-01282-JLR - 5

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  show that for each "material requirement" of the Consent Decree that it "(a) incorporated the

2  requirement into policy; (b) trained all relevant personnel as necessary to fulfill their

3  responsibilities pursuant to the requirement; and (c) ensured that the requirement is being carried

4  out in practice."  (Dkt. 3-1) at ¶ 184.

5

6      1.    Implementation – Changes to Policy and Training

7          From 2012 on, the City, with the advice and input of the Monitor, his team, the

8  Community Police Commission ("CPC") and DOJ, developed new police department policies in

9  each of the six areas of commitment.  DOJ, exercising its independent enforcement obligation,

10  reviewed and provided input on the policies and policy revisions with the assistance of

11  nationally-regarded police practices experts. (Dkt. 422) at 3-4.  Among many other things, the

12  changes included a new requirement that, when feasible, offers use de-escalation, *i.e.* attempt to

13  "slow down or stabilize the situation so that more time, options, and resources are available for

14  incident resolution."  (Dkt. 471-1) at 13.  They also included new requirements to report,

15  investigate, and evaluate all uses of force that were more than *de minimis*. (Dkt. 107-3) at 6 and

16  (Dkt. 569-3) at 32.  The policies defined appropriate custodial stops and provided guidelines

17  around their usage. (Dkts. 116 and 587-1).  And they create a bias-free policing policy under

18  which officers are forbidden from making decisions or taking actions that are influenced by bias,

19  prejudice, or discriminatory intent.  Further, under the new bias-free policing policy SPD

20  committed to identifying, studying, and "eliminating policies and practices that have an

21  unwarranted disparate impact on certain protected classes."  (Dkt. 555-2) at 7.

22          Each of these policies, and others, were filed with and approved by the Court in both their

23  original form and as part of their periodic reviews and revisions since that time.  *See*:

24

25

26

27

28

UNITED STATES' MEMO IN SUPPORT OF JOINT MOTION FOR
TERMINATION OF ¶¶ 69-168 OF THE CONSENT DECREE
Case No. 2:12-cv-01282-JLR - 6

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

| SPD Policy | Filing and Date |
|---|---|
| Use of Force | Dkt. 107-1 to -6 (November 27, 2013)<br>Dkt. 204-1 (May 11, 2015)<br>Dkt. 388-1 (April 28, 2017)<br>Dkt. 471-1 to -3 (July 31, 2018)<br>Dkt. 500-1 to -5 (November 19, 2018)<br>Dkt. 569-2 to -4 (July 31, 2019) |
| Bias Free Policing and Terry Stops | Dkt. 116 (December 31, 2013)<br>Dkt. 205-1 (May 11, 2015)<br>Dkt. 451-1 (May 31, 2018)<br>Dkt. 496-1 (October 31, 2018)<br>Dkt. 555-2 (April 30, 2019)<br>Dkt. 587-1 (October 31, 2019) |
| Crisis Intervention | Dkt. 120 (January 31, 2014)<br>Dkt. 209 (May 22, 2015)<br>Dkt. 451-1 (May 31, 2018)<br>Dkt. 555-1 (April 30, 2019) |
| Early Intervention System | Dkt. 123 (March 3, 3014)<br>Dkt. 202 (May 4, 2015)<br>Dkt. 502 (November 29, 2018)<br>Dkt. 599 (December 31, 2019) |
| OPA | Dkt. 156 (June 30, 2014)<br>Dkt. 256-1 to -3 (January 14, 2016) |

After adoption of the new policies, SPD, again assisted by DOJ, the Monitor, and the CPC worked to develop training that would promote the implementation of each of these policies.  Once again, exercising its independent enforcement obligation, DOJ reviewed and commented on the plans for each training program with the assistance of nationally-regarded police practices experts. (Dkt. 422) at 4.  Between 2012 and 2017, SPD conducted trainings on Consent-Decree related topics.  *See*, *e.g*., (Dkt. 154) at 22-27, 33-34; (Dkt. 187) at 23-29, 81-84, 90-96.  Many of these were audited by the Monitor and DOJ.[5]  Through these efforts, the

---

[5]  *See* (Dkt. 422) at 4 (UOF Phase 1 Training Courses between June 18 and 19, 2014; Search and Seizure Training in July 2014; Basic and Advanced CIT on September 29 and 30 and November 12, 2014; Tactical De-escalation

UNITED STATES' MEMO IN SUPPORT OF JOINT MOTION FOR
TERMINATION OF ¶¶ 69-168 OF THE CONSENT DECREE
Case No. 2:12-cv-01282-JLR - 7

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Monitor and DOJ were able to gain confidence that the Consent Decree's requirements were

2  adopted into SPD mandates and communicated to its officers.

3       2.      Implementation – Structural Changes

4

5       In addition to changes to policy and training, the Consent Decree also called for structural

6  changes to some of the systems and entities necessary to guide and effectuate the policy changes.

