# Exhibit A



Home   Public Health/Coronavirus   About us   NAACP in the News   Events   Unsung Heroes

Join Today!

## President's Statement read at Seattle City Council today on ending the Consent Decree

5/11/2020                                                                    **0 Comments**

**The NAACP Seattle King County President, Carolyn Riley-Payne, read the below Statement on Motion to End Consent Decree to the Seattle City Council today, May 11, 2020**

The Seattle King County NAACP opposes the City of Seattle and Department of Justice motion to release the police from remaining Consent Decree oversight. The NAACP-SKC will work in collaboration with the office of Councilmember Kshama Sawant and other community organizations to respond in opposition to the City of Seattle and Mayor Jenny Durkan's collaboration with the Trump Justice Department. The SPD should not be released from oversight while its police union contract rejects accountability measures.

Accountability failings in the Seattle Police Officers Guild (SPOG) contract mean court mandated oversight is still necessary. The SPOG contract appeals' process evidenced by the case of SPD Officer Adley Shepherd, highlight the accountability failings that are still on-going. Recall that in 2014, while the SPD was under the oversight of the Consent Decree, Officer Shepherd punched a handcuffed and defenseless woman in the back seat of his patrol car. He was rightfully terminated for use of excessive force, but his job was later reinstated through a convoluted arbitration appeal process. The City has yet to address mechanisms in the police union contract that allow for officers like Shepherd to have seemingly more rights than the citizens they are sworn to protect.

The NAACP-SKC condemns the premature motion to end the Consent Decree and its police accountability oversight.

Like 10          Tweet

**0 Comments**

POWERED BY

### MEDIA INQUIRES:

COMMUNICATIONS@SEATTLEKINGCOUNTYNAACP.ORG

### ARCHIVES

June 2020
May 2020
April 2020
March 2020
August 2019
July 2019
June 2019
May 2019
April 2019
March 2019
January 2019
November 2018
February 2018
September 2017
June 2017
March 2017
January 2017
November 2016
October 2016
September 2016
July 2016
May 2016
April 2016
March 2016
February 2016
January 2016
November 2015
September 2015

Home    Public Health/Coronavirus    About us    NAACP in the News    Events    Unsung Heroes

Join Today!

**Name (required)**

**Email (not published)**

**Website**

**Comments (required)**

☐ Notify me of new comments to this post by email

Submit

October 2014

September 2014

June 2014

February 2014

CATEGORIES

All

RSS Feed

http://100yrsofseattlekcnaacp.weebly.com/google7422b0214f44d261.html

POWERED BY

# Exhibit B

# NEWS.SEATTLE.GOV (HTTPS://NEWS.SEATTLE.GOV/)

NEWS FROM THE CITY OF SEATTLE

| Select Category ⌄ | Search this website |
| --- | --- |

06/03/2020

### City Attorney to Withdraw Consent Decree Motion

Seattle City Attorney Pete Holmes issued the following statement regarding George Floyd, recent demonstrations in Seattle, and the federal consent decree with the Seattle Police Department:

"We've witnessed historic events this past week. We saw protests erupt in cities across our nation in reaction to an heinous act by a Minneapolis police officer, rooted in a larger history of racially disproportionate policing. George Floyd's murder was gruesome and the Minneapolis officers' apparent nonchalance chilled me to the bone. I am struggling with feelings of sadness, grief, and anxiety, and know I am not alone.

"We're deep into an economic crisis in which people of color are disproportionately losing their jobs. We face a pandemic in which people of color are more likely to die. We operate in a criminal justice system in which people of color are much more likely to find themselves entangled, echoing the Jim Crow chain gangs—which in turn perpetuated the evils of slavery beginning in Virginia four centuries ago, despite the Civil War and the 13th Amendment. No thinking person can deny that our society is fundamentally unjust. These are issues rooted in trauma and continue to traumatize our nation today.

"Here in Seattle, I've been closely monitoring the response to demonstrations, and 14,000 complaints to our Office of Police Accountability (OPA) in recent days signal that we are about to witness the most vigorous testing ever of our City's accountability systems. As OPA undertakes its independent investigation of misconduct allegations, it's become clear to me that we need to pause before asking U.S. District Judge James Robart to terminate the sustainment plan elements of the federal consent decree so that the City and its accountability partners can conduct a thorough assessment of SPD's response to the demonstrations.

"Therefore, I intend to withdraw the City from the pending motion before the Court, until we thoroughly review and assess SPD's response to recent demonstrations. I hope and expect that the City will continue to refine its proposal to address the Court's concerns relating to accountability. The City will then be in a better and more informed position to submit further briefing to the Court in collaboration with the parties to the Consent Decree."

FILED UNDER: CITY ATTORNEY (HTTPS://NEWS.SEATTLE.GOV/CATEGORY/NEWS-RELEASE/CITY-ATTORNEY/), NEWS RELEASE (HTTPS://NEWS.SEATTLE.GOV/CATEGORY/NEWS-RELEASE/)

**News.seattle.gov (https://news.seattle.gov)**
**Entries (RSS) (https://news.seattle.gov/feed/)**
**Blog Use Notice (//www.seattle.gov/council/blog_use_notice.htm)**

**Log in (https://news.seattle.gov/wp-login.php)**

**ADA Notice (//www.seattle.gov/americans-with-disabilities-act)**
**Notice of Nondiscrimination (//www.seattle.gov/civilrights/title-vi-notice-of-nondiscrimination)**
**Privacy (//www.seattle.gov/tech/initiatives/privacy/about-the-privacy-program)**

© 1995- 2020 City of Seattle

# Exhibit C

City of Seattle

# Office of the Mayor

Mayor Jenny A. Durkan

HOME    TOPICS ▼   |

Home / Racial Equity & Social Justice

<< Previous                               Next >>

# Statement from Mayor Jenny Durkan on the Consent Decree

by Kelsey Nyland on June 3, 2020

**Seattle** (June 3, 2020) – Mayor Jenny A. Durkan issued the below statement on the Consent Decree, which she discussed earlier with City Attorney Holmes:

"As U.S. Attorney, I witnessed the use of force being used against young men of color, including John T. Williams, who was killed just blocks from the federal courthouse. Community groups demanded action. Based on the voice and unified actions of civil rights groups, I was able to lead the investigation of the Seattle Police Department and helped negotiate and sign the Consent Decree. Not only was the Consent Decree drafted with community, it created the first version of the Community Police Commission. I deeply believe the ConsentDecree has brought significant, important, and systemic changes in the Seattle Police Department and has aided in the creation of training, transparency, and new oversight measures when force is used.

"The City has not filed to end the Consent Decree, and I oppose being released from the Consent Decree at this time. The City made clear to the Court that the City knows it still needed to address concerns on discipline and accountability, and even as we have met the required

filings of the sustainment plan, I believe that we should pause as our community is rightfully calling for more police reforms.

"I also want to be clear that when I say the Seattle Police Department has made great progress on reforms, it's true. But saying that doesn't mean we're done. Just because we have made real gains does not mean we are finished. No one is more certain of that than Chief Carmen Best. She believes in and demands a culture of continuous improvement. When she sees officers, policies, or procedures that she believes are contrary to the community good, she is the first person to demand change.

"There has never been a larger test of our resolve and commitment to justice. It will also test our accountability system to ensure complaints are investigated by the Office of Police Accountability, policies and practices are reviewed by Office of the Inspector General, and the Community Police Commission is providing meaningful community accountability. And I think both the Court and the public should know about the use of force in demonstrations as well as how the accountability system is working – this is ultimately what can build or break public confidence.

"We need to have community-led a conversation on where they believe the Court should have oversight and where oversight is appropriately moved to the Office of the Inspector General, the Community Police Commission, and the Office of Police Accountability. Change and reform must be continuous. And we must be unflinching in our willingness to build even deeper changes and create deeper trust."

Filed Under: Citywide Strategy, Office of the Mayor, Press Releases, Public Health & Safety, Racial Equity & Social Justice, Statements

Share            Tweet            Pin

<< Previous                                        Next >>

## You might also like...



A Transformative, Consequential Event in Our City,...

---

## Browse the Archive

Choose a Month ⌄

🔻 **All Seattle.gov Blogs** 🔻

## Mayor Jenny A. Durkan

**Address:** 600 4th Ave, Seattle, WA, 7th Floor, Seattle, WA, 98104
**Mailing Address:** P.O. Box 94749, Seattle, WA, 98124-4749
**Phone:** 206-684-4000

## City-Wide Information

Departments & Agencies

List

Elected Officials

Open Data Portal

Public Information

Requests

Services & Information

## Top Requests

1. Pay a Utility Bill
2. Find a City Job
3. Pay a parking ticket
4. Adopt a pet
5. Get building permits

Seattle's Mayor is the head of the Executive department. The Mayor directs and controls all City offices and departments except where that authority is granted to another office by the City

Charter.

© Copyright City of Seattle 1995-2019

About Our Digital Properties     Privacy Policy     Notice of Nondiscrimination     ADA Notice

**Exhibit D**


**Seattle** Office of
Police Accountability

**For Immediate Release**
June 1, 2020

**Contact:** Anne Bettesworth
Deputy Director of Public Affairs
Anne.Bettesworth@seattle.gov

# Office of Police Accountability processing 12,000 complaints after weekend demonstrations

Seattle, WA — The Seattle Office of Police Accountability (OPA) recognizes the community's anger and sadness following the death of George Floyd. We whole-heartedly support the movement for equitable policing across the nation.

OPA has received approximately 12,000 individual complaints concerning the Seattle Police Department's (SPD) response to this weekend's demonstrations. We are currently reviewing and processing these complaints. The resulting investigations will be our top priority moving forward.

Below are the ten specific incidents about which OPA has received the most complaints. We have assigned each a case number that can be used to track the progress online of the corresponding investigation. These investigations will be civilian-led and as transparent as possible given the law and police collective bargaining agreements. We will complete our investigations quickly due to the immense public concern and will provide updates via our website and Twitter.

1. Pepper spraying a young girl (Saturday): **2020OPA-0322**
2. Punching a person on the ground who was being arrested (Friday): **2020OPA-0323**
3. Placing a knee on the neck area of two people who had been arrested (Saturday): **2020OPA-0324**
4. Covering up badge numbers: **2020OPA-0325**
5. Failing to record law enforcement activity on body-worn video: **2020OPA-0326**
6. Pepper spraying peaceful protestors (Saturday): **2020OPA-0327**
7. The use of flashbangs, including causing a significant thumb injury (Saturday): **2020OPA-0328**
8. Failing to secure rifles in the rear of a patrol vehicle (Saturday): **2020OPA-0329**
9. Punching a person on the ground who was being arrested (Sunday): **2020OPA-0330**
10. Officers breaking windows of a Target store (date unknown): **2020OPA-0331**

Please note that we will not prejudge any actions prior to finishing our investigations. We respectfully caution the public about reaching findings without having all the evidence.

