EXHIBIT 1

City Council Ordinance No. 126102

# SEATTLE CITY COUNCIL

600 Fourth Ave. 2nd Floor
Seattle, WA 98104

## Legislation Details (With Text)

| | | | |
|---|---|---|---|
| **File #:** | CB 119805 **Version:** 2 | **Name:** | CB 119805 |
| **Type:** | Ordinance (Ord) | **Status:** | Passed |
| | | **In control:** | City Clerk |
| **On agenda:** | 6/15/2020 | | |
| **Final Action:** | 6/26/2020 | **Ord. No.** | Ord 126102 |
| **Title:** | AN ORDINANCE relating to the Seattle Police Department; banning the ownership, purchase, rent, storage, or use of crowd control weapons; and adding a new Section 3.28.146 to the Seattle Municipal Code. | | |
| **Sponsors:** | Kshama Sawant | | |
| **Indexes:** | | | |
| **Attachments:** | 1. Att 1: Less Lethal Weapons in Protests, OIG for Public Safety, 2. Summary and Fiscal Note, 3. Central Staff Memo, 4. Proposed Amendment 1, 5. Proposed Amendment 1 as modified (added; 6/15/20), 6. Proposed Amendment 2 | | |

| Date | Ver. | Action By | Action | Result |
|---|---|---|---|---|
| 6/26/2020 | 2 | City Clerk | attested by City Clerk | |
| 6/26/2020 | 2 | Mayor | returned | |
| 6/26/2020 | 2 | Mayor | returned unsigned | |
| 6/19/2020 | 2 | City Clerk | submitted for Mayor's signature | |
| 6/15/2020 | 1 | City Council | passed as amended | Pass |
| 6/8/2020 | 1 | City Council | referred | |

## CITY OF SEATTLE

### ORDINANCE _____

COUNCIL BILL _____

AN ORDINANCE relating to the Seattle Police Department; banning the ownership, purchase, rent, storage, or use of crowd control weapons; and adding a new Section 3.28.146 to the Seattle Municipal Code.

WHEREAS, The City of Seattle supports the right to freedom of speech and freedom of assembly as essential

democratic rights; and

WHEREAS, on May 25, 2020 officers of the Minneapolis Police Department brutally killed George Floyd,

while he was handcuffed and in their custody; and

WHEREAS, in Seattle and in cities across the country, people joined a protest movement against this and other

police violence, particularly protesting the police violence disproportionately targeting African

File #: CB 119805, **Version:** 2

American people; and

WHEREAS, in Seattle, tens of thousands of community members have joined mass demonstrations for black lives and against police violence on May 30, 2020 and on subsequent days; and

WHEREAS, the SPD has responded to these protests against police violence with crowd control weaponry including lachrymator agents commonly known as tear gas and pepper spray and explosive devices such as blast balls and stun grenades; and

WHEREAS, Seattle's Office of Professional Accountability reported on June 3, 2020 that they had received 15,000 complaints of police misconduct related to the SPD's response to these protests; and

WHEREAS, testimony from protestors and other protest witnesses, along with complaints filed with the Office of Police Accountability suggests that some SPD officers were instigating and escalating violent confrontations with these protests; and

WHEREAS, the use of tear gas in war is banned by the Chemical Weapons Convention of 1993, which set forth agreements signed by nearly every nation in the world, including the United States; and

WHEREAS, infectious disease experts warn that the use of tear gas and other lachrymator agents will increase the spread of COVID-19; and

WHEREAS, research shows that tear gas increases the risk of respiratory infection; and

WHEREAS, an open letter signed by over 1,000 healthcare professionals opposes, "any use of tear gas, smoke, or other respiratory irritants, which could increase risk for COVID-19 by making the respiratory tract more susceptible to infection, exacerbating existing inflammation and inducing coughing"; and

WHEREAS, studies into the impacts of policing at protests have determined that escalating force by police at protests leads to increasing violence; and

WHEREAS, during public comment at the Seattle City Council meeting on June 1, 2020, and the meeting of the Council's Public Safety and Human Services Committee on June 3, 2020, members of the public attested to being prevented from joining George Floyd protests out of fear of violence at the hands of

File #: CB 119805, **Version:** 2

the Seattle Police Department; and

WHEREAS, a June 1, 2020 release from the Seattle Office of Professional Accountability notes that

misconduct complaints stemming from the George Floyd protests include:

  i.    Pepper spraying a young girl;

  ii.   Punching a person on the ground who was being arrested;

  iii.  Placing a knee on the neck area of two people who had been arrested;

  iv.   Covering up badge numbers;

  v.    Failing to record law enforcement activity on body-worn video;

  vi.   Pepper spraying peaceful protesters;

  vii.  The use of flashbangs, including causing a significant thumb injury;

  viii. Failing to secure rifles in the rear of a patrol vehicle;

  ix.   Punching a person on the ground who was being arrested; and

  x.    Officers breaking windows of a Target store; and

WHEREAS, a June 5, 2020 letter to Mayor Durkan and Chief Best from the Seattle Office of Police

Accountability, Seattle Community Police Commission, and Seattle Office of the Inspector General for

Public Safety recommends the immediate cessation of CS gas, otherwise known as tear gas; and

WHEREAS, the Office of the Inspector General in a June 12, 2020 Report, Attachment 1 to this ordinance,

notes "In its preliminary research, OIG did not find credible external sources advocating a blanket ban,"

and that "This summary is a preliminary report, as OIG is continuing to gather and synthesize

information about use of crowd management tools by SPD. Analysis of the sufficiency and

appropriateness of SPD policy and training related to crowd management will be a forthcoming

product";

NOW, THEREFORE,

**BE IT ORDAINED BY THE CITY OF SEATTLE AS FOLLOWS:**

Section 1. A new Section 3.28.146 of the Seattle Municipal Code is added to Subchapter I of Chapter 3.28 as follows:

**3.28.146 Prohibition of the use of crowd control weapons**

A. Unless exempted or excepted, no City department shall own, purchase, rent, store or use crowd control weapons.

B. Law enforcement agencies operating under mutual aid agreements are prohibited from using crowd control weapons while rendering aid to the Seattle Police Department. Seattle Police Department mutual aid agreements for crowd control must prohibit other law enforcement agencies from using crowd control weapons for the purpose of crowd dispersal.

C. As used in this Section 3.28.146, "crowd control weapons" means kinetic impact projectiles, chemical irritants, acoustic weapons, directed energy weapons, water cannons,     disorientation devices, ultrasonic cannons, or any other device that is designed to be used on multiple individuals for crowd control and is designed to cause pain or discomfort.

D. Oleoresin capsicum (OC) spray is not a crowd control weapon for purposes of owning, purchasing, renting, or storing under subsection 3.28.146.A. Use of OC spray is prohibited under subsection 3.28.146.A if:

1. It is used in a demonstration, rally, or other First Amendment-protected event; or

2. When used to subdue an individual in the process of committing a criminal act or presenting an imminent danger to others, it lands on anyone other than that individual.

E. A person shall have a right of action against the City for physical or emotional injuries proximately caused by the use of crowd control weapons for crowd dispersal that occur after this ordinance takes effect.

F. Absent evidence establishing a greater amount of damages, the damages payable to an individual for injuries proximately caused in violation of this Section 3.28.146 shall be $10,000,  added to attorney fees and

court fees. This does not preclude any other legal recovery or process available to a person under federal and state law.

Section 2. Consistent with the advisory roles established in the Accountability Ordinance (Ord. 125315), subsection 3.29.030.B, the Office of the Inspector General for Public Safety, the Office of Police Accountability, and the Community Police Commission are each requested to make a formal recommendation to the City Council on whether the Seattle Police Department should be reauthorized to use less-lethal weapons for crowd dispersal purposes.  The recommendation shall include: 1) suggested policy revisions to the Seattle Police Department manual for use of less-lethal weapons for the purpose of crowd dispersal; and 2) identification of a crowd dispersal authorization process that requires Executive approval and reflects best practices in policing to minimize harm to protesters.  The recommendation shall be provided no later than August 15, 2020.

Section 3. In accordance with United States of America v. City of Seattle, 12 Civ. 1282 (JLR), during the pendency of the consent decree Council requests that notice of this action be submitted by the City Attorney to the Department of Justice, the Court, and the Monitor.

Section 4. Council will engage with the Labor Relations Director and staff as they work with the City's labor partners in the implementation of this prohibition.

Section 5. This ordinance shall take effect and be in force 30 days after its approval by the Mayor, but if not approved and returned by the Mayor within ten days after presentation, it shall take effect as provided by Seattle Municipal Code Section 1.04.020.

Passed by the City Council the _____ day of _____, 2020, and signed by me in open session in authentication of its passage this _____ day of _____, 2020.


_____

**File #:** CB 119805, **Version:** 2

President _____ of the City Council


Approved by me this _____ day of _____, 2020.


_____

Jenny A. Durkan, Mayor


Filed by me this _____ day of _____, 2020.


