EXHIBIT 5

Joint Statement of Office of Police Accountability
and Office of Inspector General for Public Safety

 

*Statement of the Office of Police Accountability and Office of Inspector General Regarding Seattle City Ordinance 126102*

The Office of Police Accountability (OPA) and Office of Inspector General for Public Safety (OIG) submit the following for the Court's consideration in conjunction with the City's filing transmitting City Ordinance 126102 to the Court for review.

The ordinance in question alters SPD policies and practices surrounding the use of a number of less-lethal tools in the context of demonstration management, as well as patrol and SWAT operations. The ordinance contains three provisions which impact OPA and OIG, as well as implicate the Court's jurisdiction with respect to the Consent Decree.

First, the ordinance directs the accountability entities (including OPA, OIG, and the Community Police Commission) to review SPD's crowd management policies and, specifically, to opine on whether SPD "should be reauthorized to use less-lethal weapons for crowd dispersal purposes." While OPA and OIG requested that the Council allow the accountability entities to assess the substance of the legislation and to make recommendations prior to its passage, the Council instead set a date of August 15, 2020, for our feedback.

Second, the ordinance instructs the City Attorney's Office to provide notice of the ordinance to the Court, which is presumably a recognition that, given the ordinance's impact on policies under the Court's jurisdiction, it requires Court review and approval.

Third, the ordinance contains an implementation date of July 26, 2020, which is prior to the submission date for the accountability entities' recommendations and almost certainly prior to the Court being able to meaningfully evaluate the ordinance, including seeking comment and briefing from the parties to the Consent Decree.

Fundamentally, OPA and OIG recognize the right and prerogative of the City Council, as the duly elected representatives of the City, to legislate in this area. However, OPA and OIG simultaneously recognize that the ordinance addresses matters within the four corners the Consent Decree and thus are subject to the Court's jurisdiction. Moreover, OPA and OIG recognize that, based on the terms of the Consent Decree, the Court's prior rulings, and the past practice of the City, alterations to policies under the Court's jurisdiction must be reviewed by the U.S. Department of Justice and the Monitoring Team prior to submittal to the Court for approval.

Without offering any substantive opinions at this point on the contents of the ordinance, OPA and OIG have procedural concerns regarding the impact of legislating matters under the Court's jurisdiction, as well as on the implementation of significant changes to SPD policy without allowing the accountability entities to provide input and recommendations for consideration by the City and the Court.

To this end, our offices are working in collaboration with the Community Police Commission to identify evidence-based recommendations concerning modifications to SPD policies that are consistent with national best practices, consider the specific needs and concerns of Seattle, and recognize the potential appropriate roles less-lethal tools may play during demonstrations and during patrol operations to reduce the need to use potentially more harmful force options. As part of this process, OIG provided an initial overview on less-lethal

Case 2:12-cv-01282-JLR Document 625-3 Filed 07/17/20 Page 3 of 19

 

tools to the Council on June 12, 2020.[1] OPA and OIG have also sought feedback concerning the alterations to policy set forth in the ordinance from community stakeholders and SPD personnel. We anticipate the Community Police Commission also conducting robust outreach to assess the wider community perspective, including those most disparately affected by policing. Thus, the accountability entities are engaged in a comprehensive look at SPD's current policies, industry best standards, and Seattle community expectations regarding the use of less lethal weapons, and will submit their recommendations to the Council and the City by August 15, 2020.

We respectfully request that whatever action the Court may take in response to the parties' current filings regarding the Ordinance, it reserve any ruling on the specific language or provisions of SPD policy regarding the use of less lethal weapons until the City submits a copy of the accountability entities' recommendations to the Court for its consideration.

---

[1] http://www.seattle.gov/Documents/Departments/OIG/Other/LessLethalWeaponsUsage06122020.pdf

EXHIBIT 6

June 5, 2020 Letter from Mayor Durkan to Accountability Partners



**City of Seattle**
Mayor Jenny A. Durkan

***TRANSMITTAL VIA E-MAIL***

June 5, 2020

Director Andrew Myerberg
Inspector General Lisa Judge
Interim Executive Director Bessie Scott
Federal Monitor Merrick Bobb
US Department of Justice, Assistant US Attorney Christina Fogg

    **RE:**     ***Evaluation of Crowd Management Tactics and Use of Less-Lethal Tools***

Dear Director Myerberg, Inspector General Judge, Executive Director Scott, federal Monitor Bobb, and Assistant US Attorney Fogg:

On Tuesday, June 2nd, I had the opportunity to discuss with Director Myerberg and Inspector General Judge the need for immediate recommendations, as well as a systemic review to examine and evaluate the City's crowd management policy, which was previously developed with the assistance of the federal Monitor and approved by the Court. In addition, both Chief Best and I attended the Community Police Commission meeting on Wednesday, June 3rd to hear from Commissioners and community members.

