UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. C12-1282JLR |
| Plaintiff, | ORDER |
| v. | |
| CITY OF SEATTLE, | |
| Defendant. | |

## I.    INTRODUCTION

Before the court is Plaintiff United States of America's ("the Government")

motion for a temporary restraining order ("TRO") enjoining implementation of Seattle

Police Chief Carmen Best's directive to Seattle Police Department ("SPD") officers on

July 23, 2020, which implemented portions of the Seattle City Council's Ordinance No.

119805 banning certain crowd control weapons ("CCW").  (*See* TRO Mot. (Dkt. # 627);

*see also* Fogg Decl. (Dkt. # 628) ¶ 2, Ex. A ("Directive").)  The Directive instructs

officers to cease use of and possession of certain crowd control implements known as 40

1   mm launchers, blast balls, CS gas, and oleoresin capsicum ("OC") spray.  (*See* Directive.)

2   The court has reviewed the motion, the submissions related to the motion, the relevant

3   portions of the record, and the applicable law.  In addition, the court held a video and

4   telephonic hearing on July 24, 2020, at 8:00 p.m., PDT, in which counsel for the parties

5   and the Community Police Commission ("CPC") participated.  Having considered all of

6   the foregoing, the court GRANTS the Government's motion as more fully described

7   below.

8                          **II.   BACKGROUND**

9         In 2011, the Government investigated SPD for a potential pattern or practice of

10  unconstitutional policing and excessive force.  (*See* Dkt. # 1-1.)  As a result of its

11  investigation, the Government issued findings that such a pattern or practice of excessive

12  force existed.  (*See id.*)  Rather than pursue litigation to contest this finding, the City of

13  Seattle opted to enter into the Consent Decree[1] that this court now administers.  Although

14  the City did not admit that the SPD engaged in a pattern or practice of unconstitutional

15  policing and excessive force, the City did admit that there was an evidentiary basis for

16  entry of the Consent Decree, including but not limited to the Government's investigation.

17  (*See* Findings and Conclusions (Dkt. # 14) ¶¶ 16, 27.)

18        Under the Consent Decree, the City agreed to abide by a number of prescriptive

19  requirements designed to eliminate unconstitutional uses of force.  (*See generally*

20

21        [1] The Settlement Agreement between the parties that the court entered an as order has been known as the "Consent Decree."  (*See* Settlement Agreement (Dkt. # 3-1); Order Provisionally Approving the Settlement Agreement (Dkt. # 8); Order Modifying and

22  Preliminarily Approving the Settlement Agreement (Dkt. # 13).)

ORDER - 2

1   Consent Decree.)  Specifically, the Consent Decree requires that the City submit policies

2   related to the use of force, including the use of crowd control management weapons, to

3   the Monitor and the Government before the policies are implemented.  (Consent Decree

4   ¶ 177.)  Since 2012, the City has followed these requirements, including for every

5   revision for SPD's use of force policies, since the Consent Decree's inception.  (*See* Dkt.

6   ## 569-2 to 569-4.)  Likewise, the City followed this process in passing the current

7   version of SPD's crowd management policy.  (*See* Dkt. ## 359-1, 363.)

8        In the Consent Decree, the City also agreed to abide by a series of principles

9   including that officers' actions should increase public safety, be effective and

10  constitutional, embrace principles of procedural justice, that comply with uses of force

11  that are consistent with the principles set forth in *Graham v. Connor*, 490 U.S. 368

12  (1989).   In other words, the City agreed that SPD's uses of force shall be reasonable

13  under the circumstances and that officers should use de-escalation techniques.  (*See*

14  Consent Decree ¶ 70.)  Further, the City agreed to the governing principle that policing

15  must be delivered to the people of Seattle in a manner that ensures both officer and the

16  public's safety.  (*Id.* ¶ 5.)

