

# Response to City Council Crowd Control Weapons Ordinance Ban

**Director Andrew Myerberg**
August 15, 2020


Seattle Office of Police Accountability

# Table of Contents

**Background** .................................................................. 1

**Purpose** ........................................................................ 1

**Ordinance Impact on Non-crowd Control Situations**  2

    **Noise Flash Diversionary Devices** ........................ 2

      **Chemical Agents** ...................................................... 3

    **40 mm Less Lethal "Blue Nose" Launchers** ....... 3

**Ordinance Impact on Crowd Control Situations** .. 5

**Crowd Management Policy Recommendations** ... 7

  **Executive Approval Process** .................................. 11

**Conclusion** ................................................................. 11



## Background

On May 25, 2020, George Floyd, a Black man, was murdered by a White Minneapolis police officer. Video of Mr. Floyd dying under the knee of this officer was widely circulated, kicking off massive protests for racial justice. Demonstrations began in Seattle on May 29, and thousands of people protested—mostly peacefully. Seattle Police Department (SPD) officers ultimately used force on some demonstrators, including tear gas, pepper spray, 40 mm "Blue Nose" rounds, and blast balls, and the Office of Police Accountability (OPA) was contacted over 18,000 times regarding this and other conduct. Due to grave concern about SPD's crowd management tactics and uses of force against demonstrators, Seattle City Council passed Ordinance 126102 on June 15, "banning [SPD] ownership, purchase, rent, storage, or use of crowd control weapons."[1]

## Purpose

This memorandum is in response to that Ordinance, which requested that OPA provide a "formal recommendation to the City Council on whether the SPD should be reauthorized to use less-lethal weapons for crowd dispersal purposes." The Council also requested that OPA suggest revisions to the SPD manual sections that govern use of less-lethal weapons for the purpose of crowd dispersal and identify a crowd dispersal authorization process that requires "executive approval" and reflects "best practices in policing to minimize harm to protesters." The information that follows is organized into four parts.

- Part I addresses ways in which the Ordinance's ban on less-lethal tools impacts non-crowd control situations. OPA recommends that these tools be reauthorized for non-crowd control situations.
- Part II addresses ways in which the Ordinance's ban on less-lethal tools impacts crowd or demonstration management. OPA recommends reauthorization of all tools except tear gas, with restrictions on use in crowd control contexts.
- Part III lists OPA's five primary crowd management policy recommendations.
- Part IV discusses OPA's conclusions regarding the plausibility of instituting a mandatory executive approval process prior to crowd dispersal. OPA concludes that such a process would be both impractical and legally problematic.

OPA notes that its investigations into complaints about SPD officers' actions during the recent demonstrations are still ongoing, so the recommendations herein are preliminary. OPA is likely to identify additional policy recommendations as it completes its investigations. These policy recommendations will be issued in the form of Management Action Recommendations, which are a formal tool OPA uses to suggest corrections to SPD policies or practices that have implications beyond the case at hand.

---

[1] City of Seattle, Ordinance No. 126102, (July 26, 2020).

# Ordinance Impact on Non-crowd Control Situations

Although the Ordinance labels the banned tools as "crowd control weapons," its plain language yields the conclusion that it also bars SPD from owning or using the covered weapons in any other context, regardless of whether they are used or designed for use on multiple individuals.[2] This prohibition extends to chemical irritants, kinetic impact projectiles, and disorientation devices.[3] In order to illustrate how implementation of the Ordinance would impact SPD operations, OPA has summarized below examples of how some of these less-lethal tools are used outside of crowd management situations.

## Noise Flash Diversionary Devices

Noise Flash Diversionary Devices (NFDDs) create "a bright flash and loud report designed to temporarily divert the attention of persons in the immediate vicinity, giving tactical teams a window of opportunity to exploit to their advantage."[4] Only trained SPD SWAT officers are permitted to deploy NFDDs, which may be used during standoffs with barricaded subjects, hostage rescue operations, or when serving high-risk search warrants. They are more powerful than blast balls and generally are not used during demonstrations.[5]

### *Example of Use*

SPD's Gang Unit developed probable cause to arrest a known gang member who was prohibited from possessing firearms but seen brandishing them on social media. SPD SWAT assisted the Gang Unit in serving a search warrant at the suspect's residence.[6] When they arrived, one person saw police approaching, ignored officers' orders



