

# Review of the SPD Crowd Dispersal Policy and Less Lethal Weapons

In Response to Ordinance 126102

August 14, 2020

Office of Inspector General
City of Seattle
PO Box 94764
Seattle, WA 98124-7064
oig@seattle.gov
(206) 684-3663



# Introduction and Overview

The right to peaceably assemble to protest the government is a cornerstone of democracy and a critical right protected by the Constitution. As such, the Seattle City Council's ban on the use of less lethal force against persons engaged in peaceful protest rightfully acknowledges the need to protect community members exercising their First Amendment rights. Communities across the country and around the world were rightfully outraged at the murder of George Floyd by Minneapolis police. Protests in Seattle ultimately resulted in numerous incidents of peaceful protestors being subjected to chemical and other less lethal weapons. This created a loss of community trust in SPD and a call to City leaders for action. On June 15, 2020, City Council passed Council Bill 119805, later enacted as Ordinance 126102 and referred to as the Crowd Control Weapons (CCW) ordinance.

The CCW ordinance, however, goes further than protection of peaceful protestors. It also permanently removes certain less lethal weapons for use in addressing acts of violence in an otherwise peaceful crowd, as well as to disperse groups of people who have become violent. An outright ban in all circumstances, even those posing a life safety risk, leaves officers without sufficient tools to address violence or disperse a riot. SPD's choice then becomes using tools less suited to the task that may increase the risk of injury to protestors and officers or withdrawing from the situation leaving violence and life safety issues unaddressed. As the likely outcome for either option presents significant risk to community and officers, OIG does not support a complete ban of all less lethal weapons. If Council is inclined to continue the outright ban, SPD should be afforded sufficient opportunity to establish and train for alternative response strategies and mechanisms.

If Council determines that less lethal weapons may remain available for use in the protest context, it is critical for community trust that they are not used against peaceful protestors, and that there is accountability for their use. Use of these weapons must be in clearly delineated circumstances involving violence or life safety. Also, as previously stated in a joint memorandum from the three accountability entities to the City on June 5, 2020, OIG remains concerned about use of CS (tear) gas against protestors and continues to recommend against general use in a protest setting. Similarly, many recommendations have been made to SPD regarding use of blast balls, so any authorized use should consider previous recommendations and address concerns about the significant risk of injury associated with their use.

The CCW ordinance goes even further, to ban the use of those same less lethal tools in a patrol or SWAT capacity where they are can be legitimate and necessary options to control persons in crisis, or to take a violent person into custody without resorting to higher, including deadly, levels of force. For example, the 40 mm launcher is effective in utilizing distance between a person in crisis or an armed subject to allow for creation of a



distraction to safely take the person into custody. Another example is SWAT use of chemical irritants and noise flash diversionary devices (NFDDs) to take violent, barricaded persons into custody without resorting to lethal force.

Given the importance of certain less lethal tools banned by the ordinance in ordinary patrol and SWAT operations, Council should seriously consider amending the ordinance to clearly distinguish between use in a protest context from other patrol and SWAT functions and afford appropriate exemptions.

The remainder of this report:

- identifies specific considerations that must be addressed with any reauthorization of less lethal tools;
- provides an analysis of SPD crowd management tactics and policy with associated suggestions for addressing issues that emerged in recent protest responses;
- discusses the inadvisability of adding a layer of outside decision-making in the form of Executive authorization for crowd dispersal; and,
- describes OIG's ongoing work to review crowd management and protest related issues

OIG acknowledges that this report and the contributions of the other accountability partners does not resolve the greater issues of community concern about the specific actions taken by SPD. This report is but one step in a long process involving community, the accountability partners, the Court, and City decision-makers. The report concludes with a discussion of the upcoming sentinel event review, a review process of SPD's response to the 2020 protests that for the first time will center community perspective in departmental review of force.

*Note about This Report*

To review the existing crowd dispersal policy and determine whether it is sufficient to ensure public safety while minimizing harm to protestors, as well as to determine whether the SPD crowd dispersal policy was in line with industry norms, OIG began this project as a formal audit under GAGAS federal auditing standards. The rigor of these standards require that OIG evaluate relevant risks and related internal controls, and that audit findings are supported by sufficient and appropriate evidence. OIG was unable to complete this product as a GAGAS audit due the compressed timeline required by the ordinance, given the complexity and magnitude of identified issues. While the results of this review are still supported by factual evidence and analysis, OIG offers its conclusions as suggestions for Council and SPD to consider rather than formal audit recommendations.



# Table of Contents

Introduction and Overview ........................................................................................ 1

Section One: Foundational Concepts .................................................................... 4

Overview of Less Lethal Weapons................................................................................ 4

Principles of De-escalation ......................................................................................... 5

Preliminary Summary of Force Used ........................................................................... 6

Section Two: Re-authorization of Less Lethal Weapon Use ............................... 8

Re-Authorization in Crowd Control Situations .............................................................. 8

Re-Authorization in Non-Crowd Control Situations ....................................................... 9

Section Three: Review of Crowd Management Policies and Related Training ...... 11

Summary of Section.................................................................................................... 11

The SPD crowd dispersal policy is consistent with other jurisdictions, but lack of detail may lead to cycles of escalation and inconsistent decisions within SPD ........................................................................... 11

SPD tactics and training for crowd management are designed for mobile crowds and do not adequately prepare personnel to respond to large, volatile, stationary crowds, or individual instigators using the cover of large crowds to engage in violence. ........................................ 19

The City faces two substantial and conflicting risks when working with other law enforcement agencies providing mutual aid during protests................................................................................... 28

Other Matters to be Addressed by SPD....................................................................... 30

Section Four: External Authorization Processes ................................................. 33

Section Five: Future Work for OIG ....................................................................... 34

Sentinel Event Review................................................................................................ 34

Future Projects .......................................................................................................... 35

Appendix A – OIG Memo on Less Lethal Weapons Usage in Protests (6/12/2020)............... 37

Appendix B – SPD Report on Use of Less Lethal Weapons ....................................... 71

Appendix C – Excerpt from Los Angeles Police Department Directive 11: Crowd Management, Intervention, and Control ............................................................... 87

Appendix D – Report Methodology............................................................................. 89

 **Seattle** Office of
Inspector General

# Section One: Foundational Concepts

This review covers a wide variety of topics and terms. To provide informational context, the following is a summary of less lethal weapons, principles of de-escalation, and summary of less lethal weapon use during the recent protests.

## Overview of Less Lethal Weapons

A previous OIG memo outlining different less lethal weapons more detail is included as Appendix A. However, a brief description is included here to provide immediate context for readers. These descriptions are specific to weapons used by SPD. OIG does not have information about weapons used by other agencies that may have provided mutual aid to SPD during the demonstrations.

A **blast ball** is a device designed to create diversionary light and sound. The principal difference between a blast ball and a traditional noise flash diversionary device (NFDD or "flash bang") is that a blast ball is round and made of rubber, while a NFDD is metal and cylindrical. SPD asserted that it only uses blast balls that are "inert" (i.e. only produce light and sound), or that contain a small amount of OC.[1] SPD personnel stated the department does not use the "Stinger"-style blast balls that contain small rubber pellets or blast balls containing tear gas (CS).[2] SPD tracks the serial numbers of blast balls and their use per requirements from the Bureau of Alcohol, Tobacco, Firearms, and Explosives. Personnel must attend annual training to use blast balls and the training is led by a certified instructor. See Exhibit 1 for illustrations of a flash bang and blast ball.

**Exhibit 1**



| Blast Ball | Flash Bang |
|---|---|

*Source: images taken from item information sheets made available online by Defense Technology, one of the vendors used by SPD. See* http://www.defense-technology.com.

---

[1] OC is the abbreviation for oleoresin capsicum, the active ingredient in pepper spray.

[2] CS is the abbreviation for 2-chlorobenzalmalononitrile. The abbreviation is based on the two scientists who invented the compound.


**Seattle** Office of
**Inspector** General

A **less-lethal launcher** is a weapon that is designed to propel a less lethal projectile. SPD has a variety of these launchers. Patrol officers only have access to the 40mm single shot launcher that fires a foam-tipped "blue nose" projectile. SWAT has access to additional launchers, including a multi-shot 40mm launcher, the FN303 launcher, and a Pepperball launcher.[3] SWAT is also able to use a wider variety of 40mm projectiles than patrol, including a longer-range foam projectile, and aerial burst rounds that are designed to be aimed above a crowd to dissipate OC into the air. By policy, only SWAT can deploy the 40mm launcher in a crowd control situation. However, SPD temporarily authorized patrol to use the 40mm during recent protests, citing concern that protestors would pick up and throw CS canisters back at SPD.

**Chemical irritants** include the use of OC and CS, more commonly referred to as pepper spray and tear gas.[4] These weapons are designed to cause coughing and physical distress, and thereby distract or interrupt the recipient's actions. Under normal circumstances, only SWAT is authorized to use CS. SPD temporarily authorized use of CS by patrol after running out of blast balls.[5] Medical and safety literature often include CN as a form of tear gas;[6] however, SPD personnel stated that the department does not use CN, explaining that it displaces air from lungs and can cause death. OIG review of manufacturer safety information indicates that OC has a longer active effect time than CS, with the effects of OC lasting approximately 45 minutes and the effects of CS lasting approximately 20 minutes. However, CS is significantly more difficult to decontaminate from indoor settings, as it absorbs into a variety of surfaces including plastic and food.

## Principles of De-escalation

This report refers to the term "de-escalation," so the following provides an explanation of the term as used in a law enforcement context.

De-escalation, as defined by SPD, is:

> "Taking action to stabilize the situation and reduce the immediacy of the threat so that more time, options, and resources are available to resolve the situation. The goal of de-escalation is to gain the voluntary compliance of subjects, when feasible, and thereby reduce or eliminate the necessity to use physical force." – SPD Policy 8.050, Use of Force Definitions

---

[3] The FN303 and Pepperball launchers use rounds that are similar to paintballs.

[4] Per OIG research, SPD deployed OC in a variety of formats, including in canisters, blast balls, aerial burst rounds from less lethal launchers, and various sizes of sprays. SPD stated that CS was only deployed via canisters (versus from a launcher or in liquid form).

[5] Per SWAT, there is no real tactical difference in deploying canisters of OC and CS, and patrol would not require additional training to safely deploy CS if they were already trained to deploy OC.

[6] CN is the abbreviation for phenacyl chloride or chloroacetophenone.



De-escalation may still involve the use of force, if doing so prevents the need for a higher level of force. For example, if someone attempting to engage in violence can be incapacitated with a TASER, officers can refrain from a higher level of force (such as a firearm) to control the situation.

Three primary components of traditional de-escalation are time, distance, and shielding. With *time*, the situation can be slowed down or even stabilized. Further action may not be necessary or additional resources can be called to assist to reduce the necessity for force. With *distance*, the individual is kept further from the officer and others, lessening potential safety threats, reducing the need for higher levels of force, and ideally creating more time for thoughtful action. *Shielding* works in a similar fashion. For example, officers interacting with a person armed with a knife have more non-force options, like negotiation, if they are able to stay well away from the person. A physical barrier can create space and time to try and resolve the problem peacefully.

Most less lethal weapons, when used in an ideal circumstance, help create time and/or distance. A 40mm less lethal round is fired from a distance, with the goal of interrupting someone without putting officers in close contact (and thus creating potential safety risks that may result in higher levels of force). A blast ball is designed to move individuals away from an area, creating greater distance between individuals and officer(s) or objects. Chemical irritants can be used both to incapacitate (e.g., pepper spray) and interrupt an action, or to discourage individuals from remaining in a specific area (creating distance). A TASER incapacitates someone to stop their action and creates a small window of time for officers to apply handcuffs or otherwise gain control.

## Preliminary Summary of Force Used

For context, below is a summary of less lethal force reported by SPD during the first phase of demonstrations.

A review of public timelines posted by SPD for the period of May 30, 2020 to June 10, 2020, include twenty-nine references to use of less lethal weapons, including

- 7 entries referencing the use of blast balls without other less lethal weapons;
- 8 entries referencing the use of pepper spray (OC);
- 5 entries referencing a combination of blast balls and OC;
- 7 entries referencing use of CS gas;
- 1 entry referencing no further use of CS; and
- 1 entry referencing a combination of blast balls and CS.

This time period includes the downtown demonstrations on the first weekend after the murder of George Floyd as well as a series of protests at the East Precinct, culminating in the temporary departure of SPD from the East Precinct. A review of preliminary use of



force data for the time period of May 30, 2020 to June 11, 2020, indicates the following force was used by SPD:[7]

- At least 35 uses of the 40 mm less lethal launcher, including 7 uses by non-SWAT personnel;
- At least 12 uses of the FN303 less lethal launcher;
- 1 use of a NFDD or 'flash bang' device;
- At least 163 uses of blast balls;
- 176 uses of OC spray; and
- 48 reported uses of CS gas.

These numbers do not include uses of force by other agencies providing mutual aid to SPD, as discussed further in Section Three.

---

[7] SPD reported that these numbers were preliminary and should not be considered complete, as SPD had not finished its force review processes at the time of the OIG request.


**Seattle** Office of
Inspector General

# Section Two: Re-authorization of Less Lethal Weapon Use

## Re-Authorization in Crowd Control Situations

Use of force, including use of less lethal weapons, on peaceful protestors or other persons not engaged in acts of violence is not lawful. If no threat to safety or substantial property damage exists, there is no legal justification to use force on protestors and interfere with their First Amendment activities. However, the question remains of what tools should be available to SPD to address protestors who are engaged in violence, such as individuals who set occupied buildings on fire or injure others, including both protestors and police officers. This discussion seeks to provide guidance for circumstances when acts of violence threaten the safety of persons.

Re-authorization of less lethal weapons in crowd control situations is the more prudent course of action to afford the widest range of options in addressing violence. However, given the large number of complaints and injuries arising from the use of less lethal weapons during recent protests, any re-authorization of less lethal weapons in crowd control situations should be accompanied by changes in policy and training to reduce risk of harm to non-violent protestors.

Less lethal weapons are often used by police departments because they can stop unwanted activity without progressing to a higher level of force. When violence is occurring on a larger scale, chemical agents, blast balls, and sponge rounds, while undeniably painful and capable of causing injury, pose less physical risk to groups of violent protestors than broken bones from riot batons or potentially lethal force from firearms. However, chemical agents and blast balls also have the potential to be indiscriminate, inflicting pain and potential injury on peaceful protestors as well as those responsible for the violence.

OIG specifically highlights concern with three of the weapons at issue, the first being CS gas. The very small particulates of CS, unlike OC, disperse indiscriminately and widely, as demonstrated by complaints from residents about CS seeping into their homes during demonstrations on Capitol Hill. Blast balls have the potential to inflict serious injury or even death if detonated too close to a person, underscoring the importance of policy, training, and the ability to practice before use in a live setting. Providing warnings to the public before use of these weapons would help mitigate risk. Finally, less lethal launchers, such as the 40mm, can cause lethal harm if rounds hit the head, neck, or chest, or at too close range. Policy and training should continue to emphasize safe targeting practices for these weapons.

Council faces a substantial policy choice. If SPD is re-authorized to use less lethal weapons, this report makes clear that revisions to the current policy should be made to reduce risk



of indiscriminate or inappropriate uses of force. Suggestions by OIG in this report include updating the policy to more clearly distinguish when each level and type of force is authorized, improving the way SPD communicates with protestors to ensure peaceful individuals are aware of SPD's decisions concerning the larger crowd, and devising better methods of handling large, angry, stationary crowds. OIG also highlights the need to closely review how and whether senior level command is held accountable for their decision-making in authorizing force and determining overall tactics. Focusing solely on the actions of individual line officers without reviewing how senior personnel managed the overall event would be a significant oversight. Widespread, indiscriminate use of less lethal weapons, such as tear gas, often occurs after dispersal orders or other directions from the incident commander (IC).

Federal courts that have reviewed the specific circumstances in Seattle have also provided salient guidance on appropriate use of less lethal weapons in crowd management. In the matter of *Black Lives Matter Seattle-King County et al v. City of Seattle* litigation, Judge Jones provides that SPD should restrict its use of less lethal weapons to "reasonable, proportional, and targeted action to address a specific imminent threat of physical harm, acts of violence, or property damage".[8] OIG acknowledges that use of force in defense of property is controversial and is a policy question for Council.

Further, OIG agrees with the statements of Judge Robart in the context of the Consent Decree litigation that banning these weapons without adequate time to re-train officers and develop alternative tactics for managing a violent crowd creates a substantial risk of harm to the public.[9] Banning a tool (less lethal weapons) is not equivalent to taking away the triggering event (perceived public safety need). If Council bans less lethal weapons without allowing time for the development of an alternative, SPD will be responding to the same situations seen in May and June 2020 with only batons and firearms at their disposal. Expecting officers to resolve the same problems with only these tools and no further instruction, in highly stressful situations, creates a significant risk of inconsistency and, potentially, higher levels of force. OIG is not suggesting that the only way to manage a crowd is through less lethal weapons. But SPD should be given time, in concert with the dedicated oversight bodies and the input of community, to develop and train an alternative approach.

## Re-Authorization in Non-Crowd Control Situations

OIG highlights that the CCW Ordinance, as currently worded, bans the use of less lethal weapons in all contexts, unless an exemption from Council is granted. Although the legislation makes specific reference to "crowd control weapons," the prohibition on owning,

---

[8] *Black Lives Matter Seattle-King County v. City of Seattle*, Document 34.
[9] *United States v. City of Seattle*, 12 Civ.1282 (JLR), Document 630.


**Seattle** Office of
Inspector General

storing, or otherwise having access to these weapons means SPD is unable to retain access for patrol and SWAT purposes. This is a flaw in the legislation and implicates broader public safety concerns.

To provide the public and Council with context, OIG requested that SPD provide a summary of the recent use of less lethal weapons. Per department use of force tracking systems, which have previously been approved by the Monitor and the Court, SPD used less lethal force 316 times from January 1, 2017 to April 30, 2020.[10] Use of the 40mm less lethal launcher was limited compared to other weapons, and SPD notes the subject was armed in all but one of these incidents. In three of the incidents, the subject had "explicitly stated their desire to commit suicide by cop and/or [had] attempted to do so in the past." OIG is including the SPD report in Appendix B for reference.

Less lethal weapons are an important option for incidents in which some level of police action is necessary for safety reasons. It is an unfortunate fact that not all situations can be resolved through extended discussion, and that police may need to take more immediate action due to safety considerations for themselves or the public. For example, if an agitated, potentially armed individual begins advancing towards bystanders, using a less lethal launcher such as the 40mm may allow officers to interrupt the individual long enough for other officers to gain control of the person without further force. Without such a less lethal option or other resources, officers might need to resort to higher, and potentially lethal, levels of force. In this type of scenario, a TASER is generally not a consistent or effective solution because of distance, movement and clothing.

SWAT operations are another area in which less lethal tools can play an important role in reducing the need for higher levels of force. Although SWAT does make use of trained hostage negotiators, it is not always possible – or safe, given exigent circumstances – to verbally persuade someone to surrender peacefully. If verbal persuasion does not work and SWAT can convince a barricaded, hostile, armed individual to surrender using a flash bang or chemical irritants, this is objectively preferable to using deadly force on that individual.

---

[10] Of that population, 312 (98.7%) consisted of Type I and Type II force, i.e., force that did not cause great or substantial bodily harm. SWAT reported 48.1% of the less lethal force, of which the vast majority (86.2%) were uses of flash bang devices, followed by chemical agents. 38.9% of the reported force was used by patrol, who reported using the TASER for 79.7% of their incidents, followed by OC spray (14.6%).



**Seattle** Office of
Inspector General

# Section Three: Review of Crowd Management Policies and Related Training

## Summary of Section

While SPD policy related to crowd management is consistent with other jurisdictions and SPD conducted training consistent with this policy, the policy lacks specificity in addressing varying crowd dynamics. Further, overall SPD tactics and training concerning crowd management are not designed to address large, stationary, volatile crowds. There are also conflicting risks concerning mutual aid from other law enforcement agencies: the City cannot compel other agencies to follow SPD policies or document their use of force on Seattle residents, but also lacks the resources to manage large-scale demonstrations without the assistance of other agencies.

## The SPD crowd dispersal policy is consistent with other jurisdictions, but lack of detail may lead to cycles of escalation and inconsistent decisions within SPD.

The criteria and means of crowd dispersal, as outlined in SPD policy, are consistent with other policies reviewed by OIG. However, better communication tools may help reduce confusion and improve opportunities for crowd de-escalation. Additionally, OIG found that other policies provide greater clarity and detail by breaking the behavior of a crowd into more than two phases. With this added level of detail, including information about acceptable tactics and uses of force permissible at each stage, both the public and officers have a better understanding of expectations and goals in managing a crowd, and the possibility of inconsistent use of force decisions by ICs is reduced.

