THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Case No. 2:12-cv-01282-JLR |
| Plaintiff, ) | |
| ) | **CITY OF SEATTLE'S QUARTERLY** |
| v. ) | **ACCOUNTABILITY UPDATE AND** |
| ) | **MEMORANDUM IN SUPPORT OF** |
| CITY OF SEATTLE, ) | **PROPOSED MONITORING PLAN** |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |
| ) | |

## I.   Introduction

A rigorous evaluation of the Seattle Police Department's (SPD's) response to last year's protests is necessary in order to ensure accountability and restore public confidence. The protests tested not only the policies and training of SPD, but also the effectiveness of the City's police accountability system. The City recognizes that SPD's crowd management practices must be improved, and the City's independent police accountability entities are working hard to examine the protest incidents, review SPD's policies, and propose reforms. Their efforts and the work of

CITY OF SEATTLE'S QUARTERLY ACCOUNTABILITY
UPDATE AND MEMORANDUM IN SUPPORT OF PROPOSED
MONITORING PLAN - 1
(12-CV-01282-JLR)

Peter S. Holmes
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

the parties and the Monitor under the proposed monitoring plan will identify and address deficiencies and determine which of the Consent Decree reforms remain successful. The City's accountability system has undergone an unprecedented "stress test" and proven itself robust, thoughtful, and effective.

In the wake of George Floyd's murder, people marched across the country protesting police brutality. The SPD, and law enforcement agencies in dozens of other cities, used chemical irritants and other less lethal devices to respond to incidents of violence that punctuated largely peaceful protests. These events prompted a national conversation about law enforcement tactics during protests. In Seattle, community members contacted the Office of Police Accountability (OPA) over 19,000 times regarding SPD's response to the protests. The City withdrew its motion to terminate key provisions of the Consent Decree in order to allow a thorough examination of SPD's response. Dkt. 621.

That thorough examination is now underway. Unlike in 2011, when the U.S. Department of Justice conducted an investigation of SPD, today the investigations, community review, and policy analysis are driven by the City's own accountability system. OPA has opened 141 investigations into allegations of police misconduct (some comprised of thousands of complaints about a single, high-profile incident) and issued related policy recommendations. The Office of Inspector General for Public Safety (OIG) is convening a Sentinel Event Review, involving community members and subject matter experts, to critically assess the protest incidents to determine ways to prevent future similar events. The Community Police Commission (CPC) has an important role engaging the community around SPD's use of force and crowd management policies. The work of OPA, OIG, and CPC (collectively, the "Accountability Partners") is not yet

**CITY OF SEATTLE'S QUARTERLY ACCOUNTABILITY UPDATE AND MEMORANDUM IN SUPPORT OF PROPOSED MONITORING PLAN** - 2
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

complete, but it already has yielded insights into what SPD did right during the protests, as well as critical findings about things that went wrong and how to fix them. *See*, *e.g.*, Dkts. 636, 637, & 639.

Based on these recommendations and its internal review, SPD has improved its tactics and training since the events of last summer. Chief Diaz has committed to community reconciliation, stating that "[t]he evolving nature of demonstrations and protests must be accompanied by modulated police responses," and he has explained that substantial revisions to SPD's crowd management and use of force policies are in progress.[1] The City's accountability entities, the Monitor, and DOJ are reviewing SPD's changes and they will work with SPD to help determine whether additional reforms are necessary.

## II. Statement in Support of Monitoring Plan

The proposed monitoring plan will support the City's efforts to continue to hold itself accountable. DOJ and the Monitor will conduct an in-depth analysis of SPD's uses of force during the protests last year in order to assess any Consent Decree implications and independently verify the findings of the City's accountability system. SPD's system for reporting, investigating, and reviewing force will also be evaluated by the Monitor and DOJ. In addition, the City will report disciplinary investigations and appeals data on a quarterly basis, furthering public transparency in this area. The plan recognizes the importance of bias-free policing to public trust, and it requires consideration of race and social justice impacts in each area under the Consent Decree.

---

[1] Chief Diaz's letter to the community is attached as Exhibit 1.

