THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 2:12-cv-01282-JLR |
| Plaintiff, | ) | |
| | ) | **CITY OF SEATTLE'S UNOPPOSED** |
| v. | ) | **MOTION TO APPROVE REVISIONS TO** |
| | ) | **SEATTLE POLICE DEPARTMENT'S** |
| CITY OF SEATTLE, | ) | **USE OF FORCE POLICY AND CROWD** |
| | ) | **MANAGEMENT POLICY** |
| Defendant. | ) | |
| | ) | **NOTE ON MOTION CALENDAR:** |
| | ) | **February 26, 2021** |
| | ) | |
| | ) | |

**CITY OF SEATTLE'S UNOPPOSED MOTION TO APPROVE
REVISIONS TO SEATTLE POLICE DEPARTMENT'S USE OF
FORCE POLICY AND CROWD MANAGEMENT POLICY** - i
(12-CV-01282-JLR)

Peter S. Holmes
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

## Table of Contents

I.     Introduction ................................................................................................... 1

II.    The proposed policy revisions reflect SPD's internal review, recommendations of the Accountability Partners, input from the community, and a federal court injunction. .............. 3

    *A.     As required by the Consent Decree, SPD revises its core policies annually to ensure they reflect best practices and community priorities.* ........................................................ 3

    *B.     Last year, SPD's policies received an unprecedented level of interest from the public and City leadership.* ......................................................................................................... 4

    *C.     On December 2, 2020, SPD circulated and published an initial draft of the revised policies and sought comment.* ............................................................................................ 6

III.   The proposed revisions mark the beginning—not the end—of a continuing conversation about SPD's policies. .......................................................................... 7

IV.    The City asks the Court to approve SPD's updated policies. ....................................... 9

    *A.     SPD developed an overarching framework and practical guidance for tailoring its response to different types of crowd events.* ................................................................ 9

    *B.     The revisions address criticism that SPD used force "indiscriminately" against non-violent protestors as well as violent actors.* .......................................................... 11

    *C.     SPD has improved its tactics for de-escalating tensions between police and protestors, such as by having a less visible police presence.* ...................................................... 13

    *D.     SPD continues to improve its canine policy, adopted in 2019 as a result of collaboration with the previous Monitor.* ..................................................................................... 15

    *E.     The proposed policies strengthen the existing prohibitions on neck-holds, chokeholds, and using force against a handcuffed person, and make other improvements.* ........................ 16

V.     Conclusion .................................................................................................. 17

CITY OF SEATTLE'S UNOPPOSED MOTION TO APPROVE
REVISIONS TO SEATTLE POLICE DEPARTMENT'S USE OF
FORCE POLICY AND CROWD MANAGEMENT POLICY - ii
(12-CV-01282-JLR)

Peter S. Holmes
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

## I.      Introduction

The City submits proposed revisions to the Seattle Police Department (SPD)'s Crowd Management Policy and Use of Force Policies. Since these policies were last approved by the Court on February 7, 2017 (dkt. 363) and August 16, 2019 (dkt. 580), they have come under intense scrutiny. Last year's protests against police violence, unprecedented in their duration and scope, served as a test of SPD's crowd management policies, tactics, and training. While serious concerns were raised by the community and City leadership over SPD's response, SPD demonstrated its adaptability by developing and implementing new strategies for crowd de-escalation and crowd management. SPD's proposed policies are the result of community feedback, recommendations from the City's police accountability agencies, and SPD's experiences and internal review. The U.S. Department of Justice (DOJ) and the Monitor have approved these policies.

The proposed revisions include significant tactical improvements for crowd management—lessons learned by SPD and the police accountability agencies from the protests last summer. Moving forward with these policy revisions will reenforce SPD's efforts to implement and train officers on the new strategies. However, the public conversation about SPD's policies must continue. In accordance with the Monitor's proposed plan for 2021 (dkt. 655-1) and Chief Diaz's recent letter to the community (dkt. 657-1), SPD is continuing public engagement around its policies and actions. In accordance with community input, in its next policy update, SPD is committed to exploring strategies to further minimize the use blast balls and pepper balls.[1]

---

[1] SPD has already made this a top priority; it last used blast balls at a protest on September 26, 2020, and pepperballs on October 3, 2020.

