# EXHIBIT A



**CPC Recommendations on SPD's proposed Use of Force and Crowd Management policies**
January 29, 2021

| CPC Recommendation | SPD Policy | Community Feedback |
|---|---|---|
| **1.** Protect the sanctity of human life as the primary guideline of how and when force is applied. | 8.000 Principles<br>8.050 Definitions<br>8.200 Using Force | • Community has made numerous calls for an objective and transparent review of SPD policies.<br>• During the Town Hall, community concern with the disregard for individuals' lives, bodies, and wellbeing, particularly when compared to property, was loud and clear. |
| **2.** Partner with community to redefine the "objectively reasonable" standard of force and "proportional" standard of force toward a policy that limits force to the least amount necessary. | 8.000 Principles<br>8.050 Definitions<br>8.200 Using Force | • The term "objectively reasonable" still permits officers to use force whenever they deem necessary, as long as they can justify their actions based on facts and circumstances an officer faces. There needs to be more accountability regarding the explanatory process of such actions.<br>• Whatever the use of force is, it must be proportional to the threat/subject of the circumstances. De-escalation tactics must be used when it is safe to do so, in order to reduce the need for force. |
| **3.** Collaborate with community to determine non-violent approaches and strategies in response to 1st Amendment activities and share with community the strategies that will be put implemented. | 8.050 Definitions<br>8.200 Using Force<br>8.300 Tools<br>14.090 Crowd Management | • Community members have been hurt and traumatized by the use of potentially lethal weapons on their bodies, on their peers, and in their neighborhoods.<br>• While there may be a need for these weapons in patrol operations, there is no justification for their use in protests, rallies, marches, or demonstrations. |
| **4.** Create clear, strong, and high standards for when police can declare unlawful assemblies and riots. Additionally, if SPD issues an order to disperse or declares a riot, require the authorizing officers to thoroughly document and an agency outside of SPD to review all actions taken and their | 14.090 Crowd Management | • SPD must not continue to disperse protest if they view an "imminent threat". The excuse of "threat" has been used to justify police brutality for far too long and that needs to end now.<br>• Community members have referred to the standard of four or more persons engaging in |

1

| | | |
|---|---|---|
| outcomes. Make all documentation publicly available within 24 hours of the incident, effective immediately. | | criminal activity as the bar to declare an assembly a riot too low. |
| **5.** Prohibit the use of all head and neck controls. | 8.050 Definitions<br>8.200 Using Force | • Use of force tactics should be described in concrete terms. All actions such as head controls, kneeling on a person's neck and carotid restraints should be prohibited.<br>• Prohibiting specific holds, like carotid restraints, but quietly continuing to allow other forms of head and neck controls is misleading and violates community trust. |
| **6.** Prohibit the use of canines as a use of force option. That is, for any use on humans, whether that is for pain or compliance. This does not include use of canines for tracking, search and rescue, and explosives or drug detection. | 8.050 Definitions<br>8.200 Using Force<br>8.300 Tools | • Community members have referred to the use of canines as force options as "unconscionable" and "brutal."<br>• They suggested that officers commanding a canine to bite should be removed as a use of force option. |
| **7.** Develop additional reporting requirements and other processes to address potential trauma community members may face after having a firearm pointed at them or others in proximity. | 8.050 Definitions<br>8.400 Reporting and Investigating | • A community member recalled, as a child, the trauma of seeing SPD officers point a gun at the heads of their family members.<br>• Others have pointed that pointing a weapon can only escalate a situation. |
| **8.** Create additional clear and high standards for using and reporting on uses of force on people who are: restrained, young, elderly, pregnant, "frail," and those with disabilities. | 8.200 Using Force | • Community members believe force should not be used on restrained people.<br>• Community members want the policy updated to remove the option to use force on anyone already restrained, children, the elderly, pregnant people, "frail" people, or people with disabilities. |
| **9.** Extend similar protections to protest medics as the proposed policy changes extend to journalists and legal observers. | 14.090 Crowd Management | • Community members has expressed concern about the potential targeting of protest medics at demonstrations<br>• Community has expressed gratitude for the role of protests medics, such as the ones that helped save the life of a community member in Seattle who was struck in the chest with a blast ball and nearly died. |

