# Seattle Police Monitor

## 2021 Semi-annual Report



Seattle
Police
Monitor



# Contents

**Welcome to the 2021 Semi-annual report**
**of the Seattle Police Monitor.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**3**

**Letter from the Monitor** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**4**

**2021 Monitoring Plan and Methodology** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**7**

**Seattle Police Department** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**11**
    Achievements, Challenges and Action Steps. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**Office of Inspector General** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**17**
    Achievements & Challenges. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    Action Steps . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**Office of Police Accountability.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**20**
    Achievements & Challenges. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    Action Steps . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**Community Police Commission** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**23**
    Achievements & Challenges. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
    Action Steps . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**Summary** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**27**

**Acknowledgments** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**28**



# Welcome to the 2021 Semi-annual report of the Seattle Police Monitor.

This report communicates activity and progress on the settlement agreement, or "Consent Decree," between the City of Seattle and the United States Department of Justice. The Consent Decree requires Seattle to implement reforms "with the goal of ensuring that police services are delivered to the people of Seattle in a manner that fully complies with the Constitution and laws of the United States, effectively ensures public trust and officer safety, and promotes public confidence…"

In September 2020, Judge James Robart of the United States District Court for the Western District of Washington appointed Dr. Antonio Oftelie as the new Monitor for the Consent Decree. The primary role of the Monitor, and the three-member Monitoring Team, is to advise the Court on the progress of Seattle to meet the requirements of the Federal Consent Decree. Within this role, the Monitoring Team's scope of work includes engaging with city partners on innovation in policing, developing measures and metrics for progress, providing technical assistance on initiatives, and reporting on progress.

This is the first report of the new Monitor, and within the report you will learn about progress being made by the Monitoring Team to critically assess policing in Seattle and chart a course towards successful closure of the Consent Decree. In addition, this report includes the vision and voices of key organizations that will lead advances and innovations in public safety once the Consent Decree is finished.



# Letter from the Monitor

As Seattle takes stock of a health, economic, and social crisis of a lifetime, there is a palpable demand for change in the city – and notably within public safety and policing. This moment in time has brought newfound prescience and power to the ideas of the late poet and activist James Baldwin when he said, *"Not everything that is faced can be changed; but nothing can be changed until it is faced."*

The Seattle Consent Decree is an integral piece of a broad effort to *effect change* – to face the past and learn from the present – and chart a course for the future of policing.

To be certain, much progress has been made in policing since the City of Seattle and the United States Department of Justice actively partnered to enter a Settlement Agreement, or "Consent Decree" in 2012.  At the time, Seattle entered the agreement because it wished to ensure that its police department functioned at an "exceptional" level and that it had positive relationships with all its communities.[1] Over the past nine years, the Seattle Police Department has increased diversity in its workforce, implemented new policies and practices for use-of-force, de-escalation, and mental health response, improved consistency of supervision and management, adopted new accountability systems and analysis such as the Force Investigation Team and Force Review Board, and elevated transparency through leading-edge analytics and publicly accessible open data. In addition, Seattle has designed and established the Office of Police Accountability, the Office of Inspector General, and the Community Police Commission to bolster accountability and community engagement. Yet to fulfill the vision of the community for sustainable change, more work needs to be done.

Seattle community members are keen to see their vision accomplished, and often pose questions to the Monitoring Team such as: What are you working on to accelerate progress? How are you doing that work? And what will successful completion look like?To activate this work, the Monitoring Team, in collaboration with the U.S. Department of Justice, Seattle's leadership,

---

1  Settlement Agreement, 3-1 ¶ 17



and community partners developed a new Monitoring Plan and an Assessment Methodology to guide strategy and action this year. The 2021 Plan is organized around four key areas: evaluating the status of compliance, advising on improvements to accountability, providing technical assistance to support SPD innovation and risk management, and supporting work on re-imagining public safety.[2] At the conclusion of this year, the Monitoring Team will issue a report documenting steps taken and determining what, if any, Consent Decree requirements will need to be addressed going forward.

As the Monitoring Team and Seattle do this work, it is vital to understand that the Consent Decree is not only a foundation for Constitutional and lawful policing but also a catalyst for the innovation that builds a more effective and efficient policing organization. In fact, while the Consent Decree provides clear and measurable obligations, it also stipulates that Seattle has flexibility to develop innovative local solutions.[3] And, as you will see in this report, an array of work is being done by the City of Seattle to not only put in place structures, policies, systems, training, and supervision that ensure compliance with the Consent Decree but also drive innovation in areas such as bias-free policing, officer wellness, and community engagement.

Related to this, the Consent Decree is not a ceiling for innovation but rather a floor for creating the future of safe and resilient communities. Even with all the progress Seattle has made over the past decade, the future of policing will continuously need to be reimagined and redesigned. This will be generational work – as the city, stakeholders, and community members determine the form of outcomes they want from public safety services, design the services to meet those outcome goals, and build the capacity of organizations to deliver results effectively and equitably. And these organizations, just like the Seattle Police Department, will need to be lawful and bias-free and exceptionally trained to intervene in crisis situations, in de-escalation, detainment and use of force, and in data collection and supervision. In this way, the foundation of Constitutional policing built from the Consent Decree acts as a springboard for this transformational work and long-term cultural change – and it will ultimately be up to the city to leverage learning from the Consent Decree for the long-term future of public safety.

As we look to the future, and ending federal oversight of Seattle policing, a productive tension arises. There are some communities who would like the Consent Decree ended today. They often say the decree has lost its power to effect change – that it has run its course or that conditions have changed too much since its inception. By contrast, there

---

2   See pages 7-10 of this report

3   Settlement Agreement, ¶ A1, Structure of the Agreements

are other communities who say the decree must last longer – that it should have more "bite" and over a longer period of time. It will be imperative for Seattle to balance these perspectives with an eye toward sustainable Constitutional policing. On this temporal tension, the late United States Supreme Court Justice Thurgood Marshall provided timeless guidance when he held:

 "…the continued need for a decree will turn on whether the underlying purpose of the decree has been achieved…It is justified only by the violence that induced it and only so long as it counteracts a continuing intimidation. Familiar equity procedure assures opportunity for modifying and vacating an injunction when its continuance is no longer warranted."[4]

In the context of Seattle, the underlying purpose of the Consent Decree is to not only ensure that policing is provided Constitutionally and lawfully but also that compliance will be sustainable over the long term. The results of the Monitoring Team's work in 2021 will help the people of Seattle qualitatively and quantitatively assess compliance with the Consent Decree, and the findings will then help determine when and how the City of Seattle, the U.S. Department of Justice, and the federal court will move toward closure or require additional work. A balanced approach will be taken in this evaluation, the basis of which will be performance-based termination – meaning that Seattle must demonstrate that it has continued to achieve full and effective compliance with the benchmarks in the Consent Decree in a durable manner. Lastly, we must close out the Consent Decree with a firm foundation of community trust in the efficacy and legitimacy of the Seattle Police Department and partners including the Office of Police Accountability, the Office of Inspector General, and the Community Police Commission.

The Seattle Police Department belongs to the people of Seattle – and because of that, I am hopeful we can bring together the vision, ideas, and tenacity of this great city to transform policing successfully and sustainably. Together we can show the rest of the nation – and the world – how to face and *effect change*.


Let's get to work,

Dr. Antonio M. Oftelie

Federal Monitor, Seattle Police

---

4  Bd. Of Educ. Of Okla. City Pub. Sch. v. Dowell, 498 U.S. 237, 247 (1991)

# 2021 Monitoring Plan and Methodology

A primary role of the Monitoring Team is to advise the United States District Court for the Western District of Washington on the progress of Seattle to meet the requirements of the federal Consent Decree. The Consent Decree requires that the Monitoring Team obtain the Court's approval for its areas of focus and activities, and to do this the Monitoring Team, in collaboration with the United States Department of Justice and Seattle accountability partners, developed a 2021 Monitoring Plan.[1]

The 2021 Monitoring Plan, and its accompanying Methodology, sets key actions and timelines as well as measures for documenting progress around four areas: Evaluating the status of compliance, improving accountability, advising on innovation and risk management, and supporting re-imagining public safety.

