THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 2:12-cv-01282-JLR |
| Plaintiff, | ) | |
| | ) | **CITY OF SEATTLE'S QUARTERLY** |
| v. | ) | **ACCOUNTABILITY UPDATE** |
| | ) | |
| CITY OF SEATTLE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**CITY OF SEATTLE'S QUARTERLY ACCOUNTABILITY
UPDATE** - 1
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

# TABLE OF CONTENTS

I.   Introduction ................................................................................................................. 3

II.   The protests of last year tested the City's police accountability system—a system that was created and strengthened under the Consent Decree—and resulted in significant progress. ......... 4

    A.   Responding to public concerns and in recognition of its shortcomings, SPD reformed its crowd management policies and undertook a major training effort to improve officers' crowd management tactics. ............................................................................................................... 5

    B.   A community-centered process, convened by the Office of Inspector General for Public Safety, recently yielded recommendations for how to prevent recurrence of the negative events at last year's protests; critically, the recommendations are supported by a panel of community members and SPD officers................................................................................................. 7

    C.   The Office of Police Accountability has risen to the challenge and investigated an unprecedented number of complaints alleging police misconduct during the protests. ............. 9

    D.   SPD and OIG continue to study racial disparities in policing; SPD acknowledges the critical importance of addressing this issue, has made changes, and is working to implement further change. ............................................................................................................... 12

III.   With its non-compliance ruling in 2019, this Court spurred action within the City to improve the collective bargaining process and pursue contract reforms in areas identified by the Court.. 15

    A.   The City has made concrete accountability improvements in areas of concern highlighted by the Court, Accountability Partners, City Council, and outside experts. .............................. 15

    B.   The City modified the collective bargaining process to obtain a greater level of community input. .................................................................................................................. 18

    C.   The City recently obtained legal precedent that will strengthen its position in officer disciplinary appeals going forward. ...................................................................................... 21

IV.   The Parties and the Monitor are working to reassess compliance with the Consent Decree commitments and strengthen SPD's capacity to foster public confidence. ................................. 23

V.   Quarterly activities in the areas of police discipline and proposed legislation demonstrate an effective disciplinary system and City leaders who are actively engaged.................................... 24

    A.   Officer Disciplinary Data ......................................................................................... 24

    B.   Less Lethal Weapons Bill ......................................................................................... 26

    C.   Proposed legislation to stagger CPC Commissioner terms. ......................................... 27

VI.   CONCLUSION ......................................................................................................... 28

The Monitoring Plan, Dkt. 655-1, includes a commitment for the City to provide quarterly reports updating the Court on its progress. This report describes the accomplishments and ongoing work of SPD and the City's police accountability system, including in the area of crowd management.

## I.      INTRODUCTION

Mid-way through 2021, the Court, Monitor, and parties have an opportunity to consider the status of progress under the Consent Decree. It has been more than one year since George Floyd was murdered, inspiring a intense, sustained demonstrations against police brutality. It has been more than two years since the Court found the City out of compliance with the Consent Decree in the area of accountability.

As the protests of 2020 unfolded, the City recognized it had been unprepared to address events of that nature and magnitude and that these events had significantly undermined public trust. SPD and law enforcement agencies in dozens of other cities, used less lethal devices, including chemical irritants, to respond to incidents of violence that occurred during the largely peaceful protests. Community members, advocacy groups, and City leaders raised concerns about SPD's tactics. Before these events, the parties had filed a motion to terminate key provisions of the Consent Decree. Dkt. 611-16. Days into the protests, however, the City withdrew the motion in order to allow a thorough examination of SPD's policies, tactics, and uses of force. Dkt. 621.

This examination of SPD's response to the protests is underway and meaningful progress has been achieved. The experience of the past year demonstrates that the Consent Decree has equipped the City with the institutions and processes necessary to course correct when problems arise. The Executive and City Council asked the independent police accountability entities to help

**CITY OF SEATTLE'S QUARTERLY ACCOUNTABILITY UPDATE** - 3
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

and they worked to examine the protest incidents and make systemic recommendations, including those submitted to the Court last August. *See* Dkts. 636-1, 637-1, 639-1. Based on their recommendations and its own internal review, SPD has made numerous changes to its crowd management policies, tactics, and training. *See* Dkts. 657 and 658.

In addition to examining the events of last year, the City has been working to address the accountability concerns raised by the Court. The City has made concrete advancements in these areas, which include: the selection of arbitrators, the 180-day timeline for disciplinary investigations, subpoena power of the Office of Police Accountability (OPA) and the Office of Inspector General for Public Safety (OIG), and accessibility of information about police discipline and appeals. In addition, the Executive and members of City Council—the two government branches with authority over contract negotiations—have committed publicly that the issues raised by the Court will be prioritized in the current round of bargaining.

## II.  THE PROTESTS OF LAST YEAR TESTED THE CITY'S POLICE ACCOUNTABILITY SYSTEM—A SYSTEM THAT WAS CREATED AND STRENGTHENED UNDER THE CONSENT DECREE—AND RESULTED IN SIGNIFICANT PROGRESS.

The first layer of the police accountability system is internal to SPD. It includes force reporting requirements for officers and review and investigation by either the officer's chain of command or the Force Investigation Team and Force Review Board, depending on the severity of the force involved. The Consent Decree contains numerous requirements to build SPD's internal capacity to identify problems and correct them. These internal review processes are also buttressed by three independent organizations, collectively called the Accountability Partners—OPA, OIG, and the Community Police Commission (CPC). OPA investigates complaints of misconduct against

individual officers; OIG ensures the fairness and integrity of the police system as a whole by auditing and reviewing the management, practices, and policies of SPD and OPA, identifying best practices, and making systemic recommendations for lasting reform; and CPC gives the community a voice into SPD's operations, policies, and priorities.  Both internal and external accountability processes played a role in reviewing and addressing concerns stemming from last summer's protest response.

