# EXHIBIT A




Kelly Kline, *Black Lives Matter Protest, Seattle WA*, 2020. Licensed under CC BY-NC-ND 2.0.

# Sentinel Event Review of Police Response to 2020 Protests in Seattle

## Wave 1: Downtown Protests May 29 – June 1

July 22, 2021




PO Box 94764
Seattle, WA 98124-7064
oig@seattle.gov | (206) 684-3663
www.seattle.gov/oig






# Table of Contents

**Letter from the Inspector General** ... 1

**Executive Summary** ... 2

**I. Introduction** ... 5

**II. Methodology** ... 7

**III. Panel Recommendations** ... 19

General Events - May 29 Organized Property Damage in the International District and May 30 Protests and Escalation of Violence ... 20

Review of Specific Incidents ... 34

Incident #1: OC Spraying of Child, May 30 ... 34

Incident #2: Police Vehicles Set on Fire, SPD Rifles Stolen, May 30 ... 41

Incident #3: Officer Placing Knee on Individual’s Neck During Arrest, May 30 ... 47

Incident #4: Bicycle officer altercation and arrest of pedestrian, May 31 ... 53

Incident #5: The “Pink Umbrella” Incident, June 1 ... 60

**IV. Conclusion** ... 68

**Appendix A. Dialogue Policing** ... 69

**Appendix B. SER Participants** ... 73

**Appendix C. Short Biographies of Panel Members** ... 74

**Appendix D. SER Peacemaking Circle Group Norms** ... 78

**Appendix E. Overall Description of Events May 29 and 30** ... 79

May 29, 2020: Organized Property Damage in the International District ... 79

May 30, 2020: Protests and Escalation of Violence ... 82

**Appendix F. In-Depth Description of Reviewed Incidents** ... 90

Incidents Reviewed ... 90

Incident #1: OC Spraying of Child, May 30 ... 90

Incident #2: Police Vehicles Set on Fire, SPD Rifles Stolen, May 30 ... 92

Incident #3: Officer Placing Knee on Individual’s Neck During Arrest, May 30 ... 95

Incident #4: Bicycle officer altercation and arrest with pedestrian, May 31 ... 96

Incident #5: The “Pink Umbrella” Incident, June 1 ... 99

**Appendix G. List of Recommendations by Theme** ... 104






# Letter from the Inspector General

This report represents the work of a Sentinel Event Review Panel including community members and Seattle Police Department (SPD) officers, who dedicated an incredible amount of their time and energy to engage in open, honest, and difficult dialogue around SPD actions during the course of the 2020 police protests and how the City can do better.

This report builds upon earlier work by my office on SPD use of less lethal weapons in protest response. At the outset, the Office of Inspector General (OIG) analyzed information gleaned from hundreds of Use of Force reports and hours of body-worn video, public commentary, complaints, and numerous other sources. That analysis identified five discernable “waves” of activity, each of which was punctuated by distinguishing moments that contributed to violent conflicts between and among protesters and SPD. This report presents the Panel’s recommendations related to the first of those waves. Subsequent reports addressing the remaining waves will be issued in the coming months. OIG is also producing an analysis of the collective events of 2020 from a crowd dynamics perspective with the assistance of Professor Clifford Stott, who has worked in the area of crowd psychology and policing in the global arena for decades. I hope this collective body of work leads to a fuller understanding of what took place last summer—and a deeper understanding of how we can collectively move forward.

These recommendations, which represent the consensus views of community members and SPD officers of varying ranks, would not have been possible without a peace and reconciliation approach to dialoguing. It is hoped that the peacemaking process used by the panel may provide a roadmap for other critical conversations between community and police, including but not limited to future sentinel event reviews.

I want to acknowledge and appreciate the deep commitment by the panelists who, in addition to their heavy emotional investment, met for more than 80 hours over the course of the first seven months, in addition to reviewing materials in preparation for those meetings. Another important contributor to this process was a planning group consisting of community and police representatives, who guided selection of the panel, facilitators, and incidents for review, to ensure that the process and attendant outcome was not determined by any one agency or voice. I also want to thank our facilitators, expert consultants, and my staff for their role in bringing together a product many months in the making. Panelists were not interested in participating in a process unless they believed it could result in meaningful change. That is an intention I share. During the course of this process, my office has been engaged in continuing conversation with SPD and other City stakeholders on the developing recommendations, and I will continue to use the authority vested with OIG to push for responsive and effective systemic reform.

In partnership,

Lisa Judge
Inspector General for Public Safety





# Executive Summary

## Background

The murder of George Floyd had a monumental impact on this country and internationally, and engaged wide segments of America in public dialogue about the role of race in every aspect of society. The implications of this event are still being felt even as this report is released. Like other departments in cities around the country, the Seattle Police Department (SPD) faced a complex and difficult challenge in the days after Mr. Floyd's murder. Namely, the City grappled with how to respond to ongoing community protests about the long history of abuse, excessive use of force, and deaths suffered by Black, Indigenous, and other People of Color at the hands of police. These protests also served as an urgent call for an examination of the institution of policing, to find a manner that would not further erode public trust, given these longstanding problems and concerns.

Sentinel Event Review (SER) aims to identify the causes and contributing factors to undesired incidents with the goal of prevention (see principles and goals in Table 1 below).[1] SER has been used extensively in aviation, health care, and manufacturing, among others, to identify root causes of tragedies and design improvements that will prevent their recurrence. The focus of SER is on fixing the system, not on assigning individual liability.

**Table 1. Principles and Goals of Sentinel Event Review**

| Principles | Goals |
|---|---|
| Include SPD and community stakeholders | Focus on community perspectives and concerns; define implementable recommendations for SPD change |
| No assignation of individual blame | Identify root causes of negative outcomes |
| Learn from mistakes and best practices in other jurisdictions | Improve systems to reduce or prevent future negative outcomes or harm to the community |
| Support analysis with data and evidence | Increase legitimacy of government agencies and departments |
| Take action to correct identified issues | Facilitate community healing and mutual understanding |

The SER Panel includes community members representing different lived experiences of Seattle and SPD officers at various command levels. The Panel was supported by the Inspector General, a team of Office of Inspector General (OIG) data analysts, and a group of experts in fields including crowd psychology, trauma stewardship, police crowd facilitation techniques, and civil rights law. The Panel was facilitated

[1] These fundamentals are a blend of "just culture" models from SER panels used in the health care and aerospace industries and the federal Bureau of Justice Assistance Sentinel Event Initiative. See https://bja.ojp.gov/program/sentinel-events-initiative/sentinel-events. Additional reference materials regarding SER can be found on the OIG website at www.seattle.gov/oig/sentinel-event-review.





by an expert in the use of SERs in criminal justice, and by the pioneer of a "peacemaking" process that enabled candid, respectful dialogue regarding the emotionally charged topics raised by the SER. The report represents the views and recommendations of the Panelists in their individual capacities, although each person brought their expertise from lived experiences, community affiliations, and organizational history with them.

Due to the massive number of protest days and uses of force, this first SER report focuses on key dates in the formative days of protesting, from May 29 – June 1, 2020. Additional reports will be issued covering subsequent significant moments from the 2020 protests.

Specifically, as the protests occurred over months in 2020, OIG data analysis identified five distinct "Waves" of activity. Each Wave represents a period of time with an increase in SPD uses of force and the occurrence of one or more critical events within the protests.

- Wave 1 (May 29 – June 1), the focus of this Report, comprises the period from the murder of George Floyd in Minneapolis to the first set of demonstrations in Seattle, mainly in Downtown Seattle.
- Wave 2 (June 2 – June 7) includes events that occurred before the leaving of the East Precinct by SPD. During this period, the main demonstrations and confrontations shifted from Downtown to the East Precinct.
- Wave 3 (June 8 – July 2) includes events that occurred during the existence of the Capitol Hill Organized Protest (CHOP) and Capitol Hill Autonomous Zone (CHAZ).
- Wave 4 (July 3 – Oct 6) includes events after the East Precinct was reestablished.
- Wave 5 (Oct 6 – End of 2020) includes events after the creation by SPD Interim Chief of Police Adrian Diaz of the Community Response Group, tasked specifically with responding to demonstrations, among other duties.[2]

## Incidents Reviewed in Wave 1, May 29 – June 1, 2020

Wave 1, the focus of this Report, reviewed the first significant protests in Seattle, mainly in downtown Seattle, between May 29 and June 1, 2020. The SER Panel identified Wave 1 events to review that provided them with a foundational understanding of the events, and also incidents identified with the assistance of a planning group of community, law enforcement, and other accountability stakeholder partners:

1. A group of individuals who traveled through the International District on May 29, vandalizing buildings without a meaningful response from SPD;
2. The escalation of widespread protests to violence and property damage on May 30, particularly in the downtown area;
3. A deployment of Oleoresin Capsicum (OC) spray (i.e., "pepper spray") by SPD that hit a child on the afternoon of May 30;

[2] https://spdblotter.seattle.gov/2020/10/07/department-launches-community-response-group/





4. The incineration of a group of SPD vehicles parked near Westlake Park on the late afternoon of May 30, and the theft of three SPD rifles from one of the vehicles;
5. Two arrests of individuals on the night of May 30 in which an SPD officer appeared to place his knee on the head and neck of the individuals being arrested;
6. The arrest of two people on May 31 by an SPD bicycle squad assigned to facilitate a demonstration in Downtown Seattle; and
7. The "pink umbrella" Incident, a confrontation between SPD and community protesters that resulted in widespread deployment of CS gas (i.e., "tear gas") and other less-lethal munitions in the neighborhood surrounding the SPD East Precinct Building on the night of June 1.

## SER Panel Findings

A full understanding of these events would not be possible without the open discussion of institutional racism and the longstanding trauma and fear that many in community have experienced at the hands of law enforcement. It is with this mindset that the Panel sought to identify modifications to SPD behavior that would promote, facilitate, and enable peaceful protests while minimizing police presence. The Panel also sought to identify areas where SPD actions did not match community expectations, even when those actions were permitted by existing laws or SPD policies.

In all, the SER panel identified 54 recommendations designed to improve SPD's response to protests in the future. They fall into five main areas:

- ***Community Legitimacy*** – Addressing the gap between what SPD may be permitted to do by law or policy ("structural legitimacy"), and what its officers need to do to meet the standards of justice expected by community ("perceived legitimacy");
- ***Situational Awareness*** – Acknowledging the need for SPD to change its mindset when responding to protests where the police themselves are the focus of the protests, moving from a mindset of crowd management and control to one of crowd facilitation and crowd safety;
- ***Communication and Community Engagement*** – Improving the ability of SPD to communicate with communities and with protesters – not just during, but before and after protests;
- ***Tactics and Equipment*** – Improving tactics during crowd events, and understanding how arrests or uses of force on individuals committing low level offenses can result in the escalation of tensions rather than calming a crowd; and
- ***Officer Wellness and Training*** – Prioritizing officer wellness, recognizing that the long shifts and hostile environments that police can encounter during protests take a toll on officers that can have lasting undesirable consequences on their professional behavior and beyond.

The recommendations are laid out in detail below and summarized in Appendix G.





# I. Introduction

On May 25, 2020, George Floyd was murdered while in the custody of the Minneapolis Police Department. His death had a monumental impact on this country and internationally, and created a tipping point that engaged wide segments of America in public dialogue about the role of race in every aspect of society. On April 20, 2021, a jury found Derek Chauvin guilty of three charges in the death of George Floyd: second-degree unintentional murder, third-degree murder, and second-degree manslaughter. The three other involved officers are scheduled to face trial in 2022. The implications of this event are still being felt even as this report is released.

Like other departments in cities around the country, SPD faced a complex and difficult challenge in the days after Mr. Floyd's murder. Namely, the City grappled with how to respond to ongoing community protests about the long history of abuse, excessive use of force, and deaths suffered by Black, Indigenous, and other People of Color at the hands of police. These protests also served as an urgent call for an examination of the institution of policing, to find a manner that would not further erode public trust, given these longstanding problems and concerns.

SPD responded to the 2020 protests with skills, strategies, and tactics developed over many decades of facilitating thousands of protests, enhanced by eight years of Consent Decree[3] reform efforts. Those tactics not only proved inadequate for the protests of the summer of 2020 – as will be discussed in this report, they contributed to escalation of civil unrest and violence. By the end of 2020, there had been more than 750 deployments of physical force. Some controversial uses of "less lethal" chemical and physical munitions received national attention. Curfews were imposed, and parts of the city were occupied by community members who rejected government oversight in a standoff between community members and law enforcement that lasted for weeks.

In June 2020, the Mayor and City Council called upon the City's civilian police accountability system to provide recommendations to address the widely-decried City use of less lethal crowd control weapons, including the most controversial, CS gas, commonly known as "tear gas."[4] In response, OIG produced two reports over the summer on Crowd Management and Less Lethal Tools, and engaged in conversations with SPD and other stakeholders on how to improve City response.[5]

City leadership also asked OIG as the entity charged with systemic oversight to examine what went wrong from a systems perspective and make recommendations for changes in SPD responses to community demonstrations and protests. To do this, OIG conducted a SER that brought law enforcement and a diverse group of community members together to deliberate on system failures and finding a better path forward. SER has been used extensively in aviation, healthcare, and manufacturing,

---

[3] United States of America v. City of Seattle, 12 Civ. 1282 (JLR), available at www.seattlemonitor.com/overview.

[4] Those reports can be accessed at Recommendations on 'less lethal" weapons highlight difficult policy tradeoffs for SPD in use of force and crowd control (sccinsight.com).

[5] Less Lethal Weapons Usage in Protests (6/12/20).www.seattle.gov/Documents/Departments/OIG/Other/LessLethalWeaponsUsage06122020.pdf; Review of the SPD Crowd Dispersal Policy and Less Lethal Weapons In Response to Ordinance 126102, www.seattle.gov/Documents/Departments/OIG/Other/OIGReviewSPDCrowdPolicyLLWeapons081420.pdf, filed with the federal court overseeing the Consent Decree at Case 2:12-cv-01282-JLR Document 637.





among others, to identify root causes of tragedies such as plane crashes or accidental medical deaths and design improvements that will prevent such tragedies from recurring. The focus of SER is on fixing the system, not on assigning individual liability.

The SER panel comprises a dedicated and diverse group of community members and SPD representatives from throughout its ranks. This diversity of opinion on such strongly held and emotional topics presented obvious challenges to the creation of a supportive environment that enabled the sincere, honest and respectful exchange of views, but was essential to the generation of practical, implementable recommendations for change that have the potential to heal and improve relations between SPD and the community it serves. The use of peacemaking circles, discussed in more detail below, greatly facilitated the group's ability to remain connected during these difficult conversations.

The Incidents reviewed by the Panel revealed the gap between what SPD may be permitted to do by law or policy ("structural legitimacy"), and what its officers need to do to meet the standards of justice expected by the community ("perceived legitimacy"). When these two concepts are not aligned, a "legitimacy gap" is created that fosters misunderstanding and mistrust. To begin to close that gap, the change needed is not just in terms of strategies and tactics for how the police handle demonstrations in the future – though such changes are a necessary step to improving the quality of policing and rebuilding the community's trust in the SPD. Structural change that addresses the inequity and oppression that caused so many community members to protest in the first place is also needed. As one Panelist said, "we have to always remember why those people were out there protesting in the first place, and we have to get at those reasons, or we're just mowing the lawn, and the same grass is going to grow back."

This report captures the Panel's analysis and recommendations, but it should not be interpreted as official positions of their organizations or communities. The views of the Panelists on these topics are as diverse as their backgrounds and perceptions. The Panel recognizes that their views are based on an assessment of moments in time that cannot fully capture the range and breadth of experiences and incidents from 2020. However, hundreds of hours have been devoted to identifying systemic themes and concrete, actionable steps. These views are informed by the Panel members' diverse backgrounds and lived experiences.

Through the SER process, Panelists have come to a deeper mutual understanding of the challenges faced by members of our community and of the police officers who seek to assist them. The Panelists experienced the transformative possibilities when there is serious and respectful dialogue among diverse, caring individuals to create an environment of understanding, healing, mutual respect, and change. The protests of 2020 too often reinforced our cynicism and divisions rather than creating environments for such dialogue and collective problem-solving.

The Panelists intend that (1) the recommendations generated by the SER panel will help to restore and sustain such dialogue in the future, and create an environment in which all members of our community can contribute their full voices to community issues with emotional and physical safety; and (2) the lessons learned in this process, both about improvements in protest response and about community-government partnerships for problem-solving, will translate to other government review processes that would greatly benefit from community involvement.

# II. Methodology

This section describes the development of the SER process, including the selection of Panelists.

## Stages of Sentinel Event Review

This SER was divided into three stages:[6]

- In **Stage 1**, OIG researched and built evidence-based timelines of the Events and Incidents under review.[7]
- In **Stage 2**, the present phase represented by this report, OIG and expert moderators guide a panel of community and SPD stakeholders through the identified Incidents.
- In **Stage 3**, OIG will conduct audits and further systems review of issues identified by SER.

## Working Groups

Development of the SER involved the efforts of three working groups, in order of involvement:

- **OIG** initiated the process by gathering data and input from numerous sources to describe and analyze the events of 2020, including conversations with community, public comment, news, social media, complaints to the Office of Police Accountability (OPA) about alleged officer misconduct, use of force data, SPD reports and video, claims and lawsuit information, and other sources.
- A **Planning Group** was convened comprised of stakeholders who assisted OIG in customizing and refining the SER methodology, identifying Panel membership and approving facilitators, and selecting the incidents for analysis.
- The **SER Panel** was identified with the assistance of the Planning Group. The Panel reviewed sentinel event incidents identified by the Planning Group ("Incidents") and issued the recommendations in this report.

## Planning Group Membership

It was important to the integrity of the SER process to directly involve community, law enforcement, and other stakeholders in the selection of the Panel, the facilitators, and incidents for review. Those decisions had a direct impact on the trajectory of the review, and it was important to have credibility and faith in the process by community and police to allow opportunity for meaningful change to occur.

The Planning Group included a mix of observing and participating representatives from community-based organizations, the Community Police Commission (CPC),[8] SPD, the American Civil Liberties Union (ACLU), the Seattle Police Monitoring Team, and the United States Department of Justice (DOJ). Its membership has been dynamic, expanding as additional community members and perspectives are identified that bring value to the group's discussions. As of May 2021, the Planning Group includes 24 members representing a wide cross-section of Seattle.

---

[6] An overview of the SER process can also be found at www.seattle.gov/oig/sentinel-event-review.
[7] The evidence-based timelines created by OIG are based on a methodology defined by Prof. Clifford Stott from Keele University in the UK.
[8] One member is a Community Police Commission Commissioner who attended in her Mothers for Police Accountability capacity.





## Panel Membership

The selection of the SER Panel was a collaborative process between the Planning Group and OIG. The Planning Group provided OIG with criteria for selecting a diverse set of community voices. OIG used these criteria, with assistance from the ACLU and the CPC, to identify about 100 organizations OIG initially approached to discuss participation in the SER. These organizations constituted a diverse set of identities, affiliations, and perspectives, including but not limited to: Black, African, Latinx, Native American, Pacific Islander, Asian, South Asian, and LGBTQ+, communities, business communities, representation from neighborhoods affected by the protests, faith-based organizations, minority bars, organizations serving vulnerable populations, seniors, youth, social and mental health services, among others. More than 30 organizations responded to OIG. Of those, five indicated they were not interested in participating, either because of the time/resource commitment required or an unwillingness to collaborate with SPD.

Ultimately, OIG convened a SER Panel of a total of twelve members: six community members representing different lived experiences of Seattle, five SPD personnel, and Inspector General Judge (see Appendices B and C).

> **Community members -** The original community members represented different lived experiences of Seattle: a resident and grassroots organizer, a business owner and executive of a community-based organization, the executive director of a Business Improvement Area affected by the protests, the executive director of a non-profit serving an immigrant population, a Professor at the University of Washington Evans School of Public Policy and Governance, and the director of an organization that focuses on racial equity in Seattle.
>
> **Law enforcement members** - The levels of rank represented by the SER Wave 1 SPD Panelists are Assistant Chief, Lieutenants, Sergeant, and Patrol Officer. These SPD representatives were identified by OIG and Police Chief Diaz due to their firsthand experience with the Incidents under review, and their formal and informal credibility within the Department to discuss and help implement useful recommendations.

## Facilitators and Outside Experts

OIG recognized that Panelists would have to review large amounts of sensitive information, engage in difficult and contentious conversations, and work alongside other Panelists whose different life experiences and responsibilities might result in very different views of policing and community. The facilitators approved by the Planning Group included:

- Saroeum Phoung and Thary Sun Lim from PointOneNorth Consulting. Phoung and Lim have worked extensively with City and County agencies on reconciliation, trust-building, and restoration processes. For years, Phoung and Lim have been using a structured methodology called a "peacemaking circle" in community building and crime prevention efforts in Boston and Seattle. Here, it was used to build trust among panelists and create a safer environment to share, reflect and conduct the analysis.
- John Hollway,[9] Executive Director of the Quattrone Center for the Fair Administration of Justice at the University of Pennsylvania Carey Law School. Hollway is a national thought leader on the

[9] https://www.law.upenn.edu/live/profiles/560-john-hollway/profiles/quattroneaffiliated





use of root cause analysis in criminal justice. In 2020, Hollway guided the Tucson Police Department and a diverse group of agency and community stakeholders through the review of two deaths of individuals in police custody.[10] Hollway worked closely with the OIG team and Planning Group to design the SER process, and facilitated SER Panel conversations, including discussions on contributing factors and recommendations.

Early in the process, OIG consulted with community members, partners, and external consultants to ensure the process development started with a community-focused lens. OIG also engaged the assistance of Dr. Clifford Stott,[11] Professor of Social Psychology and a Dean of Research at Keele University in England. Stott provided technical advice on the creation of reliable data for crowd and policing analysis. He also provided educational materials to help Panelists understand the dynamics and context surrounding each of the Incidents being reviewed.

## Peacemaking Process

Bringing together police and members of the community that were affected by police actions to develop solutions both find agreeable is inherently difficult and has the potential to bring up difficult emotions and traumatic memories. Panelists regularly engaged in challenging conversations and reviewed a considerable amount of sensitive and traumatizing material.

To help navigate these difficult conversations, OIG established peacemaking as a core component of SER. The peacemaking circle process is a framework for facilitating a supportive environment and encouraging open-mindedness. The process interrupts old patterns and assumptions that can block communication to create an opportunity for understanding, connection, and collaboration.

The Panel dedicated a portion of each working session to peacemaking circle activities. The first sessions focused on SER panelists getting acquainted, understanding each other's values, and creating shared principles to facilitate communication and collaboration. As the group moved forward, the peacemaking circle focused on deepening relationships, developing empathy, and building trust.

The Panel began with an 8-hour session devoted to peacemaking, followed by over 18 hours dedicated to peacemaking during its first 13 meetings. It was important for each person to express how they were present in the room and to share their history, vulnerabilities, and expectations to engage on inherently divisive topics that were foundational to many in the room. The peacemaking process has provided a positive example for future trust-building and healing processes between the community and SPD. OIG will continue to use the peacemaking circle framework in future SER work (for more information see Appendix D).

## Identifying, Selecting, and Prioritizing Incidents

The Planning Group was integral to the prioritization and selection of incidents for review. The process, summarized in Figure 1 below, was as follows:

[10] A copy of the output from the Tucson Sentinel Event Review Board on these cases can be found at In_Custody_SERB_Final_Report_Sept_2020_Redacted.pdf (tucsonaz.gov) (last accessed April 18, 2021).
[11] https://www.keele.ac.uk/psychology/people/cliffordstott/






1. **Data collection -** OIG collected data on potentially reviewable Incidents, analyzing patterns in use of force, incidents of notable public attention and concern, and other data sources.
2. **Incident selection -** The Planning Group then evaluated the incidents with a focus on undesirable outcomes that should not occur when community members are engaged in protected First Amendment activity. These include, but are not limited to, the commission of acts of violence, uses of force (whether by police or community members), injuries to individuals (community members or police), destruction of public or private property, and the creation of unsafe environments during public protests.
3. **Sentinel event review of Incidents -** Selected Incidents were then sent to the Panel for root cause analysis. The Panel also utilized its own collective expertise to assess which incidents to include or add for review.

**Figure 1. Incident prioritization process.**




## Data Collection

OIG gathered extensive data and information from government agencies and public sources about incidents occurring between May 25 and November 11, 2020. Data sources included:

- SPD data
  - Individual reports of use of force, including officer statements;
  - Chain of Command reviews of individual uses of force;
  - Aggregated use of force data;
  - SPD body worn camera video (BWV);
  - SPD Incident Action Plans for all planned events;[12]
  - SPD Computer-Assisted Dispatch (CAD) logs and other communication logs;
  - SPD Human Resources data on reportable injuries;
  - Arrest data;
  - SPD personnel rosters (when available);
  - SPD training materials on crowd control, de-escalation, use of bikes for crowd control, etc.;
  - Current and previous SPD policies;
- OPA data
  - Investigation data and summaries;
  - Case summaries;

[12] Except for June 28, 2020.





  - Videos, photos, and other materials used by OPA;
  - OPA Management Action Recommendations;
- CPC recommendations;
- City data on lawsuits filed related to police action during the protests;
- Department of Finance and Administrative Services data on claims filed for damages and injuries;
- Social media posts from community members, reporters, and city officials during each of the days under review, including Twitter Posts, YouTube videos, Facebook live streams and videos, and other data;
- News outlet articles, interviews, news coverage, and timelines;
- Public meetings in which community members provided individual accounts of their personal experiences and perceptions of the protests and SPD's protest responses; and
- Conversations with community and SPD personnel interviews conducted in 2020.

OIG used the data to analyze five months of demonstrations. OIG performed a trend and pattern analysis to map SPD uses of force across the period of review and identify protest events for further analysis. Uses of force (as reported and shared by SPD)[13] were strongly correlated with other variables (e.g., arrests, injuries, complaints, etc.) and was an important factor for the Planning Group in selecting sentinel events.

## Wave Identification

The OIG analysis organized protest-related activity into five Waves. Each Wave represented a period of time with an uptick in uses of force[14] and the occurrence of one or more critical milestones and other related events within the protests (see Figure 2 below):

- **Wave 1 (May 29 – June 1),** the focus of this Report, comprises the period from the murder of George Floyd in Minneapolis to the first set of demonstrations in Seattle, mainly in Downtown Seattle.
- **Wave 2 (June 2 – June 7**) includes events that occurred before the leaving of the East Precinct by SPD. During this period, the main demonstrations and confrontations shifted from Downtown to the East Precinct.
- **Wave 3 (June 8 – July 2)** includes events that occurred during the existence of the Capitol Hill Organized Protest (CHOP) and Capitol Hill Autonomous Zone (CHAZ).
- **Wave 4 (July 3 – Oct 6)** includes events after the East Precinct was reestablished.

[13] "Uses of Force" include the total number of instances in which SPD officers reported using force against individuals in the protests. Source: Force Review Unit report as of 11/05/2020.

[14] In Wave 1, the total Uses of Force (UoF) was 233 (30% of the total for the 5-month period under review). The day with the highest reports of UoF was June 1 with 64. In Wave 2, the total UoF was 186 (24% of the total for the 5-month period). The day with the highest reports of UoF was June 7 with 77. In Wave 3, the total UoF was 37 (5% of the total for the 5-month period). The day with the highest reports of UoF was July 1 with 26. In Wave 4, the total UoF was 305 (39% of the total for the 5-month period). The day with the highest reports of UoF was June 25 with 102.

- **Wave 5 (Oct 6 to the end of 2020)** includes events after the creation by SPD Interim Chief of Police Adrian Diaz of the Community Response Group, tasked specifically with responding to demonstrations, among other things.[15]

**Figure 2. Five Waves: Number of SPD uses of force May 30 to Nov. 5, 2020.**




## Incident Selection

The Planning Group used the information provided by OIG to identify specific Incidents that would be reviewed by the SER Panel. For Wave 1, the Planning Group chose to focus on May 30 and June 1, which included several contentious incidents that produced immediate and long-standing impacts on demonstrations throughout the summer. Out of all days in Wave 1, these two days accounted for: [16]

- Two thirds (67%) of all Uses of Force by SPD;
- Over seventy percent (71%) of the total arrests by SPD;
- Most (86%) of the injuries reported by SPD officers related to the protests, and
- A majority (12,798) of the estimated 19,000 civilian complaints filed with OPA.[17]

Of note, May 30 and June 1 also accounted for 20% of all uses of force by SPD related to protests from May 29 to December 31, 2020.

[15] https://spdblotter.seattle.gov/2020/10/07/department-launches-community-response-group/; Federal Court Order, https://www.documentcloud.org/documents/6943709-Order-on-TRO-6-12-20.html
[16] Based on data available as of November 11, 2020.
[17] Office of Police Accountability. 2020 Annual Report. April 2021. Pg. 10. https://www.seattle.gov/Documents/Departments/OPA/Reports/2020-Annual-Report.pdf

**Figure 3. Total uses of force from May 29 to June 1, 2020, as reported by SPD.**




The Planning Group prioritized potential "reviewable Incidents" by looking for moments during the dates in question where:

- Individuals (either civilians or police) were injured;
- SPD officers acted in ways that deviated from SPD policies or procedures and that that contributed to the undesired Incident;
- SPD officers acted in ways that were consistent with SPD policies or procedures but nonetheless contributed to the undesired outcome; and/or
- Private or police public property was damaged during a demonstration or other crowd Incident.

