1              UNITED STATES DISTRICT COURT

2         WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3    _____
                                      )
4    UNITED STATES OF AMERICA,        ) C12-01282-JLR
                                      )
5                   Plaintiff,        ) SEATTLE, WASHINGTON
                                      )
6    v.                               ) August 10, 2021 -
                                      ) 1:30 P.M.
7    CITY OF SEATTLE,                 )
                                      )
8                   Defendant.        ) STATUS CONFERENCE
                                      )
9    _____

10            VERBATIM REPORT OF PROCEEDINGS
11        BEFORE THE HONORABLE JAMES L. ROBART
              UNITED STATES DISTRICT JUDGE
12   _____

13

14   APPEARANCES:

15   For the Plaintiff:      Christina Fogg
                             U.S. Attorney's Office
16                           700 Stewart Street, Suite 5220
                             Seattle, WA  98101
17
                             Timothy D. Mygatt
18                           U.S. Department of Justice
                             Civil Rights Division
19                           950 Pennsylvania Avenue
                             Washington, DC 20530
20

21   For the Defendant:      Peter S. Holmes
                             Kerala Cowart
22                           Seattle City Attorney's Office
                             701 Fifth Avenue, Suite 2050
23                           Seattle, WA 98104

24

25

 1    For the CPC:            Edgar G. Sargent
                              Susman Godfrey
 2                            1201 Third Avenue
                              Suite 3800
 3                            Seattle, WA 98101

 4    Monitoring Team:        Antonio M. Oftelie, Monitor
                              Ronald R. Ward, Assistant Monitor
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  Please be seated.
 2         The clerk will call this matter.
 3              THE CLERK:  Case No. C12-1282, United States of America
 4    versus City of Seattle.
 5         Counsel, please make your appearances for the record.
 6              MS. FOGG:  Good afternoon, Your Honor.  Christina Fogg
 7    for the United States.
 8              MR. MYGATT:  Good afternoon, Your Honor.  Tim Mygatt for
 9    the United States.
10              THE COURT:  Thank you.
11              MR. HOLMES:  Good afternoon, Your Honor.  Pete Holmes
12    for the City of Seattle.
13              MS. COWART:  Good afternoon, Your Honor.  Kerala Cowart
14    for the City of Seattle.
15              THE COURT:  Thank you.
16         Mr. Oftelie, do you want to introduce yourself?
17              MR. WARD:  Good afternoon, Your Honor.  Ron Ward with
18    the Monitoring Team.
19              MR. OFTELIE:  Good afternoon, Your Honor.  Monitor,
20    Antonio Oftelie.
21              THE COURT:  Thank you.
22         The Court asked everyone to come in today for the purpose
23    that it's been a while since we've had a status conference and I
24    want to continue our tradition of trying to keep people as well
25    informed as we can.
```

1        For the people who are speaking today, you're welcome to go

2    to the podium, because we are videotaping the hearing, and you

3    can take your mask off when you're there.  Other than that,

4    please keep your masks on.  I think I'm the only one who's

5    privileged enough not to since I'm surrounded by air purifiers.

6        I've asked the parties, in addition to the Community Policing

7    Commission, to speak today, and I asked them to update me for no

8    more than 10 to 15 minutes on three questions:  what has been

9    going on in regards to the Consent Decree in recent months;

10   second, what are your areas of current attention; and third,

11   issues that you want to bring to the Court's attention.

12       And since the Department of Justice is the plaintiff in this

13   matter, I'll begin with you.

14       MS. FOGG:  Thank you, Your Honor.

15       I would like to start, if I may, with a brief reminder of the

16   recent history of the Consent Decree.  And I promise not to go

17   back to the beginning --

18       THE COURT:  Well, I intend to.

19       MS. FOGG:  -- as I sometimes have.

20       THE COURT:  You don't like July 27th, 2012?

21       MS. FOGG:  Well, it predates me, so ...  It helps me to

22   speak at least from the time that I was involved, which was

23   around 2014.

24       And, Your Honor, you're right, the Consent Decree really goes

25   back to the investigation in 2011 and the entry of the agreement

 1   in 2012, but after the initial few years of work was done under

 2   the Consent Decree, we turned our attention, in 2014 through

 3   2017, to having the Monitoring Team and the Department of Justice

 4   conduct several rounds of assessments of SPD's systems and

 5   practices to determine whether the City of Seattle had

 6   successfully complied with a hundred paragraphs contained in the

 7   "Commitment" section of the Consent Decree.

 8        In 2018, based on the results of those assessments, the Court

 9   determined that the City had in fact demonstrated full and

10   effective compliance at that time.

11        So the next step was in 2018 and 2019.  The City itself

12   undertook additional assessments that were overseen by the

13   Monitoring Team and the Department of Justice to evaluate whether

14   SPD had sustained compliance for a period of two years as is

15   required.  During that same period, Your Honor will recall that,

16   in 2019, the Court found that the City had fallen out of

17   compliance with accountability but indicated that the City could

18   continue to assess whether it had sustained compliance with the

19   100 paragraphs of commitments.

20        So at the conclusion of those sustainment assessments, the

21   City, DOJ, and the Monitor agreed that the City had demonstrated

22   sustained compliance in those areas.  Accordingly, in May 2020,

23   early May, the City moved to terminate a hundred paragraphs of

24   these commitments, and we supported that motion; however, as

25   everyone is aware, after the killing of George Floyd on May 25th,

1  2020, protests erupted nationwide, and Seattle Police

2  Department's response to those protests was the subject of

3  considerable public concern.  In response, the City rescinded its

4  motion for termination, and because of that, the Consent Decree

5  today remains a live agreement that is still in effect.  Because

6  of that, we need to continue to evaluate the City's compliance

7  with its terms.

8      So as Your Honor is certainly well aware, at the end of last

9  year, you appointed a new monitor, Dr. Oftelie, and we have

10  worked with him and his team at the end of last year and the

11  beginning of this year in developing a Monitoring Plan.

12      The purpose of that Monitoring Plan, which is described in

13  paragraph 183 of the Consent Decree, is to set forth measurable

14  objectives from which to evaluate whether the City has continued

15  to sustain compliance.

16      The Monitoring Plan, as we craft it, also contains

17  requirements that the City brief DOJ, the Monitor, and the Court

18  on the City's actions in the areas of back-end accountability,

19  innovation and risk management, and reimagining public safety.

20  These areas were included so that as the City takes on issues and

21  areas of reform beyond the commitments of the Consent Decree, DOJ

22  and the Monitor can ensure that they do not inadvertently

23  undermine reforms that were already made.

24      At the end of February of this year, the Court approved that

25  Monitoring Plan -- it can be found at Docket 655-1 -- and we have

1   been conducting the work set forth in that plan since that time.

2   Under the terms of the plan, and as we have throughout the

3   Consent Decree, we first worked with the City and the Monitor to

4   develop a detailed methodology on how each of the areas of the

5   Monitoring Plan will be assessed.  These areas include use of

6   force, use of force review and investigation, stops and

7   detentions, crisis intervention and supervision.

8       Pursuant to the methodology, SPD has now produced a large

9   amount of data, analysis, documents and information, and we are

10   in the midst of reviewing those productions.  We have also worked

11   with the Monitor and his team to select a randomized sample of

12   uses of force from last summer and have set about reviewing the

13   documents associated with those incidents through the prism of

14   the Consent Decree requirements related to use of force.

