

**Seattle**
Police Department

October 4, 2021

Dear Inspector Judge:

Let me start this letter by first noting the extraordinary work of your office in bringing together this sentinel event review (SER) panel, a first of its kind in Seattle, and my deep appreciation for the panel's willingness to move beyond surface observations and dive deep into the facts, circumstances, and perspectives that drove action and reaction over these painful months.  Headlines aside, a full read of the document reflects honesty, vulnerability, and a move towards healing in all of the many communities affected by the events of last summer, including the men and women of our department.  The report offers clear and considered recommendations, well grounded in the lived experience and expertise of those who served on and guided the panel.  In submitting for court approval last spring our revisions to our crowd management policy, we emphasized that while those revisions incorporated into policy and training lessons learned in the midst and immediate aftermath of the summer's protests, the reflections and recommendations of all of the OPA, OIG, and CPC reviews would serve to inform further reviews.  I am pleased both that many of the panel's recommendations have already been implemented and that we have in this report a solid blueprint to guide discussions in future iterations of what will always be an evolving practice.

I also want to express my deep gratitude to all who participated on the panel – to those in the community and to our officers and commanders who opened themselves up to reliving these events, and to the consultants and experts who guided them through the process.  The report reflects that from dialogue can emerge empathy, understanding and a renewed appreciation of the humanity of us all.

I write this letter in the spirit of providing you, other accountability partners, our city partners, the Department of Justice, our federal monitoring team, and the Seattle community at large with SPD's initial responses to the panel recommendations that flowed from Wave 1 of the SER.  In doing so, I remain mindful that, as we have discussed, these are panel recommendations; they are not necessarily OIG recommendations that have been vetted against best practice, deconflicted with the positions of others in the accountability structure, or socialized with others who may feel differently, particularly with regard to recommendations that hinge on staffing and resources.  These responses should accordingly be viewed as reflecting SPD's position, recognizing that implementation, where supported, may not be feasible.

Finally, before turning to the recommendations individually, let me highlight two specific initiatives that are already underway and cut directly to the heart of an underlying sentiment of the SER discussions.  First, I want to thank you for your early partnership in connecting SPD leadership and command with experts in the United Kingdom and across Europe to learn new practices, rooted in the psychology of crowd dynamics and driven by these countries' broader experience with riotous events, that have been proven a foundation for greater communication and understanding in the midst of, often, chaos.  Consistent with these discussions and aligned with several of the panel recommendations, SPD is well underway in establishing a "dialogue unit," modeled on the work of

the Stockholm Police Authority,[1] to foster greater communication and understanding between the police and those who gather before, during, and after events.  We look forward to continuing to work with you as this unit moves forward.

A second project is one of which I am particularly proud.  Grounded in principles of relational policing, SPD is launching a recurring, 45-day initiative for recruits, in advance of their Basic Law Enforcement Academy (BLEA) training, that will pull them out of traditional classroom training and immerse them in community-centered, peer-based, and introspective experiences that will provide them both a lens through which to receive their BLEA training and a foundation upon which to build healthy relationships and successful careers as Seattle Police Officers.  Structured to allow for a one-week particularized focus in each of Seattle's geographic precincts, programming will fall into three general "buckets" of learning:

- **Community Centered Dialogue and Learning:**  This module is built on the central tenets of relational policing: transparency; honesty; acknowledging mistakes and challenges; and collaboratively identifying areas for improvement and opportunities for growth.  Recruits will learn that every encounter is an opportunity to build trust and develop skills to engage respectfully in difficult conversations.  In addition to set topics relating to the history of policing in America and Seattle, officers will engage with and hear and learn directly from communities most impacted by policing, including currently and formerly incarcerated persons, persons who have experienced violence, immigrant and refugee communities, local business communities, and students.  Paired with Community Service Officers or members of the Collaborative Policing Bureau, recruits will walk beats in each of the precincts, meet with community organizations, demographic and precinct-based advisory councils, participate in volunteer opportunities, and learn about expectations, priorities, and challenges that may be unique to each precinct and its communities.  This module will also include learning in brain development and the impact of childhood trauma, poverty, addiction, and other societal stressors on many with whom officers will come into contact.

