

Internal Operations and Training Manual

Effective date: January 1, 2022
Last updated: October 25, 2021

## Table of Contents

Glossary of Acronyms and Abbreviations...................................................................... iii

**1.0    Introduction** .......................................................................................................... **1**
1.1    History.......................................................................................................... 1
1.2    Authority & Functions ................................................................................. 1
1.3    Independence ............................................................................................... 1
1.4    Vision, Mission, & Values .......................................................................... 2
1.5    Director and Staff ........................................................................................ 2

**2.0    Personnel Policies** ................................................................................................ **4**
2.1    Confidentiality ............................................................................................ 4
2.2    Conflicts of Interest..................................................................................... 4
2.3    Non-Retaliation ........................................................................................... 5

**3.0    Operations Policies** ............................................................................................. **6**
3.1    Contact & Hours of Operation .................................................................... 6
3.2    Accessibility and Interpretation Services.................................................... 6
3.3    Emergency Preparedness ............................................................................. 6
3.5    Information Management & Records Policies .............................................. 7
3.6    Training and Professional Development ...................................................... 9
3.6    Annual Report ............................................................................................. 11
3.7    Mobilization for Unusual Circumstances ................................................... 11

**4.0    Special Considerations** ..................................................................................... **13**
4.1    Employee Unions ........................................................................................ 13
4.2    Criminal and Other Sensitive Allegations................................................... 13
4.3    Contact with Complainants.......................................................................... 14
4.4    Complainants Represented by an Attorney .................................................. 14
4.5    Contact with Criminal Investigators ........................................................... 14
4.6    Contact with Prosecuting Authorities ......................................................... 14
4.7    Subpoenas .................................................................................................... 15

**5.0    Complaint Receipt and Intake** ......................................................................... **16**
5.1    Complaint Filing ......................................................................................... 16
5.2    Complaint Intake ......................................................................................... 16
5.3    Intake Investigation..................................................................................... 18
5.4    Classification............................................................................................... 21
5.5    Supervisor Action Process .......................................................................... 23

**6.0    Investigation Processes** ..................................................................................... **25**
6.1    Investigation Assignment............................................................................ 25
6.2    Investigation Timeline ................................................................................ 25
6.3    Investigation Planning ................................................................................ 26
6.4    Investigative Steps ...................................................................................... 27
6.5    Conducting Interviews ................................................................................ 28
6.6    Review and Evaluation of Evidence ........................................................... 33
6.7    The Report of Investigation ........................................................................ 33
6.8    Investigation Review and Certification........................................................ 34

**7.0**    **Investigation Findings** ........................................................................................ **35**

7.1    Issuance of Findings ........................................................................................ 35

7.2    Not Sustained Findings .................................................................................... 35

7.3    Sustained Findings ........................................................................................... 37

7.4    Notice of Missed 180-Day Timeline ............................................................... 39

7.5    Case Closing Process ....................................................................................... 39

**8.0**    **OPA Programs and Protocols** ........................................................................... **40**

8.1    Unsubstantiated Misconduct Screening .......................................................... 40

8.2    Criminal Referrals ........................................................................................... 40

8.3    EEO Screening ................................................................................................. 42

8.4    Mediation ......................................................................................................... 43

8.5    Rapid Adjudication .......................................................................................... 43

8.6    Bias Reviews .................................................................................................... 45

8.7    Monitoring Serious Incidents .......................................................................... 45

8.8    Appeals of OPA Findings ................................................................................ 46

## Glossary of Acronyms and Abbreviations

| | |
|---|---|
| **BWV** | Body-Worn Video |
| **CAD** | Computer-Aided Dispatch |
| **CAO** | City Attorney's Office |
| **CBA** | Collective Bargaining Agreement |
| **CCS** | Closed Case Summary |
| **CJIS** | Criminal Justice Information Systems |
| **CJTC** | Washington State Criminal Justice Training Commission |
| **COOP** | Continuity of Operations Plan |
| **CPC** | Community Police Commission |
| **DAR** | Disciplinary Action Report |
| **DCM** | Director's Certification Memo |
| **DOJ** | Department of Justice |
| **EEO** | Equal Employment Opportunity |
| **FIT** | Force Investigation Team |
| **FRB** | Force Review Board |
| **HR** | Human Resources |
| **ICV** | In-Car Video |
| **KCADR** | King County Office of Alternative Dispute Resolution |
| **KCPAO** | King County Prosecuting Attorney's Office |
| **MAR** | Management Action Recommendation |
| **NDA** | Non-Disclosure Agreement |
| **OIG** | Office of Inspector General |
| **OPA** | Office of Police Accountability |
| **PDU** | Public Disclosure Unit |
| **PII** | Personal Identifiable Information |
| **RA** | Rapid Adjudication |
| **ROI** | Report of Investigation |
| **SAN** | Supervisor Action Notification |
| **SPD** | Seattle Police Department |
| **SPMA** | Seattle Police Management Association |
| **SPOG** | Seattle Police Officers' Guild |
| **TSO** | Training Special Order |

**Office of Police Accountability**

**Notice**

Failure to comply, fully or in part, with any provision of the Office of Police Accountability (OPA) Manual is not to be construed to have a presumptive adverse effect on an OPA investigation and is not to be used as a means of challenging the findings or disposition of any complaint. The Office of Inspector General may apply OPA Manual provisions in its assessments of OPA classifications, investigations, and systemic audits.

The OPA Manual is subject to annual review and revision.

# 1.0   INTRODUCTION

## 1.1    History

The City of Seattle introduced civilian police oversight in 1992 with an independent civilian Auditor to review Seattle Police Department (SPD) internal investigations. The City extended this oversight in 2002 by creating a three-part civilian oversight system that included the civilian-led Office of Professional Accountability (OPA), the OPA Auditor, and a three-member OPA Review Board.

In 2011, following several highly-publicized incidents involving SPD uses of force, the Civil Rights Division of the U.S. Department of Justice, together with the U.S. Attorney's Office for the Western District of Washington, (collectively DOJ) launched a formal investigation into SPD's alleged pattern or practice of constitutional violations, including excessive force and discriminatory policing. The DOJ's investigation found that SPD had engaged in unnecessary or excessive force and expressed concerns about biased policing.[1] Further, the DOJ found that deficiencies in SPD training, policy, and oversight contributed to the constitutional violations. Following this investigation, in July of 2012, the City of Seattle signed a Settlement Agreement with the DOJ.[2] The agreement outlined specific requirements that SPD agreed to implement.

On June 1, 2017, the Seattle City Council passed an ordinance ("the Ordinance") to overhaul Seattle's police accountability system.[3] The Ordinance established a three-pronged oversight system comprised of the existing OPA (renamed the Office of Police Accountability), a new Office of Inspector General for Public Safety (OIG), and a permanent Community Police Commission (CPC). All three entities work to generate public trust in SPD by upholding a culture of accountability and adherence to policy and law.

## 1.2    Authority & Functions

OPA has authority over allegations of misconduct involving SPD employees relating to SPD policy and federal, state, and local law. While OPA does not conduct criminal investigations, it has jurisdiction over the administrative investigations into potential violations of federal, state, and local law. The office investigates complaints and recommends findings to the Chief of Police. OPA is led by a civilian Director and supervisors, while its investigations are carried out by a mix of civilian investigators and SPD sergeants.

OPA's core functions include:
- Establishing and managing processes to initiate, receive, classify, and investigate individual allegations of SPD employee misconduct
- Promoting public awareness of, full access to, and trust in OPA complaint processing
- Identifying SPD system improvement needs and recommending effective solutions
- Reducing employee misconduct

## 1.3    Independence

OPA is administratively within SPD but physically and operationally independent. This means, for example, that while SPD manages OPA payroll and assists with human resources, SPD does not have oversight of the office as a whole or the OPA Director, who reports to the Mayor rather than the Chief of Police. As a result, OPA executes its responsibilities in a neutral, non-political environment free from

---

[1] U.S. Dep't of Justice Civil Rights Div. and U.S. Attorney's Office for the W.D. Wash., *Investigation of the Seattle Police Dept.* (2011).
[2] *See* Settlement Agreement and Stipulated Order of Resolution, *U.S. v. Seattle*, No. 12-cv-1282 (W.D. Wash. July 27, 2012).
[3] *See* Seattle, Wash., Ordinance 125315 (June 1, 2017).

interference from any person, group, or organization.[4] Maintaining OPA administratively within SPD also ensures complete and immediate access to all SPD-controlled data, evidence, and personnel necessary for thorough and timely complaint handling. It further facilitates the assignment of sworn personnel otherwise employed by SPD to OPA. Although all leadership positions at OPA are held by civilian employees, some staff are sworn personnel who traditionally report to the SPD chain of command. While working at OPA, sworn employees take direction from OPA civilian leadership; not from SPD command staff or supervisors.[5]

## 1.4    Vision, Mission, & Values

OPA's *vision* is to safeguard a culture of accountability within SPD.

OPA's *mission* is to ensure the actions of SPD employees comply with law and policy by conducting thorough, objective, and timely investigations, and to drive best practices by recommending improvements to policies and training, and engaging in collaborative initiatives that promote systemic advancements.

OPA's *values* guide employee conduct and organizational culture in the pursuit of the OPA mission. These values include:
- Independent
  - Make decisions based on consistent application of facts, policies, and laws
  - Maintain neutrality and exercise impartial judgement
  - Ensure all viewpoints are heard and respected
- Transparent
  - Maintain honest and open communication with all stakeholders
  - Communicate process, reasoning, and conclusions
  - Remain accountable to vision, mission, and values, both internally and externally
- Collaborative
  - Build meaningful and cooperative working relationships
  - Solicit and value the community's perspective and expertise
  - Work with system partners to advance accountability and improve SPD policies and training
- Innovative
  - Set the national standard for police oversight agencies
  - Explore ways to improve processes and services
  - Use data and research to drive decision making

## 1.5    Director and Staff

The civilian OPA Director guides investigative processes, oversees alternative dispute resolution programs, classifies complaints, certifies the completion of investigations, issues recommended findings to the Chief of Police, and advises the Chief of Police regarding discipline. The Director also provides recommendations on SPD policies and training and publishes periodic and annual reports regarding OPA's work.

The OPA Director is responsible for the hiring, discharge, and transfer of OPA staff. All OPA staff, whether sworn or civilian, report to the OPA Director. The OPA Director may hire or appoint one or more employees to serve in the deputy or assistant director role.[6] These employees will perform those duties assigned to

---

[4] *Id.* § 3.29.105(C).
[5] Sworn OPA personnel take direction from the SPD chain of command when acting as a police officer outside of their OPA duties.
[6] Ordinance 125315, *supra*, § 3.29.100(B).

them by the OPA Director. The OPA Director has the discretion and flexibility to change work assignments and responsibilities to reflect and support the needs of the organization.

The OPA Director is selected based on criteria outlined in the Ordinance, is appointed by the Mayor and confirmed by a majority vote of City Council, and may serve up to three, four-year terms.[7] The OPA Director may only be removed for cause by the Mayor and, if so removed, is entitled to a full hearing before the City Council. The removal of the OPA Director must be approved by a majority vote of the full City Council.[8]

---

[7] *Id.* § 3.29.115(A) through 3.29.115(C).
[8] *Id.* § 3.29.115(F).

## 2.0    PERSONNEL POLICIES

OPA personnel are responsible for knowing and abiding by all policies in the SPD Policy Manual, in addition to those outlined below.

### 2.1    Confidentiality

OPA personnel must maintain the highest degree of confidentiality concerning matters related to OPA complaints and investigations. All OPA personnel are required to sign a confidentiality agreement. OPA employees, other than the OPA Director or their designee, are prohibited from disclosing or confirming to anyone outside of OPA whether a complaint has been made or an investigation is being conducted, including the identity of complainants and named and witness employees, unless required by OPA protocols or public disclosure laws. All media requests must be referred to the OPA Director or their designee. Only the Director or their designee may publicly comment about investigations.[9]

### 2.2    Conflicts of Interest

OPA investigators are sometimes tasked with investigating individuals whom they may personally know or may have previously worked with. All OPA personnel must exercise discretion in favor of recusing themselves from any process that might reasonably be expected to create a conflict or the appearance of a conflict of interest.[10] Any actual or apparent conflict of interest with the parties or subject matter involved should immediately be brought to the attention of an OPA supervisor. All OPA personnel are required to inform their supervisor of potential conflicts of interest when they begin their employment at OPA. This includes identifying SPD employees that are family members, close associates, and entities to which the investigators have a monetary and/or fiduciary relationship.

If OPA receives a formal complaint involving an OPA employee, the staff member processing receipt of the complaint will forward it to the OPA Director, who will assess whether there is a conflict of interest that prevents OPA from conducting the investigation. This assessment should be made as soon as practicable (within five days for sworn and 14 days for civilian employees) after OPA's receipt of the complaint, upon which OPA will provide written notification to OIG of OPA's conflict determination and the reasoning for the determination. If a conflict of interest is identified, OPA refers the complaint to OIG for investigation. Where a conflict is not identified and OPA chooses to investigate the case, OPA informs OIG of this decision in the written notification. Among the factors that should be considered in making this assessment are:

- Whether the conduct alleged occurred during the employee's assignment at OPA
- Whether there are other investigators without close ties to the employee who can conduct the investigation
- Whether an OPA supervisor can assess and approve the investigation impartially
- Whether the OPA Director can issue findings that will not be impacted by the employee's status

If the subject of the complaint is the OPA Director, the complaint will be forwarded to the City Human Resources (HR) Director for investigation. Where the subject of the complaint in an OPA supervisor, the OPA Director will either refer the case to OIG or, if OIG declines to investigate, forward the case to the City HR Director for investigation.

---

[9] Ordinance 125315, *supra*, § 3.29.105(C).
[10] SPD Manual 5.001-POL-18.

If OIG investigates any case involving OPA employees, the employees are entitled to due process and contractual protections consistent with applicable collective bargaining agreements (CBAs).[11] The Chief of Police is the final decider for findings and discipline for sworn OPA employees. The OPA Director is the final decider for findings and discipline for civilian OPA employees. None of the above precludes the OPA Director from taking remedial or disciplinary action for performance matters or other misconduct involving OPA employees that is not the subject of a complaint.

Where the Chief of Police is named in a complaint, the OPA Director consults with the Mayor's Office to identify whether OPA should conduct the investigation or whether it is necessary to assign the investigation to an appropriate City authority outside of OPA or an independent investigator. However, the OPA Director makes the final decision as to where the case will be assigned for investigation. If a former Chief of Police is named in a complaint, OPA may assert jurisdiction over that individual.

