THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 2:12-cv-01282-JLR |
| Plaintiff, | ) | |
| | ) | **CITY OF SEATTLE'S OCTOBER 2021** |
| v. | ) | **QUARTERLY ACCOUNTABILITY** |
| | ) | **UPDATE** |
| CITY OF SEATTLE, | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

The Court-approved "Monitoring Plan," Dkt. 655-1, includes a commitment to provide quarterly reports on the City's progress. This report includes updates regarding ongoing work under the Monitoring Plan, the City's community engagement activities, quarterly data from the Seattle Police Department (SPD) regarding the use of force, and quarterly data from the Office of Police Accountability (OPA) regarding police discipline and appeals.

CITY OF SEATTLE'S OCTOBER 2021 QUARTERLY
ACCOUNTABILITY UPDATE - 1
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

## I.   The parties and the Monitor have engaged in ongoing work throughout the last quarter under the Monitoring Plan.

The parties and the Monitor have continued to collaborate on finalizing a methodology for the Monitor's Compliance Status Update, which will include an in-depth examination of SPD's crowd management response to the 2020 protests and an overall assessment of SPD's compliance with the requirements of the Consent Decree. Pursuant to this methodology, SPD and OPA have been providing agreed information and reports to the Monitor and the United States Department of Justice (DOJ) for their review and assessment. SPD, in particular, has been working closely with the Monitoring Team to provide the data and analytics that it needs to conduct a thorough evaluation of each area covered by the Consent Decree. In the coming months, the Monitor will complete an objective, evidence-based assessment using this information.

SPD training is another area of progress addressed in the Monitoring Plan. SPD is required to report to the Court on its progress in implementing new bystander intervention training. *Monitoring Plan* (Dkt. 655-1) at 7, line 38. Starting in November 2020, SPD joined a nationally recognized, peer-intervention training program for law enforcement officers created by Georgetown University Law Center. The goals of the Active Bystandership for Law Enforcement (ABLE) Project are to "create a police culture in which officers routinely intervene as necessary to: prevent misconduct, avoid police mistakes, and promote officer health and wellness."[1] SPD has made this innovative training mandatory for all sworn officers. As of this filing, 815 sworn officers have completed the training, 199 are registered to take it before year's end, and 34 have yet to

---

[1] The ABLE project is described here: https://www.law.georgetown.edu/innovative-policing-program/active-bystandership-for-law-enforcement/

**CITY OF SEATTLE'S OCTOBER 2021 QUARTERLY ACCOUNTABILITY UPDATE** - 2
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

register.[2]

In addition to the Sentinel Event Review, discussed below, the Office of Inspector General for Public Safety (OIG) is conducting an audit examining accountability through discipline—a topic that is addressed in the Monitoring Plan and directly related to concerns previously expressed by this Court. *See 2021 Monitoring Plan* (Dkt. 655-1) at 7-8, lines 40-42; Court's 5/27/2019 Order (Dkt. 562) at 13.  The Disciplinary Review Audit is expected to be completed and filed with the Court this year. It will address whether SPD's current disciplinary process delivers consistent, fair, timely, and transparent accountability to sworn personnel. *See* OIG's 2021 Workplan at 5-6.[3]

## II.    This year the City has conducted extensive community engagement efforts around public safety issues.

The Monitoring Plan requires the City to "engage in a comprehensive, affirmative, intensive initiative to obtain community input regarding [SPD's] Crowd Management Policies." 2021 Monitoring Plan (Dkt. 655-1) at 5, line 28. The City met this requirement by gathering and incorporating public feedback on SPD's policies. In addition, the City has committed to carrying out a diverse range of public engagement efforts around SPD's policies and public safety broadly.

A.   *The Seattle Police Department sought input regarding its policies and greatly expanded its traditional methods of community engagement in order to build public trust after last year's events.*

The Consent Decree requires that SPD review and revise its core policies annually, *see* ¶ 180, and SPD's Crowd Management Policy and Use of Force Policies recently came under

---

[2] These numbers exclude officers who are currently on extended leave.

[3] Available at
https://www.seattle.gov/Documents/Departments/OIG/Annual/OIG2021Work%20Plan122120.pdf

**CITY OF SEATTLE'S OCTOBER 2021 QUARTERLY ACCOUNTABILITY UPDATE** - 3
 (12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

intense scrutiny. Last year's protests against police violence, unprecedented in their duration and scope, served as a test of SPD's crowd management policies, tactics, and training. When serious concerns were raised by the community and City leadership over SPD's response, SPD quickly developed and implemented new strategies for crowd de-escalation and crowd management. SPD gathered feedback from OPA, OIG, and the Community Police Commission (CPC), and many of their recommendations were incorporated. *See, e.g.*, Dkt. 658 at 12 & n.6, 13-16 (describing policy contributions of OPA, OIG, and CPC).

