# Comprehensive Assessment of the Seattle Police Department

*May 2022*



**Seattle
Police
Monitor**

# Table of Contents

A LETTER FROM THE FEDERAL MONITOR ..................................................................................... 3

EXECUTIVE SUMMARY ............................................................................................................... 7
    A.   USE OF FORCE ................................................................................................................ 8
    B.   CRISIS INTERVENTION .................................................................................................... 13
    C.   STOPS AND DETENTIONS ................................................................................................ 14
    D.   CONCLUSION ................................................................................................................ 18

METHODOLOGY ...................................................................................................................... 20
    A.   WHAT DISPARATE IMPACT DOES & DOES NOT ESTABLISH ................................................... 22

USE OF FORCE ........................................................................................................................ 26
    A.   BACKGROUND AND CONSENT DECREE REQUIREMENTS ...................................................... 26
    B.   PREVIOUS ASSESSMENTS DURING THE CONSENT DECREE .................................................. 27
    C.   THE CITY'S RESPONSE TO THE HISTORIC 2020 PROTESTS ................................................... 31
        1.   Introduction ........................................................................................................ 31
        2.   SPD's Performance During the 2020 Protests ....................................................... 33
        3.   Changes by SPD to Improve Protest Response ....................................................... 38
        4.   Misconduct Investigations of Protest-Related Complaints ...................................... 40
        5.   Seeking System Change Through the Office of Inspector General's Sentinel Event Review ...................43
    D.   SPD'S USE OF FORCE PERFORMANCE ............................................................................... 50
        1.   Scope & Approach ............................................................................................... 50
        2.   Introduction to Findings on SPD's Recent Performance ......................................... 51
        3.   How SPD Classifies and Counts Uses of Force ...................................................... 51
        4.   Overall Use of Force Trends ................................................................................. 53
        5.   Contextualizing Protest-Related Uses of Force within Overall Force Trends ........... 58
        6.   Use of Force by Instrument .................................................................................. 63
        7.   Rate of Use of Force per Officer Dispatch ............................................................ 67
        8.   Frequency of Force by Officer ............................................................................. 68
        9.   Officer and Subject Injuries ................................................................................ 72
        10.   Demographics of Subjects of Force ...................................................................... 74
        11.   Use of Force Review and Accountability Mechanisms ............................................ 80
    E.   CONCLUSION ................................................................................................................ 89

CRISIS INTERVENTION .............................................................................................................. 91
    A.   BACKGROUND & CONSENT DECREE REQUIREMENTS .......................................................... 91
    B.   PROGRESS TO DATE & PREVIOUS ASSESSMENTS ............................................................... 92
    C.   SPD'S RECENT PERFORMANCE ....................................................................................... 94
        1.   Scope & Approach ............................................................................................... 94
        2.   Findings ............................................................................................................. 95
    D.   CONCLUSION ................................................................................................................ 105

STOPS AND DETENTIONS ........................................................................................................... 106
    A.   BACKGROUND AND CONSENT DECREE REQUIREMENTS ...................................................... 106
    B.   PROGRESS TO DATE & PREVIOUS ASSESSMENTS ............................................................... 107
    C.   SPD'S RECENT PERFORMANCE ....................................................................................... 109
        1.   Quality of Stops & Frisks .................................................................................... 110

*2.      Stop Activity*................................................................................................................*112*
*3.      Stop Outcomes*.............................................................................................................*117*
*4.      Frisk Rates & Weapons Found During Stops*...............................................................*126*
*5.      Disparate Impact*.........................................................................................................*133*
D.      CONCLUSION..........................................................................................................................143

**SUPERVISION** .............................................................................................................................. **145**

A.      STAFFING .................................................................................................................................145
B.      EARLY INTERVENTION .............................................................................................................146
C.      CONCLUSION............................................................................................................................147

**CONCLUSION TO THE ASSESSMENT REPORT** ..................................................................... **149**

**Seattle
Police
Monitor**

# A Letter from the Federal Monitor

I am pleased to submit this Comprehensive Assessment of the Seattle Police Department to the United States District Court for the Western District of Washington and the people of Seattle.

Seattle has accomplished a great deal under the Consent Decree. Over the past decade, Seattle's communities have voiced visions for change, the Consent Decree has provided a foundation for constitutional and lawful policy and practice, and the Seattle Police Department (SPD) has changed its practice and performance across several critical functions. The vast majority of SPD officers have embraced a new mission and values; worked to create a service-oriented culture; expanded knowledge and skills on crisis intervention, de-escalation, and less-lethal tactics; and committed to new policies and practices.

Policing in Seattle has changed significantly in the last decade. At the start of the Consent Decree in 2012, the Seattle community had virtually no consistent and reliable access to SPD data or outcomes. Use of force, stops, detentions, and other interactions were rarely tracked – and if they were, it would be on an index card or scrap of paper thrown into a filing cabinet without review. Officers had inferior training and supervision on how to de-escalate volatile interactions and resolve incidents with people experiencing a mental health crisis. Now, SPD officers have an array of new policies, practices, and tools that focus on the sanctity of life. Incidents and interactions are documented and analyzed. And use of force incidents are routinely reviewed to learn and inform policy change. These basic, yet important, advances all support the constitutional and lawful policing the Consent Decree required.

These changes do not simply exist in theory or on paper.  They can be seen in how officers are performing on a day-to-day basis.  Officer use of force has declined 48 percent from 2015 to 2021. Officers and supervisors consistently adhere to Court-approved use of force policies. SPD

officers respond to nearly 10,000 people in crisis per year, and Crisis Intervention Teams have dramatically improved interactions and outcomes – with force used in only 1.5 percent of contacts with individuals experiencing crises and many improvements made in connecting individuals in crisis to supportive human services. And when officers stop or detain a person, they must now articulate the reason for a stop and provide justification for searches. As a testament to this progress, policing organizations around the nation, to advance their own reforms, have come to Seattle to learn from SPD and adopt policies and best practices in crisis response, de-escalation, and critical decision-making models.

Yet SPD's progress under the Consent Decree must not obscure either the reality of its past or the continuing work that must be done to successfully end the decree. This was made clear during community engagement sessions that the Monitoring Team held in collaboration with the Community Police Commission, as well as in other community-based meetings in which the Monitoring Team has participated, surrounding this assessment report. The purpose of this community engagement was to inform community members on the preliminary assessment measures of SPD, and gain community ideas and feedback. This engagement is valuable for the Seattle community, as it helps us track overall progress. Behind every data point on an incident, stop, or use of force are people – not only the subject of the incident but also the community impacted. Each person is someone's friend, family, or loved one, and their collective, lived experience forms their measure of trust and legitimacy in policing.

This convergence of systemic analysis and lived experience makes the final phase of the Consent Decree challenging for SPD, the City of Seattle, and community members – as all will need to find common ground, understanding, and resolve.  This work will require a mix of reforms and fixes identified in community sessions and this comprehensive assessment, as well as initiatives that, while not legally required or strictly mandated by the Consent Decree, will show the Seattle community that SPD can sustain progress, honor the experiences and needs of Seattle's diverse communities, and strengthen the Department's capacity to engage in critical self-analysis, learn, and adapt.

First, SPD must restore trust that the Department lost during the protests and demonstrations that occurred in 2020 in the wake of the murder of George Floyd in Minneapolis and SPD's resulting response. Doing so will necessitate unpacking a complex set of events and actions. SPD officers indicate that they were short-staffed, sleepless, and working endlessly for weeks. Other community members note that we ask more of police when the nation and a city is hurting and searching for justice and that, in these trying times, police need to be exceptional. Many question the preparation, supervision, and leadership of command staff during this time – a breakdown

4

which left front-line officers to pick up the pieces.  Through the Sentinel Event Review described in this report, changes to crowd management policy and practice, and a renewed commitment to being guardians of constitutional rights, SPD will need to mend some deep wounds around these events and assure the community they are prepared to justly meet such challenges in the future.

Second, the accountability system – comprised of the Office of Inspector General, the Office of Police Accountability, and the Community Police Commission – will undergo a performance and capacity assessment to ensure it has the optimal policies, structures, systems, processes, and human capital to adapt to community needs and sustainably deliver results. Connected to this work on accountability, the Monitoring Team will be tracking progress on collective bargaining agreements and advising the Court on progress and challenges to upholding accountability. Additionally, the Monitoring Team will be providing technical assistance to the City of Seattle to improve data usability, accessibility, and transparency, which is critical to ongoing public confidence in accountability.

Third, the City of Seattle must address disparate impact in policing. As this comprehensive assessment documents, Black and Native American persons in Seattle are disproportionately stopped, detained, and/or subjected to force by Seattle police. Even as the sources of these disparities may be complex, SPD must catalyze the City of Seattle to identify systematically the types of activity that lead to disproportionate impacts and explore potential alternative responses that might reduce or eliminate such disparities.  At the same time, the Department must remain relentless in its efforts to root out racism and bias within its ranks.  The foundation of solid data and analytics driven by the Consent Decree, and the creativity and ingenuity of SPD in developing analytic capabilities to better understand the root causes of disparities in policing, will help Seattle as whole. These new capabilities and insights will help the City of Seattle develop "upstream" human services that address the root causes of disparities, heal past traumas, and build a city that's equitable and safe for all.

While these workstreams and initiatives are vital, the community of Seattle should also keep pushing for the public safety services that meet the demands of today and the future. The Consent Decree is a powerful tool for ensuring safe, effective, and constitutional policing. However, the Consent Decree does not, and cannot, alone ensure public safety services in Seattle that align with the needs, challenges, values, and vision of Seattle's community.

To that end, one immediate and critical issue is the number of officers available for community. With the number of deployable SPD officers standing at approximately 960 (down 34 percent from the Department's authorized staffing level of 1,443 officers), essential core functions such

as 911 response are strained, critical functions such as investigations and clearances of crimes are limited, and proactive micro-community policing plans are all but shelved. The current level of officers creates a "negative flywheel effect" – putting at risk progress made under the Consent Decree; reducing the health, wellness, and preparedness of officers; leaving vulnerable populations and communities at risk; and eroding community trust in policing.

Sustaining progress now and building the future will require the focused efforts of stakeholders from across Seattle. The mayor must select a permanent police chief who can continue to improve SPD practices and culture over time and operate the organization ever more effectively and efficiently. The Seattle City Council must ensure that SPD can train, hire, and provide supervision to qualified and committed personnel; invest in alternative response capabilities; and negotiate a contract with police unions that upholds appropriate working conditions and procedural justice while also bolstering accountability and community trust. Most importantly, it will be up to the people of Seattle to keep visioning and defining the outcomes desired from public safety services and keep the city moving toward that future.

Dr. Antonio M. Oftelie
Federal Monitor, Seattle Police

# Executive Summary

This assessment report provides an update to the public and the Court on the Seattle Police Department's performance complying with the Consent Decree and the future progress required to complete and close the Consent Decree.

Over the past ten years, the Consent Decree has provided a foundation for sustainable progress towards constitutional and lawful policing services in Seattle. The Seattle Police Department (SPD) initially came into full and effective compliance with the Consent Decree in January 2018, based on extensive reviews by the Monitoring Team of SPD's performance implementing the requirements of the Consent Decree in practice across all substantive areas of the consent decree. On May 7, 2020, after more than two years of demonstrating sustained compliance, the City and the Department of Justice filed a motion to terminate most substantive provisions of the Consent Decree, the exception being certain provisions pertaining to accountability for which the Court had deemed the City noncompliant.

On May 25, 2020, Derek Chauvin of the Minneapolis Police Department murdered George Floyd, igniting protests across the world. SPD's response to the protests produced significant use of force, historic levels of misconduct complaints, and general community outcries, leading to the City of Seattle withdrawing the motion to terminate most of the Consent Decree on June 3, 2020 "so that the City and its accountability partners [could] conduct a thorough assessment of SPD's response to the demonstrations."[1]

As discussed below, the Department at points failed to adhere to its use of force requirements during the protests and generally struggled to meet its force review obligations under the Consent Decree, which SPD does not dispute. The resulting damage to SPD's relationship with the community was considerable. As SPD reviewed these uses of force, the Department referred potential policy violations to the Office of Police Accountability when identified and proactively raised capacity and workflow constraints around force review to the Department of Justice and the Monitoring Team, leading to impacts on the timeliness and documented thoroughness of force reviews. Commanders in the field during the protests recognized the need for a different, improved approach to protest management, pivoting in the midst of ongoing demonstrations to new tactics that led to general declines in the use of force over time.  SPD subsequently incorporated these and other important changes into policies approved by the Court and provided improved training to the entire Department on responding to demonstrations. SPD has committed to further iterations of these policies and training this year. None of this gives SPD a "pass" on the failures of the summer of 2020, but these actions and SPD's future commitments do demonstrate SPD's capacity as a learning organization, which is a fundamental goal of the

---

[1] City of Seattle, News, "City Attorney to Withdraw Consent Decree Motion" (June 3, 2020), https://news.seattle.gov/2020/06/03/city-attorney-to-withdraw-consent-decree-motion/.

Consent Decree. Confronted with failures, the systems changed for the better. While this adaptation was too slow and does not mollify the community outrage, it should not be ignored.

In sum, based upon its reviews conducted over the course of 2021 and 2022 to date, the Monitor finds that the Department has sustained full and effective compliance with areas relating to crisis intervention, stops and detention, and bias-free policing. The Monitor further finds that the Department has sustained full and effective compliance with use of force in all respects **except** during the waves of protests over the summer of 2020, in which the serious concerns from both the community and the Monitoring Team described herein evidenced a need for further work in the area of policy and training around use of force, force reporting, and force review in large-scale crowd management events.

Now, the City and SPD will continue its pursuit of full compliance with the Consent Decree by completing actions set forth in the 2022 monitoring plan, which spells out a series of specific actions in areas such as accountability, crowd management, data governance, and assessing disparities. With such continued work, the City and SPD can solidify the foundation for moving into a new era of community-led public safety, bolstered by a leading police department committed to innovation, learning, and continuous improvement.

## A.  Use of Force

The Consent Decree required that SPD implement new policy, training, and practices to improve force tactics, reporting, and review procedures to produce better outcomes on use of force and safer interactions with the public. In 2017, the Monitoring Team concluded that SPD was in compliance with the use of force requirements of the Consent Decree, based on a review of force incidents between 2014 and 2016. Subsequent reviews across 2018 and 2019 found sustained compliance with the Consent Decree's use of force requirements.

For this assessment, the Monitoring Team reviewed both general use of force practices from 2019 to 2021 as well as SPD's response to protests in the summer of 2020. While DOJ expressed concerns with SPD's protest response practices in its 2011 report, DOJ did not make specific findings regarding SPD's crowd management practices. In turn, the Consent Decree focused on requirements for the more typical, isolated use of force incidents in which one officer, or a limited number of officers, apply force to one subject, or a limited number of subjects, in an individual event.  It did not specifically address mass use of force events such as the 2020 protests, though the Consent Decree's general use of force principles and requirements certainly still applied to force during the protests. The Monitoring Team reviewed SPD's protest response through this lens, recognizing that the Consent Decree's force principles apply to any use of force while recognizing the Consent Decree's force reporting and review process may not have been geared for extensive, sustained use of force events.

The Monitoring Team's analysis of force incidents from 2019-2021 for this report found, among other things:

*Use of Force Generally*

- **Over the course of the Consent Decree, SPD's use of force decreased significantly overall and across all levels of force, with records lows in 2019 and 2021 punctuated by the historic levels of protest-related force in 2020.** SPD reported record high usage of less-lethal instruments both during protest situations and outside of protests in 2020. SPD's response to the 2020 protests is discussed in greater depth below and in the body of the report.
- **SPD's overall use of force declined 33% from 2015 to 2019 and 48% from 2015 to 2021.** 2019 and 2021 also represent record lows for SPD use of force when compared against officer dispatch metrics which attempt to account for decreased officer activity resulting from Covid-19 and other potential factors.
- **The most serious force incidents (Type III) decreased by 61% from 2014 (47) to the period of 2019 to 2021 (18.3 average).** Across 2019 through 2021, SPD used serious force in 0.003% of officer dispatches – or once in every 39,807 officer dispatches.
- The incidence of **officers pointing firearms at subjects has reduced significantly over the course of the Decree**, reaching some of the lowest levels since the start of the Consent Decree during parts of 2020 and 2021.
- **SPD reduced its average monthly usage of Tasers some 80%** from the period of 2001 to 2010 (preceding the Consent Decree) to the Consent Decree period of 2015 to 2021 – decreasing from an average of 14 to 2.8 uses of force involving a Taser per month.
- SPD officers have turned from "too quickly resorting to the use of…batons"[2] to almost never using batons. While batons were present during the 2020 protests, they were generally used for purposes of pushing or guiding, not as an impact tool.
- As discussed in the Methodology and Use of Force sections of this report, the preliminary version of this report identified that a significant portion of SPD's use of force data on its open data portal indicated that the subjects of force did not have a listed race, so the Monitoring Team called for SPD to analyze this issue. SPD reviewed this issue and reported to the Monitoring Team that there was a data mapping error between its use of force reporting system and its open data portal leading to inflated reporting of force subjects of unknown race. SPD promptly corrected this issue, and the Monitoring Team conducted a validation process to confirm consistent race reporting between IAPro and the open data portal. **The Monitoring Team recommends that SPD engage with the**

---

[2] U.S. Department of Justice, *Investigation of the Seattle Police Department* 4 (Dec. 6, 2011), https://www.justice.gov/sites/default/files/crt/legacy/2011/12/16/spd_findletter_12-16-11.pdf [hereinafter "2011 Findings Letter"].

**OIG and CPC regarding its open data to address any concerns regarding the open data or its usability to support the community's ability to continually monitor SPD's operations.**

- As with analyses of SPD's prior data, **the distribution of use of force across races does not resemble the racial makeup of Seattle**, with Black subjects and American Indian subjects comprising a larger portion of use of force subjects when compared to their share of the population. The Methodology section of this report discusses the meanings and limitations of such population-based comparisons.

- For 2019-2021, **Black subjects were involved in the highest number of the most serious types of force** (Type III, including officer shootings) with 21, followed by White subjects (14), subjects of "unknown" race (8), and Asian subjects (6).

- There was a **66% decrease of pointings of lethal firearms at Black individuals** from 2015 (304 pointings) to 2019-2021 (average of 102). Even as this decrease is notable, **Black subjects are still most likely to be the subject of a firearm pointing** despite being the subject of force less frequently than White subjects or subjects of unknown race.[3] Firearm pointing is classified as a Type I use of force.

Available information from the period of 2019 through 2021 also sheds light on various, overlapping systems of accountability in place to analyze and evaluate officer use of force.

- Overall, **SPD demonstrates consistent adherence to its use of force policies in practice**, and supervisors regularly take corrective action in response to deficiencies.

- **SPD's force reporting and review practices have improved dramatically over the course of the Consent Decree, from no apparent meaningful review at the outset to intensive reporting and reviews today.** At the beginning of this process, "force often went unreported – leaving it subject to no departmental scrutiny.[4] When force was reported, it was documented "on paper stuffed, unreviewed, in file cabinets."[5] SPD's transformation in this area has been a key achievement of SPD's reforms under the Consent Decree, leading to improved force practices and accountability.

- The Force Investigation Team continues to document in-depth investigations of the most serious force incidents, and the Force Review Board continues to conduct wide-ranging discussions which generate a variety of recommendations for organizational improvement.

- Misconduct investigation cases involving use of force rose steadily from 2014 to 2018, before decreasing by more than half in 2019, rising back up to the highest levels on record in 2020 before then hitting a recent low in 2021. Due to complaints about

---

[3] SPD's disparity analysis, conducted during the sustainment period, found firearms pointing was not typically reflective of discretionary decision-making but rather resulted from policy or training for high-risk operations (e.g., occupied stolen vehicle stops / recovery, warrant service at a residence, etc.).

[4] Ninth Systemic Assessment at 1 (internal citations omitted).

[5] Ninth Systemic Assessment at 1 (internal citations omitted).

demonstrations, 2020 produced a record high number of use of force misconduct allegations, 80% higher than the next highest year (2017). OPA sustained 10% of use of force allegations from 2019 to 2021.

- As SPD's internal force review mechanisms, misconduct investigations by the Office of Police Accountability, and the systemic oversight by the Office of Inspector General and the Community Police Commission continue to strengthen capabilities, SPD and its accountability partners will be positioned to improve accountability and performance on use of force provided the City sufficiently staffs and emphasizes these functions.

**These various internal and external systems together provide Seattle with rigorous use of force oversight programs and present mechanisms for continually improving force practices into the future.** Especially as the events of 2020 made clear, the existence of these systems does not, by themselves, eliminate problematic uses of force by SPD.  Instead, these systems support improved performance overall and provide heightened levels of accountability and feedback when misconduct or issues occur. With continued support, emphasis, and community collaboration, these interlocking systems of accountability can maintain and enhance SPD force practices to promote safety for the Seattle community moving forward.

*Use of Force & the 2020 Protests*

- **SPD's response to the 2020 protests in the aftermath of the murder of George Floyd resulted in historic levels of protest-related uses of force and misconduct complaints**, leading the City to revoke a motion to terminate paragraphs 69-168 of the Consent Decree.

- In the midst of the 2020 protests, SPD notified OIG, OPA, the Monitoring Team, and DOJ that it would be out of policy with respect to the time requirements of force reporting, investigation, and review, due to the volume of use of force incidents and decisions to redirect staff to protest response and other operational duties.

- Additionally, **SPD recognized—and the Monitoring Team found—that some uses of force in the demonstration context did not accord with the policies developed under the Consent Decree**. Perhaps more importantly, SPD's tactics and demonstration management approaches did not meet the community's expectations, and all involved believed that SPD could do better.
  - As a result of these issues, SPD overhauled its crowd management policy and training to guide future protest responses of this scale, with a focus on facilitating First Amendment protected activity while addressing specific criminal activity.
  - **SPD's protest response generated approximately 19,000 complaints, resulting in 145 unique incidents involving allegations of police misconduct, according to OPA.** Many thousands of these complaints stemmed from a small number of incidents that went viral on social media. As of March 2022, OPA had completed

130 of the 145 investigations.[6] These completed cases led to 43 total sustained findings of misconduct. To date, two thirds of cases leading to a disciplinary outcome have resulted in written or oral reprimands. Thus far, four cases resulted in a suspension without pay, with two cases leading to resignations prior to discipline, and one case leading to a disciplinary transfer.

o   **City leadership called for a systemic review of SPD's protest response to identify what went wrong and how the City could avoid these problems in the future**. This led to the Office of Inspector General initiating an in-depth Sentinel Event Review (SER) process with community partners and SPD to critically analyze SPD's protest response and generate recommendations to improve the City's protest response in the future. **The Monitoring Team has observed this process from the start and found it to be a robust, necessary process of critically analyzing SPD's protest response and generating meaningful recommendations for moving forward**. SPD either agreed to implement or had already implemented the vast majority of the SER's recommendations, demonstrating a commitment to improvement both based on community feedback and SPD's identification of issues. The important work of the SER continues to this day and will produce additional recommendations for improvement in future reports.

*Conclusion on Use of Force*

SPD's outcomes with respect to use of force have largely sustained or improved in the ensuing years since the 2017 compliance determination, except for notable problems in SPD's response to the 2020 protests. **As a result, the Monitoring Team finds SPD has sustained compliance with the use of force requirements outside of the protest context.** Over the course of the Consent Decree, force overall and at every level, including the most serious use of force like an officer shooting, have decreased significantly. As a result, **SPD's reforms have translated into safer interactions between police and the community.** SPD must continue to strive for ever-improving outcomes in its interactions with the community, building upon these significant, positive changes in its operations.

While the City and SPD have taken meaningful action to remedy the issues apparent in the City's response to the protests, more work is required to protect against such problems in the future – and ultimately conclude this central area of the Consent Decree, including:

---

[6] The City reports that 13 of the 15 remaining cases involve an employee on leave or a former employee, which may complicate the investigation.

1. SPD must review and submit its policy and training for protest response and supervision and submit the new policy to the Court for approval, building on extensive policy and training changes already completed by SPD.
2. SPD must continue to follow-through on its commitments from the Sentinel Event Review process and implement feasible policy changes.
3. SPD must develop an alternative reporting and review process to ensure similar failures in reporting and review do not occur should significant, sustained protests arise again.

SPD's overall compliance with Consent Decree requirements on use of force do not represent the end of SPD's potential improvement in this area. SPD should do everything in its power to avoid the tragic outcomes that can result from use of force moving forward. SPD has made significant gains in its use of force practices over the course of the Consent Decree and must continue to strive toward further improvement with the assistance of its accountability partners.

## B. Crisis Intervention

The Consent Decree required that SPD implement a number of reforms aimed at reducing force applied to individuals experiencing behavioral crisis and steering individuals in crisis to appropriate mental health and social services. Over the course of the Consent Decree, SPD has implemented new policy, training, and data tracking mechanisms to support improved response to crisis situations. Based on a 2016 assessment of SPD's performance, the Monitoring Team declared that SPD had complied with the crisis intervention requirements of the Decree. This compliance was subsequently confirmed in a 2018 review. This assessment revisits SPD's performance on crisis intervention and finds the following:

- SPD responds to a significant number of crisis events, documenting around 10,000 crisis contacts per year.
- Specially trained Crisis Intervention Team officers continue to be dispatched to calls for service that appear to implicate behavioral crisis issues. CIT officers were dispatched in 73% of all crisis calls in 2019 and 82% of calls in 2020, according to SPD's records.
- **SPD reported using force one or more times in approximately 1.5% of crisis contacts across 2019 and 2020.** This rate of force is slightly below previous rates reported over the course of the Consent Decree.
- **0.03% of crisis contacts involved a Type III use of force, such as an officer shooting, from 2019-2020.** This is a low frequency, and SPD must continue to strive to minimize such serious uses of force, which can have profound consequences for community members. **Critically, the 2022 monitoring plan calls for a focused review of policy and training for interactions with a person holding an edged weapon, particularly in environments where it can be difficult for SPD to establish time and distance to de-escalate effectively.**

13

- **The sustained, low rate of force – and especially serious force – in crisis intervention situations represents a dramatic improvement from DOJ investigative findings that led to the Consent Decree.**
- **Crisis contacts results rarely lead to misconduct findings.** About 0.24% of all crisis contacts in 2020 were the subject of a complaint to the Office of Police Accountability (OPA), with OPA sustaining allegations stemming from those investigations in 0.07% of crisis contacts overall, according to City records.
- **SPD's crisis response frequently seeks non-enforcement outcomes to help the individual in crisis.** SPD's arrest rate in crisis situations remains consistent with what the Monitoring Team found in its 2016 assessment. The Monitoring Team's 2016 review found SPD crisis contacts resulted in arrest 7.5% of the time. SPD's arrest rate was 8.62% in 2019 and 6.30% in 2020.

**Overall, SPD's outcomes with respect to crisis contacts have largely sustained or improved** in the ensuing five plus years since the Monitoring Team initially declared SPD's compliance with the crisis intervention requirements of the Consent Decree in 2016. **As a result, the Monitoring Team finds sustained compliance in this area.**

## C.  Stops and Detentions

The Consent Decree required SPD to implement new policies, trainings, documentation procedures, and supervisory requirements regarding its stop practices and to respond to concerns about associated biased policing. In a comprehensive review in 2017, the Monitoring Team found that SPD consistently followed law and policy when conducting stops and searches. The Monitoring Team also found that race was "not a factor in determining an individual's likelihood of being the subject of a 'bad' stop," i.e., a stop that was counter to law or policy.[7] Based on these and other findings, the Monitoring Team certified SPD as in compliance with the stops and detentions requirements of the Consent Decree and the related bias-free policing requirements (paragraphs 138-151).[8]  Subsequent reviews in 2018 and 2019 found sustained compliance in this area.

Even as it found SPD in compliance with these provisions, the Monitoring Team identified that "an individual's race . . . helps to predict the likelihood of being stopped and the likelihood of being frisked by an SPD officer," when factoring in various potential sociological factors that could impact disparities in policing.[9] While the Monitoring Team recognized that "neither the Consent Decree nor the Court-approved policies on stops and bias-free policing demand that SPD

---

[7] Tenth Systemic Assessment at 6.
[8] Tenth Systemic Assessment at 7.
[9] Tenth Systemic Assessment at 4.

immediately stop practices that it may determine are linked to disparate impacts,"[10] the Monitors pointed to the need for more action on the issue. Specifically, the Monitoring Team emphasized that disparate impacts in stop data, regardless of whether the stops were legally justifiable or not, were of continuing concern and should be further examined by SPD and the Seattle community.

The Monitoring Team observed that this future work aligned with SPD's bias-free policing policy, developed and implemented as a result of the Consent Decree, which provides a framework for SPD to engage collaboratively with the community toward addressing disparities. The bias-free policing policy requires that where "unwarranted disparate impacts are identified" with respect to a given SPD practice or policy, "the Department will consult as appropriate with neighborhood, business and community groups, including the Community Police Commission, to explore equally effective alternative practices that would not result in disproportionate impact."[11] SPD has subsequently conducted further analysis in this area in partnership with the Community Police Commission to identify opportunities to modify SPD's operations, as discussed later in this report.

*Summary of This Assessment of SPD's Recent Performance on Stops and Detentions*

The Monitoring Team reviewed SPD's recent performance related to stops and detentions to provide an updated compliance assessment, and key findings include:

- **Officers continue to routinely articulate reasonable suspicion for their stops** at rates consistent with what was previously found by SPD during the sustainment phase of the Consent Decree.
- **Officers are appropriately articulating the justification for conducting frisks** at rates consistent with previous sustainment phase audits.
- **SPD does not conduct frisks after stops as a matter of course**, with frisks occurring in 23% of stops from 2018 to 2020.
- **Race was not a factor in determining an individual's likelihood of being the subject of a stop or frisk lacking documentation of sufficient legal justification** by officers.

This assessment also summarized a variety of quantitative statistics and trends within SPD stop practices and outcomes that, while not strictly relating to specific Consent Decree requirements, provide context and additional findings regarding SPD's performance over time:

- SPD conducted 4,282 stops in 2021 – its lowest on record, 30% below the previous low in 2020, and 52% below the recorded high in 2018.
- **Racial disparities in stops remained fairly consistent between 2015 and 2020**, with the greatest disparities for Native American and Black individuals, compared to Seattle's

---

[10] Tenth Systemic Assessment at 8.
[11] Tenth Systemic Assessment at 40–41.

population. Such findings have long produced concern in the community, and it is important to recognize what population-based comparisons do and do not establish to help SPD and the community move forward in addressing this issue. As the previous Monitor observed, comparing police activity to population provides a "generalized type of analysis [that] does not tell us much about what is driving disparity."[12] Further, determining the extent of racial disparity caused specifically by policing is difficult to quantify.[13] **Directly comparing stop or frisk rates to the racial composition of Seattle's population does not, by itself, render conclusions on biased-policing or tell us the amount of disparity caused specifically by SPD's practices, because racial disparities evident in police data may be impacted by societal inequities, not just by the actions of individual subjects or officers.** Certainly, despite these limitations, population-based comparisons still present community concerns and questions that require further engagement and analysis. Given both the limitations of population-based comparisons and the community concerns resulting from such population disparities, SPD must continue to assess its data at a deeper level and act to address unwarranted disparities in partnership with the community, as discussed below in alignment with SPD's bias-free policing policy.

- **Differences in frisk rates across races have reduced over time**, from a gap of 11 percentage points in 2015 to 5 percentage points in 2020. Frisk rates for stopped individuals ranged 7% across races, with a low of 20% for White subjects to a high of 27% for Asian and Black subjects, between 2018 and 2020.

- From 2018 to 2020, **the rate at which SPD officers found weapons in a stop with a frisk was higher for White subjects than any other racial group – and 10 percentage points higher than frisks of Black individuals**. This difference is similar to earlier findings by the previous Monitor.[14]

- **SPD has developed robust in-house analytics that confirm stop disparities previously identified by the Monitoring Team**, though to varying extents in some areas, using an advanced analytical approach that assesses disparities at levels beyond overall population-based comparisons. SPD's own analytics now identify specific differences in stop and post-stop data across races through this sophisticated method, and these identified issues require further examination and appropriate follow-up as discussed below. As explained by the prior Monitor, in various points in this report, and in a variety of contexts in current law, racial disparities by themselves do not necessarily prove bias by individual police officers or agencies – as they operate within the context of social factors that may contribute to disparities. Still, racial disparities of this nature are concerning—regardless of intent or cause—and the City as a whole, including SPD, should strive to eliminate them. SPD's ability to critically assess its performance in this area and identify potential unwarranted

---

[12] Tenth Systemic Assessment at 3.
[13] Tenth Systemic Assessment at 40-41 ("Sorting out whether disparity on the basis of suspect classifications, like race, is the result of intentional discrimination, the result of unknowing or subconscious bias, or is the effect of one or many factors having nothing to do with race or that are tangled up with race is challenging.").
[14] Tenth Systemic Assessment at 76.

disparities through rigorous analyses is particularly critical in this regard. **Few, if any, law enforcement agencies in the United States have built or maintain the internal capacity to produce ongoing disparity analyses at this level of rigor and sophistication.**

- **SPD must use this sophisticated analytical capacity to continue to collaborate with the Community Police Commission and Office of Inspector General to identify opportunities for improvement and implement recommendations toward more equitable policing, in line with SPD's bias-free policing framework**, which requires collaborative community engagement toward addressing unwarranted disparities. SPD collaborated with the Community Police Commission to assess disparities and identify opportunities to potentially reduce future disparities. Collaborations like this must continue and strengthen for the City to move forward in addressing disparities in stops and across SPD enforcement activity.

*Conclusion on Stops and Detentions*

The Monitoring Team previously found SPD in compliance with the Consent Decree's stops and detentions requirements based on extensive analyses of SPD stop practices.  The Monitoring Team also found SPD in compliance with the policy, training, and supervisory requirements pertaining to bias-free policing, while also identifying concerning disparities in SPD practices requiring further evaluation and action. **This assessment finds that SPD has sustained compliance in this area, though important, ongoing work with the community remains with regards to disparities.**

Disparities persist, and the critical work toward more equitable policing must continue.  As the prior Monitoring Team and the Court has observed, the Decree does not require the elimination of all disparities among SPD's various enforcement activities.  At the same time, however, the Decree process has not been silent as to the import of addressing disparities, with Decree-required policies producing a necessary path forward for SPD and the community to meaningfully address specific disparities across various areas of SPD's activities and performance.

