THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) Case No. 2:12-cv-01282-JLR |
| v. | ) **CITY OF SEATTLE'S AUGUST 2022 QUARTERLY ACCOUNTABILITY UPDATE** |
| CITY OF SEATTLE, | ) |
| Defendant. | ) |

The Court-approved "Monitoring Plan," Dkt. 655-1 and the proposed 2022 Monitoring Plan, include a commitment to provide quarterly reports on the City's progress. This report includes updates regarding (I) ongoing work under the Monitoring Plan, and (II) quarterly, quantitative data from the Seattle Police Department (SPD) regarding the use of force and the Office of Police Accountability (OPA) regarding police discipline and appeals.

**I.  SPD Continues to fulfill its obligations to the task items in the Monitoring Plain.**

The Monitoring Plan includes a variety of discrete tasks, ongoing projects, and other activities

**CITY OF SEATTLE'SAUGUST 2022 QUARTERLY ACCOUNTABILITY UPDATE** - 1
(12-CV-01282-JLR)

Ann Davison
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

to include in the City's quarterly reports. The following updates reflect SPD's ongoing commitment to fulfilling its obligations under the consent decree and the monitoring plan.

    A.    *The City's "Re-Imagining Public Safety" program is being developed to meet measurable improvement and efficiency goals.*

The City is committed to designing diversified 911 responses which recognize that not all calls for service require a sworn officer. Indeed, the City believes that certain call types may benefit from a diversified response. The ongoing shortage of police officers is another reason for a robust diversified 911 response system. The City is focused on developing diversified 911 response options that are cost effective, scalable, and contribute to overall improvements in public safety services.

It will, however, take time for the City to launch a fully operational diversified response system for calls currently routed to SPD. Various initiatives related to this have been proposed over the last two years, but a systematic, rigorous, and holistic approach to this work has been lacking. The City is undertaking efforts to develop and deploy a comprehensive system.. In the short term, the City will explore and execute potential pilot programs for diversified 911 response systems, as well as evaluate whether existing resources can be redeployed or more efficiently deployed on staffing projects like Special Events to increase SPD or alternative response to priority three and four calls in the near term, without engaging in costly expenditures in the face of a prospective budget deficit.

The City's work in this area is guided by the following questions:

1. What types of 911 and non-emergency calls should be assigned to a diversified response?
2. What are the most cost-effective and scalable solutions to respond to these calls?
3. To what extent does Seattle need to acquire or reallocate existing resources to deploy a diversified response system?

**CITY OF SEATTLE'SAUGUST 2022 QUARTERLY ACCOUNTABILITY UPDATE** - 2
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

4. What changes to operational and IT systems need to happen to facilitate a diversified response dispatch system?
5. Where should diversified response functions be situated/located?
6. To what extent will a diversified response system free up police officers for higher priority calls?

These questions will be answered using a multi-step approach. First, SPD is in the process of completing a sophisticated and innovative analysis of the risk of 911 calls. As discussed more in section I(B)(2) below, this builds on the National Institute of Justice's report ("NICJR report") on SPD call types. This analysis - Risk-Management Demand (RMD) - is being conducted by SPD's research scientists under the oversight of researchers from the Institute of Criminology at the University of Cambridge. SPD is nearing completion of this analysis.

The RMD analysis is complementary, not duplicative, of the NICJR report. The report was extremely valuable as a starting point for a call shifting analysis; however, in reaching its conclusions, the report analyzed calls based on their conclusions, not the initial facts that a 911 call taker would have interpreted and inputted. Focusing on the final call type and the result of the call, the report made recommendations on low-risk calls that could be transitioned to a diversified response. However, the report does not include analysis based on additional context that, at the moment of dispatch, a 911 call taker would not know. To the contrary, during the evaluation period, it was determined that a high percentage of calls resolved differently than how they came in. This disparity presents a level of uncertainty that must be quantified to inform the appropriate response to each call type and to determine what amount of risk is acceptable to the City and providers who may be responding to these calls. Ultimately, SPD and the Mayor's Office seek to use the RMD as confirmatory evidence for determining what call types are good candidates for a diversified response. Per the results of the RMD analysis, SPD anticipates it will

CITY OF SEATTLE'S AUGUST 2022 QUARTERLY
ACCOUNTABILITY UPDATE - 3
(12-CV-01282-JLR)

Ann Davison
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

be able to place calls into a risk matrix that accounts for both the likelihood and the consequence of various call type outcomes.

