

May 4, 2022

Inspector General Lisa Judge
Office of the Inspector General

Re: SER Wave 2 SPD Response

Dear Inspector General Judge:

As I did back in October 2021, following the release of recommendations emerging from Wave 1 of the Sentinel Event Review panel convened to examine incidents over the months-long protests during the Summer of 2020, I am writing to provide you and others with our initial responses to the recommendations emerging from Wave 2 of the SER. In my earlier letter, I expressed my appreciation for the thoroughness and integrity of the SER process; I remain both grateful for the continued work of the panel and impressed by, again, the depth of their review.

Before turning to the Wave 2 recommendations, I also want to update you on progress made regarding two initiatives I highlighted back in October. First, despite significant staffing challenges, including in the Training Section, we are in the final weeks of preparing to launch the pre-academy relational policing program for new recruits (now titled *SPD 360: Before the Badge*), in advance of an SPD-only class at the state academy in July. This program is made possible not only through the commitment of many within the department to ensure that our next generations of officers are provided with the community experience, department support, and mentorship by their more senior colleagues, but also because of the generosity of time and energy by many diverse partners within the community. I am grateful to all who have come together to drive this project forward.

Second, the "dialogue unit" that was in progress at the time of my earlier writing has now been implemented and stood up as POET – the Public Outreach and Engagement Team. Grounded in early partnerships with academic partners and colleagues in the United Kingdom and across Europe, POET has been an active presence before, during, and after numerous events this year, engaging with organizers and crowd members to offer support and build rapport with a goal of facilitating safety for all who wish to exercise their First Amendment rights. Thank you again for your early collaboration in this direction.

With that preface, I have provided below SPD's responses to each of the Wave 2 recommendations. Please note that, as with our earlier responses to Wave 1, we understand that these are panel recommendations, not necessary OIG recommendations, and may not have been deconflicted with the positions of others in the accountability structure or socialized with others who feel differently with regard to recommendations that hinge on staffing and resources. Additionally, where several of these recommendations call for action by other departments of City government, SPD highlights those for broader City coordination.

Recommendation 1. SPD and City should coordinate and jointly create designated officers/staff in both SPD and the City who are responsible for engaging with residents and businesses affected by civil unrest or large-scale incidents causing similar disruption. (Emergency Community Communications Officers (ECCO)). (Subparts a-f of Recommendation 1 provide further detail as to the envisioned role of the ECCOs; because SPD supports this recommendation in full, SPD addresses all within its response below.)

- *Implemented in part, and as is within SPD's control, by way of the POET engagement described above, and which SPD will continue to build out to meet those recommendations provided in Recommendation(s) 1(a-f) that, again, are within SPD's purview.  Please note that city-wide coordination is the responsibility of the Seattle Office of Emergency Management, which works through the Emergency Operations Center to direct resource needs across departments during large-scale events or emergencies.  (AlertSeattle, which is managed by OEM, is one tool currently in use to communicate with residents at large during such incidents.)*

Recommendation 2. When an emergency creates a public safety need that limits access to buildings, SPD should create a standard, unbiased procedure for ensuring maximum access for building residents and guests.

- *SPD is committed to ensuring that any limitation on access to buildings based upon public safety needs is as narrow as is it responsibly can be based upon staffing, resources, and public safety needs under circumstances then present.  One role of the POET is also to assist as it can in such situations.*

Recommendation 3.  SPD should coordinate more effectively with the City of Seattle and relevant agencies to ensure the continued provision of city services (e.g., power, water, waste management, etc.) throughout periods of emergency, including civil unrest.

- *Coordination of City services during emergencies is the specific purview of the OEM, which operates the EOC, which was activated during the events of 2020 and responsible for coordinating the continued provision of city services.  OEM should be engaged in any additional discussion in this area.*

Recommendation 4.  Given the highly indiscriminate nature of CS gas, SPD and City Council should restrict use of this weapon to full-scale riot situations involving violence. SPD should also consider prohibiting the use of weapons such as CS solely in defense of property.

- *SPD acknowledges the concerns around the use of CS gas and has modified its already restrictive crowd management policy to implement additional controls around the authorization for its use.  These policy revisions were approved by the federal court in February 2021.  Subsequent to those revisions, state law was amended to provide that CS may only be used in the context of crowd control when necessary to quell a riot and only upon the authorization by the highest elected official in the jurisdiction.  Revisions to that effect (and revisions implementing POET) are incorporated into a current working draft of a future iteration of the crowd management and use of force policies.*

Recommendation 5.  In keeping with SPD's commissioned report after May Day 2015, SPD leadership, including the Chief, should be fluent in all SPD rules of engagement and understand specific "if/then" scenarios contained in the rules.

- *Rules of engagement, generally, are rooted in policy, which all members of the department are required to be aware of and act in accordance with, and, more granularly, specific to the circumstances of the event for which they are prepared.  All sworn members of the department are provided with and are expected to know the rules of engagement for the events they are required to work. In particular, SPD's revised policies include a matrix that defines the appropriate options under specific circumstances to help guide consistent decision-making.*

Recommendation 6. As set forth in OIG's Review of the SPD Crowd Dispersal Policy and Less Lethal Weapons Report in August 2020, SPD and the City should "[p]rovide public education concerning crowd dispersal policies, procedures and overall SPD crowd management tactics." These materials should be easily accessible and provide information that can assist residents and bystanders who may be affected by nearby deployments of crowd dispersal devices (e.g., CS gas, OC spray, or "blast balls").

