THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) Case No. 2:12-cv-01282-JLR ) |
| v. | ) **CITY OF SEATTLE'S NOVEMBER 2022** ) **QUARTERLY ACCOUNTABILITY** |
| CITY OF SEATTLE, | ) **UPDATE** ) |
| Defendant. | ) ) ) ) ) |

The City submits this quarterly report regarding its progress and activities in the following areas: (I) ongoing work under the Monitoring Plan and implementation of the Monitor's recommendations, and (II) quarterly, quantitative data regarding the use of force and police discipline.

**I.     The City continues to implement the Monitor's recommendations, including expanding the oversight role of the Office of Inspector General for Public Safety.**

The Monitor's 2022 Comprehensive Assessment provides technical assistance in the form of recommendations for improving systems and capacity building. In addition, the 2022 Monitoring Plan

CITY OF SEATTLE'S NOVEMBER 2022 QUARTERLY
ACCOUNTABILITY UPDATE - 1
(12-CV-01282-JLR)

Ann Davison
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

specifies tasks, ongoing projects, and other activities that the City has agreed to undertake throughout 2022. The following updates reflect the City's ongoing commitment to continuous improvement and accountability.

    A.    *OIG has continued its work promoting and ensuring systemic reform and accountability in areas that are core to the Consent Decree, as well as conducting projects that reach beyond it.*

OIG selects projects based on risk-management criteria. This approach increases the effectiveness of OIG resources and focuses efforts on issues with the greatest impact on the City and its residents. OIG defines "high-impact risks" as including, but not limited to, those involving racial disparity, potential loss of life, damage to public trust, or weakening of accountability systems or major reforms. In addition, OIG places weight on community priorities and maintains space in its work plan for emerging issues that arise during the year and which could potentially impact accountability. *See generally* Exhibit A at 3 (OIG's 2022 Work Plan).

On October 11, 2022, OIG issued its third Sentinel Event Review (SER) report covering the period during the protests after SPD withdrew its officers from the East Precinct building and the Capitol Hill Organized Protest was established. The report is attached as Exhibit B. SER is a community-centered process examining SPD's response to the protests through a non-blaming, forward-looking framework. The goals of the SER are to reflect the perspectives of the community, identify root causes of negative outcomes, and recommend ways to improve systems. Among other focuses, the third SER report examines the decision to leave the East Precinct; an instance of SPD using deceptive radio messaging with protestors[1]; and the impacts on victims of crime (including

---

[1] After investigating, OPA found that the deception used, which raised the possibility of a Proud Boys demonstration, "took a volatile situation and made it even more so."

**CITY OF SEATTLE'S NOVEMBER 2022 QUARTERLY ACCOUNTABILITY UPDATE** - 2
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

two homicide victims as well as residents, local businesses, and protestors affected by other types of crime). Exhibit B at 4. Among other recommendations, the report provides ideas for how the City can achieve: more accountable, transparent decision-making; improved internal and public-facing communications; better tactics for responding to an "occupy-style protest movement." *Id.* at 5 and App. B.

SPD continues to be an engaged and critical partner in the SER Panels and has worked collaboratively with OIG to incorporate and respond to the recommendations in each successive report. SPD's response to the Wave 3 SER Report is attached as Exhibit C. Examples (among many) of Wave 3 recommendations that SPD already has adopted include: improving internal channels of communication among command and officers in advance of foreseeable crowd events; adding a civilian position to ensure accurate log keeping at the Seattle Police Operations Center (SPOC); new SPOC protocol for documenting planning and decisions in TEAMS; adopting a standardized approval process for IAPs; and ensuring that SPD and the Seattle Fire Department have an option available to communicate with each other using the same radio channels. *See generally id*.

Importantly, OIG's monitoring work is not limited to areas—such as the use of force—addressed by the Consent Decree. On October 12, 2022, OIG issued a memo to help inform SPD policy on the use of deception ("ruses"). SPD undertook this policy process in the aftermath of two cases that prompted significant community concerns. Although the officers involved in both cases were disciplined for violations of SPD policy, the incidents brought attention to potential gaps in SPD's policy on dishonesty. As part of its efforts, OIG commissioned a white paper from a subject matter expert and held stakeholder meetings and roundtable discussions, which included

CITY OF SEATTLE'S NOVEMBER 2022 QUARTERLY
ACCOUNTABILITY UPDATE - 3
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

active SPD participation. This process culminated in OIG providing feedback to SPD with respect to potential review and approval processes, impact on community trust, and promoting legitimacy.[2] SPD is in the process of developing a policy for patrol officers in light of OIG's recommendations.

