## **EXHIBIT A**



# 2022 OIG Work Plan

December 30, 2021

Office of Inspector General
City of Seattle
PO Box 94764
Seattle, WA  98124-7064

www.seattle.gov/oig/reports
oig@seattle.gov
(206) 684-3663



## I.    Introduction

The Office of Inspector General for Public Safety (OIG) was established in 2017 as part of the City of Seattle police oversight system. OIG provides oversight of management, practices, and policies of the Seattle Police Department (SPD) and Office of Police Accountability (OPA). OIG promotes fairness and integrity in the delivery of law enforcement services and the investigation of police misconduct. OIG strives to make systemic recommendations for lasting reform that reflect the values of Seattle's diverse communities.

OIG responsibilities include:

- conducting performance audits and reviews to ensure the integrity of SPD and OPA processes and operations;
- ensuring SPD is meeting its mission to address crime and improve quality of life through the delivery of constitutional, professional, and effective police services that retain the trust, respect, and support of the community;
- reviewing OPA's intake and investigation of misconduct allegations;
- evaluating SPD response to incidents involving death, serious injury, serious use of force, mass demonstrations, or other issues of significant public concern, to assess the integrity of SPD investigative processes; and
- making recommendations to policymakers for increasing fairness and integrity in the delivery of SPD services and related criminal justice system processes.

To fulfill these responsibilities, OIG has four operational functions: audit, policy, investigations, and strategic leadership, guided by an overarching goal to work toward a sustainable, accountable law enforcement system.

*Looking Back and Ahead*

OIG work in 2021 continued to be impacted by the historic global events of 2020: the COVID-19 pandemic and mass demonstrations demanding police reform and accountability. COVID-19 changed the way OIG performs its work, while the demonstrations altered the priorities of OIG work for 2020 and beyond. These events meant that OIG delayed planned 2020 projects and re-evaluated its work plan for 2021.

Going into 2021, staff were still managing the significant impacts of 2020 and adjusting the workload to manage and complete large projects begun during that prolonged period of turmoil. The 2022 work plan continues to dedicate resources to finishing projects from prior work plans that are important for accountability. Clearing the slate of projects from the past two years will allow OIG to start 2023 with a clean slate for the new challenges that lie ahead for police accountability.



*Project Prioritization*

OIG uses a risk management approach for project selection. This increases the effectiveness of OIG resources and focuses efforts on issues with greater impact on the City and its residents. Risk assessment has two components: potential impact and likelihood of the impact occurring. OIG prioritizes issues with risks that have a high potential impact and a high likelihood of occurrence.

In the OIG assessment process, high-impact risks include, but are not limited to, those involving racial disparity, potential loss of life, damage to public trust, or weakening of accountability systems or major reforms. Likelihood is evaluated through a variety of factors, including past incidents and the strength of any preventative or mitigating systems.

OIG considers information from a wide variety of sources, such as:

- systemic issues identified by OIG staff during ongoing work;
- input from community members;
- referrals or work plan requests from stakeholders;
- consent decree-related and regulatory requirements;
- best practice trends, reports, or activities in the field of accountability, both within the City and in other jurisdictions; and
-  current events and news media.

With so many sources of salient potential topics and limited OIG resources, OIG strategically balances project selection to better achieve work plan commitments. Any projects added during the year will undergo strategic consideration of need versus impact on ability to complete existing projects.

*Emerging Issues*

This work plan preserves necessary space for emerging issues impacting accountability that arise during the year. That space is critical to allow OIG to devote resources to unplanned significant issues, while also leaving sufficient resources to complete the planned body of work with minimal disruptions.

 **Seattle** Office of Inspector General

## II.    Audits

This section of the work plan describes OIG audit work performed in accordance with the Generally Accepted Government Auditing Standards (GAGAS)[1] and other "non-audit projects." Non-audit projects are not subject to the strict standards of GAGAS and are used when the analysis of the topic or request is best approached with a less formal and time/resource intensive process. Examples include alert letters, highlighting emergent issues, or a -summaries of best practices. However, these non-audit projects are still subject to rigorous standards of criteria selection, evidence review, and quality control. Selection of audits also depends upon available resources, given expected resource needs for a project.

*Audit Team Projects*

## Ongoing Projects

### Audit of Mutual Aid

OIG is conducting an audit of SPD operations and actions when the agency engages  with other law enforcement agencies pursuant to task force and mutual aid agreements to assess SPD compliance with policy. OIG expanded the scope of this audit to include an assessment of interactions with mutual aid entities during the 2020 mass demonstrations.

### Non-Audit Report on High-Risk Persons-in-Crisis SPD Responses

OIG is finalizing work on this non-audit report about SPD responses to high-risk persons-in-crisis calls, particularly those where the subject is armed.

## Recurring Projects

### Review of Collection of Information for Law Enforcement Purposes

Pursuant to SMC 14.12.330, OIG determines whether SPD is complying with Chapter 14.12 regarding the collection of private sexual information and other restricted information, including religious and political affiliation. This work is done on an on-going basis. The follow-up review to the original OIG audit of Chapter 14.12 will determine whether SPD implemented prior OIG recommendations.

### Audit Follow-Up Reporting

OIG will examine how best to report on recommendation follow-ups on its website and identify a schedule for follow-up of its existing audits. This is related to the OIG 2021 Work Plan request by Public Safety Chair Herbold for a public dashboard of the status of OIG recommendations.

---

[1] Promulgated by the U.S. Government Accountability Office.

 **Seattle** Office of Inspector General

## 2022 Performance Audits and Reviews

### Youth Rights Ordinance

OIG will undertake a work request from Councilmember Herbold to review SPD compliance with the Mi'Chance Dunlap-Gittens' Youth Rights Ordinance. See Inter-Agency Requests below.



**2022 OIG Work Plan**
▸ Surveillance Work

## III.   Surveillance Work

Pursuant to Section 14.18.060 of the Seattle Municipal Code (SMC), OIG annually reviews SPD use of surveillance technology and department compliance with SMC Chapter 14.18 by September for the technologies of the previous year.

*First-Year Implementation*

There are presently eight technologies that have been approved, and are required to be included in the review, including two with additional requested analysis.



Seattle Office of
Inspector General

## IV.    Policy

OIG policy work utilizes a data-driven approach to increase the organizational effectiveness and efficiency of the public safety and accountability system, with a focus on projects that impact community trust and support racial justice and diversity. OIG utilizes statistical, analytical, and process-mapping expertise to support and inform our work.

*Policy Projects*

## Ongoing Projects

### Sentinel Event Review

A sentinel event is a significant negative outcome, such as a death or serious injury, that acts as a signal that problems exist within a system. A sentinel event review seeks to determine root causes of the negative event in order to prevent its recurrence. In 2019 OIG began a community-centered Sentinel Event Review (SER) of 2020 mass demonstrations in Seattle. OIG is conducting SERs on five waves of critical protest incidents; the -inaugural report covering the first wave was released in July 2021. OIG is also working with an international expert consultant on crowd psychology to further inform our understanding of the events of 2020, and approaches for improved crowd management in a separate report.

### Minor Traffic Stops Workgroup

In May 2021, the IG sent a letter to Police Chief Diaz inviting SPD to collaborate in exploring alternatives to traffic enforcement in ways that do not involve in-person stops for minor violations.[2] A stakeholder workgroup was formed and data gathering commenced in mid-2021. The goal of this effort is to identify and implement alternatives to minor traffic stops that support racial equity (by reducing opportunities for racial disparity in traffic stops as has been discussed nationwide).

## Recurring Projects

### State Legislative Agenda

OIG issues recommendations on the City's State Legislative Agenda (SLA) each year.[3] OIG's priorities are determined by assessing themes seen in OIG work throughout the year that signal areas where greater strides may be made to improve the systems of policing through legislative efforts. OIG recommendations are also supported by considering laws, practices, and stakeholder concerns, locally and nationally.

---

[2] http://www.seattle.gov/Documents/Departments/OIG/Other/OIGDiazLetterMinorTrafficOffenses051821.pdf
[3] This project is mandated by Ordinance 125315.

 **Seattle** Office of Inspector General

### Trends in Inquests, Claims and Lawsuits

OIG annually reports data on inquests, claims, and lawsuits alleging police misconduct. [4] OIG worked with city agencies to identify data sources, partnerships, and methods to collect and analyze relevant data. Such data provide an opportunity for future trend analysis.

### OPA Sworn and Civilian Staff Study

OIG is charged with annually examining the impact of OPA's civilianization efforts on OPA processes and outcomes for complaint investigation.[5] A cross-jurisdictional review and analysis is in progress to determine the impact of civilianization within OPA.

---

[4] This project is required by Ordinance 125315.
[5] This work is required by Ordinance 125315.



**2022 OIG WORK PLAN**
‣ Investigations and OPA Review

## V.    Investigations and OPA Review

With both OIG and OPA being civilian-led, OIG acts as a double safeguard in the system to ensure investigations are conducted properly and -that the OPA Director is provided  the necessary information to reach fair findings of fact and issue recommendations for discipline.  In that capacity, OIG reviews completed OPA investigations and certifies whether they are timely, thorough, and objective. On a quarterly basis, OIG reviews OPA decisions about classifying a complaint for full investigation; OIG also assesses the appropriateness of the allegations to ensure no allegations have been missed. OIG is charged with reviewing OPA and SPD for systemic issues of concern.[6]

---

*OPA Review Work*

---

### Recurring Work

#### Case Certification and Classification Review

OIG conducts individual reviews of completed OPA investigations and quarterly sampling of classification decisions.  Classification review has an added focus on cases OPA has referred to the SPD chain of command to address.

#### Programmatic Reviews

OIG assesses OPA programs that offer alternative responses to addressing complaints. In 2022, OIG will refine and document its processes for regular review of OPA programs.

- Unsubstantiated misconduct screenings - a program to screen allegations of serious misconduct that are learned of during an internal Chain of Command review that can be clearly refuted by the evidence.
- Bias reviews closed out by OPA - Bias reviews are one of two primary methods by which biased based policing allegations against SPD are resolved (the second method are complaints filed directly with OPA). All bias reviews completed by supervisors in the field are submitted to OPA for final review before being closed out.
- Mediation - OPA may offer mediation to Complainants and Named Employees to resolve disagreements, particularly those involving possible miscommunication or misperception, with the guidance of a neutral third party. When accepted by both parties, mediation is the final resolution of the case.
- Rapid adjudication - Rapid adjudication is available in certain circumstances for employees who acknowledge their behavior was inconsistent with policy and are willing to accept discipline without undergoing a full investigation by OPA. OPA submits cases to OIG for review prior to final classification.

---

[6] Work on systemic matters occurs on multiple fronts throughout OIG's audit, policy, and OPA case review functions.



- Management Action Recommendations – As one potential case outcome, OPA may issue recommendations for systemic policy or training improvements when the OPA Director identifies a potential deficiency.

## 2022 Projects

### Bias Complaint Investigation Process Alternative

In 2021, Councilmember Herbold requested work to determine whether the OPA investigation process might benefit from a Biased-Policing Review Team of community members. OIG is conducting a descriptive analysis of the handling of bias allegations against SPD officers and a benchmarking analysis of other jurisdictions.

### OIG Case Management System

OIG is developing an internal database for case reviews, along with a dashboard for case tracking.



## VI.    Strategic Leadership, Outreach, and Partnerships

Strategic work is performed by the Inspector General to further the goals of OIG, represent the expertise of OIG in stakeholder activities, and participate in Consent Decree sustainability efforts in preparation for the future OIG sustainment role. The IG conducts outreach to inform community about OIG work, and develops partnerships with community and other stakeholders to ensure that OIG work products are relevant and reflect public concern.

The IG or a designee responds to officer-involved shooting (OIS) scenes, certain significant use of force scene investigations, and is present at the SPD Force Review Board that meets on a weekly basis to review significant uses of force.

Work product requirements for OIG include production of an annual report, annual work plan, annual mid-year report, and ongoing public disclosure request responses. Additionally, the IG produces memoranda throughout the year on emerging issues identified as matters of immediate concern by OIG, at the request of Councilmembers, the Mayor, or in response to a request for independent technical assistance.

 **Seattle** Office of Inspector General

## VII.   Horizon Project Areas

Horizon topics arise from existing work and the same sources of systemic issues that inform OIG risk assessment and strategic planning for its annual work plan. These are generally projects that, but for staffing limitations, OIG would otherwise add to its work plan. It may include projects that were previously on the OIG work plan which were discontinued due to resource constraints but remain a priority for review.

*Horizon Audit and Review Areas*

### Overtime and Personnel Management

The ability to reliably track and report on SPD employee hours, including the assignment and fulfillment of overtime hours, is crucial to ensuring public dollars are spent efficiently and appropriately. Use of overtime and personnel management emerged as risk areas through the OIG sentinel event review and discipline audit, as well as public concern over high wages paid to SPD personnel without adequate documentation.

### SPD Contracting and Purchasing

Appropriate use of City funds, particularly on items of major monetary value or related to critical areas such as training, is intrinsically connected to SPD's ability to provide transparent, efficient, effective public safety to the community. Prior OIG projects have encountered potential issues with the accuracy and completeness of SPD contract records.

### Planned Audit(s) in Response to Sentinel Event Review

The community-led Sentinel Event Review work may lead to one or more audits as a by-product of the review, in areas such as use of force, crowd management and force review.

### 911 Call Center Transition

Previously, CPC requested work related to the 911 Call Center. The City will need to be clear on its system for effective oversight of 911 now that it is outside of SPD. OIG may examine issues around the transition. Other issues of interest and community concern in this category include call assignment, response times, response protocols, crisis and equity training, and disparate impact analysis.

### SPD Response to Hate Crimes

With hate crimes on the rise in 2020, this area remains ripe for review and of immediate community concern. CPC has expressed interest in an audit of SPD response to hate crimes, including review of potential bias in investigations and interviews of hate crime victims. The City Auditor issued a two-part review of hate crime response in 2017 and 2019. OIG will continue to review and  assess opportunities for improved police response to hate crimes in collaboration with the City Auditor's Office and other partners.



*Horizon Policy Areas*

## Mapping Use of Force

Previously, OIG created a detailed process map of the SPD disciplinary system.[7] That map is part of OIG efforts to provide transparency to the public about SPD operations. It also  created a starting foundation for the 2021 OIG audit of the SPD disciplinary system.[8] A visual mapping of the Use of Force (UoF) incident handling process, checks and balances, and decision-making steps would provide similar transparency and utility for investigation and review of force, beginning with when an incident is reported through to force administrative review.

## Data Collaborations

OIG collaborates with police accountability system partners (CPC, OPA, and SPD) to standardize and provide access to data used by SPD, OPA and OIG for its analysis. The SPD Data Analytics Platform (DAP) is a data warehouse drawing from multiple systems of record within SPD. In 2020, OIG worked closely with OPA and SPD to produce standardized fields for more transparent and efficient case trend analysis – an endeavor that previously has required labor intensive manual counting due to OPA case management system limitations. There are many opportunities for the development of meaningful data dashboards in DAP that can increase oversight ability and efficiency.

---

[7] http://www.seattle.gov/oig/policy/spd-disciplinary-process-roadmap
[8] http://www.seattle.gov/Documents/Departments/OIG/Audits/AuditofDisciplinarySystemforSPDSwornPersonnel.pdf

## VIII.   Inter-Agency Requests

OIG requests input from stakeholders when establishing the annual work plan. OIG responses to such requests fall into the following categories:

1. **Accept** – OIG will undertake a project on the topic in the current year;

2. **Assess** – OIG will take a preliminary assessment of the subject and evaluate it as a potential future project;

3. **Defer** – OIG recognizes that the topic is appropriate for OIG oversight, but reasons exist why it is not feasible to perform in the current year, e.g., availability of sufficient data, OIG resource constraints, etc.

4. **Decline/Refer to Other Agency** – OIG will refer to this work to a more appropriate agency, with reason given.

### Council Requests

1.   [Accept] Audit/Review/Collaboration of Youth Rights

> Public Safety Chair Herbold has requested OIG to review SPD's implementation of and compliance with the Mi'Chance Dunlap-Gittens' Youth Rights Ordinance. The Mi'Chance Dunlap-Gittens' Youth Rights Ordinance prohibits law enforcement officers from questioning youths aged 18 or younger, in circumstances where a Miranda warning is administered, until a lawyer at King County Department of Public Defense explains Miranda Rights to the young person in question. The ordinance also prohibits law enforcement from requesting consent from a youth to conduct a person, property, or vehicle search, unless that young person has spoken with the Department of Public Defense and has chosen to waive their rights.[9] This was also requested by CPC for the OIG 2021 work plan. The ordinance passed in August 2020, so sufficient data should be available to examine this request.

### Community Police Commission Requests

For many of the below requests, CPC expressed willingness to collaborate with OIG in 2022. OIG appreciates that the numerous requests, many of high concern to community, illustrate the breadth of issues in police oversight to address with limited resources. With requests far outpacing resources, OIG will continue to work with CPC in 2022 to identify opportunities for further collaboration in the requested areas. Some of the topics below are touched on in work already in progress throughout the City.

1.   Review or Audit 911 Dispatch Center—Assess

> CPC requests a review of topics related to the 911 Dispatch Center. These include how calls are classified and assigned, what the reported race and ethnicity were in call types involving a "suspect" or "suspicious person," response times, response protocols, and what crisis and equity

---

[9] https://council.seattle.gov/2020/08/17/council-passes-michance-dunlap-gittens-youth-rights-ordinance/



training is provided to employees. CPC also requests that OIG complete a disparate impact analysis as well as an analysis of how moving 911 dispatch out of the department impacts the ordinance, consent decree, and work conducted by the accountability partners and their ability to receive data, if at all. CPC previously made a similar request for inclusion in the 2019 work plan.

*OIG Response: Migration of the 911 center is included on OIG's list of horizon projects. Call assignment, response times, response protocols, crisis and equity training, and disparate impact analysis will be added to that topic in recognition of CPC's highlighted areas of community concern.*

2. SPD Body-Worn Video (Audit Request)—Deferred

CPC requests an audit focused on the drafted policy and if officers are activating their cameras appropriately. If there is a randomized review process for supervisors, that could be reviewed as well.

*OIG Response: As new BWV policies are implemented, OIG will monitor compliance through OPA case review and issues raised at the Force Review Board. OIG will reconsider the priority of this request relative to other work plan items if issues emerge from monitoring in 2022.*

3. Assess Disparity in Police Stops—Accept [Ongoing]

CPC requests OIG to provide recent data for 2021 and share data from 2020 that highlights findings on disparity in stops. This should be an ongoing study conducted through OIG.

*OIG Response: OIG shares CPC's interest in the ongoing assessment of disparity in police stops. This has been a requirement for SPD under the Consent Decree. OIG will continue to participate as one of the accountability partners, including lending technical expertise to disparity discussions and analysis. Disparity in stops is also part of ongoing stakeholder work regarding minor traffic stops commenced by OIG in 2021. Because this topic intersects with other existing work projects and an SPD dashboard is pending, OIG is not adding a specific separate item to its work plan at this time, but welcomes the opportunity to discuss opportunities for additional analysis with CPC and the other Consent Decree partners throughout 2022.*

4. Follow Up on OIG and CPC Recommendations—Accept

CPC requests that OIG follow up on recommendations made in its 2021 reports and the recommendations CPC made by the CPC to OIG in the previous year. The request includes updates on the status of recommendations not yet implemented (as seen in CPC's recommendation tracker, PART).

*OIG Response: OIG agrees with CPC on the need to follow up on recommendations from OIG audits. It is standard audit procedure to do so, but staff resource limitations have hampered the ability to conduct regular follow-ups. In recognition of this need, the development of a public reporting system for audit recommendation follow-up has been identified in this year's work plan.*



**Seattle** Office of
**Inspector** General

5.   Evaluate SPD Response to Hate Crime Reports—Assess

CPC requests a status report of the current hate crimes reports. CPC requests OIG initiate a continuing audit of hate crimes and department response to hate crimes. This should also include review of potential bias in investigations and interviews of hate crime victims.

*OIG Response: OIG concurs with the CPC's identification of hate crimes as a priority area, with the rise of hate crimes nationally as noted in media and FBI statistics – including a 73 percent rise in anti-Asian hate crimes from 2019 to 2020,[10] and the recent assault on CPC Co-Chair Rev. Walden. The City Auditor previously issued a Review of Hate Crime Prevention, Response, and Reporting in Seattle in 2017 and 2019.[11] In 2022, OIG will continue to offer its technical expertise to City efforts in addressing hate crimes and extremism. Due to staffing limitations, OIG will place this item on its list of horizon projects and discuss with the City Auditor about potential partnership in this area.*

6.   Evaluate White Supremacy in SPD—Assess

CPC requests an evaluation of the rate of white supremacy in the ranks of SPD, how SPD is ensuring candidates are being screened to eliminate bias, and how current SPD personnel are being screened or re-screened to eliminate bias and acts of hate.

*OIG Response: Work is presently ongoing by the Office of the Employee Ombud in this area. OIG provides technical expertise in collaborative discussions as needed and will assess its role in these efforts related to SPD as the project unfolds.*

7.   Continued Efforts on Effective Interviewing—Deferred [Partially completed]

CPC requests that OIG continue to work with CPC and SPD to bring training on effective interviewing techniques and relevant policy changes to SPD, OPA, and OIG. CPC also requests that OIG conduct ongoing audits or review of SPD interviewing practices in the future.

*OIG Response: Since the fall of 2018, OIG has worked to bring an international expert to Seattle to develop a customized training on effective interviewing based on best practices, in collaboration with the other accountability partners and SPD. Early work included discussions with the Washington Innocence Project and Innocent Project New York due to the nexus between bad interviewing practices and false confessions. In 2020, OIG implemented a training program for OPA, OIG, and SPD Force Investigations Team staff which was converted to a virtual training after the advent of COVID-19. Since then, SPD has begun work on a program for a larger segment of its police force. As that program is deployed, OIG will assess opportunities for future evaluation, sustainability, and improvement.*

---

[10] https://www.nbcnews.com/news/asian-america/anti-asian-hate-crimes-rose-73-last-year-updated-fbi-data-says-rcna3741
[11]http://www.seattle.gov/Documents/Departments/CityAuditor/auditreports/Hate%20Crime%20Final%20092017v2.pdf; http://www.seattle.gov/Documents/Departments/CityAuditor/auditreports/2017-09%20Hate%20Crimes%20Ph2_Final.pdf



8. Less-lethal Demonstrations—Declined/Referred to Other Agency

CPC requests a partnership with OIG to plan and share a live demonstration for community of SPD's less-lethal tools. CPC would like this to lead to an ongoing performance review of those less-lethal tools and tactics that would rate tool management, efficacy, and safety.

*OIG Response: SPD arranged less-lethal tool demonstrations for community and the accountability partners as the City was grappling with SPD use of less-lethal tools in mass demonstrations, including as part of OIG's sentinel event review of protest response. OIG believes that expanding these opportunities with community is a matter better suited to CPC working directly with SPD. OIG can continue discussions with CPC on possible future work within OIG's purview.*

9. Officer Wellness Survey— Declined/Referred to Other Agency [Ongoing]

CPC requests OIG to conduct an ongoing Officer Wellness survey that evaluates officer wellness and the correlation between officer wellness and de-escalation efforts.

*OIG Response: Officer wellness was part of the recommendations arising out of the OIG sentinel event review of police protest response. SPD has a wellness unit that is already surveying officers, and it is better positioned to perform any ongoing assessment. However, as illustrated by the sentinel event review, OIG remains attuned in the course of its work to the impacts and implications of officer wellness in ongoing OIG projects.*

10. Review OPA Complaint Handling—Accept [Ongoing]

CPC requests that OIG conduct ongoing reviews and issue a report on the thoroughness, fairness, consistency, and timeliness of OPA complaint handling for cases that are not investigated by OPA. For example, these include cases that result in supervisor action, mediation, and rapid adjudication.

*OIG Response: Since 2020, OIG has engaged in significant efforts to increase staffing for its investigations unit that reviews OPA work. In 2022, staffing resources will be more closely aligned with the heavy workload for the first time. The 2022 work plan reflects that OIG will return to quarterly reporting in mid-2022 as new staff are trained. In the meantime, OIG continues to report on these areas as part of its annual report.*

11. Improve SPD Disciplinary Process—Assess

CPC requests that OIG collaborate with SPD to improve its disciplinary process. Specifically, CPC would like OIG to determine what process is in place to ensure officers are not repeat offenders regarding misconduct and officer-involved shootings. CPC would like OIG to conduct an audit of officers involved in multiple shooting incidents to determine if there is a pattern in the cases that produce repeated involvement in using deadly force.

*OIG Response: OIG shares CPC's high prioritization of disciplinary process improvement; it has long been an item of concern to the federal court and to community predating the consent decree. OIG has been engaged in a multi-year effort to address this issue, beginning with a 40-*



**Seattle** Office of
Inspector General

*page mapping of the SPD disciplinary process. From that starting point, OIG initiated a discipline audit that was published in November 2021. As OIG engages in follow up to its audit, OIG welcomes further discussion with CPC on areas of strong community interest.*

## 12. Retention and Recruitment Audit—Deferred

CPC requests an audit of SPD's recruitment and retention efforts to ascertain how the loss of officers impacts communities and the goals of policing in Seattle.

