THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

                Plaintiff,

        v.

CITY OF SEATTLE,

                Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 2:12-cv-01282-JLR

**CITY OF SEATTLE'S MEMORANDUM IN SUPPORT OF PARTIES' JOINT MOTION TO APPROVE COMPLIANCE AGREEMENT**

**CITY OF SEATTLE'S MEMORANDUM IN SUPPORT OF PARTIES' JOINT MOTION TO APPROVE COMPLIANCE AGREEMENT** - i
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................................. 1

II.   BACKGROUND ............................................................................................................. 2

    A.    The Parties entered into the Consent Decree because DOJ found that SPD was using force unconstitutionally.............................................................................................................. 2

    B.    After years of work by the parties and the Monitor to implement the reforms required by the Consent Decree, the Court found that the City has achieved compliance. ........................... 3

    C.    Since achieving compliance, the City has encountered two main obstacles in sustaining compliance: accountability and crowd management. ................................................................ 5

    D.    The Monitor's recent assessment confirmed SPD's tremendous progress and identified the remaining areas where work must be done. ....................................................................... 7

III.  ARGUMENT................................................................................................................... 8

    A.    The sweeping reforms that SPD made under the Consent Decree have led to safer interactions between police and the community. ...................................................................... 8

        1.    It is now rare for officers to use force, and SPD has eliminated the pattern of unconstitutional force that led to the Consent Decree. ........................................................... 8

        2.    SPD has dramatically improved interactions with and outcomes for people in crisis. 13

        3.    Officers consistently and appropriately document the basis for making investigative ("*Terry*") stops. ....................................................................................................... 16

        4.    OPA conducts thorough, complete disciplinary investigations.................................. 18

    B.    The proposed Compliance Agreement will replace the Consent Decree with new requirements in the areas where work remains to be done. .................................................... 21

        1.    The Monitor will assess the accountability reforms made by the City and develop a path forward to address the Court's concerns................................................................... 21

        2.    SPD will revise its policies on using force at protests and provide data to show whether its practices have improved....................................................................................... 27

    C.    SPD will continue working to mitigate racial disparities in policing. ........................... 29

IV.   CONCLUSION............................................................................................................... 34

**CITY OF SEATTLE'S MEMORANDUM IN SUPPORT OF PARTIES' JOINT MOTION TO APPROVE COMPLIANCE AGREEMENT** - ii
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

1   **I.      INTRODUCTION**

2           Over a decade ago, the United States Department of Justice (DOJ) began its investigation of

3   the Seattle Police Department (SPD). Since then, SPD has made far-reaching reforms under the

4   oversight of this Court.  Today SPD is a transformed organization.

5           Force used by SPD now presents a night-and-day contrast to the practices found by DOJ

6   in 2011. This case began because DOJ found that an estimated *twenty percent* of SPD's uses of

7   force were unconstitutional. DOJ also found that officers were too quick to use force on people in

8   crisis, use impact weapons, and use force on restrained subjects. Now, because of the Consent

9   Decree reforms, more than 99% of force used by officers complies with SPD policy—a standard

10  that greatly exceeds constitutional requirements. The Monitor and DOJ helped SPD build and

11  implement a crisis intervention program that helps connect people in crisis with services. Today

12  SPD uses force in fewer than 2% of its interactions with people in crisis. Any pattern or practice

13  of unconstitutional force that existed has been eliminated.

14          The City and SPD have taken steps to ensure that the reforms and ongoing work will

15  endure. SPD adopted robust internal accountability mechanisms, such as overhauling its force

16  reporting system and assembling an elite team of detectives specially trained to investigate force

17  used by police officers. The City created the independent Office of Inspector General for Public

18  Safety (OIG) to provide robust, independent oversight of SPD and to foster SPD's continual

19  adoption of emerging best practices.

20          While recognizing this tremendous progress, the Monitor and the Court have identified two

21  areas where work remains to be done: accountability and crowd management. First, the Court

22  raised concerns about whether the City's accountability system is adequate to address systemic

23  **CITY OF SEATTLE'S MEMORANDUM IN SUPPORT OF**
    **PARTIES' JOINT MOTION TO APPROVE COMPLIANCE**
    **AGREEMENT** - 1
    (12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

policing failures and individual misconduct. Second, the Monitor identified problems with SPD's response to the racial justice protests of 2020, specifically regarding SPD's use, reporting, and review of force. Accordingly, the parties propose to replace the Consent Decree with a targeted Compliance Agreement that focuses federal oversight on these areas.

Accordingly, the parties ask the Court to adopt the proposed Compliance Agreement and focus continued reform in two areas: ensuring a sustainable system of accountability and improving the use, reporting, and review of force in crowd settings. In the other areas of the Consent Decree, where the Monitor has found compliance, the responsibility for police oversight should be returned to the people of Seattle, through their local government institutions.

## II.       BACKGROUND

### A.    The Parties entered into the Consent Decree because DOJ found that SPD was using force unconstitutionally.

In March 2011, at the request of community groups, DOJ began an investigation of the City's policing practices. DOJ's Findings Letter at 1.[1] At the conclusion of its investigation, DOJ estimated that 20% of SPD's use-of-force incidents were unconstitutional. *Id.* at 4.  Among other failings, DOJ found problems with SPD's use of impact weapons, use of force on restrained subjects, and use of force on people in crisis. Complaint ¶ 9.[2]

To resolve DOJ's allegations, the Parties negotiated a comprehensive settlement agreement, or "Consent Decree," to be enforced by the Court.  The Consent Decree mandates that the City make extensive policy, training, and operational changes to its policing practices.

---

[1] Docket Entry No. 1-1.

[2] Docket Entry No. 1.

**CITY OF SEATTLE'S MEMORANDUM IN SUPPORT OF PARTIES' JOINT MOTION TO APPROVE COMPLIANCE AGREEMENT** - 2
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

**B.** **After years of work by the parties and the Monitor to implement the reforms required by the Consent Decree, the Court found that the City has achieved compliance.**

Between 2013 and 2015, SPD implemented comprehensive reforms affecting nearly every aspect of its operations. The Consent Decree defines "compliance" to mean that the City and SPD have: (a) incorporated its requirements into policy; (b) trained personnel to fulfill the relevant responsibilities; and (c) ensured that the requirements are being carried out in practice. ¶ 184.

As required, SPD first developed comprehensive policies to address all areas of the Consent Decree. The policies were developed through a rigorous drafting and revision process that involved the Monitor,[3] DOJ, SPD command staff and patrol officers, the two police unions, the Community Police Commission (CPC), and the general public during a period of public comment. *See, e.g.*, Monitor's Mem. Re Use of Force Policies (2013) at 1-2.[4] This intensive process generated new policies based on national best practices and constitutional principles. Monitor's June 2014 Rept. at 13-16.[5] The Court reviewed and approved each policy.

SPD also developed and implemented new training for all of its sworn employees. On December 15, 2014, describing these extraordinary training accomplishments, the Monitor wrote:

> Whatever the issues might have been in the past with the quality of SPD training and resources devoted to it, the Education and Training Section under its new leadership—which has only been on the job for eight months—has become one of the Department's most promising drivers of systemic change. . . . By December 31,

---

[3] Merrick Bobb served as the court-appointed Monitor from 2012-2020. In 2020, Dr. Antonio Oftelie was appointed Monitor and he continues to serve today. This memorandum attributes work by both Mr. Bobb and Dr. Oftelie to "the Monitor."

[4] Docket Entry No. 107.

[5] Docket Entry No. 154.

**CITY OF SEATTLE'S MEMORANDUM IN SUPPORT OF PARTIES' JOINT MOTION TO APPROVE COMPLIANCE AGREEMENT** - 3
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

all officers will have received 32 hours of in-class training on the new force-related policies, at least eight hours of live training on how officers should deal with the mentally ill and others in behavioral crisis ("crisis intervention"), and eight hours of training on stops, detentions, and bias-free policing. . . . [A]s of January 1, 2015, . . . all officers will have received the same, comprehensive picture of the new policies on force, bias-free policing, stops, and crisis intervention.

