THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

Plaintiff,

v.

CITY OF SEATTLE,

Defendant.

No. 2:12-cv-01282-JLR

**UNITED STATES' MEMORANDUM IN SUPPORT OF AGREEMENT ON SUSTAINED COMPLIANCE AND ORDER OF RESOLUTION**

As the Monitor's[1] May 2022 Comprehensive Assessment attests, the City of Seattle has achieved compliance[2] with the Consent Decree's requirements related to use of force (except in crowd management situations), crisis intervention, stops and detentions, bias-free policing, supervision, and the Office of Police Accountability (OPA) and sustained that compliance for

---

[1] Mr. Merrick Bobb served as the court-appointed Monitor from 2012 – 2020.  In 2020, Dr. Antonio Oftelie was appointed Monitor and continues to serve in that role.  This memorandum uses the term "Monitor" interchangeably to attribute the work done by both individuals.

[2] *See* Assessments (Dkt. 231) (Reporting and Investigations of Type I, II, and III (FIT) Uses of Force); (Dkt. 247) (Force Review Board); (Dkts. 235 and 263) (Public Confidence Surveys); (Dkt. 259-1) (OPA); (Dkt. 272) (Crisis Intervention); (Dkt. 351) (Supervision); (Dkt. 360) (Type II Force Investigation and Review Re-Assessment); (Dkt. 374) (Early Intervention System); (Dkt. 383) (Use of Force); (Dkt. 394) (Stops and Bias Free Policing).

more than four years.  However, the Monitor and the United States continue to assess the City's ongoing work in two remaining areas: officers' use of force in crowd management situations, including how the City and Seattle Police Department (SPD) are addressing uses of force that occurred during the 2020 racial justice protests and accountability, including the City's efforts to alleviate concerns identified by the Court in its May 2019 Order concerning officer discipline and steps taken by the City to strengthen its accountability systems.

Accordingly, the parties submit the proposed Agreement on Sustained Compliance (the Compliance Agreement) to recognize the progress made to date and focus the parties' and the Monitor's efforts on these two outstanding areas. The Compliance Agreement would relieve the City of substantive obligations in the areas of the Consent Decree where it has demonstrated sustained compliance, while the City continues its work in these two remaining areas.

## I.   BACKGROUND

A.   COMPLAINT AND ENTRY OF THE CONSENT DECREE (2010 – 2012).

1.   Complaint

On July 27, 2012, the DOJ filed a Complaint under 42 U.S.C. § 14141[3] to "remedy a pattern or practice of conduct by law enforcement officers of the Seattle Police Department . . . that deprives persons of rights, privileges, and immunities secured and protected by the Constitution and the laws of the United States." (Dkt. 1) at 1. The Complaint alleged that SPD officers' conduct resulted in excessive force that violated the Fourth Amendment.  *Id.* at 6-9. The unconstitutional use of force included:  (1) the unjustified use of impact weapons, such as batons

---

[3] Since recodified at 34 U.S.C. § 12601.

UNITED STATES' MEMO IN SUPPORT
Case No. 2:12-cv-01282-JLR - 2

1  and flashlights; (2) the use of excessive force on subjects who are already restrained; (3) the use

2  of excessive force by multiple SPD officers at a time against a single subject; (4) the escalation

3  of situations leading to the use of excessive force when arresting individuals for minor offenses

4  or during improper investigatory stops, particularly during encounters with individuals in mental

5  health crisis, or individuals under the influence of drugs or alcohol; (5) the use of excessive force

6  against people of color.[4] *Id.* The Complaint noted that this pattern and practice of Fourth

7  Amendment violations stemmed from SPD's failure to institute adequate policies, supervision,

8  training and procedures related to use of force. *Id.* at 9-13.

9       2.    Resolution – the Consent Decree

10      On the same day in July 2012, the Parties agreed to negotiate a Consent Decree to resolve

11  DOJ's allegations that SPD engaged in a pattern or practice of unconstitutional policing.  *See*

12  (Dkts. 3-1 and 13).  The Consent Decree mandates changes to SPD policies, training, supervision

13  practices, and internal oversight mechanisms with the stated goal of "ensuring that police

14  services are delivered to the people of Seattle in a manner that fully complies with the

15  Constitution and laws of the United States, effectively ensures public and officer safety, and

16  promotes public confidence in the Seattle Police Department and its officers."  (Dkt. 3-1) at 5.

17  The Consent Decree prescribes a set of organizational changes designed to ensure that SPD has

18  mechanisms in place to engage in critical analysis of its policing practices in the areas in which

19  DOJ made findings.  These mechanisms, combined with the changes to policy and training, are

---

[4] In the findings report attached to the Complaint, DOJ stated "[w]e do not make a finding that SPD engages in a pattern or practice of discriminatory policing, but our investigation raises serious concerns on this issue." (Dkt. 1-1) at 5.

UNITED STATES' MEMO IN SUPPORT
Case No. 2:12-cv-01282-JLR - 3

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

intended not only to catch potential violations of law or policy, but to evaluate the causes of such violations in order to prevent constitutional violations in the first place.

The Consent Decree also specifies that it is intended to "provide clear, measurable obligations, while at the same time leaving Seattle with appropriate flexibility to find solutions suitable for this community." *Id.* at ¶ 1.  The Consent Decree then sets forth six identified subject matter areas for reform, titled "Commitments."  *Id.*  They are: (1) Use of Force; (2) Crisis Intervention; (3) Stops and Detentions; (4) Bias-Free Policing; (5) Supervision; and (6) the Office of Professional Accountability (now renamed the Office of Police Accountability ("OPA")).  *Id.* at ¶¶ 69-168.  In August 2012, the Court approved the Consent Decree, appointed a Monitor, and work on implementing the Consent Decree's requirements began.  *See* (Dkts. 13 and 35).

B.      IMPLEMENTATION AND INITIAL COMPLIANCE (2012 – 2018).

Under the Consent Decree, the City has the option to demonstrate "full and effective compliance" through either "Compliance Reviews and Audits" or through "Outcome Assessments," each of which is expressly defined.  *See* (Dkt. 3-1) at ¶ 182.  The City opted to be evaluated under Compliance Reviews and Audits. (Dkt. 439) at 2-3.[5]  Under that option, to demonstrate full and effective compliance, the City is required to show that, for each "material

---

[5] However, the Monitor and the City also tracked a considerable number of outcome data metrics, which were provided to the Court as an alternative means of demonstrating initial compliance.  (Dkt. 419) at 8. The Court ultimately relied only on the findings of the Compliance Reviews and Audits.  *Id.*  Nonetheless, the City continued to track and provide outcome metrics during the later sustainment period, defined below. (Dkt. 452-1) (Community Engagement Program Report May 2018); (Dkt. 458-1) (Stops and Detentions Annual Report 2018); (Dkt. 495-1) (Crisis Intervention Program Report October 2018); (Dkt. 524-1) (Use of Force Annual Report January 31, 2019); (Dkt. 564-1) (Stops and Detentions Annual Report 2019); (Dkt. 588-1) (Comprehensive Use of Force Report); (Dkt. 588-3) (Crisis Intervention Program Report October 2019); (Dkt. 605-1) (Use of Force Annual Report January 10, 2020); (Dkt 709) (2022 Comprehensive Assessment).  The data from these outcome assessments are discussed further below.

UNITED STATES' MEMO IN SUPPORT
Case No. 2:12-cv-01282-JLR - 4

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

requirement" of the Consent Decree, it "(a) incorporated the requirement into policy; (b) trained all relevant personnel as necessary to fulfill their responsibilities pursuant to the requirement; and (c) ensured that the requirement is being carried out in practice." (Dkt. 3-1) ¶ 184.

