Honorable James L. Robart

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| UNITED STATES OF AMERICA, | 2:12-cv-01282-JLR |
|---|---|
| Plaintiff, | BRIEF OF AMICUS CURIAE ANTHONY SIMS, PLAINTIFF IN *SIMS v. CITY OF SEATTLE, ET AL*, REGARDING HIGH RISK STOP PRACTICES (EXCESSIVE FORCE, UNLAWFUL SEARCHES) |
| v. | |
| CITY OF SEATTLE, | |
| Defendant. | |

I.      INTRODUCTION

Amicus is the plaintiff in a civil case against the City of Seattle and several of its police officers, *Sims v. City of Seattle et al*, Case No. 2:22-CV-00483-TL, pending before the Honorable Tana Lin. Through this filing, Amicus informs this court of the testimony of the City's officers and Fed. R. Civ. P. 30(b)(6) designees from January through March 2023, about the City's policies (and lack thereof), practices, and protocols that bear on its compliance (or lack thereof) with the Consent Decree and the pending Joint Motion to terminate most aspects of it.[1]

Specifically, the City's officers and Fed. R. Civ. P. 30(b)(6) designees have testified that: (1) SPD officers conduct "high risk" gunpoint stops, which include vehicle searches, without probable cause or any particularized reason to believe the person they stopped poses a threat; (2) the City has no policy regarding the use of these "high risk" tactics; (3) the City does not require

---

[1] While the testimony of the City and its police officers in Mr. Sims's case sheds light on whether the City is in compliance with the Consent Decree, the constitutionality of the City's and its police officer's treatment of Mr. Sims is not before this court in this matter, so this court need not and should not opine on it in deciding the Joint Motion.

BRIEF OF AMICUS CURIAE ANTHONY SIMS - 1

No. 2:12-cv-01282-JLR

MACDONALD HOAGUE & BAYLESS
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604 Fax 206.343.3961

officers to report a use of force when officers point firearms; (4) the City considers displaying and pointing firearms to be a form of "de-escalation"; and (5) the SPD's Office of Police Accountability ("OPA") has approved these practices and formally cleared officers of wrongdoing for engaging in them, despite internal conclusions to the contrary.

Amicus believes that the testimony and other information contained herein does not duplicate the submissions of any party or other amici. He respectfully submits this brief for the court's information and in opposition to the Joint Motion, on the basis that the evidence discussed herein demonstrates recent and ongoing non-compliance with the Consent Decree.

## II.     IDENTITY AND INTEREST OF AMICUS

As articulated in Amicus's Motion for Leave, Amicus Anthony Sims is the plaintiff in a pending case before the Honorable Tana Lin, in U.S. District Court for the Western District of Washington, *Sims v. City of Seattle et al*, Case No. 2:22-CV-00483-TL. Mr. Sims alleges the City, and its police officers violated his Fourth and Fourteenth Amendment rights under 42 U.S.C. § 1983 and *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). The suit arises from the Seattle Police Department's May 17, 2020 gunpoint "high risk" stop of Mr. Sims – captured on body worn and in-vehicle cameras – in which seven police officers stopped Mr. Sims in downtown Seattle purportedly based on a "near hit" between his license plate and a different license plate. *See Sims v. City of Seattle et al*, 2:22-CV-00483-TL, Dkt. No. 42 (Plaintiff's Motion for Partial Summary Judgment); No. 20 (operative complaint), ¶¶4.1-4.21.

The testimony of the City and its police officers in Amicus's case reflect training, policies, and practices that contradict the City's representations to this Court, the Department of Justice, or the Monitor and show a lack of compliance with the Consent Decree as it relates to the Fourth Amendment.[2]  Amicus has an interest in ensuring that the court has current information about the City's training, policies, and practices for "high risk" stops, "de-

---

[2] The Consent Decree identified two pathways to compliance: (1) compliance reviews and audits, and (2) outcome assessments. Dkt. No. 439 at p. 2:15-3:7.  The City's testimony in Amicus's case suggest that neither pathway has been satisfied.

BRIEF OF AMICUS CURIAE ANTHONY SIMS - 2

No. 2:12-cv-01282-JLR

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

escalation," use of force, searches, and OPA's review of complaints, to ensure that the Consent Decree is not prematurely terminated, and that SPD is accountable to the law.

