Exhibit 15
to DECLARATION OF NATHANIEL FLACK
IN SUPPORT OF BRIEF OF AMICUS
CURIAE ANTHONY SIMS



Seattle
Office of Police
Accountability

# DIRECTOR'S CERTIFICATION MEMO

| TO: | CAPTAIN MATTHEW ALLEN | DATE: | NOVEMBER 13, 2020 |
|---|---|---|---|
| | WEST PRECINCT | | |
| FROM: | DIRECTOR ANDREW MYERBERG *AM* | | |
| | OFFICE OF POLICE ACCOUNTABILITY | | |
| SUBJECT: | DIRECTOR'S CERTIFICATION MEMO 2020OPA-0303 | | |

**INFORMATION FOR THE REVIEWER:**

This Director's Certification Memo (DCM) represents the opinion of the OPA Director regarding the misconduct alleged. The DCM, while based upon the evidence and information contained in the case file, should not be considered part of the investigation process. It should be viewed as an aid to your evaluation of the Director's findings. **Please review the case file in <u>Blue Team</u> if you have questions or further information is needed.**

**The Director's recommended finding(s) contained in this investigation include three (3) Not Sustained finding(s).**

**CASE IDENTIFICATION:**

| 180 Date: | OPA Case Number: |
|---|---|
| **11/13/2020** | **2020OPA-0303** |
| Reported Date: | General Offense Number: |
| May 18, 2020 | 2020-162199 |
| Incident Date: | Incident Location: |
| May 17, 2020 | Cherry St/1st Ave, Seattle, WA |
| Complainant: | Subject: |
| Anthony Sims | N/A |
| Office of Police Accountability | |
| Interviews & Evidence: | |
| OPA Complaint | |
| CAD Call Report | |
| License Plate Inquiry | |
| Body-Worn Video | |
| CAD/RMS Records | |

**Named Employee(s)**

| Named Employee(s): | |
|---|---|
| #1 | Police Lieutenant Robert Brown #6194 |



**Seattle Office of Police Accountability**

## DIRECTOR'S CERTIFICATION MEMO

FROM: DIRECTOR ANDREW MYERBERG
OFFICE OF POLICE ACCOUNTABILITY
OPA CASE NUMBER: 2020OPA-0303

**Allegations of Misconduct and the Director's Findings**

**Named Employee #1**

| Allegation(s): | | Director's Findings |
|---|---|---|
| # 1 | 5.001 - Standards and Duties 11. Employees Shall Be Truthful and Complete in All Communication | Not Sustained (Unfounded) |
| # 2 | 5.140 - Bias-Free Policing 2. Officers Will Not Engage in Bias-Based Policing | Not Sustained (Unfounded) |
| # 3 | 8.200 - Using Force 1. Use of Force: When Authorized | Not Sustained (Management Action) |

**EXECUTIVE SUMMARY:**

The Complainant alleged that he was improperly stopped because of his race by the Named Employee. He further alleged that the Named Employee's claimed belief that the Complainant's vehicle was stolen was a lie. Lastly, he alleged that officers improperly pointed firearms at him.

**SUMMARY OF INVESTIGATION:**

The Complainant initiated a complaint with OPA. He stated that, at around 5:00 a.m. on May 17, 2020, he drove to a 7/11 store to pick up a delivery. Approximately four to five blocks from the 7/11 he saw a police car, which he said was not uncommon in that location and at that time. The Complainant stopped his vehicle and was about to go inside of the 7/11 when an officer ordered him to return to his vehicle. The Complainant did so. He observed a police officer in the vicinity of his vehicle. The police officer was pointing a firearm at him.

The police officer told the Complainant that he was driving a stolen vehicle. The Complainant said that he responded: "I don't believe you" or "bullshit." He said that they told him to get out of the car and he did. He was told to walk backwards towards the officers, but he got sick of complying with orders when he had not done anything, and he turned around. He saw a number of officers who had handguns out and pointed at him.

An officer told him that his license plates might be stolen. They asked him for his name and identification, as well as examined the VIN for his vehicle. He was ultimately given his keys back and was told that he was free to go. The Complainant said that no one ever explained to him why he was stopped and why he was not arrested when they believed his vehicle to be stolen.

The Complainant believed that he was racially profiled and that the stop of his vehicle was biased. He felt that the officer lied when he said that the Complainant's vehicle was stolen. Lastly, he was upset that firearms were pointed at him.

