1
2
3
4
5
6

EXHIBIT A

7    UNITED STATES DISTRICT COURT
8    WESTERN DISTRICT OF WASHINGTON

9

10   UNITED STATES OF AMERICA,

11              Plaintiff,

12   v.

13   CITY OF SEATTLE,

14              Defendant.

CASE NO. 2:12-cv-01282-JLR

**AMICUS BRIEF OF AMERICAN CIVIL LIBERTIES UNION OF WASHINGTON**

15
16

## I.    IDENTITY AND INTEREST OF AMICUS

17
18       The identity and interest of Amicus are set forth in the Motion for Leave to
19   File, submitted contemporaneously with this brief.

20

## II.   INTRODUCTION

21
22       In 2010, 35 community organizations, including the American Civil Liberties
23   Union of Washington (ACLU-WA), called on the United States Department of Jus-
24   tice (DOJ) to utilize its enforcement authority to investigate egregious incidents of
25
26

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
P.O. BOX 2728
SEATTLE, WA 98111
(206) 624-2184

excessive force by the Seattle Police Department (SPD, Department) against community members of color. Pattern-or-practice investigations and consent decrees are important tools to address systemic failures within police departments resulting from constitutional violations. Community groups in Seattle reached out to federal authorities because SPD and City leaders were ineffective at changing the problematic and dangerous culture, practices, policies, and outcomes of police interactions with community members. *See Request to Investigate Letter* (Dec. 3, 2010), https://www.seattle.gov/Documents/Departments/Council/Members/Harrell/DOJ/2012-01aclu_ltr120310.pdf.

For the last eleven years, under a Consent Decree, the City has been required to ensure that "police services are delivered to... [its residents] ...in a manner that fully complies with the Constitution and laws of the United States, effectively ensures public and officer safety, and promotes public confidence in the Seattle Police Department...and its officers." *See* Dkt. No. 3-1 at 5.

Now, the United States and the City of Seattle (collectively "the Parties") are asking this Court to terminate the Consent Decree, with the City declaring that SPD is a "transformed organization." *See* Dkt. No. 728 at 3. Doing so would end Court oversight of discriminatory policing, model use-of-force policies, development and implementation of a wide-ranging and sophisticated data-collection and officer

AMICUS BRIEF OF AMERICAN CIVIL LIBERTIES UNION OF WASHINGTON - NO. 2:12-CV-01282-JLR

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
P.O. BOX 2728
SEATTLE, WA 98111
(206) 624-2184

early warning system, strong community participation, and civilian oversight. In lieu of the Consent Decree, the Parties are asking this court to adopt a Transition Agreement (Agreement), a streamlined tool focused on a narrow set of outcomes, concentrating on two broad, yet crucial, areas – the use of force within the context of crowd control and officer accountability.

While the Consent Decree ushered in changes to SPD's policies, data collection, and training, the Department, regrettably, is not a "transformed organization." The Consent Decree was never intended to be a permanent fixture. After a decade, terminating it now should spark further action by the City to achieve greater gains in reducing discriminatory policing, reducing excessive force, and increasing accountability. If the Consent Decree is terminated, Amicus, an original requestor, will not celebrate the news as a moment of "mission accomplished."

Unfortunately, as described below, the presence of such a tool has not meant that the significant problems which led to the present case have been resolved. While there have been gains made in reducing the use of force and creating important structures for accountability, data consistently illustrates that discriminatory policing continues as SPD officers are more likely to stop Black and Indigenous people at alarming rates. *See Chong Yim v. City. Of Seattle*, 63 F.4th 783 (9th Cir. 2023).

AMICUS BRIEF OF AMERICAN CIVIL
LIBERTIES UNION OF WASHINGTON -
NO. 2:12-CV-01282-JLR

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
P.O. BOX 2728
SEATTLE, WA 98111
(206) 624-2184

However, the absence of this Consent Decree, if ordered, need not result in regression. The path to truly transforming SPD has already been laid out by advocates, oversight bodies, and Seattle law makers, including, but not limited to, implementing the City Council's 2021 less lethal weapons ordinance, banning the use of tear gas for First Amendment protected activity, and fully adopting all provisions of the 2017 Accountability Ordinance. If the Consent Decree is terminated, the City should be called to action to make these remaining changes, developed while under the Consent Decree, in order to leave a legacy of transformation.

