# City of Seattle

Seattle Police Department

# **MEMORANDUM**

To:         Antonio Oftelie, Monitor
            Tim Mygatt, United States Department of Justice
            Matt Waldrop, United States Attorney's Office
            Lisa Judge, Inspector General for Public Safety

Cc:         Tim Burgess, Deputy Mayor
            Kerala Cowart, City Attorney's Office
            Gino Betts, Director, Office of Police Accountability
            Cali Ellis, Interim Director, Community Police Commission
            Rev. Harriet Walden, Co-Chair, Community Police Commission
            Rev. Patricia Hunter, Co-Chair, Community Police Commission
            Joel Merkel, Co-Chair, Community Police Commission
            Lisa Herbold, Council Public Safety Chair

From:       Adrian Diaz, Chief, Seattle Police Department
            Eric Barden, Deputy Chief, Seattle Police Department
            Brian Maxey, Chief Operating Officer, Seattle Police Department
            Rebecca Boatright, General Counsel, Seattle Police Department

Date:       July 28, 2023

Re:         Sentinel Event Review – Comprehensive Response

## **Preface**

With the Inspector General's four waves of the Sentinel Event Review (SER) to examine significant events over the summer of 2020 now complete, the Seattle Police Department is pleased to have this opportunity to update the federal monitor, the Department of Justice, City partners, and the people of Seattle about actions taken over the past two and a half years to address the concerns and suggestions reflected in each of the SER wave reports and to respond comprehensively to the recommendations offered by the SER panels.

We begin by noting again the extraordinary work of the OIG in bringing together these panels and the panels' willingness to dig beyond surface assumptions and into facts, circumstances, and perspectives that drove action and reaction over those painful months of 2020. We appreciate the honesty, vulnerability, and move towards healing evident in the SER reports, both within the community and among the members of SPD who participated.

Seattle Police Department, 610 Fifth Avenue, PO Box 34986, Seattle, WA 98124-4986
An equal employment opportunity, affirmative action employer.
Accommodations for people with disabilities provided upon request. Call (206) 233-7203 at least two weeks in advance.

Sentinel Event Review – Comprehensive Response
July 28, 2023

The approximately 140 SER recommendations generally fall within eight categories, as grouped by the OIG: accountability, communication, crowd management generally, officer wellness, procedures, situational awareness, training and use of force/crowd control.  Because many recommendations overlap or are repeated between waves, we respond to the recommendations comprehensively by category, but with each specific category's recommendations listed.

***Before turning to the recommendations specifically, however, we also want to take this opportunity to discuss a topic that hovers around the periphery of these recommendations, ties into the ongoing work SPD is doing to foster healing externally and internally, and which continues, for some, to be inextricably clouded through the lens of 2020.***  We address this topic – "SPD culture" – in the spirit of honest dialogue and on a foundation based in research, while also recognizing how flat this may land with some.  We take this opportunity because just as the SER sought to humanize all involved in the process, and because so many of the SER recommendations land in this space, if we – as a department and as a City – are truly to move forward to make Seattle a safer, healthier place for all, an honest discussion must move beyond surface headlines when discussing our department and our officers. We approach this topic fully mindful of the sensitivity inherent in the discussion, cognizant of self-inflicted wounds, and with the sincere hope of driving productive conversation.

This conversation is necessary because the word "culture" is often pejoratively referenced, but without definition, foundation, or metric for assessment. To level set, accordingly, we address culture in the context of organizational governance, in which "culture" – across any field or organization – is studied as a paramount indicator of organizational health and a corollary marker of success.

In policing, "culture" is typically defined by two distinct concepts: "occupational culture," or traits similar across police organizations, and "organizational culture," or traits unique to a particular organization.  At a macro level, both occupational and organizational culture comprise a set of shared beliefs, attitudes, and values driven in large part by the nature of police work and the environments in which officers serve and are commonly understood as a foreseeable response to conflicts between roles and expectations inherent in the work.  This has been described as follows:

> [P]olicing can be understood to have *instrumental* and *symbolic* roles. The former has to do with issues such as crime reduction, public safety, and prosecution of offenders; the latter is concerned with public perception of safe communities, as well as trust and confidence in, and the legitimacy of, the police profession. These roles, and public perceptions of how successful police are in performing them, are increasingly in conflict because of social change. One such change is reflected in "non-crime demands" on police, which are estimated to account for about 80% of police calls for services. These calls result mainly from failures in other social service delivery and criminal justice systems, such as mental health, drug, and alcohol treatment; housing; public schools; the courts and correctional institutions. As the instrumental police role broadens, the number of non-crime contacts with citizens increases. But when responding to non-crime calls for service involving the mentally ill, the homeless, and parties in dispute, the

Sentinel Event Review – Comprehensive Response
July 28, 2023

potential for violent escalation also increases, which undermines public assessment of police officers in their symbolic role.[1]

The impact of this duality, in turns, can play out in predictable form:

> The occupational environment of criminal justice includes exposure to human misery, exposure to great situational uncertainty, and exposure to intrinsic danger, all coupled with high levels of coercive authority and 'invisible discretion' granted to these officers which enable them to carry out their mandates. Moreover, most criminal justice employees work in unique organizational environments which expose them to rigid, militaristic authority structures with fixed lines of command and communication that are coupled with often vague and conflicting guidelines for policing and procedures. As a result, these employees are faced with tremendous job-related stressors. In an effort to cope with these working conditions, these employees are said to adopt a unique subcultural response … presumed to be made manifest in the manner by which officers perceive their role as police and the scope of this role; their beliefs regarding how the role should and should not be performed; and their attitudes toward the criminal law, criminal procedures including department policies, the police and other criminal justice practitioners, [and] criminal offenders[.].[2]

***In other words, simply put, police "culture" can and should be understood as a predictable sociological and psychological response to the unique constellation of stressors under which police operate.*** For this reason – and as many of the SER recommendations reflect – if we (collectively, in City government) are serious about sustaining a healthy ecosystem that encourages true community engagement in fostering public safety, we must also take seriously our responsibility to provide a working environment that mitigates to the extent we can against the stressors that so often are at the root cause of an unhealthy culture.

To assume or to infer from this discussion, however, a *negative* culture inherent to SPD would not only be unfounded, but it would also be inaccurate. We know from the extensive backgrounding, screening, and overall hiring process that officer candidates ultimately selected to join our department seek these positions in large part from a desire to give back to the community and advance the common good – traits consistent with research showing that desire to be a core motivation for most individuals entering a career of public service. We also know, from studies and surveys conducted over the past ten years and, more recently, through ongoing near real-time feedback from individuals receiving police service, that Seattle citizens hold overwhelmingly positive views of those SPD officers with whom they engage – reflective of the integrity, compassion, and professionalism with which officers routinely perform their duties. And we know, because we see every day in those events that don't make headlines, the acts of compassion and dedication that officers exhibit every day – acts that yes, are usual, ordinary, and expected, that we offer up not for praise, but for context.

---

[1] Corey, D.M. and Zelig, M. (2020). *Evaluations of Police Suitability and Fitness for Duty*. New York: Oxford University Press (*citing* Hales, G. and Higgins, A. (2016). Prioritisation in a changing world: seven challenges for policing. *The Police Effectiveness Project in a Changing World*, Paper 2. London: Police Foundation.)

[2] Cochran, J.K. and Bromley, M.L. (2003). The myth (?) of the police subculture. *Policing: An International Journal of Police Strategies and Management*. 26(1): 88-117 (pp. 88-89).

Sentinel Event Review – Comprehensive Response
July 28, 2023

But we also acknowledge how easily in-group isolation – in any occupation – can form and, as the events of 2020 laid bare, we are acutely aware of the fragility of community trust and cohesion.  Over the past two and a half years, as we work to rebuild the department, a central focus has been on efforts to foster an organizational culture of service and community through programs that strengthen the foundational commitments that brought employees to SPD.  SPD's outward mindset initiative, pre-academy training for police and community service officer recruits (SPD 360: Before the Badge), expanded programs around officer wellness, and an evolved system to support employee performance (Proactive Integrated Support Model, or PrISM) are all evidence of the department's commitment to mitigate against the professional strain that is well understood to drive the insularity of the occupational culture.  Because we reference back to these programs throughout this response, we describe these briefly below.

**Outward Mindset.**  SPD implemented this program in 2022 to address a theme common to both community members and officers that became amplified during 2020 – a deep desire (demand) to be treated as people who matter rather than as objects.  Community members feel objectified by the police; police officers feel objectified when they are viewed only as a badge number.  This feeling of objectification can lead to low trust and poor relationships with the community and low employee engagement within the department, which can further degrade employee morale and performance.  Appreciating this as an area that needed to be addressed, SPD engaged with organizational change management experts (the Arbinger Institute) to conduct training that focuses the department on understanding those factors at the root cause of organizational dysfunction. Starting from the premise that the reason that most organizational change efforts fail is because they focus too heavily on behavior, rather than the cognitive drivers (mindset) underlying behavior, the focus of this training is to enable participants to make the shift from an inward mindset to an outward mindset, where intentional consideration of the unique needs, challenges, and goals in each interaction can lead to more equitable interactions, internally and externally. As participants increasingly shift from inward to outward, it creates a positive reciprocal effect that leads to greater trust, engagement, and results. Some milestones relating to this initiative include:

- All members of Command Staff participated in the Outward Mindset program in 2022 with a senior facilitator from the Arbinger Institute in anticipation of a broader implementation.

- Five SPD employees became certified to facilitate the Outward Mindset program.

- The Outward Mindset program was incorporated into the core of the new Before-the-Badge program for all new recruits prior to attending the academy.

- All Community Service Officers (CSOs) went through the Outward Mindset program to enhance teamwork and improve their ability to help community members with their unique needs.

- All civilian and sworn supervisors, including sergeants, lieutenants, and captains, have now completed the program.

- All OPA supervisors including the director have participated in the Outward Mindset program.

Sentinel Event Review – Comprehensive Response
July 28, 2023

- Starting in the fall of 2023, 50 SPD leaders (including Command Staff) will participate in a one-year intensive Outward Mindset Leadership program which includes the application of the Outward Mindset concepts throughout the department as well as small cohorts for discussion and individual coaching for support.

**Before the Badge (BTB).**  This multi-week program is designed to provide pre-academy recruits with foundational knowledge, skills, and relationships to succeed as partners in the community and leaders in our department.  The program includes several distinct modules that include:

- **Community Centered Dialogue and Learning** is built on the central tenets of relational policing: transparency, honesty, acknowledging mistakes and challenges, and collaboratively identifying areas for improvement and opportunities for growth.  Recruits learn that every encounter is an opportunity to build trust and develop skills to engage respectfully in difficult conversations.  In addition to topics relating to the history of policing in America and Seattle, recruits engage and learn directly from communities most impacted by policing, including currently and formerly incarcerated persons, personal who have experienced violence, immigrant and refugee communities, local business communities, and students.  Recruits walk beats in each of the precincts, meets with demographic and precinct advisory councils, participate in volunteer opportunities, and learn about expectations, priorities, and challenges that may be unique to each precinct.  This module also includes learning about brain development and the impact of childhood trauma, poverty, addiction, and other societal stressors on many with whom officers will come into contact.

- **Wellness and Professional Development** includes training on the neurophysiology of stress, identifying early warning signs, and tools to build resilience.  Recruits are introduced to existing training around wellness and peer intervention, including Active Bystander for Law Enforcement training, to give them the skills to intervene with themselves and others before their behavior may take them down a negative path.  A central objective of this module is to counter any stigma around the utilization of wellness services and to emphasize the importance of self-care.  Active Bystander for Law Enforcement (ABLE) training – a training that all sworn members of SPD have received and that empowers colleagues to intervene with each other when they see a colleague going down a negative path – is introduced as a measure to be welcomed as a supportive tool.

- **Public Safety 360** introduces recruits to the administration and structure of SPD and others in the public safety system.  Recruits interact with both sworn and civilian command staff members, learn about the different units within the department, and ride along with officers in each precinct.  Recruits hear from public safety partners, including prosecutors, defenders, social services, and outreach programs.  Particularly as public safety is re-examined locally and nationally, this module aims to provide a welcome to the department and a baseline understanding of their roles in a more holistic model of public safety.

Sentinel Event Review – Comprehensive Response
July 28, 2023

More information about this program, which is now routinely studied for replication by departments around the country, can be found on our website at https://www.seattle.gov/police/community-policing/before-the-badge.

**Officer Wellness.** Occupational safety has long been an unquestioned priority for law enforcement generally.  Recognizing the physical demands of the job, many agencies equally prioritize the physical health of their officers through either mandatory physical fitness requirements or incentive packages to maintain a level of physical well-being.  Yet despite the overwhelming body of research showing the psychological damage caused, acutely and cumulatively, by the vicarious trauma to which officers are routinely exposed, the undeniable interplay between mental health and physical well-being, and the impact of both on officer performance, it has only been relatively recently that the urgency of prioritizing first responder mental health has been advanced as an integral and equally critical component of comprehensive police reform.

