# OIG Workplan for the Transition of Monitoring Responsibilities

The Seattle Police Department (SPD) has been under federal oversight since 2012, when the Department of Justice (DOJ) found that SPD routinely engaged in unconstitutional excessive force. As a result, the City of Seattle (City) and the DOJ entered into a settlement agreement, or "Consent Decree," requiring the City to implement reforms with the goal of ensuring police services are delivered in full compliance with the Constitution and laws of the United States. In 2017, the City passed a comprehensive accountability law establishing three departments intended to work in tandem to provide individual, systemic, and community-based oversight of SPD. That ordinance established the Office of Inspector General (OIG) to ensure systematic police oversight and ongoing fidelity to the reforms gained under the Consent Decree.

Upon achieving compliance with the initial tenets of the Consent Decree in January 2016, the City entered a two-year sustainment period to ensure reforms were firmly implemented and institutionalized. A second sustainment period occurred between 2018 and 2020, and in May 2020, the City moved to terminate the Consent Decree. The City withdrew that motion shortly thereafter, in the wake of ongoing protests against police violence and institutional racism following the murder of George Floyd.

In 2022, the Seattle Monitor (Monitor) concluded that SPD had demonstrated sustained compliance with the Consent Decree on use of force; stops and detentions; and response to people experiencing behavioral health crises. Accordingly, the DOJ and City, seeking to return responsibility for police reform and oversight to the community, jointly moved to eliminate many of the Consent Decree obligations to focus on crowd management and accountability. The Court granted in part and denied in part the joint motion.[1] The Court agreed that the City had demonstrated sustained full and effective compliance in the following relevant Consent Decree areas: crisis intervention, stops and detention, bias-free policing, and supervision. The Court outlined remaining compliance concerns, including the use of force in large-scale crowd management settings and an insufficient system of review and accountability. The Court also reiterated the importance of mitigating racial disparities in SPD's provision of policing services. In transitioning greater responsibility for police reform to the community, the Court charged OIG and SPD with primary roles in carrying out the remaining work with support roles for the Monitor and the DOJ.[2]

Consistent with the parties' motion, the Court Order requires OIG to develop a Workplan to include a methodology, with corresponding timelines, for the ongoing assessment of the following areas: use of force (including crowd management); crisis intervention; stops and detentions; bias-free policing; and supervision.[3] The Court ordered OIG to conduct a Use of Force Assessment examining 2021, 2022, and 2023 data on SPD's use of force with the following timelines: draft due to DOJ and Monitor by January 31, 2024, and final due to the Court by February 29, 2024.[4] The Court included additional parameters for ongoing work with SPD, including review of data analysis for accuracy,[5] and strategizing to improve the

---

[1] United States of America v. City of Seattle. Case No. C12-1282JLR, Court Order dated September 7, 2023. (Court Order), page 2.
[2] Court Order, pages 4-6.
[3] Court Order, page 9, ¶11.
[4] Court Order, page 9, ¶12.
[5] Court Order, page 8, ¶10.

transparency, usability, and accessibility of SPD's publicly available data.[6] The Court also instructed OIG to collaborate with SPD in its comprehensive plan for applying best-practice methodological approaches to identify racial disparities in use of force, crisis intervention, and stops and detentions.[7]

## Additional Projects for Ongoing Improvement

In addition to assessing ongoing Consent Decree fidelity, OIG will foster efforts to enhance and improve police services for Seattle residents. OIG oversight will encourage innovation and improvement of policing for the benefit and protection of the community. With this in mind, OIG will involve community members and stakeholders in the assessment process as discussed below. Assessments undertaken by OIG will focus on foundational elements for effective public safety, including: constitutional, fair, and equitable policing; community legitimacy; leadership; and officer wellness.

An example of work to support and enhance continuing innovations in Seattle policing is the creation of a community-oriented "Sentinel Event Review" process (SER).[8] In the wake of the 2020 protests in Seattle, OIG developed a process to review SPD actions that uplifted community voices and sought to identify, understand, and resolve root causes of incidents that eroded community trust. That SER process included a planning group and review panel comprised of diverse community members, SPD personnel, and other accountability stakeholders, and it was facilitated by experts in SER, root cause analysis, and restorative justice. The process successfully brought SPD and community stakeholders together in complex problem-solving and trust-building collaboration around contentious, emotionally charged issues—resulting in over 150 actionable recommendations.

