```
                   UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF WASHINGTON AT SEATTLE
_____

UNITED STATES OF AMERICA,         )
                                  ) CASE NO. C12-01282-JLR
               Plaintiff,         )
                                  ) Seattle, Washington
v.                                )
                                  ) September 6, 2023
CITY OF SEATTLE,                  ) 11:00 a.m.
                                  )
               Defendant.         ) MOTION TO APPROVE
                                  ) COMPLIANCE AGREEMENT
                                  )
_____

                   VERBATIM REPORT OF PROCEEDINGS
              BEFORE THE HONORABLE JAMES L. ROBART
                   UNITED STATES DISTRICT JUDGE
_____

 APPEARANCES:



  For the Plaintiff:        Matt Waldrop
                            United States Attorney's Office
                            700 Stewart Street, Suite 5220
                            Seattle, WA 98101-1271



  For the Defendant:        Kerala Thie Cowart
                            Jessica L. Leiser
                            Seattle City Attorney's Office
                            701 Fifth Avenue, Suite 2050
                            Seattle, WA 98104-7097



  Reported by:              Nancy L. Bauer, CCR, RPR
                            Federal Court Reporter
                            700 Stewart Street, Suite 17205
                            Seattle, WA 98101
                            nancy_bauer@wawd.uscourts.gov
```

| | |
|---|---|
| 1 | PROCEEDINGS |
| 2 | |
| 3 | THE CLERK:  Case No. C12-1282, United States of |
| 4 | America versus City of Seattle. |
| 5 | Counsel, please make your appearances for the record. |
| 6 | MR. WALDROP:  Good morning, Your Honor.  Matt Waldrop |
| 7 | for the United States. |
| 8 | MS. COWART:  Good morning, Your Honor.  Kerala Cowart |
| 9 | for the City of Seattle. |
| 10 | MS. LEISER:  Good morning, Your Honor.  Jessica Leiser |
| 11 | for the City of Seattle. |
| 12 | THE COURT:  Thank you. |
| 13 | Counsel, we have finished the order on the joint motion to |
| 14 | terminate the consent degree, and I thought it was appropriate, |
| 15 | due to the length of time that I've been handling this matter, |
| 16 | to hold a hearing, and that's why you-all were invited to come |
| 17 | here today. |
| 18 | Some of this, people in the audience has lived through. |
| 19 | For the other of you who have not, by way of background, the |
| 20 | *Department of Justice v. City of Seattle* was filed July 27, |
| 21 | 2012.  The consent decree was approved, signed by the court on |
| 22 | August 30, 2012, approximately 11 years and some few days ago. |
| 23 | You need to go back to August 30, 2010, is really the |
| 24 | starting point of this case.  That was the tragic shooting death |
| 25 | of John T. Williams, a Native American, who was a woodcarver. |

1  It was a tragic death, and one that was unnecessary.
2      If we go back to August 30, 2010, there were six major
3  areas that were under scrutiny:  First, as Mr. Williams' death
4  illustrates, an unconstitutional level of use of force;
5  secondly, a high number of problems arising out of crisis
6  interventions; a relaxed approach to stops and detentions, which
7  gave rise to unconstitutional policing; and what the consent
8  decree describes as "bias-free policing," which is not defined
9  to have the normal meaning that you and I might consider it, but
10 in the consent decree, it's the Seattle Police Department's
11 commitments to revise its unbiased policing policy, develop
12 training on bias-free policing, and reinforce to officers that
13 discriminatory policing is unacceptable.  Bias-free policing
14 sometimes, in the press today, takes on more of the dimension of
15 racial parity, and I will speak to that in the course of this
16 morning.
17     Area five was supervision, probably more accurately could
18 have been described as non-supervision, and, finally, the
19 disciplinary process and civilian input into it was through an
20 ombudsman, who was well intentioned and tried hard and made some
21 progress.
22     Turning, then, to today, we have core commitments in those
23 areas.  In terms of the use of force, I'm going to find that the
24 department is in conformity to the consent decree, with the
25 exception of a crowd-control policy, which has been an issue in

