# Seattle Accountability System Sustainability Assessment
## December 2023



**Seattle Police Monitor**

**Seattle Accountability System Sustainability Assessment**

**Table of Contents:**

1. **Introduction & Scope**……………………………………………………… 4
2. **Synthesized Findings and Recommendations**………………………….. 5
3. **Methodology & Data Sources**…………………………………………… 8
   a. Evaluation of OPA/OIG Case Files………………………………….. 9
4. **Dimensions of Accountability**…………………………………………… 14
   a. Front End…………………………………………………………… 14
   b. Back End…………………………………………………………... 15
      1. *Arbitration of Police Discipline*
      2. *Collective Bargaining Impact on Back-End Police Accountability*
      3. *OPA Investigations & OIG Audits*
   c. Learning and Innovation……………………………………………… 28
   d. Findings and Recommendations……………………………………… 29
5. **Sustainable Organizational Capacity**…………………………………… 31
   a. An Introduction to the Accountability Triad………………………… 31
   b. The 2017 Accountability Ordinance………………………………….. 32
   c. The Office of the Inspector General for Public Safety (OIG)……………… 33
      i. OIG Stakeholder Interviews
      ii. OIG Policies
      iii. OIG Structure
      iv. OIG Systems & processes
      v. OIG Staffing
      vi. OIG Budget
      vii. OIG Recommendations
   d. Office of Professional Accountability (OPA)……………………… 41
      i. OPA Stakeholder Interviews
      ii. OPA Policies
      iii. OPA Structure
      iv. OPA Systems & processes
      v. OPA Staffing
      vi. Budget
      vii. Recommendations
   e. Community Police Commission (CPC)…………………………….. 49
      i. CPC Stakeholder Interviews
      ii. CPC Policies
      iii. CPC Structure
      iv. CPC Systems & processes
      v. CPC Staffing
      vi. CPC Budget
      vii. Recommendations
6. **Sustainable Systemic Capacity**…………………………………………… 58

a.      Intersection of work – challenges and opportunities…………………………..   58
            *1. Policy Tracking*
            *2. Division of Responsibilities – Policy Analysis & Recommendation*
            *3. Stakeholder Opinions as to Quality of Oversight Provided by*
            *Accountability Triad*
            *4. Community Activist Opinions as to Quality of Oversight Provided by*
            *Accountability Triad*
b.      Collaborative capabilities/constraints…………………………………………..   64
c.      Collaborative learning and feedback loops………………………………………..   64
            *1. Acceptance of Recommendations*
            *2. Seattle Police Department Budget & Resources*
d.      Recommendations…………………………………………………………………   68

**7.    Monitoring Team Conclusions**…………………………………………………   69


**Tables**:
**Table 1**.  Reports Posted to Accountability Triad Websites…………………………………   11
**Table 2**.  Status of SPD Termination Cases……………………………………………………   18
**Table 3**.  SPD Disciplinary Cases Pending Arbitration/Appeal………………………………   18
**Table 4**.  Quantitative Description of OPA/OIG files reviewed………………………………   26
**Table 5**.  OIG Annual Budget 2021-2024………………………………………………………   39
**Table 6**.  OPA Annual Budget 2021-2024………………………………………………………   48
**Table 7**.  CPC Annual Budget 2021-2024………………………………………………………   56
**Table 8**.  SPD Response to SER Recommendations……………………………………………   66


**Appendix**:

**I.      HISTORY OF POLICE ACCOUNTABILITY IN SEATTLE**…………………….   72
            1.      Committees Appointed to Review Police Accountability Issues……………..   76
**II.     PROGRESSION OF POLICE ACCOUNTABILITY SINCE THE ENTRY OF THE**
            **CONSENT DECREE**…………………………………………………………………...   84
            1.      History Related to the Creation of the Accountability Ordinance…………….   89
            2.      The City's Filing on the Accountability System………………………………   90
            3.      DOJ's 2015 Filing on the Accountability System……………………………..   90
            4.      OPA Director 2015 Filing on Accountability System…………………………   91
            5.      OPA Auditor 2015 Filing on Accountability System…………………………   91
            6.      CPC Filing on Accountability System………………………………………...   92
            7.      Court Advises the Parties to Consider Reforms and Monitor
                    Conducts its Fourth Systemic Assessment……………………………………   92
            8.      The Parties Develop a Working Group to Address Accountability
                    System Reforms………………………………………………………………   93
            9.      The Review and Enactment of the Accountability Ordinance…………………   97
            10.     Subsequent Court Hearings related to the Implementation of the
                    Accountability Ordinance……………………………………………………   100
            11.     Collective Bargaining Clashes with the Accountability Ordinance……………   101
            12.     21CP Accountability Assessment and Subsequent Assessment by
                    Federal Monitor……………………………………………………………..   103

13.    Status Conference……………………………………………………………… 104

14.    Recent developments……………………………………………………... 105

**III.    Comparing Seattle Accountability Mechanisms to National Standards and Comparative Cities**………………………………………………………….. 105

a.    Comparable Cities…………………………………………………………… 106

b.    Comparison Points…………………………………………………………… 112

**Appendix Table 1.**  History of Police Accountability in Seattle…………………………..  72

**Appendix Table 2.**  Seattle Police Chief Tenures and Respective Accountability-Related Incidents (since 1979) [Not including Interim Chiefs]………………………………..  83

**Appendix Table 3.**  Police Accountability in Seattle Following the Entry of the Consent Decree……………………………………………………………………..  84

## 1.    Introduction & Scope

This report details the Federal Monitoring Team's findings and recommendations relating to the Seattle Police Department's ("SPD," the "Police Department," or the "Department") external accountability systems. The assessment evaluates the extent to which the City of Seattle's external accountability programs have sufficient policies, structures, systems, processes, and human capital to adapt to community needs and sustainably deliver results.

The assessment is primarily a capacity audit and qualitative evaluation of the SPD's "Accountability Triad": (1) the Office of Inspector General for Public Safety ("OIG"), (2) the Office of Police Accountability ("OPA"), and the Community Police Commission ("CPC"). The pivotal issue addressed in this assessment is whether the City's existing accountability structures are suitably positioned to provide robust and sustainable external oversight to the Police Department upon the termination of the Consent Decree.

This assessment complements the Federal Monitor's review and recommendations on systems accountability, as required by the Court, and is intended to augment and reference findings from the Monitor's 2022 Comprehensive Assessments on Use of Force, Stops and Detentions, Crisis Intervention, and Supervision.

Ultimately, this assessment is not designed to determine compliance with the Consent Decree. Rather, it is designed to provide the Court, the City of Seattle ("the City"), and the community with key insights and findings for bolstering sustainability of robust policing accountability. Specifically, this assessment was developed to provide information to address the Court's concerns about whether the City's current accountability system has adequate capacity to address systemic policing failures and individual misconduct.[1] Specifically, we looked to determine:

1. To what extent is the City able to deter and address individual misconduct by officers? and,
2. To what extent is the City able to identify system-wide policing failures and address them through effective reforms and innovation?[2]

For purposes of this assessment, we consider external police accountability to be a success if the City has established an accountability system that has the capacity to provide robust and rigorous oversight of the SPD. This report concludes that the city has developed a sophisticated accountability system, yet sustaining the system will require ongoing attention, funding, innovation, and support from the community, the city, and police leadership.

---

[1] See, City of Seattle Mot. Supp. Parties' Joint Mot. to Approve Compliance Agmt at 3-4, *U.S. v. City of Seattle*, No. 2:12-cv-01282-JLR (W.D. Wash. filed July 27, 2012) (Dkt. No. 730).
[2] See, Order Finding the City of Seattle Partially Out of Compliance with the Consent Decree at 6, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 562); Stip. Mem. Supp. Joint Mot. Approve Compliance Agmt at 21, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 728).

## 2.    Synthesized Findings and Recommendations

After reviewing the past and current state of the Seattle police accountability mechanisms, we agree with a report completed by 21CP Solutions in 2019 that "[t]he City of Seattle has one of the most multi-layered and sophisticated oversight systems in the United States [and]…[t]he current state of accountability appears to be quite effective..."[3] Further, we agree with the majority of stakeholder opinions reported herein that the Accountability Triad is positioned to provide sustainable oversight in the future – even if there is potential for future internal and external challenges and interagency conflict.

Nevertheless, no accountability system can ever be deemed perfect, and all accountability systems must continually adapt to meet changing community needs and departmental realities.  To this end, the City of Seattle is in a position to improve its position relating to the sustainability of its accountability structures by taking the following actions:

1. Despite the capacity of the Accountability Triad to provide meaningful oversight of SPD, there is a need for more clarity with respect to each agencies' roles, goals, and processes, particularly when compared to one another.

2. Overall, it appears that the accountability system would function more effectively if the OIG were to be used as a clearinghouse for accountability-related recommendations which are then referred to the SPD for consideration. OPA and CPC should retain responsibility to research and identify policy concerns and request policy reviews in whatever area they identify, with OIG developing those concerns in collaboration with SPD. Transparency would be essential, with the OIG publicly reporting its policy work and the ultimate results of any recommendations made to it and to the SPD.

3. The Accountability Triad must continue their work to repair relationships broken over the past two years by a CPC that was not fully functional. The OIG should regularly attend CPC meetings to improve collaboration between the two entities.

4. The OPA, OIG and CPC should use their statutorily required quarterly meetings[4] to ensure improvements in tracking and reporting on the status of pending recommendations from the Accountability Triad to the SPD.
    - The City should consider transferring from the CPC to the OIG the responsibility of maintaining a database and reporting on the status of implementation of the Accountability Ordinance and Accountability Triad policy recommendations implementation.[5]

With respect to the OIG:

---

[3] 21CP SOLUTIONS, AN ASSESSMENT OF THE CITY OF SEATTLE'S POLICE ACCOUNTABILITY SYSTEM 2, https://www.seattle.gov/documents/Departments/OPA/Reports/21CP-Solutions-Assessment-of-Seattle-Police-Accountability-System-December-2019.pdf (Dec. 11, 2019).
[4] See SEATTLE, WASH., ORDINANCE NO. 125315 § 3.29.420.A.2.
[5] See SEATTLE, WASH., ORDINANCE NO. 125315 § 3.28.410.A.3.

5. While recognizing that the City has finite funds available to support policing, the City must appropriately fund the OIG going forward, to include ensuring adequate office space and competitive salaries. The City will need to confer with the IG in order to ensure that the OIG has the resources, office space and full-time staff needed to take over SPD-related monitoring responsibilities.

6. The City should consider granting the OIG the primary role of researching and making recommendations on police policy with the OPA and the CPC providing information and data to the OIG. The OIG should also be given the role of publicly reporting on the status of pending recommendations made to the SPD. The City would need to ensure that the OIG has the resources necessary to accurately track and report on the status of recommendations made.

7. OIG should conduct an updated assessment of SPD discipline for cases adjudicated under the leadership of Chief Diaz.

8. OIG annual reports need to be prepared in a timelier manner with an objective of completing annual reports prior to the end of the first quarter of the next calendar year. Further OIG annual reports and/or semi-annual reports should contain more detail relating to OPA cases that have either not been certified as thorough, objective and timely or where OIG and OPA disagree as to classification decisions.

With respect to the OPA:

9. SPD and its accountability partners should consider establishing a dedicated policy and process for expediting the resolution of certain expressly identified, low-level, and minor misconduct.  To the extent that such a policy and process may outline specific expectations for first-line supervisors to address such misconduct, the policy and process must ensure that supervisor action is fair and uniform; is adequately documented; and is subject to ongoing, systematic review and oversight by OIG.

10. As recommended by the OIG in their November 2021 Discipline Audit, the OPA Director, in consultation with the Chief of Police, should develop criteria to consistently identify opportunities for complainants to communicate with the Chief of Police as provided in the Accountability Ordinance 3.29.125.G.

With respect to the CPC:

11. The CPC must create and implement internal policies and procedures to clarify roles, goals and processes that will support the CPC's work going into the future and reduce the risk of conflict amongst and between the CPC Executive Director, CPC staff, the CPC Co-Chairs, and individual Commissioners when they interact with staff. The CPC should also formalize its Communications Strategy policy.

12. The City has taken recent steps to better set the CPC up for success, including by reducing its size and funding a Deputy Director position. However, the CPC has struggled for years

and there has not been sufficient time to determine if these recent changes will lead to a functional accountability partner. Therefore, in three to five years, the City should evaluate the effectiveness and capacity of CPC based on its staffing needs, budget, size, composition, and written policies and procedures.

With respect to the SPD, Police Discipline and Collective Bargaining:

13. The City needs to evaluate the SPD's budget to ensure it has the resources necessary to adequately review, respond, manage, implement, and track recommendations made by the Accountability Triad. The current state of funding in that regard does not appear sustainable and will not support SPD capacity to implement reasonable recommendations made by the Accountability Triad now and going forward.

14. The City's new processes for involving City Council staff and the Accountability Triad in collective bargaining negotiations has increased the potential for positive outcomes that should support the sustainability of Constitutional policing going forward. However, unless and until the State of Washington changes the state of the law to prohibit collective bargaining on issues of accountability, it will not be possible for the City to fully implement public expectations regarding police accountability. As such, the City must continue to both prioritize the importance of police accountability when it engages in collective bargaining with the City's police unions and continue to lobby the state legislature to prohibit accountability-related ordinance and policies from being part of the collective bargaining process. The City should consider codifying the process by which the accountability partners are involved in collective bargaining going forward.

15. Changes in the law relating to the arbitration process and its impact on the authority of the SPD to discipline its employees have reduced the risk that the SPD will be unable to hold its officers accountable in the future. However, the City must balance any tactical benefits that may exist from delaying the adjudication of police disciplinary-related arbitrations against the public policy benefit of ensuring timely and final disciplinary decisions and push forward the adjudication of these arbitrations to reduce an otherwise unacceptable backlog.

16. The City should seek to eliminate the significant, negative impact of a violation of the 180-day requirement for completion of OPA investigations from its collective bargaining agreements wherein officers may not be disciplined if an OPA investigation is not completed within that period of time. While timely investigations are essential for fairness and responsiveness to both sworn personnel and external complainants, where involved, a requirement that an investigation be completed within an arbitrary time frame can make it impossible for the SPD to hold its officers accountable, even in the face of serious misconduct and/or where allegations and investigations are complex.

### 3.    Methodology & Data Sources

For this report, the assessors reviewed and reference herein many of the key documents filed as part of the Seattle Consent Decree litigation to ensure a full understanding of the history of the SPD accountability system, its structure, and issues and concerns that have been identified in the past.[6]

As such, this assessment included a review of all Consent Decree court documents referencing issues of police accountability, as well as court filings made by the SPD accountability partners. In addition, this review references historical information compiled in a Ph.D. dissertation entitled: "Seattle Consent Decree: Excessive or Effective Force in Police Reform?;"[7] findings and recommendations made by 21CP Solutions in their December 2019 report entitled: "An Assessment of the City of Seattle's Police Accountability System;"[8] and the accountability provisions accepted in police union Collective Bargaining Agreements, to include the most recent collective bargaining agreement reached between the City and the Seattle Police Management Association (SPMA) in 2022.

Between January and March 2023, and in September 2023, interviews and follow-up interviews were conducted with key stakeholders who have been intricately involved with the work of the OIG, OPA and CPC. These interviews were semi-structured and generally conducted in-person in January and March and virtually in September.

Interviews were not recorded to better ensure participants felt comfortable sharing potentially confidential information and personal thoughts and impressions. As an alternative to audio or video recording of these interviews, copious notes were taken during each interview. Apart from a public meeting with the CPC, and correspondence received from a community group, all participants were promised confidentiality and no quotes or comments have been included in this report that can or should be attributed to any one specific person.

With respect to the OPA, assessors specifically examined two previously published reports by the prior federal Monitor: (1) the "Fourth Systemic Assessment: Office of Professional Accountability (OPA)," published January 2016;[9] and (2) the "Follow-up Review of the Office of Police Accountability," dated January 10, 2020[10] and have examined the OPA's responses to the conclusions and recommendations made in those reports.

---

[6] For an extensive history of police accountability in Seattle, see the attached Appendix.
[7] RICHARD ROSENTHAL, THE SEATTLE CONSENT DECREE: EXCESSIVE OR EFFECTIVE FORCE IN POLICE REFORM?, https://summit.sfu.ca/_flysystem/fedora/2022-08/input_data/21424/etd21447.pdf (2021).
[8] 21CP Solutions, supra note 3.
[9] Attach. Seattle Police Monitor's Fourth Syst. Assess. Re Office of Prof. Account., *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 259-1).
[10] Follow-Up Rev. Office Police Account., U.S. v. Seattle, No. 2:12-cv-01282-JLR (Dkt. No. 604).

The assessment also considered OIG, OPA & CPC reports, as posted on each organization's websites as of June 1, 2023, as well as the Manuals and Internal Operating documents published by the Accountability Triad and available on their websites.[11]

      a.      Evaluation of OPA/OIG Case Files

By ordinance, the OIG is responsible for certifying OPA investigations for thoroughness, lack of bias and timeliness. A Monitoring Team subject matter expert reviewed a total of 64 cases investigated by OPA and audited by the OIG to evaluate the quality of OPA investigations and OIG reviews of those investigations.

For cases that were fully certified by the OIG, a population of cases was randomly selected with an emphasis on cases involving allegations of bias or use of excessive force. In addition, our SME reviewed all cases, from 2022 and 2023, where the OIG found an insufficient basis to fully certify OPA cases as thorough, timely or objective.

| Review Area | Time Period | Cases |
|---|---|---|
| Partial Certifications | All from 2022 & 2023 | 26* |
| Bias & Force Cases | Sample of 2023 Q1-Q2 | 25** |
| Non-Concurrence | All from 2022 & 2023 | 16* |

**Total Cases Reviewed = 64**
*Two cases involved both a partial certification and a non-concurrence; one case involved Force/Bias and an OIG non-concurrence.
**An additional four cases involve partial certifications and are already counted under the case count for the partial certification review, meaning twenty-nine bias/force cases were reviewed in total.

Of the 64 cases reviewed, four (4) cases were initiated in 2020, eight (8) cases were initiated in 2021, forty-eight (48) cases were initiated in 2022, and four (4) cases were initiated in 2023.

Data collected over the course of this assessment were compared to identify similar and dissimilar themes and ideas. The information was organized using a "qualitative thematic analysis."[12] Themes offered by stakeholders were compared to objectively available data and are discussed.

The assessment also considered the positions of the parties (the City and the DOJ), as expressed in recent court filings while evaluating the accountability systems overall. Keys position points considered included the parties' stipulation to the following improvements to the accountability systems under review here:

---

[11] Including, OPA Internal Operation and Training Manual & SPD Policies 5.001 & 5.002 (*U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. Nos. 156 & 161, 256, 258, 278, 689)); OPA Mem. Of Understanding with prosecuting agencies (*U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 682, Ex C)); and OPA Revised Manual (*U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 689, Ex 2)).

[12] GRETCHEN B. ROSSMAN & SHARON F. RALLIS, AN INTRODUCTION TO QUALITATIVE RESEARCH: LEARNING IN THE FIELD (Sage Publications 1998).

a. "Continuous improvements to disciplinary investigations" with the OPA "following recommendations of the Monitor and the OIG," having "augmented its training on interviewing techniques; added two new civilian investigators; increased standards for case documentation; and adopted changes to improve the experience of complainants."[13]

b. "Continuous learning and building community trust" with the OIG having "developed the Sentinel Event Review (SER) system for substantive city-wide learning, policy reform and innovation" and "working to transition the current SER process into a means to analyze officer-involved shooting incidents where there is an intersection with mental health/crisis to better understand root causes and identify broader system changes."[14]

c. Modifications in "the process for collective bargaining to incorporate more community input" with input now being provided by City Council staff and the CPC.[15]

d. Accountability advances with respect to a recently adopted agreement with the Seattle Police Management Association (SPMA),[16] to include "(1) adopt[ing] an evidentiary standard that makes it easier for the City to prove misconduct; (2) require[ing] that arbitrators must uphold the Chief of Police's decision unless it is arbitrary or capricious; (3) mak[ing] disciplinary appeal hearings more transparent and accessible to the public" and 4) …retain[ing]" full subpoena power for OIG and OPA."[17]

e. "Rulings by the Washington Court of Appeals have limited the discretion of arbitrators in police disciplinary appeals. First, the Washington Court of Appeals upheld the City's termination of an officer who had used excessive force on a woman while she was handcuffed and restrained in his patrol car. The court found that an arbitrator's award reinstating the officer 'was so lenient it violates the public policy against the use of excessive force.' In a second case, not involving the City, an arbitrator reinstated a police officer who had been sexually harassing women in the community. The Court of Appeals held that reinstatement violated the 'well-defined and dominant public policies aimed at ending current discrimination and preventing future discrimination . . . by officials acting under color of state law.'"[18]

f. "Reformed arbitrator selection procedures. In 2021, the state legislature enacted a new law creating mandatory arbitration selection procedures for police unions. As required, a state commission now appoints a roster of trained, experienced arbitrators to hear disciplinary appeals for police officers. Appeals are automatically assigned by the commission to the

---

[13] Agmt on Sust. Compliance and Stip. [Proposed] Order of Resolution at ¶ 6a, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 727-1).

[14] *Id.*, ¶ 6b.

[15] *Id.*, ¶ 6c.

[16] The SPMA represents SPD Lieutenants and Captains in collective bargaining with the City. See, *Seattle unanimously passes police management contract focusing on accountability*, MYNORTHWEST (June 15, 2022, 4:11 AM), https://mynorthwest.com/3517576/seattle-unanimously-passes-police-management-contract-focusing-on-accountability/.

[17] Agmt on Sust. Compliance and Stip. [Proposed] Order of Resolution at ¶ 6d, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 727-1).

[18] *Id.*, ¶ 6e.

next available arbitrator on the list, eliminating negotiations between the parties over arbitrator selection."[19]

g. "A new state law supports the termination of officers who use excessive force or exhibit racial bias. It mandates the decertification of officers who have been terminated for using unlawful force or for failing to intervene to stop such force by another officer. RCW 43.101.105(2)(b) & (c). It also establishes discretionary authority to decertify officers who use force in violation of their department's policy and officers who discriminate based on a person's protected status. RCW 43.101.105(3)(e) & (h). The legislation will help prevent these officers from continuing to serve in law enforcement."[20]

Finally, we reviewed Accountability Triad reports posted to their websites as of June 1, 2023, which are inventoried in Table 1, to better understand the findings and recommendations made by the accountability partners over the course of the past few years.

**Table 1.** **Reports Posted to Accountability Triad Websites**

| | |
|---|---|
| Office of Inspector General<br><br>OIG Reports - OIG \| seattle.gov | • Sentinel Event Review Report, Wave 1 (July 22, 2021) (112 pp.)<br>• Sentinel Event Review Report, Wave 2 (March 14, 2022) (73 pp.)<br>• Sentinel Event Review Report, Wave 3 (October 11, 2022) (81 pp.)<br>• Sentinel Event Review Report, Wave 4 (April 18, 2023) (45 pp.)<br>• Annual, Semi-Annual & Quarterly Reports (14 reports dated between April 14, 2019, and December 15, 2023)<br>• Police Intelligence Audit (June 21, 2019)<br>• Surveillance Reports (13 reports and letters dated between January 27, 2020, and September 29, 2023)<br>• UOF and Crowd Management (10 reports dated between July 31, 2019, and May 13, 2022), including Sentinel Event Review Reports, Waves 1 & 2<br>• Traffic (5 memorandums, dated between May 18, 2021, and December 14, 2023),<br>• Discipline (2 audit reports: July 18, 2019 "SPD Disciplinary Process – Policy Report" and November 30, 2021 "Audit of SPD Disciplinary System for SPD Personnel – Audit Report")<br>• Operations (11 reports dated between September 26, 2018, and October 18, 2022, including,<br>   o Peer Intervention Memo to Chief Best (September 26, 2018), |

---

[19] *Id.*, ¶ 6f.
[20] *Id.*, ¶ 6g.

| | |
|---|---|
| | <ul><li>○ Evaluation of SPD Disparity Review Methodology (March 18, 2019)</li><li>○ Crime Stoppers Memo to Chief Best (April 29, 2019)</li><li>○ Firearms Inventory Controls Review (May 23, 2019)</li><li>○ IAPro Information Memo (May 8, 2020)</li><li>○ Audit of SPD Patrol Canine Teams (June 24, 2020)</li><li>○ Audit of Destruction of Post-Conviction DNA Evidence (December 17, 2020)</li><li>○ Pursuit Policy Alert Letter (February 18, 2021)</li><li>○ Audit of Secure Firearm Storage in Training Facilities (August 4, 2021)</li><li>○ Review of Systemic Non-Compliance with COVID-19 Masking Requirements among SPD Personnel (April 15, 2022)</li><li>○ Use of Deception in Public Safety Roundtable Memo (October 18, 2022)</li></ul><ul><li>OPA Review and OIG Investigations (3 reports dated between February 16, 2021, and December 15, 2023)</li><li>SPOG/SPMA Contract Recommendations (3 memorandum dated between January 27, 2020, and October 26, 2018)<ul><li>○ SPOG Contract Impacts Memo to CM Gonzalez (October 26, 2018)</li><li>○ SPMA Contract Recommendations (December 5, 2019)</li><li>○ SPOG Contract Negotiations Feedback to CM Herbold (January 27, 2020)</li></ul></li><li>Chief of Police Complaints (4 reports dated between April 19, 2023, and June 22, 2023)</li></ul> |
| Office of Professional Accountability<br><br>Reports - OPA \| seattle.gov | "Recent Reports" 2018-2021:<ul><li>Follow-up Review of the Office of Police Accountability, Seattle Police Monitor (January 2020)</li><li>2019 Police Discipline Appeals Status Report, Seattle City Attorney's Office & OPA (May 2020)</li><li>Joint Officer-Involved Shooting Protocol, OPA, CPC & OIG (May 2020)</li><li>OPA Response to Council Crowd Control Weapons Ordinance (August 2020)</li><li>2020 Annual Report, OPA (April 2021)</li><li>Complainant Experience Report, OPA (June 2021)</li><li>2021 Annual Report, OPA (April 2022)</li><li>2022 Annual Report, OPA (May 2023)</li></ul> |
| Community Police Commission<br><br>Statements, Reports, and Letters - | Reports:<br>**2020**<ul><li>Accountability System Midyear Report (with OIG, OPA, SPD) to Public Safety and Human Services Committee, Dec 8</li></ul> |

| Community Police Commission \| seattle.gov | | |
|---|---|---|
| | **2021** | ▪ Report on Crowd Control Weapons Ban, Aug 14 - 9 recommendations<br>▪ CPC 2019 Annual Report, Mar 31 |
| | **2022** | ▪ CPC Section (pages 23-26) in Seattle Police Monitor 2021 Semi-annual Report, Aug 3<br>▪ Accountability System Midyear Report (with OIG, OPA, SPD) to Public Safety and Human Services Committee, Jul 13 |
| | **2023** | ▪ 2022 - 2024 Seattle Community Police Commission Strategic Plan<br>▪ Mid-Year Report \| Seattle City Council Mid-Year Report Presentation Recording<br>▪ Proposed 2023/24 Budget Analysis Presentation<br>▪ CPC Mid-Year Report – July 11, 2023 |

### 4.    Dimensions of Accountability

a.    Front End

"Front-end Accountability" involves ensuring that officer performance is aligned with community needs and expectations before anything goes wrong. This type of accountability focuses on establishing clear, transparent expectations aligned with public input and priorities that officers follow. If officers understand and perform according to departmental and community expectations at the outset, they can be considered to be policing in a responsive and accountable manner.

A key example of the accountability partners' efforts in this area includes the OIG's work on creating a policy on police use of deception (or "ruses"). The OIG identified the need for a policy in this regard after two incidents which caused public concern regarding SPD practices. As described by the OIG, in one case, which occurred during the 2020 protests, "SPD implemented a ruse to drive people out of the Capitol Hill Organized Protest (CHOP) Zone by sending fake radio dispatches reporting that armed proud boys were gathering downtown, agitating protesters and others." Another case, as described by the OIG, involved an officer who in 2019, "used deception to find the driver responsible for a hit and run fender bender, which contributed in the driver dying by suicide."

The OIG and SPD recognized that "[a]lthough allegations were sustained in both cases, none of the allegations were specifically related to the use of a ruse because SPD did not have a specific policy governing ruses or deception." To address this gap, OIG reported working collaboratively with SPD to develop a policy with stakeholder review and input. The policy, as described by the OIG, "aim[ed] to create guidelines for using deception during patrol activities and a process for documentation of deception when used."[21]

In addition, OIG has recently completed a "Sentinel Event Review" project, which is described as "a community inclusive accountability program . . . A SER panel [] reviews 'critical incidents,' looking at SPD systems to determine how they can avoid future harmful outcomes and better serve the community… SER is not focused on individual actions or assigning blame, but strengthening system fail-safes to prevent harm. SER aims to identify the causes and contributing factors to these incidents with the goal of prevention" [emphasis omitted].[22] As described later in this report, the OIG's four Sentinel Event Review reports do appear to have had positive impact on SPD policy and practice and have been supported by robust methodologies giving the OIG credence as an agency dedicated to both community input and best practices in policing.[23] Specifically, many of

---

[21] See, Seattle Office of Inspector General, *SPD Deception ("Ruse") Policy* (Oct. 13, 2022), https://www.seattle.gov/documents/departments/oig/other/221017deceptionpolicymemofinal.pdf.

[22] Seattle Office of Inspector General, *Sentinel Event Review* (last visited Nov. 19, 2023), https://www.seattle.gov/oig/sentinel-event-review.

[23] The OIG defines a "sentinel event" as: "a significant negative outcome, such as a death or serious injury, that acts as a signal that problems within a system exist and may lead to similar bad results if the system is not examined to find root causes and proper remedies. Industries like airlines and health care providers have developed and used 'sentinel event review' processes to thoroughly examine these types of incidents, identify what caused them, and use those lessons to prevent them in the future." The OIG further defines a "Sentinel Event Review" as: "a community inclusive accountability program led by the Office of Inspector General (OIG). A SER panel will review 'critical incidents,' looking at SPD systems to determine how they can avoid future harmful outcomes and better serve the

the SER recommendations involved recommendations that would clarify SPD expectations for its officers to include in areas, including but not limited to use of force reporting, expectations regarding crowd control, the establishment of reliable and effective communications strategies, altering policing strategies and tactics, crowd management and emergency response training, and the development of arrest policies for individual events.

On the OPA side, OPA Management Action Reports ("MAR's") often include recommendations for reviews and/or changes in police policy to provide clarity and eliminate ambiguity to better inform officers of department expectations.[24]

With respect to the CPC, the Commission was created  to provide an ongoing community voice within and to codify community expectations as part of SPD policies, procedures and training.[25] Indeed, CPC does not review particular performance or adjudicate particular incidents but, instead, is intended to serve as a primary conduit between the community and police.

      b.     Back End

"Back-end Accountability" involves how and whether officer misconduct is addressed – that is, whether there are appropriate actions taken when officers fail to meet performance standards, follow SPD policy, and/or adhere to legal requirements. Back-end Accountability refers to what happens when officers fail to adhere to departmental and community expectations.

The City recognized the importance of "Back-end Accountability," at the time of the passage of the 2017 Accountability Ordinance when the City Council observed that "…WHEREAS, an essential element of a strong oversight system is a disciplinary system that prevents misconduct by engaging in thorough and timely civilian-led investigations that engender public trust and confidence; and WHEREAS, a disciplinary system, with the Chief as the final arbiter, that metes out fair, impartial, and swift discipline commensurate to the wrongdoing will reduce misconduct and ensure and maintain a culture of accountability and adherence to policy and constitutional law…"[26]

As an example of the importance of "Back-end Accountability," the Court in its May 21, 2019, decision to find the City partially out-of-compliance with the Consent Decree, specifically cited an arbitration decision that sought to reverse an SPD decision to terminate an officer for excessive use of force.[27] The Court identified that arbitration decision as a key example of a failure in "Back-end accountability" that impacted the ability of the SPD to engage in Constitutional policing.

---

community. This work is different from that of the Office of Police Accountability, which investigates allegations of individual police employee misconduct. SER is not focused on individual actions or assigning blame, but strengthening system fail-safes to prevent harm. SER aims to identify the causes and contributing factors to these incidents with the goal of prevention." *Id.*

[24] See,  https://www.seattle.gov/opa/policy/policy-recommendations (last visited Nov. 19, 2023).

[25] See, SEATTLE, WASH., ORDINANCE 126860 (July 20, 2023) ("WHEREAS, the Community Police Commission (CPC) was created by federal consent decree in 2012 and charged with a significant oversight function that is intended to serve as a community voice for the entire City…")

[26] See, SEATTLE, WASH., ORDINANCE NO. 125315 (May 22, 2017).

[27] See, Order Finding City Partially out of Compliance with Consent Decree at 11, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 562).

Ultimately, however, the officer in that case was terminated and held accountable, because the City successfully appealed the arbitration decision to the courts.

To better understand the effectiveness of the OPA and the OIG in ensuring "Back-end Accountability," our SME reviewed recent SPD disciplinary decisions, arbitration decisions and the overall status of pending arbitrations. Specifically, our SME looked at the City's recent history with arbitration decisions relating to the imposition of discipline and how that history compares with arbitration issues facing other police agencies nationwide. In addition, our SME reviewed a population of recent OPA investigations and OIG audits of those investigation to evaluate to what extent OPA investigations were through, unbiased, and timely and how effectively the OIG has been holding OPA investigations to account.

### 1. Arbitration of Police Discipline

Many stakeholders interviewed as part of this assessment noted that a key moment in the history of the Seattle Consent Decree was when an arbitrator overturned then-Chief O'Toole's attempt to terminate Officer Adley Shepard for his use of excessive force against a handcuffed prisoner. This fact was cited by the Court as one of the reasons the City fell out of compliance: "Because the CBA eliminates reforms instituted by the Accountability Ordinance and leaves the old arbitration regime "materially unchanged" [], the court finds that the City and SPD have fallen out of full and effective compliance with the Consent Decree concerning SPD discipline and accountability."[28]

Within employment and government employment, the use of arbitration as a means of resolving disputes about employment actions has been common. Indeed, public employee unions for various types of departments and agencies have often agreed to procedures that involve outside arbitration to resolve employment disputes and/or grievances.[29] Within policing, the issue of arbitrators overturning serious discipline imposed by police departments was (and is) not unique to the City of Seattle or the State of Washington. Campaign Zero, a non-profit group that analyses American police practices, reviewed police union contracts in eighty-one of the one hundred most populated cities and determined that seventy-two of the cities allow police officers to appeal disciplinary decisions to an arbitrator or arbitration board.[30]

Police accountability literature has identified certain practices relating to police officer rights to appeal discipline as having a negative impact on police accountability nationwide:

---

[28] *Id.*, at 13.

[29] See, Collective Bargaining Agreement between Seattle Public Schools and Seattle Education Association, SEATTLE PUBLIC SCHOOLS (Nov. 28, 2022), https://www.seattleschools.org/wp-content/uploads/2022/12/CBA-Certificated-2022-25.pdf; Samantha Delbick, *Mandatory Arbitration in US Employment Law*, USC GOULD'S BUSINESS LAW DIGEST (May 6, 2019), https://lawforbusiness.usc.edu/mandatory-arbitration-in-united-states-employment-law/; W H Hyman, Arbitration and the Public Employee – An Alternative to the Right to Strike, Detroit College of Law Review (Fall 1983), https://www.ojp.gov/ncjrs/virtual-library/abstracts/arbitration-and-public-employee-alternative-right-strike.

