

# Seattle Police Department Use of Force Assessment

February 29, 2024



PO Box 94764
Seattle, WA 98124-7064
oig@seattle.gov | (206) 684-3663
www.seattle.gov/oig

# Contents

*Introduction* ...................................................................................................................................... 4

Ongoing Assessment Goals ................................................................................................................ 4

*SPD Use of Force* ................................................................................................................................ 5

Main Findings .................................................................................................................................... 5

SPD Classification and Documentation of Uses of Force ................................................................... 6

Overall Use of Force Trends .............................................................................................................. 6

    Use of Force by Tool ...................................................................................................................... 8

    Rate of Use of Force per Officer Dispatch ..................................................................................... 8

    Frequency of Force by Officers ...................................................................................................... 9

    Officer and Subject Injuries ......................................................................................................... 11

    Demographic of Force Subjects ................................................................................................... 12

    Use of Force and Behavioral Crisis .............................................................................................. 14

    Demographics of Crisis Contacts Involving Force......................................................................... 15

    Accountability ............................................................................................................................. 16

*Force Review Board Assessment* ..................................................................................................... 21

Force Review Board Meetings.......................................................................................................... 21

    OIG Assessment Goals for FRB .................................................................................................... 22

    OIG Review .................................................................................................................................. 23

    Areas of Assessment ................................................................................................................... 23

        *Facilitation* .............................................................................................................................. 23

        *Presentation of Case* ............................................................................................................. 24

        *Board Discussion* .................................................................................................................... 24

        *Impact of OPA Investigations on Discussion* ......................................................................... 26

        *Referral Process*...................................................................................................................... 26

    Continued Monitoring of Force Review Board................................................................................ 27

FRB Stakeholder Interviews ............................................................................................................. 28

    Overview ..................................................................................................................................... 28

    Methodology................................................................................................................................ 28

    Summary of Interviews ................................................................................................................ 28

        *FRB Process and Respondent's Role* ...................................................................................... 28

        *Evolution of FRB* ..................................................................................................................... 30

        *Current Organizational Structure and Membership* ............................................................... 30

*Process and Procedures* .................................................................................................................. *31*

*Quality of FRB Discussion* .............................................................................................................. *32*

*Impact and Effectiveness of FRB* ................................................................................................... *33*

Conclusions ........................................................................................................................................ 34

*Board Selection and Participation* ................................................................................................. *34*

*Board Facilitation* .......................................................................................................................... *34*

*Board Preparation* ......................................................................................................................... *34*

*Board Procedures* ........................................................................................................................... *35*

**Use of Force in Crowd Management** ................................................................................................... 36

SPD Response to SER Crowd Management Recommendations ............................................................ 36

Communication .................................................................................................................................. 36

Tactics ................................................................................................................................................ 37

Community Legitimacy ...................................................................................................................... 37

**Next Steps** .......................................................................................................................................... 38

Appendix A ........................................................................................................................................... 39

Appendix B ........................................................................................................................................... 48

FRB Process Assessment Tool............................................................................................................ 48

FRB Content Assessment Tool ........................................................................................................... 50

Appendix C ........................................................................................................................................... 53

Interview Protocol: FRB Leadership .................................................................................................. 53

Interview Protocol: Board Chair/Facilitators .................................................................................... 55

Interview Protocol: FRU Sergeant ..................................................................................................... 57

Interview Protocol: FIT Captain ........................................................................................................ 59

Interview Protocol: Board Members .................................................................................................. 61

FRB Interview Protocol: Crisis Officer .............................................................................................. 64

Appendix D ........................................................................................................................................... 65

## *Introduction*

As the City of Seattle transitions from Federal oversight of the Seattle Police Department (SPD) to reliance on its own accountability system, monitoring functions are transitioning to the Office of Inspector General (OIG). OIG has developed qualitative and quantitative methods to assess the ongoing efforts by SPD to ensure constitutional and lawful policing services which promote public trust and officer safety.

In May 2022, the Seattle Police Monitor (the Monitor) submitted a Comprehensive Assessment of SPD to the Federal Court. A significant portion of that assessment focused on SPD use of force between 2019 and 2021. This assessment report provides an update to the Court and to the public on SPD's compliance with the Consent Decree requirements. While many parts of this assessment include updates on information previously provided by the Monitor, it also includes additional methods OIG has incorporated for ongoing oversight and engagement with SPD.

This assessment includes quantitative information about SPD use of force, a descriptive "map" of the force investigation and review process, a qualitative review of the Force Review Board (FRB) process, and an update on SPD Crowd Management policies related to use of force.

Moving forward, rather than relying solely on formal periodic reviews, OIG has developed processes to provide real-time feedback to SPD regarding force investigation and review, as well as mechanisms to provide formal, regular reporting of feedback and recommendations to ensure transparency with community and follow-through by SPD. In furtherance of ensuring uses of force are appropriate and constitutional, OIG will assess whether: 1) force incidents comply with SPD Use of Force policies; 2) SPD continues to thoroughly examine officer uses of force consistent with policy and the terms of the Consent Decree; and 3) use of force reporting, investigation, policies, and review are proper and informed by best practices.

## Ongoing Assessment Goals

OIG has set assessment goals for SPD as follows:

- Policies are sound and are informed by best practices identified by OIG, SPD, the Monitor, and experts in other jurisdictions;
- Officers receive consistent and regular training;
- Use of force incidents are properly documented;
- When identified, bias is appropriately addressed;
- Incidents involving force are properly supervised;
- Uses of force are thoroughly investigated according to policy;
- Force investigation is thoroughly reviewed by the Chain of Command (COC) and Force Review Unit (FRU)/FRB as appropriate;
- Out of policy use of force is addressed by the COC/FRU/FRB and Office of Police Accountability (OPA);
- Information, data, and incidents are transparently handled;
- There is proper and consistent data collection, analysis, and reporting;
- Proper consequences occur for violation of policy or law;
- Robust processes exist to learn organizational lessons around analysis of force incidents; and
- Consistent improvement of crowd management policies, practices, and training in responding to protests.

## SPD Use of Force

This section assesses SPD use of force metrics and processes for investigation and review between 2021 and 2023, with specific focus on updating the Court and Seattle community on SPD use of force practices. To conduct this analysis, OIG reviewed SPD data regarding force incidents, subjects of force, officer and subject injuries, force during crisis events, and OPA data related to force misconduct allegations. To offer consistency in this transition of oversight, this report replicates the previous Monitor's quantitative use of force assessment methods, including use of population demographics in assessing potential disparity. This might not create an accurate account, so future OIG work will focus on exploring other benchmarks aside from Seattle's population for a more accurate analysis. Potential approaches to analyze racial disparity in SPD use of force include area use of force rates, area crime complaints rates, circumstances of presumed race-blindness, and officer and subject shared racial characteristics, among others. Although OIG acknowledges the benefits and drawbacks of the aforementioned benchmarks, they may provide a more nuanced and comprehensive approach to future analyses.

## Main Findings

- 3,686 uses of force occurred between 2021 and 2023.
    - 2021 had the lowest record of uses of force (1,116) since 2015. 2022 and 2023 had the second (1,257) and third (1,323) lowest uses of force, respectively;
    - 2021 had the lowest uses of force Type I (850) and Type II (246) since 2015; and
    - 2023 had the lowest uses of force in Officer Involved Shootings (OIS) (2) since 2015.
- Unknown and not specified race:
    - Unknown race of subjects of force was 20.94% (406) during 2021 to 2023;
    - Unknown race of subjects with complaints of pain increased from 2021 (11.23%, 84) to 2023 (23.17%, 186); and
    - Unknown race of civilians subject to pointing of a firearm increased from 2021(11.48%, 28) to 2023 (28.28%, 97).
- The period from 2021 to 2023 had the lowest record of frequency of force used by officers since 2015.[1]
- 2021 had the lowest count of subjects with injury or complaints of pain (748). 2022 had the lowest count of officers with injury or complaints of pain (109), and 2021 and 2023 had the second lowest counts (113 each).
- Behavioral crisis:
    - 2021 had the lowest rate (1.35%) of use of force since 2016;
    - 2022 and 2023 years had no Type III and no Type III OIS use of force for the first time since 2015; and
    - 2021 had the lowest percentage of Type II force (66.67%) since 2015.

---

[1] SPD began classifying its use of force as a result of the Consent Decree. 2015 was the first year of complete force reporting data.

## SPD Classification and Documentation of Uses of Force

SPD categorizes force according to the severity or significance of the force involved:[2]

- De minimis force: Physical interaction meant to separate, guide, and/or control without the use of control techniques that are intended to or are reasonably likely to cause any pain or injury.
- Type I: Force that causes transitory pain or the complaint of transitory pain.
- Type II: Force that causes or is reasonably expected to cause physical injury greater than transitory pain but less than great or substantial bodily harm.
- Type III: Force that causes or is reasonably expected to cause great bodily harm, substantial bodily harm, loss of consciousness, or death.

SPD records and calculates force data for situations with multiple involved officers, multiple applications of force per officer, and/or multiple objects. SPD counts force statistics based on individual officer use of force reports, with each use of force constituting a combination of a unique officer, unique subject, and unique incident.[3] For example, if three officers use varying applications of force against a single subject during a single event, that would count as at least three uses of force, one per officer reported, and is investigated at the highest level of force used during the incident.

## Overall Use of Force Trends

Figure 1 shows the breakdown of use of force from 2021 to 2023. Of the 1,116 uses of force reported during 2021, 76.16% involved Type I force, 22% Type II, and 1.79% Type III. In 2022, 73.02% of cases involved Type I force, 24.86% involved Type II force, and 2.12% Type III force respectively. Lastly, 2023 had 77.93% Type I force incidents, 21.16% Type II, and 0.91% Type III force incidents.



Source: SPD Data Analytics Platform.

Table 1 and Figure 1 compile SPD's annual force reporting from 2021 to 2023 by level and percentage of total force. Overall, use of force increased 18.55% between 2021 and 2023, mostly due to the steady increase in count and percentage of incidents involving Type I force. 2022 had the highest Type III since

---

[2] SPD Policy Manual, Interim Policy 8.050 Use of Force Definitions.
[3] Seattle Police Department, *Use of Force Annual Report* (2019).

2017. On the other hand, Type III – OIS incidents have significantly decreased in the past three years. For instance, 2023 had the lowest number of incidents (2) since 2017.

As previously described, SPD counts all force statistics based on individual officer use of force reports, with each use of force constituting a combination of unique officer, unique subject, and unique incident. For example, if two officers use force against a single subject in an OIS, the OIS count would be two despite there being only one subject. While this information is important, SPD should also include a separate category of analysis that includes the unique subjects of force in an OIS, so it is clear how many discrete OIS incidents have occurred. The current reporting does not make this distinction easily discernable. SPD should also include whether an OIS resulted in a fatality. SPD should make this information readily available on their public dashboards.

While OIG replicated the Monitor's quantitative use of force methods throughout this report, OIG finds it important to use a different approach in Figure 2. On the left side of Figure 2, OIG counted force incidents which include a combination of unique officer, unique subject, and unique incident. On the right side of Figure 2, OIG counted SPD use of force by individual subject. The right side of Figure 2 provides a clearer portrayal of the individual subjects involved in an OIS.



Source: SPD Data Analytics Platform. Left: counts and percentage based on use of force incidents. Right: counts and percentage based on use of force by subject. Left. 2022 Type 3 – OIS has a duplicate count.

Despite the number of force incidents increasing from 2021 to 2023, SPD's overall use of force has decreased in 2021, 2022, and 2023. For instance, 2021 had the lowest total number of Type I and Type II uses of force since 2015, followed by 2022 with the third lowest Type I and second lowest Type II use of force.

**Table 1. Force Levels by Year, 2021-2023**

| Year | Type I | Type II | Type III | Total |
|------|--------|---------|----------|-------|
| 2021 | 850<br>76.16% | 246<br>22.04% | 20<br>1.79% | 1,116 |
| 2022 | 931<br>73.02% | 317<br>24.86% | 27<br>2.12% | 1,275 |
| 2023 | 1,031<br>77.93% | 280<br>21.16% | 12<br>0.91% | 1,323 |

Source: SPD Data Analytics Platform.

## Use of Force by Tool

SPD tracks the specific techniques and less-lethal tools used during force incidents. Table 2 tabulates the application of less-lethal devices between 2021 and 2023.[4] There was a significant increase in the use of the 40mm launcher during this period. This is likely due to a brief prohibition of the 40mm launcher after 2020, and then a department wide shift to use the 40mm launcher in certain interactions that might otherwise result in lethal force.

| Table 2. Reported Application of Less-Lethal Tools 2021 and 2023. | | | |
|------------------------------------------------------------------|------|------|------|
| Device | 2021 | 2022 | 2023 |
| 40 mm - BIP Round | 4 | 6 | 2 |
| 40 mm Launcher | 5 | 6 | 19 |
| Baton - Expandable - Impact | | 1 | |
| Baton - Expandable - Control/Pressure Point | 1 | | |
| Baton - Straight - Control/Pressure Point | 1 | | |
| Canister - OC | 11 | 2 | 4 |
| Chemical Agent - OC Spray | 4 | 4 | 1 |
| FN303 | 2 | | |
| Pepperball Launcher | 5 | 2 | 2 |
| Bola Wrap (full and partial wrap)[5] | | | 3 |
| Total | 30 | 21 | 31 |

Source: SPD Data Analytics Platform. Counts based on use of force incidents.

## Rate of Use of Force per Officer Dispatch

SPD calculates the rate of force per officer dispatch to scenes, as each officer dispatch represents a potential for use of force. The metric provides some understanding of the frequency of force distributed across SPD scene responses.

---

[4] It is important to note the table shows the count of force applications in each case reported, and there may be multiple applications of force in a single officer use of force report.
[5] SPD discontinued Bola Wrap pilot program in 2023.

