

# Seattle Police Department Crisis Assessment

October 16, 2024



**Seattle** Office of Inspector General

PO Box 94764
Seattle, WA 98124-7064
oig@seattle.gov | (206) 684-3663
www.seattle.gov/oig

# Table of Contents

I.   **Introduction** ............................................................................................. **3**

   Assessment Objectives ............................................................................3

   Definitions ....................................................................................................4

II.  **SPD Crisis Response** .............................................................................. **7**

   Scope and Approach .................................................................................7

   Main Findings ..............................................................................................7

   Crisis Contacts ...........................................................................................8

   Subjects with Multiple Crisis Contacts ...............................................8

   Subject Demographics .............................................................................9

   Resolution of Crisis Contacts ...............................................................12

   CIT-Certified Officers ...............................................................................12

   Crisis Contacts Involving Use of Force ...............................................13

   Misconduct Allegations for Crisis Contacts ......................................14

III. **SPD Crisis Intervention Training** .......................................................**18**

   SPD Training Requirements ....................................................................18

   CIT Training Best Practices ......................................................................18

   Four-Hour Crisis Training ........................................................................19

   CIT 40-Hour Certification Course .........................................................20

   Seattle 911 Dispatcher Crisis Identification Training......................20

   Conclusion ..................................................................................................21

IV.  **Qualitative Assessment of SPD Crisis Response** ..........................**22**

   Key Insights ................................................................................................22

   Crisis Communications and Tactics .....................................................23

   Use of Force in Crisis Contacts .............................................................23

   Force Reporting and Chain of Command Reviews............................24

   Summary ......................................................................................................24

V.   **Conclusion** ..............................................................................................**25**

Appendix A .........................................................................................................**26**

Appendix B .........................................................................................................**29**

# I.   Introduction

The Office of Inspector General (OIG) is responsible for oversight of the Seattle Police Department (SPD) as the City of Seattle (the City) transitions from Federal oversight by the Seattle Police Monitor (the Monitoring Team) to a local accountability system. In 2022, the Monitoring Team found SPD to be in sustained compliance with the crisis intervention requirements of the Federal Consent Decree.[1] As part of the transition, OIG developed a methodology to provide ongoing assessment of SPD efforts to ensure lawful and constitutional policing to promote public trust and officer safety. The first substantive review under that plan was the Seattle Police Department Use of Force Assessment (Use of Force Assessment) published in February 2024 to update the Court and the public on SPD compliance with the Consent Decree.[2]

This report assesses SPD response to individuals in crisis during the years 2021 to 2023. For this assessment, OIG reviewed:

- SPD data related to crisis intervention response and use of force;
- Training received by officers and dispatchers for responding to individuals in crisis; and
- A sample of cases from 2023 to complete a qualitative examination of SPD crisis response by examining body-worn videos (BWV), officer reports, and Chain of Command (COC) reviews.

Consistent with previous Monitoring Team reports, OIG found SPD to be in continued compliance with the crisis intervention requirements of the Consent Decree. Analysis of SPD crisis intervention data indicated similar outcomes as those previously reported by the Monitoring Team with improved data collection related to individual demographics. Many of the crisis trainings reviewed by OIG prioritized de-escalation and reducing the need for force; OIG identified potential improvements for trainings to more closely align with national best practices. The qualitative review found officers largely acted within policy, with the COC identifying and addressing any practices found to be out of policy.

## Assessment Objectives

OIG has set the following objectives for this assessment:

- Compare current rates of deployment for SPD Crisis Intervention Team (CIT) certified officers, responses to crisis calls, outcomes of crisis contacts, and other key statistical measures to previous years to identify relevant trends;[3]
- Review training provided to SPD officers to assess whether they are based on CIT best practices;

---

[1] Comprehensive Assessment of the Seattle Police Department, 2022, page 105.
[2] Seattle Police Department Use of Force Assessment, February 2024.
[3] Crisis Intervention Team (CIT) is used in multiple sections of this report. SPD refers to their internal crisis program as the CIT Program. The SPD CIT Program offers trainings in crisis intervention team-trained tactics. Officers may also be certified in crisis response team tactics upon receiving external CIT training. CIT best practices refer to guidance provided by CIT International for crisis intervention team policies, trainings, and certifications.

- Verify the tactics and decision-making of officers when responding to individuals in crisis to assess compliance with policy and training;
- Verify the methods used to de-escalate in crisis contacts and prevent situations leading to unnecessary, excessive, and unreasonable uses of force;
- Review crisis responses, including uses of force, to identify potential race-based disparities;
- Analyze officer interactions with people in crisis to identify systemic issues that may contribute to improper or inappropriate responses; and
- Verify force reporting, investigation, and COC reviews for crisis contacts to confirm compliance with SPD policy.

# Definitions

## SPD Classification and Documentation of Crisis and Uses of Force

### *Crisis Intervention Documentation*

SPD 16.110-POL defines behavioral health crisis as: "An episode of mental and/or emotional distress in a person that is creating significant or repeated disturbances and is considered disruptive by the community, friends, family, or the person themselves."

Policy requires officers to document all contacts with subjects appearing to be in any type of behavioral crisis.[4] The Behavioral Crisis Report is required for every interaction involving behavioral crisis, even if no other documentation is required (i.e., Use of Force Reports).[5] References to "crisis contacts" in this evaluation are these individual incidents documented by SPD.

The relatively broad definition of crisis results in the identification and tracking of an expansive range of contacts with individuals exhibiting an array of behaviors. The inclusive definition and the requirement to track contacts beyond those that result in force or arrest allow for a more comprehensive review of officer interactions with individuals in crisis.

