THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) Case No. 2:12-cv-01282-JLR )  )  **DECLARATION OF MATTHEW DIDIER** |
| v. | ) |
| CITY OF SEATTLE, | ) |
| Defendant. | ) |

I, Matthew Didier, being familiar with the facts set forth herein based on my personal knowledge, and being competent to testify, hereby declare under penalty of perjury that the following is true and correct:

1. I have worked with the Seattle Police Department for over 16 years. I became a lieutenant in June of 2023; before that I served as a patrol sergeant and a sergeant for the Office of Police Accountability. Before that I was a bike officer for six years specializing in crowd management from 2016-2021. I have taught crowd management training to officers since 2016. I have been involved in hundreds of crowd events during my time with SPD.

2. I currently serve as the Community Response Group (CRG) Commander, a role I began in July of 2023. CRG's role in crowd management is to intervene when needed; CRG

DECLARATION OF MATTHEW DIDIER - 1
(12-CV-01282-JLR)

Ann Davison
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

makes targeted interventions on individuals who need to be addressed for crowd safety. In addition to managing and leading CRG in crowd management settings, I also oversee street level operations (e.g., narcotics, auto theft), and investigative support.

**After the 2020 Protests, SPD Fundamentally Changed its Crowd Management Policy.**

3.  I have personal experience with the policy changes because I served as a bike supervisor during many of the demonstrations in 2020, and my role as a crowd management trainer requires that I learn and teach all policy changes. Since 2023, my role as a CRG Commander requires me to stay up to date on current Crowd Management policy; in addition, I regularly review policy when significant events are coming up to ensure policy is fresh on my mind. The version of SPD's Crowd Management policy that took effect in April 2021 is attached here as **Exhibit 1**. I will describe some of the key policy changes below.

4.  The policy has a matrix that separates crowd situations into tiers based on objective, observable crowd activities and dynamics. The tiers in the matrix correspond with different communication, management, and intervention strategies, giving commanders a roadmap to make decisions based on what they are seeing in the crowd and consistent with best practice on how to handle it. We work to modulate responses when possible so that our interventions have the least impact on the protest as a whole. The matrix provides the goal of returning to a peaceful protest posture as quickly as possible.

5.  Policy places a greater emphasis on de-escalation and allowing the First Amendment activity to continue as long as possible. Post-2020, we have taken de-escalation to the next level. For example, policy encourages promptly making arrests and removing people when a small number of individuals are committing unlawful actions within a crowd. Evidence shows that intervening to promote accountability in this way reduces escalation of

**DECLARATION OF MATTHEW DIDIER** - 2
(12-CV-01282-JLR)

Ann Davison
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

events and increases officer legitimacy within the crowd, especially when we focus our efforts on *individual* threats—versus focusing on the crowd as a whole. Effective communication allows the crowd to understand the basis for the police intervention and promotes legitimacy.

6. Greater emphasis is placed on de-escalation whenever it is safe and feasible, for example, by meeting with event organizers (before and during the protest) and tailoring the nature of the police presence (uniform, numbers deployed) to each event's circumstances.

7. Methods for giving dispersal orders are greatly improved. If a crowd must be dispersed for public safety reasons, officers must use sound amplification so that orders can be heard even by those at the back of the crowd. The dispersal order also must give protestors clear instructions about how and where to depart, acknowledging it can be difficult for someone in the middle of a large crowd to find a clear pathway to exit. Less lethal devices cannot be used to move or disperse a crowd until a reasonable amount of time is given for people to comply with the dispersal order. Policy authorizes individual officers to use force that is reasonable, necessary, and proportional in response to specific imminent threats of physical harm to themselves or identifiable others or to respond to specific acts of violence or substantial destruction of property.

### SPD Conducts Robust Crowd Management Training.

8. To implement the policy revisions, SPD substantially updated its crowd management training. The revised Crowd Management training places a heightened emphasis on de-escalation principles in the crowd management context. See Excerpts from Crowd Management Training Slides at p. 5 (attached here as Exhibit 2). Similar to individualized de-escalation tactics, crowd management can support positive outcomes by emphasizing time, distance, and communication. Examples include meeting with event organizers ahead of a

**DECLARATION OF MATTHEW DIDIER** - 3
(12-CV-01282-JLR)

protest; maintaining a less-visible police presence when feasible; and using social media to communicate information to protestors in real time. Exhibit 2 at p. 3-4.

9. Officers are trained in using new tactics to address individuals who are taking unlawful actions in otherwise lawful crowds, in order to minimize the collateral effects (e.g, of OC spray or blast balls) on non-violent demonstrators. Exhibit 2 at 1-2.

10. Crowd Management training emphasizes to officers that the use of any less lethal tool—such as pepper spray—must be reasonable, necessary, and proportional. Officers must articulate whether there is a less intrusive alternative and whether the subject poses an "immediate threat to any person," among other considerations. Exhibit 2 at 6-7.

