THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:12-cv-01282-JLR |
| Plaintiff, | |
| v. | **CITY OF SEATTLE'S MOTION TO TERMINATE CONSENT DECREE** |
| CITY OF SEATTLE, | **NOTE ON MOTION CALENDAR:** |
| Defendant. | **July 29, 2025** |

**CITY OF SEATTLE'S MOTION TO TERMINATE CONSENT DECREE** - 1
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

TABLE OF CONTENTS

BACKGROUND ................................................................................................................. 3

    I.    In 2012, the Parties entered into the Consent Decree because DOJ determined that SPD was using force unconstitutionally. ............................................................................ 3

    II.    In 2018, the Court found that the City had achieved compliance with all requirements of the Consent Decree. ............................................................................................. 4

    III.    From 2018 until 2020, SPD sustained compliance until unprecedented, mass protests arose… ................................................................................................................... 4

    IV.    In 2023, the Court found sustained compliance with most requirements; and terminated the corresponding paragraphs. .................................................................... 6

LEGAL ANALYSIS ............................................................................................................ 6

    I.    SPD made comprehensive reforms under the Consent Decree that have led to safer interactions between police and the community. ......................................................... 6

        A.    It is now rare for officers to use force, and SPD has eliminated the pattern of unconstitutional force that led to the Consent Decree. ........................................... 6

        B.    SPD has improved interactions with and outcomes for people in crisis. ........................ 8

        C.    To ensure that the Consent Decree reforms endure, SPD adopted robust, internal layers of review and accountability. ........................................................................ 10

    II.    The City has met all of the requirements established by the Court and cleared the final remaining hurdles to ending federal oversight. ........................................................ 11

        A.    Crowd Management Policy and Training (¶¶ 1-5) .................................................. 11

        B.    Accountability System (¶¶ 6-9) .............................................................................. 13

        C.    Ongoing Assessments (¶¶10-13) ........................................................................... 15

    III.    The City built an independent oversight system to ensure accountability. ................... 15

CONCLUSION .................................................................................................................. 18

**CITY OF SEATTLE'S MOTION TO TERMINATE CONSENT DECREE** - 2
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

# CITY OF SEATTLE'S MOTION FOR TERMINATION

Defendant, the City of Seattle, pursuant to paragraphs 229-230 of the Settlement Agreement and Stipulated Order of Resolution ("Consent Decree"), requests that the Court terminate the Consent Decree.

The Seattle Police Department (SPD) has achieved and sustained compliance with all requirements of the Consent Decree. As a result of the Consent Decree reforms, the pattern and practice of unconstitutional force alleged by the U.S. Department of Justice (DOJ) have been eliminated. There was a 60 percent reduction in the use of serious force between the DOJ's 2011 investigation and the Court-appointed Monitor's 2017 assessment—a reduction that SPD continues to sustain. *See* Monitor's Ninth Assessment at 8, 31-32 (Dkt. 383); Monitor's 2022 Comprehensive Assessment (hereinafter "2022 Assessment") at 13, 80 (Dkt. 709). Over the life of the Consent Decree, SPD's "reforms have translated into safer interactions between police and the community." Monitor's 2022 Assessment at 12 (Dkt. 709).

## BACKGROUND

### I. In 2012, the Parties entered into the Consent Decree because DOJ determined that SPD was using force unconstitutionally.

In March 2011, at the request of community groups, DOJ began an investigation of the City's policing practices. DOJ's Findings Letter at 1 (Dkt. 1-1). At the conclusion of its investigation, DOJ estimated that 20% of SPD's use-of-force incidents were unconstitutional. *Id.* at 4. Among other failings, DOJ found problems with SPD's use of impact weapons, use of force on restrained subjects, and use of force on people in crisis. Complaint ¶ 9 (Dkt. 1).