7  The City has met these requirements, as described herein.

8           a.      The Force Investigation Team and Force Review Board

9

10       The Consent Decree called for the implementation and strengthening of entities of critical

11  self-analysis within SPD.  Among these were changes to mechanisms by which supervisors

12  oversee officer activity (including unity of command and sergeant training issues), as well as

13  changes to SPD's early intervention system ("EIS"), which was designed to identify early

14  warning signs of issues with officer behavior and correct for them before they lead to larger

15  problematic incidents.  *See* (Dkt. 3-1) at ¶¶ 153-163.  As discussed herein, the Monitor and DOJ

16  found that these structural changes were completed in a manner consistent with the Consent

17

18  Decree requirements.

19       But perhaps the most significant structural changes to SPD's internal mechanisms of

20  critical analysis relate to the Force Investigation Team and the Force Review Board.  The

21  Consent Decree called for the formation of a Force Investigation Team ("FIT") to investigate all

22  serious uses of force by SPD officers.  The members of FIT were required to have "appropriate

23  expertise and investigative skills to ensure that uses of force that are contrary to law or policy are

24

25

26  _____

27  Training on May 12, 2015; Supervisor Training (Day 1) on August 2, 2015; and Rapid Intervention Tactics on
    September 4, 2015.

28

UNITED STATES' MEMO IN SUPPORT OF JOINT MOTION FOR
TERMINATION OF ¶¶ 69-168 OF THE CONSENT DECREE
Case No. 2:12-cv-01282-JLR - 8

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    identified and appropriately resolved." (Dkt. 3-1) at ¶ 116. These specially-trained officers were

2    then tasked with conducting immediate, on-scene investigations of officer uses of force,

3    including canvassing for and collecting physical evidence and conducting officer and witness

4    interviews. *Id.* at ¶¶ 117-118. The Consent Decree also mandated certain referral requirements.

5    *Id.* These requirements were intended to ensure that (1) potentially criminal actions taken by

6    officers was quickly and appropriately referred to local prosecutors, (2) any officer misconduct

7    was identified and referred to OPA; and (3) all relevant facts and evidence were collected and

8    reported to a force review committee (discussed herein) so that "trends or patterns of policy,

9    training, equipment, . . . tactical deficiencies, or positive lessons related to use of force" could be

10   identified and addressed. *Id.* ¶ 116-118. SPD constituted a FIT in 2012 and its operations have

11   been assessed and re-assessed through the Compliance Assessment and Sustainment Audit

12   processes described below. *See* (Dkts. 231 and 588-1). Through those efforts, as well as SPD's

13   own initiative in seeking out and studying best practices in the field, FIT operations have

14   strengthened significantly over time. Indeed, the Monitor found that "FIT investigations are

15   consistently excellent." (Dkt. 231) at 4 (Phase I Assessment findings).

16           The Consent Decree also required SPD to establish a use of force committee to conduct

17   "timely, comprehensive, and reliable reviews of all Type II and Type III uses of force." (Dkt. 3-

18   1) at ¶ 119. This committee was to be comprised of specially-trained officers from the training,

19   patrol, and investigations departments and helmed by an Assistant Chief-level supervisor. *Id.* at

20   ¶ 120. The committee was tasked with: (1) determining if the underlying factual investigations

21   (conducted by either the chain of command or by FIT, depending upon the severity of the use of

22   force involved) were thorough and complete, (2) if the chain of command determined that a use

UNITED STATES' MEMO IN SUPPORT OF JOINT MOTION FOR
TERMINATION OF ¶¶ 69-168 OF THE CONSENT DECREE
Case No. 2:12-cv-01282-JLR - 9

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

of force was consistent with policy, determining if that conclusion was supported by a preponderance of the evidence, (3) making referrals to OPA if misconduct was identified; and (4) identifying and making appropriate referrals for any tactical, equipment, or policy issues stemming from a use of force.  *Id*. at ¶ 124 and 125.  SPD formed the current Force Review Board ("FRB") in June 2015 to fulfill these requirements.  (Dkt. 247) at 5.  As with FIT, the composition and function of the FRB were assessed and re-assessed through the Compliance Assessment and Sustainment Audit process described below.  In the Phase I FRB Assessment, conducted in 2015, the Monitor noted that FRB had helped SPD rapidly become "far more comfortable with critically analyzing and scrutinizing officer use of force and holding officers accountable for their performance during incidents involving force."  (Dkt. 247) at 4.  In Phase II, the Monitor and DOJ validated that FRB's performance continued to satisfy the Consent Decree requirements, noting that FRB was "appropriately reviewing uses of force to ensure that the force used was reasonable, necessary and proportional…and complied with SPD policies and training."  (Dkt. 588-1) at 27.[6]

   b. The Crisis Intervention Committee

  External to SPD, the Consent Decree and MOU also called for the City to expand and deepen its engagement with the City's mental health professionals and organizations through the formation of a Crisis Interventional Committee ("CIC").  *See* (Dkt. 3-1) at Section III.B. and MOU at ¶¶ 23-25.  Under the Consent Decree, SPD was required to consult the CIC regarding

---

[6] While both FIT and the FRB have met all the requirements of the Consent Decree, in order to serve their intended functions, both entities should continually engage in self-improvement, including in the areas identified by the Monitor and DOJ in the "validation" section of the relevant sustainment plan audits, discussed in Section C.1., *infra*.