We also urge the public to allow the system created by the Police Accountability Ordinance to carry out its respective responsibilities. This includes not only OPA's investigative duties, but the Inspector General's systemic review and the Community Police Commission's raising of community concerns. The system was built to respond to these incidents, and OPA is confident that all involved will do so ethically and to the best of their ability.

We encourage community members to continue filing complaints. We are working to ensure space on our voicemail, but if you are unable to leave a message, please file a complaint via our web form. If you have video that you think may be useful, please include a link to it.

### ###

# Exhibit E

 **Help prevent the spread of COVID-19 in King County**

Help prevent the spread of COVID-19 in King County. **Find out more at King County Public Health**.

## Seattle Police Department Manual
Carmen Best, Chief of Police

# 14.090 - Crowd Management

Effective Date: 11/01/2018

## 14.090 – POL

It is the policy of the Seattle Police Department to facilitate free speech and assembly whenever possible, while preserving order and protecting persons and property. This manual section governs the Department's response to such events when transportation and public safety considerations are best served by a police presence.

### 1. The Department Uses the Incident Command System (ICS) for Crowd Management

When assigned, an Incident Commander will oversee the Department's response before, during and after an event.

- The Incident Commander may delegate authority and assignments.

### 2. The Incident Commander Will be a Sergeant or Above

- **Exception**: An officer can serve as Incident Commander until a sergeant can respond.

- A lieutenant will assume command when there are two sergeants and/or two squads involved in the event.

- A captain will assume command when there are two lieutenants involved in the event.

- For more information, see **Manual Section 1.020 – Chain of Command**.

### 3. As Far in Advance of the Incident as Possible, the Incident Commander Will Coordinate with the Appropriate Department Resources to Obtain Information to Assist with Operational

Planning and Staffing

### 4. The Incident Commander May Consider Utilizing Specialty Units, Based on Operational Needs

In the event of an unplanned crowd management event, the Incident Commander shall request SWAT when feasible.

See **14.090–TSK–1** Responsibilities of the Incident Commander.

### 5. The Incident Commander Will Determine Minimum Staffing for Crowd Management Events

- The Incident Commander will base staffing levels on the projected number of event participants and any pre-event information indicating potential violence.

- The Incident Commander will develop contingency plans regarding staffing and tactics.

- When feasible, the Incident Commander will provide the staffing plan to the SPD Budget Section prior to the incident.

### 6. The Incident Commander Will Deliver Event Briefings Using a Standardized Format (SPD ICS Briefing Format 🗋)

### 7. The Incident Commander Will Communicate Each Unit's Mission to That Unit's Supervisor or Commander

The involved unit's supervisor or commander will develop the specific methods or tactics that will be used to accomplish the mission. See 14.090–TSK–2 Responsibilities of the Supervisor.

- The unit supervisor or commander will submit all unit plans to the Incident Commander, who will approve or modify the plans to accomplish the overall mission, with any modifications communicated back to the unit supervisor or commander.

### 8. The Incident Commander Retains Ultimate Responsibility for the Decisions of Subordinates

In order to fulfill this obligation, the Incident Commander will be available for on-scene consultation.

### 9. Crowd Dispersal

### a. Upon Determining That There are Acts or Conduct Within a Group of Four or More Persons That Create a Substantial Risk of Causing Injury to Any Person or Substantial Harm to Property, the Incident Commander May Order That the Crowd Be Dispersed

See **SMC 12A.12.020** ↗

Before ordering that the crowd be dispersed, the Incident Commander shall consider whether less restrictive means of crowd management are available.  Such means may include strategies such as area denial and/or seeking voluntary compliance.

Upon determining that dispersal is appropriate, the Incident Commander shall ensure that there is an avenue of egress sufficient to allow the crowd to depart.

The Incident Commander or designee will issue the order to disperse prior to instructing officers to disperse the crowd, if feasible.

See **14.090-TSK-3** Issuing the Order to Disperse.

## b. The Incident Commander Shall Have Authority to Direct the Use of Blast Balls and OC Spray to Disperse the Crowd (See Manual Section 8.300 – Use-of-Force Tools)

A lieutenant may authorize the use of blast balls and OC spray to disperse a crowd if an immediate life safety emergency exists that requires this action be taken and there is insufficient time to obtain incident command approval.

- An immediate life safety emergency is an unplanned, dynamic situation where immediate police action is necessary to protect the officers' and/or the public's safety.

- Only personnel trained to deploy patrol CART tools (blast balls and OC spray) are authorized to carry and use these tools under the supervision of a CART-trained supervisor, unless otherwise directed by the Incident Commander.

When feasible, officers will not deploy blast balls and OC spray until a dispersal order has been issued to the crowd and the crowd has been given a reasonable amount of time to comply.

When feasible, officers shall avoid deploying blast balls and OC spray in the proximity of people who are not posing a risk to public safety or property.

The deployment of blast balls away from people (i.e. a "bang out") is reported and investigated as Type I force.   Deployments in the vicinity of people may be categorized as Type II or Type III force, depending upon the circumstances of the deployment and the resulting injury. (See Manual Section 8.400 regarding force classification.)

## c. Each Precinct Will Maintain a Supply of Blast Balls and OC Spray

Each precinct will maintain a log of the serial number of each blast ball in its supply.  Blast balls will be issued, by serial number, to specific officers as needed.  Officers will be responsible for each blast ball that they are issued.  Officers will return unused blast balls after the event, and will provide the event number related to any deployments.

After a crowd management event, the Department blast ball coordinator will be responsible for ensuring that the precinct log is reviewed to verify whether all deployed blast balls were reported.

### d. The Incident Commander Will Deploy Department Personnel to Accomplish Specific Tactical Objectives Consistent with ICS

### 10. Officers May Make Individual Decisions to Deploy OC Spray, and Blast Balls Consistent with Title 8 – Use-of-Force

The authorized use of OC in crowd management situations involving violent activity shall have as a primary objective at least one of the following:

- Defend oneself

- Defend someone else

- Prevent significant destruction of property

### a. OC Will be Directed at the Specific Suspect(s) who are Posing a Threat

When feasible, officers shall issue a verbal warning to the suspect(s), other officers, and other individuals present, that OC spray will be used.  When feasible, officers will wait a reasonable amount of time to allow the suspect(s) to comply with the warning before using OC spay.

Officers deploying OC will attempt to limit collateral exposure to non-involved parties.

- If there is probable cause to arrest for a crime, it is a priority for officers to arrest individuals against whom OC has been deployed.

### b. Officers Will Provide Aid to Subjects Exposed to OC and/or Blast Balls, if Feasible

Officers will request medical response or assistance for subjects exposed to OC when they complain of continued effects after having been decontaminated, or they indicate that they have a pre-existing medical condition (e.g. asthma, emphysema, bronchitis, heart ailment, etc) that may be aggravated by OC.

Officers will request medical response or assistance for subjects who appear to have been injured by a blast ball or who complain of pain or injury from having been struck by a blast ball.

## 11. Incident Commanders and Officers Must Document Uses of Force

- The Incident Commander authorizing the use of less-lethal tools must justify that decision in a Use-of-Force Report, with a copy submitted to the relevant Bureau Commander in addition to the normal routing.

- Officers shall individually justify and document all reportable uses of force consistent with **Manual Section 8.400 - Use-of-Force Reporting and Investigation**.

## 12. Following the Event, Sergeants and Incident Commanders Will Conduct a Day-of-Event Debrief

- Sergeants will conduct a debriefing of their assigned officers and document any observations or suggestions on an Event Debrief Form (form 23.5).

- Sergeants and the Incident Command staff will then have a separate debrief to discuss the following subjects:

     - Event staffing

     - Deployment

     - Command issues

     - Communication issues

     - Logistical issues

     - Use of less-lethal tools

     - Areas of success

     - Areas for improvement

## 13. Incident Commander Will Complete an After-Action Report (See: 14.010-After-Action Reports)

## 14. Uses of Force that Occur During the Course of Crowd Management Are Reviewed in Accordance with Manual Section 8.500-POL-6.

## 14.090–TSK–1 Responsibilities of the Incident Commander

During the course of managing a crowd, the Incident Commander:

1. If feasible, **contacts** the event organizer to discuss the Department response

2. **Develops** contingency plan regarding staffing and tactics

    - SPD task force callout criteria

    - Mutual aid callout criteria

3. **Considers** utilizing specialty units

    - Bicycle units for marches or mobile protests

    - Officers on foot for static events, or to function as arrest teams or bicycle unit support for marches or mobile protests

    - Mounted patrol for static events, marches or mobile protests

    - Video Unit for events where information indicates that civil disobedience or crowd violence will occur (Recordings must be in compliance with **SMC 14.12 – Collection of Information for Law Enforcement Purposes** ↗.)

    - Special Weapons and Tactics (SWAT) officers to use less-lethal launchers and tools that are approved for use solely by the SWAT team

    - CART-trained officers when there is insufficient time to deploy SWAT

    - Prisoner processing for events where information indicates civil disobedience or crowd violence will occur

    - Intelligence Unit resources when there is a need for ongoing information gathering and dissemination during the event

    - SPOC for planning and logistical support

4. **Provides** a staffing plan to the SPD Budget Section, if feasible

5. **Communicates** each unit's mission to the relevant supervisor or commander

a. **Instructs** the supervisor or commander to develop and provide plans

b. **Approves** unit plans

6. **Briefs** officers and supervisors using the SPD ICS briefing format

7. **Remains** available for on-scene consultation

8. Debriefs supervisors and commanders following the event

a. **Collects** Event Debrief Forms from the supervisors

9. **Completes** an After-Action Report consistent with the requirements of Manual Section **14.010 – After-Action Reports**

b. **Routes** the After-Action Report and Event Debrief Forms to the Patrol Operations Bureau Commander, via the chain of command

## 14.090–TSK–2 Responsibilities of the Supervisor

The supervisor:

1. **Develops** methods or tactics that will be used to accomplish the mission, as directed by the Incident Commander

a. **Submits** plans to the Incident Commander

2. **Debriefs** assigned officers after the incident

3. **Documents** observations and suggestions on an Event Debrief Form (form 23.5)

a. **Submits** Event Debrief Forms to Incident Commander

4. **Attends** separate debrief with Incident Commander

## 14.090–TSK–3 Issuing the Order to Disperse

Upon determining that the crowd presents an imminent risk to public safety or that large-scale property destruction appears likely, the Incident Commander, as feasible:

1. **Considers** placing officers at the rear of the crowd to verify that the order to disperse will be heard by all

2. **Issues** the following order:

> "I am (rank and name) of the Seattle Police Department. I am now issuing a public safety order to disperse and I command all those assembled at (specific location) to immediately disperse, which means leave this area. If you do not do so, you may be arrested or subject to other police action. Other police action could include the use of chemical agents or less-lethal munitions, which may inflict significant pain or result in serious injury. If you remain in the area just described, regardless of your purpose, you will be in violation of city and state law. The following routes of dispersal are available: (routes). You have (reasonable amount of time) minutes to disperse."