_____

Monica Martinez Simmons, City Clerk


(Seal)


Attachment 1: Less Lethal Weapons in Protests, Office of the Inspector General for Public Safety, June 12, 2020

EXHIBIT 2

June 12, 2020 Informational Summary Report of Office of Inspector General for
Public Safety



PO Box 94764
Seattle, WA 98124-7064
www.seattle.gov/oig
(206) 684-3663

June 12, 2020

## Less Lethal Weapons Usage in Protests

*Informational Summary of Less Lethal Weapons Used by the Seattle Police Department During Mass Demonstrations (5/29/2020 – 6/7/2020)*

---

### Objective

This document provides an informational summary of less lethal weapons used by the Seattle Police Department (SPD) at recent mass demonstrations in Seattle, covering the period of 5/29/2020 to 6/7/2020. It includes information on the purpose and function of each tool, SPD policies governing its use, and, where applicable, information from credible external sources on potential health impacts or use limitations.[1] This summary is a preliminary report, as OIG is continuing to gather and synthesize information about use of crowd management tools by SPD. Analysis of the sufficiency and appropriateness of SPD policy and training related to crowd management will be a forthcoming product.

Time constraints and a desire to prioritize the weapons of most immediate public concern mean that this initial document is not an exhaustive list of all possible less lethal devices available to the department. For example, this report does not discuss TASERs, batons, or the full extent of tools available to SWAT when addressing barricaded subjects or other unusual, hostile situations.

### Purpose of Less Lethal Weapons

SPD describes the purpose of less lethal weapons as follows:

> *Less-lethal tools are used to interrupt a subject's threatening behavior so that officers may take physical control of the subject with less risk of injury to the subject or officer than posed by greater force applications.[2]*

In short, less lethal weapons are intended to reduce the need for greater (lethal) use of force. In an ordinary patrol capacity, less lethal weapons offer alternatives to higher levels of force that might otherwise be necessary to protect persons or take control of a dangerous situation. Officers must have an individualized rationale to justify each application of this force. In a crowd management context, the rationale is more generalized

---

[1] By "credible", OIG refers to sources relying on published scientific evidence, organizations that are widely considered to be standard-setting in the field of policing, and information published directly by manufacturers of the weapons discussed in this report. The list of sources is not exhaustive given the limited time in preparing this report; however, the sources reviewed by OIG appeared to be in alignment.

[2] Seattle Police Department, "SPD Manual 8.300 – Use of Force Tools", last modified 9/15/2019.



**Seattle** Office of **Inspector General**

and force used by officers may impact bystanders and other not involved in violent or riotous action.

Less lethal weapons come in a variety of forms, including chemical agents, conducted electrical weapons, impact weapons (such as batons), and impact projectiles. The SPD manual requires all officers to carry at least one less lethal weapon. In general, officers are not permitted to carry and use a less lethal weapon unless they are trained and certified in its use. The manual discourages the use of improvised weapons, such as nearby debris, except in the case of "exigent circumstances."

Distinguishing between the less lethal weapons available to patrol officers and additional specialized less-lethal weapons available to the Special Weapons and Tactics (SWAT) unit is important when discussing force options and criteria. The training and certification required of SWAT officers is extensive and not comparable to that required of patrol. Use of less lethal weapons by SWAT in their ordinary operations provides options, other than lethal force, to address incidents like barricaded individuals and hostage situations.

Under normal circumstances, only SWAT is authorized and trained in deploying CS gas (tear gas), and only SWAT is authorized to use the 40mm less lethal launcher in crowd management situations. Chief Best temporarily authorized use of CS canisters and the 40mm launcher by patrol officers for the mass demonstrations occurring between 5/31/2020 and 6/5/2020, citing shortages in other less lethal tools such as blast balls and OC spray.[3]

### General Criteria for Use of Less Lethal Weapons

Much of the criteria for the use of less lethal weapons distills down to a subjective assessment by the involved officer that the use of the weapon is necessary to prevent harm to the officer or the public.

Excerpts of SPD policy are provided in Appendix B, and readers will find the phrase "reasonable, necessary, and proportional" repeated multiple times as thresholds for the use of less lethal tools. These factors apply to all uses of force by SPD. The reasonableness requirement is based on Supreme Court case law,[4] and the necessary and proportional requirements adopted by SPD are policy choices that go beyond legal requirements. However, it is important for non-police readers to know that officer decision-making on these factors is judged against the information known and understood by the officer using the force *at the time of the force*, rather than 20/20 hindsight. The manual – and case law –

---

[3] Seattle Police Department, "Memorandum – Policy 8.300 – POL (5) and POL 11 (13) – 40mm Launcher and Policy 8.300-POL 5" (5/31/2020).
[4] Graham v. Connor, 490 U.S. 386 (1989)



does not expect police officers to be omniscient, but it does require them to use their best judgment in making a force decision.

Similarly, the SPD manual cites a "life safety emergency" as criteria for the use of less lethal weapons in crowd management situations. This is based on the information known to, and interpreted by, officers on the scene.[5]

Police officers analyze potential threats to safety based on their training and experience, which is different from that of an average person. For this reason, force decisions made by police officers may not align with community interpretation of the same event, and thus the actions taken by the police may not align with community expectations. The degree of that dissonance could be alleviated by changes to the guidance and/or training provided to officers, ensuring adherence to proper policy and training, and/or instituting limitations that align with community desire.

### General Guidance on Use of Less Lethal Weapons

In its preliminary research, OIG did not find credible external sources advocating a blanket ban on the use of less lethal weapons either in general patrol operations or crowd control. In the absence of less lethal options, officers may rely on greater use of lethal force to respond to threats to their or others' safety. The International Network of Civil Liberties Organizations (INCLO) wrote in 2018 that "the lawful exercise of the use of force by policing institutions is a key component in protecting and promoting the rights to protest."[6] However, INCLO goes on to note that the use of force in the context of protests "remains of utmost concern" due to the number of deaths and injuries. It provides the following general guidance:

> *The disproportionate use of force is a complex problem and is due to several factors, including: limited and insufficient training; inadequate and outdated norms and protocols for intervention; deficiencies in the preparation and design of operational plans; problems in institutional design; the absence of functioning internal and external oversight mechanisms; and, in some occasions, deficiencies in the crowd-control equipment and weapons used.*

> *Force in the context of protests should only be used to protect the right to life and the physical integrity of protesters, bystanders, and police officers, and it must always comply with the principles of: legality, necessity, proportionality, precaution, non-discrimination and accountability.*

---

[5] Seattle Police Department, "SPD Manual 14.090 – Crowd Management" last modified 11/01/2018.
[6] International Network of Civil Liberties Organizations and the International Human Rights Clinic of the University of Chicago Law School, "Defending Dissent; Towards State Practices that Protect and Promote the Rights to Protest" (2018), 74.



*Proper training, tactics, and equipment are all needed to ensure that unlawful and disproportionate force is not used. Precautionary measures should be taken during preparation for an event to ensure the use of force does not become necessary. This includes training officers to exercise good judgment and improve their communication and de-escalation skills.[7]*

OIG includes the full list of recommendations from the 2018 INCLO report in Appendix A.

OIG also reviewed the Crowd Management Concepts and Issues paper developed by the International Association of Chiefs of Police (IACP). In it, the IACP offered general guidance on the use of force in crowd management situations:

*Prior to deployment, all personnel engaged in crowd management or control should be made aware of the ground rules for the use of force as part of their briefing and any terms that may have been negotiated between law enforcement and demonstration organizers. Officers providing support from other agencies should always be briefed on policies related to use of force and crowd control. The fact that some individuals in a crowd have engaged in unlawful conduct does not normally provide blanket grounds for use-of-force countermeasures, crowd dispersal, or declaration of an unlawful assembly. When lines of communication have been maintained between event organizers or leaders and a law enforcement liaison, it is sometimes possible to negotiate a resolution to the situation. Given such situations, many crowds tend to become self-enforcing to ensure that they can continue to assemble and convey their message.[8]*

## Information on Specific Less Lethal Weapons Used in Recent Demonstrations by SPD

For the remainder of this memo, OIG will provide a summary of each weapon, the guidance provided by SPD for its use, and any external guidance or recommendations that OIG identified in its preliminary research.

### Oleoresin Capsicum (OC) Spray

<u>Overview of Weapon and Purpose</u>

OC spray distributes a substance that causes an intense burning sensation of the skin, eyes, and mucous membranes. It is often called "pepper spray" because the active ingredient (capsaicin) is derived from peppers (capsicum).

OC spray works by pressurizing an oily liquid containing capsaicin. When the trigger is pulled, the liquid is discharged as an aerosolized spray that is hard to remove, except with a degreasing agent such as baby shampoo. Immediate effects include skin and eye pain, and extensive eye-watering or temporary blindness. The full effect can generally last

---

[7] International Network of Civil Liberties Organizations and the International Human Rights Clinic of the University of Chicago Law School, "Defending Dissent; Towards State Practices that Protect and Promote the Rights to Protest" (2018), 74.
[8] International Association of Chiefs of Police, "Crowd Management" (2019), 6.



approximately half an hour, but secondary effects, such as coughing, may last several hours. Individuals who already have compromised respiratory systems, such as individuals with asthma or who are recovering from respiratory-related illness, may experience more severe effects.