During the past nearly 10 years under the Consent Decree, there has been a rigorous process of reviewing and developing SPD policy and practices that must conform to national best practices on policing with input from the federal Monitor, US Department of Justice ("DOJ") and approval by the federal court.

In light of recent events, I request your initial review of SPD's crowd management policy, including the use of all crowd control tools and strategies, in the next 30 days. I fully appreciate the review may take longer, and that you will need to determine both the scope and timeframe. I also respectfully request that the City's accountability partners, federal Monitor, and DOJ working with Public Health – Seattle & King County determine what innovative techniques, or combination of techniques, can provide a greater ability to de-escalate situations that occur with mass protests, so that the use of force can be greatly minimized and avoided.

I understand that more input from community members or accountability partners may be needed to revise and submit a final and updated policy for approval on crowd management. However, I am hopeful the initial phase of this work can be completed in the next 30 days, and that a preliminary report be provided to the Chief. This report would have a recommendation about the use of CS gas in any situation, including the circumstances, a review of SPD crowd management policy and training, including SWAT crowd management protocols, and other recommendations that are best practices for the use of

less-lethal tools for crowd management. Likewise, the Chief is also seeking recommendations from the national Center for Policing Equity.  Also, if you have any immediate practical recommendations for policy changes that can be implemented immediately – similar to the recommendation on CS gas or mourning badges - please know that the Chief and I urgently want to hear them.

As you know, earlier today Chief Best announced that the Seattle Police Department is suspending the use of CS gas for at least thirty (30) days or longer depending on the status of your work. The limited exception to this will be that the SWAT Team will maintain their trained and limited ability to deploy CS gas to prevent or protect against the loss of life or to end stand-off situations like a hostage situation. Additionally, during this thirty (30) day suspension, any deployment of CS gas must be approved by the Chief or her designee.

Seattle has never seen demonstrations of this size and duration, since the Consent Decree was entered. This has been a significant test of many of the policies, procedures and training implemented under the Consent Decree.  The Chief and I believe it is imperative that we review and evaluate where there needs to be changes, revisions, or improvements.  For example, some community members have urged that the City deploy community-based de-escalation teams during mass protests.  These teams could facilitate communication between protestors and police; reduce the potential for isolated incidents of violence precipitating into any escalation or use of force.  The teams could be drawn from protest organizers or related community-based organizations, who are trained and compensated for their work.

We are committed to using the robust process set forth by the Consent Decree to engage the expertise of the federal Monitor and DOJ, but this also gives the independent accountability entities (CPC, OPA and OIG) an opportunity to fulfill their oversight functions developed under the Consent Decree.  The City anticipates submitting a final report and any proposed revisions based on your recommendations to Judge Robart for his review and approval.

For so many reasons, the most important being community confidence, the urgency of this review is critical.  I know this has been a very challenging time and I appreciate all your efforts to respond to these recent events.  Your knowledge, expertise, community ties, and diverse roles are all needed now to assist the City, to ensure public trust and confidence. I welcome your recommendations and input, and I have informed the City's accountability partners that they will have the resources needed to do this work.

Thank you for your assistance.

Sincerely,

*Jenny A. Durkan*

Jenny A. Durkan
Mayor
City of Seattle

Cc:	Seattle Chief of Police Carmen Best
	City Attorney Pete Holmes
	Public Health- Seattle & King County, Director Patty Hayes

# EXHIBIT 7

Project Scoping Documents of Office of Inspector General for Public Safety



# Project Initiation Document

## Project Information

### Project Title
Audit of Crowd Dispersal Policy

### Project Team
Auditor-in Charge: Mary Dory

Auditors: Steve Komadina, Matt Miller

### Preliminary Objective
The preliminary objective is to determine whether current Seattle Police Department (SPD) policies on crowd dispersal contain sufficient controls to ensure public safety while minimizing harm to non-violent protesters.