17       Recently, the City Council passed Ordinance No. 119805 banning certain crowd

18  control weapons ("CCW Ordinance").  The CCW Ordinance prohibits the City's use or

19  possession of "crowd control weapons," which are defined to include "kinetic impact

20  projectiles, chemical irritants, acoustic weapons, direct energy weapons, water cannons,

21  disorientation devices, ultrasonic cannons, or any other device that is designed to be used

22  on multiple individuals for crowd control and is designed to cause pain or discomfort."

1   (*See* Notice (Dkt. # 625) at 2; *see also id.*, Ex. 1 (attaching a copy of the CCW

2   Ordinance) §§ 1(A), 1(B).) The CCW Ordinance makes an exception for the use of

3   oleoresin capsicum spray ("OC spray") outside the setting of a "demonstration, rally, or

4   other First Amendment-protect event." (*Id*. Ex. 1 § 1(D)(2).) However, when used, OC

5   spray must not "land on anyone other than" "an individual in the process of committing a

6   criminal act or presenting an imminent danger to others." (*Id*.) Finally, the CCW

7   ordinance also creates a private right of action for individuals against whom a prohibited

8   crowd control weapon is used. (*Id*., Ex 1 §§ 1(E)-(F).) Because Mayor Durkan returned

9   the CCW Ordinance to the City Council without a signature, the Ordinance will take

10   effect on July 26, 2020. (*See* Notice at 3; see also id., Ex. 1 § 5 ("This ordinance shall

11   take effect and be in force 30 days after it is approved by the Mayor, but if not approved

12   and returned by the Mayor within ten days of presentation, it shall take effect as provided

13   by Seattle Municipal Code Section 1.04.020.").)

14        On July 17, 2020, the City filed a notice with the court concerning the CCW

15   Ordinance. (*See* Notice.) Because both Mayor Jenny Durkan and Chief Best asked the

16   court to enjoin the effective date of the CCW Ordinance (*see id.* at 6), the court construed

17   the notice as a motion for a TRO (*see* 7/22/20 Order (Dkt. # 626) at 3). However, the

18   court declined to enjoin the effective date of the CCW Ordinance because the City had

19   failed to demonstrate that it met the necessary standard for entry of this type of relief.

20   (*Id.* at 4-7.) The court nevertheless ordered the City to provide the court with the Office

21   of Police Accountability ("OPA") and the Inspector General's ("IG") analysis of the

22   CCW Ordinance, which OPA and IG have committed to provide to the City Council by

1    August 15, 2020, and the court set a briefing schedule so that it could consider the

2    interaction of the CCW Ordinance with the Consent Decree, as well as with any SPD

3    policies that the Consent Decree governs.  (*Id.* at 7-9.)

4        On July 23, 2020, Chief Best issued her Directive to SPD officers to ensure their

5    compliance with the CCW Ordinance.  (Fogg Decl. ¶ 2, Ex. A.)  Chief Best's Directive

6    becomes effective on July 25, 2020 at 3:00 a.m., PDT.  (*See id.*)

7        The Government maintains that removing all forms of less lethal implements from

8    all police encounters, as Chief Best's Directive and the CCW Ordinance will do, will not

9    increase public safety nor provide the means for SPD officers to abide by the

10   de-escalation mandate.  The Government asks the court to grant a TRO prohibiting the

11   implementation of Chief Best's Directive.  (*See* TRO Mot.)  The court now considers the

12   Government's motion.

13                              **III.   ANALYSIS**

14       The standard for issuing a TRO is the same as the standard for issuing a

15   preliminary injunction.  *See New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434

16   U.S. 1345, 1347 n.2 (1977).  A TRO is "an extraordinary remedy that may only be

17   awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat.*

18   *Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  "The proper legal standard for

19   preliminary injunctive relief requires a party to demonstrate (1) 'that he is likely to

20   succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of

21   preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an

22   //

ORDER - 5

1   injunction is in the public interest.'"  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th

2   Cir. 2009) (citing *Winter*, 555 U.S. at 20).

3          As an alternative to this test, a preliminary injunction is appropriate if "serious

4   questions going to the merits were raised and the balance of the hardships tips sharply in

5   the plaintiff's favor," thereby allowing preservation of the *status quo* when complex legal

6   questions require further inspection or deliberation.  *All. for the Wild Rockies v. Cottrell*,

7   632 F.3d 1127, 1134-35 (9th Cir. 2011).  However, the "serious questions" approach

8   supports the court's entry of a TRO only so long as the plaintiff also shows that there is a

9   likelihood of irreparable injury and that the injunction is in the public interest.  *Id.* at

10  1135.  The moving party bears the burden of persuasion and must make a clear showing

11  that it is entitled to such relief.  *Winter*, 555 U.S. at 22.