---

[2] Memorandum from Kerala Cowart, Assistant City Attorney, to Bessie Scott, Interim Executive Director, Community Police Commission, (July 8, 2020).
[3] The Ordinance provides that SPD may use oleoresin capsicum (OC) spray outside of demonstrations when it does not land on anyone other than the targeted individual. Due to the difficulty of preventing cross contamination when using OC spray and the creation of a legal cause of action where this occurs, SPD informed OPA on July 29 that it will order officers to cease the use of OC spray if the ordinance goes into effect.
[4] National Tactical Officers Association, Tactical Response and Operations Standard for Law Enforcement Agencies, (April 2018), last accessed August 3, 2020, https://ntoa.org/pdf/swatstandards.pdf, 42.
[5] SPD SWAT Team Manual, Polices & Procedures 3.050 – NFDD.
[6] SPD's SWAT team is typically called upon to serve high-risk search warrants and arrest warrants or called out by patrol officers to respond to armed and barricaded individuals. SWAT tactics in dealing with armed or barricaded suspects rely on the use of time as a de-escalation tool, and often last for hours. If negotiations and time do not convince a subject to surrender, SWAT gradually applies more pressure via less-lethal tools.

to stop, and ran inside the garage. SWAT deployed three NFDDs into the yard outside the residence to encourage the suspect to surrender. Almost immediately, the suspect and other people in the residence did so. The NFDDs did not strike anyone, no other force was used, and no one was injured. Firearms and ammunition were recovered from inside the residence.

## Chemical Agents

When negotiation and NFDDs are not effective, SPD SWAT sometimes uses chemical agents, including oleoresin capsicum (OC) and CS gas (tear gas), to compel a suspect to surrender.[7] SWAT is the only SPD unit authorized to use CS gas.[8] SPD patrol officers carry OC spray (pepper spray) on duty, but SWAT is the only unit that has regular access to other means of dispersing OC. This includes devices that can disperse OC into a residence, as well as paintball guns that fire pellets of chemical irritants ("pepperball" guns).[9]

### *Example of Use*

East Precinct patrol officers responded to a report of a fire inside an apartment building. When they contacted the occupant of the apartment, he informed officers he had a handgun and would shoot officers who attempted to enter. Officers smelled natural gas and evacuated the building. SWAT and the Hostage Negotiation Team (HNT) responded, resulting in an hours-long standoff. HNT and social workers tried to convince the suspect to surrender, but he refused. Eventually, SWAT detonated an NFDD outside his apartment window. When the suspect still refused to surrender, SWAT fired pepperballs into the suspect's apartment; he then surrendered with no further use of force.

## 40 mm Less Lethal "Blue Nose" Launchers

Both specially trained patrol officers and SWAT officers are equipped with 40 mm Less Lethal "Blue Nose" Launchers. These devices fire a sponge-tipped 40 mm round at a range of up to 120 feet. This makes them an ideal less-lethal option for situations where a Taser and/or OC spray are not effective due to their limited maximum range of 20 feet. SPD officers typically use Blue Nose Launchers in situations where subjects are armed with knives or firearms. Since 2016, SPD officers have used 40 mm Blue Nose Launchers on 11 occasions outside the crowd control context.[10]

---

[7] Under the CCW Ordinance, forms of OC which are not a "spray" appear to be completely banned. Pepperballs are also banned, both as chemical irritants and as kinetic impact projectiles.
[8] Chief Best temporarily authorized patrol officers to use CS gas during the George Floyd demonstrations. That authorization has subsequently been rescinded.
[9] According to use of force reports reviewed by OPA, SPD pepperball launchers fire a synthetic capsaicinoid called pelargonic acid vanillylamide.
[10] Some incidents involved multiple deployments of the Blue Nose Launcher against the same suspect. Of the 11 occasions: one ended in an officer-involved shooting; seven involved subjects who had firearms, imitation firearms, or edged weapons; three involved subjects who officers believed were armed; and four involved subjects who were more than twenty feet away, making other less lethal options ineffective.

*Example of Use*

South Precinct officers responded to a report of an intoxicated subject with a firearm planning to commit suicide. When officers contacted the subject, who was in a vehicle in a park, he pointed a handgun at his own head. After an hour of negotiations, the subject exited the vehicle and began to walk through the park toward other officers and community members, still holding the gun to his head. An officer followed him, took cover, and fired a single Blue Nose round into the subject's hip area. The subject dropped the gun, fell to the ground, and surrendered. He was taken into custody for an involuntary mental health evaluation and suffered only minor injuries.