### SPD Policy is Consistent with Other Jurisdictions Reviewed by OIG

SPD's stated policy objective for crowd management is to "facilitate free speech and assembly whenever possible, while preserving order and protecting persons and property." This philosophy is echoed in SPD crowd management training materials, which describe the preferred means of crowd management as communicating with demonstration leaders, agreeing on a safe means of achieving the objectives, and allowing the demonstration to proceed with as little interference as possible. Those same training materials discuss legal criteria governing when SPD can, and cannot, interfere with demonstrations, permitted or otherwise. The complete SPD crowd dispersal policy is included with the previous OIG memo on less lethal weapon usage, submitted as Appendix A of this report. For comparison, OIG reviewed crowd dispersal materials from eight other jurisdictions:



- City of Los Angeles, CA;
- Oakland, CA;
- San Francisco, CA;
- University of California Santa Barbara, CA;
- Portland, OR;
- Austin, TX;
- Vancouver, Canada and
- Toronto, CA.

All jurisdictions reviewed, including those from Canada, use variations of the FEMA Incident Command System model to plan and manage crowd events. Given that their response is based on the same model, the major elements of crowd control and conditions for crowd dispersal are similar. For example, all cities granted the IC the ability to issue dispersal orders. OIG did identify that other jurisdictions included more detailed description of crowd phases and attendant authorized police responses, as discussed in more detail below.

All of the entities permitted less lethal force for crowd control. However, the Los Angeles Police Department was a notable exception in that it required commander approval before chemical agents other than OC could be used. OC was still permitted in response to individual crowd members, but not as an indiscriminate tool.

### Protestors May Not Distinguish Between Force Used for Formal Dispersal and Force Used at the Discretion of Individual Officers, Creating the Potential for a Cycle of Escalation

SPD permits officers to make independent decisions to use force at demonstrations if there is either a threat to safety or a threat of significant property damage. However, it is crucial to note – and likely unclear to protestors in the crowd – that SPD policy distinguishes between a formal dispersal of a crowd and individual officer discretion to use force to address specific acts.

A dispersal order creates a circumstance where the crowd is no longer legally allowed to be present in a certain area, and force to disperse the crowd is presumed to be reasonable. The decision to disperse a crowd is solely the responsibility of the IC, who is operationally in charge of SPD's response to a given demonstration. This person is typically a senior lieutenant or captain. The IC can disperse a crowd, per policy, if "there are acts or conduct within a group of four or more persons that create a substantial risk of causing injury to any person or substantial harm to property."

The policy requires the IC to consider whether there are less restrictive means of crowd management available, such as seeking voluntary cooperation, and to ensure there is a



safe route for the crowd to depart. If feasible, the IC then issues the order to disperse.[11] The IC is not required to ensure all of the crowd (those in the rear, for example) can hear the warning, but the policy requires the IC to consider the option. If the crowd does not disperse, the IC has the authority to direct the use of blast balls and OC spray to disperse the crowd. CS is not mentioned in the policy, but SWAT is authorized to use it at the direction of the IC, according to the SWAT manual. The policy is silent on the minimum time, if any, to be given for the crowd to disperse before less lethal force is used; this is likely to allow the IC to immediately authorize force if a life safety emergency exists.

While the IC controls the decision to disperse a crowd, they do not have complete control of the type and timing of all uses of force by SPD personnel at the event. SPD, in alignment with other department policies reviewed by OIG, affords individual officers discretion to use force if they believe it is necessary to defend themselves, defend someone else, or prevent significant destruction of property.[12] All individual use of force is still subject to SPD use of force policies and accountability protocols, including the requirement for force to be documented and subsequently reviewed.

Authorizing individual discretion in the context of an immediate life safety concern, or when the IC is not immediately present to authorize the force, is reasonable. For example, SPD's preferred model of crowd management is mobile bike squads, which are not always near the IC as they engage in their duties. However, individual deployment of blast balls or OC spray could be confusing for protestors within a crowd, who may not understand why force is being used without a dispersal order. Additionally, the individuals may not receive a warning before this force is used. SPD policy requires personnel to issue a verbal warning, if feasible, before deploying OC spray or the 40mm launcher, but does not include any warning requirement for blast balls.

As discussed further in this section, crowd psychology literature and SPD training materials recognize that if protestors do not understand why police are using force, they are likely to view the force as illegitimate and the police as an unreasonable, violent entity stifling First Amendment expression. Protestors may then respond by becoming increasingly confrontational. This, in turn, may lead to police perceiving increased violence and a

---

[11] The language of the order is set by policy: "I am (rank and name) of the Seattle Police Department. I am now issuing a public safety order to disperse and I command all those assembled at (specific location) to immediately disperse, which means leave this area. If you do not do so, you may be arrested or subject to other police action. Other police action could include the use of chemical agents or less-lethal munitions, which may inflict significant pain or result in serious injury. If you remain in the area just described, regardless of your purpose, you will be in violation of city and state law. The following routes of dispersal are available: (routes). You have (reasonable amount of time) minutes to disperse." SPD stated to OIG that per training materials, ICs are required to issue the order; however, this is not required by policy.

[12] OIG identified that the description of the property damage threshold as "significant" appears vague; however, when asked, personnel gave very consistent responses. They gave examples of broken windows (actionable) versus overturned garbage cans (not actionable).


**Seattle** Office of
Inspector General

corresponding need to use more force, creating a toxic cycle of escalation. The effect is magnified if dispersal orders are not issued, or not issued in a way that is not audible and understandable to the entire crowd. OIG identified at least two incidents in which dispersal orders were not issued prior to initiation of a large-scale use of force designed to move the crowd, per SPD communication records.

Better communication to the entire crowd could help break the cycle of escalation, as peaceful members of the crowd would be able to understand what is happening and respond accordingly. Reviews of major demonstration incidents in other cities, including the 2007 May Day demonstrations in Los Angeles and the 2010 G20 Summit demonstrations in Toronto both highlight the role of communication in potentially de-escalating the crowd. In Los Angeles, the authors recommended that the department create a mobile sound unit vehicle, preferably with visual aids such as the signs used to relay traffic information, to help communicate dispersal orders and warnings to the crowd.

### The SPD Policy Lacks Detail and Specificity on the Stages of Crowd Dynamics, Which May Create Confusion for Protestors and Lead to Inconsistent Actions by ICs

Although the SPD crowd dispersal policy is clear as to the conditions under which crowds can be dispersed and less lethal force can be used, the general nature of the policy reduces crowd status to two conditions: lawful, and unlawful. In a very general sense, protestors are allowed to assemble, until they are not. The transition from managing a lawful demonstration to dispersing an unlawful assembly has the potential to be abrupt and confusing to non-violent participants in the crowd who are unaware of violence occurring elsewhere in the crowd, and who then may become understandably angry when subjected to unexpected force.

In comparison, a more detailed matrix of crowd management considerations provides clearer expectations for SPD and the public alike as to what actions may trigger dispersal, and what tactics are permitted at each stage. OIG includes an excerpt from the LAPD matrix as Exhibit 2. The full matrix is included as Appendix C of this report.


**Seattle** Office of
Inspector General

## Exhibit 2: LAPD Crowd Management Matrix Excerpt

| Isolated Unlawful Behavior | Unlawful Assembly |
|---|---|
| *Isolated unlawful activity by individuals or small groups within a crowd should not automatically form the basis for declaring an assembly unlawful.* | 407 PC Two or more persons assemble<br>• **To do an unlawful act or**<br>• **To do a lawful act in a boisterous or tumultuous manner** |
| • **Isolated destruction of property**<br>• **Isolated acts of violence**<br>• **Isolated rock or bottle throwers**<br>• **Individual sit down demonstrators** | *Assemblies may be dispersed when they are: Violent, or pose a clear and present danger of violence, or the group is breaking some other law in the process. If a crime is occurring action may be taken to stop it prior to a Dispersal Order being given.*<br>• **Civil Disobedience**<br>• **Sit down demonstration** |

| Police Action | |
|---|---|
| **Use Crowd Intervention strategies:** | **Use Crowd Control strategies:** |
| • Use organizers and monitors to gain voluntary compliance<br>• Isolate, arrest and remove law violators as quickly as possible<br>• Video action of officers and law violators<br>• Use amplified sound (sound trucks or CIUVs) to communicate intent or to gain compliance<br>• Use low profile tactics when possible. Don't become the focus of the demonstration.<br>• Use Passive Arrest Teams, Tangle Teams, Shadow Teams, Cross Bows, Arrest Circles<br>• When it is not possible to make an immediate arrest, identify and track suspects using cameras, observation posts, an air unit or shadow teams<br>• Continue to assess; escalate and deescalate as behavior changes<br>• Don't increase crowd tension or change crowd focus to law enforcement by unnecessary aggressive appearance or behavior | • Obtain voluntary compliance<br>• Video action of officers and law violators<br>• Act quickly<br>• Request resources (MFF)<br>• Put control forces in place<br>• Identify dispersal routes<br>• Put a traffic plan in place<br>• Move media to protected area. Use amplified sound (sound trucks or CIUVs) to communicate intent to declare an unlawful assembly<br>• Disperse unlawful crowd<br>• Track and contain groups involved in illegal behavior using cameras, observation posts, Shadow Teams or Air Unit<br>• Arrest individuals who fail to disperse or who are involved in illegal activity<br>• Use Arrest Links to move arrestees<br>• With appropriate approval, deploy the appropriate less lethal munitions to defend officers or to disperse the crowd<br>• Ensure only reasonable force<br>• Report use of force and munitions<br>• Restore traffic flow |

In comparison, SPD's policy is much more general. This creates the risk of varying interpretations by SPD personnel and affords a considerable degree of latitude to ICs. Additionally, the general nature of the policy makes it hard for members of the public to predict how SPD will respond to a given crowd. See Exhibit 3, SPD criteria for crowd dispersal.



**Exhibit 3: SPD Criteria for Crowd Dispersal**

> **a. Upon Determining That There are Acts or Conduct Within a Group of Four or More Persons That Create a Substantial Risk of Causing Injury to Any Person or Substantial Harm to Property, the Incident Commander May Order That the Crowd Be Dispersed**
>
> See **SMC 12A.12.020** ☑
>
> Before ordering that the crowd be dispersed, the Incident Commander shall consider whether less restrictive means of crowd management are available. Such means may include strategies such as area denial and/or seeking voluntary compliance.
>
> Upon determining that dispersal is appropriate, the Incident Commander shall ensure that there is an avenue of egress sufficient to allow the crowd to depart.
>
> The Incident Commander or designee will issue the order to disperse prior to instructing officers to disperse the crowd, if feasible.
>
> See **14.090-TSK-3** Issuing the Order to Disperse.

While considerations referenced in the LAPD matrix are included in various SPD training materials, this information is not readily accessible to the public, or by SPD personnel looking for quick reference. Providing greater detail in policy promotes opportunities for public understanding and cooperation, while also reducing the risk that SPD personnel may not be aware of departmental expectations and techniques or may apply policies in a widely varying manner.

## Suggestions for Council and SPD to Consider

1. Augment the existing crowd dispersal policy with a matrix containing different stages of crowd dynamics and associated authorized techniques to respond. In accordance with Suggestion 10, ensure the matrix addresses the possibility of both mobile and static crowds. SPD may wish to consider delineating when each type of less lethal weapon is authorized, based on the stage. For example, given the highly indiscriminate nature of CS gas, SPD and Council may wish to consider limiting use of this weapon to full-scale riot situations involving violence. SPD and Council may also wish to consider prohibiting the use of weapons such as CS solely in defense of property.

2. Research and acquire technology to communicate with large crowds, such as a sound truck, and visual display boards. This technology could be used in a variety of settings and SPD may wish to explore partnership with other departments to share the cost. Social media is another low-cost option for wide-spread, real-time communication with crowds and the public at large during a protest to keep the crowd apprised of developments and any forthcoming police action.



3. Research and enhance policy requirements for increased communication with crowds, especially during large or stationary protests, to manage expectations and provide greater credibility for police action. For example, the current policy does not require dispersal orders to be announced.

4. Review and, if necessary, modify policy language for all less lethal weapons to ensure policy has consistent warning requirements, or include language explaining why inconsistencies exist.

5. Provide public education concerning crowd dispersal policies, procedures and overall SPD crowd management tactics.

### Training is consistent with current policy but does not afford sufficient practice opportunities with less lethal weapons.

OIG found that, per SPD records, all individuals providing incident command and supervision had attended crowd control training within the past two years, and 83% had attended in-person training in the past fifteen months.[13] Further, almost all relevant personnel had records of training related to supervision (sergeants) or incident command (lieutenants and above).[14] Individuals informed OIG that they had a clear understanding of the crowd control policy and the conditions under which crowds could be dispersed and less lethal weapons could be used. These results, together with analysis of the content of the commanders' crowd control training, indicate that personnel in charge of supervising and managing demonstrations were knowledgeable as to SPD's expectations and requirements for crowd management.

OIG examined whether individuals identified as using force during the demonstrations were qualified by the department to use that force. SPD provided OIG with dates indicating all officers who reported using the 40mm launcher had attended the required training in the previous year (2019), and all officers who reported using OC had attended training within the past two years as required by policy (2018-2019). OIG also found that all individuals who reported using blast balls had received some level of training, per SPD's reported records, although a small minority of officers deployed having not taken training for several years. OIG determined that four officers received blast ball training for the first time during the demonstrations, but per the department blast ball coordinator, these officers were given the opportunity to deploy a test device prior to deploying live blast balls in the field. OIG acknowledges that CPC and OPA, as well as external experts, have issued

---

[13] Due to the covid-19 pandemic, in-person training was halted in 2020.

[14] SPD did not find records of supervisory training ("sergeant school") for two sergeants involved in the demonstrations. One acting sergeant had not attended sergeant school because they are not permanently assigned to the acting sergeant role. SPD noted that the remaining sergeant's records may be missing due to attending an outside course on supervision.


**Seattle** Office of
**Inspector** General

multiple recommendations concerning SPD use of blast balls in the past, and the status of these recommendations should be reviewed for implementation in future work.[15]

OIG also reviewed the training materials and interviewed department specialists concerning blast balls and the 40mm launcher and determined that department training did incorporate information about safe use and applicable manufacturer's regulations. However, OIG identified that there are limited opportunities for officers to gain proficiency and experience with practice in using these weapons. Practice munitions are not available to officers for the 40mm launcher outside of annual qualification requirements, and officers may not have an opportunity to deploy live blast balls during annual re-training, depending on supply. In both cases, personnel described department budget as the limiting factor.

OIG did not review training materials for the deployment of CS, as this weapon is typically only authorized for use by SWAT, and its normal use is outside a crowd control setting. As referenced in Section One of this report, the Chief of Police made a policy decision to authorize patrol officers to deploy CS without prior training. By default, this means that patrol officers deploying CS did so without the safeguards of training or policy. While SWAT officers asserted the deployment of CS is not substantially different than the deployment of OC canisters, there is nevertheless risk associated with officers deploying weapons with which they have neither been trained or qualified. Additionally, officers not formally trained in use of CS may be unfamiliar with dispersal patterns, as well as proper first aid or decontamination procedures.

Personnel also reported that SPD likely used expired CS canisters during the recent demonstrations. Upon inquiry from OIG, personnel explained that expired canisters lose effectiveness over time, but there should not be any additional danger when deployed. OIG notes that deploying a less lethal weapon that does not have the desired effect (e.g., dispersal from CS gas) creates a risk that officers may then compensate with additional, or higher, uses of force to achieve the desired response. SPD asserted that the status of other less lethal weapons, such as OC and blast balls, are monitored through inventory tracking procedures.

## Suggestions for Council and SPD to Consider

6. Address previous recommendations issued by CPC, OPA, and external experts on blast balls.

---

[15] OIG has requested that SPD provide a status update on these recommendations but did not receive the results in time to review for this report.



Seattle Office of
Inspector General

7. Evaluate the effectiveness of any expired munitions and, if no longer deemed safe or effective for use, dispose of the munitions in accordance with regulatory guidance.

8. Increase opportunities for SPD personnel to train with the 40mm launcher and ensure each officer is able to deploy a live blast ball safely and within policy during annual recertification.

9. If it is determined that non-SWAT officers will be authorized to deploy CS in future demonstrations, ensure officers receive training regarding the proper use of CS and related first aid and decontamination procedures.

## SPD tactics and training for crowd management are designed for mobile crowds and do not adequately prepare personnel to respond to large, volatile, stationary crowds, or individual instigators using the cover of large crowds to engage in violence.

In conducting this review and future related analysis, OIG feels it is important to distinguish between the events that occurred downtown during the first weekend (May 29, 2020 to May 31, 2020) and the protests that took place in the vicinity of the East Precinct. Although SPD was not prepared for the scale and violence of the downtown protests,[16] this was still generally a moving crowd and could theoretically be managed with existing mobile crowd control tactics given sufficient personnel. The protests at the East Precinct were unusual in that they involved a stationary, volatile crowd that was focused on a fixed location. As will be discussed, SPD policy and training did not prepare personnel to manage such a crowd, and SPD was unable to de-escalate the crowd. Consequently, SPD relied on widespread use of less lethal weapons to respond to perceived safety threats.

### SPD training and related material are designed for mobile crowds, not static ones.

SPD trainings and related material provide a detailed overview of crowd psychology and crowd management techniques. By 2016, SPD recognized many deficiencies related to the use of traditional fixed riot lines. These weaknesses were both tactical – in that fixed lines were less flexible and had a limited ability to de-escalate the crowd – and psychological, in that the appearance and nature of a "hard line" may cause the crowd to be more antagonistic towards the police. It is clear from these documents that SPD understands the problems inherent in the design of a fixed riot line:

> "At the core of the tactical changes [made by SPD after WTO] was the recognition that allowing a disruptive crowd to coalesce at fixed points creates a greater likelihood of

---

[16] OIG addresses this lack of preparation in the "Matters for Consideration and Future Work" section of this report.



confrontation. Once officers and crowds are fixed in place, officers and demonstrators are often face with individual confrontations at close range; literally face-to-face or arms-length away from each other. These confrontations, at these distances, carry a high degree of risk to both sides and have a high potential for physical confrontation due to the perception of danger by each side. WTO and later events all point to the limitations of these traditional police demonstration tactics. Fielding enough officers in line formations, on short notice, to handle crowds from 500 – 10,000 demonstrators is almost impossible for all but the largest police agencies. [...] Line formations become very inflexible once engaged with a crowd. Without sufficient backing officers, line formations are easily penetrated, flanked or otherwise displaced through the pressure of a large crowd."

– SPD 2016 ISDM on Crowd Management

The ISDM goes on to specifically note that fixed lines are to be avoided whenever possible.

In these materials the department acknowledges the value of perceived legitimacy and procedural justice when managing a crowd. In a discussion of the Elaborated Social Identity Model of Crowd Behavior, SPD personnel write

"how the police act can influence a crowd in ways that promote conflict. Defensive police actions that are interpreted as considering a group as dangerous forms a reality for the crowd, who then consider the police as the opposition and promoting eventual conflict with those viewed as opposing the crowd. Interestingly, one of the theory's primary principles is that the more the police are viewed as legitimate, the less likely there will be conflict."

-    SPD 2016 ISDM on Crowd Management

Supported by this research, SPD designed its crowd management tactics to avoid fixed lines, enhance the mobility of officers and the crowd, and emphasize the need for cooperation and engagement with leaders of demonstrations. The 2019 Commanders' Crowd Control training specifically states that commanders should create distance and limit physical confrontation between the demonstrators and officers.

While SPD training materials refer to the difficulties of applying these tactics to a confrontational crowd or less mobile crowd, they offer few details on how to resolve these problems. Further, it is apparent that SPD has wrestled with the problem of how to intervene against coordinated individuals who use a larger crowd to conceal acts of violence and property damage for years, but has not developed a durable solution other than mobile bike officers. That solution is not workable in a large, fixed crowd as it is almost impossible for officers to safely enter the crowd and extract the individuals in question, especially if they are intent on disappearing into the larger crowd.

 Seattle Office of
Inspector General

SPD personnel stated it was unprecedented to defend a fixed location against what they described as a large, angry crowd. They believed the situation effectively nullified SPD's standard tactics for managing protests.[17] Officers explained that mobile bike troops were not effective against a static crowd, but SPD could also not simply withdraw and allow the crowd unfettered movement, as the risk that individuals might enter the precinct was too great. Personnel listed several reasons for believing they were unable to abandon the precinct without preparation, including:

1) Intelligence that a group was trying to burn down a precinct and signs in the crowd to that effect;[18]
2) The presence of weapons and confidential information in the precinct, including informant files; and
3) Concern that if the precinct was set on fire, it would spread to other nearby buildings containing apartments.

One IC added that retreating inside the East Precinct was not a viable option, as the building is awkward to defend. It has no plaza or other area to place barriers without blocking the street, and the placement of the entrances and exits mean it would be easier for personnel to be trapped inside by individuals purposely blocking the way. The IC indicated that for these reasons, SPD was concerned that officers could be trapped inside a burning precinct.

### Without the ability to deploy standard crowd management tactics or effectively de-escalate, SPD engaged in significant use of less lethal weapons.