**CITY OF SEATTLE'S QUARTERLY ACCOUNTABILITY UPDATE AND MEMORANDUM IN SUPPORT OF PROPOSED MONITORING PLAN** - 3
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

Under the proposed plan, the Monitor and DOJ will provide technical assistance to ensure that budget cuts or structural changes to policing are not undertaken in a manner that undermines the City's compliance with the Consent Decree. This past year, City leaders and community groups have called for budget cuts to SPD accompanied by increased funding to policing alternatives. Concurrently, SPD lost a number of officers to retirement and transfer and experienced significant budget cuts due to COVID-19. The City recognizes that additional, major reductions to SPD's staffing could threaten to undermine Consent Decree reforms in areas such as supervision, training, and use of force reporting, investigation, and review. The City will work with the Monitor and DOJ to prevent that outcome.

The proposed plan also will show where SPD has continued to sustain the remarkable progress it achieved as a result of the Consent Decree reforms and where SPD must make improvements. The Monitor previously determined that more than 99% of force used by SPD officers complies with policy—a standard that exceeds constitutional requirements—and there has been a sixty percent reduction in the use of serious force. Dkt. 383 at 8, 31-32. SPD has become a national leader in crisis intervention, and its rate of using force in crisis incidents is extraordinarily low. Dkt. 272 at 4, 12; Dkt. 588-3 at 27.

The proposed Monitoring Plan lays out a process for gathering and analyzing the necessary data to demonstrate whether these accomplishments and the other required Consent Decree reforms have endured.

**CITY OF SEATTLE'S QUARTERLY ACCOUNTABILITY UPDATE AND MEMORANDUM IN SUPPORT OF PROPOSED MONITORING PLAN** - 4
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

### III. Quarterly Accountability Report

*A. The City acted quickly to provide robust oversight of SPD's response to the protests.*

The interactions between protestors and officers last year have presented an urgent challenge to the police accountability system. The first layer of this system is internal to SPD: all uses of force are reported, investigated, and reviewed by SPD's chain of command and all serious uses of force receive further scrutiny from a specialized team of detectives and the Force Review Board. SPD's internal review is buttressed by three independent organizations: OPA investigates complaints of misconduct against individual officers; OIG ensures the fairness and integrity of the police system as a whole by auditing and reviewing the management, practices, and policies of SPD and OPA, identifying best practices, and making systemic recommendations for lasting reform; and CPC gives the community a voice into SPD's operations, policies, and priorities.

Beginning in May, conflicts between police officers and protestors unfolded, compelling action by the Mayor, City Council, and the police accountability entities. Protests following the murder of George Floyd began in Seattle on May 29, 2020. The first notable interactions between protestors and police officers occurred on May 30 and May 31, when peaceful protests downtown devolved into a public safety event. Multiple police cars were set on fire and a small number of people threw items at police officers (ranging from water bottles to Molotov cocktails) and physically assaulted officers. Mayor Durkan issued emergency orders declaring a civil emergency, and Governor Inslee activated the National Guard. On May 31, after learning that some individuals had a plan to set fire to the East Precinct building, which is attached to residential apartments, SPD set up barricades and prohibited direct access to the precinct. These barricades became a point of confrontation between the police and protestors.

**CITY OF SEATTLE'S QUARTERLY ACCOUNTABILITY UPDATE AND MEMORANDUM IN SUPPORT OF PROPOSED MONITORING PLAN** - 5
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

SPD issued numerous orders to disperse and deployed pepper spray and blast balls to enforce its orders. On five out of the first ten days of protesting, SPD and other law enforcement agencies deployed tear gas (it has not been deployed since). Many non-violent protestors were affected by chemical irritants or other less lethal devices. In one widely publicized incident on June 1, involving a pink umbrella, pepper spray was used to disperse the crowd, and the OPA Director later determined that no substantial risk of harm existed to justify SPD's actions.[2]

On the evening of June 1, after observing the pink umbrella incident and other events, Mayor Durkan immediately contacted OPA and OIG and met with them the next morning. She requested a thorough review of individual officer actions and an in-depth review of SPD's crowd management policies and practices. Mayor Durkan followed up this request with a letter to OPA, OIG, and CPC on June 5, asking that the review be completed in 30 days. At the community's request, to ensure that officers would be held accountable for their actions, Chief Best ordered SPD officers to activate body-worn video at all times during the protests. On June 15, City Council responded to community concerns by restricting the use of oleoresin capsicum (OC) spray, banning other crowd control tools, and requesting the Accountability Partners to make recommendations regarding the use of such tools. Ordinance No. 126102. As addressed at length in previous filings, this Court enjoined the City from implementing that Ordinance until completion of the process set forth in paragraph 177 of the Consent Decree. Dkts. 630 & 647.