**CITY OF SEATTLE'S UNOPPOSED MOTION TO APPROVE REVISIONS TO SEATTLE POLICE DEPARTMENT'S USE OF FORCE POLICY AND CROWD MANAGEMENT POLICY** - 1
(12-CV-01282-JLR)

Peter S. Holmes
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

The Office of Inspector General for Public Safety (OIG), Office of Police Accountability (OPA), and Community Police Commission (CPC), (collectively, the "Accountability Partners"), also are working to bring community perspectives into SPD's policies. As one example, OIG is convening a community-led Sentinel Event Review, involving community members and subject matter experts, to critically assess the protest incidents to determine ways to prevent future similar events. SPD will incorporate further changes reflective of additional feedback from the community and the Accountability Partners in its November 2021 policy revisions. Moreover, there will be no "final" policies; SPD reviews and revises all of its policies regularly in the spirit of continuous improvement and to ensure that they continue to reflect community priorities and best practices.

As the Court may be aware, the City Council's Public Safety and Human Services Committee is considering draft legislation regarding SPD's use of less lethal weapons. Pursuant to paragraph 177 of the Consent Decree and the Court's orders, the Committee has committed to seek feedback from DOJ and the Monitor before taking further action. While the timing and outcome are unpredictable, it is possible that the conclusion of this legislative process will have implications for the policies that are now before the Court. Consistent with SPD's obligation under the Consent Decree to revise its policies annually, the City asks the Court to act promptly to approve SPD's proposed policy revisions. They provide crucial guidance to officers and improved strategies for crowd management at a critical time.

**CITY OF SEATTLE'S UNOPPOSED MOTION TO APPROVE REVISIONS TO SEATTLE POLICE DEPARTMENT'S USE OF FORCE POLICY AND CROWD MANAGEMENT POLICY** - 2
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

## II. The proposed policy revisions reflect SPD's internal review, recommendations of the Accountability Partners, input from the community, and a federal court injunction.

A. *As required by the Consent Decree, SPD revises its core policies annually to ensure they reflect best practices and community priorities.*

The Consent Decree required SPD to substantially reform its policies on the use of force and in other key areas. ¶ 177. During 2013 and 2014, SPD worked with the Monitor, DOJ, and the CPC to develop new policies and, after obtaining approval from this Court, implemented them through a comprehensive training initiative. To ensure that the policies continue to reflect best practices and community priorities, the Consent Decree also requires SPD to review and revise its core policies annually. ¶ 180.

SPD's Audit, Policy, and Research section ("APRS") is responsible for this policy review process. In reviewing policies, APRS incorporates suggestions from many sources within SPD. Ideas may be raised by any SPD unit or bureau chief, but they often come directly from the recommendations of SPD's Force Review Board, which meets regularly to review the most serious uses of force by SPD officers. Patrol officers are encouraged to raise policy issues as well. When drafting revisions, APRS also consults with SPD subject-matter experts and the SPD units most impacted by the policy under review.

The City's police accountability entities play an important role in setting SPD's policies. OIG is invited to SPD's weekly policy committee discussions, in addition to making policy recommendations through reports and audits. OPA, which investigates allegations of individual officer misconduct, regularly sends "management action recommendations" to the Chief of Police

CITY OF SEATTLE'S UNOPPOSED MOTION TO APPROVE REVISIONS TO SEATTLE POLICE DEPARTMENT'S USE OF FORCE POLICY AND CROWD MANAGEMENT POLICY - 3 (12-CV-01282-JLR)

Peter S. Holmes
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

when its investigations identify systemic issues that may be effectively addressed through changes to policy or training.[2]

CPC's role as a community advocate is intended to ensure that SPD's policies reflect the priorities of the broader community. Accountability Ordinance (dkt. 396-1), §§ 3.29.300(C), 3.29.300(D)(1). Over the course of the Consent Decree, CPC has provided substantial input to SPD's policies, and CPC continues to provide policy recommendations and gather public input. *See* Dkt. 225 at 3 (Court recognizing CPC's work to engage the community, including SPD officers, in policy development); *see also* Dkt. 107 at 4.

As described below, pursuant to the proposed Monitoring Plan, there will be additional opportunity for the Accountability Partners and the broader community to provide feedback to shape the next set of policy revisions. In addition, the Monitoring Plan contemplates ways of strengthening SPD's partnerships with the Accountability Partners to ensure a robust system of feedback into SPD's policies that outlasts the Consent Decree.