Seattle
**Community**
Police Commission

| | | |
|---|---|---|
| **10.** Remove taser sparks, advisements, and warnings from de-escalation tactics. Change "avoid taunting and insults" to strictly prohibit them. Add validating the experience of the people you are addressing and meeting them where they are. | 8.000 Principles<br>8.100 De-escalation | • Community members are shocked at what SPD considers de-escalation tactics. Many who have served in customer service, nursing, medical, and teaching roles shared their personal experience successfully de-escalating individuals who are behaving violently and not following instructions. They de-escalated without weapons and often without any physical contact.<br>• Community members agreed that anyone would respond to a taser spark or show of force as an escalating threat.<br>• The call for real non-violent de-escalation is clear. |
| **11.** Do not use weapons that have not been codified into policy and do not introduce new weapons in policy without them being vetted by community. | 8.000 Principles<br>8.050 Definitions<br>8.200 Using Force<br>8.300 Tools<br><br>*Part of this recommendation – not using policies that are not in the manual – is beyond policy edits.* | • Community members strongly condemned SPD's quiet introduction of the pepper ball launcher and use of weapons that are not in policy.<br>• The people of Seattle deserve to be policed as they see fit. |
| **12.** Do not charge SPD officers with investigating the actions of their fellow officers. | 8.400 Reporting and Investigation | • The police are policing themselves, which is not sufficient to maintain a true accountability system. |
| **13.** Humanize language throughout the SPD policy manual to prompt culture change. Replace "subject" with "person," "tools" with "weapons," and "less-lethal tools" with "potentially lethal weapons." Remove all references to "us versus them." We encourage SPD to adopt this language beyond the policies being reviewed. | The word "subject" appears 253 times in policies 8.000 through 8.500 and 14.090.<br>The world "tool(s)" appears 49 times in policies 8.000 through 8.500 and 14.090.<br>The words "less-lethal" or "less lethal" appear 38 times in 8.050, 8.200, 8.300, 8.500, 14.090. | • Community members asked officers to see them as fellow humans, made of flesh, who can be hurt and traumatized – not as abstract "subjects."<br>• Weapons designed to hurt or incapacitate human beings are not akin to tools of a trade.<br>• SPD officers have used "less-lethal tools" in near lethal or lethal ways. Community specifically requested that they be called what they are – potentially lethal weapons. |

| | | |
|---|---|---|
| | "Officer versus subject factors" and "number of officers versus subjects" appear in policy 8.050. | • During the Town Hall, participants discussed the fear officers feel of their own community members, particularly people of color. |
| **14.** Publicize, annually, a schedule of all SPD policies that will be reviewed, when they will be under review during that year, and deadlines for feedback. | *This recommendation is outside of specific policy edits.* | • Community members are frustrated they are not regularly included in SPD policy reviews.<br>• There has not been sufficient time for these proposals to be read or reviewed by anyone in the community. |
| **15.** Disclose to the community, within 60 days of this letter, how SPD has incorporated community feedback and the recommendations issued here. | *This recommendation is outside of specific policy edits.* | • Community members are tired of being called to give feedback only to have their recommendations ignored. Engaging in these conversations takes exhausting emotional labor, not to mention time and resources. Ignoring their input is counter to centering their voices and does not build trust.<br>• This is consistent with SPD's stated commitment to re-envisioning public safety *together.* Community members were given very little time and yet showed up to read, analyze, discuss, and give feedback on hundreds of pages of policies. To believe in SPD's good faith and build trust, they need to know that SPD will not waste their time and ignore their work. |

# EXHIBIT B



**Seattle**
Police Department

February 3rd, 2021

Dear Director Grant,

I am writing with regard to your letter of January 29th providing the Community Police Commission's feedback on the Seattle Police Department's revisions to the Crowd Management and Use of Force policies. I will address each of your recommendations separately below but want to note three specific points in response to your letter itself.

First, there is no question that this year has been unprecedented in terms of the level of civil unrest that we have seen not just locally, but nationally.  And while many events have proceeded without incident, we have also seen peaceful demonstrations infiltrated by individuals who clearly have no interest in a lawful exercise of First Amendment rights, but rather utilize the crowd as cover for what are often highly coordinated directed acts of destruction and violence.  As I hope our policies reflect, we have made significant changes in the field over the summer to adapt to this new era of crowd management, including, most specifically, introducing tactics that allow for better isolation of individual actors such that we are able to allow assemblies to continue notwithstanding reasonable time, place, and manner restrictions that might otherwise be required.