## Evaluating the Status of Compliance

To evaluate the status of compliance with the Consent Decree, the Monitoring Team is working with the parties and stakeholders to update the Court and the community on where SPD is in its compliance regarding:

- **Use of Force:** In this area, the Monitor will assess whether use-of-force outcomes comply with SPD's Use of Force Policies, which incorporate the requirements of the Consent Decree. The Monitor will also assess whether SPD has continued to thoroughly examine officer uses of force consistent with SPD policy and the terms of the Consent Decree. In addition, the Monitor will conduct an in-depth examination of SPD's force used at protests and demonstrations in 2020 and make findings regarding compliance with the Consent Decree requirements related to use of force, use of force reporting, investigation and review, and constitutional policing generally.

- **Crisis Intervention:** In this area, the Monitor will review SPD's data, training, and outcomes in the areas of crisis intervention, de-escalation, and scenario-based integrated tactics training.  Reporting in this area will also describe the training provided to dispatchers with respect to identifying calls for service regarding individuals in crisis, as well as evaluate deployment and supervision. In addition, this evaluation will track SPD's work to provide training in verbal tactics with the goal of reducing the use of force against individuals in behavioral or mental health crisis, or who are under the influence of drugs or alcohol, and to direct or refer such individuals to the appropriate services wherever possible.

- **Stops and Detentions:** In this area, the Monitor will evaluate the City's review of SPD's use of stops and detentions, searches, and seizures to determine if they are being done Constitutionally and lawfully.  In this review, training plans and materials will be evaluated to ensure all patrol officers are knowledgeable on the importance of community contacts for effective policing, community relations, and trust, as well as the legal distinctions and rights for conducting stops and detentions. To understand the outcomes of SPD's use of stops and detentions, analysis will be conducted on the number of Terry stops conducted and measures such as, but not limited to, percentage of stops that led to citations, warnings, or arrests, and how those incidents were documented.

- **Supervision:** In this area, the Monitor will assess the rigor of SPD's supervision of patrol officers. This analysis is critical in ensuring that SPD is effective and efficient in its operations and in improving the capabilities and wellness

---

1 This section summarizes some elements of, and incorporates some language contained in, the Monitoring Team's memorandum submitting the 2021 Monitoring Plan. For the sake of readability, this section does not individually cite every instance of summary or incorporation.

of officers. Evaluation will include, but not be limited to, how many supervisors SPD employs, number of patrol officers with consistent and appropriate supervision, and the quality of supervision. In addition, supervision will be measured on how it proactively intervenes to manage risk as well as help patrol officers improve their skills through mentorship and enhanced training. Particular focus in this area will be on how well the Early Intervention System is performing and areas for development.

Importantly, in all four of the compliance categories above, measures and analysis of bias-free policing and officer conduct will be overlaid. This additional overlay will be critical to understanding not only the baseline lawfulness of a range of incidents but also any disparities in approach and outcomes.

For evaluating the status of compliance, the data collection process includes identifying the types of performance information and data that will be evaluated, securing such data from SPD or the City, and analyzing information to understand SPD's current state.  The Monitor, Parties, and SPD's accountability partners have engaged in regular, ongoing discussions about this process of providing updated information about the Department's performance and whether that remains consistent with the Consent Decree's requirements.  Initial data regarding use of force has been provided, and the production of data and information on other areas is forthcoming.

## Improving Accountability

Accountability is core to public trust and legitimacy in policing, as it links the expectations of the community with the governance, decisions, actions, and results of the police department. The Consent Decree process provides an opportunity to assess and improve accountability, and the Monitoring Plan focuses on two focal points of accountability:

- **Back-end Accountability:** The first type of accountability involves how and whether officer misconduct is addressed – that is, whether there are appropriate outcomes when officers fail to follow SPD policy or the law. On this front, the Monitor, Parties, and Court all receive regular updates on the City's efforts in the areas of misconduct and discipline, including the City's ongoing collective bargaining with the Seattle Police Officers Guild on the terms of a new contract. In addition, members of the Monitoring Team are working closely with the Washington State legislature to track changes to law and inform implications for policing in Seattle.

- **Front-end Accountability:** The second type of accountability at the heart of the Consent Decree involves ensuring that officer performance is aligned with community needs and expectations before anything goes wrong.  This type of accountability focuses on establishing clear, transparent expectations aligned with public input and priorities that officers follow. For example, SPD has joined the Active Bystandership for Law Enforcement ("ABLE") Project. That initiative, as the Monitoring Team has previously summarized, aims to "prepare officers to successfully intervene to prevent harm," avoid misconduct, "and to create a law enforcement culture that supports peer intervention." [2] ABLE's purpose is to empower officers with the tools necessary to step into situations involving peers to prevent harm, stop misconduct, and avoid bad outcomes.

As a distinct area of accountability, the Monitor and DOJ will conduct an in-depth examination of SPD's usage of force at protests and demonstrations in 2020 and make findings regarding compliance with the Consent Decree requirements related to use of force, use of force reporting, investigation and review, and Constitutional policing more generally. In early 2021, SPD engaged in a process of revising and updating its policies and procedures regarding use of force and crowd management. During the remainder of 2021, SPD and other City stakeholders – including the Community Police Commission ("CPC"), OPA, and OIG – are working to determine what changes, revisions, or improvements should be made to Seattle's policies relating to the use of force in crowd situations and the operational management of protests and circumstances involving large numbers of people.  The Monitoring Plan presents specific deadlines for milestones for revisions.  Critically, it requires that the City engage in "a comprehensive, affirmative, intensive initiative to obtain community input regarding [SPD's] Crowd Management Policies." The Monitoring Team will be evaluating that process

---

2   Georgetown Innovative Policing Program, Active Bystandership for Law Enforcement (ABLE) Project, https://www.law.georgetown.edu/innovative-policing-program/active-bystandership-for-law-enforcement/ (last visited June 21, 2021).

to ensure that it uses all appropriate mechanisms possible to engage all of Seattle's many communities in a substantive process that establishes a community vision for crowd and protest management.

In addition, OIG's ongoing Sentinel Event Review ("SER") process also promises to provide SPD with specific, actionable recommendations and issues that it might address to further improve its approach to managing crowds and using force within crowd contexts.  The Monitoring Team has continued to participate in the SER process as observers and, to date, is encouraged by the rigor, candor, and thoughtfulness that the process has so far entailed.

## Advising on Innovation & Risk Management

The Consent Decree does not prevent SPD from continuing to innovate and identify areas where it should make additional progress so long as those efforts are not inconsistent with the Decree's basic requirements.  The Monitoring Team and Parties have been engaged with SPD with respect to several of the Department's innovation and risk management initiatives including:

- **Officer Wellness Initiative:** Police officers face a high degree of trauma and stress on a daily basis, which over time can affect job performance and overall personal health and wellness. The Monitoring Team recognizes that officer wellness is integral to not only job performance but also to enabling innovation and change from all levels of the Seattle Police Department. Thus, the workstreams of the monitoring plan factor officer wellness into account as a foundation for effective transformation.

- **Early Intervention System ("EIS"):** Leading organizations across industries and sectors are building systems that can improve performance and minimize risk by understanding the factors that lead to positive and negative outcomes. The Monitoring Team is working with SPD to advance an EIS that not only helps individual officers and supervisors understand root causes of outcomes but also informs the organization on how structures, systems, and processes can be modified to improve enterprise-wide outcomes.

- **Correlation One Collaboration:** Through this novel collaboration, Correlation One, an organization that provides free data and analytics training programs for underrepresented and diverse students, will have cohorts of students develop a problem statement and methodology for gaining insights via SPD data.[3] The cohort capstone projects will not only educate aspiring data analysts on real-world issues but also provide SPD and the Monitoring Team with real-time insights on the performance of policing.