> **A.** **Responding to public concerns and in recognition of its shortcomings, SPD reformed its crowd management policies and undertook a major training effort to improve officers' crowd management tactics.**

As described at length in the City's previous filing, since last year SPD has made numerous changes to incorporate feedback from the public, the Accountability Partners, subject matter experts, and the Monitoring Team. SPD modified its crowd management tactics and, with the Court's approval, reformed its crowd management and use-of-force policies.[1] Dkts. 657, 658, & 662. SPD also has incorporated Judge Jones' injunction in *Black Lives Matter—King County, et al. v. City of Seattle*, No. 2:20-civ-00887-RAJ, Dkt. 42 (W.D. Wash. June 17, 2020), into all of its practices and policies. Among many changes, SPD adopted the following policy revisions:

- Reduced officers' visible presence at demonstrations, when safe and feasible, in recognition of the fact that the appearance of officers can affect interactions with a crowd.
- Took additional measures to provide media, legal observers, and protest medics safe avenues to carry out their important roles.
- Required incident commanders to complete additional pre-event planning.

---

[1] As the Court may be aware, the City Council's Public Safety and Human Services Committee recently recommended the Full Council approve draft legislation regarding SPD's use of less lethal weapons. Procedural considerations for compliance with paragraph 177 of the Consent Decree are discussed in Section V.B, below. It is possible that the conclusion of this legislative process will have implications for the policies discussed in this report.

**CITY OF SEATTLE'S QUARTERLY ACCOUNTABILITY UPDATE** - 5
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

- Adopted new requirements for issuing an order to disperse, including using sound amplification, giving protestors instructions for how to find a clear pathway to exit, and giving people more time to comply before less lethal devices[2] can be used.

- Placed greater emphasis on de-escalation whenever it is safe and feasible, for example by meeting with event organizers, carefully considering the type of uniforms and visible police presence warranted for each event, and using social media to communicate information to protestors in real time.

- Implemented new tactics to address individuals who are taking unlawful actions in otherwise lawful crowds, in order to minimize the incidental effects (e.g, of OC spray or blast balls) on non-violent demonstrators. SPD has not used blast balls at a protest since September 26, 2020, and it has not used tear gas since last summer.

Consistent with recommendations from OIG, improved communication and public education are one of the most important areas in which SPD has made changes. At the suggestion of OIG, to better communicate with crowds, SPD invested in sound amplification technology to ensure that, if a crowd must be dispersed for public safety reasons, officers' orders can be heard even by those at the back of the crowd. Officers also now give more detailed and clear instructions about why they are issuing a dispersal order and how and where to depart, because it can be difficult for someone in the middle of a large crowd to find a clear pathway to exit.

To accompany these tactical and policy changes, SPD conducted a major effort to provide updated training to nearly 1,200 officers. Starting on April 6, 2021, SPD began implementing a mandatory Crowd Management, Intervention, and Control training for all sworn personnel with the rank of Captain or below. Every officer completed a full day of training; half is in the classroom and half teaches practical skills. The classroom training covers lessons learned from the 2020 protests and the policy revisions discussed above. The practical portion of the training gives

---

[2] The Consent Decree defines the term as a "device that is not expected or intended to cause death or Great Bodily Harm." ¶ 45.

**CITY OF SEATTLE'S QUARTERLY ACCOUNTABILITY UPDATE** - 6
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

officers the opportunity to perform crowd management drills and scenarios. All active[3] officers have completed the training.

### B. A community-centered process, convened by the Office of Inspector General for Public Safety, recently yielded recommendations for how to prevent recurrence of the negative events at last year's protests; critically, the recommendations are supported by a panel of community members and SPD officers.

OIG was formed in 2018 by the City's Accountability Ordinance to provide systemic oversight of SPD's practices. The events of last year have only underscored the importance of OIG's role. In response, OIG swiftly set about convening a community-centered process, called a Sentinel Event Review (SER), to examine SPD's response to the protests through a non-blaming, forward-looking framework. The goals of the SER process are to reflect the perspectives of the community, identify root causes of negative outcomes, and recommend ways to improve systems.

OIG issued a report with recommendations from the first SER Panel on July 22, 2021.[4] The panel was composed of six community members, six SPD officers, and the Inspector General. While the Panel was limited in numbers for practical reasons, it included a diverse group of community members and SPD officers from different ranks who had firsthand experience responding to protests. It was supported by subject matter experts in areas such as crowd psychology. The Panel examined the first of five waves of significant protest-related activity, including many of the most widely criticized incidents and a significant share of SPD's uses of force. *See* Ex. A at 3-4 (listing incidents). To achieve a set of consensus recommendations from these panel members, OIG employed a peacemaking process for building trust and rapport: "These

---

[3] This excludes officers on extended leave.

[4] The report and a presentation summarizing it are attached as Exhibits A and B.

CITY OF SEATTLE'S QUARTERLY ACCOUNTABILITY UPDATE - 7
(12-CV-01282-JLR)

Peter S. Holmes
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

recommendations, which represent the consensus views of community members and SPD officers of varying ranks, would not have been possible without a peace and reconciliation approach to dialoguing." Ex. A at 1.