The Planning Group further sought to prioritize:

- Incidents where the Panel would have the ability to hear from both civilians and police who participated in the Incident;
- Undesirable Incidents that rarely occur but have significant impact on perceptions of public safety, identified as "high impact/low frequency" (e.g., having six SPD squad vehicles incinerated and two rifles stolen from Police patrol vehicles during an assembly that had been declared unlawful); and
- Undesirable Incidents that may happen often and have individually minimal but collectively significant impact on perceptions of public safety, identified as "low impact/high frequency" (e.g., disrespectful language being used by SPD officers towards demonstrators).

Using these criteria, the Planning Group selected the following Incidents from Wave 1 for review by the Panel:

- A deployment of OC gas (i.e., "pepper spray") by SPD officers on the afternoon of May 30 that affected a child in the crowd;
- The incineration of a group of SPD vehicles parked near Westlake Park on the late afternoon of May 30, and the theft of three SPD rifles from one of the vehicles;






- Two arrests of individuals on the night of May 30 in which an SPD officer appeared to place his knee on the head and neck of the individuals being arrested;
- The arrest of two people on May 31 by an SPD bicycle squad assigned to facilitate a demonstration in Downtown Seattle; and
- The "pink umbrella" Incident, a confrontation between SPD and community protesters that resulted in widespread deployment of CS gas (i.e., "tear gas") and other less-lethal munitions in the neighborhood surrounding the SPD East Precinct Building on the night of June 1.

The Panel also had a voice in the selection process, and could decline to review an Incident or add other events it deemed helpful to deliberations as it delved into the available data and developed deeper understanding of events.

## Panel Review

The SER Panel first met in January 2021 to begin analyzing the Wave 1 Incidents selected by the Planning Group. The Panel identified "Contributing Factors" that contributed to the undesired negative outcomes (e.g., violence and property damage). Next, the Panel made specific recommendations for change that would help SPD officers tasked with facilitating a public protest act in ways that would reduce the likelihood of those undesirable outcomes happening again in the future.



The Panel acknowledged the errors made by SPD and other Contributing Factors that led to negative outcomes and stressed the importance of holding officers accountable, but did not discuss what discipline, if any, should be administered to individual officers. The Panel focused instead on the design of reforms that would help SPD to respond to the next set of protests and achieve better facilitation and enabling of peaceful protests. The inclusion of SPD officers, including officers in leadership, ensured that such reforms were implementable.

SPD has engaged in a self-critique of many of the events reviewed by the Panel and has begun to implement improvements, at least in part as a result of the Panel's discussions in advance of the release of this Report. OIG was also involved in conversations with SPD about improvements stemming from the OIG August 2020 report on crowd management and less lethal tools. Thus, the report may include recommendations that are already in place or are in the process of implementation. SPD's continued willingness to engage in critical self-analysis, especially with community involvement in developing recommendations, as well as in implementing those recommendations, will be crucial to improving its relationship with the residents of Seattle in the future.

## Contributing Factors

In the SER process, Contributing Factors are actions or circumstances that play a part in what led to a negative outcome. The identification of something as a contributing factor is not a value judgment





about whether the factor is positive or negative. For each specific Incident reviewed, the Panel identified associated Contributing Factors. During Panel deliberations, OIG provided Panelists with available video coverage of the event, including publicly available video from the Internet and SPD BWV and in-car video (ICV) where available. Together, the Panel watched the videos and discussed each Incident, listing Contributing Factors in the following categories:

- Communication
- Cultural leadership
- Operational supervision
- Tactics
- Policies and procedures
- Equipment
- Environment
- Other

The Panel tried to identify as many Contributing Factors as possible and differentiate between those that reflected individual behaviors and those that could not have been avoided as it crafted recommendations for change. It is important to note that a Contributing Factor is not an attribution of blame. For example, crowd behaviors contributed to how police responded, but recommendations are about how understanding those behaviors can result in improved police response, not an attempt to change crowd behavior.

The Panel felt that its review of the events of May 30 – June 1 would not be complete without additional insight into the events leading up to those dates, including the perspectives of both law enforcement and community voices from on-scene participants in the protests on those dates. To provide this, the Panel was fortunate to be able to speak with Seattle resident Omari Salisbury, who personally attended, recorded, and reported about many of the demonstrations, including the vandalism in the International District on the night of May 29, the downtown protests on May 30, and the "pink umbrella" Incident on the night of June 1. He provided observations and context regarding these events that video alone could not provide.

Once the Panel analyzed each of the reviewable Incidents and agreed on potential Contributing Factors, it drafted and refined recommendations for change that might prevent the recurrence of the specific contributing factors that were observed.

## Training

In preparation for the review, OIG provided the Panel with a series of interactive presentations:

- An overview of the philosophy and structure of sentinel event reviews from John Hollway of the Quattrone Center for the Fair Administration of Justice at the University of Pennsylvania Carey Law School;
- A discussion on the law of protected First Amendment activities from Alison Holcomb of the ACLU of Washington;





- Presentations on SPD's current policies regarding (1) permissible uses of force and (2) existing policies and procedures regarding crowd management and crowd control;
- Education on peacemaking circles and their role in emotional healing from Saroeum Phoung and Thary Sun Lim at PointOneNorth Consulting; and
- Information sessions from the Trauma Stewardship Institute on the effects of trauma and some methods for coping with trauma.

## Limitations

The Panel identified 53 contributing factors, leading to 54 recommendations for improvement for SPD and others. Even so, it is important to acknowledge the limitations of the SER process.

First, the Panel's judgments of contributing factors and recommendations are based upon a data-driven analysis of Incidents. While the Panel has reached conclusions leading to specific recommendations, these conclusions do not necessarily determine the objective "truth" of the Incidents or their underlying causes. They are consensus products based on the data available to the Panel, and judgments about potential underlying factors that may - or may not - have played a role.

- Tens of thousands of individual actions contributed to the actions of SPD and the crowds of people protesting. It is impossible to capture all of them, or to know whether the intentions of any of them were pure or designed to interfere with peaceful protests.
- Uses of force, destruction of property and protests happened in multiple geographic locations. Because of this, the Planning Group was forced to select a sample of those things that it found to be impactful and representative of the whole, and may have missed other events that are worthy of review and response.
- The data available was incomplete:
    - Information from SPD regarding its officers' actions may have been improperly or inadequately documented,[18] or inaccurately documented in SPD systems (e.g., incomplete or "rote" use force statements);
    - OIG was unable to contact every community group or individual that might have had insightful information, due to the number of potential individuals and OIG's dependence upon the willingness of individuals to reengage with moments that were, for many, traumatic;
    - Existing rules and regulations limited OIG's ability to access, use or record video from Seattle Department of Transportation or any other camera located in public spaces. The main source of government-produced



[18] According to SPD's Force Review Unit, most statements by SPD officers related to uses of force were written an average of three (3) or more days after the actual use of force. This was often attributed to the long (12-18 hours or more) shifts that the Events imposed upon them during the periods of time under review.





video evidence used for analysis is SPD BWV cameras, with some additional video coming from ICV.

- The technology adopted by SPD limits the data saved. When BWV cameras are turned on, either by an officer or automatically by SPD, there is a one-minute "buffer" of video beginning one minute before the initiation of the camera that is retained. The buffered minute has video but not audio. This limited the Panel's ability to fully perceive events and incidents through BWV.
- Video review is limited to the perspective available through the video camera and may not provide complete fields of vision. A BWV worn on an officer's chest, for example, may not show what was in the officer's field of vision at eye level.
- Existing rules and regulations limit the storage of public closed-circuit TV surveillance cameras.[19] As a result, the Panel sometimes lacked a complete video of many Incidents that it evaluated.
- Community and police perspectives from the Panelists and others during discussions, some of whom participated in some of the Incidents, shed some light on the experiences and concerns of those involved. Nonetheless, they are not representative of all participants in the Incidents.

The Panel reviewed OPA reports but did not conduct additional interviews with officers involved in the Incidents in question (although SPD Panel and Planning Group members contributed their knowledge of events). As a result, it could only infer officers' rationales for their actions based on the available documentation.

## Addressing Institutional and Systemic Bias

Many on the Planning Group and Panel felt strongly that it was not possible to conduct a SER of the protests in 2020, or to understand the "root causes" of these protests, without acknowledging and grappling with the long and deeply ingrained history of racial inequalities in Seattle, and in the United States. It was important to the Panelists, the Planning Group, and OIG that the SER consciously engage with the context of institutional racism and the longstanding trauma and fear that many in the community have of police. At the same time, these groups recognized the limitations of a process that looks at a series of specific Incidents and the resulting inability to "solve" institutional racism or remedy hundreds of years of racial oppression solely through this process.

For the benefit of future SER groups, OIG describes here the various efforts that were undertaken to reach a consensus understanding of the depth and breadth of hurt that has been suffered by unjust police and community interactions. Whether these interactions were suffered personally by Panelists, inflicted by SPD upon others, or inflicted by other police officers in other communities, the combined impact of repeated exposure to abuses of power by police officers have created an insistence that SPD

[19] The Seattle Department of Transportation (SDOT) has cameras installed throughout the City to monitor congestion, incidents, closures, and other traffic issues. These cameras provide the ability to see roads, providing engineers with the necessary information to manage an incident and identify alternate routes. Every camera is available for live viewing by the public via our Traveler Information Web Map (http://web6.seattle.gov/Travelers/). Chapter 14.12 of the Seattle Municipal Code, Collection of Information for Law Enforcement Purposes, prevents the storage of SDOT traffic video for policing purposes.





needs to embrace, acknowledge, and repudiate an older power dynamic. Instead, SPD must truly protect and serve the community in ways that are just, fair, and supportive.

Panelists agreed to proceed with an acknowledgment of the history and environment in which the protests occurred, and to try to perceive how that affected police and community relations and responses from both sides. They also attempted to identify moments during the protests where Black, Indigenous, other People of Color, and white individuals might perceive power dynamics or motivations of actors differently, and to be explicit in discussing those moments in the Report.

Unsurprisingly, engaging directly on the impact of police behavior on Black, Indigenous, and other People of Color communities proved to be difficult. Often, actions by SPD officers that were deemed "legal" or within the acceptable bounds of policy by SPD or OPA generated great anger and frustration among Panelists. At these times, many of the non-SPD panelists expressed feelings of being unheard, unacknowledged, and misunderstood, sustaining their belief that SPD still did not understand the true nature of their discontent, or the true basis of concern about institutional racism.

The Panel felt that building trust and understanding within the group was necessary to generate consensus recommendations, and so it paused to perform some additional inquiry into the role of race as a contributing factor in the protests. Panelists were led through a special peacemaking circle in which Panelists were invited to share the emotions that watching police uses of force brought forth for them. This led to the realization that even police acts that are not racially motivated on their face still carried significant emotional weight for Panelists of color, and evoked for them lifetimes of fear and pain from past personal and family interactions with police, including but not limited to SPD.

In addition to this special peacemaking circle, Panelist Dr. Karin Martin of the University of Washington led the Panel in a conversation on systemic racism, where Panelists spoke about their own experiences with race, revealing larger racial dynamics at play in society. Panelists reflected on definitions of systemic racism, institutional racism, and other vocabulary, and discussing each Panelist's first awareness of race as a way of bringing to light each person's particular experience related to race, while revealing racial dynamics in society that are larger than any given person. Panelists used https://www.racialequitytools.org/glossary to standardize the group's vocabulary.

These conversations were (and continue to be) extremely challenging. They created a substantial hurdle to generating a shared understanding of the Incidents reviewed by the Panel – and therefore to the drafting of consensus recommendations. The damage that has been done – the damage that caused these protests in the first place, and the overall inability of SPD as a Department and the City of Seattle to immediately craft particularized responses to the needs of peaceful protestors while addressing threats to public order and safety – is deep and lasting. However, acknowledging the underlying Contributing Factor of institutional and systemic racism was critical to being able to move forward as a group.





# III. Panel Recommendations

This chapter contains the Panel's analysis of the police response to the protests and recommendations for policy change. The chapter is broken into two sections. The first section provides a brief overview of the protests along with recommendations stemming from an analysis of the protests on May 29 and May 30 (for a more detailed overview of protests across these two days, see Appendix E). The second section focuses on the specific Incidents identified by the Planning Group as pivotal moments for review. Therefore, the events and Incidents reviewed are as follows:

A. **General Events** – General events providing context for SER Incidents
   i. May 29 and 30 in general: Overarching Contributing Factors that permeated events of the initial protest days
   ii. May 29, 2020: Organized Property Damage in the International District
   iii. May 30, 2020: Protests and Escalation of Violence
B. **Review of Specific Incidents** –SER analysis for each Incident prioritized by the Planning Group
   i. Reviewable Incident #1: OC Spraying of Child, May 30
   ii. Reviewable Incident #2: Police Vehicles Set on Fire, SPD Rifles Stolen, May 30
   iii. Reviewable Incident #3: Officer Placing Knee on Individual's Neck During Arrest, May 30
   iv. Reviewable Incident #4: Bicycle officer altercation and arrest with pedestrian, May 31
   v. Reviewable Incident #5: The "Pink Umbrella" Incident, June 1

Each of the incidents is explained and analyzed, with a more detailed discussion of the Contributing Factors and recommendations attributed to each Incident. Each event or Incident review is described in the following format:

1. **Description of Incident** – a short summary of the Incident (A more detailed narration of the daily events can be found in Appendix F.)
2. **Descriptive Analysis** – a summary of Panel discussion about the Incident
3. **Fishbone Diagram**[20] – a visual depiction of the Contributing Factors to the negative outcomes of the Incident, sorted by type of factor
4. **Table of Contributing Factors and Recommendations** – a summary of all Contributing Factors and Recommendations identified by the Panel for the Incident.

Note that some of the Panel's recommendations may have financial costs that the Panel has not attempted to calculate. In addition, many in the community are strongly against providing any additional financial resources to SPD. The Panel's recommendations are intended to prevent the recurrence of negative outcomes of the protests in the summer of 2020 and the Panel takes no position on the allocation of City budget dollars to SPD or other important social services.

[20] A fishbone diagram, also known as an Ishikawa diagram, is a tool for visually explaining an event that had multiple possible causes. For additional information, see https://asq.org/quality-resources/fishbone.





## General Events - May 29 Organized Property Damage in the International District and May 30 Protests and Escalation of Violence

### May 29

On May 29, some of the first protests in Seattle following the murder of George Floyd by officers of the Minneapolis Police Department occurred starting in the International District and spreading to Downtown and Capitol Hill. The protests sent an early signal that tensions were high and typical crowd management or crowd control tactics by SPD might not be sufficient.

As the organized protests dissipated, a group of (mostly white) young protesters, filmed by an independent Seattle filmographer, destroyed numerous street fronts of commercial businesses along a 1.4 mile stretch of the International District. SPD did not engage with the group during this 45-minute period as it destroyed storefronts in a predominantly Asian community.

The Incident concerned both SPD and community members, as the group appeared well organized and orchestrated, wearing clothes that hid their identity, tearing down security cameras, and methodically moving from one building to the next. In addition, the lack of a visible SPD response to the group raised questions from skeptical Panelists about whether SPD would have responded more harshly to vandalism in a wealthier neighborhood by Black, Indigenous, or other People of Color.

### May 30

On Saturday, May 30, a much larger group of approximately 5,000 protesters gathered in and around Westlake Park in the afternoon.

The crowd was far larger than SPD predictions at the start of the day, and the number of SPD officers deployed to Downtown appeared insufficient to safely manage the crowd. Fixed lines established by SPD to protect protesters from vehicular traffic and facilitate the ability to enter and exit the park instead became flash points for a crowd focused on illegitimate uses of police power. Crowd members were frustrated by police presence, particularly a police presence that limited their ability to move freely, prompting some of the protesters to chant and confront officers positioned in stationary lines.

As the crowd grew, the SPD officers remained in place on their lines. SPD operational leadership worried that attempts to move or disperse the crowd might provoke violence against the officers on site, while leaving the scene risked abandoning the Downtown area to the crowd, which SPD believed had the potential to become destructive after the looting that occurred the day before. Thus, despite SPD's goal of "minimal presence or contact with the crowd," its continued presence angered many protesters, some of whom became confrontational, even while other planned and unplanned events proceeded peacefully with positive SPD crowd facilitation.

In Westlake, at the intersections of 4th and 5th with Pine St., SPD issued an order for the crowd to disperse at 3:10 p.m., though its PA system appeared no match for the size and noise of the crowd even if the crowd had been compliant. Tensions continued to grow around Westlake Park until officers deployed CS gas, blast balls, and OC spray to disperse the crowd.





The CS gas dispersed large numbers of people, sending them in the direction of 6th Ave. Just before 4:00 p.m., a police vehicle on Pine now surrounded by protesters was set on fire. Shortly afterward, individuals began to attack and subsequently destroy a line of police vehicles parked on 6th Ave. SPD rifles were stolen from one of the police-patrol vehicles. That vehicle and several others were then set on fire, and continued to burn as SPD, overwhelmingly outnumbered and powerless to engage with the now-riotous section of the crowd, stayed in place near Westlake Park.

Protesters spread throughout the downtown area, further limiting the ability of the outnumbered SPD officers on the scene to respond to the expanding number of confrontations and acts of vandalism and looting that broke out amidst the protest. Police radio traffic, already complex across multiple police agencies assisting SPD, became even more disjointed as protests expanded to multiple locations, and the SPD Incident Commander returned to the Seattle Police Operations Center (SPOC) to better evaluate and respond to protests citywide. Some protesters marched onto Interstate 5 (I-5), blocking traffic on the southbound lanes. Others headed towards SPD headquarters, where some launched paintballs and rocks at officers.

Mayor Durkan announced a curfew for the city beginning at 5:00 p.m., and an executive order prohibiting a range of weapons, including firearms, rocks, and flares. While the curfew made being on the streets of downtown technically illegal, it was increasingly difficult for protestors to leave the city, as the Westlake Metro station and Downtown sections of I-5 were temporarily closed, and King County buses stopped operating in the Downtown core.

Looting, vandalism, and peaceful protests in defiance of the curfew and the police department continued throughout the evening, leaving the City and SPD struggling to adapt their tactics for facilitating protests motivated by anger at the police themselves.

## *Analysis of Overarching Contributing Factors and Recommendations, May 29-30, 2020*

The Panel's analysis of the events of May 29 and 30 included an evaluation of the environment in Seattle and elsewhere that led to the protests occurring in the first place. As one community member said, "we can't forget why all these people were here, and what was motivating their behavior. We have to understand that, deal with that, and address that if we're going to get anywhere."

The Panel identified several common Contributing Factors that challenged SPD's ability to interact productively with Seattle's protesters and demonstrators. The Panel considered these to be "overarching" factors that are common to any one of the specific Incidents reviewed in this report.

Many of these factors were (and are) beyond the control of SPD. Even so, they can be expected to persist for the foreseeable future. The accompanying recommendations aim to facilitate understanding of the potential contributing factors so that they may be properly considered and addressed moving forward.

**Police Violence and Systemic Racism**

Police misconduct and systemic and institutional racism within everyday encounters provided the original stimulus for demonstrations and set the identity of the demonstrations, which were already defined by a perception of police illegitimacy. This made the protests on this day (and throughout Wave





1) a fundamentally different challenge than thousands of community events SPD had "managed" before. With this historical context and identity, SPD tactics that had allowed prior events to occur peacefully and safely were now more likely to escalate tension and increase the outpouring of anger and resentment rather than facilitate peaceful demonstrations.

Everyone involved in the protests was grappling with powerful emotions. While the protests created the impression of "community" as a single mind and voice against "police" as a unified force, the situation in Seattle was much more complex than that. Both within protest crowds and within the groups of police officers at the protests were individuals of varied and conflicting beliefs. While the police had protective equipment and munitions, they were vastly outnumbered by the angry crowd. Tensions were high for everyone involved, as lines of officers were confronted by lines of protesters.

**COVID-19 and Social Media**

Another unique factor affecting the protests was the COVID-19 global pandemic. Protests around the country during the summer of 2020 saw increased attendance. Publications attributed the impact of COVID-19 on protests to various causes, including, among others, how it highlighted racial disparity, greater availability of time from a public that was now working from home or experiencing higher unemployment, and more consumption of social media and news which connected the country in new ways.[21]

Smartphones and social media also contributed to the heightened tension and increased crowds on May 30. Images and messages on social media enhanced the speed and scale of the spread of global outrage at the murder of George Floyd. Social media also provided platforms that allowed community organizers and agitators to convene, and to move, in ways that complicated SPD efforts to engage supportively with crowds.

In part because of these the protests on May 30 – June 1 were of a volume and scope that was unprecedented for SPD. As one SPD Panelist noted, "these protests were events that you'd usually take six to eight months, maybe even a year, to prepare for. We had days." Again, because police were the focus of the protests, community/police communications regarding these events were reduced.

Moreover, images of confrontations and conflagrations during these days, in Seattle and elsewhere, were broadcast widely through social media and traditional media, enhancing tensions among many participants on a daily basis. Events like the burning of a Minneapolis police building on May 28 heightened police fears of organized violence and arson among protesters, and the destruction of downtown Seattle buildings and SPD vehicles on May 29 and 30 upset and concerned community members, business owners and SPD alike. SPD officers who responded with uses of force and deployments of less-lethal munitions had a similarly galvanizing effect on protesters, who became more determined to protest by the day. Each new "back and forth" of violence or destruction was easily accessible and shareable on social media and broadcast by traditional media. Panelists described each subsequent day of protests pitting increasingly scared, angry, and exhausted community members

[21] See, e.g., Maneesh Arora, *How the coronavirus pandemic helped the Floyd protests become the biggest in U.S. history*, WASH. POST (Aug. 5, 2020 6:00 AM), https://www.washingtonpost.com/politics/2020/08/05/how-coronavirus-pandemic-helped-floyd-protests-become-biggest-us-history/; Paolo, Gerbaudo. *The Pandemic Crowd: Protest in the Time of COVID.* Columbia Journal of International Affairs. https://jia.sipa.columbia.edu/pandemic-crowd-protest-time-covid-19





against increasingly scared, angry, and exhausted police, and contributing to the continuation of protests throughout the summer.

**Communication and Crowd Facilitation Mindset**

Communication between SPD and protest organizers *before* a protest can greatly help reduce the number of unexpected circumstances *during* a protest. "Any agency's ability to successfully facilitate and de-escalate a demonstration will depend in large part on the relationship it has with the public before the event."[22]

In the past, it has been common for protest organizers to reach out to SPD and enlist its support in planning and holding a safe protest. Such was not the case in the wake of George Floyd's murder. First, the protests were decentralized. Many appeared to grow organically, while others, such as the Westlake Park demonstrations on May 30, included a variety of different groups with different messages and perspectives. In a sign of the community's current distrust of police and of SPD, many organizers refused to communicate with SPD, viewing them as part of the problem rather than a possible partner in the solution.

The absence of advance notice of protester intentions and goals forced SPD into a more reactive approach to crowd management rather than a proactive conversation about protest facilitation. This, coupled with the anti-police focus of the Events, created a "new normal" for protests that SPD was reacting to for the first time, in real time.

In response, SPD fell back on its standard tactics and procedures for "crowd management," defined as "strategies and tactics that employ communication and dialogue with event leaders to obtain voluntary compliance with lawful orders and allow for minimal enforcement action"[23] and "crowd control and dispersal." While these policies have helped hundreds of protests and demonstrations per year occur in Seattle without violence, the phrases "crowd management" and "crowd control" and the focus on "compliance with lawful orders" and "minimal enforcement action" are telling.

Panelists, several of whom were SPD officers, accepted the statements of SPD in support of First Amendment freedoms at face value and recognized the competing concerns of protecting personal safety and public and private property. But community members on the Panel noted that a policy of "crowd management" implies the authority to tell even a peaceful crowd where to go and what to do, and a shift to "crowd control" once an SPD officer determines in his or her discretion that such control is necessary. This reveals an underlying perspective of SPD that the community is permitted to act based on SPD's authority, when in fact the Panel felt the opposite was true: SPD's authority to act is predicated upon its actions being deemed legitimate by the community.

Certainly, there are reasonable limits that can and should be imposed on peaceful crowd behavior. As one Panelist pointed out, for example, it is essential that emergency vehicles always have a clear path to

---

[22] "Policing Protests to Protect Constitutional Rights and Public Safety," The Policing Project at NYU School of Law, October 2020, at 3. Available at https://static1.squarespace.com/static/58a33e881b631bc60d4f8b31/t/5f9af5fe6b0e0f0c265ffdb8/1603991043508/POLICING+PROTESTS+TO+PROTECT+CONSTITUTIONAL+RIGHTS+AND+PUBLIC+SAFETY+10-29.pdf

[23] SPD Directive Number 21-00016, revised policy 14.090 – Crowd Management, Intervention, and Control, effective-date: 04/15/21. Draft, accessed on April 5, 2021.





hospitals and trauma centers for people in need. SPD likely has the legal authority to “manage” or “control” a crowd, and when individuals in that crowd create a danger to others, SPD should have the authority to address that danger in the least intrusive way possible.

But a “command and control” approach may not be productive in responding to the demands of a crowd whose anger has been fueled by perceptions of persistent, unaddressed and unjust police behavior, particularly towards Black, Indigenous, and other People of Color. It was the panel’s judgment that between May 30 and June 1, such an approach caused an escalation in the crowd’s anger and increased the potential for violence and destruction. The Panel felt that a new strategic framework and new policies and tactics are needed from SPD for protests where the police are the focus of the demonstration.

In any event, the inability of SPD to effectively communicate with community members – not just in the few days before May 30, but in the months and years before – contributed to a protest environment completely devoid of trust. As one SPD officer stated:

> Effective communication is not going to happen when there is mistrust. And that mistrust has never been so blatant as it was during that time. Officers do so much, but it isn’t evident. A lot of people had been carrying things for a long time, and all the things of 2020 brought it to a boiling point. People aren’t willing to forget, and I am glad they aren’t because it is making us address what we do. So, we need to ask how we can effectively build trust within the community. As a police officer, I am not going to do it just by myself. I’m looking for people to partner with to help and build trust. Police brutality protests are met with more police brutality – where is that going to go? That’s going to lead to more anger and mistrust. I would like to continue to talk and hear what people think would work to communicate and build trust. But in the middle of a protest, that communication is not going to happen.

Several Panelists noted that the frustration of the protesters and the rising levels of confrontation were exacerbated by the silence of SPD officers in response to requests from people in the crowd asking officers to “stand with the crowd” in objecting to police brutality. It should be noted that the Chief of Police vocally and publicly described Mr. Floyd's death as a "murder" on May 27,[24] and many officers stated that they personally found the actions of the Minneapolis Police Department officers in question to be outrageous and unacceptable. At the same time, many SPD officers in attendance at the protests felt unable to show any support for or solidarity with the crowds due to SPD’s policy of content neutrality, which precludes officers facilitating protests from signaling support for particular points of view expressed by protesters. Many officers interpreted this policy as preventing them from any outward show of support for the crowd’s views, including verbal statements against police brutality or physical demonstrations of support (e.g., “taking a knee”).

---

[24] Chief Carmen Best, *Chief Best’s Statement to Officers Regarding George Floyd,* SPD BLOTTER (May 27, 2020), https://spdblotter.seattle.gov/2020/05/27/chief-bests-statement-to-officers-regarding-george-floyd/.





Section 5.001-POL of the Seattle Police Department Policy Manual sets forth the policy for SPD conduct and professionalism. It states that:

> The Department expects all employees to treat all people with dignity; *remember that community care-taking is at times the focus, not always command and control*; and that the guiding principle is to treat everyone with respect and courtesy, guarding against employing an officious or overbearing attitude and refraining from language, demeanor, and actions that may cause the individual feeling belittled, ridiculed, or intimidated.

(Emphasis added). Section 5.001-POL-10 adds that:

> Employees on duty or in uniform will not publicly ridicule:
>
> i. The Department or its policies
> ii. Other Department employees
> iii. Other law enforcement agencies
> iv. The criminal justice system or police profession
> v. This applies where such expression is defamatory, obscene, undermines the effectiveness of the Department, interferes with the maintenance of discipline, or is made with reckless disregard for truth."

Section 5.001-POL-18 addresses "conflicts of interest" and further explains:

> Employees will not associate with persons or organizations where such association reasonably gives the appearance of conflict of interest.
>
> Employees will not engage in enforcement, investigative, or administrative functions that create or give the appearance of conflicts of interest.

Most Panelists did not consider public condemnation of the death of George Floyd to be an act that would "ridicule the Department, its employees or other law enforcement agencies." The Panel felt that "taking a knee" or standing publicly against police brutality, as Mayor Durkan, Chief Best and other SPD leaders stated, was a show of support for fair and just policing, and something SPD officers should do without reservation. In fact, the willingness of SPD officers to acknowledge the will of the crowd might have been viewed as an important co-operative perspective to address the crowd's anti-police frustration. However, SPD officers at "street level" during the days reviewed by the Panel were not given express guidance on this point.