15       We know that the accountability partners -- the Office of

16   Police Accountability, the Office of the Inspector General, and

17   the Community Police Commission -- have also been evaluating some

18   of those same protest incidents, and we have been reviewing their

19   work with interest.  It is our hope that there will be synergy

20   between our work and theirs.  After all, it is the accountability

21   partners who will largely be responsible for carrying the work of

22   reform forward after the Consent Decree ends.

23       To be clear, the role of these partners and the eventual

24   transition of our work to theirs was always contemplated as a

25   critical part of this process.  The Consent Decree is not

1    intended to hold a monopoly on reform or to be a permanent

2    fixture in the City's reform efforts.  Rather, the Consent Decree

3    was intended to, one, make specific changes to address specific

4    problems identified in our investigation and, two, act as a

5    catalyst to further reform by empowering entities like the OPA,

6    OIG, and CPC to take the reins of oversight and reform that go

7    beyond the limited scope of the Consent Decree and continue after

8    it ends.  However, until the Decree is terminated, we will

9    continue doing the important work set forth in the Monitoring

10   Plan to evaluate whether there has been sustained compliance with

11   its terms.  So between now and the end of the year, we intend to

12   complete our analysis and share our findings with the Court in

13   briefing, in accordance with the Monitoring Plan schedule.

14        That's all.  Thank you, Your Honor.

15        THE COURT:  Thank you.

16   Mr. Mygatt, do you wish to say anything?

17        MR. MYGATT:  No, Your Honor.  I have nothing to add.

18        THE COURT:  Let me ask you, then, the question -- and

19   you can stay seated for responding to this -- what is your

20   expectation regarding the role of the Consent Decree going

21   forward?  Do you see it as continuing to be the basis of the work

22   of the litigation?

23   We have a fundamental disagreement as to the scope of the

24   Consent Decree vis-à-vis discipline and accountability.  That's

25   been sort of tacked on in a part of the plan that I wrote in late

1   February.  I'm trying to get a sense of where the Department of

2   Justice is these days because we have gone from full support of

3   the Consent Decree to we think termination of the Consent Decree

4   and then implicitly abandoning that position, and now I want to

5   know where you are now.

6        MS. FOGG:  Are you --

7        THE COURT:  Either one of you.

8        MR. MYGATT:  I'm happy to try to address that, Your

9   Honor.

10     I guess what I would say to that is that because the last

11   time compliance with the Consent Decree had been thoroughly

12   assessed was before the City moved for termination of the hundred

13   paragraphs of the Consent Decree and we supported it at that

14   time.  We've now had a significant time period that's elapsed.

15   And so under the Monitoring Plan, the plan was, we need to go

16   back and see what's happened during that time period to determine

17   whether or not compliance with the Consent Decree terms have been

18   sustained so that we can then come to you, Your Honor, and

19   represent to you whether or not we think the Consent Decree needs

20   to continue or the Consent Decree --

21        THE COURT:  You need to slow down a little, Mr. Mygatt.

22        MR. MYGATT:  Certainly.

23     To determine whether or not the Consent Decree needs to

24   continue or whether or not the Consent Decree is in a position

25   where at least a significant portion of it would be moving

1   towards termination.  We can't prejudge that at this point

2   because that review is ongoing.  The City is still giving us its

3   documents related to its sustained compliance in a number of

4   different areas, and we're looking with specificity at some areas

5   of concern that arose last summer around use of force in the

6   protest circumstances that occurred last summer.  So we want to

7   be able to come to the Court and represent, you know, whether or

8   not compliance has been sustained since the Consent Decree has

9   been in effect that entire period.

10          THE COURT:  So let me see how successful I can be of

11  putting words in your mouth.  You are willing to engage in not an

12  assumption but a probability that there is compliance vis-a-vis,

13  depending upon how you count, six or so of the Consent Decree

14  major topics.  I'm reserving out from that use of force, which

15  really was crowd control, which is still an open item, and the

16  Court's belief, and therefore what will be the truth, that

17  discipline and accountability are still open.

18      Is that a fair summary of the federal government's position?

19          MR. MYGATT:  I think I would modify that a little bit,

20  Your Honor, to say that we are not assuming that they're still in

21  compliance with those six other areas, but, instead, the City has

22  to demonstrate sustained compliance in the same way that it

23  demonstrated sustained compliance during the original sustainment

24  period that came through the beginning of -- through January 2020

25  or so.  And so the City still is going to validate whether or not

1   it has maintained compliance in those areas.  There's no

2   assumption being made.

3       On the other two areas, we recognize that the Court has ruled

4   that there's certain measures that still need to be taken with

5   regard to accountability, and we acknowledge that, Your Honor, as

6   well as we want to take a look at what happened in use of force.

7   We're going to be looking at a lot of sustainment compliance by

8   the City in that area, but we're also taking a specific look at

9   some of the issues that arose last summer because they raise

10  significant concerns such that the City withdrew its motion.  So

11  we need to make sure that we can represent to the Court whether

12  or not that has stayed in compliance as well.

13          THE COURT:  That's a more articulate statement of what I

14  was trying to accomplish.  Thank you.

15          MR. MYGATT:  Yeah.

16          THE COURT:  Mr. Holmes, I don't believe we have been

17  introduced.

18          MR. HOLMES:  Good afternoon, Your Honor.  If you could

19  give me a moment.

20      You would think a country that has commercial space flights

21  would have worked out a better way to coordinate glasses, hearing

22  aids, and masks, but, alas, that's not been true the last 16 to

23  18 months.

24          THE COURT:  Well, welcome, sir.

25          MR. HOLMES:  It's good to see you again, Your Honor.

1    And may it please the Court.  I am Pete Holmes, the current-

2    elected City Attorney for the City of Seattle.

3        I note that last time I think we were here prepandemic, we

4    discussed the fact that Your Honor and I were the last two

5    signatories out of five that were still in office for the Consent

6    Decree, and as of New Year's Day, that honor falls to you alone,

7    Your Honor, so --

8            THE COURT:  That does not mean that I'm happy about it.

9            MR. HOLMES:  There are mixed feelings all around.

10           THE COURT:  You will recall that -- I think it's

11   paragraph 3 that says that this was a five-year gig.  That was

12   done in 2012.

13           MR. HOLMES:  That's right, Your Honor.  But it takes the

14   time it takes.

15           THE COURT:  True.

16           MR. HOLMES:  And, Your Honor, I do want to make sure --

17   I think it's important to note that Ms. Cowart, Kerala Cowart,

18   my Assistant City Attorney colleague on this case, is going to

19   take on even more importance.  She has been key to this case.

20   She knows it backwards and forwards.  She has the relationships

21   with the Monitoring Team, DOJ, SPD, the counsel, the OPA

22   Director, the Office of the Inspector General, as well as City

23   Council, and the two leading contenders for mayor who were also

24   former City Council members.  So I do think that -- I want to

25   commend Kerala again to you as an incredible resource and a

1    brilliant lawyer.

2         But for the rest of my time, Your Honor, today, I do want to

3    highlight the City's achievements over the past month, consistent

4    with the quarterly report that was just filed.  At the same time,

5    it's important to recognize, Your Honor, as DOJ alluded, that the

6    Monitor and DOJ are in the process of assessing SPD's compliance

7    even now under the Consent Decree.  Their analysis and findings

8    will inform this Court's conclusions about compliance with the

9    Consent Decree and how to move forward.

10        The experience of the past year demonstrates that the Consent

11   Decree has equipped the City with institutions and processes

12   necessary to correct -- to correct course, to change course, when

13   problems arise.  We all agree, I believe, that SPD's response to

14   the protests over George Floyd's murder in the summer of 2020

15   undermined public confidence, and it demonstrated that the City

16   was unprepared to address events of that nature and magnitude.