- **Wellness and Professional Development:**  An overwhelming body of research shows the psychological damage caused, acutely and cumulatively, by the vicarious trauma to which officers are routinely exposed, the undeniable interplay between mental health and physical well-being, and the impact of both on officer performance.  This module will include training on the neurophysiology of stress, identifying early warning signs, and tools to build resilience.  Recruits will learn about their own learning styles and gain an understanding as to how their own experiences may shape how they perceive and react to others.  Recruits will be introduced to existing trainings around wellness and peer intervention, including Active Bystander for Law Enforcement training, to give them the skills to intervene with themselves and others before their behavior may take them down a negative path.  Recruits will also be paired with volunteer "mentor" officers to help ease their transition into the department and the law enforcement

---

[1] https://static1.squarespace.com/static/5437a800e4b0137bd4ed4b13/t/594750011b10e3c4c96e684c/1497845774724/Dialogue_bok100630Webb.pdf

profession.

- **Public Safety "360":** This module will introduce to the administration and structure of the SPD and others in the public safety system. Recruits will meet members of both sworn and civilian command, will learn about different units within the department, and have opportunities to ride along with officers in each of the precincts. Recruits will hear from public safety partners, including prosecutors, public defenders, social services, and outreach programs. Particularly as public safety is re-examined, the goal of this module is to provide a welcome to the department and a baseline understanding of their roles in a more holistic model of public safety in Seattle.

We know that restoring and maintaining community trust is paramount to our ability to meet the public safety needs of this city, and we know that trust is only built – and the culture of policing changed – when there is true, meaningful, and ongoing dialogue between police and community. While it will always be iterative and fluid in design, I believe this initiative is a critical and long overdue first step.

It would be naïve, however, to ignore the reality that our ability to implement change hinges precariously on our budget and staffing, both of which have been under significant threat over the past 18 months. As we know from our experience over the past eight years of reaching compliance with our obligations under the Consent Decree, change, and a reform mindset, is not without continuing significant cost and support. While we have been successful in funding some initiatives through grants and the generosity of the Seattle Police Foundation and its donors, and while we continue to leverage a wide network of research partners to ensure the validity and integrity of our work, it is only with support of our city partners that we can fully meet our commitment to the community. It is my hope that, just as we take seriously the recommendations of this panel, so too will others whose collaboration and support is necessary to realize full implementation.

With that said, SPD's responses to each of the Wave 1 panel recommendations, including the status of implementation where appropriate, are as follows. Please note that, as several of the recommendations substantively overlap, where one recommendation has been answered with a descriptive answer, subsequent responses may simply reference back.

Recommendation 1: Enable better interaction with demonstration organizers in advance of protests, SPD should build legitimacy through expanded community Policing initiatives, including the expansion of foot patrols, and build deeper personal relationships between officers and individuals throughout the communities of Seattle.

- *In progress. This recommendation lies at the heart of both the dialogue unit and the pre-BLEA initiatives described above.*

Recommendation 2: Engage in direct and ongoing community dialogue to understand and adapt to the diverse community perspectives about the institution of police.

- *In progress. In addition to continuing in-service learning on the role of police in society (in partnership with the Seattle Holocaust Center), SPD is moving forward with training planned, pre-COVID-19, on the history and community perspectives of policing in Seattle (undertaken in partnership with the Northwest African American Museum and the Wing Luke Museum).*

Recommendation 3:  Alter SPD's strategy for policing protests to focus more explicitly and comprehensively on the facilitation of peaceful assembly and ensuring the safety of protestors.  The focus and mindset of SPD officers deployed to assist in crowd events should move away from "crowd management" "crowd control" and Law enforcement" to "facilitation of speech" and "crowd protection and safety."

- *In progress.  In addition to the Dialogue Unit described above, this recommendation aligns with the changes that were made, tactically, in the field, and which were subsequently incorporated into policy (Manual Section 14.090, and specifically the Crowd Management, Intervention, and Control matrix that outlines expected considerations) and training.*

Recommendation 4:   Embrace procedures that visibly signal SPD's commitment to ensuring the safe and peaceful gathering with the minimum necessary engagement of SPD officers, and limit that engagement to: promoting the ability of individuals and groups to express First Amendment freedoms;  protecting the physical safety of individuals within as well as beyond the crowd and preventing the destruction of public or private property.