If a matter involving the Chief of Police or OPA staff member is being investigated outside OPA, a member of OPA leadership will consult with the outside investigator to ensure due process in accordance with OPA's policies and procedures.

## 2.3    Non-Retaliation

Retaliation in any form for reporting misconduct will not be tolerated.[12] If OPA personnel are made aware of facts indicating possible retaliation against a complainant, they must immediately notify an OPA supervisor to evaluate whether a new case will be opened. Similarly, OPA personnel must not take any action or fail to take any necessary action in retaliation for a person having provided information pursuant to an OPA complaint or otherwise participated in the complaint process. In all cases of reported possible retaliation, the OPA Director must be informed and has the sole authority to determine what action OPA will take in response.

---

[11] For non-represented civilian OPA employees, OPA and OIG will establish protocols to ensure due process and notice requirements are met.
[12] SPD Manual 5.002-POL-4.

## 3.0    OPERATIONS POLICIES

### 3.1    Contact & Hours of Operation

OPA is open to the public from 8am to 5pm, Monday through Friday, except on City-observed holidays or where other unique circumstances require the office to close. Notices of closures or other advisories are published on OPA's website. The main OPA telephone number is (206) 684-8797. Callers may leave voicemails during non-business hours. OPA's office and mailing address is:

Office of Police Accountability
720 3rd Ave, Suite 1800
Seattle, WA 98124

### 3.2    Accessibility and Interpretation Services

Federal, state, and municipal regulations require that OPA communicate effectively with people who have communication disabilities.[13] The purpose of these regulations is to provide equal access to OPA's services by ensuring that communications with people with communication disabilities are as effective as communications with others. To that end, OPA provides auxiliary aids and services, including interpreter services, when necessary to effective communication. These services will be provided at no cost to the individual requesting the service. To determine when and what auxiliary aids or services are necessary, OPA employees must give primary consideration to the requests of the person with the disability. Primary consideration means that, with certain limitations, the person's request for an accommodation will be honored unless another equally effective means of communication is available.

In addition, if an individual is of limited English proficiency and in need of interpretation services, OPA will provide those services at no cost to the individual.

If an OPA employee believes that the requested aid or service is unduly burdensome and/or another form of communication would be equally effective, the employee should raise the issue with the OPA Director as soon as possible for a final determination.

OPA investigators will determine, as soon as feasible and no later than during the first contact with the complainant or witness, whether an interpreter or other auxiliary aid or service is required. To the extent possible, OPA investigators should make this determination by asking each complainant or witness—verbally, in writing, through an interpreter, or otherwise—if they require any accommodations. This must be documented in the OPA case file.

While the Pacific Building, OPA restrooms, and OPA office are accessible to those with physical disabilities, OPA employees should prepare interview spaces to be user friendly (i.e., open doors, clear pathways), as not all disabilities are visible.

### 3.3    Emergency Preparedness

OPA will maintain a Continuity of Operations Plan (COOP) that provides guidance to ensure the continuity of essential office and oversight functions and minimizes the impact of an emergency on OPA personnel and operations. The COOP covers a range of emergencies, including pandemics, acts of nature, accidents, technological emergencies, and military or terrorist attack-related incidents.

---

[13] *See generally* Title II of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12131-12165 (2018), Washington State Law Against Discrimination, RCW 49.60.010 *et seq.*, *and* Seattle Municipal Code § 1406.010 *et seq.*

The essential services that OPA must maintain during an emergency, or within 72 hours of the disruption, include:

1. Receiving and processing complaints of SPD employee misconduct
2. Responding to and monitoring all officer-involved shootings and Type III use of force investigations
3. Conducting thorough and timely investigations of complaints

The COOP also includes:

- A designated line of succession in the occurrence the OPA Director position is suddenly vacated
- A designated alternate worksite when ordered by an SPD Incident Commander
- An inclement weather plan
- A list of OPA civilian personnel and the programs each manages
- A list rating the essential communication-related software, programs, and equipment

### 3.5    Information Management & Records Policies

A.  **Information security**

OPA restricts case files and network folders from unauthorized access. Paper files and archives are stored in a secured file room within the OPA office. Files may not be shown to any person outside OPA except upon approval from the OPA Director or their designee. OPA records must not be left unattended in areas accessible by non-OPA personnel.

OPA maintains electronic case files for all cases after 2014. Access to OPA records in the case management system is granted to OPA personnel and approved City personnel with Criminal Justice Information Systems (CJIS) security clearance. All user activity is logged in the case management system and includes the user's name, date and time of access, and description of the user's activity in the case file.

An OPA staff member designated by the Director is responsible for submitting requests to the SPD system administrator to grant additional access or change database user permissions. This staff member has database administration authorization to complete OPA-specific tasks, such as changing mailbox access, running advanced reports, and conducting statistical analysis that cannot be completed using the standard user interface.

B.  **Release of information**

Given OPA's obligation to exercise maximum transparency allowed by law and contract, the contents of OPA complaint and investigative case files will be released to the fullest extent permitted in response to requests from legal authorities or the SPD Public Disclosure Unit (PDU). All public records are presumed disclosable unless they fall within the specific exemptions of the Public Records Act or other statutes that exempt or prohibit disclosure of specific information or records.[14]

No individual other than the employee, OPA staff members, OIG, the employee's assistant chief, SPD Legal unit, or the Chief of Police may review an employee's OPA file without permission from the OPA Director, except pursuant to a court order or by other legal authority.[15] OPA does not release any original paper files; only electronic copies will be provided.

---

[14] RCW 42.56.240.
[15] Agreement by and between the City of Seattle and Seattle Police Officers' Guild ("SPOG Agreement") § 3.6(H), (2018).

An SPD employee or external law enforcement agency may request access to the investigatory portion of an OPA case file in which the employee was named. The request must be in writing. External agencies conducting background reviews on lateral applicants will be required to sign a Confidentiality and Non-Disclosure Agreement (NDA), as well as a release of information waiver signed by the employee. For employees requesting their own files, an NDA and Retaliation Admonition form must be signed. OPA staff will provide electronic copies of the files to the requesting party with the understanding that the files must be destroyed after use.

A copy of the investigatory portion of an OPA file may be released to an employee for whom a sustained finding has been recommended, their attorney, and/or their union representative in preparation for a *Loudermill* hearing.[16]

Where there is a public disclosure or discovery request for an OPA file, a copy of the entire file should be turned over to SPD PDU, the SPD legal advisor, or the Seattle City Attorney's Office (CAO) in response to the request. OPA staff members will not make decisions as to what material in a file should be released or withheld. SPD public disclosure staff is responsible for determining what information should be redacted, if any, and making such redactions.

OPA will furnish CPC with closed investigative files upon request and approval from the OPA Director. OPA will make necessary redactions in the files to remove CJIS data and information on involved juveniles before sharing the files. The preferred method of data sharing is through a secure, temporary OneDrive folder. Pursuant to the Ordinance, CPC is responsible for utilizing these documents and the information therein in an appropriate manner and bears responsibility for any privacy breaches that may occur.[17]

Access to limited OPA case data may be granted to additional parties with authorization from the OPA Director and SPD. External consultants, SPD technical staff, or authorized City personnel will sign NDAs prior to accessing OPA data or systems.

### C. Personal identifiable information

#### i. Employee personal information

State law and CBAs prohibit OPA from publishing or sharing personal identifiable information (PII) on SPD employees named in complaints.[18] OPA may be required to provide employee PII in response to a public disclosure request.

#### ii. Community member personal information

OPA staff enter community member information in the case management system and verify accuracy of existing information for community members, such as name, race, gender, email address, addresses, and phone numbers. Complainants are given the option of whether they would like their information that is provided to OPA disclosed or not disclosed, if applicable, in a public disclosure request. Upon obtaining this information, the OPA investigator must update the community member's role in the electronic case file to reflect their disclosure preference.[19]

---

[16] This informal meeting with the Chief of Police is named after a 1985 decision of the U.S. Supreme Court in *Cleveland Board of Education v. Loudermill,* 470 U.S. 532 (1985).

[17] Ordinance 125315, *supra,* § 3.29.380.

[18] PII is data that can be used to identify an individual; it includes data that may indirectly identify an employee when combined with other relevant data.

[19] If a complainant requests non-disclosure in an OPA investigation, their PII will be redacted in any public disclosure request pursuant to RCW 42.56.240(2). Police labor contracts require OPA to disclose the name of the complainant(s) to the named SPD employees and their union unless the complainant was filed anonymously. *See SPOG Agreement, supra,* § Appendix H.

OPA may use community member race and gender data for aggregate reporting. OPA may also use complainant contact information to conduct surveys or outreach aimed at improving internal processes.

D. **Record retention**

i. Case files

As of January 1, 2015, all case files, whether completed or open, are retained indefinitely in the electronic case management system.[20]

ii. Officer Card

An Officer Card is an electronic copy of an employee's OPA record accessed via a protected web application. It lists the OPA case number for each completed investigation, including allegations and findings. Complaints classified as Contact Logs and Supervisor Actions do not appear on an employee's Officer Card. OPA maintains an electronic index of all employees' Officer Cards. Officer Card files may be reviewed by SPD command staff during promotional reviews, by recruiters from outside police agencies, and by OPA staff during case reviews.

iii. Email

OPA staff must follow the City and SPD's guidance on email retention. As a general framework, the City's Records Manager recommends the following:

- **(7 yr) Programs_Projects:** Use for day-to-day administration of programs or special projects that do not involve investigations.
- **(10 yr) Investigations:** Use for investigations-related emails and records. The general retention for these types of records is six years after completion, but since investigations may last longer than one year, the seven-year does not adequately ensure the retention will be met.
- **(20 yr) Executive Management:** Only used by OPA Director for high-level policy and program administration. Records created at that level are often historically valuable, meaning that once the Director has left the City, they need to be transferred for preservation in the Seattle Municipal Archives.

iv. Work phones

OPA personnel must retain text messages and cell phone data concerning official OPA business and/or investigations and be able to produce those records pursuant to a public disclosure or other legal request. SPD Legal unit or CAO may require OPA personnel to sign declarations that a work phone has been searched in response to an information request. Departing OPA staff must either turn over their SPD-issued cell phone or provide relevant cell phone data for archiving.

## 3.6    Training and Professional Development

OPA supports the growth and continuous professional development of all sworn and civilian staff. OPA leadership will regularly assess each individual staff member's training needs, role within OPA, and interests to develop a training plan that will serve the employee and OPA. Supervisors will work with each direct report to implement the training plan and incorporate it into performance reviews. All staff are encouraged to have a growth mindset and seek out training and professional development opportunities through the City and external providers. Historically, OPA staff have participated in workshops, seminars, and conferences centered around leadership development, internal affairs best practices, interview techniques, forensic video analysis, and more.

---

[20] SPD Directive 13-00051.

OPA sergeants are required to view all SPD Training Special Orders (TSOs) and complete mandated training for sworn personnel through the SPD Training Unit and the Washington State Criminal Justice Training Commission (CJTC). OPA's civilian investigators are also expected to view all SPD TSOs and may be assigned to attend trainings held by the SPD Training Unit and the CJTC. Attendance at such training will be determined by OPA supervisors.

OPA is committed to educating civilian staff on the realities of policing and providing relevant and up-to-date training and education. Some civilian OPA personnel may observe and/or take part in SPD sworn trainings (e.g., crisis intervention, defensive tactics, firearms, crowd management, patrol tactics, etc.) to enhance their understanding of SPD as well as the application of SPD policy. Civilian personnel are also encouraged to participate in ride-alongs with SPD officers.

### A. Investigator training

OPA supervisors will oversee OPA employees' training to ensure it aligns with individual duties, organizational priorities, and the OPA Manual.[21] The supervisor of each new OPA investigator will assign an experienced investigator to serve as a mentor to the new staff member. The mentor will assist the new investigator in developing relevant skills and understanding OPA procedures. The new investigator will shadow the mentor and other OPA investigators as they conduct investigations and interviews. OPA supervisors will determine how long the new investigator should shadow the mentor. Civilian investigators without prior experience using SPD systems will require additional training from OPA sworn and civilian staff. Further, all new OPA investigators complete training on investigative interview techniques.

When possible, new investigators will perform intake functions for the first couple of months of their assignment. Focusing initially on intakes will help the new investigator gain competencies necessary for administrative investigations. This will also serve to expose the investigator to a variety of allegations and classification types and to increase the investigator's familiarity with OPA's systems and processes.

Training for new OPA investigators should address the following topics:
1. Relevant laws and policy
2. Police CBAs
3. Intake, complaint classification, findings, and discipline
4. Case management and tracking
5. Best practices in administrative investigations
6. Investigation planning
7. Communication with employees and complainants
8. SPD records management systems, computer-aided dispatch (CAD), and mobile data terminal (MDT)
9. Body-worn video (BWV), in-car video (ICV), and holding cell video
10. Collection and preservation of evidence
11. Writing case summaries
12. Overview of criminal investigation procedures
13. Use of Force – policy, reporting and review
14. SPD Equal Employment Opportunity (EEO) procedures and referrals
15. Interface with other law enforcement agencies
16. Civilian oversight of law enforcement in Seattle and elsewhere
17. OPA Mediation program
18. State law materials available through the CJTC, where applicable

---

[21] Ordinance 125315, *supra*, § 3.29.120(J).