Because of the critical need to inspire public confidence and trust, the parties and the Monitor agreed that SPD's regular process of seeking input from the Accountability Partners, DOJ, the Monitor, and the Court would not be sufficient in 2021. *See 2021 Monitoring Plan* (Dkt. 655-1) at 5, line 28. Accordingly, SPD published the draft policies online and sought public comment. SPD also gathered input by presenting the draft policies to a meeting of its citywide advisory council. The in-person feedback and online public comments were reviewed by theme and, where actionable, incorporated in a manner that is consistent with best practices. Based on all of this community feedback, recommendations from the Accountability Partners, and its experiences and internal review, SPD proposed extensive revisions to its policies in February 2021. *See* Dkt. 658. The changes and improvements are described at length in the City's previous filing. *Id.* DOJ, the Monitor, and the Court approved these policies. *See* Dkt. 662.

Approval of the revised policies did not signal an end to SPD's community engagement efforts. Throughout the year SPD has worked to increase public awareness of its policies and priorities broadly. SPD gave public presentations on its policy changes and provided informational demonstrations of less lethal tools to a diverse range of groups. In addition to SPD's regular

**CITY OF SEATTLE'S OCTOBER 2021 QUARTERLY ACCOUNTABILITY UPDATE** - 4
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

precinct and demographic advisory council engagement, it has also participated in numerous facilitated dialogues with community members about topics ranging from SPD's policies to the broader issues of SPD's response to the protests, as well as other police-community interactions.

One new approach used by SPD was the peacemaking circle. SPD hosted and participated in several peace circle dialogues during 2021. A peacemaking circle is a process that brings together individuals who wish to engage in conflict resolution, healing, and decision making in a manner that centers relationship development and community building. A "circle" can create trust, respect, and good will and it differs from typical meeting dynamics which can reinforce hierarchy and other unproductive dynamics.[4]

One example of a peace circle dialogue with SPD participation is the OIG Sentinel Event Review (SER). *See* Dkt. 682-1. Through the SER, SPD has participated in approximately 20 peace circles with community members, running approximately 4 hours per meeting, since early 2021. The size of the meetings can vary between 15-20, and typically at least 4-7 of the participants are SPD officers. OIG has explained that, while community participation is central, SPD's support and participation also were important to the process. *See, e.g.*, SER Report (Dkt. 682-1) at 4.

SPD also engaged in a series of peace dialogues with a group of community activists, many of whose members have seen or experienced police violence. The group founder, whose family member was killed by police, reached out to SPD to collaborate on conducting these peace dialogues. The community group's goal is to conduct these dialogues with officers and families affected by police violence to bring healing and humanity to all involved. Seven dialogues took

---

[4] *See generally* Informational page on Indigenous Native American Peacemaking created by the Indian Peacemaking Initiative and the National Indian Law Library: http://www.narf.org/nill/resources/peacemaking.html

**CITY OF SEATTLE'S OCTOBER 2021 QUARTERLY ACCOUNTABILITY UPDATE** - 5
(12-CV-01282-JLR)

Peter S. Holmes
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

place between December 2020 and August 2021. These were pilot dialogues to help select a preferred format to use moving forward.

SPD also conducted 15 micro-community police dialogues. In collaboration with Jacqueline Helfgott, Ph.D., Director of the Seattle University Crime and Justice Center, SPD held dialogues in each of its five precincts between May and August 2021. There were 109 community participants and 131 police officers (sworn and civilian from patrol through command staff ranks). The sessions ranged from 8 to 30 participants and each included approximately half community and half police officer participants. Seattle University conducted a post-assessment survey to collect feedback and took extensive participant-observation notes. Seattle University is currently working on a report on the findings.

SPD also partnered with the Mightiest Bridge, a group created in response to the events in Seattle that have contributed to a widening division between civilians and SPD officers. The goal for this project is to build on a model established by the Immigrant Family Institute[5] in order to create relationships that foster greater understanding among participants and to establish a shared way forward. These events occurred every week from April 17, 2021, through June 5, 2021, for a total of nine meetings. Each meeting had six law enforcement participants and nine community members.

Growing out of its experience with these dialogues and in accordance with a key OIG recommendation, SPD is currently establishing a "dialogue unit," with the goal of forging greater communication and understanding between police officers and community members who attend

---

[5] https://www.seattle.gov/iandraffairs/RWI The IFI program "focuses on immigrant families that have been impacted by the juvenile justice system and frontline police officers who interact regularly with the public."

**CITY OF SEATTLE'S OCTOBER 2021 QUARTERLY ACCOUNTABILITY UPDATE** - 6
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

demonstrations and protests. *See Chief Diaz Letter to IG Judge Re SER Report Wave 1* at 1-2 (included here as Exhibit 1).

    B. *The Office of Inspector General for Public Safety is convening a community-led process to understand the root causes of 2020's negative police-protester interactions and determine ways to prevent similar future events.*

    Described in the City's most recent quarterly report, OIG is in the process of facilitating an exhaustive, community-led effort to examine SPD's response to the protests through a non-blaming, forward-looking framework. The goals of SER process are to reflect the perspectives of the community, identify root causes of negative outcomes, and recommend ways to improve systems. To prepare, OIG engaged an estimated 100 organizations and government agencies to learn about community perspectives and concerns. A planning group, composed of a diverse group of community leaders and SPD officials, helped select Panel members and determine which events to consider. *SER Rept.* (Dkt. 682-1) at 11-12.