With SPD's leading disparity analytics to inform evidence-based approaches, a Police Department committed to improvement, and community oversight bodies dedicated toward ensuring the Department's improvement, Seattle now has a foundation for substantive collaborative action toward more equitable policing that is present in few other cities – and certainly not present in Seattle at the beginning of the Consent Decree.  This potential for further transformation, of course, does not minimize the findings of disparity highlighted in this report – which cannot be satisfying to the Seattle community or to SPD.  However, it appears that Seattle has the information, policies, tools, and systems in place to allow for the Seattle community to consider how to best address identified disparities in the long-term. SPD has come a long way in this area, and the work toward continual improvement must be ongoing.

### D. Conclusion

**Overall, this assessment finds that SPD has sustained its compliance with the Consent Decree generally outside of notable issues with SPD's response to the 2020 protests and other specific issues that require additional work to help prevent such problems in the future.** SPD's sustained compliance generally is a commendable achievement that has resulted in improved policing outcomes for the public, from a reduction in use of force to consistently lawful stops and detentions. SPD's significant Consent Decree reforms provide a higher baseline for future public safety operations, and the City should continue to push forward toward enhanced public safety services.

Still, even with these reforms, policing problems will continue to arise, as the events of 2020 made clear. But now, through the Consent Decree and other actions by the City to build systems of accountability, the City has systems in place to assess police operations and make recommendations for accountability and future improvements. The City must support those systems to ensure sustained and improved public safety performance and oversight. With continued support, the City's overlapping accountability systems and the Seattle community are poised to direct the future of Seattle's public safety moving forward.

The Monitoring Team looks forward to observing the implementation of the 2022 monitoring plan, which sets out specific steps for moving forward with the Consent Decree, as the City and SPD work toward the conclusion of the Consent Decree and full City oversight and direction of Seattle's public safety future. The monitoring plan both includes required actions to deliver full compliance with the Consent Decree as well as technical assistance on areas of interest to advancing the Department's operations. The plan includes the following important tasks, amongst other requirements:

- Sentinel Event Review: The Monitoring Team and SPD will continue participation in and monitoring of the Sentinel Event Review process in order to complete findings regarding SPD's protest response and integrate feasible recommendations to improve future operations.
- Crowd Management Policies: SPD will work to revise and improve policies related to crowd management and submit new policies to the Court for approval, building on its extensive work in this area.
- Active Bystandership in Law Enforcement (ABLE): SPD will continue to provide peer intervention training for all officers to support officers in stepping in to prevent mistakes and misconduct and improve outcomes for the community.
- Accountability System Performance Assessment: The Monitoring Team will develop a methodology for and complete an assessment of the accountability triad of the Office of

Inspector General, the Office of Police Accountability, and the Community Police Commission.

- Anti-Bias and Disparity Policing Plan: SPD and the City will further develop a plan that addresses potential bias and unwarranted disparate impacts in policing.
- Data Governance: SPD and the City will implement a plan to improve data accuracy, usability, accessibility, and transparency on public-facing dashboards.

The Monitoring Team will continue to report on SPD's progress implementing its reforms as it works toward achieving full compliance with the Consent Decree.

# Methodology

As with prior Monitoring assessments, the Monitoring Team aspires to be transparent about the methodological approach to its work and to be clear about what was done, what was not, and why.

This assessment is intended to measure sustained compliance of the City of Seattle across four important dimensions – Use of Force, Crisis Intervention, Stops and Detentions, and Supervision with disparity analyses across these dimensions, when applicable, in keeping with the Bias-Free Policing elements of the Consent Decree. As contemplated by the implementation of the Consent Decree and the real-world structural changes made to the accountability systems in the City of Seattle, this assessment is primarily designed as a quantitative analysis of the activities of the Seattle Police Department and those structures designed to serve as an accountability backstop.

In doing the quantitative review, the Monitoring Team relied on SPD's public facing data – which is fed by SPD's Data Analytics Platform (DAP) – as much as possible but did request and receive information from the discrete source systems that support the Department's DAP. As the public as a whole relies on the publicly facing data, it seemed prudent to use that data when possible to assess SPD's public data and demonstrate how the public can use these data for continued monitoring of the Department's activities, which will be important when the City ultimately concludes the Consent Decree.

However, there are limits to the public data. There are privacy and Criminal Justice Information System (CJIS) restrictions on what can be made public. The City has attempted to design the open data and associated dashboards to be useful to the public without inadvertently compromising the privacy of the people involved, directly or indirectly. Additionally, given the complexity of the DAP, the City states there are functional limits to what can be readily accessed by the public without access to the more robust analytic tools that are internal to the Department. In turn, the Monitoring Team did request data not available through SPD's public data to examine certain performance areas for this assessment.

Notwithstanding these limitations, SPD's transformation from an agency lacking meaningful internal data in many respects at the beginning of this process to now producing extensive public data and dashboards on areas of public interest has been a notable, important achievement over the course of the Consent Decree, even if there is room for continued improvement. During the Monitoring Team's engagement sessions with the Community Police Commission regarding preliminary versions of this report, questions arose about data quality, the availability of certain data points, and how to maximize the insights available to the public through these data. To that end, the Monitoring Team encourages continued dialogue between SPD, the CPC, and the OIG

regarding public data accessibility, building upon SPD's extensive foundation for public transparency.

The Monitoring Team's preliminary reporting on some data for this assessment produced particular concern regarding the high percentage of use of force subjects with an unknown race reported in the public-facing data, and the Monitoring Team called for SPD to conduct a review of this issue. SPD promptly assessed the issue and reported a systemic issue with the data mapping between IAPro – the system where officers enter race for use of force – and the DAP, which provides data to the public open data site. The Department addressed this issue within days of identification, resulting in updated race reporting in the use of force open data. As discussed later in this report, the Monitoring Team then conducted a validation process to assess the consistency of data between the source system and public data and found the data to be consistent. The Monitoring Team, having worked extensively with this data over years, recognizes the complexity of such systems and the resulting potential for issues of this sort. To address potential data issues on an ongoing basis, SPD has a standing data governance program to identify, analyze, remediate, and mitigate deficiencies in its data. This particular issue in the public data had obviously not been detected prior to the Monitoring Team's preliminary report, but SPD was able to swiftly assess and address this issue, as it has with other data questions observed by the Monitoring Team. While the Monitoring Team appreciates SPD's continued work to manage its data and share data transparently with the public, the Monitoring Team also recognizes the community concern that can arise from such data quality issues and recommends continued engagement between SPD and its accountability partners on the topic of public data, as previously stated.

Returning to the overall purpose of this assessment, it is important to recognize the context for the assessment. After the City achieved compliance with the Consent Decree, as previously discussed, the City entered a sustainment phase where the City took a lead role in monitoring its performance across the Consent Decree's dimensions with subsequent validation by the Monitoring Team and Department of Justice. This assessment largely continued with that precedent, with SPD conducting qualitative analyses in areas such as use of force and stops and detentions with subsequent validation by the Monitoring Team. In addition to these qualitative reviews, the Monitoring Team assessed a variety of quantitative metrics through SPD's open data as well as reviews of data not publicly available. The Monitoring Team and the Department of Justice also conducted a review of many demonstration-related events and associated uses of force primarily to assess the functioning of SPD's overall systems during the protests in the summer of 2020. Overall, given this context and the extensive work completed during the sustainment phase, the Monitoring Team did not endeavor in this assessment – nor should it at this stage in this process – to conduct another comprehensive qualitative analysis of every element across the Consent Decree's dimensions.

The pivotal questions at this late stage of a Consent Decree are whether the Seattle Police Department has developed the necessary *internal* systems of critical self-analysis to continue to evolve as a learning organization – and whether the existing accountability structures set in place by the City can continue to provide robust *external* oversight to the police department. In turn, the methodology for this assessment aimed to assess systemic performance, with the 2022 Monitoring Plan requiring further work in certain areas to support the City's pursuit of the ultimate conclusion of the Consent Decree.

### A.  What Disparate Impact Does & Does Not Establish

**This assessment presents findings of disparate impacts for certain races, and it is important to discuss what these disparity findings do and do not establish.** Disparity analyses in policing assess whether police actions are having a disproportionate impact on a given demographic group. This critical topic has long been the subject of wide-ranging research and discussion, given its import to the community and policing. In the Tenth Systemic Assessment, the previous Monitoring Team provided an overview of disparity analyses and how the Consent Decree process engages with disparity and bias. Here, the Monitoring Team provides a brief overview of this topic of vital community interest, in advance of presenting statistics on how SPD actions are impacting demographic groups in Seattle.

**At the outset, it is important to distinguish between disparity and bias.** Disparity refers to actions or outcomes that are disproportionate for a given demographic group; the Consent Decree defines bias as the "selective enforcement or non-enforcement of the law, including the selecting or rejecting of particular policing tactics or strategies, based on membership in a demographic category."[15] As the previous Monitoring Team noted, "[s]orting out whether disparity on the basis of suspect classifications, like race, is the result of intentional discrimination, the result of unknowing or subconscious bias, or is the effect of one or many factors either having nothing to do with race or that are tangled up with race is challenging."[16] In other words, disparity, by itself, may not prove bias, though bias may be a factor driving disparity. **While disparity analyses may have limited ability to determine bias, this does not mean disparity findings lack meaning or import.** However, as a result of challenges proving bias, "courts have been historically reluctant to invalidate governmental actions as discriminatory and impermissible" "[w]hen there are reasonable and legitimate reasons for a practice that produces disparities."[17]

"Consequently," with this backdrop and in the absence of DOJ finding SPD engaged in biased policing, **"neither the Consent Decree nor the Court-approved policies on stops and bias-free**

---

[15] Dkt. 3-1 ¶¶ 30.
[16] Tenth Systemic Assessment at 40.
[17] Tenth Systemic Assessment at 40.

**policing demand that SPD immediately stop practices that it may determine are linked to disparate impacts**."[18] However, disparity in policing is obviously still an area of great community interest, and SPD's bias-free policing policy, approved through the Consent Decree process, requires that SPD assess its data to identify unwarranted disparities and collaborate with the community to "explore equally effective alternative practices that would result in less disproportionate impact."[19] This report discusses SPD's efforts in this area – and provides recommendations for the ongoing work to come in partnership with the community.

This ongoing work will require both analysis of disparity data and action toward addressing identified issues. **Despite extensive research and interest in identifying and addressing bias in policing, there is no consensus on how to best assess disparities or discern bias in policing activities and outcomes**. While a variety of statistical approaches can provide meaningful insights, research has found that "[a]ll approaches have weaknesses."[20] In particular, statistical analyses are limited in explaining precisely *why* the disparities exist amidst a number of potential contributing factors and, critically, *what* needs to be done to address them. While available analytical methods have their limitations, assessing and acting, where possible, on disparity findings is important to police legitimacy and effectiveness.

One common disparity analysis involves comparing police data on topics like stops or uses of force against population statistics to examine whether police actions are impacting certain demographics in a disproportionate fashion. **Population-based analyses present insights but also do not, by themselves, tell a complete story regarding disparity or potential bias, since other sociological factors may impact policing disparities as they do in other areas of society.** Consequently, population-based comparisons do "not tell us much about what is driving disparity," as noted by the previous Monitoring Team.[21] For example, this assessment will show that SPD use of force and stops disproportionately impact certain minority groups in Seattle, but these population-based conclusions cannot identify to what degree these disparities result specifically from SPD apart from broader sociological forces. Certainly, the limitations of population-based disparities do not mean that such disparities lack meaning. Rather, they are an important way of reviewing police activity, but it is likewise important to remain cognizant of their limitations in factoring in other potentially relevant social forces or explaining why specifically disparities are occurring – or what specifically can be done to address the identified disparities.

---

[18] Tenth Systemic Assessment at 40.
[19] Seattle Police Department Manual, Section 5.140, Bias-Free Policing (last rev. Aug. 1, 2019), https://www.seattle.gov/police-manual/title-5---employee-conduct/5140---bias-free-policing.
[20] Ridgeway, Greg, and John MacDonald, "Methods for Assessing Racially Biased Policing," *Race, Ethnicity, and Policing: New and Essential Readings*, edited by Stephen K. Rice and Michael D. White, March 2010, chapter 7, pages 180-204. Copyright 2010 NYU Press
[21] Tenth Systemic Assessment at 3.

For example, the Center for Policing Equity (CPE) published a 2021 report comparing SPD's use of force and stop practices against Seattle's population.[22] CPE is national leader in assessing and addressing these very issues. Similar to previous Monitoring Team assessments, CPE's report found disparities in stop trends that once again prompted community concerns regarding the racial impacts of policing in Seattle. CPE contextualized what these findings meant up front in their report:

> While findings of racial disparities are always reason for concern, they are not necessarily attributable to decisions or practices by law enforcement. In other words, observed racial disparities do not necessarily indicate that officers have prejudiced beliefs or that they have even engaged in discriminatory behavior. Crime, poverty, institutional neglect, and a host of other factors may drive law enforcement's disparate contacts with and other behaviors toward various racial groups. These factors do not mean disparities are not a concern, just that those seeking to address the concern must focus on all of the factors that produce them—including, but not limited to, the policies and behaviors of law enforcement.[23]

**While the CPE report recognized that "[d]isparities do not necessarily indicate that police officers have engaged in biased or discriminatory behavior," CPE also emphasized that disparities are critically "important to measure, as these differences can represent pain points for communities."**[24] Moreover, such disparities require further examination due to their potential association with biased policing. CPE's report produced three specific action steps, amongst other recommendations, related to stops data collection to help SPD "investigate [disparities] further"[25] and "enhance the department's commitment to fair and equitable policing."[26]

Methods exist to assess disparity on a more detailed level than population-based comparisons by factoring in potentially impactful social forces, such as crime rates, income, and other potential factors.[27] Such analyses can present more specific insights on how various forces might be impacting policing activities and outcomes, but these analyses, too, are limited in precisely articulating *why* the disparities exist amidst a number of potential contributing factors. Over the course of the Consent Decree, SPD has built the capacity to assess disparities with sophisticated

---

[22] CPE noted multiple times in its report that it would have conducted regression analyses beyond population-based comparisons if additional data were available.

[23] Center for Policing Equity. "The Science of Justice: Seattle Police Department National Justice Database City Report." January 2021.

[24] Center for Policing Equity. "The Science of Justice: Seattle Police Department National Justice Database City Report." January 2021. Page 9.

[25] Center for Policing Equity. "The Science of Justice: Seattle Police Department National Justice Database City Report." January 2021. Page 9.

[26] Center for Policing Equity. "The Science of Justice: Seattle Police Department National Justice Database City Report." January 2021. Page 6.

[27] As previously mentioned, the Center for Policing Equity would have conducted such analysis with additional data.

methods, which are more complex than population-based comparisons, and SPD can now conduct a deeper level of disparity analysis by attempting to account for a variety of factors to isolate the impacts of race. **In turn, SPD is now identifying specific disparities through sophisticated analyses, previously conducted solely by the Monitoring Team since they were beyond SPD's abilities. Now, critically, SPD must build upon the Department's prior analyses and community engagement in this area to move forward in addressing any unwarranted disparities in accordance with its Court-approved bias-free policing policy.**

As trends in demographics and associated racial disparities are discussed throughout this report, it is important to keep this context in mind when considering what disparate impacts do and do not establish. Relevant sections of this report refer back to this overview to provide continued context regarding these important statistics. **In particular, the Stops & Detentions section of this report discusses the history – and future – of SPD disparity analyses in greater depth.**

# Use of Force

### A.   Background and Consent Decree Requirements

It is useful to review a brief history of use of force reforms under the Consent Decree.

*The Department of Justice's Initial Findings on Use of Force*

The Department of Justice's (DOJ) 2011 investigation found that the Seattle Police Department (SPD) "engage[d] in a pattern or practice of using unnecessary or excessive force."[28] DOJ attributed this pattern or practice of excessive force to SPD's "fail[ure] to: (1) properly monitor or investigate the use of force; (2) implement adequate policies on the proper use of various force weapons; and (3) adequately train its officers on the use of force, particularly the appropriate use of various force weapons."[29]

As a result of these systemic deficiencies, DOJ found that, overall, "[w]hen SPD officers use force, they do so in an unconstitutional manner nearly 20% of the time."[30] After such uses of force, "the secondary review process [was] little more than a formality that provide[d] no substantive oversight or accountability," according to DOJ's investigation.[31] The Monitoring Team later found that where force reports existed, they were "on paper stuffed, unreviewed, in file cabinets or entered into an unreliable, inaccurate, and incomplete legacy database."[32] This led the Monitoring Team to question whether a force review and accountability process "existed at all."[33]

*Consent Decree Requirements*

To remedy the deficiencies that DOJ identified in 2011 as contributing to the unconstitutional pattern or practice of use of force, the Consent Decree required SPD to implement a host of systemic changes, including:

- Implementing comprehensive use of force policies focused on de-escalation to safely resolve encounters with the minimal amount of force required. SPD adopted policies that required uses of force not just be "objectively reasonable" – as has been the status quo in policing – but also necessary and proportional, in line with community expectations;

---

[28] 2011 Findings Letter at 3.
[29] 2011 Findings Letter at 4.
[30] 2011 Findings Letter at 4.
[31] 2011 Findings Letter at 4.
[32] Fourth Semiannual Report at 26.
[33] Fourth Semiannual Report at 26.

- Reporting all force incidents, from lower-level compliance techniques to officer-involved shootings, with requirements for officers to explain their actions;
- Requiring meaningful supervisory and chain-of-command review of force incidents and investigations to evaluate uses of force against policy and training and take corrective action where appropriate;
- Training all officers in the new use of force principles and practices;
- Expanding requirements for the Force Investigation Team's investigation of the highest-level force incidents; and
- Creating a Use of Force Committee, which evolved into the Force Review Board, to review higher level uses of force to improve organizational accountability and identify opportunities for departmental improvement.

## B.  Previous Assessments During the Consent Decree

The Monitoring Team has reported on SPD's progress implementing these reforms throughout the Decree process, starting with policy development and then training delivery and finally SPD's performance on the new policies and training. The Monitoring Team's previous findings regarding SPD's progress are summarized herein.

In 2014 the Monitoring Team characterized SPD's new use of force policies as "the embodiment of the Consent Decree" since they "provid[ed] officers with clear guidance and expectations consistent with constitutional imperatives."[34] These policies required that uses of force be not just "objectively reasonable" – as has been the status quo in policing resulting from the *Graham v. Connor* court ruling – but also necessary and proportional. They required that SPD officers de-escalate situations when safe and feasible to do so, "represent[ing] a significant evolution – and one that was asked for by members of the Seattle community for years."[35]  SPD's revised force policies, "consistent with the Decree, set forth 'different levels of departmental reporting and review that become more rigorous depending on the type of force used,'" placing far greater emphasis on use of force officer reporting and supervisory review than previously was the case.[36]

In addition, the Department created a Force Review Unit to provide a layer of quality assurance for use of force investigations. The Department also enhanced its Force Investigation Team (FIT) dedicated to investigating incidents with the highest levels of force. As a result of the Decree, SPD created a Force Review Board, comprised of leaders across the department, that reviewed FIT investigations and a sample of other force cases to bring greater accountability to force practices and identify ongoing opportunities for departmental improvement. This suite of

---

[34] Fourth Semiannual Report at 17.
[35] Fourth Semiannual Report at 18.
[36] Ninth Systemic Assessment at 16.

changes represented a dramatic shift from a potentially non-existent supervisory system to a multi-layered review process inside SPD, always subject to Office of Police Accountability (OPA) investigations and Office of Inspector General (OIG) systemic analyses.

To support the implementation of these significant policy changes, SPD delivered "high-quality, interactive training" on the new force policies to help "translate the clear expectations of the use of force policy into everyday officer performance."[37]

In 2017, the Monitoring Team analyzed SPD's compliance with the Consent Decree use of force requirements and issued its systemic assessment of SPD use of force policy, training, and practices after years of monitoring SPD's progress throughout the decree. The Monitoring Team noted how the ability to even conduct such a review represented a significant change as a result of the Decree:

> This report would not have been possible even just a few years ago. When the reform process began, "force often went unreported – leaving it subject to no departmental scrutiny." When force was reported, it was documented "on paper stuffed, unreviewed, in file cabinets." If reported force was investigated, those inquiries were typically incomplete or inadequate.
>
> Now that SPD is reporting, tracking, investigating, and reviewing its use of force as never before, this analysis of the Department's use of force can entail both quantitative and qualitative components, as envisioned by the Consent Decree.[38]

This systemic assessment reviewed SPD's use of force practices from July 2014 to October 2016.  It found, among other things, that:

- "[O]verall use of force by the SPD is down – both across time under the Consent Decree and compared to the time period studied by the original DOJ investigation."[39]
- There was "a decrease of 743 force incidents, or a 60 percent reduction in the use of moderate- to higher-level force, between the 2014–2016 period studied here and the time period addressed by DOJ's investigation."[40]
- "SPD's use of less-lethal weapons (which constitute a kind of Type II [or intermediate] force) is relatively infrequent. With respect to one such less-lethal tool, the baton, the

---

[37] Ninth Systemic Assessment at 18.
[38] Ninth Systemic Assessment at 1-2 (internal citations omitted).
[39] Ninth Systemic Assessment at 2.
[40] Ninth Systemic Assessment at 32. SPD Policy 8.050 – Use of Force Definitions defines SPD's forces levels. Type I force is the lowest level and includes force that results in transitory pain. Type II force, the intermediate level, includes force that results in injury greater than transitory pain. Type III force, the highest level, includes force that could lead to substantial bodily harm or death. For more detailed definitions, see SPD Policy 8.050 – Use of Force Definitions at https://www.seattle.gov/police-manual/title-8---use-of-force/8050---use-of-force-definitions.

decline in use has been dramatic. In 2011, the DOJ investigation concluded that 'SPD officers too quickly resort to the use of impact weapons, such as batons,' which included finding that a single officer had used his baton 12 times in a 14-month period. For the 28-month period studied for this report, all of Seattle's officers combined used their batons just 23 times. This is a noteworthy finding."[41]

- "The frequency of Taser use also declined – from approximately 14 incidents per month from January 2001 through December 2010 to an average of 7 incidents per month between July 2014 and August 2015."[42]

- "[W]hen force occurs, it happens increasingly at the lower end of the force spectrum."[43] The Monitoring Team found a spike in low-level, Type I force, which made up a larger share of overall reported force. Exploring this trend, "[t]he Team hypothesizes that this increase is at least partially due to changes and improvements in reporting this type of force, which was not reported or logged prior to the Consent Decree." The Monitoring Team added, "[t]his initially-increasing number of Type I force incidents could reflect that officers are increasingly able to apply de-escalation and tactical skills to reduce the number of incidents that might otherwise have involved a higher level of force incident – using more Type I force because they are using less higher-level force."

- "[A]lthough there may be some disparate impact established by aggregate data with respect to use of force, there are no statistically significant disparities with respect to the *type* or *severity* of force used." The Monitoring Team, however, did highlight that it "appear[ed] that SPD officers are more likely to point firearms at historically-underrepresented than White subjects but are more likely to go hands-on with White subjects. Because nothing immediately obvious about the circumstances of the interactions reviewed in the Monitoring Team's qualitative assessment suggested reasons why pointing a firearm at Black, Latino, and Asian subjects was more reasonable or necessary than for White subjects, the Monitor encourages more study by SPD, the Community Police Commission ("CPC"), and the anticipated Inspector General."[44] While the Consent Decree does not have specific requirements or benchmarks for disparities in uses of force, the Monitoring Team nevertheless encouraged more engagement and work on this topic of great community interest.

- "[I]ncidents involving problematic use of moderate to serious force are, in the larger context of SPD encounters, substantially infrequent."[45]

- Finally, it "appear[ed] that when an officer performs in manner contrary to SPD's use of force policy, the Department is able to catch and correct the error."[46]

---

[41] Ninth Systemic Assessment at 3 (internal citation omitted).
[42] Ninth Systemic Assessment at 3 (internal citation omitted).
[43] Ninth Systemic Assessment at 4.
[44] Ninth Systemic Assessment at 5-6.
[45] Ninth Systemic Assessment at 9.
[46] Ninth Systemic Assessment at 9.

Overall, the Monitoring Team found that "[b]ecause officers are using less force overall, without negatively impacting officer safety or public safety, and are using force consistent with law and SPD policy in those increasingly infrequent instances when force is deployed, the Monitor finds that SPD is in initial compliance with Paragraphs 69 to 90 of the Consent Decree."[47] This 2017 finding of compliance represented a "major milestone" in the reform process and was based on the aforementioned "analysis of [SPD's] performance over time," specifically July 2014 to October 2016.[48] The Monitoring Team concluded that, SPD's "ability to meaningfully and effectively implement the use of force policies and apply the related use of force training on the streets of Seattle – while facing the unpredictable challenges that are part and parcel of law enforcement – is worthy of substantial praise."[49]

In October 2019, SPD issued a report assessing its compliance with the use of force requirements of the Consent Decree, in keeping with Phase II's approach of transferring preliminary monitoring responsibilities to the City and SPD with subsequent review and validation by the Monitoring Team and DOJ. SPD's 2019 assessment concluded that the agency had sustained compliance with the use of force requirements of the Decree.[50] The subsequent review by the Monitoring Team and Department of Justice validated SPD's finding of sustained compliance. Specifically, the Monitoring Team and DOJ found the following:

- "DOJ and the Monitoring Team noted generally satisfactory investigation and review of the underlying use of force by the chain of command, including identifying and making appropriate referrals for additional officer training, or referrals to the Office of Police Accountability, where necessary."[51]
- "Similarly, the Force Review Board and Force Review Unit appropriately and thoroughly reviewed uses of force to confirm that SPD officer made reasonable efforts to de-escalate prior to using force, that the use of force was reasonable, necessary and proportional, that reporting and investigation of the use of force by the chain of command was complete and timely, and to determine whether the use of force ultimately complied with SPD policies and training."[52]
- "The caliber of investigations conducted by the Force Investigation Team was also satisfactory. FIT detectives consistently took control of a scene upon arrival and canvassed the area for witnesses and privately-owned video. The FIT detectives generally asked the relevant material questions during their interviews with officers and witnesses. The FIT presentations to the FRB contained the material information needed for the

---

[47] Ninth Systemic Assessment at 2.
[48] Ninth Systemic Assessment at 10.
[49] Ninth Systemic Assessment at 10.
[50] Dkt. 511 at 5.
[51] Dkt. 588-1, 27.
[52] Dkt. 588-1, 27.

Board's review and deliberation, and appropriately identified issues related to training, policy, and equipment."[53]

Consequently, the Monitoring Team and DOJ concluded that SPD had "sustained compliance with the requirements of the Consent Decree, including uses of force by SPD officers over time and across incidents, and in subsequent investigation and review of the uses of force by the chain of command, consistent with SPD's policies and training regarding the same."[54]

## C.  The City's Response to the Historic 2020 Protests

### 1.  Introduction

Before assessing SPD's overall performance on use of force in recent years and progress over the course of the Consent Decree, it is first necessary to specifically address SPD's response to the 2020 protests and the City's subsequent actions to address issues evident during this pivotal period of time in policing. SPD's response to the historic protests in the wake of George Floyd's murder produced immediate outrage, lasting harm, and a number of important questions about the future of policing in Seattle. Two of these questions related to the Consent Decree: What had the Consent Decree accomplished? And how did SPD's protest response impact the City's compliance with the Decree's requirements and the City's efforts to conclude the agreement?

Before evaluating SPD's overall progress on use of force over the course of the Consent Decree, this section of the report addresses SPD's performance during the protest period and subsequent actions by the City to improve future protest response. This introductory section on SPD's crowd management provides a brief overview before diving into related topics in greater depth.

On May 7, 2020, the City of Seattle filed a joint motion with the Department of Justice to terminate paragraphs 69-168 of the Consent Decree. On May 28, 2020, Derek Chauvin of the Minneapolis Police Department murdered George Floyd, igniting protests across the globe. Soon thereafter in Seattle large crowds gathered to protest police violence and racial injustice. While many were peaceful, some were not. Criminal acts by certain protestors resulted in significant property damage and injuries to officers, and uses of force by SPD resulted to injuries to protestors.  SPD responded with a variety of tactics that prompted community outcries, including significant use of less-lethal tools, including tear gas. There is no doubt that SPD, and the City, suffered significant reputational damage as a result of the summer of 2020.  While recognizing that presenting a balanced picture of those events is a task that agencies, experts, and professional bodies around the nation continue to grapple with as work continues to advance best

---

[53] Dkt. 588-1, 27-28.
[54] Dkt. 588-1, 27.

practices in this complicated area, the Monitoring Team finds the Inspector General's summary in the Sentinel Event Review Report insightful:

> On May 25, 2020, George Floyd was murdered while in the custody of the Minneapolis Police Department. His death had a monumental impact on this country and internationally, and created a tipping point that engaged wide segments of America in public dialogue about the role of race in every aspect of society. On April 20, 2021, a jury found Derek Chauvin guilty of three charges in the death of George Floyd: second-degree unintentional murder, third-degree murder, and second-degree manslaughter. The three other involved officers are scheduled to face trial in 2022. The implications of this event are still being felt even as this report is released. Like other departments in cities around the country, SPD faced a complex and difficult challenge in the days after Mr. Floyd's murder. Namely, the City grappled with how to respond to ongoing community protests about the long history of abuse, excessive use of force, and deaths suffered by Black, Indigenous, and other People of Color at the hands of police. These protests also served as an urgent call for an examination of the institution of policing, to find a manner that would not further erode public trust, given these longstanding problems and concerns. SPD responded to the 2020 protests with skills, strategies, and tactics developed over many decades of facilitating thousands of protests, enhanced by eight years of Consent Decree reform efforts. Those tactics not only proved inadequate for the protests of the summer of 2020 – as will be discussed in this report, they contributed to escalation of civil unrest and violence. By the end of 2020, there had been more than 750 deployments of physical force. Some controversial uses of "less lethal" chemical and physical munitions received national attention. Curfews were imposed, and parts of the city were occupied by community members who rejected government oversight in a standoff between community members and law enforcement that lasted for weeks.

On June 3, 2020, the City of Seattle withdrew the joint motion to terminate paragraphs 69-168 of the Consent Decree, less than one month after filing, "so that the City and its accountability partners [could] conduct a thorough assessment of SPD's response to the demonstrations."[55]

Indeed, during the summer of 2020, SPD itself identified that it was not able to meet certain policy requirements, specifically around force reporting and force review.  Following the demonstrations, extensive review by the Office of Inspector General and a community panel independently identified a raft of issues that contributed to problematic outcomes during the

---

[55] City of Seattle, News, "City Attorney to Withdraw Consent Decree Motion" (June 3, 2020), https://news.seattle.gov/2020/06/03/city-attorney-to-withdraw-consent-decree-motion/.

protests. **Most fundamentally, a review by the Monitoring Team supported by the Department of Justice found that, during its response to protests and unrest beginning in May 2020, and largely ending by September 2020, SPD at times did not comply with its policies mandated by the Consent Decree relating to de-escalation, use of force decision-making, officer force reporting, and supervisory review of force.**

With policy violations regarding use of force and a near collapse of reporting and review obligations for that force, a subsequent question, from the Consent Decree's perspective, was how the City and SPD would respond and work to prevent such issues in the future. Ultimately, one goal of the Consent Decree is to create critical systems of self-analysis both within SPD and the City as a whole to learn and evolve from mistakes, even critical ones.

One of the City's primary responses was to launch a "Sentinel Event Review" (SER) process to conduct a deep analysis of what went wrong and how to work toward addressing identified issues. The City's extensive efforts to analyze these problems and generate recommendations for future improvement have been significant and laudable. The City has demonstrated a substantive commitment and ability to both identifying and working to address its issues. In this way, even as SPD's response to the protest presented a crisis for its longstanding compliance with the Consent Decree, the City's response to identify, acknowledge, explore, and address identified issues aligns closely with the Consent Decree's goal of establishing a system that can self-monitor and self-correct.

This section of the use of force assessment discusses these topics in greater depth, from the problems evident in SPD's response to the intensive, ongoing work to help prevent such problems in the future. This section proceeds as follows:

1. An overview of issues with SPD's response to the 2020 protests;
2. Changes implemented by SPD to improve its protest response;
3. The Office of Police Accountability's response to a historic number of misconduct inquiries related to SPD's protest response; and
4. The Office of Inspector General's collaborative Sentinel Event Review process which is assessing issues in SPD's protest response and identifying recommendations for improvement for future crowd management situations. This section also addresses how SPD has engaged with this process and demonstrated real action toward addressing identified issues.

2. SPD's Performance During the 2020 Protests

**SPD's response to the protests in the aftermath of the murder of George Floyd resulted in historic levels of protest-related uses of force and misconduct complaints. In this context the City withdrew a motion to terminate most provisions of the Consent Decree.**

Police response to protests in the Summer of 2020 were problematic across the country. Police departments in a number of communities often resorted to ineffective and excessive tactics that escalated situations and reinforced the very police injustices igniting global protests in the first place. One would have hoped that SPD would have set an example of how to respond to the 2020 protests, given its progress on use of force reforms, but SPD's response very much seemed emblematic of problems with policing in America. While SPD had advanced beyond many departments over the past decade on a variety of fronts – with model use of force policies and leading analytics – its response to the 2020 protests tended to reflect past SPD practices decried before the Consent Decree, dating back to the WTO protests in 1999, amongst other instances.

Even amidst problematic encounters between police and protestors, there were, to be sure, many examples of good policing in difficult circumstances. There were countless hours in which officers responded calmly to protest situations and remained appropriately reserved when engaging with protestors upset with police violence. Even as the vast majority of protestors were peaceful, there were individuals within these peaceful crowds committing criminal acts and sometimes endangering officers. In many circumstances, officers responded with relative restraint to attacks by individual protestors – from thrown objects, to punches, to being yelled at, to being spit on in the face from close proximity, all in the midst of the Covid-19 pandemic. The professionalism of many officers, who worked extensive hours often in profoundly difficult, chaotic circumstances, was laudable.