Simultaneous to the comprehensive review work, the workgroup convened by the Mayor's Office, including the City Council, SPD, the Community Safety and Communications Center (CSCC), and the Seattle Fire Department, will recommend approaches that increase SPD or alternative response to priority three and four calls in the near term, through an alternative response pilot and evaluation of existing resource that could be redeployed or more efficiently deployed on projects like Special Events.  After this review is completed, the Mayor's Office will put forth a preliminary recommendation on the subset of calls that may be good candidates to divert from police. The recommendation will also identify calls that may warrant a co-response along with calls that will continue to dispatch police as a first response. The Mayor's Office anticipates that this process will be completed in the fall of 2022.

After completion of the recommended modifications to call dispatch options, the Mayor's Office will begin to explore the feasibility of different responses and begin preparing for expected labor negotiations. To do so, the Mayor's Office will set up a workgroup – which will include the City Council and other stakeholders – to evaluate different models and to help envision and craft Seattle's diversified response system. The result of this workgroup will be a white paper that will set forth the executive's proposal for a comprehensive diversified response system, including an evaluation of personnel and staffing requirements. This white paper will be completed by the end of 2022.

CITY OF SEATTLE'SAUGUST 2022 QUARTERLY ACCOUNTABILITY UPDATE - 4
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

B. *The City continues to implement initiatives within the Innovation and Risk Management areas*

    1. <u>Officer Accountability and Trust Hub (OATH) (Next generation EIS).</u>

The Officer Accountability and Trust Hub (OATH) is the SPD's response to deficiencies identified in the current, threshold based, Early Intervention System (EIS). A 2017 study of the current EIS found a general lack of precision, as well as a high false positive rate of alerts penalizing highly productive and female officers. Since, SPD has produced a Machine Learning based EIS, leveraging the breadth of data and data processing available from the Data Analytics Platform (DAP). The prototype, built in collaboration with Accenture under a public/private partnership to explore the viability of such a solution, was able to identify an officer forecast to receive a complaint at a level of precision greater than 60%[1] and scoped requirements for engineering infrastructure necessary to process data on a routine basis.

Beginning in the spring of 2021, the SPD undertook an effort to upgrade the data processing infrastructure underlying the DAP. DAP 2.0 will be "System Ready"[2] in the first week of August, 2022, with "Go Live"[3] projected before the end of the third quarter, 2022.[4] OATH integration is fully funded and contracted. Under this project, the OATH data models are configured to run on DAP 2.0 data, considering nearly 400 individual data elements in the forecast of officer adverse events (e.g., sustained complaints). These insights are deconstructed

---

[1] Findings from that prototype effort identified a precision rate for the threshold-based system, currently in operation, around 25%.

[2] All engineering infrastructure, data sources and processes are operational but not in use.

[3] All production data and analytical resources are based on DAP 2.0 data.

[4] In addition to reengineering the DAP structures and processes to ingest and render data for processing and analysis, Go Live requires reconstruction of data sources and analytical products in Tableau Server. In December of 2021, the Department purchased new internal and external facing Tableau Servers to support enhanced capacity needs and *high availability* public data assets (dashboards and data sources for public access). Those assets will be fully system ready at the end of July, 2022 and can then be configured to accept upgraded data from DAP 2.0.

**CITY OF SEATTLE'S AUGUST 2022 QUARTERLY ACCOUNTABILITY UPDATE** - 5
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

using a technique called "explainability" and packaged for supervisors as guidance on supportive interventions. These supportive interventions are being developed in collaboration with the focused deterrence subject matter experts at the National Network for Safe Communities (NNSC)[5] at John Jay College and are being designed to identify and address behaviors potentially leading to the receipt of a sustained complaint.

OATH is scheduled and on track to be in production and rendering predictions by the end of 2022. It will be run in parallel with the existing system for a period of six months. After this evaluation period, the rate of true and false positive and negatives will be compared and the City may choose to implement the new system, assuming no objection from the parties. The OATH models and code used to render predictions is built on open-source software and will be made available, free of charge, in a public facing repository.

2. Risk Managed Demand (RMD)

Following the events of the Summer of 2020, and an emphasis on efforts to *reimagine policing*, the SPD completed several progressively more robust analyses to determine which of the approximately 300 discrete call types currently responded to by officers can be handled by alternative or co-responders, and how to do so—safely. The NICJR report established a rough estimate of the opportunity for differential police response. Recently, the RMD project has entered a prototype data phase to further refine those estimates through a risk management approach common to commercial aviation.