- *SPD's policies around crowd management and use of force, including the use of less lethal tools that may be used for crowd control situations, are online and available for public review.  SPD agrees that it would be of community benefit to have broader information regarding SPD tactics and means to mitigate any impact of these tools.  SPD believes this would be a ripe area for collaboration between SPD, the OIG, and the Community Police Commission. Additionally, SPD's adoption of Long-Range Acoustical Devices (LRADs) should help in-the-field notifications and warnings that are part of SPD's dispersal orders. While this is not before-the-fact education, it will provide clarity to those on scene about what is happening and what options they have to avoid exposure (see also 11 below).*

Recommendation 7. Acoustic and light devices used during extended SPD operations should be placed in ways that minimize their impact on neighborhood residents.

- *SPD agrees in principle, as public safety interests allow.*

Recommendation 8. Firearms with telescoping capabilities should not be used for surveillance when lethal force is not authorized, even if the firearm is disabled.

- *SPD understands the panel's concern reflected in this recommendation.  SPD intends to seek equipment that better positions SPD to identify and monitor criminal behavior from a safe distance, without the risk of escalation that comes with positioning officers closer to the crowd.*

Recommendation 9. SPD should conduct a public education campaign alerting the public to the specific harm that lasers can cause when shined into the eyes of others, and to the state laws surrounding their usage.

- *SPD is open to discussing this recommendation, particularly to the extent the OIG and CPC are interested in engaging in any such education. This is a very real concern to officers, who were repeatedly subjected to lasers during the summer of 2020.  That said, we also believe that many of the individuals who choose to shine lasers at others are or should be familiar from widespread media reports with the risk (particularly in the context of federal law around the lasering of aircraft) and may use lasers specifically to bring about such harm.  In fact, SPD submits that the risk of harm is precisely why this tool was used.*

Recommendation 10.   SPD should develop a public education program regarding tactics when arresting someone. The program should include education about the number of officers used to conduct the arrest, the rationale for arrest procedures and an openness to discussion with community about ways to improve these tactics.

- *SPD has engaged in such presentations in the past with members of the CPC and OIG and found them to be productive.  SPD is open to continued partnership in this area.*

Recommendation 11. SPD should research and enhance policy requirements for increased communication with crowds, especially during large or stationary protests, to manage expectations and provide greater credibility for police action.

- *Implemented and ongoing.  In addition to the POET and policy revisions around enhanced communication, SPD purchased, and has been using as necessary, a long-range acoustical device (LRAD), modified for use as a loudspeaker only, to ensure clear and audible communication during such events.  The device has proven effective in this regard.*

Recommendation 12. SPD should provide safety eyewear and noise protection equipment to protect officers from lasers and sound devices that may be deployed in a protest/demonstration setting.

- *While officers are provided with protective eye- and ear-wear, SPD's safety officer is currently reviewing available options for enhanced protection.*

Recommendation 13. SPD should embrace and maintain principles of procedural justice in all of its communications and tactics relative to the facilitation of crowd events.

- *This recommendation is at the heart of SPD's revised crowd management policies, as approved by the federal court in 2021 (specifically with respect to the Crowd Management, Intervention, and Control Matrix), and underlies the establishment of the POET and continued work to grow that program.  SPD continues to review the significant volume of research following the events of 2020, nationwide, to identify additional ways to incorporate procedural and organizational justice principles throughout facilitation of crowd events.*

Recommendation 14. SPD officers should eliminate their use of sarcasm or confrontational dialogue with protesters in accordance with 5.001 - Standards and Duties Sec. 10. While the SPD section in question states that "employees will strive to be professional," (emphasis added), SPD should strike "strive to" from the policy and require professionalism.

- *SPD expects all employees to act with professionalism and respect and employees are subject to discipline for failing to adhere to this policy requirement.  Several policies within Title 5 (including 5.001) are currently under review, and this recommendation will be considered.  However, while agreeing in principle, officers who are exhausted, overwhelmed, and under constant verbal and physical assault will make mistakes – it is incumbent on the department to manage officer exposure to support them in their professionalism (see also 16 below).*

Recommendation 15. Wherever practicable, officers should inform non-compliant persons of their intention to physically touch/move them when necessary to achieve a public safety goal prior to initiating the physical contact.

- *This recommendation aligns with principles of procedural justice as incorporated in Manual Section 8.000 – Use of Force Core Principles.  Title 8 in full is currently under annual review and SPD will consider this recommendation.   SPD also appreciates the "whenever practicable" language, as this goal is often not possible under the circumstances.*

Recommendation 16. SPD should pursue opportunities for officers to express their tensions and frustrations in an appropriate setting and provide guidance on productive ways to channel those emotions to help avoid scenarios in which officers use sarcasm, obscenities, or other displays of disrespect to community members.

- *SPD appreciates the panel's understanding of the significant levels of stress under which officers were required to work during these events.  One of the core recommendations that has emerged from after-action reports nationwide focuses on wellness services for officers.  As SPD works to build up its Wellness Unit to be on par with similarly situated agencies and align with best practices, SPD hopes for continued support from the OIG, OPA, and the CPC, and for support from other city stakeholders.*

Recommendation 17.  During protests, SPD should ensure that protesters are protected from vehicular traffic and ensure a constant ability to visually monitor those barriers.

- *SPD regularly works with organizers of <u>permitted</u> protests, during the permitting process, to identify routes and necessary resources to facilitate the safety of both protestors and the traveling public, Unpermitted protests,  however, pose significant challenges in that respect.  While SPD's tactics are based upon reasonable time, place, and manner considerations with the aim of promoting public safety, if there are best practices in this area that are not yet incorporated into SPD policy or training, SPD would welcome the OIG's assistance in this area.  This issue also raises tactical complexities - "holding a line" and "moving a crowd" are the two actions that generate the most controversy and yet are the tactics requited to prevent protesters from accessing the freeway or encountering traffic (see also 20 below). T*

Recommendation 18. SPD should strive to ensure it has visibility to all parts of a crowd during a protest event or demonstration to ensure the real-time ability to prevent or minimize a mass casualty incident. This may include appropriate rooftop access (with proper consent), or other solutions developed with community input.