Another upcoming report demonstrates OIG's capacity to go beyond the Consent Decree and examine a broad range of issues that are important to the community. The Community Police Commission and City Councilmember Herbold asked OIG to review SPD's implementation of and compliance with the 2020 Mi'Chance Dunlap-Gittens' Youth Rights Ordinance. The Youth Rights Ordinance affords legal rights to young people aged 18 or under who are being questioned by law enforcement officers. Now, in circumstances that necessitate a Miranda warning, questioning cannot take place until a lawyer at King County Department of Public Defense explains Miranda Rights to the young person.

OIG recently received independent verification of its effective performance. On October 6, 2022, OIG received a rating of "Pass" (which is the highest rating) as a result of its first independent peer review through the Association of Local Government Auditors (ALGA). Under Generally Accepted Government Auditing Standards (GAGAS), this review occurs every three years and provides assurance that performance audits conducted in the review period were in compliance with GAGAS. The results of the review can be found here.

> B.   *OIG has incorporated a new approach to identifying disparity issues, dovetailing with recent recommendations of the Monitor.*

Since its founding, OIG has dedicated significant efforts to the impact of SPD practices on

---

[2] Available at https://www.seattle.gov/documents/Departments/OIG/Other/221017DeceptionPolicyMemoFinal.pdf

**CITY OF SEATTLE'S NOVEMBER 2022 QUARTERLY ACCOUNTABILITY UPDATE** - 4
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

racial disparities. In 2019, OIG provided technical assistance to SPD by conducting an independent evaluation of statistical methods that it uses to identify and track potential racial disparity in investigative stops.[3] Throughout the SER process, race dynamics and equity have been a critical focus. As another example, at OIG's urging, OIG and SPD convened a stakeholder workgroup beginning in 2021 to collaborate on a traffic enforcement initiative. The goal of this effort is to identify and implement alternatives to minor traffic stops that support racial equity. Data gathering to inform these alternatives has been ongoing since 2021. This work culminated in SPD de-prioritizing the following traffic offenses by no longer considering them as a primary basis for a stop:

- Expired or missing vehicle registration,
- Issues with the display of registration plates (e.g., missing front license plate),
- Technical violations of the traffic code, such as items hanging from the rear-view mirror and cracks in the windshield, and
- Bicycle helmet violations.

See Chief Diaz's Letter to OIG.[4]

Looking forward, in order to more fully center community concerns about racial disparities in its work going forward, OIG recently made a commitment that all SPD-related audits it conducts in the future will include an analysis of racial disparities as one component of the audit.

---

[3] Available at https://www.seattle.gov/documents/Departments/OIG/Policy/DisparityMethodEval031819.pdf

[4] Available at https://www.seattle.gov/documents/Departments/OIG/Other/Letter%20to%20Inspector%20General%20Lisa%20Judge%20-%20Traffic.pdf

**CITY OF SEATTLE'S NOVEMBER 2022 QUARTERLY ACCOUNTABILITY UPDATE** - 5
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

Although not a specific recommendation of the Monitor, this equity-centered approach to SPD oversight addresses some of the Monitor's findings and resonates with the Monitor's message that action is needed in order to build community trust. Dkt. 709 at 135. In the 2022 Comprehensive Assessment, the Monitor wrote that "SPD must continue the important work of assessing and addressing unwarranted disparities in partnership with the community." *Id*. The Monitor also recommended that SPD re-engage OIG in this work. *Id*. at 142. OIG's future efforts in this area will bring analytical rigor and valuable experience from the SER community-driven process.

C. *SPD and OIG are collaborating on implementing a key recommendation of the Monitor: making SPD's analytical reports and public-facing data dashboards more digestible to the public.*

In its recent findings on SPD's disparity analytics, the Monitor concluded, "[f]ew, if any, law enforcement agencies in the United States have built or maintain the internal capacity to produce ongoing disparity analyses at [SPD's] level of rigor and sophistication." Dkt. 709 at 137. Indeed, SPD is currently ranked third highest for data transparency across police departments nationwide, by the Vera Institutes Police Data Transparency Index. In his Comprehensive Assessment, the Monitor also stated that SPD's ability to identify and meaningful analyze its disparity data should "inspire confidence." Dkt. 709 at 141.