*OIG Response: OIG had retention on its 2020 work plan, but much of the work plan was disrupted by the major events of 2020. COVID-19 and protests in the aftermath of George Floyd's murder changed the public discourse around staffing and budgeting for SPD. After the effects become more settled in 2022, OIG can re-examine this issue.*

## 13. Sentinel Event Review—Assess

CPC requests that OIG conduct a sentinel event review of the Iosia Faletogo officer-involved shooting to identify avenues for preventing similar incidents, including changes to SPD policies and training to avoid the use of deadly force.

*OIG Response: Sentinel event review has been in the OIG work plan since the first filing in 2019. In the 2020 OIG work plan, OIG agreed with CPC that the tragic officer-involved death of Iosia Faletogo could be an important case for sentinel review. As initial work progressed on developing an approach for the review, the summer of 2020 police protests happened. The rolling incidents that occurred became the basis for a years-long sentinel event review that is still in progress. The methodology that was developed to keep the process community-centered includes a stakeholder planning group that helps to identify incidents for review. As OIG concludes its review of five waves of protest activity, OIG will bring the Faletogo case, as well as others involving persons in crisis, to the planning group for consideration as the next subject of review.*

## 14. Audit of SPD Supervision—Assess [Ongoing]

CPC requests that OIG conduct an audit of SPD supervision to evaluate consistency in supervisory duties and training across Seattle,  and to examine accountability for supervisors, with particular focus on supervisory reporting and discipline in the field.

*OIG Response: OIG had supervision on its 2020 work plan, but much of the work plan was disrupted by the major events of 2020. Supervision is a recurring theme in the accountability ordinance, as supervision and mentoring play an important role in building a sustainable culture of accountability. Because supervision has so many aspects, OIG has instead incorporated elements of supervision into ongoing projects, such as the audit of the canine unit and the recently released discipline audit. As OIG engages in follow up to the discipline audit, OIG welcomes further discussion with CPC on supervision topics of interest to CPC and community.*

 **Seattle** Office of **Inspector General**

## 2022 Work Plan Timelines

| Project | Beginning | End |
|---|---|---|
| **AUDITS AND REVIEWS** | | |
| **Ongoing Projects** | | |
| Persons in Crisis | Q2 2021 | Q1 2022 |
| Mutual Aid | Q3 2019 | Q2 2022 |
| **Recurring Projects** | | |
| Chapter 14.12 | n/a | Q3 2022 |
| Audit Follow-up Reporting Dashboard | Q1 2022 | Q4 2022 |
| **New Projects** | | |
| SPD Compliance with Mi'Chance Dunlap-Gittens' Youth Rights Ordinance | Q2 2022 | Q4 2022 |
| **SURVEILLANCE WORK** | | |
| Surveillance Annual Review | Q1 2022 | Q3 2022 |
| **POLICY PROJECTS** | | |
| **Ongoing Projects** | | |
| Sentinel Event Review Waves 2 through 5 | Q2 2020 | Q4 2022 |
| Sentinel Event Review OIG Critical Events Summary | Q2 2020 | Q1 2022 |
| Minor Traffic Offenses Workgroup | Q2 2021 | Q4 2022 |
| **Recurring Projects** | | |
| State Legislative Agenda | Q4 2021 | Q4 2021 |
| Trends in Inquests, Claims and Lawsuits | Q1 2021 | Q2 2021 |
| OPA Sworn and Civilian Staff Study | Q2 2021 | Q2 2022 |
| **INVESTIGATIONS AND OPA REVIEW** | | |
| **Recurring Projects** | | |
| Case certification and classification review | Ongoing | Ongoing |
| Quarterly report on OPA Review activities | Q2 2022 | Quarterly |
| **Ongoing Projects** | | |
| Review of Bias Complaint Investigation Process Alternatives | Q4 2021 | Q3 2022 |
| OIG case management system and public dashboard | Q2 2021 | Q4 2022 |
| **OTHER DEPARTMENTAL RECURRING WORK** | | |
| Annual Work Plan | Q4 2021 | Q4 2021 |
| OIG & CPC Mid-Year Report | Q3 2022 | Q3 2022 |
| Annual Report | Q1 2022 | Q3 2022 |
| Consent Decree and Monitoring Plan Work Items | As needed | As needed |
| Emerging Issues Memoranda | As needed | As needed |
| Public Disclosure Requests | Ongoing | Ongoing |

**<u>EXHIBIT B</u>**



Kelly Kline, *Black Lives Matter Protest, Seattle WA*, 2020. Licensed under CC BY-NC-ND 2.0.

# Sentinel Event Review of Police Response to 2020 Protests in Seattle

Wave 3: June 8 – July 1, 2020

October 11, 2022


Seattle Office of Inspector General

PO Box 94764
Seattle, WA 98124-7064
oig@seattle.gov | (206) 684-3663
www.seattle.gov/oig



# Table of Contents

Contents...........................................................................................................................................2

Executive Summary...........................................................................................................................4

   Wave 3 Incidents Considered..........................................................................................................4

   Summary of Contributing Factors ...................................................................................................5

   Summary of Recommendations.......................................................................................................5

I. Introduction ..................................................................................................................................6

II. Methodology ................................................................................................................................7

   The SER Planning Group and Panel .................................................................................................7

   Data Reviewed by OIG and the SER Panel ......................................................................................7

III. Panel Analysis & Recommendations by Critical Incident .............................................................9

Incident 1. SPD Evacuates the East Precinct ....................................................................................9

   Incident Description ........................................................................................................................9

   Panel Analysis ...............................................................................................................................11

   Contributing Factors ....................................................................................................................12

   Recommendations........................................................................................................................13

Incident 2. Deceptive or Misleading SPD Communications, June 8th - 10th ................................15

   Incident 2a. Proud Boys Ruse .......................................................................................................15

   Incident Description ......................................................................................................................15

   Panel Analysis ...............................................................................................................................16

   Contributing Factors ....................................................................................................................17

   Recommendations........................................................................................................................18

   Incident 2b. June 10th Press Conference .....................................................................................20

   Incident Description ......................................................................................................................20

   Panel Analysis ...............................................................................................................................21

   Contributing Factors ....................................................................................................................24

   Recommendations........................................................................................................................25

Incident 3: CHOP Community Experience .......................................................................................26

   Incident Description ......................................................................................................................26



SENTINEL EVENT REVIEW WAVE 3

Panel Analysis .................................................................................................. 28

Contributing Factors ....................................................................................... 29

Recommendations ........................................................................................... 30

Incident 4: Fatal Shootings in the CHOP, June 20th and June 29th ............................................ 31

Incident 4a. June 20th Homicide ............................................................................. 32

Incident Description ......................................................................................... 32

Incident 4b. June 29th Homicide ............................................................................. 34

Incident Description ......................................................................................... 34

Panel Analysis .................................................................................................. 37

Contributing Factors ....................................................................................... 38

Recommendations ........................................................................................... 39

IV. Conclusion ........................................................................................................ 40

Appendix A. SER Participants ................................................................................. 41

Appendix B. Wave 3 SER Recommendations ......................................................... 43

Appendix C. Wave 3 SER Contributing Factors ..................................................... 46

Incident 1. SPD Evacuates East Precinct .............................................................. 46

Incident 2a. Proud Boys Ruse ............................................................................... 49

Incident 2b. June 10th Press Conference .............................................................. 51

Incident 3. CHOP Community Experience ............................................................ 53

Incident 4. Fatal Shootings in the CHOP, June 20th and June 29th .......................... 55

Appendix D. White Paper ....................................................................................... 57

Appendix E. SER Peacemaking Circle Group Norms .............................................. 70

Appendix F. Wave 3 SER Methodology .................................................................. 72


Seattle Office of
Inspector General

# Executive Summary

The May 2020 murder of George Floyd by Minneapolis police officers sparked an unprecedented global response. Protestors gathered in cities across the United States to express their collective concern and anger about institutionalized racism in policing, and the number of unarmed Black men dying at the hands of police. Like cities across the United States, the City of Seattle and the Seattle Police Department (SPD) grappled with how to respond to the protests and eroding public trust. The Office of Inspector General, in collaboration with community members and SPD, conducted a series of Sentinel Event Reviews (SER) to identify root causes of critical incidents in the 2020 protests.[1] This report is the third in the 2020 protest series, centering on events that occurred between June 8 and July 1, 2020, during which SPD vacated the East Precinct and the CHOP was established.[2]

The report presents the Panelists' recommendations using insight from their diverse experiences in the Seattle community. Panelists participating in this SER made no attempt to assign individual accountability for acts taken during the incidents reviewed. Instead, Panelists identified strategies to repair the public trust and safety compromised by SPD decisions throughout Wave 3.

## Wave 3 Incidents Considered

The SER Planning group selected four Critical Incidents for review in Wave 3. These incidents span the duration of the CHOP, beginning with the evacuation of the East Precinct and culminating in the clearing of the CHOP. The Critical Incidents follow in chronological order:

1. The decision by the City of Seattle and SPD to leave the East Precinct on June 8th.
2. Two incidents in the formative days of the CHOP involving allegations of SPD lying to or misleading the public:
    a. SPD's use of a "ruse" on the night of June 8th wherein officers attempting to draw protestors away from the CHOP generated false radio traffic asserting a group of Proud Boys was marching in Downtown Seattle;[3] and
    b. A press conference held by SPD on June 10, 2020 regarding criminal activity in the CHOP.[4]
3. The impact of the CHOP on residents, local businesses, protestors, and City departments.
4. Two fatal shootings inside the CHOP:
    a. The homicide of a teenager on the morning of June 20th; and

---

[1] The Waves 1 and 2 reports may be found on the OIG website: Sentinel Event Review - OIG | seattle.gov
[2] The Capitol Hill Organized Protest (CHOP), originally called the Capitol Hill Autonomous Zone (CHAZ), was a five-block area in Seattle's Capitol Hill neighborhood. Protestors remained in the area after SPD's withdrawal from the East Precinct, establishing a hub for protest activity and mutual aid surrounded by makeshift barriers which were soon reinforced by the City. For more information, see: CHOP: One year later — The East Precinct is abandoned and the protest zone forms | CHS Capitol Hill Seattle News
[3] OPA Case 2020OPA-0749
[4] OPA Case 2020OP-0355, referred for external investigation


Seattle Office of Inspector General

b. The shooting of two teenagers, one fatally, on the morning of June 29th.

## Summary of Contributing Factors

The Panel identified 53 Contributing Factors leading to the Critical Incidents reviewed in this report, including factors related to:

- The provision of public safety in the absence of police services;
- The provision of other City services to the Capitol Hill neighborhood;
- The lack of transparency and accountability in decision-making processes;
- Siloed decision making by the City and SPD;
- Adaptation to evolving styles of protest movements; and
- Ineffective communication with protestors and the Capitol Hill community, within the department, and across City agencies.

Appendix C provides a complete list of the Contributing Factors.

## Summary of Recommendations

The Panel made 34 recommendations to SPD and the City of Seattle, explained in greater detail in Section 3. The Wave 3 recommendations fall into the following categories:

- **Community Legitimacy** – Addressing the gap between structural and perceived legitimacy and acknowledging the need for SPD and the City to continue to fulfill their duty to provide essential services despite criticism and anger from the community.
- **Situational Awareness** - Acknowledging the need for SPD to change its mindset when responding to occupy-style protest movements and to protests where the police themselves are the focus, and to minimize the negative impact of emergencies or civic disruptions on uninvolved community members.
- **Communication** – Improving the ability of SPD to communicate with the public, protestors specifically, and other City agencies to continue provision of essential services during emergencies and civic disruptions.
- **Tactics** – Improving SPD tactics during crowd events to ensure appropriate and effective responses to occupy-style movements and understanding how tactical decisions impact community legitimacy and trust.
- **Decision Making –** Ensuring transparency and accountability by improving decision making and control processes to clearly define authority and responsibility, particularly when decisions will impact access to City services and public safety.
- **Planning –** Establishing protocol to maintain the provision of public services and public safety, even when police precincts or other critical infrastructure cannot be used by the City.

Appendix B provides a complete list of recommendations.

 Seattle Office of
Inspector General

# I. Introduction

On the evening of June 8th, SPD evacuated its East Precinct, giving protestors greater access to the area around the building. For more than a year after the evacuation, it was unclear who authorized SPD to vacate the precinct and why.[5] The initial plan appeared to be for SPD to leave the precinct to allow for a de-escalation of the crowd, and then to return the next day to resume normal operations.

After SPD evacuated the precinct a group of protestors used erected barricades to establish the CHOP. The CHOP existed until July 1, 2020, during which time several shootings occurred, prompting the Mayor to order SPD to clear the area.

Many Capitol Hill residents and business owners whose daily lives were already altered by the COVID pandemic were further restricted by the presence of the CHOP and impacted by the SPD and City response to it. Residents interviewed by OIG felt they were the "forgotten group" during this period, noting "numerous gaps in the quality of services provided by [City] agencies," including garbage collection, mail delivery, and park maintenance.[6] Many of the residents and business owners supported the protestors, but also felt abandoned by SPD and the City.

During this period, protestors were resolute about the need to reimagine public safety in Seattle. A list of demands was set forth on June 3rd, which would require 1) defunding the Seattle Police Department by at least fifty percent; 2) the reallocation of those funds to community led health and safety systems; and 3) the release of all those arrested during the protests, with charges dropped.[7]

The response by SPD to the CHOP was characterized by a lack of evolution in response to a protest which had changed from a demonstration to an occupy style movement. SPD personnel made several public statements, the accuracy of which was questioned by community. Other tactical decisions made by SPD and the City further undermined public trust and safety, and neither SPD nor the City was able to communicate effectively with the protestors or other community members in the area.

---

[5] OPA Case 2020OPA-0354
[6] On file with OIG.
[7] Defund Seattle Police | Decriminalize Seattle



**Seattle** Office of
Inspector General

# II. Methodology

## The SER Planning Group and Panel

Continuing the incident selection process established at the outset of this project, the SER Planning Group, a body of community members, police officers, and police accountability stakeholders convened regularly to guide the SER process. OIG provided the Planning Group with data used to identify specific incidents for the SER Panel to review. The SER Panel is comprised of a dedicated and diverse group of community members and SPD officers at various command levels who worked together with the support of the Inspector General and OIG staff.[8] The SER Panel met for nearly 40 hours over six months to analyze the incidents selected by the SER Planning Group.

## Data Reviewed by OIG and the SER Panel

Wave 3 provided unique challenges for OIG data collection. Because Waves 1 and 2 focused largely on SPD conduct, most of the information needed for the review was available from SPD in the form of reports, computer-assisted dispatch (CAD) data, radio traffic and body-worn video. Social media postings and videos provided additional information and insight. By contrast, the distinguishing feature of the CHOP was the *absence* of SPD. As a result, OIG sought to understand the perspectives of the protestors and how the City responded to the protests.

To do this, OIG gathered and reviewed data from the following sources:

- Body-worn video of SPD officers where available;
- Data from the City's Emergency Operations Center (EOC), from the start of Wave 3 until the City disbanded it on June 14th;
- Data provided by the 911 call center (now the independent Community Safety and Communications Center [CCSC] but at the time a civilian department within SPD);
- Print and video coverage of the CHOP from mainstream media (e.g., newspapers, TV, etc.) and video bloggers (e.g., Converge Media, which extensively covered the CHOP);
- OPA investigations related to the Critical Incidents;
- Press releases by the Mayor's Office, SPD, and the Seattle Fire Department (SFD);
- Protocols and policies of SPD and SFD;
- Social media, including Facebook livestream, Twitter, Instagram, etc.;
- SPD CAD logs;
- SPD Incident Action Plans (IAPs) for specific dates throughout Wave 3;
- SPD public statements, documents, and videos; and
- SPD Use of Force (UOF) statistics.

OIG also reached out to almost 50 community stakeholders with personal experience of the CHOP. Of these, 19 agreed to be interviewed by OIG about their perspectives on the CHOP. These stakeholders included community members, protestors, representatives from City

---

[8] See Appendix A for Panel membership.



agencies, and others. OIG refers to the content from these interviews as "testimony" in this report but no interviewee provided sworn statements.

In addition, the Panel met with both SPD and community representatives who experienced the CHOP. This provided otherwise inaccessible first-person perspectives of the Critical Incidents, insight into operation of the EOC, the establishment of CHOP security, and some of the acts preceding the fatal shootings. These engagements included discussions with Donnitta Sinclair-Martin, the mother of Horace Lorenzo Anderson, the victim of the June 20th shooting. The Panel also met with an SPD Assistant Chief who, as a scene Commander, worked with the EOC to make decisions and issue recommendations about the protests. Many CHOP participants were reluctant to speak with OIG for various reasons and declined to participate, limiting the Panel's ability to review first-hand knowledge of the structure and day-to-day functioning of the CHOP. Some information instead had to be inferred from the sources described above.

OIG also commissioned Dr. Edward R. Maguire, a Professor in the School of Criminology and Criminal Justice at Arizona State University and an expert in occupy movements, to provide an analysis of the CHOP. Dr. Maguire produced a white paper, *An Intergroup Perspective on Seattle's CHOP Occupation*, and presented his findings to the panel.[9]

> *Donnitta Sinclair-Martin spoke to the Panel in May 2022. Donnitta recounted the inconsistent communications from SPD and Harborview personnel on the evening of June 20, 2020, and the continued difficulty communicating with SPD and City leadership in the months following the murder of Horace Lorenzo. She described her heartbreak watching videos of the SFD medics waiting for clearance to enter the CHOP and her frustration with lack of information provided to her from Harborview staff. She was informed of her son's death when Harborview staff asked if she wanted to donate his organs. Donnitta also highlighted the lack of accountability taken by SPD and the City in the wake of Horace Lorenzo's passing, including the infuriating silence from the Chief of Police and Mayor. Donnitta has since become an advocate for the elimination of violence in Seattle.*

---

[9] See Appendix D.



**Seattle** Office of
Inspector General

# III. Panel Analysis & Recommendations by Critical Incident

This section includes a description of each Critical Incident followed by the SER Panel's analysis of the incident, the Contributing Factors allowing each incident to occur, and the recommendations of the Panel designed to prevent such outcomes in the future.[10]

## Incident 1. SPD Evacuates the East Precinct

### Incident Description

SPD's East Precinct building was a consistent flash point during the 2020 protests. The focus on the East Precinct and relative inability to create a buffer that was not a point of escalation caused concern among SPD and other City departments. A central concern was the possibility of arson attempts on the building and the risk of personal injury and property damage to the residences and businesses adjoining the precinct. This concern was based on FBI intelligence generally indicating government buildings might be a target for protestors across the country. These fears were exacerbated by the May 28th burning of a Minneapolis Police Department precinct, as well as the burning of Seattle police vehicles downtown during the first days of the protests.

> **Incident 1. SPD Evacuates the East Precinct**
>
> ❖ Meeting between Mayor's Office and SPD on June 7th.
> ❖ SPD evacuates East precinct on June 8th per orders from Assistant Chief, with plan to return the following day.
> ❖ Barricades around East Precinct removed by 6:00 pm on June 8th; protestors fill intersection on 12th Avenue and Pine Street.
> ❖ The CHOP forms and exists for the next 23 days.

During the week of June 1st, SPD attempted various strategies to minimize potential harm to officers and destruction to the East Precinct, including using different fencing systems to prevent street access to the precinct and to increase the distance between protestors and officers. However, protestors continued to dismantle the new barricades throughout the week, and interactions in the area grew more violent.[11]

On Sunday, June 7th, the Mayor's Office met with SPD representatives to discuss possible changes to SPD strategy which would provide de-escalation and limit the use of less-lethal weapons. While no minutes were kept of this meeting, an OPA investigation revealed SPD reasserted its concerns that the removal of the barricades would lead to the destruction of the East Precinct by protestors intent on arson.[12] According to the OPA case summary, this risk was deemed to be a "credible threat" based on the intelligence gathered by the FBI.

---

[10] Some of the Panel's recommendations may have financial costs that the Panel has not attempted to calculate. In addition, many in the community are strongly against providing any additional financial resources to SPD. The Panel's recommendations are intended to prevent the recurrence of negative outcomes of the protests in the summer of 2020 and the Panel takes no position on the allocation of City budget dollars to SPD or other important social services.

[11] Increased violence during this period included the "Pink Umbrella" incident (see Incident #5 in the Wave 1 report).

[12] OPA Case 2020OPA-0354



During the June 7th meeting, an SPD representative presented a case for acquiring stronger barricade fencing and laid out four possible strategies SPD could pursue:

1. Maintain the current SPD posture with hardened barricades. *This was deemed by SPD to be the safest option for protestors and officers.*
2. Remove all barricades and establish a bike line of officers along the sidewalk outside the East Precinct, with SPD members maintaining a perimeter behind the bike line outside the East Precinct headquarters. *SPD viewed this as creating a risk of injury to protestors and officers.*
3. Remove all barricades and establish a bike line of officers along the sidewalk outside the East Precinct, with SPD personnel remaining inside the East Precinct. *As with option 2, SPD viewed this as creating a risk of injury to protestors and officers.*
4. Remove all barricades, including bicycle fencing, and remove officers and sensitive property from the precinct. *SPD felt that this option would "very likely" result in the destruction of the East Precinct.*

The June 7th meeting did not result in a significant change in strategy, and SPD continued to hold its position behind the barricades that evening. At 8:20 pm on June 7th, a car drove quickly through these makeshift barricades, and the driver shot a protestor attempting to slow the car down.[13] Later that evening, SPD issued a dispersal order and, despite pressure from the Mayor's Office to limit less-lethal weapons usage, deployed blast balls, CS gas, and OC spray to clear the area.

At 10:27 am on June 8th, a deputy mayor texted an SPD official, "I want to see a plan to remove firearms, ammunition, and all evidence from the East Precinct today. That plan should be capable of being fully executed by 5 pm today."[14] At noon, representatives from the Mayor's Office and SPD met to discuss the situation, with the Mayor's Office directing SPD to remove the barricades surrounding the East Precinct in order to open the street and permit public passage by the building. An SPD Assistant Chief ordered temporary evacuation of the building with the plan to stage East Precinct officers at Volunteer Park while the protestors had access to the previously barricaded area.

The SPD Incident Action Plan (IAP) issued in the early morning of June 8th was modified by a brief addendum describing the new plan. The addendum included directives for the removal of SPD personnel, the barricades surrounding the East Precinct, and all evidence and weapons stored in the building. The amended IAP also included instructions for SPD to install new fencing immediately around the precinct, board up exterior windows, wrap the lower stories in chain-link fencing, place barriers outside the buildings and coordinate with the SFD to apply flame retardant to the building.

After 6:00 pm, the barricades on the street were removed and protestors began filing into the intersection of 12th Avenue and Pine Street. Livestream footage from the event shows

---

[13] For more information on this event, see Incident #4 in the Wave 2 report.

[14] FBI Says There Was Specific Threat Against East Precinct; Durkan Letter Dodges Protestors' Three Demands | South Seattle Emerald



protestors taking turns addressing the crowd, voicing their vision for systemic change, and creating a list of demands for reform.[15] Some protestors implored the crowd to not interfere with the precinct building, and the building remained undamaged.

After SPD evacuated the precinct, protestors used barricades to create an area that would become the CHOP. SPD's strategy was to return to the East Precinct the following day. Instead, once the CHOP perimeter was established and SPD leadership observed the East Precinct was not being destroyed, the decision was made to hold off re-occupying the precinct. According to an OPA interview with an SPD Assistant Chief, "reestablishing a police presence in the area would require significant planning.[16] The CHOP existed for the next 23 days.

## Panel Analysis

Panel discussion centered on the unprecedented nature of the police leaving the East Precinct building, as well as the lack of credibility in the stated justification for the evacuation and apparent lack of transparency and accountability in City and SPD leadership decision-making processes.

Many Panelists remained highly skeptical about the FBI's unsubstantiated intelligence of a "credible threat" of plans to destroy the building. They noted that no specifics have been provided to support the statement.[17] The use of a general, unsubstantiated threat increased Panelists' doubts about the veracity of the claim and the validity of the threat as a justification for evacuation of the precinct.

Despite the questions as to whether protestors posed a real danger to the East Precinct, most Panelists viewed the decision to have SPD pull back the barricades around the building as inevitable. The decision was also viewed, by some, as one which successfully de-escalated a tense situation between protestors and SPD officers. However, both community members and SPD officers were dissatisfied with the way the Mayor's Office and SPD leadership made and communicated the decision.