Monitor's Dec. 2014 Rept. at 2-3.[6]

After developing new SPD policies and implementing them through a comprehensive training initiative, the parties and the Monitor planned a series of assessments to evaluate whether these efforts had achieved compliance with the Consent Decree. The Monitor conducted ten planned assessments between 2015 and 2017. In them, the Monitor documented and confirmed the City's compliance with each assessed Consent Decree requirement.

The City subsequently asked the Court to find that it had achieved compliance. DOJ supported the City's motion, confirming that "SPD's use of force, stops, and related data show that it has complied with all of the terms of the Decree, and has eliminated the pattern or practice of unconstitutional policing that led to DOJ's investigation and findings." Docket Entry No. 422 at 2. On January 10, 2018, based on the Monitor's assessments, the Court found that the City had achieved "full and effective compliance" with the Consent Decree. Court's 1/10/2018 Order at 12.[7]

---

[6] Docket Entry No. 187.

[7] Docket Entry No. 439.

**CITY OF SEATTLE'S MEMORANDUM IN SUPPORT OF PARTIES' JOINT MOTION TO APPROVE COMPLIANCE AGREEMENT** - 4
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

C.      **Since achieving compliance, the City has encountered two main obstacles in sustaining compliance: accountability and crowd management.**

Under paragraph 223 of the Consent Decree, the City's attainment of compliance initiated a two-year "sustainment" period from 2018 to 2020. At the end of the two-year period, if the City had sustained compliance, then the Consent Decree would have provided for termination.  ¶¶ 229-30. To determine whether the City was maintaining compliance in all areas of the Consent Decree, the parties and the Monitor planned and executed another series of assessments. During this period, however, the City encountered two significant challenges.

First, in May 2019, the Court determined that the City had fallen "partially out of full and effective compliance with the Consent Decree . . . in one of its additional areas of responsibility—accountability." Court's 5/21/2019 Order at 2.[8] The Court's ruling was based on a collective bargaining agreement (CBA) that the City had negotiated with one of the police unions. After the bargaining negotiations had begun, the City had enacted legislative reforms to the police disciplinary system; that legislation could not legally take effect until it had been bargained with the police unions.[9] However, because the Ordinance was enacted mid-bargaining, the City was not

_____

[8] Docket Entry No. 562. In their briefs, the parties took the contrary position that the City had not fallen out of compliance and that—beyond those requirements which are expressly stated—the Consent Decree does not mandate that the City make changes to its police disciplinary procedures or accountability system. Docket Entry Nos. 512, 528. The City continues to maintain this legal position, while recognizing that it is critical to address the Court's accountability concerns to ensure public confidence in SPD.

[9] *See* Accountability Ordinance § 3.29.510(C) (stating that provisions subject to bargaining would not take effect until the City's "collective bargaining obligations are satisfied"); *Spokane v. Spokane Police Guild*, 553 P.2d 1316 (Wash. 1976) (Spokane Police Guild's CBA superseded local regulation issued by the Spokane Civil Service Commission); *Teamsters Union, Local 378,*

**CITY OF SEATTLE'S MEMORANDUM IN SUPPORT OF PARTIES' JOINT MOTION TO APPROVE COMPLIANCE AGREEMENT** - 5
(12-CV-01282-JLR)

Ann Davison
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

entitled to go to arbitration if the parties reached an impasse on issues related to the Ordinance. As a result of good-faith bargaining by the City and SPOG, the CBA implemented some but not all of the reforms in the Ordinance. Of particular significance to the Court, it left the procedures for disciplinary appeals substantially unchanged. Court's 5/21/2019 Order at 6, 13.

The second obstacle to sustainment came in the summer of 2020 with SPD's response to the racial justice protests motivated by the murder of George Floyd. SPD and law enforcement agencies in dozens of other cities used less lethal devices, including chemical irritants, to respond to incidents of violence that occurred during the protests. Many non-violent protestors were affected by chemical irritants or other less lethal devices. Community members, advocacy groups, and City leaders (including some of SPD's own commanders) raised concerns about SPD's tactics.[10] As the protests of 2020 unfolded, the City recognized it had been unprepared to address protests of that nature and magnitude, especially when faced with evolving community expectations. SPD's response significantly undermined public trust.

At the request of the City Council and then-Mayor Durkan, the independent police accountability entities worked to investigate the protest incidents and make systemic recommendations, which were submitted to the Court. See Dkts. 636-1, 637-1, 639-1. Based on

---

*vs. Mason Cnty.*, Decision 3706, 1991 WL 733717 (Wash. Pub. Emp. Rel. Com. Jan 31, 1991) (county violated RCW 41.56.1440(4) because it implemented a no-smoking ordinance without first engaging in collective bargaining). The City explained this legal dynamic at greater length in a prior brief. *See* Docket Entry No. 512 at 3-4.

[10] As one example, community members contacted the Office of Police Accountability (OPA) over 19,000 times regarding SPD's response to the protests. OPA distilled the complaints to 141 incidents (over 13,000 of the contacts were about a single, widely publicized incident) and investigated every incident.

**CITY OF SEATTLE'S MEMORANDUM IN SUPPORT OF PARTIES' JOINT MOTION TO APPROVE COMPLIANCE AGREEMENT** - 6
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

their recommendations and its own internal review, SPD made numerous changes to its crowd management policies, tactics, and training. *See* Docket Entry Nos. 657 & 658. Unlike in 2011, when DOJ conducted its investigation of SPD, in 2020 the review and analysis were driven by the City's own accountability system.

The City also welcomed the Monitor's evaluation of the protest response, which appropriately came after the City's internal review process and confirmed many of the issues that SPD had self-identified. Echoing the concerns shared across the City, the Monitor concluded, "SPD at times did not comply with its policies mandated by the Consent Decree relating to de-escalation, use of force decision-making, officer force reporting, and supervisory review of force." Monitor's 2022 Comprehensive Assessment (hereinafter "2022 Assessment") at 32-33.[11]

**D.      The Monitor's recent assessment confirmed SPD's tremendous progress and identified the remaining areas where work must be done.**

In 2022, the Monitor conducted a comprehensive assessment to update the public and the Court on SPD's performance complying with the Consent Decree. The 2022 Assessment confirms that SPD has largely sustained or built upon the remarkable improvements that it previously achieved regarding force, crisis intervention, and stops and detentions. *Id.* at 8-17. It concludes that SPD has sustained compliance with the Consent Decree "except during the waves of protests over the summer of 2020." *Id.* at 8.

In addition to providing a compliance update, the 2022 Assessment also lays out the Monitor's vision for "the final phase of the Consent Decree." *Id.* at 3-5. The Monitor identifies critical areas for improvement: (1) ensuring that the independent police accountability system is

---

[11] Docket Entry No. 709.

**CITY OF SEATTLE'S MEMORANDUM IN SUPPORT OF PARTIES' JOINT MOTION TO APPROVE COMPLIANCE AGREEMENT** - 7
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

sustainable and responsive to the public; and (2) restoring trust that SPD lost due to its response to the racial justice protests over the murder of George Floyd. The Monitor makes recommendations for how SPD can restore trust and advance progress in these areas, which are discussed in Section III.B below.

The Monitor also makes recommendations in a third area: mitigating racial disparities in policing. Although the Consent Decree does not cover this topic, the City addresses it in Section III.C below because of its critical importance to the City's leaders and community.

## III.   ARGUMENT

### A.   The sweeping reforms that SPD made under the Consent Decree have led to safer interactions between police and the community.

Even more important than the legal achievements of compliance and sustainment, is the fact that SPD's hard work over the past decade has improved outcomes for the people of Seattle. Those results are described in this section.