      1.    <u>Implementation – Changes to Policy and Training</u>

From 2012 on, the City developed, with the advice and input of the Monitor, his team, the Community Police Commission ("CPC") and DOJ, new policies in each of the six commitment areas. DOJ, exercising its independent enforcement obligation, reviewed and provided input on the policies and policy revisions with the assistance of nationally regarded police practices experts. (Dkt. 422) at 3-4. The policy changes included a new requirement that, when feasible, officers use de-escalation, *i.e.*, attempt to "slow down or stabilize the situation so that more time, options, and resources are available for incident resolution." (Dkt. 471-1) at 13. They also included new requirements to report, investigate, and evaluate all uses of force that were more than *de minimis*. (Dkt. 107-3) at 2 and (Dkt. 569-3) at 32. The policies defined appropriate custodial stops and provided guidelines around their usage. (Dkts. 116 and 587-1).

The City also created a bias-free policing policy under which officers are prohibited from making decisions or taking actions that are influenced by bias, prejudice, or discriminatory intent. Further, under the bias-free policing policy, SPD committed to identifying, studying, and "eliminating policies and practices that have an unwarranted disparate impact on certain protected classes." (Dkt. 555-2) at 7.

Each of these policies and others were filed with and approved by the Court in both their original forms and as part of their periodic reviews and revisions since that time.

UNITED STATES' MEMO IN SUPPORT
Case No. 2:12-cv-01282-JLR - 5

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

| SPD Policy | Filing and Date |
|---|---|
| Use of Force | Dkt. 107-1 to -6 (November 27, 2013)<br>Dkt. 204-1 (May 11, 2015)<br>Dkt. 388-1 (April 28, 2017)<br>Dkt. 471-1 to -3 (July 31, 2018)<br>Dkt. 500-1 to -5 (November 19, 2018)<br>Dkt. 569-2 to -4 (July 31, 2019)<br>Dkt. 658-3 to -5 (February 11, 2021) |
| Bias Free Policing and Terry Stops | Dkt. 116 (December 31, 2013)<br>Dkt. 205-1 (May 11, 2015)<br>Dkt. 451-1 (May 31, 2018)<br>Dkt. 496-1 (October 31, 2018)<br>Dkt. 555-2 (April 30, 2019)<br>Dkt. 587-1 (October 31, 2019) |
| Crisis Intervention | Dkt. 120 (January 31, 2014)<br>Dkt. 209 (May 22, 2015)<br>Dkt. 451-1 (May 31, 2018)<br>Dkt. 555-1 (April 30, 2019) |
| Early Intervention System | Dkt. 123 (March 3, 3014)<br>Dkt. 202 (May 4, 2015)<br>Dkt. 502-1 (November 29, 2018)<br>Dkt. 599-1 (December 31, 2019) |
| OPA | Dkt. 156 (June 30, 2014)<br>Dkt. 256-1 to -3 (January 14, 2016) |

After adoption of the new policies, SPD, again assisted by DOJ, the Monitor, and the CPC, worked to develop training that would promote the implementation of each of these policies. Exercising its independent enforcement obligation, DOJ reviewed and commented on the plans for each training program with the assistance of nationally-regarded police practices experts. (Dkt. 422) at 4. Between 2012 and the present, SPD conducted trainings on Consent-Decree related topics. *See*, *e.g*., (Dkt. 154) at 22-27, 33-34; (Dkt. 187) at 23-29, 81-84, 90-96;

UNITED STATES' MEMO IN SUPPORT
Case No. 2:12-cv-01282-JLR - 6

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

(Dkt. 652); (Dkt. 682).  Many of these trainings were audited by the Monitor and DOJ.[6]

Through these efforts, the Monitor and DOJ gained confidence that SPD adopted the Consent

Decree's requirements into Department mandates and communicated them effectively to its

officers through robust training.

2.  <u>Implementation – Structural Changes</u>

In addition to changes to policy and training, the Consent Decree calls for structural

changes to some of the systems and entities necessary to guide and effectuate the policy changes.

The City has met these requirements.

a.  The Force Investigation Team and Force Review Board

The Consent Decree calls for the establishment and strengthening of entities that provide

critical self-analysis within SPD.  To satisfy this requirement, the City made changes to

mechanisms by which supervisors oversee officer activity (including unity of command and

sergeant training), as well as changes to SPD's early intervention system ("EIS"), which was

designed to identify early warning signs of issues with officer behavior and correct for them

before they lead to larger problematic incidents.  *See* (Dkt. 3-1) at ¶¶ 153-163.  The Monitor and

DOJ found that these structural changes were completed in a manner consistent with the Consent

Decree requirements.

The Consent Decree also calls for the formation of a Force Investigation Team ("FIT") to

investigate all serious uses of force by SPD officers.  FIT members must have "appropriate

---

[6]  *See* (Dkt. 422) at 4 (UOF Phase 1 Training Courses between June 18 and 19, 2014; Search and Seizure Training in July 2014; Basic and Advanced CIT on September 29 and 30 and November 12, 2014; Tactical De-escalation Training on May 12, 2015; Supervisor Training (Day 1) on August 2, 2015; and Rapid Intervention Tactics on September 4, 2015.

expertise and investigative skills to ensure that uses of force that are contrary to law or policy are identified and appropriately resolved." (Dkt. 3-1) at ¶ 116.  These specially trained officers are then tasked with conducting immediate, on-scene investigations of officer uses of force, including canvassing for and collecting physical evidence and conducting officer and witness interviews.  *Id*. at ¶¶ 117-118.  The Consent Decree also mandates certain referral requirements following FIT investigations.  *Id*.  These requirements are intended to ensure that (1) potentially criminal actions taken by officers are quickly and appropriately referred to local prosecutors, (2) any officer misconduct is identified and referred to OPA; and (3) all relevant facts and evidence are collected and reported to a force review committee (discussed herein) so that "trends or patterns of policy, training, equipment, . . . tactical deficiencies, or positive lessons related to use of force" can be identified and addressed.  *Id*. ¶ 116-118.  SPD constituted a FIT in 2012 and its operations have been assessed and re-assessed through the Monitor's First Systemic Assessment, Sustainment Audit and the 2022 Comprehensive Assessment.  *See* (Dkts. 231, 588-1 and 709).  Through those efforts, as well as SPD's own initiative in seeking out and studying best practices in the field, FIT operations have strengthened significantly over time.  Indeed, by 2015 the Monitor found that "FIT investigations are consistently excellent." (Dkt. 231) at 4 (Monitor's First Systemic Assessment).  In 2022, the Monitor noted that FIT "continues to document in-depth investigations[.]" (Dkt. 709) at 83-84.

The Consent Decree also requires SPD to establish a use of force committee to conduct "timely, comprehensive, and reliable reviews of all Type II and Type III uses of force." (Dkt. 3-1) at ¶ 119.  This committee is comprised of specially trained officers from the training, patrol, and investigations departments and helmed by an Assistant Chief-level supervisor.  *Id*. at ¶ 120.