### III.   AMICUS'S POSITION AND AUTHOIRTY

**A.   Background: the May 17, 2020 "High Risk" Stop of Amicus**

On May 17, 2020, at 5:07 am, Defendant Robert Brown—then an Acting Lieutenant with the SPD—was on patrol on Marion Street near First Avenue, in downtown Seattle. Exhibit 18,[3] Brown Dep., 44:14-22; No. 42-6. Exhibit 6, Field Contact Report; Exhibit 1 (Brown dashboard video, at 0:00). Brown's attention was drawn to Amicus's car approximately 100 feet ahead. Exhibit 18, Brown Dep., 46:17- 47:9. Brown followed Amicus and "entered the license plate number" in the mobile data terminal ("MDT"), a touch screen device inside the patrol vehicle, while driving. *Id*., 48:1-9; 50:5-14; 58:23-59:6; 52:6-7; 55:11-14. Brown received two returns on his MTD, both of which were clearly labeled as a "near hit" for the license plate he entered. *Id*., 52:11-53:12; 181:11-182:22) (discussing Exhibit 2 (Brown body cam, at 6:07); No. 42-16, Exhibit 16 (MDT return). The return stated that each of the license plates labeled as a "near hit" had been reported stolen. Exhibit 16 (MDT return).

When Amicus parked in front of a store to pick up a delivery order, Brown initiated a "high risk" stop. Exhibit 1 (Brown Dash Cam), at 0:35; Exhibit 18, (Brown Dep.), 76:13-25; 104:3-5 and 151:7-10. Brown got out of his patrol car and issued orders to Amicus over his patrol car loudspeaker *Id*., 85:16-86:6; Exhibit 1, (Dash cam) at 1:10. Amicus was "compliant." Exhibit 5 (radio communication audio), at 2:15. **Brown drew his "sidearm," a Glock 22 .40 caliber handgun**. Exhibit 18, (Brown Dep.), 104:14-105:4.  **The driver did not do anything to

---

[3] Unless otherwise specified, Exhibits are to the Declaration of Nathaniel Flack in Support of Brief of Amicus Curiae Anthony Sims. All exhibits filed in support of this Amicus Brief have already been filed on the public docket at Case No. 2:22-CV-00483-TL, Dkts. 41-43.

BRIEF OF AMICUS CURIAE ANTHONY SIMS - 3

No. 2:12-cv-01282-JLR

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

**suggest he was dangerous in any way**. *Id*., 102:19-24. Brown could see Amicus was a Black male. Exhibit 18, Brown Dep., 103:5-7; *Id*., 86:7-20.

Officers Gregory Nash, Bradley Richardson, Garrett Follette, Kathryn Reed, Tre Smith, and Jeremy Farkas all arrived on scene. *Id*., 109:25-110:9. Brown ordered Amicus to "lift his outer jacket and turn around in a 360-degree manner." *Id*., 111:9-16. Brown and multiple other officers on the scene had their firearms drawn. *Id*., 122:16-19; Exhibit 3 (Nash body camera), at 0:50 to 2:15; Exhibit 4 (Farkas body camera), at 1:00-1:20.  At least one officer – Officer Gregory Nash – had his gun pointed directly at Sims. Exhibit 4, (Farkas body cam), at 1:07 through 1:25; Exhibit 3 (Nash BWC), at 2:00-2:15. Officers Smith and Farkas frisked Amicus under Brown's supervision. *Id*., 138:3-6, No. 42-2, Exhibit 2 (Brown BWC), at 1:35. At 5:13:06 am, after dispatch had already expressly cleared the driver's plate over the radio, the officers continued to detain him near Brown's patrol car, while Officers Nash, Bradley Richardson, and Garrett Follette looked through his car, including using his keys to unlock and view the trunk while Amicus' back was turned. *Id*., 4:53-6:00. After finding nothing, the officers released Amicus.

It is undisputed that Amicus owned the car, Exhibit 18 (Brown Dep.), 91:22 ("I realize it was indeed his vehicle now."), and that he had been performing his job as delivery driver, picking up an order at the 7-11 store when the police officers detained him.