OPA determined that Named Employee #1 (NE#1) was the officer who stopped the Complainant's vehicle. From reviewing radio traffic, OPA determined that NE#1 reported that he observed the Complainant's vehicle driving with no rear illumination. In-Car Video (ICV) confirmed that there were no rear lights except for brake lights when activated. The ICV further indicated that it was dark outside at the time and the inside of the vehicle was not visible. Radio traffic reflected that NE#1 asked dispatch to verify a possible "rolling stolen" (a vehicle driving with stolen plates) and provided the license plate. NE#1 told dispatch that he had not yet pulled the vehicle over and then updated that the vehicle had stopped on its own and that he was going to address the driver over the PA system. The dispatcher held



| | |
|---|---|
| **Seattle** <br> Office of Police Accountability | **DIRECTOR'S CERTIFICATION MEMO** <br><br> FROM: DIRECTOR ANDREW MYERBERG <br> OFFICE OF POLICE ACCOUNTABILITY <br> OPA CASE NUMBER: 2020OPA-0303 |

the air, meaning that no radio transmissions were made while the stop was effectuated. After several minutes, NE#1 went back over the radio and said that the scene was under control. NE#1 then asked for dispatch to verify whether the plate was stolen. Dispatch repeated the plate number and told NE#1 that the plate was "clean" (not stolen) and that it was a "near miss." Dispatch told NE#1 that the actual stolen plate was identical to the Complainant's except for one digit – a nine versus a four. NE#1 said that he understood.

Body Worn Video (BWV) and ICV showed the stop that occurred while the radio was being held. The stop progressed much like the Complainant described. The Complainant stopped his vehicle and began to get out; however, NE#1 went over the PA system and told him: "Wait by your vehicle, ok?" NE#1 indicated that the license plate was returning to a stolen vehicle and that he needed the Complainant to exit and speak with him. He told the Complainant: "What we found is sometimes there's a misunderstanding…" He asked the Complainant to get out and show his waistband. NE#1 then asked the Complainant to walk backwards towards NE#1's voice with his hands in the air. The Complainant said that his vehicle was not stolen. NE#1 replied: "I understand what you are saying, we are going to work through this." The Complainant asked why officers had guns pointed at him and NE#1 said that it was for their safety. The Complainant noted that he did not believe that his car was coming back stolen.

The Complainant remained with other officers while NE#1 went back to his vehicle to check on the status of the license plate. Once NE#1 determined that it was not stolen, he returned to the Complainant to let him know. NE#1 explained to the Complainant:

> My apologies, we have to handle this a certain way, I had the hit come up, looked like it was the stolen plate, then I was following you waiting till I had additional units here, and that's the reason we had this stop here. But it looks like this may be a misunderstanding on the plate. I'll show you what I was looking at.

The Complainant, who was clearly upset, said that he did not need to see anything because he knew that his car was not stolen. NE#1 again tried to explain what occurred, but the Complainant declined to look at his screen. He told the Complainant that he was free to go and the Complainant left.

As part of its investigation, OPA interviewed both the Complainant and NE#1. The Complainant's statement is detailed above. NE#1's recounting of this incident was consistent with the BWV and ICV. He said that he felt that it was necessary to perform a high-risk felony stop on the vehicle because he believed that it was stolen, it was dark outside, and he did not know how many people were in the vehicle. He told OPA that stolen vehicles have a high correlation rate with weapon possession. NE#1 said that, because it was a high-risk felony stop, he and the backing officers drew their firearms. He said that he did not point his firearm at the Complainant and kept it at the low ready. He further did not see any of the backing officers point their firearms at the Complainant at any point.

NE#1 acknowledged that he made a mistake when he transposed the numbers. He said that he wished he could have been able to explain this to the Complainant and he tried to do so by offering to show the Complainant his screen. However, he understood that the Complainant was angry and did not want to talk to him. NE#1 denied that he was dishonest with the Complainant. He said that he legitimately believed that he had a basis to stop the vehicle, even if he was wrong. He also asserted that he did not stop the vehicle because of the Complainant's race and did so because of the license plate.



| | |
|---|---|
| **Seattle**<br>Office of Police Accountability | **DIRECTOR'S CERTIFICATION MEMO**<br><br>FROM:  DIRECTOR ANDREW MYERBERG<br>         OFFICE OF POLICE ACCOUNTABILITY<br>OPA CASE NUMBER:  2020OPA-0303 |

**ANALYSIS AND CONCLUSIONS:**

**Named Employee #1 - Allegation #1**
*5.001 - Standards and Duties 11. Employees Shall Be Truthful and Complete in All Communication*

The Complainant alleged that NE#1 fabricated the basis for the stop and, as such, that NE#1 was dishonest. SPD Policy 5.001-POL-11 requires Department employees to be truthful and complete in all communications.