While consent decrees may be temporary, the work of being accountable is perpetual. If the City does not act, community groups, the Office of the Inspector General (OIG), Community Police Commission (CPC), Office of Police Accountability (OPA), and the City Council will continue the difficult work of change and oversight to ensure just, equitable public safety in Seattle.

## II.   ARGUMENT

### A.   SPD Is Not A Transformed Agency Because the Consent Decree Did Not Resolve Discriminatory Policing.

Despite community groups calling for the DOJ to investigate SPD's discriminatory policing, and the DOJ raising "serious concerns" about discriminatory policing, it did not make a finding of discriminatory policing. *See Investigation of the Seattle Police Dep't,* United States Department of Justice, Civil Rights Division &

United States Attorney's Office, Western District of Washington, Dec. 16, 2011,

https://www.justice.gov/sites/default/files/crt/legacy/2011/12/16/spd_find-

letter_12-16-11.pdf at 3.

Those concerns included acknowledgement that "inappropriate pedestrian

encounters may disproportionately involve youth of color. Of the cases that we de-

termined to be unnecessary or excessive uses of force, over 50% involved minori-

ties. Analysis of limited data suggests that, in certain precincts, SPD officers may

stop a disproportionate number of people of color where no offense or other police

incident occurred." *Id. at 6.* However, to the disappointment of community groups,

the Consent Decree had only minimal requirements relating to policy clarifications,

data review and analysis, and anti-bias training to address discriminatory policing.

*See Settlement Agreement and Stipulated [Proposed] Order of Resolution, Dkt. No.*

*3-1      at      41,*      https://www.justice.gov/sites/default/files/crt/leg-

acy/2012/07/31/spd_consentdecree_7-27-12.pdf. While there was no explicit com-

mitment to actually reduce discriminatory policing, SPD cannot be considered a

"transformed organization" because of the continued culture and outcomes of dis-

criminatory policing which continue to erode trust in SPD and public safety.

In 2021, SPD posted a 54-page document to its website, compiled by the Cen-

ter for Policing Equity, showing that between 2015-2019, while the Consent Decree

AMICUS BRIEF OF AMERICAN CIVIL
LIBERTIES UNION OF WASHINGTON -
NO. 2:12-CV-01282-JLR

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
P.O. BOX 2728
SEATTLE, WA 98111
(206) 624-2184

was actively in place, Black people were seven times more likely to be subjected to force by Seattle police than white people and five times more likely to be stopped and questioned. Mike Carter, *Report: Seattle police stop Black people, Native Americans at far higher rate than white people*, The Seattle Times, https://www.seattletimes.com/seattle-news/law-justice/report-black-people-and-native-americans-get-stopped-by-seattle-police-at-a-far-higher-rate-than-white-people/.   Indigenous people were nine times more likely to be stopped based on this data, which was compiled, analyzed, and posted while SPD was under federal DOJ oversight. *Id.* While Amicus recognizes that SPD was open and transparent about this data, if this data is not used to fuel clear and systemic change within the Department, it has little impact other than sowing greater distrust within the Seattle community.