The integrity of officer wellness to comprehensive reform efforts is evidenced through the evolution of DOJ investigations and actions since the Final Report of President Obama's Task Force on 21st Century Policing was published in 2015 (three years after Seattle's Consent Decree was negotiated). This report, which sets standards on which many DOJ actions and Consent Decrees are based, calls out Officer Wellness as a key pillar of reform, on equal footing with other core pillars (such as those that are reflected in Seattle's Consent Decree). Of note, whereas Seattle's Consent Decree focuses almost exclusively on issues concerning transparency and accountability in police/community interactions and operations, Consent Decrees implemented in the years following show the increasing awareness at the federal level of holding jurisdictions and agencies equally accountable to their officers – of ensuring that officers are receiving not just the training they need to provide the community the safe and Constitutional policing it deserves, but the support they need to mitigate against the daily trauma they are expected to bear.  The DOJ's 2017 Findings Letter into the practices of the Chicago Police Department, for example, emphasized this point:

> Policing is a high-stress profession.  Law enforcement officers often are called upon to deal with violence or crises as problem solvers, and they often are witness to human tragedy. … The President's Task Force on 21st Century Policing put it well, noting that "the 'bulletproof cop' does not exist.  The officers who protect us must also be protected – against incapacitating physical mental, and emotional health problems as well as against the hazards of their job. Their wellness and safety are crucial for them, their colleagues, and their agencies, as well as the well-being of the communities they serve.'

A report from DOJ to the Congress in support of the Law Enforcement Mental Health and Wellness Act of 2017, signed into law in January 2018 with broad bipartisan support, likewise urged:

> Good mental and psychological health is just as essential as good physical health for law enforcement personnel to be effective in keeping our country and our communities safe from crime and violence. An officer's mental state affects his or her behavior in a variety of situations and can influence decision-making and judgment. However, the current state of support for officer wellness nationally is disjointed and faces both cultural and logistical obstacles.

Sentinel Event Review – Comprehensive Response
July 28, 2023

The daily realities of the job can affect officers' health and wellness. They face a constant need to be vigilant, long hours and shift work, exposure to the daily tragedies of life, and regular interaction with people who are in crisis or hostile toward them. Patrol officers face a national undercurrent of heightened public scrutiny of the profession that overshadows the legitimacy of their individual efforts. … All of these things added to the ordinary hassles of the workplace and their personal lives can lead to cumulative stress and burnout.

Officers anticipate and accept the unique dangers and pressures of their chosen profession. However, people under stress find it harder than people not experiencing stress to connect with others and regulate their own emotions. They experience narrowed perception, increased anxiety and fearfulness, and degraded cognitive abilities. This can be part of a healthy fight-or-flight response, but it can also lead to significantly greater probabilities of errors in judgment, compromised performance, and injuries. Failing to address the mental health and wellness of officers can ultimately undermine community support for law enforcement and result in officers being less safe on the job.

While SPD has long had an established and robust peer support program, SPD has historically lagged far behind other similarly situated jurisdictions in providing and prioritizing comprehensive, pro-active in-house wellness-based services. Over the past few years, recognizing the fundamental risk management value of providing employees the supports they need to be at their best when meeting the demands of their duties, SPD has pivoted to elevate in-house wellness as a central pillar of its core priorities and commitments. SPD's Wellness Unit, comprising both sworn and civilian members, now provides critical in-service support services, including critical incident stress debriefing, roll call check-ins, advisory work, mentorship programs, multi-faith chaplaincy referrals, enhanced peer support, referrals for outside services where appropriate, and training. SPD is in the process of recruiting an executive level, licensed clinical psychologist with experience in first responder trauma to further grow this unit.

**Proactive Integrated Support Model (PrISM).** As part of its obligations under the Consent Decree, SPD established an Early Intervention System (EIS), intended to provide supervisors insight into employees at risk of "problematic behavior." Consistent with empirical study of other similar systems in other agencies that called into question the efficacy of the model, external review of SPD's system found the methodology to be rife with false positives, weak at identifying true positives, viewed as punitive and ineffective, and with disparate impact on female officers. With support from the DOJ and the Monitor, SPD is nearing implementation of a new system that, consistent with the social science view that problematic performance can be to some extent a behavioral manifestation of the cognitive and emotional strain inherent in the policing environment. The new system is rooted in examining factors far upstream of performance indicators that are empirically predictive of a future negative outcome if left unmitigated. Based on principles of wellness, mentorship, and positive supervision, this approach has gained national attention as an innovative model of proactive support.

Through this lens of root cause remediation and mitigation and against the backdrop of this work over the past two and a half years, we now turn to the recommendations offered by the SER panels. As one final caveat, we ask that readers remain mindful of two important points: (1) These recommendations are, consistent with protocols of a sentinel event review generally, those of lay citizens selected to

Sentinel Event Review – Comprehensive Response
July 28, 2023

serve on the panels. They are not necessarily OIG recommendations that have been vetted against best practice, deconflicted with others in the City's accountability structure, or socialized with stakeholders who may feel differently. And (2), in several instances, recommendations reach into matters that are directed by other City departments or programs; where collaboration is required, we pledge our engagement in any discussions that may follow.

## 1. <u>Accountability</u>

### Recommendations

- Ensure that officers are held accountable for securing their weapons at all times and that violations of SPD policies on these matters are investigated and enforced.

- In the event of an evacuation of a government building or other emergency, strategic decision-making should be done at the highest level of government with accountability and transparency.

- SPD should ensure processes for transparency and accountability are in place in case of evacuation or another emergency.

- SPD should ensure appropriate recordkeeping and documentation during significant planning and decisions during large-scale protests.

- SPD should conduct and publish an After-Action Review of actions taken during a large-scale protest response within 60 days of the incident, including all non-confidential materials used in the review.

- Evaluate current Use of Force reporting during protests and large-scale events to ensure accuracy and sufficient level of detail, including requiring explicit justification for each instance of force used and prohibiting the use of "boilerplate" justifications, and ensuring officers complete reports in a timely fashion.

- Acknowledge the importance of discipline and corrective action for accountability as well as community's perception of legitimacy of disciplinary processes and evaluate current disciplinary policies and procedures to ensure consistency and appropriate levels of discipline.

- Acknowledge the harm to BIPOC community caused by SPD actions over time and issue a public apology for the actions of SPD during the 2020 protests.

### Response

Like "culture," "accountability" is a word often referenced but without clear definition. In some circles, "accountability" seems inextricably conflated with discipline, with little room for mistakes, and remediation that can only be achieved if punitive measures are meted out. In others, "accountability" means reaching deep into root cause analysis, understanding the circumstances that led to an action, identifying failures (whether systemic or individual) along the way, and implementing measures to address deficiencies, whether in policy, training, supervision, governance, and/or – where

Sentinel Event Review – Comprehensive Response
July 28, 2023

warranted – discipline.  As designed under the Consent Decree, internal systems of accountability are directed towards that iterative improvement – identifying negative (or positive) outcomes through a critical review of events to drive continual refinement of policies and training.  Although policy requires SPD to refer to the Office of Police Accountability any policy violations identified, investigations into such violations, and recommendations as to discipline, are handled by that office, subject to oversight by the Office of the Inspector General (as designed under the City's Accountability Ordinance, SMC Chapter 3.29).

The legitimacy of any accountability process is inherently riddled with nuance between perception and the reality.  For example, of the estimated 19,000 contacts OPA received relating to the 2020 protests, it is estimated that more than half (around 13,000) were specific to one incident, reviewed by the SER panel, in which it was alleged that a seven-year-old boy was pepper sprayed by a named officer (with cell phone video of the aftermath and the officer's personally identifying information subsequently going viral). Breaking down the incident, OPA identified that (1) the seven-year-old was not pepper sprayed; instead, pepper spray was transferred onto him by his father, who in turn received a transfer of pepper spray from the original subject to whom pepper spray was applied (in an incident in which the force was found consistent with policy) and (2) the officer whose information was published on social media worldwide was, in fact, not the officer applying the force.  This incident illustrates the complexity: while fully understanding how optics often drive perceptions of an event, accountability measures must be both grounded in factual accuracy *and* appropriately directed, if the system is to have legitimacy.  This, of course, takes time.

At a systemic level, requirements and timelines inherent in the ordinance-created accountability processes that – while understandable for purposes of thoroughness, fairness, and completeness – also impact supervisors' ability, particularly in the case of minor policy violations, to timely address errors. For SPD employees, any policy violation, however minor, is referred to OPA, and employees are prohibited from discussing the substance of the allegation.  This can be contrasted with other agencies and businesses, where supervisors are expected to address minor issues in a timely manner, often through training or mentoring.  This means, in the case of SPD employees, that complaints are typically subject to a six-month investigation process, sometimes longer.  While SPD appreciates the work of OPA to streamline complaints to the extent it can, SPD also strongly supports a model that empowers supervisors to take firmer action in managing their squads.

At a procedural level, as many of the SER recommendations reflect, it is the stark reality that, however refined and comprehensive existing policies and practices (all previously court-approved) were, usual protocols were quickly overwhelmed by the magnitude, duration, intensity, and distribution of the protests, in addition to added complications imposed by the strain of the still-early weeks of the pandemic. Policies and protocols, particularly around planning, use of force reporting, and after-action review that easily apply in the ordinary circumstances for which they are drafted were impractical, if not impossible, to comply with under the rapidly evolving, escalating, and ongoing circumstances at hand.  Recognizing this, SPD engaged with OPA, the OIG, the CPC, DOJ, and the Monitor to establish an alternative procedure – leveraging the accountability roles of OPA and the OIG – for ensuring that force was reported, thoroughly reviewed, and evaluated, and that appropriate channels were identified for capturing the lessons learned that would typically fall within an after-action report.  This protocol, which contemplates agility and recognizes that the extraordinary nature of such events is often

Sentinel Event Review – Comprehensive Response
July 28, 2023

incompatible with prescriptive and precise directives, are now captured in policy revisions to Manual Section 14.090 (Crowd Management, Intervention, and Control) and Manual Section 8.500 (Reviewing Force), which provides (POL-6):

> This policy recognizes that there may be long periods of civil unrest or other large-scale events where the investigation and review processes set forth in this policy are not feasible in a reasonably timely manner. In such instances, the Chief of Police will consult with the Director of the Office of Police Accountability, the Inspector General for Public Safety, and the Director of the Community Police Commission, to determine whether department goals of critical review, transparency, and accountability are better and/or more timely achieved through alternative process(es), within SPD or in coordination with the OIG.

Other policy revisions related to SER recommendations in this category have also been implemented. SPD Manual Section 9.060 (Firearms) requires employees to take reasonable precautions to assure that any department-authorized firearms are safely stored and "in such a manner as to prevent loss or access by unauthorized persons. Revisions to 14.090 (Crowd Management), discussed more fully below, provide clearer guidance for documentation and assessment.

One specific recommendation in this category warrants individual attention. While much of the work SPD has done over the past two and a half years towards reconciliation and healing with the community has been through personal interactions and engagement, from officers up to the Chief, in June 2021, Chief Diaz issued this public statement, which bears reiterating here:

> To say that the last 18 months have been challenging is an understatement. The global pandemic brought sharply into focus disparities and service gaps at the complex intersection of public safety, public health, and public welfare. The virus and resultant but necessary restrictions further stretched capacity within the safety net of social services that provide basic food, shelter, and health resources. The deaths of George Floyd in Minneapolis, Breonna Taylor in Louisville, and so many others around the country at the hands of police created long-overdue urgency to address the systemic racism that pervades institutions far upstream of police – in housing, healthcare, education – and that are perpetuated throughout the criminal justice system. Amidst often hostile rhetoric, SPD experienced an unprecedented exodus of officers to other jurisdictions, including many from SPD's newest, best trained, and most diverse recruit classes, that dropped SPD to its lowest deployable patrol staffing levels since the 1980s. These converging challenges, each complex, are hallmarks of what is unquestionably a pivotal point for policing.

> At the same time, from these challenges emerge unique opportunities. The unprecedented events of this past summer were in many respects a "stress test" in extreme conditions of those systems established through the Consent Decree for self-assessment, review, and iterative reform. A Consent Decree cannot cure all injustice that may result in the next crisis, but it can ensure that when crises arise, the department has in place structures, processes, and capacity to ensure that lessons learned continue to inform tactics, policies, and training as they evolve. Without in any way seeking to minimize the real harm that many experienced this past summer, SPD believes these systems have shown themselves to be intact and strong. Within weeks of

Sentinel Event Review – Comprehensive Response
July 28, 2023

the death of George Floyd, SPD reviewed its policies to ensure alignment with calls for change. Reflection in the midst of protests gave rise to tactical adaptations, since incorporated into new policies and training, that led to a marked shift in how we manage events such as those that overwhelmed us, as they did cities across the nation, at the time.  Collaboration with the Office of Police Accountability, the Office of the Inspector General, and the Community Police Commission ensures that continuing analysis will inform yet further iterations of policy, in the spirit of the on-going reform the Consent Decree sought to ingrain.  Of particular note, SPD is grateful for the partnership of the OIG in bringing together SPD commanders and experts based throughout Europe to share knowledge on communications and understanding crowd dynamics, as well as for the invitation to engage in the OIG's community-based Sentinel Event Review, which represents, for Seattle, a first-of-its-kind opportunity for reform grounded in reconciliation and healing.

…

We also know that paramount to the success of these efforts, and overarching all that we do, is our ability to restore the community trust that we know was shattered over the events of this past summer.  We know that trust, especially in times of crisis, is a sacred promise that can be easily broken, and that restoring this trust requires not simply difficult conversations along the way, but true action.  I pledge, for as long as I am privileged to hold the position of Chief of this department, that building community trust, grounded in principles of relational policing, equity, transparency, and accountability, will remain my highest priority.  To those who have demanded of us no less, to those who have challenged us, and to those many city and community stakeholders who are partnering to re-envision how public safety services in this city are delivered, I extend my deepest gratitude and respect.  Your vision, your experience, and your perspective are and will always be critical to driving change for the better.  And to all with whom trust has been broken, to members of the community and the department alike who bear the physical and emotional scars from this past summer, and to all who are hurting: I am deeply sorry.  Reform means that we accept the responsibility that is ours to bear, we learn from our experience, and we consistently strive to do better.  We have, we can, and we will continue to do better.  We will never stop listening.