This process holds great promise for solving problems, building trust, and increasing transparency in assessing other SPD actions. OIG intends to transition the SER framework into a means to analyze officer-involved shooting (OIS) incidents where there is an intersection with mental health and crisis to better understand root causes and identify broader systemic changes that could minimize future tragedy. Collaborative analysis of these incidents by mental health experts, community members, and SPD may significantly improve service to people in crisis by identifying ways that SPD can better respond to these situations including avenues for intervention well before a person encounters law enforcement. Using SER to take a broad, multidisciplinary approach to understanding and addressing police response to persons in crisis could provide lessons that save lives, reduce community harm, and foster greater collaboration between SPD, mental health service providers, and other community resources. Additionally, OIG will continue to use the SER process to address specific critical incidents of great community concern.

---

[6] Court Order, page 7, ¶8.
[7] Court Order, page 9, ¶13.
[8] A sentinel event is a significant negative outcome, such as a death or serious injury, that acts as a signal that problems within a system exist and may lead to similar bad results if the system is not examined to find root causes and proper remedies. Industries like airlines and health care providers have developed and used "sentinel event review" processes to thoroughly examine these types of incidents, identify what caused them, and use those lessons to prevent them in the future.

# Summary of Projects

OIG will develop a body of qualitative and quantitative methods to assess SPD's ongoing efforts to ensure "services are delivered to the people of Seattle in a manner that fully complies with the Constitution and laws of the United States, effectively ensures public trust and officer safety, and promotes public confidence…" (Settlement Agreement, ¶ 1).

New responsibilities for OIG will include the following areas of evaluation:

- **Use of Force**. Assess whether use of force incidents comply with policies, including large-scale crowd management. Evaluate the adequacy of use of force reporting, investigation, policies and training, and review, specifically the Force Review Board and Force Review Unit. While the review will be consistent with prior assessments, the review scope will not be limited to that of prior assessments and may explore more nuanced issues.
- **Stops and Detentions**. Review SPD stops, searches, and detentions to ensure they are constitutional and lawful. OIG will assess training plans and materials regarding stops and detentions to evaluate whether they provide all patrol officers with an understanding of the legal requirements, the obligation to protect the rights of individuals, and the importance of community trust in effective policing and community relations.
- **Crisis Intervention**. Evaluate processes and outcomes in the areas of crisis intervention, de-escalation, and scenario-based integrated tactics training. This review will evaluate the training provided to patrol officers, as well as consistency with trainings provided to call takers and dispatchers for calls involving individuals in crisis; the review will also evaluate deployment of CIT trained officers, the SPD co-responder program, and supervision in the crisis context. There may be overlap and intersection with the Use of Force assessment with regard to force used on persons experiencing crisis.
- **Supervision**. Review SPD supervision of patrol officers. This analysis is critical in ensuring SPD is effective and efficient in its operations. OIG will evaluate whether supervisors proactively manage risk and help patrol officers improve through mentorship and enhanced training. OIG will evaluate SPD practices for addressing early indicators of potential risk (including Early Intervention, now referred to as Proactive Integrated Support Model, or PrISM ).
- **Bias-free Policing.**[9] Review compliance with SPD Bias-Free Policing policy and Bias-free Policing Municipal Ordinance 119018. All areas of OIG assessments in the above categories will include a bias component where possible and appropriate. OIG has partnered with academics and begun an Equity Assessment to establish baselines for future work.

OIG has set assessment goals within each of the areas of evaluation:

**Use of Force**

- Policies are sound and are informed by best practices identified by OIG, SPD, the Seattle Monitoring team, and experts in other jurisdictions;

---

[9] In this document, reference to bias contemplates improper bias based on race, ethnicity, color, national origin socioeconomic status, gender identity, sexual orientation, mental health status, or disability status.