1  every major city and is still under development, and, perhaps
2  will be forever, but we will come up with the best one that we
3  can.
4      For those of you who want to get into the inside baseball
5  nuts and bolts of this, I would ask you to look at the monitor's
6  report concerning the use of force and, most importantly,
7  de-escalation, and take a look at the Type 1 and Type 2
8  categories.  Those are the most casual of uses of force.  Type 3
9  is service weapons and discharges of firearms.  Type 1
10 illustrates the progress that has been made by the police force.
11 The de-escalation techniques have dramatically decreased the use
12 of any kind of force in Type 1 and Type 2, and as someone who
13 has followed this now for 11 years, I'm immensely proud of the
14 progress that the force has made on that question.
15     In terms of crisis interventions, once again, the progress
16 is not just substantial, it's very substantial.  The City has
17 crisis intervention teams now.  It has trained a high percentage
18 of the force, and, as a result, we do not have the unfortunate
19 outcomes of crisis intervention that we had when we started this
20 process.  It's an area that continues to change, in part because
21 of the progress that we've made.  We now recognize that crisis
22 response teams are a valuable tool, and I know there's movement
23 afoot to fund even a greater percentage of them.
24     Area three:  Stops and detentions have improved
25 substantially.  Training, in terms of bias-free policing, went

1   from more or less nonexistent to a carefully crafted training
2   program.  So when people hear that I'm going to find compliance
3   with bias-free policing, they need to be mindful of the fact
4   that it's the defined commitment to it that's in the consent
5   decree and not, perhaps, your popular model.
6          Another part that I'm immensely proud of the force for is
7   supervision.  We tracked, in the early part of the 2010s, 121
8   violations that were filed, or alleged violations, complaints
9   against the police.  Those went to sergeants out in the various
10  precincts.  We could find 14 that were never followed up on.
11  The remainder just disappeared into the ether.
12         Contrast that with today, where we have an extremely
13  efficient and professional record keeping, and, more
14  importantly, something that was, by and large, lacking at that
15  point, a transparency for what the force is doing, and that
16  transparency is illustrated by the dashboard, which is up and
17  gets regular use.
18         And, lastly, and, perhaps, the thing that I'm most proud
19  of, is we have revised the system that we use to report both
20  complaints and discipline.  The ombudsman has been replaced by
21  an Office of Police Accountability, freestanding.  Part of its
22  force of investigators are nonsworn.  We have an Office of the
23  Inspector General, which looks at the activities of the
24  department and makes recommendations as to how to do things
25  better.  It's been helpful, and it's been helpful to me.

1    And, lastly, and their usual position in the first or
2 second row, is the Community Policing Commission.  That group
3 and I have had our ups and downs.  They have made progress in
4 terms of defining their mission and offering meaningful
5 contributions to this process, and I am delighted to see that
6 you are here again today.
7    So I would simply say to you that there is a substantial
8 difference between where we started and where we are today.
9    Therefore, being fully advised, the court grants in part
10 and denies in part the parties' joint motion to approve the
11 compliance agreement found in the docket at Docket No. 727.
12    Specifically, the court agrees with the parties that the
13 City has achieved substantial, sustained compliance with
14 majority of the core commitment set forth in paragraph 69
15 through paragraph 168 of the consent decree; thus, the court
16 grants the parties' joint motion to the extent the parties seek
17 a finding that the City has full, sustained, and effective
18 compliance for at least two years, with the commitment set forth
19 in the consent decree regarding crisis intervention, stops and
20 detentions, bias-free policing, and supervision and the office
21 of police accountability, and terminates the parties'
22 obligations under paragraphs 130 through 168 of the consent
23 decree.
24    In addition, the court grants the parties' joint motion, to
25 the extent the parties ask the court to adopt many of their