[30] DeRay McKesson, Samuel Sinyangwe, Johnetta Elzie, & Brittany Packnett, *Police Union Contracts and Police Bill f Rights Analysis*, CAMPAIGN ZERO (June 29, 2016), https://campaignzero.org/wp-content/uploads/2022/11/CampaignZeroPoliceUnionContractReport-1.pdf; see also, Stephen Rushin, *Police Union Contracts*, 66 DUKE L.J. 1191, 1191–1253 (2017); Christopher Harris & Matthew M. Sweeney, *Police Union Contracts: An Analysis of Large Cities*, 15 POLICING: J. POL'Y & PRAC. 622, 622-34 (March 2021).

In some jurisdictions, police unions get to choose which arbitrators are included in a pool that is used when officers file appeals of decisions made by their superiors[31] This has led to some police chiefs choosing not to take any disciplinary action against officers who deserve it, or allowing officers to resign (instead of being punished or fired), which means that officers leave the agency with a clean record allowing them to seek employment in another police agency without any problems[32]… Arbitration can also lead to the rehiring of police officers who have been previously fired, often with retro-active pay.[33]

In 2017, *the Washington Post* reported that police chiefs from many of the largest police departments in the country were required to rehire approximately one-quarter of the officers they previously fired.[34] As noted by one commentator, "[t]he *Washington Post* article noted that officers who were rehired after being fired were involved in serious acts of misconduct including sexual abuse, lying, being drunk on duty, and driving a gunman from the scene of a shooting where someone died."[35]

Despite an outside arbitrator initially overturning the SPD's decision to terminate Officer Shepard, the City nevertheless ultimately successfully terminated his employment, successfully arguing that the arbitration decision that overturned his suspension was against public policy and therefore unenforceable.[36] At the same time, another recent Washington Court of Appeals decision also limited the discretion of arbitrators in police disciplinary cases:[37]

> [T]he Washington Court of Appeals held that public policy required the termination of an officer who demonstrated bias. This [] case did not involve the City, but it establishes state-wide precedent. In that case, an arbitrator reinstated a police officer who had sexually harassed women in the community. The Court of Appeals held that reinstatement violated the "well-defined and dominant public policies

---

[31] Carol A. Archbold, Police Accountability in the US: Gaining Traction or Spinning Wheels, 15 POLICING: J. POL'Y & PRAC. 1665, 1675-77 (Sept. 2021) (citing B. Burger, *Columbus Police Union Wins Most Arbitration Cases*, COLUMBUS DISPATCH (July 21, 2017).

[32] *Id*. (citing Kim Barker, Michael H. Keller, & Steve Eder, *How Cities Lost Control of Police Discipline*, NEW YORK TIMES (Dec. 22, 2020), https://www.nytimes.com/2020/12/22/us/police-mis conduct-discipline.html.

[33] *Id*. (citing Martha Bellisle, *Collective Bargaining Agreements for Police Officers Provide Protections that Stand in the Way of Accountability, Experts Say*, DENVER POST (July 19, 2020), https://www.denverpost.com/2020/07/19/police-accountability-punishment-contracts-racism-force.

[34] Kimbriell Kelly, Wesley Lowey & Steven Rich, *Fired/Rehired: Police Chiefs Are Often Forced to Put Fired Officers Back on the Streets*, WASHINGTON POST (August 3, 2017), https://www.washingtonpost.com/graphics/2017/investigations/police-fired-rehired/.

[35] Archbold (2021), *supra* note 31 at 1675-1677.

[36] The appellate court made the following findings: "The DRB's decision reinstating Shepherd is so lenient it violates the explicit, well-defined, and dominant public policy against the excessive use of force in policing Indeed, the DRB's decision sends a message to officers that a violation of a clear and specific policy is not that serious if the officer is dealing with a difficult subject, losing patience, or passionate in believing that he or she did nothing wrong—however mistaken that belief may be. Such a message cannot be squared with the public policy against the excessive use of force in policing, which we hold imposes on the City an affirmative duty to sufficiently discipline officers. Thus, the superior court did not err when it vacated the DRB's decision reinstating Shepherd. We affirm." *City of Seattle v. Seattle Police Officers' Guild*, 484 P.3d 485, 502 (Wash. App. 2021).

[37] See, City's Mem., *supra* note 1 at 23.

aimed at ending current discrimination and preventing future discrimination . . . by officials acting under color of state law."[38]

Further, the City notes that in 2021, the Washington state legislature enacted a new law creating mandatory arbitration selection procedures for police unions. A state commission now appoints a roster of trained, experienced arbitrators to hear disciplinary appeals for police officers. Appeals are automatically assigned by the commission to the next available arbitrator on the list, eliminating negotiations between the parties over arbitrator selection.[39]

We asked the City to provide arbitration decisions issued since the decision which overturned Chief O'Toole's decision to terminate Officer Shepard (dated November 19, 2018). Only two decisions appear to have been issued since that time: one on April 23, 2021, affirming a four-day suspension for an off-duty officer who participated in an arrest while on a ride-along with another agency, and a January 22, 2023, decision upholding the termination of an evidence warehouse employee for improper handling of evidence and dishonesty.

We identified the following data for termination cases and appeals to arbitrators during the tenures of Chief Best and Chief Diaz:

**Table 2.  Status of SPD Termination Cases**

| Chief | Terminations | Resignations in lieu of Termination | Pending Arbitration |
|-------|-------------|-------------------------------------|---------------------|
| Best  | 8           | 10                                  | 5                   |
| Diaz  | 12          | 2                                   | 3                   |

We also obtained information regarding all cases where discipline has been imposed that are still pending arbitration as of the end of May 2023.

**Table 3.  SPD Disciplinary Cases Pending Arbitration/Appeal**

| Chief | Total # of discipline cases | # of cases pending arbitration | Original Discipline Imposed | Year Discipline Imposed |
|-------|-----------------------------|-------------------------------|-----------------------------|-------------------------|
| O'Toole | 350 | 6 | 1 Oral Reprimand<br>5 Written Reprimand | 2016 cases – 2<br>2017 cases - 4 |
| Best | 209 | 30 | 1 -  PSA Entry<br>10 - Oral Reprimand<br>7 - Written Reprimand<br>1 – One Day Suspension<br>3 – Two Day Suspension<br>3 – Four Day Suspension<br>1 – 6 Day Suspension<br>1 – 9 Day Suspension<br>1 – 10 Day Suspension<br>2 – 30 Day Suspension | 2017 cases – 8<br>2018 cases – 10<br>2019 cases – 9<br>2020 cases - 1 |

---

[38] *Id.* (citing City of Prosser v. Teamsters Union Local 839, 21 Wash. App. 2d 1058, 2022 WL 1151427, at *7 (2022)).

[39] *Id.* (citing S.B. 5055, 67th Leg., Reg. Sess. (Wash. 2021) (Law Enforcement Disciplinary Grievance Arbitration)).

| Diaz | 190* | 19 | 1 – Oral Reprimand<br>8 – Written Reprimand<br>5 – 1 Day Suspension<br>1 – 3 Day Suspension<br>1 – 6 Day Suspension<br>1 – 7 Day Suspension<br>1 – 10 Day Suspension<br>1 – 20 Day Suspension | 2021 cases – 14<br>2022 cases - 5 |

*As of January 2023.

In response to the Monitoring Team's concern about the large number of cases pending arbitration and the lack of timeliness in the adjudication of these cases, the City advised that the passage of time tends to support the imposition of discipline and that an officer appealing a disciplinary decision issued by the Chief is nonetheless required to serve their discipline prior to the completion of any appeal. While there may be a tactical benefit in not unilaterally pushing forward with appeals of disciplinary decisions, the City needs to recognize that there are public confidence and transparency related benefits to speedy resolutions of officer appeals of discipline. As such, it will be important for the City to push forward with the adjudication of these cases to both eliminate the current backlog and avoid delays going forward.

### 2. Collective Bargaining Impact on Back-End Police Accountability

Concerns in Seattle regarding the impact of collective bargaining on police accountability are not new. In fact, such concerns were expressed as far back as 1999 when the Citizens Review Panel, commissioned by then-Mayor Schell, expressed concerns that collective bargaining agreements that had been previously negotiated between the City and the police guild were negatively impacting the integrity of police internal investigations.[40]

Ultimately, contract negotiations with the Seattle Police Unions (the Seattle Police Management Association ("SPMA") and the Seattle Police Officer's Guild ("SPOG")) that were already in progress prior to the adoption of the Accountability Ordinance, were approved by the City, but contained provisions that contradicted and nullified portions of the Accountability Ordinance.[41] The City's inability to implement portions of the Accountability Ordinance was one of the reasons described by the Court that led to its decision to find the City out-of-compliance with portions of the Consent Decree in 2019.[42] Amongst the provisions identified as being unfulfilled as referred to in recent court filings, are a 180-day timeline for disciplinary investigations, subpoena authority for OPA and OIG, the standard of review and quantum of proof in disciplinary appeals, and features of grievance arbitration that affect public confidence, such as degrees of transparency.[43]

---

[40] See, Item No. arc3247, Citizens Review Panel Final Report, Aug. 19, 1999. Seattle City Clerk's Office, Clerk File 304446.
[41] As noted by the City, however, there was no contractual right for the City to bargain issues relating to the new Ordinance since it was enacted in the middle of bargaining negotiations. As such, if the parties reached impasse, the City did not have an option to go to interest arbitration.
[42] See, Order Finding the City of Seattle Partially Out of Compliance with the Consent Decree, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 562).
[43] See, 21CP Solutions, *supra* note 3.

In their 2019 report, 21CP Solutions identified some primary issues relating to the inconsistencies between the Accountability Ordinance and the SPD-related collective bargaining agreements:

- "Maintaining arbitration as a method for resolving disciplinary appeals. While the accountability ordinance eliminated the Disciplinary Review Board (DRB) for appeals of SPD discipline decisions and provided for the PSCSC as the only avenue for appeal, both SPOG and SPMA negotiated for the retention of arbitration over disciplinary appeals but agreed to eliminate the DRB. The agreements [also] eliminated the requirement in the accountability ordinance that disciplinary appeals be open to the public…"
- "Maintaining a presumption of termination in cases involving dishonesty while modifying the description of the quantum of proof needed to sustain termination cases involving stigmatizing conduct in arbitration."
- Restriction on subpoena power for OPA and OIG.
- Reducing the limitations period for the City to take disciplinary action from five years to four.[44]

With respect to Accountability Ordinance implementation, the CPC has published what they refer to as an "Accountability Ordinance Tracker." As of April 13, 2023, they identified 258 distinct provisions of the Accountability Ordinance, documenting 77% of those provisions (n=198) having been implemented, 7% as "partially implemented (n=18), 3% as "in progress" (n=8), and 13% as "not implemented" (n=34). Of the 60 provisions that were identified as either "partially implemented," "in progress", or "not implemented," thirty-two provisions were reported as not implemented due to the collective bargaining agreement (53.3%), nine due to "agency capacity (15%), nine due to "insufficient partner cooperation (15%), five due to "insufficient implementation" (8.3%), two due to "covid-19 restrictions" (3.3%), two due to "other" (3.3%) and one indicating "null" (1.6%)[45]

According to the City, however, it is complex and difficult to determine which provisions of the Accountability Ordinance have been implemented, in whole or in part, and there are differences of opinion within the City. CPC's tracker is based on CPC staff perspectives on implementation and did not necessarily reflect the input or views of either of the other accountability entities or SPD.

To supplement our assessment, the City provided us with a detailed list of those provisions of the Accountability Ordinance that they have determined were either not implemented or only partially implemented by the 2018-adopted SPOG contract as follows:

Regarding the OPA:

- "When necessary, the OPA Director may issue a subpoena at any stage in an investigation if evidence or testimony material to the investigation is not provided to

---

[44] 21CP Solutions, supra note 3, at 8-9, 47.

[45] See, Community Police Commission, *Accountability Ordinance Tracker* (Apr. 26, 2022), https://www.seattle.gov/community-police-commission/our-work/accountability-ordinance-tracker.

OPA voluntarily, in order to compel witnesses to produce such evidence or testimony" (Ordinance Section 3.29.125.E.).

- "OPA shall notify named employees, the Captain or equivalent of the named employees, and the bargaining unit of the named employees within 30 days of receiving directly or by referral a complaint of possible misconduct or policy violation. The notice shall by default not include the name and address of the complainant, unless the complainant gives OPA written consent for disclosure after OPA communicates to the complainant a full explanation of the potential consequences of disclosure. The notice shall confirm the complaint and enumerate allegations that allow the named employees to begin to prepare for the OPA investigation; however, if OPA subsequently identifies additional allegations not listed in the 30-day notice, these may also be addressed in the investigation" (Ordinance Section 3.29.130.A).

- "The time period in which investigations must be completed by OPA is 180 days. The time period begins on the date OPA initiates or receives a complaint. The time period ends on the date the OPA Director issues proposed findings" (Ordinance Section 3.29.130.A).

- "If an OPA interview of a named or witness employee must be postponed due to the unavailability of the interviewee or the interviewee's labor representative, the additional number of days needed to accommodate the schedule of the employee or the employee's bargaining representative shall not be counted as part of the 180-day investigation period" (Ordinance Section 3.29.130.E).

- "If the OPA Director position becomes vacant due to unforeseen exigent circumstances, the 180-day period shall be extended by 60 days to permit the designation of an interim OPA Director and the initiation of the appointment process for a permanent OPA Director" (Ordinance Section 3.29.130.F).

- "To ensure the integrity and thoroughness of investigations, and the appropriateness of disciplinary decisions, if at any point during an OPA investigation the named employee or the named employee's bargaining representative becomes aware of any witness or evidence that the named employee or the employee's bargaining representative believes to be material, they shall disclose it as soon as is practicable to OPA, or shall otherwise be foreclosed from raising it later in a due process hearing, grievance, or appeal. Information not disclosed prior to a due process hearing, grievance, or appeal shall not be allowed into the record after the OPA investigation has concluded if it was known to the named employee or the named employee's bargaining representative during the OPA investigation, and if OPA offered the employee an opportunity to discuss any additional information and suggest any additional witnesses during the course of the employee's OPA interview" (Ordinance Section 3.29.130.I).

Regarding the imposition of discipline:

- "Termination is the presumed discipline for a finding of material dishonesty *based on the same evidentiary standard used for any other allegation of misconduct*" (Ordinance Section 3.29.135.F) [italicized verbiage in conflict with CBA].

Regarding the authority of the OIG:

- "OIG authority to "[i]ssue a subpoena if evidence or testimony necessary to perform the duties of OIG set forth in this Chapter 3.29 is not provided voluntarily, in order to compel witnesses to produce such evidence or testimony. If the subpoenaed individual or entity does not respond to the request in a timely manner, the Inspector General may ask for the assistance of the City Attorney to pursue enforcement of the subpoena through a court of competent jurisdiction" (Ordinance Section 3.29.240.K.).

Regarding the CPC:

- "…[CPC] advocacy may include, but is not limited to, reforms related to the referral of certain criminal cases to independent prosecutorial authorities, officer de-certification, pension benefits for employees who do not separate from SPD 'in good standing,' and the standards for arbitrators to override termination decisions by the Chief" (Ordinance Section 3.29.300.E).

- "Without the necessity of making a public disclosure request, CPC may request and shall timely receive from other City departments and offices, including SPD, information relevant to its duties under this Chapter 3.29 that would be disclosed if requested under the Public Records Act" (Ordinance Section 3.29.330.D.).

Regarding Disciplinary, grievance, and appeals policies and processes:

- "The Chief shall have the authority to place an SPD employee on leave without pay prior to the initiation or completion of an OPA administrative investigation where the employee has been charged *with a felony or gross misdemeanor; where the allegations in an OPA complaint could, if true, lead to termination; or where the Chief otherwise determines that leave without pay is necessary for employee or public safety, or security or confidentiality of law enforcement information*…" (Ordinance Section 3.29.420A.4) [italicized verbiage in conflict with CBA].

- "No disciplinary action will result from a complaint of misconduct where the misconduct comes to the attention of OPA more than five years after the date of the alleged misconduct, except where the alleged misconduct involves criminal law violations, dishonesty, or Type III Force, as defined in the SPD policy manual or by applicable laws, or where the alleged act of misconduct was concealed" (Ordinance Section 3.29.420.A.5).

- "All appeals related to employee discipline shall be governed by this 14 Chapter 3.29 and Chapter 4.08" (Ordinance Section 3.29.420.A.6).

Regarding the Public Safety Civil Service Commission:

- "All appeals related to SPD employee discipline shall be open to the public and shall be heard by PSCSC" (Ordinance Section 3.29.420.A.7.a).

- "The PSCSC shall be composed of three Commissioners, none of whom shall be current City employees or individuals employed by SPD within the past ten years, who are selected and qualified in accordance with subsection 4.08.040.A" (Ordinance Section 3.29.420.A.7.b).

- "…no grievance procedure may result in any alteration of the discipline imposed by the Chief. Such grievances are not subject to arbitration and may not be appealed to the PSCSC or any other forum: (Ordinance Section 3.29.420.7.c).

- "…(One Two members shall be appointed by the Mayor, and one by the City Council and one elected by and representing employees. Commissioners shall be selected using merit-based criteria and shall have appropriate expertise and objectivity regarding disciplinary and promotional decisions " (Ordinance Section 4.08.040.A).

Regarding Ordinance Interpretation:

- "In the event of a conflict between the provisions of this Chapter 3.29 and any other City ordinance, the provisions of this Chapter 3.29 shall govern" (Ordinance Section 3.29.500.A).

In a recent declaration from a labor negotiator for the City, the City identified the following priorities established by a "convergence" of needs identified by "the Court, … the [City] Executive, City Council, the Monitor, CPC, OIG and OPA:

1) Calculation of the 180-day timeline for disciplinary investigations.
2) Limits on subpoena authority for OPA and OIG.
3) The standard of review and quantum of proof in disciplinary appeals. And,
4) Features of grievance arbitration that affect public confidence, such as degree of transparency." [46]

Further, according to the City's labor negotiator: "These publicly expressed priorities of the Court, the Executive, City Council and the Accountability serve as guideposts, along with the Accountability Ordinance itself for the bargaining team in the recently concluded negotiations with the SPMA and now help to guide current negotiations with SPOG."[47]

---

[46] Declaration of Danielle Malcolm at ¶ 6, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. No. 733).
[47] *Id.*, ¶ 7.

In addition, a review of the 2019 21CP Solutions assessment, and the current OPA Director's declaration, submitted by the City in support of its recent motion in support of replacing the Consent Decree with a more limited Compliance Agreement,[48] also helps to clarify the City's accountability-related priorities in bargaining:

1) The Accountability Ordinance provided greater subpoena authority to the OPA and OIG, but that authority is not authorized in the CBA.
   a. 21CP Solutions made the following Finding #4: "Subpoena authority –There is uncertainty about the tools available to OPA and OIG to obtain evidence. The breadth of subpoena authority of OPA and OIG, including regarding officers, their family members, and personal records of officers and family members is unclear."[49]
   b. The OPA Director stated: "I consider uncompromised subpoena authority a top priority in the current collective bargaining negotiations with SPOG to ensure OPA has unfettered access to relevant records for investigative purposes."[50]

2) The Standard of Proof for imposition of discipline.
   a. 21CP Solutions made the following Finding #7: "Quantum of Proof – Of the benchmark labor agreements the assessment reviewed, Seattle is unique in that its labor agreement includes specific language regarding the quantum of proof used during arbitration, however there have been no use of force arbitration cases heard in the current discipline appeals process to draw any conclusion that an elevated standard will be used when an allegation of Force-Use is sustained and the officer is discharged."[51]
   b. The OPA Director stated in his declaration: "The recently executive SPMA contract directs arbitrators to apply a preponderance of evidence standard in all disciplinary appeals. I believe that it is imperative for the current collective bargaining negotiations with SPOG to adopt that same standard."[52]

To its benefit, the City, as required by the 2017 Accountability Ordinance,[53] has adopted a process that appears rare for municipalities throughout the country, by incorporating community (and accountability partner) input into the bargaining process. As represented by the City in recent filing:

*City modified the process for collective bargaining to incorporate more community input.* During the recent negotiations with the Seattle Police Management Association (SPMA) and in current negotiations with the Seattle Police Officers' Guild (SPOG), for the first time, a City Council policy analyst, who reports to all nine councilmembers, joined the City's team as a member of the bargaining team. As a result, council members have greater visibility into the day-to-day negotiations and the bargaining team receives direct access to additional

---

[48] Declaration of Gino Betts, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 731).
[49] 21CP Solutions, supra note 3 at 3, 40-45.
[50] Declaration of Gino Betts, *supra* note 48 at ¶17.
[51] 21CP Solutions, supra note 3 at 4, 8, 28, 50-53.
[52] Declaration of Gino Betts, *supra* note 48 at ¶19.
[53] See, Seattle, Wash., Ordinance No. 125315, § 3.29.460.A.

input. For the first time, the Community Police Commission has a role in the bargaining process by selecting one of its members to be a Technical Advisor....[54]

The City has further represented that it has made "accountability advances" in the recently adopted contract with the SPMA:

> The City recently finalized an agreement with SPMA that addresses priorities recognized by the Court. The contract: (1) adopts an evidentiary standard that makes it easier for the City to prove misconduct; (2) requires that arbitrators must uphold the Chief of Police's decision unless it is arbitrary or capricious; (3) makes disciplinary appeals hearings more transparent and accessible to the public. The agreement also retains full subpoena power for OIG and OPA.[55]

Even with the accountability-related improvements made to the SPMA contract, however, there is no assurance that the same changes will be made with respect to the SPOG contract. For SPOG members (officers and Sergeants), as opposed to the Lieutenants and Captains represented by the SPMA, disciplinary action is much more common by virtue of their roles and responsibilities within the Department. As such, it can be reasonably expected that SPOG negotiators will resist making the same compromises agreed to by the SPMA.

At the same time, collective bargaining agreements are, by their very nature, transitory. What is obtained in bargaining today could be given away in bargaining tomorrow. If a future Mayoral administration were to become more focused on obtaining police officer support, that Mayor may be more inclined to bargain away CBA accountability-related provisions.[56] As such, while the progress made with the SPMA contract is laudable, it may be that the inclusion of the SPD Accountability partners as active participants in collective bargaining is, in fact, the most effective way to ensure that future collective bargaining does not dimmish the City's ability to hold its officers accountable. As noted by one of the accountability stakeholders: "There were lots of opportunities for meaningful engagement with the negotiation team during the current negotiations; in prior negotiations the mayor's team was unchecked resulting in things going sideways and resulting in a collective bargaining agreement that was perceived as anti-accountability."

Ultimately, however, the only true solution to this challenge would be for the state legislature to act and prohibit accountability-related issues from being part of police collective bargaining.

---

[54] Agmt on Sustained Compliance, *supra* note 13 at 8.

[55] *Id.*

[56] It is well established that changes in Mayoral administrations can have a deleterious impact on police oversight and accountability. The experiences of post-Consent Decree Pittsburgh provide a well-documented example wherein a new Mayor fired the City's reform-minded Police Chief after running on an "anti-crime" platform. See Joshua M. Chanin, *Negotiated Justice? The Legal, Administrative, and Policy Implications of 'Pattern or Practice' Police Misconduct Reform* at 32, 255, & 311, AM. UNIV. (2011); Samuel Walker, *Institutionalizing Police Accountability Reforms: The Problem of Making Police Reforms Endure*, 32 ST. LOUIS U. PUB. L. REV. 57, 64 (2012); Joshua M. Chanin, *Examining the Sustainability of Pattern or Practice Police Misconduct Reform*, 18(2) POLICE QUARTERLY 163, 183 (2015); and STEPHEN RUSHIN, FEDERAL INTERVENTION IN AMERICAN POLICE DEPARTMENTS, 241-242 (Cambridge Univ. Press 2017).

3.      *OPA Investigations & OIG Audits*

As described previously, the Monitoring Team assigned a police accountability SME to review a selection of OPA investigations and OIG reviews of those investigations to evaluate to what extent the City's process to use the OIG to ensure OPA investigations are thorough, objective and timely has been effective. Sixty-four OPA cases were selected for review, specifically examining those cases where the OIG did not concur with an OPA classification decision or declined to fully certify an OPA investigation as either timely, thorough, or objective. Additional cases were selected that were fully certified by the OIG as timely, thorough, and objective, but which involved allegations of either force or bias.  OIG and SME findings can be summarized as follows:

**Table 4.       Quantitative Description of OPA/OIG files reviewed**

| | |
|---|---|
| Additional Investigation Requested by OIG | 13 of 64 cases (20.3%) |
| *OPA Conducts Additional Investigation as Requested | 11 of 13 cases (84.6%) |
| *Monitoring Team SME concerns regarding OPA response to OIG request[57] | 1 of 13 cases (7.7%) |
| OIG agrees with OPA classification of Expedited Investigation[58] | 20 of 23 requests (87.0%) |
| OIG declines to certify a classification of "Expedited Investigation" | 4 of 23 requests (17.4%) |
| Case not certified by OIG as "timely" | 17 of 64 cases (26.6%) |
| *OPA misses 5-day complaint notification deadline[59] | 4 of 64 cases (6.3%) |
| *OPA misses 30-day complaint classification deadline[60] | 4 of 64 cases (6.3%) |
| *OPA fails to provide investigation to OIG at least 10 days prior to 180-day deadline for completion of OPA cases | 7 of 64 cases (9.4%) |
| *OPA fails to complete an investigation within | 4 of 64 cases (6.3%) |

---

[57] In one case, which the Monitoring Team SME ultimately concluded was an aberration, the response of the OPA to OIG recommendations appeared to be defensive and ill-advised. At the same time, the OIG failed to adequately provide a rationale for its conclusion that the OPA investigation summary contained "several misleading or inaccurate statements…"

[58] Expedited Investigations are conducted where the OPA, with the agreement of the OIG, believe recommended findings can be made based solely on the OPA's intake investigation without interviewing the involved employees. (See, OFFICE OF POLICE ACCOUNTABILITY, OPERATIONS MANUAL, Section 5.4.B.iv.).

[59] Per the Collective Bargaining Agreement between the City and the Seattle Police Officer's Guild, officers are generally entitled to be notified of a complaint against them within five business days of the receipt of the complaint (see, Agmt between City of Seattle and Seattle Police Officers Guild, at Article 3.6.A). According to OIG memorandum: "lack of compliance [relating to the 5-day requirement is] taken into consideration in determining discipline per SPOG." According to OPA memorandum, however; "unlike the 180-day timeline, the SPOG CBA does not impose a penalty for failure to timely serve a 5-day notice."

[60] Per the Collective Bargaining Agreement between the City and the Seattle Police Officer's Guild, officers are entitled to receive a notice of how the OPA has classified a complaint no later than 30 days after the receipt of the complaint (see, Agmt between City of Seattle and Seattle Police Officers Guild, at Article 3.6.A.).

| | |
|---|---|
| the 180-day deadline for completion[61] | |
| Cases not OIG certified as "thorough"[62] | 9 of 64 cases (14.1%) |
| Cases not OIG certified as "objective"[63] | 3 of 64 cases (4.7%) |
| Cases where the OIG disagreed with an OPA case classification[64] | 8 of 64 cases (12.5%) |
| Cases identified by Monitoring Team SME as indicating lack of sufficient OIG and/or OPA resources.[65] | 6 of 64 cases (9.4%) |
| Cases negatively impacted SPOG refusal to grant OPA extension on 180-day rule[66] | 2 of 64 cases (3.1%) |

---

[61] Per the Collective Bargaining Agreement between the City and the Seattle Police Officer's Guild, no discipline can be imposed where an OPA investigation is not completed within 180-days of OPA receiving a complaint (See, Agmt between City of Seattle and Seattle Police Officers Guild, at Article 3.6.B). None of the cases where the OPA missed the 180-day deadline involved sustained findings relating to officers who were in the current employ of the SPD.

[62] The OIG provided multiple different rationales for declining to certify OPA investigations as "thorough," to include a failure to identify a subject officer, a failure to interview a witness officer, documentation failures (2), failure to investigate potential allegations (2) and a failure to add additional allegations (2). With respect to the case involving the failure to add additional allegations, the Monitoring Team reviewer agreed with the OPA that the addition of an allegation was unnecessary to the investigation or adjudication of the case which resulted in sustained findings and the imposition of significant discipline.

[63] Two of these cases involved OPA investigator use of leading and/or suggestive questions; one case involved an OPA investigator assuming a defense on behalf of an officer without specific inquiry.

[64] In seven cases, the OIG recommended an investigation instead of either a "Contact log" (which serves only as a documentation of the complaint) or a "Supervisor Action" (which involves an informal debrief between a subject officer(s) and a supervisor). In one case, the OIG recommended a Supervisor Action in addition to a "bias review" which had already been conducted by the SPD. In one case, the Monitoring Team's reviewer noted that the OPA failed to conduct an investigation into allegations of misconduct on the part of a police Captain, which was correctly objected to by the OIG, albeit after-the-fact and which resulted in an insufficient investigation of that Captain's off-duty conduct.

[65] In three cases, the OPA failed to complete a Director's Closing Memo (DCM) that included any rationale for the Director's decision-making due to "present OPA staff limitations." In another case, the OIG noted that it could not certify a complex case for Expedited Investigation "due to severe staffing shortages." In another case, the OPA noted that it was unable to investigate an apparent Body Worn Camera violation as the underlying "case was investigated during a period of critical understaffing and high leadership turnover at OPA" (memo dated, 6/30/22). In another case, the OIG noted that in a case reviewed in October 2022, that multiple corrections in the investigation were required "due to current transitions at OPA, and the learning curve such transitions entail…"

[66] In two cases, the OIG specifically commented on SPOG's refusal to grant an extension of the 180-day rule which negatively impacted on the quality of an OPA investigation. One case involved a Detective alleged to have lied during a homicide trial wherein the OPA investigation was delayed by a referral to a prosecution agency; in another case, SPOG declined to waive the 180-day rule involving an allegation against an officer who had been on leave for approximately 2 months.

Notably, OIG in its most recent reporting, for the first half of 2023, reported a high percentage of concurrence between the OPA and the OIG on case classification decisions.[67] Similarly, OIG reported finding 93% of OPA investigations as thorough, objective and timely.[68]

Ultimately, it appears that the OIG review of OPA cases has been robust and has, in some instances, enhanced the quality of OPA investigations. In addition, the OIG is presently providing an excellent level of transparency in its review process through its publication of quarterly and mid-year reviews of its review of OPA cases.[69] Going forward, we recommend that OIG include in its annual and/or semi-annual reports more detail on those OPA cases that are not certified as thorough, objective and timely, or where OIG and OPA disagreed as to a classification decision.

c.     Learning and Innovation

Assisting the SPD in learning from its mistakes and coming up with innovative solutions for current challenges is an essential component of any effective oversight system. And, in fact, the City Council identified the need for a holistic, 360-degree approach to oversight in the preamble to the 2017 Accountability Ordinance. Specifically, City Council found that:

> …WHEREAS, The City of Seattle recognizes the need to have effective, constitutional policing and a police department that has the trust, respect, and support of the community; and
> WHEREAS, having constitutional policing requires a strong oversight system that takes into account the voice and values of the community that is being policed; and
> WHEREAS, it is The City of Seattle's intent to ensure by law a comprehensive and sustainable independent oversight system that guarantees a police department that has the trust and confidence of the community and respects the constitutional rights of the people of Seattle; and
> WHEREAS, policing that aligns with Seattle community values, needs, and expectations has been an ongoing goal as highlighted by events involving allegations of unconstitutional use of force and biased policing, including the death of First Nations woodcarver John T. Williams and other episodes that led community groups in 2010 to call for the federal investigation that ensued into the policing practices of the Seattle Police Department (SPD)…[70]

By design, the Accountability Triad was created to identify, in conjunction with SPD internal accountability mechanisms, community and police issues and concerns and collaboratively develop solutions to ongoing problems and challenges. The OIG's work in addressing community and Constitutional issues arising from the 2020 protests appears to be an excellent example of the

---

[67] In its "Mid-Year Review of OPA Classifications – 2023 (January 1 through June 30, 2023), OIG reported 100% agreement with the OPA on OPA classifications for "Batch Contact Logs," Bias Reviews, Rapid Adjudications and Mediations. OIG reported 98.8% concurrence for Supervisor Action and 97.4% concurrence for Contact Logs. Seattle Office of Inspector General, *Mid-Year Review of OPA Classifications – 2023* (2023), https://www.seattle.gov/documents/Departments/OIG/Investigations/OPA%20Quarterly%20Reports/MidYearReview2023.pdf.

[68] *Id.*

[69] See, Seattle Office of Inspector General, *OIG Reports* (last visited Nov. 19, 2023), https://www.seattle.gov/oig/reports.

[70] *See* SEATTLE, WASH., ORDINANCE 125315, Preamble (June 1, 2017).

accountability system's ability to identify and address these issues, and work with the SPD in learning and innovating because of these experiences. As described below, the SPD's response to the OIG's SER recommendations appeared to be comprehensive and collaborative and recognized the importance of oversight's part in reducing the risk of similar problems in the future. Further, the reports written by the OIG, OPA and CPC (as indicated in Table 1, *supra*), exhibit significant work on the part of all three agencies to effectively collaborate with the SPD to minimize the risk of future officer misconduct, and ensure appropriate discipline when such misconduct occurs.

The SPD's response to the OIG's SER recommendations (as further discussed below) also appears to exhibit the Department's willingness to learn and innovate. Specifically, with respect to "Front-end Accountability," the SPD highlighted multiple officer training and wellness initiatives intended to improve officer conduct overall and minimize misconduct and mistreatment of community members.[71]

### d.   Findings and Recommendations

Changes in the law relating to the arbitration process and its impact on the authority of the SPD to discipline its employees appear to have reduced the risk that the SPD will be unable to hold its officers accountable in the future. However, the City must balance any tactical benefits that may exist by delaying the adjudication of police disciplinary-related arbitrations against the public policy benefit of ensuring timely and final disciplinary decisions and push forward the adjudication of these arbitrations to reduce an otherwise unacceptable backlog.

Although it appears that prior resource-related issues have been generally resolved with respect to OIG and OPA staffing, multiple stakeholders noted that the OPA's involvement in the monitoring of SPD's handling of minor complaints not only diverts OPA's attention away from its more significant case investigations, but results in the untimely debriefings and counseling relating to minor complaints and negatively impacts the ability of front-line supervisors to monitor and supervise their officers. Ultimately, the City needs to either provide additional resources for OPA & OIG to complete their work in a timely fashion or develop more efficient processes which would empower SPD supervisors to handle cases involving minor misconduct and reserve more serious cases/allegations for OPA investigation and OIG review.

As several SPD stakeholders indicated, even the Supervisor Action classification requires that full due process be provided to the involved officers and involves OPA referring complaints back to

---

[71] In its July 28, 2023 Sentinel Event Review – Comprehensive Response, the SPD described four programs being utilize to impact SPD culture: 1) The "Outward Mindset" program, initiated in 2022, to "to address a theme common to both community members and officers that became amplified during 2020 – a deep desire (demand) to be treated as people who matter rather than as objects;" 2) The "Before the Badge" program, described as a "multi-week program is designed to provide pre-academy recruits with foundational knowledge, skills, and relationships to succeed as partners in the community and leaders in our department;" 3) SPD's Wellness Unit, SPD's Wellness Unit, "comprising both sworn and civilian members, now provid[ing] critical in-service support services, including critical incident stress debriefing, roll call check-ins, advisory work, mentorship programs, multi-faith chaplaincy referrals, enhanced peer support, referrals for outside services where appropriate, and training; and, 4) The Proactive Integrated Support Model, reporting that: "SPD is nearing implementation of a new system that, consistent with the social science view that problematic performance can be to some extent a behavioral manifestation of the cognitive and emotional strain inherent in the policing environment." Memorandum from Seattle Police Dep't to OIG, DOJ and the Monitor (July 28, 2023) (on file with the author).

supervisors to do what they should have been able to do in the first place. One solution that the City should consider is having OIG audit SPD's handling of minor complaints instead of having OPA continue to use up precious investigative resources that could otherwise be applied to more serious allegations of misconduct. OIG could then follow up by working with SPD command staff to ensure that SPD supervisors are held accountable for appropriately supervising and counseling their officers. As one stakeholder observed, "It is completely inefficient to refer everything back to the OPA."