Table 3 shows the number of officer dispatches between 2021 and 2023. These dispatches factor into the rates of force shown in the same table. Comparing the number of dispatches with the number of force cases previously discussed in this report produces the rates of force per officer dispatch.

| Table 3. Rates of Force per Officer Dispatch | | | | |
|---|---|---|---|---|
| Year | Officer Dispatches | Force per Officer Dispatch | Intermediate or Serious Force per Dispatch | Serious Force per Officer Dispatch |
| 2021 | 692,631 | 0.16% | 0.038% | 0.003% |
| 2022 | 715,936 | 0.18% | 0.048% | 0.004% |
| 2023 | 746,414 | 0.18% | 0.039% | 0.002% |

Source: SPD's Internal Data Analytics Platform. Intermediate or Serious Force: Type II, Type III, Type III – OIS. Serious Force: Type III and Type III – OIS.

SPD used force at one of the lowest rates on record (overall and at every level) in 2021. 2021 had the second lowest number of officer dispatches per year since 2015. Despite a slight increase in 2022 in comparison with 2021, rates of force per officer dispatch for this period are within the lowest range since 2015. Intermediate or serious force per dispatch and serious force per officer dispatch rates mirror previous years rates.

## Frequency of Force by Officers

Figure 3 summarizes trends in force frequency for officers who were involved in a use of force incident.[6] A large majority of officers who use force do not use it frequently, though a minimal percentage of SPD officers between 2021 and 2023 used force with greater frequency. Of those officers who used force between 2021 and 2023, 37.3% of officers used force once.

---

[6] OIG plans to assess the relationship between use of force and officer assignment, unit, and precinct.



**Figure 3. Frequency of Force by Officer**

| | 1 | 2 | 3 | 4 - 5 | 6 - 7 | 8 - 10 | 11 - 19 |
|---|---|---|---|---|---|---|---|
| 2021 | 164 | 92 | 55 | 58 | 23 | 17 | 3 |
| 2022 | 156 | 89 | 73 | 63 | 34 | 14 | 8 |
| 2023 | 155 | 76 | 63 | 64 | 32 | 25 | 11 |

Source: SPD open data.

Specific officer force frequency for Type II or serious force Type III is depicted in Figure 4. One officer reported using intermediate or serious force six times in 2021. In 2022, the number of officers who reported using intermediate or serious force four or more times increased from six to ten. In 2023, six officers reported using force four or more times. Of those officers that used intermediate or serious force in 2021, 70% used it once. Similarly, of those officers that used intermediate or serious force in 2022 and 2023, 68.26% and 66.83% used it once. Overall, the past three years had the lowest record of frequency of intermediate or serious force used by officers.



**Figure 4. Frequency of Type II and Type III Force by Officer**

| | 1 | 2 | 3 | 4 - 6 |
|---|---|---|---|---|
| 2021 | 129 | 36 | 13 | 6 |
| 2022 | 157 | 46 | 17 | 10 |
| 2023 | 129 | 38 | 20 | 6 |

Source: SPD open data.

## Officer and Subject Injuries

Table 4 shows injury or complaints of pain resulting from uses of force. The following analysis counts **any complaint of pain** as an injury. The underlying nature of these occurrences ranged from relatively minor complaints of pain to substantial bodily harm.

In 2021, out of the total uses of force with injuries reported, subjects' injury rate was 67.03% and officer injury rate was 10.13%. While overall complaints of pain increased by 7.88% from 2021 to 2023, subject injury rate (61%) and officer injury rate (8.54%) decreased.

Since 2015, subject injury rates ranged from a low of 44% in 2015 to a high of 71% in 2018.[7] For 2021 to 2023, rates of subjects with complaints of pain were within range of previous years. Regarding officer injury rate, the lowest rate was 7% in 2018 and the highest was 13% in 2020. As with subject injury complaints, officer injury rates are also within range of previous years and have decreased in frequency.

**Table 4. Use of Force with Injury or Complaints of Pain**

| Year | Subject Injured | | Officer Injured | | |
| | Count | Rate | Count | Rate | UoF |
|---|---|---|---|---|---|
| 2021 | 748 | 67.03% | 113 | 10.13% | 1,116 |
| 2022 | 790 | 61.96% | 109 | 8.55% | 1,275 |
| 2023 | 807 | 61.00% | 113 | 8.54% | 1,323 |

Source: SPD Data Analytics Platform. Injuries related to uses of force

Total subjects' injury or complaints of pain were the lowest recorded in 2021. Since 2015, injury or complaints of pain ranged from lows of 896 in both 2017 and 2019 to highs of 1,610 in 2018.[3] The lowest count of officer injury or complaints of pain was reported in 2022, followed by 113 reports in 2021 and 2023, the second lowest record since 2019.

Figure 5 shows use of force with injury or complaint of pain by subject race. A higher percentage of white subjects were reported to be injured or complained of pain during force encounters during the past three years, followed by Black subjects.

---

[7] Comprehensive Assessment of the Seattle Police Department, 2022. Since January 2019, handcuffing discomfort is separately tracked from Type I use of force.



Source: SPD Data Analytics Platform. Based on Injured subject count.

Between 2021 and 2023, individuals with recorded unknown race[8] had the third highest rates of injury or complaints of pain. While rates of injury or complaints of pain for white, Native Hawaiian/Other Pacific Islander and two or more races decreased from 2021 to 2023, rates for Black individuals increased by 3.98% and rates for individuals with unknown or not specified race increased by 11.94% in the same period.

## Demographic of Force Subjects

Table 5 shows uses of force by race from 2021 to 2023 as well as Seattle race estimates. White individuals were the most frequent subjects of force, followed by Black, and unknown race. While Hispanic/Latino subjects were involved in 7.32% (142) of all use of force incidents, they were subjects of force in 7.69% (1) of Type III-OIS and 11.76% (2) of Type III: Other force incidents. Black subjects were the most frequent subjects of Type III and OIS incidents including OIS, followed by unknown race, and white subjects.

Table 5 indicates where rates of force are higher for a racial/ethnic group than their percentage of the Seattle population. The information in this table is not sufficient to draw conclusions of bias. Besides Black, American Indian/Alaska Native and Native Hawaiian/Other Pacific Islander, subjects are represented less in the population of force subjects than their comparative share of the Seattle population. Black subjects' representation is higher in all types of force, particularly for Type III uses of force (both OIS and other serious uses of force).

---

[8] SPD is aware of the unknown race issue raised in this report and are in the process of working to understand and resolve the issue.

**Table 5. Use of Force by Race 2021-2023 combined**

| Race | Pop | Total | | Type I | | Type II | | Type III: OIS | | Type III: Other | |
|------|-----|-------|--|--------|--|---------|--|---------------|--|----------------|--|
| White | 63.60% | 673 | 34.71% | 536 | 33.71% | 200 | 36.68% | 4 | 28.57% | 4 | 23.53% |
| Black | 6.70% | 613 | 31.61% | 505 | 31.76% | 171 | 33.08% | 3 | 21.42% | 7 | 41.18% |
| Hispanic | 7.50% | 142 | 7.32% | 112 | 7.04% | 34 | 6.58% | 1 | 7.14% | 2 | 11.76% |
| Asian | 16.80% | 59 | 3.04% | 48 | 3.02% | 16 | 3.09% | | | | |
| Am Indian | 0.60% | 35 | 1.81% | 29 | 1.82% | 8 | 1.55% | | | | |
| NPI | 0.20% | 23 | 1.19% | 19 | 1.19% | 9 | 1.74% | | | | |
| Two or More Races | 9.40% | 8 | 0.41% | 7 | 0.44% | 2 | 0.39% | | | | |
| Not Specified | | 406 | 20.94% | 352 | 21.14% | 83 | 16.05% | 6 | 42.85% | 4 | 23.53% |

Source: SPD Data Analytics Platform. US Census Bureau, retrieved Feb, 2024. Counts based on use of force by subject. Multiple types of force can be applied to a subject. The OIS data includes a duplicate case and a case where two race categories were counted.

Figure 6 visualizes changes between 2021 and 2023 in racial classification of uses of force. The counts of Type 1 and Type 2 subjects of force remained steady for white and Asian populations, while counts of force against Black, Hispanic/Latino, and other minorities increased.



Source: SPD Data Analytics Platform. Data was retrieved in Feb 2024. Counts based on use of force by subjects.

Pointing of a firearm has reduced between 2021 and 2023, and over the course of the Consent Decree. Figure 7 shows pointing of a firearm categorized by subject race. Black subjects are still most likely to be

subject to pointing of a firearm, despite not being subjects of force as frequently as white or unknown race persons (See Figure 6 and Table 5). In 2021, 11.48% of force subjects were reported as an unknown race. This percentage increased to 28.28% in 2023.



**Figure 7. Pointing of Lethal Firearms by Race of Subject.**

Source: SPD Data Analytics Platform. Counts based on use of force incidents.

## Use of Force and Behavioral Crisis

Table 6 summarizes the rates and counts of use of force incidents by SPD in crisis contacts. In 2021, SPD responded to 10,503 behavioral crisis incidents, followed by 10,082 in 2022 and 9,833 in 2023. SPD used force in approximately 1.42% of crisis contacts between 2021 and 2023. 2021 had the lowest rate of use of force in crisis contacts since 2016.

| Table 6. Use of Force in Behavioral Crisis | | | | | | |
|---|---|---|---|---|---|---|
| | **2021** | | **2022** | | **2023** | |
| **UoF** | **Count** | **Rate** | **Count** | **Rate** | **Count** | **Rate** |
| No | 10,361 | 98.65% | 9,935 | 98.54% | 9,688 | 98.53% |
| Yes | 142 | 1.35% | 147 | 1.46% | 145 | 1.47% |
| | **10,503** | | **10,082** | | **9,833** | |

Source: SPD Data Analytics Platform. Behavioral crisis count.

Figure 8 presents the count and rate of use of force in behavioral crisis by force type. Rates are determined by the type of force and the number of crisis contacts where force was used. No Type III uses of force were reported in 2022 and 2023, marking the first years with no Type III force in crisis incidents

since consistent data collection began in 2015. The lowest percentage of Type II force was reported in 2021 (66.67%).[9]



Figure 8. Type of Use of Force in Behavioral Crisis

Source: SPD Data Analytics Platform. Counts based on use of force incidents.

## Demographics of Crisis Contacts Involving Force

Figure 9 depicts the race of subjects of force in behavioral crisis. Between 2021 and 2023, more than 60% of force in crisis contacts involved white subjects, around 30% involved Black subjects, and the rest involved subjects of other races. Between 4.23% and 9.66% crisis contacts were documented as unknown or not specified race. Contacts with race listed as unknown increased 5.43% from 2021 to 2023.

---

[9] These numbers reflect the data that was retrieved by OIG on January 12, 2024. These numbers are subject to changes and revision by SPD.



Source: SPD Data Analytics Platform. Based on behavioral crisis count.

## Accountability

OPA investigates misconduct allegations. A misconduct investigation case refers to a unique event which is under investigation for one or more allegations of misconduct. Investigations data is available for public inspection on the City of Seattle's open data portal. The following visualizations are presented by case and allegation.

Figure 10 depicts misconduct investigation cases involving use of force in the past nine years. The highest levels on record within that period were reported in 2018 (184) followed by 2020 (181). The number of force-related misconduct investigations opened between 2021 and 2023 are the lowest since 2015.



Source: SPD Data Analytics Platform - OPA investigations data. Based on received date for allegations due to more complete data than is available for incident date.

OPA tracks allegations of use of force policy violations in four categories: inappropriate use of force, de-escalation, reporting, and investigation. Figure 11 tabulates the number of cases involving these force

allegations between 2021 and 2023. There were no allegations related to force investigations reported in 2023. Note the total number of cases listed on Figure 11 is greater than the total listed on Figure 10, as one case related to use of force may have multiple different allegations related to force.



Source: SPD Data Analytics Platform: OPA investigations data. Based on received date for allegations due to more complete data than is available for incident date.

Figure 12 shows the number of force-related misconduct allegations over the past three years. These numbers are higher than the counts of cases above, as one case can involve multiple allegations against different officers. 2021 had the highest number of total allegations due to the high number of allegations of inappropriate use of force (Force – Use). The numbers for total allegations related to use of force decreased in the years 2019 to 2023, with the exception of 2020, due to all other categories decreasing. Figure 12 will change as outstanding cases are resolved for 2023 and data becomes available.



Source: OPA open data. Based on received date for allegations due to more complete data than is available for incident date.

Figure 13 tabulates the number of sustained allegations in use of force investigations. The years between 2021 and 2023 recorded the lowest number of sustained force allegations.[10] Figure 13 will change as outstanding cases are resolved for 2023 and data becomes available.

---

[10] Note this data was retrieved in January 2024.



Source: OPA open data. Percentage of sustained allegations in parentheses. Based on received date for allegations due to more complete data than is available for incident date.

Figure 14 provides counts of misconduct investigations with sustained allegations between 2015 and 2023. Consistent with the graph above, 2017 and 2020 had the highest totals of sustained findings on record in the past nine years. The lowest number of sustained cases since 2016 were reported between 2021 to 2023.[11]



Source: SPD Data Analytics Platform: OPA investigations data. Based on received date for allegations due to more complete data than is available for incident date.

Figure 15 shows the percentage of use of force allegations resulting in sustained or not sustained findings between 2021 and 2023. For completed cases, OPA sustained findings in 3.87% of use of force allegations and delivered not sustained findings for 69.24% of cases. The remaining cases were listed as

---

[11] Some cases may remain pending for 2023 as of the generation of this analysis in January 2024.

"Resolved Outside of OPA Investigation" and were all considered resolved through Supervisor Action.[12] 2023 reported the lowest percentage of sustained cases since 2017. Some cases may still be open as of the end of 2023.



Source: SPD Data Analytics Platform: OPA investigations data. Based on received date for allegations due to more complete data than is available for incident date. Other category indicates active cases within OPA.