### *Use of Force Categorization and Reporting*

SPD categorizes force according to the severity or significance of the force involved:[6]

- **De minimis:** Physical interaction meant to separate, guide, and/or control without the use of control techniques that are intended to or are reasonably likely to cause any pain or injury.

- **Type I:** Force that causes transitory pain or the complaint of transitory pain.

---

[4] SPD Policy Manual, 16.110-POL-5.9.
[5] SPD policy refers to this as a Behavioral Crisis Report. OIG observed that in previous Monitoring Team reports and other settings it has been referred to by other names such as a Crisis Template and Crisis Contact Form. OIG will use the term Behavioral Crisis Report in this assessment.
[6] SPD Policy Manual, Interim Policy 8.050 Use of Force Definitions during 2023. OIG notes there have been updates to the policy categorizing force reporting. These were the definitions used during the reporting period included in this assessment.

- **Type II:** Force that causes or is reasonably expected to cause physical injury greater than transitory pain but less than great or substantial bodily harm.

- **Type III:** Force that causes or is reasonably expected to cause great bodily harm, substantial bodily harm, loss of consciousness, or death.

SPD records and calculates force data for situations with multiple involved officers, multiple applications of force per officer, and/or multiple tools. SPD counts force statistics based on individual officer Use of Force Reports, with each use of force constituting a combination of a unique officer, unique subject, and unique incident. For example, if three officers use varying applications of force against a single subject during a single event, that would count as at least three uses of force, one per officer reported, and is investigated at the highest level of force used during the incident.

## SPD Crisis Infrastructure

SPD refers to their internal crisis program as the CIT Program. The SPD CIT Program manages the Department's response to individuals in crisis, including overseeing the Crisis Response Unit (CRU) and the Crisis Intervention Committee (CIC).[7]

### Crisis Intervention Training

All SPD officers receive foundational crisis training as well as annual refresher training. Officers must complete an additional 40-hour comprehensive training to be CIT-certified. These trainings are described in greater detail in Section III. SPD policy requires at least one CIT-certified officer be dispatched to calls potentially involving a subject in crisis.[8] Policy also requires officers to make reasonable efforts to request the assistance of CIT-certified officers when encountering subjects in crisis.[9] When available and appropriate, CIT-certified officers are expected to take the lead when interacting with subjects in crisis, and to be available for consultation regarding strategies for resolving the crisis contacts.[10]

### Crisis Response Unit

The CRU has two components. The Crisis Response Team (CRT) primarily responds to in-progress calls to support patrol officers. The Crisis Follow-Up Team (CFT) follows up on crisis contacts to support subjects' behavioral health and to "prevent and reduce harm."[11]

### Crisis Intervention Committee

SPD maintains the CIC with the purpose of building "an effective regional crisis incident response built upon best practices, innovation, and experience."[12] The committee includes representatives from various City departments, mental health professionals, academics, and community organizations. The CIC holds meetings facilitated by SPD CIT program sergeants. The meetings include presentations on crisis-related topics and opportunities for feedback and questions from

---

[7] SPD Policy Manual, 16.110-POL-2.1.
[8] SPD Policy Manual, 16.110-POL-5.2.
[9] SPD Policy Manual, 16.110-POL-5.1.
[10] SPD Policy Manual, 16.110-POL-5-2.
[11] SPD Policy Manual, 16.110-POL-4.2.
[12] SPD Policy Manual, 16.110-POL-1.1.

stakeholders. SPD has indicated a desire for future meetings to be more interactive and directed by all participants, not just SPD. OIG has observed the meetings to be an effective opportunity for regional stakeholders to collaborate and share ideas.

# II.   SPD Crisis Response

## Scope and Approach

This section assesses SPD officer interactions with individuals experiencing behavioral or mental health crises between 2021 and 2023. OIG reviewed SPD data for crisis contacts, including subject demographics, contact resolution, deployment of CIT-certified officers, and use of force reporting. OIG also reviewed Office of Police Accountability (OPA) data related to misconduct allegations for crisis contacts.[13] To provide a continuation of the analysis conducted by the Monitoring Team, OIG replicated the Monitoring Team's assessment methodology and used a similar approach to extend the analysis through 2023. As such, data reported by SPD may differ from the data presented in this report. OIG plans to evaluate SPD data processing to identify future improvements in assessment and reporting.

 SPD noted during this evaluation that the data provided to OIG did not include crisis contacts involving Type III uses of force or Officer Involved Shootings (OIS). There was one Type III and one Type III OIS that were not tracked as crisis contacts in SPD's database.[14] This discrepancy was not identified by SPD until after OIG submitted the Use of Force Assessment, so the data is not represented in that report filed with the Court earlier this year. SPD is developing a process to ensure any future contacts are appropriately reported and captured for subjects in crisis. Of note, Type III and Type III OIS cases receive the most rigorous review of any force cases, per SPD policy. These cases are examined individually in extended FRB meetings. As with all FRB meetings, OIG is in attendance and has an opportunity to provide feedback on the process at the time of review.

## Main Findings

Between 2021 and 2023:

- SPD responded to a yearly average of 10,153 crisis contacts, representing around 3% of total SPD contacts.
- A yearly average of 65% (5,802) of crisis contacts involved white subjects, 27% (2,428) involved Black subjects, and 5% (466) involved Asian subjects. Contacts with subject race listed as unknown decreased from 44.7% (4,551) in 2019 to 11.2% (1,125) in 2022.
- Individuals with recorded unknown gender decreased from 38% (3,853) in 2019 to 2% (229) in 2021.
- Emergent detentions/ITA increased from 29.8% in 2021 to 34.7% in 2023. Contacts offered or referred to services also decreased.
- CIT-certified officers were dispatched in 77% (7,823) of crisis calls and arrived to 71% (7,177) of crisis calls.