11. SPD also updated its training around communicating dispersal orders. Officers are coached in giving detailed and clear instructions about why they are issuing a dispersal order and how and what direction people should go to leave the area—otherwise, it can be difficult for someone in the middle of a large crowd to find a clear pathway to exit.

12. Training requirements are rigorous. Every bike officer is required to take a full day of crowd management training as part of Bike School. CRG officers must complete Bike School, advanced tactics training, and work regularly with bike officers. Bike officers and CRG officers must conduct annual two-hour refresher training; patrol officers who work with CRG regularly also must complete the same annual refresher course.

13. Before SPD's new recruits receive state-mandated training at the Basic Law Enforcement Academy, they report to SPD for a five-week pre-academy course. Their coursework includes a full day of POET training that teaches de-escalation and conflict management skills.

14. In addition, SPD developed a specialized, four-hour crowd management

**DECLARATION OF MATTHEW DIDIER** - 4
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

training for commanders (lieutenants and above). The training equips commanders to lead safe events, e.g., by communicating reasonable and clear expectations before the event and by being available for on-scene consultation during the event. See Excerpts from Commanders Crowd Management Training Slides at p. 1-2 (attached here as Exhibit 3). We highlight the importance of following policy, the matrix, and the goal of allowing the First Amendment event to continue.

**SPD Has Improved at Facilitating Events Involving Large Crowds.**

15. Examples from demonstrations over the past three years illustrate the changes in SPD's policy and practice. Now the initial staffing for all demonstrations includes a Police Outreach Engagement Team, or "POET," team. POET is made up of two lieutenants, three sergeants, and eight officers. POET requires an eight-hour training class in addition to one-on-one field (practical) training experience that must be completed.

16. For planned events, POET regularly meets with demonstration organizers to prepare for successful and safe events and engages during the events to reduce any points of friction. When counter-protesters are expected, POET also contacts those organizers as well to try and prepare for different possibilities.

17. POET officers wear khakis and polo shirts (a softer, less intimidating look) and stay close enough to the crowd during events that they can engage quickly. Other assigned officers remain out of sight unless a more visible, active presence becomes necessary. That means, frequently, there is no need for a line with the officers on one side and the protesters on the other. SPD can staff 1,000-plus-person demonstrations this way, with POET as the only visible presence for the entire event.

18. An example from a specific protest illustrates how SPD uses POET. At one

**DECLARATION OF MATTHEW DIDIER** - 5
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

event, individuals were throwing lime bikes and construction signs into the road. POET was close by and saw that the protesters were doing their best to clean up the bikes and signs. POET walked over and thanked the organizers for cleaning up. The officers did not have to use sound amplification—they talked face-to-face, which helps maintain calm. The officers told the organizers that, if the unlawful activity escalated to a dangerous level, then SPD would have to disperse the protest. After that, the organizers talked to the offenders, convinced them to leave, and the demonstration was able to continue.

19.  Since 2020, SPD has become better at targeting and arresting people who cause property damage or violence without dispersing the entire protest. SPD uses a variety of tactics to isolate, arrest, and remove law violators quickly in order to contain unlawful activity. For example, to address crimes of property damage, SPD often has plainclothes officers follow offenders and make an arrest once they are sufficiently separated from the crowd, allowing the protesters to continue their First Amendment activities uninterrupted. Another example is that, if someone has assaulted a protester, then—depending on the circumstances—POET may inform the event organizers that an assault happened and let them know that officers are going to move in closer, thus securing the crowd's cooperation in advance so that officers can safely make the arrest.

**Less Lethal Tools and Force Overall Are Used Less Often at Crowd Events.**

20.  From 2021 through 2024, there have been hundreds of significant demonstrations, addressing highly charged topics and divisive political current events. SPD facilitated these First Amendment events with wide participation and safe outcomes.

21.  Overall levels of force used by officers at crowd events have been consistently low, particularly after the significant changes to policy and training that occurred 2021. When

**DECLARATION OF MATTHEW DIDIER** - 6
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200

it comes to less lethal tools, since 2020, SPD has not used blast balls or tear gas in any setting.

22. In 2025, compared to 2022-2024, more crowd events have required SPD to use force. Importantly, SPD's response has been moderate. One example stands out. On June 14, the "No Kings" protest, drew an estimated crowd of more than 70,000 people, the largest since the Women's March in 2017. No force was used, and no arrests were made. In addition to the peaceful approach taken by the demonstrators, POET's approach of continually communicating with the organizers also facilitated the positive outcome.

23. I repeatedly have seen firsthand how SPD's changed policy and strategies since 2020 have led to successful outcomes and allowed officers to manage events safely and, when necessary, gain compliance without using any force or using infrequent, low levels of force.

I declare under penalty of perjury that the foregoing is true and correct.

DATED this 20th day of June, 2025 at Seattle, King County, Washington.

MATTHEW DIDIER

**DECLARATION OF MATTHEW DIDIER - 7**
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
(206) 684-8200