To resolve DOJ's allegations, the Parties negotiated a comprehensive settlement agreement, or "Consent Decree," to be enforced by the Court. The Consent Decree mandates that

**CITY OF SEATTLE'S MOTION TO TERMINATE CONSENT DECREE** - 3
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

the City make extensive policy, training, management, and operational changes to its policing practices.

### II. In 2018, the Court found that the City had achieved compliance with all requirements of the Consent Decree.

Between 2013 and 2015, SPD implemented comprehensive reforms affecting nearly every aspect of its operations. As required, SPD developed policies to address all areas of the Consent Decree based on national best practices and constitutional principles. Monitor's June 2014 Rept. at 13-16 (Dkt. 154). The Court reviewed and approved each policy.

SPD also implemented new training for all of its sworn employees. On December 15, 2014, describing these training accomplishments, the Monitor wrote:

> [T]he Education and Training Section under its new leadership . . . has become one of the Department's most promising drivers of systemic change. . . . [A]s of January 1, 2015, . . . all officers will have received the same, comprehensive picture of the new policies on force, bias-free policing, stops, and crisis intervention.

Monitor's Dec. 2014 Rept. at 2-3 (Dkt. 187).

The Monitor conducted a series of assessments to confirm that SPD's improved policies and training had resulted in compliance with each Consent Decree requirement. Based on the Monitor's assessments, the Court found that the City had achieved "full and effective compliance" with the Consent Decree. Court's 1/10/2018 Order at 12 (Dkt. 439).

### III. From 2018 until 2020, SPD sustained compliance until unprecedented, mass protests arose.

Under paragraph 223 of the Consent Decree, the City's achievement of compliance initiated a two-year "sustainment" period, which was to run from 2018 to 2020. At the end of the two-year period, if the City could demonstrate sustained compliance, then the Consent Decree

CITY OF SEATTLE'S MOTION TO TERMINATE CONSENT DECREE - 4
(12-CV-01282-JLR)

Ann Davison
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

authorizes a motion to terminate. ¶¶ 229-30. During this period, however, SPD confronted an unprecedented test of its crowd management policies and training.

In the summer of 2020, SPD and law enforcement agencies in dozens of other cities used less lethal devices, such as pepper spray, to respond to incidents of violence that occurred during mass protests. Community members, advocacy groups, and City leaders (including some of SPD's own commanders) raised concerns about SPD's tactics. The City recognized it had been unprepared to address protests of that nature and magnitude. Overall, the City's response undermined public trust.

The City's independent police accountability entities investigated, made systemic recommendations, and submitted them to the Court. *See* Dkts. 636-1, 637-1, 639-1. Based on their recommendations and its own internal review, SPD made fundamental changes to its crowd management policies, tactics, and training. *See* Docket Entry Nos. 657 & 658. Unlike in 2011, when DOJ conducted its investigation of SPD, in 2020 the review and analysis were driven by the City's own accountability system.

After the City's internal review process had concluded, the Monitor evaluated SPD's protest response. It confirmed many of the issues that the City self-identified. The Monitor concluded, "SPD at times did not comply with its policies mandated by the Consent Decree relating to de-escalation, use of force decision-making, officer force reporting, and supervisory review of force." 2022 Assessment at 32-33 (Dkt. 709). It determined that, between 2019 and 2022, SPD had continued to maintain compliance with the Consent Decree "except during the waves of protests over the summer of 2020." *Id.* at 8.

**CITY OF SEATTLE'S MOTION TO TERMINATE CONSENT DECREE** - 5
(12-CV-01282-JLR)

Ann Davison
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

**IV.    In 2023, the Court found sustained compliance with most requirements; and terminated the corresponding paragraphs.**

On March 28, 2023, based on the Monitor's 2022 Assessment, the parties jointly sought to terminate many provisions of the Consent Decree. Dkt. 727. The Court determined that "the majority of the core commitments" had been met and the Court terminated the related paragraphs. Court's September 7, 2023 Order (hereinafter Court's 9/7/23 Order), Dkt. 769, at 2. The Court laid out the requirements that the City would be required to satisfy prior to full termination. *Id.* ¶¶ 1-13.