UNITED STATES' MEMO IN SUPPORT OF JOINT MOTION FOR TERMINATION OF ¶¶ 69-168 OF THE CONSENT DECREE
Case No. 2:12-cv-01282-JLR - 10

the content of policy and training practices, as well as data collection issues.  *See* (Dkt. 3-1) at ¶¶ 133, 135, 136.  Under the MOU, the CIC was to serve as a data-sharing and problem-solving forum for interagency issues.  *See* MOU at ¶ 24.  Further, the CIC was tasked with advising on the creation of policies and procedures that would help divert people in crisis away from law enforcement mechanisms and into voluntary referrals to community services, when appropriate. *Id.* at ¶ 25.  The CIC has appropriately served all of these roles.  Formed in 2012, the CIC has met quarterly at SPD Headquarters for eight (8) years.  In that time, it has advised on policies and trainings relevant to crisis intervention; steered the collection of appropriate data; and facilitated voluntary diversion to community services.  *See* (Dkt. 511) at 6.  Further, the Monitor and DOJ have twice assessed and verified that the CIC was appropriately consulted with respect to the crisis intervention issues required by the Consent Decree.  *See* (Dkts. 272 and 511).[7] Certainly, the CIC's existence and commitment to strengthening SPD's response to people in crisis can be credited as one of the factors leading to the impressive statistics related to SPDs interactions with people in crisis and it is well poised to continue offering its counsel into the future.  *See* Section I.D. (Outcome Measures).

       3.      <u>Evaluating Initial Compliance – Compliance Assessments</u>

      Beginning in 2014, the Parties and the Monitor began discussing how to systematically evaluate whether the Consent Decree-required policies and training were being "carried out in practice" and how to "define and measure 'full and effective compliance.'" (Dkt. 422) at 4-5.  As a result of these discussions, the Parties and Monitor agreed to a process by which the Monitor

---

[7] The City demonstrated completion of the MOU's requirements with respect to the CIC and, the MOU has since terminated.  *See* (Dkt. 422) at 1 n.1.

UNITED STATES' MEMO IN SUPPORT OF JOINT MOTION FOR
TERMINATION OF ¶¶ 69-168 OF THE CONSENT DECREE
Case No. 2:12-cv-01282-JLR - 11

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

would conduct a series of assessments between March 2015 and June 2017 to evaluate each of

the subject areas of the Consent Decree.  *Id.* at 5-6.  The Parties and Monitor further agreed that

DOJ would also review the same issues and data in order to render an independent opinion

regarding whether the City had satisfied the requirements of the Consent Decree. A summary of

each Phase I Assessment is set forth here:

| PHASE I COMPLIANCE ASSESSMENTS | | | | | |
|---|---|---|---|---|---|
| | Topic | Dkt. | Dates Assessed | Filed with the Court | Finding |
| 1 | Reporting and Investigations of Type I, II, and III (FIT) Uses of Force | 231 | 7/1/14-12/31/14 | 9/25/15 | Initial compliance except for chain of command investigations for Type I and II incidents |
| 2 | Force Review Board | 247 | 6/2/15-8/25/15 | 11/24/15 | Initial compliance |
| 3 | Public Confidence Surveys | 235 and 263 | 2015 | 10/1/15 and 1/27/16 | N/A[8] |
| 4 | OPA | 259-1 | 8/1/14-4/30/15 | 1/22/16 | N/A |
| 5 | Crisis Intervention | 272 | 6/1/15-8/31/15 | 2/16/16 | Initial compliance |
| 6 | Supervision | 351 | | 12/31/16 | Initial compliance |
| 7 | Type II Re-Assessment | 360 | 1/1/16-3/31/16 | 1/27/17 | Initial compliance |

---

[8] While included in the Monitoring Plans and filed with the Courts as "assessments," both the community confidence and OPA "assessments" were expressly submitted as technical assistance, not required for compliance with the Consent Decree. *See* (Dkt. 263) at 5-6 ("Nor is it the purpose of this [community confidence] assessment to determine compliance with specific requirements under the Consent Decree. While most assessments are for such purposes, some are not. Instead, this present report can best be viewed as a survey of the many areas, initiatives, programs, and general characteristics that are commonly associated with community policing and public confidence in law enforcement – and an evaluation of how SPD is doing with respect to each of them"); (Dkt. 259-1) at 4 ("In contrast to nearly all other assessments (compare the FRB and Public Confidence assessments), the purpose of this [OPA] assessment is not to assess compliance with specific requirements under the Consent Decree, nor to declare that the SPD is in initial or full and effective compliance with the Decree.").

UNITED STATES' MEMO IN SUPPORT OF JOINT MOTION FOR
TERMINATION OF ¶¶ 69-168 OF THE CONSENT DECREE
Case No. 2:12-cv-01282-JLR - 12

| 8 | Early Intervention System | 374 | 1/1/16-6/1/16 | 3/23/17 | Initial compliance |
| 9 | Use of Force | 383 | 7/14-10/16 | 4/6/17 | Initial compliance |
| 10 | Stops and Bias Free Policing | 394 | 7/1/15-1/31/17 | 6/18/17 | Initial compliance |

4.     The Court Found the City to be in Initial Compliance

Relying on the results of these compliance review assessments, the City moved in November 2017 to be found in "full and effective compliance" and, on the basis of its own independent analysis, the DOJ moved in support of that motion. *See* (Dkts. 419 and 422). In January 2018, the Court agreed, holding that the Monitor's findings of "initial compliance" in each of the relevant assessments was "the substantive equivalent of full and effective compliance under the Consent Decree." (Dkt. 439) at 13. "Accordingly, the court finds that SPD has achieved full and effective compliance with the Consent Decree such that Phase I of the Consent Decree is now complete and the Phase II sustainment period should commence." *Id.* at 13-14.[9]