3. **Allows** a reasonable amount of time for the crowd to disperse

4. **Repeats** the order to disperse, if feasible

5. **Continually assesses** the balance of dispersal time and the goal of retaining control of the situation

---

# Police

**Address:** 610 5th Avenue, Seattle, WA, 98104-1900
**Mailing Address:** PO Box 34986, Seattle, WA, 98124-4986
**Phone:** 206-625-5011

## City-Wide Information

Departments & Agencies List

Elected Officials

Open Data Portal

Public Information Requests

Services & Information

## SPD Information

1. Find a Police Job

2. Contact SPD

3. Police Locations

4. Crime Information

5. SPD Manual

The Seattle Police Department (SPD) prevents crime, enforces laws, and supports quality public safety by delivering respectful, professional, and dependable police services. SPD operates within a framework that divides the city into five geographical areas called "precincts". These precincts define east, west, north, south, and southwest patrol areas, with a police station in each.

Site Disclaimer: The Seattle Police Department's website was developed to provide general information. Data contained at this location is generally not reviewed for legal sufficiency. SPD documents displayed are for reference purposes only. Their completeness or currency are not guaranteed. Links or references to other information or organizations are for reference only and do not constitute an endorsement.

© Copyright 1995-2020 City of Seattle

About Our Digital Properties     Privacy Policy     Notice of Nondiscrimination     ADA Notice

# Exhibit F

6/8/2020    'No sense of de-escalation' at crucial moment during latest Seattle protest, videographer says | The Seattle Times

Case 2:12-cv-01282-JLR   Document 623-1   Filed 06/09/20   Page 25 of 71

**Local Politics**

# The Seattle Times

## 'No sense of de-escalation' at crucial moment during latest Seattle protest, videographer says

June 2, 2020 at 2:55 pm | *Updated June 4, 2020 at 9:20 am*



Omari Salisbury records a live stream of a downtown Seattle protest on Saturday.
(Naomi Ishisaka / The Seattle Times)

 By Daniel Beekman 🐦

*Seattle Times staff reporter*

The live-streamer who recorded a widely shared, street-level video of a moment Monday night when officers on Capitol Hill in Seattle began to shoot pepper spray and tear gas at demonstrators said people had for hours been passionately but peacefully protesting police killings of Black people.

"There was no sense of de-escalation" by police at that apparently crucial moment, said Omari Salisbury, a Seattle-based citizen journalist with Converge Media who's been documenting the protests here. "The police are the professionals. They're supposed to know how to de-escalate."

In the video recorded by Salisbury, some demonstrators facing a line of officers across a barricade at 11th Avenue and East Pine Street open umbrellas to guard against the pepper spray some officers are threatening to deploy. Other protesters can be seen standing still, some with their arms up in the air. They'd been chanting, "Hands up, don't shoot," Salisbury said.

Then an officer grabs a pink umbrella, setting off a tug of war with protesters as other officers start to shoot pepper spray. The incident was also captured on another video from a view above the scene, with the crowd loudly chanting, "Take off your riot gear. We don't see no riot here."

Officers deploy more pepper spray at protesters pressed against other points along the barricade. Some objects are thrown from the crowd, the aerial video shows. The officers deploy still more pepper spray, along with flash **bang**s and tear gas.

Most people in the crowd run away, but Salisbury stays nearby as long as he can, pleading with the officers to "bring it down" and then finally walking away, gasping for breath.

"I took in so much tear gas," he said in an interview Tuesday morning. "I got hit with the pepper spray and the tear gas."

As events progressed, the Seattle Police Department declared a riot.

In a news conference Tuesday afternoon, Mayor Jenny Durkan and Police Chief Carmen Best said they'd seen videos of the incident. Durkan said she "was concerned that things had escalated and changed so rapidly," though she said she believed the officers were in a "highly charged and very fluid situation."

Salisbury, who hosts a local Black news show called "The Morning Update" online, said he grew concerned in the minutes leading up to the chaos for multiple reasons.

Earlier Monday evening, as protesters moved around Capitol Hill and encountered lines of officers positioned in the blocks surrounding the Police Department's East Precinct, Black Lives Matter activists had led the way and had sought to maintain some distance at other barricades.

"The Black Lives Matter people were like, 'Five feet! Five feet!'" he said. "There was definitely a buffer zone kept by Black Lives Matter."

Salisbury no longer saw those people at the front of the crowd in the minutes before the pepper-spraying began, he said. Some protesters were very close to the barricade, and the police hadn't issued clear instructions about distance.

Salisbury said he grew even more concerned when Seattle officers wearing gas masks, accompanied by some state troopers, replaced a line of bicycle officers wearing gas masks and carrying batons.

*Warning: This video contains explicit language.*

In an extended video clip, Salisbury warns what that could mean.

"We have a definite change in posture," he says. "What we can expect next is tear gas. ... This situation is escalating."

Salisbury didn't see anything being thrown at officers at that point, he said.

In the video, Salisbury mentions that no dispersal order has been given. "We have not heard an audible anything from any authority here," he says. Seconds later, an officer grabs the pink umbrella and the pandemonium starts.

"The Seattle Police Department declared a demonstration on Capitol Hill a riot Monday evening after a crowd ... threw rocks, bottles and fireworks at officers and attempted to breach barricades one block from the East Precinct," the Police Department said in an online blotter post, describing the location as 11th and Pine.

"In response to the increasing number of assaults on officers and the increasing risk to public safety, the Incident Commander declared the incident a riot. Officers deployed less-lethal munitions and a mobile line of bike officers was established to disperse the crowd."

As the night wore on, there were protesters at other locations nearby and other interactions with officers. Best said Tuesday an officer was "struck in the face with a large piece of concrete" and several other officers were injured.

She noted East Precinct commanders had knelt down with protesters shortly before the situation devolved. She and Durkan said they wanted peaceful demonstrations to continue.

Case 2:12-cv-01282-JLR Document 623-1 Filed 06/09/20 Page 27 of 71

They said the Police Department's Office of Police Accountability would investigate the Capitol Hill incident for potential misconduct and said the city's Office of Inspector General would review the incident for potential policy changes.

What happened frustrated Salisbury, because the protesters had been nonviolent Monday and because some Police Department sergeants had at times previously displayed composure and judgment, he said.

"There are officers who have shown exceptional leadership, but that was lacking" at a critical juncture, he said.

The incident also bothered Salisbury because he said he saw officers fail to stop property destruction Friday night in the Chinatown-International District.

"These anarchists tore the ID up," he said.


**Daniel Beekman:** *206-464-2164 or* [dbeekman@seattletimes.com](mailto:dbeekman@seattletimes.com); *on Twitter:* [@dbeekman](https://twitter.com/dbeekman). *Seattle Times staff reporter Daniel Beekman covers Seattle city government and local politics.*

**Exhibit G**

6/8/2020
Seattle council questions SPD's use of tear gas, mace during weekend protests
Case 2:12-cv-01282-JLR Document 623-1 Filed 06/09/20 Page 29 of 71



MY**Northwest**

# Seattle council questions SPD's use of tear gas, mace during weekend protests

BY NICK BOWMAN
JUNE 1, 2020 AT 1:57 PM



Someone pours water onto a protesters face who has been exposed to tear gas in downtown Seattle. (Photo by Karen Ducey/Getty Images)

Seattle councilmembers levied criticism against police officers at weekend protests downtown, citing reports of excessive force and inappropriately used dispersal tactics.

### Sawant calls for investigation into SPD conduct at weekend protests

"I personally witnessed the unacceptable escalation of violence by the Seattle Police Department," Councilmember Kshama Sawant said in Monday's council briefing. "We have had hundreds, if not thousands of accounts from ordinary people of unacceptable conduct from the SPD."

MY**Northwest** 

"Seattle police officers indiscriminately used tear gas, mace, flash bang grenades, and other types of excessive use of force on the peaceful protesters," she added.

Officers in Seattle are required by law to provide advance a verbal command to disperse before each use of extreme dispersal tactics. They must also ensure that the order is heard by everyone in the area.

Reports from Saturday's protest appear to indicate that no such warnings were issued to people in attendance.

"In my conversations with people after the event, people confirmed for me that they were not receiving advance notice or receiving orders to disperse, which are required under city law," said Councilmember Lisa Herbold, who said she was in attendance at Saturday's peaceful rally at Westlake.

"In that situation, where people were standing on the street not causing harm, not assaulting officers, not harming property, in those videos that we saw, there was no dispersal warning," Councilmember Teresa Mosqueda described, citing "multiple reports that audible warnings were not given to a diverse crowd, including children, elderly, and people with disabilities."

### 'We all have a lot of work to do,' says Seattle rally organizer

Those reports included footage of a small child who was allegedly maced by police, and video of an officer kneeling on the neck of a protester.

Councilmember Mosqueda compiled a number of other videos posted by protesters on social media where officers appeared to be using excessive force, and has already sent them to the city's civilian-run Office of



The OPA has not yet made any determinations, but plans to review video footage and interview eye-witnesses in the days ahead to get a full accounting of the weekend's events.

"Suffice it to say there is a lot of video evidence that confirms our city has work to do as it relates to properly handling interactions with members of the community, particularly at times like this," Herbold noted.

---

## Subscribe to MyNorthwest.com's Breaking News Alerts

**MY**Northwest

Like first in the know? Keep up to date with MyNorthwest.com's Breaking News Alerts. Delivered whenever news breaks

Email                    Required

SUBSCRIBE

---

190 Comments 💬    Share ➔

---

## Top Stories

What is allowed under King County's modified Phase 1 plan?