The SPD manual warns that

> *When inhaled (secondary exposure), the respiratory tract will likely become inflamed and temporarily restrict breathing to short, shallow breaths. The individual may experience choking, gagging, gasping for breath, or, on rare occasion, unconsciousness. The individual may experience nausea, lung pain, or temporarily impaired thought processes. The individual may become disoriented or lose his or her balance.[9]*

<u>Summary of SPD Policy on Use</u>[10]

During normal patrol operations, officers can use OC spray for officer protection if the officer can justify the force as reasonable, necessary, and proportional. Officers must issue a warning when possible and must document and justify each separate spray. Officers are not required to issue a warning if the officer believes that doing so would compromise the safety of the officer or others. However, in this case, the officer must document the reason for this belief in their use of force statement. OC is widely accepted and used as an intermediate force option in patrol operations when dealing with combative subjects.

During a crowd control event, the incident commander can authorize the use of OC spray if the commander believes that there is an immediate life safety emergency. A lieutenant can also issue this authorization if there is not time to contact the incident commander. The policy instructs a warning to be given if possible, and for officers to direct OC spray away from individuals who are not causing a safety risk or damaging property, if possible.

Officers are required to assist individuals with decontamination and medical aid as soon as reasonably possible.

There is also a policy describing how the department's inventory of OC spray is tracked, maintained, and disbursed, which we do not describe here.[11] Issues related to this policy will be fully addressed in future analysis.

<u>Training and Certification</u>
The SPD manual states that officers will be trained and certified in the use of OC spray every two years.

---

[9] Seattle Police Department, "SPD Manual 8.300-POL-5 Use of Force – Oleoresin Capsicum (OC) Spray". Last modified 9/15/2019.
[10] Ibid.
[11] Seattle Police Department, "SPD Manual 8.310 OC Spray Chain of Custody". Last modified September 2015.



The SPD Training Section notes that the minimum recommended distance for use is between three and twelve feet, depending on the type of spray used (MK-4, MK-9, and MK-46).[12]

<u>Prior Recommendations to SPD on Crowd Management Use of this Weapon</u>
In 2015, the Community Police Commission (CPC) issued the following suggestion to SPD:

> *As we discussed in our May 13 meeting, current SPD policy with regard to use of projectiles and pepper spray in crowd management and demonstration situations either provides insufficient guidance to officers about when these tools should be used, or they appear to be used frequently outside of policy. Demonstrators and observers described instances where peaceful demonstrators who posed no threat and were dispersing were sprayed with pepper spray, and the same can be observed in a variety of videos. Use of blast balls in the immediate vicinity of a mass of demonstrators was reported, and we saw on May Day that these projectiles cause significant and painful injury. The CPC suggests that policy in this area requires immediate review, public discussion and clarification, so that individuals participating in free speech and assembly do not feel that they risk serious physical injury just by showing up to participate in a march.[13]*

<u>External Guidance On Potential Health Impacts or Crowd Management Use Limitations</u>
OIG reviewed *Lethal in Disguise: The Health Consequences of Crowd Control Weapons*. This report, published in 2016, is a joint product by INCLO and Physicians for Human Rights. The report reviewed 31 studies published between 1993 and 2000 examining the health impact of chemical irritants, including CS and OC.

In addition to noting the health effects described above and identifying studies citing evidence of more severe injuries, the report advises that

> *Chemical irritants, especially those deployed in gas forms, are inherently indiscriminate and can impact not only the intended targets but also other demonstrators, bystanders, neighborhood businesses and residences, and law enforcement officers themselves [...] because of the indiscriminate nature of chemical irritants, limiting the exposure to individuals or small groups is difficult while exposing large and diverse groups to the weapons poses the risk of widespread injuries, including to potentially vulnerable people.[14]*

The Police Executive Research Forum (PERF) issued a report on the use of less lethal weapons in February 2020. This report observes that OC spray tends to spread across wide

---

[12] Seattle Police Department, "2020 Blast Ball 040620". Last modified 4/6/2020.
[13] Community Police Commission, "RE: SPD Response to Post-Ferguson and Black Lives Matter Demonstrations" (May 19, 2015).
[14] International Network of Civil Liberties Organizations and Physicians for Human Rights, "Lethal in Disguise – The Health Consequences of Crowd-Control Weapons" (2016), 51.



areas and, depending on environmental factors, may affect both officers and the intended subject. The report cites some departments who rely on OC spray as an effective less lethal weapon, particularly in combination with other tools such as a polycarbonate shield, but adds that many departments believe it is not effective on individuals who are under the influence of substances or in mental health crisis.

The IACP Crowd Management Concepts and Issues paper suggests that

> *OC should not be used indiscriminately against groups of people; in demonstrations or crowds where bystanders or other officers would be unreasonably affected; or against passively resistant individuals. High-volume OC delivery systems (such as MK-9 and MK-46) are designed for and can be used in civil disturbances against groups of people engaged in unlawful acts or endangering public safety and security, with approval of the IC [incident commander]. A warning should be issued prior to the use of these systems, whenever reasonably possible.*"[15]

## Blast Balls

### Overview of Weapon and Purpose

A blast ball is a less lethal grenade that, in addition to creating a large bang and flash, may release rubber balls. Some types of blast balls also contain OC or CS. Blast balls that contain rubber balls, OC, or CS may spread their payload over a fifty-foot radius, per one manufacturer. SPD training materials indicate that officers are trained to use blast balls with and without OC.[16]

Blast balls are designed to create pain compliance, temporary distraction, or disorientation. One manufacturer states that blast balls are "generally reserved as a last selection when chemical agents and less lethal impact munitions have not resolved the disorder or routed the crowd."[17]

A blast ball is not the same thing as an NFDD (noise flash diversionary device), also referred to as a "flash bang" grenade. Per SPD, only SWAT is authorized to use flash bangs. SWAT reported to OIG that no flash bangs were used in the recent demonstration responses.

### Summary of SPD Policy on Use In Crowd Control

---

[15] International Association of Chiefs of Police, "Crowd Management" (2019), 7.
[16] Seattle Police Department, "2020 Blast Ball 040620". Last modified 4/6/2020.
[17] Defense Technology, "Technical Specifications – Stinger® Grenade Rubber Pellet RP, RP/CS & RP/OC", accessed 6/10/2020, https://www.defense-technology.com/on/demandware.static/-/Sites-DefenseTech-Library/default/dw4b6d9f56/product-pdfs/Stinger%20Grenade.pdf



**Seattle** Office of
**Inspector General**

SPD policy states that blast balls may only be used when the force is reasonable, necessary, and proportional. When feasible, officers should wait until a dispersal order has been issued to the crowd, the crowd has been given time to comply, and a supervisor has authorized the deployment. The policy also instructs officers to avoid using blast balls near people who are not posing a risk to public safety or property, if possible. However, the policy allows for officers to deploy blast balls on their own (without a warning or supervisor approval) to address an imminent risk of harm to a person, or significant property damage. Officers may use an underhand throw or overhand throw, depending on the need for distance and any obstacles in the way.

Officers must report the use of blast balls as a use of force and must re-evaluate (and document) the reason for each subsequent use after the initial deployment. The policy requires officers to request and/or render medical aid as soon as reasonably possible for individuals injured by a blast ball deployment.

Training and Certification
The SPD manual states that only officers who have completed department blast ball training are permitted to deploy blast balls. Officers are only allowed to use department-issued blast balls.

The Training Section instructs officers that "absent exigent circumstances, Officers shall not use chemical agents or less-lethal munitions to overcome passive resistance by non-violent and/or peaceful protestors".[18]

Prior Recommendations to SPD on this Weapon
The CPC recommendation cited in the OC spray portion of this report also encompasses blast balls.

The Office of Police Accountability (OPA) issued a Management Action Recommendation (MAR) in 2015 (2015OPA-0643) about blast balls. The MAR addresses concerns regarding use of blast balls in proximity to individuals and overhand use of blast balls.

> *Use of Rubber Blast Ball Grenades (blast-balls): OPA recommends that SPD re-evaluate how and under what circumstances officers use blast-balls as a means of moving or dispersing crowds of people. The evidence from May Day 2015 indicates that, while highly effective in getting people to move, the ball-blasts create fear and panic when detonated. Additionally, blast-balls deployed by SPD officers exploded in extremely close proximity to people, not all of whom were engaged in destruction of property or posed a threat to public safety. This is contrary to our understanding of how officers have been trained to deploy blast-balls, specifically so that they detonate in: open areas to create greater distance between the police*

---

[18] Seattle Police Department, "2020 Blast Ball 040620". Last modified 4/6/2020.