### Preliminary Project Scope
Timeframe of Data/Events Included

According to an SPD timeline, the department has been responding to demonstrations across Seattle since May 29, 2020. The proposed timeframe of events included in this audit starts on May 29, 2020 and continues through to current date (6/17/2020 as of this writing).

Major Topic Areas

- Describing the SPD policies and procedures related to crowd management, control, and dispersal which were in place at the time of the initial Seattle protests.
- Describing what less-lethal weapons SPD has in its possession for use in crowd control, management, and dispersal, including their basic function and what units are trained and authorized to use them.
- Reviewing a sample of Incident Action Plans and After-Action Reports from recent protests to determine what the incident objectives and concept of operations were as well as whether less-lethal weapons were used for crowd control or dispersal.
- Identifying best practices in policing for minimizing harm to protesters during crowd dispersal.
- Identifying current controls in place in SPD policies and procedures to ensure that crowd dispersal minimizes harm to protesters, including any authorization requirements before dispersal is carried out.
- Comparing identified best practices to current SPD policies and procedures.

Excluded Topics

Last updated: 6/17/2020



- OIG will not focus on specific incidents of alleged misconduct by SPD during the ongoing protests. The Office of Police Accountability (OPA) is currently investigating these incidents.
- OIG will note any differences between identified best practices and SPD current policies and procedures and will note any observed policy-related control deficiencies that affect SPD's ability to safely and effectively disperse crowds. If deficiencies exist, recommendations will be issued to that effect. However, as per standard OIG auditing practice, OIG will not issue specific policy language suggestions. Doing so would impact OIG's independence and ability to conduct audits on this topic in the future.

## Preliminary Timeline

Per the recent Crowd Control Weapons ordinance, OIG recommendations must be provided to the City Council no later than August 15, 2020. Our estimate of mid-point of planning is July 17, 2020.

# Background Information

## Purpose of Project

The Seattle City Council passed an ordinance on June 15, 2020 restricting the Seattle Police Department's ownership, purchase, rent, storage, or use of crowd control weapons. Section 2 of the ordinance included this requirement:

> *[...] the Office of the Inspector General for Public Safety, the Office of Police Accountability, and the Community Police Commission are each requested to make a formal recommendation to the City Council on whether the Seattle Police Department should be reauthorized to use less-lethal weapons for crowd dispersal purposes. The recommendation shall include: 1) suggested policy revisions to the Seattle Police Department manual for use of less-lethal weapons for the purpose of crowd dispersal; and 2) identification of a crowd dispersal authorization process that requires Executive approval and reflects best practices in policing to minimize harm to protesters. The recommendation shall be provided no later than August 15, 2020.*

This project addresses the OIG mission of ensuring constitutional, accountable, effective, and compassionate policing. In the ordinance, the City Council expresses its support for the right to freedom of speech and freedom of assembly as essential democratic rights. It notes in response to protests against police violence, SPD deployed crowd control measures that include "tear gas and pepper spray and explosive devices such as blast balls and stun grenades."

The Council notes that the Office of Police Accountability had received over 15,000 complaints of police misconduct as of June 3, 2020 related to the SPD response to the protests, and cites allegations that include "pepper spraying a young girl", "punching a person on the ground who was being arrested", and "pepper spraying peaceful protesters". Further, the Council notes that "studies into the impacts of policing at protests have determined that escalating force by police at protests leads to increasing violence."

Last updated: 6/17/2020



The ordinance reflects clear concern on the part of the Council and the public as to whether SPD is carrying out its duties in a way that is constitutional, accountable, effective, and compassionate.

## Connection to Settlement Agreement / Sustainment Plan

The project is not directly related to the consent decree process. However, on June 5, 2020 the City withdrew a motion to terminate sustainment plan provisions of the consent decree, including use of force. Accountability is another area of the consent decree which remains in effect.

## Prior Work

OIG

OIG has not issued audit recommendations related to less-lethal weapons or crowd dispersal policies and procedures.