12  **A.     Serious Questions Going to the Merits and the Balance of Equities**

13         With the respect to the first factor, the court concludes that the Government has

14  met the Ninth Circuit's alternative test of serious questions going to the merits and the

15  balance of hardships tipping sharply in the Government's favor.  If Chief Best's Directive

16  is implemented, the Government loses its right under the Consent Decree, in which the

17  City voluntarily engaged, to review these policies prior to implementation.  Further, the

18  court agrees that by removing all forms of less lethal crowd control weapons from

19  virtually all police encounters, the Directive and the CCW Ordinance will not increase

20  public safety.  This is so particularly because neither the CCW Ordinance nor the

21  Directive provide time for police training in alternative mechanisms to de-escalate and

22  resolve dangerous situations if the crowd control implements with which the officers

1   have been trained are abruptly removed.  As Chief Best stated:  "Left only with the

2   options of a baton, a Taser (effective distance of approximately 7-12 feet), and an

3   officer's body, the likelihood of greater injury – to both the officer and subject in those

4   . . . empirically rare but foreseeable situations where some level of force is necessary –

5   should be patent and concerning."  (Best Mem. (Dkt. # 625-2) at 4.)

6          Further, the City is anticipating significant and potentially dangerous protests this

7   weekend just as the Directive and CCW Ordinance go into effect.  (*See* Fogg Decl. ¶ 4,

8   Ex. C (attaching a letter from Chief Best to the City Council on July 23, 2020).)  The

9   issuance of this immediate change, without time for additional direction or training, is

10  likely to result in officer confusion, particularly if the Directive or CCW Ordinance

11  undergo additional changes after review by IG, OPA, the parties to this litigation, and the

12  court.  (*See* 7/22/20 Order at 8-9.)  These additional changes to policy risk whipsawing

13  officers through three varying sets of expectations in less than one month.  The court

14  concludes that such officer confusion presents risks to both the officers' and the public's

15  safety.

16         These substantial risks tip the balance of the equities in the Government's favor.

17  Further, the Government is not arguing that the CCW Ordinance may never be

18  implemented.  The Government merely seeks a pause until such time as the Chief Best's

19  Directive, and the underlying CCW Ordinance, can be reviewed pursuant to the terms of

20  the Consent Decree.  For these reasons, the court concludes that the Government has

21  established serious questions going to the merits of its claim and that the balance of the

22  equities tips sharply in the Government's favor.

**B.      Irreparable Harm and the Public Interest**

The remaining factors of the *Winter* test also favor an injunction.  There are both substantive and procedural grounds on which to find that the absence of injunctive relief will yield irreparable harm.  First, substantively, the Government has established that implementation of the Directive and the CCW Ordinance will create a risk that SPD officers will resort to excessive force, which could violate both the Fourth Amendment and the terms of the Consent Decree relating to the use of force.  "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'"  *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)) (finding irreparable harm in case where the plaintiffs established likelihood of success on the merits of their Fourth Amendment claims).

Second, procedurally, as discussed above, the Government, the Monitor, and the court are entitled to review "the policies, procedures, training curricula, and training manuals required to be written, revised, or maintained" by the Consent Decree before implementation by SPD.  If the court allows SPD to implement the CCW Ordinance and the Directive without first complying with the procedural protections in the Consent Decree, that procedural harm cannot be undone.  These substantive and procedural harms are particularly acute here given that the City has reason to believe that protests and public demonstrations in Seattle may occur shortly after the Directive and the Ordinance go into effect.  (*See* Fogg Decl. ¶ 4, Ex. C (attaching July 23, 2020, letter from Chief Best to the City Council).