## Recommendation: Reauthorize use of all less-lethal tools for non-crowd control situations

It is possible that the subjects in the above examples would have surrendered even in the absence of the less-lethal tools. However, it is equally plausible that these situations could have ended with a greater use of force or loss of life, particularly if officers were forced to choose between addressing a public safety threat or forcing a confrontation with a potentially armed subject in a confined space. Compelling officers to make such a choice goes against SPD's court-approved de-escalation policy, which dictates that officers should use time, distance, and shielding to stabilize a scene while avoiding a physical confrontation and the use of force until absolutely necessary.[11]

The above examples illustrate why OPA is opposed to a total prohibition on the use of less-lethal devices. A complete ban risks escalating dangerous situations that SPD officers are called upon to handle outside of the crowd control context. OPA is committed to minimizing the use of force by SPD, but in cases where force is necessary, the use of these tools may help officers avoid using a higher level of force. Furthermore, with anticipated reductions in SPD staffing, it is very likely that officers will no longer be able to respond to calls with the same numbers as under current protocol. The lack of backing officers, which is an element of the de-escalation policy, will make it even more important for officers to have less-lethal tools at their disposal.

---

[11] Seattle Police Department Policy 8.100 – De-Escalation.

## Ordinance Impact on Crowd Control Situations

As a starting point, OPA agrees with the Council that the use of CS gas should be banned during demonstrations. OPA is concerned by the sheer amount of force used by SPD over the last two months, which appears to represent a significant departure from previous demonstrations. However, OPA does not support a total ban on the use of other less lethal tools during demonstrations, including OC spray, blast balls, or the 40 mm Blue Nose Launcher, because such a ban leaves SPD with no choice but to use impact weapons at demonstrations if there is an imminent threat of harm to people and using force is necessary.

As the Council recognized and the accountability system partners noted in a June 5, 2020, letter, CS gas is banned in warfare by the Chemical Weapons Convention of 1993, and the use of indiscriminate respiratory irritants also exacerbates the risk of COVID-19 transmission among those exposed. Community members have repeatedly expressed concerns about tear gas seeping into structures and residences near a protest zone, and OPA is aware that CS gas often causes extensive property damage when deployed inside a structure. OPA also believes that the deployment of tear gas cannisters may precipitate other uses of force as officers fire other less-lethal tools at individuals who are attempting to pick up, disable, or throw them back.

However, the Ordinance does not just ban CS gas. As written, it leaves only one authorized crowd control weapon available to SPD: the use of impact weapons such as batons. Without the ability to respond to objects thrown at an intermediate range, SPD will be forced to either order officers to retreat or to disperse the crowd using only impact weapons. There may be scenarios in which it is most appropriate to retreat, but there also may be scenarios in which officers will need to be responsive to public safety needs such as stopping threats of widespread harm. The evidence on use of impact weapons suggests that this approach will be less safe for officers and demonstrators alike.[12] It would also run contrary to the goals of the Consent Decree, which was imposed partly because SPD officers were overly reliant on batons and other impact weapons.[13] Since the Consent Decree has been in place, SPD has virtually eliminated the use of impact weapons by officers, with only six uses reported over the last two years.[14] While optimally no force would be used, OPA believes that a return to a reliance on impact weapons as a less-lethal tool is not in the best interests of officers or the community and also risks jeopardizing SPD's compliance with the Consent Decree.

In an ideal world, police would be able to isolate individuals engaging in criminal activity and extract them from the crowd while allowing the remainder of the crowd to peacefully exercise their First Amendment rights. Unfortunately, there are limited practical tactics that would

---

[12] One study found that the use of batons by law enforcement results in minor injury to the suspect in roughly one-third of uses and hospitalization of the suspect in 3.2% of uses. See Derrick E. Jacobous, "Trauma Caused by Law Enforcement Use of Force." JEMS: The Journal of Emergency Medical Services, (June 3, 2020), accessed August 3, 2020, https://www.jems.com/2015/06/28/trauma-caused-by-law-enforcement-use-of-force/.
[13] Department of Justice, Investigation of the Seattle Police Department, (December 16, 2011), 13.
[14] Assistant Chief Lesley Cordner, Remarks at SPD Defensive Tactics Training Demonstration on July 29, 2020.

make this approach safe and effective. Even if officers were able to consistently identify people breaking the law who were among a group of thousands, sending a team of officers to push through the crowd and make an arrest may not be safe for either party. Officers should have access to less lethal tools that allow them to respond to assaults from a range and safely disperse a crowd.