In addition to not being able to deploy the department's primary means of managing a protest – moving the crowd – the events at the East Precinct indicated that the standard de-escalation principles of time, distance and shielding were not effective or not feasible.

Time did not appear to work, perhaps as SPD itself was the focus of the crowd's agitation. Distance was compromised by the nature of the fencing used at the East Precinct. This fencing was repeatedly destroyed or moved by protestors, allowing the crowd to close the space between themselves and the police.[19] One officer interviewed by OIG argued that by engaging in extended skirmishes with protestors, SPD actually escalated the situation. The officer reasoned that by tossing blast balls and then allowing the crowd to re-approach or move the fencing, SPD de-legitimized its actions by making it appear as if force was used

---

[17] In reviewing operational plans for the protests, it was apparent that SPD shifted rapidly from viewing their primary objective as safe facilitation of First Amendment activity to defending officers from violent protestors.
[18] In interviews, SPD maintained they had specific information about threats to precinct facilities.
[19] One individual interviewed by OIG stated that SPD had suggested placing more durable barriers that were effectively mounted into the street, but this was allegedly met with resistance from decision-makers.

 **Seattle** Office of
Inspector General

for no reason. The officer argued that if SPD had fully dispersed the crowd early on, events may not have escalated to such a degree later.

OIG includes an extended section of CAD (radio) traffic as Exhibit 4. Although lengthy, this section depicts how the fencing set up by SPD was not suitable for enforcing distance between officers and protestors. **Note: the chronological order of the CAD output reads from bottom to top, as seen by the time stamps on the far left.**


**Seattle** Office of Inspector General

## Exhibit 4: CAD Excerpt from the Night of June 7, 2020

| | | | | |
|---|---|---|---|---|
| 22:21 | OD/8009 | A | 216 | (5774)IF CONFRONTED UNITS WILL DEFEND SHIELD OFFCRS,AUTHORIZED USE OF OC AND BLAST BALLS |
| 22:21 | OD/8009 | | | (M)216 IF CONFRONTED UNITS WILL DEFEND SHIELD OFFCRS,AUTHORIZED USE OF OC AND BLAST BALLS |
| 22:21 | OD/8009 | A | 216 | (5774)11/PINE,CROWD APPROACHED WITHIN 5 FT OF OFCRS |
| 22:21 | OD/8009 | | | (M)216 11/PINE,CROWD APPROACHED WITHIN 5 FT OF OFCRS |
| 22:20 | OD/8009 | | | (M)PER 2D,PASSING OUT WALKIE TALKIES AT FRONT OF THE CROWD |
| 22:20 | OD/8009 | | | Related Call:ADDED DUPLICATE:20-183479 |
| 22:20 | OD/8009 | | | (M)DUPLICATE: 20-183479: RP REPORTING 20 PEOPLE IN MIDDLE OF INTERSECTION BLOCKING TRAFFIC, ALSO SEE TRASH CANS & DEBRIS IN ROAD, NO WPNS SEEN |
| 22:20 | SPVB/7274 | | | WEST SIDE SLOWLY ADVANCING,MALE WITH A DUMPSTER PUSHING IT IN ROAD |
| 22:19 | OD/8009 | A | CAR21 | (5648)SLOWLY ADVANCING |
| 22:19 | OD/8009 | | | (M)CAR21 SLOWLY ADVANCING |
| 22:19 | OD/8009 | | | (M)GRN DUMPSTER NB ON 13 AV FROM PIKE ST |
| 22:18 | OD/8009 | | | (M)NORTH SIDE MALE APPROACHIKNG THE LINE,HM,BLU,RED BANADANA |
| 22:18 | OD/8009 | | | (M)BIKE FENCE FULL APART AND MOVING FORWARD |
| 22:17 | OD/8009 | | | (M)BICYCLE FENCE HALF REMOVED TO THE SOUTH SIDE |
| 22:17 | OD/8009 | | | (M)PER 214,AM BLK JKT YEL SHIRT N95 MASK BLU UMBRELLA AESOL CAN COULD BE USED AS FIRE ACCELERANT,INFO ONLY |
| 22:13 | OD/8009 | | | Related Call:ADDED DUPLICATE:20-183476 |
| 22:13 | OD/8009 | | | (M)DUPLICATE: 20-183476: CALLER:[redacted] PHONE ONLY |
| 22:13 | OD/8009 | | | (M)DUPLICATE: 20-183476: RP REPORTING APPROX 20 PROTESTERS WITH SHIELDS, WEARING BULLET PROOF VESTS AND GAS MASKS, HELMETS, LOOKS LIKE THEY ARE GOING TO START A RIOT, NO WEAPNS SEEN. |
| 22:12 | OD/8009 | | | (M)CROWD BREAKING THE FENCE AND USING IT AS WEAPONS,USING THE RODS |
| 22:07 | ED/8018 | | | BROADCAST INFO |
| 22:07 | OD/5396 | | | (M)INFO PER CITIZEN TO 3I31 |
| 22:07 | SPVB/7274 | | | ED ADVISED OF UPDATE |
| 22:06 | OD/5396 | | | (M)******* MAN WITH PISTOL. ******************** 12,OLIVE.. WM,25,RED HOODIE,BLK BACKPACK |
| 22:06 | OD/5396 | | | (M)WM,25 PISTOL 12/OLVIE RED HOODIE,BLK BACKPACK... |
| 22:05 | OD/5396 | A | CAR21 | (5648)ADV CROWD THEY HAVE ADVANCED TOWARD THEIR LINES. WE HAVE NOT ADVANCED TOWARDS THEM ONCE THEY CAME THRU THE LARGER FENCE. REPEATEDLY TOLD THEM THEY WANT IT PEACEFUL BUT DONT WANT THEM THRU THE LINE WE HAVE SET HERE |

**Seattle** Office of
Inspector General

Further, the open construction of the fencing did not provide the shielding element of de-escalation, consequently exposing officers to projectiles from the crowd. OIG reviewed use of force statements in which officers described the following:

- Officers struck with glass bottles and rocks, including rocks from a slingshot device;
- Fireworks "similar in size to mortar shell fireworks" being thrown at officers;
- Green lasers shone into officers' eyes;[20]
- Officers hit with boards; and
- Officers hit with other items, such as a full gallon of milk and full cans of drinks.

These reported injuries are highlighted to illustrate the perceived safety risk, and the role this played in subsequent decisions to use less lethal weapons. SPD policy allows for the dispersal of crowds, including the use of blast balls and OC spray, if there is a "substantial risk of causing injury to any person or substantial harm to property." Injury to officers would qualify as meeting that criteria. ICs interviewed by OIG cited acts such as large rocks or frozen water bottles being thrown at officers as the primary factor in deciding to issue a dispersal order, accompanied by subsequent use of less lethal tools to carry that order out. Again, this is borne out in the CAD data, in which exposure to projectiles from members of the crowd appear to be a key factor in the decision to use CS as seen in Exhibit 5. **As with the previous excerpt, readers should review the excerpt from the bottom up.**

---

[20] The American Academy of Ophthalmology states that laser pointers with above 5 milliwatts of power have the potential to cause permanent eye and skin damage. They note consumer-grade lasers often lack adequate labeling and warning about their output power, and that per the FDA, about sixty percent of consumer laser pointers have greater power than their label states. Pointing lasers at aircraft and law enforcement officers has been designated a criminal offense in some jurisdictions.


Seattle Office of
Inspector General

## Exhibit 5: CAD Excerpt from the Morning of June 8th, 2020

| | | | |
|---|---|---|---|
| 00:14 | OD/8009 | | |
| | (M)CAR21 DEPLOY CS | | |
| 00:13 | OD/8009 | A | 216 |
| | (5774)STARTING TO WITHDRAW | | |
| 00:13 | OD/8009 | | |

file:///C:/vdx2k/MWS/MDT/Temp/msg_5TE0QVXAQ.htm                    7/16/2020

Page 16 of 33

| | | | |
|---|---|---|---|
| | (M)216 STARTING TO WITHDRAW | | |
| 00:12 | OD/8009 | | |
| | (M)WB ON PINE TO GET TO 216 | | |
| 00:12 | OD/8009 | | |
| | (M)NEED MORE MUNITIONS AT 11/PINE | | |
| 00:11 | OD/8009 | | |
| | (M)PER 198 OFFCIERS SURROUNDED ON 3 SIDES | | |
| 00:11 | OD/8009 | A | 216 |
| | (5774)HOLDING HERE,TAKING HEAVY PROJECTILES | | |
| 00:11 | OD/8009 | | |
| | (M)216 HOLDING HERE,TAKING HEAVY PROJECTILES | | |
| 00:10 | OD/8009 | A | CAR21 |
| | (5648)CONTINUE THE PUSH | | |
| 00:10 | OD/8009 | | |
| | (M)CAR21 CONTINUE THE PUSH | | |
| 00:10 | OD/8009 | A | 216 |
| | (5774)TAKING PROJECTILES,WE HAVE PUSHED THEM ACROSS INTERSECTION | | |
| 00:10 | OD/8009 | | |
| | (M)216 TAKING PROJECTILES,WE HAVE PUSHED THEM ACROSS INTERSECTION | | |
| 00:10 | OD/8009 | A | 216 |
| | (5774)MOVE FORWARD TO BARRACADES | | |
| 00:10 | OD/8009 | | |
| | (M)216 MOVE FORWARD TO BARRACADES | | |
| 00:09 | OD/8009 | A | 216 |
| | (5774)CROWD IS USING BLAST BALLS AND PROJECTILES | | |
| 00:09 | OD/8009 | | |
| | (M)216 CROWD IS USING BLAST BALLS AND PROJECTILES | | |
| 00:08 | OD/8009 | A | 216 |
| | (5774)UNITS TO HOLD THE INTERSECTION | | |
| 00:08 | OD/8009 | | |
| | (M)216 UNITS TO HOLD THE INTERSECTION | | |
| 00:08 | OD/8009 | A | 216 |
| | (5774)SHIELD TROOPS MOVE FORWARD | | |
| 00:08 | OD/8009 | | |
| | (M)216 SHIELD TROOPS MOVE FORWARD | | |
| 00:08 | OD/8009 | A | 216 |
| | (5774)SHIELDS PREPARE TO MOVE FORWARD | | |
| 00:08 | OD/8009 | | |
| | (M)216 SHIELDS PREPARE TO MOVE FORWARD | | |
| 00:07 | OD/8009 | | |
| | (M)INJURED OFFCER W/NAT GAURD MEDIC IN SALLEY PORT | | |
| 00:07 | OD/8009 | A | CAR21 |
| | (5648)ITEMS BEING THROWN AT OFFCRS,I HAVE GIVEN 2 DISPERSAL ORDERS,GRN LAZER SHINING AT OFFICRS EYES | | |
| 00:07 | OD/8009 | | |
| | (M)CAR21 ITEMS BEING THROWN AT OFFCRS,I HAVE GIVEN 2 DISPERSAL ORDERS,GRN LAZER SHINING AT OFFICRS EYES | | |
| 00:06 | OD/8009 | A | 216 |
| | (5774)STILL TAKING,MULTIPLE BOTTLES AND FIREWORKS FROM CROWD | | |
| 00:06 | OD/8009 | | |
| | (M)216 STILL TAKING,MULTIPLE BOTTLES AND FIREWORKS FROM CROWD | | |
| 00:05 | OD/8009 | A | CAR21 |
| | (5648)DISPERSAL ORDER GIVEN | | |
| 00:05 | OD/8009 | | |
| | (M)CAR21 DISPERSAL ORDER GIVEN | | |
| 00:05 | OD/8009 | A | 216 |


**Seattle** Office of
**Inspector General**

In dispersing the crowd, SPD used significant amounts of blast balls and CS, as summarized in the background section of this report. Personnel noted that protestors appeared to acclimate to blast balls (which work primarily by surprise) and so chemical irritants appeared to be the only successful means of dispersing the crowd.

SPD appeared to devise successful alternate strategies at other precincts as the demonstrations continued, including providing minimal visible officer presence in response to protestors and erecting large, immovable concrete barriers.[21] The barriers erected at West Precinct are included as Exhibit 6, below. However, it is fair to note that other precincts benefit from infrastructure advantages such as plazas or parking lots that render retreat or barriers more feasible.

**Exhibit 6: Barriers Being Erected at West Precinct**



*Source: photo published on Reddit by user kodaobscura on July 24, 2020.*

## Conclusions for Tactics and Training

In reviewing departmental training materials, SPD clearly recognizes the challenges and counterproductive nature of relying on a fixed line to manage crowds, and additionally recognizes the difficulty of intervening with isolated individuals within a larger, otherwise non-violent crowd. However, identifying and acknowledging areas of concern is simply one step in the process of establishing policies, training, and protocols for stationary crowd management. SPD should develop complete stationary crowd management plans, supported by clear policy and training, to manage those situations when they arise.

---

[21] One SPD officer described arriving at the North Precinct, determining the crowd was likely to be peaceful (i.e., comprised of individuals in loungewear and teenagers being dropped off by their parents), and making the decision to bring officers inside so as not to create a focus for the crowd.



Although these recent events were driven by anger at police and focused on police facilities, police precincts are not the only occasion on which SPD may need to defend a fixed location. For example, it is not inconceivable that a future demonstration may target a building completely unassociated with the police, such as a place of worship or a school. SPD must be able to respond to such situations in a way that presents greater opportunities for a peaceful resolution or avoiding confrontational strategies.

Traditional approaches to "de-escalation" involving time, distance and shielding were developed to address, and are generally effective on, individuals presenting a threat of violence or in crisis. However, these traditional approaches may not translate to managing the actions of a large, stationary, volatile crowd. Other strategies that may be more effective to de-escalate large groups include enhanced communication before and during the event, and modulating police presence to possibly include wearing "softer" uniforms and limiting the number visible officers. For example, SPD could communicate to the overall peaceful crowd that a small section has become violent and the police may need to take corresponding action.

Reasonable police intervention using force is sometimes necessary to secure public safety. By researching, developing, and training on policies and tactics that address large, static crowds, and individual agitators within such crowds, SPD can improve its ability to respond to such events while lessening the likelihood that less lethal weapons will be improperly used on non-violent protestors. OIG recognizes that this tactical issue is not unique to SPD and is a long-standing, complex problem in policing. That does not absolve the City of Seattle from attempting to seek solutions that meet community expectation. The City and the Seattle Police Department are known for setting new and best practices in many areas and this area of intersection between policing and free exercise of expression is ripe for innovation and new thinking.

## Suggestions for Council and SPD to Consider

10. Research and develop policies, strategies, and tactics to manage a fixed, confrontational crowd that may contain isolated individuals throwing projectiles or otherwise creating life safety concerns and incorporate tactics into departmental crowd control training. For example, tactics could include acquiring and deploying sturdier barriers, or intentionally reducing visible police presence.

**Seattle** Office of
Inspector General

## The City faces two substantial and conflicting risks when working with other law enforcement agencies providing mutual aid during protests.

First, there is inadequate transparency and accountability concerning use of force by non-SPD entities. Second, without additional resources in the form of mutual aid, SPD does not have the capacity to manage large-scale demonstrations in a peaceful manner.

SPD and, by extension, accountability entities tasked with reviewing recent protest responses, do not have sufficient data to determine if force used by mutual aid agencies was in alignment with SPD policies and crowd dispersal procedures because almost all involved agencies have not yet complied with SPD's request to submit use of force statements.[22] Review of what documentation exists indicates that mutual aid partners were making use of, at minimum, blast balls, OC, 40mm less lethal launchers, and CS gas.

Agencies that provide mutual aid to SPD are not compelled to follow SPD policy on use of force or force documentation. Although SPD frequently trains with neighboring jurisdictions to develop a common understanding of crowd control techniques, this is not a guarantee the other jurisdictions will follow SPD's policy, training, tactics, and importantly, philosophy on use of force. In its research for the on-going mutual aid audit, OIG determined that none of the agreements between SPD and federal task force partners require the other entity to follow SPD policy, as a local agency cannot compel federal agents to follow local policies. For local law enforcement partners, Washington state law allows for any law enforcement officer in in the state to "enforce the traffic or criminal laws of this state" subject to SPD request for assistance. This law does not compel the other agency to follow SPD policy as part of enforcing the law.

This creates a risk that when engaging the assistance of outside agencies, Seattle community members may be subjected to force outside normal community expectations and standards for SPD. Additionally, there is a risk that individuals in the crowd may confuse the actions of other agencies for those of SPD, increasing anger towards the department and further damaging trust in SPD. This anger may reduce the ability of SPD personnel to de-escalate the crowd.

However, it is also apparent that SPD felt unable to manage the recent protests without reliance on mutual aid assistance. In reviewing email correspondence, OIG identified requests for 400 members of the National Guard and varying daily requests throughout the relevant period for between 15 and 50 officers from other agencies, depending on the

---

[22] SPD asserts that the King County Sheriff's Office and the Washington State Patrol have assured SPD that they will provide statements via a public records request; however, these statements have not yet been received by the department. SPD stated that the agencies have supplied statements in the past.


**Seattle** Office of
Inspector General

expected protest activity. Early on, a City of Seattle employee requesting aid wrote the following, expressing the dire need for support:

> "please note: all local resources have been exhausted; mutual aid has been exhausted; commercial resources have been exhausted or predicted to be exhausted in the near future; the City is willing to pay for assistance."

One IC noted to OIG that lack of sufficient officers raised the potential that increased reliance on less lethal weapons would be needed to manage the crowd and address safety risks.

As the protests progressed, it became harder for SPD to secure mutual aid assistance, potentially because of the high-profile nature of the demonstrations. The King County Sheriff's Office wrote that "We are unable to support the East Precinct due to the potential to be drawn into demonstrations." Several individuals interviewed by OIG implied that the lack of mutual aid was a factor in the shifting rules of engagement from SPD concerning the use of less lethal weapons. For example, personnel reported that command staff appeared to waver between allowing force in response to property damage and then removing property damage as actionable criteria. One of these individuals explained that other agencies viewed the changing rules of engagement as putting officer safety at risk, because the other agencies felt that their officers would not be able to take action to protect themselves within the rules of engagement specified by SPD. This individual stated that the other agencies were worried that they would be targeted for following their own policies instead of those deemed acceptable by SPD and the Seattle community.

Use of mutual aid raises the risk that force may be used outside the boundaries set by SPD policy. However, without assistance by mutual aid agencies to back-fill patrol during a demonstration or assist in the demonstration itself, SPD may either:

- be more reliant on less lethal weapons to manage crowds;
- be unable to adequately protect crowds, as in the event of counter-protestors or individuals intent on attacking protestors as in the case of Charlottesville, VA; or
- be unable to respond to high priority calls for service in a timely manner.

Although it may be difficult, if not impossible, to compel other agencies to follow SPD policy, the City may be more successful in convincing other agencies to report their uses of force as a matter of routine. This may mitigate the immediate safety risk created by lack of mutual aid while still providing data that oversight agencies can use to determine whether the value of mutual aid is worth the compromise.



Seattle Office of Inspector General

Suggestions for Council and SPD to Consider

11. Work with Council, regional law enforcement agencies, and, if necessary, state legislative partners on a long-term solution for prompt and transparent reporting of force during large-scale events. Use of force reporting does not necessarily need to include identifying information for individual officers from other agencies.

# Other Matters to be Addressed by SPD

These issues emerged during the course of the review, but OIG did not have sufficient time or data to draw full conclusions. Nevertheless, they emerged as significant matters for SPD to research further.

## Consider requiring formal documentation of tactical briefings prior to demonstration events.

SPD does not document detailed tactical information and rules of engagement in the Incident Action Plan, in part to avoid this information being included in public records requests. SPD policy requires that briefings including this information be provided to personnel. OIG was unable to obtain copies of written briefing materials given at roll call and other events during the timeframe of this review. Further, OIG was informed by SPD personnel that briefings did not always occur, and that some briefings were not detailed enough to properly inform officers as to new objectives and situational changes. If briefing material is not preserved in written or other form, SPD and accountability partners will be unable to evaluate whether personnel had appropriate and useful information to inform decision-making in the field. Further, lack of documentation of instructions and guidance issued by senior SPD command makes it difficult to hold these personnel accountable for decision-making, versus the comparative transparency that policy and modern technology mandate for line personnel (i.e., body-worn video and videos captured by bystanders).

## Consider improving communications equipment for individuals involved in supervision during crowd management events.

Personnel stated it could be very difficult to hear instructions over the radio using existing equipment, particularly when wearing gas masks. If personnel cannot hear instructions clearly, they may misunderstand instructions and take action which unnecessarily or improperly escalates the situation. For sergeants and above, improved headsets or other technology may mitigate this risk.

## Consider conducting debriefing exercises with the public and officers.

It is evident that the public does not understand why SPD undertook many of its actions during the recent demonstrations and are horrified by the scenes of violence and perceived indiscriminate use of force. These actions have eroded public trust in the department. By conducting outreach to explain its actions and begin to understand community concerns, SPD may begin to restore this trust.