In response to the requests by the Mayor and City Council, OPA, OIG, and CPC issued recommendations about whether or to what extent less lethal devices should be used for the purpose

---

[2] https://www.seattle.gov/Documents/Departments/OPA/ClosedCaseSummaries/2020OPA-0334ccs010821.pdf

**CITY OF SEATTLE'S QUARTERLY ACCOUNTABILITY UPDATE AND MEMORANDUM IN SUPPORT OF PROPOSED MONITORING PLAN** - 6
(12-CV-01282-JLR)

Peter S. Holmes
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

of crowd management. Among other findings and recommendations: OPA made five specific policy proposals and advocated prohibiting the use of chlorobenzylidene malononitrile or "tear" gas in crowd control settings, *see* Dkt. 636; OIG recommended changes to policy in order to reduce the risk of harm to non-violent protestors and to reduce the risk of indiscriminate or inappropriate uses of force, *see* Dkt. 637[3]; and CPC urged SPD to ban the use of all less lethal devices (including tear gas, OC spray, blast balls, and the 40mm launcher) during First Amendment protected events, *see* Dkt. 639.

As the protests continued into the fall, OPA received an unprecedented number of complaints. Investigators ultimately reviewed over 19,000 communications regarding possible misconduct related to the protests and distilled them to 141 investigations (over 13,000 of the

---

[3] OIG wrote: "[T]his report makes clear that revisions to the current policy should be made to reduce risk of indiscriminate or inappropriate uses of force. Suggestions by OIG in this report include updating the policy to more clearly distinguish when each level and type of force is authorized, improving the way SPD communicates with protestors to ensure peaceful individuals are aware of SPD's decisions concerning the larger crowd, and devising better methods of handling large, angry, stationary crowds. OIG also highlights the need to closely review how and whether senior level command is held accountable for their decision-making in authorizing force and determining overall tactics. Focusing solely on the actions of individual line officers without reviewing how senior personnel managed the overall event would be a significant oversight. Widespread, indiscriminate use of less lethal weapons, such as tear gas, often occurs after dispersal orders or other directions from the incident commander." Dkt. 637-1 at 9-10.

**CITY OF SEATTLE'S QUARTERLY ACCOUNTABILITY UPDATE AND MEMORANDUM IN SUPPORT OF PROPOSED MONITORING PLAN** - 7
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

contacts were about a single, widely publicized incident[4]). OPA created a demonstration dashboard so the public can track progress into investigations and easily review OPA's findings.[5]

OPA issued its first protest-related findings in September and as of now it has completed over one third of the protest investigations. Out of fifty closed investigations, OPA recommended a "not sustained" finding in forty. In ten cases, OPA recommended a "sustained" finding (in other words, OPA determined that one or more officers committed misconduct). In three additional incidents, OPA identified a minor policy violation or performance issue and requested that a supervisor take specific, relevant action with the officer (such as training or coaching). Among other sustained findings, there are six instances in which OPA concluded that one or more officers used unnecessary or excessive force. All OPA's protest case summaries are available online.[6] In addition to publishing a case summary explaining each finding, OPA often provides a short video of the incident to help the public understand the reasons for its findings.

In some of its protest investigations, OPA has identified systemic issues that go beyond the actions of individual officers and may be more effectively addressed through changes to training

---

[4] OPA received over 13,000 complaints about a child who attended a protest with his parent and was hit by pepper spray. After reviewing the evidence, including body-worn video, OPA recommended not sustaining the misconduct allegation, because the officer did not intentionally spray the parent and child—they were standing directly behind a protestor who grabbed an officer's baton and who then ducked as the stream of pepper spray hit her. OPA created a video presentation explaining its findings, published here: https://www.seattle.gov/opa/news-and-reports/news The OPA Director's written findings are available here: https://www.seattle.gov/Documents/Departments/OPA/ClosedCaseSummaries/2020OPA-0322ccs09-04-20.pdf