B. *Last year, SPD's policies received an unprecedented level of interest from the public and City leadership.*

After the murder of George Floyd, SPD—like law enforcement agencies in dozens of other cities—used chemical irritants and other less lethal devices to respond to incidents of violence that punctuated largely peaceful protests against police brutality. Many non-violent protestors were affected, and SPD's tactics gave rise to serious concerns on the part of community and the City's leaders.

---

[2] OPA publishes its Management Action Recommendations and SPD's responses at *https://www.seattle.gov/opa/management-action-recommendations*.

**CITY OF SEATTLE'S UNOPPOSED MOTION TO APPROVE REVISIONS TO SEATTLE POLICE DEPARTMENT'S USE OF FORCE POLICY AND CROWD MANAGEMENT POLICY** - 4
(12-CV-01282-JLR)

Peter S. Holmes
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

After observing these events, Mayor Durkan asked OPA, OIG, and CPC to conduct an in-depth review of SPD's crowd management policies and practices. Dkt. 625-3 (Ex. 6). The City Council responded by passing legislation to restrict the use of oleoresin capsicum (OC) spray, ban other crowd control tools, and obtain recommendations from the Accountability Partners on the use of such tools.[3] Ordinance No. 126102. Dkt. 625-1 (Ex. 1). The City Council also enacted Ordinance No. 126096 which bans the use of chokeholds by law enforcement officers.

Addressing the requests of the Mayor and City Council, each of the Accountability Partners issued a report with recommendations about whether or to what extent less lethal devices should be used for the purpose of crowd management. *See* Dkts. 636, 637, 639. Among other findings: OPA made five specific policy proposals and advocated prohibiting the use of chlorobenzylidene malononitrile or "tear" gas in crowd control settings, *see* Dkt. 636; OIG recommended policy changes to reduce the risk of harm to non-violent protestors and to reduce the risk of indiscriminate or inappropriate uses of force, *see* Dkt. 637; and CPC urged SPD to ban the use of all less lethal devices (including tear gas, oleoresin capsicum "OC" spray, blast balls, and the 40mm launcher) during First Amendment protected events, *see* Dkt. 639.

In addition to the recommendations of the Accountability Partners, the orders issued by another court in this district have informed SPD's policy revisions. In *Black Lives Matter—King County, et al. v. City of Seattle*, No. 2:20-civ-00887-RAJ (W.D. Wa), a group of protestors filed a lawsuit against the City challenging SPD's tactics. Judge Richard A. Jones found that plaintiffs

---

[3] As addressed at length in previous filings, this Court enjoined the City from implementing that Ordinance until completion of the process set forth in paragraph 177 of the Consent Decree. Dkts. 630 & 647.

**CITY OF SEATTLE'S UNOPPOSED MOTION TO APPROVE REVISIONS TO SEATTLE POLICE DEPARTMENT'S USE OF FORCE POLICY AND CROWD MANAGEMENT POLICY** - 5
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

established a likelihood of success in proving that SPD has used excessive force and issued an

injunction restricting (but not banning) SPD's ability to use chemical irritants and other tools. *Id.*,

dkts. 34 & 42. With respect to OC spray, pepperballs, blast balls, and sponge-tipped rounds, Judge

Jones ordered as follows:

> [T]hey shall not be deployed indiscriminately into a crowd and to the extent reasonably
> possible, they should be targeted at the specific imminent threat of physical harm to
> themselves or identifiable others or to respond to specific acts of violence or destruction
> of property.

*Id.*, dkt. 42. Subsequently, Judge Jones held the City in contempt, finding violations based on four

SPD uses of force that occurred on September 7, 22, and 23. *Id.*, dkt. 161 at 15, 20-22.

   C.  *On December 2, 2020, SPD circulated and published an initial draft of the revised policies
       and sought comment.*

   APRS developed draft policy revisions incorporating the external feedback and SPD's

internal review, consistent with best practices. SPD posted the draft policies online and shared them

with DOJ, the Monitor, and the Accountability Partners. SPD received public comment online and

gathered additional input by presenting the draft policies to a meeting of its citywide advisory

council. SPD also received suggested edits from and had discussions with DOJ, the Monitor, OPA,

and OIG about the drafts.

   CPC requested public written comment through its website and held a town hall with a panel

of community members on January 26, at which SPD subject matter experts answered questions

about the draft policy revisions. Subsequently, CPC submitted eleven policy recommendations to

SPD. *See* Exhibit A (CPC's Jan. 29, 2021 Policy Recommendations).