I also want to acknowledge concerns around the process by which these were brought before you and explain the process from our perspective.   Under the Accountability Ordinance, SMC 3.29.300, engaging Community around SPD policies and practices is among the CPC's paramount duties.  To this end, prior iterations of the CPC had a robust policy subcommittee, which met regularly, and to which meetings SPD was invited.  In advance of those meetings, the subcommittee would identify particular SPD policies they wished to review and provide community input with respect to those policies.  This committee worked proactively; recognizing the timeline for SPD policy review, they did not wait for SPD to put a policy before them, but rather, as the policy manual itself is online and available for review at any point, made it a priority to act on their own schedule.  If that policy subcommittee is still meeting, SPD would welcome an invitation. I regret that there seemed to be misunderstanding as to the extent to which CPC was able to engage Community around these policies given the timeline as set by the Monitoring Plan, or the expectation that SPD would drive this process.

You rightly note in your letter that SPD should not view these as CPC's final input, but rather as an important step in CPC's on-going work.  We could not agree more.  As we have consistently emphasized, policy development is, and should always be, an on-going, iterative process that is informed by experience and can agilely adapt to changing circumstances and expectations.  The Office of the Inspector General, as you know, has convened a Sentinel Event Review panel to conduct a thorough, multi-faceted review of the events this summer, and the Office of Police Accountability continues to review individual acts over the course of the summer.  Recommendations from both will continue to inform our learning process and without question factor into discussions around the next round of policy revisions.  Just as SPD would welcome an invitation to any policy subcommittee meetings the CPC may convene, SPD appreciates the CPC's participation in these broader discussions with OPA and OIG as well.

Finally, I want to circle back to your question of December 2020, as to what SPD would be doing to ensure the community voice is heard.  While again SPD is respectful of CPC's codified role in this respect, I also want

to assure you of the work SPD is doing to make sure that Community is heard, not only with respect to these policies but as to the events of this past summer more broadly. I, personally, am out in the community nearly every day, popping into businesses, walking neighborhoods, meeting with organizations small and large. Our Collaborative Policing Bureau, likewise, is continuing its work within the community, both in person where we can, and as we've adapted to the virtual platform. We have heard loudly anger and frustration from all corners – from individuals impacted by SPD actions this summer, from business owners decimated by vandalization and destruction, from communities asking for an end from what they see as widespread decline in public order; as the public comments you provide with your submission likewise reflect, community input on how SPD should manage public assemblies is far from consistent. While I cannot promise that SPD policy will ever achieve the perfect balance between often conflicting interests, I can promise you that we will continue to listen, continue to engage, and in the spirit of iterative review and reform I described above, continue to work to continually improve.

Turning to your specific recommendations, I note that your last recommendation (No. 15) asks for a response within 60 days of your January 29th letter as to how SPD has incorporated community feedback and the recommendations issued. As you know, this current round of policy revisions is due to be filed with the Court on February 11th; where certain of your recommendations are accepted now, those will be noted here and reflected in the policies that will be filed. Where further discussion is needed, I highlight that here, but affirmatively commit that CPC will be a valued voice at the table as those discussions take place.

> **Recommendation 1:** Protect the sanctity of human life as the primary guideline of how and when force is applied.
>
> **SPD Response:** Both SPD policy and training emphasize the sanctity of human life as of paramount importance. Responsive to your recommendation, we have added in more robust language reflecting this point and the Department's values in the introduction to Manual Section 8.000.
>
> **Recommendation 2:** Partner with community to redefine the "objectively reasonable" standard of force and "proportional" standard of force toward a policy that limits force to the least amount of force necessary.
>
> **SPD Response:** The definitions of the term "objectively reasonable" and the terms "necessary" and "proportional" are derived from case law as it has evolved around Fourth Amendment principles. While good policy should track the legal standards, SPD welcomes further suggestions from CPC as to how the definitions might be further refined.
>
> **Recommendation 3:** Collaborate with community to determine non-violent approaches and strategies in response to First Amendment activities and share with community the strategies that will be implemented.
>
> **SPD Response:** SPD understands that much of the work coming out of the OIG's Sentinel Event Review will focus in this direction. SPD has consistently welcomed dialogue around alternatives to current training and equipment and looks forward to these continued discussions. At the same time, SPD must also be mindful of both the very real public safety threats that have emerged and will foreseeably continue to emerge when individuals intent on causing harm immerse themselves in otherwise peaceful assemblies, as well as lessons

from recent and historical events that inform crowd control practices.  SPD welcomes any specific suggestions from the CPC as to how SPD might improve its crowd management practices while balancing the rights of all.