## Supporting Reimagining Public Safety

The Consent Decree does not prevent the City from exploring new and different ways of providing for public safety and community wellbeing so long as those efforts are not inconsistent with the minimum requirements to which the City previously agreed in the Decree.  The Monitoring Team, Parties, and City stakeholders continue to engage in regular, active discussions about the City of Seattle's efforts to develop new solutions for community challenges and issues. The purpose of this continuing dialogue is to ensure that any new initiatives do not compromise the ability of the City and SPD to comply with the terms of the Consent Decree.

In October 2020, Mayor Jenny Durkan issued an Executive Order to Reimagine Policing and Community Safety in Seattle. The Order established a Functional Analysis Interdepartmental Team (IDT) to advise on operational and functional aspects of SPD as it pertains to reimagining community safety. The IDT took immediate action to address some of the community requests that surfaced during the protests including:

- Transforming 911 by laying the foundation for an independent police emergency dispatch and communications center;

- Transferring functions from SPD to: The Office of Emergency Management, Victim Advocacy Team, 911 Communications Center, and Parking Enforcement Officers;

- Completing robust analysis on SPD 911 calls, sworn officer functions, and personnel and staffing.

---

3  https://www.correlation-one.com/

The IDT conducted significant community outreach to guide any recommendations or policy options. The community outreach included meetings with 11 city-wide boards, commissions, and advisory councils; roundtables and neighborhood tours; and compilation of thousands of constituent emails, phone calls, and letters. What was quickly discovered is that community is not a monolith; there were differing recommendations and prioritization of concerns. Community was clear, however, that the concept of public safety extends beyond policing. To that end, significant investments are being made by the City through varied departments on upstream, prevention and intervention efforts in tandem with identifying current police functions that can be moved elsewhere.

Ongoing IDT efforts have expanded beyond what was initially outlined in the Mayor's Executive Order including engagement with national experts on implementing alternate public safety response models and using SPD's data and the analysis of said data by the National Institute of Criminal Justice Reform to begin developing proposals tailored to Seattle's needs. It should be noted that there is added urgency in finding non-sworn methods to responding to certain call types considering the severe staffing shortage Seattle is experiencing. It remains to be seen whether developing and operationalizing alternate response models will have any appreciable impact on the number of police needed.

## Assessing Overall Compliance

The Consent Decree provides no specific formula regarding the precise point at which deficient performance is indicative of a non-compliance. Instead, the Decree expressly contemplates a balancing of factors.  Specifically, "[n]on compliance with mere technicalities, or temporary or isolated failure to comply during a period of otherwise sustained compliance, will not constitute failure to maintain full and effective compliance." Likewise, "temporary compliance during a period of otherwise sustained noncompliance will not constitute full and effective compliance."[4] As the prior Monitoring Team articulated and the Court endorsed, "compliance with provisions of the Consent Decree depends not just on the number or percent of instances where SPD is adhering to requirements but also on the quality or nature of those instances where SPD is falling short."[5]

Consequently, in evaluating all the evidence, the Monitoring Team will seek to balance:

- The Department and its officers' performance during a material span of time, number of incidents or encounters, and number of officers;
- The Department's trends with respect to its aggregate performance over time, including comparisons of more recent material spans of time with prior, similar spans;
- The severity or significance of a performance or incident that deviates from policy, law, or Consent Decree requirements; and
- The extent to which SPD and/or its accountability partners appropriately identify performance contrary to law, expectations, or Consent Decree requirements and take appropriate remedial action that is consistent with the significance and severity to the nature and magnitude of the identified performance deficiency.

At the end of 2021, the Monitor will complete this Compliance Status Report.  The report will present the Court and community with up-to-date information and data as to SPD's current performance and status with complying with the Consent Decree.

---

4   Settlement Agreement, 3-1 ¶ 184.

5   First Systemic Assessment at 6.



Seattle Police Department
Adrian Diaz, Police Chief

# Seattle Police Department

The Seattle Police Department appreciates this opportunity to update the Court and our community as to our work over the past year and goals for the second half of 2021. Primary among these is the commitment to strengthen, build upon, and innovate around the reforms that brought SPD into full and effective compliance with each of its commitments under the Consent Decree and to ensure that police services continue to be delivered to the people of Seattle in a manner that fully complies with the Constitution, the laws of the United States, State of Washington, and our City,  effectively ensures public and officer safety, and promotes public confidence in the SPD.

To say that the last 18 months have been challenging is an understatement.  The global pandemic brought sharply into focus disparities and service gaps at the complex intersection of public safety, public health, and public welfare.  The virus and resultant but necessary restrictions further stretched capacity within the safety net of social services that provide basic food, shelter, and health resources.  The deaths of George Floyd in Minneapolis, Breonna Taylor in Louisville, and so many others around the country at the hands of police created long-overdue urgency to address the systemic racism that pervades institutions far upstream of police – in housing, healthcare, education – and that are perpetuated throughout the criminal justice system.  Amidst often hostile rhetoric, SPD experienced an unprecedented exodus of officers to other jurisdictions, including many from SPD's newest, best trained, and most diverse recruit classes, that dropped SPD to its lowest deployable patrol staffing levels since the 1980s.  These converging challenges, each complex, are hallmarks of what is unquestionably a pivotal point for policing.

At the same time, from these challenges emerge unique opportunities.  The unprecedented events of this past summer were in many respects a "stress test" in extreme conditions of those systems established through the Consent Decree for self-assessment, review, and iterative reform.  A Consent Decree cannot cure all injustice that may result in the next crisis, but it can ensure that when crises arise, the department has in place structures, processes, and capacity to ensure that lessons learned continue to inform tactics, policies, and training as they evolve.  Without in any way seeking to minimize the real harm that many experienced this past summer, SPD believes these systems have shown themselves to be intact and strong. Within weeks of the death of George Floyd, SPD reviewed its policies to ensure alignment with calls for change.  Reflection in the midst of protests gave rise to tactical adaptations, since incorporated into new policies and training, that led to a marked shift in how we manage events such as those that overwhelmed us, as they did cities across the nation, at the time.  Collaboration with the Office of Police Accountability, the Office of the Inspector General, and the Community Police Commission ensures that continuing analysis will inform yet further iterations of policy, in the spirit of the on-going reform the Consent Decree sought to ingrain.  Of particular note, SPD is grateful for the partnership of the OIG in bringing together SPD commanders and experts based throughout Europe to share knowledge on communications and understanding crowd dynamics, as well as for the invitation to engage in the OIG's community-based Sentinel Event Review, which represents, for Seattle, a first-of-its-kind opportunity for reform grounded in reconciliation and healing.

At a more holistic level, these challenges also gave rise to a much-needed critical examination as to how public safety services are delivered and administered comprehensively, efficiently, and compassionately to the people of Seattle.  In partnership with the Mayor's Office, SPD has been engaged in two key collaborations: (1) an analysis conducted by the

National Institute for Criminal Justice Reform (NICJR), in line with a methodology applied in other cities, of 911 calls and recommendations for call types suitable for a non-police response; and (2) the development, with the Accenture Public Safety Team that partnered with SPD previously on building its Data Analytics Platform, of a Blueprint for Innovation, modeled on this team's prior work for the West Midlands (UK) Police Service.  While continuing to caution that building up effective alternatives, let alone reversing the generational trauma that underlies so many of the inequities in the criminal justice system, is a process that will take time and should not be rushed; SPD, which has long highlighted the dearth of peripheral services that often leaves police as responders by default, wholly supports the paradigm shift and opportunity for meaningful change that this work represents.