The Panel made recommendations in five main areas: community legitimacy; situational awareness of SPD; communication and community engagement; tactics and equipment; and officer wellness and training. Among other insights, the Panel determined that last year's interactions between officers and protestors revealed a gap between the legal requirements that constrain officers and the community's expectations for public safety and justice. Exhibit A at 6. In addition, the Panel provided insights into what made these protests different and why SPD's time-tested crowd managements did not work:

> Police misconduct and systemic and institutional racism within everyday encounters provided the original stimulus for demonstrations and set the identity of the demonstrations, which were already defined by a perception of police illegitimacy. … With this historical context and identity, SPD tactics that had allowed prior events to occur peacefully and safely were now more likely to escalate tension and increase the outpouring of anger and resentment rather than facilitate peaceful demonstrations. . . . In a sign of the community's current distrust of police and of SPD, many organizers refused to communicate with SPD, viewing them as part of the problem rather than a possible partner in the solution. The absence of advance notice of protester intentions and goals forced SPD into a more reactive approach to crowd management rather than a proactive conversation about protest facilitation. This, coupled with the anti-police focus of the Events, created a "new normal" for protests that SPD was reacting to for the first time, in real time.

*Id.* at 21-23.

While it has only been a few weeks since the report was issued, the Chief of Police is committed to working with the City and OIG to identify improvements stemming from the SER recommendations. SPD has already implemented some of the recommendations and is in the

CITY OF SEATTLE'S QUARTERLY ACCOUNTABILITY
UPDATE - 8
(12-CV-01282-JLR)

Peter S. Holmes
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

process of reviewing the full report.[5] Over the rest of this year OIG will convene additional SER panels to examine other important protests events. Ex. A at 3. SPD command staff will continue to review and address the recommendations of the panel's reports as they are released.

### C.    The Office of Police Accountability has risen to the challenge and investigated an unprecedented number of complaints alleging police misconduct during the protests.

OPA has existed since 2002; however, the rigor of its systems were made more robust through the Consent Decree process. It too faced significant challenges in the past year. OPA received over 19,000 communications regarding possible misconduct related to the protests and distilled them to 145 investigations (over 13,000 of the contacts were about a single, widely publicized incident[6]). In response, OPA created a demonstration dashboard so the public can track progress into investigations and easily review OPA's findings.[7]

---

[5] The Report notes:

> SPD has engaged in a self-critique of many of the events reviewed by the Panel and has begun to implement improvements, at least in part as a result of the Panel's discussions in advance of the release of this Report. OIG was also involved in conversations with SPD about improvements stemming from the OIG August 2020 report on crowd management and less lethal tools. Thus, the report may include recommendations that are already in place or are in the process of implementation.

Exhibit A at 14.

[6] OPA received over 13,000 complaints about a child who attended a protest with his parent and was hit by pepper spray. OPA created a video presentation explaining its findings, published here: https://www.seattle.gov/opa/news-and-reports/news The OPA Director's written findings recommending a "not sustained" finding are available at: https://www.seattle.gov/Documents/Departments/OPA/ClosedCaseSummaries/2020OPA-0322ccs09-04-20.pdf

[7] Available at http://www.seattle.gov/opa/case-data

CITY OF SEATTLE'S QUARTERLY ACCOUNTABILITY
UPDATE - 9
(12-CV-01282-JLR)

Peter S. Holmes
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

OPA issued its first protest-related findings in September 2020 and as of now it has completed approximately three-quarters of the protest investigations. Out of 109 closed investigations, OPA recommended a "not sustained" finding in 91. In 18 cases, OPA recommended a "sustained" finding (in other words, OPA determined that one or more officers committed misconduct). Among other sustained findings, for 13 allegations OPA concluded that an officer used unnecessary or excessive force. In 30 cases (some which involved sustained allegations and some which did not), OPA identified a minor policy violation or performance issue and requested that a supervisor take specific, relevant action with the officer (such as training or coaching). All OPA's protest case summaries are available online.[8] In addition to publishing a case summary explaining each finding, OPA has provided a short video of some high-profile incidents to help the public understand the reasons for its findings.[9]

Thus far, the Chief of Police has agreed with OPA's recommended findings and imposed discipline in all but one of the protest investigations. The one exception is a widely publicized incident that occurred on June 1, 2020, and involved a pink umbrella, in which officers used pepper spray, tear gas, and blast balls to disperse a crowd. OPA determined that SPD's decision to disperse the crowd and to use less-lethal tools to do so was unjustified and recommended discipline for the lieutenant who issued the orders.[10] OPA had considered the lieutenant to be the *de facto* Incident

---

[8] Available at http://www.seattle.gov/opa/case-data/demonstration-complaint-dashboard#completedprotestcases.gov

[9] Available at https://www.youtube.com/channel/UCPvinIUku-If5fXudC0zJPwbility - YouTube

[10] Available at https://www.seattle.gov/Documents/Departments/OPA/ClosedCaseSummaries/2020OPA-0334ccs010821.pdf

**CITY OF SEATTLE'S QUARTERLY ACCOUNTABILITY UPDATE** - 10
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

Commander, but Chief Diaz disagreed and concluded that the city-wide Incident Commander for the demonstrations that took place between May 29 and June 1, 2020, was responsible. Chief Best had made the initial decision to remove the person from the city-wide Incident Commander role in the immediate aftermath of the June 1 incident. In his statement disagreeing with OPA's finding, Chief Diaz further stated: "As a simple matter of fairness, I cannot hold the [lieutenant] responsible for circumstances that were created at a higher level of command authority and for carrying out decisions made at a higher rank." The Chief's full statement is available on SPD's website.[11]

In some of its protest investigations, OPA has identified systemic issues that go beyond the actions of individual officers and may be more effectively addressed through changes to training or policy than through discipline. Thus far, OPA has issued 12 protest-related recommendations (in 14 cases) to SPD addressing an array of issues such as ensuring accuracy in SPD social media posts, placing additional restrictions on the use of blast balls, changing municipal law to expand the use of body-worn video at protests, treatment of media observers at demonstrations, strengthened incident management protocols for demonstrations, and improving consistency of force reporting during demonstrations.[12] OPA also provided extensive recommendations and feedback on SPD's recently revised polices on crowd management and the use of force.