In many crowd facilitation settings – for example, a demonstration on immigration issues – a show of support for one perspective or another by the police facilitating the protest could inflame or otherwise negatively impact the demonstration. Without clear guidance from SPD leadership on why these protests were different, and knowing they were likely being recorded by hundreds of cell phones at all times during the protests, officers overwhelmingly chose to follow the existing policy of content neutrality rather than share their feelings of support for the protesters' activities. The Panel's judgment was that in these early days of the protests, many in the crowd seemed to interpret the officers' silence as an alignment with, or at least a refusal to refute, the police brutality that was the source of the





protest. As a result, the silence of officers likely escalated tensions overall.

Of course, silence is preferable to a response from officers to community members that is disrespectful, sarcastic, or insulting, and the Panel reviewed several instances in which officers, while not expressing political opinions, nonetheless responded in anger to community members, using expletives or derogatory expressions. It would be naïve to think that officers are not affected by the words or actions of community members at these protests, and Panelists understood the human responses to exhaustion, fear, anger, and frustration on the part of everyone involved in these protests. It is one of the expectations of SPD officers that they rise above the invective while facilitating a protest. SPD acknowledges and accepts this responsibility, and it is an existing policy that "any time employees represent [SPD] or identify themselves as police officers or Department employees, they will not use profanity directed as an insult or any language that is derogatory, contemptuous, or disrespectful toward any person,"[25] regardless of the behavior that a community member is exhibiting. Despite this, Panelists witnessed numerous instances in which this policy was not followed. It is the behavior displayed by our officers when engaging with those members of our community that are the most aggrieved that demonstrates their true commitment to protect and serve our community, in all its complexity. Instances in which officers exhibit disrespect, frustration, or anger to members of our community – even after repeated extra-long and extra-stressful shifts in which they have been subjected to lengthy and repeated verbal assaults –simply cannot be tolerated, as they further undermine trust and underscore the divide between the community and the police that it is essential for the community to heal. SPD must find a more effective way of ensuring that this policy is followed by its officers as a matter of course.

**Staffing**

The Panel did not know what level of staffing might have been optimal for SPD on May 30, but acknowledged SPD's awareness that its staffing was not sufficient for the protests that occurred. SPD should use the protests on May 30 as a baseline for what can be anticipated in the future and develop staffing plans for resource levels that would be needed to facilitate such protests using the other tactics described in this Report.

Future anti-police protests can be mobilized on very short notice via social media, and may occur at any time an officer anywhere in the country commits an egregious use of improper force, or is not held accountable for the officer's actions in ways that communities find unjust. In such instances, SPD will need the ability to mobilize more officers, more rapidly, and with more flexibility than it was able to do on May 29 or 30.[26]

It will be important that these officers receive appropriate training for these sorts of events – including commanders and supervisors, who should receive extra training on the supervision of officers during such events. If, as the Panel believes, it is reasonable to assume that protests of the size and type as the May 30 protests can occur again the future, SPD will need all of its officers to have the capacity to respond. As a result, it should ensure that all of its officers are trained in the psychology of crowds,

---

[25] Seattle Police Department Manual 5.001.10

[26] Currently, SPD's collective bargaining agreement (CBA) with the Seattle Police Officers Guild (SPOG) allows for a minimum of 72 hours' notice before an officer may be required to report for unscheduled duty; this may require negotiation between the City of Seattle, SPD, and the police union to enable SPD to meet the needs of this recommendation.





peaceful crowd facilitation, public safety, and other strategies and tactics set forth in this report and in evolving SPD policies and procedures.

The training should also ensure that officers from multiple departments can communicate in a secure and effective fashion, potentially taking advantage of new technologies to permit this even in the challenging environment of a large protest. SPD's Ops Center (SPOC) would have benefitted from an encrypted standardized alert messaging system (e.g., WhatsApp, Yammer, or other technology) that could replace radio communication during crowd facilitation events. The Panel would anticipate that such a system would:

- Be encrypted such that only users of the system could hear the communications;
- Be standardized such that all mutual aid agencies would be able to hear the communications;
- Permit sub-channels or sub-groups for units (e.g., Mobile Response Units or dialogue officers) with particular communication needs;
- Enable control of the system at the SPOC; and
- Ensure audio communication, including dictation, between officers and the SPOC so that officers do not need to read texts and can communicate while wearing gas masks, etc.

### *Contributing Factors and Recommendations – May 29-30*

Given the highly emotional and deeply felt anti-police sentiment that animated the protests, amplified by the COVID-19 pandemic and social media, the size of the crowd and the speed with which it came together, and the communication challenges described above, is it not surprising that SPD's preparation of "crowd management" and "crowd control" through the use of fixed lines that restricted the crowd's ability to move was ineffective in de-escalating tensions throughout the crowd, contributing to the ultimate acts of violence, uses of force, and property damage that were to come.





**Figure 4. Overarching contributing factors by category.**







**Table 2. Table of Overarching Contributing Factors and Recommendations.**

| Overarching Contributing Factors and Recommendations | |
|---|---|
| **Contributing Factors** | **Recommendation Summary** |
| 1. *The protests were rooted in widespread outrage at repeated acts of police brutality committed by police departments in Minneapolis and across the country, including Seattle. SPD and its officers were targets of anger, frustration, and hate and some of their attempts to facilitate the protests were viewed by many as provocative acts that further agitated the crowd. This outpouring of community emotion in the wake of the killing of George Floyd created novel challenges for police seeking to facilitate community demonstrations.*<br><br>2. *The COVID-19 global pandemic may have augmented feelings of anger, tension, frustration, and powerlessness among protesters.*<br><br>3. *Smartphones and both open-source and encrypted social media, augmented by traditional media sources, may have been a factor in inflaming tensions and anti-police emotions among protesters.*<br><br>4. *The SPD policy on "content neutrality" for officers staffing demonstrations may have limited interactions between officers and demonstrators and further angered some demonstrators.*<br><br>5. *The protests that began on May 30 were decentralized, unpermitted, and often hostile to the SPD, and SPD lacked the time and the means of communication with community organizers to prepare for them effectively.*<br><br>6. *Tensions and emotions were high for all participants – community and police alike – and neither "protesters" nor "police" had a unified identity or agenda shared by all of their members.*<br>7. *The dispersal of protesters from the downtown Seattle area was complicated by* | 1. **To enable better interactions with demonstration organizers in advance of protests, SPD should build legitimacy through expanded community policing initiatives, including the expansion of foot patrols, and build deeper personal relationships between officers and individuals throughout the communities of Seattle.**<br><br>2. **Engage in direct and ongoing community dialogue to understand and adapt to the diverse community perspectives about the institution of police.**<br><br>3. **During crowd events, especially those directed at protesting police activity, SPD should alter its strategy for policing protests to focus more explicitly and comprehensively on the facilitation of peaceful assembly and ensuring the safety of protestors. The focus and mindset of SPD officers deployed to assist in crowd events should move away from "crowd management," "crowd control," and "law enforcement" to "facilitation of speech" and "crowd protection and safety."**<br><br>4. **Embrace procedures that visibly signal SPD's commitment to ensuring the safe and peaceful gathering with the minimum necessary engagement of SPD officers, and limit that engagement to:**<br>• **Promoting the ability of individuals and groups to express First Amendment freedoms;**<br>• **Protecting the physical safety of individuals within as well as beyond the crowd and**<br>• **Preventing the destruction of public or private property.**<br><br>5. **Modify SPD's tactics of crowd facilitation to prioritize communication, de-escalation, and carefully conducted removal of those who are creating an immediate danger to** |





| | |
|---|---|
| *the declaration of a curfew and the closing of multiple public transportation options.* | **others or causing destruction to property, allowing the rest of the event to continue undisturbed.** These actions should be performed in ways that cause minimal interference with the acts of peaceful protesters.<br><br>6. **Modify SPD's policy on content neutrality to permit officers staffing a public event focused on issues of policing to demonstrate solidarity with the crowd participants' rights to protest if they choose.** To ensure widespread and uniform adoption of the new policy, SPD should consider implementing universal training on the new policy and provide explicit messaging guidance to officers prior to such events, so that officers will know what words and actions will convey SPD's position with regard to the protests.<br><br>7. **Eliminate disrespectful statements or actions from SPD officers to individuals or groups protesting.** |

### *Contributing Factors and Recommendations – May 29 Vandalism in International District*

**Table 3. Table of Contributing Factors and Recommendations, May 29 Vandalism in International District.**

| **May 29, 2020: Vandalism in the International District** | |
|---|---|
| **Contributing Factors** | **Recommendation Summary** |
| 8. *A group of organized, predominantly white individuals vandalized businesses in the International District, escalating SPD concerns of anarchists with criminal intent participating in protests.*<br><br>9. *SPD's loss of legitimacy (and related) community anger were enhanced by perceptions that SPD did not respond to those damaging property in the International District as aggressively as it would have in parts of Seattle that are predominantly white, or if the vandals had been people of color.* | 8. **Use live CCTV footage and mobile SPD officers, whether on bicycles or in other vehicles, to rapidly intervene with and address groups destroying property.** |





| 10. *SPD did not identify, engage with, or arrest the vandals at the time, and lacked investigative tools (e.g., closed circuit TV footage) to investigate them further.* | |
|---|---|

*Contributing Factors and Recommendations – May 30 SPD Protest Tactics*

**Table 4. Table of Contributing Factors and Recommendations, May 30 SPD Protest Tactics**

| **May 30, 2020: SPD Protest Control Tactics** | |
|---|---|
| 11. *SPD officers deployed in ways that limited crowd movement, creating inflexibility and conflict with the crowd and enhancing a feeling of an "us versus them" conflict.* | 9. **SPD should provide officers with clear direction about SPD's priorities in facilitating demonstrations, particularly when the institution of policing is the focus of the protest. SPD's focus should be on facilitating access and safety for all. SPD should enhance the ability to address dangerous situations with minimal impact on peaceful demonstrators while minimizing the use of munitions or indiscriminate force.**<br><br>10. Rather than treating "the crowd" as a single entity with a unified purpose, or attributing the risk of violent behavior to the entire crowd when it may be only a few individuals, **SPD should pursue a differentiated approach toward individuals within the crowd,** and should avoid the use of undifferentiated munitions (e.g., CS gas) wherever possible.<br><br>11. **SPD should avoid the creation of immovable lines of officers at demonstrations and provide a mobilization plan for the deployment of bicycle or other mobile officers to ensure appropriate and rapid responsiveness to unplanned crowd events** and ensure that the crowd can move in the direction(s) it wishes without undue danger from cars or other risks. |
| 12. *SPD did not provide sufficient officers to Westlake Park protests to facilitate effective crowd movement or to deter criminal activity.*<br><br>13. *It is the belief of the Panel that some individuals in the crowd were provocateurs or agitators.* | 12. **Establish a staffing model for crowd events such that protests of the size and scale of the Westlake protests can be suitably staffed with mobile officers and other facilitation while minimizing SPD intrusion into the protests.** |





| | |
|---|---|
| 14. *SPD officers held lines in part to protect protesters once violence and fires started, preventing them from directly addressing criminality.* | 13. **Ensure that all SPD officers, not just those officers assigned to crowd facilitation teams, are trained in crowd psychology, crowd facilitation, public safety procedures and tactics, and the mobilization techniques likely to be used at future crowd events.**<br><br>14. **SPD should use mobile response units (e.g., bicycle or other vehicles) that are distinct from crowd facilitation officers or "dialogue officers" to address agitators or instigators of violence in the crowd.** |
| 15. *Single channel radio communication led to an increase in radio silence, which contributed to a lack of operational awareness of the scene.* | 15. **Evaluate whether an encrypted standardized alert messaging system (e.g., WhatsApp, Yammer, or other technology) could replace radio communication during crowd facilitation events.** |
| 16. *The SPD Incident Commander was in the field and unable to keep a broad perspective of all simultaneous protests occurring throughout Seattle. As a result, his ability to deploy officers effectively was limited.* | 16. **Provide specific training, including scenario-based training on the management of large crowd events, and on the supervision of officers, for all SPD supervisors and above, including Incident Commanders and officers in the SPOC.**<br><br>17. **Establish the Incident Command Post and communication lines to officers facilitating protests or demonstrations so that the Incident Commander can observe multiple events in different locations simultaneously and receive real-time updates about each event, from officers trained in the supervision of crowd events who are physically present at each protest or demonstration.**<br><br>18. **The Mayor's Office, SPD, SFD, the Department of Transportation and other departments should conduct appropriate scenario planning for disruptive protests. In particular the scenario planning should**<br>• **Ensure that sufficient resources are deployed so that other SPD locations can protect and serve the people of Seattle in the event that public service from one or more of its buildings are disrupted by protests.**<br>• **Ensure that sufficient public transportation exists to help protesters** |





| | |
|---|---|
| | **leave a protest where an unlawful assembly or curfew has been declared or a legal order to disperse has been issued.** |





## Review of Specific Incidents

After reviewing the protests and demonstrations of May 29 and 30, the Panel reviewed several specific Incidents prioritized by the Planning Committee for Wave 1. This section provides a more granular narrative description of each Incident and specific contributing factors and recommendations for each Incident that are designed to prevent the recurrence of similar Incidents during future crowd events.

While many of the recommendations in this section are not as wide-ranging as those listed above, the Panel feels that they may be equally important in preventing the escalation of tensions during crowd events. Each of these Incidents generated substantial agitation and anger, both at the time of their occurrence and in their review by the Planning Group and the Panel. Each day's events were cumulative, and the elimination of any individual act that inflamed tensions might have been sufficient to avoid the eruptions of violence that occurred late in each day.

### Incident #1: OC Spraying of Child, May 30

#### *Description of Incident*

At approximately 3:00 p.m. on May 30, SPD officers were standing in a fixed line across 4th Ave. intended to keep vehicle traffic away from protests at Westlake Park and guide pedestrians to a different entrance to the park given the large crowds gathered there. A man attempting to walk past the line was prevented from doing so by SPD officers. The situation quickly escalated into an angry confrontation in which SPD Officers sprayed the man with OC spray and struck him with a 40mm foam bullet while the man threw what appeared to be his own can of OC spray at the officers before departing.

The fixed line of officers attracted a group of demonstrators who formed their own line and engaged with the SPD officers. The interactions were peaceful, though some in the crowd were verbally aggressive and insulting the officers.

Approximately 30 minutes later, the man who had thrown the OC spray can at the officers returned and verbally engaged with the officers who had sprayed him previously. SPD officers deemed his previous actions as assault. Without warning to the crowd, they pushed through the line of protesters and arrested the man. This sudden push into the line of protesters agitated the crowd, and a woman farther down the line refused to move back, grabbing an SPD officer's baton. When she did not immediately let go, SPD officers behind the front-line deployed OC spray towards the woman. The woman turned away from the spray, and an 8-year-old child who was standing behind her was also affected by the spray.

A video was posted on social media showing the child crying from the OC spray as others in the crowd tried to aid. The video was widely reviewed and led to more than 13,000 complaints to OPA.

#### *Analysis*

The Panel felt this arrest, while permissible under the law, was both undesirable from a community perspective and unproductive for SPD for several reasons. The initial engagement between the officer and the man was not one in which either person calmly and respectfully explained why they were doing what they were doing, or tried to defuse the rising anger. The man did not ask why he could not pass, and the officer did not explain. The officer's BWV did not show any indication of a warning to the man before OC spray was deployed. It was a swift altercation ending in a use of force.

Particularly when SPD or policing is the source of the protests, SPD should deploy its resources in ways





that facilitate the legitimate objectives of crowd participants, allowing individuals to enter and exit areas of protests as freely as possible while protecting protesters from vehicular traffic. Even when roads need to be closed to vehicular traffic, SPD should consider whether sidewalks need to be closed, absent imminent danger to pedestrians unrelated to vehicle traffic. When they do, officers should remain calm and patient, and explain to anyone seeking to enter blocked areas both the public safety rationale behind the blockage and alternative routes to assist in getting where they need to go.

SPD officers on the Panel referenced the "LEED" principles of communication as a technique for officers that might be helpful in instances such as this Incident. LEED – Listen and Explain with Equity and Dignity – is a technique for improving police communication with community members developed around 2012 by officers in SPD. It leverages psychological concepts of "procedural justice" to enhance police legitimacy, both with community members and internally among officers in the Department. Whether LEED or some other technique is used, ensuring that officers clearly, calmly, and respectfully articulate a public safety rationale for limitations and provide protesters with alternatives is essential to prevent a stand-off or escalation.

While improving the communication of the SPD officers is important, the Panel does not want to minimize the role that the individual who was arrested played in the altercation. He was disrespectful and quick to anger, and threw a can of OC spray at the officers. Such behavior should not be condoned, yet, SPD did not arrest the man at that time. The Incident would have ended there if the man had not returned to angrily re-engage with the officer.

When the man returned, he addressed the SPD officers in a loud, confrontational manner. This time, however, he remained several feet away from the officers and did not engage with them physically. While other protesters did appear to be attempting to hold him back from a greater escalation, his aggression was entirely verbal. Absent the context of his prior interaction with SPD, the individual did not appear significantly more aggressive than other protesters. Nonetheless, it likely appeared to onlookers that SPD officers responded with a greater use of force – pushing into the crowd with several other officers to arrest the man.

Perhaps if the officers' actions had occurred at the same time the man had physically engaged with them, the crowd's response would have been different. But because the officers arrested the individual for conduct that happened roughly 20 minutes prior, the arrest appeared to be a display of police force in response to mere verbal insults – what some police observers have labeled "arrest for contempt of cop" – rather than legitimate law enforcement action to reduce violence or promote public safety. Given the environment, SPD should have considered that the likely result of such a use of force might be increased agitation of the crowd rather than de-escalation.

It is certainly important for SPD officers to be able to address individuals, safely and efficiently, in the crowd who are agitating or inciting violence or other crimes and to separate them from peaceful people (a) before they create physical danger to others and (b) in ways that do not further agitate the crowd. The Panel is hopeful that dialogue officers (discussed below) and other recommendations from this report will assist with that.

It is also important that SPD officers consider the circumstances in which they are acting. SPD Panelists emphasized the need for SPD officers to improve their "situational awareness" and to think of the ramifications of their actions before they act. Before using force, SPD officers should consider how the specific use of force might affect (and potentially inflame) the crowd. Under circumstances like these,





officers may well conclude that while conduct might technically be "arrestable" under the law, the arrest should not be made until a later time, given the potential to inflame crowd. The physical distance between the subject and the officer, the need to move through other members of the crowd, the time that has passed since the offense was committed, the perception of those in the immediate vicinity, and the relative "pettiness" or "seriousness" of offense should all factor into the officer's decision process.

The Panel also discussed whether the level of force used by the officer deploying OC was appropriate and whether other types of interactions would have de-escalated the Incident without affecting the child behind the agitated protesters on the line.

The Panel assumed the officer who deployed the OC spray in this instance gave truthful responses to OPA and the Force Review Unit during the interviews and written reports that the Panel reviewed.[27] If so, the officer did appear to include these considerations in his decisions, deploying two short bursts of OC spray and not using additional force. However, it is the Panel's understanding that officers who are behind the front row on the line have larger OC spray cans (MK-9 canisters) that provide greater distance and "spread" than the smaller cans of OC spray (MK-4 canisters) given to SPD officers for daily use on their belts. The MK-9 canister has a range of up to 18 feet and is generally intended to be used from farther back behind a line or to reach farther into a crowd; had the officer used an MK-4 canister, it is possible that the smaller dispersal area would have satisfied the immediate safety goal of separating an SPD officer from the protestor grabbing his baton while avoiding the collateral injury to the child and others. (The Panel felt that this equipment change should be viewed as secondary, behind a shift in emphasis on officer de-escalation training.)

The Panel does not know if there are other equipment alternatives that might have improved the officer's ability to target only the individual in question and minimize the risk of the child or others also being affected. One member of the Panel mentioned "pepper gel" products[28] that might advance this goal; the Panel has not examined such products and mentions them as a potential consideration only.

Ultimately, as will later be addressed in the altercation between bicycle officers and community members on the next day, while police actions like this may be legal according to the letter of the law, they may not be viewed as just by members of the community. Equally important, the arrest did not advance the tactical goals of SPD in facilitating peaceful protests. It was perceived by the nearby protesters as an arrest for disrespect towards the police, increasing their anger towards SPD. The fallout – deployment of pepper spray on protesters, including an 8-year-old, a viral video and thousands of outraged complaints – negatively impacted SPD's legitimacy at protests in the days and weeks to follow. As such, this arrest ended up confirming skepticism and distrust of SPD in the eyes of protesters and served to reinforce the notion of SPD as an organization that exists to use force to suppress expressions of undesirable speech.

The Panel identified two other areas that it felt contributed to the undesirable events that occurred here. One involved the insufficient announcement of the declaration of unlawful assembly prior to SPD uses of force. The Panel reviewed video of SPD officers discussing an imminent declaration of unlawful assembly prior to the arrest of the man and the spraying of the child, but the actual declaration was not heard by the Panel. SPD officers on the Panel agreed that the PA systems SPD used to transmit dispersal orders to the crowds downtown on May 30 were inadequate to be heard over the noise generated by

---

[27] Use of Force Reports 05-30-2020; OPA Investigation Summary 2020OPA-0322
[28] See, e.g., https://www.sabrered.com/pepper-gel-industry-leading-innovation-sabre





the crowd. The Panel strategized a number of approaches to enhance the ability of SPD to communicate with everyone in the crowd, including those who might have hearing impairments.

At subsequent events, SPD used larger, professional PA systems to improve communication with protesters. SPD Panelists provided information that Long-Range Acoustic Devices (LRAD), designed for communications with large crowds, have been acquired and are in use by SPD. The Panel notes that other jurisdictions have elected not to purchase LRAD devices over concern they can be weaponized or cause damage to the hearing of protesters close to where they are when deployed. If an LRAD is used, SPD should develop and publish written protocols governing its use that ensure it is not used in ways that may harm individuals within its range.

Where possible, SPD should position officers and loudspeakers in various locations at the demonstration to verify communications are clearly heard and understood by the crowd. SPD should verify instructions are heard on the police radio prior to further crowd facilitation acts by SPD.

The other issue reviewed by the Panel involved the use of, and need for batons by SPD officers at protests like this. The protesters in this instance were clearly angry and agitated, but they displayed no weapons, leading members of our Panel to ask why SPD officers had their batons out in the first place. Many on the Panel viewed this as an unsubtle threat of force that was unnecessary given the situation. Had the baton been sheathed, it would not have been as easily grabbed by the woman in the crowd, and the OC spray might not have been viewed as necessary by another officer.

SPD officers and supervisors on the Panel felt that the batons often did more harm than good. The batons issued for crowd events were longer and difficult to wear on the body and they were rarely used for any protective purpose. Instead, their primary use was to push members of the crowd in particular directions. Given SPD’s desire to eliminate physical contact between officers and protesters, these officers felt it would be possible to severely curtail, and potentially eliminate, the presence of batons at crowd events without impacting public safety, including the safety of officers on the scene.






*Contributing Factors and Recommendations: OC Spraying of Child, May 30*

**Figure 5. Contributing factors - OC spraying of child.**







**Table 5. Table of Contributing Factors and Recommendations, May 30, 2020: OC Spraying of Child**

| May 30, 2020: OC Spraying of Child | |
|---|---|
| 17. *The mood between officers and community members was already tense, emotional, and confrontational as a result of earlier incidents.*<br><br>18. *SPD established a static police line across 4th Avenue, which acted as a magnet for angry protesters and provided an outlet for increasing expressions of their frustration and anger.*<br><br>19. *SPD did not explain clearly and calmly to protesters the reasons for establishing the line, or for limiting pedestrian movements.* | 19. **SPD should avoid the deployment of officers in ways that prevent pedestrian/crowd movement or that separate individuals from other areas of protest without a clearly articulated safety rationale.**<br><br>20. **If short term closures of streets or blockages of specific intersections are necessary for the safety of the crowd, SPD should ensure that its officers can adequately inform individuals in the crowd of the reasons for the blockages and provide them with adequate alternative options to continue moving.**<br><br>21. **SPD should ensure that all limitations on crowd behavior or conduct are designed to maximize the safety of individuals in the crowd, and that any communications about such limitations articulate that safety rationale in ways that emphasize LEED (Listening and Explaining with Equity and Dignity) principles. Specific messages should be conveyed in simple, layperson terms that are accessible to all, and should be focused on explaining the public safety necessity motivating the message.** |
| 20. *SPD did not effectively communicate with the crowd and did not effectively inform the crowd of its declaration of "unlawful assembly" or of the potential ramifications of that declaration.* | 22. **Improve SPD's capability to inform and communicate with demonstrators during group events in the following ways:**<br>• **Multiple modes of communication should be considered, including audio, video, other visual media (e.g., posters, banners, etc.), social media, and others;**<br>• **The modes of communication and specific messages should be included in the Incident Action Plan created by SPD prior to events and updated throughout the pre-event planning phase;** |





| | |
|---|---|
| | • **The communications should be documented and recorded during the event, including by having officers certify their use on police radio that is retained by SPD; and**<br>• **Their impact should be evaluated and specifically assessed in post-event review by SPD.**<br><br>23. **Procure a suitable audio device to ensure that the crowd can hear messages relevant to the event.** |
| 21. *The arrest of an individual by SPD inflamed nearby demonstrators, resulting in physical contact across the line between front-line officers and front-line protesters.*<br><br>22. *A baton held by an SPD officer on the line was grabbed by a protester, who refused a verbal order to let it go, causing an SPD officer behind the line to deploy OC spray against the individual.*<br><br>23. *The OC spray distributed to non-frontline SPD personnel spread more widely than the intended individual target.* | 24. **Review SPD protocols related to the presence of batons and their use during crowd facilitation events, potentially eliminating their presence at such events unless justified by a specific and compelling public safety purpose.**<br><br>25. **In considering whether to use force during a crowd event, SPD officers must evaluate whether the use of force can be limited to those against whom the force is justified, and ensure that the potential for collateral impact is minimized.**<br><br>26. **Limit arrests during protests targeted at the police to individuals committing immediate or imminent harm to people or property, and do not arrest individuals for offenses committed at an earlier time unless they can be accomplished in a way that will not escalate emotions in the crowd.** |





## Incident #2: Police Vehicles Set on Fire, SPD Rifles Stolen, May 30

### *Description of Incident*

SPD has a great deal of experience in crowd management and crowd control, overseeing thousands of events each year. Even so, SPD was unprepared for the combination of the sheer number of protesters in downtown Seattle on May 30 and the anger directed at SPD officers given the nature of the protests. Under these circumstances, SPD's normal tactics were inadequate to ensure public safety.

As protesters flowed into and around Westlake Park, SPD held a variety of static positions designed to limit vehicular traffic and ensure safe pedestrian entrance to and exit from the Park. For the most part, SPD officers remained silent as they were being engaged verbally by protesters, in part because of SPD's "content neutrality" policy, which prevents officers from making statements that might support or demean a protesting group. As a result, protesters frustrated about the arbitrary and inappropriate uses of police power in George Floyd's murder in Minneapolis, were met by unmoving, silent officers in riot gear preventing their free travel across public streets in Seattle. This turned static police lines into increasingly tense areas of confrontation.

As protesters were gathering, a group of SPD officers assigned to the protests drove into the Downtown area and parked their vehicles on 6th Ave., near Westlake Park. In one vehicle, three officers had brought their department-issued rifles, which they stored in the locked but unattended vehicle. Two of the rifles were in a cabinet designed to hold two rifles, while the other was in a bag in the back of the vehicle in the car.

After a series of escalations, SPD declared an unlawful assembly and issued a dispersal order. It is unlikely the order was heard by many in the crowd given the size and noise of the crowd and the AV system available to SPD at the time. As SPD deployed CS gas and blast balls, protesters were forced into Pine St. Lacking sufficient resources to both hold the intersection and move forward into Pine St., SPD remained in their lines rather than moving forward to disperse the crowd further. This left a group of highly agitated protesters next to a fleet of unattended police vehicles on Pine St. and 6th Ave., which became a target for their anger.

Shortly before 4:00 p.m., an individual sets a police vehicle on fire at 5th and Pine St. Soon after, around 4:15 p.m., a line of five police vehicles parked on 6th Ave were vandalized. Videos taken by people in the crowd[29] show individuals removing three rifles from the back of one of the vehicles. One of the rifles was quickly recovered, unloaded and returned to SPD shortly thereafter by a private security guard in the crowd and broadcasted live on local news. Of the other two rifles, one was later anonymously returned to the West Precinct, and the other was recovered from an individual currently facing criminal charges for the incident.

Individuals in the crowd continued vandalizing the vehicles and then set them on fire. The vehicles burned on the street for more than 20 minutes, until SPD was able to secure safe access for the Seattle Fire Department (SFD) to the area. The fires, as well as the seeming lack of SPD or SFD presence for an

[29] Closed Circuit Television (CCTV) video is not stored in the City of Seattle, and therefore could not be used to trace the other stolen rifle.





extended period of time during these incidents, were indicators to the general public of the unrest and lack of control in Downtown Seattle.