17   That's why I decided to withdraw the City from the motion that

18   was then pending to terminate the sustainment plan.

19        As I said at the time, the accountability system was about to

20   undergo a stress test like it had never seen before.  In the

21   aftermath, that's when the Executive and City Council asked the

22   Inspector General, OPA, and the CPC to make recommendations, and

23   they were submitted to the Court in August.  Based on those

24   recommendations and its own internal review, SPD has made

25   numerous changes to its crowd-management policies, tactics, and

 1    trainings.  It's been nothing short of heroic, actually, since

 2    last spring when this Court approved SPD's revised policies, that

 3    SPD undertook a major effort to train every officer on the force

 4    in these new crowd-management policies and tactics.  And the

 5    accountability entities are indeed determining what happened

 6    during those protests and how to move forward.

 7         In addition to making recommendations based on best

 8    practices, the Inspector General also set about convening a

 9    community-oriented process called a Sentinel Event Review to

10    examine SPD's responses to the protests through a non-blaming,

11    forward-looking framework.  The first panel recently, wave one,

12    recently issued its recommendations and insights into some of the

13    most infamous protest incidents.  OPA, for its part, has

14    investigated an unprecedented number of allegations of police

15    misconduct stemming from the protests.  And it's important to

16    recognize, Your Honor, throughout all of this, that it is the

17    role of the Consent Decree, in establishing the accountability

18    system, is why we have this rigorous system.  CPC was formed as a

19    requirement of the Consent Decree, to give the community a voice

20    into SPD's operations and policies.  And although OPA preexisted

21    the Consent Decree, the rigors of its system was made more robust

22    through the Consent Decree process.  And the Inspector General

23    was formed by legislation put into motion by the Consent Decree.

24         So in addition to examining the events of last year, the City

25    has been working to address the accountability concerns raised by

1    the Court.  With its noncompliance ruling in 2019, this Court

2    spurred actions within the City to improve the collective

3    bargaining process and pursue contract reforms in areas

4    identified by the Court.  Since then, since 2019, the Court has

5    worked to identify areas where change could be made quickly and

6    without extensive bargaining, and it has taken concrete steps in

7    these areas, such as executing an MOU to ensure that OPA finds

8    out immediately when the 180-day clock begins to run or stops and

9    restarts because of a prosecutor's review.

10    The City has enacted legislation establishing subpoena

11    procedures for OPA and the Inspector General, augmenting OPA's

12    website, to increase transparency into police discipline and

13    disciplinary appeals, both of those measures.

14    Starting in 2020, OPA began posting anonymized information

15    about the disciplinary resolution for each of its investigations

16    and the status of all pending or open disciplinary appeals on its

17    website.  As a result, a member of the public can now look up any

18    OPA case from 2016 forward and read the OPA Director's findings,

19    determine what discipline the chief imposed, and whether that

20    discipline has been appealed, and on top of that, the status and

21    the final outcome for each appeal.

22    The City has modified the collective bargaining process to

23    obtain a greater level of community input, including, for the

24    first time, giving the Community Police Commission a formal role

25    in the bargaining process.  It's important that the City's new

1   collective bargaining process, newly developed through

2   collaboration between the Executive and the City Council, be

3   tested.  That is one of the reasons why the proposal to include

4   the Monitor in the bargaining, while well intentioned, it's

5   probably not in the best interests for a sustainable foundation

6   for the City to sustain reform.  And, finally, the recent Court

7   of Appeals ruling, one that I'm particularly proud of, regarding

8   Adley Shepherd goes beyond just simply the result, Your Honor.

9   It has created precedent that is going to make it very difficult

10  for any future arbitrator to consider reinstating an officer who

11  has been terminated because of the excessive use of force.  The

12  law has actually shifted as a result of the litigation, and I'm

13  confident that next year we will be defending that, if it's not

14  concluded, before the Washington Supreme Court.

15       So the City has taken these concrete steps forward, and these

16  were the achievable ones, but the improvements that are made thus

17  far, Your Honor, do not alter the fact that broader changes to

18  the collective bargaining agreement can be achieved only by

19  bargaining a new contract.  The City understands that addressing

20  the Court's concerns is critical to restoring public confidence.

21  Substantive contract reforms with SPMA and SPOG would allow the

22  City to continue to improve and strengthen police accountability.

23  To that end, the Executive and members of City Council had

24  publicly committed that the Court's areas of concern will be top

25  priorities in the current round of bargaining negotiations.  And

 1   I am going to give you a very quick update on the status of those

 2   negotiations.

 3        Currently, SPMA, the Seattle Police Management Association

 4   for captains and lieutenants, the negotiations are quite far

 5   along, and the parties are now in mediation over some sticking

 6   points.  Although the SPOG bargaining negotiations themselves

 7   have not yet started, I am personally surprised at the level of

 8   work that the City has accomplished through the Executive and the

 9   Labor Relations Policy Committee of the Council in setting the

10   parameters, that is, the overall costs, expense, and terms

11   and the like, key terms, for the police contract.  They are very

12   close to finalizing those internal bargaining parameters or those

13   priorities, which are called parameters.  And so, again, it's a

14   process that's moving along very quickly.

15        I want to conclude, Your Honor, with an observation.  Maybe

16   that's in answer to your third question about concerns.  And that

17   is, of course, the SPOG negotiations, in particular, will be

18   conducted largely under a new executive.  The fact that a fifth

19   mayor since I have been in office will be leading those

20   negotiations underscores our challenge, the City's challenge, of

21   struggles with continuity and leadership.  We'll be -- In fact,

22   though, it's kind of uniform through the City because SPOG will

23   be bargaining with its third or fourth president since I have

24   been in office.  And all the while, of course, the City is

25   required to conduct by the charter a new search for a police

1    chief.

2         So I can say that I'm leaving office after not only twelve

3    years as City Attorney, but I also, you know, would note that

4    early next year will be actually two decades since I accepted the

5    appointment to the City's first police oversight board, the OPA

6    Review Board.

7         And it has just, Your Honor, simply been an immense honor to

8    work with Your Honor on this case.  United States versus City of

9    Seattle has been the most challenging and rewarding case of my

10   four decades in the law.

11        We need the police as guardians, Your Honor, not warriors.

12   That's an often repeated phrase.  And it's the paramount goal, of

13   course, to maintain public safety.  That's why I never join a

14   call to defund or certainly not to abolish the police.  Because

15   Seattle is, instead, about to undertake something much more

16   exciting, and that is to reimagine policing.  And I submit that

17   there's also something beyond the Court and the police department

18   itself as we undertake that task, and that is to address some of

19   the other things that are impacting us every day.  That is, the

20   gap between the haves and the have nots is wider at this point in

21   time, Your Honor, than at any other time in the last 100 years.