- *In progress, and in line with the changes that have been incorporated into policy and training.  Further, recognizing that the appearance of officers may itself escalate tensions, SPD is purchasing new uniforms for officers serving in a frontline capacity to wear during crowd management events, specifically moving away (as circumstances allow) from what the community may perceive as more "tactical uniforms" to a more subdued appearance.*

Recommendation 5:   Modify SPD's tactics of crowd facilitation to prioritize communication, de-escalation, and carefully conducted removal of those who are creating an immediate danger to others or causing destruction or to property, allowing the rest of the event to continue undisturbed.

- *Implemented in part. In addition to the Dialogue Unit (in progress) and policy revisions (implemented) discussed above, SPD has also (responsive in part to prior OIG recommendations) purchased and is using a long-range acoustical device (LRAD), modified for use as a loudspeaker only, to ensure clear and audible communications during such events. This device has since proven effective in ensuring that all members of a crowd are able to clearly hear information and directions presented.*

Recommendation 6:   Modify SPD's policy on content neutrality to permit officers staffing a public event focused on issues of policing to demonstrate solidarity with the crowd participants' rights to protest if they chose.

- *Needs further discussion.  SPD understands and appreciates the perceptions and concerns underlying this recommendation.  At the same time, SPD has an obligation under law to maintain content neutrality in how it facilitates free speech and expression; modifying policy to allow officers to affirmatively engage in a manner that imparts personal viewpoint raises foreseeable challenges and legal complexities.  SPD would welcome any guidance from the OIG and the City Attorney's Office as to how policy might be modified in a way that meets the concerns underlying this recommendation without straying into potential legal complications.*

Letter – Inspector General Judge Re: Sentinel Event Review Wave 1

Recommendation 7:   Eliminate disrespectful statements or actions from SPD officers to individuals or groups protesting.

- *Implemented and monitoring.  SPD Policy is clear that such statements or conduct will not be tolerated. See Section 8.100 ("[t]aunts and insults are prohibited") and Section 5.001 ("The Department expects all employees to treat all people with dignity; remember that community care-taking is at times the focus, not always command and control; and that the guiding principle is to treat everyone with respect and courtesy, guarding against employing an officious or overbearing attitude and refraining from language, demeanor, and actions that may cause the individual feeling belittled, ridiculed, or intimidated.").  Guarding against such conduct is a key objective of the Active Bystander for Law Enforcement Training that, by the end of 2021, all eligible sworn members of the department will have completed.  SPD continues to emphasize not only the contours of these policies, but also to remind officers on how their actions – even those that may not necessarily fall within the scope of Title 5 – may be negatively construed during and after an event, and how such statements may further polarize police from the community.*

Recommendation 8:   Use live CCTV footage and mobile SPD officers, whether on bicycles or in other vehicles, to rapidly intervene with and address groups destroying property.

- *Needs further discussion.  SPD does not disagree that CCTV footage would be useful for such purposes; however, this recommendation raises considerations under Seattle Municipal Code Chapters 14.12 (Collection of Information for Law Enforcement Purposes) and 14.18 (Acquisition and Use of Surveillance Technologies) and would thus need City Attorney review and, potentially, legislative action.*

Recommendation 9:   Provide officers with clear direction about SPD's priorities in facilitating demonstrations, particularly when the institution of policing is the focus of the protest.  SPD's focus should be on facilitating access and safety for all.  SPD should enhance the ability to address dangerous situations with minimal impact on peaceful demonstrators while minimizing the use of munitions or indiscriminate force.

- *Implemented; see policy and training revisions.*

Recommendation 10: Pursue a differentiated approach toward individuals withing the crowd.

- *Implemented; see policy and training revisions.*

Recommendation 11:   Avoid the creation of immovable lines of officers at demonstrations and provide a mobilization plan for the deployment of bicycle or other mobile officers to ensure appropriate and rapid responsiveness to unplanned crowd events.

- *Implemented; 2021 training revisions focus on stabilizing incidents with rapid response rather than maintaining a prolonged police presence within the crowd.*

Recommendation 12:  Establish a staffing model for crowd events such that protests of the size and scale of the Westlake protests can be suitably staffed with mobile officers and other facilitation while minimizing SPD intrusion into the protest.

- *Concur. SPD's goal is to ensure adequate staffing at all events to support both crowd and officer safety without impacting ability to respond to emergent events throughout the city. However, as SPD experiences dire staffing shortages, its ability to meet this goal remains challenged. The Emergency Operations Center is also a necessary party to further discussions.*

Recommendation 13: Ensure that all SPD officers, not just those officers assigned to crowd facilitation teams are trained in crowd psychology, crowd facilitation, public safety procedures and tactics, and the mobilization techniques likely to be used at future crowd events.