The following topics should be covered in training for all investigators at least annually:
1. Interviewing skills
2. Investigation planning
3. Evidence analysis
4. Case law updates on use of force, search and seizure, stops and arrests, biased policing, and other topics frequently raised in OPA complaints
5. OPA Mediation and Rapid Adjudication programs
6. Selected topics such as crisis intervention, race and social justice, and de-escalation strategies

## 3.6    Annual Report

The Ordinance requires OPA to publish an annual report that describes OPA's work in fulfilling its purpose, duties, and responsibilities, as well as the OPA Director's recommendations for changes in policies and collective bargaining.[22] The annual report must include, but is not limited to, the following statistics and information:[23]
1. The number and percent of all cases by classification and nature of allegation received by OPA
2. The number and percent of all cases and allegations that were sustained and the specific disciplinary action taken in sustained cases
3. The number and percent of cases that were not certified as thorough, timely, and objective by OIG, including actions taken by the OPA Director to reduce the number of not certified cases
4. The number and percent of cases that were appealed, and the number and percent of these cases in which findings and/or discipline were changed, and the nature of those changes, as a result of appeals or for other reasons
5. The number and percent of all cases and allegations that were not sustained, and the categorization of all not sustained findings
6. The number and percent of all complaints handled directly by frontline supervisors, referred for Supervisor Action, management action, training, or alternative dispute resolution
7. The precinct, sector, and shift distribution of incidents resulting in complaints
8. The racial, ethnic, gender, and geographic distributions of complainants, to the extent this information is provided voluntarily by complainants
9. The racial, ethnic, gender, assignment, shift, and service seniority distributions of named employees who are subjects of complaints
10. The number of named employees who received two or more sustained complaints within one year
11. Patterns and trends in all OPA complaints, including year-to-year comparisons of demographic data that can help identify problems, deter misconduct, and inform SPD improvements
12. The accessibility, transparency, timeliness, thoroughness, responsiveness, and effectiveness of OPA and SPD processes

## 3.7    Mobilization for Unusual Circumstances

OPA personnel will not normally be directly involved in special assignments for disturbances, riots, or other unusual occurrences. However, it is possible that OPA sworn personnel could be requested or assigned to other non-OPA tasks in a significant or unforeseen occurrence. In this scenario, the OPA Director will grant the request where it does not undermine the operations of OPA or implicate public trust and confidence in the accountability system. If sworn personnel assigned to OPA do engage in SPD tasks outside of OPA, this will be considered in assessing conflicts of interest. Sworn OPA personnel must be prepared to take police action when necessary and are required to have uniforms and equipment available when working in the OPA office. Lockers are available for storage of uniforms, weapons, and other police

---

[22] Ordinance 125315, *supra*, § 3.29.145(F).
[23] *Id.*

gear. In the event of such a major occurrence, OPA sergeants will respond as directed by the SPD chain of command subject to the limitations set forth above.

## 4.0    SPECIAL CONSIDERATIONS

### 4.1    Employee Unions

Most SPD employees are represented by a union. OPA processes and requirements may vary based on which union the named employee is represented by. The majority of OPA complaints are against sworn police officers through the rank of sergeant who are represented by the Seattle Police Officers' Guild (SPOG). Though OPA investigates complaints involving employees represented by other unions, OPA may choose to default to SPOG's CBA requirements for complaint processing, as they are the most stringent.

OPA supervisors are responsible for ensuring that the office complies with the requirements of police CBAs. Supervisors will provide information and training to staff on the terms of the SPOG CBA, investigation timelines, and requirements for OPA notifications to named employees and the union. For cases involving SPD employees represented by a union other than SPOG, staff should refer to the applicable CBA for notification requirements, and OPA supervisors should discuss any special considerations or requirements to this in the investigation plan.

The other SPD employee unions include:

- Seattle Police Management Association (SPMA): Lieutenants and captains
- Professional and Technical Employees, Local 17: Many civilian administrative and technical employees
- Teamsters 117 Evidence Warehouse Unit: Community service officers, evidence warehousers

### 4.2    Criminal and Other Sensitive Allegations

SPD policy requires that all employees inform their supervisor if they are the subject, or believe they may be the subject, of a criminal investigation, criminal traffic citation, arrest, conviction, or court order.[24] SPD further requires employees to report when their Washington driver's license is expired, suspended, revoked, or restricted. The SPD supervisors must then report this information to OPA.

Although OPA conducts administrative investigations into criminal complaints, OPA does not have the authority to conduct criminal investigations.[25] Allegations of criminal conduct should immediately be brought to the attention of an OPA supervisor, who will ensure the OPA Director is notified in a timely manner. OPA is not required—but has the discretion—to send a notice of complaint to the named employee where potential criminal conduct is involved.[26] That decision will be made by the OPA Director and/or investigations supervisors. Information on processing and tracking criminal allegations can be found in OPA Manual section 8.2.

OPA may also learn of potential criminal conduct by an SPD employee while investigating a separate complaint. If this is the case, the OPA investigator must notify a supervisor and the OPA Director as soon as practicable. The OPA Director or their designee will assess the case and determine if a referral to a law enforcement entity is required.

While the contents of an open, ongoing criminal investigation are generally exempt from production under a public records request, OPA administrative investigations are not exempt under this rule unless the release of such information would adversely affect an ongoing criminal investigation. SPD Legal unit makes any

---

[24] SPD Manual 5.002-POL-8.
[25] Ordinance 125315, *supra*, § 3.29.100(G).
[26] *See SPOG Agreement, supra*, §§ 3.6(A); 3.7.

necessary determination whether the contents of an OPA file—as it relates to an active criminal investigation—may be subject to redaction.

## 4.3    Contact with Complainants

OPA provides written notice to complainants upon complaint receipt, classification, case closing, and appeal filing or decision, unless not feasible or where the circumstances of the case warrant not doing so. Each notice will inform the complainant of next steps in the process. Throughout the investigation, the complainant may track the complaint on OPA's website to view additional milestones within the investigation.

When feasible, OPA investigators will make first contact with the complainant within five business days of being assigned a complaint. The investigator documents the date and type of each contact attempted or made with the complainant in both the report of investigation (ROI) and electronic case file by making an entry in the case management system to properly reflect the type of contact attempted or made.

Care and compassion must be exercised with a complainant who may have a mental illness. The presence of a mental illness does not necessarily make an individual less able to perceive, recall, or report an incident. A complaint may be valid even if a person has difficulty communicating the essential facts. OPA personnel should assume that a person with a developmental disability, a neurological disorder, or a physical impairment that makes it difficult to communicate is as credible and reliable as any other person. OPA personnel must objectively consider all facts in deciding the weight given to an individual's testimony (*see* OPA Manual section 6.6 for information on evaluating testimonial evidence).

## 4.4    Complainants Represented by an Attorney

OPA staff should not contact a complainant directly if they are represented by an attorney in connection with the incident that resulted in the complaint. This is done to ensure the complainant's rights are fully protected. In these instances, OPA will only interview the complainant without their attorney present if the attorney and complainant have clearly authorized such an arrangement.

Where an attorney is actively representing the complainant on another criminal or civil matter involving SPD or the City of Seattle, the OPA investigator should seek approval from a supervisor prior to engaging in any substantive contact with the complainant.

## 4.5    Contact with Criminal Investigators

At the direction of the OPA Director or their designee, OPA staff may communicate with criminal investigators concerning an ongoing criminal investigation. However, in doing so, OPA staff will not disclose any *Garrity*-protected information.[27] OPA may coordinate with criminal investigators to ensure that both the administrative and criminal investigations are thorough, complete, and timely, and that OPA receives the complete criminal investigation file. OPA will not conduct criminal investigations or seek to direct criminal investigations.

## 4.6    Contact with Prosecuting Authorities

At the direction of the OPA Director or their designee, and if pertinent to an OPA investigation, OPA staff may contact a prosecuting agency to monitor the status of criminal charges pending against an SPD employee or clarify the status of criminal charges against a complainant.

---

[27] *See Garrity v. New Jersey*, 385 U.S. 493 (1967).

A designated OPA staff member maintains regular communication with CAO and the King County Prosecuting Attorney's Office (KCPAO) to provide notice of potentially exculpatory evidence that could be used to impeach a government witness, in accordance with the *Brady* rule.[28] OPA sends an initial notice to prosecutors after receiving allegations of potential bias, dishonesty, or criminal law violations involving SPD sworn employees. Upon completion of the investigation, OPA provides final notice to prosecutors of the case findings, generally within two weeks of case closing. OPA must also provide this information upon request to the U.S. Attorney's Office.[29]

For criminal complaints that are referred to a law enforcement agency, the OPA Director's designee will maintain communication with the investigating agency and/or prosecutor regarding the criminal case status to ensure that OPA is able to meet the 180-day timeline (*see* OPA Manual section 8.2(B)).

## 4.7    Subpoenas

OPA has the authority to issue subpoenas at any stage in an investigation to compel individuals to produce records, evidence, or testimony material to the investigation.[30] OPA's subpoena power is subject to, and limited by, the contractual agreements with SPD unions and/or City ordinance.[31] Any subpoena issued by OPA must be signed by the OPA Director or their designee.

---

[28] *Brady v. Maryland*, 373 U.S. 83 (1963). *See also United States v. Giglio*, 405 U.S. 150 (1972), *United Stated v. Bagley*, 473 U.S. 667 (1985), and *Kyles v. Whitley*, 514 U.S. 419 (1995).
[29] *See U.S. v. Henthorn*, 931 F.2d 29, 31 (9th Cir. 1991) (requiring the prosecution to review personnel files of officers upon defendant's request for production) *cert. denied* 503 U.S. 972 (1992). OPA provides officer discipline files to the U.S. Attorney's Office on request to facilitate review for potentially impeaching information.
[30] Ordinance 125315, *supra*, § 3.29.125(E).
[31] SMC 3.29.126.  For due process protections for individuals and complainants subject to subpoena, *see* SMC 3.29.245.

# 5.0   COMPLAINT RECEIPT AND INTAKE

## 5.1   Complaint Filing

Complaints may be filed by anyone, including any person who had an encounter with SPD or was the subject of police action, a third party (e.g., civilian witness, an individual's parent, spouse, etc.), a person's legal representative, an SPD employee, or an OPA supervisor. OPA also processes complaints forwarded from other City departments or community organizations, including the Mayor's Office, City Council, Customer Service Bureau, Office for Civil Rights, OIG, and CPC.

### A.  **External complaints**

External complaints are those received directly from the public or via an intermediary, such as another City agency. There are five ways members of the public can directly file a complaint with OPA: in person, by phone, in a mailed letter, via email, or through OPA's website complaint form. Complainants can choose to remain anonymous. In some cases, an anonymous complaint may limit OPA's ability to obtain relevant information that would aid the investigation and retrieval of evidence. However, this does not prevent OPA from conducting an investigation.

### B.  **Internal complaints**

Internal complaints are those initiated by an SPD employee or forwarded by an SPD employee on behalf of a community member. All SPD employees are required to report any alleged serious policy violations to a supervisor or to OPA and to assist any person who wishes to file a complaint.[32] OPA also receives internal complaints forwarded from the Force Review Board (FRB), Force Investigation Team (FIT), Collision Review Board, and SPD supervisors. The OPA Director or their designee may initiate a complaint based on a claim made against the City, litigation filing, media coverage of an incident, or any other source of information.

## 5.2   Complaint Intake

### A.  **Case creation**

OPA administrative staff review and record every contact made with OPA. A contact is an individual communication with OPA through one of OPA's channels of complaint filing. New contacts are reviewed on business days and undergo a preliminary screening process by OPA civilian supervisors. Contacts that are determined to involve complaints against SPD employees are entered into OPA's case management system.

When OPA receives multiple complaints about the same incident, OPA processes those complaints as a single case. If a duplicate case is created (same fact pattern, employees, and allegations) and both cases are assigned an incident number, the duplicate case will be closed as a Contact Log, indicating no further investigation should occur under that incident number. All associated records for the complaint should be linked to the primary case.

If a contact does not involve allegations of potential misconduct against an SPD employee, administrative staff enter the information into a designated bulk Contact Log file. OPA allocates specific case numbers in each calendar year to log contacts that fall outside of OPA's jurisdiction or are otherwise not identified as

---

[32] *See* SPD Manual 5.002. Serious policy violations are defined in 5.002-POL-5(a).

complaints by OPA leadership (e.g., 2021OPA-0001). OPA supervisors review Contact Logs to ensure that each was handled appropriately. Examples of contacts that might be designated as Contact Logs include:

1. Complaints against non-SPD employees, without an articulated complaint or potential SPD policy violation, or another eligible category as outlined in OPA Manual section 5.4(B)(i).
2. Crimes reported to OPA that fall within the jurisdiction of SPD or another law enforcement agency
3. Public records requests
4. Complaints against employees of City departments that were formerly part of SPD

For complaints that are best addressed by a different City department, OPA will forward the complaint to that office. Otherwise, OPA will provide the complainant with the information they need to proceed. If OPA determines that the employees named in a complaint do not work for SPD, OPA will refer the case to the appropriate agency. If the individual contacting OPA requested a police report or other records, OPA will provide them with information for filing a public disclosure request, as OPA is not at liberty to provide such records directly.

B. **Complaint receipt notices**

    i.   Notice of complaint to named employees

CBAs for sworn employees through the rank of captain require that OPA provide a notice of complaint to an alleged involved employee. For SPOG members, OPA is required to send this notification no later than five business days after receiving a complaint.[33] For SPMA members, this notice must be sent within 10 calendar days of receipt.[34] OPA sends notices for unrepresented employees and employees represented by other bargaining units consistent with the SPOG requirements.

OPA investigators or supervisors ensure that the notice of complaint is emailed to the alleged involved employee(s)—and copied to their unit captain/civilian equivalent and union—within the designated timeline. The notice of complaint will identify the named employee(s), complainant (if known or identified and not anonymous) and a general summary of the complaint.[35] A record of the notification is saved to the case file as evidence of the date and time the notice was sent.

If OPA cannot determine the identity of an involved employee within five days, the investigator will send a notice of complaint to SPOG and SPMA—or to the union that most likely represents the unknown employee—with the employee identified as "unknown employee." OPA does not need to notify anyone if the matter is believed to involve an unrepresented civilian employee (*see* OPA Manual section 4.1 or the appropriate CBA for represented civilian employees). If the unknown employee is later identified, OPA will send a notice of complaint to the employee within five days of the date OPA learned of the employee's identity.

    ii.   Complaint receipt notice to complainant

OPA's administrative staff send a complaint receipt notice to the complainant after the case is created in nearly all cases where OPA has the complainant's contact information. The notice includes the OPA case number and instructions for tracking the status of the case. Notices to complainants are sent by email or by postal mail when no email address is provided. If a complaint was filed anonymously but with a valid email address, OPA administrative staff should send a complaint receipt notice to the email address listed on the complaint. A record of the notification is saved to the case file as evidence of the date and time the notice was sent.

---

[33] *SPOG Agreement, supra,* § 3.6(A).
[34] Agreement by and between the City of Seattle and Seattle Police Management Association ("SPMA Agreement") § 16.4(B), (2017).
[35] *See SPOG Agreement, supra,* § Appendix H.

Where OPA receives numerous complaints about an incident, including from third-party complainants, and outreach to complainants individually is not feasible, OPA is permitted to issue the notice of complaint in a manner purposed to reach all complainants at once (e.g., social media, website), rather than sending each complainant a separate complaint receipt notice.