    The first panel concluded its work last summer. It was composed of six community members, six SPD officers, and the Inspector General, and it was supported by subject matter experts in areas such as crowd psychology. It examined the first of five waves of significant protest-related activity, including many of the most widely criticized incidents and a significant share of SPD's uses of force. *See id.* at 3-4 (listing incidents). To achieve a set of consensus recommendations from these panel members, OIG employed a peacemaking process for building trust and rapport. OIG issued a report with recommendations from the First Panel on July 22, 2021. *Id.* OIG anticipates that the report on the second wave of protest events will be completed and filed with the Court before the end of the year.

**CITY OF SEATTLE'S OCTOBER 2021 QUARTERLY ACCOUNTABILITY UPDATE** - 7
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

In addition to the important role that SPD played in the SER process, SPD also has worked to implement the SER recommendations and engage seriously with the ideas it has not yet been able to adopt. As a result of SPD's own self-critique and because of the ongoing dialogue between OIG and SPD, by the time the First Panel's recommendations were published in July of 2021, SPD already had implemented some of the recommendations. Dkt. 682-1 at 14. Subsequently, Chief Diaz followed up with a public letter detailing SPD's response to each and every one of the 54 recommendations contained in the SER Report. *See* Exhibit 1. A great many (~ 25) have been implemented or implemented in part; for those that have not been implemented, the letter explains that they are in progress, describes why additional discussion would be helpful, or notes relevant resource constraints. *See id.*

C. *The Community Police Commission helps to ensure that SPD policies reflect the community's concerns and interests.*

The CPC hosted town halls in 2020 and 2021 to inform its recommendations to SPD regarding its use of force and crowd management policies. After receiving draft, proposed policy revisions from SPD in late 2020, CPC requested public written comment through its website and held a town hall with a panel of community members on January 26, 2021, at which SPD subject matter experts answered questions about the draft policy revisions. Subsequently, CPC submitted eleven policy recommendations to SPD. *See CPC's Jan. 29, 2021, Policy Recommendations* (Dkt. 658-2) at 2-4. As with the SER Panel's recommendations described above, SPD responded to each of CPC's recommendations in a detailed public letter. *Chief Diaz's 2/03/2021 Letter to CPC* (Dkt. 658-2) at 7-12.

The CPC's community engagement efforts have also extended more broadly. The CPC created a publicly available and accessible dashboard that tracks recommendations from the

**CITY OF SEATTLE'S OCTOBER 2021 QUARTERLY ACCOUNTABILITY UPDATE** - 8
(12-CV-01282-JLR)

Peter S. Holmes
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

Accountability Partners and SPD's progress with respect to the recommendations. *CPC Annual Rept.* at 3.[6] In 2021, the CPC re-established a number of committees to provide additional avenues for community engagement, including creating a police practices committee. The committee focuses on SPD's response to the demonstrations and on SPD policies in general. *Id.* at 4.

   D. *The Office of Police Accountability has explored new ways to communicate clearly and transparently to the public about its disciplinary investigations.*

   Community engagement is not explicitly part of OPA's mission, but OPA does play an important role in this area. Recognizing the urgent public interest, in 2020 OPA created a demonstration dashboard so the public can track progress into its investigations of complaints related to the protests and easily review OPA's findings.[7] In addition to publishing a case summary explaining each finding (as OPA does for all of its investigations), in six protest-related cases where the public interest was particularly compelling, OPA created short videos of the incident to help the public understand the reasons for its findings. In addition, OPA has issued numerous protest-related recommendations to SPD addressing diverse topics such as ensuring accuracy in SPD social media posts and placing additional restrictions on the use of blast balls. OPA posts these recommendations and its reasoning on its website, making them publicly available.[8]

   Finally, it is important to recognize the longer-term work OPA has undertaken to promote transparency and public access to information. Starting in June 2020, OPA began posting

---

[6] Available at https://www.seattle.gov/Documents/Departments/CommunityPoliceCommission/CPC2020AnnualReport.pdf

[7] Available at https://www.seattle.gov/opa/case-data/demonstration-complaint-dashboard

[8] Available at http://www.seattle.gov/opa/policy/policy-recommendations

**CITY OF SEATTLE'S OCTOBER 2021 QUARTERLY ACCOUNTABILITY UPDATE** - 9
(12-CV-01282-JLR)

anonymized information about the disciplinary resolution of each of its investigations and the status of all pending or open disciplinary appeals on its website.[9] As a result, a member of the public now can look up any OPA case from 2016 or later and read the OPA Director's findings, determine what discipline the Chief imposed, learn whether the discipline has been appealed, and see the status and final outcome of each appeal.[10] In order to make this information as accessible and interactive as possible, OPA created a dashboard that aggregates complaint and case information, as well as the demographics of the officers and complainants (such as gender, race, and age). The online database is fully searchable.[11] Finally, OPA also launched a new webpage containing information on OPA findings that were overturned by the Chief of Police or disagreed with by SPD's chain of command.[12]

### III. The Office of Police Accountability has continued to refine its policies and procedures to incorporate best practices.