    *i.*    *Departmental Use of Force Performance*

**Despite the many SPD officers who responded professionally while responding to protests, SPD's overall approach to the protests and particular uses of force produced tremendous community concern and disappointment.** As the Department has since recognized, certain tactics contributed to problematic encounters with protesters that sometimes escalated the events and increased the chances of future uses of force. A lack of coordination – both at the Departmental and City levels – was evident at times during the protest response, with SPD's own officers at times demonstrating frustration with tense situations that could have been avoided with better coordination and communication. It appeared that the Department sometimes used force against the protest crowds generally, when only certain individuals amidst the crowd may have been committing criminal acts. In all, these actions too often served to escalate rather than de-escalate these situations, further emphasizing the very topic protestors were marching against and making future protest management all the more difficult.

**In particular, SPD's use of less-lethal tools produced widespread community concern and local action.** SPD used tools like blast balls, tear gas, and OC spray against crowds sometimes in an indiscriminate manner with insufficient justification in reporting for such actions. As described later in this report, SPD's application of less-lethal instruments in 2020 was more than eight times greater than any year dating back to 2015, the first full year of use of force data under the Consent Decree. SPD's deployment of these tools sometimes impacted protestors that were peacefully protesting, drawing community ire and complaints, and further inflaming tensions between the police and protestors.

**SPD's problematic use of less-lethal weapons prompted swift action by City accountability partners (including OPA, the Inspector General, and the Community Police Commission), who recognized the need for immediate change as well as an intensive system evaluation.** As the City accountability partners wrote in a joint statement, "[w]hile a number of other concerns have been identified by community, the use of CS gas on largely peaceful demonstrators demands immediate attention."[56] The letter stated, "[I]n response to a wave of community concern about an overly militaristic approach to regulating demonstrations in the wake of the killing of George Floyd,"[57] "the CPC, OIG, and OPA ask the Seattle Police Department to cease the use of CS gas in response to First Amendment activity, until such time as any appropriate use can be vetted by oversight entities and incorporated into a written SPD policy."[58]

The accountability entities appropriately noted that "as CS gas is not mentioned in the SPD manual, it was not approved by the federal court in the context of the Consent Decree required review of the policies surrounding use of force and demonstration management."[59] While CS gas was not specifically addressed in the SPD policy manual, SPD's overarching use of force policy requires, amongst other requirements, that all uses of force be reasonable, necessary, and proportional, a requirement which applies regardless of the instrument or type of force use, including the use of CS gas.

At the same time, there was a clear need to create specific policy guidance on using such tools. The City's accountability entities emphasized that this was but one of many changes required by

---

[56] The Seattle Office of Inspector General, Seattle Community Police Commission, and the Office of Police Accountability, *Joint Statement on Use of CS Gas in SPD's Response to Mass Demonstrations in the Wake of the Killing of George Floyd* (June 5, 2020).

[57] The Seattle Office of Inspector General, Seattle Community Police Commission, and the Office of Police Accountability, *Joint Statement on Use of CS Gas in SPD's Response to Mass Demonstrations in the Wake of the Killing of George Floyd* (June 5, 2020).

[58] The Seattle Office of Inspector General, Seattle Community Police Commission, and the Office of Police Accountability, *Joint Statement on Use of CS Gas in SPD's Response to Mass Demonstrations in the Wake of the Killing of George Floyd* (June 5, 2020).

[59] The Seattle Office of Inspector General, Seattle Community Police Commission, and the Office of Police Accountability, *Joint Statement on Use of CS Gas in SPD's Response to Mass Demonstrations in the Wake of the Killing of George Floyd* (June 5, 2020).

SPD and the City to improve its response to protests. To this end, Mayor Durkan and Chief Best "also request[ed] the accountability entities thoroughly review the Seattle Police Department (SPD) protest response."[60] This systemic review is discussed in greater detail below, during the Sentinel Event Review section.

**SPD's use of certain less-lethal tools also set the occasion for court action against SPD, beyond the Consent Decree.** In response to legal action by Black Lives Matter, a federal District Court judge placed a temporary restraining order on SPD's use of certain less-lethal equipment in June 2020 that enjoined the City and SPD "from employing chemical irritants or projectiles of any kind against persons peacefully engaging in protests or demonstrations."[61] The Court did not prohibit SPD from using these tools in "reasonable, proportional, and targeted action to address a specific imminent threat of physical harm, acts of violence, or property damage."[62] This language largely mirrors SPD's use of force policy, which requires that *all* uses of force be reasonable, necessary, and proportional in light of the threat and circumstances encountered by the officer. It should be noted, however, that SPD's policies under the Consent Decree were more restrictive than the injunction imposed on SPD through litigation and as such, violation of the injunction necessarily meant a violation of SPD policy.

In this way, the court order effectively mandated SPD adhere to its existing, Consent-Decree-required use of force policy in practice. The court subsequently found that SPD violated that restraining order in four specific instances, resulting in fines paid by the City. The Seattle City Council later approved an ordinance limiting SPD's use of less-lethal equipment beyond SPD's current policy, a gap that remains unresolved at the time of this writing.

*ii.    Force Reporting & Review*

**Not only were force tactics of concern, but force reporting and the review of force by supervisors was a significant problem during SPD's protest response. While SPD consistently adheres to substantive use of force reporting and review expectations for more typical use of force events, these systems clearly broke during the protest period.** Officer reports were often delayed.  The reports lacked necessary detail regarding the circumstances encountered and the justification for individual uses of force. SPD reports that most officer force statements were written three or more days after the use of force, attributing this delay to long shifts worked by officers during the protests.[63] These delays, along with the significant number

---

[60] The Seattle Office of Inspector General, Seattle Community Police Commission, and the Office of Police Accountability, *Joint Statement on Use of CS Gas in SPD's Response to Mass Demonstrations in the Wake of the Killing of George Floyd* (June 5, 2020).

[61] Black Lives Matter Seattle-King County v. City of Seattle, 466 F.Supp.3d 1206, 2020 WL 3128299.

[62] Black Lives Matter Seattle-King County v. City of Seattle, 466 F.Supp.3d 1206, 2020 WL 3128299.

[63] Seattle Office of Inspector General, *Sentinel Event Review of Police Response to 2020 Protests in Seattle, Wave 1: Downtown Protests May 29 – June 1,* 16.

of use of force reports to complete, appeared to have contributed to officer force reports of significantly lesser quality than is standard for SPD in non-protest situations.

**Supervisor reviews of force frequently demonstrated no meaningful review by the chain of command, and the first-line supervisor review often lacked a specific consideration of the precise use of force at issue.** In use of force reports during the protest period, reviewing supervisors would sometimes justify force based on general criminal acts occurring during the protest rather than evaluate the specific use of force in response to specific actions by individuals in that crowd, as they would in typical supervisor reviews of force. The number of uses of force to review and the chaotic nature of some of the force events likely contributed to this degradation in quality of supervisor reviews.

Given the high levels of force used and the lengthy duration of the protests, the Department quickly amassed a significant backlog of cases and struggled to work through these reviews. Ultimately, SPD halted its typical chain of command review process for use of force, instead requiring sergeants to screen each use of force and refer potential misconduct to OPA without the typical full chain-of-command review and documentation process. As a result, documentation of supervisor reviews overall was inconsistent and incomplete. **Clearly, SPD did not comply with the Consent Decree's use of force reporting and review requirements during the protest period.** SPD readily recognizes that its force reporting and review processes struggled in these unique circumstances.

In hindsight, the force reporting and review processes were not structured to handle an event of this magnitude. While DOJ expressed concerns with SPD's protest response practices in its 2011 report, DOJ did not make specific findings regarding SPD's crowd management practices. In turn, the Consent Decree focused on requirements for the more typical, isolated use of force incidents in which one officer, or a limited number of officers, apply force to one subject, or a limited number of subjects, in an individual event.  It did not specifically address mass use of force events such as the 2020 protests.

Consequently, SPD's standard, Consent Decree-required use of force reporting and review requirements were not designed for high-volume, continuous use of force situations that stretch for months. These review systems assess force incidents largely as individualized, relatively infrequent events rather than intertwined elements of a broader, sustained event. In turn, available use of force reviews for the 2020 protests often demonstrated a narrow focus to an individual use of force, insufficiently considered by itself as well as in the context of SPD's overall response. This resulted in deficient quality control and significantly delayed insights both for individual and Department-level crowd management and use of force tactics. The glut of delayed use of force reviews resulted in the Department not having real-time information regarding the appropriateness of its force and how to improve its response. These issues point to

the need for a streamlined reporting process and unified supervisor review process to gather necessary information quickly and review activity holistically in the context of the overall event to foster more timely and impactful quality control and operational adjustments.

To this end, SPD revised its use of force policy to allow for more timely, coordinated use of force reviews in future protests situations. However, the Department still has work to do to specifically define these procedures that will be implemented for reporting and review in such circumstances.

Separately, SPD has now created a centralized Crowd Management Force Investigation Team to improve the investigations of Type II uses of force during protest situations. This is a positive step. SPD should ensure the activation of this review team is addressed in future incident action plans for protest events.

SPD's revised use of force reporting policy recognizes that SPD may need to explore "alternative processes" for force reporting and review in consultation with the CPC, OIG, and OPA, to conduct more timely and impactful reviews in the event of "long periods of civil unrest or other large-scale events where the investigation and review processes set forth in this policy are not feasible in a reasonably timely manner."[64] Collaborating with City accountability partners on implementing any alternative approaches is essential, but the best time to explore and craft an effective alternative mechanism is in advance of, and not during, a potentially chaotic time period.

**The Monitoring Team recommends that SPD begin working with City accountability partners now to craft any alternative force reporting and review mechanisms – in advance of future protest events – to ensure both timely and comprehensive use of force reviews for future protest situations.** Collaborating now on a plan for force reporting and review in large crowd and protest contexts will allow SPD to be prepared to avoid past review problems and provide the Department a ready mechanism for more timely feedback and quality control on organizational performance. Ideally, SPD would deploy alternative tactics to reduce use of force and the consequent need for extensive reporting and review. But should such an event arise again in the future, SPD needs a plan to avoid force reporting and review issues widely apparent during the 2020 protests.

3.   Changes by SPD to Improve Protest Response

As SPD identified problems with its protest response, the Department worked to address these issues in real-time as well as build out related policy and training to improve future responses,

---

[64] Seattle Police Department Manual, Section 8.500-POL-6, Reviewing Use of Force (last rev. April 15, 2021), https://www.seattle.gov/police-manual/title-8---use-of-force/8500---reviewing-use-of-force.

incorporating lessons learned and the best guidance research in the field. These efforts resulted in (1) significantly more detailed departmental policies and (2) training for officers focused on effectively facilitating First Amendment expression while addressing criminal activity and working to maintain public order.

    *i.   New Crowd Management Policy*

SPD's new crowd management policy emphasizes at the outset the Department's purpose and role during protests, affirming SPD's "responsibility and commitment to support and facilitate the exercise of these rights in fair and equitable manner, without consideration as to content or political affiliation, with as minimal a footprint as is reasonably necessary to preserve public safety and order."[65] The policy "recognizes that the visible appearance and/or actions of law enforcement may affect the demeanor and behavior of a crowd" and emphasized "the Department's mission to de-escalate whenever safe and feasible to do so, without compromising public order and safety."[66]

The new policy provides much more specific guidance about when and how to engage with or intervene in protests, from facilitating peaceful protests to addressing isolated unlawful behavior in a targeted manner to dispersing an unlawful assembly. In the policy, SPD "recognizes that the unlawful acts of some members of a crowd do not automatically turn an assembly from peaceable to unpeaceable" but that the Department must also "remov[e] individuals whose illegal behavior jeopardize the safety of lawful activity."[67]

SPD has now adopted a detailed decision-making matrix to calibrate SPD's level of response and tactics to the circumstances of the protest. A fundamental practice in the decision-making matrix is to continually "re-evaluate tactics and strategies" and "adjust the response as time and circumstances permit, consistent with" the matrix.[68] This matrix was a core element of new

---

[65] Seattle Police Department Manual, Section 14.090, Crowd Management, Intervention, and Control (last rev. April 15, 2021), https://www.seattle.gov/police-manual/title-14---emergency-operations/14090---crowd-management-intervention-and-control.

[66] Seattle Police Department Manual, Section 14.090, Crowd Management, Intervention, and Control (last rev. April 15, 2021), https://www.seattle.gov/police-manual/title-14---emergency-operations/14090---crowd-management-intervention-and-control.

[67] Seattle Police Department Manual, Section 14.090, Crowd Management, Intervention, and Control (last rev. April 15, 2021), Https://Www.Seattle.Gov/Police-Manual/Title-14---Emergency-Operations/14090---Crowd-Management-Intervention-And-Control.

[68] Seattle Police Department Manual, Section 14.090, Crowd Management, Intervention, and Control (last rev. April 15, 2021), https://www.seattle.gov/police-manual/title-14---emergency-operations/14090---crowd-management-intervention-and-control.

training on crowd management to protect First Amendment rights while addressing criminal acts as appropriate.[69]

####     ii.    *Training*

To help implement this new guidance in practice, SPD provided Department-wide training as well as command-specific guidance on command's responsibility for properly planning, supervising, and reporting crowd management events. These trainings emphasized facilitating protests, de-escalation, and targeted enforcement actions where necessary to address problems while supporting the community's First Amendment rights. In addition to focusing on appropriate responses and tactics, this instruction emphasized the importance of communicating and engaging with community members participating in the protest to explain why officers were taking enforcement action when possible.

####     iii.   *Participation in Sentinel Event Review Process*

Additionally, SPD engaged extensively with the Office of Inspector General and community members through a robust system review and recommendation process, called a "Sentinel Event Review," which is described elsewhere in this report.

###     4.   Misconduct Investigations of Protest-Related Complaints

**SPD's protest response generated a historic level of complaints to the Office of Police Accountability, with approximately 19,000 complaints resulting in 145 unique investigations into allegations of police misconduct, according to OPA.**[70] Investigating this historic influx of misconduct allegations required extensive review of body-camera footage, other video, and available written documentation to evaluate the facts and circumstances of the complaints.

Given the tremendous interest in these misconduct investigations, the Office of Police Accountability (OPA) took multiple steps to foster transparency with the process. OPA has a standard practice of publicly posting its misconduct investigation summaries and conclusions, open data related to its investigations, as well as an annual report. For the protest-related cases,

---

[69] Seattle Police Department Manual, Section 14.090, Crowd Management, Intervention, and Control (last rev. April 15, 2021), https://www.seattle.gov/police-manual/title-14---emergency-operations/14090---crowd-management-intervention-and-control.

[70] Community members complained to the Office of Police Accountability (OPA) over 19,000 times regarding SPD's response to the protests. Investigators ultimately reviewed these communications regarding possible misconduct related to the protests and distilled them to 145 unique investigations (e.g., over 13,000 of the contacts were about a single, widely publicized incident. Dkt. 657 at 7-8 & n.4. *See also* Office of Police Accountability, *2020 Annual Report* at 7). The 2020 Annual Report indicated OPA had initiated 143 investigations. This number later increased to 145 investigations.

OPA posted progress trackers for individual complaint investigations related to the protest on its website to allow the public to see where individual case investigations stood. When the case was closed, in keeping with standard OPA practice, OPA posted its conclusions and explanations for those conclusions on its website in "Case Closed Summaries." For certain cases of great community interest, OPA created videos breaking down relevant case factors contributing to investigative conclusions.

As of March 2022, OPA has completed 130 of the 145 investigations. OPA has sustained an allegation in 24 of 130 completed cases (18%). **OPA sustained findings for excessive force, improper use of less-lethal tools, insufficient use of force reporting, professionalism, and enacting a ruse regarding the presence of armed members of the volatile "Proud Boys" group, amongst other misconduct findings.**

179 officers were the subject of a protest-related misconduct investigation, with 69% of those officers receiving one complaint, 11 officers receiving four or more complaints, and one officer being a subject of 11 different misconduct investigations. Table 1 below shows the distribution of protest-related complaint frequencies for officers who received a complaint. One of the 55 officers subject to multiple complaints was sustained for more than one misconduct complaint (the officer had sustained violations in three different cases).

**Table 1. Number of Protest-Related Misconduct Investigations by Officer**

| Protest Investigations | # of Officers |
|---|---|
| 1 Case | 124 |
| 2 Cases | 33 |
| 3 Cases | 11 |
| 4 Cases | 6 |
| 5 Cases | 2 |
| 6 Cases | 1 |
| 8 Cases | 1 |
| 11 Cases | 1 |
| **Total** | **179** |

*Source: OPA Data*

Table 2, below, presents the investigative findings for allegations in protest-related investigations. 16% of allegations remained pending as of March 2022. For allegations with completed investigations, 7% of those allegations have resulted in a sustained finding. Where OPA did not sustain findings, the public can view OPA's reasoning regarding investigative conclusions on OPA's demonstration complaint dashboard. The public can also view whether the OIG certified the quality of these investigations, on a case-by-case basis, on the OIG's website.

**Table 2. Findings for Misconduct Allegations Related to Protests**

| Findings for Allegations | Count | % |
|---|---|---|
| Not Sustained Lawful and Proper | 211 | 30% |
| Not Sustained Unfounded | 137 | 19% |
| Not Sustained Inconclusive | 70 | 10% |
| Not Sustained Training Referral | 49 | 7% |
| Not Sustained Management Action | 37 | 5% |
| Process as Supervisor Action | 48 | 7% |
| Sustained | 42 | 6% |
| Sustained Rapid Adjudication | 1 | 0% |
| Pending Findings | 117 | 16% |
| **Total** | **712** | |

*Source: OPA Data*

OPA reports these 43 sustained allegations resulted in 30 disciplinary outcomes (multiple sustained allegations may be for the same officer and result in one cumulative disciplinary outcome). Of these 30 disciplinary outcomes, two thirds were written or oral reprimands. Four cases resulted in a suspension without pay, with two cases leading to resignations prior to discipline, and one case leading to a disciplinary transfer. Discipline was pending for three officers as of March 2022. 16% of allegations remain under investigation, so more disciplinary outcomes may be forthcoming.

**Table 3. Disciplinary Outcomes of Protest-Related Investigations**

| Disciplinary Action Taken | Count |
|---|---|
| Written Reprimand | 14 |
| Oral Reprimand | 6 |
| Suspension Without Pay | 4 |
| Resigned Prior to Discipline | 2 |
| Disciplinary Transfer | 1 |
| Pending Discipline | 3 |
| **Total** | **30** |

*Source: OPA Data*

The balance of protest-related complaints (19,000 community inquiries regarding 145 unique incidents and resulting in 145 misconduct investigations[71]) and the number of suspensions or

---

[71] Community members contacted the Office of Police Accountability (OPA) over 19,000 times regarding SPD's response to the protests. Investigators ultimately reviewed these communications regarding possible misconduct related to the protests and distilled them to 145 unique investigations (e.g., over 13,000 of the contacts were about a single, widely-publicized incident). Dkt. 657 at 7-8 & n.4. *See also* Office of Police Accountability, *2020 Annual*

resignations (6) raises significant questions. This requires further examination regarding the efficacy of the overall disciplinary system, and the Monitoring Team will conduct a review of the accountability system as part of the 2022 monitoring plan. In addition, the Monitoring Team recommends that the OIG consider reviewing disciplinary outcomes specifically related to protests to identify any concerns and necessary improvements to the overall system, as an extension of its recent disciplinary system audit and Sentinel Event Review process.[72]

5.   Seeking System Change Through the Office of Inspector General's Sentinel Event Review

Soon after SPD's protest response produced strong outcries in the community, City leadership called for a systemic review of SPD's protest response to identify what went wrong and how the City could avoid these problems in the future. This led to the Office of Inspector General initiating an in-depth Sentinel Event Review (SER) process with community partners and SPD to critically analyze SPD's protest response and generate recommendations to improve the City's protest response in the future. The OIG may use the SER process to help community and the Department work through critical events in the future.

In practice, the rigor and thoughtfulness of the City's approach to analyzing and addressing these issues is commendable.  In many ways, Seattle's community-led after-action assessment is notable from a nationwide perspective. Unlike in many communities elsewhere that experienced large-scale protests and community concern about police response, in Seattle, community members and police of diverse perspectives have come together to critically analyze these events and produce recommendations for improvement, and these recommendations are already being acted on by SPD and the City. The strength of the City's response to SPD's problematic response to protests in no way diminishes these issues of tremendous community concern; however, it does demonstrate an elevated capacity to engage with these problems and work toward improvement with the goal of preventing these issues in the future.

The following sections provide an overview on the City's Sentinel Event Review process, the recommendations generated from this process to improve SPD's operations, and how SPD has engaged and acted to improve its operations.

---

*Report* at 7. The 2020 Annual Report indicated OPA had initiated 143 investigations. This number later increased to 145 investigations.

[72] *See* Seattle Office of Inspector General, *Audit of Disciplinary System for SPD Sworn Personnel* (Nov. 30, 2021), https://www.seattle.gov/Documents/Departments/OIG/Audits/AuditofDisciplinarySystemforSPDSwornPersonnel.pdf (audit of the overall disciplinary system).

*i.    The Sentinel Event Review Process*

To address the need for deep systems analysis, Seattle's Office of the Inspector General turned to a Sentinel Event Review process. This specific process been used "extensively in aviation, health care, and manufacturing, among others, to identify root causes of tragedies and design improvements that will prevent their recurrence."[73] The OIG coordinated this pivotal effort with community partners "to examine  what went wrong from a systems perspective and make recommendations for changes in SPD responses to community demonstrations and protests."[74] This section of this report quotes extensively from the first SER report to provide an overview of the process and its recommendations.

OIG's SER process "brought law enforcement and a diverse group of community members together to deliberate on system failures and finding a better path forward,"[75] with a focus on "fixing the system, not on assigning individual liability."[76] To steer this critical process, the OIG convened an SER Planning Group comprised of stakeholders "consisting of community and police representatives, who guided selection of the SER Panel, facilitators, and incidents for review, to ensure that the process and attendant outcome was not determined by any one agency or voice."[77] This Planning Group consisted of 24 members as of May 2021 and included "a mix of observing and participating representatives from community-based organizations, the Community Police Commission (CPC), SPD, the American Civil Liberties Union (ACLU), the Seattle Police Monitoring Team, and the United States Department of Justice (DOJ)."[78] This Planning Group helped select a panel of community and law enforcement representatives to review and discuss SPD's protest response to generate recommendations for how the City and SPD could better respond to future protests. The SER Panel consisted of a diverse set of OIG staff, community representatives, and SPD officers.

The work ahead of the SER was extensive, given the duration of protest activity, volume of uses of force, and raft of issues to discuss. OIG worked with the SER Planning Group to construct a meaningful process and broke the extensive protest activity into five distinct periods for review, calling these periods "waves"[79] to help structure the SER Panel review. OIG identified these

---

[73] Seattle Office of Inspector General, *Sentinel Event Review of Police Response to 2020 Protests in Seattle, Wave 1: Downtown Protests May 29 – June 1* at 2.

[74] Seattle Office of Inspector General, *Sentinel Event Review of Police Response to 2020 Protests in Seattle, Wave 1: Downtown Protests May 29 – June 1* at 5.

[75] Seattle Office of Inspector General, *Sentinel Event Review of Police Response to 2020 Protests in Seattle, Wave 1: Downtown Protests May 29 – June 1* at 5-6.

[76] Seattle Office of Inspector General, *Sentinel Event Review of Police Response to 2020 Protests in Seattle, Wave 1: Downtown Protests May 29 – June 1* at 2.

[77] Seattle Office of Inspector General, *Sentinel Event Review of Police Response to 2020 Protests in Seattle, Wave 1: Downtown Protests May 29 – June 1* at 2.

[78] Seattle Office of Inspector General, *Sentinel Event Review of Police Response to 2020 Protests in Seattle, Wave 1: Downtown Protests May 29 – June 1* at 7.

[79] Seattle Office of Inspector General, *Sentinel Event Review of Police Response to 2020 Protests in Seattle, Wave 1: Downtown Protests May 29 – June 1* at 3.

waves by analyzing "information gleaned from hundreds of Use of Force reports and hours of body-worn video, public commentary, complaints, and numerous other sources."[80] OIG explained, that"[e]ach Wave represents a period of time with an increase in SPD uses of force and the occurrence of one or more critical events within the protests,"[81] including notable incidents drawing significant community concern during this period.[82] The Planning Group helped select specific incidents within each wave for review by the SER Panel.

After this extensive foundational work by the OIG and the SER Planning Group, the SER Panel began meeting in January 2021 to review the first wave of protest activity and generate recommendations for future improvement. The Panel continues to meet to this day to review the latter waves of protest events.[83] The SER Panel meetings include analysis and discussion regarding specific incidents to identify "contributing factors" that "contributed to undesired negative outcomes." [84] From these reviews and discussions, the SER Panel concluded that SPD's "tactics not only proved inadequate for the protests of the summer of 2020…they contributed to escalation of civil unrest and violence."[85] In an attempt to remedy the identified issues, "the Panel made specific recommendations for change that would help SPD officers tasked with facilitating a public protest act in ways that would reduce the likelihood of those undesirable outcomes happening again in the future."[86]

To review the first wave of events alone, the SER Panel "met for more than 80 hours over the course of the first seven months, in addition to reviewing materials in preparation for those meetings."[87] SPD played a prominent role in this process, engaging with community members with a variety of perspectives toward identifying opportunities for improving protest response in the future.

---

[80] Seattle Office of Inspector General, *Sentinel Event Review of Police Response to 2020 Protests in Seattle, Wave 1: Downtown Protests May 29 – June 1* at 1.
[81] Seattle Office of Inspector General, *Sentinel Event Review of Police Response to 2020 Protests in Seattle, Wave 1: Downtown Protests May 29 – June 1* at 3.
[82] Seattle Office of Inspector General, *Sentinel Event Review of Police Response to 2020 Protests in Seattle, Wave 1: Downtown Protests May 29 – June 1* at 3-4.
[83] Seattle Office of Inspector General, *Sentinel Event Review of Police Response to 2020 Protests in Seattle, Wave 1: Downtown Protests May 29 – June 1* at 14.
[84] Seattle Office of Inspector General, *Sentinel Event Review of Police Response to 2020 Protests in Seattle, Wave 1: Downtown Protests May 29 – June 1* at 14.
[85] Seattle Office of Inspector General, *Sentinel Event Review of Police Response to 2020 Protests in Seattle, Wave 1: Downtown Protests May 29 – June 1* at 5.
[86] Seattle Office of Inspector General, *Sentinel Event Review of Police Response to 2020 Protests in Seattle, Wave 1: Downtown Protests May 29 – June 1* at 14.
[87] Seattle Office of Inspector General, *Sentinel Event Review of Police Response to 2020 Protests in Seattle, Wave 1: Downtown Protests May 29 – June 1* at 1.

The SER's intensive, collaborative engagement clearly demonstrated a deep commitment to the critical issues at hand and identifying ways to avoid such issues in the future. This work has both been challenging and vital, as the OIG remarked:

> During this process, Panelists – both community leaders and police officers – repeatedly found ways to discuss the challenging topics raised by these Events and Incidents, learning from each other how different people perceive the same events, and proposing improvements to the system that took these perspectives into account. One identifiable success from SER is the universal feeling of mutual respect that developed between Panelists on this difficult subject. It is hoped that these recommendations will lead to meaningful and lasting improvements within SPD that can help to rebuild the legitimacy of policing in the eyes of community.[88]

The Monitoring Team has observed this process from the early planning stages to the SER panel meetings. **The Monitoring Team has found the SER to be a robust, necessary process of critically analyzing SPD's protest response and generating meaningful recommendations for moving forward.** The Monitoring Team is aware of few efforts on this level nationally in the wake of widespread issues in police response to the 2020 protests. This is a credit to the OIG, its partners, and SER participants—including SPD officers who participated as panelists as well as SPD subject matter experts who provided information requested by the panel. The Monitoring Team joins the OIG in thanking the SER Panel members "who dedicated an incredible amount of their time and energy to engage in open, honest, and difficult dialogue around SPD actions during the course of the 2020 police protests and how the City can do better."[89]

*ii.    Sentinel Event Review Recommendations*

The SER Panel focused on identifying and recommending "modifications to SPD behavior that would promote, facilitate, and enable peaceful protests while minimizing police presence."[90] From the first wave of review, the SER Panel produced 54 recommendations, across five topic areas. The Panel recognized that these recommendations may have financial implications, and the Panel took "no position on the allocation of City budget dollars to SPD or other important social services."[91] The SER report describes the five areas of recommendations as follows:

---

[88] Seattle Office of Inspector General, *Sentinel Event Review of Police Response to 2020 Protests in Seattle, Wave 1: Downtown Protests May 29 – June 1* at 68.
[89] Seattle Office of Inspector General, *Sentinel Event Review of Police Response to 2020 Protests in Seattle, Wave 1: Downtown Protests May 29 – June 1* at 1.
[90] Seattle Office of Inspector General, *Sentinel Event Review of Police Response to 2020 Protests in Seattle, Wave 1: Downtown Protests May 29 – June 1* at 4.
[91] Seattle Office of Inspector General, *Sentinel Event Review of Police Response to 2020 Protests in Seattle, Wave 1: Downtown Protests May 29 – June 1* at 19.

- ***Community Legitimacy*** – Addressing the gap between what SPD may be permitted to do by law or policy ("structural legitimacy"), and what its officers need to do to meet the standards of justice expected by community ("perceived legitimacy");
- ***Situational Awareness*** – Acknowledging the need for SPD to change its mindset when responding to protests where the police themselves are the focus of the protests, moving from a mindset of crowd management and control to one of crowd facilitation and crowd safety;
- ***Communication and Community Engagement*** – Improving the ability of SPD to communicate with communities and with protesters – not just during, but before and after protests;
- ***Tactics and Equipment*** – Improving tactics during crowd events, and understanding how arrests or uses of force on individuals committing low level offenses can result in the escalation of tensions rather than calming a crowd; and
- ***Officer Wellness and Training*** – Prioritizing officer wellness, recognizing that the long shifts and hostile environments that police can encounter during protests take a toll on officers that can have lasting undesirable consequences on their professional behavior and beyond.[92]

The 54 specific recommendations across these categories can be found in the first SER report, which is available on the OIG website. An overarching recommendation was to "[a]lter SPD's strategy for policing protests to focus more explicitly and comprehensively on the facilitation of peaceful assembly and ensuring the safety of protestors," "mov[ing] away from…'crowd control'… to 'facilitation of speech' and 'crowd protection and safety.'"[93] Specific recommendations spanned SPD operations and included improving "interactions with demonstration organizers in advance of protests,"[94] "avoid[ing] the deployment of officers in ways that prevent pedestrian/crowd movement…without a clearly articulated safety rationale,"[95] and providing "officers with clear direction about SPD's priorities in facilitating demonstrations, particularly when the institution of policing is the focus of the protest,"[96] amongst many other recommendations. **In all, the SER Panel's recommendations demonstrate the rigor of the SER process and its commitment to producing real change.**

---

[92] Seattle Office of Inspector General, *Sentinel Event Review of Police Response to 2020 Protests in Seattle, Wave 1: Downtown Protests May 29 – June 1* at 4.

[93] Seattle Office of Inspector General, *Sentinel Event Review of Police Response to 2020 Protests in Seattle, Wave 1: Downtown Protests May 29 – June 1* at 104-105.

[94] Seattle Office of Inspector General, *Sentinel Event Review of Police Response to 2020 Protests in Seattle, Wave 1: Downtown Protests May 29 – June 1* at 104-105.

[95] Seattle Office of Inspector General, *Sentinel Event Review of Police Response to 2020 Protests in Seattle, Wave 1: Downtown Protests May 29 – June 1* at 39.

[96] Seattle Office of Inspector General, *Sentinel Event Review of Police Response to 2020 Protests in Seattle, Wave 1: Downtown Protests May 29 – June 1* at 31.

### iii.    SPD's Response to Sentinel Event Review Recommendations

Of course, the purpose of the SER process and its many recommendations is to produce action and change. SPD did not wait to begin implementing improvements both apart and as a result of the SER process, as recognized by OIG:

> SPD has engaged in a self-critique of many of the events reviewed by the Panel and has begun to implement improvements, at least in part as a result of the Panel's discussions in advance of the release of this Report. OIG was also involved in conversations with SPD about improvements stemming from the OIG August 2020 report on crowd management and less lethal tools. Thus, the report may include recommendations that are already in place or are in the process of implementation. SPD's continued willingness to engage in critical self-analysis, especially with community involvement in developing recommendations, as well as in implementing those recommendations, will be crucial to improving its relationship with the residents of Seattle in the future.[97]

After OIG released the SER Wave 1 report, SPD responded in writing to each recommendation. **SPD either agreed to implement or had already implemented the vast majority of the OIG's recommendations, demonstrating a commitment to improvement both based on community feedback and SPD's identification of issues.** SPD referenced a variety of policy and training initiative related to SER recommendations geared toward improving protest response and overall operations. Where SPD did not immediately agree with a recommendation, the Department suggested further discussion to explore the topic collaboratively.

While SPD agreed with the vast majority of the recommendations, SPD also recognized that some recommendations would depend on City budgetary decisions.[98] The SER Panel likewise recognized that its recommendations may have budgetary implications and, as previously stated, took "no position on the allocation of City budget dollars to SPD or other important social services."[99] That said, many of the recommendations were effectively budget neutral, including changes to SPD policy and practices, and SPD has demonstrated substantive action in these areas. **Overall, SPD's engagement both throughout the SER process and in response to the SER Panel's recommendations bodes well for the ongoing impact of the SER work and other potential City-led initiatives to improve policing in Seattle.**

---

[97] Seattle Office of Inspector General, *Sentinel Event Review of Police Response to 2020 Protests in Seattle, Wave 1: Downtown Protests May 29 – June 1* at 14.
[98] Seattle Police Department, *Memorandum to Office of Inspector General in Response to Sentinel Event Review Recommendations* at 3.
[99] Seattle Office of Inspector General, *Sentinel Event Review of Police Response to 2020 Protests in Seattle, Wave 1: Downtown Protests May 29 – June 1* at 19.