Under the developing approach, the likelihood of a severe outcome (death, serious injury, injury requiring treatment or other *harm*) is used to classify four tiers of response. These tiers are

---

[5] Home - National Network for Safe Communities (NNSC) (nnscommunities.org)

**CITY OF SEATTLE'S AUGUST 2022 QUARTERLY ACCOUNTABILITY UPDATE** - 6
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

designed to mitigate or eliminate the risk of direct and/or indirect harm associated with the service being requested (e.g., a burglary report, a person in crisis) and the collateral harm potential of an armed response. As noted above, this data analysis is nearing completion.[6] SPD has funded and contracted work, to operationalize the concept utilizing natural language processing. Currently, in collaboration with the Community Safety Communication Center (CSCC), the Department is exploring several vendors capable of rendering call triage *on the fly*, while simultaneously constructing base statistical models for the identification of risk, latent in the nearly 41,000 permutations of service rendered by the operation.

C.   SPD continues to refine and implement the Equity, Accountability and Quality (EAQ) system.

Equity, Accountability & Quality (EAQ) is a novel accountability meeting format (e.g., CompStat) and we believe the first of its kind in the United States to use measures, other than the crime rate, to manage police service. As the name suggests, three areas of analytical focus (e.g., equity, accountability, quality) establish a focus for monthly meetings of Department leadership. Utilizing analytical processes established to demonstrate compliance with and sustainment of Consent Decree priorities or through SPD's research program (a subordinate program to the Performance Analytics & Research group, which also manages data warehousing and data governance), measures of disparity in decision to search (i.e., differential perceptions of dangerousness), over and under policing of neighborhoods (geostatistical analysis of Automated Vehicle Locator Data) and the qualities of interactions between police and the community

---

[6] Sufficient to establish estimates of staffing for each response tier.

CITY OF SEATTLE'S AUGUST 2022 QUARTERLY ACCOUNTABILITY UPDATE - 7
(12-CV-01282-JLR)

Ann Davison
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

(analyzed utilizing machine learning of bodyworn video) are used to focus strategic engagement around procedural justice.

EAQ entered an integration phase in advance of DAP 2.0 go live (a dependency), in December 2021. During this time, analytical products were tested with leadership, the format of the meeting was developed and a third-party quality assurance contractor[7] was engaged to confirm and consult on the methods employed. The project is currently on pause until DAP 2.0 can integrate the analytical processing code for Equity and Accountability metrics (work currently in progress). The Quality component of the project is pending successful *model fit* validation of the Truleo platform but is scheduled to come online before the end of the year.

D.      *SPD has completed deployment of the ABLE/Peer Intervention Training.*

SPD has completed a nationally recognized, peer-intervention training program for law enforcement officers created by Georgetown University Law Center, the Active Bystandership for Law Enforcement (ABLE) Project. The goals of the ABLE Project are to "create a police culture in which officers routinely intervene as necessary to: prevent misconduct, avoid police mistakes, and promote officer health and wellness."[1] All eligible sworn personnel have completed this training.  Principles of this training will be sustained through implementation into ongoing in-service training and SPD's new Before the Badge training for recruits.

In the Monitor's Semi-Annual Report, dated August 3, 2021 (Dkt. # 680), SPD identified several core projects related to risk management, including the Before the Badge training program for recruit and lateral police and community service officers, next-generation early

---

[7] Research Triangle Institute (RTI) International was engaged to vet the methods and provide guidance on the deployment of EAQ. A final report and a manuscript for peer review are in draft. Publication is forthcoming, before the end of the third quarter, 2022.

**CITY OF SEATTLE'S AUGUST 2022 QUARTERLY ACCOUNTABILITY UPDATE** - 8
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

intervention system, and the Equity, Accountability, and Quality Program (EAQ).  SPD is pleased to have now completed two, and begun a third, inaugural sessions of the Before the Badge (BTB) program, a 45-day pre-academy training for new recruits, community service officers, and lateral officers, that pulls recruits out of traditional classroom training and immerses them in community-based, peer-based, and introspective experiences that will provide them both a lens through which to receive their Basic Law Enforcement Academy training and, reinforced through post-academy field training, a foundation upon which to build their careers as Seattle Police Officers.  Structured to allow for a one-week particularized focus on each of Seattle's geographic precincts, programming falls into three general "buckets" of learning: community centered dialogue and learning (relational policing), outward mindset and engagement, and officer wellness and development.   The sessions to date have included training and facilitation by inhouse subject matter experts and contracted psychology professionals, criminal justice academics, and leadership experts, focusing on topics that include:

- Principles of neuroscience and impact of complex trauma, childhood experiences (Adverse Childhood Experience Scores), elevated anxiety, the intersection of trauma responsive practices and diversity, equity and inclusion;

- Collaboration with Seattle University that leverages research into community perceptions of crime and public safety in Seattle to facilitate micro-community meetings, during which cohorts have an opportunity to listen to community members and share their reasons for joining for SPD;

- "Outward Mindset" training, a philosophical learning method that organizations can use to meet goals and objectives by focusing on individuals' humanity, using self-awareness, mindset, accountability, and collaboration tools. The first and second cohorts successfully demonstrated the use of the Outward Mindset strategies during their interactions with the community throughout the program.

- Engagement with BIPOC communities (Black, LatinX, East African, Middle Eastern, Filipino) in transparent dialogue to educate officer recruits on their community histories and the history of policing within those communities; and

**CITY OF SEATTLE'S AUGUST 2022 QUARTERLY ACCOUNTABILITY UPDATE** - 9
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

- Wellness training around mindfulness, resilience, and physical fitness.

In addition, BTB is augmented with several programs to enhance cohort participants' understanding of Relational Policing, including dialogues with formerly incarcerated individuals, gender responsiveness, LGTBQ perspectives, and the City's Race and Social Justice Initiative. Included in this training is viewing and training around the film "Who We Are: A Chronicle of Racism in America (2021)," documenting the history of policing in Black communities in the U.S.

Feedback from participants in the program has been overwhelmingly positive (see Exh. A, which includes screenshots of feedback and ratings received from Cohort 1). Examples of comments received include:

- BTB has given me the chance to look at SPD/policing in a different way, I feel more confident in myself to enter law enforcement, being able to serve people/community/family and myself better day to day.

- I am glad that I attended the Before the Badge training. SPD is a department that truly cares about its employees and their mission to build trust with the greater Seattle community through relational policing and community engagement, is one that embodies both excellence and integrity.

E. *SPD has responded to Sentinel Event Review recommendations*

SPD continues to participate in the Sentinel Event Reviews and has timely responded to each of the reports issued so far. Copies of SPD response to Wave 1 and Wave 2 are attached as Exhibit B.

CITY OF SEATTLE'S AUGUST 2022 QUARTERLY ACCOUNTABILITY UPDATE - 10
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

**II.      SPD's Quantitative reporting reflects sustained compliance with the Consent Decree.**

*A.     SPD quarterly data for January 1, 2022, through June 30, 2022, demonstrates stability with respect to use-of-force and crisis-intervention outcomes.*

The Monitoring Plan requires SPD to provide quarterly data and analysis "to facilitate oversight and long-term trend analysis." *2021 Monitoring Plan* (Dkt. 655-1) at 3, line 13. One important metric that has been tracked throughout the Consent Decree is the amount of serious force[8] used by SPD officers. When comparing results with findings from previous reporting periods, the numbers generally show stability in the number of incidents involving a serious use of force *See* Table 1.

Table 1. Incidents involving a serious use of force

| Time Period | Incidents Involving a Serious Use of Force |
|---|---|
| DOJ's 2011 Investigation January 2009 - April 2011 | 1,230 |
| July 2014 - October 2016 | 487 |
| January 2017 - April 2019 | 454 |
| May 2019 - August 2021 | 857 (associated with demonstrations) 737 (excluding demonstrations) |
| July 2021 – June 2022[9] | 225 (excluding demonstrations) |

---

[8] Serious force includes all Type II and Type III uses of force. Type II force is defined as "[f]orce that causes or is reasonably expected to cause physical injury greater than transitory pain but less than great or substantial bodily harm. Type III force is defined as "[f]orce that causes or may be reasonably expected to cause substantial bodily injury." *See* Seattle Police Manual § 8.050, available at https://www.seattle.gov/police-manual/title-8---use-of-force/8050---use-of-force-definitions

[9] Because prior quarterly reporting included data through August 2021, the reporting periods are not aligned with a quarterly division of the year. As a result, the third quarter of July through September, is counted in both the fourth and fifth row. Consequently, the number of incidents involving a serious use of force is lower than reported.

**CITY OF SEATTLE'S AUGUST 2022 QUARTERLY ACCOUNTABILITY UPDATE** - 11
(12-CV-01282-JLR)

Ann Davison
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

Below the City provides SPD's serious force data from the past 2.5 years, broken out by type of force. *See* Table 2.