- *While recognizing as well conflicting recommendations towards minimizing the SPD footprint at such events, SPD will consider this recommendation as part of its policy and training reviews.*

Recommendation 19. To reduce perceptions of racial bias in SPD actions, SPD should incorporate the scenario of a white man shooting a Black protester, then walking unchallenged through a police barricade and surrendering to SPD officers into antiracism training for reflection and discussion by SPD officers to encourage equal treatment.

- *SPD will consider this recommendation in conjunction with annual training reviews.*

Recommendation 20.  Particularly when police are the subject of a protest, SPD should avoid the creation of immovable lines of officers at demonstrations and ensure that the crowd can move in directions it wants without undue danger from cars or other risks.

- *This recommendation has been addressed in the policy revisions that were approved by the federal court in February 2021.  SPD notes, however, that Recommendation 17 seems to urge the use of barriers; that street closures need to be coordinated by SDOT (through OEM); and that SPD's options for mitigating the inherent risks of conflict with other road users when crowds are able to move in any direction they wish are limited by resources and staffing.*

Recommendation 21.  As set forth in OIG's Review of the SPD Crowd Dispersal Policy and Less Lethal Weapons Report in August 2020, SPD should review and, if necessary, modify policy language for all less

lethal weapons to ensure the policy has consistent warning requirements prior to the use of any less lethal weapon.

- *This recommendation was previously implemented in revisions to the Crowd Management and Use of Force policies that were approved by the federal court in February 2021.*

Recommendation 22. As set forth in OIG's Review of the SPD Crowd Dispersal Policy and Less Lethal Weapons Report in August 2020, SPD should research and enhance policy requirements for increased communication with crowds, especially during large or stationary protests, to manage expectations and provide greater credibility for police action. SPD should prioritize "normative compliance," that is, crowd agreement with SPD requests due to their legitimacy, over "instrumental compliance," or the use of tools (e.g., less lethal weapons) to force compliance.

- *Implemented, through both the use of the LRAD (incorporated into court-approved policy revisions in February 2021) and the POET, which was stood up in 2021 and will be reflected in 2022 policy revisions.*

Recommendation 23.  SPD should use deployments of blast balls during the 2020 protest response as case studies when training new officers on blast ball use in high pressure scenarios.

- *Implemented; 2022 revisions to crowd management training include lessons learned from blast ball deployments of 2020.*

Recommendation 24.  SPD and SFD should attempt to coordinate with civilian medics participating in crowd events prior to the protests and establish a plan for care of injured or incapacitated persons during the event. In situations where coordination before an event is not possible, SPD and SFD should ensure civilian medics within crowd events have an established and continuous communication method with SPD and SFD to coordinate the efficient and safe removal of anyone who has been injured or incapacitated during a protest or crowd event.

- *SPD supports this recommendation; to the extent safe and feasible, this is a role that POET officers will be available to serve.*

Recommendation 25.  SPD should review its policy and training for using less-lethal munitions in crowd management situations, including the use of less-lethal munitions by mutual aid agencies.

- *Implemented and continuing; this has been addressed in revisions to the crowd control and use of force policies that were approved by the federal court in 2021; additional revisions specific to state legislation have been implemented into 2022 training and into pending revisions to policy.*

Recommendation 26. Prior to planned demonstrations, SPD should coordinate with the City of Seattle and residents to remove barriers to visibility that might reduce safety to protesters during protest events, including, for example dumpsters.

- *See response to Recommendation 3.  OEM is responsible for coordination of City services during protest events and should be included in discussions in this area.*

Again, thank you for the opportunity to review and response to these recommendations. We look forward to continued discussions.

Sincerely,

Adrian Z. Diaz
Chief of Police



October 4, 2021

Dear Inspector Judge:

Let me start this letter by first noting the extraordinary work of your office in bringing together this sentinel event review (SER) panel, a first of its kind in Seattle, and my deep appreciation for the panel's willingness to move beyond surface observations and dive deep into the facts, circumstances, and perspectives that drove action and reaction over these painful months.  Headlines aside, a full read of the document reflects honesty, vulnerability, and a move towards healing in all of the many communities affected by the events of last summer, including the men and women of our department.  The report offers clear and considered recommendations, well grounded in the lived experience and expertise of those who served on and guided the panel.  In submitting for court approval last spring our revisions to our crowd management policy, we emphasized that while those revisions incorporated into policy and training lessons learned in the midst and immediate aftermath of the summer's protests, the reflections and recommendations of all of the OPA, OIG, and CPC reviews would serve to inform further reviews.  I am pleased both that many of the panel's recommendations have already been implemented and that we have in this report a solid blueprint to guide discussions in future iterations of what will always be an evolving practice.

I also want to express my deep gratitude to all who participated on the panel – to those in the community and to our officers and commanders who opened themselves up to reliving these events, and to the consultants and experts who guided them through the process.  The report reflects that from dialogue can emerge empathy, understanding and a renewed appreciation of the humanity of us all.

I write this letter in the spirit of providing you, other accountability partners, our city partners, the Department of Justice, our federal monitoring team, and the Seattle community at large with SPD's initial responses to the panel recommendations that flowed from Wave 1 of the SER.  In doing so, I remain mindful that, as we have discussed, these are panel recommendations; they are not necessarily OIG recommendations that have been vetted against best practice, deconflicted with the positions of others in the accountability structure, or socialized with others who may feel differently, particularly with regard to recommendations that hinge on staffing and resources.  These responses should accordingly be viewed as reflecting SPD's position, recognizing that implementation, where supported, may not be feasible.