The Monitor did, however, make a series of recommendations, including that SPD "[m]ake [its] disparity analytics publicly available and digestible where feasible" and to "[c]ollaboratively engage[] with its community partners on these new analytics and their potential impact." *Id*. at 138-39. In keeping with these recommendations, SPD committed in the 2022 Monitoring Plan to work to better align the internal data that it relies on for analytics with the data available on its public-facing "dashboards."

CITY OF SEATTLE'S NOVEMBER 2022 QUARTERLY
ACCOUNTABILITY UPDATE - 6
(12-CV-01282-JLR)

Ann Davison
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

Accordingly, SPD and OIG have been engaged in a collaboration to enhance SPD's public-facing "dashboards" and other analytical products. These dashboards allow any member of the public to search policing data on SPD's website. During this effort, the OIG has been contributing to the development of visual "infographics" designed to help people who do not have a technical background understand the dashboards. In addition, OIG is assisting the department with a review of the metadata pages describing the public data maintained by the department.

D.  *The Executive and City Council are collaborating to develop diversified responses to 911 calls, rather than routing all emergency calls to SPD.*

During the last quarter, the Executive Branch and City Council Central Staff formed a joint task force to develop a strategy and near-term steps for creating an alternative 911-response program that (among other goals) does the following: diversifies the City's response options to appropriately meet community needs, including through non-law-enforcement responses; increases the rate and timeliness of responses; and is more equitable for the City's Black, Indigenous and people of color and most vulnerable underserved populations.

The initial workplan and shared goals and commitments were [presented publicly](#) at a hearing of the City Council Public Safety and Human Services Committee on September 13, 2022.  One proposal being explored is a co-response pilot to be implemented in the short-term that would separately dispatch SPD officers and civilian teams to respond to certain non-violent, non-criminal calls that involve people experiencing a behavioral health crisis. In addition to building consensus among the City's leadership on a path forward, the task-force's findings are informing the City budget review process currently underway.

**CITY OF SEATTLE'S NOVEMBER 2022 QUARTERLY ACCOUNTABILITY UPDATE** - 7
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

E.  *In parallel with the work of the Executive-Council Task Force, SPD is analyzing its past 911 response data and developing technology that will enable the City to provide diversified responses to 911 calls.*

In the last quarter, SPD completed Phase I of its Risk Managed Demand (RMD) analysis. As part of this phase, SPD studied which call types currently responded to by officers can be handled by alternative or co-responders. To do this, SPD analyzed nearly 2 million records of police responses, taking into account the initial classification or "type," the final type, and the outcome of each emergency call. Declaration of Brian Maxey, ¶¶ 3-4.

SPD now is moving into Phase II which involves designing and building a "Call Classifier." The Call Classifier will be a machine-learning tool that classifies the severity of risk for any given call. It will use the historical data analyzed in Phase I and continue to improve and learn from the new data generated as it operates. For example, the model identifies some calls that do not require an in-person patrol response and could, instead, be best addressed by scheduling an appointment with a detective. The model additionally recognizes the possibility that the very act of sending an armed police response could, itself, escalate an otherwise low-risk situation. Some types of calls, accordingly, may best be addressed by dispatching non-police responders with police in close attendance (but not necessarily physically present) and able to rapidly intervene. Maxey Decl. ¶¶ 5-6.

Once completed, the solution will be integrated with the SPD's computer-aided dispatch system and available for access by Community Safety Communication Center (CSCC) workstations. The CSCC handles more than 900,000 calls per year, and approximately 80% of the

**CITY OF SEATTLE'S NOVEMBER 2022 QUARTERLY ACCOUNTABILITY UPDATE** - 8
(12-CV-01282-JLR)

911 calls last year were for non-criminal events; as a result, an important goal is to invest more resources on emergencies and fewer resources on low-risk calls. Maxey Decl. ¶ 7.

In addition, SPD and CSCC hope to implement a more advanced online reporting system that can reach a wider group of people. They are evaluating a system that can provide language translation services, be accessible to people with disabilities, and also increase the ability to assist people with limited access to technology. Maxey Decl. ¶ 7.