Despite investigation from OPA, the actual decision-making process between the City and SPD remains unclear. There is no known documentation of who participated in the meetings between the Mayor's Office and SPD on June 7th and 8th, or who gave what instructions to whom.[18] Statements from Mayor Durkan suggest she did not order the withdrawal and the decision was made by SPD "frontline commanders."[19] Statements from Chief Best indicate she had not supported the decision to leave the Precinct but, "[u]ltimately, the City had other plans for the building."[20] These declarations added to the widespread perception that there was no

---

[15] Raz Simone was live. | By Raz Simone | Facebook

[16] OPA Case 2020OPA-0354

[17] One attempt to burn the building did occur, though not until June 12, 2020. See Former Seattle resident pleads guilty to arson at Seattle Police East Precinct | USAO-WDWA | Department of Justice

[18] The OPA investigation suggests the decision to evacuate was made by an Incident Commander at the East Precinct, an authority delegated to him by the Chief.

[19] Mayor Durkan clarifies role in clearing of East Precinct - MyNorthwest.com

[20] Chief Best's Address to Officers - SPD Blotter (seattle.gov)



unity between the City and SPD and illustrated the lack of transparency and accountability in major decision-making processes.

The Panel agreed with the strategy in the amended IAP and felt the decision to withdraw from the East Precinct defused the tension at the barricades. However, the hasty implementation of the decision created substantial communication and operational challenges. It was clear to Panelists the decision was made in a siloed fashion resulting in a lack of understanding and awareness throughout SPD, even for some at the command level, and created unnecessary confusion within SPD. Moreover, in the absence of clear information, rumors and misinformation filled the void and contributed to the anxiety of both the community and some within SPD.[21]

This lack of communication falls both on the Mayor's Office and on SPD leadership. The Panel was left to draw one of two conclusions from the Mayor and the Chief distancing themselves from the decision process. Either (a) the leaders of the City or SPD were removed from the decision, in which case they did not adequately participate in potentially impactful decision-making, or (b) the leaders of the City and/or SPD were being disingenuous with both the community and SPD officers.

SPD officers also felt unsupported by leadership. SPD panelists felt the City had abandoned the Department, capitulating to protestor unrest and forcing the withdrawal from the East Precinct. Adding to their frustration, the Mayor's Office regulated all public statements by SPD, preventing the department from engaging with the CHOP to try and establish common ground, rapport, and appropriate public safety.

## Contributing Factors

The Panel identified 21 Contributing Factors, organized into six areas:

**Communication:**

1. The decision to temporarily leave the East Precinct was not communicated to SPD officers by City leadership.
2. There was little to no communication from the City in the days leading up to SPD's withdrawal from the East Precinct.
3. Capitol Hill residents and business owners were not informed of SPD's decision to withdraw from the East Precinct, nor were they aware of the City's or SPD's plans for next steps.
4. There were gaps in cross-functional communications between the Mayor's Office, SPD leadership, and officers.

**Operational Supervision:**

5. Instruction and direction on who and what to evacuate from the East Precinct, and how to do so, was unclear.

---

[21] For example, many officers and 911 call center staff moved from the East to West Precinct stated a concern that the Department would soon also withdraw from the West Precinct and wondered what that would mean for their safety.


**Seattle** Office of
Inspector General

6. Decisions regarding the East Precinct were made by a siloed group of SPD leaders and City representatives.

**Environment:**

7. Members of the community were hesitant to engage with police out of concern of possible philosophical backlash from protestors.
8. Distrust within the community predated the withdrawal of SPD.
9. The protests were centered on the police and questioning their role in community.
10. Multiple days of protests had created an environment of significant mutual distrust among SPD and community members.
11. There was consistent violence between protestors and SPD at East Precinct barricades.

**Procedures:**

12. There was inadequate documentation of decision-making in meetings between the Mayor's Office and SPD, resulting in confusion about who was responsible for plan execution or communication.
13. Officers were moved to the West Precinct without warning or preparation.
14. Direction was given to the Assistant Chief to remove precinct barricades without clear direction on how to ensure the safety of the precinct.

**Tactics:**

15. The FBI told the City and SPD about a "general threat" to the East Precinct building. This unspecified information was then distributed.
16. SPD's revised Incident Action Plan (IAP) for June 8th lacked specifics about how the withdrawal from the East Precinct would be conducted and how and when SPD would re-enter the East Precinct.
17. SPD's plan was for a temporary departure was expected to reduce tension at the barricades and then to return to the East Precinct the following day. This plan was then changed without clear indication of when they would return.

**Cultural Leadership:**

18. A structure did not exist to involve community in decisions about the actions of SPD.
19. The absence of justification for major decision allowed for the spread of inaccurate information.
20. Both the Chief of Police and the Mayor denied responsibility for the decision to withdraw from the East Precinct, further escalating community concerns about a lack of clear leadership or control of the situation.
21. There was not a clear decision-maker for the directive to withdraw from the East Precinct, and lack of accountability at City leadership made it difficult to get answers about processes and services.

## Recommendations

- **Recommendation 1:** SPD and the City of Seattle should ensure Seattle neighborhoods are not left without public safety and other essential services. If City government is



prevented from accessing an area, it should make every effort to provide essential city services and emergency response. The City should assign a City liaison to facilitate communications with impacted community members about service provision or interruption.[22]

- **Recommendation 2:** In the event of an evacuation of a government building or other emergency, strategic decision-making should be done at the highest level of government with accountability and transparency.

- **Recommendation 3:** SPD should improve internal channels of communication to increase efficient and timely collaborative decision making amongst command and with officers.

- **Recommendation 4:** SPD should ensure processes for transparency and accountability are in place in case of evacuation or other emergency. Ensure accurate logs are kept at the Seattle Police Operations Center (SPOC).

- **Recommendation 5:** SPD should ensure appropriate recordkeeping and documentation during significant planning and decisions during large-scale protests.

- **Recommendation 6:** SPD should conduct and publish an After-Action Review of a large-scale protest response within 60 days of the incident, including publication of all non-confidential materials used in the review.

- **Recommendation 7:** SPD Incident Action Plans (IAPs) should follow a standardized approval process that includes review at the appropriate command level to allow for accountability of decision-making.[22] SPD should communicate IAPs to all officers prior to the implementation of the acts set forth in the IAP.

- **Recommendation 8:** SPD should ensure coordinated communication of goals, so the public has a clear understanding of SPD actions.

- **Recommendation 9:** SPD and the Mayor's Office should publicly communicate rationale for decision-making during large-scale protest response to decrease mistrust on the part of the public and officers.

- **Recommendation 10:** SPD and the City of Seattle should include OIG in planning meetings to offer recommendations and to stay informed.

- **Recommendation 11:** An SPD Public Information Officer should accompany the Incident Commander to important or large-scale events.

---

[22] See Recommendation 1 in the SER Wave 2 report for more information on implementing Emergency Community Communications Officers (ECCOs).



## Incident 2. Deceptive or Misleading SPD Communications, June 8th - 10th

The rapid withdrawal of SPD from the East Precinct surprised virtually everyone – community residents, protestors, and many within SPD. The lack of transparency in the communications from the Mayor's Office and SPD leadership reinforced cynicism among the Seattle community and protestors.

The Planning Group identified two instances where many in the community felt SPD had not communicated in honest or appropriate ways, each of which was the subject of an OPA investigation:

- On June 8th, several SPD officers made radio transmissions on public radio channels containing false information about Proud Boys gathering near the CHOP;[23] and
- On June 10th, an SPD Assistant Chief conducted a press conference reporting anecdotal concerns about criminal acts within the CHOP. These reports were echoed by Chief Best a day later in a video address to SPD officers.[24]

The Panel reviewed each of these Critical Incidents separately.

### Incident 2a. Proud Boys Ruse[25]

### Incident Description

On the evening of June 8th, SPD removed barricades around the East Precinct building and protestors congregated at the intersection of 12th Avenue and Pine Street.[26] At 9:24 pm protestors listening to the SPD radio channel heard reports that members of the Proud Boys were moving towards the CHOP.[27] Around 11:30 pm, a Facebook live video followed a protestor to their vehicle, where the protestor picked up two rifles, handing one to another protestor and starting to explore the perimeter of the occupied area.[28] Information indicates that some protestors readied themselves for a potentially violent confrontation, while others fearfully anticipated the arrival of the Proud Boys.

According to the OPA investigation findings, an SPD Captain appointed an officer to recruit a team to carry out a disinformation effort to draw

> *Incident 2a. Proud Boys Ruse*
>
> ❖ At 9:24 pm on June 8th SPD radio channel reports Proud Boys congregating downtown and moving towards the CHOP.
> ❖ Protestors in the CHOP arm themselves in case of conflict.
> ❖ OPA investigation indicates an SPD Captain appointed an officer to make false radio broadcasts to draw protestors away from the CHOP.
> ❖ OPA found the broadcasts violated SPD Policy 5.001-POL-11, which prohibits officers from engaging in dishonesty.

---

[23] OPA Case 2020OPA-0479
[24] OPA Case 2020OP-0355, referred for external investigation.
[25] This incident has been referred to as a "ruse," but should be understood as a form of deception.
[26] Raz Simone was live. | By Raz Simone | Facebook
[27] The Proud Boys are a far-right hate group, self-described as "Western Chauvinists." Members promote anti-Muslim, antisemitic, misogynistic, and "pro-white" rhetoric. The Proud Boys have been designated as a terrorist group in Canada and New Zealand. For more information, see the Southern Poverty Law Center's article, "Proud Boys."
[28] See: Raz Simone was live. | By Raz Simone | Facebook. A self-identified CHOP security guard interviewed by OIG indicates the CHOP security team did not carry rifles, a rule for the vetted security. SPD body-worn video evidence indicates that other individuals in the CHOP did carry rifles.



**Seattle** Office of
Inspector General

protestors away from the East Precinct.[29] According to the organizing officer, several officers were instructed to make false radio broadcasts that would not cause shock or be unusual but would draw protestors away from the CHOP. The organizing officer also had the team create call signs that were not used by SPD so other SPD officers who heard them would be aware the communications were false. OPA interviewed four of the five named officers who participated in the radio transmissions. All four stated they had not received specific direction about what to say in the broadcast messages. None of the officers recalled how the decision was made to include the threat of the Proud Boys in the messages.

OPA found the broadcasts violated SPD Policy 5.001-POL-11, which prohibits officers from engaging in dishonesty.[30] OPA also noted the use of the Proud Boys, a white supremacist group, was particularly inflammatory given the context of the protests. In addition, the broadcast was not recorded and stored by SPD. OPA's assessment was hampered by the lack of a specific policy governing the use of ruses and deception.

## Panel Analysis

Panelists focused discussion on the racism implicit in this ruse and about systemic racism within SPD. Many panelists felt the use of the Proud Boys for the ruse was an intentional manipulation of protestor fear of a violent white supremacist group, used to frighten and undermine the establishment of a Black Lives Matter protest at the height of anti-police tensions in Seattle. Many Panelists viewed this incident as an example of the way structural and internalized racism can coalesce in police decision-making and cause harm to the community. OPA's findings did not fully acknowledge and explore issues of potential racial bias or systemic racism.

Another area of discussion for the Panel was what many considered an obligation of SPD officers to tell the truth to the community. Lying to the community in this way was not only contrary to policy, but it was also a poorly considered tactic contributing to tensions in the CHOP. Panelists also voiced concerns about the lack of specificity of SPD's dishonesty policy as related to various police functions. SPD lacks specific policies governing the use of deception or ruses during crowd management, patrol operations, investigations, or interviewing/interrogation. The lack of SPD policies specific to any acceptable use of deception or ruses limited OPA's review of the incident. OPA was left to assess alleged improper conduct via a policy that was not directly applicable.

The officers' stated justification for the ruse did not seem credible to most on the Panel. OPA concluded that there was no exigent threat to life safety or public safety that might otherwise justify such a ruse. During the time of the transmission, SPD officers were not operating in the area and there "was no ongoing violence within the zone or imminent violence that could have been reasonably foreseen." The Panel also reviewed BWV footage of protestors discussing possible placement of armed security to address the Proud Boys threat.[31] Some Panelists

---

[29] OPA Case 2020OPA-0479

[30] 5.001 - Standards and Duties - Police Manual | seattle.gov

[31] Raz Simone was live. | By Raz Simone | Facebook

 **Seattle Office of Inspector General**

considered these defensive acts designed to protect the CHOP from external aggressors, not meant as ambushes for SPD officers. Given these considerations, the involved officers' explanations to OPA were perceived by most Panelists as disingenuous.

The radio transmissions were not recorded and stored in accordance with normal SPD procedures, which was also a concern to the Panel. This lack of documentation undercut OPA's ability to fully investigate the incident (or, in fact, to even identify such conduct had taken place until provided with evidence collected by a community member) and further convinced many Panelists the officers involved acted in bad faith.

Panelists also considered issues related to the chain of command. The Captain who authorized but failed to supervise the ruse acknowledged he acted on his own discretion and without involving other Department members in his plan. A review of that day's IAP revealed that the Captain was not in the chain of command for the events. This raised the question of how and why the Captain inserted himself into this operation, and how he was able to order officers to engage in the ruse while outside the designated chain of command.

These actions outside the chain of command created other problems. The involved officers used a publicly accessible radio channel to broadcast the ruse and used made up call signs for one another to purportedly signal to other SPD officers that the broadcast was a ruse. However, witness officers interviewed by OPA reported being unaware the call signs were fake. Because the ruse was an order from a Captain acting alone outside the chain of command, other leadership was also not informed the broadcast was a ruse.

Importantly, in the wake of the OPA report and recommendations, SPD is working to modify its policies involving deception and ruses in collaboration with OIG and a stakeholder workgroup. Panel recommendations were generated without any insight into this ongoing policy development.

## Contributing Factors

The Panel identified 10 Contributing Factors, organized into four categories:

**Operational Supervision:**

22. Decisions being made by SPD on June 8th were siloed. Officers in the chain of command and in the EOC were excluded from the conception, justification, and execution of the ruse and thus lacked the opportunity to evaluate or weigh in on the decision to conduct the ruse.
23. The Captain who ordered the ruse did not effectively supervise the officers broadcasting the ruse communications.
24. The SPOC, SPD HQ, EOC and SPD field operations were all operating in separate locations, in part because of the COVID pandemic. This complicated decision making and made it harder to discuss strategy or provide information about the ruse.

**Procedures:**



**Seattle** Office of
Inspector General

25. SPD does not have a specific policy governing "ruses," only general guidance about "dishonesty."

26. The current SPD policy on dishonesty does not provide guidance on how to document tactical decisions to be dishonest to a member of the public, or who should be notified in the chain of command prior to using dishonesty as a police tactic.

27. Formal daily debriefs were not conducted or documented on a regular basis, making it hard for officers gather or generate new information or raise up suggestions for tactical improvement.

28. Although the ruse employed invented call signs intended to signal the ruse to SPD officers, they were not recognized as invented by other emergency personnel who also believed the ruse information.

29. SPD did not document the ruse. Radio channels on which the Proud Boys ruse was broadcast were not recorded, limiting OPA's ability to intake and investigate the ruse.

**Tactics:**

30. SPD officers used a channel they knew was being publicly monitored to broadcast the ruse.

**Other:**

31. The use of the Proud Boys by officers in the ruse added an element of racism which was inflammatory given the protests against systemic and historical racism.

## Recommendations

- **Recommendation 12:** SPD should implement policies limiting deception and ruses used for patrol activities to instances in which (a) the ruse seeks to avoid an imminent personal injury or death or significant property damage; (b) the ruse will not itself cause an escalation in tension with members of the community potentially leading to a personal injury, death or significant property damage; and (c) the ruse is clearly documented by an authorized command officer or supervisor and communicated to other SPD individuals as appropriate to ensure compliance with the Incident Command System and stated SPD tactical objectives.

- **Recommendation 13:** SPD should prohibit broadcasted ruses.

- **Recommendation 14:** SPD should prohibit the use of ruses for crowd management or control purposes. If a ruse is justified during a crowd event or other emergency, any officer ordering a ruse should (a) be in the chain of operational command set forth in the daily briefing sheet; (b) document the circumstances justifying the ruse, the substance of the ruse, and the outcome of the ruse; and (c) inform and document communication to others in the chain of command on the existence, timing and content of planned ruse transmissions. SPD should specifically task appropriate members of the chain of command to coordinate the ruse if these conditions are met.

- **Recommendation 15:** SPD should amend SPD Communications policy (12.010) to require all SPD radio transmissions to be recorded and stored for a specified period to

allow for appropriate after-event review. SPD officers should not use unrecorded radio channels to transmit information, whether such lines are public (unencrypted) or secure (encrypted).

- **Recommendation 16:** SPD should implement a system for daily debriefs with reports at the officer, supervisor, and command levels during emergencies. These debriefs should be sent to the SPOC and EOC to assist senior officers in managing the emergency, as well as to assist senior officers in communicating important information back to those squads.
- **Recommendation 17:** SPD should evaluate the utility of a circular organization chart, where information flows internally from one bureau to another.
- **Recommendation 18:** SPD Incident Command Plans during crowd events or emergency events should include officers with day-to-day operational authority over the resources necessary to address the emergency in question.
- **Recommendation 19:** SPD should ensure all officers at the rank of Lieutenant and above receive thorough training on all aspects of crowd management and emergency response, so any officer in SPD leadership can capably staff the EOC, the SPOC, or other crowd event response structures.
- **Recommendation 20:** SPD should ensure a diverse set of officers with relevant operational authority are permitted to observe and/or participate in strategic and tactical discussions during emergencies to allow for differing perspectives and critical evaluation in decision making.
- **Recommendation 21:** SPD should require consistent cultural competency and emotional intelligence trainings for supervisors and command staff to encourage deeper understanding of the impact of individual decisions on officers and community.
- **Recommendation 22:** SPD should consider implementing a departmental culture evaluation to identify and address barriers for officers of color being promoted to leadership roles within the department and encourage attention to identifying and reducing bias across the department.



Seattle Office of
Inspector General

## Incident 2b. June 10th Press Conference

### Incident Description

SPD held a press conference on June 10th regarding the decision to leave the East Precinct and the emerging CHOP protest.[32] The Panel examined three statements from the press conference:

**Threats to the East Precinct**:

During the press conference, it was stated:

> We were made aware that there were several threats to burn down the East Precinct. As you know, the East Precinct is not a free-standing building. It is in fact connected to residential apartment buildings, and to several businesses. We consulted with the Seattle Fire Department who informed us that if the East Precinct were to catch on fire, that there is the possibility that the fire would spread, and a very real possibility that those businesses and residences would be impacted. This would endanger firefighters, residences, and businesses. We felt that the safest plan at the time was to secure the building and have our officers relocated.

In response to a question about the credibility of the arson threats, the speaker replied:

> Well, I consider them incredibly credible in that there were incendiary devices used at some of the officers on the lines during the earlier protests. When you look at the fact that we had businesses downtown looted and set on fire I think they were very credible threats.

**Armed Checkpoints:**

During the press conference, it was stated:

> We have been hearing from community members that they have been subjected to barricades set up by the protestors with some armed individuals running them as checkpoints into the neighborhood. While they have a constitutionally protected right to bear arms, and while Washington is an open carry state, there is no legal right for those arms to be used to intimidate community members. If someone feels threatened or intimidated, we ask that they call 911 and report the incident. No one at these checkpoints has the legal authority to demand identification from anyone.

> *Incident 2b. June 10th Press Conference*
> ❖ SPD held a press conference on June 10th regarding the decision to leave the East Precinct and the emergence of the CHOP.
> ❖ Three claims made during the press conference garnered cynicism from community.
> ❖ These claims included: 1) Threats of arson to the East Precinct; 2) Armed checkpoints requiring identification to enter the CHOP; and 3) Extortion of businesses in the CHOP area.

---

[32] KOMO News - WATCH: Seattle Police Assistant Chief Deanna Nollette is providing updates on the East Precinct. | Facebook



The following day, the Chief of Police released a video to SPD officers reaffirming SPD had received multiple reports of armed patrols who "may be demanding to see identification for people who live in the area." She continued, "This is not legal."

**Extortion in the CHOP:**

During the press conference, it was stated:

> We have heard anecdotally reports of citizens and businesses being asked to pay a fee to operate within this area. This is the crime of extortion. If anyone has been subjected to this, we need them to call 911 and report the incident.

In the video directed to SPD on June 11th, the Chief again refers to claims of armed individuals in the CHOP who "may be demanding payment from business owners in exchange for some of that protection." The Chief describes the claims as rumors, requesting victims of extortion to come forward. No police reports were filed related to extortion of businesses within or around the CHOP.

## Panel Analysis

The Panel undertook a careful evaluation of the June 10th press conference statements, discussing the accuracy while keeping in mind the rapidly changing circumstances of the period. This was the first press conference held by SPD after the unprecedented withdrawal from the East Precinct and the only press conference about the CHOP not held by Chief Best. This was viewed by some Panelists as potentially problematic in terms of consistency in communications. The Panel also felt the press conference failed to address protestor concerns or provide pertinent information to the community.[33]

**Threat to the East Precinct**:

As described in Incident 1, interview excerpts published by OPA stated the FBI's Seattle Field Office informed representatives from the Mayor's Office and SPD of a general threat to burn down police facilities. This information could be viewed as a factor supporting SPD's decision to evacuate the East Precinct. When asked about the credibility of the threat to the precinct, however, SPD made no reference to the FBI's intelligence. Instead, the statement referenced looting and property damage from the first weekend of protests and the use of incendiary devices against SPD officers during the protests. The considerations of a threat to the building were unclear and there seemed to be no unified beliefs about why the building was at risk.

The absence of specific information within SPD's rationale led many Panelists to question the legitimacy of the threat. Panelists also discussed reference in the press conference to "incendiary devices." SPD Panelists confirmed this was in reference to an unlit candle thrown at

---

[33] See Incident 3.


the police line on June 7th.[34] For many panelists, the reference to "incendiary devices" seemed like an overstatement of danger to officers.

**Armed Checkpoints:**

Community Panelists who were present at the CHOP confirmed seeing checkpoints with protestors requiring identification for individuals entering the CHOP. Other reports indicated local business owners had not witnessed ID checkpoints, armed or otherwise.[35]

The panel reviewed video evidence of armed individuals in the CHOP (see Incident #2a), as well as SPD BWV taken in the early morning of June 9th. The video showed officers in conversation with several protestors when another protestor, with a gun in a holster at his side, confronted the group. The armed protestor can be heard verbally challenging the officers and telling them to leave the area. The conversation between SPD and the other protestors was continued farther from the barricades.

In response to this video, an officer safety bulletin was issued by SPD later that day warning officers of potential safety risks in the area. The bulletin read:

> The organizers of this movement have posted their own security cadre at all of the vehicle access points to the area. Many of the individuals at those locations have been seen openly carrying a combination of long guns and sidearms. The group appears resolute in their objective of preserving control of the area. *They are challenging anyone entering the area, often demanding to see identification and questioning their right to be there.*
>
> Open carry sentries have been observed at the barricades on 13th Avenue at Pine Street, 12th Avenue at Pike Street, 11th Avenue at Pike Street, and Pine Street at Nagle Place, as well as directly in front of the precinct. Organizers have used social media platforms to call for more people with weapons to assist in staffing the barricades around the clock. (Emphasis added).

News reports from the time largely questioned SPD's assertions:

- "It's understandable how the barriers around the zone—movable wood and plastic left behind by the police—and the hygienically masked sentinels standing at them could look intimidating to residents. But I passed through them perhaps a dozen times over three days and, like everyone I saw and talked to in the zone, was never stopped or asked my business. Even if this were the 'border wall' Fox commentators call it, it would hardly be impenetrable; people could still come and go through the park abutting the zone. . . The barriers, other guards explained, were there to stop cars from driving into

---

[34] That day, the SPD Twitter account posted a picture of broken candles, referring to them as "improvised explosives." See Seattle Police Dept. on Twitter.

[35] REDACTED-—-Email-to-Best-et-al-June-10-2020.pdf (southseattleemerald.com)



the occupied streets—a real fear. . . There have been guns in the zone, however, at least in its first days (I never saw any in later days). The sentinels carrying them belong to a left-wing gun rights and self-defense group called the Puget Sound John Brown Gun Club."[36]

- "During our six-hour afternoon visit, we did not see any examples of what police are talking about, but that doesn't mean it's not happening."[37]
- "If the prospect of armed stop-and-frisks within the CHAZ seems too terrible to be true, that's probably because it is. Take a stroll around the neighborhood right now and you'll find some (slightly haphazard) community gardens, chalk art on the pavement, and probably someone playing a guitar. There was music and dancing. Businesses are open, albeit on a limited basis due to coronavirus."[38]

The Panel saw little other evidence of armed individuals within CHOP using their weapons to intimidate or prevent either SPD or non-SPD personnel from entering the area. The Director of the Office of Emergency Management (OEM) sent an email to SPD officials in the early evening of June 10th stating a site visit by OEM had not uncovered any evidence of armed checkpoints.[35] Despite these communications, Chief Best's video published on June 11th continued to focus on intimidation in the CHOP.