#### 1.   It is now rare for officers to use force, and SPD has eliminated the pattern of unconstitutional force that led to the Consent Decree.

DOJ's  2011 investigation found that SPD used excessive, unconstitutional force in an estimated 20% of all incidents involving the use of force. DOJ's Findings Letter at 4. DOJ determined that "[t]his pattern or practice is . . . the product of inadequate policy, training and supervision." *Id.* at 4. To address these findings, the Consent Decree mandates substantive principles governing the use of force, ¶¶ 69-90, and imposes rigorous procedures for the reporting, investigation, and review of force, ¶¶ 91-129.

**CITY OF SEATTLE'S MEMORANDUM IN SUPPORT OF PARTIES' JOINT MOTION TO APPROVE COMPLIANCE AGREEMENT** - 8
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

*(a) Constitutionality of Force*

After SPD implemented the required reforms, the Monitor documented a dramatic change compared to DOJ's 2011 findings. SPD has reduced the use of serious force by 60% and achieved a better than 99% rate of compliance with its use-of-force policy—which holds officers to a standard that exceeds constitutional requirements.[12] *See* Ninth Assessment (Apr. 2017) at 8, 31-32;[13] SPD Use of Force Report (Oct. 2019) at 4;[14] 2022 Assessment at 13, 80.

Force used by SPD today presents a night-and-day contrast to the practices documented by DOJ in 2011. The use of force by Seattle police officers is now an empirically rare occurrence, and serious uses of force are exceedingly rare. In 2021, officers reported using force of any type a total of 1,085 times, a rate of just under one fifth of one percent (0.17%) of all dispatches. 2022 Assessment at 68. Of these uses of force, the overwhelming majority (71%) involved no greater than the lowest type of reportable force (such a complaint of minor pain with no sign of injury). *Id.* at 54. Notably this lowest level of force was not even reported or tracked before the Consent Decree. First Assessment (Sept. 2015) at 9.[15] The most serious force—Type III force, defined as force that causes

---

[12] The Supreme Court held, in *Graham v. Connor*, that the Fourth Amendment prohibits officers from using excessive force. 490 U.S. 386 (1989). Force is excessive unless it is "objectively reasonable in light of the facts and circumstances" known to the officer at the time. *Id.* at 397. SPD policy imposes obligations that go above and beyond the constitutional requirements of *Graham v. Connor.* For example, SPD policy requires that the force used be "necessary." *See* Seattle Police Manual § 8.000-POL(4); *compare Graham*, 490 U.S. at 396-97. In addition, under SPD policy, officers have an affirmative obligation to de-escalate. *See* Seattle Police Manual § 8.100.

[13] Docket Entry No. 383.

[14] Docket Entry No. 588-1.

[15] Docket Entry No. 231.

**CITY OF SEATTLE'S MEMORANDUM IN SUPPORT OF PARTIES' JOINT MOTION TO APPROVE COMPLIANCE AGREEMENT** - 9
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

or may be reasonably expected to cause substantial bodily injury—is extraordinarily rare, occurring only 20 times in 2021, or 0.003% of all dispatches. 2022 Assessment at 54, 68. With small variations in the annual rates, SPD has maintained these extraordinary improvements consistently since 2015. *Id.* at 54-56, 67-68.

The Monitor has repeatedly assessed the force used by the Department and determined that SPD has eliminated the pattern of unconstitutional force that gave rise to the Consent Decree. Ninth Assessment (Apr. 2017) at 8, 31-32; SPD Use of Force Report (Oct. 2019) at 3-5, 26-27;[16] 2022 Assessment at 12, 33, 80. Accordingly, SPD has maintained compliance with the Consent Decree's force requirements, except for one, temporary lapse: SPD's response to the racial justice protests of 2020. 2022 Assessment at 12, 33, 80. The Monitor concluded that, during the protests, "SPD at times did not comply with its policies mandated by the Consent Decree relating to de-escalation, use of force decision-making, officer force reporting, and supervisory review of force." *Id.* at 32-33.

*(b) Force Reporting, Investigation, and Review*

DOJ concluded in 2011 that "[t]he chain of command does not properly investigate, analyze, or demand accountability from its subordinate officers for their uses of force." DOJ's Findings Letter at 4.

---

[16] Docket Entry No. 588-1.

**CITY OF SEATTLE'S MEMORANDUM IN SUPPORT OF PARTIES' JOINT MOTION TO APPROVE COMPLIANCE AGREEMENT** - 10
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

The Monitor documented a dramatically transformed Department in this area as well. *See Second Assessment (Nov. 2015) at 1-2.*[17] All force is now reported and reviewed by an officer's chain of command. The most serious uses of force are investigated by an elite, interdisciplinary team of detectives who are specially trained in investigating force used by officers. Monitor's Dec. 2015 Mem. Re Training at 37.[18] After each investigation is completed, SPD's reformed Force Review Board (FRB) determines whether the force complied with policy, training, and tactics. The Monitor has lauded the FRB as "the Department's hub of internal accountability, analysis, and continual improvement with respect to force." Second Assessment (Nov. 2015) at 4. In addition, extensive data about SPD's use of force is made available to the public through SPD's online dashboards and detailed annual reports.[19]

Compliance has continued. In a follow-up review in 2018, DOJ and the Monitor concluded:

> The overall quality of SPD's review and investigation was high and the care that officers and their chain of command took in writing reports, reviewing information, ensuring complete reporting, probing issues of concern, and addressing shortcomings was impressive. . . . DOJ and the Monitoring Team believe SPD's thorough and established system of internal checks and balances in its force process (reporting, investigation and review) will help ensure organizational accountability from the officer that uses force through the Chief of Police who is responsible for the process and its outcomes.

SPD Force Reporting, Investigation & Review Audit (Oct. 2018) at 23.[20]

---

[17] Docket Entry No. 247.

[18] Docket Entry No. 254.

[19] Available at https://www.seattle.gov/police/information-and-data

**CITY OF SEATTLE'S MEMORANDUM IN SUPPORT OF PARTIES' JOINT MOTION TO APPROVE COMPLIANCE AGREEMENT** - 11
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

Since 2016, SPD has maintained compliance with the Consent Decree force reporting, investigation, and review requirements—except during the 2020 protests. *See* First Assessment (Sept. 2015) at 1;[21] Second Assessment (Nov. 2015) at 2; Seventh Assessment (Jan. 2017) at 7;[22] SPD Force Reporting, Investigation & Review Audit (Oct. 2018) at 23; SPD Force Reporting, Investigation & Review Audit (July 2019) at 28;[23] 2022 Assessment at 36.

### (c) Supervision

DOJ's 2011 investigation found that SPD's use of excessive force was due, in part, to inadequate supervision. DOJ's Findings Letter at 4. In 2011, officers routinely reported to two or more different sergeants during their work week. SPD Supervision Audit (Oct. 2018) at 10.[24] Under the Consent Decree, SPD changed its patrol staffing approach to ensure that all officers have consistent, clearly identified supervisors who work the same scheduled work week. *Id.*; 2022 Assessment at 145. SPD developed training specific to new supervisors to prepare them for effective supervision and leadership. Sixth Assessment (Dec. 2016) at 2.[25] In addition, the Department adjusted staffing to maintain an adequate number of first-line supervisors to respond

---

[20] Docket Entry No. 497-1.

[21] Docket Entry No. 231.

[22] Docket Entry No. 360.

[23] Docket Entry No. 570-1.

[24] Docket Entry No. 497-2.

[25] Docket Entry No. 351.

**CITY OF SEATTLE'S MEMORANDUM IN SUPPORT OF PARTIES' JOINT MOTION TO APPROVE COMPLIANCE AGREEMENT** - 12
(12-CV-01282-JLR)

to the scene of uses of force and to investigate. Sixth Assessment (Dec. 2016) at 43; 2022 Assessment at 145-46.