UNITED STATES' MEMO IN SUPPORT
Case No. 2:12-cv-01282-JLR - 8

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

The committee is tasked with: (1) determining if the underlying factual investigations (conducted by either the chain of command or by FIT, depending upon the severity of the use of force involved) are thorough and complete, (2) if the chain of command determines that a use of force was consistent with policy, determining if that conclusion is supported by a preponderance of the evidence, (3) making referrals to OPA if potential misconduct is identified; and (4) identifying and making appropriate referrals for any tactical, equipment, or policy issues stemming from a use of force. *Id*. at ¶¶ 123-125.  SPD formed the Force Review Board ("FRB") in June 2015 to fulfill these requirements.  (Dkt. 247) at 5.  As with FIT, the composition and function of the FRB were assessed and re-assessed through the Monitor's Second Systemic Assessment, Sustainment Audit and 2022 Comprehensive Assessment processes. *See* (Dkts. 247, 588-1 and 709).  In the Phase I FRB Assessment, conducted in 2015, the Monitor noted that FRB had helped SPD rapidly become "far more comfortable with critically analyzing and scrutinizing officer use of force and holding officers accountable for their performance during incidents involving force."  (Dkt. 247) at 4.  In Phase II, the Monitor and DOJ validated that FRB's performance continued to satisfy the Consent Decree requirements, noting that FRB "appropriately and thoroughly reviewed uses of force to confirm that SPD officer[s] made reasonable efforts to de-escalate prior to using force, that the force used was reasonable, necessary and proportional…and complied with SPD policies and training."  (Dkt. 588-1) at 27.[7] Similarly, during the 2022 Comprehensive Assessment, the Monitor again noted that "[t]he

---

[7] While both FIT and the FRB have met all the requirements of the Consent Decree, in order to serve their intended functions, both entities should continually engage in self-improvement, including in the areas identified by the Monitor and DOJ in the "validation" section of the relevant sustainment plan audits, discussed in Section C.1., *infra*.

UNITED STATES' MEMO IN SUPPORT
Case No. 2:12-cv-01282-JLR - 9

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Force Review Board continues to generate specific recommendations for departmental

improvement across a good majority of Type II [UoF] cases." (Dkt. 709) at 83.

        b.        The Crisis Intervention Committee

        The Consent Decree and Memorandum of Understanding (MOU) also call for Seattle to

expand and deepen its engagement with the City's mental health professionals and organizations

through the formation of a Crisis Interventional Committee ("CIC"). *See* (Dkt. 3-1) at Section

III.B. and MOU at ¶¶ 23-25.  Under the Consent Decree, SPD is required to consult the CIC

regarding the content of policy and training practices, as well as data collection issues. *See* (Dkt.

3-1) at ¶¶ 133, 135, 136.  Under the MOU, the CIC serves as a data-sharing and problem-solving

forum for interagency issues. *See* MOU at ¶ 24.  Further, the CIC is tasked with advising on the

creation of policies and procedures that help divert people in crisis away from law enforcement

and into voluntary referrals to community services, when appropriate. *Id*. at ¶ 25.  The CIC has

appropriately served all of these roles.  Formed in 2012, the CIC continues to meet quarterly at

SPD Headquarters.  In that time, it has advised on policies and trainings relevant to crisis

intervention; steered the collection of appropriate data; and facilitated voluntary diversion to

community services. *See* (Dkt. 511) at 6.  Further, the Monitor and DOJ have twice assessed and

verified that the CIC was appropriately consulted with respect to the crisis intervention issues

required by the Consent Decree. *See* (Dkts. 272 and 511).[8]

---

[8] The City demonstrated completion of the MOU's requirements with respect to the CIC and, the MOU has since terminated. *See* (Dkt. 422) at 1 n.1.

UNITED STATES' MEMO IN SUPPORT
Case No. 2:12-cv-01282-JLR - 10

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

3. <u>Evaluating Initial Compliance – Compliance Assessments</u>

Beginning in 2014, the Parties and the Monitor began discussing how to systematically evaluate whether the Consent Decree-required policies and training were being "carried out in practice" and how to "define and measure 'full and effective compliance.'" (Dkt. 422) at 4-5.  As a result of these discussions, the Parties and Monitor agreed to a process by which the Monitor would conduct a series of assessments between March 2015 and June 2017 to evaluate each of the subject areas of the Consent Decree.  *Id.* at 5-6.  The Parties and Monitor further agreed that DOJ would also review the same issues and data in order to render an independent opinion regarding whether the City had satisfied the requirements of the Consent Decree. A summary of each Phase I Assessment is set forth here:

| PHASE I COMPLIANCE ASSESSMENTS | | | | | |
|---|---|---|---|---|---|
| | Topic | Dkt. | Dates Assessed | Filed with the Court | Finding |
| 1 | Reporting and Investigations of Type I, II, and III (FIT) Uses of Force | 231 | 7/1/14-12/31/14 | 9/24/15 | Initial compliance except for chain of command investigations for Type I and II incidents |
| 2 | Force Review Board | 247 | 6/2/15-8/25/15 | 11/24/15 | Initial compliance |
| 3 | Public Confidence Surveys | 235 and 263 | 2015 | 10/1/15 and 1/27/16 | N/A[9] |

[9] While included in the Monitoring Plans and filed with the Courts as "assessments," both the community confidence and OPA "assessments" were expressly submitted as technical assistance, not required for compliance with the Consent Decree. *See* (Dkt. 263) at 5-6 ("Nor is it the purpose of this [community confidence] assessment to determine compliance with specific requirements under the Consent Decree. While most assessments are for such purposes, some are not. Instead, this present report can best be viewed as a survey of the many areas, initiatives, programs, and general characteristics that are commonly associated with community policing and public confidence in law enforcement – and an evaluation of how SPD is doing with respect to each of them"); (Dkt. 259-1) at 4 ("In contrast to nearly all other assessments (compare the FRB and Public Confidence assessments), the purpose of this

UNITED STATES' MEMO IN SUPPORT
Case No. 2:12-cv-01282-JLR - 11

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

| 4 | OPA | 259-1 | 8/1/14-4/30/15 | 1/22/16 | N/A |
| 5 | Crisis Intervention | 272 | 6/1/15-8/31/15 | 2/16/16 | Initial compliance |
| 6 | Supervision | 351 | 6/14-9/16 | 12/31/16 | Initial compliance |
| 7 | Type II Re-Assessment | 360 | 1/1/16-3/31/16 | 1/27/17 | Initial compliance |
| 8 | Early Intervention System | 374 | 10/16-6/16 | 3/23/17 | Initial compliance |
| 9 | Use of Force | 383 | 7/14-10/16 | 4/6/17 | Initial compliance |
| 10 | Stops and Bias Free Policing | 394 | 7/1/15-1/3/17 | 6/18/17 | Initial compliance |

4.     Evaluating Initial Compliance – Outcome Measurements

The Consent Decree permits the City of Seattle to demonstrate full and effective compliance through either "Compliance Reviews and Audits" or, alternatively, "Outcome Assessments."  *See* (Dkt. 3-1) at ¶ 182.[10]  The City opted to prove full and effective compliance during Phase I through Compliance Reviews and Audits.  Nonetheless, the Monitor also evaluated the City's outcome measurements in a number of ways during Phase I that further demonstrated the status of reform in Seattle.

---

[OPA] assessment is not to assess compliance with specific requirements under the Consent Decree, nor to declare that the SPD is in initial or full and effective compliance with the Decree.").

[10] With respect to Outcome Assessments, the Consent Decree provides, "[t]he goal of the Parties in entering into the Settlement Agreement is to ensure that SPD's use of force is consistent with the requirements of the United States Constitution and 42 U.S.C. § 14141. As more fully described in the section on termination of the Settlement Agreement, if the City is able to establish, through outcome measures, that the purposes of the Settlement Agreement have been met, the decree may terminate even if the City is not in full and effective compliance with the specific process terms."  *See* (Dkt. 3-1) at ¶ 186.

At the conclusion of Phase I, the Court highlighted some of the outcome measures related to force that were indicative of SPD's "impressive advancements… during the course of the Consent Decree." *See* (Dkt. 439) at 10-11. Namely:

- In the 760,000 incidents to which SPD officers were dispatched during the two-year study period, they used force in just under 2,400 incidents or less than 0.5% of all incidents.

- SPD officers' use of force decreased 11% from the first half of the two-year study period to the second half.

- About 80% of those uses of force were at the lowest level or Type I force that causes transient pain but no injury, or firearm pointing but no discharge.

- Only 39 incidents over the two-year study period involved serious uses of force or Type III force that is likely to result in serious injury.