**B.     The City's High Risk Stop Practices, and Training Violate the Consent Decree.**

Defendants call the stop, detention, and use of force towards Sims a "high-risk vehicle stop." Exhibit 19 (Nash Dep.), 54:7-8; Exhibit 18 (Brown Dep.), 107:18-20; Exhibit 20 (Richardson Dep.), 107:25-108:6; Exhibit 12 (OPA conclusion that officers "conducted a high-risk vehicle stop"). The City has no policy on high-risk vehicle stops. Exhibit 23 (Davisson

BRIEF OF AMICUS CURIAE ANTHONY SIMS - 4

No. 2:12-cv-01282-JLR

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

30(b)(6) Dep.), 81:12-14 ("Q. [A]re high-risk vehicle stops defined anywhere in the city's policies? A. No."). Instead, the City relies solely on training., Exhibit 13; Exhibit 8 (High risk stop training materials); Exhibit 23 (Davisson 30(b)(6) Dep.), 81:22-82:2.

An HRVS involves multiple officers responding, drawing or pointing weapons, frisking the suspect, and performing a "sweep" of the vehicle. Exhibit 8 (training materials), p. 5, 12, 14 (showing multiple officers with guns drawn and pointed, illustrating techniques); Exhibit 20 (Richardson Dep.), 69:11-13 (search of trunk is "part of the standard vehicle clearing for a high risk vehicle stop"); Exhibit 18, Brown Dep., 124:18-22 ("The high-risk stop is a very commonly trained tactic…So my assumption is that the frisk would have occurred"), 122:16-19 ("there were multiple officers on the scene, yourself included, with firearms drawn, right? A. Yes. In accordance to [sic] our training and practices, yes.").

SPD trains its officers to initiate HRVS at their discretion if they believe they are "dealing with a possible higher risk." Exhibit 21, Outlaw 30(b)(6), 51:8-9 (high risk stop authorized "if they deem this to be a safer practice and they deem it necessary, then they need to articulate why they did it"). "[S]tolen vehicles are treated with a high-risk vehicle stop." Exhibit 19, Nash Dep., 25:6-9; Exhibit 23 (Davisson 30(b)(6) Dep.), 17:19-21. Officers use their discretion to decide when to conduct HRVS, including to rule out the possibility of danger based on lack of knowledge. Exhibit 20 (Richardson Dep.), 107:9-14 ("If there's no weapons, or if there's no intelligence on what we have, high-risk vehicle stops are done for everybody's safety."); Exhibit 18 (Brown Dep.), 86:15-17. SPD Detective Leroy Outlaw authored the City's "high risk" stop training, adopted by SPD in 2019. Exhibit 21 (Outlaw 30(b)(6) Dep.), 90:19-92:11; Exhibit 8 (high risk stop materials). Defendants Brown, Richardson, and Nash testified that they conducted the HRVS of Mr. Sims according to City training and practices. Exhibit 18

BRIEF OF AMICUS CURIAE ANTHONY SIMS - 5

No. 2:12-cv-01282-JLR

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

(Brown Dep.), 196:11-19 (all actions consistent with SPD policy and training), 110:23-25, Exhibit 20 (Richardson Dep.), at 108:3-6; Exhibit 19 (Nash Dep.), at 69:11-13; 105:5-14.

i. **The City trains officers to point guns at cooperative suspects during what they characterize as "high risk" stops.**

The City and its officers testify they can draw or point firearms at a person in the circumstances of the *Sims* case, *id*., 51:7-10; Exhibit 20 (Richardson Dep.), 46:11-19, claiming as justification that the clearly labeled "near hit" with a different license plate required the use of high-risk stop procedures. Brown Dep., 52:11-53:12. The City trains officers to point weapons during high risk stops:



Exhibit 8, p.5.

These practices cast doubt on the City's representation to the Court that, "SPD has eliminated the pattern of unconstitutional force that gave rise to the Consent Decree" and that "[a]ny pattern or practice of unconstitutional force that existed has been eliminated." *See* Dkt. [4] No. 728 at pp. 3, 12.

---

[4] Unless otherwise specific, references to "Docket" or "Dkt." pertain to this matter, *United States of America v. City of Seattle*, Case No. 2:12-cv-01282-JLR.