The video evidence and radio transmissions clearly indicate that, at the time of the stop, NE#1 genuinely believed that the Complainant's license plate matched that of a stolen vehicle. The plates were identical except that the second to last digit for the stolen plate was a 9 and was a 4 on the Complainant's plate. There is no evidence establishing that NE#1 was dishonest and that this was anything other than an incredibly unfortunate mistake.

That OPA does not find dishonesty on NE#1's part does not mean that OPA is not extremely sympathetic for what the Complainant experienced. It must have been terrifying for the Complainant to be ordered out of his vehicle for no apparent reason and to have multiple officers standing behind him with their firearms drawn. Moreover, while NE#1 did try to explain what occurred, the Complainant understandably was angry and did not want to hear it. This was clearly a very negative experience for the Complainant, and he was still very emotionally affected at his OPA interview, which occurred a period of time after the fact.

Unfortunately, OPA does not have a true remedy to make the Complainant whole. This type of incident, which involves a significant but good faith mistake on the part of an officer, is better remedied through civil legal proceedings than through an administrative investigation where OPA's scope is admittedly limited. With regard to the narrow question before OPA – whether NE#1 was dishonest during this incident – OPA finds that he was not. As such, OPA recommends that this allegation be Not Sustained – Unfounded.

Recommended Finding: **Not Sustained (Unfounded)**

**Named Employee #1 - Allegation #2**
*5.140 - Bias-Free Policing 2. Officers Will Not Engage in Bias-Based Policing*

The Complainant further alleged that the stop was also based on bias towards him due to his race. SPD policy prohibits biased policing, which it defines as "the different treatment of any person by officers motivated by any characteristic of protected classes under state, federal, and local laws as well other discernible personal characteristics of an individual." (SPD Policy 5.140.) This includes different treatment based on the race of the subject. (*See id*.)

As with the finding in Allegation #1, OPA concludes that the stop was effectuated because of the near identical plates, not because of the Complainant's race. In further support of this finding is that fact that, as he considered the vehicle stolen, he would not have known what the race of the Complainant was, even when he looked up the vehicle's registration. It was further dark outside, and the vehicle's windows were dark, which made NE#1 unable to see inside of the vehicle.


| | |
|---|---|
| **Seattle**<br>Office of Police Accountability | **DIRECTOR'S CERTIFICATION MEMO**<br><br>FROM: DIRECTOR ANDREW MYERBERG<br>OFFICE OF POLICE ACCOUNTABILITY<br>OPA CASE NUMBER: 2020OPA-0303 |

Again, OPA wants to be clear that it understands why the Complainant would feel the way he did and why, knowing that the vehicle was not stolen, he would believe the stop was based on bias. However, this is simply not supported by the evidence. As such, OPA recommends that this allegation be Not Sustained – Unfounded.

Recommended Finding: **Not Sustained (Unfounded)**

**Named Employee #1 - Allegation #3**
*8.200 - Using Force 1. Use of Force: When Authorized*

The Complainant asserted that officers improperly pointed firearms at him.

SPD policy classifies the pointing of a firearm as Type I reportable force. While policy does not explicitly detail when it is permissible to draw and point a firearm, officers are trained that doing so is appropriate in delineated situations, including when responding to a crime of violence, when performing a building search, and when conducting a high-risk felony stop.

Given that the officers were conducting a high-risk felony stop here, they were permitted to draw their firearms. While the Complainant perceived the officers to have pointed firearms at him, the evidence indicated that they did not do so and that they kept their firearms at the low ready. As such, the officers technically did not use force under policy, let alone improper or excessive force.

The more fundamental question for OPA is whether the officers should have drawn their firearms in the first place. OPA has repeatedly identified concerns with the Department's use of high-risk felony stops. There is no policy that governs such tactics even though they constitute a significant imposition on a person's liberty and involve the drawing of firearms, all on a reasonable suspicion stop. There is no written guidance concerning during on which high-risk felony stops firearms should be drawn and, as far as OPA is aware, the training lacks any nuance in this respect. OPA interviewed a Sergeant assigned to the Training Unit who confirmed that absence of such discussion in the training.

OPA accordingly takes this opportunity to reiterate its strong recommendation that SPD create a policy governing high-risk felony stops. Moreover, SPD should amplify its training to provide examples of stops where, even if there is plausibly heightened danger, it may be unnecessary to draw firearms.

- **Management Action Recommendation**: OPA recommends that the Department create a policy governing high-risk felony stops, including providing specific guidance on the categories of cases in which such stops should be used. OPA further recommends that the Department consider training officers on examples of stops where drawing firearms may not be necessary.

Recommended Finding: **Not Sustained (Management Action)**