SPD's own data in its use of force annual report for 2019 show that force was used against non-white Seattle residents over 50% of the time. *See* Seattle Police Department, *Use of Force Annual Report January 31, 2019*, Dkt. 524-1, at 9, https://www.seattle.gov/documents/Departments/Police/Publications/2019_Annual_UoF_Report.pdf. (uses of force against white people amount to 42.47% of total uses of force). The City is 65% white, demonstrating the stark disproportionality of force borne by community members of color. *See Quick Facts, Seattle City,*

AMICUS BRIEF OF AMERICAN CIVIL
LIBERTIES UNION OF WASHINGTON -
NO. 2:12-CV-01282-JLR

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
P.O. BOX 2728
SEATTLE, WA 98111
(206) 624-2184

*Washington*, United States Census Bureau, https://www.census.gov/quick-facts/fact/table/seattlecitywashington/RHI125221#RHI125221. Current SPD data shows that "Black persons are stopped at a rate that is 4.1 times that of non-Hispanic white persons and Indigenous persons are stopped [at] a rate that is 5.8 times that of non-Hispanic white persons." *Yim*, 63 F.4th at 788. Furthermore, "[w]hile the over-all population in King County, home to Seattle, is just 6.8% Black, the population of the King County [J]ail is 36.6% Black…[a]nd while Native Americans are 1.1% of the King County population, they number 2.4% of the County's jail population." *Id.* The current data shows significant, ongoing racial disparities in policing that mirror the issues from over ten years ago that led up to the original investigation and lawsuit in the present matter.

Racial disparities not only plague SPD and how officers conduct stops, but also impact officers within the Department, as Black officers are the target of ra-cially motivated behavior by other officers. For example, Detective Cookie Bouldin, who has served 43 years with SPD and is a Black, female officer, has operated within a hostile work environment for those 43 years of service because of her gen-der identity and race. *See* Mike Carter, *Pioneering detective filed claim against SPD, alleges racial and gender discrimination*, The Seattle Times, https://www.seat-

AMICUS BRIEF OF AMERICAN CIVIL
LIBERTIES UNION OF WASHINGTON -
NO. 2:12-CV-01282-JLR

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
P.O. BOX 2728
SEATTLE, WA 98111
(206) 624-2184

tletimes.com/seattle-news/law-justice/pioneering-detective-sues-spd-alleges-racial-and-gender-discrimination/. Detective Bouldin details how, for the entirety of her service with SPD, she has constantly dodged racist remarks; had her loyalty to the Department questioned because of her ties to Black community members; and navigated assignments and treatment with racist overtones. *Id.* Adding to her mistreatment, while "[t]he Department regularly points to Detective Bouldin's strong relationship with the communities of color whenever there is controversy in relation to a Seattle Police action…[b]ehind the scenes, other officers and supervisors have belittled Detective Bouldin and challenged whether she is with the Department or with the community." *Id.* This culture of policing that pits officers against the very community members they are sworn to serve is a fundamental crisis at SPD.

While the Consent Decree and the Monitor's suggestions regarding racial disparity issues attempt to paint a narrative of steady progress, current SPD data tells a starkly different story, one that mirrors the original issues that led to the 2011 DOJ investigation. If the Consent Decree is terminated, the City and Department must take concrete action to directly address the obvious racial disparities that continue to plague SPD, specifically, and the culture of policing in Seattle, generally, which only reinforces the historic and ongoing harms inflicted on communities of color.

AMICUS BRIEF OF AMERICAN CIVIL
LIBERTIES UNION OF WASHINGTON -
NO. 2:12-CV-01282-JLR

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
P.O. BOX 2728
SEATTLE, WA 98111
(206) 624-2184

**B.**   **Tear Gas Should Be Banned and Less Lethal Weapons Significantly Restricted as Crowd Control Measures in Light of Rampant Abuse and Misuse by SPD and the City's Ordinance.**

While the Parties' proposed Agreement directs SPD to revise its crowd management policy in a general sense, it fails to explicitly address the use of less lethal weapons, in particular, tear gas, as a crowd control measure. Due to the historic abuse of tear gas by SPD, banning the use of tear gas for protected First Amendment activity and restricting less lethal alternatives in compliance with the City Council ordinance passed in 2021 are critical to ensuring that SPD is a transformed organization.