It is in that vein and with this spirit of reconciliation, healing, and resolve that we offer this summary as to the work ongoing and upcoming within SPD to ensure that even as challenges and set-backs arise, we correct course, and we hold true to our commitment to be the department that our city, our communities, and our employees deserve.

Apologies may be easily said; living up to a promise is more difficult.  SPD genuinely hopes that the sincerity of its apology and its commitments to promises – both to the community and the officers who have given so much to this department – are manifest in the work it has done over the past two and a half years, including in the initiatives described in the preface to this response.

Sentinel Event Review – Comprehensive Response
July 28, 2023

## 2. Communication

### Recommendations

- Enable better interaction with demonstration organizers in advance of protests, SPD should build legitimacy through expanded community policing initiatives, including the expansion of foot patrols, and build deeper personal relationships between officers and individuals throughout the communities of Seattle.

- Engage in direct and ongoing community dialogue to understand and adapt to the diverse community perspectives about the institution of police.

- Evaluate whether an encrypted standardized alert messaging system (e.g., WhatsApp, Yammer, or other technology) could replace radio communication during crowd facilitation events.

- Establish the Incident Command Post and communication lines to officers facilitating protests or demonstrations so that the Incident Commander can observe multiple events in different locations simultaneously and receive real-time updates about each event, from officers trained in supervision of crowd events who are physically present at each protest or demonstration.

- If short term closures of street or blockages of specific intersections are necessary for the safety of the crowd, SPD should ensure that its officers can adequately inform individuals in the crowd of the reasons for the blockages and provide them with adequate alternative options to continue moving.

- In addition to the use of the LRAD, which has proven effective in ensuring that communications are heard, exploring feasibility of leveraging the "Alert Seattle" and communications network within the Emergency Operations Center to provide real-time information to the community.

- Ensure that all limitations on crowd behavior or conduct are designed to maximize the safety of individuals in the crowd, and that any communications about such limitations articulate that safety rationale in ways that emphasize LEED principles. Specific messages should be conveyed in simple, layperson terms that are accessible to all, and should be focused on explaining the public safety necessity of motivating the message.

- Improve SPD's capability to inform and communicate with demonstrators during group events in the following ways: 1. Multiple modes of communication should be considered, including audio, video, other visual media (e.g., posters, banners, etc.), social media, and others; 2. The modes of communication and specific messages should be included in the Incident Action Plan created by SPD prior to events and updated throughout the pre-event planning phase; 3. The communications should be documented and recorded during the event, including by having officers certify their use on police radio that is retained by SPD; and 4. Their impact should be evaluated and specifically assessed in post-event review by SPD.

Sentinel Event Review – Comprehensive Response
July 28, 2023

- Procure a suitable audio devise to ensure that the crowd can hear messages relevant to the event.

- Communicate in advance when it plans to create barricades or restrictions to protesters or marches. The reason for the creation of such zones should be clearly articulated and driven by a public safety rationale.

- SPD and City should coordinate and jointly create designated officers/staff in both SPD and the City who are responsible for engaging with residents and businesses affected by civil unrest or large-scale incidents causing similar disruption. (Emergency Community Communications Officers (ECCO)).

- As set forth in OIG's Review of the SPD Crowd Dispersal Policy and Less Lethal Weapons Report in August 2020, SPD and the City should "[p]rovide public education concerning crowd dispersal policies, procedures and overall SPD crowd management tactics." These materials should be easily accessible and provide information that can assist residents and bystanders who may be affected by nearby deployments of crowd dispersal devices (e.g., CS gas, OC spray, or "blast balls").

- SPD should conduct a public education campaign alerting the public to the specific harm that lasers can cause when shined into the eyes of others, and to the state laws surrounding their usage.

- SPD should develop a public education program regarding tactics when arresting someone. The program should include education about the number of officers used to conduct the arrest, the rationale for arrest procedures and an openness to discussion with community about ways to improve these tactics.

- SPD should research and enhance policy requirements for increased communication with crowds, especially during large or stationary protests, to manage expectations and provide greater credibility for police action.

- SPD and SFD should attempt to coordinate with civilian medics participating in crowd events prior to the protests and establish a plan for care of injured or incapacitated persons during the event. In situations where coordination before an event is not possible, SPD and SFD should ensure civilian medics within crowd events have an established and continuous communication method with SPD and SFD to coordinate the efficient and safe removal of anyone who has been injured or incapacitated during a protest or crowd event.

- SPD and the City of Seattle should ensure Seattle neighborhoods are not left without public safety and other essential services. If City government is prevented from accessing an area, it should make every effort to provide city services and emergency response. The City should assign a City liaison to facilitate communications with impacted community members about service provision or interruption.

- SPD should improve internal channels of communication to increase efficient and timely collaborative decision making amongst command and with officers.

- SPD should ensure coordinated communication of goals so the public has a clear understanding of SPD actions.

Sentinel Event Review – Comprehensive Response
July 28, 2023

- SPD and the Mayor's Office should publicly communicate rationale for decision-making during large-scale protest response to decrease mistrust on the part of the public and officers.

- An SPD Public Information Officer should accompany the Incident commander to important or large-scale events.

- SPD should amend SPD Communications policy (12.010) to require all SPD radio transmissions to be recorded and stored for a specified period to allow for appropriate after-event review. SPD officers should not use unrecorded radio channels to transmit information, whether such lines are public (unencrypted) or secure (encrypted).

- SPD should implement a system for daily debriefs with reports at the officer, supervisor, and command levels during emergencies. These debriefs should be sent to the SPOC and EOC to assist senior officers in managing the emergency, as well as to assist senior officers in communicating important information back to those squads.

- SPD should evaluate the utility of a circular organization chart, where information flows internally from one bureau to another.

- SPD should develop a policy framework to guide public communications to ensure assertions are credible and supported by reliable information before dissemination.

- SPD and the City of Seattle should establish a reliable and effective communication strategy to address the provision of public safety and other City services during "occupy" style protests.

- SPD and the City of Seattle should ensure a strategy for events that may impact neighborhoods, including appropriate contact information and identification of appropriate stakeholders.

- SPD should use POET (Public Outreach and Engagement Team) officers to work with protestors to establish systems and procedures for providing other emergency safety and medical assistance.

- Ensure that SFD and SPD operational staff have real-time, direct lines of communication during emergencies.

- Implement a unified radio channel for dispatchers that responding officers from both SPD and SFD use for direct communication and rapid coordination when responding to a potentially dangerous scene.

- SPD and the City of Seattle should ensure public statements by SPD and City government are accurate.

- Implement a staging area for media where possible.

- Develop a process to identify a visual signal for media to obtain from SPD and wear as identification.

- Explore other policies and practices from other jurisdictions regarding media presence at protests and events to incorporate best practices.

Sentinel Event Review – Comprehensive Response
July 28, 2023

- Work with a diverse range of local media outlets to identify best practices for facilitating observation.
- Develop a process for POET officers to communicate with media during crowd events.

**Response**

The fact that so many of the SER recommendations focus on matters of communication underscores the critical point that – let alone whether crowd members can hear police direction – when the purpose of police action is not communicated or understood, crowds tend to coalesce around a unifying belief that it is their simple act of assembly, and the purpose of their assembly, to which the police were reacting.

While the principles of outreach, engagement, and transparency have long been fundamental to managing large crowds, over the past two years a growing number of agencies in the United States, borrowing from structures common in the United Kingdom and Europe, have begun to formalize units dedicated to open channels for communication and information flow. With appreciation to the Inspector General, who introduced crowd psychology expert Professor Clifford Stott to SPD, SPD has leaned into this approach, formally establishing its Police Outreach and Engagement Team (POET). Serving in khakis and polo shirts, rather than regular uniform, unit members serve as liaisons between crowd organizers, members, and operational commanders, checking on crowd members' well-being, and offering aid and guidance as requested. While always difficult to measure outcomes avoided, the success of this approach can be argued from the fact that, since this unit was stood up, it has deployed to approximately 20 large scale city-wide events, all of which have proceeded without incident.

- Measures to facilitate communication are now baked into policy and practice. Building on initial post-2020 revisions to SPD's Crowd Management policy (Manual Section 14.090, approved by the federal court in 2021 and which incorporated early lessons learned from the field and from SER), SPD's current policy contains clear direction on communicating during large scale events. Such direction includes:

  o Formalizing ongoing POET engagement with event organizers, participants, and stakeholders in facilitating lawful assemblies (speeches, marches, demonstrations, rallies, picketing, public assemblies, protests, celebratory events);

  o Using sound amplification equipment to ensure that directions to crowds are heard/received;

  o Utilizing social media and Alert Seattle applications to disseminate information;

  o Documenting any issues with communication in event debrief forms;

  o Repeating directions as feasible and necessary;

  o Providing, where practical, an area for media and legal observers to assemble outside of an anticipated impacted area, but within viewing distances and audible range of the event (without restricting any member of the media or legal observers to such area).

Sentinel Event Review – Comprehensive Response
July 28, 2023

SPD also continues to work with City partners, including Emergency Operations, Fire, SDOT, SPU, and Parks to identify further opportunities to improve communication and cooperation. Additionally, during large-scale events, SPD embeds a public information officer at the scene to (a) liaise with the media as appropriate and (b) assure that information is accurate and current.

Finally, SPD supports panel recommendations aimed at fostering greater transparency and understanding outside the immediate context of a crowd management event. SPD's Before the Badge initiative, described earlier in this report, is aimed directly at this goal. SPD has, since 2020, also hosted events to familiarize community groups with certain tools that SPD uses, including discussions about policies and training around the use of such tools. Consistent with one recommendation, SPD has adopted a circular organization chart specifically to embed a culture of information exchange and collaboration between bureaus.

SPD stands ready to continue discussions on better and more collaborative ways to foster communication in regard to recommendations that extent beyond SPD and welcomes continued OIG and CPC collaboration.

### 3. Crowd Management

#### Recommendations

- Alter SPD's strategy for policing protests to focus more explicitly and comprehensively on the facilitation of peaceful assembly and ensuring the safety of protestors. The focus and mindset of SPD officers deployed to assist in crowd events should move away from "crowd management" "crowd control" and Law enforcement" to "facilitation of speech" and "crowd protection and safety."

- Embrace procedures that visibly signal SPD's commitment to ensuring the safe and peaceful gathering with the minimum necessary engagement of SPD officers and limit that engagement to: promoting the ability of individuals and groups to express First Amendment freedoms; protecting the physical safety of individuals within as well as beyond the crowd and preventing the destruction of public or private property.

- Modify SPD's tactics of crowd facilitation to prioritize communication, de-escalation, and carefully conducted removal of those who are creating an immediate danger to others or causing destruction or to property, allowing the rest of the event to continue undisturbed.

- Provide officers with clear direction about SPD's priorities in facilitating demonstrations, particularly when the institution of policing is the focus of the protest. SPD's focus should be on facilitating access and safety for all. SPD should enhance the ability to address dangerous situations with minimal impact on peaceful demonstrators while minimizing the use of munitions or indiscriminate force.

- Use mobile response units (e.g., bicycle or other vehicles) that are distinct from crowd facilitation officers or "dialogue officers" to address agitators or instigators of violence in the crowd. Mobile response units should remain out of sight and in reserve unless and until

they are needed and engage in ways that permit individualized attention and minimize the impact on peaceful protestors and on the event in general.

- Avoid the deployment of officers in ways that prevent pedestrian/crowd movement or that separate individuals from other areas of protest without a clearly articulated safety rationale.

- Seattle City Council should consider whether CCTV camera footage could be kept by a third party for a limited time, and accessible to SPD or other appropriate parties upon request for suitable public safety purposes, including the ability to track stolen police weapons that would pose an imminent danger to the community.

- The Mayor's Office and SPD leadership should critically examine the utility of a curfew and should exhaust other messaging options before declaring one. If a curfew is announced it should be limited in scope and clearly focused on public safety, rather than the deterrence of public protest.

- Establish protocols to guide officer responses to property crimes occurring during significant public disorder events. These protocols would, among other things, establish clear guidance for officers on: a. when to disperse and when to arrest individuals who may be committing property crimes during civil unrest; b. how to conduct arrests of individuals who require prone handcuffing; and c. how to arrest individuals committing property crimes without escalating tensions between SPD and observers of the arrest.

- SPD incident commanders should maximize the buffer space between officers and the crowd whenever possible.

- On-site incident commanders should carefully evaluate the context and threat from a crowd, with assistance from "dialogue officers" in the crowd.

- Consider the creation of dialogue officers to ensure effective, real-time, de-escalatory communication between SPD and Protestors.

- In keeping with SPD's commissioned report after May Day 2015, SPD leadership, including the Chief, should be fluent in all SPD rules of engagement and understand specific "if/then" scenarios contained in the rules.

- SPD should embrace and maintain principles of procedural justice in all of its communications and tactics relative to the facilitation of crowd events.

- During protests, SPD should ensure that protesters are protected from vehicular traffic and ensure a constant ability to visually monitor those barriers.

- As set forth in OIG's Review of the SPD Crowd Dispersal Policy and Less Lethal Weapons Report in August 2020, SPD should research and enhance policy requirements for increased communication with crowds, especially during large or stationary protests, to manage expectations and provide greater credibility for police action. SPD should prioritize "normative compliance," that is, crowd agreement with SPD requests due to their legitimacy, over "instrumental compliance," or the use of tools (e.g., less lethal weapons) to force compliance.