- Officers receive consistent and regular training;
- Use of force incidents are properly documented;
- Proper identification and handling of bias when it appears to be a factor in a use of force;
- Incidents involving force are properly supervised;
- Uses of force are thoroughly investigated according to policy;
- Force investigation is thoroughly reviewed by the Chain of Command (COC)/ Force Review Unit (FRU)/Force Review Board (FRB);
- Out of policy use of force is addressed by the COC/FRU/FRB and the Office of Police Accountability (OPA);
- Information, data, and incidents are transparently handled;
- There is proper and consistent data collection, analysis, and reporting;
- Proper consequences occur for violation of policy/law; and
- Robust processes exist to draw organizational lessons from analysis of force incidents.

Additionally, OIG will provide ongoing and periodic evaluation and feedback on the Force Review Board process with the following assessment goals:

- Thorough presentation;
- Adequate identification of issues;
- Thorough discussion;
- Proper referral of issues to OPA, Chain of Command, Training, or other appropriate entity;
- Robust feedback to COC/Force Investigation Team (FIT);
- Meaningful dissemination/sharing of lessons learned/findings/outcomes to SPD;
- Follow-up/implementation of board actions;
- Proper assessment of investigation quality;
- Transparency of process and decisions to community;
- Inclusion of community perspective; and
- Continued improvement of crowd management and police response to protests.

**Stops and Detentions**

- Policies are sound and informed by best practices identified by OIG, SPD, the Seattle Monitoring team, and experts in other jurisdictions;
- Partnerships and collaboration with relevant stakeholders are utilized to align policy and training with best practices and expertise;
- Training on constitutional and lawful stops, searches, and detentions (including searches and detentions of passengers in vehicles) is proper and adequate;
- Stops, searches, detentions, warnings, and citations are conducted/issued without improper bias;
- Data collection and reporting of stops, searches, detentions, warnings, and citations is complete and appropriate, including:
  - Justification for stops
  - Perceived demographic information of subjects
  - Outcome of stops;

- Documentation and review of uses of force stemming from stops, searches, and detentions is completed appropriately as part of the use of force review;
- Analysis of stops, searches, detentions, warnings, and citations is comprehensive and consistent; and
- Continue work with SPD to analyze Seattle Municipal Court (SMC) ticketing outcomes for traffic stops.

**Crisis Intervention**

- Policy and training follow innovations in crisis response, prioritizing de-escalation, and resolution with the least force (coordination, communication, leadership at scene);
- Training is effective and follows policy;
- Training is provided on effective communication with people in crisis;
- Clear definitions and concepts related to crisis are reflected in policy and training. (Clear meanings and distinctions for "mental illness," "in crisis," "suicidal," etc.);
- Documentation of crisis response is proper and complete;
- There is thorough investigation and review of force involving people in crisis;
- Partnerships and collaborations with mental health professionals are utilized to align policy and training with best practices and relevant expertise;
- Community participants and SMEs are included in incident reviews to broaden opportunities for lessons learned (e.g., Sentinel Event Review (SER) of Officer Involved Shootings (OIS) incidents relating people in crisis); and
- Handling, investigation, reporting, and review of incidents is transparent.

**Supervision and Early Intervention System**

- SPD has an effective method for early intervention (PrISM);
- Supervisors proactively identify patrol officers who may need early intervention;
- EIS assessments are done in a timely manner;
- Supervisors find the EIS effective and useful as a tool to evaluate patrol officers; and
- The proposed EIS is reviewed and compared to the current system for evaluation of efficacy.

**Bias-Free Policing**

- SPD makes a concentrated effort to capture perceived demographic data on subjects;
- SPD actions do not improperly consider race, ethnicity, gender identity, or other identities of the subject
  - Race and ethnicity and other identity markers of the subject are not considered in police response except insofar as they relate to a specific suspect description;
- SPD continually evaluates and seeks to mitigate disparate impact on people who are historically marginalized or affected by policing;
- SPD continuously trains on cultural awareness and fosters cultural competence and humility;
- SPD engages in ongoing training and actions to address/mitigate internal bias;
- Promotions and hiring reflect and encourage diversity, equity, and inclusion;

- Allegations of bias are documented, investigated, and addressed;
- SPD involves community partners in the bias review process in line with SPD bias-free policing policy; and
- SPD approaches to education, policy, and discipline are consistent with other public safety city departments (e.g., dispatchers).