1   proposals for action that the City and the Seattle Police
2   Department must complete with respect to the use of force in
3   crowd settings and ensuring a sustainability system of review
4   and accountability regarding the conduct of officers, policies,
5   and principles of the Seattle Police Department.
6        The court, however, denies the parties' joint motion, to
7   the extent the parties seek the court's approval of an agreement
8   that supersedes the consent decree.
9        The significance of the consent decree extends beyond the
10  settlement agreement between the parties.  It has been entered
11  as an order of the court, and, therefore, it is the
12  responsibility of the court, rather than the parties, to
13  determine when it is appropriate to terminate the consent decree
14  and dismiss this action.
15       A written order will be filed tomorrow morning, which has
16  detailed information about these various activities, including
17  the areas that need to be completed before I'm prepared to
18  dismiss or grant the motion to terminate the entire consent
19  decree, as opposed to the portions that I have done so today.
20       It has been a long and difficult road, and I am proud of
21  the efforts of the Seattle Police Department, and especially the
22  hardworking line personnel who have to be trained about our new
23  policies, and then implement new policies and procedures.
24       The Seattle Police Department leadership and the line force
25  have both worked well.  I was going to include the names of all

1  of the mayors and chiefs, but I ran out of space.

2       It is with some internal satisfaction that I recall the
3  beginning of this process, when the Seattle Police Department,
4  the Seattle Police Officers Guild, and the ACLU were in complete
5  agreement, and that agreement was opposition to dashboard and
6  body cameras.  The court simply said you're going to get both.
7  It made no one very happy, for various different reasons.

8       Sitting here today, dashboard cams, body cams, and the cell
9  phone cameras have ushered in a new era of police professional
10 and police accountability in our daily lives.

11      My thanks to the leadership of the department, the line
12 staff of the department, the City Council, and the Mayor's
13 office, all of whom have worked with me on these various
14 questions.

15      The court has had the opportunity to work with two very
16 talented professionals who accepted the positions of monitor,
17 Merrick Bob in the start of the process, and then Antonio
18 Oftelie through today.  They have contributed immensely to
19 everything that we have done.

20      It is important for the public to recognize that this has
21 not been a straight line.  I guess I group it, in my own mind, a
22 period at the start, where disagreement existed over the need
23 for the consent decree in entrenched opposition from police
24 department leadership and the officers.

25      There then followed a period of grudging acceptance, led in

part by new leadership and the departure of some officers who thought the consent decree was a bad idea. That progress was interrupted by the pandemic. Since then, I believe we have had renewed progress, which allows me today to make decisions regarding termination that I have made.

The remainder of my remarks are a personal prerogative.

After 11 years of administering the consent decree, going to annual conferences, in Texas, with judges who have consent decrees, and being a mentor judge to judges in three other cities who had consent decrees filed, I have some observations that I'd like to make.

First and foremost, the Seattle Police Department has lost about a third of its line force. We are not alone. The national attitude about police violence, the protests that came out of police violence have damaged our ability to recruit new officers. So did irresponsible talk about 50 percent cuts to the Seattle Police budget, with no plan on where to go, has taken a toll. As I mentioned, size of the departments are a national issue. There is some progress being made in the use of non-sworn civilian specialists, and I would encourage the City of Seattle to continue to pursue those efforts.