With respect to the Collective Bargaining Agreement, the SPOG contract specifically requires that OPA investigations be completed within 180 days, otherwise no discipline may be imposed.[72] The 180-day deadline is ultimately an arbitrary deadline that has the potential to allow an officer who has committed serious misconduct to remain as a member of the SPD, even after a sustained finding. None of the cases reviewed for this assessment that exceeded the 180-day deadline ultimately involved sustained findings where discipline could not be imposed on a current employee of the SPD.  Even so, the type of strict requirement that exists within the collective bargaining agreement for a violation of a timeliness goal is a poor practice that the City should seek to eliminate.

---

[72] See, Agmt between City of Seattle and Seattle Police Officers Guild, at Article 3.6.B.

## 5.     Sustainable Organizational Capacity

### a.  An Introduction to the Accountability Triad

The City of Seattle created the Office of Police Accountability ("OPA") in 2002, with clarified roles and responsibilities established by the Accountability Ordinance passed by the City Council on May 22, 2017. The OPA is led by a civilian director and currently is budgeted for a staff of 28 full-time employees.  OPA is primarily responsible for "establishing and managing processes to initiate, receive, classify, and investigate" allegations of misconduct against employees of the Police Department.[73]

The Community Police Commission ("CPC") was initially created in 2013 as a requirement of the Consent Decree[74] and made permanent by the Accountability Ordinance. As per the Accountability Ordinance, the purpose of the CPC is:

> to help ensure public confidence in the effectiveness and professionalism of SPD and the responsiveness of the police accountability system to public concerns by engaging the community to develop recommendations on the police accountability system and provide a community-based perspective on law enforcement-related policies, practices, and services affecting public trust; all for the purpose of ensuring constitutional, accountable, effective, and respectful policing.[75]

The CPC currently consists of 15 Commissioners.[76]

The 2017 Police Accountability Ordinance established the Office of the Inspector General ("OIG") for Public Safety, which is currently budgeted for a staff of 19 full-time employees.[77] The role of the OIG is "to help ensure the fairness and the integrity of the police system as a whole in its

---

[73] Office of Police Accountability, *What we Do* (last visited Nov. 19, 2023), https://www.seattle.gov/opa/about-us/what-we-do.

[74] See, Mem. of Understanding Between US and City of Seattle (July 27, 2012), https://www.seattle.gov/Documents/Departments/CommunityPoliceCommission/120727FINAL_MOU.pdf#:~:text=July%2027%2C%202012%20I.%20INTRODUCTION%20The%20United%20States,in%20a%20manner%20that%20fully%20complies%20with%20the.

[75] SEATTLE, WASH., ORDINANCE No. 125315 § 3.29.010.

[76] It should be noted that on April 18, 2023, a proposal went before the CPC recommending a reduction in the size of the Commission from 21 to 15. According to the proposal: "The final 2017 Accountability Ordinance increased the CPC to 21 [from 15]. In the years since, the increased size has not resulted in better representation of community viewpoints or increased ability to meet the obligations of the Accountability Ordinance, Rather, the increased size has led to increased vacancies, generally less contribution from each individual commissioner, and greater commissioner engagement issues. In other words, 'more cooks in the kitchen' have not resulted in increased output or better outcomes. Returning the Commission size to 15 will enable it to return to the period of greater productivity and community engagement and responsiveness." The Seattle City Council ultimately amended the Accountability Ordinance to reduce the number of Commissioners as requested, finding that "the increased size [initiated by the 2017 Accountability Ordinance] has not resulted in better representation of community viewpoints or increased ability to meet the obligations of the Accountability Ordinance. Rather, the increased size has led to increased challenges in providing effective oversight." *See* SEATTLE, WASH., ORDINANCE No. 126860.

[77] An updated Budget proposal for 2024 would increase the number of OIG FTE's to 22.

delivery of law enforcement services by providing civilian auditing of the management, practices, and policies of SPD and OPA."[78]

21CP Solutions, in its 2019 report, referenced the Public Safety Civil Service Commission (PSCSC), as a fourth Seattle oversight agency because the Accountability Ordinance intended that PSCSC would be the ultimate adjudicator for all SPD employee discipline.[79] Because that provision of the Accountability Ordinance has never been implemented (as it conflicts with the current Collective Bargaining Agreement), it is not evaluated here as part of Seattle's police oversight system.

The Monitoring Team's assessors paid particular attention to the extent to which SPD has been (1) thoughtfully considering recommendations from the OPA, CPC and OIG; (2) implementing them when it is feasible and beneficial; and (3) publicly and clearly explaining the reasons when it does not implement them. Additionally, the assessors evaluated the extent to which the OPA, CPC and OIG track and publicly report on the status of their recommendations.

### b. The 2017 Accountability Ordinance

Passed by the Seattle City Council on June 1, 2017, but never fully implemented due to requirements of Washington state law that requires certain elements of accountability to be subject to collective bargaining, the Accountability Ordinance includes the following provisions warranting comment here:

Regarding its ultimate goals:

> The goals of this ordinance are to institute a comprehensive and lasting police oversight system that ensures that police services are delivered to the people of Seattle in a manner that fully complies with the Constitution and laws of the United States and State of Washington, effectively ensures public and officer safety, and promotes public confidence in SPD and the services that it delivers. To accomplish these goals, the City of Seattle has committed to strengthen elements of Seattle's existing system including building a strong community-based entity with authority to review and weigh in on police policies and assess the responsiveness of SPD, the City of Seattle, and accountability system professionals to community concerns, which has been missing in previous reform efforts.[80]

Regarding relationships between the Accountability Triad and the SPD:

> OPA, OIG, CPC, and the Chief shall each advise the Council, Mayor, City Attorney, and each other on issues related to the purposes of this Chapter 3.29, and recommend and promote to policymakers changes to policies and practices, collective bargaining agreements, City ordinances, and state laws in order to

---

[78] Seattle, Wash., Ordinance No. 125315 § 3.29.010.
[79] Seattle, Wash., Ordinance No. 125315 § 3.29.420.A.7.a.
[80] Seattle, Wash., Ordinance No. 125315 § 1, K.

support systemic improvements and other enhancements to SPD performance and in furtherance of community trust.[81]

OPA, OIG, CPC, and SPD shall engage in collaborative conversations with each other on a quarterly basis and as otherwise reasonably requested by each other in order to effectuate coordinated oversight, including meeting collectively to review the extent to which the purposes and requirements of this Chapter 3.29 are being met.[82]

Nationally, municipalities have found it challenging to identify, hire and retain competent civilian oversight of law enforcement directors. The 2017 Accountability Ordinance provides an excellent framework for the qualifications needed for the leaders of the OPA, OIG and CPC:[83]

        c.        The Office of the Inspector General for Public Safety (OIG)

This section of the report discusses the responsibilities and performance of the OIG. It finds that the OIG appears to be performing its role of providing systemic oversight of the SPD in an effective and responsible manner.

The OIG's critical role in ensuring sustainable Constitutional policing in the absence of federal oversight cannot be overstated. As represented by the City and the DOJ in their recent Agreement on Joint Compliance:[84]

The City's elected leaders have entrusted the OIG with [the] responsibility [to identify and correct systemic policing failures].[85] OIG has broad oversight authority over SPD and is charged with ensuring the ongoing integrity of its processes and operations.[86] OIG provides systematic oversight of the management, practices, and policies of SPD and OPA.[87] OIG's role incorporates forward-looking advice and recommendations, as well as audits and after-the-fact evaluations, which apply rigorous analysis to systems and past incidents. In addition, OIG "oversee[s] ongoing fidelity to organizational reforms implemented pursuant to the goals of the . . . Consent Decree.[88]

The City has represented its intent, over the course of the then-proposed Compliance Agreement to:

---

[81] SEATTLE, WASH., ORDINANCE NO. 125315 § 3.29.030.B.

[82] SEATTLE, WASH., ORDINANCE NO. 125315 § 3.29.030.C.

[83] Originally, the Accountability Ordinance only provided qualifications for the OPA Director and the Inspector General. Qualifications for the CPC Executive Director were recently added to the Ordinance at the request of the CPC.

[84] See, City's Mem., City's Mem., *supra* note 1 at 25-26.

[85] Id. (citing SEATTLE, WASH., ORDINANCE NO. 125315 § 3.29.010 et seq.).

[86] Id. (citing SEATTLE, WASH., ORDINANCE NO. 125315 § 3.29.200(D)).

[87] Id. (citing SEATTLE, WASH., ORDINANCE NO. 125315 § 3.29.200(D)-(K)).

[88] Id. (citing SEATTLE, WASH., ORDINANCE NO. 125315 § 3.29.010(B)).

> [I]n collaboration with the Monitor, [support] the OIG [in] develop[ing] a Workplan describing its approach for ensuring continued robust, independent monitoring of SPD. As part of the Workplan, OIG will develop a methodology and timeline for assessment of the following areas: use of force (including crowd management); crisis intervention; stops and detentions; bias-free policing; and supervision (including the early intervention system).[89]

Further, the City has represented that:

> In addition, OIG will conduct a Use-of-Force Assessment examining 2021 and 2022 data on SPD's use of force. As components of the Use-of-Force Assessment, OIG will examine force used in crisis incidents, the use of less lethal devices, and force used in the crowd management context. The assessment also will provide an update on the force-related issues identified by the Monitor in the 2022 Comprehensive Assessment.[90]

In a declaration in support of the transitioning from the Consent Decree to a Compliance Agreement, SPD Chief Adrian Diaz also represented that the SPD has worked collaboratively with the OIG in several important ways:

- "First, SPD has implemented many of the recommendations that it received from the community-led Sentinel Event Review facilitated by OIG. For example, SPD recently collaborated with OIG and established a 'dialogue unit,' modeled on the work of the Stockholm Police Authority, to foster greater communication and understanding between the police and those who gather before, during, and after events. This unit, the Public Outreach and Engagement Team (POET) regularly meets with demonstration organizers or points of contact to plan for successful and safe events and engages during the events to reduce any points of friction."[91]

- "A second example of SPD-OIG collaboration involves promoting racial equity. OIG and SPD convened a stakeholder workgroup beginning in 2021 to collaborate on a traffic enforcement initiative. The goal of this effort is to identify and implement alternatives to minor traffic stops. Data gathering to inform these alternatives has been ongoing since 2021. This work culminated in SPD no longer considering the following traffic offenses as a primary basis for a stop: • Expired or missing vehicle registration, • Issues with the display of registration plates (e.g., missing front license plate), • Technical violations of the traffic code, such as items hanging from the rear-view mirror and cracks in the windshield, and • Bicycle helmet violations (King County subsequently eliminated the governing law, so failure to wear a helmet is no longer a violation)."[92]

---

[89] See, Agmt on Sustained Compliance, *supra* note 13 at ¶ 88.
[90] *Id.*, ¶ 89.
[91] Declaration of [Chief of Police] Adrian Diaz at ¶ 9, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 729.)
[92] *Id.*, ¶ 10.

i.      OIG Stakeholder Interviews

As part of this assessment, we interviewed multiple City stakeholders and asked them to provide input regarding their recent experiences with the OIG. Overall, the feedback provided was positive and generally consistent with public comments provided to the Monitoring Team.

Positive comments included:

- "They have been reasonable. They audit our contact log cases and supervisor action cases…I have a lot of confidence in the ability of OIG to take on monitoring role."
- "OIG staff has been very helpful; would love for them to be the clearing house for all policy recommendations – whether coming from city council, OPA or CPC."
- "The OIG is a worthwhile entity; to include performance audits."
- "The Sentinel Event Review was groundbreaking. It's got a little bit of everything: statistical analysis, collaborations with community and police and innovative recommendations."

Some stakeholders noted that the OIG did have "growing pains" when the program first started up and suffered from some "self-inflicted injuries." It was also noted that in its formative years, the OIG didn't have the necessary "bandwidth" to complete all the tasks assigned to it by the Accountability Ordinance.

Other stakeholders acknowledged challenges in developing appropriate processes due to the OIG's "hybrid nature," with audit, policy, and investigative functions.  Stakeholders also recognized the need for the OIG to continue to take "a collaborative approach and build partnerships." As noted by one stakeholder: "You can't make meaningful changes to policing or culture by just coming in and using force. You must build relationships and convince people that changes will be meaningful to them in a positive way."

ii.      OIG Policies

As part of this review, the OIG provided the Monitoring Team with current internal OIG policies and procedures. The reviewed policies were expansive and provide an excellent level of clarity with respect to OIG expectations, roles, goals, and processes.

For example, the OIG has extensive operations policies including, but not limited to, policies relating to workplace expectations, confidentiality, supervisory expectations, and team lead expectations. The OIG also provided internal policies relating to public disclosure requests, records retention and management and a comprehensive Audit Unit Policy Manual which was recently revised in November 2022.

### iii.  OIG Structure

As per the OIG's 2023 Workplan, the agencies' responsibilities include:[93]

- Conducting performance audits and reviews to ensure the integrity of SPD and OPA processes and operations.
- Ensuring SPD is meeting its mission to address crime and improve quality of life through the delivery of constitutional, professional, and effective police services that retain the trust, respect, and support of the community.
- Reviewing OPA's intake and investigation of misconduct allegations.
- Evaluating SPD response to incidents involving death, serious injury, serious use of force, mass demonstrations, or other issues of significant public concern to assess the integrity of SPD investigative processes. And,
- Making recommendations to policymakers for increasing fairness and integrity in the delivery of SPD services and related criminal justice system processes.

OIG has identified four operational functions to accomplish its responsibilities: audit, policy, investigations, and strategic leadership. To support these functions, the Inspector General has created a robust organizational structure: two executive staff members report to the IG, including a Director of Operations & Strategy[94] and a Deputy IG who is responsible for supervising four supervising staff members, including an Investigative Supervisor,[95] a Supervising Auditor,[96] a Policy Supervisor,[97] and a Senior Policy Analyst.[98]

The organizational structure created by the OIG appears to be robust and functional. The structure was enhanced in 2021 to include the Director of Operations & Strategy position, with responsibility over the administrative side of the agency, as the Deputy IG was reportedly oversubscribed in handling both operational and administrative work responsibilities.

### iv.  OIG Systems & processes

OIG reports that it adheres to the "Generally Accepted Government Auditing Standards" (GAGAS) set by the United States Government Accountability Office.[99] As the OIG's 2023 Workplan describes, "[t]hese standards provide requirements for how OIG auditors perform their work, including guidelines related to independence, objectivity, standards of evidence, and reporting." OIG reports that it completed a peer review process in 2022 and passed, indicating that the agency is following best practices in conducting its audits.

---

[93] See Seattle Office of Inspector General, *2023 OIG Work Plan* (Dec. 16, 2022), https://www.seattle.gov/documents/Departments/OIG/Policy/2023%20OIG%20Work%20Plan.pdf.
[94] The Director of Operations & Strategy is responsible for supervising an Operations Manager and a Public Disclosure Officer.
[95] The OIG Investigative Supervisor supervises three Audit Investigators.
[96] The OIG Supervising Auditor supervises three Public Safety Auditors and two Surveillance Auditors.
[97] The OIG Policy Supervisor supervises a Policy & Statistical Analyst and a Policy Analyst.
[98] The OIG Senior Policy Analyst is intended to supervise an additional Policy & Statistical Analyst and a Policy Analyst. These three positions have been identified as "Emergency Positions" to be added to OIG staff in 2024.
[99] Also known as "Yellow Book" standards.

With respect to the OIG's monitoring of OPA, OIG touches OPA investigations at two junctures. First, when OPA makes a classification decision, OIG is responsible for making sure that OPA has appropriately identified cases for investigation where there may be a viable complaint. Upon completion of an OPA investigation, OIG is responsible for certifying investigations if they are found to be thorough, unbiased, and timely. If any deficiencies are identified, OIG may provide either informal or formal feedback. As previously noted, overall, OIG's concurrence and certification levels are high. OIG conducts, on an ongoing basis, a trend analysis regarding these reviews and certifications and publicly reports on those levels in its quarterly and annual reports. OIG is not involved in the making or adjudication of disciplinary decisions or the imposition of discipline; however, OIG can conduct audits of the disciplinary process and has, in fact, done so.[100]

It should be noted that OIG recognized that, in the past, personnel challenges resulted in some deficient reviews of OPA files and that, in the infancy of the agency, there were insufficient resources to assure a high quality of review. As a result of challenges in that regard, the OIG hired the OIR Group to conduct a "peer performance and systems review," which was published in June 2022.[101] Amongst the recommendations made by the OIR Group was that "the OIG should regularly conduct self-initiated "spot audits" of its Investigations team to ensure that all members are meeting expectations." The OIR Group noted that "[i]ncreased staffing levels and some restructuring of the office have the Office better positioned to serve as the type of model oversight entity Seattle envisioned when it was created." The OIG reports that they now have adequate staffing to ensure appropriate supervision of their personnel in conducting this important work.

*OIG Sentinel Event Reviews*

One of the most innovative steps taken by any of the members of the Accountability Triad has been the sentinel event reviews ("SER"'s) managed by the OIG. The SERs were community-inclusive reviews of significant negative results from SPD conduct that may indicate systemic problems. OIG's goal has been to determine root causes for such events and find appropriate remedies through a process that involves both SPD and community stakeholders and focuses on analysis rather than blame.

The first SER (Wave 1), published on July 22, 2021, centered on the police response to the 2020 protests, an event from which an unprecedented number of misconduct complaints arose. As OIG described, the SER reports were based upon: (1) extensive amounts of research into available evidence, including but not limited to body-worn video, complaints, and public comment; (2) a panel of community members from a cross-section of lived experiences with SPD officers; and (3) further system data review.

The Wave 1 report contained 54 recommendations from the SER panel, revolving around the improving five areas: community legitimacy, situation awareness, communication and community engagement, tactics and equipment during crowd events, and officer wellness and training.

---

[100] See, Seattle Office of Inspector General, *Audit of Disciplinary Syst. For SPD Sworn Personnel* (Nov. 30, 2021), https://www.seattle.gov/documents/Departments/OIG/Audits/AuditofDisciplinarySystemforSPDSwornPersonnel.pdf.

[101] Michael Gennaco & Julie Ruhlin, *Independent Rev. of Seattle Office of Inspector General: Peer Performance and Systs. Rev.*, OIR GROUP (June 2022), https://www.seattle.gov/a/131807.

The Wave 2 report covered events that occurred between June 2 and June 7, 2020, before the leaving of the East Precinct by SPD. During this period, the main demonstrations and confrontations shifted from Downtown to the East Precinct. A Wave 3 report covered events that occurred during the existence of the Capitol Hill Organized Protest (CHOP) and Capitol Hill Autonomous Zone (CHAZ).

The Wave 4 report covered three specific incidents:

- A march in Capitol Hill on July 25th, where more than 5,000 people protested the deployment of federal law enforcement personnel to Seattle and Portland, Oregon;
- A protest on September 7th, outside the headquarters of the Seattle Police Officers' Guild (SPOG) to demand increased transparency in future collective bargaining agreements; and
- A march in Capitol Hill on September 23rd, to protest a Kentucky grand jury's decision to indict one of the officers involved in the March 2020 murder of Breonna Taylor on charges of "wanton endangerment," with no officers facing charges directly related to Taylor's murder.

As noted at various points in this report, the OIG's Sentinel Event Reviews appear to have been positively received by both the public and the SPD. Their methodologies were robust and well-conceived. And most of the recommendations stemming from the SERs appear to have been accepted by the SPD.[102]

### v.    OIG Staffing

Lisa Judge was appointed as the first Inspector General in May of 2018 and continues in that position. IG Judge currently has greater longevity than any other leader of the Accountability Triad.

*Inspector General Qualifications, Hiring & Evaluation*

The 2017 Accountability Ordinance includes provisions for the General Qualifications, Hiring and Evaluation of the Inspector General. Specifically, the Inspector General is required to be "a civilian with a background in criminal, civil rights, labor law, governmental investigations, and/or the management of governmental auditing" and "with a demonstrated ability to lead and manage staff" and the ability to work with multiple stakeholders in conducting systemic audits and evaluations of police-related policies and practices.[103]

OIG has structural independence from the police department in that the Inspector General is appointed by the City Council's Public Safety Committee and is confirmed by the City Council. Both the CPC and the OPA Director have the opportunity to be involved in the selection process.[104]

---

[102] See, *infra*, at Table 8.
[103] See, SEATTLE, WASH., ORDINANCE NO. 125315 § 3.29.220 (Office of Inspector General for Public Safety – Qualifications).
[104] See, SEATTLE, WASH., ORDINANCE NO. 125315 § 3.29.230.B.

> The Inspector General serves up to two six-year terms and can only be removed "for cause" by a majority vote of the City Council and with input from the CPC. [105]

### vi. OIG Budget

No matter how well an accountability system may be structured or developed, if it is not appropriately resourced, it cannot be successful.[106]

As part of this assessment, the City provided the adopted and proposed budgets for the Accountability Triad for the period from 2021 through 2024.

The Office of Inspector General is expected to take over the work of the federal monitoring team and the Department of Justice to ensure the continuation of effective and Constitutional policing for the City of Seattle. Although auditor-monitor focused oversight agencies are generally expected to need fewer resources than investigation-focused agencies, the roles and responsibilities of the Seattle OIG are quite comprehensive and will require sufficient qualified staff to achieve its objectives.

In its 2023 budget submittal, OIG noted that Council added funding for 1.5 full time positions as OIG with one full-time position to support OIG's review of SPD surveillance technology and to provide "additional audit capacity for work on consent decree topics." The other 0.50 position is budgeted to "increase a part-time strategic advisor to full-time responding to public disclosure requests."[107]

The OIG budget history is detailed in Table 5.

**Table 5.  OIG Annual Budget 2021-2024**

| 2021 | 2022 Actuals | 2023 Adopted | 2024 Proposed |
|------|--------------|--------------|---------------|
| $2,918,539 | $3,722,712 | $3,933,922 | $3,989,208 |
| 15 FTE | 17.5 FTE | 19 FTE | 22 FTE[108] |

According to documents provided to the Monitoring Team, the City originally endorsed a 2024 budget for the OIG in support of 19 full-time employees. According to a recent filing by the City, however, the mayor:

---

[105] See, SEATTLE, WASH., ORDINANCE NO. 125315 § 3.29.230.E.

[106] Richard Rosenthal, *Perspectives of directors of civilian oversight of law enforcement agencies*, 41(4) POLICING, INT'L J. POLICE STRATEGIES & MGMT., 435, 439 (Table II), 445 (2018); SAMUEL E. WALKER & CAROL A. ARCHBOLD, THE NEW WORLD OF POLICE ACCOUNTABILITY 254-257 (Sage, 2d. ed., 2014); Colleen Lewis, *The Politics of Civilian Oversight: Serious Commitment or Lip Service?*, in CIVILIAN OVERSIGHT OF POLICING: GOVERNANCE, DEMOCRACY & HUMAN RIGHTS 32-33 (Andrew Goldsmith & Colleen Lewis, eds., 2000)..

[107] *See* City of Seattle – 2023 Adopted and 2024 Endorsed budgets (last visited Nov. 19, 2023), https://www.seattle.gov/documents/Departments/FinanceDepartment/23Adopted24Endorsed/OIG_2023Adopted_2024Endorsed.pdf.

[108] According to the OIG, the proposed request for twenty-two full time employees includes three "emergency" positions to accommodate current OIG needs.

[S]et aside budgeted funds and used his emergency powers to add three new auditor positions at OIG in the first quarter of 2023. The hiring process began in February. These positions will be included in the Executive's future budget requests to City Council. The increase in OIG's staff will help in transferring functions from the Monitor to OIG.

As of the writing of this report, the OIG has submitted an organizational chart that showed a total of 22 full-time positions, to include an investigative team, consisting of three "Audit Investigators" and an "Investigative Supervisor," as well as an audit team, consisting of a "Supervising Auditor," three "Public Safety Auditors," and two "Surveillance Auditors." On the policy side, the OIG reports staff consisting of a "Policy Supervisor," a "Senior Policy Analyst," two "Policy and Statistical Analysts," and two "Policy Analysts."

As previously noted, and recognized by the City,[109] the OIG looms large in any evaluation of the capacity of the Accountability Triad to take over for the Federal Monitor and the Court.

Over the course of our review, we noted that the OIG has expressed a need for additional resources prior to being able to take over the monitoring functions of the federal court. The IG needs the support of a technical writer to help the office complete more timely reports and assist in other writing activities, an FTE to be responsible for community engagement and communications, and an additional OPA investigator who could help the OIG keep up with the OPA caseload and help analyze the agency's work, as previously recommended by the OIR Group.

Further, it has also been reported that salaries for OIG auditors may not be comparable to salaries paid to staff employed by the Office of the City Auditor, who conduct similar work, but mostly relating to agencies other than the SPD. The salary data provided by the City was not conclusive on this issue due to a lack of data regarding duties, responsibilities and background required for the comparable positions. As such, it will be necessary to ensure that the salary levels paid for OIG staff are sufficient to ensure the hiring and retention of qualified personnel who are equipped to successfully complete the OIG's important work.

Even as it is laudable that the City recently added three additional auditor positions for the OIG, it will be important for the City to confer with the Inspector General to ensure that the office does, in fact, have the resources needed to effectively provide auditing and monitoring oversight for the SPD.

Even as OIG staffing has been increased, we were not made aware of any budgetary increases in support of larger office space for the OIG. A February 2023 site visit indicated an office space that was not sufficient for the anticipated personnel budgeted for the office.[110]

vii.     OIG Recommendations

OIG needs to publish its annual reports in a timelier manner. The last report published as of the

---

[109] See, City's Mem., *supra* note 1 at 25-26.
[110] On a recent site visit, although the views from the OIG office were impressive, the quarters were clearly cramped, even in the absence of the additional personnel promised by the City.

writing of this report was the 2021 Annual Report, which was published on December 31, 2022.[111] It would be a better practice for the OIG to publish its annual reports by the end of the first Quarter of the next calendar year. According to the OIG, the creation of an additional FTE position for a technical writer would assist in achieving this goal.

The City must appropriately fund the OIG going forward, to include ensuring adequate office space and competitive salaries. The City, needs to confer with the IG in order to ensure that the OIG has the resources, office space and full-time staff needed to take over SPD-related monitoring responsibilities.

Finally, OIG should conduct an updated assessment of the SPD disciplinary process for cases adjudicated under the leadership of Chief Diaz.

> d.    Office of Professional Accountability (OPA)

This section of the report describes the responsibilities and performance of the OPA. We found that OPA generally provides for thorough, unbiased, and timely investigations of complaints against SPD officers and has appropriate policies and processes in place to ensure its investigations into police misconduct, as well as recommendations relating to findings and the imposition of discipline, are reasonable and appropriate.

In the investigation that led to the Consent Decree, the Department of Justice determined that "the structure of OPA [was] sound, and the investigations OPA itself conducts generally are thorough." However, the DOJ also concluded that "OPA [was] not provid[ing] the intended backstop for the failures of the direct supervisory review process." DOJ also identified several deficiencies with respect to OPA's handling and classification of community complaints.[112] As such, the Consent Decree imposed a requirement that the OPA create a Training and Operations Manual (Consent Decree, paragraph 167) and contained additional provisions intended to provide OPA with the necessary tools to serve its function as the oversight agency charged with conducting investigations of complaints of police misconduct. In 2016, the federal monitor conducted a limited assessment of the OPA which included several recommendations to ensure timely and unbiased investigations.[113]

Since that time, the City has represented and the Monitor has confirmed that the OPA has addressed all the issues raised in the Consent Decree and become Consent Decree compliant by reforming practices relating to the sending of community complaints to SPD precincts, revising policies for reporting misconduct and retaliation to OPA, developing an OPA manual, and streamlining categories for classifying investigations and findings.[114]

---

[111] Seattle Office of Inspector General, *2021 Annual Report* (Dec. 16, 2022),
https://www.seattle.gov/documents/Departments/OIG/Annual/2021_Annual_Report.pdf.
[112] US Att'ys Office, W.D. Wash., *US Dep't Justice Investigation of the Seattle Police Dep't*, at 5 (Dec. 16, 2011),
https://www.justice.gov/sites/default/files/crt/legacy/2011/12/16/spd_findletter_12-16-11.pdf.
[113] *See*, Fourth Systemic Assessment: Office of Prof. Account., *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 294).
[114] City's Mem., *supra* note 1 at 21.

As part of the ongoing monitoring process, the Monitor conducted a follow-up review of the OPA in January 2020.[115] The Monitor made several recommendations, including that OPA:

- Update OPA Internal Operations and Training Manual.
- Expand Investigative Staff to Reduce Investigative and Case-closure Delays.
- Improve the Quality of OPA Interviews.
- Reconsider the Rule Prohibiting Access to All Documentary Evidence in Open Homicide Unit Investigative Files.
- Take Additional Steps in Some Biased-based Policing Investigations to Examine Officers' Thought Processes.
- Create a Single Report to Document All OPA Staff's Case and Investigative Actions;
- Create an Independent Investigation Plan Form; and
- Structure the Case Summary Report and Create Model Reports to Make the Case Summary More Useful.[116]

In November 2021, the OIG conducted an Audit of the Disciplinary System for SPD Sworn personnel which resulted in several recommendations that related to the OPA:[117]

- The OPA Director, in consultation with the Chief of Police, should develop criteria to more consistently identify opportunities for complainants to speak with the Chief of Police as provided in the Accountability Ordinance 3.29.125 (G).
- OPA should define an internal deadline in its manual for sending CCS to applicable complainants.
- OPA should examine cases with pending or resolved appeals where complainants were not notified of the appeal and determine if notifications should be made. And,
- OPA should create criteria for identifying and notifying individuals of the creation and resolution of a case in which they were not complainant but were directly involved in the capacity of a complainant.[118]

The City has further represented that the OPA has implemented those recommendations made by the Monitor and OIG by "augmenting its training on interviewing techniques; adding and filling two new civilian investigative staff positions; increasing the quality of its written investigative plans, improving overall case documentation; taking steps to ensure that closed case summaries are promptly sent to complainants; and notifying complainants of disciplinary appeals."[119]

The City also represented that the OPA has increased transparency into officer discipline: "Starting in June 2020, OPA began posting information about the disciplinary resolution for each of its investigations and the status of all pending disciplinary appeals on its website."[120] The OPA

---

[115] See, Follow-Up Rev. Office of Police Account., *supra* note 10 at 29-33.
[116] *Id*., 29-33 (Section IV, Conclusions & Recommandations).
[117] See, OIG Audit, *supra* note 101.
[118] *Id*, pp. 40-42.
[119] City's Mem., *supra* note 1 at 21-22 (citing Declaration of [OPA Director] Gino Betts at ¶¶ 6-14, 21-25, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 731)).
[120] Declaration of Gino Betts, *supra* note 48 at ¶ 20.

Director has further represented that he also considered recommendations made by 21CP Solutions in their 2019 report, indicating the status of follow-up on those recommendations as follows:

- When there are Parallel Criminal Proceedings, OPA May Not Get Adequate Time to Investigate (pg. 35-40)—Partially Fixed / Partially Subject to Bargaining
- Lack of clarity regarding OPA's ability to obtain records or secure testimony (at pp. 40-45)—In progress.
- The Public Has Concerns about Lack of Arbitrator Diversity and Impartiality (at pp. 49-51)—State Enacted Legislation Intended to Address
- Arbitrators Apply an "Elevated" Quantum of Proof in the Most Serious Cases (at pp. 51-53)—Fixed in SPMA, Subject to Collective Bargaining With SPOG
- Lack of Transparency in Disciplinary Appeals (at pg. 53-54)—Fixed.[121]

The City has also noted changes made by the SPD in response to OPA recommendations. The Chief Operating Officer of SPD, a civilian, has represented that the Department, based in part on recommendations made by OPA, had updated its training for responding to subjects armed with knives and other edged weapons.[122]

     i.     OPA Stakeholder Interviews

As part of our assessment, we interviewed multiple City stakeholders and asked them to provide input regarding their recent experiences with the OPA.

The opinions of stakeholders about OPA and its operations were mixed, sometimes contradictory, and largely based on perceptions about individual OPA Directors as too pro or anti police. As such, each of the three most recent OPA Directors were alternatively lauded and/or criticized during our stakeholder interviews. While some community members suggested that the OPA, in the past, had lacked transparency and was perceived to be dominated by police officers, other city stakeholders suggested that the OPA was sometimes too hard on the police and attempted to impose unreasonable expectations on officers. In fact, OPA was alternatively criticized for being too insular and police-oriented and being too community minded, usually depending on what Director was in charge at a given time.

When comparing the stakeholder feedback on the OIG and the OPA programs, one should not be surprised at the results. Oversight programs such as OPA that are "culpability focused" and emphasize disciplinary findings and recommendations are much more likely to be subject to criticism from both the police and the community than programs such as OIG that are more focused on more systemic issues relating to police policies, procedures, training, and equipment.[123]

---

[121] Id., ¶¶ 16-20.

[122] Declaration of Brian Maxey at ¶6, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 732).

[123] Debra A. Livingston, *The unfulfilled promise of citizen review*, 1 OHIO ST. J. OF CRIM. L., 653, 653-669 (2004). Livingston (1999) also argued that "a conclusion drawn by many police scholars [is that] efforts at police reform will be most effective … when reform involves not simply adherence to rules in the face of punitive sanctions, but a change in the organizational values and systems to which both managers and line officers adhere." Debra A. Livingston, *The Department of Justice: An Essay on Accountability*, 2 BUFFALO CRIM. L. REV. 850, 850 (1999) (citing David Dixon, LAW IN POLICING: LEGAL REGULATION AND POLICE PRACTICES 308 (1997); and Jerome H. Skolnick & James J. Fyfe, ABOVE THE LAW: POLICE AND THE EXCESSIVE USE OF FORCE 187 (1993)).

ii.     OPA Policies

As part of the Consent Decree process, the OPA created its first Internal Operations and Training Manual, which was submitted to the Court by the federal Monitor on June 30, 2014,[124] and which was ultimately approved by the Court on July 10, 2014.[125]

Revisions to the OPA Manual were submitted to the court on January 14, 2016,[126] and approved on March 16, 2016.[127] Most recently, an updated Internal and Operations Manual was submitted to the Court on October 29, 2021.[128] The most current Manual indicated it had last been updated on October 25, 2021, and has been effective since January 1, 2022.