Of the not sustained allegations between 2021 and 2023, OPA found 75.38% of force related allegations were Lawful and Proper or did not occur as alleged (44.16% and 31.22%, respectively). OPA found 7.61% of allegations Inconclusive, and 13.45% of allegations were resolved through Training Referral. 2022 had the lowest number of not sustained use of force allegations in this nine-year period.

---

[12] Supervisor Action resolution is used when a complaint involves a minor policy violation or performance issue that is best addressed through training, communication, or coaching by the employee's supervisor. In these instances, OPA sends a memo mandating the employee's supervisor to take specific, relevant action with the employee.



Figure 16. Percentage of Use of Force Allegations not sustained by OPA, over the years and 2021-2023 combined

Percentage of Use of Force 2021-2023 combined.

Source: SPD Data Analytics Platform: OPA investigations data. Based on received date for allegations due to more complete data than is available for incident date.

2021-2023 continued the overall trend of force decreasing. For instance, 2021 had the lowest record of uses of force in this nine-year period, and 2022 and 2023 had the second and third lowest uses of force, respectively.  Furthermore, the period from 2021 to 2023 had the lowest record of frequency of force used by officers since 2015. Use of force during crisis contacts were at the lowest rate in 2021. 2022 and 2023 had no Type II use of force on crisis contacts for the first time since 2015.  Unknown and not specified race designations in reporting have increased in the past three years. Rates of unknown race of subjects of force, subjects with complaints of pain, and civilians subject to pointing of firearm have increased more than ten percent.

## Force Review Board Assessment

The Force Review Board (FRB) is a group of SPD personnel who meets regularly to review use of force cases and make determinations as to (1) whether a use of force investigation is thorough and complete and (2) whether the force was consistent with SPD policy, training, and core principles. The FRB may provide feedback and recommendations. The goal of the FRB is continual improvement of SPD use of force practices and ensuring the Department remains updated on evolving best practices.

The FRB is composed of standing members selected by the Assistant Chief of the Professional Standards Bureau (PSB). Only standing members of the FRB may participate in the deliberations and vote during Board sessions. Standing members include one representative from the Training Section, three representatives from the Patrol Operations Bureau, one representative from the Policy & Research Section, and one representative from the Investigations Bureau. A quorum of four voting members must be present for the Board to review completed investigations. The Captain of the Force Review Unit (FRU) (or Assistant Chief of PSB in the case of an OIS review) is the standing Chair and casts the final vote if the Board's vote is evenly split. Other observers to the FRB may include the Department's Executive Director of Legal Affairs, the Office of the Inspector General, and a representative from OPA. These observers may attend FRB meetings, but they are not permitted to vote.

The FRB includes a non-voting participant from the Crisis Intervention Team (CIT) to assist the FRB in determining if an officer used "best practices" in de-escalation. Where appropriate, subject matter experts from specialty units (e.g. Canine, SWAT, Communications, or the Range) are asked to attend an FRB to answer specific questions requiring expertise that may arise.

Case selection for the FRB is determined by policy and handled by the Force Review Unit (FRU). All completed use of force investigations are forwarded to the FRU. These cases include Type I, Type II, Type III uses of force, and firearm discharges.

By policy, the FRB reviews all Type III cases. The FRU reviews all Type II use of force reports and sends Type II cases for review by the FRB when any of the following factors are involved:

- Possibility of misconduct;
- Significant policy, training, equipment, or tactical issues;
- When FIT was contacted for consultation and declined to respond or investigate;
- When less-lethal tools were used on the subject;
- When a canine makes physical contact with the subject;
- When the subject is transported to an emergency room.

FRU staff and FRB members undertake the same inquiry and apply the same standard of review when reviewing cases. FRU staff and FRB members attend the same annual training on the objective analysis of force. All cases not selected for FRB review are reviewed by the FRU detectives and their chain of command. The FRU captain makes the final determination based on the FRU's reviews and recommendations.

## Force Review Board Meetings

The FRB is tasked with conducting a timely, comprehensive, and reliable review of select Type II use of force cases referred by the FRU, and of all Type III use of force cases including OIS.

The FRB determines:

- Whether the investigation is thorough and complete;
- Whether the force was consistent with SPD policy, training, and core principles; and
- Whether, with the goal of continual improvement, there are considerations that need to be addressed regarding: de-escalation, supervision, equipment, tactics, training, policy, or department best practices.[13]

FRB members have the following responsibilities:

- Review the relevant materials for each use of force to determine whether the COC appropriately identified any deficiencies and whether appropriate corrective action was taken;
- Confirm that uniform standards were applied in any uses of force and monitor all aspects of the department's use of force with the goal of continual improvement;
- Identify instances, trends, or patterns of deficiencies regarding policy, training, supervision, equipment, or tactics;
- Assess the wellness impact of involved and witness officers and their treatment during the use of force investigation and reporting; and
- Assess the impact of the incident on community trust and efforts taken to mitigate the impact.[14]

The six standing FRB members are tasked with voting on the following aspects of each case:

- Tactics and decision-making;
- De-escalation;
- Compliance with SPD use of force policies;
- Communications;
- Supervision; and
- COC review and investigation.

All FRB determinations require a majority vote.[15] Board members are expected to vote "yes," "no," or "not feasible." The votes recorded in the Findings template and detailed in the Findings document.

## OIG Assessment Goals for FRB

OIG provides ongoing and periodic evaluation and feedback about the FRB process to the FRB Chair and Bureau Chief, with the following assessment goals:

- Proper facilitation by FRB Chair;
- Thorough presentation;
- Adequate identification and discussion of issues;
- Thorough discussion;
- Robust evaluation and discussion of crisis elements, response, and opportunities for de-escalation;
- Identifying and addressing issues properly, especially COC;
- Proper referral of issues to OPA, COC, Training, or other appropriate entity;
- Robust feedback to COC/Force Investigation Team (FIT);

---

[13] SPD Policy Manual, Interim Policy 8.500 Reviewing Use of Force, POL-4 Force Review Board, Section 1.
[14] SPD Policy Manual, Interim Policy 8.500 Reviewing Use of Force, POL-4 Force Review Board, Section 1.
[15] SPD Policy Manual, Interim Policy 8.500 Reviewing Use of Force, POL-4 Force Review Board, Section 7.

- Meaningful dissemination of lessons learned/findings/outcomes to SPD;
- Follow-up/implementation of Board actions;
- Proper assessment of investigation quality;
- Transparency of process and decisions to community; and
- Inclusion of community perspective.

OIG strives to deliver timely feedback after each FRB session to the FRB Chair and staff regarding the assessment goals. This immediate feedback provides the FRB Chair the opportunity to make timely adjustments, if needed.

## OIG Review

The Inspector General and certain OIG staff attend FRB meetings to observe the deliberations and monitor ongoing fidelity to the Consent Decree. The mode of FRB assessment has been an iterative process, evolving from the use of an assessment tool (Appendix B) to a more general assessment framework that helps OIG identify trends and areas for suggested improvement. At the end of 2023, OIG formally incorporated a debrief meeting with the Board Chair and other SPD leadership after each FRB meeting. These meetings provide a forum for immediate discussion of OIG feedback.

## Areas of Assessment

### Facilitation

The Board Chair facilitates and guides discussion, ensuring adherence to FRB protocol and parameters. The Chair is expected to begin each meeting by framing the values, expectations, and parameters for engagement, and solicit input from OIG and OPA following discussion of each case. OIG observes whether the Chair adheres to the FRB guidelines by discouraging Board members from guessing or assuming an officer's mindset, encouraging the sharing of minority opinions, and creating an environment that is hospitable to critique. If a Board member deviates from protocol, OIG notes whether and how the Chair redirects the discussion. OIG evaluates the efficacy of the Chair's facilitation, including whether they refrain from asking leading or anchoring questions and adequately explore the necessary aspects of the case. OIG also observes whether the Chair appropriately identifies and addresses any bias within the discussion.

Since 2022, OIG has observed six Board Chairs facilitate Board meetings for Type II uses of force, Type III uses of force, and OIS incidents.[16] Despite differences in facilitation styles, each Chair generally starts the meeting by reading from a script that frames the values, expectations, and parameters for engagement. The Chair usually seeks input from OIG and OPA following the discussion of each case. OIG finds Chairs generally adhere to the guidelines discouraging making assumptions about an officer's mindset and appropriately redirect the conversation when a member deviates from these guidelines.[17]

---

[16] OIG has observed three Chairs facilitate Type II and III Boards: The former Chair, a temporary replacement, and the current Chair. OIG has observed two Chairs facilitate OIS Boards: The Chief of the PSB and a temporary Assistant Chief. Additionally, the Lieutenant of the FRU occasionally chairs Type II, III, and OIS Boards when needed.

[17] The importance of preventing speculation about the mindset of an officer or making assumptions about decision-making or evidence cannot be overstated. Analysis of a use of force necessarily must explore the officer's reasoning, in the moment, for the need to use force. Speculating about why an officer used force does not allow for the evaluation of whether the officer actually had a legal basis to use force in the situation, and it likely flags a deficiency in the underlying investigation that made speculation necessary rather than relying on the officer's own statement about the rationale for force used.

Some variation was noted in the thoroughness of discussion across meetings which reflects observed differences in facilitation. The most robust discussions are observed when Board Chairs ask open-ended questions not anchored in opinion or pre-drawn conclusion. This approach fosters discussion and provides a space where differing opinions and ideas can be shared. When a facilitator shares their opinion before members discuss a matter or phrases questions in a way that signals a viewpoint, OIG has seen conversations limited or foreclosed, with members primarily agreeing with the position of the Chair or being less willing to offer critical comments or explore alternative opinions.

## Presentation of Case

Case presentations by Board members should be objective and include all relevant facts and video footage. The case presentations consistently meet these standards. During FIT presentations for Type III uses of force, the FIT Captain includes whether the involved officers were CIT-trained and certified. This component is not included in the presentations for Type II reviews. Including this information, as well as additional details regarding what officers knew before and during crisis interactions, would allow the Board to engage in a more thorough discussion of crisis response issues.

## Board Discussion

### Investigation and Chain of Command Review

In this component of the review, the Board is expected to discuss whether the on-scene investigations are thorough and complete and to identify any gaps that may exist. The Board is expected to discuss the COC review and whether the COC identified any deficiencies in training, equipment, or supervision.

OIG finds Board members' discussion on these topics to be thorough and complete. When any deficits in the on-scene investigation or COC reviews are identified, the Board issues appropriate referrals via FRB Actions, Lessons Learned, or a referral to OPA.

### Tactics

The Board is expected to discuss whether there were sufficient personnel and supervision on scene, the appropriateness of approach and time used to plan, the availability of less lethal tools, and communication amongst officers. Much of the Board's overall discussion is dedicated to the topic of tactics. The tactics discussions are thorough and substantial time is spent discussing whether officer's actions align with policy, training, and best practices.

### De-Escalation

SPD policy defines de-escalation as "Taking action to stabilize the situation and reduce the immediacy of the threat so that more time, options, and resources are available to resolve the situation."[18] According to policy, the goal of de-escalation is to "gain the voluntary compliance of subjects, when feasible, and thereby reduce or eliminate the necessity to use physical force."[19] The policy encourages officers to utilize communication, time, distance, and shielding for de-escalation.

Because the definition of de-escalation, both by policy and in usage by Board members, encompasses so many facets, the discussion does not always include thorough attention to each component. The de-scalation discussion focuses primarily on opportunities to stabilize a situation using time, distance, and shielding techniques.[20] The communication component generally receives less discussion, though SPD

---

[18] SPD Policy Manual, Interim Policy 8.050 Use of Force Definitions.
[19] SPD Policy Manual, Interim Policy 8.050 Use of Force Definitions.
[20] SPD Policy Manual, Interim Policy 8.100 De-Escalation.

trains officers to calm subjects using verbal and non-verbal communication strategies to gain compliance without the need for force. It would improve the quality of discussion if all components received thorough attention in the review.

OIG suggests restructuring the Findings template to better guide evaluation of de-escalation. The Board should begin by discussing whether officers made reasonable efforts to de-escalate a situation. If the Board concludes reasonable efforts were made, discussion should center around whether those efforts were successful. If the Board feels officers did not make reasonable efforts to de-escalate, the Board could examine whether officers were hindered by concerns for safety, lack of feasibility, or other legitimate issues. Barring a legitimate reason for not making efforts to de-escalate, the Board might conclude proper de-escalation attempts were not made. Moving away from the limited yes/no/not feasible vote to a framework that allows for consideration of nuanced factors that impact de-escalation would provide better discussion opportunities for the Board and learning opportunities for the department.[21]

OIG also notes the Board's conversations around de-escalation communication and crisis intervention intersect substantially. While the Board routinely discusses de-escalation tactics, the discussion of de-escalation communication is often missing or limited when there is not a perceived crisis component.[22]

Crisis

A Sergeant or other representative from the Crisis Response Unit (CRU) serves as a subject matter expert at FRB meetings to provide input on crisis response and de-escalation. OIG notes whether this information includes identification of a subject's crisis history, the on-scene officers' knowledge of a subject's crisis history, and the relevance of that history. OIG also assesses the Board's discussion (or absence thereof) of:

- CIT-trained communication options used with subjects,
- opportunities to modulate tactics based on known or observed crisis information,
- how those modified tactics impact the outcome of an incident, and
- whether officers explored alternative crisis resources to resolve a situation.

There are areas where the crisis conversation could be bolstered. CRU officers begin by identifying whether the subject was known to the department to have crisis history, but this should also include what officers knew of a subject's crisis history at the time of the incident so the Board can assess whether and how that knowledge impacted their decision-making. In the absence of knowledge about a person's crisis history, the Board should discuss whether an officer's response was appropriate if a subject presented as possibly having a mental health condition or experiencing a crisis. Crisis information not known to the scene officers should not be considered when reviewing decisions of scene officers at the time of incident. OIG would encourage more discussion about whether CIT-trained tactics are used (when appropriate) and how they impacted the outcome of an interaction. OIG will continue to monitor this aspect of the FRB discussion through ongoing assessment of FRB and in future Crisis Assessments.