---

[13] SPD's ongoing data cleaning operations can lead to slight changes in reporting numbers, which may lead to differences between the data in this report and SPD's continually updated dashboards and open data online.
[14] These cases were included in the overall counts of Type III and Type III OIS cases for 2023, but they were not identified as having involved subjects in crisis.

- Fewer than 2% (520) of all crisis contacts included any reportable level of force. Of these crisis contacts involving force, Type II uses of force occurred in less than 37% (188) of contacts. Type III (OIS included) uses of force occurred in less than 2% (8) of contacts.
- 0.40% of all crisis contacts resulted in an OPA complaint. The highest number of OPA cases related to crisis contacts occurred in 2023 (54).

## Crisis Contacts

Figure 1 displays the number of individuals in crisis and total number of recorded crisis contacts between 2021 and 2023. In that period, SPD responded to a yearly average of 10,153 crisis contacts involving 5,683 distinct individuals. Crisis contacts constituted between 3.14% and 3.7% of total SPD contacts.



**Figure 1. Number of Crisis Contacts and Individuals in Crisis by Year.**

SPD Data Analytics Platform based on SPD Behavioral Crisis and Subject counts.

## Subjects with Multiple Crisis Contacts

The number of individuals with one crisis contact remained stable with 4,128 in 2021, 4,123 in 2022, and 4,226 in 2023, representing a 2.4% increase between 2021 and 2023. Figure 2 categorizes individuals with more than one crisis contacts by year: 21.4% of individuals had between two and four crisis contacts, and 2.8% had seven or more reported encounters.



**Figure 2. Frequency of Crisis Contacts per Subject by Year.**

SPD Data Analytics Platform based on SPD crisis contacts.

## Subject Demographics

Figure 3 shows the percentage and count of crisis contacts by race between 2021 and 2023. In that period, 65% of crisis contacts involved white subjects, while 27% involved Black subjects, and 5% involved Asian subjects. Contacts with subject race listed as unknown decreased from 44.7% (4,551) in 2019 to 11.2% (1,125) in 2022. Percentages are based on the total number of crisis contacts per year.



Figure 3. Number of Crisis Contacts by Known Race and Year.

Source: SPD Data Analytics Platform based on SPD crisis contacts. Other Minorities: American Indian or Alaska Native and Native Hawaiian or Other Pacific Islander.

Figure 4 shows the percentage of crisis contacts by gender between 2021 and 2023. During that period, the number of women and men with reported crisis contacts both decreased. Individuals with recorded unknown gender also decreased, from 38% in 2019 to 1.7% in 2021. Subjects identifying as gender diverse or gender nonconforming constituted 2.2% of crisis contacts between 2021 and 2023. Percentages are based on the total number of behavioral crises per year.



Figure 4. Number of Crisis Contacts by Known Gender and Year.

Source: SPD Data Analytics Platform based on SPD Behavioral Crisis counts.

Figure 5 shows the percentage of crisis contacts by age between 2021 and 2023. In that period, subjects with reported crisis contacts aged 30 to 39 and 40 to 49 comprised 26% and 20% of individuals in crisis, respectively. The percentage of subjects with age recorded as unknown decreased from 39% in 2019 to 4% in 2023. The percentage remained below 5% between 2021 and 2023. Percentages are based on the total number of behavioral crises per year.

Figure 5. Number of Crisis Contacts by Known Age and Year.



Source: SPD Data Analytics Platform based on SPD crisis contacts.

## Resolution of Crisis Contacts

Figure 6 shows the resolution of crisis contacts between 2021 and 2023. The percentage of contacts ending in arrest remained largely unchanged across that period. Involuntary Treatment Act (ITA)/emergent detentions increased from 2021 (29.8%) to 2023 (34.7%). Subjects offered or referred to services decreased from 2021(20.8%) to 2023 (16.4%).

**Figure 6. Crisis Contact Outcomes by Year.**



Source: SPD Data Analytics Platform based on SPD crisis contacts. Other: Chronic Complaint, Unable to Contact, Voluntary Committal, etc. ITA: Involuntary Treatment Act. Offered or Referred to Services:  CARE referral, Detox, Shelter, Spruce Street, Social service / Alcohol and Drug / Treatment referral, Shelter transport, MCT (Mobile Crisis Team), Crisis Clinic (Crisis Connections), CSC / CDF (Crisis Solution Center / Crisis Diversion Facility), CORS (Children's Crisis Outreach Response System), DMHP / Referral (DCR), Drug / Alcohol treatment referral, Health One Referral, LEAD Referral, and resources offered / declined.

## CIT-Certified Officers

Officers must complete a 40-hour, comprehensive training to receive CIT certification. The certification training is provided by the Washington State Criminal Justice Training Commission (WSCJTC).  The number of CIT-Certified officers increased from 506 in 2021 to 517 in 2022. As of December of 2023, 629 officers are CIT certified.