## LEGAL ANALYSIS

**I.    SPD made comprehensive reforms under the Consent Decree that have led to safer interactions between police and the community.**

Even more important than the legal achievements of compliance and sustainment, is the fact that SPD's hard work over the past decade has improved outcomes for the people of Seattle. Those results are described in this section.

**A.    It is now rare for officers to use force, and SPD has eliminated the pattern of unconstitutional force that led to the Consent Decree.**

DOJ's 2011 investigation found that SPD used excessive, unconstitutional force in an estimated 20% of all incidents involving the use of force. DOJ's Findings Letter at 4 (Dkt. 1-1). DOJ determined that "[t]his pattern or practice is . . . the product of inadequate policy, training and supervision." *Id.* at 4. To address these findings, the Consent Decree mandates substantive principles governing the use of force, ¶¶ 69-90, and imposes rigorous procedures for the reporting, investigation, and review of force, ¶¶ 91-129.

After SPD implemented the required reforms, the Monitor documented a dramatic change compared to DOJ's 2011 findings. The Monitor concluded that SPD has reduced the use of

CITY OF SEATTLE'S MOTION TO TERMINATE CONSENT DECREE - 6
(12-CV-01282-JLR)

Ann Davison
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

serious force by 60% and achieved a better than 99% rate of compliance with its use-of-force policy—which holds officers to a standard that exceeds constitutional requirements.[1] *See* Ninth Assessment (Apr. 2017) at 8, 31-32 (Dkt. 383); SPD Use of Force Report (Oct. 2019) at 4 (Dkt. 588-1); 2022 Assessment at 13, 80. Between January 1, 2023, and April 30, 2025, there were 710 incidents involving serious (Type II or III) force, which is 42 percent less than the amount of serious force identified by DOJ in the 28-month period it investigated before the Consent Decree.[2]

The use of force by Seattle police officers is now a statistically rare occurrence, and serious uses of force are exceedingly rare. In 2021, officers reported using force of any type a total of 1,085 times, a rate of just under one fifth of one percent (0.17%) of all dispatches. 2022 Assessment at 68. Of these uses of force, the majority (76%) involved no greater than the lowest type of reportable force (such as a complaint of minor pain with no sign of injury). *Id.* at 54. In 2024, officers reported using force of any type a total of 1,167 times, a rate of only seventeen one hundreds of one percent (0.17%) of all dispatches; and of those uses of force 74% involved no greater than the lowest type of reportable force. The Monitor noted that the lowest level of force was not required to be reported before the Consent Decree. First Assessment (Sept. 2015) at 9 (Dkt. 231).

The most serious force—Type III force, defined as force that causes or may be reasonably expected to cause substantial bodily injury—is extraordinarily rare, occurring only 20 times in 2021,

---

[1] *See Graham v. Connor*, 490 U.S. 386, 396-97 (1989); Seattle Police Manual §§ 8.000-POL(4); 8.100. Available at https://public.powerdms.com/Sea4550/tree/documents/2042940

[2] Between January 2009 and April 2011, there were 1,230 incidents involving a serious (Type II or III) use of force. DOJ's Findings Letter at 6 (Dkt. 1-1); *see also* SPD Use of Force Report (Oct. 2019) at 3-5, 26-27 (Dkt. 588-1).

**CITY OF SEATTLE'S MOTION TO TERMINATE CONSENT DECREE** - 7
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

or 0.003% of all dispatches. 2022 Assessment at 54, 68. With small variations in the annual rates, SPD has maintained these extraordinary accomplishments consistently since 2015. *Id.* at 54-56, 67-68. In 2024, Type III force was used 15 times, or 0.002% of all dispatches.