## C.     SUSTAINING COMPLIANCE WITH THE CONSENT DECREE

The Court's January 2018 Order's reference to a "sustainment period" stems from the terms of the Consent Decree that state that the Court shall retain jurisdiction over this action "until such time as the City has achieved full and effective compliance with the Settlement

---

[9] In May 2019, the Court found that the City had fallen "out of compliance." *See* (Dkt. 562). The Court based its ruling on changes to City legislation relating to police accountability and disciplinary procedures following collective bargaining. *Id.* at 14. As it has made clear in the past, *see, e.g.,* (Dkt. 291) at 2-3; (Dkt. 422) at 2; (Dkt. 429) at 9, the United States disagrees with the basis for this ruling. However, the disagreement need not be resolved for purposes of this motion. The Court's May 2019 ruling related entirely and explicitly to issues outside of the Sustainment Plan and the paragraphs of the Consent Decree captured in the "Commitments." (Dkt. 562) at 2 ("The court does not find that the City has fallen out of compliance in any of the areas listed in the Phase II Sustainment Plan"). Accordingly, the May 2019 ruling does not impact the motion presently before the Court, which only seeks relief related to the areas listed in the Phase II Sustainment Plan.

UNITED STATES' MEMO IN SUPPORT OF JOINT MOTION FOR
TERMINATION OF ¶¶ 69-168 OF THE CONSENT DECREE
Case No. 2:12-cv-01282-JLR - 13

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Agreement and maintained such compliance for no less than two years." (Dkt. 3-1) at ¶ 223.  In

order to guide how such "sustained" compliance would be measured, the Court further ordered

"the Monitor and the parties to submit . . . a joint plan for discharging their obligations under the

Consent Decree during the Phase II sustainment period." (Dkt. 439) at 16.  The Monitor and the

Parties complied with this order and submitted a "Sustainment Plan" and its attached

"Sustainment Matrix" in March 2018, setting forth the terms by which sustained compliance

would be measured.  *See* (Dkt. 444 and 444-1).  The Court subsequently approved the

Sustainment Plan on March 13, 2018.  (Dkt. 448).  The City satisfied every requirement in each

component heading of the Sustainment Plan as discussed herein.

     1.   Compliance Audits

     Under the Sustainment Plan, the City agreed to self-assess its performance in all six

"Commitment" areas of the Consent Decree using the same or similar methods as used by the

Monitor and DOJ in Phase I.  *See* (Dkt. 444) at 4 (referred to in Phase I as "assessments" and in

Phase II as "audits").  However, DOJ and the Monitor also retained active roles.  For each audit,

DOJ and the Monitor reviewed and commented upon the City's draft audit methodology in order

to ensure that each was rigorous and statistically appropriate for assessing compliance.  No audit

commenced prior to receiving DOJ and Monitor approval.  DOJ and the Monitor also conducted

independent reviews of randomized samples of documents from each audit in order to validate

the results.  Each audit report contains a "Validation" section detailing the work and findings of

DOJ and the Monitor with respect to that topic area.  *See* footnote 11, *infra*.  The Validation

sections also call out specific strengths and areas for continuing improvement, consistent with

the technical assistance role provided by paragraph 173 of the Consent Decree.  *Id.*

UNITED STATES' MEMO IN SUPPORT OF JOINT MOTION FOR
TERMINATION OF ¶¶ 69-168 OF THE CONSENT DECREE
Case No. 2:12-cv-01282-JLR - 14

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

As a result of their audits – many of which were conducted twice during the sustainment period -- the City of Seattle ultimately concluded that it had demonstrated sustained compliance in each of the six Commitment Areas of the Consent Decree.[10]  On the basis of their Validations, DOJ and the Monitor agreed.[11]  A summary of each audit is listed here for reference:

| PHASE II – SUSTAINMENT AUDITS | | | | |
|---|---|---|---|---|
| | Topic | Dkt. | Dates Assessed | Filed with the Court | Finding |
| 1 | Type I and II Use of Force Investigation and Reporting (Round 1) | 497-1 | 1/1/18-6/30/18 and 3/30/18 | 10/31/18 | Sustained compliance |
| 2 | Supervision General (Round 1) | 497-2 | 1/10/18-6/30/18 | 10/31/18 | Sustained compliance |
| 3 | Crisis Intervention | 511 | 1/1/17-6/30/18 | 12/17/18 | Sustained compliance |
| 4 | Stops and Detentions (Round 1) | 547-1 | 1/1/18-6/30/18 | 3/7/19 | Sustained compliance |
| 5 | Early Intervention System (Round 1) | 550-1 | 1/1/17-6/30/18 | 4/15/19 | Sustained compliance |
| 6 | Type I and II Use of Force Investigation and Reporting (Round 2) | 570-1 | 7/1/18-12/31/18 and 9/30/18 | 7/31/19 | Sustained compliance |
| 7 | Force Review Board | 570-2 | 4/23/19-5/21/19 | 7/31/19 | Sustained compliance |
| 8 | Comprehensive Use of Force | 588-1 | 1/1/18-12/30/18 | 10/31/19 | Sustained compliance |
| 9 | Stops and Detentions (Round 2) | 588-2 | 7/1/18-12/31/18 | 10/31/19 | Sustained compliance |
| 10 | Early Intervention System (Round 2) | 595-1 | 1/1/19-6/30/19 | 11/29/19 | Sustained compliance |

---

[10] *See* (Dkts. 497-1 at 20-21 and 570-1 at 26-27) (Type II and II Use of Force Investigation and Reporting); (Dkt. 570-2 at 24-25) (Force Review Board); (Dkt. 588-1 at 25-26) (Comprehensive Use of Force); (Dkt. 511 at 5) (Crisis Intervention); (Dkts. 547-1 at 31-32 and 588-2 at 21) (Stops and Detentions); (Dkts. 497-2 at 15 and 595-2 at 13-14) (Supervision General); (Dkts. 550-1 at 24 and 595-1 at 23) (Early Intervention System).