**SPONSORED CONTENT**

This Car's Innovative Off-Road Mode Will Blow Your Mind

By **Mazda**

MyNorthwest presents 'Washington: Open for Business'

---

Sponsored articles

MYNorthwest





Making ends meet amid COVID 19

SPONSORED CONTENT



What's the Key to Building a Safer SUV?
By **Mazda**

 

MYNorthwest

**TOP STORIES**

WESTERN WASHINGTON

LOCAL NEWS

TRAFFIC

WEATHER

NATION/WORLD

NATIONAL NEWS

POLITICS

LIFESTYLE

WORLD NEWS

MONEY

TECHNOLOGY

ODD NEWS

**VOICES**

COMMENTARY

DAVE ROSS

MYNORTHWEST BLOG

LIFESTYLE & ENTERTAINMENT

RACHEL BELLE

TOM TANGNEY

TOM DOUGLAS

KIRO RADIO

TOM AND CURLEY

DORI MONSON

GEE AND URSULA

KIRO NIGHTS

770 KTTH

JASON RANTZ

SAUL SPADY

MICHAEL MEDVED

**RADIO**

LIVE

LISTEN NOW

WATCH IN-STUDIO VIDEO

STATIONS

KIRO RADIO

710 ESPN SEATTLE

770 KTTH AM

ON-DEMAND

PODCASTS

MOBILE APPS

KIRO RADIO

710 ESPN SEATTLE

KTTH

**SPORTS**

710 ESPN SEATTLE

SEATTLE SEAHAWKS

SEATTLE MARINERS

SEATTLE SOUNDERS FC

MLB SCOREBOARD

NFL SCOREBOARD

DANNY O'NEIL

JIM MOORE

SHANNON DRAYER

PODCASTS



MYNorthwest

SEARCH THE SITE

CONTACT US

ADVERTISE WITH US

EMPLOYMENT

TERMS OF USE

CONTEST RULES

PRIVACY STATEMENT

EEO PUBLIC FILE REPORT

COPYRIGHT INFRINGEMENT

COMMUNITY OUTREACH


**CONNECT**

FACEBOOK

TWITTER

GOOGLE+

RSS

EMAIL ALERTS


PART OF THE MYNORTHWEST.COM NETWORK OF SITES


© 2020 BONNEVILLE INTERNATIONAL. TERMS OF USE AND PRIVACY POLICY. ALL RIGHTS RESERVED.
EEO PUBLIC FILE REPORT. COPYRIGHT INFRINGEMENT LICENSING
FCC PUBLIC FILE: KIRO-FM | KIRO-AM | KTTH
FCC STATION REPRESENTATIVE: CHELSEA MILLER – CMILLER@BONNEVILLE.COM 206.726.7000

6/8/2020
Case 2:12-cv-01282-JLR Document 623-1 Filed 06/09/20 Page 35 of 71
Seattle Council questions SPD's use of tear gas, mace during weekend protests





MyNorthwest presents 'Washington: Open for Business'

_____

## Most Popular

**Seattle protest remains overnight Sunday after tense evening in Capitol Hill**

**Seattle councilmembers, lawmakers intervene after Saturday protest escalates**

**Former King County Sheriff: 'We have massive failures in all our institutions'**

**Sign up to receive the most popular email**

**Exhibit H**

Tear Gas Used on Protesters Could Lead to New Coronavirus Wave - The New York Times

**The New York Times** | https://nyti.ms/2XZpOAx

# Corrosive Effects of Tear Gas Could Intensify Coronavirus Pandemic

Tear gas brings temporary misery by stinging eyes and throats. There's also evidence that it may increase the risk of respiratory illness.

 **By Mike Baker**

June 3, 2020

SEATTLE — The billowing clouds of tear gas that the authorities are sending through protest crowds across the United States may increase the risk that the coronavirus could spread through the gatherings.

Along with the immediate pain that can cause watering eyes and burning throats, tear gas may cause damage to people's lungs and make them more susceptible to getting a respiratory illness, according to studies on the risks of exposure. The gas can also incite coughing, which can further spread the virus from an infected person.

Sven-Eric Jordt, a researcher at Duke University who has studied the effects of tear gas agents, said he had been shocked to watch how much the authorities had turned to the control method in recent days.

"I'm really concerned that this might catalyze a new wave of Covid-19," Mr. Jordt said. The virus has been linked to more than 106,000 deaths in the United States.

**Latest Updates: George Floyd Protests**   Updated 19m ago

- Congress prepares to debate sweeping police reform as protests drive action.
- Joe Biden will meet George Floyd's family in Houston before the funeral.
- Derek Chauvin, an officer accused in George Floyd's death, will appear in court for the first time.

See more updates

The protests after the death of George Floyd in Minneapolis have already raised alarm among health experts who have watched as protesters gathered by the thousands in cities around the country. While some demonstrators have worn masks and gloves, the crowds have often involved shouting and chanting in close quarters — a risky activity for a virus spread by respiratory droplets.

But the addition of wafting gases, which have been used widely by police forces in recent nights, has added an uncertain new element of risk to the scene.

In research conducted by the U.S. Army, examiners looked at the impacts of exposure that thousands of Army recruits had to the common riot-control agent known as CS gas or tear gas. The study conducted in the summer of 2012 found that the personnel in a basic training cohort had a substantially high risk of being found to have an acute respiratory illness in the days after exposure than the days before.

The risk increased the more people were exposed, the researchers said.

The miserable initial effects of tear gas — including stinging in the eyes and throat — typically lasts for only 15 to 30 minutes after a person who has been exposed gets to an area with cleaner air. But many of the illnesses in the Army research surfaced days after exposure. Researchers cautioned that illnesses were not lab-checked, and could have been caused by damage to the respiratory tract rather than infection, or could have been prompted by other factors.

A study in Turkey examining the long-term effects of tear gas found that people who had been exposed had a higher risk for chronic bronchitis.

Tear gas has been around for decades, used around the world as a riot-control tool, including in Hong Kong during recent uprisings there. Treaties prohibit its use during war.

Mr. Jordt said he worried that the effects on healthy, young military recruits may also not fully capture the risks to people who are older or have underlying conditions. He said more research was needed on tear gas generally, since much of the research was decades old, but that it had been difficult to get funding to examine the issue.

The protests after Mr. Floyd's death have focused on the disproportionate impacts of police killings on black Americans, with protests led by groups such as Black Lives Matter. People of color have also been hit particularly hard by the coronavirus pandemic, with higher rates of hospitalizations and deaths than white people.

Researchers have long found that smoking can cause damage to upper airways and increase the risk of lung infections. The Centers for Disease Control and Prevention has said that conditions such as asthma and chronic lung disease can increase the risk of someone getting a severe coronavirus illness.

The C.D.C. has said that prolonged exposure to riot-control agents may lead to long-term effects to eyes and breathing problems such as asthma.

The use of tear gas to disperse protesters has been the subject of criticism from organizations such as the American Civil Liberties Union.

Jamil Dakwar, the director of the A.C.L.U.'s Human Rights Program, said tear gas had become an overused tactic that could actually increase the volatility of a situation. He said the weapons that were so indiscriminate should not be used for dispersing people or in protests.

"It has become a first-resort weapon rather than a last resort," Mr. Dakwar said.

Mr. Dakwar said he would like to see state and federal legislation that would restrict the use of those techniques. While the A.C.L.U. was not advocating an outright ban, he said the priority should be on de-escalation techniques.

Mr. Dakwar said the gas was so indiscriminate that he also worried about the health effects on police officers.

# Exhibit I



June 13, 2016

VIA EMAIL

Councilmember M. Lorena González, Chair, Safety Communities Committee
Councilmember Lisa Herbold, Chair, Civil Rights Committee
Council President Bruce Harrell
Chief Kathleen O'Toole, Seattle Police Department
Mayor Ed Murray
OPA Director Pierce Murphy
OPA Auditor Anne Levinson

Greetings:

We write to request immediate and public review of the Seattle Police Department (SPD)'s policy with regard to the use of "blast balls." Until such time as blast balls' propensity for causing injury (including specific evidence from the past two years in Seattle), and their appropriate use given that risk, have been publicly weighed, we ask that SPD suspend their use.

We appreciate that SPD is confronted with a challenging dynamic in certain unpermitted demonstrations, in which a subset of those assembled engage in property destruction and commit assaults, including against officers, and where SPD has no designated demonstration leaders with whom to rapidly work out a plan to minimize destruction and harm. Our impression is that, overall, in recent marches, SPD has respected legitimate speech rights, including of demonstrators without a permit, so long as there are not significant instances of property damage or assault.

We also appreciate that, upon learning of our concerns, SPD leadership immediately agreed to meet and discuss the situation. We have no reason to think the department will not participate sincerely and meaningfully in discussions about the risks and appropriate use of blast balls.

That said, in our collective view, in light of documented serious injuries to bystanders and observers, these weapons should not be used again before their risks and appropriate use have been more openly reviewed.

We appreciated the opportunity to review a draft of the SPD crowd management training prior to May Day 2016, which SPD took the initiative to arrange. During our review, CPC members suggested changes based on the following two observations: 1) the consequences of using blast balls were minimized, and 2) de-escalation principles in a mass context were not emphasized clearly enough. While we don't have firsthand knowledge of whether the changes we recommended were incorporated into the training (we were not permitted to observe the training), the injuries incurred by numerous non-violent observers on May Day 2016 indicates that further examination of the use of these tools is warranted.

Over a year ago we wrote the attached letter to Chief O'Toole after conversations with many people about how Black Lives Matter demonstrations were handled by SPD. We identified six issues that seemed to warrant high-level review, including "out of policy/harmful use of pepper spray, blast balls and other projectiles." We noted that similar concerns arose from SPD's handling of incidents on May Day 2015. It now seems evident from publicly available information that blast balls injured several people on May Day 2016, including several individuals who were reporting on or documenting events. Some of these injuries were serious.

In response to our letter of a year ago, SPD arranged for the Center for Policing Equity (CPE) to review their policing of demonstrations, a plan we welcomed. Members of the CPE team met with some community members, including some demonstrators, and heard a sampling of community views. CPE was also provided with all of the letters and comments gathered by the CPC last year. In addition, we understand that use of force experts working with CPE examined SPD's past use of blast balls in the demonstration context. However, the CPE review has not proceeded in a timely manner, though we understand that this is not in SPD's control as CPE was working without charge. Nor has CPE facilitated a more open community conversation that many involved in street demonstrations, including some who attended the invitation-only focus group sessions, called for. Despite what we believe are good intentions, SPD's commitment to obtain feedback from the public on this topic has not been fully fulfilled through that process.

Due to this series of events, we reiterate the need we identified in May 2015 for a structured conversation in which the police and community members may together explore these issues. We again offer to convene that conversation unless an alternate forum is provided by the Council or other City leaders. Following that dialogue, we likely will offer recommendations for the use of blast-balls and the appropriate use of de-escalation tactics in crowd management situations. Until this can occur, we ask that the use of blast balls as a crowd management tool be suspended.

Sincerely,


Rev. Harriett Walden, Co-Chair                    Lisa Daugaard, Co-Chair
Community Police Commission                       Community Police Commission



Cc:
Brian Maxey, SPD Chief Operating Officer
Community Police Commission

**Exhibit J**

Local News

# The Seattle Times

## Seattle police continue to use 'flash-bang' grenades during protests, despite recommendations

June 2, 2020 at 6:52 pm | *Updated June 3, 2020 at 7:25 am*



📷 **1 of 4** | Protesters react as police fire about half a dozen flash-bang grenades rapidly in downtown Seattle Sunday afternoon. Across the... (Ken Lambert / The Seattle Times) **More** ⌄

 By **Lewis Kamb** 🐦

*Seattle Times staff reporter*

When she heard the explosions, Rebeca Muñiz knew her plans to participate in peaceful demonstrations in downtown Seattle last Saturday effectively had been blown apart, too.

A few blocks from where she and dozens of other people had gathered at Westlake Park to hear speakers protesting George Floyd's death at the hands of police in Minneapolis, Seattle officers in riot gear had begun tossing flash-bang grenades — military-style percussion devices often used to control crowds — toward a throng of demonstrators.