*and a crowd. Of particular concern, some SPD officers tossed blast-balls over the heads of those immediately in front of them so the explosive devices landed in the middle of a crowd. Because the initial detonation of a blast-ball separates a hard metal fuse device from its rubber base, there is a possibility of the metal fuse acting as shrapnel and causing serious injury to someone in close proximity when it separates. In addition, deployment of blast-balls at the feet of people or into a crowd can cause burns from the second and larger detonation, as well as blunt force trauma from the rubber base as the flash powder inside explodes and the two halves of the base fly apart. The product safety warning included in the literature provided by the manufacturer: "may cause serious injury or death to you or others." We particularly encourage SPD to ensure that its officers' use of blast-balls is consistent with the care due explosive devices.[19]*

OIG also reviewed a 2016 analysis of SPD crowd management policy commissioned by SPD itself.[20] This report was written by an expert in the field of less lethal weapons, Steve Ijames.[21] Mr. Ijames reviewed material relating to the 2015 May Day protests and wrote:

*[T]he area of concern is not the rules or methods of engagement [which he deemed to be comprehensive], but the justification and accountability as it relates to the established protocols and processes not being followed.[22]*

Mr. Ijames recommended that SPD conduct an inquiry into its deployment of blast balls in May 2016, writing that:

*Absent a situation where officers were facing the immediate threat of death or serious physical injury, the intentionally targeting a blast ball device at or in unreasonably close proximity to a human being would not be justified use of force. It is important to learn after every incident whether any misuse and or overuse of the blast ball device was widespread and pervasive, or limited in scope. If widespread and pervasive – which, based on the material I reviewed, I have no reason to believe was the case, that would indicate a disconnect between the blast ball training material, the actual training that was provided, and operational deployment. If limited in scope, future misuse could be prevented by identifying the unit(s) and or person(s) involved, and holding them individually accountable for violating training and policy. It is important to note that blast balls contain the same explosive payload as a noise/flash diversionary device, are registered as destructive devices*

---

[19] Office of Police Accountability, "Management Action Recommendation (2015OPA-0643)" (December 10, 2015), 3.

[20] This report does not appear to have been officially released by SPD. SPD provided a final copy of the report to OIG.

[21] Per the description provided by SPD in the report, Mr. Ijames "created the less lethal force instructor/trainer programs for the International Association of Chiefs of Police (IACP) and the National Tactical Officers Association (NTOA). He authored the IACP National Policy Center position paper on Special Weapons and Tactics, as well as their model policies on TASER, impact rounds, chemical agents, noise/flash diversionary devices, hostage rescue, and barricaded subjects."

[22] Steve Ijames, "Preliminary Assessment Report" (April 28, 2016), 4.



*with the Bureau of Alcohol, Tobacco, and Firearms (BATF), and are fully capable (as warned by the manufacturer) of causing death or serious injury if ignited against or in close proximity to a vital body part. As such, it is imperative that these devices be used as SPD training specifies, and that this issue be fully addressed and reconciled prior to May Day 2016. It is my understanding, based on my review of the 2016 training curriculum, that these concerns have in fact been addressed.[23]*

At the time of this writing, OIG was unable to determine if SPD had completed the inquiry recommended by Mr. Ijames. Analysis of the status of previous recommendations will be provided in a future report.

<u>External Guidance On Potential Health Impacts or Use Limitations in Crowd Control</u>
The *Lethal in Disguise* report, while not mentioning blast balls by name, includes a section on "Disorientation Devices" to include flash bang or stun grenades.  Health impacts are "the risk of blast injury" which are

*…complex and result from the pressure waves created by the blast. The weapons are made of both metal and plastic parts that may fragment during the explosion and act as shrapnel. Blast injuries from close proximity explosions can lead to amputation, fractures, and degloving injuries (extensive skin removal that exposes underlying tissue), while secondary injuries include asphyxiation, heart attacks, and internal bleeding.[24]*

The study also mentions the potential for secondary, tertiary, and quaternary injuries. For example, it states that the "concussive blast of the detonation can injure, and the heat created can ignite flammable materials such as fuel" and that stun grenades thrown into houses or other buildings have resulted in "numerous cases of fires leading to significant injuries[…]."[25] Finally, the study notes that "the confusion and panic caused by stun grenades can also lead to serious injuries, particularly in dense crowds."[26] It concludes that "these weapons have no place in effective crowd control management, intervention, and control."[27]

The PERF report does not offer specific guidance on blast balls, flashbangs, or stun grenades.

---

[23] Ijames, "Preliminary Assessment Report" (2016), 4-5.
[24] International Network of Civil Liberties Organizations and Physicians for Human Rights, "Lethal in Disguise" (2018), 65.
[25] Ibid, 68
[26] Ibid, 68.
[27] Ibid, 68.



## 40mm Less Lethal Launcher

Overview of Weapon and Purpose

The 40mm launcher is a single shot launcher that can fire a variety of 40mm diameter munitions.  SPD uses both a sponge round and a crushable foam round that contains OC in the sponge. SWAT also uses an extended-range sponge round.

Per the SPD manual, the advantage of the 40mm in general patrol use is that it provides an "extended standoff distance" that may "decrease officers' exposure and may provide additional time to bring the situation to a safe resolution."[28] As such, the 40mm provides a non-lethal option to address individuals unarmed individuals who are behaving violently or have a bladed or blunt weapon. In other words, because the 40mm allows officers to act without getting too close, it may reduce the immediate threat posed by the individual in question and avoid use of greater, potentially lethal force. The SPD Training Section emphasizes the value of distance, noting "distance provides us with increased time, increased time allows us to assess situation[s] more thoroughly, better assessment leads to more sound tactical planning and responses."[29]

The 40mm works through pain compliance and disorientation. Although the round is designed to be less lethal, it is designed to cause pain. The intention in normal patrol use is for officers to move in and take control of an individual while the person is reacting to the pain caused by the impact of the sponge round.

The manufacturer of the sponge round used by SPD states that the minimum safe range is 5 feet, up to a maximum effective range of 131 feet. SPD's training materials state that the effective range is 5 – 120 feet.[30] The extended range round permitted for SWAT use is unsafe to deploy at a distance of less than 33 feet and has a range of up to 229 feet.

Summary of SPD Policy on Use

SPD allows for the use of the 40mm when the force is reasonable, necessary and proportional, the subject is likely to cause injury to officers, and when physical control tactics or other force options would be more likely to cause greater injury than the 40mm munition. The policy states that when possible, officers should issue a verbal warning, unless circumstances or safety do not allow. Officers must document their reasoning for not giving a warning in their use of force statement.

---

[28] Seattle Police Department, "SPD Manual 8.300-POL-11 Use of Force – 40 mm Less Lethal Launcher". Last modified 9/15/2019
[29] Seattle Police Department, "End User 40mm PowerPoint". Last modified 1/22/2019.
[30] Ibid.



The policy instructs officers to avoid targeting the head, neck or genitals and instead instructs officers to target areas such as the buttock, thigh, and calf.[31] Officers are required to summon medical aid as soon as feasible after an individual is hit by a 40mm round.

<u>Training and Certification</u>
Only officers who are trained and certified by SPD are allowed to use the 40mm launcher. The only exception are SWAT officers, who are permitted to certify separately through annual unit training. Additionally, the SPD manual states that the 40mm launcher cannot be an officer's primary less lethal device. They must carry another option, such as OC spray, a TASER, or a baton.

As stated previously, during crowd management events SPD policy only permits SWAT personnel to use the 40mm launcher. Chief Best issued a temporary exception to this policy from 5/31/2010 – 6/5/2020, based upon an asserted need to defend officers involved in the protest response against the possibility of individuals throwing CS canisters deployed by SPD back at officers.

<u>Prior Recommendations to SPD on this Weapon in Crowd Control</u>
The CPC recommendation cited at the beginning of this report includes "other projectiles", which OIG is including as applicable to 40mm rounds.

The previously cited OPA MAR also includes a recommendation on less-lethal projectiles:

> *Use of Less-lethal Projectiles: OPA recommends that SPD review its policy and training with respect to the use of less-lethal projectiles in crowd management situations to reduce the chances of them striking the wrong person or causing serious bodily injury. Although these projectiles are specifically designed to prevent penetration and, instead, stun the target with blunt-force trauma, the fact remains they can and do cause injury. In rare, but tragic cases, less-lethal projectiles have even resulted in death. We are particularly concerned with the possibility that, due to the sometimes chaotic and confusing nature of protests or demonstrations, these projectiles may strike and injure people lawfully exercising their constitutional rights.[32]*

Mr. Ijames' report also addresses the use of less lethal projectiles. Mr. Ijames writes:

> *The material reviewed did not provide a clear indication of who was armed with an impact projectile system, the type of system(s) involved, what the specific rules of engagement for use were, how many rounds were fired, in what circumstances, and the outcomes. A review of the*

---

[31] Guidance provided by the SPD Training Section states that officers should not target the head, neck, spinal cord, kidney area, and center of mass using the 40mm launcher unless deadly force is authorized. Source: Seattle Police Department, "End User 40mm PowerPoint". Last modified 1/22/2019.
[32] Office of Police Accountability, "Management Action Recommendation (2015OPA-0643)" (December 10,2015), 2.