Office of Police Accountability (OPA)

In late 2014 and 2015, OPA made multiple recommendations to SPD following mass demonstrations. These included:

1. Re-evaluate how and under what circumstances officers use blast-balls. OPA noted that blast balls deployed by SPD exploded in extremely close proximity to people, not all of whom were engaged in destruction of property or posed a threat to public safety. OPA noted the use of blast balls was contrary to OPA's understanding of how officers had been trained to deploy blast balls.
2. Make immediate changes to its control and tracking of blast balls. OPA recommended that all blast balls be tracked by serial number. (auditor note: the ATF and others should also have requirements for tracking these devices)
3. Review its policy and training for using less-lethal munitions in crowd management situations. OPA noted their concern that projectiles may strike and injure people lawfully exercising their constitutional rights.
4. Curtail its use of officers from mutual aid agencies. OPA recommended that if SPD were to use officers from other agencies they should be in roles where they would be very unlikely to use force (such as prisoner transport and processing) or have officers for mutual aid only carry force options SPD authorizes and be trained on SPD policies.[1]
5. Consider the use of additional video sources as part of the post-event documentation and use of force investigations. OPA also recommended that SPD should create a cadre of detectives and supervisors, similar to FIT, but with the goal of reviewing mass demonstrations.
6. Affix the name and serial number to the front and back of the outermost garment or body armor as well as the helmet. OPA stated it should be done in a large, and highly visible way.

---

[1] Auditor Note: Requiring non-SPD officers to comply with SPD regulations may not be enforceable.

Last updated: 6/17/2020



7. "Seek an effective means by which Seattle's many diverse peoples and neighborhoods can actively participate in this process and communicate to SPD how they want their police service to handle protests and demonstrations in their city."

Community Police Commission (CPC)

On May 19, 2015, CPC sent an email to SPD stating that either SPD provides insufficient guidance to officers about when pepper spray, blast balls, and other projectiles may be used, or that these tools frequently appear to be used outside of policy. CPC stated that in a variety of videos, peaceful protesters who were dispersing had pepper spray used on them. Blast balls were used in the immediate vicinity of demonstrators, and CPC also noted that an injury from a blast ball occurred on May Day. CPC suggested that SPD policies required immediate review, public discussion, and clarification so individuals participating in free speech and assembly do not feel at risk.

Court Monitor

In April 2017, the Court Monitor noted in its Ninth Systemic Assessment that one of the sampled cases was a crowd-control incident. The Monitor urged SPD to ensure that appropriate protocols for the use of blast balls were included in their policies and stated that it looked forward to reviewing any new standards and protocols.

SPD Report

In 2015, SPD hired Steve Ijames to review SPD's performance in demonstration management in May Day 2015. Mr. Ijames created the less lethal force instructor/trainer programs for the International Association of Chiefs of Police (IACP) and the National Tactical Officers Association (NTOA). He also authored the IACP National Policy Center position paper on Special Weapons and Tactics as well as model polices on TASER, impact rounds, chemical agents, noise/flash diversionary devices, hostage rescue, and barricaded subjects.

Mr. Ijames submitted his preliminary assessment on April 28, 2016 to then-Chief O'Toole. He stated that the May Day 2015 Incident Action Plans were "long, detailed, and comprehensive" and the May Day 2016 Incident Action Plan was "similarly well thought-out and comprehensive." However, he noted about blast balls that "the area of concern is not the rule and or method of engagement, but the justification and accountability as it relates to the established protocols and processes are not being followed." Mr. Ijames provided multiple actions steps for SPD to take:

1. Conduct an inquiry into the issuance and deployment of blast balls, including:
    a. Determining the number of blast balls tossed by each person and or unit.
    b. Comparing these numbers with other persons and units
    c. Reviewing the reported justification of their use
    d. Conducting an objective analysis of each deployment.



2. He noted that there should not be a dramatic difference between officers and units on the use of blast balls. He also noted that the Department has ATF reporting protocols in place for tracking blast balls.
3. Conduct an inquiry into the issuance and deployment of less lethal launchers, including:
    a. the devices involved
    b. rationale for issuing/selection of a particular device
    c. rules of engagement
    d. number of rounds fired and by whom (unit and individual officer)
    e. circumstances of use
    f. outcomes
    g. command level knowledge of all the above
4. If mutual aid officers are utilized their training, equipment, assignment, supervision, and role/rules of engagement be specifically addressed in a written memorandum of understanding.
5. "There is no logical reason why officers should not be readily identifiable by a number on their chest or headgear." Mr. Ijames noted that the Department stated they have implemented measure to address this.
6. Continue the review process undertaken by the Force Review Board to asses supervisor performance, including:
    a. A brief summary of the role each person filled
    b. An objective assessment of each person and position, specifically as it relates to their DOCUMENTED and or PROVEN (emphasis original) knowledge, training, and experience and the role they are tasked with fulfilling, for purposes of guiding leadership assignments for upcoming events.
7. Ensure that SPD leadership, including the Chief, be fluent in all rules of engagement. Leadership must discuss with the authors and understand specific "if/then" scenarios contained in the rules.