//

ORDER - 8

1    The court also finds that a temporary injunction that preserves the status quo of the

2    Consent Decree and the processes put in place by the Consent Decree is in the public

3    interest for similar reasons that the court finds a likelihood of irreparable harm.  To the

4    extent that implementation of the Directive and the Ordinance makes it difficult for the

5    SPD to practice effective crowd management tactics and increases the risk of excessive

6    force in violation of the Fourth Amendment, it is in the public interest to prevent that

7    deprivation of constitutional rights.  *Melendres*, 695 F.3d at 1002 ("[I]t is always in the

8    public interest to prevent the violation of a party's constitutional rights.")  (internal

9    quotation marks omitted); *Miller v. City of Cincinnati*, 622 F.3d 524, 540 (6th Cir. 2010)

10   ("When a constitutional violation is likely . . . the public interest militates in favor of

11   injunctive relief because it is always in the public interest to prevent violation of a party's

12   constitutional rights.") (internal quotation marks omitted).

13   The court recognizes that preservation of the status quo does not ensure that SPD

14   will refrain from using crowd control tactics that result in deprivations of constitutional

15   rights.  *See Black Lives Matter Seattle-King Cty. v. City of Seattle, Seattle Police Dep't*,

16   No. C20-0887RAJ, 2020 WL 3128299, at *4 (W.D. Wash. June 12, 2020) (finding that

17   the SPD's use of force in response to recent protests likely violated the Fourth

18   Amendment).  However, the procedural and substantive provisions in the Consent Decree

19   are in place to provide the court with mechanisms to monitor SPD's practices and to

20   work in hand with the parties to determine the most effective police practices for SPD.  It

21   is not in the public's interest to eschew the protections that the parties and the court have

22   spent nearly a decade fashioning the moment SPD engages in potentially unconstitutional

1    practices.  Instead, the court concludes that the public interest weighs in favor of

2    preserving the status quo under the Consent Decree by reviewing SPD's recent practices

3    and the City's recent crowd control proposals with input from all the appropriate

4    stakeholders before determining the correct path forward under the terms of the Consent

5    Decree.

6            In summary, the court concludes that the Government has clearly met the standard

7    for issuing a TRO and therefore grants its motion.

8                              **IV.    CONCLUSION**

9            Having concluded that the Government has met the standard for issuing a TRO,

10   the court GRANTS the Government's motion (Dkt. # 627) and issues a TRO against

11   implementation of Chief Best's Directive.  The court further concludes that it would

12   cause confusion not only for SPD officers, but also the public, if the court were to enjoin

13   Chief Best's Directive while leaving the CCW Ordinance in place.  Accordingly, the

14   court's TRO will also enjoin the effective date of the CCW Ordinance.  The court does

15   not enjoin the CCW Ordinance itself, but rather enjoins only the Ordinance's

16   implementation date until such time as the procedures the City agreed to follow in the

17   Consent Decree concerning SPD use of force and crowd control policies are followed.

18          Finally, the court notes that nothing in this order is contrary to the preliminary

19   injunction that the Honorable Richard A. Jones issued in *Black Lives Matter Seattle-King*

20   *County, et al., v. City of Seattle*, No. C20-0887RAJ (W.D. Wash.), Dkt. # 42.  Judge

21   Jones' preliminary injunction is the current *status quo* and remains in effect.

22   *//*

ORDER - 10

1    Pursuant to Rule 65(b)(2), this TRO will expire 14 days after entry unless before

2  that time the court, for good cause, extends it for a like period or the adverse party

3  consents to a longer extension.  *See* Fed. R. Civ. P. 65(b)(2).  The court ORDERS the

4  parties to meet and confer to set a schedule for briefing on a preliminary injunction and

5  file a joint status report concerning the same no later than Wednesday, August 1, 2020.

6    Dated this 24th day of July, 2020.

7

8

9    JAMES L. ROBART
     United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22