## **Recommendation:** Reauthorize use—with new restrictions—of all less-lethal tools except CS gas for crowd control situations

If SPD is expected to address instances of violence that occur during demonstrations, OPA believes that SPD should be reauthorized to use all less-lethal tools except CS gas. In reaching this recommendation, we stand by current policy language that restricts officers from targeting a person's head and/or other sensitive areas with less-lethal tools and are opposed to any indiscriminate usage. OPA intends to fully investigate instances of alleged policy violations and recommend discipline for individual officers where appropriate.

OPA believes the best approach to the use of less-lethal tools in a crowd control context is one that minimizes the use of less-lethal tools by: 1) requiring that SPD incident commanders appropriately plan SPD's response to a demonstration so that confrontations do not occur between officers and demonstrators or are as brief as possible; and 2) ensuring that protesters are given adequate warning whenever less lethal tools are about to be used so that they may leave the area before they are deployed. OPA's recommendations for modifications to SPD's crowd management policies that would help implement these goals are included below.

## Crowd Management Policy Recommendations

OPA believes that, even if a particular use of force during a demonstration is justified under SPD's use of force policy, it is possible that it could have been avoided if SPD officers or incident commanders had approached the situation differently. In crowd management scenarios, individual front-line officers are typically not given discretion about where they deploy or what strategies they use to confront a crowd. Those decisions are left to SPD incident commanders.

At times, it appeared to OPA that officers were sent to confront crowds with no clear strategy or plan behind the deployment. This led to a frequent pattern: officers would be assigned to hold a line in a certain area; demonstrators would confront the officers; individuals within the crowd would throw bottles or rocks; SPD officers would respond with force; the crowd would temporarily leave. However, officers would continue to hold the same line, demonstrators would return, and the pattern would begin again. Front-line officers and supervisors sometimes appeared to be improvising their responses to the crowd in the apparent absence of clear directions from an incident commander.[15]

These types of uses of force served no clear law enforcement purpose: they did not prevent property damage, effectively disperse the crowd, or allow peaceful demonstrators their right to protest. In the absence of written documentation about how SPD intended to address these demonstrations, OPA is unable to fully evaluate the degree to which SPD's decision making contributed to the need to use force during these demonstrations. OPA's recommendations below are therefore aimed at rectifying that problem by driving accountability for the use of force during demonstrations upward within SPD's chain of command.

OPA is aware of reports that SPD officers targeted journalists and legal observers with less-lethal tools at protests, particularly on July 25, 2020. Although not discussed in this document, OPA acknowledges the concern and intends to evaluate it fully and make supplemental recommendations at a later date as requested by the Executive.

### Recommendation: Prohibit officers from using less-lethal tools during a demonstration solely to prevent property destruction

SPD's existing crowd management policy allows officers to use less-lethal tools in two situations: 1) to disperse a crowd when authorized by an incident commander, or 2) when they make an individual decision to do so that is otherwise in compliance with SPD's use of force policy. It

---

[15] OPA's information about events comes from reviewing media reports, OPA complaints and investigations, SPD use of force data, body-worn video footage, and interviews with SPD officers and supervisors.

further provides that when using OC spray during a demonstration, officers should have a "primary objective" of defending themselves, others, or preventing the destruction of property.[16] This policy stands in contrast to the International Association of Chiefs of Police Model Policy on Crowd Management, which recommends that officers should not be permitted to make arrests or use force without command authorization unless there are exigent circumstances that pose a risk of imminent injury.[17]

OPA recommends revising the crowd management policy so that individual officers may only make an independent decision to use blast balls, OC, and other less-lethal tools in order to protect themselves or others. While SPD may at times need to disperse a crowd in order to prevent widespread, significant property destruction, the decision to do so should be made at the incident command level rather than at the line level. This will help avoid situations where innocent parties are affected by blast balls and OC spray as officers try to stop property damage. If property damage committed by a crowd reaches a level that justifies a dispersal, the incident commander should make that decision.

## Recommendation: Require incident commanders to create detailed plans prior to deploying officers at demonstrations

An SPD incident commander, working with the Seattle Police Operations Center (SPOC), generally prepares an Incident Action Plan (IAP) prior to every demonstration where SPD intends to deploy officers.[18] IAPs are purposed to lay out SPD's objectives in responding to a demonstration.