It is equally apparent that personnel interviewed by OIG were unprepared and shocked at the perceived level of hostility and violence leveled at them by the public.[23] It is possible for the City to address the harm created by the institution of policing while also acknowledging concern for injuries and trauma inflicted on individual officers. At a minimum pragmatic level, officers with unresolved trauma and related mental health concerns may be more likely to react to future demonstrations and events in an unwanted manner. On a more philosophical level, SPD officers are employees of the City and should be afforded the same concern for their mental and physical health as the City expresses for its non-sworn personnel. Per personnel, SPD has not conducted debriefing exercises with officers concerning the recent protests, or otherwise provided wellness resources other than an app listing mental health providers.

## Consider less technical language in public communications.

Language such as "improvised explosives" has a specific military connotation for members of the public, and SPD may consider using more accessible language in its communications. While it may be technically correct, using such terms and then including photos of items that do not meet public expectations – such as broken candle – do not enhance department credibility. Personnel shared with OIG that the concern was not actually about the candle-as-bomb, but rather that individuals were throwing accelerants on officers and then throwing incendiary devices. In other words, the actual concern was that protestors were attempting to light officers on fire. Using more direct language such as "officers were injured because individuals attempted to set them on fire" affords an opportunity to build greater legitimacy than describing a candle using a term the public associates with a bomb. See Exhibit 7, below, for an example of a tweet and public response.

---

[23] In addition to physical injuries, officers reported that SPD personnel were targeted with racist insults and threats. For example, one officer informed OIG that someone in the crowd threw a noose at a Black officer.

 **Seattle** Office of
Inspector General

**Exhibit 7: Seattle Police Department Tweet Alleging Candle as Improvised Explosive and Sample Public Responses**





**Seattle** Office of
Inspector General

# Section Four: External Executive Authorization Processes

Council requested that OIG and other accountability partners identify crowd dispersal processes requiring Executive approval. Requiring Executive approval would introduce an additional layer of oversight in the decision to disperse a crowd. In theory, external approval has the potential to provide a non-police perspective that could complement the decision-making perspective of police officers who are following policies rooted in tactical, operational, and safety considerations. However, this approach raises several significant practical concerns: timing, expertise, and availability of information. As such, OIG does not support requiring external Executive authorization.

Sufficient time to seek executive approval may not exist for all crowd situations that shift from lawful to unlawful. Often, crowd dynamics are fast-moving and police may need to act quickly to address an act of violence or a life safety issue. Executive decision-makers will also generally lack tactical expertise, as well as access to sufficient on-the-ground information that ICs have, putting the Executive's decision-making at a disadvantage. Compounding that disadvantage, the Executive's source of information would likely be the police, so Executive authorization does not provide a truly independent source to evaluate the necessity of a dispersal order. This makes it less likely that the Executive would have a separate basis upon which to disagree with a police recommendation to issue a dispersal order. These factors may explain why in research of other jurisdictions' crowd management policies,[24] OIG did not find any that give crowd dispersal authority to decision-makers external to the department in exigent circumstances.

---

[24] See page 12 for a list of these jurisdictions.


**Seattle** Office of
Inspector General

# Section Five: Future Work for OIG

## Sentinel Event Review

OIG completed this report to address specific questions posed by Council, as described above. The report is not, and does not endeavor to be, an overall evaluation of the specific events occurring between SPD and the Seattle community in May, June, and July 2020. Digging into this set of concerns requires an inclusive process with community input and appropriate expertise in the form of a sentinel event review.

Community has identified urgent and important issues to be considered in an overall review process, including why SPD used less lethal force during what many felt were peaceful demonstrations. There are also broader questions being posed, locally and nationally, about whether policing can be sufficiently reformed to address concerns about institutional racism, militarization, and violence. OIG acknowledges that addressing systemic and historic concerns will require more than a single sentinel event review and will require commitment by policymakers and leaders to implement structural changes. A comprehensive review of an unwanted outcome can inform structural change by revealing underlying causes to future harm. Even if the ultimate objective involves completely replacing the current structure with a different one, understanding failings or defects in the current system is necessary to avoid reproducing the same core flaws in a new structure.

Based on the data and interviews OIG conducted for this report, understanding the root causes of what happened during the 2020 demonstrations involves understanding both the immediate chain of events beginning May 29th, 2020 as well as a review of institutional practices and culture around demonstration response. It will also involve acknowledging the vast gulf in perspective between protestors and SPD personnel of the same events. For example, many protestors in the crowd expressed outrage at being subjected to force without warning or cause. Meanwhile, SPD personnel stated this was the most violent and hostile crowd they had ever encountered. Understanding how and why both perspectives exist will be at the heart of determining what went wrong, and how similar outcomes can be avoided in the future.

The oversight role of OIG, informed by subject-matter expertise and access to SPD data affords some insight into what occurred and why.[25] However, it is neither appropriate nor

---

[25] This review project highlighted the tenuous nature of OIG reliance on voluntary participation by SPD personnel in OIG oversight projects. In previous work, OIG has experienced no issues with cooperation by SPD personnel. However, for this report, given the high-profile and on-going nature of the issues discussed, personnel expressed concern that information shared with OIG could be used punitively by others. Some personnel declined to participate entirely. Other personnel stated they understood the value of the project and wanted to participate, but they were concerned that their rights against self-incrimination and to labor representation be preserved. To invoke "Garrity" protections, the Seattle Police Management Association



viable for OIG to complete such a review on its own. The forthcoming sentinel event review will combine community input, relevant external expertise, access to SPD data and personnel, and technical assistance from OIG to form a more complete response to community questions and concerns about SPD actions.

SPD may also wish to consider including community input in its existing force review processes to ensure that its analysis and investigation address community questions and concerns. Members of the public may not be experts on defensive tactics, but their input can shed an important early warning light on aspects of police procedure and practice that are confusing and jarring to non-police observers. SPD can take advantage of these opportunities to provide more public education or amend its policies, as appropriate, before another serious event occurs that may further damage public trust.

## Future Projects

OIG was unable to fully investigate these issues during the compressed timeframe of the review but plans to conduct further research.

### 1. Disparity analysis of SPD response to current and past demonstrations.

OIG was unable to analyze whether SPD displayed bias in its response to the 2020 demonstrations in the context of this review. Analysis of the Incident Action Plans revealed that SPD very quickly began considering the entire crowd as violent and a potential threat, and arguably did not change this general assessment throughout the entire series of protests (with some exceptions for planned events such as the silent march organized by Black Lives Matter Seattle-King County). Treating the entire crowd as a single entity prevented OIG analysis of how SPD responded to specific groups within the crowd.

OIG recognizes and plans to conduct a future disparity analysis to consider whether SPD response to demonstrations changes depending on the nature of the protest. While there are some significant logistical barriers – for example, lack of body-worn video at peaceful protests means that it is difficult to assess events in which SPD officers did not exert force – the OIG policy unit will make maximum effective use of the available data.

### 2. Review of department preparation for large-scale mobilization.

Personnel interviewed by OIG reported that SPD was unprepared for the scale and violence associated with protests from the first night (May 29, 2020). One IC estimated that they had

---

(SPMA) requested that the Chief of Police order their cooperation, but she declined to do so, citing concern about intervening in a labor relations matter and over the applicability of Garrity.  As an alternative, SPD suggested establishing a policy requirement for personnel to cooperate fully with OIG. OIG eventually arrived at a solution in cooperation with the City Attorney; however, the time needed to develop this workaround took valuable time from the project, especially in such a short overall timeline.

 **Seattle** Office of
**Inspector General**

400 officers available to respond to demonstrations with 10,000 attendees and rated the observed violence as a "9.8" compared to "4 or 5" for May Day 2016.

Because the department reportedly lacks an electronic staffing system, the department was unable to easily identify available staff to recall for duty, leading to extraordinarily extended hours and fatigue for officers assigned to shifts at the start of the protest.[26] Multiple commanders noted that the department ultimately had to revert to twelve hour rotating shifts, which had not been done since the 1999 World Trade Organization demonstrations. One officer interviewed by OIG reported working 150 hours in the first two weeks. Other personnel identified problems with basic logistical issues such as providing food to personnel.

Extended working hours may negatively affect officer behavior. OIG research indicates that impaired sleep due to extended hours is associated with negative impacts to vigilance, reaction time, information processing, and decision-making. OIG also found studies indicating that lack of sleep in law enforcement officers, specifically, is associated with a higher probability of serious administrative errors, safety violations, and exhibiting uncontrolled anger towards suspects.

Additionally, emails from the Emergency Operations Center reveal that SPD ran out of its stock of less lethal munitions during the first weekend of protests, and the City had to scramble to resupply, including (possibly) chartering a private cargo flight from Florida.[27] Review of APRS blast ball audits indicate that by 2019, the department's supply of blast balls was at a historic low, and SPD personnel indicated that SPD stopped performing an annual assessment of OC supplies several years ago.

Further research and interviews are required to determine why the department did not plan or prepare for the possibility of such a large-scale event. Given the history of natural disasters in Washington state, it is not unreasonable to expect that the department would be better prepared to schedule, feed, and otherwise manage a full-scale deployment of staff.

---

[26] OIG notes that the City Auditor identified SPD's lack of an electronic workforce scheduling system as early as April 2016, in an audit of SPD overtime controls. The Auditor recommended that SPD either implement a new scheduling and timekeeping system or enhance existing systems to include automated controls. The full audit report can be found at
http://www.seattle.gov/Documents/Departments/CityAuditor/auditreports/PublishedReport-Corrected-04_22_16.pdf.
[27] OIG did not find final confirmation of the flight, but found emails indicating this was being considered as the last remaining option.


# Appendix A – OIG Memo on Less Lethal Weapons Usage in Protests (6/12/2020)





PO Box 94764
Seattle, WA 98124-7064
www.seattle.gov/oig
(206) 684-3663

June 12, 2020
## Less Lethal Weapons Usage in Protests

*Informational Summary of Less Lethal Weapons Used by the Seattle Police Department During Mass Demonstrations (5/29/2020 – 6/7/2020)*

### Objective

This document provides an informational summary of less lethal weapons used by the Seattle Police Department (SPD) at recent mass demonstrations in Seattle, covering the period of 5/29/2020 to 6/7/2020. It includes information on the purpose and function of each tool, SPD policies governing its use, and, where applicable, information from credible external sources on potential health impacts or use limitations.[1] This summary is a preliminary report, as OIG is continuing to gather and synthesize information about use of crowd management tools by SPD. Analysis of the sufficiency and appropriateness of SPD policy and training related to crowd management will be a forthcoming product.

Time constraints and a desire to prioritize the weapons of most immediate public concern mean that this initial document is not an exhaustive list of all possible less lethal devices available to the department. For example, this report does not discuss TASERs, batons, or the full extent of tools available to SWAT when addressing barricaded subjects or other unusual, hostile situations.

### Purpose of Less Lethal Weapons

SPD describes the purpose of less lethal weapons as follows:

> *Less-lethal tools are used to interrupt a subject's threatening behavior so that officers may take physical control of the subject with less risk of injury to the subject or officer than posed by greater force applications.[2]*

In short, less lethal weapons are intended to reduce the need for greater (lethal) use of force. In an ordinary patrol capacity, less lethal weapons offer alternatives to higher levels of force that might otherwise be necessary to protect persons or take control of a dangerous situation. Officers must have an individualized rationale to justify each application of this force. In a crowd management context, the rationale is more generalized

---

[1] By "credible", OIG refers to sources relying on published scientific evidence, organizations that are widely considered to be standard-setting in the field of policing, and information published directly by manufacturers of the weapons discussed in this report. The list of sources is not exhaustive given the limited time in preparing this report; however, the sources reviewed by OIG appeared to be in alignment.

[2] Seattle Police Department, "SPD Manual 8.300 – Use of Force Tools", last modified 9/15/2019.



and force used by officers may impact bystanders and other not involved in violent or riotous action.

Less lethal weapons come in a variety of forms, including chemical agents, conducted electrical weapons, impact weapons (such as batons), and impact projectiles. The SPD manual requires all officers to carry at least one less lethal weapon. In general, officers are not permitted to carry and use a less lethal weapon unless they are trained and certified in its use. The manual discourages the use of improvised weapons, such as nearby debris, except in the case of "exigent circumstances."

Distinguishing between the less lethal weapons available to patrol officers and additional specialized less-lethal weapons available to the Special Weapons and Tactics (SWAT) unit is important when discussing force options and criteria. The training and certification required of SWAT officers is extensive and not comparable to that required of patrol. Use of less lethal weapons by SWAT in their ordinary operations provides options, other than lethal force, to address incidents like barricaded individuals and hostage situations.

Under normal circumstances, only SWAT is authorized and trained in deploying CS gas (tear gas), and only SWAT is authorized to use the 40mm less lethal launcher in crowd management situations. Chief Best temporarily authorized use of CS canisters and the 40mm launcher by patrol officers for the mass demonstrations occurring between 5/31/2020 and 6/5/2020, citing shortages in other less lethal tools such as blast balls and OC spray.[3]

### General Criteria for Use of Less Lethal Weapons

Much of the criteria for the use of less lethal weapons distills down to a subjective assessment by the involved officer that the use of the weapon is necessary to prevent harm to the officer or the public.

Excerpts of SPD policy are provided in Appendix B, and readers will find the phrase "reasonable, necessary, and proportional" repeated multiple times as thresholds for the use of less lethal tools. These factors apply to all uses of force by SPD. The reasonableness requirement is based on Supreme Court case law,[4] and the necessary and proportional requirements adopted by SPD are policy choices that go beyond legal requirements. However, it is important for non-police readers to know that officer decision-making on these factors is judged against the information known and understood by the officer using the force *at the time of the force*, rather than 20/20 hindsight. The manual – and case law –

---

[3] Seattle Police Department, "Memorandum – Policy 8.300 – POL (5) and POL 11 (13) – 40mm Launcher and Policy 8.300-POL 5" (5/31/2020).
[4] Graham v. Connor, 490 U.S. 386 (1989)



does not expect police officers to be omniscient, but it does require them to use their best judgment in making a force decision.

Similarly, the SPD manual cites a "life safety emergency" as criteria for the use of less lethal weapons in crowd management situations. This is based on the information known to, and interpreted by, officers on the scene.[5]

Police officers analyze potential threats to safety based on their training and experience, which is different from that of an average person. For this reason, force decisions made by police officers may not align with community interpretation of the same event, and thus the actions taken by the police may not align with community expectations. The degree of that dissonance could be alleviated by changes to the guidance and/or training provided to officers, ensuring adherence to proper policy and training, and/or instituting limitations that align with community desire.

## General Guidance on Use of Less Lethal Weapons

In its preliminary research, OIG did not find credible external sources advocating a blanket ban on the use of less lethal weapons either in general patrol operations or crowd control. In the absence of less lethal options, officers may rely on greater use of lethal force to respond to threats to their or others' safety. The International Network of Civil Liberties Organizations (INCLO) wrote in 2018 that "the lawful exercise of the use of force by policing institutions is a key component in protecting and promoting the rights to protest."[6] However, INCLO goes on to note that the use of force in the context of protests "remains of utmost concern" due to the number of deaths and injuries. It provides the following general guidance:

> The disproportionate use of force is a complex problem and is due to several factors, including: limited and insufficient training; inadequate and outdated norms and protocols for intervention; deficiencies in the preparation and design of operational plans; problems in institutional design; the absence of functioning internal and external oversight mechanisms; and, in some occasions, deficiencies in the crowd-control equipment and weapons used.

> Force in the context of protests should only be used to protect the right to life and the physical integrity of protesters, bystanders, and police officers, and it must always comply with the principles of: legality, necessity, proportionality, precaution, non-discrimination and accountability.

---

[5] Seattle Police Department, "SPD Manual 14.090 – Crowd Management" last modified 11/01/2018.
[6] International Network of Civil Liberties Organizations and the International Human Rights Clinic of the University of Chicago Law School, "Defending Dissent; Towards State Practices that Protect and Promote the Rights to Protest" (2018), 74.



*Proper training, tactics, and equipment are all needed to ensure that unlawful and disproportionate force is not used. Precautionary measures should be taken during preparation for an event to ensure the use of force does not become necessary. This includes training officers to exercise good judgment and improve their communication and de-escalation skills.[7]*

OIG includes the full list of recommendations from the 2018 INCLO report in Appendix A.

OIG also reviewed the Crowd Management Concepts and Issues paper developed by the International Association of Chiefs of Police (IACP). In it, the IACP offered general guidance on the use of force in crowd management situations:

*Prior to deployment, all personnel engaged in crowd management or control should be made aware of the ground rules for the use of force as part of their briefing and any terms that may have been negotiated between law enforcement and demonstration organizers. Officers providing support from other agencies should always be briefed on policies related to use of force and crowd control. The fact that some individuals in a crowd have engaged in unlawful conduct does not normally provide blanket grounds for use-of-force countermeasures, crowd dispersal, or declaration of an unlawful assembly. When lines of communication have been maintained between event organizers or leaders and a law enforcement liaison, it is sometimes possible to negotiate a resolution to the situation. Given such situations, many crowds tend to become self-enforcing to ensure that they can continue to assemble and convey their message.[8]*

## Information on Specific Less Lethal Weapons Used in Recent Demonstrations by SPD

For the remainder of this memo, OIG will provide a summary of each weapon, the guidance provided by SPD for its use, and any external guidance or recommendations that OIG identified in its preliminary research.

### Oleoresin Capsicum (OC) Spray

<u>Overview of Weapon and Purpose</u>

OC spray distributes a substance that causes an intense burning sensation of the skin, eyes, and mucous membranes. It is often called "pepper spray" because the active ingredient (capsaicin) is derived from peppers (capsicum).

OC spray works by pressurizing an oily liquid containing capsaicin. When the trigger is pulled, the liquid is discharged as an aerosolized spray that is hard to remove, except with a degreasing agent such as baby shampoo. Immediate effects include skin and eye pain, and extensive eye-watering or temporary blindness. The full effect can generally last

---

[7] International Network of Civil Liberties Organizations and the International Human Rights Clinic of the University of Chicago Law School, "Defending Dissent; Towards State Practices that Protect and Promote the Rights to Protest" (2018), 74.
[8] International Association of Chiefs of Police, "Crowd Management" (2019), 6.



**Seattle** Office of
**Inspector General**

approximately half an hour, but secondary effects, such as coughing, may last several hours. Individuals who already have compromised respiratory systems, such as individuals with asthma or who are recovering from respiratory-related illness, may experience more severe effects.

The SPD manual warns that

> *When inhaled (secondary exposure), the respiratory tract will likely become inflamed and temporarily restrict breathing to short, shallow breaths. The individual may experience choking, gagging, gasping for breath, or, on rare occasion, unconsciousness. The individual may experience nausea, lung pain, or temporarily impaired thought processes. The individual may become disoriented or lose his or her balance.[9]*

<u>Summary of SPD Policy on Use[10]</u>

During normal patrol operations, officers can use OC spray for officer protection if the officer can justify the force as reasonable, necessary, and proportional. Officers must issue a warning when possible and must document and justify each separate spray. Officers are not required to issue a warning if the officer believes that doing so would compromise the safety of the officer or others. However, in this case, the officer must document the reason for this belief in their use of force statement. OC is widely accepted and used as an intermediate force option in patrol operations when dealing with combative subjects.

During a crowd control event, the incident commander can authorize the use of OC spray if the commander believes that there is an immediate life safety emergency. A lieutenant can also issue this authorization if there is not time to contact the incident commander. The policy instructs a warning to be given if possible, and for officers to direct OC spray away from individuals who are not causing a safety risk or damaging property, if possible.

Officers are required to assist individuals with decontamination and medical aid as soon as reasonably possible.

There is also a policy describing how the department's inventory of OC spray is tracked, maintained, and disbursed, which we do not describe here.[11] Issues related to this policy will be fully addressed in future analysis.

<u>Training and Certification</u>
The SPD manual states that officers will be trained and certified in the use of OC spray every two years.

---

[9] Seattle Police Department, "SPD Manual 8.300-POL-5 Use of Force – Oleoresin Capsicum (OC) Spray". Last modified 9/15/2019.
[10] Ibid.
[11] Seattle Police Department, "SPD Manual 8.310 OC Spray Chain of Custody". Last modified September 2015.



The SPD Training Section notes that the minimum recommended distance for use is between three and twelve feet, depending on the type of spray used (MK-4, MK-9, and MK-46).[12]

Prior Recommendations to SPD on Crowd Management Use of this Weapon
In 2015, the Community Police Commission (CPC) issued the following suggestion to SPD:

*As we discussed in our May 13 meeting, current SPD policy with regard to use of projectiles and pepper spray in crowd management and demonstration situations either provides insufficient guidance to officers about when these tools should be used, or they appear to be used frequently outside of policy. Demonstrators and observers described instances where peaceful demonstrators who posed no threat and were dispersing were sprayed with pepper spray, and the same can be observed in a variety of videos. Use of blast balls in the immediate vicinity of a mass of demonstrators was reported, and we saw on May Day that these projectiles cause significant and painful injury. The CPC suggests that policy in this area requires immediate review, public discussion and clarification, so that individuals participating in free speech and assembly do not feel that they risk serious physical injury just by showing up to participate in a march.[13]*

External Guidance On Potential Health Impacts or Crowd Management Use Limitations
OIG reviewed *Lethal in Disguise: The Health Consequences of Crowd Control Weapons*. This report, published in 2016, is a joint product by INCLO and Physicians for Human Rights. The report reviewed 31 studies published between 1993 and 2000 examining the health impact of chemical irritants, including CS and OC.