[5] https://www.seattle.gov/opa/case-data/demonstration-complaint-dashboard

[6] Demonstration Complaint Dashboard - OPA | seattle.gov

**CITY OF SEATTLE'S QUARTERLY ACCOUNTABILITY UPDATE AND MEMORANDUM IN SUPPORT OF PROPOSED MONITORING PLAN** - 8
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

or policy than through discipline. Thus far, OPA has issued six protest-related recommendations to SPD addressing diverse topics such as ensuring accuracy in SPD social media posts, placing additional restrictions on the use of blast balls, and changing municipal law to expand the use of body-worn video at protests.[7]

After months of planning, on January 10, 2021, OIG began facilitating a community-centered process, called a Sentinel Event Review, to examine SPD's response to the protests through a non-blaming, forward-looking framework. In this context, a sentinel event is "a significant negative outcome, such as a death or serious injury, that acts as a signal that problems within a system exist and may lead to similar bad results if the system is not examined to find root causes and proper remedies."[8] A panel of community members and subject matter experts will review critical incidents that occurred during the protests from start to finish. The panel will focus on the perspectives and concerns of the community, identify root causes of negative outcomes, and discuss ways to improve systems to prevent future negative outcomes. The Sentinel Event Review goals, framework, and process are described at length on OIG's website.[9]

In addition to the Sentinel Event Review, many of OIG's ongoing or planned audits and projects address core Consent Decree areas, including an audit to determine if SPD's current disciplinary process delivers consistent, effective, and transparent accountability to sworn

---

[7] OPA's recommendations are published on its Demonstration Dashboard and here: Policy Recommendations - OPA | seattle.gov

[8] http://www.seattle.gov/oig/sentinel-event-review

[9] *Id.*

**CITY OF SEATTLE'S QUARTERLY ACCOUNTABILITY UPDATE AND MEMORANDUM IN SUPPORT OF PROPOSED MONITORING PLAN** - 9
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

personnel; an audit of discretionary citations (e.g., failure to wear a bike helmet) to assess for evidence of bias and disparity; and anticipated audits growing out of the Sentinel Event Review which likely will evaluate the use of force, crowd management, or force review. *See* OIG's 2021 Workplan at 5-6.[10]

> B. Since last year, SPD has made changes to its training and crowd management practices to incorporate feedback and address shortcomings.

SPD has made numerous changes as a result of its internal review, the recommendations of the Accountability Partners, and a federal court injunction.[11] These reforms will be subject to scrutiny by the Monitor and DOJ in the forthcoming months, and the City provides only a brief summary here, recognizing that review is forthcoming.

The first change is better coordinating resources to respond to large protests. SPD created a new community response group with officers and sergeants from all five precincts. These officers are charged with responding to demonstrations and 911 calls and can be deployed quickly to any location within the City. Getting officers more quickly to the places they are needed helps ensure that protests are adequately staffed.

---

[10] OIG's detailed 2021 workplan is available on its website: https://www.seattle.gov/Documents/Departments/OIG/Annual/OIG2021Work%20Plan122120.pdf

[11] In *Black Lives Matter King County, et al. v. City of Seattle*, No. 2:20-civ-00887-RAJ (W.D. Wa), a group of protestors filed a lawsuit against the City challenging SPD's tactics. The federal court found that plaintiffs established a likelihood of success in proving that SPD has used excessive force and issued an injunction restricting SPD's ability to use chemical irritants and other tools. *Id.* at dkts. 34 & 42. That court recently held the City in contempt, finding violations based on four SPD uses of force from September 7, 22, and 23. *Id*. dkt. 161 at 15, 20-22.

**CITY OF SEATTLE'S QUARTERLY ACCOUNTABILITY UPDATE AND MEMORANDUM IN SUPPORT OF PROPOSED MONITORING PLAN** - 10
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

SPD has substantially changed its crowd management tactics. To avoid situations that led to conflicts early last summer, SPD adopted better techniques to prevent crowds from forming fixed lines or large stationary groups. When feasible, officers position themselves on the periphery of protests in order to form a less visible presence and maintain space between themselves and protestors. SPD also has increased its emphasis on conducting targeted arrests of individuals who are committing serious crimes or posing safety hazards, instead of ordering the entire crowd to disperse.

At the recommendation of OIG, SPD invested in sound amplification technology so that, if a crowd must be dispersed for public safety reasons, officers' orders can be heard even by those at the back of the crowd.[12] Another improvement is that officers now give protestors clear instructions about how and where to depart, acknowledging it can be difficult for someone in the middle of a large crowd to find a clear pathway to exit.