   With respect to the Accountability Partners' recommendations, SPD incorporated some,

modified some, earmarked others for future discussion, and explained its reasoning for declining

**CITY OF SEATTLE'S UNOPPOSED MOTION TO APPROVE
REVISIONS TO SEATTLE POLICE DEPARTMENT'S USE OF
FORCE POLICY AND CROWD MANAGEMENT POLICY** - 6
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

to adopt others. *See, e.g.*, Exhibit B (SPD's Responses to CPC's Policy Recommendations). Some of the recommendations, for example, go to fundamental aspects of SPD's policies and would necessitate changes that require extended deliberation and conversation. SPD needs more time to consider these comments. To that end, under the proposed Monitoring Plan, there will be additional opportunities for OPA, OIG, CPC, and the broader community to provide feedback into the next iteration of revisions.

In addition, SPD anticipates discussions about the proposed policies with the affected police unions, SPMA and SPOG, during joint labor-management meetings the week of February 15, 2021.

### III.    The proposed revisions mark the beginning—not the end—of a continuing conversation about SPD's policies.

The events of last summer underscore the necessity of continued public engagement around SPD's policies. The revisions proposed to the Court today reflect the tactical improvements that SPD made as a result of the protests last summer and key Accountability Partners' recommendations. The conversation will not stop here.

SPD is committed to working with OPA, OIG, and CPC to continue to incorporate community perspectives into its policies. OIG's Sentinel Event Review is in progress and will generate community input regarding these policies, which will be available for the second round of policy revisions and Court review. OPA expects to complete its protest-related misconduct investigations this spring, and it is likely that OPA's findings will further inform SPD's policies. CPC plans to continue community engagement on these subjects as well. Finally, SPD has received over 2,000 online public comments on its policies and is in the process of substantive review.

CITY OF SEATTLE'S UNOPPOSED MOTION TO APPROVE
REVISIONS TO SEATTLE POLICE DEPARTMENT'S USE OF
FORCE POLICY AND CROWD MANAGEMENT POLICY - 7
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

To ensure that this work will be reflected in SPD's policies, the proposed Monitoring Plan provides two additional rounds of policy feedback from DOJ, the Monitor, and the Accountability Partners. Dkt. 655-1, rows 28-29 & 31. By November 19, 2021, consistent with the Consent Decree requirement of annual review, SPD will submit its proposed policy revisions to the Court. *Id.*, row 32.

The ways in which SPD uses less lethal devices at crowd events will continue to be a subject of discussion. The Consent Decree required that SPD "consult with the Monitor as to whether and when each uniformed officer should be required to carry at least one Less Lethal Device," ¶ 76, and SPD did adopt the requirement as one of its policy reforms, *see* 8.300(2). However, serious concerns have been raised regarding how SPD used these tools at protests last summer, leading to calls by CPC and others for them to be banned outright. *See*, *e.g.*, Dkt. 639; Exhibit A.

As noted above, the City Council enacted legislation last summer to heavily restrict the use of OC spray and ban other less lethal tools. This Court enjoined the legislation, holding that the City did not follow the Consent Decree policy review process and that the legislation would not increase public safety. Dkt. 630 at 6.

Going forward, the City Council has committed to follow the Consent Decree process as part of any future legislative efforts in this area. On February 9, 2021, the City Council's Public Safety and Human Services Committee approved submitting an amended version of the enjoined legislation to DOJ and the Monitor. The draft bill represents one potential alternative under consideration by councilmembers. The Committee's intention to seek DOJ's and the Monitor's review of the draft legislation is consistent with the process required by paragraph 177 of the

CITY OF SEATTLE'S UNOPPOSED MOTION TO APPROVE
REVISIONS TO SEATTLE POLICE DEPARTMENT'S USE OF
FORCE POLICY AND CROWD MANAGEMENT POLICY - 8
(12-CV-01282-JLR)

Peter S. Holmes
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

1  Consent Decree. *See* Dkt. 630. Once the draft legislation has been provided to DOJ and the

2  Monitor, they will have 45 days to review it, ask questions, and engage in conversations with the

3  City before deciding whether to approve it. ¶¶ 177-78.

4  **IV.    The City asks the Court to approve SPD's updated policies.**

5  The City requests that the Court approve SPD's proposed revisions to its Crowd Management

6  Policy and Use of Force Policies. DOJ and the Monitor have approved the proposed revisions, which

7  are attached in redline format as Exhibits D-K.