**Recommendation 4:**     Create clear, strong, and high standards for when police can declare unlawful assemblies and riots.  Additionally, if SPD issues an order to disperse or declares a riot, require the authorizing officers to thoroughly document and an agency outside of SPD to review all actions taken and their outcomes.  Make all documentation publicly within 24 hours of the incident, effective immediately.

**SPD Response:**  Standards that govern when police can declare an unlawful assembly are set by state and local law; documentation requirements are established in the revisions to 14.090 (Pol 8).  SPD policy, training, and practice, however, is to facilitate public assemblies well beyond these legal standards.  SPD remains a willing partner in any further conversations on these points.  Practical considerations around external agency review and the 24-hour timeline post-incident for public distribution of review documents likely preclude the viability of these requests, but if CPC has thoughts on how this might be implemented, or if CPC has specific suggestions around standards for declaring an unlawful assembly, SPD welcomes discussion.

**Recommendation 5:**     Prohibit the use of all head and neck controls.

**SPD Response:**  Previously, SPD policy prohibited the use of neck and carotid restraints except in deadly force scenarios.  Present policy revisions now prohibit these tactics outright, including any tactic that would involve placing a knee on a subject's neck.  Recently, SPD provided a training demonstration to some members of the CPC to explain control tactics, including tactics that involve de minimis head control.  Feedback from those CPC members reflected that such demonstration was helpful in understanding what is meant by these terms.  SPD suggests further discussion around this point.

**Recommendation 6:**     Prohibit the use of canines as a use of force option.  That is, for any use on humans, whether that is for pain or compliance.  This does not include the use of canines for tracking, search and rescue, and explosives or drug detection.

**SPD Response:**  The current revisions to policy more narrowly circumscribe the circumstances in which a canine can be deployed or used for apprehension.  I also understand the concerns around the use of canines that are being debated both at the state and national level.  I also believe, however, that canines provide a valuable alternative to a higher use of force in some circumstances.  We are closely tracking the state legislation in this area.

**Recommendation 7:**     Develop additional reporting requirements and other processes to address potential trauma community members may face after having a firearm pointed at them or others in proximity.

**SPD Response:**  SPD was one of the first agencies to require reporting around the pointing of a firearm as a use of force and worked with the DOJ and the Monitoring Team to develop

the reporting standards.  If CPC has specific reporting suggestions it would like to propose, we welcome discussion.

**Recommendation 8:**     Create additional clear and high standards for using and reporting on uses of force on people who are: restrained, young, elderly, pregnant, "frail," and those with disabilities.

**SPD Response:**  Consideration of these facts is implicit in the factors to be considered in assessing the reasonableness of force used (8.050) and is addressed elsewhere in policy.  If CPC has specific suggestions it would like to propose, we welcome discussion.

**Recommendation 9:**     Extend similar protections to protest medics as the proposed policy changes extend to journalists and legal observers.

**SPD Response:**  The protections granted to members of the media and legal observers is rooted in law.  These protections afford them the right to remain in an area following an order to disperse for purpose of monitoring and reporting on police activity.  While SPD respects the services of those who provide medical aid to others in a crowd, SPD chose not to include "protest medics" in policy for three primary reasons:  (1) to SPD's knowledge, there is no uniform way to determine whether an individual is validly there in a medical capacity (unlike media/legal observers who carry specific identification); (2) practically, because SPD will not interfere with any individual, medic or not, attempting to provide first aid to another so long as the medic does not disrupt lawful police activity (as has been seen, e.g., on one occasion this summer with a medic seeking to "de-arrest" an individual being placed in custody), there is no distinction between a "protest medic" and any good Samaritan in the crowd; and (3) if an individual is injured to the point where they are unable to follow lawful commands, it is incumbent upon SPD to summon SFD for medical aid.  That said, we are open to engaging in further discussion around this recommendation.

**Recommendation 10:**   Remove taser sparks, advisement, and warnings from de-escalation tactics.  Change "avoid taunting and insults" to strictly prohibit them.  Add validating the experience of the people you are addressing and meeting them where they are.