We also know that paramount to the success of these efforts, and overarching all that we do, is our ability to restore the community trust that we know was shattered over the events of this past summer.  We know that trust, especially in times of crisis, is a sacred promise that can be easily broken, and that restoring this trust requires not simply difficult conversations along the way, but true action.  I pledge, for as long as I am privileged to hold the position of Chief of this department, that building community trust, grounded in principles of relational policing, equity, transparency, and accountability, will remain my highest priority.  To those who have demanded of us no less, to those who have challenged us, and to those many city and community stakeholders who are partnering to re-envision how public safety services in this city are delivered, I extend my deepest gratitude and respect.  Your vision, your experience, and your perspective are and will always be critical to driving change for the better.  And to all with whom trust has been broken, to members of the community and the department alike who bear the physical and emotional scars from this past summer, and to all who are hurting:  I am deeply sorry.  Reform means that we accept the responsibility that is ours to bear, we learn from our experience, and we consistently strive to do better.  We have, we can, and we will continue to do better.  We will never stop listening.

It is in that vein and with this spirit of reconciliation, healing, and resolve that we offer this summary as to the work ongoing and upcoming within SPD to ensure that even as challenges and set backs arise, we correct course, and we hold true to our commitment to be the department that our city, our communities, and our employees deserve.


Adrian Diaz

Chief of Police

2020 – 2021

# Achievements, Challenges and Action Steps

## Public Safety

Seattle, like most other major cities, experienced a marked increase in violent crime, including gun violence and homicide, beginning in 2020 and continuing into 2021.  Amidst discussions around creating alternative response models for 911 calls, service adjustments at other levels of the criminal justice system, and historic staffing losses, SPD continues to assess its operations to ensure it continues to provide effective and efficient public safety services.

**Patrol Staffing:** While the number of sworn members dropped significantly in 2020, SPD initiated several steps to ensure adequacy and efficiency of patrol response, including:

1.  Redeploying 100 sworn personnel from non-patrol functions (investigations, special operations) to patrol;

2.  Developing the Community Response Group (CRG) to aid in staffing areas hit with staffing shortages, high call volumes, and demonstration management;

3.  Expanding the online reporting portal to include more crime categories; and

4.  Working to adjust patrol schedules to provide less compression between work weeks and hours that match the reality of the current workload.

**Investigations:** While SPD partners with several community organizations to prevent gun violence and other violent crime, when these prevention efforts fail it is SPD's solemn responsibility to bring some sense of justice to the victims of violent crime and their families. In 2020, amidst a recent record in homicides and even as detectives were redeployed to provide 911 response support, SPD achieved a clearance rate of 75% - among the highest of similarly situated jurisdictions.  In 2021, as violent crime remains relatively high, SPD has cleared 71% of homicides. Of note, while every loss of life is tragic, it is important to acknowledge the outstanding work of patrol officers in mitigating the harm on-scene: often first to arrive to such incidents by virtue of their more mobile response to dispatch, it is without question that the number of fatalities resulting from crimes of violence would be higher but for the first aid provided by officers – including frequent application of tourniquets, wound packs, and chest seals to gunshot and stabbing victims, consistent with their Law Enforcement Casualty Care training in trauma medical response.

Additionally, amidst the pandemic and its broad effects on the justice system, SPD detectives continue respond to community concerns around increased levels of property crime – including a nearly 200% increase in arson.  As partners in the criminal justice system downstream of police responsibility refine approaches to accountability alternatives to prosecution, SPD continues to make significant arrests – including of individuals who persistently engage in property crime in an effort to at least temporarily disrupt or deter these activities.

**Harm Reduction:** As drug overdose deaths in King County continue to rise, driven by a significant rise in methamphetamine and fentanyl use, SPD detectives continue to work with regional and federal partners to interdict predatory distribution activities before often lethal doses can be distributed.  In the first half of 2021 alone, across multiple operations, SPD detectives were instrumental in recovering nearly 100 pounds of methamphetamine, over half a million fentanyl pills, disrupting a fentanyl pill manufacturing lab, and seizing over 100 illegally possessed firearms in the process.  These are not victimless crimes of subsistence; each of these seizures represents countless lives potentially lost to the scourge of these narcotics and the firearms violence that is often associated.

## Community Trust

It is a responsibility of every member of the SPD to work to restore and strengthen community relations.  In addition to the ongoing programmatic work of the Collaborative Policing Bureau, SPD developed new initiatives built around principles of relational policing, hiring diversity, training, and transparency.

Relational Policing:  Relational policing draws on the premise that every interaction is an opportunity to build connection. While long a part of SPD outreach work formally and informally, SPD is strengthening its commitment to community outreach, community mentorship, race and social justice work consistent with the City's Race and Social Justice Initiative (RSJI), cultural awareness, and growth mindset through both in-service and pre-service training intensives.

1.  Relational Policing Training Module:  This in-service training, delivered through facilitated discussion, covers concepts of relational policing inside the framework of community policing models, key factors of police-community interactions, understanding what individual practices can be done on a daily basis to increase public trust, programs sponsored within the department that work towards community relations, and the work of the Community Service Officer program.

2.  Community Centered Pre-BLEA Experience:  This 45-day program for new police recruits, in advance of their State Basic Law Enforcement Academy (BLEA) training, will focus on community outreach, community mentorship, RSJI, reconciliation efforts, cultural awareness, and growth mindset.  The goal of the program is to embed these concepts in the DNA of the department by facilitating cultural transformation at the front end of an officer's career.  SPD is presently seeking position authority to bring in-house a curriculum coordinator with demonstrated experience and connection with Seattle's communities, especially among youth.  To SPD's knowledge, this will be a first-of-its-kind program for new recruits.

The Patrol Operations Bureau has integrated relational policing into several initiatives, including "community roll calls" to provide a police presence in areas experiencing crime or disorder issues, with a focus on engagement with the community, not enforcement alone; partnerships with local retailers on issues that impact customer-on-employee safety via precinct-level community forums; and on-going, direct engagement with social service providers to offer alternatives to jail for vulnerable populations struggling with mental health and addiction issues.  Additionally, in partnership with George Mason University, patrol officers are following up with robbery victims to gather additional information about the case and to "check in" with the victim.  GMU is studying the effects of this follow-up on solvability factors in the case, as well as community satisfaction related to the receipt of police services.

**Hiring Diversity:**  As SPD looks to recover from the unprecedented staffing loss over the past year, SPD remains committed to recruiting and retaining a highly qualified sworn workforce that reflects the diversity of the community and that has the backgrounds and skillsets to meet the challenges of 21st century policing.  As a result of these continuing efforts, SPD's sworn staffing hiring in recent years has been more diverse than Seattle in whole – a trend that has continued as in both 2020 and 2021, persons of color represented nearly 40% of new officers.  Additionally, women comprise a solid 20% of SPD's 2021 hiring to date – up from 13.73% in 2020.  Introductions to new officers can be found here.

**Training:**  While SPD policy has long required officers to intervene when they become aware of another's misconduct, in 2021, with the support of the OIG and community and executive sponsorship, SPD implemented Active Bystander for Law Enforcement (ABLE) training, a training program developed at Georgetown University designed to prepare officers to successfully intervene to prevent harm and to create a law enforcement culture that supports peer intervention. Additionally, as a result of increased encounters involving individuals, often in crisis, armed with edged weapons, SPD's training unit developed scenario-based and e-learning training specifically focused on edged weapon scenarios.  In collaboration with the OIG and law enforcement experts, SPD also expanded its research into other available less-lethal tools to allow for intervention at a distance; while there are few new options available in the United States other than those already considered by SPD, SPD will be launching this summer, with community support, a pilot program using the BolaWrap – a low-impact device that allows officers to restrain a person from a distance, offering an alternative to Tasers or less-lethal foam launchers.  SPD also hopes to move forward this year shifting certain of its scenario-based training to a virtual reality platform, allowing for the delivery of more customized and reality-based training more efficiently and cost-effectively.