---

[11] Available at https://spdblotter.seattle.gov/2021/05/26/chief-diaz-announces-command-staff-change/)

After being demoted, the person filed a Claim for Damages against the City asserting civil rights violations.

[12] OPA's recommendations are published here: Policy Recommendations - OPA | seattle.gov

**CITY OF SEATTLE'S QUARTERLY ACCOUNTABILITY UPDATE** - 11
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

1    Thus, even with unprecedented numbers of complaints, OPA has demonstrated its capacity

2    to thoroughly process and investigate allegations of misconduct and address them in a way intended

3    to foster community trust and improve SPD operations.

4    **D.      SPD and OIG continue to study racial disparities in policing; SPD
         acknowledges the critical importance of addressing this issue, has made
5         changes, and is working to implement further change.**

6    Racial disparity in policing continues to be a topic of enormous concern. While the Consent

7    Decree does not require the City to demonstrate eradication of disparity, it does (through revisions

8    to SPD's Bias Free Policing policy), require SPD to study and attempt to eradicate unwarranted

9    disparities.

10   In 2019, SPD conducted a "disparity review" which included rigorous statistical analysis

11   of *Terry* stops and firearm pointing incidents. Dkts. 554-1 & 600-1. The effort also included a

12   community-centered review of individual incidents. Together, the advanced statistical and

13   community work pointed to multiple areas where SPD could make changes that could potentially

14   decrease disparate impacts. Dkt. 600-1 at 29-30.

15   While the COVID-19 pandemic limited its ability to undertake more ambitious efforts,

16   SPD has been working to address these findings. For example, SPD found disparities with firearm

17   pointing. To ensure adequate scrutiny, SPD revised policy so that any pointing of a firearm—

18   whether intentional or not—at a person is a reportable use of force. As part of a more sustained

19   effort, SPD engaged a contractor to help embed disparity analytics and reviews of potential over-

20   and under-policing into its management dashboards. SPD will use this tool to devote one of every

21   four of its monthly SEASTAT management meetings to the topics of disparity and over- and

22   under-policing.

23   **CITY OF SEATTLE'S QUARTERLY ACCOUNTABILITY
     UPDATE** - 12
     (12-CV-01282-JLR)

SPD also began a partnership with the Center for Policing Equity (CPE), a Los Angeles based social justice and policing think tank. CPE is undertaking a nationwide effort to collect enforcement and use of force data from departments across the country to help develop strategies for more equitable policing. SPD has worked with CPE to identify and share its extensive policing data.

CPE completed a report on SPD in 2021.[13] When compared to the demographics of Seattle residents, CPE found stark racial disparities in *Terry* Stops and uses of force, particularly in interactions with Black people and Native Americans. CPE did not reach conclusions about the causes of the disparities, recognizing that these disparities can result from varied causes, many of which fall outside the control of individual officers. Nonetheless, CPE made recommendations for ways to decrease disparity in SPD's operations.

SPD has been working to implement CPE's recommendations. Chief Diaz reaffirmed SPD's prioritization of these issues: "The CPE report and its recommendations mirror my commitments to ensuring equity for all. The SPD will not hide from the hard work ahead but will embrace our mandate to end bias in policing."[14] Thus far, SPD has acted on CPE's recommendations by implementing a new reporting system to ensure that its data on stops and use of force is more complete; changing its policy to ban neck and carotid restraints; and by making arrest and booking information available to the public in its online dashboard.

---

[13] Available at https://spdblotter.seattle.gov/wp-content/uploads/sites/11/2021/07/SPD_CityReport_Final_1.11.21-1.pdf

[14] Available at https://spdblotter.seattle.gov/2021/07/15/seattle-police-department-and-center-for-policing-equity-release-findings-from-policing-practices/

**CITY OF SEATTLE'S QUARTERLY ACCOUNTABILITY UPDATE** - 13
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

1      Recognizing the importance of these issues to the public, OIG has several projects planned

2  in this area. OIG is in the process of conducting an audit of discretionary citations issued by SPD

3  (e.g., failure to wear a bike helmet) to assess for evidence of bias and disparity. This effort also

4  will examine SPD's training efforts on bias and disparity. *See* OIG's 2021 Workplan at 5, 14.[15] At

5  the request of Councilmember Herbold, OIG will conduct a descriptive analysis of OPA's process

6  and outcomes in investigations of bias-based policing and perform benchmarking analysis of how

7  other cities investigate such complaints. *Id.* at 5. Also importantly, in 2020, OIG began to sample

8  bias complaints that OPA closed out and referred to SPD supervisors, in order to monitor this area

9  for effectiveness, limitations, and risk. *Id.* at 11.

---

[15] OIG's detailed 2021 workplan is available on its website:
https://www.seattle.gov/Documents/Departments/OIG/Annual/OIG2021Work%20Plan122120.pdf

**CITY OF SEATTLE'S QUARTERLY ACCOUNTABILITY UPDATE** - 14
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

III.   **WITH ITS NON-COMPLIANCE RULING IN 2019, THIS COURT SPURRED ACTION WITHIN THE CITY TO IMPROVE THE COLLECTIVE BARGAINING PROCESS AND PURSUE CONTRACT REFORMS IN AREAS IDENTIFIED BY THE COURT.**

Addressing the Court's accountability concerns will be critical to ensure public confidence in SPD. Accordingly, this section of the report includes a status update on these topics.[16]

A.   **The City has made concrete accountability improvements in areas of concern highlighted by the Court, Accountability Partners, City Council, and outside experts.**

Since 2019, the City has worked to identify areas where change could be made quickly and without extensive bargaining. The City has taken achievable, concrete steps in these areas. But the improvements made thus far do not alter the fact that broader changes to the CBA can be achieved only by bargaining a new contract. Under state labor law, all aspects of police discipline are "mandatory" bargaining subjects. To that end, the Executive and members of City Council have publicly committed that the Court's areas of concern will be top priorities in the current round of bargaining negotiations.