### *Analysis*

The Panel's discussion of this Incident focused specifically on concern about the ability of vandals to access unattended SPD patrol vehicles and to remove three rifles from one of the vehicles during the chaos. The instance in which an individual actually fired a live round from one of the rifles at the vehicle was particularly disturbing. If a private security guard with his own sidearm had not been there able to immediately recover, disarm, and return the rifle to SPD, the harm could have been far worse. As it was, another rifle remained stolen and missing for multiple days.

The Panel first discussed how to ensure patrol vehicles are not left unattended near crowd events. While the scope of these protests was beyond what was expected, it was also clear the SPOC was challenged in its ability to know exactly where all of its personnel and equipment were located as the protests evolved. This is an important issue for SPD moving forward.

SPD Panelists noted that on subsequent days, officers reporting to the protests were instructed to park their vehicles in a location that (a) was farther away from the protest locations and likely exit routes and (b) could be supervised so that vehicles were not left unattended. The Panel felt some form of this practice should continue. In instances where circumstances require officers to leave vehicles, it would be useful for SPD to have some way to access and move any SPD vehicles even if the officer to whom the vehicle has been issued are not able to return to it.

Panelists were unaware whether a specific system exists that could provide the SPOC with real-time positioning of all SPD "assets" deployed to facilitate crowd events, or what challenges might be involved in implementing such a system. However, in a world where every SPD officer is issued a cell phone, where Location Services allows for precise tracking of that phone, OnStar allows for GPD and remote access to locked vehicles, and where Bluetooth and other networks allow for location finders to be affixed to very small objects, it would seem this challenge is surmountable.

Most of the Panel discussion focused on the necessity and wisdom of bringing rifles to a protest, and the extent to which officers need access to such weapons at crowd events. The Panel acknowledged the need for SPD to be prepared for rare but terrible "mass shooter" events (e.g., the Las Vegas sniper who fired into a crowd at a music festival). At the same time, that rationale did not persuade many Panelists of the need for rifles to be in police vehicles that were left unattended near the protests. If SPD officers had been carrying them, their presence would have greatly escalated tensions with the crowd. And their removal from the vehicle greatly increased the danger to protesters.

Ultimately, many Panelists did not feel the potential "mass shooter" scenario justified the presence of these rifles in unattended police vehicles near the protests. The fact that the rifles were not part of SPD's crowd management/crowd control strategy on this day convinced these Panelists that other tactics for preparing for a "mass shooter" scenario should be pursued by SPD to ensure the large-scale safety of the event.





When rifles are kept in SPD vehicles, it is SPD policy[30] to store them in locked cabinets in a condition described as "patrol car ready," meaning that the weapon has the safety on and is loaded without a round in the chamber so it is immediately ready for use when removed from storage. The Panel recognized seconds matter in emergencies, and there may be scenarios in which rapid access to loaded rifles might be necessary. Still, some on the Panel felt that the safety benefit of having unloaded rifles justified the slight time delay in loading and using the weapon in a time of need. Panelists also questioned whether the third rifle should have been in the vehicle, as it could not be contained within a locked cabinet. However, the locked containers were no guarantee, as they noted the relative ease with which vandals were able to break the locks on the rifle cabinet to remove the two secured rifles. Equipment improvements – for example, expanding the capacity of the cabinets and improving the lock mechanism – would reduce the likelihood of firearms being stolen in the future.

Several Panelists asked about the accountability measures SPD has to ensure that rifles or other firearms do not get lost, stolen, etc. Seattle Police Department Manual, 5.001 Section 2 states that officers must adhere to laws, City policy and Department policy. The proper securing of weapons is governed by Seattle Patrol Rifle Program- Operators Manual, 2010. Currently a failure to follow the Patrol Rifle Program Operators Manual is reviewable by OPA (when there is possible misconduct) or by SPD Chain of Command (in all other cases). The Panel recommends these reviews be performed regularly to incentivize and ensure accountability for the proper handling and storage of weapons at all times.

Finally, the Panel discussed the issues created by the inability of SPD to use CCTV footage to track the rifles that were taken from the patrol vehicle. The Panel understands the existing City rules prevent the storage of CCTV footage within the City, and the principles of privacy that led to the creation of those rules. There will always be tensions between privacy and public safety, and the City may continue to feel that the need for individual privacy is such that there should not be public safety exceptions like this one. At the same time, Panelists recognized that archived CCTV footage would have assisted SPD in its ability to locate its stolen rifle, minimizing the risk that the rifle could be used to injure someone. Enabling the use of CCTV footage for such legitimate public safety rationales, with strict safeguards, would be useful if it is politically feasible.

---

[30] Seattle Patrol Rifle Program- Operators Manual, 2010. Chapter 1, Patrol Car Ready Skill Steps and Chapter 5, Conditions of Carry. Patrol Car Ready is used in a patrol vehicle locking rack or cased in the trunk; the rifle will be administratively unloaded before transporting it back inside a precinct for storage. This means, weapon selector I on "safe," there are no rounds in the chamber, bolt is closed to an in-battery condition, dust cover is closed, loaded magazine inserted into the weapon.






*Contributing Factors and Recommendations: Police Patrol Vehicles set on fire, rifles stolen*

**Figure 6. Vehicles set on fire, rifles stolen contributing factors.**







**Table 6. Table of Contributing Factors and Recommendations, May 30, 2020: Police Vehicles Set on Fire on Public Streets, Rifles Stolen**

| **May 30, 2020: Police Vehicles Set on Fire on Public Streets, Rifles Stolen** | |
|---|---|
| 24. *Officers drove into the downtown protest area in police vehicles containing SPD-issued rifles. They left the vehicles unattended near a significant anti-police protest.*<br><br>25. *SPD's use of CS gas dispersed the crowd in the direction of unattended SPD police vehicles.*<br><br>26. *Rifles, including rifles kept in locked cabinets, within one of the police vehicles were stolen by individuals in the crowd.*<br><br>27. *The locks on the rifle cabinet did not prevent vandals from stealing the rifles contained within.*<br><br>28. *One of the rifles was not in a locked cabinet within the police vehicles.*<br><br>29. *While managing the crowds, the drivers of vehicles were assigned by SPOC to a role and location that prevented them from being able to move the vehicles before they were damaged by individuals in the crowd.* | 27. **Identify a specific area for officers reporting for crowd facilitation duty to convene and leave their vehicles, providing a shuttle system for officers to and from the areas where they are deployed and supervision for the vehicles.**<br><br>28. **If exigent circumstances prevent an officer from parking a vehicle at the designated area, officers should notify the SPOC of the location of the vehicle(s), and a designated officer should move the vehicle(s) to a designated safe area.** (The Panel noted that this will require some method by which the designated officer can access a car left locked by the driving officer.)<br><br>29. **Ensure that any weapons or munitions brought to protests are securely stored and cannot be taken or used by anyone other than the officer to whom they were issued or other authorized SPD personnel.**<br><br>30. **SPD officers attending protests should not leave rifles unlocked in unattended police vehicles.**<br><br>31. **SPD should invest in rifle cabinets with locks that cannot be easily breached by others.**<br><br>32. **SPD should consider the utility of "biolocks" on all rifles to ensure that only the officer who is issued the rifle can fire it.** |
| 30. *SPD lacked the ability to track precise locations of SPD officers, vehicles, or weapons. As a result:*<br>• *Officers were not deployed as quickly or efficiently as possible;*<br>• *Unattended vehicles near the protests were not identified and moved prior to* | 33. **Implement a GPS system through the SPOC that allows Incident Command to know the precise location of every officer, vehicle, and lethal munition deployed during a crowd event.**<br><br>34. **Seattle City Council should consider whether CCTV camera footage could be kept by a** |





| | |
|---|---|
| *being surrounded by unsafe crowd activity; and*<br>• *A rifle taken from a patrol vehicle could not be tracked and found.* | **third party for a limited time, and accessible to SPD or other appropriate parties upon request for suitable public safety purposes, including the ability to track stolen police weapons that would pose an imminent danger to the community.**<br><br>35. **Ensure that officers are held accountable for securing their weapons at all times, and that violations of SPD policies on these matters are investigated and enforced.** |





## Incident #3: Officer Placing Knee on Individual's Neck During Arrest, May 30

### *Description of Incident*

Downtown Seattle continued to be a chaotic environment into the early hours of May 31, 2020, with pockets of protesters being joined by dozens, and perhaps hundreds of individuals breaking into and stealing from stores and businesses throughout the area.

At approximately 11:30 p.m. on May 30, a 911 call was placed from a T-Mobile store at 1527 6th Ave. (between Pine and Pike Streets), reporting that a group of individuals had broken into the store and were stealing property. A squad of SPD bicycle officers, many of whom had been on duty for as many as 16 or more hours responded to the call. A crowd had gathered across the street from the T-Mobile, and video taken by bystanders showed that as the officers arrived, a number of people were running out of the store and away from police.

The officers dismounted and began trying to apprehend individuals fleeing from the store. One SPD officer grabbed a male in a white hoodie and pulled him to the ground. A second officer dismounted from his bike and began to assist the first officer with handcuffing the subject. As the handcuffing proceeded, the second officer's knee was resting on the subject's head and was very close to, and potentially on, the man's neck.

At that moment, another male in an orange hoodie and wearing a backpack ran out of the T-Mobile. The second officer jumped up from his position on the man in the white hoodie, and pulled the man in the orange hoodie down to the ground with the assistance of a third officer. The two officers worked to remove the individual in the orange hoodie's backpack so they could handcuff him. As with the prior arrest, the officer again put his knee on or very close to the subject's neck and shoulder blades.

A crowd had gathered around the T-Mobile store, and bystanders were loudly and angrily yelling at the officers to "get your knee off of his neck!" Body-worn video (BWV) captured the third officer saying to his colleague, "get your knee off his neck," to which the kneeling officer replied, "yup." The third officer then reached over and pulled his colleague's knee down to the middle of the man's back, between his shoulder blades. The man was handcuffed, and the officers immediately discontinued their use of force, helped the man up, and led the individual to an area with other arrestees.

A video of both arrests and the positioning of the second officer's knee was recorded by a community member and received substantial visibility on social media.

### *Analysis*

In light of the way that George Floyd was killed, and how that death ignited the protests during which this incident occurred, the Panel felt the officer placing his knee near any individual's neck reflected at best a profound lack of situational awareness. It energized an already angry crowd in the moment and provided footage on social media that added fuel to the fire of protests in the days and weeks that followed.

Panelists were deeply disturbed by the imagery of the officer with his knee on the skull of the first man arrested, pressing his skull into the concrete sidewalk. The opportunity for serious injury to the





individual seems obvious, and while the Panel recognized that arrests are dynamic and unpredictable, and that suspects will resist the officers' actions, the potential for serious head injury outweighed the arrest for a small amount of stolen property.

When questioned by OPA, Officer NE#1 explained that he was acting in accordance with his training (from several police departments and the U.S. military), attempting to control the head of each individual being arrested to prevent them from being able to resist arrest. The officer denied having his knee on either man's neck, believing his knee was either on the head (in the case of the first man, in the white hoodie) or between the upper shoulder blades (in the case of the second man, in the orange hoodie) of each subject. He said he had no problem with WO#1 moving his knee down lower on the second man's back, particularly given the inflammatory nature of such a posture due to the method by which George Floyd had been killed.

NE#1 stated his objective was not to impair either man's ability to breathe, but simply to handcuff and move the men away as quickly and efficiently as possible – and the uses of force were brief and force was ended once each individual was handcuffed. He and other officers reported being the targets of many different types of projectiles thrown from the crowd, and he was aware that "seconds matter" in these sorts of arrests, where the crowd could easily get more agitated and seek to interfere in the arrests or harm the officers.

SPD policy for prone handcuffing – handcuffing a subject who is lying face down – explicitly prohibits a "carotid restraint," or pressure on the neck designed to interrupt the breathing passage or blood vessels in the neck.[31] It does not, however, expressly prohibit placing pressure on an individual's head.[32] Statements from the review of the incident conducted by OPA that restraining the head was "not included in Department training and is largely discouraged"[33] but was not a prohibited practice. This was deeply disturbing to many Panelists. Prohibiting the ability of officers to place their body weight on any part of an individual above the shoulders would eliminate this concern without materially impacting the safety of the officer.

The Panel also discussed whether these arrests were necessary or desirable for SPD at all. The Panel appreciated the need for officers to use their discretion when approaching a scene where crimes are being committed and was reluctant to substitute their discretion for that of the SPD officers, but it questioned whether that discretion was used well here. Panelists recognized the need for SPD officers to protect public and private property. As one community member on the Panel pointed out, "once you walk into that T-Mobile store, you are no longer a protester. Now you're a looter, and the police have a job to do." At the same time, Panelists expressed a strong belief that protecting lives was far more important than recovering stolen property. While Panelists did not object to the arrest of people who were stealing from the store, some did not feel that the theft of relatively inexpensive electronics was a suitable justification for the decision of SPD officers to use the tactics they did in this instance.

In this instance, the SPD bike officers simply responded to the scene and began arresting people. No Supervising Officer was on the scene, and the squad, which does train together, did not pause to create

---

[31] SPD Use of Force Policy, SPD Manual 8.050. Prohibition of carotid restraint took effect on June 19, 2020.
[32] D Training Unit, Prone Handcuffing training materials updated on April 20, 2017.
[33] OPA Director's Certification Memo 2020OPA-0324, page 5.





a tactical plan or agree on their approach to the scene. Some Panelists felt that a brief discussion among the officers before arriving on the scene might have established important context and a different approach to the scenario that would have prevented these uses of force.

Some Panelists who questioned the need for the arrests did so out of concern for the SPD officers involved. They asked whether arresting these individuals with force while getting pelted with debris by a hostile crowd subjected both the suspects and the police to an undesirable risk of injury for what amounted to a relatively small amount of stolen property. They wondered whether confronting individuals in the store and allowing them to leave without taking any of the store's property might have led to dispersal of the looters in a way that minimized the theft of property and reduced the use of force against fleeing suspects.

SPD officers on the Panel stated that officers in these situations are trained to be reactive – to only use the amount of force necessary to interrupt the criminal activity and apprehend the individual and not more. In this way, SPD said that it was the actions of the individuals that dictated the terms of engagement, not those of SPD. Many on the Panel viewed this as a shifting of responsibility for police uses of force onto others. In their view, it is SPD's responsibility to ensure that officer discretion on when and how to arrest is applied with greater situational awareness, and officers preparing for protest facilitation should be reminded that in circumstances like those of May 30, restraint is worth its weight in gold. The suggestion that SPD's officers are merely "reactive" serves to remove some of that discretion, rather than promote its proper use.

Panelists reflected concern that officers who had been on duty since the morning hours,[34] especially hours dedicated to facilitating a protest with plenty of anger directed at them and their position as police officers, might be more likely to treat the people running out of the T-Mobile store more aggressively. Other Panelists acknowledged the emotional and physical toll on the officers, but pointed out that police are trained to handle such situations, and that this was a larger issue in the days and weeks to come than on May 30, which was one of the first of many days of protest and resistance. Any further discussion would be speculative on the part of the Panel without additional interviews of the officers. Still, attention should be paid to officer well-being and the impact of such occurrences on their ability to act calmly and within the challenging parameters demanded by the situation over time.

One additional factor discussed by the Panel was whether the impact of a declaration of a curfew on the protests could really be known, or how it should be used in the future. The decision to declare a curfew is the Mayor's, and is not within SPD's ability to control, though SPD was consulted prior to the declaration in this instance.[35] Once the curfew was issued:

- Panelists noted that the curfew might have kept people from coming to the site of the protest or other event, believing the area to be unsafe;

---

[34] According to SPD records (Use of Force statements and the Incident Action Plan) for May 30, the first shift of officers participating in these events arrived at their precincts at approximately 7:00 a.m. and did not finish their shifts until 1:00 a.m. on the morning of May 31. Approximately 40% of participating officers had shifts that lasted longer than 15 hours, of which 5 hours required officers to wear full riot gear. For additional information regarding the physical and emotional impact of extended shifts in protest rotations, see https://www.stltoday.com/online/dojs-ferguson-after-action-report/pdf_d2a40881-df39-558c-8b7e-e54cc2906aa7.html.

[35] SPOC log entry 288, https://spdblotter.seattle.gov/2020/05/31/chiefs-statement-on-may-30th-protests-downtown/





- On the other hand, some might have been attracted to the area, either as observers or as people seeking to capitalize on the unrest in some way.
- On later days, some protesters made clear that their presence on the street was precisely to protest the curfew, which they viewed as an illegitimate restraint on their freedoms.

In theory, the curfew gives SPD the ability to arrest anyone on the street. In this instance, however, there were thousands of people throughout the downtown area, which far outmatched SPD's capacity to arrest. Given that SPD lacked the resources to enforce the curfew, the Panel doubted that its upside outweighed its negatives in this instance, and instead served to underscore how chaotic the situation had become and empower those who were seeking to contribute to the unrest.






*Contributing factors and recommendations - Officer Placing Knee on Alleged Looter's Neck During Arrest*

**Figure 7. Officer placing knee on individual's neck during arrest contributing factors.**







**Table 7. Table of Contributing Factors and Recommendations, May 30, 2020: Officer Placing Knee on Individual's Neck During Arrest**

| **May 30, 2020: Officer Placing Knee on Individual's Neck During Arrest** | |
|---|---|
| 31. *The Mayor declared a curfew at 5:00 p.m.* | 36. **The Mayor's Office and SPD leadership should critically examine the utility of a curfew and should exhaust other messaging options before declaring one. If a curfew is announced it should be limited in scope and clearly focused on public safety, rather than the deterrence of public protest.** |
| 32. *Individuals had broken into a store and appeared to be stealing property.*<br><br>33. *There was no SPD squad supervisor on the scene and responding bicycle officers did not form an incident plan before responding to the scene of the looting. Upon arriving, the bicycle officers immediately engaged forcibly with suspects running out of the T-Mobile store.* | 37. **SPD should establish protocols to guide officer responses to property crimes occurring during significant public disorder events. These protocols would, among other things, establish clear guidance for officers on:**<br>● When to disperse and when to arrest individuals who may be committing property crimes during civil unrest;<br>● How to conduct arrests of individuals who require prone handcuffing; and<br>● How to arrest individuals committing property crimes without escalating tensions between SPD and observers of the arrest. |
| 34. *Officers were in a hostile environment, being yelled at and receiving thrown projectiles from the crowd, and therefore were trying to act quickly.*<br><br>35. *An officer placed his knee on one subject's head and another subject's upper back/neck area while effectuating arrests.*<br><br>36. *SPD policy does not expressly prohibit restraining individuals by putting pressure on their heads.* | 38. **Modify the policy and training for prone handcuffing to eliminate body weight pressure being applied above the shoulders of a subject being restrained.** |
| 37. *Officers had been on duty for many hours and were frustrated, exhausted, and angry by the end of the night.* | 39. **Implement staffing schedules, and provide officers with breaks, food and water, and pre- and post-event wellness initiatives to help officers at crowd events – and especially at crowd events that are critical of SPD and policing – deal with exhaustion, stress, and primary or secondary trauma that might result from their participation at such events.** |






## Incident #4: Bicycle officer altercation and arrest of pedestrian, May 31

### *Description of Incident*

Protests resumed on May 31. That afternoon, a large group of protesters was peacefully marching northbound on 4th Ave. A squad of six SPD bicycle officers were facilitating the march by operating in "leapfrog[36]" fashion, moving ahead of marchers to block vehicular traffic at intersections.

At approximately 4:30 p.m., the officers got on their bikes at Spring St. and moved north along with the marchers. The crowd was very large but moving calmly. The officers rode single file on the far right of the sidewalk, but even when pressed against the side of the buildings, pedestrians occasionally blocked their passage.

One individual was at the far right of the crowd, in the path of the advancing bicycle squad. As the bike line attempted to pass, the officers came into contact with the individual, who did not attempt to move out of the officers' path.

It is difficult to see precisely what happened next due to limited view from body worn video located on officers' chests, but as the fifth bicycle officer approached the individual, he reached out and pushed the individual slightly. The two became entangled and the officer dismounted (or fell) over the front handlebars while holding the individual, bringing both himself and the individual to the ground. The officer later claimed that his actions were a response to the individual punching him in the head, though this allegation could not be proved or disproved by the video reviewed by the Panel.

A crowd of demonstrators immediately and angrily gathered around the officers as they arrested the individual. At least two people from the crowd attempted to intervene in the arrest, one of whom was also arrested themselves.

The previously peaceful crowd became quite agitated, with signs, bottles, and a metal pan being thrown at the group of officers. The officers called for help, and a large number of additional bicycle officers appeared on the scene and created a protective perimeter around the area while the two individuals were being handcuffed. Ultimately over 30 officers were deployed, using OC spray and blast balls to disperse the crowd and send them moving down 4th Ave. in a far more agitated state. A single decision by an SPD officer had instantaneously transformed an otherwise peaceful march into an angry confrontation.

### *Analysis*

Of all of the Incidents the Panel reviewed in Wave 1, this Incident proved to be particularly divisive for the Panelists. It is important that SPD understand why.

While some Panelists reflexively sided with the SPD officers and felt strongly that an individual had assaulted an officer and such actions should not ever be tolerated by SPD, others saw it completely differently. These Panelists saw this event as the most salient example of a regular practice of SPD

---

[36] A coordinated tactic where a portion of the squad advances faster to create cover (e.g. block vehicular traffic) while the other advances with the marchers.





officers misusing force, abusing their power and defending it through a transparently false post-hoc rationale. For them, it underscored the reasons the protests were necessary and further eroded SPD legitimacy.

The importance of understanding both of these perspectives is discussed below. The Panel was unanimous about three things related to this Incident:

1. One snap decision by an SPD officer instantaneously transformed an otherwise peaceful march into an angry confrontation, involving 30 SPD officers deploying OC spray and flashbangs and increasing tensions for the rest of the day;
2. The officer's decision to arrest the individual, which to many on the Panel was difficult to justify on its merits, conflicted in every way with the SPD's stated strategic and tactical goals for the day; and
3. The Incident could have been avoided entirely if the officers had simply taken a different route to their objective or paused for 10 seconds to dismount and walk their bikes.

The Panelists felt the mobility of the bicycle officers was by and large a positive; it allowed a smaller group of less obtrusive officers to facilitate the demonstration and allowed the crowd to move in different directions and still remain safe from vehicular traffic in the downtown area. Panelists appreciated that the relatively small number of officers helped reduce intimidation associated with heavy police presence. At the same time, the "leapfrogging" tactic required officers to move faster than individual marchers, creating the potential for contact and interference with slower-moving individuals in the crowd.

The Panelists did not disagree with the OPA review of the incident, which noted that "the officers had the legal authority to drive down the sidewalk and did so in a manner that allowed sufficient space between them and the individuals next to them." However, they noted that the individual appeared simply to be walking on the sidewalk, and the officers rode up to him from behind. As such, they viewed it as SPD's obligation to avoid the man, or to ask him to move in a calm and courteous fashion.

Whether the subject could or should have gotten out of the way of the officers or not, this interaction would not have occurred had officers not attempted to push past the individual on a crowded sidewalk.[37] The decision to move along the far-right side of the sidewalk, where there was very little space for the bicycles, left officers with no ability to attempt to avoid the individual who made contact with officers as officers could not move anywhere other than forward. They then chose not to slow or dismount their bikes to safely navigate the crowd. This contributed to the altercation's occurrence, which then engaged more than 30 SPD officers in an aggressive and counterproductive confrontation with a previously calm crowd for over five minutes. Thus, this decision not only deprived the officers of their mobility, but also of their efficiency.

[37] As explained by the SPD officers involved in the OPA report related to this Incident, SPF bicycle officers are trained on the importance of bicycle squads staying together and avoiding separation, especially in hostile crowds. 2020OPA-0332 Case Summary

https://www.seattle.gov/Documents/Departments/OPA/ClosedCaseSummaries/2020OPA-0332ccs122320.pdf





Several of the officers involved stated that "shoulder-checking" was a well-known method for protesters to interfere with bike officers and break free of police control of the protest or commit crimes. Several Panelists were skeptical of the concept, and equally skeptical that it was occurring in this instance but acknowledged that officers are trained that such actions are unlawful and worthy of arrest.

The officer who made the arrest justified his actions by explaining that an individual with a potentially criminal motive was intentionally impeding his progress and threw a punch at his head. The Panel could not confirm whether that was true, though his credibility was undermined by the seemingly false statement in his report that the individual had "charged" him, which the Panel felt was disproved in its review of the video. Whether or not a punch was thrown, however, it is clear that the man had done nothing to prompt his arrest prior to the bicycle squad's arrival, and that the squad's conduct provoked whatever response the man provided. Indeed, the Panel noted how quickly this Incident occurred: less than 25 seconds before jumping/falling off his bike to arrest the marcher, Officer 5 had been standing in the crosswalk of 4th Ave. and Spring St. with no inkling of what was about to happen. Fewer than seven (7) seconds passed from the moment that Officer 1 contacted the individual until Officer 5 engaged with the individual and spontaneously decided to make an arrest.

Thus, SPD arguably initiated this Incident – and so the Panel's question became "even if a punch was thrown, did this interaction further SPD or community objectives?" The clear answer to the Panel was that it did not.

The Panel agrees with OPA's statement that "officers are not required – or expected – to stand by idly while they are being assaulted."[38] However, officers are expected to "use de-escalation tactics in order to reduce the need for force when safe under the totality of the circumstances and time and circumstances permit."[39] A single individual's failure to give ground to the bicycle squad – even after receiving multiple requests or orders from the officers – did not need to end in the arrest of two people, use of a spit hood, the deployment of numerous blast balls, the further incitement of the crowd, and the confrontational deployment of more than 30 bicycle officers.

The Panel saw no evidence of any actual desire on the part of the individual to interfere with SPD's actions – but if the individuals arrested truly did wish to disrupt the peaceful nature of the situation or SPD's facilitation of the protests and protection of individuals in the crowd, their actions were a resounding success. None of these outcomes furthered SPD's goal of facilitating a peaceful march. Whatever tactical purposes SPD hoped to achieve, the decision to arrest the individual incited far more aggression and took far more time than a decision to dismount, walk past the individual, and remount would have.

OPA appears to have reached the same conclusion, as its report of the incident reads: "The larger question that OPA has with this case and with other similar cases that have arisen during the course of the protests is not whether officers could act but, instead, whether they should have done so. OPA has seen a number of situations where officers made decisions to effectuate arrests and/or to use force and,

[38] See Seattle Police Manual section 8.100 – De-escalation 1.
[39] Seattle Police Manual section 8.100 – De-escalation 1.





as a result, tensions with demonstrators rose, leading to even more police action and, in most cases, even more force. For example, in this case, [Officer 5] indisputably had probable cause to make an arrest when the [individual] physically contacted him when he was riding by. However, in doing so, he set in motion a chain of events that resulted in projectiles being thrown at officers, less-lethal tools being used, and multiple arrests."

What is more, given the context of two preceding days of forceful interventions by SPD, this Incident may well have added further to a growing sense among protesters that the SPD was "part of the problem" rather than a partner in the fight for social justice and against police brutality.

Putting aside the tactical futility of the officer's action, what became clear as the Panel watched the video of this event was that Panelists had two very different interpretations of the same set of events. SPD officers saw a man deliberately impeding their progress with the intent of committing crimes within the protest, and then saw a man assault an officer. This, in their mind, justified immediate and aggressive conduct by the officers to indicate that such acts cannot and should not be tolerated.

Many Panelists saw this event quite differently, and it will be essential for SPD to understand their reactions if it is to reconnect and rebuild trust throughout the community. For these Panelists, what they believed they saw was a man walking down the street when a bike squad of cops bumped into him. When he did not immediately move out of the way, the perspective of these Panelists was the officer jumped on the man and arrested him, and then lied about it in the report.[40]

Panelists explained that particularly for people of color, this scenario – police officers exercising their authority in ways that physically injure (and even kill) members of the community and then retreating to a false, reconstructed scenario and hiding behind imbalanced laws that protect their actions – has happened to people of color again and again. Thus, this event evoked many of the same emotions as watching George Floyd die in Minneapolis. It was extraordinarily evocative and infuriating, and the inability of SPD officers to understand the perspective – or even to acknowledge it – was deeply upsetting to them.

While many of the law enforcement Panelists understood this perception from community members, they nonetheless pointed to the existing laws, policies and procedures as the only "road map" available to them in terms of permitted behavior, and maintained that the actions in this Incident were within those policies. In this way, the situation is similar to the above Incident involving an Officer's knee close to or resting on a subject's neck – while the incident may have been "within policy," it does not reflect an acceptable tactic in the eyes of the community, and while SPD may be justified in not punishing the officer for his actions, SPD still should change the policy to bring it into alignment with community perceptions of justice.

[40] Panelists agreed that these events may well have met the legal criteria for assault but differed as to who was assaulting whom. Many on the Panel viewed this much more as an assault by the SPD on an individual.





It will be challenging for SPD to regain the trust of community members unless and until line officers working in communities throughout Seattle understand this perspective held by many in impacted communities, explicitly acknowledge it, and engage about it openly and honestly.