22   We live in a state with the most regressive revenue structure and

23   one that is No. 47 in providing mental healthcare and other basic

24   needs, and so it's of little surprise that we're seeing the kind

25   of tensions playing out on the streets.  With those kinds of

1   statistics, they play out in real life in the same way that

2   global warming creates wild fires.  That's what we're witnessing,

3   Your Honor.  And for the holistic approach and the groundwork

4   that Your Honor and the Consent Decree have established for the

5   City of Seattle, I submit that I'm ultimately optimistic that we

6   are going to move forward, we're going to reimagine the police

7   under new leadership, and the results of all of the work that

8   have gone into this Consent Decree cannot be lost, instead we

9   need to build on them because they have provided the framework

10  and the path forward.

11       THE COURT:  I'm going to ask you to wear one of your

12  many hats that the City charter asks you to engage in.

13       How do you respond to the criticism that the Court and the

14  Monitor and the various accountability partners have not been

15  severe enough on the police?

16       MR. HOLMES:  You know, Your Honor, that's inherent in

17  any system of adjudication, any system of fact-finding and

18  decision-making.  Decisions of a Court can be questioned.

19       I think that the real question, though, is:  Is the process

20  fair?  And even when you disagree with the outcome, is that

21  criticism being taken back and reviewed?

22       I think that, the long review, Your Honor, I haven't seen

23  cases that I've exactly disagreed with personally.  I think that

24  the force is starting to understand that the OPA process is a

25  thorough one and it's one that is consistently meeting deadlines,

1    like the 180-day deadline.  And then we look to you, Your Honor,

2    as in the case of Adley Shepherd, where we're able to ensure

3    appropriate discipline, like termination, sticks.

4             THE COURT:  All right.  Thank you, sir.

5         Mr. Sargent, if you would come forward, please.

6         The CPC is not a party to this litigation, but you asked to

7    be heard, and so I'll ask you to deal with the same three

8    questions that I have asked everyone else to deal with.

9             MR. SARGENT:  Thank you, Your Honor.  And thank you for

10   granting our request to be heard today.

11        As Your Honor is aware, the primary issue we wanted to

12   address was the Court's 1999 finding that the City is out of

13   compliance with the Consent Decree on certain accountability and

14   officer discipline areas, and, in particular, we wanted to

15   address a couple of orders that the Court issued following that

16   finding.

17        We don't -- I don't think it's worthwhile to review all of

18   the complex history of that accountability litigation.  We're not

19   interested in looking backwards here.  We want to see where we

20   are today and find the best way to move forward to address these

21   particular issues that were raised by the Court as a result of

22   those 1999 proceedings.

23        I think there is some important general background, though,

24   to keep in mind.  There was the Accountability Ordinance that was

25   passed in, I believe 2017, that was an essential part of the

1    first round of this litigation in getting the City in compliance

2    with the requirements of the Consent Decree.  It was a City

3    ordinance that many of the accountability partners, certainly

4    including the CPC, worked on very hard.  And following the

5    enactment of that ordinance, there were collective bargaining

6    negotiations with both unions which vitiated a number of the key

7    provisions of that Accountability Ordinance, and as a result of

8    that, the Court -- as a result and part of those changes, the

9    Court found that the City had fallen out of compliance.

10    We think that this is an appropriate time for the Court and

11    the parties to revisit those issues explicitly, both because we

12    are beginning another round of negotiations with both unions and

13    because, as I think both of the parties mentioned today, the

14    events of last summer have provided a stress test on the

15    accountability measures that are currently in place and provide

16    some data for all the parties to review to help with that

17    analysis.

18    The two orders that we wanted to address were issued in

19    October 2019.  The Court directed both parties to submit a

20    proposal for the Monitor's involvement with oversight of the

21    efforts to get back in compliance on accountability, and the

22    Court also ordered the City to provide a written proposal for its

23    methodology for getting back into compliance.

24    It's CPC's position that either one of those orders has yet

25    been explicitly complied with.  We have had many conversations

1  with the parties in this case, and certainly there's some feeling

2  that the orders have been effectively complied with or that

3  certain steps have been taken that are as much as can be done

4  right now.  I think the CPC does not agree with that.  But even

5  if it's true -- and this is an important point that I want to

6  make today -- even if it is true that it's as much as could be

7  done with the Monitor's involvement with the City proposing what

8  it's going to do to get into back into compliance, we believe

9  that the Court's orders should nevertheless be complied with,

10  with an explicit filing setting out those steps and those

11  statements.

12     And there's a couple reasons why that's important.  It

13  provides a focal point for all of the parties and the

14  accountability partners to respond.  Right now, there hasn't been

15  any actual explanation of the plan or the proposal for getting

16  back into compliance or any real explanation of the Monitor's

17  involvement.  And because there hasn't been that filing, there's

18  no place for us to respond to it or make additional proposals.

19     I think it's also really important to the public, to the

20  press, and to the coming election, people who are following this

21  case.  And, you know, reviewing the elections -- I mean, the

22  materials in the recent primary election, many of them mentioned

23  the fact that the City has fallen out of compliance in this area

24  and the City's, you know, failure to file a proposal, as the

25  Court ordered.  I'm trying not to be critical here, but if they

1    would file the proposal, it would show a willingness to respond

2    and an active engagement with this particular issue that I think

3    is missing from the docket as it currently stands.

4        The CPC is suggesting that the parties consider proposals for

5    additional involvement of the Monitor in two areas.  First, the

6    collective bargaining negotiations that were just discussed by

7    Mr. Holmes.  Currently, those negotiations really are just a

8    black box.  And we know from the prior round of negotiations that

9    things can come out of those that are crucial to the

10   implementation of an effective accountability system.  And it's

11   just too long to wait until the process is completely finished,

12   which, as the Court is aware, can be several years in some

13   instances, and then have the completed package presented to us

14   with no ability to respond to it, no ability to modify it.

15       The City's formula --

16            THE COURT:  Well, let me stop you there.  This is where

17   I begin to lose track of where you think we're going.

18       Under what authority can I order the Monitor to engage in a

19   process that's governed by state law?

20            MR. SARGENT:  I don't think engaging in the process -- I

21   guess I'm not certain that you can order the Monitor to engage in

22   a process, but I think you could order the City to update the

23   Monitor and provide the Monitor ongoing information about the

24   status of the negotiations.  And that's what we would propose,

25   that -- I'm sorry?

1      THE COURT:  Go ahead and finish.

2      MR. SARGENT:  As Mr. Holmes has just explained, the City

3  is in the process of establishing its parameters for its

4  negotiations.  We think that those parameters are crucial

5  elements for the Court to be aware of and the DOJ to be aware of.

6  They don't necessarily need to be shared with all parties or made

7  public, but to have a sense for how the City is organizing its

8  priorities in the negotiations is essential information to know

9  how the Consent Decree process is proceeding.  That's the CPC's

10  position.

11      THE COURT:  I think you fundamentally misunderstand the

12  purpose and my powers under the Consent Decree.  I'm not running

13  the police.  The Chief of Police, who I'm honored is here today,

14  is running the police.  The Mayor is running the police.  My job

15  is to tell you when you don't get it right, not how to do it.

16  Otherwise, I'm usurping the power of the citizens of Seattle to

17  decide how they want to run their police.  And, yet, you have

18  come here and said, "Order them to do this, order them to do

19  that."  And, frankly, you know, putting this back into legal

20  terms, I don't understand where my jurisdiction would come from

21  to do that.