- *Implemented; see discussion of policy and training revisions.*

Recommendation 14: Use mobile response units (e.g., bicycle or other vehicles) that are distinct from crowd facilitation officers or "dialogue officers" to address agitators or instigators of violence in the crowd. Mobile response units should remain out of sight and in reserve unless and until they are needed and engage in ways that permit individualized attention and minimize the impact on peaceful protestors and on the event in general.

- *Implemented and in progress; see 2021 policy and training revisions and discussion of the Dialogue Unit, above.*

Recommendation 15: Evaluate whether an encrypted standardized alert messaging system (e.g., WhatsApp, Yammer, or other technology) could replace radio communication during crowd facilitation events.

- *Need further discussion. SPD cell phones include tracking technology such that sergeants, lieutenants and commanders are more easily locatable, which is a GPS function native to these cell phones. SPD would defer to Seattle IT on whether additional applications, and the additional records they create, should be procured.*

Recommendation 16: Provide specific training, including scenario-based training on the management of large crowd events, and on the supervision of officers, for all SPD supervisors and above, including Incident Commanders and officers in the SPOC.

- *Implemented, to the extent SPD is able to do so without a dedicated training space. As SPD continues to seek City partnership in procuring an adequate training facility, SPD has patched together training solutions through contracts for privately-owned land, and – leveraging advances in, and the cost-efficiency of, virtual reality training – is exploring that as an supplement or alternative.*

Recommendation 17: Establish the Incident Command Post and communication lines to officers facilitating protests or demonstrations so that the Incident Commander can observe multiple events in different locations simultaneously and receive real-time updates about each event, from officers trained in supervision of crowd events who are physically present at each protest or demonstration.

- *Further discussion needed. While there are budget, technology, and Surveillance Ordinance constraints that come into play, SPD supports in concept identifying additional means of allowing for broader situational awareness.*

Recommendation 18: The Mayor's Office, SPD, SFD, the Department of Transportation and other departments should conduct appropriate scenario planning for disruptive protests. In particular the scenario planning should ensure that sufficient resources are deployed so that other SPD locations can protect and serve the people of Seattle in the event that public service from one or more of its buildings are disrupted by protest and ensure that sufficient public transportation exists to help protesters leave a protest where an unlawful assembly or curfew has been declared or a legal order to disperse has been issued.

- *Concur. While maintaining adequate resources to meet public safety demand continues to be a challenge, SPD will continue to work with other City and County departments to identify means of safety facilitating demonstrations in a manner that is least disruptive to those needing services. The Emergency Operations Center is a necessary party to this work.*

Recommendation 19: Avoid the deployment of officers in ways that prevent pedestrian/crowd movement or that separate individuals from other areas of protest without a clearly articulated safety rationale.

- *Implemented; revisions to policy and training provide direction to commanders to both avoid the use of fixed positions and, where fixed positions are necessary, to better articulate and convey safety and law enforcement concerns to the crowd.*

Recommendation 20: If short term closures of street or blockages of specific intersections are necessary for the safety of the crowd, SPD should ensure that its officers can adequately inform individuals in the crowd of the reasons for the blockages and provide them with adequate alternative options to continue moving.

- *Implemented in part; in addition to the use of the LRAD, which has proven effective in ensuring that communications are heard, SPD and the City are exploring the feasibility of leveraging the "Alert Seattle" and the communications network within the Emergency Operations Center to provide real-time information to the community.*

Recommendation 21: Ensure that all limitations on crowd behavior or conduct are designed to maximize the safety of individuals in the crowd, and that any communications about such limitations articulate that safety rationale in ways that emphasize LEED principles. Specific messages should be conveyed in simple, layperson terms that are accessible to all, and should be focused on explaining the public safety necessity of motivating the message.

- *Implemented and continuing; see discussion of policy and training revisions and communication, above.*

Recommendation 22: Improve SPD's capability to inform and communicate with demonstrators during group events in the following ways: 1. Multiple modes of communication should be considered, including audio, video, other visual media (e.g., posters, banners, etc.), social media, and others; 2. The modes of communication and specific messages should be included in the Incident Action Plan created by SPD prior to events and updated throughout the pre-event planning phase; 3. The communications should be documented and recorded during the event, including by having

officers certify their use on police radio that is retained by SPD; and 4. Their impact should be evaluated and specifically assessed in post-event review by SPD.