## 5.3    Intake Investigation

After OPA administrative staff enter a complaint into the case management system, a supervisor reviews it and assigns the case to an investigator for preliminary investigation. Nearly all complaints that contain a plausible allegation of misconduct involving one or more SPD employees undergo a preliminary investigation, referred to as the intake investigation.[36] To avoid bias, investigators are required to notify their supervisors of any potential conflict of interest that may compromise the integrity of the investigation (*see* OPA Manual section 2.2). Investigators should endeavor to complete the intake investigation in around 20 days in order for the complaint to be classified by day 30.

The intake investigation should answer relevant factual questions and ensure the collection and preservation of time-sensitive evidence. It should include, but is not limited to, information such as:
- Who was involved or present?
- What happened?
- Where did it happen?
- When did it happen?
- How did it come to light?
- Is there evidence, including perishable evidence, relevant to the complaint (cell phone video, etc.)

OPA investigators should follow up on any written statements submitted by complainants by making direct contact with the complainant and conducting a recorded interview, when possible. Where this does not occur and/or when declined by the complainant, the investigator should document the reason in the case file. Any additional information obtained during this interview should be evaluated in concert with the original complaint when assessing the allegations and involved employees.

### A.   Contacting the complainant

OPA personnel must comply with OPA procedures if they determine a complainant requires a translator or other auxiliary aid or service (*see* OPA Manual section 3.2). To the extent possible, OPA investigators should make this determination by asking each complainant or witness—verbally, in writing, through an interpreter, or otherwise—if they require any accommodations.

OPA investigators should attempt to contact the complainant within five days of receiving the intake assignment. As a rule, investigators should make three attempts to contact a complainant before proceeding with the intake investigation without an interview. This contact may be by phone, email, or in person. OPA may attempt to reach a complainant by postal mail when no other contact method is provided or available in SPD records of the incident.

If the only known contact information for a complainant is a phone number, OPA investigators will attempt to reach them at that number. When possible, investigators will leave a voicemail and will vary call times to increase the possibility that the complainant can be reached and interviewed. During the call, investigators should seek to obtain or verify the email (preferred) or mailing address for the complainant.

---

[36] In some instances, OPA may not assign a complaint for intake, such as if the complainant is clearly suffering from a mental health crisis and/or based on other preliminary steps taken by OPA investigators at the instruction of OPA's civilian supervisors to obtain clarifying information regarding the potential allegations.

Investigators must notify OPA administrative staff if a new contact address is identified for a complainant to ensure future complainant notices (*see* OPA Manual section 4.3) can be sent.

Investigators should document the date and type of each contact attempted or made with complainants in both the ROI and in the case management system. In the ROI, investigators should provide sufficient detail for the quality and nature of the contact to be assessed. If OPA does not have valid contact information or is otherwise unable to contact a complainant, it should be documented in the ROI.

Sometimes complainants do not wish to be interviewed, in which case investigators will try to gather the necessary information from the complainant via email, including a written statement, if possible. In some instances, a complainant may decline to participate in the investigation after submitting their complaint. OPA will continue to investigate the complaint without further participation by the complainant, provided there is sufficient information to proceed.

i.   Pre-interview steps

Complainants must be offered the option of an in-person interview.[37] The investigator should ask the complainant if they prefer to be interviewed at the OPA office, by phone, or online. The investigator can also interview the complainant at a location that is more accessible and convenient for the complainant, but this should be screened with a supervisor. Prior to conducting a phone interview, the investigator should ask the complainant whether any witness to the incident is currently with them. If so, the complainant should be asked to conduct the interview in private as a means of minimizing the chance of influencing the other person's interview. The intake investigator will attempt to obtain the complainant's permission to audio record the interview for purposes of accuracy and transparency.

At the beginning or end of the initial conversation with the complainant, the investigator should collect the below information on a voluntary basis (if the interview is audio recorded, this information should be collected either prior to starting the recording or after the recording has concluded). Investigators should ask for this information in such a way that the person clearly understands why it is being sought (to be able to have future contact and for statistical purposes) and that providing it is completely voluntary. After the interview has concluded, the investigator should enter and/or update the information in the complainant and witness entity profiles in the electronic case file, including:
- Full name
- Date of birth (or age)
- Race/Ethnicity
- Gender identity
- Email address
- Street address (and mailing address, if different)
- Phone number(s)
- Complainant disclosure preference (yes or no)

As a general matter, none of the above information, except the complainant's name, should be included in any OPA investigative document or audio recording. This does not preclude demographic information from being referenced in the OPA investigation or findings where it is relevant to the allegations being assessed, such as biased policing.

ii.   During the interview

The complainant should be asked to describe what happened, where and when, and to provide any other information they may have describing the named employee(s), whether there were witnesses who could be contacted, and any other evidence that might assist the investigation. The investigator will attempt to obtain

---

[37] Ordinance 125315, *supra*, § 3.29.125(B).

any relevant photos, private video, text messages, or other evidence from the complainant. If an injury was reported, the investigator will ask the complainant if photos may be taken and/or whether they will sign a form authorizing the release of medical records for the treatment of the injury to OPA.

### B.  Gathering evidence

It is important that investigators recover and preserve any perishable evidence at the earliest opportunity, especially if there has been a time gap between the incident and the complaint. Investigators should ask complainants and witnesses whether any private evidence exists (texts, photos, videos, social media posts, etc.), request that they be downloaded or saved, and inquire how OPA can obtain originals or copies. In addition, investigators should gather relevant documentary and physical evidence, including 911 and communications audio, CAD records, precinct or unit logs, incident and arrest reports, BWV, ICV, use of force reports, jail booking records, traffic or parking infractions/citations, and other relevant documentation of the incident. In some instances, a site visit is appropriate for the investigator to assess or photograph the scene. If circumstances make it impossible to obtain or review certain evidence during the intake investigation (e.g., obtain a video or interview a witness), the investigator should record this information in the intake follow up report.

All evidence should be saved to the investigator's own folder for backup and uploaded to the electronic case file. This should be done in such a manner that the case file can, on its own, provide the basis and supporting documentation for the findings ultimately reached.

### C.  Complaints eligible for alternative dispute resolutions

#### i.  Mediation

Information on mediation, including eligibility criteria, can be found in OPA Manual section 8.4. If the investigator believes a complaint may be well suited for mediation, it should be discussed with a supervisor during the intake investigation. For complaints that are eligible for mediation, the investigator or other OPA representative should inform the complainant of the mediation process and ask if the complainant would be interested in this option if the case is selected for mediation. Investigators should not ask the complainant if they would be interested in mediation if the complaint does not meet the mediation eligibility criteria. The investigator should note in the intake follow up report whether the complainant expressed interest in mediation, or the reason mediation was not discussed.

#### ii.  Rapid Adjudication

Information on Rapid Adjudication (RA), including eligibility criteria, can be found in OPA Manual section 8.5. The intake investigator may recommend the RA option in the completed intake follow-up report and case routing to a supervisor (which happens at or around day 20). OPA completes an intake investigation even for cases that are considered for RA. The supervisor, in consultation with the OPA Director, is responsible for deciding whether a case is appropriate for RA. The supervisor and OPA Director may suggest RA or consider an employee's request for RA prior to complaint classification.[38]

### D.  Completing the intake investigation

The intake investigator should endeavor to complete the intake investigation and route the case to a supervisor for review within 20 days after OPA receives the complaint, unless otherwise extended by up to 5-8 days by a supervisor. This information will be documented in the case file. Due to certain notification requirements contained in the City's contracts with employee unions, the intake investigation must be completed in a timeframe that allows OPA to make a classification decision and send contractual notice within 30 days from the day OPA initiates or receives the complaint.

---

[38] *See SPOG Agreement, supra,* § 3.11(B); *SPMA Agreement, supra,* § 16.8(B).

## 5.4    Classification

### A.   Intake review

A supervisor reviews the intake investigation and determines the specific allegations by assessing whether any laws or SPD policies would have been violated if the alleged actions are later proven to be true. The supervisor records each allegation and the corresponding SPD policy directive in effect at the time of the incident that resulted in the complaint. A single complaint may contain multiple allegations of misconduct against one or more employees.

The supervisor also determines whether the correct employees were added to the case and, if necessary, adds or removes employees to ensure that the alleged misconduct identified by the complainant is addressed.

### B.   Classification types and definitions

The supervisor, acting in their capacity as the Director's designee, determines how the complaint is classified. Expedited Investigations are only classified as such if OIG approves the classification decision and certifies the case as thorough, objective, and timely.

#### i.   Contact Log

A case may be classified as a Contact Log under the following circumstances: (1) The complaint does not involve a potential policy violation by an SPD employee; (2) there is insufficient information to proceed with further inquiry; (3) the complaint is time-barred under the contractual statute of limitations; (4) the complaint has already been reviewed or adjudicated by OPA and/or OIG; or (5) the complaint presents fact patterns that are clearly implausible or incredible, and there are no indicia of other potential misconduct.

#### ii.   Supervisor Action

The complaint generally involves a minor policy violation or performance issue that is best addressed through training, communication, or coaching by the employee's supervisor.[39] In these instances, OPA sends a memo mandating the employee's supervisor to take specific, relevant action with the employee. The supervisor has 15 days to complete the action and return the case to OPA for review. Upon request by the supervisor, OPA may extend the deadline for completion. OPA may not classify allegations of excessive force, biased policing, and violations of law for Supervisor Action.[40] In some cases, OPA may issue an "FYI" Supervisor Action for a complaint deemed unfounded through the intake investigation that does not meet the criteria to be closed as a Contact Log. In these situations, OPA directs the chain of command to take no action other than informing the named employee of the complaint's closing.

#### iii.   Investigation

The complaint alleges a violation of SPD policy or other category of violation that OPA is required by law and policy to investigate.[41] In these instances, OPA conducts a comprehensive investigation (e.g., gathering additional evidence, interviewing involved parties and/or witnesses, etc.) and issues recommended findings. An OPA Investigation can result in formal discipline.

---

[39] Minor policy violations are defined by SPD Manual 5.002 and OPA classification precedent. Examples of cases generally classified as Supervisor Actions under OPA's classification precedent include non-intentional failures to activate body-worn video, minor driving issues, minor paperwork deficiencies with no prior similar conduct, and missed trainings with no prior similar conduct.
[40] Ordinance 125315, *supra*, § 3.29.125(A).
[41] *Id.*

iv.   Expedited Investigation

The complaint alleges a violation of SPD policy or other category of violation that OPA is required by law and policy to investigate.[42] However, OPA, with the agreement of OIG, determines that findings can be reached based on the intake investigation, and no further investigation needs to be conducted. In cases classified for Expedited Investigation, OPA will generally not interview named employees but may interview witness employees. Per CBAs, if OPA does not interview a named employee, allegations against them cannot be sustained. This classification may be appropriate if: (1) the evidence shows that misconduct did not occur as alleged; (2) minor misconduct occurred, but OPA deems corrective action via a training referral, rather than discipline, to be appropriate; or (3) minor misconduct may have occurred, but there is a systemic issue with SPD policy or training for which OPA deems a Management Action Recommendation (MAR) to be appropriate.

An Expedited Investigation classification should not be utilized for cases where one or more of the following are present: (1) a lack of video depicting relevant and material issues of fact or elements of the alleged misconduct; (2) multiple unrelated allegation types involving two or more named employees;[43] (3) complex or confusing fact patterns; or (4) cases involving matters of significant public concern.

Where an Expedited Investigation is contemplated for the purpose of issuing a training referral, the following elements must be met: (1) the policy violation is minor; (2) the conduct was self-reported or timely identified and addressed by the chain of command; (3) the officer acknowledged responsibility for the violation; and (4) the employee does not have a history of similar sustained violations or other significant disciplinary issues.

Where an Expedited Investigation is contemplated for the purpose of issuing a MAR, the following elements must be met: (1) there is a clear gap in policy and/or training or a pattern of officer behavior that suggests a systemic practice; (2) the conduct at issue is a result of a gap in policy and/or training or consistent with the identified systemic practice; (3) there is no evidence indicating willful misconduct; and (4) the matter is best addressed with a MAR.

v.   Mediation

The complaint involves a misunderstanding or conflict between an SPD employee and a community member that may be suitable for resolution via a face-to-face discussion by the involved parties. Mediation is voluntary and can only occur if both parties agree to participate. It is an opportunity for the employee and community member to discuss the conflict with the guidance of a neutral, third-party mediator. If the mediator reports that the employee participated in good faith (listened and participated respectfully), the complaint will not appear on the employee's disciplinary record.

vi.   Rapid Adjudication

The complaint involves a minor to moderate policy violation that the named employee recognizes was inconsistent with policy. The employee is willing to accept discipline in place of undergoing a full OPA Investigation.

C.  **OIG classification certification**

OPA routes cases that are recommended for partial or full handling as Expedited Investigations to OIG for simultaneous classification review and investigation certification. If OIG concurs, they attach a

---

[42] *Id.*
[43] This does not preclude specific allegations within these cases from being proposed as Expedited if appropriate under the circumstances.

Certification Memo to the case file and route it back to OPA. If OIG does not concur, an Expedited Investigation classification cannot be used. The complaint is typically classified for full OPA Investigation.

Per the Ordinance, OIG will audit random samples of OPA classifications unless OIG determines, based on an assessment of risk, that individual review of classifications is warranted.[44] In such scenarios, OIG will identify classification types that OPA must provide for individual review. OPA will route the intake investigations to OIG with sufficient time for the intake and proposed classification to be assessed.

### D. **Classification notices**

#### i. 30-day notice to named employees

CBAs for sworn employees through the rank of captain require that OPA provide a classification report ("30-day notice") to the involved named employees. The classification report will identify the complainant and named employee(s), include a factual summary of the underlying incident and allegations against the named employee(s), the SPD Manual sections implicated, and OPA's classification for the complaint.[45] OPA administrative staff and/or supervisors ensure that the 30-day notice is emailed to the named employees—and copied to their unit captain/civilian equivalent and union—within the designated timeline. A record of the notification is saved to the case file as evidence of the date and time the notice was sent.

If OPA's intake determines that an alleged involved employee was not involved in the underlying incident or was instead a witness to the incident, OPA sends a notice to the employee to disregard the notice of complaint ("disregard notice"). Witness employees may still be called in for OPA interviews.