With the exception of requiring that OPA revise its manual and incorporate certain policies and procedures, the Consent Decree does not impose requirements on OPA. ¶¶ 165-67. In fact, the Consent Decree recognizes, "DOJ found that the OPA system is sound and that investigations of police misconduct complaints are generally thorough, well-organized, well-documented, and thoughtful." Consent Decree ¶ 164. OPA satisfied its Consent Decree requirements in 2014.

---

[9] The Seattle City Attorney's Office provides disciplinary appeals data to OPA.

[10] Available at http://www.seattle.gov/opa/case-data

[11] Available at https://www.seattle.gov/opa/news-and-reports/closed-case-summariessummaries - OPA | seattle.gov

[12] Available at https://www.seattle.gov/opa/case-data/overturned-findings

**CITY OF SEATTLE'S OCTOBER 2021 QUARTERLY ACCOUNTABILITY UPDATE** - 10
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

*Monitor's Fourth Assessment* (Dkt. 259-1) at 2; *see also* Court's 7/10/2014 Order Approving OPA's Manual Revisions (Dkt. 161).

However, because of OPA's important role in ensuring constitutional policing, the parties and the Monitor agreed that the Monitor also would conduct two reviews of OPA's performance to provide technical assistance and recommendations. In its first review, the Monitor confirmed that OPA's investigations continued to be thorough and adequate, concluded that OPA's "back-end review phase is among the strongest we have seen," and wrote that the "review process should lend greater credibility to the entire investigative process." *Monitor's Fourth Assessment* (Dkt. 259-1) at 2. In a follow-up report, filed in early 2020, the Monitor confirmed that the "great majority" of OPA's investigations continued to be "adequate" or "thorough, well documented, and complete." *Follow-up Review of the OPA* (Dkt. 604-1) at 2. The Monitor determined that, under Director Myerberg's leadership, OPA had improved from 75% of its investigations being timely to 95% being timely, and in no case had a missed deadline prevented the imposition of discipline during the study period. *See id.* The Monitor noted that Director Myerberg had completed certification memos for 530 investigations between mid-2018 to mid-2019 and observed: "[f]unneling all OPA investigations through the OPA director ensures an impressive level of consistency, rigorous analysis, and sound judgment but it also represents an onerous workload." *Id.* at 25.

In the past quarter, OPA has completed additional revisions to its manual, continuing its commitment to implementing best practices. Important changes include the following:

- New section on Rapid Adjudication—a collectively bargained alternative resolution program available to sworn SPD employees. It encourages SPD employees to take responsibility for conduct that is inconsistent with SPD policy;

**CITY OF SEATTLE'S OCTOBER 2021 QUARTERLY ACCOUNTABILITY UPDATE** - 11
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

- New section on OPA's subpoena authority which states that "OPA has the authority to issue subpoenas at any stage in an investigation to compel individuals to produce records, evidence, or testimony material to the investigation." OPA's subpoena authority was expanded, albeit with limitations, in the collective bargaining agreements negotiated with SPMA and SPOG, in 2017 and 2018, respectively, and the manual is updated accordingly;

- Additional new sections on: Unsubstantiated Misconduct Screening, OIG's role in certifying OPA cases, the equal employment opportunity (EEO) complaint protocol, and adjustments to the 180-day timeline tolling;

- More robust guidelines for accessibility and interpretation services for complainants to ensure effective communication with people who have communication disabilities;

- Expanded conflicts of interest section, including procedures for transferring complaints to the OIG or Seattle Department of Human Resources;

- More detailed protocols and requirements for communicating with complainants, such as specific guidelines for frequency of contact and how to document communications;

- Updated information on investigator training, investigation, and interview best practices;

- Updated definition and case eligibility criteria for Expedited Investigations; and

- Updated definition and case eligibility criteria for Contact Logs.

During the manual revision process, OPA gathered input and feedback from SPD, CPC, OIG, the Monitor, and DOJ. OPA's final revised manual is included with this report as Exhibit 2. It takes effect on January 1, 2022.

## IV. Setting aside the force used during demonstrations, SPD quarterly data demonstrates stability with respect to use-of-force and crisis-intervention outcomes.

The Monitoring Plan requires SPD to provide quarterly data and analysis "to facilitate oversight and long-term trend analysis." *2021 Monitoring Plan* (Dkt. 655-1) at 3, line 13. This data is intended to assist, not supplant, the critical assessment work that the Monitor and DOJ are currently undertaking. In the coming months, the Monitor will file with the Court a Compliance Status Update that extensively analyzes the City's status and progress based on objective, evidence-based measures. *Id.* at line 8.