*iv.      Moving Forward with Sentinel Event Review and System Changes*

The SER work is not yet completed. Although the SER's first report provides a strong, broad foundation for system improvements, the OIG and SER Panel continue to work through all five waves of protest review over the course of 2022.  This continuing process will surely generate additional recommendations for improved policing. While SPD has implemented many recommendations toward improved protest response, SPD has agreed to additional changes and initiatives that require further work. It will be important for the CPC and OIG to monitor SPD's implementation of these commitments to ensure timely and effective implementation. The Monitoring Team will continue to participate in SER and observe the City's progress moving forward with system changes to improve its facilitation of First Amendment expression and other operations to provide better policing to the Seattle community.

The Monitoring Team commends the City's extensive efforts to analyze these problems and generate recommendations for future improvement. Clearly, the City has taken substantive strides toward preparing for this next event and is poised to continue to engage and improve in this area as the SER process move forward. Many cities endured similar issues with police responses to the 2020 protests and have not conducted such an intensive, collaborative effort toward preventing future crises of this sort. City-led efforts like this will be necessary to continually assess and improve public safety in Seattle moving forward.

As noted previously, even as many within the City and SPD wish that the response would have transpired differently, the harm of SPD's protest response in 2020 is lasting. Still, the City has demonstrated a substantive commitment and ability to both identifying and working to address its issues so that lessons can be learned and problematic performance prevented in the future.

In this way, SPD's response to the protest presented a crisis for its longstanding compliance with the Consent Decree, and the City's response to acknowledge and address these issues lives into the Consent Decree's goal of a self-monitoring, self-correcting City. Although this does not diminish the issues in the protest response or minimize the critical work that remains in this area, the ability of a system to identify and respond to issues that arise is critical to fostering accountable policing in Seattle. Of course, the true test of its impact will be the next significant protest, whenever it comes. Since the peak of the protests, SPD reports responding to a variety of crowd events without issue, with the last reported blast bell deployment in September of 2020.

Ultimately, the challenges surrounding police activity during the 2020 protests has emphasized a central question, perhaps more than ever before: What does Seattle want policing to be? This is obviously a profoundly complicated, multi-faceted question – but nonetheless an essential topic and conversation. The Monitoring Team has heard feedback from a diverse cross-section of community members with varying visions for the future of policing in Seattle. Some say that they want to defund the police department; some want expanded civilian oversight; some want

reforms beyond the scope of the Consent Decree; and still others want a strengthened police department able to police the city more proactively in the hopes of decreasing crime and disorder. Certainly, no one process or mechanism will harmonize these differences into one coherent vision for policing in Seattle. However, the City and community is not limited in this regard, and the OIG's Sentinel Event Review process has shown how community members of starkly conflicting perspectives can come together to have meaningful conversations toward improving public safety in Seattle. SER has not resolved and will not resolve, by itself, all of the issues with SPD's protest response or policing in general, but this intensive, collaborative process has clearly demonstrated how a capable, progressive city can engage in self critique toward improving community safety. Similar efforts can help Seattle continue to work toward reimagining public safety for its community moving forward.

## D. SPD's Use of Force Performance

### 1. Scope & Approach

This report now turns toward assessing SPD's overall use of force performance over the course of the Consent Decree with a specific focus on updating the Court and Seattle community on SPD's use of force practices since the Phase II assessment in October 2019. To do so, the Monitoring Team reviewed a variety of data as well as analyses conducted by SPD, in line with the sustainment phase of the decree. Specifically, the Monitoring Team reviewed SPD data regarding force incidents, use of force reports and supervisory reviews, associated body-camera footage, SPD reviews of departmental performance on force policies, Force Investigation Team investigative reports, Force Review Board meetings and findings memos, and OPA statistics related to force misconduct allegations.[100]

Much of the data used for this assessment did not exist prior to the Consent Decree or, at a minimum, was not readily available or analyzed by the Department, as previously mentioned. It is notable that SPD has not only greatly enhanced its data collection and review in these areas but also published extensive open data pertaining to crisis intervention, use of force, and other topics of public interest. SPD's use of force dashboard[101] and open data[102] provide the public an

---

[100] As noted in the preliminary use of force assessment that was provided to the public, the Monitoring Team has updated the 2021 use of force statistics to include all use of force reports for 2021, including certain use of force reports which were not finalized and available for the statistical analysis published in the preliminary assessment report.

[101] SPD's use of force dashboard is available on its website: https://www.seattle.gov/police/information-and-data/use-of-force-data/use-of-force-dashboard.

[102] SPD's use of force open data is available on its website: https://www.seattle.gov/police/information-and-data/use-of-force-data/use-of-force-dataset.

opportunity to continually analyze SPD's use of force practices in ways not possible prior to the consent decree.[103]

### 2. Introduction to Findings on SPD's Recent Performance

The world – and specifically the world of policing – has changed dramatically since the Monitoring Team's finding of compliance in 2017, based on SPD's performance beginning in 2014. This report provides an update on SPD's use of force performance over recent years exploring SPD's force performance both in more typical circumstances, involving one subject or a small number of subjects, and within the context of crowds and protests. Although this section of the assessment does provide statistics on SPD's reported force during the 2020 protests, the previous section of this report focuses more specifically on SPD's actions during the protests, SPD's subsequent corrective actions, the disciplinary investigations related to protest actions, and the City's overarching system response to the problems evident to the world during this time. Consequently, the following discussion focuses on SPD's overall force practices, as well as the impact of protest-related force on SPD's overall force trends.

### 3. How SPD Classifies and Counts Uses of Force

In 2014, as a result of the Consent Decree, SPD began classifying its use of force with a three-level system that, generally, categorizes force according to the severity or significance of the force involved:

- Type I force, the lowest level, includes "[f]orce that causes transitory pain or the complaint of transitory pain" such as hand compliance techniques.[104] Type I also includes pointing a firearm.
- Type II, or intermediate force, is defined as "[f]orce that causes or is reasonably expected to cause physical injury greater than transitory pain but less than great or substantial bodily harm."[105] Type II force generally includes the use of tasers, OC spray, and impact weapons.

---

[103] SPD's ongoing data cleaning operations can lead to slight changes in reporting numbers on these dashboards over time, which may lead to differences between the data in this report and SPD's continually updated dashboards and open data online.
[104] Seattle Police Department Manual, Section 8.050, Use of Force Definitions (last rev. April 15, 2021 https://www.seattle.gov/police-manual/title-8---use-of-force/8050---use-of-force-definitions).
[105] Seattle Police Department Manual, Section 8.050, Use of Force Definitions (last rev. April 15, 2021 https://www.seattle.gov/police-manual/title-8---use-of-force/8050---use-of-force-definitions).

- Type III force is the most serious force, including "[f]orce that causes or is reasonably expected to cause, great bodily harm, substantial bodily harm, loss of consciousness, or death."[106] Officer-involved shootings are Type III uses of force.[107]

This system brought greater structure to SPD's force reporting, review, and analysis. Before considering SPD's use of force in terms of this classification system, it is important to understand how SPD documents and calculates force statistics for those situations where there may be multiple involved officers, multiple applications of force per officer, and/or multiple subjects.

SPD counts force statistics based on officer use of force reports with each "use of force" constituting a "combination of a unique officer, unique subject, and unique incident," as explained by SPD.[108] SPD's open data and public use of force dashboard use this counting approach to present statistics to the public. The following scenarios help explain how this reporting system plays out in practice:

- If an officer uses multiple applications of force against a single subject during a single event, that would count as one use of force, reported and investigated at the highest level of force used during the interaction.
- If an officer uses force multiple times against two different subjects in one event, that would count as two uses of force, both reported and investigated at the highest level of force used against the individual subjects.
- If two different officers use multiple applications of force against a single subject during a single event, that would count as two uses of force, one per officer both reported and investigated at the highest level of force used by the individual officers.

For example, if one officer deployed a Taser against Subject A (Type II) and subsequently used hand compliance techniques to arrest Subject A (Type I), and then pointed a firearm at Subject B (Type I) before handcuffing and arresting the individuals, the incident would involve one officer, two subjects, and two use of force reports documenting three applications of force. The use of force reports involving Subject A would be classified as a Type II, also including information regarding the application of Type I compliance techniques. A separate, second use of force report would be required for the Type I use of force involving the second subject, Subject B.

To reiterate, this means that, throughout this report, **statistics regarding "uses of force" refer to officer use of force reports involving "the combination of a unique officer, unique subject,**

---

[106] Seattle Police Department Manual, Section 8.050, Use of Force Definitions (last rev. April 15, 2021 https://www.seattle.gov/police-manual/title-8---use-of-force/8050---use-of-force-definitions).
[107] SPD sometimes classifies these force types by "level" rather than "type." For example, SPD may refer to Type II force as Level 2 force. "Type" and "level" are synonymous in this context for this report and when viewing SPD's open data and dashboards pertaining to force.
[108] Seattle Police Department, *Use of Force Annual Report* (Jan. 31, 2019). Pages 4-5.

**and unique incident, and reported at the highest level of force used by a given officer," as SPD explains**. [109] One force incident could lead to multiple use of force reports, which could include multiple applications of force against involved subjects.

### 4. Overall Use of Force Trends

This section of the report analyzes SPD's use of force over time in a variety of ways. In short, **over the course of the Consent Decree, SPD's use of force decreased significantly overall and across all levels of force, with records lows in 2019 and 2021 punctuated by the historic levels of protest-related force in 2020**. The following discussion provides more context and analysis regarding these trends.

2015 was the first year of complete force reporting consistent with the Consent Decree's required system, which allows SPD and the public to compare annual statistics on force from that point forward. Table 4 shows SPD's annual force reporting by level and what percentage of total force each type accounted for.

---

[109] Seattle Police Department, *Use of Force Annual Report*, January 31, 2019. Page 5.

**Table 4. Force Levels by Year, 2015-2021**[110]

| Year | Type I | Type II | Type III | Total |
|------|--------|---------|----------|-------|
| 2015 | 1,574 (75%) | 477 (23%) | 35 (1.7%) | 2,086 |
| 2016 | 1,203 (75%) | 381 (24%) | 25 (1.6%) | 1,609 |
| 2017 | 1,292 (76%) | 364 (22%) | 33 (2.0%) | 1,689 |
| 2018 | 1,870 (83%) | 368 (16%) | 26 (1.1%) | 2,264 |
| 2019 | 1,048 (75%) | 324 (23%) | 18 (1.3%) | 1,390 |
| 2020 | 899 (43%) | 1,151 (56%) | 17[111] (0.8%) | 2,067 |
| 2021 | 821 (76%) | 244 (22%) | 20 (1.8%) | 1,085 |
| Total | 8,707 (71%) | 3,309 (27%) | 174 (1.4%) | 12,190 |

*Source: SPD Open Data*

**SPD's overall use of force declined 33% from 2015 to 2019 and 48% from 2015 to 2021.**
Later sections of this report evaluate the impact of decreased officer activity on the decreases in force in the Covid-19 pandemic era. **2019 and 2021 not only represented record lows in use of force overall but also records lows in use of force per officer dispatch**, a metric which measures uses of force against officer activity as discussed in greater depth later in this report.

**2020 represented a significant deviation from recorded lows in use of force in 2019 and 2021, driven by 931 protest-related uses of force.** SPD reported 1,151 intermediate (Type II) uses of force in 2020, a 141% increase over the next highest year on record for Type II force (2015).

---

[110] This table has been updated to reflect additional 2021 use of force reports which were not finalized and available for the Monitoring Team's preliminary report on this topic. The preliminary report indicated that the final report would be updated accordingly.

[111] The number of reported Type III uses of force in 2020 decreased from 18 in the preliminary assessment report to 17 in this assessment report based on SPD reclassifying one force event during a Force Review Board meeting that occurred between the initial data collection for the preliminary report and the final data collection for this assessment report. SPD's Force Review Board memo articulated the reason for this change. Initial reporting indicated two officers were involved in a Type III use of force incident, leading to two separate Type III use of force reports. The Force Review Board concluded that one of the officers "was not in physical contact with the subject during the takedown that was alleged to have caused the injury" which led to a Type III classification for the event. Ultimately, the event was investigated as a Type III use of force and reviewed by the Force Review Board, with the Board concluding that one of the officers did not use Type III force.

**Serious force (Type III, which includes officer-involved shootings) decreased 48% from 2015 to 2019-2021. Serious force accounted for 1.4% of all uses of force between 2015-2021, and 1.2% of all uses of force for 2019-2021.** This decrease in serious force has been an important outcome of this reform process, and SPD must continue to work to reduce serious force where possible, recognizing the tragic outcomes that can result for individuals and the community.

Figure 1 visualizes annual force trends, highlighting the significant increase in Type II force in 2020.

**Figure 1. Use of Force by Level Over Time**



*Source: SPD Open Data*

While SPD did not collect complete force data for 2014, the 2014 data that are available regarding serious force present a starker contrast between early Consent Decree operations and recent performance. **The most serious force incidents (Type III) decreased by 61% from 2014 (47) to 2019-2021 (18.3 average).** SPD reported using Type III force 47 times in 2014, decreasing to 18 times in 2019, 17 times in 2020, and 20 times in 2021. Officer-involved shootings decreased from 23 in 2014 to 5 in 2020 and 13 in 2021. SPD began using this force reporting system in the middle of 2014, so the 2014 data collection for Type III may not be complete, meaning the decrease from 2014 may be greater than demonstrated with these statistics.

**Figure 2. Serious (Type III) Uses of Force Over Time**



*Source: SPD Open Data. SPD began using this force reporting system in 2014, so the Type III reporting for 2014 may be incomplete or otherwise present data quality issues.*

The share of total force classified as intermediate or serious (Type II or III) remained relatively consistent for most years from 2015 to 2021, with notable deviations in 2018 and 2020. 2018 saw the lowest share of intermediate or serious force on record; however, this trend was driven by a significant increase in Type I force that year – and not a sizable decrease in more serious types of force (Type II and III force). **The proportion of intermediate or serious force in 2020 was more than double any other year since 2015**, resulting mostly from an unprecedented increase in intermediate force in protest situations as well as a decrease in lower-level force. Outside of protest situations, 2020's proportion of intermediate or serious force was similar to other years (27% compared to an average of 23% for 2015-2021, excluding 2020).

**Figure 3. Distribution of Lower-Level vs. Intermediate or Serious Force**



*Source: SPD Open Data. For the above figure, Type I force constitutes "Low-Level" and Type II and III constitute "Intermediate or Serious."*

The substantial increase in intermediate (Type) II force during 2020 occurred during the protests in the months immediately following the murder of George Floyd, as Figure 4 highlights. Both Type I and II force have demonstrated a general downward trend since the beginning of the Consent Decree, outside of the massive increase in Type II force during the 2020 protests.

**Figure 4. Low-Level (Type I) and Intermediate (Type II) Force Frequency by Month**



*Source: SPD Open Data*

5. Contextualizing Protest-Related Uses of Force within Overall Force Trends

This report presents analysis of SPD's use of force trends over time, and recent events such as SPD's response to the protests against police violence in 2020 and the Covid-19 pandemic impact these statistics and trends, complicating the analysis in this report.

Use of force statistics from 2020 capture force used during the period of protest and First Amendment activity that occurred beginning in May 20, and that continued throughout 2020 at varying levels, in the wake of the murder of George Floyd in Minneapolis (which this analysis typically refers to as "the protest period").  While SPD had reported uses of force during protests prior to 2020, the typical use of force report or incident prior to 2020 involved one or a small number of subjects and one or a small number of officers.  Indeed, SPD's force policies and procedures generally address the usual circumstances in which force is deployed in a situation involving a limited number of individuals.  However, as the following analysis describes, SPD used significantly more force in crowd contexts in 2020, contributing to higher overall levels of force in 2020 from an aggregate perspective.

To get a sense of how 2020 compares to SPD's performance during other time periods, but to also ensure that the notable and significant force deployed in the 2020 protest period is adequately considered and reflected, the Monitoring Team's analysis considers both (1) comparative aggregate force statistics *including* force related to protests, and (2) the same comparisons *excluding* force related to protests for certain statistics provided in this report. This is done to both highlight the significant amount of force used during the protest period as well as attempt to approximate apples-to-apples comparisons of force between years with minimal protest activity and SPD's performance in 2020, outside of its response to historic protest activity against police violence.

While comparisons excluding use of force related to protests present the public with the opportunity to assess SPD's force in more typical interactions with the public across time, the value of these metrics is certainly limited for a variety of reasons. First and foremost, as already discussed, SPD used significant force during the protests and seriously harmed its relationship with the community as a result. Further, SPD dedicated significant resources to the protest response, thereby likely decreasing its policing response to non-protest activity and the likelihood of force outside of protest settings. With these serious limitations in mind, the Monitoring Team – to provide a more comprehensive understanding of SPD's force practices – presents both (1) complete statistics that *include* protest-related force and (2) statistics *excluding* protest-related to force.

Aside from the challenges that SPD's response to protest activity in 2020 pose for comparing aggregate force statistics for 2020 with prior years, 2019 and 2020's statistics also reflect notably

altered patterns of human behavior and social life in light of the Covid-19 pandemic and related public health restrictions. Analysis later in this report situates force trends within the context of officer dispatches to events in an attempt to understand how force trends were impacted by changes in the frequency of officer interactions with the public. See the "Rate of Use of Force per Officer Dispatch" section in this report for this discussion.

To facilitate analysis of force in protest situations, SPD tracked whether a use of force was related to a protest by having officers check a box on use of force reports indicating protest relation on subsequent force reporting. SPD provided these data to the Monitoring Team to facilitate this analysis. While this method of tracking force related to protests is, like any system, subject to error, SPD reported high levels of uses of force related to protests in 2020, indicating frequent usage of this mechanism for flagging force related to protests, though the Monitoring Team is confident that some uses of force related to protests were reported but not flagged as protest-related, impacting these statistics. As Table 5 below shows, SPD had reported uses of force related to protests prior to 2020 but such instances were rare compared to the historic numbers in 2020. In turn, when this report presents force statistics over time excluding protest-related force, 80% of that exclusion impacts 2020 force totals. Table 5 breaks out SPD's reporting of uses of force related to protests from 2015 to 2020:

**Table 5. Uses of Force Related to Protests**

| Year | Type I | Type II | Type III | Total |
|------|--------|---------|----------|-------|
| 2015 | 9 | 62 | 0 | 71 |
| 2016 | 1 | 49 | 2 | 52 |
| 2017 | 3 | 47 | 0 | 50 |
| 2018 | 5 | 7 | 0 | 12 |
| 2019 | 9 | 18 | 0 | 27 |
| 2020 | 73 | 853 | 5[112] | 931 |
| 2021 | 11 | 14 | 0 | 25 |
| **Total** | **111** | **1,050** | **7** | **1,168** |

*Source: SPD Protest Force Datasets*

---

[112] The number of reported Type III uses of force related to protests in 2020 decreased from 6 in the preliminary assessment report to 5 in this assessment report based on SPD reclassifying the force during a Force Review Board meeting that occurred between the initial data collection for the preliminary report and the final data collection for this assessment report. SPD's Force Review Board memo articulated the reason for this change. Initial reporting indicated two officers were involved in a Type III use of force incident, leading to two separate Type III use of force reports. The Force Review Board concluded that one of the officers "was not in physical contact with the subject during the takedown that was alleged to have caused the injury" which led to a Type III classification for the event. Ultimately, the event was investigated as a Type III use of force and reviewed by the Force Review Board, with the Board concluding that one of the officers did not use Type III force.

**SPD reported 931 protest-related uses of force in 2020, a historic figure far surpassing any other year.** Figure 5 compares total force over time, including and excluding protest force, highlighting the significant levels of protest-related force in 2020. SPD reported using Type II force 853 times in 2020, with force involving less-lethal instruments primarily driving this trend, as discussed later in this report. Community members in a Community Police Commission engagement session voiced concerns about SPD's statistics fully capturing the extent and level of force used during the protests, specifically believing that more Type III uses of force occurred with protestors sustaining what could be considered substantial bodily injuries resulting from less-lethal device deployments in a crowd environment.

Figure 5 shows the significant impact of 2020's protest-related force on overall force trends, which are mostly downward otherwise except for a significant spike in 2018.

**Figure 5. Total Use of Force by Year**



*Source: SPD Open Data and SPD Protest Force Datasets*

When viewed on a monthly basis, **protest-related force spiked significantly in May through July 2020 (averaging 222 incidents per month) before a significant decrease in August (38) and subsequent increase in September (155)** related to the Labor Day protests. Protest-related force decreased to significantly lower levels in October and beyond.

**Figure 6. Use of Force Related to Protests by Month**



*Source: SPD Open Data & SPD Protest Force Datasets*

Figure 7 shows use of force by type by year, excluding protest-related force. This figure depicts a general downward trend in force in everyday situations over the course of the Consent Decree, with the exception of a notable increase in Type I and Type II force in 2018 before a resumed downward trend. **When excluding protest-related force, 2019-2021 all have lower use of force – both overall and at every level – than preceding years.** A subsequent section of this report analyzes these trends in the context of officer activity to attempt to assess the impact of Covid-19 and overall police activity on these downward force trends.

**Figure 7. Use of Force by Level Over Time, *Excluding* Protest Force**



*Source: SPD Open Data & SPD Protest Force Datasets*

As discussed previously, SPD force statistics available on SPD's online dashboard and open data set count force reports for unique officers and unique subjects in unique events. A single force report may include multiple *applications* of force. For example, **across 246 Type II use of force reports in June 2020, SPD reported 522 applications of Type II force – the highest reported levels of Type II force application on record.** This historic increase in Type II force was primarily driven by uses of less-lethal equipment, as discussed elsewhere in this report.

**Figure 8. Type II Uses of Force and Force Applications Over Time**



*Source: SPD Open Data*

Again, SPD force statistics count uses of force as unique officers using force against unique subjects in a unique event. Consequently, one use of force may include multiple applications of force. Indeed, *one* use of force report from the time period of the 2020 protests included *21 different applications* of Type II force. Further complicating these statistics, SPD's protest-related force sometimes occurred in a crowd context with a group of subjects for the force, but SPD's reporting system likely counted the group as one collective subject rather than a series of individuals. This contrasts with SPD's standard force reporting procedures outside of the protest context, where one officer using force against two different subjects would result in two use of force reports. These factors complicate the analysis of force used in protest situations as well as comparisons across time.

When viewed in this context, SPD's historic use of force during the protests is greater than perhaps originally considered based on SPD's standard method of counting unique force reports.

Given that some of the already-significant number of use of force reports from the 2020 protest period in fact involve numerous separate applications of Type II force in a crowd context, **the volume of individual force applied to separate individuals may actually be much higher than SPD's standard method of reporting force statistics suggest.**

### 6.  Use of Force by Instrument

SPD tracks the specific techniques and instruments used during force incidents. Again, officers may apply multiple force tactics as part of one use of force report involving a unique subject. This section generally considers the number of applications of specific force instruments and tactics, rather than the number of use of force reports as is this the case throughout most of this report.

SPD reported using less-lethal instruments an average of 164 times per year in the period from 2015 to 2017, decreasing to 116 per year for 2018 through 2019 – before a recorded high of 1,409 in 2020. SPD reported 1,242 applications of less-lethal instruments in 2020 during protests and 167 times outside of protests. For these statistics less-lethal instruments included instruments such as batons, electronic control devices (for example, Tasers), OC spray, blast balls, and less-lethal launchers, amongst other tools.

SPD's reported use of less-lethal instruments 167 times in 2020 outside of protest situations is a recorded high outside of protest environments. However, some of the 167 less-lethal deployments purportedly occurring outside the protest context appear to have in fact occurred in protests and simply were not appropriately classified by the officers using force. In the end, **SPD reported record highs in usage of less-lethal instruments both during protest situations and outside of protests in 2020.** Less-lethal usage in 2021 reduced significantly but remained above average for years outside of 2020.

**Figure 9. Less-Lethal Instrument Applications by Year**



*Source: SPD Data on Force Instruments and Protest-Related Force*

The 1,242 reported uses of force in 2020 involving less-lethal equipment in protest situations are broken down in Figure 10 below. It is, once again, important to note that this chart shows applications of force, and that there may be multiple applications of force in a single officer use of force report. For context, the 1,242 *applications* of less-lethal instruments (which are generally classified as Type II uses of force) exceeds the 853 Type II, protest-related force *reports* due to multiple applications of force against recurring subjects included in a single force report as part of the overall incident. For example, one SPD use of force report during the protest response included 21 different applications of less-lethal equipment (40mm launcher and OC balls).

SPD reported using OC spray in 551 use of force incidents during the 2020 protests, with blast balls and OC balls deployed 183 and 177 times respectively according to SPD records. SPD's recording of only 12 uses of force involving batons during the protests calls into question how SPD reported baton usage during the protests and the clarity of its policies in this regard, given the Monitoring Team's review of body-camera footage related to SPD's protest response. Community members during a Community Police Commission engagement session also voiced concerns about potential undercounting of the number of blast ball deployments as well as whether SPD accurately categorized uses of force as Type III in situations where SPD may not have known of a serious bodily injury occurring to a protestor in a crowd as a result of SPD force.

**Figure 10. Reported Applications of Less-Lethal Devices During 2020 Protests**



*Source: SPD Force Application Data and Protest Force Datasets from SPD's Data Analytics Platform*

DOJ's investigation found that "SPD officers too quickly resort[ed] to the use of impact weapons, such as batons and flashlights" and that "when SPD officers use[d] batons, 57% of the time it [was] either unnecessary or excessive."[113] SPD's use of batons outside of protest situations decreased over the course of the Consent Decree, averaging 3.7 uses per year in 2019-2021 outside of protest situations. **SPD officers have turned from "too quickly resorting to the use of…batons"** [114] **to almost never using batons outside of protest situations.** Figure 11 shows the decrease in baton usage and OC spray use outside of protests over the course of the Consent Decree.

---

[113] 2011 Findings Letter at 4.
[114] 2011 Findings Letter at 4.

**Figure 11. Baton and OC Spray Applications *Outside* of Protest Events**



*Source: SPD Force Application Data and Force Protest Datasets from SPD's Data Analytics Platform*

SPD's use of electronic control devices (ECDs, commonly known as Tasers) during the Consent Decree has been significantly lower than SPD's reported averages from 2001-2010. **SPD reduced its average monthly usage of Tasers some 80% from the period of 2001 to 2010 (preceding the Consent Decree) to the Consent Decree period of 2015 to 2021 – decreasing from an average of 14 to 2.8 uses of force involving a Taser per month.**

**Figure 12. Electronic Control Device (Taser) Uses of Force Over Time, Compared to 2001-2010 Average**



*Source: SPD Force Application Data from SPD's Data Analytics Platform. 2001-2010 Average comes from "Taser Use Update," Seattle Police Department, May 2011.*

Firearm pointings, which are classified as Type I force, have reduced over the course of the Decree, reaching the some of the lowest levels on record during parts of 2020 and 2021.

**Figure 13. Lethal Firearm Pointing by Month**



*Source: SPD Force Application Data from SPD's Data Analytics Platform*

### 7.  Rate of Use of Force per Officer Dispatch

An imperfect yet insightful way of considering SPD's force practices across time is to consider the frequency of uses of force in light of the number of officer encounters with the public. This approach provides some level of comparison between periods in which the amount of officer activity may differ, including as a result of the Covid-19 pandemic starting in 2019 or the protests in 2020. To produce such comparisons across different periods, SPD calculates a rate of force per officer dispatch, since each officer dispatch theoretically represents an opportunity for a use of force. This metric provides some insight into the frequency of force distributed across the wide array of SPD responses, but it is imperfect for a variety of reasons, including the fact that some officer dispatches are unlikely to produce a potential use of force situation. SPD reports the following number of officer dispatches, which factor into the rates of force shown in the subsequent table.

**Table 6. Officer Dispatches per Year**

| Year | Officer Dispatches |
|------|--------------------|
| 2015 | 802,876 |
| 2016 | 832,969 |
| 2017 | 891,559 |
| 2018 | 863,306 |
| 2019 | 865,165 |
| 2020 | 678,667 |
| 2021 | 645,552 |

*Source: SPD's Internal Data Analytics Platform*

Comparing these dispatch statistics with the force statistics previously discussed in this report produces the following rates of force per officer dispatch:

**Table 7. Rates of Force per Officer Dispatch**

| Time Period | Force per Officer Dispatch | Intermediate or Serious Force per Dispatch | Serious Force per Officer Dispatch |
|-------------|----------------------------|--------------------------------------------|------------------------------------|
| 2015 | 0.26% | 0.06% | 0.004% |
| 2016 | 0.19% | 0.05% | 0.003% |
| 2017 | 0.19% | 0.04% | 0.004% |
| 2018 | 0.26% | 0.05% | 0.003% |
| 2019 | 0.16% | 0.04% | 0.002% |
| 2020 | 0.30% | 0.17% | 0.003% |
| 2021 | 0.17% | 0.04% | 0.003% |

*Source: SPD Open Data and SPD Dispatch Data from the SPD Data Analytics Platform*

**SPD used force at the lowest rates on record in 2019 and 2021 overall and at every level, when compared against officer dispatch activity.  SPD's overall force in 2020 once again deviates significantly higher as a result of historic protest-related force. Across 2019 through 2021, SPD used serious force in 0.003% of officer dispatches – or once in every 39,807 officer dispatches.**

8.  Frequency of Force by Officer

SPD tracks force statistics by officer to allow for analysis on how frequently its officers use force. The following statistics summarize trends in officer force frequency for *officers who*

*reported using force in a given* year. Therefore, the number of officers in the following figures only includes officers reporting force for that year – *not* all officers in the Department.  This is because some officers do not use force in a given year (for example, officers who perform primarily administrative duties or otherwise do not use force in a given year) and therefore are not listed as an officer using force in SPD's open data set for a given year. In turn, when this report presents percentages of officers using force at a given frequency in a year, these percentages are of officers using force – and not the entire Department – for that year. All of the following percentages in this section would be *lower* if calculated against the full sworn size of the Department; however, such calculations would then include some officers who do not, by virtue of their job responsibilities, generally have the possibility of encountering force situations, thereby clouding frequency rates of officers who may be likely to encounter situations in which force may be used. In the end, these force statistics should be read as follows: "for officers who used force during a given year, how frequently did they use force for that year."

**Most officers who use force do not use it frequently, though a small percentage of SPD officers in a given year use force with greater frequency.**  A majority of officers who used force across 2019 to 2021 used force once or twice per year. Between 0 and 3% of officers using force reported using force 12 or more times in a given calendar year – or at least once a month – in all years from 2015-2021 except 2020 when 5% of officers using force reported using force 12 or more times, likely related to SPD's response to protests in the Summer of 2020. 2021 shows the lowest officer force frequencies in nearly every band in Figure 14 below.

**Figure 14. Frequency of Force by Officer**



| | 1 | 2 | 3 | 4-5 | 6-7 | 8-10 | 11-19 | 20+ |
|---|---|---|---|---|---|---|---|---|
| ■ 2015 | 201 | 146 | 70 | 93 | 47 | 38 | 24 | 1 |
| ■ 2016 | 197 | 110 | 90 | 81 | 41 | 19 | 11 | 0 |
| ■ 2017 | 208 | 109 | 87 | 87 | 53 | 23 | 7 | 0 |
| ■ 2018 | 195 | 109 | 78 | 112 | 54 | 51 | 21 | 2 |
| ■ 2019 | 203 | 115 | 70 | 70 | 36 | 12 | 6 | 1 |
| ■ 2020 | 188 | 124 | 75 | 77 | 50 | 29 | 32 | 2 |
| ■ 2021 | 165 | 94 | 52 | 56 | 26 | 14 | 2 | 0 |

■ 2015  ■ 2016  ■ 2017  ■ 2018  ■ 2019  ■ 2020  ■ 2021

*Source: SPD Open Data*

Officer force frequency for intermediate or serious force once again emphasizes the significant increase in force in 2020 related to SPD's response to protest environments. While the trends in force frequencies were relatively consistent in the period between 2015 and 2019, 2020 is again an outlier in this respect, as highlighted in Figure 15 below. Conversely, 2021 once again ranks lowest in nearly every force frequency band for intermediate or serious force.

70

**Figure 15. Frequency of Intermediate or Serious Force by Officer**



| | 1 | 2 | 3 | 4-5 | 6-7 | 8-10 | 11-19 | 20+ |
|---|---|---|---|---|---|---|---|---|
| 2015 | 200 | 70 | 32 | 12 | 4 | 0 | 0 | 0 |
| 2016 | 165 | 49 | 29 | 8 | 2 | 1 | 0 | 0 |
| 2017 | 180 | 39 | 22 | 12 | 2 | 1 | 0 | 0 |
| 2018 | 170 | 51 | 24 | 7 | 3 | 0 | 0 | 0 |
| 2019 | 178 | 50 | 14 | 5 | 0 | 0 | 0 | 0 |
| 2020 | 175 | 73 | 33 | 42 | 27 | 19 | 13 | 1 |
| 2021 | 129 | 35 | 13 | 6 | 0 | 0 | 0 | 0 |

*Source: SPD Open Data. Type II is considered intermediate force and Type III is considered serious force.*

Fourteen officers reported using intermediate or serious force 11 or more times in 2020, with one officer reporting more than 20 uses of force. This officer used Type II force 24 times in 2020, 23 of which were documented as protest-related. This officer reported using force once in 2021 and no more than three times in three years preceding 2020.

When excluding force related to protests, trends in officer force frequency across time become far more consistent. Specifically, 2020 ranks toward the bottom in terms of force frequency by officers outside of the protest context, with the Covid-19 pandemic potentially impacting this trend. A number of factors may explain these trends, including the dedication of SPD officer resources to protest response that would have, in part, otherwise been dedicated to typical policing services that may have resulted in other force incidents.

Outside of protest situations, four officers reported using intermediate or serious force 10 or more times from 2019-2021, and 19 officers reported using intermediate or serious force five or more times from 2019-2021. This means that, in recent years, the vast majority of officers have not used intermediate or serious force frequently outside of protest situations, but a small group

of officers have used intermediate or serious force more frequently, meriting close analysis by SPD to ensure appropriate supervision across these force events.

### 9.  Officer and Subject Injuries

Table 8 below shows statistics regarding complaints of pain or injury resulting from uses of force. It is important to note that the following analysis counts any complaint of pain as an injury. The underlying nature of the complaints of pain and injuries ranged from relatively minor complaints of pain to substantial bodily harm or death.