Table 2. Incidents involving serious (Type II or III) uses of force

| | 2020 | | | | | 2021 | | | | | 2022 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Year Total | Q1 | Q2 | Q3 | Q4 | Year Total | Q1 | Q2 | Year Total |
| Type II Force | 106 | 79 | 61 | 58 | 304 | 70 | 60 | 58 | 56 | 244 | 65 | 22 | 87 |
| Type III Force | 2 | 1 | 1 | 3 | 7 | 1 | 2 | | 4 | 7 | 3 | 3 | 6 |
| Type III - OIS | 3 | 1 | | 1 | 5 | 8 | 1 | 3 | 1 | 13 | 8 | 2 | 10 |

When excluding the force used during the 2020 demonstrations, the overall numbers have remained relatively stable compared to previous years.

Table 3. Total number of uses of force[10]

| | 2020 | | | | 2021 | | | | 2022 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q4 | Year Total | Q1 | Q2 | Q4 | Year Total | Q1 | Q2 | Year Total |
| Type I Force | 303 | 216 | 138 | 657 | 239 | 223 | 179 | 641 | 206 | 173 | 379 |
| Type II Force | 106 | 79 | 58 | 243 | 70 | 60 | 56 | 186 | 65 | 22 | 87 |
| Type III Force | 2 | 1 | 3 | 6 | 1 | 2 | 4 | 7 | 3 | 3 | 6 |
| Type III - OIS | 3 | 1 | 1 | 5 | 8 | 1 | 1 | 10 | 8 | 2 | 10 |
| Total | 414 | 297 | 200 | 911 | 318 | 286 | 240 | 844 | 282 | 200 | 482 |

In addition to amount of force, the Monitor and the parties also have considered the rate of force used by SPD. That is, how frequently do interactions between police officers and members of the public result in a use of force? One method that the Monitor and SPD have used to estimate this rate is taking the number of reported uses of force and dividing it by the number of "dispatches" (i.e., the number of events to which officers were either dispatched or which they on-viewed in the field). *Monitor's Ninth Systemic Assessment* (Dkt. 383) at 30 (reporting that SPD used force in 0.3% of all incidents, while noting this figure is approximate). When SPD last reported the rate of force to the Court, it was less than one-fifth of one percent (0.15%) of all

---

[10] Excludes force used during demonstrations.

**CITY OF SEATTLE'S AUGUST 2022 QUARTERLY ACCOUNTABILITY UPDATE** - 12
(12-CV-01282-JLR)

Ann Davison
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

officer dispatches for calendar year 2019. *SPD's Use of Force Rept.* (Dkt. 605-1) at 2. This rate shows that, overall, the use of force by Seattle police officers has become an empirically rare occurrence. *See id.* Once again, *excluding the force used during demonstrations*, quarterly data from the past two and a half years demonstrates sustainment. *See* Table 4.

Table 4. Total number of uses of force divided by number of dispatches, *excluding force used during demonstrations*

| 2020 | | | | 2021 | | | | 2022 | |
|---|---|---|---|---|---|---|---|---|---|
| Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 |
| 0.20% | 0.15% | 0.14% | 0.12% | 0.19% | 0.15% | 0.12% | 0.13% | 0.16% | 0.11% |

The excessive use of force against individuals experiencing behavioral crisis was a critical finding in DOJ's 2011 investigation. *DOJ Findings Letter* (Dkt. 1-1) at 4. During Phase I, the Monitor evaluated SPD's compliance with Consent Decree mandated crisis intervention practices and found that SPD had met the requirements in this area. *Monitor's Fifth Assessment* (Dkt. 272) at 1. The Monitor concluded that "SPD has, in a relatively brief amount of time, created a full-fledged crisis intervention program that is successfully being woven into the SPD organization." *Id.* at 4.

Due to these training and programmatic changes, the use of force in crisis incidents has become infrequent. The Monitor reported in 2016 that this rate had fallen to less than 2 percent and observed, "[t]hese numbers suggest that the SPD is using significant and appropriate restraint in difficult situations, making decisions that preserve safety and reduce use of force." *Monitor's Fifth Assessment* (Dkt. 272) at 11-12. When the City last reported on this metric to the Court, for the 18-month period from Jan 1, 2018, to June 30, 2019, reportable force was used in only two percent of crisis contacts. *SPD's Crisis Intervention Rept.* (Dkt. 588-3) at 27. Over the past two and a half years, this rate has remained consistently low, fluctuating between 1.7 and 3.72 percent. *See* Table 5 (note

CITY OF SEATTLE'S AUGUST 2022 QUARTERLY ACCOUNTABILITY UPDATE - 13
(12-CV-01282-JLR)

Ann Davison
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

that data in Table 5 *includes* force used during the demonstrations).