Finally, before turning to the recommendations individually, let me highlight two specific initiatives that are already underway and cut directly to the heart of an underlying sentiment of the SER discussions.  First, I want to thank you for your early partnership in connecting SPD leadership and command with experts in the United Kingdom and across Europe to learn new practices, rooted in the psychology of crowd dynamics and driven by these countries' broader experience with riotous events, that have been proven a foundation for greater communication and understanding in the midst of, often, chaos.  Consistent with these discussions and aligned with several of the panel recommendations, SPD is well underway in establishing a "dialogue unit," modeled on the work of

the Stockholm Police Authority,[1] to foster greater communication and understanding between the police and those who gather before, during, and after events. We look forward to continuing to work with you as this unit moves forward.

A second project is one of which I am particularly proud. Grounded in principles of relational policing, SPD is launching a recurring, 45-day initiative for recruits, in advance of their Basic Law Enforcement Academy (BLEA) training, that will pull them out of traditional classroom training and immerse them in community-centered, peer-based, and introspective experiences that will provide them both a lens through which to receive their BLEA training and a foundation upon which to build healthy relationships and successful careers as Seattle Police Officers. Structured to allow for a one-week particularized focus in each of Seattle's geographic precincts, programming will fall into three general "buckets" of learning:

- ***Community Centered Dialogue and Learning:***  This module is built on the central tenets of relational policing: transparency; honesty; acknowledging mistakes and challenges; and collaboratively identifying areas for improvement and opportunities for growth. Recruits will learn that every encounter is an opportunity to build trust and develop skills to engage respectfully in difficult conversations. In addition to set topics relating to the history of policing in America and Seattle, officers will engage with and hear and learn directly from communities most impacted by policing, including currently and formerly incarcerated persons, persons who have experienced violence, immigrant and refugee communities, local business communities, and students. Paired with Community Service Officers or members of the Collaborative Policing Bureau, recruits will walk beats in each of the precincts, meet with community organizations, demographic and precinct-based advisory councils, participate in volunteer opportunities, and learn about expectations, priorities, and challenges that may be unique to each precinct and its communities. This module will also include learning in brain development and the impact of childhood trauma, poverty, addiction, and other societal stressors on many with whom officers will come into contact.

- ***Wellness and Professional Development:***  An overwhelming body of research shows the psychological damage caused, acutely and cumulatively, by the vicarious trauma to which officers are routinely exposed, the undeniable interplay between mental health and physical well-being, and the impact of both on officer performance. This module will include training on the neurophysiology of stress, identifying early warning signs, and tools to build resilience. Recruits will learn about their own learning styles and gain an understanding as to how their own experiences may shape how they perceive and react to others. Recruits will be introduced to existing trainings around wellness and peer intervention, including Active Bystander for Law Enforcement training, to give them the skills to intervene with themselves and others before their behavior may take them down a negative path. Recruits will also be paired with volunteer "mentor" officers to help ease their transition into the department and the law enforcement

---

[1] https://static1.squarespace.com/static/5437a800e4b0137bd4ed4b13/t/594750011b10e3c4c96e684c/1497845774724/Dialogue_bok100630Webb.pdf

Page | 2

profession.

- ***Public Safety "360":***  This module will introduce to the administration and structure of the SPD and others in the public safety system.  Recruits will meet members of both sworn and civilian command, will learn about different units within the department, and have opportunities to ride along with officers in each of the precincts.  Recruits will hear from public safety partners, including prosecutors, public defenders, social services, and outreach programs.  Particularly as public safety is re-examined, the goal of this module is to provide a welcome to the department and a baseline understanding of their roles in a more holistic model of public safety in Seattle.

We know that restoring and maintaining community trust is paramount to our ability to meet the public safety needs of this city, and we know that trust is only built – and the culture of policing changed – when there is true, meaningful, and ongoing dialogue between police and community. While it will always be iterative and fluid in design, I believe this initiative is a critical and long overdue first step.

It would be naïve, however, to ignore the reality that our ability to implement change hinges precariously on our budget and staffing, both of which have been under significant threat over the past 18 months.  As we know from our experience over the past eight years of reaching compliance with our obligations under the Consent Decree, change, and a reform mindset, is not without continuing significant cost and support.  While we have been successful in funding some initiatives through grants and the generosity of the Seattle Police Foundation and its donors, and while we continue to leverage a wide network of research partners to ensure the validity and integrity of our work, it is only with support of our city partners that we can fully meet our commitment to the community.   It is my hope that, just as we take seriously the recommendations of this panel, so too will others whose collaboration and support is necessary to realize full implementation.

With that said, SPD's responses to each of the Wave 1 panel recommendations, including the status of implementation where appropriate, are as follows.  Please note that, as several of the recommendations substantively overlap, where one recommendation has been answered with a descriptive answer, subsequent responses may simply reference back.

Recommendation 1:  Enable better interaction with demonstration organizers in advance of protests, SPD should build legitimacy through expanded community Policing initiatives, including the expansion of foot patrols, and build deeper personal relationships between officers and individuals throughout the communities of Seattle.

- *In progress.  This recommendation lies at the heart of both the dialogue unit and the pre-BLEA initiatives described above.*

Recommendation 2:   Engage in direct and ongoing community dialogue to understand and adapt to the diverse community perspectives about the institution of police.

- *In progress.  In addition to continuing in-service learning on the role of police in society (in partnership with the Seattle Holocaust Center), SPD is moving forward with training planned, pre-COVID-19, on the history and community perspectives of policing in Seattle (undertaken in partnership with the Northwest African American Museum and the Wing Luke Museum).*

Recommendation 3:  Alter SPD's strategy for policing protests to focus more explicitly and comprehensively on the facilitation of peaceful assembly and ensuring the safety of protestors.  The focus and mindset of SPD officers deployed to assist in crowd events should move away from "crowd management" "crowd control" and Law enforcement" to "facilitation of speech" and "crowd protection and safety."