F.   **SPD reached two milestones in developing a next generation "early intervention system."**

As one of the Consent Decree required reforms, SPD adopted an early intervention system (EIS) in 2014 in order to support employee wellness and professional growth by seeking to identify and mitigate against factors that may lead to negative performance issues. Dkt. 125. Since then, SPD has annually revised and improved on that system.

SPD has partnered with researchers from the Washington State University College of Nursing and the National Network for Safe Communities at John Jay College of Criminal Justice in developing a next-generation EIS. The ultimate goal is that the next-generation EIS will provide insights and guidance for supervisors on how to mentor and achieve positive outcomes. The system is expected to combine forecasts of adverse events with guidance on how to support an employee in improving their behavior. The code for this system, including predictive models, is being built on open-source software, and SPD will make it publicly available, free of charge. Maxey Decl. ¶ 9.

Over the past quarter, SPD achieved two milestones in this work. The first milestone is that SPD implemented a substantial upgrade to its data analysis software, called "DAP 2.0." Next generation EIS requires this software in order to operate. All engineering infrastructure,

**CITY OF SEATTLE'S NOVEMBER 2022 QUARTERLY ACCOUNTABILITY UPDATE** - 9
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

data sources and processes for DAP 2.0 became operational as of October 12, 2022. This achievement sets the stage for DAP 2.0 to "go live" on November 3, 2022. Maxey Decl. ¶ 11.

This upgrade to SPD's already advanced data processing capabilities will allow the next generation EIS to analyze approximately 1,500 individual data points in the forecast of officer adverse events (e.g., sustained complaints). In the future, SPD plans to add even more direct measures of officer behavior and more adverse event types (e.g., high severity complaint types, EEO complaints, serious use of force). Maxey Decl. ¶ 11.

The second milestone reached is that, on October 6, 2022, SPD hosted a workshop with subject matter experts from across the country and internal stakeholders to design interventions (i.e., specific action plans that supervisors can use with officers) to address behaviors potentially leading to the receipt of a sustained complaint. A follow-up workshop will be held the week of November 7, 2022. Maxey Decl. ¶ 12.

The next generation EIS is on schedule to be in production and rendering predictions by the end of 2022. An evaluation of the next generation EIS will be conducted in parallel with SPD's existing, threshold-based EIS during the first half of 2023, and the results will inform SPD's decision-making regarding next steps. Maxey Decl. ¶ 13.

G. *SPD continues to expand and advance its internal accountability systems.*

SPD is nearly finished implementing a new feedback mechanism for patrol officers. Through quick, mobile-friendly surveys, a new customer service platform will gather near-real-time feedback on how members of the public experience their interactions with officers. In addition to collecting important feedback on professionalism and other metrics, the program also is expected to provide reference information and resource links more quickly to people who seek

CITY OF SEATTLE'S NOVEMBER 2022 QUARTERLY
ACCOUNTABILITY UPDATE - 10
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

assistance. By the first quarter of 2023, SPD anticipates that it will use data generated from this program as one of its quality metrics in monthly SEAStat meetings. Maxey Decl. ¶ 14.

SPD also volunteered to serve as a pilot site with Health Check, an initiative of the New York University School of Law Policing Project to implement "a comprehensive tool to define and measure the characteristics of a fair, effective, and just policing agency." As part of this pilot, a social science researcher is working with SPD to analyze approximately 100 different metrics that are intended to assess the quality of public safety services, just policing, accountability, and organizational efficiency. Maxey Decl. ¶ 16.

SPD is also participating in the "Justice Counts" initiative of DOJ, a coalition of state governments, and numerous other partners. Justice Counts developed a set of metrics that draw on criminal justice data and which constitute another important self-assessment tool. The primary purpose of Justice Counts is to provide policy makers, including law enforcement agencies, with current, usable criminal justice data for decision-making. SPD is one of the early police departments to begin participating in this self-assessment tool. Maxey Decl. ¶ 16.

**II.     Quarterly data reflect sustained compliance with the Consent Decree and a well-functioning accountability system.**

A.   *SPD quarterly data for July 1, 2022, through September 30, 2022, demonstrate stability with respect to use-of-force and crisis-intervention outcomes.*

The Monitoring Plan requires SPD to provide quarterly data and analysis to facilitate oversight and long-term trend analysis. One important metric that has been tracked throughout the

**CITY OF SEATTLE'S NOVEMBER 2022 QUARTERLY ACCOUNTABILITY UPDATE** - 11
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

Consent Decree is the amount of serious force[5] used by SPD officers. In 2022, the number of incidents involving a serious use of force continue to be exceedingly low. *See* Table 1.