**Extortion in the CHOP:**

The Panel discussed two pieces of anecdotal evidence of extortion in the CHOP. The first was a neighborhood business owner who was collecting and distributing donations to local organizations. The business owner described being asked by CHOP participants for $500. The business owner declined to speak to SPD or OIG about their experience but confided in a fellow business owner who confirmed the case to the Panel. The second instance was a post from a user in the comment section of an article in the Capitol Hill Seattle Blog:

> I'm a business owner in the area; my business was entered this evening by a group of six Free Cap Hill participants who requested I pay $500 to help finance what they said was community security and protection. They said they will accept cash or Bitcoin; I told them I would prefer to pay in the latter in hope it would buy time. They're supposedly coming back tomorrow to give me digital wallet details (none of them actually had that info when they showed up; I'm assuming there's a leader or someone in the background who keeps it). Even $500 is going to be a hit for us as we only just reopened but I'd rather pay than ask for trouble.[39]

[36] Don't Listen to Fox. Here's What's Really Going On in Seattle's Protest Zone. - POLITICO

[37] Police make allegations of intimidation, extortion inside Capitol Hill's Autonomous Zone | KOMO (komonews.com)

[38] Businesses Extorted? Armed Checkpoints on Capitol Hill? Yes, and Also Mercer Island Is for Sale - The Stranger

[39] 'Welcome to Free Capitol Hill' — Capitol Hill Autonomous Zone forms around emptied East Precinct — UPDATE | CHS Capitol Hill Seattle News



The same user added a follow-up comment, reading "I also am hoping they provide some more clarity as to whether this is a one-time or recurring payment and how often payment is expected." The author of the article replied to the comment, "I haven't heard of this from any other owners so please consider contacting me so I can learn more and shed some light . . . Or you can email [redacted]. I will also contact you at the email address you provided when leaving this comment."

In the 24 hours after the press conference, several journalists and members of the community sought to verify the extortion claim but could not find evidence.[40] Without the ability to confirm either case, the statement made in the press conference did not appear credible to community.

News articles over the next year indicated SPD was, in fact, aware the claims were unconfirmed, both at the time of the press conference, and at the time of the video released by Chief Best on June 11th.[41]

**Impact of Claims**:

Panelists voiced concern that SPD's reactions to the CHOP were about potential or unconfirmed criminal activity and that SPD purposefully portrayed the CHOP as a dangerous area. Several Panelists noted SPD should have made efforts to communicate with business owners in Capitol Hill to confirm the extortion and armed checkpoint claims or to memorialize the communications, but there is no record of such efforts.

## Contributing Factors

The Panel identified six Contributing Factors, organized into three categories:

**Communication:**

32. There was a general lack of clarity regarding City and SPD engagement with the CHOP that created anxiety and concern among business owners and residents.
33. SPD provided insufficient support for assertions of "credible threats" against the East Precinct, or of the existence of armed checkpoints or extortion of businesses in the CHOP.

**Environment:**

34. The inability of SPD to substantiate the criminal activity reinforced distrust and cynicism about SPD motives regarding the CHOP.

---

[40] GSBA, Washington's LGBTQ+ and allied chamber of commerce, posted on Twitter in response to a thread about the extortion claim: "GSBA and Capitol Hill Business Alliance have also reached out to businesses in the area, and we have found no evidence of this occurring. Keep up the good work."
A local journalist also reached out to businesses in the area and posted on Twitter: "Three firm denials from businesses that this is happening…Worker says they've had no problems with new zone: 'I've been talking with neighboring businesses and they're all elated honestly.'"
[41] SPD Finally Confirms: They Have No Reports of Extortion in the CHOP - The Stranger; Police walk back report that Capitol Hill protesters extorted businesses - The Seattle Times Police walk back report that Capitol Hill protestors extorted businesses - The Seattle Times



35. The community perception was that SPD was perpetuating inaccurate information regarding the protestors and CHOP.

**Procedures:**

36. SPD did not verify the checkpoint or extortion rumors before or after the press conference.
37. SPD lacked established channels for communication with residents and business owners contributed to confusion, misinformation, and rumors about what was happening in the CHOP.

## Recommendations

- **Recommendation 23:** SPD should develop a policy framework to guide public communications to ensure assertions are credible and supported by reliable information before dissemination.



**Seattle Office of Inspector General**

# Incident 3: CHOP Community Experience

## Incident Description

The OIG reviewed information related to the goals and values of those involved in the CHOP, as well as the impact of the CHOP on essential City services for those living and working in the area.

**Community Values:**

The three key demands of the protestors (to defund and demilitarize the police, to invest in community-based public health and safety strategies, and to free the protestors who were arrested) were guiding values for those in the CHOP. On June 9th, a group called the Collective Black Voices at Free Capitol Hill published nineteen demands to the City.[42] The document made clear the consensus view of protestors that the CHOP was focused on social and racial justice, the elimination of police brutality, and the creation of a fair and just system of public safety. Specific demands focused on police transparency and accountability, reparations for harms caused by police brutality, the abolition of police and prisons, as well as for mental health crisis response to be separate from law enforcement and 911 services.

> **Incident 3: CHOP Community Experience**
>
> ❖ Three overarching protestor demands: 1) Defund and demilitarize the police, 2) Invest in community-based public health and safety strategies, and 3) Free arrested protesters.
> ❖ The CHOP included mental health, mutual aid, and medical services.
> ❖ People living and working in the area impacted by City and SPD leadership decisions, including reduced access to City services and delays in emergency response.

Additional demands in the document sought broader social reforms linked to violence and poverty but not directly linked to SPD. These included improved health and medical care; free public housing and rent control; improved public education and free college for Washingtonians; naturalization services; additional funding for arts and culture; and a new process for electing government officials.

Protestors sought to embed these values in the CHOP through the establishment of mental health, mutual aid, and medical services for those visiting and living near the area. Local chefs provided hot meals, and protestors filled tents with fresh produce, canned and dry foods, and hygiene supplies. An area designated as the Conversation Café provided a space for discussing a variety of social justice issues and strategies for systemic change. Peaceful marches occurred daily, as did community gatherings which provided a space for protestors to identify goals and strategies for the community and the City to address systemic racism, promote equitable community development, and establish community-oriented health and safety measures.

**Experiences of Residents and Business Owners**

Throughout the establishment and dismantling of the CHOP, people living and working in the area were impacted by City and SPD leadership decisions. Residents and business owners expressed concern and frustration with the lack of organized response to the CHOP, as well as the delay or lack of response to 911 calls.

---

[42] The list can be found at https://medium.com/@seattleblmanon3/the-demands-of-the-collective-black-voices-at-free-capitol-hill-to-the-government-of-seattle-ddaee51d3e47.



Many in the Capitol Hill community supported the protestors and their goals. However, the CHOP and the absence of SPD and City resources complicated daily life for residents, some of whom found it more difficult to access their homes or businesses, and for whom transit and public services were reduced or not available.

The influx of people occupying Cal Anderson Park and the surrounding areas, coupled with the absence of City services, created garbage and waste issues; some residents interviewed by OIG expressed safety concerns related to the increased number of people in the park.[43] Residents found the communication from the City about these disruptions inconsistent and unclear.

The Mayor issued a directive on June 10th establishing certain City responses in the CHOP designed to support the protest and further safety.[44] Responsibility was delegated to:

- SFD for responding to fires and medical emergencies and helping reduce the risk of arson for businesses and residences;
- Seattle Department of Transportation (SDOT) and Seattle Public Utilities (SPU) for ensuring trash collection;
- Seattle Parks Department to assist in cleaning and repairing the area, and facilitating the work of community artists in the area; and
- The Office of Economic Development to communicate with small businesses about City services and first responder operations.

SFD Chief Scoggins, SPU CEO Mami Hara, and SDOT Director Sam Zimbabwe emerged as messengers for the city, communicating directly with protestors, residents, and other city agencies. Meetings were operational in nature, with less focus on addressing political issues or demands. Representatives of the protestors and business owners in meetings were often self-appointed, and participation in discussions with the City agencies was inconsistent. The intent of the meetings was to facilitate increased understanding among people impacted by the CHOP, however, substantial confusion remained on such foundational issues as barricade construction and placement, emergency response, and provision of other essential City services in the area.

**Delays/Unavailability of SPD and Emergency Services**

From the beginning of protest activity in late May, the Office of Emergency Management (OEM) had coordinated City resources and responsibilities for all aspects of emergencies through the EOC. The EOC ceased operation on June 14th, as the ongoing CHOP situation was no longer deemed an "emergency."[45]

On June 15th, the Mayor's Office issued a statement clarifying the circumstances under which SPD and SFD would enter the CHOP. [46] SPD would respond to "significant life-safety issues." For other calls (e.g., property crime calls), SPD would coordinate officer contact outside the CHOP boundaries. SFD would respond to fires and medical emergencies in the CHOP, but only after

---

[43] On file with OIG.
[44] City Takes Steps to Create Safe Place for Peaceful Demonstrations - Office of the Mayor (seattle.gov)
[45] For more on what constitutes an "emergency," see Seattle EOC Leadership Guide.
[46] City of Seattle Engages with Capitol Hill Organized Protest to make Safety Changes - Office of the Mayor


**Seattle** Office of
**Inspector General**

police had secured the scene.[47] In the meantime, SFD would work with CHOP volunteer medical staff to arrange for injured people to be taken to the perimeter of the area and call 911 from there.

After the transfer of emergency responsibilities from the OEM, one 911 call-taker told OIG, "[i]t was highly publicized [to the community] that SPD and SFD were not responding to incidents within the CHOP zone. This was not communicated to the 911 center, and we did not provide that instruction to our call takers and dispatchers. {…} We were taking every call, we were processing every call. And we were doing our best to handle every call, according to our existing policies and procedures."[48]

In contrast, some Capitol Hill community members interviewed by OIG reported being told by 911 that SPD could not access the area and anyone needing services would have to go to a designated area outside the CHOP. One individual interviewed by OIG stated they called 911 several times during the occupation: "They gave me a very good idea of what to expect, which was absolutely nothing."[49] Another recalled hearing gunshots outside and someone screaming for help. When they called 911, the call-taker said the police could not come because it was within the CHOP zone.[50] A neighborhood building manager was told by an SPD officer, "We will not be able to provide for your safety. You should get out."[51]

The differing understandings of 911 services highlight how internal miscommunication can lead to inconsistent perceptions and responses by City personnel and contribute to confusion among community.

**Conclusion**

The hierarchical structure of City government was unprepared and unable to communicate effectively with the horizontal structure of the CHOP. As a result, little progress was made on political or operational issues of importance to the protestors.

## Panel Analysis

The Panel noted a lack of effective communication between SPD and the protestors in the CHOP, attributing this to SPD's inability to effectively engage with a occupy-style of protest. SPD's strategy to seek communication with leaders and spokespeople was not effective. Both community and SPD Panelists pointed to this as a key factor in the insufficient progress made on political or operational issues of importance to the protestors.

Panelists suggested insufficient communication contributed to the misinformation and lack of clarity for residents and business owners in the area. A business owner on the Panel described the lack of vetting conducted by the City for those allowed in the meeting, noting that one

---

[47] This was not a departure from the standard practice of SPD and SFD prior to the CHOP, but the level of concern and perceived danger at the border of the CHOP was much higher, and therefore the hesitancy of SFD (and others) to enter without an SPD escort was greater.
[48] On file with OIG.
[49] On file with OIG.
[50] On file with OIG.
[51] On file with OIG.


**Seattle** Office of
Inspector General

attendee disingenuously portrayed themselves as a business owner. To the Panelists, this suggested a lack of structure and processes which the City should have had in place.

Panelists also discussed the demobilization of the EOC on June 14th. SPD Panelists noted this resulted in a breakdown of communication between SPD and other City departments, as the EOC had acted as the center for City coordination since May 30th.

## Contributing Factors

The Panel identified nine Contributing Factors, organized into five categories:

**Communication:**

38. The CHOP protestors had a non-hierarchical leadership structure, leading to different representatives attending different meetings. Representatives for Capitol Hill business owners were not vetted by the City, also leading to different representatives attending meetings.
39. Traditional news reporting was reduced due to COVID precautions, allowing social media to be much more impactful in the spread of information.

**Operational Supervision:**

40. The Mayor delegated operational negotiations to SDOT, SPU, and SFD; SPD was largely absent from discussions between CHOP representatives and City agency representatives on the provision of essential services.
41. The EOC was disbanded on June 14th.

**Environment:**

42. Independent of the existence of CHOP, there was a lack of resources, programs, activities, sports, safe spaces for youth, with access further limited during COVID.

**Procedures:**

43. Due to safety concerns many City agencies were hesitant to allow employees to enter or work in the CHOP.
44. The Mayor's June 15th Executive Order limited SPD responses within the CHOP to life-threatening emergencies, and limited SFD's responses to areas where SPD has declared the area safe.

**Cultural Leadership:**

45. There was a lack of acknowledgement by City and SPD of protestors' goals and demands for change.
46. The City had no internal expertise and no access to external expertise for negotiating with "occupy" style of protest, which resulted in an inability to engage in effective leadership over the span of the CHOP.



## Recommendations

- **Recommendation 24:** SPD and the City of Seattle should establish a reliable and effective communication strategy to address the provision of public safety and other City services during "occupy" style protests.
- **Recommendation 25:** SPD should provide increased health and wellness services to 911 call-takers and other emergency services employees.
- **Recommendation 26:** SPD and the City of Seattle should assess which department 911 call-taking and dispatch services should be housed under (note: Seattle City Council voted to move 911 call-taking moved to the new Community Safety and Communications Center (CSCC) on May 24, 2021).[52]
- **Recommendation 27:** SPD and the City of Seattle should ensure a strategy for events that may impact neighborhoods, including appropriate contact information and identification of appropriate stakeholders.
- **Recommendation 28:** SPD and the City of Seattle should recognize the role of SPD as public servants in delivering public safety and should develop procedures to ensure continued provision of public safety and essential services in the case of large-scale protests or other instances where regular service delivery is interrupted.

---

[52] Seattle City Council approves bill to move 911 dispatch out of the Seattle Police Department (seattlepi.com)



## Incident 4: Fatal Shootings in the CHOP, June 20th and June 29th

The Planning Group identified two fatal shootings in late June for review by the Panel. The Panel discussions and analysis of both shootings centered on the ineffective communications between SPD and SFD which caused delays in providing life-saving care. The Panel analyses for both incidents are combined below for this reason.



*Figure 1. Incident 4 Map[53]*

---

[53] Shooting at Seattle's CHOP protest site kills 16-year-old boy, leaves 14-year-old seriously injured | The Seattle Times


**Seattle Office of Inspector General**

## Incident 4a. June 20th Homicide

> *Horace Lorenzo Anderson Jr. graduated from high school in 2019. He was well liked by his teachers and fellow students, remembered for his passion and perseverance. Horace Lorenzo was an aspiring musician and loved to write music about his childhood. He was involved with a local art collective, and that year created a mural expressing his ability to overcome obstacles and the importance of staying true to oneself. Horace Lorenzo wanted to participate in the Black Lives Matter movement and in the local protests.*

### Incident Description

In the early morning of June 20th, an argument broke out on Cal Anderson playfield, and at 2:18 am, 19-year-old Horace Lorenzo Anderson, Jr. was shot four times. He was transported by protestors from the playfield to a civilian medic tent on 10th Avenue and Pine Street, where civilian medics in the CHOP performed CPR and attempted to resuscitate him.

Multiple individuals in the medical tent called 911 and asked call-takers to provide emergency medical assistance. According to KUOW reporters, CHOP medics reported receiving conflicting information from emergency dispatchers about how to transport Mr. Anderson to an ambulance.[54] At the time of the shooting, SPD units were located at 12th Avenue and Cherry Street, about seven blocks away. This was a staging location where SPD and SFD could connect before entering the CHOP in response to emergency calls. The location had been chosen to be close to the CHOP while being out of sight of protestors, as the sight of SPD cars from within the CHOP escalated tensions and anxiety of protestors.

While SPD was waiting at the staging area at 12th Avenue and Cherry Street, an SFD ambulance was parked at the corner of Broadway and Pike Street, about two blocks away from the CHOP medical tent. SFD policy is to wait until it is safe to respond after SPD has secured scenes involving potential violence.[55] Thus, despite the availability of SFD and SPD resources, a significant delay occurred in their ability to facilitate medical care. SPD officers were waiting for SFD to arrive at the SPD staging area while SFD was parked in a different location waiting for a confirmation from SPD that it was safe to enter the CHOP.

At 2:33 am, a community member was recorded pleading with an SFD ambulance driver to drive into the CHOP and assist.[56] The driver radioed SFD dispatch to confirm that he was not cleared to enter the CHOP. "That's negative," said the SFD dispatcher. "We're still working

> *Incident 4a: June 20th Homicide*
>
> ❖ At 2:18 am on June 20th, 19-year-old Horace Lorenzo Anderson, Jr. was shot four times in Cal Anderson Park.
> ❖ CHOP medics performed CPR and attempted to resuscitate Mr. Anderson while others called 911 for emergency medical assistance.
> ❖ SPD units were located at 12th Avenue and Cherry Street, and an SFD ambulance was parked at the corner of Broadway and Pike Street.
> ❖ At 2:34 am, CHOP medics transported Mr. Anderson to Harborview Medical Center.
> ❖ SPD arrived at the CHOP at 2:39 am.
> ❖ Mr. Anderson was pronounced dead at 2:53 am.

---

[54] [A timeline of the fatal shooting in Seattle's #CHOP, formerly known as #CHAZ - YouTube](#)
[55] [Seattle Fire Department, Standard Operating Guideline (imgix.net)](#)
[56] [Raz Simone on Twitter: "Medics refused to help even after people in the CHOP begged. They let our bro bleed out for 30 minutes till he died. Fuck politics. Fuck your currupt system. https://t.co/PMwxU9yEzd" / Twitter](#)



on it." "OK," replied the ambulance driver, "we have a number of citizens that want us [to go] into the location, I just want to make sure we are not clear to move into the location." In a recording published by KUOW, another paramedic can be heard asking "Where are they staging? They are not with us." "Yes, we advised them to go to your location," said a dispatcher. "They were staging somewhere else."[57]

The SFD and SPD personnel were unable to communicate directly with each other, as each department was using its own radio frequency to communicate with its own dispatchers. Communications flowed in a linear "chain" from SPD officers to SPD dispatchers to SFD call-takers to SFD dispatchers to SFD officers, and back through the same process.

At 2:34 am, CHOP medics placed Mr. Anderson into a pickup truck to transport him to a previously agreed rendezvous point with SFD, while one of the medics in the CHOP ran two blocks east on Pine Street to SFD Station 25, outside the CHOP. Video from a cell phone showed her speaking through the glass garage door of the station at 2:38 to an SFD officer: "I've been doing CPR on a man at 10th and Pine, and I've been trying to close four bullet wounds for ten f*****g minutes." The firefighter's reply was inaudible, but the medic furiously responded "Broadway! I'm on the phone with your dispatch right now, hope you can make it!" before running back to the medical tent. At that same moment, SPD dispatch informed SFD that SPD was moving into the CHOP from the West. SFD dispatch responded, "Yeah, we've been directed to meet you at 12th and Cherry, is that correct? Yes or no." "Negative," replied SPD. "We're no longer waiting, we're moving in."

At 2:39 am, almost 20 minutes after the shots were fired, a group of approximately 12 SPD officers arrived, walking east on Pine Street from Broadway into the CHOP. By the time SPD entered the CHOP, the civilian car had left the zone with Mr. Anderson.

Several bystanders attempted to explain to the officers that Mr. Anderson was no longer there. As the group of police continued through the area, the crowd became increasingly agitated, telling the police to put their guns down and screaming that Mr. Anderson was already gone.

Neither SFD nor SPD were present at the rendezvous point agreed upon by the medics and SFD, so they drove Mr. Anderson to Harborview Medical Center, arriving at Harborview at 2:45 am. Mr. Anderson was pronounced dead at 2:53 am.[58]

Individuals providing security to the CHOP gathered information from the scene including shell casings and fragments and photographs of the scene. They coordinated with SPD, which had begun its own investigation. Less than 24 hours after the shooting, the suspected shooter was identified by witnesses, and nearby business surveillance video appeared to confirm eyewitness accounts. The suspect was apprehended by US Marshalls in Des Moines, Washington, the following year.

In a statement to KUOW in July 2020, Chief Best described protestors hindering SPD's arrival to the scene. She stated, "Officers entered the CHOP and attempted to locate a shooting victim

---

[57] [A timeline of the fatal shooting in Seattle's #CHOP, formerly known as #CHAZ - YouTube](#)
[58] [Teen who died in CHOP shooting wanted 'to be loved,' those who knew him recall | The Seattle Times](#)



but were met with a violent crowd that prevented officers' safe access to the victim. The Department later learned that the victim had been transported to Harborview."[59]

## Incident 4b. June 29th Homicide

> *Antonio Mays Jr. travelled from San Diego to Seattle to experience the protests and support the Black Lives Matter movement. He was preparing to take over his family's barbeque sauce business after finishing high school and attending college. Antonio was a musician, describing himself as a vocalist, songwriter, and producer. Antonio's family remembers him as kindhearted, caring, and passionate about civil rights.*

## Incident Description

Violent incidents in the CHOP continued in the days following Mr. Anderson's death. In an incident unrelated to Mr. Anderson's shooting, a 33-year-old man was shot hours later in the early morning of June 20th. On June 21, a 17-year-old boy was shot in the arm inside the CHOP.

On June 22nd, Mayor Durkan released an Executive Order announcing the imminent closure of the CHOP.[60] She said in a statement, "[O]ver the last month thousands of people, including families, have visited the area and shown their support for the messages of equity and change. Unfortunately, that message has been undermined by the violence in the area. The area has increasingly attracted more individuals bent on division and violence, and it is risking the lives of individuals."[61] Data indicates a decrease in calls for service in the summer of 2020.[62]

The following day, June 23rd, a 30-year-old man was shot in CHOP. His injuries were not life-threatening.

While protestors and activity within the CHOP remained active, the Seattle Times reported that enthusiasm within the CHOP was waning.[63] After the violent incidents of the weekend the number of protestors decreased, with only a handful of tents remaining in Cal Anderson Park.

The City made an initial attempt to close the CHOP on June 26th, sending SDOT crews to remove the barricades in the street.[64] The SDOT vehicles were met with resistance, with one protestor

---

[59] KUOW - Seattle police claimed protestors blocked way to dying man. In fact, miscommunication with Seattle Fire was problem

[60] Executive Order 2020-08

[61] The violent end of CHOP, formerly known as CHAZ, explained - Vox

[62] Several factors may have contributed to this drop, including the reduced number of public interactions as a result of the COVID-19 pandemic, and the reluctance of many in the community to call the police as public attention was focused on the history of systemic racism in policing and on alternative methods of public safety. For more information, see: SPD Data.

[63] Seattle's CHOP shrinking, but demonstrators remain | The Seattle Times

[64] Mayor Durkan meets with protestors after city thwarted from removing barricades at CHOP | The Seattle Times



lying down in the path of a city vehicle. An agreement was negotiated that the City would allow three days for protestors to gather their belongings and leave the CHOP before the City would clear the area.

Shortly after 11 pm on June 29th, approximately 15 shots were fired in Cal Anderson Park. Many people called 911 reporting the gunshots, but the callers had not actually seen the shots or the shooter(s). Without a description of the shooter or any reported injuries, dispatchers instructed callers that no SPD officers would be sent to the CHOP.

Beginning shortly after the first round of shots, individuals in the CHOP described two vehicles driving erratically around the CHOP. One, a white Jeep Cherokee, had two teenagers inside. The other, a gold Lincoln Town Car, was later reported to be CHOP security attempting to assess the situation and locate the shooters.

Several reports of physical altercations were called in to the 911 call center over the next hour, including reports of a man pulling a knife out in Cal Anderson Park, and a fight that culminated in a man firing shots into the air. A volunteer medic interviewed in a livestream broadcast stated that one assault victim was transported to Dick's Drive-In on Broadway to receive medical care, and another was taken to the hospital by CHOP security.[65] Around 1:15 am another round of shots was fired near the ball field. People in the park scattered, some running for cover while others laid on the ground for protection.

Yet another round of gunfire occurred in the CHOP at 2:58 am. Video and witness interviews indicated that the white Jeep Cherokee had driven from Cal Anderson Park to the East Precinct on 12th Avenue and Pine Street, firing shots both in the direction of the park and near the precinct. As the car turned onto Pine Street, it approached a group of barricades. The barricades were protecting tents erected in front of the East Precinct. Unnamed individuals later described by eyewitnesses as CHOP security opened fire on the white SUV, shooting its two occupants: the driver, 16-year-old Antonio Mays, Jr., and the passenger, an unnamed 14-year-old.