As a result of these changes, as well as the reformed procedures for reporting, investigating, and reviewing force, SPD has achieved and maintained compliance with the Consent Decree supervision requirements.  Sixth Assessment (Dec. 2016) at 1-2; SPD Supervision Audit (Oct. 2018) at 17; SPD Supervision Audit (Dec. 2019) at 15; 2022 Assessment at 147-48. The Monitor observed that, "[s]upervisors continue to document more substantive reviews of low-level uses of force and initiate associated corrective actions far more frequently than occurred prior to the Consent Decree." 2022 Assessment at 81.

> **2.    SPD has dramatically improved interactions with and outcomes for people in crisis.**

DOJ's 2011 investigation found that "SPD officers escalate situations and use unnecessary or excessive force when arresting individuals for minor offenses. This trend is pronounced in encounters with persons with mental illnesses or those under the influence of alcohol or drugs." DOJ's Findings Letter at 4.

Consistent with the Consent Decree's requirements, SPD made significant training and program changes to prepare its officers to respond to people experiencing behavioral crisis. The Monitor observed that "SPD has, in a relatively brief amount of time, created a full-fledged crisis intervention program that is successfully being woven into the SPD organization." Fifth Assessment (Feb. 2016) at 4.[26]  SPD now requires all officers to receive a minimum of eight hours of crisis

---

[26] Docket Entry No. 272.

**CITY OF SEATTLE'S MEMORANDUM IN SUPPORT OF PARTIES' JOINT MOTION TO APPROVE COMPLIANCE AGREEMENT** - 13
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

intervention training annually. *Id.* at 7; 2022 Assessment at 96-97; Seattle Police Manual § 16.110-POL-3(1). In addition, officers are offered the opportunity to take a forty-hour crisis intervention course and over 60% of patrol officers have completed this voluntary, advanced training. 2022 Assessment at 96.

To coordinate across the Department, SPD established a specialized Crisis Response Unit (CRU) made up of a sergeant, five officers and a mental health professional. Fifth Assessment (Feb. 2016) at 4. CRU provides real-time, expert advice to officers city-wide; it also reviews and analyzes crisis data collected by SPD and uses it to inform program decisions. SPD Crisis Intervention - Use of Force Evaluation (Dec. 2018) at 5.[27] SPD's extensive tracking of information about crisis incidents has equipped CRU with the ability to identify members of the community who frequently use crisis intervention services and develop profiles and response plans for them, which are shared with officers in the field. *Id.* In 2016, the Monitor observed, "SPD is the only agency in the nation that is currently tracking [force used in crisis incidents] with any level of detail." Fifth Assessment (Feb. 2016) at 12. As a result of these programs, SPD responders "frequently seek non-enforcement outcomes to help the individual in crisis, such as connecting individuals in crisis to supportive human services." 2022 Assessment at 4. To that end, CRU deploys a co-responder model, partnering mental health professionals with specially trained sworn officers. Declaration of Police Chief Adrian Z. Diaz ("Diaz Dec."), ¶ 8.

SPD is also committed to exploring alternative 911 responses. SPD recognizes the possibility that the very act of sending an armed police response could, itself, escalate an otherwise low-risk

---

[27] Docket Entry No. 511.

**CITY OF SEATTLE'S MEMORANDUM IN SUPPORT OF PARTIES' JOINT MOTION TO APPROVE COMPLIANCE AGREEMENT** - 14
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

situation. 11/01/2022 Dec. of Brian Maxey ¶¶ 3-8.[28] Through its "Risk Managed Demand" (RMD) initiative, SPD is analyzing 911 call data and working to develop a model to identify which calls do not require an in-person patrol response. *Id.* In addition, SPD and the Community Safety Communications Center are working to implement a more advanced online 911 reporting system that can reach a wider group of people. *Id.* ¶ 9. They are evaluating a system that can provide language translation services, be accessible to people with disabilities, and also increase the ability to assist people with limited access to technology. *Id.* ¶ 7.

Due to SPD's training and programmatic changes, the use of force in crisis incidents has become infrequent. Of the crisis contacts reported during 2019 and 2020, reportable force occurred in approximately 1.5% of them. 2022 Assessment at 13. Because this information was not tracked before the Consent Decree, no direct comparison can be drawn. First Assessment (Sept. 2015) at 9. However, the Monitor observed that "[t]he sustained, low rate of force—and especially serious force—in crisis intervention situations represents a dramatic improvement from DOJ investigative findings that led to the Consent Decree." *Id.* at 14.

SPD has maintained compliance with the Consent Decree requirements for crisis intervention practices. Fifth Assessment (Feb. 2016) at 1; SPD Crisis Intervention Audit (Dec. 2018) at 2-5;[29] 2022 Assessment at 14.

---

[28] Docket Entry No. 722.

[29] Docket Entry No. 511.

**CITY OF SEATTLE'S MEMORANDUM IN SUPPORT OF PARTIES' JOINT MOTION TO APPROVE COMPLIANCE AGREEMENT** - 15
(12-CV-01282-JLR)

Ann Davison
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

1

2

### 3. Officers consistently and appropriately document the basis for making investigative ("*Terry*") stops.

DOJ concluded in 2011 that "SPD officers exhibit confusion between a casual, social contact and a brief, investigative detention (a "*Terry*" stop[30])." DOJ's Findings Letter at 6. Although DOJ did not find that SPD was engaging in racially discriminatory policing, it did raise "serious concerns about practices that could have a disparate impact on minority communities." *Id.* at 6. "[I]n certain precincts, SPD officers may stop a disproportionate number of people of color where no offense or other police incident occurred." *Id.* at 6. On this basis, DOJ concluded that SPD's "policies and practices, particularly those related to pedestrian encounters, could result in unlawful policing." *Id.* at 3.

To address these issues, in close consultation with the Monitor, DOJ, and the CPC, SPD reformed its policy and training related to stops and detentions. SPD also overhauled its data collection for *Terry* stops.  *See* Monitor's Mem. Re Collection of Data on Stops (May 2014).[31] Officers are now required to complete a report after every *Terry* stop to document, among other items, important demographic information about the subject (such as perceived race), the duration of the stop, and a description of the circumstances giving rise to articulable reasonable suspicion. Seattle Police Manual § 16.110-POL-5(9). These demographic data support SPD in conducting

---

[30] In *Terry v. Ohio*, 392 U.S. 1 (1968), the United States Supreme Court held that a brief, investigative detention is authorized under the Fourth Amendment when an officer has a reasonable suspicion of criminal activity and the suspicion is based on specific and articulable facts.

[31] Docket Entry No. 143.

**CITY OF SEATTLE'S MEMORANDUM IN SUPPORT OF PARTIES' JOINT MOTION TO APPROVE COMPLIANCE AGREEMENT** - 16
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

trend analysis, as described below, and also support OPA investigations into possible patterns of bias.

> With regard to stops and detentions, the Monitor reported:
>
>> SPD and its officers are complying with the legal and policy requirements related to stops, searches, and seizures. The number of stops and detentions of individuals that are not supported by sufficient legal justification is exceedingly small. Importantly, an individual's odds of being a subject of a "bad" stop do not depend on that individual's race. This means that, regardless of who a subject is, the Department is complying with the requirements of law and SPD policy in a vast majority of instances.

Tenth Assessment (June 2017) at 3.[32]

In addition to improving its policies, training, and data collection for stops and detentions, SPD also developed programming to explicitly counter the issue of bias. With input from DOJ, the Monitor, and CPC, SPD adopted a comprehensive bias-free policing policy. *See* Seattle Police Manual § 5.140; Monitor's June 2014 Rept. at 13-14.[33] The City Council took the further step of codifying the policy into local law. Seattle Mun. Code Ch. 14.11. Under the policy, any officer who learns of a bias complaint must call a supervisor; the supervisor then must come to the scene of the incident and investigate in person. All bias complaints are forwarded to OPA for review or investigation. Seattle Police Manual §§ 5.140-PRO-1, 5.002-POL-5.