- More serious uses of force (Type II and Type III) declined by 60% compared with the findings during the original investigation covering January 2009 to April 2011.

- More serious uses of force declined across the study period, suggesting that officers were not only using less force overall, but using lower levels of force, too.

- The number of incidents in which officers used force in each of SPD's five precincts was roughly proportional to the number of arrests in each precinct.

- Although a group of 109 SPD officers accounted for almost 40% of the force used during the study period, those officers did not use serious force more frequently than other SPD officers who used force.

- Crime rates remained flat while use of force rates fell.

*Id*. (citing (Dkt. 383) at 30-34, 39, 62-63).

In 2017, the Monitor similarly found notable results in the use of force outcome measurements, and in the outcome measurements related to officer injuries, SPD's interactions

UNITED STATES' MEMO IN SUPPORT
Case No. 2:12-cv-01282-JLR - 13

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

with persons in crisis, and use of *Terry* stops.  On use of force, the Monitor found that SPD officers were:

- Using only force that was necessary under the circumstances more than 99 percent of the time;

- Force was likewise proportional and reasonable in the same more than 99 percent of force incidents; and

- Officers complied with the duty to de-escalate in 99 percent of cases where that duty was applicable.

(Dkt. 383) at 12.  The Monitor also found that "officer injuries are flat to slightly down" during the implementation of the Consent Decree, although the decrease was not statistically significant, concluding that "officer force has gone down without any increases in officer injury." *Id.* at 6. With respect to crisis response, the Monitor found that officers used force against individuals in crisis less than 2% of the time and, when they did use force, 80% of the time they used the lowest level of force.  *See* (Dkt. 272) at 5.  With respect to stops and frisks, the Monitor held that "the vast majority [99 percent of stops] were adequately justified" with reasonable, articulable suspicion.  *See* (Dkt. 394) at 7.  Further, the Monitor noted that 97% of frisks were adequately justified and most stops were appropriately limited to reasonable scope and duration.  *Id.*

    5.    The Court Finds the City in Initial Compliance

    Relying on the results of these compliance review assessments, the City moved in November 2017 to be found in "full and effective compliance" and, based on its own independent analysis, the DOJ supported that motion.  *See* (Dkts. 419 and 422).  In January 2018, the Court agreed, holding that the Monitor's findings of "initial compliance" in each of the relevant assessments was "the substantive equivalent of full and effective compliance under the Consent Decree."  (Dkt. 439) at 13.  "Accordingly, the court finds that SPD has achieved full and

UNITED STATES' MEMO IN SUPPORT
Case No. 2:12-cv-01282-JLR - 14

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  effective compliance with the Consent Decree such that Phase I of the Consent Decree is now

2  complete and the Phase II sustainment period should commence." *Id*. at 13-14.

3  C.      SUSTAINING COMPLIANCE WITH THE CONSENT DECREE (2018 – 2020).

4

5          The Court's January 2018 Order finding SPD in full and effective compliance with the

6  Consent Decree required "the Monitor and the parties to submit . . . a joint plan for discharging

7  their obligations under the Consent Decree during the Phase II sustainment period."[11]  (Dkt. 439)

8  at 16.  The Monitor and the Parties complied and submitted a "Sustainment Plan" in March 2018,

9

10 setting forth the terms by which sustained compliance would be demonstrated.  *See* (Dkt. 444

11 and 444-1).  The Court approved the Sustainment Plan on March 13, 2018.  (Dkt. 448).

12         As described below, over the next two years, the City satisfied every requirement of the

13 Sustainment Plan through compliance audits, additional reviews conducted by the Monitor and

14 the City, and review and submission of policy revisions to the DOJ, the Monitor and the Court.

15

16         1.      Compliance Audits

17         Under the Sustainment Plan, the City self-assessed its performance in all six

18 "Commitment" areas of the Consent Decree with methods similar to those used by the Monitor

19 and DOJ in Phase I.  *See* (Dkt. 444) at 4 (referred to in Phase I as "assessments" and in Phase II

20

21 as "audits").  However, DOJ and the Monitor also retained active roles.  For each audit, DOJ and

22 the Monitor reviewed and commented upon the City's draft audit methodology to ensure that

23 each was rigorous and statistically appropriate for assessing sustained compliance.  No audit

24 commenced prior to receiving DOJ and the Monitor's approval.  DOJ and the Monitor also

25

26  _____

27  [11] The Court's reference to a "sustainment period" stems from the terms of the Consent Decree that state that the
Court shall retain jurisdiction over this action "until such time as the City has achieved full and effective compliance
with the Settlement Agreement and maintained such compliance for no less than two years."  (Dkt. 3-1) at ¶ 223

28

UNITED STATES' MEMO IN SUPPORT
Case No. 2:12-cv-01282-JLR - 15

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

conducted independent reviews of randomized samples of documents from each audit to validate

the results.  Each audit report contains a "Validation" section detailing the work and findings of

DOJ and the Monitor with respect to that topic area.  *See* footnote 11, *infra*.  The Validation

sections also call out specific strengths and areas for continuing improvement, consistent with

the technical assistance role provided by Paragraph 173 of the Consent Decree.  *Id*.

As a result of their audits – many of which were conducted twice during the sustainment

period – the City ultimately concluded that it had demonstrated sustained compliance in each of

the six Commitment Areas of the Consent Decree.[12]  On the basis of their Validations, DOJ and

the Monitor agreed.[13]  A summary of each audit is listed here for reference:

| PHASE II – SUSTAINMENT AUDITS | | | | | |
|---|---|---|---|---|---|
| | Topic | Dkt. | Dates Assessed | Filed with the Court | Finding |
| 1 | Type I and II Use of Force Investigation and Reporting (Round 1) | 497-1 | 1/1/18-6/30/18 and 3/30/18 | 10/31/18 | Sustained compliance |
| 2 | Supervision General (Round 1) | 497-2 | 1/10/18-6/30/18 | 10/31/18 | Sustained compliance |
| 3 | Crisis Intervention | 511 | 1/1/17-6/30/18 | 12/17/18 | Sustained compliance |
| 4 | Stops and Detentions (Round 1) | 547-1 | 1/1/18-6/30/18 | 3/7/19 | Sustained compliance |
| 5 | Early Intervention System (Round 1) | 550-1 | 1/1/17-6/30/18 | 4/15/19 | Sustained compliance |

---

[12] *See* (Dkts. 497-1 at 20-21 and 570-1 at 26-27) (Type I and II Use of Force Investigation and Reporting); (Dkt. 570-2 at 24-25) (Force Review Board); (Dkt. 588-1 at 25-26) (Comprehensive Use of Force); (Dkt. 511 at 5) (Crisis Intervention); (Dkts. 547-1 at 31-32 and 588-2 at 21) (Stops and Detentions); (Dkts. 497-2 at 15 and 595-2 at 13-14) (Supervision General); (Dkts. 550-1 at 24 and 595-1 at 23) (Early Intervention System).

[13] (Dkts. 497-1 at 22-24 and 570-1 at 27-29) (Type I and II Use of Force Investigation and Reporting); (Dkt. 570-2 at 39-41) (Force Review Board); (Dkt. 588-1 at 26-29) (Comprehensive Use of Force); (Dkt. 511 at 39-43) (Crisis Intervention); (Dkts. 547-1 at 32-34 and 588-2 at 22-23) (Stops and Detentions); (Dkts. 497-2 at 16-17 and 595-2 at 14-15) (Supervision General); (Dkts. 550-1 at 27-30 and 595-1 at 26-28) (Early Intervention System).