BRIEF OF AMICUS CURIAE ANTHONY SIMS - 6

No. 2:12-cv-01282-JLR

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604 Fax 206.343.3961

The reasonableness of force – including pointing a firearm at a member of the public – is assessed by balancing the gravity of the intrusion on the individual against the government's interests, including whether the suspect posed an immediate threat, was resisting arrest, or attempting to escape. *Thompson v. Rahr*, 885 F.3d 582, 586 (9th Cir. 2018) (*citing Graham v. Connor*, 490 U.S. 386, 396-97 (1989)). "[W]hen police draw their guns, it greatly increases the seriousness of the stop." *Green v. City & County of San Francisco*, 751 F.3d 1039, 1047 (*citing Washington*, 98 F.3d at 1188); *United States v. Robertson*, 833 F.2d 777 (9th Cir. 1987) (finding detention at gunpoint by seven police officers, lasting between five and fifteen minutes, without handcuffs unlawful as *Terry* stop and was an arrest requiring probable cause); *Kraus v. Cty. of Pierce*, 793 F.2d 1105 (9th Cir. 1986) (concluding "seizure more intrusive than an investigatory stop occurred," where multiple officers had **"weapons at the ready"**).

The City's training and policy authorize routine drawing and pointing of firearms without reference to an objective need, and thereby violate the Consent Decree. Exhibit 20 (Richardson Dep.), 46:11-19 ("Anytime there's a stolen vehicle or advised a stolen vehicle or a vehicle engaged in any type of crime or if we're looking for something, I will always point my firearm toward a vehicle until that potential threat is deemed clear or safe."); Exhibit 23 (Davisson 30(b)(6) Dep., 79:22-80:3; Exhibit 10, p. 5 (finding display of firearms against Amicus consistent with City policy).

### ii.   City Defines "Deescalation" to Include Pointing or Displyaing Firearms

The Consent Decree makes clear that de-escalation is supposed to "reduce the need for force." Dkt. 3-1, ¶70. The Monitor has found that SPD's use of force policies are "clear, simple, balanced, and well-reasoned –perhaps, **with their emphasis on de-escalation, among the best in the country**." Dkt. No. 383 at p. 5 of 108. Yet, the City and its officers testified that drawing

BRIEF OF AMICUS CURIAE ANTHONY SIMS - 7

No. 2:12-cv-01282-JLR

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

or pointing a firearm in the circumstances of their stop of Amicus constitutes a form "de-escalation," and that pointing a firearm at a member of the public can also be "de-escalation." Exhibit 20 (Richardson Dep., 112:4-6); Exhibit 19 (Nash Dep.), 80:21-23, 80:24-81:1; Exhibit 18 (Brown Dep.), 123:2-124:8, 122:22-123:1; Exhibit 22 (Outlaw 30(b)(6) Dep.), 116:4-7). Officer Nash testified that the manner in which he held his firearm towards Mr. Sims – which he called "low ready" – could be a form of de-escalation. Exhibit 19, (Nash Dep.), 80:24-81:1.

While touting its emphasis on de-escalation in its Joint Motion, so far as Amicus can tell, the City has not disclosed to the Monitor, the DOJ, or the Court its testimony characterizing its officers' display of firearms as a form of "de-escalation." Use-of-force tactics are not commonly understood as forms of de-escalation. The City reached initial compliance with core provisions of the Consent Decree by "emphasizing the importance of de-escalation, the professional development of police officers, and the ongoing strengthening of ties between SPD and the diverse communities that the Department serves." *Id*. at p. 14 of 108. Amicus respectfully submits that SPD's training and practices – which conflict with the principle that de-escalation should "reduce the need for force," Dkt. 3-1, ¶70 – are not compliant with the Consent Decree.

    **iii.**    **The City Fails to Report Pointing Firearms as a Use of Force.**

The First Systemic Assessment noted the importance of oversight that "critically analyzes officer and departmental performance based on unbiased evidence and objective data, and proactively identifies and seriously addresses performance issues and trends." Dkt. No. 231 at p. 8 of 60. A cornerstone of accountability is knowing when force is used so it can be properly examined.[5] *See id.* at p. 11 of 60.

---

[5] "A foundational objective of the Consent Decree is that the use of force by SPD officers be uniformly reported by the officers who use it and thoroughly reviewed by supervisors. For any police department to be able to minimize the risk of unconstitutional force and for the community to be able to have confidence that the department is affirmatively taking officer encounters involving force seriously, it must know when officers use force." Dkt. No. 231 at p. 11 of 60.