The use of tear gas by law enforcement against American citizens immediately evokes memories of some of the worst moments in our nation's history. State and local police officers released tear gas, and worse, on peaceful voting rights protesters, many of whom were college-age young adults, as they walked across the Edmund Pettus Bridge in Selma, Alabama on March 7, 1965. *Alabama: The Edmund Pettus Bridge*, National Park Service, https://www.nps.gov/places/alabama-the-edmund-pettus-bridge.htm

In 1999, during the World Trade Organization protests in Seattle, SPD used it on protestors. In retrospect, then police chief Norm Stamper regrets the decision: "The bottom line, I do believe, was my failure to veto a decision to use chemical

AMICUS BRIEF OF AMERICAN CIVIL
LIBERTIES UNION OF WASHINGTON -
NO. 2:12-CV-01282-JLR

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
P.O. BOX 2728
SEATTLE, WA 98111
(206) 624-2184

agents. These are fellow Americans who had exercised their First Amendment rights." Jim Brunner, *50,000 protesters, tear gas — and Madeleine Albright trapped in her hotel: How the 1999 WTO protests changed Seattle*, Seattle Times, https://www.seattletimes.com/seattle-news/wto-seattle-protests-20-years-later-do-they-matter/.

In 2020, history repeated itself when police officers in various cities nation-wide released tear gas on protesters after George Floyd was killed while in the custody of police officers in Minneapolis, Minnesota. Tens of thousands of people across Washington – from Spokane[1] to Forks[2], and Walla Walla[3] to Omak[4] and many places in between[5] – gathered to protest police violence in the wake of George Floyd's horrific and unnecessary murder.

---

[1] *See Thousands March in Spokane,* The Spokesman-Review, https://www.spokes-man.com/stories/2020/may/31/protesters-gather-in-downtown-spokane-to-demon-stra/.

[2] Jesse Major, *Widespread protests continue,* Peninsula Daily News, https://www.peninsuladailynews.com/news/widespread-protests-continue/.

[3] Dian Ver Valen, *Peaceful downtown rally Sunday,* Union-Bulletin, https://www.union-bulletin.com/news/peaceful-downtown-rally-sunday/collec-tion_04c6cc1f-5e7c-5037-a0ed-c09ddb8535f2.html.

[4] *Community pulls together for Floyd March, The Omak Chronicle*, https://www.omakchronicle.com/free/community-pulls-together-for-floyd-march/article_289ba0ae-a77c-11ea-a35d-eb152d431011.html.

[5] *See, e.g., George Floyd Protests in Washington (state)*, Wikipedia: The Free Dictionary, https://en.wikipedia.org/wiki/George_Floyd_protests_in_Washing-ton_(state)#cite_note-26.

Officers in Seattle responded in some instances with such significant amounts of tear gas that residents in the Capitol Hill neighborhood uninvolved in the protests were tear gassed in their homes. *Seattle Residents Got Tear Gassed in Their Own Apartments,* The Stranger, https://www.thestranger.com/slog/2020/06/04/43840246/seattle-residents-got-tear-gassed-in-their-own-apartments. The tear gas released at protesters was not able to single out individuals causing harm—small pets, infants asleep in their Capitol Hill homes, and immuno-compromised 70-year-olds not participating in the protests were also impacted. *Id.*

As a result of tear gas being used during the George Floyd protests, a group of Seattle protesters brought First Amendment and Fourth Amendment claims against the City of Seattle and the Seattle Police Department, arguing that their use of tear gas and other "less-lethal" weapons including, but not limited to, weapons designed to stun people with light and sound, chilled their constitutional right to assemble and protest peacefully. *Black Lives Matter Seattle-King County v. Cty. Of Seattle, Seattle Police Dep't,* 466 F. Supp. 3d 1206 (W.D. Wash. 2020). The Western District of Washington held that the Seattle Police Department had "used less-lethal weapons disproportionately and without provocation," supporting the plaintiffs' motion for a temporary restraining order. *Id.* at 1211.