Sentinel Event Review – Comprehensive Response
July 28, 2023

- SPD should prohibit the use of ruses for crowd management or control purposes. If a ruse is justified during a crowd event or other emergency, any officer ordering a ruse should (a) be in the chain of operational command set forth in the daily briefing sheet; (b) document the circumstances Justifying the ruse, the substance of the ruse, and the outcome of the ruse; and (c) inform and document communication to others in the chain of command on the existence, timing and content of planned ruse transmissions. SPD should specifically task appropriate members of the chain of command to coordinate the ruse if these conditions are met.

- SPD should ensure all officers at the rank of Lieutenant and above receive thorough training on all aspects of crowd management and emergency response, so any officer in SPD leadership can capably staff the EOC, the SPOC, or other crowd event response structures.

- Task POET officers with identifying certain protestors as point-people and coordinating direct communication.

- Station POET officers strategically within crowds of protestors to communicate with officers on the front lines and to provide information about the crowd's ability to move back, and to safely facilitate such movement.

- Station POET officers in police vehicles equipped with LRAD to effectively communicate with the crowd.

- Develop an ongoing assessment of the feasibility of crowd movement to increase on-the-ground awareness.

- SPD should ensure a diverse set of officers with relevant operational authority are permitted to observe and/or participate in strategic and tactical discussions during emergencies to allow for differing perspectives and critical evaluation in decision making.

- SPD should consider implementing a departmental culture evaluation to identify and address barriers for officer of color being promoted to leadership roles within the department and encourage attention to identifying and reducing bias across the department.

- SPD should provide increased health and wellness services to 911 call-takers and other emergency services employees.

- Establish a staffing model for crowd events such that protests of the size and scale of the Westlake protests can be suitably staffed with mobile officers and other facilitation while minimizing SPD intrusion into the protest.

- The Mayor's Office, SPD, SFD, the Department of Transportation and other departments should conduct appropriate scenario planning for disruptive protests. In particular the scenario planning should ensure that sufficient resources are deployed so that other SPD locations can protect and serve the people of Seattle in the event that public service from one or more of its buildings are disrupted by protest and ensure that sufficient public transportation exists to help protesters leave a protest where an unlawful assembly or curfew has been declared or a legal order to disperse has been issued.

Sentinel Event Review – Comprehensive Response
July 28, 2023

- Develop an arrest policy for each event and convey this to officers beforehand. Flexibility should exist in the tolerance of lower-level misdemeanors balanced against the priority for ensuring the strategic goals of the operation.

- Conduct appropriate scenario planning and provide enough resources so that other SPD locations can protect and serve the people of Seattle in the event that public service from one or more of its buildings are disrupted by protests.

- Prior to planned demonstrations, SPD should coordinate with the City of Seattle and residents to remove barriers to visibility that might reduce safety to protesters during protest events, including, for example dumpsters.

- SPD and the City of Seattle should include OIG in planning meetings to offer recommendations and to stay informed.

- SPD should establish consistent staging points during large-scale protests or in areas where there is no public safety presence. If necessary, establish agreements with nearby businesses or other entities to establish closer staging areas to respond quickly to emergency situations.

- SPD and the City of Seattle should establish consistent rendezvous points for connecting injured people to emergency medical staff.

**Response**

Several recommendations in this category overlap with those in others, and in such cases, we refer back to those initiatives earlier discussed, including Before the Badge, and the discussion in response to recommendations relating to communication (including POET).  And, where recommendations relate to broader City policy and engagement, we reiterate the department's commitment to working with City partners to advance greater alignment.  In this section, we focus on two specific points: (1) evolved philosophy around crowd management that better informs policy and training, and (2) the inherent friction that may emerge between community stakeholders that policy and training must seek to reconcile.

This latter point is reflected, for example, in those recommendations that relate to the response to property crimes.  We wholly acknowledge the perception of some that "property is just property" – that "it is insurable," and that damage to property may pale in comparison to the broader message of the protests.  We acknowledge that arrests in such instances may serve to escalate tensions within a crowd.  At the same time, we also understand that to those who own or lease the property – including small business owners struggling to remain viable –  such damage may reflect a significant threat to their livelihood and thus carries more significance than merely the brick and mortar.   We also emphasize that to dismiss damage to property as "just property" ignores the reality that what may, on its face, be merely a broken window becomes very much a life safety threat when it becomes a portal for flammable material – such as a thrown Molotov cocktail – in a densely populated area.  These are the types of policy considerations that incident commanders are expected to balance, often in rapidly evolving situations where the circumstances limit their immediately available options to a "bad

Sentinel Event Review – Comprehensive Response
July 28, 2023

choice" versus a "worse choice," and without the lens of 20/20 hindsight and known outcomes to guide their assessment.[3]

***We offer that consideration as a way of daylighting in the spirit of honest dialogue the conundrum that arises –*** not as an excuse, and not to suggest that there is no way to untangle that knot.  To the contrary, it is precisely this type of tension that evolved approaches to crowd management – implementing precisely the lessons that can be learned around crowd psychology – can mitigate to some extent.  Consistent with recommendations relating to policy and training rooted in the social science literature in this area, SPD's current Crowd Management Policy (Interim Manual Section 14.090, building off previously approved revisions in 2021) and  its 2023 Crowd Management training[4] are rooted in the following principles:

- Grounding the police approach in an understanding of social identity theory – understanding the impact of a police response in fostering separation and conflict; noting that while individuals may join a protest for myriad reasons, a police response that fails to differentiate among individuals or segments within the crowd and modulate their approach accordingly may foreseeably serve to unite the crowd in competition against the common "other" of the police, thus fomenting the very conflict the police are seeking to avoid.[5]

---

[3] Consider, for example, the use of tear gas to disperse a crowd.  While we wholly acknowledge the negative impact on the community (a lesson learned from the WTO protests and carried forward), it is more difficult to consider that decision objectively in the context of potential outcomes avoided (the "but for" consequences that may have resulted had SPD *not* dispersed the crowd at that time).  With the real fear of buildings catching fire because of actual or threatened arson attempts, the floors of residential housing above businesses and the population density of the area, and the limited access for emergency vehicles to reach the scene, it is not an exaggeration to suggest that an alternative outcome – deaths, serious injuries, widespread damage – may have been avoided through that decision.  While events and the nature of events will vary, consider, for example, the Mardi Gras riots of 2001, following which SPD was roundly criticized for not using available options to disperse the crowd as it had (to great criticism) the night before; consider as well the events on Capitol Hill only a week before this writing (https://spdblotter.seattle.gov/2023/07/26/crowd-obstructs-police-response-on-broadway/).

[4] Two SPD commanders, both of whom have been nationally recognized as experts in crowd management training and tactics, visited Europe following 2020 to learn from the practices of other jurisdictions, including Sweden and England, regarding both the use of dialogue units (POET) and implementation of a response more rooted in understanding how crowd perception can drive crowd behavior.

[5] A paper presented by the Swedish National Police, in discussing the formation of their dialogue units, explains this dynamic well:

> If the police carry out a collective intervention against demonstrators, it creates an "us versus them" situation which may lead to [the result] that a group which started out as heterogenous will unite through the perception of the police as an assailant.  This leads to a considerable risk that the conflict may escalate and that the police may be obliged to resort to increasingly robust methods.  This may have the effect of increasing group solidarity still further in the group.

Swedish National Police Board (2010).  *Dialogue Police: Experiences, Observations and Opportunities*. https://static1.squarespace.com/static/5437a800e4b0137bd4ed4b13/t/594750011b10e3c4c96e684c/1497845774724/Dialogue_bok100630Webb.pdf.

Sentinel Event Review – Comprehensive Response
July 28, 2023

- More robust emphasis on crowd intervention tactics that focus on isolating and arresting law violators within an otherwise peaceable assembly;

- Reducing the SPD visible footprint around these events in order to avoid escalation that may result from an SPD presence;

- Emphasizing de-escalation and force modulation responsive to changes in crowd behavior following an order to disperse.

- A more robust statement of purpose that embraces Seattle's approach to facilitating public assembly, over and beyond what would be required under a strict First Amendment analysis;

- Emphasis on de-escalation and acknowledging the potential for escalating tension through officer appearance;

- Emphasis on crowd intervention strategies where safe and feasible;

- Use social media to communicate expectations and dispersal orders;

- Revising the dispersal order/requirements for announcement to better inform of conditions and reflect expectations;

- Providing consistency in required warnings around the use of less-lethal tools;

- Additional documentation around pre-event planning and tactical considerations (incorporated in revisions to 14.100, incorporated by reference in 14.090).


While again difficult to measure outcomes that did not occur, it should be noted that, since these approaches were implemented, while SPD has continued to respond to and facilitate numerous assemblies, including some potentially volatile, *all* have remained peaceful.


**4. <u>Officer Wellness</u>**

   **Recommendations**

- Implement staffing schedules, and provide officers with breaks, food and water, and pre- and post-event wellness initiative to help officers at crowd events - and especially at crowd events that are critical of SPD and policing - deal with exhaustion, stress, and primary or secondary trauma that might result from their participation at such events.

- SPD should provide safety eyewear and noise protection equipment to protect officers from lasers and sound devices that may be deployed in a protest/demonstration setting.

- SPD should pursue opportunities for officers to express their tensions and frustrations in an appropriate setting and provide guidance on productive ways to channel those emotions to help avoid scenarios in which officers use sarcasm, obscenities, or other displays of disrespect to community members.

Sentinel Event Review – Comprehensive Response
July 28, 2023

- SPD should provide increased health and wellness services to 911 call-takers and other emergency services employees.

**Response**

SPD very much appreciates the panels' recognition of the impact on its officers staffing these events. This acknowledgment is in line with similar reports issued reflecting on the strain of 2020, overall, on law enforcement.  A comprehensive guidebook published by one think tank, for example, noted generally:

> The last few years have presented unprecedented challenges, both to our communities and to public safety officers and first responders – especially law enforcement.  Current events, including COVID-19, political rhetoric and chaos, societal conflict and division, and attacks on the policing institution, individual officers, and officers' families, have created a challenging environment where stress and trauma increased exponentially.  High-stress police operations such as crowd management during periods of civil unrest are mentally and physically demanding.  Crowd management often challenges officers to push their bodies beyond normal limits, leading to poor performance, fatigue, insomnia, and injury.  In the summer of 2020, many officers repeatedly worked shifts that, at times, exceeded 12 hours, for 10 to 12 days straight, leaving little time for appropriate nutrition, rest, exercise, recovery, or sleep.  Large numbers of arrests, long periods on bicycles, standing or moving in formations, or responding to threats are physically and mentally demanding.[6]

Indeed, acknowledging the physiological interplay between stress and demeanor, resilience, and performance – including the ability to employ de-escalation and communication strategies – almost all after-action reports driving best practices in crowd management following 2020 emphasize the importance of attending to the human needs of officers.  As a department that in many respects is still struggling with organizational trauma, that is thrust back into those dark moments with every negative headline written (while fully acknowledging,  in some instances, that is our own unforced error that may bring about the story), and that continues to stress its officers to compensate for the significant loss of personnel following 2020, SPD is grateful for the grace reflected in these recommendations.

With respect to recommendations relating specifically to industrial safety, SPD has supplemented its equipment for officers with better eye and ear protection.  Concerning stress mitigation, in addition to the ongoing services provided by the Wellness Unit (described earlier in this report), measures emphasized in incident planning now include, consistent with these recommendations, ensuring that pre-event planning includes regular rotation of officers, that respite stations where officers can rest, with food and water, are provided, that officers are reminded to lean into principles of active bystander training and intervene when they see fellow officers exhibiting indicators of stress, and regular debriefings for officers following events with mental health practitioners, peer support, and chaplains.

---

[6] National Policing Institute (2021). *Staying healthy in the fray: The impact of crowd management on officers in the context of civil unrest*.  Arlington,VA.  https://www.policinginstitute.org/publication/staying-healthy-in-the-fray-the-impact-ofcrowd-management-on-officers-in-the-context-of-civil-unrest/.

Sentinel Event Review – Comprehensive Response
July 28, 2023

We also feel compelled to respond specifically to one important recommendation from the panel – that "SPD should pursue opportunities for officers to express their tensions and frustrations in an appropriate setting and provide guidance on productive ways to channel those emotions to help avoid scenarios in which officers use sarcasm, obscenities, or other displays of disrespect to community members." ***Without in any way attempting to normalize, minimize, or otherwise downplay the inappropriateness of such actions***, two considerations bear on this recommendation.

First, because so much of what officers do and say is captured on video and audio – a working condition that is critical for transparency and accountability but unique to law enforcement – the "safe spaces" that many would take for granted to vent and decompress (offices, vehicles, away from the public) are often not available to police officers. Thus, despite the objectively higher level of occupational stress under which officers operate, any opportunity outside a formal wellness setting to seek respite comes with the inherent risk that statements will be overheard and taken in context that does not account for the strain under which they were made. This point is, again, not to excuse conduct that is unquestionably unprofessional and organizationally embarrassing, but to note that the freedom to decompress that may be taken in other professions is less so in law enforcement.

A second point relates to conduct and statements that may be captured in a setting presumed to be private. There is no question that officers carry tremendous authority, are granted extraordinary privileges, and are appropriately held to an incredibly high standard of conduct on *and off* duty. At the same time, they are human – and coping mechanisms of dark humor are – as they are in any high-stress occupation – not abnormal from the perspective of human psychology. Consider, for example, the prevalence of dark humor in teaching[7] (as a means of coping with increasingly hostile accountability measures directed towards teachers), in the medical field[8] (as a means of coping with the inherent tragedy of sickness and death), and other high-stress environments.[9]

***We reiterate: we offer these points not to downplay the impact on public trust when statements and conduct recorded outside the public space, outside of interaction with community, are daylighted***. We note these because, if an honest conversation is to be had in this space, we must also acknowledge that statements and conduct that some will understandably view as shocking, that when published understandably serve to diminish the public trust, and that will lead many to broadly view the culture of an organization through the lens of that perception, are neither unique to law enforcement nor an

---

[7] Bullough, R.V. (2012) Cultures of (un)happiness: teaching, schooling, and light and dark humor. *Teachers and Teaching*, 18:3, 281-295).