OIG will complete the assessments required by the Court Order, as well as establish ongoing mechanisms to assess issues that were core pillars of the Consent Decree. These assessments and subsequent reporting will provide the Court and community with up-to-date information and data regarding SPD's current performance in areas addressed under the Consent Decree. OIG will continue to engage and evaluate ongoing progress with SPD and key stakeholder partners. Additionally, OIG will identify trends in assessments to inform more in-depth analysis into key issues. This will allow OIG to be responsive to emerging issues. This deeper analysis will include best practice reviews and recommendations to improve policies and procedures as well as audits into specific subject matter identified by OIG.

## Project Work Completed to Date

1. Met with members of the Seattle Police Monitor team to discuss and document preliminary thoughts to define the elements of the methodology that will be implemented by the OIG;
2. Collected and revised previous Monitor workplans/methodologies to reflect OIG planning and approach;
3. Expanded review of relevant literature related to the main pillars of the Consent Decree;
4. Defined assessment objectives in accordance with the main pillars of the Consent Decree;
5. Designed OIG Monitoring Methodology proposals with Monitor, SPD, and OIG contributions, as well as previous monitoring methodologies and reports; and
6. Requested input from stakeholders and made appropriate adjustments.

## Feedback Structure and Assessment Timeline

As OIG transitions into the role previously held by the Monitor, many of the initial reports will include similar structures and methodologies as previous Monitor assessments, while expanding the purview of the work to allow for greater nuance and exploration of innovations. OIG intends to provide more real-time feedback to SPD that includes a combination of formal and informal observations and recommendations. For example, while the Use of Force Assessment will include a formal, written assessment of the functioning of the Force Review Board (FRB), OIG will also provide periodic informal feedback in regular meetings with SPD. OIG will work to shorten reporting periods so assessment feedback can be provided in a timely fashion.

Pursuant to the Order, OIG will provide a draft Use of Force Assessment to DOJ and the Monitor by January 31, 2024. The assessment will be filed with the Court by February 29, 2024. This assessment will include both crowd management and FRB components.

> While not required as an ongoing parameter of the Consent Decree, OIG intends to complete the following work during 2024. Methodologies for Crisis Intervention, Stops and Detentions, and

Supervision will be available by the end of Q2 2024. Work on these assessment areas will be ongoing and reporting is anticipated after the end of Q4 2024. All areas of OIG assessments in the above categories will include a bias component where possible and appropriate.

Moving forward after 2024, assessment will transition to a model of periodic quantitative and qualitative reviews of SPD performance in these areas, in addition to use of force and other SPD operations and programs that impact delivery of constitutional policing.

# Appendix A. Use of Force

Paragraphs 69-129 of the Settlement Agreement and Memorandum of Understanding between the United States and the City of Seattle explains that "In order to achieve […] balance in the application of force, the [SPD] commits (a) to maintaining a police force that is highly trained and knowledgeable, not only in matters of law and professional standards on use of force, but also on matters of reporting, investigation, and reviewing uses of force."

In evaluating SPD use of force, OIG will examine compliance with policies and whether SPD continues to thoroughly review officers' use of force consistent with SPD policy. OIG will also continue to assess the evolution of SPD protest response and crowd management policy and practices.

## Objectives

**Objective 1.** Compare use of force (Type I, Type II, Type III) numbers, rates, and key statistical measures from the current and previous year and over time to identify and describe significant trends.

**Objective 2.** Measure whether disproportionality or bias in use of force incidents exist; review cases broken down by level of force; time and location of the incident; and the race/ethnicity, age, and gender of the subject.

**Objective 3.** Assess how use of force incidents are reported, documented, investigated, and reviewed, as well as the ability of SPD to learn from these occurrences.

## Qualitative and Quantitative Methods

**Force Review Unit**

OIG will evaluate the work of the Force Review Unit (FRU) through a randomized sample of the cases reviewed. In this randomized review, OIG will assess each of the selected cases using the SPD Use of Force guidelines to ensure investigations were thorough and complete according to policy and reviewed properly by FRU.