There was an unknown factor in this loss of force that's become increasing apparent to me, and that is, as the number of officers has declined, the extent which existing and continuing officers are forced to work more than they, perhaps, want to,

1  has had an effect on officer welfare.
2      We had an early intervention part of the consent decree.
3  It didn't work very well, and we took it out.  But the question
4  of officer wellness is one that I think the department is facing
5  and will continue to face.  Enough said about the size of the
6  force.
7      My next point is simply one that I see over and over again
8  and I think goes largely unrecognized.
9      In my opinion, television is the worst enemy of good police
10 work.  There was a report out of New York a couple of years ago
11 in which they had watched thousands of hours of police shows on
12 television.  They reported that actions of vigilante justice or
13 outright lawlessness by the police occurred at least every show.
14 We have this notion that somehow vigilante justice is glorified.
15 Accompanying that is misinformation runs rampant.  A discussion
16 that I've had with any number of people is why do police always
17 empty their service weapon when they have to shoot someone?  Why
18 don't they just shoot the gun out of their hand?  That's
19 television.  It's make-believe.  It's not the real world.
20     I have regular demonstrations of what the public thinks is
21 real when I talk to jurors after a trial here in my courtroom,
22 and I'm asked, where is the electronic board that you move
23 things around with your hand, or where is the DNA evidence in a
24 real estate transaction?  Sometimes it's hard for me not to take
25 that stuff seriously.

1        I have two other issues that I'd like to discuss with you
2   before I conclude.
3        The consent decree helps define a system which has made
4   major changes in police accountability.  After a long period of
5   study by people who are much more informed than I am, the
6   general conclusion is there is no perfect model for a system of
7   police accountability.
8        Regrettably, there will always be situations were an
9   officer makes a poor decision, and the accountability system set
10  up by the consent decree is designed to handle that.  Until the
11  City decides an independent investigation and a group producing
12  a recommendation to the chief is -- needs to be changed, that is
13  the system the City has chosen.
14       Things that are important to me, both citizens and police
15  can file complaints or charges with the Office of Professional
16  Accountability.  The problem that this creates for the court is
17  that, many times, it is made aware -- usually by the monitor --
18  of a situation early on.  The questions that I ask are:  Did the
19  line rank in the Seattle Police Department notify the upper
20  leadership of the incident?  Did the chief or the senior
21  leadership forward the case which deserves attention to the OPA?
22  What was the OPA's recommendations for discipline?  What did the
23  chief to do with that recommendation?
24       All of that leaves me out of the picture because, having
25  set up that system, the court should not and cannot fairly

1  adjudicate a case before the facts are known.  If I'm
2  dissatisfied with what happens, I'm limited to this, my bully
3  pulpit and the ability to keep the consent decree open to
4  continue to review the accountability system.  The court will
5  continue to review accountability and discipline systems over
6  the coming months to ensure that those systems continue to
7  perform well.  But I take a systemic view, as opposed to being
8  focused on individual incidents.
9       It has been no secret that the court was going to be
10 issuing this order, and I think it's reflected in what happened
11 this morning, when a local news source published an article
12 involving an incident, and, basically, seemed intent on getting
13 the officer's side of the story out there first.  I can't
14 comment on that.  I don't know the facts.  I'm not sure that the
15 person who published the article knows the facts.  He only knows
16 what one side told him.
17      We are not going to prejudice the defendant or the
18 respondent in the disciplinary system by engaging in sort of
19 public speculation of what if.  It handicaps the police, it
20 handicaps me, it handicaps anyone that's involved in this
21 process.  And it's infuriating to me that we now want to battle
22 it out in the court of public opinion as opposed to trying to
23 find out what the facts are and then deal with the situation
24 appropriately.
25      The other issue that I'm constantly asked about is the

1    collective bargaining agreements. And I get very thoughtful
2    letters from the public, particularly some people who take a
3    keen interest in the subject, asking why the court doesn't take
4    a more direct hand in that question.
5         We have collective bargaining agreements, the City of
6    Seattle does, with the Seattle Police Management Association and
7    the Seattle Police Officers Guild. These are labor contracts.
8    When I'm asked why don't I just void the provisions in them or
9    prohibit some provisions going forward in the future, the answer
10   is I can't, except in some very limited situations.
11        And it may come as a shock to those people who think I'm
12   doing a bad job at this. In the court's view, I shouldn't be
13   able to negotiate collective bargaining agreements. That's why
14   it's a collective bargaining agreement.
15        To me, the exception to that principle should be when a
16   contract is used to lock in procedures which foster unacceptable
17   police behavior or avoid accountability for improper actions.
18        In my view, contracts should relate to wages, hours,
19   benefits, and working conditions. They should not shelter
20   officers from City ordinances.
21        Once again, police contracts blocking necessary reforms are
22   a national problem. The problem is being addressed in other
23   cities. Everyone is trying to deal with this issue. I'm not
24   recommending anything they did, but I will tell you that in
25   Washington, D.C., legislation was recently enacted that limits