OPA's Internal Operations and Training Manual consists of 46-pages and contains sections on "Personnel Policies,"[129] "Operations Policies,"[130] "Special Considerations,"[131] "Complaint Receipt and Intake,"[132] "Investigation Processes,"[133] "Investigations Findings,"[134] and "OPA Programs and Protocols."[135] The OPA Manual is posted on the OPA website.[136]

Overall, the OPA Manual is thorough and robust and continues to be updated as new circumstances and challenges arise. However, multiple stakeholders suggested that the OPA gets overburdened with complaints that would be better handled informally through front line supervisors or through a more expanded use of "contact logs," which would reduce the number of cases subject to a full investigation. Other stakeholders proposed that the OPA Manual could be changed to allow the

---

[124] Mem. Submitting Office of Prof. Account. Internal Ops and Training Manual and SPD Policies 5.001 and 5.002, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 156).
[125] Order Approving Office of Prof. Account. Internal Ops and Training Manual and SPD Policies 5.001 and 5.002, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 161).
[126] Mem. Sub. Rev'ns to Office of Prof. Account. Manual, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 256).
[127] Order Approving Rev'ns to Office of Prof. Account. Manual with One Exception, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 278).
[128] City of Seattle's Oct. 2021 Quart. Account. Update at Exh. 2, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 689-2).
[129] To include sections on Confidentiality, Conflicts of Interest and Nonretaliation.
[130] To include sections on Contact & Hours of Operation, Accessibility and Interpretation Services, Emergency Preparedness, Information Management & Records Policies, Training and Professional Development, Annual Report, and Mobilization for Unusual Circumstances.
[131] To include sections on Employee Unions, Criminal and Other Sensitive Allegations, Contact with Complainants, Complainants Represented by an Attorney, Contact with Criminal Investigators, Contact with Prosecuting Authorities, and Subpoenas.
[132] To include sections on Complaint Filing, Complaint Intake, Intake Investigation, Classification, and Supervisor Actions Process,
[133] To include sections on Investigation Assignment, Investigation Timeline, Investigation Planning, Investigative Steps, Conducting Interviews, Review and Evaluation of Evidence, The Report of Investigation, and Investigation Review and Certification.
[134] To include sections on Issuance of Findings, Not Sustained Findings, Sustained Findings, Notice of Missed 180-day deadline, Case Closing Process,
[135] To include sections on Unsubstantiated Misconduct Screening, Criminal Referrals, EEO Screening, Mediation, Rapid Adjudication, Bias Reviews, Monitoring Serious Incidents, Appeals of OPA Findings,
[136] Office of Police Accountability, *Guiding Documents* (last visited Nov. 19, 2023), https://www.seattle.gov/opa/policy/guiding-documents.

OPA *not* to investigate a case "in the interest of justice."[137]

### iii.    OPA Structure

As per the OPA Manual, OPA's core functions include:[138]

- Establishing and managing processes to initiate, receive, classify, and investigate individual allegations of SPD employee misconduct.
- Promoting public awareness of, full access to, and trust in OPA complaint processing.
- Identifying SPD system improvement needs and recommending effective solutions.
- Reducing employee misconduct.

The OPA has identified three operational functions to accomplish its responsibilities: Investigations, Legal and Operations & Training. To support these functions, the OPA has created a robust organizational structure: four staff members report directly to the Director, including a Manager of Communications and three executive staff members, including an Assistant Director of Investigations, a General Counsel, and an Assistant Director of Operations & Training. The Assistant Director of Investigations supervises two Investigations Managers, who in turn supervise investigative teams consisting of four to five Police Sergeants and one civilian investigator. The General Counsel supervises an Assistant Council (pending City Council approval) and a Policy Manager. And, the Assistant Director of Operations & Training supervises an Executive Assistant, three Administrative Specialists, an Administrative Staff Analyst, a Community Engagement & Restorative Justice Coordinator, a Complaint Navigation & Community Outreach Specialist, a Data Analyst, and a Project Manager.

The organizational structure created by the OPA appears to be appropriate and functional. However, multiple stakeholders noted the need for a "Deputy Director" position within the OPA, which is intended to ensure the timely preparation of Disciplinary Action Reports and Management Action Recommendations. It has been reported that this position has been funded in the upcoming budget cycle and a hire has recently been made.

### iv.    OPA Systems & processes

OPA systems and processes for handling complaints (including receipt, intake, and investigation processes) are documented in its Manual of Operations. Further additional protocols exist in the Manual of Operations for screening complaints that can be clearly refuted by objective evidence, the process for referring allegations of criminal conduct against an officer, the process for screening for and identifying allegations of workplace discrimination and harassment, the rapid adjudication of cases wherein officers are encouraged to accept responsibility for conduct that is in violation of SPD policy, a process for dealing with complaints of bias made in the field, and the monitoring of Force Investigation Team (FIT) investigations.

---

[137] One example that was provided was in a case where an SPD officer had been the victim of domestic violence but was not cooperative with responding officers.
[138] See Office of Police Accountability, OPERATIONS MANUAL, Section 1.2.

Multiple stakeholders have noted that current SPD processes do not give complainants an opportunity to be heard by the Chief prior to discipline being imposed regarding their complaint. In fact, the OIG in their November 2021 Discipline Audit recommended that: "[t]he OPA Director, in consultation with the Chief of Police, [] develop criteria to more consistently identify opportunities for complainants to speak with the Chief of Police as provided in the Accountability Ordinance 3.29.125 (G)." It has been reported that the OPA and the SPD are working on such a process; that work should be completed at the earliest opportunity.

> v.   OPA Staffing

Since the time of its creation in 2001, the OPA has had five permanent directors:

- Sam Pailca (2001-2007)[139]
- Kathryn Olson (2007-2013)[140]
- Pierce Murphy (2013-2017)[141]
- Andrew Myerberg (2017-2022)[142]
- Gino Betts (2022-present)[143]

---

*OPA Director Qualifications, Hiring & Evaluation*

As with the Inspector General, the 2017 Accountability Ordinance includes robust provisions for the General Qualifications, Hiring and Evaluation of the OPA Director. According to the provisions of the Accountability Ordinance, the OPA Director "shall be a civilian with significant legal, investigative, human resources, law enforcement oversight, or prosecutorial experience" and "shall not have been formerly employed by SPD as a sworn officer…"[144]

Like the Chief of Police, the OPA Director is appointed by the mayor and confirmed by City Council with both the CPC and the OIG having an opportunity to have input into the selection process.[145]

---

[139] Hector Castro, *Police Oversight Director Leaving Job: Sam Pailca Walked Tight Line Between Officers, Rights Groups*, SEATTLE PI (Feb. 8, 2007), https://www.seattlepi.com/seattlenews/article/police-oversight-director-leaving-job-1227826.php.
[140] John B. Saul, *Council, Mayor Should Thank Resigning OPA Director*, SEATTLE TIMES (October 11, 2012), https://www.seattletimes.com/opinion/council-mayor-should-thank-resigning-opa-director/.
[141] Steve Miletich, *Pierce Murphy, Head of Seattle Police's Civilian Watchdog, Stepping Down*, SEATTLE TIMES (May 17, 2017) https://www.seattletimes.com/seattle-news/law-justice/pierce-murphy-seattle-polices-civilian-watchdog-stepping-down/#:~:text=Murphy%2C%20who%20was%20appointed%20OPA%20director%20in%202013,Department%E2%80%99s%20internal%20investigations%20and%20discipline%20during%20his%20tenure.
[142] *Andrew Myerberg Named Seattle Director of Public Safety*, SECURITYMAGAZINE.COM (January 14, 2022), https://www.securitymagazine.com/articles/96908-andrew-myerberg-named-seattle-director-of-public-safety.
[143] Jamie Housen, *Mayor Bruce Harrell to Appoint Accountability Leader Gino Betts as Next Office of Police Accountability Director*, SEATTLE OFFICE OF THE MAYOR (July 19, 2022). https://harrell.seattle.gov/2022/07/19/mayor-bruce-harrell-to-appoint-accountability-leader-gino-betts-as-next-office-of-police-accountability-director/.
[144] See, SEATTLE, WASH., ORDINANCE NO. 125315 § 3.29.110 (Office of Police Accountability Director – Qualifications).
[145] See, SEATTLE, WASH., ORDINANCE NO. 125315 §§ 3.29.115.A & B.

> The OPA Director may serve up to three four-year terms and may only be removed "for cause" with a vote of a majority of the City Council.[146]

While the importance of hiring and retaining a qualified OPA Director cannot be overstated, interviewed stakeholders have pointed out that "the investigative team is the life blood of OPA." It has also been pointed out that OPA investigators have suffered from "burnout" in the past. "It is an unforgiving workload with an unforgiving timeline…the OPA investigates 500 cases a year, generally without missing deadlines."

OPA is currently budgeted for nine sworn and two civilian investigators for a total of eleven (11) full time investigators. It has been suggested that unless the OPA is able to reduce its workload through better triage of complaints and utilization of front-line supervisors to handle more minor complaints, that up to fifteen full time OPA investigators would be necessary to reduce employee fatigue and ensure sustainability and timeliness in investigations.[147]

> *Civilianization*
>
> As to the composition of OPA investigative staff, there has been much debate as to whether OPA needs to be civilianized or sworn. The Accountability Ordinance, Section 3.29.140, sought to ensure a greater degree of civilianization within the OPA,[148] but that goal has been blocked by collective bargaining agreements.

---

[146] See SEATTLE, WASH., ORDINANCE NO. 125315§ 3.29.115.F.

[147] Stakeholders have advised that on numerous occasions, SPD command staff is given little time to review sustained case recommendations when OPA investigations are completed just under the required deadlines.

[148] SEATTLE, WASH., ORDINANCE NO. 125315 § 3.29.140 reads as follows:
Office of Police Accountability - Staffing
A. The OPA Director and the Deputy Director shall be civilians and, within 18 months of the effective date of the ordinance introduced as Council Bill 118969, all investigative supervisors shall be civilian.
B. All OPA staff working directly with SPD supervisors to support the handling of minor violations and public access to the accountability system shall be civilians.
C. Within 12 months of the effective date of the ordinance introduced as Council Bill 118969, intake and investigator personnel shall be entirely civilian or a mix of civilian and sworn, in whatever staffing configuration best provides for continuity, flexibility, leadership opportunity, and specialized expertise, and supports public trust in the complaint-handling process.
D. All staff shall have the requisite skills and abilities necessary for OPA to fulfill its duties and obligations as set forth in this Chapter 3.29 and for OPA's operational effectiveness. No civilian staff shall be required to have sworn experience and no civilian staff shall have been formerly employed by SPD as a sworn officer.
E. The OPA Director and the Chief shall collaborate with the goal that the rotations of sworn staff into and out of OPA are done in such a way as to maintain continuity and expertise, professionalism, orderly case management, and the operational effectiveness of both OPA and SPD, pursuant to subsection 3.29.430.G.
F. The appropriate level of civilianization of OPA intake and investigator personnel shall be evaluated by OIG pursuant to Section 3.29.240.
G. OPA investigators and investigative supervisors shall receive training by professional instructors outside SPD in best practices in administrative and police practices investigations. OPA investigators and investigative supervisors shall also receive in-house training on current SPD and OPA policies and procedures.

No research conclusively establishes what ratio of sworn/civilian personnel for civilian oversight investigation-focused agencies is a best practice. In general, it appears that the most accepted "best practice," based solely on theory and perception, is a mixed ratio, but that ratio varies from agency to agency depending on the politics and culture of each jurisdiction.[149] Critically, many oversight practitioners believe that it is less about the background of an investigator (law enforcement vs. civilian) and more about the ability of that person to avoid confirmation bias, approach their job in an objective and evidence-based manner, and to function within an organization and culture committed to implementing best investigative practices. They argue that staffing ratios should be left to the discretion of the head of the agency and that court or legislatively mandated ratios tend to be arbitrary.[150]

> vi.    Budget

Of the Accountability Triad, the Office of Police Accountability has the largest budget and staffing numbers. This is generally consistent with its classification as an "investigation-focused" oversight agency.[151]

The OPA budget history is detailed in Table 6.

**Table 6.  OPA Annual Budget 2021-2024**

| 2021 Actual | 2022 Actuals | 2023 Adopted | 2024 Proposed |
|---|---|---|---|
| $4,378,667 | $4,408,221 | $5,483,765 | $5,520,181 |
| 27 FTE | 28 FTE | 31 FTE[152] | 31 FTE |

For the OPA 2023 budget proposal, an additional full-time employee was included in the OPA budget proposal to "add[] a full time Assistant Counsel & Legal Writer to the Office of Police Accountability (OPA) to help draft Director Certified Memos (DCMs) and ensure that OPA has the capacity to issue administrative findings in compliance with the mandated deadlines for review, investigation, classification, and distribution of the case files."

---

[149] See, Stephen P. Savage, *Seeking "Civilianness"; Police Complaints and the Civilian Control Model of Oversight*, 53 BRIT. J. CRIM., 886-904 (2013) (wherein the author examined "[h]ow the actors justify and rationalize the 'mix' of investigators who populate these oversight bodies.").

[150] See, Richard Rosenthal, *Independent Critical Incident Investigation Agencies: A Unique Form of Oversight*, 83 Albany L. Rev. 855, 915 (2019): "It may very well be the culture of the organization and how it develops over time that has the most substantial impact on the objectivity, fairness and competency of each ICIIA [Independent Critical Incident Investigation Agency], more so than the specific nature of the entity as created by statute or the background of its investigators. While it could certainly be argued that the more structural independence the better, the social, political and historical nature of the jurisdiction and the leadership of the involved government stakeholders appears more likely to have a meaningful impact on the actual independence of each agency. (Further, see discussion of arguments in favor and against use of current and former police officers as investigative staff for Independent Critical Incident Investigation Agencies worldwide, see, *Id.*, at 919-920).

[151] See, Joseph De Angelis, Richard Rosenthal, & Brian Buchner, *Civilian Oversight of Law Enforcement: A Review of the Strengths and Weaknesses of Various Models*, US DEP'T. OF JUSTICE, OFFICE OF JUSTICE PROGRAMS DIAGNOSTIC CTR., 8 (NCJ Number: 250265) (2016).

[152] OPA reports 2 PDR (Policy Development & Research) staff and 1 Deputy Director added.

vii.     Recommendations

The OPA must continue to explore, in collaboration with its accountability partners, the potential to better triage or filter police complaints in a manner that would allow and expedite resolution of certain low-level complaints without a requiring a formal OPA investigation. In addition, or alternatively, the City should consider having OIG audit the SPD's handling of minor complaints, as opposed to requiring that all minor complaints be run through the OPA process prior to being able to be resolved by SPD supervisors.

As recommended by the OIG in their November 2021 Discipline Audit, the OPA Director, in consultation with the Chief of Police, needs to develop criteria to more consistently identify opportunities for complainants to speak with the Chief of Police as provided in the Accountability Ordinance 3.29.125 (G).

e.     Community Police Commission (CPC)

Prior sections have described the responsibilities and performance of OIG and OPA. This section does the same with respect to the Community Police Commission. It finds that, although CPC has encountered some difficulties and its original structure appears to have been challenging, the Commission can and should be a vital conduit between Seattle's many, diverse communities, and SPD.

The CPC was created by a Memorandum of Understanding filed on July 17, 2021, concurrent with the Consent Decree. As previously noted, the CPC has been an active participant in the Consent Decree process. The CPC has conducted regular monthly public meetings and has regularly communicated with the SPD, public officials, and the public through a host of reports, statements, and letters, all published on its website. For example, in January 2021, after soliciting and receiving public feedback, the CPC provided fifteen recommendations to the SPD on its proposed Use of Force and Crowd Management policies.[153] Additionally, the CPC has also published an "Accountability Ordinance Tracker" and a "Recommendations Tracker" as a follow-up to its involvement in the creation of the Accountability Ordinance. The CPC has also reports itself as having been active in legislative advocacy as it relates to state legislation involving police accountability and reform.[154]

i.     CPC Stakeholder Interviews

As with the OIG and the OPA, we interviewed multiple City stakeholders and asked them to provide input regarding their recent experiences with the CPC.

Stakeholders reported that the CPC has struggled over the last two years and lost ground in its ability to serve as a bridge between the community and the SPD. Many interviewees suggested

---

[153] Seattle Community Police Commission, *CPC Recommendations on SPD's proposed Use of Force and Crowd Management policies* (Jan. 29, 2021), https://perspectives.seattle.gov/wp-content/uploads/2021/01/2021-01-29_SPD_Policies_Recommendation_Chart.pdf.
[154] Seattle Community Police Commission, *Fighting for Statewide Police Reforms* (last visited Nov. 19, 2023), https://www.seattle.gov/community-police-commission/our-work/state-legislative-advocacy.

that the CPC lost the trust of its accountability partners during this period.[155] Some interviewees even suggested that the CPC was set up to fail when established, noting it was designed to be comprised of competing political factions and has been unwieldy in size since its inception. At the same time, stakeholders indicated that the CPC appears to some to be on a road to recovery, with new leadership in place that better understands the role that the CPC needs to serve within the Accountability Triad and the need to rebuild relationships between all the accountability partners.

Overall, stakeholders focused on the need for the CPC to create better processes to act as a true bridge between the community, the SPD, and within the Accountability Triad. An often-heard concern – one that is not unique to Seattle – was that CPC meetings were dominated by a few loud voices claiming to represent the community. Some stakeholders recommended that the CPC borrow some of the methodologies used by the OIG in their Sentinel Reviews to conduct community forums and create workgroups which would be equipped to conduct evaluations of SPD's current and proposed policies in a way that can better represent a diversity of community voices – including those disinclined to engage in public speaking at designated CPC meeting times.

Another common refrain from CPC's other accountability partners was the need for the CPC to work with them to better clarify each entity's roles and responsibilities. There was not as clear of a consensus as to CPC's role in particular, as some felt it was meant to be collaborative liaison among the public, the other accountability partners, and the SPD, while others felt that it was supposed to be, at least to some degree, an outlet or advocate for the communities most affected by policing. Many stakeholders lamented that OPA and OIG are required to find ways to engage community in their policy reviews and recommendations in no small part because the CPC has not been able to fulfill that function as reliably or comprehensively as other stakeholders believe is necessary.

Stakeholders also commented on the need for a strong Executive Director and dedicated, objective staff. As one stakeholder stated: "There are lots of strong personalities on the CPC that have stifled productivity." Other stakeholders believed] that some members of the CPC staff joined the organization with a desire to advocate a "defund the police point of view . . . which was not consistent with the needs of the organization" or the voices of most of the commissioners and/or community members.

Other stakeholders believed that the CPC had been "set up to fail:"

- "It's too large, there is too much work for volunteers and a very small staff. The OPA and IG are better staffed and funded. The CPC was set up to be the weakest link in the system and that is what happened."
- "They have tried to do some good engagement – they got Zoom bombed…. I can't really point to any successes here. the way it is structured; Mayor/Council appointments – there's a group of activists and some moderates; so, CPC gets divided and struggles to be effective."
- "It was not designed for success.  There is always tension between the CPC executive and staff and/or commissioners. There is a lack of clarity on goals, roles, and

---

[155] A few stakeholders criticized the CPC strongly, sometimes using pejorative terms.

processes. It would take a very savvy leader to navigate between staff and Commission."

- "When you add in the commissioners – there is a level of politics that comes into play (due to who appoints them) that can be difficult. A game of 3D chess – there's subtext, conflict, undermining of work."
- "For the Sentinel Event Review: in a perfect world, it would have been a CPC-initiated project, but they simply didn't have the bandwidth."

Despite concerns about CPC's performance in the past and the recognition of some limitations in CPC's influence, most stakeholders were supportive of the CPC conceptually, although it was noted that the other accountability partners, including SPD, have a role and responsibility to conduct their own community outreach. As mentioned by one stakeholder: "Although the CPC is a community lens, it is not and should not be considered as the only community lens."

All stakeholders recognized a need for a "reset" in the relationship between the CPC and other accountability partners. That reset does appear to be a work in progress at this time.

ii.     CPC Policies

The CPC adopted its first formal bylaws on December 16, 2020 – more than eight years after its creation. The bylaws have since been amended on September 15, 2021, December 15, 2021, and, most recently, on May 17, 2023.

The CPC Bylaws explain the relationship between the Commission and its executive director, specifying that "the Executive Director has the authority and responsibility for the day-to-day functions of the Office of the CPC. The Executive Director shall execute these functions in consultation with and under supervision of the CPC Co-Chairs."[156]

The Bylaws also include provisions relating to the independence and structure of the CPC, the need to develop a communications strategy, how to address staff concerns, expectations regarding the conduct and participation and attendance of Commissioners, removal of Commissioners for cause, election of officers, responsibilities and removal of co-chairs, meeting protocols and rules, and standing committees and workgroups.

Since the time of its inception, the CPC has operated without an internal Operations Manual. The current CPC executive was able to provide the Monitoring Team with an uncompleted draft Operations Manual, last reviewed in 2021, that was found in a CPC archived computer drive. The lack of any internal policies and procedures has likely exacerbated the ongoing struggles of the CPC specifically with respect to reported conflicts amongst and between CPC staff, the CPC co-chairs, and individual Commissioners. It is widely recognized that "[l]ack of clarity about tasks, strategies, and/or goals can lead people to make assumptions that others do not share or agree with,

---

[156] See, Seattle Community Police Commission, *CPC Bylaws: Revisions to 12-14-16 bylaws* at Article II.A.2 (Nov. 15, 2017), https://seattle.gov/documents/Departments/CommunityPoliceCommission/Administration/By-Laws/CPC_Bylaws_amended_111517.pdf.

which can result in conflict."[157]

### iii.    CPC Structure

The CPC originally consisted of fifteen (15) members but was increased to twenty-one (21) by the 2017 Accountability Ordinance. As previously noted, the number of commissioners was reset to fifteen through a 2023 amendment to the Accountability Ordinance. Commissioners are appointed by the mayor (5), the City Council (5) and the CPC itself (5).[158] Commissioners are reported to "represent the diversity of Seattle and include individuals from communities of color, ethnic and faith communities, immigrant communities, the urban Indian community, the LGBTQ community, and the business community. Commissioners also include youth representatives, civil rights advocates, and individuals familiar with the challenges faced by homeless people and those with mental illness or substance abuse issues."[159]

Two CPC positions are designated for public defense and civil liberties lawyers, one position is designated for a member of the Seattle Police Officers Guild, and one position is designated for a member of the Seattle Police Management Association.[160] Commissioners are required to live or work in Seattle.[161]

The CPC is currently led by three co-chairs, (1) Rev. Patricia Hunter, Interim Pastor at Mount Zion Baptist Church, appointed by Seattle City Council, (2) Rev Harriett Walden, appointed by the mayor, and (3) Joel Merkel, an Assistant Attorney General, appointed by the Seattle City Council.[162]

CPC staff is currently led by an Executive Director with four direct reports, a Policy Director, a Communications Advisor, an Executive Assistant, and a Communication Engagement Director. The Policy Director supervises two Policy Analyst positions, and the Communication Engagement Director supervises two Community Engagement Specialists. As indicated below, a Deputy Director position has recently been added to the agency, which is anticipated to result in changes to the organizational structure in the near future.

---

*CPC Request for Ordinance Changes*

On May 17, 2023, the CPC adopted amendments to its bylaws and recommended a slate of proposed ordinance changes most which were subsequently enacted by the City Council. The ordinance changes included, creating a Deputy Director position for the CPC, establishing

---

[157] See, Kerry Osborne, *9.2: The Impact of Interpersonal Conflict on Team Performance*, SOCIALSCI.LIBRETEXTS.ORG (last visited Nov. 19, 2023), https://socialsci.libretexts.org/Courses/College_of_the_Canyons/COMS_120%3A_Small_Group_Communication_(Osborn)/09%3A_Managing_Conflict_in_Teams/9.02%3A_The_Impact_of_Interpersonal_Conflict_on_Team_Performance; See also, Suzanne Lucas, *The GRPI model, an acronym for Goals, Roles, Processes, and Interpersonal Relationships, provides a comprehensive framework for team development and optimization*, ACADEMY TO INNOVATE HR (last visited Nov. 19, 2023), https://www.aihr.com/blog/grpi-model/.
[158] See, SEATTLE, WASH., ORDINANCE NO. 125315 § 3.29.350.
[159] See, Seattle Community Police Commission, *About Us* (last visited Nov. 19, 2023), https://seattle.gov/community-police-commission/about-us#commissioners
[160] See, SEATTLE, WASH., ORDINANCE NO. 125315 § 3.29.340.D.
[161] See, SEATTLE, WASH., ORDINANCE NO. 125315 § 3.29.340.A.
[162] See, CPC About Us, *supra* note 161.

qualifications for the CPC Executive Director on par with the qualifications of the OPA Director and the Inspector General, creating provisions to allow for the removal of the CPC Executive Director and CPC commissioners "for cause," reducing the size of the Commission from 21 to 15,[163] clarifying the roles of the Executive Director vis-à-vis the CPC Co-Chairs, [164] and removing a requirement that CPC members be appointed by Council District.[165]

The process of creating, evaluating, and reforming civilian oversight structures has a long and storied history throughout the United States. As discussed below, even amongst just the "West Coast Seven" cities, there have been many different iterations of oversight in each of the cities over time. In fact, local crises involving the police often generate significant pressure to review or reform local oversight and accountability programs. As such, jurisdictions that have repeated crises over time will often see multiple changes to their oversight structures.[166]

The CPC's recent work in evaluating their current role and authority and seeking appropriate statutory changes and City Council's timely response to those requests will likely place the CPC in a better position to be successful in their future work.

iv.    CPC Systems & processes

The CPC's Bylaws provide examples of past and current CPC workgroups to include, Police Practices, Behavioral Health, Complainant Appeals, and State Legislative Agenda. According to the CPC's Mid-year Report for 2023 the current workgroups consist of:

- A Police Practices Workgroup reviewing policies and practices relating to Emergency Vehicle Operation, "Bola Wrap," and "P.O.E.T." (The SPD's Public Outreach and Engagement Team).
- A Behavioral Health Workgroup, working with SPD Crisis Intervention Team to provide a community presentation on SPD's response to community members in crisis.
- A Complainant Appeals Workgroup, "working with key stakeholders and engaging with

---

[163] Council found that: "Wheras, the number of CPC Commissioners has increased from 15 members as authorized in 2012 in Ordinance 124021 to 21 Commissioners as authorized in 2017 in the Accountability Ordinance (Ordinance 125315), and in the years since, the increased size has not resulted in better representation of community viewpoints or increased ability to meet the obligations of the Accountability Ordinance. Rather, the increased size has led to increased challenges in providing effective oversight;"

[164] The Ordinance was amended with respect to the Executive Director's authorities and responsibilities to clarify that the Executive Director works "in consultation with and under the supervision of the [CPC] Co-chairs." SEATTLE, WASH., MUN. CODE § 3.29.320.E.

[165] Council found that: "Whereas, the CPC should include diverse voices that best represent Seattleites, and allows them to share responsibility for their governance... such representation may not be realized if Commissioners must be appointed by District."

[166] See, SAMUEL WALKER, POLICE ACCOUNTABILITY: THE ROLE OF CITIZEN OVERSIGHT, Chap. 2 (The Rise, Fall and Revival of Citizen Oversight) (Wadsworth, 1st ed., 2001); see also, De Angelis, et. al. (2016), *supra* note 152; and, TIM PRENZLER, CIVILIAN OVERSIGHT OF POLICE: ADVANCING ACCOUNTABILITY IN LAW ENFORCEMENT, at Chap. 1 (Scandal, Inquiry, and Reform: The Evolving Locus of Responsibility for Police Integrity) (Tim Prenzler & Garth den Heyer, eds., 1st 2016), *Chapter 1*.

community to develop recommendations for a complainant appeals process."[167]

In addition, according to the CPC, two additional current CPC workgroups include the "Legislative Advocacy Workgroup" and a "Community Engagement Workgroup."

The CPC lists three "current issues" on its website, under the title of "Our Work" detailing its priorities:[168]

- Under the heading "Seattle police contracts:" The CPC states that "[t]he Community Police Commission (CPC) has been working for years to create a strong police accountability and disciplinary system in Seattle. However, Seattle's police contracts have stood in the way of many of those efforts. On February 25, 2021 the CPC submitted eight additional recommendations to the Mayor and City Council concerning upcoming contract negotiations with the Seattle Police Officers Guild (SPOG)."
- Under the heading of "Use of force and crowd control policies:" The CPC represents that "[t]he Community Police Commission (CPC) has issued 15 recommendations to the Seattle Police Department (SPD) in response to their proposed use of force and crowd control policy changes. These recommendations are a result of hundreds of community comments gathered by the CPC."
- Under the heading of "State legislative advocacy:" The CPC reports that it "is committed to uplifting and amplifying the voices of our community in police accountability and reform across Washington State. Working with the City of Seattle and other community groups, the CPC has identified twelve main areas we'll be fighting for during legislative session… On 1/18/2023, the CPC voted to support the 4 paragraphs of RES 32076 the City of Seattle's 2023 State Legislative Agenda that are directly related to policing. They also voted to support a 2023 CPC Legislative Statement of Values to guide the work of CPC staff in reviewing most policing-related bills."

The CPC has issued multiple statements, letters, and reports over the years. In 2023, the CPC has issued the following statements, letters, and reports:

- Undated Statement from Co-Chairs, "Community Police Commission responds to DOJ announcement."
- September 15, 2023, CPC Co-Chairs' Letter to the Counsel General of India in Response to Inquiry About Callous Comments from an SPD Officer About the Death of an Indian National.
- September 7, 2023, Community Police Commission Recommendations for City of Seattle's Collective Bargaining Agreement Negotiations with Seattle Police Management Association.
- June 8, 2023, Follow-Up Letter of Inquiry to SPD Regarding SPD Emergency Vehicle Response Training and Policy.

---

[167] Cali Ellis, *Mid-Year Report 2023* at 6, SEATTLE CMTY. POLICE COMM'N (last visited Nov. 19, 2023), https://seattle.gov/documents/Departments/CommunityPoliceCommission/Reports%20and%20Letters/2023/CPC%20Mid%20Year.pdf.
[168] Seattle Community Police Commission, *Our Work* (last visited Nov. 19, 2023), https://www.seattle.gov/community-police-commission/our-work.

- January 31, 2023, Letter of Condolence to the Memphis Community Regarding the Killing of Tyre Nichols.
- January 31, 2023, Letter of Inquiry to SPD Regarding Pedestrian Death

The CPC meets twice a month to discuss issues of CPC governance, the CPC's position on issues of significance, the status of various SPD related projects, to hear updates from community and stakeholder partners and to take public comment. The CPC Co-Chairs are authorized, pursuant to the CPC Bylaws, to make public statements consistent with previously expressed CPC positions and to talk to the media on behalf of the CPC. The CPC has apparently adopted a Communications Strategy which in addition to describing an overall communications strategy, includes protocols for "Crisis Communications," describes communications restrictions imposed by city ordinance, communication approval requirements, a communication drafting process, and includes general guidelines and protocols for press releases and statements. When asked to provide the document to the Monitoring Team, however, the only format that the CPC was able to provide was a PowerPoint entitled: "CPC Communications Strategy Overview." It would behoove the CPC to restructure the PowerPoint presentation into a more formalized Communications Strategy policy.

     v.     CPC Staffing

CPC has reported challenges in retention of qualified personnel and struggled with staff who have pursued their own agendas, that have been inconsistent with the City's expectations for collaborative work amongst and between the accountability partners. In addition, the CPC currently has vacant positions amongst its staff that have negatively impacted on its ability to do its work. Even so, the CPC reports that it is in a rebuilding phase.

With respect to its Executive Director, the CPC has had two permanent and two interim Executive Directors since 2014:

- Fé Lopez (Feb. 2014-2019)[169]
- Bessie Marie Scott (interim) (May 2019-Aug. 2020)[170]
- Brandy Grant (interim August 2020; permanent February 2021)[171]
- Cali Ellis (interim February 2023; permanent December 2023)[172]

---

[169] F Fé Lopez, *Experience*, LINKEDIN.COM (last visited Nov. 19, 2023), https://www.linkedin.com/in/fe-lopezgaetke/.

[170] CPC designates Bessie Marie Scott as interim Executive Director (seattle.gov)

[171] Paul Kiefer, *Community Police Commission Appoints Permanent Director*, PUBLICOLA.COM (Feb. 4, 2021), https://publicola.com/2021/02/04/community-police-commission-appoints-permanent-director/.

[172] Seattle Community Police Commission, *News Release: Seattle CPC Commissioners name Cali Ellis, PhD, Interim Executive Director of CPC* (Feb. 15, 2023), https://seattle.gov/documents/Departments/CommunityPoliceCommission/Reports%20and%20Letters/2023/Dr_Cali_Ellis_Interim_ED_announcement.pdf. The CPC indicates that it anticipates the current interim Executive Director will be made permanent prior to the end of the 2023 calendar year; Seattle City Council Journal of Proceedings, December 5, 2023, p. 3.

---

*CPC Executive Director Qualifications, Hiring & Evaluation*

The newly amended Accountability Ordinance contains provisions with respect to the qualifications of the CPC Executive Director, similar to the required qualifications of the OPA Executive Director and the Inspector General, requiring that the CPC Executive Director "shall be a civilian with a background in development, community engagement, criminal legal system and police reform issues."[173]

Although City Ordinance provides for the structural independence of the CPC by ensuring that only the CPC can appoint its director, the appointment is subject to confirmation by City Council. The term of the executive director position is six years,[174] which is consistent with the terms provided for the other accountability partners.

The recently adopted CPC proposal to amend the Accountability Ordinance created a removal process for the CPC Executive Director position that is more consistent with the other accountability partners and would help "avoid[] requiring commissioners act in a supervisory capacity except in an instance where the commissioners act as a check on the Co-Chairs' removal authority."[175]

---

vi.      CPC Budget

The CPC has been budgeted with a staff of nine full time employees for the four-year period provided. It has recently received an additional FTE in the form of a Deputy Director which has been described as an essential position by the CPC co-chairs.

**Table 7. CPC Annual Budget 2021-2024**

| 2021 | 2022 Actuals | 2023 Adopted | 2024 Proposed |
|------|--------------|--------------|---------------|
| $1,377,981 | $1,471,202 | $1,887,556 | $2,215,663 |
| 9 FTE | 9 FTE | 9 FTE | 10 FTE[176] |

vii.     Recommendations

To strengthen the long-term effectiveness of CPC as a vehicle for robust community participation in policing, the City recently reduced the size of the CPC which should help the CPC function more effectively. The City has also recently funded a Deputy Director position for the CPC which will bring the CPC into parity with the other accountability partners with respect to leadership resources.

However, it may behoove the City to amend the Accountability Ordinance to allow the CPC to transfer the responsibility of tracking and reporting on the status of implementation of policy recommendations to the OIG. (See discussion below). Based on the current state of funding and

---

[173] See, SEATTLE, WASH., MUN. CODE § 3.29.320.B.
[174] SEATTLE, WASH., MUN. CODE § 3.29.320.B.1.
[175] *Id.*
[176] At the CPC's request, the Accountability Ordinance was amended to include a Deputy Director position.

available personnel, the OIG appears better situated to ensure accurate and up-to-date data reporting than the CPC.

Even more importantly, the CPC must create and implement internal policies and procedures to clarify roles, goals and processes that will support the CPC's work going into the future and reduce the risk of conflict amongst and between the CPC Executive Director, CPC staff, the CPC Co-Chairs, and individual Commissioners when they interact with staff.

## 6.    Sustainable Systemic Capacity

The Accountability Triad system created by Seattle is unique from a national perspective and, as designed, is complex and multifaceted. Rather than relying on one of the accountability partners to take a leadership role, the City chose a model where each partner, while having different areas of focus, is independent of the other and wherein each partner works directly with the SPD to provide its own recommendations, even if those recommendations might be different or conflicting.

To make this type of system work, all three accountability partners require excellent leadership, appropriate funding and staffing and the will and capacity to collaborate and cooperate on an ongoing basis amongst themselves and the SPD.