---

[21] OIG has discussed this suggested change with SPD. SPD is currently working on revisions to the de-escalation portion of the FRB template.

[22] It should be noted that at the time of publication of this report, FRU leadership has already begun working with SPD on changing the de-escalation question and format on the Findings document to foster a more thorough and robust discussion.

Officer Wellness

The Board's discussion of officer wellness and the impact of the interaction on involved officers focuses primarily on any injuries to officers during the interaction, or the potential for injuries based on tactics used. The discussions are thorough, particularly in identifying ways to avoid future injuries. In OIS cases, the Board discusses an officer's treatment at the scene and whether appropriate mental health and peer support are provided to involved officers post-incident. In these discussions, the Board notes measures taken to support officer wellness such as finding a safe place for officers to stay while awaiting an interview and the speed with which they are photographed so they can change their clothing. Additional information about whether the officer felt appropriately supported might be helpful to the Board to better assess SPD efforts.

## Impact of OPA Investigations on Discussion

SPD policy states "the FRB may review, discuss, and make recommendations to matters under OPA investigation, but will not make a final determination on these matters, unless requested by the OPA Director."[23] Board Chairs regularly outline this policy and voting restrictions at the outset of FRB meetings, however, the level of discussion varies based on the Chair. It appears this lack of uniformity is based on differing understanding of how OPA investigations impact what can be discussed and to what degree. OPA should provide adequate information to the Board to allow for discussion and deliberation, and to provide necessary resources for the Board regarding allegations under investigation, so the Board understands any limitations on voting.

## Referral Process

For each case, the Board can make referrals to address lapses identified in the review. OIG finds that FRB appropriately addresses identified issues by making proper referrals and recommendations. Serious policy violations are referred by the Chair to OPA.[24] Referrals concerning policy, equipment, and training issues are sent as an FRB Action by the FRB Chair to the Assistant Chief (AC) of the PSB.[25] Policy provides that the AC of the PSB will, as appropriate, forward any policy, equipment, or training referrals as FRB Actions from the Board to the appropriate bureau chief or section for review and implementation. Individual training recommendations are to be referred as FRB Actions to the COC of the involved officer for follow up.[26] The follow-up options are:

1. No further action;
2. Performance Appraisal System (PAS) entry;
3. Refer to COC for counsel;
4. Refer to training;
5. Refer to OPA;
6. Refer to other.

Although not outlined in policy, the Board also issues Lessons Learned, which are shared more broadly with the department.

---

[23] SPD Policy Manual, Interim Policy 8.500 Reviewing Use of Force, POL-4 Force Review Board, Section 11.
[24] SPD Policy Manual, Interim Policy 8.500 Reviewing Use of Force, POL-4 Force Review Board, Section 10.
[25] SPD Policy Manual, Interim Policy 8.500 Reviewing Use of Force, POL-4 Force Review Board, Section 13.
[26] SPD Policy Manual, Interim Policy 8.500 Reviewing Use of Force, POL-4 Force Review Board, Section 13.

The PSB maintains records of FRB recommendations and their status.[27] While the PSB maintains the required record, it would also be useful to track potential patterns or trends in referrals. The Board currently does not receive any follow-up on implementation of recommended Actions. It would be beneficial for the Board to see the impact of their review and referrals on use of force practices. OIG suggests a single location to house FRB Actions and Lessons Learned, along with Findings documents, which is accessible to Board members and, potentially, others in the Department.[28] Widespread sharing of the insight gained in FRB discussions could add to the collective knowledge and expertise of officers and would better serve the FRB's goal of continual improvement of use of force practices. Developing a means to share these actions and outcomes with the public would benefit ongoing efforts related to transparency, accountability, and trust.

## Continued Monitoring of Force Review Board

OIG finds that FRB consistently completes a thorough review of the cases. Overall, FRB identifies any issues in the use of force, including whether force complies with policy and training, whether force reporting is consistent with policy, and whether the COC consistently complies with policy and identifies any noncompliance. OIG has observed that FRB consistently makes appropriate recommendations or referrals for corrective actions. OIG finds the current structure and processes of the FRB to be in line with the requirements of the Consent Decree, and notes the following areas where the FRB process could be improved:

- New Board Chairs should receive formal training in meeting facilitation.
- Case presentations should always include whether involved officers are CIT-certified, any relevant crisis information the officers had at the time of the incident, and if/how officers modulated tactics based on that information.
- Board discussions of de-escalation should always thoroughly assess involved officers' communication efforts with the subject and the relative effectiveness, with as much focus and attention as is paid to the use of time, distance, and shielding.
- The Board should examine officers' use of CIT-trained communication and tactics and whether officers modulated their decision-making and tactics based on what they knew at the time of interaction. If there is not appropriate modulation or application of CIT principles, the Board should discuss what officers could have done differently and whether those tactical differences were available to them at the time.
- OPA should provide adequate information to the Board to allow for discussion and deliberation, and to provide necessary resources for the Board regarding allegations under investigation, so the Board understands any limitations on voting.
- SPD should develop a mechanism for sharing a periodic summary of the outcomes and impacts of FRB Actions and Lessons Learned within the department and with external stakeholders.[29]

OIG will continue to monitor FRB meetings with attention to the areas outlined above. OIG will provide real-time feedback to FRB leadership, and work collaboratively to identify areas for further review by

---

[27] SPD Policy Manual, Interim Policy 8.500 Reviewing Use of Force, POL-4 Force Review Board, Section 13. "The PSB will maintain a record of all recommendations and their status."
[28] Currently, Lessons Learned are shared on the internal SPD homepage and FRB Actions are distributed to the COC via Blue Team.
[29] OIG acknowledges that some FRB Actions relate to a particular officer and the details of some outcomes may need to be aggregated to comply with relevant personnel rules.

OIG. Formalized feedback regarding FRB will be provided to SPD in periodic reports, with a summary in the OIG annual report.

# FRB Stakeholder Interviews

## Overview

OIG conducted in-depth, semi-structured interviews with various SPD stakeholders for this assessment. Respondents were asked about their role on the FRB, the FRB process, and its effectiveness. This section outlines the perspectives and experiences of interview respondents, and, as such, does not represent the views of the FRU, SPD, or OIG.

## Methodology

OIG requested interviews with seventeen current FRB stakeholders and conducted interviews with thirteen. The following is a breakdown of the respondents OIG interviewed:

- Seven standing Board members (representing the Investigations Bureau, Patrol Operations Bureau, Training Section, and Audit, Policy and Research Section)
- One alternate Board member with experience as a standing Board member
- Four members of leadership from the:
  - FRB (i.e. current Board Chairs)
  - FRU
  - FIT
- One representative from the CRU

The standing Board member respondents represent 70% (7) of all standing Board members. Board member respondents (including the alternate) have served anywhere between seven months and six years on the FRB, with most serving between two and three years.

Questions to Board members and FRU and FRB leadership focused on the respondent's perceptions of:

- Their roles and responsibilities and the goals of the FRB;
- The evolution of the FRB and specific changes to the process;
- The impact of Board facilitation;
- Process and procedures such as training and meeting preparation, FRB Actions, and limitations on discussion of cases under OPA investigation;
- The quality of the various Board discussions; and
- The overall effectiveness and impact of the FRB.

FRU and FRB leadership were asked about the current organizational structure and membership, including how FRB members and Chairs are selected to participate in FRB. FIT leadership were asked about the FRU-FIT relationship, and the CRU representative was asked about the impact of the crisis component of FRB discussion and their suggestions for improving the crisis discussion.

## Summary of Interviews

### FRB Process and Respondent's Role

FRB Process and Goals

Overall, Board members' and leadership's responses regarding the FRB process and goals emphasized FRB's role in:

- Thoroughly evaluating tactics, equipment, training, decision-making, and policy to identify problems, gaps, and areas for improvement, as well as to provide feedback and make recommendations;
- Ensuring SPD is using force consistent with law and policy; and
- Contributing to the continual improvement of departmental use of force practices.

Less common but still notable responses that emerged were FRB's role in:

- Ensuring all parties reviewing use of force, especially the Chain of Command, are in compliance with reporting and review requirements;
- Providing public transparency in the use of force review process;
- Ensuring consistent application of force across all precincts; and
- Serving as a mechanism for organizational and individual accountability.

Also mentioned was FRB's role in imparting police legitimacy by helping SPD grow and change, and in lessening departmental liability by identifying and responding to problems before they escalate.

Board Member Role, Responsibilities, and Qualities for Effectiveness

In describing their role and responsibilities and what they considered to be important qualities for being effective on the FRB, Board members responses fell into four main themes: (1) knowledge of SPD policy and procedures and staying informed about best practices; (2) experience—particularly a broad range of experience in different units; (3) a willingness to "speak their mind" when discussing difficult topics, regardless of whether others on the Board agree with those views or not; and (4) the ability to practice objectivity and impartiality in case review. Some leadership respondents similarly emphasized the importance of Board members being neutral and objective, as well as their willingness to provide critical feedback and to disagree with other members when necessary.

Other qualities important to Board members include: (1) willingness to surface and discuss issues overlooked by supervisors and others; (2) knowledge of departmental goals and objectives; (3) willingness to listen to others without judgment; and (4) an understanding of community expectations and how officers' actions influence public perceptions.

Board Chair Role, Responsibilities, and Qualities for Effectiveness

When asked about their role and responsibilities, Board Chair respondents emphasized the importance of creating the conditions for a thorough discussion while maintaining impartiality so as not to unduly influence Board members. Board Chairs described varying approaches to encourage comprehensive discussion. Some implement a passive, conversational approach to broadly seek input from the Board without calling on individual members. Others rely on a more decisive approach, directly questioning Board members when needed to encourage discussion (i.e., when the Board has not identified an important issue or if a Board member has not contributed to the discussion)

When asked about the qualities of an effective Chair, many Board members similarly valued neutrality, explaining the Chair's role is to manage the discussion, not steer it in a specific direction. Furthermore, many shared that an effective Chair understands the cadence of Board meetings and where to focus conversation. Board member respondents said an effective Chair can discern which topics to expand upon and which require less mining and discussion.

## Evolution of FRB

Interviews with FRB and FRU leadership show SPD's review of use of force has changed since the inception of the Consent Decree in 2012. According to respondents, the process for reviewing force has evolved to become more systematic and detailed in nature.

Before 2012, SPD reviewed 20-25 cases per FRB meeting (the FRB currently reviews three Type II cases per meeting or one Type III or OIS case per meeting). Board members recalled cases were largely "rubber-stamped," even those presenting serious policy violations. Unlike the current structure, the FRB previously had no standardized framework for evaluating uses of force.

A more formalized FRB process was eventually developed and implemented. Meetings now are three and a half hours per week, with one to three cases reviewed per meeting. According to respondents, the current process allows for a more methodological breakdown of each case, more time dedicated to case review, and high-quality discussion. Other important changes mentioned are attendance of OPA at meetings, the inclusion of a crisis element to discussions, and the attendance of a CRU representative as a non-voting member. This process was eventually codified into SPD policy. [30]

## Current Organizational Structure and Membership

### Selection of Standing Board members and Facilitators

The AC of the PSB selects standing Board members, who are expected to serve a minimum of 18 months. [31] There is no formal selection process the AC is required to undertake, or eligibility criteria they must consider when selecting candidates (e.g., competencies or knowledge, experience, skills, abilities). Interviews with leadership show selection of Boad members is informal and discretionary, often based on reputation as a supervisor. Openings are not widely publicized, and there is no formal application or vetting process. Instead, leadership respondents describe soliciting recommendations from the COC, reading performance reviews, and surveying line officers about their supervisors to identify candidates who are "vocal," experienced, and who, in their estimation, will not be punitive. Leadership may also reach out to individual candidates to solicit their interest. Candidates may directly appeal to FRB leadership for consideration, but this appears to be less common. One respondent was critical of this process, noting department connections and timing are the most important selection factors.

### Board Staffing

There is no guidance on how FRB meetings are staffed (i.e. how standing Board members are selected to attend which meetings). Leadership described a rotating schedule to mitigate burnout. In contrast, the frequency of attendance described by Board member respondents varied greatly, with some serving more often than others; some Board members reported serving once a week or once every two weeks, while others reported attending 1-2 times a month or bimonthly. Board members often described coordinating with others in their unit to divide up Board attendance when possible. Some Board members also noted they have provided coverage during their "off time" when the Board was short voting members. These individuals noted an increased need for alternates in recent months, which they attributed to recent Board turnover.

---

[30] SPD Policy Manual, Interim Policy 8.500 Reviewing Use of Force, POL-4 Force Review Board, Section 3.
[31] SPD Policy Manual, Interim Policy 8.500 Reviewing Use of Force, POL-4 Force Review Board, Section 4.

Interviews with Board members indicated some respondents do not have a concrete idea of when they are expected to serve. Some members expressed confusion related to attendance expectations, inconsistency in meeting scheduling, and the apparent "ad-hoc" nature of selecting case presenters.

Training

*Board Member Training*

Each standing FRB member is required to attend a minimum of eight hours of basic FRB training per year.[32] Interviews indicate training for new Board members is largely informal. New Board members receive access to case materials and observe two to four Board meetings as non-voting members. The observation period helps to familiarize new members with the structure of meetings, as well as the typical issues discussed and questions asked. Some Board members also reported receiving in-depth, one-on-one training from FRU leadership.