Figure 7 shows the percentage of CIT-certified officers dispatched to and arriving to crisis contact calls between 2021 and 2023. On average, CIT-certified officers were dispatched in 77% of crisis calls, with the lowest percentage reported in 2022 at 73.8%. This represents a decrease from 82% response rate reported by the Monitoring team in 2020. The arrival rates of CIT-certified officers were lower than dispatch rates, averaging 70.6% between 2021 and 2023. The lowest arrival rate was also reported in 2022, at 67%.[15]

---

[15] While the data available for review did not provide an explanation for these changes, this is a possible area of future review by OIG.



**Figure 7. CIT-Certified Officers Dispatched and Arriving to Crisis Contacts by Year.**

Source: SPD Data Analytics Platform based on SPD crisis contacts.

## Crisis Contacts Involving Use of Force

SPD records and calculates force data for situations with multiple involved officers, multiple applications of force per officer, and/or multiple objects. SPD counts force statistics based on individual officer Use of Force Reports, with each use of force constituting a combination of a unique officer, unique subject, and unique incident. SPD categorizes force according to the severity and significance of the force used with the following terms: de minimis, Type I, Type II, Type III, Type III OIS.[16]

Figure 8 shows reported uses of force during crisis contacts. Fewer than two percent of all crisis contacts between 2021 and 2023 included any reportable level of force. Of these crisis contacts involving force, Type II uses of force occurred in less than 37% of contacts and Type III (OIS included) uses of force occurred in less than 2% of contacts.

---

[16]De minimis force does not require force reporting and therefore will not be included in force counts. Type I force is the lowest level and includes firearm pointing and force that causes transitory pain or complaint of transitory pain. Type II includes force that is reasonably expected to cause greater than transitory pain but less than great or substantial bodily harm, such as a Taser or 40-millimeter launcher use. Type III is the most serious force and causes or is reasonably expected to cause great bodily harm, substantial bodily harm, loss of consciousness, or death. Type III includes potentially lethal force by discharge of a firearm.



Figure 8. Use of Force in Crisis Contacts by Type and Year.

Source: SPD Data Analytics Platform based on SPD crisis contacts.

## Misconduct Allegations for Crisis Contacts

OPA conducts investigations into allegations of misconduct by SPD officers. A misconduct investigation involves a unique event with one or more allegations of misconduct and one or more officers. Investigations data is available for public inspection on the City's open data portal.

Figure 9 shows number of OPA cases related to crisis contacts reported to OPA between 2021 and 2023.[17] The highest number of OPA cases related to crisis contacts occurred in 2023 (54). Seven of these cases included specific allegations of violations of SPD crisis intervention policies (six in 2021, one in 2020, and none in 2023).[18]

---

[17] OPA investigates complaints on an ongoing basis. Incidents involving crisis which occurred prior to 2021 may be included in this analysis. OIG linked OPA case number with its respective crisis contact report number. Report number source: SPD Data Analytics Platform, Crisis Events dataset. OPA case number source: SPD Data Analytics Platform, OPA data set.

[18] Allegations related to SPD crisis intervention policies: 3 active cases, 3 cases processed as Supervisor Action, 1 case not sustained: Lawful and Proper.

**Figure 9. Crisis Contacts with OPA Complaint by Year.**



Source: SPD Data Analytics Platform and case management system.

Table 1 tabulates the source of complaints by year.  Between 2021 and 2023, 50% of OPA cases related to crisis contacts were forwarded or initiated by SPD, while 48% were initiated by community members.

**Table 1. Complaint Source by Year**

| Source | 2021 | 2022 | 2023 |
|---|---|---|---|
| Community Member | 24 | 11 | 31 |
| SPD - Forwarded | 15 | 12 | 16 |
| SPD - Initiated | 11 | 11 | 4 |
| Other | | 1 | 3 |

Source: Case management system. Other: Outside Agency, City Attorney, Customer Service Bureau, Third Party.

Figure 10 shows the classification of OPA complaints related to crisis contacts between 2021 and 2023. Full investigations were the most common classification each year. Supervisor Action classifications had the largest increase, with five classifications in 2021, two in 2022, and twelve in 2023.



**Figure 10. OPA Classification by Year.**

Source: Case management system.

Figure 11 shows the breakdown of OPA complaints by resolution type between 2021 and 2023. Of the 139 total complaints, one investigation concluded with all allegations sustained. Nine investigations concluded with partially sustained allegations, and 73 concluded with no sustained allegations. Sixteen investigations were closed with Supervisor Actions.

**Figure 11. OPA Complaints by Resolution Type between 2021 and 2023.**



Source: Case management system. OIG certified all above cases as Full (84%, 70), Full with Notes (12%, 10), or Partial (4%, 3).

The sustained allegations included:

- Nine for Force (Six De-Escalation, one Type I Use of Force, and two Reporting);
- Four for Search and Seizure;
- Three for Professionalism;
- Two for Equipment and Uniform;
- Two for Supervisory Responsibility; and
- One for Investigations and Reports.

Table 2 shows the number of officers referred to OPA for incidents involving crisis contacts reported between 2021 and 2023. Officers who received multiple OPA referrals in a calendar year were counted once for that year. The highest number occurred in 2023, with 96 individual officers referred to OPA.

**Table 2. Number of Officers Involved in OPA Cases.**

| Year | Number of Officers |
|------|-------------------:|
| 2021 | 84 |
| 2022 | 61 |
| 2023 | 96 |

Source: Case management system.

# III.   SPD Crisis Intervention Training

## SPD Training Requirements

Officers receive crisis training multiple times throughout their tenure at SPD, including foundational learning for new officers, annual refresher trainings, and an optional certification course. Some trainings are provided by SPD's Education and Training Unit while others are offered by the WSCJTC. In 2022, SPD launched a comprehensive foundational training on crisis intervention.