The Monitor has repeatedly assessed the force used by the Department and determined that SPD has eliminated the pattern of unconstitutional force that gave rise to the Consent Decree. Ninth Assessment (Apr. 2017) at 8, 31-32; SPD Use of Force Report (Oct. 2019) at 3-5, 26-27 (Dkt. 588-1); 2022 Assessment at 12, 33, 80. Accordingly, SPD has maintained compliance with the Consent Decree's force requirements, except for one lapse: SPD's response to the protests of 2020. 2022 Assessment at 12, 33, 80; *see generally* OIG 2024 Use of Force Assessment (Dkt. 792-1).

**B. SPD has improved interactions with and outcomes for people in crisis.**

DOJ's 2011 investigation found that "SPD officers escalate situations and use unnecessary or excessive force when arresting individuals for minor offenses. This trend is pronounced in encounters with persons with mental illnesses or those under the influence of alcohol or drugs." DOJ's Findings Letter at 4 (Dkt. 1-1).

Consistent with the Consent Decree's requirements, SPD made training and program changes to prepare its officers to respond to people experiencing behavioral crisis. The Monitor observed that "SPD has, in a relatively brief amount of time, created a full-fledged crisis intervention program that is successfully being woven into the SPD organization." Fifth Assessment (Feb. 2016) at 4 (Dkt. 272). SPD now requires all officers to receive a minimum of eight hours of crisis intervention training annually. *Id.* at 7; 2022 Assessment at 96-97; Seattle Police Manual

CITY OF SEATTLE'S MOTION TO TERMINATE CONSENT DECREE - 8
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

§ 16.110-POL-3(1).[3] In addition, officers are offered the opportunity to take a forty-hour crisis intervention course and over 60% of patrol officers have completed this advanced training. 2022 Assessment at 96.

To coordinate across the Department, SPD established a specialized Crisis Response Unit (CRU) made up of a sergeant, five officers and a mental health professional. Fifth Assessment (Feb. 2016) at 4. CRU provides real-time, expert advice to officers city-wide; it also reviews and analyzes crisis data collected by SPD and uses it to inform program decisions. SPD Crisis Intervention - Use of Force Evaluation (Dec. 2018) at 5 (Dkt. 511). SPD's tracking and analysis of information about crisis incidents has equipped CRU with the ability to identify members of the community who frequently use crisis intervention services and develop profiles and response plans for them, which are shared with officers in the field. *Id*. In 2016, the Monitor observed, "SPD is the only agency in the nation that is currently tracking [force used in crisis incidents] with any level of detail." Fifth Assessment (Feb. 2016) at 12 (Dkt. 272). As a result of these programs, SPD responders "frequently seek non-enforcement outcomes to help the individual in crisis, such as connecting individuals in crisis to supportive human services." 2022 Assessment at 4. CRU deploys a co-responder model, partnering mental health professionals with specially trained sworn officers. *Id.* at 98.

Due to SPD's training and programmatic changes, the use of force in crisis incidents has become infrequent. Of the crisis contacts reported during 2019 and 2020, reportable force occurred in approximately 1.5% of them. 2022 Assessment at 13. Because this information was not tracked before the Consent Decree, no direct comparison can be drawn. First Assessment (Sept. 2015) at 9.

---

[3] Available at https://public.powerdms.com/Sea4550/tree/documents/2042832

**CITY OF SEATTLE'S MOTION TO TERMINATE CONSENT DECREE** - 9
(12-CV-01282-JLR)

Ann Davison
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

However, the Monitor observed that "[t]he sustained, low rate of force—and especially serious force—in crisis intervention situations represents a dramatic improvement from DOJ investigative findings that led to the Consent Decree." *Id.* at 14. There were 8,305 crisis contacts reported in 2024, and reportable force occurred in approximately 1.33% (n=111) of them.

### C. To ensure that the Consent Decree reforms endure, SPD adopted robust, internal layers of review and accountability.