[11] (Dkts. 497-1 at 22-24 and 570-1 at 27-29) (Type I and II Use of Force Investigation and Reporting); (Dkt. 570-2 at 39-41) (Force Review Board); (Dkt. 588-1 at 26-29) (Comprehensive Use of Force); (Dkt. 511 at 39-43) (Crisis Intervention); (Dkts. 547-1 at 32-34 and 588-2 at 22-23) (Stops and Detentions); (Dkts. 497-2 at 16-17 and 595-2 at 14-15) (Supervision General); (Dkts. 550-1 at 27-30 and 595-1 at 26-28) (Early Intervention System).

UNITED STATES' MEMO IN SUPPORT OF JOINT MOTION FOR TERMINATION OF ¶¶ 69-168 OF THE CONSENT DECREE
Case No. 2:12-cv-01282-JLR - 15

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

| 11 | Supervision General (Round 2) | 595-2 | 7/1/18-6/30/19 | 11/29/19 | Sustained compliance |

2.      Additional Reviews by the Monitor

In addition to compliance audits, under the terms of the Sustainment Plan, there were a number of additional reviews of the City's police functions offered by the Monitor consistent with its role as technical advisor pursuant to Consent Decree paragraph 173.  For instance, the Monitor conducted reviews of the Data Analytics Platform ("DAP") and the OPA, and performed an additional community survey, mirroring the questions from Phase I.  The results were all highly positive.  With respect to the DAP, the Monitor found that it "appears solid" and "has impressive potential to measure officer performance on an individual and comparative basis; to analyze patterns, trends, and statistics; to perform studies on a historical and longitudinal basis; and to discover failures of leadership, supervision, discipline and training; among other capabilities to manage the risk of police misconduct." *See* (Dkt. 549) at 3.  The Monitor thus concluded that the DAP's "capacity to deal with Fourth Amendment constitutional failures is not only impressive in comparison to where SPD was at the outset of the Consent Decree, but also in comparison with many other major city police departments today."  *Id.*

With respect to the Office of Police Accountability, the Monitor found that, consistent with the prior (Phase I) review, the quality of the "great majority" of OPA's investigations was either "thorough, well documented, and complete" or "adequate."  (Dkt. 604-1) at 2.

UNITED STATES' MEMO IN SUPPORT OF JOINT MOTION FOR
TERMINATION OF ¶¶ 69-168 OF THE CONSENT DECREE
Case No. 2:12-cv-01282-JLR - 16

Furthermore, the Monitor noted that OPA significantly improved its closure of investigations within the 180-day deadline from a rate of 75% during the 2016 review, to a rate of 95%.  *Id.*[12]

With respect to community confidence, the Monitor retained the services of the same analysts from Phase I of the Consent Decree in order to take the pulse of community sentiment with respect to the Seattle Police Department.  *See* (Dkt. 546).  As discussed in further detail in Section I.D. regarding outcome measures, the results were positive, demonstrating continued improvements to SPD's approval rating in the community (now at 74%, up from 72% in 2016, and 60% in 2012.  *Id.* at 3 and 5.

3.    Additional Reviews by the City

Likewise, the City of Seattle conducted two "Disparity Reviews."  *See* (Dkt. 554-1) (April 2019) and (Dkt. 600-1) (December 2019).  Although the Consent Decree does not mandate the study of disparity in policing or progress against it, *per se*, the Bias Free Policing policy written under the Consent Decree's mandated processes, calls for SPD to "periodically analyze data which will assist in identification of SPD practices – including stops, citations, and arrests – that may have a disparate impact on particular protected classes relative to the general population."  *See* (Dkt. 555-2) (SPD Policy 5.140).  The two reviews demonstrated to the satisfaction of the Monitor and DOJ that the City is appropriately undertaking studies of this important area in satisfaction of its policy-based requirement.  The City of Seattle also timely

---

[12] This review and its findings were expressly offered as technical assistance.  *See* (Dkt. 604-1) at 2 ("The review's purpose 'is not to assess compliance with specific requirements under the Consent Decree.' Rather, this review was designed to follow-up on issues the Monitoring Team identified in its Fourth Systemic Assessment: Office of Professional Accountability, filed with the court on January 22, 2016, and provide information to the OPA and other stakeholders about how the OPA, a key component of Seattle's police accountability system, can continue to improve its performance.").