A few moments later, Muñiz recalled, she was helping a woman with a badly injured hand who emerged from a torrent of fleeing bodies. The woman told Muñiz and medics that her thumb and forefinger, gouged and streaming with blood, had been struck by shrapnel from one of the police grenades, Muñiz said.

"I don't know why police would even think about using a flash-bang in a situation like that," said Muñiz, 28, a hospital worker who photographed the woman's injuries. "There were children around, there were families with strollers, and from where I was, the crowd didn't seem out of control. I didn't hear [police] give anybody any warning."

Deployment of flash-bang grenades, blast balls and other devices to control and disperse crowds have become a hallmark of the mayhem that has marred recent demonstrations in Seattle and other U.S. cities in the wake of Floyd's death. The Seattle Police Department's use of the crowd-control tool date back at least several years and has drawn past scrutiny and concern from civilian watchdogs.



### Crowd-control grenades

Nonlethal devices, activated by pulling one or more pins and releasing a safety lever, which are then thrown. Some create a loud bang and a bright flash and others release tear gas or small rubber balls.

**FLASH-BANG GRENADES**

**M84**
Produces a bright flash and a loud bang through side holes.
**Light intensity:** 6–8 million candela*
**Sound level:** 170-180 decibels**

**Model 7290**
Produces a bright flash and a loud bang through slits in the top and bottom. Some models can also release tear gas.
**Light intensity:** 4-5 million candela*
**Sound level:** 165-175 decibels**

**Sting-ball**
Produces a bright flash and a loud bang while releasing over 100 rubber balls in 360 degrees, up to 50 feet from the point of detonation.
**Light intensity:** 6 million candela*
**Sound level:** 175 decibels**

**TEAR-GAS GRENADES**

**ABC-M7A3**
Releases a cloud of tear gas for 15 to 35 seconds.

**ABC-M25A2**
Burst open, releases a cloud of tear gas.

*One candela is the intensity of light created by a single candle.

**Decibel level within 5-foot radius of device detention. A balloon popping is about 125 decibels.

Sources: GlobalSecurity.org; Botach Tactical; Federation of American Scientists; Combined Tactical Systems; operationalmedicine.org

MARK NOWLIN / THE SEATTLE TIMES

But despite recommendations by the city's Community Police Commission in 2016 that the agency suspend use of the grenades until they could be more thoroughly assessed, Seattle police never completed the requested study, and continue to use the devices in its repertoire of crowd-policing tactics, according to one former commissioner.

"There's never been a systemic review of if and when these kinds of devices could be appropriately used, as we were calling for," said Lisa Daugaard, executive director of the Public Defender Association and then a co-chair of the police commission.

A Seattle police spokesman said this week he could not readily answer questions about the department's internal assessments, training protocols and documented use of flash-bang grenades, blast balls or similar devices due to the "dynamic nature of the ongoing demonstrations."

"At this time, our subject matter experts on force training, tactics, and equipment are all currently deployed," the spokesman, Jonah Spangenthal-Lee, said in an email.

Mike Solan, president of the Seattle Police Officers Guild, did not respond to requests for comment Tuesday.

The department generally has said officers have acted appropriately in response to the latest demonstrations, and police commanders previously have described crowd-control grenades as a permitted, "less lethal" tool not meant to hurt anyone, but rather to confuse, distract and scare agitated and uncooperative crowds into dispersing.

But the devices have caused several documented injuries in Seattle — including at least one to an officer — and several dozen examples in nationwide news accounts over the past two decades of people being wounded, maimed or killed by flash-bang-type devices.

The hand injury witnessed by Muñiz last weekend is among at least 10 cases of complaints about Seattle police's response to Saturday's demonstrations now under investigation by the Office of Police Accountability, the city's civilian-led police watchdog.

6/8/2020    Seattle police continue to use 'flash-bang' grenades during protests, despite recommendations | The Seattle Times

Case 2:12-cv-01282-JLR   Document 623-1   Filed 06/09/20   Page 45 of 71

"In my opinion, these devices are dangerous and not appropriate for general use as a tactic for crowd control," said Pierce Murphy, a former OPA director who examined multiple complaints about police crowd-control projectiles and once asked the Seattle department to reevaluate their use. "If they're deployed close to people, they can certainly cause significant physical injuries."

Some police tactical experts, however, say such devices often are far less dangerous than other tools, and can help police create space, buy time and make better decisions in unruly demonstrations where they're likely outnumbered.

"I feel when used appropriately, they are very, very safe," said Thor Eells, executive director of the National Tactical Officers Association, a police-training group.

---

**Coverage of the George Floyd protests**

- Live updates on George Floyd protests in Seattle and elsewhere, June 8
- Sunday in Seattle: Man shot on Capitol Hill after car drives into protest
- "Defund the police": What does this movement really mean?
- Naomi Ishisaka: How we got to this "extraordinary moment"
- Complete coverage from the Northwest and the nation

---

### "Distance equals time"

Flashbang grenades were first put into practice by the British Special Air Services, which were involved in a counter-terrorism raid of a hijacked Lufthansa jetliner in Somalia in 1977, Eells said. Since then, the devices and similar ones have been used more frequently in police operations, he said.

The classic flash-bang — technically not a grenade — typically contains a fuse head, with magnesium powder encased in gunmetal that weighs about a pound and a half, said Eells, a retired Colorado Springs police commander and tactical trainer who has deployed the devices hundreds of times. It's primarily utilized by SWAT teams to create the distraction with a disorienting loud noise and bright flash as officers make entry into a hostage or barricade situation, he said.

Offshoots of flash-bang grenades have been designed more specifically for crowd control in recent years. The devices typically consist of a fusehead with a small cartridge, a striker and a firing pin atop a rubber body. Like a grenade, when the pin is pulled and the device is tossed, it initiates and fragments on contact.

Five varieties are typically used in riot situations, including those capable of only making noise and light; sting-ball or blast-ball grenades that spray small rubber balls; devices that emit pepper spray or tear gas; or a combination of some or all of those, Eells said.

In situations with unruly crowds, the devices are meant to help police more effectively use resources by splintering large crowds into smaller groups and creating a "reactionary gap" that can improve policing decisions, and they are far less likely to cause injury than a 39-inch hickory wood riot baton, Eells said.

"What a lot of people don't recognize, these can be deployed in a way that allows law enforcement to remain separate from the crowd they're trying to manage," he said. "Distance equals time, and time equals better

6/8/2020　Seattle police continue to use 'flash-bang' grenades during protests, despite recommendations | The Seattle Times

Case 2:12-cv-01282-JLR　Document 623-1　Filed 06/09/20　Page 46 of 71

decision-making for how I, as an officer, should act  given the circumstances.”

## Calls for reform

News accounts cite examples of serious injuries and deaths tied to the devices dating back decades: A woman killed by an exploding flash-bang grenade during a Los Angeles Police drug raid in 1984; a 7-year-old girl who was shot amid smoke and mayhem of a flashbang deployed during a Detroit police SWAT raid in 2010; a toddler injured critically after one landed near him during a raid in Habersham County, Georgia, in 2014.

During the 2014 riots in Ferguson, Missouri —  which erupted after a white officer shot and killed a Black man — protesters and a journalist reported burns and other injuries from police crowd-control devices. In 2018, the Portland Police Bureau temporarily suspended using the devices after several people reported serious injuries during a Patriot Prayer rally and counter-demonstration.

In Seattle, the two former civilian police watchdogs said they don't dispute there are instances when police need such tools, but question whether widespread deployment of the devices as a tactic for general crowd control is safe or necessary.

Following violent clashes between Seattle police and protesters during May Day demonstrations in 2015, Murphy, then the OPA director, recommended in a letter to then-police Chief Kathleen O'Toole that her department “reevaluate” and limit the use of blast balls grenades during demonstrations.

The intense heat and potential for shrapnel from the devices couldn't be controlled and posed dangers to peaceful demonstrators, as police were using them in big crowds in confined spaces, Murphy said.

“This is contrary to our understanding of how officers have been trained to deploy blast balls, specifically so that they detonate in open areas to create greater distance between the police and a crowd,” he wrote to the chief.

The department's response, Murphy recalled, was that “with proper deployment, these were relatively harmless devices that were effective for crowd management.”

The city's Community Police Commission separately requested in 2016 “an immediate and public review” of the department's policies for blast-ball grenades after injuries were reported during several demonstrations.

“Until such time as blast balls' propensity for causing injury (including specific evidence from the past two years in Seattle), and their appropriate use given that risk, have been publicly weighed, we ask that SPD suspend their use,” the panel's co-chairs, Daugaard and the Rev. Harriett Walden, wrote in a letter to police and city officials.

“That study was not done and there's never been a response at any level,” Daugaard said this week. She said the commission repeatedly tried but failed to add policing protocols during demonstrations to the Seattle department's required reforms under a federal consent decree.

During a city council briefing Monday, Councilmember Lisa Herbold said she'd received reports that — contrary to department policy to announce dispersal orders and give warnings before using flash-bang grenades and tear gas — “people confirmed for me that their experience was that they were not receiving advance notice or receiving orders to disperse.”

OPA director Andrew Myerberg said his office is now investigating those complaints.

Case 2:12-cv-01282-JLR  Document 623-1  Filed 06/09/20  Page 47 of 71

To Daugaard, complaints about a communication breakdown between police and demonstrators is a more critical issue than concerns about flash-bang grenades or any specific police crowd-control device.

"It's not just about blast balls, it's any similar device that causes pain and feels like an attack," she said.

"Once you start using those, you're really starting to shut down other avenues that could help you accomplish a legitimate goal that protesters perhaps would help you accomplish had you effectively communicated with them."

*Seattle Times news researcher Miyoko Wolf contributed to this report.*

**Lewis Kamb:** *206-464-2932 or [lkamb@seattletimes.com](mailto:lkamb@seattletimes.com); on Twitter: [@lewiskamb](https://twitter.com/lewiskamb).*

**Exhibit K**

6/8/2020
Now isn't the time to backpedal on consent decree in Seattle as George Floyd protests unfold | The Seattle Times
Case 2:12-cv-01282-JLR Document 623-1 Filed 06/09/20 Page 49 of 71

Local News

# The Seattle Times

## Now isn't the time to backpedal on consent decree in Seattle as George Floyd protests unfold

June 1, 2020 at 6:00 am | Updated June 3, 2020 at 7:43 am



SWAT officers scatter protesters from Fourth Avenue downtown on Saturday. The protests were sparked by the killing of George Floyd, a Black man who died... (Dean Rutz / The Seattle Times) **More** ⌄

 By Naomi Ishisaka 🐦
*Seattle Times columnist*

If the events of the past week have taught us anything, it's that now is not the time to take our foot off the gas of police accountability.