**Seattle** Office of
**Inspector General**

*open source photographic material showed officers with 40mm launchers, pepperball
systems, and the FN303. Impact projectiles have been used in public disorder situations for
several hundred years. In recent times (1966 to present) they have resulted in the death of 19
people in the United Kingdom, and 17 in the United States. There is a place for impact
projectile launching systems in public disorder situations, but only in the hands of highly
trained officers who have proven a mastery (validated training) of the potentially deadly
limitations of the systems involved.[33]*

Mr. Ijames again recommends that SPD conduct an inquiry, this time into the use of less
lethal projectiles at May Day 2016. This inquiry was to include the rules of engagement, the
circumstances of use, the outcomes, and the command level knowledge, among other
factors. OIG was not able to determine at the time of this writing whether SPD had
conducted that inquiry.

Mr. Ijames concludes his discussion of less lethal projectiles with a warning and advice
regarding their use in crowd management contexts:

*Impact projectiles are potentially lethal. This is especially true in dynamic environments such
as public disorder, where targets are moving and the speed of the round over distance
increases the probability of impacting non-selected persons and or body parts. It is important
to assess the exact circumstances in which impact launchers were authorized and used in
2015, and whether the deployments were consistent with training, policy, and rules of
engagement. It is my understanding that these circumstances were in fact assessed by the
Force Review Board following May Day 2015, and I recommend the same practice be in place
following May Day 2016. There should be absolute clarity at the operational command level
concerning who will be issued an impact launcher, why they are issued a specific type of
launcher, the circumstances in which the launcher is intended to be used, and validation of
learning concerning the specific impact launcher/rounds involved and the unique risks to
citizens as it relates to impact launcher use in crowd control scenarios. Historically, impact
launchers have been involved in a disproportionate number of accidental/unintended serious
injuries as compared to other force options during crowd control events. Accordingly, the
issuing and potential use of these devices in public disorder situations should be limited, and
demands specific command level approval, oversight, and ownership at every level
referenced above generally, and specifically prior to May Day 2016.[34]*

<u>External Guidance On Potential Health Impacts or Use Limitations in Crowd Control</u>
Literature reviewed and summarized in the *Lethal in Disguise* report discusses the
importance of using these tools at the appropriate distance, noting:

*…that the deployment of these projectiles often occurs from distances much closer than
those deemed safe. Safe shooting ranges are not well validated and vary a great deal*

---

[33] Steve Ijames, "Preliminary Assessment Report" (2016), 5.
[34] Steve Ijames, "Preliminary Assessment Report" (2016) 5-6.



*between weapons, countries, and manufacturers. Firing distance, while hard to assess in many cases, correlates with the severity of injuries. […] Some of the literature specifically noted that firing distances in instances resulting in injury were less than those recommended by KIP [kinetic impact projectile] manufacturers, and it highlighted that the firing distance was difficulty to assess not only forensically, but also by law enforcement agents working in dynamic and fast-changing conditions.*[35]

The IACP Crowd Management Concepts and Issues document highlights that in a large crowd, direct-fire munitions such as the 40mm may not hit their intended target. The IACP states that for this reason, these weapons should generally be only used "against specific individuals who are engaged in conduct that poses an immediate threat of death or serious injury or significant levels of property damage" in a mass demonstration setting.[36]

The PERF report does not provide extensive guidance on 40mm launchers, other than to note that like other less lethal weapons, using a launcher is a perishable skill that should be bolstered with regular proficiency training. Lack of refresher training "can increase the chances of user error and inappropriate or unsafe deployments." This advice is echoed to some degree by the SPD Training Section, which warns that officers are taught to aim for center mass with firearms, but that targeting this area with a 40mm launcher has potential for serious or fatal injury. Thus, the Training Section notes that "in a stressful encounter, the officers may focus on center mass due to prior weapons training and subconscious motor memory", and advises instructors to ensure that officers are not aiming for center mass with the 40mm launcher unless deadly force has been authorized.[37]

## Specialty Unit Weaponry Used for Crowd Control, including CS

The following is a discussion of the crowd management weapons used by SWAT in the recent demonstrations. It is important to note that SWAT also uses many of these same weapons to address barricaded subjects, hostage situations, and other unusual events involving the potential for violence and the need for force options other than lethal force. Policies and recommendations on use of these weapons in the context of crowd management may not easily translate to those other contexts.

In addition to the 40mm less lethal launcher used by patrol officers, SWAT also has access to three other less lethal launchers. The three launchers are:

---

[35] International Network of Civil Liberties Organizations and Physicians for Human Rights, "Lethal in Disguise" (2018), 31.
[36] International Association of Chiefs of Police, "Crowd Management" (2019), 7.
[37] Seattle Police Department, "End User 40mm PowerPoint". Last modified 1/22/2019.



**Seattle** Office of
**Inspector General**

- 40mm multi launcher: This is identical to the single shot 40mm launcher used by patrol except it can fire up to six munitions before having to reload.

- FN303: A CO2-powered launcher that shoots projectiles slightly heavier than standard paintballs with a range of 50 meters.

- PepperBall Launcher: A CO2-powered paintball-type launcher that shoots projectiles that contain 5% PAVA (a synthetic form of OC) and have a range of 60 feet.

SWAT confirmed all of these launchers were used during recent demonstrations and provided to OIG a list of the different rounds used.

SWAT also uses a chemical agent orthochlorobenzalmalononitrile, commonly called CS. Per OIG review of both the SPD department manual and the SWAT manual, only SWAT is trained and authorized to use CS. Although SWAT has access to multiple forms of CS, the unit reported to OIG that only hand-thrown canisters were used during the recent demonstrations.

SWAT informed OIG that they have maintained a round count of all munitions used by SWAT for future reference and review.

<u>Summary of SPD Policy on Use</u>

OIG is not including excerpts from the SWAT tactical manual, but notes the tactical manual's guidance on using SWAT weaponry for crowd management is not dissimilar from SPD departmental policy on the use of blast balls, OC spray, and the 40mm launcher. However, the SWAT manual does include more details on environmental factors officers should consider before deploying these tools.

<u>Training and Certification</u>
SWAT manages its own certification and training requirements, distinct from the SPD Training Section. These requirements include regular weapons qualification testing and attendance at specialized courses for certain tools. One of the SWAT instructors is a certified instructor with the National Tactical Officer's Association. SWAT reported to OIG that in addition to initial qualification and on-going evaluation through training, every SWAT officer is required to re-qualify with less lethal tools on an annual basis using a written test. This written test, per SWAT, includes questions on safe and effective ranges of the weapons.

<u>Prior Recommendations to SPD on these Weapons for Crowd Control</u>
OIG is unaware of any previous recommendations made to SPD about these specialty weapons used by SWAT. However, recommendations made to SPD regarding the 40mm would presumably apply to these weapons due to their similar nature.



External Guidance On Potential Health Impacts or Use Limitations in Crowd Control

In one well-documented case in Boston in 2004, a FN303 was fired into the crowd with lethal effect in one instance and caused two serious injuries. The commission investigating the death noted that the manufacturer stated, "the system has been conceived in such a way that it never exceeds the minimum energy levels causing a traumatism or a perforation of the skin."[38] However, the commission found that skin penetrations can occur, although the fatality and the other two penetration injuries were all caused by impacts to the head. The manufacturer states, "Misuse may result in injury or death. Avoid aiming at face or head."[39]

Previously included external guidance on health impacts related to the use of OC spray is applicable to the use of CS. However, it is notable that CS may be more difficult to remove or otherwise decontaminate than OC, depending on how it was deployed. CS powder, in particular, may require extensive cleaning procedures.

The IACP Concepts and Issues paper states that CS should be used with caution in crowd control situations, as "uncontrolled use can have negative consequences with respect to efforts to control, management or disperse crowds." The IACP notes use of CS may escalate violence and states "the crowd should be warned prior to CS deployment and provided with avenues of egress."[40]

---

[38] Commission Investigating the Death of Victoria Snelgrove, May 25, 2005.
[39] See manufacturer's description of projectiles and safety warnings at https://fnamerica.com/products/less-lethal/projectiles/.
[40] International Association of Chiefs of Police, "Crowd Management" (2019), 8.



## Appendix A: INCLO Recommendations on Use of Force from *Defending Dissent: Towards State Practices that Protect and Promotes the Rights to Protest*

- The use of firearms and live ammunition in the context of protests, particularly automatic firearms, should be prohibited.

- The use of CCWs which are indiscriminate in their nature, such as stun grenades and tear gas, should not be used for dispersion or generally in the context of protests.

- The use of force is subject to the principles of legality, necessity, proportionality, precaution, non-discrimination, and accountability, and should only be used in self defence or in defence of others facing an imminent threat to life or serious injury.

- Wherever possible, the use of dialogue and communication should always precede the use of force. Police commanders must be trained in dialogue and engagement and should use these tactics before any decisions are made to resort to the use of force.

- To ensure a graduated, necessary, and proportionate deployment of force, policing institutions may be provided with a range of tools that allow for such a response. This may include CCWs but only when they have been independently and thoroughly tested, are human rights-compliant, and where they are situationally appropriate.

- CCWs must not be misused or used as tools of intimidation.

- The use of armed or weaponised drones equipped to discharge CCWs must be prohibited pending further investigations into their compliance with international human rights law.