## Relevant SPD/OPA Operations and Personnel

Crowd management and control duties focused on crowd dispersal are primarily carried out by the Patrol Operations Bureau and the Special Weapons and Tactics (SWAT) team, which is under the Special Operations Bureau.

According to SPD Manual 14.090 – Crowd Management:

> **4. The Incident Commander May Consider Utilizing Specialty Units, Based on Operational Needs**
>
> In the event of an unplanned crowd management event, the Incident Commander shall request SWAT when feasible.

In SPD Manual 14.090-TSK-1, the responsibilities of the Incident Commander include:

Last updated: 6/17/2020



    3. Considers utilizing specialty units

- Bicycle units for marches or mobile protests

- Officers on foot for static events, or to function as arrest teams or bicycle unit support for marches or mobile protests

- Mounted patrol for static events, marches or mobile protests

- Video Unit for events where information indicates that civil disobedience or crowd violence will occur (Recordings must be in compliance with SMC 14.12 – Collection of Information for Law Enforcement Purposes.)

- Special Weapons and Tactics (SWAT) officers to use less-lethal launchers and tools that are approved for use solely by the SWAT team

- CART-trained officers when there is insufficient time to deploy SWAT

- Prisoner processing for events where information indicates civil disobedience or crowd violence will occur

- Intelligence Unit resources when there is a need for ongoing information gathering and dissemination during the event

- SPOC for planning and logistical support

SPD's description of SWAT duties includes responding to "crowd control during large-scale disturbances or riots." Their areas of expertise include "Tasers" and "Other Less Lethal Weapons." The 2012 SWAT Policies & Procedures Manual includes sections on less lethal impact weapons and chemical agents and discussion of their use in crowd control incidents.

## Relevant Data Systems and Access Privileges

The primary sources will be from SPD documents. These may include departmental policies and procedures, unit manuals, Incident Action Plans, and After-Action Reports. Special access should not be required beyond filing document requests.

# Other Considerations

## Community Perspectives, Significant Cases, and Media Coverage

As stated above, the Seattle community has had ongoing concerns about SPD use of force and specifically at protests and demonstrations.

Major community concerns relating to SPD crowd dispersal techniques include:

- o Use of tear gas, blast balls, and other tools on protestors in general
- o Use of less lethal weapons in a manner that caused significant injuries
- o Use of crowd dispersal tactics without adequate warning



- o Use of chemical weapons on minors and disabled individuals
- o Inability to identify officers due to covered badges
- o Use of specific ground control tactics such as punching subjects in the head and using a knee on an individual's neck.
- o Failure of officers to activate body-worn video

Past media coverage of SPD crowd dispersal techniques refers to the use of projectiles, blast balls, and tear gas.

Notable events connected to SPD crowd dispersal controversies in the past include May Days 1970, 2015, and 2016; the 1999 World Trade Organization protests; and Mardi Gras 2001.

## Race and Social Justice

The ongoing protests are explicitly about the Race and Social Justice (RSJI) issues facing the City and the country, including whether members of the public are treated differently by police departments based on their race and ethnicity. The Seattle Race and Social Justice Initiative 2019-2021 Strategy includes the following principles:

- **Power of history:** Honor the history of racial justice organizing that birthed the Race and Social Justice Initiative.
- **City role and impact:** Understand the City of Seattle's institutional power and footprint in local communities most impacted by structural racism.
- **Accountability:** Accept responsibility for institutional actions and harm, and work to restore relationships, share information and follow-through with commitments.
- **Value community:** Value the wisdom, expertise and leadership of communities most impacted; and compensate community members for their contributions to the institution.
- **Show up for community:** Respect, support and show up for communities organizing for racial justice and systems-change.
- **Learn from community:** Center and learn from those who are burdened by the multiplicity of institutional harm.