OPA is concerned that IAPs are too vague and do not provide the guidance officers and supervisors need to handle a demonstration. For example, a recent IAP declared the following objective: "Provide for the safety of the first responders, general public, spectators, and participants by maintaining a police presence that will give officers the ability to respond to any gathering that may impact public safety." Further, objectives often appear to be copied from one day's IAP into the next, with no differentiation between them. IAPs also include "special instructions" for responding officers, but these, too, are vague. One often-repeated set of "special instructions" states: "Taking enforcement action in any large group requires good judgement to ensure Officer safety and to prevent inciting the crowd. When possible, quickly remove suspects from the area to facilitate the continuation of the demonstration."

SPOC told OPA that incident commanders do engage in more detailed contingency planning, but that it is not reflected on the IAPs due to security concerns about IAPs being leaked outside the department. While OPA is sensitive to that unease, we are not aware of any instance in which an IAP has been leaked and, regardless, the benefits of creating a detailed plan may outweigh the risks of disclosure.

---

[16] Seattle Police Department Policy 14.090 (10) Officers May Make Individual Decisions to Deploy OC Spray, and Blast Balls Consistent with Title 8 – Use-of-Force.
[17] International Association of Chiefs of Police, Model Policy: Crowd Management, (April 2019), 5.
[18] Seattle Police Department Policy 14.090-TSK-1 Responsibilities of the Incident Commander.

The lack of any written contingency plan prevents OPA from evaluating an incident commander's planning for a demonstration and leaves front-line supervisors and officers without clear instructions about what to do if communications with the incident commander break down. OPA recommends that SPD revise policy to require incident commanders to plan for and document the contingencies that predictably arise during a large demonstration. These should include:

- Under what circumstances they will order a crowd to disperse
- How the dispersal order will be given
- Who will give the dispersal order
- In what direction the crowd will be moved
- Where officers will be positioned relative to the crowd
- The justification for these decisions

Including this information in the IAP will allow individual officers and squad leaders to align their decisions with the commander's overall intent. By giving guidance on the circumstances under which crowds will be dispersed and for what purpose, the IAP may help reduce uses of force and ensure that any force used is directed toward a clear, articulated objective.

## Recommendation: Avoid confrontation between officers and community members when demonstrations are in response to law enforcement

The recent protests in Seattle have been about police misconduct—not, for example, women's rights or the environment—which has posed a unique challenge for SPD. During protests, the police are generally responsible for protecting the public, preserving property, and mitigating traffic impacts. But when the protests are police-focused, they must also avoid escalating existing tensions with demonstrators unnecessarily.

It appears to OPA that, at times, SPD deployed large groups of officers for reasons that are unclear. Not only does this create the risk of unnecessary escalation, it also forces officers into a situation where they become targets for anyone in the crowd who seeks to engage or harm them. If police presence at a demonstration would not serve any apparent purpose, it may be more appropriate for officers to monitor it from a distance.

OPA recommends that SPD revise the crowd management policy to require incident commanders to plan responses to protests that are about law enforcement in a way that minimizes the likelihood of escalating the situation. For example, incident commanders should not deploy officers to form a line along the edge of such an event in the absence of some specific law enforcement reason for doing so. However, if critical infrastructure must be protected or a crowd dispersed for reasons of public safety, incident commanders should direct officers to take appropriate action to remedy the issue while avoiding harm.

## Recommendation: Make portable public address systems available and require that orders to disperse be broadcast to the crowd

It appears from OPA's review of many incidents – especially those in late May and early June – that SPD officers at times did not have access to or bring to demonstrations an appropriate public address system. One SPD commander told OPA that SPD has relied on using vehicle-mounted public address systems to give instructions to demonstrators, despite the fact that many demonstrations are now often policed by officers mounted on bicycles.

The absence of an appropriate public address system at a demonstration is problematic because in the event that commanders need to disperse a crowd, they are left with the choice of either waiting for a patrol vehicle to arrive or dispersing the crowd without giving an appropriate public safety order. It also makes it virtually impossible for SPD to give appropriate warnings to demonstrators when unlawful conduct occurs. Whenever possible, the use of blast balls and OC to disperse a crowd should be avoided until the crowd has been given a dispersal order that is audible. The use of force on community members who have not been given an audible dispersal order has the potential to cause physical harm, escalates tensions and undermines public trust.

OPA recommends that SPD adopt a policy that requires incident commanders to have a public address system available to communicate with demonstrators. To the extent that SPD does not currently own any portable public address systems, the department should take steps to acquire them.