In addition to noting the health effects described above and identifying studies citing evidence of more severe injuries, the report advises that

*Chemical irritants, especially those deployed in gas forms, are inherently indiscriminate and can impact not only the intended targets but also other demonstrators, bystanders, neighborhood businesses and residences, and law enforcement officers themselves [...] because of the indiscriminate nature of chemical irritants, limiting the exposure to individuals or small groups is difficult while exposing large and diverse groups to the weapons poses the risk of widespread injuries, including to potentially vulnerable people.[14]*

The Police Executive Research Forum (PERF) issued a report on the use of less lethal weapons in February 2020. This report observes that OC spray tends to spread across wide

[12] Seattle Police Department, "2020 Blast Ball 040620". Last modified 4/6/2020.
[13] Community Police Commission, "RE: SPD Response to Post-Ferguson and Black Lives Matter Demonstrations" (May 19, 2015).
[14] International Network of Civil Liberties Organizations and Physicians for Human Rights, "Lethal in Disguise – The Health Consequences of Crowd-Control Weapons" (2016), 51.



areas and, depending on environmental factors, may affect both officers and the intended subject. The report cites some departments who rely on OC spray as an effective less lethal weapon, particularly in combination with other tools such as a polycarbonate shield, but adds that many departments believe it is not effective on individuals who are under the influence of substances or in mental health crisis.

The IACP Crowd Management Concepts and Issues paper suggests that

> *OC should not be used indiscriminately against groups of people; in demonstrations or crowds where bystanders or other officers would be unreasonably affected; or against passively resistant individuals. High-volume OC delivery systems (such as MK-9 and MK-46) are designed for and can be used in civil disturbances against groups of people engaged in unlawful acts or endangering public safety and security, with approval of the IC [incident commander]. A warning should be issued prior to the use of these systems, whenever reasonably possible."[15]*

## Blast Balls

### Overview of Weapon and Purpose

A blast ball is a less lethal grenade that, in addition to creating a large bang and flash, may release rubber balls. Some types of blast balls also contain OC or CS. Blast balls that contain rubber balls, OC, or CS may spread their payload over a fifty-foot radius, per one manufacturer. SPD training materials indicate that officers are trained to use blast balls with and without OC.[16]

Blast balls are designed to create pain compliance, temporary distraction, or disorientation. One manufacturer states that blast balls are "generally reserved as a last selection when chemical agents and less lethal impact munitions have not resolved the disorder or routed the crowd."[17]

A blast ball is not the same thing as an NFDD (noise flash diversionary device), also referred to as a "flash bang" grenade. Per SPD, only SWAT is authorized to use flash bangs. SWAT reported to OIG that no flash bangs were used in the recent demonstration responses.

### Summary of SPD Policy on Use In Crowd Control

---

[15] International Association of Chiefs of Police, "Crowd Management" (2019), 7.
[16] Seattle Police Department, "2020 Blast Ball 040620". Last modified 4/6/2020.
[17] Defense Technology, "Technical Specifications – Stinger® Grenade Rubber Pellet RP, RP/CS & RP/OC", accessed 6/10/2020, https://www.defense-technology.com/on/demandware.static/-/Sites-DefenseTech-Library/default/dw4b6d9f56/product-pdfs/Stinger%20Grenade.pdf





**Seattle** Office of
**Inspector General**

SPD policy states that blast balls may only be used when the force is reasonable, necessary, and proportional. When feasible, officers should wait until a dispersal order has been issued to the crowd, the crowd has been given time to comply, and a supervisor has authorized the deployment. The policy also instructs officers to avoid using blast balls near people who are not posing a risk to public safety or property, if possible. However, the policy allows for officers to deploy blast balls on their own (without a warning or supervisor approval) to address an imminent risk of harm to a person, or significant property damage. Officers may use an underhand throw or overhand throw, depending on the need for distance and any obstacles in the way.

Officers must report the use of blast balls as a use of force and must re-evaluate (and document) the reason for each subsequent use after the initial deployment. The policy requires officers to request and/or render medical aid as soon as reasonably possible for individuals injured by a blast ball deployment.

<u>Training and Certification</u>
The SPD manual states that only officers who have completed department blast ball training are permitted to deploy blast balls. Officers are only allowed to use department-issued blast balls.

The Training Section instructs officers that "absent exigent circumstances, Officers shall not use chemical agents or less-lethal munitions to overcome passive resistance by non-violent and/or peaceful protestors".[18]

<u>Prior Recommendations to SPD on this Weapon</u>
The CPC recommendation cited in the OC spray portion of this report also encompasses blast balls.

The Office of Police Accountability (OPA) issued a Management Action Recommendation (MAR) in 2015 (2015OPA-0643) about blast balls. The MAR addresses concerns regarding use of blast balls in proximity to individuals and overhand use of blast balls.

> *Use of Rubber Blast Ball Grenades (blast-balls): OPA recommends that SPD re-evaluate how and under what circumstances officers use blast-balls as a means of moving or dispersing crowds of people. The evidence from May Day 2015 indicates that, while highly effective in getting people to move, the ball-blasts create fear and panic when detonated. Additionally, blast-balls deployed by SPD officers exploded in extremely close proximity to people, not all of whom were engaged in destruction of property or posed a threat to public safety. This is contrary to our understanding of how officers have been trained to deploy blast-balls, specifically so that they detonate in: open areas to create greater distance between the police*

---

[18] Seattle Police Department, "2020 Blast Ball 040620". Last modified 4/6/2020.



*and a crowd. Of particular concern, some SPD officers tossed blast-balls over the heads of those immediately in front of them so the explosive devices landed in the middle of a crowd. Because the initial detonation of a blast-ball separates a hard metal fuse device from its rubber base, there is a possibility of the metal fuse acting as shrapnel and causing serious injury to someone in close proximity when it separates. In addition, deployment of blast-balls at the feet of people or into a crowd can cause burns from the second and larger detonation, as well as blunt force trauma from the rubber base as the flash powder inside explodes and the two halves of the base fly apart. The product safety warning included in the literature provided by the manufacturer: "may cause serious injury or death to you or others." We particularly encourage SPD to ensure that its officers' use of blast-balls is consistent with the care due explosive devices.[19]*

OIG also reviewed a 2016 analysis of SPD crowd management policy commissioned by SPD itself.[20] This report was written by an expert in the field of less lethal weapons, Steve Ijames.[21] Mr. Ijames reviewed material relating to the 2015 May Day protests and wrote:

*[T]he area of concern is not the rules or methods of engagement [which he deemed to be comprehensive], but the justification and accountability as it relates to the established protocols and processes not being followed.[22]*

Mr. Ijames recommended that SPD conduct an inquiry into its deployment of blast balls in May 2016, writing that:

*Absent a situation where officers were facing the immediate threat of death or serious physical injury, the intentionally targeting a blast ball device at or in unreasonably close proximity to a human being would not be justified use of force. It is important to learn after every incident whether any misuse and or overuse of the blast ball device was widespread and pervasive, or limited in scope. If widespread and pervasive – which, based on the material I reviewed, I have no reason to believe was the case, that would indicate a disconnect between the blast ball training material, the actual training that was provided, and operational deployment. If limited in scope, future misuse could be prevented by identifying the unit(s) and or person(s) involved, and holding them individually accountable for violating training and policy. It is important to note that blast balls contain the same explosive payload as a noise/flash diversionary device, are registered as destructive devices*

[19] Office of Police Accountability, "Management Action Recommendation (2015OPA-0643)" (December 10, 2015), 3.
[20] This report does not appear to have been officially released by SPD. SPD provided a final copy of the report to OIG.
[21] Per the description provided by SPD in the report, Mr. Ijames "created the less lethal force instructor/trainer programs for the International Association of Chiefs of Police (IACP) and the National Tactical Officers Association (NTOA). He authored the IACP National Policy Center position paper on Special Weapons and Tactics, as well as their model policies on TASER, impact rounds, chemical agents, noise/flash diversionary devices, hostage rescue, and barricaded subjects."
[22] Steve Ijames, "Preliminary Assessment Report" (April 28, 2016), 4.



*with the Bureau of Alcohol, Tobacco, and Firearms (BATF), and are fully capable (as warned by the manufacturer) of causing death or serious injury if ignited against or in close proximity to a vital body part. As such, it is imperative that these devices be used as SPD training specifies, and that this issue be fully addressed and reconciled prior to May Day 2016. It is my understanding, based on my review of the 2016 training curriculum, that these concerns have in fact been addressed.[23]*

At the time of this writing, OIG was unable to determine if SPD had completed the inquiry recommended by Mr. Ijames. Analysis of the status of previous recommendations will be provided in a future report.

<u>External Guidance On Potential Health Impacts or Use Limitations in Crowd Control</u>
The *Lethal in Disguise* report, while not mentioning blast balls by name, includes a section on "Disorientation Devices" to include flash bang or stun grenades.  Health impacts are "the risk of blast injury" which are

*...complex and result from the pressure waves created by the blast. The weapons are made of both metal and plastic parts that may fragment during the explosion and act as shrapnel. Blast injuries from close proximity explosions can lead to amputation, fractures, and degloving injuries (extensive skin removal that exposes underlying tissue), while secondary injuries include asphyxiation, heart attacks, and internal bleeding.[24]*

The study also mentions the potential for secondary, tertiary, and quaternary injuries. For example, it states that the "concussive blast of the detonation can injure, and the heat created can ignite flammable materials such as fuel" and that stun grenades thrown into houses or other buildings have resulted in "numerous cases of fires leading to significant injuries[...]."[25] Finally, the study notes that "the confusion and panic caused by stun grenades can also lead to serious injuries, particularly in dense crowds."[26] It concludes that "these weapons have no place in effective crowd control management, intervention, and control."[27]

The PERF report does not offer specific guidance on blast balls, flashbangs, or stun grenades.

---

[23] Ijames, "Preliminary Assessment Report" (2016), 4-5.
[24] International Network of Civil Liberties Organizations and Physicians for Human Rights, "Lethal in Disguise" (2018), 65.
[25] Ibid, 68
[26] Ibid, 68.
[27] Ibid, 68.



## 40mm Less Lethal Launcher

Overview of Weapon and Purpose

The 40mm launcher is a single shot launcher that can fire a variety of 40mm diameter munitions.  SPD uses both a sponge round and a crushable foam round that contains OC in the sponge. SWAT also uses an extended-range sponge round.

Per the SPD manual, the advantage of the 40mm in general patrol use is that it provides an "extended standoff distance" that may "decrease officers' exposure and may provide additional time to bring the situation to a safe resolution."[28] As such, the 40mm provides a non-lethal option to address individuals unarmed individuals who are behaving violently or have a bladed or blunt weapon. In other words, because the 40mm allows officers to act without getting too close, it may reduce the immediate threat posed by the individual in question and avoid use of greater, potentially lethal force. The SPD Training Section emphasizes the value of distance, noting "distance provides us with increased time, increased time allows us to assess situation[s] more thoroughly, better assessment leads to more sound tactical planning and responses."[29]

The 40mm works through pain compliance and disorientation. Although the round is designed to be less lethal, it is designed to cause pain. The intention in normal patrol use is for officers to move in and take control of an individual while the person is reacting to the pain caused by the impact of the sponge round.

The manufacturer of the sponge round used by SPD states that the minimum safe range is 5 feet, up to a maximum effective range of 131 feet. SPD's training materials state that the effective range is 5 – 120 feet.[30] The extended range round permitted for SWAT use is unsafe to deploy at a distance of less than 33 feet and has a range of up to 229 feet.

Summary of SPD Policy on Use

SPD allows for the use of the 40mm when the force is reasonable, necessary and proportional, the subject is likely to cause injury to officers, and when physical control tactics or other force options would be more likely to cause greater injury than the 40mm munition. The policy states that when possible, officers should issue a verbal warning, unless circumstances or safety do not allow. Officers must document their reasoning for not giving a warning in their use of force statement.

---

[28] Seattle Police Department, "SPD Manual 8.300-POL-11 Use of Force – 40 mm Less Lethal Launcher". Last modified 9/15/2019
[29] Seattle Police Department, "End User 40mm PowerPoint". Last modified 1/22/2019.
[30] Ibid.




The policy instructs officers to avoid targeting the head, neck or genitals and instead instructs officers to target areas such as the buttock, thigh, and calf.[31] Officers are required to summon medical aid as soon as feasible after an individual is hit by a 40mm round.

Training and Certification

Only officers who are trained and certified by SPD are allowed to use the 40mm launcher. The only exception are SWAT officers, who are permitted to certify separately through annual unit training. Additionally, the SPD manual states that the 40mm launcher cannot be an officer's primary less lethal device. They must carry another option, such as OC spray, a TASER, or a baton.

As stated previously, during crowd management events SPD policy only permits SWAT personnel to use the 40mm launcher. Chief Best issued a temporary exception to this policy from 5/31/2010 – 6/5/2020, based upon an asserted need to defend officers involved in the protest response against the possibility of individuals throwing CS canisters deployed by SPD back at officers.

Prior Recommendations to SPD on this Weapon in Crowd Control

The CPC recommendation cited at the beginning of this report includes "other projectiles", which OIG is including as applicable to 40mm rounds.

The previously cited OPA MAR also includes a recommendation on less-lethal projectiles:

> Use of Less-lethal Projectiles: OPA recommends that SPD review its policy and training with respect to the use of less-lethal projectiles in crowd management situations to reduce the chances of them striking the wrong person or causing serious bodily injury. Although these projectiles are specifically designed to prevent penetration and, instead, stun the target with blunt-force trauma, the fact remains they can and do cause injury. In rare, but tragic cases, less-lethal projectiles have even resulted in death. We are particularly concerned with the possibility that, due to the sometimes chaotic and confusing nature of protests or demonstrations, these projectiles may strike and injure people lawfully exercising their constitutional rights.[32]

Mr. Ijames' report also addresses the use of less lethal projectiles. Mr. Ijames writes:

> The material reviewed did not provide a clear indication of who was armed with an impact projectile system, the type of system(s) involved, what the specific rules of engagement for use were, how many rounds were fired, in what circumstances, and the outcomes. A review of the

---

[31] Guidance provided by the SPD Training Section states that officers should not target the head, neck, spinal cord, kidney area, and center of mass using the 40mm launcher unless deadly force is authorized. Source: Seattle Police Department, "End User 40mm PowerPoint". Last modified 1/22/2019.

[32] Office of Police Accountability, "Management Action Recommendation (2015OPA-0643)" (December 10,2015), 2.



> *open source photographic material showed officers with 40mm launchers, pepperball systems, and the FN303. Impact projectiles have been used in public disorder situations for several hundred years. In recent times (1966 to present) they have resulted in the death of 19 people in the United Kingdom, and 17 in the United States. There is a place for impact projectile launching systems in public disorder situations, but only in the hands of highly trained officers who have proven a mastery (validated training) of the potentially deadly limitations of the systems involved.[33]*

Mr. Ijames again recommends that SPD conduct an inquiry, this time into the use of less lethal projectiles at May Day 2016. This inquiry was to include the rules of engagement, the circumstances of use, the outcomes, and the command level knowledge, among other factors. OIG was not able to determine at the time of this writing whether SPD had conducted that inquiry.

Mr. Ijames concludes his discussion of less lethal projectiles with a warning and advice regarding their use in crowd management contexts:

> *Impact projectiles are potentially lethal. This is especially true in dynamic environments such as public disorder, where targets are moving and the speed of the round over distance increases the probability of impacting non-selected persons and or body parts. It is important to assess the exact circumstances in which impact launchers were authorized and used in 2015, and whether the deployments were consistent with training, policy, and rules of engagement. It is my understanding that these circumstances were in fact assessed by the Force Review Board following May Day 2015, and I recommend the same practice be in place following May Day 2016. There should be absolute clarity at the operational command level concerning who will be issued an impact launcher, why they are issued a specific type of launcher, the circumstances in which the launcher is intended to be used, and validation of learning concerning the specific impact launcher/rounds involved and the unique risks to citizens as it relates to impact launcher use in crowd control scenarios. Historically, impact launchers have been involved in a disproportionate number of accidental/unintended serious injuries as compared to other force options during crowd control events. Accordingly, the issuing and potential use of these devices in public disorder situations should be limited, and demands specific command level approval, oversight, and ownership at every level referenced above generally, and specifically prior to May Day 2016.[34]*

External Guidance On Potential Health Impacts or Use Limitations in Crowd Control
Literature reviewed and summarized in the *Lethal in Disguise* report discusses the importance of using these tools at the appropriate distance, noting:

> *…that the deployment of these projectiles often occurs from distances much closer than those deemed safe. Safe shooting ranges are not well validated and vary a great deal*

---

[33] Steve Ijames, "Preliminary Assessment Report" (2016), 5.
[34] Steve Ijames, "Preliminary Assessment Report" (2016) 5-6.



**Seattle** Office of
**Inspector General**

*between weapons, countries, and manufacturers. Firing distance, while hard to assess in many cases, correlates with the severity of injuries. [...] Some of the literature specifically noted that firing distances in instances resulting in injury were less than those recommended by KIP [kinetic impact projectile] manufacturers, and it highlighted that the firing distance was difficult to assess not only forensically, but also by law enforcement agents working in dynamic and fast-changing conditions.* [35]

The IACP Crowd Management Concepts and Issues document highlights that in a large crowd, direct-fire munitions such as the 40mm may not hit their intended target. The IACP states that for this reason, these weapons should generally be only used "against specific individuals who are engaged in conduct that poses an immediate threat of death or serious injury or significant levels of property damage" in a mass demonstration setting. [36]

The PERF report does not provide extensive guidance on 40mm launchers, other than to note that like other less lethal weapons, using a launcher is a perishable skill that should be bolstered with regular proficiency training. Lack of refresher training "can increase the chances of user error and inappropriate or unsafe deployments." This advice is echoed to some degree by the SPD Training Section, which warns that officers are taught to aim for center mass with firearms, but that targeting this area with a 40mm launcher has potential for serious or fatal injury. Thus, the Training Section notes that "in a stressful encounter, the officers may focus on center mass due to prior weapons training and subconscious motor memory", and advises instructors to ensure that officers are not aiming for center mass with the 40mm launcher unless deadly force has been authorized. [37]

### Specialty Unit Weaponry Used for Crowd Control, including CS

The following is a discussion of the crowd management weapons used by SWAT in the recent demonstrations. It is important to note that SWAT also uses many of these same weapons to address barricaded subjects, hostage situations, and other unusual events involving the potential for violence and the need for force options other than lethal force. Policies and recommendations on use of these weapons in the context of crowd management may not easily translate to those other contexts.

In addition to the 40mm less lethal launcher used by patrol officers, SWAT also has access to three other less lethal launchers. The three launchers are:

---

[35] International Network of Civil Liberties Organizations and Physicians for Human Rights, "Lethal in Disguise" (2018), 31.
[36] International Association of Chiefs of Police, "Crowd Management" (2019), 7.
[37] Seattle Police Department, "End User 40mm PowerPoint". Last modified 1/22/2019.

Page **14** of **33**




- 40mm multi launcher: This is identical to the single shot 40mm launcher used by patrol except it can fire up to six munitions before having to reload.

- FN303: A CO2-powered launcher that shoots projectiles slightly heavier than standard paintballs with a range of 50 meters.

- PepperBall Launcher: A CO2-powered paintball-type launcher that shoots projectiles that contain 5% PAVA (a synthetic form of OC) and have a range of 60 feet.

SWAT confirmed all of these launchers were used during recent demonstrations and provided to OIG a list of the different rounds used.

SWAT also uses a chemical agent orthochlorobenzalmalononitrile, commonly called CS. Per OIG review of both the SPD department manual and the SWAT manual, only SWAT is trained and authorized to use CS. Although SWAT has access to multiple forms of CS, the unit reported to OIG that only hand-thrown canisters were used during the recent demonstrations.

SWAT informed OIG that they have maintained a round count of all munitions used by SWAT for future reference and review.

<u>Summary of SPD Policy on Use</u>

OIG is not including excerpts from the SWAT tactical manual, but notes the tactical manual's guidance on using SWAT weaponry for crowd management is not dissimilar from SPD departmental policy on the use of blast balls, OC spray, and the 40mm launcher. However, the SWAT manual does include more details on environmental factors officers should consider before deploying these tools.