The interactions between police officers and protestors appear to be improving. While demonstrations continue to take place almost nightly, the vast majority in recent months have resolved with no arrests or uses of force. Further, SPD has not used blast balls at a protest since September 26, 2020, and it has not used pepperballs since October 3, 2020.

SPD also is implementing new training. Starting in November 2020, it joined a nationally recognized, peer-intervention training program for law enforcement officers created by Georgetown University Law Center. The goals of the Active Bystandership for Law Enforcement

---

[12] SPD uses long-range acoustic devices only as a loudspeaker to communicate instructions or orders. The devices do not have a sound cannon or other any sound weapon capability.

**CITY OF SEATTLE'S QUARTERLY ACCOUNTABILITY UPDATE AND MEMORANDUM IN SUPPORT OF PROPOSED MONITORING PLAN** - 11
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

Project are to "create a police culture in which officers routinely intervene as necessary to: prevent misconduct, avoid police mistakes, and promote officer health and wellness."[13]

Finally, SPD has been working to incorporate the improved tactics, feedback, and recommendations into its policies on the use of force and crowd management. In the near term, SPD plans to submit an initial set of policy revisions to the Court. These revisions will reflect tactical adaptations discussed above and provide additional guidance to officers and community members. Longer term, SPD is committed to working with OPA, OIG, and CPC to continue gathering feedback and incorporating community perspectives into its policies. To that end, the monitoring plan includes a schedule for multiple rounds of feedback and revisions during 2021.

C. *Collective bargaining negotiations with the police unions are proceeding with increased accountability to the community.*

Collective bargaining negotiations with the Seattle Police Management Association are in their early stages and negotiations with the Seattle Police Officers Guild (SPOG) have not begun. This round of collective bargaining negotiations will be fundamentally different from the last round in two respects. First, in the last round of bargaining, the bargaining procedures limited how far the City could advance the reforms in the Accountability Ordinance.[14] In this new round of bargaining,

---

[13] The project is described here: https://www.law.georgetown.edu/innovative-policing-program/active-bystandership-for-law-enforcement/

[14] When the Accountability Ordinance passed in June 2017, collective bargaining negotiations were already well under way, having started in January 2015 with SPOG. Because bargaining topics are agreed on at the start of negotiations, the City had no unilateral right to make the provisions of the Ordinance part of bargaining unless the police unions agreed. While both unions did agree to discuss accountability in the negotiations (and many of the reforms in the Accountability Ordinance were bargained), the SPOG did not waive its right to pursue interest arbitration only on the original subjects identified at the start of bargaining in 2015.

**CITY OF SEATTLE'S QUARTERLY ACCOUNTABILITY UPDATE AND MEMORANDUM IN SUPPORT OF PROPOSED MONITORING PLAN** - 12
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

the City will have the right to negotiate (and advance to "interest arbitration," as needed) issues arising out of the Accountability Ordinance if the parties reach impasse. Second, the Executive and the City Council have recently taken important steps to ensure that collective bargaining better reflects community priorities.

The community will have multiple layers of input into this round of bargaining. Under municipal law, the City Council already has a role through the Labor Relations Policy Committee which helps set bargaining parameters and is regularly briefed on negotiations regarding "grievance procedures and working conditions." SMC 4.04.120(C). All collective bargaining agreements must be approved by the full Council. SMC 4.04.120(D). In the current round of contract negotiations, for the first time, a City Council central staff member will join the City's team at the bargaining table on issues related to accountability. In previous negotiations, OPA and OIG provided technical assistance and input to the bargaining team in their areas of subject matter expertise. Their role has been formalized. In addition, a representative from the CPC will serve as a Technical Advisor in the bargaining negotiations. This change marks the first time a representative from the Community Police Commission will have a role in the bargaining process.

*D. The City's leaders are working to change state laws that constrain police disciplinary reform.*

Due to the constraints of state labor laws, it will be difficult to make fundamental reforms to the police contracts through the collective bargaining process. All aspects of police discipline are "mandatory" bargaining subjects. *See, e.g., Spokane Police Guild*, Dec. 5054, 1995 WL 849648 (Wash. Pub. Emp. Rel. Comm'n). In addition, the City has a legal obligation to use the current contract as the starting place for negotiations over the next contract. *See Snohomish Cnty.*, Dec.