8  *A.  SPD developed an overarching framework and practical guidance for tailoring its*
   *response to different types of crowd events.*

9
10  As overarching guidance for the revised Crowd Management Policy, SPD added a more

    robust statement of purpose at the beginning that embraces Seattle's approach to facilitating public
11

12  assembly over and beyond First Amendment protections. It states, in part:

13  > The rights to free speech and peaceable assembly are guaranteed by the First
   > Amendment to the United States Constitution and Article 1, § 4 and 5 of the

14  > Washington State Constitution.  The Seattle Police Department takes seriously its
   > responsibility and commitment to support and facilitate the exercise of these rights

15  > in fair and equitable manner, without consideration as to content or political
   > affiliation, with as minimal a footprint as is reasonably necessary to preserve public

16  > safety and order.  . . .

17  > . . . This policy is intended to provide clear guidance to officers, supervisors, and
   > commanders in employing appropriate crowd management, intervention, and

18  > control strategies in a manner so as to facilitate, to the extent safe and feasible, the
   > right to free expression and peaceable assembly. This policy is also intended to

19  > provide guidance by which officers and supervisors may objectively determine at
   > what juncture a demonstration or assembly leaves the realm of legal protest and

20  > becomes an abridgement on the life-safety and property rights of others.

21

22

23  **CITY OF SEATTLE'S UNOPPOSED MOTION TO APPROVE**
   **REVISIONS TO SEATTLE POLICE DEPARTMENT'S USE OF**
   **FORCE POLICY AND CROWD MANAGEMENT POLICY** - 9
   (12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

Seattle police Manual (SPM) 14.090. This passage acknowledges the value that the local community places on free expression and sets expectations for how the Crowd Management Policy shall be implemented.

One of OIG's central recommendations was that SPD update its policy to more clearly distinguish when each level and type of force is authorized in a crowd management setting.[4] To accomplish this goal, SPD drew on OIG's advice and an example from the Los Angeles Police Department to create a matrix that maps out considerations for decision-making regarding how and when SPD should intervene in a crowd setting. *See* 14.090. The matrix separates situations based on observable crowd activities and dynamics into different tiers with corresponding intervention strategies, providing a practical, easy-to-understand way to better align SPD's response to the specific actions of the people who are assembled. In this way, the matrix responds to the Accountability Partners' feedback that there must be clearer guidance regarding when to issue an order to disperse a crowd.[5]

Under the revised policies, when an incident commander issues an order to disperse and if officers must enforce it by using force, the commander now must document, in a use of force statement, each of the considerations as set forth in this matrix. *See* 8.500-POL-6(2). This new requirement incorporates feedback from the CPC.[6] As the matrix makes clear, SPD's overall response and any uses of force must be modulated in proportion to the nature of the event and the

---

[4] *See* Dkt. 637-1 at 14-15 (OIG's Aug. 15, 2020 Report).

[5] *See* Dkt. 639-1 at 8 (CPC's August 15, 2020 Report); Dkt. 637-1 at 16 (OIG's Aug. 15, 2020 Report).

[6] *See* Dkt. 639-1 at 6 (CPC's August 15, 2020 Report).

**CITY OF SEATTLE'S UNOPPOSED MOTION TO APPROVE REVISIONS TO SEATTLE POLICE DEPARTMENT'S USE OF FORCE POLICY AND CROWD MANAGEMENT POLICY** - 10
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

specific crowd dynamics as they unfold, across a spectrum of crowd management events, including:

- Small gatherings that require no police support;
- Permitted marches (celebratory and protest) requiring traffic coordination;
- Large-scale, unpermitted demonstrations requiring ad hoc traffic control; or
- Large-scale events where activities outside of First Amendment protections, including significant traffic disruption, property destruction, and/or threats of violence require a greater police presence.

The matrix and revised crowd management policy provide practical guidance by which officers and supervisors may objectively determine at what point it is necessary to intervene to protect life-safety and property rights of others.

Another OIG recommendation is that SPD should center and incorporate community feedback more directly into the force review process for large or lengthy crowd management events. Instead of going before the Force Review Board (made up of SPD supervisor and subject matter experts), in the future such events will be examined through an OIG-facilitated, community led Sentinel Event Review. *See* 8.500-POL-6. Through this process, a panel of community members and subject matter experts will review critical incidents that occurred during the protests from start to finish. SPD officers will be invited to participate in, but not lead, the process. The panels will focus on the perspectives and concerns of the community, identify root causes of negative outcomes, and discuss ways to improve systems to prevent future negative outcomes.