**SPD Response:**

- **Taser sparks:**  We acknowledge that there seems to be a great deal of misunderstanding about how we use Taser sparks as a form of de-escalation.  <u>Policy does not allow Tasers to be sparked as a threat.</u>  Where other de-escalation tactics  have proven ineffective, and where an officer is at the point of deploying a Taser, policy allows for Taser sparks as a penultimate advisement, accompanied by verbal explanation, to urge an individual to comply ("I don't want to have to tase you; this is what it sounds like.").  We have observed through the force review process instances where  such an advisement has been effective in resolving incidents without any use of force.  These instances are carefully reviewed, along with an officer's tone of voice and behavior.  We believe that outright prohibiting this an option along the force continuum would only eliminate an option that, if performed as trained, may lead to a better outcome for all.

- **Taunting and Insults:**  We agree with this recommendation, and have changed the verbiage in policy (8.100) accordingly ("Taunts and insults are prohibited.").

- **Validating Experience:**  This recommendation reaches the core of Manual Section 5.001 ("The Department expects all employees to treat all people with dignity; remember that community care-taking is at times the focus, not always command and control; and that the guiding principle is to treat everyone with respect and courtesy, guarding against employing an officious or overbearing attitude and refraining from language, demeanor, and actions that may cause the individual feeling belittled, ridiculed, or intimidated."). These principles are also addressed in Manual Section 16.110, Crisis Intervention.

**Recommendation 11:**   Do not use weapons that have not been codified into policy and do not introduce new weapons in policy without them being vetted by the community.

**SPD Response:**  While the Charter of the City of Seattle places responsibility on the Chief of Police to determine rules and regulations for the Department, SPD is always willing to engage in productive discussion with the CPC and Community around the tools and weapons that it maintains.  With respect to the pepperball launcher, which was introduced, in part responsive to CPC concerns around blast balls, as a more targeted alternative, please note that the authorization did conform with policy as it followed specific approval by Chief Best.

**Recommendation 12:**   Do not charge SPD officers with investigating the actions of their fellow officers.

**SPD Response:**  Ultimately, under the Accountability Ordinance, the Office of Police Accountability is responsible for investigating the actions of SPD employees where misconduct is alleged.  The chain of command reviews set forth in Manual Section 8.400/8.500 that were implemented as part of the Consent Decree are rooted in the principle that sustained organizational reform is best achieved through an internally driven commitment to iterative, critical review of department actions and decisions.  SPD believes that its internal review processes are both demonstrably strong and complementary of – not in lieu of – external independent oversight.

**Recommendation 13:**   Humanize language through the SPD policy manual to prompt culture change.  Replace "subject" with "person," "tools" with "weapons," and "less-lethal tools" with "potentially lethal weapons."  Remove all references to "us versus them."  We encourage SPD to adopt this language beyond the policies being reviewed.

**SPD Response:**  We accept this recommendation with respect to changing "tools" to "weapons."  We are open to continuing discussion, but decline to change additional verbiage in this round of revisions for the following reasons:

- **Subject v. Person:**  SPD uses the term "subject" uniformly throughout the policy manual in order to denote the role of the individual within the encounter, regardless of encounter (to distinguish, e.g., between witnesses, victims, arrestees).  Changing the

verbiage in 14.090 or Title 8 would require, for consistency, a change in verbiage throughout the manual, which would require a more substantial review.

- **"Less-Lethal [Weapons] v. "Potentially Lethal Weapons":** The term "less lethal" is used as industry practice to distinguish between those weapons that are highly unlikely to cause lethal injury and firearms, which is by definition a use of deadly force. However, as not all firearm injuries are fatal (indeed, many are not); the term "potentially lethal weapons" would by definition encompass firearms as well, which carry with them restrictions that should be separately addressed.

- **"Us versus Them":** We have found no references to "Us versus Them" in our policy manual. If the CPC could provide specific reference, we would welcome being so directed, as we agree that there is no place in our manual, or in policing, for any such sentiment.

**Recommendation 14:** Publicize, annually, a schedule of all SPD policies that will be reviewed, when they will be under review during that year, and deadlines for feedback.

**SPD Response:** The Audit, Policy, and Research Section maintains a review schedule for policies, which we have previously shared with CPC, and which we remain willing to share. In previous years, the CPC also maintained, separately, a schedule of policies it placed high priority on reviewing, and routinely engaged SPD in discussion around those policies regardless of whether they were on the APRS schedule. If CPC determines to reconstitute its policy review practices, SPD remains a ready partner.