**Transparency:**  SPD continues to expand and enhance the dashboards that provide real-time visibility into SPD's ongoing compliance with its commitments under the Consent Decree, including data relating to crisis contacts, use of force, and Terry stops.  A new dashboard reflecting arrest data is pending release. Upcoming enhancements to the Data Analytics Platform, which powers these dashboards, include first-of-its-kind programming to bake into the DAP the analytic capability to model disparity in police activities through propensity score matching, an advanced methodology for calculating disparity as SPD described in an earlier report.

Additionally, in the interest of providing greater transparency around daily calls for service, in 2020 SPD expanded its blotter to add daily significant incident reports – reports generated for internal distribution for purposes of providing command staff with rapid notification of events, to inform supervisors and commanders of potential cross-precinct issues, and to make specific information about significant events directly and quickly available to officers.

## Risk Management, Accountability, and Innovation

For several years, SPD has been working towards developing a model of Enterprise Risk Management (ERM) to drive business efficiencies and operationalize risk control post-Consent Decree.  Envisioned to complement both the structures for review and assessment developed under the Consent Decree and work of the OPA, OIG, and the CPC by identifying and controlling for risk before negative outcomes occur, SPD is prepared to move forward with operationalizing what it has been refining, in pro bono collaboration with academic partners, in concept.  Critical to the success of this initiative are three distinct programs:  Officer Wellness, Early Intervention, and Performance Analytics and Research.

**Officer Wellness:**  The Final Report of President Obama's Task Force on 21st Century Policing emphasizes the importance of first responder mental health as an integral and equally critical component of comprehensive police reform. While Seattle's Consent Decree, entered in 2012, does not include requirements with respect to officer wellness, SPD believes the risk management case for mitigating against the impact – neurobiologically, psychologically, and behaviorally – of job-related stress is clear.  In 2020, modeled on best practices, SPD stood up a Wellness Unit, under the guidance of a licensed clinical psychologist, which helps to coordinate and/or provide services ranging from peer support to substance abuse counseling, family counseling, acute crisis care, trauma response, and spiritual care.  In the second half of 2021, SPD will expand this program with the addition of Mental Health Practitioners in each of its five precincts. The Wellness Unit represents one significant and long overdue step towards attending equally to the needs of department employees amidst the undeniable stress of the job.

**Early Intervention:**  Foundational to ERM is an early intervention system that better meets its intended goals by focusing not strictly on outcomes, but, through root cause analysis, on those inputs and professional exposures that are as linked to performance risks as on the frequency of particular outcomes.  SPD's Next Generation Early Intervention System, prototyped in collaboration with Accenture, is designed to enhance supervisor engagement and link chain of command accountability for guidance to line supervisors in supporting employees exhibiting leading indicators (predictive exposures) of an adverse event.  A pilot of this system will begin in the second half of 2021.

**Performance Analytics and Research:**  The Performance Analytics and Research Section is the backbone for the data governance, production, and analysis that brought SPD into full and effective compliance with its commitments under the Consent Decree and continues to drive SPD innovation.  Working with internal stakeholders and the OIG, this team maintains a network of more than 50 researchers worldwide across a range of academic disciplines and leads a national workgroup on Analytic and Evidence Based Policing, affiliated with the Major Cities Chiefs Association.  In addition to the next-generation EIS, current projects include a capacity planning tool that utilizes performance data to simulate scenarios for resource planning and to model adequate resource staffing to maintain Consent Decree requirements and to meet existing police service performance targets); a service quality assurance tool, based in natural language

processing, that scores interactions and identifies events of interest for reporting compliance and quality assurance; and intelligent decision support, which enables automated processing of data to identify potential events of interest as backstop assurance of appropriate routing and review.

Budget and staffing level – both sworn and civilian – remain SPD's biggest challenge heading into the second half of 2021.  SPD has previously highlighted for the Court the operational impact, in terms of call-handling and response times, of depleted sworn staffing.  As noted earlier in the discussion around diversity hiring, SPD believes that while it will take years to recoup the losses and build the department to the sworn staffing levels necessary to meet community expectations around public safety, it is making good headway in that effort.  SPD agrees with the City that overreliance on overtime as a means of compensating for fewer employees is problematic from both a risk management and officer wellness perspective, but it is also true that much of the training, technology, and review systems implemented under the Consent Decree cannot be sustained without necessary budget and personnel.  Of increasing concern are capacity and condition of SPD's training facilities, which continue to fall far short of industry standards as set by comparable agencies.  While a new training facility was included in the plans for a new North Precinct, that potential was lost when the city decided against moving forward with the new building.  SPD continues to search for ways to mitigate this issue, in part through leasing of other facilities and by shifting where it can to virtual reality options.

Of most pressing concern on the civilian side are increasing challenges relating to public disclosure, which carry with them, as SPD has cautioned, legal, financial, and reputational risk implications.  As both the volume and complexity of requests continues to expand, this is an issue that can only be solved through position authority to staff this unit of highly trained specialists to the level necessary to meet the growing demand.  SPD continues to request such authority in order to bring the workload of SPD public disclosure officers to a level on par with those of other city agencies.  In the meantime, in an effort to at least provide transparency to the workload of the unit and the processing of requests, SPD launched a public dashboard showing the number, nature, and timeline of requests.



**Office of Inspector General**
Lisa A. Judge, Inspector General

# Office of Inspector General

The Office of Inspector General for Public Safety (OIG) is the independent, civilian, systemic arm of the accountability system. Historically, the review mechanism for investigations of alleged officer misconduct lacked sufficient resources to effectively identify and address larger system issues discovered in the course of such reviews. For example, an act that was out of policy might point to a need for clearer or more defined policy, in addition to any potential individual disciplinary action. That gap was partly the impetus for the creation of OIG in 2017, with the first Inspector General (IG) taking office in 2018.

OIG was established to make systemic recommendations for lasting reform that are intended to reflect the values of Seattle's diverse communities. To accomplish that purpose, OIG is charged with providing oversight of management, practices, and policies of the Seattle Police Department (SPD) and Office of Police Accountability (OPA), ensuring organizational reforms arising from the Consent Decree are maintained and improved upon, and auditing and review of criminal justice system policies and practices related to policing and other criminal justice matters.

Organizationally, work at OIG is divided into four main areas:

1. **Auditing** – OIG conducts performance audits and assessments of police operations and systems in accordance with Generally Accepted Government Auditing Standards (GAGAS). While labor intensive, following GAGAS ensures that OIG adheres to consistent standards of objectivity and independence that are critical for public and law enforcement trust in OIG findings and recommendations.

2. **Policy Work** – OIG provides policy and research guidance to SPD on areas for improvement informed by best practices and innovative efforts in other jurisdictions. Within this realm, the Inspector General utilizes her expertise and observes trends and patterns to identify key initiatives that she believes can help achieve sea changes in SPD structure and culture that are needed to build, or rebuild, community trust.

3. **OPA Oversight** – OIG reviews OPA case classifications, certifies OPA investigations, reviews complaints handled by OPA via alternative mechanisms to investigations (such as mediations or unsubstantiated misconduct reviews), conducts misconduct investigations when OPA is unable to due to a conflict of interest, and reviews patterns, complaints, and misconduct outcomes involving use of force or biased policing.

4. **Strategic Leadership** – The IG directs office efforts to focus on matters of greatest public concern. The IG represents the expertise of OIG in stakeholder activities and participates in Consent Decree sustainability efforts in preparation for the future OIG sustainment role. The IG also independently monitors SPD review of significant uses of force, such as being on-scene for officer involved shooting investigations and attending SPD's force review board deliberations.