The first area of concern identified by the Court is the risk that OPA's disciplinary investigations into officer misconduct will "time-out" due to a 180-day time limit in the CBA. May 15, 2019, Hearing Trans. at 17:11-18:14; Dkt. 562 at 13. The City provided access to the previous Monitor and retained outside experts, 21CP Solutions, LLC (21CP) to examine the impact of the time limit on discipline. 21CP concluded that there had been no impact on discipline in the past two years, but that risk exists. Dkt. 598-2 at 43. As a near-term step, the City executed a protocol

---

[16] CPC's filing, which was stricken by the Court, requested a status update, in addition to other relief. *See* Dkts. 676 & 681. The City agrees that it is time for an update on these topics. If called for, the City will be prepared to address CPC's other requests at the upcoming hearing on August 10.

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

that covers city and county prosecutors and requires them to notify OPA when prosecutor review starts and finishes (i.e., when 180-day clock stops and re-starts). Exhibit C. Longer-term, the Executive and members of City Council have publicly committed to prioritize this issue in collective bargaining negotiations.

The second area of concern identified by the Court is the limits on OPA and OIG subpoena authority. May 15, 2019, Hearing Trans. at 17:11-18:14; Dkt. 562 at 13. The City provided access to 21CP to examine the impact of subpoena limits on investigations. 21CP interviewed OPA and OIG and determined that the limits have not impeded specific investigations, but have symbolic import and could affect likelihood of future compliance. 21CP also determined that the boundaries of authority and procedures for issuing subpoenas were unclear. Historically, the City has been limited in securing subpoena power to OPA and OIG because of (1) potential legal challenges based on due process concerns; and (2) objections by the police unions. Accordingly, as a near-term step, the City enacted legislation establishing subpoena procedures for OPA and OIG. The legislation codifies due process protections for subjects of subpoenas (including complainants and civilian witnesses) and authorizes OPA and OIG to seek a court order to address non-compliance. Ordinance 126264.[17] SMC §§ 3.29.126, 3.29.245. In the last round of bargaining, the City successfully negotiated to address these concerns in the SPMA contract, which contains no restrictions on subpoenas. *See generally* Dkt. 512-1. Longer-term, the Executive and members of

---

[17]Also available at:
https://seattle.legistar.com/ViewReport.ashx?M=R&N=Text&GID=393&ID=4180691&GUID=E50842EA-E997-4E37-AA52-8AF6EBC1DA54&Title=Legislation+Text

**CITY OF SEATTLE'S QUARTERLY ACCOUNTABILITY UPDATE** - 16
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

City Council have publicly committed to prioritize this issue in collective bargaining negotiations with SPOG.

Third, the Court identified concerns over the quantum of proof and standard of review used by arbitrators who decide disciplinary appeals of police officers. May 15, 2019, Hearing Trans. at 17:11-18:14; Dkt. 562 at 13. Because these disciplinary procedures are established explicitly by provisions in the CBAs, no changes can be made without bargaining new contracts. Longer-term, the Executive and members of City Council have publicly committed to prioritize this issue in collective bargaining negotiations with SPOG.

Fourth, the Court identified concerns regarding transparency into police discipline and the role of arbitrators. May 15, 2019, Hearing Trans. at 17:11-18:14; Dkt. 562 at 13. To increase transparency into police discipline, starting in June 2020, OPA began posting anonymized information about the disciplinary resolution for each of its investigations and the status of all pending or open disciplinary appeals[18] on its website.

As a result, a member of the public now can look up any OPA case from 2016 or later and read the OPA Director's findings, determine what discipline the Chief imposed, learn whether the discipline has been appealed, and see the status and final outcome of each appeal.[19] In order to make this information as accessible and interactive as possible, OPA created a dashboard that

---

[18] The Seattle City Attorney's Office provides disciplinary appeals data to OPA.

[19] Available at http://www.seattle.gov/opa/case-data

**CITY OF SEATTLE'S QUARTERLY ACCOUNTABILITY UPDATE** - 17
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

aggregates complaint and case information, as well as the demographics of the officers and complainants (such as gender, race, and age). The online database is fully searchable.[20]

Since the Court's non-compliance order, the City also has worked to increase neutrality and quality of arbitrators in police discipline cases. In fall 2019, the City negotiated a new process with SPOG for the selection of neutral, experienced, and highly accredited arbitrators (with strict limits on ability to strike arbitrators). Dkt. 598-4. 21CP concluded that the new selection process appears to be fair and efficient; yet the pool of arbitrators lacks diversity. Dkt. 598-2 at 49.

Importantly, the State Legislature recently enacted reforms state-wide which will continue to improve the arbitrator selection process. Changes consistent with the legislation must be incorporated into the next contracts with both SPOG and SPMA. The Law Enforcement Disciplinary Grievance Arbitration Act[21] provides that all police discipline arbitration hearings must be heard by arbitrators that are part of a new PERC panel of arbitrators. All of the arbitrators will be trained for performing these tasks, and the arbitrator for any case will be appointed by PERC, thus removing the parties from in any way controlling or influencing that process.