*Contributing Factors and Recommendations: Bicycle officer altercation and arrest with pedestrian, May 31*

**Figure 8. Bike officer altercation with pedestrian contributing factors.**







**Table 8. Table of Contributing Factors and Recommendations, May 31, 2020: Bike Officer Altercation and Pedestrian Arrests**

| May 31, 2020: Bike Officer Altercation and Pedestrian Arrests | |
|---|---|
| 38. *A standard operating procedure for SPD bicycle squads is to "leapfrog" ahead of the demonstration and block one-way streets to ensure the crowd does not march against traffic, which SPD considers a public safety concern.*<br><br>39. *SPD bicycle officers rode on the crowded sidewalk on 4th Avenue to reach their next destination.*<br><br>40. *"Shoulder-checking" is a perceived disruptive tactic used against bicycle officers to impede their progress in a protest.* | 40. **Monitor crowd activities from a sufficient distance that physical contact between SPD and protesters is not required or likely to occur, unless an individual is an immediate physical danger to others.**<br><br>41. **Train bicycle officers not to arrest individuals for passive resistance techniques like "shoulder-checking" unless the officer(s) determine that the acts are clear, deliberate, and intended to substantially interfere with the ability of the officer(s) to perform his or her immediate public safety responsibilities.**<br><br>42. **When "leap-frogging" a protest, SPD officers should select alternative routes that minimize the likelihood of exposing officers or crowd participants to unnecessary risks.**<br><br>43. **When a crowd prevents safe movement of bikes without contacting individuals in the crowd, SPD bicycle officers should consider dismounting and walking with bikes physically placed between officers and crowd members to minimize agitation and physical contact.** |
| 41. *The individual did not comply with alleged orders by police to yield to the bicycles, or move out of the way of bicycles after the first SPD rider passed.*<br><br>42. *An SPD officer spontaneously decided to arrest the individual rather than continuing with his role to facilitate the march.*<br><br>43. *Once the arrest began, the crowd and SPD embarked upon a path of mutual escalation.* | 44. **SPD officers should improve their situational awareness, considering the relationship of their actions to the overall strategy and tactics of the event, and the support available to the officer(s) relative to the size of the event.**<br><br>45. **Develop an arrest policy for each event and convey this to officers beforehand. Flexibility should exist in the tolerance of lower-level misdemeanors balanced against the priority for ensuring the strategic goals of the operation.** |





## Incident #5: The "Pink Umbrella" Incident, June 1

### *Description of Incident*

Monday, June 1, 2020, marked Seattle's fourth consecutive day of protests. As clashes between SPD and protesters continued, what had started as protests of police brutality in other jurisdictions became more focused specifically on improper uses of force by SPD, and the community's desire to change SPD behavior. At the same time, SPD was concerned about the violence and disorder and the corresponding risk to people and property that had affected not just Seattle but many other cities on prior days.

The SPD East Precinct building at 12th Ave. and Pine St. had become a recurring focus of protestors in the preceding three days. SPD claimed to have received intelligence that the building might be a target for arson, imitating the destruction of a Minneapolis Police Department precinct building on May 28. The building was difficult to protect, and presented a substantial risk to nearby buildings if it caught on fire.

Despite these concerns, protest leaders negotiated with SPD Chief Best for permission to march to the East Precinct, and the Chief agreed. Shortly after 6 p.m., protesters marched peacefully eastbound on Pine St. SPD officers had deployed "fence lines" of officers in a protective perimeter one block away from the building in each direction. The lines were made of moveable interlocking metal racks similar to bicycle racks.

An estimated crowd of 7,000 marchers reached the west side of the police line at 11th Ave. and Pine St. just after 7:00 p.m. Conversations between SPD representatives and protest leaders took place, and shortly after 7:30 p.m., two members of SPD leadership took a knee with protesters. The crowd wanted to continue past the barricade to the East Precinct building, but SPD refused, holding the fence lines in place.

SPD's stockpile of "less lethal" or crowd control munitions had been largely expended in the past three days. As a result, officers outside the East Precinct were more heavily reliant on CS gas than on other munitions. CS gas is a less targeted tool for addressing crowd behaviors. Once deployed, it can be dispersed in unpredictable ways by wind and other weather conditions, and its minute particulates render it able to seep into unintended areas.

The crowd of protesters continued to protest at the SPD barricade, and occasionally pushed the unstable fencing. To protect the line, SPD bicycle officers in "soft gear" (i.e., lacking protective padding or armor) stood immediately behind the fencing, within arms' length of the protesters. At about 9:00 p.m., there were some attempts by the crowd to push through the barricade. The attempts were quickly halted by the officers on the scene.

While the situation then appeared to calm, these attempts to push through the line caused the SPD Incident Commander to authorize the dispersal of the crowd. Given the depleted capacity of OC spray, SPD chose to deploy CS gas. SPD officers wearing gas masks and carrying batons replaced the bicycle officers at the front of the line. In response, the crowd gathered together more tightly and opened several umbrellas.





There was little, if any communication between the SPD and the crowd as this transition was occurring. As on previous days, SPD's audio system was insufficient as it could not be heard over the noise of the crowd, and once officers donned their gas masks, their ability to communicate with protesters was significantly reduced. As a result, no message was conveyed to the crowd that might have de-escalated the situation.

One protester opened a pink umbrella and held it out over the police line, very near the face of an SPD officer on the line. Umbrellas were viewed by SPD as a safety risk because they reduce visibility. The officer grabbed the umbrella and tried to pull it out of the protester's hands as several officers nearby deployed OC spray at the protester with the umbrella. The spray hit a number of protesters in the area, causing them to retreat while inciting reactions elsewhere in the crowd, including a push forward at the line and several glass bottles and other projectiles being thrown by protesters standing further back in the crowd. This, in turn, prompted SPD officers to use CS gas, blast balls and smoke grenades to clear the crowd from the intersection.

Chaos ensued throughout the intersection and the park, as SPD officers extended their perimeter around the East Precinct. SPD declared a riot in the area at 9:28 p.m. as CS gas filled the air, drifting throughout the neighborhood and seeping into homes, making SPD and the East Precinct a flashpoint and symbol for police oppression in Seattle. As one resident angrily yelled at the officers that night: "I live here! You're invading my neighborhood!"[41]

### *Analysis*

The events of June 1 left many Panelists feeling that a substantial lack of trust permeated all the interactions at 11th Ave. and Pine St. The Panel was uniformly confused and confounded by the escalation of events that seemed easily avoidable, though Panelists did not see those events in the same way. At any point in the evening, the ability of police to view the crowd as peaceful in intent, not seeking to destroy the East Precinct or to refrain from escalating from soft gear to gas masks might have stopped this escalation of events. At any point in the evening, the ability of the crowd to perceive the police actions as self-protective and measured, rather than escalatory, might have done the same.

SPD officers found it difficult to understand how protests in the early part of the day could be facilitated peacefully and effectively by the very same officers who would be present at the "Pink Umbrella" Incident later in the day, when events went so awry. They also expressed concern that the crowd, after receiving a great deal of support from SPD (permitting the crowd to march from Westlake to the East Precinct, engaging with the protest leaders enroute, East Precinct leadership taking a knee, etc.) continued to want more, and was unwilling to stop at a line drawn within eyesight and earshot of the East Precinct building. Pointing not only to intelligence raising concerns about property damage and danger to life, but to the prior three days of rioting, arson and looting that had occurred, SPD's actions were driven by a perceived need to protect the community around the East Precinct. "At some point, we

[41] https://twitter.com/heidigroover/status/1267679520011632641





have to protect these buildings, and the buildings are part of a neighborhood, and we have to protect all of that," said one officer.

But many Panelists questioned whether the East Precinct building was ever really in danger, as SPD feared. They saw no evidence from police intelligence or in video footage that there were actually instigators in the crowd on that night. As a result, several Panelists viewed this regrettable Incident as evidence of an SPD mindset that fundamentally distrusted the crowd's motivations and misunderstood its actions. Panelists noted that one of the key motivators driving SPD's decision-making was the need for the East Precinct to remain operational to protect the neighborhoods it serves. This struck many on the Panel as ironic given how events unfolded – but in any event, the Panel felt that scenario planning and proactive planning exercises to allow SPD to "game out" responses to protests that seek to shut down the East Precinct (and other key SPD and City landmarks) would help SPD leadership prepare for such scenarios in ways that would preserve important City services and minimize interference with the crowd.

It is difficult to know what was truly going through the heads of the community and police participants in these moments. But the acts of each group were understandable and predictable – and each act, received by a person on the other side of the fence line who was not predisposed to trust the other, escalated the tension and increased the likelihood of a violent confrontation.

It appeared to the Panel that the decision of the Incident Commander at 9:04 p.m. to don gas masks was something that could have been delayed or reversed. From the six minutes between the brief attempts of the crowd to push through the fencing at 9:04 p.m. until the deployment of CS gas at 9:10 p.m., the crowd did nothing that appeared to be provocative or violent, and thus the deployment of gas masks (which led to the crowd's use of umbrellas as a defensive response to police stepping to the line in gas masks, which then led to the "flash point" of the officer grabbing the pink umbrella) was viewed by many on the Panel as the unnecessary instigating act. Had officers simply remained in their "soft gear" without masks, these Panelists felt, the crowd would simply have remained in place. They viewed SPD as the aggressor, escalating the Incident by donning gas masks and then unnecessarily deploying crowd dispersal munitions.

One difference between the police perspective and the perspective of many community Panelists is how SPD should assess the *potential* for violence and what steps it should take to prevent it. In a situation like the one described above, an officer may feel justified using force *before* the fence line is actually breached – to potentially thwart even greater harm or the potential to be overwhelmed.

Several Panelists felt this was not the right standard for measuring or justifying SPD uses of force – particularly given that the protests were a statement against police use of force and in support of the crowd's desire to dictate which police actions are just, and which are not. These Panelists evaluated whether violence was *actually occurring* and did not view uses of force based on *potential* violence to be acceptable.

SPD officers did not share this perspective. They perceived the use of umbrellas as acts of aggression and escalation on multiple levels. First, the umbrellas blocked the officers' view of the crowd, which





increased concerns for officer safety as the umbrellas could hide acts designed to damage or penetrate the fence. Second, the existence of umbrellas in the crowd suggested to SPD that individuals were acting in a calculated fashion to neutralize SPD tactics (particularly OC spray). This was particularly troubling to SPD Incident Command on June 1, when its stock of OC spray was limited. Without OC spray as a viable option, SPD incident commanders were left with two options for dispersing an unwilling crowd: (1) the less targeted and more debilitating CS gas or (2) physical force.

SPD's inability to communicate with the crowd further exacerbated the situation. First, the audio-visual (AV) truck that SPD used at the time to communicate with the crowd was not present, and SPD officers believed it was inadequate for people in the crowd to hear given the size and noise of the crowd. For example, clearly broadcast and audible statements like "Due to specific threats that have been made suggesting an intention to cause damage to the East Precinct Building, which could in turn affect other nearby residences, SPD will erect barriers at 11th and Pine Street to ensure that protests remain a safe distance away from the East Precinct building, and to maintaining ingress/egress with suitable buffers for emergency vehicles or other public safety needs" would have been viewed favorably by many Panelists. Second, once the decision had been made to don gas masks, the ability of SPD officers to communicate with individuals in the crowd was virtually eliminated.

These failures of communication were regrettable, but the Panel viewed them as symptoms of a larger communication failure, which was the inability for SPD Incident Command to understand whether the crowd was *actually* intent on destruction or merely intent on peaceful demonstration. SPD officers who spoke to the Panel claimed that if the crowd had simply remained behind the fence line, "they could have stayed all night." But because SPD could not discern the true nature of the crowd, it relied on a desire to prevent the worst-case outcome. Without any way to speak to people in the crowd, or gauge the emotion away from the fence line, SPD could not:

- Effectively establish trust with the crowd or explain its reasoning for establishing the fence line;
- Communicate to the crowd that SPD was prepared to permit the crowd to peacefully assemble at 11th Ave. and Pine St. so long as the fence line was not breached, nor of its plan to deploy CS gas if *and only if* individuals in the crowd made an effort to breach the fence line;
- Communicate the tactics that it would deploy in the event that the crowd attempted to breach the fence line, or provide advance notice of those intentions through any means other than putting on gas masks, which escalated the situation; or
- Engage with the crowd to evaluate the crowd's true intentions, the presence of instigators or provocateurs, or evaluate the actual risk of damage to the East Precinct;

In discussing how to address this challenge, Dr. Clifford Stott suggested that the Panel and SPD look to the Swedish police, who have developed a group of specially trained "dialogue officers" connected by radio to the police incident commanders. The dialogue officers walk with protesters and have training in how to convey the perspectives, goals and likely actions of the crowd, and how to communicate with people in the crowd in ways that facilitate the protests, and convey advance notice of necessary





limitations on the crowd driven by public safety concerns. This helps all parties evaluate and manage circumstances as they evolve.

If it becomes necessary, the dialogue officers would inform the crowd of impending dispersal orders and the rationale behind those orders, to assist protesters in preparing for and avoiding activities that would cause the deployment of force. These officers could also identify and inform police about people in the crowd who are creating danger to others in ways that will facilitate their individual identification and removal from the protests when justified, and assist the crowd in safe and timely dispersal from an event. Perhaps most importantly, they are a source of vital information that was unavailable to Incident Commanders at the Incidents reviewed by the Panel – information that will allow SPD commanders to make better decisions about whether force, arrests, or dispersal are prudent. (Additional information is provided in Appendix A.)

SPD was very interested in this approach, and immediately began discussions with Swedish police, and police departments in the United Kingdom, to learn more and evaluate the feasibility of such an approach to future protests. The Panel is optimistic that such a reform will greatly improve future crowd events, and hopes that this is the first of many positive reforms to come from the SER.






*Contributing Factors and Recommendations: The "Pink Umbrella" Incident, June 1*

**Figure 9. The "Pink Umbrella" incident contributing factors.**







**Table 9. Table of Contributing Factors and Recommendations, June 1, 2020: The "Pink Umbrella" Incident**

| June 1, 2020: The "Pink Umbrella" Incident | |
|---|---|
| 44. *SPD, aware of violence directed at police buildings in Minneapolis in recent days and aware that the East Precinct had been a site of previous demonstrations, perceived the need to protect the East Precinct and surrounding buildings from potential acts of arson.* | 46. **Communicate in advance when it plans to create barricades or restrictions to protesters or marches. The reason for the creation of such zones should be clearly articulated and driven by a public safety rationale.**<br><br>47. **Conduct appropriate scenario planning and provide sufficient resources so that other SPD locations can protect and serve the people of Seattle in the event that public service from one or more of its buildings are disrupted by protests.** |
| 45. *SPD established static fence lines that it was unwilling to move in a perimeter around the East Precinct. The fence lines prevented the crowd from freely gathering in front of the East Precinct building, and effectively placed police on an island, giving them no ability to retreat from the lines.*<br><br>46. *The fence lines were made of loosely interlocking metal gates (bicycle racks) that were easily moved, even without concerted crowd aggression. Members in the crowd expressed a desire to move through the fence, and on several occasions attempted to push through the fence. SPD did not have sufficient staffing to prevent this without the use of munitions.*<br><br>47. *To preserve the integrity of the fence against the crowd, police officers stood immediately behind the fence, reducing the physical space between officers and protesters.*<br><br>48. *An umbrella was pushed over the fence line and very close to the face of an SPD officer, blocking the officer's view of the fence line. The officer pulled it away from the protester holding it, and the protestor resisted surrendering the umbrella.* | 48. **Construct barricades between protesters and critical pieces of the public safety infrastructure (e.g., the East Precinct) rather than using lines of officers. Such barriers should strike a balance between protecting the integrity of the facility and preserving its accessibility to the public.** |





| | |
|---|---|
| 49. *After three days of protests, protestors were aware of police tactics and the use of crowd control munitions, and many in the crowd had umbrellas, goggles, and other tools to limit the impact of these munitions upon them. While many protestors viewed these tools as purely defensive, many officers on the scene viewed them as equipment used to enable illegal or violent behavior, and to limit the ability to police to prevent crime and ensure the protection of the crowd.* | 49. **SPD officers should be trained to realize that the existence of Personal Protective Equipment ("PPE") or other defensive measures in a crowd of demonstrators, is not itself an aggressive measure requiring an escalating police response.** The existence of these defensive measures may signify that existing less lethal munitions may not be effective, underscoring the need for improved communication and de-escalation efforts.<br><br>50. **SPD incident commanders should maximize the buffer space between officers and the crowd whenever possible.**<br><br>51. **On-site incident commanders should carefully evaluate the context and threat from a crowd, with assistance from "dialogue officers" in the crowd.** |
| 50. *SPD had no useful mechanism for mass communication with the crowd at the line on 11th Ave. and Pine St., nor did the crowd have an effective means of communicating with SPD about its intentions.* | 52. **Consider the creation of dialogue officers to ensure effective, real-time, de-escalatory communication between SPD and protesters.** |
| 51. *Officers' crowd control munitions were depleted due to prior days of protests; as a result, officers had very little OC spray and were forced to rely more heavily on widely dispersing CS gas and less on the more targeted OC spray. Many of the CS gas canisters were provided by an outside agency and were not of a type that SPD purchased.*<br><br>52. *Once deployed, the spread of CS gas cannot be controlled and it is temporarily disabling to any individual exposed to it. Accordingly, SPD officers were ordered to don gas masks well in advance of the deployment of CS gas.*<br><br>53. *SPD responded to attempts to penetrate the fence line by placing officers at the front of the line wearing gas masks, as well as officers with 40MM "less lethal" munitions and SWAT gear. The gas masks escalated tensions with the crowd, and further reduced the ability of officers to communicate with the crowd.* | 53. **Ensure access to adequate supplies of OC spray to ensure that CS gas is never deployed due to a lack of access to other more preferable or appropriate options.**<br><br>54. **Implement OIG's guidance on the use of CS gas set forth in Review of the SPD Crowd Dispersal Policy and Less Lethal Weapons, In Response to Ordinance 126102.** |






# IV. Conclusion

The protests that consumed Seattle on May 29 – June 1 were manifestations of a long-simmering frustration with many in Seattle – and in the nation – about the role of police in our communities. The issues they raise are emotional, deeply felt, and often divisive.

In moments of community divide, it can be helpful to remind ourselves of areas of agreement, and to restart the conversation from that point. The SER process began with the uniform agreement of a diverse set of stakeholders, including the Seattle Police Department, that the ability of Seattleites to give full voice to their First Amendment freedoms without fear of unwarranted police restrictions and in ways that ensure the physical and emotional safety of all involved and of the communities where the protests occur is critical. OIG, SPD, the Planning Group, and the Panel all held this as their primary goal. With this agreement, and a dedication to listening and respecting each other, the differences among individuals within the group remained substantial, but manageable.

During this process, Panelists – both community leaders and police officers –repeatedly found ways to discuss the challenging topics raised by these Events and Incidents, learning from each other how different people perceive the same events, and proposing improvements to the system that took these perspectives into account. One identifiable success from SER is the universal feeling of mutual respect that developed between Panelists on this difficult subject. It is hoped that these recommendations will lead to meaningful and lasting improvements within SPD that can help to rebuild the legitimacy of policing in the eyes of community.





# Appendix A. Dialogue Policing

## About this appendix

The information in this appendix is a lightly edited passage from HMIC (2009) Adapting to Protest. This was a report from the UK Police Oversight body that resulted from the death of a member of the public as a result of police use of force.[42]

## Adapted passage from HMIC (2009)

Due to public outrage over the police response to large-scale protests during the European Union Summit in Gothenburg in 2001,[43] Sweden developed a new approach to policing protest crowds which focused on improving communication between police and protest groups through the use of dialogue police. Called the "Special Police Tactic" (SPT), it was informed by research on crowd psychology[44] that identified the critical manner in which interactions between demonstrators and police governed the escalation of disorder.[45]

Through dialogue, police can explore the intentions of protesters and better understand their aspirations. Any conditions or restrictions placed on demonstrations can be explained, discussed and negotiated. Fundamentally, the tactic recognizes that when police are uncompromising with protesters, the risk of injury to persons or property increases. However, when there is an open dialogue, the risk is reduced.

Where protest groups are unwilling to communicate with the police, the aim of the crowd communication enablers, or dialogue officers, is to begin a process of engagement with these groups which may lead to more meaningful communication and dialogue in the future.

### The Role of Dialogue Officers

The ultimate objective for dialogue officers is to facilitate freedom of expression and peacefulprotest and to reduce confrontation between crowds and police. The role of dialogue police can be summarized in five core functions, defined in the table below (see Table 10).

**Table 10. Dialogue Police Functions**

| Function | Definition |
|---|---|
| **Negotiation** | To facilitate compromises and agreements between police commanders' interest in getting the best tactical conditions, and the protesters' interest to get best terms for their goal. |

[42] http://www.justiceinspectorates.gov.uk/hmicfrs/media/adapting-to-protest-nurturing-the-british-model-of-policing-20091125.pd
[43] http://edition.cnn.com/2001/WORLD/europe/06/15/eu.protests02/
[44] RIOT PSYCHOLOGY (rageuniversity.com) http://rageuniversity.com/PRISONESCAPE/PRISON%20RIOTS/RIOT%20PSYCHOLOGY.pdf
[45] https://www.workingwithcrowds.com/wp-content/uploads/2018/05/Dr_Clifford_Scott_Crowd_Psychology_and_Public_Order_Policing.pdf





| | |
|---|---|
| **Mediation** | To explain the police point of view to groups of demonstrators and the demonstrators' view to the police, in order to increase mutual understanding and avoid stereotyping. |
| **Initiation** | To come up with possible solutions to avoid or minimize the risk forconflicts and confrontations. |
| **Communication** | To function as link between demonstrators and commanders in their exchange of information. |
| **Sensing** | To read moods and preparedness for action in the group of demonstrators and how that is affected by police activities and to inform commanders of consequences of different courses of actions in a short- and long-term perspective. |

Dialogue officers work as dedicated units before, during and after events to establish links to protest groups, adopting a "community policing" style to engage with community groups and protest participants. They seek to create lines of communication and negotiation between police commanders and influential protesters during protest events. Since they have points of contact with protest groups, they can assist commanders by providing advice on, and negotiating potential impacts of, different courses of police action.

## Levels of Dialogue

### *Dialogue pre-event*

Dialogue between police and protesters before an event informs expectations and reduces the chance of action or conduct by either party during an event being interpreted as provocative, which in turn reduces the likelihood of a violent response. The initial dialogue allows police to explain the need for restrictions on an event and to facilitate the legitimate objectives of the organizers. Dialogue officers are also a useful resource for police commanders when scenario planning. Their knowledge of protest groups provides a more comprehensive and informed approach. Where groups are unwilling to engage prior to the event, the focus moves to engagement and co-operation once the event has begun.

### *Dialogue during the event*

While other police are engaged in policing the event, dialogue officers are there to assist with communication between police and protesters. Without other operational taskings, theyconcentrate on establishing communication lines with protest representatives. Dialogue officers do not wear police uniform but are identifiable by yellow vests. As the dialogue officers are within or close to the protest crowd, they are better able to sense the mood of the crowd and to assess how police actions are perceived. As dialogue officers will often have had longterm contact with protest groups, they will be better able to interpret the mood and conduct ofthe group than someone who is unfamiliar with the group. Similarly, they can interpret and explain the actions of the police to organizers in an attempt to prevent negative responses from the protest crowd.





*Dialogue post-event*

Dialogue officers facilitate post-event reviews between police and protesters. These reviews offer the opportunity to discuss elements of policing operations which caused difficulty – or were felt to be provocative to protesters – and enables officers to discuss difficulties they experienced.

*Evaluation*

The work of dialogue officers is credited with minimizing (and in many cases averting) confrontations related to protests. The engagement of the dialogue officers with protesters offers the opportunity for both the police and protest groups to better understand the objectives and constraints that each face. While confrontation between protesters and police has not been completely eliminated in Sweden, the level of confrontation and disorder is markedly less than at comparable events in other countries. The knowledge of the dialogue police of protest groups and their actions has enabled the scale of police operations to be adjusted to the most appropriate level for the event. Potential disorder has been avoided through mediation, direct communication between organizers and dialogue officers and the development of increased levels of trust as a result of these ongoing interactions.

Associated research indicates that people who have early positive contact with the police are less likely to associate themselves with violent groups, or groups hostile to police. Although dialogue cannot completely prevent violence in crowds, it can have a positive effect on relationships between police and the crowd. Therefore, dialogue can also affect whether violence and disorder remain isolated or spreads throughout crowds or across multiple events.This depends on the crowd's perception of the legitimacy of police action.

## Additional Information

### Critical Incident Management Command Structures

In August of 2020, OIG published a Review on SPD Crowd Dispersal Policies and Less Lethal Weapons. OIG found that SPD and other North American police departments, including those from Canada, use variations of the Federal Emergency Management Agency (FEMA) Incident Command System model (ICS) to plan and manage crowd events.

The SER Panel identified limitations related to the ICS model for managing public demonstrations. Particularly, the SER Panel identified a need to create a command structure based on competency for the role assigned rather than rank. Officers of a senior rank to those nominated to undertake an incident command role should not automatically assume superiority solely on the basis of rank or territorial responsibility. This system is already used by some police departments in Europe (see, e.g., the UK Gold Silver and Bronze Command Model -GSB).[46]

[46] Manual of Guidance on Keeping the Peace. Produced on behalf of the Association of Chief Police Officers and the Association of Chief Police Officers in Scotland by the National Policing Improvement Agency. https://www.statewatch.org/media/documents/news/2012/jan/uk-manual-public-order-2010.pdf





## Application to SPD

The UK and other European and Australian police forces have also developed similar units specifically designed to facilitate dialogue, as well as Critical Incident Management Command Structures that take dialogue units into account. During the SER process, with the assistance of OIG and crowd psychology expert Professor Stott, SPD began conversing with the Swedish Police and U.K. police to understand if and how the European approaches could be meaningfully applied within Seattle.





# Appendix B. SER Participants

*Names listed by role and alphabetically.*

| Name | Title | Role |
|---|---|---|
| **Benalfew, Sophia** | Executive Director, Ethiopian Community in Seattle | Panel Member |
| **Brooks, John** | Lieutenant, Seattle Police Department | Panel Member |
| **Davis, Tyrone** | Sergeant, Seattle Police Department | Panel Member |
| **Dyment, James** | Lieutenant, Seattle Police Department | Panel Member |
| **Judge, Lisa** | Inspector General, Office of Inspector General | Panel Member |
| **Mahaffey, Thomas** | Assistant Chief, Seattle Police Department | Panel Member |
| **Martin, Karin** | Assistant Professor, University of Washington | Panel Member |
| **Moodie, Donna** | Executive Director, Capitol Hill EcoDistrict | Panel Member |
| **Roberson, Matthew** | Officer, Seattle Police Department | Panel Member |
| **Santillan, Alina** | Director of Racial Equity, Seattle Center Cohort | Panel Member |
| **Singh, Monisha** | Executive Director, Chinatown-International District Business Improvement Area | Panel Member |
| **Washington, Maurice** | Community Advocate | Panel Member |
| **Hollway, John** | Associate Dean and Executive Director, Quattrone Center for the Fair Administration of Justice at the University of Pennsylvania Law School | Facilitator |
| **Lim, Thary** | Co-circle Keeper, CEO of PointOneNorth Consulting LLC. | Facilitator |
| **Phoung, Saroeum** | Circle Keeper, CEO of PointOneNorth Consulting LLC. | Facilitator |
| **Rowe, Cassidy** | J.D. Candidate, University of Pennsylvania Law School | Facilitator (staff) |
| **Scott, Bessie** | Former Community Police Commission Interim Executive Director | Project Pre-Planning |
| **Ruiz, Isaac** | Managing Attorney, Ruiz & Smart PLLC; former Community Police Commission Co-Chair | Project Pre-Planning |
| **Stott, Clifford** | Professor of Social Psychology, Dean for Research in the Faculty of Natural Sciences, and Director of the Keel Policing Academic Collaboration at Keele University | Subject Matter Expert |
| **Hernandez Aldaco, Daniel** | Policy and Data Analyst, Office of Inspector General | OIG Staff |
| **McCracken, Conor** | Policy and Data Analyst, Office of Inspector General | OIG Staff |
| **Meza, Miroslava** | Policy and Data Supervisor, Office of Inspector General | OIG Staff |
| **Tsai, Amy** | Deputy Inspector General, Office of Inspector General | OIG Staff |





# Appendix C. Short Biographies of Panel Members

**Sophia Benalfew** is the Executive Director of the non-profit Ethiopian Community in Seattle. She promotes the organization's overall mission through the provision of quality programs in education, health, and housing. She has extensive non-profit program management experience, including managing global programs, working across cultures, and grant writing and technical expertise in the fields of micro-insurance, financial inclusion, gender and resilience, and climate change. Prior to joining Ethiopian Community in Seattle, she worked for CARE and Oxfam America. She has degrees in management and public administration from Addis Ababa University in Ethiopia.

**John T. Brooks** is a Lieutenant, 29-year veteran, of the Seattle Police Department. He has served as a Police Officer, Sergeant and Lieutenant. His previous assignments include Patrol, SWAT, Anti-Crime, lead Tactics Instructor, Training, Mountain Bike, Ops Lt., member of the Force Review Board and Community Response Group. He is currently the Acting Captain of the Community Response Group, which he assisted in forming in 2020.