22      MR. SARGENT:  Well, I apologize.  I'm not suggesting

23  that the Court order the Monitor to participate in anything.  I

24  was suggesting that the parties respond to the Court's order that

25  there be a proposal for Monitor involvement in efforts to

1   reestablish compliance.  And, as an example, as something that

2   the City could offer in that circumstance, in our view, is that

3   the Monitor could be provided with additional information about

4   the CBA negotiations as they're ongoing rather than waiting until

5   they're completed.

6          THE COURT:  And then what would the Monitor do with

7   that information?

8          MR. SARGENT:  Share it with the Court, along with the

9   other information that the Monitor is collecting that's related

10  to accountability.

11         THE COURT:  So you're saying that the CPC is not going

12  to see it?

13         MR. SARGENT:  Well, of course, we would love to see it,

14  but I think that there are legitimate concerns about the

15  confidentiality of this information that have come up many times

16  in our discussions with the City on this.  And we believe that

17  the DOJ, the Court, the Monitor, and the City can address issues

18  raised by the CBA negotiations effectively, but do it in a way

19  that protects the confidentiality of the information.

20         THE COURT:  See, what I see happening here is you file,

21  excuse me, on July 27th, Docket 676 -- I appreciate you phrasing

22  it as a request and not a motion, so I don't have to jump on you

23  for civil procedure matters -- saying, you know, we're being cut

24  out of the game here, we need you to do this and we need you to

25  do that.  And then, on August 3, the Seattle Police Monitor,

 1   Mr. Oftelie, files a semiannual report which, and I will

 2   acknowledge we have taken a slightly different tack with it; we

 3   included information put forward by a number of the

 4   accountability partners.  But the police are certainly in here,

 5   the OIG is in here, the OPA is in here, and the CPC is in here.

 6   And that's followed by the City of Seattle filing, as of

 7   March 6th, 29 pages of a quarterly accountability update.

 8       You know, the timing is off, it seems to me, in this, in that

 9   if you were going to criticize what they're doing now, you needed

10   to know what they were doing, which doesn't happen until after

11   you've filed.

12           MR. SARGENT:  Well, Your Honor, we've had extensive

13   discussions with both the attorneys from the City Attorney's

14   Office, the DOJ, the Monitor, the other accountability partners

15   about this issue.  The, in our view, failure to respond to the

16   Court's 2019 orders was a top-level serious concern of my client

17   as soon as I was retained this spring, and it's something we have

18   been working on extensively since then.

19       It's true that -- You're absolutely right that the filing of

20   the City last week and also the Monitor's filing do address some

21   of the concerns that we have, but, again, I would emphasize the

22   CPC would like to see a response directly to the order that a

23   plan be proposed by the City for reestablishing compliance, that

24   a plan be proposed by the parties for the Monitor's involvement

25   with these issues.  And we don't believe that either of the

1   reports that were filed last week satisfy that requirement.

2           THE COURT:  Let's talk a little history here.  Are you

3   familiar with paragraph 7 of the Settlement Agreement, commonly

4   referred to as the Consent Decree?

5           MR. SARGENT:  Not off the top of my head, Your Honor,

6   no.

7           THE COURT:  It says, in regards to the Commission that

8   you represent, it will have the following distinct roles:

9   "... undertake the responsibilities assigned to the Commission in

10  the Agreements, review the reports and recommendations of the

11  Monitor, and may issue its own reports or recommendations to the

12  City.  The Commission may review and issue reports or

13  recommendations as to the implementation of SPD's 20/20

14  initiative."  I think that occurred during the Renaissance

15  period, frankly.  "The Commission may consider other issues as

16  referred by the Parties in Section III.C of the Memorandum of

17  Understanding."

18      It goes on to talk about, specifically, the questions of

19  misconduct, it says, "... will not seek to influence the course

20  or outcome of any specific complaint investigation or discipline

21  of specific police officers; shall not have access to any

22  non-public information regarding an individual police officer or

23  allegation of misconduct or disciplinary action."

24      That's what the role of the CPC under the Consent Decree is.

25  And you're in federal court, where you and I spend most of our

 1   time, and we're dealing with the Consent Decree.  You have

 2   referenced the Accountability Ordinance, and I agree with you,

 3   the Accountability Ordinance extinguished the CPC as a part of

 4   the Consent Decree and put it into the City charter.  And so I'm

 5   asking why, if that's where your power now comes from, you're

 6   back in federal court saying, "Judge, you know, tell the parties

 7   that the Monitor needs to do this, tell the parties the Monitor

 8   needs to do that."  Do you understand?  I'm at a loss to this

 9   sort of amorphic role that you want me to take, which, frankly,

10   is a complete departure from at least two other regimes that have

11   been the CPC, and I'm trying to get an understanding of where you

12   think your role in this litigation is.

13         MR. SARGENT:  I understand the CPC's role to be as an

14   amicus.  And, again, the Court issued orders in 2019, and we are

15   providing comment on those orders and the parties' responses to

16   those orders as an amicus.

17         THE COURT:  Well, comment and specific direction of

18   "make them do something" seem to me to be two different things.

19         MR. SARGENT:  But, again -- I apologize, Your Honor --

20   I'm not intending to make these suggestions as a request for the

21   Court to issue any order at all.  I'm making these suggestions to

22   show that there are ideas that the CPC believes can be

23   implemented in response to the Court's order and that the parties

24   should consider those ideas.

25         THE COURT:  Mr. Sargent, let me read you the title of

 1    your pleading that you filed with the Court:  CPC's Request for

 2    an Order Requiring the Parties to Address these questions.  Now,

 3    let's not play, you know, semantic games here.  You just said,

 4    "Oh, we're not asking for anything," and your own title of your

 5    pleading is "Request for an Order."

 6         MR. SARGENT:  The Court properly struck that.  And we

 7    should not have filed it framed that way.  It was unfortunate and

 8    it was an error.  But part of the reason the error was reversed

 9    is that we're not asking the Court -- if you read the pleading,

10    we're not asking the Court to take any steps.  We're asking the

11    parties comply with the prior order.

12         THE COURT:  Well, I can assure you, sir, I have read

13    your pleadings, and that's not what I got out of them.  So why

14    don't you go ahead and wrap up.

15         MR. SARGENT:  Well, the second area where we believe the

16    Monitor's involvement could effectively be increased with regard

17    to accountability is that the Monitor could have additional

18    engagement with individual disciplinary proceedings.  The prior

19    Monitor proposed that.  The City and the DOJ rejected it.  The

20    Court overruled the objection on which the City and the DOJ

21    objected to that proposal, but the proposal has not been

22    reimplemented.  And the current Monitor's engagement with officer

23    discipline is primarily at a very high level, with the directors

24    of the OPI and the directors of OIG and the SPD, at least that's

25    our understanding, and most of the information that's shared is

 1  statistical.  But the CPC believes that statistics about the

 2  number of complaints that are upheld, for example, is not as --

 3  does not provide as much information as a review of individual

 4  proceedings.  I heard from Ms. Fogg that there is going to be

 5  review of some of the individual complaints from last summer, and

 6  maybe that satisfies, you know, what the CPC was concerned about

 7  there.  But it's just another example of a suggestion that the

 8  CPC believes shows that there can be more done to respond to the

 9  Court's order regarding the Monitor's involvement with these

10  issues.

11       THE COURT:  Well, why should the Monitor be doing that

12  in addition to the OPA?