- *In progress. In addition to the emphasis on communications discussed in prior responses, SPD has embedded a Public Information Officer during certain events in order to accurately and efficiently provide updates to the media and the public. SPD is also exploring the use of more basic modes of communication, such as using physical, electronic signs.*

Recommendation 23: Procure a suitable audio devise to ensure that the crowd can hear messages relevant to the event.

- *Implemented; see discussion on LRAD, above.*

Recommendation 24:  Review SPD protocols related to the presence of batons and their use during crowd facilitation events, potentially eliminating their presence at such events unless justified by a specific and compelling public safety purpose.

- *Further discussion needed.  While SPD understands the history and optics of officers carrying batons, officers presently have no dedicated space to store batons when deployed, such that they would be easily accessible if needed.  Additionally, while SPD has long moved away from using batons as a weapon (as opposed to leveraging their utility as a bar to hold back crowds where necessary), SPD also cautions that a perhaps unintended consequence of recent City Council legislation may be a foreseeable increase in the presence of batons, in those circumstances where law enforcement action is needed to move a crowd.  That said, as a key component of recent policy and training revisions is to reduce to the extent feasible the need for fixed lines and to minimize the police presence in a crowd, SPD also submits that the goals of this recommendation may be largely met through reduced officer presence.*

Recommendation 25: In considering whether to use force during a crowd event, SPD officers must evaluate whether the use of force can be limited to those against whom the force is justified, and that the potential for collateral impact is minimized.

- *Implemented; while these considerations have long been a part of SPD's use of force policy, requiring that any use of force be reasonable, necessary, and proportional, policy and training revisions implemented in 2021 require greater articulation and consideration of alternative tactics.*

Recommendation 26: Limit arrests during protests targeted at the police to individuals committing immediate or imminent harm to people or property, and do not arrest individuals for offenses committed at an earlier time unless they can be accomplished in a way that will not escalate emotions in the crowd.

- *Implemented; see 2021 policy and training considerations.*

Recommendation 27: Identify a specific area for officers reporting for crowd facilitation duty to convene and leave their vehicles, providing a shuttle system for officers to and from the areas where they are deployed and supervision for the vehicles.

- *Implemented; planning for events includes identifying a secured staging area from which officers will deploy by alternative means.*

Recommendation 28: If exigent circumstances prevent an officer from parking a vehicle at the designated area, officers should notify the SPOC of the location of the vehicle(s), and a designated officer should move the vehicle(s) to a designated safe area.

- *Concur; SPD's goal, with the means available, is to eliminate unsecured parking areas.*

Recommendation 29: Ensure that any weapons or munitions brought to protests are securely stored and cannot be taken or used by anyone other than the officer to whom they were issued or other authorized SPD Personnel.

- *Concur; in addition to secured storage requirements, the use of secured parking areas will further address this concern.*

Recommendation 30: SPD officers attending protests should not leave rifles unlocked in unattended police vehicles.

- *Concur; in addition to secured storage requirements, the use of secured parking areas will further address this concern.*

Recommendation 31: SPD should invest in rifle cabinets with locks that cannot be easily breached by others.

- *Implemented; SPD has purchased new rifle cabinets and modified police vehicles with secure mesh cages to mitigate this concern.*

Recommendation 32: SPD should consider the utility of "bio locks" on all rifles to ensure that only the officer who is issued the rifle can fire it.

- *Needs further discussion; the utility of "bio locks" raises practical challenges.*

Recommendation 33: Implement a GPS system through the SPOC that allows incident Command to know the precise location of every officer, vehicle, and lethal munition deployed during a crowd event.

- *SPD currently uses approved technology, some native to department phones and vehicles, that allow for the tracking of officers and police vehicles.*

Recommendation 34: Seattle City Council should consider whether CCTV camera footage could be kept by a third party for a limited time, and accessible to SPD or other appropriate parties upon request for suitable public safety purposes, including the ability to track stolen police weapons that would pose an imminent danger to the community.

- *SPD supports this recommendation but defers to Council for a response.*

Recommendation 35: Ensure that officers are held accountable for securing their weapons at all times, and that violations of SPD policies on these matters are investigated and enforced.