If an employee is still unidentified at the time of classification, OPA sends the 30-day notice to the union most likely to represent the unknown employee. OPA notifies the union by day 60 if the employee is still unknown, from which point the 180-day timeline is held in abeyance if the employee were to later be identified.[46] If the unknown employee is later identified, OPA will send a notice of complaint and a classification report to the employee within five days of the discovery. The tolling pertains to the portion of the case involving the unknown employee; the remainder of the case continues to be governed by the applicable contractual timeline.

#### ii. Classification notice to complainant

OPA sends a classification letter to the complainant after the case has been classified. The classification notice is sent by email or by postal mail when no email address is provided for the complainant. If a complaint is submitted anonymously but an email address is provided, staff should send the complaint receipt notice to the email address listed on the complaint. A record of the notification is saved to the case file as evidence of the date and time the notice was sent.

## 5.5   **Supervisor Action Process**

If a case is classified for Supervisor Action, OPA administrative staff prepare a Supervisor Action Notification (SAN) to be transmitted to the employee's chain of command under the direction of OPA supervisors. The SAN mandates specific action, such as contacting the complainant, counseling the employee, and/or assigning relevant training to the employee. In addition, OPA may direct that a certain topic be addressed at a roll call if the topic is believed to be beneficial for all precinct officers. The chain of command has 15 days to take the recommended action, document it in the case file, and return it to OPA. OPA staff follow up with the chain of command on overdue Supervisor Actions. Once returned to OPA,

---

[44] Ordinance 125315, *supra*, § 3.29.250(A).
[45] *See SPOG Agreement, supra,* § Appendix H.
[46] *Id.* § 3.6(B)(1).

administrative staff review the chain of command's report to make sure the directed actions were completed as required. If additional information is still needed, administrative staff will notify OPA supervisors for appropriate follow up. OPA administrative staff ensure the chain of command's report and/or any performance record associated with the Supervisor Action is uploaded to the case file.

# 6.0    INVESTIGATION PROCESSES

## 6.1    Investigation Assignment

If the complaint is classified for full Investigation, a supervisor assigns the case to an investigator. The supervisor may consider various factors when making case assignments, including investigator subject matter expertise and workload. However, if possible, OPA will assign the investigation to the same investigator who conducted the intake. Investigation assignment is aligned with contractual agreements. For example, if one of the named employees is of a rank higher than sergeant, the SPMA contract requires that an investigator of equal or greater rank conduct the interview.[47] In these cases, an OPA supervisor will work with the assigned investigator to manage the investigation.

## 6.2    Investigation Timeline

The OPA Director or their designee is responsible for calculating and confirming the 180-day investigation deadline. In some cases, OPA may start the 180-day timeline from the date of the incident, even when the complaint is received at a later date, to ensure that the deadline is not inadvertently missed. Requirements for calculating OPA's 180-day investigative timeline are set forth in employee CBAs.[48]

Investigations are assigned to an OPA investigator at around day 30 in the 180-day timeline unless the case involves criminal allegations or other extenuating circumstances. Investigators continuously discuss cases with supervisors as the timeline progresses. Investigators should strive to complete their investigation in roughly 90 days, or by day 120 in the 180-day timeline. The actual time needed to complete the investigation may vary depending on several factors, including the availability of the named employee(s), the complexity of the case, and the investigator's case load. This should always be discussed with a supervisor in advance of day 120, and generally no later than day 90, so OPA can ensure that any needed adjustments are made, including obtaining an extension to the 180-day timeline. If the 180-day timeline is not met, discipline cannot be imposed in a case where the employee was found to have engaged in misconduct.

For cases that result in not sustained findings, regardless of the employee's bargaining unit, the 180-day timeline ends when the OPA Director issues recommended findings via a Director's Certification Memo (DCM).

For cases that result in sustained findings, and where the employee is represented by SPOG, the timeline stops when the proposed Disciplinary Action Report (DAR) is issued.[49] The issuance of an oral or written reprimand will also stop the timeline. For employees represented by SPMA, the timeline stops once the employee receives written notice of proposed findings and discipline.[50]

### A. Extensions

OPA may request a timeline extension from the union for several reasons, including but not limited to the short-term unavailability of a named or witness employee, the unavailability of a union representative, or the rescheduling of an employee interview for reasons beyond OPA's control. The OPA Director or their designee may also request a timeline extension when a criminal investigation takes an unusually long time to complete and renders OPA unable to conduct its investigation before the expiration of the 180-day timeline. Extensions should be discussed with a supervisor before a request is made to the union. Requests

---

[47] *SPMA Agreement*, *supra*, § 16.4(A).
[48] *See SPOG Agreement, supra*, § 3.6(B); *SPMA Agreement, supra*, § 16.4(C).
[49] *SPOG Agreement, supra*, § 3.5(F).
[50] *SPMA Agreement, supra*, § 16.4(C).

for a timeline extension should include the number of extension days requested and the reason for the request. SPD unions approve extensions on a case-by-case basis.

B. **Administrative tolling**

OPA may request that the union administratively toll—or pause—the 180-day investigation timeline for articulable reasons beyond the control of OPA, such as the extended absence of a named or witness employee. Named and witness employees who are on approved extended leave should be asked to specify to SPD HR the accommodations needed to be able to participate in the OPA interview and/or their anticipated return date. A tolling request will be in writing to the union, documenting the reason for the request. OPA's request and the union's response should be saved to the electronic case file as a record of the tolling agreement.

OPA may request to toll the entirety of an investigation if one of the named employees becomes unavailable due to approved leave, including but not limited to military or sick leave. The testimony of one employee may impact the findings for others. If the investigator and a supervisor determine that OPA can complete a portion of the investigation without the unavailable employee's testimony, OPA may ask the union to toll one employee's 180-day timeline while OPA continues investigating the remaining employees ("bifurcated tolling"). If the union agrees to bifurcated tolling for one employee, the OPA Director will issue two sets of findings compliant with each 180-day deadline. In cases involving both SPOG and SPMA employees, OPA may seek approval from both unions to toll the 180-day deadline.

The OPA investigator and/or the OPA Director's designee should follow up as needed with the employee, their supervisor, and/or SPD HR to monitor the leave status of employees in tolled cases. OPA notifies the union once the employee becomes available to participate in the OPA investigation and the investigator schedules the interview.

## 6.3   Investigation Planning

All investigations require an investigation plan.[51] An investigation plan is a strategic document that places evidence collection and interviews in the context of the overall investigation. All investigation plans must be formally documented in writing and cannot consist of oral communications, must be agreed upon and approved by both the investigator and a supervisor, and must be uploaded to the electronic case file when completed.

The investigation plan must include the following elements:[52]
- The prioritization of the investigation within OPA's ongoing body of work.
- The witnesses that are to be interviewed.
- The perishable evidence that will be prioritized for collection.
- An assessment of other evidence that needs to be obtained.
- The approach to addressing each allegation classified for investigation.

The investigation plan should further identify potential sources of information, establish anticipated timelines and chronology for the investigation, and help the investigator anticipate potential issues before they arise. At the discretion of the supervisor, an investigation plan can be abbreviated, particularly when dealing with non-complex cases; however, it must still meet the minimum requirements set forth in the Ordinance.

---

[51] Ordinance 125315, *supra*, § 3.29.125(F).
[52] *Id.*

As part of the investigation planning meeting, the investigator and supervisor should discuss the general investigative approach, as well as identify any time sensitive issues, prospective evidence, and other factors that may be important in the overall investigative approach. The investigation planning meeting should also address some or all of the following questions:

- Will the investigation require assistance from others in OPA (e.g., the complaint is time-sensitive, involves many witnesses, and/or the issues are novel or complex and a second perspective is useful)?
- Does the case involve employees from multiple unions, and will this require additional OPA staff members or supervisors to conduct witness interviews?
- Will OPA require outside assistance, such as external forensic video analysis?
- Is the complaint related to another OPA complaint, investigation by SPD or another agency, or litigation from which material evidence might be obtained?
- Do the named employee or complainant have other open OPA cases with which the investigator should be familiar?

## 6.4   Investigative Steps

The investigative steps taken are often case and fact specific and will be discussed during the planning stage. Below is a list of common steps—which is neither chronological nor exhaustive—that may be used as a guide for investigators.

### A.   Evaluate allegations and relevant facts

- Review the specific violations and applicable SPD Manual sections alleged for each named employee.
- Save a copy of the SPD Manual sections at issue to the case file, along with any related directives or statutes. If the alleged conduct occurred when a different policy was in effect, that version of the policy must be included. If the alleged conduct occurred over time, include all relevant versions of the policy.
- Identify the primary and secondary issues involved and the elements that would need to be established to prove or disprove each allegation. Identify the specific actions, behaviors, and words alleged by the complainant.
- Do not limit the allegations to only the words or facts/allegations raised by the complainant's first contact with OPA. Follow-up conversations may also encompass potential allegations/facts and should be included in the assessment. Be cognizant that complainants are not expected to frame their concerns within the context of SPD policies.
- Assess the totality of the facts available and ensure OPA has identified all relevant employees and allegations. If allegations or named employees need to be changed, discuss with a supervisor, who will consult with the OPA Director to make sure amended notifications are sent to the named employees.

### B.   Identify and interview witnesses

- Identify the main witnesses to the alleged conduct. This will likely include the complainant, named employees, witnesses to the incident, others with information about the incident, and internal or external experts.
- The complainant likely was interviewed during intake, but consideration should be given as to whether to conduct a follow-up interview, particularly if the original interview was not done in person. Sworn staff members should be cognizant of complainants' potential reluctance to speak with SPD staff and, as such, should offer a civilian investigator to assist where resources permit.

- Add newly identified witness entities and their contact information to the case file; update their disclosure preference (yes or no) based on their response.
- Consider the order in which to interview witnesses and any special considerations, such as whether any parties are anticipated to be unavailable for a period of time or whether there is concern a witness might be less willing to participate if substantial time passes.
- Evaluate the relationships among and between witnesses and the named employees and note this in the file.
- Be conscious of any communication barriers that the interviewee may have (language, ADA, etc.) and accommodations available to facilitate the interview.

C. **Assess documentary and physical evidence**

  i. Documentary evidence:

  - CAD records, precinct or unit logs, incident and arrest reports, property and evidence reports, training protocols or records, use of force reports, Seattle Fire Department medic run sheets, jail booking records, specialty unit manuals, FRB and/or FIT reports, medical records (obtain a medical release), traffic or parking infractions/citations, collision reports, secondary employment permits, external agency investigations

  ii. Physical evidence:

  - 911 and communications audio, BWV, ICV, precinct holding cell video, video and/or audio from the scene (e.g., security systems from nearby businesses) or taken by witnesses, cell phone footage (streamed events, social media posts, etc.), photographs, texts, maps, phone records

## 6.5    Conducting Interviews

All interviews will follow best practices as defined in OPA Manual section 6.5(G) and in OPA training.

A. **General guidelines**

  i. Order of interviews

Interviews should be scheduled to allow time for preparation by the investigator and to provide sufficient notice to the individual being interviewed. The order of interviews depends on the specific nature of the complaint, the anticipated testimony of each person being interviewed, and other strategic considerations, though circumstances may dictate when an interview can or should take place. Individuals who are expected to be uncooperative are sometimes best interviewed last, allowing the investigator to gather evidence from other sources and to develop specific questions, rather than relying on that individual to offer information.

Interviews are generally conducted in the following order:
1. Complainant
2. Subject (if not the complainant)
3. Non-SPD witness
4. SPD employee witness
5. Named employee

  ii. Location of interviews

Interviews of current SPD employees are conducted in person unless the employee's union agrees to a virtual interview. If the interview of a named employee does not occur in person, the investigator should document the reason in the ROI. If possible, interviews of non-SPD witnesses should be conducted in person, though special considerations may necessitate holding the interview elsewhere (e.g., a complainant

is in jail). Some non-SPD witnesses may prefer not to come to OPA, so the investigator may need to arrange to meet with the individual elsewhere. In-person interviews attempted outside of OPA's office should be screened with a supervisor. Consideration should be given to having a second investigator attend the interview.

### B. Scheduling employee interviews

Investigators should contact employees wanted for an interview to request their availability. Interviews are scheduled during employees' on-duty hours.[53] For SPD employees covered by the SPOG contract, notice of scheduled interviews should be sent by email at least five calendar days and no more than 30 days prior to the scheduled interview day.[54] For SPMA employees, notice of an interview must be sent at least three business days before.[55]

The email should include an order to appear, the date, time, and location of the interview, information on employee representation rights and consequences for failing to appear, a confidentiality directive, and interview documentation options. A copy of the complaint summary, the Police Officers' Bill of Rights, and a *Garrity* advisement should be attached.[56] The employee's captain/civilian equivalent and union are copied on the email. If a captain elects to not receive these emailed notifications, OPA supervisors should inform investigators of this preference. The OPA investigator saves a copy of the email to the electronic case file as evidence of the date and time the interview notice and accompanying materials were sent.

If SPD employees covered by other CBAs are to be interviewed, the investigator should check the applicable CBA for interview notice requirements.

#### i. Employee no-show for OPA interview

If an employee fails to appear for a scheduled interview without prior notification, the OPA investigator should schedule a new interview date as soon as possible while providing sufficient notice to the employee and their union. The investigator should notify a supervisor and document in the ROI any reason provided by the employee for the failure to appear. The supervisor will consider whether to initiate a new OPA complaint against the employee for failing to appear for an OPA interview. After a new interview is scheduled, the investigator should request a timeline extension from the union for the days lost due to rescheduling (*see* OPA Manual section 6.2(A)).

### C. Scheduling complainant and witness interviews

Interviews of non-SPD complainants and witnesses should be scheduled at the interviewee's convenience while avoiding unnecessary delays to the investigation. If a complainant or witness is difficult to locate or not responsive to OPA's contact attempts, the investigator may consult with a supervisor on alternate strategies to contact the individual. In some cases, other OPA staff may assist the investigator in establishing contact with the complainant. OPA may also consider a visit to the community member's home or workplace to establish contact, if necessary. Doing so should be discussed with a supervisor. As a final step, a letter should be sent asking for contact and indicating a deadline by which OPA needs to hear from the community member in order for them to participate in the investigation.