CITY OF SEATTLE'S OCTOBER 2021 QUARTERLY
ACCOUNTABILITY UPDATE - 12
(12-CV-01282-JLR)

Peter S. Holmes
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

As part of this endeavor, the Monitoring Team and DOJ will conduct an in-depth evaluation of SPD's response to the protests that took place last year. *Id.* Accordingly, it would be premature for the City to offer conclusions here about what the data mean for compliance with the Consent Decree. It is noteworthy, however, that when the 2020 protest-related uses of force are excluded, these quarterly numbers demonstrate stability in two critical Consent Decree areas: the use of serious force and the use of force on people experiencing behavioral crisis. That fact does not discount the magnitude of what happened during the protests, nor does it forestall the need for the careful accounting that is being provided by the Accountability Partners, DOJ, and the Monitor. However, this information may help inform a path forward for the Court, the parties, and the people of Seattle.

One important metric that has been tracked throughout the Consent Decree is the amount of serious force[13] used by SPD officers. In a 2017 use-of-force assessment, the Monitor determined that, as a result of SPD's work implementing the Consent Decree policies and training, SPD had reduced the use of serious force by sixty percent. *Monitor's Ninth Assessment* (Dkt. 383) at 31-32. This decrease was sustained in subsequent years. *SPD's Comprehensive Use of Force Rept.* (Dkt. 588-1) at 3.

When comparing results with findings from previous reporting periods, the numbers generally show stability since the Monitor documented a dramatic reduction in Phase I. *See* Table 1.

---

[13] Serious force includes all Type II and Type III uses of force. Type II force is defined as "[f]orce that causes or is reasonably expected to cause physical injury greater than transitory pain but less than great or substantial bodily harm. Type III force is defined as "[f]orce that causes or may be reasonably expected to cause substantial bodily injury." *See* Seattle Police Manual § 8.050, available at https://www.seattle.gov/police-manual/title-8---use-of-force/8050---use-of-force-definitions

**CITY OF SEATTLE'S OCTOBER 2021 QUARTERLY ACCOUNTABILITY UPDATE** - 13
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

Table 1. Incidents involving a serious use of force

| 28 Month Time Period | Incidents Involving a Serious Use of Force |
|---|---|
| DOJ's 2011 Investigation January 2009 - April 2011 | 1,230 |
| Phase I July 2014 - October 2016 | 487 |
| Phase II January 2017 - April 2019 | 454 |
| "Phase III" May 2019 - August 2021 | 119 (associated with demonstrations) 391 (excluding demonstrations) |

*See SPD's Comprehensive Use of Force Assessment* (Dkt. 588-1) at 3; *DOJ Findings Letter* (Dkt. 1-1) at 4; *Monitor's Ninth Systemic Assessment* (Dkt. 383) at 31-32.

Below the City provides SPD's serious force data from the past 2.5 years, broken out by type of force and *excluding force associated with demonstrations*. These data show continuity from year to year. *See* Table 2.

Table 2. Incidents involving serious (Type II or III) uses of force, *excluding force used during demonstrations*

|  | 2019 | | | | | 2020 | | | | | 2021 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Q1 | Q2 | Q3 | Q4 | Year Total | Q1 | Q2 | Q3 | Q4 | Year Total | Q1 | Q2 |
| Level 2 - Use of Force | 36 | 46 | 43 | 49 | 174 | 54 | 49 | 32 | 33 | 168 | 38 | 32 |
| Level 3 - Use of Force | 2 | 1 | 1 | 1 | 5 | 2 | 1 | 1 | 3 | 7 | 1 | 2 |
| Level 3 - OIS | 2 | 2 | 1 | 1 | 6 | 2 | 1 |  | 1 | 4 | 2 | 1 |

In addition to a reduction in serious uses of force, the Monitor also scrutinized the overall amount and rate of force used by Seattle police officers. *Monitor's Ninth Systemic Assessment*

CITY OF SEATTLE'S OCTOBER 2021 QUARTERLY
ACCOUNTABILITY UPDATE - 14
(12-CV-01282-JLR)

(Dkt. 383) at 29-32. These two metrics (amount and rate) show that the use of any force at all is now an empirically rare occurrence.

First, Consent Decree reporting has identified the overall amount of force used. In 2017, officers reported using force of any type a total of 1,578 times. *SPD's 2017 Use of Force Rept.* (Dkt. 443) at 4.

When looking at the numbers for 2020, the amount of force used during demonstrations is a striking anomaly. The protests of 2020 were unprecedented for complex reasons that OIG is working to identify and analyze through its community-led SER process. *See, e.g.*, Dkt. 682-1 at 21-27. The number of SPD's uses of force during demonstrations throughout 2019, 2020, and the first half of 2021 helps illustrate the unprecedented nature of these events. *See* Table 3.

Table 3. Total number of uses of force associated with a demonstration

| 2019 | | | 2020 | | | | | 2021 | |
|---|---|---|---|---|---|---|---|---|---|
| Q1 | Q3 | Year Total | Q1 | Q2 | Q3 | Q4 | Year Total | Q1 | Q2 |
| 4 | 4 | 8 | 1 | 448 | 404 | 64 | 917 | 1 | 8 |

In addition to the OIG-facilitated SER and OPA's thorough disciplinary investigations, DOJ and the Monitor also are scrutinizing the protest-related uses of force from last year. To facilitate their review, SPD has provided video, Force Investigation Team files, and use of force reports for an agreed upon random sample of incidents.