While officer injury rates per use of force were relatively consistent between 7% and 13% from 2015 to 2021, officer injuries in 2020 were 60% higher than any other year on record, emphasizing the difficult circumstances in which officers were operating during the 2020 protests.

Subject injury rates ranged fairly significantly from a low of 44% in 2015 to a high of 71% in 2018. The period between 2018 and 2021 was relatively more consistent, ranging from 64-71% with the exception of 2020. The injury rate for subjects in 2020 was significantly lower at 52%, but this lower rate may have primarily resulted from the protest context in which officers used less-lethal tools from some distance and may not have documented specific subject injury information as accurately as they would in non-protest situations.

**Table 8. Uses of Force with Injury or Complaints of Pain for Subjects and Officers**

| Year | Subject Injured | Officer Injured | Total UOF | Subject Injury Rate | Officer Injury Rate |
|---|---|---|---|---|---|
| 2015 | 926 | 162 | 2,086 | 44% | 8% |
| 2016 | 788 | 145 | 1,609 | 49% | 9% |
| 2017 | 896 | 162 | 1,689 | 53% | 10% |
| 2018 | 1,610 | 167 | 2,264 | 71% | 7% |
| 2019 | 896 | 116 | 1,390 | 64% | 8% |
| 2020 | 1,069 | 268 | 2,067 | 52% | 13% |
| 2021 | 751 | 119 | 1,085 | 69% | 11% |
| **Total** | **6,936** | **1,139** | **12,190** | **57%** | **9%** |

*Source: SPD data on injuries related to uses of force*

2018, as has been the case throughout much of this report, is a significant outlier with subject injuries increasing 80% over the preceding year and 51% higher than 2020, the year with the second highest count of subject injuries. Figure 16 visualizes these statistics by month.

72

**Figure 16. Uses of Force with Injury or Complaints of Pain Over Time**



*Source: SPD data on injuries related to uses of force*

Next, we consider whether SPD data show any differences in injury rates by a subject's race. **White subjects were most likely to be injured or complain of pain in force incidents for all years from 2015 to 2021 except 2020**, ranging from a low of 53% in 2015 to a high of 80% in 2021. In 2020 non-Black minority populations had the highest injury/complaint of pain rate, at 70%. In comparison, Black individuals who were the subject of force were injured or complained of pain at a rate 9 percent below the White subject rate for 2015-2021.

**Figure 17. Rate of Injury or Complaint of Pain by Race of Subjects of Use of Force**



*Source: SPD Open Data and SPD Force Injury Data. Excludes reports of subjects with "Unknown" race. Non-White and Black races are grouped together under "Other" for purposes of percentage comparisons for groups with significantly fewer force incidents.*

### 10. Demographics of Subjects of Force

This section provides summary statistics regarding the demographic characteristics of individuals who were the subjects of SPD uses of force.

As discussed in the Methodology section of this report, the preliminary version of this report identified that a significant portion of SPD's use of force data on its open data portal indicated that the subjects of force did not have a listed race, and the Monitoring Team called for SPD to analyze this issue. SPD reviewed this issue and reported to the Monitoring Team that there was a data mapping error between its use of force reporting source system (IAPro) and its open data portal whereby a specific race in IAPro would sometimes translate to an unknown race value in the open data. SPD reported that it had updated the mapping between the source system and the open data to address this issue. The Monitoring Team then updated its demographic analysis for this section of the report and conducted a validation process to review a sample of incidents which changed from an "unknown" race to a specific race in SPDs open data. In this validation process, the Monitoring Team found that the reported race in the underlying IAPro use of force reports were matching what was posted in SPD's open data. The Monitoring Team also reviewed access logs for these sampled incidents and found no indication that individuals had accessed or changed the force reports between the Monitoring Team issuing its preliminary report and this validation process.

This issue has raised community questions about these data, joining other data-related questions voiced by members of the public during the Monitoring Team's engagement sessions with the Community Police Commission. The Monitoring Team recommends that SPD engage with the OIG and CPC regarding its open data to address any concerns regarding the open data or its usability to support the community's ability to continually monitor SPD's operations.

After these changes, the percentage of use of force reports with a subject of unknown race reduced from 32% to 23% for 2019 to 2021. Outside of the protest context where a higher percentage of reports did not indicate subject race, this percentage decreased from 25% to 15%. For reference, the Ninth Systemic Assessment's review of incidents spanning 2014 to 2016 found that 16% of use of force reports listed the subject's race as unknown.[115]

The extent of missing information on race – with around one out of seven force incidents outside of the protest context not reflecting the subject's race in the appropriate field – highlights a few

---

[115] Ninth Systemic Assessment at 43.

potential systemic issues that SPD will need to address.  First, officers are sometimes failing to report a salient piece of information for which the use of force report calls.  The Department will need to ensure that officers systematically do not, in the first instance, bypass or skip over force reporting data fields.  Second, first-line supervisors, which SPD policy entrusts to review use of force reports in most instances, are failing to appropriately identify and flag reports that are incomplete because they omit information about the subject's race.  The Department will need to ensure that supervisors are fully and completely review reporting forms, including for omissions of critical data fields.  Third, SPD's Force Review Unit, which is charged among other things with reviewing force reports for completeness for Type II and Type III force incidents, has been systematically identifying omissions, which the Department also needs to address.

Table 9, below, breaks out uses of force for 2019-2021 by race. It is important to note that the statistics below count each use of force report against a given subject. For example, one use of force event involving three officers using force against a single subject would be counted three times in the following tables rather than one time, in keeping with how SPD reports use of force statistics generally. In other words, the following demographic statistics do not reflect distinct subjects of force; rather they reflect the demographics of the subject of each use of force.

White individuals were the most frequent subject of force (40% of force incidents), followed by Black individuals (28%), and subjects of unknown race (23%). While Asian subjects were only involved in 3% of use of force incidents, they were the subject in 6 of 31 (19%) officer shootings from 2019-2021. **Black subjects were involved with the highest number of Type III uses of force (officer shootings and other serious uses of force) with 21, followed by White subjects (14), "unknown" subjects (8), and Asian subjects (6, all officer shootings).**

Undoubtedly, the characteristics of the population of force subjects for 2019-2021 do not precisely match the Seattle population, as shown in Table 9.  In particular, White, Hispanic, and Asian subjects are represented less in the population of force subjects than their comparative share of the Seattle population overall.  Black subjects are represented more – especially for the most serious force. **However, the Monitoring Team finds it impossible to reach definitive conclusions with any confidence on this front because 23% of force reports do not specify the subject's race. The significant percentage of serious use of force with an unknown race overall merits further analysis by SPD.**

**Table 9. Use of Force by Race, 2019-2021**

| Race | Pop. | Total | | Type I | | Type II | | Type III: OIS | | Type III: Other | |
|------|------|-------|---|--------|---|---------|---|---------------|---|----------------|---|
| Am. Indian | 0.5% | 55 | 1% | 43 | 2% | 11 | 1% | 0 | 0% | 1 | 4% |
| API | 0.3% | 44 | 1% | 26 | 1% | 18 | 1% | 0 | 0% | 0 | 0% |
| Asian | 16.3% | 135 | 3% | 101 | 4% | 28 | 2% | 6 | 19% | 0 | 0% |
| Black | 7.1% | 1,260 | 28% | 919 | 33% | 320 | 19% | 14 | 45% | 7 | 29% |
| Hispanic | 7.1% | 154 | 3% | 114 | 4% | 37 | 2% | 2 | 6% | 1 | 4% |
| White | 62.6% | 1,814 | 40% | 1,114 | 40% | 686 | 40% | 4 | 13% | 10 | 42% |
| Unknown | NA | 1,060 | 23% | 434 | 16% | 618 | 36% | 3 | 10% | 5 | 21% |
| 2+ Races | 7.6% | 20 | 0% | 17 | 1% | 1 | 0% | 2 | 6% | 0 | 0% |
| Total | | 4,542 | 100% | 2,768 | 100% | 1,719 | 100% | 31 | 100% | 24 | 100% |

*Source: SPD Open Data. Population statistics pulled from US Census Bureau.*

Complicating these data, more than half (55%) of uses of force related to the 2020 protests did *not* include a specified race for the subject of the use of force. This significantly increased the total number of uses of force with a subject of unknown race for the 2019–2021 period.  15% of uses of force unrelated to protests still had a subject of "unknown" race.

Table 10 shows uses of force related to the 2020 protest broken out by race of the subject of force. The vast majority of documented subjects of protest-related uses of force were unknown (55%) or White (38%). SPD reported 853 Type II uses of force during the protests, largely involving less-lethal instruments that may have been deployed against a crowd of mostly masked protestors of multiple races and potentially reported on days later. These factors may have contributed to the lack of specificity in racial identification in protest-related force reporting.

**Table 10. Race of Use of Force Subjects During 2020 Protests**

| Race | Total | Type I | Type II | Type III |
|------|-------|--------|---------|----------|
| API | 7 (1%) | 0 | 7 | 0 |
| Asian | 6 (1%) | 0 | 6 | 0 |
| Black | 55 (6%) | 20 | 35 | 0 |
| Hispanic | 1 (0%) | 0 | 1 | 0 |
| White | 352 (38%) | 43 | 306 | 3 |
| Unknown | 510 (55%) | 10 | 498 | 2 |
| Total | 931 | 73 | 853 | 5 |

*Source: SPD Open Data & SPD Protest Force Datasets*

Table 11 below shows uses of force by race excluding both protest-related force and subjects of "unknown" race to present clearer comparisons across racial categories during ordinary policing

activities. White subjects still received the highest proportion of force (47%), with Black subjects increasing to 40%. When excluding protest-related force and subjects of unknown race, the proportion of Type II force used against Black subjects doubles from 19% to 38%.

**Table 11. Use of Force by Race, 2019-2021, *Excluding* Force Related to Protests and Subjects of "Unknown" Race**

| Race | Pop. | *Total* | | Type I | | Type II | | Type III: OIS | | Type III: Other | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Am. Indian** | 0.5% | *55* | *2%* | 43 | 2% | 11 | 2% | 0 | 0% | 1 | 6% |
| **API** | 0.3% | *37* | *1%* | 26 | 1% | 11 | 2% | 0 | 0% | 0 | 0% |
| **Asian** | 16.3% | *129* | *4%* | 101 | 4% | 22 | 3% | 6 | 21% | 0 | 0% |
| **Black** | 7.1% | *1,201* | *40%* | 899 | 40% | 281 | 38% | 14 | 50% | 7 | 44% |
| **Hispanic** | 7.1% | *153* | *5%* | 114 | 5% | 36 | 5% | 2 | 7% | 1 | 6% |
| **White** | 62.6% | *1,436* | *47%* | 1,057 | 47% | 368 | 50% | 4 | 14% | 7 | 44% |
| **2+ Races** | 7.6% | *20* | *1%* | 17 | 1% | 1 | 0% | 2 | 7% | 0 | 0% |
| **Total** | | *3,031* | *100%* | 2,257 | 100% | 730 | 100% | 28 | 100% | 16 | 100% |

*Source: SPD Open Data & SPD Protest Force Datasets. Population statistics pulled from US Census Bureau.*

The following charts visualize these trends over time. Figure 18 visualizes trends in racial classifications of uses of force over time. The share of force across races has remained relatively stable from 2014-2021, with a notable disruption in 2020 resulting from a spike in force against subjects of unknown races related to the protests.

**Figure 18. Race of Subjects of Use of Force Over Time**



*Source: SPD Open Data*

One particular area of concern regarding uses of force against minorities has been firearm pointing. Earlier, this assessment reported that firearm pointings, which are classified as Type I force, have reduced over the course of the Decree, reaching some of the lowest levels on record during parts of 2020 and 2021. Firearm pointings have decreased most significantly for Black subjects. **There was a 66% decrease of pointings of lethal firearms at Black individuals from 2015 (304 pointings) to 2019-2021 (average of 102).** Even as this decrease is notable**, Black subjects are still most likely to be the subject of a firearm pointing despite being the subject of force less frequently than White subjects or subjects of unknown race.**

**Figure 19. Pointing of Lethal Firearms by Race of Subject**



*Source: SPD Force Instrument Data*

The distribution of uses of force against male or female subjects over time is relatively consistent from 2014-2021. Males comprised 77-81% of use of force incidents with a documented gender for all years between 2014 and 2021, except for 2018 and 2021 (both 74%). SPD rarely documents the force subject's gender as unknown, occurring in 1-2% of uses of force between 2015 and 2019. This rate increased to 14% in 2020, primarily driven by protest-related uses of force, before reducing to 2% in 2021.

    i.   *SPD Disparity Analysis of Use of Force*

As discussed in greater depth in the **Stops & Detentions** section of this report, SPD has replicated a sophisticated analytical method for assessing disparities and potential biases in policing that the Monitoring Team previously employed in its assessment of disparities in SPD activities and outcomes. SPD is automating analytical methods to provide the organization

ongoing insights into critical areas impacting SPD's pursuit of more equitable policing, including force tactics. SPD will utilize live dashboards demonstrating these data for a newly launched organizational meeting focused on improving equity, accountability, and overall quality in SPD's policing.  SPD has engaged a research partner to evaluate this new approach to provide feedback on the rigor of SPD's analytics and its methods of employing them toward organizational improvement.

The Monitoring Team previously highlighted concerns regarding statistics demonstrating "that SPD officers are more likely to point firearms at historically-underrepresented than White subjects." The Monitoring Team provided direction on next steps, stating, "Because nothing immediately obvious about the circumstances of the interactions reviewed in the Monitoring Team's qualitative assessment suggested reasons why pointing a firearm at Black, Latino, and Asian subjects was more reasonable or necessary than for White subjects, the Monitor encourages more study by SPD, the Community Police Commission ("CPC"), and the anticipated Inspector General."[116]

SPD acted on this recommendation and focused on firearm pointing as part of its disparity analyses, documented in its Disparity I and II reports as part of Phase II assessments for the Consent Decree. Using an analytical method called propensity score matching to compare SPD force trends across various races in similar situations, SPD found that "[f]irearms were pointed at non-Whites about 30% more often than at similarly situated Whites."[117] SPD conducted additional analysis on this trend as part of its follow-up disparity report and engaged the CPC and community members regarding opportunities to address these disparities in firearm pointing. This process led to a recommendation to "[r]eview policies, trainings, and protocols for the pointing of firearms," focusing on specific areas of potential change within SPD operations that could possibly reduce these disparities.[118]

As previously mentioned, there was a 66% decrease of pointings of lethal firearms at Black individuals from 2015 (304 pointings) to 2019-2021 (average of 102). While this decrease is notable, Black subjects are still most likely to be the subject of a firearm pointing despite being the subject of Type I force less frequently than White subjects or subjects of unknown race. While disparities between White and non-White subjects of firearm paintings appear to have decreased, SPD expresses commitment to the important work ahead.

SPD's approach of analyzing disparities, engaging community members around potential solutions, and acting on solutions aligns with previous Monitoring Team recommendations and

---

[116] Ninth Systemic Assessment at 5,6.
[117] Seattle Police Department's "Disparity Review – Part I: Using Propensity Score Matching to Analyze Racial Disparity in Police Data." Page 5. April 2019.
[118] Seattle Police Department's "Disparity Review – Part II: Developing a Deeper Understanding of Disparities Identified in Part I." Page 29. December 2019.

SPD's bias-free policing policy. The Monitoring Team recommends expanding these disparity analyses related to force practices and engaging with the Community Police Commission and Office of Inspector General on the most impactful path forward, as discussed in the **Stops & Detentions** section of this report.

### 11. Use of Force Review and Accountability Mechanisms

We next consider how Seattle's various systems for use of force review and accountability are functioning.  First, we consider SPD's review of force both by the supervisory chain of command and SPD's dedicated Force Review Board.  The report then turns to how the Office of Professional Accountability (OPA) addresses incidents involving officer use of force and potential misconduct. **Overall, SPD demonstrates consistent adherence to its use of force policies, and supervisors regularly take corrective action in response to deficiencies.**

### i.    *Overview of Seattle's Force Investigative and Accountability Systems*

DOJ's 2011 investigation found that SPD's "secondary review process [of force] is little more than a formality that provides no substantive oversight or accountability."[119] Through the Consent Decree, SPD has now developed a sophisticated force reporting and review system, with internal and external quality assurance mechanisms. This system includes the following requirements and processes:

- Officers must report all uses of force according to policy.
- Supervisors must conduct a comprehensive investigation of low-level and intermediate (Type I and II) uses of force and submit the investigation through the chain of command for review and approval.
- After chain of command approval, the Force Review Unit inspects all Type I uses of force at a high level and closely reviews all Type II uses of force to provide an additional layer of quality control and oversight on lower-level and intermediate uses of force.
- The Force Investigation Team investigates all serious (Type III) uses of force and subsequently presents investigations for assessment by the Force Review Board.
- The Force Review Board regularly analyzes SPD's performance in serious incidents and select intermediate incidents to elevate organizational accountability and identify opportunities for organizational improvement. The Office of Police Accountability and Office of Inspector General observe these meetings to provide external feedback and yet another layer of accountability, with OPA being able to self-initiate misconduct investigations should SPD fail to do so.

---

[119] 2011 Findings Letter at 4.

- The civilian-led Office of Police Accountability investigates any complaints of improper force and recommends disciplinary action to the Chief of Police as appropriate.
- The Office of Inspector General conducts systemic analyses of SPD's performance to provide continuing recommendations on how SPD can improve its systems and services to the community.

This system has resulted in better documentation, more meaningful review of force incidents, and heightened levels of accountability on SPD force practices. The core pillars of this force review system are discussed in the sections that follow.

ii.    *Type I Investigations*

As part of this assessment, in keeping with Phase II's focus on SPD conducting self-assessments for subsequent validation by DOJ and the Monitoring Team, SPD reviewed 200 Type I cases from 2021 to assess the frequency of policy compliance and supervisory activity related to force investigations, including identifying opportunities to improve officer performance related to force.

In this review, supervisors documented issues in 18% of cases, ranging from policy to tactical issues, many of which were screened with OPA or FIT. Supervisors screened potential issues in 27.5% of cases with OPA or SPD's Force Investigation Team regarding topics such as the appropriateness of force, force classification, and whether a misconduct investigation by OPA was necessary. These screenings led to two OPA referrals (1% of cases), three bias allegation investigations (1.5%), and 21 training referrals (10.5%).

**Supervisors continue to document more substantive reviews of low-level uses of force and initiate associated corrective actions far more frequently than occurred prior to the Consent Decree.** DOJ commented in its investigation, "[t]ellingly, of the approximately 1,230 internal use of force reports we received, covering the period between January 1, 2009 and April 4, 2011, only five were referred for 'further review' at any level within SPD."[120] **While SPD only referred 0.4% of** *any* **force cases for further review before the Consent Decree, SPD supervisors in 2021 referred 13% of the** *lowest-level* **cases for disciplinary investigation or remedial training and documented actively screening the cases with accountability experts in 27.5% of cases**, in addition to identifying other issues in their reviews, based on an inspection for this assessment.

---

[120] 2011 Findings Letter at 4.

### iii.   Type II Investigations & Force Review Board Reviews

For this report, SPD assessed 31 Type II cases from 2020 which were reviewed by FRB over the course of 2020 and 2021. This review indicated frequent identification of opportunities for improvement by both the chain of command and the Force Review Board.

**The supervisory chain of command appears to be continuing to identify issues with use of force.** The supervisory chain of command identified system or officer performance issues before FRB review in 30 of the 31 cases. Supervisors screened nearly a third of the cases with OPA to discuss the need for OPA investigation (10 of 31 cases). In addition to screening cases with OPA, supervisors frequently took other supervisory action to improve individual performance or make recommendations to improve organizational polices, training, or other practices. The chain of command identified issues regarding tactics (17), policy (16), equipment (15), training (12), and supervision (7). Of concern, however, the one case that had no supervisory action resulted in a self-initiated investigation by OPA.

**The Force Review Board continues to generate specific recommendations for departmental improvement across a good majority of Type II cases.** FRB issued some kind of action in 81% of cases reviewed of the 31 case sample. This frequency of action by the FRB demonstrates a sustained commitment to critical analysis toward improving SPD's operations, spanning multiple operational areas. Recommendations directed follow-up action related to tactics (13), policy (10), training (7), and supervision (3). FRB referred four of the sampled cases for OPA investigation. In these cases, FRB found officers in compliance with policy 97% of the time, in line with overall training in 83% of events, and in keeping with de-escalation tactics 91% of the time, with 3% of cases pending OPA review regarding de-escalation. These numbers are not inconsistent with the findings of the previous Monitoring Team regarding force between 2014 and 2016, where 99 percent of force overall, and 96 percent of Type II and Type III force, "were consistent with SPD policy" implemented pursuant to the Consent Decree.[121]

### iv.   Force Investigation Team & Force Review Board Reviews

SPD's Force Investigation Team (FIT) is a dedicated team of trained detectives that investigate serious uses of force. FIT continues to conduct in-depth investigations and investigated 5 officer-involved shootings, 14 other Type III incidents, 4 unintentional discharges, and 1 in-custody death in 2020. **The Force Investigation Team continues to document in-depth investigations, and the Force Review Board continues to conduct wide-ranging discussions which generate a variety of recommendations for organizational improvement.**

---

[121] Ninth Systemic Assessment at 74.

Upon completion of an investigation, FIT presents its investigation to a Force Review Board (FRB) comprised of representatives from across the Department. FRB meets frequently to discuss FIT investigations, Type II cases referred by the Force Review Unit per policy, a 10% random sample of Type II cases, and other cases as needed.

FRB does not make determinations regarding discipline but is required to refer all serious policy violations to the Office of Police Accountability. The Force Review Board analyzes these incidents and makes recommendations regarding opportunities to improve departmental policies, training, tactics, supervision, equipment, or other areas to improve performance and community and officer safety. FRB then documents these conversations and any associated recommendations.

From July 1, 2019 to March 31, 2021, the Force Review Board reported reviewing 151 cases, including 8 officer-involved shootings, 4 other Type III uses of force, and 139 Type II uses of force. Seven of the 139 Type II cases were reviewed as part of a 10% sample review of the Force Review Unit's reviews; the other 132 Type II reviews were submitted by the Force Review Unit for higher-level Force Review Board analysis and discussion. Since March 31, 2021, FRB has continued to meet regularly to discuss cases and work through a backlog of cases, which grew during Covid-19 and SPD's protest response. While the backlog had previously reached a high of 146 cases, SPD reports that backlog FRB had reduced it to 36 cases as of March 2022, with three cases under investigation by FIT which will be reviewed by FRB when investigations are completed.

FRB reviewed the actions of all involved officers across these 151 cases. FRB referred seven of these cases to OPA for investigation, and Force Review Unit referred three cases, one of which FRB also referred. In total, SPD referred 9 of these cases for OPA investigation – 6% of all FRB reviews. OPA self-initiated an investigation for one of the FRB cases.

In addition to referring cases for OPA investigation, FRB identifies concerns regarding policy, training, supervision, or other topics at both the individual and organizational level. FRB most frequently flags training issues, with FRB generating training recommendations for 9% of officers and supervisors involved in FRB cases. FRB also produces other recommendations regarding policy, de-escalation tactics, supervision, force review quality, and other topics. SPD would be well served by providing sufficient administrative support to track the implementation of the wide array of recommendations generated by the FRB. The Force Review Unit, which tracks these recommendations, has lost staffing over time, presenting concern for the daily operations of the Force Review Unit and Force Review Board administration.

The Office of Police Accountability and Office of Inspector General both observe SPD's Force Review Board meetings, providing yet another layer of oversight. Should SPD fail to refer a

potentially serious violation, OPA may initiate an investigation by its own accord, as it did for one FRB case in 2020. Based on its observations, the OIG published a systems analysis of SPD's FRB with substantive recommendations for improving FRB's operations.

**Between SPD's internal force review mechanisms, misconduct investigations by the Office of Police Accountability and the systemic oversight by the Office of Inspector General and Community Police Commission, SPD and its accountability partners are well positioned for continually improving accountability and performance improvement on use of force with sufficient staffing and emphasis on these functions.**

*v.    Accountability*

The tables and figures present statistics on investigations of misconduct allegations related to use of force. The Office of Police Accountability (OPA) investigates these allegations and maintains these statistics, which are available for public inspection on Seattle's open data portal.[122] The statistics that follow are presented in two different ways: cases and allegations. A misconduct investigation case refers to a unique event which is under investigation for one or more allegations of misconduct. For example, one misconduct investigation case may involve multiple allegations of misconduct related to use of force for multiple officers.

**Misconduct investigation cases involving use of force rose steadily from 2014 to 2018, before decreasing by more than half in 2019, rising back up to the highest levels on record in 2020 before then hitting a recent low in 2021.** When assessing the number of total allegations of force misconduct, as will be evident shortly, 2020 greatly exceeds any other year, meaning many of the 2020 cases involved multiple allegations of misconduct related to force.

---

[122] Public data related to OPA's investigations can be found here: https://www.seattle.gov/opa/case-data

**Figure 20. Misconduct Investigation Cases Involving Use of Force**



*Source: OPA Open Data. Based on received date for case due to more complete data than is available for incident date.*

The cases tabulated above may include one or more types of misconduct allegations related to use of force. OPA tracks use of force allegations in four categories: inappropriate use of force, de-escalation, reporting, and investigation. The following chart shows the number of cases involving each of these allegation types over time, with the de-escalation allegation first appearing in 2018. Note that the total number of cases listed below is greater than the total listed above since one case related to use of force may have multiple different kind of allegations related to force. The trends in this figure largely mirror the previous figure with more granularity.

**Figure 21. Number of Cases Involving Various Force Allegations**



*Source: OPA Open Data. Based on received date for allegation due to more complete data than is available for incident date.*

The following chart breaks out the number of use force misconduct allegations over time. These numbers are far higher than the case counts above since one case can involve multiple allegations against multiple officers. **2020 produced a record high number of use of force misconduct allegations with 1,749, 80% higher than the next highest year (2017 with 974 allegations).**

**Figure 22. Use of Force Misconduct Allegations**



| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|
| ■ Force - Use | 93 | 237 | 360 | 605 | 715 | 239 | 1,386 | 267 |
| ■ Force - Reporting | 24 | 28 | 70 | 264 | 99 | 37 | 182 | 34 |
| ■ Force - Investigation | 9 | 8 | 33 | 105 | 61 | 18 | 14 | 4 |
| ■ Force - De-Escalation | | | | | | 41 | 167 | 50 |

*Source: OPA Open Data. Based on received date for allegation due to more complete data than is available for incident date.*

Investigations into these allegations resulted in the following number of sustained allegations by category. 2017 and 2020 had the highest numbers of sustained allegations, with 2021 having the lowest total since 2016. As of the end of February 2020 still had 571 use of force allegations outstanding, and 2021 had 146 allegations outstanding. Some of these pending allegations may result in sustained findings, which would add to the current totals below.

**Figure 23. Sustained Force Allegations**



| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|
| ■ Force - Use | 16 | 35 | 1 | 56 | 31 | 12 | 93 | 4 |
| ■ Force - Reporting | 6 | 1 | 2 | 42 | 11 | 9 | 9 | |
| ■ Force - Investigation | 3 | | | 17 | 10 | | | |
| ■ Force - De-Escalation | | | | | | 13 | 18 | 12 |

*Source: OPA Open Data. Based on received date for allegation due to more complete data than is available for incident date. Pending allegations may result in sustained findings, which would add to the statistics above.*

These sustained findings arose out of the following number of cases. Once again, 2017 and 2020 saw the highest totals on record, with 2021 having the lowest total since 2016. 20 cases remain pending for 2020, and 23 cases remain pending for 2021, as of the end of February.

**Figure 24. Use of Force Misconduct Investigation Cases with a Sustained Allegation**



*Source: OPA Open Data. Based on received date for case due to more complete data than is available for incident date. Pending cases may result in additional cases with sustained allegations related to use of force, which would add to the statistics above.*

Figure 25 below shows the percentage of use of force allegations resulting in sustained or not sustained findings over time. For completed cases, **OPA sustained 10% of use of force allegations from 2019 to 2021.** Cases listed below as "Resolved Outside of OPA Investigation" were considered resolved through supervisory action.

**Figure 25. Percentage of Use of Force Allegations Sustained by OPA**



*Source: OPA Open Data. Excludes unresolved investigations. Based on received date for allegation due to more complete data than is available for incident date.*

In 72% of not sustained allegations from 2019-2021, OPA found that either the use of force was within policy (57%) or did not occur as alleged ("unfounded," 15%). Across this time period, another 14% were resolved through management action, 7% were inconclusive, and 6% led to training referrals.

**Figure 26. Reasons for Not Sustained Findings for Use of Force Allegations**



*Source: OPA Open Data*

All of the above statistics related to OPA misconduct investigation are based on open data sets available through OPA's website. These data are both rich and complex. The Monitoring Team recommends that the City work to create a live dashboard summarizing OPA's complex open data to greatly enhance the ease with which the public can assess OPA's activities and conclusions on an ongoing basis.

### E.  Conclusion

In 2017, the Monitoring Team concluded that SPD was in compliance with the use of force requirements of the Consent Decree, based on a review of incidents between 2014 and 2016. SPD's outcomes with respect to use of force have largely sustained or improved in the ensuing five years, except for notable problems in SPD's response to the 2020 protests. As a result, the Monitoring Team finds SPD has sustained compliance with the use of force requirements outside of the protest context. While the City and SPD have taken meaningful action to remedy the issues apparent in the City's response to the protests, more work is required to protect against such problems in the future – and ultimately conclude this central area of the Consent Decree.

The prior Monitoring Team rightly called SPD's achievement of compliance with the use of force requirements of the Consent Decree a "major milestone." That SPD has sustained this compliance generally for years now is commendable and gives confidence in the Department's ability to

sustain these reforms beyond the conclusion of the Consent Decree. Over the course of the Consent Decree, force overall and at every level, including the most serious use of force like an officer shooting, have decreased. As a result, SPD's reforms have translated into safer interactions between police and the community. SPD must continue to strive for ever-improving outcomes in its interactions with the community, building upon these significant, positive changes in its operations.

The 2020 protests presented an unprecedented challenge for SPD and policing broadly. Many officers responded professionally in incredibly difficult circumstances, but the Department overall struggled to respond to this historic challenge, and SPD's relationship with the community was damaged as a result. The City and SPD have conducted intensive reviews of problems with the response and taken meaningful action since those issues occurred. Still, more work must occur to help guard against similar problems in the future. SPD has taken substantive steps in overhauling its policy and training for protest response. SPD now needs to continue to follow-through on its commitments from the Sentinel Event Review process. In addition, SPD must develop an alternative reporting and review process to ensure similar failures in reporting and review do not occur should significant, sustained protests arise again.

SPD's overall compliance with Consent Decree requirements on use of force do not represent the end of SPD's potential improvement in this area. SPD should do everything in its power to avoid the tragic outcomes that can result from use of force moving forward. SPD has made significant gains in its use of force practices over the course of the Consent Decree and must continue to strive toward further improvement with the assistance of its accountability partners.

# Crisis Intervention

### A.  Background & Consent Decree Requirements

The Department of Justice's (DOJ) 2011 investigation of the Seattle Police Department (SPD) found systemic issues related to use of force practices, with specific concerns on SPD's interactions with individuals experiencing mental and behavioral health or substance abuse issues. Specifically, DOJ found that:

> SPD officers escalate situations and use unnecessary or excessive force when arresting individuals for minor offenses. *This trend is pronounced in encounters with persons with mental illnesses or those under the influence of alcohol or drugs.* This is problematic because SPD estimates that 70% of use of force encounters involve these populations.[123]

The DOJ investigation found that these problematic crisis outcomes resulted from systemic deficiencies in Seattle's crisis intervention programs, as summarized by the Monitoring Team:

> There was no overarching policy governing response to and performance in crisis events; no crisis intervention committee that brought together key community stakeholders to collaboratively and collectively address community and interagency issues; no ongoing, structured crisis intervention training program; no experienced, trained, and dedicated certified CIT-officers; and no centralized organizational structure to implement a strategic and coordinated approach to policing those in crisis [sic].[124]

Indeed, there was a "general concern that when SPD officers arrived at the scene of a behavioral crisis event, they did not always have the skill or training to address them in a manner that adequately promoted officer safety, subject safety, and any implicated law enforcement objectives."[125]

Paragraphs 130 through 137 of the Consent Decree required that SPD implement a number of reforms aimed at reducing force applied to individuals experiencing behavioral crisis and steering individuals in crisis to appropriate mental health and social services.  (As the prior Monitoring Team observed, "[b]ehavioral crises include mental illness, substance abuse disorders, [and] other personal and behavioral issues or concerns."[126])  These changes included:

---

[123] Dkt. 1-1 at 5 (emphasis added).
[124] Fifth Systemic Assessment at 3.
[125] Fifth Systemic Assessment at 3.
[126] Fourth Semiannual Report at 76.

- Developing new policies on crisis intervention and de-escalation;
- Enhancing the 40-hour CIT certification training to equip specialized officers to respond and address crisis events;
- Increasing the number of specialized CIT officers available on every shift to respond to crises;
- Training all officers on crisis intervention techniques to ensure all officers have foundational skills in de-escalation and crisis response;
- Improving documentation of crisis events to help SPD evaluate its crisis intervention response and identify opportunities for improvements; and
- Continuously engaging with a Crisis Intervention Committee on policy, training, data capture, and opportunities for improvements in the city's crisis response.