Table 5. Percentage of crisis contacts in which reportable force occurred.

| | 2019 | | | | | 2020 | | | | | 2021 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Q1 | Q2 | Q3 | Q4 | Total | Q1 | Q2 | Q3 | Q4 | Total | Q1 | Q2 |
| 3.88% | 2.58% | 2.66% | 4.16% | 3.32% | 3.49% | 3.18% | 2.41% | 2.52% | 2.90% | 3.44% | 2.79% |

    B.    *Quarterly data on police disciplinary investigations and appeals.*

Under the Court-approved Monitoring Plan, the City committed to submit data to the Court regarding disciplinary investigations and appeals. When it receives a complaint alleging that one or more officers have committed a serious policy violation, OPA opens a new investigation. The police union contracts require that OPA must complete its investigations within 180 days, with some exceptions. Between October 1, 2021, and December 31, 2021, OPA opened 114 new investigations. Between December 1, 2022, and March 31, 2022, OPA opened 102 new investigations. Between April 1, 2022, and June 30, 2022, OPA opened 131 new investigations. As of July 21, 2022, OPA had a total of 240 open investigations. These data are consistent with prior quarterly reports.

OPA completed 50 investigations during the fourth quarter of 2021, 67 investigations during the first quarter of 2022, and 100 investigations during the second quarter of 2022. For each of these investigations, the OPA Director issued a memo with their conclusions and recommended findings to the Chief of Police. As noted above, all OPA findings issued since 2016 are available on OPA's website.[11] If the evidence shows that a serious violation of SPD policy occurred, the OPA Director will recommend a "sustained" finding. If the evidence shows that misconduct did not occur, the Director will likely recommend a "not sustained" finding. Out of the 217 completed

---

[11] Available at https://www.seattle.gov/opa/news-and-reports/closed-case-summaries

CITY OF SEATTLE'S AUGUST 2022 QUARTERLY ACCOUNTABILITY UPDATE - 14
(12-CV-01282-JLR)

Ann Davison
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

investigations, OPA recommended sustaining allegations in 40 of these cases (18%) against a total of 48 SPD employees, which is a modest decrease over prior reporting. In 2022, there have been six force related cases to-date (for three different officers); two of the cases involved sustained use-of-force findings; two involved sustained use-of-force de-escalation findings; and two sustained force reporting violations.

If the OPA Director recommends finding that an employee committed misconduct, then the Chief of Police decides whether to impose discipline and what the discipline should be. Examples of discipline include oral reprimand, written reprimand, demotion, reassignment, suspension from work (without pay), and termination. If the Chief decides not to follow one of the OPA Director's recommended findings, then the Chief must issue a public statement explaining the reasons. Thus far in 2022, the Chief has overturned one of OPA's findings, a decision described in the City's last quarterly report. Dkt. 682 at 10-11. Between October 1, 2021, and June 30, 2022, as a result of OPA's investigations, the Chief imposed discipline on 51 officers.[12] During this time, eight disciplinary appeals were filed related to an OPA recommended finding of misconduct.

## CONCLUSION

Consistent with the Monitor's conclusion in the Comprehensive Assessment (Dkt. #709) the City has maintained, and often improved, its efforts to meet its Consent Decree requirements.

---

[12] Because the Chief must review and contemplate disciplinary matters before reaching a decision, there is a time lag. Some of the cases in which the Chief imposed discipline in the third quarter were closed by OPA before the third quarter.

CITY OF SEATTLE'S AUGUST 2022 QUARTERLY ACCOUNTABILITY UPDATE - 15
(12-CV-01282-JLR)

Ann Davison
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

Respectfully submitted,

DATED this 1st day of August, 2022.

    For the CITY OF SEATTLE
    ANN DAVISON
    Seattle City Attorney

    *s/ Jessica Leiser*
    Jessica Leiser, WSBA #49349
    Sarah E. Tilstra, WSBA #35706
    Assistant City Attorney
    Seattle City Attorney's Office
    701 Fifth Avenue, Suite 2050
    Phone: (206) 77-8874
    Fax: (206) 684-8284
    Email: Jessica.Leiser@seattle.gov

CITY OF SEATTLE'S AUGUST 2022 QUARTERLY
ACCOUNTABILITY UPDATE - 16
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200