- *In progress.  In addition to the Dialogue Unit described above, this recommendation aligns with the changes that were made, tactically, in the field, and which were subsequently incorporated into policy (Manual Section 14.090, and specifically the Crowd Management, Intervention, and Control matrix that outlines expected considerations) and training.*

Recommendation 4:   Embrace procedures that visibly signal SPD's commitment to ensuring the safe and peaceful gathering with the minimum necessary engagement of SPD officers, and limit that engagement to: promoting the ability of individuals and groups to express First Amendment freedoms;  protecting the physical safety of individuals within as well as beyond the crowd and preventing the destruction of public or private property.

- *In progress, and in line with the changes that have been incorporated into policy and training.  Further, recognizing that the appearance of officers may itself escalate tensions, SPD is purchasing new uniforms for officers serving in a frontline capacity to wear during crowd management events, specifically moving away (as circumstances allow) from what the community may perceive as more "tactical uniforms" to a more subdued appearance.*

Recommendation 5:   Modify SPD's tactics of crowd facilitation to prioritize communication, de-escalation, and carefully conducted removal of those who are creating an immediate danger to others or causing destruction or to property, allowing the rest of the event to continue undisturbed.

- *Implemented in part. In addition to the Dialogue Unit (in progress) and policy revisions (implemented) discussed above, SPD has also (responsive in part to prior OIG recommendations) purchased and is using a long-range acoustical device (LRAD), modified for use as a loudspeaker only, to ensure clear and audible communications during such events.  This device has since proven effective in ensuring that all members of a crowd are able to clearly hear information and directions presented.*

Recommendation 6:   Modify SPD's policy on content neutrality to permit officers staffing a public event focused on issues of policing to demonstrate solidarity with the crowd participants' rights to protest if they chose.

- *Needs further discussion.  SPD understands and appreciates the perceptions and concerns underlying this recommendation.  At the same time, SPD has an obligation under law to maintain content neutrality in how it facilitates free speech and expression; modifying policy to allow officers to affirmatively engage in a manner that imparts personal viewpoint raises foreseeable challenges and legal complexities.  SPD would welcome any guidance from the OIG and the City Attorney's Office as to how policy might be modified in a way that meets the concerns underlying this recommendation without straying into potential legal complications.*

Recommendation 7:   Eliminate disrespectful statements or actions from SPD officers to individuals or groups protesting.

- *Implemented and monitoring.  SPD Policy is clear that such statements or conduct will not be tolerated. See Section 8.100 ("[t]aunts and insults are prohibited") and Section 5.001 ("The Department expects all employees to treat all people with dignity; remember that community care-taking is at times the focus, not always command and control; and that the guiding principle is to treat everyone with respect and courtesy, guarding against employing an officious or overbearing attitude and refraining from language, demeanor, and actions that may cause the individual feeling belittled, ridiculed, or intimidated.").  Guarding against such conduct is a key objective of the Active Bystander for Law Enforcement Training that, by the end of 2021, all eligible sworn members of the department will have completed.  SPD continues to emphasize not only the contours of these policies, but also to remind officers on how their actions – even those that may not necessarily fall within the scope of Title 5 – may be negatively construed during and after an event, and how such statements may further polarize police from the community.*

Recommendation 8:   Use live CCTV footage and mobile SPD officers, whether on bicycles or in other vehicles, to rapidly intervene with and address groups destroying property.

- *Needs further discussion.  SPD does not disagree that CCTV footage would be useful for such purposes; however, this recommendation raises considerations under Seattle Municipal Code Chapters 14.12 (Collection of Information for Law Enforcement Purposes) and 14.18 (Acquisition and Use of Surveillance Technologies) and would thus need City Attorney review and, potentially, legislative action.*

Recommendation 9:   Provide officers with clear direction about SPD's priorities in facilitating demonstrations, particularly when the institution of policing is the focus of the protest.  SPD's focus should be on facilitating access and safety for all.  SPD should enhance the ability to address dangerous situations with minimal impact on peaceful demonstrators while minimizing the use of munitions or indiscriminate force.

- *Implemented; see policy and training revisions.*

Recommendation 10: Pursue a differentiated approach toward individuals withing the crowd.

- *Implemented; see policy and training revisions.*

Recommendation 11:  Avoid the creation of immovable lines of officers at demonstrations and provide a mobilization plan for the deployment of bicycle or other mobile officers to ensure appropriate and rapid responsiveness to unplanned crowd events.

- *Implemented; 2021 training revisions focus on stabilizing incidents with rapid response rather than maintaining a prolonged police presence within the crowd.*

Recommendation 12:  Establish a staffing model for crowd events such that protests of the size and scale of the Westlake protests can be suitably staffed with mobile officers and other facilitation while minimizing SPD intrusion into the protest.

- *Concur.  SPD's goal is to ensure adequate staffing at all events to support both crowd and officer safety without impacting ability to respond to emergent events throughout the city.  However, as SPD experiences dire staffing shortages, its ability to meet this goal remains challenged.  The Emergency Operations Center is also a necessary party to further discussions.*

Recommendation 13: Ensure that all SPD officers, not just those officers assigned to crowd facilitation teams are trained in crowd psychology, crowd facilitation, public safety procedures and tactics, and the mobilization techniques likely to be used at future crowd events.