Table 1. 2022 Incidents involving serious (Type I or II) uses of force

| Q1 | Q2 | Q3 |
|----|----|----|
| 43 | 46 | 21 |

It is also instructive to track the overall numbers of uses of force. In reviewing these numbers, it is important to note that a "use of force" is different from an incident involving force. A "use of force" is defined to include the interactions between one officer and one subject. Because many incidents involve more than one officer, frequently a single incident involves multiple uses of force.

Table 2. 2022 Total number of uses of force

|  | Q1 | Q2 | Q3 |
|---|----|----|----|
| Type I | 205 | 211 | 188 |
| Type II | 71 | 83 | 50 |
| Type III | 3 | 3 | 1 |
| Officer-involved shootings | 8[6] | 2 | 0 |

---

[5] Serious force includes all Type II and Type III uses of force. Type II force is defined as "[f]orce that causes or is reasonably expected to cause physical injury greater than transitory pain but less than great or substantial bodily harm. Type III force is defined as "[f]orce that causes or may be reasonably expected to cause substantial bodily injury." *See* Seattle Police Manual § 8.050, available at https://www.seattle.gov/police-manual/title-8---use-of-force/8050---use-of-force-definitions

[6] The officer-involved shootings in Quarter 1 were spread across three separate, fatal incidents, each involving one subject. The number eight represents the number of officers who discharged a firearm in those three incidents.

**CITY OF SEATTLE'S NOVEMBER 2022 QUARTERLY ACCOUNTABILITY UPDATE** - 12
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

| Total | 287 | 299 | 239 |

In addition to amount of force, the Monitor and the parties also have considered the rate of force used by SPD. That is, how frequently do interactions between police officers and members of the public result in a use of force? One method that the Monitor and SPD have used to estimate this rate is taking the number of reported uses of force and dividing it by the number of "dispatches" (i.e., the number of events to which officers were either dispatched or which they on-viewed in the field). *Monitor's Ninth Systemic Assessment* (Dkt. 383) at 30 (reporting that SPD used force in 0.3% of all incidents, while noting this figure is approximate). More recently, in 2019 the annual rate was less than one-fifth of one percent (0.15%) of all officer dispatches. *SPD's Use of Force Rept.* (Dkt. 605-1) at 2. This rate shows that, overall, the use of force by SPD officers has become an empirically rare occurrence. *See id.* Quarterly data from the past year demonstrate sustainment. *See* Table 3.

Table 3. 2022 total number of uses of force divided by number of dispatches

|  | Q1 | Q2 | Q3 |
|---|---|---|---|
| Dispatches | 163,219 | 175,136 | 189,994 |
| Uses of Force | 286 | 298 | 210 |
| Rate | 0.18% | 0.17% | 0.11% |

The excessive use of force against individuals experiencing behavioral crisis was a critical finding in DOJ's 2011 investigation. *DOJ Findings Letter* (Dkt. 1-1) at 4. In 2016, the Monitor evaluated SPD's compliance with Consent Decree mandated crisis intervention practices and found that SPD had met the requirements in this area. *Monitor's Fifth Assessment* (Dkt. 272) at 1.

**CITY OF SEATTLE'S NOVEMBER 2022 QUARTERLY ACCOUNTABILITY UPDATE** - 13
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

The Monitor concluded that "SPD has, in a relatively brief amount of time, created a full-fledged crisis intervention program that is successfully being woven into the SPD organization." *Id.* at 4.

Due to these training and programmatic changes, the use of force in crisis incidents has become infrequent. The Monitor reported that this rate had fallen to less than 2 percent and observed, "[t]hese numbers suggest that the SPD is using significant and appropriate restraint in difficult situations, making decisions that preserve safety and reduce use of force." *Monitor's Fifth Assessment* (Dkt. 272) at 11-12. During the most recent crisis intervention assessment, covering the 18-month period from Jan 1, 2018, to June 30, 2019, reportable force was used in only two percent of crisis contacts. *SPD's Crisis Intervention Rept.* (Dkt. 588-3) at 27. Throughout 2022, this rate has remained equally low, fluctuating between less than 1% and 1.34%. *See* Table 4.