CHOP medics and others converged on the scene, pulling the two boys out of the car to provide aid. Several more calls were made to 911 as civilian medics attempted to perform CPR and apply tourniquets to the victims. At 3:05 am, the civilian medics administering care to the two teenagers decided that the situation was too urgent to wait for emergency services to arrive, and each victim was loaded into a private car for transport out of the CHOP.[66] SPD units staged

> **Incident 4b: June 29th Homicide**
> - Shots fired at 2:58 am from White Jeep Cherokee driving from Cal Anderson Park to East Precinct.
> - CHOP security opened fire on the vehicle, shooting the driver, 16-year-old Antonio Mays, Jr., and 14-year-old passenger.
> - CHOP medics provided aid, deciding at 3:05 am to transport victims out of CHOP for emergency assistance.
> - Passenger arrived at Harborview Medical Center at 3:11 am; care transferred to Harborview staff.
> - CHOP medics drove Mr. Mays to meet paramedics at staging location but had difficulty meeting paramedics.
> - Mr. Mays transferred to SFD paramedics at 3:22 am; pronounced dead at scene.
> - SPD arrived on scene at 7:45 am.

---

[65] Guy witnessed assault & gun shot in CHAZ park - YouTube
[66] A medic who transported Mr. Mays later said in an interview with Mr. Omari Salisbury (with Converge Media) that confusion among medics within the CHOP was a challenge: "It's all because we weren't going fast enough. I'm shouting, 'put him in a car,' someone else is shouting, 'no bandage him up.' I'm like 'f*** that, he needs to be in a car now.' Other people are like 'No he needs to be bandaged first.' To me, it was communication between the medical staff." See KUOW - 1 teen dead, 1 wounded in shooting at Seattle's CHOP.


Seattle Office of
Inspector General

at the intersection of Broadway and Harvard Avenue, approximately three blocks south of Cal Anderson Park, were dispatched to establish a staging area on 14th Avenue and Union Street for SFD and assist in a safe rendezvous with the civilian medics.

Meanwhile, video taken of the scene showed an ambulance leaving Station 25 and driving away from the scene of the shooting, presumably going to the rendezvous point, which was farther away from the shooting location than the station was.[67] The victim arrived at Harborview Medical Center at 3:11 am and care was transferred to Harborview staff.

A silver SUV carrying Mr. Mays attempted to meet paramedics at the rendezvous point at 14th Avenue and Union Street. SPD dispatchers provided a description of the vehicle and informed SFD that the medic unit was on their way to the staging area.

Despite these communications, the CHOP medics had difficulty connecting with the SFD emergency medical personnel. As one civilian medic described it:

> It took us probably 15 minutes just chasing one paramedic around that was supposed to be waiting for us on 14th and Union -- and once we got to him, he and the Chief looked directly at me on top of the car covered in blood, and they look at each other and they bust a U-turn and they start speeding down the road. And then we finally catch up with the paramedics, they're like three or four blocks away from us. So we finally catch up to them, they see us, and they take off again. And so we're in another high-speed chase with the paramedics. . . . I yelled to 'go straight to the hospital.'

The civilian medics pursued the ambulance, ultimately making contact with the paramedics in a parking lot. The CHOP medics pulled into the lot at 3:22 am to transfer Mr. Mays to SFD for transport to Harborview. According to the civilian medic, "By the time they got to the car, he died. There was no heart-to-heart resuscitation done by the paramedics, nothing, they just bagged him up."[68]

Mr. Omari Salisbury, who provided comprehensive video coverage throughout the protests and the existence of the CHOP, interviewed an individual at the scene of the shooting who stated the two teenagers in the white SUV had driven into barricades protecting residents of the CHOP, causing CHOP security to open fire into the vehicle.

SPD did not arrive on the scene until 7:45 am. Radio transmissions stated that individuals were disturbing the scene and making the collection of evidence difficult for SPD.

The following day, an email from an SFD spokesperson indicated the ambulance crew perceived the car pursuing them "as a threat."[69] The email described two ambulances driving to the staging location:

---

[67] Replay of Streams after Multiple Shootings In and Around CHOP June 28, 2020 - YouTube
[68] KUOW - 1 teen dead, 1 wounded in shooting at Seattle's CHOP
[69] Shooting at Seattle's CHOP protest site kills 16-year-old boy, leaves 14-year-old seriously injured | The Seattle Times



Seattle Office of
Inspector General

> [The ambulances] encountered a Nissan Pathfinder driving
> erratically towards them with someone riding on top of the vehicle.
> The responding crew perceived this as a threat, and as this area had
> not yet been secured by SPD, attempted to drive away from the
> vehicle and continue to the staging location. The crew was
> unaware during this time that this vehicle was carrying a patient.[69]

The CAD log from the incident indicates dispatch alerted SPD and SFD the victim was being
transported in a silver SUV to meet at the SFD staging area.[70]

## Panel Analysis

The Panelists focused discussion on the presence of the barricades around the CHOP, as well as
the absence of SPD and SFD in the area. They felt this presented several complicating factors to
the provision of emergency safety and medical services. As SPD Panelists noted, SPD had
anticipated an increase of violence in the CHOP due to their absence and therefore chose to
stage nearby. Further, City and SFD representatives had met regularly with CHOP
representatives to coordinate procedures and rendezvous points in case of emergencies inside
the CHOP. Despite these preparations, it took City departments over 20 minutes to respond to
the 911 calls for assistance for Mr. Anderson and 24 minutes to meet the medics carrying Mr.
Mays. SFD did not send ambulances into the CHOP on either occasion, although ambulances
were within two blocks of the victims both nights. The efforts of those in the CHOP to connect
to SFD ambulances outside the CHOP were unsuccessful on June 20th and significantly delayed
on June 29th.

The Panelists highlighted the need for SPD and SFD responses to be well coordinated with each
other, and with medics on the scene, to avoid unnecessary delays in the provision of potentially
life-saving treatment for community members. To this end, there were several factors that the
Panel found contributed to the time it took for SPD and SFD to respond.

SPD Panelists agreed with SFD's assessment of the situation as a "Scene of Violence," which SFD
articulated in a statement the morning after Mr. Anderson's death:[71]

> Our crews do not have training to go into a volatile situation to
> extract patients, which is why we have instructed people to walk or
> bring the patients to the perimeter of the crowd or transport in a
> private vehicle to the hospital to expedite medical treatment... Our
> mission is to save lives and protect property, but we must keep our
> firefighters and paramedics safe so we can continue to help people.

---

[70] CAD log: CP 2020-200050
[71] SFD's Scenes of Violence policy addresses incidents "that necessitate Law Enforcement (LE) to be the lead
agency based on apparent or potential violence. LE operations should address scene safety and security issues
prior to the start of Seattle Fire operations in the Warm Zone." See: Seattle Fire Department, Standard Operating
Guideline (imgix.net)



> This was a scene where the risk was too high to commit our crews
> to respond in without a police escort.[72]

Without a presence in the East Precinct building, officers were staged farther away than normal to respond to violence in and around the CHOP area. The 12th Avenue and Cherry Street location was deemed to be SPD's best staging option on June 20th, despite being more than half a mile away from the scene of the shooting. The 14th Avenue and Union Street staging location for SPD and SFD on June 29th was farther away from the CHOP than the fire station itself. Many Panelists were concerned that SPD did not have officers stationed closer to the CHOP on either occasion, particularly as SPD Panelists discussed the anticipation that violence would occur in the CHOP.

The Panel discussed the delay on June 20th, attributing it to the different radio frequencies used by SPD and SFD.[73] Having to wait for SPD and SFD dispatchers to transmit information back and forth was time-consuming and directly contributed to the lack of coordinated response and shared understanding of meeting locations and other critical information. Staging SFD and SPD in different areas reflected additional lack of coordination between the agencies that contributed to the response delays. Panelists suggested these incidents illustrate the need for a shared communications capability that would allow SPD officers on the scene or at the staging area to directly communicate with SFD ambulances coming to the scene.

Even after reviewing SFD's explanation of the incident, Panelists did not understand why SFD paramedics drove away from the civilian SUV carrying one of the shooting victims on June 29th, particularly given SPD's communication to SFD that the silver SUV was approaching them for assistance. The Panel noted confusion between SFD and the CHOP medics about the rendezvous locations in both incidents. OIG interviews suggested that multiple rendezvous points outside the CHOP had been proposed among CHOP and SFD representatives to address possible emergencies in various locations across the zone. However, the Panel maintained that SFD should have been prepared with specific agreed-upon rendezvous locations within the CHOP so that any 911 call-taker could communicate to SFD personnel and CHOP medics which rendezvous point would be used.

## Contributing Factors

The Panel identified seven Contributing Factors, organized into six categories:

**Communication:**

47. There was a communication breakdown in meeting locations for ambulances to access people needing medical attention with no secondary plan.

---

[72] Statement from Seattle Fire - Fire Line
[73] SPD and SFD use different radio frequencies because using a shared line may cause confusion for listeners.



48. SFD and CHOP representatives had discussed multiple rendezvous points over time to prepare for incidents in various locations within the CHOP. Communication between SFD and protestors did not include SPD.

**Operational Supervision:**

49. SPD and SFD lacked efficient and effective communication protocols, including the lack of direct communication for operational personnel, leading to confusion about staging areas and meeting points.

**Environment:**

50. SPD had evacuated the East Precinct and was staged blocks away from the CHOP.

**Procedures:**

51. SPD policy dictated a "Scene of Violence" situation where SFD will not come in without clearance from SPD.

**Tactics:**

52. SPD did not have patrols in the vicinity of the CHOP.

**Cultural Leadership:**

53. Remarks made by SPD that characterized protestors as interfering with the response to the shooting were not accurate.

## Recommendations

- **Recommendation 29:** SPD should establish consistent staging points during large-scale protests or in areas where there is no public safety presence. If necessary, establish agreements with nearby businesses or other entities to establish closer staging areas to respond quickly to emergency situations.
- **Recommendation 30:** SPD and the City of Seattle should establish consistent rendezvous points for connecting injured people to emergency medical staff.
- **Recommendation 31:** SPD should use POET (Public Outreach and Engagement Team) officers to work with protestors to establish systems and procedures for providing other emergency safety and medical assistance.
- **Recommendation 32:** Ensure that SFD and SPD operational staff have real-time, direct lines of communication during emergencies.
- **Recommendation 33:** Implement a unified radio channel for dispatchers that responding officers from both SPD and SFD use for direct communication and rapid coordination when responding to a potentially dangerous scene.
- **Recommendation 34:** SPD and the City of Seattle should ensure public statements by SPD and City government are accurate.



**Seattle** Office of Inspector General

# IV. Conclusion

The decision of the City and SPD to withdraw from the East Precinct to de-escalate tension between SPD and protestors made space for creation of the CHOP. Once established, neither the City nor SPD leadership were able to communicate effectively with the occupy style protest or to provide consistent essential services to the CHOP or the surrounding neighborhood.

SPD officers are expected to be public safety professionals, ready to protect and serve the community. The community expectations transcend the circumstances of any particular moment, including situations where SPD is criticized or community members reject their presence as unjust and hurtful. Perhaps the best summary was provided by one of the SPD representatives to the Panel, when he said, *"We have to have the police, and we have to have the police that community wants."*

At the conclusion of the Panel's review, the Panel discussed the shutdown of the CHOP by the City and the expulsion of protestors from Cal Anderson Park by SPD on July 1st The Panel considered this incident to conclude their thoughts and to more fully understand this important period of protest, and to explore why SPD tactics which generated considerable anger from community members earlier in the protests were deployed with considerably less negative reaction from the community during the clearing of Cal Anderson Park and the CHOP Zone. The panelists observed that at this point the number of protestors residing in CHOP had diminished, and people were moving to other forms of protests.

The Panel wishes to give the last word to Ms. Sinclair, who concluded her presentation to the Panel by saying, "Lorenzo is still here. This is an opportunity for change. Something bad did happen, but we're coming together to make sure bad things don't happen again. This has given a real opportunity for healing and change."


**Seattle** Office of
Inspector General

## Appendix A. SER Participants

*Names listed by role and alphabetically.*

| Name | Title | Role |
|---|---|---|
| **Panelists** | | |
| **Argo, Mergitu** | Community Service Officer, Seattle Police Department | Panel Member |
| **Benalfew, Sophia** | Executive Director, Ethiopian Community in Seattle | Panel Member |
| **Brooks, John** | Captain, Seattle Police Department | Panel Member |
| **Davis, Tyrone** | Lieutenant, Seattle Police Department | Panel Member |
| **Ebrahimi, Taha** | Chair, Cal Anderson Park Alliance | Panel Member |
| **Greening, Eric** | Assistant Chief, Seattle Police Department | Panel Member |
| **Judge, Lisa** | Inspector General, Office of Inspector General | Panel Member |
| **Martin, Karin** | Associate Professor, University of Washington | Panel Member |
| **Moodie, Donna** | Executive Director, Capitol Hill EcoDistrict | Panel Member |
| **Taylor, Tracy** | Owner, Elliott Bay Book Co. | Panel Member |
| **Roberson, Matthew** | Officer, Seattle Police Department | Panel Member |
| **Ward, Ronald** | Associate Monitor, Seattle Police Monitor | Panel Member |
| **Washington, Maurice** | Community Advocate | Panel Member |
| **Facilitators and Subject Matter Experts** | | |
| **Hollway, John** | Associate Dean and Executive Director, Quattrone Center for the Fair Administration of Justice at the University of Pennsylvania Law School | Facilitator |
| **Lim, Thary** | Co-circle Keeper, CEO of PointOneNorth Consulting LLC. | Facilitator |
| **Maguire, Edward** | Professor in the School of Criminology and Criminal Justice at Arizona State University | Subject Matter Expert |
| **Phoung, Saroeum** | Circle Keeper, CEO of PointOneNorth Consulting LLC. | Facilitator |
| **Rowe, Cassidy** | J.D. Candidate, University of Pennsylvania Law School | Facilitator (staff) |
| **OIG Staff** | | |
| **Hernandez Aldaco, Daniel** | Former Policy Analyst, Office of Inspector General | Former OIG Staff |



| Hiller, Sienna | Policy Analyst, Office of Inspector General | OIG Staff |
|---|---|---|
| McCracken, Conor | Policy Analyst, Office of Inspector General | OIG Staff |
| Meza, Miroslava | Deputy Inspector General, Office of Inspector General | OIG Staff |
| Perez-Morrison, Alyssa | Policy Supervisor, Office of Inspector General | OIG Staff |
| Sierra, Miriam | Policy Analyst, Officer of Inspector General | OIG Staff |
| Tsai, Amy | Former Deputy Inspector General, Office of Inspector General | Former OIG Staff |



## Appendix B. Wave 3 SER Recommendations

For the reader's convenience, the Wave 3 recommendations are compiled in a single list below:

**Recommendation 1:** SPD and the City of Seattle should ensure Seattle neighborhoods are not left without public safety and other essential services. If City government is prevented from accessing an area, it should make every effort to provide city services and emergency response. The City should assign a City liaison to facilitate communications with impacted community members about service provision or interruption.

**Recommendation 2:** In the event of an evacuation of a government building or other emergency, strategic decision-making should be done at the highest level of government with accountability and transparency.

**Recommendation 3:**  SPD should improve internal channels of communication to increase efficient and timely collaborative decision making amongst command and with officers.

**Recommendation 4:** SPD should ensure processes for transparency and accountability are in place in case of evacuation or other emergency. Ensure accurate logs are kept at the Seattle Police Operations Center (SPOC).

**Recommendation 5:** SPD should ensure appropriate recordkeeping and documentation during significant planning and decisions during large-scale protests.

**Recommendation 6:** SPD should conduct and publish an After-Action Review of actions taken during a large-scale protest response within 60 days of implementation, including all non-confidential materials used in the review.

**Recommendation 7:** SPD Incident Action Plans (IAPs) should follow a standardized approval process that includes review at the appropriate command level to allow for accountability of decision-making.[22] SPD should communicate IAPs to all officers prior to the implementation of the acts set forth in the IAP.

**Recommendation 8:** SPD should ensure coordinated communication of goals so the public has a clear understanding of SPD actions.

**Recommendation 9:** SPD and the Mayor's Office should publicly communicate rationale for decision-making during large-scale protest response to decrease mistrust on the part of the public and officers.

**Recommendation 10:** SPD and the City of Seattle should include OIG in planning meetings to offer recommendations and to stay informed.

**Recommendation 11:** An SPD Public Information Officer should accompany the Incident commander to important or large-scale events.

**Recommendation 12:** SPD should implement policies limiting deception and ruses to instances in which (a) the ruse seeks to avoid an imminent personal injury or death or significant property damage; (b) the ruse will not itself cause an escalation in tension with members of the community potentially leading to a personal injury, death or significant property damage; (c) the ruse is clearly documented by an authorized command officer or supervisor and communicated to other SPD individuals as appropriate to ensure compliance with the Incident Command System and stated SPD tactical objectives.

**Recommendation 13:** SPD should prohibit broadcasted ruses.

**Recommendation 14:** SPD should prohibit the use of ruses for crowd management or control purposes. If a ruse is justified during a crowd event or other emergency, any officer ordering a ruse should (a) be in



Seattle Office of Inspector General

the chain of operational command set forth in the daily briefing sheet; (b) document the circumstances justifying the ruse, the substance of the ruse, and the outcome of the ruse; and (c) inform and document communication to others in the chain of command on the existence, timing and content of planned ruse transmissions. SPD should specifically task appropriate members of the chain of command to coordinate the ruse if these conditions are met.

**Recommendation 15:** SPD should amend SPD Communications policy (12.010) to require all SPD radio transmissions to be recorded and stored for a specified period to allow for appropriate after-event review. SPD officers should not use unrecorded radio channels to transmit information, whether such lines are public (unencrypted) or secure (encrypted).

**Recommendation 16:** SPD should implement a system for daily debriefs with reports at the officer, supervisor, and command levels during emergencies. These debriefs should be sent to the SPOC and EOC to assist senior officers in managing the emergency, as well as to assist senior officers in communicating important information back to those squads.

**Recommendation 17:** SPD should evaluate the utility of a circular organization chart, where information flows internally from one bureau to another.

**Recommendation 18:** SPD Incident Command Plans during crowd events or emergency events should include officers with day-to-day operational authority over the resources necessary to address the emergency in question.

**Recommendation 19:** SPD should ensure all officers at the rank of Lieutenant and above receive thorough training on all aspects of crowd management and emergency response, so any officer in SPD leadership can capably staff the EOC, the SPOC, or other crowd event response structures.

**Recommendation 20:** SPD should ensure a diverse set of officers with relevant operational authority are permitted to observe and/or participate in strategic and tactical discussions during emergencies to allow for differing perspectives and critical evaluation in decision making.

**Recommendation 21:** SPD should require consistent cultural competency and emotional intelligence trainings for supervisors and command staff to encourage deeper understanding of the impact of individual decisions on officers and community.

**Recommendation 22:** SPD should consider implementing a departmental culture evaluation to identify and address barriers for officer of color being promoted to leadership roles within the department and encourage attention to identifying and reducing bias across the department.

**Recommendation 23:** SPD should develop a policy framework to guide public communications to ensure assertions are credible and supported by reliable information before dissemination.

**Recommendation 24:** SPD and the City of Seattle should establish a reliable and effective communication strategy to address the provision of public safety and other City services during "occupy" style protests.

**Recommendation 25:** SPD should provide increased health and wellness services to 911 call-takers and other emergency services employees.

**Recommendation 26:** SPD and the City of Seattle should assess which department 911 call-taking and dispatch services should be housed under (note: Seattle City Council voted to move 911 call-taking moved to the new Community Safety and Communications Center [CSCC] on May 24, 2021).



**Seattle** Office of
Inspector General

**Recommendation 27:** SPD and the City of Seattle should ensure a strategy for events that may impact neighborhoods, including appropriate contact information and identification of appropriate stakeholders.

**Recommendation 28:** SPD and the City of Seattle should recognize the role of SPD as public servants in delivering public safety and should develop procedures to ensure continued provision of public safety and essential services in the case of large-scale protests or other instances where regular service delivery is interrupted.

**Recommendation 29:** SPD should establish consistent staging points during large-scale protests or in areas where there is no public safety presence. If necessary, establish agreements with nearby businesses or other entities to establish closer staging areas to respond quickly to emergency situations.

**Recommendation 30:** SPD and the City of Seattle should establish consistent rendezvous points for connecting injured people to emergency medical staff.

**Recommendation 31:** SPD should use POET (Public Outreach and Engagement Team) officers to work with protestors to establish systems and procedures for providing other emergency safety and medical assistance.

**Recommendation 32:** Ensure that SFD and SPD operational staff have real-time, direct lines of communication during emergencies.

**Recommendation 33:** Implement a unified radio channel for dispatchers that responding officers from both SPD and SFD use for direct communication and rapid coordination when responding to a potentially dangerous scene.

**Recommendation 34:** SPD and the City of Seattle should ensure public statements by SPD and City government are accurate.


**Seattle** Office of
**Inspector General**

## Appendix C. Wave 3 SER Contributing Factors

For the reader's convenience, the contributing factors for each incident are compiled below:

### Incident 1. SPD Evacuates East Precinct

The Panel identified 21 Contributing Factors, organized into six areas:

**Communication:**

1. The decision to temporarily leave the East Precinct was not communicated to SPD officers by City leadership.
2. There was little to no communication from the City in the days leading up to SPD's withdrawal from the East Precinct.
3. Capitol Hill residents and business owners were not informed of SPD's decision to withdraw from the East Precinct, nor were they aware of the City's or SPD's plans for next steps.
4. There were gaps in cross-functional communications between the Mayor's Office, SPD leadership, and officers.

**Operational Supervision:**

5. Instruction and direction on who and what to evacuate from the East Precinct, and how to do so, was unclear.
6. Decisions regarding the East Precinct were made by a siloed group of SPD leaders and City representatives.

**Environment:**

7. Members of the community were hesitant to engage with police out of concern of possible philosophical backlash from protestors.
8. Distrust within the community predated the withdrawal of SPD.
9. The protests were centered on the police and questioning their role in community.
10. Multiple days of protests had created an environment of significant mutual distrust among SPD and community members.
11. There was consistent violence between protestors and SPD at East Precinct barricades.

**Procedures:**

12. There was inadequate documentation of decision-making in meetings between the Mayor's Office and SPD, resulting in confusion about who was responsible for plan execution or communication.
13. Officers were moved to the West Precinct without warning or preparation.
14. Direction was given to the Assistant Chief to remove precinct barricades without clear direction on how to ensure the safety of the precinct.

**Tactics:**

15. The FBI told the City and SPD about a "general threat" to the East Precinct building. This unspecified information was then distributed.
16. SPD's revised Incident Action Plan (IAP) for June 8th lacked specifics about how the withdrawal from the East Precinct would be conducted and how and when SPD would re-enter the East Precinct.



17. SPD's plan was for a temporary departure was expected to reduce tension at the barricades and then to return to the East Precinct the following day. This plan was then changed without clear indication of when they would return.

**Cultural Leadership:**

18. A structure did not exist to involve community in decisions about the actions of SPD.
19. The absence of justification for major decision allowed for the spread of inaccurate information.
20. Both the Chief of Police and the Mayor denied responsibility for the decision to withdraw from the East Precinct, further escalating community concerns about a lack of clear leadership or control of the situation.
21. There was not a clear decision-maker for the directive to withdraw from the East Precinct, and lack of accountability at City leadership made it difficult to get answers about processes and services.





**COMMUNICATION**

The decision to temporarily leave the East Precinct was not communicated to SPD officers by City leadership.

There were gaps in cross-functional communications between Mayor's Office, SPD, and officers.

Capitol Hill residents and business owners were not informed of SPD's decision to withdraw from the East Precinct, nor were they unaware of the City's or SPD's plans for next steps.

There was little to no communication from the City in the days leading up to SPD's withdrawal from the East Precinct.

**OPERATIONAL SUPERVISION**

Instruction and direction on who and what to evacuate from the East Precinct, and how to do so, was unclear.

Decisions regarding the East Precinct were made by a siloed group of SPD leaders and City representatives.

**EQUIPMENT**

The FBI told the City and SPD about a "general threat" to the East Precinct building. This unspecified information was then distributed.

SPD's revised Incident Action Plan (IAP) for June 8th lacked specifics about how the withdrawal from the East Precinct would be conducted and how and when SPD would re-enter the East Precinct.

SPD's plan was for a temporary departure was expected to reduce tension at the barricades and then to return to the East Precinct the following day. This plan was then changed without clear indication of when they would return.

**ENVIRONMENT**

There was consistent violence between protestors and SPD at East Precinct barricades.

Multiple days of protests had created an environment of significant mutual distrust among SPD and community members.

The protests were centered on the police and questioning their role in community.

Distrust within the community predated the withdrawal of SPD.

Members of the community were hesitant to engage with police out of concern of possible backlash from protestors.

A structure did not exist to involve community in decisions about the actions of SPD.

The absence of justification for major decision allowed for the spread of inaccurate information.

Both the Chief of Police and the Mayor denied responsibility for the decision to withdraw from the East Precinct, further escalating community concerns about a lack of clear leadership or control of the situation.

There was not a clear decision-maker for the directive to withdraw from the East Precinct, and lack of accountability at City leadership made it difficult to get answers about processes and services.

Direction was given to the Assistant Chief to remove precinct barricades without clear direction on how to ensure the safety of the precinct.

Officers were moved to the West Precinct without warning or preparation.

There was inadequate documentation of decision-making in meetings between the Mayor's Office and SPD, resulting in confusion about who was responsible for plan execution or communication.