The Monitor lauded SPD's bias-free training, writing that it "incorporates critical features and key insights from numerous fields, well-established research, and existing law enforcement

---

[32] Docket Entry No. 394.

[33] Docket Entry No. 154.

**CITY OF SEATTLE'S MEMORANDUM IN SUPPORT OF PARTIES' JOINT MOTION TO APPROVE COMPLIANCE AGREEMENT** - 17
(12-CV-01282-JLR)

Ann Davison
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

and professional training programs." Monitor's Sept. 2014 Mem. Re Training at 6.[34] The Monitor observed that "[t]he dynamic collaboration between [SPD] and CPC across multiple iterations of [drafts] has helped to ensure that the training addresses some of the central concerns of Seattle's diverse communities with respect to differential treatment and issues relating to procedural justice." *Id.* at 7.

Based on this ongoing work, SPD has achieved and maintained compliance with the Consent Decree requirements to implement policies and training to address bias and improve the handling of bias complaints. ¶¶ 145-52. Tenth Assessment (June 2017) at 3; SPD Stops and Detentions Audit (Jan. 2019)[35] at 32-34; SPD Stops and Detentions Audit (Oct. 2019)[36] at 22-23; 2022 Assessment at 17.

### 4.    OPA conducts thorough, complete disciplinary investigations.

DOJ's 2011 investigation found "that the OPA system is sound and that investigations of police misconduct complaints are generally thorough, well-organized, well-documented, and thoughtful." Consent Decree ¶ 164. However, DOJ identified three issues related to OPA's handling of complaints:

- OPA dispose[d] of nearly two-thirds of citizens' complaints by sending them to SPD's precincts, where they [were] not adequately investigated.
- OPA's . . . classification and findings systems [were] so complex that they damage[d] OPA's credibility and undermine[d] public confidence in OPA.

---

[34] Docket Entry No. 176.

[35] Docket Entry No. 547-1.

[36] Docket Entry No. 588-2.

**CITY OF SEATTLE'S MEMORANDUM IN SUPPORT OF PARTIES' JOINT MOTION TO APPROVE COMPLIANCE AGREEMENT** - 18
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

- OPA consistently overuse[d] and misuse[d] the finding "Supervisory Intervention," which result[ed] in neither a true finding nor a remediation of the officer.

DOJ's Findings Letter at 5. To address these findings, the Consent Decree mandates that the OPA Manual be updated and requires revisions to SPD's policies on reporting misconduct and retaliation to OPA. ¶¶ 165-167.

The City satisfied these requirements. Fourth Assessment (Jan. 2016) at 2.[37] As an initial step, OPA eliminated the practice of sending community members' complaints to SPD precincts to be handled by the chain of command. *Id*. OPA then worked with the Monitor and DOJ to re-start the practice in a way that would ensure appropriate supervisor review of complaints involving minor misconduct (whereas complaints of serious misconduct must be investigated by OPA).[38] In addition, SPD issued revised policies for reporting misconduct and retaliation to OPA which were approved by the Monitor, DOJ, and the Court. Monitor's Mem. Submitting OPA Manual & SPD Policies.[39] Finally, OPA worked with the Monitor, DOJ, and City stakeholders, including CPC, to develop an OPA manual. *Id*. In the manual, OPA adopted "streamlined" categories for classifying investigations and findings to "ensure that [the complaint process] is accessible to the public." *Id*. at 2. Notably, OPA eliminated the "supervisory intervention" finding category and adopted new

---

[37] Docket Entry No. 259-1.

[38] *See* OPA's 2019 Annual Report at 21-22, available at
http://www.seattle.gov/Documents/Departments/OPA/Reports/2019-Annual-Report.pdf

[39] Docket Entry No. 156.

**CITY OF SEATTLE'S MEMORANDUM IN SUPPORT OF PARTIES' JOINT MOTION TO APPROVE COMPLIANCE AGREEMENT** - 19
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

findings categories which the Monitor praised as "an important advance." Fourth Assessment (Jan. 2016) at 2.

These reforms have had a profound impact on the compliance culture within SPD. In 2011, DOJ found that referrals from SPD supervisors about misconduct to OPA were "rare to non-existent." DOJ's Findings Letter at 2. OPA's most recent annual report documents that one-third of its 558 cases came from referrals made by SPD employees. OPA Annual Report at 8.[40] Referrals from within SPD are important, because they allow OPA to learn about potential misconduct that the community does not observe or report.

After OPA obtained compliance with the Consent Decree, because of its important role in ensuring constitutional policing, the parties and the Monitor agreed that the Monitor would continue to evaluate OPA's performance—not from a compliance perspective, but to provide technical assistance and recommendations. *See, e.g.*, Fourth Assessment (Jan. 2016) at 2; Monitor's OPA Follow-Up Review (Jan. 2020)[41] at 2. Subsequently, OIG conducted an audit of SPD's disciplinary system that led to additional improvements.[42] OPA is working to implement all of the resulting recommendations from the Monitor and OIG, described below in Section III.B.1.

---

[40] Available at https://www.seattle.gov/documents/Departments/OPA/Reports/2021-Annual-Report.pdf

[41] Docket Entry No. 604-1.

[42] Audit of Disciplinary System for SPD Sworn Personnel (Nov. 30, 2021), available at https://www.seattle.gov/documents/Departments/OIG/Audits/AuditofDisciplinarySystemforSPDSwornPersonnel.pdf

**CITY OF SEATTLE'S MEMORANDUM IN SUPPORT OF PARTIES' JOINT MOTION TO APPROVE COMPLIANCE AGREEMENT** - 20
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

**B.     The proposed Compliance Agreement will replace the Consent Decree with new requirements in the areas where work remains to be done.**

   **1.     The Monitor will assess the accountability reforms made by the City and develop a path forward to address the Court's concerns.**

As set out in previous orders, the Court's concerns implicate two elements of accountability: first, the City's ability to deter and address misconduct by individual officers; and, second, the City's ability to identify system-wide policing failures and address them through effective reforms.[43] Since the Court found the City out of compliance in the area of accountability, the City has spent three years making improvements in these areas. It is time to take the measure of these improvements and chart a course forward. The Compliance Agreement provides a framework for this body of work.

> *(a) The Monitor will examine the recent City-wide and state-wide reforms to police discipline and determine how well they have worked.*

Under the Compliance Agreement, the Monitor will assess the strengths and weaknesses of the City's accountability system, including the changes to the City's disciplinary system described below. Compliance Agreement ¶ 85.

Over the past three years, the City has improved disciplinary investigations and procedures. Although DOJ and the Monitor previously confirmed the high quality of OPA's disciplinary investigations,[44] OPA has continued to improve. Among other actions, OPA has implemented

---

   [43] *See, e.g.*, Court's 5/21/2019 Order Finding Seattle Partially Out of Compliance, Docket Entry No. 562 at 6; Court's 8/26/2015 Minute Order; Court's 8/07/2015 Minute Order.

   [44] Consent Decree ¶ 164; Fourth Assessment at 3.

**CITY OF SEATTLE'S MEMORANDUM IN SUPPORT OF PARTIES' JOINT MOTION TO APPROVE COMPLIANCE AGREEMENT** - 21
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

recommendations made by the Monitor and OIG[45] including: augmenting its training on interviewing techniques; adding and filling two new civilian investigative staff positions; increasing the quality of its written investigative plans, improving overall case documentation; taking steps to ensure that closed case summaries are promptly sent to complainants; and notifying complainants of disciplinary appeals. Declaration of Gino Betts Jr. ("Betts Dec.") ¶¶ 6-14, 21-25. These changes have strengthened the quality and independence of OPA's work. In addition, OPA has increased transparency into officer discipline. Starting in June 2020, OPA began posting information about the disciplinary resolution for each of its investigations and the status of all pending disciplinary appeals on its website.[46] *Id.* ¶ 20. Transparency is important because it helps to ensure public accountability.