UNITED STATES' MEMO IN SUPPORT
Case No. 2:12-cv-01282-JLR - 16

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

| 6 | Type I and II Use of Force Investigation and Reporting (Round 2) | 570-1 | 7/1/18-12/31/18 and 9/30/18 | 7/31/19 | Sustained compliance |
| 7 | Force Review Board | 570-2 | 4/23/19-5/21/19 | 7/31/19 | Sustained compliance |
| 8 | Comprehensive Use of Force | 588-1 | 1/1/18-12/30/18 | 10/31/19 | Sustained compliance |
| 9 | Stops and Detentions (Round 2) | 588-2 | 7/1/18-12/31/18 | 10/31/19 | Sustained compliance |
| 10 | Early Intervention System (Round 2) | 595-1 | 1/1/19-6/30/19 | 11/29/19 | Sustained compliance |
| 11 | Supervision General (Round 2) | 595-2 | 7/1/18-6/30/19 | 11/29/19 | Sustained compliance |

2.    Additional Reviews Conducted by the Monitor in 2018-2019

In addition to compliance audits conducted by the City, the Sustainment Plan also provided for several additional reviews of the City's police functions to be conducted by the Monitor consistent with its role as technical advisor pursuant to Paragraph 173 of the Consent Decree.

For instance, the Monitor conducted reviews of the Data Analytics Platform ("DAP") in 2018 and the OPA in 2019.  The results were all highly positive.  With respect to the DAP, the Monitor found that it "appears solid" and "has impressive potential capacity to measure officer performance on an individual and comparative basis; to analyze patterns, trends, and statistics; to perform studies on a historical and longitudinal basis; and to discover failures of leadership, supervision, discipline and training; among other capabilities to manage the risk of police misconduct." *See* (Dkt. 549) at 3.  The Monitor concluded that the DAP's "capacity to deal with Fourth Amendment constitutional failures is not only impressive in comparison to where SPD was at the outset of the Consent Decree, but also in comparison with many other major city police departments today." *Id.*

UNITED STATES' MEMO IN SUPPORT
Case No. 2:12-cv-01282-JLR - 17

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

With respect to the Office of Police Accountability, the Monitor found that, consistent with the prior (Phase I) review, the quality of the "great majority" of OPA's investigations was either "thorough, well documented, and complete" or "adequate." (Dkt. 604-1) at 2. Furthermore, the Monitor noted that OPA significantly improved its closure of investigations within the 180-day deadline from a rate of 75% during the 2016 review, to a rate of 95%. *Id.*[14]

With respect to community confidence, the Monitor retained the services of the same analysts from Phase I of the Consent Decree in order to take the pulse of community sentiment with respect to the Seattle Police Department. *See* (Dkt. 546). The results were positive, demonstrating continued improvements to SPD's approval rating in the community (at 74% in 2020, up from 72% in 2016, and 60% in 2012.) *Id.* at 3 and 5.

3. <u>Additional Work by the City in 2018-2020</u>

During the initial sustainment period the City also conducted two "Disparity Reviews." *See* (Dkt. 554-1) (April 2019) and (Dkt. 600-1) (December 2019). Although the Consent Decree does not mandate the study of disparity in policing or progress against it, *per se*, the Bias-Free Policing policy written under the Consent Decree's mandated processes calls for SPD to "periodically analyze data which will assist in identification of SPD practices – including stops, citations, and arrests – that may have a disparate impact on particular protected classes relative to the general population." *See* (Dkt. 555-2) (SPD Policy 5.140). The two reviews demonstrated to

---

[14] This review and its findings were expressly offered as technical assistance. *See* (Dkt. 604-1) at 2 ("The review's purpose 'is not to assess compliance with specific requirements under the Consent Decree.' Rather, this review was designed to follow-up on issues the Monitoring Team identified in its Fourth Systemic Assessment: Office of Professional Accountability, filed with the court on January 22, 2016, and provide information to the OPA and other stakeholders about how the OPA, a key component of Seattle's police accountability system, can continue to improve its performance.").

UNITED STATES' MEMO IN SUPPORT
Case No. 2:12-cv-01282-JLR - 18

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   the satisfaction of the Monitor and DOJ that the City is appropriately undertaking appropriate

2   studies of this important area.

3           The City continued to share draft revisions to Consent Decree-related policies with DOJ,

4   the Monitor, and the CPC throughout the Sustainment Period.  The City of Seattle worked

5   collaboratively to incorporate the suggestions of each of these groups and ultimately filed 10

6   policy revisions with the Court without objection.[15] The City also timely filed all "Quarterly

7   Reports" (providing summaries of all Sustainment Period activities in each quarter from 2018-

8   2020) and "Outcome Reports" (providing outcome measurements and data for various Consent

9

10  Decree topic areas) as required by the Sustainment Plan.

11          4.      Outcome Measures during Phase II

12          In Phase II, the outcome measurements in each of the Consent Decree subject areas

13  continued to trend positively, as did measurements of public confidence.  *See* (Dkt. 452-1)

14  (Community Engagement Program Report May 2018); (Dkt. 458-1) (Stops and Detentions

15  Annual Report 2018); (Dkt. 495-1) (Crisis Intervention Program Report October 2018); (Dkt.

16

17  524-1) (Use of Force Annual Report January 31, 2019); (Dkt. 564-1) (Stops and Detentions

18  Annual Report 2019); (Dkt. 588-1) (Comprehensive Use of Force Report October 2019); (Dkt.

19

20  588-3) (Crisis Intervention Program Report October 2019); (Dkt. 605-1) (Use of Force Annual

21  Report January 10, 2020). For example, with respect to officer uses of force, the City's

22

23  Comprehensive Use of Force Report made similar findings to those of Monitor during Phase I,

24

25  ─────────────────

26  [15] *See* (Dkts. 451-1 at 26-34 and 555-2) (Bias Free Policing); (Dkts. 451-1 at 2-24 and 555-1) (Crisis Intervention); (Dkts. 471-1 to -2 and 569-2 to -4) (Use of Force); (Dkts. 496-1 and 587-1) (Stops and Detentions); and (Dkts. 502-1 and 599-1) (Early Intervention System).  The Court subsequently approved each. *See* (Dkts. 453 and 563) (Bias Free Policing); (Dkts. 453 and 563) (Crisis Intervention); (Dkts. 477 and 580) (Use of Force); (Dkts. 501 and 593) (Stops and Detentions); and (Dkts. 510 and 607) (Early Intervention System).

27

28

UNITED STATES' MEMO IN SUPPORT
Case No. 2:12-cv-01282-JLR - 19

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    including that the FRB found that 98.4% of force cases it evaluated to be reasonable, necessary,

2    proportional and consistent with policy.  (Dkt. 588-1) at 15.  DOJ and the Monitor validated

3    these assessments.  *Id*. at 27.

4
         5.    Accountability during the Sustainment Period
5
6           In May 2019, the Court found that the City had fallen partially "out of compliance" with

7    the Consent Decree.  *See* (Dkt. 562).  The Court based its ruling on changes to City legislation

8    relating to police accountability and disciplinary procedures following collective bargaining.  *Id*.