BRIEF OF AMICUS CURIAE ANTHONY SIMS - 8

No. 2:12-cv-01282-JLR

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

The Consent Decree requires that "Pointing a firearm at a person is reportable as a Type I use of force." Dkt. 3-1 ("Settlement Agreement"); *see also* No. 231 at pp. 11-16. SPD Chief of Police Adrian Diaz has touted the City's purported reductions in use of force. *See* Dkt. No. 729, ¶6 (declaration claiming "reduction of nearly 50%" in use of force since 2015). However, in *Sims*, officers and OPA claimed no Type I force occurred, casting doubt on the accuracy of the City's reported statistics on firearms pointed, and specifically firearms pointed at Black subjects.



Exhibit 4, at 1:20 (Farkas BWC, Officer Nash at left).

After extensive review of the Consent Decree docket and pleadings, Amicus could not locate any disclosure by the City to the Court, the Monitor, or the DOJ explaining that officers characterize pointed firearms as "low ready" and so do not report them as uses of force, and thus they are not captured in official statistics or the court's evaluation of the City's compliance:

//
//
//
//

BRIEF OF AMICUS CURIAE ANTHONY SIMS - 9

No. 2:12-cv-01282-JLR

MACDONALD HOAGUE & BAYLESS
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604   Fax 206.343.3961

Table 8. Use of Force Techniques/Instruments Used by Subject Race/Ethnicity

| Type of Force | Total | Native American | Asian/PI | Black | Hispanic | Unknown | White |
|---|---|---|---|---|---|---|---|
| Verbal | 13% | 12% | 16% | 14% | 7% | 12% | 13% |
| Handcuff | 55% | 52% | 49% | 53% | 47% | 55% | 58% |
| Firearm - Point | 26% | 24% | 34% | 32% | 39% | 28% | 19% |
| Personal Weapons | 13% | 12% | 17% | 14% | 11% | 11% | 13% |
| Baton/Balls | 1% | 0% | 0% | 1% | 0% | 2% | 1% |
| Chemical Agent | 1% | 0% | 1% | 1% | 2% | 2% | 1% |
| Control Hold | 35% | 31% | 33% | 35% | 23% | 31% | 37% |
| Taser | 3% | 2% | 3% | 3% | 5% | 3% | 3% |
| Firearm - Fire | 1% | 0% | 0% | 1% | 0% | 2% | 1% |
| Other | 3% | 0% | 4% | 2% | 5% | 6% | 3% |
| Hobble | 0% | 0% | 0% | 1% | 0% | 1% | 0% |
| N | 2,385 | 42 | 89 | 794 | 109 | 371 | 980 |

Dkt. No. 383 at p. 48 of 108. Notably, even SPD's likely incomplete statistics show that "officers are more likely to point firearms at historically-underrepresented [subjects] than White subjects." *Id.*, at 10 of 108.

"[P]ointing a loaded gun at a suspect, employing the threat of deadly force, is use of a high level of force." *Thompson v. Rahr*, 885 F.3d 852, 586 (9th Cir. 2018); *Espinosa v. City & Cty. of S.F.*, 598 F.3d 528 (9th Cir. 2010). According to the City's testimony, officers can point a firearm or hold it in the "low ready" position as part of a high risk stop. Exhibit 23, Davisson 30(b)(6) Dep., 79:22-80:3. And pursuant to City policy officers do not report a use of force when they use what they consider the "low ready" position. *Id.*, 67:16-68:3.

The City's designee on this topic, Captain George Davisson, testified that as long as the gun is positioned such that the officer can see the civilian's hands, which is the "low ready" position. Exhibit 23, Davisson Dep., 77:12-16; 88:3-8. **The City's designee further testified that if someone on the street were holding a firearm in another person's direction, you would not be able to distinguish between the "low ready" position and a gun "pointed" at someone.** *Id.*, 91:8-12. Thus, because the City considers the "low ready" position non-reportable despite acknowledging that position is indistinguishable from pointing a gun, the City's practice is not to report a use of force when its officers engage in conduct that is indistinguishable from pointing guns at members of the public. *Id.*, 68:17-69:71.