AMICUS BRIEF OF AMERICAN CIVIL
LIBERTIES UNION OF WASHINGTON -
NO. 2:12-CV-01282-JLR

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
P.O. BOX 2728
SEATTLE, WA 98111
(206) 624-2184

The 2021 Washington State Legislature responded by passing RCW 10.116.030, which severely restricts the use of tear gas by law enforcement for crowd control, requiring that the highest elected official in the municipality—not the chief of police—decide when tear gas can be deployed against a crowd. This provision was created in large part due to SPD's abuse of tear gas during the 2020 protests. Capitol Hill lawmaker Senator Jamie Pedersen advocated for the extended chain of command, stating:

> This summer, my neighborhood, not just my district, my neighbor-hood, was filled with tear gas, indiscriminately used by police who had too easy a chain of command to decide that... a chemical weapon that we have agreed by treaty not to use against hostile combatants, is going to be used on our own citizens, peaceful protestors. It needs to stop.

*See Senate Law and Justice Committee – Senator Jamie Pedersen's Statement,* March 18, 2021, https://tvw.org/video/senate-law-justice-committee-2021031276/?eventID=2021031276 (beginning at 48:33).

Moreover, in August 2021, the Seattle City Council, based on consensus rec-ommendations from the Community Police Commission, the Office of Public Ac-countability, and the Office of the Inspector General – the three accountability bod-ies created by the Consent Decree – passed an ordinance limiting the use of tear gas and other less lethal weapons such as blast balls, chemical irritants, etc. even further.

AMICUS BRIEF OF AMERICAN CIVIL
LIBERTIES UNION OF WASHINGTON -
NO. 2:12-CV-01282-JLR

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
P.O. BOX 2728
SEATTLE, WA 98111
(206) 624-2184

*See* Ordinance 126422, August 27, 2021,https://seattle.le-gistar.com/View.ashx?M=F&ID=9811339&GUID=DA9D3B9C-8D4E-4778-A094-0D69CB650242.

Time and time again, this community has witnessed SPD utterly disregarding their crowd control weapons policies[6], even while under the scrutiny of a Consent Decree, resulting in widespread devastation, physical, mental, and emotional inju-ries to individuals[7], the infringement of people's constitutional rights to free speech and free assembly, and pending litigation alleging civil rights violations. The com-munity can no longer rely on SPD to utilize discretion in deciding when and on whom this form of chemical warfare is deployed.

Amicus urges the City to bar the use of tear gas as a crowd control measure for constitutionally protected activity, and restrict the use of other less lethal weap-ons, according to the democratically and collaboratively passed City Ordinance.

---

[6] Jemima McEvoy, *Seattle Police Use Tear Gas Against Protestors Despite City Ban*, Forbes, https://www.forbes.com/sites/jemimamcevoy/2020/06/08/seattle-po-lice-use-tear-gas-against-protestors-despite-city-ban/#cf4dc5d5b4bc.

[7] Liz Jones, Isolde Raftery, *This woman 'died three times' after Seattle Police hit her with a blast ball*, KUOW, KUOW - This woman 'died three times' after Seattle Police hit her with a blast ball.

AMICUS BRIEF OF AMERICAN CIVIL
LIBERTIES UNION OF WASHINGTON -
NO. 2:12-CV-01282-JLR

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
P.O. BOX 2728
SEATTLE, WA 98111
(206) 624-2184

C.     The City Must Fully Implement the 2017 Accountability
       Ordinance.

Amicus shares the Court's concern over accountability. Dkt. No. 727-1 at7.

To address the Court's concerns, the Parties propose that the Monitor will, essen-

tially, study and assess the strengths and weaknesses of the City's accountability

system. Dkt. No. 728at 23. This is insufficient to address critical concerns with

SPD's internal accountability systems. Amicus urges the City to fully implement

the Accountability law and fund accountability, particularly since SPD has fallen

out of compliance in the past, with dire outcomes.