[8] Duenas, A.N., Kirkness, K., and Finn, G.M. (2020) Uncovering hidden curricula: use of dark humor in anatomy labs and its implications for basic sciences education. *Med.Sci.Educ.* 30, 345-354 (noting the use of dark humor as a coping mechanism for the surreal and morbid acts of dissection); Nunes, R.I., Jose, H., and Capelas, M.L. (2018) Grieving with humor: a correlational study on sense of humor and professional grief in palliative care nurses. *Hol.Nurs.Pract.* 32(2): 98-106 (noting the use of humor to cope with end of life); Hardy, C. (2020) Humor and sympathy in medical practice. *Med Health Care Philos*.23(2): 179-190 (noting the prevalence of dark humor often directed at patients). *See also* Segal, J. (2019) Physicians and Gallows Humor. Is it Unprofessional? *Medical Justice*, https://medicaljustice.com/physicians-and-gallows-humor-is-it-unprofessional/ (identifying gallows humor as "grim and ironic humor in a desperate and hopeless situation" and arguing that dark banter between colleagues, outside the presence of patients, is not unexpected, not inappropriate, and not unprofessional).

[9] Potter, ZR (2023) *Laughing through the pain: an analysis of dark humor in trauma-and-crisis centered occupations.* https://pdxscholar.library.pdx.edu/cgi/viewcontent.cgi?article=2550&context=honorstheses

Sentinel Event Review – Comprehensive Response
July 28, 2023

unforeseeable response to professional strain.  It is precisely for purposes of mitigating this stress, breaking down siloes with communities, and providing officers with productive means of identifying and productively channeling their stress that Before the Badge was developed and the Wellness Unit expanded.

## 5.  Procedures

### Recommendations

- Identify a specific area for officers reporting for crowd facilitation duty to convene and leave their vehicles, providing a shuttle system for officers to and from the areas where they are deployed and supervision for the vehicles.

- If exigent circumstances prevent an officer from parking a vehicle at the designated area, officers should notify the SPOC of the location of the vehicle(s), and a designated officer should move the vehicle(s) to a designated safe area.

- Implement a GPS system through the SPOC that allows incident Command to know the precise location of every officer, vehicle, and lethal munition deployed during a crowd event.

- When an emergency creates a public safety need that limits access to buildings, SPD should create a standard, unbiased procedure for ensuring maximum access for building residents and guests.

- SPD should coordinate more effectively with the City of Seattle and relevant agencies to ensure the continued provision of city services (e.g., power, water, waste management, etc.) throughout periods of emergency, including civil unrest.

- SPD Incident Action Plans (IAPs) should follow a standardized approval process that includes review at the appropriate command level to allow for accountability of decision-making. SPD should communicate IAPs to all officers prior to the implementation of the acts set forth in the IAP.

- SPD Incident Command Plans during crowd events or emergency events should include officers with day-to-day operational authority over the resources necessary to address the emergency in question.

- SPD and the City of Seattle should assess which department 911 call-taking and dispatch services should be housed under (note: Seattle City Council voted to move 911 call-taking moved to the new Community Safety and Communications Center [CSCC] on May 24, 2021).

- SPD and the City of Seattle should recognize the role of SPD as public servants in delivering public safety and should develop procedures to ensure continued provision of public safety and essential services in the case of large-scale protests or other instances where regular service delivery is interrupted.

Sentinel Event Review – Comprehensive Response
July 28, 2023

**Response**

SPD has incorporated several of these recommendations into deployment protocols around crowd
management events.  Specifically:

- SPD has re-evaluated the way it mobilizes patrol task force resources and has procured two
retired King County Metro vans for each precinct, which are used to facilitate the ingress
and egress of additional SPD resources from dynamic events.  When a request for task
force mobilization occurs, all precinct officers assigned to the event muster at their
precincts; one officer is the designated driver who drives to a pre-determined location,
drops off the squad, and leaves the area – staying in close enough proximity to be able to
immediate respond to pick up the squad as needed.

- Major deployments of SPD resources are managed by the Seattle Police Operations Center
(SPOC), which leverages these vans and other large conveyance vehicles to move
resources in and out of deployment areas; only department vehicles which are required to
facilitate other operational priorities (road closures, area denials, escorts, etc.) are deployed
into the field to support operations.

- Gaps in location data have been addressed by way of a transition to Motorola PSERN
(Puget Sound Radio Network) radios, which can "geolocate" all SPD officers during large-
scale deployments.  Vehicles are viewable through their mobile data terminals, as all are
equipped with GPS beacons.

- All deployments of less-lethal munitions are documented on the SPOC log, including the
deployment location, and all entries into the SPOC long are timestamped for easy post-
incident reconciliation.

- Concerning coordination with other City departments, SPD provides liaisons to the
Emergency Operations Center during large-scale events and demonstrations when the EOC
is activated.  These liaisons work to ensure the smooth flow of information to and from
SPD.

- SPD follows a standardized process for incident action plans that – in ordinary
circumstances – are pushed out by 5:00 pm the evening before the anticipated event.  While
this process – like others discussed in the section above – was impacted by the scale and
duration of the protests, SPD is satisfied that it is achieving its goals, both for assuring
chain of command responsibilities and, learning from each incident, continual iterative
improvement.

6.  **Situational Awareness**

Sentinel Event Review – Comprehensive Response
July 28, 2023

### Recommendations

- Modify SPD's policy on content neutrality to permit officers staffing a public event focused on issues of policing to demonstrate solidarity with the crowd participants' rights to protest if they chose.

- Eliminate disrespectful statements or actions from SPD officers to individuals or groups protesting.

- Pursue a differentiated approach toward individuals withing the crowd.

- Limit arrests during protests targeted at the police to individuals committing immediate or imminent harm to people or property, and do not arrest individuals for offenses committed at an earlier time unless they can be accomplished in a way that will not escalate emotions in the crowd.

- Train bicycle officers not to arrest individuals for passive resistance techniques like "shoulder-checking" unless the officer(s) determine that the acts are clear, deliberate, and intended to substantially interfere with the ability of the officer(s) to perform his or her immediate public safety responsibilities.

- SPD officers should improve their situational awareness, considering the relationship of their actions to the overall strategy and tactics of the event, and the support available to the officer(s) relative to the size of the event.

- SPD officers should be trained to realize that the existence of Personal Protective Equipment (PPE) or other defensive measures in a crowd of demonstrators, is not itself an aggressive measure requiring an escalating police response.

- SPD officers should eliminate their use of sarcasm or confrontational dialogue with protesters in accordance with 5.001 - Standards and Duties Sec. 10. While the SPD section in question states that "employees will strive to be professional," (emphasis added), SPD should strike "strive to" from the policy and require professionalism.

- Wherever practicable, officers should inform non-compliant persons of their intention to physically touch/move them when necessary to achieve a public safety goal prior to initiating the physical contact.

- Develop policies to address and minimize officer fatigue during long-term protests.

- Consider reducing length of shifts.

- Provide officers with mental and physical support to help reduce stress and exhaustion, including counseling and mental health services and offering sufficient opportunities for breaks, food, and water during shifts.

- Use live CCTV footage and mobile SPD officers, whether on bicycles or in other vehicles, to rapidly intervene with and address groups destroying property.

Sentinel Event Review – Comprehensive Response
July 28, 2023

- Avoid the creation of immovable lines of officers at demonstrations and provide a mobilization plan for the deployment of bicycle or other mobile officers to ensure appropriate and rapid responsiveness to unplanned crowd events.

- Modify the policy and training for prone handcuffing to eliminate body weight pressure being applied above the shoulders of a subject being restrained.

- Monitor crowd activities from a sufficient distance that physical contact between SPD and protesters is not required or likely to unless an individual is an immediate physical danger to others.

- When "leap-frogging" a protest, SPD officers should select alternative routes that minimize the likelihood of exposing officers or crowd participants to unnecessary risks.

- When a crowd prevents safe movement of bikes without contacting individuals in the crowd, SPD bicycle officers should consider dismounting and walking with bikes physically placed between officers and crowd members to minimize agitation and physical contact.

- Construct barricades between protesters and critical pieces of the public safety infrastructure (e.g., the East Precinct) rather than using lines of officers. Such barriers should strike a balance between protecting the integrity of the facility and preserving its accessibility to the public.

- SPD should strive to ensure it has visibility to all parts of a crowd during a protest event or demonstration to ensure the real-time ability to prevent or minimize a mass casualty incident. This may include appropriate rooftop access (with proper consent), or other solutions developed with community input.

- Particularly when police are the subject of a protest, SPD should avoid the creation of immovable lines of officers at demonstrations and ensure that the crowd can move in directions it wants without undue danger from cars or other risks.

- SPD should implement policies limiting deception and ruses to instances in which (a) the ruse seeks to avoid an imminent personal injury or death or significant property damage; (b) the ruse will not itself cause an escalation in tension with members of the community potentially leading to a personal injury, death or significant property damage; (c) the ruse is clearly documented by an authorized command officer or supervisor and communicated to other SPD individuals as appropriate to ensure compliance with the Incident Command System and stated SPD tactical objectives.

- SPD should prohibit broadcasted ruses.

Sentinel Event Review – Comprehensive Response
July 28, 2023

### Response

We divide this response into three subcategories: professionalism, tactics, and presentation.[10]

**Professionalism.**  First and foremost, acts of unprofessionalism violate SPD policy, are unacceptable, and in situations such as protest management serve only to exacerbate existing tension.  As with any policy violation, such acts are appropriately reviewed by OPA and, where warranted, subject to discipline.  Emphasizing again that two truths, however competing, can each be valid, the fact that in some cases acts of unprofessionalism can be explained as a manifestation of underlying stress and fatigue does not make it excusable.

At a root cause level, the work SPD is doing around wellness, and its adoption of measures to address issues called out in the SER (shift length, respite, availability of food and water), are aimed in part at mitigating the impact of inherently stressful situations on officer physiology – allowing time for cortisol levels to retreat, assuring adequate nutrition, etc. – and to foster resilience.

Understanding the tremendous impact of the "ruse" incident specifically, we take this opportunity to address this incident and related recommendations.  As Chief Diaz articulated in the Disciplinary Action Report, agreeing with OPA's finding that what amounted to a deliberate disinformation campaign violated SPD's policies on standards of conduct, while ruses, in and of themselves, are recognized as an accepted tactic by government agents when they fall within the scope bounded by law, ruses that "shock the conscience" can not only lead to legal risk but fundamentally risk undermining the public's trust in law enforcement, as was the case here.  This ruse was found to be squarely outside the bounds of reasonableness; both the scope and content were found to be unprecedented.

SPD is presently working on a revised policy that is intended to provide clearer guidance around the use of ruses to ensure they are limited to circumstances where they serve a legitimate, law enforcement interest; inure to the benefit of the subject to whom they are directed; and do not negatively impact public perception.  Explicit in this policy is a prohibition, in any circumstance, on broadcasting ruses over radio – an act that SPD, in this incident, agreed was unprecedented and unacceptable.

---

[10] We note that two recommendations included in this category relate as well to officer wellness; we refer back to the discussion in an earlier section of this report.

Sentinel Event Review – Comprehensive Response
July 28, 2023

**Tactics.**  Many of the SER recommendations reflect considerations that SPD also identified as the protests wore on, which commanders tactically adjusted to address, and which adjustments are now embodied in both the policy revisions that were court-approved in 2021 and interim revisions currently in place.  These include integrating the lessons of crowd psychology into policy, training, and practice; avoiding the use of static lines; and – importantly – increased communication with crowd members (whether via POET or by amplified sound) to relay intent and foster cooperation around, for example, creating safe egress, isolating individual actors who demonstrate an intent to cause damage or harm, and explaining SPD actions.  Of note and validating both the recommendations of the panels and the adjustments in the field, data around the use of force (see below graphic) show the dramatic impact of this change in tactics – specifically, after peaks of conflict throughout the end of May and into June, and following another peak around July 25th, the use of force dropped off considerably – reflecting a deliberate change in approach.



The department's expectations as to the lens through which officers and commanders are expected to form their tactical response is also cemented in policy (Manual Section 14.090-POL-1 Purpose:

> The rights to free speech and peaceable assembly are guaranteed by the First Amendment to the United States Constitution and Article 1, § 4 and 5 of the Washington State Constitution. The Seattle Police Department (SPD) takes seriously its responsibility and commitment to support and facilitate the exercise of these rights in a fair and equitable manner, without consideration as to content or political affiliation, with as minimal a footprint as is reasonably necessary to preserve public safety and order.

> This policy recognizes that assemblies in Seattle may range from small gatherings that require no police support, to permitted celebratory and/or protest marches, to large-scale, unpermitted demonstrations where activities outside of First Amendment protections, including significant traffic disruption, property destruction, and/or threats of violence may require a greater police presence.

Sentinel Event Review – Comprehensive Response
July 28, 2023

This policy is intended to provide clear guidance to officers, supervisors, and commanders in employing appropriate crowd management, intervention, and control strategies in a manner to facilitate, to the extent safe and feasible, the right to free expression and peaceable assembly. This policy is also intended to provide guidance by which officers and supervisors may objectively determine at what juncture a demonstration or assembly leaves the realm of legal protest and becomes an abridgement on the life-safety and property rights of others. At all times, SPD's response will be based upon the conduct of those assembled, not the content of their speech or affiliation. See RCW 9A.84.010.