**Force Review Board**

Qualitative analysis will include observation and evaluation of Force Review Board sessions. This will include review of:

- Board composition to ensure adequate representation of department units and diverse interests;
- Feedback and Assessment of Board regarding:
    - Proper identification of issues for discussion;
    - Robustness of discussions and how identified issues are addressed;
    - Recommendations and corresponding follow up/implementation;
    - Proper referral of potential policy violations to OPA or the Chain of Command;
    - Whether there is meaningful dissemination and sharing of lessons learned, findings, and outcomes to chain of command, FIT, and officers;
    - Proper assessment of the quality of the underlying investigation;

- Whether FRB acted within its established parameters and consistent with its mission and goals; and
- The adequacy of the board facilitation.

**Types of Use-of-Force and Racial Bias**

OIG will apply an ordered logit analysis (or ordered logistic regression), as the types of force are consecutively ordered. This type of regression analysis allows for observation of disparities and investigation of any potential relationship between the type of force implemented by an officer and subject characteristics such as ethnicity, race, age group, and gender, as well as the subject's actions and level of resistance or threat.

## Quantitative and Qualitative Features

**Type I, Type II, and Type III Cases**

- Number of uses of force, overall and broken out by type
- Number of cases and allegations received by OPA related to UoF
    - Number of force-related misconduct allegations that OPA sustained
    - Number of uses of force involved in the sustained allegations
    - Number of officers with sustained force allegations
- Number of officer-involved shootings
- Number and rate of officer dispatches in which any force was used
- Number and rate of officer dispatches in which greater than Type I force was used
- Age of person subjected to force
- Race/ethnicity of subjects of force
- Sex of subjects of force
- Behavior displayed by the subject (violent, suicidal, etc.)
    - Exhibiting signs of mental illness or behavioral crisis
    - Under the influence of substances
- Officer sex
- Officer race/ethnicity
- Location/neighborhood/beat
- Time and date of incident
- Origin of call (on view, off duty, call for service)
- Subject or officer was injured or hospitalized
- Officer years of experience/tenure
- Possession of weapons by the subject
- Subject level of resistance[10]

**Frequency of All Types of Use of Force**

- Handcuff pain/hobble
- Taser

---

[10] Identify if there is mischaracterization or an overreliance on a behavioral interpretation, rather than an objective and accurate description of behavior.

9

- BolaWrap
- Control hold
- Firearm - Point
- Firearm - Fire
- Personal Weapons
- Chemical Agent/ Oleoresin Capsicum (OC) spray
- Chemical Agent/Other
- Baton
- 40 mm
- Canine
- Blast Balls
- Vehicle Tactics/ Precision Immobilization Technique (PIT)
- Vehicle Tactics/Other

**FIT Investigations of Type III incidents**

- Number of FIT responses for Type III force
- Number of FIT responses for OISs
- Number of unintentional firearm discharges
- Number of in-custody deaths
- Number of assaults on officers
- Number of potential misconduct allegations/cases
- Number of misconduct complaints reported

**Cases Reviewed, FRU/FRB by Type**

- Number of FIT investigations reviewed by FRB
- Number of referrals by FIT to OPA for identified potential misconduct

## Appendix B. Stops and Detentions

### Objectives

**Objective 1.** Compare stops and detentions numbers, rates, and key statistical measures from the current and previous year and over time to identify and describe significant trends.

**Objective 2.** Assess whether SPD officers conduct all investigatory stops and detentions in a manner that protects subjects' rights and prevents discriminatory decisions based on subjects' ethnicity or racial characteristics.

**Objective 3.** Assess the proper documentation and evaluation of stops and detentions.

### Methods

OIG will create a rubric to evaluate a sample of SPD stops to assess:

- Completeness of stop template;
- Whether stops are supported by the necessary reasonable articulable suspicion;
- Whether there is a legal basis for the stop;
- Whether a search (frisk) was conducted after the initial stop;
- Whether the officer articulated a proper legal basis for the search;
- Whether the search yielded evidence or contraband;
- Whether an arrest occurred unrelated to the initial stop.

**Assessing Racial Bias in Stops and Detentions**

To examine racial bias in stops and detentions, OIG will employ propensity score methods. Specifically, OIG will utilize propensity score matching to assess whether treatment of a subject is associated with certain observable characteristics, such as perceived race or skin color. The procedure matches subjects of different races across various other factors known to impact an officer's decision to conduct a stop and/or make a detention. Propensity score matching allows for assessment of the likelihood that two subjects, who share the same characteristics (e.g., gender, age, stop reason, stop location, beat and additional matching variables) but differ by race, will end up with different stop resolutions.