1  the kinds of restraints police may use, improves access to
2  body-camera footage, removes disciplinary rules from the
3  collective bargaining agreement process, and reforms the police
4  discipline system.
5       Those are the kinds of things that other people are
6  contemplating doing, and I think they reflect the difficulty
7  that's involved in having, particularly, discipline and
8  accountability systems included as parts of labor contracts.
9       Lastly, a couple of random thoughts.
10      I'm troubled that we hold the police responsible for things
11 they didn't create.  People write me all the time and say, "Why
12 did the police create homelessness?"  My answer is, "Huh?"  I
13 don't think the police created homelessness.  There are a whole
14 series of factors that did.  The police are not one of them.
15 They have to deal with homelessness, but that's a different
16 question.
17      They want to know why do we have a gang problem and what
18 are the police going to do about it?  Well, the police have
19 their views on why we have a gang problem and they have their
20 views on what we should do about it, but the existence of those
21 gangs is not as a result of the police.
22      The police are regularly brought to task when bad things
23 happen, events get out of control.  They are almost never
24 credited when they do something good, and I know they do.  I've
25 participated in officer ride-arounds, where people talk about

1  paying money out of their own pocket because of someone they had
2  arrested that day.
3        I have not wavered at all in that I think the police should
4  be held responsible for things they can control, most recently,
5  what, four or five months ago the discovery of political signs
6  that were in precinct houses.  You know, come on.  If you're a
7  captain in a precinct, you ought to know you've got political
8  signs and do something about it.  I was happy to see that that
9  was what happened.
10       So I close with the following thoughts:  The consent decree
11 and constitutional policing are different animals.  The consent
12 decree is part of constitutional policing.  It's a process to
13 get us to it.  The consent decree will pass away when its
14 requirements are met.  I hope that is not in the immediate
15 future but in the near future.  However, the goal of
16 constitutional policing is one that will be with us forever.
17       And I'm reminded of something that Winston Churchill said
18 in 1942, after the success of the North African campaign of
19 World War II.  He said and asked, "Now, is this the end?  This
20 is not the end.  It is not even the beginning of the end, but it
21 is, perhaps, the end of the beginning."  That is where I believe
22 we are today.
23       And so as I grant and deny termination of various parts of
24 the consent decree, I follow in his statements and sentiments.
25 I believe that is where we are today.

1    I'll ask counsel if they have any questions before I
2 adjourn.
3    Mr. Waldrop?
4       MR. WALDROP:  Nothing from the United States, Your
5 Honor.
6       THE COURT:  Ms. Cowart?
7       MS. COWART:  Nothing from the City.  Thank you, Your
8 Honor.
9       THE COURT:  Counsel, I would like a representative of
10 the City, if there is someone from the Mayor's office here, a
11 lawyer, and someone from the U.S. Attorney's Office to come back
12 to chambers.  I want to talk to you briefly.
13    Thank you very much, ladies and gentlemen.  We will be in
14 recess.
15            (Proceedings concluded at 11:32 a.m.)

C E R T I F I C A T E

       I, Nancy L. Bauer, CCR, RPR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

       I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.

       Dated this 30th day of September 2023.

                            /S/  Nancy L. Bauer

                            Nancy L. Bauer, CCR, RPR
                            Official Court Reporter