Maintaining police accountability programs are akin to the story of Sisyphus– it is a task that is "both laborious and futile" unless it is accompanied by adequate resourcing and constant attention.[177] In fact, there is no such thing as an accountability system that can ultimately survive poor leadership or management, and/or which is starved of funding in the long term.

   a.    Intersection of work – challenges and opportunities

   *1. Policy Tracking*

When this assessment first began in the Spring of 2023, the CPC was attempting to track the status of more than 300 recommendations that had been made over the years from the CPC, the OPA and the OIG. A preliminary review of the Recommendation Tracker, as it existed on May 14, 2023, showed that the Tracker was not up-to-date and that the status of SPD's response to many of the OPA recommendations were not accurately reflected.

Since that time, the CPC has reformatted its "Recommendation Tracker" to track only "Management Action Recommendations" (MAR's) made by the OPA.[178]  According to the CPC, staff assigned to update the Recommendation Tracker have struggled with the software used to create the Tracker, to include unstable links and password protected information that staff was unable to access. Staff specifically described the system as "complicated, convoluted, [and] with many avenues for error…" CPC was eventually able to update, correct and post the status of OPA MARs, but has not yet been able to update the tracker with additional recommendations made by the CPC itself, the OIG, and OPA recommendations not made via the MAR process.

---

[177] "In Greek mythology, Sisyphus or Sisyphos (/ˈsɪsɪfəs/; Ancient Greek: Σίσυφος *Sísyphos*) was the founder and king of Ephyra (now known as Corinth). Hades punished him for cheating death twice by forcing him to roll an immense boulder up a hill only for it to roll back down every time it neared the top, repeating this action for eternity. Through the classical influence on modern culture, tasks that are both laborious and futile are therefore described as Sisyphean." *Sisyphus*, Wikipedia.org (Nov. 6, 2023), https://en.wikipedia.org/wiki/Sisyphus.
[178] As of October 13, 2023, the CPC "Recommendation Tracker" purported to track 122 OPA "Management Action Recommendations made between 2018 and 2023."

*2. Division of Responsibilities – Policy Analysis & Recommendation*

According to several stakeholders, one of the most frustrating aspects of the existence of three different accountability partners, relates to conflicts in policy recommendations. While there is no disagreement that community voices need to be heard through the CPC and policy issues identified by the OPA need to be addressed, there is significant disagreement as to what extent the OIG should be utilized as a clearinghouse for recommendations and the agency responsible for researching "best practices" in police policy.

On one side, there are stakeholders who believe that the CPC, the OPA and the OIG should each have the authority to make their own independent policy recommendations to the SPD. These stakeholders believe that each agency should have its own independent role and resources to conduct policy analysis and forward their recommendations to the SPD for their consideration.

And, in fact, at the current time, each of the accountability partners have their own full-time staff dedicated to policy analysis. A review of the Accountability Triad organization charts shows the CPC as having three full-time staff positions dedicated to policy review and analysis (a "Policy Director," a "Policy Analyst" and a "Data & Policy Analyst);" the OPA as having a "Policy Manager;" and, the OIG as having a "Policy & Statistical Analyst," with two full-time subordinate positions.

There is a strong belief, amongst some stakeholders, however, that the current system is too complex and creates unnecessary conflict. As indicated by one stakeholder:

> It seems odd to have the CPC and OPA conducting their own research on policy recommendations. There seems to be a nonproductive overlap in the CPC and the OPA having policy analysts. Instead, both agencies would be better utilized identifying areas where gaps exist and letting the OIG do the research. OPA and CPC importance should be in identifying the issues, with OIG then developing policy recommendations for SPD to consider.

This opinion, is consistent with a May 12, 2017, letter, sent by then-Chief O'Toole to the City Council opining on the structure of the proposed oversight system.[179]

> I am struck by the abject complexity of the proposed model, which seems destined to mire what should be a simple, efficient process for ensuring timely and collaborative dialogue in a tangle of bureaucratic process. For example, as I attempted to graph out the processes described, I was left with a series of arrows pointing every which way between CPC, OPA, and the OIG, each representing either opportunity to advise, an obligation to report, or a duty to assess as between

---

[179] Prior to taking on the position of Seattle Chief of Police, O'Toole served as the federal Monitor for the East Haven, CT Consent Decree, had previously served as a member of the Independent Commission on Policing in Northern Ireland (the "Patten Commission"), and served as the Chief Inspector of the Garda Síochána, the Irish national police service. See, *Former Police Chiefs Kathleen O'Toole and Sylvia Moir Join WRAP as Senior Advisors*, WRAP TECHNOLOGIES, INC. (Jan. 11, 2021), https://wrap.com/media/former-police-chiefs-kathleen-otoole-and-sylvia-moir-join-wrap-as-senior-advisors/.

the three; all, eventually, turn to SPD. SPD, in turn, seems contemplated to be the "hub" for receiving input from each of CPC, OPA, and the OIG, with responsibility to marry up (foreseeably conflicting) inputs and report back on an abbreviated timeline either an action plan to change policy, training, or operations - or a full articulation as to its reasons for not doing so…

I worry that the department's ability to timely implement substantive change - regardless of whether driven through internal mechanisms or external review - will inevitably become buried in an administrative quagmire of back-and-forth between all of the four entities in the equation. [180]

Instead of the model that has been proposed (and which was ultimately adopted by the City Council), Chief O'Toole recommended "a much simpler model" that would,

(1) [T]ask[] the OIG to gather and aggregate recommendations from the CPC, OPA, or any other stakeholder that may reach out; (2) require[] the OIG, based upon review of these recommendations, to distribute on a manageable schedule to SPD and the Executive those recommendations it believes align with best practices and the City's interests; and (3) obligates SPD, in turn, to report back to OPA, the CPC, the OIG, and the Executive its determination as to each. Coupled with the department's separate commitment to report out on, and publish data relating to, core topics addressed through the Consent Decree, this more streamlined approach to accountability would be consistent with principles of governance that have proven effective in other organizations.

Chief O'Toole concluded that:

I worry that by effectively over-codifying the mechanics of a process that should by definition remain flexible enough to evolve independent of legislative action, this legislation may not only impede the ability of either SPD or the oversight structure to implement timely and relevant change, but worse, risk losing its force altogether through its unworkability.

The City Council, however, did not accept Chief O'Toole's recommendations and gave each accountability partner overlapping responsibilities and functions as well as the authority to research, evaluate and formulate their own policy recommendations.

In practice, it does appear that this arrangement has caused significant conflict amongst and between the accountability partners and the SPD – and has resulted in the expenditure of significant resources without accompanying positive results. The accountability partners appear to be less collaborative and more willing to push their own agendas, to the detriment of the SPD's ability to respond to and implement positive policy changes.

---

[180] Letter from SPD Chief of Police Kathleen O'Toole to Council President Bruce Harrell, Councilmember Tim Burgess, and Councilmember Lorena González (May 12, 2017) (on file with the City).

Overall, it appears that the system would function more effectively if it was the responsibility of OPA and CPC to raise policy concerns and request policy reviews, in whatever area they identify and have OIG develop those concerns in collaboration with SPD. Transparency would be essential, with the OIG publicly reporting on its policy work and the ultimate results of any recommendations made to it and to the SPD.

    *3. Accountability Stakeholder Opinions as to Quality of Oversight Provided by Accountability Triad*

We asked Accountability stakeholders about the extent to which they believed that the Accountability Triad has worked and is currently working. In general, stakeholders shared positive impressions of the system overall:

- "I like the system of checks and balances…it helps us do a better job having as second set of eyes."
- Overall, I can't think of a jurisdiction that has such a robust system.
- "OIG and OPA work well together. They can agree to disagree and still work together…"
- "The partnership between the OIG and OPA has been really effective…."

There were strong criticisms, however:

- "The system is unwieldy in practice. The SPD gets inundated with recommendations – there is often not even an effort to accord with best practices."
- "In a perfect world, the OIG would be a dispassionate auditor – it would take recommendations from the OPA and the CPC – deconflict the recommendations, vet them against best practices and then send them to the SPD and the City Executive, but that does not happen."
- "OPA, OIG and CPC: everyone is scrambling for relevance. Everyone wants to be the first and the last at the table with loudest voice…"

Some with generally positive opinions nonetheless shared some concerns:

- "Historically, the system has worked well although the CPC has struggled in the recent past and having a new OPA Director has caused stress on the system."
- Globally, it's working; pieces of it have worked better at times; the most synergy we saw was probably two and a half years ago…"
- "The systems are so person dependent. You need the right people for the right time. If there's not mutual trust that we are all trying to get to the right result, there is not the right ethos. The system does function well – it dips but comes back to equilibrium. Compared to national systems it works well; particularly when everything clicks. We do need the CPC – if they are functioning, the whole system is functioning."

Several stakeholders shared concerns regarding the role and performance of CPC:

- "In theory, it's a great design. In practice, there is still a question mark relative to the CPC."
- "The CPC is a wild card in the whole process…"

- "The CPC should have been doing listening sessions; but CPC community engagement eroded due to staffing issues; and as OPA and OIG wanted to do their own community engagement, it became competitive."
- "There needs to be more collaboration between the three partners. There needs to be a CPC liaison within both the OPA and the OIG; It would be better if the CPC were more directly involved in decision-making processes…. including identifying patterns or practices regarding OPA work, SPD policies and practices."
- "The OIG's Sentinel Reviews were extremely effective, but arguably, the CPC should have led that initiative."

Whether one accepts the internal or the external perspective on how the Accountability Triad works with respect to collaboration and cooperation amongst themselves, there is no question that, with the appointment of a new OPA Director and a new CPC Executive Director, and given the passage of time since the creation of the Accountability Triad (six years), the system will likely be best served by having the groups meet, reassess, and work together to ensure appropriate collaboration and cooperation in the future.

Consequently, the most significant question asked of stakeholders was: Can the City of Seattle rigorously and sustainably deliver accountability oversight of the SPD?

Stakeholder reaction to this question was virtually unanimous in support of the Accountability Triad's capacity to provide sustainable oversight going into the future. This long-term optimism is notable and suggests a strong capacity for the Accountability Triad to function as a stable, self-correcting system of oversight going forward.

At the same time, stakeholders noted the challenges ahead, including: (1) a need to ensure competent and collaborative leadership of the OPA, CPC and OIG going into the future, and (2) the need for budgetary resources for the Accountability Triad and for SPD to be able to respond to policy recommendations, conduct policy reviews, track recommendations, collect and analyze data collection and conduct ongoing police training, and (3) the need for changes to the Collective Bargaining Agreements to ensure the SPD has the ability to holds its officers accountable.

As one stakeholder observed:

> The big question is, without the potential hammer of the court, can the accountability entities deliver? The current willingness of the SPD is based on their current leadership and the mayor's leadership. If we get a Mayor and a Chief who don't believe in accountability – it comes down to the political will of the Council or public sentiment.

Another stakeholder echoed a similar sentiment: "If the CPC has a strong Executive Director and engaged commissioners and a place within the system to assist the OPA and the OIG; if the three legs are empowered, it can work…"

A letter from the CPC co-chairs, posted to the CPC website, dated April 26, 2023, was also consistent with the overall sentiment expressed in the stakeholder interviews:

The Seattle police accountability system established under the 2017 Accountability Ordinance is a leading national model. The Seattle Community Police Commission, along with our accountability partners, OPA, OIG and SPD stand ready to lead on ensuring that police services in Seattle are rooted in the constitution and center justice, equity, and transparent accountability.[181]

*4. Community Activist Opinions as to Quality of Oversight Provided by Accountability Triad*

We also inquired as to the opinions of some community activists relating to their opinion as to the current state of the quality of police oversight in Seattle. In addition to pointing out what they saw as the City's inability to fully implement its vision for police accountability due to the results of collective bargaining, a number of community stakeholders have expressed their belief that the none of the members of the Accountability Triad are fully up to the task of ensuring sustainable police accountability for the City. Instead, these stakeholders believed that police accountability could ultimately only be achieved and maintained through continuing community awareness and by holding public officials accountable for allowing police misconduct and unconstitutional policing to continue.

Four recent incidents involving officer misconduct or allegations thereof that have been widely publicized have caused these community stakeholders to question whether there have really been any changes to the SPD culture since the pre-Consent Decree period:

- Allegations currently under investigation by the OIG (due to a conflict of interest being declared by the OPA)[182] and disclosed in 2023 of Body Worn Camera video that showed a bicycle repair room at the SPD's East Precinct that contained a mock tombstone for a person shot by police in 2017, along with a Donald Trump 2020 poster and a "Black Lives Matter" sign with a red hat hanging from it.[183]
- Body Worn Camera footage which caught audio of the Vice-President of the Seattle Police Officer's Guild apparently disparaging the value of the life of a young female pedestrian killed in a traffic collision with an SPD patrol car that was engaged in emergency driving while responding to a drug overdose.[184]

---

[181] See, Reverand Harriett G. Walden, Reverand Patricia Hunter, & Joel Merkel, Jr., Community Police Commission responds to DOJ announcement, Seattle Community Police Commission (last visited Nov. 19, 2023), https://www.seattle.gov/documents/Departments/CommunityPoliceCommission/Reports%20and%20Letters/2023%20CPC%20Statements/Consent%20Decree/CPC%20responds%20to%20DOJ%20announcement.pdf.

[182] SPD mock tombstone case given to Inspector General after the OPA finds conflict of interest, KIRO 7 NEWS (Oct. 3, 2023), https://www.msn.com/en-us/news/us/spd-mock-tombstone-case-given-to-inspector-general-after-opa-finds-conflict-of-interest/ar-AA1hE0Hn.

[183] Deborah Horne, *That erodes trust: SPD bodycam video exposes mock tombstone of teen officers shot and killed*, KIRO 7 NEWS (July 12, 2023), https://www.kiro7.com/news/local/spd-bodycam-video-exposes-mock-tombstone-teenager-officers-shot-killed/GO4HVZLPYNCXDODAKUFW6CO2ZU/.

[184] Laurel Wamsley, *Seattle officer recorded joking about woman's death, saying 'she had limited value'*, NPR (Sept. 14, 2023), https://www.npr.org/2023/09/13/1199352063/seattle-officer-recorded-joking-about-womans-death-saying-she-had-limited-value.

- Audio footage of an off-duty SPD officer using racial slurs while threatening his Asian neighbors.[185]
- The filing of a discrimination lawsuit by a long-serving African American SPD Detective, alleging racial and gender discrimination over the years.[186]

Ultimately, however, the Monitoring Team believes that it is not the existence of police misconduct that ultimately determines the cultural health of a police agency, but how that agency deals with such misconduct when it is identified. With respect to the current state of the SPD culture, the Monitoring Team has considered, the SPD's July 28, 2023, response to the OIG's Sentinel Event Review,[187] which specifically recognized the importance of ensuring that SPD culture supports Constitutional policing and outlining SPD's work in that regard.

b.    Collaborative capabilities/constraints

The 2017 Accountability Ordinance requires quarterly meetings between the SPD and the Accountability Triad.[188] Stokeholds told us that, prior to recent leadership changes at the CPC, these quarterly meetings did not take place on a regular basis. When they did take place, they were not effective. It is clearly necessary for the SPD, OPA, OIG and CPC to meet and discuss the status and tracking of recommendations and collaborate to ensure a reporting system that is streamlined, accurate, and up to date.

c.    Collaborative learning and feedback loops

*1. Acceptance of Recommendations*

The accountability system created by Seattle was intended, in large part to ensure that SPD will consider public input when creating and modifying SPD policies, tactics and police practices overall.[189] Overall, stakeholders believed the SPD responded well to recommendations from the Accountability Triad and the public:

- "Command staff appears to have integrity and desire to ensure accountability."
- The SPD has a policy unit that tries to identify areas of improvement in consultation with us."

---

[185] Ashley Nerbovig, *Seattle Police Officer Hurls Racist Slur at Chinese-American Neighbor*, STRANGER (Sept. 22, 2023), https://www.thestranger.com/news/2023/09/22/79177194/seattle-police-officer-hurls-racist-slur-at-chinese-american-neighbor.

[186] *Black SPD detective of 43 years sues over years of alleged racism, 'culture of retaliation'*, KIRO 7 NEWS (Nov. 9, 2023), https://www.kiro7.com/news/local/black-spd-detective-43-years-sues-over-years-alleged-racism-culture-retaliation/E2BFGE4J3FAOHKZKL5CEIF3ZAQ/.

[187] Discussed in Section 6.c.1, *supra*.

[188] SEATTLE, WASH., MUN. CODE § 3.29.410.A.2.

[189] See, SEATTLE, WASH., MUN. CODE §§ 3.29.010 ["Public trust in the appropriate use of those powers is bolstered by having a police oversight system that reflects community input and values"]; 3.29.300.C ["CPC shall review and provide input to OPA, OIG, SPD, and other City departments and offices, including the Mayor, Council, and City Attorney on the police accountability system, police services, and SPD policies and practices of significance to the public"].

- "SPD leadership is very responsive to public concerns. They want this to work. They are not as recalcitrant as activists think."
- "The Sentinel Review had a huge impact on the SPD."
- "With the Sentinel Event Review, the vast majority directed to SPD have been accepted."
- "The SPD tends to respond well to audit reports and recommendations."

With respect to the CPC, however, there does appear to be a perception that CPC recommendations are generally ignored and that, absent the OIG's recent community engagement on its Sentinel Review and "ruse" policies, public input is too limited and sporadic. As indicated by one stakeholder:

> There are a lot of communities in Seattle that require more focused engagement to hear what they think and want to say- they are not loud voices. We are tasked to reach out to all parts of the City – but some loud voices do not want to hear about people experiencing violence who are asking for police intervention.

Even so, it does appear that a significant number of recommendations have been being made by the Accountability Triad and accepted and implemented by the SPD.

The OPA website indicates that for 2022 OPA MARs, the SPD implemented or partially implemented 38.9% of its recommendations (n=7) and declined to act in only 11.1% of the cases (n=7). For 2021 MAR's, the OPA reports that SPD implemented or partially implemented 72% of OPA recommendations (n-18) and declined to act in 20% of the cases (n-5). Per the CPC's reporting as reflected by a May 2023 review of its "Recommendation Tracker," the SPD implemented 82 recommendations from the Accountability Triad since reporting began in 2018, to include 17 recommendations coming from the CPC.

According to SPD documentation, it has received thirty-eight recommendations from a series of audits,[190] concurring and tracking the progress of implementation with respect to thirty-seven of those recommendations (97.4%). Further, the SPD has been tracking and implementing OIG recommendations made through its "Sentinel Event Review of Police Response to 2020 Protests in Seattle," as detailed in Table 8.

---

[190] To include the following audits: "Audit of Disciplinary System for SPD Sworn Personnel," "Audit of Secure Firearm Storage in Training Facilities," "Audit of SPD Patrol Canine Teams," "Audit of Destruction of Post Conviction DNA Evidence" and "Surveillance Technology Usage Review FLIR (2021)."

**Table 8.  SPD Response to SER Recommendations[191]**

| Report & Release Date | Number of Recommendations | Status of Recommendations/SPD Responses per SPD spreadsheets: |
|---|---|---|
| Wave 1 (released June 2, 2021) [192] | 54 recommendations | Various responses to include Implemented (n=23); Concur (n=13), Needs further discussion (n=6), Implemented in Part (n=5), In Progress (n=4), Ongoing (n=2) and Defer to Council (n=1). |
| Wave 2 (released March 14, 2022) [193] | 26 recommendations | Agree in Principle / Concur (n=9), Implemented (n=6), Under review (n=5), Conflicting Recommendations (n-2), Need to address with other City Agency (n=2), Implemented in part (n=1), Further discussion needed (n=1). |
| Wave 3 (released October 11, 2022) [194] | 34 recommendations | Agree in Principle / Concur (n=18), Implemented (n=15), Disagree (n=1) |
| Wave 4 (released April 14, 2023) [195] | 22 recommendations | Pending Review & Comment by SPD. |

In a memo dated July 28, 2023, SPD Command Staff provided a 34-page memo entitled: "Sentinel Event Review – Comprehensive Response" to the Monitor, the USDOJ and the Inspector General detailing the SPD's general response to the "the Inspector General's four waves of the Sentinel Event Review (SER) to examine significant events over the summer of 2020."

The SPD response noted that: "[t]he approximately 140 SER recommendations generally fall within eight categories, as grouped by the OIG: accountability, communication, crowd management generally, officer wellness, procedures, situational awareness, training, and use of force/crowd control. Because many recommendations overlap or are repeated between waves, we

---

[191] As per a spreadsheet provided by the SPD to the Monitoring Team, updated July 2023.

[192] Wave 1: key dates in the formative days of protesting, from May 29 – June 1, 2020. Notable incidents, such as the "pink umbrella incident," included in Wave 1 are described at pp. 3-4 of the Wave 1 report. Seattle Office of Inspector General, *Sentinel Event Rev. of Police Resp. to 2020 Protests in Seattle: Wave 1: Downtown Protests May 19-June 1* (July 22, 2021), https://www.seattle.gov/documents/Departments/OIG/Policy/OIGSERWave1Report072221.pdf.

[193] Wave 2: events that occurred between June 2 and June 7, 2020, before the leaving of the East Precinct by SPD. During this period, the main demonstrations and confrontations shifted from Downtown to the East Precinct. Notable incidents, such as a child affected by pepper spray, included in Wave 2 are described at pp. 5-6 of the Wave 2 report. Seattle Office of Inspector General, *Sentinel Event Rev. of Police Resp. to 2020 Protests in Seattle: Wave 2: June 2-7* (May 14, 2022), https://www.seattle.gov/documents/Departments/OIG/Sentinel%20Event%20Review/SER%20Wave%20Two%20Draft%20Report%20Final%20Version%20%28V2%29.pdf..

[194] Wave 3 (June 8 – July 2) includes events that occurred during the existence of the Capitol Hill Organized Protest (CHOP) and Capitol Hill Autonomous Zone (CHAZ). Notable incidents, such as SPD's use of a ruse and two fatal shootings (committed by private actors), included in Wave 3 are described at pp. 4-5 of the Wave 3 report. Seattle Office of Inspector General, *Sentinel Event Rev. of Police Resp. to 2020 Protests in Seattle: Wave 3: June 8-July 1, 2020* (Oct. 11, 2022), https://www.seattle.gov/documents/Departments/OIG/Sentinel%20Event%20Review/Wave3ReportFinal.pdf

[195] Seattle Office of Inspector General, *Sentinel Event Rev. of Police Resp. to 2020 Protests in Seattle: Wave 4: July 2-Oct. 7, 2020* (Apr. 18, 2023), https://www.seattle.gov/documents/Departments/OIG/Sentinel%20Event%20Review/FINALSERWave%204Report.pdf.

respond to the recommendations comprehensively by category, but with each specific category's recommendations listed."

In highlighted text, the SPD discussed the issue of "police culture:"[196]

> Before turning to the recommendations specifically, however, we also want to take this opportunity to discuss a topic that hovers around the periphery of these recommendations, ties into the ongoing work SPD is doing to foster healing externally and internally, and which continues, for some, to be inextricably clouded through the lens of 2020.

> In other words, simply put, police "culture" can and should be understood as a predictable sociological and psychological response to the unique constellation of stressors under which police operate.

The Department went on to explain how its new programs, "Outward Mindset," (implemented in 2022), "Before the Badge," Officer Wellness programs and a new Early Intervention System (Proactive Integrated Support Model (PrISM) are all being used to positively impact SPD police culture, overall.[197]

The SPD memo identified and addressed eight specific recommendations under the heading of "Accountability,"[198] thirty-six recommendations under the heading of "Communication,[199] thirty-three recommendations under the heading of "Crowd Management,"[200] four recommendations under the heading of "Officer Wellness,"[201] nine recommendations under the heading of "Procedures,"[202] twenty-three recommendations under the heading of "Situational Awareness,"[203] five recommendations under the heading of "Training,"[204] and twenty recommendations under the heading of "Use of Force/Crowd Control"[205]

The SPD memo ended with the statement: "Let's keep talking,"[206] expressing the SPD willingness and the overall need for the SPD to continue working with its Accountability partners.

OIG reports that it will be conducting follow-up on SPD SER implementation efforts to ensure implementation is consistent with how the OIG views the recommendations and appropriate next steps.  In addition, the OIG is in the starting stages of conducting an "equity assessment" which is hoped to assist in identifying any issues or concerns relating to police culture, specifically as it may relate to racial bias.

---

[196] See, SPD July 28, 2023, Mem., *supra* note 71 at 2-3.
[197] See, SPD July 28, 2023 Mem., *supra* note 71 at 4-8.
[198] See, *id*. at 8-11.
[199] See, *id*. at 12-16.
[200] See, *id*. at 16-21.
[201] See, *id*. at 21-24.
[202] See, *id*. at 24-25.
[203] See, *id*. at 25-31.
[204] See, *id*. at 31-32.
[205] See, *id*. at 32-34.
[206] See, *id*. at 34.

Finally, as previously noted, the Accountability Ordinance requires that "[t]he OPA Director, Inspector General, the CPC co-chairs, and the Chief, or their designees, shall meet together at least quarterly to collectively review and verify their positions on the status of all recommendations."[207] It has been reported that this quarterly meeting has not been effectively utilized in the recent past. Upon a reset between the OPA, OIG and CPC, such meeting should be able to assist police accountability now and into the future.

### 2. Seattle Police Department Budget & Resources

Overall, it does appear that the SPD has generally been responsive to recommendations made by the Accountability Triad but based on our review of SPD spreadsheets, the tracking and reporting of the status of these recommendations needs to be improved. Specifically, it does not appear that the SPD has the resources necessary to fully and timely track and respond to recommendations made by the Accountability Triad, let alone the resources necessary to implement recommendations relating to training and/or equipment.

Although it is beyond the scope of this assessment to evaluate the budget for the Seattle Police Department, it is important to recognize that providing adequate resources for the Accountability Triad alone will not ensure accountable policing in Seattle. The SPD is an accountability partner as well and requires the funding necessary to ensure that it has the capacity to review, respond, implement, and track the recommendations made by the Accountability Triad. As indicated by one SPD stakeholder: "As staffing decreases, the SPD's ability to be responsive to its accountability partners is reduced…" If the City fails to adequately fund the SPD to do its part, any recommendations made by the Accountability Triad may become an exercise in futility.

### d.       Recommendations

Despite the capacity of the Accountability Triad to provide meaningful oversight of SPD, there is a need for more clarity with respect to each agencies' roles, goals, and processes, particularly when compared to one another.

The Accountability Triad must continue their work to repair relationships broken over the past two years by a CPC that was not completely functional. It will also be important for the OIG to reach out to the CPC going forward, in order to report on OIG activities on a regular basis and answer and address any concerns raised by CPC Commissioners. Having the OIG attend CPC meetings on a monthly basis could be a step forward in ensuring collaboration between these two accountability partners.

The OPA, OIG and CPC should use their statutorily required quarterly meetings to ensure improvements in tracking and reporting on the status of pending and adjudicated recommendations from the Accountability Triad to the SPD.

The City should consider transferring from the CPC to the OIG the responsibility of tracking and reporting on the status of implementation of the Accountability Ordinance and Accountability

---

[207] See, SEATTLE, WASH., ORDINANCE No. 125315 § 3.29.140.2.

Triad policy recommendations implementation.

The current process by which each accountability partner provides independent policy and practice recommendations to the SPD is untenable. Although we understand that the different entities within the City have strong and varying opinions on this issue, we believe that the City should consider granting the OIG the primary role of researching and making recommendations on police policy with the OPA and the CPC providing information and data to the OIG. We also believe that the OIG should also be given the primary role of publicly reporting on the status of pending recommendations made to the SPD.

Although we recognize that using the OIG as a "clearinghouse" for policy recommendations will be perceived by some as a reduction in the responsibilities and authority of OPA and CPC, we have concluded that while both the OPA and CPC need to remain an important part of the policy-making process, the benefit of having one entity with the primary responsibility of making and tracking the status of recommendations would significantly improve the ability of all three accountability partners to have a positive impact on policing in Seattle. Regardless, the City must consider ways to improve the efficiency of the policy recommendation process, which appears to be unwieldy at this time.

Finally, the City needs to evaluate SPD budget and resources to ensure that the organization is capable of accepting lessons learned from its accountability partners and implementing those recommendations as appropriate.

### 7.    Monitoring Team Conclusions

This report evaluates the SPD's external accountability systems, specifically examining the sustainability of their policies, structures, systems, processes, and human capital. Through a combination of stakeholder interviews, Court and organizational document review, and analysis of OPA and OIG case files, we found that the City has developed a robust accountability system that has the ability to provide sustainable SPD oversight. We have also identified some areas for improvement and provided corresponding recommendations.

This report first assessed the policies, structure, systems, processes, staff, and budget of each individual accountability partner. We found OIG to be an effective and productive accountability partner. Based on both stakeholder interviews and document review, OIG has a clear mandate, a well-established internal structure based around its core operational functions, and an extensive set of written policies, procedures, systems, and standards. However, we had concerns about maintaining appropriate staffing and budget to support OIG in its essential functions and noted there were some delays in OIG's publishing of its reports. We therefore recommended the following:

1. The City confer with and appropriately fund OIG going forward, providing a sufficient budget for adequate office space, staffing, and competitive salaries.
2. OIG should conduct an updated assessment of the SPD discipline for cases adjudicated during Chief Diaz's tenure.
3. OIG needs to prepare annual reports in a timely manner, with a goal to complete each

annual report prior to the end of the first quarter of the following calendar year, and those reports should include more detail regarding OPA cases that have either not be certified or for which OIG and OPA disagree on the classification decisions.

Next, we evaluated OPA, which we found generally completes thorough, unbiased, and timely investigations of complaints and provides appropriate recommendations on findings and discipline. Stakeholder interviews revealed that opinions on OPA tend to vary widely based on whether a particular director is viewed as pro- or anti-SPD, but a review of internal documents revealed that OPA has a robust library of policies, procedures and manuals that are responsive to new circumstances and challenges. However, stakeholders suggested that more full-time investigators may be needed to meet workload needs, and they identified as a weakness of the OPA processes that complainants are not given any opportunity to be heard by the Chief prior to discipline being imposed. OPA and SPD are working on a process to address this. We therefore recommended the following:

1. SPD and the accountability partners should consider developing a policy and process for expedited resolution of certain low-level, minor misconduct complaints, and such policy and process should include front-line supervisors and be periodically reviewed by OIG.
2. The OPA Director, in consultation with the Chief of Police, should develop criteria to allow complainants opportunities to be heard by the Chief of Police prior to the imposition of discipline.

Finally, the report examined the capacity and sustainability of the CPC, which seemed to have struggled the most of the three accountability partners, having started with what appears to be an challenging organizational structure. Stakeholder interviews widely suggested that the CPC's effectiveness had declined in the recent past and that tensions between it and its accountability partners had increased. A review of available documentation revealed that the CPC has insufficient written policies and procedures, and still does not have an internal operations manual. The CPC previously consisted of an unwieldy 21 commissioners, though it was very recently reduced back down to 15. In addition, the CPC has reported that it has, in the past, encountered difficulties in hiring and retaining qualified, unbiased staff. Although recent improvements appear to have been made through the efforts of the CPC's co-chairs, it will be essential for the CPC to establish formal internal policies and procedures to support its work going forward in order to reduce the risk of conflict between the Executive Director, the Co-Chairs, the Commissioners, and the staff., We also recommended that in three to five years, the City evaluate the effectiveness and capacity of the CPC based on its staffing needs, budget, size, composition, and written policies and procedures.

Having reviewed each individual accountability partner, this report then assessed the accountability system as a whole. The Seattle system is unusual and comprehensive in its triad structure that involves three independent partners. The system allows for coverage in the event one of the accountability partners fails – but also creates significant opportunity for tension, confusion, and conflict. In order to succeed, the system requires strong, collaborative leadership in each accountability partner.

Unsurprisingly, the Seattle system has struggled in certain relevant areas, including policy recommendations (and responses), overlapping duties, and developing productive, collaborative

relationships among the partners. We therefore made the following recommendations:

1. The roles, goals, and processes of each accountability partner needs to be better defined, particularly when compared to one another.
2. The City should consider establishing OIG as a clearing house for accountability-related recommendations to be referred to SPD, in order to allow more consistency and effectiveness in the system as a whole. OPA and CPC should continue to be responsible for researching and identifying policy concerns.
3. All three accountability partners must work to repair relationships with one another and move past recent difficulties.
4. All three accountability partners should use their mandatory quarterly meetings to facilitate improvements in tracking and reporting on the status of recommendations made by them to the SPD. In addition, the City should consider transferring the responsibility to maintain a database on such tracking from CPC to OIG.
5. The City should evaluate the SPD's budget to make sure it has the necessary resources to review, respond to, implement, and track recommendations from the Accountability Triad.
6. The City must continue to prioritize police accountability when bargaining with the City's police unions and to lobby the state legislature to prohibit accountability-related policies from being part of the bargaining process.
7. The City must balance strategic reasons for delaying adjudication of police disciplinary-related arbitrations against the public policy benefit of timely and final disciplinary dispositions and reduce the significant backlog in such cases.
8. The City should seek to remove the requirement that OPA investigations be completed within 180 days in order for disciplined to be imposed.

## APPENDIX

## I.        HISTORY OF POLICE ACCOUNTABILITY IN SEATTLE

To understand how the Consent Decree and the Accountability Triad came to exist, it is helpful to understand the history of police accountability in Seattle.  It is important to emphasize that efforts to ensure police accountability in Seattle date back, at least, nearly 70 years – with systems and efforts to change those systems evolving to match changing dynamics within the Department and the community overall.  Especially since 1999, numerous community commissions, outside experts, or independent professionals have studied, reviewed, made recommendations about, or worked in structures aimed at providing oversight and external accountability for SPD.  Table 2 summarizes some of this history, with Appendix 1 of this report providing additional context.

**Appendix Table 1.  History of Police Accountability in Seattle.[208]**

| Date/Year | Police Accountability Occurrence | Reference |
|---|---|---|
| 1955 | Mayor Pomeroy formed the Advisory Committee on Police Practices ("the Leffler committee") which identified potential problems with respect to brutality, racial discrimination, and corruption and then disbanded. | Chair: Very Reverend John Leffler, dean of Saint Mark's Episcopal Cathedral; Bayley, 2015, pp. 35-36.[209] |
| January 1967 | *Seattle Times* runs seven articles over two weeks describing "a police payoff system" with respect to bars and taverns and a "parking ticket racket" where businesses paid police to ignore customers with parking violations.