Many Board members shared that new FRB members would benefit from additional training and guidance. Collectively, Board member and leadership respondents offered the following suggestions to improve FRB training:

- Continue to emphasize the importance of maintaining neutrality as a Board member;
- Provide an overview of the roles, responsibilities, and expectations for reviewing uses of force;
- Teach Board members to critically discuss and analyze force;
- Include an overview and definition of all the possible remedies and outcomes available to Board members and the FRB broadly (e.g. Lessons Learned, FRB Actions, etc.);
- Provide investigations training for Board members without experience; and
- Provide training on use of force and constitutional law.

*Board Chair Facilitator Training*

There are no training requirements for Board Chairs, and interviews with leadership indicate Chairs do not receive formalized training. Instead, Chairs describe their policing experience as training. One leadership respondent suggested new Chairs would benefit from public speaking training.

Board Meeting Preparation

Interviews show Board members prepare thoroughly for FRB meetings, and largely prepare in a similar way. Most members review all provided materials, read COC reports to understand flagged issues, and compare videos to written statements. Many noted selectivity in viewing videos due to amount and length of files. Some also prepare questions in advance to guide their review and analysis.

Board members reported dedicating two to three hours to reviewing each Type II case, and longer for cases they present to the Board and for OIS cases. As a result, some respondents reported spending as much as 12 hours per week preparing for FRB meetings. Some expressed their work duties do not allow sufficient time for this level of preparation; these respondents reported using overtime hours to prepare for weekly meetings.

## Process and Procedures

FRB Voting Process

Some respondents noted the FRB voting structure presents a challenge for more complex issues where a ternary yes/no/not feasible vote may be reductionist. Both a Board member and leadership respondent

---

[32] SPD Policy Manual, Interim Policy 8.500 Reviewing Use of Force, POL-4 Force Review Board, Section 5.

raised the distinction between *acceptable* and *optimal* tactics or decision-making: some actions may be within policy and training but are not optimal given the circumstances. An action can be necessary, reasonable, and proportionate yet still have room for improvement. In such cases, Board members may discuss potential tactical improvements but still vote that actions fall within policy/training, despite this vote not reflecting the nuances of the discussion. SPD Leadership shared that while the Board currently votes without such caveats, the Findings document includes a record of the nuances discussed. It would be useful for Board members to have access to the Findings document to understand how the additional information is incorporated.

<u>FRB Actions</u>
Leadership respondents reported some cases in which the same FRB Action is sent to multiple SPD sections without explanation or context as to how the FRB action applies to each entity.

<u>OPA Limitations</u>
OIG received varied responses from Board member and leadership respondents about the impact of active OPA investigations on FRB discussion and voting. Some Board members expressed confusion around the restrictions for discussion and voting, noting they do not receive clear or consistent guidelines. Most respondents noted discussion can be somewhat stymied or restricted because the Board cannot vote on whether force was within policy and training. Some respondents also observed less thorough discussions for active OPA cases because Board members were concerned about influencing the outcome of the OPA investigation. Others shared that the restrictions on OPA cases do not affect the thoroughness of discussion and, although there is no official vote, the opinion of the Board members is recorded in discussion notes.

## Quality of FRB Discussion
<u>Impact of Facilitation</u>
Most Board member respondents noted they have experienced a range of Chairs throughout their tenure on the Board. These respondents described the Board Chair as a key driver in the quality of discussion, noting substantial variation in discussions due to differences in facilitation style and level of experience. Many distinguished between Chairs who directly "push back" against Board member statements and Chairs with more conversational approaches who broadly seek input from Board members. Some respondents expressed concern about facilitation styles they perceive to undermine the flow of discussion, either by spending too much time on certain topics or by utilizing approaches which do not generate enough discussion to comprehensively review a case. They also expressed concern about the objectivity of some Chairs and their ability to influence the Board, with some describing Chairs who would altogether override or disregard collective Board opinions or decisions about referrals and recommendations. Board member respondents also expressed appreciation for facilitators who directly seek input from individual members, noting this inclusive approach ensures everyone is provided the opportunity to speak and ensures topics are adequately discussed.

<u>Discussion of Minor Type II Uses of Force</u>
Board member respondents expressed frustration that Type II cases involving "minor" uses of force (i.e., handcuffing discomfort or small abrasions) are reviewed with the same level of detail as cases involving more "serious" force (i.e., taser or 40 mm launcher). These respondents expressed a desire for a more expedited discussion and review process for minor Type II uses of force.

Patrol Experience and Perspective on the Board

A common theme in interviews with Board members was the desire for better representation of patrol officers on the FRB. These respondents described the discussion as feeling theoretical and disconnected from the realities of patrol officers on the ground. They spoke of the importance of having Board members who have patrol training and experience but also advocated for having officers on the Board who are currently working patrol and could speak to the current realities of that role.

Crisis Discussion and Role of the CRU Representative

Most Board member and leadership respondents expressed that information shared by the CRU representative focuses primarily on a subject's crisis history. They noted that if this information is not known by the officer at the scene (which is often the case), it is irrelevant for assessing the involved officer's use of force. Some expressed the desire for the CRU representative to focus more attention on whether involved officers' actions were consistent with CIT training, especially regarding de-escalation. Other Board member respondents shared that most FRB members have CIT training and having the CRU representative in attendance did not provide additional perspective. A CRU respondent similarly shared that the Board is already aware of the crisis elements CRU highlights, and that CRU attends solely in a consultation capacity. Some shared it was helpful to have a CRU representative in attendance at FRB to answer questions from Board members. One Board member respondent expressed that having the CRU representative at Board meetings foreclosed crisis discussion, since questions about crisis from the Chair were directed to that person, who "does all the talking."

De-Escalation Discussion

Most Board member and leadership respondents focused their definition of de-escalation on tactical de-escalation, i.e. using time, distance, shielding techniques to stabilize a situation. Only a small minority also described de-escalation in terms of de-escalation of the subject, using verbal and non-verbal communication strategies to gain compliance without having to resort to force. Respondents were divided on whether de-escalation was sufficiently discussed, with some saying that it is robust and others expressing that it could be improved. Those who thought it could be improved reported that more time should be dedicated to discussing de-escalation by Board members and that de-escalation should not just be the purview of the CRU representative. Leadership respondents worried that de-escalation is not sufficiently addressed by the FRB because of differing perspectives among different generations of officers around what constitutes de-escalation, or because Boad members do not have adequate knowledge of de-escalation to identify it or the language/vocabulary to discuss it.

## Impact and Effectiveness of FRB

COC Accountability

Some respondents reported insufficient emphasis on COC accountability for deficiencies in use of force practices by Patrol officers. These respondents expressed concern that individual Patrol officers are held accountable for systemic issues or for issues that should have otherwise been identified and addressed by the COC. In these instances, respondents would prefer to also see the COC disciplined or re-trained.

Timeliness of FRB Review and Feedback

For Type II use of force, the COC has 60 days to complete the use of force packet or request an extension. The case then moves to the FRU for review to determine if it meets the criteria to be sent to the Board. Subsequently, the Board schedules the case for the weekly FRB meeting where three cases are typically reviewed each time. The number of cases coming into FRU is greater than three per week, creating a backlog. Many Board member respondents said the review process is not conducted in a timely manner.

They noted many cases are not reviewed until months after the case occurred, leaving the involved officer responding to calls in that period of time, with potential gaps in their knowledge or training before feedback or recommendations are delivered. These respondents expressed concern that such a delay may undermine the effectiveness of the FRB and its intended purpose to continually improve use of force practices.[33]

## Conclusions

### Board Selection and Participation

Interviews showed the process for Board member selection is informal and ad-hoc.[34] A formalized application and selection process could be implemented with clear eligibility requirements to establish a transparent vetting process. These practices could help improve the diversity and representativeness of FRB composition.

Interviews indicated substantial discrepancy in the frequency with which Board members attend FRB meetings. This creates differing burdens on members given the significant time commitment required to prepare for and attend meetings, and lends to over-representation of certain voices in serious force review.

### Board Facilitation

Board member respondents noted significant differences in facilitation styles which greatly impacted the quality of FRB discussion. Standardized training for all Chairs may help mitigate some of this variance. In addition to teaching facilitation skills (e.g. how to encourage discussion, how to ask open-ended questions, how to follow-up for clarity), this training should inform all Chairs of the parameters for discussion, including the topics to cover each meeting and rules governing OPA limitations. The training should also provide Chairs with awareness of how hierarchical power dynamics might unduly influence Board discussion and voting, and thus the importance of maintaining neutrality and objectivity as a facilitator.

### Board Preparation

Interviews with member respondents indicated a lack of standardized training other than annual training required by policy. New member training should be standardized and required for all newly selected members. It should provide an overview of expectations and responsibilities and include guidance on, among other things, how to prepare for meetings, analyze use of force, and practice neutrality in discussion.

Many Board members expressed interest in receiving regular feedback on their contributions in meetings. Feedback would help Board members feel supported and that their contributions and

---

[33] SPD is internally discussing the use of training bulletins to disseminate Board feedback in a timelier way to the whole department. OIG commends this innovative and proactive approach to further the impact of recommendations made in FRB meetings.

[34] Empirical research shows the process described by leadership disadvantages candidates who are Black, people of color, and women. Lucas, B, Berry, Z., & Chugh, D. (2021). A longer shortlist increases the consideration of female candidates in male-dominant domains. Nature Human Behavior, 5, 736-742. https://www.nature.com/articles/s41562-020-01033-0. Beaman, L., Keleher, N., & Magruder, Jeremy. (2017). Do Job Networks Disadvantage Women? Evidence from a Recruitment Experiment in Malawi. Journal of Labor Economics, 36(1). Holzer, H. (1987). Informal Job Search and Black Youth Unemployment. The American Economic Review, 77(3): 446-452. https://www.jstor.org/stable/1804107.

perspectives are valuable (especially important given how much time they dedicate to the FRB) and help to improve the force review process overall.

## Board Procedures

The FRB Findings document provides a record of the Board's vote and includes the nuances of Board discussion. Board members should have access to the Findings document to review how the additional information is incorporated. The voting structure should similarly reflect this nuance and be modified to allow for additional options. The current voting structure (yes/no/not feasible) does not account for the complexity of cases reviewed by the FRB or instances when use of force is within policy or training but is not optimal. Adding additional options may help to accommodate instances where use of force is within policy and training, but improvement may be necessary to advance the FRB's goal of continual improvement of use of force practices. Accordingly, discussion should also include a component distinct from whether the actions were within law and policy, to instead focus on how to optimize actions to produce a better outcome.

When voting on the topic of de-escalation specifically, the vote should be done in two parts. First the Board should address whether the officer made reasonable efforts to de-escalate using time, distance, shielding, and communication. If the officer made reasonable efforts, the Board should summarize those efforts. If the officer did not make reasonable efforts, the Board should discuss why efforts were not made and include possible justifications around whether it was safe or feasible.

Most respondents did not distinguish between (a) tactical de-escalation using time, distance, and shielding techniques to stabilize a scene and (b) de-escalation of subjects through non-verbal and verbal communication to gain compliance without having to use force. In defining de-escalation, these respondents focused primarily on the former. Both are integral for effective de-escalation and a holistic assessment of de-escalation by the Board requires consideration of both. Accordingly, Chairs should require Board members to differentiate between the two and discuss whether both were adequately considered and implemented by involved officers.

Most Board member respondents reported they do not receive follow-up about FRB Actions. FRB Actions are a key metric for tracking improvement in use of force practices, and both Board members and the community would benefit from regular reporting on the outcome of FRB Actions. Consistent reporting will help provide transparency for the community and may help increase the legitimacy of the FRB by demonstrating Board members' impact on use of force practices.

Many respondents reported concern about the lack of timeliness of FRB feedback due to the lag time in reviewing cases. Timelier review of cases would ensure problematic use of force practices are addressed and remedied soon after they happen. Timely feedback is also an important component of effective supervision and development for officers. SPD is aware of the delay and agrees more timely review would be beneficial. SPD has identified the current process and volume of cases contribute to the delay and is reviewing policy modifications to improve timeliness.

## *Use of Force in Crowd Management*

OIG has worked in collaboration with SPD to improve SPD response to mass demonstration and crowd management. One area of collaboration was development of a means to handle force reporting and review in mass use of force situations, as occurred in the summer of 2020. In December 2023, SPD submitted an alternative reporting process for emergency situations involving mass use of force reporting and review.[35] This process follows best practices and was reviewed by OIG prior to submission. Additionally, OIG will conduct a review of the Police Outreach and Engagement Team (POET).[36]

## SPD Response to SER Crowd Management Recommendations

The Sentinel Event Review (SER) Panel issued 140 recommendations to SPD across the four Waves of protest review. Recommendations fell into seven categories: accountability, communication, crowd management, procedures, situational awareness, training, and use of force/crowd control. Though 36 of the recommendations were specific to crowd management, the theme carried through in recommendations from each of the other categories.

SPD accepted 32 of the 36 crowd management recommendations, marking 20 as accepted and complete, seven as accepted and ongoing, three as accepted but deferred to other departments, one as accepted in part, and one as accepted. Four crowd management recommendations were not accepted and deferred by SPD to other departments.

The SER recommendations suggest a necessary shift in SPD strategy from a "crowd management/control" approach to one centering the facilitation of peaceful assembly. Broadly, the recommendations highlighted the need for increased situational awareness, both by the department and officers on-scene. Specifically, recommendations centered on the need for SPD to prioritize communication, tactics to limit force, and community legitimacy.

### Communication

Communication recommendations focused on improving SPD's capability to inform and communicate with demonstrators during group events, and on improving internal channels of communication to allow efficient and collaborative decision-making amongst command and with officers.

External communication recommendations pointed to the use of new or improved communication technologies, and to the need for alternative methods for real-time engagement with protestors. SPD addressed external communications with the introduction of a new technology, the long-range acoustical device (LRAD), and the establishment of the POET. The LRAD is now used as a loudspeaker to ensure clear and audible communications during largescale events. In his response to Wave 1 recommendations, Chief Diaz stated the LRAD has "proven effective in ensuring that all members of a crowd are able to clearly hear information and directions presented."