Newly recruited officers receive eight hours of foundational CIT training through the WSCJTC police academy. SPD provides ten hours of post-academy CIT training. Both include scenario-based training.

SPD officers are required to complete eight hours of in-service CIT training annually.[19] Washington State requires completion of a two-hour online crisis intervention training each year.[20] The remaining six hours of yearly training are provided by SPD. In 2024, this comprised of a four-hour CIT training with the remaining two hours of crisis training woven into other training courses.

Officers receive CIT certification after attending a 40-hour course provided by the WSCJTC. Consistent with best practices for CIT certification, it is not required for SPD officers to complete the course - certification is instead offered on a voluntary basis. SPD monitors the required annual training hours for all officers, including those who are CIT-certified. The training progress is sent to OIG periodically.

## CIT Training Best Practices

OIG developed a CIT best practices rubric using guidance from CIT International and the Department of Justice.[21] The rubric was used to evaluate the WSCJTC 40-hour CIT-certification course curriculum and individual modules. The guidance suggests:

- Dedicated time should be spent learning about mental health topics including mental health conditions, signs and symptoms, special populations and their community, and special topics like suicide assessment.
- Sessions should be taught by mental health practitioners and should include presentations by people living with mental health conditions, their families, and community advocates.
- Substantial time should be spent on:

---

[19] SPD Policy Manual, 16.110-POL-3.1

[20] RCW 43.101.427

[21] OIG primarily relied on two sources to develop the CIT Best Practices Rubric: CIT International's Guide to Best Practices in Mental Health Crisis Response which was developed by CIT international with contributions from the National Alliance on Mental Illness (NAMI) and the National Council for Behavioral Health; and U.S Department of Justice Bureau of Justice Assistance, Effective Community Responses to Mental Health Crises: A National Curriculum for Law Enforcement Based on Best Practices from CIT Programs Nationwide, Instructor Guide which provides detailed guidance for planning each training module in the CIT curriculum.

- ○ Site visits with individuals living with mental health conditions in community settings like mental health clinics or local National Alliance on Mental Illness (NAMI) chapters; and
- ○ De-escalation training, including practical skills which should occur on multiple days throughout the training.

OIG created an additional rubric using CIT International's guidance for developing CIT curriculums in alignment with adult learning strategies.[22] The primary building blocks are knowledge; experiencing, sensitizing, and building empathy; and experiential, practical application. The guidance suggests:

- Officers should begin by learning the basics about mental health conditions, as well as available resources to support people in crisis, and how those services can support officers in their work.
- Once officers have a foundational knowledge of these topics, they should progress to informal conversations with people with mental health conditions to hear directly about their life experiences.
- Officers can apply their knowledge to learn and practice de-escalation skills. They can integrate their knowledge with practical skills for safely resolving a crisis scenario and practice realistic scenarios.

Although the summaries of SPD's four-hour crisis training and 911 dispatch training reference these best practices, the rubrics were used only to evaluate the WSCJTC training.

## Four-Hour Crisis Training

OIG staff attended a session of the four-hour CIT training provided by SPD's Education and Training Unit as part of the required eight hours of SPD's annual crisis intervention training. The training was offered multiple times over the course of two months to accommodate officers' schedules.

The training format was a combination of lecture, video, and interactive discussion. Instructors continually integrated the experiences of officers and asked for examples and input. Officers were engaged throughout the training, sharing personal experiences, discussing tactics and decision-making, and offering suggestions for improved outcomes.

The content of the training was based on CIT best practices and SPD policy. Instructors emphasized respect for subjects in crisis while acknowledging the different needs officers are balancing during crisis interactions. Instruction and resulting discussion focused on time, distance, shielding, and verbal tactics with concrete examples. An overview of resources available to individuals in crisis was provided with instructions on how and when to make appropriate referrals. OIG found the instructors balanced the need to cover a great deal of information while also providing officers the opportunity to participate and share their experiences.

---

[22] OIG relied on the following sources for the Adult Learning Principles Rubric: CIT International's Guide to Best Practices in Mental Health Crisis Response provides guidance on adult learning strategies through a "CIT Training Building Blocks" section; and Education Techniques for Lifelong Learning: Principles of Adult Learning is a journal article on adult learning within the nursing context.

## CIT 40-Hour Certification Course

OIG evaluated the 40-hour CIT Certification training offered through the WSCJTC using the best practices and adult learning principles rubrics described above. OIG staff attended two sessions of the 40-hour certification courses at WSCJTC. In addition to attending the sessions, OIG reviewed WSCJTC's training materials and the post-training evaluations completed by attendees.

OIG found the courses that most closely followed CIT best practices and adult learning principles were also the courses that received the most positive feedback on attendee evaluations. In line with CIT best practices, the instructors of those courses drew explicit connections to make material relevant and meaningful for officers. They focused on how the information and skills could keep officers safe and provide better outcomes for the subjects they encounter. In line with adult learning principles, these presentations engaged the attendees by using different mediums, asking questions of officers, and bringing in real-life experiences of subjects in crisis.

The training concluded with a hands-on, scenario-based training to practice de-escalation skills learned in the courses. This session was well received by attendees and generally aligned with best practices. However, the two-hour module occurred at the very end of the week. According to CIT best practices, there should have been more time allocated to practicing skills, and it should have been included throughout the course, rather than only at the very end.

While there were multiple courses on mental health topics, a course focused primarily on substance use disorders was not included. A dedicated course would have been especially relevant to SPD attendees given the individuals they often encounter in their work. CIT best practices also focus on providing trainees the opportunity to hear from and interact with those experiencing mental health conditions and their families. This piece was almost completely absent from the training.