DOJ concluded in 2011 that "[t]he chain of command does not properly investigate, analyze, or demand accountability from its subordinate officers for their uses of force." DOJ's Findings Letter at 4. To ensure appropriate review and lessons learned after force incidents, the Consent Decree mandates robust procedures for reporting, investigating, and reviewing officer uses of force.

The Monitor documented a dramatically transformed Department in this area as well. *See* Second Assessment (Nov. 2015) at 1-2 (Dkt. 247). All force is now reported and reviewed by an officer's chain of command. The most serious uses of force are investigated by an elite, interdisciplinary team of detectives who are specially trained in investigating force used by officers. Monitor's Dec. 2015 Mem. Re Training at 37 (Dkt. 254). After each investigation is completed, SPD's reformed Force Review Board (FRB) determines whether the force complied with policy, training, and tactics. The Monitor has lauded the FRB as "the Department's hub of internal accountability, analysis, and continual improvement with respect to force." Second Assessment (Nov. 2015) at 4. In addition, extensive data about SPD's use of force is made available to the public through SPD's online dashboards and detailed annual reports.[4]

---

[4] Available at https://www.seattle.gov/police/information-and-data

**CITY OF SEATTLE'S MOTION TO TERMINATE CONSENT DECREE** - 10
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

Comprehensive force reporting, prompt and rigorous investigations of serious force, and the availability of body-worn video footage all provide a strong foundation for the disciplinary investigations conducted by the independent, civilian-led Office of Police Accountability.

### II. The City has met all of the requirements established by the Court and cleared the final remaining hurdles to ending federal oversight.

#### A. Crowd Management Policy and Training (¶¶ 1-5)

As described above, the Court's 9/l7/23 Order establishes a roadmap to concluding the Consent Decree. To address concerns over SPD's response to the protests of 2020, the Court required revisions to SPD's Crowd Management Policy and Training. *Id.* ¶¶ 1-3.

After the mass protests, SPD made an initial set of fundamental changes to its Crowd Management policies and tactics. SPD changed its policy to place a greater emphasis on de-escalation and allowing First Amendment assemblies to continue as long as possible. City's 2021 Motion to Approve Policy Revisions at 9-10, 13-14 (Dkt. 658). DOJ, the Monitor, and the Court approved SPD's policy revisions in 2021. *Id.* at 1; Dkt. 662. SPD has worked to improve communication, by meeting with protest organizers beforehand and—if necessary—by giving clearer, louder orders and instructions regarding how to disperse. City's 2021 Motion to Approve Policy Revisions at 15-16 (Dkt. 658). Policy and tactics focus on promptly making arrests and removing people when a small number of individuals are committing unlawful actions within a crowd. *Id.* at 13-14. Evidence shows that reduces escalation of events. Declaration of Lieutenant Matthew Didier, Commander of SPD Community Response Group ("Didier Dec.") ¶ 5 (Dkt. 829).

Since making those changes, SPD has used low levels of force at protests. Didier Dec. ¶ 21; Declaration of Sergeant Gabriel Shank, SPD Force Review Unit ("Shank Dec."), ¶ 7 (Dkt.

CITY OF SEATTLE'S MOTION TO TERMINATE CONSENT DECREE - 11
(12-CV-01282-JLR)

Ann Davison
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

830). While the City has not seen the kind of mass demonstrations that occurred in 2020, there have been hundreds of significant demonstrations during this time. Didier Dec. ¶ 20. SPD used force at approximately five demonstrations in 2021; used no reportable force in 2022 or 2023; and used force to manage a crowd at fewer than five demonstrations in 2024. Shank Dec. ¶ 7. Since September 2020, SPD has not used CS ("tear") gas or blast balls in any setting. Didier Dec. ¶ 21; Shank Dec. ¶ 8.