UNITED STATES' MEMO IN SUPPORT OF JOINT MOTION FOR TERMINATION OF ¶¶ 69-168 OF THE CONSENT DECREE
Case No. 2:12-cv-01282-JLR - 17

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

filed all "Quarterly Reports" (providing summaries of all Sustainment Period activities in each quarter from 2018-2020) and "Outcome Reports" (providing outcome measurements and data for various Consent Decree topic areas) as required by the Sustainment Plan.[13]

4.      Review and Submission of Policy Revisions

In addition, as required by the Sustainment Plan, the City of Seattle shared draft revisions to Consent Decree-related policies with DOJ, the Monitor, and the CPC throughout the Sustainment Period.  The City of Seattle worked collaboratively to incorporate the suggestions of each of these groups and ultimately filed 10 policy revisions with the Court without objection. *See* (Dkts. 451-1 at 25-34 and 555-2) (Bias Free Policing); (Dkts. 451-1 at 2-24 and 555-1) (Crisis Intervention); (Dkts. 471-1 to -2 and 569-2 to -4) (Use of Force); (Dkts. 496-1 and 587-1) (Stops and Detentions); and (Dkts. 502-1 and 599-1) (Early Intervention System).  The Court subsequently approved each. *See* (Dkts. 453 and 563) (Bias Free Policing); (Dkts. 453 and 563) (Crisis Intervention); (Dkts. 477 and 580) (Use of Force); (Dkts. 501 and 593) (Stops and Detentions); and (Dkts. 510 and 607) (Early Intervention System).   Accordingly, all requirements of the Phase II Sustainment Plan were met.

**D.      OUTCOME MEASURES ALSO SUPPORT A FINDING OF FULL AND EFFECTIVE COMPLIANCE**

As noted, the Consent Decree permits the City of Seattle to demonstrate full and effective compliance through either "Compliance Reviews and Audits" or, alternatively, "Outcome Assessments." *See* (Dkt. 3-1) at ¶ 182.[14]  The City of Seattle opted to prove full and effective

---

[13] The substance of the Outcome Reports is discussed in more detail in Section I.D., *infra*.
[14] With respect to Outcome Assessments, the Consent Decree provides, "The goal of the Parties in entering into the Settlement Agreement is to ensure that that SPD's use of force is consistent with the requirements of the United

UNITED STATES' MEMO IN SUPPORT OF JOINT MOTION FOR
TERMINATION OF ¶¶ 69-168 OF THE CONSENT DECREE
Case No. 2:12-cv-01282-JLR - 18

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

compliance during Phase I through Compliance Reviews and Audits.  Nonetheless, the Monitor

also evaluated the City of Seattle's outcome measurements in a number of ways during Phase I

that proved illuminating to the state of reform in Seattle.  For this reason, the parties and the

Monitor agreed that, during Phase II/the Sustainment Period, the City of Seattle would continue

to update the Court of a number of these metrics through "Outcome Reports."  (Dkt. 444) at 11-

12.  The outcome measurements from both of these periods are discussed in further detail herein.

      1.    <u>Phase I Outcome Measurements Reflected Achievement of Consent Decree
Purposes</u>

      At the conclusion of Phase I, the Court highlighted some of the outcome measures related

to force that the Court deemed indicative of SPD's "impressive advancements… during the

course of the Consent Decree."  *See* (Dkt. 439) at 10-11 (Order Finding City in Full and

Effective Compliance).  Namely:

- In the 760,000 incidents to which SPD officers were dispatched during the two-year study period, they used force in just under 2,400 incidents or less than 0.5% of all incidents.

- SPD officers' use of force decreased 11% from the first half of the two-year study period to the second half.

- About 80% of those uses of force were at the lowest level or Type I force that causes transient pain but no injury, or firearm pointing but no discharge.

- Only 39 incidents over the two-year study period involved serious uses of force or Type III force that is likely to result in serious injury.

---

States Constitution and 42 U.S.C. § 14141. As more fully described in the section on termination of the Settlement Agreement, if the City is able to establish, through outcome measures, that the purposes of the Settlement Agreement have been met, the decree may terminate even if the City is not in full and effective compliance with the specific process terms." *See* (Dkt. 3-1) at ¶ 186.

UNITED STATES' MEMO IN SUPPORT OF JOINT MOTION FOR
TERMINATION OF ¶¶ 69-168 OF THE CONSENT DECREE
Case No. 2:12-cv-01282-JLR - 19

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

- More serious uses of force (Type II and Type III) declined by 60% compared with the Government's findings covering January 2009 to April 2011.

- More serious uses of force declined across the study period, suggesting that officers were not only using less force overall, but using lower levels of force, too.

- The number of incidents in which officers used force in each of SPD's five precincts was roughly proportional to the number of arrests in each precinct.

- Although a group of 109 SPD officers accounted for almost 40% of the force used during the study period, those officers did not use serious force more frequently than other SPD officers who used force.

- Crime rates remained flat while use of force rates fell.

*Id.* (citing (Dkt. 383) at 30-34, 39, 62-63)).

The Monitor similarly found notable results in the use of force outcome measurements, and in the outcome measurements related to officer injuries, SPD's interactions with persons in crisis, and use of Terry stops.  On use of force, the Monitor found that SPD officers were:

- Using only force that was necessary under the circumstances more than 99 percent of the time;

- Force was likewise proportional and reasonable in the same more than 99 percent of force incidents; and

- Officers [] complied with the duty to de-escalate in 99 percent of cases where that duty was applicable.