The devastating death of George Floyd, a Black man who died after being pinned beneath the knee of a white Minneapolis police officer, has sparked widespread protests nationwide, including fiery confrontations between protesters and police in Seattle on Saturday night.

But while calls are growing nationwide for greater scrutiny of biased policing — particularly toward African Americans — Seattle officials are trying to go in the opposite direction. On May 7, the city and Trump's Justice Department filed a joint motion to ask a judge to find that the city had met its obligations under a 2012 consent decree and release the department from remaining oversight.

The consent decree was put in place after a federal investigation found a "pattern or practice of excessive force," and required the department to address allegations of excessive force and biased policing.

Calling the SPD a "transformed organization," the joint motion said the city had met its oversight obligations but also said that it was unable to fully address outstanding "accountability issues in this filing, because it is now confronting an unprecedented public-health crisis caused by the COVID-19 pandemic."

Isn't the midst of a pandemic — especially one that puts extraordinary stress on people experiencing homelessness and poverty, and people of color — exactly when we need more community responsiveness from the police?

After Floyd's death, Seattle Police Chief Carmen Best issued a statement saying due to the department's high level of training and commitment to de-escalation, she was confident a similar incident would not happen in Seattle. But during weekend protests, demonstrators reported that one SPD officer put his knee on a protester's neck (before another officer pushed it off); another punched a man on the ground; and a third sprayed a

young girl with chemical spray. On Monday, the SPD Office of Police Accountability reported more than 12,000 complaints filed about the Seattle police response to weekend protests. Details are still emerging, but if we're ever to know the truth of these allegations, SPD must be fully engaged and accountable.

Sadé Smith, a defense attorney and advocate based in King County, said that while the city says all the right things in public about accountability, transparency and racial justice, the promises come up empty. "What they're doing behind closed doors is undermining the very policies that make those promises a reality."

In response to the joint motion, the NAACP Seattle King County issued a statement May 11 opposing removal of consent decree oversight. "The City [of Seattle] has yet to address mechanisms in the police union contract that allow for officers … to have seemingly more rights than the citizens they are sworn to protect."



Teri Rogers Kemp, defense attorney and the co-chair of NAACP Seattle King County's police accountability committee. (Johnny Andrews / The Seattle Times)

Teri Rogers Kemp is a defense attorney and co-chair of NAACP Seattle King County's police accountability committee. She said the police department has not shown it can be answerable to the community.

"How do you trust them to do it without oversight?" she asked. "We see across the country and right here in the city and in the state, the number of Black and brown people who are overwhelmingly in danger of the use of excessive force."

To her point, a Seattle Times investigation in 2015 found that of 213 people killed by police in Washington state from 2005 to 2014, only one officer was criminally charged with illegal use of deadly force; he was later acquitted. In fact it was the only prosecution in at least 30 years. The investigation found those killed by police were disproportionately African American, and in King County, Black people were 20% of the deaths by police while only 6.3% of the population.

Since then, voters passed Initiative 940 in 2018 to remove some barriers that made it virtually impossible to prosecute police, but there remains deep concern about how it will be implemented. Then in February, Seattle police union members overwhelmingly elected a hard-line president, who said police were "under unreasonable levels of scrutiny both locally and nationwide" and led the campaign against Initiative 940.

Kemp said two recent SPD killings are putting accountability to the test. Regardless of the circumstances, she said, "We have to, as a community, begin to reject the idea that some of us don't deserve those same constitutional protections as others of us do. [That idea] was the entire premise of slavery."

Case 2:12-cv-01282-JLR Document 623-1 Filed 06/09/20 Page 51 of 71

While Floyd's death might have provided the spark for the events of the past week, we have been collecting the kindling and fuel for the flames for centuries. Systemic racism is woven into the fabric of our society and the rage, frustration and heartbreak we have seen are a result.

The systemic biases and conditions that lead to racial disproportionality in policing, excessive use of force and mass incarceration are not going to change overnight. They were years in the making and will take years to disassemble. And they are not going to go away with good intentions alone. To dismantle them will require vigilance, oversight, accountability, transparency and a willingness to take a hard look at some of the worst parts of ourselves and our systems. Weakening that oversight is a step in the wrong direction to get there.

*Naomi Ishisaka: nishisaka@seattletimes.com; on Twitter: @naomiishisaka. Naomi Ishisaka writes about race, culture and equity, through a social-justice lens. Her column appears weekly on Mondays.*

**Exhibit L**

# Office of Police Accountability
2019 Annual Report



Seattle Office of
Police Accountability

**Director Andrew Myerberg**
April 2020



# Table of Contents

**Executive Summary** ...................................................................... **1**

**Facts at a Glance** ...................................................................... **2**

**About OPA** ...................................................................... **3**
Core Functions ...................................................................... 3
Vision, Mission, & Values ...................................................................... 3
Seattle Police Accountability System ...................................................................... 4
Oversight of OPA ...................................................................... 4
Staff & Organizational Structure ...................................................................... 5
Training & Professional Development ...................................................................... 6

**Complaints** ...................................................................... **7**
Complaints Received ...................................................................... 7
Method of Complaint Filing ...................................................................... 8
Demographics of Complainants ...................................................................... 9
Employees Receiving Complaints ...................................................................... 9
Locations of Incidents Resulting in Complaints ...................................................................... 11
Allegations ...................................................................... 11

**Complaint Classification** ...................................................................... **13**
Number & Types of Complaints Classified ...................................................................... 14

**Investigations** ...................................................................... **15**
Summary of Investigations Trends ...................................................................... 15
Expedited Investigations ...................................................................... 15
Timeliness of Investigations ...................................................................... 15
Findings ...................................................................... 16

**Discipline Imposed** ...................................................................... **17**
Overturned Findings ...................................................................... 18
Summary of Disciplinary Trends ...................................................................... 19
Appeals ...................................................................... 20

**Policy & Program Development** ...................................................................... **21**
Unsubstantiated Misconduct Screening ...................................................................... 21
Mediation ...................................................................... 22
Rapid Adjudication ...................................................................... 23
Management Action Recommendations ...................................................................... 24
Reviewing SPD Policy ...................................................................... 25

**Other OPA Functions** ...................................................................... **26**
Community Engagement ...................................................................... 26
SPD Employee Engagement ...................................................................... 28
Monitoring Serious Incidents ...................................................................... 29
Bias Reviews ...................................................................... 29

# Complaints

## Complaints Received

Every contact made with OPA is documented in an electronic tracking system and reviewed to determine next steps. Communication with OPA can be initiated by anyone, including anonymously, and is accepted by whatever means it is conveyed, including in person, by phone, in a mailed letter, via email, or through the OPA web complaint form. In 2019, OPA received 928 complaints.

The number of external complaints originating from the public was consistent with the number of external complaints OPA received in 2018. In contrast, OPA experienced a reduction in the number of internally-generated complaints in 2019. Internal complaints are those either initiated by an SPD employee or forwarded from within SPD on behalf of a member of the public.



**OPA received fewer complaints against SPD employees** in 2019 than in any of the last five years

*Figure 3: Number of complaints received by year (2015-2019)*

### Data Collection

Data for this report was collected between January 28, 2020, and March 17, 2020, from OPA's records management database, IAPro. This report reflects accurate and complete data as of April 15, 2020, the date the report was published. Since OPA uses dynamic, live databases, the recorded allegation, finding, and case disposition numbers presented here are subject to future revision. Likewise, historical data presented may vary slightly from figures presented in previous OPA reports due to changes in processes and reporting.

---

9.   In April 2017, OPA began consolidating contacts that did not fall within its jurisdiction, including complaints unrelated to SPD employees, reports of criminal activity, and public disclosure requests. These contacts were not counted toward the total number of complaints for the years 2017-2019 while they were counted in 2015 and 2016. The number of contacts that were consolidated in 2019 was 771.



**Complaints initiated or forwarded from within SPD** dropped by nearly half since 2018

*Figure 4: Number of internally vs. externally submitted complaints by year (2018-2019)*

OPA can point to a new supervisor screening program—the Unsubstantiated Misconduct Screening—as a significant contributor to the decline in internal complaints received in 2019. Through the program, SPD supervisors critically review and document incidents involving potentially-refutable claims of police misconduct, then screen the incidents with OPA. Of the 242 complaints screened through the program in 2019, the OPA Director requested the supervisor forward the complaint to OPA for further investigation in 23 cases. For the remaining 219 cases, the OPA Director instructed the supervisor to thoroughly document their review. Prior to this program, there was no mechanism in place to process refutable claims, which meant virtually all the screened cases would have required OPA referrals and subsequent investigations. More information on this program and its impact can be found on page 21.

## Method of Complaint Filing

An external complaint is a complaint received directly from the public or via an intermediary, such as another City agency. There are five ways members of the public can directly file a complaint with OPA. Figure 5 shows a breakdown of the methods by which external complaints were filed in 2019.



**More than three-quarters of external complaints** were filed through web form or phone

*Figure 5: Method of external complaint filing by type (2019)*

## Demographics of Complainants

A total of 261 complainants voluntarily identified themselves in 2019.[10] Of these complainants, 88% provided their gender and 73% provided their race. The gender breakdown of complainants was 54% male and 44% female, with the remaining two percent identifying as gender non-binary. The gender of complainants was more evenly distributed than in 2018, where OPA reported 62% of complainants were male and 38% were female. The racial distribution of complainants was largely consistent with previous years; however, the number of complainants identifying as Black or African American dropped 13% over 2018. Figure 6 shows the racial distribution of complainants over the last three years.

| Race | 2017 | 2018 | 2019 |
|---|---|---|---|
| White | 61% | 55% | 58% |
| Black/African American | 29% | 36% | 23% |
| Asian/Pacific Islander | 5% | 5% | 8% |
| 2 or More | | | 5% |
| Other | | | 2% |
| Native American | 3% | 2% | 2% |
| Hispanic/Latino | 2% | 5% | 2% |

*Figure 6: Racial/ethnic distribution of complainants with known races (2017-2019)*

## Employees Receiving Complaints

A total of 1,088 employees were identified in OPA complaints in 2019. This number represents non-unique employees, with 256 employees receiving more than one complaint. Six-hundred and sixty unique employees received at least one complaint.[11] Of these, 563 (85%) were sworn employees and 97 were civilian personnel. The gender breakdown was 80% male and 20% female. Forty percent of all sworn employees and 30% of all SPD employees received at least one complaint in 2019. More than two-thirds of the 660 employees who received one or more complaints in 2019 held the rank of police officer in a non-detective assignment.[12]



**30% of all SPD employees** received at least one complaint in 2019

| | |
|---|---|
| 7 Complaints | 1 |
| 6 Complaints | 6 |
| 5 Complaints | 15 |
| 4 Complaints | 26 |
| 3 Complaints | 46 |
| 2 Complaints | 162 |
| 1 Complaint | 404 |
| Total Employees | 660 |

*Figure 7: Number of complaints received per employee (2019)*

---

10. OPA gathers data on the demographics of complainants from several sources. Anyone who files a complaint in person or via the web complaint form is asked if they would like to voluntarily disclose their race and gender to OPA. For complaints generated internally or referred from SPD, the supervisor who submits the complaint may enter the complainant's demographic information. Less frequently, OPA may collect complainant demographic data from police reports associated with the OPA complaint. Lastly, while conducting the preliminary investigation, OPA investigators ask complainants if they would like to disclose their race and gender. There are limitations to complainant demographic data. OPA's analysis suggests some complainants provide incorrect demographic information.