- Training on the use of crowd-control equipment and weapons should include: the impact and harm caused by each weapon or piece of equipment; the likely perceptions of and reaction to the use of each weapon, including the possible escalation in tensions; whether less harmful means are available to achieve the particular aim, and if not, whether the overall objective of the use of force is better achieved by not using the provided equipment.

- Any arrests or detentions that occur in the context of protests should be performed by police officials wearing appropriate uniforms and visible name tags. Prompt information on the place of detention should be provided to interested persons and access to legal services for the detainee must be ensured.

- Mass arrests are inherently indiscriminate and should be prohibited as they do not comply with the principles of necessity, proportionality, and legality.

- Dogs and horses can be indiscriminate tools and their use should be prohibited in the context of protests.

- In the event that people are injured or killed – or in any circumstance that requires investigation – a clear chain of custody of evidence must be established. Commands issued (including dispersal orders) must be documented, and all weapons used must be seized for the purposes of investigation.



**Seattle** Office of
**Inspector General**

Appendix B: Excerpted SPD Policies on Less Lethal Weapons and Crowd Management

The complete SPD department manual can be found at https://www.seattle.gov/police-manual/. OIG has copied the policies below for easy reference. All content is original to SPD.

## 8.300 – POL –5 Use of Force – Oleoresin Capsicum (OC) Spray

This policy applies to the use of OC spray by all sworn Department employees.

Oleoresin Capsicum spray (OC spray) is an inflammatory agent that causes an intense burning sensation of the skin, eyes, and mucous membranes. A one second burst applied directly to the face (direct exposure), even with glasses, will usually result in the immediate closing of the eyes. The individual's eyes will likely close, tear, and swell as a result. When inhaled (secondary exposure), the respiratory tract will likely become inflamed and temporarily restrict breathing to short, shallow breaths. The individual may experience choking, gagging, gasping for breath, or, on rare occasion, unconsciousness. The individual may experience nausea, lung pain, or temporarily impaired thought processes. The individual may become disoriented or lose his or her balance.

OC spray may reduce or eliminate the need for substantial physical force to make an arrest or gain custody. It may reduce the potential for injuries to officers and subjects.

**1. Education & Training Section (ETS) Will Train and Certify Officers in the Use of OC Spray Every Two Years**

The OC spray policy and training will incorporate the evolving guidance contained within the SPD Post-Basic Law Enforcement Academy course on less-lethal force as well as guidance from the medical community.

**2. Officers Shall Only Use Department-Issued or Approved OC Spray**

Officers will periodically check the manufacturer's date on their issued OC Spray container and if beyond five years, exchange for a new container from the stationmaster or quartermaster.

**3. Officers Will Use OC Spray, Including for Crowd Dispersal or Protection, Only When Such Force is Objectively Reasonable, Necessary, and Proportional**



See 8.050 for definition and explanation of "objectively reasonable," "necessary," and "proportional" force.

For use and reporting of OC spray in the context of crowd management, see 14.090 (10).

## a. OC Spray May Be Used Against a Dangerous Animal to Deter an Attack or to Prevent Injury to Persons Present

## b. OC Spray Shall Not Be Used Unless the Use of Physical Force Is Necessary

## 4. When Feasible, Officers Shall Issue a Verbal Warning to the Subject, Fellow Officers and Other Individuals Present Prior to Using OC Spray

Officers shall issue a verbal warning to the subject, other officers, and other individuals present, that OC spray will be used and defer using OC spray for a reasonable amount of time to allow the subject to comply with the warning.

Verbal warnings may come from any officer involved in the incident when employing a team tactics approach.

> **Exception**: A verbal warning is not required if giving the warning would compromise the safety of the officer or others. In such circumstances, only the deploying officer should document his/her reason for believing his/her safety would have been compromised in his/her use of force statement.
>
> A verbal warning is required if feasible and unless giving the warning would compromise the safety of the officer or others.

## 5. Officers Must Justify Each Separate Application of OC Spray

After the initial application of OC spray, each subsequent spray must also be reasonable and the employee should reevaluate the situation accordingly.

## 6. Officers are Required to Report the Use of OC Spray, Regardless of the Effect, as Well as the Decontamination Procedures That Followed

## 7. The Application of OC Spray on Persons in Restraints Such As Handcuffs Must Be to Protect an Officer or Member of the Public from Physical Injury

## 8. Officers Shall Direct OC Spray at the Specific Subject(s) Who are Posing a Threat



Officers deploying OC will attempt to minimize exposure to non- targeted parties.

**9. Officers Shall Assist Exposed Subjects with Decontamination and Medical Aid, As Soon as Reasonably Possible**

If the subject was exposed in a confined space, officers will remove the subject as soon as feasible from the contaminated area and expose the individual to fresh air.

Officers shall request medical response or assistance for subjects exposed to OC spray when requested by the subject, when the subject complains of continued effects after having been decontaminated, or the subject indicates that they have a pre-existing condition (such as asthma, emphysema, bronchitis, or heart ailment) that may be aggravated by OC spray.

Officers shall monitor exposed subjects for changes in their condition while in police custody and request medical evaluation as needed or as requested.

**10. The Department Shall Maintain Written Documentation of the Number of OC Spray Canisters Annually Distributed to Each Employee**

---

## 8.300 – POL –10 Use of Force – Blast Balls

This policy applies to the use of blast balls by all sworn Department employees.

**1. Only Officers Who Have Completed Department Blast Ball Training are Permitted to Deploy Blast Balls**

**2. Officers Shall Only Use Department-Issued Blast Balls**

**3. Officers May Use Blast Balls Only When Such Force is Objectively Reasonable, Necessary, and Proportional**

When feasible, officers shall avoid deploying blast balls in the proximity of people who are not posing a risk to public safety or property.

**4. When Feasible, Officers Will Not Deploy Blast Balls Until a Dispersal Order Has Been Issued to the Crowd, the Crowd Has Been Given a Reasonable Amount of Time to Comply, and a Supervisor Has Authorized the Deployment**



**Exception**: Officers may reasonably deploy blast balls to address an imminent risk of harm to a person or significant property damage.

The preferred method of blast ball deployment is low deployment ("bowling style"). Officers may use a high deployment ("overhand throw") when the need for a farther deployment or the need to get around an obstruction outweighs the risk created by the separating sub-munition.  Officers must document their deployment method and the reasoning for using such in their use-of-force report.

## 5. Officers Must Justify Each Separate Blast Ball Deployment

After the initial blast ball deployment, each subsequent deployment must be reasonable and the employee should reevaluate the situation accordingly.

## 6. Officers Are Required to Report the Use of Blast Balls, Regardless of Whether a Subject is Struck

The deployment of blast balls away from people (i.e. a "bang out") that does not result in any injury or complaint of pain is reported and investigated as Type I force (See 8.400).

The deployment of blast balls within close proximity to people is reported and investigated as Type II force, even if no injury or complaint of pain or injury is reported (See 8.400).

**Exception**:  When the deployment of blast balls results in injury or complaint of injury that meets the criteria for a Type III investigation, the deployment is reported and investigated as Type III force (See 8.400).

## 7. As Soon As Reasonably Possible, Officers Will Request and/or Render Medical Aid for Subjects Who Appear to Have Been Injured by a Blast Ball Deployment or Who Complain of Pain or Injury Resulting From a Blast Ball Deployment

## 8. The Department Shall Maintain Written Documentation of the Number of Blast Balls Annually Distributed to, and Utilized by, Each Employee

## 8.300 – POL-11 Use of Force– 40 mm Less Lethal Launcher

40 mm Less Lethal (LL) Launchers are designed to temporarily interrupt the behavior of a dangerous subject, so that officers can take enforcement action with



less danger of injury or death to themselves and others. The extended standoff distance that the 40 mm LL Launcher may decrease officers' exposure and may provide additional time to bring the situation to a safe resolution.

**1. Education and Training Section (ETS) Manages the 40 mm LL Launcher Program**

ETS maintains the 40 mm LL Launcher operator's manual.

**2. The Firearms Training Squad (FTS) Will Maintain Inventory Records for 40 mm LL Launchers**

**3. ETS Trains and Certifies 40 mm LL Launcher Operators Annually**

**Exception**: SWAT officers will certify annually through annual specialized unit training. The SWAT commander will forward training rosters to ETS within seven days of completion.

Only officers who have been trained and certified with the Seattle Police Department are allowed to use the 40 mm Less Lethal Launcher.

Officers may only use 40 mm LL Impact Munitions (LLIM) in a manner consistent with the Seattle Police Use of Force Policy and training provided by the Department.

**4. Officers Who Have Been Trained, Certified and Issued a 40 mm LL Launcher Will Deploy with It During Their Shift**

Officers deploying with a 40 mm LL Launcher will deploy with a primary less lethal device in accordance with 8.300 (2)

**5. Officers Deciding to Withdraw from the 40 mm LL Launcher Program Will Notify their Chain of Command and Return the 40 mm LL Launcher to the Range Armorer as Soon as Practicable**

Officers will notify a supervisor, in person, that they have decided to no longer carry their 40 mm LL Launcher.