The initial Department of Justice Civil Rights Division pattern or practice investigation in 2011 which led to the consent decree found that there were "constitutional violations regarding the use of force that result from structural problems, as well as serious concerns about biased policing." This project will help advance the RSJI goals of understanding the City's role and impact as well as accountability by examining SPD's use of force in the recent protests and whether its policies are aligned with best practices.

Last updated: 6/17/2020



# Project Initiation Document

## Project Title
Crowd Dispersal Authorization Process

## Project Team
Auditor-in Charge: Miroslava Meza

Auditors: Matt Miller, Mary Dory

## Preliminary Objective
As requested by Council Bill 119805 (CB 119805), the preliminary objective for this non-audit will be to identify crowd dispersal authorization processes that require Executive approval and reflects best practices in policing to minimize harm to protesters for the purpose of informing how the Seattle Police Department can appropriately and safely use less-lethal weapons for crowd dispersal purposes.

## Preliminary Project Scope
- Map/describe the SPD authorization process for crowd dispersal police response.
- Research crowd dispersal authorization processes of other jurisdictions.
- Summarize best practices in crowd dispersal authorization from leading law enforcement associations.
- Identify elements of national response processes that can inform a City Executive approval process.

Excluded Topics
- This non-audit will not focus on specific crowd dispersal tactics, nor on policies unrelated to crowd dispersal authorization.

## Preliminary Timeline
Per CB 119805, OIG suggestions must be provided to the City Council no later than August 15, 2020. The OIG estimate for mid-point of planning is July 17, 2020.

# Background Information
## Purpose of Project   🟢 Crowd Dispersal Ordinance
The Seattle City Council passed Council Bill 119805 on June 15, 2020, restricting the Seattle Police Department's ownership, purchase, rent, storage, nor use of crowd control weapons. Section 2 of the ordinance included this requirement:

> [...] the Office of the [sic] Inspector General for Public Safety, the Office of Police Accountability, and the Community Police Commission are each requested to make a formal recommendation

Last updated: 7/29/2019



*to the City Council on whether the Seattle Police Department should be reauthorized to use less-lethal weapons for crowd dispersal purposes. The recommendation shall include: 1) suggested policy revisions to the Seattle Police Department manual for use of less-lethal weapons for the purpose of crowd dispersal; and 2) identification of a crowd dispersal authorization process that requires Executive approval and reflects best practices in policing to minimize harm to protesters. The recommendation shall be provided no later than August 15, 2020.*

In CB 119805, the City Council expresses its support for the right to freedom of speech and freedom of assembly as essential democratic rights. It notes that in response to protests against police violence, SPD deployed crowd dispersal measures that included "tear gas and pepper spray and explosive devices such as blast balls and stun grenades."

This project reflects OIG mission of ensuring constitutional, accountable, effective, and compassionate policing by identifying crowd dispersal authorization processes that reflects best practices in policing to minimize harm to protesters.

## Connection to Settlement Agreement / Sustainment Plan

The City of Seattle is still under Consent Decree. On June 5, 2020, the City withdrew a motion to terminate sustainment plan provisions of the Consent Decree, including use of force. The project is directly related to the Consent Decree requirements of accountability.

## Prior Work

### OIG

OIG has not issued audit recommendations related to crowd dispersal policies and procedures.

### Office of Police Accountability (OPA)  Summary of OPA Management Actions

In late 2014 and 2015, OPA made multiple recommendations to SPD following mass demonstrations on May 1, 2015. Most of the recommendations centered in the use and inventory control of blast-balls and chemical agents during mass demonstrations.

OPA recommendations to SPD related to authority and authorization of use of less-lethal force in a crowd management setting were:

- To rethink its approach to planning and providing policing services in relation to protests and demonstrations. They encouraged SPD to look beyond the confines and thinking of the American law enforcement establishment.

### Community Police Commission (CPC)
Summary of CPC recommendations and monitor discussion of blast balls

On May 19, 2015, CPC sent recommendations to SPD stating that either "SPD (had) provided" insufficient guidance to officers about when pepper spray, blast balls, and other projectiles could be used, or that these tools appeared to be frequently used in a manner outside of policy. CPC

Last updated: 7/29/2019



stated that in a variety of videos, peaceful protesters who were dispersing had pepper spray used on them. They noted that blast balls were used in the immediate vicinity of demonstrators and had resulted in protesters being injured on May Day. CPC suggested that SPD crowd control policies required immediate review, public discussion, and clarification so individuals participating in free speech and assembly would not feel at risk.