## Recommendation: Explore the feasibility of tactics that allow officers to make targeted arrests of people engaging in criminal activity

OPA has received numerous complaints from community members who contend that they or others were subjected to the use of less-lethal weapons despite having done nothing wrong.[19] Although these incidents are still under investigation, they highlight the secondary effects that the use of less-lethal tools can have on peaceful demonstrators and on public trust in SPD. In cases where it is safe and feasible to do so, OPA believes SPD should attempt to arrest people who are causing physical harm to others within a crowd rather than relying upon less-lethal tools or issuing a dispersal order. This would allow people to continue to peacefully protest while preserving the safety of officers and others.

OPA recommends that SPD explore the development of new targeted arrest tactics for crowd control scenarios and evaluate the risks associated with the use of such tactics. Some experts recommend, for example, that officers could be sent in smaller groups to move within a demonstration rather than simply forming a line along the edge of it.[20] OPA understands there are scenarios where sending officers into a crowd to make an arrest could result in an escalation of the situation and require a greater use of force. However, OPA believes that SPD's Advanced Training Unit and other subject matter experts in the department should see what options are available.

---

[19] These cases include: 2020OPA-0322, 2020OPA-0327, 2020OPA-0328, 2020OPA-0334, and 2020OPA-0345. A list of demonstration related OPA cases is available at: https://www.seattle.gov/opa/case-data/demonstration-complaint-dashboard.
[20] Maxine Bernstein, "Tear Gas, Riot Gear Incite Protesters. Make Targeted Arrests Instead, Experts Say.," (July 12, 2020), accessed August 7, 2020, The Oregonian/OregonLive, https://www.oregonlive.com/crime/2020/07/tear-gas-riot-gear-incite-protesters-make-targeted-arrests-instead-experts-say.html.

## Executive Approval Process

The Ordinance asks OPA to identify "a crowd dispersal authorization process that requires Executive approval." While not completely clear, OPA construes this to be a request by the Council for OPA to identify a process by which the Mayor or her staff would become directly involved in the decision-making process when SPD decides whether to disperse a crowd or demonstration. OPA believes that any such process would be both impractical and legally problematic.

Requiring the Mayor's Office to approve every decision SPD makes to disperse a crowd is not practical. SPD incident commanders make the decision about whether to disperse a crowd based on conditions they are monitoring in real time, either through in-person observation or via police radio. They do so at all hours of the day and night, in a city that has approximately 300 demonstrations every year.[21] SPD is able to ensure a commander is always available to monitor a demonstration because it employs dozens of captains and lieutenants who take on that responsibility. Requiring that the Mayor or a member of her civilian staff also monitor every demonstration would be overly burdensome and impractical. It would likely require that the Mayor hire new, full-time civilian staff solely to monitor demonstrations across the city.

The existence of such a process would also run counter to the Seattle City Charter, which explicitly delegates responsibility for the management and supervision of SPD to the Chief. "The Chief of Police shall manage the Police Department, and shall prescribe rules and regulations, consistent with law, for its government and control."[22] The Chief must still answer to the Mayor for the manner in which the department is run, but OPA believes that the structure of the Charter clearly places responsibility for the day-to-day operations of the police department with the Chief of Police. Requiring the Mayor's Office to constantly monitor and approve operational decisions made by the police department's chain of command would run contrary to that structure.

## Conclusion

OPA understands that the Council and the community have serious concerns about how less-lethal tools have been used by SPD over the past two months. In response, OPA has made the investigation of complaints that arose from recent demonstrations a top priority. OPA's recommendations herein are designed to ensure that the use of force during demonstrations going forward is minimized, and that when force is necessary, it is used in a manner that minimizes injuries to community members and protects public safety. OPA's recommendations are also intended to ensure that when poor planning results in preventable uses of force, individuals at SPD are held accountable. OPA believes that this approach is preferable to requiring SPD to return to the use of batons alone for crowd control, which will likely result in greater risk of injury to community members, officers, and the public. OPA lastly recognizes that less-lethal tools play a crucial role outside of crowd control, including by patrol and SWAT officers. Eliminating such options for officers may result in more harm to community members, which would run contrary to the goal of the Ordinance.

---

[21] Seattle Police Department, "Official Statement on Use of Force During Friday Night Protests." SPD Blotter, (May 30, 2020), accessed August 3, 2020, https://spdblotter.seattle.gov/2020/05/30/official-statement-on-use-of-force-during-friday-night-protests/.
[22] Seattle City Charter, Article VI, Section 4.