<u>Training and Certification</u>
SWAT manages its own certification and training requirements, distinct from the SPD Training Section. These requirements include regular weapons qualification testing and attendance at specialized courses for certain tools. One of the SWAT instructors is a certified instructor with the National Tactical Officer's Association. SWAT reported to OIG that in addition to initial qualification and on-going evaluation through training, every SWAT officer is required to re-qualify with less lethal tools on an annual basis using a written test. This written test, per SWAT, includes questions on safe and effective ranges of the weapons.

<u>Prior Recommendations to SPD on these Weapons for Crowd Control</u>
OIG is unaware of any previous recommendations made to SPD about these specialty weapons used by SWAT. However, recommendations made to SPD regarding the 40mm would presumably apply to these weapons due to their similar nature.



**Seattle** Office of
**Inspector General**

<u>External Guidance On Potential Health Impacts or Use Limitations in Crowd Control</u>
In one well-documented case in Boston in 2004, a FN303 was fired into the crowd with lethal effect in one instance and caused two serious injuries. The commission investigating the death noted that the manufacturer stated, "the system has been conceived in such a way that it never exceeds the minimum energy levels causing a traumatism or a perforation of the skin."[38] However, the commission found that skin penetrations can occur, although the fatality and the other two penetration injuries were all caused by impacts to the head. The manufacturer states, "Misuse may result in injury or death. Avoid aiming at face or head."[39]

Previously included external guidance on health impacts related to the use of OC spray is applicable to the use of CS. However, it is notable that CS may be more difficult to remove or otherwise decontaminate than OC, depending on how it was deployed. CS powder, in particular, may require extensive cleaning procedures.

The IACP Concepts and Issues paper states that CS should be used with caution in crowd control situations, as "uncontrolled use can have negative consequences with respect to efforts to control, management or disperse crowds." The IACP notes use of CS may escalate violence and states "the crowd should be warned prior to CS deployment and provided with avenues of egress."[40]

---

[38] Commission Investigating the Death of Victoria Snelgrove, May 25, 2005.
[39] See manufacturer's description of projectiles and safety warnings at https://fnamerica.com/products/less-lethal/projectiles/.
[40] International Association of Chiefs of Police, "Crowd Management" (2019), 8.



## Appendix A: INCLO Recommendations on Use of Force from *Defending Dissent: Towards State Practices that Protect and Promotes the Rights to Protest*

- The use of firearms and live ammunition in the context of protests, particularly automatic firearms, should be prohibited.

- The use of CCWs which are indiscriminate in their nature, such as stun grenades and tear gas, should not be used for dispersion or generally in the context of protests.

- The use of force is subject to the principles of legality, necessity, proportionality, precaution, non-discrimination, and accountability, and should only be used in self defence or in defence of others facing an imminent threat to life or serious injury.

- Wherever possible, the use of dialogue and communication should always precede the use of force. Police commanders must be trained in dialogue and engagement and should use these tactics before any decisions are made to resort to the use of force.

- To ensure a graduated, necessary, and proportionate deployment of force, policing institutions may be provided with a range of tools that allow for such a response. This may include CCWs but only when they have been independently and thoroughly tested, are human rights-compliant, and where they are situationally appropriate.

- CCWs must not be misused or used as tools of intimidation.

- The use of armed or weaponised drones equipped to discharge CCWs must be prohibited pending further investigations into their compliance with international human rights law.

- Training on the use of crowd-control equipment and weapons should include: the impact and harm caused by each weapon or piece of equipment; the likely perceptions of and reaction to the use of each weapon, including the possible escalation in tensions; whether less harmful means are available to achieve the particular aim, and if not, whether the overall objective of the use of force is better achieved by not using the provided equipment.

- Any arrests or detentions that occur in the context of protests should be performed by police officials wearing appropriate uniforms and visible name tags. Prompt information on the place of detention should be provided to interested persons and access to legal services for the detainee must be ensured.

- Mass arrests are inherently indiscriminate and should be prohibited as they do not comply with the principles of necessity, proportionality, and legality.

- Dogs and horses can be indiscriminate tools and their use should be prohibited in the context of protests.

- In the event that people are injured or killed – or in any circumstance that requires investigation – a clear chain of custody of evidence must be established. Commands issued (including dispersal orders) must be documented, and all weapons used must be seized for the purposes of investigation.



**Seattle** Office of
**Inspector General**

## Appendix B: Excerpted SPD Policies on Less Lethal Weapons and Crowd Management

The complete SPD department manual can be found at https://www.seattle.gov/police-manual/. OIG has copied the policies below for easy reference. All content is original to SPD.

### 8.300 – POL –5 Use of Force – Oleoresin Capsicum (OC) Spray

This policy applies to the use of OC spray by all sworn Department employees.

Oleoresin Capsicum spray (OC spray) is an inflammatory agent that causes an intense burning sensation of the skin, eyes, and mucous membranes. A one second burst applied directly to the face (direct exposure), even with glasses, will usually result in the immediate closing of the eyes. The individual's eyes will likely close, tear, and swell as a result. When inhaled (secondary exposure), the respiratory tract will likely become inflamed and temporarily restrict breathing to short, shallow breaths. The individual may experience choking, gagging, gasping for breath, or, on rare occasion, unconsciousness. The individual may experience nausea, lung pain, or temporarily impaired thought processes. The individual may become disoriented or lose his or her balance.

OC spray may reduce or eliminate the need for substantial physical force to make an arrest or gain custody. It may reduce the potential for injuries to officers and subjects.

**1. Education & Training Section (ETS) Will Train and Certify Officers in the Use of OC Spray Every Two Years**

The OC spray policy and training will incorporate the evolving guidance contained within the SPD Post-Basic Law Enforcement Academy course on less-lethal force as well as guidance from the medical community.

**2. Officers Shall Only Use Department-Issued or Approved OC Spray**

Officers will periodically check the manufacturer's date on their issued OC Spray container and if beyond five years, exchange for a new container from the stationmaster or quartermaster.

**3. Officers Will Use OC Spray, Including for Crowd Dispersal or Protection, Only When Such Force is Objectively Reasonable, Necessary, and Proportional**

Page **18** of **33**



See 8.050 for definition and explanation of "objectively reasonable," "necessary," and "proportional" force.

For use and reporting of OC spray in the context of crowd management, see 14.090 (10).

**a. OC Spray May Be Used Against a Dangerous Animal to Deter an Attack or to Prevent Injury to Persons Present**

**b. OC Spray Shall Not Be Used Unless the Use of Physical Force Is Necessary**

**4. When Feasible, Officers Shall Issue a Verbal Warning to the Subject, Fellow Officers and Other Individuals Present Prior to Using OC Spray**

Officers shall issue a verbal warning to the subject, other officers, and other individuals present, that OC spray will be used and defer using OC spray for a reasonable amount of time to allow the subject to comply with the warning.

Verbal warnings may come from any officer involved in the incident when employing a team tactics approach.

**Exception**: A verbal warning is not required if giving the warning would compromise the safety of the officer or others. In such circumstances, only the deploying officer should document his/her reason for believing his/her safety would have been compromised in his/her use of force statement.

A verbal warning is required if feasible and unless giving the warning would compromise the safety of the officer or others.

**5. Officers Must Justify Each Separate Application of OC Spray**

After the initial application of OC spray, each subsequent spray must also be reasonable and the employee should reevaluate the situation accordingly.

**6. Officers are Required to Report the Use of OC Spray, Regardless of the Effect, as Well as the Decontamination Procedures That Followed**

**7. The Application of OC Spray on Persons in Restraints Such As Handcuffs Must Be to Protect an Officer or Member of the Public from Physical Injury**

**8. Officers Shall Direct OC Spray at the Specific Subject(s) Who are Posing a Threat**



Officers deploying OC will attempt to minimize exposure to non- targeted parties.

**9. Officers Shall Assist Exposed Subjects with Decontamination and Medical Aid, As Soon as Reasonably Possible**

If the subject was exposed in a confined space, officers will remove the subject as soon as feasible from the contaminated area and expose the individual to fresh air.

Officers shall request medical response or assistance for subjects exposed to OC spray when requested by the subject, when the subject complains of continued effects after having been decontaminated, or the subject indicates that they have a pre-existing condition (such as asthma, emphysema, bronchitis, or heart ailment) that may be aggravated by OC spray.

Officers shall monitor exposed subjects for changes in their condition while in police custody and request medical evaluation as needed or as requested.

**10. The Department Shall Maintain Written Documentation of the Number of OC Spray Canisters Annually Distributed to Each Employee**

---

### 8.300 – POL –10 Use of Force – Blast Balls

This policy applies to the use of blast balls by all sworn Department employees.

**1. Only Officers Who Have Completed Department Blast Ball Training are Permitted to Deploy Blast Balls**

**2. Officers Shall Only Use Department-Issued Blast Balls**

**3. Officers May Use Blast Balls Only When Such Force is Objectively Reasonable, Necessary, and Proportional**

When feasible, officers shall avoid deploying blast balls in the proximity of people who are not posing a risk to public safety or property.

**4. When Feasible, Officers Will Not Deploy Blast Balls Until a Dispersal Order Has Been Issued to the Crowd, the Crowd Has Been Given a Reasonable Amount of Time to Comply, and a Supervisor Has Authorized the Deployment**

Page **20** of **33**



**Exception**: Officers may reasonably deploy blast balls to address an imminent risk of harm to a person or significant property damage.

The preferred method of blast ball deployment is low deployment ("bowling style"). Officers may use a high deployment ("overhand throw") when the need for a farther deployment or the need to get around an obstruction outweighs the risk created by the separating sub-munition.  Officers must document their deployment method and the reasoning for using such in their use-of-force report.

**5. Officers Must Justify Each Separate Blast Ball Deployment**

After the initial blast ball deployment, each subsequent deployment must be reasonable and the employee should reevaluate the situation accordingly.

**6. Officers Are Required to Report the Use of Blast Balls, Regardless of Whether a Subject is Struck**

The deployment of blast balls away from people (i.e. a "bang out") that does not result in any injury or complaint of pain is reported and investigated as Type I force (See 8.400).

The deployment of blast balls within close proximity to people is reported and investigated as Type II force, even if no injury or complaint of pain or injury is reported (See 8.400).

**Exception**:  When the deployment of blast balls results in injury or complaint of injury that meets the criteria for a Type III investigation, the deployment is reported and investigated as Type III force (See 8.400).

**7. As Soon As Reasonably Possible, Officers Will Request and/or Render Medical Aid for Subjects Who Appear to Have Been Injured by a Blast Ball Deployment or Who Complain of Pain or Injury Resulting From a Blast Ball Deployment**

**8. The Department Shall Maintain Written Documentation of the Number of Blast Balls Annually Distributed to, and Utilized by, Each Employee**

---

**8.300 – POL-11 Use of Force– 40 mm Less Lethal Launcher**

40 mm Less Lethal (LL) Launchers are designed to temporarily interrupt the behavior of a dangerous subject, so that officers can take enforcement action with



**Seattle** Office of
**Inspector General**

less danger of injury or death to themselves and others. The extended standoff distance that the 40 mm LL Launcher may decrease officers' exposure and may provide additional time to bring the situation to a safe resolution.

**1. Education and Training Section (ETS) Manages the 40 mm LL Launcher Program**

ETS maintains the 40 mm LL Launcher operator's manual.

**2. The Firearms Training Squad (FTS) Will Maintain Inventory Records for 40 mm LL Launchers**

**3. ETS Trains and Certifies 40 mm LL Launcher Operators Annually**

**Exception**: SWAT officers will certify annually through annual specialized unit training. The SWAT commander will forward training rosters to ETS within seven days of completion.

Only officers who have been trained and certified with the Seattle Police Department are allowed to use the 40 mm Less Lethal Launcher.

Officers may only use 40 mm LL Impact Munitions (LLIM) in a manner consistent with the Seattle Police Use of Force Policy and training provided by the Department.

**4. Officers Who Have Been Trained, Certified and Issued a 40 mm LL Launcher Will Deploy with It During Their Shift**

Officers deploying with a 40 mm LL Launcher will deploy with a primary less lethal device in accordance with 8.300 (2)

**5. Officers Deciding to Withdraw from the 40 mm LL Launcher Program Will Notify their Chain of Command and Return the 40 mm LL Launcher to the Range Armorer as Soon as Practicable**

Officers will notify a supervisor, in person, that they have decided to no longer carry their 40 mm LL Launcher.

Additionally, officers will document the decision to no longer carry a 40 mm LL Launcher by emailing their chain of command and the Department 40 mm LL Launcher coordinator prior to deployment without their assigned launcher.

**6. If the 40 mm LL Launcher Requires Inspection and/or Repairs, the Officer Will Notify their Supervisor and take the 40 mm LL Launcher Out of Service**



Officers will email their supervisor, the 40 MM LL Launcher coordinator and the 40MM LL Launcher Armorer prior to deployment without their 40 mm LL Launcher.

**7. Officers Will Only Use a 40 mm LL Launcher When Objectively Reasonable, Necessary, and Proportional**

See 8.050 for definition and explanation of "objectively reasonable," "necessary," and "proportional" force.

Officers may use a 40 mm LL Launcher in the following circumstances:

- When a subject poses an immediate threat of harm to any person; or

- When public safety interests dictate that a subject needs to be taken into custody and the level of resistance presented by the subject is

(1) likely to cause injury to the officer; or

(2) if hands-on control tactics or other force options would be likely to cause greater injury to the subject than the use of the 40 mm Less Lethal Impact Munition (LLIM).

Officers will consider Department training regarding deployment distances and target areas. Each situation must be evaluated on the totality of the circumstances at the time of the deployment.

**8. When Feasible, Officers Shall Issue a Verbal Warning to the Subject and Fellow Officers Prior to Deploying the 40 mm LL Launcher**

Officers shall issue a verbal warning to the subject, other officers, and other individuals present, that a 40 mm LL Launcher will be used. Absent exigent circumstances, officers shall defer using the 40 mm LL Launcher a reasonable amount of time to allow the subject to comply with the warning.

Verbal warnings may come from any officer involved in the incident when employing a team tactics approach.

> **Exception**: A verbal warning is not required if giving the warning would compromise the safety of the officer or others. In such circumstances, the deploying officer should document his/her reason for believing his/her safety would have been compromised in their use of force statement.



**9. Officers Shall Consider the Risk of the 40 mm LLIM Round Causing Serious Harm When Determining Whether to Deploy**

**10. Officers Will Not Intentionally Target a Subject's Head, Neck or Genitals**

Officers will not target the head or neck unless deadly force is justified.

**11. Preferred Target Areas for 40 mm LL Launchers Are:**

- Buttocks

- Thigh area

- Calf

- Large muscle groups

Officers shall collect and submit into evidence all primary components of the expended 40mm round to include the sponge nose cone with the rifling ring, and the casing.

**12. Only Munitions Purchased, Authorized and Issued by the Seattle Police Department May Be Used by Officers**

Officers deploying 40 mm LL Launchers are responsible for ensuring the proper munitions are loaded. Officers will inspect each 40 mm LLIM round prior to loading it into the launcher to ensure munitions adhere with this policy.

**13. Officers will Securely Store 40 mm LL Launchers**

While on duty, 40 mm LL Launchers will be secured in patrol vehicles when not in use.

When not on duty, Officer's will store 40 mm LL Launchers in a secure Department locker.

**14. Only SWAT Officers Will Deploy 40 mm LL Launchers During Crowd Management Events**

**15. Officers Must Justify Each Separate 40 mm LL Launcher Use in Their Use-of-Force Statement**



**16. Officers Are Required to Report the Use of 40 mm LL Launcher as Force, Regardless of Whether a Subject is Struck**

See 8.400-POL-1(3)

Officers should also be prepared to employ other means to control the individual — including, if necessary, other force options consistent with Department policy—if the individual does not respond sufficiently to the LLIM and cannot otherwise be subdued.

**17. Officers Will Summon Medical Aid as Soon as Feasible, Whenever a Subject Has Been Struck by a 40mm LL Launcher Round**

**18. The Firearms Training Section (FTS) Will Inspect 40 mm LL Launchers on an Annual Basis to Ensure That All Are Operable and Perform any Necessary Maintenance or Repairs**

Exception: SWAT officers will inspect the 40 mm LL Launchers assigned to their unit on an annual basis.

---

## 14.090 – Crowd Management

It is the policy of the Seattle Police Department to facilitate free speech and assembly whenever possible, while preserving order and protecting persons and property.  This manual section governs the Department's response to such events when transportation and public safety considerations are best served by a police presence.

**1. The Department Uses the Incident Command System (ICS) for Crowd Management**

When assigned, an Incident Commander will oversee the Department's response before, during and after an event.

- The Incident Commander may delegate authority and assignments.

**2. The Incident Commander Will be a Sergeant or Above**

- **Exception**: An officer can serve as Incident Commander until a sergeant can respond.

Page **25** of **33**



- A lieutenant will assume command when there are two sergeants and/or two squads involved in the event.

- A captain will assume command when there are two lieutenants involved in the event.

- For more information, see Manual Section 1.020 – Chain of Command.

**3. As Far in Advance of the Incident as Possible, the Incident Commander Will Coordinate with the Appropriate Department Resources to Obtain Information to Assist with Operational Planning and Staffing**

**4. The Incident Commander May Consider Utilizing Specialty Units, Based on Operational Needs**

In the event of an unplanned crowd management event, the Incident Commander shall request SWAT when feasible.

See 14.090–TSK–1 Responsibilities of the Incident Commander.

**5. The Incident Commander Will Determine Minimum Staffing for Crowd Management Events**

- The Incident Commander will base staffing levels on the projected number of event participants and any pre-event information indicating potential violence.

- The Incident Commander will develop contingency plans regarding staffing and tactics.

- When feasible, the Incident Commander will provide the staffing plan to the SPD Budget Section prior to the incident.

**6. The Incident Commander Will Deliver Event Briefings Using a Standardized Format (SPD ICS Briefing Format)**

**7. The Incident Commander Will Communicate Each Unit's Mission to That Unit's Supervisor or Commander**

The involved unit's supervisor or commander will develop the specific methods or tactics that will be used to accomplish the mission. See 14.090–TSK–2 Responsibilities of the Supervisor.



- The unit supervisor or commander will submit all unit plans to the
Incident Commander, who will approve or modify the plans to
accomplish the overall mission, with any modifications
communicated back to the unit supervisor or commander.

**8. The Incident Commander Retains Ultimate Responsibility for the Decisions of Subordinates**

In order to fulfill this obligation, the Incident Commander will be available for on-scene consultation.

**9. Crowd Dispersal**

**a. Upon Determining That There are Acts or Conduct Within a Group of Four or More Persons That Create a Substantial Risk of Causing Injury to Any Person or Substantial Harm to Property, the Incident Commander May Order That the Crowd Be Dispersed**

See SMC 12A.12.020

Before ordering that the crowd be dispersed, the Incident Commander shall consider whether less restrictive means of crowd management are available.  Such means may include strategies such as area denial and/or seeking voluntary compliance.

Upon determining that dispersal is appropriate, the Incident Commander shall ensure that there is an avenue of egress sufficient to allow the crowd to depart.

The Incident Commander or designee will issue the order to disperse prior to instructing officers to disperse the crowd, if feasible.

See 14.090-TSK-3 Issuing the Order to Disperse.

**b. The Incident Commander Shall Have Authority to Direct the Use of Blast Balls and OC Spray to Disperse the Crowd (See Manual Section 8.300 – Use-of-Force Tools)**

A lieutenant may authorize the use of blast balls and OC spray to disperse a crowd if an immediate life safety emergency exists that requires this action be taken and there is insufficient time to obtain incident command approval.

- An immediate life safety emergency is an unplanned, dynamic situation where immediate police action is necessary to protect the officers' and/or the public's safety.



**Seattle** Office of
**Inspector General**

- Only personnel trained to deploy patrol CART tools (blast balls and OC spray) are authorized to carry and use these tools under the supervision of a CART-trained supervisor, unless otherwise directed by the Incident Commander.

When feasible, officers will not deploy blast balls and OC spray until a dispersal order has been issued to the crowd and the crowd has been given a reasonable amount of time to comply.

When feasible, officers shall avoid deploying blast balls and OC spray in the proximity of people who are not posing a risk to public safety or property.

The deployment of blast balls away from people (i.e. a "bang out") is reported and investigated as Type I force.   Deployments in the vicinity of people may be categorized as Type II or Type III force, depending upon the circumstances of the deployment and the resulting injury. (See Manual Section 8.400 regarding force classification.)

**c. Each Precinct Will Maintain a Supply of Blast Balls and OC Spray**

Each precinct will maintain a log of the serial number of each blast ball in its supply.  Blast balls will be issued, by serial number, to specific officers as needed.  Officers will be responsible for each blast ball that they are issued.  Officers will return unused blast balls after the event, and will provide the event number related to any deployments.

After a crowd management event, the Department blast ball coordinator will be responsible for ensuring that the precinct log is reviewed to verify whether all deployed blast balls were reported.