**CITY OF SEATTLE'S QUARTERLY ACCOUNTABILITY UPDATE AND MEMORANDUM IN SUPPORT OF PROPOSED MONITORING PLAN** - 13
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

9834-B, 2008 WL 936569, at *3 (Wash. Pub. Emp. Rel. Comm'n). Finally, the only way changes can be made to the contract is if the union agrees to the changes in bargaining or an interest arbitrator awards the new provision through the arbitration process.[15]

Accordingly, achieving an overhaul of disciplinary procedures in the existing contract likely would require changing state labor law. A notable example is the role of arbitration, which is a mandatory subject of bargaining under state law. Two of the City's elected leaders, Mayor Durkan and Councilmember Herbold recently testified in Olympia and urged statewide changes to the police disciplinary process, including changes to disciplinary arbitrations. Their testimony supported two bills and argued in favor of substantial amendments to one bill, in order to increase accountability.

Senate Bill 5134 eliminates arbitration for police disciplinary appeals in favor of administrative appeals to a civil service commission.[16] The bill also identifies specific types of misconduct that must result in termination and provides that police discipline must be affirmed on appeal unless it is "arbitrary, capricious, or based on an illegal reason."

Senate Bill 5055 establishes a uniform arbitrator selection procedure for police officer disciplinary appeals.[17] It states that the Public Employment Relations Commission shall appoint

---

[15] Under state law, RCW 41.56, if the City and a union representing uniformed employees (such as police officers and firefighters) reach an impasse in bargaining a new contract, then they proceed to "interest arbitration." Under that procedure, the City and the union would present their positions, and a Public Employment Relations Commission "interest arbitrator" could award either side's proposal, or a "compromise" proposal, which would ultimately be included in the contract.

[16] 5134.pdf (wa.gov)

[17] 5055.pdf (wa.gov)

**CITY OF SEATTLE'S QUARTERLY ACCOUNTABILITY UPDATE AND MEMORANDUM IN SUPPORT OF PROPOSED MONITORING PLAN** - 14
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

nine arbitrators who will decide disciplinary appeals for law enforcement on a rotating basis. The arbitrator or panel of arbitrators shall be assigned from the roster alphabetically by last name; the parties (the union and the employer) are not permitted to participate in selection.[18] Mayor Durkan proposed strengthening Senate Bill 5055 by requiring arbitrators to: (1) give "substantial deference" to a Chief's or Sheriff's disciplinary decision, (2) limit new evidence unless it is newly discovered and material; (3) apply a preponderance of the evidence standard, and (4) increase transparency of arbitration.

Each of these bills must pass many hurdles before being enacted into law, and the chances of that happening for any given legislative proposal are small. Although sweeping legislative reform is unlikely, these bills and the coalitions that support them represent important first steps.

*E. Additions to the OPA website and quarterly reporting to the Court will increase transparency into police discipline.*

To increase transparency into police discipline, starting in June 2020, OPA began posting anonymized information about the status of all pending or open disciplinary appeals on its website. The Seattle City Attorney's Office provides this data to OPA. A member of the public now can look up any OPA case from 2016 or later and read the OPA Director's findings, determine what discipline the Chief imposed, learn whether the discipline has been appealed, and see the status and final outcome of each appeal.[19] Beginning later this month, OPA is launching a new online accountability tool to increase transparency and accessibility of case information. An interactive

---

[18] In 2019, the City and SPOG agreed to a similar arbitrator selection process, with a list of sixteen arbitrators in a randomly generated order. Dkt. 598-4.

[19] https://www.seattle.gov/opa/case-data/disciplinary-appeals

**CITY OF SEATTLE'S QUARTERLY ACCOUNTABILITY UPDATE AND MEMORANDUM IN SUPPORT OF PROPOSED MONITORING PLAN** - 15
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

dashboard will aggregate OPA complaint and case information, as well as the demographics of the officers and complainants (such as gender, race, and age).

Under the proposed monitoring plan, the City agreed to submit data to the Court regarding disciplinary investigations and appeals. The City provides quarterly data on these topics below.