B.   *The revisions address criticism that SPD used force "indiscriminately" against non-violent protestors as well as violent actors.*

The strongest criticism of SPD's response to the protests was that people perceived the force to be indiscriminate. *See, e.g.,* Dkt. 637-1 at 30 (OIG's Aug. 15, 2020 Report); Judge Jones'

CITY OF SEATTLE'S UNOPPOSED MOTION TO APPROVE
REVISIONS TO SEATTLE POLICE DEPARTMENT'S USE OF
FORCE POLICY AND CROWD MANAGEMENT POLICY - 11
(12-CV-01282-JLR)

Peter S. Holmes
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

1    Order (Dkt. 34 at 7). An important, related complaint was that the police did not effectively address

2    specific criminal acts. As a result, non-violent protestors were affected by tear gas, OC spray, and

3    blast balls, while those who committed violent acts were not arrested.

4          To address these concerns and incorporate feedback from OPA,[7] SPD improved its tactics

5    throughout last summer in order to better isolate and arrest law breakers within an otherwise non-

6    violent crowd. SPD's new crowd management matrix incorporates these adaptations into policy.

7    *See* 14.090. When safe and feasible, such crowd intervention strategies are effective, because they

8    contain the unlawful behavior. To help clarify, the new matrix states that "isolated unlawful

9    activity by individuals or small groups within a crowd should not automatically form the basis for

10   declaring an assembly unlawful." *Id.*

11         As SPD has adapted its tactics, the interactions between police officers and protestors

12   appear to be improving. While demonstrations continue to take place almost nightly, the vast

13   majority in recent months have resolved with no arrests or uses of force. SPD has not used blast

14   balls at a protest since September 26, 2020, and it has not used pepperballs since October 3, 2020.

15         SPD also revised the policy regarding OC spray, by explicitly stating that officers must

16   direct OC spray towards the specific threat when other people are present, responding to

17   widespread concerns from the community, the Accountability Partners, and the rulings of Judge

18   Jones. *See* 8.300-POL-4(5) (adding new subsection with this language). Similarly, the policy on

19   blast balls has been strengthened and clarified, by adding language from Judge Jones' order in a

20   bolded subheading. *See* 8.300-POL-9(3).

---

22         [7] *See* Dkt. 636-1 at 12 (OPA's August 15, 2020 Report).

23   **CITY OF SEATTLE'S UNOPPOSED MOTION TO APPROVE
     REVISIONS TO SEATTLE POLICE DEPARTMENT'S USE OF
     FORCE POLICY AND CROWD MANAGEMENT POLICY** - 12
     (12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

Accompanying these changes is an emphasis on more targeted tools. SPD has taken tools previously used by SWAT and in specific, limited patrol situations and authorized exceptions for them to be used by trained patrol officers in a crowd setting. *See* 8.300-POL-10(13) & 8.300-POL-11. A "pressurized launcher" is a gun that shoots "less lethal" ammunition, such as pepperballs (filled with OC powder), paintballs (filled with yellow paint), or sponge-tipped rounds (called "bluenose" rounds). Pepperballs provide an intermediate, less-lethal alternative to blast balls that allows officers to more accurately target individuals within a crowd. The goal is to minimize incidental effects of chemical irritants on non-violent protestors who may be standing or marching close to someone committing a violent act. The bluenose is also an accurate tool that can be used to address violent or illegal actions in a targeted manner within an otherwise peaceful crowd. Current policy authorizes only SWAT to use the bluenose in a crowd setting. Under the policy revisions, a bluenose round may be used in a crowd setting by trained patrol officers, but only with approval by the Chief.

C. *SPD has improved its tactics for de-escalating tensions between police and protestors, such as by having a less visible police presence.*

SPD's revised policies emphasize de-escalation and acknowledge the potential for escalation through the presence and appearance of officers. *See* 14.090. Strategies for de-escalation identified in the new crowd management matrix include meeting with event organizers, reducing the visibility of the police presence, determining the appropriate uniform for the event, using social media to communicate expectations and provide information to protestors in real time, and attempting to work with organizers and monitors to gain voluntary compliance. *Id.* Many of these

**CITY OF SEATTLE'S UNOPPOSED MOTION TO APPROVE REVISIONS TO SEATTLE POLICE DEPARTMENT'S USE OF FORCE POLICY AND CROWD MANAGEMENT POLICY** - 13
(12-CV-01282-JLR)

Peter S. Holmes
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

strategies were recommended by OPA, OIG, and CPC.[8] To implement these strategies, the proposed policies require incident commanders to complete additional pre-event planning, including documenting their consideration of the strategies and crowd dynamics identified in the matrix—one of OPA's key policy recommendations. *See* Dkt. 636-1 at 10-11; 14.090-POL-5. As requested by CPC, SPD also clarified its de-escalation policy to make it explicit that officers are prohibited from using taunts or insults under any circumstances. *See* Exhibit A; 8.100.