**Recommendation 15:** Disclose to the community, within 60 days of this letter, how SPD has incorporated community feedback and recommendations issued here.

**SPD Response:** SPD provides this letter to achieve exactly that level of feedback. Consistent with this letter, you will also see certain of your recommendations captured in the revisions that are due to be filed with the Court later this month. Separately, when those revisions are filed, SPD will provide clear explanation to the community as to how it has incorporated DOJ, OPA, OIG, CPC, and Community input.

Thank you for your thoughtful review. Good policy is best driven when all stakeholders are given a voice, and I and my leadership team look forward to continued discussion as we continue our hard work to advance the complicated social science of policing and public safety.

Sincerely,

Adrian Z. Diaz
Chief of Police
Seattle Police Department

# EXHIBIT C

# Seattle Police Department Crowd Management and Use of Force Policies

## Consent Decree

### 2012-2013

Development of SPD Manual Title 8, Use of Force

- Use of Force Core Principles/De-Escalation
- Using Force
- Use of Force Tools
- Use of Force Reporting and Investigation
- Reviewing Use of Force

# Monitor's Memo Submitting Use of Force Policies for Court Approval November 2013

"*After 15 or more marathon negotiating sessions facilitated by the Monitor…; after many conference calls, telephone conversations and meetings…' after the Parties reached consensus in August 2013 and the Monitor published the use of force policies or comment; and after nearly four months in which the Monitor and Monitoring Team performed independent research and received and considered recommendations, including those of the community, the Community Police Commission, the two police unions, and others, the Monitor hereby submits the consensus Seattle Police Department Use of Force Policies. …*

*[These] policies … are congruent with Constitutional requirements.  In addition, these policies embody best practice and reflect the policies and practices of the finest law enforcement agencies in the country.*"

# Commitment to Iterative Review

## Consent Decree, paragraph 180:

"SPD will review each policy, procedure, training curricula and training manual required by the Settlement Agreement 180 days after it is implemented, and annually thereafter (on a regularly published schedule), to ensure that the policy or procedure continues to provide effective direction to SPD personnel and remains consistent with the purpose and requirements of the Settlement Agreement and current law."

*"This process of critical self-analysis and self-correction is a fundamental goal of the Consent Decree and will be taken seriously."*

- Monitoring Team/DOJ/Court approval
- Labor Negotiation

New/Updated Policy Implemented

Training

Critical Review of Policy in Practice/Field Experience
(Force Review, Chain of Command)

Stakeholder Recommendations/Feedback
(SPD Personnel, OPA, OIG, CPC, FRB, Law Department)

Policy Revisions
(Draft Updates, Stakeholder Discussions)

# Critical Review of Force



# Use of Force, Title 8

| | |
|---|---|
| December 2013: | Court approval of draft policies |
| January 2014: | New policies published as Title 8 |
| September 2015: | Revised policies published |
| January 2019: | Revised policies published |
| September 2019: | Revised policies published |
| June 2020: | Revised policies published |
| December 2020: | Proposed revisions distributed for review |

# Crowd Management, Manual Section 14.090

| | |
|---|---|
| January 2014: | Policy published |
| September 2015: | Revised policy published |
| March 2017: | Revised policy published |
| November 2018: | Revised policy published |
| December 2020: | Proposed revisions distributed for review |

## Significant Dates

# Crowd Management

## 2020-2021 Revisions

## Reflect Tactical Adaptations Implemented Summer/Fall 2020

- More robust emphasis on crowd intervention tactics that focus on isolating and arresting law violators within an otherwise peaceable assembly
- Reducing SPD visible footprint in order to avoid escalation that may result from an SPD presence
- More robust use of social media to distribute information and direction in real time
- Formalizing in matrix form considerations around principles of crowd management, intervention, and control
- Emphasizing de-escalation and force modulation responsive to changes in crowd behavior following an order to disperse

# Crowd Management

## 2020-2021 Revisions

## Build on and Complement Existing Policy/Intended to Provide Additional Guidance to Officers and Community

- More robust statement of purpose that embraces Seattle's approach to facilitating public assembly over and beyond First Amendment activity
- Acknowledging potential for escalation through officer appearance
- Additional guidance around the role of legal observers and media
- Emphasis on crowd intervention strategies where safe and feasible