January – June 2021

# Achievements & Challenges

The collective outrage and grief for George Floyd's death at the hands of police was a pivotal moment that brought longstanding questions of racial equity to the forefront of general public consciousness, discourse, and action. In the face of significant community outcry about SPD handling of community protests of police brutality, the City asked OIG and the other accountability partners to help the City learn from and improve its police response. From mid-2020 and continuing into the first half of 2021, OIG has focused on projects that have direct bearing on the 2020 protests, specifically issues impacting exercise of First Amendment rights and community trust around use of force. There has been a clear call to "rethink" or "reimagine" policing, but it is also necessary to apply that thinking to police accountability and the hidden institutional racial barriers around us that undermine public confidence in government. OIG is continually working to better ensure community voice and priorities are centered in its work, including within the projects themselves, through building a community advisory group to advise OIG, and beginning a data decolonization effort for OIG analytics.

The largest endeavor for OIG in the first half of 2021 has been the initiation of the first community-involved sentinel event review (SER) of SPD response to the 2020 protests. SER is used in the health care and airline industries to examine root causes of tragic events in order to look for preventative system improvements. OIG added SER to its first annual work plan in 2019 with the aim of applying it to officer-involved shootings or other serious injuries of significant public concern. As the 2020 protests were happening, OIG shifted its SER focus to the controversial SPD protest responses. OIG policy staff distilled information for review from many sources including, e.g., over 100 misconduct complaint cases (arising from over 19,000 complaints to the Office of Police Accountability), over 500 uses of force, more than 200 hours of body worn video, and thousands of posts on social media and other public comments. OIG collaborated in planning efforts with academic experts, community representatives, and other accountability stakeholders. A panel comprised of community and SPD staff has been meeting since January, dedicating an enormous number of hours (over 70 hours in panel meeting time alone) and significant emotional labor to engage in honest, tough discussions that tackle gaps between community and police perceptions. A report that covers the first critical days of the protests will be released in summer 2021 and filed with the court. OIG is already engaging in work with SPD and international partners to improve policing protest response.

Other actions locally and nationally in the first half of 2021 led to the IG drawing upon her experiences in policing best practices to issue memoranda inviting SPD to engage in collaborative work on police response to persons in crisis, rethinking vehicle pursuit policies, and looking for alternatives to police response for certain types of minor traffic offenses that have serious disparity implications for community trust. Those conversations are in progress. OIG also initiated a review of officer mask-wearing for COVID-19 in response to community concerns. OIG is analyzing a population of high-risk crisis calls that did not result in death in order to capture takeaways from positive events instead of just focusing on lessons learned from negative ones. A major audit undertaking for OIG in 2021 is a discipline audit, a topic that has been a subject of community and Court concern; results will be published later this year.

One of the challenges for the accountability system and OIG specifically in 2021 has been how to fulfill its permanent function as a city creation with city priorities and responsibilities, juxtaposed against its role in the present-day Consent Decree requirements. Although SPD is the subject of the Consent Decree, the independent accountability entities support the City's ability to comply with the Consent Decree by providing a check on SPD activities. OIG is lending its independent, technical, analytical expertise to the Consent Decree process to verify SPD performance metrics, as it did in evaluating SPD's statistical approach to measuring disparity in stops and detentions in 2019. OIG also advances accountability and system improvement through its four main areas of work.

One of the greatest internal challenges for OIG in 2021 is adequacy of resources for completing 2020 work plan items that were sidelined by 2020 events, while undertaking new initiatives in 2021 to respond to emerging community concerns and planning for foreseeable work demands. OIG has endeavored in the first half of 2021 to remain responsive

to the national and local call for meaningful change, and at the same time perform its core functions in areas of OPA review and other mandated bodies of work. These functions form one of the underpinnings of public trust in the system, by having OIG provide independent civilian oversight over how investigations into allegations of officer misconduct are handled by OPA, and how police intelligence and surveillance data are handled by SPD. Specifically:

- **OPA review and investigations -** OIG has issued 191 OPA case certifications from January 1, 2021 to July 26, 2021. Other related work has included conducting quarterly sampling of OPA case classifications (the determination of whether to investigate); beginning a descriptive analysis of the bias complaint investigation process for SPD and OPA; and implementing a training for OIG, OPA, and SPD investigators in effective interviewing techniques based on international best practice principles. OIG also concluded three OIG investigations as part of its duty to handle cases for which OPA has a conflict of interest.

- **Intelligence data** - OIG monitors Seattle Municipal Code (SMC) Chapter 14.12 police intelligence authorizations as required by code. A significant new body of work related to review of SPD surveillance technologies pursuant to Chapter 14.18 will commence in 2022 as technologies are approved by Council.

There is of course also the larger challenge of addressing racial disparity in policing and regaining public trust. Through SER, OIG has created one forum for the City to talk about those critical issues with community. OIG also advances the dialogue around disparity in the course of its regular oversight of SPD and OPA systems. For example, OIG will be examining bike helmet stops for disparity, an area OIG identified for inquiry prior to a viral video drawing public attention. Review of SPD and OPA handling of allegations of officer bias is another area of pending work. In addition, OIG is providing data analytical support to the City in exploring alternative response systems for persons in crisis.

July – December 2021

# Action Steps

For the second half of 2021, OIG will continue to support the City's Consent Decree efforts. It will continue to work to improve its understanding of community concerns, to decolonize OIG data, and to better see and address the impacts of systemic racism embedded in government infrastructure. It will continue to finish audit, policy, and investigations work begun in 2020 that shine a light on SPD operations in order to build community confidence in policing and police oversight. Ongoing work that OIG anticipates concluding in 2021 includes the following:

- Audit of Disciplinary Processes for Sworn SPD Personnel
- Additional SER reports and assessment by crowd psychology expert on significant periods from 2020 protests
- OIG recommendations on the City 2022 state legislative agenda
- Audit of Mutual Aid
- SMC Chapter 14.12 police intelligence audit report
- Annual reporting of trends in claims, lawsuits, and inquests
- Audit of Secure Firearm Storage (initiated after theft of a firearm from an SPD facility)

OIG will be monitoring the migration of the 911 call center out of SPD and any other changes the City may institute that will affect law enforcement services.



## Office of Police Accountability
### Andrew Myerberg, Director

# Office of Police Accountability

The Office of Police Accountability (OPA) has jurisdiction over allegations of misconduct involving SPD employees relating to SPD policy and federal, state, and local law. OPA investigates complaints and recommends findings to the chief of police. OPA also promotes public awareness of the complaint investigation process and identifies/recommends system improvements. OPA is physically and operationally outside of SPD but within it administratively. This ensures complete and immediate access to all SPD-controlled data, evidence, and personnel necessary for thorough and timely complaint handling.

In accordance with the 2017 Police Accountability Ordinance, all leadership positions at OPA are currently held by civilian employees. OPA hired two civilian investigators in 2020 to join the existing nine SPD sergeants who conduct investigations. Two is the maximum number of civilian investigators allowed under the Seattle Police Officer's Guild collective bargaining agreement. The remaining staff members are assigned to administrative, community engagement, policy and data analysis, operational management, and leadership positions. In 2020, OPA also began a legal intern program to expose one law student per academic quarter or semester to the field of police accountability and support OPA's in-house legal team.

January – June 2021

## Achievements & Challenges

OPA closed its office in March 2020 in response to the pandemic. Everything from technology to intra-office communication to onboarding new employees had to be revamped to fit within a virtual environment. A second shift followed when widespread demonstrations occurred following the killing of George Floyd by a Minneapolis police officer. The ensuing flood of complaints tested OPA's processing abilities and resulted in an unprecedented workload surge. In an all-hands-on-deck effort, various OPA staff shifted away from their normal work duties to help support investigative needs.

As the protests continued throughout the summer, so did the complaints about police conduct. Despite receiving case timeline extensions, investigation deadlines piled up. Each individual investigation required a significant amount of time, particularly to review body-worn video and draft findings. The protests had political ramifications, too, as the public called for new police accountability policies at both the local and state levels. OPA reacted by researching a multitude of policy recommendations, carefully weighing potential feasibility and impact. This information was then shared with elected officials to ensure they had a deeper understanding of these issues.