### B. The City modified the collective bargaining process to obtain a greater level of community input.

The concerns raised by the Court have also been raised as concerns by individuals and groups in the Seattle community, including the Accountability Partners. Accordingly, the City has taken steps to improve community input into the collective bargaining process going forward. While the process already includes opportunities for the community to provide input before

---

[20] Available at https://www.seattle.gov/opa/news-and-reports/closed-case-summariessummaries - OPA | seattle.gov

[21] Available at http://lawfilesext.leg.wa.gov/biennium/2021-22/Pdf/Bills/Session%20Laws/Senate/5055-S.SL.pdf?q=20210410160716

CITY OF SEATTLE'S QUARTERLY ACCOUNTABILITY UPDATE - 18
(12-CV-01282-JLR)

Peter S. Holmes
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

bargaining begins and when bargaining ends (before the City Council votes on a new contract), the Executive and City Council have taken steps to ensure that the process will be even more inclusive during this current round of bargaining.

First, as required by ordinance, the City held public hearings on the SPMA and SPOG contracts on September 18, 2019, and December 5, 2019, respectively. CPC co-chaired these public hearings in tandem with City Council's Gender Equity, Safe Communities, New Americans and Education Committee and Labor Relations Policy Committee. CPC, OPA, and OIG representatives and many members of the public testified. Councilmembers spoke about their priorities and goals for reforming the contracts. Many voiced a strong commitment to address concerns raised by the Court in 2019. Public hearing testimony was memorialized with Resolution 31930.[22]

Second, the City modified the process of setting bargaining "parameters." Parameters are a confidential[23] set of guidelines, priorities, and upper and lower boundaries that tell the City's negotiators what type of contract the LRPC and City Council would be willing to accept. Parameters greatly influence the outcome of the negotiations.

By ordinance, the Executive and City Council set the bargaining parameters together, through the City's Labor Relations Policy Committee (LRPC), composed of five councilmembers,

---

[22] Available at http://clerk.seattle.gov/search/resolutions/31930

[23] Confidentiality of parameters helps the City bargaining team obtain their bargaining goals. Imagine going to buy a car and telling the dealer first thing: "I would like to pay $18,000, but I think $20,000 is a fair price, and I would be willing to go as high as $23,000."

**CITY OF SEATTLE'S QUARTERLY ACCOUNTABILITY UPDATE** - 19
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

the City's Human Resources Director, a representative appointed by the Mayor, and a representative from the City Budget Office. SMC 4.04.120(C).

This time, all of the Accountability Partners and the community have had significant and direct input into the parameters and that process for input has been formalized. First, the City's Labor Relations Department, the City's bargaining team, members of City Council, Council Central staff, OPA, OIG, and CPC, spent a period of several months working to clarify the roles that each could play in bargaining under existing labor law. Under this new process, the roles of OPA and OIG have been formalized and include their attendance at LRPC meetings and participation in some bargaining sessions as subject matter experts. In addition, a representative from the CPC is serving as a Technical Advisor throughout bargaining negotiations. This change marks the first time a representative from the Community Police Commission will have a role in the bargaining process. As a result of these changes, over the course of 2020 and 2021, through their selected Technical Advisors, OIG, OPA, and CPC have had substantial input into the parameters for both SPMA and SPOG. They have attended LRPC meetings and met regularly with the City's Labor Relations team.

Once parameters are finalized, the City and the union start bargaining. Negotiations with SPMA began in early 2021[24] and negotiations with SPOG will begin after the City sets parameters.[25] At the start of negotiations, the City and the union must each set forth their respective

---

[24] While SPMA negotiations began in early 2020, they were suspended shortly thereafter during the pandemic, and began again in early 2021.

[25] The SPOG collective bargaining agreement expired one year after the SPMA agreement. Bargaining has been delayed by several factors. The COVID-19 pandemic created extreme uncertainty over the City's budget; it was believed that remote bargaining would be less effective; and the afstrictddition of numerous meetings and consultations with the Accountability Partners added preparation time.

CITY OF SEATTLE'S QUARTERLY ACCOUNTABILITY UPDATE - 20
(12-CV-01282-JLR)

Peter S. Holmes
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

proposals; the topics included in these proposals generally cannot be added to later in the course of negotiations unless the other party agrees. (For the previous round of bargaining, none of the Accountability Ordinance provisions were included in these proposals because the exchange of proposals took place years before that Ordinance was enacted.) City officials also must "maintain strict confidentiality during the period of negotiations." S.M.C. 4.04.120(E).

In the current round of contract negotiations, for the first time, a City Council central staff member is joining the City's team as a member of the bargaining team, focusing primarily on issues related to accountability. This change will give the LRPC and the City Council greater visibility into the day-to-day negotiations and allow the bargaining team direct access to any needed additional input. In previous negotiations, OPA and OIG provided technical assistance and input to the City's bargaining team in their areas of subject matter expertise, and those roles will continue.

Once the bargaining team and the union reach a "tentative agreement," the LRPC must concur and the full City Council must vote to approve the agreement before it can become final. SMC 4.04.120(D).

Accordingly, the Seattle community will have more mechanisms for input into the important contract negotiations regarding police accountability than ever before. The City is hopeful that these mechanisms will result in agreements that both comply with labor law and advance the reform goals of our community.

### C.      The City recently obtained legal precedent that will strengthen its position in officer disciplinary appeals going forward.

The City also made significant progress in addressing the concerns raised by the Court through its actions in the litigation stemming from the discipline of Adley Shepherd.  In 2016,

SPD's Chief terminated Adley Shepherd for punching a handcuffed suspect in the face while she was seated in the back of a patrol car, fracturing her skull.  In 2018, an arbitrator (selected through the process that pre-dates the changes referenced in Section III.a) modified the Chief's discipline, reducing it to a suspension. Then-Chief Best refused to rehire Shepherd and the City challenged the arbitrator's decision in court. As a result, the City obtained a ruling in Superior Court overturning the arbitrator's modification of discipline. The union appealed that decision.  Again, the City of Seattle argued in favor of keeping Shepherd terminated and, in April 2021, the Washington State Division 1 Court of Appeals upheld the Superior Court's decision, maintaining termination.[26]  *City of Seattle, Seattle Police Dep't v. Seattle Police Officers' Guild*, 484 P.3d 485 (Wash. App. 2021).