**Tyrone Davis** is a Sergeant with the Seattle Police Department which he joined in 1999. Davis has worked most of his career as an officer serving the diverse communities of the East Precinct, including assignments in Patrol, East Precinct Bike Squad, Community Police Team, and Anti-Crime Team, all involving close interaction with the community. As a Sergeant, he served the Office of Police Accountability as an Investigator for four years, where he conducted investigations into allegations of employee misconduct. Sergeant Davis is currently assigned to the Investigations Bureau with the Domestic Violence Unit. He is also a Board Member with the Department's Force Review Board, tasked with objective and critical analysis of the use of force incidents and events. Sergeant Davis was also a member of the Education and Training Section's Tactic Cadre. He taught officers in the classroom and, through scenario-based training environments, tactics with handling patrol-related calls for service, demonstration management, crisis intervention, and de-escalation. He is also a veteran of the United States Navy.

**James K. Dyment** is a Lieutenant, 28-year veteran, of the Seattle Police Department. He has served as a Police Officer, Sergeant, and Lieutenant. His previous assignments include Patrol, Mountain Bike, Anti-Crime, Gang Unit, Wellness, and Community Response Group. His current assignment is the Wellness Unit, which Dyment assisted in forming in 2019 and implementing in 2020. He is also an instructor for the Mountain Bike program and a bicycle crowd control instructor and served as the commander while assigned to the Community Response Group.





**Lisa A. Judge** is the Inspector General for Public Safety at the City of Seattle. For the past two and a half years, she has built a department dedicated to critically examining SPD use of force and improving its policies, practices, and culture. Along with the new Sentinel Event Review process, other ongoing projects at OIG include developing an officer peer intervention program, and developing an innovative training program with oversight partners and SPD for effective suspect and witness interviewing inspired by concerns of organizations like the Innocence Project. She spent over 20 years as a Tucson City attorney and in-house counsel for the Tucson Police Department, guiding police management in constitutional policing. She was an ACLU-approved trainer for court-ordered training on Fourth Amendment law and anti-bias for the Maricopa County Sheriff's Office. Lisa earned her Juris Doctor from the University of Arizona.

**Thomas Mahaffey** is an Assistant Chief with the Seattle Police Department which he joined in 1992. He started his career working with the many diverse communities of the East Precinct as a Patrol, Mountain Bike, Anti-Crime Team, and Field Training Officer. As a Lieutenant, Thomas served as a Watch Commander, Bike Squad Commander, and Operations Lieutenant, which included planning and leading numerous crime reduction initiatives, responses to significant protests, and managing large festivals and events. As Captain and West Precinct Commander, he served on multiple community councils and committees, such as the West Precinct Advisory Council and Chinatown/International District Public Safety Steering Committee. He championed the involvement of district patrol officers in engagement and problem solving with community stakeholders. Assistant Chief Mahaffey is a graduate of the University of Washington and has also completed the Senior Management Institute for Police, DEA Leadership Academy, and the Washington State Law Enforcement Leadership Course.

**Karin D. Martin** is an Assistant Professor for the Evans School of Public Policy & Governance at the University of Washington. Karin is a crime policy specialist whose areas of expertise are monetary sanctions, racial disparities in the criminal justice system, and decision-making in the criminal justice context. These issues come together in her current projects, which examine the use of money in punishment (e.g., fines, fees, restitution, etc.). She studied Psychology at Stanford University and worked in the non-profit sector in the San Francisco Bay Area before attending University of California, Berkeley, where she earned an MPP, an M.A. in Political Science, and a Ph.D. in Public Policy. She was a post-doctoral scholar in the Psychology Department at UCLA where she was also a Fellow with the Center for Policing Equity. She was Assistant Professor of Public Management at John Jay College of Criminal Justice and The Graduate Center of the City University of New York (2013-2017) and was a Visiting Professor at the Goldman School of Public Policy at the University of California, Berkeley, in 2016.





**Donna Moodie** is the owner of Marjorie restaurant, the executive director of the Capitol Hill EcoDistrict, and was recently named the new Executive Vice President of Community Development for Community Roots Housing. She has been a pillar of the community for many years, opening her first restaurant in Belltown in 1993 and leading neighborhood activism for the 20+ years she has been a Seattle resident. Her history of community work includes co-chairing the Mayor's Small Business Advisory Council, participating in the Central Area Land Use Review Committee, serving on the Seattle Center Advisory Commission, chairing the Central District Forum for Arts and Ideas Board, and consulting on business startups. She was also recently named one of Puget Sound Business Journal's 2020 Women of Influence.

**Matthew Roberson** is a Police Officer for the Seattle Police Department. He has worked with for the City of Seattle for 14 years—six years with Seattle Parks and Recreation as a youth program leader and the last eight years with the police department working in patrol, as a school emphasis officer, and running the Seattle Police Activities League (SEAPAL) youth program year-round. Outside of work, Officer Roberson has been a volunteer track coach for the Rainier Beach Community Center team for 15 years. He has a degree in history from Claremont McKenna College in California.

**Alina Santillan** is the Director of Racial Equity for the Seattle Center Cohort, a Fabian's Fund Board member, and a commissioner on the City of Seattle's Community Police Commission. As the Director of Racial Equity, his role is to facilitate and support intersectional anti-racism work within arts and culture organizations engaged in the Cohort. Cohort members work collectively to dismantle how white supremacy culture shows up in the arts and culture sector and strive to create actively anti-racist and equitable organizations. As a Board member for Fabian's Fund, he focuses on how to support Black and Brown communities' ability to thrive by addressing the disproportionate impact issues like mass incarceration, and the school-to-prison pipeline have on those communities. His lived experience as a Trans, Queer, Latinx person of color also allows him to connect with other communities impacted by systemic injustice. He brings experience in community organizing, non-profit fundraising, and culture change work to the Community Police Commission. Regardless of the system he is working within, he is fiercely committed to building authentic, long-lasting, and trusting relationships with under-invited communities, centering those voices most impacted by policing, and advocating for justice and equity throughout our city.

**Monisha Singh** is the Executive Director of the Chinatown-International District Business Improvement Area (CIDBIA), one of Seattle's ten BIAs contributing to neighborhood improvement and economic development. Monisha joined the CIDBIA in 2015 and has managed the neighborhood's street festivals and promotional events, curated the neighborhood's communication and marketing strategy, managed the neighborhood sanitation and public safety program, and advocates on behalf of businesses in an effort to create a clean, safe, and welcoming Chinatown-International District. Monisha is passionate about working with small businesses while protecting and promoting the cultural integrity of Chinatown-ID.






**Maurice Washington** is a social justice activist and community advocate. He was born and raised in Washington, DC, where he graduated high school and attended Prince George's Community College for Business Management for one year. Having an entrepreneurial spirit, he became the co-founder of an urban clothing line (City Style Clothing) in 1997. Moe moved to Seattle 20 years ago, where he soon started a catering business out of his loft along Airport Way. Not making the money he needed, Moe began to work for Swedish Medical Center, where he worked in Family Medicine, Heart Institute, Physical Therapy, Transplant Department, and The Cancer Institute. Working at the Cancer Institute inspired him to combine natural herbs with medical purposes into a tea tincture. Being an entrepreneur at heart, Moe became CEO and Founder of Brakamela Herb Tea, founded in 2020. Moe is also currently contracting at a biotech lab as a lab technician. He has been a member of the Masonic Fraternity Grand Lodge of Washington Jurisdiction for 16 years. In the summer of 2020, he took part in the Seattle protests in the wake of the Murder of George Floyd by Minneapolis police officer Derek Chauvin and others. As the Co-founder of UFFN (United Family, Friends and Neighbors), Moe met numerous times with Seattle Mayor Jenny Durkan, Police Chief Carmen Best, Fire Chief Harold Scoggins, Inspector General Lisa Judge, CPC Interim Executive Director Bessie Scott, and multiple Black/African American grassroots organizations, to bring change to the way racial Seattle policing is done in and to the communities of Seattle and the surrounding areas.





# Appendix D. SER Peacemaking Circle Group Norms

As part of the SER peacemaking circles, the Panel agreed upon group norms and behavioral principles that would guide the group and assist its work in evaluating and analyzing Incidents that occurred during the protests of 2020. These group norms are set forth below. **How to address tension, disagreement, and/or conflict (when a guideline is broken):**

- Call it out/name it in a respectful way.
- Recognize subjectivity & objectivity.
- Agree as a group with decision-making process.

**Guiding Principles/Group Norms:**

- Respect the talking piece.
- Speak from the heart.
- Respect each other's thoughts.
- Respect each other's time.
- It takes time to build trust.
- Speak from your own perspective and use "I" statements.
- Encourage people to move up/move back.
- Practice compassionate curiosity.
- Listen through an objective lens (it's difficult to be objective at all times).
- Do not "drop a bomb" and leave.
- Try not to let your beliefs, experiences, and values cloud your own judgement when listening to others.
- Accept others' ideas and thoughts.
- Whatever is discussed stays in the circle.
- Speak clearly and not aggressively.
- Be mindful of the way we speak.
- Practice forgiveness.
- Come from a place of vulnerability.
- Be accepting of direct language so long as it is respectful.
- Be present and engaged.
- Be accepting of being uncomfortable.
- Do not take things personally.
- Be open and transparent.
- Discretion.
- Acknowledge risks of expressing opinions.
- Express disagreement that seeks to understand not silence.
- Keep an open mind.
- Assume good intentions.
- Inclusion.
- Stay curious.
- Confidentiality.
- Time Management.






# Appendix E. Overall Description of Events May 29 and 30

## May 29, 2020: Organized Property Damage in the International District

Protests and violence unfolded in Minneapolis and across the country following the murder of George Floyd. Protests began in downtown Seattle on Friday, May 29, 2020. Around 7:00 p.m., a group of over 150 individuals[47] gathered at Hing Hay Park in Seattle's Chinatown International District (see Figure 10 below). Originally, SPD had expected a small group (5-10 individuals) to gather at this location.[48] Based on that estimate, two bike squads and one Anti-Crime Team (ACT) were assigned to the event. Accounts from SPD officers and command[49] show that SPD personnel experienced hostility from protesters, and that SPD personnel on the scene believed that some members of the crowd were affiliated with anarchist groups like Antifa based on their appearance. This assessment prompted SPD chain of command to request more units and initiate the "Incident Command System," and to begin mobilizing other police resources from other duties to manage the emerging demonstration.

**Figure 10. Map of SPD and protester positions, May 29, 2020, 7:00 p.m.**




47 https://nwasianweekly.com/2020/06/blog-a-protest-transforms-seattles-chinatown-hope-and-perseverance/
48 Use of force Statement by a Lieutenant 1 on scene.
49 SPD Use of Force Reports, May 29, 2020.





At 7:30 p.m., the demonstrators left Hing Hay Park and weaved through Downtown Seattle[50] chanting "Black Lives Matter" and "George Floyd."[51] As they progressed, SPD bike squads and additional units arriving on the scene sought to create mobile cordons that would separate the marchers from street front businesses along the route. Other SPD units created stationary police lines at various intersections to prevent traffic from endangering the marchers, and to prevent the demonstration from deviating off the main road.

In response to hostility expressed towards SPD officers,[52] SPD removed the bike squads from alongside the progressing crowd.

At approximately 8:00 p.m., the protestors reached 5th Ave. and Madison St., where SPD had created a police line with bike officers to prevent the demonstration from progressing. This appears to have angered the protestors. Individuals in the crowd verbally berated SPD officers in the line and a window on an adjacent building was shattered. At roughly 8:30 p.m., SPD officers used OC spray (i.e., "pepper spray") and "flash bang" devices[53] in an attempt to disperse the crowd.[54]

After this SPD intervention, smaller groups of people began moving in different directions away from 5th Ave. Photos taken at the time show at least one individual in possession of an axe, which was used to smash a store window on 5th Ave. and Pike St. As the evening progressed people across the downtown area damaged private buildings and cars. This led the Seattle Fire Department (via social media) to advise all downtown business owners to "immediately secure all open areas . . . [and] remove all combustibles that cannot be secured."[55]

Around 11:00 p.m., SPD began tracking a group moving towards the King County Children and Family Justice Center, where individuals threw rocks and fireworks at the building,[56] while another group of around 100 individuals headed towards the SPD East Precinct.[57] SPD tried to direct people from downtown towards the International District.[58]

Over the course of the evening, several buildings were damaged, including the Convention Center and a QFC on Capitol Hill. One group moved slowly down Jackson Street, smashing windows at Bank of America, Washington Federal, Seattle Vision Clinic, among others.[59]

---

[50] SPD Blotter, May 29, 2020.
[51] https://www.seattletimes.com/seattle-news/protesters-break-windows-clash-with-police-in-downtown-seattle/
[52] Use of Force report by Officer 1, 05-29-2020. CAD log 05-29-2020.
[53] "Flash bang" devices are also known as Noise Flash Diversionary Devices (NFDD). They are ATF-controlled Class C explosive devices that emit a bright light and loud noise to distract and disperse crowds. See, e.g., "Performance Characterization Study: Noise Flash Diversionary Devices (NFDDs), DOJ Document No. 205642, accessible at https://www.ojp.gov/pdffiles1/nij/grants/205642.pdf
[54] https://www.seattletimes.com/seattle-news/protesters-break-windows-clash-with-police-in-downtown-seattle/
[55] https://twitter.com/SeattleFire/status/1266588744359874560
[56] SPD Blotter for May 29, 11:19 p.m.
[57] Accounts in Use of Force Reports from May, 29, 2020
[58] Video report by Omari Salisbury from Converge Media. https://youtu.be/pv5j15IonEU
[59] https://www.seattletimes.com/seattle-news/protesters-break-windows-clash-with-police-in-downtown-seattle/

**Figure 11. Route of vandals in the International District, May 29.**




“Looters route” filmed by Converge Media, 05-29-2020
https://www.whereweconverge.com/post/anarchist-leave-a-1-4-mile-trail-of-destruction-in-downtown-seattle-last-night

Another group that had broken off from the protests at Hing Hay Park was followed and chronicled by Omari Salisbury, an independent Seattle videographer and media executive who had attended the protests downtown. Mr. Salisbury was leaving the protests when he came upon the group at 5th Ave. and Jackson St., and walked with them to 7th Ave. and Pine St. Recording from his phone, he narrated a video of their actions as they systematically destroyed numerous street fronts of commercial businesses along a 1.4 mile stretch of the International District (See Figure 11 above). The group, made up predominantly of young white men, did not encounter the SPD during this 45-minute period. (Mr. Salisbury's video suggests that SPD did respond to the group's break-in of a Bank of America retail location but did not arrive until the group was several blocks away. The video did not show any observable attempt by SPD to apprehend the group, which was on foot.)

The group's destructive activity was troubling to many Panelists for various reasons. First, a group of predominantly white vandals was destroying storefronts in a predominantly Asian community.

Second, the group appeared to be well organized for this activity. The vandals wore clothes that hid their identity, they tore down security cameras, and they moved quickly from one building to the next. Mr. Salisbury referred to them as "professionals," and it was his opinion that the goal of this group was to foment discord and breed distrust between the community and the police.

Third, the Panel was concerned about the lack of an SPD response to this vandalism. Mr. Salisbury's video[60] followed the group for roughly five (5) minutes after they initially shattered the windows of the Bank of America only blocks from an existing Seattle Police presence. Near the end of the video he states "[a]t this point, I almost gotta think that, like, the police have just kind of said 'f**k it,' which very well might be the case. These guys have been out here for about 15 minutes. There has been zero presence."[61]

[60] Anarchists leave a 1.4-mile trail of destruction in downtown Seattle last night. — Converge Media (whereweconverge.com)

[61] Panelists noted the perceptions of others in the community that property destruction was more readily tolerated and less aggressively enforced by SPD outside the downtown area, and pointed to the annual "May Day" celebrations as examples of moments when predominantly white crowds are permitted to act in ways that protests predominantly made up of people of color would expect to be treated more severely. SPD did not agree with these perceptions but should nonetheless be aware of them and act in ways that will address them.





SPD has pointed out that it can be difficult in these situations to establish probable cause for an arrest of any individual vandal, particularly without the use of surveillance camera video recordings. While this may be accurate, many Panelists saw the non-existent SPD response as an example of a disregard for the safety of neighborhoods other than downtown that are populated by non-Whites, and repeatedly offered the perspective that if the vandals had been people of color, or if the vandalism had been in downtown Seattle rather than the International District, the SPD response would have been faster and more aggressive.

For both community and police, then, the events of May 29, including organized vandalism and SPD uses of force, set the stage for what was to become an escalating pattern of unpredictable crowd behavior emerging simultaneously in multiple parts of the city. The events increased tensions, mutual distrust and violence as protesters expressed rage at police and police sought to enforce the law and ensure order. SPD's fears of the riots and property damage that had occurred in Minneapolis, and the presence of anarchists set on fomenting the same, were seemingly confirmed, while community perceptions of racial disparities in policing were reinforced by the lack of SPD response to vandalism in the International District.

The events of May 29 also signaled that SPD's traditional law enforcement-based approach to crowd management and crowd control would not be productive in the days to come. As one SPD officer explained:

> The night before, we were following a group [of demonstrators] headed to the SPD East Precinct headquarters. We are used to escorting groups like this and it's rarely a problem. But I decided to pull back our team so that it didn't seem like they were corralling people toward the precinct. Usually when we pull back everything is fine. But this time, when we disengaged and pulled back, the protesters started to confront us and attack. A patrol car got stuck with an officer, but we got it out. But that was when I realized that this was different. It was the first time we really realized that this really was directed at us and there were individuals intent on attacking us. It made doing our traditional job – of facilitating – difficult. Our usual tactics that would work, no longer did. . . we had to come up with different approaches for May 30 and beyond.

## May 30, 2020: Protests and Escalation of Violence

SPD had prepared for at least two demonstrations Seattle protest organizers had planned for Saturday, May 30. The *Justice for George Floyd* group planned a demonstration for 12:00 p.m. at SPD Headquarters (5th Ave. and Cherry St.), and the group *Not This Time*! organized a demonstration beginning at 3:00 p.m. at Westlake Center (Pine St. between 4th Ave. and 5th Ave.)[62] SPD established a command post in the Seattle Police Operations Center (SPOC) to coordinate the various SPD deployments throughout the city. All other participating agencies, including Seattle Fire Department ("SFD"), had representatives at the SPOC to ensure a coordinated response among the agencies and their respective officers as needed.

[62] https://www.seattletimes.com/seattle-news/protests-planned-in-seattle-on-saturday-over-george-floyd-death-in-minneapolis/





Normal SPD event procedures placed the overall Incident Commander in the field to ensure that important operational decisions would include a real-time review of the scene. SPD initiated a dedicated radio communication channel[63] for the day's demonstration events at 6:00 a.m.[64] Between 9:00 a.m. and 10:00 a.m., SPD personnel assigned to this event received presentations and instructions at their Precincts on the Incident Action Plan.[65]

As expected, protesters began gathering outside SPD Headquarters on 5th Ave. around 11:00 a.m.,[66] and by noon, the crowd was estimated at about one thousand protesters.[67] SPD officers, wearing protective equipment and using bikes and temporary fencing, created a police line preventing access to the building.[68] While protesters occasionally blocked the roadway, the situation remained calm and peaceful.

Around 1:00 p.m., protesters began to leave SPD Headquarters in groups, heading north on 4th and 5th Aves. toward Westlake Park, where the other demonstration was scheduled to start at 3:00 p.m.[69] While overall the crowd was peaceful, tensions were high. SPD radio communications reported a handful of individuals throwing bottles and rocks at officers at three intersections (5th Ave. and Cherry St., 5th Ave. and Madison St., and 5th Ave. and James St.),[70] though these reports could not be corroborated through other sources by the OIG data team.

By 2:00 p.m., SPD had placed multiple cordons around the Westlake area,[71] limiting direct access to the main protest site on Pine St. through the intersections at 4th Ave. and 5th Ave. The only remaining entrance to Westlake Park was on its southern end, at the intersection of 4th Ave. and Pike St. (See Figure 12 below). Officers supervising these cordons indicated the intention was to provide safe and controlled ingress and egress to the park while keeping protesters moving with the one-way street traffic flow, which facilitates protester and vehicle safety.[72]

---

[63] SPOC: Seattle Police Operations Center, coordinates Special Events Planning and Logistics support while serves as the primary representative and contact point of SPD. WSP: Washington State Patrol is the state police agency for the U.S. state of Washington. As of 2016 it had up to 1,100 troopers and 1,100 civilians
[64] https://spdblotter.seattle.gov/2020/06/07/timelines-of-police-responses-to-demonstrations/
[65] Source: SPD, Incident Action Plan May 30 2020.; Seattle Police Operations Center (SPOC) Log May 30, 2020.,
[66] Ibid.
[67] https://spdblotter.seattle.gov/2020/06/07/timelines-of-police-responses-to-demonstrations/
[68] https://twitter.com/c_clarridge/status/1266801804722925568
[69] https://twitter.com/amandamsnyder/status/1266825808292622337; SPD Blotter May 30, 2020.
[70] https://spdblotter.seattle.gov/2020/06/07/timelines-of-police-responses-to-demonstrations/
[71] Use of Force Report Lt. 2
[72] SPD Personal Communication.






**Figure 12. Map of downtown Seattle and SPD locations, May 30, 2020, 2:00 p.m.**




One Panelist said that in his 25 years as a police officer,

> [t]his [George Floyd] was one of the first times where every officer said 'this is bad, this guy needs to go to jail.' I have never seen a higher percentage of officers who felt this way." At the same time, the officer said, due to SPD's content neutrality policy, "We support [the protesters], we agree with you . . . but we can't say that when we're on the line because it's part of our job. We aren't allowed to be political. This was so unprecedented that everyone was like 'oh my gosh this shouldn't have happened.' We were frustrated because we were angry too and why is the crowd throwing sticks at us? This happened in Minnesota, we agree with you, this was wrong.

As more and more protesters arrived, the roads around the cordons became clogged with people. While many chants came from the crowd, a persistent one was "let us through, let them through," suggesting that some of the crowd's agitation was being caused by the cordons and the limited access to Westlake Park.

Around 2:20 p.m., a man attempted to push past one side of an SPD line set up on 4th Ave and Pine St. An SPD officer pushed the man back twice; when then man stepped forward a third time and attempted to grab at the officer's OC spray can, SPD officers used OC spray and a 40 mm launcher (i.e., foam bullet) to force him back and away from the line. In response, the man brandished an OC can of his own, throwing it at officers before leaving the area.[73]

Roughly 20 minutes later, the man returned to the same police line and verbally antagonized the officers again. This time, he was arrested.[74] A group of officers suddenly and aggressively pushed into the entire crowd using their bicycles as shields, grabbed the targeted individual and retreated behind the police line. This arrest angered the crowd, resulting in an altercation in which SPD deployed OC spray that

---

[73] SPD BWV, BWV3 May 30, 2020
[74] SPD BWV, BWV1 May 30, 2020





affected an 8-year old child in the proximity of the intervention – an act caught on video and posted on social media, leading to thousands of complaints filed with SPD.[75] (This is one of the Incidents reviewed in greater detail by the Panel below.)

By 2:30 p.m., SPD estimated that the crowd had grown to 4,000 – 5,000 people, gathered near an erected platform.[76] The crowd was far larger than SPD's predictions at the start of the day, and it was clear to SPD operational commanders that the number of SPD officers deployed to downtown was not sufficient to manage the crowd safely. The cordons established by SPD had gradually become "stand-off" lines where protesters gathered to chant and confront SPD officers. SPD officers reported that the crowd at 5th and Pine was becoming more "hostile," so SPD moved bike officers to the area from 4th and Pine. Around 2:35 p.m., officers blocking the intersection at 5th Ave. and Pine St. moved to allow protesters to walk from Pine St. south on 5th Ave. Rather than moving south, however, the protesters remained, with more filling into the newfound space and protesters on the other side of the line getting more frustrated by the moving police line pushing them backwards. During this time, an SPD officer and a protester had a physical exchange, after which police deployed OC spray and blast balls and some protesters threw plastic and glass bottles.[77]

As the crowd grew, the SPD officers remained in place on their lines. SPD operational leadership viewed the decision to have their officers remain in place in the lines as the best of a number of unsatisfactory alternatives. Attempts to move the crowd could provoke violence against the officers on site, and the number of officers on the scene was insufficient to control an angry crowd of the size that was present. At the same time, having SPD leave the scene risked abandoning the downtown area to the crowd, which was exhibiting a worrisome potential for violence that could endanger people and buildings.

SPD leadership sought to have "minimal presence or contact with the crowd" by remaining in place, but their unwillingness to move and the unwillingness of officers to constructively engage with the crowd continued to anger those who could not get access to the park (due to the limitation on movement) and those who were nearby (due to the refusal to engage with the crowd or leave the scene, which was viewed as defiance of the crowd by SPD). It also subjected the officers on the scene to a continuing risk of injury from thrown projectiles.

SPD officers deployed approximately 10 "blast balls" in the intersection to disperse the crowd at 5th Ave. and Pine St. after some protesters threw bottles at the officers.[78] While the explosions were outside Westlake Park, their sounds were heard inside the Park, causing fear and causing some within the Park to run away from the bangs.[79] As crowd psychologist Clifford Stott, who reviewed the events of the day on video, stated:

> It's evident that people didn't really understand what those munitions were, where they were coming from, but they heard the munitions, they heard loud

---

[75] https://www.youtube.com/watch?v=f1e4jRlIu3I&feature=youtu.be OPA opened a case and found that use of force was lawful and proper https://www.seattle.gov/Documents/Departments/OPA/ClosedCaseSummaries/2020OPA-0322ccs09-04-20.pdf

[76] https://spdblotter.seattle.gov/2020/06/07/timelines-of-police-responses-to-demonstrations/https://twitter.com/asiakmfields/status/1266872902873317376/photo/1

[77] https://spdblotter.seattle.gov/2020/06/07/timelines-of-police-responses-to-demonstrations/

[78] https://spdblotter.seattle.gov/2020/06/07/timelines-of-police-responses-to-demonstrations/; WSP Incident Timeline 5.30.2020. Body Worn Video _Clip_1_1__AXON_Body_2_Video_2020-05-30_1437

[79] https://twitter.com/KOMOPopham/status/1266851885043970048?s=20 and https://twitter.com/choeshow/status/1266847778442895363 (Cole Chow).





> explosions and they turned and they ran away in fear. . . it's clear that the munitions and the explosions had a wider effect on the crowd as a whole. . .[80]

While the munitions did initially disperse the crowd at 5th Ave. and Pine St., SPD cordons remained static and demonstrators moved back to the intersection. These uses of force seemed to energize rather than deter the protesters, who approached the police with hands up and open, chanting "hands up, don't shoot." These people, who were not throwing objects or physically engaging with SPD officers, were nonetheless subsequently subjected to SPD blast and gas munitions.[81] This increased the crowd's rejection of SPD's legitimacy in this situation. As Professor Stott observed,

> The [Westlake Park area] was fully packed with protesters now . . . the blast munitions [were] being counter-productive, given they were potentially deployed to disperse the crowd. What they've actually achieved is to increase the numbers there and indeed the density. Also interestingly what we see here is considerable levels of interaction initiated by protesters who come up to police and try to engage in verbal communication with them to talk to them about what they're doing, to express their anger about the illegitimacy about what the police are doing, and try to initiate forms of conversation and dialogue with police officers who are forming the cordon, but none of the video evidence shows any indication that any police officer engaged in any form of verbal communication with those protesters and I think that's really important. [There] is a relative lull from about 3:15 to around 3:20 when the protesters move back into this space and for at least 30 minutes there's no evidence of any major or further confrontation that takes place, so we've gone from a situation of escalated tension and conflictual interaction and gone back into a situation of relatively peaceful assembly in this location. . . There are protesters . . . moving around the crowd verbally gesticulating to de-escalate the situation, engaging with other protesters trying to calm them down, so there is evidence of de-escalation processes at work in this particular crowd. However, during this period of time . . . the police department is also mobilizing further resources into the intersection at 5th and Pine.[82]

SPD issued another dispersal order at 5th Ave. and Pine St. at 3:10 p.m.,[83] though it was the belief of SPD officers on the scene that the order was unlikely to be widely heard or understood given the size and noise of the crowd and the PA system available to SPD at the time. Tensions continued to grow between the police line and the groups of demonstrators at 5th Ave. and Pine St.[84] Officers donned gas masks[85] and SPD and mutual aid forces[86] began to disperse all protesters from the intersection,[87] using

[80] Dr. Clifford Stott, Review of videos on May 30, 2020.
[81] SPD BWV: _Clip_1_1__AXON_Body_2_Video_2020-05-30_1437, AXON_Body_2_Video_2020-05-30_1438.
[82] Prof. Clifford Stott, personal communication to OIG.
[83] https://spdblotter.seattle.gov/2020/06/07/timelines-of-police-responses-to-demonstrations/
[84] https://twitter.com/amandamsnyder/status/1266856841683722241
[85] https://twitter.com/c_clarridge/status/1266858623344373760
[86] Mutual Aid refers to police departments from other jurisdictions, such as Bellevue Police Department, or from the state, such as Washington State Patrol (WSP). The obligation of one department to provide aid to another and the rules of engagement and command structure across departments is typically set forth in a Mutual Aid Agreement signed by both departments.
[87] Mutual Aid UoF Info January 8, 2021

CS gas (i.e., “tear gas,” blast balls, and OC spray).[88] Video footage from this location shows large numbers of peaceful protesters suffering from the effects of the gas.