13       MR. SARGENT:  The Monitor should be doing -- should be

14  engaging with the OPA to determine whether or not the OPA's

15  processes function properly.  And instead of just receiving

16  statistics from Director Myerberg, the proposal would be, from

17  the CPC, that the Monitor meet with not just Director Myerberg

18  but some of the more junior investigators on the team, that he

19  discuss ongoing investigations to confirm that some of the issues

20  identified by the Court in 1999 {sic}, limits on subpoena power,

21  timelines, are not negatively impacting the OPA's ability to

22  execute its duties.

23       THE COURT:  Well, you're a relative newcomer to this, so

24  I'll tell you something that I have said to the parties here

25  numerous times, which is I ask them to take the training wheels

1    off of the OPA and the OIG, because those are the freestanding

2    institutions that are building blocks to the Consent Decree.  And

3    to the extent that you are now saying, as the prior Monitor

4    asked, "Oh, I would like to get back in there and then roll my

5    sleeves up," no.  You know, we've spent a lot of time and a lot

6    of effort creating institutions.  Let's now see if they're going

7    to work.  And if they're not, I'm the first to say we would be

8    happy to make changes to them.  I'm not sure I can in some

9    circumstances because they're creatures of the City charter.

10   But, you know, I'm not going to impose the Monitor upon people

11   who are trying to do their job in this notion that somehow he's

12   going to be able to do it better or he's going to say something.

13        So why don't you close up, sir.

14        MR. SARGENT:  I will just clarify that last point and

15   then sit down.

16        Again, it is not at all what we were envisioning, that the

17   Monitor would reconduct an investigation that the OPA has already

18   conducted.  But conversation, frank conversations with Director

19   Myerberg and with other investigators about the OPA.  It's not

20   about -- not to try to check and determine whether or not

21   investigations are going the right way or that the Monitor agrees

22   with the result, but just in order to share information about

23   whether or not there are impediments to the current process that

24   are making it difficult for the OPA to execute its duty as the

25   OPA sees best fit to do.  That's the proposal that we're making,

 1  Your Honor.

 2          THE COURT:  Should that be addressed to the Monitor, or

 3  should it be addressed to the Mayor and the City Council?

 4          MR. SARGENT:  We believe it belongs -- it properly at

 5  least should be considered as a part of the proposal that the DOJ

 6  and the City were to make for the Monitor's involvement in

 7  accountability reform.

 8          THE COURT:  All right.  Thank you, sir.

 9          MR. SARGENT:  Thank you.

10          THE COURT:  Mr. Oftelie.

11          MR. OFTELIE:  Good afternoon, Your Honor.

12          THE COURT:  Good afternoon.  I would have suggested that

13  you were in the role of batting cleanup, notwithstanding my

14  wife's advice not to use sports analogies, but since I intend to

15  go after you, I guess we will have you batting third in this

16  batting order.

17          MR. OFTELIE:  Well, Your Honor, I'm a Minnesota Vikings

18  fan, so I'm used to ending up last.

19      Your Honor, last week the Monitor and the Monitoring Team

20  filed a semiannual report with the Court on progress of the

21  collective work ensuring that policing services are delivered to

22  the people of Seattle in a manner that fully complies with the

23  Constitution and the laws of the United States.

24          THE COURT:  And you also need to slow down, otherwise

25  you're never going to get a transcript of this.

1          MR. OFTELIE:  Okay, Your Honor, as long as you want to

2     be here an hour.

3          We filed this annual report to further this collective work

4     ensuring that policing services are delivered to the people of

5     Seattle in a manner that fully complies with the Constitution and

6     laws of the United States and effectively ensures public and

7     officer safety and promotes public confidence.

8          The semiannual report filed with the Court was developed in

9     collaboration with stakeholders in the City of Seattle and charts

10     a series of actions and measures that not only build on progress

11     made over previous years but also move the City closer to full

12     and effective compliance with the Consent Decree.

13          To be certain, Your Honor, much progress has been made in

14     policing since the City of Seattle and the United States

15     Department of Justice actively partnered to enter a settlement

16     agreement in 2012.  At that time, Seattle entered the agreement

17     because it wished to ensure that its police department functioned

18     at an "exceptional" level, as quoted in the Consent Decree, and

19     that it had positive relationships with all its communities.

20          Over the past nine years, the Seattle Police Department has

21     increased diversity in its workforce, implemented new policies

22     and practices for use of force, de-escalation, and mental health

23     response, improved consistency of supervision and management,

24     adopted new accountability systems and analysis, such as the

25     Force Investigation Team and Force Review Board, and elevated

 1   transparency through leading-edge analytics and publicly

 2   accessible open data.  In addition, Seattle has designed and

 3   established the Office of Police Accountability, the Office of

 4   Inspector General, and the Community Police Commission to bolster

 5   these accountability measures and community engagement.

 6        Yet, Your Honor, to fulfill the vision of the community for

 7   sustainable change, more work needs to be done to not only

 8   rebuild community trust but also ensure constitutional and lawful

 9   policing as well as confidence by the community.

10        To activate this work, the Monitoring Team, in collaboration

11   with the parties, developed a new Monitoring Plan that was filed

12   with the Court and an assessment methodology to guide strategy

13   and action and measures this year.  I'll provide brief detail of

14   those four core areas that are ongoing work this year and

15   synthesize that for the Court.

16        First, the Monitoring Team and the parties are evaluating the

17   status of compliance with the Consent Decree, looking at use of

18   force, crisis intervention, stops and detentions, and

19   supervision.  Also looking at issues related to bias-free

20   policing and officer misconduct as they're closely related to

21   those other core areas.  The purpose, Your Honor, of the

22   compliance status update is to provide the Court and the Seattle

23   community with up-to-date information and evidence-based insight

24   on where the department stands across the areas that the Consent

25   Decree covers.

1    The second core area is around improving accountability.

2   Importantly, we're looking across two dimensions here.  The first

3   dimension is back-end accountability to ensure that the systems

4   for addressing officer misconduct and deficient performance are

5   fair, rigorous, unbiased, and thorough, and as such, the

6   monitoring plan requires the City to update the Court quarterly

7   and update the United States, City stakeholders, and the

8   Monitoring Team monthly on the status of these efforts.

9    In addition, we have a second dimension under accountability,

10  and that's front-end accountability, ensuring that policing is

11  aligned with community needs and priorities and therefore

12  democratically and publicly accountable.  Included in this is use

13  of force under crowd management, which, as all the parties know,

14  has been an area of concern since last year.  For this work, the

15  Office of Professional Accountability, the Office of Inspector

16  General, and a collaborative of City stakeholders are engaging in

17  several post-protest investigations, reviews, and a Sentinel

18  Event Review process that will seek to establish what transpired

19  and address systemic issues identified.  In addition, those

20  parties are working together to determine what changes,

21  revisions, or improvements should be made to Seattle's policies

22  relating to the use of force in crowd situations and the

23  operational management of protests and circumstances involving

24  large numbers of people.

25    I would like to say that, in addition, on these

 1    accountability areas, critically around front-end accountability,

 2    are innovations such as the Active Bystandership for Law

 3    Enforcement, or ABLE project.  The ABLE project was developed by

 4    Georgetown Innovative Policing Program and prepares officers to

 5    successfully intervene to prevent harm, avoid misconduct, and to

 6    create a lawful enforcement culture that supports peer

 7    intervention.  The program recognizes that having officers

 8    actively step in and prevent misconduct or potential harm by one

 9    of their peers can help avoid or mitigate bad outcomes in the

10    first instance.  And I'm happy to say that SPD to date has had

11    792 personnel complete this training and more is ongoing this

12    year.