- *Officers are expected to follow all department policies, training, and laws relating to the safe storage of firearms, and failure to do so may result in an OPA referral.*

Recommendation 36: The Mayor's Office and SPD leadership should critically examine the utility of a curfew and should exhaust other messaging options before declaring one. If a curfew is announced it should be limited in scope and clearly focused on public safety, rather than the deterrence of public protest.

- *Concur. SPD understands that curfews issued by the Mayor's Office are subject to input from the City Attorney's Office and follow the considerations set forth in this recommendation.*

Recommendation 37: Establish protocols to guide officer responses to property crimes occurring during significant public disorder events. These protocols would, among other things, establish clear guidance for officers on: a. When to disperse and when to arrest individuals who may be committing property crimes during civil unrest; b. How to conduct arrests of individuals who require prone handcuffing; and c. How to arrest individuals committing property crimes without escalating tensions between SPD and observers of the arrest.

- *Implemented in part and in progress. Existing training comports with best practice on the proper application of handcuffs, including of prone subjects. Expanded 2021 training further addresses considerations as to when dispersals, arrests, and property crimes should be addressed during a dynamic demonstration. The next iteration of defensive tactics training will include an updated module on knee positioning when using a prone handcuffing technique, which will reiterate and emphasize that proper positioning focuses body pressure across the large muscles of the upper back/shoulder, not the neck.*

Recommendation 38: Modify the policy and training for prone handcuffing to eliminate body weight pressure being applied above the shoulders of a subject being restrained.

- *See response to Recommendation 37.*

**Recommendation 39:** Implement staffing schedules, and provide officers with breaks, food and water, and pre- and post-event wellness initiative to help officers at crowd events - and especially at crowd events that are critical of SPD and policing - deal with exhaustion, stress, and primary or secondary trauma that might result from their participation at such events.

- *SPD has resolved issues relating to food and water provides wellness services that address stress, exhaustion, and primary and secondary trauma. However, the wellness of our officers remains among our highest priorities and our greatest challenges. As SPD continues to struggle with staffing, these challenges are unlikely to relax soon. SPD would welcome the OIG's support in encouraging City investment in its frontline workers to ensure that as an employer we are providing them with the time and tools they need to deal with the undeniable stress of their job.*

Recommendation 40: Monitor crowd activities from a sufficient distance that physical contact between SPD and protesters is not required or likely to unless an individual is an immediate physical danger to others.

- *Implemented; see discussion of policy and training revisions, above.*

Recommendation 41: Train bicycle officers not to arrest individuals for passive resistance techniques like "shoulder-checking" unless the officer(s) determine that the acts are clear, deliberate, and intended to substantially interfere with the ability of the officer(s) to perform his or her immediate public safety responsibilities.

- *Implemented. 2021 training revisions emphasize distance and monitoring of crowd activities to limit physical contact with attendees, including, when making a determination as to whether to take law enforcement action at that time, balancing the severity of the crime with the impact that immediate arrest may have on the crowd and event.*

Recommendation 42: When "leap-frogging" a protest, SPD officers should select alternative routes that minimize the likelihood of exposing officers or crowd participants to unnecessary risks.

- *Implemented in 2021 training revisions.*

Recommendation 43: When a crowd prevents safe movement of bikes without contacting individuals in the crowd, SPD bicycle officers should consider dismounting and walking with bikes physically placed between officers and crowd members to minimize agitation and physical contact.

- *Implemented in 2021 training revisions.*

Recommendation 44: SPD officers should improve their situational awareness, considering the relationship of their actions to the overall strategy and tactics of the event, and the support available to the officer(s) relative to the size of the event.

- *Implemented in 2021 policy and training revisions.*

Recommendation 45: Develop an arrest policy for each event and convey this to officers beforehand. Flexibility should exist in the tolerance of lower level misdemeanors balanced against the priority for ensuring the strategic goals of the operation.

- *Implemented in 2021 policy and training revisions and in the development of incident action plans.*

Recommendation 46: Communicate in advance when it plans to create barricades or restrictions to protesters or marches. The reason for the creation of such zones should be clearly articulated and driven by a public safety rationale.

- *Implemented in 2021 policy and training revisions and effected through use of the LRAD, as described above.*

Recommendation 47: Conduct appropriate scenario planning and provide enough resources so that other SPD locations can protect and serve the people of Seattle in the event that public service from one or more of its buildings are disrupted by protests.