---

[53] *SPOG Agreement, supra,* § 3.12(C)(3).
[54] *Id.* § 3.6(F)(2).
[55] *SPMA Agreement, supra,* § 16.4(H)(2).
[56] This informational explains that compelled statements made by an employee during an internal administrative interview cannot be used against the employee in any subsequent criminal proceedings. In *Garrity v. New Jersey, 385 U.S. 493 (1967)*, the U.S. Supreme Court ruled that public employees can be compelled by their government employer to make statements against self-interest as a condition of employment but that the Fifth and Fourteenth Amendment protections against self-incrimination prohibit the use of such statements or the fruit of such statements against that employee in a criminal prosecution of that employee.

### D.  Preparing for the interview

Each investigator reviews the issues to be addressed with the interviewee and prepares an outline of topics to be covered. This outline will serve as an interview guide. The interview guide is a strategic document and identifies: the aim of the interview; key topics to be covered; and what questions may be posed to ensure all aspects of the investigation are addressed. The investigator may consider presenting documents, video, photos, or other evidence for context or as a physical reference of the incident scene. Investigations of a complex or sensitive nature may warrant a second investigator present at the interview (*see* OPA Manual section 6.4(H)). In such cases, a briefing between both investigators is required to ensure that each investigator is aware of their role and responsibilities during the interview process.

### E.  Recording the interview

All interviews, whether in person or remote, should be recorded in their entirety with consent. Verbal consent to the recording should be noted at the beginning of the interview. If any discussion of the case or review of evidence (i.e., video) occurred prior to the interview, it should be noted on the record.

All interviews of SPD employees must be digitally audio recorded and transcribed.[57] In addition to the OPA recording, an employee or their union representative may also choose to audio record the interview. If this occurs, the recording party must provide OPA with a copy of the full recording. The OPA investigator provides SPD employees and their union with a copy of the interview recording. Additionally, OPA provides the employee's union with a copy of the interview transcription within five days of its completion.[58] OPA personnel save interview recordings and transcripts to the case file.

An employee may object to OPA creating a recording of the interview. If this occurs, the employee is responsible for retaining a stenographer or court reporter to transcribe the interview and to pay all appearance and transcription fees and costs. The employee must also provide a certified copy of the transcription to OPA.[59]

Investigators should encourage non-SPD complainants and witnesses to consent to a recorded interview and explain the rationale for the recording. If consent to record is not given, investigators will not record the interview, but instead document the refusal and prepare a narrative summary of the interview immediately afterward to include in the ROI. Interviewees are permitted to create their own recording of the interview. Complainants may ask the OPA investigator who recorded the interview for a copy of the recording after the interview is complete.

### F.  Role of the union representative

The primary role of a union representative during an OPA interview is to protect the contractual rights of the employee. The OPA investigator may accommodate the union's request to place any initial objections it has on the record before the investigator begins asking questions and should allow for the union representative to make objections where appropriate. These objections should be concise and should cite to the contractual or legal provision implicated by the question. Objections should not be disruptive, argumentative, leading, suggestive of an answer to the witness, prejudicial, insulting, profane, or speaking objections. Regardless of the nature of an objection, the employee is required to answer the question unless it is withdrawn by the investigator. The investigator should further provide an opportunity at the end of the interview for the union to ask any follow up questions it has and for it to place any final objections it would like to offer that were not previously made at the beginning or during the interview.

---

[57] *SPOG Agreement, supra*, § 3.6(F)(6).
[58] *Id.* § 3.6(F)(7).
[59] *Id.* § 3.6(F)(6).

### G.  Conducting the interview

All interviews will follow conversational investigative interview techniques. Investigators are required to act ethically and with integrity. As such, the investigator's demeanor during the interview should be respectful, courteous, and professional.  Investigators are required to have an assertive and empathetic mindset that supports a consultative environment for the interview process.

Questions must be relevant, respectful, sensible, sensitive, short (but convey what is required), non-compound, sincere, and stimulate the interviewee's thinking and disclosing of thoughts.[60] Throughout the interview, investigators should use repetition to understand details, restate what they heard to ensure accuracy, and avoid commenting on what was said. Interviews will adopt a funneled approach in that questions should move from broad to more specific questions.

The interview structure adopts a similar approach for complainants, community witnesses, employee witnesses and named employees. There are six basic stages in the interview:

> i.   Opening

At this stage, the investigator establishes a road map and expectations for the interview. This is somewhat of a scripted approach used to identify each person present in the interview room, as well as other information such as the date, time, location of the interview, etc. The investigator conducting the interview reads aloud from the prepared interview guide at the start of the interview to ensure this information is on the record. The guide explains to those present how the interview will proceed and underscores the expectation that the interviewee answers truthfully and completely to the questions posed, discloses in detail what is asked, and does not rush in their explanation. If the person being interviewed is an SPD employee, the guide specifically asks the employee if he or she does or does not invoke their *Garrity* rights prior to giving an interview.

> ii.   Information gathering

At this stage, the interviewee provides their first account of the event at issue. The investigator should use a "tell, explain, and describe" approach to encourage narrative disclosure by the interviewee.[61] The investigator should ask open-ended questions as much as possible to elicit the interviewee's testimony. Interruptions should be kept to a minimum so that the interviewee offers as much detail as possible and the transcriptionist can hear statements by all participants.

Examples of potential questions to ask include:
- Tell me what you remember seeing when you arrived.
- Where were you when you saw the subject?
- Who was present?
- What did the other officer tell you happened?
- Why did you use force on the subject?

For interviews of SPD employees, the investigator may ask questions regarding the background and prior assignments of interviewees. In addition, the investigator should ask the interviewee about their understanding of the policies at issue and training they have received relevant to those policies and the specifics of the case.

As the interview progresses, the funneling approach narrows. Probing questions should then be used. Closed-ended questions will normally be left until the end of the interview.

---

[60] Eric Shepherd & Andy Griffiths, *Investigative Interviewing: The Conversation Management Approach*, 197 (3d ed. 2021).
[61] Shepherd & Griffiths, *supra* at 267.

iii. Account development

The interviewer obtains a comprehensive account of the incident. The investigator may assist the interviewee in the development of their account but should avoid asking leading and closed-ended questions. These types of questions can generally be answered with a 'yes' or 'no' or are phrased in such a way that may be construed as providing a rationale or explanation to the interviewee.

Examples of questions to avoid include:
- Do you remember seeing the subject with a gun when you arrived?
- Were you next to your car when you saw the subject?
- Were Officers X and Y present?
- Did Officer X say that the subject had a weapon?
- Did you use your Taser because the subject would not drop his weapon after you asked them to?
- You were worried about your safety, right?
- Did the other officers ask for your assistance?

When interviewing non-police personnel, the investigator should avoid using police terminology to ensure that the interviewee understands what is being asked.

iv. Introduce evidence

In this stage of the interview, the investigator introduces evidence in such a way that prevents the investigator from disclosing what they know or contaminating the interviewee's memory. The investigator or interviewee may use tools to help explain and understand what happened, such as a map, diagram, photo, video, etc. The investigator must be mindful that a written record is being created and that individuals who review the OPA investigation must understand the interviewee's testimony in relation to any tool or gesture used. For example, if the interviewee watches BWV of an incident and makes a comment, the investigator should make a note on the record of the point in the BWV that the comment was made. If the interviewee uses their hands to indicate the type of force used or size or distance, the interviewer must document what the interviewee described (if not audio-recorded) or verbally record the description (if audio-recorded).

v. Manage discrepancies

The investigator should establish the relationships among parties present at the incident, as well as any other witnesses, with each other, and with the named employee. Perceptions, statements, and credibility may vary depending on the interviewee's relationship to others. Where there is a discrepancy between the interviewee's testimony and other testimony or evidence, question the interviewee about the discrepancy without expressing judgment. For example: "You said you returned to the precinct after the incident, but CAD indicates you responded to another call at the time. Can you help me understand this?"

vi. Closure

Before ending the interview, the investigator should ask if the interviewee has any other information about the incident or complaint they would like to provide, including whether they are aware of other witnesses. If an SPD employee is represented by their bargaining unit at the interview, the OPA investigator may invite the union representative to ask the interviewee questions, to which the OPA interviewer may ask follow-up questions as needed. When interviewing community members, the investigator should always make sure that OPA has current contact information for all complainants and witnesses and verify that this information is updated in the electronic case file. The investigator may inform community members that OPA may need to follow up with them if necessary to clarify information gathered during the initial interview.

At the end of the interview, the investigator should give specific orders to SPD employees not to discuss the matter or their interview with unauthorized persons. However, this does not preclude the disclosure of

the existence of the complaint, nor does it prohibit a discussion of the underlying incident and any relevant laws, policies, training, and/or tactics during a supervisory debrief and/or counseling session. Community members who are interviewed should also be encouraged not to talk about the interview or the incident with others out of fairness to all persons involved.

### H. Two-person interview teams

Depending on the complexity and sensitivity of the case, it is often useful for two investigators to be involved in the same interview. In such a situation, the primary investigator on the case takes the lead, setting strategy prior to the interview, controlling the flow of the interview, asking most of the questions, taking brief notes, and operating the recorder. The secondary investigator may be tasked with playing relevant footage during the interview, taking more thorough notes, identifying areas where more probing is needed, and following up with questions after the primary investigator is finished. On occasion, it will not be necessary to ask any follow-up questions, but the secondary investigator will still be useful in sharing notes of the interview and observations about the demeanor and non-verbal behavior of the person being interviewed.

## 6.6    Review and Evaluation of Evidence

A "clarify, anomaly, recap, and entirety" review process is used for witness statements.[62] This approach allows the identification of any contradictions and/or inconsistencies in the witness's account at the conclusion of questioning. A "final, anomaly, investigation, and reason to suspect" approach is used for interviews of named employees.[63] This process identifies if there are significant omissions at the end of questioning.

As evidence is obtained during the investigation, it should be carefully and thoroughly catalogued in the ROI (e.g., source, date obtained, etc.) and uploaded to the case file. At the conclusion of the investigator's report, the value and importance of each piece of evidence should be weighed and described in a neutral and objective manner.

The investigator should carefully evaluate testimonial evidence (statements made by involved parties and witnesses) for relevance and credibility, while also being mindful to observe and correct their own potential biases. The investigator may not give any greater or lesser weight or credence to an individual's testimony because of that person's position (including employment by SPD or another City entity), race or ethnicity, gender identity, economic status, sexual orientation, housing status, or membership in any other protected class. Only objective criteria relating directly to the truthfulness or credibility of the person should be used in deciding the weight given to their testimony.

## 6.7    The Report of Investigation

Once all steps in the investigation have been completed, relevant and material evidence is summarized in the ROI. Where applicable, all sections of the ROI should be populated with information. Investigators should proofread their ROIs for substantive, grammatical, formatting, and typographical errors. The ROIs should set forth evidence in a clear and concise manner. Where possible, the ROIs should avoid internal duplication. Investigators should refrain from pasting interviews verbatim and, instead, should summarize salient portions and organize those portions to create a clear narrative.

---

[62] Shepherd & Griffiths, *supra* at 453.
[63] Shepherd & Griffiths, *supra* at 512.

All ROIs should have the following characteristics:

- Evidence should be clearly labeled and concisely described
- All complaints classified for investigation, as well as any subparts, should be analyzed
- Inconsistencies in evidence or testimony should be identified and, where possible, assessed against other evidence or testimony
- Where specific statements or testimony is relevant, direct quotes should be used
- If video is evaluated, the investigator should create a video log that contains timestamps
- The conclusion section should be able to stand on its own and provide an overview of the complaint, the investigation, and the conclusion. It should list each named employee and the SPD policy sections at issue. For each policy, the investigator should summarize: the nature of the claim, a summary of complainant, employee, and witness accounts as they relate to the policy; a synopsis of the video and an evidentiary conclusion, where applicable (i.e., BWV showed three strikes, BWV indicated the subject's hand was not bleeding, etc.).

## 6.8    Investigation Review and Certification

The investigator will submit the completed investigation to a supervisor for approval. The supervisor reviews the investigation before routing the case to OIG for final review and certification. The supervisor will review the case, taking steps consistent with OPA's internal quality control requirements. This review should ensure the completeness of the investigation and electronic case file (including the addition and proper naming of attachments and case-level data), the quality of the ROI and other investigative reports, and the readiness of the investigation to be reviewed and certified by OIG. Investigations required by OIG for review and certification should be provided to OIG as soon as possible after the investigator submits them to a supervisor.

The OIG reviewer documents in writing whether the investigation is: (a) certified as thorough, timely, and objective; (b) partially certified as one or two of thorough, timely, and objective; (c) not certified because the investigation is not thorough, timely, and objective but additional investigation is not requested or directed, and the reason; or (d) not certified because the investigation is not thorough and objective, along with any requested or directed further investigation to be conducted by OPA.[64] Any further investigation conducted by OPA should be resubmitted to OIG for re-review and certification in a timely manner to ensure OPA may issue findings prior to the expiration of the 180-day deadline.[65] After the investigation is certified, it is ready for the issuance of recommended findings by the Director.

---

[64] Ordinance 125315, *supra*, § 3.29.260(F).
[65] *Id.* § 3.29.130(H).

# 7.0   INVESTIGATION FINDINGS

## 7.1   Issuance of Findings

The OPA Director reviews completed investigations and issues recommended findings for each allegation using a preponderance of the evidence standard. Applying this standard, if the greater weight of the evidence—more than 50%—supports the allegation, the recommended finding will be "sustained." If the preponderance of the evidence shows that misconduct did not occur, or that minor misconduct occurred but is better handled through retraining and counseling, the recommended finding will be "not sustained."

If the preponderance of the evidence shows that the actions of an employee violated SPD policy, but such actions were consistent with specific and known SPD training and/or supervisory direction proven to have been provided to the employee prior to the incident under review, the OPA Director may consider such facts in determining whether a sustained or not sustained finding should be recommended.

The DCM summarizes the evidence collected in the investigation and provides an analysis of the facts through the application of relevant law and policy. The DCM is addressed to the named employee's chain of command.

## 7.2   Not Sustained Findings

For cases in which the OPA Director does not recommend any sustained findings, a copy of the investigative file is electronically sent to the named employee's chain of command, who has ten days to review the case and respond back to OPA whether they agree or disagree with the summary of findings. Where there is disagreement, OPA administrative staff forward the chain's response to the OPA Director for review and consideration.