When excluding the force used during the 2020 demonstrations, the overall numbers have remained stable compared to previous years, at 1,149 for 2020 and 592 for the first half of 2021. *See* Table 4.

Peter S. Holmes
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

Table 4. Total number of uses of force *excluding force used during a demonstration*

|  | 2019 | | | | | 2020 | | | | | 2021 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Q1 | Q2 | Q3 | Q4 | **Year Total** | Q1 | Q2 | Q3 | Q4 | **Year Total** | Q1 | Q2 |
| Level 1 - Use of Force | 290 | 261 | 238 | 255 | 1,044 | 303 | 217 | 174 | 138 | 832 | 235 | 218 |
| Level 2 - Use of Force | 70 | 77 | 83 | 89 | 319 | 106 | 80 | 61 | 58 | 305 | 68 | 59 |
| Level 3 - Use of Force | 2 | 1 | 1 | 1 | 5 | 2 | 1 | 1 | 3 | 7 | 1 | 2 |
| Level 3 - OIS | 6 | 3 | 2 | 2 | 13 | 3 | 1 |  | 1 | 5 | 8 | 1 |
| **Grand Total** | 368 | 342 | 324 | 347 | 1,381 | 414 | 299 | 236 | 200 | 1,149 | 312 | 280 |

In addition to amount of force, the Monitor and the parties also have considered the rate of force used by SPD. That is, how frequently do interactions between police officers and members of the public result in a use of force? One method that the Monitor and SPD have used to estimate this rate is taking the number of reported uses of force and dividing it by the number of "dispatches" (i.e., the number of events to which officers were either dispatched or which they on-viewed in the field). *Monitor's Ninth Systemic Assessment* (Dkt. 383) at 30 (reporting that SPD used force in 0.3% of all incidents, while noting this figure is approximate). When SPD last reported the rate of force to the Court, it was less than one-fifth of one percent (0.15%) of all officer dispatches for calendar year 2019. *SPD's Use of Force Rept.* (Dkt. 605-1) at 2. This rate shows that, overall, the use of force by Seattle police officers has become an empirically rare occurrence. *See id.* Once again, *excluding the force used during protests*, quarterly data from the past two and a half years demonstrates sustainment. *See* Table 5.

Table 5. Total number of uses of force divided by number of dispatches, *excluding force used during demonstrations*

| 2019 | | | | | 2020 | | | | | 2021 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Q1 | Q2 | Q3 | Q4 | Total | Q1 | Q2 | Q3 | Q4 | Total | Q1 | Q2 |
| 0.21% | 0.17% | 0.16% | 0.19% | **0.18%** | 0.23% | 0.18% | 0.15% | 0.13% | **0.18%** | 0.18% | 0.14% |

**CITY OF SEATTLE'S OCTOBER 2021 QUARTERLY ACCOUNTABILITY UPDATE** - 16
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

The excessive use of force against individuals experiencing behavioral crisis was a critical finding in DOJ's 2011 investigation. *DOJ Findings Letter* (Dkt. 1-1) at 4. During Phase I, the Monitor evaluated SPD's compliance with Consent Decree mandated crisis intervention practices and found that SPD had met the requirements in this area. *Monitor's Fifth Assessment* (Dkt. 272) at 1. The Monitor concluded that "SPD has, in a relatively brief amount of time, created a full-fledged crisis intervention program that is successfully being woven into the SPD organization." *Id.* at 4.

Due to these training and programmatic changes, the use of force in crisis incidents has become infrequent. The Monitor reported in 2016 that this rate had fallen to less than 2 percent and observed, "[t]hese numbers suggest that the SPD is using significant and appropriate restraint in difficult situations, making decisions that preserve safety and reduce use of force." *Monitor's Fifth Assessment* (Dkt. 272) at 11-12. When the City last reported on this metric to the Court, for the 18-month period from Jan 1, 2018, to June 30, 2019, reportable force was used in only two percent of crisis contacts. *SPD's Crisis Intervention Rept.* (Dkt. 588-3) at 27. Over the past two and a half years, this rate has remained consistently low, fluctuating between 1.16 and 1.99 percent. *See* Table 6 (note that data in Table 6 *includes* force used during the demonstrations).

Table 6. Percentage of crisis contacts in which reportable force occurred.

| 2019 | | | | | 2020 | | | | | 2021 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Q1 | Q2 | Q3 | Q4 | 2019 Total | Q1 | Q2 | Q3 | Q4 | 2020 Total | Q1 | Q2 |
| 1.77% | 1.31% | 1.29% | 1.99% | 1.59% | 1.81% | 1.48% | 1.16% | 1.20% | 1.41% | 1.51% | 1.34% |

**V.    Quarterly data on police disciplinary investigations and appeals.**

Under the Court-approved Monitoring Plan, the City committed to submit data to the Court regarding disciplinary investigations and appeals. The City provides quarterly data on these topics

**CITY OF SEATTLE'S OCTOBER 2021 QUARTERLY ACCOUNTABILITY UPDATE** - 17
(12-CV-01282-JLR)

Peter S. Holmes
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

below. As an initial matter, to explain why the City provides this data to the Court, it is helpful to briefly review the distinct roles of OPA, OIG, and the Monitor.