## B. Progress to Date & Previous Assessments

Over the course of the Consent Decree, the Monitoring Team evaluated and provided feedback on SPD's implementation of crisis-related requirements. In 2016, the Monitoring Team concluded that SPD was in compliance with required Decree reforms after conducting a systemic assessment of SPD's crisis performance.[127]   Specifically, the Monitoring Team found:

- "[A]lthough there is no bright line percentage"[128] required by the Decree, SPD's response rates of specially-trained, crisis-intervention-certified officers to the scenes of incidents involving individuals experiencing a crisis was "impressive" and "supportive of initial compliance."[129]  Such officers were staffed such that they could be available across shifts and precincts.[130]
- Specially-trained crisis-intervention-certified officers were "tak[ing] appropriate roles at crisis incidents" to which they responded.[131]
- Officers used force in two percent of contacts with individuals experiencing a crisis, which was "indicative of" a "culture shift that has taken place" within SPD with respect to crisis intervention and was "supportive of initial compliance."[132]
- A qualitative review of documentation of crisis incidents "indicates that officers are skillfully dealing with those in crisis," placing the Department "in initial compliance in this respect."[133]

---

[127] Fifth Systemic Assessment at 13.
[128] Fifth Systemic Assessment at 9.
[129] Fifth Systemic Assessment at 7.
[130] Fifth Systemic Assessment at 15–16.
[131] Fifth Systemic Assessment at 11.
[132] Fifth Systemic Assessment at 12.
[133] Fifth Systemic Assessment at 13.

- Monitoring Team review of training and interviews with SPD officers, a survey by Seattle University, and SPD data indicating that as many as two-thirds of the Department having completed advanced crisis training all suggested that SPD's crisis training "meets the intent of, and is supportive of initial compliance with, the Consent Decree with respect to having a force adequately trained to take on the challenge of dealing with individuals in crisis."[134]
- SPD's collaboration with the wider Seattle community on issues relating to crisis intervention was currently "meet[ing] . . . expectations[,] and the Department is in initial compliance with these requirements."[135]
- "SPD is developing and institutionalizing a thoughtful approach geared toward guiding those in crisis to appropriate services rather than jail."[136]

The Monitoring Team "conclude[d] that SPD has made great strides toward implementing a very successful CIT program and is in initial compliance with the Consent Decree."[137]

In December 2018, SPD issued a report assessing its compliance with the crisis intervention requirements of the Decree, in keeping with Phase II's approach of transferring preliminary monitoring responsibilities to the City and SPD with subsequent assessment and validation by the Monitoring Team and DOJ.  SPD's assessment concluded the agency had sustained compliance with the crisis intervention requirements of the Decree.[138]  The subsequent review by the Monitoring Team and DOJ validated SPD's finding of maintained compliance.  Specifically, the Monitoring Team and DOJ concluded that SPD:

- "Engag[ed] with individuals in crisis in a manner generally consistent with crisis intervention and force policies.[139]
- "[W]here issues related to the use of force against a person in crisis did exist, the chain of command made appropriate referrals." DOJ and the Monitoring Team added that "such instances of self-referral indicate a willingness and ability to manage risk in the Department and, where appropriate, hold fellow officers accountable for violating policy."[140]
- There "were markedly high rates of CIT certification among patrol officers (73%)," and "[a]pproximately 80% of crisis contacts involved a CIT certified officer."[141]

---

[134] Fifth Systemic Assessment at 14.
[135] Fifth Systemic Assessment at 18.
[136] Fifth Systemic Assessment at 20.
[137] Fifth Systemic Assessment at 22.
[138] Dkt. 511 at 5.
[139] Dkt. 511 at 40.
[140] Dkt. 511 at 41.
[141] Dkt. 511 at 40.

Consequently, the Monitoring Team and DOJ concluded that SPD had continued its compliance through 2018 and satisfied its obligations related to crisis intervention for the required term of sustainment.[142]

## C.  SPD's Recent Performance

### 1.  Scope & Approach

The task here is to update the Court and Seattle community on SPD's performance with respect to interacting with individuals experiencing behavioral health crises in the period since the Phase II assessment. To do so, the Monitoring Team reviewed a variety of data as well as crisis analyses conducted by SPD, in line with the sustainment phase of the Decree. Specifically, the Monitoring Team reviewed data pertaining to use of force reporting, dispatch, crisis intervention documentation, and Force Review Board meetings to assess SPD's current practices pertaining to crisis intervention.

To assess many of the statistics that follow in this report, it is important to understand how SPD documents and reports its crisis intervention efforts. Policy 16.110 – Crisis Intervention requires that SPD "Officers Shall Document All Contacts With Subjects Who are in Any Type of Behavioral Crisis." This means that officers are required to document a crisis contact regardless of whether the officer has to complete other documentation for the event (for a use of force or an arrest, for example). SPD officers are required to complete crisis contact information for each individual in crisis they engage. For example, an officer would complete two crisis contact forms if the officer engaged with two individuals in crisis on a single dispatched call. This also means that the officer would not document a crisis contact if the officer does not engage with an individual in crisis during an event, even if the call was preliminarily classified as a crisis call or if the officer was dispatched to a crisis call where the incident concluded prior to the officer's arrival (a "gone on arrival" call). In turn, references to "crisis contacts" or "crisis contact forms" throughout this report refer to the number of individualized crisis contacts that were documented by SPD over a given period of time.

Much of the data used for this assessment, including these crisis contact forms, did not exist prior to the entry of the Consent Decree. It is notable that SPD has not only greatly enhanced its data collection and review in these areas but also published extensive open data pertaining to crisis intervention, use of force, and other topics of public interest. SPD's crisis intervention dashboard and open data provide the public an opportunity to continually analyze SPD's crisis performance

---

[142] Dkt. 511 at 36-40.

in ways not possible prior to the Consent Decree.[143] The Monitoring Team commends this enhanced transparency and urges SPD to continually engage with its community partners on maximizing the usability and community insights to be gained from these data and dashboards.

When the Monitoring Team determined that SPD had complied with the Consent Decree's crisis intervention requirements in 2016, it still found opportunities for improvement in crisis data analysis, noting, "while a lot of new data is being collected, the information is not set up to be analyzed easily and often – so that Department managers might view key statistics to track the effectiveness of the CIT program and make evidence-based changes based on that data."[144] SPD's public data advancements demonstrate a continued commitment to innovation, transparency and evidence-based management beyond Decree requirements that establish a foundation for public engagement critical to continued improvement in this area.

### 2. Findings

**SPD responds to a significant number of crisis events**. The Department averaged more than 25 crisis contacts per day over 2019 and 2020. According to SPD's crisis contact documentation, SPD interacted with 6,813 individuals in crisis, across 10,155 contacts, in 2019. Officers interacted with 5,397 individuals in crisis, across 9,438 contacts, in 2020.  This represents a decrease of 717 crisis contacts, and 1,416 fewer individuals interacting with SPD in crisis in 2020, which is likely at least partially attributable to the changes in general activity patterns that occurred especially at the onset of the Covid-19 pandemic. SPD provided these statistics from its internal Data Analytics Platform, and the community can review crisis trends on SPD's crisis contacts dashboard.

**Even as SPD responds to many crisis situations, these events represent a small percentage of overall SPD dispatched or proactive events.** SPD reports that crisis contacts accounted for 2.6% of events in 2019 and 3.3% in 2020, according to dispatch records in SPD's Data Analytics Platform. It should be noted a significant portion of these contacts were identified as crisis *after* 911 Communications[145] dispatched officers to the scene, with 911 Communications initially identifying 0.99% of calls as crisis contacts in 2019 and 1.40% of calls in 2020, according to SPD's statistics. This indicates that SPD is identifying situations and calls as implicating behavioral crisis issues even across a number of instances where 911 Communications is not.

---

[143] SPD's ongoing data cleaning operations can lead to slight changes in reporting numbers on these dashboards and open data over time, which may lead to differences between the data in this report and SPD's continually updated dashboards and open data online.
[144] Fifth Systemic Assessment at 5.
[145] Seattle transitioned management of 911 call taking and dispatch operations from SPD to the City of Seattle Communications Center in June 2021, per the City.

*i.    CIT Officer Capacity to Respond to Crises*

The Consent Decree required SPD to provide enhanced 40-hour crisis intervention certification training to additional officers and to ensure availability of specialized Crisis Intervention Team (CIT) officers on every shift to respond to crisis calls across the city.

**SPD has continued to expand its CIT program after achieving compliance with the related Consent Decree requirements in 2016.** As of October 2021, SPD reported having 721 CIT-certified officers, an increase from 550 in 2015[146] and approximately 365 at the beginning of the Decree.[147] CIT officers now constitute 62% of active personnel and 63% of patrol officers, according to SPD, up from 40% and 58% respectively in 2015.[148]

SPD hit a high point of 73% of patrol officers being CIT certified[149] before the Covid-19 pandemic. After a pause due to the pandemic and other operational and logistical constraints, SPD reported that CIT certification training would resume in January 2022. In fact, SPD reported having a waitlist of 86 officers interested in taking the certification class. The Department plans to hold classes regularly in 2022 to meet officer demand and continually increase the percentage of CIT officers in the Department.

**Specialized CIT officers continue to be dispatched to calls for service that appear to implicate behavioral crisis issues.** CIT officers were dispatched in 73% of crisis calls in 2019 and 82% of calls in 2020, according to SPD's records. These CIT response rates exceed the 71% response rate reported by the Monitoring Team in 2016, when SPD was first deemed in compliance with the Consent Decree's crisis intervention requirements.[150] While SPD's CIT response rate in 2019 (73%) represented a 7 percentage point decrease from 2018's rate of approximately 80%,[151] SPD's 82% response rate in 2020 is the highest reported during the Consent Decree.

SPD tracks its distribution of CIT-certified officers across precinct and shift, allowing for an analysis of SPD's capacity to send specially trained officers to respond to crises across the city at any time. SPD routinely staffs most patrol shifts with more than half (50%) CIT-certified officers, according to SPD's internal Data Analytics Platform.

**SPD continues to provide basic training on crisis intervention to all officers, including non-CIT-certified personnel.** The Monitoring Team previously verified that SPD provided at least eight hours of foundational crisis intervention training to officers department-wide in 2014, with

---

[146] Fifth Systemic Assessment at 14.
[147] Dkt. 3-1 ¶ 130.
[148] Fifth Systemic Assessment at 14.
[149] Dkt. 511 at 40.
[150] Fifth Systemic Assessment at 5.
[151] Dkt. 511 at 40.

subsequent refresher training.[152] Between this foundational training and the expansions and elevation of CIT certification training, the Monitoring Team concluded that "this level of training meets the intent of, and is supportive of initial compliance with, the Consent Decree with respect to having a force adequately trained to take on the challenge of dealing with individuals in crisis."[153]

**SPD has continued to provide training, addressing required Consent Decree topics, in both the introductory academy and annual in-service training.** This means that, when a CIT officer is not available to respond to a crisis call, the non-CIT officer responding to the scene still has received foundational and refresher crisis intervention training through SPD's ongoing training of all officers.

Through continual training and management of its distribution of CIT-certified officers, SPD can work toward continually increasing its CIT staffing across the city, thereby increasing the percentage of crisis calls receiving a CIT-certified officer specifically trained to de-escalate the situation.

## ii.    *Individuals with Multiple Crisis Contacts with SPD*

**In 2019 and 2020, individuals having multiple crisis contacts with SPD decreased (though there was an increase in individuals having five or more crisis contacts**), according to statistics from SPD's Data Analytics Platform**.** One of the goals of SPD's crisis intervention program is to connect individuals in crisis to services to help reduce the likelihood of future crises and decrease the likelihood of future encounters with SPD and the criminal justice system. In 2020, 92% of individuals with an SPD crisis contact had 1 or 2 contacts. 8% of individuals involved in a crisis event with a police response had 3 or more reported crisis encounters with police, and 2% had 7 or more reported encounters with police.

Individuals with multiple crisis contacts with SPD decreased from 1,502 to 1,250 from 2019 to 2020. From 2019 to 2020, SPD's data demonstrate a significant decrease in individuals having 1-4 crisis contacts. There was an increase from 2019 to 2020 of individuals having 5 or more crisis contacts with SPD, though this group of frequent contacts is small compared to the number of individuals with fewer contacts with SPD. Figure 27 depicts frequency of crisis contacts for individual community members with SPD across 2019 and 2020:

**Figure 27.  Number of SPD Crisis Contacts by Individual, 2019 – 2020**

---

[152] Fifth Systemic Assessment at 14.
[153] Fifth Systemic Assessment at 14.



*Source: Statistics provided by SPD's Data Analytics Platform based on SPD Crisis Contact Forms*

**SPD is using non-sworn mental health professionals to help address incidents involving individuals in crisis.** SPD added four mental health providers to its co-responder unit in 2020, for a total of five mental health professionals working in tandem with sworn officers to provide specialized crisis response in certain situations and to individuals frequently encountering SPD in crisis. SPD reports that this enhanced unit is expanding its intensive crisis response strategies in 2021 with the goal of reducing the need for law enforcement encounters for individuals in crisis.

SPD and its partners in the behavioral health community can use these data on individuals with frequent crisis contacts with SPD to tailor response strategies to help reduce the likelihood of future crises and improve the quality of life of its community members, where possible. SPD's Crisis Intervention Committee and other forums should continue to evaluate SPD crisis data to identify system gaps and opportunities to provide alternative responses to crises.

### iii.   *Demographics of Crisis Contacts*

In 2020, 55% of crisis contacts involved White subjects, while 23% involved Black subjects and 16% involved subjects with a race documented as "Unknown," according to SPD reporting. Contacts with race listed as "Unknown" decreased significantly from 4,716 in 2019 (46%) to 1,472

in 2020 (16%). This decrease in 2020 led to more clear statistics in crisis contacts across races. SPD should work toward increasing the percentage of contacts with demographic reporting, in this area and others as discussed throughout the report, to enhance its analyses of interactions across demographics.

**Figure 28. Race of Crisis Contacts, 2019-2020**



*Source: Statistics provided by SPD's Data Analytics Platform based on SPD Crisis Contact Forms*

SPD improved the data collection pertaining to the gender of individuals in crisis from 2019 to 2020. SPD documented 3,853 crisis contacts with an "Unknown" gender in 2019, representing 38% of all crisis contacts for the year. This percentage decreased dramatically to 1.7% in 2020. This improvement in documentation leads to a corresponding increase in reporting for the other gender categories for 2020. While this positive change complicates year-to-year analysis of crisis contacts by gender, it presents a more accurate picture for analysis in 2020, with males and females representing 58% and 39% of crisis contacts respectively.

**Figure 29. Gender of Crisis Contacts, 2019-2020**



*Source: Statistics provided by SPD's Data Analytics Platform based on SPD Crisis Contact Forms*

Similarly, SPD improved its data collection for the age of individuals officers interact with in crisis. The percentage of crisis forms completed with an "Unknown" age decreased from 39% in 2019 to 4% in 2020.

**Figure 30. Crisis Contacts by Age Group, 2019-2020**



*Source: Statistics provided by SPD's Data Analytics Platform based on SPD Crisis Contact Forms*

Like with gender reporting, the decrease in "Unknown" ages for 2020 led to a corresponding increase in reporting for the other age categories for 2020. While this positive change likewise complicates year-to-year analysis of crisis contacts by gender, it presents a more accurate picture for analysis in 2020, with ages 25-34 and 35-44 representing 24% and 23% respectively of crisis contacts with a documented age for the crisis contact.

<em>iv.    Resolution of Crisis Contacts</em>

**SPD's arrest rate in crisis situations remains consistent with what the Monitoring Team found in its 2016 assessment.** The Monitoring Team's 2016 review, which found SPD in compliance with the terms of the Consent Decree relating to behavioral crisis, found SPD crisis contacts resulted in arrest 7.5% of the time.[154] SPD's arrest rate in 2019 was 8.62% and 6.30% in 2020, averaging near the rate found by the Monitoring Team in its 2016 report and below the 9.7% for 2016-2017 rate reported in SPD's Phase II assessment.[155] SPD referred crisis contacts to services in 16% of contacts for both 2019 and 2020, and more than a third of crisis contacts resulted in an emergency detention in 2019 and 2020. The public can view other crisis contact outcomes over time on SPD's public crisis contacts dashboard.

**Table 12.  Crisis Contact Outcomes, 2019–2020**

| Outcome | 2019 | 2020 |
|---|---|---|
| Arrested | 8.62% | 6.30% |
| Referred to Services | 16.19% | 16.42% |
| Emergency Detention | 35.31% | 38.52% |

*Source: Statistics provided by SPD's Data Analytics Platform based on SPD Crisis Contact Forms*

<em>v.    Use of Force in Crisis Contacts</em>

A primary goal of the parties in entering into the Consent Decree was to reduce excessive use of force in crisis situations.  Consequently, one important indicator is the rate of force that SPD officers employ in crisis situations – and the rate of misconduct. SPD reports the following uses of force during crisis contacts, which should be considered with some caution as discussed below:

---

[154] Fifth Systemic Assessment at 18.
[155] Dkt. 511 at 70.

**Table 13. Use of Force Involving Individuals Experiencing Behavioral Health Crisis, by Use of Force Level, 2019–2020[156] [157]**

| Force Level | 2019 | 2020 |
|---|---|---|
| Type I | 123 | 99 |
| Type II | 60 | 50 |
| Type III | 5 | 3 |
| **Total** | **188** | **152** |

*Source: Statistics provided by SPD's Data Analytics Platform based on SPD Crisis Contact Forms and Use of Force Reports.*

As discussed in the use of force section of this report, one incident can lead to multiple uses of force, so one crisis contact may involve more than one use of force report. SPD's data indicates that crisis contacts involved use of force 162 times in 2019 and 134 times in 2020; these contacts. In turn, **SPD reported using force one or more times in approximately 1.5% of crisis contacts across 2019 and 2020.** This rate of force is slightly below what the Monitoring Team found in its 2016 assessment, when officers used "force against individuals in crisis less than two percent of the time."[158] The aggregate rate for 2019-2020 (1.5%) is also slightly below the use of force per crisis contact rate of 1.74% found by SPD in its 2018 Phase II report assessing performance across 2017 and the first half of 2018.[159]

The Monitoring Team requested additional detail from SPD regarding use of force in crisis situations for this assessment. SPD's crisis dashboard and open data indicate whether a use of force occurred during a crisis contact but not whether multiple uses of force occurred or what level of force was used during crisis contacts. SPD has stated it does not provide that level of detail due to privacy concerns for the individuals in crisis. Multiple community members voiced interest in SPD providing more detail regarding uses of force in the public data and dashboard, and the Monitoring Team recommends further engagement between the CPC and SPD on this topic.

---

[156] SPD classifies its use of force with a three-level system that, generally, categorizes force according to the severity or significance of the force involved. In short, Type I force is the lowest level and includes force that causes transitory pain or complaint of transitory pain, in addition to firearm pointings. Type II, the intermediate level, includes force that is reasonably expected to cause greater than transitory pain but less than substantial bodily harm, such as Taser usage. Type III force is the most serious force and includes potentially lethal force such as officer-involved shootings and other force that could cause substantial bodily harm.

[157] In the preliminary draft of this report, the Monitoring Team identified that SPD's statistics regarding Type III use of force in crisis appeared slightly more frequent than the data available for analysis would suggest. Based on this finding, SPD conducted a review of Type III force cases and whether a crisis was involved and provided updated data to the Monitoring Team, which is reflected in this report. SPD should continue to monitor this area for quality control. SPD's classification of force as crisis related has been a topic raised by a community member in Community Police Commission meetings, and the Community Police Commission plans to facilitate a discussion between SPD and the community regarding the classification of use of force cases as crisis related or not.

[158] Fifth Systemic Assessment at 1.

[159] Dkt. 511 at 14.

The eight Type III use of force reported across crisis contacts in 2019 and 2020, shown in Table 13 above, occurred in five distinct events. This means that **0.03% of crisis contacts involved a Type III use of force, such as an officer shooting, from 2019-2020.** This is a low frequency, and SPD must continue to strive to minimize such serious uses of force, which can have profound consequences for community members.

**The sustained, low rate of force – and especially serious force – in crisis intervention situations represents a dramatic improvement from DOJ investigative findings that led to the Consent Decree.** In 2011, according to DOJ's investigation, SPD estimated 70% of use of force incidents involved a crisis.[160]   The Monitoring Team later reported that SPD indicated for 2015 that "slightly more than 50 percent of the Department's applications of force involved subjects impaired by either mental illness, or drugs or alcohol, or other indicators which would meet the current 'behavioral crisis' definition over the past year."[161] In significant contrast, 9.8% of use of force reports overall involved a crisis in 2019-2020, according to SPD data. Although SPD's 2011 estimate was not rooted in data, as SPD did not systematically and reliably track crisis contacts prior to the decree, the significant positive distance between prior estimates and current outcomes is notable.

We observe here that SPD has systems and processes in place, via its use of force investigation and review and its misconduct investigation process, to identify problematic or deficient performance in the context of interactions with individuals experiencing behavioral crisis.  In the rare instance where a Type III use of force, like an officer-involved shooting, does occur, these critical incidents prompt a specific, detailed Force Investigation Team investigation of the force incident. SPD's Force Review Board would then have a lengthy discussion regarding the force incident, potential misconduct, and opportunities for departmental improvement. SPD policy requires referring potential misconduct in these events to the Office of Professional Accountability. OPA sits on the Force Review Board and may self-initiate an investigation of misconduct if SPD does not refer to the case, providing an additional backstop.

When a Type II use of force occurs in a crisis situation, the Force Review Unit will review the use of force for compliance with policy, training, and tactics as well as evaluate the quality of the chain of command's review. These uses of force may then also go before the Force Review Board as part of a random sample review or if the Force Review Unit flags the case for Board discussion. The Force Review Board also reviews all uses of less-lethal instruments in Type II use of force incidents, some of which involve crisis situations. In all, SPD has multiple layers of review and accountability on use of force incidents involving individuals in crisis.

---

[160] 2011 Findings Letter at 5.
[161] Fifth Systemic Assessment at 3.

SPD's accountability partners provide additional systems for monitoring and accountability on crisis use of force cases. OPA will investigate any internal or external complaint of inappropriate force or crisis intervention tactics, as it would with any complaint of misconduct. The Office of Inspector General reviews OPA investigations of misconduct and also conducts proactive systemic audits of SPD performance, including a forthcoming crisis intervention review. Both the Office of Police Accountability and the Office of Inspector General monitor SPD's Force Review Board meetings to provide feedback to SPD and refer incidents for misconduct investigation, should SPD fail to do so. Through SDP's internal management mechanisms and the wide-ranging oversight of its accountability partners, Seattle has multi-layered systems of accountability and performance improvement rivaled by few cities in America.

### vi.   *Misconduct Allegations for Crisis Contacts*

**About 0.24% of all crisis contacts were the subject of a complaint to OPA, with OPA sustaining allegations stemming from those investigations in 0.07% of crisis contacts overall.** The City reports that the Office of Police Accountability received 23 complaints of potential misconduct involving subjects in behavioral crisis in 2020. This represents 0.24% of the 9,438 crisis contacts for 2020. OPA sustained at least one allegation in 7 of these cases, leading to a rate of sustained findings in 0.07% of crisis contacts. Complaints may originate from a member of the public filing allegations of misconduct against an officer or from a member of the Department identifying potential misconduct and referring the incident for review by OPA.

More specifically, the 23 complaints in 2020 involved a total of 93 allegations (as one case can involve multiple allegations). Five of the 23 cases involved allegations related to SPD's crisis intervention policy, with seven total alleged violations specifically related to SPD's crisis intervention policy. None of the seven allegations directly related to the crisis intervention policy were sustained for misconduct, with four allegations not sustained, two handled through supervisor action (indicating there was an issue needing lower-level corrective action), and one case pending as of the City's reporting. In total, the City reports that 11 allegations across 7 investigations involving 8 different officers resulted in sustained findings from the OPA investigation. Only one of the sustained allegations involved a violation of SPD's use of force and de-escalation policies. The sustained allegations included:

- 5 for professionalism;
- 2 for force reporting procedures;
- 2 for video and/or audio recording;
- 1 for de-escalation and use of force requirements; and
- 1 for supervisory responsibility.

As previously described, OPA investigates complaints on an ongoing basis and will post the results of its current and future investigations related to crisis intervention on its website for public inspection. The Office of Inspector General reviews OPA's investigations of misconduct to provide another layer of quality control and oversight on the misconduct complaint investigation process. The Monitoring Team commends the City for making these reports publicly available but also recommends that the City explore ways to make these important data more readily accessible by the general public. Public feedback through the Community Police Commission raised this issue.

### D. Conclusion

In 2016, the Monitoring Team concluded that SPD was in compliance with the crisis intervention requirements of the Consent Decree. **SPD's outcomes with respect to crisis contacts have largely sustained or improved in the ensuing five plus years, and thus the Monitoring Team finds SPD in sustained compliance in this area.**

SPD handles many crisis situations, with around 10,000 crisis contacts a year according to SPD's crisis documentation. Very few serious uses of force or complaints occur during these encounters and circumstances, though SPD needs to ensure precise data collection in this regard. When SPD performance does not meet the requirements of the Consent Decree, the Force Review Board, Office of Police Accountability, and Office of Inspector General serve as accountability mechanisms to address problematic performance and work toward continuous improvement.

SPD's compliance with decree requirements on crisis intervention do not represent the end of SPD's potential improvement in this area. Tragic deaths have resulted during crisis situations, including recently, and SPD should do everything in its power to avoid these tragic outcomes. Toward that end, SPD has demonstrated commitment to continuous improvement in SPD's crisis response and is engaging with community partners in reimagining the City's response to crisis situations, with a focus on reducing police involvement in crisis situations moving forward, where appropriate.

# Stops and Detentions

## A. Background and Consent Decree Requirements

The Department of Justice's 2011 investigation found that SPD had "deficient policies" and provided "inadequate supervision and training of its officers" with respect to stops and detentions.[162] Additionally, SPD did not collect "adequate data to self-assess" its stop and detention practices for appropriate legal bases for individual stops or potential trends of biased policing.[163] In particular, DOJ's investigation "raise[d] serious concerns about SPD's practices related to pedestrian stops."[164] DOJ found that "SPD need[ed] to implement better policies, training, and supervision to ensure officers constitutionally detain someone in a pedestrian encounter."

While the Department of Justice's investigation did "not reach a finding of discriminatory policing,"[165] the investigation "raise[d] serious concerns about practices that could have a disparate impact on minority communities."[166] With respect to aggregate data on stops, DOJ observed that "[s]tanding alone, disparities in stop and arrest data are insufficient to show discriminatory policing."[167] Instead, disparities "can be one indicator as to whether a Department needs to look further to determine if the data can be explained or if it is a reflection of discriminatory policing."[168]

To address the concerns that the investigation raised with respect to stops and detentions and any associated bias, the Consent Decree required, among other things, that SPD:

1. Revise its policy addressing investigatory stops and detentions;[169]
2. Provide annual in-service training to all officers on the importance of constitutional, professional police-community contacts for effective policing and public trust;[170]
3. Ensure the supervisory review of investigatory stops;[171]
4. Revise its policies relating to bias-free policing;[172]
5. Provide bias-free training to all SPD officers;[173] and

---

[162] 2011 Findings Letter" at 6.
[163] 2011 Findings Letter at 30.
[164] 2011 Findings Letter at 26.
[165] 2011 Findings Letter at 6.
[166] 2011 Findings Letter at 6.
[167] 2011 Findings Letter at 30.
[168] 2011 Findings Letter at 30.
[169] Dkt. 3-1 ¶¶ 140–41.
[170] Dkt. 3-1 ¶¶ 142–43.
[171] Dkt. 3-1 ¶¶ 144.
[172] Dkt. 3-1 ¶¶ 146.
[173] Dkt. 3-1 ¶¶ 147–49.

6. Ensure that supervisors play the appropriate role in identifying and addressing instances of discriminatory policing.[174]

## B. Progress to Date & Previous Assessments

The Monitoring Team approved the implementation of new policies and training on stops and bias-free policing and subsequently reviewed SPD's compliance with these new requirements. In 2017, the Monitoring Team conducted an assessment – including a quantitative review of patterns in SPD investigatory stops and a qualitative review of individual stops to determine if they complied with law and SPD policy – that concluded, among its many findings, that:[175]

- "The number of stops and detentions of individuals that are not supported by sufficient legal justification is exceedingly small."[176]
- "Similarly, officers by and large are conducting frisks of a stopped subject when they have the appropriate legal justification – not as a matter of course."[177]
- "[A]n individual's race . . . helps to predict the likelihood of being stopped and the likelihood of being frisked by an SPD officer."[178]
- Race was "not a factor in determining an individual's likelihood of being the subject of a 'bad' stop," i.e., a stop that was counter to law or policy.[179]
- Black subjects were both more likely to be subjected to a legally justified frisk and less likely to be subjected to a legally-unjustified frisk during a stop than White subjects.[180]

Largely because "SPD and its officers are complying with the legal and policy requirements related to stops, searches, and seizures,"[181] the Monitoring Team certified SPD as in compliance with paragraphs 138 through 151 of the Consent Decree.[182]

Even as the Monitoring Team found SPD in compliance with these provisions, the Monitoring Team emphasized that disparate impacts in stop practices, regardless of whether the stops were legally justifiable or not, was of continuing concern and required further examination by SPD and the Seattle community. As the Monitoring Team reported, because "the likelihood that an individual will be stopped in the first instance and, when stopped, will be frisked do vary substantially by and depend on race – even after controlling for other potential influences like

---

[174] Dkt. 3-1 ¶¶ 150–52.
[175] Tenth Systemic Assessment at 7.
[176] Tenth Systemic Assessment at 3
[177] Tenth Systemic Assessment at 3.
[178] Tenth Systemic Assessment at 4.
[179] Tenth Systemic Assessment at 6.
[180] Tenth Systemic Assessment at 7.
[181] Tenth Systemic Assessment at 3.
[182] Tenth Systemic Assessment at 7.

crime and neighborhood,"[183] "[a]dditional study by the Department and others to determine the underlying causes of the disparity and how such disparities might best be addressed will be necessary."[184] SPD has subsequently conducted further analysis in this area in partnership with the Community Police Commission to identify opportunities to modify SPD's operations, as discussed later in this report.

The Monitoring Team observed that this future work aligned with SPD's policy on bias-free policing, developed through the Consent Decree process, which commits SPD "to eliminating policies and practices that have an unwarranted disparate impact on certain protected classes" by working to "identify ways to protect public safety and public order without engaging in unwarranted or unnecessary disproportionate treatment."[185] Specifically, in its bias-free policing policy, SPD commits to identify practices "that have a disparate impact on protected classes relative to the general population,"[186] consider "effective alternative practices that would result in less disproportionate impact,"[187] and provide ongoing updates on its "efforts to address disparate impact."[188] Later sections of this report detail SPD's efforts toward analyzing and addressing unwarranted disparities – and the continued work ahead for SPD and its community partners, in line with SPD's bias-free policing policy.

In keeping with Phase II's approach of transferring preliminary monitoring responsibilities to the City and SPD with subsequent assessment and validation by the Monitoring Team and DOJ, SPD issued two reports in 2019 assessing SPD's compliance with stops and detentions practices in 2018. SPD found the following:

- "[I]n the vast majority of cases, SPD officers are continuing to meet their consent decree requirements to specifically and clearly document their reasonable suspicion for a stop or frisk."[189]
- "A deeper review of case files associated with stops or frisks deemed, based upon review of the [written stop documentation] alone, lacking in articulated suspicion shows that in the vast majority of this smaller subset of instances, the observed deficiency was one of documentation, rather than legal basis."[190]
- "Statistical analysis (a Pearson's Chi-square test) was applied to test the relationship between [whether the audit determined stops and frisks had legal bases] and the perceived race and gender of the subject. While some differences were observed [between races and

---

[183] Tenth Systemic Assessment at 3.
[184] Tenth Systemic Assessment at 4.
[185] Dkt. 116 at 27.
[186] Dkt. 116 at 27–28.
[187] Seattle Police Department Manual, Section 5.140, Bias-Free Policing (last rev. Aug. 1, 2019), https://www.seattle.gov/police-manual/title-5---employee-conduct/5140---bias-free-policing.
[188] Dkt. 116 at 27–28.
[189] Seattle Police Department, Stops and Detentions Audit 3 (Jan. 2019).
[190] Seattle Police Department, Stops and Detentions Audit 32 (Jan. 2019).

genders], the relationship was not significant. Observed differences between groups can be said to be coincidental."[191]

SPD's assessment concluded the agency had sustained compliance with the stops and detention requirements of the Consent Decree. The subsequent review by the Monitoring Team and DOJ validated SPD's finding of sustained compliance. Specifically, the Monitoring Team and DOJ found the following:

> The City of Seattle has demonstrated that it continues to sustain compliance with the stops and detentions requirements of the Consent Decree and SPD's policies, including requirements that SPD officers report all *Terry* stops through a *Terry* template and that supervisors will review such reports by the end of that shift, absent exceptional circumstances. DOJ and the Monitoring Team have concluded that officers are consistently satisfying these reporting requirements. Further, DOJ and the Monitoring Team have found that the number of *Terry* stops supported by documented, articulable, reasonable suspicion was consistent with SPD's findings.[192]

SPD also produced two reports analyzing disparities in SPD's stop activities and outcomes as part of Phase II assessments. SPD's approach to conducting these assessments, their findings, and associated recommendations are summarized later in this section of the report during the disparate impacts discussion.

## C.  SPD's Recent Performance

For this assessment, the Monitoring Team reviewed stop data from SPD's records management system available in SPD's open data portal, body-worn camera footage, internal SPD compliance reviews, and SPD disparity analysis reports to evaluate where SPD stands currently with respect to the Consent Decree requirements addressing stops and detentions.

SPD publishes a regularly updated dashboard regarding its stop activity, as well as a detailed open data set allowing wide-ranging public analysis.  Whereas SPD lacked "adequate data to self-assess" at the beginning of the Consent Decree, SPD and the public now have far greater data and analytics available for analysis of SPD stop activity and disparate impacts. The dashboard includes visualizations on stop activity by geography, shift, demographics of officers and individuals stopped, and outcomes of the stop.

---

[191] Seattle Police Department, Stops and Detentions Audit 32 (Jan. 2019).
[192] Seattle Police Department, Stops and Detentions Audit 23 (Oct. 2019).

We note at the outset that the data and discussion relating to stops within the Consent Decree process has been focused primarily on investigatory stops, or so-called *Terry* stops.   Officer discretion has a significant role in this common type of stop because the legal threshold is the lowest and most amorphous for these encounters. Under current law, an officer may conduct "a brief, investigatory stop"[193] if they have "a reasonable, articulable suspicion"[194] that an individual was, "is, or is about to be, engaged in criminal activity."[195] An individual who is the subject of a *Terry* stop may be on foot, in a car, on a bike, or in other circumstances.