- *Implemented; see discussion of policy and training revisions.*

Recommendation 14:  Use mobile response units (e.g., bicycle or other vehicles) that are distinct from crowd facilitation officers or "dialogue officers" to address agitators or instigators of violence in the crowd.  Mobile response units should remain out of sight and in reserve unless and until they are needed and engage in ways that permit individualized attention and minimize the impact on peaceful protestors and on the event in general.

- *Implemented and in progress; see 2021 policy and training revisions and discussion of the Dialogue Unit, above.*

Recommendation 15: Evaluate whether an encrypted standardized alert messaging system (e.g., WhatsApp, Yammer, or other technology) could replace radio communication during crowd facilitation events.

- *Need further discussion.  SPD cell phones include tracking technology such that sergeants, lieutenants and commanders are more easily locatable, which is a GPS function native to these cell phones. SPD would defer to Seattle IT on whether additional applications, and the additional records they create, should be procured.*

Recommendation 16: Provide specific training, including scenario-based training on the management of large crowd events, and on the supervision of officers, for all SPD supervisors and above, including Incident Commanders and officers in the SPOC.

- *Implemented, to the extent SPD is able to do so without a dedicated training space.  As SPD continues to seek City partnership in procuring an adequate training facility, SPD has patched together training solutions through contracts for privately-owned land, and – leveraging advances in, and the cost-efficiency of, virtual reality training – is exploring that as an supplement or alternative.*

Recommendation 17:  Establish the Incident Command Post and communication lines to officers facilitating protests or demonstrations so that the Incident Commander can observe multiple events in different locations simultaneously and receive real-time updates about each event, from officers trained in supervision of crowd events who are physically present at each protest or demonstration.

- *Further discussion needed.  While there are budget, technology, and Surveillance Ordinance constraints that come into play, SPD supports in concept identifying additional means of allowing for broader situational awareness.*

Recommendation 18: The Mayor's Office, SPD, SFD, the Department of Transportation and other departments should conduct appropriate scenario planning for disruptive protests. In particular the scenario planning should ensure that sufficient resources are deployed so that other SPD locations can protect and serve the people of Seattle in the event that public service from one or more of its buildings are disrupted by protest and ensure that sufficient public transportation exists to help protesters leave a protest where an unlawful assembly or curfew has been declared or a legal order to disperse has been issued.

- *Concur. While maintaining adequate resources to meet public safety demand continues to be a challenge, SPD will continue to work with other City and County departments to identify means of safety facilitating demonstrations in a manner that is least disruptive to those needing services. The Emergency Operations Center is a necessary party to this work.*

Recommendation 19: Avoid the deployment of officers in ways that prevent pedestrian/crowd movement or that separate individuals from other areas of protest without a clearly articulated safety rationale.

- *Implemented; revisions to policy and training provide direction to commanders to both avoid the use of fixed positions and, where fixed positions are necessary, to better articulate and convey safety and law enforcement concerns to the crowd.*

Recommendation 20: If short term closures of street or blockages of specific intersections are necessary for the safety of the crowd, SPD should ensure that its officers can adequately inform individuals in the crowd of the reasons for the blockages and provide them with adequate alternative options to continue moving.

- *Implemented in part; in addition to the use of the LRAD, which has proven effective in ensuring that communications are heard, SPD and the City are exploring the feasibility of leveraging the "Alert Seattle" and the communications network within the Emergency Operations Center to provide real-time information to the community.*

Recommendation 21: Ensure that all limitations on crowd behavior or conduct are designed to maximize the safety of individuals in the crowd, and that any communications about such limitations articulate that safety rationale in ways that emphasize LEED principles. Specific messages should be conveyed in simple, layperson terms that are accessible to all, and should be focused on explaining the public safety necessity of motivating the message.

- *Implemented and continuing; see discussion of policy and training revisions and communication, above.*

Recommendation 22: Improve SPD's capability to inform and communicate with demonstrators during group events in the following ways: 1. Multiple modes of communication should be considered, including audio, video, other visual media (e.g., posters, banners, etc.), social media, and others; 2. The modes of communication and specific messages should be included in the Incident Action Plan created by SPD prior to events and updated throughout the pre-event planning phase; 3. The communications should be documented and recorded during the event, including by having

officers certify their use on police radio that is retained by SPD; and 4. Their impact should be evaluated and specifically assessed in post-event review by SPD.

- *In progress.  In addition to the emphasis on communications discussed in prior responses, SPD has embedded a Public Information Officer during certain events in order to accurately and efficiently provide updates to the media and the public. SPD is also exploring the use of more basic modes of communication, such as using physical, electronic signs.*

Recommendation 23: Procure a suitable audio devise to ensure that the crowd can hear messages relevant to the event.

- *Implemented; see discussion on LRAD, above.*

Recommendation 24:  Review SPD protocols related to the presence of batons and their use during crowd facilitation events, potentially eliminating their presence at such events unless justified by a specific and compelling public safety purpose.

- *Further discussion needed.  While SPD understands the history and optics of officers carrying batons, officers presently have no dedicated space to store batons when deployed, such that they would be easily accessible if needed.  Additionally, while SPD has long moved away from using batons as a weapon (as opposed to leveraging their utility as a bar to hold back crowds where necessary), SPD also cautions that a perhaps unintended consequence of recent City Council legislation may be a foreseeable increase in the presence of batons, in those circumstances where law enforcement action is needed to move a crowd.  That said, as a key component of recent policy and training revisions is to reduce to the extent feasible the need for fixed lines and to minimize the police presence in a crowd, SPD also submits that the goals of this recommendation may be largely met through reduced officer presence.*

Recommendation 25: In considering whether to use force during a crowd event, SPD officers must evaluate whether the use of force can be limited to those against whom the force is justified, and that the potential for collateral impact is minimized.