Table 4. 2022 percentage of crisis contacts in which reportable force occurred.

| Q1   | Q2   | Q3   |
|------|------|------|
| 1.2% | 1.3% | 0.9% |

    B.    *Quarterly data on police disciplinary investigations and appeals demonstrate that discipline is a solid component of the City's robust police accountability system.*

The Office of Police Accountability (OPA) is responsible for conducting disciplinary investigations into allegations of misconduct by individual officers. In addition to making findings with respect to officer misconduct, OPA also identifies training, policy, and other system issues through its work. On October 31, 2022, the current Director of OPA, Gino Betts, was re-confirmed by a unanimous vote of City Council to serve a four-year term. Director Betts had previously been confirmed to serve for the remainder of former Director Myerberg's term.

**CITY OF SEATTLE'S NOVEMBER 2022 QUARTERLY ACCOUNTABILITY UPDATE** - 14
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

Because of the important role that OPA serves, the City has committed to submit data to the Court regarding its disciplinary investigations and appeals. When OPA receives a complaint alleging that one or more officers have committed a serious policy violation, it opens a new investigation. The police union contracts require that OPA must complete its investigations within 180 days, with some exceptions. Between July 1, 2022, and September 30, 2022, OPA opened 51 new investigations. As of September 30, 2022, OPA had a total of 255 open investigations.

OPA completed 56 investigations during the third quarter of 2022. For each of these investigations, the OPA Director issued a memo with conclusions and recommended findings to the Chief of Police. All OPA findings issued since 2016 are available on OPA's website.[7] If the evidence shows that a serious violation of SPD policy occurred, the OPA Director will recommend a "sustained" finding. If the evidence shows that misconduct did not occur, the Director will likely recommend a "not sustained" finding. Out of the 56 completed investigations during the past quarter, OPA recommended sustaining allegations in four of these cases against a total of six SPD employees. There was one sustained use-of-force allegation, one sustained force reporting allegation, and one sustained use-of-force de-escalation allegation; these findings involved two cases and two officers.

If the OPA Director recommends finding that an employee committed misconduct, then the Chief of Police decides whether to impose discipline and what the discipline should be. Examples of discipline include oral reprimand, written reprimand, demotion, reassignment, suspension from work (without pay), and termination. If the Chief decides not to follow one of the OPA Director's recommended findings, then the Chief must issue a public statement explaining

---

[7] Available at https://www.seattle.gov/opa/news-and-reports/closed-case-summaries

**CITY OF SEATTLE'S NOVEMBER 2022 QUARTERLY ACCOUNTABILITY UPDATE** - 15
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

the reasons. Thus far in 2022, the Chief has not overturned any of OPA's findings. Between July 1, 2022, and September 30, 2022, as a result of OPA's investigations, the Chief imposed discipline on ten officers.[8] During this time, one disciplinary appeal was filed related to an OPA recommended finding of misconduct; in this case, the union chose to appeal to the Public Safety Civil Service Commission (the appellate body specified in the Accountability Ordinance, Ordinance No. 125315, § 3.29.420(A)(7)(a)[9]) rather than to an arbitrator.

## CONCLUSION

Consistent with the Monitor's conclusion in the 2022 Comprehensive Assessment, the City continues to sustain its compliance with the Consent Decree requirements and remains dedicated to continuous improvement and ongoing reform. The Monitor's recommendations and technical assistance have served an important role over the past quarter.

---

[8] Because the Chief must review and contemplate disciplinary matters before reaching a decision, there is a time lag. Some of the cases in which the Chief imposed discipline in the third quarter of 2022 were closed by OPA before the third quarter.

[9] The relevant provision of the Accountability Ordinance appears Dkt. 396-1, p. 86.

**CITY OF SEATTLE'S NOVEMBER 2022 QUARTERLY ACCOUNTABILITY UPDATE** - 16
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

Respectfully submitted,

DATED this 1st day of November, 2022.

    For the CITY OF SEATTLE
    ANN DAVISON
    Seattle City Attorney

    *s/ Kerala Cowart*
    Kerala Cowart, WSBA #53649
    Assistant City Attorney
    Seattle City Attorney's Office
    701 Fifth Avenue, Suite 2050
    Phone: (206) 733-9001
    Fax: (206) 684-8284
    Email: Kerala.Cowart@seattle.gov

**CITY OF SEATTLE'S NOVEMBER 2022 QUARTERLY ACCOUNTABILITY UPDATE** - 17
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200