**OTHER**

**PROCEDURES**

**TACTICS**

**CULTURAL LEADERSHIP**

| Incident 1: SPD Evacuates East Precinct |
| --- |



## Incident 2a. Proud Boys Ruse

The Panel identified 10 factors contributing to this incident, organized into four categories:

**Operational Supervision:**

22. Decisions being made by SPD on June 8th were siloed. Officers in the chain of command and in the EOC were excluded from the conception, justification, and execution of the ruse and thus lacked the opportunity to evaluate or weigh in on the decision to conduct the ruse.

23. The Captain who ordered the ruse did not effectively supervise the officers broadcasting the ruse communications.

24. The SPOC, SPD HQ, EOC and SPD field operations were all operating in separate locations, in part because of the COVID pandemic. This complicated decision making and made it harder to discuss strategy or provide information about the ruse.

**Procedures:**

25. SPD does not have a specific policy governing "ruses," only general guidance about "dishonesty."

26. The current SPD policy on dishonesty does not provide guidance on how to document tactical decisions to be dishonest to a member of the public, or who should be notified in the chain of command prior to using dishonesty as a police tactic.

27. Formal daily debriefs were not conducted or documented on a regular basis, making it hard for officers gather or generate new information or raise up suggestions for tactical improvement.

28. Although the ruse employed invented call signs intended to signal the ruse to SPD officers, they were not recognized as invented by other emergency personnel who also believed the ruse information.

29. SPD did not document the ruse. Radio channels on which the Proud Boys ruse was broadcast were not recorded, limiting OPA's ability to intake and investigate the ruse.

**Tactics:**

30. SPD officers used a channel they knew was being publicly monitored to broadcast the ruse.

**Other:**

31. The use of the Proud Boys by officers in the ruse added an element of racism which was inflammatory given the protests against systemic and historical racism.





Seattle Office of
Inspector General

## Incident 2b. June 10th Press Conference

The Panel identified six Contributing Factors, organized into three categories:

**Communication:**

32. There was a general lack of clarity regarding City and SPD engagement with the CHOP that created anxiety and concern among business owners and residents.

33. SPD provided insufficient support for assertions of "credible threats" against the East Precinct, or of the existence of armed checkpoints or extortion of businesses in the CHOP.

**Environment:**

34. The inability of SPD to substantiate the criminal activity reinforced distrust and cynicism about SPD motives regarding the CHOP.

35. The community perception was that SPD was perpetuating inaccurate information regarding the protestors and CHOP.

**Procedures:**

36. SPD did not verify the checkpoint or extortion rumors before or after the press conference.

37. SPD lacked established channels for communication with residents and business owners contributed to confusion, misinformation, and rumors about what was happening in the CHOP.


**Seattle** Office of Inspector General



COMMUNICATION

OPERATIONAL SUPERVISION

EQUIPMENT

ENVIRONMENT

SPD provided insufficient support for assertions of "credible threats" against the East Precinct, or of the existence of armed checkpoints or extortion of businesses in the CHOP.

There was a general lack of clarity regarding City and SPD engagement with the CHOP created anxiety and concern among business owners and residents.

The community perception that SPD was perpetuating inaccurate information regarding the protestors and CHOP.

The inability of SPD to substantiate the criminal activity reinforced distrust and cynicism about SPD motives regarding the CHOP.

Incident 2b: June 10th Press Conference

SPD's inability to substantiate the criminal activity contributed to distrust and cynicism about SPD motives regarding the CHOP.

SPD did not verify the checkpoint or extortion rumors before or after the press conference.

SPD lacked an established channels for communication with residents and business owners contributed to confusion, misinformation, and rumors about what was happening in the CHOP.

OTHER

PROCEDURES

TACTICS

CULTURAL LEADERSHIP

52

## Incident 3. CHOP Community Experience

The Panel identified nine Contributing Factors, organized into five categories:

**Communication:**

38. The CHOP protestors had a non-hierarchical leadership structure, leading to different representatives attending different meetings. Representatives for Capitol Hill business owners were not vetted by the City, also leading to different representatives attending meetings.

39. Traditional news reporting was reduced due to COVID precautions, allowing social media to be much more impactful in the spread of information.

**Operational Supervision:**

40. The Mayor delegated operational negotiations to SDOT, SPU, and SFD; SPD was largely absent from discussions between CHOP representatives and City agency representatives on the provision of essential services.

41. The EOC was disbanded on June 14th.

**Environment:**

42. Independent of the existence of CHOP, there was a lack of resources, programs, activities, sports, safe spaces for youth, with access further limited during COVID.

**Procedures:**

43. Due to safety concerns many City agencies were hesitant to allow employees to enter or work in the CHOP.

44. The Mayor's June 15th Executive Order limited SPD responses within the CHOP to life-threatening emergencies, and limited SFD's responses to areas where SPD has declared the area safe.

**Cultural Leadership:**

45. There was a lack of acknowledgement by City and SPD of protestors' goals and demands for change.

46. The City had no internal expertise and no access to external expertise for negotiating with "occupy" style of protest, which resulted in an inability to engage in effective leadership over the span of the CHOP.



**SENTINEL EVENT REVIEW WAVE 3**



COMMUNICATION

Traditional news reporting was reduced due to COVID precautions, allowing social media to be much more impactful in the spread of information.

The CHOP protestors had a non -hierarchical leadership structure, leading to different representatives attending different meetings. Representatives for Capitol Hill business owners were not vetted by the City, also leading to different representatives attending meetings.

OPERATIONAL SUPERVISION

The EOC was disbanded on June 14 th.

The Mayor delegated operational negotiations to SDOT, SPU, and SFD; SPD was largely absent from discussions between CHOP representatives and City agency representatives on the provision of essential services.

EQUIPMENT

ENVIRONMENT

Independent of the existence of CHOP, there was a lack of resources, programs, activities, sports, safe spaces for youth, with access further limited during COVID.

Incident 3: CHOP Community Experience

Due to safety concerns many City agencies were hesitant to allow employees to enter or work in the CHOP.

The Mayor's June 15 th Executive Order limited SPD responses within the CHOP to life -threatening emergencies, and limited SFD's responses to areas where SPD has declared the area safe.

There was a lack of acknowledgement by City and SPD of protestor's goals and demands for change.

The City had no internal expertise and no access to external expertise for negotiating with "occupy" style of protest, which resulted in an inability to engage in effective leadership over the span of the CHOP.

OTHER

PROCEDURES

TACTICS

CULTURAL LEADERSHIP

**Seattle** Office of
Inspector General

Incident 4. Fatal Shootings in the CHOP, June 20th and June 29th

The Panel identified seven Contributing Factors, organized into six categories:

**Communication:**

47. There was a communication breakdown in meeting locations for ambulances to access people needing medical attention with no secondary plan.
48. SFD and CHOP representatives had discussed multiple rendezvous points over time to prepare for incidents in various locations within the CHOP. Communication between SFD and protestors did not include SPD.

**Operational Supervision:**

49. SPD and SFD lacked efficient and effective communication protocols, including the lack of direct communication for operational personnel, leading to confusion about staging areas and meeting points.

**Environment:**

50. SPD had evacuated the East Precinct and was staged blocks away from the CHOP.

**Procedures:**

51. SPD policy dictated a "Scene of Violence" situation where SFD will not come in without clearance from SPD.

**Tactics:**

52. SPD did not have patrols in the vicinity of the CHOP.

**Cultural Leadership:**

53. Remarks made by SPD that characterized protestors as interfering with the response to the shooting were not accurate.





## Appendix D. White Paper

**An Intergroup Perspective on Seattle's CHOP/CHAZ Occupation**

Edward R. Maguire
School of Criminology and Criminal Justice
Arizona State University

### Introduction

George Floyd was murdered by Minneapolis police officer Derek Chauvin on May 25, 2020. Video footage of Floyd's tragic slow-motion death underneath the knee of Officer Chauvin touched the hearts of people worldwide and led to massive protests throughout the United States and abroad. Seattle was no exception. Although located nearly 1,400 miles away from Minneapolis, Seattle was home to numerous protests associated with the death of George Floyd. These protests led to conflict between police and protestors in Seattle. In response to this conflict, the city decided to withdraw police personnel temporarily from the Seattle Police Department's East precinct. The city's decision to have police leave the East precinct led the protestors to occupy an adjacent six-block area in the Capitol Hill neighborhood. The area was known by various names, including the Capitol Hill Occupied Protest (CHOP) and the Capitol Hill Autonomous Zone (CHAZ), among others. Drawing on interviews with a variety of key stakeholders, this report examines the genesis of CHOP/CHAZ and the perspectives of different stakeholders about the CHOP/CHAZ occupation. The results reveal widely differing opinions about the CHOP/CHAZ. The report closes by reflecting on the findings and considering some options for preventing or reducing intergroup conflict in the future.

### The Genesis of CHOP/CHAZ

On May 29, 2020, the city of Seattle experienced the first protest over the death of George Floyd. The protests continued daily and, on several occasions, involved significant conflict between protestors and the police. The protests also resulted in significant looting and property damage. Many of the protests took place around the Seattle Police Department's East Precinct which is located in the Capitol Hill neighborhood. On June 8, the eleventh day of the protests, the Seattle police withdrew from the East Precinct and reopened nearby streets. Mayor Jenny Durkan described the retreat as "an effort to proactively de-escalate interactions between protestors and law enforcement outside the East Precinct" (Durkan, 2020). Although it was a highly controversial decision, a later investigation by the Seattle Office of Police Accountability concluded that the decision to withdraw from the East Precinct was "a reasonable decision based on the information available… and the need to protect both the East Precinct and the physical safety of protestors and SPD officers" (Bettesworth, 2021; also see Myerberg, 2021).

After police withdrew from the East Precinct, protestors set up barricades around a six-block area near the precinct and the Seattle Department of Transportation (SDOT) provided more permanent, cement barricades to protect the area from vehicle traffic. The area became known variously as Free Capitol Hill, the Capitol Hill Organized Protest or the Capitol Hill

Occupied Protest (CHOP), and the Capitol Hill Autonomous Zone (CHAZ). Protestors established a security force, some members of which were armed with handguns. Protestors regulated access to the space in an effort to prevent people with ill intent from causing a disturbance or harming people located within the barricades. The CHOP/CHAZ occupation was highly controversial and elicited disparate opinions both locally and nationally. For instance, President Donald Trump (2020) said:

> Radical Left Governor @JayInslee and the Mayor of Seattle are being taunted and played at a level that our great Country has never seen before. Take back your city NOW. If you don't do it, I will. This is not a game. These ugly Anarchists must be stooped IMMEDIATELY. MOVE FAST!

Seattle Mayor Jenny Durkan took a very different perspective, referring to the zone as a "block party atmosphere" and reassuring the community that "there is no threat right now to the public."

## Methodology

The primary sources of data used in this study are 32 typewritten transcripts and/or field notes resulting from 24 interviews of, and eight testimonies by, stakeholders involved in some facet of the CHOP/CHAZ occupation. These stakeholders fall into four general categories: protestors, neighborhood stakeholders,[1] Seattle Police Department employees (both sworn and civilian), and other city agency employees. I use thematic analysis to analyze the transcripts and field notes. Thematic analysis is a primarily inductive method for extracting themes from qualitative data (Braun & Clark, 2012). Consistent with my purpose here, Guest et al. (2012, p. 16) note that the focus of thematic analysis is on "presenting the stories and experiences voiced by study participants as accurately and comprehensively as possible." I conducted separate thematic analyses – a process known as "segmenting" – for each of the four general stakeholder categories included in this study (Guest et al., 2012).

## Results

This section presents the results of the qualitative analysis broken down into four sections: protestors, neighborhood stakeholders,[57] Seattle Police Department employees, and other city agency employees.

### 1. Protestors

The thematic analysis of interview and testimony data from protestors revealed four primary themes. The first two themes focus on CHOP, including its goals and its racial composition. The next two themes focus on the police, including police use of force, and police non-responsiveness to requests for assistance.

The first primary theme that emerged, *Goals,* focuses on two issues: the movement's stated goals, and protestors' efforts to clarify external misconceptions about those goals. During the interviews, multiple protestors expressed CHOP's goals using very specific, almost identical language, suggesting that internal messaging about these goals has been successful at spreading the word. For example, one protestor explained that CHOP's goals are to (1) defund

and demilitarize the police, (2) invest in community-based public health and safety strategies, and (3) free the protestors who were arrested (File 19, p. 202).

Numerous protestors expressed concerns about external messaging about their goals and their motives, particularly the inaccurate messaging coming from certain politicians and media outlets. Many acknowledge that some of this inaccurate messaging likely resulted from one of the early names given to the protest zone. One of the names used at the start of the movement was "Capitol Hill Autonomous Zone," which raised questions among some pundits about whether its members were looking to secede from the union or declare themselves outside the jurisdiction of the United States. The following quotations illustrate protestors' efforts to set the record straight.

- *The conservative media lies every day. How you gonna call me a terrorist and we're out here feeding poor people? We're out here taking care of the mentally ill. We're out here de-escalating violence in the city's jurisdiction. This ain't no autonomous zone. (File 27, p. 247).*

- *We're not a separatist movement. We are not Antifa. We're not terrorists. We're concerned members of the community that want to remain members of community. So, we've actually changed the acronym. We're no longer using CHAZ. We're using CHOP. CHOP means Capitol Hill Occupied Protest. It's still a protest. It's an Occupy movement. It's nothing else (File 21, p. 215).*

- *We're not trying to dismantle Western democracy or civilization in any way. I think we're just a little upset that our constables are acting with impunity (File 22, p. 219).*

- *It's an occupying protest. It's not, we're not, trying to secede from the country or separate ourselves from it (File 24, p. 228).*

- *We're all being manipulated by the boys in blue. You know, we're all being arrested by them, we're all being identified as threats by them. They called us domestic terrorists because we were out here defending our people's rights, you know? (File 33, p. 263)*

The goals of the movement, as expressed by its participants, are instead oriented toward social justice rather than secession, terrorism, or violence. As one protestor explained, "what we're trying to start here is a second civil rights movement" (File 27, p. 250).

The second primary theme that emerged from the interviews with protestors involved issues associated with *Race*, specifically the racial composition of CHOP participants. Although the protests focused heavily on injustices experienced by people of color, most of the protestors were white. As shown in the sample quotes below, some of the protestors acknowledged this issue during their interviews.

- *Don't get me wrong, but the majority of the people there [CHOP] were white… once again, don't let me take away from the white brothers and sisters who did come out and stand up (File 7, p. 76).*

- *"This is somewhat controversial that, you know, a bunch of white people gather around and have fun when we're talking about police brutality, but it does help us occupy the space. So, you know… we're working on making sure that everyone is aware of what's happening, that we're here for Black Lives Matter, not just to have fun (File 23, p. 221).*

Serious questions about the racial composition of CHOP arose during the occupation. For instance, what is the proper role of white allies in a protest focused on injustices experienced by people of color? Do people of color feel comfortable coming together with white allies to protest against racial injustice issues?

While acknowledging the contributions made by white allies during CHOP, one participant noted that people of color may not feel safe or comfortable in such settings:

- *And that was my biggest thing coming out here as a Black woman is recognizing that, first of all, ninety percent of people out here don't even look like me. And I know that they're fighting for my Black life and the lives of my Black brothers and sisters and aunties and cousins, uncles, but my people don't feel like they can come down here. And for me, I want to be able to be with my people, especially if this movement is for us (File 25, p. 232).*
- *Based on the results of our survey from the CHOP protestors, our white allies are looking for Black leadership. And you know, in order to get Black leadership though, you have to first create an opportunity. And then try your best to make them feel safe because every day, as a Black person, you never know what's going to happen… We always feel like we're under attack. So, for me, it's important if I'm gonna bring Black folks together, that we do so in a way that makes everyone feel safe and comfortable" (File 25, p. 235).*

Other people of color within the movement emphasized the importance of people coming together across racial lines and welcoming all allies.

*We need, once again, allies of every race, every gender, every religion, culture, however you want to frame it, we need people who believe in justice and human rights on our side. They don't need to be alienated. They need to be celebrated for stepping up and doing what's right (File 27, p. 241).*

These are difficult and sensitive issues that led to some level of divisiveness within CHOP.

The third primary theme that emerged from the analysis of protestor interviews is *Police Use of Force*. The excessive use of force against George Floyd in Minneapolis is what first triggered the protests in Seattle. When protestors began encountering excessive force by Seattle police, it fueled the growth of the protest movement and led to the development of CHOP. Several protestors raised these issues during their interviews, as illustrated by the sample quotes below:

- *The police officers are out here right now treating us like it's the military… and bombing us. It looks like Iraq out here (File 20, p. 210).*

- *Well, we have had a lot of local police violence. We've had to deal with an escalation of force, an escalation of resources. And a great deal of our community's budget is sent to the Seattle Police Department unchallenged and that's been an issue for many years. And so, it's really a response to police violence. It's a response to violence in our Black community. And that's why there are so many people out here to support the movement (File 23, p. 226).*

Police use of force in the United States was widespread during the George Floyd protests in the summer of 2020, and Seattle was no exception (Seattle OIG, 2021).

The final primary theme that emerged during the analysis of data from protestors was *Police Non-Responsiveness* to calls for service. Protestors provided numerous examples of this phenomenon. For example, during a shooting in the early morning on June 20, witnesses called the police to report an active shooter. CHOP security and medics responded to the incident. CHOP medics tried to keep the victim alive while waiting for an ambulance. However, the ambulance could not go in because they were not allowed to respond to a scene with a possible active shooter. Protestors took the victim to Harborview Medical Center. The police did not arrive until later. Protestors were angry that SPD responded so late (File 18, p. 199). In another incident, an individual in the protest zone walked around naked during a mental health crisis and police would not respond (File 18, p. 199). Another protestor was trying to arrange help for a mentally ill woman with a child, but police refused to come. He had to walk five blocks at 2 a.m. to deliver her to police (File 27, p. 243). When questioned about why police were refusing to respond to calls for service in and around the CHOP zone, city officials responded by saying they did not feel it was a safe place for police to enter (File 18, p. 199).

**2. Neighborhood Stakeholders**

The thematic analysis of data from neighborhood stakeholders revealed four primary themes. The first theme focuses on the composition of, and changes that occurred within, the CHOP community during the occupation. The remaining three themes focus on the SPD, including concerns about police aggression, communication, and nonresponse to requests for assistance.

The first primary theme, *CHOP Composition and Change*, focuses on the characteristics of CHOP participants as well as changes that occurred in CHOP as the occupation evolved. One key characteristic of the CHOP community was that it was heterogeneous in a variety of ways. As one Capitol Hill resident noted, there were "many different groups and many different beliefs" among CHOP participants, and "there were different protest groups against each other" (File 3, p. 23). Moreover, as another resident noted, "there was churn on a regular basis among CHOP participants. Some people were consistently present, but "it was generally pretty few" (File 5, p. 55). This inconsistency in who was present in CHOP, especially when combined with the fact that it was a leaderless movement, often made it challenging for neighborhood stakeholders to coordinate with CHOP members.

The CHOP movement itself also began to change as the occupation continued. In the beginning, CHOP was often described as having a festive atmosphere and resembling a block party. However, as time went on, several key changes occurred in CHOP. For example,



neighborhood stakeholders noted that the movement became more violent and unruly, particularly at night. One Capitol Hill resident explained that the movement was "changing from hour to hour, from day to day" (File 3, p. 19). Another resident said "there was a change from the beginning to when it became more violent" (File 10, p. 109). An area business owner who sympathized with the protestors in the beginning grew less tolerant when the movement "started leading to people getting killed" (File 9, p. 102). Several residents emphasized that the movement "became more violent as the sun went down" (File 10, p. 109; also see File 5, p. 46).

In addition to the perceptions of increasing levels of violence, several neighborhood stakeholders also emphasized the extent to which CHOP became a magnet for social problems such as homelessness, mental illness, and drug use. One resident felt that the homeless had taken over the park, and that it was no longer safe to bring their children there. During the occupation, "there were a lot more homeless people camping in the park, so much so that we couldn't even use it anymore. They're defecating, urinating, their needles everywhere... it was disgusting. The whole thing was disgusting" (File 10, p. 109). Another noted that "once the place got full of houseless people, like, you could hear screams at night (File 3, p. 19). Another said that "across the street when the homeless were camping, there was a lot of drug activity... People injecting drugs. It just made me sick" (File 8, p. 85).

Consistent with evidence from protestors, several neighborhood stakeholders also raised concerns about the racial composition of CHOP participants. As one respondent noted, "CHOP was like this experiment. It was supposed to be a no cop zone where Black lives mattered, and then in the period of one month of this experiment happening," it ended up being largely composed of white people (File 3, p. 21). A local business owner also observed that the movement involved "a lot of white faces" (File 9, p. 101).

The second primary theme emerging from the analysis of the neighborhood stakeholder data was *Police Aggression*. Within this theme, there were three specific subthemes: hostile behavior, escalation, and the use of chemical agents. A property manager described one example of hostile behavior, noting that police officers on bicycles acted like gangs. Groups of officers would go "riding down the street like hooting and hollering. A bunch of frat bros or something...they were very angry and aggressive" (File 2, p. 14). A resident described an incident in which an elderly resident in his building went outside to dump his trash and the police would not let him back into his own building. "They started questioning him and harassing him...They're like fourteen-year-old little boys who are trying to get away with something. They don't act in a mature manner" (File 10, p. 112). Other neighborhood stakeholders described more egregious incidents, such as an officer using a police vehicle as a battering ram against a crowd (File 5, p. 47), and an officer knocking somebody off a bicycle for no apparent reason (File 9, p. 98).

Neighborhood stakeholders also described several incidents in which police escalated tensions and conflict rather than engaging in de-escalation practices. For example, one resident observed that the police use of barricades during the protests seemed to make things worse. "By creating that barrier, it actually attracted a very, very, large crowd and the crowd got bigger" (File 3, p. 18). Another resident said the violence was the fault of the police because

they escalated matters. "I think that by way of their actions, they [the police] really created this unsafe situation" (File 5, p. 63).

Several residents also raised specific concerns about the police use of chemical agents (such as tear gas and pepper spray) near buildings where they lived and worked. For example, one property manager tried to seal up air conditioners, doors, and windows to keep the tear gas out of the building (File 2, p. 11-12). "The degree of caution they used for the residential neighborhood, it didn't seem to ever cross their minds" (File 2, p. 13). Another resident said that when police chased protestors past his house, they released chemical agents that came through his windows and led him to cough (File 3, p. 18). Some residents also raised specific concerns about the effect of chemical agents on vulnerable people in their homes, such as children and people with chronic health problems (File 2, p. 13).

The third primary theme that emerged from the analysis of neighborhood stakeholders is *Police Communication*. The principal concerns here focused on either an outright lack of communication by police, or poor communication skills. In terms of the former, a property manager was trying to locate information about the health risks associated with tear gas after a resident with chronic health issues was exposed. They were unable to obtain this information from the police. They assembled their own hodgepodge of information "because [they] weren't getting any responses from the people actually responsible for it" (File 2, p. 15). Because police did not communicate with them about what was happening, neighborhood residents felt like they were "the forgotten group" in this saga (File 5, p. 46). As one resident said, "it was kind of negligent, frankly, that there wasn't more communication" (File 5, p. 52). A local business owner also noted that "there was a lack of clear communication between the various city departments, which led to numerous gaps in the quality of services provided by these agencies (File 9, p. 104). One resident expressed particular concerns about the 911 call center. This resident dialed 911 several times during the occupation. "They gave me a very good idea of what to expect, which was absolutely nothing. They were cold, lacking heart, zero regard" (File 10, p. 108).

The final primary theme that emerged from the analysis of the neighborhood stakeholder interviews is *Police Nonresponse*. For example, one resident heard gunshots outside and someone screaming for help. When they called 911, the call taker said the police could not come because it was the CHOP zone (File 3, p. 20). Another resident said that after numerous experiences with the SPD, "I now have a very low opinion of the police force. They are not here for us" (File 10, p. 111). Shortly before SPD withdrew from the East precinct, one officer told a neighborhood building manager "we will not be able to provide for your safety. You should get out" (File 5, p. 51).  According to a local clergy member, when the police left the precinct, there were many unanswered questions. "What's gonna happen?" "Are we gonna be cared for?" Furthermore, police would not go into the park when called there. The respondent noted that for a couple incidents, "we had to go meet them somewhere else" (File 8, p. 86). One resident said that when he called 911, "they let me know flat out, no one's coming" (File 10, p. 108). As I will demonstrate shortly, these concerns about the police not responding to calls for service are inconsistent with information provided by the 911 call center.

**3. Seattle Police Department Employees**

I examined transcripts from interviews with seven Seattle Police Department (SPD) employees, including four sworn police officers and three nonsworn employees. The principal theme emerging from my analysis of the interviews with sworn SPD personnel was the perception of high rates of crime and violence in the CHOP zone. For example, in a publicly available interview, Seattle police chief Carmen Best said that CHOP had "too much crime, too much violence, we had to do something. It was time to act. It has gone on far too long. We have two young African-American men not even to the age of 20, both teenagers that are dead, and many others are injured, raped, robbery, assault. It was time for us to get in and do what we needed to do to clear out the area and start restoring public safety to the area" (File 29, p. 253). Another police officer said, "there were guns in there and I think CHOP was a horrible failure as far as a social experiment or whatever. We had two murders in there. We had a young woman get sexually assaulted… we had people openly carrying semi-automatic rifles" (File 4, p. 36).