Since the Court's 2019 non-compliance ruling—which was prompted by the approval of a collective bargaining agreement—the City has taken steps to ensure that the collective bargaining process better reflects community priorities. It modified the bargaining process to incorporate greater input from OPA, OIG, CPC, and City Council members than ever before. Declaration of Danielle Malcolm ("Malcolm Dec.") ¶¶ 11-13. Recent negotiations with one of the police unions were conducted using this process, resulting in a contract that transformed the disciplinary appeals system for captains and lieutenants. *See id.* ¶¶ 14-15.

---

[45] The Monitor's and OIG's recommendations are laid out in the Monitor's OPA follow-Up Review (Jan. 2020) (Docket Entry No. 604-1) at pages 29-33, and the OIG's Audit of Disciplinary System for SPD Sworn Personnel (Nov. 30, 2021), at pages 40-42.

[46] Available at https://www.seattle.gov/opa/case-data

**CITY OF SEATTLE'S MEMORANDUM IN SUPPORT OF PARTIES' JOINT MOTION TO APPROVE COMPLIANCE AGREEMENT** - 22
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

In addition to making reforms at the local level, the City also obtained a legal victory that directly addresses the Court's concerns with respect to arbitrators' discretion in excessive force cases. In the Washington Court of Appeals, the City prevailed in a case that will strengthen its position in officer disciplinary appeals going forward. The court upheld the City's termination of an officer who had used excessive force on a woman while she was handcuffed in his patrol car. *City of Seattle v. Seattle Police Officers' Guild*, 484 P.3d 485 (Wash. App. 2021). It found that the arbitrator's award reinstating the officer "was so lenient it violates the public policy against the use of excessive force." *Id.* at 502. Thus, due to the City's advocacy and the principles declared in the Consent Decree, a state appellate court held for the first time that there is a clear public policy against excessive force by police officers. This precedent will have ripple effects for police departments throughout the state when disciplining officers for using excessive force.

In another important case, the Washington Court of Appeals held that public policy required the termination of an officer who demonstrated bias. This second case did not involve the City, but it establishes state-wide precedent. In that case, an arbitrator reinstated a police officer who had sexually harassed women in the community. The Court of Appeals held that reinstatement violated the "well-defined and dominant public policies aimed at ending current discrimination and preventing future discrimination . . . by officials acting under color of state law."[47]

The City also helped shape the state legislative agenda in ways that respond to the Court's concerns. City leaders, including City Councilmember Herbold, then-Mayor Durkan, and current

---

[47] *City of Prosser v. Teamsters Union Local 839*, 21 Wash. App. 2d 1058, 2022 WL 1151427, at *7 (2022).

**CITY OF SEATTLE'S MEMORANDUM IN SUPPORT OF PARTIES' JOINT MOTION TO APPROVE COMPLIANCE AGREEMENT** - 23
(12-CV-01282-JLR)

Ann Davison
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

Senior Deputy Mayor Harrell, testified in Olympia and urged changes to the police disciplinary process.[48] In 2021, the state legislature enacted a new law creating mandatory arbitration selection procedures for police disciplinary appeals.[49] It eliminates negotiations between police unions and police departments over selecting an arbitrator. The state commission now appoints a roster of trained, experienced arbitrators to hear disciplinary appeals for police officers. This law addresses the Court's concerns about the qualifications and impartiality of arbitrators. It took effect on January 1, 2022, and the new procedures and roster of arbitrators are now being used. RCW 41.58.070(2)(a).

In the same session, the legislature enacted a law that supports termination of officers who use excessive force or exhibit racial bias. The statute establishes discretionary authority for the state commission to decertify officers who use force in violation of their department's policy; decertification is also authorized for officers who discriminate based on a person's protected status.[50] RCW 43.101.105(3)(e) & (h). City leaders testified in favor of this bill as well.[51]

---

[48] January 14, 2021, Labor, Commerce, and Tribal Affairs Committee Hearing on SB 5055 & SB 5134, available at https://tvw.org/video/senate-labor-commerce-tribal-affairs-committee-2021011163/?eventID=2021011163

[49] Law Enforcement Disciplinary Grievance Arbitration, SSB 5055.SL.

[50] It also helps to prevent officers from staying in law enforcement if they are found to have used excessive force. It mandates decertification of officers who have been terminated for using unlawful force or for failing to intervene to stop such force by another officer, RCW 43.101.105(2)(b) & (c), preventing them from transferring to another agency. This reform is important state-wide, although it has not been identified as a problem for SPD.

[51] January 14, 2021, Labor, Commerce, and Tribal Affairs Committee Hearing on SB 5055 & SB 5134, available at

**CITY OF SEATTLE'S MEMORANDUM IN SUPPORT OF PARTIES' JOINT MOTION TO APPROVE COMPLIANCE AGREEMENT** - 24
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

In sum, the City and the state legislature have taken achievable, concrete steps leading to improvements in the police disciplinary system and the collective bargaining process. But the improvements made thus far do not alter the fact that broader systemic changes can be achieved only by bargaining a new contract or through additional changes to state law. Under state labor law, virtually all aspects of police disciplinary procedures are "mandatory" bargaining subjects.[52] To that end, the Executive and members of City Council have publicly committed that the Court's areas of concern will be top priorities in the current round of bargaining negotiations. Malcolm Dec. ¶¶ 6-7.

> *(b) The Monitor will assess OIG's track record in addressing systemic failures and OIG's capacity to provide robust oversight of SPD.*

The Compliance Agreement also addresses concerns about how well the City can identify and correct systemic policing failures. The City's elected leaders have entrusted the OIG with this responsibility. Accountability Ordinance § 3.29.010 et seq. OIG has broad oversight authority over SPD and is charged with ensuring the ongoing integrity of its processes and operations. *Id.* § 3.29.200(D). It provides systematic oversight of the management, practices, and policies of SPD and OPA. *Id.* § 3.29.200(D)-(K). OIG's role incorporates forward-looking advice and

---

https://tvw.org/video/senate-labor-commerce-tribal-affairs-committee-2021011163/?eventID=2021011163

[52] An employer must bargain mandatory subjects with the unions whose members are affected before implementing changes. *See generally Int'l Ass'n of Fire Fighters, Local Union 1052 v. Pub. Employment Relations Comm'n*, 778 P.2d 32, 35 (Wash. 1989) (interpreting bargaining requirement of Public Employees' Collective Bargaining Act (PECBA)); *see also Spokane Police Guild*, Dec. 5054, 1995 WL 849648 (Wash. Pub. Emp. Rel. Comm'n) (disciplinary procedures are mandatory subject of bargaining).

---

**CITY OF SEATTLE'S MEMORANDUM IN SUPPORT OF PARTIES' JOINT MOTION TO APPROVE COMPLIANCE AGREEMENT** - 25
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

1   recommendations, as well as audits and after-the-fact evaluations of past incidents. *Id.* In addition,

2   OIG "oversee[s] ongoing fidelity to organizational reforms implemented pursuant to the goals of

3   the . . . Consent Decree." *Id.* § 3.29.010(B).

4        Because of OIG's central role in ensuring accountability, the Compliance Agreement

5   provides that the Monitor will examine the critical question of whether SPD is taking OIG's

6   recommendations and making needed course corrections in response. Compliance Agreement

7   ¶ 85. The Monitor also will consider broadly whether the policies and priorities of SPD as an

8   organization reflect those advocated by OIG, CPC, and OPA—a key indicator of whether the

9   accountability system is working as intended. The Monitor's conclusions will inform the Court

10  and the public as to whether SPD as an institution is being held responsible when there are systemic

11  failures.