9
     at 14.  The Court's May 2019 ruling related to issues outside of the Sustainment Plan and the
10
11   paragraphs of the Consent Decree captured in the "Commitments."  *Id*. at 2 ("The court does not

12   find that the City has fallen out of compliance in any of the areas listed in the Phase II

13   Sustainment Plan").

14
         6.    Completion of Sustainment Plan and Filing of Joint Motion for Termination
15
16          Based on the actions taken above, the City concluded that, as of January 10, 2020, it had,

17   outside of accountability, successfully sustained compliance as set forth in the Sustainment Plan

18   for the two-year period required.[16] The Monitor and the United States agreed.[17] On May 7, 2020,

19
     the Parties jointly moved for termination of the Consent Decree provisions that were assessed
20
21   under the Sustainment Plan, along with all monitoring activity related to those provisions, while

22

23   _____

24   [16] *See* (Dkts. 497-1 at 20-21 and 570-1 at 26-27) (Type I and II Use of Force Investigation and Reporting); (Dkt.
     570-2 at 24-25) (Force Review Board); (Dkt. 588-1 at 25-26) (Comprehensive Use of Force); (Dkt. 511 at 5) (Crisis
25   Intervention); (Dkts. 547-1 at 31-32 and 588-2 at 21) (Stops and Detentions); (Dkt. 497-2 at 15 and 595-2 at 13-14)
     (Supervision General); (Dkts. 550-1 at 24 and 595-1 at 23) (Early Intervention System).
26   [17] *See* (Dkts. 497-1 at 22-24 and 570-1 at 27-29) (Type I and II Use of Force Investigation and Reporting); (Dkt.
     570-2 at 39-41) (Force Review Board); (Dkt. 588-1 at 26-29) (Comprehensive Use of Force); (Dkt. 511 at 39-43)
27   (Crisis Intervention); (Dkts. 547-1 at 32-34 and 588-2 at 22-23) (Stops and Detentions); (Dkt. 497-2 at 16-17 and
     595-2 at 14-15) (Supervision General); (Dkts. 550-1 at 27-30 and 595-1 at 26-28) (Early Intervention System).
28

UNITED STATES' MEMO IN SUPPORT
Case No. 2:12-cv-01282-JLR - 20

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

explicitly acknowledging that the Court's May 2019 Order on accountability still remained to be

addressed.  *See (*Dkts. 611and 612).

D.    2020 PROTESTS, ADDITIONAL ASSESSMENTS AND CONTINUED
      SUSTAINMENT (2020 -2022).

On May 25, 2020—three weeks after the Parties filed their joint motion to terminate—

George Floyd was murdered by Minneapolis police officer Derek Chauvin. (Dkt. 709) at 32.

Widespread and  "unprecedented" protests quickly developed in Seattle. *See id.*; (Dkt. 621 at 1).

SPD's use of force tactics during those protests—including the use of teargas and physical

munitions—generated public outcry and civil litigation. *See, e.g.*, *Black Lives Matter Seattle-*

*King County v. Seattle*, 466 F. Supp. 3d 1206 (W.D. Wash. 2020); (Dkt. 709) at 33–38.

As a result of these developments, on June 4, 2020, the City withdrew from the joint

motion to terminate. *See* (Dkt. 621). The City explained that SPD's crowd management tactics

were "governed by policies implemented under the Consent Decree, including crowd

management and use of force." *Id*. at 1. In addition, SPD's actions would be "subject to review

through many of the processes put in place by the Consent Decree, including the Force

Investigation Team, Force Review Board, and Office of Police Accountability." *Id.* Accordingly,

the City concluded that "additional time [wa]s necessary to ensure that termination . . .

remain[ed] appropriate." *Id.* at 2. On June 4, the Court terminated the joint motion based on the

City's withdrawal.

Following the City's 2020 withdrawal from the joint motion, the Parties and the Monitor

continued to assess the crowd management and use of force issues that were present during the

2020 protests.  The City continues to address the issues identified by the Court in its May 2019

UNITED STATES' MEMO IN SUPPORT
Case No. 2:12-cv-01282-JLR - 21

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

order on accountability.  Finally, the Monitor and the United States both assessed the City efforts

to sustain compliance with the core areas of the Consent Decree.

     1.  <u>Review of SPD's Crowd Management Practices and Use of Force (2020 – 2022)</u>

     The Consent Decree extensively addresses the use of force by officers.  Although it did

not include specific requirements for use of force in crowd management situations like the 2020

protests, a number the policies and processes put in place under the Consent Decree apply to

crowd management situations, as the City itself acknowledged when it withdrew from the joint

motion to terminate. *See* (Dkt. 3-1) at ¶¶ 69–129; (Doc. 709 at p. 9 (Monitor noting that while

SPD was in compliance with general use of force requirements, the City should commit to

addressing "the area of policy and training around use of force, force reporting, and force review

in large-scale crowd management events"); *See* (Dkt. 621) at 1-2. Therefore, during and after the

protests that arose in the wake of George Floyd's murder, the Parties and Monitor began

assessing the City's and SPD's response and its compliance with the Consent Decree.

     As the Monitor described the May 2022 Comprehensive Assessment, SPD's response to

the George Floyd protests suffered several significant deficiencies and "at times did not comply

with [the] policies mandated by the Consent Decree relating to de-escalation, use of force

decision-making, officer force reporting, and supervisory review of force." (Dkt. 709) at 33-34.

SPD's use of less-lethal tools raised particular concerns. (Dkt. 709) at 36. "SPD used tools like

blast balls, tear gas, and OC spray against crowds sometimes in an indiscriminate manner"—

including in ways that "impacted" peaceful protesters—"with insufficient justification in

reporting for such actions." *Id.* Ultimately, the Monitor found that "SPD's application of less-

lethal instruments in 2020 was more than eight times greater than any year dating back to 2015,

UNITED STATES' MEMO IN SUPPORT
Case No. 2:12-cv-01282-JLR - 22

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

the first full year of use of force data under the Consent Decree." *Id.* On the whole, the Monitor concluded that SPD's actions during the protests "too often served to escalate rather than de-escalate these situations, further emphasizing the very topic protesters were marching against and making future protest management all the more difficult." *Id.* at 35.

The Monitor found force reporting and supervisor review of uses of force were also a "significant problem" during the protests. *Id.* at 37-38. Although, according to the Monitor, SPD "consistently adheres to substantive use of force reporting and review expectations for more typical use of force events," during the 2020 protests, those same systems "clearly broke down." *Id.* at 37. "Supervisor reviews of force frequently demonstrated no meaningful review by the chain of command, and the first-line supervisor review often lacked a specific consideration of the precise use of force at issue." *Id.* at 38. Meanwhile, given the high volume of force that was used during the protests, SPD developed a "significant backlog" in its review process. *Id.* Because of this backlog, SPD decided to depart from the typical chain-of-command process for reviewing use of force, and the supervisory reviews that resulted were "inconsistent and incomplete." *Id.* at 37. Because of these issues, the Monitor found that SPD "[c]learly" did not comply with the Consent Decree's requirements for use of force reporting and review during the protests. *Id.*

The City's response to the use of force concerns that arose from the 2020 protests has been robust. As part of that response, the City developed new policies, including the adoption of "a detailed decision-making matrix to calibrate SPD's level of response and tactics to the circumstances of the protest." *Id.* at 40. To ensure that new policies are implemented in practice, SPD provided Department-wide training and "command-specific guidance on command's

UNITED STATES' MEMO IN SUPPORT
Case No. 2:12-cv-01282-JLR - 23

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

responsibility for properly planning, supervising, and reporting crowd management events." *Id.* at 41. "These trainings emphasized facilitating protests, de-escalation, and targeted enforcement actions where necessary to address problems while supporting the community's First Amendment rights." *Id.* The City is currently working on additional proposed revisions to SPD's crowd management policy that will address concerns identified in the wake of the 2020 protests and also bring the policy in alignment with recent changes to Washington State law.

SPD also "engaged extensively" with Seattle's Office of Inspector General for Public Safety (OIG) to assess SPD's protest response through a "robust recommendation and review process" called a "Sentinel Event Review." *Id.* at 41. To conduct that review, the OIG worked with community partners "to examine what went wrong from a systems perspective and make recommendations for changes in SPD responses to community demonstrations and protests."[18] As a result of this collaborative process, OIG has issued several reports, including three "wave" reports that address various aspects of SPD's response to the 2020 protests.