BRIEF OF AMICUS CURIAE ANTHONY SIMS - 10

No. 2:12-cv-01282-JLR

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

1      This explains why no officer reported use of force in the Amicus's case, and why OPA found no gun was pointed, despite the video footage. Exhibit 3 (Nash body cam), at 2:16; Exhibit 4 (Farkas body cam), at 1:05-1:20. Despite officer agreement that the video shows Nash "pointing in the direction of Mr. Sims and the vehicle," (Exhibit 18 (Brown Dep.), at 160:13-115), the OPA and the City's designees concluded that no reportable use of force occurred. *See* Exhibits 10, 11; Exhibit 23, Davisson Dep., 77:12-16; 88:3-8.

The City's testimony that in practice its officers point firearms towards members of the public but do not report that as a use of force (labeling it "low ready"), undercuts[6] the City's claims of sustained compliance with the Consent Decree requirements. Dkt. No. 728, p. 9 (City claims "SPD has reduced the use of serious force by 60% and achieved a better than 99% rate of compliance with its use-of-force policy."). While the City touts data made available to the public, Amicus's evidence shows this data is incomplete, and therefore misleading, with respect to incidents of SPD officers pointing firearms at members of the public. *Id.*, at p. 11.[7]  The court should not rely on the City's claim "that SPD has eliminated the pattern of unconstitutional force that gave rise to the Consent Decree." Dkt. 728, p. 10. The data on which the Monitor relied was necessarily incomplete since it reflected SPD's practice of failing to report significant uses of force. *Id.*, at p. 10; *see* Dkt. No. 3-1 (Settlement Agreement), ¶190 (Monitor to rely on SPD and OPA data).[8] Based on a review of the Consent Decree docket, it appears that the City has failed to disclose its policy of not reporting such instances of pointing a firearm to the Monitor, the DOJ, or the Court.

---

[6] While the Consent Decree and assessments do not require that "SPD is always uniformly perfect . . . ." Dkt. No. 231 at p. 8 of 60, this evidence is contrary to the City's representations in support of the Joint Motion that "[a]ny pattern or practice of unconstitutional force that existed has been eliminated." Dkt. 728, p. 1.

[7] This is especially troubling because the Monitor's Ninth Systemic Report from April of 2017 noted improvements, yet SPD's failure to report the use of force on Amicus is reminiscent of SPD's practices before the supposed consent decree reforms, despite the reported improvements. Dkt. No. 383 at p. 6 of 108.

[8] Additionally, the Monitor found that "SPD officers are more likely to point firearms at historically-underrepresented [subjects] than White subjects." Dkt. No. 383 at p. 10 of 108.

BRIEF OF AMICUS CURIAE ANTHONY SIMS - 11

No. 2:12-cv-01282-JLR

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

### iv. Ongoing Use of Force for "Talking Back"

Officer Gregory Nash – who pointed his gun directly at Sims – testified that although Amicus was "compliant," Amicus was "talking back," as justification for the display of his firearm. Exhibit 19 (Nash Dep.), 62:2-3. This current conduct aligns with the DOJ's express finding, all the way back in 2011, that SPD officers "too frequently used excessive force against individuals who "talk-back" but otherwise pose no physical danger and too frequently escalate situations when arresting individuals for minor offenses. Dkt. No. 383 at p. 16 of 108. The City's reliance in 2023 on Amicus "talking back" to justify displaying a firearm towards him casts doubt on the City's assertion that its practices have changed since 2011. *See* Exhibit 10, p. 5 (finding display of firearms consistent with City policy). Indeed, in reviewing this incident, OPA found no use of force and no misconduct. Exhibits 10-11; *compare with* Exhibit 4, at 1:20 (BWC, Officer Nash at left).

### v. HRVS Firearms Training Based on Centrifuge Training Solutions, LLC

The City's high-risk vehicle stop training document states that it was "developed and based on" the work of Will Petty of Centrifuge Training Solutions LLC. *See* Exhibit 9, p. 7. **The City testified Mr. Petty's techniques had been adopted by the FBI; but the City did not check with the FBI or DOJ**. Exhibit 21, Outlaw 30(b)(6) Dep., 115:11-116:3; 109:16-110:19. The City testified it became aware of Mr. Petty through social media posts.[9] *Id*., 107:7-108:11. Publicly available videos of Mr. Petty's techniques cast doubt on the City's claim in support of the Joint Motion that it relies on "[h]igh-quality" and "professional" training. *See* Dkt. No. 728 at p. 34 of 37.