In 2017, after many months of unsuccessful efforts by the CPC to secure im-

plementation of reforms through internal SPD policy changes, and additional

months of consultation with Seattle's police and community leaders and locally and

nationally recognized accountability experts to draft legislation, the Seattle City

Council unanimously passed an Accountability law creating an integrated structure

of community input and civilian oversight through a new OIG, a strengthened OPA,

and a permanent CPC. Steve Miletich, *Seattle City Council passes historic police-

accountability legislation,* The Seattle Times,  https://www.seattletimes.com/seat-

tle-news/law-justice/seattle-city-council-passes-historic-police-accountability-leg-

islation/. The Ordinance commits the City to, among other things, "take whatever

AMICUS BRIEF OF AMERICAN CIVIL
LIBERTIES UNION OF WASHINGTON -
NO. 2:12-CV-01282-JLR

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
P.O. BOX 2728
SEATTLE, WA 98111
(206) 624-2184

steps are necessary… including negotiating with its police unions to update all affected collective bargaining agreements so that the agreements each conform to and are fully consistent with the provisions and obligations of this Ordinance, in a manner that allows for the earliest possible implementation to fulfill the purposes of this Chapter…" *See* SEATTLE, WA., ORDINANCE 125315 3.29.510:Implementation (2017) at 85-86. *See also* Ordinance 125315, Seattle City Council, 85-86, https://www.seattle.gov/Documents/Departments/CommunityPoliceCommission/Ordinance_APPRVED_052217_ALL_STRIKEOUTS_REMOVED.pdf.

However, as the Court recognized in November of 2017, the City approved a collective bargaining contract with the Seattle Police Management Association (SPMA), which contradicted provisions of the accountability law that aligned with the Consent Decree, particularly around arbitration procedures. *See* Steve Miletich, *Federal judge asks for more information on clearing of Seattle police in Charleena Lyles shooting,* The Seattle Times, https://www.seattletimes.com/seattle-news/law-justice/federal-judge-asks-for-more-information-on-clearing-of-seattle-police-in-charleena-lyles-shooting/. The following year, the Court recognized inconsistencies between the Accountability law, the Consent Decree and the City's contract with the Seattle Police Officer's Guild (SPOG), which the CPC urged City Council to reject because of how it undermined the Accountability law. Lester Black, *CPC:*

*Throw Out This Terrible Police Union Contract*, The Stranger, https://www.seat-tle.gov/documents/Departments/CommunityPoliceCommis-sion/CPC%20Press%20Release%2010-17.pdf. Because "the contract water[ed] down hard-fought-for improvements in the system for disciplining officers for dishonesty... [and] weaken[ed] improvements regarding the 180-day time limit on misconduct investigations, both of [which]... were acknowledged and addressed by the City Council when it passed the 2017 Ordinance," 24 community groups, including the ACLU-WA and many of the original requestors, also urged rejection of the SPOG contract, to no avail. *Community groups urge Seattle City Council to reject police contract as step backwards for community trust in the police department*, The ACLU, https://www.aclu-wa.org/news/community-groups-urge-seattle-city-coun-cil-reject-police-contract-step-backwards-community. The damaging impacts of undermining the Accountability law were quickly realized, when the Disciplinary Review Board, allowed under the SPOG contract, reversed the firing of Officer Adley Shepherd, who punched a handcuffed woman seated in the back of his patrol car hard enough to fracture the orbital rim of her right eye.

These failures on the part of the City to implement, defend, and demand compliance with the Accountability law resulted in the Court finding that the City had

AMICUS BRIEF OF AMERICAN CIVIL
LIBERTIES UNION OF WASHINGTON -
NO. 2:12-CV-01282-JLR

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
P.O. BOX 2728
SEATTLE, WA 98111
(206) 624-2184

fallen out of compliance in 2019. Dkt. No. 562. The City must act to not repeat its actions in this year's contract negotiations.

Additionally, Seattle's 2020 budget demonstrated the City's lack of prioritizing the accountability bodies, OPA, CPC, and OIG, created by the Accountability law and under the Consent Decree. The approved budget for policing and accountability, excluding significant policing overtime costs, resulted in "a meager 1% ... dedicated to the three police accountability entities. The remaining 99% is for the police." Mina Barahimi Martin, www.aclu-wa.org/story/follow-money-2022. It is critical that the City invest in accountability in order to ensure those agencies can engage in robust oversight.