The department recognizes that the visible appearance and/or actions of law enforcement may affect the demeanor and behavior of a crowd. It is the department's mission to de-escalate whenever safe and feasible to do so, without compromising public order and safety. The department also recognizes that the unlawful acts of some members of a crowd do not automatically turn an assembly from peaceable to unpeaceable. It is the department's commitment to provide officers and supervisors with crowd management and intervention strategies that allow for the peaceable expression of federal and state rights while at the same time removing individuals whose illegal behavior jeopardize the safety of lawful activity.

**Presentation.**  We consider presentation in terms of both individual officer appearance and the SPD footprint, overall, in First Amendment events.  Regarding the former, SPD understands the community concern that officers in "hard gear" may signify an expectation that events will turn violent, thus in itself serving as an escalatory element.  At the same time, SPD must balance its obligations with respect to occupational health and safety regulations and its duty to provide its employees with adequate protection against foreseeably hazardous circumstances.   Considering acts of arson, potentially blinding lasers being directed into officers' eyes (discussed in a prior SER recommendation), projectiles routinely directed at officers, and a direct attack on an officer that, but for his helmet, might have proved deadly,[11] orders with respect to how officers were equipped necessarily involved a balancing of several factors.  That said, SPD's crowd management policy now specifically contemplates (as referenced above) acknowledgement the negative impact that the appearance of officers in hard gear may have on crowds; for that reason, in nearly all events that SPD staffs, SPD's preferred approach is to deploy officers in their standard duty uniform and gear.

Several recommendations relating to SPD's visible footprint at crowd events urge SPD to develop tactics to be able to monitor crowds from a distance to minimize their visible presence (e.g., via CCTV or other such technological solutions).  To be clear: SPD would strongly support the ability to be able to meet these recommendations by expanded use of technology; other cities, for example, rely heavily on the availability of cameras in the public space, drones, and other means of providing situational awareness for exactly the reasons that are called out in the SER reports.  Not only does the use of such equipment allow departments to use their human resources more efficiently (critical, in this era of depleted staffing nationwide), it enhances the ability to target situations calling for a police response more precisely. In situations such as crowd management, it would allow officers to identify and isolate individuals who are causing harm more accurately.  Two pieces of City legislation limits SPD's ability in this area: SMC Chapter 14.12, which restricts SPD from collecting certain information relating to

---

[11]  KIRO News, Man sentenced for attack on Seattle officer during 2020 demonstration, March 11, 2022. https://www.kiro7.com/news/local/man-sentenced-attack-seattle-officer-during-2020 demonstration/MS6TJKZ7LBAQ5NZACH77ZAQJ7M/

Sentinel Event Review – Comprehensive Response
July 28, 2023

political activity, and SMC Chapter 14.18, which relates to the acquisition of technology meeting the definition of "surveillance" equipment.  SPD would welcome discussions with the OIG, CPC, elected leaders, and community stakeholders to identify ***and develop appropriate policies around the use of*** technology solutions that not only meet these SER recommendations, but that also would serve to promote the overall peace and wellbeing of the city and the people of Seattle.

One additional recommendation that warrants further discussion relates to adjusting SPD's policy requiring a "content-neutral" approach to First Amendment events to allow officers who sympathize with the crowd's message to overtly convey their solidarity.  In the context of the George Floyd protests, for example, there were SPD officers who took a knee – as there were in jurisdictions nationwide.  To be clear - SPD applauds these officers for doing so in these circumstances but is also mindful of legal landmines around a policy that would allow officers to sympathize with one group but not another, depending on the content.  This becomes particularly challenging in protest/counter-protest events, where the responsibility of the police is to allow both groups equal rights of speech and assembly, without appearing to be aligned with either.[12]

This is not to discount the recommendation at all, but to point out the difficulty in drafting a policy that would allow for such expression by government actors without running up against First Amendment requirements around content neutrality.

7.  **Training**

       **Recommendations**

- Ensure that all SPD officers, not just those officers assigned to crowd facilitation teams are trained in crowd psychology, crowd facilitation, public safety procedures and tactics, and the mobilization techniques likely to be used at future crowd events.

- Provide specific training, including scenario-based training on the management of large crowd events, and on the supervision of officers, for all SPD supervisors and above, including Incident Commanders and officers in the SPOC.

- To reduce perceptions of racial bias in SPD actions, SPD should incorporate the scenario of a white man shooting a Black protester, then walking unchallenged through a police barricade and surrendering to SPD officers into antiracism training for reflection and discussion by SPD officers to encourage equal treatment.

- SPD should use deployments of blast balls during the 2020 protest response as case studies when training new officers on blast ball use in high pressure scenarios.

---

[12] In the spirit of learning from the experience of other jurisdictions, consider the experience of the police in Northern Ireland, where sectarian violence routinely erupted following the Good Friday Accord, as Protestant "Orangemen" paraded through Catholic neighborhoods, challenging police to develop approaches to managing these inherently volatile events in a manner that would allay the perspective that the police, "in attempting to maintain public order, only placate one community at the expense of the other."  See White, B.P. (2000) Walking the Queen's highway: peace, politics, and parades in Northern Ireland.  *San Diego Int'l. L.J.* 1 (175).  We reference this because it is the Northern Ireland experience that in large part informs best practice around crowd psychology and the police response to crowds.

Sentinel Event Review – Comprehensive Response
July 28, 2023

- SPD should require consistent cultural competency and emotional intelligence trainings for supervisors and command staff to encourage deeper understanding of the impact of individual decisions on officers and community.

### Response

SPD's current crowd management training, which follows revisions to the crowd management and use of force policies (as described earlier in this report and in the following section), is rooted in the lessons from 2020, including input from diverse community stakeholders, City partners (including CPC, OPA, and the OIG), and consultation with international experts. SPD contracted with one international expert, widely recognized as the foremost leader in the field of crowd psychology,[13] to craft training that focuses on crowd dynamics, how police engagement can impact behavior, communication, and measures to both minimize the potential for escalation and de-escalate tensions that arise. This training recalls and incorporates other modules of SPD training, including Active Bystander for Law Enforcement (encouraging officers to intervene when they see colleagues at risk of conflict), Outward Mindset (described in the preface to this response), Bias-Free Policing, and others. Concepts around emotional intelligence (inherent in all of the above trainings) are discussed.

Components of revised policies around crowd management and the use of force, as discussed below, are also included.

### 8. Use of Force/Crowd Control

#### Recommendations

- Review SPD protocols related to the presence of batons and their use during crowd facilitation events, potentially eliminating their presence at such events unless justified by a specific and compelling public safety purpose.

- In considering whether to use force during a crowd event, SPD officers must evaluate whether the use of force can be limited to those against whom the force is justified, and that the potential for collateral impact is minimized.

- Ensure that any weapons or munitions brought to protests are securely stored and cannot be taken or used by anyone other than the officer to whom they were issued or other authorized SPD Personnel.

- SPD officers attending protests should not leave rifles unlocked in unattended police vehicles.

- SPD should invest in rifle cabinets with locks that cannot be easily breached by others.

---

[13] Dr. Clifford Stott (https://www.keele.ac.uk/psychology/people/cliffordstott/) also guided some discussions throughout the SER, and SPD appreciates the OIG's partnership in facilitating this connection.

Sentinel Event Review – Comprehensive Response
July 28, 2023

- SPD should consider the utility of "bio locks" on all rifles to ensure that only the officer who is issued the rifle can fire it.

- Ensure access to adequate supplies of OC spray to ensure that CS gas is never deployed due to a lack of access to other preferable or appropriate options.

- Implement OIG's guidance on the use of CS gas set forth in Review of the SPD Crowd Dispersal Policy and Less Lethal Weapons in response to Ordinance 126102.

- Given the highly indiscriminate nature of CS gas, SPD and City Council should restrict use of this weapon to full-scale riot situations involving violence. SPD should also consider prohibiting the use of weapons such as CS solely in defense of property.

- Acoustic and light devices used during extended SPD operations should be placed in ways that minimize their impact on neighborhood residents.

- Firearms with telescoping capabilities should not be used for surveillance when lethal force is not authorized, even if the firearm is disabled.

- As set forth in OIG's Review of the SPD Crowd Dispersal Policy and Less Lethal Weapons Report in August 2020, SPD should review and, if necessary, modify policy language for all less lethal weapons to ensure the policy has consistent warning requirements prior to the use of any less lethal weapon.

- SPD should review its policy and training for using less-lethal munitions in crowd management situations, including the use of less-lethal munitions by mutual aid agencies.

- Clarify current Use of Force policies to require an imminent life-safety threat to justify over-hand blast ball throws and other uses of force deviating from general policy.

- Evaluate the effectiveness of bicycle tactics for crowd control, especially during extended periods of sustained protest activity.

- Clarify SPD policy 8.300-POL-3 to define "bicycle pushes" as opposed to "bicycle strikes," and the proper reporting policy for each.

- Require reporting of all bicycle tactics resulting in contact with a member of the public.

- Log blast ball usage using tag numbers to evaluate reporting, including intent, justification, and outcome.

- Evaluate the use of armored vehicles during crowd events and the impact on community perceptions.

- Increase diversity of officers trained and selected as "linebackers."

**Response**

Since 2021, when SPD's first revisions to the use of force and crowd management policies were approved by the federal court, SPD has continued to iteratively refine and revise both to account for continued evolutions in the law and best practice.  SPD's 2021 policies, for example, were informed in part by a comprehensive review of after action and independent assessments of 2020 protest events

Sentinel Event Review – Comprehensive Response
July 28, 2023

from 22 other departments and from professional organizations, including the Police Executive Research Forum, Major Cities Chiefs Association, and the Center for Policing Equity. SPD also surveyed laws in other states addressing the use of less lethal tools, best practices in crowd management, and other considerations. These policies also incorporated all substantive provisions of a temporary restraining order regarding the use of certain force that had been entered by a federal judge over the summer of 2020. Additionally, SPD reviewed and incorporated into those policies numerous recommendations from both OPA and the OIG.

On May 18, 2021, the Governor signed into law ESSB2 1310, creating new provisions around the use of force by law enforcement, and directing the Washington State Attorney General to promulgate, by July 1, 2022, a model policy incorporating these provisions. Pursuant to RCW 10.120.030(2), all law enforcement agencies across the state were required to adopt, by December 1, 2022, policies consistent with the model policies or, if the agency does not adopt the model policies, provide notice to the attorney general as to any departures, and an explanation of how they are nonetheless consistent with the statutory requirements.

On July 1, 2022, the Attorney General released two documents: its model use of force policy and a best practice guide for the use of physical force in crowd management events. These documents were, in turn, included in the materials SPD considered in 2022 and 2023 as it reviewed and drafted revisions to its 2021 iterations of policy, now in effect as interim policies (pending additional revisions that may follow).[14]

These policies (on which crowd management training, as described above, is largely based) address recommendations in this category to a substantial degree. As with any iteration of policy, as is contemplated by the City's Accountability Ordinance and as is consistent with the collaborative process by which SPD, OPA, the OIG, and the CPC engage around the development of policy and practice, SPD is open to continuing to discuss any of these points that the OIG may put forth.


**<u>Conclusion</u>**


In keeping with the spirit of reconciliation and healing offered through the SER process, we offer this comprehensive response as one step in an ongoing dialogue in a partnership to truly advance collaboration and help to make Seattle a safer, equitable space for all, where the humanity of all is honored and where there can be room for grace. We do not pretend to have all the answers. Still, we can promise that we are doing all we can to live up to the expectations of our community and City partners, to promote public safety as an ideal measured not merely by the absence of crime but by the presence of well-being, and to remain steadfast to the principles of continuing self-reflection and reform that are at the core of the Consent Decree. While ugly reminders of the anger and strain from 2020 may continue to surface, we also hope that our work is measured at least in part by the strides taken since 2020 to learn from our mistakes and those missteps that impacted not only the community, but so many of our officers, who likewise still bear physical and emotional scars.

Let's keep talking.