Another method OIG will use to assess racial profiling is propensity score weighting. In this method, all available stop cases are included in the data set, rather than only matching cases.

### Quantitative and Qualitative Features

- Number of Terry stops
    - Pedestrian
    - Bicycle
    - Motor vehicle
- Number of Probable Cause stops
    - Pedestrian
    - Bicycle

- Motor vehicle
- Number and percentage of Terry stops that led to
    - Arrest
    - Citation
    - Warning
    - No action
- Number and percentage of Terry stops that were responsive to a call for service from the public (911)
- Number and percentage of Terry stops from officer on-views
- Demographics of subjects of Terry Stops
    - Subject sex
    - Subject ethnicity/race
    - Subject age
- Officer sex
- Officer ethnicity/race
- Location
- Time of day
- Triggering event
- Number of searches
- Types of searches
- Frequency that contraband is found
- Number and percentage of frisks conducted
- Number and percentage of uses of force that associated with an arrest

## Appendix C. Crisis Intervention

### Objectives

**Objective 1.** Compare training, deployment of CIT trained officers, response and supervision of crisis intervention cases, rates, and key statistical measures from the current and previous year and over time to identify relevant trends.

**Objective 2.** Evaluate techniques that can help prevent situations leading to excessive and unreasonable use of force, and evaluate the effectiveness of crisis intervention and de-escalation training programs.

**Objective 3.** Review crisis responses to observe potential race-based disparities or force inconsistent with subject actions.

**Objective 4.** Analyze officer interactions with people in crisis to identify systemic issues that contribute to improper/inappropriate responses.

### Methods

OIG will create rubrics to assess the Crisis Intervention process which will include:

- Review of Crisis Intervention training (CIT), including external mandatory training;
- Review of impact of crisis information on the event
    - If before the contact, did it factor into planning?
    - If during the contact, how did it change tactics or communication?
    - If after the contact, why was it designated crisis after the fact and how did it change the review process?
- Review whether de-escalation was used consistent with policy;
- Review the resolution of crisis contacts to identify potential ways to avoid an arrest or use of force outcome.

**Analyzing Use of Force in Crisis Calls**

OIG will conduct a review of force used in crisis calls as a subsample of the UoF review. OIG will review associated reports and footage and will assess the completeness of CIT forms submitted in association with a use of force.

### Quantitative and Qualitative Features

- Trends in OPA cases
    - Number of cases received by OPA in previous years
    - Number allegations involved
    - Number of allegations sustained
    - Number of incidents involving use of force
- Number and percentages of Computer-Aided Dispatch (CAD) events with a related crisis report
- Age of subject
- Race of subject

- Sex of subject
- Number subjects with repeated SPD contact during the previous year
- Percentage and number of crisis reports resulting in emergent detention
- Percentage and number of crisis reports referred for services
- Number of crisis response plans generated in the previous year
- Rate of crisis events resulting in a reportable use of force in the previous year
- Distribution of force types
- Frequency of use of less lethal tools in the previous year
- Number and distribution of CIT-certified officers across precinct/watch/sector/administrative assignment, rank
- Number and percentage of incidents with a CIT-certified officer on-scene
- Number and percentage of total calls volume
- Number of calls identified by communications involving a subject in crisis
    - Number of crisis cases identified after call (by the officer)
    - Number of crisis cases identified before a call (by the CSCC call taker/dispatcher)
- Number and percentage of calls cleared by a CIT-certified officer as primary
- Number and percentage of templates completed by the CIT-certified officer
- Cases response time
- Date of the incident
- Time of the incident
- Location of the incident
- Subject weapon and weapon description
- Subject U.S. military veteran status
- Whether officer(s) involved in the incident are CIT-certified
- Whether a supervisor responded to the scene
- Whether there was appropriate supervision of incident
- Whether there was appropriate follow-up
- Injuries to officers, subject, others
- Resolution of contact
- Narrative of event compared to recorded account
- Whether each use of force was consistent with policy
- Whether each use of force was consistent with training
- Whether de-escalation was attempted when feasible
- Type of behavior displayed by the subject (violent, suicidal, etc.)
    - Whether the subject was exhibiting signs of behavioral crisis or characteristics of mental illness
    - Whether the subject was under the influence of substances
- Completeness of crisis assessment