Mayor Braman appoints a citizen committee ("the Blue-Ribbon Committee") to look into allegations raised by *Seattle Times* articles. | Bayley, 2015, pp. 67-72; 72.74. |
| April 11, 1967 | Report of the Blue-Ribbon Committee published. | Bayley, 2015, pp. 73-74. |

---

[208] For an even more extensive timeline relating to the history of police accountability in Seattle, see, *City of Seattle, Police Accountability in Seattle*, SEATTLE MUN. ARCHIVES (last visited Nov. 23, 2023), https://www.seattle.gov/cityarchives/exhibits-and-education/online-exhibits/police-accountability/timeline (represented as "a chronology of selected legislation and events regarding police accountability in Seattle through 2020.").
[209] CHRISTOPHER T. BAYLEY,. SEATTLE JUSTICE: THE RISE AND FALL OF THE POLICE PAYOFF SYSTEM IN SEATTLE (2015).

| Date/Year | Police Accountability Occurrence | Reference |
|-----------|----------------------------------|-----------|
| October 6, 1969 | "Palace Revolt" against Chief Frank Ramon led by his three Assistant Chiefs for covering up corruption, leading to his resignation. | Bayley, 2015, pp. 96-98; *Seattle Times*, 2/22/2005.[210] |
| July 1970 | Acting Chief Charles Gain appoints SPD Task Force to investigate graft. | Bayley, 2015, pp. 143-144. |
| September 14, 1970 | SPD Task Force issues public report. | Bayley, 2015, pp. 143-144. |
| July 27, 1971 | Former SPD Chief Ramon, Assistant Police Chief & 13 police officers and Sheriff's Deputies (and others, including former District Attorney & longtime City Council member) indicted for payoff scheme involving illegal gambling (Bayley, 2015, p. xv.). | District Attorney Christopher Bayley |
| August 7, 1971 | SPD Chief Police Chief George Tielsch quoted in *Seattle Times* as saying that the country grand jury investigating allegations of a police bribery ring "functions 'like a Spanish Inquisition—all they need is a rack and thumbscrews.'" | *New York Times*, 8/7/1971.[211] |
| July 10, 1992 | ACLU Report: "Recommendations for Changes in Seattle Police Operations to Improve Accountability and the Complaint Review Process." | ACLU of Washington.[212] |
| March 16, 1992 | Seattle appoints first civilian auditor to independently review SPD internal investigations. | City of Seattle.[213] |
| March 1999 | Homicide Detective attempted theft reported to County Prosecutor. | Citizens Review Panel Final Report, p. 2. |

[210] Stuart Eskenazi, *Ex-Seattle police official helped expose corruption in department*, . SEATTLE TIMES, https://www.seattletimes.com/seattle-news/ex-seattle-police-official-helped-expose-corruption-in-department/ (Feb. 22, 2005).
[211] Wallace Turner, *Police Bribe Ring Charges Studied by Jury in Seattle*, NEW YORK TIMES, https://www.nytimes.com/1971/08/08/archives/police-bribe-ring-charges-studied-by-jury-in-seattle-officials-and.html (Aug. 8, 1971).
[212] Am. Civ. Liberties Union, *Recommendations for Changes in Seattle Police Operations to Improve Accountability Complaint Review Process*, SEATTLE MUN. ARCHIVES, https://archives.seattle.gov/digital-collections/media/collectiveaccess/images/1/6/9/1/64428_ca_object_representations_media_169170_original.pdf (July 10, 1992). .
[213] Police Accountability in Seattle, *supra* note 1.

| Date/Year | Police Accountability Occurrence | Reference |
|---|---|---|
| May 1999 | Public reports that eight SPD officers (including an internal investigations Sergeant) failed to report allegations that a veteran Homicide Detective stole $10,000 from a crime scene 2 ½ years prior. | ACLU of Washington, 6/14/1999 Press Release.[214] |
| May 7, 1999 | Mayor Schell appoints Citizen Review Panel. | Citizens Review Panel Final Report, p. 2. |
| August 19, 1999 | Citizens Review Panel Final Report recommending creation of an Office of Public Accountability. | Johnson, C.; Durkan, J.; McKay, M.; Pasenelli, B. (FBI).[215] |
| December 1999 | Office of Professional Accountability (OPA), OPA Review Board and OPA created by Ordinance. | Seattle Municipal Archives.[216] |
| January 2001 | First OPA Director hired. | Seattle Municipal Archives.[217] |
| February 27, 2001 | Mardi Gras Riots [resulting in one death and 70 injuries - partly blamed on police commanders who had initially kept officers from intervening, fearing for their safety]. | *Seattle Times*, 9/3/2011.[218] |
| May 31, 2001 | Shooting of Aaron Roberts [public controversy over shooting leads to claims of "de-policing"]. | *Seattle Times*, 6/26/2001, 8/2/2001.[219] |
| March 26, 2002 | SPOG "vote of no confidence" in Chief Kerlikowske. Reportedly resulting from discipline imposed on an officer in a racial profiling case, command staff actions in Mardi Gras Riot and "tepid support" from Chief for officers involved in shootings. | *Seattlepi.com*, 3/26/2002.[220] |

[214] News Release, *Seattle: ACLU-WA Calls for An Independent Office of Police Accountability*, AM. CIV. LIBERTIES UNION (June 14, 1999), https://www.aclu-wa.org/news/seattle-aclu-wa-calls-independent-office-police-accountability#:~:text=The%20American%20Civil%20Liberties%20Union%20of%20Washington%20today,tinkering%20cannot%20be%20expected%20to%20make%20it%20work..
[215] Charles Johnson et al., Citizens Review Panel Final Report, Seattle Mun. Archives (Aug. 19, 1999), https://archives.seattle.gov/digital-collections/media/collectiveaccess/images/1/6/9/2/9252_ca_object_representations_media_169246_original.pdf
[216] Police Accountability in Seattle, *supra* note 1..
[217] *Id.*
[218] Steve Miletich & Mike Carter, *Culture of Mistrust Behind SPD's woes*, SEATTLE TIMES (Sept. 3, 2011), https://www.seattletimes.com/seattle-news/culture-of-mistrust-behind-spds-woes/.
[219] Alex Tizon & Ian Ith, *Stats contradict 'de-policing' claims*, SEATTLE TIMES (Aug. 2, 2001), https://archive.seattletimes.com/archive/?date=20010802&slug=depolicing02.
[220] Lewis Kamb, *Seattle Officers Vote No Confidence in Chief*, SEATTLE POST INTELLIGENCER (Mar. 26, 2002) https://www.seattlepi.com/news/article/seattle-officers-vote-no-confidence-in-police-1083823.php

| Date/Year | Police Accountability Occurrence | Reference |
|---|---|---|
| June 2007 | Mayor Nickels appoints 11-member panel to "perform a thorough and comprehensive review of Seattle's Police accountability system." | Police Accountability Review Panel Final Report, at i. |
| January 29, 2008 | Final Report of Police Accountability Review Panel. | Chair, Judge Terrence Carroll; Boruchowitz, B.; Durkan, J.; Gonzalez, M.L.; Jayapal, P.; Locke, G.; Krebs, J.; McKay, M.; Rice, N.; Shaw, J.[221] |
| June 11, 2009 | Beating of Daniel Macio Saunders. | Referred to in Dec. 3, 2010 ACLU letter to DOJ. |
| October 31, 2009 | Fatal Ambush Shooting of SPD Officer Timothy Brenton. | *Seattle Times*, 9/3/2011. |
| April 17, 2010 | Officer threatens to beat "the Mexican piss out of" Martin Monetti Jr. | *Seattle Times*, 6/7/2012[222] Referred to in Dec. 3, 2010 ACLU letter to DOJ. |
| April 24, 2010 | Incident involving alleged choking in the back of a police car with in-car video not working. | Referred to in Dec. 3, 2010 ACLU letter to DOJ. |
| June 14, 2010 | Video shows SPD officer punching teenage African American girl in the face during a jaywalking incident. | *Seattle Times*, 12/10/2010.[223] Referred to in Dec. 3, 2010 ACLU letter to DOJ. |
| August 30, 2010 | Shooting of John T. Williams. | Referred to in Dec. 3, 2010 ACLU letter to DOJ. |
| October 18, 2010 | Beating of unarmed cooperative African-American teenage in a convenience store, captured by surveillance video. | Referred to in Dec. 3, 2010 ACLU letter to DOJ. |
| December 3, 2010 | ACLU Letter to DOJ requesting §14141 investigation. | ACLU of Washington.[224] |
| December 16, 2011 | USDOJ Investigation of the Seattle Police Department published. | USDOJ.[225] |

[221] J. Terrance A. Carroll et al., Final Report, Police Accountability Review Panel at 15-18 (Jan. 29, 2008), https://archives.seattle.gov/digital-collections/media/collectiveaccess/images/1/9/8/5/33505_ca_object_representations_media_198533_original.pdf.

[222] Steve Miletich & Mike Carter, *City blasts DOJ's findings on Seattle police in court filing*, SEATTLE TIMES (June 7, 2012), https://www.seattletimes.com/seattle-news/city-blasts-dojs-findings-on-seattle-police-in-court-filing/.

[223] Steve Miletich, *SPD Officer Who Punched Teen in Jaywalking Incident Cleared of Using Excessive Force*, SEATTLE TIMES (Dec. 10, 2010),https://www.seattletimes.com/seattle-news/spd-officer-who-punched-teen-in-jaywalking-incident-cleared-of-using-excessive-force/ .

[224] Kathleen Taylor, *Re: Request to Investigate Pattern or Practice of Misconduct by Seattle Police Dep't*, AM. CIV. LIBERTIES UNION (Dec. 3, 2010), https://www.aclu-wa.org/pages/re-request-investigate-pattern-or-practice-misconduct-seattle-police-department.

[225] Press Release, *Justice Dep't Releases Investigative Findings on the Seattle Police Dep't*, US DEP'T OF J. (Dec. 16, 2011), https://www.justice.gov/opa/pr/justice-department-releases-investigative-findings-seattle-police-department.

## 1. Committees Appointed to Review Police Accountability Issues

Over a period of years, the city attempted to address police misconduct through the creation of several committees and task forces.

*a. The advisory committee on police practices (1955)*

The first report of a Seattle committee to address issues of police accountability was the "Advisory Committee on Police Practices," appointed in 1955 by then-Mayor Allan Pomeroy who served one term in office (1952-1956). Mayor Pomeroy appointed that committee based on allegations of SPD racism:

> The committee soon became intrigued by a report from the Federal Bureau of Narcotics stating that narcotics were not a significant problem in Seattle except among [B]lacks but that investigation of the problem was hampered because bars in the predominantly African American Central District paid off the police. [The] committee asked the police to come to meetings and answer questions. The police refused with the exception of a Captain Cook, who denied everything. The committee issued a report noting their frustration and suggesting the police might have problems in areas like brutality, racial discrimination, and corruption. It then disbanded.[226]

*b.    The blue-ribbon committee (1967)*

The next committee appointed to look into allegations of police corruption was created as the result of a series of articles run by the *Seattle Times* and was formed in January 1967. That committee, which had no ability to subpoena witnesses or put them under oath, reported back on April 11, 1967, based solely on voluntary testimony provided during confidential hearings. The committee concluded that:

> The information submitted to this committee falls short of establishing payoffs to police officers. While a number of statements by witnesses indicated the acceptance of payoffs by a few policemen in isolated cases, there was no substantiation or corroboration that would permit a finding by the committee as to the truth of the statements. Police officers appearing before the committee denied receiving any payoffs.[227]

The committee did, however, recommend that police no longer be permitted to "moonlight" at bars and that officers should be required to "rotate their beats no less than every two years."[228]

---

[226] Bayley, *supra* note 2 at 37-38.
[227] *Id.*, at 73-74.
[228] *Id.*, at 74.

c.      *The SPD task force (1970)*

After the resignation of Chief Frank Ramon in October 1969, a new Acting Police Chief, on leave for one month from the Oakland Police Department (July – August 1970), appointed Edward Toothman, a retired Oakland Police Chief to run an internal task force to investigate internal graft. The task force subsequently interviewed hundreds of police officers. In its public report, published on September 14, 1970, the task force minimized the extent and harm of the police corruption previously exposed by the *Seattle Times*:

> The question is asked, "How extensive was the involvement in terms of numbers of officers?" It has been stated earlier that only a few districts were involved. At a given period, there were about 35 to 40 men working in these districts. Of that number, not all were involved. There is only speculation as to how many there were. Of those who worked in the department during the last ten years, the Task Force identified about 70 to 80 as having been involved in payoffs. The majority of those persons had left the Police Department prior to the beginning of the investigation…

> It must be remembered, however, that there were many persons other than police officers that were involved in the payoff system. There were first, the Chiefs of Police who during their respective tenures failed to exercise adequate controls to prevent the criminal activities of the officers. Secondly, there were the gamblers and homosexuals who paid off the police to protect their own interests. Under the law, they are as guilty as the officers…Thirdly, the Mayors and Councilmen in the past who conceived and perpetuated what was known as the "tolerance policy" carried a major part of the responsibility for the shaping of the conditions that spawned crime and corruption in the Seattle Police Department…

> With the removal from the department of those officers known to have been involved, and the filing of criminal charges against several, the department through its own efforts has purged itself of most of the guilty officers. There are, of course, some officers who have not been exposed, so they will probably go unpunished, except by the knowledge of their guilt. Darkness, however, does not protect a man from his own conscience.[229]

d.      *The citizens review panel (1999*[230]

The next committee to address issues and concerns regarding police accountability in Seattle, was not appointed until 1999, almost thirty years after the SPD task force report was published:

> The appointment of the panel followed the filing of first-degree theft charges against a police detective, accused of stealing $10,000 from the home of a Seattle resident who died after engaging in a shootout with Seattle Police in October 1996. The charges state that while the money was returned to the home and subsequently

---

[229] *Id.*, at 144-145.
[230] See, Item No. arc3247, Citizens Review Panel Final Report, Aug. 19, 1999. Seattle City Clerk's Office, Clerk File 304446.

placed in evidence, the alleged theft – which was known to a number of Seattle police officers and was reported to a sergeant in the Department's Internal Investigation's Section – was not investigated by the Department until March, 1999, when a homicide detective informed a King County Deputy Prosecutor of the incident.[231]

The panel was given specific charges by then-Mayor Schell to:

- Examine the barriers that give rise to the failure of employees to report misconduct, and propose steps to ensure compliance with reporting requirements.[232]
- Evaluate the Department's mechanisms to encourage and support citizens and employees who report or witness misconduct, and
- Undertake a systemic review of Department policies, procedures and training programs – including Internal Investigations – that define employee responsibilities in disclosing and investigating allegations of misconduct.[233]

The panel was chaired by Charles V. Johnson, a retired Judge of the King County Superior Court and included three other members: a former U.S. Attorney for the Western District of Washington, a retired Special Agent in Charge of the Seattle FBI office and a lawyer and former Executive Counsel to the Governor who would later become the U.S. Attorney who led the Department of Justice's reform effort in 2011 – and Seattle's 56th Mayor – Jenny Durkan.

The panel reported that while it "found that a number of factors can deter or encourage the reporting of misconduct, the single most important factor is whether people have confidence that complaints will be handled thoroughly, fairly and expeditiously." The panel then concluded that "the present system has not uniformly engendered such confidence."[234] The panel went on to recommend the creation of an "Office of Police Accountability" which would "subsume both the present duties of the Internal Investigations Section [IIS] and the IIS Auditor." The OPA would be led by a civilian appointed by the Chief and confirmed by City Council and staffed by police officers. The panel recommended that the Chief would still, ultimately, be responsible for all disciplinary decisions, but noted that the OPA Director would "enforce the rights of officers and citizens with equal diligence." The panel further recommended what they referred to as additional "substantive changes… in the areas of leadership; policies and procedures, and training."[235]

Although the panel found "no widespread or systemic corruption," it did find that "some employees [were] reluctant to report [] misconduct."[236] And, although it did end up making a total of twenty-three recommendations for reform, the panel concluded by saying:

---

[231] Charles Johnson et al., *supra* note 8 at 2.

[232] Interestingly, in its 2011 report announcing the conclusion of its pattern or practice investigation, the DOJ specifically noted concerns regarding then-existing barriers to internal reporting of misconduct: "during our investigation, we were told that referrals from supervisors about misconduct by their supervisees are admittedly "rare to non-existent" (US Att'ys Office, W.D. Wash., *US Dep't Justice Investigation of the Seattle Police Dep't*, at 2 (Dec. 16, 2011), https://www.justice.gov/sites/default/files/crt/legacy/2011/12/16/spd_findletter_12-16-11.pdf).

[233] Charles Johnson et al., *supra* note 8 at 2.

[234] *Id.*, p. 4.

[235] *Id.*, p. 5.

[236] *Id.*, p. 6.

> If the panel were convinced, after four months of probing examination, that the Seattle Police Department was systemically flawed or poorly managed, it would not hesitate to say so. It is the conviction that an essentially good Department can be made better that has led to the panel's recommendations.[237]

The panel was particularly concerned about how collective bargaining agreements between the city and the police guild were negatively impacting the integrity of police internal investigations. It was acknowledged that "[t]he current polic[ies] afford[] Seattle Police Department employees more rights and protections than those granted to citizens. In essence, current policy obliges the Department to conduct most investigations of misconduct by correspondence."[238] The panel found "this set of circumstances to be quite incompatible with the best traditions of police management and with procedures followed in most other police departments in the United States."[239]

Amongst the recommendations made by the panel included that:

- "The Chief should issue a 'bright line' rule stating that lying, cheating, or stealing will not be tolerated by the Department and will result in termination" (Recommendation Two).
- "The Chief have a more direct and authoritative role in the training and internal investigations process" (Recommendation Three).
- An SPD ethics officer be appointed (Recommendation Four); "Sergeants be provided with additional managerial training regarding…their responsibility concerning complaints of misconduct" (Recommendation Five).[240]
- The department determine whether budget cuts had reduced the ability of supervisors to perform their duties (Recommendation Six).
- The Department "institute a more comprehensive 'early warning system'" (Recommendation Seven).[241]
- Supervisors needed to "be held accountable for a pattern of misconduct allegations in their squads" (Recommendation No. 8).
- Officers "be transferred and supervisors rotated in their assignments with greater frequency" (Recommendation No. 9).
- "All commanders, supervisors, and officers regularly [] be reminded of their duty to receive complaints from citizens whenever and wherever they are made" (Recommendation No. 10).
- The department resume conducting performance evaluations (Recommendation No. 12).
- The department increase and improve ethics training (Recommendations 13-16). And,

---

[237] *Id.*, p. 34.

[238] *Id.*, p. 18.

[239] *Id.*, p. 19. This was the first report that appears to have identified the role of collective bargaining as an impediment to SPD accountability; a now reoccurring issue that ultimately resulted in the Federal Court, twenty years later, finding the city out of compliance with the Consent Decree (U.S. v. City of Seattle, No. 2:12-cv-01282-JLR (W.D. Wash. filed July 27, 2012) (Dkt. No. 562).

[240] The DOJ investigation report in 2011 would find that the finding of a pattern or practice of excessive force and issues related to biased policing was caused, in part, on lack of supervision on the part of SPD Sergeants and command staff (US Dep't Justice Investigation Report, *supra* note 25 at 4, 6, 8, 15 & 17).

[241] The DOJ investigation report in 2011 would find that the SPD's Early Intervention System was "broken." (US Dep't Justice Investigation Report, *supra* note 25 at 22).

- The department ensure appropriate training and resources for internal investigations investigators (Recommendations 17-18).

As indicated in the preamble to the 2017 Police Accountability Ordinance,

> Adopting the 1999 recommendations of the Citizens' Review Panel, the city of Seattle extended civilian oversight in 2002 by creating a three-part civilian oversight system. SPD's Internal Investigations Unit was replaced by a civilian-led OPA, the civilian auditor became the OPA Auditor, responsible for reviewing OPA investigations, and a three member OPA Review Board was created to review the quality of the complaint-handling process, advise the city [] on police department policies and practices, and conduct public outreach.[242]

*e.        The Seattle police accountability review panel (2009)[243]*

Eight years after the Citizen Review Panel report of 1999 (on June 29, 2007), then-Mayor Nickels appointed an 11-person panel to review the police accountability system that was set up as a result of the 1999 Citizen Review Panel recommendations. The department had been under the leadership of Chief Gil Kerlikowske since 2000 and public allegations had been made that the Chief had improperly influenced an OPA investigation, was regularly undercutting disciplinary recommendations being made by the OPA Director and was taking "extraordinary measures to protect [his] officers."[244]

As reported by the *Seattle Times* on June 20, 2007:

> A Seattle Times statistical review in 2005 found that since January 2002, [Chief] Kerlikowske had reversed 27 out of 100 findings by investigators of misconduct by officers. In some of those cases, officers accused of multiple violations were disciplined for at least one offense. But in others, no discipline was imposed…
>
> The reversals caught the attention of the citizen-review board — the panel that last week concluded in a report that Kerlikowske intervened in the internal investigation into the actions of a pair of officers involved in a controversial drug arrest in January.[245]

---

[242] SEATTLE, WASH., ORDINANCE NO. 125315 §1.B. (Findings of Fact and declarations).

[243] J. Terrance A. Carroll et al., *supra* note 14.

[244] Mike Carter & Sharon Pian Chan, *Scathing report says chief interfered with police probe*, SEATTLE TIMES (June 19, 2007), *https://www.seattletimes.com/seattle-news/scathing-report-says-chief-interfered-with-police-probe/*.

[245] Steve Miletich, *Once Tough on Cops Once tough on cops, is chief now too easy?*, SEATTLE TIMES (June 20, 2007), *https://www.seattletimes.com/seattle-news/once-tough-on-cops-is-chief-now-too-easy/*. The citizen review report which criticized Chief Kerlikowske's actions was written by the then-Board President, attorney Pete Holmes, who would later be elected Seattle's City Attorney in 2009 and served in that position until through 2022. Holmes later supported a cooperative approach with the DOJ in the negotiation and implementation of the Consent Decree.

Shortly after a series of articles appeared in local papers repeatedly commenting on the discipline issue,[246] Mayor Nickels announced his plan to thoroughly review the police accountability systems to ensure they were working effectively. Referred to as "a big-name panel," the panel included not only a former Governor of Washington and a former Mayor.[247] But also attorney Jenny Durkan, who served on the 1999 Citizens Review Panel and would find herself appointed as the United States Attorney for the Western District of Washington in October 2009.[248]

In another prescient comment on the creation of the panel, the police guild president repeated a comment that was heard multiple times over the course of the implementation of the Consent Decree when he said: "I have no problem with a review of the accountability system… This panel has some distinguished professionals and they will know that any significant changes to the discipline system will have to be bargained with the union."[249]

The Panel issued its report on January 29, 2008. The report presented "29 specific recommendations for enhancing and strengthening the police accountability system in [] four areas": Accountability & Public Confidence, Independence, Professional Conduct and Transparency.[250] Overall, the panel recommended that the city expand the role of the OPA auditor, increase the independence and the authority of the OPA Director, expand the OPA Review Board,

---

[246] *Id.*; Carter & Chan, *supra* note 37.; Jennifer Sullivan, *Rights group, union enter police chief fray*, SEATTLE TIMES (June 23, 2007), https://www.seattletimes.com/seattle-news/rights-groups-union-enter-police-chief-fray/. ("Two civil-rights groups have lined up on opposite sides of the controversy swirling around Seattle police Chief Gil Kerlikowske for intervening in the internal police investigation of two officers"); Christine Clarridge & Mike Carter, *Police chief exonerated officers in violent arrest*, SEATTLE TIMES (June 26, 2007), https://www.seattletimes.com/seattle-news/police-chief-exonerated-officers-in-violent-arrest/("Oversight leader had urged punishment - Police official defends decision by Kerlikowske - A federal civil-rights lawsuit over the violent arrest of a young African-American man is drawing new attention to Seattle Police Chief Gil Kerlikowske and his record on police discipline"); Christine Clarridge & Mike Carter, *Police chief: No regrets, but I'm open to change*, SEATTLE TIMES (June 27, 2007), https://www.seattletimes.com/seattle-news/police-chief-no-regrets-but-im-open-to-change/("Gil Kerlikowske says that while he stands by the controversial decisions he's made on Seattle police discipline, he's not opposed to re-examining how the department polices itself"); Bob Young & Sharon Pian Chan, Stronger police oversight sought, SEATTLE TIMES (June 29, 2007), https://www.seattletimes.com/seattle-news/stronger-police-oversight-sought/ ("Kerlikowske probe - Licata envisions group that would work with accountability experts - Seattle City Council President Nick Licata announced plans Thursday to convene an advisory group on how to strengthen citizen oversight of the police department").

[247] Panel members included former Gov. Gary Locke; former Seattle Mayor Norm Rice, the first and only African-American Mayor of Seattle; attorneys Jenny Durkan and Mike McKay (both members of the 1999 blue-ribbon commission that recommended the creation of the OPA); Bob Boruchowitz, the former director of a King County public-defense agency; Hubert Locke, former dean of the public-affairs school at the University of Washington; Terrence Carroll, a former King County Superior Court judge and Seattle police auditor who also served on the 1999 commission; M. Lorena Gonzales, a civil rights attorney who would go on to be elected in 2005 as a member of Seattle's City Council and its President in January 2020; Pramila Jayapal, the Director of an immigrant rights group who was later elected to the Washington Senate in 2015 and the U.S. House of Representatives in 2017; Judith Krebs, the General Council for a union representing health care workers; and Jennifer Shaw, a representative of the ACLU of Washington. Steve Miletich & Sharon Pian Chan, *Mayor forms big-name panel to scrutinize police oversight*, SEATTLE TIMES (June 29, 2007), https://www.seattletimes.com/seattle-news/mayor-forms-big-name-panel-to-scrutinize-police-oversight/;; J. Terrance A. Carroll et al., Final Report, Police Accountability Review Panel at 15-18 (Jan. 29, 2008), https://archives.seattle.gov/digital-collections/media/collectiveaccess/images/1/9/8/5/33505_ca_object_representations_media_198533_original.pdf..

[248] See, Jenny Durkan, http://www.jennydurkan.com/ (last visited Nov. 23, 2023).

[249] Miletich & Chan, *supra* note 40.

[250] J. Terrance A. Carroll et al., *supra* note 40 at  ii.

require the disclosure of OPA records "to the maximum extent allowed by law," adopt a policy of presumptive termination for sustained complaints involving dishonesty, and enhance the level of cooperation and coordination  between the three OPA mechanisms (OPA Director, OPA Auditor and OPA Review Board).[251]

The Panel report noted that:

> [o]ver the past several decades, the Seattle Police Department has improved its image and reputation in communities of color in our city. Periodic assessments of community attitudes toward the Department indicate this general development. At the same time, other indicators point to how much remains to be accomplished if a genuine climate of trust and cooperation is to exist between police officers and communities of color in Seattle.[252]

Overall, the Panel found that: 1) the overall structure of the police accountability system did not need to be changed; 2) the intended working relationship between the OPA partner agencies needed to be better defined; 3) "the independent civilian review of the current system [needed to] be strengthened;" and, 4) all panel recommendations, not requiring collective bargaining, needed to be implemented "without delay."[253]

The panel did not, however, recommend any restrictions on the police chief's decision-making in disciplinary cases other than the implementation of a policy of presumptive termination for false statements (Recommendation No. 20) and a requirement that if the Chief changed a finding of the OPA director, the Chief should be required to explain his/her decision in writing (Recommendation No. 25).

In the preamble to the 2017 Police Accountability Ordinance, it was declared that:

> In 2007, [t]he City of Seattle convened two police accountability review panels and implemented many of their recommendations to further strengthen civilian police oversight by clarifying the roles of the OPA Director and the OPA Auditor, expanding the OPA Auditor's roles, and increasing OPA Review Board membership to seven.[254]

---

[251] *Id*. at ii-iii.
[252] *Id*.  at 3.
[253] *Id*.  at 4. Amongst its many recommendations, the Panel recommended the creation of an SPD ethics officer; a recommendation made previously by the 1999 panel, but never put in place. (*Id*. (Recommendation No. 21), at 11).
[254] SEATTLE, WASH., ORDINANCE NO. 125315 §  1.C. (Findings of Fact and declarations).

**Appendix Table 2.** Seattle Police Chief Tenures and Respective Accountability-Related Incidents (since 1979) [Not including Interim Chiefs]

| Chief of Police (Term of Office) | Events During Term of Office | References |
|---|---|---|
| Chief Frank Fitzsimons (1979-1994) (former Assistant Chief, NYPD) | Longest serving Chief in Seattle history; initiated community policing; criticized by rank & file for some police officer terminations; criticized by City Council for "stonewalling calls for change" | (*Seattle Times*, 7/16/1993)[255] |
| Chief Norm Stamper (1994-2000) (former San Diego Chief) | Theft by homicide detective not reported and investigated. Citizens Review Panel appointed by Mayor Schell. Resigned after taking criticism for police response to WTO riots in 1999. | June 14, 1999: ACLU calls for "the creation of an independent office for police accountability." (ACLU press release, 6/14/1999).   Citizens Review Panel (August 19, 1999). |
| Chief Gil Kerlikowske (2000-2009) (former Police Commissioner – Buffalo NY; former Chief of Fort Pierce PD (Fla.) and Port St. Lucie PD (Fla.) | In June 2007, Mayor Greg Nickels appointed a citizen panel to perform a thorough and comprehensive review of Seattle's police accountability system after the Chief was accused of taking extraordinary measures to protect officers. | Police Accountability Review Panel (2008). |
| Chief John Diaz (2009-2013) | DOJ investigation initiated after August 2010 shooting of Native Woodcarver John T. Williams | DOJ Investigation Report (2011) & Consent Decree (2012) |
| Chief Kathleen O'Toole (2014-2017) (Former Police Commissioner, Boston PD.) | Implementation of Consent Decree & Initial Compliance Recommendations from court-appointed Monitor; Passage of Police "Accountability Ordinance" on May 21, 2017. | Court finding of Initial Compliance on January 10, 2018.[256] |

---

[255] Dave Birkland & Dick Lily, *Police Chief says 15 years will be enough*, SEATTLE TIMES (July 16, 1993), https://archive.seattletimes.com/archive/?date=19930716&slug=1711387#:~:text=%22I%20would%20just%20like%20to,he%20turns%20in%20his%20badge.&text=Fitzsimons%20said%20he%20sees%20tough,budget%20and%201%2C%20100%20uniformed%20officers...
[256] *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 439).

| Chief of Police (Term of Office) | Events During Term of Office | References |
|---|---|---|
| Chief Carmen Best (2018-2020) | Court "out of compliance" finding due to arbitrator ruling and police union contract inconsistent with Accountability Ordinance.<br>Seattle Protest complaints. | Joint motion (DOJ & Seattle) to terminate Consent Decree (May 7, 2020);[257]<br>City Motion to withdraw termination request (June 4, 2020).[258] |
| Chief Adrian Diaz (2020-Present) | SPMA contract adopts additional provisions of 2017 Accountability Ordinance;<br>Joint Motion to Terminate Consent Decree in favor of more limited Compliance Agreement. | Joint statement by Mayor Harrell & Council Member Herbold, June 14, 2022.[259] Agreement on Sustained Compliance and Stipulated Proposed Order of Resolution & Supporting Documents.[260] |

## II.    PROGRESSION OF POLICE ACCOUNTABILITY SINCE THE ENTRY OF THE CONSENT DECREE

Appendix Table 3 provides a synthesized history of the progression of police accountability since the entry of the Consent Decree.

**Appendix Table 3.**  **Police Accountability in Seattle Following the Entry of the Consent Decree.**

| Date/Year | Police Accountability Occurrence | Reference |
|---|---|---|
| July 27, 2012 | Settlement Agreement (Consent Decree) filed with Federal Court. | *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 3-1). |
| January 2013 | Community Police Commission appointed. | Seattle Municipal Archives.[261] |

---

[257] *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. Nos. 612 & 615).

[258] *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 621).

[259] Jamie Housen,  *Mayor Harrell, Councilmember Herbold Highlight Accountability Improvements in Newly Passed Seattle Police Management Association Labor Agreement*, Office of Mayor (June 14, 2022), https://harrell.seattle.gov/2022/06/14/mayor-harrell-councilmember-herbold-highlight-accountability-improvements-in-newly-passed-seattle-police-management-association-labor-agreement/.

[260] *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. Nos. 727-1 through 733).

[261] Police Accountability in Seattle, *supra* note 1.

| Date/Year | Police Accountability Occurrence | Reference |
|---|---|---|
| June, 2014 | Monitor's Third Semi-Annual Report commenting on state of SPD disciplinary system.[262] | SPD Publications & Reference Information.[263] |
| August 21, 2015 | City Letter to Monitor providing Accountability and Civilian Oversight Recommendations. | City's Memorandum Regarding Proposed Framework for Ensuring Systems of Review and Accountability.[264] |
| August 26, 2015 | Court Status Conference regarding Accountability Systems | |
| September 30, 2015 | DOJ and City file briefings regarding existing systems of accountability and review. | City's Memorandum Regarding Proposed Framework for Ensuring Systems of Review and Accountability;[265] US' Memorandum Regarding SPD's Accountability and Review Systems.[266] |
| October 16, 2015 | OPA Director, OPA Independent Auditor, and CPC file comments on the city's and US' accountability systems briefings. | Memorandum of OPA Director Pierce Murphy re: SPD Accountability Systems;[267] Memorandum of Office of Professional Accountability Independent Auditor Re City of Seattle's Proposed Framework for Accountability System;[268] Submission by the Community Police Commission.[269] |
| January 13, 2016 | Court proposes questions to guide the parties in discussing the optimal accountability system for City of Seattle. | Referred to in Monitor's Memorandum re Process for Accountability Systems Review.[270] |
| January 22, 2016 | Monitor's Fourth Systemic Assessment: OPA | U.S. v. Seattle, Dkt. No. 259-1. |

---

[262] "The last six months have made clear that…, SPD's disciplinary system is byzantine and arcane. Providing SPD officers and the Seattle community with a rational, reasonable disciplinary system will require significant and sustained effort. SPD must ensure that it has a well-functioning system for imposing discipline on police officers found to have violated SPD policy." (Seattle Monitor Third Semi-Annual Report, at p. 71).

[263] *Publications and Reference Information*, CITY OF SEATTLE (last visited Nov. 23, 2023), https://www.seattle.gov/police/about-us/professional-standards-bureau/publications

[264] Appendix A, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 233).

[265] *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 233).

[266] *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 234).

[267] *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 238).

[268] *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 239).

[269] *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 240).

[270] *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 274-1).

| Date/Year | Police Accountability Occurrence | Reference |
|---|---|---|
| February 1, 2016 | CPC files comments on Monitor's Fourth Systemic Assessment related to the scope of the assessment, community concerns, and the proposal to institute an OIG | CPC Response to Monitor's OPA Assessment.[271] |
| February 23, 2016 | Monitor provides the Court with City Attorney's proposal for a workgroup composed of City stakeholders, including SPD, CPC, and OPA, DOJ and Monitor to conduct comprehensive review of accountability system structure. | Monitor's Memorandum re Process for Accountability Systems Review.[272] |
| February 25, 2016 | Court approves workgroup proposal. | Order Approving Memorandum re Process for Accountability Systems Review.[273] |
| March 9, 2016 to April 6, 2016 | Workgroup met weekly to answer January 13, 2016, questions from the Court and provide agreed upon proposals. | Referred to in City's Brief re SPD Accountability Systems Review.[274] |
| May 10, 2016 | City files a memorandum discussing the aspects of the accountability system on which there was group consensus and the aspects that it believes should be determined through the legislative process. | City's Brief re SPD Accountability Systems Review.[275] |
| July 11, 2016 | Parties file a stipulated motion outlining a process for anticipated ordinance on the accountability system. | Stipulated Motion re SPD Accountability Systems Legislation.[276] |
| August 9, 2016 | Court grants the stipulated motion in part, but requires court review prior to a City Council vote on the draft legislation. | Order re SPD Accountability Systems Legislation.[277] |
| October 7, 2016 | City provides Court with draft accountability ordinance. | City's Brief re the Submission of SPD Accountability Systems Legislation.[278] |
| October 27, 2016 | CPC responds asking that the Court approve the draft accountability ordinance. | CPC's Memorandum Brief.[279] |

---

[271] *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 264).

[272] *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. Nos. 274, 274-1, 274-2).

[273] *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 275).

[274] *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 289).

[275] *Id.*

[276] *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 297).

[277] *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 305).

[278] *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. Nos. 320, 320-1).