SPD implemented the POET program in response to recommendations across the four waves suggesting the need for officers to better communicate with crowd members and to inform other officers on-scene

---

[35] SPD is currently reporting no uses of force in crowd management settings between 2021 and 2023. As SPD does not report uses of force in crowd management as separate from other uses of force, OIG is unable to validate that information at this time. OIG will continue to track SPD response to demonstrations.

[36] See: SPD Response to SER Crowd Management Recommendations.

of the feasibility of crowd compliance with various commands. The program, which SPD initiated in 2020, is based on principles of crowd psychology and supports engagement with community before, during, and after crowd events. POET officers wear special, more "dressed down" uniforms and are strategically stationed among protestors to facilitate communication between crowd organizers and members, operational commanders, and frontline officers. SPD notes, "the success of this approach can be argued from the fact that, since this unit was stood up, it has deployed to approximately 20 large scale city-wide events, all of which have proceeded without incident."

Panelists recommended SPD improve internal channels of communication to increase efficient, timely, and collaborative decision making amongst command, with officers, and with City partners. SPD accepted this recommendation as written in the Wave 3 Report and categorizes its response as ongoing. Within recommendations related to internal communications, panelists specifically suggested a circular organization chart to improve internal communications and decision-making processes. SPD accepted the recommendation and has incorporated a circular organization chart. In Wave 1, panelists recommended the establishment of an Incident Command post and communication lines to officers to provide real-time updates about the event. This recommendation was accepted by SPD. Wave 3 recommendations included the implementation of processes to ensure SPD and Seattle Fire Department (SFD) operational staff have real-time, direct lines of communication during emergencies. Recommendations for direct communication between SPD and SFD are marked as "under consideration" by SPD.

## Tactics

Recommendations across the four waves directed SPD to review and clarify policies for crowd control tactics. SPD accepted six tactical recommendations, including evaluating the use of bicycle tactics and armored vehicles during crowd events, ensuring access to adequate supplies of OC spray to minimize the need for CS gas, and reviewing policy and training for all less-lethal munitions in crowd management situations. SPD marked three recommendations related to defining and reporting bicycle tactics and reviewing the use of batons to facilitate crowd management as "under consideration."

SPD declined two Wave 1 recommendations related to tactics: 1) limit arrests during protests targeted at the police to individuals committing immediate or imminent harm to people or property, and do not arrest individuals for offenses committed at an earlier time unless they can be accomplished in a way that will not escalate emotions in the crowd; and 2) train bicycle officers not to arrest individuals for passive resistance techniques unless they determine the acts are clear, deliberate, and intended to substantially interfere with the ability of officers to perform immediate public safety responsibilities. Both recommendations aimed to increase SPD's focus on community legitimacy by isolating individuals engaging in criminal or harmful activities rather than dispersing or employing wholesale uses of force against the larger crowd. Panelists offered additional recommendations in this area, as described in the next section.

## Community Legitimacy

For panelists, SPD's response to the 2020 protests indicated a significant gap between structural and perceived legitimacy wherein SPD emphasized "instrumental compliance" (the use of tools to force compliance) over "normative compliance" (crowd agreement with legitimate SPD directives). Recommendations in this area include broad suggestions aimed at shifting SPD perspectives and priorities, as well as specific recommendations to facilitate that shift.

Two recommendations aimed to encourage normative compliance by centering procedural justice in crowd management strategies. In Wave 1, panelists recommended that SPD focus more explicitly and comprehensively on the facilitation of peaceful assembly and ensuring the safety of protestors, noting SPD's focus should move away from crowd control to the facilitation of free speech and crowd safety. SPD marked this recommendation as "accepted and complete." In Wave 2, panelists recommended SPD embrace and maintain principles of procedural justice in communications and tactics relative to the facilitation of crowd events. SPD marked this recommendation as "accepted and complete."

Panelists highlighted the need for SPD to change its mindset when responding to protests, particularly where police themselves are the focus, by minimizing the belief within SPD that protesters work as a unified, oppositional group, rather than a diverse population of individuals with a diverse set of reasons for attending a protest. To support this change, panelists recommended SPD provide clear guidance for officers on when to disperse an entire crowd and when to arrest and remove individuals while allowing the rest of the event to continue undisturbed. SPD accepted these recommendations, and its updated crowd management policy includes guidance on crowd dispersal versus removal of individuals engaging in property crimes or activities that may cause danger to the public or officers.

SPD has implemented two programs to encourage perceptions of police legitimacy through improved interactions between officers and community. The Outward Mindset program, initiated in 2020, teaches officers and command staff to consider the unique needs, challenges, and goals of every community interaction, and to employ tactics that support more equitable interactions with community members and others in the department. The Before the Badge program, launched in 2022, addresses themes of community legitimacy and the role of police in public safety. Each module of the program is designed to provide pre-academy recruits with foundational knowledge, skills, and relationships to succeed as partners in the community and leaders in the department. The Community Centered Dialogue and Learning module, based in principles of relational policing, teaches recruits to prioritize transparency, honesty, and trust building in interactions with community. The Public Safety 360 module provides new officers with a basic understanding of the role of police in a holistic, community-centric model of public safety.

## Next Steps

OIG will continue to utilize qualitative and quantitative methods for ongoing assessment of SPD's efforts to ensure constitutional and lawful policing which promote public trust and officer safety.  In order to continue to provide timely and consistent feedback to SPD regarding force investigation and review, OIG will attend FRB meetings and meet with SPD leadership regularly to share observations. These meetings will also provide an opportunity for OIG, with input from SPD, to identify additional areas of review. The feedback will be summarized and provided to SPD in periodic formalized reports and as well as a yearly summary in the OIG annual report. OIG will complete additional qualitative assessments of SPD processes. Additionally, OIG will continue to work in collaboration with SPD to advance the SER recommendations and to ensure SPD crowd management policies and training are adhering to best practices and continue to increase SPD legitimacy and community trust. This will include a review of SPD's dialogue policing unit, POET and working with SPD and international experts to build a robust crowd management plan for the 2026 World Cup.

## Appendix A

Below is the Use of Force Workflow Process which includes a descriptive "map" of SPD force investigation and review process.

**Handcuff Discomfort Screening**



De Minimis Force is defined as physical interaction meant to separate, guide, and/or control without the use of control techniques that are intended to or are reasonably likely to cause any pain or injury.

* Slight indentation and temporary discoloration of skin from handcuff does not constitute injury.

BWV: Body-Worn Video
FIT: Force Investigation Team
ICV: In-Car Video
OPA: Office of Police Accountability
UoF: Use of Force

**Key agents**

Officer    Sergeant

Source: SPD's Manual 8.400-TSK-1, 8.400-TSK-2. For details refer to SPD's Manual.

**Use of Force, Type I**



Use of Force **Type I** is defined as actions which cause transitory pain, the complaint of transitory pain, disorientation, or intentionally pointing a firearm or bean bag shotgun.

* Type I use of force reports will be routed in the following order: 1. Sergeant, 2. Lieutenant, 3. Captain or designated Operations Lieutenant, 4. Force Review Unit
** Reports include: Summary of the incident, description of the Type I force, why the force was necessary, who screened the incident, where the screening occurred, anything else noteworthy.

Source: SPD's manual 8.400-TSK-3, 8.400-TSK-4. For details refer to SPD's Manual.

## Use of Force, Type II



Use of Force Type II is defined as a force that causes or is reasonably expected to cause physical injury greater than transitory pain but less than great or substantial bodily harm.

\* FIT investigators are required to respond to the scene of all officer-involved shootings, in-custody deaths, Type III use-of-force, Type II use-of-force when requested by a supervisor and serious assaults against an officer. \*\* Sergeant photographs the following: the location where the incident occurred, any officer injuries or areas of complained injury, and any damaged government or private property, subjects' injuries.\*\*\* SPD Disciplinary Process Roadmap depicts how each classification will be processed. \*\*\*\* Type II use-of-force reports will be routed in the following order: 1. Sergeant, 2. Administrative Lieutenant (when utilized), 3. Lieutenant, 4. Captain, 5. Force Review Unit, and as necessary, the Force Review Board.

Source: SPD's manual 8.400 TSK-5, 8.400 TSK-8. For details refer to SPD's Manual.

## Use of Force, Type II



Use of Force **Type II** is defined as a force that causes or is reasonably expected to cause physical injury greater than transitory pain but less than great or substantial bodily harm.

**Key agents**



UoF: Use of Force
CAD: Computer-Aided Dispatch
FIT: Force Investigation Team
OPA: Office of Police Accountability
ICV: In-Car Video
BWV: Body-Worn Video
PV: Policy Violation

\* FIT investigators are required to respond to the scene of all officer-involved shootings, in-custody deaths, Type III use-of-force, Type II use-of-force when requested by a supervisor and serious assaults against an officer.
\*\* SPD Disciplinary Process Roadmap depicts how each classification will be processed.
\*\*\* Type II use-of-force reports will be routed in the following order: 1. Sergeant, 2. Administrative Lieutenant (when utilized), 3. Lieutenant, 4. Captain, 5. Force Review Unit, and as necessary, the Force Review Board.

For details refer to SPD's Manual.

## Use of Force Type III (Not Firearm Discharge)



Source: SPD's Manual 8.400-TSK-9, 8.400-TSK-11, 8.400-TSK-13, 8.400-TSK-16, 8.400-TSK-18. For details refer to SPD's Manual.

## Use of Force Type III (Not Firearm Discharge)



**Type III** Force causes or is reasonably expected to cause great bodily harm, substantial bodily harm, loss of consciousness or death, and/or the use of neck and carotid holds, stop sticks for motorcycles, and impact weapon strikes to the head. Force that causes or is reasonably expected to cause great bodily harm, substantial bodily harm, loss of consciousness or death, and/or the use of neck and carotid holds, stop sticks for motorcycles, and impact weapon strikes to the head.

**BWV:** Body-Worn Video
**CAD:** Computer-Aided Dispatch
**CISM:** Critical Incident Stress Management
**COC:** Chain of Command
**CSI:** Crime Scene Investigators
**FIT:** Force Investigation Team
**FRB:** Force Review Board
**ICV:** In-Car Video
**OIG:** Office of Inspector General
**OPA:** Office of Police Accountability
**PAU:** Public Affairs Units
**PSS:** Public Safety Statement
**PV:** Criminal conduct or/and Policy Violation
**UoF:** Use of Force

\*\* FIT investigators are required to respond to the scene of all officer-involved shootings, in-custody deaths, Type III use-of-force, Type II use-of-force when requested by a supervisor and serious assaults against an officer.
\* SPD Disciplinary Process Roadmap depicts how each classification will be processed.

**Key Agents**



Source: SPD's Manual 8.400-TSK-9, 8.400-TSK-11, 8.400-TSK-13, 8.400-TSK-16, 8.400-TSK-18. For details refer to SPD's Manual.

## Use of Force,  Type III. Firearm Discharge. (On-scene)



**Officer**

Notifies sergeant, if off duty, notifies on-duty lieutenant

**Sergeant**

Responds to the scene and confirms medical aid

Subject hospitalized? — No

Yes

Arranges hospital guard

Completes and broadcasts info from PSSOIS card

Identifies witnesses and requests FIT response

Possible PV? — Yes / No

**Sergeant**

Contacts OPA and OIG representatives on-scene

Notifies an on-duty watch lieutenant

**Lieutenant**

Responds to the scene and advises about arrival

Ensures PSS-OIS card and confirms proper notifications

Maintains command until the FIT arrives

Possible PV? — No / Yes

Contacts OPA representative on-scene

Notifies the on-duty captain

**OPA**

Consults with the FIT captain to identify any  PV

**On-duty Captain**

Verifies notifications are made to the Section captain and Assistant Chief of the involved officer, Office of the Chief and PAU

**FIT Detective**

Arranges for a canvass for any witnesses privately-owned video

Participates in interviews and its reviews

Takes custody of the weapon used by the involved officer(s)

**FIT Unit sergeant**

Arranges documentation and evidence collection

**FIT Captain**

Contacts CISM to coordinate a response

Arranges for an OPA and Training Section representative to respond investigation

Notifies the OIG of the incident

**OIG**

Consults with FIT Captain overseeing investigation

FIT investigators are required to respond to the scene of all officer-involved shootings, in-custody deaths, Type III use-of-force, Type II use-of-force when requested by a supervisor and serious assaults against an officer.

Source: SPD's manual 8.400-TSK-10, 8.400-TSK-12, 8.400-TSK-14-15, 8.400-TSK-17, 8.400 -TSK-19, 8.400 -TSK-20. For details refer to SPD's Manual.

Use of Force,  Type III. Firearm Discharge. (Off-scene)



**Type III** Force causes or is reasonably expected to cause great bodily harm, substantial bodily harm, loss of consciousness or death, and/or the use of neck and carotid holds, stop sticks for motorcycles, and impact weapon strikes to the head. Force that causes or is reasonably expected to cause great bodily harm, substantial bodily harm, loss of consciousness or death, and/or the use of neck and carotid holds, stop sticks for motorcycles, and impact weapon strikes to the head.

BWV: Body-Worn Video
CAD: Computer-Aided Dispatch
CISM: Critical Incident Stress Management
COC: Chain of Command
CSI: Crime Scene Investigators

FIT: Force Investigation Team
FRB: Force Review Board
ICV: In-Car Video
OIG: Office of Inspector General
OPA: Office of Police Accountability

PAU: Public Affairs Units
PSS-OIS: Public Safety Officer Involved in Shooting
PV: Criminal conduct or/and Policy Violation
UoF: Use of Force

Source: SPD's manual 8.400-TSK-10, 8.400-TSK-12, 8.400-TSK-14-15, 8.400-TSK-17, 8.400-TSK-19, 8.400 -TSK-20. For details refer to SPD's Manual.