OIG shared these observations and additional feedback with SPD leadership in April 2024. As noted, OIG relied on best practice guides in assessing the training. Much of the feedback provided by officer participants paralleled the observations of OIG.  OIG suggested SPD consult with WSCJTC using the best practices and adult learning guides to evaluate where courses align or deviate and to assess potential changes to content and structure.

## Seattle 911 Dispatcher Crisis Identification Training

OIG staff attended a portion of the 911 call center training for dispatchers, provided by the Seattle Community Safety and Communications Center. Although SPD officers do not receive this training, it is included in the assessment because many crisis contacts begin with calls to the dispatch center, making the information dispatchers receive from callers, and provide to officers, crucial to SPD crisis response.

OIG observed a three-hour lecture training instructing call takers how to identify and handle crisis calls. The course trained on recognizing if mental illness or behavioral crisis is a primary factor in an incident, communicating with individuals in crisis, and dispatching CIT-certified officers and appropriate community mental health resources. The course included foundational learning on behavioral health crisis definitions, behaviors, and symptoms, as well as SPD policies on CIT-

20

certified officer response and dispatch. Instructors highlighted the importance of properly identifying a crisis call and its impact on the outcome of a call.

After the lecture, students observed call takers on the dispatch floor and were provided practice scenario packets to study independently. Additional role-playing practice occurred in the classroom with other students. Although OIG was not present for the scenario training, the training instructor noted the role-playing lasts three hours and consists of an instructor acting as a caller, with trainees taking turns as the call taker. The class then discusses what went well and areas for improvement.

The training provided a thorough overview of behavioral health. Instructors taught tactics to assist in collecting as much information as possible and how to interpret that information to best support responding officers. Overall, the training aligned with SPD policies and trainings received by officers.

## Conclusion

SPD trainings provided clear definitions on concepts related to crisis and effective communication skills for engaging with individuals in crisis. SPD training prioritizes de-escalation and the resolution of each contact with the least amount of force. While OIG provided feedback for the WSCJTC CIT Certification Course, there were many aspects that aligned with best practices. OIG found the dispatch and call taker trainings to be consistent with training received by officers. OIG will attend future trainings periodically to provide ongoing assessment of SPD trainings and reassessment of WSCJTC CIT Certification Course if changes are made.

# IV.   Qualitative Assessment of SPD Crisis Response

OIG conducted a qualitative assessment of SPD crisis response, including use of force, OIG reviewed relevant video, corresponding reports, force reporting, and COC reviews. The assessment evaluated whether:

- Officers follow training and policy;
- Officer tactics and decision-making help de-escalate and avoid unnecessary, excessive, or unreasonable force;
- Documentation is proper and complete; and
- There is thorough investigation and review of force used on individuals in crisis.

OIG examined a sample of 91 cases from 2023 by reviewing relevant video and documentation from each case on a variety of dimensions including crisis planning and tactics, respectful interaction with subjects, and thoroughness of COC reviews.[23] OIG used a multi-stage sampling strategy to collate a set of cases with diverse outcomes and varying levels of force (Table 3).[24] This review is intended to be a small-scale study to demonstrate the capacity of OIG to conduct in-depth qualitative assessments while being mindful of current resources and timelines. This assessment lays the groundwork for future, large-scale qualitative assessments by OIG.

| Table 3. Crisis Cases Selected for Evaluation by Use of Force Type | | | | |
|---|---|---|---|---|
| Outcome | De Minimis/None | Type I | Type II | Total |
| Subject Arrested | 11 | 12 | 12 | 35 |
| Chronic Complaint | 8 | | | 8 |
| Emergent Detention/ITA | 8 | 8 | 8 | 24 |
| No Action Possible/Necessary | 8 | | | 8 |
| Referred to Services | 8 | | | 8 |
| Voluntary Committal | 8 | | | 8 |
| Total | 51 | 20 | 20 | 91 |

## Key Insights

While OIG is not presenting the findings from this assessment as a representative sample of crisis contacts from 2023, the following insights were gained from the review:

- Overall, officers followed policy and training when communicating with subjects in crisis by demonstrating respect for subjects' dignity, using language civilians could understand when warning about potential force, and avoiding unnecessary threats of force or language that could escalate incidents.
- When feasible, officers utilized appropriate tactics and decision-making to de-escalate incidents by stabilizing or slowing down situations, maintaining distance between subjects and themselves to allow for greater reaction time, and seeking additional resources as needed to avoid unnecessary, excessive, or unreasonable force.

---

[23] See Appendix A.
[24] See Appendix A.

- When force was used, it was almost always within policy and officers stopped using force when no longer necessary to gain compliance. Any out of policy force was identified and addressed by SPD internal review processes.
- Overall, documentation of force was thorough and complete, with the COC reaching evidenced-based conclusions and the internal review structure of COC, FRU, or FRB identifying or addressing deficiencies.

## Crisis Communications and Tactics

SPD policy requires officers to attempt de-escalation in crisis contacts when safe and feasible.[25] Officers are trained to use verbal and nonverbal communication skills as well as time, distance, and shielding.

OIG observed the use of trained communication skills in most contacts, including officers maintaining a calm demeanor, building rapport with subjects, and attempting to gain voluntary compliance. Officers communicated with subjects using one voice, demonstrated respect for subjects' dignity, and avoided unnecessary threats of force or other language that could escalate an incident. OIG also observed officers utilizing time and shielding to de-escalate crisis contacts, and officers consistently using multiple de-escalation tactics before physically engaging with the subject or using force.