The Court's 9/7/23 Order instructed SPD to conduct another round of policy and training revisions to incorporate additional community feedback. ¶¶ 1 & 3. After the 2020 protests, OIG convened a community-centered process, called a Sentinel Event Review (SER), to examine SPD's response to the protests through a non-blaming, forward-looking framework. The 9/7/2023 Order directed SPD to incorporate feedback from the SER process[5]; provide DOJ and the Monitor an opportunity to review and comment; submit the policy to the Court; and train officers on the updated policy. ¶¶ 1, 3. SPD has completed this process, obtained approval from DOJ and the Monitor, and submitted the revised policy and training plan to the Court. Dkts. 827-830.

During the mass protests of 2020, it was sometimes impossible for officers to comply with SPD's force reporting process. Accordingly, the Court directed SPD to "develop an alternative reporting and review process for force used in crowd settings . . . in the event that significant, sustained protests arise again." 9/7/23 Order ¶ 2. Accordingly, SPD consulted with the Office of Inspector General for Public Safety, DOJ, and the Monitor and developed an

---

[5] The community recommendations from the Sentinel Event Review process are published here in four waves: https://www.seattle.gov/oig/reports

**CITY OF SEATTLE'S MOTION TO TERMINATE CONSENT DECREE** - 12
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

alternative process for review for extraordinary events. Declaration of SPD Chief Operating Officer Brian Maxey Dec. ¶¶ 9-10 (Dkt. 828).[6]

The Court directed SPD to submit a report on the status of the SER recommendations, including identifying whether any specific recommendation did not result in a policy change and with an explanation. Court's 9/7/23 Order ¶ 4. SPD submitted a comprehensive response detailing the many ways in which crowd management policy and strategy were adjusted to incorporate community feedback from the SER process. Dkt. 773-1. SPD also completed a required report on its implementation of state requirements for investigations of serious or deadly force by officers. Court's 9/7/23 Order ¶ 5; Dkt. 781-2 at 1-3.

### B. Accountability System (¶¶ 6-9)

To determine whether the City's independent police accountability system was robust, the Court directed that the Monitor conduct an evaluation. Court's 9/7/23 Order ¶¶ 6-7. The Monitor completed the evaluation in December 2023 and concluded that the City's accountability system is "quite effective" and "positioned to provide sustainable oversight in the future." Dkt. 782. The City submitted a report to the Court describing how it is implementing the Monitor's recommendations. Dkt. 788.

The Court directed SPD to submit a plan regarding data transparency, usability, and accessibility. Court's 9/7/23 Order ¶ 8. SPD provided its plans for improving its analytical capacity and transparency to the Court on December 15, 2023. Dkt. 781-2 at 2-5.

---

[6] SPM, 8.400-POL-5 (force reporting for extraordinarily long crowd events) and 8.500-POL-6(3) (for review for same). Available at:
https://public.powerdms.com/Sea4550/tree/documents/2042947
https://public.powerdms.com/Sea4550/tree/documents/2042948

**CITY OF SEATTLE'S MOTION TO TERMINATE CONSENT DECREE** - 13
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

In light of the City's collective bargaining negotiations[7] with its largest union for sworn officers, the Court requested an update with analysis regarding any effects "on SPD's accountability and review systems and the implementation of the City's Accountability Ordinance." Court's 9/7/23 Order ¶ 9. In May 2024, the City's labor negotiators completed bargaining on a contract that covers up through the end of 2023. The contract provides a wage increase that cumulatively amounts to 23 percent spread over three years and provides competitive compensation. It also increases the ratio of civilian to sworn OPA investigators; specifies for the first time the amount of deference that must be given by an arbitrator to the Chief's judgment in discipline; and simplifying calculation of the deadline for disciplinary investigations.