(Dkt. 383) at 12.  The Monitor also found that officer injuries remained flat to slightly down during the implementation of the Consent Decree.  *Id.* at 59.  With respect to crisis, the Monitor found that officers used force against individuals in crisis less than 2% of the time and, when they did use force, 80 percent of the time they used the lowest level of force.  *See* (Dkt. 272) at 5.  With respect to stops and frisks, the Monitor found that "the vast majority [99 percent of stops]

UNITED STATES' MEMO IN SUPPORT OF JOINT MOTION FOR
TERMINATION OF ¶¶ 69-168 OF THE CONSENT DECREE
Case No. 2:12-cv-01282-JLR - 20

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

were adequately justified" with reasonable, articulable suspicion.  *See* (Dkt. 394) at 7.  Further, the Monitor found that 97% of frisks were adequately justified and most stops were appropriately limited to reasonable scope and duration.  *Id.*

Tellingly, the progress in these substantive areas was reflected in data regarding the community's level of confidence in SPD.  By the time of the Monitor's study, the public's overall approval rating of SPD had improved from 60% in 2013 to 64% in 2015.  *See* (Dkt. 235) at 4.  Similarly, public approval regarding individual interactions with SPD improved from 65% in 2013 to 70% in 2015.  *Id.*  While at the same time, public confidence that SPD kept them safe did not diminish.  *Id.*

2.    Phase II Outcome Measurements Reflect Sustainment of the Consent Decree Purposes

In Phase II, the outcome measurements in each of these same Consent Decree subject areas continued to trend positively, as did measurements of public confidence.  *See* (Dkt. 452-1) (Community Engagement Program Report May 2018); (Dkt. 458-1) (Stops and Detentions Annual Report 2018); (Dkt. 495-1) (Crisis Intervention Program Report October 2018); (Dkt. 524-1) (Use of Force Annual Report January 31, 2019); (Dkt. 564-1) (Stops and Detentions Annual Report 2019); (Dkt. 588-1) (Comprehensive Use of Force Report October 2019); (Dkt. 588-3) (Crisis Intervention Program Report October 2019); (Dkt. 605-1) (Use of Force Annual Report January 10, 2020). By way of example, with respect to officer uses of force, the City's Comprehensive Use of Force Report made similar findings to those of Monitor during Phase I, including that the FRB found that 98.4% of force cases it evaluated to be reasonable, necessary, proportional and consistent with policy.  (Dkt. 588-1) at 15.  DOJ and the Monitor validated these assessments.  *Id*. at 27.

UNITED STATES' MEMO IN SUPPORT OF JOINT MOTION FOR
TERMINATION OF ¶¶ 69-168 OF THE CONSENT DECREE
Case No. 2:12-cv-01282-JLR - 21

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Similarly, the number of incidents involving a serious (Type II or III) use of force were

as follows:

| 18 Month Time Period | Incidents Involving a Serious Use of Force |
|---|---|
| January 2009 – April 2011 (Pre-Consent Decree) | 1,230 |
| July 2014 – October 2016 (Phase I) | 487 |
| January 2017 – April 2019 (Phase II) | 454 |

(Dkt. 588-1) at 3.  In other words, the dramatic 60% reduction in serious uses of force was not a

fluke.  It has continued to hold as a rate of use of force for years after achieving full and effective

compliance.

Likewise, the outcome measurements surrounding crisis and stops have both been held at

a level of high performance:

| Time Period | Force Used During Contacts with People in Crisis |
|---|---|
| Phase I (6/1/15-8/31/15) | 2% |
| Phase II (1/1/17-6/30/18) | 1.8% |

*See* (Dkt. 272) at 15; (Dkt. 511) at 7.

| Time Period | Stops Supported by Reasonable, Articulable Suspicion |
|---|---|
| Phase I | 97% |
| Phase II, Round 1 | 93.5% |
| Phase II, Round 2 | 94.24% |

UNITED STATES' MEMO IN SUPPORT OF JOINT MOTION FOR
TERMINATION OF ¶¶ 69-168 OF THE CONSENT DECREE
Case No. 2:12-cv-01282-JLR - 22

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

*See* (Dkt. 394) at 7; (Dkt. 547-1) at 2 (93.5%, Round 1; sustainment validated by Monitor and DOJ); (Dkt. 588-2) at 3 (94.24%, Round 2, sustainment validated by Monitor and DOJ).  And crime rates have similarly remained flat.  *See* footnotes 1 and 2.  Again, public confidence has followed these results.  The Monitor's 2019 public survey showed dramatic results in confidence since the inception of this process.  For instance:

|  | 2013 | 2015 | 2019 |
|---|---|---|---|
| Overall approval of SPD | 60% | 64% | 74% |
| African American approval rating | 44% | 48% | 72% |
| Belief SPD had a valid reason for stopping (White) | Not measured | 64% | 69% |
| Belief SPD had a valid reason for stopping (African American) | Not measured | 43% | 47% |

(Dkt. 546) at 5, 9.  Thus, even though the outcome measurements are not being used to provide an independent basis for termination, they do provide additional assurance that the requirements of the Consent Decree have been met.

## II.   LEGAL ARGUMENT

The Consent Decree provides that when "the United States and the Monitor agree that the City has maintained substantial compliance, the City will be relieved of that portion of the Settlement Agreement."  *See* (Dkt. 3-1) at ¶ 223.  That agreement has been reached with respect to paragraphs 69-168 of the Consent Decree.