11. Unique refers to having only one occurrence.

12. Four-hundred and forty-three held the rank of police officer and an additional 32 held the rank of police officer detective.

| Race | Named in Complaints | Sworn | All SPD |
|------|--------------------|-------|---------|
| White | 71% | 70% | 67% |
| Asian/Pacific Islander | 8% | 7% | 9% |
| Black/African American | 7% | 8% | 8% |
| Hispanic/Latino | 6% | 6% | 5% |
| Native American | 2% | 2% | 1% |
| 2 or More | 5% | 4% | 5% |
| Unknown | 3% | 3% | 5% |

**Racial/ethnic distribution of employees receiving complaints generally correlated to that of all SPD**

*Figure 8: Comparison of racial demographics for employees (2019)*

Forty percent of employees named in 2019 complaints had been employed by SPD for less than five years. Generally, newer employees tend to receive more complaints for several reasons. For example, most new officers are assigned to patrol and regularly interact with the public, thus exposing themselves to more opportunities for complaints than officers assigned to detective or other non-patrol units. Increased hiring in recent years has also contributed to the number of newer officers working these assignments. Employees hired in 2016 made up six percent of all SPD employees yet comprised more than 12% of all employees named in OPA complaints in 2019.[13]



**Newer employees received more complaints** than employees with more experience

*Figure 9: Service seniority of employees who received complaints (2019)*

---

13. At the time of this report's publication, there were more complaints received involving employees hired in 2016 (135) than there were employees hired in that year (132). Sixty-six employees hired in 2016 received a combined total of 135 complaints in 2019. This trend was also discussed in OPA's 2018 Annual Report, as employees hired in 2016 received more complaints in 2018 than employees hired in any other year.

## Locations of Incidents Resulting in Complaints

OPA recorded the incident location in 77% of complaints received in 2019. West Precinct—which includes the downtown core, South Lake Union, Queen Anne, and Magnolia—had the highest number of incidents that resulted in an OPA complaint in 2019. The locations of incidents are mapped by police precinct in Figure 10.



| Precinct | Total |
|---|---|
| West | 241 |
| North | 182 |
| South | 116 |
| East | 93 |
| Southwest | 58 |
| Outside of Seattle | 28 |
| Total Known | 718 |

Number of incidents
0            241

*Figure 10: Known incident locations by SPD precinct resulting in complaints (2019)*

## Allegations

OPA reviews complaints and determines what SPD policy or policies are alleged to have been violated if the allegations are later determined to be true.[14] A single complaint may contain multiple allegations of misconduct against one or more officers.

OPA recorded 1,191 total allegations against SPD employees in 2019, a 52% decrease over 2018.[15] Complaints of excessive force—previously the most common allegation, making up 18% of all allegations in 2018—decreased to 11% of all allegations received in 2019. Instead, Professionalism became the most common allegation, comprising 20% of

> *A single complaint may contain multiple allegations of misconduct against one or more officers.*

all allegations received in 2019. The year-to-year change is partially attributed to the Unsubstantiated Misconduct Screening Program (discussed on page 21). Nearly eight of every 10 incidents screened through the program in 2019 involved excessive force complaints that were conclusively disproved by body-worn and in-car video.

---

14. The SPD policy manual can be found at seattle.gov/police-manual. All communications and OPA case reports shared with employees and complainants list the specific SPD policy directives investigated, but do not show their corresponding OPA allegation type.

15. OPA currently has 37 allegation types, of which 34 were used in 2019. OPA maintains and periodically revises these allegation categories for data tracking and reporting purposes. In 2019, OPA updated its allegation types based on an audit of existing allegation types, their usage, and their relevance in reporting on areas of community concern. New allegation types were created for: Crisis Intervention; Bias – Reporting; Bias – Investigation; and Force - De-Escalation. Allegation types were removed, either due to infrequent use or because they were vague or duplicative for: Chain of Command; Court Appearances; Off-duty Conduct; Tactics and Decision Making; Workplace Conduct; Complaints – Internal; and Complaints – Public.

Another reason for the decrease was a conscious effort by OPA to identify the overarching policy or procedure alleged to have been violated, rather than include each subsection within that policy as a separate allegation. This has resulted in fewer allegations, particularly duplicative ones, being added. According to research conducted by the Mayor's Office, this was an area consistently identified by officers as procedurally unjust.[16] Figure 11 shows the number and types of allegations received.[17]



*Figure 11: Allegations by type (2019)*

In addition, collective bargaining agreements no longer require that each policy subsection be identified in order for the underlying behavior implicating that policy to be investigated. OPA is now only required to provide notice of the policy title and section, which also contributes to the reduction by eliminating the need to include every relevant policy subsection.

OPA received 85% fewer Video & Audio Recording allegations in 2019 compared to 2018.[18] This corresponds to a change in SPD policy that no longer identifies these violations as requiring an OPA referral.[19] When OPA determines there is potentially a failure to record or timely activate video, it is returned to the chain of command for handling and those allegations are not classified for investigation. The only exceptions are if the officer had been previously counseled for failing to record or if the failure to record was believed to be intentional.

---

16. Email attachment from Kathryn Aisenberg to Anne Bettesworth on July 28, 2019, regarding survey data from SPD employees.

17. The 'All Other Allegations' category in Figure 11 includes: Obedience to Orders (7); Information & Communications Systems (6); Equipment & Uniform (5); Tickets & Traffic Contact Reports (5); Alcohol & Substance Use (5); Self-reporting Obligations (4); Bias - Investigation (3); Confidentiality (3); Training, Qualification & Certification (3); Secondary Employment (3); Timekeeping & Payroll (3), and; Duty to Provide Identification (2).

18. OPA counted 164 Video & Audio Recording allegations in 2018 complaints.

19. See Court Docket 563 at seattle.gov/Documents/Departments/OPA/Legislation/Dkt-563_SPD-Policy-Revisions_052319.pdf.

# Complaint Classification

After OPA receives a complaint, the case is assigned to an OPA investigator for preliminary investigation. All complaints that contain a plausible allegation of misconduct against an SPD employee undergo a preliminary 30-day investigation. This entails gathering evidence, analyzing documentation and video, and interviewing the complainant, if possible. OPA leadership reviews the preliminary investigation and determines the allegations by assessing whether any laws or SPD policies would have been violated if the alleged actions are later proven to be true. OPA leadership then classifies the complaint—which indicates how it will be processed—as one of the following within 30 days of the complaint being filed.

## Classification Types

**Contact Log:** The complaint either does not involve a policy violation by an SPD employee or there is insufficient information to proceed with further inquiry. In these instances, OPA takes no action other than recording the information and sending a closing letter to the complainant, if applicable. Examples of complaints often classified as Contact Logs include slow police response times, parking ticket disputes, issues with officers from other law enforcement agencies, and crime reports.

**Supervisor Action:** The complaint generally involves a minor policy violation or performance issue that is best addressed through training, communication, or coaching by the employee's supervisor. In these instances, OPA sends a memo requesting that the employee's supervisor take specific, relevant action with the employee. The supervisor has 15 days to complete the action and return the case to OPA for review.

**Investigation:** The allegation, if true, constitutes a serious policy violation or other category of violation that OPA is required by law and policy to investigate. In these instances, OPA conducts a comprehensive investigation, including gathering additional evidence and interviewing involved parties and/or witnesses. An investigation is followed by a recommended finding and can result in formal discipline

**Expedited Investigation:** The allegation, if true, constitutes a serious policy violation or other category of violation that OPA is required by law and policy to investigate. However, OPA, with the agreement of the OIG, determines that findings can be reached based on the preliminary investigation and no further investigation needs to be conducted. In most cases, OPA will issue a finding without interviewing the involved or witness employee(s).

## Alternative Dispute Resolution Types

**Mediation:** The complaint involves a misunderstanding or conflict between an SPD employee and a community member. Mediation is voluntary and can only occur if both parties agree to participate. It is an opportunity for the employee and community member to discuss the conflict with the guidance of a neutral, third-party mediator. If the mediator reports that the employee listened and participated respectfully, the complaint will not appear on the employee's disciplinary record.

**Rapid Adjudication:** The complaint often involves an allegation of misconduct that the employee recognizes was inconsistent with policy. The employee is willing to accept discipline in place of undergoing a full OPA investigation.

## Number & Types of Complaints Classified

OPA classified 36% of complaints for Investigation in 2019, down from 44% in 2018. The percent of complaints sent back to SPD supervisors as Supervisor Actions increased slightly from 17% in 2018 to 19% in 2019. An additional 44% percent of complaints were closed as Contact Logs, a minor increase over the 38% of complaints that were classified as Contact Logs in 2018.[20]

Of the 13 cases handled via one of OPA's alternative dispute resolution types, seven went through Mediation and six were resolved through Rapid Adjudication. Summaries of OPA's efforts to expand the Mediation and Rapid Adjudication programs are further discussed on pages 22 and 23.



**OPA classified over a third of complaints** for Investigation

*Figure 12: Complaint classification by type (2019)*



20. OPA believes this is partially due to the decrease in unfounded complaints received as a result of the Unsubstantiated Misconduct Screening program.

# Exhibit M

6/8/2020
Case 2:12-cv-01282-JLR Document 623-1 Filed 06/09/20 Page 64 of 71
As complaints pour in about police at Seattle protests, city will withdraw request that could lift federal oversight | The Seattle Times

Crime

# The Seattle Times

## As complaints pour in about police at Seattle protests, city will withdraw request that could lift federal oversight

June 3, 2020 at 4:24 pm | *Updated June 4, 2020 at 7:35 pm*



📷 **1 of 5** | Seattle Mayor Jenny Durkan and Police Chief Carmen Best made good on their promise to meet with community and protest leaders to forge a path forward. Wednesday marked the sixth day of major protests in Seattle. (Dean Rutz / The Seattle Times)

By Steve Miletich 🐦, Daniel Beekman 🐦, Melissa Hellmann 🐦 and Scott Greenstone 🐦
*Seattle Times staff reporters*

On the sixth day of major protests in Seattle over the death of George Floyd, a Black man killed by a white police officer in Minnesota, city officials announced Wednesday they would withdraw a request that could have cleared the way to lift eight years of federal oversight of the Seattle Police Department.