Additionally, officers will document the decision to no longer carry a 40 mm LL Launcher by emailing their chain of command and the Department 40 mm LL Launcher coordinator prior to deployment without their assigned launcher.

**6. If the 40 mm LL Launcher Requires Inspection and/or Repairs, the Officer Will Notify their Supervisor and take the 40 mm LL Launcher Out of Service**



Officers will email their supervisor, the 40 MM LL Launcher coordinator and the 40MM LL Launcher Armorer prior to deployment without their 40 mm LL Launcher.

## 7. Officers Will Only Use a 40 mm LL Launcher When Objectively Reasonable, Necessary, and Proportional

See 8.050 for definition and explanation of "objectively reasonable," "necessary," and "proportional" force.

Officers may use a 40 mm LL Launcher in the following circumstances:

- When a subject poses an immediate threat of harm to any person; or

- When public safety interests dictate that a subject needs to be taken into custody and the level of resistance presented by the subject is

(1) likely to cause injury to the officer; or

(2) if hands-on control tactics or other force options would be likely to cause greater injury to the subject than the use of the 40 mm Less Lethal Impact Munition (LLIM).

Officers will consider Department training regarding deployment distances and target areas. Each situation must be evaluated on the totality of the circumstances at the time of the deployment.

## 8. When Feasible, Officers Shall Issue a Verbal Warning to the Subject and Fellow Officers Prior to Deploying the 40 mm LL Launcher

Officers shall issue a verbal warning to the subject, other officers, and other individuals present, that a 40 mm LL Launcher will be used. Absent exigent circumstances, officers shall defer using the 40 mm LL Launcher a reasonable amount of time to allow the subject to comply with the warning.

Verbal warnings may come from any officer involved in the incident when employing a team tactics approach.

**Exception**: A verbal warning is not required if giving the warning would compromise the safety of the officer or others. In such circumstances, the deploying officer should document his/her reason for believing his/her safety would have been compromised in their use of force statement.



**9. Officers Shall Consider the Risk of the 40 mm LLIM Round Causing Serious Harm When Determining Whether to Deploy**

**10. Officers Will Not Intentionally Target a Subject's Head, Neck or Genitals**

Officers will not target the head or neck unless deadly force is justified.

**11. Preferred Target Areas for 40 mm LL Launchers Are:**

- Buttocks

- Thigh area

- Calf

- Large muscle groups

Officers shall collect and submit into evidence all primary components of the expended 40mm round to include the sponge nose cone with the rifling ring, and the casing.

**12. Only Munitions Purchased, Authorized and Issued by the Seattle Police Department May Be Used by Officers**

Officers deploying 40 mm LL Launchers are responsible for ensuring the proper munitions are loaded. Officers will inspect each 40 mm LLIM round prior to loading it into the launcher to ensure munitions adhere with this policy.

**13. Officers will Securely Store 40 mm LL Launchers**

While on duty, 40 mm LL Launchers will be secured in patrol vehicles when not in use.

When not on duty, Officer's will store 40 mm LL Launchers in a secure Department locker.

**14. Only SWAT Officers Will Deploy 40 mm LL Launchers During Crowd Management Events**

**15. Officers Must Justify Each Separate 40 mm LL Launcher Use in Their Use-of-Force Statement**



**16. Officers Are Required to Report the Use of 40 mm LL Launcher as Force, Regardless of Whether a Subject is Struck**

See 8.400-POL-1(3)

Officers should also be prepared to employ other means to control the individual — including, if necessary, other force options consistent with Department policy—if the individual does not respond sufficiently to the LLIM and cannot otherwise be subdued.

**17. Officers Will Summon Medical Aid as Soon as Feasible, Whenever a Subject Has Been Struck by a 40mm LL Launcher Round**

**18. The Firearms Training Section (FTS) Will Inspect 40 mm LL Launchers on an Annual Basis to Ensure That All Are Operable and Perform any Necessary Maintenance or Repairs**

Exception: SWAT officers will inspect the 40 mm LL Launchers assigned to their unit on an annual basis.

---

## 14.090 – Crowd Management

It is the policy of the Seattle Police Department to facilitate free speech and assembly whenever possible, while preserving order and protecting persons and property.  This manual section governs the Department's response to such events when transportation and public safety considerations are best served by a police presence.

**1. The Department Uses the Incident Command System (ICS) for Crowd Management**

When assigned, an Incident Commander will oversee the Department's response before, during and after an event.

- The Incident Commander may delegate authority and assignments.

**2. The Incident Commander Will be a Sergeant or Above**

- **Exception**: An officer can serve as Incident Commander until a sergeant can respond.



- A lieutenant will assume command when there are two sergeants and/or two squads involved in the event.

- A captain will assume command when there are two lieutenants involved in the event.

- For more information, see Manual Section 1.020 – Chain of Command.

**3. As Far in Advance of the Incident as Possible, the Incident Commander Will Coordinate with the Appropriate Department Resources to Obtain Information to Assist with Operational Planning and Staffing**

**4. The Incident Commander May Consider Utilizing Specialty Units, Based on Operational Needs**

In the event of an unplanned crowd management event, the Incident Commander shall request SWAT when feasible.

See 14.090–TSK–1 Responsibilities of the Incident Commander.

**5. The Incident Commander Will Determine Minimum Staffing for Crowd Management Events**

- The Incident Commander will base staffing levels on the projected number of event participants and any pre-event information indicating potential violence.

- The Incident Commander will develop contingency plans regarding staffing and tactics.

- When feasible, the Incident Commander will provide the staffing plan to the SPD Budget Section prior to the incident.

**6. The Incident Commander Will Deliver Event Briefings Using a Standardized Format (SPD ICS Briefing Format)**

**7. The Incident Commander Will Communicate Each Unit's Mission to That Unit's Supervisor or Commander**

The involved unit's supervisor or commander will develop the specific methods or tactics that will be used to accomplish the mission. See 14.090–TSK–2 Responsibilities of the Supervisor.



- The unit supervisor or commander will submit all unit plans to the Incident Commander, who will approve or modify the plans to accomplish the overall mission, with any modifications communicated back to the unit supervisor or commander.

**8. The Incident Commander Retains Ultimate Responsibility for the Decisions of Subordinates**

In order to fulfill this obligation, the Incident Commander will be available for on-scene consultation.

**9. Crowd Dispersal**

**a. Upon Determining That There are Acts or Conduct Within a Group of Four or More Persons That Create a Substantial Risk of Causing Injury to Any Person or Substantial Harm to Property, the Incident Commander May Order That the Crowd Be Dispersed**

See SMC 12A.12.020

Before ordering that the crowd be dispersed, the Incident Commander shall consider whether less restrictive means of crowd management are available.  Such means may include strategies such as area denial and/or seeking voluntary compliance.

Upon determining that dispersal is appropriate, the Incident Commander shall ensure that there is an avenue of egress sufficient to allow the crowd to depart.

The Incident Commander or designee will issue the order to disperse prior to instructing officers to disperse the crowd, if feasible.

See 14.090-TSK-3 Issuing the Order to Disperse.

**b. The Incident Commander Shall Have Authority to Direct the Use of Blast Balls and OC Spray to Disperse the Crowd (See Manual Section 8.300 – Use-of-Force Tools)**

A lieutenant may authorize the use of blast balls and OC spray to disperse a crowd if an immediate life safety emergency exists that requires this action be taken and there is insufficient time to obtain incident command approval.

- An immediate life safety emergency is an unplanned, dynamic situation where immediate police action is necessary to protect the officers' and/or the public's safety.



- Only personnel trained to deploy patrol CART tools (blast balls and OC spray) are authorized to carry and use these tools under the supervision of a CART-trained supervisor, unless otherwise directed by the Incident Commander.

When feasible, officers will not deploy blast balls and OC spray until a dispersal order has been issued to the crowd and the crowd has been given a reasonable amount of time to comply.

When feasible, officers shall avoid deploying blast balls and OC spray in the proximity of people who are not posing a risk to public safety or property.

The deployment of blast balls away from people (i.e. a "bang out") is reported and investigated as Type I force.   Deployments in the vicinity of people may be categorized as Type II or Type III force, depending upon the circumstances of the deployment and the resulting injury. (See Manual Section 8.400 regarding force classification.)

### c. Each Precinct Will Maintain a Supply of Blast Balls and OC Spray

Each precinct will maintain a log of the serial number of each blast ball in its supply.  Blast balls will be issued, by serial number, to specific officers as needed.  Officers will be responsible for each blast ball that they are issued.  Officers will return unused blast balls after the event, and will provide the event number related to any deployments.

After a crowd management event, the Department blast ball coordinator will be responsible for ensuring that the precinct log is reviewed to verify whether all deployed blast balls were reported.

### d. The Incident Commander Will Deploy Department Personnel to Accomplish Specific Tactical Objectives Consistent with ICS

### 10. Officers May Make Individual Decisions to Deploy OC Spray, and Blast Balls Consistent with Title 8 – Use-of-Force

The authorized use of OC in crowd management situations involving violent activity shall have as a primary objective at least one of the following:

- Defend oneself

- Defend someone else



- Prevent significant destruction of property

## a. OC Will be Directed at the Specific Suspect(s) who are Posing a Threat

When feasible, officers shall issue a verbal warning to the suspect(s), other officers, and other individuals present, that OC spray will be used.  When feasible, officers will wait a reasonable amount of time to allow the suspect(s) to comply with the warning before using OC spay.