SPD Report ⊙✦ Review of Steven Ijames Report

In 2015, SPD hired Steve Ijames[1] to review SPD's performance in demonstration management in May Day 2015. Ijames submitted his preliminary assessment on April 28, 2016 to then-Chief O'Toole. He stated that the May Day 2015 Incident Action Plans were "long, detailed, and comprehensive" and the May Day 2016 Incident Action Plan was "similarly well thought-out and comprehensive." However, he noted about blast balls that "the area of concern is not the rule and or method of engagement, but the justification and accountability as it relates to the established protocols and processes are not being followed."

Ijames provided multiple actions steps regarding crowd management for SPD to take. The recommendations he issued that relate to crowd dispersal authorization were:

- Ensure that SPD leadership, including the Chief, be fluent in all rules of engagement. Leadership must discuss with the authors and understand specific "if/then" scenarios contained in the rules.
- If mutual aid officers are utilized their training, equipment, assignment, supervision, and role/rules of engagement be specifically addressed in a written memorandum of understanding

## Relevant SPD/OPA Operations and Personnel

Crowd management and control duties focused on crowd dispersal are primarily carried out by the Patrol Operations Bureau and the Special Weapons and Tactics (SWAT) team, which is under the Special Operations Bureau.

According to SPD Manual 14.090 – Crowd Management, SPD uses the Incident Command System for crowd management. SPD assigns an Incident Commander to oversee the department's response before, during, and after an event. The responsibilities of the Incident Commander are described in SPD Manual 14.090-TSK-1.

---

[1] Ijames created the less lethal force instructor/trainer programs for the International Association of Chiefs of Police (IACP) and the National Tactical Officers Association (NTOA). He also authored the IACP National Policy Center position paper on Special Weapons and Tactics as well as model polices on TASER, impact rounds, chemical agents, noise/flash diversionary devices, hostage rescue, and barricaded subjects.

Last updated: 7/29/2019



The Incident Commander may delegate authority and assignments. Also, the Incident Commander may consider using specialty units, based on operational needs. In the event of an unplanned crowd management event, the Incident Commander shall request SWAT when feasible.

SPD's description of SWAT duties includes responding to "crowd control during large-scale disturbances or riots." Their areas of expertise include "Tasers" and "Other Less Lethal Weapons." The 2012 SWAT Policies & Procedures Manual includes sections on less lethal impact weapons and chemical agents and discussion of their use in crowd control incidents.

### Relevant Data Systems and Access Privileges

The primary sources will be SPD documents including departmental policies and procedures, unit manuals, Incident Action Plans, and After-Action Reports. Special access should not be required beyond filing document requests.

## Other Considerations

### Community Perspectives, Significant Cases, and Media Coverage

As stated above, the Seattle community has had ongoing concerns about SPD use of force and specifically at protests and demonstrations.

Major community concerns relating to SPD crowd dispersal authorization policies and process include:

- Policy loopholes on the ban on use of tear gas for crowd dispersal
- Authorization to use of tear gas, blast balls, and other tools on protestors in general
- Use of less lethal weapons in a manner that caused significant injuries
- Use of crowd dispersal tactics without adequate warning
- Use of chemical weapons on minors and disabled individuals

For more details on media coverage see:
  Review of Community Concerns and Media Coverage Related to SPD Crowd Dispersal

### Race and Social Justice

The ongoing protests in the City and the country are explicitly about systemic racism in policing. The Department of Justice Civil Rights Division investigation of SPD in 2011 found that there were "constitutional violations regarding the use of force that result from structural problems, as well as serious concerns about biased policing."

This project will help advance the Seattle Race and Social Justice Initiative 2019-2021 (RSJI) [2] goals of understanding the City's role and impact as well as accountability by comparing SPD's crowd

---

[2] The Seattle Race and Social Justice Initiative 2019-2021 Strategy includes the following principles:
- Power of history
- City role and impact

Last updated: 7/29/2019



dispersal authorization policies and process in the recent protests with other jurisdictions and generally accepted crowd dispersal best practices.

---

- Accountability
- Value community
- Show up for community
- Learn from community

Last updated: 7/29/2019