**d. The Incident Commander Will Deploy Department Personnel to Accomplish Specific Tactical Objectives Consistent with ICS**

**10. Officers May Make Individual Decisions to Deploy OC Spray, and Blast Balls Consistent with Title 8 – Use-of-Force**

The authorized use of OC in crowd management situations involving violent activity shall have as a primary objective at least one of the following:

- Defend oneself

- Defend someone else

Page **28** of **33**



- Prevent significant destruction of property

**a. OC Will be Directed at the Specific Suspect(s) who are Posing a Threat**

When feasible, officers shall issue a verbal warning to the suspect(s), other officers, and other individuals present, that OC spray will be used.  When feasible, officers will wait a reasonable amount of time to allow the suspect(s) to comply with the warning before using OC spay.

Officers deploying OC will attempt to limit collateral exposure to non-involved parties.

- If there is probable cause to arrest for a crime, it is a priority for officers to arrest individuals against whom OC has been deployed.

**b. Officers Will Provide Aid to Subjects Exposed to OC and/or Blast Balls, if Feasible**

Officers will request medical response or assistance for subjects exposed to OC when they complain of continued effects after having been decontaminated, or they indicate that they have a pre-existing medical condition (e.g. asthma, emphysema, bronchitis, heart ailment, etc) that may be aggravated by OC.

Officers will request medical response or assistance for subjects who appear to have been injured by a blast ball or who complain of pain or injury from having been struck by a blast ball.

**11. Incident Commanders and Officers Must Document Uses of Force**

- The Incident Commander authorizing the use of less-lethal tools must justify that decision in a Use-of-Force Report, with a copy submitted to the relevant Bureau Commander in addition to the normal routing.

- Officers shall individually justify and document all reportable uses of force consistent with Manual Section 8.400 - Use-of-Force Reporting and Investigation.

**12. Following the Event, Sergeants and Incident Commanders Will Conduct a Day-of-Event Debrief**

- Sergeants will conduct a debriefing of their assigned officers and document any observations or suggestions on an Event Debrief Form (form 23.5).



- Sergeants and the Incident Command staff will then have a separate debrief to discuss the following subjects:

  - Event staffing

  - Deployment

  - Command issues

  - Communication issues

  - Logistical issues

  - Use of less-lethal tools

  - Areas of success

  - Areas for improvement

**13. Incident Commander Will Complete an After-Action Report (See: 14.010-After-Action Reports)**

**14. Uses of Force that Occur During the Course of Crowd Management Are Reviewed in Accordance with Manual Section 8.500-POL-6.**

**14.090–TSK–1 Responsibilities of the Incident Commander**

During the course of managing a crowd, the Incident Commander:

1. If feasible, **contacts** the event organizer to discuss the Department response

2. **Develops** contingency plan regarding staffing and tactics

   - SPD task force callout criteria

   - Mutual aid callout criteria

3. **Considers** utilizing specialty units

   - Bicycle units for marches or mobile protests



- Officers on foot for static events, or to function as arrest teams or bicycle unit support for marches or mobile protests

- Mounted patrol for static events, marches or mobile protests

- Video Unit for events where information indicates that civil disobedience or crowd violence will occur (Recordings must be in compliance with SMC 14.12 – Collection of Information for Law Enforcement Purposes.)

- Special Weapons and Tactics (SWAT) officers to use less-lethal launchers and tools that are approved for use solely by the SWAT team

- CART-trained officers when there is insufficient time to deploy SWAT

- Prisoner processing for events where information indicates civil disobedience or crowd violence will occur

- Intelligence Unit resources when there is a need for ongoing information gathering and dissemination during the eventdi

- SPOC for planning and logistical support

4. **Provides** a staffing plan to the SPD Budget Section, if feasible

5. **Communicates** each unit's mission to the relevant supervisor or commander

    a. **Instructs** the supervisor or commander to develop and provide plans

    b. **Approves** unit plans

6. **Briefs** officers and supervisors using the SPD ICS briefing format

7. **Remains** available for on-scene consultation

8. Debriefs supervisors and commanders following the event

    a. **Collects** Event Debrief Forms from the supervisors

9. **Completes** an After-Action Report consistent with the requirements of Manual Section 14.010 – After-Action Reports


**Seattle** Office of
**Inspector General**

b. **Routes** the After-Action Report and Event Debrief Forms to the Patrol
Operations Bureau Commander, via the chain of command

**14.090–TSK–2 Responsibilities of the Supervisor**

The supervisor:

1. **Develops** methods or tactics that will be used to accomplish the mission, as
directed by the Incident Commander

   a. **Submits** plans to the Incident Commander

2. **Debriefs** assigned officers after the incident

3. **Documents** observations and suggestions on an Event Debrief Form (form 23.5)

   a. **Submits** Event Debrief Forms to Incident Commander

4. **Attends** separate debrief with Incident Commander

**14.090–TSK–3 Issuing the Order to Disperse**

Upon determining that the crowd presents an imminent risk to public safety or that
large-scale property destruction appears likely, the Incident Commander, as
feasible:

1. **Considers** placing officers at the rear of the crowd to verify that the order to
disperse will be heard by all

2. **Issues** the following order:

   "I am (rank and name) of the Seattle Police Department. I am now issuing a
   public safety order to disperse and I command all those assembled at (specific
   location) to immediately disperse, which means leave this area. If you do not do
   so, you may be arrested or subject to other police action. Other police action
   could include the use of chemical agents or less-lethal munitions, which may
   inflict significant pain or result in serious injury. If you remain in the area just
   described, regardless of your purpose, you will be in violation of city and state
   law. The following routes of dispersal are available: (routes). You have
   (reasonable amount of time) minutes to disperse."

3. **Allows** a reasonable amount of time for the crowd to disperse

Page **32** of **33**



4. **Repeats** the order to disperse, if feasible

5. **Continually assesses** the balance of dispersal time and the goal of retaining control of the situation

Page **33** of **33**

**Seattle** Office of
Inspector General      APPENDIX B – SPD REPORT ON USE OF LESS LETHAL WEAPONS

# Appendix B – SPD Report on Use of Less Lethal Weapons

Seattle Office of
Inspector General    APPENDIX B – SPD REPORT ON USE OF LESS LETHAL WEAPONS

---

### SEATTLE POLICE DEPARTMENT MEMORANDUM

**TO:**      The Office of the Inspector General for Public Safety      **DATE:**  7/24/2020

**FROM:**    Loren T. Atherley, MA
             Director of Performance Analytics & Research, Senior Research Scientist

**SUBJECT:**   Less Lethal Force - 2017 to April 30, 2020

Pursuant to your request, made via email on July 22nd, 2020, please find the attached descriptive report of Seattle Police Department (SPD) *less lethal* Use of Force (UoF) events between January 1st 2017 and April 30th 2020 ("the study period"). For the purposes of this report, less lethal force is identified as involving *applications*, use by the officer, of:[1]

| | |
|---|---|
| Balls – Blast | Chemical Agent – Other |
| Balls – OC | Electronic Control (ECD / |
| Beanbag / Stunbag | Taser) |
| Blue Nose Device | NFDD (Noise Flash Distraction |
| Carotid / Neck Restraint | Device) |
| Chemical Agent – OC Spray | Sting Ball |

These *implements* were identified by Matt Miller in a call preceding the July 22nd request. The Data Analytics Platform (DAP) reports on a total of forty-four (44) specific implements available in BlueTeam for force reports. A complete list is attached (see Attachment A).

In total, 316[2] Uses of Force (defined by the unique combination of officer, community member on a single incident) were reported across 195 incidents. Less lethal involved force represents approximately 5.4% of all force during the study period (*n=5,827*).

---

[1] One UoF indicated the use of a Carotid / Neck Restraint and was classified as Type I, in error. The issue was investigated by the Data Governance Manager and with the assistance of the FRU Data Steward, corrected the record. Documentation of the error can be found in the Data Governance Activity Log, reference number 488. The record can be inspected in the IAPro system, file number: 2018UOF-0398.
[2] While drafting this report, PA&R identified an additional Blue Nose Device (BND) less lethal force report. The implement "other" was selected, in error (see 2018UOF-0215). DGAL 489 was logged to document the correction and future extracts will reflect the correct count. DGAL 491 is related and documents implementation of the change to BlueTeam. Some remediation of the data may occur, retroactively.

From: Performance Analytics & Research
Subject: Less Lethal Force – 2017 to April 30, 2020

|  | UoF Count | % of Force | Force Event Count | % of Force Events |
|---|---|---|---|---|
| Type I | 121 | 38.3% | 70 | 36.1% |
| Type II | 191 | 60.4% | 131 | 67.5% |
| Type III | 4 | 1.3% | 4 | 2.1% |
| Grand Tot.. | 316 | 100.0% | 194 | 100.0% |

The following descriptive report details the use of less lethal implements by function (e.g. 911 Response, SWAT, etc.), response type (e.g. Dispatched, Onviewed, Call Type, Service Type, etc.), outcomes and their use within interactions involving community members experiencing behavioral crisis.

This report only includes force which has cleared BlueTeam at the time of this writing (the week of July 20th, 2020) and may not include force excluded from DAP for data quality errors[3]. The Data Governance program has documented these limitations (see DGAL) and is actively managing all open issues. Complete data, at the case level, is always available from the source system.

The Blue Nose Device (BND), also referred to as "40mm launcher", was used a reported ten (10) times during the study period. While a more comprehensive review should be undertaken to address the efficacy of this device, a summary of each of the deployments (at the case level) is provided at the end of the descriptive section of this report. Some common themes emerge and may be relevant to its consideration:

1) In all but one incident involving the use of a BND, the subject was armed. In the case of the one incident where the subject was not armed, his size and apparent altered state (possibly chemically induced), were a consideration for the officers when assessing the threat.
2) Three (3) of the events involved a subject who had explicitly stated their desire to commit suicide by cop and / or who had attempted to do so in the past.
3) The BND may not be effective at long range or where the subject is in a chemically induced altered state; however, in those cases, the implement can still be effective in disarming the subject.

If you have any questions or would like additional information, please do not hesitate to reach out.

Sincerely,

Loren T. Atherley, MA
Director of Performance Analytics & Research
Senior Research Scientist
Seattle Police Department

[3] Functional errors related to the incident number for mutual aid / interagency assistance incidents have been observed to reject some force reports where a SPD Incident / Office (CASENUM) was not pulled. DGAL 294 (1/1/2019) has been logged to identify and track this issue. Data quality reports detail this limitation for the IAPro Data Stewards in the Force Review Unit (FRU). As of the 22nd of July, 61 functional errors are reported under this issue and the DGAL is "parked", meaning unresolved and in a monitor status.

Descriptive Report

Between 1/1/2017 and 4/30/2020, less lethal applications of force have been reported 316 times, across 195 incidents (see Table 1). Less lethal involved force represents approximately 5.4% of all force during the study period (n=5,827).

*Table 1 - Less Lethal Force*

|  | UoF Count | % of Force | Force Event Count | % of Force Events |
|---|---|---|---|---|
| Type I | 121 | 38.3% | 70 | 36.1% |
| Type II | 191 | 60.4% | 131 | 67.5% |
| Type III | 4 | 1.3% | 4 | 2.1% |
| Grand Tot.. | 316 | 100.0% | 194 | 100.0% |

When compared to the distribution of all force across force classifications (Type I, II, III and III-OIS), Type I force is underrepresented, and Type II force is overrepresented. (see Table 2).

*Table 2 - All Force by Type*

|  | UoF Count | % of Total Force |
|---|---|---|
| Type I | 121 | 38.3% |
| Type II | 191 | 60.4% |
| Type III | 4 | 1.3% |
| Total | 316 | 100.0% |

Less lethal force applications occurred most frequently in Type II classified force (60.4%), followed by Type I (38.3%) and in just 1.3% (*n=4*) of Type III force.

Seattle Office of
Inspector General          APPENDIX B – SPD REPORT ON USE OF LESS LETHAL WEAPONS

From: Performance Analytics & Research
Subject: Less Lethal Force – 2017 to April 30, 2020

*Table 3 - Less Lethal Detail by Type*

| | UoF Count | % of Force | Force Event Count | % of Force Events |
|---|---|---|---|---|
| NFDD | 131 | 41.5% | 74 | 38.1% |
| Electronic Control (ECD / Taser) | 110 | 34.8% | 98 | 50.5% |
| Chemical Agent – OC Spray | 55 | 17.4% | 22 | 11.3% |
| Chemical Agent – Other | 15 | 4.7% | 8 | 4.1% |
| Blue Nose Device | 10 | 3.2% | 9 | 4.6% |
| Balls - Blast | 3 | 0.9% | 1 | 0.5% |
| Total | 316 | 100.0% | 194 | 100.0% |

The most commonly reported less lethal implement was the Noise Flash Distraction Device (NFDD), reported in 41.5% (*n=131*) of all less lethal force and 38.1% (*n=74*) of all less lethal force events. During the study period, the Blue Nose Device (BND) was reported in 10 UoF[4] (3.2%), across 9 events. (see Table 3)

Of 316 less lethal UoF, 132 (41.8%) were on a warrant service (by Service Type), 36.6% of force events. Calls for service (classified as either Onviewed or Dispatched) accounted for 37.7% of less lethal force, 49.5% of force events. Demonstrations were indicated as the Service Type in 12% (*n=38*) of less lethal applications. The remaining 8.5% of less lethal force (*n=28*) included bookings, traffic stops, observation, and off-duty involvement types. (see Table 4)

---

[4] In the course of reviewing these incidents, it was determined the implement "other" was selected, in error (see 2018UOF-0215). DGAL 489 was logged to document the correction and future extracts will reflect the correct count.

**Seattle** Office of
**Inspector** General      APPENDIX B – SPD REPORT ON USE OF LESS LETHAL WEAPONS

From: Performance Analytics & Research
Subject: Less Lethal Force – 2017 to April 30, 2020

*Table 4 - Less Lethal by Service Type*

| | UoF Count | % of Force | Force Event Count | % of Force Events |
|---|---|---|---|---|
| Warrant Service | 132 | 41.8% | 71 | 36.6% |
| Call for Service | 119 | 37.7% | 96 | 49.5% |
| Demonstration | 38 | 12.0% | 9 | 4.6% |
| Booking | 12 | 3.8% | 12 | 6.2% |
| Observation – Non-traffic Stop | 12 | 3.8% | 11 | 5.7% |
| Off-duty | 2 | 0.6% | 2 | 1.0% |
| Observation – Traffic Stop | 1 | 0.3% | 1 | 0.5% |
| Total | 316 | 100.0% | 194 | 100.0% |

A closer examination of the role of particularly less lethal implements further illuminates their application. The NFDD is most commonly represented in Warrant Services (35.4%)[5] and Calls for Service, generally (6%). In Warrant Service applications, as a particularly high-risk type interaction, the NFDD is often used when approaching or making entry to an enclosed space when the officers intend to take into custody. The percussion and bright flash disorient a subject who might otherwise attempt to harm the contact team. Similarly, Chemical Agents (commonly Oleoresin Capsicum or OC, also known as "pepper spray") is used to disperse a crowd and is represented most frequently in Demonstration service types. (see Table 5)

---

[5] The underlying charge for these warrants is not readily available for this analysis; however, involvement of the SWAT team in all 131 uses of the NFDD device (99% of all Warrant Service related force) can be taken as an indicator of the risk assessment and seriousness of the underlying charge or the threat the subject posed to officer safety.

**Seattle** Office of
**Inspector General**        APPENDIX B – SPD REPORT ON USE OF LESS LETHAL WEAPONS

From: Performance Analytics & Research
Subject: Less Lethal Force – 2017 to April 30, 2020

*Table 5 - Less Lethal / Service Type Detail*

| | | UoF Count | % of Force | Force Event Count | % of Force Events |
|---|---|---|---|---|---|
| **Warrant Service** | NFDD | 112 | 35.4% | 62 | 32.0% |
| | Chemical Agent – Other | 11 | 3.5% | 6 | 3.1% |
| | Electronic Control (ECD / Taser) | 6 | 1.9% | 6 | 3.1% |
| | Chemical Agent – OC Spray | 6 | 1.9% | 5 | 2.6% |
| | Blue Nose Device | 1 | 0.3% | 1 | 0.5% |
| **Call for Service** | Electronic Control (ECD / Taser) | 84 | 26.6% | 73 | 37.6% |
| | NFDD | 19 | 6.0% | 15 | 7.7% |
| | Chemical Agent – OC Spray | 8 | 2.5% | 5 | 2.6% |
| | Blue Nose Device | 7 | 2.2% | 7 | 3.6% |
| | Chemical Agent – Other | 2 | 0.6% | 2 | 1.0% |
| **Demonstration** | Chemical Agent – OC Spray | 36 | 11.4% | 9 | 4.6% |
| | Balls - Blast | 3 | 0.9% | 1 | 0.5% |
| | Chemical Agent – Other | 2 | 0.6% | 1 | 0.5% |
| **Booking** | Electronic Control (ECD / Taser) | 9 | 2.8% | 9 | 4.6% |
| | Blue Nose Device | 2 | 0.6% | 2 | 1.0% |
| | Chemical Agent – OC Spray | 1 | 0.3% | 1 | 0.5% |
| **Observation – Non-traffic Stop** | Electronic Control (ECD / Taser) | 8 | 2.5% | 8 | 4.1% |
| | Chemical Agent – OC Spray | 4 | 1.3% | 3 | 1.5% |
| **Off-duty** | Electronic Control (ECD / Taser) | 2 | 0.6% | 2 | 1.0% |
| **Observation – T..** | Electronic Control (ECD / Taser) | 1 | 0.3% | 1 | 0.5% |
| **Total** | | 316 | 100.0% | 194 | 100.0% |

Within the context of calls for service, of the 1,315,741 unique CAD events responded to by a sworn employee during the study period, 195 or .015% involved the use of a less lethal implement. The full use of force rate for the period (*n=5,827*), including all application types, was .44%, when measured at the CAD Event level[6]. As a measure of dispatches, unique officers on calls, the rate of less lethal force was

---

[6] The Computer Aided Dispatch (CAD) system logs both events and individual dispatched behaviors related to those events. These concepts are referred to as "CAD Events" and "Dispatches". Dispatches are generally used as a baseline for workload normalization, as they represent the most granular unit of work tracked by the department.

Seattle Office of
Inspector General          APPENDIX B – SPD REPORT ON USE OF LESS LETHAL WEAPONS

From: Performance Analytics & Research
Subject: Less Lethal Force – 2017 to April 30, 2020

just .011% of the total 2,890,551 dispatches logged during that time. The full use of force rate was .25% or 25 UoF for every 10,000 dispatches logged.

During the study period, 58.5% of all CAD Events were classified as dispatched, with 41.5% classified as onviewed, the remainder. Table 6 depicts the distribution of less lethal force across the Call Type of the original call. 82.6% of all less lethal force is related to "dispatched" calls.[7] In 16.1% of less lethal force during the period, the officer "onviewed" the call and initiated action, without a call from the public.[8] (see Table 6)

*Table 6 – Less Lethal by Call Type*

|  |  | UoF Count | % of Force | Force Event Count | % of Force Events |
|---|---|---|---|---|---|
| **Null** | NFDD | 4 | 1.3% | 3 | 1.5% |
|  | Total | **4** | **1.3%** | **3** | **1.5%** |
| **DISPATCH** | NFDD | 109 | 34.5% | 58 | 29.9% |
|  | Electronic Control (ECD / Taser) | 90 | 28.5% | 79 | 40.7% |
|  | Chemical Agent – OC Spray | 42 | 13.3% | 14 | 7.2% |
|  | Chemical Agent – Other | 14 | 4.4% | 7 | 3.6% |
|  | Blue Nose Device | 10 | 3.2% | 9 | 4.6% |
|  | Balls - Blast | 3 | 0.9% | 1 | 0.5% |
|  | Total | **261** | **82.6%** | **151** | **77.8%** |
| **ONVIEW** | Electronic Control (ECD / Taser) | 20 | 6.3% | 19 | 9.8% |
|  | NFDD | 18 | 5.7% | 13 | 6.7% |
|  | Chemical Agent – OC Spray | 13 | 4.1% | 8 | 4.1% |
|  | Chemical Agent – Other | 1 | 0.3% | 1 | 0.5% |
|  | Total | **51** | **16.1%** | **40** | **20.6%** |
| **Total** |  | **316** | **100.0%** | **194** | **100.0%** |

Four (4) less lethal UoF were without a relationship to an underlying CAD Event, through the incident / offense report. All involved the use of an NFDD implement and were reported by officers assigned to

---

[7] Calls are classified as Onview or Dispatch depending on how they are received. A response to a request from the public is classified as a "dispatched" call. When an officer observes some behavior and initiates the activity, without a call from the public, that call is classified as "onviewed".
[8] Calls may haven been received separately of these events. The Communication Center merges these related CAD Events under a common parent.