When it receives a complaint alleging that one or more officers have committed a serious policy violation, OPA opens a new investigation. The police union contracts require that OPA must complete its investigations within 180 days, with some exceptions. Between October 1, 2020, and December 31, 2020, OPA opened 80 new investigations. As of December 31, 2020, OPA had a total of 250 open investigations.

During the quarter, OPA completed 105 investigations. For each of these investigations, the OPA Director issued a memo containing his conclusions and recommended findings to the Chief of Police. All OPA findings issued since 2016 are available on OPA's website.[20] If the evidence shows that a serious violation of SPD policy occurred, the OPA Director will recommend a "sustained" finding. If the evidence shows that misconduct did not occur, the Director will likely recommend a "not sustained" finding. Out of the 105 completed investigations, OPA recommended sustaining allegations in 28 of these cases (27%) against a total of 30 SPD employees. Five of the cases involved sustained use-of-force findings; one involved a force reporting violation. Also of note, one of the sustained cases was resolved through rapid adjudication, a relatively new dispute resolution process whereby the employee recognizes the conduct was inconsistent with policy and accepts discipline without a full investigation.

---

[20] https://www.seattle.gov/opa/news-and-reports/closed-case-summaries

**CITY OF SEATTLE'S QUARTERLY ACCOUNTABILITY UPDATE AND MEMORANDUM IN SUPPORT OF PROPOSED MONITORING PLAN** - 16
(12-CV-01282-JLR)

Peter S. Holmes
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

If the OPA Director recommends finding that an employee committed misconduct, then the Chief of Police decides whether to impose discipline and what the discipline should be. Examples of discipline include oral reprimand, written reprimand, demotion, reassignment, suspension from work (without pay), and termination. If the Chief decides not to follow one of the OPA Director's recommended findings, then the Chief must issue a public statement explaining the reasons. Throughout 2020, the Chief did not overturn any of OPA's findings. Between October 1 and December 31, 2020, as a result of OPA's investigations, the Chief imposed discipline on 26 officers.[21] During this time, one disciplinary appeal was filed and it is still pending.

## IV. CONCLUSION

Ten years ago, community groups asked DOJ to investigate SPD's use of force which led to this Consent Decree. The record from Phase I and II of the Consent Decree demonstrates that SPD has made significant improvements in contrast to the practices documented by DOJ in 2011. Despite this monumental progress, the response to the protests of last summer has shaken some community members' trust and confidence in SPD.[22] These concerns are not unique to Seattle and are driving a national conversation about how law enforcement officers should respond to protests.

The City's independent police accountability system, like SPD, has been transformed during the course of the Consent Decree. The City's accountability entities are examining what

---

[21] Because the Chief must review and contemplate disciplinary matters before reaching a decision, there is a time lag. Some of the cases in which the Chief imposed discipline in the fourth quarter were closed by OPA during the third quarter.

[22] Both protestors and property owners have filed lawsuits challenging the City's response to the protests. *See*, *e.g.,* *Black Lives Matter King County, et al. v. City of Seattle*, No. 2:20-civ-00887-RAJ (W.D. Wa); *Hunter's Capital, LLC, et al. v. City of Seattle*, No. 2:20-civ-00983-TSZ (W.D. Wa).

**CITY OF SEATTLE'S QUARTERLY ACCOUNTABILITY UPDATE AND MEMORANDUM IN SUPPORT OF PROPOSED MONITORING PLAN** - 17
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

happened during the protests and how to move forward. Their analysis and findings will be independently verified by the Monitor and DOJ and will inform this Court's conclusions about compliance with the Consent Decree. Ultimately, the priorities and values of the community must answer broader questions about how to support peaceful protestors and maintain public safety.

Respectfully submitted,

DATED this 5th day of February, 2021.

      For the CITY OF SEATTLE
      PETER S. HOLMES
      Seattle City Attorney

      *s/ Kerala T. Cowart*
      Kerala T. Cowart, WSBA #53649

      Assistant City Attorney
      Seattle City Attorney's Office
      701 Fifth Avenue, Suite 2050
      Phone: (206) 733-9001
      Fax: (206) 684-8284
      Email: kerala.cowart@seattle.gov

**CITY OF SEATTLE'S QUARTERLY ACCOUNTABILITY UPDATE AND MEMORANDUM IN SUPPORT OF PROPOSED MONITORING PLAN** - 18
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200