In response to recommendations by OIG and OPA,[9] the proposed policies set out several new requirements for issuing an order to disperse. *See* 14.090-TSK-3. If a crowd must be dispersed for public safety reasons, officers must use sound amplification so that orders can be heard even by those at the back of the crowd.  The dispersal order also must give protestors clear instructions about how and where to depart, acknowledging it can be difficult for someone in the middle of a large crowd to find a clear pathway to exit. Less lethal devices cannot be used until a reasonable amount of time is given for people to comply with the dispersal order. In addition, SPD moved the requirement to issue a warning before using any less lethal tools into its own section, in order to reinforce the importance of these warnings, responding to feedback from OIG.[10] *See* 8.300.

---

[8] *See* Dkt. 636-1 at 11-12 (OPA's Aug. 15, 2020 Report); Exhibit A (CPC's Jan. 29, 2021 Recommendations); Dkt. 637-1 at 16-17 & 27 (OIG's Aug. 15, 2020 Report).

[9] *See* Dkt. 637-1 at 16 (OIG's Aug. 15, 2020 Report); Dkt. 636-1 at 12 (OPA's Aug. 15, 2020 Report).

[10] *See* Dkt. 637-1 at 17 (OIG's Aug. 15, 2020 Report).

**CITY OF SEATTLE'S UNOPPOSED MOTION TO APPROVE REVISIONS TO SEATTLE POLICE DEPARTMENT'S USE OF FORCE POLICY AND CROWD MANAGEMENT POLICY** - 14
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

Finally, the revisions provide enhanced guidance around interactions with legal observers and media, specific rulings of Judge Jones.[11]

D. *SPD continues to improve its canine policy, adopted in 2019 as a result of collaboration with the previous Monitor.*

In 2019, SPD adopted a new canine policy, 8.300-POL-1, to address issues raised internally by its command staff, as well as the Monitor and DOJ. SPD worked in close collaboration with the Monitor to develop the policy, and the Court approved it on August 16, 2019. Dkt. 580. Today's revisions continue to refine the policy, informed by SPD's experiences in the field and a performance audit conducted by OIG on the canine unit as a whole.[12]

The proposed policy requires that the Force Investigation Team conduct an evaluation of any accidental bite. It adds new definitions to distinguish among different types of tracking: "on-lead track," "off-lead track," and "evidentiary confirmation track."

The requirement that a canine may be used only for specific, suspected crimes is sharpened by adding language to clarify that "probable cause or a valid arrest warrant" must exist. The draft policies also clarify and strengthen the warning that an officer must issue before deploying a canine.

---

[11] *Black Lives Matter—King County v. City of Seattle*, No. 2:20-cv-00887-RAJ, Dkt. 110 at 3-4 (Aug. 10, 2020).

[12] OIG's audit is available here:
https://www.seattle.gov/Documents/Departments/OIG/Audits/CanineAudit06242020.pdf

**CITY OF SEATTLE'S UNOPPOSED MOTION TO APPROVE REVISIONS TO SEATTLE POLICE DEPARTMENT'S USE OF FORCE POLICY AND CROWD MANAGEMENT POLICY** - 15
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

*E. The proposed policies strengthen the existing prohibitions on neck-holds, chokeholds, and using force against a handcuffed person, and make other improvements.*

Section 8.200(2) identifies circumstances under which the use of force is prohibited. The policy most recently approved by this Court (dkt. 580)—which prohibited neck and carotid restraints except in deadly force situations—was amended by directive last June to prohibit such restraints in all circumstances. That absolute prohibition has been expanded and strengthened to add that the prohibition extends to "any action that involves kneeling on a subject's neck." Newly added language expressly states that "[o]fficers are further prohibited from intentionally placing a knee on a prone subject's neck while taking them into custody." While these revisions do not include the broader prohibition requested by CPC, see Exhibit A, they respond to City Council legislation and community concerns.