## Crowd Management

## 2020-2021 Revisions

# Incorporate Recommendations Issued by OIG, OPA, and CPC

- Implementation of matrix to better align response to crowd dynamics
- Use of social media to communicate expectations and dispersal orders
- Revisions to dispersal order/requirement for announcement to better inform of conditions and reflect expectations
- More robust statement of the policy's purpose
- Introduction of the pepperball launcher as an intermediate, less-lethal option to blast balls for area denial and intervention
- Implementing strategies around de-escalation, including a reduced visible presence
- Additional documentation around pre-event planning and tactical considerations

# Crowd Management

## 2020-2021 Revisions

## Align with Provisions of the Preliminary Injunction entered in *BLM v. City of Seattle*

- Incorporation of crowd intervention tactics
- Clarification of the rights, roles and identification of media and legal observers

# Policy Objectives

Clearer guidance to officers, supervisors, and commanders in employing agile strategies that support protected rights to free expression and peaceable assembly across a spectrum of crowd management events:

- Small gatherings that require no police support
- Permitted marches (celebratory and protest) requiring traffic coordination
- Large-scale, unpermitted demonstrations requiring *ad hoc* traffic control
- Large-scale events where activities outside of First Amendment protections, including significant traffic disruption, property destruction, and/or threats of violence require a greater police presence.

Provide guidance by which officers and supervisors may objectively determine at what juncture a demonstration or assembly leaves the realm of legal protest and becomes an abridgement on the life-safety and property rights of others, which SPD is equally responsible to safeguard.

Emphasize that at all times, SPD's response will be based upon the conduct of those assembled, not the content of their speech or affiliation.

# Feedback From Force Review Board/Unit, Crisis Response/Patrol, Accountability Partners, and Others

## Use of Force

## 2020-2021 Revisions

**8.100 – De-escalation**

Added "pattern interrupt" as a communication tactic (technique to change a particular thought, behavior or situation based in behavioral psychology and neurolinguistic programming).

## 8.200 – Using Force

Prohibits intentionally placing a knee on the neck of a prone subject

Complete prohibition on neck-holds/chokeholds

Reiterates requirement for verbal warning prior to using deadly force (stated elsewhere in policy as well)

Added additional circumstances in which officers will summon medical aid, including
- Where a subject states they cannot breathe or is having difficulty breathing
- Any canine bite
- OC (pepper spray) applications (where the person is still on-scene)

## 8.300 – Use of Force Tools

- Added pepperball launcher
- Removed stop sticks/added stationary tire deflation device (STDD)
- Moved prohibition on use of force on restrained subjects to its own section
- Moved requirement to issue warnings prior to use of less lethal tools into its own section to stress importance of warning
- Clarified definitions for canine use, including adding definitions for on-lead, off-lead, and evidentiary confirmation track
- Clarified crimes for which a canine can be deployed
- Clarified warnings for use of canines
- Requires a FIT investigation of any accidental bite
- Clarified requirement for battery functionality tests for Tasers
- Amplified the requirement to direct OC spray towards the specific threat where multiple persons are present
- Added prohibition on using a STDD on moving vehicles
- Clarified deployment of blast balls
- Created exception for trained patrol officers to use 40 mm less-lethal launcher in crowd control situations, upon Chief approval

## 8.400 - Use of Force Reporting and Investigation

- Updated classification chart consistent with updates on types of force and investigations
- Removed stop sticks (previously removed via interim policy)
- Clarified requirements for FIT screening where injury is a chipped tooth or non-serious joint dislocation
- Removed requirement for Training representative present at the scene of a FIT call-out
- Removed policy that delayed administrative interviews where criminal conduct is suspected For witness interviews, authorized sergeants to delegate the interview to another sergeant or to an officer who has received appropriate training.

## 8.500 – Force Review

- Revised to allow for Sentinel Event Review of crowd management events of long duration or large scale, through the OIG
- In crowd management situations, added requirement that commanders document, in their use of force statement, their considerations as set forth in the matrix provided in 14.090.

# Next Steps

January 2021:          DOJ/Community/OPA/CPC/OIG Feedback

February 2021:         2021 Revisions Filed with Court

March 2021:            Training

Winter/Spring 2021:    Sentinel Event Review

Summer/Fall 2021:      Drafting of 2022 Revisions

…. And so on…



# QUESTIONS?

https://spdblotter.seattle.gov/2020/12/16/spd-seeks-community-feedback-on-draft-use-of-force-crowd-management-policies/