As a result of the protests, OPA's work was brought to the forefront of the public's awareness. Staff responded by creating a proactive communication strategy. The primary tenet of this approach was transparency: explain clearly what OPA was doing and why. This led to numerous media interviews to clarify OPA's processes, reasoning, and findings for protest-related complaints. OPA increased its social media presence and developed a dashboard to provide regular

updates to the community on the progress of each investigation. Finally, staff created "Investigations Explained" videos, which expounded on the evidence and described OPA's findings.

OPA established the following office-wide strategic priorities at the start of 2021.

### Increase transparency around what we do and why

The public is interested in police accountability, which is often opaque due to contractual provisions. OPA wants to change that by making more information public about what we do and why we do it. For example, creating a webpage that documents the cases in which the chief of police or chain of command reverses or disagrees with OPA's recommended findings.

### Create innovative products to tell our story

Reading a lengthy Director's Certification Memo should be one of a few different ways to find out about a specific investigation. OPA wants to think outside the box to make information more accessible. For example, compiling videos that both show and explain the findings of every investigation.

### Improve existing system functionality

There are many processes and procedures that go into receiving, processing, and investigating complaints. OPA wants to move beyond the status quo and push the boundaries of efficiency and effectiveness. For example, training all OPA investigators on new interview techniques.

### Institutionalize and document progress

OPA has grown, innovated, and improved throughout Director Myerberg's tenure. We want to ensure this progress is memorialized by creating thorough documentation. For example, creating an internal SharePoint site with guides on how to choose newsletter content and onboard new staff.

Looking back on the first six months of the year, OPA's priorities have been as follows.

### Finish the outstanding 2020 protest investigations

OPA was contacted approximately 19,000 times as a result of police conduct at 2020 protests. The emails, phone calls, and other feedback resulted in 145 investigations. As of June 11, 2021, 106 of those are complete; 18 of the investigations resulted in one or more sustained findings. OPA has issued systemic policy recommendations on 11 unique topics as a result of the protest-related investigations. Those recommendations have been on the following topics:

1. Recording body-worn video at demonstrations while upholding constitutional protections.
2. Balancing crowd escalation against the need to make arrests for misdemeanors during protests.
3. Improving processes for reporting force in instances where it is used multiple times.
4. Modifying the blast balls policy to reduce potential harm.
5. Requiring the chain of command to screen all high-profile social media posts.
6. Strengthening incident management protocols, command structure for complex incidents, and training for SPD commanders.
7. Developing a policy governing enforcement action against members of the media.
8. Ensuring that officer roles are clear in protest arrests so that required Miranda warnings are read.
9. Clarifying what it means to decontaminate individuals affected by OC spray.
10. Developing a training and engagement plan for officers responding to leaf blowers in protests.
11. Creating policy and training around the use of the Long-Range Acoustic Device.

## Complete work on paused initiatives

Since various OPA staff shifted away from their normal work duties to help support office needs due to protest activity, most internally driven initiatives were put on hold. Many of those efforts have resumed in the first half of 2021, including:

1. Improving the OPA "user" experience by addressing concerns within the complaint process such as communication gaps and inconsistent correspondence.

2. Influencing state legislative reform on police accountability by providing objective research and feedback to legislators.

3. Developing written guidelines to increase transparency around Rapid Adjudication, an alternative to traditional complaint resolution.

4. Creating an internal SharePoint site to enable better internal collaboration and communication.

## Reorganize the staffing structure

OPA reorganized its staffing structure in early 2021 to increase efficiency and effectiveness. The biggest change was splitting the investigators into two teams, each led by an assistant director. The community engagement specialists also shifted so that they were more closely aligned with investigations and could assist community members with complaint navigation.

July – December 2021

# Action Steps

Looking forward to the final six months of the year, OPA's priorities are as follows.

## Strengthen investigations

OPA plans to continue to advance the quality of its investigations and the professional development of its investigative team. This will include efforts to streamline investigative processes, improve written output from investigators and supervisors, and continue training staff on national best practices.

## Begin work on new initiatives

OPA would like to complete the following projects this year:

1. Update the existing OPA Internal Operations and Training Manual to reflect current practices and increase transparency into OPA actions.

2. Create a database of the legal rules OPA has applied in search and seizure cases to improve future consistency of rule application.

3. Finalize written drafts of all office policies, procedures, and tasks to memorialize current practice and aid in future knowledge transfer.

4. Research concepts surrounding "revisioning policing" in order to be a resource to city officials.

## Hire new staff

OPA plans to hire three additional staff members in the second half of 2021: a data analyst, a video content creator, and an additional investigations supervisor. These positions will provide further expertise and capacity to carry out OPA functions.



Community Police Commission
Brandy Grant, Executive Director

# Community Police Commission

In 2013, as part of the Consent Decree requirements in United States vs City of Seattle, the Community Police Commission (CPC) was created. The City of Seattle made the CPC permanent via the landmark 2017 Accountability Ordinance. The Commission is comprised of twenty-one community members supported by a team of six staff and an Executive Director. The CPC's mission is, "The Community Police Commission listens to, amplifies, and builds common ground among communities affected by policing in Seattle. We champion policing practices centered in justice and equity."

The year 2020 brought racial justice and police accountability to the forefront in an unprecedented manner in Seattle and across the nation. Last year also brought a sense of urgency to address issues the CPC has long fought for in Seattle. This urgency resulted in the CPC being primarily reactive to the Seattle Police Department's (SPD) protest response and to advocate for community needs in 2020.

In 2021, the CPC increased its outreach and policy advocacy to amplify the voice and concerns of community in local discussions about police accountability and public safety. The CPC hosted multiple town halls to ensure the recommendations it provided to the City of Seattle— regarding collective bargaining and SPD's use of force and crowd management policies— reflected the community concerns and interests.  For the first time, the CPC engaged in the State legislative process advocating for significant reforms to the police accountability structure in the state of Washington. The CPC also for the first time met its statutory obligation to create a publicly available database that tracks recommendations from the accountability partners and SPD's action or inaction on said recommendations.

In 2021 the Commission is focused on building organizational capacity to increase its efficacy. We have appointed seven new commissioners, elected new co-chairs and hired a new executive director. Over the past year, the CPC has filled positions to become a fully staffed office of seven.  Additionally, we have initiated a strategic planning process, facilitated by outside consultants to allow the new Commission the ability to set priorities and policies that will guide CPC's work for years to come.

January – June 2021

## Achievements & Challenges

### CPC Builds Organizational Capacity

Beginning in 2020 and continuing through 2021, the CPC has reached important organizational growth milestones. The CPC successfully completed a national search for a permanent Executive Director, appointing Brandy Grant, former CPC Commissioner and Interim Executive Director to create a new vision and direction for the CPC and revitalize and oversee its work for the next six years.  In addition, the CPC elected Erin Goodman and La Rond Baker as new co-chairs and welcomed the following new commissioners: Austin Field, Reverend Patricia Hunter, Tascha Johnson, Erica

Newman, Dr. Navin Pinto, Katherine Seibel, and Le'Jayah Washington. New commissioners were onboarded using a recently developed platform that provided Commissioners with a detailed history of the CPC and clearly outlined expectations.  The CPC also hired a Policy Director, Senior Policy Advisor, Policy Analyst, Community Engagement Director, and an Administrative Staff Specialist. Finally, the CPC began a strategic planning process with Connected Realities, LLC that will guide CPC's future work.

Due to COVID restrictions the CPC moved to a virtual meeting format which significantly increased community engagement and participation in regular and special meetings. During this time, the CPC also expanded its online and social media presence, including  Black History Month and Women's History Month social media campaigns.