The Court of Appeals held that the arbitrator exceeded her legal authority, because "reinstating Shepherd was so lenient it violates the public policy against the use of excessive force." *Id.* at 502. This was possible because the City and SPD were able to establish the clear public policy against the use of excessive force in policing, based in large part on the City's strides under the Consent Decree. This significant precedent is likely to have ripple effects in police disciplinary appeals throughout the state.

It is critical for public confidence that Shepherd remains terminated. However, the broader precedent set by the Court of Appeals may be even more important. The decision cannot be ignored by future arbitrators in SPD disciplinary matters—and arguably throughout the state, given the broad nature of the reasoning which relied on the Fourth Amendment and federal statues, as well as the Consent Decree. It also shows that SPD is willing to take a firm stance against such behavior.

---

[26] SPOG has filed a petition for review in the Washington Supreme Court which is pending.

**CITY OF SEATTLE'S QUARTERLY ACCOUNTABILITY UPDATE** - 22
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

1
2

**IV.    THE PARTIES AND THE MONITOR ARE WORKING TO REASSESS COMPLIANCE WITH THE CONSENT DECREE COMMITMENTS AND STRENGTHEN SPD'S CAPACITY TO FOSTER PUBLIC CONFIDENCE.**

3
4
5
6

The Monitoring Plan for 2021 was developed collaboratively by the parties and then-newly-appointed Monitor last winter. As described in paragraph 183 of the Consent Decree, the plan is an agreement setting forth the requirements and schedule for how the City's compliance will be measured. The Court approved the Monitoring Plan in early 2021. Dkt. 661.

7
8
9
10
11
12
13
14

In accordance with the plan, DOJ and the Monitor currently are examining SPD's response to last year's protests and asking whether it complied with Consent Decree requirements regarding using, reporting, and investigating force. The Plan also responds to broader concerns about whether the City has maintained its progress by assessing the status of compliance with all of the Consent Decree Commitments. The parties and the Monitor agreed that these efforts were necessary in light of their common concerns about SPD's response to the protests and because of how strongly these events have shaken public trust. The Monitor's findings will help determine whether these areas of the Consent Decree will move toward closure or require additional work.

15
16
17
18
19
20

In addition, the Monitoring Plan addresses accountability. The goal of oversight in this area is to ensure that the City addresses issues of police accountability in a manner that is consistent with the terms of the Consent Decree, while allowing the City latitude to develop solutions that are driven by the community and its democratic processes. Accordingly, the Monitoring Plan requires the City to update the Court quarterly on disciplinary data, and to update DOJ and the Monitor monthly on developments in collective bargaining and discipline.

21
22
23

In addition to discipline and disciplinary appeals, the Monitoring Plan addresses front-end accountability: that is, "ensuring that policing is aligned with community needs and priorities and

**CITY OF SEATTLE'S QUARTERLY ACCOUNTABILITY UPDATE** - 23
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

therefore democratically and publicly accountable." Dkt. 655 at 6. To that end, the collective efforts of SPD and the Accountability Partners to make policy and other systemwide changes that reflect community expectations are included in the Monitoring Plan. Dkt. 655-1. OIG's work designing the SER process and the recommendations of the SER Panel are an example of a process that reinforces front-end accountability.

## V.   QUARTERLY ACTIVITIES IN THE AREAS OF POLICE DISCIPLINE AND PROPOSED LEGISLATION DEMONSTRATE AN EFFECTIVE DISCIPLINARY SYSTEM AND CITY LEADERS WHO ARE ACTIVELY ENGAGED.

One of the City's commitments under the Monitoring Plan is to keep the Monitor, DOJ, and Court apprised of quarterly disciplinary data and developments that could potentially affect police accountability more broadly.

### A.   Officer Disciplinary Data

Under the Court-approved Monitoring Plan, the City committed to submit data to the Court regarding disciplinary investigations and appeals. The City provides quarterly data on these topics below.

When it receives a complaint alleging that one or more officers have committed a serious policy violation, OPA opens a new investigation. The police union contracts require that OPA must complete its investigations within 180 days, with some exceptions. Between April 1, 2021, and June 30, 2021, OPA opened 139 new investigations. As of June 30, 2021, OPA had a total of 221 open investigations.

During the quarter, OPA completed 83 investigations. For each of these investigations, the OPA Director issued a memo with his conclusions and recommended findings to the Chief of

CITY OF SEATTLE'S QUARTERLY ACCOUNTABILITY
UPDATE - 24
(12-CV-01282-JLR)

Peter S. Holmes
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

Police. All OPA findings issued since 2016 are available on OPA's website.[27] If the evidence shows that a serious violation of SPD policy occurred, the OPA Director will recommend a "sustained" finding. If the evidence shows that misconduct did not occur, the Director will likely recommend a "not sustained" finding. In four additional investigations, OPA issued partial findings for the current SPD employees who were identified and has not yet issued findings for unknown or former employees. Out of the 83 completed investigations, OPA recommended sustaining allegations in 20 of these cases (24%) against a total of 28 SPD employees. Two of the cases involved one or more sustained use-of-force violations; two involved one or more sustained force reporting violations; and one involved a sustained use-of-force de-escalation finding.