The CS gas in particular effectively dispersed large numbers of people – but it sent them in the direction of 6th Ave., where a number of unmarked police vehicles were parked. Individuals began to attack and subsequently destroy these vehicles, and two SPD rifles were stolen from a police-patrol vehicle. One of the firearms was discharged into a patrol vehicle and was immediately recovered by the private security guard of a journalist covering the chaos.[89] The other gun remained at large for the next 24 hours.[90]

**Figure 13. Map of various protest group locations, afternoon/evening of May 30, 2020.**




A few minutes before 4:00 p.m., one of the police vehicles was set on fire in front of Old Navy at the intersection of 5th Ave and Pine St. People began shattering store windows and breaking into businesses in the area, and sustained property theft and property damage occurred. Given the size of the crowd at Westlake Park, the number of individuals who were now engaged in violent acts of vandalism, and limitations on the number of SPD officers on the scene, no safety perimeter could be established around the fires. A decision was made by SPD to maintain the lines that kept many in the crowd away from the fires and allow the vehicles to continue burning,[91] though eventually SFD was able to reach the fires with an SPD officer escort.[92] Dozens of buildings in the area had their storefronts shattered and people entered and looted the stores.

Again, Omari Salisbury was on the scene and recording a video chronicle of events. He described the scene as follows:

> The 30th was chaos. I don’t remember exactly how the Police positioned themselves there, but it was not a winning position initially. They were trying to block off multiple blocks, but they couldn’t hold that position because they were surrounded. People were coming

[88] https://twitter.com/amandamsnyder/status/1266863963448307712
[89] OPA Case 2020OPA-0329
[90] See, e.g., Complaint 6th USA vs Means, W. D. Washington, pages 6-8.
[91] https://spdblotter.seattle.gov/2020/06/07/timelines-of-police-responses-to-demonstrations/
[92] https://www.kuow.org/stories/seattle-protest-over-george-floyd-leads-to-damage-arrests-may-30-31





down 5th Ave. on both sides, the police were trying to hold the line, but they couldn't hold the line, and it was chaos.

I want to debunk the narrative that the protests devolved into riots. That's not true. The protests were peaceful. But we saw the makings of professional [anarchists] on the 29th. What people need to understand – the professionals don't like to deal with police. They like to create chaos and then let the general public get smacked by the police for that chaos. They were not there to loot. Looters are the lowest common denominator. They come late, last. I have on tape, at 6th and Pike, the corner of Nordstrom's, the people who were organized would bust things out, the police would constitute a line, and then the "professionals" would bust things out and then leave. The police are holding the line, and then you have people going into the Nordstrom's after the "pros" bust it open. The State Police came up, that field unit is there to bust heads, restore order. They are who you call when your police can't handle it. It was a few hours before you could say that order was restored, if you can call it that.

What you could see was police wanting to go to Nordstrom's, watching people jumping in and out. But [SPD was] holding the line. They were holding the line for peaceful protests.

The use of CS gas also had the effect of breaking the crowd up into different pockets that spread throughout the downtown area. This further limited the ability of the outnumbered SPD officers on the scene to respond to an expanding array of confrontations, vandalism and looting amid the increasingly unruly protests. As had happened on the 29th, protesters from the Westlake area split into many smaller groups who then roamed around the city. One group of protestors marched onto Interstate 5 (I-5), blocking traffic on the southbound lanes.[93, 94] Others headed towards SPD headquarters, causing the SPD Emergency Operations Center (EOC) to broadcast a regional mutual aid request seeking further support from other law enforcement agencies.[95] Ultimately, a crowd of approximately 1,200 protesters gathered outside SPD Headquarters, causing SPD officers inside the building to say they were "under siege."[96] SPD personnel at the front line radioed SPD Command[97] for backup as paintballs and rocks continued to be launched at officers, and assaults on officers and the presence of possible fire accelerants were also reported over SPD radio channels.[98]

At 4:46 p.m., Mayor Durkan announced the implementation of a curfew for the city beginning at 5:00 p.m.,[99] and an executive order prohibiting a range of weapons, including firearms, rocks, and flares.[100] AlertSeattle sent a text message to city residents informing them of the curfew order. While the curfew made being on the streets of downtown technically illegal, it was increasingly difficult for protestors to

93 https://spdblotter.seattle.gov/2020/06/01/timeline-of-events-on-may-30th-2020/
94 https://seattlespectator.com/2020/06/03/photo-essay-seattle-5-30-protest/#modal-photo
95 https://spdblotter.seattle.gov/2020/06/07/timelines-of-police-responses-to-demonstrations/
96 https://spdblotter.seattle.gov/2020/06/07/timelines-of-police-responses-to-demonstrations/
97 SPD Command- Incident Command Staff coordinating the police action.
98 SPD Blotter May 30.
99 https://www.kuow.org/stories/seattle-protest-over-george-floyd-leads-to-damage-arrests-may-30-31
100 https://durkan.seattle.gov/wp-content/uploads/sites/9/2020/05/0898_001.pdf





leave the city, as the Westlake Metro station and downtown sections of I-5 were temporarily closed and King County buses stopped operating in the downtown core. [101, 102]

Unlike the vandalism and looting of downtown, there were other protest groups (on I-5, at SPD HQ, and at the King County Courthouse)[103] that remained peaceful. The *Not This Time!* protesters, for example, physically distanced themselves from the nearby conflict. They concluded their speeches and encouraged people to join them on a march to the courthouse, which hundreds if not thousands of people did. During that procession, demonstrators actively self-regulated within the crowd to maintain peaceful norms. SPD facilitated that march even though it was in defiance of the curfew that was then in place.

The demonstrations downtown gradually dissipated in the evening and night hours of May 30,[104] though groups of individuals remained in defiance of the curfew. SPD and media outlets continued to report incidents of vandalism, looting, public and private property damage, arson and other perceived threats.[105] SPD sent bike teams and officers to respond to these incidents, with Bellevue SWAT and Washington State Patrol (WSP) providing assistance.[106] I-5 northbound reopened at 11:11 p.m., with southbound I-5 reopening after 12:15 a.m.[107] At that time, volunteers were already picking up after protesters in downtown Seattle,[108] with more volunteers helping to clean the following morning.[109]

---

101 Source: Seattle Department of Transportation, and Washington State Patrol.
102 https://www.seattletimes.com/seattle-news/protest-updates-as-the-country-reacts-to-the-death-of-george-floyd-follow-the-latest-developments-in-seattle-and-elsewhere/
103 https://twitter.com/amandamsnyder/status/1266898238918914050
104 https://spdblotter.seattle.gov/2020/06/07/timelines-of-police-responses-to-demonstrations/
105 SPD Blotter May 30.
106 Bellevue Police Department Reports of Use of Force, Washington State Patrol Use of Force Statement. Source: SPD Force Review Unit.
107 https://twitter.com/wspd2pio/status/1266975486934040576
108 https://twitter.com/choeshow/status/1266986867976626186
109 https://twitter.com/mikevorel/status/1267144360606306304






# Appendix F. In-Depth Description of Reviewed Incidents

## Incidents Reviewed

### Incident #1: OC Spraying of Child, May 30

Before 3:00 pm on May 30, a group of SPD officers established a line facing south across 4th Ave. just to the west of Pine St. (see Figure 14 below.) The line was established to ensure that vehicles would not interfere with the protesters, and to enable protesters on 4th Ave. to safely enter Westlake Park for the demonstration scheduled there. However, it also acted to prevent individuals on Pine St. from walking to 4th Ave. While establishing the line, a number of community members were ushered by police from the north side of the police line towards Westlake Park so that they would not be caught behind the newly established line.

**Figure 14. Map of SPD line where child was pepper sprayed, May 30, 2020.**




As people were walking southbound from behind the line (i.e., from 4th Ave.) a male approached the front of the line walking eastbound along Pine St. He tried to walk past the line on the west sidewalk of 4th Ave., saying he wanted access to a rest room. The officer said, “stay back,” without further explanation, and pushed the man back with an open palm to the man’s chest. The man became enraged, and repeatedly yelled (with expletives), “don’t you touch me.” The officer responded, “I’m giving you an order, stay back.” The man persisted, getting very close to the officer and insisting that the officer keep his hands off the man. The officer pushed the man back harder. The man stepped forward again and continued to swear at the officer, saying “get your f***ing hands off of me,” at which point the officer used OC spray on the man and another officer used foam bullets fired from a 40mm launcher to push the man back. The man retreated, and after a few seconds produced what appeared to be his own can of OC spray, which he threatened to deploy against the officer. He then threw the can at the officer and left the scene.

Over the course of the next 20 minutes, a crowd gathered at the police line. Some held signs, and





several engaged angrily with the SPD officers. In the crowd were a father and his 8-year-old child. The two were standing behind a group of protesters that was engaging verbally with a line of nine SPD officers in protective gear (e.g., helmets and padding). The officers were not engaging with the protesters, but were standing in formation on the line facing south with their batons drawn.[110] The father was pacing back and forth along the line, a few feet back from the line, challenging SPD officers to a fight and making other derogatory statements about SPD and the officers.

The protesters assembled very close to the officers, who held their batons in front of them. Several individuals in the crowd, including the father, were aggressive in their verbal criticisms and insults directed at the SPD officers, including calling them by name (SPD officers are required to keep their names and badge numbers visible during crowd facilitation) and threatening bodily harm to them.

At approximately 3:08 p.m., an SPD Lieutenant informed two SPD Sergeants that due to injuries suffered by officers earlier from projectiles, the demonstration occurring in the immediate vicinity was going to be declared an "unlawful assembly." Not long after, the individual who had been OC sprayed (and who had thrown a can of OC spray at the officers) returned to the north side of the line and began swearing at the officer who had deployed OC spray, holding his phone out in front of him and challenging the officer verbally. A woman stood in front of him facing the officers, with her arms out to her sides and her palms open. She stated, "we're just talking" to the officers and "don't give them a reason" to the individual, in what appeared to be an attempt to prevent the situation from escalating on both sides.

An SPD officer recognized the individual as the man from the prior altercation. Although the altercation had taken place 20 minutes before, the officer could satisfy the legal requirements to arrest the man for assault (and potentially other offenses), based on the man pushing the officer, resisting orders, trying to grab the officer's OC spray, and throwing his own at the officer. The officer explained this to a Sergeant on the scene and received permission from the Sergeant to arrest the man for those actions.

The officer communicated with his colleagues on the line and approximately one minute later, several officers on the right of the line forcefully pushed out into the crowd, grabbed the individual, and pulled him behind the re-formed police line, where he was arrested. At the same time, the entire line of SPD officers loudly yelled "MOVE BACK" and stepped forward with their batons held horizontally in front of them to forcefully push the whole crowd in front of the line back and create space between the police line and the protesters.

The reaction of the crowd, many of whom were not present for the prior acts leading to the arrest, was surprise, anger and defiance as the SPD line stepped forward into the crowd. A woman in the front line of the crowd tried not to move back, yelling "No, you move back." Pushing back against the officers, she reached over and grabbed an officer's baton, yelling again, "don't push me. You move back." An officer behind the front line responded by deploying OC spray to the woman's head and face, causing her to release the baton and turn and move backward away from the police line. As the woman turned away, the father and child, who had been standing behind the protester, were affected by the OC spray as well.

The father and child also moved back away from the line, and a video was taken by another person in

[110] Several of our panelists questioned the wisdom of a parent bringing a child to the front lines of a police protest, particularly as tensions escalated. We express no further comment on this and raise it simply to highlight the complex community dynamics at work.





the crowd of the child, loudly crying in discomfort, being tended to and having milk poured on his face. This was captured on video and was widely viewed on social media. The Seattle Office of Police Accountability ("OPA") received more than 13,000 complaints about the incident.

The officer who deployed the OC spray told OPA he intended to spray only the woman grabbing the other officer's baton, rather than the child. He further stated that at the time he deployed the spray, he could not see the child, as the child was smaller and hidden from his view. The officer who deployed the OC was behind the first line of police and the child was behind one line of protesters. BWV from multiple officers suggested the child would have been difficult to see from behind the first line of officers, but the Panel could not fully verify the officer's statement, as the various BWV footage it reviewed was filmed by cameras at chest-level, not eye-level.

## Incident #2: Police Vehicles Set on Fire, SPD Rifles Stolen, May 30

Protesters began to assemble in and around Westlake Park in the early afternoon of May 30, as protesters seeking to join the *Not This Time!* protests were joined by protesters walking to Westlake Park from the earlier protest at SPD Headquarters.

SPD Incident Command (IC) had been deploying officers to different locations (downtown and SPD Headquarters) to enable peaceful protests and minimize the risk of criminal activity,[111] and as protest groups moved from place to place, IC sought to ensure officers were deployed efficiently and effectively. As the scheduled time for the Westlake protests neared, a team of officers was dispatched to the Westlake protests; they drove in three patrol vehicles to their assigned location south of Westlake Park, and parked on Pine Street between 4th Ave. and 5th Ave., close to their posted location, at about 2:00 pm.[112]

By that time, SPD had placed multiple cordons around the Westlake area.[113] SPD sought to minimize the risk that protestors would have unsafe contact with motor vehicle traffic in the area, in part by ensuring that the flow of pedestrians followed the existing traffic flow of one-way streets.[114] This led an SPD Captain to position officers in a line at 4th Ave. and Pine St. that prevented people from entering Westlake Park and joining the protest if they approached from the west or the north. Other lines of SPD officers were created at the intersection of 5th Ave. and Pine St. that similarly restricted access to the Westlake area from the north and east (see Figure 15 below).

---

[111] Incident Action Plan 05-30-2020, IAP Objectives: "Provide for the safety of the general public, spectators, first responders, and participants during this statewide COVID-19 state of emergency which does not permit public gatherings; Facilitate citizen's right to peacefully express their First Amendment free speech rights within the parameters set forth by the Washington State Governor's Stay at Home proclamation and the suspension of permitted events; Take enforcement action for violent crimes committed against persons or significant property damage, while ensuring arrests are conducted in a safe and effective manner and in accordance with training and law; Deter criminal activity and protect public and private property by providing a significant uniformed patrol presence; Minimize the disruption to traffic through the use of traffic diversion as required."

[112] Use of Force Report, SWAT2 May 30, 20202, reports on cars been parked; Incident Action Plan May 30, 2020, assigned personnel their posts for the event, including the teams at Westlake; SPOC Log May 30, 2020, entries 151,158, reports on the arrival of teams to Westlake and their potential locations, including that of their vehicles.

[113] Use of Force Report Lt. 2

[114] Personal communication, Sentinel Event Review, session 9, March 1, 2021.





**Figure 15. Map of SPD cordons and patrol vehicles, afternoon of May 30, 2020.**




At 2:40 p.m. the SPOC instructed SPD bicycle officers to move the protesters southbound on both 4th Ave. and 5th Ave., and eastbound on Pine St. Two minutes later, officers were ordered to clear police patrols from Pine St.

Officers who had parked their vehicles on Pine St. moved them one block away, to the block of Pine St. between 5th Ave. and 6th Ave. One of the vehicles contained three SPD rifles. Two of these were stored in a locked cabinet in the back of the patrol vehicle. Because the cabinet only had capacity for two rifles, the third rifle was unlocked in a zippered bag in the back of the locked SUV.[115]

A group of protesters gathered on Olive Way between 4th Ave. and 6th Ave., remaining there until after 6 p.m. To protect these protesters from vehicular traffic on cross streets, SPD dispatched a group of officers to Olive Way, including the original drivers of the three patrol vehicles parked near the protest. The officers were issued “less lethal” munitions and were asked to support the SPD officers at the front of the line at 5th Ave. and Olive Way as “linebackers.”[116] Given the requirement that SPD officers remain where they were assigned to assist with crowd management, the drivers of those vehicles were unable to return and move them (see figure 16).

SPD began a dispersal tactic at 5th Ave. and Pine St., deploying CS gas and flash bang grenades that forced protesters into Pine St. However, SPD lacked sufficient resources to both hold the intersection and move forward into Pine St., and so officers held back from further movement or crowd dispersal. The SPD decision to remain at the intersection rather than continue the dispersal left the now highly agitated protesters free to begin attacks on property, and the unattended police vehicles provided a target for their anger.[117]

---

[115] See, e.g., Complaint 6th USA vs Means, W. D. Washington: “On May 30, 2020, three SPD officers were utilizing Vehicle 4. All three officers were issued rifles and had been asked to bring them with them when they deployed to the area of the protest. Two of the officers stored their rifles in locked rifle drawers in Vehicle 4, but there was not room for [the third officer’s] rifle, so she placed her rifle . . . in its rifle bag in the trunk/cargo area of the vehicle. The last time Vehicle 4 was moved, one of the officers parked it on 6th Avenue between Olive Way and Pine Street.”

[116] “Linebackers” are SPD officers trained in the use of “less lethal” munitions whose role is to stand behind the initial police line, ready to deploy munitions if needed to protect protesters or officers.

[117] SPD BWV: (a) _Clip_1_1__AXON_Body_2_Video_2020-05-30_1437, (b) AXON_Body_2_Video_2020-05-30_1438; CAD Log: 2020-05-30 Saturday log – Redacted.






**Figure 16. Locations of SPD lines and unattended patrol vehicles, May 30.**




1. At 2:42 p.m., SPD vehicles originally parked on Pine St. Between 4th Ave and 5th Ave are moved to 6th.
2. At 3:00 p.m., a protest organized by *Not this Time!* begins in Westlake Park.
3. At 3:05 p.m. officers establish a new line on 4th near Olive Way to block southbound traffic.
4. 3:10 p.m. A child is pepper sprayed close to a police line on Pine St. close to 4th Ave.
5. One SPD vehicle Parked on Pine St is vandalized and set on fire at 3:55 p.m.
6. Five SPD Vehicles on 6th Ave are set on fire at roughly 4:18 p.m.
7. Later in the evening, three King County Metro vehicles are set on fire within several blocks of the protest.

At 3:55 p.m., one of the SPD vehicles was vandalized and set on fire in front of the Old Navy store (511 Pine St., near 5th Ave.). The scene rapidly became more violent and destructive. Lacking a safe perimeter around the area, SPD allowed the vehicles to burn and, due to the lack of a safety perimeter around the area, refused a request from the Seattle Fire Department (SFD) to put the fire out at 4:00 p.m.[118]

Beginning around 4:14 p.m., a line of five police vehicles parked on 6th Ave were vandalized. Videos taken by people in the crowd[119] show individuals removing three rifles from the back of one of the vehicles. One of the rifles was quickly recovered, unloaded and returned to SPD shortly thereafter by a private security guard in the crowd. Of the other two rifles, one was later anonymously returned to the West Precinct, and the other was recovered from an individual currently facing criminal charges for the incident.

Individuals in the crowd continued vandalizing the vehicles and then set them on fire. The vehicles caught fire and burned on the street for more than 20 minutes, until SPD was able to secure safe access for SFD to the area. By 5:53 p.m. SFD had extinguished the fires on Pine St. and those on 6th Ave.[120]

Overall, at least eight (8) vehicles – six (6) SPD vehicles and two (2) King County Metro cars – were vandalized and incinerated during the day. The fires, as well as the seeming lack of SPD or SFD presence for an extended period of time during these incidents, were dramatic indicators to the general public of the unrest and lack of control in downtown Seattle.

---

118 https://spdblotter.seattle.gov/2020/06/07/timelines-of-police-responses-to-demonstrations/
119 CCTV video is not stored in the City of Seattle, and therefore could not be used to trace the other stolen rifle.
120 SPD BWV: (Clip 2.1) AXON Body 2 Video May 30, 2020, 1558 (SFD 6th 4-46pm).






## Incident #3: Officer Placing Knee on Individual's Neck During Arrest, May 30

Downtown Seattle continued to be a chaotic environment into the early hours of May 31, 2020. Pockets of protesters were joined by dozens, and perhaps hundreds of individuals breaking into and stealing from stores and businesses throughout the area.

At approximately 11:30 p.m. on May 30, a 911 call was placed from a T-Mobile store at 1527 6th Ave. (between Pine and Pike Streets), reporting that a group of individuals had broken into the store and were stealing property (see Figure 17 below). A squad of SPD bicycle officers responded to the call.

A crowd had gathered across the street from the T-Mobile, and as the officers arrived, a number of people were running out of the store and away from police.[121] Bystanders on the scene filmed the interactions.[122] The officers dismounted and began trying to apprehend individuals fleeing from the store. One SPD officer grabbed a male in a white hoodie and pulled him to the ground. A second officer, who was the subject of complaints and was referred to in the OPA report as "Named Employee #1" or "NE#1," dismounted from his bike and began to assist the first officer with handcuffing the man.

**Figure 17. Map of Westlake Area on May 30.**




With the man face down on the sidewalk, the first officer straddled the man at the waist and pulled his arms behind his back so he could be handcuffed. NE#1 knelt at the man's head, facing the other officer. Telling the man to put his hands behind his back, NE#1 pushed the man's face down towards the sidewalk. The other officer repeated the instruction for the man to put his hands behind his back, and then NE#1 appeared to place his knee on the man's head or upper shoulder or neck.

---

[121] A curfew had been declared from 5 p.m. on May 30 until 5 a.m. on May 31, making it illegal to be on the streets. SPD officers described "hundreds" of people on the street observing the T-Mobile looting and subsequent arrests. SPD officers were not attempting to carry out mass arrests of these individuals.

[122] See, e.g., https://www.independent.co.uk/news/world/americas/seattle-police-video-kneeling-neck-george-floyd-video-protests-violent-riots-a9541226.html.





As individuals continued to run out of the store and officers were being yelled at by onlookers, it appeared that NE#1's attention was split between the arrest and his surroundings. As he placed his hands on the man's head, he was holding an OC canister that he put back in his belt, and he was looking up and around him while his knee was on the man's head, rather than looking down at the man. As the handcuffing proceeded, NE#1's knee could be viewed on the man's lower head and, possibly his neck (though the Panel could not confirm this from the available video).

At that moment, another male in an orange hoodie and wearing a backpack ran out of the T-Mobile. NE#1 jumped up from his position over the man in the white hoodie, and pulled the man in the orange hoodie down to the ground with the assistance of a third officer, referred to by OPA as "Witness Officer #1" or "WO#1." NE#1 and WO#1 worked to remove Subject #2's backpack so they could handcuff him. As with the prior arrest, the man in the orange hoodie was face down on the street, with WO#1 straddling his waist and facing towards his head as he attempted to put on handcuffs. Again, NE#1 was at the man's head, facing WO#1. For a second time, NE#1 placed his knee in an area that appeared to be the top of the back and/or the neck of Subject #2.

At that time, bystanders were loudly and angrily yelling at the officers, repeatedly shouting at the officers to "Get your knee off of his neck!" BWV captured WO#1 saying to NE#1: "Get your knee off his neck," to which NE#1 replied: "Yup." WO#1 then reached over and pulled NE#1's knee down to the middle of the man's back, between his shoulder blades. The man was rapidly handcuffed, and the officers immediately discontinued their use of force, helped the man up, and led the individual to an area with other arrestees.

A video of both arrests and the positioning of NE#1's knee was recorded by a community member and received substantial visibility on social media.

## Incident #4: Bicycle officer altercation and arrest with pedestrian, May 31

On the afternoon of May 31, 2020, a large group of protesters was peacefully marching northbound on 4th Ave. A squad of six (6) SPD bicycle officers on duty were facilitating the march by operating in "leapfrog" fashion, moving ahead of marchers to block vehicular traffic at intersections and ensure that protesters did not turn down one-way streets against the flow of traffic, which could cause injury and/or add disruption to traffic in the area. As the protesters progressed, the bicycle officers would move as a squad up to the next block to ensure continued safe passage for the protesters.

At approximately 4:30 p.m., the officers got on their bikes at Spring St. and moved north along with the marchers (see Figure 18 below). The crowd was very large but moving calmly. The officers rode single file on the far right of the sidewalk, essentially against the side of buildings along 4th Ave. Even when the officers were pressed against the side of the buildings, pedestrians occasionally blocked their passage.





**Figure 18. Location of the bicycle altercation.**




As officers approached people from behind, they reported that they "gave verbal orders to these individuals, to move to the side and out of the way and identified themselves as police."[123]

One individual, wearing a hooded jacket with the hood pulled up, with a backpack on and a duffle bag on his left shoulder, was at the far right of the crowd, in the path of the advancing bicycle squad. The first two bicycle officers appeared able to pass this individual with little or no contact. The third officer made contact with the individual and was forced to briefly put one foot down from the pedals of the bike. The officer remounted the bike and continued on. The fourth officer reached out while riding with his left hand, which he placed on the right shoulder of the individual, pushing the individual slightly to the left and creating enough space for his bike to move past. At this, the individual raised his arm as if exasperated by the officer's contact.

The individual did not at any point turn back to see if other bicycles were coming and did not move to the left despite the contact from the first four officers. Officers in the squad viewed the individual's actions as deliberate "shoulder-checking" of the officers as they rode past, describing this as a known tactic to slow down and separate officers in a single-file bicycle line and reduce their ability to direct the crowd at the front of the line, potentially allowing the demonstrators to commit crimes. There were also four people walking to the left of the individual, which could have made it difficult for him to move left, though the individual did not stop or make any outward effort to allow the officers to easily pass.

It is difficult to see precisely what happened next, as the BWV from the fifth and sixth officers were on their chests, and neither camera captured a perspective of the fifth officer's head. As the fifth officer

[123] The Panel could not corroborate that these statements were made. The OPA report of this Incident concluded that while "the Body Worn Video (BWV) of this portion of the incident did not contain sound as it was recorded within the one-minute buffer period which the camera records prior to an officer activating the camera . . . that these orders were given does not appear to be in dispute given the totality of the evidence."





approached the individual, it appears that the officer attempted to repeat the same maneuver as the officer in front, reaching out with his hand and pushing the individual slightly. The camera from the 6th officer (Officer 6) shows the bike handlebars of the 5th officer (Officer 5) getting entangled with the individual, and then Officer 5 grabbing the individual and dropping his handlebars, dismounting/falling over the front handlebars while holding the individual and bringing both himself and the individual to the ground.

Because Officer 6 had his chest bent down over his own handlebars, it is impossible to see what exactly happened between the individual and Officer 5. Officer 5 claimed that the individual had punched him in the head. The individual later claimed that he had simply been walking down the street and the officers ran into him, threw him down, and punched him repeatedly. On viewing the footage, the Panel could not see whether a punch was thrown.

Once Officer 5 brought the individual to the ground, Officer 4 (immediately in front of arresting Officer 5) got off his bicycle and turned toward Officer 5 and the individual, while Officer 6, the trailing officer, got off his bicycle and began blocking Officer 5 and the individual from the rest of the crowd. The crowd immediately and angrily gathered around the officers, with at least two people from the crowd rushing in and attempting to intervene in the arrest. One of those individuals was arrested after she attempted to grab the vest of Officer 5.

While on the ground, Officer 5 and the individual struggled, and Officer 5 punched the Subject twice in quick succession in the individual's upper shoulder/lower head area. While this was occurring, the crowd became quite animated, and signs, bottles, and a metal pan were thrown at the officers. SPD officers deployed OC spray, and people in the crowd responded in kind, spraying the officers with what was described by one officer as "bear spray" and in the OPA Case Summary Report as "some sort of pepper spray." One officer pushed his "emergency response" button, causing more than 30 additional SPD officers to appear on the scene and create a protective perimeter around the area while the two individuals were being handcuffed.

As officers were streaming to the scene, a protester opened an umbrella and pointed it towards the officers. This further heightened tensions for the police, since as one officer explained, "once that umbrella opens, now I can't see anyone's hands or anything going on behind that umbrella – it's really scary." This, coupled with continued physical abuse from protesters and thrown objects, led officers to deploy blast balls and forcibly extend their protective perimeter to the end of the block, which in turn sent a previously peaceful crowd down 4th Ave. in a state of extreme agitation.

As the second individual was being arrested, she asked what she had done. "I was standing up for someone," she said. One of the officers replied, "You interfered with a lawful arrest, that's why you're under arrest." "Well then maybe you shouldn't beat people, did you ever think of that?" was her reply.

Officer 5 and the two individuals being arrested were moved over to the side of the buildings as other officers arrived and began to move the crowd back. The first individual kept repeating "I didn't do nothing," and an officer's voice can be heard telling the individual to stop spitting at the officer. The individual was lowered to the ground and officers explained to him that they were putting a spit sock on him – a mesh hood that is designed to be breathable but to prevent the transmission of fluids from an individual's mouth and nose. The arrests were completed without further incident.





With the man face down on the sidewalk, the first officer straddled the man at the waist and pulled his arms behind his back so he could be handcuffed. NE#1 knelt at the man's head, facing the other officer. Telling the man to put his hands behind his back, NE#1 pushed the man's face down towards the sidewalk. The other officer repeated the instruction for the man to put his hands behind his back, and then NE#1 appeared to place his knee on the man's head or upper shoulder or neck.