13         The third core area of review, Your Honor, is around

14    providing technical assistance to support innovation and risk

15    management.  And within that area, the Monitoring Team is working

16    with SPD and the parties on an early intervention system to

17    identify potentially problematic trends in performance and help

18    prevent challenges before they arise, as well as an Officer

19    Wellness Initiative to help improve officer mental health,

20    well-being, and performance.

21         And the fourth and last in those core areas, in the

22    monitoring work this year, and as identified in the semiannual

23    report, is providing technical assistance to support reimagining

24    public safety.  The City is currently engaged in a process of

25    reimagining public safety and has recently issued a report on

 1   possible alternative response.  This is important and valuable

 2   work as it is a generally recognized principle that police are

 3   being asked to do too much, not only in Seattle but across the

 4   nation.  Alternative response innovations such as the HealthOne

 5   teams are key to providing better public safety and community

 6   resilience in the future.

 7       This reimagining public safety work will be beyond what the

 8   parties here, what the Monitoring Team, will be working on.  It's

 9   really generational work, as the City, the stakeholders, and

10   community members determine the form of outcomes they want from

11   public safety services, design those services, and then build the

12   capacity of the organizations to deliver.

13       It's important, though, to remember, Your Honor, that just

14   like the Seattle Police Department, these new services,

15   organizations, and solutions will need to be lawful and bias-free

16   and exceptionally trained to intervene in crisis situations, in

17   de-escalation, detainment, in use of force, in data collection

18   and in supervision, for just a short list of examples.  In this

19   way the foundation of constitutional policing built from the

20   Consent Decree acts as a springboard for this transformational

21   work and long-term culture change in Seattle, and it will

22   ultimately be up to the City to leverage learning from the

23   Consent Decree for the long-term future of public safety and

24   resilience.

25       As the Monitoring team and the City of Seattle do this work,

1    it's vital for the community to understand that the Consent

2    Decree is not only a foundation for constitutional and lawful

3    policing, but also a catalyst for the innovation that builds a

4    more effective and efficient policing and public safety

5    ecosystem.  In fact, while the Consent Decree provides clear and

6    measurable obligations, it also stipulates that Seattle has

7    flexibility to develop innovative local solutions.  And as

8    documented in the semiannual report, an array of work is being

9    done by the City of Seattle to not only put in place structures,

10   policies, systems, training, and supervision to ensure

11   compliance, but also to drive innovation in areas such as

12   bias-free policing, officer wellness, and community engagement.

13       Now, Your Honor, in the very present tense, I would also like

14   to outline early indications of progress as well as concern

15   within the context of these unprecedented times.  As we all know,

16   amidst the social upheaval that this country has been in, and as,

17   of course, the City of Seattle has experienced, brought about by

18   a global pandemic and generational civil rights uprising, public

19   safety, like every other aspect of the City, was turned somewhat

20   upside down.  While calls for help from the community and officer

21   proactivity understandably decreased during the pandemic,

22   emergency calls are now at or above prepandemic levels as the

23   world reopens.  This demand for services is occurring during a

24   staggering loss of a number of officers in a short period of

25   time, with over 300 officers having left the department and while

1   less than 100 have been hired during this same time.  While much

2   analysis and discussion still needs to be done, SPD's supervision

3   and review mechanisms continue under tremendous strain.

4        Reports are showing that SPD emergency response times are

5   increasing while reduced resources confront this increase in

6   emergency calls.  This includes high levels of gun violence and

7   homicide.  Public data shows response times for the most serious

8   calls are now close to prepandemic levels again.  And within all

9   this, there are fewer officers available to respond to calls.

10  But SPD has continued to decrease the use of force, which is a

11  good sign, down 28 percent compared to 2019 levels overall, and

12  down 15 percent when responding to a person in behavioral crisis.

13  In addition, when SPD does have to directly engage persons in

14  crisis, arrests are down 7 percent compared to 2019, and the use

15  of emergent detention is down 39 percent.  So there's some really

16  good indicators of early progress.

17       But it's also clear that while the department is working to

18  sustain this progress, it also has not lost sight of the need to

19  innovate and improve.  SPD continues to partner with researchers

20  around the world to better understand the effects of training on

21  use of force, decriminalization of drug use and possession, on

22  crime and disorder, also looking at the impacts of social

23  distancing and quarantine on domestic violence situations.  And

24  by the end of this year, SPD will be the first police service in

25  the United States to incorporate ideals and data around social

1    justice, equity, and accountability into their management

2    meetings, along with traditional crime statistics.

3           That all being said, Your Honor, it is also true that much of

4    the training, technology, and review systems implemented under

5    the Consent Decree cannot be sustained without necessary budget

6    and personnel.  SPD is at, what I would view, an inflection

7    point, and the actions and investments of the City will either

8    tip the department into a deepening crisis or lead the department

9    into a future in which it can sustain compliance and build trust

10   in constitutional policing.

11          As one small but important example of this, because of budget

12   cuts and loss of personnel, SPD is no longer able to activate

13   their microcommunity policing plans.  Essentially, there is no

14   community policing happening in Seattle.  All available officers

15   are generally now on patrol and in emergency response.  It's

16   estimated that SPD would need approximately 165 more officers to

17   be able to deliver true community policing.

18          Lastly, Your Honor, the semiannual report brings to light

19   that there's a robust ecosystem of organizations, including the

20   Office of Police Accountability, the Office of Inspector General,

21   and the Community Police Commission, that are supporting

22   community-based collaboration.  It's vitally important for

23   progress that these organizations continue to partner, to build

24   communications systems across partners and to work towards its

25   future, to root and grow their capabilities here in Seattle.  And

1    it's critical that the City not only invest in the future of

2    these accountability organizations but also invest in the

3    organizations, structures, systems, and people that the community

4    and SPD need today.

5         The results of the Monitoring Team's work in 2021 will help

6    the people of Seattle qualitatively and quantitatively assess

7    compliance with the Consent Decree, and the findings will then

8    help determine when and how the City of Seattle, the U.S.

9    Department of Justice, and the federal court will move toward

10   closure or require additional work ongoing.  The end-of-year

11   report will provide a full assessment of progress and compliance

12   with the Consent Decree and the steps necessary for 2022.

13        The Monitoring Team, Your Honor, looks forward to completing

14   this work effectively, efficiently, and legitimately for the

15   people of Seattle.

16        Thank you, Your Honor.

17            THE COURT:  Before you run off, I'm going to ask you the

18   same question that I asked Mr. Holmes.  At the risk of

19   misinterpreting the results of our recent municipal primary

20   election, where there seemed to be strong support for people who

21   have a more problematic view of the department, when, if it is

22   justified, will the Monitoring Team say:  You didn't do this

23   right and it needs to change?

24            MR. OFTELIE:  I think, Your Honor, this year, as part of

25   our work, we're doing a very rigorous analysis of SPD's actions

1  and its use of force, its management and operational processes,

2  the way it does its review, its training.  If we find in all that

3  research and analysis that SPD has fallen short in an area

4  relative to the Consent Decree, we will document that and make a

5  plan with them to address that issue.

6      I think the public, the community, needs to understand that

7  we're in the middle of that process right now, that we are

8  actively reviewing all of those areas, and that we are ready and

9  able to respond to problems that we, the Monitoring Team, finds.