- *See response to Recommendation 18, above.*

Recommendation 48: Construct barricades between protesters and critical pieces of the public safety infrastructure (e.g., the East Precinct) rather than using lines of officers.  Such barriers should strike a balance between protecting the integrity of the facility and preserving its accessibility to the public.

- *Such considerations, including the determination as to whether to barricade, factor into incident action planning and coordination with other City departments.  In general, 2021 revisions to policy and training emphasize a minimized officer footprint to the extent feasible, within law enforcement priorities.*

Recommendation 49: SPD Officers should be trained to realize that the existence of Personal Protective Equipment (PPE) or other defensive measures in a crowd of demonstrators, is not itself an aggressive measure requiring an escalating police response.

- *SPD training emphasizes planning and tactics that are driven by crowd behavior, not appearance.  SPD understands that the wearing of PPE, alone, should not be a factor in determining the police response.*

Recommendation 50: SPD incident commanders should maximize the buffer space between officers and the crowd whenever possible.

- *Implemented; see 2021 policy and training revisions and response to Recommendation 48, above.*

Recommendation 51: On-site incident commanders should carefully evaluate the context and threat from a crowd, with assistance from "dialogue officers" in the crowd.

- *Implemented in part; see 2021 policy and training revisions and discussion concerning the Dialogue Unit, earlier in this letter and in response to Recommendation 5.*

Recommendation 52: Consider the creation of dialogue officers to ensure effective, real-time, de-escalatory communication between SPD and Protestors.

*In progress; see discussion concerning the Dialogue Unit, earlier in this letter and in response to Recommendation 5.*

Recommendation 53: Ensure access to adequate supplies of OC spray to ensure that CS gas is never deployed due to a lack of access to other preferable or appropriate options.

- *SPD strongly supports this recommendation, and would welcome discussion, in light of competing perspectives. For purposes of context, SPD adds the following:*

   *While SPD  has seen in practice that the tactics, policy revisions, and trainings over the past 18 months have led to a near-cessation of confrontation between police and protestors, even as events continued since their peak over the summer of 2020, such that the use of force in crowd management events has all but ceased, in would be naive to imagine that this City will never again experience a situation where the need to effect crowd control through less lethal means arises.  (Consider, for example, the political tensions that have continued to fuel often*

> *violent clashes between opposing groups of protestors in Washington and other areas of the country.)*
>
> *<u>CS is, and has long been, the less-lethal option of last resort for riot control</u>. Of note, prior to 2020, the last deployment of CS, by SPD, for such purposes was over twenty years ago, during the WTO protests of 1999. As was discussed during the SER, the circumstances that led to its use in 2020 were in large part driven by the depletion of alternative resources. As a general principle of risk management and consistent with the use of force principles embedded in our Consent Decree requirements, having a greater supply, and more options, of less-lethal tools allows for threats to be mitigated at the least-intrusive level of the force continuum and ultimately decreases the likelihood that a higher level of force (such as CS) may become necessary. SPD has emphasized this point in response to recent Council legislation that limits not just the use, but the procurement, of less lethal alternatives, cautioning that an unintended consequence may be the escalation of events to a point where that higher level of force may ultimately become the only reasonable and necessary option to address imminent threats of harm.*

<u>Recommendation 54</u>: Implement OIG's guidance on the use of CS gas set forth in Review of the SPD Crowd Dispersal Policy and Less Lethal Weapons in response to Ordinance 126102.

- *Presently, SPD is bound under both injunctive and state law limitations concerning when CS gas may be lawfully deployed, including RCW 10.116.030 as enacted during the last legislative session, which requires authorization from, in Seattle's case, the Mayor.*

Again, thank you for the opportunity to engage on these important issues. As I hope our considerations and implementations to date evidence, we take seriously our commitment to ongoing critical review and demonstrating our ability to adjust to and innovate around the evolving landscape of demonstration management. As always, I appreciate your partnership and collaborative approach to ensuring that Seattle always remains at the leading edge of reform across all areas of public safety operations.

Sincerely,

Adrian Diaz
Chief of Police

CC:    Lesley Cordner, Asst. Chief Professional Standards
       Tom Mahaffey, Asst. Chief Patrol Operations
       Rebecca Boatright, Exec. Dir. Risk Management and Legal Affairs
       Andrew Myerberg, Dir. OPA
       Antonio Oftelie, Federal Monitor
       Julie Kline, Mayor's Office
       Lisa Herbold, City Council Public Safety Chair