   A.   **Types of not sustained findings**

        i.   Not Sustained Unfounded

The evidence indicates the alleged policy violation did not occur as reported or did not occur at all.

        ii.   Not Sustained Lawful and Proper

The evidence indicates the alleged conduct did occur but was justified and consistent with policy.

        iii.   Not Sustained Inconclusive

The evidence neither supports nor refutes the allegation of misconduct.

        iv.   Not Sustained Training Referral

There was a potential, but not willful, violation of policy that does not amount to serious misconduct. The employee's chain of command will provide appropriate training and counseling.

        v.   Not Sustained Management Action

The evidence indicates the employee may have acted contrary to policy, but due to a potential deficiency in policy or training, OPA issues SPD a recommendation to clarify or revise the policy or training.

vi.  Not Sustained Timeliness

The evidence indicates a policy violation occurred, but OPA is unable to issue a sustained finding because either OPA did not reach its findings within the required timeframe, or the complaint was made to OPA beyond the allowable timeframe in which discipline can be imposed.[66]

vii. Not Sustained Grievance Settlement

A previously issued sustained finding was overturned on appeal.

B.  **Training referral process**

OPA can require that a named employee's chain of command assign or provide appropriate training or counseling to address the employee's misunderstanding, inadequate training, or improper application of a policy. This encourages the chain of command to address correctable, minor mistakes or behavior that does not rise to the level of misconduct through education and counseling.

The DCM details the type and scope of training recommended based on the specific facts of the case. It directs how the training should be documented and gives the chain of command 15 days to respond to OPA with a report of completed action. OPA administrative staff monitor outstanding training referrals and follow up with the chain of command as needed.

The training is usually performed by the named employee's immediate supervisor; however, it may be completed by someone else in the chain of command or a specialty unit. After the training is completed and the memo returned, OPA administrative staff review the chain of command report for completeness and save it to the electronic case file. If the required training appears to be incomplete, OPA administrative personnel forward the follow-up memo to a civilian supervisor to review and assess whether further action is needed.

C.  **Management Action Recommendations**

In the course of an investigation, OPA may identify concerns with SPD policies or training and issue SPD a MAR to address them. OPA issues MARs in the form of a letter to the Chief of Police and copies the Assistant Chief of the SPD Professional Standards Bureau, the Inspector General, and the Executive Director of CPC. The MAR summarizes the incident as it relates to OPA's policy or training concern, provides an analysis of applicable SPD policies and training, and includes a recommendation for how the issue could be addressed from OPA's perspective.

Through MARs, OPA can be proactive in preventing misconduct before it occurs, while at the same time ensuring that any discipline imposed as a result of investigations will not be overturned on appeal based on flaws in SPD policies, procedures, and training, or a determination that officers were held accountable to standards to which they were not trained or that were unclear.

SPD is not required to implement OPA's recommendations, but they do actively collaborate and attempt to find solutions. SPD strives to complete MARs in six months and/or notify OPA of the anticipated completion date beyond 180 days. OPA and SPD also hold quarterly meetings to discuss concerns and progress on open MARs. OPA shares MAR updates with accountability system partners.

A MAR is considered complete when OPA receives a formal response letter from SPD either confirming that SPD took steps to address the concern or declining to implement OPA's recommendation. OPA reviews SPD's response and determines the appropriate closing disposition as "fully implemented," "partially

---

[66] *See SPOG Agreement, supra,* § 3.6(G).

implemented," or "declined action." In cases where the MAR resulted in changes to SPD training, OPA may continue to monitor the full implementation of the recommendation.

## 7.3    Sustained Findings

If the OPA Director recommends a sustained finding for one or more allegation(s), the following steps are taken:

### A.   **Discipline meeting**

The OPA Director or their designee schedules a meeting with the named employee's captain/civilian equivalent, assistant or deputy chief, and SPD employment counsel—which form the "discipline committee"—to review the case and answer any questions concerning the investigation and recommended findings. Each participant receives the investigative file electronically prior to the meeting and comes prepared to discuss the investigation. Unless, based on the discussion, the OPA Director amends all sustained findings to not sustained findings, a disciplinary recommendation is discussed.

#### i.    Proposed discipline

The named employee and their union are notified of the proposed finding and the discipline committee's recommended disciplinary range in a document called the proposed Disciplinary Action Report (DAR), issued by the SPD HR Director.

If the discipline involves an oral or written reprimand, and where the discipline committee does not recommend a range of discipline above a reprimand, the reprimand is issued at this point and is signed by an assistant or deputy chief or an SPD employee acting in this role. The discipline is then served on the employee by their chain of command.

In most cases, the OPA 180-day investigative timeline ends with the issuance of the proposed DAR (or reprimand packet). For SPOG employees, the timeline ends when the proposed DAR is electronically served on the union. Service on the employee by their chain of command occurs at some point thereafter. For SPMA employees, the timeline ends when the proposed DAR is served on the employee.[67] If the named employee separates from SPD employment prior to the DCM issuance, the 180-day timeline ends on the date of the DCM.

### B.   **Loudermill hearing**

If the proposed range of discipline involves a suspension, demotion, or termination, the employee has an opportunity to meet with the Chief of Police to provide information the employee feels the Chief should consider before making a final decision. This is called the "due process" or *Loudermill* hearing.[68] The Chief's office schedules the meeting.

The employee may invite other attendees to the *Loudermill*. Typically, the employee brings a union representative. They may also bring an attorney or another SPD employee(s). In some cases, the employee may present written testimony from other SPD officers or supervisors familiar with the employee's work. Attendance depends on the employee's CBA but generally includes the Chief of Police, the OPA Director, the SPD HR Director, an assistant or deputy chief, and legal counsel. The Inspector General is also authorized to attend. Where the OPA Director is unavailable, attendance at the *Loudermill* may be delegated

---

[67] *SPMA Agreement, supra*, § 16.4(C).
[68] *See Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985).

to another OPA supervisor when the discipline for a SPOG employee involves a suspension under eight days.[69] The OPA Director should provide timely notice of delegation to the union.

If information arises at the *Loudermill* that necessitates, in the Chief's opinion, further investigation or consideration by OPA, the Chief may request that OPA perform additional investigation. In such cases, the OPA 180-day timeline will be automatically extended up to 60 days to allow OPA to complete the additional investigation.[70] OPA may seek additional time to conduct the investigation from the union. OPA may also independently determine that additional investigation is warranted after a *Loudermill* and subsequently request an extension from the union.

After the employee has presented information for the Chief to consider and the Chief has had an opportunity to review relevant information pertaining to the incident, the investigation, and the employee's personnel record and past disciplinary history, the Chief makes the final decision on findings and determines the discipline to be imposed for any sustained allegation(s).[71] There is currently no established timeline or required deadline within which the Chief must issue a final decision in a disciplinary matter.

### C.  Final Disciplinary Action Report

Once the Chief makes a final determination on discipline, the SPD HR Director notifies the employee and their union in writing through the final DAR. The named employee's chain of command serves the discipline on the employee and returns a signed receipt of the service to SPD employment counsel. Discipline may include the following: oral reprimand, written reprimand, suspension without pay (up to 30 days), or termination. If the Chief issues no discipline for a sustained finding, the employee is served with a closure letter. In some cases, the Chief may also impose a demotion, disciplinary transfer, or require further training in addition to another form of discipline.

If the employee is no longer employed by SPD, the DAR is mailed to their home address. The discipline may either be: resigned or retired prior to discipline, resigned or retired prior to termination, or resigned or retired in lieu of termination.

The CJTC is responsible under state law for all matters of police officer certification. SPD HR must send a notice of peace officer separation to the CJTC within 15 days of any police officer separation.[72] If an officer is terminated and the violation meets the criteria for disqualifying misconduct under state law, the CJTC must decertify the officer upon completion of any disciplinary proceeding (including appeal).[73] If an officer resigns or retires due to misconduct, even if the misconduct was undiscovered at the time of resignation, the officer will be investigated by the CJTC as though they were still an employee. If decertified, they will no longer be allowed to be an officer anywhere in the state. A record of all CJTC investigations and case dispositions will be made publicly available and will be entered into an interstate database.[74] OPA monitors ongoing CJTC investigations into SPD officers and provides the CJTC with responsive records upon request.

### D.  Chief's authority to overturn OPA findings

If the Chief ultimately disagrees with one or more of the OPA Director's recommended findings, the Chief must meet with the OPA Director to discuss the anticipated reversal and to allow the OPA Director the

---

[69] *SPOG Agreement, supra,* § 3.5(D).
[70] *See SPOG Agreement, supra,* § 3.5(F); *SPMA Agreement, supra,* § 16.6.6.
[71] SMC 3.28.810(F).
[72] SB 5051, § 11 (2021).
[73] *Id.* § 9.
[74] *Id.* § 21.

opportunity to provide a response. If, after the meeting, the Chief still wishes to reverse the findings, they must provide their rationale in a written letter to the Mayor, City Council, OPA Director, Inspector General, CPC co-chairs, and CPC Executive Director within 60 days of their final decision.[75] OPA's annual report includes information on findings overturned by the Chief.

## 7.4    Notice of Missed 180-Day Timeline

If OPA fails to issue investigation findings within the 180-day contractual timeline required for current SPOG or SPMA employees, OPA will issue a written statement within 30 days of the final certification of the investigation by the OPA Director documenting the allegations and the reason why the time limit was exceeded.[76] The letter is addressed to the Mayor, the City Council President, the City Councilmember assigned to chair the committee overseeing public safety, the City Attorney, the Inspector General, and the CPC Executive Director. The notice is also provided to the complainant, included in the case file, and made publicly available.

## 7.5    Case Closing Process

After the employee's chain of command has had the opportunity to review the findings and offer comments, OPA administrative staff prepare a Closed Case Summary (CCS), which lists the SPD policy directives at issue, OPA's recommended findings (taken from the DCM), and the discipline imposed by the Chief, if any. The CCS is sent to the employee by way of their chain of command, as well as to the complainant. Once this is complete, OPA administrative staff close the case, and the CCS is published on OPA's website.

OPA administrative staff ensure that investigations are closed in a timely manner, generally around 30 days after findings are issued in not sustained cases. In some instances, the closing of a case may be delayed due to case-specific circumstances, such as the extended absence of an employee who receives a training referral, when the case involves multiple employees from different chains of command, or due to heavy workloads and/or case volume within OPA. OPA administrative staff strive to close sustained cases within 15 days after discipline is imposed on the named employee, when possible. OPA may expedite the case closing process in the interest of transparency based on community concerns about an incident or when resources permit.

A. **Closing notices**

    i.   Case completion notice to named employees

OPA administrative staff ensure that a case completion notice is emailed to the named employee(s) and copied to their unit captain/civilian equivalent, SPD HR Director and assistant, and union. A record of the email notification is saved to the case file as evidence of the date and time the notice was sent.

    ii.  Case completion notice to complainant

OPA administrative staff send a case completion notice to the complainant after the case is closed, including a copy of the CCS document. When the findings include a Management Action Recommendation, the closing letter will include a copy of the letter written by the OPA Director to the Chief of Police. Notices to complainants are sent by email or by postal mail when no email address is provided. If a complaint is submitted anonymously but an email address is provided, staff should send the complaint receipt notice to the email address listed on the complaint. A record of the notification is saved to the case file as evidence of the date and time the notice was sent.

---

[75] Ordinance 125315, *supra*, § 3.29.135(B).
[76] *Id.* § 3.29.135(C).

# 8.0 OPA PROGRAMS AND PROTOCOLS

## 8.1 Unsubstantiated Misconduct Screening

Allegations of misconduct that are clearly refuted by evidence can be investigated and documented by the chain of command and then screened with OPA via email. The OPA Director or their designee reviews the information and relevant video to determine if the allegation is disproved by the evidence or whether it is necessary for the supervisor to formally submit the allegation of potential misconduct to OPA. OIG conducts quarterly audits of cases screened through the program to ensure the integrity and continued success of the process.

The screening process is set forth in SPD policy.[77] As a general matter, allegations that are appropriate for screening include excessive force, violations of law, sexual assaults, and unlawful search and seizure. Incidents that are not fully captured on video and that have complex fact patterns will generally not be appropriate for screening. In addition, bias allegations will generally not be appropriate for screening and should be assessed in either a Bias Review or an OPA complaint referral. The chain of command may screen incidents with the OPA Director if they are unclear whether a Bias Review is required.

## 8.2 Criminal Referrals

If a complaint involves a potential violation of criminal law, OPA refers the matter for criminal investigation and, in most cases, suspends the administrative investigation into the complaint.

### A. Administrative process for criminal complaints

The OPA Director generally receives information from an employee's supervisor or a member of the chain of command that an employee was arrested, is the subject of a criminal investigation, is the respondent in an order of protection, or may have engaged in acts that rise to the level of criminal behavior. This information may also be received through other means, including but not limited to an external agency, another SPD employee, or a community member.

When OPA receives notice of potential criminality, administrative staff generate a new "OPA Restricted" case and notify a supervisor. The OPA Director or their designee will instruct administrative staff on how to prepare a criminal referral letter to the law enforcement agency with jurisdiction over the incident. If the matter is to be investigated by SPD, OPA delivers the referral letter to the Assistant Chief of the Investigations Bureau. If the incident occurred in an outside jurisdiction, OPA may deliver the referral letter directly to the appropriate law enforcement agency and should also notify the SPD Investigations Bureau. If the incident occurred within Seattle, but OPA believes that there is a conflict of interest or another legitimate reason that necessitates that the matter be investigated by an outside law enforcement agency, OPA may make a written request for this to occur. If the Chief of Police concurs that the case should be sent to an outside law enforcement agency, the Chief must confer with OPA concerning the selection of that agency. If the Chief does not concur, an explanation for this decision must be provided to OPA.

In some cases, OPA may conduct a preliminary investigation into the complaint, which is usually limited to obtaining a copy of the incident report or other associated paperwork generated at the outset of the

---

[77] SPD Policy 5.002-POL-4; 5.002-PRO-1. *United States v. City of Seattle*. No. 12-CV-1282 JLR (W.D. Wash. May 2, 2019) (Order Approving Policy at DKT #563).

incident. At a minimum, a "conformance to law" allegation is made in the OPA complaint, though other allegations may be added at the conclusion of the criminal process as more information is obtained.[78]

The usual notice of complaint and 30-day notice requirements for named employees do not apply when criminal allegations are involved.[79] Instead, a classification report is issued to the employee once the criminal matter is concluded and OPA moves forward with its administrative investigation.

Every case transmitted to SPD for criminal investigation must be formally referred to a prosecuting attorney's office for a charging decision. SPD is required to notify OPA once this referral occurs. If the case is prosecuted, SPD is further required to notify OPA once the prosecution has concluded.