A. *OPA's role in the police accountability system.*

OPA conducts disciplinary investigations into allegations of misconduct made against individual SPD employees. Accountability Ordinance, §§ 3.29.010.B, 3.29.100. When an investigation is complete, the OPA Director makes a recommended finding to the Chief of Police. *Id.* § 3.29.120.F. Then, it is the Chief's responsibility to decide whether and in what form discipline should be imposed. *Id.* Thus, under this system, OPA's role is to investigate, evaluate evidence, and determine facts in specific cases of alleged misconduct. In addition, OPA identifies systemic issues that go beyond the actions of individual officers and may be more effectively addressed through changes to training or policy than through discipline. *Id.* § 3.29.100.

OIG, by contrast, focuses almost exclusively on systemic issues. It is charged with "ensur[ing] the fairness and integrity of the police system as a whole" and "oversee[ing] ongoing fidelity to organizational reforms implemented" by SPD under the Consent Decree. Accountability Ordinance § 3.29.010.B. In other words, OIG's mission is to help ensure the fairness and integrity of the police system. OIG conducts performance audits and reviews of SPD—including OPA—to determine the health of department systems and processes. While most of OIG's audits and assessments focus on other aspects of SPD's operations, two of its current projects address OPA. The first is a staffing study evaluating the impact of hiring civilian investigators and investigation supervisors.[14] The second is the Disciplinary Review Audit described above. With respect to

---

[14] *See* OIG's 2021 Workplan at 8, available at
https://www.seattle.gov/Documents/Departments/OIG/Annual/OIG2021Work%20Plan122120.pdf

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

OPA's disciplinary investigations, OIG has an oversight role to ensure that OPA is classifying and routing complaints correctly; OIG also reviews OPA investigations and certifies whether each investigation was thorough, objective, and timely. Accountability Ordinance, § 3.29.240.C. However, OIG does not act as an appeals board to verify if OPA's findings are correct; its focus is directed to procedural compliance and any systemic issues that may arise.

Like OIG, the role of the Monitor also is concerned with overarching patterns and practices. Although discipline is not a focus of the Consent Decree,[15] the parties and the Monitor agree that a robust disciplinary system is critically important and collectively "recognize that a pattern and practice of inadequate accountability for officers could threaten to undermine substantial compliance with the requirements of the Consent Decree." Dkt. 655-1 at 7, line 41. Federal oversight and the Monitor's role thus are concerned with the overall strength of the police accountability system—not with the outcomes of isolated cases.

*B.  OPA's process and data from the past quarter.*

When it receives a complaint alleging that one or more officers have committed a serious policy violation, OPA opens a new investigation. The police union contracts require that OPA must complete its investigations within 180 days, with some exceptions. Between July 1, 2021,

---

[15] The Consent Decree contains several discrete requirements related to discipline. *See* ¶ 12 (CPC shall not comment on discipline, seek to influence disciplinary investigations, or access non-public disciplinary information); ¶ 125 (Force Review Board shall not make disciplinary recommendations but must make appropriate referrals to OPA); ¶ 150 ("[O]fficers who engage in discriminatory policing will be subject to discipline"); ¶ 157 (EIS shall not be used for disciplinary purposes); ¶ 166 (SPD policies must explicitly prohibit "intimidation, coercion, or adverse action against any person who reports misconduct, makes a misconduct complaint, or conducts or cooperates with an investigation of misconduct"); ¶ 167 (specifying procedural requirements for OPA's manual).

**CITY OF SEATTLE'S OCTOBER 2021 QUARTERLY ACCOUNTABILITY UPDATE** - 19
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

and September 30, 2021, OPA opened 81 new investigations. As of September 30, 2021, OPA had a total of 259 open investigations.

During the quarter, OPA completed 64 investigations. For each of these investigations, the OPA Director issued a memo with his conclusions and recommended findings to the Chief of Police. As noted above, all OPA findings issued since 2016 are available on OPA's website.[16] If the evidence shows that a serious violation of SPD policy occurred, the OPA Director will recommend a "sustained" finding. If the evidence shows that misconduct did not occur, the Director will likely recommend a "not sustained" finding. Out of the 64 completed investigations, OPA recommended sustaining allegations in 14 of these cases (22%) against a total of 14 SPD employees. Three of the cases involved one or more sustained use-of-force findings; one involved sustained use-of-force de-escalation findings (against two officers); and there were no sustained force reporting violations.

If the OPA Director recommends finding that an employee committed misconduct, then the Chief of Police decides whether to impose discipline and what the discipline should be. Examples of discipline include oral reprimand, written reprimand, demotion, reassignment, suspension from work (without pay), and termination. If the Chief decides not to follow one of the OPA Director's recommended findings, then the Chief must issue a public statement explaining the reasons. Thus far in 2021, the Chief has overturned one of OPA's findings, a decision described in the City's last quarterly report. Dkt. 682 at 10-11. Between July 1 and September 30, 2021, as

---

[16] Available at https://www.seattle.gov/opa/news-and-reports/closed-case-summaries

**CITY OF SEATTLE'S OCTOBER 2021 QUARTERLY ACCOUNTABILITY UPDATE** - 20
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

a result of OPA's investigations, the Chief imposed discipline on 11 officers.[17] One additional case was forwarded to the Community Safety and Communications Center for consideration of discipline against a dispatcher. During this time, eight disciplinary appeals were filed related to an OPA recommended finding of misconduct.