Even after the Supreme Court determined for the first time in 1969 that officers could stop individuals on grounds less significant and demanding than the "probable cause" articulated under the plain language of the Fourth Amendment of the Constitution, there remains a class of police encounters that are "probable cause" stops – where an officer is able to establish "a fair probability" that a subject is engaged in criminal activity.[196]  For example, an officer who observes a driver of a car failing to signal before making a turn would have not just "reasonable articulable suspicion" but "probable cause" to initiate a stop.  While officers do sometimes report "probable cause" stops as *Terry* stops, "probable cause" stops are not investigatory or *Terry* stops and, as such, are not systematically included in the stops analyzed here. As a general matter, given the wide-ranging nature of the bias-free policing policy's mandate for SPD to analyze all of its enforcement activities to determine if they disproportionately affect some populations more than others, SPD should ensure the ongoing, systematic analysis of data on stops initiated pursuant to the higher legal standard of "probable cause," including "probable cause" traffic stops which are of great interest to the public.

   1.   Quality of Stops & Frisks

Pursuant to the current Monitoring Plan, SPD conducted a qualitative performance assessment of its compliance with the Consent Decree's stops and detentions requirements and submitted this assessment to the Monitoring Team and Department of Justice for review.  As part of this undertaking, SPD reviewed a random sample of 533 stops from 2020 and assessed whether officers articulated reasonable suspicion for the stop and any frisks conducted, in accordance with SPD policy and the Consent Decree.

**SPD audits indicate consistent articulation of reasonable suspicion for their stops during the sustainment phase of the Decree.**  SPD's review of 2020 stops found that officers adequately and appropriately articulated reasonable suspicion to justify 94.3% of the stops reviewed. The Monitoring Team's random sample review of SPD's inspection found that officers sometimes

---

[193] *Terry v. Ohio*, 392 U.S. 1, 30 (1969)
[194] *Terry v. Ohio*, 392 U.S. 1, 30 (1969)
[195] *Untied States v. Cortez*, 449 U.S. 411, 417 (1981).
[196] *United States v. Solow*, 490 U.S. 1, 7.

articulated their reasonable suspicion for the stop in other supporting documents, indicating SPD's compliance rate may have in fact been higher than the reported 94.3%. However, these findings are consistent with previous SPD stop inspections during the sustainment phase, which found 93.5%[197] and 94.2%[198] compliance in this area, which the Department of Justice and prior Monitoring Team determined to be satisfactory. While the most recent findings represent a decrease from the Monitor's 2017 finding of 99% adherence to policy,[199] both SPD and DOJ recognize that this change may simply be a result of changes in the review process, with SPD taking over primary audit responsibilities from the Monitoring Team, rather than an actual decrease in performance. For Phase II, SPD developed an approved audit methodology that has yielded consistent, stable results across three different studies, and those results were validated as accurate by the Monitor and DOJ during the sustainment phase.

**Similarly, SPD's most recent audit demonstrated officers are appropriately articulating the justification for conducting frisks at a rate within the range previously identified by SPD in sustainment phase audits.** SPD's review of 2020 frisks found that officers articulated frisks properly in 86.0% of frisks in the random sample. Again, the Monitoring Team's random sample review of SPD's inspection found that officers sometimes articulated their reasonable suspicion for conducting a frisk in other supporting documents, indicating SPD's rate of adequately documenting its justifications may have in fact been higher than the reported 86.0%. This rate is above SPD's first finding during the sustainment phase of 83.3%[200] but below its second finding of 93.8%.[201] As with audits of SPD's stop practices, SPD's Phase II frisk audit results are below the 97% rate reported in the 2017 Monitoring Team report,[202] but once again differences in review processes may be the cause of the differences in audit results rather than changes in underlying performance.

**Race was not a factor in determining an individual's likelihood of being the subject of a "bad" stop or frisk**. For example, White and Black individuals were subjected to insufficiently articulated stops and frisks at nearly identical rates. These findings align with previous findings by the Monitoring Team in June 2017[203] and SPD's Phase II assessment in 2019.[204]

Overall, SPD's matured ability to self-assess critically is essential to sustaining and improving performance over time. **The Office of Inspector General should consider conducting a systemic review of SPD's stop and frisk practice in the future to monitor performance over time to support sustainment and improvement.** Both SPD and the OIG state they have auditing capacity

---

[197] Seattle Police Department, Stops and Detentions Audit at 2 (Jan. 2019).
[198] Seattle Police Department, Stops and Detentions Audit at 3 (Oct. 2019).
[199] Tenth Systemic Assessment at 5.
[200] Seattle Police Department, Stops and Detentions Audit at 3 (Jan. 2019).
[201] Seattle Police Department, Stops and Detentions Audit at 20 (Oct. 2019).
[202] Seattle Police Department, Stops and Detentions Audit at 20 (Oct. 2019).
[203] Tenth Systemic Assessment at 6.
[204] Seattle Police Department, Stops and Detentions Audit at 32 (Jan. 2019).

constraints, presenting concerns about the City's ability to sustain these quality control mechanisms to the degree necessary to sustain and improve performance beyond the Consent Decree.

## 2. Stop Activity

At the start of the Consent Decree, SPD did not systematically or electronically track investigatory stops. SPD's subsequent implementation of new data collection requirements as a result of the Consent Decree allows for far greater analysis of SPD's stop activities over time in a variety of important ways. The following sections analyze available data to provide a variety of quantitative statistics on SPD stop practices and outcomes that do not relate to specific compliance requirements for SPD but provide context and additional findings regarding SPD's performance over time.

SPD's stop activity ranged from 7,715 total investigatory stops in 2016, the first year of complete data, to a high of 8,883 in 2018 and a low of 6,157 in 2020 (likely related to the impacts of Covid-19 and other factors). While the following analysis primarily focuses on SPD's performance up to the conclusion of 2020, **it is worth noting that SPD conducted 4,282 stops in 2021 – its lowest on record, 30% below the previous low in 2020, and 52% below the recorded high in 2018.** This record low in stops could be attributable to any of a variety of factors, including but not limited to reduced staffing and ongoing impacts from the Covid-19 pandemic.

**Figure 31. Stops by Year, 2016-2021**



*Source: SPD Open Data based on stop report date*

112

*i.    How Stops Originated*

SPD has improved its data collection on the origin of these stops over time. SPD may stop an individual after responding to a dispatched call for service or based on "On-View" observations by an officer of potential or apparent criminal activity.  In 2020, 66% of stops occurred after a dispatched police response, 29% related to an "On-View" event, and 5% of stops were of unknown origin. The percentage of stops in SPD's open data with an unknown origin has decreased significantly from 40% in 2015 to 5% in 2020. This improvement in data collection is the result of SPD's Data Governance program and leads to a clearer picture of the origination of stops in 2020, even as it complicates historical comparisons to prior years with higher frequencies of unknown origin stops.

When considering only those stops with a documented origin of dispatch or on view (that is, excluding calls with an unknown origin), "On-View" stops increased as a share of stops from 23% to 31% from 2015 to 2020.  This means that SPD's records indicate that SPD officers may be self-initiating a bigger share of stops in 2020 compared to 2015, though potential changes in data collection practices could be impacting this trend.  Again, these comparisons are limited due to the varying nature of the data over time, and a variety of factors could contribute to this increase.

*ii.    Demographics of Stopped Individuals*

SPD collects demographic information for the individuals it stops, allowing for analysis of trends in SPD stop activity across demographic groups.  Figure 32 shows SPD stops broken out by the race of the stopped individual from 2015 to 2020. Note that SPD ceased using "Hispanic" as a racial category in mid 2019 for stops documentation, and instead began capturing ethnicity in a separate field.

**Figure 32. Stops by Race, 2015-2020**



*Source: SPD Open Data. Percentages below 3% not labeled.*

**The racial composition of stopped individuals remained fairly consistent over the period from 2015 to 2020, with one primary exception: the portion of individuals of an "unknown" race increased by 10 percent.** The percentage of stops of individuals with an "unknown" race increased from 6% in 2018 to 16-17% in 2019 and 2020. This means that, in 2020, the race of the subject is missing with respect to approaching one-fifth (17%) of all SPD investigatory stops.

Figure 33 shows the significant, sudden increase in stops reported with "unknown" race in May 2019, coinciding with a sustained decrease in reported stops of non-Black minorities and, to a lesser degree, White subjects. The percentage of stops of Black subjects briefly decreased at this time before mostly resuming levels occurring prior to May 2019. SPD ceased the use of "Hispanic" as a racial category for stops at that time, instead tracking it separately as an ethnicity, contributing to the increase in subject race being reported as "unknown." SPD implemented its new stop reporting and records management system in May 2019, leading to system changes in data collection and reporting and impacting these trends.

**Figure 33. Stops by Race, 2018-2020**



*Source: SPD Open Data. Non-Black minorities are grouped into the "Other" category for this chart due to the lower aggregate stop activity for these groups.*

Comprehensive demographic reporting of SPD stop activity is important for SPD's ongoing analysis of disparate impacts.  SPD should work to identify the sources of this increase in stops involving subjects of "unknown" race and implement mechanisms to improve the percentage of stops where the officer documents the subject's perceived race.

Table 14 breaks down SPD stop activity in greater detail across demographic categories for 2018-2020.  It presents overall, aggregate stop data across demographic groups with reference to the population of Seattle.

115

**Table 14. Stops, by subject perceived race, age, gender, and call origin, 2018-2020**

| | Asian | | Black | | Hispanic | | Native American | | White | | Other | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | # | % | # | % | # | % | # | % | # | % | # | % | # | % |
| **Pop.** | | 15.4% | | 7.3% | | 6.7% | | 0.5% | | 67.3% | | | | |
| **Stops** | 768 | 4% | 6,736 | 33% | 657 | 3% | 583 | 3% | 11,359 | 56% | 289 | 1% | 20,392 | 100% |
| *AGE* | | | | | | | | | | | | | | |
| 1 – 17 | 27 | 0% | 324 | 2% | 29 | 0% | 12 | 0% | 214 | 1% | 17 | 0% | 623 | 3% |
| 18 – 25 | 152 | 1% | 1,294 | 6% | 156 | 1% | 98 | 0% | 1,744 | 9% | 96 | 0% | 3,540 | 18% |
| 26 – 35 | 229 | 1% | 2,198 | 11% | 249 | 1% | 193 | 1% | 4,176 | 21% | 95 | 0% | 7,140 | 36% |
| 36 – 45 | 190 | 1% | 1,355 | 7% | 143 | 1% | 171 | 1% | 2,771 | 14% | 56 | 0% | 4,686 | 24% |
| 46 – 55 | 117 | 1% | 913 | 5% | 60 | 0% | 77 | 0% | 1,599 | 8% | 14 | 0% | 2,780 | 14% |
| 56+ | 36 | 0% | 450 | 2% | 13 | 0% | 28 | 0% | 625 | 3% | 7 | 0% | 1,159 | 6% |
| **Total** | 751 | 4% | 6,534 | 33% | 650 | 3% | 579 | 3% | 11,129 | 56% | 285 | 1% | 19,928 | 100% |
| *GENDER* | | | | | | | | | | | | | | |
| Female | 147 | 1% | 1,169 | 6% | 95 | 0% | 211 | 1% | 2,368 | 12% | 69 | 0% | 4,059 | 20% |
| Male | 619 | 3% | 5,559 | 27% | 561 | 3% | 372 | 2% | 8,976 | 44% | 211 | 1% | 16,298 | 80% |
| Diverse | 0 | 0% | 3 | 0% | 0 | 0% | 0 | 0% | 1 | 0% | 0 | 0% | 4 | 0% |
| **Total** | 766 | 4% | 6,731 | 33% | 656 | 3% | 583 | 3% | 11,345 | 56% | 280 | 1% | 20,361 | 100% |
| *HOW THE ENCOUNTER WAS INITIATED* | | | | | | | | | | | | | | |
| Dispatch | 434 | 3% | 4,099 | 25% | 303 | 2% | 322 | 2% | 6,388 | 39% | 175 | 1% | 11,721 | 72% |
| On View | 197 | 1% | 1,436 | 9% | 116 | 1% | 153 | 1% | 2,553 | 16% | 46 | 0% | 4,501 | 28% |
| **Total** | 631 | 4% | 5,535 | 34% | 419 | 3% | 475 | 3% | 8,941 | 55% | 221 | 1% | 16,222 | 100% |

*Source: SPD Open Data. Statistic totals may vary between categories based on data availability for the respective categories.*

*Notes:* SPD ceased using "Hispanic" as a racial category for stops in May 2019, instead capturing ethnicity in a separate field. Stops with subjects of unknown race excluded. Overall totals for race, age, gender, and call origin differ as a result of the exclusion of stops with unknown values. Population statistics pulled from US Census Bureau.

**Undoubtedly, the characteristics of the population of stopped subjects in 2018 through 2020 do not match the Seattle population, as has been found previously.** While population-based comparisons do not reveal to what degree disparities result specifically from police action in the context of other sociological factors that may impact disparities, as discussed earlier in this report, they are worthy of examination. In particular, White and Asian subjects are represented less in the population of stop subjects than their comparative share of the Seattle population overall. Black and Native American subjects are represented more. Hispanic subjects are represented below their proportion of the Seattle population, but SPD ceased using this category for documentation of race of subjects in May 2019. In 2018 when SPD last used Hispanic as a racial category for a full year, Hispanic subjects comprised 5.2% of stops, compared to a 6.7% share of the population.

Four out of five (80%) stops involved male subjects, with 44% of stops involving White males and 27% involving Black males. Individuals between 26-35 years old were stopped most frequently

(36%), followed by individuals ages 36 to 45 (24%). White individuals ages 26 to 35 made up 21% of stops, followed by White individuals ages 36 to 45 at 14%, and Black individuals ages 26 to 35 at 11%.

### 3. Stop Outcomes

SPD policy, and the law, authorize officers to conduct investigatory, or *Terry*, stops only when there is reasonable suspicion that an individual has engaged, is engaging, or is about to engage in criminal activity. The officer will typically take some type of action, ranging from a verbal warning or citation to arrest, if the reasonable suspicion is confirmed and the officer establishes probable cause of a crime. On the other hand, if the officer's reasonable suspicion is dispelled through further investigation and there is no indication that criminal activity was occurring, the officer must conclude the stop without taking further action.

SPD tracks the outcomes of stops using the following categories, listed as a progression from no formal enforcement outcome (a so-called field contact) to arrest:

- *Field Contact:*  The stop leads to no formal enforcement action or additional documentation in an offense report. The officer still documents the reason for the stop and any actions taken during the stop. Field contacts are stops where *either* (1) the officer's suspicion of a crime was *not* sufficiently confirmed or (2) the officer's suspicion *was* confirmed but only for a minor offense which could be resolved through informal means, such as a verbal warning. In either case, the detained individual is sent on their way without formal enforcement action, and the officer does not complete additional documentation beyond the stop report.  This category, and issues with its imprecision, is discussed in greater depth below.
- *Offense Report:*  The officer documents the violation or event in a report but does not take any formal enforcement action (e.g., make an arrest or refer to prosecutor).
- *Citation/Infraction:* The officer cites the stopped individual for an offense.
- *Referred for Prosecution:*  The officer refers the stopped individual for prosecution but does not arrest the stopped individual immediately.
- *Arrest:*  The officer arrests the stopped individual for an offense. This includes instances where an officer arrests an individual but subsequently releases the individual. This situation is referred to as an Identify & Release (I&R), as opposed to a "Booking," where custody is transferred to a holding facility (e.g., King County Department of Adult and Juvenile Detention)

Before this assessment discusses statistical trends in SPD stop outcomes, it is important to discuss the imprecision of the "field contact" category. While this topic does not relate to any specific Consent Decree requirements, it does relate to SPD's overall goals of performance improvement

through sophisticated data-driven management. **In short, "field contact" refers to both stops for which there *is* and *is not* an underlying crime, complicating analysis of SPD stop outcomes overall and by demographics.** For example, analyses of stop practices sometimes assess what percentage of stops result in the identification of criminal activity (sometimes referred to as the "hit rate" of stops), but SPD's current stop outcome categorizations do not allow for clean analysis of stop hit rates, overall or by demographic. With SPD working to automate analyses of stop practices to identify potential biases, as discussed later in this report, resolving this imprecision will bring greater clarity for more informed management of SPD stop practices.

Improving data collection in this regard may not require significant effort. For stops leading to the generic "field contact" outcome category, SPD officers already document which stops result in no further action and which stops lead to a verbal warning in response to a confirmed minor violation. This granular data below the "field contact" outcome category may provide SPD a potential opportunity for distinguishing between stops that do and do not identify criminal activity – and greater clarity in public reporting and analysis of stops activity.

To resolve this issue, the Monitoring Team recommends that SPD break up the "field contact" outcome category into at least two categories: (1) "no action" or "no criminal activity," for which the reasonable suspicion for the stop was dispelled and, consequently, the officer took no action and (2) "verbal warning," for which the reasonable suspicion of criminal activity was confirmed but the officer responded informally, whether by policy or discretion. Not only will those refined outcome categories improve SPD analysis of stop outcomes, but they also move the Department away from "field contact" language which implies something less than what these interactions are in reality: investigatory stops during which an individual is not free to leave.

With these considerations in mind, Table 15 summarizes the outcomes of stops from 2016 to 2020, since 2016 was the first full year of stop reporting with this system.

**Table 15. Stop Outcomes, 2016-2020**

| Year | Arrest | Citation / Infraction | Field Contact | Offense Report | Referred for Prosecution | Total |
|------|--------|----------------------|---------------|----------------|--------------------------|-------|
| 2016 | 1,615 | 33 | 3,010 | 2,905 | 152 | **7,715** |
| 2017 | 1,727 | 27 | 2,758 | 2,830 | 146 | **7,488** |
| 2018 | 2,437 | 33 | 2,825 | 3,397 | 191 | **8,883** |
| 2019 | 2,353 | 27 | 3,475 | 2,305 | 78 | **8,238** |
| 2020 | 1,611 | 26 | 3,163 | 1,356 | 1 | **6,157** |
| **Total** | **9,743** | **146** | **15,231** | **12,793** | **568** | **38,481** |

*Source: SPD Open Data*

Figure 34 presents this same outcome data highlighting the percentage of total stops falling in each outcome category. This chart includes data from 2015, when SPD began this level of data collection in the middle of the year, since the percentage composition of stop outcomes can be calculated for what portion of the year was reported.

Field contacts and offense reports fluctuated most significantly from 2015-2020, with an inverse relationship. "Field contacts" accounted for 40% of stop outcomes in 2015, hitting a low in 2018 of 32% before rising to a high of 51% in 2020. Arrests increased from a low of 21% in 2015 and 2016 to high of 29% in 2019, with a subsequent decrease to 26% in 2020.

**Figure 34. Stop Outcome Distribution by Year, 2015-2020**



*Source: SPD Open Data*

**The significant increase in field contact outcomes – meaning stops where officers took no formal enforcement action pursuant to the stop – is notable and merits further analysis.** Figure 35 below demonstrates these changes in stop outcomes on a month-to-month basis, providing greater detail on these trends and highlighting the significant jump in field contacts in mid 2019, with a corresponding decrease in offense reports. The implementation of SPD's new records management system coincides with these significant changes, suggesting that new data capture processes significantly impacted these trends. The impact of this systems change on the available data is discussed in multiple areas throughout this report.

**After the murder of George Floyd in May 2020 and subsequent protests, the number of stops and arrests resulting from stops decreased. During this same period, the percentage and number of stops in which stopped individuals were simply sent on their way also declined.** A correspondingly higher percentage of stops led to arrests, suggesting that **SPD was making fewer stops for minor offenses or where officer suspicion was not validated through the subsequent encounter during the peak protest period in the latter half of 2020**.

**Figure 35. Stop Outcome Distribution by Month, Mid 2015 – Mid 2021**



*Source: SPD Open Data*

While the previous chart shows that stops increasingly led to arrest during the protest period *after a stop occurred*, the *number* of arrests decreased during the protests, as show in Figure 36 below.

120

**Figure 36. Stops Resulting in Arrests, Mid-2015 to Mid-2021**



*Source: SPD Open Data*

Figure 37, below, further contextualizes Figure 36, above, by showing stop activity overlaid with the percentage of stops leading to an arrest or a field contact. In the wake of the protest activity beginning in May 2020, as previously mentioned, there was a significant decrease of documented stops, alongside a decrease in field contacts and increase in arrests as a percentage of the outcomes from the decreased stops. **As stop activity increased slightly in the latter stages of 2020 and 2021, field contacts resumed a similarly significant percentage of stop outcomes as it did prior to the protests.**

**Figure 37. Stop Activity & Frequency of Outcomes, Mid-2015 to Mid-2021**



*Source: SPD Open Data*

The significant increase in field contacts (stops with no criminal activity or action beyond verbal warning) starting in 2019 coincided with the previously highlighted significant jump in stops of individuals of "unknown" race, as depicted in Figure 38 below. This requires further inspection by SPD. These phenomena arose after the implementation of SPD's new records management system and require further analysis to identify discernible causes and any necessary modifications.

**Figure 38. Overlaying Percentage of Stops Resulting in Field Contact Outcomes with Percentage of Stopped Subjects of Unknown Race, Over Time**



*Source: SPD Open Data*

<em>i.    Stop Outcomes by Demographics</em>

The following table details the outcomes for both stops overall and for frisks from 2018 to 2020. Subsequent charts and tables explore these data further, with accompanying discussions on trends in SPD stop outcomes overall and differences in stop outcomes across races.

At the outset, it is important to note that SPD stopped non-Black minorities significantly less than White or Black individuals, so the percentages that follow for non-Black minority racial groups are calculated out of a relatively smaller number of stops, which potentially leads to more variability in percentage outcomes over time.

**Table 16. Frisks, Weapons Found, and Stop Outcomes by Race, 2018-2020**

| | Asian | | Black | | Hispanic | | Native American | | White | | Other | | *Total* | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | # | % | # | % | # | % | # | % | # | % | # | % | # | % |
| **WHETHER SUBJECT WAS FRISKED** | | | | | | | | | | | | | | |
| Not Frisked | 556 | 73% | 4,900 | 73% | 500 | 77% | 443 | 76% | 8,977 | 80% | 219 | 77% | *15,595* | *77%* |
| Frisked | 210 | 27% | 1,797 | 27% | 153 | 23% | 139 | 24% | 2,313 | 20% | 67 | 23% | *4,679* | *23%* |
| Total | 766 | 100% | 6,697 | 100% | 653 | 100% | 582 | 100% | 11,290 | 100% | 286 | 100% | *20,274* | *100%* |
| **RESULT OF FRISK** | | | | | | | | | | | | | | |
| Weapon Not Found in Stop with Frisk | 167 | 80% | 1,450 | 81% | 128 | 84% | 114 | 82% | 1,647 | 71% | 61 | 91% | *3,567* | *76%* |
| Weapon Found in Stop with Frisk | 43 | 20% | 347 | 19% | 25 | 16% | 25 | 18% | 666 | 29% | 6 | 9% | *1,112* | *24%* |
| Total | 210 | 100% | 1,797 | 100% | 153 | 100% | 139 | 100% | 2,313 | 100% | 67 | 100% | *4,679* | *100%* |
| **OUTCOME OF STOP** | | | | | | | | | | | | | | |
| Arrest | 229 | 30% | 2,117 | 31% | 157 | 24% | 204 | 35% | 3,126 | 28% | 72 | 25% | *5,905* | *29%* |
| Field Contact | 316 | 41% | 2,369 | 35% | 235 | 36% | 205 | 35% | 4,593 | 40% | 83 | 29% | *7,801* | *38%* |
| Offense Report | 211 | 27% | 2,156 | 32% | 249 | 38% | 165 | 28% | 3,452 | 30% | 126 | 44% | *6,359* | *31%* |
| Other | 12 | 2% | 94 | 1% | 16 | 2% | 9 | 2% | 188 | 2% | 8 | 3% | *327* | *2%* |
| Total | 768 | 100% | 6,736 | 100% | 657 | 100% | 583 | 100% | 11,359 | 100% | 289 | 100% | *20,392* | *100%* |

*Source: SPD Open Data.*

*Notes:* "Unknown" race category and unknown values excluded, which may produce different counts and percentages than charts below including unknown values. Total stop counts and total decisions to frisk or not do not match for the reason specified below.

There were 141 stops (or 0.6% of all stops) with no indication of whether a frisk occurred from 2018 to 2020. 118 of the 141 stops without documented frisk decisions had a documented race. Because stops without documented frisk decisions were excluded from the "Whether Subject Was Frisked" portion of Table 16 above and stops with unknown race were excluded from the "Outcome of Stop" portion of Table 16, the totals do not match, leading to a 118 difference between the total number of stops and total number of frisk decisions documented in the table. SPD has rectified this data collection issue, with only one such stop in 2020 and zero instances through three quarters of 2021.

Figure 39 visualizes these data for stop outcomes by race for 2018-2020.

**Figure 39. Stop Outcomes by Race, 2018-2020**



*Source: SPD Open Data*

Stops with individuals of "unknown" race led to the lowest percentage of arrests, the highest percentage of field contacts, and the lowest percentage of offense reports, compared to documented racial categories over 2018-2020.  These trends emphasize the need for SPD to analyze the increase in stops with "unknown" racial identifications to improve future data collection and analyses.

Native Americans were most likely to be arrested pursuant to a stop encounter (35% of stops), followed by Black individuals (31%), and Asian subjects (30%).  The "Other" racial category was least likely to have a stop turn into a field contact with no further documentation or enforcement (29%), followed by Black, Native American, and Hispanic individuals (35-36%).

Table 17 distills the difference between racial categories for the frequency of arrest and field contact outcomes after a stop was initiated for 2018-2020. Outcomes are substantially different for individuals with an "unknown" race, with the lowest arrest and highest field contact rates, as demonstrated above and highlighted below.

**Table 17. Stop Outcome Differences from Average by Race, 2018-2020**

| Race | Arrest Rate Percentage Point Difference from Average (27.5%) | Field Contact Rate Percentage Point Difference from Average (40.7%) |
|---|---|---|
| Asian | 2.3% | 0.5% |
| Black | 3.9% | -5.5% |
| Hispanic | -3.6% | -4.9% |
| Native American | 7.5% | -5.5% |
| White | 0.0% | -0.2% |
| Other | -2.6% | -11.9% |
| Unknown | -10.3% | 16.9% |

*Source: SPD Open Data*

While these figures do not factor in underlying circumstances and factors that could lead to different rates in outcomes, they do present an area for further inquiry in SPD's disparity analyses. In addition to an overarching review of potential differences in stop outcomes across demographics, as previously recommended, SPD should analyze stop trends related to the "unknown" race category, including its increased frequency since 2019 and differences in stop outcomes compared to the average.

### 4. Frisk Rates & Weapons Found During Stops

Per SPD policy, officers can conduct a frisk "only if they have an articulable and reasonable safety concern that the person is *armed and presently dangerous*."[205] Automatically conducting a frisk during a stop is unconstitutional. Conducting a stop and conducting a frisk are distinct actions that each require a separate legal basis. Whereas an officer needs articulable, reasonable suspicion of criminal activity to conduct a stop, the officer needs reasonable suspicion the stopped individual is armed *and* dangerous to conduct a frisk of the stopped individual.

**SPD frisk rates tend to establish that frisks are *not* conducted after stops as a matter of course.** Frisk rates are calculated as the percentage of stops in which a frisk is conducted. SPD data demonstrate that officers conduct frisks in 22-25% of stops from 2016 to 2020, with frisk rates increasing slightly in 2019 and 2020 as stop activity decreased. Documented frisk rates increased slightly after the implementation of SPD's new records management system in mid 2019, so the slight increases in frisk rates for 2019 and 2020 may be more attributable to documentation practice changes than officer performance changes or social changes (for example, an increase in carrying dangerous weapons).

---

[205] SPD Policy 6.220-POL-2 ¶ 6. Emphasis added.

126

**Figure 40. Stop Activity and Frisk Rates by Year, 2016-2020**



*Source: SPD Open Data. Stops with no indication of whether a frisk occurred or not are excluded from the frisk rate calculation.*[206]

**Frisk rates for stopped individuals ranged 7% across races, with a low of 20% for White subjects to a high of 27% for Asian and Black subjects,** from 2018 through 2020:

**Table 18. Frisk Rates by Race, 2018-2020**

| Race | Frisk Rate |
|---|---|
| Asian | 27% |
| Black | 27% |
| Hispanic | 23% |
| Native American | 24% |
| White | 20% |
| Other | 23% |
| Unknown | 24% |
| **Overall** | **23%** |

*Source: SPD Open Data*

---

[206] Stops without indication of whether a frisk occurred or not decreased year after year, from 1.7% of stops in 2016 to 0.02% of stops in 2020, with no such stops in 2021 through three quarters of the year.

Frisk rates by race have remained somewhat consistent from 2015 to 2020, with a slight upward trajectory for stopped individuals who were not Black.  Frisk rates for White subjects increased the most across racial groups, from 17% in 2016 to 23% in 2020.  Frisk rates for Black subjects were consistently around 28%.  Non-Black minorities are grouped into the "Other" category for this chart due to the low aggregate frisk activity for these groups on an annual basis. Frisk rates for non-Black minorities, comprising the "Other" category, remained largely consistent, increasing slightly from 25% in 2016 to 27% in 2020. In all, **differences in frisk rates across races have reduced over time, from a gap of 11 percentage points in 2015 to 5 percentage points in 2020.**

**Figure 41. Frisk Rates by Race, 2015-2020**



*Source: SPD Open Data. Stops with no indication of whether a frisk occurred or not are excluded from the frisk rate calculation.*

   *i. Weapons Found & Search Hit Rates*

SPD found weapons in 2,246 stops from 2016 to 2020. The percentage of stops leading to the finding of a weapon was consistently 5-6% from 2015 through 2019 before an increase to 7.5% in 2020. SPD may stop an individual for a variety of suspected crimes, many of which do not involve a weapon, so there is not necessarily an expectation that SPD would find weapons during stops at a significantly high rate.

A metric used to assess the effectiveness of officer decision making in conducting frisks is the "frisk hit rate," meaning the percentage of frisks through which an officer indeed finds a weapon. While this measure makes intuitive sense, its calculation is often clouded by the manner in which frisk and contraband data are collected across most police departments nationwide, including SPD. Even as SPD is not required to calculate frisk hit rates as a result of the Consent Decree, and SPD

is not required to capture frisk data any differently than it currently is, the following context is important to understand caveats regarding the figures that follow on hit rates with SPD's available data.

To calculate the frisk hit rate precisely, one would have to know whether weapon recovery resulted directly from a frisk. The officer could have alternatively recovered the weapon through a seizure subsequent to an on-view observation at the onset of the stop or through a search incident to arrest, potentially after conducting a frisk to no avail. SPD officers recovered weapons in 322 stops with no documented frisk from 2016 to 2020, representing 14% of all documented stops resulting in the finding of a weapon during this period. While this demonstrates that available data can distinguish stops without frisks that led to the finding of weapons (for example through a search incident to arrest), the data currently does not allow for analysis of when a frisk occurred with negative results but the officer otherwise found a weapon.

Further complicating this calculation, the data on weapons found pursuant to a stop present questions regarding whether officers may sometimes document searches besides frisks, like searches incident to arrest, as frisks. The frisk hit rate aims to assess the quality of officer discretion in conducting frisks, and this metric should not include non-discretionary searches like searches incident to arrest which are standard practice. SPD officers recovered weapons in 322 stops with the finding of a weapon in 2020 did *not* involve a documented frisk, meaning SPD almost never found a weapon through a search incident to arrest without a prior frisk. This strikes the Monitoring Team as potentially a low rate of weapon recovery due to searches incident to arrest in comparison to frisks. A Monitoring Team review of SPD stops documentation demonstrated potential examples of searches incident to arrest being documented as frisks, and the topic bears further analysis.

Moreover, as Figure 42 below demonstrates, SPD's data over time demonstrate a clear difference in data collection in this regard coinciding with the implementation of its records management system in the middle of 2019, going from an average of 79% of stops resulting in a found weapon also involving a frisk before implementation of the new system to 99% after implementation. This calls into question whether documented frisks in the new system may include searches incident to arrest, or other searches, clouding analysis of frisks and frisk rates. The jump below also coincided with increases in documented frisk rates.

129

**Figure 42. Percentage of Stops Leading to the Finding of a Weapon Where a Frisk Was Documented**



*Source: SPD Open Data*

Since SPD records do not distinguish whether a frisk specifically leads to the recovery of the weapon and it is possible some frisks were in fact not frisks, the Monitoring Team cannot calculate a precise frisk hit rate, which assesses the percentage of time a frisk for a weapon in fact recovers a weapon. For example, if an officer conducts a stop, does not find a weapon after conducting a frisk, but subsequently finds a weapon through a search incident to arrest, such a frisk would not be a "hit" in reality but would be in SPD's data, which would simply indicate that a frisk occurred and a weapon was obtained, regardless of which search obtained it. While this situation may be relatively rare, it bears mentioning before analyzing the following frisk hit rate calculations.

With this context in mind, Table 19 shows the number of frisks and the number of weapons found in stops with frisks from 2018-2020, followed by the corresponding frisk hit rates by race in Figure 43.

**Table 19. Weapons Found in Stops with Frisks, 2018-2020**

| Race | No Weapon Found | Weapon Found | Total Frisks |
|---|---|---|---|
| Asian | 167 | 43 | 210 |
| Black | 1,450 | 347 | 1,797 |
| Hispanic | 128 | 25 | 153 |
| Native American | 114 | 25 | 139 |
| White | 1,647 | 666 | 2,313 |
| Other | 61 | 6 | 67 |
| Unknown | 541 | 153 | 694 |
| **Total** | **4,108** | **1,265** | **5,373** |

*Source: SPD Open Data*

**From 2018 to 2020, the rate at which SPD officers found weapons in a stop with a frisk was higher for stops of White individuals than any other racial group – and 10 percentage points higher than frisks of Black individuals.** These findings largely mirror the Monitoring Team's previous findings in this area from a 2017 report.[207]

**Figure 43. Frisk Hit Rate by Race, 2018-2020**



*Source: SPD Open Data. See previous disclaimer regarding precision of frisk hit rate calculations.*

The overall frisk hit rate was steady around 20% for 2015-2018 before increasing to 23% in 2019 and then 30% in 2020. This increase, once again, coincides with the implementation of SPD's new records management system. SPD's frisk hit rate averaged 20% prior to implementation in mid 2019 and then averaged 29% post implementation. Clearly, new data capture mechanisms

---

[207] Tenth Systemic Assessment at 76.

impacted this rate and distinguishing the role of officer performance in the frisk rate increase would require further analysis on officer documentation and performance before and after implementation of the new records system.