- *Implemented; while these considerations have long been a part of SPD's use of force policy, requiring that any use of force be reasonable, necessary, and proportional, policy and training revisions implemented in 2021 require greater articulation and consideration of alternative tactics.*

Recommendation 26: Limit arrests during protests targeted at the police to individuals committing immediate or imminent harm to people or property, and do not arrest individuals for offenses committed at an earlier time unless they can be accomplished in a way that will not escalate emotions in the crowd.

- *Implemented; see 2021 policy and training considerations.*

Recommendation 27: Identify a specific area for officers reporting for crowd facilitation duty to convene and leave their vehicles, providing a shuttle system for officers to and from the areas where they are deployed and supervision for the vehicles.

- *Implemented; planning for events includes identifying a secured staging area from which officers will deploy by alternative means.*

Recommendation 28: If exigent circumstances prevent an officer from parking a vehicle at the designated area, officers should notify the SPOC of the location of the vehicle(s), and a designated officer should move the vehicle(s) to a designated safe area.

- *Concur; SPD's goal, with the means available, is to eliminate unsecured parking areas.*

Recommendation 29: Ensure that any weapons or munitions brought to protests are securely stored and cannot be taken or used by anyone other than the officer to whom they were issued or other authorized SPD Personnel.

- *Concur; in addition to secured storage requirements, the use of secured parking areas will further address this concern.*

Recommendation 30: SPD officers attending protests should not leave rifles unlocked in unattended police vehicles.

- *Concur; in addition to secured storage requirements, the use of secured parking areas will further address this concern.*

Recommendation 31: SPD should invest in rifle cabinets with locks that cannot be easily breached by others.

- *Implemented; SPD has purchased new rifle cabinets and modified police vehicles with secure mesh cages to mitigate this concern.*

Recommendation 32: SPD should consider the utility of "bio locks" on all rifles to ensure that only the officer who is issued the rifle can fire it.

- *Needs further discussion; the utility of "bio locks" raises practical challenges.*

Recommendation 33: Implement a GPS system through the SPOC that allows incident Command to know the precise location of every officer, vehicle, and lethal munition deployed during a crowd event.

- *SPD currently uses approved technology, some native to department phones and vehicles, that allow for the tracking of officers and police vehicles.*

Recommendation 34: Seattle City Council should consider whether CCTV camera footage could be kept by a third party for a limited time, and accessible to SPD or other appropriate parties upon request for suitable public safety purposes, including the ability to track stolen police weapons that would pose an imminent danger to the community.

- *SPD supports this recommendation but defers to Council for a response.*

Recommendation 35: Ensure that officers are held accountable for securing their weapons at all times, and that violations of SPD policies on these matters are investigated and enforced.

- *Officers are expected to follow all department policies, training, and laws relating to the safe storage of firearms, and failure to do so may result in an OPA referral.*

Recommendation 36: The Mayor's Office and SPD leadership should critically examine the utility of a curfew and should exhaust other messaging options before declaring one. If a curfew is announced it should be limited in scope and clearly focused on public safety, rather than the deterrence of public protest.

- *Concur. SPD understands that curfews issued by the Mayor's Office are subject to input from the City Attorney's Office and follow the considerations set forth in this recommendation.*

Recommendation 37: Establish protocols to guide officer responses to property crimes occurring during significant public disorder events. These protocols would, among other things, establish clear guidance for officers on: a. When to disperse and when to arrest individuals who may be committing property crimes during civil unrest; b. How to conduct arrests of individuals who require prone handcuffing; and c. How to arrest individuals committing property crimes without escalating tensions between SPD and observers of the arrest.

- *Implemented in part and in progress. Existing training comports with best practice on the proper application of handcuffs, including of prone subjects. Expanded 2021 training further addresses considerations as to when dispersals, arrests, and property crimes should be addressed during a dynamic demonstration. The next iteration of defensive tactics training will include an updated module on knee positioning when using a prone handcuffing technique, which will reiterate and emphasize that proper positioning focuses body pressure across the large muscles of the upper back/shoulder, not the neck.*

Recommendation 38: Modify the policy and training for prone handcuffing to eliminate body weight pressure being applied above the shoulders of a subject being restrained.

- *See response to Recommendation 37.*

**Recommendation 39:** Implement staffing schedules, and provide officers with breaks, food and water, and pre- and post-event wellness initiative to help officers at crowd events - and especially at crowd events that are critical of SPD and policing - deal with exhaustion, stress, and primary or secondary trauma that might result from their participation at such events.

- *SPD has resolved issues relating to food and water provides wellness services that address stress, exhaustion, and primary and secondary trauma. However, the wellness of our officers remains among our highest priorities and our greatest challenges. As SPD continues to struggle with staffing, these challenges are unlikely to relax soon. SPD would welcome the OIG's support in encouraging City investment in its frontline workers to ensure that as an employer we are providing them with the time and tools they need to deal with the undeniable stress of their job.*

Recommendation 40: Monitor crowd activities from a sufficient distance that physical contact between SPD and protesters is not required or likely to unless an individual is an immediate physical danger to others.

- *Implemented; see discussion of policy and training revisions, above.*

Recommendation 41: Train bicycle officers not to arrest individuals for passive resistance techniques like "shoulder-checking" unless the officer(s) determine that the acts are clear, deliberate, and intended to substantially interfere with the ability of the officer(s) to perform his or her immediate public safety responsibilities.

- *Implemented. 2021 training revisions emphasize distance and monitoring of crowd activities to limit physical contact with attendees, including, when making a determination as to whether to take law enforcement action at that time, balancing the severity of the crime with the impact that immediate arrest may have on the crowd and event.*

Recommendation 42: When "leap-frogging" a protest, SPD officers should select alternative routes that minimize the likelihood of exposing officers or crowd participants to unnecessary risks.