Another police officer emphasized not only the presence of crime and violence in the CHOP zone, but the difficulty in conducting thorough, timely criminal investigations of those incidents. "There have been assaults, rapes, batteries, burglaries, that have gone completely uninvestigated because they cannot get law enforcement in there to start an investigation. The shootings that happened the other weekend down here, detectives still have not been able to get in. The other problem is, because so much time has passed, the chance of conviction goes down astronomically, and that's the problem" (File 28, p. 252).

Another police officer emphasized the difference in crime and violence between the daytime and nighttime hours. "So, during the daytime, one of the things for CHAZ and CHOP that they've done, is they've had a really great PR campaign up until the shootings. Which was during daylight hours, it was a hippie fest. It was the summer of love. Families could come in with kids, everybody's happy, happy, joy, joy. The sun goes down and the AR-15s come out, and it becomes a totalitarian regime where, without arrest, without due process, without anything, you could be assaulted, beat up, and/or excommunicated and thrown out of CHAZ and CHOP (File 28, pp. 251-252).

While crime and violence issues were raised by all of the officers who were interviewed, other issues were only raised by individual officers. For example, Chief Best noted that police were seeking to balance people's constitutional rights with the need for public order and public safety. "It was very important for people to be able to peacefully demonstrate and express their First Amendment free speech rights, but there has to be order and peace in the city" (File 29, p. 253). Another officer noted that "…one of the big things that has happened since they've set up the CHAZ and CHOP area up in Capitol Hill is you see a lot more just overly aggressive behavior by individuals going, well, 'you're in uniform, you have no power over me. I can do whatever I want.' They've bought into that Marxist/socialist ideology where if you are any symbol of authority or power, you're evil… Where you would normally see people as I'm walking around who would sit there and smile and wave and all of that. They now look at you with complete disdain" (File 29, p. 251).

Another SPD officer took issue with two aspects of the police response: the use of tear gas, and the decision to place barricades around the East precinct. With regard to tear gas, the officer said, "I personally do not believe that tear gas is ever a good thing to use in an urban



environment, but it was a tool that we used" (File 4, p. 32). With regard to barricades, the officer said, "If we have to put up big huge concrete blocks to protect our house, how can we assure the public that we can protect them? I said we have to open up this precinct. We have to make it accessible and we have to work with our community… forming relationships, fostering trust between each other is the only way we're going to move forward from what happened from last year" (File 4, p. 33).

No dominant theme emerged from our analysis of interviews with civilian SPD employees. Instead, the issues they raised appeared to be unique to their specific vantage point within the agency. For example, one civilian employee noted that some protestors were looking to connect with someone in the police department. According to this employee, an SPD official should have communicated with these protestors but didn't. There was "a total lack of communication" with protestors (File 1, p. 4). There was also insufficient communication with the community, including the residents who lived near the CHOP/CHAZ zone. The SPD did not have a "plan or strategy to reach out to the community during the protest…" (File 1, p. 5).

For a member of the 911 call center, the principal issue was that call center employees were scared. The following three quotes illustrate this concern.

- *Our building was the site of several demonstrations, including demonstrations where the building was hit with explosive devices, where there was fire safety issues. There were very significant protests at the West Precinct during this time while all of the attention was on the East precinct. There was still significant protests here at the West Precinct and the employees at the time were very concerned. Hey, we see that you've left the East Precinct, are you going to do that here at the West Precinct? And if you do, you have 100 civilian employees on the second floor? What about us? What happens when the group comes here? Are the police just going to leave us here? Are they going to abandon us? (File 12, p. 124).*

- *Our employees were answering 911 calls and dispatching emergency calls. They had to take 911 calls as the building shook with sounds of explosive devices going off. This left our employees feeling that their safety was at risk and the city was not taking their safety seriously. Even today, our employees continue to express concern that their safety was not accounted for during this time period (File 12, p. 124).*

- *"The most concerning thing for me is the safety of our employees. And the city's response to violent actions that were taken against the city's facilities where employees are working was not adequate in my opinion. I felt the city's response and the actions taken to protect its own employees were lacking and put our employees' safety at risk" (File 12, p. 129).*

Civilian employees also noted that dealing with the protests, including the closure of the East precinct, was demoralizing. For example, one civilian employee said that the day the East precinct was evacuated was "the worst day of my career. Everybody was crying" (File 13, p. 160). A member of the 911 call center noted an increase in the number of people calling and "cussing out our call takers." The call center received "many, many calls in which people were telling our call takers that they were murderers, that they should commit suicide" (File 1, p.

148). These anecdotes reinforce the importance of carefully monitoring employee wellness during these types of events.

As I have already discussed, the qualitative data paint an inconsistent picture about the extent to which the SPD was responding to calls for service in and around the CHOP zone. According to a 911 call center employee:

- *The 911 center's strategy was to continue operating by policy and procedures and not to deviate. For instance, it was publicized that the police department and the fire department were not responding to incidents within the CHOP zone. This was not communicated to the 911 center and we did not provide that instruction to our call takers and dispatchers. Our strategy was to ensure that our call takers and dispatchers continued answering and processing calls consistent with our existing standard operating policies and procedures (File 12, p. 129).*
- *Sometimes stuff gets out there into the world and I know as, like, a community member, I would see on the news where somebody would call 911 and they would say on the news 911 is not responding to the CHOP zone. That was not my experience. My experience was that we were taking every call, we were processing every call, and we were doing our best to handle every call according to our existing policies and procedures (File 12, p. 142).*

At the same time, another civilian employee said that "during this time, 911 response had to be approved by a supervisor. It must be a significant event to deploy." All calls to the East precinct were considered unsafe due to officer safety concerns" (File 13, p. 160). As reported earlier, there was a widespread perception among protestors and other stakeholders in the Capitol Hill area that police were not responding to calls for service in the area.

**4. Other City Agency Employees**

I analyzed transcripts or field notes from interviews with representatives of four different entities: the Seattle Emergency Operations Center (EOC), the Seattle Fire Department (SFD), the Seattle Department of Transportation (SDOT), and Seattle Public Utilities (SPU). The EOC interview revealed that it was only open for the first three or four days of the CHOP occupation. Given the widespread concerns about interagency communication and coordination issues during the occupation, it is worthwhile to reconsider the wisdom of that choice. In either case, the EOC interview does not provide much information of direct relevance for this report. Thus, the analysis focuses on interview data from the other three other city agencies. The analysis revealed two primary themes: concerns about employee safety and the importance of dialogue and relationship-building.

The first primary theme focuses on *Employee Safety*. All three agencies raised concerns about this issue. For example, a representative of the SFD said, "the balancing act for us, or the challenge that we had to navigate, is how do we keep our firefighters safe when we've got people with open carry long guns and things like that walking around within this area?" (File 14, p. 162). A representative of the SDOT raised similar concerns. Employees were concerned about being in the area without a police presence. Some were verbally abused by people while onsite. Some said "we are not going there if the police are not there" (File 15, p. 189). A representative

of SPU noted that there were shootings very close to where they had people working (File 17, p. 196). In another instance, SPU contractors had rocks and bottles thrown at them by protestors (File 17, p. 194). SPD's decision to withdraw from the East precinct had major implications for the work of all three of these agencies.

The second primary theme focuses on the importance of *Dialogue and Relationship-Building*. Representatives from all three agencies described engaging in significant efforts to coordinate with CHOP residents. For example, the following two quotes from a representative of the SFD acknowledge the importance of genuine dialogue for effective service delivery:

- *I'm trying to, you know, maintain rapport with the community members there and how we can best support them and their concerns. So, it was more of a listen. You know, listen to the concerns and then see what we can do to address some of those concerns (File 14, pp. 162-163).*
- *I went down there with [Chief Scoggins] a few times and we wanted to ensure that we had dialogue. You know, try to establish some sort of dialogue with the folks that were in there…We were trying to work through these challenges daily, you know?" (File 14, p. 167).*

Representatives from all three agencies also emphasized the importance of de-escalation for calming tensions and preventing conflict when engaging with the protestors at CHOP. At the same time, all three acknowledged the ongoing challenges of engaging in dialogue and negotiations with a leaderless movement.

### Discussion and Conclusion

The findings presented here reveal that the stakeholders examined in this study have widely differing perspectives on the protests that occurred in Seattle following the death of George Floyd. When discussing their perspectives on CHOP/CHAZ, *protestors* focused heavily on the goals and racial composition of CHOP/CHAZ, as well as their concerns about police use of force and police non-response to requests for assistance. *Neighborhood stakeholders* focused heavily on the composition of CHOP/CHAZ and the changes that occurred within the movement as it evolved. They also focused on the SPD, including concerns about police aggression, communication, and nonresponse to requests for assistance. *SPD employees* focused primarily on the crime and violence that occurred in and around the CHOP/CHAZ zone. The other issues that they discussed, such as the fear experienced by 911 call takers, were associated with their specific role in the agency. Finally, other city agency employees focused primarily on two issues: employee safety, and the importance of dialogue and relationship-building.

The differing perspectives presented here are reminiscent of a large body of scholarship from the study of intergroup relations in social psychology (Tajfel, 1982, 2010). This scholarship teaches us that people from different groups often have very different social identities, worldviews, attitudes, and values. These key differences often result in tension and conflict – and in some cases violence – when different groups come into contact with one another.  During the protests in Seattle following the death of George Floyd, both positive and negative intergroup dynamics were omnipresent. For example, though CHOP/CHAZ led to considerable levels of stress and inconvenience for local residents and businesses, many of

these stakeholders sought to accommodate and assist protestors. Similarly, several city agencies, particularly the "three amigos" (SDOT, SFD, and SPU) engaged in an ongoing campaign of dialogue and de-escalation in their efforts to serve the needs of both protestors and neighborhood stakeholders. Put differently, there were many acts of intergroup kindness during the occupation. At the same time, there were also many instances in which intergroup dynamics were negative and conflictual. The two most obvious examples emerging from this study were the profoundly disturbing relations between the SPD and protestors and between the SPD and neighborhood stakeholders.

Consistently negative intergroup relations are often characterized by prejudiced or biased perspectives on the other group. For instance, one of the protestors in this study said "all cops are bastards," and one of the police officers referred to protestors as socialists and Marxists. Both statements are based on dubious assumptions about the other group. But this tendency to view outgroups as homogeneous and uniformly negative is common in the study of intergroup relations, particularly among groups in conflict. Fortunately, there is a large body of research evidence from the study of intergroup contact and communication which shows that it is possible to overcome bias and prejudice and heal intergroup relations using structured dialogue-based interventions (Allport, 1954; Pettigrew & Tropp, 2006). Research shows that these interventions are effective, even under extremely challenging circumstances such as longstanding ethnic and religious conflict (Ditlmann & Samii, 2016; Lemmer & Wagner, 2015). Research on the effects of these interventions for improving police-community relations is slim, but recent research has shown promising results (Hill, et al., 2021). More generally, community policing interventions have repeatedly been found to improve public satisfaction with police and public perceptions of police legitimacy (Gill et al., 2014; Peyton et al., 2019). The research evidence presented in this report provides community leaders with useful information about potential points of intervention for improving intergroup relations in Seattle.

## References

Bettesworth, A. (2021, October 4). *Police oversight entity determines that evacuation of East Precinct did not violate law or police*. Seattle Office of Police Accountability.

Braun, V., & Clarke, V. (2012). Thematic analysis. In H. Cooper, P. M. Camic, D. L. Long, A. T. Panter, D. Rindskopf & K. J. Sher (Eds.), *APA handbook of research methods in psychology, Vol. 2. Research designs: Quantitative, qualitative, neuropsychological, and biological* (pp. 57–71). American Psychological Association.

Ditlmann, R. K., & Samii, C. (2016). Can intergroup contact affect ingroup dynamics? Insights from a field study with Jewish and Arab-Palestinian youth in Israel. *Peace and Conflict: Journal of Peace Psychology, 22*(4), 380-392.

Durkan, J. [@MayorJenny] (2020, June 8). *In an effort to proactively de-escalate interactions between protestors and law enforcement outside the East Precinct*… [Tweet]. Twitter. https://twitter.com/MayorJenny/status/1270239226378899456

Durkan, J. (2020, June 11). Seattle mayor fights back after Trump threatens to intervene. CNN. https://www.youtube.com/watch?v=JXjvrkmXd4s

Gill, C., Weisburd, D., Telep, C. W., Vitter, Z., & Bennett, T. (2014). Community-oriented policing to reduce crime, disorder and fear and increase satisfaction and legitimacy among citizens: A systematic review. *Journal of Experimental Criminology*, *10*(4), 399-428.

Guest, G., MacQueen, K. M., & Namey, E. E. (2012). *Applied thematic analysis*. Sage.

Hill, S., Giles, H., & Maguire, E. R. (2021). VOICES: A theory-driven intervention for improving relationships between police and the public. *Policing: An International Journal, 44*(5), 786-799.

Lemmer, G., & Wagner, U. (2015). Can we really reduce ethnic prejudice outside the lab? A meta-analysis of direct and indirect contact interventions. *European Journal of Social Psychology*, *45*(2), 152-168.

Myerberg, A. (2021, September 30). *Allegations of misconduct and Director's findings*. Seattle Office of Police Accountability.

Pettigrew, T. F., & Tropp, L. R. (2006). A meta-analytic test of intergroup contact theory. *Journal of Personality and Social Psychology*, *90*(5), 751-783.

Peyton, K., Sierra-Arévalo, M., & Rand, D. G. (2019). A field experiment on community policing and police legitimacy. *Proceedings of the National Academy of Sciences*, *116*(40), 19894-19898.

Seattle OIG (2021, July 22). *Sentinel event review of police response to 2020 protests in Seattle*. Seattle Office of Inspector General.

Tajfel, H. (1982). Social psychology of intergroup relations. *Annual Review of Psychology*, *33*(1), 1-39.

Tajfel, H. (Ed.). (2010). *Social identity and intergroup relations* (Vol. 7). Cambridge University Press.

Trump, D. J. [@realDonaldTrump] (2020, June 11). *Radical Left Governor @JayInslee and the Mayor of Seattle are being taunted and played* … [Tweet]. Twitter.

## Appendix E. SER Peacemaking Circle Group Norms

As part of the SER peacemaking circles, the Panel agreed upon group norms and behavioral principles that would guide the group and assist its work in evaluating and analyzing Incidents that occurred during the protests of 2020. These group norms are set forth below.

**How to address tension, disagreement, and/or conflict (when a guideline is broken):**
- Call it out/name it in a respectful way.
- Recognize subjectivity & objectivity.
- Agree as a group with decision-making process.

**Guiding Principles/Group Norms:**
- Respect the talking piece.
- Speak from the heart.
- Respect each other's thoughts.
- Respect each other's time.
- It takes time to build trust.
- Speak from your own perspective and use "I" statements.
- Encourage people to move up/move back.
- Practice compassionate curiosity.
- Listen through an objective lens (it's difficult to be objective at all times).
- Do not "drop a bomb" and leave.
- Try not to let your beliefs, experiences, and values cloud your own judgement when listening to others.
- Accept other's ideas and thoughts.
- Whatever is discussed stays in the circle.
- Speak clearly and not aggressively.
- Be mindful of the way we speak.
- Practice forgiveness.
- Come from a place of vulnerability.
- Be accepting of direct language so long as it is respectful.
- Be present and engaged.
- Be accepting of being uncomfortable.
- Do not take things personally.
- Be open and transparent.
- Discretion.
- Acknowledge risks of expressing opinions.
- Express disagreement that seeks to understand not silence.
- Keep an open mind.
- Assume good intentions.
- Inclusion.
- Stay curious.

**Seattle** Office of
Inspector General

- Confidentiality.
- Time Management.

## Appendix F. Wave 3 SER Methodology

This section describes the development of the SER process, including the selection of Panelists.

**Stages of Sentinel Event Review**
This SER was divided into three stages:

- In **Stage 1**, OIG researched and built evidence-based timelines of the Events and Incidents under review.
- In **Stage 2**, the present phase represented by this report, OIG and expert moderators guide a panel of community and SPD stakeholders through the identified Incidents.
- In **Stage 3**, OIG will conduct audits and further systems review of issues identified by the SER.

**Working Groups**
Development of the SER involved the efforts of three working groups, in order of involvement:

- **OIG** initiated the process by gathering data and input from numerous sources to describe and analyze the events of 2020, including conversations with community, public comment, news, social media, complaints to the Office of Police Accountability (OPA) about alleged officer misconduct, use of force data, SPD reports and video, claims and lawsuit information, and other sources.
- A **Planning Group** was convened comprised of stakeholders who assisted OIG in customizing and refining the SER methodology, identifying Panel membership and approving facilitators, and selecting the incidents for analysis.
- The **SER Panel** was identified with the assistance of the Planning Group. The Panel reviewed sentinel event incidents identified by the Planning Group ("Incidents") and issued the recommendations in this report.

**Planning Group Membership**
It was important to the integrity of the SER process to directly involve community, law enforcement, and other stakeholders in the selection of the Panel, the facilitators, and incidents for review. Those decisions had a direct impact on the trajectory of the review, and it was important to have credibility and faith in the process by community and police to allow opportunity for meaningful change to occur.

The Planning Group included a mix of observing and participating representatives from community-based organizations, the Community Police Commission (CPC), SPD, the American Civil Liberties Union (ACLU), the Seattle Police Monitoring Team, and the United States Department of Justice (DOJ). Its membership has been dynamic, expanding as additional community members and perspectives are identified that bring value to the group's discussions.

**Panel Membership**
The selection of the SER Panel was a collaborative process between the Planning Group and OIG. The Planning Group provided OIG with criteria for selecting a diverse set of community

voices. OIG used these criteria, with assistance from the ACLU and the CPC, to identify about 100 organizations OIG initially approached to discuss participation in the SER. These organizations constituted a diverse set of identities, affiliations, and perspectives, including but not limited to: Black, African, Latinx, Native American, Pacific Islander, Asian, South Asian, and LGBTQ+, communities, business communities, representation from neighborhoods affected by the protests, faith-based organizations, minority bars, organizations serving vulnerable populations, seniors, youth, social and mental health services, among others. More than 30 organizations responded to OIG. Of those, five indicated they were not interested in participating, either because of the time/resource commitment required or an unwillingness to collaborate with SPD.

OIG convened a SER Panel of a total of thirteen members: seven community members representing different lived experiences of Seattle, five SPD personnel, and Inspector General Judge (see Appendix A). This report is the third set of incidents reviewed by the SER Panel.

**Facilitators and Outside Experts**

OIG recognized that Panelists would have to review large amounts of sensitive information, engage in difficult and contentious conversations, and work alongside other Panelists whose different life experiences and responsibilities might result in very different views of policing and community. The facilitators approved by the Planning Group included:

- **Saroeum Phoung** and **Thary Sun Lim** from PointOneNorth Consulting. Phoung and Lim have worked extensively with City and County agencies on reconciliation, trust-building, and restoration processes. For years, Phoung and Lim have been using a structured methodology called a "peacemaking circle" in community building and crime prevention efforts in Boston and Seattle. Here, it was used to build trust among panelists and create a safe environment to share, reflect and conduct the analysis.

- **John Hollway**, Executive Director of the Quattrone Center for the Fair Administration of Justice at the University of Pennsylvania Carey Law School. Hollway is a national thought leader on the use of root cause analysis in criminal justice.[74] In 2020, Hollway guided the Tucson Police Department and a diverse group of agency and community stakeholders through the review of two deaths of individuals in police custody.[75] Hollway worked closely with the OIG team and Planning Group to design the SER process, and facilitated SER Panel conversations, including discussions on contributing factors and recommendations.

Early in the process, OIG consulted with community members, partners, and external consultants to ensure the process development started with a community-focused lens. For Wave 3, OIG also engaged the assistance of Dr. Edward R. Maguire, a professor in the School of Criminology and Criminal Justice at Arizona State University.[76] Professor Maguire provided an

---

[74] Home | John Hollway
[75] In_Custody_SERB_Final_Report_Sept_2020_Redacted.pdf (tucsonaz.gov)
[76] Edward R. Maguire, PhD (edmaguire.net)

analysis of the differing perspectives and goals of those involved in the protests and presented his findings to the Panelists (see Appendix D).

**Peacemaking Process**

Bringing together police and members of the community that were affected by police actions to develop solutions both find agreeable is inherently difficult and has the potential to bring up difficult emotions and traumatic memories. Panelists regularly engaged in challenging conversations and reviewed a considerable amount of sensitive and traumatizing material.

To help navigate these difficult conversations, OIG established peacemaking as a core component of SER. The peacemaking circle process is a framework for facilitating a supportive environment and encouraging open-mindedness. The process interrupts old patterns and assumptions that can block communication to create an opportunity for understanding, connection, and collaboration.

The Panel dedicated a portion of each working session to peacemaking circle activities. The first sessions focused on SER panelists getting acquainted, understanding each other's values, and creating shared principles to facilitate communication and collaboration. As the group moved forward, the peacemaking circle focused on deepening relationships, developing empathy, and building trust.

The Panel began with an 8-hour session devoted to peacemaking, followed by over 18 hours dedicated to peacemaking during its first 13 meetings. It was important for each person to express how they were present in the room and to share their history, vulnerabilities, and expectations to engage on inherently divisive topics that were foundational to many in the room. The peacemaking process has provided a positive example for future trust-building and healing processes between the community and SPD. OIG will continue to use the peacemaking circle framework in future SER work (for more information see Appendix B).

**Identifying, Selecting, and Prioritizing Incidents**

The Planning Group was integral to the prioritization and selection of incidents for review. The process, summarized in Figure 1 below, was as follows:

1. **Data collection** - OIG collected data on potentially reviewable incidents, analyzing patterns in use of force, incidents of notable public attention and concern, and other data sources.
2. **Incident selection** - The Planning Group then evaluated the incidents with a focus on undesirable outcomes that should not occur when community members are engaged in protected First Amendment activity. These include, but are not limited to, the commission of acts of violence, uses of force (whether by police or community members), injuries to individuals (community members or police), destruction of public or private property, and the creation of unsafe environments during public protests.

3. **Sentinel event review of Incidents** - Selected Incidents were then sent to the Panel for root cause analysis. The Panel also utilized its own collective expertise to assess which incidents to include or add for review.

**Figure 1. Incident prioritization process.**



## Data Collection

OIG gathered extensive data and information from government agencies and public sources about incidents occurring between June 8 and July 2, 2020. Data sources included:

- SPD data
    - Aggregated use of force data;
    - SPD Incident Action Plans for all planned events;
    - SPD Computer-Assisted Dispatch (CAD) logs and other communication logs;
    - SPD Human Resources data on reportable injuries;
    - SPD arrest data;
    - SPD training materials on crowd control, de-escalation, use of bikes for crowd control, etc.;
    - Current and previous SPD policies;
- OPA data
    - Investigation data and summaries;
    - Case summaries;
- City data on lawsuits filed related to police action during the protests;
- Social media posts from community members, reporters, and city officials during each of the days under review, including Twitter Posts, YouTube videos, Facebook live streams and videos, and other data;
- News outlet articles, interviews, news coverage, and timelines;

Uses of force (as reported and shared by SPD) were strongly correlated with other variables (e.g., arrests, complaints, etc.) and was an important factor for the Planning Group in selecting sentinel events.

## Wave Identification

The OIG analysis organized protest-related activity into five Waves. Each Wave represented a period of time with an uptick in uses of force[14] and the occurrence of one or more critical milestones and other related events within the protests (see Figure 2 below):

- **Wave 1 (May 29 – June 1)** includes the period from the murder of George Floyd in Minneapolis to the first set of demonstrations in Seattle, mainly in Downtown Seattle.
- **Wave 2 (June 2 – June 7**) includes events that occurred before the leaving of the East Precinct by SPD. During this period, the main demonstrations and confrontations shifted from Downtown to the East Precinct.
- **Wave 3 (June 8 – July 11)**, the subject of this report, includes events that occurred during the existence of the Capitol Hill Organized Protest (CHOP) and Capitol Hill Autonomous Zone (CHAZ).
- **Wave 4 (July 22 – Oct 9)** includes events after the East Precinct was reestablished.
- **Wave 5 (Oct 10 – December 31)** includes events after the creation of the Community Response Group (CRG) by SPD Interim Chief of Police Adrian Diaz. The CRG is tasked specifically with responding to demonstrations, among other things.[77]

**Figure 2. Five Waves: Number of SPD uses of force May 30 to Nov. 5, 2020.**



**Panel Review**

The SER Panel first met in December 2021 to begin analyzing the Wave 3 incidents selected by the Planning Group. The Panel identified "Contributing Factors" that contributed to the undesired negative outcomes (e.g., violence and property damage). Next, the Panel made specific recommendations for change that would help SPD officers tasked with facilitating a public protest act in ways that would reduce the likelihood of those undesirable outcomes happening again in the future.