12       In addition, the Compliance Agreement will help inform the Court as to whether OIG has

13  the capacity to provide robust oversight of SPD. In close consultation with the Monitor and

14  Inspector General Judge, Mayor Harrell directed the City Budget Director to create and fund three

15  emergency auditor/analyst positions at OIG for the remainder of 2023. The hiring process for these

16  new positions began in February. This increase in OIG's staff will help in transferring functions

17  from the Monitor to OIG. These positions will be included as permanent additions to OIG in the

18  Executive's 2023 mid-year supplemental budget request to City Council.

19       Going forward, OIG commits to undertake substantial obligations in the Compliance

20  Agreement as an important step toward assuming the role of the Monitor. OIG will review SPD's

21  data reporting and analysis to help verify continued compliance in the areas addressed in

22  paragraphs 69-168 of the Consent Decree: use of force; crisis intervention; stops and detentions;

23  **CITY OF SEATTLE'S MEMORANDUM IN SUPPORT OF PARTIES' JOINT MOTION TO APPROVE COMPLIANCE AGREEMENT** - 26
(12-CV-01282-JLR)

Ann Davison
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

bias-free policing and supervision. Compliance Agreement ¶ 87. In addition, OIG will conduct a Use-of-Force Assessment to examine: force used in crisis incidents (an area criticized in DOJ's 2011 investigation); the use of less lethal devices (an area of recent concern for the Monitor), and force used in the crowd management context (an area of recent concern for the Monitor). *Id.* ¶ 89. These reports will update the Court and the public on whether SPD has maintained progress in responding to people in crisis and also whether SPD has addressed the force-related issues identified by the Monitor in the 2022 Assessment.

Finally, OIG will work with the Monitor to develop a Workplan detailing its approach for ensuring continued, robust monitoring of SPD. Compliance Agreement ¶ 88. As part of the Workplan, OIG will develop a methodology and timeline for continuing to assess SPD's performance in the areas covered by the Consent Decree—even after the Consent Decree has concluded. *Id.*

In performing these oversight responsibilities, OIG will demonstrate whether it is ready to take on the role of the Monitor. It is important that OIG have ample capacity, because once federal oversight ends the people of Seattle must take on the responsibility of ensuring police accountability, and OIG is the institution established by the City's elected leaders to do this work.

> **2.      SPD will revise its policies on using force at protests and provide data to show whether its practices have improved.**

The Monitor determined that, during the protests of 2020, "SPD at times did not comply with its policies mandated by the Consent Decree relating to de-escalation, use of force decision-making, officer force reporting, and supervisory review of force." 2022 Assessment at 32-33. The Monitor also concluded that "SPD must restore trust that the Department lost during the protests

**CITY OF SEATTLE'S MEMORANDUM IN SUPPORT OF PARTIES' JOINT MOTION TO APPROVE COMPLIANCE AGREEMENT** - 27
(12-CV-01282-JLR)

Ann Davison
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

and demonstrations that occurred in 2020 in the wake of the murder of George Floyd in Minneapolis and SPD's resulting response." *Id.* at 4.

To address concerns over SPD's response to the protests, the Compliance Agreement requires revisions to policies and training. Compliance Agreement ¶¶ 81-83. In the months following the protests, SPD substantially revised its crowd management policies to incorporate feedback from the OIG, OPA, and CPC and to implement new strategies for crowd de-escalation and crowd management. *See generally* City's Motion to Approve Policy Revisions.[53] Since then, SPD has been receiving additional, community-centered feedback on its policies through the Sentinel Event Review (SER) process. OIG is convening the ongoing SER process to examine SPD's response to the protests through a non-blaming, forward-looking framework. *See* Wave 1 SER Rept.[54] at 2-3. Through the SER, community members, subject matter experts, and SPD officers have come together to critically assess the protest incidents to determine ways to prevent future similar events. *Id.* at 2. The resulting recommendations are intended to reflect the perspectives of the community, identify root causes of negative outcomes, and recommend ways to improve systems. *Id.* Accordingly, the Compliance Agreement provides that SPD will respond to crowd management recommendations that come out of the OIG's Sentinel Event Review process. Compliance Agreement ¶¶ 81, 84.

Another key recommendation of the Monitor is that SPD must develop a process to ensure thorough, accurate reporting and timely, appropriate investigations of force used during protests.

---

[53] Docket Entry No. 658.

[54] Docket Entry No. 282-1.

**CITY OF SEATTLE'S MEMORANDUM IN SUPPORT OF PARTIES' JOINT MOTION TO APPROVE COMPLIANCE AGREEMENT** - 28
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

2022 Assessment at 38. Under the Compliance Agreement, SPD commits to do this in consultation with DOJ and the Monitor. Compliance Agreement ¶ 82.

In addition, the Compliance Agreement requires SPD to report data regarding its practices at protests, demonstrations, and other crowd settings. Compliance Agreement ¶ 87. The Monitor's 2022 Assessment documented the type, nature, and frequency of force SPD used in protests. 2022 Assessment at 58-63. It found that SPD's use of less-lethal devices in 2020 was more than eight times greater than any year dating back to 2015, the first full year of use of force data under the Consent Decree; the Monitor also found that these SPD's use of these devices at times impacted people who were peacefully protesting. *Id.* at 35, 48-66. SPD will provide comparable force data for 2021 and 2022 and information about the frequency and size of protests during those years to allow the Court to determine whether SPD has successfully addressed the issues found by the Monitor. Compliance Agreement ¶ 87.

### C.     SPD will continue working to mitigate racial disparities in policing.

Although the Consent Decree does not impose requirements in this area, SPD is committed to continuing to address a third area of critical importance to the City's leaders and community: mitigating racial disparities in policing. The Consent Decree does not directly mandate the study of racial disparities in policing or the reduction of such disparities. However, as a result of the Consent Decree, SPD now has the necessary data collection and analytical capacity to identify and mitigate disparities. The Monitor has applauded SPD's work in this area. "SPD is now identifying specific disparities through sophisticated analyses, previously conducted solely by the Monitoring Team since they were beyond SPD's abilities." 2022 Assessment at 25. The Monitor also concluded that [f]ew, if any, law enforcement agencies in the United States have built or maintain

**CITY OF SEATTLE'S MEMORANDUM IN SUPPORT OF PARTIES' JOINT MOTION TO APPROVE COMPLIANCE AGREEMENT** - 29
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

the internal capacity to produce ongoing disparity analyses at [SPD's] level of rigor and sophistication. *Id.* at 137-38.

Importantly, SPD and the Monitor agree that SPD's work is not finished in this area. SPD has stated, "[a]s is reflected in statistics nationwide, racial disparity is of significant ongoing concern." SPD Jan. 2020 Annual Rept. at 9.[55] Similarly, while finding compliance with the Consent Decree requirements on bias-free policing, the Monitor acknowledged that "important, ongoing work with the community remains with regards to disparities." 2022 Assessment at 17. Notably, SPD has analyzed the data it gathers and determined that, when policing data are compared to Seattle's population, there are racial disparities seen in police interactions, particularly for Native American and Black individuals. SPD Disparity Review Pt. I at 3-5[56]; 2022 Assessment at 15-16, 76-78, 128, 132, 139. The City and SPD agree with the Monitor's conclusion that:

> Directly comparing stop or frisk rates to the racial composition of Seattle's population does not, by itself, render conclusions on biased-policing or tell us the amount of disparity caused specifically by SPD's practices, because racial disparities evident in police data may be impacted by societal inequities, not just by the actions of individual subjects or officers. . . . Still, racial disparities of this nature are concerning—regardless of intent or cause—and the City as a whole, including SPD, should strive to eliminate them.

2022 Assessment at 16.

---

[55] Docket Entry No. 605-1.

[56] Docket Entry No. 554-1.