The "first wave" of the Sentinel Event Review process ultimately produced 54 recommendations. (Dkt. 709) at 47. SPD responded to each of them in writing, and it "either agreed to implement or had already implemented the vast majority of the OIG's recommendations, demonstrating a commitment to improvement both based on community feedback and SPD's identification of issues." *Id.* at 49. The "second wave" of the Sentinel Event Review process analyzed crowd dynamics and how SPD policies impacted those dynamics, including SPD's use of CS gas, barricades, and blast balls. (Dkt. 682-1) at 5-6. The "second

---

[18] Seattle Office of the Inspector General, Sentinel Event Review of Police Response to 2020 Protests in Seattle, Wave 1: Downtown Protests May 29–June 1 (July 22, 2021), at 5, *available at* https://www.seattle.gov/documents/Departments/OIG/Policy/OIGSERWave1Report072221.pdf

UNITED STATES' MEMO IN SUPPORT
Case No. 2:12-cv-01282-JLR - 24

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

wave" produced 26 additional recommendations that SPD also responded to. (Dkt. 715-2) at 1-7.

The "third wave" of the Sentinel Event Review process, analyzed four critical incidents that

occurred during the duration of the Capitol Hill Organized Protest ("CHOP"). (Dkt. 722-1) at 25-

26. The City is reviewing the 34 "third wave" recommendations.

As the Monitor found in its Comprehensive Assessment in May 2022, the City's attention

thus far to the issues that arose during the 2020 protests is promising. As the Monitor explained,

> "The City's extensive efforts to analyze these problems and generate
> recommendations for future improvement have been significant and
> laudable. The City has demonstrated a substantive commitment and
> ability to both identifying and working to address its issues. In this
> way, even as SPD's response to the protest presented a crisis for its
> longstanding compliance with the Consent Decree, the City's
> response to identify, acknowledge, explore, and address identified
> issues aligns closely with the Consent Decree's goal of establishing
> a system that can self-monitor and self-correct."

(Dkt. 709) at 34.

In the Compliance Agreement, the City has committed to continuing this ongoing work to

address crowd management.  It will update its crowd management policy to incorporate

community feedback through the Sentinel Event Review process and train officers on the new

policy.  It will also develop an alternative reporting and review process specific to crowd

management situations to reduce the likelihood of the breakdowns in reporting and review of use

of force that occurred in 2020.

2. The City's Continued Efforts on Accountability

The City remains focused on addressing the Court's concerns about its accountability

systems as noted in its May 2019 Order. (Dkt. 562) at 10-11.  The City has taken numerous steps

to address those concerns, and these efforts are ongoing.  For example, OPA has bolstered its

UNITED STATES' MEMO IN SUPPORT
Case No. 2:12-cv-01282-JLR - 25

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  training on interviewing techniques, added two new civilian investigators, increased its standards

2  for case documentation and adopted changes to address the experience of complainants.

3      The City has also made changes to its collective bargaining team.  In the most recent

4  negotiations with Seattle Police Officers' Guild (SPOG) and Seattle Police Management

5  Association (SPMA), a policy analyst from the City Council and a technical advisor from the

6  CPC are now included as part of the City's bargaining team.  The City and the Seattle Police

7  Management Association recently agreed to a new labor agreement that makes improvements to

8  the accountability system for SPD captains and lieutenants.  The SPMA contract applies a

9  preponderance of the evidence standard for misconduct findings and appeals, gives deference to

10 disciplinary decisions made by the Chief of Police, prevents the presentation of new evidence not

11 previously disclosed prior to appeal, increasing the independence of arbitrators, and by making

12 appeals more transparent and accessible to the public.  The City is currently in negotiations with

13 SPOG on a new labor agreement.

14     In its May 2019 Order, the Court also expressed concern about officer discipline imposed

15 by the Chief of Police.  (Dkt. 562 at 1).  Since that time, the City has prevailed in litigation

16 challenging the Chief of Police's decision to terminate an SPD officer's employment, obtaining a

17 published decision at the Washington State Court of Appeals affirming that his reinstatement

18 would be against public policy.

19     To ensure that it addresses or has addressed the Court's concerns on accountability, under

20 the proposed Compliance Agreement, the Monitor will conduct a capacity assessment of the

21 City's police accountability system, including the work of the OIG, OPA, and CPC.  The City

UNITED STATES' MEMO IN SUPPORT
Case No. 2:12-cv-01282-JLR - 26

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  has also agreed that the OIG will take on additional work to ensure that robust, independent

2  monitoring of SPD will continue after the Monitor's role comes to an end.

3          3.   Continued Sustained Compliance with the Core Areas of the Consent Decree

4

5          As the City worked to address the crowd management and accountability issues described

6  above, it was also subject to continued assessment on all other areas of the Consent Decree to

7  ensure that it sustained compliance.  The 2021 Monitoring Plan, which was agreed to by the

8  Parties and approved by the Court, focused on the following topics: (1) evaluating the status of

9  the City's sustained compliance with the Consent Decree; (2) improving front- and back-end

10 accountability by looking closely at use of force incidents during the 2020 protests; (3) providing

11 technical assistance to SPD on changes to its crowd management and use of force policies; and

12 (4) providing technical assistance in supporting the City's effort to re-imagine public safety.

13 (Dkt. 655) at 4.

14

15

16         In evaluating the status of the City's continued, sustained compliance with certain

17 provisions of the Consent Decree, the Monitor focused on four areas: use of force, crisis

18 intervention, stops and detentions, and supervision.[19]  *Id.*  In reporting on the City's sustained

19 compliance in these four core areas, the Monitor issued two semi-annual reports and the 2022

20 Comprehensive Assessment.  *See* (Dkts. 680, 695, 709).

21

22         In the 2022 Comprehensive Assessment, the Monitor found "that SPD has sustained its

23 compliance with the Consent Decree generally outside of notable issues with SPD's response to

24 the 2020 protests and other specific issues that require additional work to help prevent such

25

26

27

---

28  [19] Within these four areas, the Monitor also focused on bias-free policing and officer misconduct issues.  *Id.*

UNITED STATES' MEMO IN SUPPORT
Case No. 2:12-cv-01282-JLR - 27

problems in the future." (Dkt. 709) at 19.  As to specific areas, the Monitor found that "SPD's outcomes with respect to use of force have largely sustained or improved in the ensuing years since the 2017 compliance determination," including significant decreases in force "overall and at every level." *Id.* at 13.  Similarly, with respect to crisis intervention, the Monitor noted sustained improvement in the "five years plus since the Monitoring Team initially declared SPD's compliance with the crisis intervention requirements of the Consent Decree." *Id.* at 15. Finally, with stops and detentions, the Monitor found sustained compliance, although noting that ongoing work to address disparities in stops remained.  *Id.* at 18.  According to the Monitor, this sustained compliance "has resulted in improved policing outcomes for the public, from a reduction in use of force to consistently lawful stops and detentions." (Dkt. 709) at 19.

Similarly, outcome measures during this period also demonstrate sustained compliance by the City.  For example, the number of incidents involving a serious (Type II or III) use of force were as follows:

| 18 Month Time Period | Incidents Involving a Serious Use of Force |
| --- | --- |
| January 2009 – April 2011 (Pre-Consent Decree) | 1,230 |
| July 2014 – October 2016 (Phase I) | 487 |
| January 2017 – April 2019 (Phase II) | 454 |
| January 2021 – June 2022 (Continued Sustainment) | 444 |

(Dkt. 588-1) at 3 and SPD's Data Dashboard.  In other words, SPD has sustained the dramatic reduction in serious uses of force.