---

[9] Mr. Petty posts numerous videos of his techniques to social media. *See, e.g.*, www.youtube.com/watch?v=LOR5sLXLmeo, last accessed 3/31/2023; Exhibit 21, Outlaw 30(b)(6)Dep., at 112:13-113:11.

BRIEF OF AMICUS CURIAE ANTHONY SIMS - 12

No. 2:12-cv-01282-JLR

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

### vi. HRVS Training Authorizes Unlawful Frisks in Violation of Consent Decree

SPD officers testified that they had no information to believe that Amicus was armed or dangerous, but frisked him anyways as a matter of routine. *See* Exhibit 18, Brown Dep., 124:18-22, 102:19-24. This conflicts with the basic premise of the Consent Decree. *Compare* Dkt. No. 394 at p. 26 of 165: "A frisk is not automatically justified by the factors or circumstances that might justify the original stop. Instead, the officer must have sufficient, articulable grounds not just that the subject has been, is or will soon be engaging in criminal activity but also 'reason to believe that the suspect is armed and dangerous.' Factors tending to support a frisk include, but are not limited to, a subject failing to keep his hands in view, a bulge in a subject's clothing, or the nature of the criminal activity underlying the stop."

### vii. HRVS Training Authorizes Vehicle "Sweeps" Without Probable Cause

A warrantless search of an automobile is unlawful unless performed pursuant to one of several limited exceptions. *United States v. Scott*, 705 F.3d 410, 416 (9th Cir. 2012). "Searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009).

A search of a vehicle must be justified by a warrant or an exception thereto. *See*, *e.g.*, *United States v. Jackson*, 415 F.3d 88 (D.C. Cir. 2005) (search of trunk illegal where suspect stopped lawfully on reasonable suspicion of stolen tags, because there "can be no serious argument that the existence of stolen tags affixed to a car gives rise to probable cause to believe that additional contraband…would be in trunk."); *cf. United States v. Jones*, 471 F.3d 868 (8th Cir. 2006) (officer had warrant for firearms and could conduct vehicle "sweep"); *see Gant*, 556 U.S. at 347 (2009). It is well-established that opening the trunk of a car constitutes a search that

BRIEF OF AMICUS CURIAE ANTHONY SIMS - 13

No. 2:12-cv-01282-JLR

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604   Fax 206.343.3961

must comply with the Fourth Amendment warrant requirement or a recognized exception. *See United States v. Ludwig*, 641 F.3d 1243, 1250 (10th Cir. 2011) (noting it is "well settled that a trooper's opening of a car trunk is a search....").

The City's training and practice for high-risk stops is to engage in warrantless searches of vehicles without probable cause or any applicable exception. *Sims* Dkt. No. 42-10, Exhibit 20 (Richardson Dep.), 69:11-13 (search of trunk is "part of the standard vehicle clearing for a high-risk vehicle stop"); 50:18-22 ("Q And why did you open the trunk? A. To do a quick sweep, to make sure there was no threats inside. To make sure that the unknown was known, for the safety of officers as well as people that were out and about."); No. 42-19, Exhibit 19 (Nash Dep.), 69:11-13 ("Q. So you do check the trunk as part of the standard vehicle clearing for a high-risk vehicle stop? A. Yes."), 68:2-3 ("Clearing the vehicle is part of training for a high-risk vehicle stop."); Exhibit 21, Outlaw 30(b)(6) Dep., 71:24-73:23.

C.  **OPA Covers Up Violations of the Constitution**

The City asserts in support of the Joint Motion that its "OPA conducts thorough, complete disciplinary investigations." Dkt. No, 728, p. 20. Yet, the testimony and evidence in Amicus's case shows the opposite.