The recently approved contract between the City and Seattle Police Management Association creates a new discipline review system "that marks a sea change in how discipline appeals operate." *See* Erica C. Barnett, *Police Management Contract, Which Includes Concessions, Could Serve as Template for SPOG Negotiations*, Publicola, https://publicola.com/2022/06/13/se/.

While this is a positive development, given the history of the City's actions in light of the Accountability law, more is needed than a proposed study to ensure that the City finally implements the Accountability Ordinance. Critical unmet provisions remain, including, but not limited to, a 180-day timeline for disciplinary

AMICUS BRIEF OF AMERICAN CIVIL
LIBERTIES UNION OF WASHINGTON -
NO. 2:12-CV-01282-JLR

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
P.O. BOX 2728
SEATTLE, WA 98111
(206) 624-2184

investigations; subpoena authority for OPA and OIG; the standard of review and quantum of proof in disciplinary appeals, and features of grievance arbitration that affect public confidence, such as degree of transparency. *See Accountability Ordinance Tracker*, City of Seattle Community Police Commission, https://www.seattle.gov/community-police-commission/our-work/accountability-ordinance-tracker.

### III.   CONCLUSION

Since 2011, Amicus has been concerned that continued discriminatory policing, abuse of force tactics, and lack of accountability harm public safety. As we said in our initial request to DOJ, "[d]istrust of the police by communities of color grows as a result, and it becomes harder for the Seattle Police Department to do its job of keeping all Seattle residents safe." *See Request to Investigate Letter* (DEC. 3, 2010), https://www.seattle.gov/Documents/Departments/Council/Members/Harrell/DOJ/2012-01aclu_ltr120310.pdf, at 3.

While consent decrees are not meant to last forever, we do believe the Parties and the Court continue to have a role in creating a Transition Agreement that would leave a legacy of profound change, with concrete policy changes in crowd control, adequate funding, and full implementation of the Accountability law. If the Consent Decree ends, it does not herald victory over discriminatory policing in Seattle, but

AMICUS BRIEF OF AMERICAN CIVIL LIBERTIES UNION OF WASHINGTON - NO. 2:12-CV-01282-JLR

AMERICAN CIVIL LIBERTIES UNION OF WASHINGTON FOUNDATION
P.O. BOX 2728
SEATTLE, WA 98111
(206) 624-2184

it can and should be a call to action for the City and its police to continue the per-

petual work of constitutional policing and for the civilian oversight bodies and com-

munity groups to continue oversight to ensure the Department is being held account-

able.

I certify that this memorandum contains 3,366 words, in compliance with

the Local Civil Rules.

Dated this 26th day of April, 2023.

Respectfully submitted,

<u>s/Jazmyn Clark</u>
Jazmyn Clark, WSBA 48224
La Rond Baker, WSBA 43610
Enoka Herat, WSBA 43347
Susannah Porter Lake, WSBA 60762
AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON
PO Box 2728
Seattle, WA 98111
Phone: (206) 624-2184
jclark@aclu-wa.org
baker@aclu-wa.org
eherat@aclu-wa.org
slake@aclu-wa.org

***Attorneys for Amici Curiae***

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## CERTIFICATE OF SERVICE

I hereby certify that on the date indicated below, I caused service of the foregoing *AMICUS BRIEF OF AMERICAN CIVIL LIBERTIES UNION OF WASHINGTON* via the CM/ECF system that will automatically send notice of such filing to all counsel of record.

DATED this 26th day of April, 2023 at Seattle, Washington.

By: /s/Tracie Wells
Tracie Wells, Paralegal
American Civil Liberties Union
of Washington Foundation
P.O. Box 2728
Seattle, WA 98111
(206) 624-2184
twells@aclu-wa.org

AMICUS BRIEF OF AMERICAN CIVIL
LIBERTIES UNION OF WASHINGTON -
NO. 2:12-CV-01282-JLR