---

[14] These policies have been submitted to the state as required.

| Theme | Recommendation | Wave | Status |
|---|---|---|---|
| **Accountability** | Ensure that officers are held accountable for securing their weapons at all times, and that violations of SPD policies on these matters are investigated and enforced. | 1 | Accepted/ Complete |
| | In the event of an evacuation of a government building or other emergency, strategic decision-making should be done at the highest level of government with accountability and transparency. | 3 | Defer to City Collaboration |
| | SPD should ensure processes for transparency and accountability are in place in case of evacuation or other emergency. Ensure accurate logs are kept at the Seattle Police Operations Center (SPOC). | 3 | Accepted/ Complete |
| | SPD should ensure appropriate recordkeeping and documentation during significant planning and decisions during large-scale protests. | 3 | Accepted/ Complete |
| | SPD should conduct and publish an After-Action Review of actions taken during a large-scale protest response within 60 days of implementation, including all non-confidential materials used in the review. | 3 | Accepted |
| | Evaluate current Use of Force reporting during protests and large-scale events to ensure accuracy and sufficient level of detail, including requiring explicit justification for each instance of force used and prohibiting the use of "boilerplate" justifications, and ensuring officers complete reports in a timely fashion. | 4 | Accepted/ Complete |
| | Acknowledge the importance of discipline and corrective action for accountability as well as community's perception of legitimacy of disciplinary processes, and evaluate current disciplinary policies and procedures to ensure consistency and appropriate levels of discipline. | 4 | Accepted in Part; Defer in Part to Labor/City Processes |
| | Acknowledge the harm to BIPOC community caused by SPD actions over time, and issue a public apology for the actions of SPD during the 2020 protests. | 4 | Accepted/ Complete |
| | Enable better interaction with demonstration organizers in advance of protests, SPD should build legitimacy through expanded community Policing initiatives, including the expansion of foot patrols, and build deeper personal relationships between officers and individuals throughout the communities of Seattle. | 1 | Accepted/ Ongoing |
| | Engage in direct and ongoing community dialogue to understand and adapt to the diverse community perspectives about the institution of police. | 1 | Accepted/ Ongoing |
| | Evaluate whether an encrypted standardized alert messaging system (e.g., WhatsApp, Yammer, or other technology) could replace radio communication during crowd facilitation events. | 1 | Defer to Seattle IT |
| | Establish the Incident Command Post and communication lines to officers facilitating protests or demonstrations so that the Incident Commander can observe multiple events in different locations simultaneously and receive real-time updates about each event, from officers trained in supervision of crowd events who are physically present at each protest or demonstration. | 1 | Accepted |
| | If short term closures of street or blockages of specific intersections are necessary for the safety of the crowd, SPD should ensure that its officers can adequately inform individuals in the crowd of the reasons for the blockages and provide them with adequate alternative options to continue moving. | 1 | Accepted/ Complete |
| | Ensure that all limitations on crowd behavior or conduct are designed to maximize the safety of individuals in the crowd, and that any communications about such limitations articulate that safety rationale in ways that emphasize LEED principles. Specific messages should be conveyed in simple, layperson terms that are accessible to all, and should be focused on explaining the public safety necessity of motivating the message. | 1 | Accepted/ Complete |

| | | | |
|---|---|---|---|
| | Improve SPD's capability to inform and communicate with demonstrators during group events in the following ways: 1. Multiple modes of communication should be considered, including audio, video, other visual media (e.g., posters, banners, etc.), social media, and others; 2. The modes of communication and specific messages should be included in the Incident Action Plan created by SPD prior to events and updated throughout the pre-event planning phase; 3. The communications should be documented and recorded during the event, including by having officers certify their use on police radio that is retained by SPD; and 4. Their impact should be evaluated and specifically assessed in post-event review by SPD. | 1 | Accepted/ Complete |
| | Procure a suitable audio devise to ensure that the crowd can hear messages relevant to the event. | 1 | Accepted/ Complete |
| | Communicate in advance when it plans to create barricades or restrictions to protesters or marches. The reason for the creation of such zones should be clearly articulated and driven by a public safety rationale. | 1 | Accepted/ Complete |
| | SPD and City should coordinate and jointly create designated officers/staff in both SPD and the City who are responsible for engaging with residents and businesses affected by civil unrest or large-scale incidents causing similar disruption. (Emergency Community Communications Officers (ECCO)). | 2 | Accepted/ Complete |
| | As set forth in OIG's Review of the SPD Crowd Dispersal Policy and Less Lethal Weapons Report in August 2020, SPD and the City should "[p]rovide public education concerning crowd dispersal policies, procedures and overall SPD crowd management tactics." These materials should be easily accessible and provide information that can assist residents and bystanders who may be affected by nearby deployments of crowd dispersal devices (e.g., CS gas, OC spray, or "blast balls"). | 2 | Accepted/ Defer to City/CPC Collaboration |
| | SPD should conduct a public education campaign alerting the public to the specific harm that lasers can cause when shined into the eyes of others, and to the state laws surrounding their usage. | 2 | Under Consideration/ Suggest CPC Collaboration |
| | SPD should develop a public education program regarding tactics when arresting someone. The program should include education about the number of officers used to conduct the arrest, the rationale for arrest procedures and an openness to discussion with community about ways to improve these tactics. | 2 | Under Consideration/ Suggest CPC Collaboration |
| Communication | SPD should research and enhance policy requirements for increased communication with crowds, especially during large or stationary protests, to manage expectations and provide greater credibility for police action. | 2 | Accepted/ Complete |
| | SPD and SFD should attempt to coordinate with civilian medics participating in crowd events prior to the protests and establish a plan for care of injured or incapacitated persons during the event. In situations where coordination before an event is not possible, SPD and SFD should ensure civilian medics within crowd events have an established and continuous communication method with SPD and SFD to coordinate the efficient and safe removal of anyone who has been injured or incapacitated during a protest or crowd event. | 2 | Accepted/ In Coordination With SFD/EOC |
| | SPD and the City of Seattle should ensure Seattle neighborhoods are not left without public safety and other essential services. If City government is prevented from accessing an area, it should make every effort to provide city services and emergency response. The City should assign a City liaison to facilitate communications with impacted community members about service provision or interruption. | 3 | Accepted/ Defer to City Collaboration |
| | SPD should improve internal channels of communication to increase efficient and timely collaborative decision making amongst command and with officers. | 3 | Accepted/ Ongoing |
| | SPD should ensure coordinated communication of goals so the public has a clear understanding of SPD actions | 3 | Accepted/ Complete |

| | | |
|---|---|---|
| SPD and the Mayor's Office should publicly communicate rationale for decision‑making during large-scale protest response to decrease mistrust on the part of the public and officers | 3 | Accepted |
| An SPD Public Information Officer should accompany the Incident commander to important or large-scale events. | 3 | Accepted in Part |
| SPD should amend SPD Communications policy (12.010) to require all SPD radio transmissions to be recorded and stored for a specified period to allow for appropriate after-event review. SPD officers should not use unrecorded radio channels to transmit information, whether such lines are public (unencrypted) or secure (encrypted). | 3 | Accepted in Part |
| SPD should implement a system for daily debriefs with reports at the officer, supervisor, and command levels during emergencies. These debriefs should be sent to the SPOC and EOC to assist senior officers in managing the emergency, as well as to assist senior officers in communicating important information back to those squads. | 3 | Accepted |
| SPD should evaluate the utility of a circular organization chart, where information flows internally from one bureau to another. | 3 | Accepted/ Complete |
| SPD should develop a policy framework to guide public communications to ensure assertions are credible and supported by reliable information before dissemination. | 3 | Accepted/ Complete |
| SPD and the City of Seattle should establish a reliable and effective communication strategy to address the provision of public safety and other City services during "occupy" style protests. | 3 | Accepted/ Defer to City Collaboration |
| SPD and the City of Seattle should ensure a strategy for events that may impact neighborhoods, including appropriate contact information and identification of appropriate stakeholders. | 3 | Accepted/ Defer to City Collaboration |
| SPD should use POET (Public Outreach and Engagement Team) officers to work with protestors to establish systems and procedures for providing other emergency safety and medical assistance. | 3 | Accepted/ Complete |
| Ensure that SFD and SPD operational staff have real-time, direct lines of communication during emergencies. | 3 | Under Consideration |
| Implement a unified radio channel for dispatchers that responding officers from both SPD and SFD use for direct communication and rapid coordination when responding to a potentially dangerous scene. | 3 | Under Consideration |
| SPD and the City of Seattle should ensure public statements by SPD and City government are accurate. | 3 | Accepted |
| Implement a staging area for media where possible. | 4 | Accepted/ Complete |
| Develop a process to identify a visual signal for media to obtain from SPD and wear as identification. | 4 | Under Consideration |
| Explore other policies and practices from other jurisdictions regarding media presence at protests and events to incorporate best practices. | 4 | Accepted/ Complete |
| Work with a diverse range of local media outlets to identify best practices for facilitating observation. | 4 | Accepted |
| Develop a process for POET officers to communicate with media during crowd events. | 4 | Accepted/ Complete |
| Alter SPD's strategy for policing protests to focus more explicitly and comprehensively on the facilitation of peaceful assembly and ensuring the safety of protestors. The focus and mindset of SPD officers deployed to assist in crowd events should move away from "crowd management" "crowd control" and Law enforcement" to "facilitation of speech" and "crowd protection and safety." | 1 | Accepted/ Complete |

| | | |
|---|---|---|
| Embrace procedures that visibly signal SPD's commitment to ensuring the safe and peaceful gathering with the minimum necessary engagement of SPD officers, and limit that engagement to: promoting the ability of individuals and groups to express First Amendment freedoms; protecting the physical safety of individuals within as well as beyond the crowd and preventing the destruction of public or private property. | 1 | Accepted/ Complete |
| Modify SPD's tactics of crowd facilitation to prioritize communication, de-escalation, and carefully conducted removal of those who are creating an immediate danger to others or causing destruction or to property, allowing the rest of the event to continue undisturbed. | 1 | Accepted/ Ongoing |
| Provide officers with clear direction about SPD's priorities in facilitating demonstrations, particularly when the institution of policing is the focus of the protest. SPD's focus should be on facilitating access and safety for all. SPD should enhance the ability to address dangerous situations with minimal impact on peaceful demonstrators while minimizing the use of munitions or indiscriminate force. | 1 | Accepted/ Complete |
| Use mobile response units (e.g., bicycle or other vehicles) that are distinct from crowd facilitation officers or "dialogue officers" to address agitators or instigators of violence in the crowd. Mobile response units should remain out of sight and in reserve unless and until they are needed and engage in ways that permit individualized attention and minimize the impact on peaceful protestors and on the event in general. | 1 | Accepted/ Complete |
| Avoid the deployment of officers in ways that prevent pedestrian/crowd movement or that separate individuals from other areas of protest without a clearly articulated safety rationale. | 1 | Accepted/ Complete |
| Seattle City Council should consider whether CCTV camera footage could be kept by a third party for a limited time, and accessible to SPD or other appropriate parties upon request for suitable public safety purposes, including the ability to track stolen police weapons that would pose an imminent danger to the community. | 1 | Defer to Surveillance Ordinance Process |
| The Mayor's Office and SPD leadership should critically examine the utility of a curfew and should exhaust other messaging options before declaring one. If a curfew is announced it should be limited in scope and clearly focused on public safety, rather than the deterrence of public protest. | 1 | Accepted/ Defer to City Collaboration |
| Establish protocols to guide officer responses to property crimes occurring during significant public disorder events. These protocols would, among other things, establish clear guidance for officers on: a. When to disperse and when to arrest individuals who may be committing property crimes during civil unrest; b. How to conduct arrests of individuals who require prone handcuffing; and c. How to arrest individuals committing property crimes without escalating tensions between SPD and observers of the arrest. | 1 | Accepted/ Complete |
| SPD incident commanders should maximize the buffer space between officers and the crowd whenever possible. | 1 | Accepted/ Complete |
| On-site incident commanders should carefully evaluate the context and threat from a crowd, with assistance from "dialogue officers" in the crowd. | 1 | Accepted/ Complete |
| Consider the creation of dialogue officers to ensure effective, real-time, de-escalatory communication between SPD and Protestors. | 1 | Accepted/ Complete |
| In keeping with SPD's commissioned report after May Day 2015, SPD leadership, including the Chief, should be fluent in all SPD rules of engagement and understand specific "if/then" scenarios contained in the rules. | 2 | Accepted/ Complete |
| SPD should embrace and maintain principles of procedural justice in all of its communications and tactics relative to the facilitation of crowd events. | 2 | Accepted/ Complete |
| During protests, SPD should ensure that protesters are protected from vehicular traffic and ensure a constant ability to visually monitor those barriers. | 2 | Accepted/ Ongoing |

| | | | |
|---|---|---|---|
| **Crowd Management** | As set forth in OIG's Review of the SPD Crowd Dispersal Policy and Less Lethal Weapons Report in August 2020, SPD should research and enhance policy requirements for increased communication with crowds, especially during large or stationary protests, to manage expectations and provide greater credibility for police action. SPD should prioritize "normative compliance," that is, crowd agreement with SPD requests due to their legitimacy, over "instrumental compliance," or the use of tools (e.g., less lethal weapons) to force compliance. | 2 | Accepted/ Ongoing |
| | SPD should prohibit the use of ruses for crowd management or control purposes. If a ruse is justified during a crowd event or other emergency, any officer ordering a ruse should (a) be in the chain of operational command set forth in the daily briefing sheet; (b) document the circumstances justifying the ruse, the substance of the ruse, and the outcome of the ruse; and (c) inform and document communication to others in the chain of command on the existence, timing and content of planned ruse transmissions. SPD should specifically task appropriate members of the chain of command to coordinate the ruse if these conditions are met. | 3 | Accepted in Part/Ongoing |
| | SPD should ensure all officers at the rank of Lieutenant and above receive thorough training on all aspects of crowd management and emergency response, so any officer in SPD leadership can capably staff the EOC, the SPOC, or other crowd event response structures. | 3 | Accepted/ Complete |
| | Task POET officers with identifying certain protestors as point-people and coordinating direct communication. | 4 | Accepted/ Complete |
| | Station POET officers strategically within crowds of protestors to communicate with officers on the front lines and to provide information about the crowd's ability to move back, and to safely facilitate such movement. | 4 | Accepted/ Complete |
| | Station POET officers in police vehicles equipped with LRAD to effectively communicate with the crowd. | 4 | Accepted/ Complete |
| | Develop an ongoing assessment of the feasibility of crowd movement to increase on-the-ground awareness. | 4 | Accepted/ Complete |
| | SPD should ensure a diverse set of officers with relevant operational authority are permitted to observe and/or participate in strategic and tactical discussions during emergencies to allow for differing perspectives and critical evaluation in decision making. | 3 | Accepted/ Complete |
| | SPD should consider implementing a departmental culture evaluation to identify and address barriers for officer of color being promoted to leadership roles within the department and encourage attention to identifying and reducing bias across the department. | 3 | Accepted/ Ongoing |
| | Implement staffing schedules, and provide officers with breaks, food and water, and pre- and post-event wellness initiative to help officers at crowd events - and especially at crowd events that are critical of SPD and policing - deal with exhaustion, stress, and primary or secondary trauma that might result from their participation at such events. | 1 | Accepted/ Ongoing |
| | SPD should provide safety eyewear and noise protection equipment to protect officers from lasers and sound devices that may be deployed in a protest/demonstration setting. | 2 | Accepted/ Complete |
| | SPD should pursue opportunities for officers to express their tensions and frustrations in an appropriate setting and provide guidance on productive ways to channel those emotions to help avoid scenarios in which officers use sarcasm, obscenities, or other displays of disrespect to community members. | 2 | Accepted/ Ongoing |
| | SPD should provide increased health and wellness services to 911 call-takers and other emergency services employees. | 3 | Defer to CSCC |