## Appendix D. Supervision

SPD will provide aggregate data and information to ensure proper supervision. Assessments related to use of force, crisis intervention, and stops and detentions will have a component related to proper supervision of those incidents. OIG will review staffing levels to ensure officers have access to adequate guidance in the field. To properly support supervision efforts, SPD is currently developing a new Early Intervention System (EIS) now called Proactive Integrated Support Model, or PrISM. This system will be implemented in a pilot version and evaluated by a third-party evaluator to confirm its effectiveness. The current EIS will remain in place until the new version is approved. OIG will continue to review data from the current system while also reviewing and monitoring development and implementation of the new system.

### Assessment Features of EIS/PrISM

- Review number of EIS assessments completed;
- Review number of assessments that led to a mentoring plan and which risk categories were triggered for each mentoring plan;
- Assess time taken to complete mentoring plans;
- Receive regular updates on SPD's innovation strategies and plans for the EIS program;
- Review number of cases where the chain of command review/investigation of force was delayed beyond the requirements of applicable policy;
- Ensure SPD has monitored EIS to determine whether it is meeting its risk management objectives;
- Ensure the new EIS threshold levels and triggers better meet SPD's risk management objectives, as compared with previous years;
- Ensure the EIS policy contains a mechanism by which the threshold for review is lower after EIS has already been triggered; and
- Ensure that information is collected on the following:
    - Supervisor, precinct, squad, and unit trends with respect to EIS
    - Precinct level use of force information
    - Closed OPA complaints and their dispositions
    - Number of individual officers who have triggered EIS reviews
    - Number of supervisor reviews of officers based on EIS triggers.

### Performance Review Committee

OIG will ensure:

- Supervisors periodically and appropriately review EIS activity of officers in their chain of command;
- EIS intervention strategies are implemented in a timely matter;
- Data regarding interventions are tracked in EIS;
- Supervisors review the progress of assigned intervention strategies as appropriate.

## Appendix E. Bias in Policing

OIG will assess and review bias throughout each assessment of use of force, crisis intervention, stops and detention, and supervision. The assessments include objectives that identify areas to evaluate potential bias, as this topic is intersectional with each of the proposed assessments. OIG will assess internal SPD trainings and equity in promotion and assignments. The upcoming Equity Assessment work will assist in establishing baselines and methodologies to address bias, disparity, and agency culture.

### Training

SPD engages in ongoing training on cultural awareness and cultural competence and training and actions to address internal disparity. To examine if SPD officers are regularly engaged in trainings on these topics OIG will collect enrollment information and ensure officers are receiving relevant training. OIG will gather or implement pre and post training surveys to assess the impact of these trainings on officers.

### Equity in Promotion and Assignments

OIG will assess if promotions within the department foster and reflect diversity. For those assessments, OIG will consider the following data:

- Training rubrics for the past five years
- Enrollment information for the past five years
- Number and percentage of officers that have participated in bias training in the past five years
- Pre and post training tests or surveys
- Data related to promotions in the past five years
- Demographic data of SPD in comparison to Seattle demographics

# Appendix F. Alphabetical List of Acronyms and Names of Organizations, Systems, and Processes

BWC: Body-Worn Camera

CAD: Computer-Aided Dispatch

CCORS: Children's Crisis Outreach Response System

CIT: Crisis Intervention Team

COC: Chain of Command

CPC: Community Police Commission

DMHP: Designated Mental Health Professionals

DOJ: The United States Department of Justice

EIS: Early Intervention System

FIT: Force Investigation Team

FRB: Force Review Board

FRU: Force Review Unit

ICV: In-Car Video

OC: Oleoresin Capsicum spray

OIG: Office of Inspector General

OIS: Officer Involved Shooting

OPA: Office of Police Accountability

PIT: Precision Immobilization Technique

SER: Sentinel Event Review

SMC: Seattle Municipal Curt

SPD: Seattle Police Department

UoF: Use of Force