[279] *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 325).

| Date/Year | Police Accountability Occurrence | Reference |
|---|---|---|
| November 4, 2016 | DOJ objects to four aspects of the city's draft accountability ordinance. | DOJ's Response to City's Draft Accountability Systems Legislation.[280] |
| January 6, 2017 | Court approves draft legislation with caveats related to certain sections. | Order re Accountability Legislation.[281] |
| May 22, 2017 - June 1, 2017 | Passage of Seattle Police Accountability Ordinance. | Seattle City Ordinance 125315. |
| June 21, 2017 | City submits final ordinance for further review. | City Brief re Submitting Ordinance for Further Review.[282] |
| July 18, 2017 | Court requests additional information regarding the impact of collective bargaining on accountability ordinance. | Minute Order.[283] |
| September 7, 2017 | Court declines to rule on accountability ordinance pending City's entry into collective bargaining agreements with SPOG and SPMA. | Order re Accountability Ordinance.[284] |
| November 2017 | City and SPMA enter into collective bargaining agreement for 2014-2019. | Referred to in City's Response to Court's Order to Show Cause.[285] |
| January 10, 2018 | Federal Court finds City in Initial Compliance with Consent Decree. | U.S. v. Seattle, Dkt. 439. |
| May, 2018 | Inspector General for Public Safety (OIG) takes office. | OIG website.[286] |
| November 13, 2018 | City enters into agreement with SPOG, inconsistent with some provisions of the Accountability Ordinance. | Ordinance Number 125693; see also, U.S. v. Seattle, Dkt. No. 728, p. 7-8 |
| December 3, 2018 | Court issues order to show cause regarding whether the SPMA and SPOG collective bargaining agreements and the Adley Shepherd case have taken City out of compliance with the Consent Decree. | Order to Show Cause Whether the Court Should Find that the city Has Failed to Maintain Full and Effective Compliance with the Consent Decree.[287] |
| May 21, 2019 | Federal Court finds City Partially Out of Compliance with Consent Decree. | U.S. v. Seattle, Dkt. No. 562. |

---

[280] *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 331).
[281] *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 357).
[282] *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 396).
[283] *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 405).
[284] *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 413).
[285] 10, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 512).
[286] Office of Inspector General, *About the Office of Inspector General* (last visited Nov. 23, 2023), https://seattle.gov/oig/about .
[287] *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 504).

| Date/Year | Police Accountability Occurrence | Reference |
|---|---|---|
| August 15, 2019 | Parties submit agreed upon accountability methodology outlining accountability assessment to examine outcome in the Adley Shepherd case, elements of SPOG agreement, and accountability system. | Stipulated Motion to Approve Accountability Methodology.[288] |
| December 2019 | 21CP Solutions Assessment of Seattle's Police Accountability System. | City of Seattle.[289] |
| December 5, 2019 | OPA/OIG joint recommendations for Seattle Police Management Association contract negotiations with the city. | City of Seattle.[290] |
| May 7, 2020 | Parties proposed stipulated order to terminate provisions of the Consent Decree. | U.S. v. Seattle, Dkt. 611. |
| May 25, 2020 | Murder of George Floyd in Minneapolis, resulting in widespread protests in Seattle. | |
| June 4, 2020 | City Motion to Withdrawal Request to terminate provisions of the Consent Decree. | U.S. v. Seattle, Dkt. 621. |
| September 8, 2020 | First Federal Monitor, Merrick Bobb resigns and replaced by Dr. Antonio Oftelie. | Seattle Times, 9/8/2020.[291] |
| November 30, 2021 | OIG Audit of Disciplinary System for SPD Sworn Personnel.[292] | Seattle OIG.[293] |

---

[288] *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 576).

[289] 21CP SOLUTIONS, AN ASSESSMENT OF THE CITY OF SEATTLE'S POLICE ACCOUNTABILITY SYSTEM 2, https://www.seattle.gov/documents/Departments/OPA/Reports/21CP-Solutions-Assessment-of-Seattle-Police-Accountability-System-December-2019.pdf (Dec. 11 2019).

[290] Andrew Myerberg & Lisa Judge, Mem. To Mayor, Seattle City Council, and City Atty, Seattle Office of Police Account. and Seattle Office of Inspector General (Dec. 5, 2019), https://www.seattle.gov/Documents/Departments/OPA/Letters/OPA-OIG-Joint-Recommendations-for-SPMA-Contract-Negotiations-12-05-19.pdf.

[291] Dave Birkland & Dick Lily, *Seattle police monitor resigns, says use of force during protests has cost goodwill*, SEATTLE TIMES (Sept. 9, 2020), https://www.seattletimes.com/seattle-news/federal-judge-appoints-new-monitor-for-seattle-police-harvard-professor-replaces-merrick-bobb-who-resigned/.

[292] "This audit is intended to provide a better understanding of how the disciplinary system for SPD sworn personnel currently operates, and the impacts of that system on individual officer accountability as well as community members affected by police misconduct.,,,, OIG initiated this audit in December of 2020 as part of the OIG 2020 work plan, with the objective to assess provision 3.29.420 (A) of the Accountability Ordinance: "SPD disciplinary, grievance, and appeal policies and processes shall be timely, fair, consistent, and transparent…Within the scope of this audit OIG did not observe conditions generally thought to be most harmful to accountability or public trust (e.g., a pattern of arbitrators overturning discipline or a chronic failure to address repeated misconduct). However, current processes and practices, alongside SPOG and SPMA provisions, create gaps in the discipline system. These collectively impact the timeliness, fairness, consistency, and transparency of discipline for individual officers, and diminish transparency and fairness for community members affected by police misconduct" (OIG Audit of Disciplinary System, SPD Sworn Personnel at 2 (Executive Summary), OFFICE OF INSPECTOR GENERAL (Nov. 30, 2021), https://seattle.gov/documents/Departments/OIG/Audits/AuditofDisciplinarySystemforSPDSwornPersonnel.pdf)).

[293] *OIG Reports*, OFFICE OF INSPECTOR GENERAL (last visited Nov. 23, 2023), https://seattle.gov/oig/reports.

| Date/Year | Police Accountability Occurrence | Reference |
|---|---|---|
| June 14, 2022 | City Council Approves SPMA contract. | Office of Mayor.[294] |
| March 28, 2023 | Joint DOJ and City Motion to replace Consent Decree with a more limited "Compliance Agreement." | U.S. v. Seattle, Dkt #'s 727 through 733. |
| May 30, 2023 | Hearing on Proposed Compliance Agreement. | |
| September 7, 2023 | Order Granting in Part and Denying in Part Joint Motion to Approve Proposed Agreement on Sustained Compliance | U.S. v. Seattle, Dkt #769. |

### 1.    History Related to the Creation of the Accountability Ordinance

As part of a Memorandum of Understanding between the USDOJ and the city of Seattle, filed concurrently with the Consent Decree, the CPC was charged with reviewing and proposing improvements to the accountability system. It began its work in 2013 and provided its accountability system recommendations in April 2014.[295] The city, SPD, and CPC met several times to negotiate the recommendations, and then conveyed them to the Monitoring Team and DOJ on June 15, 2015, and to the Mayor's Office on June 29, 2015. The city provided its final recommendation, in the form of proposed legislation, to the Monitor on August 21, 2015.[296] The most notable recommendations included: (1) strengthening the OPA Auditor role; (2) eliminating OPA Review Board; and (3) codifying the CPC as a permanent community oversight body. These recommendations took the form of draft legislation the city was interested in passing to reform the police accountability system structure.[297]

The Court held a status conference on June 30, 2015, and shared concerns that legislation in relevant areas might conflict with the Consent Decree.[298] Judge Robart, therefore, requested that the Parties come prepared to discuss the accountability system at a status conference on August 26, 2015. Following presentations from the Parties, the Court requested that the Parties provide a statement about the various perceived systems for accountability and review within SPD, and in particular, the disciplinary system.[299]

---

[294] *Housen*, supra note 52.

[295] City Atty's Brief re SPD Account. Sys Rev. at 9, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 289).

[296] City's Mem. re Proposed Framework Ensuring Sys. Rev. and Account. at Appendix A, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 233)at Appendix A, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (.

[297] *Id.*

[298] Minute Order, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 216).

[299] Minute Order, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 228) ("[T]he court directs the Department of Justice and the city to file (jointly or separately) an approach for SPD accountability and review systems by September 30, 2015.").

## 2.      The City's Filing on the Accountability System

On September 30, 2015, the city and DOJ each separately filed the requested briefing. The city primarily focused on the then-current system and the reforms it sought to impose through its proposed legislation (the accountability and civilian oversight recommendations).[300]

As it related to external accountability, the city identified the OPA (including the OPA Review Board), as having independent oversight responsibility.[301] The city pointed out that OPA, which was responsible for investigating and opining on SPD's disciplinary processes, had both sworn and civilian employees, and a civilian director responsible for providing the SPD Chief with disciplinary recommendations.[302] According to the city's briefing, the OPARB coordinated public outreach and solicited community feedback related to the fairness, timeliness, and completion of the OPA complaint process.[303] The city acknowledged, however, that the OPARB had been largely inactive for years due to recent changes in public disclosure law that allowed greater public access to information and the creation of CPC to handle many of the same community engagement functions.[304]

The city filed as an exhibit the Accountability and Civilian Oversight Recommendations, an early draft of SMC 3.29 (Civilian Oversight of Police) which would morph into SMC 3.29 (the Accountability Ordinance (AO)) and which was meant to codify the duties, authority, and processes of the OPA, the OPA Director, the Independent Police Accountability Auditor, and the CPC.[305] The city noted, however, that it was in the middle of collective bargaining negotiations with the police unions which could have an impact on the impact of the AO legislation.[306]

## 3.      DOJ's 2015 Filing on the Accountability System

DOJ filed a memo that highlighted the three goals of the consent decree (constitutional policing, public and officer safety, and public confidence in the SPD) and laid out its framework for implementing the "Four Pillars of Reform": (1) developing policies that provide officers with clear direction and expectations for conduct, (2) training, (3) accountability systems, and (4) assessment of the accountability systems.[307]

DOJ specifically noted that community oversight, including public perceptions of SPD, was intended to "act as a mechanism of accountability long after the Consent Decree is completed" through the CPC and the Crisis Intervention Committee (CIC).[308] In addition, the CPC was expected to assist in developing key reforms, commenting on relevant policies and/or training, and

---

[300] City's Mem. re Proposed Framework Ensuring Sys. Rev. and Account., *supra*, note 89.
[301] Pursuant to SEATTLE WASH., CODE (SMC) §3.28.
[302] City's Mem. re Proposed Framework Ensuring Sys. Rev. and Account. at 5, *supra* note 89.
[303] *Id*. at. 6.
[304] *Id*.
[305] *Id*. at Appendix A.
[306] *Id*.
[307] US Mem. re SPD's Account. and Rev. Sys. at 3-4, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 234).
[308] *Id*. at 7.

reviewing and recommending any necessary changes to OPA and SPD accountability and transparency systems.[309]

### 4.      OPA Director 2015 Filing on Accountability System[310]

The OPA was invited to provide feedback on the Parties' submissions regarding the accountability systems by the Court at the status conference on August 26, 2015.[311] Pierce Murphy (OPA Director), who had been sworn in on July 1, 2013, noted that OPA had been given the additional responsibility of overseeing all Type 3 use of force investigations conduct by the Force Investigation Team under the then-new Use of Force policy SPD implemented in 2014.[312] At the time of the filing, OPA was staffed "almost entirely by commissioned Seattle Police Officers Guild or the Seattle Police Management Association," the two unions representing most SPD officers.[313]

Director Murphy identified 4 core principles of accountability: proper delegation of authority and responsibility, critical self-review, appropriate discipline, and independent community oversight.[314] With the last principle, OPA Director Murphy noted that there were significant challenges to perceptions of OPA's independence and validity, because the OPA was only quasi-independent - the OPA Director was an SPD employee with no civil service or contractual protection, and the OPA was entirely staffed by commissioned officers.[315] Furthermore, Director Murphy argued that it was important for the OPA and the "rest of the independent oversight apparatus" to have adequate authority and resources to monitor and audit the systems. In short, Director Murphy did not feel that adequate structures, policies, and processes for accountability were yet in place.[316]

### 5.      OPA Auditor 2015 Filing on Accountability System[317]

The OPA Independent Auditor, retired Judge Anne Levinson, also provided comment, concurring with submissions from Director Murphy and the CPC. Judge Levinson pointed out that the city and SPD previously took the narrow view that the accountability system only included "the way in which complaints and investigations of incidents of possible misconduct are handled."[318] The OPA Auditor suggested in assessing the status of the accountability systems, the Court consider the following criteria:

- Alignment of the processes, policies, and mechanisms for supervisory responsibilities, training, internal investigations, force review, EIS, recruiting, hiring, promotion,

---

[309] *Id.* at 7-8.

[310] Mem. Office Police Account. Dir. Pierce Murphy re: SPD Account. Sys., *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 238).

[311] Minute Entry, *supra* note 92..

[312] Mem. Office Police Account. Dir. Pierce Murphy re: SPD Account. Sys. at 3, *supra* note 103.

[313] *Id.*

[314] *Id.*

[315] *Id.* at 5-6.

[316] *Id.*

[317] Mem. Office of Prof. Account. Indep. Auditor re City's Proposed Framework for Account. Sys., *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 239).

[318] *Id.* at 3.

assignment, overtime, complaint-handling, investigative functions, disciplinary decisions, appeals, and decertification with the goals and objectives of the Consent Decree;

- Benefits of further civilianization of SPD leadership and staff;
- Transparency of the terms and impacts of the collective bargaining agreements;
- Implementation of lessons leaned from civil litigation, prosecutions, misconduct and EEO investigations;
- Adequate purpose, independence, authority, responsibility, resources, and capacity for civilian oversight entity in connection audits, recommendations, policy implementation;
- Effective checks and balances within the accountability systems to avoid dependence on good leadership.[319]

### 6.    CPC Filing on Accountability System[320]

The CPC acknowledged that the draft accountability legislation[321] was a joint submission between the CPC and the city.[322] The CPC felt this code was necessary to support and formalize both the three-prong civilian oversight system and SPD's internal accountability obligations.

The CPC also took the opportunity to explain their role and relevance. It was created to "leverage the ideas, talent, experience, and expertise of the community" while developing and implementing police reform. It was specifically tasked with evaluating the current civilian accountability triad and had conducted extensive community outreach to seek the perspectives of "the general public, police officers and their union representatives, and other key stakeholders in the reform process."

With regard to the city filing, the CPC agreed that reforms already implemented by the city were improvements and that the proposed framework of Chapter 3.29 would "address important issues and strengthen the system."[323] With regard to DOJ's filing, CPC largely agreed, but felt that reform of OPA, including a "more robust permanent community-based body than the current" OPARB, was necessary to strengthen civilian oversight.[324]

CPC's proposed reforms (through the proposed legislation filed with the city's briefing) focused on a hybrid civilian/sworn oversight model that CPC felt was better to ensure transparency, public access to information, and confidence from SPD.[325]

### 7.    Court Advises the Parties to Consider Reforms and Monitor Conducts its Fourth Systemic Assessment

On January 13, 2016, in the interest of guiding the Parties in their discussions around the accountability systems, the Court proposed a series of questions for their consideration.[326] The

---

[319] *Id.* at 4-6.
[320] Submiss'n. Cmty. Police Comm'n, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 240).
[321] Draft SEATTLE, WASH., ORDINANCE NO. 125315 §3.29.
[322] Submiss'n. Cmty. Police Comm'n at 3, *supra* note 113.
[323] *Id.* at 7.
[324] *Id.*
[325] *Id.*, at 10-13.
[326] Monitor's Mem. re Process for Account. Sys. Rev., *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 274-1).

questions revolved around the obligations, processes, and requirements related to the OPA, the OPA Director, the OPA Auditor, and the OPARB.[327]

Shortly thereafter, the Monitor filed its Fourth Systemic Assessment (Fourth Assessment) with the Court. The Fourth Assessment was designed to (1) provide the Parties with data-driven evidence of SPD trends to help revise the OPA manual, and (2) to provide the Court with the same to advise it how to "create a better framework of independent review of the various policies, organizations and systems that will monitor the performance of" SPD.[328]

The Monitor found that the design of SPD's complaint process was "exceptionally strong and very well structured," based on its extensive documentation and redundancy requirements, its built-in transparency, and its "streamlined findings and classifications system."[329] Similarly, the Monitor concluded that the adjudication and review mechanism was "among the strongest we have seen," based on detailed and thorough review by the OPA Director and Auditor.[330]

The Monitor also found that although the investigations were "generally satisfactory or better," the OPA needed to make targeted changes to its operations and manual to ensure best practices.[331] Specifically, the Monitor identified weaknesses in the quality, consistency, and timeliness of investigative interviews, as well as in the failure to address issues that arose in the context of criminal investigations.[332] The Monitor recommended that civilian investigators be included in interviews, that additional civilian investigators or administrators be hired, and that supervisors, rather than the OPA, be given greater responsibility for addressing minor policy violations.[333]

On February 1, 2016, the CPC filed a response to Fourth Systemic Assessment. The CPC stated that both it and the OPA Auditor felt that additional steps needed to be taken, above and beyond recommendations made by the Monitor, including more discretion for the OPA Director in hiring and better orientation and training of OPA personnel.[334] The CPC expressly disagreed with the Monitor's recommendation to create an OIG to oversee SPD accountability.[335]

## 8.    The Parties Develop a Working Group to Address Accountability System Reforms

Following the discussions around the Fourth Assessment, the Parties agreed upon a process that would require the city, DOJ, the CPC, and the Monitoring Team to examine the city's proposed approach in light of questions identified by the Judge and Monitor earlier that year.[336] Importantly,

---

[327] *Id.*

[328] Monitor's Fourth Sys. Assess.: Office of Prof. Account. at 4, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 259-1).

[329] *Id.* at 5.

[330] *Id.*

[331] *Id.*

[332] *Id.*, at 6.

[333] *Id.* at 8.

[334] Cmty. Police Comm'n Resp. to Monitor's OPA Assessment , *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 264).

[335] *Id.*, at 9.

[336] Monitor's Mem. re Process for Account. Sys. Rev., *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. Nos. 274, 274-1, 274-2).

the Parties wanted to find an avenue through some version of the legislation proposed by the city and the CPC that would not conflict with the Consent Decree.[337]

The city (and the Monitor) proposed a working group that included City participants, DOJ, and the Monitor to answer the questions asked by the Court on January 13, 2016, address issues raised by the city Attorney, and identify the best accountability system for Seattle.[338] The Court approved this proposal on February 25, 2016.[339] The Parties then had six weekly work group sessions (including representatives from the SPD, Mayor's office, OPA, OPA Auditor, OPARB, the CPC, the DOJ, and the Monitoring Team) between March 9, 2016 and April 6, 2016.[340]

Generally, the workgroup was able to come to a consensus on questions related to the composition or selection of OPA investigators, the process for OPA investigations, how to bolster OPA independence, the role of the OPA Auditor in investigations, the reporting structures for the OPA Director and the OPA Auditor, how to bolster OPA independence, and questions related to the functional assessment of the system. According to the city, the work group came to a consensus on the following issues:

| **Appendix Table 4.**<br>**Accountability Workgroup Findings on Court Questions Concerning the OPA**[341] ||
| --- | --- |
| **What is the OPA, and what does its Director do and should do?** | OPA is a civilian led entity housed within SPD that investigates officer misconduct. Specifically, the OPA has jurisdiction over any allegation of officer misconduct, whether referred from within the Department or initiated based on a civilian complaint. The OPA Director is a civilian who is appointed by the Mayor to a three-year term and approved by the city Council. The OPA Director is responsible for overseeing the investigations conducted by OPA and for ultimately making recommendations as to the findings for each allegation. |
| **Where do "complaints" about the police go?** | A complaint can come to OPA in a variety of manners. If a civilian initiates a complaint, it can be done so via email, telephone, letter, or by simply walking into OPA's offices and making a complaint in person to OPA staff. SPD employees can also refer complaints to OPA. In fact, SPD employees are required to report to OPA any misconduct that they observe or which is reported to them. (See SPD Policies 5.002 and 5.003.)<br>Presently, formal complaints alleging police misconduct fall under OPA's jurisdiction and, when made, begin to make their way through OPA's administrative and investigatory processes. |
| **What types of complaints should go to the OPA?** | OPA presently retains jurisdiction over all complaints of misconduct, regardless of severity; however, OPA can classify minor complaints as a Supervisor Action ("SA") and require that those matters be investigated within the Department's chain of command. Not all complaints may be so classified—notably, complaints in which biased policing, excessive or unnecessary force and criminal conduct is alleged cannot be designated as SA. Instead, those, and all other non-minor complaints, must be fully investigated by OPA. |

---

[337] *Id.*

[338] *Id.*

[339] Order Approving Mem. re Process Account. Sys. Rev., *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 275).

[340] City's Brief re Account. Sys. Rev., *supra* note 88..

[341] *Id.*, at 12-27.

| | Expanding (or limiting) OPA's jurisdiction was identified by the participants as a forward-looking question. While there was broad consensus that OPA should have jurisdiction over all misconduct, regardless of severity, there was less agreement on other questions of scope. The forward-looking questions concerning the scope of OPA's jurisdiction, should be fully explored during the legislative process. |
|---|---|
| **Should the OPA Director be a civilian?** | There was universal consensus that the OPA Director should remain a civilian. |
| **Collective bargaining issues implicated by the OPA?** | A number of collective bargaining issues may be implicated by alterations to OPA, its scope of work and jurisdiction, and its staff. In engaging in the accountability systems review process, the participants looked at issues aspirationally—meaning, what would be the best or ideal accountability system for Seattle, both in terms of function and transparency. While the limitations of the current collective bargaining landscape were taken into account, they did not drive the discussions. However, civilianizing OPA, allowing OPA to conduct public hearings, altering and/or streamlining the appellate process, and expanding the scope of OPA's jurisdiction, just to name a few of the discussed aspects of a prospective accountability system, could all implicate collective bargaining. |
| **Questions Concerning the OPA Auditor** | |
| **What is the OPA Auditor and what does it do?** | The Auditor is a civilian with a legal/judicial background who is appointed by the Mayor to three-year terms and approved by the Council. The primary responsibility of the Auditor is to review the quality of OPA's investigations and to decide whether further investigation is needed or if any reclassifications need to be made. If not, the Auditor is tasked with—in concert with the Director—certifying the investigation as complete. A secondary function of the Auditor is to conduct audits of OPA and all of its records, and to provide reports detailing the results of those audits semiannually to the Mayor and Council. The reports may contain recommendations on the timeliness, fairness and thoroughness of OPA investigations, and may also evaluate any other SPD or City policies relating to police accountability or police professional conduct. In practice, however, the scope of the Auditor's work has expanded, offering recommendations on systemic issues broader than those concerning OPA and the functioning of the accountability system and related policies. |

| Authority Questions | |
|---|---|
| **Who should be the decision-maker?** | For matters of Department discipline, there was broad consensus that the Chief of Police should be the final authority on discipline. |
| **Questions Concerning OPARB** | |
| **What is OPARB's Role?** | Presently, OPARB is a seven member board comprised of civilians appointed by the city Council. OPARB's purpose is to provide community oversight and awareness of SPD and its accountability system. In order to do so, OPARB independently reviews the quality of the accountability system, promotes public awareness of and full access to the system, surveys the community and police officers to obtain information and opinions on police practices and accountability, and advises the city on its police policies and accountability. In furtherance of this mission, OPARB reviews complaint forms and closed OPA files, and is required to provide reports on a semi-annual basis. Thus, OPARB oversees the quality and efficacy of the work of both the OPA Director and the Auditor. |
| | Functionally, however, OPARB's anticipated role has been marginalized both by the public availability of OPA files and by the increased scope of the work being performed by the CPC. The CPC has taken on much of the public outreach efforts once viewed as within the purview of OPARB, and has also conducted its own inquiries into systemic issues, both concerning the accountability system and SPD writ large, through its review of closed OPA investigations and other issues of community concern. |
| **Is OPARB the only Entity through Which the community presently weighs in on police accountability?** | OPARB is no longer the sole avenue through which the community presently weighs in on police accountability. As discussed above, the CPC has taken on much of this role in its daily work. CPC commissioners attend a wide spectrum of community meetings, listening to concerns that are articulated. As discussed above, the CPC has conducted reviews of SPD actions and/or closed OPA investigations in order to make systemic recommendations. For example, the CPC reviewed the hiring and firing of Mohamed Said with an eye towards making systemic recommendations to the Department. The CPC also looked into SPD's demonstration management policies in light of concerns flagged by community groups concerning the policing of protests. Most recently, the CPC has taken it upon itself to examine OPA's investigation of allegations stemming out of May Day 2015. |
| | This expanded role that the CPC has been playing is not codified and is arguably at odds with language within the Consent Decree and Memorandum of Understanding that precludes CPC review of OPA files. However, the CPC views it as incumbent on themselves and the unique role that they play to respond to what it perceives to be the community's concerns about OPA, the accountability system, and SPD's policies, procedures and tactics, and identifies this as an area of shortcoming in the current accountability structure. The Mayor's Office's community outreach programs and SPD's advisory councils serve to provide other valuable avenues for community input |

Following the recommendations of the working group, the city sought the Court's leave to pass legislation on five subject matters that obviously implicated the terms of the Consent Decree: (1) Modifications to OPA Manual, and to related SPD Policies 5.002 and 5.003; (2) Moving OPA outside SPD; (3) Establishing SPD's permanent civilian oversight body; (4) Modifying or

terminating OPARB's role or existence; and (5) Modification of other internal SPD accountability components called out in the Consent Decree, such as the FIT, FRB, or EIS.[342]

### 9.      The Review and Enactment of the Accountability Ordinance

On July 11, 2016, the Parties agreed, in a joint motion to the Court, that the legislation would address the areas identified by the city's briefing and would be introduced sometime in 2016.[343] The Parties further outlined the legislative process for the anticipated act, which included discussions with the SPD police unions (SPOG and SPMA).[344]

On August 9, 2016, the Court entered an order that essentially granted the Parties stipulated request; however, the Court disagreed with the Parties proposal to submit the legislation for Court review only once it was finalized and passed.[345] According to the Court, submitting the legislation only after it had passed would inhibit its ability to ensure the legislation aligned with the goals of the Consent Decree and might even leave it in the position of having to judicially veto passed legislation.[346] Instead, the Court ordered the city to provide it the draft legislation before it was presented to the Seattle City Council for a vote.[347] The Court further indicated that it would review the draft legislation within ninety days and issue an order regarding whether any part of the legislation conflicted with the terms and/or the purpose of the Consent Decree.[348]

The Court then held a status conference on August 15, 2016, at which the parties and the CPC discussed upcoming efforts to develop accountability legislation pursuant to the Court's order.[349] At the status conference, the Court ordered the parties to respond to the city's proposed legislation within twenty-one days its filing with the Court.[350]

On October 7, 2016, the city submitted its draft legislation regarding SPD's accountability systems to the Court. The city represented to the Court that the legislation was based on collaboration between the city and key stakeholders.[351] Although the city declared that the "vast majority" of the draft legislation was agreed upon by all, including provisions related to the creation of the OIG, the independence and civilian staffing of OPA, and the establishment of CPC as a permanent community oversight entity, it acknowledged that there was not total consensus.[352] The draft legislation was 53 pages long and contained 23 provisions with two or more alternative options that might be adopted. Despite the uncertainty, the CPC subsequently filed a brief requesting that the Court approve the draft legislation.[353]

---

[342] City's Brief re Account. Sys. Rev. at 28, *supra* note 88.
[343] Stip. Mot. re SPD Account. Sys. Legis., *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 297).
[344] *Id.*
[345] Order re SPD Account. Sys. Legis, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR(Dkt. No. 305).
[346] *Id.*
[347] *Id.*
[348] *Id.*, at 3.
[349] Minute Order, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR(Dkt. No. 307).
[350] *Id.*
[351] City's Brief re Submiss'n SPD Account. Syst Legis., *U.S. v. Seattle*, No. 2:12-cv-01282-JLR(Dkt. No. 320).
[352] Id., p. 3.
[353] Cmty. Police Comm'n.'s Mem. Brief, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR(Dkt. No. 325).

On November 4, 2016, the DOJ filed a response to the city's request for court approval of the draft legislation that was generally supportive but highlighted four objections to the draft legislation.[354]

- First, DOJ objected to Section 3.19.027.F of the draft legislation, which offered three alternative standards for terminating an officer based on dishonesty, one of which imposed a "preponderance of the evidence" standard of proof, and the other two a higher "clear and convincing evidence" standard. The DOJ argued that the heightened standard was antithetical to the purposes of the Consent Decree, as it would undermine public confidence in the accountability system.
- Second, the DOJ objected to the proposed composition of CPC in Section 3.29.215, which did not explicitly require the inclusion of SPD officers. Because the Consent Decree required that CPC membership include SPD officers, and because DOJ believed their inclusion was necessary to bolster the CPC's expertise and effectiveness, the DOJ argued that Section 3.29.215 was inconsistent with the Consent Decree.
- Third, the DOJ argued that the additional duties required of the CPC, without language commanding it to prioritize its duties under the Consent Decree, would conflict with the Consent Decree.
- Finally, DOJ did not approve of allowing CPC to evaluate the performance of OIG, as it felt that was not a best practice.

On January 6, 2017, the Court entered an order generally approving of the draft legislation, with several notable caveats.

In its order, the Court specifically considered each of DOJ's four objections to the draft legislation. First, the Court agreed with DOJ that the two options in Section 3.19.027.F that required a heightened "clear and convincing" standard of proof were inconsistent with the purposes of the Consent Decree. The Court explained that while heightened protections for officers made sense in certain circumstances, such as civil actions, they had no place in decisions to terminate employment for alleged dishonesty.[355]

The Court disagreed with the DOJ on its second objection. Although the Court noted that removing the requirement to include SPD officers among CPC membership did not conform to the explicit terms of the Consent Decree but did not conflict with its purposes. As a result, the Court dictated that the parties would need to amend the Consent Decree by stipulation, with the Court's approval, before it could enact Section 3.29.215 into law.[356]

The Court agreed with the DOJ's third objection and ordered that the draft legislation be revised to include an explicit requirement that the CPC prioritize its Consent Decree obligations over any additional duties.[357]

Finally, the Court disagreed with the DOJ's objection to one of two alternative provisions in Section 3.29.215.A.9, which permitted CPC to "evaluate the performance of OIG and its

---

[354] Dep't J.'s Resp. City's Draft Account. Sys. Legis., *U.S. v. Seattle*, No. 2:12-cv-01282-JLR(Dkt. No. 331).
[355] Order re Account. Legis. at 6, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 357).
[356] *Id.*, at 9.
[357] *Id.*, at 10.

management and leadership." Although it agreed that having CPC review OIG might not be the best policy option, DOJ presented insufficient evidence that the provision violated the terms or the purposes of the Consent Decree.[358]

Pursuant to the Court's August 9, 2016, order, the city submitted the final accountability legislation for review on June 21, 2017.[359]

The Council passed the ordinance unanimously on May 22, 2017. The mayor signed it shortly thereafter and then it was submitted to the Court for final review. Under the structure of the ordinance, as with the draft legislation, the OPA was given jurisdiction over the handling of complaints and investigations, including systemic issues that arise as trends in those complaints; the OIG performed systemic reviews and audits; the CPC was authorized to manage community engagement and review the policies, practices, and services of SPD from a community perspective; and the Chief of Police retained the authority as the final arbiter on discipline.[360] However, the ordinance had some significant additions to the draft version, including but not limited to:

- Whereas clauses that outlined the structure of the accountability system, provided the reasoning behind the components, and explain the importance of ensuring the CPC is representative of the people of Seattle.
- Findings of fact that provided background on the city's historical reform attempts, the imposition of the Consent Decree, current local and national challenges in policing, and the policing policy and practice recommendations from President Obama's task force.
- Provision of express authority to OPA Director to make Management Action recommendations in discipline cases.
- A requirement that the OPA director submit an annual budget to the mayor annually.
- A prohibition against prior employment as a sworn SPD officer for the OPA Director, OPA civilian staff, Inspector General, OIG staff, and CPC Executive Director.
- A requirement that 25% of OPA Director search committee and the IG search committee be CPC Commissioners.
- A guarantee of anonymity of complainant in OPA complaint in the "notice to named employee."
- A requirement for annual performance reviews by Council of the OPA Director (with input from the IG) and the IG (with input from the OPA Director).
- Giving the OIG the authority to monitor the implementation of recommendations to SPD from the OPA Director, the IG, and the CPC.
- Requiring that CPC Commissioners either live or work in and are geographically representative of Seattle.
- Retaining police union members as part of the CPC membership.
- Increasing the number of CPC Commissioners from fifteen to twenty-one.
- Requiring the CPC to periodically assess and report on SPD processes in relation to work force diversity.

---

[358] *Id.*, at 11.
[359] City Brief re Submit. Ordinance Further Rev., *U.S. v. Seattle*, No. 2:12-cv-01282-JLR(Dkt. No. 396).
[360] *Id.*

- Eliminating the Office of Professional Accountability Review Board (OPARB) and transitioning its obligations to CPC.
- Requiring OIG and CPC to jointly report mid-year to the public safety committee regarding the status of recommendations to SPD from OPA, OIG, and CPC.
- Clarifying that SPD has 30 days to respond to recommendations from the accountability partners that are contained in mandated reports.
- Requiring quarterly meetings between OIG, OPA, and CPC regarding the status of recommendations by the accountability partners and the responses from SPD.
- Requiring the CPC to maintain a current database of the status of such recommendations and allowing it to include its own analysis and comments.
- Outlining circumstances in which the Chief may, in their discretion, suspend an officer without pay. And,
- Establishing a 5-year statute of limitations for most types of misconduct.[361]

## 10. Subsequent Court Hearings related to the Implementation of the Accountability Ordinance

On July 18, 2017, instead of approving or disapproving of the ordinance, the Court requested additional information on the collective bargaining process and how it would impact the ordinance.[362] The Court was concerned that collective bargaining might undermine the accountability process, describing it as a "black hole" that could affect the ordinance in unpredictable ways.[363]

In a supplemental briefing filed on August 18, 2017, the city noted that the police unions could technically challenge any provision but provided a list of "those provisions that the city will bargain further before implementing."[364] The list included:

1. Reorganization of OPA
   - Civilianization (Section 3.29.140)
   - Change to rotation, assignment, and transfer of officers to OPA (Sections 3.29.430(G); 3.29.140(E))
   - Changes to Deputy Director position (Section 3.29/140(A))
2. PSCSC Changes
   - Standards and procedures used in SPD disciplinary hearings (Sections 4.08.070(J); 4.08.105(B)
   - Elimination of employee-elected Commissioner (Section 4.08.040(A),(B))
3. Standard of review for dishonesty cases (Section 3.29.135(F))
4. Changes to SPD disciplinary timelines and time-bar provisions
   - Timelines and deadlines for OPA and SPD (Section 3.29.420(A)(2))
   - New 5-year limitations period (Section 3.29.420(A)(5))
   - Changes to provisions related to 180-day deadline (Section 3.29.135(C))
5. Expansion of OIG Responsibility (over current OPA Auditor)

---

[361] *Id*. at 5-24.
[362] Minute Order, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR(Dkt. No. 405).
[363] Order at 22, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 407).
[364] City's Supp. Brief at 4, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 412).