**Key Agents**

| Officer | Sergeant | Lieutenant | On-duty Captain | FIT Detective | FIT Unit Sergeant |

| FIT Captain | Force Review Board | OPA Investigator | OPA Supervisor | OIG Representative |

47

# Appendix B

## FRB Process Assessment Tool

### *Facilitation*

Protocol assessment:

- ➢ Did facilitator follow FRB protocol?
    - ○ *Considerations:*
        - ▪ *Facilitator starts the FRB by framing values and expectations, as well as by stating parameters for engagement for the discussions*
        - ▪ *Facilitator requests input from OIG/OPA for each case*
        - ▪ *Facilitator redirects board members if/when they deviate from stated parameters/framework for engagement*
        - ▪ *Facilitator appropriately explores all necessary aspects of case (i.e., de-escalation) [If no, which items missed?]*

Discussion facilitation assessment:

- ➢ Did facilitator supervise discussion appropriately?
    - ○ *Considerations:*
        - ▪ *Facilitator asks leading or anchoring questions vs using open-ended questions to allow FRB members to raise and explore issues*
        - ▪ *Facilitator allows Board members to extrapolate, assume, or guess information not provided in reports; and were Board members redirected back to the stated parameters/framework for engagement for the discussions? (i.e., officer thought processes, COC review, non-verbal communications.)*
        - ▪ *Facilitator identifies bias in discussion and addresses appropriately*
- ➢ Overall quality of facilitation:
- ➢ Possible improvements to future facilitation:

### *Crisis Elements*

General:

- ➢ Overall quality of discussion: Thorough and sufficient to identify possible deficiencies?
    - ○ *Considerations:*
        - ▪ *Officer knowledge of crisis history discussed*
        - ▪ *Relevance of crisis history considered*
- ➢ Possible improvements to future crisis discussions:

Presenter:

- ➢ Presentation included discussion of crisis information:
    - ○ *Considerations:*
        - ▪ *Identification of subject crisis history in initial incident summary*
        - ▪ *Officers modulated plan in response to known crisis history or on-viewed signs of crisis?*
        - ▪ *Crisis Response Team (CRT) officers responded to call?*
- ➢ Overall quality of presenter discussion of crisis elements:
- ➢ Possible improvements to future presentation of crisis elements:

Board:

- ➢ Board members engaged in thorough discussion of crisis elements and response tactics:
  - ○ *Considerations:*
    - ▪ *Did Board identify and discuss opportunities to modulate tactics based on known crisis history or emerging signs of crisis?*
    - ▪ *Did Board identify and discuss how modified tactics could impact outcome of incident?*
- ➢ Overall quality of Board discussion of crisis elements:
- ➢ Possible improvements to future Board discussion of crisis elements:

Crisis Response Unit Discussion:

- ➢ Appropriate consideration of crisis information:
  - ○ *Considerations:*
    - ▪ *Did CRT officer identify subject crisis history?*
    - ▪ *Did CRT officer describe how crisis diagnosis (history and/or emerging elements) impact interaction with officers?*
    - ▪ *Did CRT officer engage in inappropriate speculation about impact of subject's demeanor or potential crisis condition on situation/SPD tactics?*
- ➢ Appropriate discussion of tactics:
  - ○ *Considerations:*
    - ▪ *Did CRT officer discuss if/how officers modulated tactics based on known crisis history or emerging signs of crisis?*
    - ▪ *Did CRT officer discuss how officers could better modulate tactics in future incidents?*
- ➢ Overall quality of CRT officer discussion of crisis elements:
- ➢ Possible improvements to future CRT input on crisis elements:

*Meeting Structure & Discussion*

- ➢ Facilitator and Board members adherence to FRB guidelines:
  - ○ *Considerations:*
    - ▪ *Did Board members attempt to extrapolate or guess information not provided in reports? (i.e., mindset of officers)*
    - ▪ *Did Board members allow facilitator to fully ask questions before answering?*
- ➢ Thorough consideration and discussion of all opinions and critiques:
  - ○ *Considerations:*
    - ▪ *Atmosphere where minority opinions can be shared and discussed?*
    - ▪ *Hospitable environment where board members feel free to share critiques / engage in critical thinking not shared by majority?*
- ➢ Overall quality of meeting and discussion:
- ➢ Possible improvements for future meetings:

*Referral Process*

- ➢ Did Board appropriately identify issues to refer to COC?
- ➢ Did Board appropriately identify issues to refer to OPA?
- ➢ Did facilitator identify appropriate process for referral?

## FRB Content Assessment Tool

*Tactics Assessment*

1. **Special weapons and tactics (SWAT)/Hostage Negotiation Team (HNT) Involvement:**
   a. Proper identification of need for SWAT?
   b. Is negotiation appropriate and feasible?
      i. *If so, was discussion thorough?*
   c. Discussion of SWAT criteria and appropriateness of response?
   d. Discussion of SWAT tactics and decision-making?
2. **Tactics Assessment:**
   a. Were there sufficient personnel on scene?
   b. Was a supervisor on scene, if appropriate?
   c. Proper discussion of response?
   d. Did someone assume control or leadership of the incident?
   e. Did responding officers discuss approaches or use time to plan?
      i. *Was the plan adequate and given proper time?*
   f. Were sufficient less lethal tools available?
   g. Proper communication between responding officers?
3. **Use of Force Assessment:**
   a. Force properly classified?
      ii. *Corrections made, if necessary?*
   b. Feedback provided appropriately?
   c. Adequate discussion of appropriateness of tools/weapons?
   d. Thorough discussion of if the officer's force consistent with SPD policy?
   e. Deficiencies in UoF identified?
   f. Issues with UoF properly referred to OPA, COC, Training?

*Case Assessment*

4. **Call Center Communications:**
   a. Information properly obtained and conveyed to responding officers? (Weapons present/mental health information, etc.)
   b. Discussion of response times and proper referral or feedback provided to Communications, if appropriate?
   c. Any gaps related to call taking, dispatch, or sufficiency of information identified and referred?
5. **De-Escalation:**
   d. Were opportunities to de-escalate properly identified?
   a. Was scene management adequately addressed?
      i. *Were there enough resources on the scene?*
      ii. *Was time used properly?*
      iii. *Was shielding used if necessary?*
   b. Was CIT trained communication used with the subject?
      iv. *Were CIT skills used effectively?*
      v. *If not, were alternative ways explored?*
   c. Proper identification of deficiency/policy violation?
      vi. *Issues properly referred to OPA, COC, Training?*

6. **Mental Health/Crisis Issues:**
   a. Appropriate identification of mental health factors?
   a. Crisis template completed if appropriate?
   b. Relevance to situation identified/discussed?
   c. Involvement of CIT officers?
       vii. *Were CIT skills used effectively?*
       viii. *Could feedback or training increase effectiveness of CIT response?*
   d. Was communication effective/were alternatives used to establish communication/rapport?
   e. Were other crisis resources explored to resolve the situation?
7. **Officer Wellness:**
   a. Officer injuries are noted and discussed to ensure proper treatment was provided?
   b. Ways to avoid injury in future are discussed with any feedback provided to Training/COC/Policy? If needed, was the issue forwarded to the department's Safety Officer?
   c. EIS and overall wellbeing are discussed, if appropriate?
8. **Co-Response with SFD:**
   a. Issues with dispatch or staging identified and discussed?
   b. Feedback or issues provided to SFD?
   c. If needed, was a unified command established?

*Investigation Assessment*

1. **Presentation of Case:**
   a. Relevant facts provided?
   b. Case presented objectively/without opinion?
   c. Sufficient presentation of relevant Body Worn Video (BWV)?
   d. Board members properly prepared to discuss and have opportunity to discuss facts to ensure shared understanding of the case?
2. **Underlying Investigation:**
   a. Complete?
       i. Is the Use of Force investigation by COC thorough and complete?
           1. *If not, what were noted deficiencies?*
       ii. If applicable:
           1. Is the Use of Force investigation by FIT thorough and complete?
               a. *If not, what were noted deficiencies?*
           2. Is the criminal investigation of the subject by COC complete?
               a. *If not, what were noted deficiencies?*
           3. Is the criminal investigation of the subject by FIT complete?
               a. *If not, what were noted deficiencies?*
   b. Were gaps properly identified by board?
   c. Discussion of necessary/desirable feedback to FIT/COC regarding material deficiencies.
   d. BWV and In-car Video (ICV) available?
       i. *Any malfunction of equipment or unavailability of video is identified, discussed, and addressed?*

     e.   Proper discussion of legal bases for contacts, stops, detentions, arrests, other types of custody, and use of force, as appropriate?

3. **Chain of Command Review:**

     a.   Did the COC identify training deficiencies appropriately?

         i.   *Was corrective training provided by the appropriate entity?*

         ii.   *Was the training properly documented?*

     b.   Did the COC identify equipment, training, policy, and supervision deficiencies appropriately?

         i.   *Were the deficiencies addressed properly?*

         ii.   *Were the deficiencies documented properly?*

     c.   Did the COC identify deficiencies in policy? (i.e., BWV review)

4. **Were the Typical Patrol Use of Force guidelines followed adequately?**

*OPA Referrals*

5. **OPA Referral:**

     a.   Case referred to OPA?

     b.   OPA investigation initiated? (OIG Follow-up)

     c.   OPA allegation sustained? (OIG Follow-up)

# Appendix C

OIG interviewed various FRB Stakeholders. Given the different roles and responsibilities of these individuals, OIG developed role-specific interview protocols to explore the different perspectives.

## Interview Protocol: FRB Leadership

Opening Script

Thank you for taking the time to speak with us today. By way of background, OIG is working on an assessment of the FRB process as part of our overall assessment of SPD use of force. As part of the FRB assessment, we are speaking with various SPD stakeholders about their experience with the FRB. Your responses are important for helping improve the FRB process, and, ultimately, use of force practices.

This interview will last about one hour. Although we will be taking notes, your responses will not be quoted, and our conclusions will only be shared with stakeholders in the aggregate.

Do you have any questions before we begin?

Background/Warm-up

1. How long have you been involved with the FRB?
2. What roles have you had with the FRB?
3. How long have you been in this current role?

Changes in FRB

4. How often do you attend FRB meetings?
   a. When did you last attend a meeting?
5. How has the FRB changed since you became involved?
6. Has the process for FRB actions (i.e. recommendations regarding policy, equipment and training issues) changed?
   a. If yes, how has it changed?
7. What are your criteria for selecting FRB members (beyond the policy that requires representatives from certain sections, e.g. one from the Training Section, three from Patrol Operations Bureau, etc.)?
   a. What are important qualities in selecting a board member?
8. What is the process for determining which FRB members will staff an FRB meeting?
   a. What are the considerations in selecting which Board members will staff an FRB meeting (other than meeting the requisites in policy)?
   b. Who makes those selections?
9. What is the process for determining who facilitates an FRB meeting?

Meeting Preparation

10. What are your expectations for facilitator preparation for FRB meetings and how do you communicate those expectations?
11. What are your expectations for board member preparation for FRB meetings and how do you communicate those expectations?

Quality of FRB Facilitation and Discussion

12. What are important qualities for effective facilitation?
13. If you've observed different facilitation styles, please tell me about ones you've found to be effective or less effective? (e.g. in terms of types of questions the facilitator asks, facilitation style, etc.)?
14. What is currently working well in the facilitation of FRB meetings?
15. Are there any improvements you think could be made in the facilitation of FRB meetings?
16. Do you think facilitation has an impact on the quality of discussion?
17. Have you observed variations in the level or robustness of the discussion?
18. How well do you think the following issues are discussed by the board?
    a. Investigation
    b. COC review
    c. Tactics
    d. De-escalation
    e. Crisis
        i. Is the crisis information provided helpful in the discussion?
            1. Would other types of information around crisis help the board make determinations or provide more clarity?
            2. Would more information help to facilitate a thorough discussion of crisis issues?
19. Are there any improvements or changes you would like to see in FRB discussions?

FRB actions

20. Do you feel FRB Actions have impacted use of force policy or practices?
21. How do you determine which FRB Actions to forward?
22. Do you feel there is appropriate follow through on implementation of FRB Actions by bureau chiefs and sections?
    a. If not, what changes or improvements would you like to see?

OPA

23. How do the limits on cases under OPA investigation impact FRB discussion?
24. Would you like to see the outcome of the underlying OPA investigation reflected in FRB materials?

Closing

25. Is there anything else you'd like to add?
26. Do you have any questions for me?

This concludes our interview. Thank you for your time.

## Interview Protocol: Board Chair/Facilitators

<u>Opening Script</u>

Thank you for taking the time to speak with us today. By way of background, OIG is working on an assessment of the FRB process as part of our overall assessment of SPD use of force. As part of the FRB assessment, we are speaking with various SPD stakeholders about their experience with the FRB. Your responses are important for helping improve the FRB process, and, ultimately, use of force practices.

This interview will last about one hour. Although we will be taking notes, your responses will not be quoted, and our conclusions will only be shared with stakeholders in the aggregate.

Do you have any questions before we begin?

<u>Background/Warm-up</u>

1. What is your rank/title?
2. How long have you served (did you serve) as an FRB facilitator?
3. Were you ever a board member?
   a. If yes, during what time period?

<u>FRB process and Respondent's Role</u>

4. If you were to explain the FRB to someone who didn't know anything about it, how would you explain what it is and how it works?
5. How would you explain the goals of the FRB?
6. How would you describe your role and responsibilities as facilitator?
7. What are important qualities for an effective facilitator?

<u>Changes in FRB</u>

8. Have you noticed changes or differences in the board process or discussions during your tenure?

<u>Current Organizational Structure and Membership</u>

9. What is the criteria for selecting FRB members (beyond the policy that requires representatives from certain sections, e.g. one from the Training Section, three from Patrol Operations Bureau, etc.)?
   a. What are important qualities in selecting a board member?
10. What is the process for determining which FRB members will staff an FRB meeting?
    b. What are the considerations in selecting which Board members will staff an FRB meeting (other than meeting the requisites in policy)?
    c. Who makes those selections?
11. What is the process for determining who facilitates an FRB meeting?