## Use of Force in Crisis Contacts

### Necessity, Reasonableness, and Proportionality of Force

Force largely appeared to OIG reviewers to be necessary, reasonable, and/or proportional to subjects' actions when considering factors such as the time available to officers to make decisions, the availability of other resources, and the need to protect officers, subjects, and members of the public from greater injury.

Decisions to use force were often impacted by subjects' access to weapons as well as the time available to officers to consider options. Reviewers observed officers employing de-escalation tactics to prevent unnecessary, unreasonable, or excessive uses of force. Reviewers noted at least one case where officers demonstrated a reluctance to use force, and the COC determined officers would have been justified in using the eventual force sooner to protect their safety. In the small number of cases where reviewers noted issues with officer choices, those concerns were also identified by SPD's internal review process through COC, FRU, or FRB or ultimately by OPA.

### Duration of Force

Reviewers evaluated whether officers stopped using force when it was no longer necessary to gain compliance. In all but one case involving use of force, reviewers observed officers stopping or reducing force upon gaining a subject's compliance.[26]

---

[25] SPD Policy Manual, 16.110.
[26] The FRB reviewed the one case where reviewers concluded that force lasted longer than necessary. The FRB documented concerns regarding whether the force was necessary, reasonable, and proportional and made a referral to OPA.

## Force Reporting and Chain of Command Reviews

OIG observed officers and sergeants reporting uses of force appropriately to ensure potential injuries were addressed. Officers also reported subject injuries and complaints of pain as applications of force, even if their origin was unclear. For example, in a case involving a subject punching the windows of vehicles parked on a street, an officer reported a subject's complaint of wrist pain during handcuffing, even though the subject's pain could have resulted from his own actions. In another case, officers used control holds to prevent a disoriented, jaywalking subject from boarding a bus. After the subject was placed on a gurney, officers noticed bruises on the subject's legs and reported the encounter as a Type II use of force, even though the bruises may not have been caused by the officers' actions.

Each use of force is reviewed by the COC, including the officer's sergeant, administrative lieutenant, watch commander, and captain. OIG examined each step of the COC investigation process to assess thoroughness and compliance with policy.

In the sample reviewed, OIG noted some concerns in COC investigations. OIG was unable to locate Handcuff Discomfort Forms in some cases where subjects expressed pain during handcuffing.[27] The COC also rarely noted when officers did not follow best practices for communication in crisis intervention. OIG notes that the FRU or FRB frequently identified these issues in their review at a later stage in the process. OIG reiterates that given the sample of cases, this review cannot provide an overall assessment of these areas.

## Summary

In a review of videos and documentation associated with 91 crisis contacts, OIG observed officers communicating effectively with subjects and attempting to de-escalate incidents before resorting to force. When uses of force did occur, OIG consistently found them necessary, reasonable, and proportional to circumstances. Any force that did not comply with policy was also identified by the SPD internal review process. While not intended to be a representative review, the findings yield valuable insights and provide a foundation for future work.

---

[27] 6 of 91 examined cases included a subject complaint of handcuff discomfort, yet Handcuff Discomfort Forms could only be located for three of these cases. OIG advises against drawing broad inferences from a limited number of cases.

24

# V.    Conclusion

In its 2011 investigation of SPD, the U.S. Department of Justice reported an estimated 70% of use of force cases involved a subject in behavioral health crisis.[28] SPD has since developed sound and standardized policies and training regarding crisis intervention and created new infrastructures for documenting crisis contacts for purposes of continuous improvement. These reforms resulted in substantially decreased uses of force against subjects in crisis since 2016.

OIG's findings provide further evidence of improvement, with fewer than two percent of crisis contacts between 2021 and 2023 including any reportable use of force. OIG's review of body-worn video, which oversampled encounters that included force, found few instances of officers using unnecessary, unreasonable, or disproportionate levels of force. When such uses of force do occur, they are reviewed and addressed by the COC, FRB, and OPA.

Between 2021 and 2023, ITAs increased and referrals to services decreased. Fewer than 7% of crisis subjects were arrested per year, a rate lower than the 7.5% the Monitoring Team reported in its 2016 assessment when SPD was found compliant with Consent Decree provisions. [29]

SPD's tracking of crisis contacts and outcomes allowed OIG to conduct the robust analyses of this assessment. The extensive video footage available for review allowed for a deeper analysis that provides opportunity for continued learning and insight. SPD policies that govern these aspects of SPD operations provide the framework for continued internal and external oversight and accountability.

Since the inception of OIG in 2018, the Inspector General (IG) has observed noticeable changes in SPD response to individuals in crisis. The conclusions drawn from this assessment are also supported by observations over the last six years in FRB meetings and other reviews by OIG. The impact of enhanced policies and training, and ongoing internal and external review has been observed in officers' interactions with the community. The IG has observed a strong commitment to ongoing improvement of the FRB process by SPD leadership and FRU staff, and a focus on learning from force incidents to create better outcomes for officers and the community.

The City is continuing to implement alternative strategies for crisis response with less reliance on law enforcement. In 2020, SPD began a co-responder program to dispatch non-sworn mental health professionals alongside sworn officers to crisis contacts. In October 2023, the City established the Community Assisted Response and Engagement (CARE) department as a "third branch of public safety."[30] CARE consists of civilian Community Crisis Responders (CCR) who can respond to low-risk behavioral health incidents in lieu of officers. CARE is currently expanding to serve more geographic areas and residents in Seattle. In future assessments, OIG will review how these diversified approaches impact crisis response and intervention.