With the assistance of a mediator the parties have continued to negotiate without pause, and the City is prioritizing additional accountability gains in these ongoing negotiations. Since December of 2023, a mediator appointed by the Public Employment Relations Commission has been assisting the parties in bargaining on a contract that would cover 2024, and possibly additional years. As the parties work to negotiate with SPOG over officer wages, hours, and working conditions, the City is pushing to advance accountability, improve our police discipline system, and enhance public safety for all Seattle residents. If continued bargaining in good faith does not resolve these issues, then the state law governing collective bargaining requires that the parties submit the unresolved issues to a third-party arbitrator who will hear proposals from both sides and issue a binding decision on the remaining contract terms. RCW 41.56.

---

[7] Collective bargaining is required by state law. Rev. Code Wash. 41.56.

**CITY OF SEATTLE'S MOTION TO TERMINATE CONSENT DECREE** - 14
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

### C. Ongoing Assessments (¶¶10-13)

In order to ensure that SPD's earlier constitutional policing reforms endured, the Court directed SPD to submit data on officers' use of force, crisis intervention, stops and detentions, bias-free policing, and supervision. Dkt. 769 ¶ 10. To gauge whether the City's Office of Inspector General for Public Safety (OIG) is ready to assume the role of the Monitor, the Court instructed OIG to review and assess these submissions with a focus on force and crisis response. Dkt. 769 ¶¶ 10-12. OIG determined that SPD has continued to sustain the improved outcomes documented by the Monitor. OIG 2024 Use of Force Assessment (Dkt. 792-1); OIG 2024 Crisis Assessment (Dkt. 814-1). For example, OIG concluded that fewer than two percent of all contacts with people in crisis between 2021 and 2023 involved any reportable force and, overall, officers followed policy and training. Dkt. 814-1 at 13, 22-23. In addition, officers communicated in ways that demonstrated respect for subjects' dignity and used decision-making to de-escalate situations. *Id.* at 22. As noted above, in 2024, reportable force occurred in approximately 1.33% of crisis contacts.

The Court directed SPD to submit a comprehensive plan setting forth its methods and tools for studying and mitigating disparate impacts. Court's 9/7/23 Order ¶ 13 (Dkt. 769). SPD provided its detailed plans to the Court describing strategies on February 29, 2024. Dkt. 792-2 at 14-27.

### III. The City built an independent oversight system to ensure accountability.

The City went beyond the requirements of the Consent Decree and established a three-part, independent police accountability system. Monitor's 2023 Accountability Evaluation at 32-33 (Dkt. 782). It created the Office of Inspector General for Public Safety (OIG) to provide audits and analyses of SPD policies, procedures and practices. *Id.* The City also transitioned the

**CITY OF SEATTLE'S MOTION TO TERMINATE CONSENT DECREE** - 15
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

Community Police Commission into a permanent body and gave it authority to give the public a formal role to provide policy input and oversight. *Id.* at 32.

Since it was created in 2018, OIG has increasingly undertaken obligations previously filled by the Monitor. As directed by the Court, it reviewed SPD's data reporting and analysis to help verify continued compliance with respect to the use of force; crisis intervention; stops and detentions; bias-free policing and supervision. Dkt. 792-2. OIG conducted a Use-of-Force Assessment to identify quantitative trends and verify levels of force used in crowd events. Dkt. 792-1. Another example is OIG's in-depth crisis assessment which concluded that SPD had maintained the progress achieved under the Consent Decree in responding to people in crisis. Dkt. 814-1. Implementing a recommendation of the Monitor, *see* Dkt. 782 at 7, OIG conducted a 2024 follow-up to its earlier, 2021, audit of SPD's disciplinary system outcomes.[8] Last month, in June 2025, it analyzed the performance of SPD's Force Review Board and published a formal memorandum providing feedback.[9]

OIG's detailed audit workplans are publicly available on its website.[10] They summarize OIG's past, ongoing, and upcoming work on issues that are of critical importance to SPD and the community. The following examples of planned 2025 projects have particular relevance to the Consent Decree:

---

[8] Available at https://www.seattle.gov/documents/Departments/OIG/Audits/OIG_Disciplinary_Determinations_Followup_Audit.pdf

[9] Available at https://www.seattle.gov/a/170270

[10] Available at https://www.seattle.gov/oig/reports

**CITY OF SEATTLE'S MOTION TO TERMINATE CONSENT DECREE** - 16
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

- Officer-Involved Shootings with a Crisis / Mental Health Nexus
- SPD Crowd Management Review
- Improved System for OPA Referrals

See 2025 OIG Work Plan at 9-11.[11] In sum, OIG has demonstrated that it is ready to take on the role of the Monitor.