The Parties, the Monitor, and the Court all agreed that the City's compliance with paragraphs 69-168 (the "Commitments") would be measured in Phase I by the Assessments and in Phase II by the audits of the Sustainment Plan.  (Dkt. 439) at 2-3 (Order noting the choice of

UNITED STATES' MEMO IN SUPPORT OF JOINT MOTION FOR
TERMINATION OF ¶¶ 69-168 OF THE CONSENT DECREE
Case No. 2:12-cv-01282-JLR - 23

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

compliance audits); (Dkt. 422) at 5-6 (detailing the Parties' Phase I compliance workgroups); (Dkt. 448) at 2 (Order approving the Sustainment Plan). The Parties and the Monitor then participated in good faith with each of these plans and updated the Court on their progress at regular agreed intervals.[15] The outcomes of these systemic and rigorous evaluations are undisputed. The City of Seattle demonstrated in both Phase I and Phase II that they both achieved full and effective compliance with all of the enumerated requirements Commitments of the Consent Decree and held that compliance for the agreed-upon period of two years. *See* footnote 11. Accordingly, termination of Paragraphs 69-168 is both warranted and appropriate.

### III.   CONCLUSION

For the foregoing reasons, termination of the Commitments Section of the Consent Decree, Paragraphs 69-168, and all related monitoring by the Court is now warranted and the United States respectfully requests the Court's entry of such an order.

---

[15] *See* Outcome Reports ((Dkt. 452-1) (Community Engagement Program Report May 2018); (Dkt. 458-1) (Stops and Detentions Annual Report 2018); (Dkt. 495-1) (Crisis Intervention Program Report October 2018); (Dkt. 524-1) (Use of Force Annual Report January 31, 2019); (Dkt. 564-1) (Stops and Detentions Annual Report 2019); (Dkt. 588-3) (Crisis Intervention Program Report October 2019); (Dkt. 605-1) (Use of Force Annual Report January 10, 2020)); City's Quarterly Reports ((Dkt. 470) (City's First Quarterly Report); (Dkt. 497) (City's Second Quarterly Report); (Dkt. 523) (City's Third Quarterly Report); (Dkt. 553) (City's Fourth Quarterly Report); (Dkt. 570) (City's Fifth Quarterly Report); (Dkt. 588) (City's Sixth Quarterly Report); (Dkt. 600) (City's Seventh Quarterly Report)); Sustainment Period Updates ((Dkt. 539) (Monitoring Plan for February 2019); (Dkt. 540) (United States' Report on Status of Sustainment Period); (Dkt. 542) (City's Report on Status of Sustainment Period)).

UNITED STATES' MEMO IN SUPPORT OF JOINT MOTION FOR TERMINATION OF ¶¶ 69-168 OF THE CONSENT DECREE
Case No. 2:12-cv-01282-JLR - 24

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   DATED this 7th day of May, 2020.

2   For the UNITED STATES OF AMERICA:

3

4   BRIAN T. MORAN                                    ERIC S. DREIBAND
    United States Attorney for the                    Assistant Attorney General
5   Western District of Washington                    Civil Rights Division

6

7   s/Christina Fogg                                  s/Timothy Mygatt
    Kerry J. Keefe, Civil Chief                       Steven H. Rosenbaum, Chief
8   Christina Fogg, Assistant United States Attorney  Timothy D. Mygatt, Deputy Chief
    Matt Waldrop, Assistant United States Attorney    Jeffrey R. Murray, Trial Attorney
9   United States Attorney's Office                   United States Department of Justice
    Western District of Washington                    Civil Rights Division
10  700 Stewart Street, Suite 5220                    Special Litigation Section
    Seattle, Washington 98101-1271                    950 Pennsylvania Avenue, NW
11  Phone: (206) 553-7970                             Washington, DC 20530
    Fax: (206) 553-4073                               Phone: (202) 514-6255
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES' MEMO IN SUPPORT OF JOINT MOTION FOR
TERMINATION OF ¶¶ 69-168 OF THE CONSENT DECREE
Case No. 2:12-cv-01282-JLR - 25

1

**<u>CERTIFICATE OF SERVICE</u>**

2

3        I certify that on the May 7, 2020, I electronically filed the foregoing with the Clerk of the

4   Court using the CM/ECF system, which will send notification of such filing to the following

5   attorneys of record:

6

7        Brian T. Moran                    bmoran@usdoj.gov

8        Christina Fogg                    christina.fogg@usdoj.gov

9        Matt Waldrop                      james.waldrop@usdoj.gov

10       Kerry Jane Keefe                  kerry.keefe@usdoj.gov

11       Peter Samuel Holmes               peter.holmes@seattle.gov

12       Jeff Murray                       jeff.murray@usdoj.gov

13       Ronald R. Ward                    ron@wardsmithlaw.com

14       Timothy D. Mygatt                 timothy.mygatt@usdoj.gov

15       Gary T. Smith                     gary.smith@seattle.gov

16       Hillary H. McClure                hillarym@vjmlaw.com

17       David A. Perez                    dperez@perkinscoie.com

18       Anna Thompson                     annathompson@perkinscoie.com

19       Kristina M. Detwiler              kdetwiler@unionattorneysnw.com

20       Merrick Bobb                      mbobb@pacbell.net

21       Bruce E.H. Johnson                brucejohnson@dwt.com

22       Eric M. Stahl                     ericstahl@dwt.com

23       Paul A. Olsen                     paul.olsen@seattle.gov

24       John Wolfe                        wolfe@orrick.com

25       DATED this 7th day of May, 2020.

26                                    *s/Brittany Cirineo*
                                      Brittany Cirineo, Legal Assistant (Contractor)
27

28

UNITED STATES' MEMO IN SUPPORT OF JOINT MOTION FOR
TERMINATION OF ¶¶ 69-168 OF THE CONSENT DECREE
Case No. 2:12-cv-01282-JLR - 26

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970