The dramatic change in the city's approach capped a day of pressure from political leaders, community organizers and demonstrators who called for measures such as defunding and demilitarizing Seattle police. Meanwhile, the protests showed no signs of slowing: Thousands continued to march downtown and in Capitol Hill on Wednesday to oppose police brutality and call for racial justice.

The city also announced it would end nightly curfews, which had been scheduled to remain in effect through Saturday morning.

City Attorney Pete Holmes said Wednesday he has been closely monitoring the city's response to the demonstrations and the 14,000 complaints about police officers' actions during the protests – including the use of pepper spray, flash-bang devices and tear gas against some demonstrators – that have been made to Seattle's Office of Police Accountability (OPA), the watchdog agency that conducts internal investigations.

Noting "we are about to witness the most vigorous testing of our city's accountability systems," Holmes said, "it's become clear to me that we need to pause before asking U.S. District Judge James Robart to terminate" a key portion of a 2012 federal consent decree "so that the City and its accountability partners can conduct a thorough assessment of SPD's response to the demonstrations."

The city last month, in a motion filed jointly with the U.S Department of Justice, had asked Robart to find the city had met the requirements of a two-year period to show it has remained in compliance with the consent decree. The city cited the need to recognize the department's widely praised efforts to address Justice Department allegations of excessive use of force and biased policing and shift badly needed resources to the coronavirus crisis.

Before Holmes' announcement, Seattle City Council President M. Lorena González told The Seattle Times on Wednesday that she supported withdrawing the motion, saying much had changed since Floyd's killing.

"The sheer volume of … complaints that are flowing from the Police Department's response and management of these demonstrations is reason enough for the city to take a step back," González said.

Seattle Mayor Jenny Durkan said in a Seattle City Club interview Wednesday that she agreed with the decision to withdraw the city's request. She had supported the motion last month and since then. But she said Wednesday, "We need to take a pause … With what's going on right now, we need to engage more people."

She said in a statement Wednesday that the motion was not filed with the intent to end the consent decree.

But if approved, the request would have opened the door for the city to ask Robart to be released from oversight, while leaving it unclear how it planned to address his concerns.

The city still needs to address issues Robart flagged a year ago regarding the city's contract with the Seattle Police Officers Guild (SPOG), Durkan said. The judge cited an appeal process that allowed an arbitrator to lift the firing of an officer who had punched a handcuffed woman who had kicked him. A King County judge later reinstated the firing at the city's request.

Durkan pointed to a May 29 open letter from SPOG as a hopeful sign toward seeking consensus. It condemned the killing of Floyd, saying there was "no law enforcement or self-defense rationale" for the prolonged use of the officer's knee on Floyd's neck captured with cellphone video.

The letter said SPOG, which represents more than 1,200 officers and sergeants, recognizes that all police officers, possibly for years to come, will be held accountable.

Guild President Mike Solan said Wednesday that he is on record saying he will "meet with anyone at any time."

But Solan said he didn't have time to elaborate since he had been working long days protecting the community.

"I'd be happy to talk at a later time," he said in an email, when the Police Department's emergency staffing has ended and "law [and] order is restored."

## Calls to defund

In a video news conference Wednesday morning, City Councilmember Kshama Sawant, community leader Nikkita Oliver and other advocates called for the consent decree to remain in effect and criticized a "militarized" response to mostly peaceful protests. They said half the city's police budget should be redirected to youth programs, affordable housing, health care and other uses.

The Police Department's budget is more than $400 million this year, accounting for about a quarter of Seattle's general-fund spending. The city has projected a budget gap of $300 million this year, due to tax revenue streams reduced by coronavirus-caused business shutdowns.

"There is absolutely no reason for police forces to be marching through the streets with military-grade equipment," Oliver said in the news conference.

Similar themes dominated a meeting later Wednesday where Durkan and Seattle Police Chief Carmen Best sat down with protest leaders and longtime community activists, including Oliver, at City Hall.

Outside the meeting, in the late afternoon, thousands of people wearing face masks stood on the sidewalks or sat in the streets. Cardboard signs with such phrases as "White silence=violence" and "One bad apple spoils the bunch" sat on their laps as they listened to speakers on the City Hall steps. In between, the sea of people chanted in unison, "Black Lives Matter!"

"With destruction, we will rebuild it as it's supposed to be," said 20-year-old protester Jordan Davis-Miller as the crowd cheered.

When Oliver and Durkan emerged from the meeting, Oliver listed the protesters' demands, which included cutting the city police budget in half and investing in communities, affordable housing and alternatives to incarceration.

In response, Durkan addressed the crowd by acknowledging that they stood on Duwamish lands "and that all we have was actually taken," she said. When Durkan mentioned "the death that happened in Minneapolis," the crowd drowned out her speech for several minutes with demands that she "say his name."

"I know as mayor, I have enormous privilege," Durkan told them. "And that my ancestors came here from Ireland to seek freedom, but that many Black Americans ancestors' came here in shackles, stolen from their lands," Durkan said. A protestor shouted: "But what are you going to do?"

"True public safety does not come from police. True public safety comes from access to health care, in education justice, and good paying jobs, and respect and dignity, and making sure that we do have more progressive taxation," Durkan said.

When Durkan returned to her meeting, Oliver told the crowd the mayor had not addressed the demands.

At a Seattle City Council public safety committee meeting, also on Wednesday, Sawant said she intends to bring forward a proposal that would cut the police budget. She also wants to ban Seattle's use of chemical weapons and rubber bullets.

Hours earlier in the meeting, public commenters described being terrorized by police during the protests and urged the council to make sweeping changes. A middle school teacher said her students wanted to participate

in the protests but were too scared of the police. A nurse described officers ratcheting up tensions by massing in riot gear. A father described tear gas seeping into his Capitol Hill home.

Councilmember Dan Strauss said using military-grade weapons in response to protesters throwing water bottles is disproportional force.

In an exchange between Sawant and Best, Best said SPD's crowd-management policies were developed under the "watchful eye" of the federal government and approved by the Department of Justice and courts.

For hours each day and night, Seattle police have allowed nonviolent protests to proceed, she said, blaming the chaos that also has erupted each night on bad actors hurling concrete, fireworks and feces at officers.

Durkan said in the Seattle City Club interview Wednesday evening that some changes may need to be made to police tactics for demonstrations, particularly later at night.

"In the peaceful protests, we've done really well," the mayor told Civic Cocktail host Joni Balter.

"But what we've seen is at the end of the night, when people need to disperse, we need to work on how we do it, because it has not ended well any night," she added.

Seattle's current crowd-management policies went through a court-approval process as part of the city's consent decree, Durkan said. But it's become clear another from the Police Department's independent Office of the Inspector General is needed, she said.

"There's a huge amount of distrust in the community," she said. "We've got to get better at de-escalating that."

Hundreds of protesters had gathered again in Cal Anderson Park in the early afternoon, feet from the intersection of 11th Avenue and Pike Street where on Monday and Tuesday night police deployed flash-bang devices and tear gas to disperse protesters.

Emi Nakamura, a music teacher at Leschi Elementary, was out for the second time this week, handing out bags filled with water bottles, bandages, eye drops and alcohol pads in front of a van with the words "medic + food" on it. She said some of her students, all fifth grade or younger, have even been out at the protest.

Each time she's gone out to protest, she's gone home when the sun goes down — but she's determined to keep coming out until something changes.

"I fully believe we'll be keeping up these protests until the day police reform, or are defunded, or even abolished," Nakamura said. "We've been waiting a long time."

After 2, the march began. Marchers in the front led the crowd down Broadway, where cars swerved or turned around as the streets were filled with marchers. When they got to Union Street, the leaders of the march looked back at the crowd, which stretched more than two full city blocks. Everyone cheered.

"Yo, we (expletive) did that," one organizer laughed.

She and others began chanting, "Whose streets? Our streets!"

**Steve Miletich:** *206-464-3302 or smiletich@seattletimes.com; on Twitter: @stevemiletich.*

**Daniel Beekman:** *206-464-2164 or dbeekman@seattletimes.com; on Twitter: @dbeekman. Seattle Times staff reporter Daniel Beekman covers Seattle city government and local politics.*

Case 2:12-cv-01282-JLR   Document 623-1   Filed 06/09/20   Page 68 of 71

***Melissa Hellmann:*** *206-464-2168 or* *mhellmann@seattletimes.com*; *on Twitter:* *@M_Hellmann*. *Seattle Times staff reporter Melissa Hellmann covers South Seattle and South King County with a focus on marginalized communities.*

***Scott Greenstone:*** *sgreenstone@seattletimes.com*; *on Twitter:* *@evergreenstone*.

The Seattle Times occasionally closes comments on particularly sensitive stories. If you would like to share your thoughts or experiences in relation to this story, please email the reporter or submit a letter to be considered for publication in our Opinion section. You can read more about our community policies here.

# Exhibit N

## Thompson, Anna M.  (SEA)

**From:**            Merrick Bobb <merrickbobb@gmail.com>
**Sent:**            Thursday, June 4, 2020 1:45 PM
**To:**              Perez, David A. (SEA)
**Subject:**         Fwd: Monitoring Team Budget


---------- Forwarded message ---------
From: **Cowart, Kerala T** <Kerala.Cowart@seattle.gov>
Date: Fri, May 15, 2020 at 11:21 AM
Subject: Monitoring Team Budget
To: Merrick Bobb <merrickbobb@gmail.com>, Bobb, Merrick <merrickbobb@parc.info>
Cc: Holmes, Peter <Peter.Holmes@seattle.gov>


Merrick,

I am writing to respond to the proposal that you made by phone on May 11. The City agrees to a monitoring budget of no more than $30,000 per month through the end of June. Taking into account the nature of the work items remaining and the City's current financial outlook, the City cannot agree to extend the timeline past the end of June without a ruling from the Court. To the extent the work items include activity by approved monitoring team members, such as Ron Ward and Jeffrey Yamson, the City has no objection. Joseph Goldhammer, however, is not an approved member of the monitoring team, and as the City has previously stated, it does not approve his addition.  Please send a revised work plan and proposed budget within these parameters for our final review.

Best,

Kerala



   **Kerala T. Cowart**

               Assistant City Attorney

Seattle City Attorney's Office

Civil Division

701 Fifth Avenue, Suite 2050

Seattle, WA 98104-7097

Phone: 206-733-9001

FAX:  206-684-8204

kerala.cowart@seattle.gov

**CONFIDENTIALITY STATEMENT:** This message may contain information that is protected by the attorney-client privilege, the attorney work product doctrine, or by other confidentiality provisions.  If this message was sent to you in error, any use, disclosure, or distribution of its contents is prohibited.  If you receive this message in error, please contact me at the telephone number or e-mail address listed above and delete this message without printing, copying, or forwarding it.  Thank you.

--
Merrick J.Bobb
Police Assessment Resource Center (PARC)
P.O. Box 27445
Los Angeles, California 90027-0445
merrickbobb@parc.info
(213) 623-5757