Officers deploying OC will attempt to limit collateral exposure to non-involved parties.

- If there is probable cause to arrest for a crime, it is a priority for officers to arrest individuals against whom OC has been deployed.

## b. Officers Will Provide Aid to Subjects Exposed to OC and/or Blast Balls, if Feasible

Officers will request medical response or assistance for subjects exposed to OC when they complain of continued effects after having been decontaminated, or they indicate that they have a pre-existing medical condition (e.g. asthma, emphysema, bronchitis, heart ailment, etc) that may be aggravated by OC.

Officers will request medical response or assistance for subjects who appear to have been injured by a blast ball or who complain of pain or injury from having been struck by a blast ball.

## 11. Incident Commanders and Officers Must Document Uses of Force

- The Incident Commander authorizing the use of less-lethal tools must justify that decision in a Use-of-Force Report, with a copy submitted to the relevant Bureau Commander in addition to the normal routing.

- Officers shall individually justify and document all reportable uses of force consistent with Manual Section 8.400 - Use-of-Force Reporting and Investigation.

## 12. Following the Event, Sergeants and Incident Commanders Will Conduct a Day-of-Event Debrief

- Sergeants will conduct a debriefing of their assigned officers and document any observations or suggestions on an Event Debrief Form (form 23.5).


**Seattle** Office of
**Inspector General**

- Sergeants and the Incident Command staff will then have a separate debrief to discuss the following subjects:

- Event staffing

- Deployment

- Command issues

- Communication issues

- Logistical issues

- Use of less-lethal tools

- Areas of success

- Areas for improvement

**13. Incident Commander Will Complete an After-Action Report (See: 14.010-After-Action Reports)**

**14. Uses of Force that Occur During the Course of Crowd Management Are Reviewed in Accordance with Manual Section 8.500-POL-6.**

**14.090–TSK–1 Responsibilities of the Incident Commander**

During the course of managing a crowd, the Incident Commander:

1. If feasible, **contacts** the event organizer to discuss the Department response

2. **Develops** contingency plan regarding staffing and tactics

- SPD task force callout criteria

- Mutual aid callout criteria

3. **Considers** utilizing specialty units

- Bicycle units for marches or mobile protests



- Officers on foot for static events, or to function as arrest teams or bicycle unit support for marches or mobile protests

- Mounted patrol for static events, marches or mobile protests

- Video Unit for events where information indicates that civil disobedience or crowd violence will occur (Recordings must be in compliance with SMC 14.12 – Collection of Information for Law Enforcement Purposes.)

- Special Weapons and Tactics (SWAT) officers to use less-lethal launchers and tools that are approved for use solely by the SWAT team

- CART-trained officers when there is insufficient time to deploy SWAT

- Prisoner processing for events where information indicates civil disobedience or crowd violence will occur

- Intelligence Unit resources when there is a need for ongoing information gathering and dissemination during the eventdi

- SPOC for planning and logistical support

4. **Provides** a staffing plan to the SPD Budget Section, if feasible

5. **Communicates** each unit's mission to the relevant supervisor or commander

    a. **Instructs** the supervisor or commander to develop and provide plans

    b. **Approves** unit plans

6. **Briefs** officers and supervisors using the SPD ICS briefing format

7. **Remains** available for on-scene consultation

8. Debriefs supervisors and commanders following the event

    a. **Collects** Event Debrief Forms from the supervisors

9. **Completes** an After-Action Report consistent with the requirements of Manual Section 14.010 – After-Action Reports



b. **Routes** the After-Action Report and Event Debrief Forms to the Patrol Operations Bureau Commander, via the chain of command

### 14.090–TSK–2 Responsibilities of the Supervisor

The supervisor:

1. **Develops** methods or tactics that will be used to accomplish the mission, as directed by the Incident Commander

    a. **Submits** plans to the Incident Commander

2. **Debriefs** assigned officers after the incident

3. **Documents** observations and suggestions on an Event Debrief Form (form 23.5)

    a. **Submits** Event Debrief Forms to Incident Commander

4. **Attends** separate debrief with Incident Commander

### 14.090–TSK–3 Issuing the Order to Disperse

Upon determining that the crowd presents an imminent risk to public safety or that large-scale property destruction appears likely, the Incident Commander, as feasible:

1. **Considers** placing officers at the rear of the crowd to verify that the order to disperse will be heard by all

2. **Issues** the following order:

"I am (rank and name) of the Seattle Police Department. I am now issuing a public safety order to disperse and I command all those assembled at (specific location) to immediately disperse, which means leave this area. If you do not do so, you may be arrested or subject to other police action. Other police action could include the use of chemical agents or less-lethal munitions, which may inflict significant pain or result in serious injury. If you remain in the area just described, regardless of your purpose, you will be in violation of city and state law. The following routes of dispersal are available: (routes). You have (reasonable amount of time) minutes to disperse."

3. **Allows** a reasonable amount of time for the crowd to disperse



4. **Repeats** the order to disperse, if feasible

5. **Continually assesses** the balance of dispersal time and the goal of retaining control of the situation

EXHIBIT 3

June 29, 2020, Statement of Mayor Durkan



**City of Seattle**
Mayor Jenny A. Durkan

June 29, 2020

Monica Martinez Simmons
Seattle City Clerk
600 4th Avenue, 3rd Floor
Seattle, WA 98124

Dear Ms. Martinez Simmons,

I have returned Council Bill 119805, passed unanimously by the council, unsigned, understanding it will become law 30 days upon my return of the legislation pursuant to SMC 1.04.020. While I share the Council's concerns about the Seattle Police Department's ("SPD") crowd management tactics to respond to recent protests, the Council's actions:

1) undermined the authority of the three SPD civilian accountability oversight bodies, the Office of Police Accountability ("OPA"), Office of the Inspector General ("OIG"), and Community Police Commission ("CPC").  In part on my request made on June 5th, those entities are reviewing SPD's crowd control practices, policies and actions and were asked to make recommendations in 30 days, which would be July 5th.  Unfortunately, Council set a date of August 15th to receive the accountability partners report, which is <u>after</u> this legislation goes into effect.  While I understand the issue is significant, I am hopeful that the accountability partners are able to return recommendations under the original timeframe and certainly before the legislation goes into effect and that Council should amend the legislation consistent with the recommendations.  This review is critical to ensure we have crowd management policies and practices that enhance public safety and reduce use of force by officers;

2) the law directly impacts and possibly contravenes SPD policies developed and approved by federal court judge James Robart in the consent decree litigation.  These policies were subject to review by Council, the previous Mayor, the accountability partners, U.S. Department of Justice and the federal Court Monitor.  If the ordinance is found in conflict with court orders under the consent decree, it could bring the city out of compliance with the court orders;

3) the legislation effectively attempts to expand or overrule an order entered by federal court Judge Richard Jones, entered on June 12, 2020.  This order was entered in litigation against the city for the actions taken by SPD during the protests and unrest.  U.S. District Judge Jones, has entered a temporary order regarding crowd control measures, including the use of less than lethal options like tear gas, flash bangs and pepper spray. Until the city adopts a permanent crowd control policy, I support the Court's ruling and the preliminary injunction that is in place.  Notably, there were extensive arguments urging an outright ban of the less than lethal options.  Yet, Judge Jones instead struck a balance and his order allows specified uses where there is an imminent identifiable threat to life safety and property.  The

Council's legislation has no such exemption for the imminent threat and risk of life; therefore is inconsistent with Judge Jones's federal court order; and

       4) could result in significant financial and legal liability for the city, because the legislation allows anyone, including bystanders, who participated in a mass demonstration to seek compensation from the City for emotional or physical injuries regardless of whether they actually sustained an injury directly caused by a crowd control device.  It also provides that even when police are using pepper spray as lawfully allowed by policy, the City is liable.

The ordinance states:
> "When used to subdue an individual in the process of committing a criminal act or presenting an imminent danger to others, it lands on anyone other than that individual.
>
> E. A person shall have a right of action against the City for physical or emotional injuries proximately caused by the use of crowd control weapons for crowd dispersal that occur after this ordinance takes effect.
>
> F. Absent evidence establishing a greater amount of damages, the damages payable to an individual for injuries proximately caused in violation of this Section 3.28.146 shall be $10,000, added to attorney fees and court fees."

Given these concerns and that we are waiting for the accountability partners to give their recommendations, I am returning this legislation unsigned. It is my hope that Council will review the accountability recommendations and amend the bill before its effective date a month from now.  I have stated the crowd control actions by SPD during the protests failed appropriately to de-escalate conflicts and used a disproportional response that impacted people lawfully exercising First Amendment rights. However, I share the concerns of accountability partners and the Chief that the removal of all less than lethal crowd control measures could result in more direct use of force being used.

Sincerely,

Jenny A. Durkan
Mayor of Seattle