From: Performance Analytics & Research
Subject: Less Lethal Force – 2017 to April 30, 2020

Special Weapons and Tactics (SWAT). Three (3) of the four (4) UoF were related to a Warrant Service[9] and one, a "Call for Service" service type. More than ninety (90) distinct initial call types were represented across CAD Event data. No meaningful descriptive patterns were observed across these data.[10]

Officers assigned to SWAT reported 48.1% of all less lethal force during the study period. 911 Response units were responsible for the next largest share, 38.9%. 12.3% of less lethal force was reported by officers assigned to Active Crime Teams (ACT) and proactive units (designated as "Beats"), primarily consisting of bicycle units. (see Table 7)

---

[9] During the study period, 9,028 CAD Events were classified initially as some form of warrant service, excluding search warrants (although some high risk search warrants may involve a SWAT deployment, the majority of them are classified as type of narcotics warrant call type) and "pickups" form other agencies. Warrant Service involving a NFDD account for just 1.5% of all calls of that type.

[10] The data was observed to be either deterministic or overly defused across the call types to be of use for probable inference. An appropriate inferential method may be able to identify and effect but is not in scope for this report.

**Seattle** Office of
**Inspector General**   APPENDIX B – SPD REPORT ON USE OF LESS LETHAL WEAPONS

From: Performance Analytics & Research
Subject: Less Lethal Force – 2017 to April 30, 2020

*Table 7 - Less Lethal by Function*

|  |  | UoF Count | % of Force | Force Event Count | % of Force Events |
|---|---|---|---|---|---|
| SWAT | NFDD | 131 | 41.5% | 74 | 38.1% |
|  | Chemical Agent – Other | 13 | 4.1% | 7 | 3.6% |
|  | Chemical Agent – OC Spray | 8 | 2.5% | 5 | 2.6% |
|  | Blue Nose Device | 3 | 0.9% | 3 | 1.5% |
|  | Electronic Control (ECD / Taser) | 2 | 0.6% | 2 | 1.0% |
|  | Total | **152** | **48.1%** | **78** | **40.2%** |
| 911 Response | Electronic Control (ECD / Taser) | 98 | 31.0% | 87 | 44.8% |
|  | Chemical Agent – OC Spray | 18 | 5.7% | 9 | 4.6% |
|  | Blue Nose Device | 7 | 2.2% | 6 | 3.1% |
|  | Total | **123** | **38.9%** | **100** | **51.5%** |
| ACT / Proactive | Chemical Agent – OC Spray | 28 | 8.9% | 11 | 5.7% |
|  | Electronic Control (ECD / Taser) | 9 | 2.8% | 9 | 4.6% |
|  | Balls - Blast | 3 | 0.9% | 1 | 0.5% |
|  | Chemical Agent – Other | 2 | 0.6% | 1 | 0.5% |
|  | Total | **39** | **12.3%** | **20** | **10.3%** |
| Null | Chemical Agent – OC Spray | 1 | 0.3% | 1 | 0.5% |
|  | Total | **1** | **0.3%** | **1** | **0.5%** |
| CANINE - SQUAD C | Electronic Control (ECD / Taser) | 1 | 0.3% | 1 | 0.5% |
|  | Total | **1** | **0.3%** | **1** | **0.5%** |
| Total |  | **316** | **100.0%** | **194** | **100.0%** |

The profile of specific less lethal implements closely aligns with the role of these units across the operation. SWAT more frequently deploys NFDD implements than any other function, 41.5%. This is reflective of their role in apprehending fugitives (Warrant Service). Similarly, ECD's were the most frequently deployed less lethal device among 911 Response Units. Officers assigned to ACT and proactive functions (bicycles and special foot patrols) used OC and Blast Balls more frequently than other functions. This is likely the result of their role in demonstration management. Bicycles are often deployed as a moving fence and so are in close proximity to demonstrators.

Since 2015, the SPD has reported 52,219 behavioral crisis contacts. Of all crisis contacts, 1,456 (2.8%) have resulted in some reportable use of force. During the study period, 504 out of a total 34,755 crisis contacts involved a reportable use of force, 1.5%.

Seattle Office of
Inspector General          APPENDIX B – SPD REPORT ON USE OF LESS LETHAL WEAPONS

From: Performance Analytics & Research
Subject: Less Lethal Force – 2017 to April 30, 2020

Of all crisis related force reported during the study period, forty-three (43) involved fifty-one (51) reported less lethal UoF reports. The Taser was the most frequently reported less lethal implement, 76.5%. NFDD was reported in the next largest portion of force, 13.7%. The remaining three implement types accounted for a cumulative 11.8%. The BND was deployed three (3)[11] times on events involving a behavioral crisis report.[12]

*Table 8 - Crisis Related Less Lethal Force*

| Implement Type | UoF Count | % of Total |
|---|---|---|
| Electronic Control (ECD / Taser) | 39 | 76.5% |
| NFDD | 7 | 13.7% |
| Blue Nose Device | 3 | 5.9% |
| Chemical Agent – OC Spray | 2 | 3.9% |
| Chemical Agent – Other | 1 | 2.0% |
| Total | 51 | 100.0% |

Of interest to this report is the use of the BND. The BND was reported used in ten (10) of the 316 less lethal UoF during the study period, 3.2%. Attachment B provides reference for all ten (10) applications of a BND. Given the number of observations of BND force during the period, statistical inference is not supported. Instead, a summary of each incident and reference to them is provided for an idiographic analysis of their use.

20180000236935   6/28/2018      HXXXXXR – MXXXXXXL

Officers in the Southwest Precinct responded to an apartment when a resident called to report a male in the building threatened their daughter with a knife. When officers arrived, they located the subject, armed with a rifle and a "machete". The subject barricaded himself and was described in reports as "erratic", "unstable" and "unpredictable". SWAT and the Hostage Negotiation Team (HNT) responded to the scene. SWAT took the subject into custody.

---

[11] An additional BND crisis related force event was identified as misclassified in the DAP either due to a technical fault ("bug") with the ETL code that populates DAP or the source system (Mark 43). DGAL 490 has been logged to track this issue and is in progress. Also see footnote 13.

[12] Systems for the documentation of force and crisis are siloed. As a result, native relationships between the subject of the crisis report and the subject of the UoF, cannot be made. A character to character match between these data sources has been found to omit approximately 30% of reportable force. The analysis to migrate reports has been completed, the test environment has been configured in the Records Management System, in preparation for an order to cutover reporting.

From: Performance Analytics & Research
Subject: Less Lethal Force – 2017 to April 30, 2020

20180000326490        9/1/2018        GXXXXL A GXXXXXN


Officers in the South Precinct responded to a Domestic Violence (DV) incident. The subject had barricaded himself in a parked vehicle after confronting the victim with two "10 inch" knives. The subject also told police he ws in possession of a firearm. Officers obtained the subjects name from the victim and learned he was also wanted on a "felony DOC" warrant for violating a DV no contact order.  SWAT responded and took the subject into custody.


20190000025276        1/19/2019        MXXXXA A CXXXXXXL


Officers in the West Precinct responded to a report of a female, armed with a knife, threatening to suicide. The subject was located in front of a residence making "cutting motions on her arm." Officers identified the subject as a community member they have contacted frequently, who has been involuntarily committed and who has threatened "suicide by cop". Officers formed a "contact team" and approach the subject, with a BND as a less lethal option. Officers repeatedly ordered the subject to drop the knife and after multiple attempts to "run at officers", run into traffic and to access the residence, officers deployed the BND. The subject dropped the knife and was taken into custody.

At the time of this writing, the subject is an involved person in 106 reports.


20190000025444        1/19/2019        TXXXXXY - CXXXXXS[13]

Officers in the West Precinct responded to the precinct building to a report of a male, who called 911, stating he was attempting "suicide by cop". The male stated he was in possession of an airsoft gun and had covered the orange safety tip. Multiple officers responded to the scene and located the subject. Officers attempted to deescalate the situation but the subject became more agitated. An officer fired the BND at a distance of approximately 300 feet, striking the subject in the thigh, to no effect. A second BND was fired, striking the subjects pelvis. Again, to no effect. A Taser was eventually used to bring the subject into custody.

As of this writing the subject was involved in 49 reports.

20190000098802        3/19/2019        SXXXL A MXXXXXJ


Officers in the West Precinct responded to reports of a suicidal male, armed with a firearm and threatening suicide by cop. Officers located the subject on the street, still in possession of the firearm.  Two contact teams approached the subject. The subject raised the firearm toward the

---

[13] A second officer fired a BND but indicated "other" in implements. A DGAL (489) was filed and the data was corrected in cooperation with the FRU Data Steward.

From: Performance Analytics & Research
Subject: Less Lethal Force – 2017 to April 30, 2020

officers and a BND was fired. Other officers fired on the subject with lethal munitions. The subject was taken into custody and recovered from his injuries.

20190000185820      5/23/2019      PXXL A MXXXXXXXH

Officers in the East Precinct responded to a call for a male subject, trespassing, "armed with a shovel". The PR stated when she attempted contact with the subject and asked him to leave, he responded by saying he was "from the military" and didn't need to leave. Officers located the subject at the residence, in possession of "a small metal shovel". Officers asked the subject to drop the shovel, but he refused. After several minutes, an officer fired on the subject and struck the shove. A second round cause the subject to drop the shove and the subject was taken into custody.

As of this writing, the subject was involved in 94 reports.

20190000478870      12/28/2019      PXXXXXX R SXXXXXXS

Officers in the East Precinct responded to a Domestic Violence (DV) call. The remarks stated "ROOMMATE IS IN CRISIS, LOCKED COMPL OUT OF HOUSE, MESSING AROUND WITH GAS STOVE, UNK WHAT HE IS DOING WITH IT, SUSP CURRENTLY HAS HAMMER, NO OTHER WEAPNS." This location had been involved in multiple responses in the last 6 months and multiple officers responded. The subject barricaded himself in the unit. SWAT and HNT responded to the scene. An officer assigned to SWAT attempted to fire the BND but it failed. A canine was used to take the subject into custody.

20200000007733      1/7/2020      KXXXXXH M PXXXXXS

Officers in the West Precinct responded to a report of a "lewd disturbance". Upon arrival they found a nude male in the middle of the street, "yelling incoherently". A BND was fired at the subject, striking him in the thigh, to no effect. The subject was taken into custody and booked for Property Destruction, Indecent Exposure, Obstructing a Public Officer and Resisting Arrest. The case was referred to the City Attorney's Office.

20200000055593      2/13/2020      MXXXXXL A BXXXXH

Officers in the South Precinct responded to reports that a man threatened a community member with a knife. When officers arrived, they located the subject, in possession of a fixed blade knife. Officers used lethal cover and ordered the subject to drop the knife but ultimately determined the subject did not intend to ham officers and was in behavioral crisis.[14] Additional resources were requested, including HNT and BND equipped officers. While taking the subject into custody, a BND was fired at the subjects hand, causing him to drop the knife. A second BND was fired,

---

[14] The Crisis Involved flag was not set in the DAP system, indicating this UoF involved a person in behavioral crisis. A DGAL has been logged (490) and is in process.

Form 1.11 Rev. 2/07                                                    Page 12 of 15

**Seattle** Office of
Inspector General      APPENDIX B – SPD REPORT ON USE OF LESS LETHAL WEAPONS

From: Performance Analytics & Research
Subject: Less Lethal Force – 2017 to April 30, 2020

striking the subject in the foot. The subject was taken into custody. At this time the incident is
under investigation for "Felony Harassment" and is "pending".

**Seattle** Office of
Inspector General                 APPENDIX B – SPD REPORT ON USE OF LESS LETHAL WEAPONS

**Attachment A**
All Implement Types in BlueTeam

Balls - Blast
Balls - OC
Baton – Expandable – Impact
Baton – Expandable –Control/Pressure
Point
Baton – Straight – Impact
Baton – Straight –Control/Pressure
Point
Beanbag / Stunbag
Bicycle – Powerslide / Takedown
Bicycle – Push
Blue Nose Device
Canine
Carotid/Neck Restraint
Chemical Agent – OC Spray
Chemical Agent – Other
Control Hold – Restraint
Control Hold – Takedown
Control Hold – Team Takedown
Electronic Control (ECD / Taser)
Firearm – Pistol – Fire
Firearm – Pistol – Other
Firearm – Pistol – Point
Firearm – Rifle – Fire

Firearm – Rifle – Other
Firearm – Rifle – Point
Firearm – Shotgun – Fire
Firearm – Shotgun – Point
Flashlight – Control/Pressure Point
Flashlight – Strike
Handcuffing
Hobble Restraint
NFDD
Other Weapon - Other
Other Weapon – Blunt Object
Personal Weapons – Feet/Leg
Kick/Knee
Personal Weapons – Feet/Leg Sweep
Personal Weapons – Open Hand Strike
Personal Weapons – Pressure Point
Personal Weapons – Punch/Elbow
Personal Weapons – Push
Shield
Sting Ball
Vehicle – Other
Vehicle – PIT
Verbal Commands



**Attachment B**
Blue Nose Device Reference Detail

| Force ID | File Num | GO Num | Occurred Date | Crisis Ind | Service Type | Incident Type | Function | |
|---|---|---|---|---|---|---|---|---|
| 2018UOF-1091-44-16152 | 2018UOF-1091 | 20180000236935 | 6/28/2018 | N | Call for Service | Level 2 - Use of Force | SWAT | Abc |
| 2018UOF-1600-44-4453 | 2018UOF-1600 | 20180000326490 | 9/1/2018 | N | Call for Service | Level 2 - Use of Force | SWAT | Abc |
| 2019UOF-0026-2364-15292 | 2019UOF-0026 | 20190000025276 | 1/19/2019 | Y | Booking | Level 3 - Use of Force | 911 Response | Abc |
| 2019UOF-0215-1096-3859 | 2019UOF-0215 | 20190000025444 | 1/19/2019 | Y | Call for Service | Level 2 - Use of Force | 911 Response | Abc |
| 2019UOF-0326-2292-18633 | 2019UOF-0326 | 20190000098802 | 3/19/2019 | Y | Call for Service | Level 2 - Use of Force | 911 Response | Abc |
| 2019UOF-0804-1134-16670 | 2019UOF-0804 | 20190000185820 | 5/23/2019 | N | Call for Service | Level 2 - Use of Force | 911 Response | Abc |
| 2019UOF-1281-1167-21188 | 2019UOF-1281 | 20190000478870 | 12/28/2019 | N | Warrant Service | Level 2 - Use of Force | SWAT | Abc |
| 2020UOF-0138-1096-21257 | 2020UOF-0138 | 20200000007733 | 1/7/2020 | N | Call for Service | Level 2 - Use of Force | 911 Response | Abc |
| 2020UOF-0360-2476-21570 | 2020UOF-0360 | 20200000055593 | 2/13/2020 | N | Call for Service | Level 2 - Use of Force | 911 Response | Abc |
| 2020UOF-0361-2177-21570 | 2020UOF-0361 | 20200000055593 | 2/13/2020 | N | Booking | Level 2 - Use of Force | 911 Response | Abc |



# Appendix C – Excerpt from Los Angeles Police Department Directive 11: Crowd Management, Intervention, and Control


**Seattle** Office of **Inspector** General

APPENDIX C — EXCERPT FROM LOS ANGELES POLICE DEPARTMENT DIRECTIVE 11: CROWD MANAGEMENT, INTERVENTION, AND CONTROL

**Crowd Management, Intervention, and Control**
**Concepts and Strategies**

| Lawful Assembly | Isolated Unlawful Behavior | Unlawful Assembly | Riot |
|---|---|---|---|
| *Free Speech and assembly are protected First Amendment activity. The following are examples:*<br><br>• Speeches<br>• Marches<br>• Demonstrations<br>• Rallies<br>• Picketing<br>• Public assemblies<br>• Protests<br>• Celebratory events | *Isolated unlawful activity by individuals or small groups within a crowd should not automatically form the basis for declaring an assembly unlawful.*<br><br>• **Isolated destruction of property**<br>• **Isolated acts of violence**<br>• **Isolated rock or bottle throwers**<br>• **Individual sit down demonstrators** | **407 PC Two or more persons assemble**<br>• **To do an unlawful act or**<br>• **To do a lawful act in a boisterous or tumultuous manner**<br><br>*Assemblies may be dispersed when they are: Violent, or pose a clear and present danger of violence, or the group is breaking some other law in the process.  If a crime is occurring action may be taken to stop it prior to a Dispersal Order being given.*<br><br>• **Civil Disobedience**<br>• **Sit down demonstration** | **404 PC Riot, (a) Any use of force or violence, disturbing the public peace, or any threat to use force or violence, if accompanied by immediate power of execution, by two or more persons acting together, and without authority of law, is a riot.**<br><br>• **Group violent behavior**<br>• **Group acts of property damage** |

| Police Action | | | |
|---|---|---|---|
| **Use Crowd Management strategies:**<br><br>• Meet with event organizers and stakeholders<br>• Determine the history and risk of the group<br>• Create a planning team<br>• Check permit limitations<br>• Develop commanders intent<br>• Develop Incident Action Plan and objectives<br>• Identify and assign resources: Video unit, fixed posts, MFF, Bicycle Units, Air Support, TSE, Shadow Teams, Mounted Unit<br>• Monitor and assess crowd behavior<br>• Separate opposing factions<br>• Maintain video log<br>• Provide direction and expectations at roll call<br>• Engender facilitation not confrontation<br>• Ensure the appropriate uniform for the event<br>• Interact with organizers and gain cooperation | **Use Crowd Intervention strategies:**<br><br>• Use organizers and monitors to gain voluntary compliance<br>• Isolate, arrest and remove law violators as quickly as possible<br>• Video action of officers and law violators<br>• Use amplified sound (sound trucks or CIUVs) to communicate intent or to gain compliance<br>• Use low profile tactics when possible.  Don't become the focus of the demonstration.<br>• Use Passive Arrest Teams, Tangle Teams, Shadow Teams, Cross Bows, Arrest Circles<br>• When it is not possible to make an immediate arrest, identify and track suspects using cameras, observation posts, an air unit or shadow teams<br>• Continue to assess; escalate and deescalate as behavior changes<br>• Don't increase crowd tension or change crowd focus to law enforcement by unnecessary aggressive appearance or behavior | **Use Crowd Control strategies:**<br><br>• Obtain voluntary compliance<br>• Video action of officers and law violators<br>• Act quickly<br>• Request resources (MFF)<br>• Put control forces in place<br>• Identify dispersal routes<br>• Put a traffic plan in place<br>• Move media to protected area. Use amplified sound (sound trucks or CIUVs) to communicate intent to declare an unlawful assembly<br>• Disperse unlawful crowd<br>• Track and contain groups involved in illegal behavior using cameras, observation posts, Shadow Teams or Air Unit<br>• Arrest individuals who fail to disperse or who are involved in illegal activity<br>• Use Arrest Links to move arrestees<br>• With appropriate approval, deploy the appropriate less lethal munitions to defend officers or to disperse the crowd<br>• Ensure only reasonable force<br>• Report use of force and munitions<br>• Restore traffic flow | **Use Crowd Control strategies:**<br><br>• Video actions of officers and law violators<br>• Immediately stop the behavior<br>• Request resources (MFF)<br>• Put control forces in place<br>• Stop the illegal activity<br>• Put a traffic plan in place<br>• Track and contain groups involved in illegal behavior using cameras, observation posts, Shadow Teams or Air Unit.<br>•  Arrest law violators<br>• Use Arrest Links to move arrestees<br>• With appropriate approval, deploy the appropriate less lethal munitions to defend officers or to stop violent behavior or property damage<br>• Ensure only reasonable force<br>• Report use of force and munitions<br>• Restore and maintain order<br>• Restore traffic flow<br>• Discourage groups from forming<br>• Protect lives, property, and vital facilities<br>• Establish and patrol divisions<br>• Remain present<br>• Reassess the situation<br>• Return to normalcy<br>• Act quickly |

UOF-TAC DIR NO. 11, 2011

Seattle Office of
Inspector General

# Appendix D – Report Methodology

To complete this review, OIG:

- Researched and tested less lethal weapons available to SPD, including less lethal launchers;
- Analyzed preliminary use of force data for the period under review to identify officers using less lethal weapons and confirmed whether the officers had received training to do so in accordance with SPD requirements;
- Compared the SPD policy to publicly available materials from other jurisdictions;
- Consulted with an industry expert on less lethal weapons;
- Reviewed public timelines published by SPD and internal SPD communications data to identify patterns in dispersal orders and use of less lethal weapons;
- Researched manufacturer regulations, reviewed past audits, and interviewed SPD personnel to confirm whether less lethal weapons were stored and tracked appropriately;
- Interviewed SPD incident commanders and other supervisory staff involved in the 2020 demonstrations;
- Analyzed SPD Incident Action Plans for the recent demonstrations to determine how SPD planned for, and staffed these events, including establishing rules of engagement;
- Reviewed SPD training materials and interviewed SPD specialists concerning crowd management, crowd control, and use of less lethal weapons; and
- Requested feedback from OPA and CPC on any issues of concern or risks OIG should investigate as part of this review.

In accordance with its normal reporting practices, OIG provided SPD with a draft of this report to confirm its factual accuracy, and offered SPD the opportunity to submit a response. SPD declined to do so, citing concerns about discussing events that are still under review by OPA and the Court.