In addition, the existing language that addresses using force on restrained subjects, is reformulated as a prohibition, with limited exceptions, and it has been moved up from 8.200(6) to 8.200(2). The corresponding language in 8.300(8), regarding the use of less lethal weapons on a restrained person, has been strengthened. These revisions emphasize and stress the importance of this principle.

The proposed revisions also contain numerous, important revisions that do not fit in the above categories. Illustrative examples include:

- Responded to a CPC recommendation, *see* Exhibit A, by adding language to the introduction to Title 8 to emphasize the sanctity and paramount importance of human life. *See* 8.000.

- Repeat the requirement that officers must issue a warning before using deadly force to prevent escape of a fleeing subject in two separate places within policy. 8.200(4) (existing statement); 8.200(5) (proposed addition).

**CITY OF SEATTLE'S UNOPPOSED MOTION TO APPROVE REVISIONS TO SEATTLE POLICE DEPARTMENT'S USE OF FORCE POLICY AND CROWD MANAGEMENT POLICY** - 16
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

- Expand the situations in which officers must summon medical aid, including: any canine bite, a person states they cannot breathe or is having difficulty breathing, and if OC spray is used and the person remains on-scene. *See* 8.200(7) & 8.200(8).

- Change the wording throughout 8.300 and 14.090 to refer to "tools and weapons" or "weapons" instead of "tools." CPC requested this change, and it makes the policy more readable. *See* Exhibit A.

- Prohibit using stop sticks on vehicles under any circumstances and add stationary tire deflation devices as an alternative (however, use of such devices is prohibited on moving vehicles) in order to reduce the risk of harm *See* 8.300-POL-5(1).

- Upon OIG's and OPA's recommendation, SPD will no longer delay administrative interviews by FIT where criminal conduct by an officer is suspected. *See* 8.400-TSK-17(7). The reason that current policy required such delays was to avoid contamination of a potential criminal prosecution. However, delaying the interview is not legally necessary, and prompt interviews are important to gather accurate information while memories are fresh.[13]

A more extensive description of the proposed revisions to SPD's Crowd Management and Use of Force policies is contained in SPD's presentation to its citywide advisory council and attached here as Exhibit C.

## V.    Conclusion

SPD's proposed revisions to its Crowd Management Policy and Use of Force Policies contain significant improvements. They respond to community criticism, incorporate recommendations of the Accountability Partners, and adopt better tactics for crowd management. The revisions include a strong statement of the value of public demonstrations and assemblies, provide practical guidance for

---

[13] The Fifth Amendment right against self-incrimination does not prevent an officer from being interviewed in an administrative investigation—rather, it prohibits the use of information or statements compelled in an administrative interview from later being used against the officer in a criminal prosecution. *See United States v. Koon*, 34 F.3d 1416, 1431 (9th Cir. 1994), *aff'd in part, rev'd in part, on other grounds*, 518 U.S. 81 (1996) (affirming criminal convictions of police officers because prosecutor did not use at trial their compelled statements from internal affairs investigation) (applying *Garrity v. State of N.J.*, 385 U.S. 493, 500 (1967)).

**CITY OF SEATTLE'S UNOPPOSED MOTION TO APPROVE REVISIONS TO SEATTLE POLICE DEPARTMENT'S USE OF FORCE POLICY AND CROWD MANAGEMENT POLICY** - 17
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

commanders making crowd management decisions, and implement numerous strategies intended to reduce harm to non-violent protestors. For the reasons stated above, the City respectfully requests that the Court approve the proposed revisions to SPD's policies.

Respectfully submitted,

DATED this 11th day of February, 2021.

    For the CITY OF SEATTLE

    PETER S. HOLMES
    Seattle City Attorney

    *s/ Kerala T. Cowart*
    Kerala T. Cowart, WSBA #53649
    Assistant City Attorney

    Seattle City Attorney's Office
    701 Fifth Avenue, Suite 2050
    Phone: (206) 733-9001
    Fax: (206) 684-8284
    Email: kerala.cowart@seattle.gov

**CITY OF SEATTLE'S UNOPPOSED MOTION TO APPROVE REVISIONS TO SEATTLE POLICE DEPARTMENT'S USE OF FORCE POLICY AND CROWD MANAGEMENT POLICY** - 18
(12-CV-01282-JLR)