## CPC Provides Robust Recommendations Regarding SPD's Policies and Practices

This year the CPC started strong. SPD requested substantive feedback on proposed changes to its use of force and crowd management policies with approximately a month to collect, analyze and compile community feedback. In addition to collecting hundreds of community comments through the CPC website and email, the Commission hosted a Town Hall that featured a diverse group  of panelists including SPD. The town hall was produced in partnership with Converge Media. The CPC distilled the public input into 15 recommendations on SPD's Crowd Management and Use of Force policies.[6] These recommendations call for protecting the sanctity of human life, placing controls on the use of police dogs, protecting medics during protests, and prohibiting threats of force and insults. SPD responded quickly and declined most of the CPC's recommendations. Of the recommendations SPD accepted two and agreed to partially implement a handful of others.[7]

For years, the CPC has flagged the police contracts as a major barrier to accountability. In 2021, for the first time, the CPC has a representative serving as a police accountability technical advisor to the negotiators of the SPD contracts. To inform CPC's advocacy around the collective bargaining process and accountability, the CPC hosted two community conversations. During these meetings, we shared background of the current contracts and on our work around collective bargaining and accountability. The City Department of Human Resources presented on legal restrictions on the negotiation and contracting processes. The first meeting was attended by representatives of twenty-five (25) community groups and the second by around fifty (50) community members. During these meetings, the CPC received detailed feedback that informed the eight (8) recommendations CPC provided to the Labor Relations Policy Committee. Many of the recommendations would lead to the full implementation of the 2017 Accountability Ordinance.[8]

---

6   CPC recommendations, January 29, 2021 https://www.seattle.gov/Documents/Departments/CommunityPoliceCommission/2021-01-29_RecsUseForceCrowdMgmtPolicies_compiled_CPC.pdf

7   SPD's response letter, February 3, 2021 https://www.seattle.gov/Documents/Departments/CommunityPoliceCommission/2021-02-10_ResponsePolicy_SPD.pdf

8   CPC recommendations, February 25, 2021 https://www.seattle.gov/Documents/Departments/CommunityPoliceCommission/2021-02-25_CollectiveBargainingRecs_CPC.pdf

## CPC Workgroups Start New Bodies of Work

The CPC has revitalized commissioner workgroups which now include police practices workgroups focusing on SPD's response to demonstrations and protest activity, community engagement workgroup, complainant appeals process workgroup, and behavioral health workgroup which will focus on de-escalation of individuals in crisis.

Recently, the CPC, for the first time, created a workgroup to advocate for statewide legislative reforms to improve police accountability in Seattle. In late 2020 the CPC set its legislative priorities— all but one of which were incorporated by the City of Seattle into its legislative agenda.[9] The CPC tracked the progress of the bills the Commission voted to support and supported the bills through written and oral testimony at legislative hearings. Many of the bills the CPC supported passed including restrictions on the use of chokeholds and no-knock warrants; strengthening the decertification process; statewide collection of use of force data; establishing a mandatory duty to intervene; and requiring independent investigations of the use of deadly force.[10]

## CPC Creates Police Accountability Recommendation Tracker

The Commission worked with accountability partners – the Office of Police Accountability (OPA), Office of Inspector General (OIG), and SPD – to develop the Police Accountability Recommendations Tracker (PART), which was published in April 2021.[11] PART is a publicly accessible data dashboard that tracks all recommendations and the status of their implementation in one place. The primary purpose of PART is to ensure transparency and ease of access to recommendations made by all three accountability partners to SPD — and SPD's response or implementation regarding the same.  PART also fulfills CPC's mandate from the Accountability Ordinance to track all accountability partners' recommendations and allows for more robust and thorough conversations about SPD's pattern of implementation and engagement with the accountability partners.

The CPC's primary challenge in 2021 is that it is functionally a new organization with new leadership and new staff operating under heightened community expectations and working remotely. There was almost a full turnover in CPC office staff and as of this writing most staff have been working for the CPC for less than a year.

This turnover meant that it was necessary to rebuild and develop relationships with our accountability partners— (OPA, OIG, SPD) City Council, the Mayor, and the Monitoring Team. While we have seen recent improvements, the CPC has struggled to have consistent and meaningful communications with the Monitoring Team and SPD. This has meant that there have been missed opportunities to collaborate in meaningful and fulsome ways.

---

9   The City did not include our recommendation to ban tear gas in Washington State.

10   More details at https://www.seattle.gov/community-police-commission/current-issues/state-legislative-agenda

11   See here https://www.seattle.gov/community-police-commission/current-issues/recommendations-tracker

July – December 2021

# Action Steps

In the second half of 2021, the CPC will continue to develop and build upon the work described above to increase transparency and accountability in policing.

The work of the CPC largely resides in its workgroups. Workgroups are created to focus on a specific body of work and allows for deeper exploration, discussion, and community involvement regarding public safety. Currently, the CPC has the following workgroups:

- Police Practices — has a current focus on SPD's policies and practices regarding demonstration management;
- Complainant Appeals Process — mandated by City Council Resolution 31753, companion resolution to the 2017 Accountability Ordinance, will investigate the feasibility of establishing an appeal process for individuals who are dissatisfied with how their complaints were resolved;
- Behavioral Health — has an initial focus on de-escalation techniques to be used in interactions with individuals experiencing a mental health crisis;
- Strategic Planning — develops the CPC's goals and strategies for the next five years;
- State Legislative Agenda — develops the CPC's legislative priorities and strategies for 2022 legislative session; and
- PART Workgroup — in conjunction with OIG, OPA, and SPD. The CPC will refine the process to track recommendations made by the accountability partners and ensure that all updates are shared in a manner that allows for timely and accurate tracking.

The CPC continues to focus on community engagement and education. To that end, the CPC will develop podcasts focused on police accountability topics including collective bargaining and crowd control strategies. The CPC will also publish a monthly newsletter. In addition to continuing to host our monthly Community Engagement committee meetings and Town Hall meetings, we will also expand Commissioner community engagement and outreach efforts.

Later this year, the CPC will also release the Accountability Ordinance tracker which will be a publicly accessible dashboard covering the implementation status of each aspect of the 2017 Accountability Ordinance.

# Conclusion

The CPC looks forward to capitalizing on the changes, momentum, and challenges brought by 2020 and the first half of 2021 to continue to elevate community voices in working towards a Seattle public safety system that enables all Seattle communities to feel safe and thrive.



# Summary

This semi-annual report has provided an in-depth look at the strategies and actions the Seattle Police Monitor and the City of Seattle are working on in 2021 to ensure compliance with the Consent Decree. While the Monitoring Team is still evaluating the policies, data, training, and results of policing, the City and SPD continue to work diligently to uphold commitments under the Consent Decree, to engage in ongoing self-evaluation and correction, and to provide the Monitoring Team with the data and information needed for a comprehensive assessment.

As the report brings to light, there is a robust ecosystem of organizations – not only the Monitoring Team and the Seattle Police Department but also the Office of Police Accountability, the Office of Inspector General, the Community Police Commission, and supporting community-based collaborations – that are co-creating and building the future of constitutional, lawful, and accountable policing. This is vitally important for progress, as no organization alone can ensure that public safety outcomes are sustainably trusted and legitimate. It is critical that this ecosystem approach continues to root and grow in Seattle.

For the balance of 2021, the Monitoring Team will be working with the leadership of the City of Seattle and the ecosystem of organizations to complete the deliverables in the Monitoring Plan.  The end-of-year report will provide a full assessment of progress and compliance with the Consent Decree and outline steps, if any, that Seattle must focus on in 2022 to meet and sustain compliance.

The Monitoring Team looks forward to completing this work effectively, efficiently, and legitimately for the people of Seattle, and we welcome your ideas and engagement.

# Acknowledgments

The Seattle Police Monitor would like to expressly thank the Monitoring Team:



**Monisha Harrell**
**Deputy Monitor**



**Ron Ward**
**Associate Monitor**



**Matthew Barge**
**Associate Monitor**

Additionally, credit and thanks are due to Karen Notch and Erica Jones for administrative, operational, and technical support and Todd Gillenwaters for the report's graphic design.

# Seattle Police Monitor

www.seattlepolicemonitor.org