If the OPA Director recommends finding that an employee committed misconduct, then the Chief of Police decides whether to impose discipline and what the discipline should be, after providing a hearing if warranted. Examples of discipline include oral reprimand, written reprimand, demotion, reassignment, suspension from work (without pay), and termination. If the Chief decides not to follow one of the OPA Director's recommended findings, then the Chief must issue a public statement explaining the reasons. Thus far in 2021, the Chief has overturned one of OPA's findings (discussed above in Section II.C). Between April 1 and June 30, 2021, as a result of OPA's investigations, the Chief imposed discipline on 42 officers.[28] During this time,

---

[27] https://www.seattle.gov/opa/news-and-reports/closed-case-summaries

[28] Because the Chief must review and contemplate disciplinary matters before reaching a decision, there is a time lag. Some of the cases in which the Chief imposed discipline in the second quarter were closed by OPA earlier in 2021.

**CITY OF SEATTLE'S QUARTERLY ACCOUNTABILITY UPDATE** - 25
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

disciplinary appeals were filed in one case; four officers in that case (2020OPA-0407) received written reprimands and they are challenging that discipline.

### B.     Less Lethal Weapons Bill

On June 15, 2020, the City Council enacted an ordinance banning the use of crowd control weapons by SPD. Dkt. 625-1. Upon DOJ's motion, the Court restrained the implementation of the Ordinance. Dkt. 630.

Subsequently, in August 2020, addressing the requests of the Mayor and City Council, each of the Accountability Partners issued a report with recommendations about whether or to what extent less lethal devices should be used for the purpose of crowd management. *See* Dkts. 636, 637, 639.

As previously described, in response to the Court's ruling and the Accountability Partners' recommendations, the City Council Public Safety and Human Services Committee developed and voted to approve a draft bill that would amend the ordinance that the Court enjoined. The Committee also voted to submit the draft bill to DOJ and the Monitor to enable conversations, seek feedback, and promote collaboration with respect to any concerns that may be raised.

After having conversations with and receiving informal comments from DOJ and the Monitoring Team, Councilmember Herbold, Committee Chair, made substantial revisions to the draft bill. On July 13, 2021, a revised version was voted out of Committee to be sent to Full Council. Aside from the Committee's vote to send the bill to Full Council for consideration, no other formal legislative action has been taken.

CITY OF SEATTLE'S QUARTERLY ACCOUNTABILITY
UPDATE - 26
(12-CV-01282-JLR)

Peter S. Holmes
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

At this stage, DOJ and the Monitor have not yet conducted a formal review under the Consent Decree.[29] Under the terms of paragraph 177, DOJ and the Monitor's formal role under the Consent Decree is to review SPD policy revisions, not to review City Council legislation. Accordingly, their review will take place only if the bill becomes law and if SPD drafts policy revisions. The engagement conducted by individual councilmembers with DOJ and the Monitor about the draft bill was an informal process to enable dialogue before City Council takes legislative action.

Accordingly, at this time, it would be premature to brief the Court on the contents of the bill or submit it to the Court. As currently drafted, the bill provides that its restrictions on the use of less lethal weapons do not take effect until after the Court has reviewed and approved them. The City will continue to keep the Court apprised of further developments.

### C.       Proposed legislation to stagger CPC Commissioner terms.

CPC has proposed legislation, which is likely to be considered by the City Council in the future, to stagger the term start dates of CPC commissioners. Having seven commissioners begin each year, instead of ten beginning some years, will help smooth transitions and preserve institutional knowledge. In addition, there is a technical element as well. When the City expanded the size of the Community Police Commission to 21 members, the ordinance did not specify term dates for the additional CPC members. SMC 3.29.350.D. The additional CPC members were appointed on such a schedule that ten of the current 21 terms are set to expire in 2022. However, the same law requires that "no more than seven Commissioners' terms expire in any given year."

---

[29] The Executive, including SPD, pursuant to their obligations under the City Charter, also will serve a role by evaluating any final legislation to determine potential impacts on SPD's operations that are governed by the Consent Decree.

**CITY OF SEATTLE'S QUARTERLY ACCOUNTABILITY UPDATE** - 27
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

3.29.350D. Accordingly, CPC has proposed legislation to address this ambiguity by creating some long and some short terms. The City believes this legislation will have no Consent Decree implications.

**VI.    CONCLUSION**

To restore public confidence, the Monitor and the parties are focusing their efforts this year on measuring the City's compliance with all of the Consent Decree Commitments. This effort necessarily will involve a critical examination by the Monitor and DOJ of SPD's response to last year's protests.

In the months after the protests began, SPD implemented significant course corrections to improve its policies, tactics, and training. These actions show that the Consent Decree has helped to instill a culture of self-examination and continuous improvement within SPD. The City's independent police accountability system, like SPD, has been transformed during the course of the Consent Decree. The City's accountability entities are working to determine what happened during the protests and how to move forward. Their analysis and findings will be independently verified by the Monitor and DOJ and will inform this Court's conclusions about compliance with the Consent Decree.

**CITY OF SEATTLE'S QUARTERLY ACCOUNTABILITY UPDATE** - 28
(12-CV-01282-JLR)

Peter S. Holmes
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

Respectfully submitted,

DATED this 6th day of August, 2021.

      For the CITY OF SEATTLE
      PETER S. HOLMES
      Seattle City Attorney

      *s/ Kerala T. Cowart*
      Kerala T. Cowart, WSBA #53649

      Assistant City Attorney
      Seattle City Attorney's Office
      701 Fifth Avenue, Suite 2050
      Phone: (206) 733-9001
      Fax: (206) 684-8284
      Email: kerala.cowart@seattle.gov

**CITY OF SEATTLE'S QUARTERLY ACCOUNTABILITY
UPDATE** - 29
(12-CV-01282-JLR)