As individuals continued to run out of the store and officers were being yelled at by onlookers, it appeared that NE#1's attention was split between the arrest and his surroundings. As he placed his hands on the man's head, he was holding an OC canister that he put back in his belt, and he was looking up and around him while his knee was on the man's head, rather than looking down at the man. As the handcuffing proceeded, NE#1's knee could be viewed on the man's lower head and, possibly his neck (though the Panel could not confirm this from the available video).

At that moment, another male in an orange hoodie and wearing a backpack ran out of the T-Mobile. NE#1 jumped up from his position over the man in the white hoodie, and pulled the man in the orange hoodie down to the ground with the assistance of a third officer, referred to by OPA as "Witness Officer #1" or "WO#1." NE#1 and WO#1 worked to remove Subject #2's backpack so they could handcuff him. As with the prior arrest, the man in the orange hoodie was face down on the street, with WO#1 straddling his waist and facing towards his head as he attempted to put on handcuffs. Again, NE#1 was at the man's head, facing WO#1. For a second time, NE#1 placed his knee in an area that appeared to be the top of the back and/or the neck of Subject #2.

At that time, bystanders were loudly and angrily yelling at the officers, repeatedly shouting at the officers to "Get your knee off of his neck!" BWV captured WO#1 saying to NE#1: "Get your knee off his neck," to which NE#1 replied: "Yup." WO#1 then reached over and pulled NE#1's knee down to the middle of the man's back, between his shoulder blades. The man was rapidly handcuffed, and the officers immediately discontinued their use of force, helped the man up, and led the individual to an area with other arrestees.

A video of both arrests and the positioning of NE#1's knee was recorded by a community member and received substantial visibility on social media.

## Incident #5: The "Pink Umbrella" Incident, June 1

Monday, June 1, 2020, marked Seattle's fourth day of protests focused on police legitimacy (or the lack thereof) and the disproportionality of police responses to community behavior. In each of the prior days, protests had begun peacefully, only to escalate later in the day and night into violence and police uses of force, often directed at officers or property of the Seattle Police Department (e.g., the patrol vehicles set on fire on May 30).

Given the previous three days, it is likely that protesters were increasingly viewing the actions of the City and SPD on prior days as restricting the right to protest, and therefore were increasingly protesting the lack of perceived legitimacy of the SPD and the City of Seattle to impose limitations on the crowd's actions. On the other hand, SPD was quite reasonably concerned about the loss of order and the corresponding risk to people and property that had resulted on prior days, and its obligation to protect and serve the community. As SPD prepared for June 1 it anticipated a similar pattern of events and was





concerned that peaceful protesters would be replaced as the day went on with individuals more focused on violence and destruction toward police and other community institutions.

Demonstrations on Monday, June 1, began at noon with a vigil outside First African Methodist Episcopal Church in Seattle. Pastor Carey Anderson, protest organizer Andre Taylor, Police Chief Carmen Best, and Fire Chief Harold Scoggins addressed attendees. "We are talking today because of the continuous killing of black men and women needs to be addressed. We are here today because of the inhumane, unusual treatment of black and brown people in this country," said Pastor Anderson.[124]

At 2:00 p.m., Mayor Durkan, Police Chief Best, and Fire Chief Scoggins held a press conference from the Emergency Operations Center in which they addressed the prior weekend's demonstrations, discussed preparations for future demonstrations, and announced a 6:00 p.m. citywide curfew.[125]

Many protest organizers seemed to understand the potential for disorder to emerge again, and some restated their commitment to non-violent protests. At approximately 3:00 p.m., SPD gathered at Westlake Park.[126] Leaders of the march conveyed their desire for peaceful protests, saying to the assembled crowd "If you are here to riot, loot, cause problems, then go home!"[127] At 3:56 p.m., the protesters left Westlake Park and with the support and protection of SPD, traveled to Seattle City Hall, where speakers addressed the crowd before demonstrators marched back to Westlake Park.[128] According to SPD estimates, the number of marchers started at about 1,500 but grew rapidly; by 5:40 p.m., SPD reported that the crowd had roughly 7,000 participants. Organizers of the march informed SPD representatives of their intention to march to the East Precinct building at 1519 12th Ave. (between Pike St. and Pine St.)[129]

The East Precinct had been a recurring site for protestors in the preceding three days, and SPD claimed to have received intelligence that the building might be a target for arson, imitating the destruction of a Minneapolis Police Department precinct building on May 28.[130] This was a matter of concern to SPD leadership, as the building itself was relatively unprotected and very close to other buildings. SPD deemed the building to (a) be difficult to protect and (b) present a substantial risk to nearby buildings if it caught on fire.[131]

Despite these concerns, protest leaders negotiated with Police Chief Best for permission to march to the East Precinct,[132] and the Chief agreed. Shortly after 6:00 p.m., protesters marched peacefully eastbound on Pine St.

As the crowd moved toward the Seattle Police Department's East Precinct, SPD officers, concerned that the protesters intended to "capture" the East Precinct and "burn it down,"[133] deployed "fence lines" of

[124] https://www.q13fox.com/news/prayer-vigil-at-seattle-church-promotes-peace-not-violence
[125] https://www.youtube.com/watch?v=n12ik35H4t4&feature=youtu.be
[126] https://twitter.com/choeshow/status/1267574346794455041
[127] https://twitter.com/choeshow/status/1267580080189960192
[128] https://twitter.com/HannaKIROFM/status/1267590755519918080
[129] SPD Blotter June 1.
[130] The Panel was not provided with this "intelligence," and is unable to confirm its existence or its credibility. Many Panelists remain skeptical of its existence and view it as a justification for illegitimate limitations on public gatherings.
[131] See, e.g., SPOC Log May 29, 2020, entry 61.; SPOC Log May 31, 2020, entries 212, 310, 342; Force Review Unit (FRU) Arrest Report for May 31, 2020; SPD Blotter June 29 and June 31, 2020; SPD presentation, Debrief of June 1, 2020, Event.
[132] https://twitter.com/choeshow/status/1267618361942237184
[133] Use of Force Statement, Sgt3 June 1, 2020, at 5.

officers in a protective perimeter one block away from the building in each direction, with lines on the west side of 11th Ave. across Pine St; on the east side of 13th Ave. across Pine St.; on the south side of Olive St. across 12thAve., and on the north side of 12th St. across Pike St. (see Figure 19 below). The fences were made of loosely interlocking metal racks approximately 6 feet in length and approximately 4 feet high – similar to bicycle racks or the barriers constructed near the stage at popular music concerts.

**Figure 19. Map of SPD barrier placement at East Precinct, June 1, 2020.**




At 7:11 p.m., the estimated crowd of 7,000 marchers reached the west side of the police line at 11th Ave. and Pine St.[134] Discussions between SPD representatives and protest leaders took place, and shortly after 7:30 p.m., East Precinct Captain Bryan Grenon and Lieutenant Paul Leung took a knee with protesters.[135] The crowd wanted to continue to the East Precinct building, but SPD refused, holding the fence lines in place. Protestors requested Mayor Durkan's presence, but the Mayor did not appear. Protesters chanted "Where's the mayor?"[136] and "Let us walk."[137]

SPD officers at the scene had been briefed on SPD's concerns regarding potential crowd tactics and the risk of arson to the East Precinct, and on SPD tactics to move the demonstrators from the area if needed. The plan of action was to use less lethal munitions to disperse the crowd into Cal Anderson Park.[138]

SPD's stockpile of "less lethal" or crowd control munitions had been largely expended in the past three days, and the Department was reliant on mutual aid requests from other departments to replenish what

---

[134] SPD Blotter June 1.
[135] https://twitter.com/choeshow/status/1267646433454206977
[136] https://twitter.com/heidigroover/status/1267658468413980675
[137] https://twitter.com/heidigroover/status/1267661343730962433
[138] To the extent the stated tactical goal here is accurate, it would appear to have some flaws. The throng of marchers approached the police line from the west on Pine St, with Cal Anderson Park on their north (left) side. The edge of the park is a baseball field, with approximately 8-foot high chain link fencing across its southern border, making entry into the park impossible for anyone in the crowd who was on the street west of Pine St. Thus, the majority of the crowd could not enter the wide-open space of the park, and instead had nowhere to disperse except back down Pine St.





it could on short notice. As a result, officers outside the East Precinct shared a depleted stock of OC spray and were more heavily reliant on CS gas than during normal times – a less targeted tool for addressing violent demonstrators or looters, and one that would certainly have a negative impact on anyone in the vicinity of its use far beyond any single instigator of violence who was the target of SPD.[139]

By 9:00 p.m., the crowd of protesters continued to protest at the SPD barricade, and was occasionally pushing the unstable fencing. To protect the line, SPD bicycle officers with helmets and in "soft gear" (i.e., regular uniforms, lacking protective padding or armor) stood immediately behind the fencing. These officers had very few options for movement, as they were unwilling to allow the crowd greater access to the East Precinct; accordingly, the protesters remained in place waiting for the police to allow them to pass.

As protesters chanted "let us through," SPD radio transmissions at 9:04 p.m. reflect at least two efforts of a few individuals at the front of the crowd to push into the fence line.[140] These attempts were halted by the bicycle officers on the scene without further incident, and the crowd stayed behind the line in the moments that followed.

While the situation then appears to calm, these brief attempts to push through the line caused the SPD Incident Commander to authorize the use of OC spray, CS gas and blast balls if the crowd made further attempts to push through the line. Given depleted stocks of OC spray and the size of the crows, the Incident Commander considered CS gas the most viable alternative. Officers were instructed to put gas masks on, and SPD officers wearing gas masks and carrying batons replaced the bicycle officers at the front of the line, who in turn donned their gas masks. Both publicly available and BWV footage shows this "change in posture" at the front of the line, as well as a group of officers in gas masks and hard gear assembling farther behind the barricades.[141]

The replacement of the bicycle officers with officers in gas masks and hard gear was interpreted by some in the crowd as a signal that more aggressive crowd control tactics, and likely gas, were about to be deployed. The crowd reacted with increased agitation and with the opening of several umbrellas.

There was little, if any communication between the SPD and the crowd as this transition was occurring. SPD lacked any sort of appropriate PA system that could be heard over the noise of the crowd, and what equipment they did have for broadcasting communications to the crowd was not physically present at 11th Ave. and Pine St. at that time. To make things worse, once officers donned their gas masks, their ability to communicate with protesters was significantly reduced. As a result, no message was conveyed to the crowd that might have de-escalated the situation and SPD's self-protective rationale donning gas masks actually added to the likelihood that gas would be used and masks would be needed.

At approximately 9:09 p.m., as individuals stood by the fence chanting "take off your riot gear, we don't see a riot here," one protester held an opened pink umbrella out over the police line and very near the

[139] SPD, Combined Event Operations Center (EOC) emails.
[140] SPD reported that one of these attempts to breach the police line caused a section of fencing to tip over on top of an SPD officer, who then had to be rescued and the fencing restored. The Panel was unable to confirm this account, as no officer BWV was available until moments after this incident. The Panel did observe one attempt to push through the fence that was halted by SPD and Washington State Police, followed by roughly six (6) minutes of peaceful protesting at the line prior to the deployment of crowd control munitions by police.
[141] https://youtu.be/4IHbLRdi09Y. The individual who took this video provides narration throughout. Notably, the individual mentions "a definite change in posture" and that the crowd "can expect next . . . tear gas . . . and possibly flash bangs . . . now that they brought out the troopers." (Video around 2:10).





face of an officer on the line. The officer grabbed the umbrella out of the protester's hands. When the protester tried to pull the umbrella back, several officers nearby deployed OC spray in the direction of the protester with the umbrella.[142] The spray hit a number of protesters in the area, causing them to retreat. This use of force incited reactions elsewhere in the crowd, however, causing a surge in another area of the line and several glass bottles and other projectiles being thrown by protesters standing further back in the crowd. This, in turn, caused SPD officers to use blast balls and CS smoke grenades, both of which were used to clear the crowd from the intersection.[143, 144]

Chaos ensued throughout the intersection and nearby Cal Anderson Park, as SPD officers moved through the park and extended their perimeter around the East Precinct. At 9:28 p.m., SPD declared a riot in the area.[145] Ultimately, the neighborhood was flooded with CS gas.[146] The gas drifted throughout the neighborhood and seeped into homes, making SPD and the East Precinct a flashpoint and symbol for police oppression in Seattle. As one resident angrily yelled at the officers that night: "I live here! You're terrorizing my neighborhood!" The protests began to taper off after 10:30 p.m.

---

[142] SPD BWV: AXON Body 3 Footage: 4:09:58 – Lt. yells "OC, OC." 4:10:00 – officer sprays

[143] https://www.reddit.com/r/Seattle/comments/gv0ru3/this_is_the_moment_it_all_happened/?utm_content=title&utm_medium=post_embed&utm_name=80928aa101ce46778c28ad2f173bb1c5&utm_source=embedly&utm_term=gv0ru3

[144] Many gas canisters were deployed using a high deployment ("overhand throw") method rather than the preferred low deployment ("bowling style") method. Officers stated that it was necessary to overhand throw past the officers in the front line to facilitate ground-level dispersal of CS gas in the crowd and to avoid accidental dispersal across the police line. Use of Force Statement, Sgt3 June 1, 2020; Use of Force Statement, Sgt4 June 1, 2020.

[145] SPD Blotter June 1.

[146] https://twitter.com/heidigroover/status/1267686451472248832





# Appendix G. List of Recommendations by Theme

For convenience, OIG has grouped each recommendation in this report into one of five themes. These themes are:

- **Communication and Community Engagement** – recommendations for SPD to promote dialogue between police and community;
- **Priorities and Situational Awareness** – recommendations for improving SPD situational awareness and shifting from crowd management and control to crowd facilitation and crowd safety;
- **Tactics and Equipment** – recommendations for alternatives to tactics and tools used by officers that appeared to escalate tensions or otherwise contributed to negative outcomes;
- **Officer Wellness and Training** – recommendations for areas of opportunity to support both the department and individual officers in demonstrations; and
- **Coordination of City-wide Response / Suggestions to other Agencies** – recommendations related to other departments.

Many of the Panel's recommendations could fit into two or more categories, highlighting the degree to which these subjects are interrelated. Additionally, most of the Panel's recommendations touched on the theme of community legitimacy, or the gap between what SPD may be permitted to do by law or policy (structural legitimacy) and what officers need to do to meet standards of justice expected by community (perceived legitimacy). Because most of the Panel's recommendations impact community legitimacy in some form, OIG has not included it in the table below.

**Table 11. Recommendations by Theme**

| Recommendations | Related Incident (Recommendation #) |
|---|---|
| **Communication and Community Engagement** | |
| Enable better interactions with demonstration organizers in advance of protests, SPD should build legitimacy through expanded community policing initiatives, including the expansion of foot patrols, and build deeper personal relationships between officers and individuals throughout the communities of Seattle. | Overarching Contributing Factors and Recommendations (1) |
| Engage in direct and ongoing community dialogue to understand and adapt to the diverse community perspectives about the institution of police. | Overarching Contributing Factors and Recommendations (2) |
| Modify SPD's policy on content neutrality to permit officers staffing a public event focused on issues of policing to demonstrate solidarity with the crowd participants' rights to protest if they choose. | Overarching Contributing Factors and Recommendations (6) |
| Eliminate disrespectful statements or actions from SPD officers to individuals or groups protesting. | Overarching Contributing Factors and Recommendations |





| | (7) |
|---|---|
| Evaluate whether an encrypted standardized alert messaging system (e.g., WhatsApp, Yammer, or other technology) could replace radio communication during crowd facilitation events. | May 30, 2020: SPD Protest Control Tactics<br><br>(15) |
| If short term closures of streets or blockages of specific intersections are necessary for the safety of the crowd, SPD should ensure that its officers can adequately inform individuals in the crowd of the reasons for the blockages and provide them with adequate alternative options to continue moving. | May 30, 2020: OC Spraying of Child<br><br>(20) |
| Ensure that all limitations on crowd behavior or conduct are designed to maximize the safety of individuals in the crowd, and that any communications about such limitations articulate that safety rationale in ways that emphasize LEED (Listening and Explaining with Equity and Dignity) principles. Specific messages should be conveyed in simple, layperson terms that are accessible to all, and should be focused on explaining the public safety necessity motivating the message. | May 30, 2020: OC Spraying of Child<br><br>(21) |
| Improve SPD's capability to inform and communicate with demonstrators during group events in the following ways:<br><br>1. Multiple modes of communication should be considered, including audio, video, other visual media (e.g., posters, banners, etc.), social media, and others;<br>2. The modes of communication and specific messages should be included in the Incident Action Plan created by SPD prior to events and updated throughout the pre-event planning phase;<br>3. The communications should be documented and recorded during the event, including by having officers certify their use on police radio that is retained by SPD; and<br>4. Their impact should be evaluated and specifically assessed in post-event review by SPD. | May 30, 2020: OC Spraying of Child<br><br>(22) |
| Procure a suitable audio device to ensure that the crowd can hear messages relevant to the event. | May 30, 2020: OC Spraying of Child<br><br>(23) |
| Communicate in advance when it plans to create barricades or restrictions to protesters or marches. The reason for the creation of such zones should be clearly articulated and driven by a public safety rationale. | June 1, 2020: The "Pink Umbrella" Incident<br><br>(46) |
| **Priorities and Situational Awareness** | |
| Alter SPD's strategy for policing protests to focus more explicitly and comprehensively on the facilitation of peaceful assembly and ensuring the safety of protestors. The focus and mindset of SPD officers deployed to assist in crowd events should move away from "crowd management," | Overarching Contributing Factors and Recommendations<br><br>(3) |





| | |
|---|---|
| "crowd control," and "law enforcement" to "facilitation of speech" and "crowd protection and safety." | |
| Embrace procedures that visibly signal SPD's commitment to ensuring the safe and peaceful gathering with the minimum necessary engagement of SPD officers, and limit that engagement to:<br>• Promoting the ability of individuals and groups to express First Amendment freedoms;<br>• Protecting the physical safety of individuals within as well as beyond the crowd and<br>• Preventing the destruction of public or private property. | Overarching Contributing Factors and Recommendations<br><br>(4) |
| Provide officers with clear direction about SPD's priorities in facilitating demonstrations, particularly when the institution of policing is the focus of the protest. SPD's focus should be on facilitating access and safety for all. SPD should enhance the ability to address dangerous situations with minimal impact on peaceful demonstrators while minimizing the use of munitions or indiscriminate force. | May 30, 2020: SPD Protest Control Tactics<br><br>(9) |
| In considering whether to use force during a crowd event, SPD officers must evaluate whether the use of force can be limited to those against whom the force is justified, and that the potential for collateral impact is minimized. | May 30, 2020: OC Spraying of Child<br><br>(25) |
| SPD officers should improve their situational awareness, considering the relationship of their actions to the overall strategy and tactics of the event, and the support available to the officer(s) relative to the size of the event. | May 31, 2020: Bike Officer Altercation and Pedestrian Arrests<br><br>(44) |
| SPD officers should be trained to realize that the existence of Personal Protective Equipment ("PPE") or other defensive measures in a crowd of demonstrators, is not itself an aggressive measure requiring an escalating police response. | June 1, 2020: The "Pink Umbrella" Incident<br><br>(49) |
| On-site incident commanders should carefully evaluate the context and threat from a crowd, with assistance from "dialogue officers" in the crowd. | June 1, 2020: The "Pink Umbrella" Incident<br><br>(51) |
| Consider the creation of dialogue officers to ensure effective, real-time, de-escalatory communication between SPD and protesters. | June 1, 2020: The "Pink Umbrella" Incident<br><br>(52) |
| **Tactics and Equipment** | |
| Modify SPD's tactics of crowd facilitation to prioritize communication, de-escalation, and carefully conducted removal of those who are creating an immediate danger to others or causing destruction to property, allowing the rest of the event to continue undisturbed. | Overarching Contributing Factors and Recommendations<br><br>(5) |
| Use live CCTV footage and mobile SPD officers, whether on bicycles or in other vehicles, to rapidly intervene with and address groups destroying property. | May 29, 2020: Vandalism in the International District |





| | |
|---|---|
| | (8) |
| Pursue a differentiated approach toward individuals within the crowd. | May 30, 2020: SPD Protest Control Tactics<br><br>(10) |
| Avoid the creation of immovable lines of officers at demonstrations and provide a mobilization plan for the deployment of bicycle or other mobile officers to ensure appropriate and rapid responsiveness to unplanned crowd events. | May 30, 2020: SPD Protest Control Tactics<br><br>(11) |
| Use mobile response units (e.g., bicycle or other vehicles) that are distinct from crowd facilitation officers or "dialogue officers" to address agitators or instigators of violence in the crowd. Mobile response units should remain out of sight and in reserve unless and until they are needed and engage in ways that permit individualized attention and minimize the impact on peaceful protestors and on the event in general. | May 30, 2020: SPD Protest Control Tactics<br><br>(14) |
| Establish the Incident Command Post and communication lines to officers facilitating protests or demonstrations so that the Incident Commander can observe multiple events in different locations simultaneously and receive real-time updates about each event, from officers trained in the supervision of crowd events who are physically present at each protest or demonstration. | May 30, 2020: SPD Protest Control Tactics<br><br>(17) |
| Avoid the deployment of officers in ways that prevent pedestrian/crowd movement or that separate individuals from other areas of protest without a clearly articulated safety rationale. | May 30, 2020: OC Spraying of Child<br><br>(19) |
| Review SPD protocols related to the presence of batons and their use during crowd facilitation events, potentially eliminating their presence at such events unless justified by a specific and compelling public safety purpose. | May 30, 2020: OC Spraying of Child<br><br>(24) |
| Limit arrests during protests targeted at the police to individuals committing immediate or imminent harm to people or property, and do not arrest individuals for offenses committed at an earlier time unless they can be accomplished in a way that will not escalate emotions in the crowd. | May 30, 2020: OC Spraying of Child<br><br>(26) |
| Identify a specific area for officers reporting for crowd facilitation duty to convene and leave their vehicles, providing a shuttle system for officers to and from the areas where they are deployed and supervision for the vehicles. | May 30, 2020: Police Vehicles Set on Fire on Public Streets, Rifles Stolen<br><br>(27) |
| If exigent circumstances prevent an officer from parking a vehicle at the designated area, officers should notify the SPOC of the location of the vehicle(s), and a designated officer should move the vehicle(s) to a designated safe area. | May 30, 2020: Police Vehicles Set on Fire on Public Streets, Rifles Stolen<br><br>(28) |





| | |
|---|---|
| Ensure that any weapons or munitions brought to protests are securely stored and cannot be taken or used by anyone other than the officer to whom they were issued or other authorized SPD personnel. | May 30, 2020: Police Vehicles Set on Fire on Public Streets, Rifles Stolen<br><br>(29) |
| SPD officers attending protests should not leave rifles unlocked in unattended police vehicles. | May 30, 2020: Police Vehicles Set on Fire on Public Streets, Rifles Stolen<br><br>(30) |
| SPD should invest in rifle cabinets with locks that cannot be easily breached by others. | May 30, 2020: Police Vehicles Set on Fire on Public Streets, Rifles Stolen<br><br>(31) |
| SPD should consider the utility of "biolocks" on all rifles to ensure that only the officer who is issued the rifle can fire it. | May 30, 2020: Police Vehicles Set on Fire on Public Streets, Rifles Stolen<br><br>(32) |
| Implement a GPS system through the SPOC that allows Incident Command to know the precise location of every officer, vehicle, and lethal munition deployed during a crowd event. | May 30, 2020: Police Vehicles Set on Fire on Public Streets, Rifles Stolen<br><br>(33) |
| Ensure that officers are held accountable for securing their weapons at all times, and that violations of SPD policies on these matters are investigated and enforced. | May 30, 2020: Police Vehicles Set on Fire on Public Streets, Rifles Stolen<br><br>(35) |
| Establish protocols to guide officer responses to property crimes occurring during significant public disorder events. These protocols would, among other things, establish clear guidance for officers on:<br><br>a. When to disperse and when to arrest individuals who may be committing property crimes during civil unrest;<br>b. How to conduct arrests of individuals who require prone handcuffing; and<br>c. How to arrest individuals committing property crimes without escalating tensions between SPD and observers of the arrest. | May 30, 2020: Officer Placing Knee on Individual's Neck During Arrest<br><br>(37) |





| | |
|---|---|
| Modify the policy and training for prone handcuffing to eliminate body weight pressure being applied above the shoulders of a subject being restrained. | May 30, 2020: Officer Placing Knee on Individual's Neck During Arrest<br><br>(38) |
| Monitor crowd activities from a sufficient distance that physical contact between SPD and protesters is not required or likely to unless an individual is an immediate physical danger to others. | May 31, 2020: Bike Officer Altercation and Pedestrian Arrests<br><br>(40) |
| Train bicycle officers not to arrest individuals for passive resistance techniques like "shoulder-checking" unless the officer(s) determine that the acts are clear, deliberate, and intended to substantially interfere with the ability of the officer(s) to perform his or her immediate public safety responsibilities. | May 31, 2020: Bike Officer Altercation and Pedestrian Arrests<br><br>(41) |
| When "leap-frogging" a protest, SPD officers should select alternative routes that minimize the likelihood of exposing officers or crowd participants to unnecessary risks. | May 31, 2020: Bike Officer Altercation and Pedestrian Arrests<br><br>(42) |
| When a crowd prevents safe movement of bikes without contacting individuals in the crowd, SPD bicycle officers should consider dismounting and walking with bikes physically placed between officers and crowd members to minimize agitation and physical contact. | May 31, 2020: Bike Officer Altercation and Pedestrian Arrests<br><br>(43) |
| Develop an arrest policy for each event and convey this to officers beforehand. Flexibility should exist in the tolerance of lower level misdemeanors balanced against the priority for ensuring the strategic goals of the operation. | May 31, 2020: Bike Officer Altercation and Pedestrian Arrests<br><br>(45) |
| Conduct appropriate scenario planning and provide sufficient resources so that other SPD locations can protect and serve the people of Seattle in the event that public service from one or more of its buildings are disrupted by protests. | June 1, 2020: The "Pink Umbrella" Incident<br><br>(47) |
| Construct barricades between protesters and critical pieces of the public safety infrastructure (e.g., the East Precinct) rather than using lines of officers. Such barriers should strike a balance between protecting the integrity of the facility and preserving its accessibility to the public. | June 1, 2020: The "Pink Umbrella" Incident<br><br>(48) |
| SPD incident commanders should maximize the buffer space between officers and the crowd whenever possible. | June 1, 2020: The "Pink Umbrella" Incident<br><br>(50) |
| Ensure access to adequate supplies of OC spray to ensure that CS gas is never deployed due to a lack of access to other more preferable or appropriate options. | June 1, 2020: The "Pink Umbrella" Incident<br><br>(53) |





| | |
|---|---|
| Implement OIG's guidance on the use of CS gas set forth in Review of the SPD Crowd Dispersal Policy and Less Lethal Weapons, In Response to Ordinance 126102. | June 1, 2020: The "Pink Umbrella" Incident<br><br>(54) |
| **Officer Wellness and Training** | |
| Establish a staffing model for crowd events such that protests of the size and scale of the Westlake protests can be suitably staffed with mobile officers and other facilitation while minimizing SPD intrusion into the protests. | May 30, 2020 SPD Protest Control Tactics<br><br>(12) |
| Ensure that all SPD officers, not just those officers assigned to crowd facilitation teams, are trained in crowd psychology, crowd facilitation, public safety procedures and tactics, and the mobilization techniques likely to be used at future crowd events. | May 30, 2020 SPD Protest Control Tactics<br><br>(13) |
| Provide specific training, including scenario-based training on the management of large crowd events, and on the supervision of officers, for all SPD supervisors and above, including Incident Commanders and officers in the SPOC. | May 30, 2020 SPD Protest Control Tactics<br><br>(16) |
| Implement staffing schedules, and provide officers with breaks, food and water, and pre- and post-event wellness initiatives to help officers at crowd events – and especially at crowd events that are critical of SPD and policing – deal with exhaustion, stress, and primary or secondary trauma that might result from their participation at such events. | May 30, 2020: Officer Placing Knee on Individual's Neck During Arrest<br><br>(39) |
| **Coordinated City Response / Suggestions to other Agencies** | |
| The Mayor's Office, SPD, SFD, the Department of Transportation and other departments should conduct appropriate scenario planning for disruptive protests. In particular the scenario planning should<br>• Ensure that sufficient resources are deployed so that other SPD locations can protect and serve the people of Seattle in the event that public service from one or more of its buildings are disrupted by protests;<br>• Ensure that sufficient public transportation exists to help protesters leave a protest where an unlawful assembly or curfew has been declared or a legal order to disperse has been issued. | May 30, 2020: SPD Protest Control Tactics<br><br>(18) |
| Seattle City Council should consider whether CCTV camera footage could be kept by a third party for a limited time, and accessible to SPD or other appropriate parties upon request for suitable public safety purposes, including the ability to track stolen police weapons that would pose an imminent danger to the community. | May 30, 2020: Police Vehicles Set on Fire on Public Streets, Rifles Stolen<br><br>(34) |
| The Mayor's Office and SPD leadership should critically examine the utility of a curfew and should exhaust other messaging options before declaring one. If a curfew is announced it should be limited in scope and clearly focused on public safety, rather than the deterrence of public protest. | May 30, 2020: Officer Placing Knee on Individual's Neck During Arrest<br><br>(36) |