10      THE COURT:  All right.  Thank you.

11      I'm going to exercise my prerogative, as the person who

12  convened this meeting, to go last.  I asked for updates from the

13  Department of Justice because I want to know where they are and

14  where they're going; I asked for it from the City of Seattle

15  because they are a party to this agreement and they are an

16  essential part of any changes that are to be made; the Monitor,

17  to give Dr. Oftelie the opportunity to talk about what they are

18  doing, which I think sometimes gets concealed under various

19  layers of effort, some good, some bad; the Seattle Police

20  Department and the Mayor and the City Council, all of whom, under

21  the charter, are in some manner represented by the City Attorney;

22  and what I consider to be the interested stakeholders in this:

23  the Office of Police Accountability, the Office of Inspector

24  General, and the Community Policing Commission.  It's not my

25  intention to come down hard on the CPC, but I think that given

1   some of the turmoil that's gone on in that organization, they

2   periodically reinvent themselves and start trying to exceed what

3   it is that's within their grasp.

4       When I meet with my fellow judges handling Consent Decree

5   cases in other cities, I tell them that this is the only case in

6   my docket which has two parties and nine points of view.  That is

7   often the case here.

8       I will spare you the history that I have written out because

9   it's largely been covered by other people.  This case was filed

10  July 27, 2012.  I would remind everyone that the terms of the

11  Consent Decree are not the Court's terms.  They were negotiated

12  between the City and the Department of Justice.  When I signed

13  them in the form of an order, they then became an order of the

14  Court, which must be obeyed.  We made a number of changes, which

15  I thought were positive, up through 2017, when the City Council

16  passed the Police Accountability Ordinance.

17      As I discussed with Mr. Sargent, the role of the CPC under

18  the Consent Decree was extremely, extremely limited.  It is now,

19  under the Accountability Ordinance, a commission of the City of

20  Seattle, not a party to this litigation, but I have tried

21  steadfastly to respect that their role is part of the City.  I

22  find it difficult to accept the implicit criticism that somehow

23  the Monitor owes a special duty to the CPC.  They are all owed

24  the same level of engagement, and that's what we hope to provide.

25      Going to January 2018, I indeed found full and effective

1   compliance outside of the five-year original prediction, but that

2   would have then triggered the two-year maintenance period, and at

3   that time I made a major caveat to that finding, which was the

4   Collective Bargaining Agreement, known as the labor contract,

5   principally with the Police Officers Guild.  What happened when

6   the new contract was unveiled was -- and this is in May of

7   2019 -- I orally ruled the City had fallen out of compliance, and

8   that was followed by a May 2019 order for a methodology to be

9   presented for assessing accountability, as in the accountability

10  regime, and how that would bring the City back into compliance.

11      By November, late November 2019, there was filed proposals

12  for a third-party assessment -- the City on December 13, 2019,

13  and the CPC on January 6th, 2020.  2020 brings us where we begin

14  our problems with the pandemic.

15      I would note that during the summer of 2019 both the City and

16  the Department of Justice rejected the Court's finding that

17  disciplinary proceedings were outside the scope of the Consent

18  Decree.  And, in fact, both the City and the Department of

19  Justice in the summer of 2019 were urging the termination of the

20  Consent Decree.

21      In light of the COVID-19 pandemic, which really started in

22  February of 2020, the tragic murder of George Floyd and the

23  breakdown in the Seattle Police Department crowd-control

24  procedures, the City, I think, found itself in a position of

25  having to withdraw its proposal to terminate.

 1       Since the Court set the current status conference date, I

 2   found it significant that the Monitor filed the 2021 semiannual

 3   report, which includes reports from various stakeholders,

 4   including the Mayor, and the City filed its quarterly

 5   accountability update.

 6       I was, I guess, not surprised to open the newspaper the other

 7   day and find an Op-Ed from Former Chief of Police Carmen Best

 8   with the provocative headline "Where is Seattle's plan to address

 9   crime and prioritize public safety?"  Chief Best went on to say,

10   "I knew the Council's actions and rhetoric would lead to an

11   exodus of good officers who could serve in another community with

12   greater support for the risks they take and the vital services

13   they provide."

14       It's not my job to engage in an analysis of politics, and I

15   will steadfastly attempt to avoid doing so, but in response to

16   the question of where is the plan, I can tell you how I view that

17   situation.  Frankly, the position of mayor is open.  There's an

18   election this fall.  We have two candidates.  And there has been

19   a statement made by Mayor Durkan that she does not want to tie

20   the hands of the new mayor.  As a result, significant decisions

21   are being postponed.  We have an interim police chief who is

22   doing the best he can, but he carries the word "interim" with all

23   the implications that go with that.  We have city council

24   elections featuring people who have different points of view of

25   how to proceed.  We have a city attorney election featuring

1   perhaps, most starkly, candidates from somewhat the left and

2   somewhat the right.  And as the CPC correctly notes, we have both

3   SMPA and SPOG collective bargaining negotiations coming up or

4   being engaged in right now.  And I will add, from my own point of

5   view, that we have a police department budget that has been

6   threatened by abolition, zeroing out, a 50 percent cut, a

7   20 percent cut, a 5 percent cut.

8       As I said earlier, my job is not to tell you what to do; it

9   is to ensure you did what you said you were going to do.  And I

10  take that obligation that the Consent Decree is an order of the

11  Court and it will be followed.  So here are some suggestions on

12  how we do so, strictly from the point of view of the Court.

13      The City, meaning the Mayor and other elected officials and

14  the City Council, need to be constructive, not destructive, to

15  progress.  I have seen too much of knee-jerk reaction and not

16  enough forethought.  We have to be vigilant in continuing to

17  reduce bias and disparities.  At the same time, we need to

18  recognize public safety is an imperative for all residents and

19  communities.  I can tell you I get lots of correspondence from

20  people saying "You can't abandon the police precinct.  They're my

21  police department."  There is, you know, an essential requirement

22  for public safety.

23      So the next steps for the City in terms of its elected

24  officials to help in this process is we need to develop a role

25  for the S.P.O.G., or SPOG, to advance the progress.  We have lots

1    of good innovation happening right now, more than I would have

2    imagined, and I'm delighted with it.  We have community groups

3    that are stepping up to attempt to transform an intervention at

4    an earlier stage with people who ultimately could end up in the

5    criminal justice system.  We're reimagining policing, not as

6    fast as some people would like, but things like the 911

7    transformation, the HealthOne program, those are things that the

8    City needs to encourage and allocate resources to scaling up

9    those new services and at the same time improving the Seattle

10   Police Department.  If we would do that -- and I'm not sure we

11   can with an election pending -- we would have a better police

12   department, we would have greater equity and inclusion, and we

13   would have a better City, and, most importantly, you would

14   finally be able to get rid of me.

15       Counsel, thank you for your attention today, and this hearing

16   is in recess.

17                        (Adjourned.)

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2

3      I, Nickoline M. Drury, RMR, CRR, Court Reporter for the

4   United States District Court in the Western District of

5   Washington at Seattle, do certify that the foregoing is a correct

6   transcript, to the best of my ability, from the record of

7   proceedings in the above-entitled matter.

8

9

10                    /s/ Nickoline Drury

11                    Nickoline Drury

12

13

14

15

16

17

18

19

20

21

22

23

24

25