As a general matter, once there is a conclusion to the criminal investigation (verdict, decline notice, etc.), OPA initiates the administrative investigation. Exceptions are described in more detail below. At this point, a civilian supervisor assigns the complaint for intake investigation. After an initial review of the criminal investigation and OPA intake, a civilian supervisor makes a recommendation to add other applicable allegations that OPA will investigate. Complaints that were referred for criminal investigation will generally be classified for full OPA Investigation.

### B. Timelines for criminal investigations and prosecutions

Under the SPOG agreement, the 180-day timeline tolls when the alleged crime occurred outside of Seattle and the case is being criminally investigated by an outside law enforcement agency, or when the case is being reviewed or prosecuted by a city, state, or federal prosecuting authority.[80] The 180-day timeline does not toll when a case involving a SPOG employee is referred to SPD for criminal investigation or where the alleged crime occurred within Seattle and is being investigated by an outside law enforcement agency. Once SPD refers the matter for review to CAO or KCPAO, the 180-day clock stops and does not resume until there is a decline notice or verdict in a criminal trial, whichever is later.[81]

Under the SPMA agreement, OPA's timeline tolls any time a case is being criminally investigated or prosecuted, regardless of where the crime occurred and whether the case is being investigated by SPD or an outside law enforcement agency.[82]

In rare cases, OPA may choose to conduct its administrative investigation concurrently with a criminal investigation or prosecution. In such instances, the 180-day timeline continues to run.[83]

The OPA Director's designee will maintain communication with the criminal investigating entity and/or prosecutor regarding the criminal case status to ensure that the timeline is maintained. The staff member notifies a supervisor and/or the OPA Director when the criminal investigation is expected to take a particularly long time or may impact OPA's ability to resume or complete its administrative investigation within the 180-day timeline.

---

[78] This step is necessary to ensure that proper notifications are made to prosecuting authorities under the *Brady* rule, when applicable.
[79] *SPOG Agreement, supra,* §§ 3.6(A), 3.7.
[80] *SPOG Agreement, supra,* § 3.6(B)(2).
[81] *Id.* There is a lack of clarity in the SPOG contract about whether the 180-day timeline resumes on the date OPA receives notice of the criminal case completion or on the date the decline or verdict is reached, even if OPA is notified at a later date. Under the SPMA contract, the former applies. *See SPMA Agreement, supra,* § 16.4C(1).
[82] *SPMA Agreement*, *supra*, § 16.4(C)(1).
[83] *SPOG Agreement, supra,* § 3.7.

C.   **Tracking criminal cases**

OPA administrative staff maintain a tracking sheet of pending criminal cases involving SPD employees, regardless of whether they are being investigated internally, externally, or under review by a prosecutor. The tracking sheet must include the name of the agency handling the investigation, the detective and/or prosecutor assigned to the investigation, and their contact information.

After a case has been with the investigating agency for 60 days, the OPA Director's designee follows up with the agency or prosecutor twice a month to inquire on the status of the criminal investigation. The OPA Director's designee should make appropriate notations in the OPA case file and the criminal referral tracking sheet to reflect the most recent status of the pending criminal review.

OPA provides a bi-annual report of active criminal referrals to OIG.[84]

## 8.3   EEO Screening

Workplace discrimination and harassment is prohibited under City of Seattle, State, and Federal laws.[85] City of Seattle Personnel Rule 1.1 and SPD Manual 5.040 require all employees to report workplace discrimination or harassment related to any of the EEO protected classes.[86] City of Seattle protected classes include race, sex/gender, age, disability, sexual orientation, national origin, gender identity, political ideology, marital status, parental status, religion, ancestry, veteran status, genetic information, color, or creed.[87]

Any allegations related to EEO protected classes made by or involving OPA staff must be reported to an OPA supervisor and/or to the SPD EEO investigator or Seattle Department of Human Resources.

OPA staff must notify a supervisor if they become aware of potential workplace discrimination or harassment during the course of an investigation or if a complaint contains hybrid OPA-EEO allegations. OPA supervisors will ensure that these complaints are screened, as necessary, with the SPD EEO investigator. OPA and SPD EEO developed a protocol governing the referral of complaints that may partly or entirely fall under the jurisdiction of the EEO investigator.

A.   **Complaint only contains allegations for EEO**

If the screening results in an EEO investigation and no other policies under OPA's jurisdiction are identified, OPA processes the complaint as a Contact Log and links to the EEO case number. OPA administrative staff send a closing letter to the complainant stating that the case has been referred to EEO and provides the EEO case number. The letter will also detail that a new OPA case could be initiated if the EEO investigator uncovers potential non-EEO policy violations.

B.   **Complaint contains hybrid OPA-EEO allegations**

OPA coordinates a meeting between the EEO investigator, OPA investigator, and OPA supervisor to discuss the allegations at issue, which entity will handle each allegation, and any necessary coordination between the offices to process the complaint. When feasible and if appropriate under the specific circumstances of each case, OPA and EEO conduct joint interviews. The OPA and EEO investigators may conduct subsequent case planning meetings as needed. OPA should determine if the EEO investigation

---

[84] *See* Ordinance 125315, *supra*, § 3.29.145(E).
[85] *See* RCW 49.60; Title 162 WAC; U.S. Equal Employment Opportunity Commission, https://www.eeoc.gov/discrimination-type.
[86] City of Seattle Human Resources Dep't, *Personnel Rules* (2021), https://www.seattle.gov/human-resources/rules-and-resources/personnel-rules.
[87] Personnel Rules, *supra*, § Preamble.

could impact the timely completion of OPA's administrative investigation, and whether any future extensions to the 180-day deadline should be requested from the appropriate union. If both investigations result in sustained findings, a joint discipline meeting may be held, and combined discipline may be issued under the OPA and EEO cases.

### C. Complaint only contains allegations for OPA

OPA proceeds with the preliminary investigation and saves the EEO screening in the case file.

## 8.4    Mediation

OPA has the discretion to recommend certain cases for mediation based on eligibility criteria. Typically, OPA will assess mediation eligibility during the 30-day intake period. Research cites that mediation delivers the best results when conflict is moderate. Complaints alleging unprofessionalism, bias, and general miscommunication may be eligible for mediation. Criminal allegations, dishonesty, misuse of authority, and other serious policy violations are not eligible for mediation. In addition, an allegation of bias that appears likely to be sustained is not appropriate for mediation. If a case contains multiple allegations of misconduct where only one or some of the allegations are eligible for mediation, the case will not be considered for mediation.

When reviewing the intake investigation, a supervisor may recommend a case for mediation. In such instances, OPA will classify the case for full OPA Investigation. The classification may be updated later if all mediation requirements are met. Mediation is voluntary and can only occur if both the named employee and the complainant agree to participate. If mediation fails for any reason, the case moves to a full investigation.

OPA partners with King County Office of Alternative Dispute Resolution to supply trained mediators. Should OPA wish to pursue an alternative contractor or method of obtaining mediators, OPA will consult with SPD labor unions per the collective bargaining agreement.[88]

A civilian OPA staff member supports OPA supervisors in scheduling, coordinating, and arranging all required forms and documentation for the mediation. On the scheduled date of the mediation, the OPA staff member ensures that the mediator and all participants complete an exit survey. If the mediator reports that the named employee listened and participated respectfully, OPA will not conduct further investigation into the matter and the complaint will not appear on the employee's OPA Officer Card.

OPA provides training to investigators on mediation best practices, with a focus on appropriately explaining mediation as a valuable alternative to the traditional complaint resolution process.

## 8.5    Rapid Adjudication

Rapid Adjudication is a collectively bargained alternative resolution and program available to sworn SPD employees represented by SPOG and SPMA. It encourages SPD employees to take responsibility for conduct that is inconsistent with SPD policy. The employee accepts pre-determined discipline in lieu of undergoing a full OPA investigation. RA provides faster case resolution for the complainant, named employee, and OPA while upholding principles of accountability.

---

[88] *See SPOG Agreement, supra,* § 3.10.

A. **Process**

i.   Classification proposal

Rapid Adjudication may be initiated by a named employee or by OPA before or after the completion of the intake investigation.[89] The OPA Director and supervisors determine if a case (or portion of a case) is eligible for RA. OPA sends RA classification proposals to OIG for review and agreement prior to classifying (or reclassifying, if the request for RA occurred post-classification) as RA.

If OPA is initiating RA, OPA may send written communication to the named employee and their union to inquire whether the employee would be interested in RA if it is approved by the Chief. OPA should consider requesting that SPOG toll or waive the 30-day classification timeline to allow the following steps to occur before classifying the case.

ii.   Disciplinary recommendation, offer, and acceptance

If OIG concurs with the RA classification, OPA informs legal counsel of a potential RA case. Legal counsel reviews the employee's history, past discipline, and the nature of the allegations to help inform a disciplinary recommendation. OPA presents the RA and recommendation for discipline (or proposed range of discipline) to the Chief of Police.

If the Chief accepts the RA and recommended discipline, OPA will notify the employee in writing of the Chief's acceptance of RA. The employee may then accept or reject the discipline. If a range of discipline is offered, the employee may request to meet with the Chief to discuss the case.[90] If the employee rejects the discipline, the case is classified for investigation. The rejection of RA at any stage by the employee or OPA has no bearing on the outcome of the employee's investigation or potential discipline.

The timing of these steps is determined by the employee's CBA.[91] All discipline imposed through RA is final and binding and is not subject to employee grievance or appeals processes. To document the case, the OPA Director issues a Rapid Adjudication Memorandum, the RA equivalent of a DCM. As with sustained cases, SPD issues discipline in the form of a final DAR.

B. **Eligibility criteria**

Cases involving minor to moderate misconduct may be eligible for RA. OPA determines RA classifications on a case-by-case basis. The following allegations are ineligible for RA:
- Criminal violations: SPD Manual 5.001-POL-2 – Employees Must Adhere to Laws, City Policy, and Department Policy
- Dishonesty: SPD Manual 5.001-POL-11 – Employees Shall be Truthful and Complete in All Communication
- Force: SPD Manual 8.200 – Using Force
- Bias: SPD Manual 5.140 – Bias-Free Policing
- Insubordination: SPD Manual 5.001-POL-15 – Employees Obey any Lawful Order Issued by a Superior Officer
- Failure to report serious policy violations to OPA: SPD Manual 5.002-POL-6 – Employees Will Report Alleged Violations
- Intentional or reckless violation of policy: SPD Manual 5.001-POL-2 – Employees Must Adhere to Laws, City Policy, and Department Policy
- Retaliation: SPD Manual 5.001-POL-14 – Retaliation is Prohibited

---

[89] *See SPOG Agreement, supra*, § 3.11(B); *SPMA Agreement, supra*, § 16.8(B).
[90] *SPOG Agreement, supra*, § 3.11(B).
[91] *See Id.*; *SPMA Agreement, supra*, § 16.8.

- ▪ Failure to cooperate in an internal investigation: SPD Manual 5.002-POL-11 – Employees Will Cooperate with Department Internal Investigations
- ▪ Any case with a concurrent EEO, FRB, or FIT investigation

## 8.6    Bias Reviews

SPD frontline supervisors conduct preliminary investigation into bias allegations that are made in the field. There are two potential outcomes of that investigation: (1) referral to OPA; or (2) entry of a Bias Review.

A Bias Review is an electronic report completed by a frontline supervisor. Officers are required to call a supervisor to the scene in response to allegations of biased-based policing.[92] Frontline supervisors must conduct preliminary inquiry into the allegations, including attempting to discuss the allegation with the complainant and assessing the availability of other evidence, including additional witnesses.[93] A Bias Review may only be completed in instances where a supervisor does all of the following: (1) conducts a preliminary investigation and believes there is no evidence of bias; (2) offers to refer the allegation to OPA and the complainant declines; and (3) provides the complainant information on how to contact OPA. If the complainant is non-responsive, non-communicative, or leaves the scene either prior to or during the supervisor's response, the supervisor must attempt to reach the complainant and document these attempts in the Bias Review entry. If contact attempts fail, the supervisor will review BWV/ICV of the incident and document it in the Bias Review entry. If the supervisor determines misconduct may have occurred or if the complainant requests a referral to OPA, a Bias Review is not permitted, and the supervisor must refer the complaint to OPA.[94]

The supervisor submits the completed Bias Review entry to their chain of command up to the bureau chief for review. The file is subsequently forwarded to OPA to review the Bias Review and determine if the allegation was handled appropriately.[95] OPA then attaches relevant documentation to the electronic case file. If OPA has concerns about bias or discovers other potential policy violations, OPA can open a new case.

## 8.7    Monitoring Serious Incidents

All serious and deadly force (Type III) is investigated by FIT. Force-related incidents that involve potential misconduct may also result in a FIT investigation. OPA has a defined oversight role as an observer to all FIT investigations, including all officer-involved shootings.[96] This includes full and unfettered access to scenes, evidence, FIT files, and interviews of involved and witness officers.

At any point during a FIT investigation, OPA can initiate jurisdiction over the case to conduct an administrative misconduct investigation. In such scenarios, OPA notifies the FIT chain of command of this decision and provides the OPA case number.

In addition, OPA or FIT personnel may identify potential criminal conduct on the part of an SPD employee. OPA is required to discuss this belief with SPD; however, OPA ultimately has the authority to determine that a criminal referral needs to be made. If a referral is made, a case master will be appointed to ensure that appropriate walls are maintained between the administrative and criminal investigations.

---

[92] SPD Manual 5.140-POL-5.
[93] SPD Manual 5.140-POL-6.
[94] *Id.*
[95] SPD Manual 5.140-PRO-1.
[96] SPD Manual 8.400-POL-5; 8.400-TSK-21.

## 8.8    Appeals of OPA Findings

There is no process for complainants to appeal the outcome of their complaint. An OPA staff member may provide informal mediation of the dispute or assist the complainant in contacting OIG, if requested.

Employee appeal rights are governed by CBAs and City of Seattle personnel rules. Represented employees may appeal any disciplinary decision involving suspension, demotion or termination to either the Public Safety Civil Service Commission or arbitration as provided in their CBA.[97]

When possible, OPA will inform the complainant of any appeal or grievance of discipline filed and the outcome of such appeal or grievance. In addition, OPA will update the Closed Case Summary upon completion of an appeal to reflect any outcome from a settlement or decision modifying discipline in the matter. Information about the appeal—including records of a settlement, decision, dismissal, or withdrawal—will be added to the case file.

---

[97] SPOG employees may appeal written reprimands. *See SPOG Agreement, supra,* § 3.2.