## VI.   City Council's Less Lethal Weapons Ordinance No. 126422.

On June 15, 2020, the City Council enacted an ordinance banning the use of crowd control weapons by SPD. Dkt. 625-1. Upon DOJ's motion, the Court restrained the implementation of the Ordinance. Dkt. 630.

Subsequently, in August 2020, as requested by both the Mayor and City Council, each of the Accountability Partners issued a report with recommendations about whether or to what extent less lethal devices should be used for the purpose of crowd management; the Court directed that these reports be submitted for its consideration. *See* Dkts. 626 at 7-8, 636, 637, 639. As previously described, in response to the Court's ruling and the Accountability Partners' recommendations, the City Council Public Safety and Human Services Committee developed and voted to approve a draft bill that would amend the ordinance that the Court had enjoined. The Committee also voted to submit the draft bill to DOJ and the Monitor to enable conversations, seek feedback, and promote collaboration with respect to any concerns that may be raised.

After having conversations with and receiving informal comments from DOJ and the Monitoring Team, Councilmember Herbold, Committee Chair, made substantial revisions to the

---

[17] Because the Chief must review and contemplate disciplinary matters before reaching a decision, there is a time lag. Some of the cases in which the Chief imposed discipline in the third quarter were closed by OPA before the third quarter.

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

draft bill. On August 17, 2021, a modified version was adopted by the City Council in a 7-0 vote. Mayor Durkan issued a statement describing her reasons for not signing the bill. Ordinance No. 126422 took effect on September 27, 2021.

Section 4 of the Ordinance requires SPD to draft and publish revised policies. In accordance with the Court's preliminary injunction, the provisions of the Ordinance that regulate SPD's use of less lethal weapons do not take effect until such revised policies have undergone the process set forth in paragraphs 177-181 of the Consent Decree. *See Court's Temporary Restraining Order* (Dkt. 630) at 8:12-21; *Court's Preliminary Injunction* (Dkt. 647) at 1; Ordinance 126422, § 5. The Ordinance gives SPD until November 26, 2021, to publish draft policy revisions, after which time DOJ and the Monitor will have an opportunity to review them. Ordinance 126422, §§ 4 & 6. Accordingly, DOJ's and the Monitor's formal review under the Consent Decree has not yet begun.

**VII.  The Washington Supreme Court denied SPOG's petition for review, thus making final the Court of Appeal's ruling that the City does not have to reinstate former Officer Adley Shepherd.**

On September 2, 2021, the Washington Supreme Court denied the petition for review of the Seattle Police Officers Guild (SPOG).[18] SPOG had sought to challenge the decision of the Washington State Division 1 Court of Appeals upholding the Superior Court order vacating an arbitrator's decision to reinstate Officer Adley Shepherd.[19] Former Seattle Police Chief O'Toole had terminated Shepherd after he punched a handcuffed suspect in the face while she was seated in the back of a patrol car, fracturing her skull.  In 2018, after an arbitrator decided that Shepherd

---

[18] Available at https://news.seattle.gov/wp-content/uploads/2021/09/090121ShepherdDenial.pdf

[19] Available at https://www.courts.wa.gov/opinions/pdf/804677.pdf

**CITY OF SEATTLE'S OCTOBER 2021 QUARTERLY ACCOUNTABILITY UPDATE** - 22
(12-CV-01282-JLR)

**Peter S. Holmes**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

1
2
3

was entitled to less severe discipline and should be reinstated, the City made the decision to not reinstate him and, instead, to seek review in Superior Court. Under the Supreme Court's ruling, Adley Shepherd remains terminated.

4

## CONCLUSION

5
6
7
8
9
10

The City's independent police accountability system has been working as intended to determine what happened during the 2020 protests, reflect the values and perspectives of the community, and build a foundation for the City to move forward. In addition, the Monitor and DOJ are carrying out their important role to independently evaluate the facts and issue findings related to the Consent Decree requirements. Their analysis will inform the public and allow this Court to draw conclusions about the status of the City's compliance.

11
12

Respectfully submitted,

13

DATED this 29th day of October, 2021.

14
15

For the CITY OF SEATTLE
PETER S. HOLMES
Seattle City Attorney

16
17

*s/ Kerala T. Cowart*
Kerala T. Cowart, WSBA #53649

18
19
20

Assistant City Attorney
Seattle City Attorney's Office
701 Fifth Avenue, Suite 2050
Phone: (206) 733-9001
Fax: (206) 684-8284
Email: kerala.cowart@seattle.gov

21
22
23

CITY OF SEATTLE'S OCTOBER 2021 QUARTERLY
ACCOUNTABILITY UPDATE - 23
(12-CV-01282-JLR)

Peter S. Holmes
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200