**Figure 44. Frisk Hit Rate Over Time, 2015-2020**



*Source: SPD Open Data. See previous disclaimers regarding precision of frisk hit rate calculations and the impact of the new data collection system on this rate.*

The following chart presents the frisk hit by race over time. Due to the lower aggregate frisk amounts for non-Black minorities, these racial categories are grouped into the "Other" category for the purposes of frisk hit rate percentages in the following chart. Between 2015 and 2020, frisk hit rates for "Other" races increased 10 percentage points from 19% to 29%, hit rates for Black subjects increased 9 percentage points from 15% to 24%, and White hit rates increased 8 percentage points from 26% to 34%. While frisk hit rates for these racial categories all increased at least 8 percentage points from 2015 to 2020, this may largely be attributable to the implementation of the new records management system and new data collection processes, as previously discussed. **Despite these increases in hit rates across races, Black hit rates were still 10% lower than White hit rates in 2020.** The Monitoring Team recommends that SPD engage with its community partners to evaluate these trends in disparities to identify potential opportunities to reduce disparities, as SPD previously has, which is discussed later in this report.

Ultimately, the various statistics presented here and in preceding sections help identify that **SPD frisks of White subjects more consistently find weapons, even as a higher percentage of Black subjects are frisked (27%) than White subjects (20%) between 2018 and 2020.** These findings largely mirror the Monitoring Team's previous findings in this area from a 2017 report.[208]

---

[208] Tenth Systemic Assessment at 76.

**Figure 45. Frisk Hit Rate by Race Over Time, 2015-2020**



| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|
| Black | 15% | 16% | 15% | 16% | 19% | 24% |
| White | 26% | 23% | 27% | 25% | 28% | 34% |
| Other | 19% | 22% | 15% | 16% | 13% | 29% |

*Source: SPD Open Data. See previous disclaimers regarding precision of frisk hit rate calculations and the impact of the new data collection system on these rates.*

### 5. Disparate Impact

Building on the preceding analysis of demographic trends in SPD stop practices over time, this section summarizes, at a high level, SPD's progression in assessing and working toward addressing unwarranted disparities – and the important work to come for SPD, the City, and community partners. This sections details:

1. Consent Decree background on bias-free policing and the previous Monitoring Team's findings related to disparities;
2. SPD's analytical growth which allows SPD to analyze disparities with greater insights and meaning than simple, population-based comparisons can provide;
3. SPD's findings on disparity using these sophisticated analytics, which largely matched previous monitor findings on disparity; and
4. SPD's previous engagement with the community to assess and address unwarranted disparities – and SPD's community-oriented, collaborative policy framework for moving forward toward addressing unwarranted disparities.

The sections that follow detail this evolution and the important work to come between SPD and the community it serves.

i.    *Consent Decree Background & Monitor Findings*

The Department of Justice's did "not reach a finding of discriminatory policing," but it nonetheless "raise[d] serious concerns about practices that could have a disparate impact on minority communities." [209] DOJ found that "SPD officers may stop a disproportionate number of people of color where no offense or other police incident occurred."[210] "[P]erhaps the most important" deficiency to DOJ was that SPD "fail[ed] to collect and analyze data that could address and respond to the perception that some of its officers engage in discriminatory policing."[211]

In response to these concerns, the Consent Decree mandated new policy, training, and accountability mechanisms pertaining to bias. Through the Consent Decree policy approval process, SPD adopted a bias-free policing policy that requires SPD to analyze and meaningfully address disparities in its enforcement activities – such that, as noted previously, disparities "can be one indicator as to whether a Department needs to look further to determine if the data can be explained or if it is a reflection of discriminatory policing."[212]

The prior Monitoring Team previously summarized the Consent Decree's purview with disparities as well as a community-oriented path forward in addressing disparities:

> Sorting out whether disparity on the basis of suspect classifications, like race, is the result of intentional discrimination, the result of unknowing or subconscious bias, or is the effect of one or many factors having nothing to do with race or that are tangled up with race is challenging. When there are reasonable and legitimate reasons for a practice that produces disparities with respect to whom the practice is applied, the courts have been historically reluctant to invalidate government actions as discriminatory and impermissible.

> Consequently, neither the Consent Decree nor the Court-approved policies on stops and bias-free policing demand that SPD immediately stop practices that it may determine are linked to disparate impacts. Instead, and importantly, [SPD policy] requires that SPD determine whether such disparities are warranted or unwarranted and, where "unwarranted disparate impacts are identified" with respect to a given SPD practice or policy, "the Department will consult as appropriate with neighborhood, business and community groups, including the Community Police Commission, to explore equally effective alternative practices that would not result in disproportionate impact."[213]

---

[209] 2011 Findings Letter at 6.
[210] 2011 Findings Letter at 6.
[211] 2011 Findings Letter at 6.
[212] 2011 Findings Letter at 30.
[213] Tenth Systemic Assessment at 40-41.

It elaborated further about the need for collaboration between SPD and the community to address disparities:

> This does not mean that the identification of disparate impacts in this report, through SPD's own analysis, or by other community organizations is not important. It certainly is. It means that, if Seattle is going to resolve unwarranted disparities in its policing, it is up to the Seattle community, SPD, the Department's formal oversight mechanisms, elected officials, and community watchdogs to identify meaningful disparities, explore their causes, and determine if SPD could carry out safe, effective, and constitutional policing while eliminating or reducing the disproportionality. Simply because some disparities might not establish violations of the Constitutional, state, or federal law does not mean that they cannot, or should not, be addressed through these local political mechanisms. This approach ensures that Seattle can work out specific solutions informed substantially by the experiences and values of all of the city's diverse communities.[214]

The Court's prior finding that Seattle was in "full and effective compliance" with the Consent Decree pertaining to the areas of stops and detentions and bias-free policing therefore occurred within the context of data revealing long-term, aggregate disparities across some enforcement activities that SPD and the Seattle community continued to confront – with SPD's bias-free policing policy providing a collaborative framework for moving forward. In turn, while SPD achieved compliance with the baseline requirements of the Consent Decree, SPD must continue the important work of assessing and addressing unwarranted disparities in partnership with the community.

### ii.   *Capacity to Assess Disparities*

The Monitoring Team previously reported that SPD officers consistently articulated reasonable suspicion for individual stops and frisks.  However, there were also racial disparities in the people affected by SPD's post-stop practices. SPD summarized the prior Monitor's findings in its own follow-up disparity analysis:

> The Monitor found as part of this qualitative assessment that the clear majority of stops and frisks (99 and 97 percent respectively) were justified on Constitutional and policy grounds. However, the Monitor also identified using Propensity Score Matching substantial racial disparities, including the findings that (1) some differences were observed in frisk rates; (2) black and Hispanic subjects were frisked more often than white subjects; (3) weapons were more likely to be recovered from white subjects than black or Asian

---

[214] Tenth Systemic Assessment at 40-41.

subjects; and (4) black and Asian subjects were more likely to be arrested subsequent or pursuant to a stop.[215]

While this kind of robust statistical assessment was beyond the reach of SPD at the onset of the Consent Decree due to limited data availability and analytical capacity, SPD now has built the data infrastructure and analytical capacity to conduct rigorous analysis on an ongoing basis to support evidence-based management practices. SPD describes its maturation in this regard:

> As SPD's data collection and governance processes over the life of the Consent Decree have become increasingly robust, SPD, often in partnership with academic and professional research organizations, has been able to leverage its data to perform increasingly sophisticated analyses with respect to many of the most legally and circumstantially complex areas of police-community interactions. Of particular focus over the past six years, and a topic of on-going research and debate in the social science of policing, is racial disparity across many facets of the criminal justice system, including police contacts.[216]

SPD has taken the rich foundation of disparity analyses established by the Monitoring Team and developed in-house capacity to assess disparities rigorously and sustainably.  SPD utilizes "Propensity Score Matching" (PSM), a method used in the Monitoring Team's Tenth Systemic Assessment, to assess potential disparities in SPD actions. Propensity Score Matching, as SPD explains, is an analytical method "which uses regression to 'score' how similar events are to each other across a variety of factors and match them for comparison."[217]  SPD has developed and implemented this statistical approach in partnership with leading academics and with oversight from the Office of Inspector General.

SPD offers an example of how it uses this sophisticated analytical technique: PSM "was used to match a *Terry* stop where the stopped individual was Black to a stop where the stopped individual was White, but all other known factors (available in fielded data) were as similar as possible."[218] A variety of factors can influence officer actions and outcomes, and SPD's use of PSM helps focus disparity analyses toward greater insight that can inform more precise remedies toward addressing disparities.  SPD specifies how it has implemented PSM internally in one of its disparity reports:

> SPD builds upon and extends the Monitor's application of Propensity Score Matching by (1) refining the analysis as relates to frisks and stop duration by

---

[215] Seattle Police Department's "Disparity Review – Part I: Using Propensity Score Matching to Analyze Racial Disparity in Police Data." Page 2. April 2019.

[216] Seattle Police Department's Disparity Review – Part I: Using Propensity Score Matching to Analyze Racial Disparity in Police Data, April 2019.

[217] Seattle Police Department's Disparity Review – Part II: Developing a Deeper Understanding of Disparities Identified in Part I. December 2019. Page 2-3

[218] Seattle Police Department's Disparity Review – Part II: Developing a Deeper Understanding of Disparities Identified in Part I. December 2019. Page 2-3

matching for additional factors that are available through SPD's data analytics platform but were not available to the Monitoring Team at the time of data production for the Tenth Systemic Assessment; and (2) applying Propensity Score Matching to examine the role of race in Use of Force data relating to force type (Type I or Type II) and around the pointing of a firearm (the latter being another area that is often a matter of substantial officer discretion).[219]

While SPD has focused its disparity analysis on internalizing and enhancing PSM, SPD recognizes that "quantifying *unwarranted* racial disparities in police contacts is difficult and there is no academic consensus about the best method to do so."[220]  While aggregate disparities in SPD actions compared to the Seattle population present questions and concerns, such comparisons only provide a "generalized type of analysis [that] does not tell us much about what is driving disparity"[221] since "they do not take into account that disparities in terms of race might be a natural byproduct of the police basing stops on other factors not related to race," as the previous Monitor noted.[222]  SPD's use of PSM is an advancement beyond simple population-based comparisons. PSM is rigorous approach that provides a deeper level of disparity analysis by attempting to account for a variety of factors to isolate the impacts of race.  By doing so, SPD can generate more precise insights for future action. SPD explains its basis for this approach:

> Using only the overall, aggregate data about race from the general SPD dataset does little to help resolve the issue of whether the differences in treatments are most driven by some other factor that is not purely a subject's race or are instead driven primarily by racial identity. Indeed, a central challenge of the post-stop analysis is to distinguish unlawful disparity from variation that exists because of SPD policy, random chance, or some other social or sociological factor.[223]

While PSM will not answer every question SPD or the community has regarding disparities, SPD's matured ability to conduct these analyses internally in partnership with leading academics is notable. The Monitoring Team has engaged with law enforcement agencies across the country, and SPD's analytical capacity in this regard is extremely rare, if not unmatched nationally. **Few, if any, law enforcement agencies in the United States have built or maintain the internal capacity to produce ongoing disparity analyses at this level of rigor and sophistication.  These analyses can provide a vital foundation for continued collaboration with the community toward substantive actions on unwarranted disparities.**  Whereas SPD lacked the ability to

---

[219] Seattle Police Department, *Disparity Review – Part I: Using Propensity Score Matching to Analyze Racial Disparity in Police Data* 3 (Apr. 2019).
[220] Seattle Police Department, *Disparity Review – Part I: Using Propensity Score Matching to Analyze Racial Disparity in Police Data* (Apr. 2019).
[221] Tenth Systemic Assessment at 3.
[222] Tenth Systemic Assessment at 9.
[223] Seattle Police Department, *Disparity Review – Part II: Developing a Deeper Understanding of Disparities Identified in Part I* 2 (Dec. 2019).

"self-assess" regarding disparities at the start of the Consent Decree, it is now a leader in policing analytics and regularly provides guidance to other police departments in this area and others.

SPD is automating these and other analytical methods to provide the organization ongoing insights into critical areas impacting SPD's pursuit of more equitable policing.  SPD will utilize live dashboards demonstrating these data for a newly launched organizational meeting focused on improving equity, accountability, and overall quality in SPD's policing.  SPD has engaged a research partner to evaluate this new approach to provide feedback on the rigor of SPD's analytics and its method of employing them toward organizational improvement.

SPD plans to offer the code for this ongoing analysis open source for other agencies interested in conducting this level of analysis.  Such analysis is far beyond the reach of most agencies, and SPD's innovation in this regard represents not just a significant step forward for SPD but also emphasizes its leadership nationally in police analytics.

Still, SPD must continually assess the quality and meaning of its data to ensure its analysis facilitates maximum comprehension and impact. For example, the aforementioned imprecision of the "field contact" outcome category hinders SPD and the public's ability to assess precisely what percentage of stops lead to no identification of a crime overall and by race. SPD must also work toward reducing the number of stops and uses of force for which the subject's race is documented as "unknown," thereby limiting potential disparity analyses in areas of vital interest to the public. These are correctable issues that SPD must address to further elevate its analytics and overall management of operations based on insightful analytics.

As SPD continually works to elevate its analytics platforms, SPD's advancements in this area will not only continue to provide SPD with robust mechanisms for improving management and outcomes but can also provide greater insights to community partners in providing feedback to SPD on potential improvements in reducing disparities.  SPD should continue to work collaboratively with the Community Police Commission and Office of the Inspector General on how to best engage with SPD's performance analytics, maximizing the benefits for SPD's operations with community feedback.

SPD has demonstrated a strong commitment to transparency with its extensive open data and dashboards on topics such as use of force, crisis intervention, and stops.  As SPD develops and implements these new processes focused on equity, SPD is exploring how to engage its community partners in these efforts moving forward.  Toward this end, the Monitoring Team recommends that SPD:

1. Make these disparity analytics publicly available and digestible where feasible, as SPD has in other areas;

2. Collaboratively develop a framework for engaging with its community partners on these new analytics and their potential impact, in line with how SPD has previously engaged CPC and the OIG in the development of previous disparity reporting; and

3. Report on a recurring basis its findings in partnership with community partners, what actions SPD plans to take to address identified issues, the status of recommendation implementation, and the impact of implemented recommendations, where known. SPD previously committed to doing so with its disparity report recommendations.[224]

SPD's analytical development over the course of the Decree is laudable, and SPD's advancing toward robust equity-focused analytics and meeting framework presents a strong foundation for continued collaboration with community partners toward improved policing outcomes for the entire Seattle community. Much work remains in this regard, as the following section details based on SPD's own findings.

### iii.   *Disparities in Stop Practices*

**SPD's robust in-house analytics now confirm post-stop disparities previously identified by the Monitoring Team, though to varying extents in some areas.** SPD produced two disparity reports in 2019 analyzing stop performance from 2016 through the middle of 2018, and their key findings are highlighted below. SPD is automating these rigorous analyses for ongoing analysis of disparities, as discussed above. The key findings of SPD's two disparity reports follow, largely using the Propensity Score Matching analyses described in the previous section. **While these findings, alone, do not implicate SPD's compliance with the bias-free policing requirements of the Consent Decree, they do highlight the need for SPD to continue collaboration with community partners in assessing and attempting to address unwarranted disparities.**

**SPD's disparity analysis found that chances of an individual being stopped and frisked increased the more the individual did not match the racial composition of the neighborhood the individual was stopped in.** SPD stated this finding "reinforces the need for the Department to evaluate the call-taking/dispatching segment of police response to mitigate bias."[225]

**SPD's disparity analysis finds that officers frisk minorities more frequently than White subjects in similar situations.** Specifically, SPD found that "non-white (including black)" individuals "were frisked approximately 18% more frequently than white subjects." [226] Further,

---

[224] Seattle Police Department, *Disparity Review – Part II: Developing a Deeper Understanding of Disparities Identified in Part I* 30 (Dec. 2019).
[225] Seattle Police Department, *Disparity Review – Part II: Developing a Deeper Understanding of Disparities Identified in Part I* 6 (Dec. 2019).
[226] Seattle Police Department, *Disparity Review – Part I: Using Propensity Score Matching to Analyze Racial Disparity in Police Data* 3 (Apr. 2019).

SPD found "the greatest disparity was found with respect to Asian subjects, who were approximately one-third more likely to be frisked than white subjects."[227]

**While officers were least likely to frisk White subjects, officers were most likely to find a weapon on White subjects after a frisk, according to SPD analysis.**[228]  SPD found that, "Although subjects perceived to be Asian were frisked nearly 34% more than white subjects, they were found with weapons 21.5% less often than white subjects in the same situations."[229]  SPD found the "largest disparity in hit rate" for "subjects perceived to be American Indian/Alaska Native, who were just 3.9% more likely to be frisked but found with weapons nearly 50% less than white subjects, all other things being equal."[230]

SPD identified disparities not just along racial demographics but also across its operational units. SPD found that "frisk, hit, and weapon recovery rates differ by precinct and beat," which "strongly calls for deeper examination of why there are not similar outcomes across the City."[231]

**SPD's disparity findings should not only focus community concern and engagement regarding SPD practices, but also inspire confidence and continued investment in SPD's ability to critically assess its performance through rigorous data analysis, learning, and policy and practice innovation**.  Clearly, SPD's growth in analytical capacity and transparency do not diminish disparity findings of great concern to the community, but this analytical advancement does provide a foundation for moving forward with evidence-based insights to work toward addressing community concerns, in stark contrast to SPD's inability to adequately "self-assess" in this area prior to the Decree.[232]

       *iv.*    *Capacity to Engage with Community Toward Solutions*

Collecting and analyzing data regarding disparities represents a necessary step forward from the important issues identified by DOJ's investigation, but collaborative action toward addressing identified unwarranted disparities is the reason for the analysis in the first place.  SPD recognizes that as it identifies disparities, "The question, therefore, becomes what factors – be they policies,

---

[227] Seattle Police Department, *Disparity Review – Part I: Using Propensity Score Matching to Analyze Racial Disparity in Police Data* 3 (Apr. 2019).
[228] Seattle Police Department, *Disparity Review – Part I: Using Propensity Score Matching to Analyze Racial Disparity in Police Data* 4 (Apr. 2019).
[229] Seattle Police Department, *Disparity Review – Part I: Using Propensity Score Matching to Analyze Racial Disparity in Police Data* 4 (Apr. 2019).
[230] Seattle Police Department, *Disparity Review – Part I: Using Propensity Score Matching to Analyze Racial Disparity in Police Data* 4 (Apr. 2019).
[231] Seattle Police Department, *Disparity Review – Part II: Developing a Deeper Understanding of Disparities Identified in Part I* 6 (Dec. 2019).
[232] 2011 Findings Letter at 30. SPD's full disparity reports are available on SPD's Blotter website.

trainings, or shared information – contribute to these disparities" – and what they can do to address the disparities effectively.[233]

SPD's bias-free policing policy, developed and implemented as a result of the Consent Decree, provides a framework for SPD to engage collaboratively with the community toward addressing disparities. This policy requires that where "unwarranted disparate impacts are identified" with respect to a given SPD practice or policy, "the Department will consult as appropriate with neighborhood, business and community groups, including the Community Police Commission, to explore equally effective alternative practices that would not result in disproportionate impact."[234] SPD explained further in its disparity analysis reporting:

> Under this policy, SPD committed to eliminating policies and practices that have an unwarranted disparate impact on certain protected classes of people. SPD recognizes that even in the absence of intentional bias, the long-term impacts of historical inequality and institutional bias can result in disproportionate enforcement activities. With that in mind, the Department is committed to identifying and eliminating unwarranted or unnecessary disproportionate enforcement while protecting public safety and public order.[235]

As part of SPD's disparity analysis process, SPD reports it "sought the City of Seattle's Community Police Commission's (CPC) partnership for their expertise in engaging community and facilitating working meetings focused on addressing issues in law enforcement." [236] As SPD describes, the purpose of these meetings was to review incidents with community members "to help the Department assess these incidents from the perspective of those experiencing the interactions, so that any institutional bias might be overcome."[237]

Through these community feedback meetings, SPD's advanced statistical analyses, and other mechanisms, SPD identified actionable recommendations that could help reduce future disparities. SPD summarized the actions it would take from this collaborative analysis process "to address the identified disparities and continue this work" as follows: [238]

1. Amplify the training and guidance around how much of a match between the description of a suspect and the appearance of the subject there must be to constitute

---

[233] Seattle Police Department, *Disparity Review – Part II: Developing a Deeper Understanding of Disparities Identified in Part I* 2 (Dec. 2019).
[234] Tenth Systemic Assessment at 40-41.
[235] Seattle Police Department, *Disparity Review – Part II: Developing a Deeper Understanding of Disparities Identified in Part I* 2–3 (Dec. 2019).
[236] Seattle Police Department, *Disparity Review – Part II: Developing a Deeper Understanding of Disparities Identified in Part I* 15 (Dec. 2019).
[237] Seattle Police Department, *Disparity Review – Part II: Developing a Deeper Understanding of Disparities Identified in Part I* 15 (Dec. 2019).
[238] Seattle Police Department, *Disparity Review – Part II: Developing a Deeper Understanding of Disparities Identified in Part I* 6–7 (Dec. 2019).

a "match" to initiate a stop, and safety frisk, if warranted (and how specifically that match must be described in order to appropriately documents a stop and/or frisk)

2. Review policies, trainings, and protocols for the pointing of firearms
3. Develop enhanced procedures and trainings for 9-1-1 call takers and 9-1-1 dispatchers to improve their ability to recognize and mitigate implicit bias
4. Address "disparity-associated" issues involving officer professionalism
5. Continue the work on identifying and responding to disparate impacts by continuing to partner with the CPC in developing and holding incident review community sessions, as was trialed during this analysis.[239]

SPD further committed "to an annual, published review of this work on analyzing and responding to disparity, including updates on implemented strategies to lower disparity and any evidence of their success." [240] SPD likewise committed to "continued community sessions to review incidents – as the Department works with the CPC and community to learn from the pilot sessions conducted during this review and continue to improve the process."[241]

**The Monitoring Team recommends that SPD re-engage CPC and the OIG in this effort to report on its progress implementing these commitments, receive feedback regarding these efforts, and renew collaborative analyses with CPC and the OIG to move forward on these critical topics.** SPD's maturation in analyzing disparity is laudable, and the Department must ensure that it translates these analyses into collaborative action toward addressing unwarranted disparities, in accordance with its bias-free policing policy.

The Seattle community is now, in many ways, better positioned than ever to analyze disparities and work collaboratively toward improved policing. SPD has processes and systems in place that allow it to acknowledge and describe disparities. The Community Police Commission, created as a result of the Consent Decree and now codified as a continuing oversight body, can provide ongoing community perspectives and recommendations to SPD regarding practices producing disparities. The Office of Inspector General can provide systemic oversight of SPD practices, including its disparity analyses, to offer performance improvement recommendations for SPD action. When a complaint of bias-based policing arises, the Office of Police Accountability will investigate the complaint under civilian leadership.

Consequently, SPD has layered systems in place for multiple levels of analysis, feedback, and accountability regarding SPD stop practices and related disparities, creating a foundation for

---

[239] Seattle Police Department, *Disparity Review – Part II: Developing a Deeper Understanding of Disparities Identified in Part I* 6–7 (Dec. 2019).
[240] Seattle Police Department, *Disparity Review – Part II: Developing a Deeper Understanding of Disparities Identified in Part I* 30 (Dec. 2019).
[241] Seattle Police Department, *Disparity Review – Part II: Developing a Deeper Understanding of Disparities Identified in Part I* 30 (Dec. 2019).

substantive collaborative action toward improved policing present in few other cities.  It is up to these collective bodies, City leadership, and the Seattle community at large to continuously engage on this and other vital topics and ensure appropriate follow-up by SPD and others toward creating a better, more equitable community.

### D. Conclusion

The Monitoring Team previously found SPD in compliance with the Consent Decree's stops and detentions requirements based on extensive analyses of SPD stop practices.  The Monitoring Team also found SPD in compliance with the policy, training, and supervisory requirements pertaining to bias-free policing, while also identifying concerning disparities in SPD practices requiring further evaluation and action. **This assessment finds that SPD has sustained compliance in this area though important, ongoing work with the community remains with regards to disparities.**

Based on an SPD review of stop practices, the quality of stops and frisks are in line with SPD's prior performance during the sustainment period – but lower than what the Monitor reported when it declared compliance in its 2017 report, though differing review teams and procedures may have contributed to this difference.  SPD should continue to audit its practices in these areas and implement measures to sustain high levels of compliance with frisk requirements. OIG should consider reviewing SPD's performance in this area, both by SPD officers and SPD auditors.

SPD's robust in-house analytics now confirm post-stop disparities previously identified by the Monitoring Team, though to varying extents in some areas.  SPD's disparity findings both produce concern regarding SPD practices and confidence in SPD's ability to critically assess its performance through rigorous analyses in collaboration with community partners.

Disparities persist, and the critical work toward more equitable policing must continue.  As the prior Monitoring Team and the Court has observed, the Decree does not require the elimination of all disparities among SPD's various enforcement activities.  At the same time, however, the Decree process has not been silent as to the import of addressing disparities, with Decree-required policies producing a necessary path forward for SPD and the community to meaningfully address specific disparities across various areas of SPD's activities and performance.

With leading disparity analytics to inform evidence-based approaches, a Police Department committed to improvement, and community oversight bodies dedicated toward ensuring the Department's improvement, Seattle now has a foundation for substantive collaborative action toward more equitable policing that is present in few other cities – and certainly not present in Seattle at the beginning of the Consent Decree.  Now, it appears that Seattle has the information, policies, tools, and systems in place to allow for the Seattle community to consider how to best

address identified disparities in the long-term. SPD has come a long way in this area, and the work toward continual improvement must be ongoing.

# Supervision

DOJ's 2011 findings letter reported that deficiencies in SPD's supervision contributed to problematic practices related to use of force, stops and detentions, and bias-free policing. While the primary focus of the resulting Consent Decree with regards to supervision was to build stronger systems of supervision in core performance areas such as use of force, stops and detentions, and bias-free policing, the Consent Decree also prescribed specific, fundamental requirements to bolster the overall effectiveness of the Department's supervision, namely through improved supervisory staffing and training and the use of an early intervention system.

Ultimately, supervisory performance in supporting consistent provision of constitutional policing services to the Seattle community is the true overarching test of the supervisory requirements detailed in the Consent Decree. The preceding sections of this report broadly detailed how supervisory performance has sustained since SPD first achieved compliance with the Consent Decree, with supervisors continuing to consistently support performance in accordance with the Consent Decree. For example, supervisors consistently demonstrate close review and feedback of use of force practices, and stop and detention practices consistently adhere to policy, with the support of effective supervision.

This section addresses the specific requirements in the supervision section of the Consent Decree, which help foster improved supervisory and departmental outcomes in various performance areas that impact the community.

## A. Staffing

The Consent Decree requires that SPD provided consistent supervision to its officers to support constitutional policing. From 2019 to 2020, SPD maintained a consistent level of front-line supervisors, with the overall number increasing slightly from 223 to 225. The percentage of front-line supervisor operating in an acting, rather than a permanent capacity, increased slightly over this period from 59 (26%) in 2019 to 63 (28%) in 2020. With the amount of overall front-line supervisors remaining stable, SPD reports that patrol officers regularly reported to consistent, clearly defined supervisors on an ongoing basis. According to SPD analysis, patrol officers worked the same days and hours as their front-line supervisors 93.9% of the time in 2019. This percentage decreased to 89.5% in 2020. **Overall, SPD's supervisory staffing over 2019 and 2020 demonstrate alignment with requirements detailed in paragraph 154 regarding assignment of consistent supervisors, who "should normally be assigned to work the same days and hours as the officers they are assigned to supervise."**

However, SPD reports that consistent supervision staffing trended negatively in 2021, with roughly 80% of patrol officers working the same days as their supervisor (sometimes referred to

as "unity of command"). SPD reports that use of overtime was frequently required to provide this level of consistent supervision.

The need for overtime for consistent staffing also applied to front-line patrol officers. SPD reports that, in 2021, augmentation (assigning officers on overtime) was required to meet minimum staffing levels in 81% of first watch shift, 96% of second watch shifts, and 97% of third watch shifts. Across all shifts, augmentation was required 364 of 365 days of the year. The Monitoring Team will continue to monitor staffing levels at both the supervisory and front-line officer level.

**Timely training for new front-line supervisors represents an area for further improvement.** SPD reports that 51% of acting sergeants received first-line supervisor training within 90 days of assuming supervisory responsibilities in 2019. This percentage increased to 70% in 2020, meaning 19% more acting sergeants received supervisory training near the beginning of their duties but 30% went more than 90 days without training tailored to their new duties. Timely training for new supervisors supports their success in properly guiding and correcting their officers providing policing services on a daily basis. SPD should work to train as many supervisors as possible before assuming supervisory duties, or shortly thereafter.

## B.  Early Intervention

The Consent Decree requires that SPD continue to use an early intervention system to help supervisors monitor officer performance across a variety of areas and intervene where necessary to support improved officer performance. SPD's current early intervention considers trends in use force, misconduct complaints, and other performance areas to assess officer performance broadly to identify officers in possible need of intervention to support improved outcomes. SPD's early intervention policy explains the purpose of the system:

> The Early Intervention System is a key element in the SPD's strategy to support employee wellness and professional growth by seeking to identify and mitigate against factors that may lead to negative performance issues, employee discipline, and/or employee or department liability. Once an SPD employee exceeds a preset threshold of risk factors described below, an Early Intervention Assessment will be conducted. An assessment may also be conducted at the discretion of a supervisor as part of his or her ongoing duties to monitor employee conduct and maintain performance standards.[242]

SPD has demonstrated continued use of its early intervention system, with supervisors conducting assessments prompted by a variety of performance trends. The EIS initiated supervisor assessments of officer performance based on trends related to use of force, vehicle

---

[242] Seattle Police Department Manual, Section 3.070, Early Intervention System (last rev. April 1, 2020) https://www.seattle.gov/police-manual/title-3---employee-welfare/3070---early-intervention-system

collisions, and complaints, or a combination of various performance statistics over the course of a 2019-2020 review period. Commanders also initiated EIS assessments proactively based on their observations of an officer's performance.

Once the EIS prompted an assessment, the officer's supervisor reviewed associated performance and recommended a course of action to remedy any identified issues, if any. This recommendation was then submitted to the chain of command for review. Assessments could lead to mentoring plans, counseling, or remedial training, amongst other options. If the assessment identified no issues requiring further action, the supervisor would recommend no action and submit this recommendation up the chain of command for approval. After the chain of command reviews the assessment, the Department's Performance Review Committee, which includes executive level leadership, reviews the assessment to provide an additional layer of quality control and management on early intervention operations outside of the officer's immediate chain of command.

Building on this foundation, the Department is working to implement a new early intervention system that advances beyond the requirements of the Consent Decree, utilizing SPD's matured analytical capabilities developed over the course of the Consent Decree and reflecting innovative thinking in the evolving field of early intervention. This new system will attempt to assess officer performance more holistically, utilizing more extensive data toward producing more nuanced and insightful prompts for supervisory assessments and interventions, where appropriate.

**SPD's drive to innovate in the early intervention space is commendable and a demonstration of one of the Consent Decree's overarching goals: to develop an agency that is continually seeking opportunities to improve its operations and services to the community.** SPD members leading the effort to implement this new system published a journal article regarding these efforts to promote officer wellness and improved performance through innovative early intervention practices, and SPD looks to help lead policing into a more advanced era of early intervention with its new system.

### C.  Conclusion

Overall, SPD has generally continued its performance with regards to the specific supervision requirements in the Consent Decree. The Monitoring Team reiterates that the Department should work toward training new supervisors in a more timely manner to facilitate effective supervision in practice. While the specific requirements in the supervision section of the Consent Decree provide an important foundation for effective supervision practices, the Consent Decree's true test for supervision is in the quality of the implementation of reforms related to use of force, crisis intervention, and stops and detentions in practice. As is discussed throughout this report, SPD has largely sustained or improved its performance in these areas, with the support of more

effective supervision practices. **As a result of SPD's sustained performance overall with regards to supervision, the Monitoring Team finds that SPD has sustained compliance in this area.** Moving forward, it will be important for the City and SPD to ensure appropriate supervisory staffing and training to support sustained and further improving performance of the Department. Given recent negative trends in supervisory staffing and the critical role of quality supervision in achieving – and sustaining – the goals of the Consent Decree, the Monitoring Team will continue to monitor this situation and related impacts.

## Conclusion to the Assessment Report

**Overall, this assessment finds that SPD has generally sustained its compliance with Consent Decree requirements outside of notable issues with the 2020 protest response. SPD's sustained compliance is a commendable achievement that has resulted in improved policing outcomes for the public, from a reduction in use of force to consistently constitutional stops and detentions.** SPD's significant Consent Decree reforms provide a higher baseline for future policing operations, and the City should continue to push forward toward enhanced public safety services.

Still, even with these reforms, policing problems will continue to arise, as the events of 2020 made clear. But now, through the Consent Decree and other actions by the City to build systems of accountability, the City has systems in place to assess police operations and make recommendations for accountability and future improvements. The City must support those systems to ensure sustained and improved public safety performance and oversight. With continued support, the City's overlapping accountability systems and the Seattle community are poised to direct the future of its public safety moving forward.

The Monitoring Team looks forward to observing the implementation of the 2022 monitoring plan, which sets out specific steps for moving forward with the Consent Decree, as the City and SPD work toward the conclusion of the Consent Decree and full City oversight and direction of Seattle's public safety future.



**Seattle Police Monitor**

www.seattlepolicemonitor.org