- *Implemented in 2021 training revisions.*

Recommendation 43: When a crowd prevents safe movement of bikes without contacting individuals in the crowd, SPD bicycle officers should consider dismounting and walking with bikes physically placed between officers and crowd members to minimize agitation and physical contact.

- *Implemented in 2021 training revisions.*

Recommendation 44: SPD officers should improve their situational awareness, considering the relationship of their actions to the overall strategy and tactics of the event, and the support available to the officer(s) relative to the size of the event.

- *Implemented in 2021 policy and training revisions.*

Recommendation 45: Develop an arrest policy for each event and convey this to officers beforehand. Flexibility should exist in the tolerance of lower level misdemeanors balanced against the priority for ensuring the strategic goals of the operation.

- *Implemented in 2021 policy and training revisions and in the development of incident action plans.*

Recommendation 46: Communicate in advance when it plans to create barricades or restrictions to protesters or marches. The reason for the creation of such zones should be clearly articulated and driven by a public safety rationale.

- *Implemented in 2021 policy and training revisions and effected through use of the LRAD, as described above.*

Recommendation 47: Conduct appropriate scenario planning and provide enough resources so that other SPD locations can protect and serve the people of Seattle in the event that public service from one or more of its buildings are disrupted by protests.

- *See response to Recommendation 18, above.*

Letter – Inspector General Judge Re: Sentinel Event Review Wave 1

Recommendation 48: Construct barricades between protesters and critical pieces of the public safety infrastructure (e.g., the East Precinct) rather than using lines of officers. Such barriers should strike a balance between protecting the integrity of the facility and preserving its accessibility to the public.

- *Such considerations, including the determination as to whether to barricade, factor into incident action planning and coordination with other City departments. In general, 2021 revisions to policy and training emphasize a minimized officer footprint to the extent feasible, within law enforcement priorities.*

Recommendation 49: SPD Officers should be trained to realize that the existence of Personal Protective Equipment (PPE) or other defensive measures in a crowd of demonstrators, is not itself an aggressive measure requiring an escalating police response.

- *SPD training emphasizes planning and tactics that are driven by crowd behavior, not appearance. SPD understands that the wearing of PPE, alone, should not be a factor in determining the police response.*

Recommendation 50: SPD incident commanders should maximize the buffer space between officers and the crowd whenever possible.

- *Implemented; see 2021 policy and training revisions and response to Recommendation 48, above.*

Recommendation 51: On-site incident commanders should carefully evaluate the context and threat from a crowd, with assistance from "dialogue officers" in the crowd.

- *Implemented in part; see 2021 policy and training revisions and discussion concerning the Dialogue Unit, earlier in this letter and in response to Recommendation 5.*

Recommendation 52: Consider the creation of dialogue officers to ensure effective, real-time, de-escalatory communication between SPD and Protestors.

*In progress; see discussion concerning the Dialogue Unit, earlier in this letter and in response to Recommendation 5.*

Recommendation 53: Ensure access to adequate supplies of OC spray to ensure that CS gas is never deployed due to a lack of access to other preferable or appropriate options.

- *SPD strongly supports this recommendation, and would welcome discussion, in light of competing perspectives. For purposes of context, SPD adds the following:*

  *While SPD has seen in practice that the tactics, policy revisions, and trainings over the past 18 months have led to a near-cessation of confrontation between police and protestors, even as events continued since their peak over the summer of 2020, such that the use of force in crowd management events has all but ceased, in would be naive to imagine that this City will never again experience a situation where the need to effect crowd control through less lethal means arises. (Consider, for example, the political tensions that have continued to fuel often*

> *violent clashes between opposing groups of protestors in Washington and other areas of the country.)*
>
> *CS is, and has long been, the less-lethal option of last resort for riot control. Of note, prior to 2020, the last deployment of CS, by SPD, for such purposes was over twenty years ago, during the WTO protests of 1999. As was discussed during the SER, the circumstances that led to its use in 2020 were in large part driven by the depletion of alternative resources. As a general principle of risk management and consistent with the use of force principles embedded in our Consent Decree requirements, having a greater supply, and more options, of less-lethal tools allows for threats to be mitigated at the least-intrusive level of the force continuum and ultimately decreases the likelihood that a higher level of force (such as CS) may become necessary. SPD has emphasized this point in response to recent Council legislation that limits not just the use, but the procurement, of less lethal alternatives, cautioning that an unintended consequence may be the escalation of events to a point where that higher level of force may ultimately become the only reasonable and necessary option to address imminent threats of harm.*

<u>Recommendation 54</u>: Implement OIG's guidance on the use of CS gas set forth in Review of the SPD Crowd Dispersal Policy and Less Lethal Weapons in response to Ordinance 126102.

- *Presently, SPD is bound under both injunctive and state law limitations concerning when CS gas may be lawfully deployed, including RCW 10.116.030 as enacted during the last legislative session, which requires authorization from, in Seattle's case, the Mayor.*

Again, thank you for the opportunity to engage on these important issues. As I hope our considerations and implementations to date evidence, we take seriously our commitment to ongoing critical review and demonstrating our ability to adjust to and innovate around the evolving landscape of demonstration management. As always, I appreciate your partnership and collaborative approach to ensuring that Seattle always remains at the leading edge of reform across all areas of public safety operations.

Sincerely,

*[signature]*

Adrian Diaz
Chief of Police

CC:   Lesley Cordner, Asst. Chief Professional Standards
       Tom Mahaffey, Asst. Chief Patrol Operations
       Rebecca Boatright, Exec. Dir. Risk Management and Legal Affairs
       Andrew Myerberg, Dir. OPA
       Antonio Oftelie, Federal Monitor
       Julie Kline, Mayor's Office
       Lisa Herbold, City Council Public Safety Chair