---

[77] Department Launches Community Response Group - SPD Blotter (seattle.gov)

The Panel acknowledged the errors made by SPD and other Contributing Factors that led to negative outcomes and stressed the importance of holding officers accountable, but did not discuss what discipline, if any, should be administered to individual officers. The Panel focused instead on the design of reforms that would help SPD to respond to the next set of protests and achieve better facilitation and enabling of peaceful protests. The inclusion of SPD officers, including officers in leadership, ensured that such reforms were implementable.

SPD has engaged in a self-critique of many of the events reviewed by the Panel and has begun to implement improvements, at least in part as a result of the Panel's discussions in advance of the release of this Report. OIG was also involved in conversations with SPD about improvements stemming from the OIG August 2020 report on crowd management and less lethal tools. Thus, the report may include recommendations that are already in place or are in the process of implementation. SPD's continued willingness to engage in critical self-analysis, especially with community involvement in developing recommendations, as well as in implementing those recommendations, will be crucial to improving its relationship with the residents of Seattle in the future.

**Contributing Factors**

In the SER process, Contributing Factors are actions or circumstances that play a part in what led to a negative outcome. The identification of something as a contributing factor is not a value judgment about whether the factor is positive or negative. For each specific incident reviewed, the Panel identified associated Contributing Factors. During Panel deliberations, OIG provided Panelists with available video coverage of the event, including publicly available video from the Internet and SPD BWV and in-car video (ICV) where available. Together, the Panel watched the videos and discussed each incident, listing Contributing Factors in the following categories:

- Communication
- Cultural leadership
- Operational supervision
- Tactics
- Policies and procedures
- Equipment
- Environment
- Other

The Panel tried to identify as many Contributing Factors as possible to craft recommendations for change. It is important to note that a Contributing Factor is not an attribution of blame. For example, crowd behaviors contributed to how police responded, but recommendations are about how understanding those behaviors can result in improved police response, not an attempt to change crowd behavior.

Once the Panel analyzed each of the reviewable incidents and agreed on potential Contributing Factors, it drafted and refined recommendations for change that might prevent the recurrence of the specific contributing factors that were observed.

**Training**

In initial preparation for the review, OIG provided the Panel with a series of interactive presentations:

- An overview of the philosophy and structure of sentinel event reviews from John Hollway of the Quattrone Center for the Fair Administration of Justice at the University of Pennsylvania Carey Law School;
- A discussion on the law of protected First Amendment activities from Alison Holcomb of the ACLU of Washington, this training was made available to all panelists in a recorded version;
- Education on peacemaking circles and their role in emotional healing from Saroeum Phoung and Thary Sun Lim at PointOneNorth Consulting; and
- Information sessions from the Trauma Stewardship Institute on the effects of trauma and some methods for coping with trauma.

**Limitations**

The Panel identified 57 contributing factors, leading to 35 recommendations for improvement for SPD and the City. Even so, it is important to acknowledge the limitations of the SER process. First, the Panel's judgments of contributing factors and recommendations are based upon a data-driven analysis of incidents. While the Panel has reached conclusions leading to specific recommendations, these conclusions do not necessarily determine the objective "truth" of the incidents or their underlying causes. They are consensus products based on the data available to the Panel, and judgments about potential underlying factors that may - or may not - have played a role. As such, limitations include the following:

- Tens of thousands of individual actions contributed to the actions of SPD and the crowds of people protesting. It is impossible to capture all of them, or to know whether the intentions of any of them were pure or designed to interfere with peaceful protests.
- Uses of force, destruction of property and protests happened in multiple geographic locations. Because of this, the Planning Group was forced to select a sample of those things that it found to be impactful and representative of the whole, and may have missed other events that are worthy of review and response.
- The data available was incomplete:
  - Information from SPD regarding its officers' actions may have been improperly or inadequately documented, or inaccurately documented in SPD systems (e.g., incomplete or "rote" use force statements);
  - OIG was unable to contact every community group or individual that might have had insightful information, due to the number of potential individuals and OIG's dependence upon the willingness of individuals to reengage with moments that were, for many, traumatic.
  - Existing rules and regulations limited OIG's ability to access, use or record video from Seattle Department of Transportation or any other camera located in public spaces. The main source of government-produced video

evidence used for analysis is SPD BWV cameras, with some additional video coming from ICV.

- o The technology adopted by SPD limits the data saved. When BWV cameras are turned on, either by an officer or automatically by SPD, there is a one-minute "buffer" of video beginning one minute before the initiation of the camera that is retained. The buffered minute has video but not audio. This limited the Panel's ability to fully perceive events and incidents through BWV.
- o Video review is limited to the perspective available through the video camera and may not provide complete fields of vision. A BWV worn on an officer's chest, for example, may not show what was in the officer's field of vision at eye level.
- o Existing rules and regulations limit the storage of public closed-circuit TV surveillance cameras.[78] As a result, the Panel sometimes lacked a complete video of many incidents that it evaluated.
- o Community and police perspectives from the Panelists and others during discussions, some of whom participated in some of the incidents, shed some light on the experiences and concerns of those involved. Nonetheless, they are not representative of all participants in the incidents.
- The Panel reviewed OPA reports but did not conduct additional interviews with officers involved in the incidents in question (although SPD Panel and Planning Group members contributed their knowledge of events). As a result, it could only infer officers' rationales for their actions based on the available documentation.

**Addressing Institutional and Systemic Bias**

Many on the Planning Group and Panel felt strongly that it was not possible to conduct a SER of the protests in 2020, or to understand the "root causes" of these protests, without acknowledging and grappling with the long and deeply ingrained history of racial inequalities in Seattle, and in the United States. It was important to the Panelists, the Planning Group, and OIG that the SER consciously engage with the context of institutional racism and the longstanding trauma and fear that many in the community have of police. At the same time, these groups recognized the limitations of a process that looks at a series of specific incidents and the resulting inability to "solve" institutional racism or remedy hundreds of years of racial oppression solely through this process.

For the benefit of future SER groups, OIG describes here the various efforts that were undertaken to reach a consensus understanding of the depth and breadth of hurt that has been suffered by unjust police and community interactions. Whether these interactions were suffered personally by Panelists, inflicted by SPD upon others, or inflicted by other police officers in other communities, the combined impact of repeated exposure to abuses of power by police officers have created an insistence that SPD needs to embrace, acknowledge, and

---

[78] About Surveillance - Tech | seattle.gov

repudiate an older power dynamic. Instead, SPD must truly protect and serve the community in ways that are just, fair, and supportive.

Panelists agreed to proceed with an acknowledgment of the history and environment in which the protests occurred, and to try to perceive how that affected police and community relations and responses from both sides. They also attempted to identify moments during the protests where Black, Indigenous, other People of Color, and white individuals might perceive power dynamics or motivations of actors differently, and to be explicit in discussing those moments in the Report.

Unsurprisingly, engaging directly on the impact of police behavior on Black, Indigenous, and other People of Color communities proved to be difficult. Often, actions by SPD officers that were deemed "legal" or within the acceptable bounds of policy by SPD or OPA generated great anger and frustration among Panelists. At these times, many of the non-SPD panelists expressed feelings of being unheard, unacknowledged, and misunderstood, sustaining their belief that SPD still did not understand the true nature of their discontent, or the true basis of concern about institutional racism.

The Panel felt that building trust and understanding within the group was necessary to generate consensus recommendations, and so it paused to perform some additional inquiry into the role of race as a contributing factor in the protests. Panelists were led through a special peacemaking circle in which Panelists were invited to share the emotions that watching police uses of force brought forth for them. This led to the realization that even police acts that are not racially motivated on their face still carried significant emotional weight for Panelists of color, and evoked for them lifetimes of fear and pain from past personal and family interactions with police, including but not limited to SPD.

In addition to this special peacemaking circle, Panelist Dr. Karin Martin of the University of Washington led the Panel in a conversation on systemic racism, where Panelists spoke about their own experiences with race, revealing larger racial dynamics at play in society. Panelists reflected on definitions of systemic racism, institutional racism, and other vocabulary, and discussing each Panelist's first awareness of race as a way of bringing to light each person's particular experience related to race, while revealing racial dynamics in society that are larger than any given person. Panelists used the Racial Equity Tools glossary to standardize the group's vocabulary.[79]

These conversations were (and continue to be) extremely challenging. They created a substantial hurdle to generating a shared understanding of the incidents reviewed by the Panel – and therefore to the drafting of consensus recommendations. The damage that has been done – the damage that caused these protests in the first place, and the overall inability of SPD as a Department and the City of Seattle to immediately craft particularized responses to the needs of peaceful protestors while addressing threats to public order and safety – is deep and

---

[79] Glossary | Racial Equity Tools

Seattle Office of
Inspector General

lasting. However, acknowledging the underlying Contributing Factor of institutional and systemic racism was critical to being able to move forward as a group.

**EXHIBIT C**

# City of Seattle
Seattle Police Department

November 1, 2022                                             Via Email

Dear Inspector General Judge:

As I did back in October 2021, following the release of recommendations emerging from Wave 1 of the Sentinel Event Review panel convened to examine incidents over the months-long protests during the Summer of 2020, and in April, 2022, following the release of Wave 2 recommendations, I am writing to provide you and others with our initial responses to the recommendations emerging from Wave 3 of the SER. As before, I remain both grateful for the continued work of the panel and impressed by, again, the depth of their review.

In my response to Wave 2 recommendations, I updated you on progress made regarding two initiatives – SPD's pre-academy Before the Badge (BTB) training and POET, the Public Outreach and Engagement Team. Before the Badge has, frankly, exceeded all of our expectations, not only in the overwhelmingly positive response we are receiving from our diverse classes of recruits, but in how it has been embraced across the department, the community, and indeed, across the country, with organizations ranging from local departments to the Department of Justice (which recently awarded SPD a grant to support this work) looking at BTB as a next-generation model of training. And POET, which focuses on providing a subdued presence before, during, and after crowd events, has now been integrated seamlessly into our crowd management response, engaging with organizers and crowd members to offer support and build rapport with a goal of facilitating safety for all who wish to exercise their First Amendment rights. Thank you again for your early collaboration in this direction.

With that introduction, I have provided below SPD's responses to each of the Wave 3 recommendations. As with our earlier responses to Waves 1 and 2, we understand these are panel recommendations, not necessary OIG recommendations, and may not have been deconflicted with the positions of others in the accountability structure or socialized with others who feel differently with regard to recommendations that hinge on staffing and resources. And again, where several of these recommendations call for action by other departments of City government, SPD defers those recommendations to those departments.

Recommendation 1. SPD and City should ensure Seattle neighborhoods are not left without public safety and other essential services. If City government is prevented from accessing an area, it should make every effort to provide essential city services and emergency response. The City should assign a City liaison to facilitate communications with impacted community members about service provision or interruption.

- *SPD acknowledges the harm that resulted from the extraordinary circumstances presented during the CHOP/CHAZ occupation and the exacerbating impact of a lack of (or mis) communications between City executives and executive departments and community members. Consistent with Mayor Harrell's One Seattle approach to cohesive,*

Seattle Police Department, 610 Fifth Avenue, PO Box 34986, Seattle, WA 98124-4986
An equal employment opportunity, affirmative action employer.
Accommodations for people with disabilities provided upon request. Call (206) 233-7203 at least two weeks in advance.

SPD SER Wave III Response
November 1, 2022

*collaborative governance, SPD is confident that lessons learned from this incident have informed and will continue to inform the City's response to emergency management.*

Recommendation 2. In the event of an evacuation of a government building or other emergency, strategic decision-making should be done at the highest level of government with accountability and transparency.

- *SPD concurs with this recommendation. While the Office of Emergency Management stands now as an independent executive department, the recommendation encompasses core operating principles of that department.*

Recommendation 3. SPD should improve internal channels of communication to increase efficient and timely collaborative decision making amongst command and with officers.

- *This recommendation has been implemented. Where events are known or foreseeable, and as feasible, SPOC holds a supervisors meeting two weeks out and follows up with a Command meeting the day of prior to roll call.*

Recommendation 4. SPD should ensure processes for transparency and accountability are in place in case of evacuation or other emergency. Ensure accurate logs are kept at the Seattle Police Operations Center (SPOC).

- *While recognizing that even best practices can be impacted by extraordinary events, this is, and has been, both transparency and accountability are core commitments of SPD. Since 2020, We have added a civilian position for most events, whose duties include keeping the log.*

Recommendation 5. SPD should ensure appropriate recordkeeping and documentation during significant planning and decisions during large-scale protests.

- *Implemented; see above response as to the log; in addition, SPOC is documenting planning and decisions in TEAMS.*

Recommendation 6. SPD should conduct and publish an After-Action Review of a large-scale protest response within 60 days of the incident, including publication of all non-confidential materials used in the review.

- *Concur in principle, with the caveat that (as here) the strain of staffing, the pandemic, and the highly extraordinary nature of sustained events can interfere with critical processes, thus leading to collaborative alternative review mechanisms (such as, as here, the decision collectively between SPD, OIG, OPA, and the CPC to defer to the SER process for this review).*

Recommendation 7. SPD Incident Action Plans (IAPs) should follow a standardized approval process that includes review at the appropriate command level to allow for accountability of

SPD SER Wave III Response
November 1, 2022

decision-making.  SPD should communicate IAPs to all officers prior to the implementation of the acts set forth in the IAP.

- *Implemented.  IAP's currently follow a standardized approval process and are reviewed by the IC prior to publishing. All personnel involved are provided accurate and standardized information about the event at roll call, to include Commanders Intent, Mission and Objectives. IAP's are available at roll call and officers are encouraged read through them.*

Recommendation 8. SPD should ensure coordinated communication of goal, so the public has a clear understanding of SPD actions.

- *Implemented.  This recommendation is at the heart of POET's mission and demonstrated success.*

Recommendation 9. SPD and the Mayor's Office should publicly communicate rationale for decision-making during large-scale protest response to decrease mistrust on the part of the public and officers.

- *In addition to its own public messaging and deployment of POET, SPD is committed to working collaboratively with the Mayor's Office to ensure that the public remains informed about what actions are taking place, and why.*

Recommendation 10.   SPD and the City of Seattle should include OIG in planning meetings to offer recommendations and stay informed.

- *Where circumstances allow for advanced planning around specific events, SPD believes that OIG should be included in discussions.  It should be noted that OIG is actively involved in developing the policies that guide tactics and planning, both in advance of known events and in the field.*

Recommendation 11. An SPD Public Information Officer should accompany the incident commander to important or large-scale events.

- *A Public Information Officer can be assigned to accompany the incident commander during an important or large-scale event on a case-by-case basis and is also available 24/7 to message to the public via SPD's social media platforms. In addition, a PIO will be included in all planning meetings and the current practice of having them in SPOC during events will be maintained.*

Recommendation 12. SPD should implement policies limiting deception and ruses to instances in which (a) the ruse seeks to avoid an imminent personal injury or death or significant property damage; (b) the ruse will not itself cause an escalation in tension with members of the community potentially leading to a personal injury, death or significant property damage; and (c) the ruse is clearly documented by an authorized command officer or supervisor and

SPD SER Wave III Response
November 1, 2022

communicated to other SPD individuals as appropriate to ensure compliance with the Incident Command System and stated SPD tactical objectives.

- *While emphasizing that the incident in question was not a "ruse" as would be contemplated in SPD policy and was found to be an act of dishonesty in violation of existing policy, SPD is committed to working collaboratively with the OIG in developing what it understands would be a "first of its kind" patrol ruse policy. SPD notes that a separate engagement occurred vis-à-vis ruses with OIG and other community members resulting in parallel recommendations from that workgroup.*

Recommendation 13. SPD should prohibit broadcasted ruses.

- *With the same qualifier as to the incident in question as stated above and emphasizing as well that SPD has never affirmatively permitted ruses of any type to be broadcasted, SPD does not disagree with this prohibition. The draft ruse policy submitted to OIG and the ruse workgroup contained this provision.*

Recommendation 14. SPD should prohibit the use of ruses for crowd management or control purposes. If a ruse is justified during a crowd event or other emergency, any officer ordering a ruse should (a) be in the chain of operational command set forth in the daily briefing sheet; (b) document the circumstances justifying the ruse, the substance of the ruse, and the outcome of the ruse; and (c) inform and document communication to others in the chain of command on the existence, timing and content of planned ruse transmissions. SPD should specifically task appropriate members of the chain of command to coordinate the ruse if these conditions are met.

- *With the same qualifier as to the incident in question as stated above, SPD agrees that ruses should not be used for crowd management or control purposes (full stop).*

Recommendation 15. SPD should amend SPD Communications policy (12.010) to require all SPD radio transmissions to be recorded and stored for a specified period to allow for appropriate after-event review. SPD officers should not use unrecorded radio channels to transmit information, whether such lines are public (unencrypted) or secure (encrypted).

- *While noting that radio communications may be recorded on an as-needed basis depending on operational need and technical feasibility, the recommendation to record all channels, encrypted and unencrypted, carries both data governance and operational security risks and is not reasonably feasible. SPD declines to implement this recommendation.*

Recommendation 16: SPD should implement a system for daily debriefs with reports at the officer, supervisor, and command levels during emergencies. These debriefs should be sent to the SPOC and EOC to assist senior officers in managing the emergency, as well as to assist senior officers in communicating important information back to those squads.

SPD SER Wave III Response
November 1, 2022

- *Implemented; SPOC requires supervisors to provide information on events on a form that they turn in daily with their timesheets. Those comments are discussed by senior staff/event incident commanders as relevant to future activities.*

Recommendation 17. SPD should evaluate the utility of a circular organization chart, where information flows internally from one bureau to another.

- *A circular organization chart was implemented in Spring 2022.*

Recommendation 18. SPD Incident Command Plans during crowd events or emergency events should include officers with day-to-day operational authority over the resources necessary to address the emergency in question.

- *Implemented; designating appropriate personnel for resource management is part of the IAP.*

Recommendation 19. SPD should ensure all officers at the rank of Lieutenant and above receive thorough training on all aspects of crowd management and emergency response, so any officer in SPD leadership can capably staff the EOC, the SPOC, or other crowd event response structures.

- *While we do not disagree with this at an aspirational level, present and foreseeable staffing challenges limit the feasibility of this option. Presently all members from the rank of Lieutenant and above do receive thorough training in crowd management; training for the EOC and SPOC is based upon assignment.*

Recommendation 20. SPD should ensure a diverse set of officers with relevant operational authority are permitted to observe and/or participate in strategic and tactical discussions during emergencies to allow for differing perspectives and critical evaluation in decision making.

- *SPD supports this recommendation in principle, as resources allow, and to the extent that SPD is included in broader City discussions. As a general rule, as to SPD decision-making, members with operational authority are core to the decision-making process.*

Recommendation 21. SPD should require consistent cultural competency and emotional intelligence trainings for supervisors and command staff to encourage deeper understanding of the impact of individual decisions on officers and community.

- *Implemented and ongoing. To develop greater emotional intelligence and cultural competency, the department began the roll out of the Outward Mindset program in early 2022 starting with Command Staff. Outward Mindset was then designated as a core component in the first of its kind Before-The-Badge program to enable new officers and CSOs to integrate Outward Mindset concepts into their work from the very beginning. To ensure that the SPD operationalizes Outward Mindset concepts throughout the department, every sworn and civilian supervisor will be trained in the two-day program by*

SPD SER Wave III Response
November 1, 2022

> *the end of the first quarter of 2023. Pending further funding, the Outward Mindset could be expanded to all officers, detectives, and civilian individual contributors by the end of 2023. The Outward Mindset also provides a foundation to layer another optional program called Outward Inclusion that further deepens cultural competency and emotional intelligence and is supportive of RSJI objectives. Outward Inclusion could be implemented in 2023 or 2024 depending on funding and available training hours. SPD would likely be the only major agency to train employees in Growth Mindset, Outward Mindset, and Outward Inclusion.*

<u>Recommendation 22</u>. SPD should consider implementing a department culture evaluation to identify and address barriers for officers of color being promoted to leadership roles within the department and encourage attention to identifying and reducing bias across the department.

- *This has been and continues to be a point of ongoing emphasis for SPD. In addition to regular surveys around organizational culture and health, over the past two years since programs have re-opened from the pandemic closures of 2020, SPD has sent a number of employees from historically underrepresented populations to premiere national law enforcement leadership development training such as the FBI National Academy (10 weeks), the Senior Management Institute for Policing (3 weeks), and the Executive Management Program at the Northwestern University Center for Public Safety (3 weeks). Of note, over the past two years, a significant number of promotions to leadership positions have been women and individuals of color (with three of SPD's five precincts now commanded by individuals of color).*

<u>Recommendation 23</u>.  SPD should develop a policy framework to guide public communications to ensure assertions are credible and supported by reliable information before dissemination.

- *Implemented; it is standard practice that all information released by SPD's Public Information Officers is first vetted and confirmed by investigators, patrol, or any other SPD unit whose information is being shared with the public.*

<u>Recommendation 24</u>.  SPD and the City should establish a reliable and effective communication strategy to address the provision of public safety and other City services during "occupy" style protests.

- *Implemented; it is standard for SPD's Public Information Officers to share via the department's social media platforms information posted publicly by other City services and agencies during "occupy" style protests or any other news-worthy event. Those City services and agencies also routinely share SPD's social media posts.*

<u>Recommendation 25</u>. SPD should provide increased health and wellness services to 911 call-takers and other emergency services employees.

SPD SER Wave III Response
November 1, 2022

- *With the caveat that the Community Safety and Communications Center (911) and Seattle Fire Department maintain their own wellness programs, SPD continues to grow its in-house wellness programs, including anticipated position authority in the 2023 budget for an executive level Director to provide and/or oversee clinical services and wellness programs. SPD believes that all City employees involved in first response should have the support, resources, and working environment necessary and consistent with research and best practice to mitigate against the inherent stress of their work.*

Recommendation 26. SPD and the City of Seattle should assess which department 911 call-taking and dispatched services should be housed under (note: Seattle City Council voted to move 911 call-taking to the new Community Safety and Communications Center [CSCC] on May 24, 2021).

- *With the benefit of the opportunity to now critically examine the impact of the move of 911 call-taking and dispatch from SPD to CSCC, informed by data and relevant metrics over the past year, SPD supports this recommendation, but defers to the City generally on any next steps.*

Recommendation 27. SPD and the City of Seattle should ensure a strategy for events that may impact neighborhoods, including appropriate contact information and identification of appropriate stakeholders.

- *Implemented as to SPD; SPD Public Affairs and POET work collaboratively to strategize best avenues for communicating information in advance of and in real-time of significant events.*

Recommendation 28. SPD and the City of Seattle should recognize the role of SPD as public servants in delivering public safety and should develop procedures to ensure continued provision of public safety and essential services in the case of large-scale protests or other instances where regular service delivery is interrupted.

- *Please see response to Recommendation 1.*

Recommendation 29. SPD should establish consistent staging points during large-scale protests or in areas where there is no public safety presence. If necessary, establish agreements with nearby businesses or other entities to establish closer staging areas to respond quickly to emergency situations.

- *Implemented and ongoing, as part of routine SPOC operations. SPD has also been working to build additional partnerships, while acknowledging the understandable security concerns of private sector businesses and organizations.*

Recommendation 30. SPD and the City of Seattle should establish consistent rendezvous points for connecting injured people to emergency medical staff.

SPD SER Wave III Response
November 1, 2022

- *SPD supports this recommendation but defers to the Office of Emergency Management and the Seattle Fire Department, which coordinates between departments during emergency events.*

<u>Recommendation 31</u>. SPD should use POET officers to work with protestors to establish systems and procedures for providing other emergency safety and medical assistance.

- *Implemented; see earlier responses and introduction to this letter.*

<u>Recommendation 32</u>.  Ensure that SFD and SPD operational staff have real-time, direct lines of communication during emergencies.

- *Implemented; currently, SFD and SPD are able to operate on the same channels.*

<u>Recommendation 33</u>. Implement a unified radio channel for dispatchers that responding officers from both SPD and SFD use for direct communication and rapid coordination when responding to a potentially dangerous scene.

- *While noting that there are operational reasons why different first responders with different missions do not operate on the same channel (in particular, the concern about talking over each other while trying to coordinate different operations), as noted above, the technological capacity exists to communicate on the same channels.*

<u>Recommendation 34</u>. SPD and the City of Seattle should ensure public statements by SPD and City government are accurate.

- *Implemented.  All information released by SPD's Public Information Officers is first confirmed by investigators, patrol, or any other SPD unit whose information is being shared with the public. SPD's PIOs routinely communicate and work with other City services and agencies to ensure any information they may share about SPD operations is accurate. If an inaccuracy is made public, SPD will work to correct and clarify as soon as possible.*

Again, thank you for the opportunity to review and response to these recommendations, and as always, we stand ready to engage in deeper discussion around any of these, in addition to our ongoing work.

Sincerely,

Adrian Diaz
Chief of Police