**CITY OF SEATTLE'S MEMORANDUM IN SUPPORT OF PARTIES' JOINT MOTION TO APPROVE COMPLIANCE AGREEMENT** - 30
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

As stated in the Compliance Agreement, ¶ 4(f), SPD remains committed to the work of identifying and implementing opportunities to improve its practices in ways that promote racial equity. Some of those efforts are described below.

SPD makes public extensive data on the demographics of subjects of police interactions and provides an online dashboard for the public to search and analyze this data. SPD uses statistics to analyze racial disparities in its interactions with the public. Most importantly, SPD uses its data and analyses to inform policy changes designed to support racial equity. In one example, OIG and SPD convened a stakeholder workgroup beginning in 2021 to collaborate on a traffic enforcement initiative. Diaz Dec. ¶ 10. The goal of this effort is to identify and implement alternatives to minor traffic stops. *Id.* Data gathering to inform these alternatives has been ongoing since 2021. *Id.* This work culminated in SPD de-prioritizing certain, non-moving traffic offenses by no longer considering them as a primary basis for a stop, such as bicycle helmet citations or a missing front license plate. *Id.*

Another example came out of SPD's disparity review report, completed in 2019. SPD identified unexplained racial disparities in its frisk and "hit" rates. SPD Disparity Review Pt. I at 3-5.[57] This finding highlighted the importance of training officers in how to "match" a 911 description to a subject and also enhanced training for 911 call takers. SPD conducted further analysis and found that the more "out of place" a subject is, when considering the racial demographics of the neighborhood, the more the subject is to be stopped and frisked. SPD

---

[57] Docket Entry No. 554-1.

**CITY OF SEATTLE'S MEMORANDUM IN SUPPORT OF PARTIES' JOINT MOTION TO APPROVE COMPLIANCE AGREEMENT** - 31
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

Disparity Review Pt. II.[58] SPD's updated (2022) "legal refresher" training curriculum on stops instructs officers in several scenarios regarding how and when it is acceptable to conduct a *Terry* stop or frisk based on an anonymous caller or other "tip." Maxey Dec. ¶ 15. In addition, the 911 call taker manual was updated to include a section regarding potential bias and callers who report "suspicious people" but are unable to explain what is suspicious. *Id.*

Another finding was an unexplained racial disparity in the rate of firearm pointing. Disparity Review Pt. I at 3-5. In response, SPD reviewed and updated its reporting and review requirements for pointing a firearm to require reporting and review regardless of whether or not the pointing was intentional. Maxey Dec. ¶ 14.

SPD has worked hard to make rigorous disparity analysis part of its regular business practices. SPD recently began implementing a program called Equity, Accountability, and Quality (EAQ). Maxey Dec.¶¶ 12, 16. SPD's researchers use statistical methods to identify possible areas of unwarranted racial disparities. *Id.* ¶ 16. As of February 2023, command staff has begun meetings with captains and lieutenants using a forward-looking framework structured to uncover root causes and identify solutions. *Id.*

High-quality, innovative training can support officers to have more equitable interactions with members of the community. *Id.* ¶¶ 5, 8-9. For example, in 2022 SPD launched a training course for new officers called "Before the Badge." *Id.* ¶ 5. Among other topics, the curriculum explores the policing profession's history with communities of color, gender responsiveness, and the science of relationship-based policing. In addition, police recruits and Community Service

---

[58] Docket Entry No. 600-1.

**CITY OF SEATTLE'S MEMORANDUM IN SUPPORT OF PARTIES' JOINT MOTION TO APPROVE COMPLIANCE AGREEMENT** - 32
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

Officers meet with and are expected to have honest, open dialogues with the public about the history of policing in their communities, their expectations of how officers should interact with people in those communities, and the public safety challenges those communities face. *Id.* Trainees meet with people directly impacted by policing, including currently and formerly incarcerated persons, persons who have experienced violence, immigrant and refugee communities, local business communities, and students. *Id.* In a similar vein, SPD also developed a training on community perspectives of policing in Seattle which it offers to officers in partnership with the Northwest African American Museum and the Wing Luke Museum. *Id.* ¶ 8.

As noted above, SPD's work to mitigate racial disparities is not finished.  The Monitor's 2022 Assessment concluded that SPD must continue to "identify opportunities for improvement and implement recommendations toward more equitable policing." 2022 Assessment at 17.  The Monitor made the following recommendations to support that goal:

- Make disparity analytics publicly available and digestible where feasible, in collaboration with CPC and OIG. (Intent: increase public engagement, promote accountability.)
- Develop a plan to address potential bias and unwarranted racial disparities in policing; report out regularly with community partners regarding the status and impacts (if known) of actions that SPD has taken in this area. (Intent: reduce unwarranted disparities.)
- Continue to collaborate with CPC and OIG to identify and implement strategies to reduce disparities; including incident review community sessions. (Intent: reduce disparities, increase public engagement, generate community-driven solutions, support and respect dignity of subjects during interactions with police.)
- Amplify the training and guidance around how much of a match between the description of a suspect and the appearance of the subject there must be to constitute a "match" to initiate a stop, and safety frisk, if warranted. (Intent: reduce disparities in the stop rate and frisk rate.) *Completed*—Maxey Dec. ¶ 15.
- Develop enhanced procedures and trainings for 911 call takers and dispatchers to improve their ability to recognize and mitigate implicit bias. (Intent: reduce disparity in stop rate and frisk rate.) *Completed*—Maxey Dec. ¶ 15.

**CITY OF SEATTLE'S MEMORANDUM IN SUPPORT OF PARTIES' JOINT MOTION TO APPROVE COMPLIANCE AGREEMENT** - 33
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

- Address disparity-associated issues involving officer professionalism. (Intent: support and respect dignity of subjects during interactions with police.)
- Review policies, trainings, and protocols for the pointing of firearms. (Intent: reduce disparity in the pointing of firearms.) *Completed*—Maxey Dec. ¶ 14.

2022 Assessment at 132, 138-39, 141-42.

SPD commits to provide updates regarding the status of each recommendation. In addition, SPD is developing a plan that details the technologies, policies, and practices that it will seek to employ to mitigate disparities in policing.  SPD's report and plan will be published on its website and filed with the Court. Compliance Agreement ¶ 4(f).

## IV.    CONCLUSION

As documented by the Monitor, SPD has achieved and maintained compliance with the vast majority of the requirements of the Consent Decree, and its "reforms have translated into safer interactions between police and the community." 2022 Assessment at 12. Work in these areas is not finished. Rather, lasting reform requires continuous innovation, improvement, and public engagement. The Compliance Agreement will allow the people of Seattle and their elected and appointed leaders to shape that process going forward.

By incorporating the findings and recommendations from the Monitor's 2022 Assessment, the Compliance Agreement will focus attention on the two areas where work remains: ensuring a sustainable system of accountability and improving the use, reporting, and review of force in crowd settings. Accordingly, the parties ask the Court to approve and enter the proposed Compliance Agreement.

**CITY OF SEATTLE'S MEMORANDUM IN SUPPORT OF PARTIES' JOINT MOTION TO APPROVE COMPLIANCE AGREEMENT** - 34
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

Respectfully submitted,

DATED this 28th day of March, 2023.

       For the CITY OF SEATTLE
       ANN DAVISON
       Seattle City Attorney

       *s/ Kerala Cowart*
       Kerala Cowart, WSBA #53649
       Assistant City Attorney
       Phone: (206) 733-9001
       Fax: (206) 684-8284
       Email: Kerala.Cowart@seattle.gov

       *s/ Jessica Leiser*
       Jessica Leiser, WSBA #49349
       Assistant City Attorney
       Phone: (206) 727-8874
       Fax: (206) 684-8284
       Email: Jessica.Leiser@seattle.gov

       Seattle City Attorney's Office
       701 Fifth Avenue, Suite 2050

**CITY OF SEATTLE'S MEMORANDUM IN SUPPORT OF PARTIES' JOINT MOTION TO APPROVE COMPLIANCE AGREEMENT** - 35
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200