Likewise, the outcome measurements surrounding crisis and stops have both been held at a level of high performance:

UNITED STATES' MEMO IN SUPPORT
Case No. 2:12-cv-01282-JLR - 28

| Time Period | Force Used During Contacts with People in Crisis |
|---|---|
| Phase I (6/1/15-8/31/15) | 2% |
| Phase II (1/1/17-6/30/18) | 1.8% |
| 2022 Comprehensive Assessment (1/1/2019 – 12/31/2020) | 1.5% |

*See* (Dkt. 272) at 15; (Dkt. 511) at 7; (Dkt 709) at 103.

| Time Period | Stops Supported by Reasonable, Articulable Suspicion |
|---|---|
| Phase I | 97% |
| Phase II, Round 1 | 93.5% |
| Phase II, Round 2 | 94.24% |
| 2022 Comprehensive Assessment | 94.3% |

*See* (Dkt. 394) at 7; (Dkt. 547-1) at 2 (93.5%, Round 1; sustainment validated by Monitor and DOJ); (Dkt. 588-2) at 3 (94.24%, Round 2, sustainment validated by Monitor and DOJ); (Dkt. 709) at 111-12.

In the Compliance Agreement, the City has committed to ensure that the Consent Decree's reforms are sustained, providing updates outcome measures regarding use of force, crisis intervention, stops and detentions, bias-free policing, and supervision, with validation of those measures by the OIG.

## II.    ARGUMENT

The Court should approve the proposed Compliance Agreement because the City has demonstrated four years of sustained compliance with the Consent Decree's requirements on use of force (except in crowd management situations), crisis intervention, stops and detentions, bias-

UNITED STATES' MEMO IN SUPPORT
Case No. 2:12-cv-01282-JLR - 29

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

free policing, supervision, and the Office of Police Accountability.  The proposed Compliance Agreement relieves the City of those obligations, while retaining oversight over the City's efforts to address use of force in crowd management and accountability.[20]

The Consent Decree provides that when "the United States and the Monitor agree that the City has maintained substantial compliance, the City will be relieved of that portion of the Settlement Agreement."  *See* (Dkt. 3-1) at ¶ 223.  Relief from the provisions of the Consent Decree is covered by Paragraph 225, which provides that the Parties, along with the Monitor "may jointly stipulate to make changes, modifications, and amendments" to the Consent Decree. *Id.* at ¶ 225.  These changes can be made when the "Parties agree, or where the reviews, assessments, and/or audits of the Monitor demonstrate, that a Settlement Agreement provision as drafted" no longer furthers the purpose of the Consent Decree.  *Id.*

Here, the Parties and the Monitor agree that the City's compliance with the core areas of the Consent Decree would be measured in Phase I by the Assessments, in Phase II by the audits of the Sustainment Plan, and over the last two years by the process set forth in the 2021 Monitoring Plan.  (Dkt. 439) at 2-3 (Order noting the choice of compliance audits); (Dkt. 422) at 5-6 (detailing the Parties' Phase I compliance workgroups); (Dkt. 448) at 2 (Order approving the Sustainment Plan); (Dkt. 661) (Minute Order Approving 2021 Monitoring Plan).  The Parties

---

[20]  Similar agreements have been approved in cases involving the Los Angeles and Detroit police departments. *See United States v. City of Los Angeles*, No. 2:00-cv-11769, July 17, 2009, ECF No. 417 (Order Re:  Transition Agreement); *United States v. City of Detroit*, No. 2:03-cv-72258, August 25, 2014, ECF No. 731 (Order Terminating Consent Judgment and Entering Transition Agreement).  In those cases, the courts approved joint motions by the parties to terminate the consent decrees and enter "Transition Agreements" as orders of the court. The transition agreements in each case were designed to narrow the scope of compliance efforts to the areas of the consent decrees that needed further work or time to demonstrate that reforms were durable.  Both transition agreements retained court oversight, but replaced the role of independent monitor with direct monitoring by DOJ. Unlike those agreements, under the proposed Agreement the Court's Monitor would retain its role in the process.

UNITED STATES' MEMO IN SUPPORT
Case No. 2:12-cv-01282-JLR - 30

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

and the Monitor then participated in good faith with each of these plans and updated the Court on their progress at regular agreed intervals.[21]

The outcomes of these systemic and rigorous evaluations are undisputed.  The City of Seattle demonstrated in Phase I, Phase II, and during the 2021 Monitoring Plan that they both achieved full and effective compliance with the core areas of the Consent Decree and sustained that compliance for more than four years.  *See* footnote 11.  Based on those metrics, the Parties now jointly move under Paragraph 225 for this Court to enter an Order approving the Compliance Agreement to supersede the Consent Decree.  Approval of the Compliance Agreement will allow the Parties, Monitor, and the Court to focus on the remaining work to be completed, while also recognizing the significant work the City and SPD have done to fulfill their obligations under the Consent Decree.

### III.    CONCLUSION

For the foregoing reasons, the Court should approve the Agreement on Sustained Compliance.

---

[21] *See* Outcome Reports: ((Dkt. 452-1) (Community Engagement Program Report May 2018); (Dkt. 458-1) (Stops and Detentions Annual Report 2018); (Dkt. 495-1) (Crisis Intervention Program Report October 2018); (Dkt. 524-1) (Use of Force Annual Report January 31, 2019); (Dkt. 564-1) (Stops and Detentions Annual Report 2019); (Dkt. 588-3) (Crisis Intervention Program Report October 2019); (Dkt. 605-1) (Use of Force Annual Report January 10, 2020)); City's Quarterly Reports: ((Dkt. 470) (July 2018 Quarterly Report); (Dkt. 497) (October 2018 Quarterly Report); (Dkt. 523) (January 2019 Quarterly Report); (Dkt. 553) (April 2019 Quarterly Report); (Dkt. 570) (July 2019 Quarterly Report); (Dkt. 588) (October 2019 Quarterly Report); (Dkt. 600) (December 2019 Quarterly Report); (Dkt. 657) (February 2021 Quarterly Report); (Dkt 670) (April 2021 Quarterly Report); (Dkt. 682) (August 2021 Quarterly Report); (Dkt. 690-1) (October 2021 Quarterly Report); (Dkt. 715) (August 2022 Quarterly Report); (Dkt. 722) (November 2022 Quarterly Report)); Sustainment Period Updates: ((Dkt. 539) (Monitoring Plan for February 2019); (Dkt. 540) (United States' Report on Status of Sustainment Period); (Dkt. 542) (City's Report on Status of Sustainment Period)).

UNITED STATES' MEMO IN SUPPORT
Case No. 2:12-cv-01282-JLR - 31

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  DATED this 28th day of March, 2023.

2  For the UNITED STATES OF AMERICA:

3

4  KRISTEN CLARKE                          TESSA GORMAN
   Assistant Attorney General              First Assistant United States Attorney

5  Civil Rights Division                   Western District of Washington
                                           Attorney for the United States

6  *s/Katherine Chamblee-Ryan*             Acting Under Authority Conferred
   Steven H. Rosenbaum, Chief              by 28 U.S.C. § 515

7  Timothy D. Mygatt, Deputy Chief

8  Jeffrey R. Murray, Trial Attorney       *s/ Matt Waldrop*
   Katherine Chamblee-Ryan, Trial Attorney Matthew Waldrop, Assistant United States Attorney

9  United States Department of Justice     Kerry Keefe, Assistant United States Attorney
   Civil Rights Division                   Rebecca Cohen, Civil Division Chief

10 Special Litigation Section              United States Attorney's Office
   950 Pennsylvania Ave, NW                Western District of Washington

11 Washington, DC 20530                    700 Stewart Street, Suite 5220
   Phone: (202) 514-6255                   Seattle, Washington 98101-1271

12                                         Phone: (206) 553-7970

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES' MEMO IN SUPPORT                    UNITED STATES ATTORNEY
Case No. 2:12-cv-01282-JLR - 32                   700 STEWART STREET, SUITE 5220
                                                  SEATTLE, WASHINGTON 98101
                                                  (206) 553-7970