Amicus promptly filed a complaint with the City's Office of Police Accountability ("OPA"). *Sims* Dkt No. 42-9, Exhibit 9. OPA assigned SPD's Sgt. Derek Ristau to investigate; he interviewed Mr. Sims and Lt. Brown. *Sims* Dkt. No. 42-10, Exhibit 10. During the investigation, OPA's legal advisor, attorney John Berry, advised Sgt. Ristau that the stop and search of Amicus's vehicle were unlawful. *Sims* Dkt. No. 42-14, Exhibit 14, pp. 3 -5 ("While I understand standard high-risk vehicle stop procedure would require them to ensure the car was empty and there were no weapons, I'm having trouble justifying the use of that procedure here"). Nevertheless, OPA Director Andrew Myerberg found all allegations against the SPD and its officers "Not Sustained." *Sims* Dkt. No. 41-10, Exhibit 10, p. 2.

BRIEF OF AMICUS CURIAE ANTHONY SIMS - 14

No. 2:12-cv-01282-JLR

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

OPA found "… that no officers pointed their firearms and that having firearms at the low ready would have been consistent with a high-risk felony stop." *Id.*, 46:17-22; No. 42-10, Exhibit 10, No. 42-11, Exhibit 11. OPA found that the stop was consistent with SPD policy. *Sims* Dkt. No. 42-22, Exhibit 22 (Myerberg 30(b)(6) Dep.), at 33:13-20 ("…yes, the stop would have been consistent with SPD policy at the time, the traffic stop.").

OPA's investigation in Amicus's case was neither thorough nor complete, and instead covered up conduct that OPA's own advisor found unconstitutional. *Sims* Dkt. No. 42-14, Exhibit 14. The City represents that during Mr. Myerberg's tenure as OPA director and at the time of the incident involving Amicus, the City's policy was to transcribe interviews with officers; but OPA did not transcribe interviews with complainant Sims,[10] which could explain why the City claims it did not investigate the lawfulness of the stop at all. *Sims* Dkt. No. Exhibit 22 (Myerberg 30(b)(6) Dep.), 70:19-71:4, 35:11-19; No. 42-14, Exhibit 14, pp. 3 -5.

Leading to the Consent Decree, OPA "classification and findings systems [were] so complex that they damage[d] OPA's credibility and undermine[d] public confidence in OPA." Dkt. No. 259-1 at p. 17 of 36. In Amicus's case, OPA Director Andrew Myerberg testified, on behalf of the City, that OPA found the high-risk stop consistent with City policy and training and closed the complaint as "not substantiated" (Exhibit 10 (OPA memo)), yet Myerberg then testified the City had not even investigated the stop at all, claiming this was not the "gravamen" of Amicus's complaint. *Sims* Dkt. No. 22, Myerberg 30(b)(6) Dep., 70:19-21. Thus OPA problems with "classification" remain. Indeed, classifying complaints appears to be a convenient if not disingenuous way for the City to avoid reckoning with the results of its own investigations. The City's representations to the contrary in support of the Joint Motion should not be credited.

---

[10] In January 2016, the Monitor found that "Approximately 14 percent of OPA investigations were judged to be inadequate" Dkt. No. 259-1 at p. 23 of 26. In January of 2020, the Monitoring Team found that 19% of investigations were "inadequate," an *increase* from 14% from the 2016 assessment. Dkt. No. 601-1 at p. 17 of 34. Similar to the 2016 assessment, the Monitoring Team found that "the OPA's interview techniques likely deprived it of necessary, material, and relevant evidence" in some investigations. *Id*. at pp. 17, 30 of 34. These issues appear to be ongoing as evidenced by the City's records and testimony in Amicus's case.

BRIEF OF AMICUS CURIAE ANTHONY SIMS - 15

No. 2:12-cv-01282-JLR

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

## IV. CONCLUSION

For the foregoing reasons Amicus Curiae respectfully requests that the Joint Motion (Dkt. 727) be denied.

DATED this 26th day of April, 2023.

MacDONALD HOAGUE & BAYLESS

By: */s/ Nathaniel Flack*
Nathaniel Flack, WSBA #58582
NathanielF@mhb.com
705 Second Avenue, Suite 1500
Seattle, WA 98104
Phone: (206) 622-1604
*Attorneys for Plaintiff*

By: */s/ Lauren Freidenberg*
Lauren Freidenberg, WSBA #59145
LaurenF@mhb.com
705 Second Avenue, Suite 1500
Seattle, WA 98104
Phone: (206) 622-1604
*Attorneys for Plaintiff*

BRIEF OF AMICUS CURIAE ANTHONY SIMS - 16

No. 2:12-cv-01282-JLR

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961