| | | |
|---|---|---|
| Establish a staffing model for crowd events such that protests of the size and scale of the Westlake protests can be suitably staffed with mobile officers and other facilitation while minimizing SPD intrusion into the protest. | 1 | Accepted/ Ongoing |
| The Mayor's Office, SPD, SFD, the Department of Transportation and other departments should conduct appropriate scenario planning for disruptive protests. In particular the scenario planning should ensure that sufficient resources are deployed so that other SPD locations can protect and serve the people of Seattle in the event that public service from one or more of its buildings are disrupted by protest and ensure that sufficient public transportation exists to help protesters leave a protest where an unlawful assembly or curfew has been declared or a legal order to disperse has been issued. | 1 | Defer to EOC |
| Develop an arrest policy for each event and convey this to officers beforehand. Flexibility should exist in the tolerance of lower level misdemeanors balanced against the priority for ensuring the strategic goals of the operation. | 1 | Accepted/ Complete |
| Conduct appropriate scenario planning and provide enough resources so that other SPD locations can protect and serve the people of Seattle in the event that public service from one or more of its buildings is disrupted by protests. | 1 | Accepted/ Defer to EOC |
| Prior to planned demonstrations, SPD should coordinate with the City of Seattle and residents to remove barriers to visibility that might reduce safety to protesters during protest events, including, for example dumpsters. | 2 | Accepted/ Defer to EOC |
| SPD and the City of Seattle should include OIG in planning meetings to offer recommendations and to stay informed. | 3 | Accepted in Part |
| SPD should establish consistent staging points during large-scale protests or in areas where there is no public safety presence. If necessary, establish agreements with nearby businesses or other entities to establish closer staging areas to respond quickly to emergency situations. | 3 | Accepted |
| SPD and the City of Seattle should establish consistent rendezvous points for connecting injured people to emergency medical staff. | 3 | Defer to EOC |
| Identify a specific area for officers reporting for crowd facilitation duty to convene and leave their vehicles, providing a shuttle system for officers to and from the areas where they are deployed and supervision for the vehicles. | 1 | Accepted/ Complete |
| If exigent circumstances prevent an officer from parking a vehicle at the designated area, officers should notify the SPOC of the location of the vehicle(s), and a designated officer should move the vehicle(s) to a designated safe area. | 1 | Accepted/ Complete |
| Implement a GPS system through the SPOC that allows incident Command to know the precise location of every officer, vehicle, and lethal munition deployed during a crowd event. | 1 | Accepted/ Complete |
| When an emergency creates a public safety need that limits access to buildings, SPD should create a standard, unbiased procedure for ensuring maximum access for building residents and guests. | 2 | Accepted |
| SPD should coordinate more effectively with the City of Seattle and relevant agencies to ensure the continued provision of city services (e.g., power, water, waste management, etc.) throughout periods of emergency, including civil unrest. | 2 | Defer to EOC |
| SPD Incident Action Plans (IAPs) should follow a standardized approval process that includes review at the appropriate command level to allow for accountability of decision-making. SPD should communicate IAPs to all officers prior to the implementation of the acts set forth in the IAP. | 3 | Accepted/ Complete |

**Procedures**

| | | |
|---|---|---|
| SPD Incident Command Plans during crowd events or emergency events should include officers with day-to-day operational authority over the resources necessary to address the emergency in question. | 3 | Accepted/ Complete |
| SPD and the City of Seattle should assess which department 911 call-taking and dispatch services should be housed under (note: Seattle City Council voted to move 911 call-taking moved to the new Community Safety and Communications Center [CSCC] on May 24, 2021). | 3 | Complete |
| SPD and the City of Seattle should recognize the role of SPD as public servants in delivering public safety and should develop procedures to ensure continued provision of public safety and essential services in the case of large-scale protests or other instances where regular service delivery is interrupted. | 3 | Accepted |
| Modify SPD's policy on content neutrality to permit officers staffing a public event focused on issues of policing to demonstrate solidarity with the crowd participants' rights to protest if they chose. | 1 | Accepted in Part/Complete |
| Eliminate disrespectful statements or actions from SPD officers to individuals or groups protesting. | 1 | Already in Policy |
| Pursue a differentiated approach toward individuals withing the crowd. | 1 | Accepted/ Complete |
| Limit arrests during protests targeted at the police to individuals committing immediate or imminent harm to people or property, and do not arrest individuals for offenses committed at an earlier time unless they can be accomplished in a way that will not escalate emotions in the crowd. | 1 | Declined as Written |
| Train bicycle officers not to arrest individuals for passive resistance techniques like "shoulder-checking" unless the officer(s) determine that the acts are clear, deliberate, and intended to substantially interfere with the ability of the officer(s) to perform his or her immediate public safety responsibilities. | 1 | Declined as Written |
| SPD officers should improve their situational awareness, considering the relationship of their actions to the overall strategy and tactics of the event, and the support available to the officer(s) relative to the size of the event. | 1 | Accepted/ Complete |
| SPD officers should be trained to realize that the existence of Personal Protective Equipment (PPE) or other defensive measures in a crowd of demonstrators, is not itself an aggressive measure requiring an escalating police response. | 1 | Accepted/ Complete |
| SPD officers should eliminate their use of sarcasm or confrontational dialogue with protesters in accordance with 5.001 - Standards and Duties Sec. 10. While the SPD section in question states that "employees will strive to be professional," (emphasis added), SPD should strike "strive to" from the policy and require professionalism. | 2 | Already in Policy |
| Wherever practicable, officers should inform non-compliant persons of their intention to physically touch/move them when necessary to achieve a public safety goal prior to initiating the physical contact. | 2 | Accepted/ Complete |
| Develop policies to address and minimize officer fatigue during long-term protests. | 4 | Accepted/ Ongoing |
| Consider reducing length of shifts. | 4 | Accepted in Principle; Subject to Staffing |
| Provide officers with mental and physical support to help reduce stress and exhaustion, including counseling and mental health services and offering sufficient opportunities for breaks, food, and water during shifts. | 4 | Accepted/ Ongoing |
| **Situational Awareness**  Use live CCTV footage and mobile SPD officers, whether on bicycles or in other vehicles, to rapidly intervene with and address groups destroying property. | 1 | Accepted in Part/ Defer to Surveillance Ordinance Process |

| | | |
|---|---|---|
| Avoid the creation of immovable lines of officers at demonstrations and provide a mobilization plan for the deployment of bicycle or other mobile officers to ensure appropriate and rapid responsiveness to unplanned crowd events. | 1 | Accepted in Part/ Completed |
| Modify the policy and training for prone handcuffing to eliminate body weight pressure being applied above the shoulders of a subject being restrained. | 1 | Current Training Focuses Body Weight on Shoulders/Upper Back |
| Monitor crowd activities from a sufficient distance that physical contact between SPD and protesters is not required or likely unless an individual is an immediate physical danger to others. | 1 | Accepted in Part |
| When "leap-frogging" a protest, SPD officers should select alternative routes that minimize the likelihood of exposing officers or crowd participants to unnecessary risks. | 1 | Accepted |
| When a crowd prevents safe movement of bikes without contacting individuals in the crowd, SPD bicycle officers should consider dismounting and walking with bikes physically placed between officers and crowd members to minimize agitation and physical contact. | 1 | Accepted in Part |
| Construct barricades between protesters and critical pieces of the public safety infrastructure (e.g., the East Precinct) rather than using lines of officers. Such barriers should strike a balance between protecting the integrity of the facility and preserving its accessibility to the public. | 1 | Accepted in Part |
| SPD should strive to ensure it has visibility to all parts of a crowd during a protest event or demonstration to ensure the real-time ability to prevent or minimize a mass casualty incident. This may include appropriate rooftop access (with proper consent), or other solutions developed with community input. | 2 | Accepted/ Ongoing |
| Particularly when police are the subject of a protest, SPD should avoid the creation of immovable lines of officers at demonstrations and ensure that the crowd can move in directions it wants without undue danger from cars or other risks. | 2 | Accepted in Part |
| SPD should implement policies limiting deception and ruses to instances in which (a) the ruse seeks to avoid an imminent personal injury or death or significant property damage; (b) the ruse will not itself cause an escalation in tension with members of the community potentially leading to a personal injury, death or significant property damage; (c) the ruse is clearly documented by an authorized command officer or supervisor and communicated to other SPD individuals as appropriate to ensure compliance with the Incident Command System and stated SPD tactical objectives. | 3 | Accepted/Ongoing |
| SPD should prohibit broadcasted ruses. | 3 | Accepted/Ongoing |
| Ensure that all SPD officers, not just those officers assigned to crowd facilitation teams are trained in crowd psychology, crowd facilitation, public safety procedures and tactics, and the mobilization techniques likely to be used at future crowd events. | 1 | Accepted/ Complete |
| Provide specific training, including scenario-based training on the management of large crowd events, and on the supervision of officers, for all SPD supervisors and above, including Incident Commanders and officers in the SPOC. | 1 | Accepted/ Complete |
| To reduce perceptions of racial bias in SPD actions, SPD should incorporate the scenario of a white man shooting a Black protester, then walking unchallenged through a police barricade and surrendering to SPD officers into antiracism training for reflection and discussion by SPD officers to encourage equal treatment. | 2 | Under Consideration |
| SPD should use deployments of blast balls during the 2020 protest response as case studies when training new officers on blast ball use in high pressure scenarios. | 2 | Accepted |

**Training**

| | | | |
|---|---|---|---|
| | SPD should require consistent cultural competency and emotional intelligence trainings for supervisors and command staff to encourage deeper understanding of the impact of individual decisions on officers and community. | 3 | Accepted |
| | Review SPD protocols related to the presence of batons and their use during crowd facilitation events, potentially eliminating their presence at such events unless justified by a specific and compelling public safety purpose. | 1 | Under Consideration |
| | In considering whether to use force during a crowd event, SPD officers must evaluate whether the use of force can be limited to those against whom the force is justified, and that the potential for collateral impact is minimized. | 1 | Consistent with Title 8 |
| | Ensure that any weapons or munitions brought to protests are securely stored and cannot be taken or used by anyone other than the officer to whom they were issued or other authorized SPD Personnel. | 1 | Accepted/ Complete |
| | SPD officers attending protests should not leave rifles unlocked in unattended police vehicles. | 1 | Accepted/ Complete |
| | SPD should invest in rifle cabinets with locks that cannot be easily breached by others. | 1 | |
| | SPD should consider the utility of "bio locks" on all rifles to ensure that only the officer who is issued the rifle can fire it. | 1 | Declined as Written |
| | Ensure access to adequate supplies of OC spray to ensure that CS gas is never deployed due to a lack of access to other preferable or appropriate options. | 1 | Accepted |
| | Implement OIG's guidance on use of CS gas set forth in Review of the SPD Crowd Dispersal Policy and Less Lethal Weapons in response to Ordinance 126102. | 1 | CS Now Governed by State Law |
| | Given the highly indiscriminate nature of CS gas, SPD and City Council should restrict use of this weapon to full-scale riot situations involving violence. SPD should also consider prohibiting the use of weapons such as CS solely in defense of property. | 2 | CS Now Governed by State Law |
| **Use of Force/Crowd Control** | Acoustic and light devices used during extended SPD operations should be placed in ways that minimize their impact on neighborhood residents. | 2 | Accepted |
| | Firearms with telescoping capabilities should not be used for surveillance when lethal force is not authorized, even if the firearm is disabled. | 2 | Under Consideration |
| | As set forth in OIG's Review of the SPD Crowd Dispersal Policy and Less Lethal Weapons Report in August 2020, SPD should review and, if necessary, modify policy language for all less lethal weapons to ensure the policy has consistent warning requirements prior to the use of any less lethal weapon. | 2 | Accepted/ Complete |
| | SPD should review its policy and training for using less-lethal munitions in crowd management situations, including the use of less-lethal munitions by mutual aid agencies. | 2 | Accepted/ Complete |
| | Clarify current Use of Force policies to require an imminent life-safety threat to justify over-hand blast ball throws and other uses of force deviating from general policy. | 4 | Addressed in Current Policy |
| | Evaluate the effectiveness of bicycle tactics for crowd control, especially during extended periods of sustained protest activity. | 4 | Accepted |
| | Clarify SPD policy 8.300-POL-3 to define "bicycle pushes" as opposed to "bicycle strikes," and the proper reporting policy for each. | 4 | Under Consideration |
| | Require reporting of all bicycle tactics resulting in contact with a member of the public. | 4 | Under Consideration |
| | Log blast ball usage using tag numbers to evaluate reporting, including intent, justification, and outcome. | 4 | Accepted in Part |
| | Evaluate the use of armored vehicles during crowd events and the impact on community perceptions. | 4 | Accepted |

| Increase diversity of officers trained and selected as "linebackers." | 4 | Dependent on Staffing |