- Authority to review all OPA classifications and "incidents," direct investigations, make certification determinations (Sections 3.29.240(C); (Section 3.29.250(B)))
- Authority to investigate in OPA-conflicted cases (Section 3.29.240(D))
- Subpoena authority (Section 3.29.240(K))
- Changed review obligations, procedures, standard of review (Sections 3.29.260(A); (Section 3.29.120(F))
- IG procedures regarding certification of OPA investigations (Section 3.29.260(B)-(H))
- Increased access to officer information (Section 3.29.260(B))
- Increased participation in disciplinary meetings (Section 3.29.260(C))

6. Elimination of Discipline Review Board/Phase is of new PSCSC appeal processes (Sections 4.08.070(j); 4.08.100; 3.29.420(A)(6), (7))
7. Changes to OPA notification procedures (Section 3.29.130(A))[365]

On September 7, 2017, having reviewed both the city Attorney's letter and the city's supplemental briefing, the Court refused to rule on the entirety of the ordinance. The Court remained concerned that collective bargaining could derail the ordinance, and declined to rule on the ordinance until collective bargaining was completed.[366] The Court encouraged the city to move forward with implementation of those portions that the city represented had gone into effect thirty days after the mayor signed the ordinance, and granted its approval specifically and only to the provisions allowing for selection of the OPA Director and the Inspector General (Sections 3.29.115(A)-(B) and 3.29.230(A)-(B)), conditional upon the provisions remaining unchanged by collective bargaining.[367]

## 11.   Collective Bargaining Clashes with the Accountability Ordinance

Following the Court's September 7, 2017, Order, the city moved forward with implementing its ordinance while simultaneously engaging in collective bargaining with the police unions. In November 2017, the city reached a collective bargaining agreement with SPMA (the SPMA Agreement), which covered 2014 through 2019.[368] Negotiations were more extensive with SPOG, but the city eventually reached a tentative agreement covering 2015 through 2020. The final agreement was approved November 13, 2018, and signed by the mayor the next day (the SPOG Agreement).[369]

At a status conference on November 5, 2018, the Court indicated that it intended to review the agreements with the police unions to determine their impact on the ordinance as well as whether any provision within them conflicts with the terms or purposes of the Consent Decree.[370] To aid in its deliberation, the Court requested that the city provide information related to the collective bargaining process, as well as to "the discipline, DRB process, and outcome in the appeal of Officer Adley Shepherd's termination."[371] On December 3, 2018, the Court issued an Order to Show Cause Whether the Court Should Find That the city Has Failed to Maintain Full and

---

[365] *Id.* at Exh. 1.
[366] Order re Account. Ordinance at 3, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 413).
[367] *Id.* at 4.
[368] City's Resp.  Order to Show Cause at 10, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 512).
[369] Id.
[370] Order to Show Cause, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 504).
[371] City's Resp.  Order to Show Cause at 14, *supra* note 161.

Effective Compliance with the Consent Decree, requesting that the parties provide comment and argument regarding the implications of the SPMA and SPOG Agreements and the recently decided Adley Shepherd case.[372]

On December 17, 2018, in its response to the Court's order, the city acknowledged that both the SPMA and the SPOG Agreements contained provisions that were "inconsistent with – and therefore supersede – provisions in the Ordinance."[373] The city identified the most significant overrides as:

1. Arbitration – both agreements require arbitration thought a grievance arbitration system similar to those used by other City union employees.
2. Standard of proof for dishonesty cases – because SPOG and the city previously negotiated a presumption of termination in exchange for a higher "clear and convincing evidence" standard in such cases, SPOG insisted that the arbitrator be allowed to apply the higher standard "consistent with established principles of labor law."
3. Statute of Limitations – SPOG and the city settled on a 4-year statute of limitations as a compromise between the prior 3-year statute of limitations and the ordinance's 5-year statute.
4. Subpoena power of OIG and OPA – the city and SPOG agreed that the subpoena power granted to OPA and OIG by the ordinance would not apply to officers or their families.[374]

On May 15, 2019, the Court orally ruled that the city had fallen partially out of full and effective compliance with the Consent Decree in the area of accountability.[375] The Court concluded that the changes imposed by the SPMA and SPOG agreements weakened the system of accountability established by the ordinance. In its written ruling entered on May 21, 2019, the Court determined that while arbitration was not expressly addressed by the Consent Decree, discipline related to use of force clearly implicated the purposes of the Consent Decree, and, therefore, all provisions related to such discipline had to be consistent with them.[376] Further, the Court ruled that the prior accountability system was inadequate and could not serve as an acceptable baseline for finding full and effective compliance, and thus, the SPMA and SPOG Agreements' elimination of certain reforms left the old arbitration process "materially unchanged." The Court held that to achieve full and effective compliance, the city had to reinstate the provisions of the ordinance overridden by the SPMA and SPOG Agreements. To that end, the Court ordered the Monitor and CPC to develop a methodology to evaluate the present accountability system and the city to provide a proposal for achieving compliance.[377]

On August 15, 2019, the Parties filed an agreed upon accountability methodology with the Court. The proposed accountability assessment would (1) analyze the elements of the prior SPOG agreement that led to the outcome in the Adley Shepherd case, including the calculation of the 180-day disciplinary investigation deadline, OPA and OIG's subpoena authority, and the standard

---

[372] Order to Show Cause, *supra* note 163.
[373] City's Resp.  Order to Show Cause at 10, *supra* note 161.
[374] *Id*. at 13-14.
[375]  Minute Order, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 561).
[376] Order Finding the City of Seattle Partially Out of Compliance with the Consent Decree at 7, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 562).
[377] *Id. at 13.*

of proof and review in appeals; and (2) gather disciplinary data in nineteen areas from comparable police departments in the U.S.[378] In addition, the parties proposed that after completion of the assessment, the city would be required to submit a plan to the Court for proposed next steps developed in collaboration with the other key stakeholders.

The Court ultimately authorized the Parties to proceed as proposed.[379]

## 12.    21CP Accountability Assessment and Subsequent Assessment by Federal Monitor

In accordance with its proposed methodology, the city hired 21CP Solutions to conduct the third-party assessment of its accountability mechanisms. The assessment was filed with the Court on December 13, 2019, and found that the accountability system was robust, but suffered from several key flaws, including those previously identified by the Court.[380]

The city of Seattle has one of the most multi-layered and sophisticated oversight systems in the United States. Up to four civilian-led agencies can at some point have a role in reviewing or evaluating a use of force incident or a finding that an officer acted out of policy when using force. These agencies operate independent of and in addition to the units within SPD who investigate and evaluate force incidents (the Force Investigation Team, Force Review Unit and Force Review Board). The civilian-led agencies not only serve as a check on the SPD but on each other as well. The current state of accountability appears to be quite effective in no small part due to the commitment of city leaders, police officers, other city employees, and the public.[381]

The 21CPC Solutions consultants ultimately made the following findings/ recommendations:

- Finding 1: Use of Force – SPD officers continue to use force infrequently and when force is used, findings of out of policy force are rare.
- Finding 2: 180-Day Extension of Time Requests – While OPA has not formally sought an extension under the current contract because of an ongoing criminal investigation, the requirements for an investigation extension request by OPA to the Guild due to a criminal investigation lack precise definitions that could create a risk that serious misconduct could be held unaccountable.
- Finding 3: The 180-Day Investigation Time Limit –The prosecution review process creates a risk that when an administrative investigation is paused by OPA during a prosecutor's review of the same matter for consideration of criminal prosecution, time could restart without OPA being aware of the change in status.
- Finding 4: Subpoena authority –There is uncertainty about the tools available to OPA and OIG to obtain evidence. The breadth of subpoena authority of OPA and OIG, including regarding officers, their family members, and personal records of officers

---

[378] Stip. Mot. Approve Account. Methodology at 23-25, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 576).
[379] Order re Mot. to Approve Account. Methodology at 8, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 585).
[380] City Rep. Account. Assess., *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 598).
[381] 21CP SOLUTIONS, AN ASSESSMENT OF THE CITY OF SEATTLE'S POLICE ACCOUNTABILITY SYSTEM 2, https://www.seattle.gov/documents/Departments/OPA/Reports/21CP-Solutions-Assessment-of-Seattle-Police-Accountability-System-December-2019.pdf (Dec. 11, 2019).

and family members is unclear. There are comparable West Coast cities that also have investigative civilian oversight agencies, similar to the OPA, but with enunciated powers to issue subpoenas for witnesses and records. OPA may have other means, though, to obtain information accessible to an officer involved in an investigation. The assessment team understands that open questions remain regarding whether judicial oversight or other protections are needed, and whether subpoenas (vs. search warrants) can be used for certain classes of evidence.

- Finding 5: Arbitrator selection – The city and SPOG agreed to an efficient arbitration selection process that is consistent with the terms of the labor agreement. It is too soon to establish whether concerns raised about the impartiality of arbitrators have been satisfied.
- Finding 6: Arbitrator diversity–The current selection process creates a pool of eligible arbitrators drawn from American Arbitrator Association members on the Pacific Northwest panels. While the process does appear to have been a fair one, the pool drawn from, and the ultimate panel, lacks racial and ethnic diversity and the depth of experience that could be provided by additional requirements.
- Finding 7: Quantum of Proof – Of the benchmark labor agreements the assessment reviewed, Seattle is unique in that its labor agreement includes specific language regarding the quantum of proof used during arbitration, however there have been no use of force arbitration cases heard in the current discipline appeals process to draw any conclusion that an elevated standard will be used when an allegation of Force-Use is sustained and the officer is discharged.
- Finding 8: Transparency – It is difficult for the public to track the status of sustained discipline cases through the grievance and appeals process and have access to information about the outcomes of grievances and appeals.[382]

## 13.    Status Conference

On August 10, 2021, The Court called a status conference to discuss the city's progress on accountability. The Court noted that there were practical limitations to major decisions that could be made by the city or SPD as the city was approaching a mayoral election with two viable candidates; SPD's Chief had resigned and the department was being managed by an interim Chief; the Council had several positions up for election, and two diametrically opposed candidates were vying for the city attorney's position.[383] In addition, negotiations over the next SPMA and SPOG collective bargaining agreements were looming over all of it.[384] Taking all that into account, the Court did not make any ruling, and instead advised the parties to be thoughtful, constructive, and inclusive as they worked on next steps.[385]

In May 2022, the Monitor completed a comprehensive assessment of SPD's compliance with the Consent Decree. Specifically, the 2022 assessment evaluated use of force, crisis intervention, and stops and detentions, for which it found the city had sustained compliance (with the exception of

---

[382] *Id.*, at 3-4
[383] Verbatim Rep. Proc. before Hon. James L. Robart, US Distr. J. at 45, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 685).
[384] *Id.*, at 46,
[385] *Id.*, at 47.

the time period during the summer of 2020). The Monitor noted that a few key areas for improvement remained: ensuring a sustainable accountability system, restoring community trust in SPD in the wake of its response to the 2020 protests, and mitigating racial disparity.[386]

### 14.    Recent developments

Following the Monitor's assessment, on March 28, 2023, the Parties filed a joint motion to approve a proposed Compliance Agreement and transition away from the Consent Decree. The motion sought a court ruling that the city has demonstrated sustained compliance with Consent Decree requirements for use of force, crisis intervention, stops and detentions, bias-free policing, supervisions, and the OPA and that the paragraphs of the Consent Decree containing those requirements may be dismissed.[387] The Parties agreed that under a new Compliance Agreement, the Court should retain jurisdiction to oversee use of force in crowd management situations and accountability. The Court heard oral argument on May 30, 2023, and while the Court ultimately declined to approve the creation of a new Agreement, the Court did dismiss portions of the Consent Decree and maintain other portions of the Consent Decree consistent with the request of the parties.[388]

The parties also identified the current "capacity" assessment as a tool that would be used to identify any additional areas where improvements needed to be made to ensure the existing accountability structures set in place by the city are positioned to provide robust and sustainable external oversight to the Police Department upon the termination of the Compliance Agreement.[389] The Court ordered that the assessment be filed with the Court by December 29, 2023.

### III.    Comparing Seattle Accountability Mechanisms to National Standards and Comparative Cities

In its 2019 report to the City, 21CP Solutions, a national consulting group, concluded that:

> The City of Seattle has one of the most multi-layered and sophisticated oversight systems in the United States. Up to four civilian-led agencies can at some point have a role in reviewing or evaluating a use of force incident or a finding that an officer acted out of policy when using force.[390] These agencies operate independent of and in addition to the units within SPD who investigate and evaluate force incidents (the Force Investigation Team, Force Review Unit and Force Review Board). The civilian-led agencies not only serve as a check on the SPD but on each other as well. The current state of accountability appears to be quite effective in no

---

[386] Comprehensive Assess. SPD Antonio M. Oftelie, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 709).

[387] Agmt on Sust. Compliance, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 727).

[388] See, Order re Joint Mot. Approve Proposed Agmt on Sust. Compliance, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 769).

[389] *Id.*, at 2; Stip. Mem. Supp. Joint Mot. Approve Compliance Agmt at ¶ 85, *U.S. v. Seattle*, No. 2:12-cv-01282-JLR (Dkt. No. 728).

[390] 21CP Solutions identified the four "civilian-led agencies" as the Office of Professional Accountability (OPA), the Office of Inspector General for Public Safety (OIG), the Community Police Commission (CPC) and the Public Safety Civil Service Commission (PSCSC) (21CP Solutions, *supra* note 3 at 5-6.

small part due to the commitment of city leaders, police officers, other city employees, and the public.[391]

This assessment compared the Seattle police accountability structure to other practices in civilian oversight nationally to better understand how Seattle's current structures and system compares to other jurisdictions – and to gauge whether there are any structures, systems, or processes that may need to be changed or introduced to align the City with best practices.[392]

a.    Comparable Cities

The cities listed in Table 9, below, when including Seattle, comprise what has been referred to by City stakeholders as "the West Coast Seven." According to the City, these cities were chosen several decades ago as comparable cities because they had policing and community safety environments like Seattle – including high numbers of workday commuters, active nightlife scenes, professional sports teams, high rates of tourism, etc. Although the policing environment has certainly changed since the list was first created, these cities, when compared together, provide an excellent sample of civilian oversight structures as they currently exist in the United States.

The comparable cities all fall within the list of 100 largest cities in population in the United States.

**Table 9.  "West Coast Seven" Cities Ranked by Population (2020)[393]**

| City | Rank out of Top 100 | Population |
|------|---------------------|-----------|
| San Diego, California | #8 of 100 | 1,387,000 |
| San Jose, California | #10 of 100 | 1,013,000 |
| San Francisco, California | #17 of 100 | 873,000 |
| **Seattle, Washington** | **#18 of 100** | **737,000** |
| Portland, Oregon | #24 of 100 | 652,000 |
| Sacramento, California | #34 of 100 | 525,000 |
| Long Beach, California | #41 of 100 | 467,000 |

To provide a context for Seattle's system of oversight, the remainder of this section considers the systems of community and external police oversight that the various members of the "West Coast Seven" have adopted. A summary of the systems of each city is outlined, in turn, below.

1.    San Diego

In 1988, the Citizen's Review Board on Police Practices was established after the passage of a City Charter amendment. The "CRB" was established "to review and evaluate complaints brought by the public against the San Diego Police Department (SDPD). The CRB also reviewed officer-

---

[391] *Id.*, at 2.
[392] See, De Angelis, et. al., *supra* note 152.
[393] See, *Largest cities in the US by population*, BALLOTPEDIA.ORG (Feb. 10, 2022), https://ballotpedia.org/Largest_cities_in_the_United_States_by_population (drawn from 2020 census data).

involved shootings (OIS) cases, in-custody death (ICD) cases, and the administration of discipline resulting from 'sustained' complaints."[394]

In 2016, the name of the CRB was changed to the "Community Review Board on Police Practices "so that it was inclusive of all San Diegans." A ballot measure also created "a dual responsibility of the CRB to the Mayor and the City Council and codified the practice of CRB's review of in-custody deaths and officer-involved shootings…"

In 2020, another ballot measure created a new independent "Commission on Police Practices" that replaced the CRB. "The purpose of the Commission on Police Practices is to provide an independent investigation of officer-involved shootings and in-custody deaths, and an unbiased evaluation of all complaints against the [SDPD] and its personnel, in a process that will be transparent and accountable to the community."

The San Diego "Commission on Police Practices" reportedly "reviews and evaluates serious complaints brought by the public against officers of the Police Department of the City of San Diego; reviews all officer involved shootings and in-custody deaths; [and,] reviews and evaluates the administration of discipline arising from sustained complaints…Subsequent to the review and evaluation process, the Commission may choose to make policy and procedure recommendations to the Chief of Police."[395]

"Commissioners are appointed by the City Council. The commission is staffed by an executive director, who is appointed by the Council; investigators and other City employees or contractors, who are independent of the Police Department and the Mayor; and legal counsel, independent of the City Attorney."

The implementation of the Commission of Police Practices was delayed until January 2022 when the City Attorney released a "second draft" of an implementation ordinance. It was not until November 2022 that the final implementation ordinance took effect, that was described in the media as a "framework" for the Commission.[396]

The City Council reportedly appointed 25 members to the Commission on Police Practices in late May, 2022 and after background checks and a review of their qualifications, 23 of members were sworn in at the end of August 2023.[397] As of the writing of this assessment, the Commission website provided the following status report:

> Currently, the Commission is in a transition phase as it awaits the approval of the implementation ordinance. Until the implementation ordinance process is

---

[394] See, City of San Diego, *Commission on Police Practices* (last visited Nov. 19, 2023), https://www.sandiego.gov/cpp/about.

[395] *Id.*

[396] See, David Hernandez, *San Diego City Council approves framework for Commission on Police Practices: Council Oks an ordinance that will shape the oversight panel*, SAN-DIEGO UNION-TRIBUNE (Oct. 3, 2022) ("The action came after seven months of bargaining between the City and the San Diego Police Officers Association.")

[397] See, David Hernandez, *San Diego police oversight commission set to convene for first time*, SAN-DIEGO UNION-TRIBUNE (August 21, 2023) (The Commission on Police Practices will need to deal with a backlog and implement rules to carry out investigations).

complete, the Commission will only review cases that allege force, arrest, criminal conduct, discrimination, slurs, search and seizure, and detention that are investigated by SDPD's Internal Affairs Unit and auditing cases that allege violations of courtesy, procedure, service or conduct policies and/or procedures.[398]

2.  <u>San Jose</u>

The City of San Jose is generally known for creating the first broadly mandated municipal independent police auditor program in the United States, in 1993.[399] The San Jose Independent Police Auditor (IPA) was authorized by ordinance "to review the complaint investigations completed by the San Jose Police Department (SJPD), analyze complaint trends and statistics, and review and recommend improvements to SJPD policies and procedures."[400] Thereafter, in 1996, the City Charter was amended to establish the office as a permanent arm of city government.

In November 2020, the City Charter was amended to expand the IPA's review authority to include officer-involved shootings and use-of-force incidents causing death or great bodily injury. The Charter amendment also expanded the IPA's review authority to department-initiated investigations against officers and allowed access to related unredacted records.[401]

The IPA is appointed by the City Council and may serve an unlimited number of four-year terms. The IPA has enormous protection in that removal prior to the expiration of the term can only be made by a resolution adopted by all ten of its members. Removal can only be for "misconduct, inefficiency, incompetence, inability or failure to perform the duties of such office or negligence in the performance of such duties."[402]

The Independent Police Auditor has authority to review Department investigations of complaints against police officers, make recommendations regarding Department policies and procedures, and conduct public outreach.

As of the writing of this assessment, the City of San Jose was actively recruiting for a new police auditor.[403]

---

[398] *Commission on Police Practices*, *supra* note 209.

[399] Although the City of Seattle did create its own independent civilian auditor to audit and review civilian complaint investigations completed by the Seattle Police Department's Internal Investigations Section two years earlier, in 1991.

[400] See, Michael Vitoroulis, Cameron McEllhiney, & Liana Perez, *Civilian Oversight of Law Enforcement: Report on the State of the Field and Effective Oversight Practices* at 12, CMTY ORIENTED POLICING SERVS. (2021) (citing *Seattle: A Call for an Independent Office for Police Accountability*, ACLU OF WASHINGTON (Dec. 9, 2009)).

[401] *San José Measure G - Multi-Issue Charter Amendments*, SPUR.ORG, https://www.spur.org/voter-guide/2020-11/sj-measure-g-multi-issue-charter-amendments (last visited Nov. 19, 2023).

[402] See SAN JOSE, CAL., CITY CHARTER § 809.

[403] *APPLY NOW – Independent Police Auditor – City of San Jose, CA*, MOSAIC PUBLIC PARTNERS, https://www.mosaicpublic.com/post/apply-now-independent-police-auditor-city-of-san-jos%C3%A9-ca (September 29, 2023).

3.      San Francisco

In 1982, the San Francisco Office of Citizen Complaints (OCC) was incorporated into the City Charter as an investigation-focused oversight agency. The OCC was intended to reform how civilian complaint investigations were conducted, with the OCC replacing the police department's Internal Affairs unit as the investigating agency. The OCC was created by an amendment to the San Francisco City Charter (section 4.127) and placed under the direct supervision of the Police Commission.

In 1996, San Francisco was the first to establish a mandatory ratio of internal investigators to sworn officers, requiring the OCC to employ one investigator for every 150 sworn officers employed by the SFPD.[404]

In 2006, however, a performance audit of the OCC by the City controller's office was conducted and identified "weak case management and organizational issues" which were found to have "degraded" OCC's performance. The audit report included 45 recommendations "for the OCC to improve its timeliness in completing investigations, meet standard expectations for performance and management, and improve its community outreach efforts."[405]

In 2016, an amendment to the City Charter renamed the OCC as the Department of Police Accountability (DPA), removed the DPA from the police department's budget and provided the DPA with the power to conduct periodic audits of the SPD. The DPA is staffed by civilians who have never been police officers in San Francisco.[406]

As reported by 21CP Solutions in their 2019 report: "In San Francisco, the Department of Police Accountability has similar powers to the OPA to 'investigate all complaints regarding police use of force, misconduct.' The DPA has the authority to subpoena witnesses under the City and County of San Francisco Municipal Code section 96.6 and it has the authority to issue subpoenas for third party records."[407]

It should be noted that in 2020, San Francisco, as a City and a County, created a new oversight board and an Inspector General position to oversee its Sheriff's Department.[408] However, it has been reported that "[n]early three years after its creation by San Francisco voters, the board established to provide civilian oversight of the San Francisco Sheriff's Department is mired in internal squabbles and has yet to complete its primary task — hiring the person who can investigate misconduct at the department."[409]

---

[404] See, Vitoroulis, et. al., *supra* at note 215 at 50 (citing S.F., CAL., CITY CHARTER § 4.136(c)).
[405] Office of the Controller, *Office of Citizen Complaints (OCC): Weak Case Management and Organizational Issues Degrade OCC's Performance*, S.F. City and County (Jan. 24, 2007), https://www.sfcontroller.org/ftp/uploadedfiles/controller/reports/OCC_012407.pdf.
[406] See, Dep't. of Police Accountability, *About us*, SF.GOV (last visited Nov. 19, 2023), https://sf.gov/departments/department-police-accountability/about; S.F., CAL., CITY CHARTER § 4.136.
[407] 21CP Solutions, *supra* note 3 at 43.
[408] See, *Sheriff's Department Oversight Board*, SF.GOV (last visited Nov. 19, 2023), https://sf.gov/departments/sheriffs-department-oversight-board.
[409] See, Christopher Alam, *Big Delays Hinder Oversight at San Francisco Sheriff's Department*, KQED NEWS (June 30, 2023), https://www.kqed.org/news/11954672/big-delays-hinder-oversight-at-san-francisco-sheriffs-department.

4.    Portland

In 2001, the City of Portland replaced its volunteer Police Internal Investigations Audit Committee (PIIAC) with the Independent Police Review Division of the City Auditor's Office (IPR). The IPR has existed as an audit-focused model of oversight that, over time, received increased authority to conduct independent investigations, respond to and monitor critical incident investigations and make recommendations on the imposition of police discipline. Twenty years into its tenure, on July 1, 2022, the City Charter was changed, placing the IPR under the authority of the City Council.[410]

The IPR Director is invested by the Charter with powers and authorities relating to initiating, monitoring, and conducting investigations, with additional jurisdiction relating to the imposition of discipline and the hiring of a consultant to review closed officer-involved shootings. Civilian oversight in Portland also includes an 11-member Citizen Review Committee (CRC) that has the authority to hear appeals of Internal Affairs investigation findings, recommend policy changes and conduct community outreach. The IPR has jurisdiction over both community and internally generated complaints and can initiate its own complaint investigations as well. The IPR is authorized to issue subpoenas to non-police personnel and further authorized to require police personnel to cooperate in its investigations.

On July 30, 2020, the Portland City Council voted to refer a Charter amendment to the voters of Portland that authorized the creation of a new police oversight system; that Charter amendment was ultimately passed into law on November 3, 2020, with an 82% majority vote.

The Charter amendment authorized the creation of a "Community Police Oversight Board" with the authority to "independently investigate Portland Police Bureau sworn employees and supervisors thereof…, to impose discipline as determined appropriate by the Board, and to make recommendations regarding police practices, policies and directives to the Portland Police Bureau and with a primary focus on community concerns."[411]

The City Council subsequently created a "Police Accountability Commission" (PAC) to "craft and provide City Council with recommendations for the details for establishing a new police oversight system" in accordance with the Charter amendments.[412] As of the writing of this report, the PAC had completed its report to the City Council and submitted it on September 21, 2023. City Council agendized that report for a hearing and passed a resolution in support of implementation of the report's recommendations on November 15, 2023.[413]

5.    Sacramento

The City of Sacramento, California created the Office of Public Safety Accountability (OPSA) to "monitor or independently investigate any other matter as directed by the City council pursuant to

---

[410] PORTLAND, OR., CODE Chap. 3.21 (Office of Independent Police Review).
[411] See, PORTLAND, OR., CITY CHARTER chap. 2, art. 10 § 2-1001.
[412] See, PORTLAND, OR., CITY COUNCIL RES. NO. 37527.
[413] See, PORTLAND, OR., CITY COUNCIL RES. NO. 37637.

section 34 of the charter." Its authority to investigate is not as independent as in other cities in this review, but the OPSA may "as needed, request the City council, or any duly appointed committee of the council, to issue subpoenas as provided in section 34 of the charter. The City council may, by resolution, establish the procedures for the request, issuance, and service of those subpoenas."[414]

In 2020, the mayor added a new position to the OPSA staff, an "inspector general," responsible for reviewing community complaints, monitoring critical incident investigations, and conducting "search and seizure audits." The Inspector General is called out to critical incident scenes and "is supposed to receive access to the same evidence and reports as police investigators." He is then expected to prepare reports in conjunction with the OPSA Director.[415] As stated by the Inspector General: "I will issue findings and possible recommendations, but I can't actually discipline or educate or fire a police officer. That's the role of the City manager."[416]

The OPSA accepts community complaints and then refers those complaints for investigation to the police department's Internal Affairs Division. The case is then adjudicated by the Chief of Police with the OPSA having the ability to "monitor and investigate at any stage and make recommendations when necessary. These recommendations may include additional investigation or re-interviewing involved persons. The OPSA also reviews completed formal investigations for final disposition as recommended by the Police Chief."[417]

The OPSA program also includes the "Sacramento Community Police Review Commission," which was "established to provide community participation in reviewing and recommending police department policies, practices, and procedures, and to monitor the implementation, evaluation and sustainability of city policing initiatives and programs." The Commission consists of twelve City residents who "have not been a past or present police officer and are not current employees of the City of Sacramento." Three positions are appointed by the mayor, eight positions by distinct members of City Council and one by the Personnel and Public Employees Committee" As of the writing of this report, one of the mayoral appointed positions was vacant with the Mayor "accepting applications" for the position."[418]

      6.   <u>Long Beach</u>

The Citizen Police Complaint Commission (CPCC) was created by the City of Long Beach in 2016 and was authorized by City Charter[419] to "administer and investigate, through [an]

---

[414] *Id.*

[415] Karma Dickerson & Megan Camponovo, *Sacramento's inspector general speaks about the work he has done since starting the job*, FOX 40 NEWS (Feb. 9, 2023), https://fox40.com/news/local-news/sacramento/sacramentos-inspector-general-speaks-about-the-work-he-has-done-since-starting-the-job/. Although, the OPSA website does not contain any reference to public reports.

[416] Daniela Pardo & Hannah Poukish, *Sacramento's first inspector general to bring more transparency to policing*, SPECTRUM NEWS 1 (Apr. 23, 2021), https://spectrumnews1.com/ca/la-west/inside-the-issues/2021/04/23/sacramento-s-first-inspector-general-to-bring-more-transparency-to-policing.

[417] See, Office of Public Safety, *Public Safety Complaint Process* (last visited Nov. 19, 2023), www.cityofsacramento.orgOPSA/complaint-process.

[418] See, *Community Police Review Commission* (last visited Nov. 19, 2023), https://boards.cityofsacramento.org/board/2945.

[419] LONG BEACH, CA, CITY CHARTER article XIA.

independent investigator, allegations of police misconduct, with emphasis on excessive force, false arrest and complaints with racial or sexual overtones." The Commission was also authorized to conduct hearings into allegations of police misconduct, issues subpoenas and make recommendations concerning the allegations of misconduct to the City Manager. The Commission was not given the authority, however, to make disciplinary recommendations.

The Commission consists of 11 members, appointed by the Mayor and confirmed by the City Council.

As of December 2022, however, the City Council authorized "a phased transition" of the CPCC to a new Police Oversight Commission, based on a voter-approved Charter amendment, passed in the November 2022 mid-term election. The City reported a six-to-twelve-month transition period needed to establish the new office and recruit and onboard a Director of Police Oversight.[420]

Under the new Charter, the Police Oversight Director will have the authority to "audit police department complaint investigations, review major use of force incidents, make recommendations on police department operations, policies, procedures, and trainings." The Charter provision also created a "Police Oversight Commission," consisting of seven members, appointed by the mayor and confirmed by the City Council, to "provide feedback to the Director" and replace the CPCC.[421]

b.    Comparison Points

The Seattle Accountability Triad of the OIG, the OPA and the CPC, does appear to constitute one of the most robust systems of police oversight in the United States. Although some cities (specifically Cleveland, Ohio[422] and Portland, Oregon) are in the process of creating community commissions that will have the ultimate authority to impose discipline,[423] the OIG-OPA-CPC Triad have, amongst them, more expansive authority, and jurisdiction than the vast majority of other jurisdictions in the nation. Specifically, while most jurisdictions have either "investigation

---

[420] See, City of Long Beach website, at: CPCC (longbeach.gov).

[421] See, LONG BEACH, CA, RES. NO. RES-22-0140.

[422] See, CLEVELAND, OHIO, CITY CHARTER, chap. 25, §§ 115-5 (establishing the Community Police Commission as "an independent municipal commission [with 13 members broadly representative of the racial, social, economic and cultural interests of the community…], with an executive director nominated by the Commission and appointed by the Mayor.") It was adopted by voters of Cleveland on Nov. 2, 2021, but Commissioners were not appointed until December 2022. See, *New, independent Community Police Commissioners officially approved*, Office of the Mayor of Cleveland, https://mayor.clevelandohio.gov/news/new-independent-community-police-commissioners-officially-approved#:~:text=The%20resolution%20adopted%20by%20City%20Council%20is%20effective,Lier%20Audr ianna%20Rodriguez%2C%20Teri%20Wang%20and%20Sharena%20Zayed (Dec. 5, 2022).

[423] The City of Rochester, New York's attempt to give its oversight body authority over police discipline was recently determined to be in conflict with state law and overturned after a successful appeal by the police union. See, Kayla Canne, *Police Accountability Board can't discipline officers, court says. What's next for PRB?* Rochester Democrat & Chronicle (Nov. 20, 2023), https:news.yahoo.com/police-accountability-board-can't-discipline-201620068.html?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuYmluZy5jb20v&guce_referrer_sig=AQAAA B-Us-1vVbAlviZuqZ8jOdcirA9QEdan4xlMuDmoEg338uaWncXLQ3bUxOC-OKe8hWtgcO-L_bUmv4q41biAGIVsYie0cuonNKZV1qwuRYR82xYv_er4b-JtD1VKmryxA8NfhmcInAgaW7PpaJgwrU81n5LH_5CY_znB6uxQZ1Kj.

focused," "review focused," or Auditor/monitor focused" agencies,[424] between the OIG, OPA and CPC, all classifications of oversight are included in Seattle police oversight.

In enacting the 2017 Accountability Ordinance, which created the most recent version of the police accountability structure in Seattle, the City had to address a myriad of decision-points. Key to these decision points was the City's choice of three separate accountability partners, each responsible to the public and to each other, with the ultimate responsibility of monitoring, auditing, and investigating the Seattle Police Department and making recommendations for improvement.

Seattle's City Council ultimately chose the form of oversight we see today, with the OPA, OIG and CPC as partners in oversight each with responsibilities to audit, monitor, investigate and/or collaborate with the SPD and in several respects, audit and assess each other.

Like many other jurisdictions around the United States, the 2020 murder of George Floyd and the ensuing dialogues about policing and police accountability had a significant impact on the then-existing oversight structures of the comparable cities. As described above, each of the described jurisdictions modified their oversight structures with an intent to increase their authority and influence, all in response to community pressure.

Unlike the aforementioned cities, however, Seattle has not significantly changed its oversight structure since its creation by the Accountability Ordinance of 2017. Although the 2020 protests put enormous pressure on the SPD and the Accountability Triad, City leaders did not appear to recognize or identify any significant need for a change in the overall accountability structure, above and beyond the previously identified need to more fully implement the Accountability Ordinance through collective bargaining. OPA managed and adjudicated a huge number of complaints[425] relating to the protests and OIG conducted a "Sentinel review" (in multiple "waves") of policies and police practices and made a number of recommendations that have been accepted and either implemented or in the process of being implemented by the SPD.[426] This work strongly suggests that – on a systemic, programmatic basis – the OPA and the OIG were equipped with the tools needed to effectively complete their work, even under the most challenging circumstances.

In fact, the only other city in the country that appears to be able to boast about having as robust a system of police oversight would be the City of Chicago which has five oversight agencies: the Community Commission for Public Safety and Accountability (described as a policymaking entity), the Chicago Police Board, (primarily responsible for holding disciplinary hearings in cases of police accused of misconduct), the Civilian Office of Police Accountability (COPA) (an investigative focused model of oversight), the Community Policing Advisory Panel (created by the Police Superintendent to help foster community policing) and, a Deputy Inspector General for Public Safety (responsible for enhancing the effectiveness of the public safety system).

---

[424] See, Joseph De Angelis, Richard Rosenthal, & Brian Buchner, *Civilian Oversight of Law Enforcement: Assessing the Evidence*, US DEP'T. OF JUSTICE, OFFICE OF JUSTICE PROGRAMS DIAGNOSTIC CTR., 8 (NCJ Number: 250287) (2016).
[425] See, Nick Bowman, *Accountability group received over 19,000 complaints against SPD from protests in 2020*, MYNORTHWEST (Aug. 19, 2021), https://mynorthwest.com/2824611/opa-complaints-spd-summer-2020-protests/.
[426] See, *Sentinel Event Review, supra* note 21.

The Chicago oversight model, however, has been recently criticized by the former Executive Director of the Chicago Police Board for "being the country's most complex, convoluted process for strengthening community input and holding police accountable."[427]

---

[427] See Mark Iris, *Chicago's process for police accountability and community input is hopelessly convoluted*, Chicago Tribune (February 21, 2023), https://www.chicagotribune.com/opinion/commentary/ct-opinion-chicago-district-councils-police-accountability-20230221-djwcujmf5ja6nmiz7vtxgiszlq-story.html.

# Seattle
# Police
# Monitor

www.seattlepolicemonitor.org