<u>Process and Procedures</u>

12. Meeting preparation
    a. Can you please describe your process to prepare for FRB?
    b. Do you generate discussion questions in advance?
       i. How do you encourage discussion?

      c.   Is there anything that can be improved regarding the information you receive to prepare for the FRB?

13. Training
      a.   What training did you receive regarding FRB facilitation?
      b.   Did this training occur before you facilitated a board meeting?
      c.   What did you think was effective about the training?
      d.   Are there any changes you would make to the training?
      e.   Are there any areas where you would like more guidance or training?

14. OPA
      a.   How do the limits on cases under OPA investigation impact FRB discussion?
      b.   Are there any ways to adjust the way FRB reviews and OPA investigations are sequenced that would improve the FRB discussion?

<u>Quality of FRB</u>

15.  What responsibility does the facilitator have to encourage thoughtful discussion?

16. Are there any resources, information, or formal training that could improve board members' preparation for board meetings?

17. How well do you think the following issues are discussed by the board?
      a.   Investigation
      b.   COC review
      c.   Tactics
      d.   De-escalation
      e.   Crisis
          i.   Is the crisis information provided helpful in the discussion? Expand on yes/no.
             1.   Would other types of information around crisis help the board make determinations or provide more clarity?
             2.   Would more information help to facilitate a thorough discussion of crisis issues?

18. Are there any improvements or changes you would like to see in FRB discussions?

<u>Effectiveness of FRB</u>

19. According to SPD policy, the goal of the FRB is continual improvement of use of force practices. As the board is currently structured, do you think it achieves this?
      a.   Can you please explain your answer providing examples if appropriate?

20.  Are you aware of any changes to policies, practices, or procedures resulting from FRB Actions?

<u>Closing</u>

1.   Is there anything else you'd like to add?
2.   Do you have any questions for me?

This concludes our interview. Thank you for your time.

## Interview Protocol: FRU Sergeant

<u>Opening Script</u>

Thank you for taking the time to speak with us today. By way of background, OIG is working on an assessment of the FRB process as part of our overall assessment of SPD use of force. As part of the FRB assessment, we are speaking with various SPD stakeholders about their experience with the FRB. Your responses are important for helping improve the FRB process, and, ultimately, use of force practices.

This interview will last about one hour. Although we will be taking notes, your responses will not be quoted, and our conclusions will only be shared with stakeholders in the aggregate.

Do you have any questions before we begin?

<u>Background/Warm-up</u>

1. What is your rank/title?
2. Can you describe your role and responsibilities within the FRU and specifically at FRB meetings?
3. How long have you served in this capacity?
4. How often do you attend FRB meetings?

<u>FRB process and the Respondent's Role</u>

5. If you were to explain the FRB to someone who didn't know anything about it, how would you explain what it is and how it works?
6. How would you explain the goals of the FRB?
7. How are cases selected for board review?
   a. Which are sent automatically?
   b. When there is only a sample of certain cases reviewed, how is that sample chosen?
8. What are the criteria for selecting FRB members (beyond the policy that requires representatives from certain sections, e.g. one from the Training Section, three from Patrol Operations Bureau, etc.)?
   a. What are important qualities in selecting a board member?
9. What is the process for determining which FRB members will staff an FRB meeting?
   a. What are the considerations in selecting which Board members will staff an FRB meeting (other than meeting the requisites in policy)?
   b. Who makes those selections?
10. What is the process for determining who will present a case?

<u>Training</u>

11. What training do board members receive?

<u>Changes in FRB</u>

12. Have you noticed changes or differences in the board process or discussions during your time on the FRB?
13. How many Board Chair/facilitators have you experienced?
   a. Do you know the process for deciding who will facilitate a board? (Assistant Chief vs. Captain vs. Lieutenant)
   b. Has the facilitation changed during your time (i.e. in terms of types of questions the facilitator has asked, facilitation style, etc.)?

      i.   If yes, how has it changed?
     ii.   What do you like about these changes?
    iii.   What don't you like about these changes?

<u>Quality of FRB</u>

14.  What are important qualities for being an effective Board Chair/facilitator for the FRB?
15.  In your experience, how has facilitation impacted FRB discussion?
    a.  Can you provide examples of positive and negative impacts of facilitation?
16.  How well do you think the following issues are discussed by the board?
    a.  Investigation
    b.  COC review
    c.  Tactics
    d.  De-escalation
    e.  Crisis
       i.  Is the crisis information provided helpful in the discussion?
         1.  Would other types of information around crisis help the board make determinations or provide more clarity?
         2.  Would more information help to facilitate a thorough discussion of crisis issues?
17.  Are there any improvements or changes you would like to see in FRB discussions?

<u>FRB actions</u>

18.  Has the process for FRB Actions changed during your time in FRU?
    a.  If yes, how has it changed?
19.  What can you tell us about the process for FRB findings and FRB actions?
20.  Can you provide any examples of how FRB actions have been implemented?

<u>Effectiveness of FRB</u>

21.  According to SPD policy, the goal of the FRB is continual improvement of use of force practices. As the board is currently structured, do you think it achieves this?
    a.  Can you please explain your answer providing examples if appropriate?

<u>Closing</u>

12.  Is there anything else you'd like to add?
13.  Do you have any questions for me?

This concludes our interview. Thank you for your time.

## Interview Protocol: FIT Captain

<u>Opening Script</u>

Thank you for taking the time to speak with us today. By way of background, OIG is working on an assessment of the FRB process as part of our overall assessment of SPD use of force. As part of the FRB assessment, we are speaking with various SPD stakeholders about their experience with the FRB. Your responses are important for helping improve the FRB process, and, ultimately, use of force practices.

This interview will last about one hour. Although we will be taking notes, your responses will not be quoted, and our conclusions will only be shared with stakeholders in the aggregate.

Do you have any questions before we begin?

<u>Background/Warm-up</u>

1. What is your rank/title?
2. How long have you been in this role?
3. Can you share with us your background and other roles you've held within the department?
4. Have you served in any other roles related to the FRB?

<u>History of FRU/FIT Relationship</u>

5. When did FIT begin participating in FRB?
6. Has the way FIT participates changed at all?
7. How do you view the relationship between FIT and FRU?
8. How would you describe FIT's contribution to FRB?
9. Can you explain how FIT enhances FRB?

<u>FRB process and Respondent's Role</u>

10. If you were to explain the FRB to someone who didn't know anything about it, how would you explain what it is and how it works?
11. How would you explain the goals of the FRB?
12. How would you describe your role and responsibilities as FIT Captain at FRB meetings?

<u>Process and Procedures</u>

13. Can you please describe your process to prepare for an FRB meeting?

<u>Effectiveness of FRB</u>

14. According to SPD policy, the goal of the FRB is continual improvement of use of force practices. As the board is currently structured, do you think it achieves this?
    a. Can you please explain your answer providing examples if appropriate?
15. Are you aware of any changes to policies, practices, or procedures resulting from FRB actions on FIT cases?
    a. What about any FRB actions coming from other types of cases the board reviews?

<u>Closing</u>

16. Is there anything else you'd like to add?
17. Do you have any questions for me?

This concludes our interview. Thank you for your time.

## Interview Protocol: Board Members

<u>Opening Script</u>

Thank you for taking the time to speak with us today. By way of background, OIG is working on an assessment of the FRB process as part of our overall assessment of SPD use of force. As part of the FRB assessment, we are speaking with various SPD stakeholders about their experience with the FRB. Your responses are important for helping improve the FRB process, and, ultimately, use of force practices.

This interview will last about one hour. Although we will be taking notes, your responses will not be quoted, and our conclusions will only be shared with stakeholders in the aggregate.

Do you have any questions before we begin?

<u>Background/Warm-up</u>

1. What is your rank/title?
2. Can you share with us your background and other roles you've held within the department?
3. How long have you served on the FRB?
4. How often do you attend as a board member?
5. Which entity do you represent as Board member (Training, Patrol, Audit, Policy and Research)?

<u>FRB process and the Respondent's Role</u>

6. If you were to explain the FRB to someone who didn't know anything about it, how would you explain what it is and how it works?
7. How would you explain the goals of the FRB?
8. How would you describe your role and responsibilities as a board member?
9. What are important qualities for an effective board member?

<u>Changes in FRB</u>

10. Have you noticed changes or differences in the board process or discussions during your time on the FRB?
11. How many board chairs/facilitators have you experienced?
    a. Has the facilitation changed during your time as a board member (i.e. in terms of types of questions the facilitator has asked, facilitation style, etc.)?
        i. If yes, how has it changed?
        ii. What do you like about these changes?
        iii. What don't you like about these changes?

<u>Process and Procedures</u>

12. Meeting preparation
    a. Can you please describe your process to prepare for FRB?
    b. Is there anything that can be improved regarding the information you receive to prepare for the FRB?
    c. Are there any ways that leadership can better prepare you and other board members for participation in FRB meetings?
13. Training
    a. What training did you receive for your role as a board member?
    b. Did this training occur before you served on the board?

  c. How did this training prepare you for the role?

  d. What did you think was effective about this training?

  e. Are there any changes you would make to the training?

  f. Are there any areas you would like more guidance or training on, either for yourself or your fellow board members?

14. FRB actions

  a. Has the process for FRB Actions changed since you started as a Board member?

    i. If yes, how has it changed?

  b. What factors or considerations impact your decision to recommend/suggest an FRB Action to the rest of the Board?

    i. Can you walk us through your decision-making process?

  c. According to policy, the FRB "will identify instances, trends, or patterns of deficiencies regarding policy, training, equipment or tactics."

    i. How do you determine whether something rises to the level of a "pattern" or "trend?"

    ii. Can you share an example of when this occurred?

  d. Have you ever received follow-up from FRB leadership and/or facilitators about implementation of FRB Actions?

    i. Can you share an example of when this occurred?

15. OPA

  a. How do the limits on cases under OPA investigation impact FRB discussion?

  b. Would you like to see the outcome of the underlying OPA investigation reflected in FRB materials?

**Quality of FRB**

16. What are important qualities for being an effective facilitator for the FRB?

17. In your experience, how has facilitation impacted FRB discussion?

  a. Can you provide examples of positive and negative impacts of facilitation?

18. How well do you think the following issues are discussed by the board?

  a. Investigation

  b. COC review

  c. Tactics

  d. De-escalation

  e. Crisis

    i. Is the crisis information provided helpful in the discussion?

      1. Would other types of information around crisis help the board make determinations or provide more clarity?

      2. Would more information help to facilitate a thorough discussion of crisis issues?

19. Are there any improvements or changes you would like to see in FRB discussions?

**Effectiveness of FRB**

20. According to SPD policy, the goal of the FRB is continual improvement of use of force practices. As the board is currently structured, do you think it achieves this?

       a.   Can you please explain your answer providing examples if appropriate?

<u>Closing</u>

21. Is there anything else you'd like to add?
22. Do you have any questions for me?

This concludes our interview. Thank you for your time.

## FRB Interview Protocol: Crisis Officer

Opening Script

Thank you for taking the time to speak with us today. By way of background, OIG is working on an assessment of the FRB process as part of our overall assessment of SPD use of force. As part of the FRB assessment, we are speaking with various SPD stakeholders about their experience with the FRB. Your responses are important for helping improve the FRB process, and, ultimately, use of force practices.

This interview will last about one hour. Although we will be taking notes, your responses will not be quoted, and our conclusions will only be shared with stakeholders in the aggregate.

Do you have any questions before we begin?

Background/Warm-up

1. What is your rank/title?
2. Can you share with us your background and the other roles you've held within the department?
3. How long have you served on the FRB as a CRU representative?
4. Have you ever served in any other capacity on the FRB?
5. How often do you attend FRB meetings?

FRB process and the Respondent's Role

6. How would you describe your role and responsibilities as a CRU representative on the FRB to someone who is new to the FRB?
7. How would you describe the purpose of the crisis discussion for a new FRB member?

Process and Procedures

8. Can you please describe your process to prepare for FRB?
   a. Is there anything that can be improved regarding the information you receive to prepare for the crisis discussion in FRB meetings?

Impact of Crisis Discussion and FRB

9. What impact has the crisis component made to the overall FRB process?
10. Do you have any suggested improvements for these areas:
    a. The crisis component of the FRB?
    b. The board members' discussion of crisis?
11. Do you have any suggested improvements for the FRB overall?

Effectiveness of FRB

14. According to SPD policy, the goal of the FRB is continual improvement of use of force practices. As the board is currently structured, do you think it achieves this?
    a. Can you please explain your answer providing examples if appropriate?
15. Are you aware of any changes to policies, practices, or procedures resulting from FRB actions?

Closing

12. Is there anything else you'd like me to add?
13. Do you have any questions for me?

This concludes our interview. Thank you for your time.

## Appendix D

**Acronyms, initialisms, and abbreviations:**

AC: Assistant Chief

APRS: Audit, Policy, and Research Section

BWV: Body-Worn Video

CIT: Crisis Intervention Team

COC: Chain of Command

CRT: Crisis Response Team

CRU: Crisis Response Unit

FIT: Force Investigation Team

FRB: Force Review Board

FRU: Force Review Unit

HNT: Hostage Negotiation Team

ICV: In-Car Video

LRAD: Long-range acoustical device

Monitor: Seattle Police Monitor

OIG: Office of Inspector General

OIS: Officer Involved in Shootings

OPA: Office of Police Accountability

PAS: Performance Appraisal System

POET: Public Outreach and Engagement Team

SER: Sentinel Event Review

SFD: Seattle Fire Department

SPD: Seattle Police Department

SWAT: Special Weapons and Tactics

UoF: Use of Force