---

[28] U.S. Department of Justice Civil Rights Division and United States Attorney's Office Western District of Washington, *Investigation of the Seattle Police Department*, p. 4.
[29] Seattle Police Monitor, May 2022 Comprehensive Assessment, p. 105.
[30] CARE Department.

# Appendix A

**Qualitative Assessment of SPD Crisis Response Sampling and Methodology**

## Sample and Sampling Strategy

Cases were selected for review using a purposive sampling strategy. All cases involving subjects who experienced a mental health crisis and subsequent encounter with SPD in 2023 were stratified by four levels of force (none, Type I, Type II, or Type III).  They were further categorized by six outcomes (subject arrested, emergent detention/ITA, no action possible/necessary, referral to services, voluntary committal to treatment, and chronic complaint). This yielded twenty-four possible categories (6 possible outcomes × 4 levels of force). Only 10 of these categories had sufficient case counts for analysis (Table 4).

OIG excluded cases with other outcomes (Other, Unable to Contact, Case Manager/MH Agency Notified, Courtesy Transport, DCR Referral/DMHP, and Crisis Response Bulleting Reference). The team could not draw meaningful insights about cases with these outcomes because they rarely occurred, or cases within categories (e.g., "Other") were too dissimilar to draw substantive conclusions.

Cases within each category were randomly assigned an "index number" that corresponded to the order in which OIG would review them. Emulating a strategy first described by Guest et al. (2020)[31], OIG initially reviewed five cases from each category, then reviewed cases in batches of three. After reviewing each batch, OIG reviewers collectively determined if enough new insights emerged to warrant reviewing another batch of three cases.

---

[31] Guest, Greg, Emily Namey, and Mario Chen. "A simple method to assess and report thematic saturation in qualitative research." *PloS One* 15, no. 5 (2020): e0232076.

Table 4 displays the final count of cases reviewed within each category.[32]

**Table 4**

*Crisis Cases Selected for Evaluation by Use of Force Level and Outcome*

| Use of Force Level | Outcome | Cases |
|---|---|---|
| None | Subject Arrested | 11 |
| | Chronic Complaint | 8 |
| | Emergent Detention/ITA | 8 |
| | No Action Possible/Necessary | 8 |
| | Referred to Services | 8 |
| | Voluntary Committal | 8 |
| Type I | Subject Arrested | 12 |
| | Emergent Detention/ITA | 8 |
| Type II | Subject Arrested | 12 |
| | Emergent Detention/ITA | 8 |
| **Total** | | **91** |

## Data Collection

Three OIG staff members reviewed footage from body-worn and in-car videos recorded by officers responding to the selected crisis contacts. Reviewers read statements written by each responding officer and, in cases involving force, reviewed templates completed by SPD chain of command.

Using footage, reviewers evaluated officers' tactics (e.g., attempting to stabilize the situation, avoiding unnecessary physical confrontation), communication skills (e.g., providing subjects clear instructions in understandable terms, demonstrating respect for subjects' dignity), and professionalism (e.g., avoiding language that could escalate the incident) using 20 metrics derived from SPD Policy Manual. Reviewers appraised officers' performance on each metric. Reviewers also compared recorded events to officers' written statements and noted any discrepancies.

For cases involving any reportable level of force, reviewers checked whether officers followed SPD policies prohibiting officers from using neck restraints, using force to punish or retaliate against subjects, or using unnecessary force against restrained subjects. Reviewers then indicated whether force stopped when it was no longer necessary and, using 13 metrics, whether they agreed force was reasonable, necessary, and proportional to circumstances (e.g., the seriousness of the crime, level of threat posed by the subject to officers and the community). Reviewers inspected use of force investigation templates completed by involved officers' chain of command, including a sergeant, administrative lieutenant, watch commander, and captain. Reviewers verified that the chain of command completed all required forms, thoroughly reviewed the circumstances

---

[32] During a quality control check, OIG discovered that two additional cases were inadvertently reviewed. These two cases involved arrested subjects who experienced a Type I or Type II use of force. The error arose from a discrepancy between case outcome(s) recorded on crisis templates and arrest records. Upon this realization, reviewers discussed the impact of the additional cases on the assessment's integrity and determined that their inclusion would bolster the thoroughness of the findings.

surrounding the use of force, determined whether force was consistent with department policy and best practices, and, when necessary, took appropriate action to address deficiencies.

Information was stored in a Microsoft Access database hosted on a Criminal Justice Information Services (CJIS) compliant server.

For purposes of allocation of resources for future review, OIG estimates database development, data collection, and analysis spanned a combined 500 hours.

# Appendix B

**Acronyms, initialisms, and abbreviations:**

CARE: Community Assisted Response & Engagement

CCR: Community Crisis Responders

CFT: Crisis Follow-up Team

CIC: Crisis Intervention Committee

CIT: Crisis Intervention Team

CJIS: Criminal Justice Information Services

COC: Chain of Command

CRT: Crisis Response Team

CRU: Crisis Response Unit

DCR: Designated Crisis Responders

FRB: Force Review Board

FRU: Force Review Unit

ITA: Involuntary Treatment Act

IG: Inspector General

NAMI: National Alliance on Mental Illness

OIG: Office of Inspector General

OIS: Officer Involved in Shooting

OPA: Office of Police Accountability

SPD: Seattle Police Department

The Monitoring Team: Seattle Police Monitor

WSCJTC: Washington State Criminal Justice Training Commission