OPA conducts robust disciplinary investigations into allegations of misconduct by individual officers. OPA has continued to civilianize its investigators, recently posting two new civilian positions as a result of the interim contract negotiations that concluded last fall. In 2024, OPA was recognized with a national award for achievement in oversight. The National Association for Civilian Oversight of Law Enforcement honors one organization annually, and OPA received that distinction in 2024. Several programs contributed to its selection. In one year, OPA doubled its community outreach efforts, providing know-your-rights trainings at local high schools and a youth detention center, and collecting feedback at community centers, back-to-school events, and an Urban League breakfast. OPA worked with a local research firm to conduct a comprehensive community-focused survey—involving email, social media, and in-person components. The award also recognized OPA's Complainant Impact Statement. Complainants are given an opportunity to write a statement describing how an officer's alleged misconduct affected them. These statements help officers understand the perspective of the complainant and the effects of the officer's actions. The initial idea to include an impact statement was provided by OIG, and OPA is working with OIG, CPC, SPD, and the affected police unions to finalize this process.

---

[11] https://www.seattle.gov/documents/Departments/OIG/Annual/OIG2025WorkPlanV2.pdf

**CITY OF SEATTLE'S MOTION TO TERMINATE CONSENT DECREE** - 17
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

CPC represents community perspective and priorities on public safety and associated policy issues. Executive Director Eci Ameh began leading the CPC in 2024, and the organization has since made great strides with respect to hiring talented staff. Accordingly, CPC has revitalized its community engagement efforts by, for example, attending events, engaging with advocacy groups, and soliciting feedback from communities that are most impacted by policing. CPC recently conducted a community survey to gather feedback on draft City Council legislation[12] regarding SPD's crowd management practices. CPC's work facilitated meaningful commissioner and community input into the final, enacted Ordinance. In recent months, applications to become a CPC Commissioner have steadily increased, signaling CPC's greater credibility within the community.

## CONCLUSION

The City has achieved full and effective compliance with the Consent Decree by demonstrating sustained and continuing improvement in constitutional policing. The Monitor's reports and the submissions of the City together demonstrate sustained compliance with all material terms of the Consent Decree and the requirements of the Court's 9/7/23 Order. Accordingly, pursuant to paragraph 229 and 230 of the Consent Decree and paragraph 16 of the Court's 9/7/23 Order, the City requests that the Court grant this Motion, terminate the Consent Decree, and dismiss this lawsuit with prejudice.

---

[12] The final, enacted legislation is discussed in the City's Unopposed Motion to Approve Crowd Management Policy (Dkt. 827).

**CITY OF SEATTLE'S MOTION TO TERMINATE CONSENT DECREE** - 18
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200

DATED this 8th day of July, 2025.

Defendant CITY OF SEATTLE:

ANN DAVISON
Seattle City Attorney

*s/ Kerala Cowart*
Kerala Cowart, WSBA #53649
Jessica Leiser, WSBA #49349
Seattle City Attorney's Office
701 Fifth Avenue, Suite 2050
Phone: (206) 733-9001
Email: Kerala.Cowart@seattle.gov

*Attorneys for the City of Seattle*

**CITY OF SEATTLE'S MOTION TO TERMINATE CONSENT DECREE** - 19
(12-CV-01282-JLR)

**Ann Davison**
Seattle City Attorney
701 5th Avenue, Suite 2050
Seattle, WA 98104-7095
(206) 684-8200